**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 06-20373-CR-LENARD-TORRES

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

NARSEAL BATISTE, *et al.*,

      Defendants.

_____/

**REPORT AND RECOMMENDATION ON MOTIONS TO SUPPRESS**
**TITLE III WIRE COMMUNICATIONS AND OTHER ELECTRONIC SURVEILLANCE**

      THIS CAUSE comes before the Court upon Defendant Patrick Abraham's Motion to Suppress Title III Wire Communications and Request for *Franks* Hearing [**D.E. 187, 190**] and Defendant Burson Augustin's Motion to Suppress Evidence Discovered as a Consequence of Unlawful Interception of Telephone Communications and Other Forms of Electronic Surveillance [**D.E. 200**], as well as the government's Response in opposition to these motions [D.E. 240].[1] These motions concern the government's interception of oral communications pursuant to Title III wiretap orders as well as the interception of visual, non-verbal conduct by means of a closed-circuit television pursuant to a Fed. R. Crim. P. 41(b) order.

      These matters were referred to the undersigned by the Honorable Joan A. Lenard for a report and recommendation [D.E. 192, 204]. The Court conducted a hearing on these motions on July 16-18, 2007. The Court granted in part the Defendants' request

---

[1]     The Court has granted the motion for the other Defendants to adopt these motions. [D.E. 318-321, 324, 333]. Thus, this Report and Recommendation applies to the Defendants who have joined in these motions.

for a *Franks* hearing and allowed limited examination on one topic raised in their pending motions (the reliability of the confidential informants) for the reasons stated on the record at the hearing and as elaborated upon herein.   Having carefully considered the motions and the government's response thereto, the arguments of counsel, the testimony of the witnesses and the exhibits, and being fully advised in the premises, the Court concludes that the pending motions to suppress evidence from Title III wire intercepts and Rule 41(b) closed-circuit TV should be DENIED, as more fully explained below.

## I.   BACKGROUND

The seven defendants in this case were charged in a four-count indictment with conspiracy to provide material support to a foreign terrorist organization, conspiracy to provide material support for the commission of an act of terrorism, conspiracy to destroy or damage a building by means of an explosive, and seditious conspiracy to levy war against the United States.  [D.E. 3 (Indictment)].  The charges stem from the defendants' alleged plans to use explosives to destroy the Sears Tower building in Chicago, Illinois, and their alleged support for a purported plan of al Qaeda, a foreign terrorist organization, to use explosives to destroy the offices of the Federal Bureau of Investigation ("FBI") in five cities in the United States, including one in North Miami Beach, Florida.  *Id.*

The pending motions concern orders issued by the Honorable Donald L. Graham and the Honorable Marcia G. Cooke authorizing the interception of electronic communications pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, and to Federal Rule of Criminal Procedure 41(b). Defendants contend that the contents of the communications intercepted pursuant to this statute and rule should be suppressed for a variety of reasons.  They allege the supporting affidavits contain insufficient facts to show that normal investigative procedures had been tried and failed, or reasonably appeared to have been unlikely to

succeed, or to be too dangerous, a prerequisite to issuance of a wiretap order under §§ 2518(1)(c) and 2518(3)(c).  Defendants also contend that telephone conversations were not minimized, as required by § 2518(5); tapes of conversations were not sealed, as required by § 2518(8)(a); normal investigative procedures had been successfully employed, obviating the need for electronic interception; the affidavits supporting the orders lacked probable cause because they contained stale information, lacked indicia of informant credibility and factual reliability, and lacked meaningful corroboration. Finally, Defendants argue that the affidavits were tainted by fraudulent misrepresentations of fact, omissions, or both, and that if the fraudulent information were excised, and the omitted information added, the affidavits would fail to establish probable cause to support issuance of the intercept orders.[2]   Defendants thus requested a *Franks* hearing to flesh out the extent of the alleged falsehoods and omissions.

The following summarizes the information contained in the affidavits submitted by the government to Judges Graham and Cooke in support of the Title III wiretap and Rule 41(b) orders.[3]

Defendants are members of a radical Islamic group located in Miami, Florida, the "Moorland Organization," whose leader is Defendant Narseal Batiste.  Batiste first came to the attention of law enforcement in late October 2005, when the FBI learned that he

---

[2]      Defendants agree that if the original orders authorizing the interception of electronic communications pursuant to Title III and Rule 41(b) are supported by probable cause, the extensions of those orders likewise are supported by probable cause.

[3]      Although the affidavits were prepared by different FBI agents, the background information contained in each is essentially the same, up through the date of each affidavit, of course.  The information was obtained during the same FBI investigation and comes from consensually recorded telephone conversations, cooperating witnesses, grand jury subpoenaed telephone records, physical surveillance, pen register and trap and trace devices, public records, and information from other law enforcement officers.

had discussed with others his desire to form an army and wage violent war, or "jihad," from within the United States in order to overthrow the government and replace it with an Islamic government.  Batiste's objective was to form and train an army of soldiers to fight jihad, which would be initiated by the destruction of  the Sears Tower building in Chicago, Illinois, and included destroying other FBI buildings around the country.

In late October 2005, Batiste attempted to recruit an individual whom he had learned was traveling to Yemen to assist Batiste in locating foreign Islamic extremists to fund his mission.  Unbeknownst to Batiste, that individual, CI-1, alerted the FBI.  During this time frame, CI-1 had telephone conversations with Batiste over Batiste's cellular telephone number (786) 222-8351, which was later the subject of one of the wiretap orders at issue here.  Also during this time, CI-1 learned that Batiste and the other Defendants used an abandoned store located at 6262 Northwest 15th Avenue, Miami, Florida, as their Mosque or Temple, which they called "the Embassy," referring to their place of government for their new Muslim government.

In November 2005, after CI-1 returned from Yemen, he met with Batiste and other Defendants who were interested in whether CI-1 had found anyone in Yemen to support their cause.  During this conversation, Batiste discussed his desire to fight jihad.  He stated that he wanted to receive financial support from extreme Arab and Islamic governments and organizations to build an Islamic government within the United States, and said he was willing to work with al Qaeda to accomplish the group's mission.  CI-1 also met with Defendant Augustin, who discussed his belief in Islam and jihad, describing Defendants' mission as taking over the world in the name of Allah.  Augustin said that many people think they are crazy because of the way that they talk about taking over Miami and the world but they can do it with Allah's help.

In furtherance of Batiste's request for financial backers in Yemen, CI-1 introduced Defendants to another cooperating witness, CI-2, who was of Arabic decent.  CI-2 passed himself off as such a representative of an Islamic terrorist group and later told Batiste that he was from al Qaeda.   In the first meeting between CI-2 and Batiste on December 16, 2005, CI-2 told Batiste that he had just arrived in Miami from overseas and was here to evaluate Batiste's organization for funding and assistance.  CI-2 asked Batiste what support he needed and Batiste wrote out a list which included weapons, vehicles, and supplies to outfit his army.

In various meetings that occurred shortly thereafter, Batiste outlined to CI-2 his plans to destroy the Sears Tower and wage war against the government of the United States to achieve the overthrow of the government.  Batiste requested materials, including guns and military gear, and financial backing for his group's "mission."  Later, Batiste also asked for a cellular telephone for communications with CI-2 and cameras for photographic and video reconnaissance of buildings targeted by Batiste's group.

During these early meetings, some of the details of the "mission" included:

1.	On December 21, 2005, Batiste outlined to CI-1 his plans to conduct attacks in the United States which included poisoning the public and/or water in public places, taking control of National Guard installations in Miami, and acquiring weapons.  Batiste also advised there were other followers of the group in Chicago.

2.	On December 22, 2005, Batiste discussed with CI-2 his "brothers" in Chicago, Louisiana, and Miami, some of whom were once Marines and who could train people.  Batiste told CI-2 he was familiar with the Sears Tower and access routes to it, and discussed his plans for "taking down" the Tower.  During this meeting, CI-2 gave Batiste a cellular telephone bearing telephone number (786) 294-5990, which was later the subject of another one of the wiretap orders at issue here.

3.      On December 29, 2005, Batiste again discussed with CI-2 his plan to destroy the Sears Tower.  Citing his experience in the construction field, Batiste stated that he considered using dynamite or a more powerful explosive that would achieve his goal of taking down the Sears Tower.  In this regard, Batiste explained, "If I can put up a building, I should definitely know how to take one down."  Batiste also said he owned land in Louisiana, or had access to land in Louisiana and Alabama, where some of his soldiers train.  He also said he had approximately 10 guerrillas across the United States.

Beginning in January 2006, Batiste ceased contact with CI-2.[4]  During this time frame, CI-1 spoke to Defendant Abraham, who told CI-1 that Batiste was suspicious of CI-2, but that they were still working on the mission.  On January 28, 2006, at Abraham's request, CI-1 and CI-2 met Abraham at "the Embassy" where they were asked to remove their clothing and electronic devices and change into clothing provided by Abraham.  Also present at this time were the remaining defendants with the exception of Batiste. Believing that they were going to be killed or harmed, CI-2 told Abraham and the other Defendants that he was from al Qaeda and needed his cellphone to remain in contact with al Qaeda.  The CIs were taken by Abraham and other Defendants to a location in the Florida Keys to meet Batiste.  During the subsequent meeting between Batiste and the CIs, they discussed the fact that CI-2 was an al Qaeda operative in the U.S. to assist Batiste and defendants in their mission.  To bolster his "credentials," CI-2 told Batiste that he also assisted in the planning of the attack on the U.S.S. Cole.

After January 28th, Batiste resumed using the cellular telephone that CI-2 had given him, telephone number (786) 294-5990.  As the relationship between CI-2 and the

_____

[4]      The government indicates that pen register and trap and trace orders were entered on January 19, 2006, on the two cellular telephones referenced above.

Defendants continued to develop, a meeting was held on February 19, 2006 between Batiste, Abraham and CI-2. During the meeting, Batiste outlined his plans to wage jihad in the United States. The plan included taking down the Sears Tower, training an army to fight and attacking a prison to free Muslim brothers who were incarcerated. Batiste said that he wanted to arrange for some of his followers to receive training in jihad.

Some of the meetings between Defendants and the CIs occurred in the Embassy, where Defendants regularly met and engaged in private discussions. The FBI attempted to conduct surveillance of the Embassy, however, such efforts were frustrated because the Embassy was located in a high drug and crime area and agents on surveillance were easily spotted. In addition, on occasion when agents attempted to cover meetings at the Embassy, they noticed individuals acting as posted lookouts watching for surveillance. Accordingly, the Defendants' frequent meetings and conversations in the Embassy which occurred outside the presence of the CIs were not monitored by law enforcement.

On October 28, 2005, CI-1 met Batiste and others at the Embassy, where he observed several machetes and guns, and saw several members of the group practicing karate and fighting with machetes. On a December 18, 2005 visit to the Embassy, CI-1 and Batiste discussed efforts to fortify the Embassy with bullet-proof glass.

In an attempt to relocate Defendants to a meeting place which could be surveilled by law enforcement, and for the continued safety of the CIs, at the end of January 2006, CI-2 engaged Batiste in discussions regarding acquisition of a warehouse for Defendants to use for future meetings. Batiste was very interested in a large, more private location which Defendants could use to conduct training and that would include storage space for "products" and "weapons." In this regard, Batiste and CI-2 inspected three warehouses before Batiste selected, on March 15, 2006, the warehouse located at 6300 N.E. 4th

Court, Miami, Florida, which later was the subject of the wiretap and Rule 41(b) orders at issue here.  CW-2 gave the keys to the warehouse to Batiste on March 16, 2006.

In order to forge an alliance with al Qaeda, on March 10, 2006, Batiste swore an oath of "bayat," or loyalty, to al Qaeda.[5]  As the leader of the group, Batiste was the first to take the oath with the remaining Defendants to follow.  Thereafter, on March 16, 2006, in a ceremony which took place in the warehouse selected by Batiste, the Defendants each individually swore an oath of "bayat" to al Qaeda.  Just prior to the oath taking, Batiste told CI-2 how grateful he was for the support he was receiving from Usama Bin Laden, and how much he admired the work Bin Laden was doing and characterized him as an angel sent from Allah.

During the March 16th meeting, in the presence of all Defendants, CI-2 outlined a fictitious plan to conduct coordinated attacks against FBI buildings in five cities, including the FBI building in North Miami Beach.  Batiste said he would get "good footage" of the FBI building to assist in the bombing plot.  Batiste expressed concern that such a plan would make it very difficult for Defendants to conduct the Chicago mission.  Batiste stated that although he was seeking funding from al Qaeda for the mission, the funding could be obtained through other means.  CI-2 assured Batiste that the Chicago mission and al Qaeda's plan would be coordinated.  CI-2 also provided Batiste with a video camera that he had previously requested for the Chicago mission, noting that it could be used to further the al Qaeda plan.  Batiste also discussed how he and the Defendants were going to use the warehouse to further their plans, by fixing it up and training new recruits.

On March 30, 2006, a Title III wiretap order was issued that authorized the interception of oral communications at the warehouse located at 6300 N.E. 4th Court,

---

[5]       In administering the al Qaeda oath of "bayat," CI-2 stated that he was representing Usama bin Laden.  Each of the Defendants repeated the oath, and in turn, stood and stated their names.

Miami, Florida, together with a Rule 41(b) order that authorized the interception of visual, non-verbal conduct occurring at that warehouse.   Subsequent orders allowing continued interceptions of this location were also entered; monitoring ceased on May 30, 2006.

As outlined in the affidavits in support of the wire and oral interceptions, this investigation involved numerous law enforcement investigative techniques, including the use of confidential informants, surveillance of the target subjects, surveillance of the Embassy and residences of some of the Defendants, subpoenas for telephone records and for telephone subscriber records, utilization of pen registers and trap and trace devises, motor vehicle records checks, and criminal history records checks.  However, as also outlined in the affidavits, these and other techniques did not achieve all of the goals of the investigation.

As a result of these proffered facts and the agents' belief that a wiretap order was necessary, the following wiretap orders were obtained:

Wiretap of Telephone Number (786) 294-5990

On February 17, 2006, Judge Graham signed an order which authorized the interception of cellular telephone bearing electronic serial number (ESN) 03310575789, assigned telephone number (786) 294-5990, subscribed to by Mohammad Abdul Shahir, 1717 North Bayshore, Miami, Florida, a phone activated by the FBI and given to Defendant Batiste, for a period of thirty (30) days.

Before the expiration of that wiretap order, on March 17, 2006, Judge Graham signed an order that authorized the continued interception of telephone number (786) 294-5990 for a period of 30 days.  The recordings intercepted pursuant to the wiretap orders were sealed on April 19, 2006, the third business day after the expiration of the

wiretap order.[6]  *See* Gov't Resp., Exh. A (Sealing Order dated April 19, 2006).  On April 19, 2006, Judge Graham signed another order authorizing the continued interception telephone number (786) 294-5990, for a period of 30 days.  The recordings intercepted pursuant to the wiretap order were sealed on May 19, 2006, before the expiration of that wiretap order.  *See* Gov't Resp., Exh. B (Sealing Order dated May 19, 2006).

Wiretap of Telephone Number (786) 222-8351

On March 2, 2006, Judge Graham signed an order that authorized the interception of cellular telephone bearing ESN 05508931573, assigned telephone number (786) 222-8351, subscribed to by Narseal Batiste, 433 Northeast 139th Street, Miami, Florida 33161, for a period of 30 days.

Before the expiration of that wiretap order, on March 31, 2006, Judge Cooke signed an order on behalf of Judge Graham authorizing the continued interception of telephone number (786) 222-8351, for another 30-day period.  Before the expiration of that wiretap order, on April 28, 2006, Judge Graham signed an order authorizing the continued interception of telephone number (786) 222-8351, for another 30-day period.  The recordings intercepted pursuant to the wiretap orders were sealed on May 30, 2006, the first business day after the expiration of the wiretap order.[7]  *See* Gov't Resp., Exh. C (Sealing Order dated May 30, 2006).

On May 30, 2006, Judge Graham signed another order authorizing the continued interception telephone number (786) 222-8351, for a period of 30 days. The recordings

---

[6]     The last day of the interception period, April 16, fell on a Sunday.  The government states that the minor delay in sealing was the result of scheduling the sealing with Judge Graham, who was out of town.  The government maintains that the recordings were sealed as soon as was reasonably feasible and were maintained at all times in a safe and secure manner with the FBI.

[7]     The last day of the interception period, May 28, fell on a Sunday and Monday was Memorial Day.

intercepted pursuant to the wiretap order were sealed on June 29, 2006, before the expiration of that wiretap order.  *See* Gov't Resp., Exh. D (Sealing Order dated June 29, 2006).

    <u>Wiretap and Rule 41(b) Orders for Premises at 6300 N.E. 4th Court, Miami, Florida</u>

    On March 30, 2006, Judge Graham signed orders authorizing the interception of oral communications and visual, non-verbal, conduct and activities by means of closed circuit television occurring at and within the premises located at 6300 Northeast 4th Court, Miami, Florida.  Before the expiration of those two orders, on April 28, 2006, Judge Graham signed orders authorizing the continued interception of oral communications and visual, non-verbal, conduct and activities, for a period of 30 days.  The recordings intercepted pursuant to the wiretap and Rule 41 orders were sealed on May 30, 2006, the first business day after the expiration of the orders.[8]  *See* Gov't Resp., Exh. E (Sealing Order dated May 30, 2006).

## II.  ANALYSIS

    The district court's authority to authorize the electronic surveillance involved in this case is found in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, and in Fed. R. Crim. P. 41(b).  *See, e.g., United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986) (Title III wiretaps); *United States v. Falls*, 34 F.3d 674, 678-80 (8th Cir. 1994) (silent video surveillance authorized by Fed. R. Crim. P. 41(b)).  A predicate to this analysis is the government's concession that the Defendants had an expectation of privacy in the warehouse location from the moment they were handed control and dominion of that property by CI-2.  The Court assumes, therefore, that the Defendants' expectation extended to what any person would reasonably expect at a private place free from intrusion or interference from the government or any other

---

[8]    The last day of the interception period, May 28, fell on a Sunday and Monday was Memorial Day.

third party, like a home or a private office.  *See, e.g., Minnesota v. Olsen,* 495 U.S. 91, 99 (1990) (citing *United States v. Katz,* 389 U.S. 347, 361 (1967)).

### A.     *Title III Wiretaps*

Title III sets forth numerous requirements that the government must meet before a wiretap may be authorized, *see* 18 U.S.C. § 2518(1), the findings the district court must make, *see* 18 U.S.C. § 2518(3), and requirements for the district court's authorization order, *see* 18 U.S.C. § 2518(4).  *Id.* Title III contains its own exclusionary rule under which Defendants have standing to challenge the surveillance that occurred in this case, *see* 18 U.S.C. § 2518(10).  *Id.*

An application for a wiretap authorization must be supported by the same probable cause necessary for a search warrant.  *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990) (citing *United States v. Hyde*, 574 F.2d 856, 862 (5th Cir. 1978)). The issuing judge must make a "practical, common-sense decision" about whether the "totality of the circumstances" indicate that there is probable cause that the sought-for evidence will be obtained.  *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  The standard of review of the issuing judge's determination is "simply to ensure that the judge had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.* (citing *Gates* at 238-39).  The practical nature of the judge's decision justifies "great deference" upon review and calls for upholding the judge's findings even in marginal or doubtful cases. *Id.* (citing *United States v. Lockett,* 674 F.2d 843, 845 (11th Cir. 1982)).

### B.     *Fed. R. Crim. P. 41(b) Non-Verbal Electronic Surveillance*

Defendant Augustin also moved to suppress "other forms of electronic surveillance," i.e., the visual, non-verbal conduct intercepted by means of a closed-circuit television pursuant to the Rule 41(b) orders that Judge Graham issued on March 30, 2006 and April 28, 2006.  The federal wiretap law does not cover video surveillance where

no audio recording is made, but Rule 41(b) does.  *See, e.g., Falls*, 34 F.3d at 678-80;

*United States v. Koyomejian*, 970 F.2d 536, 538-40 (9th Cir. 1992) (Title III does not

address silent video surveillance; rather, Rule 41(b) authorizes a district court to issue a

warrant for silent video surveillance)).  Augustin makes no practical distinction between

the Rule 41(b) and Title III wiretap orders, however.  He simply argues that all evidence

obtained pursuant to those orders was unlawfully intercepted and should be suppressed.

Surveillance conducted pursuant to a Rule 41(b) order must only comply with the

Fourth Amendment.  *E.g., United States v. Nerber,* 222 F.3d 597, 603-04 (9th Cir. 2000).

Though this issue has not been directly addressed in the Eleventh Circuit, circuits

elsewhere conclude that to conduct lawful video surveillance, for Fourth Amendment

purposes, the government armed with probable cause must also satisfy the requirements

of Title III for analogous audio surveillance:

> (1)  the judge issuing the warrant must find that "normal investigative
> procedures have been tried and have failed or reasonably appear to be
> unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(3)(c);
> (2) the warrant must contain "a particular description of the type of [activity]
> sought to be [videotaped], and a statement of the particular offense to which
> it relates," *id*. § 2518(4)(c); (3) the warrant must not allow the period of
> [surveillance] to be "longer than is necessary to achieve the objective of the
> authorization,[ ]or in any event longer than thirty days" (though extensions
> are possible) *id*. § 2518(5); and (4) the warrant must require that the
> [surveillance] "be conducted in such a way as to minimize the [videotaping]
> of [activity] not otherwise subject to [surveillance] ..." *id.*

*Falls*, 34 F.3d at 680 (internal citation omitted) (and cases cited therein); *see also United*

*States v. Williams*, 124 F.3d 411, 417 (3rd Cir. 1997) ("every court of appeals that has

addressed video surveillance has held that video surveillance conforming to the

standards set out in Title III is constitutional"); *Koyomejian*, 970 F.2d at 542 (court

looked to substantive requirements in Title III for guidance in determining whether

silent video surveillance comported with Fourth Amendment requirements); *Nerber,* 222

F.3d at 605 ("Although no federal statute regulates the government's use of video

surveillance, the existence of a law which prohibits the warrantless use of audio surveillance on a citizen . . . is strong evidence that society is not prepared to accept the warrantless use of an even more intrusive investigative tool in the same situation."); *United States v. Cuevas-Sanchez,* 821 F.2d 248, 252 (5th Cir. 1987) ("We accept these as the standards under which an order for video surveillance may issue. We cannot add the other technical requirements of Title III because Title III does not cover video surveillance. We are not a legislature; we can mandate only those protections required by the Constitution. The above requirements protect the constitutional rights of those under surveillance as they have been announced by the Supreme Court.").

Accordingly, because of the weight of persuasive authority that requires it, this Court's analysis of the Rule 41(b) orders is the same as its analysis of the Title III wiretap orders. The Court's discussion will thus refer to both the Title III and Rule 41(b) video surveillance orders except where differentiation is appropriate.[9]

---

[9]     We question, however, whether the Eleventh Circuit or, for that matter, the Supreme Court would agree that the elements of a federal statute should define the constitutional contours of a particular type of search like video surveillance. One would think that the constitutional test does not stem from what the intent of the Congress was in 1968, but rather what constitutional framework the framers of the Fourth Amendment adopted in 1789. Under that framework, one must look at common law principles. *See, e.g., Wilson v. Arkansas,* 514 U.S. 927, 931 (1995). A critical element of those principles is notice to a person whose house is searched of the exercise of lawful authority and judicial authorization to enter a dwelling to conduct a search. Surreptitious video surveillance like that at issue here would not have been permitted absent a compelling governmental interest and clear showing of necessity, for that type of search is clearly extraordinary and deserving of special protection. *See Atwater v. City of Lago Vista,* 532 U.S. 318, 354 (2001) ("The question whether a search or seizure is 'extraordinary' turns, above all else, on the manner in which the search or seizure is executed.") (citing in part *Wilson* as an example of an extraordinary search). In other words, the "King's constable" could not have hidden in someone's attic to observe the goings-on below without a warrant, without probable cause, and without that showing of compelling necessity as found by the judge to justify an invasive intrusion and search without notice to the occupants. And, absent such a showing as would be required to conduct, for instance, a physical penetration of one's body which is also an "extraordinary" search, *id.* (citing *Winston v. Lee,* 470 U.S. 753 (1985)), the search could not be deemed reasonable under the Fourth Amendment. One would think, therefore, that all these – but only these – elements would have to be satisfied by the government to convince a judicial officer to

C.     *Necessity of Electronic Surveillance Under 18 U.S.C. § 2518(1)(e)*

Defendants first challenge the wiretaps as unnecessary under the statute based on the fact that two CIs were successfully used during the course of the government's investigation in this case.  In addition to noting that the CIs infiltrated the alleged terrorism conspiracy, Defendants point to the government's use of other traditional investigative techniques including pen registers, conversations recorded by body recording devices and/or video surveillance, and recorded telephone conversations.  Defendants therefore contend the wiretaps were unnecessary.

Under the statute, an application for wire interception must contain:

[a] full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

18 U.S.C. § 2518(1)(c).  This "necessity" requirement is "designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive methods will succeed."  *Van Horn*, 789 F.2d at 1496 (citing *United States v. Giordano*, 416 U.S. 505 (1974)).  The legislative history of 18 U.S.C. § 2518(3)(c) makes clear that the intercept application must be tested in a "practical and commonsense fashion."  *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir. 1978) (internal citation omitted).  The "determination of when the Government has satisfied [the necessity requirement] must be made against flexible standards, and [] each case must be examined on its own facts."  *Id.*  A reviewing

_____

issue such a warrant.  For that reason, video surveillance could not constitutionally be conducted, it seems to me, for anything but the most serious offenses, deserving of special extraordinary methods that are narrowly tailed to achieve the compelling governmental interest involved.  That should be the constitutional test, and we should then leave it to Congress to prescribe additional rules that it believes are necessary as a matter of public policy to provide citizens with greater protections.  Whether, for example, "sealing" or "minimization" is required or applicable for purely video surveillance would then be a matter of public comment and legislative policy, *not* constitutional principle.  Curiously, as things now stand, the elements of Congress's 1968 legislative judgments define the test that must be followed here.

court must be sensitive to the reality that the quantum of evidence "sufficient to obtain a conviction is an imprecise concept." *Nixon*, 918 F.2d at 901.

As a result,

> courts will not invalidate a wiretap order simply because defense lawyers are able to suggest post factum some investigative technique that might have been used and was not. It is enough if the affidavit explains the prospective or retrospective failure of several investigative techniques that reasonably suggest themselves.

*Hyde*, 574 F.2d at 867; *see also Van Horn*, 789 F.2d at 1496 ("The affidavit need not, however, show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves.").

Furthermore, a certain degree of success with one or more investigative techniques does not negate the government's need for the wiretap. *See, e.g., United States v. Canales Gomez,* 358 F. 3d 1221, 1227 (9th Cir. 2004) (government need not use all possible informants before obtaining a wiretap); *United States v. Bennett,* 219 F.3d 1117, 1122-23 (9th Cir. 2000) (mere attainment of some degree of success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap; informant was able to purchase drugs from defendant but could not penetrate his organization, and further, informant's credibility as a paid informant would come under attack and would therefore require further corroborating evidence); *United States v. Jones*, 451 F. Supp. 2d 71, 83 (D.D.C. 2006) (even where the government has other evidence linking a defendant to a crime, § 2518 does not prevent it from obtaining wiretaps in order to ascertain the full extent and structure of the conspiracy); *United States v. Yeje-Cabrera,* 430 F.3d 1, 10 (1st Cir. 2005) (government is not required to take extraordinary steps to exhaust other investigative avenues before a wiretap becomes necessary ).

The affidavits submitted in support of the wire interception applications in this case describe in detail the steps that agents had taken or considered during their investigation of a suspected radical Islamic group with a desire to wage war against the United States through violent acts.  Specifically, the affidavits indicate that the techniques utilized in the investigation prior to the application for the wire interception were the following:  use of confidential sources, consensual monitoring of telephone calls, use of toll records, use of pen registers and trap and trace devices, and physical surveillance.  The affidavits further included the verified proffer that the convening of a federal grand jury, the use of an undercover agent, interviews of subjects or associates, and the serving of search warrants would not be deemed likely to succeed if tried.

With respect to the use of informants, the affidavits made an adequate showing that Defendants did not fully trust the CIs.  Indeed, Batiste told CI-1 that he was suspicious of and did not trust CI-2.  *See, e.g.,* Anthony Velazquez's March 2, 2006, Affidavit in Support of Application for Order Authorizing Interception of Wire Communication (for Telephone Number (786) 222-8351) ("Velazquez Aff.") at ¶¶ 38, 41, 44, 71.[10]  Also, on January 28, 2006, both CIs were unexpectedly made to change out of their own clothes into clothes provided by Defendants, hand over all electronic devices, and drive with Defendants to an unknown location in the Florida Keys, in what is alleged to have been a staged kidnapping, apparently to test the CIs' trustworthiness in light of Defendants' suspicions about them.  *Id.,* ¶¶ 49-50.  As explained in the affidavits, the goal of the investigation was to reveal and secure admissible evidence needed to establish the full scope and nature of the offenses being investigated, including determining the identity of all the members of the organization located in Miami, Chicago, and elsewhere, the plans

---

[10]     This and the other affidavits and applications submitted in connection with the wiretap and Rule 41(b) orders were provided to the defense in June 2006 and to the Court at the suppression hearing in this case.

and schemes of the organization, including their methods for launching any attacks in the U.S., and the locations used by the organization to meet, train, or store any items gathered to facilitate their mission.  *See, e.g.,* Velazquez Aff. ¶¶7, 69.  Because the informants were not trusted, they could not penetrate the organization at a sufficient level to disclose its inner workings.

It is also clear that the government's use of informants does not necessarily negate the need for electronic surveillance.  In *Nixon*, for example, the appellants argued that wiretaps were unnecessary because the government had already obtained through less intrusive investigative techniques sufficient evidence to prosecute and convict those involved in a drug conspiracy.  918 F.2d at 901.  The Eleventh Circuit rejected this argument, upholding the wiretaps even though the judge authorizing them had been advised, among other things, that at least two of the targets had agreed to sell narcotics to undercover agents, and that a confidential informant actually had purchased drugs from members of the conspiracy.  *Id.*  The court refused to conclude that the issuing judge had "erred in concluding that alternative investigative techniques neither had succeeded, nor would succeed, in providing enough evidence to prove the conspirators' guilty beyond a reasonable doubt."  *Id.*

Similarly, in *United States v. Messersmith*, 692 F.2d 1315, 1317-18 (11th Cir. 1982), the government utilized an informant but the main target of the drug investigation was "very wary of the traditional investigative techniques which could have substituted for the challenged electronic surveillance."  The target had patted down the informant to check for the presence of recording devices, and the location of his apartment prohibited effective physical surveillance.  *Id.*  Given that the aim of the investigation was to identify the organized crime members who controlled the target's enterprise, and the

corresponding unwillingness of the target to discuss this topic with the informant, electronic surveillance offered the only possibility of success.  *Id.*

The affidavits in this case set forth why physical surveillance was also unlikely to produce sufficient evidence to determine the full scope and nature of the conspiracy.  The affiants explained that, despite having run motor vehicle and other public source records checks, they were only able to identify some of the Defendants and their residences.  *See, e.g.,* Velazquez Aff., ¶ 72.  Indeed, the identification of some of the Defendants came about only after the wire interceptions began.  Further, the FBI efforts to surveil the Embassy were deemed not successful because it was located in a high drug and crime area and agents on surveillance could be easily spotted.  *Id.*  In addition, on occasion when agents attempted to cover meetings at the Embassy, they observed lookouts from the Embassy posted to watch for surveillance.  *Id.*

Moreover, physical surveillance in and of itself often does little to succeed in gathering sufficient evidence of the criminal activities under investigation.  It shows merely that one or more individuals have met, but does nothing to prove the subject matter of their conversations, their plans, or any details regarding the criminal conspiracy.  As the court stated in *Van Horn*, even if surveillance were successful, "it could only lead to evidence that members of the conspiracy were meeting, and not to direct evidence of criminal activity."  789 F.2d at 1497.

The affidavits in this case also persuasively show that, although detailed phone records were obtained and analyzed, and several pen register orders were obtained and used, such records provided circumstantial evidence that the telephones were used to make or receive calls, but did not identify the actual individuals using the telephones or the content of their conversations.  *See, e.g.,* Velazquez Aff., ¶ 73.  Thus, this investigative technique was of marginal assistance in obtaining the goals of this investigation.  *See, e.g.,*

*United States v. Cantu*, 625 F.Supp. 656, 673 (N.D. Fla. 1985) (use of pen registers is of limited use as an investigative tool because it does not identify the individuals actually making or receiving the calls, or the nature and substance of the conversations).

The affidavits also detail how the use of the grand jury in the investigation was considered but ultimately deemed ineffective because no witnesses were known who could provide the necessary information regarding the organization; because any witnesses who became known would breach the confidentiality of the investigation; and because any witness subpoenaed to the grand jury would most likely invoke his or her Fifth Amendment testimonial privilege. *See, e.g.,* Velazquez Aff., ¶ 74. Additionally, it was reasonable to expect that any physical evidence, such as written plans or weapons would be destroyed or hidden. *Id.* The affidavits also weighed the violence associated with the group under investigation, and reasonably concluded it would act as a significant deterrent in securing not only testimony, but truthful testimony from any potential grand jury witnesses. *Id.*

The Court finds also that the affidavits adequately addressed the possibility of introducing an undercover agent to a member of the organization. *Id.*, ¶ 75. CI-2 spoke to Batiste about the fact that he (CI-2) was familiar with an individual qualified with explosives, as part of the scenario to introduce the undercover agent into the operation. *Id.*, ¶ 50. However, as of the date of the affidavits, the FBI had not been able to accomplish the introduction, and waiting for an introduction to occur would cause unnecessary delay. *Id.,* ¶ 75. The concern was that Batiste might recruit another bomb expert in the meanwhile and accomplish his stated goal of blowing up the Sears Tower. *Id.* Moreover, inasmuch as Batiste did not fully trust and confide in the CIs, there was a reasonable concern that Batiste would trust someone introduced by one of them even less. *Id.* It therefore would be unlikely that the new agent would be privy to the full scope

of all co-conspirator conversations and activities, and so would not be likely to effectively and sufficiently obtain admissible evidence needed to prosecute the offenses under investigation. *Id.*

The affidavits further detail that search warrants were unlikely to produce sufficient evidence to determine the full scope and nature of the conspiracy; would inform the targets of the investigation; and would be premature and of marginal assistance. *Id.,* ¶ 76. Moreover, the FBI was not aware, on the date the affidavits were submitted, of residence locations for any of the targets except Batiste. *Id.*

The Court thus finds that the conventional techniques suggested by the Defendants would have done little to expose the entire workings of an organization that was allegedly plotting to commit terrorist acts in the United States. This circuit has repeatedly held that, where conventional techniques will not show the entire scope of the conspiracy, a wiretap is permissible, even in those situations where conventional techniques will allow for the arrest and conviction of some members. In *Hyde*, the wiretap affidavit revealed that the government had a web of informants that would have enabled the government to prosecute lower-level conspirators. 574 F.2d at 868-69. However, because the government could not make a case against the "top-level conspirators," the court found that "the wiretap was necessary to ascertain the full scope of the conspiracy under investigation and to gather evidence against the leaders of the organization." *Id.* at 869. In approving the issuing judge's determination that ordinary techniques had been shown insufficient to collect sufficient information against the top-level leaders, the court explained:

> Although the government has actual knowledge of a conspiracy and evidence sufficient to prosecute one of the conspirators, it is unrealistic to require the termination of an investigation before the entire scope of the narcotics distribution network is uncovered and the identity if the participants learned.

*Id.* (internal citation omitted). As a result, the court affirmed the lower court's conclusion that the government had satisfied the necessity requirement under § 2518(3)(c). *Id. See also Messersmith,* 692 F.2d at 1317-18; *Cantu,* 625 F. Supp. at 673-74.

The wiretap statute does not require a piecemeal, uncoordinated approach to the investigation of this alleged conspiracy, in which agents rely on good fortune to uncover small pieces of the enterprise. Rather, the statute simply requires that the affiant explain to the issuing judge the difficulties surrounding conventional techniques that already had been taken, or been contemplated to have been taken. This was done in this case, and the issuing judges did not err in assessing those difficulties and signing the orders to intercept. This Court finds that the government complied with the necessity requirement of 18 U.S.C. § 2518(1)(c) and no basis to suppress on this ground exists as to either the wiretape evidence or the video surveillance.

### D. <u>*Sealing Requirement Under 18 U.S.C. § 2518(8)*</u>

Defendants next challenged the government's compliance with 18 U.S.C. § 2518(8)(a), which requires among other things that recordings obtained pursuant to a wiretap order be sealed immediately upon expiration of the order. In response, the government has provided proof that, with one exception, which is discussed in detail below, it sealed all the recordings prior to the expiration of the authorizing wiretap orders. *See* Gov't Resp. at 9-11, Exh. B - E. Defendants have not challenged the government's evidence.

Having reviewed the government's submissions on this issue, the Court finds that the recordings obtained from the interception of oral communications on cellular telephone number (786) 222-8351 and from the interception of oral communications as well as visual, non-verbal conduct and activities occurring at and within the premises at 6300 Northeast 4th Court, Miami, Florida (the "warehouse"), were timely sealed. The

government satisfied the sealing requirements of 18 U.S.C. § 2518(8)(a) with regard to these recordings.

The only delay in sealing occurred with respect to the April 19, 2006, sealing of the wiretap on cellular telephone number (786) 294-5990. The original order authorizing interception of this number for a period of thirty (30) days was issued by Judge Graham on February 17, 2006. Before the expiration of that wiretap order, on March 17, 2006, Judge Graham signed an order authorizing the continued interception of this number for thirty days. The recordings intercepted pursuant to the wiretap orders were sealed on April 19, 2006, which was the third business day after the expiration of the March 17, 2006, order.[11] The government maintains the delay was the result of scheduling the sealing with Judge Graham, who was out of town, and further, that the sealing occurred as soon as was reasonably feasible and that the recordings were maintained at all times in a safe and secure manner with the FBI. *See* Gov't Resp. at 9. The final wiretap order for (786) 294-5990 was issued on April 19, 2006, when Judge Graham authorized the continued interception for this number for an additional thirty days. Before the expiration of that wiretap order, the recordings intercepted pursuant to it were sealed, on May 19, 2006. *See* Gov't Resp., Exh. B. (Sealing Order dated May 19, 2006).

The question before the Court, then, is whether the three-day delay in sealing one set of recordings should result in intercepted communications from that number being suppressed. The primary purpose of 18 U.S.C. § 2518(8)(a) is to limit the government's opportunity to tamper with, alter, or edit the conversations that have been recorded, thus ensuring the "reliability and integrity of evidence obtained through electronic surveillance." *United States v. Ojeda Rios*, 495 U.S. 257, 263 (1990). The statute provides in pertinent part that:

---

[11] The last day of the interception period, April 16th, fell on a Sunday.

[i]mmediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions.

\*\*\*

The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under section (3) of section 2517.

18 U.S.C. § 2518(8)(a).

In interpreting this provision, the Supreme Court explained in *Ojeda Rios* that "the seal required by § 2518(8)(a) is not just any seal but a seal that has been obtained immediately upon expiration of the underlying surveillance order.  The 'absence' the Government must satisfactorily explain encompasses not only the total absence of a seal but also the absence of a timely applied seal."  495 U.S. at 263 (emphasis in original and added).  The length of the sealing delay is thus measured from the date the wiretap order (or extension order) expires, not the date the surveillance ends.  *See, e.g., Jones v. United States*, 224 F.2d 1251, 1257 (11th Cir. 2000) (recordings must be sealed immediately upon expiration of the order authorizing interception and recording of certain communications); *United States v. Quintero*, 38 F.3d 1317, 1326 (3rd Cir. 1994) (government's obligation to seal tapes under § 2518(8)(a) does not arise until the termination of the final extension of the order authorizing interception); *United States v. Pitera*, 5 F.3d 624, 627 (2nd Cir. 1993); *United States v. Pedroni*, 958 F.2d 262, 264 (9th Cir. 1992).  The sealing must occur "as soon as [is] practical. . . not *instanter*."  *United States v. Carson*, 969 F.2d 1480, 1487 (3rd Cir. 1992) (internal citation omitted).

"[T]he 'satisfactory explanation' language in § 2518(8)(a) must be understood to require that the Government explain not only why a delay occurred but also why it is

excusable." *Ojeda Rios*, 495 U.S. at 265.  However, the government "is not required to prove that a particular understanding of the law is correct but rather only that its interpretation was *objectively reasonable* at the time." *Id.* at 266 (emphasis supplied).  The government's explanation for not having sealed the tapes immediately is satisfactory, for instance, "where the government advanced a bona fide reason, there was no reason to believe there was any deliberate flouting of the Title III requirements, no reason to doubt the tapes' integrity, and no basis for inferring any other prejudice to the defendants." *United States v. Maldonado-Rivera*, 922 F.2d 934, 950 (2nd Cir. 1990).  Additional factors relevant to a determination of whether the government has presented a satisfactory explanation for its failure to immediately seal the tapes include "the length of the delay before sealing[,] . . ., prejudice to the defendants, any tactical advantage accruing to the government, and whether deliberate or gross dereliction of duty or honest mistake caused the failure to [seal]." *United States v. Suarez*, 906 F.2d 977, 982 (4th Cir. 1990).

These factors have been applied in various decisions in which delay in the sealing of the tapes did not result in suppression.  For example, in *Pedroni*, the Ninth Circuit found that the government had provided a satisfactory explanation for the fourteen (14) day delay in the sealing of the tapes where the integrity of the tapes had been maintained through a special procedure, the tapes had been ready for sealing in six days (and in three non-holiday work days), and the delay was caused by the heavy work load of the supervising agent, which included interviewing two potential witnesses in the investigation, and in part by the unavailability of the district judge.  958 F.2d at 265-66.

In *Pitera*, the order authorizing electronic surveillance expired on a Thursday and the tapes were not sealed until the following Tuesday.  5 F.3d at 627.  The Second Circuit found the government's explanation that it had miscalculated the expiration date and had not thought it necessary to contact a judge over the weekend in order to seal the tapes

to be satisfactory. *Id.* "Because the delay . . . was relatively short and there was no suggestion of bad faith, deliberate disregard of the statute, or tampering, the tapes need not have been suppressed." *Id.*

In this case, as previously noted, the only delay in sealing occurred with respect to the April 19, 2006 sealing of the wiretap on (786) 294-5990. The wiretap order was issued on March 17, 2006 and expired on Sunday, April 16th, making the sealing on April 19th three days late. Defendants have not challenged the government's explanation for the delay, i.e., that the delay resulted from the unavailability of Judge Graham, that the recordings were sealed as soon as was reasonably feasible, and that they were at all times maintained in a safe and secure manner with the FBI.

Under these circumstances, given the minor delay occasioned in large part by the issuing judge's unavailability, and given that there has been no suggestion whatsoever of bad faith or an attempt by the government to disregard the statutory sealing requirements, no suggestion of tampering with the tapes or any reason to doubt their integrity, and no basis for inferring any prejudice to the Defendants, the Court finds the government's explanation for its delay to be objectively reasonable and excusable. Accordingly, the government satisfied the sealing requirements of § 2518(8)(a) with regard to all intercepted communications and suppression on this basis is not warranted.

### E. *Minimization Requirement Under 18 U.S.C. § 2518(5)*

Defendant Augustin next asserts, without any argument or factual support, that the government failed to minimize the intercepted telephone conversations as required by 18 U.S.C. § 2518(5). This statute provides in pertinent part that every wiretap order contain a provision that interception "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception" under Title III. The purpose of the statute is to ensure that intrusions into the privacy of those

whose communications are intercepted are held to a minimum, consistent with the purposes of the wiretap. *Hyde*, 574 F.2d at 869.

The minimization effort must be objectively reasonable in light of the circumstances confronting the interceptor. "The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Scott v. United States,* 436 U.S. 128, 140 (1978). A "test of reasonableness" is applied to the particular facts of each case. *Id.* at 139-40; *see also Hyde*, 574 F.2d at 869.

Errors in minimizing one particular interception within the context of a lengthy and complex investigation do not automatically warrant the suppression of all the evidence obtained through electronic surveillance. Total suppression would not follow unless a defendant demonstrates that the entire surveillance was tainted. *United States v. Baltas,* 236 F.3d 27, 32 (1st Cir. 2001).

Each of the wiretap orders entered in this case contained a minimization provision. *See, e.g.,* Judge Graham's March 2, 2006, Order Authorizing the Interception of Wire Communications (for Cellular Telephone Number (786) 222-8351) at 4. Additionally, the agents and monitors were given minimization instructions by a prosecutor prior to the interception of such communications, they signed the last page of the instructions certifying that they had read and understood the instructions, and they properly followed those instructions in minimizing the intercepted communications. *See* Gov't Resp., Exh. F, G, and H (Minimization Instructions). Every ten (10) days during the course of the interception orders, the government was to report to Judge Graham the number of: pertinent calls/sessions (not minimized or partially minimized); non-monitored calls/sessions; minimized calls/sessions; other telephone calls (busy, no answer, etc.); and the total calls/sessions. There has been no suggestion that the

government failed to comply with these instructions.   The government's submissions show that approximately three-fourths of the calls were minimized and more than half of the warehouse sessions were minimized.

Defendants have failed to identify any specific conversation or patterns of conversations which they maintain should not have been intercepted.   The general allegation that the government did not comply with the statutory minimization requirement is inadequate.   *See United States v. Carter*, 449 F.3d 1287, 1295 (D.C. Cir. 2006) (defendant must identify particular conversations so that the government can explain their non-minimization; general allegation that government did not minimize is inadequate).   Moreover, on this record, the Court finds that the government made reasonable attempts to minimize the conversations in this case.   Accordingly, there is no basis to suppress the interceptions under § 2815(5).   No hearing on minimization is warranted, either, given the total lack of evidence proffered by Defendant Augustin to support his claim here.   *Id.*[12]

---

[12]   From this it is clear that the government satisfied all the elements required for issuance of a video surveillance warrant, in addition to the probable cause discussed below, under the law established in other circuits.   We pause, however, to add that under a more traditional constitutional test as the one suggested *supra* at n.9 the government would have satisfied what should be an extraordinary burden of justifying an extended, clandestine video surveillance of the premises in which the Defendants clearly had an expectation of privacy.   The compelling necessity here was great, in light of the nature of the activities that the Defendants allegedly intended to engage in at the location, the need to verify all the members of that alleged conspiracy through video identification, the need to monitor the safety of the confidential informant when he was in the location, and the need to obtain video evidence of the means that might be used for the alleged conspirators to achieve their aims.   Given the seriousness of the matter, video surveillance of a private but quasi-commercial location like this warehouse would certainly have been justified upon a finding of probable cause.   *See United States v. Torres,* 751 F.2d 875, 882-83 (7th Cir. 1984) (use of video surveillance is a type of search that is so intrusive that it requires a balancing between public safety and personal privacy); *but see United States v. Williams,* 124 F.3d 411, 417 (3rd Cir. 1997) (Alito, J.) (skeptical that a judicial officer should take into account his or her own evaluation of the seriousness of the felonies under investigation for purposes of a video surveillance warrant).

**F.    _Finding of Probable Cause_**

      As previously discussed, _supra_ section II.A, a wiretap order must be upheld if the supporting affidavit provided the issuing judge with a substantial basis for determining the existence of probable cause.  _Gates_, 462 U.S. at 238-39.  Applying this deferential standard, this Court recommends that the issuing judges' findings of probable cause be upheld, as discussed below.

### 1.    _Staleness_

      Defendant Augustin complains that information in the affidavits was stale and insufficient to support a probable cause finding for the wiretap and electronic surveillance orders issued in this case.  Specifically, Augustin suggests that the affidavits failed to disclose that the confidential informant's knowledge about Batiste pertained to the period between October and December 2005, which was over six (6) weeks before the first wiretap application was presented to Judge Graham on February 17, 2006, and that the information therefore was stale.

      It is fundamental that the information provided to a judge in the application for a wiretap order, just as for a search warrant, must be timely.  _Hyde_, 574 F.2d at 862, 864.  That is because probable cause must exist at the time the order issues.  _Id._ at 864; _see also United States v. Domme_, 742 F.2d 950, 953 (11th Cir. 1985) (citing _United States v. Bascaro_, 742 F.2d 1335, 1345 (11th Cir. 1984), and _Hyde_**,** 574 F.2d at 864).  Whether information submitted in support of a wiretap order is stale is an issue that is decided on the peculiar facts of each case.  _Hyde_, 574 F.2d at 865.  Courts traditionally allow a fairly long period of time to elapse between information and search warrant in cases where the evidence shows a long-standing, on-going pattern of criminal activity.  _Id._  This is even more reasonable in wiretap cases than in ordinary search warrant cases, because no tangible objects that can be quickly carried off are sought.  _Id.; see, e.g., Van Horn_, 789

F.2d at 1498-99 (where investigation was of large, on-going drug importation and distribution conspiracy, the fact that the most recent information was two months old did not indicate the probable cause did not exist); *United States v. Ozar*, 50 F.3d 1440, 1446 (8th Cir. 1995) (where FBI was investigating bank fraud conspiracy, passage of time was less significant when there was cause to believe continuing criminal activity).

Additionally, even otherwise stale information that is then updated, which reflects that the evidence being sought is of a continuing nature, supports the finding of probable cause. When the government can link the object of the search to the ongoing criminal conduct, and updates and corroborates any stale information, courts will find probable cause. *See, e.g., United States v. Urban,* 404 F.3d 754, 775 (3rd Cir. 2005) (probable cause for video surveillance updated to within months of warrant application in an investigation spanning several years); *United States v. Diaz,* 176 F.3d 52, 109-10 (2nd Cir. 1999) (pen register data updated and bolstered probable cause by showing use of phone to call criminal associates within a month of wiretap application); *Ozar,* 50 F.3d at 1446-47 (physical surveillance updated and corroborated otherwise stale information); *United States v. Wagner,* 989 F.2d 69, 74 (2nd Cir. 1993) (pen register data used to corroborate informant's information and support wiretaps); *United States v. Rowell,* 903 F.2d 899, 902-03 (2nd Cir. 1990) (pen register data updated and corroborated informant's statements made 18 months before wiretap authorization sought).

Given the nature of the offenses with which Defendants have been charged, and given the incompleteness of Defendants' plans, it was reasonable for the issuing judges to have concluded that the activities mentioned in the affidavits were of an on-going nature. Further, the government updated and corroborated the information provided by the informants with physical surveillance, consensually-recorded conversations, pen register and trap and trace data.

The affidavits presented to the issuing judges in this case outline the Defendants' on-going activities in terms of planning a terrorist act, and the use of cellular telephones and a warehouse in furtherance of those activities, beginning in October 2005 through the spring of 2006.  For example, when the first wiretap authorization was sought on February 17, 2006 for (786) 294-5990, Judge Graham was informed of a consensually-recorded conversation on January 28, 2006, between the informants and Batiste regarding al Qaeda assistance for Batiste's organization and Batiste's indication that he wanted to meet an al Qaeda explosives expert, and a conversation on February 2, 2006, between CI-2 and Batiste regarding Batiste selecting a warehouse suitable for use as a training location.  *See* John P. Stewart's February 17, 2006, Affidavit in Support of Application for Order Authorizing Interception of Wire Communication (for Telephone Number (786) 294-5990) ("Stewart Aff."), ¶ 49, 52.

Later, in addition to consensually-recorded conversations and communications intercepted through the first-authorized wiretap (on (786) 294-5990), the pen register and trap and trace data showed criminal use of the target telephones to within ten (10) days of the issuance of the wiretap order issued on March 2, 2006 for (786) 222-8351.  *See* Velazquez Aff., ¶¶ 60-67.

The target warehouse was used by all of the Defendants on March 16, 2006 in a meeting in which they pledged loyalty to and alliance with al Qaeda.  *See* Janet A. Waldron's March 30, 2006, Affidavit in Support of Orders Authorizing Interception of Oral Communications and Visual, Non-Verbal Conduct Occurring at 6300 Northeast 4th Court, Miami, Florida ("Warehouse Aff."), ¶ 62.  One day before, on March 15, 2006, Batiste said the warehouse was perfect, in part because it had storage space for products and weapons.  *Id.,* ¶ *57.*  He  told CW-2 on March 23, 2006, that "they" had done a lot of work on the warehouse, fixing it up, and wanted it to look presentable should CW-2 bring

people there.  *Id.*, ¶ 72.  The wiretap and Rule 41(b) orders on the warehouse were entered a week later, on March 30, 2006.

Defendant Augustin's complaint that the probable cause in the affidavits presented to the issuing judges was stale lacks merit.  As set forth above, the issuing judges correctly found that the probable cause was not stale but supported entering the wiretap and Rule 41(b) orders.  These determinations should be granted deference and should be upheld in response to the motion to suppress.

### 2. *Franks v. Delaware*

Defendants next assert that the affidavits submitted in support of the applications for wiretap and Rule 41(b) orders contained factual misrepresentations and omissions which, if excised, would leave the affidavits without probable cause to support the interceptions authorized by Judge Graham and Judge Cooke.  As articulated during the suppression hearing on July 16-18th, the Court finds that Defendants failed to make a substantial showing that the agents who prepared the supporting affidavits included material misrepresentations in their affidavits, or omitted material information from the affidavits, and that correction of such misrepresentations or omissions would vitiate Judge Graham's and Judge Cooke's finding of probable cause to intercept the electronic communications they authorized in this case.  This conclusion was the basis for the Court's denial of the defense request for a *Franks* hearing on the wiretap and Rule 41(b) orders at issue here, with the exception discussed below regarding the background, credibility, and reliability of CW-2.

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court held that where the defendant makes a substantial preliminary showing that an affiant knowingly and intentionally included a false statement in an affidavit, or made the false statement with reckless disregard for its truth, and the false statement was necessary to the finding of

probable cause, then a hearing on the affidavit must be held at the defendant's request. Courts apply the same reasoning in *Franks* to a defense challenge to the veracity of an affidavit made in support of a wiretap application. *See United States v. Bascaro*, 742 F.2d 1335 (11th Cir. 1984) (rule in *Franks* applicable to affidavits submitted in support of court-ordered electronic surveillance); *Cantu*, 625 F.Supp. at 663 (citing *Bascaro* and *United States v. Harvey*, 560 F.Supp. 1040, 1050, 1074 (S.D. Fla. 1982)). There is "a presumption of validity with respect to the affidavit supporting the search warrant." *Franks*, 438 U.S. at 171. Insignificant and immaterial misrepresentations or omissions will not invalidate a warrant. *See United States v. Sims*, 845 F.2d 1564, 1571 (11th Cir. 1978).

"To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine." *Franks*, 438 U.S. at 171. To challenge a facially valid affidavit,

> [t]here must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

*United States v. Haimowitz*, 706 F.2d 1459, 1556 (11th Cir. 1983) (quoting *Franks*, 438 U.S. at 171); *see also United States v. Cooper*, 203 F.3d 1279, 1285 (11th Cir. 1990) (holding that where the defendants' motion to suppress was wholly lacking in sufficient factual allegations to establish standing, the district court did not abuse its discretion in refusing to hold an evidentiary hearing).

*Franks* also applies to material omissions of fact. *See Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1994) ("[I]t 'is possible that when the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be

inferred from proof of the omission itself."); *United States v. Clapp*, 46 F.3d 795, 799 (8th Cir. 1995) ("The defendant must show that the facts were omitted with the intent to make, or in reckless disregard of whether they thereby make, the affidavit misleading."). Any challenged omissions in an affidavit must have been made intentionally or with a reckless disregard for the accuracy of the affidavit. *Madiwale*, 117 F.3d at 1327. The concept of reckless disregard has a different meaning when applied to omissions rather than misrepresentations. Omissions are made with reckless disregard if the information omitted is the kind of information that a reasonable person would expect a judge to want to know. *Wilson v. Russo*, 212 F.3d 781, 788 (3rd Cir. 2000). Negligent or immaterial omissions, however, will not invalidate a warrant. *Madiwale*, 117 F.3d at 1327.

If a defendant is able to establish that there are material misrepresentations or omissions in a search warrant affidavit, the Court must then determine whether, when the misrepresentations are excised from the affidavit or the omissions added thereto, the affidavit still contains sufficient content to support a probable cause finding. *Sims*, 845 F.2d at 1571. If sufficient content remains, no hearing is required and the challenge to the warrant must be overruled. *Haimowitz*, 706 F.2d at 1556 (quoting *Franks*, 438 U.S. at 171-72).

In this case, neither Defendant provided any material support for their allegations that the affidavits contain false statements or omissions, and that if amended to correct for such inaccuracies, the affidavits would lack probable cause for issuance of wiretap or Rule 41(b) orders. On this ground alone, the Defendants' request for a *Franks* hearing should be denied.

Augustin claims that if the affidavits had not misrepresented certain facts and omitted other information, Judges Graham and Cooke could not have found probable cause for the intercept orders. He asserts the following material misrepresentations in

the affidavits:  misrepresentations regarding the amount of reliable information CW-1 had provided in the past to law enforcement; false information that Batiste sought financial support for the Moors' "mission against the United States;" misrepresenting that Rotschild Augustine had discussed "jihad" with CW-1 on November 7, 2005; and misrepresenting that Defendants "strip-searched" the informants on January 28, 2006.  *See* Augustin's Mot. at 6-7.  Augustin asserts that the following material information was omitted from the affidavits:  that CW-1 was an illegal alien and subject to deportation; that one of the informants had furnished an AK-47 to a local drug addict in exchange for money; that the informants' knowledge about Batiste was stale; and that when Batiste cut off communications with CW-2 in December 2005, CW-1 enticed Abraham with news in January 2006 that his friends would finance the Moors.  *Id.*

Notably, Augustin has not provided any offer of proof to support the aforementioned claims nor demonstrated how, had this information been included in the affidavits presented to Judges Graham and Cooke, it would have vitiated a finding of probable cause.  According to the affidavits, Batiste and the other Defendants pledged to make themselves available to al Qaeda to support the plan to destroy FBI buildings, and made plans to accomplish their "mission."  The affidavits provided more than sufficient detail for Judges Graham and Cooke to find probable cause that the Defendants were involved in the commission of the listed offenses.  Augustin's alleged misrepresentations and omissions were wholly conclusory and are inadequate to justify a *Franks* hearing.

As stated above, the Court found no basis to convene a *Franks* hearing in this case, with the exception of the Defendants' argument relating to the particular background of CW-2.  Defendants' counsel persuasively argued, in the motions but primarily at the hearing, that there were substantial credibility issues here with respect to this informant that required further inquiry.  The Court thus provided the Defendants with a limited

*Franks* hearing, solely with respect to the background, credibility and reliability of CW-2. For that purpose, the government presented the testimony of an agent with the most knowledge of that individual, and the Defendants' counsel were able to cross-examine the witness and learn (1) that the government knew that CW-2 had previously worked for the FBI in Chicago, (2) that in connection with that work CW-2 failed a lie detector test, (3) that CW-2 was then terminated as an informant for the FBI in Chicago, and that he then returned to his home country only to return in approximately 2001 to work for the Miami office of the FBI in connection with national security investigations.  Moreover, he received several immigration paroles during this period for him or his family to enter into the country legally, and purportedly received assistance from the government in connection with his asylum application in 2003 that was ultimately approved in early 2006.

Defendants argue that all this information was omitted from the affidavits and could have made a difference had Judges Graham and Cooke known about these significant holes in his credibility and reliability.  After giving due consideration to Defendants' arguments, the evidence and testimony at the hearing, and the record, the Court finds that Defendants' arguments relating to CW-2's credibility and reliability are not enough to undermine the validity of the wiretap and Rule 41(b) orders under *Franks*.

In *Illinois v. Gates*, the Supreme Court clarified the standard to apply when determining whether information from an informant was sufficient to establish probable cause to support the issuance of a search warrant.  The Court explained that a reviewing court must evaluate the "totality of the circumstances," considering both the circumstances under which the informant obtained the information, and the circumstances that led the affiant to believe that the informant was reliable.  462 U.S. at 230-37.

Under the totality of the circumstances test, the "basis of knowledge" and "veracity" prongs for assessing the usefulness of an informant's tips are relevant considerations in this analysis. *Id.* at 233. They do not operate independently; a deficiency in one factor may be outweighed by a strong showing in the other. *Id.; see, e.g., United States v. Brundidge*, 170 F.3d 1350, 1352-53 (11th Cir. 1999) (quoting *Gates*, 462 U.S. at 233). Two factors that have been held to bolster an informant's reliability are firsthand observation and an explicit and detailed description of the events at issue. *Gates*, 462 U.S. at 234; *Brundidge*, 170 F.3d at 1353.

While independent corroboration of an informant's tip has never been a *per se* rule for the determination of probable cause, *see Brundidge*, 170 F.3d at 1353, "*Gates* discusses the 'value of corroboration of details of an informant's tip by independent police work.'" *United States v. Ridolf*, 76 F. Supp. 2d 1305, 1309 (M.D. Ala. 1999) (internal citation omitted).

And this is ultimately where the Defendants' arguments regarding CW-2's credibility fail. CW-2's credibility is certainly an important factor in the totality of the investigation, but it is by no means the strength of the government's showing for probable cause in the affidavits. This is not a case where CW-2 told law enforcement that the Batiste and his codefendants were terrorists, in response to which agents immediately obtained wire intercept and video surveillance orders. There was a substantial amount of investigation and corroboration here that bolster the government's case for probable cause, all of which were sufficiently detailed in the affidavits that Judges Graham and Cooke reviewed.

Defendants forget that, in the Eleventh Circuit, evidence garnered from taped conversations of a suspect carries with a great deal of reliability and constitutes the very type of corroboration that *Gates* suggests is necessary to establish probable cause. Thus,

an affiant's reliance on legally taped or wiretapped conversation satisfies the reliability requirement necessary for probable cause. *United States v. Jiminez*, 224 F.3d 1243, 1248-49 (11th Cir. 2000) (conclusory affidavit that stated that affiant's knowledge was based upon information gained through wiretaps was reliable and sufficient for probable cause); *United States v. Glinton*, 154 F.3d 1245, 1255 (11th Cir. 1998) ("The fact that a wiretap was the basis for gaining confidential information does not detract from the reliability or veracity of the source.  In fact, upon learning of the means by which this information was obtained, the magistrate judge could gain reassurance as to the veracity of the information.") (affirming the denial of a motion to suppress that was based on misleading description of reliable informant).

Here, even if one accepts that CW-2's reliability is in serious question, based on CW-2's failed polygraph in connection with his work for FBI Chicago, or that he is only providing information in exchange for immigration benefits, *Gates* allows for the government to establish probable cause through additional investigation.  The use of consensually-recorded conversations, pen register and trap and trace devices, cooperating witnesses, grand jury subpoenaed telephone records, public records, and surveillance all provide that verification sufficient to satisfy probable cause.  *Brundidge*, 170 F.3d at 1353 (sufficiently detailed description of firsthand observations overcame weaknesses in informant's veracity); *United States v. Foree*, 43 F.3d 1572, 1576 (11th Cir. 1995) (informant's information can be corroborated through various means, including by "creating circumstances under which [the informant] is unlikely to lie"); *see also United States v. Booker*, 131 Fed. Appx. 234, 242-43 (11th Cir. May 12, 2005) (even an agent's failure to include in his supporting affidavit a representation that the informant had provided reliable information in the past could be overcome in a probable cause analysis where the informant provided a detailed description of the location to be searched and a

detailed account of the undercover drug buy he had made outside the subject location; probable cause finding upheld); *United States v. Morales*, 238 F.3d 952, 953 (8th Cir. 2001) ("Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence."); *United States v. Coffee*, 434 F.3d 887, 893 (6th Cir. 2006) ("an affidavit that supplies little information concerning an informant's reliability may support a finding of probable cause, under the totality of the circumstances, if it includes sufficient corroborating information.").

The Court's review of the affidavits shows that Judges Graham and Cooke correctly found that the government had amassed sufficient evidence to reasonably believe that the Defendants were engaged in or about to engage in various terrorist acts, that they were using the warehouse for that purpose, and that the information provided by the informant was sufficiently reliable for probable cause. If one includes in the affidavits all the omitted information that Defendants point to, the result would be the same because a strengthened challenge to the veracity of the informant does not materially detract from the substantial evidence also available to Judges Graham and Cooke that corroborated the informant's information. Indeed, the strength of the affidavits is not in what CW-2 said or did, but instead on what Batiste and his co-defendants said during monitored conversations with the informant and what they were observed doing during the relevant investigatory period. CW-2's motive to lie or past unreliability is not material ultimately to the most compelling parts of the affidavits. A *Franks* challenge cannot succeed under those circumstances. *See, e.g., United States v. Novaton*, 271 F.3d 968, 987 (11th Cir. 2001) (even if statements or omissions recklessly made, they are immaterial because probable cause would still not have been lacking; "That is the test of materiality, and materiality is essential no matter how deliberate or reckless the misrepresentations

were."); *Haygood v. Johnson*, 70 F.3d 92, 95 (11th Cir. 1996) ("We . . . hold that the facts omitted here were not so clearly material that every reasonable law officer would have known that their omission would lead to a search in violation of federal law. . . . [T]he combination of omitted facts might for some reasonable police officers be insufficient to negate probable cause in these uncommon and specific circumstances.").

Additionally, we note that what was found in the affidavits relating to CW-2's credibility sufficiently gave the issuing judges some reason to read further.  The affiants conceded that CW-2 was a paid informant.  That fact highlighted for the judges that there might be a reason for CW-2 to lie.  For the judges to have learned that, in addition to being paid, CW-2 also received a form of payment through immigration considerations would not have led them to question CW-2's information any more than they already did. Judges Graham and Cooke considered the remainder of the affidavits to determine if there were sufficiently corroborating facts in the affidavits that supported CW-2's information. They concluded that there was such a factual corroboration present in the affidavits such that, under the totality test, probable cause was satisfied.  Again, the omitted additional facts here would not materially change the outcome of that probable cause analysis.  *See, e.g., United States v. King*, 2007 WL 1544830, *1 (11th Cir. May 30, 2007) (motion to suppress properly denied where weaknesses in informant's veracity were compensated for by strength of informant's basis of knowledge and detailed information that meant informant "was unlikely to lie because if the warrant issued, lies would likely be discovered in short order and favors falsely curried would dissipate rapidly.") (quoting *Brundidge*, 170 F.3d at 1353-54).

That is also true with respect to the reliance on the failed polygraph exam administered to CW-2 when he was working with the FBI in Chicago on an investigation that predated and had nothing to do with this one.  The Court readily finds that such

information was not material to this case, at least for purposes of a probable cause affidavit.  Defendants have made no showing that this examination result would ever be admissible in this case.  And, indeed there has been no showing that the results of this examination would even constitute *Brady* or *Giglio* material because the exam at issue was never administered to CW-2 in connection with this investigation.  *See, e.g., United States v. Tokars*, 95 F.3d 1520, 1536 (11th Cir. 1996) (polygraph evidence not admissible or subject to production under *Brady* where exam questions unrelated to witness's testimony about defendant).  Thus, the absence of this polygraph result from the affidavits in no way was material to Judges Graham and Cooke's consideration of wiretap and Rule 41(b) applications.

Therefore, even if all the negative and unsupported assertions about the informants' backgrounds were included to the affidavit, Judge Graham's and Judge Cooke's reliance on the affidavits, and their probable cause determinations, would not have been affected.  The Court finds that even if the affidavits were "amended" to set aside the so-called misrepresentations and to include the so-called omitted information, they still would contain content sufficient to support a probable cause finding that evidence of the charged offenses or contraband would be uncovered through the sought-after intercept orders.  On this record, there is simply no basis to suppress the evidence obtained through those orders under *Franks*.

### G.    *Good Faith Exception*

Defendants finally claim that the government's misrepresentations should preclude application of the good faith exception to the exclusionary rule.  *See United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988) (good faith exception to the exclusionary rule applies to wire interceptions).  As previously noted, Defendants' allegations are insufficient to show that the government misrepresented any information

in the affidavits submitted in support of the wiretap or Rule 41(b) applications.  As a result, the agents who executed the wiretap and Rule 41(b) orders were entitled to rely in good faith on them.  They were issued by neutral and detached judges and on their faces contain ample probable cause for the authorized interceptions.

Under *United States v. Leon,* 468 U.S. 897 (1984), such reliance is sufficient to prevent application of the exclusionary rule and suppression of the intercepted communications.  There has been no showing here that the executing agents relied on objectively unreliable information.  *See United States v. Herring,* 2007 WL 2033828 at *3-*4 (11th Cir. July 17, 2007) (rejecting application of exclusionary rule to search for evidence from a technically unlawfully arrest; exclusionary rule should only be applied to a category of cases if it will result in appreciable deterrence to misconduct by law enforcement, and where the costs of applying the rule are outweighed by the  deterrent benefits; "[t]he possibility that application of the exclusionary rule . . . may deter Fourth Amendments violations to some extent is not enough.").  Therefore, on this basis as well the pending motions to suppress must be rejected as the exclusionary rule cannot apply under these circumstances.

## III.   CONCLUSION

Based on a thorough review of the record as a whole, the undersigned Magistrate Judge does hereby **RECOMMEND** that

1.   Defendant Patrick Abraham's Motion to Suppress Title III Wire and Request for *Franks* Hearing [**D.E. 187, 190**] be **GRANTED in part and DENIED in part**.  Defendant's Request for a *Franks* hearing [**D.E. 190**] has already been **GRANTED in part**, as discussed herein.  His Motion to Suppress Title III Wire Communications [**D.E. 187**] should be **DENIED** in its entirety.

2.    Defendant Burson Augustin's Motion to Suppress Evidence Discovered as a Consequence of Unlawful Interception of Telephone Communications and Other Forms of Electronic Surveillance [**D.E. 200**] should be **DENIED**.

3.    Pursuant to Local Magistrate Rule 4(b), the parties have ten (10) business days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Joan A. Lenard, United States District Judge.   Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein.   *R.T.C. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** at Miami, Florida, this 21st day of August, 2007.

EDWIN G. TORRES
United States Magistrate Judge