```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
                 CASE NO. 06-20373-CRIMINAL-LENARD
 3

 4    UNITED STATES OF AMERICA,        Miami, Florida

 5                  Plaintiff,         January 30, 2009

 6          vs.                        9:24 a.m. to 4:39 p.m.

 7    NARSEAL BATISTE, et al.,         Volume IV

 8               Defendants.           Pages 1 to 164
      --------------------------------------------------------
 9

10                           JURY TRIAL
11          BEFORE THE HONORABLE JOAN A. LENARD,
                 UNITED STATES DISTRICT JUDGE
12


13

14    APPEARANCES:

15


16    FOR THE GOVERNMENT:    RICHARD D. GREGORIE, ESQ., and
                             JACQUELINE M. ARANGO, ESQ.
17                           ASSISTANT UNITED STATES ATTORNEYS
                             99 Northeast Fourth Street
18                           Miami, Florida 33132

19
      FOR THE DEFENDANT      ANA MARIA JHONES, ESQ.
20      NARSEAL BATISTE:     300 Seville Avenue, Suite 210
                             Coral Gables, Florida 33134
21

22    FOR THE DEFENDANT      ALBERT Z. LEVIN, ESQ.
        PATRICK ABRAHAM:     261 Northeast First Street
23                           Sixth Floor
                             Miami, Florida 33132
24

25
```

```
 1    FOR THE DEFENDANT        RODERICK D. VEREEN, ESQ.
        STANLEY PHANOR:        BRINKLEY, HENRYS & LEWIS
 2                             4770 Biscayne Boulevard
                               Suite 1200
 3                             Miami, Florida 33131

 4
      FOR THE DEFENDANT        RICHARD K. HOULIHAN, ESQ.
 5     NAUDIMAR HERRERA:       300 Aragon Avenue
                               Coral Gables, Florida 33134
 6

 7    FOR THE DEFENDANT        LOUIS CASUSO, ESQ.
       BURSON AUGUSTIN:        111 Northeast First Street
 8                             Suite 603
                               Miami, Florida 33132
 9

10    FOR THE DEFENDANT        NATHAN CLARK, ESQ.
      ROTSCHILD AUGUSTINE:     17639 South Dixie Highway
11                             Miami, Florida 33157

12
      REPORTED BY:            LISA EDWARDS, CRR, RMR
13                            Official Court Reporter
                              400 North Miami Avenue
14                            Twelfth Floor
                              Miami, Florida 33128
15                            (305) 523-5499

16

17

18                            I  N  D  E  X
19

20                                               PAGE
21
      Jury Selection                              46
22

23

24

25
```

```
 1              THE COURT:  Good morning.

 2              United States of America versus Narseal

 3    Batiste, et al., Case No. 06-20373.

 4              Counsel, state your appearances, please, for

 5    the record.

 6              MR. GREGORIE:  Good morning, your Honor.

 7              Richard Gregorie and Jacqueline Arango on

 8    behalf of the United States.

 9              THE COURT:  Good morning.

10              MS. JHONES:  Good morning, your Honor.

11              Ana Jhones on behalf of Narseal Batiste, who

12    is present.

13              THE COURT:  Good morning.

14              MR. LEVIN:  Good morning, your Honor.

15              Albert Levin on behalf of Patrick Abraham, who

16    is present.

17              THE COURT:  Good morning.

18              MR. CASUSO:  Good morning, your Honor.

19              Lou Casuso on behalf of Burson Augustin, who

20    is present.

21              THE COURT:  Good morning.

22              MR. CLARK:  Good morning, your Honor.

23              Nathan Clark for Rotschild Augustine, who's

24    present.

25              THE COURT:  Good morning.
```

```
 1              MR. HOULIHAN:  Richard Houlihan with Naudimar
 2   Herrera.
 3              THE COURT:  Good morning.
 4              MR. VEREEN:  Roderick Vereen on behalf of
 5   Stanley Phanor, who's present.
 6              Good morning, Judge.
 7              THE COURT:  Good morning.
 8              You may be seated.
 9              Ms. Jhones, you had asked for an opportunity
10   to do some more research.
11              Do you have additional cases that you want to
12   argue to the Court?
13              MS. JHONES:  I do, your Honor.
14              I have two copies -- two cases, a copy for the
15   Court, and I've already provided the Government a copy.
16   If I may approach.
17              THE COURT:  That would be great.  Thank you.
18              MS. JHONES:  Your Honor, I had a little bit of
19   a glitch with the copy machine downstairs.
20              But with respect to the Madsen case, which is
21   the first case I want to address, it's the -- I only
22   have the pages -- the particular pages that I'm going
23   to refer to.  I don't have the whole --
24              THE COURT:  These were both cases that were
25   cited by Mr. Clark yesterday.
```

1          MS. JHONES:  Correct.

2          THE COURT:  Yes.

3          MS. JHONES:  *Madsen* is the 847 F.2d 1536.

4          That case involved a case of actual prejudice,

5   which is what we have here, actual prejudice, not to be

6   confused with presumptive prejudice.

7          Actual prejudice exists when a juror makes an

8   unequivocal statement such as the one made by this

9   juror with respect to his predisposition to vote guilty

10  based on what he heard outside -- from outside

11  publicity.

12         That's one of the examples.  There are more

13  than -- there are more than one example of when you

14  have actual prejudice.

15         And what *Madsen* says, your Honor,

16  specifically looking at Page 9 of the case:  Prejudice

17  was presumed -- this is quoting to another case --

18  prejudice was presumed where a defendant's confession

19  to robbery, kidnapping and murder was videotaped and

20  shown three times by television stations and three

21  broadcasts were seen by X amount of people.

22         On the same page, when -- *Madsen* states that,

23  when there is a preconceived notion of guilt or

24  innocence that could not be laid aside, a juror's

25  assurances that he can lay aside his impression or

1   opinion and render a verdict based upon the evidence

2   presented in court cannot be dispositive of the

3   accused's rights, and it remains open to the Defendant

4   to demonstrate the actual existence of such an opinion

5   in the mind of the juror and will raise the presumption

6   of partiality.

7          Now, the problem that we have here, your

8   Honor, is -- and going to the record, the responses --

9          THE COURT:  Could you give me one minute?  I

10  just want to read it.

11         MS. JHONES:  Sure.

12         THE COURT:  Okay.

13         MS. JHONES:  May I proceed, your Honor?

14         THE COURT:  Yes.

15         MS. JHONES:  Thank you.

16         The chronology of the expressions by Juror

17  No. 13, which rise to the level of actual prejudice,

18  are as follows:

19         On Page 230 of yesterday's transcript, when --

20  you asked the question had he acquired any information

21  from news, television, conversations or any other

22  source about this case.

23         He answered, "Yes."  He indicated what

24  sources.  The sources were newspaper, Internet and TV.

25         And he gave two instances that he recalled.

1    Instance No. 1 was referring to the *Miami Herald* as

2    recently as this week.  The previous incident was when

3    the Defendants were initially -- "when the arrests were

4    made" were his exact words.

5           You may recall, your Honor, that the media

6    acquired some or all of the discovery in this case and

7    playing throughout the television sets were

8    specifically, that I saw, anyway -- there may have been

9    more -- the one tape from 12-16, when CW 2 and

10   Mr. Batiste have their initial encounter.

11          This gentleman, in spite of two years after

12   the fact, appears to have a recollection of what he saw

13   when the arrests were made.

14          Now, the second instance where we have an

15   actual prejudice and, in my opinion, the most egregious

16   of it is --

17          THE COURT:  One moment.

18          He didn't indicate that he had seen any of

19   those tapes on TV.

20          MS. JHONES:  No, he did not, your Honor.  He

21   did not.

22          I'm just pointing out to the Court --

23          THE COURT:  That was one television station,

24   as I recall.  It was Channel 4.  It was one television

25   station.

1            You filed a motion on it, Ms. Jhones.  I

2     remember it.  It was Channel 4.  You filed a motion

3     asking the Court to preemptively prevent Channel 4

4     from --

5            MS. JHONES:  That's correct.

6            THE COURT:  -- publishing or preventing in the

7     media the tapes --

8            MS. JHONES:  Correct.

9            THE COURT:  -- which I denied.

10           MS. JHONES:  Correct.

11           The second set -- the second part of -- or the

12    second example, I should say, of actual prejudice is

13    found on Pages 231 through 233, where the Court asks

14    Juror No. 13, "Do you have an open mind regarding this

15    case?"

16           Juror No. 13 says, "Somewhat."

17           And the Court then inquired as to, "What do

18    you have an open mind about and what do you not have an

19    open mind about?"

20           And he said, "I'm biased because of what

21    happened in 2001.  People -- I know that there are

22    people out there that want to hurt us."

23           Then the Court asks, "Do you understand that

24    the Defendants are presumed innocent?"  The Court asked

25    that question as it relates to his second prejudice,

1   i.e., 2001, his second set of bias.

2           He says, "Yes."

3           The Court also inquired as to whether he

4   understood that the Government has the burden of proof.

5           He says, "Yes."

6           And given the nature of the charges, the Court

7   inquired, "If the Government failed to prove, would you

8   be able to find the Defendants not guilty?"

9           He'd say -- and then he responded, "I'd say

10  'yes.'"

11          And then the Court further inquired as to, "If

12  the Government did, in fact, prove their case, could

13  you find them guilty?

14          "Yes."

15          And then you asked him if he's formed an

16  opinion about these Defendants based on outside

17  information.

18          And he says, "Yes."

19          And then, "What is your opinion?"

20          And then, after the Court had already inquired

21  and colloquied this juror about presumption of

22  innocence, about the burden of proof, once again, his

23  opinion is firm.

24          He says, "I understand that they're innocent

25  until proven guilty.  But my own opinion, from what

1   I've read in the newspaper, I would say a lot of what

2   the charges are against them are real.

3          And I'd like to see, if I am picked to hear

4   what the evidence is and I can make a formal -- I can

5   make up my mind exactly how I feel.  But walking in

6   here, I do have a little bit feeling they are not

7   innocent."

8          THE COURT:  No.  He said "but before walking

9   in here."

10          MS. JHONES:  "I do have a little bit" -- yes,

11   your Honor.  That's correct.

12          Okay.  So the Court attempted to have this --

13   these biases set aside and he remained firm in his

14   bias.  And this gentleman was very honest.

15          Now, we go to -- we then go to the part when

16   the Court called him back on Page 252 of the

17   transcript.

18          You indicated --

19          THE COURT:  Wait.

20          But you have go further on that page.

21          I then asked him, "Would your opinion affect

22   your ability to determine the Defendants' guilt based

23   solely on the evidence presented at trial?"

24          And he responded, "No, it will not."

25          I then asked him, "So would you be able to put

1   aside that opinion and sit and listen to the evidence

2   in this case and be fair to both the Government and the

3   Defendants?"

4        He said, "Yes.  Yes."

5        Go ahead.

6        MS. JHONES:  Okay.  Your Honor, do you have

7   the page on that?  I'm sorry.  I had already moved

8   forward.

9        THE COURT:  I'm working off the rough copy.

10  So I have it as 247 and 248.  But I don't know if

11  that's how it comes out in the printed transcript.  I

12  was looking at this before the printed transcript

13  arrived.

14       MS. JHONES:  That's fine.  It doesn't, but

15  that's fine.

16       Moving -- and I'll get back to that in a

17  second, your Honor, the fact that the Court did proceed

18  to inquire further before the Court brought him back

19  in.

20       Moving on to the colloquy that ensued when

21  Juror No. 13 was brought back, you started by -- and

22  this is my Page 252, anyway, of the transcript.

23       The Court -- the first initial question to

24  this gentleman was the issue of his bias because of

25  9/11.

1            You asked him if he'd be able to set aside

2     that bias and sit and listen to the evidence in this

3     case and make a determination solely on the evidence

4     presented at trial.

5            He said, "Yes."

6            Then the Court inquired about what -- his bias

7     in terms of what he had read in the newspaper before he

8     walked in here.

9            And the Court used his words, saying, "...you

10    had a feeling that they are not innocent.

11           "Would you be able to put aside that opinion

12    and make a determination on whether the Defendants are

13    guilty or not guilty solely on the evidence" --

14           THE COURT:  You've got to go slower.  It's

15    your record.

16           MS. JHONES:  Sorry.

17           THE COURT:  She won't be able to get it down.

18    You're really racing.

19           MS. JHONES:  Let me go back, your Honor.

20           -- "Would you be able to put aside that

21    opinion and make a determination on whether the

22    Defendants are guilty or not guilty solely on the

23    evidence presented at trial?"

24           Juror No. 13 responds, "I would say 'yes.'  If

25    I hear the evidence and -- then the evidence will tell

1  me how -- you know, how I will give a verdict.  How to

2  say this."

3          And then he continues by saying, "I've only

4  heard from papers.  I haven't heard the real evidence.

5  The evidence will tell me -- will give me my -- you

6  know, if I hear all the evidence of what happened or

7  what the case is about, then I can give a clear answer,

8  because I'm going by what I hear from papers, from

9  other sources."

10          And so the Court inquired, "So having not

11  heard the evidence -- or any evidence in the trial, do

12  these Defendants sit here and are they presumed

13  innocent, in your mind?"

14          And he says, "I believe, in our system,

15  that" --

16          THE COURT:  He says, "I believe -- yes."

17          MS. ARANGO:  He says, "I believe -- yes."

18          MS. JHONES:  Yes.  Yes.

19          "I believe -- yes.  I believe, in our system,

20  that everyone is innocent until proven guilty."

21          Then he qualifies it.  "But everyone does have

22  their own thoughts when you hear of -- you know, on the

23  TV or newspapers.  But I could be clear-headed about

24  hearing the evidence.  I don't know if that's the

25  answer."

```
 1              And the Court explains that there's no right
 2    or wrong answer or words to that effect.
 3              Then the Court gives him a hypothetical at
 4    Page 254.
 5              "The Government stands up and says, 'This is
 6    all the evidence we're presenting' and they don't
 7    present anything further than what you've read from
 8    outside information."
 9              And he says, "...they are guilty, of what I've
10    heard from the outside."
11              And I understand --
12              THE COURT:  Well, then he says, "I mean, if
13    it's the same evidence as what I've heard --"
14              MS. JHONES:  Correct.  Correct.
15              THE COURT:  It's an inartful question on my
16    part.  That was not the question I was asking him.
17              MS. JHONES:  You asked another question.  But,
18    quite frankly, your Honor, I thought the initial
19    question you asked was the actual question, because
20    what we were trying to determine --
21              THE COURT:  No.  That was not the question I
22    was trying to ask him.
23              I was trying to determine whether, if the
24    Government presented nothing -- well, because,
25    actually, it was based on what defense counsel had
```

```
1    asked me to ask him, which was that, if the Government

2    presented nothing, would he find them guilty or not

3    guilty.

4            And that's what I wanted to ask him.  I wanted

5    to see if he had made a determination on the

6    presumption of innocence based upon the outside

7    information.

8            The question was very inartful by me because

9    it made -- the question made it seem that the

10   Government presented only the evidence that he saw in

11   the paper.  As I read it last night, it was not a very

12   good question from me.

13           And he responds, "Of what I've heard on the

14   outside, I would say they are guilty, of what I heard

15   from the outside.  I mean, if it's the same evidence as

16   what I've heard --"

17           Then I said to him, "No.  No.  I'm not saying

18   the evidence is the same.

19           "I'm saying the Government doesn't present any

20   evidence.  They don't present any evidence.

21           They don't present anything.  They just stand

22   up and they say -- they make statements about their

23   opinions, but they don't present any evidence."

24           And then he responds, "If they don't present

25   any evidence, then, no, I wouldn't find them guilty.
```

1    I'd find them innocent.  They have to give me evidence

2    to show that they actually did what they said they

3    did."

4            MS. JHONES:  And he did say that, your Honor.

5            Now, going back to -- going back to *Madsen* --

6            THE COURT:  *Marsden*, I think.

7            MS. JHONES:  *Marsden*.  Thank you.

8            Again, at Page -- top right-hand corner,

9    Page 9, because of the fact that what we have here is

10   actual prejudice, the Court indicates that a juror's

11   assurances that he can lay aside his impression or

12   opinion and render a verdict based on evidence

13   presented in court, quote, "cannot be dispositive of

14   the accused's rights and remains open -- and it remains

15   open for the Defendants to demonstrate that the actual

16   existence of such an opinion in the mind of the juror

17   will raise a presumption of partiality."

18           Now, this juror has qualified, with respect to

19   the two different instances of bias, the presumption of

20   innocence issue and the issue of 9/11.  He has

21   qualified his responses.

22           Now, I agree with the Court that, when you

23   called him back and you gave him the second scenario,

24   he said what the transcript reflects that he said.

25           The problem is, your Honor, that, from my

1  understanding of the cases and, also, *Martin* -- but,

2  unfortunately, I think I gave you my copy that I

3  highlighted -- 749 F.2d 1514, another Eleventh Circuit

4  case from 1985, my understanding -- my reading of these

5  two cases seemed to indicate that asking leading

6  questions of a juror in the context of actual prejudice

7  under circumstances where he has qualified his

8  responses -- and, in this case, at least more than

9  twice, he's qualified them -- that it's not enough

10 because actual prejudice is something that is, per se,

11 enough to strike a juror.

12         And my argument to the Court --

13         THE COURT:  Where does it say that in *Martin*?

14         MS. JHONES:  Your Honor --

15         THE COURT:  It doesn't say anything about

16 asking leading questions.

17         MS. JHONES:  No, your Honor.

18         I'm not saying --

19         THE COURT:  It doesn't say anything about the

20 Court -- the manner in which the Court asked questions

21 in *Martin*.  *Martin* has to do with the answers of the

22 juror.

23         MS. JHONES:  Yes, your Honor.

24         But what I'm saying, what I am suggesting, is

25 that the courts are very firm with respect to the

```
 1    heightened sense of concern when we're talking about a

 2    demonstration of actual prejudice.

 3            THE COURT:  Well, here's your highlighted copy

 4    back.  Where does it say that in Martin?  Where does

 5    the Court hold or state that the courts are very

 6    heightened -- very firm with respect to the heightened

 7    sense of concern when we're talking about a

 8    demonstration of actual prejudice?  I don't see that.

 9    And I read Martin last night.

10            MS. JHONES:  Thank you.

11            Your Honor, what Martin -- the Court --

12            THE COURT:  Did you find it in Martin?

13            MS. JHONES:  No, your Honor.  But I didn't say

14    that Martin said that.

15            What I said is that these cases suggest,

16    suggest, that level of scrutiny because, if you look at

17    Martin, on Page 3, the Court inquired of the juror that

18    was in question there.

19            And the Court asked the juror, in that case, a

20    juror by the name of Ms. Booth, "If you were selected

21    as a juror, is there any question in your mind that the

22    verdict you might render would be based on the evidence

23    you heard in the courtroom rather than something you

24    heard outside the courtroom?"

25            And then the juror, very similar to the juror
```

```
 1    here, said, "I think I could stick to what was said in
 2    the courtroom."
 3            And then the Court asked, "And make a verdict
 4    based upon that?
 5            "Yes.  I feel I could do that."
 6            The Court denied the motion to strike.
 7            Defense counsel was asked -- was given an
 8    opportunity to inquire.
 9            And counsel asked, "When you stated you
10    thought you could be swayed against Defendant, would
11    you explain what you meant by that."
12            And the juror then -- the same woman who said,
13    "I could do that.  I could stick with the evidence.  I
14    could stick with what was said in the courtroom" --
15    that very same juror within seconds --
16            THE COURT:  No.  No.  She said, "I think I
17    could stick to what was said in the courtroom.  I feel
18    I could do that."
19            MS. JHONES:  Yes.
20            THE COURT:  That was the initial answers, not
21    that she said, "I can stick to what's said in the
22    courtroom."  She said, "I think I could stick to what's
23    in the courtroom.  I feel I could do that."
24            And then there was further questioning.
25            MS. JHONES:  Correct.
```

```
1              THE COURT:  And she even became more

2    qualifying.

3              MS. JHONES:  Correct.

4              And what she said was, very sincerely, just

5    like this gentleman, Juror No. 13 in our case, "If

6    there is the slightest bit of doubt of his innocence, I

7    would feel -- I would try to weigh what was said in the

8    courtroom.  But the slightest bit of doubt?  I'd say

9    he's probably guilty."

10             THE COURT:  And you say that that's like which

11   statement by this juror?

12             MS. JHONES:  Your Honor --

13             THE COURT:  Which statement?

14             MS. JHONES:  -- what this is similar to is

15   that, when the Court inquired with these -- when the

16   Court inquired of this juror, Juror No. 13, he -- if

17   the Court went further, he would qualify his responses.

18             And I don't mean to be disrespectful to the

19   Court, your Honor.

20             But my concern is that, when you ask these

21   leading questions of him, that we cannot ferret out

22   what's at the heart of this man's bias.  That's what

23   I'm suggesting.

24             My reading of these cases -- and I may be

25   wrong.  But my reading of these cases, what it tells us
```

1    is, when we're dealing with actual prejudice, it's like

2    a big flashing red light.  And we need to go a little

3    further to ferret out whether or not this gentleman

4    truly, truly, in his heart could set aside the bias.

5           And that's what I'm talking about.  I'm not

6    suggesting that *Martin* said -- indicated a standard

7    that I said to the Court.  I'm not suggesting that.

8    I'm just saying, when you read these cases in their

9    totality, that seems to be the concern of the Court.

10          I know that the Court inquired of this

11   gentleman and is doing everything in her power to get

12   to that.  But my concern is that I think this

13   gentleman, because of the issue of the -- of what he

14   said on 9/11 and because of the fact that he said on

15   two different occasions that he thinks they're not

16   innocent -- I am concerned with his understanding and

17   his ability, his ability, to -- when he sits there -- I

18   think it was *Marsden* that said, "We want jurors that

19   are indifferent."

20          That's what we need, indifferent jurors.  This

21   is not an indifferent juror, your Honor.

22          THE COURT:  Where is that in *Martin*?

23          MS. JHONES:  That I could actually cite to,

24   your Honor.

25          I'm going back to *Marsden*, the 847 --

```
 1              THE COURT:  Oh.  Marsden.

 2              MS. JHONES:  Marsden.  I'm sorry.

 3              Your Honor, I don't have the front pages, but

 4    I think it's right at the beginning of the opinion.  If

 5    you could, look at the beginning of the opinion.  If

 6    the Court can't find it, I could locate it for the

 7    Court.

 8              THE COURT:  I don't see it.

 9              MS. JHONES:  May I approach a second, your

10    Honor?

11              THE COURT:  Yes.  Here.  I have another copy

12    of it that my clerk just printed out.

13              THE COURT SECURITY OFFICER:  Yes, ma'am.

14              MR. CLARK:  Your Honor, when Ms. -- when

15    Ms. Jhones finishes, could I have an opportunity to

16    briefly address it?

17              THE COURT:  Sure.

18              MS. JHONES:  Your Honor, Page 8 of the Court's

19    copy.

20              THE COURT:  No.  No.  You've got to give me

21    the page cite, the decision itself.

22              MS. JHONES:  1542.  Page 1542, right under

23    No. 2.  Let me know if the Court has located it.

24              THE COURT:  Okay.

25              MS. JHONES:  "The constitutional standard of
```

1    fairness requires that a defendant have a panel of

2    impartial, indifferent jurors."

3           That's citing to *Murphy versus Florida*,

4    421 US 794 at 799, Supreme Court case of 1975.

5           THE COURT:  That's talking about the

6    publicity.

7           MS. JHONES:  Yes, your Honor.  And that's

8    where -- from where this gentleman's bias stems.

9           THE COURT:  Okay, Mr. Clark.

10          MR. CLARK:  All right, your Honor.

11          What I believe that the *Marsden* case says

12   about the procedure of voir dire is that, whenever

13   there's an actual prejudice that arises, which it did

14   in this case, it creates a presumption of partiality

15   against this juror.

16          That's based upon *United States versus Anwan*,

17   which is an Eleventh Circuit case, which relies upon

18   the case of *Riddow versus Louisiana*, which is the

19   presumptive prejudice standard.

20          And there's two situations.  The second

21   situation is actual prejudice.

22          So now that this juror has actual prejudice,

23   what *Marsden* says is no longer sufficient to simply get

24   him to say that he could lay it aside.

25          In order to overcome the presumption of

```
 1    partiality, the -- this juror has to demonstrate how

 2    he's going to lay aside this prejudice.

 3              And, in fact, in Marsden, the Court noted a

 4    couple of jurors who were able to lay aside this

 5    opinion -- which means to remove it, set it aside -- by

 6    saying that they assumed that the newspaper accounts

 7    were inaccurate or they would not have -- they're no

 8    longer going to have the opinion because the opinion

 9    that they're guilty is inconsistent with the

10    presumption of innocence.  You can't have both.  To lay

11    it aside means to remove it.

12              So what happened in the colloquy is that this

13    juror has never shown how he's going to lay it aside.

14    When asked about -- I think it was an artful question

15    to say, if the Government put on some evidence that --

16    similar to the outside information, and the defense did

17    not put on any -- he said, "I would find them guilty."

18    That means he still has that opinion.

19              The other question is the one I think that is

20    inartful because it says, if the Government puts on no

21    evidence, we have a Rule 29 situation.  It wouldn't

22    even go to the jury.

23              But --

24              THE COURT:  That was not the issue, Mr. Clark.

25    That was not the issue at all.
```

1          Counsel for the Defendants wanted me to --

2    specifically, I believe, you asked me to ask him, if

3    the Government didn't put on any evidence, would he

4    find them not guilty.  That's what you asked me.  And I

5    believe it was you who asked me -- or Mr. Vereen who

6    asked me to ask that.

7          So to now say that my asking of that question

8    was an error because it'd be Rule 29 is a little bit

9    disingenuous, don't you think, Mr. Clark?

10         MR. CLARK:  Well, I'm just saying to you that

11   that's not really relevant in the inquiry, in any

12   event.

13         My point is that he still -- this juror --

14         THE COURT:  This gentleman wouldn't be

15   deciding a Rule 29, would he?

16         MR. CLARK:  I'm sorry?

17         THE COURT:  This gentleman would not be

18   deciding Rule 29, would he?

19         MR. CLARK:  Right.

20         So if the Government put on no evidence at

21   all, he wouldn't even get to the jury.

22         What I'm saying is that what *Marsden* says is

23   that he has to demonstrate how he's going to lay

24   aside -- he just can't say, "Yeah.  I can lay it

25   aside."  That's not sufficient any longer because

```
 1    there's a presumption of partiality.

 2            He has to demonstrate how it's going to be

 3    done.  If you look in the Marsden case right after --

 4    on that page that Ms. Jones cited to, the Eleventh

 5    Circuit showed how most people -- because I don't think

 6    he's going to be able to set it aside.  You have to

 7    have a lobotomy to set it aside or you have to have

 8    some kind of reasoning whereby you no longer have this

 9    opinion.

10            That's what happened in the Marsden case.

11    Several of the jurors explained how they could set this

12    aside and no longer have this opinion because the

13    newspaper accounts were either one-sided or the

14    newspaper accounts were untrustworthy or something like

15    that.

16            So I believe -- I'm asking the Court to --

17    first of all, I'm asking the Court to excuse this juror

18    because he's already shown that he really -- even

19    though he's assured us, he did not demonstrate it.  And

20    there has to be a demonstration of how it's going to be

21    set aside.

22            THE COURT:  First of all, in regard to Juror

23    No. 1, I went back and reviewed that transcript.

24            And you are correct, Ms. Jhones.  He did not

25    indicate that he had an opinion.
```

1           So I wanted to clear that up for the record,

2      because I had brought that up and I had misspoken about

3      that.

4           And in regard to the arguments made yesterday

5      in regard to Juror No. 9, the lawyer, who basically

6      stated that he understood, one would hope -- he

7      understood what the burden was and he understood the

8      standards regarding both the Government and the

9      Defendants, but because he felt that certain persons

10     were disadvantaged in the criminal justice system, he

11     was going to then skew the burden and view -- I believe

12     the term that he used is "view the Government's

13     evidence with more skepticism," it was on that basis

14     that I excused him, which is separate and distinct as

15     Juror No. 1 was.  Juror No. 9 is separate and distinct

16     from this issue.

17          And I think I indicated side-bar how

18     disappointed I was that a lawyer, a person trained in

19     the law, could be so colored by personal views as to

20     not be able to separate them out.

21          But be that as it may, the parties agreed that

22     he should be struck.  He was struck.

23          I read the same cases that you read, and I

24     also read the *Rhodes* case, which is the controlling

25     case in the Eleventh Circuit now.  *Rhodes* is 177 F.3d

963.  And Mr. Gregorie quoted *Rhodes* yesterday at 965.

The *Rhodes* court says as follows:  "The decision to strike a prospective juror for cause upon a suggestion of impartiality is within the sound discretion of the trial judge.

"We will not overturn that decision absent an abuse of discretion.

"When a prospective juror reveals actual bias or when bias is implied because the juror has some special relationship to a party (such as a familial or master-servant relationship), the Court must dismiss the prospective juror for cause," citing *United States* -- or it says, "See *United States versus Nell*, 527 F.2d, 1223 at 1229 and Note 8, a Fifth Circuit decision, 1976.

"When a juror demonstrates, however, that she can lay aside any opinion she might hold and render a judgment based solely on the evidence presented in court, then dismissal is not required.  See *United States versus Martin*, 749 F.2d, 1514 at 1517 to 1518, a 1985 decision by the Eleventh Circuit."

*Martin*, which was cited today, also a decision by the Eleventh Circuit in 1985, goes through a detailed analysis of the questioning of the juror in that case, which was one of the bases upon which the

1   Eleventh Circuit reversed the conviction.

2        And it's really a very detailed analysis

3   starting at Page 1516.

4        "Martin's conviction must be reversed because

5   of error in refusing to accept a challenge for cause

6   against a prospective juror.  The complete record of

7   voir dire of Venire Person Ms. Booth was as follows:

8        Mr. McMahon, defense counsel:

9        "Question:  I believe, Ms. Booth, you're an

10  auditor with a savings and loan.

11       "Answer:  Juror:  With Decatur Federal.

12       "Question:  You're trained as a teller.  Did

13  you ever talk to anyone that had experienced a bank

14  robbery while working as a teller?

15       "Spoken to an employer that previously had

16  been."

17       And the charges here were aiding and abetting

18  a bank robbery or bank robbery.

19       The juror answers, "Yes."

20       "Question:  Did she share with you her

21  feelings -- or her feelings at the time this occurred?

22       "Answer:  She experienced some fear.

23       "Question:  Being a bank employee, do you

24  think you could listen to the evidence and not be

25  affected by the fact you're an employee and you know of

1   someone who has expressed a fear involved in a bank

2   robbery and listen to the evidence and weigh it

3   impartially?

4          "Answer:  I would like to say I could.  I

5   don't know.  Being an employee of the bank, I could

6   probably be swayed against the Defendant easily."

7          The defense lawyer then moved to strike for

8   cause.

9          And then the Court questioned the juror:

10         "Question:  Could you, Ms. Booth, if you were

11  selected as a juror -- is there any question in your

12  mind that the verdict you might render would be based

13  upon the evidence you heard in the courtroom rather

14  than something you heard outside the courtroom?"

15         Answer by the juror:  "I think I could stick

16  to what was said in the courtroom."

17         The Court, questioning the juror:  "And make a

18  verdict based upon that?

19         "Answer:  Yes.  I feel I could do that.

20         "Question:  I deny the" -- strike that.

21         The Court then denies the motion to strike for

22  cause.

23         The defense lawyer then asked if he can

24  question further.  The Court allows the defense lawyer

25  to do so.

1          Question by the defense lawyer:  "When you

2     stated you thought you could be swayed against the

3     Defendant, would you explain what you meant by that."

4          Answer by the juror:  "If there is the

5     slightest bit of doubt of his innocence, I would feel

6     that I would try to weigh what was said in the

7     courtroom.  But the slightest bit of doubt?  I would

8     say he was guilty, probably.

9          "Question:  You would say he was guilty,

10    probably?  I'm having trouble hearing.

11         "Answer:  I'm a bank employee, and that is

12    going to have a big impact on my decision.  And I hope

13    I could stick to what goes on in the courtroom, but I

14    cannot guarantee anything."

15         Again, the defense lawyer moves to strike.

16    The Court denies it.

17         There's a further motion because she can't be

18    fair and impartial.  The Court denies it again.

19         And then the Eleventh Circuit goes through a

20    detailed analysis that, first of all, the juror

21    identified herself as an employee of a savings and loan

22    institution, that she'd been trained as a teller,

23    described her conversation with a teller that had

24    experienced a robbery and expressed fear and then that

25    she expressed doubt whether she could listen to the

1    evidence, weigh it impartially, unaffected by her

2    status as an employee and her knowledge of someone who

3    had been involved in a bank robbery and experienced

4    fear.

5         And then the Court specifically cites the

6    equivocal language that the juror uses.  "I would like

7    to say I could."  And that was in reference to consider

8    the evidence impartially and not be affected.

9         The next equivocal language that the Court

10   cites -- and the Court is citing this not for the end

11   subject area, but for the equivocation of the language

12   that the juror uses.

13        "I don't know whether I could.  Being an

14   employee of the bank, I could probably be swayed

15   against the Defendant easily."

16        At this point, had nothing else happened,

17   Ms. Booth plainly was disqualified.

18        Then the Court goes on to say that -- the

19   Government then make the argument that the Government

20   thought that she was rehabilitated.

21        And then the Court goes on to cite again this

22   very qualified language that the juror uses, "I

23   think" -- and "think" is italicized -- "I could stick

24   to what was said in the courtroom.  Yes.  I feel" --

25   and "feel" is italicized by the Eleventh Circuit -- "I

1    could do that, in reference to make a verdict, based on

2    what was said in the courtroom."

3           The Court then says, "We don't need to decide

4    whether these qualified statements were enough to

5    rehabilitate her," because there was further

6    questioning.

7           And then it goes on to cite the question

8    about -- by defense counsel that -- about being swayed

9    against the Defendant.

10          And, again, it cites the statement by the

11   juror:  "If there is the slightest bit of doubt of his

12   innocence, I would feel that I would try to weigh what

13   was said in the courtroom.  But the slightest bit of

14   doubt?  I would say he was guilty, probably.  I am a

15   bank employee, and that is going to have a big impact

16   on my decision.  And I hope I could stick to what goes

17   on in the courtroom, but I cannot guarantee anything."

18          Then quoting from the Eleventh Circuit at

19   1517, "Summarizing, she reiterated that she would try

20   to weigh what was said in the courtroom" -- and "try

21   to" is italicized in the decision -- "She stated, if

22   there was the slightest bit of doubt of his innocence,

23   she would say he was guilty, probably.  She reiterated

24   her hope" -- and "hope" is italicized in the

25   decision -- "that she could stick to what went on in

1    the courtroom, but qualified it by saying that she

2    could not guarantee anything.

3           "And she stated unequivocally that her status

4    as a bank employee was going to have a 'big impact on

5    my decision.'"

6           The Eleventh Circuit goes on to state again at

7    the same page:  "These statements are inconsistent with

8    the capability to reach a decision based upon the

9    evidence.  They are inconsistent with willingness to

10   only find guilt upon proof beyond a reasonable doubt.

11   The statement of Ms. Booth that her status as a bank

12   employee was going to have a 'big impact on my

13   decision' is wholly inconsistent with deciding on the

14   evidence presented in the courtroom.  Rather, it is a

15   candid acknowledgment that she would be affected by

16   matters not in evidence."

17          Additionally, in the *Marsden* case, which was

18   cited by defense counsel, 847 F.2d 1536 -- the *Marsden*

19   case, in addition to the passage that was quoted by

20   Ms. Jhones, the next passage on 1543, states as

21   follows:

22          "The voir dire in this case does not indicate

23   a hostility to *Marsden* by the jurors that would suggest

24   an impartiality that could not be set aside.

25          "32 of the 40 prospective jurors had heard or

1    read something about the case, and 16 had read the

2    previous day's article in the *Huntsville Times*.  But

3    only four of them stated that they had formed some type

4    of opinion on the case.

5         "Of those four, one stated that he could put

6    his opinion aside because he 'knew' -- quoting now --

7    he 'knew how those articles were,'" end of quote.

8         "And another stated that he would not be

9    swayed because the media only presented one side of the

10   case.

11        "The one prospective juror who indicated that

12   his previous opinion would affect him was challenged

13   for cause and did not become a member of Marsden's

14   jury."

15        So in reading these cases, it's clear that it

16   is the juror's language, the definiteness of the

17   language and what they say as to whether they will make

18   a decision based upon the evidence presented in the

19   courtroom.

20        So after this -- reading these cases, I have

21   gone back and read Juror No. 13's testimony.

22        What was the page that you had that began this

23   juror's testimony?

24        MS. JHONES:  Before he was called in the

25   second time, your Honor?

 1          MS. ARANGO:  Judge, I have for the first
 2   time -- the line was -- I have it at 1643, when you
 3   started asking him about whether or not he could set
 4   aside his opinions the first time, before you recalled
 5   him.
 6          THE COURT:  1643?
 7          MS. ARANGO:  At least up on my screen.
 8          THE COURT:  We did that many pages yesterday?
 9          MS. ARANGO:  No.  Not page.  I'm sorry.  The
10   line.
11          THE COURT:  No.  No.  I need the page.
12          MS. ARANGO:  Oh.
13          MS. JHONES:  Your Honor, his initial -- you're
14   talking about the initial colloquy on the --
15          THE COURT:  When he came --
16          MS. JHONES:  Okay.  It started dealing with
17   these issues in particular at Page 230 --
18          THE COURT:  Okay.  Thank you.
19          MS. JHONES:  -- of the condensed version
20   transcript.
21          THE COURT:  Well, it should be the same pages.
22          Right, Lisa?
23          THE COURT REPORTER:  Yes, Judge.
24          MS. JHONES:  230 through 237.
25          THE COURT:  Okay.  At Page 231, Line 19,

1    "Question:  Do you have an open mind regarding this

2    case?

3              "Answer:  Somewhat.

4              "Question:  Okay.  In what way do you have an

5    open mind and in what way don't you have an open mind?

6              "Answer:  I would say I have an open mind

7    because I know people are innocent until proven guilty.

8              "But I'm also -- I'm biased because of what

9    happened in 2001 and what happened -- there's also

10   people in this country who want to hurt us."

11             I then went through the presumption of

12   innocence.

13             "Do you understand that every Defendant is

14   presumed innocent until they are proven guilty?"

15             That's 232 at Line 5.

16             He answered, "Yes."

17             "Question" -- Line 9 -- "And do you understand

18   that the Government has the burden of proving a

19   Defendant guilty beyond a reasonable doubt?"

20             Line 12, "Answer:  Yes.

21             "Question" -- Line 13 -- "Given that you now

22   know the nature of the charges here, if the Government

23   failed to prove its case against a Defendant, would you

24   be able to find that Defendant not guilty?

25             "Answer:  I'd say 'yes.'

1          "Question" -- Line 18 -- "And if the

2    Government proved a case against a Defendant beyond a

3    reasonable doubt, would you be able to find that

4    Defendant guilty?

5          "Answer:  Yes.

6          "Question" -- Line 22, still on Page 232 --

7    "Have you formed an opinion regarding any of the

8    Defendants based upon any outside information?

9          "Answer:  I would say 'yes.'

10          "Question -- Line 1 at 233 -- "And what is

11    your opinion?

12          "Answer" -- Line 2 -- "As for saying -- I

13    understand people are innocent until proven guilty.

14    But my own opinion, from what I've read in the

15    newspaper, I would say a lot of what the charges are

16    against them are real and that I'd like to see -- if I

17    am picked to hear what the evidence is and then I can

18    make a formal -- I can make up my mind exactly how I

19    feel.  But before walking in here, I do have a little

20    bit -- feeling that they are not innocent."

21          Question by the Court, Line 11:  "Would your

22    opinion affect your ability to determine the

23    Defendants' guilt based solely on the evidence

24    presented at trial?

25          "Answer" -- Line 14, Page 233 -- "No, it will

1    not."

2              A very definite answer there.

3              Question by the Court:  "So would you be able

4    to put aside that opinion and sit and listen to the

5    evidence in this case and be fair to both the

6    Government and the Defendants?

7              "Answer" -- Line 19 -- "Yes.  Yes."

8              And then, on Page 252, the juror is brought

9    back in after there was argument and the motion to

10   strike for cause.

11             Line 10:  "You had indicated -- you had used

12   the term that you had a bias because of 9/11."

13             Answer by the juror, Line 12:  "Yes."

14             Question by the Court at Line 13:  "Would you

15   be able to set aside that bias and sit and listen to

16   the evidence in this case and make a determination

17   solely on the evidence presented at trial?

18             "Answer" -- Line 17 -- "Yes."

19             Again, a very definite answer, "Yes."

20             "Question" -- Line 18 -- "You had also stated

21   that, based upon what you read in the newspaper before

22   you walked in here, you had a feeling that they are not

23   innocent.

24             "Would you be able to put aside that opinion

25   and make a determination on whether the Defendants are

1    guilty or not guilty solely on the evidence presented

2    at trial?

3            "Answer" -- Line 25 and continuing on 253,

4    Line 1 -- "I would say 'yes.'  If -- if I hear the

5    evidence and -- then the evidence will tell me how" --

6    and some of this is a little disjointed.

7            And I should state for the record, the

8    potential juror has a fairly extensive speech

9    impediment and sometimes it's hard for him to get out

10   full sentences.

11           It takes several phrases until such time as he

12   can complete his -- his thought is there, but it takes

13   awhile for him to translate the thought into a complete

14   verbal sentence.  So that's why some of the answers

15   have disjointed phrase before it.

16           But he does -- and he is able to complete his

17   thought through verbal statements.  It just takes him a

18   little bit of time.

19           So I thought it appropriate to state that for

20   the record because these are not hesitations by the

21   juror.  This is as a result of a speech impediment.  It

22   wouldn't be reflected in the record.

23           So he says, "I would say 'yes.'  If -- if I

24   hear the evidence and -- then the evidence will tell me

25   how -- you know, how I will give a verdict.  How to say

1  this.

2          "I've only heard from papers."

3          This is 253, Line 4:  "I've only heard from

4  papers.  I haven't heard the real evidence."

5          And I'm emphasizing this.

6          "The evidence will tell me -- will give me

7  my -- you know, if I hear all the evidence of what

8  happened or what the case is about, then I can give a

9  clear answer, because I'm going by what I hear from

10  papers, from other sources."

11          So here, we have, as Mr. Clark referenced,

12  which is talked about in *Marsden* -- and, again, is also

13  talked about in the other cases -- that here, the

14  juror's expressing that they've only made this

15  determination on what they've read in the papers, that

16  they understand that he hasn't heard the real evidence

17  and that he would make a determination on the real

18  evidence presented at the trial.

19          So question by the Court:  "So having not

20  heard the evidence --"

21          The juror says, "Okay" at Line 12.

22          THE COURT:  "-- or any evidence in the

23  trial" -- this is Line 13 -- "do these Defendants sit

24  here and are they presumed innocent, in your mind?

25          "I -- I believe" -- and, again, this is not --

1    I don't find that this is a statement of equivocation;

2    this was his stammering -- "I -- I believe -- yes.  I

3    believe, in our system, that everyone is innocent until

4    proven guilty.

5         "But everyone does have their own thoughts

6    when you hear of -- you know, on the TV or newspapers.

7    But I could be clear-headed about hearing the evidence.

8    I don't know if that's the answer."

9         And then I say to him, "Well, there's no right

10   answer.  I need to hear what your thoughts are."

11        And then I asked him the two hypotheticals --

12   or I was trying to do one hypothetical, and it was not

13   very well done by the Court.

14        I stated to him, "You're chosen as a juror

15   today.  The Government stands up" -- this is Line 2 on

16   254 -- "and says, 'This is all the evidence we're

17   presenting' and they don't present anything further

18   than what you've read from outside information.

19        "What would your verdict be?"

20        Answer at Line 8:  "Of what I've heard on the

21   outside, I would say they are guilty, of what I've

22   heard from the outside.

23        "I mean, if it's the same evidence as what

24   I've heard --"

25        And that's when I realized that I had not

1   asked -- that was not the question that I was -- wanted

2   to ask him.

3          And at Line 13, I say, "No.  No.  I'm not

4   saying the evidence is the same.

5          "I'm saying the Government doesn't present any

6   evidence.  They don't present any evidence."

7          He says at Line 17, "Oh, okay.  If --"

8          And then I state at Line 18:  "They don't

9   present anything.  They just stand up and they say --

10  they make statements about their opinions, but they

11  don't present any evidence."

12         And then he says at Line 22 on Page 254, "If

13  they don't present any evidence, then, no, I wouldn't

14  find them guilty.  I'd find them innocent.  They have

15  to give me evidence to show that they actually did what

16  they said they did."

17         So based upon the colloquy with the juror,

18  based upon the applicable case law here, I do not find,

19  as in *Martin*, that there was very qualifying language

20  as to -- that indicated -- as the Court found in

21  *Martin*, that indicated that this juror could not set

22  aside whatever opinions they had and make a

23  determination of the evidence -- make a determination

24  of the case based upon the evidence presented during

25  the trial.

1    His language was definite.  His ability to put

2  aside his opinion and make a determination of -- on a

3  verdict of the Defendants solely based upon the

4  evidence presented at trial was unequivocal.

5    He has demonstrated, as in *Rhodes*, that he

6  could lay aside any opinion that he might hold as a

7  result of reading something in the paper and render a

8  judgment based solely on the evidence presented in

9  court.

10    And as in *Marsden*, I do not find that there is

11  a hostility to the Defendants in the voir dire that

12  would suggest an impartiality that could not be set

13  aside.

14    As the record in this case reflects, including

15  the articles that were published this week in the

16  *Herald* and the editorial, much of the publicity has

17  been in line with what Juror No. 1 stated, that, "These

18  Defendants are being framed" -- that was his language.

19  I'm quoting him -- that this is a trumped-up charge

20  against the Defendants.

21    We had one juror who said to another juror in

22  the middle of voir dire, "They're never going to

23  convict these guys."

24    And several jurors have indicated that they

25  could not sit on the case.

1          In fact, that particular juror said that she

2    could not be fair and I didn't really need to go into

3    those statements with the other jurors -- to the other

4    juror regarding her.

5          So there hasn't been an indication of

6    hostility to the Defendants that indicates that

7    impartiality could not be set aside.

8          And like the jurors in *Marsden*, this Juror

9    No. 13 is a juror who stated that he could put his

10   opinion aside, that he understood that there's a

11   difference between what's reported in the newspaper and

12   the presentation of evidence in the courtroom.

13         He understands the presumption of innocence.

14   He understands and would be able to make a

15   determination and render a verdict solely on the

16   evidence presented at trial.

17         He has not indicated, as in the one juror that

18   the Court cites in *Marsden*, that his previous opinion

19   would affect him.

20         And, therefore, the motion to strike for cause

21   is denied.

22         MR. LEVIN:  Your Honor, are you going to be

23   taking up other motions for cause at this time?  I was

24   under the impression that we waited until the end.

25         THE COURT:  Can you give me one moment,

```
 1   please.
 2           MR. LEVIN:  Yes, ma'am.
 3           THE COURT:  Well, this had come up.  So I
 4   wasn't planning to do it until everybody -- we had
 5   questioned everybody.
 6           MR. LEVIN:  Right.
 7           THE COURT:  But Mr. Vereen made the motion as
 8   soon as he walked out the door.  So....
 9           MR. LEVIN:  Would you like me -- I'll wait
10   until the end, the usual --
11           THE COURT:  I think that would probably be
12   better.
13           MR. LEVIN:  No problem.
14           THE COURT:  So we are up to Juror No. 14.
15           (Thereupon, Potential Juror No. 14 entered the
16   courtroom and the following proceedings were had:)
17           THE COURT:  Good morning.
18           PROSPECTIVE JUROR NO. 14:  Good morning.
19           THE COURT:  Do you want to come up to the
20   lectern?  Is that okay if you stand there?  Or would
21   you rather sit?  I don't know.  Have you been standing
22   out there awhile?
23           PROSPECTIVE JUROR NO. 14:  No.  Sitting.  I'm
24   okay.
25           THE COURT:  In this case, the Government has
```

1    alleged that the Defendants have engaged in

2    conspiracies to commit various violations of federal

3    laws regarding terrorist activities.

4         The charges include conspiracies or agreements

5    to provide material support and resources to agents of

6    Al-Qaeda in conspiring to blow up the Sears Tower in

7    Chicago and several federal buildings in a planned war

8    against the United States.

9         Given that, is there anything that would

10   prevent you from being able to sit and listen to the

11   evidence in this case and be fair to both the

12   Government and the Defendants?

13        PROSPECTIVE JUROR NO. 14:  No.

14        THE COURT:  In this case, you may hear

15   evidence that the Government used informants who were

16   not United States citizens and who posed as

17   terrorists/agents of Al-Qaeda.

18        Do you have such strong feelings one way or

19   the other that you would not be able to sit and listen

20   to this evidence and be fair to both the Government and

21   the Defendants?

22        PROSPECTIVE JUROR NO. 14:  No.

23        THE COURT:  Have you acquired any information

24   from newspaper, television, conversations or any other

25   sources about this case?

```
 1              PROSPECTIVE JUROR NO. 14:  Are you talking in

 2   reference to recently or when this --

 3              THE COURT:  Anytime.

 4              PROSPECTIVE JUROR NO. 14:  I was -- I heard

 5   about it when it first came out.

 6              THE COURT:  Okay.  How did you hear about it?

 7              PROSPECTIVE JUROR NO. 14:  The TV.

 8              THE COURT:  Do you remember what station?

 9              PROSPECTIVE JUROR NO. 14:  No.

10              THE COURT:  Okay.

11              PROSPECTIVE JUROR NO. 14:  And I don't

12   remember a whole lot about it.  I just saw faces on the

13   TV and something about Liberty City and something to

14   the effect of being related to Al-Qaeda.

15              But, you know, I saw it and I didn't see it.

16   I didn't really --

17              THE COURT:  After that, did you see anything?

18              PROSPECTIVE JUROR NO. 14:  No.  I didn't -- it

19   came back on and I flipped the channels because I -- at

20   the time, I won't say it didn't concern me, but it

21   didn't concern me.

22              There were other things that were going on.

23   So it's like I flip the channels to see what's

24   important and then I move on.

25              THE COURT:  Okay.  Do you read the *Miami*
```

1    *Herald*, *New Times* or *Sun-Sentinel* news publications

2    either in print or on-line?

3            PROSPECTIVE JUROR NO. 14:  I read the

4    *Miami Herald*.

5            THE COURT:  Daily?

6            PROSPECTIVE JUROR NO. 14:  On occasion.

7            THE COURT:  On occasion?

8            PROSPECTIVE JUROR NO. 14:  I'm a

9    schoolteacher.  So I'm not at the computer a lot.  I'm

10   up on the board, teaching.  So when I get a chance to,

11   I try to read it on-line.  But that's not very often.

12           THE COURT:  Okay.  Have you read anything in

13   any newspaper or on the Internet or have you seen

14   anything on television or heard anything on radio about

15   this case other than what you already told me?

16           PROSPECTIVE JUROR NO. 14:  No.

17           THE COURT:  Have you followed the course of

18   the proceedings leading up to this trial prior to

19   coming to court yesterday?  Have you followed them

20   closely?

21           PROSPECTIVE JUROR NO. 14:  Yes, I have.

22           THE COURT:  No.  Prior to coming to court.

23   Not while you've been here.

24           PROSPECTIVE JUROR NO. 14:  Oh.  No.  No.  No.

25           THE COURT:  Have you discussed this case with

1    anyone?

2         PROSPECTIVE JUROR NO. 14:  No.

3         THE COURT:  Do you have an open mind regarding

4    this case?

5         PROSPECTIVE JUROR NO. 14:  Sure.

6         THE COURT:  Have you formed an opinion

7    regarding any of the Defendants based upon any outside

8    information?

9         PROSPECTIVE JUROR NO. 14:  No.

10        THE COURT:  Do you have any beliefs, thoughts

11   or opinions which may cause you to decide this case on

12   anything other than the evidence you will hear at

13   trial?

14        PROSPECTIVE JUROR NO. 14:  No.

15        THE COURT:  Are you knowledgeable about the

16   history and practice of Islam?

17        PROSPECTIVE JUROR NO. 14:  No.

18        THE COURT:  Are you knowledgeable about the

19   history and practices of the Moorish Science Temple?

20        PROSPECTIVE JUROR NO. 14:  No.

21        THE COURT:  Are you knowledgeable about the

22   Universal Divine Saviors?

23        PROSPECTIVE JUROR NO. 14:  No.

24        THE COURT:  Are you a member of any type of

25   Masonic lodge or are you knowledgeable about the

 1   history, teachings or practices of the Masons?

 2          PROSPECTIVE JUROR NO. 14:  No.

 3          THE COURT:  Have you or any of your family

 4   members ever visited the Middle East?

 5          PROSPECTIVE JUROR NO. 14:  No.

 6          THE COURT:  Do you or family members or close

 7   friends have any prior or present military service?

 8          PROSPECTIVE JUROR NO. 14:  Well, I have a

 9   brother who's in the Air Force.

10          THE COURT:  He's presently in the Air Force?

11          PROSPECTIVE JUROR NO. 14:  He's Air Force

12   Reserves, medic.

13          THE COURT:  Okay.  And where has been his

14   place of service?

15          PROSPECTIVE JUROR NO. 14:  He's at Homestead.

16          THE COURT:  Has he served in combat?

17          PROSPECTIVE JUROR NO. 14:  No.

18          THE COURT:  Has he been in the military police

19   or shore patrol?

20          PROSPECTIVE JUROR NO. 14:  No.

21          THE COURT:  Has he had any disciplinary action

22   taken against him?

23          PROSPECTIVE JUROR NO. 14:  No.

24          I also have an ex-husband, but I don't know if

25   that counts.

1          THE COURT:  Okay.  Tell me about --

2          PROSPECTIVE JUROR NO. 14:  He was in the Army.

3          THE COURT:  Where was his place of service?

4          PROSPECTIVE JUROR NO. 14:  Alaska.

5          THE COURT:  Did he see any combat?

6          PROSPECTIVE JUROR NO. 14:  No.

7          THE COURT:  Was he in the military police or

8     shore patrol?

9          PROSPECTIVE JUROR NO. 14:  No.

10          THE COURT:  Did he have any disciplinary

11     action taken against him?

12          PROSPECTIVE JUROR NO. 14:  Yes, he did.

13          THE COURT:  And do you know what that was?

14          PROSPECTIVE JUROR NO. 14:  He was on drugs.

15     So he got popped, and they dismissed him.

16          THE COURT:  Would the fact that your husband

17     had disciplinary -- ex-husband -- I'm sorry --

18          PROSPECTIVE JUROR NO. 14:  Thank you.

19          THE COURT:  -- ex-husband had disciplinary

20     action taken against him while he was serving in the

21     Army affect your ability to sit and listen to the

22     evidence in this case and be fair to both the

23     Government and the Defendants?

24          PROSPECTIVE JUROR NO. 14:  It would not affect

25     me.

1        THE COURT:  Have you or any members of your

2   family or close friends had any personal experience

3   with acts of terrorism?

4        PROSPECTIVE JUROR NO. 14:  No.

5        THE COURT:  Do you know or do you have a

6   family member or friend who knows someone who was a

7   victim of a terrorist attack?

8        PROSPECTIVE JUROR NO. 14:  No.

9        THE COURT:  Have the events of September 11th

10  or any other terrorist act affected you to such an

11  extent that it would make it difficult for you to sit

12  and listen to the evidence in this case and be fair to

13  both the Government and the Defendants?

14        PROSPECTIVE JUROR NO. 14:  No.

15        THE COURT:  Have you or any family member or

16  close friend lost a job, a business contract or

17  experienced any other financial hardship as a result of

18  September 11th or any other terrorist attack?

19        PROSPECTIVE JUROR NO. 14:  No.

20        THE COURT:  Do you have an opinion as to who

21  was responsible for the attack on the United States on

22  September 11th, 2001?

23        PROSPECTIVE JUROR NO. 14:  Of course.  Yes.

24        THE COURT:  And who do you think was

25  responsible?

1              PROSPECTIVE JUROR NO. 14:  Oh, I don't know.

2    But I do have an opinion about it.  I would love for

3    them to be caught.  But, you know --

4              THE COURT:  What's your opinion?

5              PROSPECTIVE JUROR NO. 14:  I would love for

6    them to find whoever it was that was responsible for

7    it.  But I don't know who it was.  So I'm not going to

8    lose any sleep over it.

9              THE COURT:  Okay.  Is there anything else you

10   think the Court or the attorneys should know that might

11   influence your ability to fairly and impartially judge

12   the evidence in this case and follow the Court's

13   instructions on the law?

14             PROSPECTIVE JUROR NO. 14:  Not to my

15   knowledge.

16             THE COURT:  Okay, ma'am.  If you would have a

17   seat outside and not discuss my questions with anyone.

18             (Thereupon, Potential Juror No. 14 retired

19   from the courtroom and the following proceedings were

20   had:)

21             THE COURT:  I have an issue with the

22   deliberating jurors.  So we'll be in recess in this

23   matter for 20 minutes.  I need to give Lisa a break,

24   also.  I'm going to need you to clear out as quickly as

25   possible, please.

1          (Thereupon a recess was taken, after which the

2    following proceedings were had:)

3          THE COURT:  We're back on United States of

4    America versus Narseal Batiste, et al., Case

5    No. 06-20373.

6          Counsel, state your appearances, please, for

7    the record.

8          MR. GREGORIE:  Richard Gregorie and Jacqueline

9    Arango on behalf of the United States, your Honor.

10          MS. JHONES:  Good afternoon.

11          Ana Jhones on behalf of Narseal Batiste, who

12    is present.

13          MR. LEVIN:  Your Honor, Albert Levin for

14    Patrick Abraham, who's present.

15          MR. CASUSO:  Louie Casuso on behalf of Burson

16    Augustin, who is present.

17          MR. CLARK:  Good afternoon, your Honor.

18          Nathan Clark for Rotschild Augustine, who is

19    present.

20          MR. HOULIHAN:  Richard Houlihan with Naudimar

21    Herrera.

22          MR. VEREEN:  Good afternoon, your Honor.

23          Roderick Vereen on behalf of Stanley Phanor,

24    who's present.

25          THE COURT:  You may be seated.

```
 1              Sorry for the delay.  We got a little

 2   preoccupied for a while, but we're back.

 3              So we're now proceeding with Juror No. 16.

 4   Correct?

 5              MR. VEREEN:  Yes, ma'am.

 6              MR. CLARK:  Yes.

 7              (Thereupon, Potential Juror No. 16 entered the

 8   courtroom and the following proceedings were had:)

 9              THE COURT:  Hello.

10              PROSPECTIVE JUROR NO. 16:  Hello.

11              THE COURT:  In this case, the Government has

12   alleged that the Defendants were engaged in

13   conspiracies to commit various violations of federal

14   laws regarding terrorist activities.

15              The charges include conspiracies or agreements

16   to provide material support and resources to agents of

17   Al-Qaeda in conspiring to blow up the Sears Tower in

18   Chicago and several federal buildings in a planned war

19   against the United States.

20              Given that, is there anything that would

21   prevent you from being able to sit and listen to the

22   evidence in this case and be fair to both the

23   Government and the Defendants?

24              PROSPECTIVE JUROR NO. 16:  No.

25              THE COURT:  In this case, you may hear
```

1  evidence that the Government used informants who were

2  not United States citizens and who posed as

3  terrorists/agents of Al-Qaeda.

4          Do you have such strong feelings one way or

5  the other that you will not be able to sit and listen

6  to this evidence and be fair to both the Government and

7  the Defendants?

8          PROSPECTIVE JUROR NO. 16:  No.

9          THE COURT:  Have you acquired any information

10 from newspaper, television, conversations or any other

11 sources about this case?

12         PROSPECTIVE JUROR NO. 16:  No.

13         THE COURT:  Do you read the *Miami Herald*,

14 *New Times* or *Sun-Sentinel* news publications either in

15 print or on-line?

16         PROSPECTIVE JUROR NO. 16:  *Miami Herald* once

17 in a while.

18         THE COURT:  Have you read anything in any

19 newspaper or on the Internet or have you seen anything

20 on television or heard anything on the radio about this

21 case?

22         PROSPECTIVE JUROR NO. 16:  No.

23         THE COURT:  Have you followed the course of

24 the proceedings leading up to this trial closely prior

25 to coming to court yesterday?

1              PROSPECTIVE JUROR NO. 16:  Yes.  I don't

2     understand what you are asking me.

3              THE COURT:  Prior to the time that you came to

4     court yesterday, have you followed what's happened in

5     the case at all?

6              PROSPECTIVE JUROR NO. 16:  Do you mean in the

7     news or something?

8              THE COURT:  Yes.  In the news or generally.

9              PROSPECTIVE JUROR NO. 16:  No.  I don't know

10    anything about it.

11             THE COURT:  Have you discussed this case with

12    anyone?

13             PROSPECTIVE JUROR NO. 16:  No.

14             THE COURT:  Do you have an open mind regarding

15    this case?

16             PROSPECTIVE JUROR NO. 16:  Yes.

17             THE COURT:  Have you formed an opinion

18    regarding any of the Defendants based upon any outside

19    information?

20             PROSPECTIVE JUROR NO. 16:  No.

21             THE COURT:  Do you have any beliefs, thoughts

22    or opinions which may cause you to decide this case on

23    anything other than the evidence you will hear at

24    trial?

25             PROSPECTIVE JUROR NO. 16:  No.

```
 1              THE COURT:  Are you knowledgeable about the
 2    history and practice of Islam?
 3              PROSPECTIVE JUROR NO. 16:  No.
 4              THE COURT:  Are you knowledgeable about the
 5    history and practices of the Moorish Science Temple?
 6              PROSPECTIVE JUROR NO. 16:  No.
 7              THE COURT:  Are you knowledgeable about the
 8    Universal Divine Saviors?
 9              PROSPECTIVE JUROR NO. 16:  No.
10              THE COURT:  Are you knowledgeable about the
11    history, teachings or practices of the Masons or are
12    you a member of any type of Masonic lodge?
13              PROSPECTIVE JUROR NO. 16:  No.
14              THE COURT:  Have you or any of your family
15    members ever visited the Middle East?
16              PROSPECTIVE JUROR NO. 16:  No.
17              THE COURT:  Do you or family members or close
18    friends have any prior or present military service?
19              PROSPECTIVE JUROR NO. 16:  My son was in the
20    Army, if that's what you're asking.
21              THE COURT:  When was that?
22              PROSPECTIVE JUROR NO. 16:  After he graduated
23    from high school.  He's been out over five years -- six
24    years now.
25              THE COURT:  And where was his place of
```

```
1    service?
2              PROSPECTIVE JUROR NO. 16:  He never went
3    overseas.  He was in -- it starts with a B.  He was
4    here in Atlanta, Georgia, around there.  He never went
5    anywhere.  He just stayed here.
6              THE COURT:  Was he ever in the military police
7    or shore patrol?
8              PROSPECTIVE JUROR NO. 16:  No.
9              THE COURT:  Did he have any disciplinary
10   action taken against him?
11             PROSPECTIVE JUROR NO. 16:  No.  He served
12   three years and that's it.
13             THE COURT:  Did he have an honorable
14   discharge?
15             PROSPECTIVE JUROR NO. 16:  Yes.
16             THE COURT:  Do you remember his rank at
17   discharge?
18             PROSPECTIVE JUROR NO. 16:  No.  I never even
19   bothered asking.
20             THE COURT:  Have you or any members of your
21   family or close friends had any personal experience
22   with acts of terrorism?
23             PROSPECTIVE JUROR NO. 16:  No.
24             THE COURT:  Do you know or do you have a
25   family member or friend who knows someone who was a
```

1    victim of a terrorist attack?

2            PROSPECTIVE JUROR NO. 16:  No.

3            THE COURT:  Have the events of September 11th

4    or any other terrorist act affected you to such an

5    extent that it would make it difficult for you to sit

6    and listen to the evidence in this case and be fair to

7    both the Government and the Defendants?

8            PROSPECTIVE JUROR NO. 16:  No.

9            THE COURT:  Have you or any family member or

10   close friends lost a job, a business contract or

11   experienced any other financial hardship as a result of

12   September 11th or any other terrorist attack?

13           PROSPECTIVE JUROR NO. 16:  No.

14           THE COURT:  Do you have an opinion as to who

15   was responsible for the attack on the United States on

16   September 11th, 2001?

17           PROSPECTIVE JUROR NO. 16:  No.

18           THE COURT:  Is there anything else you think

19   the Court or the attorneys should know that might

20   influence your ability to fairly and impartially judge

21   the evidence in this case and follow the Court's

22   instructions on the law?

23           PROSPECTIVE JUROR NO. 16:  No.

24           THE COURT:  Okay, ma'am.  If you would have a

25   seat outside and not discuss my questions with anyone.

```
 1              PROSPECTIVE JUROR NO. 16:  Okay.

 2              THE COURT:  Thank you for your patience.

 3              (Thereupon, Potential Juror No. 16 retired

 4    from the courtroom and the following proceedings were

 5    had:)

 6              THE COURT:  Juror No. 19.

 7              (Thereupon, Potential Juror No. 19 entered the

 8    courtroom and the following proceedings were had:)

 9              THE COURT:  Hello.

10              PROSPECTIVE JUROR NO. 19:  Hi.

11              THE COURT:  Are you comfortable standing

12    there, ma'am, or do you want to sit?

13              PROSPECTIVE JUROR NO. 19:  I'm comfortable, I

14    guess.

15              THE COURT:  Okay.

16              PROSPECTIVE JUROR NO. 19:  I've been sitting.

17              THE COURT:  In this case, the Government has

18    alleged that the Defendants were engaged in

19    conspiracies to commit various violations of federal

20    laws regarding terrorist activities.

21              The charges include conspiracies or agreements

22    to provide material support and resources to agents of

23    Al-Qaeda in conspiring to blow up the Sears Tower in

24    Chicago and several federal buildings in a planned war

25    against the United States.
```

1          Given that, is there anything that would

2     prevent you from being able to sit and listen to the

3     evidence in this case and be fair to both the

4     Government and the Defendants?

5          PROSPECTIVE JUROR NO. 19:  Yes, it will be.

6     Yes.  I have -- first of all, I have sinus real bad,

7     which my breathing is sort of short --

8          THE COURT:  Okay.

9          PROSPECTIVE JUROR NO. 19:  -- at times.

10         Second of all, I have -- yesterday I didn't

11    mention it, but I also had a son that -- I have two

12    sons.  One works for UPS, and one sort of, you know, is

13    living with his dad and got in trouble.

14         So, you know, it would be pretty hard for me

15    to, you know, make a -- I think a good choice -- a good

16    decision in this case.

17         THE COURT:  Okay.  So it's regarding your sons

18    that you think is the problem?

19         PROSPECTIVE JUROR NO. 19:  Yes.  Yes.

20         THE COURT:  So what happened to your second

21    son who's living with his dad?

22         PROSPECTIVE JUROR NO. 19:  He just got in

23    trouble when he was 16 and he was just -- it was like

24    one good one and one that got in trouble all the time.

25    That's what it was.

1          THE COURT:  The one that got in trouble:  What

2   happened that he got in trouble?

3          PROSPECTIVE JUROR NO. 19:  Well, he finally

4   got out of trouble and then he --

5          THE COURT:  What was the trouble he got into?

6          PROSPECTIVE JUROR NO. 19:  Oh.  When he was

7   16, he got accused of being with some guys and robbed

8   someone, committed a robbery somewhere.

9          THE COURT:  So he went to juvenile court?

10          PROSPECTIVE JUROR NO. 19:  Yeah.  He went to

11   juvenile court.

12          THE COURT:  What happened there?

13          PROSPECTIVE JUROR NO. 19:  Then they -- well,

14   you do -- what do you do when they transfer him?

15          THE COURT:  They adjudicated him a delinquent?

16          PROSPECTIVE JUROR NO. 19:  Over to the big

17   jail.

18          THE COURT:  They transferred him as an adult?

19          PROSPECTIVE JUROR NO. 19:  Yeah.  Yeah.  Yeah.

20          So it's -- it was just trouble --

21          THE COURT:  What happened with that charge

22   when he went to adult court?

23          PROSPECTIVE JUROR NO. 19:  Okay.  They gave

24   him youthful offender sentence.  And he completed that

25   and then he -- that's why I say this is the troubled

1    one.

2         Then he got out and he got with this

3    girlfriend and the girlfriend wasn't right and they

4    go -- trouble comes again.

5         THE COURT:  What was the trouble that came

6    again?

7         PROSPECTIVE JUROR NO. 19:  The trouble that

8    came again is the girlfriend and the family, whatever,

9    was involved in drugs.  So he was riding with them in

10   the car.  So, you know, from there, he -- I guess he

11   just took all the blame.

12        THE COURT:  So he got arrested for drugs?

13        PROSPECTIVE JUROR NO. 19:  Yeah.  He was in

14   the car with her and her family.

15        THE COURT:  What was he arrested for?

16   Possession?

17        PROSPECTIVE JUROR NO. 19:  Yeah.  Yeah.  Yeah.

18        THE COURT:  Possession of what?  Cocaine?

19        PROSPECTIVE JUROR NO. 19:  Yeah.  I guess so,

20   because I don't remember now.

21        THE COURT:  And what happened with that

22   charge?

23        PROSPECTIVE JUROR NO. 19:  Well, then, since

24   he put it all on hisself, then it was so much going on

25   in that case.  So right now I really don't -- can't

```
 1    give you a breakdown on everything.
 2            But then he got sentenced again.  So yeah.  So
 3    he's --
 4            THE COURT:  So he got sentenced for the drugs?
 5            PROSPECTIVE JUROR NO. 19:  Yeah.
 6            THE COURT:  Did he go to jail?
 7            PROSPECTIVE JUROR NO. 19:  He went to jail.
 8    At the time, you know, he had -- it was -- I don't
 9    know.  Everything went haywire.  So he wound up doing
10    time again.  So that's why I say this would be very
11    hard for me.
12            THE COURT:  He went to jail, got out and went
13    to jail again?
14            PROSPECTIVE JUROR NO. 19:  Yeah.
15            THE COURT:  And what did he go to jail for the
16    third time?
17            PROSPECTIVE JUROR NO. 19:  No.  This is the
18    second time.
19            THE COURT:  Just the second time.
20            PROSPECTIVE JUROR NO. 19:  Yeah.  Because he
21    was arrested, I think, in 1996 and then he came home
22    and he worked in the construction field and everything.
23            And I think it was way -- like in 2004 when he
24    got in trouble again.  So it was a couple of years.  He
25    was a grownup, you know, by that time.
```

1        THE COURT:  Is he still in jail?

2        PROSPECTIVE JUROR NO. 19:  Yes, he is.

3        THE COURT:  He's in jail now?

4        PROSPECTIVE JUROR NO. 19:  Yes.  That's why I

5    say it would be --

6        THE COURT:  Was it a state charge or federal?

7        PROSPECTIVE JUROR NO. 19:  A state charge.

8        THE COURT:  A state charge?

9        PROSPECTIVE JUROR NO. 19:  Yes.

10        THE COURT:  How long has he been in jail?

11        PROSPECTIVE JUROR NO. 19:  It was -- what is

12    this?  2009 now?  I think since 2005 or something like

13    that he's been in.  I'm not sure.

14        THE COURT:  For possession of drugs or for

15    drug trafficking?

16        PROSPECTIVE JUROR NO. 19:  No.  He was riding

17    in the car with his girlfriend and the family and they

18    stopped the car.  So, of course, the girlfriend didn't

19    go, but he went.  So it was difficult.

20        THE COURT:  Did you attend any of his

21    hearings?

22        PROSPECTIVE JUROR NO. 19:  Yeah.  At times, I

23    did, yes, when I wasn't working.  Yeah.

24        THE COURT:  Do you think he was treated fairly

25    by the criminal justice system?

1         PROSPECTIVE JUROR NO. 19:  Yes.  He was

2    treated fair.  But it was up to him to make the right

3    decision on a lot of things because he was, like,

4    26, 27.  So he was a full adult, you know.

5         THE COURT:  Do you think he was well

6    represented by his lawyer?

7         PROSPECTIVE JUROR NO. 19:  Oh, yes.  Yes.

8    Yes, he was.

9         THE COURT:  Is there anything about your son's

10   experience that would make it difficult for you to sit

11   and listen to the evidence in this case and be fair to

12   both the Government and the Defendants?

13        PROSPECTIVE JUROR NO. 19:  Well, it

14   wouldn't -- well, his case and their case is totally

15   different.  So it wouldn't be so hard sometimes.  It

16   wouldn't be so hard.

17        THE COURT:  It wouldn't be hard?

18        PROSPECTIVE JUROR NO. 19:  No.  Because this

19   is totally different.  It's not --

20        THE COURT:  So, then, it wouldn't affect you?

21        PROSPECTIVE JUROR NO. 19:  No.  It wouldn't

22   affect me.  It's not the same.

23        THE COURT:  Okay.  Your sinus situation:  Are

24   you taking medication for it?

25        PROSPECTIVE JUROR NO. 19:  Yeah.

```
 1            THE COURT:  Are you able to drive on the
 2   medication?
 3            PROSPECTIVE JUROR NO. 19:  Yes, I do.
 4            THE COURT:  And you work on it?
 5            PROSPECTIVE JUROR NO. 19:  Yeah.  I work on
 6   it, too.
 7            THE COURT:  You go to work?
 8            PROSPECTIVE JUROR NO. 19:  Yeah.  I go to work
 9   on it, too.  Yeah.  Okay.
10            THE COURT:  So there's a change in weather
11   today.  So it must be bothering you today.  Right?
12            PROSPECTIVE JUROR NO. 19:  Yeah.  But,
13   usually, when I go home, I take the drops, you know,
14   put the drops down in the ears and stuff.  Yeah.
15            THE COURT:  So, now let me ask the original
16   question that I asked you.
17            Now that you know what the charges are about,
18   is there anything that would prevent you from being
19   able to sit and listen to the evidence in this case and
20   be fair to both the Government and the Defendants?
21            PROSPECTIVE JUROR NO. 19:  I don't think it
22   would be nothing that would prevent me from making --
23            THE COURT:  Think so or know so?
24            PROSPECTIVE JUROR NO. 19:  I know so.
25            THE COURT:  Okay.
```

```
 1              PROSPECTIVE JUROR NO. 19:  Okay.

 2              THE COURT:  In this case, you may hear

 3    evidence that the Government used informants who are

 4    not United States citizens and who posed as

 5    terrorists/agents of Al-Qaeda.

 6              Do you have such strong feelings one way or

 7    the other that you would not be able to sit and listen

 8    to this evidence and be fair to both the Government and

 9    the Defendants?

10              PROSPECTIVE JUROR NO. 19:  Repeat that halfway

11    again, now.

12              THE COURT:  Sure.  Sure.

13              In this case, you may hear evidence that the

14    Government used informants who are not United States

15    citizens and who posed as terrorists/agents of

16    Al-Qaeda.

17              Do you have such strong feelings one way or

18    other that you would not be able to sit and listen to

19    this evidence and be fair to both the Government and

20    the Defendants?

21              PROSPECTIVE JUROR NO. 19:  No.

22              THE COURT:  Have you acquired any information

23    from newspaper, television, conversations or any other

24    sources about this case?

25              PROSPECTIVE JUROR NO. 19:  No.
```

1          THE COURT:  Do you read the *Miami Herald*,

2   *New Times* or *Sun-Sentinel* news publications either in

3   print or on-line?

4          PROSPECTIVE JUROR NO. 19:  No.  I normally

5   just watch the television news.

6          THE COURT:  Okay.  Have you read anything in

7   any newspaper or on the Internet or have you seen

8   anything on television or heard anything on the radio

9   about this case?

10          PROSPECTIVE JUROR NO. 19:  No.  No.

11          THE COURT:  Prior to coming to court

12   yesterday, have you followed the course of the

13   proceedings in this case that have led up to the trial?

14          PROSPECTIVE JUROR NO. 19:  Yes.  I have

15   followed the proceedings.

16          THE COURT:  Prior to coming to court.

17          Before you came to court yesterday, have

18   you -- did you know anything about the case before

19   coming to court yesterday?

20          PROSPECTIVE JUROR NO. 19:  No.

21          THE COURT:  Have you discussed this case with

22   anyone?

23          PROSPECTIVE JUROR NO. 19:  No.

24          THE COURT:  Do you have an open mind regarding

25   this case?

1              PROSPECTIVE JUROR NO. 19:  Yes.  I have an

2     open mind.  Yes.

3              THE COURT:  Have you formed an opinion

4     regarding any of the Defendants based upon any outside

5     information?

6              PROSPECTIVE JUROR NO. 19:  No.

7              THE COURT:  Do you have any beliefs, thoughts

8     or opinions which may cause you to decide this case on

9     anything other than the evidence you will hear at

10    trial?

11             PROSPECTIVE JUROR NO. 19:  No.

12             THE COURT:  Are you knowledgeable about the

13    history and practices of Islam?

14             PROSPECTIVE JUROR NO. 19:  No.  Not really.

15             THE COURT:  Are you knowledgeable about the

16    history and practices of the Moorish Science Temple?

17             PROSPECTIVE JUROR NO. 19:  No.

18             THE COURT:  Are you knowledgeable about the

19    Universal Divine Saviors?

20             PROSPECTIVE JUROR NO. 19:  No.

21             THE COURT:  Are you knowledgeable about the

22    history, teachings or practices of the Masons or are

23    you a member of any type of Masonic lodge?

24             PROSPECTIVE JUROR NO. 19:  No.

25             THE COURT:  Do you or family members or close

 1    friends have any prior or present military service?

 2              PROSPECTIVE JUROR NO. 19:  No.

 3              THE COURT:  Have you or any members of your

 4    family or close friends had any personal experience

 5    with acts of terrorism?

 6              PROSPECTIVE JUROR NO. 19:  No.

 7              THE COURT:  Do you know or do you have a

 8    family member or friend who knows someone who was a

 9    victim of a terrorist attack?

10              PROSPECTIVE JUROR NO. 19:  No.

11              THE COURT:  Have the events of September 11th

12    or any other terrorist act affected you to such an

13    extent that it would make it difficult for you to sit

14    and listen to the evidence in this case and be fair to

15    both the Government and the Defendants?

16              PROSPECTIVE JUROR NO. 19:  No.

17              THE COURT:  Have you or any family member or

18    close friend lost a job, a business contract or

19    experienced any other financial hardship as a result of

20    September 11th or any other terrorist attack?

21              PROSPECTIVE JUROR NO. 19:  No.

22              THE COURT:  Do you have an opinion as to who

23    was responsible for the attack on the United States on

24    September 11th, 2001?

25              PROSPECTIVE JUROR NO. 19:  No.

1          THE COURT:  Is there anything else you think

2     the Court or the attorneys should know that might

3     influence your ability to fairly and impartially judge

4     the evidence in this case and follow the Court's

5     instruction on the law?

6          PROSPECTIVE JUROR NO. 19:  No.

7          THE COURT:  Okay, ma'am.  If you would have a

8     seat outside and not discuss my questions with anyone.

9          Thank you.

10         PROSPECTIVE JUROR NO. 19:  Thank you.

11         THE COURT:  And thank you for your patience.

12         (Thereupon, Potential Juror No. 19 retired

13    from the courtroom and the following proceedings were

14    had:)

15         THE COURT:  No. 20.

16         MR. GREGORIE:  Your Honor, before that juror

17    comes in, can we have just one moment?

18         THE COURT:  Yes, Mr. Gregorie.

19         MR. GREGORIE:  I'm sorry, your Honor.

20         Your Honor, when this juror first started

21    answering questions, she said -- told your Honor she

22    couldn't be fair, said it had something to do with her

23    son.

24         In keeping with the rules this morning, if I

25    might suggest, I think it requires another question,

1    your Honor.  I think she needs to be asked can she put

2    aside what happened to her son and still be fair in

3    ruling in this case.

4         THE COURT:  I didn't ask her that?

5         MR. GREGORIE:  No, your Honor.  I don't

6    believe so.

7         THE COURT:  I asked, "Is there anything about

8    your son's experience that would make it difficult for

9    you to sit and listen to the evidence in this case and

10   be fair to both the Government and the Defendants?"

11        Do you want me to go further than that?

12        MR. GREGORIE:  I was a little confused, your

13   Honor, because when she first walked in, she was

14   totally, "I can't be fair in this case."

15        And then your Honor went into the other

16   questions and she told her story about what happened to

17   her son and then it sort of disappeared, Judge.  I'm a

18   little confused by her answers.

19        THE COURT:  Okay.  I had thought about going

20   back to it, but I didn't.

21        Will you ask her to come back in, please.

22   No. 19.

23        Sometimes I think people are nervous or they

24   see it as their way out.

25             (Thereupon, Potential Juror No. 19 entered the

```
 1   courtroom and the following proceedings were had:)

 2        THE COURT:  Ma'am, when you first came in a

 3   few moments ago and you started to tell me about your

 4   son, you said, "It would be pretty hard for me to make

 5   a good decision in this case."

 6        What did you mean by that?

 7        PROSPECTIVE JUROR NO. 19:  Because back then

 8   he was young.  He was, like, 16.  But now he's -- I

 9   think my son is, like, 28 now.

10        And sometimes I just -- you know, but -- it

11   just -- you know, how can I say it?  You know,

12   everything has sons, you know.  They have good sons.

13   They have bad sons.

14        And no two sons are alike.  And sometimes --

15   this was just a special one because he was the oldest.

16   He always just stays on my mind all the time.  So

17   that's what I mean.

18        THE COURT:  Would you be able to put aside

19   your son's experiences and what happened to him --

20        PROSPECTIVE JUROR NO. 19:  Yeah.  I --

21        THE COURT:  Let me finish my question.  Okay?

22        PROSPECTIVE JUROR NO. 19:  Okay.

23        THE COURT:  -- and sit and listen to the

24   evidence in this case and make a determination solely

25   on the evidence presented here in the courtroom?
```

1     PROSPECTIVE JUROR NO. 19:  Yes.  Because I've

2  learned to live with my son, whatever happened to him,

3  and accept it, you know, because he's a grown man now.

4  So, you know, that's what's important.

5     THE COURT:  So the fact that your son got into

6  trouble:  Would that affect your ability to sit and

7  listen to the evidence and make a determination of this

8  case solely on the evidence presented at trial?

9     PROSPECTIVE JUROR NO. 19:  No.

10     THE COURT:  Okay, ma'am.  Thank you.

11     PROSPECTIVE JUROR NO. 19:  Okay.

12     (Thereupon, Potential Juror No. 19 retired

13  from the courtroom and the following proceedings were

14  had:)

15     THE COURT:  Are we ready to go on to the next

16  juror?

17     Mr. Gregorie?

18     MR. GREGORIE:  Thank you, Judge.

19     THE COURT:  Juror 20.

20     Maybe she was concerned that she didn't bring

21  it up yesterday.  Sometimes people get very nervous if

22  they forgot to say something.

23     (Thereupon, Potential Juror No. 20 entered the

24  courtroom and the following proceedings were had:)

25     THE COURT:  Hello.

```
 1              PROSPECTIVE JUROR NO. 20:  Hello.

 2              THE COURT:  Do you want to stand at the podium

 3   or do you want to sit?  It's up to you.

 4              PROSPECTIVE JUROR NO. 20:  Can I sit?

 5              THE COURT:  Sure.

 6              PROSPECTIVE JUROR NO. 20:  Okay.

 7              THE COURT:  In this case, the Government has

 8   alleged that the Defendants were engaged in

 9   conspiracies to commit various violations of federal

10   laws regarding terrorist activities.

11              The charges include conspiracies or agreements

12   to provide material support and resources to agents of

13   Al-Qaeda in conspiring to blow up the Sears Tower in

14   Chicago and several federal buildings in a planned war

15   against the United States.

16              Given that, is there anything that would

17   prevent you from being able to sit and listen to the

18   evidence in this case and be fair to both the

19   Government and the Defendants?

20              PROSPECTIVE JUROR NO. 20:  We have to take

21   a --

22              THE COURT:  I'm sorry?

23              PROSPECTIVE JUROR NO. 20:  Yeah.  We have

24   to -- we supposed to do something about it, to defend

25   themselves, to defend themselves, from the --
```

```
 1              THE COURT:  Did you understand my question,

 2    ma'am?

 3              PROSPECTIVE JUROR NO. 20:  No.

 4              THE COURT:  No?

 5              PROSPECTIVE JUROR NO. 20:  No.

 6              THE COURT:  I'm going ask it again.  Okay?

 7    Did I talk too fast for you?  Should I go a little bit

 8    slower?

 9              PROSPECTIVE JUROR NO. 20:  Slowly.

10              THE COURT:  I'll slow it down a little bit.

11    Sorry.  I've been -- I've had a busy day.  So I'm

12    probably moving pretty fast.  So I'll slow down for

13    you.  Okay?

14              PROSPECTIVE JUROR NO. 20:  Okay.

15              THE COURT:  We'll try again.

16              In this case, the Government has alleged that

17    the Defendants were engaged in conspiracies to commit

18    various violations of federal laws regarding terrorist

19    activities.

20              The charges include conspiracies or agreements

21    to provide material support and resources to agents of

22    Al-Qaeda in conspiring to blow up the Sears Tower in

23    Chicago and several federal buildings in a planned war

24    against the United States.

25              Did you understand me?
```

1          PROSPECTIVE JUROR NO. 20:  Yes.

2          THE COURT:  Okay.  Given that, is there

3    anything that would prevent you from being able to sit

4    and listen to the evidence in this case and be fair to

5    both the Government and the Defendants?

6          PROSPECTIVE JUROR NO. 20:  They is Defendants.

7    Put it prison.  How is them?

8          THE COURT:  You're with them?

9          PROSPECTIVE JUROR NO. 20:  No, I don't.  No.

10         THE COURT:  You're not with them?

11         PROSPECTIVE JUROR NO. 20:  No.  No.  No.

12         THE COURT:  I'm trying to understand what you

13   said.

14         PROSPECTIVE JUROR NO. 20:  Yeah.  We did -- we

15   need to defend ourself, to arrest them, put them in

16   prison.

17         THE COURT:  Okay.

18         PROSPECTIVE JUROR NO. 20:  Put them in prison.

19         THE COURT:  Do you understand, ma'am, that

20   every Defendant is presumed innocent?

21         PROSPECTIVE JUROR NO. 20:  No.  It not

22   innocent.

23         THE COURT:  No?

24         PROSPECTIVE JUROR NO. 20:  No.  They're not

25   innocent.

```
 1              THE COURT:  They're not innocent?
 2              PROSPECTIVE JUROR NO. 20:  No.
 3              THE COURT:  Do you understand that, when
 4    somebody is charged with a crime, that they are
 5    presumed innocent?
 6              PROSPECTIVE JUROR NO. 20:  They're guilty.
 7    Guilty.  It's -- why is guilty.
 8              THE COURT:  When they're charged with a
 9    crime --
10              PROSPECTIVE JUROR NO. 20:  Yeah.  Is guilty.
11    Yeah.  Guilty.
12              THE COURT:  Do you understand that, in the
13    United States, when somebody is charged with a crime,
14    they're presumed innocent and the Government has to
15    prove the case against them beyond a reasonable doubt?
16    Do you understand that?
17              PROSPECTIVE JUROR NO. 20:  Yeah.  Understand
18    it.  They're guilty for me.
19              THE COURT:  Okay.
20              PROSPECTIVE JUROR NO. 20:  Guilty.
21              THE COURT:  Do you understand that the
22    Government has the burden of proving a defendant guilty
23    beyond a reasonable doubt?
24              PROSPECTIVE JUROR NO. 20:  (No response.)
25              THE COURT:  Do you understand that?
```

```
 1              PROSPECTIVE JUROR NO. 20:  No.

 2              THE COURT:  No?

 3              PROSPECTIVE JUROR NO. 20:  No.

 4              THE COURT:  Do you understand that every

 5     Defendant charged with a crime is presumed innocent

 6     under the United States Constitution?  Do you

 7     understand that?

 8              PROSPECTIVE JUROR NO. 20:  Yeah.  They're

 9     guilty.  Not innocent.  Guilty.

10              THE COURT:  If you could have a seat outside

11     and not discuss my questions with anyone.

12              PROSPECTIVE JUROR NO. 20:  Okay.  Thank you.

13              (Thereupon, Potential Juror No. 20 retired

14     from the courtroom and the following proceedings were

15     had:)

16              THE COURT:  Need I inquire any further?

17              MR. VEREEN:  No, your Honor.

18              MR. CLARK:  No, Judge.

19              MS. JHONES:  I think the Government wants her

20     on the jury, though, your Honor.

21              THE COURT:  I don't know.  You know something?

22     I didn't have this impression about her yesterday at

23     all.

24              MS. JHONES:  It's also part of the language.

25              THE COURT:  Sometimes they go over the
```

```
 1    questionnaires with someone and they come in and answer

 2    them.  But I certainly didn't have the impression

 3    yesterday -- I don't have anything about her

 4    understanding of the language.

 5            But does someone want to make a motion?

 6            MS. JHONES:  Move for cause, your Honor.

 7            MR. VEREEN:  Motion.

 8            THE COURT:  Any objection?

 9            MR. GREGORIE:  No objection, your Honor.

10            THE COURT:  Excused for cause.

11            MR. VEREEN:  I second it.

12            THE COURT:  I tried.

13            Juror No. 21.

14            (Thereupon, Potential Juror No. 21 entered the

15    courtroom and the following proceedings were had:)

16            THE COURT:  Hello.

17            PROSPECTIVE JUROR NO. 21:  Hello.

18            THE COURT:  How are you?

19            PROSPECTIVE JUROR NO. 21:  Good.

20            THE COURT:  Do you want to stand there or

21    would you prefer to sit?  It's up to you.

22            PROSPECTIVE JUROR NO. 21:  I'll stand.

23            THE COURT:  In this case, the Government has

24    alleged that the Defendants were engaged in

25    conspiracies to commit various violations of federal
```

1     laws regarding terrorist activities.

2           The charges include conspiracies or agreements

3     to provide material support and resources to agents of

4     Al-Qaeda in conspiring to blow up the Sears Tower in

5     Chicago and several federal buildings in a planned war

6     against the United States.

7           Given that, is there anything that would

8     prevent you from being able sit and listen to the

9     evidence in this case and be fair to both the

10    Government and the Defendants?

11          PROSPECTIVE JUROR NO. 21:  No.

12          THE COURT:  In this case, you may hear

13    evidence that the Government used informants who are

14    not United States citizens and who posed as

15    terrorists/agents of Al-Qaeda.

16          Do you have such strong feelings one way or

17    the other that you would not be able to sit and listen

18    to this evidence and be fair to both the Government and

19    the Defendants?

20          PROSPECTIVE JUROR NO. 21:  No.

21          THE COURT:  Have you acquired any information

22    from newspaper, television, conversations or any other

23    sources about this case?

24          PROSPECTIVE JUROR NO. 21:  No.

25          THE COURT:  Do you read the *Miami Herald*,

1    *New Times* or *Sun-Sentinel* news publications either in

2    print or on-line?

3              PROSPECTIVE JUROR NO. 21:  Not on a daily

4    basis.

5              THE COURT:  Which one do you read?

6              PROSPECTIVE JUROR NO. 21:  The *Miami Herald*.

7              THE COURT:  Okay.  Have you read anything in

8    any newspaper or on the Internet or have you seen

9    anything on television or heard anything on the radio

10   about this case?

11             PROSPECTIVE JUROR NO. 21:  No.  I think -- I

12   don't know when it happened --

13             THE COURT:  You can move that microphone up or

14   we can move up the -- will you move up the podium for

15   her so she can be a little bit more comfortable?

16             THE COURT SECURITY OFFICER:  Yes, ma'am.

17             PROSPECTIVE JUROR NO. 21:  I've heard about

18   it, but I don't know about it.  I've heard something a

19   long time ago, I think, about --

20             THE COURT:  What did you hear?

21             PROSPECTIVE JUROR NO. 21:  I just heard that

22   there was some guys trying to blow up the building.

23   That's it.  A building.  It didn't interest me.  So I

24   didn't get into it.

25             THE COURT:  Okay.  Have you followed the

1   proceedings leading up to this trial closely before you

2   came to court this week?

3        PROSPECTIVE JUROR NO. 21:  No.  No.  I don't

4   know what's going on.

5        THE COURT:  Have you discussed this case with

6   anyone?

7        PROSPECTIVE JUROR NO. 21:  No.

8        THE COURT:  Did you discuss -- you said you

9   heard about some guys.  It didn't interest you.

10        Where did you hear it from?

11        PROSPECTIVE JUROR NO. 21:  I don't know.  It

12   was years ago.  I think -- wasn't this close to, like,

13   9/11?

14        THE COURT:  Okay.

15        PROSPECTIVE JUROR NO. 21:  Wasn't this

16   somewhere around that time?

17        THE COURT:  The charges are from 2005 to 2006.

18        PROSPECTIVE JUROR NO. 21:  Oh.  Well, back

19   then, that's when I heard about it.

20        THE COURT:  So when you say you heard about

21   it, do you remember where you heard about it?

22        PROSPECTIVE JUROR NO. 21:  Probably off the

23   news on the TV.

24        THE COURT:  Okay.  Have you discussed this

25   case with anyone?

```
 1          PROSPECTIVE JUROR NO. 21:  No.

 2          THE COURT:  Do you have an open mind regarding

 3    this case?

 4          PROSPECTIVE JUROR NO. 21:  Yes.

 5          THE COURT:  Have you formed an opinion

 6    regarding any of the Defendants based upon any outside

 7    information, including what you heard probably on TV?

 8          PROSPECTIVE JUROR NO. 21:  No.  Because I just

 9    heard about it and it's not something that I would -- I

10    was interested in trying to find out what was going on.

11          THE COURT:  Okay.  Do you have any beliefs,

12    thoughts or opinions which may cause you to decide this

13    case on anything other than the evidence presented here

14    at trial?

15          PROSPECTIVE JUROR NO. 21:  No.

16          THE COURT:  Are you knowledgeable about the

17    history and practice of Islam?

18          PROSPECTIVE JUROR NO. 21:  No.

19          THE COURT:  Are you knowledgeable about the

20    history and practice of the Moorish Science Temple?

21          PROSPECTIVE JUROR NO. 21:  No.

22          THE COURT:  Are you knowledgeable about the

23    Universal Divine Saviors?

24          PROSPECTIVE JUROR NO. 21:  No.

25          THE COURT:  Are you a member of any type of
```

1  Masonic lodge or are you knowledgeable about the

2  history, teachings or practices of the Masons?

3          PROSPECTIVE JUROR NO. 21:  No.

4          THE COURT:  Have you or any of your family

5  members ever visited the Middle East?

6          PROSPECTIVE JUROR NO. 21:  No.

7          THE COURT:  Do you or family members or close

8  friends have any prior or present military service?

9          PROSPECTIVE JUROR NO. 21:  I have a

10 brother-in-law that's in the service.  Oh.  My son went

11 to the service.

12         THE COURT:  Okay.  Let's start with your son.

13         PROSPECTIVE JUROR NO. 21:  He was in the

14 Air Force.

15         THE COURT:  When was that?

16         PROSPECTIVE JUROR NO. 21:  1996, right out of

17 high school.

18         THE COURT:  And where was his place of

19 service?

20         PROSPECTIVE JUROR NO. 21:  Germany.

21         THE COURT:  Did he see any combat?

22         PROSPECTIVE JUROR NO. 21:  No.  He was an

23 accountant.

24         THE COURT:  Was he in the military police or

25 shore patrol?

```
1              PROSPECTIVE JUROR NO. 21:  No.  He worked for

2    the Department of the Defense, DEFAS, Department of

3    Finance something.

4              THE COURT:  Okay.  Did he have any

5    disciplinary action taken against him?

6              PROSPECTIVE JUROR NO. 21:  No.

7              THE COURT:  Did he receive an honorable

8    discharge?

9              PROSPECTIVE JUROR NO. 21:  Yes.

10             THE COURT:  Do you know what his rank was when

11   he was discharged?

12             PROSPECTIVE JUROR NO. 21:  I think maybe like

13   a GS-5 or something like that.

14             THE COURT:  Okay.  How about your

15   brother-in-law?  What branch of the service was he in?

16             PROSPECTIVE JUROR NO. 21:  Air Force.

17             THE COURT:  Also Air Force.  Okay.

18             When was that?

19             PROSPECTIVE JUROR NO. 21:  He is still in the

20   Air Force.

21             THE COURT:  What have been his places of

22   service?

23             PROSPECTIVE JUROR NO. 21:  Kansas.  They were

24   in Germany, also, in Europe.

25             THE COURT:  Has he seen any combat?
```

```
1              PROSPECTIVE JUROR NO. 21:  No.

2              THE COURT:  Has he been in the military police

3    or on shore patrol?

4              PROSPECTIVE JUROR NO. 21:  No.  He work with

5    the airplanes.

6              THE COURT:  Has he received any disciplinary

7    action?

8              PROSPECTIVE JUROR NO. 21:  No.

9              THE COURT:  Do you know his rank?

10             PROSPECTIVE JUROR NO. 21:  He's a chief master

11   sergeant.

12             THE COURT:  Have you or any members of your

13   family or close friends had any personal experience

14   with acts of terrorism?

15             PROSPECTIVE JUROR NO. 21:  No.

16             THE COURT:  Do you know or do you have a

17   family member or friends who knows someone who was a

18   victim of a terrorist attack?

19             PROSPECTIVE JUROR NO. 21:  No.

20             THE COURT:  Have the events of September 11th

21   or any other terrorist act affected you to such an

22   extent that it would make it difficult for you to sit

23   and listen to the evidence in this case and be fair to

24   both the Government and the Defendants?

25             PROSPECTIVE JUROR NO. 21:  No.
```

1          THE COURT:  Have you or any family member or

2     close friend lost a job, a business contract or

3     experienced any other financial hardship as a result of

4     September 11th or any other terrorist attack?

5          PROSPECTIVE JUROR NO. 21:  No.

6          THE COURT:  Do you have an opinion as to who

7     was responsible for the attack on the United States on

8     September 11th, 2001?

9          PROSPECTIVE JUROR NO. 21:  Well, now, I can't

10    say personally.  But, you know, they said that our

11    prior President.  So....

12         THE COURT:  Okay.  Is there anything else you

13    think the Court or the attorneys should know that might

14    influence your ability to fairly and impartially judge

15    the evidence in this case and follow the Court's

16    instructions on the law?

17         PROSPECTIVE JUROR NO. 21:  No.

18         THE COURT:  All right, ma'am.  If you would,

19    have a seat outside and not discuss my questions with

20    anyone.

21         Thank you.

22         (Thereupon, Potential Juror No. 21 retired

23    from the courtroom and the following proceedings were

24    had:)

25         THE COURT:  Juror No. 22.

```
 1              (Thereupon, Potential Juror No. 22 entered the
 2    courtroom and the following proceedings were had:)
 3              THE COURT:  Hello.
 4              PROSPECTIVE JUROR NO. 22:  Hello.
 5              THE COURT:  Is standing there okay or would
 6    you prefer to sit?
 7              PROSPECTIVE JUROR NO. 22:  I can stand.
 8              THE COURT:  Okay.  Is it too high for you?
 9              PROSPECTIVE JUROR NO. 22:  It's fine.
10              THE COURT:  In this case, the Government has
11    alleged that the Defendants were engaged in
12    conspiracies to commit various violations of federal
13    laws regarding terrorist activities.
14              The charges include conspiracies or agreements
15    to provide material support and resources to agents of
16    Al-Qaeda in conspiring to blow up the Sears Tower in
17    Chicago and several federal buildings in a planned war
18    against the United States.
19              Given that, is there anything that would
20    prevent you from being able to sit and listen to the
21    evidence in this case and be fair to both the
22    Government and the Defendants?
23              PROSPECTIVE JUROR NO. 22:  No.
24              THE COURT:  In this case, you may hear
25    evidence that the Government used informants who were
```

1   not United States citizens and who posed as

2   terrorists/agents of Al-Qaeda.

3            Do you have such strong feelings one way or

4   the other that you would not be able to sit and listen

5   to this evidence and be fair to both the Government and

6   the Defendants?

7            PROSPECTIVE JUROR NO. 22:  No.

8            THE COURT:  Have you acquired any information

9   from newspaper, television, conversations or any other

10  sources about this case?

11           PROSPECTIVE JUROR NO. 22:  Yes.

12           THE COURT:  And from what sources?

13           PROSPECTIVE JUROR NO. 22:  Newspaper and

14  Internet, television.

15           THE COURT:  Okay.  Let's start with the

16  newspaper.

17           What have you read in the newspaper?

18           PROSPECTIVE JUROR NO. 22:  Well, it was awhile

19  back, I think from when the case first started.  I

20  think I read something -- I'm pretty sure it was in the

21  *New Times* -- the Miami *New Times* about the case and

22  about -- I don't remember the details, but it was just

23  basically saying the -- what -- the evidence the

24  Government had against the Defendants and how it wasn't

25  enough to support the case and just the basic opinion

```
 1    of the case itself.

 2              THE COURT:  What about on the Internet?

 3              PROSPECTIVE JUROR NO. 22:  I did read recently

 4    before I actually reported to jury duty about this

 5    case, that it was starting again and the mistrials that

 6    it had.  And I sort of assumed it was this one after

 7    finding out it was in federal court.

 8              THE COURT:  Do you remember what site you read

 9    that on?

10              PROSPECTIVE JUROR NO. 22:  It could be -- I

11    don't know.  I check MSNBC, CNN, all those regulars.

12    One of those.

13              THE COURT:  And television.  Was that the

14    third one?

15              PROSPECTIVE JUROR NO. 22:  Right.

16              Probably CNN or one of those channels.  They

17    talked about the case, I think.  But it was awhile ago.

18              THE COURT:  Okay.  Do you read the *Miami*

19    *Herald*, *New Times* or *Sun-Sentinel* news publications

20    either in print or on-line?

21              PROSPECTIVE JUROR NO. 22:  Yes.

22              THE COURT:  Which one?

23              PROSPECTIVE JUROR NO. 22:  The *New Times* and

24    *Herald*.

25              THE COURT:  Okay.  Other than what you've told
```

 1    me, have you read anything in any newspaper or on the

 2    Internet or have you seen anything on television or

 3    heard anything on the radio about this case?

 4         PROSPECTIVE JUROR NO. 22:  No.  Just basically

 5    what I read in the past about -- and then just recently

 6    when they were discussing the trial being brought up

 7    again.

 8         THE COURT:  Being --

 9         PROSPECTIVE JUROR NO. 22:  Brought up again,

10    starting up again.

11         THE COURT:  Have you followed the course of

12    the proceedings prior to coming to court yesterday

13    closely?

14         PROSPECTIVE JUROR NO. 22:  Not closely.  But

15    when I would see an article that happened to be in the

16    front page of one of the on-line newspapers, I read it.

17    I would read it.

18         THE COURT:  Okay.  Have you discussed this

19    case with anyone?

20         PROSPECTIVE JUROR NO. 22:  No.

21         THE COURT:  Do you have an open mind regarding

22    this case?

23         PROSPECTIVE JUROR NO. 22:  Well, it's a little

24    difficult, because I agree with a lot of the opinions

25    in the newspaper and the article I read, if it's

1    factual.

2              THE COURT:  That would be the *New Times*?

3              PROSPECTIVE JUROR NO. 22:  Yes.

4              THE COURT:  Have you formed an opinion

5    regarding any of the Defendants based upon any outside

6    information, including the *New Times* article?

7              PROSPECTIVE JUROR NO. 22:  No.  Not really.

8              THE COURT:  So when you say you agree with the

9    *New Times*, what do you agree with?

10             PROSPECTIVE JUROR NO. 22:  Well, basically,

11   more about the portion of the evidence that was

12   presented and the strength of it.

13             THE COURT:  Okay.  And what about the portion

14   of the evidence and the strength of it?

15             PROSPECTIVE JUROR NO. 22:  Well, the

16   article that -- what I remember what it was about was

17   just saying that there wasn't enough evidence to

18   support the charges.  And from what I remember from

19   what I read in the article, it made sense to me.

20             THE COURT:  So that's what you agree with?

21             PROSPECTIVE JUROR NO. 22:  Yes.

22             THE COURT:  Would you be able to put aside

23   that opinion and sit and listen to the evidence in this

24   case and make a determination solely on the evidence

25   presented at trial?

```
 1              PROSPECTIVE JUROR NO. 22:  I think so.
 2              THE COURT:  Think so or know so?
 3              PROSPECTIVE JUROR NO. 22:  I -- yes.
 4              THE COURT:  Do you have any beliefs, thoughts
 5   or opinions which may cause you to decide this case on
 6   anything other than the evidence you will hear at
 7   trial?
 8              PROSPECTIVE JUROR NO. 22:  No.
 9              THE COURT:  Are you knowledgeable about the
10   history and practice of Islam?
11              PROSPECTIVE JUROR NO. 22:  Just the basics.  I
12   wouldn't say knowledgeable.
13              THE COURT:  Where do you get that information
14   from?
15              PROSPECTIVE JUROR NO. 22:  Whatever.  The
16   Internet or research.  I did take a few classes in
17   college for religion.  So what I recall from that.
18              THE COURT:  Okay.  Are you knowledgeable about
19   the history and practices of the Moorish Science
20   Temple?
21              PROSPECTIVE JUROR NO. 22:  No.
22              THE COURT:  Are you knowledgeable about the
23   Universal Divine Saviors?
24              PROSPECTIVE JUROR NO. 22:  No.
25              THE COURT:  Are you knowledgeable about the
```

1   history, teachings or practices of the Masons or are

2   you a member of any type of Masonic lodge?

3           PROSPECTIVE JUROR NO. 22:  No.

4           THE COURT:  Have you or any of your family

5   members ever visited the Middle East?

6           PROSPECTIVE JUROR NO. 22:  No.

7           THE COURT:  Do you or family member or close

8   friends have any prior or present military service?

9           PROSPECTIVE JUROR NO. 22:  No.

10          THE COURT:  Have you or any members of your

11  family or close friends had any personal experience

12  with acts of terrorism?

13          PROSPECTIVE JUROR NO. 22:  Well, being from

14  Colombia, my family -- we did have some encounters

15  there with the guerrilla.  But that was before I was

16  even born.  So I've just heard through the family

17  stories.

18          THE COURT:  Would you be able to put aside

19  whatever personal experience you or members of your

20  family have with acts of terrorism and sit and listen

21  to the evidence and make a determination on this case

22  solely on the evidence presented at trial?

23          PROSPECTIVE JUROR NO. 22:  Yes.

24          THE COURT:  Do you know or do you have a

25  family member or friend who knows someone who was a

1    victim of a terrorist attack?

2          PROSPECTIVE JUROR NO. 22:  No.

3          THE COURT:  Have the events of September 11th

4    or any other terrorist act affected you to such an

5    extent that it would make it difficult for you to sit

6    and listen to the evidence in this case and be fair to

7    both the Government and the Defendants?

8          PROSPECTIVE JUROR NO. 22:  No.

9          THE COURT:  Have you or any family member or

10   close friend lost a job, a business contract or

11   experienced any other financial hardship as a result of

12   September 11th or any other terrorist attack?

13         PROSPECTIVE JUROR NO. 22:  No.

14         THE COURT:  Do you have an opinion as to who

15   was responsible for the attack on the United States on

16   September 11th, 2001?

17         PROSPECTIVE JUROR NO. 22:  Yes.

18         THE COURT:  And who do you think was

19   responsible?

20         PROSPECTIVE JUROR NO. 22:  Al-Qaeda.

21         THE COURT:  Is there anything else you think

22   the Court or the attorneys should know that might

23   influence your ability to fairly and impartially judge

24   the evidence in this case and follow the Court's

25   instructions on the law?

```
 1              PROSPECTIVE JUROR NO. 22:  No.

 2              THE COURT:  Thank you, ma'am.

 3              If you would have a seat outside and not

 4    discuss my questions with anyone.

 5              PROSPECTIVE JUROR NO. 22:  Thank you.

 6              (Thereupon, Potential Juror No. 22 retired

 7    from the courtroom and the following proceedings were

 8    had:)

 9              THE COURT:  23, please.

10              MS. ARANGO:  Judge, may we....

11              THE COURT:  One moment.

12              Yes.

13              MS. ARANGO:  Judge, on the critical point

14    about whether or not she can set her bias aside or her

15    opinions aside, she said, "I think so."

16              And then, when you said, "Think so or know

17    so?", she said, "I" -- there was a long hesitation --

18    "Yes."  And it was very tentative.

19              I don't know how clear it was in the record,

20    but I sensed some qualification in just the way she

21    responded.

22              I'd like some further inquiry on there and

23    perhaps some inquiry about understanding -- whether or

24    not she can listen to the Government's case with, you

25    know, an open and impartial mind and, if the Government
```

1    met -- you know, if the Government met its burden of

2    proving the Defendants guilty beyond a reasonable

3    doubt, could she find the Defendants guilty.  And you

4    can ask the contrary as well.

5            But I think some of that inquiry needs to be

6    done with her because it was clear that she formed an

7    opinion.  She stated what her opinion was.  And then,

8    when you asked her if she can put it aside, I thought

9    her response was a bit qualified.

10           THE COURT:  I probably should have followed up

11   on the, "Yes."

12           Let's bring in Juror No. 22 again, please.

13           (Thereupon, Potential Juror No. 22 entered the

14   courtroom and the following proceedings were had:)

15           THE COURT:  A few more questions, ma'am.

16           When you were telling me about the *New Times*

17   article, you said that what you remembered was it was

18   saying that there wasn't enough evidence to support the

19   charges and, from what you remember about reading the

20   article, it made sense to you.

21           And I asked you if that's what you agree with.

22           PROSPECTIVE JUROR NO. 22:  That's correct.

23           THE COURT:  You said, "Yes."

24           PROSPECTIVE JUROR NO. 22:  Yes.

25           THE COURT:  Okay.  I then asked you, "Would

102

1    you be able to put aside that opinion and sit and

2    listen to the evidence in this case and make a

3    determination solely on the evidence presented at

4    trial?"

5           You said, "I think so."

6           And I asked you, "Think so or know so?"

7           So how would you answer that?

8           PROSPECTIVE JUROR NO. 22:  I mean, with

9    already knowing some of the details and trying to

10   completely exclude that, that would be a little

11   difficult.  But I could definitely put it aside and

12   just concentrate on what was given in court only.

13          THE COURT:  Well, on one hand, you said it

14   would be difficult to set it aside, and then you said

15   you can put it aside.

16          Is there hesitation as to whether or not you

17   could be able to do that?

18          PROSPECTIVE JUROR NO. 22:  I would have to say

19   "yes."

20          THE COURT:  That there is hesitation?

21          PROSPECTIVE JUROR NO. 22:  Yes.

22          THE COURT:  Okay, ma'am.  Thank you.

23          PROSPECTIVE JUROR NO. 22:  Thanks.

24          (Thereupon, Potential Juror No. 22 retired

25   from the courtroom and the following proceedings were

```
1    had:)
2           MS. ARANGO:  Judge, move to strike for cause.
3           THE COURT:  Any objection?
4           MR. LEVIN:  No, your Honor.
5           THE COURT:  Excused for cause.
6           Juror No. 23.
7           (Thereupon, Potential Juror No. 23 entered the
8    courtroom and the following proceedings were had:)
9           THE COURT:  Hello.  You can stand at the
10   podium, sir, or have a seat.  It's up to you.
11          In this case, the Government has alleged that
12   the Defendants were engaged in conspiracies to commit
13   various violations of federal laws regarding terrorist
14   activities.
15          The charges include conspiracies or agreements
16   to provide material support and resources to agents of
17   Al-Qaeda in conspiring to blow up the Sears Tower in
18   Chicago and several federal buildings in a planned war
19   against the United States.
20          Given that, is there anything that would
21   prevent you from being able to sit and listen to the
22   evidence in this case and be fair to both the
23   Government and the Defendants?
24          PROSPECTIVE JUROR NO. 23:  No, ma'am.
25          THE COURT:  In this case, you may hear
```

1   evidence that the Government used informants who were

2   not United States citizens and who posed as

3   terrorists/agents of Al-Qaeda.

4        Do you have such strong feelings one way or

5   the other that you would not be able to sit and listen

6   to this evidence and be fair to both the Government and

7   the Defendants?

8        PROSPECTIVE JUROR NO. 23:  No, ma'am.

9        THE COURT:  Have you acquired any information

10   from newspaper, television, conversations or any other

11   sources about this case?

12        PROSPECTIVE JUROR NO. 23:  I mean, when it

13   first -- I heard about it, like, a couple of years

14   back, but not recently.

15        THE COURT:  And do you remember from what

16   source you heard about it a couple years ago?

17        PROSPECTIVE JUROR NO. 23:  Probably *ABC News*.

18        THE COURT:  The television news, ABC?

19        PROSPECTIVE JUROR NO. 23:  Yes, ma'am.

20        THE COURT:  And do you remember what you saw

21   and heard on the TV?

22        PROSPECTIVE JUROR NO. 23:  I think I only

23   heard the verdict or the nonverdict or something.

24        THE COURT:  I'm sorry?

25        PROSPECTIVE JUROR NO. 23:  Just towards the

```
 1    end, the decision or nondecision or a hung jury or

 2    something.

 3              THE COURT:  Okay.

 4              PROSPECTIVE JUROR NO. 23:  That's about it.

 5              THE COURT:  Do you read the Miami Herald,

 6    New Times or Sun-Sentinel news publications either in

 7    print or on-line?

 8              PROSPECTIVE JUROR NO. 23:  No, ma'am.

 9              THE COURT:  Have you read anything in any

10    newspaper or on the Internet or have you seen anything

11    on television or heard anything on the radio about this

12    case other than what you've already told me?

13              PROSPECTIVE JUROR NO. 23:  No, ma'am.

14              THE COURT:  Have you followed the course of

15    the proceedings leading up to this trial closely prior

16    to coming to court yesterday?

17              PROSPECTIVE JUROR NO. 23:  No, ma'am.

18              THE COURT:  Have you discussed this case with

19    anyone?

20              PROSPECTIVE JUROR NO. 23:  No, ma'am.

21              THE COURT:  Do you have an open mind regarding

22    this case?

23              PROSPECTIVE JUROR NO. 23:  Yes.

24              THE COURT:  Have you formed an opinion

25    regarding any of the Defendants based upon any outside
```

```
1    information?

2             PROSPECTIVE JUROR NO. 23:  No.

3             THE COURT:  Do you have any beliefs, thoughts

4    or opinions which may cause you to decide this case on

5    anything other than the evidence you will hear at

6    trial?

7             PROSPECTIVE JUROR NO. 23:  No, ma'am.

8             THE COURT:  Are you knowledgeable about the

9    history and practice of Islam?

10            PROSPECTIVE JUROR NO. 23:  No, ma'am.

11            THE COURT:  Are you knowledgeable about the

12   history and practices of the Moorish Science Temple?

13            PROSPECTIVE JUROR NO. 23:  No, ma'am.

14            THE COURT:  Are you knowledgeable about the

15   Universal Divine Saviors?

16            PROSPECTIVE JUROR NO. 23:  Who?  Jesus?

17            THE COURT:  No.

18            PROSPECTIVE JUROR NO. 23:  No, ma'am.

19            THE COURT:  Are you a member of any type of

20   Masonic lodge?

21            PROSPECTIVE JUROR NO. 23:  Yes, ma'am.

22            THE COURT:  Are you knowledgeable about the

23   history, teachings or practices of the Masons?

24            PROSPECTIVE JUROR NO. 23:  Yes, ma'am.

25            THE COURT:  Would you be able to put aside
```

1    whatever knowledge you have regarding the Masons and

2    your participation as a Mason and sit and listen to

3    this -- listen to the evidence presented at trial and

4    solely make a decision based upon the evidence

5    presented at trial?

6            PROSPECTIVE JUROR NO. 23:  Yes, ma'am.  That's

7    part of the teaching of the Masonic Order.  We should

8    not conflict with any governmental or religious

9    applications.

10           THE COURT:  Have you or any of your family

11   members ever visited the Middle East?

12           PROSPECTIVE JUROR NO. 23:  No, ma'am.

13           THE COURT:  Do you or family members or close

14   friends have any prior or present military service?

15           PROSPECTIVE JUROR NO. 23:  No, ma'am.

16           THE COURT:  Have you or any members of your

17   family or close friends had any personal experience

18   with acts of terrorism?

19           PROSPECTIVE JUROR NO. 23:  No, ma'am.

20           THE COURT:  Do you know or do you have a

21   family member or friend who knows someone who was a

22   victim of a terrorist attack?

23           PROSPECTIVE JUROR NO. 23:  No, ma'am.

24           THE COURT:  Have the events of September 11th

25   or any other terrorist act affected you to such an

1    extent that it would make it difficult for you to sit

2    and listen to the evidence in this case and be fair to

3    both the Government and the Defendants?

4            PROSPECTIVE JUROR NO. 23:  No, ma'am.

5            THE COURT:  Have you or any family member or

6    close friend lost a job, a business contract or

7    experienced any other financial hardship as a result of

8    September 11th or any other terrorist attack?

9            PROSPECTIVE JUROR NO. 23:  No, ma'am.

10           THE COURT:  Do you have an opinion as to who

11   was responsible for the attack on the United States on

12   September 11th, 2001?

13           PROSPECTIVE JUROR NO. 23:  Who was

14   responsible?

15           THE COURT:  Yes.

16           PROSPECTIVE JUROR NO. 23:  bin Laden.  Yes,

17   ma'am.

18           THE COURT:  Is there anything else you think

19   the Court or the attorneys should know that might

20   influence your ability to fairly and impartially judge

21   the evidence in this case and follow the Court's

22   instructions on the law?

23           PROSPECTIVE JUROR NO. 23:  I don't know how --

24   the relevancy.  But when I was -- my first year out of

25   college, I guess, 1992 to '94, I worked as a case

1    manager at a federal halfway house.

2           THE COURT:  From '92 to '94, you worked as a

3    case manager at a halfway house for --

4           PROSPECTIVE JUROR NO. 23:  Yeah.  They hired

5    me by mistake.  They thought I was a recreational

6    specialist.  So when they found out I wasn't, they

7    moved me to case management.

8           THE COURT:  It took them two years to find

9    out?

10          PROSPECTIVE JUROR NO. 23:  Yeah.  It took an

11   audit for them to notice that --

12          THE COURT:  Okay.

13          PROSPECTIVE JUROR NO. 23:  -- my degree had

14   "elementary education," not "physical education," on

15   it.

16          THE COURT:  Okay.  So you were the

17   recreational specialist at a halfway house?

18          PROSPECTIVE JUROR NO. 23:  Actually, I was the

19   case manager.  Yes, ma'am.

20          THE COURT:  Okay.  And would that affect your

21   ability to be a fair and impartial juror?

22          PROSPECTIVE JUROR NO. 23:  No, ma'am.

23          THE COURT:  Okay, sir.  If you would have a

24   seat outside and not discuss my questions with anyone.

25          PROSPECTIVE JUROR NO. 23:  Okay.

```
 1              (Thereupon, Potential Juror No. 23 retired

 2    from the courtroom and the following proceedings were

 3    had:)

 4              THE COURT:  Anything further on this juror?

 5    Anything further?

 6              MS. JHONES:  Your Honor, not from us, your

 7    Honor.

 8              THE COURT:  Okay.

 9              MS. ARANGO:  Could we have just a moment?

10              (Discussion had off the record amongst

11    counsel.)

12              MR. GREGORIE:  Your Honor, if you could ask

13    one or two more questions about the Masons, because, as

14    you know, some of the symbols that some of the

15    individuals in this case may be wearing may have some

16    Masonic connection.

17              If you could ask the juror if that would have

18    any influence on him in believing or disbelieving

19    witnesses or, if he sees any evidence in the case which

20    has any connection to the Masons, whether that would

21    have an effect on him.

22              MS. JHONES:  For whatever it's worth, your

23    Honor, I think that's a fair question.

24              THE COURT:  Okay.  Would you ask Juror No. 24

25    to come back in.
```

```
 1            MR. GREGORIE:  23, your Honor.

 2            THE COURT:  He's 23?

 3            MR. LEVIN:  23.

 4            MR. GREGORIE:  You were ready for 24, your

 5   Honor, but that was 23.

 6            THE COURT:  I just wrote it in the wrong box.

 7   This is 23.  Sorry.

 8            MR. GREGORIE:  Yes, your Honor.

 9            THE COURT:  Okay.  23.

10            (Thereupon, Potential Juror No. 23 entered the

11   courtroom and the following proceedings were had:)

12            THE COURT:  A few more questions, sir.

13            PROSPECTIVE JUROR NO. 23:  No problem.

14            THE COURT:  There may be evidence in this case

15   that some witnesses, either in court or through our

16   presentation of evidence, may be wearing apparel that

17   have Masonic symbols on them.

18            Would that affect your ability to sit and

19   listen to the evidence in this case and be fair to both

20   the Government and the Defendants?

21            PROSPECTIVE JUROR NO. 23:  No, ma'am.  Because

22   there are different types of Masonic orders.  You have

23   Prince Hall Masonic.  You have International Masons.

24   You have several different -- they even have a Martin

25   Luther King Masonic Order.  So, I mean, everyone tries
```

1    to be a Mason nowadays.  So, no, ma'am.

2         THE COURT:  Well, would you be more likely or

3    less likely to believe or disbelieve somebody because

4    they were wearing the symbols of a Masonic Order?

5         PROSPECTIVE JUROR NO. 23:  No, ma'am.  I would

6    be impartial.  A person is a person.

7         THE COURT:  Okay, sir.  Thank you.

8         PROSPECTIVE JUROR NO. 23:  That's it?

9         (Thereupon, Potential Juror No. 23 retired

10   from the courtroom and the following proceedings were

11   had:)

12        THE COURT:  I take it, Mr. Vereen, you are

13   still following my directive not to wear your Masonic

14   ring.  Correct?

15        MR. VEREEN:  Yes, ma'am.

16        MR. LEVIN:  Your Honor, Mr. Vereen is opting

17   for black gloves these days.

18        THE COURT:  That's what I heard.

19        MR. VEREEN:  It's rather cold in here, Judge.

20   I'm sitting right up here under the air conditioning.

21        THE COURT:  Has it gotten a little bit warmer?

22   We've put in a request.  You never know.

23        We're up to Juror No. 24.

24        (Thereupon, Potential Juror No. 24 entered the

25   courtroom and the following proceedings were had:)

```
 1              THE COURT:  Hello.

 2              PROSPECTIVE JUROR NO. 24:  Hello.

 3              THE COURT:  Are you more comfortable standing

 4    there or would you like to sit?

 5              PROSPECTIVE JUROR NO. 24:  Sitting would be

 6    better.

 7              THE COURT:  That's fine.  Anywhere is good.

 8    Anywhere.

 9              In this case, the Government has alleged that

10    the Defendants were engaged in conspiracies to commit

11    various violations of federal laws regarding terrorist

12    activities.

13              The charges include conspiracies or agreements

14    to provide material support and resources to agents of

15    Al-Qaeda in conspiring to blow up the Sears Tower in

16    Chicago and several federal buildings in a planned war

17    against the United States.

18              Given that, is there anything that would

19    prevent you from being able to sit and listen to this

20    evidence and be fair to both the Government and the

21    Defendants?

22              PROSPECTIVE JUROR NO. 24:  I did have trouble

23    with my trial.  But beyond that, no.

24              THE COURT:  I'm sorry?  I'm not following you.

25              PROSPECTIVE JUROR NO. 24:  I had gone through
```

```
 1   a court case myself, and I had trouble with that court

 2   case.  But beyond that --

 3          THE COURT:  Was that the automobile accident

 4   case?

 5          PROSPECTIVE JUROR NO. 24:  Yes.

 6          THE COURT:  How did you have trouble with your

 7   own trial?

 8          PROSPECTIVE JUROR NO. 24:  Well, I had trouble

 9   with my attorneys, and I had trouble with the final

10   verdict.

11          THE COURT:  Okay.  Does that have anything to

12   do with the type of charges here?

13          PROSPECTIVE JUROR NO. 24:  No.

14          THE COURT:  What was the trouble that you had?

15          PROSPECTIVE JUROR NO. 24:  I originally had

16   one attorney and I ended up transferred to a different

17   attorney who was not my original attorney.

18          THE COURT:  Okay.

19          PROSPECTIVE JUROR NO. 24:  So the outcome of

20   the case was not as favorable as it should have been

21   for me.

22          THE COURT:  Okay.  Would that affect your

23   ability to sit and be a fair and impartial juror in

24   this case?

25          PROSPECTIVE JUROR NO. 24:  I would try to be
```

```
 1    as impartial as possible.
 2              THE COURT:  But would you be able to be
 3    impartial?
 4              PROSPECTIVE JUROR NO. 24:  I may have trouble
 5    with attorneys.
 6              THE COURT:  Oh, you have problems with
 7    attorneys, in general?
 8              PROSPECTIVE JUROR NO. 24:  True.
 9              THE COURT:  I see.
10              So would you be able to listen to the
11    attorneys in this case and sit and listen to the
12    evidence as they present their cases, if they present a
13    case, and make a determination based upon the evidence
14    presented at the trial?
15              PROSPECTIVE JUROR NO. 24:  Yes.
16              THE COURT:  Are you going to hold your
17    situation against any of the attorneys here?
18              PROSPECTIVE JUROR NO. 24:  No.  I can't hold
19    them accountable for my trial.
20              THE COURT:  Okay.  Do you have a problem with
21    attorneys, in general?
22              PROSPECTIVE JUROR NO. 24:  It's just the
23    outcome of my case that bothered me.
24              THE COURT:  So would you be able to put aside
25    the outcome of your case and what happened with your
```

1  attorneys in your case and sit and listen to the

2  evidence in this case and make a determination based

3  upon the evidence at trial?

4       PROSPECTIVE JUROR NO. 24:  Yes.

5       THE COURT:  Considering that there are

6  attorneys here who represent the Government and there

7  are attorneys for each one of the Defendants, will you

8  be able to sit and listen to what the attorneys say

9  here and be fair to both the Government and the

10  Defendants?

11       PROSPECTIVE JUROR NO. 24:  Yes.

12       THE COURT:  Okay.  So let me get back to my

13  question.

14       Now that you know the nature of the charges,

15  is there anything that would prevent you from being

16  able to sit and listen to the evidence in this case and

17  be fair to both the Government and the Defendants?

18       PROSPECTIVE JUROR NO. 24:  No.  I wouldn't

19  have any problems.

20       THE COURT:  In this case, you may hear

21  evidence that the Government used informants who are

22  not United States citizens and who posed as

23  terrorists/agents of Al-Qaeda.

24       Do you have such strong feelings one way or

25  the other that you would not be able to sit and listen

 1   to this evidence and be fair to both the Government and

 2   the Defendants?

 3            PROSPECTIVE JUROR NO. 24:  No.  I have no

 4   opinions.

 5            THE COURT:  Have you acquired any information

 6   from newspaper, television, conversations or any other

 7   sources about this case?

 8            PROSPECTIVE JUROR NO. 24:  I would not know

 9   directly.  No.

10            THE COURT:  Do you read the *Miami Herald*,

11   *New Times* or *Sun-Sentinel* news publications either in

12   print or on-line?

13            PROSPECTIVE JUROR NO. 24:  Yes.  Regularly.

14            THE COURT:  Which ones?

15            PROSPECTIVE JUROR NO. 24:  The *Miami Herald*.

16            THE COURT:  Have you read anything in any

17   newspaper or on the Internet or have you seen anything

18   on television or heard anything on the radio about this

19   case?

20            PROSPECTIVE JUROR NO. 24:  Yes.

21            THE COURT:  And what would that be?

22            PROSPECTIVE JUROR NO. 24:  Generally, that it

23   occurred.

24            THE COURT:  Do you remember when you read it?

25   Is it something that you read?

1              PROSPECTIVE JUROR NO. 24:  No.  I just

2     remember it.

3              THE COURT:  Okay.  Did you see it on the

4     Internet?  Did you hear it on the radio?  See it on TV?

5              PROSPECTIVE JUROR NO. 24:  It was on TV.

6              THE COURT:  Okay.  And do you remember when

7     you saw something on TV?

8              PROSPECTIVE JUROR NO. 24:  No.

9              THE COURT:  Do you remember on what channel?

10             PROSPECTIVE JUROR NO. 24:  No.

11             THE COURT:  Do you remember anything about

12    what the segment was?

13             PROSPECTIVE JUROR NO. 24:  Just general

14    information about -- that it occurred.

15             THE COURT:  That what had occurred?

16             PROSPECTIVE JUROR NO. 24:  With the informants

17    and there was Al-Qaeda involved.

18             THE COURT:  Okay.  Was it recently or awhile

19    ago?

20             PROSPECTIVE JUROR NO. 24:  A little while

21    back.

22             THE COURT:  Okay.  Have you discussed this

23    case with anyone?

24             PROSPECTIVE JUROR NO. 24:  No.

25             THE COURT:  Do you have an open mind regarding

1    this case?

2            PROSPECTIVE JUROR NO. 24:  Yes.

3            THE COURT:  Have you formed an opinion

4    regarding any of the Defendants based upon any outside

5    information, including what you saw on the TV?

6            PROSPECTIVE JUROR NO. 24:  No.

7            THE COURT:  Do you have any beliefs, thoughts

8    or opinions which may cause you to decide this case on

9    anything other than the evidence you will hear at

10   trial?

11           PROSPECTIVE JUROR NO. 24:  No.

12           THE COURT:  Are you knowledgeable about the

13   history and practice of Islam?

14           PROSPECTIVE JUROR NO. 24:  No.

15           THE COURT:  Are you knowledgeable about the

16   history and practices of the Moorish Science Temple?

17           PROSPECTIVE JUROR NO. 24:  No.

18           THE COURT:  Are you knowledgeable about the

19   Universal Divine Saviors?

20           PROSPECTIVE JUROR NO. 24:  No.

21           THE COURT:  Are you a member of any type of

22   Masonic lodge or are you knowledgeable about the

23   history, teachings or practices of the Masons?

24           PROSPECTIVE JUROR NO. 24:  No.

25           THE COURT:  Have you or any of your family

```
 1    members ever visited the Middle East?

 2              PROSPECTIVE JUROR NO. 24:  No.

 3              THE COURT:  Do you or family members or close

 4    friends have any prior or present military service?

 5              PROSPECTIVE JUROR NO. 24:  My father.

 6              THE COURT:  When was that?

 7              PROSPECTIVE JUROR NO. 24:  Korea.

 8              THE COURT:  Did he serve in combat in Korea?

 9              PROSPECTIVE JUROR NO. 24:  Yes.

10              THE COURT:  Was he injured?

11              PROSPECTIVE JUROR NO. 24:  No.

12              THE COURT:  Was he ever in the military police

13    or shore patrol?

14              PROSPECTIVE JUROR NO. 24:  No.

15              THE COURT:  What branch of the service was he

16    in?

17              PROSPECTIVE JUROR NO. 24:  Army.

18              THE COURT:  Did he have any disciplinary

19    action taken against him?

20              PROSPECTIVE JUROR NO. 24:  No.

21              THE COURT:  Did he receive an honorable

22    discharge?

23              PROSPECTIVE JUROR NO. 24:  Yes.

24              THE COURT:  Do you know what his rank was at

25    discharge?
```

1        PROSPECTIVE JUROR NO. 24:  No.

2        THE COURT:  Have you or any family members or

3   close friends had any personal experience with acts of

4   terrorism?

5        PROSPECTIVE JUROR NO. 24:  No.

6        THE COURT:  Do you know or do you have a

7   family member or friend who knows someone who was a

8   victim of a terrorist attack?

9        PROSPECTIVE JUROR NO. 24:  No.

10        THE COURT:  Have the events of September 11th

11   or any other terrorist act affected you to such an

12   extent that it would make it difficult for you to sit

13   and listen to the evidence in this case and be fair to

14   both the Government and the Defendants?

15        PROSPECTIVE JUROR NO. 24:  No.

16        THE COURT:  Have you or any family member or

17   close friend lost a job, a business contract or

18   experienced any other financial hardship as a result of

19   September 11th or any other terrorist attack?

20        PROSPECTIVE JUROR NO. 24:  No.

21        THE COURT:  Do you have any opinion as to who

22   was responsible for the attack on the United States on

23   September 11th, 2001?

24        PROSPECTIVE JUROR NO. 24:  No.

25        THE COURT:  Is there anything else you think

1    the Court or the attorneys should know that might

2    influence your ability to fairly and impartially judge

3    the evidence in this case and follow the Court's

4    instructions on the law?

5           PROSPECTIVE JUROR NO. 24:  No.

6           THE COURT:  All right, ma'am.  If you would

7    have a seat outside and not discuss my questions with

8    anyone.

9           Thank you.

10          (Thereupon, Potential Juror No. 24 retired

11   from the courtroom and the following proceedings were

12   had:)

13          THE COURT:  Juror No. 27.

14          (Thereupon, Potential Juror No. 27 entered the

15   courtroom and the following proceedings were had:)

16          THE COURT:  Hello.

17          You can either stand at the podium or, if you

18   feel more comfortable, sir, you can have a seat.

19          PROSPECTIVE JUROR NO. 27:  Okay.

20          THE COURT:  Do you want to stand there or sit

21   down?

22          PROSPECTIVE JUROR NO. 27:  I'm okay.

23          THE COURT:  In this case, the Government has

24   alleged that the Defendants were engaged in

25   conspiracies to commit various violations of federal

1    laws regarding terrorist activities.

2          The charges include conspiracies or agreements

3    to provide material support and resources to agents of

4    Al-Qaeda in conspiring to blow up the Sears Tower in

5    Chicago and several federal buildings in a planned war

6    against the United States.

7          Given that, is there anything that would

8    prevent you from being able to sit and listen to the

9    evidence in this case and be fair to both the

10   Government and the Defendants?

11         PROSPECTIVE JUROR NO. 27:  No.

12         THE COURT:  In this case, you may hear

13   evidence that the Government used informants who were

14   not United States citizens and who posed as

15   terrorists/agents of Al-Qaeda.

16         Do you have such strong feelings one way or

17   the other that you will not be able to sit and listen

18   to this evidence and be fair to both the Government and

19   the Defendants?

20         PROSPECTIVE JUROR NO. 27:  No.

21         THE COURT:  Have you acquired any information

22   from newspaper, television, conversations or any other

23   sources about this case?

24         PROSPECTIVE JUROR NO. 27:  No.

25         THE COURT:  Do you read the *Miami Herald*,

1    *New Times* or *Sun-Sentinel* news publications either in

2    print or on-line?

3         PROSPECTIVE JUROR NO. 27:  The sports page.

4         THE COURT:  Okay.  Of which one?

5         PROSPECTIVE JUROR NO. 27:  *Miami Herald*.

6         THE COURT:  That's it?  Just the sports page?

7         PROSPECTIVE JUROR NO. 27:  That's it.

8         THE COURT:  Have you read anything in any

9    newspaper or on the Internet or have you seen anything

10   on television or heard anything on the radio about this

11   case?

12        PROSPECTIVE JUROR NO. 27:  I can't remember.

13        THE COURT:  Have you followed the course of

14   the proceedings leading up to this trial prior to

15   coming to court yesterday?

16        PROSPECTIVE JUROR NO. 27:  No.

17        THE COURT:  Have you discussed this case with

18   anyone?

19        PROSPECTIVE JUROR NO. 27:  No.

20        THE COURT:  Do you have an open mind regarding

21   this case?

22        PROSPECTIVE JUROR NO. 27:  Yes.

23        THE COURT:  Have you formed an opinion

24   regarding any of the Defendants based upon any outside

25   information?

```
 1              PROSPECTIVE JUROR NO. 27:  No.

 2              THE COURT:  Do you have any beliefs, thoughts

 3    or opinions which may cause you to decide this case on

 4    anything other than the evidence you will hear at

 5    trial?

 6              PROSPECTIVE JUROR NO. 27:  No.

 7              THE COURT:  Are you knowledgeable about the

 8    history and practice of Islam?

 9              PROSPECTIVE JUROR NO. 27:  Not really.

10              THE COURT:  A little bit?

11              PROSPECTIVE JUROR NO. 27:  Just a little bit.

12              THE COURT:  Where do you get your information

13    from?

14              PROSPECTIVE JUROR NO. 27:  Just hear it, like,

15    on the radio.

16              THE COURT:  Are you knowledgeable about the

17    history and practices of the Moorish Science Temple?

18              PROSPECTIVE JUROR NO. 27:  Never heard about

19    it.

20              THE COURT:  Are you knowledgeable about the

21    Universal Divine Saviors?

22              PROSPECTIVE JUROR NO. 27:  Never heard about

23    them.

24              THE COURT:  Are you a member of any type of

25    Masonic lodge or are you knowledgeable about the
```

1   history, teachings or practices of the Masons?

2         PROSPECTIVE JUROR NO. 27:  I don't remember

3   hearing about them.

4         THE COURT:  Have you or any of your family

5   members ever visited the Middle East?

6         PROSPECTIVE JUROR NO. 27:  Would you mind

7   repeating that for me.

8         THE COURT:  Sure.

9         Have you or any of your family members ever

10  visited the Middle East.

11        PROSPECTIVE JUROR NO. 27:  I used to be a

12  seaman.  I used to, you know, go all the over the

13  world.

14        THE COURT:  And so where in the Middle East

15  did you have --

16        PROSPECTIVE JUROR NO. 27:  I used to go to the

17  Persian Gulf a little bit.

18        THE COURT:  When was it that you were a

19  seaman?

20        PROSPECTIVE JUROR NO. 27:  Would you mind

21  receipting that.

22        THE COURT:  When was it that you were a

23  seaman?  Were you a Merchant Marine?

24        PROSPECTIVE JUROR NO. 27:  I used to work in a

25  British tanker -- supertanker, the Burma Endeavor.

1            THE COURT:  When was that?

2            PROSPECTIVE JUROR NO. 27:  Oh, boy.  Way back.

3    Way back.  '70s.

4            THE COURT:  Okay.  Do you or family members or

5    close friends have any prior or present military

6    service?

7            PROSPECTIVE JUROR NO. 27:  I have friends.  I

8    think I have a nephew in Iraq.

9            THE COURT:  Do you know what branch of the

10   service he's in?

11           PROSPECTIVE JUROR NO. 27:  It's the Army.

12           THE COURT:  And has he seen combat in Iraq?

13           PROSPECTIVE JUROR NO. 27:  Yes.

14           THE COURT:  Has he been injured?

15           PROSPECTIVE JUROR NO. 27:  No.  In fact, I

16   haven't seen him since he has been there.

17           THE COURT:  You haven't seen him?  He's there

18   now?

19           PROSPECTIVE JUROR NO. 27:  Yes.  I haven't

20   seen him.

21           THE COURT:  Would the fact that you have a

22   nephew in Iraq affect your ability to sit and listen to

23   the evidence in this case and be fair to both the

24   Government and the Defendants?

25           PROSPECTIVE JUROR NO. 27:  No.

1      THE COURT:  Has he had any disciplinary action

2  taken against him?

3      PROSPECTIVE JUROR NO. 27:  No.  I don't know.

4  I'm not in touch with him.  I don't know.

5      THE COURT:  Okay.  Have you or any members of

6  your family or close friends had any personal

7  experience with acts of terrorism?

8      PROSPECTIVE JUROR NO. 27:  Huh-uh.  No.  No.

9      THE COURT:  Do you know or do you have a

10  family member or friend who knows someone who was a

11  victim of a terrorist attack?

12      PROSPECTIVE JUROR NO. 27:  No.

13      THE COURT:  Have the events of September 11th

14  or any other terrorist act affected you to such an

15  extent that it would make it difficult for you to sit

16  and listen to the evidence in this case and be fair to

17  both the Government and the Defendants?

18      PROSPECTIVE JUROR NO. 27:  No.

19      THE COURT:  Have you or any family member or

20  close friend lost a job, a business contract or

21  experienced any other financial hardship as a result of

22  September 11th or any other terrorist attack?

23      PROSPECTIVE JUROR NO. 27:  No.

24      THE COURT:  Do you have an opinion as to who

25  was responsible for the attack on the United States on

1    September 11th, 2001?

2            PROSPECTIVE JUROR NO. 27:  Would you mind

3    repeating that for me.

4            THE COURT:  Sure.

5            Do you have an opinion as to who was

6    responsible for the attack on the United States on

7    September 11th, 2001?

8            PROSPECTIVE JUROR NO. 27:  Well, I listen to

9    the news, and I've read the papers.  I understand that

10   it's people from the Middle East.

11           THE COURT:  Is there anything else you think

12   the Court or the attorneys should know that might

13   influence your ability to fairly and impartially judge

14   the evidence in this case and follow the Court's

15   instructions on the law?

16           PROSPECTIVE JUROR NO. 27:  No.

17           THE COURT:  Sir, if you would have a seat

18   outside and not discuss my questions with anyone.

19           Thank you for your patience.

20           PROSPECTIVE JUROR NO. 27:  Thank you.

21           (Thereupon, Potential Juror No. 27 retired

22   from the courtroom and the following proceedings were

23   had:)

24           THE COURT:  Juror No. 28.

25           (Thereupon, Potential Juror No. 28 entered the

1    courtroom and the following proceedings were had:)

2             THE COURT:  Hello.

3             PROSPECTIVE JUROR NO. 28:  Hello.

4             THE COURT:  Are you more comfortable there or

5    would you like to sit down?

6             PROSPECTIVE JUROR NO. 28:  No.  I'm okay here.

7             THE COURT:  In this case, the Government has

8    alleged that the Defendants were engaged in

9    conspiracies to commit various violations of federal

10   laws regarding terrorist activities.

11            The charges include conspiracies or agreements

12   to provide material support and resources to agents of

13   Al-Qaeda in conspiring to blow up the Sears Tower in

14   Chicago and several federal buildings in a planned war

15   against the United States.

16            Given that, is there anything that would

17   prevent you from being able to sit and listen to the

18   evidence in this case and be fair to both the

19   Government and the Defendants?

20            PROSPECTIVE JUROR NO. 28:  No.

21            THE COURT:  In this case, you may hear

22   evidence that the Government used informants who are

23   not United States citizens and who posed as

24   terrorists/agents of Al-Qaeda.

25            Do you have such strong feelings one way or

1    the other that you would not be able to sit and listen

2    to this evidence and be fair to both the Government and

3    the Defendants?

4             PROSPECTIVE JUROR NO. 28:  No.

5             THE COURT:  Have you acquired any information

6    from newspaper, television, conversations or any other

7    sources about this case?

8             PROSPECTIVE JUROR NO. 28:  No.

9             THE COURT:  Do you read the *Miami Herald*,

10   *New Times* or *Sun-Sentinel* news publications either in

11   print or on-line?

12            PROSPECTIVE JUROR NO. 28:  No.

13            THE COURT:  Have you read anything in any

14   newspaper or on the Internet or have you seen anything

15   on television or heard anything on the radio about this

16   case?

17            PROSPECTIVE JUROR NO. 28:  No.

18            THE COURT:  Have you followed the course of

19   the proceedings leading up to this trial prior to

20   coming to court yesterday?

21            PROSPECTIVE JUROR NO. 28:  Can you ask that

22   again.

23            THE COURT:  Sure.

24            Have you followed the leading up to the trial

25   of this case prior to coming to court yesterday?

```
 1               PROSPECTIVE JUROR NO. 28:  No.
 2               THE COURT:  Have you discussed this case with
 3   anyone?
 4               PROSPECTIVE JUROR NO. 28:  No.
 5               THE COURT:  Do you have an open mind regarding
 6   this case?
 7               PROSPECTIVE JUROR NO. 28:  Yes.
 8               THE COURT:  Have you formed an opinion
 9   regarding any of the Defendants based upon any outside
10   information?
11               PROSPECTIVE JUROR NO. 28:  No.
12               THE COURT:  Do you have any beliefs, thoughts
13   or opinions which may cause you to decide this case on
14   anything other than the evidence you will hear at
15   trial?
16               PROSPECTIVE JUROR NO. 28:  No.
17               THE COURT:  Are you knowledgeable about the
18   history and practice of Islam?
19               PROSPECTIVE JUROR NO. 28:  No.
20               THE COURT:  Are you knowledgeable about the
21   history and practices of the Moorish Science Temple?
22               PROSPECTIVE JUROR NO. 28:  No.
23               THE COURT:  Are you knowledgeable about the
24   Universal Divine Saviors?
25               PROSPECTIVE JUROR NO. 28:  No.
```

1          THE COURT:  Are you knowledgeable about the

2    history, teachings or practices of the Masons or are

3    you a member of any type of Masonic lodge?

4          PROSPECTIVE JUROR NO. 28:  My father is a

5    Mason or he visits one of those centers.

6          THE COURT:  In this case, there may be

7    evidence which involves either witnesses or exhibits

8    where people are wearing apparel that contain symbols

9    or logos of the Masons.

10         Would that affect your ability to sit and

11   listen to the evidence in this case and be fair to both

12   the Government and the Defendants?

13         PROSPECTIVE JUROR NO. 28:  No.

14         THE COURT:  Would you be more likely or less

15   likely to believe someone as a witness because they

16   were wearing a symbol or -- a symbol of the Masons?

17         PROSPECTIVE JUROR NO. 28:  No.

18         THE COURT:  Have you or any of your family

19   members ever visited the Middle East?

20         PROSPECTIVE JUROR NO. 28:  No.

21         THE COURT:  Do you or family members or close

22   friends have any prior or present military service?

23         PROSPECTIVE JUROR NO. 28:  No.

24         THE COURT:  Have you or any members of your

25   family or close friends had any personal experience

1   with acts of terrorism?

2   PROSPECTIVE JUROR NO. 28:  No.

3   THE COURT:  Do you know or do you have a

4   family member or friend who knows someone who was a

5   victim of a terrorist attack?

6   PROSPECTIVE JUROR NO. 28:  No.

7   THE COURT:  Have the events of September 11th

8   or any other terrorist act affected you to such an

9   extent that it would make it difficult for you to sit

10  and listen to the evidence in this case and be fair to

11  both the Government and the Defendants?

12  PROSPECTIVE JUROR NO. 28:  No.

13  THE COURT:  Have you or any family member or

14  close friend lost a job, a business contract or

15  experienced any other financial hardship as a result of

16  September 11th or any other terrorist attack?

17  PROSPECTIVE JUROR NO. 28:  No.

18  THE COURT:  Do you have an opinion as to who

19  was responsible for the attack on the United States on

20  September 11th, 2001?

21  PROSPECTIVE JUROR NO. 28:  Personally, no.

22  THE COURT:  Is there anything else you think

23  the Court or the attorneys should know that might

24  influence your ability to fairly and impartially judge

25  the evidence in this case and follow the Court's

1   instructions on the law?

2          PROSPECTIVE JUROR NO. 28:  Yesterday, you read

3   off a list of names.  I didn't recognize any names.

4   Now, I don't know if the group that came in this

5   morning is related to this case or not.

6          THE COURT:  The people who came in?

7          PROSPECTIVE JUROR NO. 28:  Right.

8          THE COURT:  And then I sent you away for a

9   while?

10         PROSPECTIVE JUROR NO. 28:  Yes.

11         THE COURT:  No.

12         PROSPECTIVE JUROR NO. 28:  Okay.

13         THE COURT:  They're not.

14         PROSPECTIVE JUROR NO. 28:  Because I

15  recognized them -- some people there.

16         THE COURT:  Okay.

17         PROSPECTIVE JUROR NO. 28:  Okay.

18         THE COURT:  Who did you recognize?

19         PROSPECTIVE JUROR NO. 28:  Their names?

20         THE COURT:  Do you know their names?

21         PROSPECTIVE JUROR NO. 28:  Yeah.  Wanda

22  Carmona and -- what was the other name?  Aurora Perez.

23         THE COURT:  Thank you, ma'am.

24         If you would have a seat outside and not

25  discuss my questions with anyone.

1            PROSPECTIVE JUROR NO. 28:  Thank you.

2            (Thereupon, Potential Juror No. 28 retired

3     from the courtroom and the following proceedings were

4     had:)

5            THE COURT:  Juror No. 29.

6            (Thereupon, Potential Juror No. 29 entered the

7     courtroom and the following proceedings were had:)

8            THE COURT:  Hello.

9            PROSPECTIVE JUROR NO. 29:  Hello.

10           THE COURT:  You can stand there, sir, or if

11    you prefer, you can sit.  It's up to you.

12           PROSPECTIVE JUROR NO. 29:  I'm good here.

13           THE COURT:  In this case, the Government has

14    alleged that the Defendants were engaged in

15    conspiracies to commit various violations of federal

16    laws regarding terrorist activities.

17           The charges include conspiracies or agreements

18    to provide material support and resources to agents of

19    Al-Qaeda in conspiring to blow up the Sears Tower in

20    Chicago and several federal buildings in a planned war

21    against the United States.

22           Given that, is there anything that would

23    prevent you from being able to sit and listen to the

24    evidence in this case and be fair to both the

25    Government and the Defendants?

1              PROSPECTIVE JUROR NO. 29:  No.

2              THE COURT:  In this case, you may hear

3    evidence that the Government used informants who were

4    not United States citizens and who posed as

5    terrorists/agents of Al-Qaeda.

6              Do you have such strong feelings one way or

7    the other that you would not be able to sit and listen

8    to this evidence and be fair to both the Government and

9    the Defendants?

10             PROSPECTIVE JUROR NO. 29:  No.

11             THE COURT:  Have you acquired any information

12   from newspaper, television, conversations or any other

13   sources about this case?

14             PROSPECTIVE JUROR NO. 29:  No, ma'am.

15             THE COURT:  Do you read the *Miami Herald*,

16   *New Times* or *Sun-Sentinel* news publications either in

17   print or on-line?

18             PROSPECTIVE JUROR NO. 29:  Yes, I do.

19             THE COURT:  Which one?

20             PROSPECTIVE JUROR NO. 29:  The *Herald*.

21             THE COURT:  Okay.

22             PROSPECTIVE JUROR NO. 29:  I receive it in the

23   house every day.

24             THE COURT:  And do you read it every day?

25             PROSPECTIVE JUROR NO. 29:  Almost every day.

 1           THE COURT:  Okay.  Have you read anything in

 2   any newspaper or on the Internet or have you seen

 3   anything on television or heard anything on the radio

 4   about this case?

 5           PROSPECTIVE JUROR NO. 29:  No, ma'am.

 6           THE COURT:  Have you followed the course of

 7   the proceedings that have led up to this trial prior to

 8   coming to court?

 9           PROSPECTIVE JUROR NO. 29:  I'm sorry?

10           THE COURT:  Prior to coming to court

11   yesterday, have you followed the proceedings in this

12   case that led up to the trial?

13           PROSPECTIVE JUROR NO. 29:  No.

14           THE COURT:  Have you discussed this case with

15   anyone?

16           PROSPECTIVE JUROR NO. 29:  No, ma'am.

17           THE COURT:  Do you have an open mind regarding

18   this case?

19           PROSPECTIVE JUROR NO. 29:  Yeah.

20           THE COURT:  Have you formed an opinion

21   regarding any of the Defendants based upon any outside

22   information?

23           PROSPECTIVE JUROR NO. 29:  Not yet.  No.

24           THE COURT:  I'm sorry?

25           PROSPECTIVE JUROR NO. 29:  Have I formed an

```
 1    opinion on it?

 2            THE COURT:  Yes.

 3            PROSPECTIVE JUROR NO. 29:  No.

 4            THE COURT:  Do you have any beliefs, thoughts

 5    or opinions which may cause you to decide this case on

 6    anything other than the evidence you will hear at

 7    trial?

 8            PROSPECTIVE JUROR NO. 29:  No.

 9            THE COURT:  Can you set those beliefs,

10    thoughts or opinions aside and decide this case based

11    on the evidence that is admitted in this courtroom --

12    strike that.  I'm sorry.

13            Are you knowledgeable about the history and

14    practice of Islam?

15            PROSPECTIVE JUROR NO. 29:  Of what?  Islam?

16            THE COURT:  Yes.

17            PROSPECTIVE JUROR NO. 29:  No.

18            THE COURT:  Are you knowledgeable about the

19    history and practices of the Moorish Science Temple?

20            PROSPECTIVE JUROR NO. 29:  No.

21            THE COURT:  Are you knowledgeable about the

22    Universal Divine Saviors?

23            PROSPECTIVE JUROR NO. 29:  No.

24            THE COURT:  Are you a member of any type of

25    Masonic lodge or knowledgeable about the history,
```

1    teaching or practices of the Masons?

2           PROSPECTIVE JUROR NO. 29:  No, ma'am.

3           THE COURT:  Have you or any of your family

4    members ever visited the Middle East?

5           PROSPECTIVE JUROR NO. 29:  No.

6           THE COURT:  Do you or family members or close

7    friends have any prior or presents military service?

8           PROSPECTIVE JUROR NO. 29:  No.

9           THE COURT:  Have you or any members of your

10   family or close friends had any personal experience

11   with acts of terrorism?

12          PROSPECTIVE JUROR NO. 29:  No.

13          THE COURT:  Do you know or do you have a

14   family member or friend who knows someone who was a

15   victim of a terrorist attack?

16          PROSPECTIVE JUROR NO. 29:  Not that I know of.

17   No.

18          THE COURT:  Have the events of September 11th

19   or any other terrorist act affected you to such an

20   extent that it would make it difficult for you to sit

21   and listen to the evidence in this case and be fair to

22   both the Government and the Defendants?

23          PROSPECTIVE JUROR NO. 29:  No.  I'm sorry.

24   Can you repeat that question, ma'am.

25          THE COURT:  Sure.

1          Have the events of September 11th or any other

2    terrorist act affected you to such an extent that it

3    would make it difficult for you to sit and listen to

4    the evidence in this case and be fair to both the

5    Government and the Defendants?

6          PROSPECTIVE JUROR NO. 29:  No.  It shouldn't.

7          THE COURT:  Have you or any family member or

8    close friend lost a job, a business contract or

9    experienced any other financial hardship as a result of

10   September 11th or any other terrorist attack?

11         PROSPECTIVE JUROR NO. 29:  No.  I don't think

12   so.

13         THE COURT:  Do you have an opinion as to who

14   was responsible for the attack on the United States on

15   September 11th, 2001?

16         PROSPECTIVE JUROR NO. 29:  An opinion as far

17   as what I see on TV, what they say on TV.

18         THE COURT:  Or who you think was responsible.

19         PROSPECTIVE JUROR NO. 29:  Just what they say

20   on TV.

21         THE COURT:  And what was it that you saw on

22   TV?

23         PROSPECTIVE JUROR NO. 29:  What they say,

24   like, bin Laden and all that.

25         THE COURT:  Is there anything else you think

```
 1    the Court or the attorneys should know that might

 2    influence your ability to fairly and impartially judge

 3    the evidence in this case and follow the Court's

 4    instructions on the law?

 5          PROSPECTIVE JUROR NO. 29:  No, ma'am.

 6          THE COURT:  Thank you, sir.

 7          If you would have a seat outside and not

 8    discuss my questions with anyone.

 9          PROSPECTIVE JUROR NO. 29:  Thank you.

10          (Thereupon, Potential Juror No. 29 retired

11    from the courtroom and the following proceedings were

12    had:)

13          THE COURT:  No. 30.

14          (Thereupon, Potential Juror No. 30 entered the

15    courtroom and the following proceedings were had:)

16          THE COURT:  Hello.

17          PROSPECTIVE JUROR NO. 30:  Hello.

18          THE COURT:  You can either stand there, sir,

19    or if you prefer to sit, you can sit.  It's up to you.

20          PROSPECTIVE JUROR NO. 30:  I'll stand.

21          THE COURT:  Okay.  In this case, the

22    Government has alleged that the Defendants were engaged

23    in conspiracies to commit various violations of federal

24    laws regarding terrorist activities.

25          The charges include conspiracies or agreements
```

1    to provide material support and resources to agents of

2    Al-Qaeda in conspiring to blow up the Sears Tower in

3    Chicago and several federal buildings in a planned war

4    against the United States.

5           Given that, is there anything that would

6    prevent you from being able to sit and listen to the

7    evidence in this case and be fair to both the

8    Government and the Defendants?

9           PROSPECTIVE JUROR NO. 30:  No, there's not.

10          THE COURT:  In this case, you may hear

11    evidence that the Government used informants who were

12    not United States citizens and who posed as

13    terrorists/agents of Al-Qaeda.

14          Do you have such strong feelings one way or

15    the other that you would not be able to sit and listen

16    to this evidence and be fair to both the Government and

17    the Defendants?

18          PROSPECTIVE JUROR NO. 30:  I will be.

19          THE COURT:  I'm sorry?

20          PROSPECTIVE JUROR NO. 30:  I will be.  I will

21    be able do that.

22          THE COURT:  You'll be able to listen to that

23    evidence and be fair?

24          PROSPECTIVE JUROR NO. 30:  Fair.  Yeah.  Yeah.

25          THE COURT:  Have you acquired any information

1    from newspaper, television, conversations or any other

2    sources about this case?

3              PROSPECTIVE JUROR NO. 30:  No.

4              THE COURT:  Do you read the *Miami Herald*,

5    *New Times* or *Sun-Sentinel* news publications either in

6    print or on-line?

7              PROSPECTIVE JUROR NO. 30:  The paper, the

8    *Miami Herald*.

9              THE COURT:  And how often do you read it?

10             PROSPECTIVE JUROR NO. 30:  Almost every day.

11             THE COURT:  Have you read anything in any

12   newspaper or on the Internet or have you seen anything

13   on television or heard anything about this case?

14             PROSPECTIVE JUROR NO. 30:  No.

15             THE COURT:  Have you followed the course of

16   the proceedings that have led up to this trial prior to

17   coming to court yesterday?

18             PROSPECTIVE JUROR NO. 30:  No.

19             THE COURT:  Have you discussed this case with

20   anyone?

21             PROSPECTIVE JUROR NO. 30:  No.

22             THE COURT:  Do you have an open mind regarding

23   this case?

24             PROSPECTIVE JUROR NO. 30:  Open mind such

25   as....

1            THE COURT:  Well, have you made a

2    determination whether you think the Defendants are

3    guilty or not guilty?

4            PROSPECTIVE JUROR NO. 30:  No.

5            THE COURT:  Have you formed an opinion

6    regarding any of the Defendants based upon any outside

7    information?

8            PROSPECTIVE JUROR NO. 30:  No.

9            THE COURT:  Do you have any beliefs, thoughts

10   or opinions which may cause you to decide this case on

11   anything other than the evidence you will hear at

12   trial?

13           PROSPECTIVE JUROR NO. 30:  No.

14           THE COURT:  Are you knowledgeable about the

15   history and practice of Islam?

16           PROSPECTIVE JUROR NO. 30:  No.

17           THE COURT:  Are you knowledgeable about the

18   history and practices of the Moorish Science Temple?

19           PROSPECTIVE JUROR NO. 30:  No.

20           THE COURT:  Are you knowledgeable about the

21   Universal Divine Saviors?

22           PROSPECTIVE JUROR NO. 30:  No.

23           THE COURT:  Are you knowledgeable about the

24   history, teachings or practices of the Masons or are

25   you a member of any type of Masonic lodge?

1           PROSPECTIVE JUROR NO. 30:  Yes, I am.

2           THE COURT:  In this case, there may be

3    evidence where either witnesses who appear in court or

4    persons who appear in -- on video or other exhibits are

5    wearing symbols of the Masons.

6           Would you be able to fairly judge whether you

7    think those persons are truthful or not truthful, even

8    though they may wear the symbols of the Masons?

9           PROSPECTIVE JUROR NO. 30:  Yeah.

10          THE COURT:  Are you more likely to believe or

11   disbelieve any witness because they may be wearing a

12   symbol of the Masons?

13          PROSPECTIVE JUROR NO. 30:  Repeat that again,

14   now.

15          THE COURT:  Would you be more likely to

16   believe or disbelieve a witness because they're wearing

17   a Masonic symbol?

18          PROSPECTIVE JUROR NO. 30:  No.

19          THE COURT:  Would the fact that there are

20   persons who may wear symbols of the Masons affect your

21   ability to sit and listen to the evidence and make a

22   determination solely on the evidence presented at

23   trial?

24          PROSPECTIVE JUROR NO. 30:  No.

25          THE COURT:  Have you or any of your family

```
1    members ever visited the Middle East?

2              PROSPECTIVE JUROR NO. 30:  No.

3              THE COURT:  Do you or family members or close

4    friends have any prior or present military service?

5              PROSPECTIVE JUROR NO. 30:  Family members,

6    yeah.

7              THE COURT:  Who is that?

8              PROSPECTIVE JUROR NO. 30:  Oh, cousins.

9              THE COURT:  And when -- in what branch of the

10   service did they serve?

11             PROSPECTIVE JUROR NO. 30:  Vietnam.

12             THE COURT:  Did they serve in combat?

13             PROSPECTIVE JUROR NO. 30:  Vietnam, yeah.

14             THE COURT:  Were they injured?

15             PROSPECTIVE JUROR NO. 30:  No.

16             THE COURT:  Were they ever in the military

17   police or shore patrol?

18             PROSPECTIVE JUROR NO. 30:  No.

19             THE COURT:  Did any of them have any

20   disciplinary action taken against them?

21             PROSPECTIVE JUROR NO. 30:  No.

22             THE WITNESS:  Did they receive an honorable

23   discharge?

24             PROSPECTIVE JUROR NO. 30:  An honorable

25   discharge?  They were not -- they served their time.
```

1             THE COURT:  Right.

2             And they were honorably discharged from that

3    service?

4             PROSPECTIVE JUROR NO. 30:  Yeah.

5             THE COURT:  Okay.  Have you or any members of

6    your family or close friends had any personal

7    experience with acts of terrorism?

8             PROSPECTIVE JUROR NO. 30:  No.

9             THE COURT:  Do you know or do you have a

10   family member or friend who knows someone who was a

11   victim of a terrorist attack?

12            PROSPECTIVE JUROR NO. 30:  No.

13            THE COURT:  Have the events of September 11th

14   or any other terrorist act affected you to such an

15   extent that it would make it difficult for you to sit

16   and listen to the evidence in this case and be fair to

17   both the Government and the Defendants?

18            PROSPECTIVE JUROR NO. 30:  No.

19            THE COURT:  Have you or any family member or

20   close friend lost a job, a business contract or

21   experienced any other financial hardship as a result of

22   September 11th or any other terrorist attack?

23            PROSPECTIVE JUROR NO. 30:  No.

24            THE COURT:  Do you have an opinion as to who

25   was responsible for the attack on the United States on

1    September 11th, 2001?

2              PROSPECTIVE JUROR NO. 30:  No.

3              THE COURT:  Is there anything else you think

4    the Court or the attorneys should know that might

5    influence your ability to fairly and impartially judge

6    the evidence in this case and follow the Court's

7    instructions on the law?

8              PROSPECTIVE JUROR NO. 30:  No.

9              THE COURT:  All right, sir.  If you would have

10   a seat outside and not discuss my questions with

11   anyone.

12             PROSPECTIVE JUROR NO. 30:  Thank you.

13             THE COURT:  Thank you for your patience.

14             (Thereupon, Potential Juror No. 30 retired

15   from the courtroom and the following proceedings were

16   had:)

17             THE COURT:  Let's take a few minutes.

18             MS. JHONES:  Thank you, your Honor.

19             THE COURT:  We'll be in recess for ten.

20             (Thereupon a recess was taken, after which the

21   following proceedings were had:)

22             THE COURT:  We're back on United States of

23   America versus Narseal Batiste, et al., Case

24   No. 06-20373.

25             Counsel, state your appearances once more for

```
 1    the record.
 2              MR. GREGORIE:  Richard Gregorie and Jacqueline
 3    Arango on behalf of the United States, your Honor.
 4              MS. JHONES:  Ana Jhones on behalf of Narseal
 5    Batiste, who is present.
 6              MR. LEVIN:  Albert Levin on behalf of Patrick
 7    Abraham, who is also present.
 8              MR. CASUSO:  Louie Casuso for Burson Augustin,
 9    who's present.
10              MR. CLARK:  Nathan Clark for Rotschild
11    Augustine, who's present.
12              MR. HOULIHAN:  Richard Houlihan with Naudimar
13    Herrera.
14              MR. VEREEN:  Roderick Vereen on behalf of
15    Stanley Phanor, who's present.
16              THE COURT:  All Defendants are present.
17              You may be seated.
18              First of all, is there any further questioning
19    of any juror from this second go-round of this panel?
20              MR. LEVIN:  Yes, your Honor.
21              Juror No. 11 indicated that he nor any other
22    members of his family had ever visited the Middle East.
23              He also indicated that his mother was Israeli.
24    And I foresee that maybe there's some confusion in that
25    regard, unless circumstances -- maybe she passed away
```

 1   years ago.  I don't know.

 2            THE COURT:  Is that it?

 3            MR. LEVIN:  Yes.  Thank you.

 4            THE COURT:  No one else?

 5            Let's bring in Juror No. 11.

 6            (Thereupon, Potential Juror No. 11 entered the

 7   courtroom and the following proceedings were had:)

 8            THE COURT:  Hello.

 9            PROSPECTIVE JUROR NO. 11:  Hi.

10            THE COURT:  You had stated yesterday, sir, I

11   thought, that your mom is from Israel.

12            PROSPECTIVE JUROR NO. 11:  Yes.

13            THE COURT:  And have you or any of your family

14   members had occasion to go to Israel?

15            PROSPECTIVE JUROR NO. 11:  A lot of them.

16   Yes.

17            THE COURT:  Okay.  So when was the last time

18   that you were in Israel?

19            PROSPECTIVE JUROR NO. 11:  I was not in

20   Israel.  My mom passed away.  And I grew up with the

21   Jewish side of my family.

22            THE COURT:  Okay.  So you haven't been to

23   Israel?

24            PROSPECTIVE JUROR NO. 11:  I have not.

25            THE COURT:  But your family members have --

 1            PROSPECTIVE JUROR NO. 11:  Yes.

 2            THE COURT:  You have family members in Israel?

 3            PROSPECTIVE JUROR NO. 11:  Yes, I do.

 4            THE COURT:  And any of your family members

 5    here:  Have they visited Israel or anywhere else in the

 6    Middle East?

 7            PROSPECTIVE JUROR NO. 11:  Sure.

 8            THE COURT:  Where?

 9            PROSPECTIVE JUROR NO. 11:  Israel.

10            THE COURT:  But you've never been there?

11            PROSPECTIVE JUROR NO. 11:  I have never been

12    there.

13            THE COURT:  Okay.  All right, sir.  Thank you.

14            PROSPECTIVE JUROR NO. 11:  Thank you.

15            (Thereupon, Potential Juror No. 11 retired

16    from the courtroom and the following proceedings were

17    had:)

18            THE COURT:  Any challenges for cause on the

19    first 16?

20            MR. LEVIN:  Yes, your Honor.

21            Your Honor, Juror No. 4.  I would describe her

22    as somewhat all over the place.  I'll start at the end

23    of her inquiry when the Court asked her at Page 203 --

24    it would be the last question that the Court posed --

25    "Is there anything else you think the Court or the

1    attorneys should know that might influence your ability

2    to fairly and impartially judge the evidence in this

3    case and follow the Court's instructions on the law?"

4           "No.  I think I have an open mind."

5           I would like a followup on that, as you have

6    done in the past with the other jurors:  "Do you think

7    or do you know?"

8           Now, I ask the Court to inquire -- to get a

9    more definitive position with regard to this

10   prospective juror, based upon her answers that came

11   before her last answer, where she told us, starting,

12   essentially, at Page 192, that she knew about the case,

13   she had discussed it among family members, she knew

14   that it was about wanting to blow up the Sears Tower

15   and that all the men were black and that they were

16   arrested and that people developed -- individuals in

17   her family developed opinions as well as herself.

18          She initially said she did not recall what her

19   opinion was.  She said at Page 192:  You know, you just

20   browse through something and you pick up little bits

21   and pieces.

22          "And then you get with family members or

23   friends and they start talking about it and you

24   remember something that you had read."

25          And then, when the Court went on to ask what

the conversations were that she had had with the family

members, she said, "Not really," but she then went on

to add that, "You know, they were just saying" --

referring to family members -- "'What a shame, you

know, all these black guys being arrested.  Couldn't

they have found something better to do?'

"And, you know, one opinion led to another,

you know.  'They should be hung,' 'They should be

caught,' 'They should be' -- you know, just talk among

family members like, you know.

Then she said that she could not remember

everything that she said -- that was said.

And then, at Page 194 -- starting at the

bottom of 193, you had, "Okay.  Do you remember your

opinion when you were reading it and discussing it?"

She said, "No.  No.  That's what I'm saying.

I couldn't remember my opinion."

The Court said, "Okay."

She then at Page 196 disclosed that she indeed

had an opinion, "I don't want to say 'yes'" -- when the

Court asked her if she had an open mind regarding this

case, "I don't want to say 'yes' because, you know, I'm

kind of in between, you know.  Because, you know, I

can -- I'm only focusing and I'm only saying my opinion

because of what I've, you know, browsed through.

1            "I'm not going to say what I've actually

2     really sat down and read with interest, you know, or to

3     say can I be fully open -- that's a 'yes' and a 'no'

4     for me.  It's not a fully 'yes' and it's not a fully

5     'no,' you know.

6            "THE COURT:  What's 'yes' about it, and what's

7     'no' about it?

8            "If I -- I think, if I had more information

9     or, you know, by me just sitting and -- you know,

10    because my mind had already been leaning towards,

11    'Well, you know, these guys are guilty,'" -- in

12    essence, giving her opinion -- "'Then, they need to

13    be' -- you know, that was my own personal opinion.  I

14    never spoke that to anybody else."

15           So now she seems to be indicating there that

16    she indeed has an opinion -- or actually remembered

17    what her opinion was, where previously she said she had

18    had an opinion, but didn't remember what it was.

19           "You know, if this is what they done, then I

20    feel that they should be punished for it, no matter --

21    you know, within the law -- whatever they did, within

22    the law, that they should be punished for it."

23           She finally goes on to say that:  I cannot

24    really "give you an honest answer whether I can be

25    really openly and say 'yes' or openly and say 'no.'"

 1          And then you asked the question, "Well, let me

 2  ask you this question:  Would your opinion affect your

 3  ability to determine the Defendants' guilt based solely

 4  on the evidence presented at trial?"

 5          She said, "No.  I don't think so."

 6          Again, a followup -- then you said, "Think so

 7  or know so?"

 8          Then she said, "No.  I know so."

 9          I just find that she kind of, you know,

10  wavered and vacillated.  I realize that she ultimately

11  did come up and say that she knew that the opinions

12  would not affect her.

13          But, you know, as the Government has pointed

14  out, the Court has the sole discretion to determine

15  credibility.  And I'm just having some difficulty with,

16  you know, really where she's coming from.

17          MS. ARANGO:  Judge, I think you made

18  sufficient inquiry.  You followed up with her.  You got

19  to the root of -- I think she was quite honest in that

20  she couldn't exactly recall.

21          She knew that there were opinions flying

22  around.  She had some initial opinions, but she has --

23  comes from a tricultural family and she heard differing

24  opinions than hers.

25          And, ultimately, I mean, you asked her:  Any

1    of that, can you set that aside?

2            She said very clearly that she could.  There

3    was no hesitation.  There was no qualification.  I

4    didn't see any of that.

5            I just thought that she had some difficulty

6    trying to conjure up, you know, what the various

7    opinions were and what -- and even what her opinion

8    was.

9            MR. VEREEN:  Your Honor, if may I piggyback --

10           MS. ARANGO:  I would also note for the record

11   that she is an African-American female.

12           MR. LEVIN:  Judge, one final response to the

13   Government's reply to my argument:

14           In the middle of being questioned, she said

15   she had an open mind and then, on your very last

16   question, she finished with, "No.  I think I have an

17   open mind," going back to thinking she had an open mind

18   as opposed to having an open mind.

19           Mr. Vereen has -- wants to add something with

20   regard to the vision issue, which, upon further review,

21   if you will, we may find to be a problem and subject to

22   a cause challenge.

23           MR. VEREEN:  That's correct, your Honor.

24           I was getting ready to add to that that this

25   is the woman that answered -- I believe it's Question

1    No. 32 -- by saying that she has right eye pain.

2         And I think the Court even went into

3    questioning her about that, and she said that she had

4    glaucoma, and I think there was something else she said

5    she may have had.

6         I believe the Court inquired as to whether or

7    not, by her blinking or resting her eyes, would that

8    stop it from hurting.

9         She said, "No," that it's a constant pain and

10   that her eye is always blurry.

11        Now, there are going to be a number of videos

12   that this woman is going to observe.  Now, I know they

13   have a monitor that's up close.  But the Defendants are

14   sitting there at some distance.

15        I think she -- I recall her saying that she

16   would not be able to identify them from that distance.

17   She could not see them.

18        I think the Court inquired as to whether or

19   not she was able to see Mr. Mitchell when he was

20   sitting there.

21        She says, "I can see him because he's close."

22        She's going to have to make a decision when

23   she's deliberating, if she's chosen as one of the

24   jurors, as to what it is that she actually sees on

25   these videotapes as opposed to having to rely on what

1    another juror tells her.

2           I think these Defendants have the right to

3    have a juror that has all of their faculties and is

4    able to make an independent determination as to what

5    evidence constitutes without having to rely on what

6    someone else tells her.

7           She's made it clear that that eye is --

8           THE COURT:  I'll dismiss her for hardship.

9           I would appreciate it if counsel -- I even

10   inquired about this after the first go-round and none

11   of you wanted her dismissed for hardship at that time.

12          So if you want her dismissed for hardship,

13   I'll dismiss her for hardship.

14          But it's a little -- you know, we're taking up

15   a lot of time that I don't need to take up if, in fact,

16   it's a hardship.

17          It seems as if you wanted to wait to see here

18   if she gave answers that you wanted to hear and now you

19   bring up the hardship.

20          But I'll dismiss her for hardship.

21          Any other challenges for cause?  Any others

22   from the first 16?

23          MR. VEREEN:  No, your Honor.

24          THE COURT:  That's it?

25          On 19 through 30?

1           MR. GREGORIE:  Nothing from the United States,

2   your Honor.

3           THE COURT:  Nothing?

4           From the defense?

5           Okay.  So from this panel, we then have Juror

6   No. 1, Juror No. 3, Juror No. 6, Juror No. 8, Juror

7   No. 11, Juror No. 12, Juror No. 13, Juror No. 14, Juror

8   No. 16, Juror No. 19, Juror No. 21, Juror No. 23, Juror

9   No. 24, Juror No. 27, Juror No. 28, Juror No. 29 and

10  Juror 30.

11          Correct?

12          MR. LEVIN:  Yes.

13          MR. CLARK:  Yes.

14          MR. VEREEN:  That's correct.

15          THE COURT:  So 17.

16          Let's bring those jurors in, please, so I can

17  dismiss them for the day.

18          (Whereupon, the remaining members of

19  Prospective Jury Panel No. II entered the courtroom at

20  4:34 p.m. and the following proceedings were had:)

21          THE COURT:  Anywhere is fine.

22          You may be seated.

23          Ladies and gentlemen, I'm going to dismiss you

24  for the day.  At this juncture, you're still under

25  consideration for being a member of this jury.  Final

 1   decisions will not be made until probably the end of

 2   next week.

 3           But Patricia will be calling you and letting

 4   you know whether you've been selected to sit on the

 5   jury.  You should feel free to call her at any time to

 6   find out what the status of the case is.

 7           But I'm going to continue to question other

 8   jury panels like you were questioned, and it'll take a

 9   few more days to do that.

10           Do not discuss this case either amongst

11   yourselves or with anyone else.  Have no contact

12   whatsoever with anyone associated with the trial.  Do

13   not read, listen or see anything touching on this

14   matter in any way.

15           If anyone should try to talk to you about this

16   case, you should immediately instruct them to stop and

17   report it to my staff.

18           Remember, now that you're still under

19   consideration to be a member of this jury, it's

20   important that you not see anything on the TV, read

21   anything in the media or on the Internet or listen to

22   anything on the radio about this case.

23           Thank you so much for your patience.  I know

24   it's been a long two days.  You'll be hearing from us

25   sometime next week.

```
 1              Thank you so much.  You're dismissed.

 2              (Whereupon, the remaining members of

 3    Prospective Jury Panel exited the courtroom at 4:36

 4    p.m. and the following proceedings were had:)

 5              THE COURT:  Ma'am, just wait a minute, please.

 6              You may be seated.

 7              You are Juror Number what?

 8              PROSPECTIVE JUROR NO. 28:  28.

 9              THE COURT:  You have someone else in the

10    military?

11              PROSPECTIVE JUROR NO. 28:  Yeah.  When you

12    first asked, because they're cousins that I don't

13    really see often, I didn't mention --

14              THE COURT:  That's fine.

15              Who else is in the military?

16              PROSPECTIVE JUROR NO. 28:  I have a cousin

17    whose son I know that just enlisted, and I have a

18    cousin -- a first cousin who had served.

19              THE COURT:  The cousin whose son just

20    enlisted:  In what branch of the service did --

21              PROSPECTIVE JUROR NO. 28:  I don't know.

22              THE COURT:  Do you know where his place of

23    service is going to be?

24              PROSPECTIVE JUROR NO. 28:  No.

25              THE COURT:  And the other cousin?
```

1           PROSPECTIVE JUROR NO. 28:  No.  I don't know.

2           THE COURT:  You don't snow.

3           PROSPECTIVE JUROR NO. 28:  No.

4           THE COURT:  Anything about their service,

5     whether they were in combat or injured or anything like

6     that --

7           PROSPECTIVE JUROR NO. 28:  No.

8           THE COURT:  Okay.  All right.  Ma'am.  Thank

9     you.  Have a nice weekend.

10          PROSPECTIVE JUROR NO. 28:  Thank you.

11          (Thereupon, Potential Juror No. 28 retired

12    from the courtroom and the following proceedings were

13    had:)

14          THE COURT:  As far as Tuesday goes, Tuesday

15    morning I have to deal with -- I have to take up

16    seating an alternate juror for the case that I have

17    deliberating, since one of the jurors was struck today.

18          Then I am going to be reinstructing that jury.

19    I think the jury instructions took about an hour and a

20    half.  Maybe it'll be a little shorter.  We're trying

21    to figure out a way not to have to read all of the

22    verdict forms, which are quite lengthy.  There's

23    33 counts.

24          So I think I'm going to reset this case to

25    begin at 11:00 on Tuesday.

```
 1            Have a nice weekend.  See you Tuesday, 11:00.

 2            (End of proceedings.)

 3

 4                   C E R T I F I C A T E

 5

 6       I hereby certify that the foregoing is an

 7  accurate transcription of the proceedings in the

 8  above-entitled matter.

 9

10

11  _____        /s/Lisa Edwards_____
        DATE            LISA EDWARDS, CRR, RMR
12                      Official United States Court Reporter
                        400 North Miami Avenue, Twelfth Floor
13                      Miami, Florida 33128
                        (305) 523-5499
14

15

16

17

18

19

20

21

22

23

24

25
```