```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                        MIAMI DIVISION
              CASE NO. 06-20373-CRIMINAL-LENARD
 3

 4   UNITED STATES OF AMERICA,        Miami, Florida

 5                  Plaintiff,        February 25, 2009

 6            vs.                     9:28 a.m. to 5:22 p.m.

 7   NARSEAL BATISTE, et al.,         Volume XVI

 8            Defendants.             Pages 1 to 181
     ------------------------------------------------------
 9

10                          JURY TRIAL
11          BEFORE THE HONORABLE JOAN A. LENARD,
                 UNITED STATES DISTRICT JUDGE
12

13

14   APPEARANCES:

15

16   FOR THE GOVERNMENT:       RICHARD D. GREGORIE, ESQ., and
                               JACQUELINE M. ARANGO, ESQ.
17                             ASSISTANT UNITED STATES ATTORNEYS
                               99 Northeast Fourth Street
18                             Miami, Florida 33132

19
     FOR THE DEFENDANT         ANA MARIA JHONES, ESQ.
20     NARSEAL BATISTE:        300 Seville Avenue, Suite 210
                               Coral Gables, Florida 33134
21

22   FOR THE DEFENDANT         ALBERT Z. LEVIN, ESQ.
       PATRICK ABRAHAM:        261 Northeast First Street
23                             Sixth Floor
                               Miami, Florida 33132
24

25
```

```
 1   FOR THE DEFENDANT        RODERICK D. VEREEN, ESQ.
       STANLEY PHANOR:        BRINKLEY, HENRYS & LEWIS
 2                            4770 Biscayne Boulevard
                              Suite 1200
 3                            Miami, Florida 33131

 4
     FOR THE DEFENDANT        RICHARD K. HOULIHAN, ESQ.
 5     NAUDIMAR HERRERA:      300 Aragon Avenue
                              Coral Gables, Florida 33134
 6

 7   FOR THE DEFENDANT        LOUIS CASUSO, ESQ.
       BURSON AUGUSTIN:       111 Northeast First Street
 8                            Suite 603
                              Miami, Florida 33132
 9

10   FOR THE DEFENDANT        NATHAN CLARK, ESQ.
      ROTSCHILD AUGUSTINE:    17639 South Dixie Highway
11                            Miami, Florida 33157

12
     REPORTED BY:            LISA EDWARDS, CRR, RMR
13                            Official Court Reporter
                              400 North Miami Avenue
14                            Twelfth Floor
                              Miami, Florida 33128
15                            (305) 523-5499

16

17

18

19

20

21

22

23

24

25
```

1                          I   N   D   E   X

2

3                                    Direct    Cross    Red.

4

WITNESSES FOR THE GOVERNMENT:

5

Anthony Velazquez                      5        73

6

7

EXHIBITS RECEIVED IN EVIDENCE:            PAGE

8

Government's Exhibit No. 92                39
9   Government's Exhibit Nos. 93 & 93-A       56
    Government's Exhibit No. 123              61

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  Good morning.

2              United States of America versus Narseal

3    Batiste, et al., Case No. 06-20373.

4              Counsel, state your appearances, please, for

5    the record.

6              MR. GREGORIE:  Good morning, your Honor.

7              Richard Gregorie and Jacqueline Arango on

8    behalf of the United States.

9              MS. JHONES:  Good morning, your Honor.

10             Ana Maria Jhones on behalf of Narseal Batiste,

11   who's present.

12             MR. LEVIN:  Your Honor, good morning.

13             Albert Levin on behalf of Patrick Abraham,

14   who's present.

15             MR. CASUSO:  Good morning, your Honor.

16             Lou Casuso on behalf of Burson Augustin, who

17   is present.

18             MR. CLARK:  Good morning, your Honor.

19             Nathan Clark on behalf of Rotschild Augustine,

20   who is present.

21             MR. HOULIHAN:  Richard Houlihan with Naudimar

22   Herrera.

23             MR. VEREEN:  Good morning, your Honor.

24             Roderick Vereen on behalf of Stanley Phanor,

25   who's present.

Velazquez - DIRECT - By Ms. Arango                    5

1             THE COURT:  Good morning to everyone.

2             We had one juror who ran extraordinarily late

3     this morning.  So that was the delay.  But they're now

4     here.

5             So let's bring the jurors in.

6             (Whereupon, the jury entered the courtroom at

7     9:28 a.m. and the following proceedings were had:)

8             THE COURT:  Good morning, ladies and

9     gentlemen.

10            You may be seated.

11            You are still under oath, sir.

12            You may proceed, Ms. Arango.

13            MS. ARANGO:  Thank you, Judge.

14            Good morning, ladies and gentlemen.

15            THE JURY:  Good morning.

16                 CONTINUED DIRECT EXAMINATION

17    BY MS. ARANGO:

18    Q.    Good morning, Agent Velazquez.

19    A.    Good morning.

20    Q.    I just wanted to take up where we left off

21    yesterday.

22            Now, to help the jury, just -- what was the

23    meeting that you surveilled and the location of it?

24    A.    I initially set up at a Burger King in the

25    vicinity of 5th Street and Alton Road on Miami Beach.

 1          There was some confusion with regard to where

 2     Abbas al-Saidi was going to meet with Narseal Batiste,

 3     and they were at two different Burger Kings.

 4          Abbas was at the Burger King on Alton and 5th,

 5     and Batiste was at the Burger King on -- right off 195

 6     and 41st Street.  So Abbas ended up driving to the

 7     Burger King to meet with Narseal.

 8          I did a drive-by of that location and then went

 9     back toward the vicinity of Collins and 23rd Street.

10     Q.    Before you went to Collins and 23rd Street, did

11     you get anything from Abbas?

12     A.    No.

13     Q.    Well, was Abbas wearing the recording device?

14     A.    Abbas was wearing the recording device.  After

15     Abbas was done with the meeting at the Burger King with

16     Narseal Batiste, the recording equipment was given to

17     John Stewart and Joe Garbato, who then gave me the

18     recording equipment.  I then gave it to Elie Assaad for

19     a meeting that was set up with Narseal Batiste later

20     on.

21     Q.    Okay.

22          MS. ARANGO:  And, in that respect, I'd like us

23     to turn to a wiretapped call.  It's marked W1-03384.

24     So it's W1-03384.

25

```
 1    BY MS. ARANGO:

 2    Q.    Once again, what was the date of these events?

 3    A.    April 19th, 2006.

 4    Q.    What was the purpose for you going to the other

 5    location?

 6    A.    Just to conduct somewhat of a surveillance of the

 7    meeting.  There were other agents that were also

 8    conducting a surveillance of the meeting between Abbas

 9    and Batiste.

10    Q.    At some point, did you come into possession of

11    the recording device that Abbas had on him?

12    A.    I did.  I took possession of the recording device

13    from John Stewart and Joe Garbato.

14    Q.    And what did you do with that recording device?

15    A.    After that, I made arrangements to give it to

16    Elie Assaad, who was -- who then had a meeting with

17    Narseal Batiste.

18         MS. ARANGO:  And for the benefit of the jury,

19    just once again, it's W1-03384.

20         I think everyone is ready.  Could you play

21    that -- Well, maybe not just yet.

22    BY MS. ARANGO:

23    Q.    While everyone is getting ready, where exactly

24    did you hand Elie Assaad the recording device?

25    A.    I believe it was right on 23rd Street between
```

```
 1    Collins and the street that's just north -- I'm
 2    sorry -- just west of Collins.  I don't know what that
 3    street -- I don't know the name of that street.
 4    Q.     And were you in your car when you handed him the
 5    device or were you outside of your car?
 6    A.     I believe I was in my car.
 7    Q.     And was he on foot?
 8    A.     Elie was on foot.
 9    Q.     After you handed it to him, what did you see him
10    do?
11    A.     I turned around and started walking toward
12    Collins.
13    Q.     And was he able, at least in your presence, to
14    activate the recording device?
15    A.     I was not -- he turned around and started walking
16    toward Collins.  And I did not see whether or not he
17    activated the recording device.
18              MS. ARANGO:  I think we're all ready now.
19              Let's go ahead and play that call.
20              (Whereupon, Government's Exhibit No. W1-03384
21    was published in open court.)
22    BY MS. ARANGO:
23    Q.     Agent Velazquez, do you know at what point in
24    time this phone call occurred in relation to when you
25    handed off of that recording device?
```

1    A.     Yes.

2    Q.     When was that?

3    A.     Very closely after I had given Elie the recording

4    device.

5           MS. ARANGO:  Let's turn to the next call,

6    which is W1-03385.

7    BY MS. ARANGO:

8    Q.     Just to be clear, the phone calls that we're

9    listening to now:  They're from a wiretap.  Correct?

10   A.     Correct.

11   Q.     On Batiste's phone?

12   A.     Correct.

13   Q.     These weren't recorded by Elie Assaad pursuant to

14   that recording device?

15   A.     That's correct.

16          MS. ARANGO:  Let's go ahead and play that

17   call.

18          (Whereupon, Government's Exhibit No. W1-03385

19   was published in open court.)

20   BY MS. ARANGO:

21   Q.     Agent Velazquez, what happened right after this

22   call?

23   A.     There was a meeting between Narseal Batiste and

24   Elie Assaad.

25   Q.     Okay.  And was Elie Assaad able to record that

Velazquez - DIRECT - By Ms. Arango                 10

1    meeting?

2    A.     During the meeting, I was uncertain.  After the

3    meeting, I was -- I discovered --

4           MS. JHONES:  Objection.  Objection.  Calls for

5    hearsay.

6           THE COURT:  Sustained.

7    BY MS. ARANGO:

8    Q.     Did you discuss with Elie Assaad whether or not

9    that meeting ever got recorded?

10   A.     Yes.

11   Q.     And after you received the recording equipment,

12   did you check to see if that meeting got recorded?

13          MS. JHONES:  My objection is just to the

14   leading nature of the question, your Honor.

15          THE COURT:  Sustained.

16          Rephrase your question.

17   BY MS. ARANGO:

18   Q.     What did you do to find out whether or not --

19   what, if anything, did you do to find out whether or

20   not that meeting got recorded?

21   A.     I had a discussion with Elie because you are

22   unable to determine whether or not a recording has been

23   made by looking at the recording device.

24          You would need to link the device up to a

25   computer with the corresponding software to determine

Velazquez - DIRECT - By Ms. Arango                    11

 1   whether or not the recording had actually been made.

 2   Q.    Okay.  Did you determine whether or not a

 3   recording had been made?

 4   A.    Yes.

 5          MS. JHONES:  Objection.  I think that calls

 6   for hearsay.

 7          THE COURT:  Overruled.

 8   BY MS. ARANGO:

 9   Q.    Had a recording been made?

10   A.    A recording had not been made between Elie and

11   Narseal Batiste at that meeting.

12   Q.    After Elie and Narseal Batiste met, did Elie

13   immediately report to you?

14   A.    Yes.  He phoned me on my cell phone.

15   Q.    How long after Narseal Batiste left did Elie

16   phone you on your cell phone?

17   A.    Elie called me as soon as the meeting was over

18   with Batiste.

19   Q.    And what did he say to you?

20          MS. JHONES:  Objection.  Hearsay.

21          MS. ARANGO:  Judge, I would -- it's 803(1), a

22   present-sense impression made -- a statement made --

23          THE COURT:  Come on up, please.

24          (Whereupon, proceedings were had at side-bar

25   outside the presence of the jury which have been sealed

```
 1    per instructions of the Court.)

 2              (Whereupon, the following proceedings were had

 3    in open court:)

 4              THE COURT:  Ladies and gentlemen, this is

 5    going to take a few minutes.  So I'm going to let you

 6    have a coffee break.

 7              Do not discuss this case either amongst

 8    yourselves or with anyone else.  Have no contact

 9    whatsoever with anyone associated with the trial.  Do

10    not read, listen or see anything touching on this

11    matter in any way.

12              If anyone should try to talk to you about this

13    case, you should immediately instruct them to stop and

14    report it to my staff.

15              You may leave all your materials at your

16    chairs.

17              Ten minutes.

18              (Whereupon, the jury exited the courtroom at

19    9:47 a.m. and the following proceedings were had:)

20              THE COURT:  You may be seated.

21              You may step down, sir.

22              (Witness excused.)

23              THE COURT:  Ms. Arango, did you want your

24    transcript back?

25              MS. ARANGO:  Thank you, Judge.
```

1          MS. JHONES:  Your Honor --

2          THE COURT:  One moment, please.

3          Yes.

4          MS. JHONES:  May I run upstairs just to pull

5     these two cases?  There's actually -- I'd like to see

6     the Velazquez case and the *Peacock* case that the

7     Government is referring to.

8          I apologize for not anticipating this.  I had

9     not reviewed this part of the transcript.  If I could

10    just go upstairs very quickly and review it.

11         THE COURT:  Here's *Peacock*.  You need to give

12    that back to me.

13         If you go to the tab, that's where I was.

14         MS. JHONES:  I'm trying to look at the factual

15    scenario.

16         THE COURT:  I'm sorry?

17         MS. JHONES:  I was trying to look at the

18    factual scenario.

19         THE COURT:  It lays it out at the tab.

20         MS. JHONES:  Okay.

21         Thank you.

22         THE COURT:  *Peacock* was vacated on another

23    issue.  It did not relate to forfeiture.

24         Yes, Mr. Clark.  You wanted to be heard on

25    this?

 1            MR. CLARK:  I just wanted to note my

 2   objection.  I wanted to, for the record, make the

 3   objection that the original statement that is being

 4   allegedly --

 5            THE COURT:  I can't hear you, sir.

 6            MR. CLARK:  The original statement that's

 7   allegedly being made and is trying to be brought into

 8   evidence is -- was a statement by Sultan Kahn-Bey to

 9   Narseal Batiste and it's not a co-conspirator's

10   statement because it wasn't made in furtherance of the

11   conspiracy.

12            So it's hearsay statement that would not --

13   should not come in.  So that statement doesn't qualify.

14            The other objection is the statement of

15   Narseal Batiste made to Elie Assaad -- when he said

16   that to him, that's not in furtherance of the

17   conspiracy as well.  So that's a hearsay statement that

18   can't come in.

19            THE COURT:  I don't think they're offering it

20   as a statement of the conspiracy.  They're offering it

21   under 803(1).

22            MS. ARANGO:  Correct.

23            MR. CLARK:  They're offering the statement

24   that Mr. Elie Assaad gave to Agent Velazquez as the

25   present-sense -- I understand they're making that as a

 1    present-sense impression.

 2              What I'm saying is that there's a statement

 3    from Sultan Kahn-Bey to Narseal Batiste.  Then there is

 4    a statement from Narseal Batiste to Elie Assaad.  And

 5    now there's a statement from Elie Assaad -- there's

 6    three statements -- from Elie Assaad to Agent

 7    Velazquez.

 8              The original source -- I'm saying those two

 9    statements were not made in furtherance of the

10    conspiracy.  So they're not co-conspirator's

11    statements.

12              You have to look at the original statement

13    under 805.  There's three hearsay statements.

14              This last statement -- those don't qualify

15    as -- come in under the hearsay -- because of hearsay.

16    The last statement that Mr. Assaad allegedly told

17    Agent Velazquez -- that's not a present -- even if

18    those were exceptions, that statement couldn't come in

19    because that's not -- the statement that Elie Assaad

20    made was not describing or explaining an event or

21    condition while he was perceiving it, because he wasn't

22    there.

23              He didn't see Sultan Kahn-Bey talking to

24    Narseal Batiste.  He has to be perceiving the event and

25    he has to make a statement about it.  That's what's got

```
 1   to come in.  He's just trying to bring in hearsay --

 2   rank hearsay, because Mr. Elie Assaad --

 3           THE COURT:  I think you need to look at the

 4   second part of the phrase of the rule.

 5           MR. CLARK:  I'm sorry?

 6           THE COURT:  There's more in the rule than

 7   you've indicated.

 8           MR. CLARK:  Well, you're talking about

 9   immediately thereafter.

10           But he has to still have perceived the event.

11   He has to be there present.  He would have to have

12   heard -- been available -- there with Narseal Batiste

13   and Sultan Kahn-Bey.

14           And then whatever he said, he would have to

15   have made it immediately thereafter, but he would still

16   have to be there and perceive the event.

17           So I understand that --

18           THE COURT:  Any response from the Government?

19           MS. ARANGO:  Judge, the statement made by Elie

20   Assaad is the statement that we are seeking -- is the

21   statement that falls within 803(1).  There's no

22   requirement that Elie Assaad had been present for when

23   Narseal Batiste --

24           THE COURT:  What about Mr. Clark's argument

25   that the statements -- give me the proffer again as to
```

1    what Elie Assaad told Velazquez.

2          MS. ARANGO:  Okay.  He told Velazquez that --

3    I will go back to his original testimony.

4          He talked about how nervous he was as to

5    whether or not Batiste had seen him.  And then he

6    talked about what he and Batiste talked about, which

7    was that Batiste, based on -- that Batiste thought he

8    was the FBI because Sultan Kahn-Bey had accused him of

9    being with the FBI.

10          Sultan Kahn-Bey's statements to Narseal

11   Batiste are not being offered to prove the truth of the

12   matter asserted.  That's not the purpose of that

13   statement.

14          The statement -- the entire statement in and

15   of itself as to what Narseal Batiste told Elie Assaad

16   comes in under the present-sense impression exception.

17          Whether or not there was a hearsay within that

18   is not being offered to prove the truth of the matter

19   asserted, but the effect of the statement on both

20   Narseal Batiste and Elie Assaad.

21          And, really, this is the same situation as all

22   of these cases, for instance, the *Peacock* case that

23   your Honor had cited originally.

24          In that case, the widow of Darryl Brackins

25   testified that Darryl had told her that Harvey had

```
 1    informed him that the investigation of this case had
 2    been stopped due to insufficient evidence.
 3            Harvey then told Darryl to get out of town.
 4            So it's really the same situation.  They don't
 5    discuss here the hearsay within hearsay because the
 6    whole point of the present-sense impression exception
 7    is the spontaneity of the statement and the effect that
 8    it had on the person who was making the statement.
 9            THE COURT:  I'm going to overrule the
10    objections --
11            MS. JHONES:  Your Honor, may I be heard before
12    the Court rules, please?
13            THE COURT:  Yes.
14            MS. JHONES:  May I be heard?
15            THE COURT:  Yes.
16            MS. JHONES:  Thank you.
17            Your Honor, a couple of things.
18            Number one, what we do know is that Elie
19    Assaad is going to testify.  We know that.
20            And there is absolutely no reason, no reason,
21    to have the agent testify about what it was that Elie
22    Assaad heard, because Elie Assaad is going to testify.
23            Now, going --
24            THE COURT:  This is a statement made to the
25    agent.
```

 1          MS. JHONES:  It's a statement made to the

 2   agent by Elie Assaad.

 3          THE COURT:  Right.

 4          MS. JHONES:  Yes.

 5          THE COURT:  Well, Ms. Jhones, for your case,

 6   you get to decide how you want to present it.  If it

 7   falls within the Rules of Evidence, you get to present

 8   it that way.

 9          The same thing is true for the Government.

10   They get to decide how they want to perceive and

11   present their case as long as it falls within the Rules

12   of Evidence and Rule 611.

13          MS. JHONES:  I understand.

14          If I may continue, your Honor.

15          If the Court -- and we have a -- we have --

16   relying on what was said in the last trial, we have two

17   different events.

18          We have the initial call by Mr. Assaad to

19   Mr. Velazquez immediately after the event.  A statement

20   was made to Mr. Velazquez based on that phone call.

21          Mr. Velazquez tells the informant, "Go home,"

22   you know, "Calm down.  Get some rest.  Call me back."

23          Then he calls him back.  And then we go into

24   the second set of statements.

25          And that is at Page -- from the February 8th

 1    transcript, Pages 97 and 98.

 2              THE COURT:  Are there two phone calls?

 3              MS. ARANGO:  No.

 4              What happens is there is a phone call -- Elie

 5    calls Tony Velazquez, says, basically, in an excited

 6    way that Batiste believes him to have been with the FBI

 7    because of Sultan Kahn-Bey's accusation.

 8              Tony says, "Okay.  Calm down.  Go" -- you

 9    know, "Just go back to your apartment.  I'll meet you

10    at your apartment and we'll discuss this further."

11              He goes back to his apartment.  Tony then goes

12    to Elie's apartment.  There's no second phone call.

13    There is a face-to-face meeting.

14              At that time, Elie elaborates a little bit

15    more on that initial statement that he made to Tony

16    Velazquez.

17              THE COURT:  What are you seeking to introduce?

18              MS. ARANGO:  We're seeking to introduce the

19    initial statement.  And I believe, also, that 803(1)

20    covers the further explanation of that statement

21    because it's the same theory that he didn't --

22              THE COURT:  What's the amount of time?

23              MS. ARANGO:  About 40 minutes.

24              So there is a -- there is a -- certainly

25    more -- it's not an immediate thing.  I mean, it's not

```
 1   contemporaneously.

 2           I think that it still falls within 803(1)

 3   because the statement that he made immediately

 4   thereafter is consistent with the statement that he

 5   made 40 minutes later.

 6           He doesn't change it in any way.  We're not

 7   going to introduce any new topics, just a further

 8   elaboration of that initial statement.

 9           So the theory about -- that there's no time

10   for the declarant to -- you know, that there's no

11   likelihood of deliberate or conscious misrepresentation

12   by the declarant still exists under those

13   circumstances.

14           MS. JHONES:  I would -- I'd like to read into

15   the record, your Honor, what the testimony will be.

16   The predicate, if you will, as to what occurred between

17   the initial receipt of the information telephonically,

18   where Mr. Velazquez testifies that this gentleman

19   was -- well, let me not misquote the record.

20           (Thereupon, the witness entered the courtroom

21   and the following proceedings were had:)

22           THE COURT:  Mr. Velazquez, can you wait

23   outside, please.

24           (Thereupon, the witness retired from the

25   courtroom and the following proceedings were had:)
```

```
 1              MS. JHONES:  Your Honor, on Page 97 of the
 2    transcript of February 8th, 2008, the question posed by
 3    the Government was:
 4              "When that meeting -- when that meeting with
 5    Batiste and Elie was over, Elie called me."
 6              "What did he say?" is the question.
 7              "He started telling me what had occurred
 8    and -- well, the first thing he said is that was really
 9    close with regard to the handoff of the recording
10    device and then Batiste calling him or he thought
11    Batiste had seen him.  And then he began to talk about
12    what transpired in the meeting between him and
13    Batiste."
14              The question posed by the Government after
15    that is:  "And what did he say in that phone call to
16    you?"
17              The response is:  "Well, he started talking
18    about that there was a belief that he was the FBI and
19    that Batiste didn't believe he was the FBI, the belief
20    coming from a different source, not from Mr. Batiste.
21              "And I directed him at that point," says the
22    agent, "to just -- you know, I directed him to wait a
23    few minutes and, when he felt comfortable, to go to his
24    apartment, at which point we'd make contact with him --
25    and I'd make contact with him and debrief him."
```

 1            And the problem there, your Honor, is that --
 2    I don't have to tell the Court what the problem is.
 3    The Court knows what the problem is.
 4            We have now removed this from the excited
 5    utterance stage.  I don't even think that there's been
 6    a predicate -- I have to look back in the transcript --
 7    that this guy really was under a certain condition of
 8    excitement or of whatever.
 9            But assuming for the sake of -- let's assume
10    for the sake of argument that he was.
11            But then the very -- the very reason -- not
12    the very reason.  Mr. Velazquez tells him, "Go back to
13    your apartment.  Get comfortable.  We'll talk later."
14            And then, then, they start talking about it.
15    And that's when he gets the meat of the coconut, if
16    you will, of what had actually -- what actually
17    Mr. Batiste told him.
18            And, respectfully, I submit to the Court that
19    that is absolutely removed from the excited utterance
20    exception, the second portion, in the light most
21    favorable to the Government.
22            THE COURT:  I'll allow the first phone call in
23    under 803(1).
24            I cite *United States versus Peacock*, 654 F.2d
25    339 at Page 350, a 1981 decision by the Fifth Circuit;

 1    and *United States versus Scrima*, 819 F.2d 996, a 1987

 2    decision by the Eleventh Circuit.

 3              The later conversation would not be admissible

 4    under 803(1), as the rule requires either while the

 5    person is perceiving the event or immediately

 6    thereafter.

 7              Ready?

 8              MS. ARANGO:  Ready.

 9              THE COURT:  Let's bring the jurors in.

10              MS. ARANGO:  Judge, could I have a moment to

11    tell Agent Velazquez we're not going to discuss the

12    second meeting?

13              THE COURT:  Sure.  Sure.

14              (Whereupon, the jury entered the courtroom at

15    10:13 a.m. and the following proceedings were had:)

16              THE COURT:  You may be seated.

17              You are still under oath, sir.

18              You may proceed.

19    BY MS. ARANGO:

20    Q.    Agent Velazquez, just to pick up where we left

21    off, after Elie Assaad met with Narseal Batiste, did he

22    call you?

23    A.    He did.

24    Q.    How long after Narseal left that meeting did he

25    call you?

Velazquez - DIRECT - By Ms. Arango                    25

 1   A.      Right after the meeting.

 2   Q.      Let's just -- where did the meeting occur?

 3   A.      The meeting occurred in the vicinity of Collins

 4   and 23rd Street.

 5   Q.      About how long did the meeting last?

 6   A.      I'd say 30 to 40 minutes.

 7   Q.      What did Elie Assaad tell you when he called you

 8   right after that meeting was over?

 9   A.      What Elie told me in the phone call was that he

10   just finished meeting with Batiste.  He was nervous

11   because he thought Batiste had saw -- saw him get the

12   recording device from me.

13          And he began to tell me that Batiste had had a

14   meeting and, at the meeting, it was believed that Elie

15   was working with the FBI and that some of Batiste's men

16   were with him and some of his men weren't.

17          He said this in one continuous flow.  Elie's a

18   hard guy to cut off sometimes when he starts talking.

19          I then told Elie that I would do a full

20   debriefing and to go up to his apartment and, when we

21   felt it was comfortable, that Batiste and anybody he

22   was with had left the area, I would go up to his

23   apartment and do a full debriefing.

24   Q.      Okay.  And did you do a full debriefing at his

25   apartment later?

1    A.    I did, about 45 minutes to an hour later.  I went

2    up to his apartment and debriefed him.

3    Q.    Without saying what he told you in that later

4    debriefing, what was the effect of what Elie Assaad

5    told you in that phone conversation -- what was the

6    effect on this investigation?

7    A.    The effect that it had on the investigation was

8    that Elie's cover had possibly been blown.  We had to

9    make a decision whether we were going to immediately

10   effect arrest or continue and try to preserve or

11   determine whether we could preserve the undercover

12   components of the investigation.

13        And so we had several meetings to discuss this

14   matter.  At the same time, we reviewed all the

15   telephone calls occurred during that time period to see

16   if we could pick up any information to indicate one way

17   or the other what had actually happened.

18        MS. JHONES:  Your Honor, just for the record,

19   I need to reserve a motion, based on that response.

20        THE COURT:  Go ahead.

21   BY MS. ARANGO:

22   Q.    What decision did FBI make after Elie's cover had

23   been blown?

24        MS. JHONES:  Objection as to the form of the

25   question.

 1          THE COURT:  Overruled.

 2          THE WITNESS:  The decision that was made was

 3    for Elie to continue to try to maintain contact with

 4    Batiste under the guise of introducing this bomb expert

 5    from Europe, who was actually an undercover officer

 6    that we were hoping to inject into the scenario, and

 7    continue the investigation and gather more information.

 8    BY MS. ARANGO:

 9    Q.    And why did FBI decide to do that as opposed to

10    ending the investigation?

11    A.    Well, when faced with the possibility of

12    potential compromise of your undercover operative,

13    there's two decisions you have to make.

14          You can either take actions to confirm it or

15    you can take actions to, hopefully, preserve the

16    undercover -- the cover of your operative.

17          In this case, we chose to try and maintain the

18    cover of the operative and maintain contact and

19    reassure Batiste that everything was okay in spite of

20    what may or may have not been said.

21    Q.    Okay.  And did you give Elie any direction in

22    that regard?

23    A.    After the meeting on the 19th, Elie was directed

24    to, you know, continue to make phone calls to Batiste

25    to try to set up a meeting and use the undercover

```
 1   operative or the bomb expert from Europe and Sultan

 2   Kahn-Bey as potential opportunities for that meeting.

 3   Q.    Now, what else, if anything, happened on

 4   April 19th in connection with this investigation?

 5   A.    On April 19th, on the same evening, there was a

 6   shooting incident that occurred at the Embassy at

 7   Liberty City where Sultan Kahn-Bey --

 8           MS. JHONES:  Objection.  Calls for hearsay,

 9   your Honor.

10           THE COURT:  Sustained.

11   BY MS. ARANGO:

12   Q.    Was Sultan Kahn-Bey ever arrested?

13   A.    He was arrested on the evening of April 19th,

14   2006.

15   Q.    What was he arrested for?

16   A.    I don't remember what the exact charge was, but

17   it involved the -- a firearm and a shooting.

18   Q.    Now, did you -- what, if any -- well, what, if

19   any, directions did you give Elie regarding making

20   phone calls after April 19th?

21   A.    Elie was directed to call Batiste and set up a

22   meeting.

23           We would then listen to some of the messages that

24   were left or review some of the messages that were left

25   on Batiste's phone.
```

 1          We determined that Batiste wasn't calling Elie

 2     back, and Elie was directed to continue to make phone

 3     calls to Batiste as other things were happening in the

 4     investigation.

 5     Q.     And did Elie do so?

 6     A.     He did.

 7          MS. ARANGO:  Now, let me refer to a wiretapped

 8     call, W2-03904.  W2-03904.  The W2-s are at the bottom

 9     portion.  W2-03904.

10     BY MS. ARANGO:

11     Q.     What's the date of this phone call, Agent?

12     A.     This is April 21st, 2006, at approximately

13     11:59 a.m.  The participants are Narseal Batiste and

14     Elie Assaad.

15     Q.     How long after April 19th is this?

16     A.     Two days.

17          MS. ARANGO:  Everybody ready?

18          Let's go ahead and play that call.

19          (Whereupon, Government's Exhibit No. W2-03904

20     was published in open court.)

21     BY MS. ARANGO:

22     Q.     Agent Velazquez, at Page 2, where Elie Assaad

23     says, "I have to take the brother -- our brother from

24     Europe to see the warehouse 'cause -- you know, for

25     them to see where the money is going, because I have to

 1   support, also, to protect myself" and then further

 2   over, on Page 3, where he continues and says, "When he

 3   go back for the money, you know, what he does tell

 4   them, 'Hey, I saw the warehouse.  Hey, I saw the

 5   leader, Brother Naz.  I say hi to him,' it would be

 6   nice for us, brother, when I ask for money -- they will

 7   send you money to the account faster," now, were those

 8   statements made consistently with your direction to

 9   Elie Assaad?

10          MS. JHONES:  Objection.  Leading.

11          THE COURT:  Sustained.

12          Rephrase your question.

13   BY MS. ARANGO:

14   Q.    Were those statements -- well, let me ask you

15   something:  Did you direct Elie Assaad prior to make

16   those phone calls?

17   A.    I did.

18   Q.    What, if any, consistency was there between what

19   you told Elie Assaad and what he did?

20   A.    He was -- Elie followed the instructions that

21   were given to him with regard to trying to set up a

22   meeting with Batiste and introducing an undercover

23   officer from Scotland Yard who was posing as a bomb

24   expert from Europe who we had actually brought down to

25   Miami for purposes of being introduced to Batiste and

1    his organization.

2    Q.    And this statement about the money, that it would

3    be nice for the brother when he asked for the money:

4    Was that or was that not consistent?

5    A.    I don't recall giving Elie instructions with

6    regard to mentioning finances.  He was just instructed

7    to set up the meeting --

8         MS. JHONES:  Objection.  Objection.

9    Nonresponsive, to the second part.

10        THE COURT:  Overruled.

11        THE WITNESS:  He was instructed to set up a

12   meeting and to use the undercover operative or the bomb

13   expert from Europe as a pretext, if he could, to set up

14   a meeting with Batiste.

15   BY MS. ARANGO:

16   Q.    Over on Page 4, you know, Elie talks about -- he

17   mentions, "I open my vein for you.  Yes.  And you told

18   me you will open your vein for me."

19        Are statements like that consistent with the

20   direction that you gave to Elie Assaad?

21        MS. JHONES:  Your Honor, I believe that that's

22   an improper question.  Form of the question.

23        THE COURT:  Overruled.

24        THE WITNESS:  Yes.

25

1   BY MS. ARANGO:

2   Q.    Why is that?

3   A.    Elie is attempting to reassure Batiste that

4   they're on the same page and he could be trusted.  He

5   trusts Batiste and Batiste trusts him.

6           MS. ARANGO:  Let's go to the next phone call

7   that same day, which is W2-03957.  W2-03957.  It's the

8   next tab.

9   BY MS. ARANGO:

10  Q.    Who were the participants in this phone call?

11  A.    The participants are Narseal Batiste, Minerva

12  Vasquez and Naudimar Herrera.

13          (Whereupon, Government's Exhibit No. W2-03957

14  was published in open court.)

15  BY MS. ARANGO:

16  Q.    Agent Velazquez, based on your involvement in

17  this investigation and your review of the recordings

18  and your experience as a trained undercover agent, do

19  you have any opinions as to what Minerva Vasquez

20  Hernandez was referring to when she told Narseal

21  Batiste, "I was just calling to make sure that you

22  don't meet up with that guy over there -- okay? -- at

23  the warehouse" and then, further down, "until we can

24  move him out of our lives and everybody else around"?

25  A.    Yes.

1    Q.    And what's that opinion?

2          MS. JHONES:  Your Honor, 701.

3          THE COURT:  Overruled.

4          THE WITNESS:  The reference to "that guy" is a

5    reference to Elie Assaad, and "the warehouse" is the

6    warehouse that meetings had previously taken place.

7    BY MS. ARANGO:

8    Q.    Now, did you continue to direct Elie Assaad to

9    make phone calls to Narseal Batiste?

10   A.    Yes.

11   Q.    And were those phone calls similar to the call

12   that we listened to two calls ago?

13   A.    Similar with regard to --

14         MS. JHONES:  Objection, your Honor.  Calls for

15   hearsay.  Form of the question.  I'm not exactly sure

16   what she's asking.

17         THE COURT:  Sustained.

18         Rephrase your question.

19   BY MS. ARANGO:

20   Q.    What kind of -- did you direct Elie Assaad in any

21   way regarding making phone calls to Narseal Batiste?

22   A.    Yes.  Elie was directed to continue making phone

23   calls to Narseal Batiste and attempt to set up a

24   meeting.

25   Q.    And were those phone calls similar to the one we

 1   listened to two calls ago?

 2   A.    Yes.

 3         MS. JHONES:  Again, the same objection, your

 4   Honor.

 5         THE COURT:  Overruled.

 6   BY MS. ARANGO:

 7   Q.    What was your answer?

 8   A.    My answer was, "Yes."

 9   Q.    Now, what effects, if any, did those phone calls

10   by Elie Assaad to Narseal Batiste have on this

11   continuing investigation?

12   A.    That there was some degree of uncertainty as to

13   whether or not Elie was actually working for the FBI.

14   Q.    Was Elie effective in reconnecting with Narseal

15   Batiste?

16         MS. JHONES:  Objection -- Withdrawn.

17         THE WITNESS:  No, he was not.

18   BY MS. ARANGO:

19   Q.    Did anything of significance happen in this

20   investigation after April 21st?

21         MS. JHONES:  Objection as to the form, your

22   Honor.

23         THE COURT:  Sustained.

24         Rephrase your question.

25

```
 1   BY MS. ARANGO:

 2   Q.    What happened in this investigation after

 3   April 21st?

 4   A.    On April 27th, Master Athea was interviewed at

 5   the FBI in North Miami Beach.

 6   Q.    How is it that Master Athea came to the North

 7   Miami Beach FBI office?

 8             MS. JHONES:  Objection.  It calls for hearsay.

 9             THE COURT:  Overruled.

10             THE WITNESS:  Master Athea called to report

11   information to law enforcement that he thought was

12   important.

13   BY MS. ARANGO:

14   Q.    So you had not reached out to Master Athea?

15             MS. JHONES:  Objection.  Leading.

16             THE COURT:  Sustained.

17             Rephrase your question.

18   BY MS. ARANGO:

19   Q.    Did the FBI contact Master Athea?

20   A.    No.

21   Q.    Did you meet with Master Athea?

22   A.    Eventually, I met with Master Athea.  But on the

23   27th of April, he was interviewed at our office and I

24   could see -- I could see and listen to the interview as

25   it occurred.
```

1    Q.     Did you ever meet with him face to face?

2    A.     I did.

3    Q.     And did he ever agree to do anything in reference

4    to this investigation?

5           MS. JHONES:  Objection, your Honor.  Leading

6    and calls for hearsay.

7           THE COURT:  Sustained.

8           Rephrase your question.

9    BY MS. ARANGO:

10   Q.     Well, as a result of your meetings with Master

11   Athea, what happened?

12   A.     He agreed to --

13          MS. JHONES:  Objection, your Honor.  It calls

14   for hearsay.

15          THE COURT:  Overruled.

16          THE WITNESS:  Master Athea agreed to meet with

17   Narseal Batiste and record that conversation.

18   BY MS. ARANGO:

19   Q.     Did he consent to wearing a recording device?

20          MS. JHONES:  Again, your Honor, same

21   objection.

22          THE COURT:  Sustained.

23          Rephrase your question.

24   BY MS. ARANGO:

25   Q.     Let me show you what's been marked as

Velazquez - DIRECT - By Ms. Arango                37

```
 1   Government's Exhibit 92 and ask you if you recognize

 2   it.

 3          MS. JHONES:  I have an objection to this

 4   document, your Honor, and I think we have to go

 5   side-bar, respectfully.

 6          THE COURT:  Come on up.

 7          (Whereupon, proceedings were had at side-bar

 8   outside the presence of the jury which have been sealed

 9   per instructions of the Court.)

10          (Whereupon, the following proceedings were had

11   in open court:)

12   BY MS. ARANGO:

13   Q.    Agent Velazquez, did you meet with Master Athea

14   regarding consent to record a conversation?

15   A.    I did.

16   Q.    And did you make him any -- make him any promises

17   of any kind to consent to make that recording?

18   A.    No.

19   Q.    Did you present a consent form to him to consent

20   to make that recording?

21   A.    Yes.

22   Q.    And did you fill out the consent form?

23   A.    I did.

24   Q.    Did you read the consent form to him prior to him

25   signing it?
```

 1   A.    I don't recall if I read it to him or if I had

 2   him read it to me.

 3   Q.    And did you witness him signing it?

 4   A.    I did.

 5   Q.    Did you sign it yourself?

 6   A.    I did.

 7   Q.    Let me show you what's been marked as

 8   Government's Exhibit No. 92, and ask you if you

 9   recognize it.

10   A.    Yes.

11   Q.    What is it?

12   A.    This is an FD-473, which is a consent form that

13   the FBI uses.

14   Q.    And was that the consent form that was provided

15   to Master Athea?

16   A.    Yes.

17   Q.    And was that done in your presence?

18   A.    Yes.

19   Q.    Who filled out the blank portions of that consent

20   form?

21   A.    I believe it was John Stewart.

22   Q.    Did you sign that consent form?

23   A.    I did.

24   Q.    Did you witness Master Athea signing the consent

25   form?

```
 1   A.    I did.

 2   Q.    And who else signed the consent form?

 3   A.    John Stewart.

 4   Q.    Is that a -- is that the original consent form

 5   signed by Master Athea?

 6   A.    This is the original consent form.

 7   Q.    Has it been changed or altered in any way?

 8   A.    No.

 9         MS. ARANGO:  Government offers 92 into

10   evidence.

11         MS. JHONES:  Your Honor, subject to our

12   discussion side-bar.

13         THE COURT:  The objections are overruled.

14         It will be admitted as Government's

15   Exhibit 92.

16         (Whereupon, Government's Exhibit No. 92 was

17   entered into evidence.)

18         MS. ARANGO:  May I publish?

19         THE COURT:  Yes.

20         MS. ARANGO:  Thank you.

21   BY MS. ARANGO:

22   Q.    Agent Velazquez, I know this is kind of blurry.

23   So I'm just going to hand it to you and ask that you

24   read the consent form into the record.  Thank you.

25   A.    Would you like me to start at the beginning of
```

1    the blank areas?

2    Q.    Yes, please.  ^ Some are your carats below

3    A.    The date is 5-5-06.  The location is Miami,

4    Florida.

5          "I, Master G.J.G. Athea, 4010 Northeast 141st

6    Street, Miami, Florida, hereby authorize SA John P.

7    Stewart and SA Anthony Velazquez, special agents of the

8    Federal Bureau of Investigation, United States

9    Department of Justice, to place a body recorder" --

10   which is checked -- "transmitter" -- which is

11   checked -- "on my person for the purpose of recording

12   any conversations with Narseal Batiste and others yet

13   unknown which I may have on or about 5-5-06 and

14   continuing this until such time as either I revoke my

15   permission or the FBI terminates the investigation.

16         "I have given this permission to the above-named

17   special agents voluntarily and without threats or

18   promises of any kind.

19         "I understand that I must be a party to any

20   conversations -- any conversation in order to record

21   that conversation.

22         "I therefore agree not to leave the recording

23   equipment unattended or take any other action which is

24   likely to result in the recording of conversations to

25   which I am not a party.

```
 1            "Signed, Master G.J.G. Athea.

 2            "Witnesses:  John P. Stewart, Anthony Velazquez."

 3   Q.    Thank you.

 4         Now, did Master Athea actually record -- secretly

 5   record any conversations with Narseal Batiste

 6   consistent with that consent form?

 7   A.    He did.

 8   Q.    When did that occur?

 9   A.    I believe it was the next day, on the 16th.

10   Q.    And did you give him the recording device before

11   he went into that meeting?

12   A.    I did.

13   Q.    Did you -- how long did the meeting last?

14   A.    That -- the meeting lasted, I think, an hour and

15   30 minutes.  The recording itself is quite lengthy

16   because there was quite a period of time from the time

17   the recorder was activated, given to Master Athea and

18   he actually met with Batiste.  There was a period of

19   time where Master Athea waited for Batiste to meet with

20   him.

21   Q.    And did you meet with him after he had met with

22   Narseal Batiste?

23   A.    Yes.

24   Q.    And did you retrieve the recording device at that

25   time?
```

```
 1   A.     I did.

 2   Q.     And since then, was a copy made of the recording

 3   on that device?

 4   A.     Yes.

 5   Q.     I'm going to show you what's been marked as

 6   Government's Exhibits 93 and 93-A, and ask you if you

 7   recognize them.

 8          MS. ARANGO:  Judge, before I hand him the

 9   transcript, I would like to have a brief side-bar with

10   you regarding a previous court order.

11          THE COURT:  We're going to take a break

12   anyhow, because I need to give Lisa a break at some

13   point to rest her fingers.

14          Do not discuss this case either amongst

15   yourselves or with anyone else.  Have no contact

16   whatsoever with anyone associated with the trial.  Do

17   not read, listen or see anything touching on this

18   matter in any way.

19          If anyone should try to talk to you about this

20   case, you should immediately instruct them to stop and

21   report it to my staff.

22          You may leave your notebooks in your chairs.

23   Please be back in the jury room in 15 minutes.

24          (Whereupon, the jury exited the courtroom at

25   10:59 a.m. and the following proceedings were had:)
```

1            THE COURT:  You may be seated.

2            You may step down, sir.

3            (Witness excused.)

4       MS. ARANGO:  A couple of things, Judge.

5            First of all, this witness reviewed the

6  original transcript that has the nonredacted portions

7  of it, the original -- before the court-ordered

8  redactions.

9            I would ask this Court -- given that there's

10  going to be -- well, first of all, I would ask for a

11  limiting instruction just instructing the jury that the

12  statements made by Master Athea are contextual and that

13  some of those statements have been removed because they

14  were found to be not contextual.

15            THE COURT:  There are blackouts in the

16  transcript?

17       MS. ARANGO:  What they are is whiteouts.

18            So I just -- I didn't want to ask Tony

19  Velazquez if he's reviewed this and him to say "yes,"

20  but there's portions of it removed pursuant to court

21  order.

22            I wanted just to get that -- make that clear

23  on the record.  I also didn't want to, you know,

24  violate any court orders myself.

25            The other thing is that I'm not quite sure

```
 1    what Ms. Jhones is going to be introducing.  But I just

 2    put this out, that any statements made by Master Athea

 3    that are, you know, not contextual, just his rantings

 4    and ravings or whatnot -- they similarly fall within

 5    your order that they are inadmissible hearsay.

 6              You know, this -- as Agent Velazquez

 7    testified, they met for a certain period of time, but

 8    there was a lengthy period of time either when he was

 9    waiting for him or perhaps they were having

10    conversations that were irrelevant to this case.

11              So I just throw that out there because I'm not

12    quite sure what she's got in mind.  But I would say

13    what's good for the goose is good for the gander.

14              If Master Athea made any statements that are

15    not contextual -- because this comes in as Narseal

16    Batiste's 801(d)(2)(E) statements.

17              MS. JHONES:  Your Honor, to say "I'm just

18    throwing that in there" -- that absolutely removes

19    everything that we discussed side-bar with respect to

20    the transcript -- the recording.

21              THE COURT:  I don't understand what that

22    means.

23              MS. JHONES:  The Government said on side-bar

24    that they would not have an objection to the entire

25    recording and the entire transcript coming in.
```

```
 1              I have no problem --

 2              THE COURT:  No.

 3              What they said was they would introduce the

 4    entire recording --

 5              MS. ARANGO:  Right.

 6              THE COURT:  -- and that you could then present

 7    in your case what you wanted to present.

 8              MS. JHONES:  Correct.  Without objection.

 9              Just so the Court is clear, the record is

10    clear --

11              THE COURT:  I don't think they said without

12    objection.  They said you could present in your case

13    what you wanted to present.

14              MS. JHONES:  So the record is clear, your

15    Honor, this recording -- the portions that were

16    excluded -- that were redacted within the recording,

17    which is a small excerpt -- the portions that were

18    excluded had to deal with something regarding Patrick

19    Abraham.

20              I don't recall offhand.  Maybe Mr. Levin

21    remembers.

22              And it had -- I don't remember what it was.

23    It was -- it wasn't -- the portions that were removed

24    had nothing to do with -- unfortunately, I just don't

25    remember.  I have the side-bar discussion somewhere
```

```
1    here that I could get to and look at later.

2         But --

3         MS. ARANGO:  She does that, Judge, because

4    it's completely inconsistent with what she's saying.

5         THE COURT:  As I recall, it was something --

6    there was something about guns that was redacted.

7         MS. ARANGO:  I will just note that, in the

8    first trial, this recording came in with the Patrick

9    Abraham statement redacted, as far as I can recall.

10        MR. LEVIN:  Redacted.  The correct.

11        MS. ARANGO:  Redacted.

12        And then these statements came in.

13        And then, in the second trial, Ms. Jhones --

14   in addition to the redaction that Mr. Abraham sought,

15   Ms. Jhones asked for additional redactions based on it

16   being not contextual.

17        And your Honor agreed with her in certain

18   circumstances, and your Honor carefully and

19   thoughtfully went back and reviewed it and found

20   portions that you found to be not contextual.  I think

21   it had to do with guns and a few other things.

22        And you ordered the Government to redact that,

23   and we did.

24        MS. JHONES:  Your Honor, just so we're clear,

25   this is at least, at least, a four-hour conversation.
```

1          At no time except now -- and, again, we will

2     address this later -- but at no time has the Court

3     looked at the entire transcript.  At no time has the

4     Court listened to this entire recording.

5          So I don't want there to be any type of

6     allegation or belief that the Court has ruled on the

7     issue of this.

8          We vehemently objected to this --

9          THE COURT:  Ms. Jhones, what I ruled on was,

10    at the prior trial, the Government sought to admit

11    certain portions of the transcript and, at your

12    request, I redacted certain statements that I found

13    were not coming in for context only.

14         MS. JHONES:  Correct.

15         What I'm saying, your Honor -- because I may

16    have confused the record -- or confused the Court, and

17    I don't mean to do that -- we objected vehemently --

18         THE COURT:  I'm not confused.

19         MS. JHONES:  Okay.  Good.

20         We objected vehemently to these two items

21    coming in first trial.  We objected vehemently --

22         THE COURT:  I know you've objected.  I've

23    overruled your objections.

24         MS. JHONES:  I understand.

25         But so that -- we will address the -- whatever

```
 1    needs to be addressed once the entire transcript and
 2    the entire recording -- because, again, Government's
 3    Exhibit 92 -- I'm sorry -- Government's Exhibit 93 -- I
 4    don't believe that the Government is -- maybe I'm
 5    incorrect.  The Government is introducing the entire
 6    recording absent the portions that were redacted.
 7            Correct, Ms. Arango?
 8            MS. ARANGO:  I don't know.  This is the entire
 9    CD without redactions?  This is the audio recording
10    without redactions?
11            MS. JHONES:  No.  This is the -- I'm sorry.
12            MS. ARANGO:  The --
13            THE COURT:  93 is what?
14            MS. ARANGO:  This is redacted.
15            THE COURT:  So that's the redactions -- that's
16    the entire recording with the redactions that I
17    previously ordered?
18            MS. ARANGO:  Judge, we'll have to check.
19    Definitely there's -- your redactions are in this
20    recording.
21            What I am not sure of -- I'm now being told --
22    is that this may be the only -- this recording may
23    only have the one hour where he met with Narseal
24    Batiste, not the three or three and a half hours before
25    he met with him and after he met with him that was
```

```
 1    picked up on the recording.

 2              THE COURT:  Now I am confused.

 3              MS. ARANGO:  As Agent Velazquez explained,

 4    when Master Athea took the tape, he turned it on.  It

 5    recorded -- the actual recording was about four or four

 6    and a half hours long.

 7              He met with Narseal Batiste --

 8              THE COURT:  So he just started recording?

 9              MS. ARANGO:  Exactly.

10              So there's all sorts of stuff with him not

11    even meeting with Narseal Batiste.

12              THE COURT:  Okay.

13              MS. ARANGO:  I'm not -- we're going to go

14    check this.  After the Court's ruling, we went back to

15    the original recording and we redacted the portions

16    that you ordered redacted.

17              THE COURT:  Right.

18              So this CD may only be the conversation

19    between Batiste and Athea?

20              MS. ARANGO:  Correct.

21              MS. JHONES:  I could tell the Court, your

22    Honor --

23              MS. ARANGO:  I'm sorry.

24              Can I just put for the record the redactions,

25    so, that way, it's clear?
```

1          THE COURT:  Sure.

2          MS. ARANGO:  At Page 5 of 93-A, the first

3     redaction was Master Athea saying that, "I never knew

4     the Honorable Elijah Mohammed to even carry as much as

5     a penknife, less alone a weapon.  You know what I'm

6     saying?  And I just did not -- I just did not agree

7     with being involved with somebody who's talking about

8     having weapons.  You understand?"

9          Then on that same page, he goes on to say,

10    which is redacted, "Because I know this war is not

11    gonna be one with no physical weapons.  It's a

12    spiritual law that we're up against.  It's a spiritual

13    thing.  You know what I'm saying?"

14          And then, "To -- to talk about dealing in

15    arms, dealing in -- in stuff like that, then I know I

16    didn't want -- I didn't want to have no part of that.

17    And I didn't want to have no parts of you being a part

18    of Universal Divine Saviors, if that's the case."

19          That's Page 5.

20          And then, at Page 10, at the top of the page,

21    Master Athea -- this is what's redacted -- "You know

22    what I'm saying?  The kind of sources -- I thought when

23    you said 'vehicles' -- but I didn't realize you were

24    talking about weapons and all that kind of stuff as

25    well.  You know what I'm saying?

1          I told you would -- we -- we -- they'd need --

2   you know, we could get what kind of vehicles you

3   needed.  But as far as weapons, I wouldn't.  I -- what

4   was -- what we -- what we gonna do with weapons?"

5          That's at Page 10.

6          And then the last redaction is at Page 12.

7          Mr. Narseal Batiste says, "Hey, Master, like I

8   say, there's a difference of what somebody can repaint

9   the picture on somebody and cause them to look a

10  certain way that they're really not.  That was under

11  the auspices of Brother Pat."

12         Then Master Athea responds, "Huh?  That was

13  the -- huh?  That was under the auspices of him?"

14         And Narseal Batiste says, "Exactly."

15         Master Athea responds, "What?  Thinking like

16  that?"

17         Narseal Batiste:  "Uh-huh."

18         Master Athea:  "As far as getting a lot of

19  guns and stuff?"

20         And then Narseal Batiste responds, "Well,

21  the -- well, he's an illegal alien over here in the

22  United States.  So everything he thinks about is

23  twisted and negative.  He always thinks to try his way

24  on everything -- into everything."

25         That passage in its entirety was redacted and

```
 1    is redacted from the present transcript.

 2            THE COURT:  So what I'm going to instruct the

 3    jury is that the statements made by Master Athea are

 4    not coming in for the truth of the matter asserted,

 5    but, rather, are contextual.

 6            I have ordered certain statements redacted.

 7    You are not to consider what might have been stated.

 8            MS. ARANGO:  Thank you.

 9            THE COURT:  So let's take about seven minutes.

10    We're in recess for seven.

11            (Thereupon a recess was taken, after which the

12    following proceedings were had:)

13            THE COURT:  We're back on United States of

14    America versus Narseal Batiste, et al., Case

15    No. 06-20373.

16            Counsel, state your appearances, please, for

17    the record.

18            MR. GREGORIE:  Richard Gregorie and Jacqueline

19    Arango on behalf of the United States, your Honor.

20            MS. JHONES:  Ana Jhones on behalf of Narseal

21    Batiste, who is present.

22            MR. LEVIN:  Albert Levin on behalf of Patrick

23    Abraham.

24            MR. CASUSO:  Lou Casuso on behalf of Burson

25    Augustin, who's present.
```

1          MR. CLARK:  Nathan Clark on behalf of

2     Rotschild Augustine.

3          MR. HOULIHAN:  Richard Houlihan with Naudimar

4     Herrera.

5          MR. VEREEN:  Roderick Vereen on behalf of

6     Stanley Phanor, who's present.

7          THE COURT:  All Defendants are present.

8          Let's bring --

9          MS. ARANGO:  Judge, may I put on the record

10    briefly that we did check Government's Exhibit 93.  It

11    does contain the entire 4 hours and 15 minutes.

12          I just want to note for the record that it is

13    not until 2 hours and 47 minutes into the recording

14    that Master Athea meets with Narseal Batiste, leaving

15    about 88 minutes.  But within that 88 minutes, Master

16    Athea drives away and meets with the FBI and they take

17    the recording device off him.

18          But I just wanted to note for the record that

19    the entire recording is contained within Government's

20    Exhibit 93, and the portions that you ordered redacted

21    have been redacted from the recording as well.

22          THE COURT:  Okay.  Let's bring them in.

23          (Whereupon, the jury entered the courtroom at

24    11:34 a.m. and the following proceedings were had:)

25          THE COURT:  You may be seated.

```
 1                You are still under oath, sir.

 2                You may proceed.

 3                MS. ARANGO:   Thank you, Judge.

 4   BY MS. ARANGO:

 5   Q.    Agent Velazquez, I'm going to show you what's

 6   been marked as Government's Exhibits 93 and 93-A ask

 7   you if you recognize them.

 8   A.    Government's Exhibit 93 is a recording of the

 9   meeting which occurred on May 16th, 2006, between

10   Narseal Batiste and Master Athea.

11   Q.    And what is Government's Exhibit 93-A?

12   A.    And Government's Exhibit 93-A is a typed

13   transcript of that meeting.

14   Q.    Now, going back to Government's Exhibit 93, let

15   me ask you this:  Did you monitor -- were you able to

16   hear the meeting between Master Athea and Narseal

17   Batiste as it occurred?

18   A.    Yes.

19   Q.    Okay.  And is Government's Exhibit 93 -- does it

20   contain a true and accurate recording of that meeting?

21   A.    It does.

22   Q.    Are there any material alterations to the

23   original recording?

24   A.    No, there aren't.

25   Q.    After -- well, let me ask you this:  After the
```

```
 1   recording was made, was it copied onto a disc?

 2   A.     It was.

 3   Q.     And is that the disc that's marked as

 4   Government's Exhibit 93?

 5   A.     Yes.

 6   Q.     Have you reviewed that recording?

 7   A.     I have.

 8   Q.     And is it consistent with your recollection of

 9   the conversations that you monitored between Master

10   Athea and Narseal Batiste?

11   A.     Yes.

12   Q.     And have you reviewed Government's Exhibit 93-A?

13   A.     I have.

14   Q.     Have you reviewed it in conjunction with

15   listening to the recording?

16   A.     I have.

17   Q.     And is it a true and accurate transcript of a

18   portion of the meeting that occurred between Narseal

19   Batiste and Master Athea?

20   A.     It is.

21   Q.     And are the speakers accurately identified?

22   A.     They are.

23          MS. ARANGO:  Government offers 93 and 93-A

24   into evidence.

25          MS. JHONES:  Just subject to the side-bar
```

 1    discussion, your Honor.

 2               THE COURT:  The objections are overruled.

 3               It will be admitted -- they will be admitted

 4    as Government's Exhibits 93 and 93-A.

 5               (Whereupon, Government's Exhibit Nos. 93 and

 6    93-A were entered into evidence.)

 7    BY MS. ARANGO:

 8    Q.    Agent Velazquez, how long did Master Athea wear

 9    the recording device and, thus, record?

10    A.    Several hours.

11    Q.    About how many hours?  "Several" meaning two or

12    "several" meaning four?

13    A.    Between three and four hours.  He -- he had

14    possession of the recording device while it was

15    recording.

16    Q.    Okay.  And did he meet with Narseal Batiste for

17    that entire time?

18    A.    No.

19    Q.    How much time was it -- elapsed before he met

20    with Narseal Batiste?

21    A.    It's about two hours before Narseal Batiste --

22    before Master Athea actually meets with Narseal Batiste

23    and they start to talk to each other.

24    Q.    Okay.  Thank you.

25               THE COURT:  Are you going to publish that at

1    this time?

2          MS. ARANGO:  I will, Judge.  I was just going

3    to ask if I could hand out the redacted transcripts to

4    the jury.

5          THE COURT:  One moment.

6          Ladies and gentlemen of the jury:  The

7    statements made by Master Athea in this exhibit are not

8    coming in for the truth of the matter asserted, but,

9    rather, are contextual.

10         I have ordered certain statements redacted.

11   You are not to consider what might have been stated.

12         MS. ARANGO:  Thank you.

13         THE COURT:  You may proceed.

14         MS. ARANGO:  Thank you, Judge.

15         May I hand out the transcripts to the jury?

16         THE COURT:  Yes.

17         MS. ARANGO:  Thank you.

18   BY MS. ARANGO:

19   Q.    Just so there's no confusion, Agent Velazquez,

20   are there portions of the transcript that have been

21   redacted or taken out pursuant to the Court's order?

22   A.    Yes.

23   Q.    And does that -- is that the case for the

24   recording as well as for the transcript?

25   A.    Yes.

```
 1              THE COURT:  Do you have a transcript for
 2   myself and for Lisa?
 3              MS. ARANGO:  Yes.  I apologize, Judge.
 4              We're going to play several clips from that
 5   recording.  I will ask the jurors to turn to Page 2 and
 6   we'll start about a third of the way down.
 7              (Whereupon, segments of Government's Exhibit
 8   No. 93 were published in open court.)
 9              MS. ARANGO:  Now we're going to play the
10   second clip, starting at Page 5, just after this.
11              (Whereupon, segments of Government's Exhibit
12   No. 93 were published in open court.)
13              MS. ARANGO:  We're going to play the third
14   clip.  We're just going to start down a little bit --
15   on Page 10, just a little further down, after the
16   redacted portion.
17              (Whereupon, segments of Government's Exhibit
18   No. 93 were published in open court.)
19              MS. ARANGO:  Then the fourth clip starts at
20   the very bottom of Page 12.
21              (Whereupon, segments of Government's Exhibit
22   No. 93 were published in open court.)
23   BY MS. ARANGO:
24   Q.    Agent Velazquez, what did you do in this
25   investigation after this meeting?
```

```
 1    A.    There was a meeting set up on May 24th with

 2   Narseal Batiste and Elie Assaad at the warehouse,

 3   because the warehouse that we were using for this

 4   investigation was actually in the process of being sold

 5   and we allowed Narseal Batiste to take out anything

 6   that he had left in there.  There was a meeting on that

 7   date.

 8    Q.    Was that meeting recorded?

 9    A.    It was.

10    Q.    Now, what concerns, if any, did the FBI have on

11   the status of this investigation?

12    A.    That we may not be able to identify other members

13   of the organization or associates of the organization

14   in some parts of the country that were mentioned, such

15   as Louisiana, Chicago and California.

16    Q.    At one point, was there a decision to make

17   arrests?

18    A.    A decision was -- there was a decision to make

19   arrests.  Those arrests were made on June 22nd, 2006.

20    Q.    Did you participate in any of the arrests?

21    A.    No, I did not.

22    Q.    And after the arrests, did you speak to any of

23   the Defendants?

24    A.    I did.

25    Q.    Who?
```

1    A.     I spoke with Patrick Abraham.

2    Q.     Okay.  Now, prior to speaking with him, did you

3    read him his Miranda rights?

4    A.     Yes.

5    Q.     And did he sign an authorization form of his

6    Miranda rights?

7    A.     He did.

8    Q.     Let me show you what's been marked as

9    Government's Exhibit No. 123, and ask you if you

10   recognize it.

11          I'm showing you what's been marked as

12   Government's Exhibit 123.

13   A.     Yes.

14   Q.     Could you tell the members of the jury what that

15   is.

16   A.     This is an FD-395, advice of rights form, that

17   has your rights printed in the first quarter of the

18   page, in the center, and then a series of statements

19   which are initialed by Patrick Abraham, signed at the

20   bottom, and then witnessed by myself and JL Gonzalez,

21   who's a City of Miami Beach police officer, at

22   approximately 6:45 p.m.

23   Q.     And did you go over that form with Patrick

24   Abraham?

25   A.     I did.

```
 1   Q.     And did he sign the form?

 2   A.     Yes.  He initial --

 3   Q.     I'm sorry.  Go ahead.

 4   A.     He initialed by each statement under "Your

 5   Rights" and then he signed it where the -- there's a

 6   place for the -- for his signature.

 7   Q.     Did you witness his signature?

 8   A.     I did.

 9   Q.     Did you sign it yourself?

10   A.     I did.

11          MS. ARANGO:  At this point, Judge, I would

12   like to introduce Government's Exhibit 123 into

13   evidence.

14          MR. LEVIN:  No objection.

15          THE COURT:  It will be admitted as

16   Government's Exhibit 123.

17          (Whereupon, Government's Exhibit No. 123 was

18   entered into evidence.)

19          MS. ARANGO:  May I publish?

20          THE COURT:  You may publish.

21          MS. ARANGO:  Thank you.

22          MS. JHONES:  Your Honor, I apologize.

23          I don't know if this is the appropriate time

24   for the instruction -- the cautionary instruction.  I

25   apologize.  I forgot to mention it.
```

```
 1              THE COURT:  Ladies and gentlemen of the jury:

 2    This evidence is being introduced against -- in the

 3    Government's case against Patrick Abraham.  It is not

 4    to be considered by you in any way against any other

 5    Defendant.

 6    BY MS. ARANGO:

 7    Q.    Agent Velazquez, could you just for the benefit

 8    of the record read the advice of rights form.

 9    A.    It begins with the title "Advice of Rights."

10          Underneath that title is, "Place:  Miami.  Date:

11    6-22-06.  Time:  18:45."

12          And then below that, in the center, is another

13    title of "Your Rights" and several statements.

14          The first reads as, "Before we ask you any

15    questions, you must understand your rights.

16          "You have the right to remain silent.

17          "Anything you say can be used against you in

18    court.

19          "You have the right to talk to a lawyer for

20    advice before we ask you any questions.

21          "You have the right to have a lawyer with you

22    during questioning.

23          "If you cannot afford a lawyer, one will be

24    appointed for you before any questioning, if you wish.

25          "If you decide to answer questions now without a
```

```
 1    lawyer present, you have the right to stop answering at

 2    any time.

 3         "I have read this statement of my rights and I

 4    understand what my rights are.  At this time I am

 5    willing to answer questions without a lawyer present.

 6         "Signed:  Patrick Abraham.  Witnessed by Anthony

 7    Velazquez.  Witnessed by JL Gonzalez.  Time:  18:45."

 8    Q.    And is that Patrick Abraham's initials to the

 9    left of each of the rights?

10    A.    Yes, it is.

11    Q.    Thank you.

12         After Patrick Abraham was read and he signed that

13    advice of rights form, did you talk to him?

14    A.    I did.

15    Q.    After talking to him, was a report written of

16    that discussion?

17    A.    It was.

18    Q.    Okay.  Have you reviewed that report?

19    A.    I have.

20    Q.    What did Patrick Abraham say to you after his

21    arrest?

22         MR. LEVIN:  Objection.  Rule 12, pretrial

23    motion.

24         THE COURT:  Objection overruled.  I adopt my

25    prior rulings.
```

1          Go ahead.

2          THE WITNESS:  Patrick Abraham told me that he

3   arrived in the United States, I believe, in May of 1997

4   on a B2 visa, which is a visitors' visa.

5          He was involved with a ministry in Haiti

6   before arriving in the United States.  Upon his

7   arrival, he began ministering to youth in North Miami.

8          At some point, he came to know an individual

9   and a relationship developed.  As a result of that

10  relationship, he became a member of the Moorish Science

11  Temple organization.

12         This organization had approximately seven to

13  eight members and had regular meetings.  At these

14  meetings, there were discussions regarding the

15  overthrow of the US Government and the establishment of

16  a Moorish Science Temple Government within the United

17  States.

18         Also during some of these meetings, there was

19  a member of the organization who frequently expressed

20  his views advocating the overthrow of the United States

21  Government.

22         The organization also engaged in

23  military-style training, such as marching and physical

24  exercise.

25         At some point in early 2006, a member of the

1   organization introduced an individual to the

2   organization known as Brother Mohammed.  This

3   individual was represented as being from the East as

4   well as a strong brother who should be emulated.

5          At some point after Brother Mohammed was

6   introduced to the organization, a -- there were some

7   suspicions surrounding whether or not Brother Mohammed

8   was with law enforcement.

9          Patrick Abraham suggested to check Brother

10  Mohammed out.  He was then directed by a member of the

11  organization to do so.

12         In January of 2006, there was a meeting which

13  was set up at the Embassy where the Moorish Science

14  Temple organization usually met.  At this meeting,

15  Patrick Abraham was present as well as other members of

16  the organization.

17         When Brother Mohammed and another individual

18  who Patrick Abraham referred to as "Occ" arrived at the

19  Embassy, they were stripped of their clothing as well

20  as their electronic devices for fear that they would be

21  able to record conversations.

22         After they were stripped of their clothing and

23  their electronic devices, they were given another set

24  of clothing -- another set of clothing to wear.

25         Patrick Abraham and another individual then

 1   drove Brother Mohammed and Occ in a red four-door

 2   vehicle to a Kentucky Fried Chicken restaurant located

 3   in the vicinity of Northwest 27th Avenue.

 4          At that location, there was another vehicle

 5   prepositioned which was described as a four-door gray

 6   Pontiac.

 7          Patrick Abraham and another individual, along

 8   with Brother Mohammed and Occ, then got into that car

 9   and made their way down to Islamorada.

10          On the way to Islamorada, they stopped at a

11   Walgreens and an individual accompanied Brother

12   Mohammed into the Walgreens.

13          Before arriving in Islamorada, there was

14   another stop where Patrick Abraham, along with the

15   occupants of the vehicle, met with another individual

16   who was driving a white Jeep.

17          One thing I neglected to say with regard to

18   the interview of Patrick Abraham was that, during the

19   meeting at the Embassy where the clothing was -- where

20   the -- Brother Mohammed and Occ changed their clothes,

21   there was a gun present inside the Embassy for security

22   purposes, which was usually left there.

23          After meeting with an individual on the way to

24   Islamorada who was driving a white Jeep, a meeting

25   occurred in Islamorada between Brother Mohammed, Occ

1    and another individual.

2              At the conclusion of that meeting, Brother

3    Mohammed and Occ were then driven back to the Embassy.

4              Patrick Abraham also said that he used

5    approximately $400 of his own money to either -- to pay

6    for the rental car, I believe, is what he told me.

7              After this meeting in January of 2006, there

8    was another meeting between Patrick Abraham and Brother

9    Mohammed, and it was where discussions took place where

10   the Sears Tower was mentioned as a potential target of

11   attack.

12             It was at this time that I believe Patrick

13   Abraham stated or made a reference to Brother Mohammed

14   being from Al-Qaeda.

15             After that meeting, there was a meeting at

16   a -- Brother Mohammed -- or -- I'm sorry -- Patrick

17   Abraham learned from a member of the organization that

18   Brother Mohammed was going to support their

19   organization and part of that support include providing

20   a warehouse.

21             Sometime after that, there was a meeting at

22   this warehouse with Patrick Abraham and other

23   individuals where an oath of allegiance to Al-Qaeda was

24   given.

25             Patrick Abraham told me that, prior to

Velazquez - DIRECT - By Ms. Arango                68

```
 1    arriving at that meeting, he did not know that this
 2    pledge was going to be given.
 3              During this same meeting, there were also
 4    discussions regarding an Al-Qaeda plot to blow up the
 5    FBI office.
 6              After that meeting, a dispute arose between
 7    Patrick Abraham -- I'm sorry -- there was also
 8    discussions at this meeting regarding taking pictures
 9    of the FBI office.
10              After this meeting, a dispute arose between
11    Patrick Abraham and a member of this other
12    organization.
13              At some point later, Patrick Abraham and
14    another individual drove Brother Mohammed to a Best Buy
15    store, where a memory card was purchased.
16              During this same meeting, Brother Mohammed was
17    driven by the FBI office, which was pointed out to him
18    by another individual, as well as a National Guard
19    Armory.
20              After this -- after this meeting, tensions
21    grew between Patrick Abraham and a member -- another
22    individual.  Patrick Abraham then learned that pictures
23    had actually been taken of the FBI office.
24              At some point after this, there was another
25    meeting with -- which Patrick Abraham attended where --
```

1   with other individuals.

2           It was after this meeting that there were

3   division -- there was a division within the

4   organization.

5           Patrick Abraham then learned about the arrest

6   of Sultan Kahn-Bey and was then later arrested by

7   Immigration and Customs Enforcement for some kind of

8   immigration violation.

9           I believe that's most of what he told me.

10  BY MS. ARANGO:

11  Q.   What, if anything, did Patrick Abraham tell you

12  regarding any meetings with Sultan Kahn-Bey?

13          MR. LEVIN:  Objection.  Leading.

14          THE COURT:  Overruled.

15          MS. JHONES:  And my only objection, your

16  Honor, would be to the extent that it calls for hearsay

17  as it relates to the Kahn-Bey individual as opposed to

18  Mr. Abraham.

19          THE COURT:  Overruled.

20          THE WITNESS:  After Patrick Abraham learned

21  that pictures had been taken of the FBI office by other

22  individuals, there was a meeting in which Patrick

23  Abraham attended, along with Sultan Kahn-Bey, Queen

24  Zekaya, Minerva Vasquez and other individuals.

25          At this meeting, a member of the organization

1   was kicked out.

2   BY MS. ARANGO:

3   Q.    What, if anything, did Patrick Abraham tell you

4   about why another person was kicked out?

5   A.    The reason, as I recall, that the individual was

6   kicked out was for insubordination, leadership issues,

7   as well as finances -- or the management of --

8   management or mismanagement of finances within the

9   organization.

10  Q.    Was there any discussion regarding Brother

11  Mohammed?

12  A.    Yes.  There was a discussion regarding Brother

13  Mohammed where there was an allegation that Brother

14  Mohammed was the FBI.

15  Q.    Thank you.

16        MS. ARANGO:  May I have just a moment, Judge?

17        THE COURT:  Sure.

18        (Discussion had off the record amongst

19  counsel.)

20  BY MS. ARANGO:

21  Q.    Agent Velazquez, do you remember the entire

22  statement or are there parts of it that you don't

23  recall?

24  A.    The statement was taken over two years ago.

25  That's most of what I remember.  But if I could have an

Velazquez - DIRECT - By Ms. Arango                71

```
 1    opportunity to review the report, I'd be happy to do
 2    so.
 3           MS. ARANGO:  Judge, may I reference this
 4    witness's recollection with the report?
 5           THE COURT:  Yes.
 6           MS. ARANGO:  Thank you.
 7           MR. LEVIN:  Your Honor, there's no pending
 8    question.  I mean, he can refresh his recollection if
 9    there's a particular question she wants to ask him.
10           If he doesn't remember, then I think it's
11    appropriate for him to refresh his recollection.
12           But without a pending question, I don't think
13    it's appropriate for a witness to review his --
14           THE COURT REPORTER:  I'm sorry.  I can't hear
15    you.
16           THE COURT:  I don't think your microphone is
17    on.
18           MR. LEVIN:  It's on, your Honor.
19           I don't think it's appropriate for a witness
20    to be able to review his testimony -- his report
21    mid-testimony without a pending question.
22           MS. ARANGO:  Judge, I asked him if he recalled
23    the entire -- the entire --
24           THE COURT:  Overruled.
25           You may refresh his recollection.
```

 1   BY MS. ARANGO:

 2   Q.    I'm going to show you, Agent Velazquez, what's

 3   been marked as Government's Exhibit No. 124 for

 4   identification purposes for you to use to refresh your

 5   recollection.

 6         I'd just note for the record that you're putting

 7   the report down --

 8   A.    Yes.

 9   Q.    -- before you testify.

10         Was there anything -- any statements that Patrick

11   Abraham made to you that you did not recall -- that you

12   did not testify to earlier?

13   A.    There were a few items that I neglected to

14   recall.

15         During the -- some of the meetings at -- with the

16   organization that Patrick Abraham attended, there were

17   discussions about recruitment and building a movement.

18         There was also discussions regarding the --

19   that -- regarding that the United States was not viewed

20   as a legitimate country.

21         I also neglected to say that Patrick Abraham told

22   me that, with the meeting which occurred at the

23   warehouse where the Al-Qaeda pledge was given, that

24   Brother Mohammed provided a videocamera to an

25   individual.

Q.     And did Brother Mohammed -- did Patrick Abraham

say anything to you regarding a construction company?

A.     There was mention in the beginning of the

interview by Patrick Abraham that members of the

organization were employed by a construction company or

did construction-type work.

       Also, at the meeting, which was attended by

Patrick Abraham, Sultan Kahn-Bey, Queen Minerva and

Queen Zekaya, along with other members of the

organization, an individual was charged with treason as

well as insubordination and, at the conclusion of that

meeting, some members of the organization left with

Patrick Abraham.

       That's pretty much everything I recall.

Q.     Thank you, Agent Velazquez.

       MS. JHONES:  Judge, at this point in time, I

have no further questions.

       THE COURT:  Ms. Jhones.

                   CROSS-EXAMINATION

BY MS. JHONES:

Q.     Agent Velazquez, you've been an agent for

approximately 18 years?

A.     Yes, ma'am.

Q.     In 2006, when this investigation -- actually, in

September of 2005, when you were acting as a

1    supervisor, you had been an agent for approximately

2    16, 17 years?

3    A.     Approximately 15 or 16 years.  Yes.

4    Q.     And you testified during your -- the beginning

5    testimony in this case that you had received

6    approximately 16 weeks of training with the Bureau?

7    A.     At that time, the FBI Academy was approximately

8    16 weeks.  Yes.

9    Q.     Okay.  And you've also testified about the

10   various investigative techniques that are utilized by

11   the Federal Bureau of Investigation.  Correct?

12   A.     Yes.

13   Q.     And some of these techniques that you testified

14   about are, for example, surveillance.  Correct?

15   A.     Correct.

16   Q.     And surveillance has to do with both audio and

17   video surveillance?

18   A.     It can, depending on what it -- what you're

19   trying to surveil.

20   Q.     If you're trying to surveil people speaking,

21   you're going to surveil them by audio?

22   A.     Yes.

23   Q.     And if you're trying to watch what they're doing,

24   you're going to surveil them with a video or in person.

25   Correct?

1    A.     Yes.  You can.

2    Q.     And you -- as it relates to this case, you

3    testified that, as it relates to the location in

4    Liberty City, the 6262 address, you personally

5    surveilled that place -- I believe your testimony was

6    on at least 10 occasions -- 10 to 14 occasions?

7    A.     Numerous times.

8    Q.     Okay.  "Numerous" meaning?

9    A.     I would guess -- I've been -- during that --

10   during the course of the investigation, I've been by

11   that location at least 10 times.

12   Q.     Okay.  And in addition to surveillance, you have

13   the authority to request documents, correct, like via

14   subpoenas?

15   A.     That's true.

16   Q.     And the reason do you that, sir, is throughout

17   the course of any given investigation, you have to

18   corroborate what is being told to you during the course

19   of an investigation.  Correct?

20   A.     That is one of the primary objectives of an

21   investigation.

22   Q.     And one of the ways do you that is by reviewing

23   documents?

24   A.     It can be.

25   Q.     Documents, unlike human beings, don't have a

```
 1   motivation to lie.

 2         Would you agree with me, sir?

 3   A.    No.  But sometimes the individuals that create

 4   the documents may.

 5   Q.    Okay.  Well, let's talk about some of the

 6   documents that are created by individuals.  Okay?

 7         For example, documents such as telephone records.

 8   A.    Yes.

 9   Q.    Documents such as financial records.

10   A.    Yes.

11   Q.    Financial records from financial institutions.

12   A.    Yes.

13   Q.    Such as banks.

14   A.    Yes.

15   Q.    Credit card companies.

16   A.    Yes.

17   Q.    Credit reports.

18   A.    Yes.

19   Q.    Property reports.

20   A.    Yes.

21   Q.    Documents that would evidence ownership and

22   assets by -- held by certain individuals.

23   A.    Yes.

24   Q.    Correct?  All righty.

25         And these are just -- these are just some of the
```

```
 1   investigative techniques at the disposal of the Federal

 2   Bureau of Investigation?

 3   A.     Yes, ma'am.

 4   Q.     Fair enough?

 5   A.     Yes.

 6   Q.     Okay.  Now, you indicated that, in October of

 7   2005, this investigation began.  Correct?

 8   A.     (No response.)

 9   Q.     Did I put you to sleep, Agent Velazquez?

10   A.     No.  I believe it was September.

11   Q.     It began in September.  Okay.

12          And the individual -- Well, strike that.

13          In September of 2005, what, if anything, did you

14   do, sir, you personally?

15   A.     In September of 2005, I directed Agent John

16   Stewart to make arrangements for Abbas al-Saidi to fly

17   back to Miami from Yemen.

18   Q.     Okay.  And I may have misunderstood your

19   testimony earlier.

20          I understood you to say that it was September or

21   October.  You weren't sure on the date.

22   A.     Well, I believe that Agent Stewart received a

23   phone call from Abbas in September and he arrived in

24   September -- on September 20th, 2005, a few days before

25   Hurricane Wilma.
```

CROSS - By Ms. Jhones                    78

 1   Q.     September 20th or October 20th, sir?

 2   A.     September 20th.

 3   Q.     Okay.  Now, going back to records, do you, as you

 4   sit here today, have any records of this -- now by

 5   "Abbas," we're talking about Paid Informant No. 1.

 6   Correct?

 7   A.     Abbas is -- has been referred to as CW 1 in

 8   transcripts related to this investigation.

 9   Q.     Okay.  This is the first informant, Abbas, who

10   has been paid.  Correct?

11   A.     Yes.

12   Q.     Okay.  And when I say "paid," you have

13   previously, sir, indicated that this individual was

14   assisting law enforcement for money.

15   A.     I don't believe that was my testimony.

16   Q.     Not in these proceedings.  In prior proceedings.

17          MS. ARANGO:  Objection, Judge.  Improper

18   impeachment.  No predicate.

19          THE COURT:  Sustained.

20   BY MS. JHONES:

21   Q.     You have indicated, sir, that Mr. -- strike

22   that -- that Abbas has provided information in this

23   investigation for money.  "Yes" or "no"?

24   A.     I'm not sure I understand your question.  If your

25   question is related to Abbas's motivation, then, my

```
 1   answer -- then, I don't believe that was my testimony.
 2        If your question is whether or not Abbas was paid
 3   during the course of this investigation, then my answer
 4   is "yes."
 5   Q.    Okay.
 6        MS. JHONES:  One moment, your Honor, if I may.
 7   BY MS. JHONES:
 8   Q.    Let me clear up the question, in case I have
 9   confused you.  And that's not my intent.
10        The information that has been provided and the
11   assistance that has been provided to the FBI by Abbas
12   was done so for money?
13        MS. ARANGO:  Objection.  Asked and answered.
14        THE COURT:  Sustained.
15        MS. JHONES:  Your Honor, I apologize.  I don't
16   have the realtime in front of me.  I'm not sure that
17   that was the question that he responded to.
18        THE COURT:  Well, I suggest you look at it,
19   then.
20        MS. JHONES:  Okay.  Let me do so.
21        (Discussion had off the record amongst
22   counsel.)
23        MS. JHONES:  Your Honor, I apologize.  But I
24   don't find that that question has been answered.  I
25   apologize.
```

```
 1              THE COURT:  Sustained.

 2              It was answered.

 3  BY MS. JHONES:

 4  Q.     What was your answer, sir?

 5              MS. JHONES:  I don't remember his --

 6              THE COURT:  Sustained.

 7              MS. JHONES:  Is the Court not allowing him to

 8  answer the question?

 9              THE COURT:  He answered the question.

10              MS. JHONES:  I apologize, your Honor.  I can't

11  remember his response.

12              THE COURT:  Come on up.

13              (Whereupon, proceedings were had at side-bar

14  outside the presence of the jury which have been sealed

15  per instructions of the Court.)

16              (Whereupon, the following proceedings were had

17  in open court:)

18              MS. JHONES:  Thank you, your Honor.

19  BY MS. JHONES:

20  Q.     Now, Mr. Velazquez, going back to the fall of

21  2005, Special Agent John Stewart, not yourself, was

22  contacted by Abbas?

23  A.     Yes.

24  Q.     And that contact, as you've indicated, was made

25  telephonically.  Correct?
```

```
 1   A.     Yes.

 2   Q.     And it was your testimony, sir, that that contact

 3   that Mr. Stewart, not yourself, was the individual that

 4   spoke -- was the person, the FBI agent, that spoke to

 5   this individual.  Correct?

 6   A.     That's correct.

 7   Q.     And you also testified, sir, that this contact

 8   was made sometime in September, October, whenever it

 9   was, and it was from overseas.  Correct?

10   A.     One contact was from overseas.  It's my

11   recollection there was another contact made prior to

12   Abbas leaving for Yemen.

13   Q.     Okay.  And that contact that was made -- without

14   telling me what this individual said, that contact that

15   was made prior to leaving from Yemen was made from

16   where?

17   A.     Miami, I believe.

18   Q.     Okay.  And do you know, sir, whether it was in

19   person or whether it was telephonic?

20   A.     It was telephonic.

21   Q.     Okay.  And -- now, without telling us, sir,

22   anything that this informant said, do you have any

23   information that -- whether or not the location of this

24   individual, such as his address -- was that verified in

25   September-October of 2005 by the FBI?
```

Velazquez - CROSS - By Ms. Jhones                82

```
 1    A.      Which individual are we talking about?

 2    Q.      Paid Informant No. 1, Abbas.

 3    A.      I'm uncertain as to whether or not Abbas's

 4    residence or his whereabouts when he made the initial

 5    phone call -- or one of the phone calls from -- while

 6    in Miami to Agent Stewart was verified.  I don't have

 7    that information.

 8    Q.      Okay.  So what you're telling us is that, when

 9    Abbas made the initial contact with Agent Stewart, as

10    you sit here today, two and a half years after this

11    investigation, you do not know where he was living.  Is

12    that accurate?

13    A.      At the time he made the phone call, no.  I had

14    never heard of Abbas until John Stewart contacted me

15    and told me he had received information from an

16    informant.

17    Q.      Okay.

18    A.      I had never met Abbas.

19    Q.      Well, you were the supervising agent in September

20    of 2005; were you not?

21    A.      I was the acting supervisor for the squad on

22    which John Stewart worked.  Yes.

23    Q.      You previously told us that, as a supervisor, it

24    was your obligation to review reports and basically

25    check up to see what, basically, the case agents that
```

CROSS - By Ms. Jhones

1   are assigned to this case are doing.  You are

2   supervising their work.  Correct?

3   A.    Yes.

4   Q.    And you're wearing your supervisor hat

5   September-October -- correct me if I'm wrong -- 2005?

6   A.    That's correct.

7   Q.    And you continued to wear your supervisor hat

8   sometime until mid-November of 2005?

9   A.    Somewhere around that time.

10  Q.    Okay.  So going back to my question:  In spite of

11  that, the whereabouts of where Mr. Abbas al-Saidi was

12  living in the fall -- in September of 2005, you did not

13  know?

14  A.    No.  That would have been inconsequential to me.

15  Q.    Okay.  Now, let's go to the second contact that

16  was made.

17        The second contact that was made, you've

18  testified previously, came to Agent Stewart from this

19  individual from Yemen?

20  A.    That's correct.

21  Q.    Yemen, the country?

22  A.    Yes.

23  Q.    Okay.  Now, did -- what, if anything, did you do

24  in September of 2005 to verify that this individual

25  was, in fact, in Yemen?

Velazquez - CROSS - By Ms. Jhones                84

1    A.     I did nothing.  John Stewart, however, it's my
2    recollection, actually called Abbas in Yemen on a phone
3    and there was problems because of the telephone service
4    between here and Yemen.
5    Q.     Okay.  So there was a phone number for this
6    individual, a phone number to Yemen?
7    A.     Well, I know in conversations that I had with
8    John Stewart that he received a phone call and he had
9    contacted Abbas in Yemen, where he actually placed the
10   call.  So, yes, there was some phone number for Abbas
11   in Yemen.
12   Q.     Okay.  Now, you told us that, after this contact
13   was made by this individual, you authorized Mr. Stewart
14   to -- Agent Stewart to have this individual come back
15   from Yemen.
16   A.     That's correct.
17   Q.     Okay.  Now, when he came back from Yemen, that
18   would have been -- correct me if I'm wrong --
19   October 20th of 2005?
20   A.     No.  September.
21   Q.     September.
22          And in September of 2005, sir, it's your
23   testimony that you met him at a hotel, the Holiday Inn.
24   Correct?
25   A.     That's correct.

1    Q.    And the hotel -- no.  I'm sorry.

2          You did not go to the airport to meet this

3    individual, did you?

4    A.    I don't believe I did.  I know that I got the

5    hotel room.  I paid for the hotel room.  And I think I

6    waited for Abbas to arrive.  That's my recollection.

7    Q.    Okay.  Let me backtrack.  There's a couple of

8    things I forgot to ask you.

9          Now, this individual was living in Miami prior to

10   his departure to Yemen?

11   A.    That was my understanding at the time.  Yes.

12   Q.    However, when he returned from Yemen, you

13   automatically went and rented a hotel for him.  Fair

14   enough?

15   A.    Yes.

16   Q.    And, also, when this individual basically got to

17   the hotel, you also provided him with money?

18   A.    I'm not sure when -- at what point Abbas received

19   any monies.

20   Q.    Okay.  Additionally, you gave him a cell phone?

21   A.    Eventually, he did -- he was given a cell phone.

22         Now, I'm uncertain as to whether we directly

23   provided the cell phone or -- he was either given money

24   or reimbursed for getting the cell phone.

25   Q.    Okay.  The hotel and the cell phone came --

1    actually, strike that.  I'll get back to that in a

2    minute.

3         When this individual arrived, he would have had a

4    passport.  Correct?

5    A.    I'm pretty sure he had a passport to get back

6    into the US.

7    Q.    Well, have you ever seen a passport?

8    A.    Have I ever seen a passport?

9    Q.    Yes.

10   A.    I've seen several passports.

11   Q.    Well, let me just be a little clearer.

12        Have you seen Abbas al-Saidi's passport in

13   September of 2005?

14   A.    I don't recall if I saw his passport in September

15   of 2005 or not.

16   Q.    Do you have any knowledge, as you sit here, as to

17   whether or not Agent Stewart has in his possession a

18   passport for this individual?

19   A.    As I sit here now, I do not.

20   Q.    All righty.  Now, you would agree with me, sir,

21   that this passport -- do you have any knowledge as to

22   whether or not a passport -- well, actually, strike

23   that.

24        You would agree with me that a passport would

25   contain a lot of information?

1   A.      Yes.

2   Q.      Such as travel -- I'm sorry.

3           Did you want to say something?

4   A.      I was going to answer your question.  But --

5   Q.      Thank you.  Appreciate that.

6           A passport would contain information such as

7   travel outside of the United States and travel back

8   into the United States.  Fair enough?

9   A.      Yes.  But -- the answer to your question is

10  "yes."  However, there are several countries that do

11  not stamp passports, for instance, Cuba, for American

12  citizens or resident aliens.

13          Also, some countries stamp your passports for

14  entry and exits and others only stamp them for entries.

15  Q.      How about Yemen?

16  A.      I'm uncertain what the passport protocol is --

17  with regard to entry and exit is with Yemen.

18  Q.      What is the policy of the United States with

19  respect to stamping a passport upon arrival?

20  A.      Well, I know your passport's stamped upon arrival

21  here in the US.

22  Q.      So if we had Mr. Al-Saidi's passport, stamps

23  evidencing travel outside of the United States would be

24  reflected at a minimum, at a minimum, as it relates to

25  his return to the United States.  Fair enough?

1    A.      That's fair enough.

2            And I did not see Mr. Al-Saidi's passport.

3    However, I did -- I have reviewed an airline ticket,

4    which indicated that someone by the name of Abbas

5    al-Saidi flew into Miami from Yemen on the 20th of

6    September, 2005.

7    Q.      Do you have that airline ticket with you?

8    A.      I believe there's a copy.

9    Q.      We can get that.

10           MS. ARANGO:  We'll get you a copy of the

11   airline ticket.

12           MS. JHONES:  Thank you.

13   BY MS. JHONES:

14   Q.      Now, sir, in your direct testimony, you indicated

15   that sometime -- I think it was October 20th -- was the

16   first time that you personally met with Abbas al-Saidi.

17   A.      No.  It was September 20th, 2005.

18   Q.      I'm just going to need a minute, then.

19           MS. JHONES:  May I have a minute to get my

20   records?

21           THE COURT:  Yes.

22           MS. JHONES:  I apologize, your Honor.

23           THE COURT:  No problem.

24   BY MS. JHONES:

25   Q.      In your testimony in this case, sir, a couple of

 1   days ago -- actually, more than a couple of days -- on

 2   February 19th, do you remember indicating that your

 3   first meeting with this individual was on October 20th?

 4   And, if not, I'm happy to show you a document.

 5   A.    No.  No.  I trust your word.

 6         If I testified that I met Abbas al-Saidi for the

 7   first time on October 20th, I misspoke.  Abbas did not

 8   arrive into Miami International Airport until

 9   September 20th.

10   Q.    Okay.  So when you stated in a prior proceeding,

11   over a year ago, that he came on October 20th, that was

12   incorrect as well?

13   A.    Yes, ma'am.

14   Q.    Okay.  So, now, it was -- so we're clear, your

15   recollection now is that he did not come on the 20th,

16   but he actually came on -- 20th of October, but he

17   actually came on the 20th of September?

18   A.    Yes.  Abbas al-Saidi arrived in Miami on

19   September 20th, 2005, from Yemen.

20   Q.    I'm sorry.  Maybe -- maybe it was me.

21         Not when he arrived.  The first meeting you had

22   with him, you personally, was that September 20th or

23   was that October 20th, sir?

24   A.    It was September 20th.

25   Q.    Okay.  All righty.  And that was in the Holiday

1    Inn?

2    A.    Yes, ma'am.

3    Q.    Okay.  So -- now, after September 20th, sir, you

4    indicated -- so, now, the second meeting would not have

5    been on October 21st, like you testified a week ago,

6    but it would be a different date.  Or would that be the

7    same date?

8    A.    I'm not sure I understand your question.

9    Q.    Okay.  You had previously testified that you met

10   with Abbas al-Saidi the second time on October 21st.

11   Is that correct?

12   A.    I'm not certain.  If I gave testimony that I met

13   with Abbas on October 21st, then, I misspoke.  But in

14   light of your -- you advising me that I testified that

15   he arrived on the 20th, it would stand to reason I

16   confused September and October.

17   Q.    Okay.  So the real dates are now September 20th

18   and September 21st as to the first and second meeting

19   you had with this individual?

20   A.    Yes.

21   Q.    Okay.  Then you testified, sir, also, that, after

22   you met with him, then you didn't see him for

23   approximately eight or nine days.  Correct?

24   A.    I believe my testimony was that other agents did

25   not meet with Abbas for eight or nine days or several

1    days after the hurricane.  I don't recall when the next

2    time I met with Abbas was --

3    Q.    Well --

4    A.    -- specifically.

5    Q.    -- let me ask you this:  There's no question, is

6    there, sir, that, after that second meeting that was

7    had on September 21st -- now it's September 21st --

8    after that initial -- that meeting where you were

9    present -- correct?

10   A.    I'm not certain if I met Abbas on September 21st.

11   I know -- I believe he was debriefed.  At some point, I

12   met with Abbas again.

13         I had a discussion with him regarding recording

14   equipment and some of the objectives of the

15   investigation.  What those specific dates were I don't

16   recall.

17              MS. JHONES:  May I approach the witness, your

18   Honor?

19              THE COURT:  Okay.

20              THE WITNESS:  Yes.

21   BY MS. JHONES:

22   Q.    (Tendering document to the witness.)

23         Does that help you, sir, remember?

24   A.    No.

25   Q.    It does not help you?

```
 1   A.    I don't understand that excerpt in the context of

 2   your question.

 3   Q.    Okay.  After you met with Abbas on

 4   September 21st, neither you nor any other agent met

 5   with this individual for eight or nine days thereafter.

 6   Correct?

 7   A.    No.  I can't testify to that question "yes" or

 8   "no."  I do know that, after Hurricane Wilma, there

 9   were several days -- which occurred on the 23rd, I

10   believe, which was a Sunday -- we had lost

11   communication with Abbas and several days after the

12   hurricane he was met by agents of the FBI at the hotel.

13         I don't -- I don't recall exactly how many days

14   had passed from the last contact between Abbas and the

15   FBI and the first contact after the hurricane.  But I

16   will agree that it was a number of days.  That number

17   is unknown to me.

18   Q.    When you say your last contact with Abbas, you

19   mean you and the case agents, both Mr. Stewart and

20   Mr. Garbato?

21   A.    Yes.

22   Q.    Basically, everybody in the FBI lost contact with

23   him for that time period?

24   A.    Yes.

25   Q.    Okay.  It was your understanding, sir, that --
```

```
 1   strike that.

 2        When you met with this individual in the Holiday

 3   Inn -- which is now September 20th of 2005.  Correct?

 4   A.    Yes, ma'am.

 5   Q.    Okay.  At that point in time, you made an

 6   assessment of what you wanted to do with this case,

 7   this investigation, as you stated.  Correct?

 8   A.    No.  I believe what I stated was that, at that

 9   time, there were some objectives that were set with

10   regard to the information that we received, and one of

11   those objectives was to verify or corroborate the

12   information.

13   Q.    The other objective that you indicated, sir, was

14   to determine whether or not there was an immediate

15   threat.

16   A.    That was another objective of the investigation.

17   Yes.

18   Q.    Okay.  And you do remember that testimony?

19   A.    I do.

20   Q.    Okay.  And that testimony -- strike that.

21        That concern of yours came after you met with

22   Abbas at the Holiday Inn on September 21st?

23   A.    No.  That's not true.

24        If I received information about a potential

25   threat, that's always a concern, if your question is my
```

```
 1    concern being the potential of an immediate threat.
 2    Q.     I'm not talking about other cases, sir.
 3           I'm talking about, when you met with Abbas
 4    al-Saidi on September 21st, 2005, is it -- was it not
 5    your testimony that you said that the objective was,
 6    among other things, to determine whether or not there
 7    was an immediate threat?
 8    A.     That was one of the objectives.  Yes.
 9    Q.     Okay.  And notwithstanding that objective, you
10    lost -- "you" meaning you and the FBI in total -- lost
11    contact with this individual for approximately -- well,
12    to use your terminology, several days?
13    A.     That's correct.
14    Q.     You had no idea where he was?
15    A.     I did not.  I assumed he was at the Holiday Inn.
16    Q.     Now, the Holiday Inn, sir, was a location
17    selected by the FBI?
18    A.     Yes, it was.
19    Q.     And the Holiday Inn that was selected by the FBI
20    happens to be within one block of the FBI office?
21    A.     More or less.
22    Q.     In North Miami?
23    A.     About two blocks.
24    Q.     All righty.  And there came a time, you said,
25    where you -- where then you reestablished communication
```

1   with Abbas?

2   A.    Yes.

3   Q.    And that wasn't you personally, was it?  That was

4   some of the other agents, such as Mr. Stewart or

5   Mr. Garbato?

6   A.    That's correct.

7   Q.    And I believe the date that contact was

8   reestablished with this individual would have been

9   October 20th?

10  A.    No.  It was several -- the next time contact was

11  made between Abbas al-Saidi and the FBI was several

12  days after Hurricane Wilma, which occurred on

13  September 23rd, which was a Sunday.

14  Q.    So the next time that you met -- that Agent

15  Stewart met with Abbas would have been now

16  September 20th -- September 23rd.  Is that your

17  testimony, sir?

18  A.    No.  September 23rd was when Hurricane Wilma hit.

19  That was a Sunday.

20  Q.    Okay.

21  A.    We lost contact with Abbas for several days after

22  the hurricane.

23  Q.    Okay.

24  A.    That brings us into the week of the 24th, which

25  is a Monday.  And I believe it was that Wednesday or

1     Thursday that contact was reestablished between Abbas

2     and the FBI, of 2005.

3     Q.    And, sir -- all right.

4           And the recording -- when the contact was

5     reestablished, not with you, but with the other agents,

6     that would have been on what date?

7     A.    Well, Hurricane Wilma was on the 23rd.  Monday

8     was the 24th.  Tuesday was the 25th.  I would say the

9     26th or 27th of September.

10    Q.    It is your testimony, sir, that the first

11    recording that was made in this case was on

12    October 29th.  Correct?

13    A.    Yes.  I believe that's the case.  Yes.

14    Q.    And I believe it was also your testimony that a

15    recording device was provided to Abbas on October 20th?

16    A.    I'm not sure what day Abbas got recording

17    equipment.

18    Q.    Okay.

19          MS. JHONES:  If I may just have a moment.

20          May I approach, your Honor?

21    BY MS. JHONES:

22    Q.    (Tendering document to the witness.)

23          Agent Velazquez, look at Page 51 and see if that

24    refreshes your recollection at all as to when a

25    recording device was provided.

Velazquez - CROSS - By Ms. Jhones                     97

1   A.    Yes.  My response to the question, "When was that

2   recording device given to him?" was, "I believe the

3   recording device was given to him on the 27th, but I'm

4   not certain.  It was after Hurricane Wilma."

5   Q.    The 27th of what month, sir?

6   A.    September.

7   Q.    Is that what the transcript says?

8   A.    No.

9   Q.    May I have that back?

10  A.    (Witness tenders document to Counsel.)

11  Q.    So, now, when the recording device was provided

12  to Abbas, Abbas had this recording device with him

13  from -- now it's the -- approximately the 27th of

14  September?

15  A.    Yes.  I believe so.

16  Q.    The first recording that we have -- "we" meaning

17  the FBI -- obtained was on October 29th of 2005.

18  A.    Yes.  I believe so.

19  Q.    Now, on November 21st, when you met with this

20  individual and you determined that one of the

21  objectives of the investigation was to determine

22  whether or not there was an immediate threat, what, if

23  anything, did you do, sir, between September 21st and

24  October 29th of 2005 -- actually, October 20th of

25  2005 -- to determine whether or not there was an

1    immediate threat to the United States?

2    A.    Well, that objective of an immediate threat was

3    to public safety, not just the United States.

4         But with regard to your question, we -- we

5    engaged in investigative activities to reestablish a

6    connection between Abbas and Narseal Batiste and,

7    hopefully, members of his organization for purposes of

8    recording conversations which would allow us to

9    corroborate information that Abbas had initially

10   provided us.

11   Q.    My question was, sir:  Within the time period

12   November 21st of 2005 and October 29th of 2005 --

13   A.    Yes.

14   Q.    -- what actions did you take to assure yourself

15   that there wasn't an immediate threat to the United

16   States or to Dade County or any jurisdiction within the

17   United States, sir?

18   A.    I directed John Stewart and Joe Garbato to direct

19   Abbas to set up meetings with Batiste and members of

20   his organization and try to accomplish the goals that

21   had been set forth in the investigation, which were to

22   identify Narseal Batiste and members of his

23   organization, determine what their intentions were and

24   whether or not there was a threat to public safety.

25        Now, in furtherance of that, based on my

1   investigative experience, that meant that Abbas would

2   have to reestablish his connection with Batiste,

3   determine whether or not it would be safe to make

4   recordings, in other words, whether he was going to be

5   searched.

6           Oftentimes, when an individual records a meeting

7   in an investigation for the first time, it's after

8   several meetings have taken place with that person or

9   persons to make sure you're not going to be searched.

10          So within the time period relative to your

11  question, that is what I was -- that is what I did

12  during that time period.

13  Q.     Okay.  So --

14          THE COURT:  We're going to break for lunch.

15          Do not discuss this case either amongst

16  yourselves or with anyone else.  Have no contact

17  whatsoever with anyone associated with the trial.  Do

18  not read, listen or see anything touching on this

19  matter in any way.

20          If anyone should try to talk to you about this

21  case, you should immediately instruct them to stop and

22  report it to my staff.

23          You may leave your binders and your notebooks

24  at your chairs.  Please be back in the jury room at

25  2:45.  We've got a late lunch today.  2:45.

CROSS - By Ms. Jhones

 1              (Whereupon, the jury exited the courtroom at

 2     1:15 p.m. and the following proceedings were had:)

 3              THE COURT:  You may be seated.

 4              You may step down, sir.

 5              (Witness excused.)

 6              THE COURT:  Would you let everyone know when

 7     the jurors have left, please, for lunch.  Let us know

 8     when they've gone down the elevators.

 9              THE COURT SECURITY OFFICER:  Yes, ma'am.

10              THE COURT:  The court security officer will

11     let you know when the jurors have exited and then you

12     can leave the courtroom.

13              We're in recess until 2:45.

14              (Thereupon, a luncheon recess was taken, after

15     which the following proceedings were had:)

16              THE COURT:  We're back on United States of

17     America versus Narseal Batiste, et al., Case

18     No. 06-20373.

19              Counsel, state your appearances, please, for

20     the record.

21              MR. GREGORIE:  Good afternoon, your Honor.

22              Richard Gregorie and Jacqueline Arango on

23     behalf of the United States.

24              MS. JHONES:  Good afternoon, your Honor.

25              Ana Maria Jhones on behalf of Narseal Batiste,

 1     who is present.

 2              MR. LEVIN:  Good afternoon, your Honor.

 3              Albert Levin on behalf of Patrick Abraham,

 4     who's present.

 5              MR. CASUSO:  Lou Casuso on behalf of Burson

 6     Augustin, who's present.

 7              MR. CLARK:  Nathan Clark on behalf of

 8     Rotschild Augustine, who's present.

 9              MR. HOULIHAN:  Richard Houlihan with Naudimar

10     Herrera.

11              MR. VEREEN:  And Roderick Vereen on behalf of

12     Stanley Phanor, who's present.

13              THE COURT:  All Defendants are present.

14              Let's bring in the jury.

15              (Whereupon, the jury entered the courtroom at

16     3:10 p.m. and the following proceedings were had:)

17              THE COURT:  You may be seated.

18              You are still under oath, sir.

19              You may proceed, Ms. Jhones.

20              MS. JHONES:  Thank you, your Honor.

21              MR. GREGORIE:  Your Honor, before we begin, we

22     just -- if we hadn't said it for the record, we invoke

23     the rule, your Honor.  So if there are any witnesses in

24     the courtroom, we wanted to make sure they were aware.

25              THE COURT:  The rule of sequestration has been

```
 1    invoked.  All witnesses are instructed to be outside of

 2    the courtroom.

 3              You may proceed.

 4              MS. JHONES:  Thank you, your Honor.

 5    BY MS. JHONES:

 6    Q.    Agent Velazquez, when we left off before lunch,

 7    we were discussing your investigation -- by "your

 8    investigation," I mean the FBI's investigation of this

 9    case -- in October of 2005.

10          Now, I believe I asked you the first date of the

11    conversation -- the first date that a conversation was

12    recorded, according to your testimony on direct, was

13    October 29th of 2005.

14    A.    I believe that's correct.

15    Q.    And that was a conversation that was recorded by

16    the Informant Abbas and Mr. Batiste.  Correct?

17    A.    Yes.

18    Q.    And you were not present when Abbas was recording

19    that conversation.  Correct?

20    A.    That's correct.

21    Q.    And that was a telephone call as opposed to a

22    person-to-person meeting?

23    A.    I don't recall if there was a telephone call and

24    a meeting or just a meeting.

25    Q.    Okay.  But you do recall that you were not
```

1   involved in that call?

2   A.      Correct.

3   Q.      The persons that were involved would have been

4   Agent Stewart?

5   A.      Possibly.

6   Q.      Or Garbato?

7   A.      I believe it was Agent Stewart and/or Garbato.

8   Q.      And just so we're clear, just in case this hasn't

9   been asked of you before, as of November of 2005, there

10  are now three case agents on the case.  Correct?

11  A.      Correct.  And the way that works is each

12  investigation has a case agent.  That's the primary

13  case agent.  They -- they're responsible for the

14  overall management of the case.

15          In addition to that case agent, there may be a

16  number of other agents assigned to that investigation,

17  depending on the manpower requirements.  Each agent

18  after the primary case agent is listed as a case agent.

19  Q.      So in this case, there are three of them -- three

20  case agents?

21  A.      There were three case agents assigned.  Yes.

22  Q.      All righty.  And in addition to the case

23  agents -- the three case agents, there was also quite a

24  bit of support staff, such as surveilling agents,

25  agents that went out there and conducted surveillance?

1    A.    Yes.

2    Q.    So when you said you went to the Liberty City

3    location and you conducted surveillance on at least ten

4    occasions, if I remember your testimony, you were just

5    one of many agents -- the co-case agents included that

6    were available to conduct surveillance in this case?

7    A.    That's correct.

8    Q.    Now, in your direct testimony, you indicated

9    that, after the conversation that was recorded on

10   October 29th, a decision was made to continue with the

11   investigation or words to that effect.

12   A.    I believe so.

13   Q.    The reason for that, you testified, sir, is

14   that -- because you had -- "you" meaning the FBI -- had

15   the objective of corroborating information that was

16   provided to you by this informant.  Correct?

17   A.    That's correct.

18   Q.    All right.  And during the course of your direct

19   testimony, after you told us that there was a recorded

20   conversation on October 29th of 2005, you subsequently

21   tell us that there was another recorded conversation on

22   November 7th of 2005.

23         Do you recall that, sir?

24   A.    Yes.

25   Q.    And I believe you also indicated in your

1   testimony that that was a conversation -- that was a

2   meeting that -- strike that -- that there was an

3   agreement -- a scheduled meeting between Mr. Batiste

4   and Abbas on November 7th of 2005.

5   A.      Yes.

6   Q.      Okay.  Now, there were several calls that were

7   recorded between October 29th and November 7th between

8   Mr. Batiste and the informant.  Correct, sir?

9   A.      I believe so.

10  Q.      And those were not calls that you testified about

11  on direct.  Correct?

12  A.      I don't believe I testified regarding all the

13  telephone calls that were made between that time

14  period.

15  Q.      Well, let's review that.

16          Because you did indicate, sir, that the phone

17  contact that was made and/or person-to-person contact

18  was very important for you to be able to determine how

19  to go about with this investigation.

20  A.      I'm not sure I understand your question.

21  Q.      All right.  Let me see if I can clear it up for

22  you.

23          Every time contact was made by the informants and

24  Mr. Batiste or anyone else, that was something that

25  told you whether or not this investigation had to go

```
 1   forward.
 2   A.      No.  Not every time.
 3   Q.      Okay.  Every time -- strike that.
 4           When conversations were recorded by the
 5   informants certainly between October and November 7th,
 6   you had made a determination -- and, again, "you" being
 7   the FBI -- that the investigation, as you term it,
 8   should continue.
 9   A.      That's correct.
10   Q.      Okay.  Now, on November 1st, there was at least
11   one recorded conversation between Mr. Batiste and the
12   informant.  Correct?
13   A.      There may have been.  I'm uncertain if there's --
14   Q.      Do you need anything to refresh your
15   recollection?
16   A.      If you have something, I'd certainly -- I'll
17   certainly review it.
18           MS. JHONES:  May I approach, your Honor?
19           MS. ARANGO:  Judge, may I see what she's
20   showing the witness?
21           THE COURT:  Yes.
22           MS. JHONES:  (Tenders document to Counsel.)
23           MS. ARANGO:  Thank you.
24           MS. JHONES:  Your Honor, would you like me to
25   mark this for identification?  I have not done that.
```

 1    It's just to refresh his recollection.

 2              THE COURT:  No.  That's fine.

 3    BY MS. JHONES:

 4    Q.    I'm going to provide this to you, Agent

 5    Velazquez.

 6          Tell me if that refreshes your recollection.

 7    A.    This is a transcript --

 8    Q.    It's not in evidence.  So please don't read from

 9    it.  Just tell me whether or not it refreshes your

10    recollection.

11    A.    No.  This specific phone call I don't recall.

12    Q.    Okay.  Does that refresh your recollection as to

13    there being a phone call between Mr. Batiste and the

14    informant between October 29th and November 7th?  Does

15    that help?

16    A.    There was -- what were the dates that you just

17    said?

18    Q.    Between October 29th, 2005, and November 7th of

19    2005.

20    A.    I'm unable to determine because of the date that

21    appears on the transcript from the preamble.

22    Q.    Okay.  Let me hand you this document.  See if

23    that helps.

24    A.    Yes.

25    Q.    And after you've reviewed that document, sir,

1  does that help to refresh your recollection as to

2  conversations that were recorded between October 29th,

3  2005, and November 7th, 2005?

4  A.    Yes.

5  Q.    May I have that back?

6  A.    (Tenders document to Counsel.)

7  Q.    Thank you.

8        So, Agent Velazquez, between October 29th and

9  November 7th of 2005, there was at least one recorded

10  conversation on November 3rd of 2005.  Correct?

11  A.    Yes.

12  Q.    Indeed, there was more than one on November 3rd

13  of 2005.  Correct?

14  A.    I think there may have been.

15  Q.    There was another recorded conversation on

16  November 4th of 2005?

17  A.    Possibly.

18  Q.    Well, would you like to look at this again?

19  A.    Certainly.  I'm not disputing that there may have

20  been a phone call.

21  Q.    (Tenders document to the witness.)

22  A.    Yes.  There was a phone call on -- two on the

23  3rd, one on the 4th.

24  Q.    And on the 6th?

25  A.    On the 6th as well.

1    Q.     Now, you have previously testified, sir, have you

2    not, that in preparation for this case, for your

3    testimony, you have reviewed all of the recordings?

4    A.     All of the recordings in the entire

5    investigation?

6    Q.     Yes, sir.

7           Was that your testimony previously, that you had

8    reviewed everything -- or almost everything, which is

9    my memory of your testimony a couple of days ago, in

10   this case?

11   A.     During preparation for this trial and my

12   involvement in the duration of the investigation, I've

13   listened to most of the conversations that were

14   recorded either consensually by telephone, in person,

15   or pursuant to a court order.

16   Q.     And the reason for that, sir, is because, again,

17   based on the recorded conversations which were taking

18   place on October and November specifically, you made a

19   decision -- the FBI collectively made a decision to

20   further pursue what you term as the investigation in

21   this case?

22   A.     That's correct.

23   Q.     So it was important to review these calls so that

24   you could determine whether or not you should proceed

25   with the investigation?

Velazquez - CROSS - By Ms. Jhones                110

```
 1    A.     That's correct.

 2    Q.     And, indeed, you did that, sir, in October and

 3    November of 2005?

 4    A.     I don't know if I personally reviewed the calls

 5    in October-November -- the telephone calls specifically

 6    in October-November of 2005 or was briefed on the

 7    content of the telephone calls as they related to

 8    setting up meetings with Narseal Batiste and Abbas

 9    al-Saidi.

10    Q.     And what you mean by being briefed, sir, is you

11    may have had a conversation with your fellow case

12    agents, Mr. Stewart or Mr. Garbato, about what was

13    taking place in the investigation?

14    A.     That's correct.

15    Q.     And the reason for that, sir, was that in,

16    October and early November of 2005, you were wearing

17    your supervisory hat.  Correct?

18    A.     In October up until about the middle of November,

19    I was the acting supervisor.

20    Q.     So whether you listened to the calls directly or

21    whether Agent Garbato or Agent Stewart told you about

22    the contents of the telephone conversations or the

23    meetings, you were aware of what was going on and what

24    was being recorded in early November of 2005.

25    A.     Generally speaking, yes.
```

```
 1   Q.    Okay.  Now, you did testify, sir, a couple of
 2   days ago that there was a scheduled meeting on
 3   November 7th between Mr. Batiste and the Informant
 4   Abbas.
 5   A.    That -- yes.
 6   Q.    Okay.  But that wasn't exactly correct, was it,
 7   sir?
 8   A.    I'm not sure.  That's my recollection, is that
 9   there was a meeting set up for Abbas to meet with
10   Narseal Batiste at the Embassy.
11   Q.    There was a meeting set up and, according to your
12   testimony, sir, that meeting was scheduled by
13   Mr. Abbas.
14         Is that a fair characterization?
15   A.    I'm not sure if Abbas scheduled that meeting or
16   Batiste.  But my recollection is that there was a
17   meeting set on November 7th at the Embassy between
18   Abbas and Narseal.
19   Q.    Narseal Batiste did not meet with the informant
20   on November 7th, 2005, did he?
21   A.    No, he did not.
22   Q.    The reason for that was that Mr. Batiste had
23   already told Mr. Abbas that he cannot meet with him on
24   November 7th.
25         Isn't that a fact, sir?
```

1    A.     Possibly.  I'm --

2    Q.     So when you say "possibly," sir, am I to

3    understand you to say that, when you previously said

4    that scheduled -- that a meeting was previously

5    scheduled, that that may have not been correct?

6    A.     If there was a telephone call that indicates a

7    conversation -- or reflects a conversation between

8    Narseal Batiste and Abbas wherein Narseal Batiste

9    states that he is not going to be at that meeting, then

10   that would be correct.  My testimony would have been

11   incorrect.

12   Q.     Now, you correct me now if I'm wrong.

13          On November 7th, was that a meeting that you

14   stated that you surveilled?

15   A.     No.  I did not surveil that meeting.

16   Q.     It was surveilled by someone -- some case agent?

17   A.     It was.

18   Q.     And is it fair to say that Abbas was wearing a

19   recording device?

20   A.     Yes.

21   Q.     Okay.  And that recording device, sir, if you

22   know, was activated by the informant well in advance of

23   his arrival to the location in Liberty City?

24   A.     I couldn't testify to that.  I don't know who

25   activated the recording device.

```
1    Q.    Moving right along, sir, in your direct

2    testimony, you stated that, after November 7th -- the

3    meeting that occurred on November 7th, then there was

4    another meeting on November 21st of 2005.

5          Do you remember that, sir?

6    A.    Yes.

7    Q.    Okay.  Now, again, on November -- prior to

8    November 21st of 2005, sir, between November 7th of

9    2005 and November 21st of 2005, there were several

10   calls and meetings that were recorded by the FBI

11   through Abbas al-Saidi.  Correct?

12   A.    I believe so.

13   Q.    Let's talk about how many.

14         Now, so that we're clear, any meetings that were

15   recorded between October and all the way till February

16   would have been through the use of a body wire in one

17   form or another.  Correct?

18   A.    I believe that's correct.

19   Q.    And that's because there was no wiretap in effect

20   until late February of 2006?

21   A.    That's correct.

22   Q.    Okay.  Now, after November 7th, but before

23   November 21st, there was a recorded conversation on

24   November 9th of 2005.  Correct, sir?

25   A.    I --
```

 1  Q.    If you need anything to refresh your

 2  recollection, please let me know.

 3  A.    Yes, if you have something that I can refer to.

 4         MS. JHONES:  May I approach, your Honor?

 5         THE COURT:  Yes.

 6  BY MS. JHONES:

 7  Q.    Please take a look at that document, Agent

 8  Velazquez, and let me know if that refreshes your

 9  recollection.

10  A.    Yes.  This indicates there was a --

11  Q.    Again, that's not in evidence.  So please don't

12  read from the document.  Just use it to refresh your

13  recollection.

14  A.    This indicates there was a telephone recording --

15  Q.    Okay.  And --

16  A.    -- on November 9th.

17  Q.    All righty.  Let me show you another one.

18         Please tell me if that refreshes your

19  recollection about phone contact that was made a second

20  time on November 9th of 2005.

21  A.    Yes.  This was another telephone contact on the

22  9th.

23  Q.    Thank you.

24         MS. JHONES:  Now, Judge, I'm going to remain

25  here just a couple minutes, just in the event I have to

 1    refresh his recollection again, if I may.

 2          THE COURT:  Okay.

 3    BY MS. JHONES:

 4    Q.    Now, after November 9th of 2005, but before

 5    November 21st of 2005, there was yet another contact --

 6    or attempted contact made with Abbas -- by Abbas with

 7    Mr. Batiste.  Correct?

 8          MS. ARANGO:  Judge, I'd ask, if she's going to

 9    be showing him any more documents, that I would see

10    them first.  I've only seen the one phone call.

11          MS. JHONES:  These have previously been

12    provided, but I will show them to them again.

13          THE COURT:  Okay.

14          (Discussion had off the record amongst

15    counsel.)

16    BY MS. JHONES:

17    Q.    Now, again, directing your attention, sir, to my

18    question regarding whether or not there was any phone

19    contact or person-to-person contact between

20    November 7th and November 21st of 2005, I'm going to

21    hand you two separate documents and ask you whether or

22    not this refreshes your recollection with respect to

23    additional phone contact and/or person-to-person

24    contact.

25    A.    Yes.

Velazquez - CROSS - By Ms. Jhones                116

1    Q.     Okay.  Finished?

2    A.     Yes.

3    Q.     Now -- and the answer to the question is, yes,

4    there was?

5    A.     Yes.

6    Q.     Okay.  Now, in addition to that, sir, during the

7    first days of November of 2005, in addition to the

8    recorded conversations of November 1st, 3rd, 4th, 6th,

9    9th and 10th that you have referenced, Abbas al-Saidi

10   was actually staying at the Temple during the first

11   week of November of 2005; was he not, sir?

12   A.     Abbas stayed at the Temple.  I'm uncertain of

13   the time frame, but it was very early on in the

14   investigation.  And my recollection is he was there

15   for one or two days.

16   Q.     Well, the meeting that took place on

17   November 21st of 2005 that was played for the ladies

18   and gentlemen of the jury -- remember that one?

19   A.     Yes.

20   Q.     That was a conversation that took place -- or,

21   actually, a meeting that took place in the informant's

22   apartment.  Correct?

23   A.     That's correct.

24   Q.     That was a new apartment.  Correct?  He didn't

25   have that apartment before -- he didn't have that

1    apartment in October of 2005, did he?

2    A.    No.  That apartment was acquired after -- what

3    was the your time -- date?

4    Q.    October of 2005.

5    A.    Yes.

6    Q.    Well, I don't want it to be my time.

7          That's your time.  Right?  That's when this

8    investigation began.  Right?

9    A.    That was in reference to your question.

10   Q.    Okay.  And that apartment, sir -- I don't have

11   any documents on it, but that apartment was acquired

12   sometime -- well, let me ask you this:  He had the

13   apartment on November 10th, 2005; did he not?

14   A.    I'm uncertain when Abbas had the apartment.  I

15   believe when -- I'm uncertain when Abbas got the

16   apartment.

17   Q.    Okay.  Maybe I can help you.

18         In addition to conversations on November 9th,

19   there were also conversations on November 10th of 2005?

20   A.    Yes.

21   Q.    There was actually phone conversations on

22   November of 2005 and there was a person-to-person

23   meeting on November 10th of 2005.

24         Do you remember that, sir?

25   A.    I remember the transcripts that indicated there

 1   were two phone calls.  I may have not seen the document

 2   that relates to a face-to-face meeting.

 3   Q.    Let me show you that.

 4         Do you need to see -- let me just show you these

 5   documents again.  I want to make sure they help you in

 6   refreshing your memory.

 7         THE COURT:  Are these documents that you've

 8   previously shown to the Government?

 9         MS. JHONES:  Yes.  Yes, I did.  But I'll show

10   them to them again, just in case.  But I did.

11         THE COURT:  No.  I don't know that she was

12   asking.

13         MS. ARANGO:  That's fine.

14         THE COURT:  Why don't you leave the documents

15   there and you can go back to questioning.  Sometimes

16   you're blocking some of the jurors.

17         MS. JHONES:  I'm sorry.  I'm sorry.  I will,

18   your Honor.

19         THE COURT:  So if you can leave the documents

20   there and then, if there comes a point where the

21   witness can't remember and he can look at the document,

22   you can --

23         MS. JHONES:  That's fine.  I actually have to

24   retrieve another one for him.

25         THE COURT:  Okay.

1            THE WITNESS:  These documents here appear to

2    reflect telephone contact --

3    BY MS. JHONES:

4    Q.     Right.

5    A.     -- on November 10th, 2005.

6    Q.     And do they confirm, sir, that there was

7    telephone contact on November 10th of 2005?

8    A.     They do.

9    Q.     Let me show you something else to refresh your

10   recollection.

11           May I have those back?

12   A.     (Witness tenders document to Counsel.)

13   Q.     Are you finished?

14   A.     Yes, ma'am.

15           MS. JHONES:  I apologize, your Honor.  I'm

16   just going to need a minute.

17           THE COURT:  What's the pending question?

18           MS. JHONES:  The question is -- he needs

19   something to refresh his recollection regarding a

20   face-to-face meeting on a particular date, your Honor.

21   I was just retrieving that document.

22           MS. ARANGO:  Judge, I'm not sure if that --

23   maybe I'm wrong.  I don't know that that was the

24   pending question.

25           MS. JHONES:  Maybe he doesn't need it.

```
 1    BY MS. JHONES:

 2    Q.     Sir, do you recall there being a meeting --

 3    face-to-face meeting on November 10th of 2005?

 4    A.     There was probably a meeting on November 10th of

 5    2005.

 6    Q.     Face-to-face meeting?

 7    A.     Possibly.  I --

 8           MS. JHONES:  May I refresh his recollection,

 9    your Honor?

10           THE COURT:  Go ahead.

11           THE WITNESS:  Yes.  This indicates there was a

12    face-to-face meeting on November 10th between Abbas and

13    Narseal Batiste.

14    BY MS. JHONES:

15    Q.     All righty.  Okay, sir.  Now, on November 21st,

16    2005, you testified -- you've already -- previously

17    testified about this encounter with Mr. Batiste and

18    Abbas al-Saidi.  Correct?

19    A.     Yes.

20    Q.     Now, that meeting, sir, November 21st of 2005,

21    occurred in Abbas al-Saidi's new apartment.  Correct?

22    A.     That's correct.

23    Q.     And that was the apartment that was provided to

24    Mr. Abbas by the FBI.  Correct?

25    A.     That's correct.
```

1   Q.    And that was the apartment that -- prior to the

2   meeting of November 21st, it was hooked up with

3   videocameras and, also, recording devices, I believe.

4   A.    It had surveillance equipment that would be able

5   to record the video and audio of the room.

6   Q.    Okay.  In addition to the body wire that

7   Mr. Al-Saidi was wearing?

8   A.    Well, body wires were usually deployed by -- with

9   both informants during meetings in case the meeting --

10  or the participants left the area that was covered by

11  the camera in either of their apartments or other

12  locations where fixed surveillance equipment was

13  installed.

14  Q.    So the answer is "yes," there was audio

15  surveillance equipment in the apartment in addition to

16  the body wire?

17  A.    Yes.

18  Q.    Okay.  Now, I believe you testified, sir, and you

19  identified the participants of the November 21st, 2005,

20  meeting as being Narseal Batiste, Abbas al-Saidi and

21  Patrick Abraham?

22  A.    That's correct.

23  Q.    Now, you have previously, sir -- on November 21st

24  of 2005 and, indeed, some time after that, sir, for

25  quite some time, you were not sure who the other person

```
 1    in that apartment with Mr. Batiste and Mr. Abbas -- who

 2    that person was.

 3         Fair to say?

 4    A.    That is fair to say.

 5    Q.    As a matter of fact, sir, as late as March 6th of

 6    2006, you still didn't know who it was that was in the

 7    apartment with Abbas al-Saidi in addition to Narseal

 8    Batiste.

 9    A.    I'm uncertain as to the time frame.  But at the

10    beginning of the investigation, there were several

11    identifications that we were having difficulty with in

12    terms of the participants in the meetings with the

13    informants -- with the informant, with Abbas.

14    Q.    And what you're basically telling us is that the

15    informants were -- had been unable to properly identify

16    people that you believed to be involved in this

17    investigation?

18    A.    I believe what happened was there were some

19    misidentifications by Abbas in the early stages of the

20    investigation.

21    Q.    Well, let me ask you this.

22         Let's go back -- well, not only in the early

23    stages of the investigation, sir, because as late as

24    March of 2006, you were still under the impression that

25    the other person in that apartment was not Patrick
```

1   Abraham.  You -- as early as March of 2006, you did not

2   know who it was that was in that apartment.

3   A.    That's possible.

4   Q.    Well, I don't want it to be possible.  I could

5   refresh something -- I could show you something to

6   refresh your recollection, if you'd like.  I want you

7   to tell me -- and, if you don't remember, I can show

8   you something.

9   A.    Yeah.  I don't recall.

10  Q.    Okay.

11        MS. JHONES:  May I approach, your Honor?

12        THE COURT:  Yes.

13  BY MS. JHONES:

14  Q.    (Tenders document to the witness.)

15  A.    Is there a particular document?

16  Q.    Yes.  Paragraph 29.

17  A.    Yes, ma'am.

18  Q.    Does that refresh your recollection, sir?

19  A.    Yes, it does.  I'm just looking at the date of

20  this document, which appears to be the 2nd of March.

21  Q.    What year?

22  A.    2006.

23  Q.    And you were still unsure of who the participants

24  were on November 21st, 2005, even after the

25  investigation came to an end.  That is, June 30th of

1    2006, you still did not know who the additional

2    participant was -- or you were mistaken, I should say,

3    as to who the participant was in the meeting of

4    November 21st of 2005.

5    A.     Okay.  What is your question?

6    Q.     As late as June 30th of 2006, you had

7    misidentified the person -- the additional person in

8    that apartment on November 21st of 2005.

9    A.     In June of 2006, I knew exactly who the

10   participants were in the meeting on November 21st,

11   2005.

12   Q.     Okay.  Do you remember giving testimony in a

13   previous proceeding on June 30th of 2006?

14   A.     Possibly.

15   Q.     Would something help to refresh your

16   recollection, sir?

17   A.     Yes.

18   Q.     Okay.

19          (Discussion had off the record amongst

20   counsel.)

21          MS. JHONES:  I apologize, your Honor.  I'm

22   looking for a page number.

23          May I approach?

24          THE COURT:  Yes.

25          MS. JHONES:  I'll get my exercise in for the

1    day.

2              THE COURT:  I see.

3    BY MS. JHONES:

4    Q.    (Tenders document to the witness.)

5    A.    Yes.

6    Q.    Okay.  Do you remember that, sir?

7    A.    Yes.

8    Q.    So as late as June 30th of 2006, you

9    misidentified the participant -- the additional

10   participant in the November 21st, 2005, meeting?

11   A.    I incorrectly identified the participants at the

12   meeting on November 21st on June 30th, 2006.

13   Q.    You were under oath on June 30th, 2006, when you

14   identified the participants; were you not?

15   A.    That is correct.

16   Q.    Okay.  May I have that back?

17   A.    (Tenders document to Counsel.)

18   Q.    Thank you.

19         Now, the November 21st, 2005, meeting, in

20   addition to you debriefing -- "you" meaning yourself or

21   your fellow case agents -- in addition to debriefing

22   the informant, you also were watching it realtime.

23   A.    That's correct.

24         On November 21st?

25   Q.    I believe that -- I understood your testimony

```
 1    previously, a couple days ago, to say that you were
 2    monitoring that meeting realtime.  That was my
 3    understanding of your testimony, sir.
 4    A.     The audio portion.  The audio portion.
 5    Q.     Not the video?
 6    A.     Right.  That's correct.
 7    Q.     Okay.  Now -- so let's talk about what you did
 8    besides giving a recording device to Abbas al-Saidi to
 9    corroborate things that came to your attention in your
10    investigation between October and November 21st -- this
11    is that time period we're talking about now -- of 2005.
12    All righty?
13           You already knew that Narseal Batiste wanted
14    money.
15           Fair enough?
16    A.     I'm not sure when I became aware of that.
17    Q.     Okay.  Again, you have testified that you have
18    reviewed these recordings.
19    A.     Yes.
20    Q.     And you reviewed them not only in preparation for
21    this proceeding, but you reviewed them throughout the
22    course of this case?
23    A.     That's correct.
24    Q.     And as you sit here today, sir, is it your
25    testimony that you don't have any recollection of
```

 1    statements made by Mr. Batiste to the informant

 2    regarding his need for money between -- let me just

 3    make sure -- between October 29th and November 21st of

 4    2005?

 5    A.    There may have been during my review statements

 6    made by Mr. Batiste indicating a need for finances.

 7    I'm -- I'm unable to refer to any specific reference or

 8    statement.

 9    Q.    Okay.  And -- now, is it fair to say, sir, that

10    between October and November 21st of 2005, the FBI,

11    yourself or your fellow case agents -- co-case agents

12    did not obtain any records of any sort pertaining to

13    Mr. Batiste to verify his financial condition?

14    A.    I'm uncertain as to when Narseal Batiste was

15    fully identified, which would have been required to

16    conduct any sort of public database search and any

17    other further inquiries regarding bank statements.

18    Q.    Well, you did testify on your direct testimony,

19    sir, did you not, that you obtained driver's licenses

20    of individuals?

21          And, indeed, Ms. Arango introduced driver's

22    license photographs, and I'll tell you the exhibit

23    numbers in a minute.

24          Specifically, Exhibit No. -- as it pertains to

25    Mr. Narseal Batiste, Exhibit No. 1 was a photograph

1   that you obtained.  And I believe your testimony was

2   that that was a driver's license photo.

3           Please correct me if I'm wrong.  Would you like

4   to see it?

5   A.    No.  No.  That's correct.

6   Q.    Was that a driver's license photo?

7   A.    I believe so.

8   Q.    So had you provided -- you had identified Narseal

9   Batiste between -- certainly between October and

10  November 21st of 2005?

11  A.    My testimony is that I don't remember exactly

12  when Narseal Batiste was fully identified and that

13  driver's license was pulled.

14  Q.    Well, why don't you tell me when you believe that

15  he was identified.

16          Do you have a recollection of when you identified

17  him by name?

18  A.    No.

19  Q.    Now, this was a terrorism investigation; was it

20  not, sir?

21          MS. ARANGO:  Objection.  Argumentative.

22          THE COURT:  Sustained.

23          Rephrase your question.

24  BY MS. JHONES:

25  Q.    Sir, this was -- you were the supervising agent,

1    I believe you testified, of the T1 squad?

2    A.    I was the acting supervisor for the T1 squad.

3    Correct.

4    Q.    The T1 squad is the squad that investigates

5    terrorism cases.  Correct?

6    A.    That's correct.

7    Q.    Now, in 2006 -- and I would dare say any year --

8    terrorism cases are a top priority for the Federal

9    Bureau of Investigation.

10   A.    That's correct.

11   Q.    And you, wearing your supervisory hat between

12   October and mid-November of 2005, were -- was

13   investigating this case, and you had 16, 17 years of

14   experience as an agent with the Federal Bureau of

15   Investigation?

16   A.    At the time, yes.

17   Q.    And you had -- and your testimony is that you

18   don't know when it was that Narseal Batiste was

19   identified by the Federal Bureau of Investigation by

20   name?

21   A.    That's correct.

22   Q.    Let me ask you this:  You certainly had the

23   ability to investigate to determine the identity of

24   Narseal Batiste early on.  Isn't that correct?

25   A.    Well, that was one of the priorities of the

 1   investigation, was to identify Narseal Batiste and the

 2   members of his organization.

 3   Q.     Okay.

 4   A.     It --

 5   Q.     I'm sorry.

 6   A.     In response to your question did we have the

 7   capabilities, we have the capabilities to run public

 8   source database checks, driver's license, other

 9   database inquiries, which would allow or assist us in

10   identifying individuals.

11   Q.     You had the capability of surveilling

12   Mr. Batiste, right, following him around?

13   A.     That's correct.

14   Q.     You certainly knew what he looked like in

15   November 21st of 2005.

16   A.     I believe I did.

17   Q.     And just so we're clear -- because, when you have

18   testified during the course of your direct testimony,

19   sir, not everything that you testified you had -- you

20   yourself had done.  You were testifying about

21   collectively the FBI.  Correct?

22   A.     At times I did.  Yes.

23   Q.     And as an example of that, so we're clear, you

24   testified about October 29th, 2005, and, yet, you were

25   not part of that recorded conversation that Mr. Abbas

1    did.

2    A.     That's correct.

3    Q.     And you've testified about different meetings

4    between January -- between November 1st and

5    November 10th, and you were not part -- you did not

6    assist Abbas al-Saidi or supervise Abbas al-Saidi when

7    he was making these phone calls.  Correct?

8    A.     I don't recall testifying about meetings in my

9    direct about the time period between November 1st and

10   the 10th.  I don't recall that.  But --

11   Q.     That's correct.  That is absolutely correct.

12   Thank you for that.

13          MS. ARANGO:  I'll just object to interrupting

14   the witness.

15   BY MS. JHONES:

16   Q.     I'm sorry.  Did I interrupt you?

17          THE COURT:  Let him finish.

18          THE WITNESS:  I don't recall testifying on

19   direct with regards to meetings between November 1st

20   and November 10th.

21          And the answer to the second part of your

22   question was, at that time, I was not directly

23   supervising Abbas al-Saidi.

24   BY MS. JHONES:

25   Q.     Joe Garbato was?

```
 1   A.      I'm not -- Abbas al-Saidi was John Stewart's

 2   informant, and I believe Joe was the co-case agent, if

 3   you will, on Abbas.

 4          So at different times, they may have been

 5   operating or directing him jointly and individually,

 6   depending on who was tasked to do what.

 7   Q.      And you were supervising your fellow case agents

 8   in early November and late October of 2005?

 9   A.      I believe in -- in late October?

10   Q.      No.  Late October -- I'm sorry.

11          Late October and early November of 2005.

12   A.      I was still the acting supervisor at that time.

13   Q.      Okay.  And during -- in the early months -- in

14   the early days of November of 2005, sir, there were

15   surveillance that was conducted by the FBI and, indeed,

16   license -- for example, license plates of cars seen in

17   the vicinity, for example, of the Embassy were written

18   down by some of the FBI agents.  Correct?

19   A.      I'm sure that occurred.

20   Q.      Now, the Embassy, sir, as the Liberty City

21   location has come to be named, was a facility that was

22   leased by Narseal Batiste; was it not?

23   A.      Yes.  I believe so.

24   Q.      And Narseal Batiste signed a lease for that

25   facility?
```

Velazquez - CROSS - By Ms. Jhones                    133

```
1    A.      I believe that's correct.

2    Q.      And he signed a lease -- he didn't use a fake

3    name.  He signed it "Narseal Batiste"?

4    A.      I believe he signed it in his true name, Narseal

5    Batiste.

6    Q.      Indeed, any documents that Narseal Batiste has

7    signed, he has always used his true name, Narseal

8    Batiste.

9    A.      I believe that's correct.

10   Q.      Now, you certainly, sir -- given the

11   investigative techniques that you're very familiar

12   with, you certainly had the ability to pull the

13   records -- the lease records for the Liberty City

14   location, an address that you were very familiar with.

15   Correct?

16   A.      No.  That would have been extremely difficult,

17   considering we were in the middle of an ongoing

18   investigation.

19           So in order to go to the landlord of a building

20   and ask for the lease of the occupants, there would be

21   no assurance that that landlord would not go back to

22   the occupants and say, "The FBI came and asked for your

23   lease."

24           So that is not an inquiry that we would have

25   made.
```

1    Q.    Well, let me ask you this, sir:  You know what a

2    pretext is, don't you?

3    A.    I do.

4    Q.    And I think you testified on direct about -- I

5    forget under what circumstance -- but where a pretext

6    was used to gather information.

7    A.    That's correct.

8    Q.    Law enforcement does that all the time.

9    A.    It depends on the type of investigation you're

10   involved with and the circumstances of that

11   investigation and the risk assessment associated with

12   the decision to use a pretext to gather information.

13   Q.    And -- but the FBI has used pretext on many

14   indications to gather information?

15   A.    That's correct.

16   Q.    And you have a lot of experience in utilizing the

17   pretext type of mechanism to acquire investigation from

18   people?

19   A.    True.

20         However, I'd like to put into context the

21   different types of pretext entries.  A pretext could be

22   a phone call or a pretext could be an actual visit.

23         Now, in order to obtain lease information on a

24   building or a property that's being leased or rented,

25   that would -- that would entail an actual face-to-face

```
 1   contact and would be significantly more intrusive than

 2   making a phone call to see if somebody's working at a

 3   particular business or location.

 4   Q.    So let me see if I understand you.

 5         You don't remember whether or not you had

 6   identified Narseal Batiste by name as early as -- I'm

 7   sorry -- as late as November 21st of 2005.  Correct?

 8         MS. ARANGO:  Objection.  Asked and answered.

 9         THE COURT:  Sustained.

10   BY MS. JHONES:

11   Q.    Okay.  You don't remember when at all you

12   identified Narseal Batiste by name.

13   A.    That's correct.

14   Q.    Okay.  Moving along, after November 21st of 2005,

15   during your direct testimony, sir, you testified that,

16   after November 21st of 2005, there was another meeting

17   that was recorded -- and correct me if I'm wrong.

18         I think that other meeting would have been the

19   meeting of December 16 of 2005.  Am I correct about

20   that?

21   A.    There was a meeting recorded on December 16th,

22   2005.

23   Q.    And that was what you testified to on direct?

24   A.    That's correct.

25   Q.    You did not testify to any other meetings
```

1   between November 21st and September -- I'm sorry --

2   December 16th of 2005 during your direct testimony.  Is

3   that correct?

4   A.    I believe that's correct.

5   Q.    Okay.  Now, there were, in fact, quite a few

6   meetings that were recorded between November 21st,

7   2005, and December 16th of 2005.

8   A.    Possibly.

9   Q.    I placed over there at your station some files.

10        Would you please take a look at them and let me

11  know if they refresh your recollection with respect to

12  other meetings between November 21st, 2005, and

13  December 16th of 2005.

14  A.    On November 23rd, there is a transcript that

15  indicates there was a phone message or an attempt at a

16  contact.

17  Q.    An attempt at a contact with whom, sir, if you

18  remember?  I don't want you to read off the document.

19  Does that refresh your recollection?

20  A.    Can I review it again?

21  Q.    Sure.

22  A.    Yes.  An attempted contact of Narseal Batiste on

23  November 23rd.

24  Q.    How about November 18th of 2005?

25  A.    I thought your question was from November 21st.

```
 1   Q.     Oh, I'm sorry.  That's correct.  On

 2   November 23rd.

 3          How about November 25th?

 4   A.     Yes.  I'm reviewing those documents now and --

 5   Q.     Just let me know when you're finished.

 6   A.     This folder appears to contain two identical

 7   documents which reflect telephone contact between --

 8   one telephone contact between Abbas al-Saidi and

 9   Narseal Batiste.

10   Q.     And the date of that, sir, please?

11   A.     November 25th.

12   Q.     Okay.  So -- are you finished reviewing them,

13   sir?

14   A.     I have one more.

15   Q.     Okay.  Let me know when you're finished.

16   A.     On November 28th, there's a transcript that

17   indicates an attempt to contact Narseal Batiste by

18   Abbas.

19          And then later on the same day, there's a

20   transcript that indicates an actual telephonic contact

21   between Narseal Batiste and Abbas.

22   Q.     Okay.  Now, does that refresh your recollection,

23   sir, about contact that was made or attempted contact

24   that was made between the 21st and, actually, the

25   remainder of the month up until November 30th of 2005?
```

1    A.    Yes.   There appears to be three separate

2    occasions in which an attempt to contact Narseal

3    Batiste was made or contact was made.

4    Q.    Okay.   Now, I'm going to ask you in a minute --

5    as soon as the prosecutor finishes reviewing these

6    documents, I'm going to ask you -- actually, let me ask

7    you now.   Maybe you didn't need to review them.

8          Do you remember --

9             MS. ARANGO:  All done.

10            MS. JHONES:  Finished?

11            MS. ARANGO:  Yes.

12   BY MS. JHONES:

13   Q.    There was contact, was there not, sir, before

14   December 16th of 2005 between Mr. Batiste and Paid

15   Informant No. 1, Abbas al-Saidi?  Correct?

16   A.    Yes.

17   Q.    Now -- and that contact, sir, that additional

18   contact, occurred on 12-14, December 14th.  Correct?

19   A.    I don't recall the exact date.

20   Q.    I'm going to go ahead and show you some more

21   documents to refresh your recollection.

22   A.    The documents in this folder indicate there was

23   contact by telephone and a face-to-face contact on

24   December 14th.

25            There appears to be an attempt to contact Narseal

 1   Batiste on a telephone via a voicemail message left on

 2   December 15th.

 3         And then this folder indicates documents dated

 4   12-18, which is after the 16th of December.

 5   Q.    Okay.  So the answer is "yes," there was contact

 6   prior to the 16th.  Correct?

 7   A.    On the 14th.

 8   Q.    All righty.  Now, sir, let me backtrack and ask

 9   you another question about your attempts at

10   corroborating.

11         We are now -- you have -- the FBI has recorded a

12   number of conversations, including those that we have

13   referenced this afternoon.  Correct?

14   A.    That's correct.

15   Q.    And just so we're clear, the phone calls that you

16   have utilized to refresh your recollection were phone

17   calls that were generated by the FBI?  Those are FBI

18   calls that were generated by Abbas, the informant, but

19   under the direction of the Federal Bureau of

20   Investigation?

21   A.    That's correct.

22   Q.    Okay.  You were aware that those phone calls were

23   being made?

24   A.    Yes.

25   Q.    Now, you also know, sir, that as early as

1    November of 2005, that Mr. Batiste had a corporation.

2    Correct?

3    A.    I was aware that Batiste had a group of men that

4    worked together.  I'm uncertain as to when I learned

5    that he actually had a corporation.

6    Q.    Well, you knew -- well, maybe you didn't know he

7    had a corporation.

8          Did you know he had a business by the name of

9    Azteca Stucco & Masonry?

10   A.    Yes.

11   Q.    And the reason you know that, sir, is because

12   every time Abbas would call him, the voicemail message

13   was, "This is Azteca Stucco & Masonry."

14         That's how you knew that.  Correct?

15   A.    No.  Every time Abbas called, he didn't get the

16   voicemail.  Sometimes the phone was answered.

17         THE COURT REPORTER:  I'm sorry.  Could repeat

18   that for me, please.

19         THE WITNESS:  Every time Abbas called Batiste,

20   he didn't get the voicemail message.  Sometimes Batiste

21   or other people answered the phone.

22   BY MS. JHONES:

23   Q.    And during those times that the phone was not

24   answered -- and there were several of those; were there

25   not, sir?

1    A.     Yes.

2    Q.     During those time periods that it wasn't

3    answered, the voicemail kicked in; did it not?

4    A.     Yes.

5    Q.     And by virtue of the voicemail kicking in, you

6    became aware of the name of Narseal Batiste's business?

7    A.     That's correct.

8    Q.     And that name is Azteca Stucco & Masonry.

9    Correct?

10   A.     That's correct.

11   Q.     Now, is it fair to say, sir, that between October

12   and December of 2005, the FBI did nothing to pull any

13   records in the Florida Department of Corporations for

14   Azteca Stucco & Masonry?  Fair to say?

15   A.     No.  I don't know what inquiries were made with

16   regard to Azteca Stucco & Masonry and/or Narseal

17   Batiste between the dates you stated in your question.

18   Q.     Okay.  But that is something that a case agent

19   with the Federal Bureau of Investigation would know; is

20   it not?  I mean, you want to identify a person who you

21   believe to be the leader of a terrorist organization;

22   do you not?

23   A.     No.  That's a mischaracterization.  We were

24   trying to get information on the leader of an

25   organization that wanted to meet someone from a

```
 1   terrorist organization.

 2   Q.    It was not an objective of the Federal Bureau of

 3   Investigation to identify by name as quickly as

 4   possible who this potential leader of a terrorist

 5   organization would be?

 6   A.    The terrorist organization I referenced in my

 7   last answer was a terrorist organization that Narseal

 8   Batiste wanted to meet to get support from.

 9         At the time of -- that you're referencing now,

10   Batiste wasn't characterized as the leader of a

11   terrorist organization.  He was characterized as the

12   leader of an organization who wanted to meet an

13   individual from a terrorist organization.

14   Q.    You, the FBI, did not have an interest in

15   identifying the persons that they believed were

16   involved in crimes that may be damaging to the United

17   States?

18         I want to make sure I understand you.

19         You did not have an interest -- "you" meaning the

20   FBI -- as quickly as possible to identify Narseal

21   Batiste by name?

22   A.    That is completely contrary to my testimony.

23   Your question was:  When did that happen?

24         My answer was:  I don't know if any inquiries --

25   when any inquiries were made with regard to Azteca
```

```
 1    Stucco & Masonry as it relates to Narseal Batiste.
 2    Q.    Maybe I asked the wrong question.
 3          When did the FBI try -- when did the FBI try to
 4    identify Narseal Batiste?  When did the FBI try?
 5    A.    When we brought Abbas al-Saidi back to
 6    corroborate his information and get information or
 7    details on Narseal Batiste and members of his
 8    organization.
 9    Q.    So the FBI did not -- other than through the
10    informant, Abbas al-Saidi, the FBI did nothing to
11    corroborate and to -- strike that -- the FBI did
12    nothing to attempt to identify people that they
13    believed were involved in these types of allegations?
14    A.    No.  That's completely wrong.
15          When Abbas arrived and we had Narseal Batiste's
16    cell phone number, there were inquiries made with
17    regard to the subscriber of the cell phone.
18          There were other inquiries made during the course
19    of the investigation as it became available with
20    respect to drivers -- or -- I'm sorry -- license plates
21    and driver's licenses, addresses and other cell phones
22    that we became aware of.
23          When those inquiries were made specifically, I'm
24    uncertain of.
25    Q.    Okay.  And you did not make any inquiry of the
```

 1    Florida Department of Corporations for the business,

 2    the name of which you were aware of?

 3    A.    I did not.  My testimony is I don't know when

 4    that occurred.

 5    Q.    Do you know if it occurred?

 6    A.    I'm uncertain if that occurred.  Yes.

 7    Q.    I'm sorry.

 8          "Yes," you're certain that it did not occur?

 9    A.    No.  I'm uncertain when, if it did, occur.

10    Q.    So you don't even know if it occurred?

11    A.    No, I do not.

12    Q.    All righty.  Now, you testified that the FBI,

13    after November 21st of 2005, made a decision to

14    introduce a second informant.  Correct?

15    A.    That's correct.

16    Q.    The reality is, Agent Velazquez, that, as early

17    as November 7th, 2005, the FBI had already made that

18    decision.

19    A.    That's -- that's incorrect in that -- well, I'm

20    uncertain.

21          I do know this:  Upon receipt of the information,

22    that -- there was an individual by the name of Brother

23    Naz who wanted to --

24    Q.    Sir.  Sir, I do not --

25          MS. ARANGO:  Objection to interrupting the

1    witness.

2           MS. JHONES:  I'm going to interrupt the

3    witness if he's going to testify to hearsay.  That

4    is --

5           MS. ARANGO:  He's answering -- he's entitled

6    to answer the question and explain his answer.

7           MS. JHONES:  Your Honor, the question that was

8    posed to him -- let me look at the realtime about the

9    specific question -- did not call for a hearsay

10   response, your Honor.

11          MS. ARANGO:  The question was, "The reality

12   is" --

13          THE COURT:  Okay.  He answered the question.

14   He said, "That's incorrect."

15   BY MS. JHONES:

16   Q.    Now, on December 16th, 2005, that was the first

17   meeting that was had between Mr. Batiste and the second

18   informant that has been identified in these proceedings

19   to date as Brother Mohammed.  Correct?

20   A.    That's correct.

21   Q.    Okay.  Now, right after -- strike that.

22          After December 16th, 2005, sir, you testified on

23   direct that there was another meeting on December 29th

24   of 2005.  Correct?

25   A.    That's correct.

1   Q.     And that's the meeting where you testified, sir,

2   that the meeting was not recorded.  Correct?

3   A.     That's correct.

4   Q.     That was the meeting that you testified that you

5   were able to listen because you had a transmitter.

6   Correct?

7   A.     Correct.

8   Q.     And that's the meeting that you testified

9   occurred somewhere in Bayside?

10  A.     That's correct.

11  Q.     Okay.  In that meeting, sir, that is where one of

12  these several lists that have been introduced by the

13  Government was provided, according to your testimony,

14  by Narseal Batiste to the second informant.  Correct?

15  A.     That's correct.

16  Q.     Okay.  Now, between December 16th of 2005,

17  the first meeting with the Informant No. 2, and

18  December 29th of 2005, sir, there were several meetings

19  of which you did not previously testify about.

20  Correct?

21  A.     There were meetings.  I don't know what the

22  number was.  I think there was one or two meetings

23  between those two dates.

24  Q.     Okay.  Do you have an independent recollection of

25  how many meetings, sir, or do you need something to

1    refresh your recollection?

2    A.    There was another meeting on -- I recall a

3    meeting on December 18th, 2005, between Abbas and

4    Narseal Batiste.

5    Q.    May I stop you a second before you continue?

6    A.    Yes.

7    Q.    I want you to finish, but I want to interject

8    something.

9          That meeting that you just referenced,

10   December 18th, 2005:  This is another meeting that

11   wasn't recorded?

12   A.    I don't recall.

13   Q.    Go ahead.  Tell me about the other meetings.

14   A.    Then I recall a meeting on December 22nd, 2005,

15   between Brother Mohammed and Batiste.  That meeting was

16   recorded.

17         And there may or may not have been another

18   meeting in between that time period after the 16th.

19   Q.    In addition to the meeting of December 22nd that

20   you had stated was recorded -- this was a face-to-face

21   meeting.  Correct?

22   A.    That's correct.

23   Q.    Before that face-to-face meeting, there was a

24   phone call on December 22nd as well; was there not?

25   A.    I believe so.

1    Q.     Okay.  And, sir, in addition to the meeting of

2    the 18th that you have referenced, there was also

3    another meeting on December 19th between the first

4    informant and Mr. Batiste; was there not?

5    A.     I believe there was.

6    Q.     There was actually at least two phone calls on

7    December 19th of 2005?

8    A.     I'm uncertain as to the number of phone calls.

9    But --

10   Q.     Would you like to look at something to refresh

11   your recollection about that?

12   A.     I mean, if it will help answer your question.

13          But I do know that most, if not all, meetings --

14   face-to-face meetings between both informants were set

15   up through phone calls.  They didn't just

16   coincidentally meet.  The meetings were set up via

17   phone calls.

18   Q.     During the course of these phone calls, there

19   were many things that were discussed; were there not?

20   A.     Sometimes.

21   Q.     And one of the things that you have told us

22   previously during your direct testimony, sir, is that

23   you wanted to have these informants -- both the first

24   informant and the second informant generate

25   conversation with Mr. Batiste to get information out of

Velazquez - CROSS - By Ms. Jhones                    149

```
 1    him.
 2            That was one of the objectives; was it not?
 3    A.      One of the objectives was to get information from
 4    Narseal Batiste.
 5    Q.      To determine his intent?
 6    A.      That was another objective.
 7    Q.      And that's why you wired these informants up.
 8    Correct?
 9    A.      Yes.  To gather evidence.
10    Q.      Before the meeting of December 22nd of 2005,
11    there was also a meeting on December 21st.  You may
12    have already said that.  Correct?
13    A.      I don't think I did.
14            But I do recall a meeting, I believe, on the
15    21st.
16    Q.      And that was a face-to-face meeting.  Correct?
17    A.      I believe so.
18    Q.      And before the meeting of December 29th that you
19    have testified that you listened in on, is your
20    testimony, there was another meeting -- or a phone
21    call, I should say, on December 28th -- or, actually,
22    there was an attempted contact on December 28th; was
23    there not?
24    A.      Possibly.  It --
25    Q.      Okay.  And, sir, is it fair to say that, between
```

 1   October and December -- the end of December of 2005,

 2   Abbas al-Saidi had significant contact that was

 3   recorded with Mr. Batiste?

 4   A.    Yes.

 5   Q.    And it's fair to say that he also had had contact

 6   that was not recorded between October and December of

 7   2005.

 8   A.    That is correct.

 9   Q.    Okay.  There was also, sir, a face-to-face

10   meeting on December 6th of 2005 between this informant

11   and Mr. Batiste.

12   A.    I don't recall that date specifically, but that's

13   highly possible.

14   Q.    Okay.  Now, from the fall of 2005 to the end of

15   December of 2005, still the FBI did not attempt,

16   indeed, did not obtain any financial records from

17   Mr. Batiste -- pertaining to Mr. Batiste.  Correct?

18   A.    I'm uncertain when we obtained Mr. Batiste's

19   financial records.

20   Q.    Do you have anything that would refresh your

21   recollection?  Does Mr. Stewart have anything that

22   would refresh your recollection as to when it was done?

23           MS. ARANGO:  Objection to any reference to any

24   other witness.

25           THE COURT:  Sustained.

BY MS. JHONES:

Q.    Do you have any records -- "you" meaning the
FBI -- do you have any documents in the possession of
the FBI that would assist you in refreshing your
recollection as to when that was done, if at all?

A.    There are documents that exist that may or may
not indicate when the inquiries were actually made.

Q.    Do you need time to get those documents, sir, to
refresh your recollection?

A.    What is the question?

Q.    The question is:  What documents were obtained by
the FBI to corroborate information -- strike that --
what financial records or any other type of records
were obtained between October and December of 2005
pertaining to Narseal Batiste and, in particular, his
financial condition?

A.    Between October and December of 2005, I don't
believe -- it's my recollection that we at that time
had not acquired any financial records.  That's my
recollection.

Q.    Okay.

A.    On Narseal Batiste.

      When records were actually acquired is -- I'm
uncertain as to the time period.

Q.    Let me ask you this, sir:  How about phone

 1   records?  You certainly had a phone number that

 2   Mr. Batiste had.  Correct?

 3   A.     That's correct.

 4   Q.     Between October of 2005 and December of 2005,

 5   tell me about the phone records that the FBI subpoenaed

 6   that belonged to Mr. Batiste or that Mr. Batiste

 7   utilized.

 8   A.     What would you like to know about the records?

 9   Q.     When you obtained them, sir.

10   A.     I don't recall the specific dates.  But I do know

11   that there are documents that I would be able to refer

12   to as to when inquiries were made regarding Batiste's

13   cell phone.

14   Q.     Okay.  You just don't know right now?

15   A.     Yes, ma'am.

16   Q.     Okay.  And, sir, you certainly knew in

17   December -- I'm sorry.

18          In -- between October of 2005 and December of

19   2005, you were aware that Mr. Batiste had indicated

20   that he had approximately 5,000 soldiers in Chicago and

21   other places around the country.

22   A.     I believe there was a statement made by

23   Batiste --

24   Q.     But --

25   A.     -- regarding --

1    Q.     I'm sorry.  Go ahead.

2    A.     -- regarding 5,000 soldiers.

3    Q.     And, presumably, if Narseal Batiste had

4    5,000 soldiers in parts of the country, in the United

5    States, that would be something that would be of great

6    interest to the Federal Bureau of Investigation; would

7    it not be?

8    A.     It would.

9    Q.     And, indeed, it may be of concern to the Federal

10   Bureau of Investigation; would it not?

11   A.     It would.

12   Q.     As you sit here today, you don't have a

13   recollection as to whether or not you obtained phone

14   records between October and December of 2005 to see

15   what activity -- phone activity Mr. Batiste would have

16   had with his 5,000 soldiers somewhere in the United

17   States?

18          MS. ARANGO:  Objection.  Asked and answered

19   about the phone records.

20          THE COURT:  Sustained.

21   BY MS. JHONES:

22   Q.     Mr. Batiste told these informants between October

23   of 2005 and December of 2005 that he had land in

24   Louisiana.

25   A.     I believe that's correct.

1    Q.    He told these informants between October of 2005

2    and December of 2005 that he had land in Alabama.

3    A.    I'm not sure if he -- if Batiste said he had land

4    in Alabama or access to land in Alabama.

5    Q.    He told these informants between October of 2005

6    and December of 2005 that he had --

7         MS. JHONES:   Just one minute, your Honor.   I

8    apologize.

9    BY MS. JHONES:

10   Q.    I'm sorry.

11        The land that he represented to have -- to having

12   had was land in Louisiana and Alabama.   Correct?

13   A.    My recollection is that there was a reference to

14   having land in Louisiana and access to land in Alabama

15   or something along those two lines.

16        But there was an indication that he had access to

17   land in both states.

18   Q.    And the access -- whether he had it or whether he

19   owned it, access or ownership to land, Mr. Batiste was

20   telling the informants had to do with training all of

21   his soldiers that he had in the United States.

22   Correct?   That was the context of the land?

23   A.    Well, the context of the land was to provide an

24   area which could be used for training soldiers.

25        Now, on November 21st, I believe, in the meeting

1    with Abbas al-Saidi, there was a reference that Narseal

2    Batiste made with respect to members or soldiers --

3    members of his organization, which were referred to as

4    "soldiers," and the distinction between those who knew

5    about the ultimate objectives of the organization and

6    those who did not.

7         So from that meeting, there was a distinction to

8    be made, irrespective of the number of soldiers, with

9    regard to which soldiers knew about the mission or the

10   ultimate objectives of the organization and those that

11   did not.

12   Q.    Are you telling me that the FBI would not care if

13   there were 5,000 soldiers training on the land in

14   Alabama or Louisiana; you would only care if the

15   soldiers knew what they were doing?  Is that what

16   you're telling me?

17   A.    No.  That's not what I said.

18   Q.    Okay.

19   A.    What I said was Narseal Batiste made a

20   distinction between members of his organization that he

21   referred to as "soldiers" as those who knew about the

22   mission -- the real mission, I think, were his words --

23   and those who did not.

24        This was in the context of recruitment for his

25   organization.

1    Q.     So you were aware that Mr. Batiste was telling

2    these people about this and you do not -- you did not

3    make any effort to obtain any phone records, sir, to

4    attempt to corroborate what Mr. Batiste was saying as

5    to whether or not contact by Mr. Batiste was actually

6    being made with his soldiers?

7               MS. ARANGO:  Objection.  Asked and answered.

8               THE COURT:  Sustained.

9    BY MS. JHONES:

10   Q.     Mr. Batiste also said that he had soldiers in

11   Haiti.

12   A.     I don't recall if Mr. Batiste said he had

13   soldiers in Haiti or that he needs to form an alliance

14   with people in Haiti.  There was a reference to Haiti.

15   Q.     He certainly said that he wanted to do all of

16   these things.  Right?

17              MS. ARANGO:  Objection.  Vague.

18              THE COURT:  Sustained.

19              Rephrase your question.

20              MS. JHONES:  That's a fair objection, your

21   Honor.

22   BY MS. JHONES:

23   Q.     Sir, referencing soldiers -- or a desire to have

24   soldiers in Haiti would be a concern to the FBI; would

25   it not?

CROSS - By Ms. Jhones                    157

1    A.     Within this context, yes.

2    Q.     Let's talk a little bit more about corroboration.

3           Government's Exhibit 100 is the initial list that

4    you indicated was provided by Mr. Batiste to Informant

5    No. 2 on December 16th at the Radisson Hotel.

6           Fair enough?

7    A.     I believe so.

8    Q.     Government's Exhibit 101 is another list that you

9    indicated was provided by Mr. Batiste, this time to the

10   first informant, if I understood your testimony

11   correctly.

12   A.     Yes.

13   Q.     Government's Exhibit 103-A is a list that was

14   provided by Mr. Batiste.  I believe you indicated on

15   December 28th or December 29th.  I don't remember.

16   A.     I believe it was the 29th of December, 2005.

17          MS. JHONES:  May I approach to ask him some

18   questions about this exhibit, your Honor?  May I

19   approach?

20          THE COURT:  Ask your question first.

21          MS. JHONES:  Sure.

22   BY MS. JHONES:

23   Q.     In this list, in Government's Exhibit 103-A,

24   Mr. Batiste referenced phone numbers to companies that

25   had -- that were selling firearms.  Correct?

1    A.    That's correct.

2    Q.    Such as an HTR-PST 26, No. 605, whatever that is.

3    A.    Yes.

4    Q.    Remember that?

5          And he provided a phone number.  I'm sorry.  The

6    605 is the area code.  And 341-3006 is the phone number

7    to the company that provides these weapons.

8    A.    That's correct, I believe.

9    Q.    He also provided another phone number for

10   weapons, a DS-ARZ4GTC, and he provided a phone

11   number of (847) 277-7258.  Correct?

12   A.    I believe so.

13   Q.    Now, there would have been a concern by the FBI

14   that Mr. Batiste may have attempted to acquire these

15   weapons on his own; would there not?

16   A.    That was a possibility.  But the fact that he

17   gave a list of those weapons to the informant indicated

18   that he did not intend to acquire those weapons on his

19   own and initially wanted the informant to provide those

20   weapons.

21   Q.    Well, sir, didn't you testify that you had a

22   concern that -- with certain statements made by

23   Mr. Batiste, that if he didn't get the money from the

24   second informant, he was going to go ahead and go along

25   with his mission with or without the money that was to

 1  be given to him by the informants?

 2  A.    Those were Mr. Batiste's words in the recorded

 3  conversation, I believe, with Elie Assaad.  I believe

 4  my testimony was that was always a possibility

 5  throughout the course of the investigation.

 6        At any time he could have severed his

 7  relationship with either informant and chosen to pursue

 8  his endeavors on his own or seek out the assistance of

 9  someone else.

10  Q.    Correct.

11        He didn't have to - somebody who's bound and

12  determined to complete this mission is going to

13  complete the mission regardless.  Correct?  You would

14  agree with me on that?

15  A.    I'm not sure I understand your question.  Can you

16  ask it a different way.

17  Q.    Let me try.

18        Anybody who is intent, as you've indicated, that

19  Mr. Batiste was intent on committing a mission, a

20  violent mission against the United States, is going to

21  do it regardless of whether Brother Mohammed provides

22  the resources or somebody else provides the resources?

23  A.    Well, based on the conversations that I listened

24  to throughout the course of the investigation, that is

25  what was indicated by Mr. Batiste.

1  Q.      And that would have been of concern to the FBI?

2  A.      Yes.

3  Q.      And Mr. Batiste indicated that he had phone

4  numbers to manufacturers of firearms as early as

5  December 22nd -- I'm sorry -- December 28th of 2005.

6  Correct?

7  A.      That's correct.

8  Q.      So the FBI would certainly have been interested

9  in finding out whether or not Mr. Batiste had made any

10 efforts -- totally separate from Brother Mohammed,

11 whether or not Mr. Batiste had made any efforts to

12 acquire weapons.  Correct?

13 A.      That would certainly -- that was certainly of

14 interest to the FBI.  However, trying to determine

15 whether or not somebody has made an attempt to acquire

16 weapons is a challenging endeavor.  The fact that he

17 gave a list of requested weapons to two informants

18 indicated that this was his mechanism or manner in

19 which he wanted to acquire weapons.

20         During meetings between both informants, had

21 conversations ensued regarding Batiste having acquired

22 weapons, we certainly would have made every effort to

23 determine where those weapons were and where they were

24 acquired from.

25 Q.      Sir, having phone records of Azteca Stucco &

 1    Masonry, the phone utilized by Narseal Batiste, would

 2    have been a very easy way, very easy way, for the FBI

 3    to get that exhibit that you had in your possession on

 4    December 28th or 29th and look at those phone records

 5    on December of 2005, January of 2006, just to verify

 6    whether or not he had made even a phone call to this

 7    company.  Correct?  That would be something the FBI

 8    would want to know:  Has he made contact with companies

 9    that manufacture firearms?

10    A.    That would be of interest to the FBI.

11          But I'm not sure I understand your question.

12    Q.    Did you review the records -- phone records from

13    October of 2005, December of 2006, or, indeed, all the

14    way till June 22nd of 2006 -- did you review phone

15    records of Azteca Stucco & Masonry to see whether or

16    not Mr. Batiste had attempted to acquire the firearms

17    that he told the informants he wanted to get as late

18    as -- as early, I should say, as December of 2005?

19    A.    I personally did not.

20          However, within the time frame that you just

21    stated, phone records were acquired.  We also obtained

22    authorization for the installation of a Trap and Trace,

23    which allows the FBI to capture each incoming and

24    outgoing phone call -- or number.

25          And, ultimately, we were successful in obtaining

 1   a court order to listen to conversations on Batiste's

 2   phone within that time period.

 3   Q.     And in looking at those records, sir, you did not

 4   see any attempt whatsoever by Mr. Batiste to contact

 5   the companies that sold these weapons.  Correct?

 6   A.     I'm unaware of any attempt by Mr. Batiste -- or

 7   for that number to contact the numbers which were on

 8   the list given to Brother Mohammed.

 9   Q.     Okay.  Were there any property searches conducted

10   between October of 2005 and December of 2005 -- any

11   property searches in the name of Azteca Stucco &

12   Masonry, Narseal Batiste, any of these Defendants

13   seated here today -- any property searches conducted by

14   the FBI in the state of Alabama, the state of

15   Louisiana?

16   A.     I'm uncertain as to whether or not any of those

17   searches you referenced took place in that time frame.

18   Q.     The reality is, sir, that none of those searches

19   were conducted by the FBI until after -- Well, strike

20   that.

21          None of the searches was conducted by the FBI at

22   all during the course of this investigation, i.e.,

23   October of 2005 up to and including the date of arrest

24   of these Defendants on June 22nd of 2005.  There was

25   absolutely no record searches conducted for property in

 1    Louisiana or Alabama.

 2    A.    I'm uncertain when those searches were made.

 3    Q.    And are you indicating that a search was made at

 4    some point?

 5    A.    Yes.  At some point, there was information

 6    obtained that the Batiste family has land in Louisiana,

 7    which I'm uncertain as to what entitlement, if any,

 8    Mr. Batiste has.

 9    Q.    Sir, from October of 2005 through December --

10    strike that -- October of 2005 through June of 2006,

11    there was no travel by the Federal Bureau of

12    Investigation to Alabama to look at any land.  Correct?

13    A.    I don't believe so.

14    Q.    From October of 2005 through June of 2006, there

15    was no travel whatsoever by the Federal Bureau of

16    Investigation in this case to the state of Louisiana to

17    look at any property that may have been in the

18    possession of any family member of Narseal Batiste?

19    A.    I'm uncertain as to the time of when inquiries

20    were made regarding land in Louisiana.

21    Q.    Now, you testified about a meeting that occurred

22    on January 28th of 2006.  Correct, sir?

23    A.    Yes.

24    Q.    And on January -- after January -- it was --

25    strike that.

1          On January of 2006, it was at that point that the

2     FBI made a determination to have this idea of providing

3     Mr. Batiste with a warehouse.  Correct?

4     A.    I'm not -- I'm not certain at what point that

5     idea was decided upon.  But it was certainly months

6     before March.  Yes.

7     Q.    Okay.  So, now, as of the end of January -- this

8     meeting that you testified about was in the end of

9     January, correct, January 28th of 2006?

10    A.    That's correct.

11    Q.    All right.  So now we are in -- four months,

12    correct, into this investigation where the Federal

13    Bureau of Investigation is recording conversations

14    between these informants and Mr. Batiste?  Fair enough?

15    A.    That's correct.  Yes.

16    Q.    The FBI has not acquired, has not found or seen

17    Mr. Batiste in possession of any firearms whatsoever

18    during this time period?

19    A.    No.  Not Mr. Batiste.

20    Q.    The FBI has not seen or acquired or surveilled or

21    in any way seen anything that has to do with any

22    explosives on the part of Mr. Batiste?

23    A.    That's correct.

24    Q.    Indeed, on the part of any of these gentlemen

25    here -- seated here today?

1    A.      That's correct.

2    Q.      After January 28th of 2006, you then testified

3    about a meeting that occurred on February 19th of 2006.

4    Correct?

5    A.      Correct.

6    Q.      Before February 16th -- I'm sorry --

7    February 19th of 2006 -- between January 28th and

8    February 19th of 2006, there were several phone calls

9    that took place between Mr. Batiste and the informant;

10   were there not, sir?

11   A.      Yes.  I believe so.

12   Q.      And, additionally, there was actually at least

13   one meeting -- one-person meeting -- an in-person

14   meeting between the 28th and the 19th of February of

15   2006; was there not?

16   A.      I believe that's accurate.

17   Q.      And that meeting would not have been recorded.

18   Correct?

19   A.      I'm uncertain if it was or not.

20   Q.      Okay.  You testified on direct that you wanted to

21   get this warehouse and -- for Mr. Batiste because you

22   were unable to surveil what went on in the Liberty City

23   location.  Correct?

24   A.      No.  That was not my testimony.

25   Q.      Okay.

1    A.    My testimony was it would be extremely difficult,

2    if not impossible, to enter into the warehouse or the

3    Embassy in Liberty City and install microphones and

4    cameras.

5         So the decision was made to introduce another

6    warehouse in hopes that we would ultimately be able to

7    record meetings where only members of Batiste's

8    organization convened.

9    Q.    And you wanted to do that because you wanted to

10   see Batiste do all of these things that he was talking

11   about in these recordings that he was representing to

12   the informants.

13        You wanted to see military training, for example.

14   Correct?

15   A.    The purpose of that warehouse and those

16   microphones was to collect evidence.

17   Q.    Correct.

18        And, sir, in that warehouse, there was -- outside

19   of the presence of the informant, sir, outside of the

20   presence of the informant, there were no discussions

21   that were collected by the FBI that dealt with the

22   Sears Tower.  Correct?

23   A.    That's correct.

24   Q.    There were no conversations, no type of evidence

25   that was collected in that warehouse that dealt with

 1   explosives outside of the presence of the informant?

 2   A.     Not that specifically mentioned explosives.

 3   Q.     Correct?

 4   A.     Not that specifically mentioned explosives.

 5   Q.     There was no conversations and no evidence

 6   whatsoever that was acquired in the warehouse outside

 7   the presence of the informants that dealt with any

 8   firearms or any other -- any type of weaponry

 9   whatsoever?

10   A.     That's correct.

11   Q.     Now, you testified on direct, again pertaining to

12   this warehouse, that this was a warehouse that

13   Mr. Batiste had selected.

14          Do you remember that testimony?

15   A.     I don't think I testified to that on direct

16   examination in this proceeding.

17   Q.     So Mr. Batiste did not select that warehouse?

18   A.     Well, the warehouse was selected by us.  There

19   was a meeting between Narseal Batiste and Elie Assaad

20   where Batiste was shown several warehouses, and he

21   chose -- he ultimately chose -- or was happy with the

22   warehouse that we had previously installed microphones

23   and cameras in.

24   Q.     He wasn't shown several warehouses, was he, sir?

25   A.     I believe he was shown two or three warehouses.

1    The warehouse that we had installed the microphones in,

2    I believe, was the second or the third.  I believe it

3    may have been the last.

4    Q.    That was the second warehouse he was shown?

5    A.    Possibly.

6    Q.    And when that warehouse was shown to

7    Mr. Batiste -- which would have been on the 15th of

8    March? --

9    A.    Yes.

10   Q.    -- pole cameras were already installed outside

11   the warehouse?

12   A.    That's correct.

13   Q.    As a matter of fact, the FBI had even gone as far

14   as already installing audio and video equipment to

15   record audio and video surveillance inside the

16   warehouse?

17   A.    That's correct.

18   Q.    The FBI knew that Narseal Batiste -- that this

19   was going to be the warehouse where -- that Narseal

20   Batiste was going to accept?

21   A.    We hoped very strongly.

22   Q.    And the reason for that, sir, was that he was

23   only shown one prior to this -- prior to this one.

24   Correct?

25   A.    I believe -- I'm not certain if he was shown one

1    or two.  I thought he was shown two -- my recollection

2    is that Batiste was shown three warehouses, the one

3    that was ultimately chosen being one of them.

4    Q.    Well, let me ask you this:  The other two or

5    three warehouses that you say he was shown, did you

6    install pole cameras outside of those?

7    A.    No.

8    Q.    Did you install audio and video surveillance

9    equipment inside those other warehouses that

10   Mr. Batiste, according to your testimony, decided not

11   to select?

12   A.    No.

13   Q.    Okay.  On March 9th of 2006, there is a meeting

14   between Mr. Batiste and the Informant No. 2 -- Paid

15   Informant No. 2, Brother Naz.  Correct?

16   A.    Yes.

17   Q.    Now, you have previously told us, sir, that the

18   way you were corroborating the information that was

19   provided to you by these informants was by getting this

20   man to talk.  Right?

21   A.    I think my testimony was one of the ways in which

22   we corroborated or verified information was recording

23   conversations between the informants and Narseal

24   Batiste.

25   Q.    And you directed these informants to let Narseal

1    Batiste speak so that you could learn what it was,

2    according to you, that he wanted to do?

3    A.     That's correct.

4    Q.     And it was very important -- every time Narseal

5    Batiste -- contact was made with Narseal Batiste, it

6    was very important to record that information.

7    Correct?

8    A.     Correct.

9    Q.     And certainly, sir, if there was an opportunity,

10   an opportunity, where you had Narseal Batiste on the

11   phone -- you wanted conversation to take place whenever

12   you had Narseal Batiste on the phone.  When I say

13   "you," I mean the informants, the FBI.

14   A.     I mean, anytime there's two parties on a

15   telephone conversation, there's going to be

16   conversation.  So I'm not sure I understand your

17   question.

18   Q.     Let me try again.

19          Your specific instructions to the informants --

20   your specific direction was, "Record any conversation

21   that you possibly can where Narseal Batiste is

22   speaking."  You want to engage Narseal Batiste in

23   conversation.

24   A.     Generally speaking, yes.  That's correct.

25   Q.     You want to know what this guy's thinking and

CROSS - By Ms. Jhones

```
 1   what this guy's saying.
 2   A.     That's correct.
 3   Q.     That is true of all these Defendants.  Correct?
 4   A.     That's correct.
 5   Q.     All righty.  Now, on March 9th of 2006, the
 6   face-to-face meeting was not recorded.  Correct?
 7   A.     That's correct.
 8   Q.     But there was a phone call before the
 9   face-to-face meeting on March 9th; was there not?
10   A.     There was.
11   Q.     Indeed, that phone call was played during the
12   direct testimony by the Government?
13   A.     That's correct.
14   Q.     I'm directing your attention, sir, and the ladies
15   and gentlemen of the jury, to Government's Exhibit
16   W1-01363.  Let me say the number again:  W1-01363-T.
17          Do you have that conversation in front of you,
18   Agent?
19   A.     I do.
20   Q.     Turn to Page 6, if you will.
21          MS. JHONES:  Your Honor, does the Court have
22   this binder?
23          THE COURT:  I'm sorry?
24          MS. JHONES:  Does the Court have this binder?
25          THE COURT:  Yes.
```

```
 1              MS. JHONES:  Let me know when you're ready.
 2    Is everybody ready?  Page 6.
 3              THE COURT:  Okay.
 4              MS. JHONES:  Ready?  Okay.
 5    BY MS. JHONES:
 6    Q.    Sir, directing your attention to the bottom of
 7    Page 6, the informant tells Narseal Batiste, "Look,
 8    going on everything, I cannot speak too much on the
 9    phone.  Now you understand why."
10          Correct?
11    A.    Yes.  I see that.
12    Q.    Those were the informant's words?
13    A.    That's correct.
14    Q.    The informant knew that he was recording Narseal
15    Batiste; did he not?
16    A.    Yes.  Well, he knew that this phone was being
17    recorded.
18    Q.    Now, this, sir -- just to place this call in
19    context, this was the call prior to the face-to-face
20    meeting on March 9th between Mr. Batiste and the
21    informant at the location known as the Embassy?
22    A.    This call was before the eventual meeting and
23    after an attempt to go to the Embassy by Elie, or
24    Brother Mohammed, to meet with Batiste and an attempt
25    to search him upon entry, at which point he left.
```

1        This phone call is between those two events.

2   Q.    And it was the informant saying, "I can't speak

3   too much on the phone"?

4   A.    That's what -- that's what it said here.  Yes.

5   Q.    Now, after this meeting, there was another

6   meeting on the 10th.  Correct?

7   A.    Yes.

8   Q.    Okay.  And the meeting of the 10th was a

9   face-to-face meeting; was it not?

10  A.    It was.

11  Q.    Okay.  And that face-to-face meeting was

12  recorded?

13  A.    It was.

14  Q.    Subsequent to the March 10th meeting, the

15  face-to-face meeting -- well, let me backtrack a

16  second.

17        At this point in time, sir, in March of 2006, in

18  addition to the body recorders that are being employed

19  by the informants -- because, by the way, as of

20  March of 2006, Informant No. 1 is still involved in the

21  picture here and there.  Correct?

22  A.    That's correct.

23  Q.    But very little?

24  A.    That's correct.

25  Q.    Fair to say?

1    A.      Yes.

2    Q.      CW 2 is running the show?

3    A.      CW 2 is not running the show.  CW 2 is acting as

4    directed by the FBI to gather evidence.

5    Q.      Okay.  Under the direction of the FBI?

6    A.      That's correct.

7    Q.      All right, sir.  By March of 2006, in addition to

8    the body wires that these informants are wearing --

9    okay? -- the FBI has already succeeded in getting a

10   court order and the conversations of two separate

11   phones are being recorded by the FBI -- or not by the

12   FBI, but by the phone company, at the request of the

13   FBI?

14   A.      That's correct.

15   Q.      Now, I believe the Government has introduced into

16   evidence, give or take, 40 conversations that were

17   generated by these so-called wiretaps.  Correct?

18   A.      That's correct.

19   Q.      We have approximately 14- to 15,000 conversations

20   that were generated?

21   A.      I don't know what the exact number is, but there

22   are thousands of phone calls that were recorded.

23   Q.      And out of those thousands, we have 40 that have

24   been introduced into evidence.  Correct?

25   A.      I believe so.

1   Q.    Okay.  Off a couple here and there.

2        You testified about a meeting that took place on

3   the 16th of March.  Correct?

4   A.    Yes.

5   Q.    That's the meeting that was played in parts for

6   the ladies and gentlemen of the jury?

7   A.    That's correct.

8   Q.    At that warehouse, the warehouse provided by the

9   Government.  Correct?

10  A.    That's correct.

11  Q.    Okay.  And then, after March 16th, sir, you

12  testified about a meeting that occurred -- I'm going on

13  memory now -- I believe, March 27th, a face-to-face

14  meeting?

15  A.    I believe it was the 26th.

16       There was a meeting on March 24th between Narseal

17  Batiste and Elie Assaad.  There was also a meeting on

18  the 26th of March between Narseal Batiste and Elie

19  Assaad.

20  Q.    The meeting of March 26th -- there is indeed a

21  meeting; is there not, sir?

22  A.    Yes.

23  Q.    And on that meeting, sir, Mr. Batiste tells the

24  informant that he doesn't want to be under the

25  direction and control of Al-Qaeda.  Correct, sir?

```
 1   A.     I'm not certain if it was in that meeting.  But

 2   there was a discussion -- there was a statement to the

 3   effect by Batiste that -- something along those lines.

 4         But I don't believe that was on the 26th.  It may

 5   have been.  I could be mistaken.  I just don't recall

 6   it was on March 26th.

 7   Q.     It was after March 16th?

 8   A.     I think that may have been March 16th.  I'm

 9   uncertain.

10   Q.     Okay.  And in that very same meeting, sir,

11   Mr. Batiste also tells the informant that he doesn't

12   want the brothers involved, meaning --

13   A.     On which date?

14   Q.     March 26th of 2006.  I could get you something,

15   if you need to refresh your recollection.

16   A.     That would be helpful.

17         MS. JHONES:  May I approach, your Honor?

18         THE COURT:  Yes.

19         MS. ARANGO:  Judge, I believe she's showing

20   the witness an exhibit that's not in evidence.

21         MS. JHONES:  This is to refresh his

22   recollection.

23         MS. ARANGO:  But if she's asking him to

24   refresh his recollection as to something that was

25   stated in -- or that was stated in a recording that is
```

1    not in evidence, that would be improper.  I think

2    that's hearsay.

3             MS. JHONES:  Mr. Batiste's statements?

4             THE COURT:  We're going to break at this time.

5             Do not discuss this case either amongst

6    yourselves or with anyone else.  Have no contact

7    whatsoever with anyone associated with the trial.  Do

8    not read, listen or see anything touching on this

9    matter in any way.

10            If anyone should try to talk to you about this

11   case, you should immediately instruct them to stop and

12   report it to my staff.

13            You may leave your binders at your chairs.

14   Please give your notebooks to the court security

15   officer.

16            Because of conflicts of members of the jury,

17   trial will not be tomorrow -- Thursday or Friday.  I

18   will see you Tuesday of next week, 9:00.

19            Enjoy your long weekend.

20            (Whereupon, the jury exited the courtroom at

21   5:17 p.m. and the following proceedings were had:)

22            THE COURT:  You may step down, sir.

23            (Witness excused.)

24            THE COURT:  What's the objection?

25            MS. ARANGO:  Let me go back and take a look,

1    but I believe it's a hearsay objection.

2            She's asking him:  Was this stated in this

3    meeting?

4            He said:  I don't recall.

5            She said:  Let me show you a transcript of

6    that meeting.

7            So she's asking -- that transcript's not in

8    evidence.  So she's asking him whether or not a

9    statement was made in a recording that is -- that's not

10   in evidence.

11           It's not his recording.  He didn't monitor or

12   record it.

13           THE COURT:  Did he testify about that meeting

14   in direct?

15           MS. ARANGO:  He testified about the fact that

16   the meeting occurred.  But he did not testify that he

17   monitored the meeting and that -- nor did the recording

18   get -- go into evidence through him.  He didn't

19   identify it.  He just discussed the fact that that

20   meeting occurred -- was that on the 26th? -- yes --

21   that that meeting occurred.

22           My point is she can refresh his recollection

23   with anything.  But I think that using -- when you ask

24   about a specific statement made in a transcript that is

25   not in evidence, I mean, I think that's -- she's

```
 1    calling for a hearsay response.

 2            MS. JHONES:  Your Honor, first of all, this

 3    agent has testified continuously that he relied upon

 4    all of the conversations and he listened to all these

 5    conversations.  He specifically referenced this one and

 6    he testified that he had an opinion about A, B, C, D.

 7            THE COURT:  Not about this conversation.

 8            MS. JHONES:  He had an opinion about the --

 9    about the overall investigation and an opinion about

10    these -- the involvement of Mr. Batiste and these

11    Defendants.

12            This is a conspiracy case, your Honor.  And

13    he -- the Government asked these questions in a way to

14    encompass everything, "Based on your investigation of

15    this case...", "Based on this...", "Based on that, do

16    you have a conclusion as to" -- A, B, C?

17            I believe that the Government has opened the

18    door to go into absolutely anything that took place

19    during the course of this investigation that he relied

20    upon in forming these opinions that he has testified

21    about from February 19th, that he took the stand.

22            They cast a very wide net, a very wide net.

23    And this witness has given opinions to this jury, as

24    the Court knows, over strenuous objection by me, as to

25    confirmation and --
```

1          THE COURT:  You can ask him about his

2     opinions.  But this is outside the scope of direct.

3     They did not go into this.

4          I did not allow them to introduce these tapes

5     at the behest of the defense, at your request,

6     actually, that only those -- you objected to any tapes

7     coming in unless -- and even those that were monitored.

8     You objected to any tapes coming in through this

9     witness.

10          So you're going to have to wait to cross on

11     this until it's in evidence.

12          MS. JHONES:  Your Honor, with the Court's

13     permission, I will lay a better predicate.

14          But based on the direct testimony of this

15     agent regarding what he relied upon to further his

16     investigation, et cetera, et cetera -- and --

17          THE COURT:  Well, et cetera, et cetera, you

18     can ask your question on Tuesday.  Et cetera, et

19     cetera, I'll rule on it then.

20          MS. JHONES:  Okay.

21          THE COURT:  We're in recess until Tuesday.

22          MS. JHONES:  That's fine, your Honor.  Thank

23     you.

24          (End of proceedings.)

25

1                    C E R T I F I C A T E

2

3          I hereby certify that the foregoing is an

4    accurate transcription of the proceedings in the

5    above-entitled matter.

6

7

8    _____          /s/Lisa Edwards
         DATE               LISA EDWARDS, CRR, RMR
9                           Official United States Court Reporter
                            400 North Miami Avenue, Twelfth Floor
10                          Miami, Florida 33128
                            (305) 523-5499
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25