```
 1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                        MIAMI DIVISION
                CASE NO. 06-20373-CRIMINAL-LENARD
 3

 4   UNITED STATES OF AMERICA,       Miami, Florida

 5                 Plaintiff,        March 3, 2009

 6         vs.                       9:29 a.m. to 5:20 p.m.

 7   NARSEAL BATISTE, et al.,        Volume XVII

 8            Defendants.        Pages 1 to 248
     ------------------------------------------------------
 9

10                         JURY TRIAL
11          BEFORE THE HONORABLE  JOAN A. LENARD,
                 UNITED STATES DISTRICT JUDGE
12

13

14   APPEARANCES:

15

16   FOR THE GOVERNMENT:   RICHARD D. GREGORIE, ESQ., and
                           JACQUELINE M. ARANGO, ESQ.
17                         ASSISTANT UNITED STATES ATTORNEYS
                           99 Northeast Fourth Street
18                         Miami, Florida 33132

19
     FOR THE DEFENDANT     ANA MARIA JHONES, ESQ.
20     NARSEAL BATISTE:    300 Seville Avenue, Suite 210
                           Coral Gables, Florida 33134
21

22   FOR THE DEFENDANT     ALBERT Z. LEVIN, ESQ.
       PATRICK ABRAHAM:    261 Northeast First Street
23                         Sixth Floor
                           Miami, Florida 33132
24

25
```

```
 1   FOR THE DEFENDANT        RODERICK D. VEREEN, ESQ.
       STANLEY PHANOR:        BRINKLEY, HENRYS & LEWIS
 2                            4770 Biscayne Boulevard
                              Suite 1200
 3                            Miami, Florida 33131

 4
     FOR THE DEFENDANT        RICHARD K. HOULIHAN, ESQ.
 5     NAUDIMAR HERRERA:      300 Aragon Avenue
                              Coral Gables, Florida 33134
 6

 7   FOR THE DEFENDANT        LOUIS CASUSO, ESQ.
       BURSON AUGUSTIN:       111 Northeast First Street
 8                            Suite 603
                              Miami, Florida 33132
 9

10   FOR THE DEFENDANT        NATHAN CLARK, ESQ.
      ROTSCHILD AUGUSTINE:    17639 South Dixie Highway
11                            Miami, Florida 33157

12
     REPORTED BY:             LISA EDWARDS, CRR, RMR
13                            Official Court Reporter
                              400 North Miami Avenue
14                            Twelfth Floor
                              Miami, Florida 33128
15                            (305) 523-5499

16

17

18

19

20

21

22

23

24

25
```

1                           I   N   D   E   X

2

3                                        Direct      Cross      Red.

4

WITNESSES FOR THE GOVERNMENT:

5

Anthony Velazquez                                    19
6                                                    81
                                                    134
7                                                   171

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            THE COURT:   United States of America versus

2   Narseal Batiste, et al., Case No. 06-20373.

3            Counsel, state your appearances, please, for

4   the record.

5            MR. GREGORIE:  Good morning, your Honor.

6            Richard Gregorie and Jacqueline Arango on

7   behalf of the United States.

8            THE COURT:  Good morning.

9            MS. JHONES:  Good morning, your Honor.

10            Ana Maria Jhones on behalf of Narseal Batiste,

11   who is present.

12            THE COURT:  Good morning.

13            MR. LEVIN:  Your Honor, good morning.

14            Albert Levin on behalf of Patrick Abraham,

15   who's present.

16            THE COURT:  Good morning.

17            MR. CASUSO:  Good morning, your Honor.

18            Louie Casuso on behalf of Burson Augustin,

19   who's present.

20            THE COURT:  Good morning.

21            MR. CLARK:  Good morning, your Honor.

22            Nathan Clark for Rotschild Augustine, who's

23   present.

24            THE COURT:  Good morning.

25            MR. HOULIHAN:  Richard Houlihan on behalf of

```
 1   Naudimar Herrera.
 2           THE COURT:  Good morning.
 3           MR. VEREEN:  Good morning, Judge.
 4           Roderick Vereen on behalf of Stanley Phanor,
 5   who's present.
 6           THE COURT:  Good morning.
 7           All the jurors are now here.  So let's begin.
 8           MS. JHONES:  Your Honor, there was an issue
 9   when we concluded Wednesday, I believe it was.  The
10   Government had lodged an objection to the last question
11   that I asked this witness.
12           THE COURT:  Which was what?
13           MS. JHONES:  It dealt with -- the question I
14   asked him was pertaining to a statement that was made
15   by Mr. Batiste on March 26th of 2006, and the witness
16   indicated he didn't remember.  I was about to refresh
17   his recollection.
18           THE COURT:  This was on a tape and a
19   transcript that is not in evidence?
20           MS. JHONES:  Correct.  I was going to use
21   it --
22           THE COURT:  You can be seated.
23           MS. ARANGO:  My objection is that it's outside
24   the scope of direct.
25           THE COURT:  Sustained.
```

1          MS. JHONES:  Your Honor, may I refer to where

2     the Government asked this witness about March 26th on

3     the record?

4          THE COURT:  Okay.

5          MS. JHONES:  Directing the Court's attention

6     to the transcript for February 25th, 2009, specifically

7     Page 175, the Government inquired of this witness with

8     respect to March 16th and, subsequent to that, the

9     Government -- the witness testified about March 16th.

10          Subsequent to that, the follow question was

11     asked by the Government:  "Okay.  And then, after

12     March 16th, sir, you testified about a meeting that

13     occurred -- I'm going on memory, now -- I believe it

14     was March 27th, a face-to-face meeting."

15          The witness responds, "It was" --

16          THE COURT:  This is your questioning?

17          MS. JHONES:  No.  This was the Government's

18     questioning.

19          "I believe it was the 26th," responds the

20     witness.

21          And then the Government asks -- I'm sorry.

22          The witness continues in his response:  "There

23     was a meeting on the 24th between Narseal Batiste and

24     Elie Assaad.  There was also a meeting on March -- on

25     the 26th of March between Narseal Batiste and Elie

 1    Assaad."

 2           And, again, the following question by the

 3    Government:  "The meeting of the 26th -- there is

 4    indeed a meeting; is there not, sir?

 5           "Yes.

 6           "And on that meeting, sir, Mr. Batiste tells

 7    the informant" --

 8           I apologize, your Honor.  That is my

 9    questioning of this witness.  I apologize.

10           MR. LEVIN:  Judge, I have a different point to

11    make with regard to that issue.

12           MS. JHONES:  May I just --

13           MR. LEVIN:  Go ahead.

14           MS. JHONES:  I just want to direct the Court

15    to the right section.  I apologize, your Honor.  Just

16    bear with me.

17           Okay, your Honor.  I apologize.

18           On the transcript for -- I thought I had it

19    marked, and I did not -- transcript of February 24th,

20    2009, Pages -- I want to make sure I'm covering all the

21    pages -- Pages 30 through 33, including 34, 35, 36, 37,

22    they're publishing --

23           THE COURT:  So what's the question that was

24    asked?

25           MS. JHONES:  I'm sorry, your Honor?

1              THE COURT:  What was the question that was
2    asked regarding this meeting?
3              MS. JHONES:  On Page 30, the question is
4    asked, "Now, what, if anything" -- the first question
5    that triggers this day, March 26th -- the first
6    question was, "Now, what, if anything, occurred the
7    next day, March 26th?
8              "The next day, there was a meeting set up at
9    the undercover warehouse where the pledge was given
10   with Narseal Batiste and Elie Assaad to take possession
11   of the pictures that were taken.
12             "And did you surveil that meeting?
13             "I did --
14             THE COURT:  I'm sorry?  It was the meeting set
15   up at the undercover warehouse where the pledge was
16   given?
17             MS. JHONES:  Yes.
18             THE COURT:  Well, that wasn't March 26th.
19             MS. JHONES:  I understand, your Honor.
20             I think that the witness -- what he's
21   referencing is that this was the warehouse where the
22   pledge had been given to identify the location in his
23   response.
24             THE COURT:  Okay.
25             MS. JHONES:  This is Lines 18 through 25 of

1    Page 30.

2          The witness is asked whether or not he

3    surveilled that meeting, and he is asked where did the

4    meeting occur.

5          He responds again by indicating that the

6    pledge had been taken in that location.

7          Were there any surveillance photographs taken

8    of March 26th?

9          And they say "yes."

10         And then some exhibits are shown to the

11   witness, exhibits that I believe are later introduced

12   without objection, on Page 32.

13         THE COURT:  What exhibits?

14         MS. JHONES:  Composite Exhibit 20 --

15         MS. ARANGO:  We can show you, Judge.  It's the

16   pictures of them going into the warehouse on the 26th.

17         THE COURT:  Okay.

18         MS. JHONES:  And --

19         THE COURT:  Were there questions about the

20   conversations in the warehouse?

21         MS. JHONES:  On Page 33, "How long was the

22   meeting in the warehouse?

23         "I would estimate maybe 45 minutes to an hour

24   or so."

25         This questioning is occurring while this

```
 1    witness is identifying --
 2              THE COURT:  Did he monitor the meeting?
 3              MS. JHONES:  The question was asked.
 4              He says, "I did surveil that meeting."
 5              THE COURT:  Well, "surveil" is different from
 6    "monitor."
 7              MS. ARANGO:  Judge, I would just say that she
 8    was just reading at Page 33 just now and then you asked
 9    "Did you monitor the meeting?"
10              And the next question that she hadn't read
11    was, "Did you monitor it?"
12              And his answer was, "I did not."
13              MS. JHONES:  That's correct, your Honor.  That
14    comes afterwards.
15              THE COURT:  Okay.  So was that tape
16    introduced or the transcript introduced?
17              MS. JHONES:  No, your Honor.
18              But let me just -- which I believe is --
19              THE COURT:  So if he didn't monitor the
20    meeting, how could he testify about what happened at
21    the meeting?
22              MS. JHONES:  Your Honor, because he's
23    testified for the past two weeks about the fact that he
24    reviewed -- whether he monitored realtime, which I
25    believe is what that question was designed to, as
```

1   opposed to whether or not he has reviewed -- he

2   reviewed that meeting subsequent to the meeting, the

3   effect that that meeting had on the way he proceeded in

4   the investigation.

5          And, specifically, this was the question right

6   after the question of -- as to whether or not he

7   monitored it -- monitored the meeting.

8          "What -- as a result of -- well, let me ask

9   you this:  Did you review the recording of that meeting

10  in the warehouse on March 26th?

11         "I did.

12         "What occurred during that meeting?

13         "What occurred during that meeting was a

14  discussion about pictures" -- and he goes on and on.

15         And, your Honor, as the Court may recall, this

16  is the way the Government has chosen to present its

17  case, as the Court has reminded me.

18         Every single time this witness has testified

19  about a meeting, whether introduced -- whether the

20  meeting has been introduced into evidence or not, this

21  witness has been allowed to testify about what he heard

22  in the meeting, the effect that it had on his

23  investigation, why he proceeded a certain way.

24         He was also allowed to testify on many

25  occasions about what Mr. Batiste said in those meetings

```
 1   and how did that affect him, his state of mind, as to

 2   how he proceeded.

 3          So, number one, as I said earlier, on

 4   Wednesday, the Government has -- first of all, they

 5   inquired -- this is well within the scope of direct.

 6          But, beyond that, they have opened the door in

 7   terms of going into every single meeting, which this

 8   man -- this witness has indicated and the Government

 9   has --

10          THE COURT:  Read to me the transcript.  It's

11   not sufficient to say he goes on and on.  I need to

12   hear the questions and the answers.

13          MR. LEVIN:  Judge, if I can just interject at

14   this point, it may help to really streamline --

15          MS. ARANGO:  I'm sorry.  Before --

16          MR. LEVIN:  -- streamline the issue.

17          MS. ARANGO:  Before you interject, can I just

18   briefly respond?  Before you interject -- I apologize,

19   but there's some responses that I have to make to what

20   Ms. Jhones said, which is read the transcript -- read

21   the transcript here.

22          I have two responses.

23          A:  He says -- I asked, "What occurred at the

24   meeting?"

25          He says that there was a discussion about the
```

1    pictures that had been taken.

2            "As a result of that meeting, what, if

3    anything, did Elie Assaad give to you?

4            "He gave me the memory card and the video

5    footage."

6            That is what is introduced into evidence.

7            I would say that he did not monitor this

8    meeting.  Ms. Jhones objected to the introduction of

9    any transcripts and recordings that were not monitored

10   by this witness.  She objected to that.

11           If she didn't object to that, he could have

12   gotten into it.  He could have introduced it and then

13   she could fully cross him on it.

14           So she can't say, on one hand, that she

15   objects to it through this witness and then, on the

16   other hand, takes the very transcript which she doesn't

17   want this witness to introduce and have him read from

18   it.

19           MS. JHONES:  Your Honor, as the Court knows,

20   anything is proper to refresh a witness's recollection.

21   That's the first thing.

22           And the Government is correct.  I have

23   objected.  And I have very limited ability to

24   cross-examine this witness.

25           The notion that I am not going to be able to

1    cross-examine on an area where this witness has

2    testified about one aspect of what occurred in that

3    meeting to the exclusion of all else -- and, again, it

4    was over objection.

5          But that -- this witness's testimony about

6    meetings that he personally was not a part of -- I have

7    preserved all those objections.

8          But that is not to say that I'm just going

9    to cross my hands and do nothing to effectuate

10   Mr. Batiste's rights of confrontation, however limited

11   they may be.

12         THE COURT:  Well, the Government's objection

13   was that your question was hearsay.

14         Your question was, "Mr. Batiste also tells the

15   informant he doesn't want the brothers involved."

16         How is that not hearsay?

17         MS. JHONES:  Your Honor, I'm happy to answer

18   that, but I would ask the witness to step out of the

19   courtroom while do I so, since he is on the stand.

20         THE COURT:  Would you step outside, please,

21   sir.

22         (Thereupon, the witness retired from the

23   courtroom and the following proceedings were had:)

24         MS. JHONES:  Thank you, your Honor.

25         THE COURT:  Under what rule of evidence does

```
 1    it come in?

 2            MS. JHONES:  It's not coming in for the truth

 3    of the matter asserted.  It's coming in to show this

 4    witness's state of mind.

 5            As I said earlier, your Honor, this witness

 6    has testified for the past two weeks --

 7            THE COURT:  This witness's state of mind?

 8            MS. JHONES:  Yes.

 9            THE COURT:  The witness's state of mind?

10            MS. JHONES:  Yes.  Yes.

11            Let me just remind the Court:  This witness

12    has testified --

13            THE COURT:  You don't have to remind me,

14    Ms. Jhones.  I'm very well familiar with what the

15    testimony has been.  Okay?

16            MS. JHONES:  I'm sorry.  I thought that the

17    Court was not, based on the Court's comment.

18            THE COURT:  Why would it be this witness's

19    state of mind?

20            MS. JHONES:  Because, your Honor, throughout

21    the course of the testimony --

22            THE COURT:  Doesn't state of mind go to the

23    declarant's state of mind?

24            MS. JHONES:  Yes.  This is the declarant.

25            THE COURT:  You're asking about a question
```

1   that Batiste says.  How is Velazquez the declarant?

2          MS. JHONES:  Your Honor, the effect, the

3   effect, of Mr. Batiste's statement on this person, the

4   declarant in trial.

5          MS. ARANGO:  Judge, I would just say, with

6   respect to state of mind, A, it has to be the state of

7   mind of the declarant, the declarant here being Narseal

8   Batiste.

9          B:  It has to be what that person's state of

10  mind was, not the reason for their state of mind.

11         And we have -- I can cite you to case law on

12  that.

13         THE COURT:  What did you want to say,

14  Mr. Levin?

15         MR. LEVIN:  Judge, very briefly, the way the

16  Government --

17         THE COURT:  Is your microphone on?

18         MR. LEVIN:  Yes, it is.  Let me speak closer

19  to it.

20         The way the Government has presented this

21  witness is, in essence, almost like a summary witness.

22  The Court has permitted opinion testimony.

23         The Government has asked a form of this

24  question at least 10 or 12 times:  "Agent Velazquez,

25  based on your involvement in this investigation and

1  your review of the recordings and your experience as a

2  trained undercover agent, do you have any opinion...."

3          They've preceded numerous questions with based

4  on his review of the recordings and his experience.

5  He's been allowed to testify with regard to the

6  contents of those recordings as to what certain people

7  said.

8          The Government has opened the door to allow

9  this type of questioning with regard to what

10 Mr. Batiste may have said or what anybody else may have

11 said based upon the open-endedness of their question,

12 allowing him, basically, blanket authority to give an

13 opinion with regard to this entire case.

14         THE COURT:  Well, I'm going to sustain the

15 objection as to the question as asked because it does

16 not come under 803(3).

17         If you want to ask him, "After this

18 meeting" -- or, "What effect did this meeting have" --

19 without going into the conversation of the meeting, but

20 what effect this meeting had on his investigation, you

21 can do that.  That's what I allowed the Government to

22 do.  You can certainly cross him on that.

23         But it is not within 803(3).  It's a statement

24 of the declarant's then-existing state of mind.  It's

25 not the witness's state of mind that comes in under

```
 1    803(3).

 2              MS. JHONES:  I understand, your Honor.  Just

 3    note my objection for the record.

 4              THE COURT:  Sure.

 5              Let's bring the jurors in, please.

 6              MR. LEVIN:  Judge, for future clarification,

 7    so your objection is --

 8              THE COURT:  My objection?

 9              MR. LEVIN:  Excuse me.

10              Ms. Jhones's objection is on hearsay grounds

11    as opposed to beyond the scope.  And that's what the

12    Court is sustaining, a hearsay objection?

13              THE COURT:  It would be beyond the scope

14    because there was no testimony particularly about this

15    conversation.  He only testified about surveilling and

16    receiving the pictures.

17              But to the extent that it might be within the

18    scope of direct examination, this particular question

19    is a question requiring a hearsay answer -- or the

20    statements made by Batiste are hearsay and the argument

21    was that they came in under 803(3); and my ruling is

22    that they do not come in under 803(3).

23              MR. LEVIN:  Okay.

24              THE COURT:  You can bring the jurors in,

25    please.
```

```
 1              (Whereupon, the jury entered the courtroom at

 2    9:49 a.m. and the following proceedings were had:)

 3              THE COURT:  You may be seated.

 4              Good morning, ladies and gentlemen.  Welcome

 5    back.

 6              THE JURY:  Good morning.

 7              THE COURT:  You are still under oath, sir.

 8              You may proceed, Ms. Jhones.

 9              MS. JHONES:  Thank you, your Honor.

10                 CONTINUED CROSS-EXAMINATION

11    BY MS. JHONES:

12    Q.    Agent Velazquez, when we concluded on Wednesday,

13    we were talking about March of 2006.

14          Do you remember that, sir?

15    A.    Yes, ma'am.

16    Q.    In March of 2006, sir, the investigation,

17    basically, at that point -- it's fair to say, is it

18    not, sir, that the Government has not -- had not seized

19    any weapons from Mr. Batiste?

20    A.    That's correct.

21    Q.    The Government had not seized any type of

22    explosives --

23    A.    That's correct.

24    Q.    -- at that point?

25          The Government had not seized or otherwise
```

 1   located any type of paraphernalia of any subversive

 2   terrorist nature?

 3   A.    That's correct.

 4   Q.    And after the March 26th meeting, there was a

 5   meeting that you testified about, sir, that occurred on

 6   March 27th of 2006.

 7         Do you recall that?

 8   A.    After the meeting on March 26th?

 9   Q.    There was another meeting on March 27th.

10   A.    Yes.

11   Q.    And that meeting was at this location that the

12   FBI had wired with video and audio.  Correct?

13   A.    Yes, ma'am.

14   Q.    And this was the meeting where you testified

15   about that Mr. Batiste -- this was after Mr. Batiste

16   had taken photographs, as you testified?

17   A.    That's correct.

18   Q.    Okay.  And it was in this meeting, sir, that

19   Mr. Batiste was provided $1,000 in cash?

20   A.    I believe so.  Yes.

21   Q.    And you testified about that.  Correct?

22   A.    Yes, ma'am.

23   Q.    And I believe you also testified that the FBI

24   made a decision to provide Mr. Batiste with $1,000

25   because the FBI did not want Mr. Batiste to get

1   arrested or to have any problem and not be able to --

2   and the FBI would not be able to conduct their

3   investigation or words to that effect?

4   A.    Yes.

5   Q.    Okay.  And this meeting on the 27th, sir,

6   occurred later in the day, in the evening; did it not?

7   A.    I don't remember the exact time, but I believe it

8   was in the later afternoon.

9   Q.    Okay.

10           MS. JHONES:  Your Honor, may I have a moment

11  to pull that transcript?

12           THE COURT:  Yes.

13  BY MS. JHONES:

14  Q.    Agent Velazquez, would you like to look at the

15  transcript to see if that refreshes your recollection

16  as to the actual time that the meeting began?

17  A.    Yes, please.

18           MS. JHONES:  May I approach, your Honor?

19           THE COURT:  Yes.

20           THE WITNESS:  Yes.  This transcript indicates

21  the meeting started sometime around 7:25 p.m.

22  BY MS. JHONES:

23  Q.    Okay.  And it was on that occasion that, I

24  believe, Mr. Batiste received $1,000?

25  A.    Yes.

1    Q.      And, sir, of course, as you earlier testified,

2    the Government was -- strike that -- the FBI was

3    attempting to corroborate all these things that

4    Mr. Batiste was telling the informant.  Fair enough?

5    A.      Yes.

6    Q.      And what Mr. Batiste told the informant on

7    March 27th was that he had gotten a continuance of his

8    hearing, of this legal proceeding.  Correct?

9    A.      I'm not sure exactly what Mr. Batiste said with

10   regard to his legal proceeding.

11   Q.      Now, based on your review of that transcript,

12   sir, do you recall whether or not Mr. Batiste -- the

13   informant was -- Mr. Batiste told the informant that

14   there was actually a continuance that he was able to

15   get of his court proceeding?

16   A.      I don't recall.

17   Q.      Let's take a look at the transcript.

18   A.      Sure.

19          MS. JHONES:  Once again, your Honor, I'm going

20   to approach, with the Court's permission.

21          THE COURT:  Yes.

22   BY MS. JHONES:

23   Q.      Directing your attention, Mr. Velazquez, to

24   Page 7 of the transcript, would you look at that and

25   see if that refreshes your recollection as to what

 1    Mr. Batiste told the informant on March 27th of 2006.

 2    A.    Yes, ma'am.

 3    Q.    Does that help you refresh your memory on that?

 4    A.    Yes.

 5    Q.    And did, in fact, Mr. Batiste tell the informant

 6    that he had gotten a continuance for his case?

 7    A.    Well, Mr. Batiste says, as reflected in this

 8    transcript, that he got a continuance on his case and

 9    that's going to give him enough time to get a good

10    lawyer.

11    Q.    The reality, sir, was that Mr. Batiste was never

12    charged.  On the 27th, there was no charges filed.

13    Isn't that a fact, sir?

14    A.    It may be.  I'm uncertain as to whether he was

15    charged or not on the 27th.

16    Q.    And the reason you are uncertain is because you

17    never bothered to check what the status of the legal

18    proceedings were?

19    A.    That's incorrect.  There was an inquiry made.  I

20    just don't recall who made the inquiry from the

21    investigative team.

22          The question was asked of me whether I knew that

23    charges were filed or not.  My answer was "no," I did

24    not know on that day whether there were or there

25    weren't.

 1    Q.    To your knowledge, sir -- you've already told us

 2    that you did not check with the court proceeding to see

 3    whether or not charges had ever been filed.  Correct?

 4    You personally did not check?

 5    A.    That's correct.

 6    Q.    As one of the three case agents in this terrorism

 7    investigation, to your knowledge, did anybody check

 8    prior to giving Mr. Batiste $1,000?

 9    A.    I'm uncertain when the -- there were several

10    inquiries made during the course of the time after we

11    became aware that there was an issue with Mr. Batiste

12    and an arrest and any legal proceedings.

13          So I'm uncertain at what point, you know, the

14    information was received as to whether he was charged

15    or not.

16    Q.    Well, let me see if I can help you.

17          You testified about a meeting on March 24th of

18    2006 between Mr. Batiste and the informant; did you

19    not?

20    A.    Yes.

21    Q.    And, in fact, you testified that, on March 24th,

22    of 2006, there was not one meeting, but there were two

23    meetings with Mr. Batiste and the informant?

24    A.    I believe that's correct.

25    Q.    And you also testified that one of the meetings

```
 1    was as early as 10:00 in the morning --
 2              THE COURT:  Ms. Jhones, you need to slow down.
 3              MS. JHONES:  Sure, your Honor.  I apologize.
 4              THE COURT:  It's much too fast for the court
 5    reporter.
 6              MS. JHONES:  Sorry, Lisa.
 7    BY MS. JHONES:
 8    Q.    The first meeting was approximately 10:00 in the
 9    morning on March 24th of 2006?
10    A.    It was in the morning.
11    Q.    And there was another meeting that was later on
12    in that evening?
13    A.    That's correct.
14    Q.    And that's the meeting that you told us about
15    during your direct testimony that Mr. Batiste went with
16    the informant and Mr. Abraham to a Circuit City?
17    A.    That's correct.
18    Q.    As a matter of fact, sir, it was -- and
19    March 24th, sir:  Do you remember whether or not that
20    would have been a Friday, 2006?
21    A.    I'm uncertain.
22    Q.    Well, you do agree that, on March 24th, there
23    were two meetings?
24    A.    Yes.
25    Q.    And it was on March 24th of 2006 when the
```

Velazquez - CROSS - By Ms. Jhones                    26

```
 1  informant advised you that Mr. Batiste was asking him
 2  for money for a lawyer?
 3  A.    I'm uncertain as to the day that Narseal Batiste
 4  asked Elie Assaad for money for a lawyer.
 5        I am aware that the request was made.  I'm just
 6  uncertain as to the exact date of when it occurred.
 7  Q.    Let me see if I can help you.
 8            MS. JHONES:  I apologize, your Honor.  Just
 9  give me a minute.
10            THE COURT:  Sure.
11            MS. JHONES:  Your Honor, I apologize.
12            I'm going to speak to my colleague, because he
13  has a copy of that transcript, which I apparently have
14  misplaced.
15            THE COURT:  Okay.
16            MS. JHONES:  Thank you.
17            (Discussion had off the record amongst
18  counsel.)
19            MS. JHONES:  I apologize for the delay, your
20  Honor.
21            May I approach, your Honor?
22            THE COURT:  Yes.
23  BY MS. JHONES:
24  Q.    Agent Velazquez, I'm going to show you something
25  to see if that will refresh your recollection as to
```

 1    when Mr. Batiste first brought up the issue of a

 2    lawyer.

 3            MS. ARANGO:  For the record, Judge, I'd like

 4    for Ms. Jhones to state on the record what it is she's

 5    showing him.

 6            MS. JHONES:  I apologize.

 7            That is a transcript of May -- March 24th,

 8    2006, in the evening.  I don't know what time, but I

 9    believe --

10    BY MS. JHONES:

11    Q.    Agent Velazquez, if you can just tell us the time

12    of that meeting.  I believe it's 7:00 or 8:00 p.m.

13    A.    This appears to be a transcript of a body

14    recording from March 24th, 2006, at 6:59 p.m., between

15    Narseal Batiste, Elie Assaad and Patrick Abraham.

16            I've read the page you've highlighted.

17    Q.    And that was a meeting -- that was the beginning

18    of the meeting, correct, where Mr. Batiste mentions a

19    lawyer?

20    A.    It's towards the beginning of the meeting.  And

21    what Mr. Batiste says is, "We really need to get an

22    attorney because" -- and it's dot, dot, dot, after

23    that.

24    Q.    And, sir, later on in that meeting, later on in

25    that meeting, you testified -- strike that.

1          Later on in that meeting, you actually placed a

2     phone call to the informant as the informant was

3     shopping around in Circuit City; did you not, sir?

4     A.     I believe at some point during the meeting there

5     were a couple of phone calls between Elie and myself.

6     I seem to remember that -- Elie asking for permission

7     to purchase a camera lens, which hadn't --

8     Q.     Which -- without telling us what the informant

9     told you, my question to you was:  Did you, sir, call

10    the informant during that meeting in Circuit City?

11    A.     I believe so.  Yes.

12    Q.     And you called him more than once?

13    A.     Possibly.

14    Q.     And you also received phone calls yourself.

15    Correct?

16    A.     That's correct.

17    Q.     Okay.  And in that meeting, sir, that you

18    participated -- strike that.

19          In the phone call, sir, in addition to the

20    beginning of the meeting, the issue of money for a

21    lawyer was discussed.  Correct, sir?

22    A.     I'm not sure I understand your question.

23    Q.     You were made aware on March 24th as to the issue

24    of money for a lawyer.

25    A.     At some point, yes.

 1   Q.    I'm asking you on March 24th, sir.  Maybe I

 2   misunderstood your response.

 3         At some point during March 24th?

 4   A.    At some point either during the debriefing of

 5   Elie Assaad, I believe there was mention about Narseal

 6   Batiste acquiring a lawyer.

 7   Q.    So going back to my original question, sir, on

 8   March 24th, the issue of a lawyer comes up and money

 9   for a lawyer, not just the lawyer, but a request for

10   money for a lawyer?

11   A.    Possibly.  I'm not sure when -- when that

12   specifically came up.  I'd have to review the

13   transcript.

14   Q.    Please.

15         MS. ARANGO:  Judge, I would object.  The

16   transcript is not in evidence.

17         MS. JHONES:  Your Honor, this is to refresh

18   his recollection.  It's not to introduce it into

19   evidence.

20         THE COURT:  He can refresh his recollection.

21         Overruled.

22         THE WITNESS:  Yes.  On Page 7 of the

23   transcript.

24   BY MS. JHONES:

25   Q.    And two days after that, sir, Mr. Batiste had a

Velazquez - CROSS - By Ms. Jhones                    30

```
 1   court hearing that resulted in no charges being filed?
 2   A.    I'm not sure when that occurred.  It may have
 3   been on the 26th.
 4   Q.    Would something help refresh your recollection,
 5   sir?
 6   A.    Possibly.
 7         MS. JHONES:  I'm sorry, your Honor.
 8         I'm approaching once again, with the Court's
 9   permission.
10         THE WITNESS:  Yes.  This appears to be a
11   certified court record --
12   BY MS. JHONES:
13   Q.    Now, let me just interrupt you, sir, because
14   that's not in evidence.  I want you to review it to
15   refresh your recollection only.  The document is not in
16   evidence.
17         My question to you, sir, is:  Does that refresh
18   your recollection as to the date that there was an
19   announcement as to no charges being filed?
20   A.    Yes.
21   Q.    And the date, sir?
22   A.    March 27th.
23   Q.    Okay.  So after Mr. Batiste was provided with
24   $1,000 cash on March 27th, how much surveillance was
25   there of Mr. Batiste by the FBI after the FBI had given
```

Velazquez - CROSS - By Ms. Jhones                    31

 1   him $1,000 in cash?

 2   A.     Well, there was surveillance throughout the

 3   course of the investigation.  Are you referring to a

 4   specific date?

 5   Q.     Yes.

 6          March 27th, after you have provided Mr. Batiste

 7   with $1,000 -- correct?  And I believe you've

 8   previously testified that you were concerned with

 9   giving him too much money.  He may have used that money

10   to purchase firearms or anything of that nature that

11   could endanger the community.

12          That was a concern of the FBI; was it not?

13   A.     Yes.  But I don't believe that my -- I testified

14   with respect to not giving him too much money.

15   Q.     Okay.  So it wasn't a concern of the FBI to give

16   him money?

17   A.     No.  It wasn't a concern of the FBI to give him

18   money.

19   Q.     And your testimony is, sir, that that was -- that

20   during the course of your investigation, providing

21   funds to Mr. Batiste was not something that the FBI

22   would be concerned about, just so I'm clear?

23   A.     No.  The -- it's something we would take into

24   consideration with regard to what was going on with the

25   investigation and what -- which direction the

1   investigation was going.

2   Q.    Okay.  So going back to my original question:

3   After March 27th, when Mr. Batiste has these funds, is

4   there any surveillance had of Mr. Batiste between the

5   27th and, indeed, up until -- well, let me just ask you

6   this:  On the evening of the 27th, after that meeting,

7   was there any surveillance done of Mr. Batiste?

8   A.    I don't believe -- I don't recall a surveillance

9   team being deployed to follow Mr. Batiste after the

10  meeting on the 27th.

11  Q.    And fair to say that that is also the case with

12  respect to the following day, March 28th?

13  A.    I'm uncertain as to what -- what occurred with

14  regard to surveillance on that date.

15  Q.    Well, if there would have been surveillance, sir,

16  there would have been a report generated for the

17  surveillance; would there not?

18  A.    Most probably.  Yes.

19  Q.    And by report, I mean a 302 -- an FBI 302 report.

20  A.    Or a surveillance log.

21  Q.    And you've already told us previously what an

22  FBI 302 is.  Correct?

23  A.    That's correct.

24  Q.    And that's one of those reports where the FBI

25  basically jots down and memorializes observations that

1    they believe to be -- they deem to be significant in an

2    investigation?

3    A.    Yes.

4    Q.    Okay.  So if we do not have a 302 for the --

5    March 28th of 2006, it's because nothing of

6    significance to the FBI would have occurred that day?

7    A.    My testimony is that I'm uncertain if there is or

8    is not a 302 for activities associated with this

9    investigation on March 28th.

10   Q.    Okay.  Fair enough.

11        Let me see if I can give you something to refresh

12   your recollection and, specifically, on the topic of

13   surveillance.  Okay?

14        MS. JHONES:  I'm going to approach again, with

15   the Court's permission, your Honor.

16        THE COURT:  Yes.

17   BY MS. JHONES:

18   Q.    I'm handing you a document, Mr. Velazquez.  Tell

19   me if that helps refresh your recollection about what,

20   if anything, was memorialized in a 302 by the FBI

21   regarding surveillance.

22        MS. ARANGO:  I object.  I don't believe that

23   was the question that she was seeking to refresh his

24   recollection on.  I think she was asking him about

25   surveillance that occurred on March 28th.

 1          MS. JHONES:  Correct.  Correct.

 2          MS. ARANGO:  Not whether or not there was

 3  anything memorialized.

 4          THE COURT:  Sustained.

 5          Rephrase your question.

 6          MS. JHONES:  Okay.  Sure.

 7  BY MS. JHONES:

 8  Q.   Sir, directing again to the question, there was

 9  no surveillance conducted by the FBI on March 28th of

10  2006.  Correct?

11  A.   I believe my testimony was I'm uncertain whether

12  there was surveillance or not conducted on that day

13  associated with this investigation.

14  Q.   If there would have been surveillance, you would

15  have had a surveillance log and/or a 302?

16  A.   There would -- most probably, if there was a

17  surveillance, there would have been some sort of

18  documentation of that surveillance.

19  Q.   As you sit here today, do you have any memory of

20  any 302s generated on March 28th besides the document

21  that you are looking at right now?

22  A.   I'm personally not aware of any specific report

23  for March 28th, as I sit here today.

24  Q.   You have previously testified that, in

25  preparation for your testimony here today, you have

 1   reviewed all of the reports and pretty much all of the
 2   conversations and wiretapped intercepts that have taken
 3   place in this case.
 4   A.    At one point or another, yes.
 5   Q.    And that's important because your memory as to
 6   what occurred is important to your testimony in this
 7   case.  Correct?
 8   A.    I would agree with that.
 9   Q.    Now, what we do know, actually, Agent Velazquez,
10   is that, as you previously testified, notwithstanding
11   you providing Mr. Batiste with $1,000 -- by "you" I
12   mean the FBI, through the informant -- indeed, two or
13   three days later you then gave him $3500 additional.
14   Correct?
15   A.    Yes.  That was on April 5th, I believe.
16   Q.    That was also in cash; was it not?
17   A.    Yes, it was.
18   Q.    And as you previously stated, there was -- there
19   were no items related to terrorism that were -- that
20   was purchased by Mr. Batiste on those days, items such
21   as weapons?
22   A.    I'm unaware of any purchases made by Batiste --
23   are you referring to March 27th?
24   Q.    March 27th and -- I apologize -- also the
25   beginning of April when he received the 3500.

```
 1   A.    The only purchases I'm aware of regarding monies

 2   given to Batiste are the airline tickets for Sultan

 3   Kahn-Bey and his wife, Queen Zekaya, to come down from

 4   Chicago.

 5   Q.    And we're talking about the Sultan Kahn-Bey that

 6   had been evicted from his apartment, as indicated in

 7   one of the transcripts?

 8             MS. ARANGO:  Objection to hearsay, Judge.

 9             THE COURT:  Sustained.

10             MS. JHONES:  Your Honor, this is in evidence.

11   I'm happy to refer to it.  It's in evidence.

12             THE COURT:  Go ahead.

13             Show it to the Government, please.

14             MS. JHONES:  I'm going to locate the page,

15   your Honor.  I'll do that as soon as I locate it.

16             Thank you, your Honor.

17             MS. ARANGO:  I would object because there's

18   nothing in here about eviction, Judge.

19             THE COURT:  Come on up.

20             MS. JHONES:  Let me rephrase the question,

21   your Honor.

22             THE COURT:  Okay.

23   BY MS. JHONES:

24   Q.    In the conversation that is in evidence,

25   specifically, Agent Velazquez --
```

```
 1              THE COURT:  What exhibit is this?

 2              MS. JHONES:  I'm about to identify it, your

 3    Honor.  Government's Exhibit W1-02645-T.

 4              THE COURT:  W1 --

 5              MS. JHONES:  -02645-T.  It's a conversation of

 6    April 2nd, 2006.

 7              THE COURT:  What's the page?

 8              MS. JHONES:  Yes, your Honor.

 9              The page is Page 4 of the transcript.

10              May I proceed, your Honor?

11              THE COURT:  Sure.

12              MS. JHONES:  Thank you.

13              Is everybody ready?

14              MS. ARANGO:  Judge, if she's going to be

15    asking this witness about something that's not in

16    evidence, I would ask that she provide it to him.  I

17    don't know if the witness is looking at the transcript.

18              MS. JHONES:  I'm going to ask him first.  If

19    he doesn't remember, I'm happy to give it to him.

20              MS. ARANGO:  She's referring to a specific

21    page, Judge.

22              THE COURT:  If you're going to read from the

23    page, you can give it to him.

24              MS. JHONES:  I wasn't going to read from it,

25    your Honor.  But if the Court would like me to give it
```

```
 1    to the witness, I'm happy to do that.

 2              THE COURT:  Okay.

 3              MS. JHONES:  (Tenders document to the

 4    witness.)

 5              THE COURT:  Ask your question.

 6              MS. JHONES:  I was just --

 7    BY MS. JHONES:

 8    Q.    Are you ready, Agent Velazquez?

 9              MS. JHONES:  He was reviewing, your Honor.

10              THE WITNESS:  Yes.

11    BY MS. JHONES:

12    Q.    Are you ready?

13          In -- the $3500 that was provided to Mr. Batiste

14    by the informant -- the second informant, I think you

15    testified earlier, was to bring down Sultan Kahn-Bey

16    from Chicago.  Correct?

17    A.    And his wife.  That's correct.

18    Q.    And his wife.

19          His wife is a lady by the name of Queen Zekaya?

20    A.    That's correct.

21    Q.    In that conversation, I --

22              MS. JHONES:  And I apologize, your Honor.  I

23    have -- that I referenced earlier W1, whatever numbers

24    are, 265, I believe --

25              THE COURT:  W1-02655.
```

```
 1              MS. JHONES:  Thank you, your Honor.
 2    BY MS. JHONES:
 3    Q.      In that conversation, the Sultan is telling
 4    Mr. Batiste that he's basically moving out of his
 5    apartment?
 6    A.      Yes.
 7    Q.      And that he has so much stuff that he doesn't
 8    know what he's going to do with it or words to that
 9    effect?
10    A.      Yes.
11    Q.      Okay.  And so, going back to the issue of the
12    3500, sir, the -- Sultan Kahn-Bey came down and it's
13    your understanding that part of the money that was
14    provided to Mr. Batiste was to pay for the travel
15    tickets, the airline tickets, for the Sultan and his
16    wife, Queen Zekaya.  Fair enough?
17    A.      Yes.  The money was to be used for transportation
18    via the airline from Chicago -- transportation here and
19    lodging, I believe.
20    Q.      Lodging.
21              And I believe you also referenced during your
22    direct testimony that there was also a car rental?
23    A.      There was discussions regarding a car rental as
24    related to Sultan Kahn-Bey coming to Miami to meet with
25    Narseal Batiste.
```

1    Q.     Correct.

2           But there was no car rental expense incurred by

3    Mr. Batiste on behalf of the Sultan, was there, sir?

4    A.     That's correct.

5    Q.     There was no hotel reservations made by

6    Mr. Batiste on behalf of the Sultan and his wife.

7    Correct, sir?

8    A.     I believe that's correct.

9    Q.     And as far as your investigation is concerned,

10   the Sultan would have stayed at the Liberty City

11   location with his wife, Queen Zekaya?

12   A.     I'm not -- I'm not certain where Sultan Kahn-Bey

13   was going to stay when he arrived.  I --

14   Q.     Were -- I'm sorry.

15   A.     I presumed he was going to stay in a hotel.

16   Q.     But you did not -- as you sit here today, there

17   is no evidence that the Government has whatsoever that

18   the Sultan and his wife stayed in a hotel?

19   A.     That's correct.

20   Q.     So out of that $3500 in cash that was given to

21   Mr. Batiste, the only thing that the FBI could confirm

22   is that Mr. Batiste purchased some tickets for the

23   Sultan and his wife to come down to Florida?

24   A.     And they came down.  Correct.  Yes.

25   Q.     And you know that they came down because that

1    meeting -- there was -- when -- the meeting -- strike

2    that.

3         The airport pickup, if you will, of the Sultan

4    was actually surveilled by the FBI?

5    A.    That's correct.

6    Q.    Okay.  Now, before I move on to April, Agent

7    Velazquez, I want to go back to a couple of items that

8    I neglected to ask you about last week.  Okay?

9         We spoke about -- last week about a meeting -- a

10   discussion, I should say, a telephone conversation,

11   between the informant and Mr. Batiste where -- which is

12   in evidence, where the informant indicated to

13   Mr. Batiste he doesn't want to talk over the phone.

14        Do you remember that?

15   A.    Yes.

16   Q.    Okay.  And, sir, that was not the only meeting --

17   strike that.

18        That was not the only conversation where the

19   informant told Mr. Batiste, "I don't want to talk over

20   the phone."

21        There were more such conversations between

22   Mr. Batiste and the informant; were there not?

23   A.    Yes.  But my recollection is that Mr. Batiste is

24   the one who said he didn't want to talk on the phone.

25   He had called Elie Assaad from a pay phone, I believe.

1    Q.     On March 9th, sir?

2    A.     I don't recall what the date was.

3    Q.     Let me see if we can go ahead and refresh your

4    recollection on that as well.

5           MS. JHONES:  I apologize, your Honor.  I did

6    have that handy.  If I may just have one moment.

7           THE COURT:  Isn't that conversation in

8    evidence?

9           MS. JHONES:  It is, your Honor.  Now I know

10   why I can't find it.

11          Thank you.

12          MS. ARANGO:  Judge, I would just suggest for

13   the record, if Ms. Jhones wants to give -- we have an

14   extra copy of these transcripts, if she wants the

15   witness to have his own copy.

16          THE COURT:  Okay.

17          MS. JHONES:  Do you have an extra binder?

18   Wonderful.

19          (Tenders document to the witness.)

20   BY MS. JHONES:

21   Q.     Agent Velazquez, just to refresh your

22   recollection, Government's Exhibit W1-01363-T.

23   A.     Yes.

24   Q.     And it was on that occasion, on March 9th, that

25   the informant tells Mr. Batiste that he cannot speak

```
 1  too much on the phone.  Correct?  On Page 6.
 2  A.    I'm sorry.  I may be -- I don't have a Page 6.
 3  Q.    Would you just check on your exhibit to make sure
 4  that the pages are complete?  Are you looking at
 5  W1-01363?
 6  A.    No, ma'am.
 7  Q.    Okay.
 8  A.    Yes.
 9  Q.    Do you have a Page 6?
10  A.    Yes, ma'am.
11  Q.    Do you see where I'm referring to at the bottom
12  of Page 6, towards the bottom, where the informant
13  says, "I cannot speak too much on the phone"?
14  A.    Yes, ma'am.
15        But in response to your question, my recollection
16  was regarding a comment made by Narseal Batiste -- I
17  believe it was on February 20th -- where there had been
18  a meeting on a prior -- the day prior, on the 19th.
19  That was my recollection, to the question that you
20  initially asked.
21  Q.    Let's see if we can clear it up.
22        The question I initially asked, sir, a couple of
23  minutes ago is that there was more than one time where
24  the informant told Mr. Batiste, such as the
25  conversation on 3-9, which is in evidence, that he
```

```
 1   doesn't want to speak over the phone?
 2   A.     Well, in this transcript, he clearly says that.
 3   Q.     And during the course of -- that's one of those
 4   wire calls.  Right?
 5   A.     Yes.
 6   Q.     By this time, the wiretap is already in effect?
 7   A.     Yes.
 8   Q.     But there were other conversations prior to
 9   February of 2006 where there are meetings and/or
10   telephone calls between Mr. Batiste and the informants
11   that are recorded via a body wire?
12   A.     That's correct.
13   Q.     And, indeed, sir, just for the benefit of the
14   jury, when that happens -- many times, when there's a
15   body wire recording, the FBI is actually seated right
16   next to the informant as the call is being made?
17   A.     Has that happened?  Yes.
18   Q.     And you yourself have participated in that type
19   of scenario; have you not?
20   A.     I have.  I believe -- yes.  I believe I was
21   actually with Elie on the 20th during the phone call I
22   referenced.
23   Q.     Okay.  And as early, sir -- early on in this
24   investigation, as you have called it, on March [sic]
25   19th, you were directing the second informant to make a
```

Velazquez - CROSS - By Ms. Jhones                45

```
 1    phone call to Mr. Batiste; were you not, sir?

 2    A.      Possibly.

 3    Q.      Do you need something to refresh your

 4    recollection?

 5    A.      Yes, please.

 6    Q.      Okay.

 7            MS. ARANGO:  Judge, I would object.  The

 8    question talks about:  On March 19th, you were

 9    directing the second informant to make a phone call.

10            And then that -- the transcript, which is not

11    in evidence, that she's seeking to show this witness to

12    refresh his recollection is dated December 19th.

13            MS. JHONES:  Your Honor, if I said March 19th,

14    I misspoke.  Did I say March 19th?

15            THE COURT:  Yes.

16            MS. JHONES:  I apologize.  I meant

17    December 19th.  I apologize.

18            THE COURT:  Why don't you just ask your

19    question, then.

20            MS. JHONES:  Yes.

21    BY MS. JHONES:

22    Q.      Sir, on -- the conversation that is in evidence

23    on March 9th was not -- where the informant tells

24    Mr. Batiste he cannot speak over the phone was not the

25    only time that the informant tells Mr. Batiste that he
```

```
 1   cannot engage him over the phone.  Correct?

 2   A.     Possibly.  Probably.

 3   Q.     There was another time on December 19th of 2005

 4   where the informant did the exact same thing?

 5          MS. ARANGO:  Now, this time I would object as

 6   to hearsay.  That transcript is not in evidence.

 7          I don't even have a problem with introducing

 8   it into evidence, Judge.  But I think that trying to

 9   take it out of context like this --

10          MR. LEVIN:  Judge, I would object to the

11   speaking objection --

12          MS. JHONES:  Likewise, your Honor.

13          MR. LEVIN:  -- what the defense may be trying

14   or not trying to do.  It's inappropriate.

15          MS. ARANGO:  I would object to hearsay

16   grounds.

17          THE COURT:  It's sustained.

18          MS. JHONES:  I'm sorry, your Honor.  The

19   question sustained relates to?  I apologize.

20          THE COURT:  Hearsay.

21          MS. JHONES:  Okay.

22   BY MS. JHONES:

23   Q.     Now, there was -- that meeting on December 19th

24   was monitored by you; was it not?

25   A.     There was a meeting on December 16th and
```

```
 1  December 19th, that's correct, at -- which meeting are
 2  you referring to?  And between whom?
 3  Q.    Mr. Batiste and the second informant, on
 4  March 19th of 2005 --
 5          THE COURT:  March 19th or December 19th?
 6          MS. JHONES:  I apologize, your Honor.  I
 7  apologize.
 8  BY MS. JHONES:
 9  Q.    December 19th of 2005 at 7:44 p.m.
10  A.    (No response.)
11  Q.    I'm happy to show you something, if it would
12  help.
13  A.    Yes, please.
14          MS. ARANGO:  I would object.  These
15  transcripts don't refer to a meeting on December 19th.
16  It's phone calls on December 19th.
17          MS. JHONES:  Phone call.
18          THE COURT:  I have no idea what your question
19  is.
20          MS. JHONES:  Let me say it again, your Honor.
21  BY MS. JHONES:
22  Q.    On December 19th, there was at least one phone
23  call between Mr. Batiste and the second informant?
24  A.    Probably.
25  Q.    And my question to you, sir, is:  Is there
```

```
 1    anything that you need to review in order to refresh

 2    your memory as to any phone calls that would have

 3    occurred on December 19th?

 4    A.    Yes.  If there's a transcript or 302 report

 5    regarding that telephone call, it would help me refresh

 6    my memory.

 7             MS. JHONES:  May I approach, your Honor?

 8             THE COURT:  Yes.

 9             MS. JHONES:  (Tenders document to the

10    witness.)

11             THE WITNESS:  Yes.

12    BY MS. JHONES:

13    Q.    Has that refreshed your recollection?

14    A.    Yes.  That appears to reflect two telephone calls

15    between Informant 1 and Narseal Batiste and another

16    phone call between Informant 2 and Narseal Batiste.

17    Q.    And on December 19th of 2005, correct?

18    A.    That's correct.

19    Q.    And those were telephone calls that you were

20    assisting as they were being placed by the informants.

21    Correct?

22    A.    I believe the one with Informant 2, that's

23    correct, yes.  I was present during that phone call.

24    Q.    Fair enough.

25             And there were many, sir, such meetings during
```

```
 1    the course of the fall of 2005.  Correct?
 2    A.    Which meetings?
 3    Q.    I'm sorry.  Meetings and/or conversations.
 4          There were many of them which you have not
 5    testified about in direct -- in your direct testimony?
 6    A.    Yes.  There were meetings that occurred that I
 7    have not testified about.
 8    Q.    Okay.  And the same is true of the -- January
 9    through May of 2006?
10    A.    That's correct.
11    Q.    Okay.  Now, you've testified, sir, about the
12    issue of lists that were provided by Mr. Batiste to the
13    informant.  Correct?
14    A.    Yes.
15    Q.    And the Government introduced these lists that
16    were produced, I believe the first one on December 16th
17    of 2005.  Correct?
18    A.    That's correct.
19    Q.    And there were some other lists provided
20    thereafter.
21    A.    Yes.
22    Q.    Fair enough?
23    A.    Yes.
24    Q.    And I believe that you testified, sir, that --
25    Well, strike that.
```

 1          The idea of having lists provide in this case did

 2    not come from Mr. Batiste, but came from the FBI?

 3    A.      The idea of writing the items on a list, I

 4    believe, came by -- from -- by way of Elie Assaad.

 5          Elie Assaad received no instructions with regard

 6    to asking for a list.  However, that would be

 7    consistent with the role that he was playing at the

 8    time.

 9    Q.      And you're talking about, now, December 16th; are

10    you not?

11    A.      That was in response to your question.  Yes.

12    Q.      December 16th?

13    A.      Yes, ma'am.

14    Q.      And, sir -- so the answer to my question is that

15    the request to produce a list on December 16th came

16    from the second informant?

17    A.      That's correct.

18    Q.      And, as a matter of fact, sir, even prior to

19    the meeting in the hotel on December 16th between

20    Mr. Batiste and the second informant, there were yet --

21    there was yet a meeting prior to that with the first

22    informant where, again, the issue of a list came up;

23    was there not, sir?

24    A.      I believe -- possibly.  I believe so.

25    Q.      And the reason why, sir, is because the notion of

 1    producing a list came not from Mr. Batiste, but came

 2    from the FBI?

 3    A.    No.  My testimony, as stated before, on -- with

 4    regard to December 16th, that was introduced by Elie in

 5    a request for Narseal Batiste to write down the items

 6    that he was requesting on a list.

 7    Q.    Maybe I'm not very clear.  I apologize.

 8          I'm going back before December 16th now.  And,

 9    specifically, I'm going to December 14th of 2005.

10          Now, again, you have testified previously that

11    you reviewed all of these conversations and transcripts

12    of meetings that occurred in the course of the

13    investigation of this case; have you not, sir?

14    A.    I have.

15    Q.    And you do recall, do you not, sir, a meeting on

16    December 14th of 2005 where an issue of a list was

17    discussed?

18    A.    I don't recall the details of the meeting -- of a

19    meeting on December 14th.

20    Q.    Okay.  Would something help to refresh your

21    recollection?

22    A.    Yes.

23    Q.    Now, before I show you something, sir, my initial

24    question to you was whether the issue of production of

25    lists came from the FBI and not from Mr. Batiste.

1          And your answer to that, sir, is what?

2   A.    My response to that is I gave no instructions to

3   either informant to ask Batiste for a list.

4   Q.    Would your answer also be, sir -- would your

5   position, I should say, also be that at no time did the

6   FBI direct these informants that, in exchange for

7   providing a list, Mr. Batiste would receive money?

8   A.    No.

9   Q.    Okay.

10          THE COURT:  Ask your next question.

11          MS. JHONES:  I want to refresh his

12   recollection, your Honor.

13          THE COURT:  There's nothing to refresh.  He

14   answered the question.  He answered the question.

15   BY MS. JHONES:

16   Q.    Did you direct, Agent Velazquez, the Informant

17   No. 1 to request a list from Mr. Batiste on

18   December 16th of 2005?

19   A.    I did not.

20   Q.    Well, when you say you did not, on December 16th,

21   you were no longer the supervisor.  Right?  You were

22   now a case agent?

23   A.    I was assigned to the case as one of the case

24   agents.  Yes.

25   Q.    And you were actively participating in this case?

1   A.      I was.

2   Q.      And, in fact, you were present for the

3   December 16th meeting where you monitored realtime from

4   another room in the hotel, the Radisson?

5   A.      That's correct.

6   Q.      Okay.  And you have also -- as you have

7   previously stated, you were present during several

8   conversations that were initiated by the informants

9   over the phone?

10  A.      That's correct.

11  Q.      So you were actively involved in December of 2005

12  in the investigation -- so-called investigation of this

13  case.  Correct?

14  A.      That's correct.

15  Q.      And is it your testimony, sir, that at no time

16  did the FBI -- you personally or any other members of

17  the FBI direct Informant No. 1 to have Mr. Batiste

18  produce a list in exchange for money?

19  A.      I provided no such instructions, and I'm unaware

20  if any other agents did.  That came, again, out of Elie

21  Assaad on the December 16th meeting.

22  Q.      Okay.  And your testimony is that, on

23  December 16th, with the first informant, there was no

24  such exchange that took place:  "Give me a list.  I'll

25  give you money"?

```
 1   A.     I don't recall anything along those lines.  No.

 2   Q.     Okay.

 3          MS. JHONES:  May I approach, your Honor?

 4          THE COURT:  Yes.

 5   BY MS. JHONES:

 6   Q.     Agent Velazquez, I'm going to show you a

 7   document.  Please read it and let me know if that

 8   refreshes your recollection as to December 14th, 2005.

 9          THE COURT:  Your question was in reference to

10   December 16th.

11          MS. JHONES:  The last question was

12   December 14th.

13          THE COURT:  No, ma'am.  It was December 16th.

14   So if you're asking about December 14th, you need to

15   ask that question, because the question that you asked

16   was in regard to December 16th.

17          MS. JHONES:  Okay.  I tend to misspeak when it

18   comes to the dates, your Honor.  I apologize.

19   BY MS. JHONES:

20   Q.     The specific reference, not on the 16th, but

21   prior to the 16th, there was a request -- there was a

22   request for a list made to Mr. Batiste.

23          The question is:  Did the FBI direct the

24   informant to do that?

25   A.     No.  I'm unaware of any instructions given to the
```

Velazquez - CROSS - By Ms. Jhones                55

1   informant in that regard.

2   Q.    Now, specifically directing your attention to

3   December 14th of 2005, the informants are under the

4   authority and the review of the FBI?

5   A.    I would agree with that.

6   Q.    They just can't go around doing things without

7   the supervision and the control of the FBI.  Correct?

8   A.    Well, they could.  But they wouldn't be working

9   for us for very long, if that's what they did.

10  Q.    Fair enough.

11        And, indeed, every time the informants were wired

12  up with the body wire, they had done so under the

13  direction of the FBI?

14  A.    That's correct.

15  Q.    Okay.  And on December 14th, 2005, Mr. Batiste

16  did not initiate the request for a list, a list.  It

17  was not Mr. Batiste that did that.  Correct?

18  A.    I'm uncertain.  I'm not familiar with this

19  meeting to the extent that I can answer that question.

20  Q.    Okay.  Does that meeting refresh your

21  recollection as to what occurred on the 14th, sir?

22  A.    Can I have a moment to review it?

23  Q.    Sure.

24        MS. ARANGO:  Judge, I just want to note for

25  the record this appears to be a transcript of a

 1   telephone call, not a meeting, on December 14th.

 2           THE COURT:  Okay.

 3           THE WITNESS:  Yes.  I found the reference to a

 4   list.

 5   BY MS. JHONES:

 6   Q.    Okay.  And, again, does that help refresh your

 7   recollection as to directions that you provided -- you

 8   or the FBI, your co-case agents, as to directions given

 9   to the informant regarding a list?

10   A.    I'm unaware of any directions given to the

11   informant with regard to a list.  But this portion of

12   the conversation is consistent with the instructions

13   that the informants were given regarding gathering more

14   information on Narseal Batiste.

15   Q.    Okay.  And, sir -- and, again, whenever the

16   informant -- the informants speak on these recorded

17   conversations, they're doing so under the direction and

18   under the control of the Federal Bureau of

19   Investigation?

20   A.    Yes, ma'am.

21   Q.    Okay.  Now, let's move on to the issue of this

22   bomb expert that you referenced during your direct

23   testimony.  Okay?

24           You testified on direct, sir, that after

25   April 19th of 2006, you instructed the Informant No. 2

1    to continue to try and introduce the bomb expert from

2    London to Narseal Batiste?

3    A.    Yes.

4    Q.    And you testified that you were concerned and you

5    wanted to do that because you were concerned that, at

6    that point on April 19th of 2006, this investigation

7    may have been compromised --

8    A.    Yes.

9    Q.    -- or words to that effect?

10   A.    Yes.

11   Q.    Okay.  And you even stated that you were

12   concerned that the second informant's cover had been

13   blown or words to that effect?

14   A.    Yes.  We had information that his undercover role

15   may have been compromised.

16   Q.    And it was very important to the FBI to introduce

17   this bomb expert to Mr. Batiste.  Correct?

18   A.    It was important for us to assess the level of

19   compromise and continue and make it -- and continue the

20   investigation.

21   Q.    But, sir, the reality is that, as early as

22   January 28th of 2006, the FBI was bound and determined

23   to introduce a bomb expert to Mr. Batiste.

24         Isn't that a fact, sir?

25   A.    As early as, I would say, December 16th, the

1    first meeting with Elie Assaad and Narseal Batiste, we

2    had hopes of eventually introducing a seasoned or

3    experienced undercover agent or officer into the

4    investigation.

5    Q.    That was not communicated to Mr. Batiste by the

6    informant on December 16th, was it?

7    A.    No.  But your question was as early as January of

8    2006, and my response was to your question.

9    Q.    It was January 28th when a suggestion was made to

10   Mr. Batiste with respect to a bomb expert?

11   A.    I believe it was sometime in early -- yes --

12   January.

13   Q.    Okay.  At that time, Mr. Batiste did not meet

14   with any bomb expert?

15   A.    No, he did not.

16   Q.    And after January 28th, Mr. Batiste -- strike

17   that.

18         After January 28th, 2006, the Government

19   persisted in its effort.  And directing your attention

20   to February 19th, that was also an occasion when the

21   Government attempted -- the FBI attempted to introduce

22   a bomb expert into the scenario of this operation.

23   Correct, sir?

24   A.    There were discussions regarding a bomb expert

25   who would be an undercover officer.  There was a

1   reference, I believe -- at some point, there was a

2   comment made by Batiste that he was going to rely on

3   someone else.

4   Q.     Right.  A family member, his brother?

5   A.     I believe so.  Right.

6   Q.     And the bottom line here is that Mr. Batiste

7   said -- Mr. Batiste did not meet with any bomb expert

8   in February of 2006?

9   A.     That's correct.

10  Q.     Despite the FBI's efforts to get him to meet with

11  the bomb expert?

12  A.     That's correct.

13  Q.     He continuously refused to have anything to do

14  with any expert for -- on explosives?

15  A.     He did not meet with any explosives expert.

16  Q.     And that occurred in January of 2006?

17  A.     I'm not sure I understand your question.

18  Q.     He did not meet -- he did not meet with any bomb

19  expert in January of 2006?

20  A.     He never met with a bomb expert.

21  Q.     Correct.

22         So on April of 2006, when you testified earlier

23  that you wanted to have this bomb expert introduced,

24  the reality is that you have been -- the FBI had been

25  trying to get Mr. Batiste to meet with the bomb expert

 1   and repeatedly Mr. Batiste did not do so?

 2          MS. ARANGO:  Objection.  Mischaracterization

 3   of testimony.

 4          THE COURT:  Sustained.

 5          Rephrase your question.

 6   BY MS. JHONES:

 7   Q.    April 19th, sir, you attempted to have

 8   Mr. Batiste meet with the bomb expert.  Correct?

 9   A.    On April 19th, we --

10   Q.    Sir, let me interrupt you.

11          Answer "yes" or "no" and then you can explain

12   your answer.

13          MS. ARANGO:  Judge, I would object to

14   interrupting this witness.  He was answering the

15   question.

16          MS. JHONES:  Your Honor, I would ask for a

17   "yes" or "no" answer and then he could explain.

18          THE COURT:  He needs to answer the question

19   "yes" or "no" and then he can explain.

20          THE WITNESS:  Can you repeat the question?

21   BY MS. JHONES:

22   Q.    Yes.

23          On April 19th, Mr. Batiste refused to meet with

24   the bomb expert?

25   A.    Yes.  That's correct.

```
 1   Q.     And that was not the first time that he refused
 2   to meet with the bomb expert, sir?
 3   A.     Possibly.  I'm uncertain if you're referring to a
 4   specific date.
 5   Q.     Well, sir, again, you have reviewed all of these
 6   conversations prior to coming in here today to testify?
 7   A.     Yes.
 8   Q.     You are an experienced Federal Bureau of
 9   Investigation agent for over 18 years?
10   A.     Close to 18 years.  Yes.
11   Q.     You have testified in numerous trials prior to
12   this trial?
13   A.     I have.
14   Q.     Don't be shy.  You basically are a very
15   experienced agent and you know what you're doing.
16   A.     I would agree with that.
17   Q.     And you have reviewed and previously told us that
18   you have reviewed everything in terms of recorded
19   conversations and meetings prior to your testimony here
20   today.
21   A.     That's correct.
22   Q.     As you sit here today, you're telling us that you
23   don't have any recollection of the number of times that
24   Mr. Batiste refused to meet with the bomb expert?
25   A.     No, ma'am.  That's not what I'm saying.
```

1        I'm disagreeing with your characterization that

2   he refused to meet with the bomb expert when there

3   wasn't a bomb expert readily available to meet with

4   him.

5        The idea was introduced and there were

6   discussions had between Narseal Batiste and Elie Assaad

7   with respect to meeting a bomb expert.

8   Q.    Well, let me ask you this:  Did Mr. Batiste ever

9   meet -- ever request to meet with a bomb expert?

10  A.    No.  I don't believe so.

11  Q.    Did Mr. Batiste ever persist in -- with the

12  second informant or the first informant with respect to

13  the offer of having a bomb expert?

14  A.    No, he did not.

15  Q.    Okay.

16           THE COURT:  We're going to take a break.

17           Do not discuss this case either amongst

18  yourselves or with anyone else.  Have no contact

19  whatsoever with anyone associated with the trial.  Do

20  not read, listen or see anything touching on this

21  matter in any way.

22           If anyone should try to talk to you about this

23  case, you should immediately instruct them to stop and

24  report it to my staff.

25           You may leave your materials at your chairs.

 1   Please be back in the jury room in ten minutes.

 2           (Whereupon, the jury exited the courtroom at

 3   11:02 a.m. and the following proceedings were had:)

 4           THE COURT:  You may step down, sir.

 5           (Witness excused.)

 6           THE COURT:  You may be seated for a moment.

 7           How much longer is your cross, Ms. Jhones?

 8           MS. JHONES:  Not much longer, your Honor.

 9   Maybe 20 minutes.  Maybe 30 minutes.

10           THE COURT:  We're in recess for ten minutes.

11           (Thereupon a recess was taken, after which the

12   following proceedings were had:)

13           THE COURT:  We're back on United States of

14   America versus Narseal Batiste, et al., Case

15   No. 06-20373.

16           Counsel, state your appearances, please.

17           MR. GREGORIE:  Richard Gregorie and Jacqueline

18   Arango on behalf of the United States, your Honor.

19           MS. JHONES:  Ana Maria Jhones on behalf of

20   Narseal Batiste, who is present.

21           MR. LEVIN:  Albert Levin on behalf of Patrick

22   Abraham, who's present.

23           MR. CASUSO:  Louie Casuso on behalf of Burson

24   Augustin, who is present.

25           MR. CLARK:  Nathan Clark on behalf of

```
 1   Rotschild Augustine, who's present.

 2            MR. HOULIHAN:  Richard Houlihan with Naudimar

 3   Herrera.

 4            MR. VEREEN:  Roderick Vereen with Stanley

 5   Phanor, who's present.

 6            THE COURT:  All Defendants are present.

 7            Let's bring in the jurors, please.

 8            (Whereupon, the jury entered the courtroom at

 9   11:24 a.m. and the following proceedings were had:)

10            THE COURT:  You may be seated.

11            You are still under oath, sir.

12            You may proceed.

13            MS. JHONES:  Thank you, your Honor.

14   BY MS. JHONES:

15   Q.    Agent Velazquez, during the course of your direct

16   testimony, you also discussed -- you indicated that,

17   after January -- I'm sorry -- after December 29th of

18   2005, the next meeting that occurred with Confidential

19   Informant No. 2 and Mr. Batiste would have been on

20   January 28th of 2006.  Correct?

21   A.    That's correct.

22   Q.    But during that time period, December 29th of

23   2005 and January 28th of 2006, there were at least

24   three telephone calls between Mr. Batiste and Informant

25   No. 2; were there not?
```

```
 1   A.     There may have been.
 2   Q.     And when you say, "There may have been," that is
 3   because you don't remember?
 4   A.     I don't remember the specific dates with regard
 5   to phone calls.
 6   Q.     And do you remember whether or not it was at the
 7   beginning of the month of January or at the end of
 8   January?
 9   A.     No, ma'am.
10   Q.     Would something help refresh your recollection as
11   to the dates?
12   A.     Yes.
13          MS. JHONES:  Your Honor, while the Government
14   is reviewing, I'm going to approach the witness with an
15   extra copy of the documents that I would like the
16   witness to refresh his recollection with.
17          THE COURT:  Okay.
18          MS. JHONES:  (Tenders documents to the
19   witness.)
20          THE WITNESS:  Yes.
21          MS. JHONES:  Ms. Arango, let me know when
22   you're finished.
23          MS. ARANGO:  Thank you.
24   BY MS. JHONES:
25   Q.     Agent Velazquez, does that refresh your
```

1   recollection as to at least two conversations had

2   between Mr. Batiste and the informant in January, prior

3   to January 28th?

4   A.    Yes.

5   Q.    And after your memory has been refreshed, what

6   are the dates that conversation occurred between

7   Mr. Batiste and the second informant in January of

8   2006?

9   A.    There was one telephone call on January 2nd,

10  2006, and then there was another telephone call on

11  January 3rd.

12  Q.    Now, additionally, Agent Velazquez, in addition

13  to actual phone conversations that took place during

14  the course of the months of -- starting as late as

15  October of 2005 and continuing on through April and May

16  of 2006 -- in addition to calls, in addition to

17  meetings, there were numerous attempts by both

18  Informant No. 1 and Informant No. 2 to reach

19  Mr. Batiste and Mr. Batiste did not return the phone

20  calls?

21  A.    There was instances where there were attempts

22  made by one or both informants to contact Mr. Batiste

23  and he did not respond to those attempts to contact

24  him.

25  Q.    Okay.  And in order to put things in perspective

```
 1   here, Government's Exhibits --

 2            MS. JHONES:  Your Honor, may I have the ELMO,

 3   please.

 4            THE COURT:  Sure.

 5            MS. JHONES:  These items are in evidence.  Is

 6   it okay, your Honor, if I use the microphone from the

 7   ELMO or should I use --

 8            THE COURT:  This one works.  You just need to

 9   turn it on.  Somehow my control is not working.

10            MS. JHONES:  Okay.  I believe there's a way to

11   highlight the words, your Honor, but I'm not exactly

12   sure how to do that.  Just bear with me.

13            There we go.

14   BY MS. JHONES:

15   Q.    Agent Velazquez, you recognize Government's

16   Exhibit 100; do you not?

17   A.    I do.

18   Q.    And that is the list that was provided to the

19   second informant at the Radisson Hotel?

20   A.    That's correct.

21   Q.    And that was on December 16th of 2005?

22   A.    That's correct.

23   Q.    Now, during all of the recorded conversations

24   that the FBI generated in this case between the

25   informant and Mr. Batiste, the informant and
```

 1   Mr. Batiste, is there any phone conversation you had

 2   where Mr. Batiste tells CW 2, the second informant,

 3   and, indeed, the first informant, Abbas al-Saidi, after

 4   December 16th, "Where are my black uniforms?  I need my

 5   black uniforms"?

 6   A.     No.  I'm unaware of any such call.

 7   Q.     In fact, there is no call in any of the body

 8   wires, in any of the 15,000 conversations generated by

 9   the FBI, where Mr. Batiste is insisting on having his

10   black uniforms.  Fair enough?

11   A.     Yes.

12   Q.     Likewise, in all of the body wires generated --

13   and we have hundreds of hours, is that fair to say, of

14   body wires alone?

15   A.     Numerous hours.  Yes.

16   Q.     And we have thousands of wiretapped conversations

17   from two separate phones?

18   A.     That's correct.

19   Q.     Nowhere in any of those body wires, in any of

20   those telephone calls, do you hear Mr. Batiste say,

21   "Where are my machine guns?  I need my guns.  You

22   promised me the guns"?

23   A.     I'm unaware of any such phone call.

24   Q.     Likewise, radio communication, Motorola cell

25   phones.  In any of the calls or in any of those body

1    wires during the course of six or seven months, do you

2    hear Mr. Batiste saying, "Where are my radio

3    communication, Motorola cell phones, Mr. CW 1 or CW 2?

4    Where are they?"

5    A.     That's correct.

6    Q.     Squad cars.  In any of those hundreds of hours of

7    body wires and 14- to 15,000 recorded conversations, do

8    you hear Mr. Batiste say, "Give me my squad cars.

9    Where are they?"

10   A.     That's correct.

11   Q.     Government's Exhibit 101.  Now, this Government's

12   exhibit, Agent Velazquez -- correct me if I'm wrong --

13   was a list that you testified was provided to Informant

14   No. 1.

15   A.     Yes.

16   Q.     Correct?

17          And correct me if I'm wrong.

18          Your testimony is that this list was provided by

19   Mr. Batiste on the 18th of December?

20   A.     That's correct.

21   Q.     As opposed to the 19th of December?

22   A.     That's correct.

23   Q.     And when this list was provided -- and correct me

24   if I'm wrong -- that's one of those recorded -- one of

25   those conversations -- or meetings, I should say,

1   between Mr. Batiste and Informant No. 1 that was not

2   recorded?

3   A.     I believe so.

4   Q.     Now, this is the list from the meeting that

5   wasn't recorded where Mr. Batiste asks for 10 mini

6   .223 Bushmasters.  Correct?

7   A.     Yes.

8   Q.     And that's a firearm; is it not?

9   A.     Yes, it is.  It's an assault rifle.

10  Q.     And he wanted 10 of them, according to this list?

11  A.     According to this list, yes.

12  Q.     In any of the body wires, in any of the 14- to

13  15,000 wiretapped conversations, is Mr. Batiste heard

14  saying to the informants or to anybody else, for that

15  matter, "Where are my 10 mini .223 Bushmaster weapons?"

16  A.     No.

17  Q.     20 pair of military boots.  Do you hear

18  Mr. Batiste in any of those body wires and 14- to

19  15,000 recorded conversations saying to the informants

20  or anybody else that he may have spoken with, "Where

21  are my 20 pair of military boots?"

22  A.     No.

23  Q.     Likewise, with the SUV trucks?

24  A.     No.

25  Q.     Nikon -- I guess he wanted five of those,

1    according to this list -- Nikon 10-by-36-millimeter

2    Monarch binoculars.

3          Is that what that is?

4    A.    Those are binoculars.  Yes.

5    Q.    Same question with respect to the five

6    binoculars:  At no time did Mr. Batiste say to the

7    informants or to anybody else in a six-to-seven-month

8    period, "Where are my binoculars?  I need those

9    binoculars for my mission?"

10   A.    No.

11   Q.    I believe that's a 20.  Correct?

12   A.    Yes.

13   Q.    I can't tell.

14         Bulletproof vests.  Right?

15   A.    Yes.

16   Q.    Now, for somebody who's going to wage a war

17   against the United States Government, bulletproof vests

18   would come in handy.

19         Do you agree with me?

20   A.    I would agree with that.

21   Q.    Nowhere in the 15,000 -- 14- to

22   15,000 conversations and hundreds of hours of body

23   wire do you hear Mr. Batiste saying, "Where are my

24   50 bulletproof vests?  I need them for the mission.

25   Where are they?"

1    A.    No.

2    Q.    Five Charter Arms Bulldog, two-and-a-half-inch

3    barrel.  Is that some type of shotgun?

4    A.    It's a revolver.

5    Q.    A revolver.

6          He wanted five of those, according to this list.

7    Correct?

8    A.    Yes.

9    Q.    Nowhere in the course of the seven or eight

10   months is Mr. Batiste heard saying, "Where are my

11   Bulldog two-and-a-half-inch barrel revolvers.  I need

12   them for my mission.  Where are they?"

13   A.    No.

14   Q.    As a matter of fact, after this list was

15   provided, according to your testimony, on December 18th

16   of 2005, no more mention whatsoever was made of any of

17   those items listed in Government's Exhibit 101?

18   A.    I don't believe so.

19   Q.    Government's Exhibit 102.  Now, this is a list

20   that I believe you testified was provided to the second

21   informant on December 22nd of 2005?

22   A.    That's correct.

23   Q.    And this is -- this meeting between the second

24   informant and Mr. Batiste would have occurred in the

25   Liberty City location?

1    A.    Yes.

2    Q.    And this is the list that depicts boot sizes.

3    Correct?

4    A.    That's correct.

5    Q.    Those boots were provided to Mr. Batiste; were

6    they not?

7    A.    Yes, they were.

8    Q.    Now, what wasn't provided to Mr. Batiste is this

9    .223, whatever that is.  Correct?

10   A.    Correct.

11   Q.    And you testified on your direct testimony that a

12   .223 is a rifle -- or an assault rifle?

13   A.    Yes.

14   Q.    At no time after December 22nd, 2005, is

15   Mr. Batiste heard in conversations with the

16   informants, in conversations with anybody -- of the

17   14,000 people -- calls that may have been generated in

18   those wires and the hundreds of hours of body wires,

19   did Mr. Batiste say, "Where is that .223 whatever that

20   I listed on December 22nd?  Where is it, sir?  I need

21   my weapon."

22   A.    The answer is "no."

23         The conversations that took place between Narseal

24   Batiste and Informant No. 2 pretty much stayed within

25   the confines of setting up meetings.

```
 1   Q.    Let's go on to what I believe to be the last and
 2   final list provided -- correct me if I'm wrong --
 3   Government's Exhibit 103-A.
 4         MS. JHONES:  Your Honor, does the Court have
 5   any remote access to narrowing this or do I have to do
 6   it from here?  So I can get the whole document in the
 7   monitor.
 8         Thank you.  I apologize.  I don't know how to
 9   do it.
10   BY MS. JHONES:
11   Q.    Now, this list, sir, three pages long, I
12   believe -- correct me if I'm wrong -- is the list that
13   you testified was provided by Mr. Batiste to the second
14   informant on the unrecorded meeting of December 29th,
15   2005.
16   A.    That's correct.
17   Q.    Now, in this list, sir, we have 20 Bushmasters,
18   again, those rifles.  Correct?
19   A.    Correct.
20   Q.    And we have DS-AR74GTC and a phone number next to
21   it.  Correct?
22   A.    That's correct.
23   Q.    Those are weapons as well?
24   A.    Yes.
25   Q.    And so are the 10 -- two Wilson 870s?
```

1    A.    Yes.

2    Q.    And then we have 20 Glocks.

3          Those are firearms, are they not, handguns?

4    A.    Yes.

5    Q.    And the list goes on, sir.

6          We have HTR-PST 26s.  What are those?

7    A.    I believe that's a rifle.

8    Q.    Five of those.  Right?

9    A.    Yes.

10   Q.    With a phone number next to it.

11         And then five TEK-9s.  Correct?

12   A.    Yes.

13   Q.    Sir, nowhere ever after December 22nd that this

14   list was provided does Mr. Batiste say to the

15   informant, "Where are my rifles?" or any of those

16   items that I have just mentioned in Government's

17   Exhibit 103-A?

18   A.    This list was provided on the 29th of December.

19   Q.    I'm sorry.

20         After the 29th of December.

21   A.    No.

22   Q.    Just so we are -- just so everything is clear,

23   sir, the other items that are listed there -- the

24   20 Nikon binoculars, the laser scope, again, 20 more

25   bulletproof vests -- those were -- the 20 bulletproof

1    vests, No. 8, in Government's Exhibit 103-A are in

2    addition to the other bulletproof vests mentioned in

3    Government's Exhibit 101?

4    A.    No.   My understanding is he wanted 20 bulletproof

5    vests.

6    Q.    He's just reminding the informant that he wants

7    those.

8          Is that your testimony, sir?

9    A.    Yes.

10   Q.    He forgot to remind the informant after

11   December 29th of 2005, didn't he, sir?

12   A.    He did not give any more lists after

13   December 29th.

14   Q.    Nor did he make any requests for weapons after

15   this list of December 29th, 2005?

16   A.    That's correct.

17   Q.    Five SUVs, Suburbans, black in color.   Correct?

18   A.    What's the question?

19   Q.    That's what's depicted on Government's

20   Exhibit 103-A?

21   A.    Yes.

22   Q.    And right beneath that, a 1997 or perhaps a 1998

23   Hummer?

24   A.    Yes.

25   Q.    Two of those?

Velazquez - CROSS - By Ms. Jhones                77

```
 1   A.     Yes.

 2   Q.     Two dirt bikes?

 3   A.     Yes.

 4   Q.     Five four-wheelers?

 5   A.     Yes.

 6   Q.     20 motorcycles?

 7   A.     Yes.

 8   Q.     Two motor campers, 20 capacity, 2000-2005?

 9   A.     Yes.

10   Q.     50,000 grand cash?

11   A.     Yes.

12   Q.     Directing your attention, sir, to the Suburbans,

13   Hummers, the four-wheelers, the dirt bikes, the

14   motorcycles:  No request whatsoever was made by

15   Mr. Batiste for those items after December 29th, 2005?

16   A.     No.  Not that I'm aware of.

17   Q.     Directing your attention to the 50 grand cash,

18   sir, let's talk about that a little bit.

19          In virtually every single telephone call,

20   meeting, between Mr. Batiste and the second informant,

21   money is mentioned by Mr. Batiste:  "Where is the

22   money?  I need to have the money."

23          Is that a fair assessment, sir?

24   A.     No.  It's not a fair assessment.

25          Money was discussed by Batiste during several
```

```
 1   meetings that occurred between one or both informants.

 2   But I think it's a mischaracterization to say that

 3   every telephone conversation there was a reference to

 4   money.  That's inaccurate.

 5   Q.    Not every conversation.

 6         The overwhelming majority of the conversations

 7   between Mr. Batiste and these informants dealt with

 8   Mr. Batiste asking for money?

 9   A.    Mr. Batiste frequently referred to the money with

10   one or both informants.

11   Q.    And, indeed, sir, in the March 16th meeting of

12   2006 -- now, this is the meeting that you testified

13   about where an oath was taken by some of the brothers

14   that are seated here today.  Correct?

15   A.    That's correct.

16   Q.    Now, in that conversation, fair to say, sir, that

17   that conversation was not played in its entirety to the

18   jury?  Correct?

19   A.    That's correct.

20   Q.    Indeed, none of the meetings between Mr. Batiste

21   and the second informant -- for example, just so we're

22   clear, 11-21-05:  That entire meeting was not played

23   for the ladies and gentlemen of the jury?

24   A.    No.  There were only clips played from a portion

25   of the entire meeting.
```

```
1    Q.     And that is so of all of these meetings that were
2    produced through your testimony.  Fair enough?
3    A.     Yes.
4    Q.     In the March 16th, 2006, meeting, Mr. Batiste
5    reminds the informant of the fact that he hasn't given
6    him the money, that he needs the money?
7    A.     There was a reference during that meeting to
8    finances.  I don't recall exactly what the specifics
9    were.
10   Q.     Reference by Mr. Batiste to money?
11   A.     That's correct.
12   Q.     There was also a reference by Mr. Batiste to the
13   Sears Tower mission; was there not?
14   A.     Yes.  I believe so.
15   Q.     On March 16th?
16   A.     Yes.  I believe so.
17   Q.     February 19th of 2006, Mr. Batiste talks about
18   the mission in Chicago, the Sears Tower; does he not?
19   A.     Yes, he did.
20   Q.     And, indeed, you testified about that in your
21   direct testimony, of -- the way Mr. Batiste explained
22   the way he was going to carry account out his mission
23   in Chicago?
24   A.     Well, that was one of the things he discussed.
25   He also talked about the mission in a broader context
```

1    in terms of recruitment.

2    Q.    And in the meeting of December 19th and in the

3    meeting of March 16th, at no time does Mr. Batiste say,

4    "Please give me my weapon.  I need it for the mission"?

5    A.    That's correct.

6    Q.    Never even mentions weapons?

7    A.    I don't believe so.

8    Q.    Now --

9          MS. JHONES:  Thank you, your Honor.  I'm

10   finished with the ELMO.

11   BY MS. JHONES:

12   Q.    The reality, Agent Velazquez, is that, from day

13   one, day one, to the final days of the so-called

14   investigation, the only thing that Mr. Batiste

15   requested repeatedly was money?

16   A.    No.  He requested support for his -- the mission

17   of his organization.  At times, he did make references

18   to finances or the need for cash in conversations with

19   Informant No. 2.

20   Q.    Thank you, Agent Velazquez.

21         MS. JHONES:  I have nothing further.

22         THE COURT:  Mr. Vereen.

23         MR. VEREEN:  Thank you, your Honor.

24                      CROSS-EXAMINATION

25

```
1    BY MR. VEREEN:

2    Q.    Agent Velazquez, good morning.

3    A.    Good morning, Mr. Vereen.

4    Q.    It was your idea to supply the boots to Narseal

5    Batiste.  Correct?

6    A.    That was a collective decision that was made.

7    But yes.

8    Q.    By the FBI?

9    A.    Yes.

10   Q.    It was also your idea or the FBI's idea to supply

11   the videocamera to Narseal Batiste?

12   A.    It was.

13   Q.    It was also your idea or the FBI's idea to supply

14   the camera chip to Narseal Batiste.  Correct?

15   A.    I believe he requested that.  But, yes, the

16   decision was made to provide him with the chip.

17   Q.    It was also your idea to supply the rental van to

18   Narseal Batiste; was it not?

19   A.    Yes.  Per his request.

20   Q.    It was your idea to supply the warehouse to

21   Narseal Batiste.  Correct?

22   A.    That's correct.

23   Q.    It was your idea to supply the $1,000 to Narseal

24   Batiste.  Correct?

25   A.    I'm sorry.  I didn't hear --
```

1    Q.      The $1,000 cash.

2    A.      Yes.

3    Q.      It was also your idea to supply the $3500 cash to

4    Narseal Batiste?

5    A.      Yes.  To bring down Sultan Kahn-Bey.

6    Q.      And it was also your idea to supply a map to

7    Chicago -- map of Chicago to Narseal Batiste.  Correct?

8    A.      No.  That map was provided to Elie Assaad to make

9    references to the United States.

10   Q.      During the meeting that he had with Narseal

11   Batiste.  Correct?

12   A.      That's correct.

13   Q.      Who was it that supplied Abbas al-Saidi with a

14   hotel room over at the Holiday Inn?

15   A.      It was the FBI.

16   Q.      The FBI.

17          And whose idea was it to give him the hotel room

18   on South Beach -- or did he have an apartment on South

19   Beach?

20   A.      I believe Abbas had an apartment on South Beach.

21   Q.      Who supplied that?

22   A.      The FBI.

23   Q.      CW No. 2 had a hotel room -- or he had a suite

24   over in the Roney on South Beach; did he not?

25   A.      Yes.

1    Q.     Who provided that?

2    A.     That was provided by the FBI as lodging for CW 2

3    while he was participating in the investigation.

4    Q.     It's a very nice hotel; is it not?

5    A.     The Roney?

6    Q.     Yeah.

7    A.     It's okay.  It's an older -- it's a condo

8    building.

9    Q.     Whose idea was it to introduce a third person

10   from Scotland Yard, the person that was supposed to be

11   the bomb expert, into this plan?

12   A.     That was a decision made collectively by the

13   agents working the investigation, including myself.

14   Q.     And whose idea was it to have Elie Assaad request

15   from Narseal Batiste photographs and video footage of

16   the Miami FBI building?

17   A.     That was -- that was the case agents, including

18   myself, assigned to the investigation.

19   Q.     And all of this was done so that you can test the

20   resolve of Narseal Batiste?

21   A.     That was one of the objectives.  Yes.

22   Q.     Let's start from your involvement in this case.

23          You initially stated you were the supervisor and

24   later became a case agent.  Correct?

25   A.     Yes.  I was the acting supervisor, filling in

1    until the permanent supervisor arrived.

2    Q.    And you started as a case agent somewhere in the

3    latter part of November, 2005.  Correct?

4    A.    Yes.  I believe so.

5    Q.    And you were aware of what had already transpired

6    in the investigation because you were, in essence,

7    leading the investigation.

8          Would you agree with that?

9    A.    No.  I was not leading the investigation.  I was

10   managing the personnel assigned to the squad, and two

11   of those agents were working this investigation.

12   Q.    That would be Agent Stewart and Agent Garbato.

13   Correct?

14   A.    That's correct.

15   Q.    And part of the process, if you will, with regard

16   to investigating any cases that the FBI has, whether

17   it's terrorism, drugs, you prepare what they call

18   FD-302s.  Correct?

19   A.    Yes.

20   Q.    Those memorialize essentially what has

21   transpired, usually on a daily basis.  Correct?

22   A.    Well, they're driven by events that occur.

23   Q.    Right.

24         And -- in other words, if there's nothing

25   transpiring, say, for instance, on January the 1st of

```
 1  whatever year, then there would be no need for an

 2  FD-302.  Correct?

 3  A.    That's correct.

 4  Q.    But then, when something transpires, say, for

 5  instance, on the 2nd, whether it's with a confidential

 6  informant or with regard to one of the targets of the

 7  investigation, there would be a 302 memorializing what

 8  actually took place.  Correct?

 9  A.    Either a 302 -- either an FD-302 or some other

10  form of documentation.

11  Q.    And that was done in this case; was it not?

12  A.    Yes.  There were many 302s created in this case.

13  Q.    And there were some 302s created by Agent

14  Stewart.  Correct?

15  A.    That's correct.

16  Q.    There were 302s created by Agent Garbato.

17  Correct?

18  A.    Yes.

19  Q.    And there were 302s prepared by yourself; were

20  there not?

21  A.    That's correct.

22  Q.    You would agree with me, would you not, that, at

23  times, you all rely on each other's 302s when you write

24  your own 302s?

25  A.    I'm not sure I understand your question.
```

```
 1   Q.    Well, if there's a 302 where you identify a
 2   subject and you've never actually seen that subject --
 3   well, let me rephrase that question.
 4         If you're looking at a videotape and you're
 5   identifying the subjects in the videotape, do you ever
 6   rely on a 302 that somebody else prepared in order to
 7   identify who that subject was?
 8   A.    Yes.  I have in the past.
 9   Q.    All right, sir.  And have you ever done that to
10   where your description was erroneous?
11   A.    My description or my identification?
12   Q.    Your identification.
13   A.    Yes.
14   Q.    And did you, in fact, do that in this case?
15   A.    I did.
16   Q.    And the person that you had misidentified on at
17   least two occasions in your 302s was Stanley Phanor.
18   Correct?
19   A.    I believe that's correct.  Yes.
20   Q.    And you identified him as Brother Ibrahim,
21   I-b-r-a-h-i-m?
22   A.    I believe that's correct.
23   Q.    And the reason why you did that is because you
24   relied on a 302 prepared by Agent Stewart that
25   contained that same information that was erroneous.
```

1          Would you agree with that?

2     A.    I'm not sure if I relied on the 302 or the

3     identification by one of the informants of the

4     individuals in that meeting.  But --

5     Q.    Well, if your 302s are dated November the 23rd,

6     2005, and November the 28th of 2005, then the person

7     that would have been doing the identifying would have

8     been CI No. 1.  Correct?

9     A.    That's correct.

10    Q.    All right.  And so, if you've identified -- if

11    you identified a person in your 302, that description

12    would have either come from another agent or it would

13    have come from CW No. 1.  Correct?

14    A.    That's correct.

15    Q.    All right.  And when did you realize that your

16    description was incorrect in those 302s?

17    A.    It was quite some time after the meeting had

18    occurred on November 21st.

19    Q.    Well, Ms. Jhones asked you during her

20    cross-examination of you last week that it was all the

21    way up until, I believe, the month of May or June of

22    2006 that you were still misidentifying Stanley Phanor.

23          Do you recall that?

24    A.    Yes.

25    Q.    Okay.  And so it was at least up until June of

Velazquez - CROSS - By Mr. Vereen                    88

```
 1   2006 -- May or June of 2006 where your identification
 2   of Stanley Phanor was still incorrect.  Correct?
 3   A.     Possibly.  Well, with regard to that meeting on
 4   November 21st, in May or June of 2006, I was aware of
 5   who Stanley Grant Phanor was in terms of the
 6   investigation.
 7   Q.     Well, did you ever write any supplementals
 8   correcting your FD-302s?
 9   A.     I did not.
10   Q.     Why not?
11   A.     I didn't.
12   Q.     Why not?  I know you didn't.  But why not?
13   A.     The purpose would be to correct something that we
14   had already identified as being a mistake.
15   Q.     Where in any 302 did you memorialize that
16   mistake?
17   A.     I did not.
18   Q.     With regard to CW No. 1, he was playing a role
19   with regard to his involvement with Narseal Batiste and
20   these gentlemen.  Correct?
21   A.     Yes.
22   Q.     And you did not write the script for him with
23   regard to what he was allowed to say and what he was
24   not allowed to say.  Correct?
25   A.     That's correct.
```

1   Q.    And so there were things that he said, whether

2   right or wrong, that he was permitted to say because of

3   the role which he played.  Correct?

4   A.    That's correct.

5   Q.    For instance, when you heard the tapes of the

6   conversations that he had in meetings with Mr. Batiste

7   where he made reference -- well, first of all, let me

8   ask you:  Are you aware of him having one of the

9   conversations where he makes reference to how he

10  advised Mr. Batiste to place a bomb in a restaurant and

11  blow up hundreds of people?  Are you aware of that

12  conversation?

13  A.    I'm familiar with that comment.  It was in the

14  context of a discussion with Narseal Batiste regarding

15  different ways in which attacks could be carried out.

16  Q.    And that was one of the ways that he suggested.

17  Correct?

18  A.    He made mention of that.  I think that was in

19  response to discussions by Batiste about putting

20  poison -- poisoning salt shakers.

21  Q.    Did you tell Mr. Abbas al-Saidi that that was

22  proper for him to suggest?

23  A.    No, I did not.

24  Q.    Now, as an informant, there are things that he's

25  allowed to do and things that he's not allowed to do.

```
 1   Correct?

 2   A.     That's correct.

 3   Q.     And he is not allowed to commit a crime unless he

 4   has the approval of the FBI.  Correct?

 5   A.     That's correct.

 6   Q.     And in his capacity as an FBI informant in this

 7   case, are you aware of any crimes that he committed?

 8   A.     Am I aware of any crimes that -- during what

 9   period?

10   Q.     The period of time where he -- from the AK-47 to

11   the smoking of the marijuana.

12          Were you aware of those two incidents?

13   A.     I was aware of the AK-47.

14   Q.     You were not aware that he was smoking any

15   marijuana?

16   A.     That's correct.

17   Q.     He did not have any approval by the FBI to smoke

18   any marijuana?

19   A.     No.  The FBI does not provide approval to smoke

20   marijuana.

21   Q.     And if he was, in fact, smoking marijuana, would

22   that have been a violation of the policies of the FBI

23   with regard to informants?

24   A.     It would have been a violation of the

25   admonishment that he was given with regard to engaging
```

```
 1   in criminal activity.

 2   Q.     And what would have been the repercussions of

 3   that?

 4   A.     It depends.  It depends on what the circumstances

 5   were surrounding the information with regard to him

 6   smoking marijuana.

 7   Q.     You mean, in other words, if he had denied it and

 8   there was no other evidence versus whether or not he

 9   confesses to it?

10   A.     Well, no.  You're asking me a hypothetical

11   question.

12          If I received information that an informant that

13   I was involved with was smoking marijuana, I would try

14   to gather as much evidence as possible to corroborate

15   that.

16          I would then talk with the informant and explain

17   that they are not allowed to smoke marijuana as it's

18   illegal and I'd make a decision based on the response

19   at that time.

20   Q.     Well, on a prior occasion, did you not receive

21   such information?

22   A.     I'm sorry?

23   Q.     Did you not receive such information, that he had

24   been smoking marijuana?

25   A.     I did not become aware of information regarding
```

```
 1  Abbas and marijuana till this -- the investigative
 2  portion of this case was over.
 3  Q.    Well, he's still working as an FBI informant on
 4  your behalf; is he not?
 5  A.    At what point?
 6  Q.    Up to today.
 7  A.    I don't believe he is open as an informant with
 8  the FBI.
 9  Q.    Well, is he closed out as an informant for the
10  FBI?
11  A.    He was previously an informant for the FBI.  I do
12  not believe that is his status at the moment.
13  Q.    Okay.  Is he able to come back as an informant
14  with the FBI?
15        MS. ARANGO:  Objection.  Relevance.
16        THE COURT:  Sustained.
17  BY MR. VEREEN:
18  Q.    Well, when this information came to your
19  knowledge with regard to him smoking marijuana, what,
20  if anything, did you do?
21  A.    What did I do?
22  Q.    Yes.
23  A.    I had a discussion with another agent, and I
24  believe that agent had a discussion with Abbas.
25  Q.    Was there any type of disciplinary action taken
```

Velazquez - CROSS - By Mr. Vereen                    93

```
 1    against him as a result of that?
 2    A.    Not that I'm aware of.
 3    Q.    Okay.  Now, you are familiar with the meetings --
 4    all the meetings that took place between CW No. 1 and
 5    Narseal Batiste.  Correct?
 6    A.    Yes.
 7    Q.    All right.  There was -- as well as the other
 8    gentlemen seated here at this table.  Correct?
 9    A.    That's correct.
10    Q.    All right.  Now, there was a meeting on November
11    the 7th of 2005 where CW No. 1 was riding in a vehicle
12    with Burson Augustin.  Correct?
13    A.    That's correct.
14    Q.    And are you familiar with that conversation?
15    A.    I am.
16    Q.    I think you've actually testified about it
17    before; have you not?
18    A.    I have.
19    Q.    That is Government's Exhibit 41.
20          There were words that were used during that
21    conversation, such as "Islam" and "jihad."
22          Do you recall that?
23    A.    Yes.
24    Q.    Now --
25               MS. ARANGO:  Objection, Judge.  Outside the
```

 1    scope of direct.  I don't believe that this was

 2    introduced into evidence.  It's hearsay, also.

 3              THE COURT:  Sustained.

 4    BY MR. VEREEN:

 5    Q.    Well, there was such a meeting, though, correct,

 6    between the two of them?

 7    A.    There was a meeting on November 7th between Abbas

 8    and Burson Augustin.

 9    Q.    All right.  Stanley Phanor was not present.  He

10    was not part of that conversation, was he?

11    A.    No.  I don't believe so.

12    Q.    All right.  November the 10th, 2005:  That was a

13    meeting where Narseal Batiste went over to CW No. 1's

14    house for the first time -- his apartment.

15          Do you recall that?

16    A.    I don't recall the specific date of

17    November 10th.  However, there may be a report I could

18    refer to regarding a meeting at Abbas's apartment on

19    November 10th.

20              MR. VEREEN:  May I have one moment, Judge?

21              42 is not in evidence, Judge.  I'll move on.

22    BY MR. VEREEN:

23    Q.    With regards to November the 21st of 2005, do you

24    recall that meeting between Narseal Batiste and CW

25    No. 1?

 1   A.      Yes.

 2   Q.      Okay.  And that was the date that you had

 3   memorialized Stanley Phanor being present in your 302.

 4   Correct?

 5   A.      That's correct.

 6   Q.      And Stanley Phanor was not present, was he?

 7   A.      He was not.

 8   Q.      You were asked during your direct examination if

 9   you had studied or research the Black P. Stone Rangers.

10           Do you recall that?

11   A.      Yes.

12   Q.      And your testimony was that you had; did you not?

13   A.      Yes.

14   Q.      And Jeff Fort -- you studied up on Jeff Fort?

15   A.      Yes.

16   Q.      During that conversation on November the 21st,

17   2005, Narseal states to CW No. 1 that he was a leader

18   of the Blackstone Rangers.

19           Do you recall that conversation?

20   A.      I recall the conversation.  I don't recall what

21   the specific reference was to the Black P. Stone

22   Rangers.  But I do recall that it was mentioned by

23   Narseal Batiste in that meeting.

24   Q.      Now, the Black P. Stone Rangers started in 1968

25   by Jeff Fort.  Correct?

1    A.    I believe it was earlier than that.  And I

2    believe it was started by Jeff Fort and Eugene

3    Hairston, who was actually above Jeff Fort.

4    Q.    Now --

5    A.    He was actually the original leader.

6    Q.    All right.  You are aware that Narseal Batiste

7    was not born until 1974.  Correct?

8    A.    I know he was born after 1968.

9    Q.    And one of the things that was talked about doing

10   was corroborating information that had been provided to

11   you by CW No. 1 and/or CW No. 2.  Correct?

12   A.    And information that was developed during the

13   investigation from the meetings with Batiste and other

14   members of his organization.

15   Q.    Well, when CW No. 1 gave you descriptions of

16   individuals, were you able to corroborate that?

17   A.    Sometimes we were, and sometimes we weren't.

18   Q.    Well, CW No. 1 identified the person he knew as

19   Brother Naz.

20         Narseal Batiste is the person that you later

21   determined Brother Naz was.  Correct?

22   A.    Yes.

23   Q.    Didn't he identify him as being 6 foot, 4 inches,

24   tall or 6 foot, 5 inches, tall?

25   A.    I forgot what the physical -- I don't recall what

1    the physical description that Abbas al-Saidi provided

2    was.

3    Q.    Would anything refresh your recollection?

4    A.    There's probably a report that documents an

5    interview wherein Abbas may have provided a physical

6    description of --

7    Q.    You don't recall offhand whether or not he ever

8    identified Narseal Batiste to you?

9    A.    That's correct.

10   Q.    You may have read a 302?

11   A.    That's correct.

12   Q.    And that would be what he told someone else.

13   Correct?

14   A.    That's correct.

15   Q.    All right.  There were driver's license

16   photographs that were used to identify some, if not

17   all, of the Defendants in this case.  Correct?

18   A.    That's correct.

19   Q.    Stanley Phanor's driver's license photograph was

20   never used to identify him by anyone, was it?

21   A.    I'm uncertain.

22   Q.    Do you recall ever seeing a driver's license

23   photograph of Stanley Phanor?

24   A.    I don't recall.

25   Q.    When the Government's case began, they put before

 1  you Government's Exhibits 1 through 6.

 2       Do you recall that?

 3  A.    Yes, I do.

 4  Q.    And you were -- you testified as to the

 5  photographs and where those photographs came from.

 6  Correct?

 7  A.    Some of the photographs.  I believe there was one

 8  or two that I was uncertain of the origin.

 9  Q.    And one is Government's Exhibit No. 6, the

10  photograph of Stanley Phanor; is it not?

11  A.    Yes.  I recall that photograph, and I do not

12  believe that is a driver's license photo of Stanley

13  Phanor.

14  Q.    Throughout your investigation, you never actually

15  saw a driver's license photo of Stanley Phanor because

16  the FBI never had one.  Correct?

17  A.    I'm uncertain if I saw a photograph of -- a

18  driver's license photo of Stanley Phanor.

19  Q.    Did you ever read an FD-302 indicating that

20  Stanley Phanor had been identified by CW No. 1 through

21  a driver's license photograph?

22  A.    I may have.

23  Q.    Have you reviewed all the 302s in this case?

24  A.    At one point or another, I have.

25  Q.    During the investigation, the FBI tried to

```
 1   identify individuals that met at the Embassy by the use
 2   of driver's license tag numbers, correct -- I mean, the
 3   tags on the vehicles?
 4   A.    That was one of the ways we tried to identify
 5   people.
 6   Q.    Right.
 7         And Stanley Phanor was not identified through the
 8   use of any auto tag, was he?
 9   A.    I'm uncertain whether he was or he wasn't.
10   Q.    Do you recall what type of vehicle Stanley Phanor
11   drove?
12   A.    Yes.  I believe -- I believe Stanley Phanor drove
13   a white Jeep Cherokee.
14   Q.    And isn't it a fact that that Cherokee was
15   registered to his mother and not Stanley Phanor?
16   A.    I'm uncertain who the vehicle was registered to.
17   I don't remember who the vehicle was registered to.
18   Q.    Does the name Elazine Phanor ring a bell?
19   A.    No.
20   Q.    No?
21         MR. VEREEN:  The Court's indulgence.
22         I'll move on.
23   BY MR. VEREEN:
24   Q.    On December the 16th of 2005 -- that is the night
25   that Narseal Batiste met with CW No. 2 for the first
```

1    time.  Correct?

2    A.    That's correct.

3    Q.    And this was at the Radisson Inn?

4    A.    Yes.

5    Q.    And there was no wiretap up at that time.

6    Correct?

7    A.    That's correct.

8    Q.    And so you were not able to memorialize any

9    conversations that Narseal Batiste may or may not have

10   had with any of these gentlemen seated here at the

11   defense table.  Correct?

12   A.    Outside of the presence of either informant,

13   that's correct.

14   Q.    Well, the only person that was present with a

15   body wire on was CW No. 2.  Correct?

16   A.    On December 16th, that's correct.

17   Q.    Did he have a body wire on or did he just -- did

18   you have the camera going on with audio?

19   A.    No.  He did not have a body wire on.

20   Q.    So there was a camera with audio in the room?

21   A.    That's correct.

22   Q.    And no other Defendant was present at that

23   meeting.  Correct?

24   A.    That's correct.

25   Q.    And you do not know what, if anything, was told

 1   to any of these Defendants by Narseal Batiste after

 2   that meeting, do you?

 3   A.    No.

 4   Q.    And you do not know what was told, if anything,

 5   to any of these Defendants before the December 16th,

 6   2005, meeting.  Correct?

 7   A.    That's correct.

 8   Q.    In between December the 16th and the 21st, there

 9   were two other meetings, one on the -- 12-18-2005

10   between Narseal Batiste and CW No. 1 at the Embassy.

11   Correct?

12   A.    There was a meeting on December 18th with CW 1.

13   Q.    That meeting was not audiotaped, was it?

14   A.    It was not.

15   Q.    And it was not videotaped?

16   A.    No.

17   Q.    And so the only information that we have as to

18   what took place would have been as -- it would have

19   come from CW No. 1.  Correct?

20   A.    That's correct.

21   Q.    And CW No. 1 advised you and the other agents as

22   to what took place during that meeting.  Correct?

23   A.    That's correct.

24   Q.    And then you memorialized in some type of 302?

25   A.    Correct.

1    Q.    And then, on 12-19-2005, there was another

2    meeting.  Correct?

3    A.    Yes.

4    Q.    That was when the second list was provided?

5    A.    Yes.

6    Q.    All right.  Was that audiotaped?

7    A.    I'm sorry.  I think that was the third list,

8    because on the meeting between Abbas and Batiste on the

9    18th, there was a list provided to Abbas.  Then there

10   was a meeting with Elie and Batiste on the 19th, the

11   next day.

12   Q.    And I think Ms. Jhones asked you.

13         You did not request these particular lists.

14   Correct?

15   A.    I did not.

16   Q.    This was something that was done between CW No. 2

17   and Mr. Batiste?

18   A.    This was --

19   Q.    CW No. 1.

20         The first two lists -- well, let's back up.

21         CW No. 1 -- the list he provided was the one that

22   was on 12-18 or 12-19?

23   A.    He obtained the list on 12-18.  I debriefed him

24   on 12-19, and that's when I got the list from CW 1.

25   Q.    So the first list was given to CW No. 2?

```
1    A.      That's correct.

2    Q.      The second list was given to CW No. 1?

3    A.      That's correct.

4    Q.      And the third list was given to CW No. 2?

5    A.      Yes, sir.

6    Q.      Did you ever advise CW No. 2 to suggest to

7    Narseal Batiste to open up a bank account?

8    A.      I did.

9    Q.      Why?

10   A.      The purpose of that was -- what we were hoping to

11   do was use the transfer of monies that we were going to

12   provide to Batiste in the hopes of identifying other

13   people in the organization in Chicago.

14           So the idea was for Narseal Batiste to open bank

15   accounts and then transfer monies to, hopefully, other

16   members of the organization in Chicago and that would

17   provide us an opportunity to identify these members and

18   possibly other information related to them.

19   Q.      That did not happen, did it?

20   A.      It did not it happen.

21   Q.      Why not?

22   A.      Why do I think it didn't happen?

23   Q.      Well, did you provide the money?

24   A.      No.  We did not give Narseal Batiste the money to

25   open the bank accounts or make transfers.
```

```
 1   Q.    How much was supposed to be given?

 2   A.    There wasn't a discussion as to a specific

 3   amount.

 4   Q.    Well, he requested $50,000.  Right?

 5   A.    He requested $50,000 on one of the lists.

 6   Q.    And were you going to provide that $50,000?

 7   A.    Were we going to give Narseal Batiste $50,000?

 8   No.  If we had bank accounts that were opened, we

 9   were -- we intended to provide money to Narseal

10   Batiste.

11         It wasn't going to be $50,000, but it would have

12   been enough to make transfers, hopefully, to other

13   members of the organization.

14   Q.    Well, what stopped the FBI from transferring any

15   money to the bank account that Mr. Batiste already had?

16   A.    Sorry?

17   Q.    What stopped the FBI from transferring to the

18   bank account Mr. Batiste already had?

19   A.    Well, we wanted Mr. Batiste to open up an account

20   and have accounts opened in Chicago where he would be

21   able to transfer the money to other members of his

22   organization that he made reference to in prior

23   meetings.

24   Q.    Because, at that time, you were under the belief

25   that Narseal Batiste had 5,000 soldiers in Chicago.
```

1    Right?

2    A.    I was not under the belief that Narseal Batiste

3    had 5,000 soldiers.  He made a reference to having

4    access to 5,000 soldiers.

5         At that time, we knew of at least seven people

6    here in Miami and at least three people -- possibly

7    three people in Chicago, as well as references to other

8    associates in Louisiana and other parts of the country.

9    Q.    The three people you're making reference to in

10   Chicago was Brother Malik.  Right?

11   A.    That's one.  Yes.

12   Q.    Sultan Kahn-Bey?

13   A.    That's correct.

14   Q.    And his wife?

15   A.    That's correct.

16   Q.    Those are the three people you're making

17   reference to?

18   A.    No.  There was another -- there was a reference

19   in some telephone calls where Sultan Kahn-Bey had other

20   brothers from California that he made reference to.  We

21   didn't know who those people were at the time.

22   Q.    That was a conversation that you picked up

23   between Narseal Batiste and Stanley Phanor where they

24   were talking about some photographs that had been taken

25   of the brothers and sent over to California.  Right?

```
 1   A.    No.   That's one of the conversations that took

 2   place with regard to other brothers in Chicago, but

 3   there were conversations between Narseal Batiste and

 4   Sultan Kahn-Bey referencing other brothers that he was

 5   rolling with in Chicago.

 6             MR. VEREEN:  With the Court's indulgence.

 7   BY MR. VEREEN:

 8   Q.    You do recall the conversation between Stanley

 9   Phanor and Narseal Batiste -- I believe it was on April

10   the 2nd.

11        Do you recall that?

12   A.    Yes.

13   Q.    Was that the correct date, April 2nd?

14   A.    I'm uncertain if it was April 2nd.  It sounds --

15   it was early April.

16   Q.    Let me find it for you.

17        This is Wire 1-02655-T.

18        Do you have that transcript in front of you,

19   Agent?

20   A.    Yes, I do.

21   Q.    Now, this was a conversation that took place

22   between Stanley Phanor and Narseal Batiste on April

23   the 2nd, 2006.  Correct?

24   A.    That's correct.

25   Q.    And what was the time of this conversation?
```

```
 1   A.      11:53.

 2   Q.      Is that a.m.?

 3   A.      Yes.

 4   Q.      And on Page 3, Narseal Batiste -- and this is the

 5   fourth "NB" indication from the top, where it says "NB"

 6   and then it says, "Yeah.  I talked to Sultan."

 7           Correct?

 8   A.      Yes.

 9   Q.      And Stanley Phanor responds, "Oh, yeah?"

10           Narseal Batiste says, "Yeah.  He said that he --

11   he said he gonna -- he gonna sit down on the table and

12   talk about it."

13           Stanley Phanor responds, "That's great, Mo."

14           Narseal Batiste then says, "Yeah.  Yeah.  He

15   don't know if I was gonna come off on him negative or

16   whatever 'cause I said I talked to him.  I said,

17   'Yeah.'  I said, 'Remember them pictures you took of

18   our men --'"

19           And Stanley Phanor says, "Uh-huh."

20           And then Narseal Batiste says, "'-- and where you

21   sent them at?'"

22           Stanley Phanor says, "Yeah."

23           Narseal Batiste says, "Yeah.  He said, 'Yeah.'"

24           Stanley Phanor says, "Huh-uh."

25           Then he says, "Yeah.  Then he didn't say
```

```
 1   nothing."
 2          And Stanley Phanor laughs.
 3          Correct?
 4   A.     Yes.
 5   Q.     Okay.  And then Narseal Batiste says to Stanley
 6   Phanor that -- he says, "I guess he said how you
 7   thought I was gonna say -- I said, 'Well, who told you
 8   to do some' -- expletive -- "'like that?'"
 9          Correct?
10   A.     Yes.
11   Q.     All right.  Go to Page 5, if you will.
12          Stanley Phanor, in the middle of that page, says,
13   "Oh, man.  He don't -- well, he don't know -- he don't
14   know the full story, what's going on, how we done
15   advanced and training in the jobsite and everything."
16          Do you recall that statement?
17   A.     Yes.
18   Q.     He's talking about Azteca?
19   A.     Sorry?
20   Q.     He's talking about Azteca Stucco & Masonry; is he
21   not?
22   A.     Among other things.  This reference --
23   Q.     That particular reference, yeah.  That particular
24   reference.
25   A.     This reference, in terms of the jobsite, is -- I
```

 1   interpret it as the construction work they were doing.

 2        In terms of the training and the advancement that

 3   they have been making, that's in reference to the

 4   developments that have been occurring with the

 5   organization down here and their association or new

 6   introduction to Elie Assaad.

 7   Q.   Well, I don't think he -- he stated training with

 8   regard to military.  He said "training in the jobsite."

 9   A.   That's correct.

10   Q.   Okay.  And the jobsite he's talking about is

11   Azteca Stucco & Masonry; is he not?

12   A.   I believe that to be true.  But with respect to

13   this excerpt from the telephone conversation, you asked

14   me what my opinion was.

15   Q.   Okay.

16   A.   He's making a reference to the developments that

17   have occurred not just with the jobsite, but the

18   advancements that the organizations have made as it

19   pertains to CW 2.

20   Q.   That's what your belief is?

21   A.   That was my interpretation, and that's my belief

22   in response to your question.

23   Q.   Right.

24        That's your interpretation as to what you believe

25   Stanley Phanor was talking about.  Correct?

1   A.     That's correct.

2   Q.     All right.  Now, you cannot read his mind, can

3   you?

4   A.     No.

5   Q.     All right.  Now, let's back up to where Narseal

6   Batiste says he told Sultan Kahn-Bey, "Who told you to

7   do some" -- expletive -- "like that?"

8          Do you recall that conversation?

9   A.     I do.

10  Q.     And he's referring to the conversation that took

11  place between him and Sultan Kahn-Bey on that same day,

12  a couple hours earlier, which is Government's

13  Exhibit W1-02645-T.

14         Do you have that conversation in front of you?

15  There's one right before that, the last one in the

16  binder.

17  A.     Yes.

18  Q.     All right.  Narseal does bring up the pictures in

19  that conversation, does he not, on Page 4?  At the

20  bottom of Page 4.

21          MS. ARANGO:  Judge, may I just ask:  Are we

22  talking about the call with Stanley Phanor or the call

23  with --

24          MR. VEREEN:  Sultan Kahn-Bey.

25          MS. ARANGO:  Okay.

```
 1    BY MR. VEREEN:

 2    Q.     The bottom of Page 4, where it says, "Mo.  Mo,

 3    let me ask you a question, 'cause you remember.

 4    Remember the last -- the time the brothers went up

 5    there and they said that they had -- they went ahead

 6    and did -- took the pictures and everything and those

 7    pictures were gonna be sent over there?

 8          "Because -- the reason why I'm bringing this up,

 9    because I got them -- them boys over there.  They've

10    been talking to me and they want to get down with us.

11          "And the thing about it is, I don't want to make

12    any moves on that yet until I first consult with you."

13    A.     Yes.

14    Q.     Nowhere in that conversation did he ever say to

15    Sultan Kahn-Bey, "Who told you to do some 'S' like that

16    as far as sending the pictures over to California, if

17    that's where they were sent?"

18    A.     I don't believe the pictures were sent to

19    California.  This is a reference to a trip by Narseal

20    Batiste and members of his organization to Chicago,

21    where pictures were taken.  He's talking around the

22    subject.

23          The pictures were sent over there.  And then

24    Narseal Batiste makes the relationship between that

25    event and Elie Assaad in reference to, "Those boys over
```

1  there, they want to" -- let me say exactly what he says

2  here -- "they've been talking to me and they want to

3  get down with us."

4        That's a reference to Elie Assaad.

5  Q.    That's your interpretation?

6  A.    Yes.

7  Q.    When were pictures ever sent to Yemen?

8  A.    I'm sorry?

9  Q.    When were pictures ever sent to Yemen, based on

10 your interpretation?

11 A.    I don't know when Sultan Kahn-Bey sent the

12 pictures to wherever he sent them.  But Narseal Batiste

13 makes the reference between pictures that were taken,

14 Sultan sending those pictures somewhere over there and

15 Elie Assaad, who's representing Al-Qaeda.

16 Q.    Well, did Sultan ever have contact with CW No. 1?

17 A.    No.

18 Q.    Did Sultan ever have contact with CW No. 2?

19 A.    No.

20 Q.    So who could he have sent pictures to in Yemen?

21 A.    I have no idea.  I'm not suggesting he sent the

22 pictures to Yemen.

23 Q.    Well, who are you suggesting he sent the pictures

24 to, Agent Velazquez?

25 A.    Whoever he sent the pictures to -- there's a

```
 1   direct relationship between Elie Assaad and his

 2   representation of Al-Qaeda and whoever Sultan Kahn-Bey

 3   sent the pictures to.

 4   Q.    The truth of the matter is you don't know.

 5   A.    No.  I don't know exactly who he sent them to.

 6   Q.    And so you sit here making an interpretation and

 7   then try to connect it with Elie Assaad and Abbas

 8   al-Saidi.

 9   A.    No.  I'm responding to your question as to what

10   this excerpt of the phone call meant.

11   Q.    Well, you said the picture weren't sent to

12   California.

13   A.    I don't believe the pictures were sent to

14   California.

15   Q.    Why not?

16   A.    Because there's a reference in this conversation

17   between -- there's a relationship that's made between

18   pictures being sent and the fact that, "Those boys over

19   there want to get down with us and they've been talking

20   to me."

21         That "they've been talking to me" is Elie Assaad

22   and the alliance that is in the process of being

23   established between Al-Qaeda and the Moorish Science

24   Temple run by Narseal Batiste.

25   Q.    Agent Velazquez, are you aware that the last trip
```

1    that any of these gentlemen took to Chicago was in the

2    year 2004?

3              MS. ARANGO:  Objection.  Hearsay.

4              MR. VEREEN:  I'm asking is he aware.

5              THE COURT:  Sustained.

6              Rephrase your question.

7    BY MR. VEREEN:

8    Q.    Do you know when it was that these gentlemen took

9    a trip, not all of them, some of them, to the trip --

10   to Chicago and took pictures?

11   A.    I'm aware of information that they were in

12   Chicago in August or September of 2005.

13         They drove from Miami to meet with Master Athea.

14   Once in Chicago, they could not find Master Athea and

15   found out he was in Alabama.

16         They then drove from Chicago to Alabama and

17   eventually met up with Master Athea.

18         While they were with Master Athea, there were

19   meetings held and some sort of training.

20         So my understanding is that they were in

21   Chicago -- or they took a trip to Chicago as late as

22   August or September of 2005, I believe.

23   Q.    Who took a trip?

24   A.    Narseal Batiste, and I believe Patrick Abraham

25   was mentioned and Naudimar Herrera --

```
 1              MR. LEVIN:  Judge, I'm going to object.
 2   Reserve a motion.
 3              THE COURT:  Overruled.
 4              MR. LEVIN:  It's also speculation, "I
 5   believe."
 6              THE COURT:  Overruled.
 7   BY MR. VEREEN:
 8   Q.    Do you know for a fact?
 9   A.    Do I know for a fact?  No.
10         I have information that this trip was taken by
11   Narseal Batiste and members of the organization, some
12   of which sit here in the courtroom today, from Miami to
13   Chicago to look for Master Athea and later on they met
14   with Master Athea in Alabama.
15   Q.    Throughout your testimony, you've testified a lot
16   as to what you believe.  Correct?
17   A.    Yes.
18   Q.    You'd agree with me, would you not, Agent
19   Velazquez, that this was a sloppy investigation?
20   A.    I would not agree with that.
21   Q.    You have a vested interest in the outcome of this
22   case?
23   A.    No.  My job is to gather evidence, present it to
24   the US Attorney's Office and, in some cases, to the
25   Court, which is what I did.
```

1   Q.    You do not have a vested interest in the outcome

2   of this case?

3   A.    That's for the jury to decide.

4   Q.    Well, on March 16th, there was a conversation --

5   or a meeting where this oath or this bayat was

6   performed by CW No. 2.  Correct?

7   A.    Yes.

8   Q.    And there's a transcript of that meeting, which

9   is Government's Exhibit 69-B.

10        Do you recall that?

11  A.    I recall the transcript.  I'm uncertain as to the

12  exhibit number.  But I do remember the transcript.

13  Yes.

14        MR. VEREEN:  May I approach the witness, your

15  Honor?

16        THE COURT:  Yes.

17        MR. VEREEN:  (Tenders document to the

18  witness.)

19        THE WITNESS:  Yes.  Government's Exhibit 69-B

20  is a typed transcript of the meeting from March 16th,

21  2006.

22  BY MR. VEREEN:

23  Q.    Now, you've testified in different proceedings

24  about this same transcript on at least two other

25  occasions; have you not?

```
 1              MS. ARANGO:  Objection.  Relevance.

 2              MR. VEREEN:  We can get to it.

 3              THE COURT:  Sustained.

 4    BY MR. VEREEN:

 5    Q.     Well, on March 16th, when this so-called bayat

 6    was being performed, the transcript indicates, if you

 7    will -- I believe it's on Pages 18 -- the speakers.

 8    Correct?

 9    A.     Yes.

10    Q.     And it was your testimony that these transcripts

11    were accurate.  Correct?

12    A.     Yes, to the best of my ability.

13    Q.     To the best of your ability.

14           This transcript was changed, was it not, with

15    regard to Page 18 in the speaker regarding Stanley

16    Phanor?

17    A.     I believe so.

18    Q.     When was that changed?

19    A.     I'm uncertain.

20    Q.     Did you change it?

21    A.     I did not.

22    Q.     You did not change it?

23    A.     I did not.

24    Q.     Do you know who did?

25    A.     No, I do not.
```

```
 1    Q.     The words in the middle of the paragraph -- in

 2    the middle of page, where it says after -- Stanley

 3    Phanor says, "Can you wait one second?" -- do you see

 4    that?

 5    A.     I do.

 6    Q.     Narseal Batiste says, "Huh?"

 7           And then it has Stanley Phanor saying, "I believe

 8    it's all right?"

 9           Do you see that?

10    A.     Yes.

11    Q.     Previously, this same transcript just had,

12    "(Unintelligible) it's all right?"

13           Correct?

14    A.     I'm uncertain what the previous transcript

15    reflected.

16    Q.     Well, you do know for a fact that that transcript

17    was changed to add the words "I believe it's all

18    right?"

19           Correct?

20    A.     No.

21    Q.     You don't agree with that?

22    A.     No.  I'm saying I don't know if that's what was

23    actually changed.  I don't....

24              MR. VEREEN:  May I approach, your Honor?

25              MS. ARANGO:  Judge, I would object as
```

```
 1   relevance grounds.

 2           MR. VEREEN:  Well, it's relevant to show that

 3   this transcript was --

 4           THE COURT:  Come on up, please.

 5           (Whereupon, proceedings were had at side-bar

 6   outside the presence of the jury which have been sealed

 7   per instructions of the Court.)

 8           (Whereupon, the following proceedings were had

 9   in open court:)

10           THE COURT:  Sustained.

11   BY MR. VEREEN:

12   Q.    Agent Velazquez, did you listen to each word in

13   this conversation when you reviewed the transcript

14   that's before you?

15   A.    At different times.  With regard to this

16   transcript here, there were changes made from a

17   previous transcript.  Those changes were pointed out to

18   me.

19         I listened to the portion of the tape and I

20   agreed with the changes that had been made with regard

21   to the transcript.

22   Q.    Are you telling this jury, on Page 18, where it

23   is --

24           MS. ARANGO:  Objection.  Argumentative.

25           THE COURT:  I need to hear the question first.
```

1              MR. VEREEN:  Thank you.

2    BY MR. VEREEN:

3    Q.    With regard to the entry where it says in the new

4    transcript, "I believe (unintelligible) it's all

5    right?", did you hear the words "I believe"?

6    A.    I don't recall which portions.  But I'm happy to

7    listen to that and give you my opinion, as I sit here.

8              But if this portion was one of the portions that

9    was changed in the previous transcript, then my answer

10   is "yes."

11   Q.    Well, you swore that this transcript was

12   accurate.  Correct?

13   A.    Yes.  Accurate to the best of my ability.

14             My experience with working transcripts -- I've

15   reviewed thousands of transcripts -- if I were to

16   review this transcript again today, I would probably

17   find a correction or two.

18   Q.    How can you even use the words, "I believe it's

19   all right?" in question format?

20             MS. ARANGO:  Objection.  Argumentative, Judge.

21             THE COURT:  Sustained.

22   BY MR. VEREEN:

23   Q.    Also in the transcript, it makes reference to

24   "All" as being the speakers; does it not?

25   A.    I believe there's parts of the transcript that

 1   reflect "All," indicating everyone is --

 2   Q.    You would agree with me that, for the majority of

 3   the transcript -- or the majority of the videotape,

 4   Stanley Phanor was not visible on the screen, was he?

 5   A.    That's -- I would agree with that.

 6   Q.    And, therefore, whoever is looking at this

 7   videotape, identifying who the speakers are, would

 8   either, one, have to know the voice of the speaker to

 9   be able to identify the speaker.  Correct?

10   A.    Yes.

11   Q.    Or see the person on the screen speaking.

12   Correct?

13   A.    Or review the tape and, through deductive

14   reasoning, determine, based on those two factors,

15   whether or not that person actually made the statement.

16   Q.    And so, when looking at this particular

17   videotape, the person -- when you have "All," that

18   means everybody speaking at one time.  Correct?

19   A.    Yes.

20   Q.    Okay.  And you would agree with me that, if

21   Stanley Phanor was not visible on the screen, that he

22   should not then be included in the word "All" as a

23   speaker.  Correct?

24   A.    That's a good point.  And my answer -- I think my

25   answer is that the "All" indicates that everyone is

1    talking.

2         Would I be able to tell if Stanley Phanor is

3    talking along with everyone else?  The answer would be

4    "no."

5    Q.    So you would agree with me, then, that Stanley

6    Phanor should not be included in the word "All"?

7    A.     Well, I'm not sure if I agree with that.

8    Q.     Well, do you recall me asking you that very same

9    question back on February the 12th, 2008, and you

10   giving this answer?

11        "Question:  And if Stanley Phanor is not in the

12   view of the camera, how is it that Stanley Phanor is

13   represented in the word 'All'?"

14        Your answer being, "Well, again, that's based on

15   my review.  If Stanley Phanor is not within the view --

16   the camera view of when everyone in the room is saying

17   anything, then I would agree that I would not be able

18   to say that Stanley Phanor was included in the 'All.'"

19        Do you recall me asking that question and you

20   giving that answer?

21         MS. ARANGO:  I would object.  It's an improper

22   impeachment.  There's no prior inconsistent statement

23   based on his review.

24         THE COURT:  Overruled.

25

BY MR. VEREEN:

Q.     Do you recall me asking you that question and you giving that answer, sir?

A.     Yes.  And I believe that's the answer I gave here.

       Your previous question was whether I agree that Stanley Phanor should be removed from the "All" as indicated in the transcript.

Q.     That wasn't my question.

A.     I recall that being your question -- your last question.  Yes.

Q.     Okay.  And your answer?

A.     I'm not certain about that.

Q.     You're not certain about that.

A.     I'm not certain if I agree with that assessment.

Q.     Okay.  Well, you clearly didn't hear Stanley Phanor's voice saying anything, did you, other than his name when he walked in the middle of the room and said his name?  Correct?

A.     From what appears in the transcript, there was -- prior to the oath being given, there was a section of the transcript where Stanley Phanor does say something.

Q.     He says, "Can you wait a second?"  "Can you wait one second?" is what he says to Narseal Batiste.  Right?

1    A.      I believe that's correct.  Yes.

2    Q.      And that is when CW No. 2 wants to read some type

3    of commitment.  Correct?

4    A.      I think -- I believe that's correct.  Yes.

5    Q.      And you've never intercepted any phone

6    conversations between Narseal Batiste and Stanley

7    Phanor indicating what was going to take place on

8    March the 16th, 2006.  Correct?

9    A.      Not with regard to the oath.  But there were

10   phone calls intercepted between Narseal Batiste and

11   Stanley Phanor regarding countersurveillance prior to

12   going into the meeting.

13   Q.      With regard to what the meeting was going to be

14   about, is my question.

15           There was no conversations intercepted with

16   regard to the nature of the meeting.  Correct?

17   A.      No.  But that was not your previous question.

18   Q.      Did you intercept any conversations between

19   Narseal Batiste and Stanley Phanor indicating what the

20   meeting on March the 16th, 2006, was going to be about?

21   A.      No.

22   Q.      The videocamera in the warehouse that evening was

23   being operated by whom?

24   A.      The videocamera at the warehouse was being

25   operated by agents at the FBI office in the monitoring

1    room.

2    Q.    All right.  So you all had the opportunity to

3    turn it on and turn it off.  Correct?

4    A.    That's correct.  Yes.

5    Q.    All right.  And the decision to turn it off was

6    because -- on March the 16th, 2005, was because the CI

7    was no longer inside the warehouse?

8    A.    That's correct.

9    Q.    You're not aware of what conversations took place

10   with Narseal Batiste and the other gentlemen, excluding

11   Patrick Abraham, after this confidential informant left

12   the warehouse, are you?

13   A.    No.

14   Q.    On March the 25th, 2006, there were photographs

15   that were taken that the Government introduced into

16   evidence.  Correct?

17   A.    Yes.

18   Q.    Were you part of the surveillance team that day?

19   A.    I was not.

20   Q.    So you don't know who took the pictures, do you?

21   A.    Yes.  It was Narseal Batiste, Stanley Phanor,

22   Rotschild Augustine at the downtown location.

23   Q.    And which agent identified Stanley Phanor as

24   holding the camera in his hand?

25   A.    I don't recall anybody identifying Stanley Phanor

1    holding a camera in his hand.

2    Q.    Okay.  Well, the term "taking pictures" means the

3    person who was the photographer when I asked the

4    question.

5    A.    Okay.

6    Q.    In fact, there was no agent that identified

7    Stanley Phanor as being the person who was taking

8    pictures.  Correct?

9    A.    That's correct.

10   Q.    Let me just ask you:  Was there ever any

11   ammunition requested by Narseal Batiste?

12   A.    Not that I'm aware of.

13   Q.    Any dynamite?

14   A.    No.

15   Q.    Any explosives?

16   A.    No.

17   Q.    Any detonators?

18   A.    No.

19   Q.    On the videotape, you indicated that there was

20   another person that you identified as another

21   individual.

22         Do you recall that?

23   A.    Which videotape?

24   Q.    Of the bayat, March the 16th, 2006.

25   A.    Yes.

1   Q.     That other person that you're referring to as

2   another individual is Lyglenson Lemorin.  Correct?

3   A.     Correct.

4   Q.     Known as Brother Levi-El?

5   A.     That's correct.

6   Q.     That's not any of these individuals sitting in

7   this courtroom.  Correct?

8               MS. ARANGO:  Objection.  Relevance.

9               THE COURT:  Sustained.

10  BY MR. VEREEN:

11  Q.     Do you recall a conversation on May the 24th,

12  2006, between Narseal Batiste and Confidential Witness

13  No. 2?

14  A.     I do.

15  Q.     And that was a conversation where Mr. Batiste was

16  advising CW No. 2 that everyone had gone their own

17  separate way?

18              MS. ARANGO:  Objection.  Hearsay.

19              THE COURT:  Sustained.

20              MR. VEREEN:  I might be finished, your Honor.

21  Let me just double-check.

22              THE COURT:  Okay.

23              MR. VEREEN:  That's all the questions I have,

24  your Honor.  Thank you very much.

25              THE COURT:  We're going to break for lunch.

1        Do not discuss this case either amongst

2   yourselves or with anyone else.  Have no contact

3   whatsoever with anyone associated with the trial.  Do

4   not read, listen or see anything touching on this

5   matter in any way.

6        If anyone should try to talk to you about this

7   case, you should immediately instruct them to stop and

8   report it to my staff.

9        You may leave your notebooks and your binders

10  at your chairs.  Please be back in the jury room at

11  2:10.

12       (Whereupon, the jury exited the courtroom at

13  12:55 p.m. and the following proceedings were had:)

14       THE COURT:  You can step down, sir.

15       (Witness excused.)

16       THE COURT:  Are you going to reply to the

17  Government's response on the two motions that you

18  filed, the *Jencks* and the *Brady* motion?

19       MS. JHONES:  Yes, your Honor.  Let me just

20  think -- because I did file a reply last night -- or

21  this morning.  That was not original -- the renewed

22  *Brady*.

23       Your Honor, in all candor, I know that they

24  were filed last night sometime, the two responses.  If

25  I may just have the lunch hour to look at them, I'll

```
 1   let the Court know.

 2             THE COURT:  Sure.

 3             MS. JHONES:  Thank you.

 4             THE COURT:  We'll be in recess.

 5        Would you just let the lawyers and

 6   participants know when the jurors have gone down the

 7   elevator?

 8             MR. LEVIN:  Your Honor, I had reserved a

 9   motion earlier.  Would you like to address that now

10   or --

11             THE COURT:  Go ahead.

12             MR. LEVIN:  During the cross-examination of

13   Special Agent Velazquez by Mr. Vereen, Mr. Vereen asked

14   questions with regard to trips to Chicago by Defendant

15   Batiste and other of the gentlemen seated here.

16        Mr. Velazquez answered that he believed that

17   Narseal Batiste went with Patrick Abraham and Naudimar

18   Herrera.

19        I would respectfully move for a severance at

20   this time.  These were questions that were beyond the

21   scope of the Government's direct examination.

22        If they weren't, the answers by the witness

23   were that he believed that Patrick Abraham and Naudimar

24   Herrera accompanied Mr. Batiste to Chicago.

25             I objected as speculative.  The Court
```

```
 1   overruled the objection.
 2           Mr. Vereen then asked, "Do you know for a
 3   fact?"
 4           The answer was, "Do I know for a fact?  No.  I
 5   have information that this trip was taken by Narseal
 6   Batiste and members of the organization."
 7           That would be hearsay.  I didn't object at
 8   that point, but I objected prior to that and reserved a
 9   motion.
10           In the alternative to a severance, I would
11   move for a mistrial.
12           My client has been prejudiced by this
13   testimony.  He cannot receive a fair trial, this
14   information coming from the cross-examination of a
15   Co-Defendant and an objection which clearly, in my
16   view, allowed for a speculative answer, which the
17   witness confirmed when he said he didn't know for a
18   fact to a followup question.
19           In the alternative, move to strike.
20           MR. HOULIHAN:  Judge, on behalf of Naudimar
21   Herrera, obviously, I would also request a severance.
22           MS. ARANGO:  Judge, these -- the responses
23   given were in direct response to a specific question.
24   The door was opened.  Mr. -- Agent -- these two
25   Defendants were not prejudiced to such an extent that
```

1    they are denied a fair trial.  They can cross-examine,

2    if they want, about his responses.

3            But the question was, "Who took a trip?"

4    That's what -- that's what Mr. Vereen asked him, "Who

5    took a trip?"

6            And there was no objection to that question by

7    any of the defense counsel.

8            And then his response was "Narseal Batiste,

9    and I believe Patrick Abraham was mentioned and

10   Naudimar Herrera."

11           That was -- and then further on, he says, "Do

12   you know for a fact?"

13           And Agent Velazquez's response was, "Do I know

14   for a fact?  No."

15           You know, he was responding to a direct

16   question that there was no objection to.  And he

17   answered that he did not know this for a fact, anyway.

18   So there's certainly no prejudice.

19           MR. HOULIHAN:  He's responding to a direct

20   question in the case of the United States of America

21   versus Stanley Phanor.  You know, we have the legal

22   fiction of six separate trials.

23           I think, for Naudimar's purposes, the

24   spillover is highly negative.  I would agree with

25   Mr. Levin, and I would request a severance.

1          MS. ARANGO:  Then, why didn't he object

2     when --

3          MR. HOULIHAN:  Because --

4          MS. ARANGO:  -- when Mr. Vereen said, "Who

5     took a trip?"

6          MR. HOULIHAN:  I think Mr. Levin preserved the

7     record.  And, obviously, neither one of us wants --

8          THE COURT:  He didn't object until after the

9     answer was given.  And then it was only after I

10    overruled the objection that he said it was

11    speculation.

12         I'm going to deny the motion for severance.  I

13    don't see any basis for severance.  There was no

14    initial objection.

15         This was a whole series of questions that

16    Mr. Vereen asked about this conversation, about what

17    was the meaning of certain portions of the conversation

18    between -- the wiretap intercept between Batiste and

19    Sultan Kahn-Bey about -- reference about the brothers

20    taking pictures and then the segue into what -- the

21    witness testified that he was referring to forming some

22    alliance with Elie Assaad and Al-Qaeda, that that was

23    the reference.

24         I don't see any basis for severance, nor do I

25    see any basis for mistrial.

1          Based upon the witness's answers -- he

2     clarified his answer, and I don't see any basis for

3     either severance or mistrial such that those Defendants

4     can't receive a fair trial here.

5          And I don't find that there's any prejudicial

6     spillover, based upon the questioning by Mr. Vereen.

7          The motions are denied.

8          We're in recess until ten after 2:00.

9          (Thereupon, a luncheon recess was taken, after

10    which the following proceedings were had:)

11         THE COURT:  We're back on United States of

12    America versus Narseal Batiste, et al., Case

13    No. 06-20373.

14         Counsel, state your appearances, please, for

15    the record.

16         MR. GREGORIE:  Good afternoon, your Honor.

17         Richard Gregorie and Jacqueline Arango on

18    behalf of the United States.

19         MS. JHONES:  Good afternoon, your Honor.

20         Ana Jhones on behalf of Narseal Batiste, who

21    is present.

22         MR. LEVIN:  Good afternoon.

23         Albert Levin for Patrick Abraham, who is

24    present.

25         MR. CASUSO:  Your Honor, good afternoon.

 1              Louie Casuso on behalf of Burson Augustin,

 2      who's present.

 3              MR. CLARK:  Good afternoon, your Honor.

 4              Nathan Clark for Rotschild Augustine, who's

 5      present.

 6              MR. HOULIHAN:  Richard Houlihan on behalf of

 7      Naudimar Herrera.

 8              MR. VEREEN:  And Rod Vereen on behalf of

 9      Stanley Phanor, who's present.

10              THE COURT:  All Defendants are present.

11              Let's bring in the jurors.

12              Mr. Houlihan, are you ready?

13              MR. CLARK:  Yes, ma'am.

14              (Whereupon, the jury entered the courtroom at

15      2:22 p.m. and the following proceedings were had:)

16              THE COURT:  You may be seated.

17              You are still under oath, sir.

18              You may proceed, Mr. Houlihan.

19              MR. HOULIHAN:  Thank you.

20              If it please the Court.

21              Good afternoon.

22              THE JURY:  Good afternoon.

23                      CROSS-EXAMINATION

24      BY MR. HOULIHAN:

25      Q.    Good afternoon, Special Agent Velazquez.

```
 1    A.    Good afternoon, Mr. Houlihan.

 2    Q.    It's a pleasure to see you again.

 3    A.    Thank you.

 4    Q.    As you know, I represent Naudimar, Naudimar

 5    Herrera.

 6    A.    Yes.

 7    Q.    And as you know, in theory, while there are six

 8    separate trials, I'm going to be really interested in

 9    Naudimar's matters.  Okay?

10    A.    Yes.

11    Q.    And I'm going to try not to repeat anything that

12    you've already gone through.  All right?

13    A.    Yes.

14    Q.    Now, as I understand it, you're one of three main

15    case agents.

16    A.    I'm sorry?

17    Q.    I'm sorry.

18          You're one of three main case agents?

19    A.    Yes.  I'm one of three agents assigned to the

20    case.

21    Q.    How many would you estimate in our case -- how

22    many hours of pure video would there be?  Hundreds?

23    A.    I'm not very good at guessing hours.

24    Q.    Well, would you agree it's hundreds?

25    A.    Of video?  There's significant video coverage of
```

 1    meetings, I'll concede.

 2    Q.     I'm not asking you to concede.

 3           But, I mean, there's a lot.  There's a lot of

 4    time.  If you sat down and watched every single minute

 5    of every video, you'd be there for days?

 6    A.     Yes.

 7    Q.     The same question for the audio:  There's much

 8    more audio.  Is that correct?

 9    A.     Yes.

10    Q.     Probably in the thousands of hours?

11    A.     That is a good estimate, I would imagine.

12    Q.     I mean, if you sat down and listened to audio

13    after audio, I mean, you'd be there more than a month?

14    A.     Probably.

15    Q.     How many man-hours -- you've talked before about

16    surveillance.

17           Surveillance I take to be when an agent would

18    monitor either a location or an individual.  Would that

19    be a fair statement?

20    A.     Yes.  Or a conversation.

21    Q.     Okay.  How many man-hours -- again, an estimate,

22    a ballpark -- of surveillance occurred in our case?

23    A.     I would say a significant amount.

24    Q.     Well, to give some ballpark idea, would, again,

25    hundreds of hours be -- of man-hours be fair?

```
 1   A.     Yes.

 2   Q.     In fact, basically, the full resources of the FBI

 3   at different points were made available to people

 4   investigating this case.  Is that fair?

 5   A.     Yes.

 6   Q.     And the investigation is beginning, I guess, back

 7   in September-October of 2005 and it continues even

 8   after the indictment.  Correct?

 9   A.     Yes.

10   Q.     Now, the three people who would be the main case

11   agents are, as you said, you -- but the other two would

12   be Agent Stewart and Agent Garbato.  Is that fair?

13   A.     That's correct.

14   Q.     The young man sitting here in the middle:  That's

15   Agent Stewart?

16   A.     That's -- that is Agent Stewart.

17   Q.     And Agent Garbato was here this morning, but I

18   guess he's on to other things.  But -- is that correct?

19   A.     Yes.  He was here earlier in the morning.

20   Q.     Of the three of you, would you agree with me that

21   Agent Stewart was the one who had the ultimate

22   responsibility for the administration of the case?

23   A.     Yes.  He was the case agent.  And Joe Garbato and

24   myself were agents assigned to the case and could be

25   considered case agents.  But he was responsible for the
```

1    administration of the case.

2    Q.    There's so much here that no one person, in

3    fairness, could do it.  Correct?

4    A.    That's correct.

5    Q.    The three of you -- you're colleagues.  You've

6    worked together before.  Right?

7    A.    Yes.

8    Q.    You trust each other?

9    A.    Yes.

10   Q.    And you kind of shared the load, basically?

11   A.    Yes.

12   Q.    But Agent Stewart is kind -- if we made a

13   metaphor like General Patton in World War II, he would

14   be in charge of the course and conduct of what happens

15   in the case?

16   A.    Yes.

17   Q.    His neck is on the proverbial line.  Right?

18   A.    Well, I don't know if I would agree with that

19   assessment.

20   Q.    Now, in our case, the jury's going to hear from

21   two paid informants.

22   A.    Yes.

23   Q.    I'm just trying to summarize.  Okay?

24         The first one -- you use the phrase "confidential

25   informant."  I use "paid informant."  Okay?

1   A.      Okay.

2   Q.      But Mr. Abbas is Paid Informant No. 1?

3   A.      Abbas is "CW 1" -- or he's been referred to as

4   "CW 1" in the investigation.

5   Q.      Or "Paid Informant No. 1," depending on how you

6   want to label someone.  Right?

7   A.      For our purposes in the investigation, he was

8   labeled CW 1.

9   Q.      The Paid Informant No. 2 is a man named Elie

10  Assaad?

11  A.      That's correct.

12  Q.      And this informant -- Paid Informant No. 2 --

13  he's the dual-national, Syrian-Lebanese, gentleman?

14  A.      I believe -- yes.

15  Q.      And I think he speaks six or seven languages?

16  A.      Yes.

17  Q.      And the FBI basically brought him in specifically

18  to work on this case.  Correct?

19  A.      That's correct.

20  Q.      Now, when you deal with either one of these two

21  agents, you followed the FBI protocol?

22  A.      Yes.

23  Q.      And each one of these individuals was always paid

24  in cash?

25  A.      Yes.

1    Q.    Each one of the individuals -- I'm just trying to

2    are summarize -- signed contracts?

3    A.    I believe that there were personal services --

4    personal services agreements executed with both

5    informants.  But I didn't participate in that aspect of

6    their --

7    Q.    But you believe such a thing existed?

8    A.    I do.

9    Q.    In economic terms, could -- would it be fair to

10   refer to them as independent contractors?

11   A.    You could, I guess, refer to them as independent

12   contractors, if you like.

13   Q.    Now, if we could stop for a second and go back a

14   little bit -- this is not to embarrass you -- you

15   described earlier about Mr. Ramos, Octavio Ramos.

16   A.    That's correct.

17   Q.    Now, he was, I guess, one of your partners?

18   A.    Yes.

19   Q.    He was, in fact, the first partner you had?

20   A.    I don't know if he was the first.  He was the

21   first agent that I was significantly involved in a

22   long-term undercover operation with.

23   Q.    Okay.  Well, as you described your career, you

24   had been in the Air Force, you were honorably

25   discharged.  Right?

1    A.    Yes.

2    Q.    One of the things -- I don't think you

3    mentioned -- but you basically care about -- you want

4    make a difference in the world, a positive difference.

5    Right?

6    A.    Yes.

7    Q.    And between your Air Force stint and working with

8    the FBI -- all right? --

9    A.    Yeah.

10   Q.    -- in fact, you were over in the West Coast of

11   Florida?

12   A.    I'm sorry?

13   Q.    Were you over in the West Coast of Florida?

14   A.    At what point?

15   Q.    Between your leaving the Air Force and then

16   joining the FBI.

17   A.    No.  I went to high school in Tampa, Florida.

18   Q.    Well, after you left the Air Force, you started

19   to work with the middle-schoolers, high-schoolers?

20   A.    Yes.

21   Q.    And this goes back to you wanted to make a

22   difference.  Right?

23   A.    Yes.

24   Q.    I mean, you taught them, I guess, math and

25   science?

Velazquez - CROSS - By Mr. Houlihan                142

1    A.    Math and tutor and mentor.

2    Q.    Okay.  Well, that was my next question.

3          You were mentoring these young people?

4    A.    Yes.

5    Q.    You wanted them to stay in school, stay out of

6    trouble, things like that?

7    A.    Yes.  It was a program for at-risk youth.

8    Q.    How long did you do that?

9    A.    I've been doing that since I've been about 19.

10   Q.    You know, as people get older, sometimes they

11   become cynical and look upon that as the person has

12   some other interest.

13         You know what I'm referring to.  Right?

14   A.    No.  I'm sorry.

15   Q.    They may be looking out to make money off it for

16   a job opportunity, for other reasons.  Right?

17   A.    Yes.

18   Q.    But you truly cared?

19   A.    I do.

20   Q.    And there's nothing wrong with that, is there?

21   A.    No.

22   Q.    And your truly caring is how your partner

23   betrayed your trust?

24   A.    I'm not sure I'm making the connection.

25   Q.    Okay.  Let's start -- let's go back a little bit.

 1    All right?

 2         You've already described to the jury how the FBI

 3    had procedural rules about how to handle paid

 4    informants.

 5    A.    That's correct.

 6    Q.    And when you deal with cash, the FBI instituted

 7    for a while rules about two agents?

 8    A.    Yes.

 9    Q.    And you've already described this to the jury.

10    Right?

11    A.    Yes.

12    Q.    And those rules are there to protect the agents?

13    A.    Yes.

14    Q.    Well, you're dealing with cash.  You're dealing

15    with paid informants.  The FBI doesn't want wrong

16    accusations to be made.  Right?

17    A.    Well, accusations can always be made.  The

18    policy, as I understand it, is a dual control to make

19    sure that the exchange of cash is properly managed and

20    documented.

21    Q.    Well, the request by your partner, Ramos, was for

22    you to sign some documents.  Correct?

23    A.    Yes.  The request was to sign a payment for an

24    informant we were working with in an undercover

25    operation.

Velazquez - CROSS - By Mr. Houlihan                144

1    Q.    And because, basically, of your trust, you did do

2    that, even though knowing the rules said something

3    different.  You trusted your partner?

4    A.    I did.

5    Q.    And that's what I was referring to.

6          You have this goodness inside of you.  You look

7    at the best of people.  That's what I'm referring to.

8          Do you see my point?

9    A.    I do see your point.

10   Q.    And it turned out Ramos was stealing?

11   A.    Yes.

12   Q.    Now, when these two paid informants were paid,

13   whatever they were paid -- all right? -- they signed

14   receipts?

15   A.    They did.

16   Q.    And I believe somewhere on the receipt states

17   something to the effect of you have tax obligations,

18   potentially.

19   A.    I'm not -- I don't believe that's on the receipt

20   they receive for the payments.  It may be now.  But

21   they are made aware that they have obligations to pay

22   taxes.

23   Q.    Okay.  And that, of course, is for any money that

24   they were paid in cash that can be fairly attributed as

25   income?

1    A.    Yes.

2    Q.    Did either paid informant in our case file an

3    income tax return, based upon the money the FBI paid

4    them?

5    A.    Not that I --

6            MS. ARANGO:   Objection, Judge.   Outside the

7    scope of direct.

8            THE COURT:   Sustained.

9    BY MR. HOULIHAN:

10   Q.    Did the FBI -- for independent contractors, it's

11   a tax form called a 1099.

12        Are you familiar with that?

13   A.    Yes.

14   Q.    Did the FBI give either paid informants a 1099?

15   A.    No.

16   Q.    Moving ahead, I'd like to talk, if you don't

17   mind, a little bit about Naudimar.

18        Now, as one of these main agents in the case,

19   while you wouldn't do everything yourself, you became

20   familiar with most of the work being done by your

21   fellow agents?

22   A.    Yes.

23   Q.    And you became aware that Naudimar was born here

24   in Miami?

25   A.    Yes.

1   Q.     And he was born at Jackson, actually, Jackson

2   Hospital.

3              MS. ARANGO:  Objection.  Hearsay.

4              THE COURT:  Sustained.

5   BY MR. HOULIHAN:

6   Q.     But Naudimar was born in 1983?

7   A.     I'm not certain what year Naudimar was born.

8   Q.     Do you know his dad was named Israel?

9              MS. ARANGO:  Objection.  Hearsay.

10             THE COURT:  Sustained.

11  BY MR. HOULIHAN:

12  Q.     Naudimar, to your knowledge, was -- is an

13  American citizen?

14  A.     Yes.

15  Q.     That he dropped out of the ninth grade in North

16  Miami Senior High School?

17             MS. ARANGO:  Objection.  Hearsay and

18  relevance.

19             THE COURT:  Sustained.

20  BY MR. HOULIHAN:

21  Q.     You did become aware, did you not, that

22  Naudimar was -- up to the point of approximately

23  October-November of 2005 -- okay? -- that Naudimar

24  was working a variety of kind of odd jobs?

25  A.     No.  I was familiar that Naudimar was working

 1   with construction or stucco projects --

 2   Q.     Okay.

 3   A.     -- with Narseal.

 4   Q.     That means Azteca?

 5   A.     Azteca Stucco.  Yes.

 6   Q.     Do you know when that began?

 7   A.     I would say as early as September of 2005.

 8   Q.     Okay.  And that, from what you could gather from

 9   your investigation, was at the invitation of Narseal

10   Batiste to Naudimar to work for Azteca?

11   A.     I believe so.  Yes.

12   Q.     In fact, jumping way ahead to the time of the

13   indictment -- which is June 22nd, 2006.  Right?

14   A.     Yes.

15   Q.     Naudimar was arrested at a work site?

16   A.     He was.

17   Q.     And he was, like, power-cleaning some concrete

18   sidewalk or something?

19   A.     I'm uncertain what he was specifically doing.

20   But he was at a work site on the day he was arrested.

21   Q.     Now, earlier in your direct, you had talked about

22   Naudimar's driver's license photograph.  Do you

23   remember that?

24   A.     Yes.

25   Q.     Now, that was attained at the end of February of

1    2006.  Is that correct?

2    A.    I'm uncertain when that driver's license was....

3    Q.    Would you agree with me that in evidence are the

4    different warrants that you've already gone through?

5    Okay?  Do you know what I'm referring to?

6    A.    I'm sorry.  The warrants?

7    Q.    The court order in Government's Exhibits 8, 9,

8    11, 12, 13, 14, 15, 16, 17 -- court orders concerning

9    surveillance, wiretapping and so forth.  Right?

10   A.    Yes.

11   Q.    They span, I guess, all times from February

12   through April of 2006?

13   A.    Yes.

14   Q.    And it wasn't until the end of March of 2006 that

15   Naudimar was identified for purposes of the warrants,

16   the court orders?

17   A.    Possibly.  I don't recall exactly when --

18   Q.    Whatever is in the exhibit speaks for itself.

19   Correct?

20   A.    Yes.

21   Q.    Do you know how Naudimar -- Naudimar's photograph

22   is Exhibit 3.  I can show it to you, if you want it.

23         But that is a driver's license photo.

24   A.    I believe it is.

25   Q.    And do you know when Naudimar -- would seeing

```
 1    Naudimar's driver's license help you to refresh your
 2    recollection as to when that photo was obtained?
 3    A.    I don't believe so, because I did not obtain the
 4    photo.
 5    Q.    Who did?
 6    A.    I'm uncertain.
 7    Q.    It just appeared one day?
 8    A.    Well, somebody ran a driver's license inquiry and
 9    pulled the photograph of Naudimar.  And that was then
10    put into the file.
11    Q.    Would it be fair to say that it is in
12    February-March of 2006, or you don't have any clue?
13    A.    I really don't have any recollection of when that
14    license was pulled.
15    Q.    Okay.  The area of the Embassy -- the address of
16    the Embassy is 6260 Northwest 15th Avenue.  Is that
17    correct?
18    A.    I believe it's 6260 to 6262 Northwest 15th
19    Avenue.
20    Q.    And that's because, actually, there's two
21    storefronts, there's two stores there?
22    A.    There's two -- yes.
23    Q.    But they're conjoined?
24    A.    Yes, they are.
25    Q.    Now, if we can make a rectangle in your mind.
```

1    Okay?  Take the northern boundary of the rectangle as

2    67th Street -- okay? -- the southern boundary at

3    57th Street, the eastern boundary at Northwest 7th

4    Avenue and the western at Northwest 17th Avenue.

5         Do you have that?

6    A.    No.  I'm sorry, but -- I'll try again.  Go ahead.

7    Q.    We're going to draw a rectangle.

8         And you're tutoring math.  Right?

9    A.    Yes.

10   Q.    Okay.  We're making a rectangle.  The northern

11   boundary is 67th Street.

12        You got that?

13   A.    Yes.

14   Q.    The southern boundary is 57th Street.

15   A.    Yes.

16   Q.    Fair enough?

17   A.    Yes.

18   Q.    The other two sides of the rectangle -- well, the

19   avenues.  Correct?

20   A.    Yes.

21   Q.    Now, we're taking Northwest 7th Avenue as the

22   eastern line.  Okay?

23   A.    Yes.

24   Q.    And Northwest 17th Avenue as the western line.

25   A.    Yes.

 1    Q.    Now do you have it in your mind?

 2    A.    Yes.

 3    Q.    The Embassy is within that area?

 4    A.    It is.

 5    Q.    This is the City of Miami jurisdiction?

 6    A.    Yes, it is.

 7    Q.    Metro-Dade or Miami-Dade, whatever they call

 8    themselves now -- they start at Northwest 18th Avenue.

 9    Right?

10    A.    Thereabouts.

11    Q.    Okay.  Well, taking our rectangle, would you

12    agree with me -- you're familiar with the area?

13    A.    I am.

14    Q.    In fact, you told us how I think you played

15    basketball with friends and things like that.

16    A.    Yes.

17    Q.    You would agree with me that there is a ton of

18    hardworking men and women in this rectangle?

19    A.    Yes.  I would agree with that.

20    Q.    There's hardworking and there's law-abiding

21    people, just trying to make it day -- like we all are,

22    day by day?

23    A.    I would agree with that.

24    Q.    These people also can labor under, you know, the

25    twin burdens of poverty and discrimination?

1    A.    The twin birds?

2    Q.    Yeah.  I mean, poverty is a burden.

3    A.    Oh.  "Burden."  I'm sorry.

4    Q.    "Burden."  I'm sorry.

5    A.    I thought you said "birds."

6    Q.    Okay.  But the people in this rectangle, would

7    you agree, labor under the twin burdens of poverty and

8    discrimination?

9    A.    I would agree with that.

10   Q.    And they, in general, can sometimes almost have a

11   battle themselves between despair versus hope?

12   A.    Yes.  I'm familiar with that.

13   Q.    And in this rectangle would be a fairly large

14   number of religious places, churches, storefronts that

15   have services, things of that nature?

16   A.    I don't know if I would characterize the area as

17   having a large number of religious --

18   Q.    But would you agree, for example, the Embassy,

19   right -- I think a half a block away was, what, two or

20   three different religious places?

21   A.    There's about three churches that I can think of

22   off the top of my head that are in that area, the

23   rectangle.

24   Q.    Now, looking at the not-so-nice side of the

25   rectangle, the FBI maintains crime statistics

 1   nationally.  Correct?

 2   A.    Yes.

 3   Q.    This area of the rectangle has one of the highest

 4   violent crime rates in Miami-Dade.

 5   A.    It does.

 6   Q.    By "violent crime," we mean things like murder,

 7   weapons offenses, things of that nature.

 8   A.    Yes.  And drugs.

 9   Q.    And drugs.

10        I'm going to be slightly facetious.

11        But any firearm that's made in the world can

12   almost be bought on the streets of this area, this

13   rectangle?

14   A.    It would be easy to buy a gun in that area of

15   Miami.

16   Q.    And by "guns," they include, like, AK-47s, a lot

17   of nasty things?

18   A.    Yes.

19   Q.    Now, you mentioned drugs.

20        This area, this rectangle, is well known for a

21   high volume of drug activity?

22   A.    It is.

23   Q.    In fact, if we step back and take South Florida,

24   Palm Beach, Broward County, Monroe County and

25   Miami-Dade, this might be the most unsafest place?

1  A.    It's one of -- it's one place that be could be

2  characterized as unsafe.

3  Q.    Okay.  Now, moving right ahead, I would like to

4  go in with you a little bit concerning the Embassy

5  specifically.  Okay?

6        And I really want to talk with you about

7  forensics, criminal scene investigation, things like

8  that.  Fair enough?

9  A.    Yes.

10 Q.    Would you agree with me that forensics, crime

11 scene work, is a very significant investigative

12 technique?

13 A.    Yes.  It's a significant investigative technique.

14 Q.    And the first critical step would be what they

15 call preservation of the scene?

16 A.    That's an important investigative measure, is to

17 secure or protect a crime scene.

18 Q.    Well, what I'm getting to is this:  The

19 indictment in our case was returned June 22nd, 2006.

20 A.    Yes.

21 Q.    And they're stamped.  I mean, actually,

22 physically, a foreman, generally, of the grand jury

23 walks into a federal courtroom with it.  Correct?

24 A.    Yes.

25 Q.    And it's time-stamped and dated.  Right?

Velazquez - CROSS - By Mr. Houlihan          155

```
 1    A.     Yes.

 2    Q.     And you were there when that happened?

 3    A.     I was where?

 4    Q.     In court.

 5    A.     For the return of the --

 6    Q.     The indictment.

 7    A.     I'm not certain.  I don't think I was in court

 8    that day.

 9    Q.     You recall that -- do you recall on the

10    indictment itself it has 12:01 p.m.?

11    A.     No.

12    Q.     Do you recall that day going in front of a

13    neutral -- a detached magistrate for the purposes of a

14    search warrant?

15    A.     I do.

16    Q.     And that was Federal Magistrate Patrick White?

17    A.     Yes.

18    Q.     And that was on June 22nd, 2006?

19    A.     I believe so.  Yes.

20    Q.     That was after the indictment actually was

21    returned; was it not?

22    A.     Yes.

23    Q.     And wasn't it returned in Judge White --

24    Magistrate White's courtroom?

25    A.     Yes.
```

 1   Q.     Okay.  So -- I know you have a lot on your plate.

 2          But you were there when the indictment was

 3   returned.  Correct?

 4   A.     I don't recall.  I recall acquiring the search

 5   warrant.

 6   Q.     Okay.  Now, what a search warrant means is that

 7   you swore to certain things in the search warrant.

 8   A.     That's correct.

 9   Q.     And what you're swearing to is basically probable

10   cause?

11   A.     Yes.

12   Q.     And "probable cause" means, in English, just what

13   it sounds like:  Probable cause.  Maybe something's

14   there.  Correct?

15   A.     Yes.

16   Q.     In our particular case, you were swearing

17   probable cause to believe that Batiste had at the

18   Embassy and in a van certain things.  Correct?

19   A.     Yes.

20   Q.     And you swore for probable cause concerning, for

21   example, blueprints?

22   A.     I believe so.  Yes.

23   Q.     You swore probable cause for drawings, sketches,

24   schematics of buildings.  Correct?

25   A.     Yes.

1   Q.     The same thing about maps showing locations of

2   buildings?

3   A.     Yes.

4   Q.     Other documents and information regarding the

5   Sears Tower.  Correct?

6   A.     Yes.

7   Q.     Computers, memory cards, memory chips, computer

8   storage media.  Right?

9   A.     Yes.

10  Q.     None of that was found in the search that the

11  jury is going to hear about.  Correct?

12  A.     That's correct.

13  Q.     Now, if I could stop for a quick second, it

14  sounds easy, but it's really very time-consuming and a

15  little difficult.

16         What you're doing is getting a specialized FBI

17  evidence team ready to search the Embassy.  Correct?

18  A.     The Embassy was searched by an evidence response

19  team that's comprised of members that have training in

20  conducting searches and collecting -- the collection of

21  evidence.

22  Q.     Right.  They're specialized.  They're FBI agents

23  who are very good at what they do.

24  A.     Yes.

25  Q.     They just don't fall out of the sky.  You have to

1  contact them.  Correct?

2  A.    That's correct.

3  Q.    I mean, you know, in this whole thing, you go

4  through where you want them to search, what you're

5  looking for, the type of search that's going to be done

6  and so forth.  Correct?

7  A.    Yes.

8  Q.    Now, that team unit has at their disposal a

9  variety of crime scene tools, if they choose to use

10  them?

11  A.    That's correct.

12  Q.    Depending upon the type of search, they select

13  what they need?

14  A.    Depending on the type of search, what you're

15  searching for and the type of crime.

16  Q.    Right.

17        I mean, if it's a murder and there's blood, one

18  might be looking for DNA, for example?

19  A.    That's correct.

20  Q.    DNA really was not something of merit in our

21  particular case.  Is that fair to say?

22  A.    Yes.

23  Q.    But some of them were that I just went over.

24        You swore probable cause for some of them?

25  A.    Yes.

1    Q.     You also swore probable cause in this for

2    training manuals and magazines?

3    A.     Yes.  I believe so.

4    Q.     Instruction manuals for combat training?

5    A.     I recall that.  Yes.

6    Q.     Firearms training?

7    A.     Yes.

8    Q.     Bomb-making?

9    A.     Yes.

10   Q.     Documents, records, news accounts, magazines and

11   articles relating to terrorism and terrorist

12   organizations?

13   A.     Yes.

14   Q.     Documents, records, news accounts, magazines and

15   articles relating to Al-Qaeda, Osama bin Laden, Islamic

16   fundamentalism, seditious activities and organizations?

17   A.     Yes.

18   Q.     I'm not going to belabor the point.  Okay?  You

19   know where I'm going.

20          At the end of the search, nothing was found in

21   any of those categories?

22   A.     Not the categories that you've just mentioned.

23   Q.     They were in your search warrant?

24   A.     I'm sorry?

25   Q.     That are in your application for the search

Velazquez - CROSS - By Mr. Houlihan          160

1   warrant.

2   A.    Well, there were some items that were collected

3   and fingerprinted to determine who had handled them.

4   One was a notebook containing references to rules and

5   combat techniques.

6   Q.    Okay.  But let's get to the heart of it.

7         Islamic fundamentalism:  Anything?

8   A.    No.

9   Q.    Terrorist organizations:  Anything?

10  A.    No.

11  Q.    Al-Qaeda, Osama bin Laden:  There was nothing

12  found?

13  A.    No.

14  Q.    One of the things that was found were two

15  computers?

16  A.    I believe so.  Yes.

17  Q.    In fact, the computers had been in the warehouse,

18  which is the building that the second paid informant

19  had obtained through the FBI?

20  A.    That's correct.

21  Q.    And during surveillance that we talked about

22  earlier, Narseal Batiste was seen removing the two

23  computers and putting them in the Embassy?

24  A.    Yes.  I believe that was May 24th.

25  Q.    Right.

 1          Well, when we talked about crime scene

 2     preservation, you want to make sure that no evidence is

 3     destroyed, if you can.  Correct?

 4     A.     Yes.

 5     Q.     That no evidence is altered?

 6     A.     Yes.

 7     Q.     And that's part of the reason for so closely

 8     surveilling things being moved from the warehouse,

 9     returned to the Embassy?

10     A.     I'm not sure I understand your question.

11     Q.     The computers, for example:  You knew the

12     computers were in the warehouse?

13     A.     That's correct.

14     Q.     And as potential evidence, you wanted to make

15     sure you knew where they were for purposes of a

16     warrant?

17     A.     Yes.

18     Q.     I mean, they're potentially critical pieces of

19     information.  Correct?

20     A.     Possibly.

21     Q.     Right.

22          They may not be.  But major corporations have

23     major problems because of things on computers.  Right?

24     A.     Yes.  That's true.

25     Q.     Now, when -- the purpose of the crime scene unit:

```
 1    After your lengthy -- or having another agent tell them

 2    what the search is about -- okay? -- their purpose is

 3    to go in to identify potential forensic evidence,

 4    number one.  Right?

 5    A.    Yes.

 6    Q.    The second purpose would be to collect that

 7    evidence?

 8    A.    Yes.

 9    Q.    And the third part would be to preserve the

10    evidence for future analysis, if so indicated?

11    A.    Yes.

12    Q.    And as far as you know, in our case, you're a

13    specialized unit to do that?

14    A.    Yes.

15    Q.    Now, these two computers were recovered?

16    A.    Yes.

17    Q.    And, in fact, the hard drives -- I think it's in

18    one of your reports -- were mirrored?

19    A.    Yes.

20    Q.    Could you tell us, what do you mean by

21    "mirrored"?

22    A.    That's basically where the hard drive is copied

23    and the contents of that hard drive is then placed on

24    another hard drive or some medium that allows you to

25    see the information that was on the hard drive.
```

1   Q.     Now, that is done because the original -- I mean,

2   it's good police work.  You don't want to mess with the

3   original?

4   A.     Yes.

5   Q.     So experts could look at the mirror copy and do

6   whatever without altering potential evidence?

7   A.     Yes.

8   Q.     And the FBI had, for example, not only local

9   computer experts, but you have a specialized unit in

10  Quantico dealing with computer issues?

11  A.     Yes.  I'm not certain if the unit's at Quantico.

12  But we do have a unit at our headquarters that deals

13  with that.

14  Q.     And they're really sophisticated.  Right?

15  They're kind of at the cutting edge of this.

16  A.     Yes.

17  Q.     Now, without going back and reading again

18  everything from the search warrant -- okay? -- the

19  bottom line, on the hard drives that were mirrored,

20  nothing was found concerning blueprints, instruction

21  manuals, news accounts and so forth.  Correct?

22  A.     None of the items you just mentioned.  No.

23  Q.     I mean, I can go through them.  But you got the

24  drift.  Right?

25  A.     Yes.

1    Q.    Now, each computer has a unique Internet IP

2    address.  Is that true?

3    A.    Yes.

4    Q.    Had either computer, to your knowledge, to the

5    FBI's knowledge, ever gone in Internet surfing to any,

6    let's assume, radical or extremist sites?

7    A.    I'm uncertain with regard to the results of the

8    search for the computers.  And I'm unfamiliar with the

9    references that you just made in respect to anything --

10   any of the computers being associated with those

11   searches.

12   Q.    I want to make sure I understand.

13         You're saying you just don't know?

14   A.    That's correct.

15   Q.    Who would know?

16   A.    The agent that conducted the search.  Possibly

17   one of the other case agents.

18   Q.    But as far as you know -- you're not that

19   familiar with how computers operate, I take it.

20   A.    I'm familiar with how they operate.

21   Q.    You don't know, as we speak today, whether either

22   computer either on the hard drive or through the IP

23   access ever tried to access any kind of radical

24   extremist website?

25   A.    That's correct.  I do not know.

1   Q.     Now, Narseal Batiste had two identities, I take

2   it -- or e-mail addresses, to your knowledge.  Is that

3   correct?

4   A.     I remember one in particular.  But I do recall

5   there were two.

6   Q.     All right.  Well, let me help a little bit.

7          One was sealford -- s-e-a-l-f-o-r-d -- 2000?

8   A.     sealford2000.  Yes.

9   Q.     And the other e-mail was Azteca, the business?

10  A.     Right.  The e-mail for the business, Azteca

11  Stucco.

12  Q.     Now, when the hard drives are mirrored, isn't it

13  fair to say that there was from your laboratory

14  people -- they concluded that there was no attempt to

15  make any erasure on either hard drive?

16  A.     I'm not familiar with the computer evidence that

17  was acquired.  I'm unaware of any such evidence that

18  was acquired during those searches.

19  Q.     You would expect -- is it fair to say that you

20  would reasonably expect to become aware if such

21  existed?

22  A.     Yes.

23  Q.     The same thing about encrypting information.

24         Do you know what encryption is?

25  A.     I do.

Velazquez - CROSS - By Mr. Houlihan                166

1    Q.     As we speak today, would you not agree with me

2    that there was no attempt to encrypt any information in

3    this entire case?

4    A.     No.  Not that I'm aware of.

5    Q.     Well, going back to sealford2000 and the Azteca

6    e-mail and identities, would you agree with me that

7    there was no inculpatory e-mails either sent to or

8    received from either one of those two addresses

9    concerning terrorism, terrorist activities and so

10   forth?

11          MS. ARANGO:  Objection, Judge.  I think that

12   calls for a legal conclusion, inculpatory.

13          THE COURT:  Sustained.

14   BY MR. HOULIHAN:

15   Q.     Was there anything under sealford2000 or the

16   Azteca business e-mail indicating any of the things you

17   were looking for in the search warrant?

18   A.     Not that I'm aware of.

19   Q.     And, you know, I just don't want to have to keep

20   repeating this.

21          You know what I'm referring to.  Right?

22   A.     The search warrant?

23   Q.     Yes.  All the materials we went over.

24   A.     Yes.

25   Q.     There is something called voiceover Internet

1    protocol, VOIP.

2          Are you familiar with that?

3    A.    I am.

4    Q.    Was there any attempt by either computer -- or

5    using either computer to use that Internet protocol for

6    purposes of communication?

7    A.    I don't know.

8    Q.    Would you agree with me, if there was, you would

9    have been told?

10   A.    Not necessarily.  VOIP is commonly used for all

11   kinds of conversations by way of Skype and other VOIP

12   programs.  So I don't know if I necessarily would have

13   been made aware that someone had -- or those computers

14   had been used to make VOIP communications.

15   Q.    Well, let me ask you:  Are you aware of whether

16   or not there's even software on either computer

17   enabling that type of communication?

18   A.    No.  I'm not aware.

19   Q.    Now, as to -- there's a phrase in English now

20   called "Googling."  Are you aware of that phrase?

21   A.    Yes.

22   Q.    And that basically refers to going on the

23   Internet and asking questions or trying to get

24   information.  Correct?

25   A.    Yes.

1    Q.    Was there any Googling on either one of these

2    computers or through any e-mail address or personal use

3    of the Internet for all the things in the search

4    warrant?

5    A.    I'm unfamiliar with the results of the search for

6    the computers with regard to --

7    Q.    Would you agree if there was --

8          MS. ARANGO:   Objection to interrupting the

9    witness, Judge.

10   BY MR. HOULIHAN:

11   Q.    I apologize.

12   A.    That's okay.

13   Q.    You can finish.

14   A.    I'm finished.

15   Q.    For example, we talked about bomb -- bomb-making.

16   Correct?

17   A.    Yes.

18   Q.    Was there any Googling, trying to get information

19   about bomb-making, things of that nature?

20   A.    Not that I'm aware of.

21   Q.    Or poison, poisoning, anything like that?

22   A.    What's your question with regard to --

23   Q.    Any Googling.

24   A.    No.  I'm unaware of Googling --

25   Q.    What about Al-Qaeda, Osama bin Laden, anything

1    like that?

2    A.    No.

3    Q.    I'd like to move on, I think.

4          Another area of forensic science would be, I

5    would guess, called forensic accounting.

6          Would that be fair?

7    A.    Yes.

8    Q.    I mean, there's scientific principles that your

9    agents, your laboratory people, can use to kind of

10   decipher economic shenanigans?

11   A.    Or money laundering.

12   Q.    Or money laundering.

13         And it be can be very complicated?

14   A.    It can be.

15   Q.    I mean, your agents, your lab people, can use

16   sophisticated programs to help.

17         I mean, we can go on and on, but you've got the

18   idea.  Right?

19   A.    Yes.

20   Q.    Anything like that in our case?

21   A.    Not that I'm aware of.

22   Q.    In fact, would you agree with me that the

23   Azteca -- are you familiar at all with Azteca business

24   records?

25   A.    No.

1   Q.     Okay.   What about Narseal Batiste's personal bank

2   records?

3   A.     I personally am not.

4   Q.     Is some other agent familiar with it and that was

5   communicated to you, as one of the case agents?

6   A.     Possibly.   But in terms of information on

7   Narseal's bank account, I knew that there was a bank

8   account associated with Narseal Batiste.

9   Q.     Would you agree with me that bank account was

10  verging on, you know, zero as a balance?

11        MS. ARANGO:   Objection.   Hearsay.

12        THE COURT:   Sustained.

13  BY MR. HOULIHAN:

14  Q.     You became aware that the workers for Azteca and

15  all these young people at some point were working for

16  Azteca.   Correct?

17  A.     Yes.

18  Q.     That wage payment was in arrears.

19        Are you aware of that?

20        MS. ARANGO:   Objection.   Hearsay.

21        THE COURT:   Sustained.

22  BY MR. HOULIHAN:

23  Q.     Are you aware of whether Naudimar contributed

24  whatever his salary was -- you're aware Naudimar

25  worked, as you said already, for Azteca.   Correct?

1    A.     Yes.

2    Q.     And that he got paid by Azteca?

3    A.     Yes.

4          MS. ARANGO:  Objection.  Hearsay.

5          THE COURT:  Sustained.

6          MR. HOULIHAN:  I have nothing else, then.

7    Thank you.

8          THE COURT:  Mr. Clark.

9                     CROSS-EXAMINATION

10   BY MR. CLARK:

11   Q.     Good afternoon.

12   A.     Good afternoon, Mr. Clark.

13   Q.     Now, you gave some testimony about some

14   violations of the policy concerning payments to

15   confidential informants.  Correct?

16   A.     That's correct.

17   Q.     And those policies are contained in the Attorney

18   General's guidelines regarding the use of the

19   confidential informants.  Correct?

20   A.     No.  Those policies are contained in, I believe,

21   the -- either the Manual for Operational Procedures, or

22   the MIIOG.  It's in the MIIOG.

23          THE COURT REPORTER:  In the MIIOG?

24          THE WITNESS:  MIIOG, M-I-I-O-G.

25          But I believe that's contained in the FBI's

```
 1    Manual for Operational Procedures.

 2    BY MR. CLARK:

 3    Q.      And have you ever looked at the Attorney

 4    General's guidelines regarding the use of confidential

 5    informants?

 6              MS. ARANGO:  Objection.  Relevance.

 7              THE COURT:  Sustained.

 8    BY MR. CLARK:

 9    Q.      Do you know what is contained in the Attorney

10    General's guidelines regarding the use of confidential

11    informants?

12              MS. ARANGO:  Same objection.

13              THE COURT:  Sustained.

14    BY MR. CLARK:

15    Q.      Did you use that in this investigation?

16    A.      I'm sorry?

17    Q.      Did you use the Attorney General's guidelines

18    regarding the use of confidential informants in this

19    investigation at all?

20    A.      In what context?  Did I use it --

21    Q.      The context is you worked with confidential

22    informants in this investigation.

23    A.      That's correct.

24    Q.      All right.  You had two confidential informants.

25    Correct?
```

Velazquez - CROSS - By Mr. Clark                    173

1    A.    That's correct.

2    Q.    And the -- don't the Attorney General's

3    guidelines regarding the use of confidential informants

4    apply to you when you're using them in this

5    investigation?

6    A.    They do.

7          MS. ARANGO:  Objection.  Relevance.

8    BY MR. CLARK:

9    Q.    And you have to --

10          THE COURT:  Overruled.

11    BY MR. CLARK:

12    Q.    You have to conduct your evaluations and your

13    relationship with the confidential informant in

14    compliance with the Attorney General's guidelines,

15    don't you?

16    A.    Yes.  And the FBI policies.

17    Q.    And is it your position that the Attorney General

18    guidelines do not have provisions regarding the

19    payments to confidential informants?

20    A.    No.  I was referring to my prior testimony in

21    regards to the informant payment receipt which I had

22    signed for my former partner.

23    Q.    I understand that.

24          But those policies that you violated are also

25    contained in the Attorney General's guidelines, aren't

Velazquez - CROSS - By Mr. Clark                    174

1   they?

2   A.    I believe they are.

3   Q.    So you're familiar with the Attorney General's

4   guidelines on this point, aren't you?

5   A.    Yes.

6   Q.    And you're required by these guidelines to

7   document payments.  Correct?

8   A.    Yes.

9   Q.    And those guidelines require you to have two

10  witnesses.  Correct?

11  A.    That's correct.

12  Q.    And the purpose of that is to avoid the theft of

13  money?

14  A.    The purpose of that is to provide dual control

15  and maintain proper management of informant payments.

16  Q.    Well, in order to prevent an informant from

17  stealing money?

18  A.    No.  I mean, if somebody wants to steal money, a

19  receipt is not going to prevent them from stealing

20  money.

21  Q.    Well, having two witnesses is probably more

22  likely to prevent a theft by an agent than one witness.

23  Correct?

24  A.    Could you state that again.

25  Q.    The rule requires two witnesses to document the

Velazquez - CROSS - By Mr. Clark                    175

```
 1   payment -- two FBI agents to witness the payment to the

 2   informant?

 3   A.     Two witnesses.  They don't necessarily have to be

 4   FBI agents.  They could be law enforcement officers.

 5   But yes.

 6   Q.     Two law enforcement officers?

 7   A.     That's correct.

 8   Q.     So the chances are less if two law enforcement

 9   officers are watching this than one?

10   A.     The chances are less for what?

11   Q.     Theft.

12   A.     I would say "yes."

13   Q.     And that's the purpose of the rule?

14   A.     That's one of the purposes.

15   Q.     Is to prevent the theft of money.

16          And --

17              THE COURT REPORTER:  I don't know if that --

18              THE COURT:  Is that a question?

19              MR. CLARK:  I'm getting ready to ask one, your

20   Honor.

21   BY MR. CLARK:

22   Q.     Also, if you permit theft to go on, it creates a

23   culture of deceit, doesn't it?

24   A.     If you allow theft to go on -- if who allows

25   theft to go on?  And go on where?
```

 1   Q.     Payments by FBI agents to confidential

 2   informants.

 3   A.     Well, that's a violation of law.  That's theft.

 4   Q.     But if there's no proper oversight, then it

 5   creates a culture of deceit with confidential

 6   informants?

 7   A.     It would create an opportunity for an

 8   investigation, I would say.

 9   Q.     And that's to be prevented.  Correct?

10   A.     The investigation?

11   Q.     No.  Theft of money is to be prevented.

12          THE COURT:  MR. Clark, you need to move on to

13   another area.

14   BY MR. CLARK:

15   Q.     Well, in this case, you had payments going to

16   Mr. Abbas, didn't you?

17   A.     Mr. Abbas and Mr. Assaad.  Yes.

18   Q.     He had -- he had money given to him for

19   subsistence?

20   A.     Yes.

21   Q.     For food?

22   A.     That's a -- yes.

23   Q.     Plane flights?

24   A.     Plane fights?

25   Q.     Plane flights.  Airplane flights.

```
 1    A.    Yes.  I believe we reimbursed him for his trip
 2   back from Yemen to Miami.
 3    Q.    He had an apartment on Miami Beach?
 4    A.    Yes.
 5    Q.    Hotel accommodations.  Correct?
 6    A.    Yes.
 7    Q.    And you entered into an agreement with the -- the
 8   FBI entered into an agreement with Mr. Abbas to --
 9   what's called a personal services agreement to act as
10   an FBI informant.  Correct?
11    A.    It's my understanding there was a personal
12   services agreement executed.  But I wasn't part of
13   that -- the signing of that document.
14    Q.    Well, before it was actually executed -- do you
15   remember when it was executed?
16    A.    No, I do not.
17    Q.    Before it was executed, you entered into an
18   implied agreement with him, did you not, for him to act
19   as an informant?
20    A.    The implied agreement -- yes.  The implied
21   agreement was that he was going to be truthful and
22   assist us in gathering evidence in this investigation.
23    Q.    In the agreement, he's supposed to not be using
24   drugs.  Correct?
25    A.    I'm not certain if that's included in the
```

Velazquez - CROSS - By Mr. Clark          178

```
 1   personal services agreement.  However, that -- I
 2   believe that is part of an admonishment that informants
 3   are given when you begin to utilize them in an
 4   investigation.
 5   Q.    Well, he can't commit any criminal acts.
 6   Correct?
 7         MS. ARANGO:  Judge, I would object.  This has
 8   all been delved into, I think, at least once before.
 9         THE COURT:  Sustained.
10         You need to move on to another area,
11   Mr. Clark.
12         MS. JHONES:  My only objection is to the
13   speaking objection, your Honor.
14         THE COURT:  Overruled.
15   BY MR. CLARK:
16   Q.    Do you know how much he was being paid?  Was
17   Abbas being paid $3,000 a month?
18   A.    I'm not certain what Abbas was being paid.  He
19   was being paid enough to pay for the rental of the
20   apartment and some subsistence, is my recollection.  I
21   don't remember what the amount was or if that amount
22   was the same each month.
23   Q.    Now -- but it was substantial enough to sustain
24   him here.  Correct?
25   A.    Yes.  That was the intended purpose.
```

1   Q.     And you also testified that, when you start an

2   investigation, you receive information from sources,

3   one of which is a confidential informant?

4   A.     Yes.

5   Q.     And I believe you testified that, when you're

6   working with confidential informants, you have to

7   evaluate and debrief them.  Is that --

8   A.     Yes.

9   Q.     And the way that you evaluate and debrief them is

10  also governed by the Attorney General's guidelines

11  regarding the use of confidential informants, isn't it?

12  A.     The way in which you debrief them?

13  Q.     The way in which you evaluate and debrief them.

14  A.     No.  I'm unfamiliar with that.

15  Q.     You're evaluating them -- you used the term

16  "suitable."

17         Do you remember testifying you had to find out

18  whether the confidential informant is suitable?

19  A.     Yes.

20  Q.     Do you remember testifying to that on your direct

21  examination?

22  A.     Yes.

23  Q.     And you also said -- when you're looking at

24  whether he's suitable or not, you look at a lot of

25  different factors; do you not?

1   A.      Yes.

2   Q.      You look at his age.  Correct?

3   A.      That's a factor that you could consider.  Yes.

4   Q.      And his connections that he has with other

5   people.  Correct?

6   A.      In terms of -- I'm a little confused here.  Are

7   you talking about -- are you asking me questions

8   relating to the use -- the suitability of an informant

9   to be used in an investigation or the suitability of

10  somebody's -- of an individual to work as an informant

11  based on the information they're given?

12  Q.      I think I'm talking about both.

13  A.      Okay.  Then, what is the question?

14  Q.      The question is -- you have to consider the

15  person's age.  Do you remember that being one of the

16  guidelines -- one of the Attorney General's guidelines?

17  A.      Well, you can consider the age.

18  Q.      You cannot?

19  A.      I said "you can."

20  Q.      His alien status is to be considered.  Correct?

21  A.      Yes.

22  Q.      Because you also testified that you consider -- I

23  believe you used the term "corroboration."  Is that

24  correct?

25  A.      Have I used the term "corroboration"?

Velazquez - CROSS - By Mr. Clark                    181

```
 1   Q.    When you were talking about whether or not he's
 2   suitable or not.
 3   A.    I'm not sure I understand the question.
 4   Q.    Well, I said, whether the person -- you have to
 5   consider his connections to other people, whether or
 6   not to use -- I mean, when you use a confidential
 7   informant, you want to see who he's connected to?
 8   A.    That would be a factor in determining his
 9   potential value as an informant.
10   Q.    And whether he's suitable.  It's the same thing.
11   A.    No.  I disagree on that point.  I've used
12   informants that know quite a few people in this
13   particular area, and I've used informants that don't
14   know anyone in a particular area.
15         A case in point would be Elie Assaad, who was
16   used in this investigation.  Prior to his arrival in
17   Miami, he didn't know any of the subjects of the
18   investigation.
19   Q.    Well, the connections is one of the -- isn't it
20   one of the bases in the Attorney General's guidelines
21   for using confidential informants and determining their
22   suitability?
23             MS. ARANGO:  Objection.  Relevance.
24             THE COURT:  Sustained.
25
```

Velazquez - CROSS - By Mr. Clark                    182

```
 1   BY MR. CLARK:

 2   Q.     You look at the relationship between the CI and

 3   the target, don't you?

 4   A.     It depends.

 5   Q.     Well, in this case, you did, didn't you?

 6   A.     We evaluated the relationship that existed to the

 7   extent of determining how it was that Abbas received

 8   this information.  And it was from a preexisting

 9   relationship with Narseal Batiste.

10   Q.     One of the other -- the motivation of the -- of a

11   confidential informant is one of the things you look at

12   to determine whether he's suitable, especially --

13   specifically including any Government compensation.

14   Correct?

15   A.     I would say motivation is something that you

16   would evaluate in terms of suitability.  Yes.

17   Absolutely.

18   Q.     And that's in the Attorney General's guidelines

19   as well, isn't it?

20          MS. ARANGO:  Objection.  Relevance.

21          THE COURT:  Sustained.

22   BY MR. CLARK:

23   Q.     Well, these evaluations of suitability is

24   something that you have to continue to do, isn't it,

25   sir?
```

Velazquez - CROSS - By Mr. Clark                183

```
 1   A.     I'm unfamiliar with the frequency of the

 2   suitability checks.

 3   Q.     Well, it has to be done at least annually,

 4   according to the guidelines.  Correct?

 5          MS. ARANGO:  Objection.  Relevance.

 6          THE COURT:  Sustained.

 7   BY MR. CLARK:

 8   Q.     You have to continue to look at your confidential

 9   informant to see if he's telling you the truth or not?

10   A.     If you're working with informants, you are

11   continually evaluating the information that they're

12   providing, whether they're operating in an undercover

13   manner or they're just providing information.

14          That's a continual process.  You're always

15   evaluating the information that they're giving you for

16   accuracy.

17   Q.     And you're trying to determine if what they're

18   giving you is false information.  Correct?

19   A.     That's correct.

20   Q.     Whether or not they're just fabricating

21   information.  Correct?

22   A.     That's part of the corroboration process.  Yes.

23   Q.     And to determine if there's any deception going

24   on and you're just being scammed or conned by the

25   confidential informant himself.  Correct?
```

Velazquez - CROSS - By Mr. Clark                    184

```
 1    A.    That would go towards the corroboration of the

 2    evidence -- of the information, rather, that's being

 3    provided.

 4    Q.    And if you are -- you're also -- if money's

 5    involved in the operation -- the sting operation, you

 6    have to look at whether or not you're being scammed by

 7    the target of the operation as well, don't you?

 8    A.    Yes.

 9    Q.    What is your definition of a "con"?

10    A.    My definition of a "con"?

11    Q.    Yes, sir.

12          MS. ARANGO:  Objection.  Relevance.

13          THE COURT:  Sustained.

14    BY MR. CLARK:

15    Q.    Anytime money is involved in an operation,

16    there's a chance that somebody can try to steal the

17    money; isn't that correct?

18    A.    Yes.

19    Q.    And so -- and that's what -- if somebody promises

20    to deliver something that they're really not going to

21    deliver in order to get money, that's a con.  Isn't

22    that correct?

23    A.    If somebody promises to give something for money

24    and they don't provide it, then, yeah, it's a ripoff or

25    it could be considered a con.  Yes.
```

1   Q.    Whenever you have a situation like that, the

2   objective is to try to get money.  Correct?

3   A.    Money or something of value.

4   Q.    And in those situations, usually you find a lot

5   of talk about money.  Correct?

6         MS. ARANGO:  Objection.  Vague.

7         THE COURT:  Sustained.

8         Rephrase your question.

9   BY MR. CLARK:

10  Q.    In order to evaluate whether or not there's a

11  scam going on versus an actual crime being committed,

12  you know, you have to look at the factors that are

13  developing in the investigation; do you not?

14  A.    Yes.  Part of the -- and one of the factors you

15  evaluate is whether the actions of the individuals

16  involved -- or the subjects of the investigation are

17  consistent with what's actually being investigated.

18  Q.    Well, if there's a lot of talk about money,

19  that's usually a factor that goes into an investigation

20  where there's a con going on.  If there's a con going

21  on, there's a lot of talk about money.  Correct?

22  A.    No.  I would disagree with that.

23  Q.    Well, if there's a lot of talk about somebody

24  trying to get money, that could be a scam, couldn't it?

25  A.    The -- I'm not sure I understand your question.

Velazquez - CROSS - By Mr. Clark                    186

1    Q.    If the confidential informant and the target are

2    constantly talking about money, then, that's a -- you

3    have to evaluate it as a possible scam.  Correct?

4    A.    That's correct.

5    Q.    Situations -- another factor where it's a

6    possible scam is if there's somebody posing as somebody

7    who can give a lot of money.  Correct?

8    A.    Could you repeat that, please.

9    Q.    If you're investigating a case and somebody is

10   posing to be someone that could give a lot of money,

11   then, that's a factor in favor of a possible scam?

12   A.    That's -- it could be a factor.

13   Q.    If somebody is complaining about money all the

14   time, that's another factor of a possible scam?

15   A.    I mean, it could be a factor of a number of

16   things.

17   Q.    It could be a factor of a scam, too, couldn't it?

18   A.    It could possibly be a factor of a scam.

19   Q.    And if someone is continuing to posture -- if the

20   target is continuing to posture and not try to deliver

21   the goods and trying to get the money, then, that's

22   another factor of a possible scam.  Correct?

23   A.    That is true.  But when the target of the

24   investigation does deliver and their actions are

25   consistent with what's being investigated, then, that

Velazquez - CROSS - By Mr. Clark                    187

1   would preclude that from being a scam.

2   Q.     You have to evaluate all the factors, don't you?

3   A.     You do.

4   Q.     And if a target makes -- starts fabricating any

5   facts, that may be evidence of a possible scam?

6   A.     Possibly.

7   Q.     And if he makes preposterous or unreasonable

8   promises, that could be a possibility that he's trying

9   to make a scam for money?

10  A.     It could be a possibility of a number of

11  different things.  It could be a deranged mental state.

12  It could be a scam.  It could be a number of different

13  things.

14  Q.     Now, you also have to look and see if the target

15  or even the CI has ever committed a scam before.

16  That's real strong evidence that this person's a scam

17  artist, if he's scammed you before?

18  A.     If someone's scammed you before, then, that would

19  certainly be taken into consideration.

20  Q.     If they got money from you based on false facts

21  or not delivering something, that would be -- strongly

22  indicate this person is scamming you.  Correct?

23  A.     No.  Not necessarily.  It's something that you

24  would consider.

25  Q.     Now, when you're evaluating the suitability of

Velazquez - CROSS - By Mr. Clark                    188

1    CIs, you also have to look at the fact if they failed

2    to make a number of consensual recordings.  Correct?

3    A.    I'm not sure I understand your question.

4    Q.    If you have a CI that fails to make consensual

5    recordings that you've instructed him to make, if he

6    does that repeatedly, you have to look at that in terms

7    of evaluating that person's suitability as a

8    confidential informant, don't you?

9    A.    No.  What you need to evaluate is the reason why

10   the recording or recordings weren't effected, one.

11        Two, every informant doesn't agree to make

12   recordings.

13        So you have generally two types, confidential

14   informants, which just provide information, and

15   cooperating witnesses, or CWs, which do.

16   Q.    First of all, if he fails it make a recording,

17   then you can -- then you can look and see why he didn't

18   make the recording.

19   A.    If he didn't make the recording, then, yes, you

20   would find out why the recording wasn't made.

21   Q.    And that's something you have to evaluate on

22   their suitability?

23   A.    Yes.

24   Q.    Now, in this case, in your direct testimony,

25   you -- the first recordings that you testified about

1    and presented in court here were on November the 21st.

2    Is that correct?

3    A.    I believe so.

4    Q.    And of that transcript, you played

5    approximately -- you played two clips.  Correct?

6    A.    I believe that's correct.  Yes.

7    Q.    And one of those clips was on Page 35, where you

8    testified that there was a statement that Narseal

9    Batiste said he knew bin Laden or asked if -- I'm

10   sorry.  He asked if the man coming from overseas knows

11   bid Laden.

12         Do you remember that?

13   A.    I do.

14   Q.    And you testified that this established that

15   there had been a previous conversation about bin Laden.

16   A.    I don't believe that was my testimony.

17         What I believe my testimony was was that clearly

18   established that there was a previous conversation

19   about Abbas putting Batiste in contact with someone

20   from a terrorist organization.

21   Q.    Okay.  And you also testified to another clip

22   that -- where a ground war was discussed.

23         Do you recall that?

24   A.    Yes.

25   Q.    And after you testified to, I believe, maybe one

Velazquez - CROSS - By Mr. Clark                    190

```
 1   other clip or two other clips, you said it was at this
 2   time on November the 21st that you began to pursue
 3   measures to bring in a second informant.
 4   A.     I believe that's correct.
 5   Q.     That's what you testified to?
 6   A.     I believe that's accurate.
 7   Q.     Now, isn't it true, sir, that the idea of
 8   bringing in the second confidential informant occurred
 9   way before this?
10   A.     With me personally?
11   Q.     With the FBI.
12   A.     I can say that, as soon as I received information
13   that Narseal Batiste asked Abbas to put him in contact
14   with a member of a terrorist organization, I was
15   immediately thinking, if the information is
16   corroborated, that, at some point, we would be
17   attempting to introduce that person in an undercover
18   role.
19   Q.     So I guess, you know, the fact of the bringing in
20   a second informant to pose as someone coming from
21   overseas -- that occurred long before 11-21?
22   A.     What occurred?
23   Q.     Deciding to bring in the second informant to pose
24   as someone coming from overseas.
25   A.     No.  The idea was there, because it would be a
```

```
 1    logical conclusion if you reached that point in the

 2    investigation.

 3          The decision to actually bring Elie Assaad posing

 4    as an Al-Qaeda member occurred after that.

 5    Q.    Well, you actually -- you had the FBI -- you --

 6    the FBI did write a letter to Immigration to give the

 7    second informant --

 8          MS. ARANGO:  Objection.  Hearsay and outside

 9    the scope of direct.

10          THE COURT:  Sustained.

11    BY MR. CLARK:

12    Q.    Did you instruct someone to arrange to bring in

13    CW 2 to pose as a second informant?

14    A.    It's my recollection that there were arrangements

15    made for Elie to come in and possibly act as the

16    Al-Qaeda representative.

17    Q.    And didn't you instruct an agent in your office

18    before November 8th to write a letter to arrange for

19    the second informant to come in?

20          MS. ARANGO:  Same objection.  Hearsay and

21    outside the scope.

22          THE COURT:  Sustained.

23    BY MR. CLARK:

24    Q.    I'm asking you if you instructed someone in your

25    organization to write a letter to Immigration prior to
```

1    November 8th to arrange for CW 2 to come in.

2              MS. ARANGO:  Same objection.

3              THE COURT:  Sustained.

4    BY MR. CLARK:

5    Q.    When you make arrangements for a confidential

6    informant to come in, you have to get approval through

7    the FBI.  Correct?

8    A.    There are -- yes, you do.

9    Q.    And you don't just do that overnight, do you?

10   A.    You can do it overnight.  Yeah.

11   Q.    Okay.  You can do it overnight?

12   A.    Yes.

13   Q.    Well, do you know what happened in this case,

14   how -- when you got CW 2 to come in to pose as a second

15   informant in this case?

16   A.    If you're talking about acquiring the authority

17   to bring an informant in to work in an investigation in

18   your division, in this case, Miami, I could do that

19   over the telephone and buy the informant a ticket to

20   fly in from New York.

21              If you're talking about utilizing an informant or

22   having somebody come in to work as an informant that

23   has immigration issues, then, we're talking about

24   something completely different.  There are other

25   authorities that you have to acquire along with that

```
 1   individual to enter into the United States.
 2   Q.    Well, I'm talking about bringing in Mr. Elie
 3   Assaad in this case to work in this case as an
 4   informant, to work on this case right here.
 5         When did you seek to bring him in to work on this
 6   case?
 7   A.    I don't recall exactly when that was.
 8   Q.    Well, would it help you to refresh your
 9   recollection -- would something refresh your
10   recollection?
11   A.    It may.
12         MR. CLARK:  May I approach the witness, your
13   Honor?
14         THE COURT:  Show it to the Government first.
15         MR. CLARK:  (Tenders document to the witness.)
16         THE WITNESS:  I'm familiar with this document.
17   BY MR. CLARK:
18   Q.    Does that refresh your recollection as to when
19   you made arrangements to have CW 2 to come and work on
20   this case?
21   A.    No.  This document indicates a date of
22   November 8th, and it's a document requesting a
23   significant public benefit parol, which allows an
24   individual who doesn't have status in the United States
25   to enter.  And it appears that's when it occurred.
```

1          Now, with regard to actually utilizing this

2     person in the investigation, the actual decision to

3     have him have any meetings occurred after the

4     November 21st meeting.

5     Q.     Well, you've had Mr. Abbas -- you instructed him

6     to talk to Mr. Narseal Batiste, did you not, about a

7     person coming from overseas?

8     A.     That's correct.  And had that -- had the response

9     to that inquiry by Abbas been, "What are you talking

10    about, a person coming over to meet?", that would have

11    indicated that there wasn't a conversation.  But that's

12    not what occurred.

13         What occurred was there was a reference to the

14    conversation where Batiste had asked to meet with

15    somebody from a terrorist organization and he made that

16    request to Abbas.

17         And it was after that that, if we were going to

18    introduce another individual, that individual would

19    have had to have -- already be here in Miami.

20    Q.     Now, you recall -- you did not -- this did not

21    get presented, I believe, in your direct testimony.

22         But you made -- did you make reference to the UDS

23    flier?

24    A.     I'm sorry?

25    Q.     A UDS flier.

```
 1    A.     Universal Divine Saviors.

 2    Q.     The flier.  Correct.

 3           Do you know about the flier?

 4    A.     Yes.

 5    Q.     Have you seen a flier?

 6    A.     I have.

 7    Q.     And it's your testimony that that was given to

 8    you by Mr. Abbas?

 9    A.     No.  My testimony, I believe, is that that flier

10    was shown to me by Agent Stewart, who received it from

11    Abbas.

12    Q.     And when were you shown that flier?

13    A.     I don't recall.

14    Q.     Well, it was before November the 21st, wasn't it?

15    A.     Yes, it was.

16    Q.     And it was before you met with Mr. Abbas on

17    October the 20th, wasn't it?

18    A.     October -- no.  Abbas came back on October the

19    20th.

20    Q.     I know.

21           But you saw the flier before -- -- before he came

22    back, didn't you?

23    A.     No.  He brought the flier back with him.  He took

24    the flier to Yemen and he brought it back, is my

25    understanding.
```

```
1    Q.    So you saw it on October the 20th?

2    A.    No.  That is not my testimony.  I saw Abbas on

3    October the 20th.  I saw the flier at some point before

4    the meeting on the 21st, I think, was your previous --

5    Q.    My question is now:  When did you see the flier?

6    A.    Before November 21st and after Abbas got back

7    from Yemen on October 20th.

8    Q.    Well, how long after he got back from Yemen did

9    you see the flier?

10   A.    I don't recall.

11   Q.    Well, I'm sure, in corroborating his testimony,

12   you're going to be looking at this flier pretty soon,

13   aren't you?

14   A.    Now?

15   Q.    No.  When he got back on October the 20th.

16   A.    When he arrived on October 20th, I was the acting

17   supervisor.  So John Stewart was making me aware of

18   developments that were going on in the investigation

19   after Abbas arrived, and one of the things he made me

20   aware of was the Universal Divine Saviors flier.

21   Q.    So you would have looked at it as soon as he got

22   back, normally, wouldn't you?

23   A.    I'm not -- I don't understand your question.  I

24   would have or did I?

25   Q.    You would have.
```

Velazquez - CROSS - By Mr. Clark          197

```
 1    A.     I did see the flier.

 2    Q.     As soon as he got back?

 3    A.     Well, that depends on how you characterize "as

 4    soon as he got back."

 5           It was after the 20th and before the 21st of

 6    November.

 7    Q.     Well, I'm trying to get a more specific date

 8    during those 51 days.

 9    A.     That's not 51 days.  October 20th to November --

10    Q.     I'm sorry.  31 days.

11    A.     Right.

12           And I don't know how to respond to that because I

13    don't remember exactly what day I saw the flier.

14    Q.     Well, you met with him on October the 20th.

15    Correct?

16    A.     I did.

17    Q.     And you -- I believe you testified that you gave

18    him a recording device on -- was it October 28th?

19    A.     I don't think that was my testimony.  I think my

20    testimony was that I don't recall who gave Abbas the

21    recording equipment.

22    Q.     Do you know when the recording equipment was

23    given to Mr. Abbas?

24    A.     I believe it was before the 29th of October -- or

25    the 31st of October, rather.
```

Velazquez - CROSS - By Mr. Clark                198

```
 1   Q.    Had you seen the flier by the time you gave
 2   him -- he was given the recording equipment?
 3   A.    I'm not sure if I did or not.
 4   Q.    At some point, you did see the flier?
 5   A.    At some point, I did see the flier.
 6   Q.    And did you look at the information on the flier?
 7   A.    I read the flier.  Yes.
 8   Q.    Do you recall there being an address on the
 9   flier?
10   A.    Yes.
11   Q.    And do you recall there being a fax number on the
12   flier?
13   A.    I do.
14   Q.    And the address -- as you sit here today, do you
15   know where that address is located?
16         MS. ARANGO:  Objection, Judge.  Outside the
17   scope and referring to a document that's not in
18   evidence.
19         THE COURT:  Sustained.
20   BY MR. CLARK:
21   Q.    Did you ever corroborate the -- do you remember
22   there being an address on the flier?
23   A.    I do.
24   Q.    Do you remember there being a fax number on the
25   flier?
```

1    A.     I do.

2    Q.     And did you ever corroborate through an

3    independent investigation where those addresses were

4    and where those fax numbers were prior to June of 2006?

5    A.     I'm not sure when that occurred, but it occurred

6    at some point.

7    Q.     Well, it didn't occur until after the arrest.

8    Isn't that correct?

9    A.     Possibly.  I don't recall.

10         THE COURT:  We're going to take a break.

11         Do not discuss this case either amongst

12   yourselves or with anyone else.  Have no contact

13   whatsoever with anyone associated with the trial.  Do

14   not read, listen or see anything touching on this

15   matter in any way.

16         If anyone should try to talk to you about this

17   case, you should immediately instruct them to stop and

18   report it to my staff.

19         You may leave your materials at your chairs.

20   Please be back in the jury room in ten minutes.  We'll

21   be in recess for ten minutes.

22         (Whereupon, the jury exited the courtroom at

23   3:42 p.m. and the following proceedings were had:)

24         THE COURT:  We're back on United States of

25   America versus Narseal Batiste, et al., Case

1   No. 06-20373.

2        Counsel, state your appearances, please, for

3   the record.

4        MR. GREGORIE:  Richard Gregorie and Jacqueline

5   Arango on behalf of the United States, your Honor.

6        MS. JHONES:  Ana Jhones on behalf of Narseal

7   Batiste, who is present.

8        MR. LEVIN:  Albert Levin for Patrick Abraham,

9   who's here.

10        MR. CASUSO:  Louie Casuso on behalf of Burson

11   Augustin, who's here.

12        MR. CLARK:  Nathan Clark on behalf of

13   Rotschild Augustine, who's present.

14        MR. HOULIHAN:  Richard Houlihan on behalf of

15   Naudimar Herrera.

16        MR. VEREEN:  Roderick Vereen on behalf of

17   Stanley Phanor.

18        THE COURT:  All Defendants are present.

19        Let's bring in the jury.

20        (Whereupon, the jury entered the courtroom at

21   4:07 p.m. and the following proceedings were had:)

22        THE COURT:  You may be seated.

23        You are still under oath, sir.

24        You may proceed, Mr. Clark.

25        MR. CLARK:  Thank you, your Honor.

```
 1   BY MR. CLARK:

 2   Q.    When we left off, Agent Velazquez, we were

 3   talking about the UDS flier.

 4         You eventually corroborated at some point that

 5   the address on that flier went to the Contractor

 6   Resource Center.  Correct?

 7   A.    Yes.

 8   Q.    The fax number on that flier also went back to

 9   the Contractor Resource Center.  Correct?

10   A.    Yes.

11   Q.    That flier was a flier that, by examination, was

12   a request for money or donations.  Correct?

13   A.    I believe it made a reference to a food pantry.

14   I'd have to look at the flier again.

15   Q.    Now, at this time, you began some surveillance of

16   the -- what has been called the Embassy, correct, or

17   the --

18   A.    At which time?

19   Q.    Well, October the 20th.

20         Did you commence -- after Hurricane Wilma, did

21   you commence to surveil the Embassy or the Temple, as

22   it's been referred to?

23   A.    Yes.

24         MR. CLARK:  May I publish, your Honor,

25   Exhibit 7?
```

```
 1              THE COURT:  Okay.
 2   BY MR. CLARK:
 3   Q.     Now, this is the Embassy.  Correct?
 4   A.     Yes.
 5   Q.     The Temple?
 6          And this is the building that contained
 7   construction supplies that went with Azteca Masonry?
 8   A.     I believe, at one point or another, there were
 9   supplies that were used by Narseal Batiste and others
10   with some of their jobsites.
11   Q.     Now, the side of the building that we are looking
12   at:  Is that facing east?
13   A.     Yes.
14   Q.     All right.  Now, on the north side of the
15   building -- which would be to this side (indicating).
16   Correct?
17   A.     Yes.
18   Q.     That is -- there are stores on that side, food
19   markets.  Correct?
20   A.     That's correct.
21   Q.     And this is a commercial street.  Correct?
22   A.     Yes.
23   Q.     And on the south side of the building, which
24   would be over here (indicating), there is an empty lot.
25   Correct?
```

Velazquez - CROSS - By Mr. Clark                    203

```
 1   A.     Yes.  I believe so.  In the back.

 2   Q.     And then south of the empty lot is a church.

 3   Correct?

 4   A.     Yes.

 5   Q.     And then, in the rear of the building, on the

 6   west side of the building, there is a lot -- an empty

 7   lot.  Correct?

 8   A.     Yes.

 9   Q.     And further west from that there are homes.

10   Correct?

11   A.     Yes.

12   Q.     And around the -- in the lot, on the rear, around

13   the fenced area, there is no trees or vegetation, are

14   there?

15   A.     On the west side?

16   Q.     Yes, sir.

17   A.     No.  I don't recall seeing any trees there.

18   Q.     Now, this sign here indicates that there was once

19   a public phone there?

20   A.     That's what -- yes.

21   Q.     And on the east of this building, across this

22   street, which is -- what street is this?  Do you know?

23   A.     Northwest 15th Avenue.

24   Q.     All right.  Across the street are projects.

25   Correct?
```

```
 1   A.     That's correct.

 2   Q.     And there's a fence around the projects.

 3   Correct?

 4   A.     Yes.

 5   Q.     And there's no -- at the time, in 2004, there was

 6   no vegetation along those fence lines.  Correct?

 7   A.     No.  You could see through the fence.

 8   Q.     Okay.  And so, on all sides of this building,

 9   there are clear signs of sight.  Correct?

10   A.     Depending on where you stand, yes.

11   Q.     During the time that you surveilled the building,

12   did you ever see at any time either one of those doors

13   open?

14   A.     Yes.

15   Q.     Would it have been this door?

16   A.     Yes.

17   Q.     What about this door?

18   A.     I don't recall ever seeing that door open.

19   Q.     But you did see this open?

20   A.     I did.

21   Q.     And you can see inside the building.  Correct?

22   A.     Yes.

23   Q.     Now, at nighttime in this area, there is a safety

24   issue; is there not?

25   A.     Is there a safety issue in that area at night?
```

1    Yes.  There can -- there could be.

2    Q.    So if you maintained the door open at nighttime,

3    you may want to be careful and have somebody guarding

4    that door.  Correct?

5    A.    It depends.

6    Q.    I said "you may."

7          If it's at nighttime, it could be a safety issue.

8    You might want to have somebody guarding the door.

9    A.    Again, I think it depends on what the purpose of

10   that building is, who the occupants are and what

11   they're doing.

12   Q.    Well, security -- numerous businesses around this

13   area have security precautions; do they not?

14   A.    Yes.  But I don't know of any of the businesses

15   that have guards.

16   Q.    Now, you said that consensual recordings began

17   around October the 29th, I believe.  Is that correct?

18   A.    The end of October.  Yes.

19   Q.    And there was a consensual recording on October

20   the 29th.  Is that right?

21   A.    I believe so.  Yes.

22   Q.    And that would be Consensual Recording No. 1?

23   A.    If it was the first one, it would be.

24   Q.    Well, that has been pre-marked as Exhibit 38 in

25   this case.

1          You're aware of that.  Correct?

2   A.     I'm not certain what the exhibit number is.

3   Q.     On the very next night -- well, the recorder was

4   given to Mr. Abbas and he controls when to turn it on

5   and turn it off.  Correct?

6   A.     He would be able to control when it was turned on

7   and when it was turned off.

8   Q.     And so, on this night -- he was given

9   instructions to record this -- record a meeting on this

10  night?

11  A.     I would presume so.  I did not personally

12  instruct Abbas on --

13  Q.     Have you ever given him instructions not to

14  record a meeting?

15  A.     No.  Not to Abbas.

16  Q.     Okay.  So on the next night, on October the 30th

17  of '05, there was another consensual recording with

18  Narseal Batiste.  Correct?

19  A.     I'm uncertain.

20  Q.     You're not sure?

21  A.     That's correct.

22  Q.     All right.  Well, the following night of

23  October the 31st, do you know if there was a consensual

24  recording then?

25  A.     I believe I recall a recording on the 31st of

1    October.

2    Q.    On November the 1st of '05, do you recall

3    instructing him to do a consensual recording with Mike

4    about the AK-47?

5    A.    No.

6    Q.    Do you know -- was there a consensual recording

7    taking place on November the 1st of '05?

8    A.    There may have been.

9    Q.    Now, on November the 3rd, do you recall if there

10   was a consensually monitored telephone conversation?

11   A.    No.

12   Q.    Could you -- did you have consensually monitored

13   telephone conversations during this time?

14   A.    Yes.

15   Q.    Now, you testified earlier on direct that you did

16   not have wiretaps until February.

17   A.    That's correct.

18   Q.    But you -- but telephone calls could be -- were

19   recorded during this time, weren't they?

20   A.    Consensually monitored telephone calls.

21   Q.    How do those work?  How does a consensually

22   monitored telephone call work?

23   A.    The way it works is one of the informants agrees

24   to record these conversations.  We obtain the proper

25   authority from FBI management, the US Attorney's

1    Office.   A phone call is placed.   And then the

2    informant or consenting party records that

3    conversation.

4    Q.     Well, does he have a device that attaches to the

5    phone?

6    A.     There are many different ways to actually make

7    the recording.   That's one way.   There are other ways.

8    Q.     Do you know how Mr. Abbas was consensually --

9    how -- having these telephone calls recorded?

10   A.     Not all of them.   No.

11   Q.     Were you monitoring or someone -- an FBI agent

12   monitoring these phone calls?

13   A.     They may have been monitored or they may not have

14   been monitored in cases where Abbas was by himself and

15   may have received a phone call or was directed to place

16   a phone call via the telephone by one of the

17   investigating agents.

18   Q.     It could have been monitored.   Correct?

19   A.     It could --

20   Q.     It could have been monitored?

21   A.     Yes.   It could have been monitored.

22   Q.     Okay.   Now, on November the 3rd of' 05, do you

23   recall doing surveillance for tags at that time at the

24   Embassy?

25   A.     I don't specifically recall that date.

Velazquez - CROSS - By Mr. Clark                209

1    Q.     Would something help refresh your recollection?

2    A.     Possibly.

3           MR. CLARK:  May I approach, your Honor?

4           THE COURT:  Yes.

5           MR. CLARK:  (Tenders document to the witness.)

6           THE WITNESS:  Yes.  This is a -- this is an

7    FD-302 dated 11-3-2004.

8    BY MR. CLARK:

9    Q.     The only question I have is:  Does that refresh

10   your recollection that they were -- there was

11   surveillance tags at the Embassy on November the 3rd?

12   A.     Yes.

13   Q.     Now, I believe -- do you recall in your testimony

14   in this case that you were testifying that surveillance

15   of tags took place after November the 7th?

16   A.     I'm sure that during the course of surveillance

17   after November the 7th, tags were taken.

18   Q.     And this would refresh your recollection.

19          And, also, identification of tags at the Embassy

20   or Temple were being done on November the 3rd?

21   A.     Yes.

22   Q.     Prior to November the 7th?

23   A.     That's correct.

24   Q.     Now, you -- also on November the 4th, you would

25   meet and debrief Mr. Abbas.  Is that correct?

Velazquez - CROSS - By Mr. Clark                210

```
 1    A.     I'm not sure if I debriefed Abbas on November
 2    the 4th.
 3    Q.     Well, was he being debriefed following each
 4    consensual recording?
 5    A.     No.  There may have been consensual telephone
 6    recordings trying to set up a meeting where he would
 7    not necessarily have been debriefed.
 8    Q.     At some point, he has to turn over the recording
 9    to someone.  Is that correct?
10    A.     That's correct.
11    Q.     At that time, he is debriefed?
12    A.     He would be debriefed.  Yes.
13    Q.     All right.  Now, on November the 4th, do you
14    recall a consensually monitored telephone conversation
15    between Narseal Batiste and Mr. Abbas?
16    A.     No.
17    Q.     And was it within Mr. Abbas's -- was he
18    instructed on November the 4th to talk to Mr. Narseal
19    Batiste about having a guy coming over, getting a guy
20    coming?
21    A.      No.  He was instructed to play the role that he
22    assumed after Narseal Batiste asked him to put him in
23    contact with a member of a terrorist organization
24    overseas.  So on that date, that wasn't Abbas's idea.
25    That came from Narseal Batiste.
```

1   Q.    Well, if Abbas was -- was it within his scope to

2   tell Mr. Narseal Batiste that a guy was coming as of

3   November the 4th of '05?

4   A.    Possibly.  No.  I -- yes.

5   Q.    So if he were doing that, it was within his scope

6   for him to tell Mr. Narseal Batiste that somebody was

7   definitely coming?

8   A.    Not to tell him that somebody was definitely

9   coming, but to engage in conversations related to that

10  topic.

11  Q.    Well, at -- if he had that authority at that

12  time, then you were considering bringing somebody else

13  in at that time.  Correct?

14  A.    I stated before that, based on the initial

15  information that Narseal Batiste wanted to meet someone

16  from a terrorist organization at that moment, that idea

17  was always in the back of my head because it would be

18  the next logical step pursuant to corroborating the

19  information that Abbas initially provided us.

20  Q.    Now, also, do you recall whether or not a

21  recorded conversation was had on November the 6th?

22  A.    No.

23  Q.    Was -- at this time, as of -- well, let me go

24  back to November 4th for a minute.

25        At this time, was Mr. Abbas instructed to discuss

 1  getting money from Faisal Hassan?

 2  A.    I'm unaware of any instructions from Abbas

 3  regarding getting money from anyone.

 4  Q.    Well, was it outside the scope of his authority

 5  on that date to discuss such?

 6  A.    I would have to see what -- in what context that

 7  conversation may or may not have taken place.

 8  Q.    Well, would that have any significance on your

 9  investigation?

10  A.    I'm sorry?

11  Q.    Would that have any significance on your

12  investigation, to make that evaluation?

13  A.    Would it have any significance?

14  Q.    Yes, sir.

15  A.    I'm not certain.  I would have to listen to or

16  read what you're referring to.

17  Q.    Well, you can -- the first thing that you played

18  in your direct testimony was November the 21st.

19  Correct?

20  A.    I believe so.  Yes.

21  Q.    Those recordings that were made in early November

22  were not played during your direct testimony --

23  A.    No.

24  Q.    -- or entered into evidence, were they?

25  A.    No.

1    Q.     On November 6th, is that about the time that the

2    FBI set up an apartment for Abbas in Miami Beach?

3    A.     I'm not sure when that apartment was set up.

4    Q.     At the time they did set up the apartment, was he

5    instructed to tell Narseal Batiste that he was getting

6    money from back home to set himself up in that

7    apartment?

8    A.     No.  I did not provide any instructions like that

9    to Abbas.

10   Q.     Well, would that have been within the scope of

11   his authority to do so, to explain how he was

12   getting -- managing to get set up in an apartment in

13   Miami Beach?

14   A.     Yes.

15   Q.     Was he instructed to discuss with Narseal Batiste

16   on November the 6th his -- Narseal Batiste's desperate

17   financial condition?

18   A.     I gave no such instructions to Abbas.

19   Q.     Would that be within his authority to do that?

20   A.     Yes.

21   Q.     Now, on November the 7th -- you talked about

22   November the 7th in your direct testimony.  Correct?

23   A.     Yes.

24   Q.     But you did not play that transcript or enter it

25   into evidence during your direct testimony.  Is that

Velazquez - CROSS - By Mr. Clark                    214

```
 1   correct?
 2   A.      That's correct.
 3   Q.      Now, that is already the -- do you know how many
 4   recordings have been had through November the 7th?
 5   A.      No.
 6   Q.      Would it be approximately ten?
 7   A.      I'm uncertain.
 8   Q.      Well, all of these recordings that are being had
 9   through November the 7th are important to evaluate the
10   suitability of your confidential informant, weren't
11   they?
12   A.      Yes.  The review of those tapes, along with other
13   information, is important as it related to the
14   suitability assessment of the informant as well as the
15   information the informant provided.
16   Q.      And they're also important to determine the
17   intentions of the target and the confidential
18   informant, aren't they?
19   A.      I'm not sure I understand that question.
20   Q.      Well, you had testified that, on November the
21   21st, you reviewed the transcript of the recording and
22   you basically evaluated that and it had an impact on
23   your investigation.
24   A.      Yes.  It was very clear that there was a prior
25   conversation where Narseal Batiste had asked Abbas to
```

 1    make this introduction, as you can hear in the tape or

 2    read in the transcript.

 3    Q.     Well, the conversations from October the 29th to

 4    November the 20th -- those are the prior conversations,

 5    aren't they?

 6    A.     Yes.  They occur before the 21st.

 7    Q.     So it would be important to the actual

 8    conversations themselves to evaluate what is going on

 9    in this case?

10    A.     Yes.

11    Q.     On November the 7th, did you instruct the --

12    Mr. Abbas to discuss financing with Mr. Narseal

13    Batiste?

14    A.     No.

15    Q.     If he did that, would that be outside the scope

16    of his authority?

17    A.     No.

18    Q.     And did you instruct him to discuss computers for

19    his -- for the Temple or Embassy?

20    A.     No.

21    Q.     Would that be outside the scope of his authority,

22    to do that?

23    A.     No.

24    Q.     And did you discuss with him -- instruct him to

25    say that his uncle was bringing money?

1   A.    No.

2   Q.    Would that be outside the scope of his authority

3   to do so?

4   A.    No.

5   Q.    And did you instruct him to say -- tell any --

6   Mr. Batiste or anyone else that, "Don't make me look

7   stupid"?

8   A.    No.

9   Q.    Would that have been outside the scope of his

10  authority to do that?

11  A.    I would say "no."

12  Q.    Now, after November the 7th, we have a 14-day

13  period to November the 21st, which is the first day

14  that -- the first tape that you testified about and put

15  into evidence on your direct.  Correct?

16  A.    Yes.

17  Q.    But there were numerous -- there was a number of

18  consensual recordings between November the 7th and

19  November the 21st as well.  Isn't that right?

20  A.    I'm -- possibly.

21  Q.    Well, did you review all of consensual recordings

22  as they happened?

23  A.    No.

24  Q.    When did you review them?

25  A.    It depends on which ones you're referring to.

1          The more significant ones which were brought to

2     my attention were reviewed as soon as they were made

3     available by the other agents working the

4     investigation.

5          Other conversations which were recorded which

6     were not as significant weren't reviewed, maybe, until

7     later on in the investigation by myself.

8     Q.    Well, did you instruct Abbas -- Mr. Abbas to have

9     a consensually recorded conversation with Faisal Hassan

10    on November the 9th of '05?

11    A.    No.

12    Q.    Would that have been within the scope of his

13    authority to do that?

14    A.    Yes, as directed by the agents that were handling

15    him.

16    Q.    And would he have been instructed -- would it

17    have been within his scope to talk about money?

18    A.    It depends on what instructions he received with

19    respect to consensual recordings with Faisal Hassan.

20    Q.    On November the 9th of 2005, would it have been

21    within Abbas's authority to discuss with Narseal

22    Batiste that he was under a lot of stress and he was

23    not making enough money to run his business?

24    A.    Yes.

25    Q.    Now, on November the 10th, there was a --

 1   Mr. Abbas had a meeting with Narseal Batiste.  Is that

 2   correct?

 3   A.    I'm uncertain of that -- of the date,

 4   November 10th.

 5   Q.    You're not familiar with November the 10th?

 6   A.    No.

 7   Q.    On that date, did you give instructions -- were

 8   you giving the instructions to Mr. Abbas at this time,

 9   in November, prior to November 21st?

10   A.    No.

11   Q.    Were you following this investigation on a daily

12   basis?

13   A.    Yes.

14   Q.    Who was giving him the instructions?

15   A.    Either John Stewart or Joe Garbato.

16   Q.    Were they -- did you give them instructions on

17   what to tell Mr. Abbas?

18   A.    No, other than general guidance on topics to

19   discuss as related to the initial information we

20   received from Abbas.

21   Q.    Well, at this time, had -- by your surveillance,

22   had you determined that there were no flags in the

23   Embassy or Temple?

24   A.    I'm uncertain at this point -- you're talking

25   early November?

1    Q.     November 10th.

2    A.     November 10th?  I'm uncertain what was inside the

3    Embassy at that time.

4    Q.     Would it have been within Mr. Abbas's authority

5    at that time to tell Narseal Batiste that, "I'm going

6    to put some furniture in the Embassy, some beds in the

7    Embassy and some paint and Arabic red in the Embassy"?

8    A.     That, in my opinion, would have been well within

9    the scope of Abbas's interaction with Batiste in that

10   he was developing a relationship and pursuing the

11   information that he initially reported.

12   Q.     Was he instructed to do that?

13   A.     I'm not certain if he was instructed to

14   specifically mention Arabic red or flags or beds or

15   furniture, as I didn't provide direct instructions to

16   Abbas at this point in the investigation.

17   Q.     On November the 10th, a consensual recording

18   regarding those things would be significant to your

19   investigation, wouldn't it?

20   A.     Yes.

21   Q.     Now, on November 21st -- you did give some

22   testimony about that and you introduced that into

23   evidence.  Is that correct?

24   A.     Yes.  I monitored that meeting.

25   Q.     Did you monitor any meetings before this?

1    A.      No.  I don't believe so.

2    Q.      Before you monitored this meeting, did you go and

3    review all the other meetings that had been recorded?

4    A.      No.

5    Q.      Did you review with anyone what was taking place

6    at any of those meetings?

7    A.      Yes.  I did review the meeting on November 7th.

8    I had meetings with John Stewart and Joe Garbato

9    regarding other meetings that had occurred as well as

10   information that had been developed in the

11   investigation up to that point.

12   Q.      You also reviewed all the 302s about those

13   meetings prior to November 21st?

14   A.      Most of them.

15   Q.      On November the 21st, did you give Mr. Abbas his

16   instructions on what to do at that meeting?

17   A.      I believe that was Agent Stewart.

18   Q.      Were you present at those instructions?

19   A.      No.  I don't believe I was.

20   Q.      Was it -- did you instruct Mr. Abbas to say

21   that -- to turn -- well, let me -- that's in evidence,

22   I believe, Exhibit 21.  It's actually Exhibit 43-B.

23          MR. CLARK:  May I have just a moment, your

24   Honor?

25          THE COURT:  Yes.

```
 1   BY MR. CLARK:

 2   Q.    Did you instruct Mr. Abbas to engage in the

 3   reading of a book on jihad at that meeting?

 4   A.    No.

 5   Q.    Was that something contemplated by the FBI?

 6   A.    I'm not sure if -- is what --

 7   Q.    Was that an idea contemplated by the FBI for this

 8   meeting?

 9   A.    No.  Not that I'm aware of.

10   Q.    Is the answer you don't know or you -- or, no, it

11   was not?

12   A.    No.  My answer is that I'm unaware of any

13   instructions given to Abbas with regard to reading

14   excerpts from a book or discussing on a book on jihad.

15   However, that would have been within the scope of the

16   role he was played.

17   Q.    That would not?

18   A.    It would be.

19   Q.    It would be.

20         And did you instruct him to turn the conversation

21   to money during this -- during this meeting?

22   A.    No.

23   Q.    And did you instruct him to refer to this person

24   as someone his uncle knows?

25   A.    No.
```

1   Q.    Was that within the scope of what he was supposed

2   to be doing?

3   A.    Yes.  The scope of what Abbas was doing was to

4   engage in conversations to corroborate the information

5   we initially received and to indicate that there was a

6   member of a terrorist organization that would come over

7   and meet with Narseal Batiste, that the connection had

8   been made.

9   Q.    Was it -- was it within -- was he instructed to

10  refer to this person as someone who supported mosques?

11  A.    No.  I'm unaware of any specific instructions in

12  that regard.

13  Q.    Was that within the scope of his authority to do

14  it, to refer to him as somebody that supported mosques?

15  A.    Yes.  Well within the scope.  Abbas is creating a

16  fictitious person that is going to be played by another

17  individual.  And that's what he was doing in that

18  meeting.

19  Q.    Well, was he also instructed to tell Narseal

20  Batiste that, "You don't have to be a terrorist"?

21  A.    No.  He was not given any such instructions.

22  Q.    Was that within the scope of his authority to do

23  that, to say, "You don't have to be a terrorist"?

24  A.    Yes.  I would say so.  He's engaging in

25  conversations with Narseal Batiste related to his

```
 1   request to meet individuals or an individual from a

 2   terrorist organization.  So that would be well within

 3   the scope.

 4   Q.     Was it also within the scope of that meeting for

 5   him to tell Narseal Batiste that he needed to fix up

 6   the building to make it look more like a mosque?

 7   A.     Yes.

 8   Q.     Was it within the scope for him to tell him that

 9   he's unhappy, it still doesn't look like a mosque and

10   needs to look like a mosque?

11   A.     Yes.  That would have been well within the scope.

12   Q.     Was it within the scope to tell him that that's

13   what was needed to get the money?

14   A.     Would that have been within the scope?  Depending

15   on the context of the conversation, I would say "yes."

16   Q.     To get the money?  That was within the scope, to

17   do it that way?

18   A.     I'm uncertain of the exact passage that you're

19   referring to.  I would like to take a look at that

20   portion of the transcript, because you're making a

21   reference, I'm presuming, to the conversation which

22   took place on November 21st, and I don't believe that

23   that's an accurate representation of the conversation.

24   Q.     Was it within the scope for him to say that, once

25   you see certain things, that the support will come
```

 1   through?

 2   A.    Could you repeat that again.

 3   Q.    Was it within the scope of what he was doing to

 4   say, once -- once the person sees certain things, that

 5   the support, the money, will come through?

 6            MS. ARANGO:  Judge, I'm going to object as

 7   vague.

 8            THE COURT:  Sustained.

 9            Rephrase your question.

10            MR. CLARK:  What was the objection, your

11   Honor?

12            THE COURT:  Vague.

13   BY MR. CLARK:

14   Q.    Was it within the scope of Abbas's authority to

15   tell Narseal Batiste that, once certain things are

16   seen, then the support will come through, the money

17   will come through?

18            MS. ARANGO:  Same question.  Same objection.

19            THE COURT:  Is this a transcript that's in

20   evidence?

21            MR. CLARK:  Yes, your Honor.

22            THE COURT:  Why don't you quote directly from

23   it.  Place it in context.

24            MR. CLARK:  I did.  All right.  Let me find

25   that, your Honor.  Just one moment, your Honor.

```
 1              THE COURT:  Sure.

 2              MR. CLARK:  I can't find it at this time, your

 3    Honor.  I'm going to move on and I'll come back to

 4    that.  I can't seem to find that part of the

 5    transcript.

 6              THE COURT:  Okay.

 7    BY MR. CLARK:

 8    Q.    After the 23rd -- 21st, there were other -- there

 9    was -- they continued to have meetings.  Is that

10    correct?

11    A.    Yes.

12    Q.    And there was a meeting -- a consensually

13    recorded meeting on 11-23-05.  Correct?

14    A.    There may have been.

15    Q.    Do you remember that Mr. Batiste loaned $25 to

16    Mr. Abbas?

17    A.    I do recall Narseal Batiste -- or Abbas borrowing

18    some money from Batiste.

19    Q.    And you instructed Mr. Abbas to give the money

20    back.  Correct?

21    A.    I don't believe I did.  He may have received

22    instructions to do so.  Yes.

23    Q.    Why was that?

24    A.    Because he borrowed the money.

25    Q.    But was there -- just to pay him back the $25?
```

```
 1   A.    My understanding is that Abbas borrowed $25 and
 2   we told him to pay him back -- or he was instructed to
 3   pay him back.
 4   Q.    And was Abbas supposed to be expecting money from
 5   Yemen?  Was he instructed to be expecting money from
 6   Yemen?
 7   A.    No.  Not that I'm aware of.
 8   Q.    Would that have been within the scope of his
 9   authority, to be expecting money from Yemen?
10          MS. ARANGO:  Objection.  Vague.
11          THE COURT:  Sustained.
12          Rephrase your question.
13   BY MR. CLARK:
14   Q.    As of November the 23rd -- on November the 23rd
15   of '05, was he authorized -- was it within his
16   authority to be expecting money from Yemen?
17          MS. ARANGO:  Same objection, Judge.
18          THE COURT:  Sustained.
19          Rephrase your question.
20   BY MR. CLARK:
21   Q.    Was it within the authority -- on November the
22   23rd of '05, was it within Mr. Abbas's authority given
23   him by the FBI to be telling Narseal Batiste that he
24   was going to be expecting money from Yemen?
25   A.    Yes.  Abbas was giving -- was given instructions
```

1    to develop his role that Narseal Batiste had placed him

2    in, which was to be the conduit for meetings from a

3    terrorist organization.

4         Now, specifically how Abbas went about doing that

5    was, in part, left up to Abbas and his creativity in

6    developing that role.

7         And so the answer to your question is "yes," that

8    that would have been within the scope of the role Abbas

9    was developing in this investigation.

10   Q.   Do you recall that, on the meeting on 11-24-05 --

11   that at that meeting, Mr. Abbas -- the following

12   meeting was not recorded?

13   A.   I'm unaware of whether there was or was not a

14   meeting on November 24th.

15   Q.   Would it have been significant to you that there

16   was no recorded meeting on the following meeting?

17   A.   Would it have been significant?

18   Q.   Yes.

19   A.   No.  In the circumstances surrounding some

20   incidents that occurred at the Embassy, no, it would

21   not have been significant.

22        There may have been a safety issue associated

23   with Abbas wearing a body wire for that particular

24   meeting.  There may have been an attempt to record the

25   meeting that was unsuccessful.  There may have been an

1    equipment malfunction.

2    Q.     Do you know how many meetings were not recorded

3    during this period between November the 7th and

4    November the 21st?

5    A.     No, I do not.

6    Q.     Do you know that -- was there a meeting on

7    November the 25th between Batiste and Abbas?

8    A.     I'm -- I don't know.

9    Q.     And do you know if there was a meeting on

10   November the 26th of '05 between Narseal Batiste and

11   Abbas?

12   A.     No.

13   Q.     You do not know?

14   A.     I do not know.

15   Q.     Do you know if there was a meeting on November

16   the 28th with -- excuse me -- where there was telephone

17   communication on November 28th between Abbas and

18   Narseal Batiste?

19   A.     There may have been.

20   Q.     On December the 1st of '05, do you know if there

21   was a meeting between Abbas and Hassan -- Faisal Hassan

22   regarding the ownership -- an ownership change in the

23   store where Abbas's signature was forged?

24   A.     There may have been.  But if there's a document

25   or recording that would assist me in refreshing my

Velazquez - CROSS - By Mr. Clark                      229

```
 1    memory, I'd be happy to look at it.

 2    Q.    You don't remember it?

 3    A.    No.

 4    Q.    On December the 2nd, do you remember a meeting

 5    between Mr. Abbas and Mr. Hassan concerning --

 6          MS. ARANGO:  I would object, Judge.  It's

 7    hearsay.

 8          THE COURT:  Sustained.

 9          Rephrase your question.

10    BY MR. CLARK:

11    Q.    Did you instruct Mr. Abbas to meet with

12    Mr. Hassan on December the 2nd?

13    A.    I did not.  He may have been instructed by other

14    agents involved in the investigation.

15    Q.    Do you know if he was so instructed?

16    A.    I remember that Abbas did receive instructions to

17    meet with Faisal Hassan or to gather information.

18    However, I'm uncertain if those instructions were given

19    on the 2nd of December or if they actually met on the

20    2nd of December.

21    Q.    There would continue to be meetings on December

22    the 5th, December the 6th.  Correct?

23    A.    Possibly.

24    Q.    December the 8th?  Do you know about that one?

25    A.    No.
```

```
 1   Q.     December the 9th?  Are you aware of that one,

 2   where Abbas went into the Embassy?

 3   A.     I believe I do recall a meeting on the 9th.

 4   Q.     Were you on call that night?  Were you working

 5   that night?

 6   A.     I don't remember.

 7   Q.     You weren't monitoring that?

 8   A.     I don't recall that meeting.

 9   Q.     On December the 14th -- do you remember being on

10   examination by Ms. Jhones on December the 14th?

11   A.     Yes.

12   Q.     Did you instruct -- what did you give

13   instructions to Mr. Abbas to do if he were asked for

14   money?

15   A.     I don't remember giving Abbas specific

16   instructions with regard to being asked for money.

17   Q.     Did you instruct Mr. Abbas to -- was it within

18   his authority to deal with requests for money?

19   A.     That's well within the scope to deal with any

20   requests that were made because you would have to

21   provide some sort of response.

22   Q.     And did you -- did you give -- make arrangements

23   for Mr. Abbas at that time -- instruct him to arrange

24   to have Narseal Batiste pick up Elie Assaad from the

25   airport?
```

```
 1    A.    It was around that time.  I can't recall if the

 2    instructions were given to him on the 14th or the 15th

 3    or the day before.

 4         But Abbas was instructed to inquire as to whether

 5    or not Narseal Batiste would be able to pick up the

 6    individual coming in from Yemen.

 7    Q.    And at that time he was instructed to do that, he

 8    was also instructed to ask Mr. Narseal Batiste for a

 9    list.  Correct?

10    A.    No.  I don't believe that -- I don't recall

11    giving Abbas instructions in that regard.

12    Q.    Well, if he had asked for a list, would that be

13    within his authority to do this on December the 14th?

14    A.    Absolutely.

15    Q.    Was -- and then, on December the 16th,

16    arrangements were made to have that -- the meeting that

17    you've testified to.  Correct?

18    A.    Yes.

19    Q.    And you made -- during that meeting, you made

20    four telephone calls to Mr. Elie Assaad during the

21    meeting.  Correct?

22    A.    I made a couple of telephone calls to Elie during

23    that meeting.

24    Q.    And during that meeting, do you recall the

25    testimony that -- where Mr. Batiste said he was going
```

```
 1   to march down to Jeb Bush's office?

 2   A.     Yes, I do.

 3   Q.     That was a civil demonstration.  Correct?

 4   A.     That could be considered a civil demonstration.

 5   Q.     And in response to that, do you recall Mr. Elie

 6   Assaad saying, "So you have to give me something

 7   stronger"?

 8              MS. ARANGO:  Objection.  Vague.

 9              THE COURT:  Sustained.

10              Rephrase your question.

11   BY MR. CLARK:

12   Q.     Do you recall in the transcript where Mr. Elie

13   Assaad, in response to that, tells Narseal Batiste,

14   "You have to give me something stronger?

15   A.     I don't believe that was his --

16              MS. ARANGO:  Same objection.

17              THE WITNESS:  -- immediate response, but it's

18   in the transcript.  I could --

19              THE COURT:  Why don't you reference the page

20   of the transcript, Mr. Clark.

21              MR. CLARK:  T, 37.  Transcript, Page 37.

22              THE COURT:  Do you have it for the witness?

23              MS. ARANGO:  Could we just have the exhibit

24   number again, Judge, from Mr. Clark?

25              MR. CLARK:  It's 44 -- 44-B.  Actually, it's
```

Velazquez - CROSS - By Mr. Clark                233

```
 1   on Page 38 in this particular transcript, your Honor.

 2   BY MR. CLARK:

 3   Q.    Do you see where it says, "You have to give me

 4   something stronger"?  Do you see that?

 5   A.    I do.  I'm reading the previous exchange.

 6   Q.    Now --

 7   A.    Okay.

 8   Q.    Well, the --

 9         THE COURT:  Well, give him a chance to read

10   it, Mr. Clark.

11         MR. CLARK:  Okay.

12         THE WITNESS:  Yes.

13   BY MR. CLARK:

14   Q.    This was after -- this particular clip wasn't

15   played during your direct testimony, was it?

16   A.    No.  But I'm -- I don't see the reference for

17   marching with regard to the portion you highlighted.

18   It may be on a previous page.

19         THE COURT:  What page is this?

20         MR. CLARK:  This is 35, your Honor.  I'm not

21   sure that -- this may be paginated a little different

22   from what was given to me.

23         THE COURT:  Where is it you're referring to?

24         MR. CLARK:  Well, I was referring to Page 37,

25   where -- I mean, 38, where he says -- I'm referring to
```

 1   Page 38 -- "You have to give me something stronger."

 2        THE WITNESS:  Yes.  But your question was:  Do

 3   I remember Elie Assaad making that statement after

 4   Narseal Batiste said he was going to march to Jeb

 5   Bush's office?

 6   BY MR. CLARK:

 7   Q.    Correct.

 8   A.    And I'm asking for that reference to put this in

 9   context.

10   Q.    I will try to find that.  I'm trying to go back

11   for you to where it is.

12        This is on Page 34, where it says, "We're gonna

13   go straight to City Hall, Jeb Bush's office, with the

14   Islamic flag and Moroccan flag and we're gonna let them

15   know we're here.  That's gonna be the first step."

16   A.    Yes.  I recall that.

17   Q.    And there's some discussion here.

18        Later on, a few pages on, he says, "You've got to

19   give me something stronger."  Correct?

20   A.    Well, four pages later, Elie Assaad does say

21   that.

22   Q.    Yes.

23   A.    What's the question?

24   Q.    Well, the question is:  When he said that, he was

25   telling him that, in order to get the money, he was --

 1    had to do -- Narseal had to say something stronger than

 2    just marching downtown to Jeb Bush's office.

 3    A.     No.  What Elie Assaad is saying here is -- he's

 4    trying to get more information from Batiste as to --

 5    details as to what he's actually up to or his ultimate

 6    objectives.

 7    Q.     Well, that's what he says.  Correct?

 8    A.     Those are the words he chose.  Yes.

 9    Q.     It's important that all these transcripts be

10    taken in context.  Isn't that correct?

11    A.     That's correct.

12    Q.     In evaluating what is actually being said.

13    Correct?

14    A.     Absolutely.

15    Q.     And you made arrangements for Narseal Batiste

16    after this meeting to meet with who after this?  Do you

17    know?

18    A.     There was a meeting between Narseal and Abbas on

19    December 18th, and he was given a list.  And then, on

20    December 19th, Elie met with Batiste again at Bayside.

21    They met again on the 22nd, Elie and Narseal, and then

22    again on the 29th of December 2005.

23    Q.     Now, it is -- if Mr. Abbas is just making a

24    connection to Mr. Elie Assaad, why is it necessary for

25    Mr. Abbas to meet with him again?

```
 1   A.    To gather more information to determine how the

 2   meeting went between Elie and Batiste insofar as there

 3   was a preexisting relationship between Narseal Batiste

 4   and Abbas.

 5   Q.    Well, on 12-21, was Mr. Abbas instructed to tell

 6   Narseal -- to start talking about the beginning of

 7   blowing himself up and going to heaven?  Was that part

 8   of his instructions?

 9   A.    On December --

10          MS. ARANGO:  I would object to anything that's

11   not in evidence.  It's hearsay.

12          MR. CLARK:  I'm not asking -- I'm asking about

13   instructions, your Honor, what they instructed him to

14   do.

15          THE COURT:  Sustained.

16          Rephrase your question.

17   BY MR. CLARK:

18   Q.    On December the 21st, did you meet with Mr. Abbas

19   before he met with Mr. Narseal Batiste?

20   A.    No.  I don't believe so.

21   Q.    Who did?

22   A.    I'm not sure.

23   Q.    Well, was he given any instructions by you or the

24   FBI to go to a meeting with Narseal Batiste and discuss

25   about blowing himself up and going to heaven?
```

```
 1              MS. ARANGO:  Objection.  Hearsay.

 2              THE COURT:  Sustained.

 3   BY MR. CLARK:

 4   Q.    Was that within the scope of his authority to do

 5   that?

 6   A.    That would be well within the scope of his

 7   authority to discuss jihad, Allah, things related to --

 8   that could possibly be construed as related to

 9   terrorism in conversations with Narseal Batiste, an

10   individual who asked Abbas to make the connection with

11   a member of a terrorist organization.  So that would be

12   well within Abbas's scope of the role he was playing.

13   Q.    And it was within his scope to develop this

14   conversation in the context of getting a count --

15   money, billions of dollars?

16   A.    No.  I'm not sure I understand your question.

17   Q.    Well, it was within the scope of his authority to

18   develop this conversation in the context of getting

19   money?

20   A.    No.

21   Q.    So if he did that, would it be outside the scope

22   of his authority?

23   A.    I would need to see a reference to what you're

24   talking about.

25   Q.    So -- would it be outside the scope of his
```

Velazquez - CROSS - By Mr. Clark                    238

```
 1    authority to discuss these things in the context of

 2    obtaining money?

 3            MS. ARANGO:  Objection.  Asked and answered

 4    and vague.

 5            THE COURT:  Sustained.

 6    BY MR. CLARK:

 7    Q.    Now, you had testified about the ground war being

 8    discussed -- do you recall that? -- on 11-21?

 9    A.    Yes.

10    Q.    Do you recall, on February 19th, when the ground

11    war was discussed, that Mr. Narseal Batiste wanted to

12    ask for horses?

13    A.    Yes.

14    Q.    And prior to that, do you recall that Mr. Elie

15    Assaad suggested donkeys?

16    A.    I think that's being represented out of context.

17    But there's a transcript of that meeting which I could

18    refer to and put it in the proper context.

19            But there was a mention by Batiste -- I'm not

20    sure if it was a request or a discussion -- about

21    possibly using horses or the need for horses.  But,

22    again, I'd be happy to review the transcript.

23    Q.    Well, that is preposterous, isn't it, sir?

24    A.    What is?

25    Q.    It was preposterous to suggest a ground war with
```

```
 1    horses.

 2    A.     No.  That's not what was suggested.

 3           What was mentioned was horses within the context

 4    of some sort of ground war as Narseal Batiste described

 5    his ideas to Elie Assaad.

 6    Q.     During this time, in November and December, there

 7    was no consensual recording with Rotschild Augustine,

 8    was there?

 9    A.     That's correct.

10    Q.     You had no communications with him, did you?

11    A.     Up to what point again?

12    Q.     November and December.

13    A.     That's correct.

14    Q.     No communications with him in January.  Is that

15    correct?

16    A.     I'm uncertain whether or not -- there were no

17    consensual recordings that I'm aware of with Rotschild

18    Augustine.

19           However, I'm uncertain whether Abbas during his

20    visits or meetings at the Embassy met with, spoke to or

21    said anything to Rotschild Augustine.  But there are no

22    consensual recordings.

23    Q.     And prior to the 3-16, you did not -- there was

24    no consensual recordings between Mr. Rotschild

25    Augustine and anyone about taking a pledge?
```

Velazquez - CROSS - By Mr. Clark                240

```
 1    A.      That's correct.

 2    Q.      Now, on 3-16, I believe you testified when they

 3    came into the room that Mr. Rotschild Augustine stood

 4    by the door.

 5    A.      I believe I said he stood guard.

 6    Q.      Stood guard.

 7            Well, on that day, isn't it true, sir, that

 8    Mr. Elie Assaad was the one who told him to stand by

 9    the door?

10    A.      I don't recall that.

11    Q.      Well, the door -- the door was wide open.

12    Correct?

13    A.      I don't recall.

14    Q.      And it was approximately 10:00 at night.

15    Correct?

16    A.      It was in the evening.

17    Q.      And if the door is open, there needs to be

18    somebody by the door.  Correct?  It's not safe to have

19    an open door.

20    A.      I'm familiar with that neighborhood.  Are you

21    asking me if it's safe to have an open door there?

22    Q.      I'm saying -- no.

23            I said it's unsafe to have an open door at 10:00

24    at night, just to have a door open in the middle of the

25    night.
```

 1   A.     Possibly.

 2   Q.     Okay.  And did you give instructions to Mr. Elie

 3   Assaad to tell one of the people to stand by the door?

 4   A.     No.

 5   Q.     If he did that, would that be within the scope of

 6   what he was authorized to do?

 7   A.     No.  Not necessarily.  Typically, in meetings

 8   that were held between Narseal Batiste and one of the

 9   informants, somebody would usually be posted out front.

10   There were other conversations with regard to standing

11   point that were recorded.

12              MR. CLARK:  Do we have Exhibit 69, your Honor?

13   I don't see Exhibit 69 here.

14              THE WITNESS:  I believe I have it.

15   BY MR. CLARK:

16   Q.     I'm going to show you what's on Page 8 of

17   December 16th.  Right here it says, "CW:  Somebody

18   watching the door, brother?"

19          Do you see that?

20   A.     Yes.

21   Q.     That was Elie Assaad directing someone to stand

22   by the door.  Correct?

23   A.     No.  That's Elie Assaad asking the question, "Is

24   somebody watching the door?"

25   Q.     Well, he's the one that says, "Is somebody

Velazquez - CROSS - By Mr. Clark                242

```
 1   watching the door?"  Correct?
 2   A.    Yes.  But you asked me was that an example --
 3   or -- him telling somebody.  He's asking a question.
 4   There's a question mark there.
 5   Q.    So he's the one that -- CW 2, Elie Assaad, is the
 6   one who raised the security concern.  Correct?
 7   A.    No.  That's Elie Assaad just engaging in
 8   conversation.
 9   Q.    Well, he's the one that brought up who was
10   watching the door.
11   A.    That may -- that may be -- have been his idea as
12   to how he wanted to go about engaging conversation
13   with -- I believe that was Rotschild at the time.
14   Q.    Well, whoever it was, he's the one that brought
15   up that somebody needs to watch the door.  Isn't that
16   correct?
17   A.    No.  He asked if somebody is watching the door.
18          THE COURT:  We're going to end here for the
19   day.
20          Do not discuss this case either amongst
21   yourselves or with anyone else.  Have no contact
22   whatsoever with anyone associated with the trial.  Do
23   not read, listen or see anything touching on this
24   matter in any way.
25          If anyone should try to talk to you about this
```

1    case, you should immediately instruct them to stop and

2    report it to my staff.

3           You may leave your binders in your chairs.

4    Please give your notebooks to the court security

5    officer.  Tomorrow we will be taking an early lunch.

6    So you can eat accordingly in the morning.

7           Have a nice evening.  See you tomorrow

8    morning, 9:00.

9           (Whereupon, the jury exited the courtroom at

10   5:13 p.m. and the following proceedings were had:)

11          THE COURT:  You can step down, sir.

12          (Witness excused.)

13          MS. JHONES:  Your Honor, may I address a

14   couple of things?

15          THE COURT:  Okay.

16          MS. JHONES:  Thank you.

17          First of all, your Honor, I think that Mr. --

18          THE COURT:  You may be seated.

19          MS. JHONES:  Thank you.

20          I think that Mr. Clark struggled with a couple

21   of the same things I struggled with.

22          I just, for the Court's edification, wanted to

23   advise the Court that the Government, on December 10th

24   of last year, 2008, produced supplemental discovery.  I

25   think it was the 19th supplemental.

1           In that supplemental discovery, they produced

2   a disc.  In that disc, the pagination of a great deal

3   of the transcripts has changed.

4           Agent Stewart has been kind enough to offer to

5   give us copies with -- well, let me backtrack.

6           The pagination has changed in most of the -- I

7   shouldn't say most -- probably half of the transcripts.

8           So -- and there are transcripts that have

9   been -- that were provided in that disc that have no

10  pagination at all.

11          So I believe that what Mr. Clark and I

12  struggled with was that issue.

13          I addressed this with Mr. Stewart, and he is

14  going to provide -- he's going to provide me -- I don't

15  know about the other lawyers, if they are going to

16  receive it as well -- transcripts that actually have

17  pagination.

18          But we have had to -- quite frankly, some of

19  us have completed it and some of us have not -- have

20  had to redo all our cross-examinations because all the

21  pagination is now -- I shouldn't say all.

22          Like I said, 50 percent of the pagination has

23  been changed.  That's what has generated the confusion

24  with citing to certain pages in these transcripts.

25          THE COURT:  Okay.

1          MS. JHONES:  The other issue I wanted to

2    raise, which I believe we have already informed the

3    Court about, is my office received a phone call from a

4    listed witness in my exhibit -- in my witness list,

5    which I am not calling, who indicated that his spouse

6    apparently is employed in the same office as some juror

7    in this case.

8          I wanted to bring that to the Court's

9    attention.  I brought it to the Government's attention.

10   Obviously, I have no idea who that is.  But I'm not

11   calling this witness.  I had not called this witness in

12   the prior two trials either.

13         MS. ARANGO:  Judge, just in that respect, we

14   would like the name of that witness.  We would like to

15   be able to know ourselves to ensure that that witness

16   did not speak to either the juror or the spouse spoke

17   to the juror.

18         MR. LEVIN:  And do they intend to conduct an

19   investigation with regard to that issue?

20         MS. ARANGO:  We would like to talk to that

21   witness to make sure there's been no talking to the

22   juror.

23         MS. JHONES:  I will speak to Ms. Armand and

24   get that name.  I didn't want to inquire at all because

25   of the fact that we have an anonymous jury here.  I'll

1    speak to Ms. Armand and provide that information to the

2    Government.

3              MS. ARANGO:  What we would like to do is find

4    out that that witness did not go -- you know, did not

5    make any kind of contact with the juror.

6              MS. JHONES:  I understand that.  That's a

7    valid concern.  I would be shocked if that were the

8    case, but I will provide that name.

9              THE COURT:  Okay.

10             MS. JHONES:  Your Honor, additionally --

11             THE COURT:  Are you going to reply to the

12   responses?

13             MS. JHONES:  Yes.  Thank you for reminding me.

14   Just very briefly.  And I think I'll have them ready

15   for the Court tomorrow.

16             THE COURT:  Okay.

17             MS. JHONES:  Let me go down my list of things

18   here.

19             THE COURT:  Let me make sure I understand what

20   the status of the removal hearing was.

21             There's a tape recording of the removal

22   hearing?

23             MS. ARANGO:  Yes.  The removal hearing was

24   tape-recorded in its entirety.  My understanding is

25   that it was just one tape after the other and that

 1    they're numbered and the -- they are -- they're in the

 2    possession of the immigration court and there's been no

 3    transcriptions of any part of those tape recordings.

 4            THE COURT:  So if I order it, you can have the

 5    tape provided to counsel?

 6            MS. ARANGO:  Yes.

 7            THE COURT:  Okay.

 8            MS. JHONES:  I'm sorry, your Honor.

 9            The only other issue I wanted to raise was

10    some *ex parte* issues regarding funding, but I think --

11    I have already spoken to Ms. Mitchell and I think that

12    she might be able to provide me with some status on

13    that, although I did have one question of the Court

14    regarding a pending *ex parte* motion, if I could address

15    that with the Court, just very briefly.

16            THE COURT:  Okay.

17            MS. JHONES:  Thank you.

18            THE COURT:  The Government is excused.  Thank

19    you.  See you tomorrow.

20            Let me ask you this before you leave, though:

21    How long do you expect the Government's case to take?

22    Is it about the same length as last time?

23            MS. ARANGO:  Yes.  Yes.

24            THE COURT:  Okay.

25            (Thereupon, counsel and representatives for

1   the Government retired from the courtroom and *ex parte*

2   proceedings were had.)

3          (End of proceedings.)

4

5              C E R T I F I C A T E

6

7       I hereby certify that the foregoing is an

8   accurate transcription of the proceedings in the

9   above-entitled matter.

10

11

12  _____        /s/Lisa Edwards_____
          DATE          LISA EDWARDS, CRR, RMR
13                       Official United States Court Reporter
                         400 North Miami Avenue, Twelfth Floor
14                       Miami, Florida 33128
                         (305) 523-5499
15

16

17

18

19

20

21

22

23

24

25