```
 1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                        MIAMI DIVISION
                CASE NO. 06-20373-CRIMINAL-LENARD
 3

 4   UNITED STATES OF AMERICA,        Miami, Florida

 5                 Plaintiff,         March 4, 2009

 6          vs.                       9:17 a.m. to 5:13 p.m.

 7   NARSEAL BATISTE, et al.,         Volume XVIII

 8             Defendants.        Pages 1 to 239
     -------------------------------------------------------
 9

10                         JURY TRIAL
11           BEFORE THE HONORABLE JOAN A. LENARD,
                 UNITED STATES DISTRICT JUDGE
12

13

14   APPEARANCES:

15

16   FOR THE GOVERNMENT:    RICHARD D. GREGORIE, ESQ., and
                            JACQUELINE M. ARANGO, ESQ.
17                          ASSISTANT UNITED STATES ATTORNEYS
                            99 Northeast Fourth Street
18                          Miami, Florida 33132

19
     FOR THE DEFENDANT      ANA MARIA JHONES, ESQ.
20     NARSEAL BATISTE:     300 Seville Avenue, Suite 210
                            Coral Gables, Florida 33134
21

22   FOR THE DEFENDANT      ALBERT Z. LEVIN, ESQ.
       PATRICK ABRAHAM:     261 Northeast First Street
23                          Sixth Floor
                            Miami, Florida 33132
24

25
```

```
 1   FOR THE DEFENDANT        RODERICK D. VEREEN, ESQ.
       STANLEY PHANOR:        BRINKLEY, HENRYS & LEWIS
 2                            4770 Biscayne Boulevard
                              Suite 1200
 3                            Miami, Florida 33131

 4
     FOR THE DEFENDANT        RICHARD K. HOULIHAN, ESQ.
 5     NAUDIMAR HERRERA:      300 Aragon Avenue
                              Coral Gables, Florida 33134
 6

 7   FOR THE DEFENDANT        LOUIS CASUSO, ESQ.
       BURSON AUGUSTIN:       111 Northeast First Street
 8                            Suite 603
                              Miami, Florida 33132
 9

10   FOR THE DEFENDANT        NATHAN CLARK, ESQ.
      ROTSCHILD AUGUSTINE:    17639 South Dixie Highway
11                            Miami, Florida 33157

12
     REPORTED BY:             LISA EDWARDS, CRR, RMR
13                            Official Court Reporter
                              400 North Miami Avenue
14                            Twelfth Floor
                              Miami, Florida 33128
15                            (305) 523-5499

16

17

18

19

20

21

22

23

24

25
```

1                    I   N   D   E   X

2

3                                    Direct    Cross    Red.

4
WITNESSES FOR THE GOVERNMENT:
5
Anthony Velazquez                              5     170
6                                             28
                                              76
7

8
EXHIBITS RECEIVED IN EVIDENCE:          PAGE
9
Defendant Abraham's Exhibit No. 1        123
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Good morning.

 2              United States of America versus Narseal

 3    Batiste, et al., Case No. 06-20373.

 4              Counsel, state your appearances, please, for

 5    the record.

 6              MR. GREGORIE:  Good morning, your Honor.

 7              Richard Gregorie and Jacqueline Arango on

 8    behalf of the United States.

 9              MS. JHONES:  Ana Jhones on behalf of Narseal

10    Batiste, who is present.

11              MR. LEVIN:  Albert Levin on behalf of Patrick

12    Abraham, who's present.

13              Good morning, your Honor.

14              MR. CASUSO:  Good morning, your Honor.

15              Louie Casuso on behalf of Burson Augustin,

16    who's present.

17              MR. CLARK:  Good morning, your Honor.

18              Nathan Clark on behalf of Rotschild Augustine,

19    who's present.

20              MR. HOULIHAN:  Richard Houlihan on behalf of

21    Naudimar Herrera.

22              MR. VEREEN:  Good morning, Judge.

23              Roderick Vereen on behalf of Stanley Phanor,

24    who's present.

25              THE COURT:  All Defendants are present.
```

```
 1              Let's bring in the jury.

 2              MR. GREGORIE:  Judge, a quick housekeeping

 3     matter.

 4              Just so that we know when to have the next

 5     witness here, your Honor, it's my understanding that

 6     you're going to stop at 10:45 this morning?

 7              THE COURT:  10:45 to 12:15.  Yes.

 8              MR. GREGORIE:  To 12:15?

 9              THE COURT:  Yes.  That'll be the lunch break.

10              MR. GREGORIE:  Thank you, Judge.

11              (Whereupon, the jury entered the courtroom at

12     9:18 a.m. and the following proceedings were had:)

13              THE COURT:  You may be seated.

14              Good morning, ladies and gentlemen.

15              You are still under oath, sir.

16              You may proceed, Mr. Clark.

17              MR. CLARK:  Thank you, your Honor.

18                   CONTINUED CROSS-EXAMINATION

19     BY MR. CLARK:

20     Q.    Agent Velazquez, when we left off yesterday, we

21     were talking about -- we were on the -- Exhibit 69,

22     which is the 3-16 --

23     A.    Yes.

24     Q.    And we had just discussed Mr. Rotschild Augustine

25     going to the door.
```

 1          Do you remember that?

 2    A.    Yes.  I believe -- yes.

 3    Q.    And you remember we also had -- on the

 4    November 21st transcript, you had asked to see a

 5    certain page number that I was referring to.

 6          Correct?  Do you remember that yesterday?

 7    A.    Yes.

 8    Q.    I'm going to go back right now to November the

 9    21st and show you that transcript now.

10          MR. CLARK:  May I publish?

11          THE WITNESS:  What was the question?

12    BY MR. CLARK:

13    Q.    Well, the question was:  Had you instructed

14    Mr. Abbas to say, once he sees -- where he said that

15    support will be coming through him, Mr. Abbas had

16    indicated that support would be coming through him,

17    didn't you instruct Mr. Abbas to develop conversation

18    with Mr. Batiste whereby he said this money would be

19    coming through him?

20    A.    No.  The instructions given to Abbas was that the

21    support will be coming through him as requested by

22    Narseal Batiste.  I believe that was my answer.

23    Q.    Okay.  Well, do you want to look at this

24    transcript?

25    A.    No.

 1   Q.    Okay.  Well, that was a piece that wasn't played

 2   for the jury, was it?

 3   A.    I don't recall that portion of the meeting being

 4   played.  No.

 5   Q.    Okay.  And that was at Page 45 of the transcript.

 6   Isn't that right?

 7   A.    I'm not sure of the page number.

 8   Q.    And -- well, do you want me to refresh your

 9   recollection to see the transcript page?

10         MS. ARANGO:  Objection.  Relevance.

11         THE COURT:  Sustained.

12   BY MR. CLARK:

13   Q.    Well, that referred to -- also, the early part of

14   the transcript before Page 35 wasn't played, was it?

15   A.    I'm not sure which pages were played with regard

16   to the clips that were played during my testimony on

17   direct.

18   Q.    Well, in the early part of the conversation, you

19   had instructed Mr. Abbas to develop a conversation with

20   Batiste that money was going to be coming to him from

21   back home.  Correct?

22         MS. ARANGO:  Objection.  Vague.

23         THE COURT:  Sustained.

24         Rephrase your question.

25

BY MR. CLARK:

Q.    On November 21st, you had instructed Mr. Abbas

that he is to develop conversation that whatever money

was coming was going to be coming from back home to

him.  Correct?

A.    There were no discussions between Abbas and

myself regarding money.

        The discussions that were had -- or the

instructions that were given to Abbas was to engage in

conversations with Narseal Batiste and others regarding

the support that Narseal Batiste had requested.

Q.    Let me show you the transcript.

        MS. ARANGO:  Judge, relevance.  For what

purpose?

        THE COURT:  Ask your next question, Mr. Clark.

        MR. CLARK:  May I have a side-bar, your Honor?

        THE COURT:  No.

        MR. CLARK:  Could I -- I need to reserve a

motion.

        THE COURT:  Sure.

BY MR. CLARK:

Q.    You also instructed at that time to Mr. Abbas

that -- to tell Mr. Batiste that somebody was going to

be coming over on November 21st.  Correct?

A.    The instructions that Abbas was given was that

1    somebody -- the connection had been made and somebody

2    would be available to come over and provide the

3    support, as Narseal Batiste had requested.

4    Q.    But before that, you instructed Mr. Abbas to

5    develop conversation that money was just going to be

6    coming through him, nobody was going to be coming over?

7    A.    No.   That's not true.

8    Q.    And the money was going to be coming from someone

9    his uncle knows.   Correct?

10   A.    No.

11   Q.    Now, this -- did you instruct Mr. Abbas to tell

12   Narseal Batiste that this someone supported mosques?

13   A.    No.

14   Q.    Was that in the scope of his authority to do

15   that?

16   A.    Well within the scope.   The instructions, again,

17   that were given to Abbas were to tell Narseal Batiste

18   that the individual from a terrorist organization that

19   he wanted to be linked up with was available to come

20   over and meet.

21        So it would stand to reason that that individual

22   who was a representative of a terrorist organization

23   would have an association with mosques and the like.

24   Q.    Well, you had instructed Mr. Abbas to tell

25   Mr. Batiste that he was going to get money to fix up

1   his building, which is a called a Temple.  Correct?

2   A.    That's not true.

3   Q.    Well, didn't you instruct him at this meeting to

4   tell him -- for Mr. Abbas to tell Narseal Batiste that

5   he needed to fix up the Temple?

6   A.    No.  The instructions, again, that were given to

7   Abbas were very general in nature.  There was -- there

8   was not a time where Abbas -- where I sat down with

9   Abbas and gave him a script to read from or to

10  memorize.  He was given the general instructions that I

11  previously testified to.

12  Q.    Well, that was in the scope of his authority, to

13  tell him that, "We're going to get money to fix up the

14  building."  Correct?

15  A.    That would be well within the scope in that

16  Batiste had asked for support from a terrorist

17  organization.  Whether that support manifested itself

18  by way of a representative of Al-Qaeda or money or

19  weapons, that would be within the scope of Abbas's

20  role.

21  Q.    And it was within the scope of his authority to

22  tell Narseal Batiste that it bothers him -- it bothers

23  Mr. Abbas that the mosque is -- the building is not

24  fixed up?

25  A.    That would be within the scope.

 1   Q.     And you monitored this conversation.  Correct?

 2   A.     Yes.

 3   Q.     Now, it's also that -- it was within the scope to

 4   indicate that he needed to get a plan to get this

 5   amount of money.  Correct?

 6   A.     Yes.

 7   Q.     Okay.  And if he didn't get a plan done, then he

 8   wasn't going to get any money?

 9   A.     No.  I don't believe that that's what was said.

10   And it's a mischaracterization of that portion of the

11   meeting.

12   Q.     Well, do you want to look at the transcript?

13   A.     If that -- if what I've testified to is in

14   conflict, I'll be happy to look at the transcript.

15          THE COURT:  What exhibit number is this,

16   please?

17          MR. CLARK:  This is Exhibit No. 43, and it's

18   turning to Page 68.

19   BY MR. CLARK:

20   Q.     Now, on Page 68, it says -- Mr. Narseal Batiste

21   says, "It's easy.  It's very easy to do it, but it

22   takes a lot of support."

23          Correct?

24   A.     The resolution on the screen isn't very good, but

25   I'll try to read.

1    Q.    Oh.

2    A.    Yes.

3    Q.    "Support" refers to money, doesn't it?

4    A.    It could refer to money.  I mean, it refers to a

5    lot of things.  It's a very broad statement:  Money,

6    assistance --

7    Q.    It includes money.  Correct?

8    A.    Yes.

9    Q.    And the CW says, "That's not an issue, brother.

10   You see, if we could organize a plan for this guy until

11   he comes...."

12   A.    Uh-huh.

13   Q.    This is where you instructed Mr. Abbas to tell

14   him he needed to organize a plan to get support.

15   Correct?

16   A.    No.  That's not true.  That is Abbas's response

17   to the portion of the conversation where Narseal

18   Batiste is expressing his idea about how to carry out

19   his mission where he would get people in the United

20   States to attack each other and cause chaos.

21         Later on in the same conversation, it switches to

22   Elie Assaad, who's the Al-Qaeda representative who was

23   going to be coming over.

24         Abbas says, "You know, if we could organize a

25   plan for this guy until he comes...."  That's an

```
 1   attempt to get more information from Narseal Batiste.

 2   Q.    Narseal Batiste responds, "Uh-huh."

 3         Then we go to Page 69.

 4         CW says, "Bring it to the table.  The support is

 5   coming.  I already spoke more than that -- more than

 6   once with you about the support.  It's not an issue.

 7   But we need to be organized.  We need to have the plan

 8   ready.  We need this amount of money.  We need this

 9   amount of this, this amount of this, and we're gonna do

10   this.  From there, they gonna help us work on it."

11         This is -- you have instructed -- this is

12   conversation you've instructed CW to develop.  Correct?

13   A.    This is within the boundaries of what he was

14   instructed to do.  But in response to your question, my

15   answer is still "no."

16         Your question was:  Did I instruct Abbas to tell

17   Narseal Batiste that he needed to have a plan;

18   otherwise, the money wasn't going to come.  That was

19   your original question.

20         And my answer is that that -- not only is that

21   not what Abbas was instructed to do, that's not what he

22   actually said in this transcript.

23   Q.    Okay.  Narseal Batiste says, "Uh-huh."

24         And then CW says, "But if we don't come up with

25   no plan, how -- how can we get support and for what?"
```

Velazquez - CROSS - By Mr. Clark                    14

```
 1          That was part of the conversation he was supposed
 2    to develop?
 3    A.      Yes.
 4    Q.      He doesn't have a plan, he doesn't get any money?
 5    A.      No.  It's -- that's a question.  Abbas is saying,
 6    "If we don't have a plan, how are we going to get
 7    support?"
 8    Q.      Well, he's supposed to develop conversation.  You
 9    do that with questions as well as statements.  Correct?
10    A.      That's correct.
11    Q.      Now, I'll take you back to March the 16th.
12            And on March the 16th -- you've given some
13    testimony about how the pledge took place.  Correct?
14    A.      Yes.  I believe so.
15    Q.      Now, it was the plan that, as soon as you got
16    there, shortly thereafter, the pledge would be given
17    before there was a discussion about what they were
18    going to do.  Correct?
19    A.      Who was going to do?
20    Q.      Did you instruct Mr. Elie Assaad to orchestrate
21    the pledge before there was discussion about the
22    bombing of buildings?
23    A.      Elie Assaad was instructed to give Narseal
24    Batiste the opportunity for him to present the pledge
25    to the rest of the members of his organization and
```

1    then, if the pledge was accepted or taken, he was then

2    to ask Batiste if it would be okay to speak in front of

3    the rest of the members of his organization and then

4    introduce the plot -- the Al-Qaeda plot to blow up five

5    FBI offices.

6    Q.    So, specifically, the pledge was to take place

7    before the discussion.  Correct?

8    A.    That's correct.

9    Q.    Now, in that conversation that was had

10   afterwards, you had given instructions to Mr. Elie

11   Assaad to -- when money was asked for, was -- to not

12   give any money, but to posture by telling Narseal

13   Batiste that he wasn't delaying the money.  Correct?

14   A.    No.  The instructions that were given to Elie

15   Assaad were with regard to support.  I didn't -- no

16   instructions were given to Elie Assaad not to give

17   Narseal Batiste any money.  We didn't give any money to

18   Elie Assaad to give to Batiste.  And so that's how he

19   handled the -- that portion of the meeting.

20   Q.    But you anticipated, didn't you, that Mr. Narseal

21   Batiste was going to ask for money?  Correct?

22   A.    Yes.  That's not something we did not expect.

23   Q.    And you instructed Mr. Elie Assaad that, when

24   that happened, to posture and defend and say that he's

25   not delaying getting the money?

Velazquez - CROSS - By Mr. Clark                16

1    A.    He was not given any instructions specifically to

2    say he's not delaying in getting the money.  Those are

3    the words that Elie Assaad chose to deal with the issue

4    of money that eventually was anticipated to come up.

5    Q.    But in this meeting, Mr. Narseal Batiste told

6    Elie Assaad that he's delaying -- "I think you're

7    delaying giving me the money."  Correct?

8    A.    Yes.  I believe so.

9    Q.    And that situation was anticipated many times

10   before in conversations that have been recorded, but

11   were not played through your direct testimony.

12   Correct?

13   A.    Can you repeat that question.

14   Q.    That posture to be taken by Mr. Assaad -- you

15   have given Mr. Assaad instructions to take that posture

16   on numerous occasions before March the 16th, correct,

17   in recorded conversations?

18            MS. ARANGO:  Objection.  Vague.

19            THE COURT:  Sustained.

20            Rephrase your question.

21   BY MR. CLARK:

22   Q.    Didn't you give an instruction to Mr. Abbas --

23   not Elie Assaad, but, also, Mr. Abbas -- on

24   December 21st to tell Mr. Narseal Batiste that, "I'm

25   going to get you some money.  I'm going to get you some

1   money"?

2   A.    No.  Those instructions weren't given.

3         With regard to the items that were requested by

4   Narseal Batiste, which included the three lists of

5   weapons and the times when he specifically discussed

6   money as support for his mission, the informants were

7   given directions to handle that to allow us to collect

8   more information and evidence.

9   Q.    Well, it was in the scope of Mr. Abbas's

10  authority on December 21st to tell Mr. Narseal Batiste

11  that, "I'm going to get you as much money as I can,

12  even if it's pocket change"?

13  A.    December 21st?

14  Q.    Yes.

15  A.    Yes.

16  Q.    That's within the scope of his authority.

17  Correct?

18  A.    Yes.  Within the scope of his authority in the

19  role that he was playing in this investigation.

20  Q.    And it was also in the scope of the authority of

21  Elie Assaad, CW No. 2, on January the 3rd, to indicate

22  to Mr. Narseal Batiste that he has a surprise for him,

23  referencing money.  Correct?

24  A.    On January the 3rd?

25  Q.    Yes, sir.

```
 1   A.    I would say that would have been within the
 2   scope.  But I'm unfamiliar with that conversation.
 3   Q.    Well, it was within the scope of his authority to
 4   do that, wasn't it, then, "I'm going to get you a
 5   surprise," referencing money?
 6   A.    No.  I'm not sure that he was -- I'm not sure
 7   what the reference was in that --
 8   Q.    But that was within the scope of his authority to
 9   do that?
10   A.    That would have been in the scope of his
11   authority to do that.
12   Q.    And it was within the scope of Mr. Elie Assaad's
13   authority on January the 28th to tell Narseal Batiste
14   that he was afraid that, if he gave him the money, he
15   will just run with the money.  Correct?
16   A.    Yes.  That would be within the scope of the role
17   that he was playing.
18   Q.    So it was within the scope of his role to posture
19   about money and to keep promising to give it, but not
20   to give it.  Correct?
21   A.    Well, no.  In response to your question, on
22   January 28th, this is when they were taken from the
23   Embassy, asked to change clothes and take all -- all
24   their electronic equipment was taken and they were
25   taken all the way down to Islamorada for a meeting with
```

1    Narseal Batiste.

2         At that point, Batiste was confident that Elie

3    and Abbas were not the police and the conversation that

4    you just referenced ensued.

5         So, yes, that would have been within the scope.

6    Q.    And in response, on December -- on March the

7    16th, when it was within the scope of Mr. Elie Assaad's

8    authority to tell him he's not delaying him on money,

9    Mr. Narseal Batiste said -- would say that money is not

10   an issue.  Correct?

11   A.    I recall words to that effect from Narseal

12   Batiste.

13   Q.    And that followed a conversation on whether or

14   not Narseal Batiste felt Elie Assaad was trusting him.

15   Correct?

16   A.    I'm not sure I understand your question.  Are you

17   asking me --

18   Q.    Well, okay.  I'm asking you -- that conversation

19   about delaying the money also involved whether they

20   trusted each other.  Correct?

21   A.    I'm not certain.

22   Q.    Now, you gave some testimony that, on March 24th,

23   there was a recorded conversation where there was a

24   planning of a van and the photos.  Correct?

25   A.    The planning of a van and photos?

Velazquez - CROSS - By Mr. Clark                    20

```
 1    Q.     Between Narseal Batiste and Elie Assaad.

 2    A.     There was a discussion about a request from

 3    Narseal Batiste for a van to be used to take pictures

 4    of the FBI office.

 5    Q.     Rotschild Augustine wasn't there, was he?

 6    A.     No, sir.

 7    Q.     And then you gave some testimony about a

 8    telephone call to Rotschild Augustine from Narseal

 9    Batiste in Call No. 1198.

10           Do you recall that?

11    A.     I don't recall the number of the transcript, but

12    I do recall the telephone call from Narseal Batiste to

13    Rotschild Augustine referencing getting his books.

14    Q.     And "that thing."  Correct?

15    A.     To go do "that thing."  Yes.

16    Q.     Well, there's a whole lot of that conversation

17    that you didn't know what that was about at the time,

18    did you, sir?

19    A.     There were portions -- there were references

20    within that conversation that I don't -- I'm uncertain

21    as to what they referred to.

22    Q.     As you sit here today, do you know what those

23    conversations were about?

24    A.     I know what the main conversation was about,

25    which was for Rotschild Augustine to meet up with
```

```
 1   Narseal Batiste to take pictures of the federal

 2   buildings.

 3   Q.    Well, I'm talking about the other conversation.

 4         You don't know what that's about, do you?  Do you

 5   know what it's about, as you sit here today?

 6   A.    I don't know which portion of the conversation

 7   you're referring to.

 8   Q.    Well, I'm going to show you what's in

 9   Exhibit W2-01998.

10         This is the conversation.  Correct?

11   A.    I'm sorry.  Which page is that?

12   Q.    Page 2.

13   A.    The first portion of this conversation, I don't

14   know what they're referring to.

15   Q.    You're talking about where it says, "Did you take

16   care of that lady?"

17         You don't know what that's referring to, do you?

18   A.    No.

19   Q.    And when it goes down, "Oh, man, Mo.  She's been

20   coming over here every day, man," you don't know what

21   that's referring to, do you?

22   A.    I do not.

23   Q.    And he says, "Yeah.  I talked to you when you

24   said you had went by there."

25         You don't know what that's referring to, do you?
```

1    A.    No, sir.

2    Q.    And this whole page -- I believe at the bottom of

3    the page -- you don't know what that's referring to

4    until you get down to the bottom of the page.  Correct?

5    A.    Yes.

6    Q.    And it says, "Yeah.  Come on and check right now.

7    And then, after that, I need you to bounce with me.

8    You gotta bring your school books and everything.  We

9    gotta go to your school."

10         Is that correct?

11   A.    Yes.  That's what it reads.

12   Q.    And your testimony is that's when Narseal Batiste

13   went to take the pictures.  Correct?

14   A.    Yes.  And there were pictures of Rotschild

15   Augustine and Narseal Batiste and Stanley Phanor at the

16   Miami-Dade Community College.

17   Q.    Right.

18         And then -- and Rotschild Augustine says, "Oh,

19   you gotta go to my school?"

20         And he says, "Yeah.  And take care of that."

21         And he says, "Oh, that thing?"

22         And Narseal says, "Oh, all right, then.

23         "All right.  Peace."

24         That's what you're referring to.  Correct?

25   A.    Yes.

1    Q.    Now, the other part of that conversation, you

2    understand, as you sit here today, that Mr. Narseal

3    Batiste basically got $1,000 for a lawyer on a case

4    that actually had been dismissed.   Correct?

5    A.    Yes.   I believe the case was dismissed on the

6    same day he received the $1,000.

7    Q.    And you gave him the $1,000 after the case was

8    dismissed?   Was the case dismissed in the morning?

9    A.    I think the -- I think I read a document that

10   Ms. Jhones showed me indicating there was -- it was

11   stamped in the morning and Narseal Batiste received the

12   money, I believe, either later that afternoon or early

13   evening.

14   Q.    So he didn't need a lawyer anymore, did he?

15   A.    That's correct.

16   Q.    So he basically conned you out of $1,000?

17   A.    Well, I don't know when Mr. Batiste knew that his

18   case was dismissed.   On the 27th -- I don't believe I

19   found out until days later that the case had been

20   dismissed.

21   Q.    When you found out days later, you realized he

22   had conned you out of $1,000?

23   A.    No.   That's incorrect.   Again, I don't know when

24   Mr. Batiste knew that his case was dismissed.

25   Q.    Well, you figured that you may have been conned

```
 1    out of $1,000.  Correct?

 2    A.     Possibly.

 3    Q.     And you needed -- that's something you should be

 4    evaluating on this case to determine what the true

 5    intentions of Mr. Batiste were.  Correct?

 6    A.     Yes.  And it was.

 7    Q.     And do you know, as you sit here today, whether

 8    that woman that was referenced in that telephone

 9    conversation was a witness or -- to that case?

10    A.     I do not.

11    Q.     I believe you also testified to another

12    conversation that Mr. Rotschild Augustine had with

13    Narseal Batiste on April the 6th of '06.  Correct?

14    A.     Yes.

15    Q.     And you testified that Mr. Rotschild Augustine

16    was at the warehouse -- is that your testimony? -- for

17    that conversation?

18    A.     On April the 6th?

19    Q.     Yes, sir.

20    A.     (No response.)

21    Q.     Would it help to look at the conversation?

22    A.     Yes.

23           THE COURT:  What's the exhibit number, please?

24           MR. CLARK:  It's W1-02901.

25           THE WITNESS:  I'm sorry.  Could you reference
```

 1    that transcript again, please?

 2                MR. CLARK:  W1-02901, -2901.

 3                THE COURT:  What page?

 4                MR. CLARK:  2.  Page 2, your Honor.  This is

 5    only a three-page transcript.  The first page is a

 6    cover page.

 7                THE WITNESS:  Yes.  I have the transcript.

 8    BY MR. CLARK:

 9    Q.    Okay.  It says that, "Oh, yeah.  I'm over here at

10    the Temple."

11          Do you see that?

12    A.    Yes.

13    Q.    Now, I believe your testimony was that he was at

14    the warehouse.

15    A.    If -- if I testified that he was at the

16    warehouse, then I was incorrect.

17    Q.    Okay.  To clarify, the warehouse and the Temple

18    are two different places.  Correct?

19    A.    They are.

20    Q.    The Temple is the place that we looked at that's

21    on 15th Avenue?

22    A.    That's correct.

23    Q.    The pink or red building?

24    A.    That's Narseal Batiste's building.

25          The warehouse was the building that was provided

1    by Elie Assaad to Narseal Batiste.

2    Q.    And I believe in your testimony just that day,

3    you testified that Mr. Narseal Batiste was at the

4    warehouse that evening.  Correct?

5    A.    Yes.

6    Q.    Okay.  Well, how far is the warehouse from the

7    Temple?

8    A.    Driving, I'd say about ten minutes.

9    Q.    So this is 4:30.  Is that in the afternoon?

10   A.    Yes.

11   Q.    And this Temple area is also the building where

12   Mr. Narseal Batiste kept his construction supplies for

13   his business.  Correct?

14   A.    The Temple, you said?

15   Q.    Yes.

16   A.    I think, at one point or another, Narseal Batiste

17   kept construction equipment at the Temple and at his

18   residence in North Miami as well.

19   Q.    Okay.  And then you -- this is where -- also

20   known as the Moorish Science Temple.  Correct?

21   A.    I'm sorry?

22   Q.    It's the Moorish Science Temple.  It's referred

23   to as the Moorish Science Temple.  Correct?

24   A.    What is?

25   Q.    The Temple.

Velazquez - CROSS - By Mr. Clark          27

 1   A.    No.  I haven't heard anyone refer to this Temple

 2   as the Moorish Science Temple.  I've heard the building

 3   be referred to as the Embassy, the mosque, the Temple

 4   and the base.  I don't think I've ever heard anyone

 5   refer to that building as the Moorish Science Temple.

 6   Q.    Well, in your investigation, you were familiar

 7   with Moorish Science.  Correct?

 8   A.    Yes.

 9   Q.    And when it's referred to as "the Temple" here,

10   that would be relative to the Moorish Science.

11   Correct?

12   A.    That would be relative to Batiste's organization.

13   Yes.

14   Q.    Now, in this, Mr. Rotschild Augustine says he

15   doesn't have any keys.  Correct?

16   A.    Yes.

17   Q.    And this was -- did you know whether or not

18   Mr. Rotschild Augustine was working on a job for

19   Mr. Narseal Batiste's company, Azteca Stucco, on that

20   day?

21   A.    I'm unsure.  He may or may not have been.

22   Q.    Do you know where Mr. Rotschild Augustine would

23   go to be paid for the work that he did?

24   A.    No.

25        MR. CLARK:  I don't have any further questions

 1    at this time, your Honor.

 2              THE COURT:  Mr. Casuso?

 3              MR. CASUSO:  Yes, ma'am.

 4                        CROSS-EXAMINATION

 5    BY MR. CASUSO:

 6    Q.    Agent Velazquez, I'll be very brief.

 7          Let me ask you this:  You bring CW 1 back from

 8    Yemen.  Right?

 9    A.    Yes, sir.

10    Q.    Pursuant to some information that you got.

11    Right?

12    A.    That's correct.

13    Q.    And your instructions to this man was to

14    actually -- to sit down with Mr. Batiste and get some

15    information, right, as to what his plans were?

16    A.    Yes.  And corroborate the information that Abbas

17    initially provided us, which was that Batiste wanted to

18    meet a member of a terrorist organization.

19    Q.    Okay.  Now, this man, CW 1, is a guy that he met

20    at some 7-Eleven or convenience store.  Correct?

21    A.    That's my understanding.  Yes.

22    Q.    He meets him at a convenience store and he tells

23    the guy, "Hook me up with a terrorist organization"?

24    A.    Well, no.  What actually happened, as I

25    understand, is there was a relationship that developed

```
 1   between Narseal Batiste and Abbas and --
 2   Q.     What relationship, sir?
 3          MS. ARANGO:  Judge, I would object to
 4   interrupting the witness.
 5          THE COURT:  Let him finish his answer.
 6          MR. CASUSO:  I'm sorry.
 7   BY MR. CASUSO:
 8   Q.     Go ahead, sir.
 9   A.     A relationship where they met at the convenience
10   store and they engaged in political conversations as
11   they pertained to world events.  Narseal expressed his
12   views about the United States and other are parts of
13   the world, as did Abbas.
14          It wasn't until Batiste started advocating
15   violence that Abbas, according to his position, decided
16   to provide us with the information that he provided us
17   at the beginning of the investigation --
18   Q.     All right.
19   A.     -- which was he asked for Abbas to link him up
20   with a terrorist organization overseas, because he was
21   going back to Yemen.
22   Q.     Okay.  So he told you that he was advocating
23   violence over there at the convenience store, right, in
24   conversations?
25   A.     No.
```

1    Q.      Correct?

2    A.      The information that Abbas provided was that

3    there was an organization that was led by Narseal

4    Batiste and they interpreted the Koran in a violent

5    way, the organization was also involved in

6    military-style training and, eventually, Narseal

7    Batiste requested to meet somebody from a terrorist

8    organization to get support for his organization.

9    Q.      Okay.   Requested him, CW 1?

10   A.      Yes, sir.   Abbas al-Saidi.

11   Q.      So you're telling us here, as you testify here,

12   sir, that it was Narseal Batiste who requested that

13   this man hook him up with a terrorist organization?

14   A.      Yes, sir.   And on November 21st, that's confirmed

15   by the conversation that takes place in Abbas's

16   apartment.

17   Q.      Okay.   We'll get to that.   Okay?   I'm asking at

18   the beginning here.

19           So you tell him, "Go in and talk to this man and

20   see what else you can get."   Right?

21   A.      Yes.   Basically.

22   Q.      You bring him back.

23           And when you bring him back, the man comes in.

24   You put him up at a Holiday Inn near the FBI office.

25   Correct?

1   A.      Yes.

2   Q.      The hurricane comes.  Right?

3   A.      Yes.

4   Q.      So, basically, the investigation is at a

5   standstill, right, during the hurricane?

6   A.      Yes.

7   Q.      And at some point -- I think you said about eight

8   days later or something -- he reappears, correct, and

9   this is when you send him in to talk to Narseal

10  Batiste?  Correct?

11  A.      Well, he did eventually go meet with Narseal

12  Batiste after that.

13  Q.      Yes, sir.

14  A.      But after the hurricane, Narseal Batiste arrived

15  at Abbas's hotel unannounced and took him for a drive

16  with several members of his organization.

17          During that drive, they pointed out the FBI

18  office and there was a reference made by Batiste that,

19  "You see the Government's weak" -- because, apparently,

20  there was a hole in one of the windows -- and he made a

21  reference to, "You can throw a grenade in there."

22  Q.      And that's recorded.  Right?

23  A.      No, sir.  That --

24  Q.      That's what he told you?

25  A.      Yes, sir.

```
 1            MS. ARANGO:  I would object to the

 2   interruption of the witness.

 3            THE COURT:  You need to let him finish his

 4   answers.

 5   BY MR. CASUSO:

 6   Q.    My question is:  This conversation that you gave

 7   us here, that is not recorded.  That is something that

 8   CW 1 told you that Narseal Batiste said.  Right?

 9   A.    That's correct.  Abbas had no recording equipment

10   at the time, and Batiste arrived unannounced at the

11   hotel.

12   Q.    Okay.  He -- how did he know he was at a hotel,

13   sir?  Did you tell him?

14   A.    Well, I did not tell him.  I --

15   Q.    Sir, did you tell CW --

16            MS. ARANGO:  Judge, I would object.  He

17   answered the question and he was about to explain.

18            THE COURT:  Mr. Casuso, you've got to let him

19   finish his answer.

20            MR. CASUSO:  Judge, but I object to the

21   rambling nature of the answers, please.  My questions

22   are very specific.

23            MS. ARANGO:  Judge, may I read the -- well --

24            MR. CASUSO:  Let me repeat it, Judge.

25            THE COURT:  Okay.
```

BY MR. CASUSO:

Q.    Did you tell CW 1 to call Narseal Batiste so he

would know where CW 1 was at the hotel?  "Yes" or "no,"

sir?

A.    No.

Q.    Okay.

A.    The instructions that were given to Abbas were

to, at some point, meet with Narseal Batiste and we

would arrange that.  He was also instructed to try to

recover the AK-47.

      Now, in furtherance of those instructions, he

contacted another individual named Nick Coriolon that

he wanted to get the AK-47 back and he was in town.

      That information, as I understand it, was

conveyed to Narseal Batiste, and that's how he ended up

at the hotel.

Q.    So someone gave information to Narseal Batiste

that this man was at this hotel.  Right?

A.    That's correct.

Q.    And he arrived there.  Correct?

A.    Yes.

Q.    So after that, I think that you said there were

some meetings that were recorded.  Others were not

recorded.  Right?

A.    Yes, sir.

Velazquez - CROSS - By Mr. Casuso                    34

1    Q.    And you showed the jury here two meetings that

2    were recorded, I think, either at the hotel or at some

3    apartment on Miami Beach.  Correct?

4    A.    Yes.  There were several meetings, I believe,

5    that were -- clips were shown from.

6    Q.    And these meetings were -- they were at an

7    apartment or were they at a hotel, sir?  I think they

8    were an apartment.  Right?

9    A.    Well, there was a meeting at Elie's apartment.

10   There was a meeting at Abbas's apartment.  There was

11   also a meeting at a hotel.  There was also a meeting at

12   the warehouse.

13   Q.    But Elie had hadn't arrived yet, right, at the

14   beginning?

15   A.    No.  Elie did not --

16   Q.    He comes in later.  Right?

17   A.    December 16th.

18   Q.    Right.  Well, we're not there yet.  Okay?

19         You show -- you showed the jury two meetings at

20   CW 1 -- CW 1 -- I forget his name -- is what?  Abbas?

21   A.    Yes, sir.

22   Q.    You showed the jury two meetings.  I think it was

23   at Abbas's apartment that you had gotten for him -- or

24   the FBI had gotten for him.  Right?

25   A.    Yes.

1    Q.     And these meetings were with Narseal Batiste?

2    A.     Narseal Batiste and Patrick Abraham.

3    Q.     Okay.  One, right, or were both with Narseal

4    Batiste and Patrick Abraham?

5    A.     The recorded meetings?

6    Q.     Well, the ones on video that we showed the clips

7    here.

8    A.     No.  There was one with Narseal Batiste and one

9    with Narseal Batiste and Patrick.

10   Q.     Okay.  Actually, in the meeting where Patrick

11   Abraham -- Patrick Abraham didn't say anything.  Right?

12   He just is sitting there and your informant says,

13   "Don't you say nothing?"

14          Remember?

15   A.     Yes.  Somebody along those lines.

16   Q.     "You're a quiet guy."  Right?  "You don't say

17   anything."  Right?

18   A.     Something along those lines.

19   Q.     And this is where he talks about -- where we talk

20   about -- let's talk about Narseal Batiste's plans.

21          His plan is to put poison in salt shakers.

22   Right?  This is his terrorism activity that he's put

23   forward?

24   A.     No.  The plan that Narseal Batiste put forward

25   was to recruit members for a movement and the advocacy

 1    of the overthrow of the US Government and creating

 2    chaos in the streets.

 3    Q.    Sir.  Sir --

 4            MS. ARANGO:   Objection.

 5    BY MR. CASUSO:

 6    Q.    Finish.  I'm sorry.  I'm sorry.  Go ahead.

 7    A.    He mentioned several different types of attacks

 8    that were his ideas, and poisoning the salt shakers was

 9    one of those ideas that he expressed to Abbas al-Saidi.

10    Q.    Sir, after he says -- after he talks about the

11    poison in the salt shakers, doesn't your informant say,

12    "Well, it's better if you just put a bomb in there"?

13    Doesn't he say that?

14    A.    I think there's a -- Abbas does mention something

15    about not -- not -- not -- making a reference to a bomb

16    and going to a restaurant with respect to not losing

17    any of your soldiers.

18    Q.    Sir, it's not if Abbas would have said something.

19    Abbas did say that.  Didn't he say exactly that, "Put a

20    bomb in a restaurant so you can kill a lot of people"?

21    A.    No.

22    Q.    Didn't he say that, sir?

23    A.    That's not exactly what Abbas said.

24    Q.    But that's not what you told him to say.  Right?

25    He just made that up.  Right?

```
 1    A.     He -- he was not given specific directions to say

 2    those words, but that was in the scope of the role he

 3    was playing as somebody who was a member or affiliated

 4    with a terrorist organization.

 5    Q.     Okay.  Let me ask you here about informants.

 6           Because, I mean, in your career in the FBI,

 7    you've dealt with many informants.  Right?

 8    A.     Yes, I have.

 9    Q.     You sit down with them.  You basically give them

10    some rules.  Right?

11    A.     Yes.

12    Q.     Basically, to summarize -- I mean, I don't know

13    all the rules -- but you make an agreement with them.

14    Right?

15    A.     Yes.

16    Q.     For maybe certain compensation, in some cases,

17    and, in some cases, they don't get compensated?

18    A.     That's true.

19    Q.     Okay.  So you tell them, "You cannot violate the

20    law," I mean, unless they have your okay.  Right?

21    A.     That's correct.

22    Q.     Also, you tell them they can't entrap people.

23    Right?

24           MS. ARANGO:  Objection, Judge.  Objection to

25    the legal conclusion.
```

1           THE COURT:  Sustained.

2   BY MR. CASUSO:

3   Q.     Do you know what "entrap people" means, sir?

4   A.     I certainly do.

5   Q.     Okay.  Is this one of the things that you tell

6   your informants, "You're not supposed to entrap

7   people"?

8   A.     No.

9   Q.     You don't tell them that?

10  A.     No.

11  Q.     So it's okay for them to go and entrap people.

12  Right?

13  A.     No, sir.

14  Q.     Okay.  That's not discussed?

15  A.     No.

16  Q.     Okay.  So -- so, in this case -- focusing on this

17  case, would CW 1 -- you really don't give him a script,

18  but you kind of tell him, "Get information."  Right?

19  A.     No.  The instructions that are given in this case

20  to Abbas al-Saidi are the instructions that I would

21  give any informant respective to the crime that we're

22  investigating.

23         In this case, the crime -- or the information

24  that we had was that Narseal Batiste wanted to meet a

25  member of a terrorist organization to support his own

```
 1   organization's objectives.  That is the conversation --
 2   or the general instructions that Abbas was given.
 3        If we had received information that an individual
 4   or individuals wanted to sell narcotics or weapons,
 5   then Abbas would have been given a different set of
 6   instructions.
 7        He was given the instructions pursuant to the
 8   information that we received at the beginning of the
 9   investigation.
10   Q.   All right.  And this investigation -- it has
11   nothing to do with narcotics.  It has to do with
12   terrorism.
13        So you give him a set of instructions?
14   A.   That's correct.
15   Q.   And I thought you said on direct examination,
16   when the prosecutor asked you, that what you had
17   instructed CW 1 to do is get information, get him
18   talking.  Right?
19   A.   Yes.
20   Q.   Okay.  And in getting this man talking -- I mean,
21   they had a number of conversations and the ones -- the
22   two clips that are played here -- and you can correct
23   me if I'm wrong.
24        I heard about salt shakers and I heard about a
25   bomb that your informant suggested.  I didn't hear
```

Velazquez - CROSS - By Mr. Casuso                    40

```
 1   about anything else that this man had as a plan in

 2   order to attract some big chief from a terrorist

 3   organization.

 4         MS. ARANGO:  Objection.  Convoluted and vague

 5   and a compound question.

 6         THE COURT:  Sustained.

 7         Rephrase your question.  It's compound.

 8   BY MR. CASUSO:

 9   Q.    Well, is there anything else on the clip that you

10   showed the jury, sir, that contains anything else other

11   than the conversations we talked about here about salt

12   shakers and bombs?  Anything else?

13   A.    Yes.  There's a portion of that clip which

14   pertains to recruitment.  There's a portion of the clip

15   that pertains to using the model of organizations like

16   the Guardian Angels to allow yourself to basically hide

17   in plain sight from the police and recruit soldiers,

18   some of which will not know the ultimate objectives of

19   the organization.

20         I think that was what was played in the clips

21   during my direct testimony.

22   Q.    Okay.  And in getting information, sir, did you

23   inquire of the informant to see, "Well, Mr. Batiste, I

24   mean, if you want someone from a terrorist organization

25   to come in, how many policemen have you killed?  How
```

```
 1    many police stations have you blown up?"  Anything like
 2    that?
 3    A.    No.  He wasn't given any such instructions.
 4    Q.    So we were going to bring -- so at some point --
 5    at some point -- when is it that this man that is this
 6    terrorist person comes into the United States to meet
 7    Narseal Batiste?  When was that?
 8    A.    Are you asking me what day Elie Assaad arrived in
 9    the United States or which day he met with Narseal
10    Batiste?
11    Q.    Well, let's see -- when he arrived.
12    A.    I don't recall the exact date.
13    Q.    February?
14    A.    I'm not certain.
15    Q.    Okay.  It doesn't matter.
16          My real question here is:  How long a time
17    elapsed between these meetings with CW 1 until CW 2 was
18    injected into the equation, sir?  How long did it pass?
19    A.    I would say about 30 days.
20    Q.    In the 30 days, basically, what we had was a lot
21    of talk and nothing else.  Right?  Nothing was
22    happening.  Correct?
23    A.    No.  We were developing information in the
24    investigation --
25    Q.    Talk, sir.  Talk.
```

```
 1          It's what you were doing.  Right?

 2              MS. ARANGO:  Objection to the interruption.

 3    He asked --

 4              THE COURT:  Let him finish his answer, please.

 5    BY MR. CASUSO:

 6    Q.    All right, sir.  Go ahead and finish your answer.

 7    A.    During that period, we were developing

 8    information from the investigation that there was an

 9    organization that existed, that Narseal Batiste was the

10    leader of this organization and that they had a

11    building or a facility that they referred to as the

12    Temple in Liberty City.

13          So the information that we initially received

14    was being verified throughout the course and up to

15    December 16th, when Elie Assaad met with Narseal

16    Batiste.

17    Q.    And did you find out that the organization was a

18    church and a small construction company, sir?

19    A.    I don't know if I would refer to the organization

20    as a church, although they do ascribe to religious --

21    different religious principles and religions.

22    Q.    And the kind of religious principles that they

23    subscribe to is really no business of the FBI.  Right?

24    We do have freedom of religion this country.  Right?

25    A.    Yes, we do.
```

Velazquez - CROSS - By Mr. Casuso                    43

```
 1   Q.     Or did it bother that some of them had Muslim

 2   leanings -- did that bother you, sir?

 3   A.     No.  Not in the least bit.  As a matter --

 4   Q.     It's --

 5          MS. ARANGO:  Objection.

 6   BY MR. CASUSO:

 7   Q.     I'm sorry.  I'm sorry.  Go ahead.  Finish your

 8   answer.

 9   A.     As a matter of fact, the research that I did with

10   regard to the Moorish Science Temple I found somewhat

11   interesting in that it blends several different

12   religions, including Judaism, Islam, Christianity and

13   mysticism.

14   Q.     And it's a real church.  Right?

15   A.     I'm sorry?

16   Q.     It's a real church?

17   A.     I'm uncertain if the Moorish Science Temple is

18   considered a real church in that a church could be

19   considered a group of people, not necessarily a

20   building.

21   Q.     Okay.  It's recognized as a religious

22   organization, isn't it?

23   A.     I'm uncertain.

24   Q.     But, I mean, as far as you're concerned, as a law

25   enforcement officer, it's not a crime to be a Muslim in
```

1    this country, even after 9/11.  Right?

2    A.    Absolutely not.

3    Q.    Okay.  So these people -- when you talk about

4    this case, sir, these people are not being prosecuted

5    for their religious leanings.  They're being prosecuted

6    on four counts of an indictment.  Right?

7    A.    Yes.  As charged in this case.

8    Q.    Okay.  Four counts.

9          Not anything -- not any religious leanings.  That

10   has no room in this courtroom.  Right?

11   A.    I'm --

12   Q.    What their religious beliefs are.

13   A.    No, sir.  I have no knowledge of any reference to

14   religious beliefs as it pertains to the indictment for

15   which we're here.

16   Q.    Okay.  So you find out -- you found out that this

17   man -- that he had this organization, what, seven guys

18   working for him?  That's the organization that he had?

19   A.    I think the -- the information initially was that

20   there were seven to twelve members.  We identified, I

21   believe, eight or nine.

22   Q.    And did you -- and when you made all these

23   identifications and you did all this legwork and found

24   out stuff, did you find out that this guy was behind in

25   his bills, was broke, that they were going to cut his

 1  power off?  Did you find that out, sir?

 2  A.    Eventually, during the course of the

 3  investigation, we discovered information that they were

 4  having financial problems -- or Mr. Batiste was having

 5  financial problems.

 6  Q.    Now, let's cut to when CW 2 comes into the

 7  equation.

 8        He is told to go pick him up at the airport.

 9  Right?

10  A.    No.  Narseal Batiste is told.

11  Q.    Narseal Batiste is told to go pick him up at the

12  airport.  Right?

13  A.    That's correct.

14  Q.    Okay.  Now, this is the guy that you say he

15  requested.  Right?

16  A.    Yes.

17  Q.    To get hooked up.  Right?

18  A.    Yes.

19  Q.    Okay.  And he doesn't pick him up at the airport.

20  He misses him at the airport.  Right?

21  A.    Yes.

22  Q.    Now, what terrorist organization was this man

23  supposed to be from?

24  A.    Eventually, he was to convey that he was from

25  Al-Qaeda.  But at the initial meeting, he was given

```
 1   instructions not to represent himself with any
 2   particular terrorist organization, but to meet with
 3   Narseal Batiste and allow him to talk on whatever topic
 4   he wanted to talk about.
 5   Q.    Okay.  And actually -- so he misses him at the
 6   airport and eventually he goes to, I think -- the man
 7   goes to the Radisson Hotel.  Right?
 8   A.    That's correct.
 9   Q.    What's his last name?  I'm sorry.  Assaad?
10   A.    Assaad.
11   Q.    Okay.
12   A.    Elie Assaad.
13   Q.    So he goes to a -- Assaad is like -- Assaad
14   checks into the Radisson Hotel?
15   A.    Yes.
16   Q.    Right there near the airport?
17   A.    No.  Down on Biscayne and right across from the
18   Checkers.
19   Q.    Okay.
20   A.    I don't -- I think that's around 16th Street or
21   so.
22   Q.    And, eventually, Narseal Batiste shows up.
23   Right?
24   A.    Yes, he does.
25   Q.    He shows up dressed like Osama bin Laden, doesn't
```

```
 1   he?  He's in costume.  Right?
 2   A.    He's wearing a turban, a white robe and a cane.
 3   Q.    And a cane.  Right.  Okay.
 4         So he's dressed kind of like Osama.  Right?
 5   A.    Yes.
 6   Q.    Okay.  I mean, does this, like, flash, like, a
 7   red like you to that there's something very strange
 8   here?
 9   A.    No.  This is completely consistent with what
10   Narseal Batiste has articulated as his plan for
11   recruiting an organization that will partake in attacks
12   in the United States, which was to represent the
13   organization as an organization that would be doing
14   good for the community to provide him an opportunity to
15   recruit people.
16   Q.    Okay.  So he's going to meet this guy.  He's a
17   big chief from some terrorist organization, if not
18   Al-Qaeda.  And he shows up in public dressed like Osama
19   bin Laden.  Okay?  Kind of like, "Look at me, people.
20   Here" -- you know, "Here's" -- "I'm dressed like Osama
21   bin Laden."  Right?
22   A.    What's your question?
23   Q.    He shows up like that?
24   A.    He shows up as --
25   Q.    That's how he shows up?
```

 1   A.     He shows up.

 2   Q.     Now, remember when you said -- let me just give

 3   you --

 4   A.     Can I finish my answer?

 5   Q.     Of course you can.

 6   A.     He shows up as depicted in the video, in a white

 7   robe, a turban and a cane.

 8   Q.     Right.

 9          Kind of the first thing he says to this man from

10   Al-Qaeda is, "I'm financially exhausted."  Right?

11   That's one of the things he says to him?

12   A.     That's one of the things he says in the meeting.

13   It is.

14   Q.     That's kind of like -- I think first he talks

15   about Jeff Fort.  Right?

16   A.     Yes.

17   Q.     Kind of like -- kind of like, "Jeff Fort is,

18   like, the first black man charged with terrorism in the

19   United States."

20          I think he tells him that.  Right?

21   A.     I believe so.  Yes.

22   Q.     Kind of like trying to establish a standing that

23   he could be a for-real guy.  Right?

24   A.     Well, my -- as I sit here now, I believe it was

25   Narseal Batiste's attempt to express exactly who he was

```
 1    modeling himself after.

 2    Q.    His bona fides?

 3    A.    Sorry?

 4    Q.    His bona fides?

 5    A.    Well, I don't know if that would be considered --

 6    it could be considered bona fides.  However, Elie

 7    Assaad did not know who Jeff Fort -- I don't know if

 8    someone like Elie Assaad would have been expected to

 9    know who Jeff Fort was.

10    Q.    Elie Assaad wouldn't know Jeff Fort from nothing.

11    Right?

12    A.    That's correct.

13    Q.    Probably hardly anybody in the Middle East would

14    even care who Jeff Fort is, right, really?

15    A.    Maybe Moammar Kadhafi.

16    Q.    Okay.  Maybe Kadhafi.  Okay.  Because he made it

17    in the papers during that case.

18          But -- so after he said -- he talks about Jeff

19    Fort, the other thing he says is that he's financially

20    exhausted.  Right?

21    A.    That's one of the statements that Narseal Batiste

22    makes during that meeting.  Yes.

23    Q.    That's actually like one of the first statements

24    he makes.  Right?

25    A.    It's in the beginning of the meeting.  I believe
```

 1    that statement is made.

 2    Q.    And then the guy goes -- CW 2 goes -- he says,

 3    "Why am I here?  What do you want from me?  What do you

 4    want?"

 5         Right?

 6    A.    Words to that effect.  Yes.

 7    Q.    And then he tells him to write a list.  Right?

 8    A.    Well, that's one of the things that Elie Assaad

 9    tells Narseal Batiste.

10         If you're asking me at what point that happens,

11    it happens after Narseal Batiste starts to discuss some

12    of the things that he wants for his organization.

13         Elie Assaad then tells him to write it on a list.

14    Q.    He also -- he says that his plan at the time --

15    isn't that where he says that his plan is to have

16    people attack people and cause a ground war?

17    A.    That's another statement generally -- or

18    summarily that was made by Narseal Batiste.  Yes.

19    Q.    Okay.  Don't people attack people in Miami every

20    day, sir, and there's no ground war?  I mean, doesn't

21    violence happen in Miami every day, or the United

22    States, for that matter, and there's -- I mean, what

23    kind of plan is this?  To bring this guy from

24    Al-Qaeda -- I mean, this plan is like -- it's pretty

25    lame.  Don't you think so?

1   A.      No.  Not at all.

2   Q.      Not at all?

3   A.      With regard to the representation of violence in

4   Miami, there is plenty of violence in Miami.

5           However, the purpose of that violence isn't to

6   create chaos and confusion in the street, which is what

7   Mr. Batiste represented as the purpose of his idea, to

8   have people attack each other.

9   Q.      People attack each other even -- I mean, for no

10  reason.  I mean, people -- you know, you read in the

11  paper, like, babies are killed every day in crossfires

12  between these drug dealers.  It's no ground war.  And

13  it's senseless.  Right?  There's no ground war as a

14  result of that.

15  A.      I would agree that that type of violence or any

16  type of violence is senseless.

17          However, the purpose of the violence of which

18  Mr. Batiste spoke about had the purpose of creating

19  chaos, confusion, with the ultimate demise of the

20  United States.

21  Q.      But the plan was to have people attack each

22  other.  Right?  That was the plan?

23  A.      Well, no.  The plan was much broader than that.

24  That was one of the aspects of the plan that Narseal

25  Batiste discussed with -- on several different

1   occasions with one or both informants.

2   Q.    Was there -- I'm talking about that meeting, sir,

3   the initial meeting.

4         Is there any other parts of the plan that we

5   didn't hear about that weren't played for the jury?

6   A.    On which date?

7   Q.    On the first date, sir, that he meets him dressed

8   in costume, sir.

9   A.    Not that I can recall off the top of my head at

10  this moment.

11  Q.    Okay.  So then he writes down the list and

12  there's, like, any number of other meetings.  Right?

13  A.    Yes.

14  Q.    Now, at some point, CW 2 tells Narseal Batiste

15  that he's from Al-Qaeda.  Right?

16  A.    That was on -- yes.  That was on January 28th.

17  Q.    Now, correct me if I'm wrong, sir:  I mean,

18  haven't we all read in the paper how wealthy Osama bin

19  Laden is, how wealthy Al-Qaeda is?  I mean, that's

20  public knowledge, isn't it?

21  A.    I don't remember reading about the wealth of

22  Al-Qaeda.  The bin Laden family is a very wealthy

23  family.

24  Q.    Yes, sir.  Okay.

25        That's common knowledge.  Right?

1   A.     That the bin Laden family is wealthy?

2   Q.     Yes, sir.

3   A.     Yes.

4   Q.     Okay.  So he tells him that he's from -- that

5   he's from -- that he's a representative of Osama bin

6   Laden or Al-Qaeda.  Right?

7   A.     Yes.

8   Q.     Osama bin Laden is supposed to be the head of

9   Al-Qaeda.  Right?

10  A.     That's correct.

11  Q.     Okay.  So in many, many meetings that we have

12  with these -- with CW 2, Narseal Batiste is asking for

13  money.  That's his paramount thing here.  Right?

14  A.     Well, among other things, yes.

15  Q.     Okay.  And, basically -- I mean, in order -- in

16  order to get money, sir, from Al-Qaeda -- I mean, if

17  he -- if this man -- if Narseal Batiste goes to the --

18  Mr. Assaad, who's the representative, although he's

19  playing a representative from Al-Qaeda -- if he told

20  him that he wants money for his church and his

21  construction company and to pay for his light, what do

22  you think the guy would say?  Goodbye?

23  A.     I know what we would have done.  We would

24  probably have not continued the investigation.

25  Q.     Yeah.  But, I mean, it would have been -- it

```
1    would have been useless.  I mean, he couldn't have

2    gotten any money from you if he said -- I mean, if he's

3    not playing a role himself, how can he get any money

4    from Al-Qaeda if he's not playing a role?

5    A.    I'm not sure I understand your question.

6    Q.    Okay.  Let me ask you something else, sir.

7          Remember when we talked about the conversations

8    on the phone where your informant says, "I can't talk

9    on the phone" and you said, "Well, he's playing a

10   role"?  Right?

11   A.    Yes.

12   Q.    And Narseal Batiste says, "I can't talk on the

13   phone."  Right?

14   A.    Yes.

15   Q.    Do you think that he's also playing a role and

16   acting conspiratorial, both of them?

17   A.    No.

18   Q.    No?

19   A.    And this is why --

20   Q.    Your informant --

21          MS. ARANGO:  Objection to interrupting the

22   witness.

23   BY MR. CASUSO:

24   Q.    -- did, but he's not.  Right?

25          THE COURT:  Let him finish his answer.
```

1    BY MR. CASUSO:

2    Q.    Your answer is "no"?

3    A.    Well, my answer is "no."  And this is why:  Both

4    informants were given instructions to play a role.

5          With regard to the comment by Elie Assaad on the

6    telephone that he didn't like to talk on the telephone,

7    this was on March 9th, after Elie Assaad attempted to

8    meet with Narseal Batiste and they were going to search

9    him, meaning he had a body wire on.

10         When he left, Narseal Batiste called him on the

11   phone.  He was very agitated and upset; and that was

12   something that Elie Assaad said so he could get off the

13   telephone conversation.  And that was very apparent in

14   that telephone conversation.

15         With respect to Narseal Batiste, from the day

16   that he met Elie Assaad in that hotel room, he was

17   suspicious that Elie Assaad may be the police or

18   working with the police.

19         He asked Elie Assaad to step out of the room.

20         Elie Assaad was given instructions not to leave

21   the room.

22         He then asked Elie Assaad if he could turn on the

23   radio during their conversations to mask their

24   conversations.

25         It wasn't until January 28th that they had taken

1    the informants, stripped them of their clothes, all of

2    their electronic devices, taken them to another

3    location, changed cars, driven them all the way down to

4    Islamorada, that Batiste had satisfied his suspicion

5    that Elie and Abbas were not working with the police.

6    Q.    Okay.  So if he thought he was the police -- if

7    he thought he was the police, sir -- at the first

8    meeting, why would he give him a plan to attack people

9    and whatnot if he thought he's dealing with the police?

10   A.    This is --

11   Q.    That doesn't make any -- your answer doesn't make

12   any sense, does it?

13   A.    It makes complete sense.

14   Q.    Complete sense?

15   A.    Absolutely.

16   Q.    You think he's dealing with the police and he's

17   talking all this trash?

18          MS. ARANGO:  Judge, I would object to the

19   argumentative nature, and I would also object to

20   interrupting the witness.

21          THE COURT:  Sustained.

22          Rephrase your question.

23   BY MR. CASUSO:

24   Q.    Go ahead, sir.  I'm sorry.  I apologize.

25          THE COURT:  Sustained as to the last question.

1    Argumentative.

2            Were you finished with your answer?

3            THE WITNESS:  No, ma'am.

4            THE COURT:  Go ahead.

5            THE WITNESS:  My testimony was not that he

6    knew he was the police.  My testimony was that he

7    suspected he was the police.

8            It's very common for people that have an

9    interest in developing a relationship with someone that

10   may assist them, whether it's in stolen property or

11   narcotics or, in this case, meeting someone from a

12   terrorist organization, to take measures to address

13   those suspicions.

14           And this is what happened in this instance.

15   BY MR. CASUSO:

16   Q.    But before what you said happened, that these

17   people were stripped and taken to Islamorada, there is

18   all kinds of talk here going on.  Right?  Isn't there?

19   A.    There were conversations that took place from

20   November all the way through the date we're discussing

21   now, which is January 28th.

22   Q.    Right.

23           And they were very incriminating conversations.

24   Right?

25   A.    I would say so.

Velazquez - CROSS - By Mr. Casuso                    58

1  Q.     Conversations that one wouldn't have if one

2  thought that they were dealing with the police, sir.

3  That's what I mean, sir.

4  A.     Well, if one knew they were dealing with the

5  police, I don't think that they would show up for

6  meetings.

7        However, it's been my experience in dealing with

8  undercover matters that, where there may be some

9  suspicion, the meetings continue until such time that

10  they believe that the person is the police or they

11  believe that they're not the police.

12        And then, depending on what that position is,

13  that's where the investigation goes.

14        In this case, I think Mr. Batiste had satisfied

15  his suspicion that Elie Assaad was not working with the

16  police and the investigation continued.

17  Q.     And what is it that you can point to, sir, in an

18  objective manner that he satisfied his fears that this

19  person was not the police?  Just because you say so or

20  it's convenient for your case?

21  A.     No, sir.

22        On March 10th, Narseal Batiste took an oath of

23  allegiance to join Al-Qaeda -- or from Al-Qaeda -- from

24  a member of -- an individual who represented himself as

25  a member of Al-Qaeda.

```
 1          And then, on March 16th, six other members of his

 2    organization took the same pledge.  And they then

 3    agreed to take photos of a building or buildings that

 4    Al-Qaeda said they were going to blow up.

 5    Q.    Let's talk about that, sir.

 6          Now, until this time -- until the time of the

 7    oath -- okay? -- has anybody given Narseal Batiste any

 8    money?

 9    A.    To the time of the oath?

10    Q.    Yeah.

11    A.    No.

12    Q.    Was --

13    A.    I apologize.  I misspoke.

14          I believe Abbas al-Saidi had borrowed $25 at some

15    point early on, and I'm not sure when he gave him that

16    $25 back.  It may or may not have been before the oath.

17    I'm uncertain.

18    Q.    You told him to give it back.  Right?

19    A.    Yes, sir.

20    Q.    I'm talking about -- this man is asking for

21    money.  I mean, it's obvious he doesn't want guns, he

22    didn't want these Hummers.  What he's after is money.

23    Correct?  That's what he harps on all the time.  Right

24    or wrong?

25    A.    What Batiste articulated to both informants is
```

 1    that he wanted support for his mission.  That could

 2    include money.  It could not.  In this case, he

 3    represented that he needed money for his organization.

 4    Q.    Sir, isn't he at some point here even getting

 5    $1,000 from the FBI -- he was in such need of money he

 6    got $1,000 from the FBI on a case that was over and he

 7    says that he needed to pay a lawyer.

 8          Did you look at the records in the case in court,

 9    sir?

10    A.    I did, as presented by Ms. Jhones.

11    Q.    You did.  Okay.

12          Did you notice, sir, that he had assigned a

13    public defender on that case, sir, that he didn't need

14    no $1,000 for a lawyer?  He had a public defender,

15    didn't he?

16    A.    Sir, I believe a public defender was assigned.

17    However, just because someone is assigned a public

18    defender does not negate the possibility that they may

19    want to hire a different attorney.

20    Q.    Sir, the case was no-actioned in court.  The

21    State never even filed charges.

22          What need is there to get a lawyer if the case

23    gets no-actioned?  Do you know what that means,

24    no-actioned?

25    A.    Yes, I do.

```
 1   Q.     Okay.  Tell the jury what it means, sir.

 2   A.     That the Government is walking away from the

 3   case.

 4   Q.     That's right.

 5          It wasn't even filed in court, sir.  So he conned

 6   you out of the money.  I hate to say that.  Okay?

 7          But what I'm saying, not to make you look bad

 8   or anything, sir, but he's trying to get even like

 9   1,000 bucks from you -- I mean, from Al-Qaeda.  Okay?

10   He's in need of money.  That's what he wants.

11   A.     Sir, what's your question?

12   Q.     My question is:  Did that raise a red flag to

13   you, sir, when this guy really is asking for, like,

14   chicken feed here?

15   A.     Well, he didn't just ask for chicken feed.  He

16   made a request for $50,000 previously --

17   Q.     Yes, sir.

18   A.     -- to Elie Assaad.

19   Q.     Right.

20          Was the $50,000 forthcoming, sir?

21   A.     Was it forthcoming?

22   Q.     Yes, sir.

23   A.     No.  We had no intentions of giving Batiste

24   $50,000.

25   Q.     I know you did not.
```

 1          But was it -- was he led to believe -- was he led

 2   to believe that, if he went along with this oath and

 3   these pictures of the FBI, he would get that money?

 4   A.     No.

 5   Q.     He was never led to believe that?

 6   A.     No.

 7   Q.     Okay.  He was given a camera, too.  Right?

 8   A.     That he requested --

 9   Q.     Okay.

10   A.     -- on February 19th.

11   Q.     Okay.  You gave -- what happened to the camera?

12   A.     At which point?  After they took the video

13   footage?

14   Q.     Did you ever get it back, sir?

15   A.     No, sir.

16   Q.     Where was it?  What happened to it?

17   A.     That camera was ultimately pawned by Narseal

18   Batiste --

19   Q.     It was pawned, wasn't it?

20          MS. ARANGO:  I would object to the

21   interruption.

22          THE COURT:  Let him finish his answer.

23   BY MR. CASUSO:

24   Q.     The camera was pawned by --

25          THE COURT:  Mr. Casuso.

```
 1              MR. CASUSO:  I'm sorry.
 2   BY MR. CASUSO:
 3   Q.     Finish your answer, sir.
 4   A.     I believe the camera was pawned after April 17th.
 5   Q.     Okay.  After you have all these meetings, all
 6   these videotapes, all these conversations with CW 2 and
 7   Narseal Batiste, sir, at some point -- actually, all
 8   there is before this oath is proposed is a bunch of
 9   talk.  Right?
10   A.     (No response.)
11   Q.     Right, sir?
12   A.     Is there talk during that period that you just
13   mentioned?
14   Q.     Well, of course there is.
15          I mean, it's all recorded.  Right?
16   A.     Yes.
17   Q.     Okay.  Who comes up with the idea of having these
18   people take an oath, sir?
19   A.     The FBI.
20   Q.     Who specifically?
21   A.     I think that was a collective decision made by
22   the agents conducting the investigation and FBI
23   management.
24   Q.     And the reason -- the reason that it was thought
25   out is because there was nothing objective happening in
```

1   the investigation and you guys needed to show

2   something -- that something was happening here.  Right?

3   Something objective was going to happen.  Right?  And

4   this is the idea for the oath.  Correct?

5   A.     There were several objective things that had

6   happened prior to that.

7          The first one occurred on January 28th, when the

8   informants were stripped and taken down to Islamorada.

9          And then, on -- at that point, Batiste expressed

10  that he wanted to form an alliance with Al-Qaeda.

11         I would consider that significantly objective.

12  Q.     Okay.  And the guy was from Al-Qaeda.  Right?

13  The guy who showed up from the terrorist organization,

14  he happens to be Al-Qaeda.  Right?  That's what he told

15  him, "I'm Al-Qaeda."  What a coincidence.  Right?

16  A.     I'm not sure I understand the coincidence you're

17  referring to.

18  Q.     Well, before he said he wanted a terrorist

19  organization, no one -- you said it was a fungible

20  terrorist organization.

21         But now that he wants to form an alliance with

22  Al-Qaeda, CW 2 happens to be with Al-Qaeda.  Right?

23  A.     Well, no.  I don't think Narseal Batiste ever

24  specifically designated Al-Qaeda.

25         As a matter of fact, on the meeting on

```
 1   March 16th, he tells Elie Assaad that he didn't know

 2   who he was going to get.  He thought he would get Hamas

 3   or somebody like that.

 4        So I don't think, based on the recorded

 5   conversations of Narseal Batiste, that Batiste knew who

 6   Elie Assaad was until he told him.

 7   Q.   But you said, when he went down -- when they were

 8   taken down to Islamorada, that Narseal Batiste said he

 9   wanted to form an alliance with Al-Qaeda.

10   A.   That's correct.

11   Q.   And is that when Elie Assaad told him, "I am from

12   Al-Qaeda.  I am Al-Qaeda"?

13   A.   No.  I believe --

14   Q.   When did he tell him --

15   A.   The sequence of events are reversed.

16        Elie Assaad told Narseal Batiste he was from

17   Al-Qaeda.  And then, during the course of that meeting,

18   Narseal Batiste said he wanted to form an alliance.

19   Q.   Okay.

20   A.   He wouldn't have been able to say he wanted to

21   form an alliance because he -- he --

22   Q.   And what prompted Mr. Assaad to say he was from

23   Al-Qaeda?

24   A.   That was the -- well, when they were taken from

25   the Embassy and taken to a different car and changed
```

```
 1    over and taken down, Elie Assaad and Abbas were both in

 2    fear for their lives.  They didn't know what was going

 3    to happen.  They didn't know where they were taken --

 4    where they were going to be taken to.

 5         Elie Assaad, in an attempt to secure his safety,

 6    said out loud to the occupants of the car that were

 7    driving him down that he was Al-Qaeda and that, if

 8    anything happened to them, that they would come looking

 9    for them --

10    Q.    Weren't they saying --

11    A.    -- or words to that effect.

12    Q.    Weren't they saying on the way to Islamorada in

13    their own language, sir, "Look at these fools"?

14    Weren't they making fun of these people who were taking

15    them down to Islamorada --

16    A.    No.

17    Q.    -- when they were speaking -- that's on the tape,

18    sir.  I mean, you're saying "no"?

19    A.    The answer to the question --

20    Q.    It's in Arabic, sir.

21         MS. ARANGO:  Objection to interrupting the

22    witness.

23         THE COURT:  Let the witness answer, please.

24         THE WITNESS:  The question that you just asked

25    with regard to those statements made by the informants
```

```
 1    didn't occur on the way down to Islamorada.
 2    BY MR. CASUSO:
 3    Q.    When --
 4    A.    They occurred on the way back from Islamorada
 5    after Batiste and Elie had made up and there wasn't any
 6    more fear on the part of Elie because Batiste had said
 7    he wanted to form an alliance.
 8          So the conversations that you're referring to
 9    occurred not on the way down to Islamorada.  They
10    occurred after they had their meeting and they were on
11    their way back to be dropped off.
12    Q.    Okay.  So let me get back to question, sir.
13          The original request that I asked regarding the
14    oath:  The FBI came up with the idea of the oath so
15    they could show something specific here, that something
16    was going on in the investigation, something -- I mean,
17    that we could show something here.  Right?  Because
18    nothing was happening other than talk.
19    A.    No, sir.  The decision to administer -- provide
20    an opportunity to take the oath occurred after Batiste
21    said he wanted to form an alliance with Al-Qaeda.
22          And there was a meeting at his apartment -- at
23    Elie's apartment on February 19th, where Batiste
24    continued to talk about the ultimate objectives of his
25    organization.
```

Velazquez - CROSS - By Mr. Casuso                    68

1    Q.    Okay.  Was there any -- was the suggestion of any

2    money forthcoming, sir?

3    A.    The suggestion of any money?

4    Q.    Yeah.

5    A.    The issue of money was made by way of

6    conversation between Batiste and Elie in terms of

7    support that Al-Qaeda would provide to Narseal

8    Batiste's organization.

9    Q.    Okay.  And do you know, sir, what Narseal Batiste

10   said to any of these men, including Burson Augustin,

11   before the oath was taken?  Do you know what he said to

12   them?

13   A.    On March 15th -- I'm not sure I understand your

14   question.

15   Q.    Do you know before -- before this oath was taken,

16   sir, what Narseal Batiste said to Burson Augustin about

17   this -- about what was going to go on?  "Yes" or "no"?

18   A.    No.  The answer is "no."

19   Q.    And then, after this oath is taken, this is when

20   your informant said, "I need you to do me a big favor."

21   Right?  "The plan is to blow, like, these five FBI

22   offices."  Right?

23   A.    That's correct.

24   Q.    Okay.  And, also, who came up with that plan,

25   sir?

Velazquez - CROSS - By Mr. Casuso                    69

1   A.     Again, that was an idea that was decided upon

2   collectively by the investigative personnel and the

3   supervisor of the squad.

4   Q.     And this is where the plan was to tell them to

5   see if they could take these pictures.  Right?

6   Pictures?

7   A.     Yes.

8   Q.     Okay.  And that was part of the plan, right, that

9   the FBI made?

10  A.     This was -- I'm not sure I understand your

11  question.

12  Q.     Okay.  The plan is -- you say there's an oath and

13  then the plan is to try to get them to take these

14  pictures.  Right?

15  A.     No.  After the oath was given, Elie was

16  instructed to ask Batiste if it would be okay to talk

17  in front of the rest of his men, providing an

18  opportunity for Batiste to decide who would be allowed

19  to stay or if he wanted to talk in private.

20         At that point, Elie was instructed to let Batiste

21  know that there was an Al-Qaeda plot to blow up five

22  FBI offices in the United States and, since they've now

23  formed an alliance, would they assist in obtaining

24  pictures and video footage of the building.

25  Q.     Okay.  So that was the plan.  That was part of

1  the plan that the FBI had.  Right?

2  A.     Yes.

3  Q.     Narseal Batiste didn't come up with any plan to

4  take pictures of FBI buildings.  Right?

5  A.     No.

6  Q.     That was the FBI's plan.  Right?

7  A.     He was requested by Elie for assistance.

8  Q.     Okay.  And he told him, "I don't know where the

9  FBI building is.  Tell me where it is," that sort of

10  thing.  Right?

11  A.     That's correct.

12  Q.     Okay.  Well, I mean, the FBI building, sir, is

13  listed in the phone book; is it not?

14  A.     It is.

15  Q.     Okay.  I mean, if I got -- from my apartment in

16  South Beach, I got into a taxi and I asked the taxi to

17  take me to the FBI building, do you think I could get

18  there, sir?  Is that doable?

19  A.     I'm quite sure you could get there.

20  Q.     But this is -- this is a ruse, isn't it?  It's a

21  game.  Take the pictures of -- there's no plan to blow

22  up any FBI buildings.  It was to see if they could get

23  him to go along.  Right?

24  A.     No, sir.  This was to provide an opportunity to

25  see if Narseal Batiste and his organization would

```
 1   assist Al-Qaeda in a plot to blow up buildings.
 2   Q.     Okay.  But it was your idea?
 3   A.     To introduce the plot?
 4   Q.     Yes.
 5   A.     Yes.
 6   Q.     Was there any money that was suggested that would
 7   be given to Narseal Batiste?
 8   A.     No.  Other than the support he initially
 9   requested months prior.
10   Q.     Which is -- what is the support?  Tell us what
11   the support is.  It's money, isn't it?
12   A.     The support, as represented by Narseal Batiste,
13   came by way of three or four different lists, which
14   included weapons and vehicles and money.
15   Q.     Yeah.
16          You don't like to say "money" in this case.
17   Right?
18   A.     Not -- I have no problem whatsoever taking -- or
19   saying "money."  It takes money to run a business.  It
20   takes money to run a terrorist organization.  It takes
21   money to hold these proceedings.
22   Q.     But he never asked -- in all these other meetings
23   where he asked for money, he didn't ask for the guns.
24          He didn't ask for anything else other than the
25   money.  Right?
```

```
 1   A.     That's correct.

 2          THE COURT:  Mr. Casuso, we're going to end

 3   here.

 4          MR. CASUSO:  I've got five minutes, Judge.

 5   If -- I can come back.

 6          THE COURT:  Well, can you do it in less than

 7   five?

 8          MR. CASUSO:  Absolutely.

 9          THE COURT:  Okay.

10   BY MR. CASUSO:

11   Q.     Last thing here.  Okay?

12   A.     Yes, sir.

13   Q.     The tapes on the warehouse --

14   A.     Yes.

15   Q.     -- the one that was provided to Narseal Batiste

16   by the FBI --

17   A.     The videocamera?

18   Q.     The videotapes.

19   A.     Yes, sir.

20   Q.     Okay.  There's a couple of meetings, sir, that

21   shows -- that show Burson Augustin sitting near the

22   door.

23   A.     I believe that's correct.  Yes.

24   Q.     Is that door like a plastic or glass door?  Can

25   you look outside?
```

```
 1    A.    No.  No.  That plastic window that you see at the

 2    end of the room actually looks into the bay area, where

 3    you could drive a truck in.  So that's enclosed.  It's

 4    an enclosed part of the warehouse.

 5    Q.    And when you -- there's a meeting that these --

 6    Narseal Batiste is looking at these photographs with

 7    the informant of the FBI buildings and whatnot.

 8    A.    Yes.

 9    Q.    Okay.  Burson Augustin is sitting back there.

10    He's not looking at any photographs.  Right?

11    A.    That's correct.  He's sitting at the door.

12    Q.    He's sitting by the door.  Okay.

13          Does that door lock, by the way?

14    A.    The door does lock.

15    Q.    And what is it made of?

16    A.    It's made of glass, I believe.

17    Q.    So you can look outside?

18    A.    That's correct.

19    Q.    From inside?

20    A.    Yes.

21    Q.    Because I notice he's looking outside.

22    A.    Yes.

23    Q.    Okay.

24          MR. CASUSO:  That's all I have.  Thank you,

25    Judge.
```

```
 1              THE COURT:  We're going to take an early
 2   lunch.
 3              Do not discuss this case either amongst
 4   yourselves or with anyone else.  Have no contact
 5   whatsoever with anyone associated with the trial.  Do
 6   not read, listen or see anything touching on this
 7   matter in any way.
 8              If anyone should try to talk to you about this
 9   case, you should immediately instruct them to stop and
10   report it to my staff.
11              You may leave your materials in your chairs.
12   Please be back in the jury room at 12:15.
13              (Whereupon, the jury exited the courtroom at
14   10:46 a.m. and the following proceedings were had:)
15              THE COURT:  You can step down, sir.
16              (Witness excused.)
17              THE COURT:  I just wanted to remind everyone,
18   you need to turn off your Blackberrys.  I can hear it
19   in the sound system.
20              Cell phones and Blackberrys must be off in
21   the courtroom because, otherwise, they're always
22   transmitting and it comes through the sound system.
23              Would you let the parties know, please, when
24   the jurors have exited the elevators.
25              THE COURT SECURITY OFFICER:  Will do.
```

```
 1            THE COURT:  We're in recess until 12:15.
 2            (Thereupon, a luncheon recess was taken, after
 3   which the following proceedings were had:)
 4            THE COURT:  We're back on United States of
 5   America versus Narseal Batiste, et al., Case
 6   No. 06-20373.
 7            Counsel, state your appearances, please, for
 8   the record.
 9            MR. GREGORIE:  Good afternoon, your Honor.
10            Richard Gregorie and Jacqueline Arango on
11   behalf of the United States.
12            MS. JHONES:  Ana Maria Jhones on behalf of
13   Narseal Batiste, who is present.
14            MR. LEVIN:  Albert Levin for Patrick Abraham,
15   who's present.
16            MR. CASUSO:  Louie Casuso on behalf of Burson
17   Augustin, who's present.
18            MR. CLARK:  Nathan Clark on behalf of
19   Rotschild Augustine, who's present.
20            MR. HOULIHAN:  Richard Houlihan on behalf of
21   Naudimar Herrera.
22            MR. VEREEN:  Rod Vereen on behalf of Stanley
23   Phanor, who's present.
24            THE COURT:  All Defendants are present.
25            Let's bring the jurors in.
```

Velazquez - CROSS - By Mr. Levin                    76

 1              (Whereupon, the jury entered the courtroom at

 2    12:47 p.m. and the following proceedings were had:)

 3              THE COURT:  You may be seated.

 4              Good afternoon, ladies and gentlemen.

 5              You are still under oath, sir.

 6              You may proceed, Mr. Levin.

 7              MR. LEVIN:  Thank you, your Honor.

 8              Good afternoon, ladies and gentlemen.

 9              THE JURY:  Good afternoon.

10                          CROSS-EXAMINATION

11    BY MR. LEVIN:

12    Q.    Good afternoon, Special Agent Velazquez.

13    A.    Good afternoon, Mr. Levin.

14    Q.    I'll try to be brief and as repetitious -- or try

15    to avoid repetition as best I can.

16          I want to ask you a couple of questions.

17          With regard to informants, you said that you

18    needed to evaluate the verbal and nonverbal behavior of

19    informants to determine their abilities to be

20    informants.

21          Did you not say that?

22    A.    I'm not sure if I said that specifically.  But

23    evaluating their verbal and nonverbal behavior is

24    something I would consider in their suitability for a

25    particular investigation.

```
 1   Q.     Right.

 2          Now, with regard to Abbas al-Saidi, who's been

 3   referred to as Confidential or Cooperating Witness

 4   No. 1, you indicated in your direct examination that

 5   you had never met him before.  Is that correct?

 6   A.     That's true.  Before he arrived back in Miami

 7   from Yemen.

 8   Q.     In truth and in fact, you had met him on a

 9   previous occasion; had you not?

10   A.     I don't believe so.

11   Q.     Did he not work a case for the City of Miami

12   Beach Police Department that you were aware of?

13   A.     He did.

14   Q.     Do you recall testifying in a prior proceeding on

15   February the 14th of 2008?

16   A.     I do.

17   Q.     And do you recall being asked the following

18   question and giving the following answer at Page 63:

19          "All right.  And you don't know Abbas al-Saidi,

20   other than through this case.  Correct?

21          "Answer:  And a prior relationship as an

22   informant with the FBI.  Yes.

23          "Question:  When -- well, when was he a prior

24   informant with the FBI?

25          "Answer:  Well, I had met Abbas prior to this
```

1    investigation"?

2         Do you recall giving that question -- or being

3    asked those questions and giving those answers?

4    A.    I may have.  Yes.

5    Q.    So do you recall now that Abbas had been an

6    informant for the City of Miami Beach Police

7    Department?

8    A.    I think -- I'm not sure if Abbas was an informant

9    for the Miami Beach Police Department.  I know that he

10   provided information on a drug investigation that led

11   to an arrest that was provided to the Miami Beach

12   Police Department.

13   Q.    So you, in fact, met him prior to this case?

14   A.    My -- if that case was before October 20th, then,

15   I be -- I'm uncertain.  I'm aware of the information

16   that he provided, and I'm aware that the information

17   was given to the City of Miami Beach police.

18   Q.    Well, you have familiarity with Mr. Abbas

19   al-Saidi; do you not?

20   A.    I do now.  Yes.

21   Q.    Special Agent John Stewart is actually his

22   control agent, isn't he?

23   A.    At this moment, he is not.

24   Q.    At the time of this -- commencement of this

25   investigation back in 2005, Special Agent John Stewart

```
 1   was his control agent.  Correct?

 2   A.     That's correct.

 3   Q.     Basically, he's the one that's responsible for

 4   monitoring and supervising the activities of

 5   Mr. Al-Saidi.  Correct?

 6   A.     Yes.

 7   Q.     And he came to his attention -- al-Saidi came to

 8   Stewart's attention through a detective out of New York

 9   named Detective Branzetti.  Isn't that true, sir?

10   A.     That's my understanding.  Yes.

11   Q.     And, in fact and truth --

12          THE COURT:  Mr. Levin.

13          MR. LEVIN:  I understand, your Honor.  You

14   want me to slow down.

15          THE COURT:  Yes.

16          MR. LEVIN:  I understand.  I apologize.

17          MS. JHONES:  Cuban coffee, your Honor.

18          THE COURT:  Well, then he'll have to stop the

19   Cuban coffee.

20          MR. LEVIN:  Okay.

21          THE COURT:  It's your record.

22          MR. LEVIN:  I understand.

23          THE COURT:  You can't ask Lisa to do the

24   impossible.

25          MR. LEVIN:  I absolutely apologize to Lisa as
```

```
 1   well.

 2              THE COURT:  Go ahead.

 3   BY MR. LEVIN:

 4   Q.    Now, you became aware that Abbas al-Saidi came to

 5   Miami in August of 2004.  Correct?

 6   A.    I'm not certain when Abbas first came to Miami.

 7   Q.    Well, you became aware that Special Agent Stewart

 8   first met with Abbas al-Saidi in a jail.  Isn't that

 9   correct?

10   A.    I'm not sure when John Stewart first met Abbas

11   al-Saidi.

12   Q.    John Stewart knows that, doesn't he?

13   A.    I -- I'm sure he does.

14   Q.    And isn't it true that Mr. Abbas al-Saidi had

15   been arrested for beating up his girlfriend, Stephanie

16   Jennings, on a domestic violence charge?

17   A.    Abbas was arrested on a domestic violence charge,

18   I believe, in Miami Beach.

19   Q.    And isn't it true that he was arrested and called

20   Special Agent -- or Detective Branzetti out of

21   New York, who he had worked as -- previously as an

22   informant, and that's how Special Agent Stewart got

23   involved in this case, that is, from a phone call from

24   Branzetti to Special Agent Stewart?

25   A.    No.  I'm uncertain of that.
```

Velazquez - CROSS - By Mr. Levin                81

```
 1          My recollection is that Abbas was stopped riding
 2    a scooter -- my recollection is that Abbas at some
 3    point was stopped by the police riding a scooter and
 4    that there was a conversation that ensued regarding a
 5    relationship with NYPD and, as a result of that police
 6    stop, John Stewart came to meet Abbas al-Saidi.
 7    Q.    Now, you're one of three co-case agents in this
 8    case.  Correct?
 9    A.    Correct.
10    Q.    And on direct examination, you were asked by
11    Ms. Arango on numerous occasions, "Based upon your
12    having listened to all the tapes in this case, based on
13    your involvement in this case...." -- and then she
14    would ask you your opinion on certain activities.
15          Do you recall that?
16    A.    I do.
17    Q.    You know that Abbas al-Saidi worked as an
18    informant in New York before coming here, don't you?
19    A.    Yes.  I do know that.
20    Q.    You know that Abbas al-Saidi has been working as
21    an informant since he was 17 years old in New York
22    City.  Isn't that correct?
23    A.    I know that he had worked as an informant for the
24    NYPD.  I'm uncertain as to when that started.  It may
25    have been when he was 17.  I'm uncertain of the --
```

1   Q.     You know that he had received compensation for

2   his efforts in New York.  Correct?

3   A.     I do.

4   Q.     You know that he was provided housing in New York

5   for his efforts as a cooperating witness in New York.

6   Correct?

7   A.     No, sir.  My understanding is that Abbas was --

8   there was an operation -- a drug operation that the

9   NYPD was involved with wherein they had Abbas -- they

10  had an apartment -- to participate in gathering

11  information in that investigation, is my recollection.

12  Q.     Okay.  So you have no knowledge as to whether or

13  not Abbas al-Saidi has been a, if you will, per-case

14  informant for the New York City Police Department for

15  some time prior to coming to Miami?

16  A.     No.  I know that he was an informant or had

17  provided information to the NYPD prior to his

18  involvement in this investigation.

19  Q.     Are you denying, sir, that he was arrested for

20  domestic violence on Stephanie Jennings, his

21  girlfriend?  Are you denying knowledge of that?

22  A.     No.  I think my testimony was that Abbas was

23  arrested by Miami Beach PD for a domestic violence

24  incident.

25  Q.     In addition to this motor scooter incident?

1    A.     I'm not sure.  The story that I recall regarding

2    Abbas al-Saidi and how John Stewart came to know him

3    was involving a scooter incident.  That's what I

4    recall.

5          Now, I don't know if it's related to the arrest

6    that you're referring to or if it's a separate

7    incident.  But that's my recollection of the

8    relationship being established with John Stewart and

9    Abbas.

10   Q.     So you really never had any opportunity, Special

11   Agent Velazquez, to evaluate the verbal and nonverbal

12   communication of Abbas al-Saidi to determine his

13   fitness as an informant prior to utilizing him in this

14   case, did you, sir?

15   A.     No.  He was John Stewart's informant.

16   Q.     So only John Stewart could testify as to whether

17   or not he had the opportunity to evaluate this person

18   as a confidential informant.  Correct?

19   A.     Well, I mean, with regard to his own assessment,

20   yes.

21   Q.     I'm talking about at the commencement of this

22   investigation.

23          Obviously, you became -- you dealt with Abbas

24   al-Saidi as the investigation progressed.  Correct?

25   A.     True.  However, Abbas wasn't selected for this

1    operation.  Abbas provided the initial information upon

2    which the investigation was initiated.

3    Q.    And law enforcement wasn't present when Narseal

4    Batiste and other individuals seated here went to his

5    convenience store and had conversations, was he?

6    A.    No.

7    Q.    And you were not present during that period of

8    time, were you, sir?

9    A.    No, sir.

10   Q.    And Abbas, being a seasoned informant since the

11   age of 15 years old -- okay? -- just -- you're saying

12   that he called up the FBI and gave this information?

13   A.    I'm saying that he provided information on a

14   couple of occasions to the FBI.

15   Q.    With regard to this case, did he ever turn over

16   to you any kind of videotape surveillance that may have

17   been captured at the convenience store on 141st Street

18   and 6th Avenue, where he worked, to show the presence

19   of any of these individuals at that convenience store?

20   A.    No.

21   Q.    So the only corroboration you have of anything he

22   ever were to tell you are things that might have been

23   captured on tape.  Isn't that correct?

24   A.    Prior to the initiation of the investigation?

25   Q.    At any time.

Velazquez - CROSS - By Mr. Levin                    85

1    A.    Yes.  The meetings that occurred between Abbas

2    and Batiste.

3    Q.    Did you monitor him 24 hours a day, 7 days a

4    week?

5    A.    No.  He was not monitored.

6    Q.    Did he always have a tape recorder with him to

7    record any conversations he may have had with these

8    people?

9    A.    No.

10   Q.    So there's nothing to corroborate what he might

11   have told you they said to him, correct, other than the

12   word of Abbas al-Saidi?

13   A.    No.  There are the consensual recordings that

14   were made between Abbas, Narseal Batiste and other

15   members of his organization, some of which have been

16   played here in court.

17   Q.    I'm talking about conversations that weren't

18   recorded.

19   A.    I'm not sure I understand your question, then.

20   Q.    I'll move forward.

21         You indicated that Abbas al-Saidi returned from

22   Yemen -- you've said September 20th and you've said

23   October 20th.

24         Would you agree with that?

25   A.    I'm not certain -- I don't recall testifying to

Velazquez - CROSS - By Mr. Levin                    86

 1    that.  But if I did, he only arrived on one date.  And

 2    that was October 20th.

 3    Q.    So your testimony is now October 20th?

 4    A.    Yes.  It's October 20th.  And I think I

 5    referenced he arrived a few days before Hurricane Wilma

 6    hit, which was in October.

 7    Q.    Okay.  You do recall testifying the other day, on

 8    February the 25th -- that would be last Wednesday --

 9    and being asked by Ms. Jhones at Page 88, "Now, sir, in

10    your direct testimony, you indicated that sometime -- I

11    think it was October 20th -- was the first time that

12    you personally met with Abbas al-Saidi.

13         "Answer:  No.  It was September 20th, 2005.

14         "Question:  In your testimony in this case, sir,

15    a couple of days ago -- actually, more than a couple of

16    days" -- this is now on direct examination by the

17    prosecutor -- "on February 19th, do you remember

18    indicating that your first meeting with this individual

19    was on October 20th?

20         "Answer:  No.  No.  I trust your word."

21         Was it September 20th or October 20th, Special

22    Agent Velazquez?

23    A.    It was October 20th.  Hurricane Wilma, I believe,

24    occurred on a Sunday, October the 23rd, later, into the

25    24th.

Velazquez - CROSS - By Mr. Levin                    87

```
 1          Abbas got here a few days before Hurricane Wilma,
 2    and that's when we lost communication.  So it was
 3    October 20th when Abbas al-Saidi arrived in Miami from
 4    Yemen.
 5    Q.    And how is it now October 20th when it was
 6    September and then October and back to September?  How
 7    is it that you're now certain in front of this jury
 8    that it's now October the 20th when, in the last week
 9    to ten days, you've testified with regard to two
10    different dates?  Have you discussed your testimony
11    with anyone?
12    A.    Absolutely not.
13    Q.    Have you -- have you gone through your mind to
14    make a proper determination as to the date?
15    A.    Well, no.  I think that, during my direct
16    testimony, I made reference to Hurricane Wilma on
17    several occasions.
18    Q.    You did.
19    A.    I did.
20          And whether I said September or October, what is
21    indisputable is that Hurricane Wilma occurred in
22    October.  So if it my testimony was that Abbas arrived
23    in September, then I misspoke.
24          But with respect to a significant event, that
25    being Hurricane Wilma, I know that occurred in October
```

```
 1   and Abbas arrived a few days before that.

 2        So I apologize if that's caused any confusion

 3   with the jury.

 4   Q.    Did you -- are you aware of any conversations

 5   that were recorded between Abbas and Narseal Batiste

 6   after he returned from Yemen within a day or two prior

 7   to meeting with you?

 8   A.    I believe the first conversations I'm aware of

 9   occurred at the end -- recorded conversations?

10   Q.    Well, you're not aware of any unrecorded

11   conversations.  Right?

12   A.    I am.

13   Q.    Right.

14        You don't know whether or not Abbas al-Saidi,

15   after he came back from Yemen, said to Narseal Batiste,

16   "I've got a wealthy uncle who knows somebody that's

17   going to be coming over here.  If you play and put

18   together a plan, you're going to get paid"?  You don't

19   know if that was said by Abbas to Narseal, other than

20   what Abbas al-Saidi told you.  Correct?

21   A.    No.  I would disagree with that.  I'm fairly --

22   I'm very confident that that conversation did not take

23   place, based upon the meetings that occurred from the

24   end of October through the end of this case between

25   Abbas, Elie and Narseal Batiste and between Batiste and
```

 1   other members of his organization that were recorded

 2   pursuant to the wiretap.

 3   Q.     Okay.  Now, when you gave Special Agent Stewart

 4   instructions to bring back Mr. Al-Saidi from Yemen, I

 5   believe you testified that he was reimbursed for his

 6   travel back.

 7   A.     Yes.

 8   Q.     And would you agree with me, sir, that the

 9   airline ticket coming back from Yemen to Miami was

10   $4400?

11   A.     I'm unsure of how much the airplane ticket was

12   from Yemen to the United States.

13   Q.     You haven't seen the ticket?

14   A.     I have looked at the ticket.  I don't recall what

15   the cost was.

16   Q.     Is there anything that might refresh your

17   recollection as to the cost of the ticket?

18   A.     If there is a copy of the ticket, I could look at

19   it and tell you how much it cost.

20          MR. LEVIN:  If I may approach, the witness,

21   your Honor.

22          THE COURT:  You may.

23   BY MR. LEVIN:

24   Q.     Let me show you what purports to be a copy of an

25   airline ticket concerning Abbas al-Saidi's travel back

 1   from Yemen on October 20th, 2005.

 2        Does that help refresh your recollection as to

 3   the cost of the ticket?

 4   A.   As well as the date.

 5        However, I'm uncertain how much this is -- this

 6   converts to in US dollars.

 7             MR. LEVIN:  May I approach and see what the

 8   confusion is?

 9             THE WITNESS:  (Tenders document to counsel.)

10   BY MR. LEVIN:

11   Q.   It's your testimony, sir, that that is not

12   US dollars?

13   A.   My testimony is I don't know if that is in

14   US dollars.  It does not appear to be in US dollars.

15   It looks like it's 41,000, whatever the currency -- I'm

16   uncertain of what that is.

17   Q.   Okay.  Fair enough.

18        Do you know who paid for Mr. -- who gave -- who

19   paid for the ticket in Yemen for him to come back?

20   A.   No.

21   Q.   Now, you said in your direct examination that,

22   apparently, you were advised of an AK-47.

23        Do you recall that?

24   A.   Yes, I do.

25   Q.   And that you tasked Mr. Al-Saidi to get the gun

```
 1   back.  Correct?

 2   A.     I tasked John Stewart with that.

 3   Q.     Right.

 4          And you never recovered that AK-47.  That's

 5   already been established.  Correct?

 6   A.     That's correct.

 7   Q.     And certainly an informant in possession of an

 8   AK-47 -- that would be a deportable offense, if you're

 9   not a United States citizen.  Correct?

10   A.     I'm not sure.  I believe, if you're a resident

11   alien, you're allowed to possess a weapon.  And I

12   believe Abbas is a resident alien, if I'm not mistaken.

13   Q.     Is he allowed to possess an assault rifle, an

14   AK-47, Special Agent Velazquez?  Isn't that a crime,

15   sir?

16   A.     I'm uncertain if the possession of an AK-47 is a

17   crime, unless it's been modified for automatic.

18   Q.     So you're suggesting to the ladies and gentlemen

19   of the jury that he could have lawfully possessed an

20   AK-47?

21   A.     My testimony is I'm uncertain.

22   Q.     You never got the AK-47 back from Abbas.

23   Correct?

24   A.     That's correct.

25   Q.     Now, Abbas was not a man of well means, would you
```

Velazquez - CROSS - By Mr. Levin                    92

```
 1    agree with me, meaning he didn't have a lot of money?

 2    A.     I would agree with that.

 3    Q.     In fact, when he came here, when he got out of

 4    jail, basically, he was homeless; was he not?

 5    A.     I'm uncertain as to whether he was homeless or he

 6    had a place to stay when he got out of jail.

 7    Q.     Well, you knew that he spent nights sleeping at

 8    the convenience store?  Just so the record's clear, was

 9    that about 144th and Northeast 6th Avenue?

10    A.     In that vicinity.  Yes.

11    Q.     And this was a, for lack of a better expression,

12    I guess, mom and pop-type grocery store?

13    A.     Yes.  A convenience store that's seen on a lot of

14    corners in Miami-Dade County.

15    Q.     It's not a 7-Eleven?

16    A.     No.  It's not a 7-Eleven.  It's a -- I can't even

17    recall what the name of it is, but it's a general

18    convenience store that sells various products.

19    Q.     And he spent a lot of nights sleeping there; did

20    he not?

21    A.     I did learn that he spent the night there and

22    worked.  When people would knock on the window, he

23    would find out what they wanted and sell it to them.

24    Q.     And we've heard testimony that he spent nights at

25    the 62nd and 15th Avenue location, commonly referred to
```

Velazquez - CROSS - By Mr. Levin                    93

1    as the Temple or the Embassy.  Correct?

2    A.    That's correct.

3    Q.    Now, on or about November 7th to November 10th,

4    the FBI provided him with an apartment; did they not?

5    A.    I'm uncertain at what point Abbas was provided --

6    arrangements were made for Abbas's apartment.

7    Q.    Let me help you.

8          There was a meeting on 11-21 in that apartment;

9    was there not?

10   A.    There was.

11   Q.    So he moved into that apartment, would you agree,

12   prior to 11-21?

13   A.    Yes.

14   Q.    And would you agree with me, sir, that there

15   needed to be some time when that apartment could be set

16   up to install the recording equipment that was used to

17   capture the conversation on 11-21?  Correct?

18   A.    That's correct.

19   Q.    So does that help refresh your recollection as to

20   when he moved in?

21   A.    Prior to November 21st.

22   Q.    That's great.

23         Do you recall him going to New York for a week to

24   give you time to put the equipment in it?

25   A.    Yes, I do.

1    Q.    So he took a trip to New York prior to 11-21.

2    Correct?

3    A.    Yes.

4    Q.    And would you agree with me that that trip lasted

5    approximately a week?  Correct?

6    A.    About a week.  Yes.

7    Q.    Would you agree with me that, based upon you

8    being the case agent here and based upon your review of

9    all the audio- and all the videotapes, that when he was

10   there, he bought a book on jihad?

11   A.    I believe -- I'm not sure if he bought the book

12   there.  I know he -- I believe he bought a prayer rug.

13   And I do recall a jihad -- or a book.  Yes.

14   Q.    You recall that?

15   A.    Yes.

16   Q.    Okay.  And you do recall, do you not -- by the

17   way, this apartment is located on, what, 78th Street

18   and Harding Avenue on Miami Beach?

19   A.    Yes.

20   Q.    And that's one block from Collins Avenue -- one

21   block due west of Collins Avenue?

22   A.    A block or two from Collins.

23   Q.    We're talking a block from the ocean.  Correct,

24   sir?

25   A.    Yes.

Velazquez - CROSS - By Mr. Levin                    95

1    Q.    So this is a guy that went from the projects of

2    New York, provided by the New York City Police

3    Department, to sleeping in a convenience store -- well,

4    first, he had an interim stay in the Miami-Dade County

5    jail.  Correct?

6    A.    Yes.

7    Q.    To sleeping in a convenience store.  Correct?

8    A.    Yes.

9    Q.    To spending a few nights at the location at

10   62nd and 15th.  Correct?

11   A.    I'm uncertain when that occurred in relation to

12   your timeline.

13   Q.    The point is he ended up in an apartment one

14   block off the Atlantic Ocean.  Correct?

15   A.    That's correct.

16   Q.    It's -- that's quite an impressive rise, is it

17   not, in status?  Would you agree?

18   A.    Not the apartment he was staying in off of

19   Harding.

20   Q.    Not the apartment he was staying in?

21   A.    No.  If you're suggesting it was a very nice

22   place, that's not the case.

23   Q.    Well, it was a one-bedroom apartment; was it not?

24   A.    Yes.

25   Q.    And it was -- by the meeting on November 21st, it

```
 1   was nicely decorated.
 2        Would you agree with that?
 3   A.    I wouldn't agree with that.
 4   Q.    Do you recall -- now, this case has been
 5   presented thus far in what I call cut-and-paste
 6   fashion.
 7        Would you agree with that?
 8   A.    No.  I wouldn't agree with that.
 9   Q.    You wouldn't?  The jury's getting a little
10   snippet here, a little snippet there.  They're not
11   seeing the whole tape, not seeing the whole context.
12   You wouldn't agree with cut and paste as the manner of
13   presentation thus far?
14   A.    I would agree that the evidence that has been
15   presented thus far allows for this case to be presented
16   in a timely manner.
17        If we were to sit here and listen to every single
18   conversation of -- and every single meeting in its
19   entirety, we could be here for six months.
20   Q.    And a person's liberty is certainly entitled to
21   that determination; is it not?
22   A.    Which determination?
23   Q.    A --
24        MS. ARANGO:  Objection.
25
```

```
 1   BY MR. LEVIN:

 2   Q.     Without regard for time.

 3             THE COURT:  Sustained.

 4             MS. ARANGO:  And, Judge, I would ask not only

 5   that you strike that statement, but that you admonish

 6   and -- given a motion in limine that was granted by you

 7   earlier.

 8             MS. JHONES:  I object to that request.  And

 9   I'd like a side-bar, your Honor.

10             THE COURT:  Come on up.

11             MR. LEVIN:  I have no idea what everybody is

12   talking about.

13             (Whereupon, proceedings were had at side-bar

14   outside the presence of the jury which have been sealed

15   per instructions of the Court.)

16             (Whereupon, the following proceedings were had

17   in open court:)

18             THE COURT:  Sustained.

19             Ask your next question.

20   BY MR. LEVIN:

21   Q.     Do you recall, Special Agent Velazquez, with

22   regard to Government 43, a portion -- have you had the

23   opportunity to review Government's Exhibit 43?

24   A.     I'm unfamiliar with what --

25   Q.     What 43 is?
```

```
1    A.      -- Exhibit 43 is.

2    Q.      No problem.

3            The meeting of November 21st, 2005.

4    A.      Yes.

5    Q.      Do you recall the beginning of that meeting when

6    Narseal Batiste enters with Patrick Abraham?

7    A.      I believe so.

8    Q.      Do you recall how excited they were to see the

9    apartment he now had been living in?

10   A.      I do remember something along those lines.  Yes.

11   Q.      That they had seen that -- "Wow, Occ" -- there

12   might have been words to the effect of, "Occ, wow.

13   What a great place.  This is unbelievable."

14           Do you remember words to that effect?

15   A.      I'm uncertain as to the words.  But I do remember

16   something along those lines at the beginning of that

17   meeting on November 21st.

18   Q.      And based on your viewing of this, they were,

19   like, amazed to see, would you agree, where he now was

20   living?  Would you agree with that?

21   A.      It appeared to me that they were excited that

22   Abbas now had an apartment.

23   Q.      And that's when the conversation began, initiated

24   by Abbas, with regard to help from overseas.  Correct?

25   A.      I'm not sure exactly at which point that
```

```
 1   conversation began or that part of the conversation,
 2   but it occurred at some point during that meeting.
 3   Q.    Do you recall in that conversation, referring to
 4   Government's Exhibit 43-A, hopefully, at Page 35, Abbas
 5   saying --
 6          MS. ARANGO:  Judge, I would ask, if he's
 7   reading from an exhibit, to please provide a copy of it
 8   to the -- or please provide it to the witness.
 9          THE COURT:  Okay.  Provide a copy to the
10   witness, please.
11          MR. LEVIN:  Okay.  Sorry.
12          (Tenders document to the witness.)
13   BY MR. LEVIN:
14   Q.    Are you there?
15   A.    Yes.
16   Q.    Do you recall him saying, "But they don't want
17   him coming over there.  I want him to come over there.
18   Look, if they want to do something for -- something for
19   nothing, you know what I'm saying"?  Do you see that
20   there?
21   A.    Yes.
22   Q.    Okay.  Are you waiting for a question?
23   A.    Yes.
24   Q.    Do you see where it says that on Page 35?
25   A.    Yes.
```

1   Q.    Okay.  I'm sorry.  I thought you were going to

2   have a followup explanation.

3         Referring you to Page 29, Special Agent

4   Velazquez --

5   A.    29 or 35?

6   Q.    29, 2-9.

7   A.    Yes.

8   Q.    -- towards the bottom, Abbas is asking Narseal

9   Batiste, "You remember the guy I told you about?"

10        And Batiste says, "Which one?"

11        Doesn't that suggest that there was a prior

12  conversation about -- initiated by Abbas with regard to

13  bringing someone over?

14  A.    This is an indication that there was a

15  conversation about Abbas bringing somebody over or

16  identifying somebody, as requested by Narseal Batiste.

17  Q.    And it continues on:  "I told you somebody is

18  supposed to be coming over."

19        That is Abbas speaking; is it not?

20  A.    Yes.

21  Q.    And he answers, "Yeah.  What happened to him?",

22  Batiste; does he not?

23  A.    Yes.

24  Q.    And Abbas says, "And he's still coming over.  I

25  was wondering, man -- I'm not sure what day yet, but

Velazquez - CROSS - By Mr. Levin                101

```
 1    they was asking me if I was to send somebody to get him

 2    from the airport."

 3           Do you see that?

 4    A.    Yes.

 5    Q.    And Batiste responds, "So what about this guy?

 6    What -- what -- I mean, what is he?"

 7           Do you see that?

 8           And Batiste asks him, "Is it somebody that your

 9    uncle knows?"

10           Do you see that?

11    A.    Yes.

12    Q.    So would you agree with me, sir, that there was a

13    conversation between Abbas and Batiste that,

14    apparently, is not recorded where he references his

15    uncle?

16    A.    There may have been several conversations that

17    took place before this recorded conversation where

18    Abbas may have mentioned his uncle.

19    Q.    His uncle being someone of wealth sending over

20    someone else of wealth.  Correct?

21    A.    No.  Not in the context of this conversation.

22    Q.    It's been established through the other

23    cross-examinations and by your own testimony that

24    Batiste was a guy that, in his own words, in his very

25    first meeting with Elie Assaad on December 16th, was
```

```
 1   financially exhausted.  Correct?
 2   A.    Those were words used by Batiste, and he did
 3   express financial difficulty.
 4   Q.    You would agree with me that, on November the
 5   21st, or in other conversations, Abbas told Batiste,
 6   "You gotta look organized"?
 7   A.    I believe there were statements made by Abbas to
 8   that effect.
 9   Q.    "You gotta look like you have a plan."  Correct?
10   A.    Yes.
11   Q.    Referring to the guy that's going to be sent over
12   that Batiste thinks is someone that's going to have
13   money.  Correct?
14   A.    This is in reference to the person that's coming
15   over from a terrorist organization.
16   Q.    Right.
17         In this case, we have mostly words.  Would you
18   agree?  It's already been established.
19   A.    I'm not sure I understand your question.
20   Q.    There was very little action.  Correct?
21   A.    No.  I wouldn't agree that.
22   Q.    Well, you have some pictures being taken.
23   Correct?
24   A.    You have meetings that have --
25   Q.    Can you answer my question?
```

```
 1   A.     Yes, sir.

 2          MS. ARANGO:  Judge, I would object --

 3   BY MR. LEVIN:

 4   Q.    And then you can explain.

 5          MS. ARANGO:  I would object to interrupting

 6   the witness.

 7          MR. LEVIN:  Judge, he's rambling on.  I'm

 8   asking specific questions.

 9          MS. ARANGO:  Judge, I would also object to the

10   characterization.

11          THE COURT:  The objection is sustained.

12          If the answer calls for a "yes" or "no," Agent

13   Velazquez, you need to answer the question "yes" or

14   "no."  And then, if you wish to explain, you may

15   explain.

16   BY MR. LEVIN:

17   Q.    Let me ask you this, Special Agent Velazquez:

18   Other than --

19          THE COURT:  Let him finish answering his

20   question.

21   BY MR. LEVIN:

22   Q.    Go ahead.  Finish.

23   A.    I believe my answer was "no."

24   Q.    Okay.  You have pictures that were being taken.

25   Correct?
```

Velazquez - CROSS - By Mr. Levin                    104

1   A.    We have pictures that were taken.

2   Q.    Those pictures were taken because Elie Assaad

3   suggested that they be taken.  Correct?

4   A.    No.  Those pictures were taken by Narseal Batiste

5   to assist in a plot to blow up buildings.

6   Q.    Did you not testify just within the last two

7   hours that it was the FBI's idea that Elie Assaad -- or

8   Elie Assaad -- excuse me -- Elie Assaad on his own

9   accord suggested that these pictures be taken?

10  A.    The answer is "yes."  But your question was:  Why

11  were the pictures taken?

12  Q.    I didn't ask why the pictures were taken.

13  A.    Then, I apologize.  What was the question?

14  Q.    The question is:  Pictures were taken of

15  buildings at the behest of the FBI and/or Elie Assaad.

16  Correct?

17  A.    That's correct.

18  Q.    Mr. Clark asked you a lot of questions where he

19  prefaced it by saying, "Was it within the scope of...."

20  Correct?

21  A.    Yes.

22  Q.    So Elie Assaad -- one of the things he was

23  permitted to do was to suggest that pictures be taken.

24  Correct?

25  A.    Well, he was provided instructions or direction

1    in that regard.

2    Q.     Right.

3    A.     Yes.

4    Q.     If you go through the entire March 16th so-called

5    oath of allegiance CD and transcript, there's many

6    references by Elie Assaad to getting paid once there's

7    some showing of further action.

8           Would you agree with that?

9    A.     No.  I'm not sure I would agree with that.

10   Q.     So you do not agree that Elie Assaad is telling

11   Narseal Batiste that he needs to see some action in

12   order for him to be able to report back to his people

13   and get money for them?

14   A.     No.  That's not my testimony.

15          There are -- there is a reference along those

16   lines within that meeting on the 16th, but I believe I

17   answered your previous question correctly.

18   Q.     Let me ask you this:  Have you ever seen anybody

19   trained?

20   A.     I'm sorry?

21   Q.     Did you ever see any training?

22   A.     What type of training?

23   Q.     Military-style training.

24   A.     Yes, I have.

25   Q.     Where did you see that?

1   A.     When I was in the Air Force --

2   Q.     Oh, okay.  Go ahead.  When you were in the Air

3   Force....

4          MS. ARANGO:  Judge, I would object.

5          THE COURT:  Sustained.

6          Ask your next question.

7   BY MR. LEVIN:

8   Q.     Did you ever see any military-style training with

9   regard to this investigation?

10   A.     I did not.  No.

11   Q.     Based upon your being one of the co-case agents

12   and based upon your involvement in this case and based

13   upon your expertise, did any of your colleagues see any

14   military-style training in connection with this case?

15   A.     Not that I'm aware of.

16   Q.     Did anybody see anybody jump off buildings?

17   A.     No.  Not that I'm aware of.

18   Q.     Did anybody see any women soldiers training?

19   A.     No.  Not that I'm aware of.

20   Q.     Other than the lists that were provided, did

21   Narseal Batiste or anybody else ever say, "It's time to

22   get this war started.  Enough talking"?

23   A.     No.  What -- no.  The answer is "no."  Narseal

24   Batiste did not say that.  He was very clear on what

25   his intentions were, which was to recruit and build a

```
 1    movement, to use his words.

 2    Q.    Recruit and build a movement?

 3    A.    That's correct.

 4    Q.    Did he ever ask for the guns that he requested?

 5    A.    He provided three different lists, some of which

 6    contained weapons.

 7    Q.    Did he ever ask anybody, "Where are my guns that

 8    I requested?"

 9    A.    He did not.

10    Q.    Did he ever ask for any -- even in those lists,

11    did he ever ask for any munitions, bullets, in the

12    list?  Do you need to see the list again?

13    A.    No.

14          There is no ammunition listed on either of the

15    lists.

16    Q.    Can you conduct a ground war without bullets?

17    A.    Could you conduct a ground war without bullets?

18    Q.    Can you take over the United States without

19    bullets?

20    A.    I don't believe you could take over the United

21    States without bullets.

22    Q.    Now, in the meeting on November 21st, you would

23    agree with me that Patrick Abraham said very little.

24    Would you agree?

25    A.    Yes.
```

Velazquez - CROSS - By Mr. Levin                    108

1   Q.     Would you agree that probably during the majority

2   of that meeting he appeared to be sleeping?

3   A.     No.  I would agree that he appeared -- he was

4   laying down.

5   Q.     Okay.  And at one point, you would agree -- or do

6   you recall, when the video was being played to the jury

7   and the video portion stopped and the audio portion

8   continued, Patrick Abraham being identified in the

9   transcript as having said the word, "Right"?  Do you

10  recall that?

11  A.     No.  Not specifically.

12  Q.     Is there -- you were the one that reviewed these

13  transcripts?

14  A.     Yes.

15  Q.     You were the one that identified the speakers?

16  A.     Yes.

17  Q.     Okay.  And, in fact, by your own testimony, as

18  of -- and I'm fast-forwarding -- June the 30th of 2006,

19  it was your testimony then that present on

20  November 21st was Narseal Batiste and Stanley Phanor?

21  A.     That's correct.

22  Q.     But you were mistaken about that.  Correct?

23  A.     That's correct.

24  Q.     And that was the same Patrick Abraham that you

25  misidentified a week later that you had an interview

Velazquez - CROSS - By Mr. Levin                    109

1    with after he got arrested.  Correct?  Do you follow

2    the question?

3    A.     No.

4    Q.     You said that you had an interview with Patrick

5    Abraham after his arrest on June the 23rd of 2006.

6    Correct?

7    A.     That's correct.

8    Q.     A week later, in a prior proceeding, you

9    testified that present on November 21st in a meeting

10   were Narseal Batiste and Stanley Phanor.  Correct?

11   A.     That's -- the answer is "yes."  And that was

12   incorrect.

13   Q.     Now, let's talk a little bit about Elie Assaad.

14          A decision was made to bring in Elie Assaad after

15   the meeting on November the 21st of 2005.  Is that

16   correct?

17   A.     Somewhere in that time period.  Yes.

18   Q.     Okay.  And Elie Assaad had worked previously as

19   an informant for the United States back in 1999.  Is

20   that not correct?

21   A.     He previously worked.  Yes.

22   Q.     He worked out of Chicago; did he not?

23   A.     I think he provided the Chicago office with

24   information.  I'm uncertain as to whether he was being

25   operated proactively or in an undercover capacity.

Velazquez - CROSS - By Mr. Levin                   110

1    Q.    You never had the opportunity to observe his

2    verbal or nonverbal behavior to determine his

3    reliability as an informant, did you?

4    A.    I believe my testimony was regarding suitability,

5    not reliability.

6    Q.    "Suitability" and "reliability" have two

7    different meanings?

8    A.    Yes.

9    Q.    "Suitability" means that the person is able to

10   speak and basically think.  Is that "suitability"?

11   A.    Those are certainly two factors that could be

12   considered -- or should be considered, among others,

13   such as whether or not you would be able to play the

14   role in which you are going to work in an undercover

15   capacity, whether or not there are other things going

16   on in your life that would interfere with your ability

17   or suitability to work in that type of capacity.  There

18   are a number of different factors.

19   Q.    When you were presented, by the way, with Abbas

20   al-Saidi, did he disclose to you that he smoked pot

21   rather frequently, marijuana?

22   A.    He did not.

23   Q.    Would that have affected your determination of

24   his suitability as an informant, had you known that?

25   A.    It probably would have.

Velazquez - CROSS - By Mr. Levin                    111

1   Q.     And isn't it true, sir, that in or about 2007,

2   September, Abbas had gone to Yemen?  This is after

3   these gentlemen had been arrested.  Isn't it true that,

4   when -- you picked him up from the airport on a return

5   trip from Yemen?

6   A.     I believe so.

7   Q.     Do you recall that you had discovered that he had

8   outstanding bench warrants for his arrest back here in

9   Miami-Dade County?

10  A.     That's true.

11  Q.     And you had to bring him over to the jail and

12  book him into the jail.  Correct?

13  A.     That's true.

14  Q.     And, in fact, you had to bond him out.  Correct?

15  A.     That's true.

16  Q.     And that's the suitable Abbas al-Saidi informant

17  that we're talking about.  Correct?

18  A.     That's correct.

19  Q.     Okay.  Now, Elie Assaad:  He provided information

20  to Chicago in 1999.  Is that your testimony?

21  A.     Yes -- well, no.  That is not my testimony.

22         My testimony is that I'm aware that Elie Assaad

23  in the past has provided information to the FBI Chicago

24  office.  I'm uncertain with regard to the date or the

25  time period.

```
 1   Q.    The information that he provided to the FBI
 2   office in Chicago had nothing to do with this case back
 3   in 2000, just so that's clear?
 4   A.    That's clear.
 5   Q.    Okay.
 6   A.    Yes.
 7   Q.    After working in Chicago, he ultimately was
 8   deported to Mexico?
 9   A.    I'm uncertain what transpired with regard to
10   Elie Assaad as it pertains to his involvement or
11   providing information to the FBI in Chicago.
12   Q.    Would you agree with me, sir, that the only
13   occupation that Elie Assaad has had since coming to the
14   United States is as an informant for the FBI?
15   A.    No.  I believe he's selling hot dogs now, as we
16   speak, or he's associated with some sort of business
17   that does that.
18   Q.    Okay.  Prior to his injection into this matter in
19   December of '05, the only occupation he had was that as
20   an informant for the United States?
21   A.    I'm unaware of any other employment by Elie
22   Assaad.
23   Q.    I believe one of my colleagues brought out the
24   fact that there came a point in time when he ended up
25   in Mexico.  Is that correct?
```

Velazquez - CROSS - By Mr. Levin                113

1    A.    Yes.

2    Q.    And that he was illegal in Mexico.  Is that

3    correct?

4    A.    I'm uncertain as to what his status in Mexico is.

5    Q.    You don't recall that he had been actually

6    incarcerated in Mexico because of his illegal status in

7    Mexico prior to being summoned here for this case?

8    A.    I recall that he was incarcerated in Mexico.  I'm

9    uncertain as to the reason why he was in a Mexican

10   jail.

11   Q.    Would the -- the reason -- would that have

12   impacted your determination with regard to his

13   suitability as an informant?  Wouldn't that have been

14   something you would want to know?

15   A.    Possibly.  But my recollection is that he was

16   involved in a corruption -- or an investigation that

17   involved some form of corruption, and that may be have

18   been a factor attributed to why he was in a Mexican

19   jail.

20   Q.    And, ultimately, to get him back, you had to have

21   some kind of request to get him back.  Correct?

22   A.    Well, at that time, I believe there was a pending

23   asylum application.  So in order to bring him into the

24   United States, because he had no legal standing -- or

25   status, rather, the FBI had to submit a significant

Velazquez - CROSS - By Mr. Levin                    114

1    public benefit parol, which is a document which allows

2    someone with Elie's status to legally enter the United

3    States.  I've submitted a number of those.

4    Q.    Ultimately, he, in fact, applied for what's

5    called political asylum; did he not?

6    A.    It's my understanding that that application was

7    already pending.  That's my recollection.

8    Q.    Can you apply for political asylum when you're

9    not in the country?

10   A.    I'm uncertain.

11   Q.    Well, the mechanism that you brought him back in

12   here was under a special parol status.  Correct?

13   A.    That's correct.

14   Q.    And it's your understanding that his application

15   for political asylum was filed prior to his arrival

16   back in the United States?

17   A.    That's correct.

18   Q.    Okay.  Now, with regard to one's suitability as

19   an informant, if you had been advised by a prospective

20   informant that they planned on writing a book about

21   their activities as an informant, would that have

22   affected your determination of his suitability as an

23   informant?

24   A.    Possibly, depending on what transpired when that

25   topic was discussed.

Velazquez - CROSS - By Mr. Levin                    115

1  Q.    And you've learned since the inception of this

2  investigation that, in fact, Mr. Assaad plans on

3  writing a book about his activities as an informant

4  with the United States Government when all is said and

5  done, whenever that may be.  Correct, sir?

6  A.    No.  What I learned from -- with regard to your

7  question is that, at some point, Elie had discussed

8  with an attorney writing a book about his experiences

9  working with the United States Government and there was

10 some sort of pending deal.

11     That relationship went south or didn't

12 materialize, and he has not had any further

13 conversations with that individual or anyone else with

14 respect to writing a book.

15 Q.    So it's your testimony that he no longer plans on

16 writing this book?

17 A.    It's my testimony that, based on conversations

18 that I've had with Elie Assaad, he has not had any

19 conversations subsequent to the conversation with the

20 attorney regarding writing the book.

21 Q.    He did consult with an attorney about writing a

22 book?

23 A.    I believe it was the -- it's my understanding

24 that the attorney approached him with the idea.

25 Q.    So let me get this straight.

 1        It's your testimony that an attorney suggested to

 2   this Government confidential informant that he write a

 3   book about his life experiences as an informant?

 4   A.    I believe that's what I recall from conversations

 5   with Elie Assaad.  There was a preexisting

 6   relationship, I believe, with this attorney.

 7        Now, I could be mistaken.  But that's what I

 8   recall with respect to the conversation I had with Elie

 9   as it pertains to the writing of any potential book.

10   Q.    Now, Elie Assaad has also gone by the name of

11   Tony Montana; has he not?

12   A.    He has.

13   Q.    And the Tony Montana that Elie Assaad fashions

14   himself after is the one that's depicted by the actor

15   Al Pacino in the movie *Scarface*.  Correct?

16   A.    He has said that.  Yes.

17   Q.    And you've had to monitor his activities while

18   he's been under the employ of the United States

19   Government; have you not?

20   A.    Yes.

21   Q.    Isn't it true that he lied in a deposition with

22   regard to his name?

23   A.    I believe -- I'm uncertain as to the specifics.

24   But I do recall a deposition with regard to the use of

25   "Montana" --

1    Q.     Right.

2    A.     -- and a representation that, I believe, it was a

3    family member's name.

4    Q.     Right.

5           That was not true.  Correct?

6    A.     I'm uncertain if there's a relative named

7    "Montana."  I do know that Elie had said after that

8    deposition that he chose the name because he liked the

9    character and it was a name that he saw frequently --

10   or the character -- in South Beach.

11   Q.     So walking around South Beach, which is where he

12   lives -- right? -- or was living during the pendency of

13   this investigation, he was walking down Lincoln Road

14   and saw a cutout of Al Pacino as Tony Montana and

15   decided he wanted to take on that identity.

16          Is that essentially what you're telling the jury?

17   A.     No, sir.  What I'm telling the jury is it's my

18   recollection that he used that name prior to this

19   investigation or has used it in the past.  So I don't

20   know where he was living when he decided that Tony

21   Montana was a name that he wanted to use.

22   Q.     But you know that, in that sworn deposition he

23   gave under oath, that he said that the name "Montana"

24   came from a family member as opposed to a name that he

25   picked up from walking around South Beach and,

1    ultimately, just liking the name?

2    A.    Yes.

3    Q.    And he was untruthful with regard to his

4    representation in that sworn proceeding.  Correct?

5    A.    It appears so.

6    Q.    And that had no effect on your determination of

7    his suitability as an informant in this case?

8    A.    Well, that would imply that I was aware of that

9    information when I met Elie Assaad.  I became aware of

10   that information after the conclusion of this

11   investigation.

12   Q.    Okay.  Fair enough.

13         Now, Elie Assaad came on December the 16th.

14   There's been a lot of questions about that; so, I'm not

15   going to get repetitious.

16         He didn't come on December the 16th.  But there

17   was a meeting on December the 16th at the Radisson

18   Hotel?

19   A.    That's correct.

20   Q.    Okay.  And he had been provided an apartment as

21   well; had he not?

22   A.    Eventually, he was.  I believe, when Elie first

23   arrived, he was -- we put him up at a hotel, one of the

24   Boutique Hotels up on -- in North Miami Beach.

25   Q.    But, ultimately, he was provided an apartment on

1    23rd Street and Collins Avenue.  Is that not correct?

2    A.    That's correct.

3    Q.    And 23rd Street and Collins Avenue -- that would

4    be -- I think Mr. Vereen referenced it as the Roney

5    Plaza.

6    A.    That's correct.

7    Q.    That's a condominium.  That's not a hotel.

8          Would you agree with that?

9    A.    Yes.  Now it may be a hotel-condo mix.

10   Q.    You described it as a so-so place; did you not?

11   A.    I did.

12   Q.    You have a familiarity with South Beach; do you

13   not?

14   A.    I do.

15   Q.    You have a familiarity with --

16          MS. ARANGO:  Objection.  Relevance.

17          THE COURT:  Sustained.

18   BY MR. LEVIN:

19   Q.    Now, during the meeting on the 16th is when that

20   first list is made.  Correct?

21   A.    Yes.

22   Q.    And that's the list that asked for the knee-high

23   ankle boots?

24   A.    Yes.

25   Q.    And that's the list that asked for pistols,

Velazquez - CROSS - By Mr. Levin                    120

```
1    without the "S," where it says "pitols," p-i-t-o-l-s?
2    A.    I believe so.  Yes.
3    Q.    And that also asks for squad cars.  Correct?
4    A.    Yes.
5    Q.    Do you know what a squad car is?
6    A.    A squad car would be a car that could be used by
7    security.  It's a car -- my understanding is it's a car
8    that markings of some kind on it.
9    Q.    Did he ever indicate that he wanted some squad
10   cars that said "Moorish Science Temple" on it?
11   A.    No.
12   Q.    Did he ever indicate he wanted anything that
13   identified the Moorish Science Temple on anything
14   associated with this so-called plot to overthrow the
15   United States Government?
16   A.    No.  There was discussions about a sign for the
17   Temple with Abbas and that the sign was going to cost
18   $900.  But I don't specifically recall mention that
19   "Moorish Science Temple" was going to be on the sign.
20   Q.    Now, do you recall in a meeting between Abbas
21   al-Saidi and Narseal Batiste two days prior to that, on
22   December the 14th, Abbas telling Batiste to get him a
23   list and he'll get him the money?
24   A.    No.  I don't recall that.  If there's a
25   transcript or something I could refer to....
```

1    Q.    If I showed you something, might it refresh your

2    recollection?

3    A.    Yes.

4          MR. LEVIN:   Judge, if I may approach the

5    witness.  We have two copies.

6          THE COURT:   Sure.

7          MR. LEVIN:   (Tenders document to the witness.)

8          THE WITNESS:   Yes.

9    BY MR. LEVIN:

10   Q.    Does this refresh your recollection with regard

11   to Narseal Batiste essentially asking Abbas al-Saidi

12   for money and then Abbas al-Saidi responding, "We

13   should able to work something out.  That's why I'm

14   going -- that's why I'm asking you for the list.

15   That's why I'm doing the best I could from our side"?

16         MS. ARANGO:   Judge, at this point -- I've

17   objected earlier to reading from a document not in

18   evidence.  I've offered to allow the document to come

19   into evidence, and the defense has objected to that.

20         He is now reading from this document.

21         I --

22         THE COURT:   Sustained.

23         MS. ARANGO:   I would move it into evidence at

24   this point.

25         THE COURT:   Do you want it moved into

```
 1   evidence?
 2          MR. LEVIN:  Not at this time, your Honor.
 3          THE COURT:  Then, you're withdrawing the
 4   question?
 5          MR. LEVIN:  I'm using this document to --
 6   could we come side-bar?  I don't want to make any
 7   statements in front of the jury.
 8          I mean, I'm using --
 9          THE COURT:  Well, I've sustained the
10   objection.  You may not ask the question reading from
11   the document, if it's not in evidence.
12          MR. LEVIN:  I won't read from the document,
13   but I'm just using it to refresh his recollection.  I
14   can ask another question where I do not read from the
15   document.
16          THE COURT:  The objection is sustained.
17          MS. JHONES:  Your Honor, may I confer with
18   Mr. Levin for a second?
19          THE COURT:  I'm sorry?
20          MS. JHONES:  May I confer with Mr. Levin for a
21   second?
22          THE COURT:  Yes.
23          MS. JHONES:  Thank you, your Honor.
24          (Discussion had off the record amongst
25   counsel.)
```

1          MR. LEVIN:  Judge, I'm going to move this into

2     evidence.  It's been stipulated to.  I won't lay the

3     predicate.

4          THE COURT:  What exhibit number is this?

5          MR. LEVIN:  It will be Abraham's 1 in

6     evidence, assuming it's permitted to be admitted into

7     evidence.

8          THE COURT:  Any objection from anyone?

9          MS. ARANGO:  No objection, Judge.

10          I would just say that the Government, though,

11     will seek to move the recording in as well.  The

12     transcript should not come in without the recording.

13     But at this point in time, we can just put the

14     transcript in.

15          THE COURT:  It will be admitted as Abraham's

16     Exhibit 1.

17          (Whereupon, Defendant Abraham's Exhibit No. 1

18     was entered into evidence.)

19          THE COURT:  Do I have an exhibit list from

20     you, Mr. Levin?

21          MR. LEVIN:  I'll provide one as soon as I'm

22     finished with this or shortly thereafter.

23          MS. JHONES:  Your Honor, I apologize.  May I

24     have a moment with Mr. Levin?  I'm sorry.

25          (Discussion had off the record amongst

```
  1    counsel.)

  2            THE COURT:  Is the transcript now marked?

  3            MR. LEVIN:  Is it marked?

  4            THE COURT:  You need to mark it.

  5            MR. LEVIN:  For identification?

  6            THE COURT:  Yes.  You need to mark it.

  7            What's the date?

  8            MR. LEVIN:  Today's date is the 4th of March.

  9            THE COURT:  Mr. Levin, what's the date of the

 10    conversation?

 11            MR. LEVIN:  Forgive me.

 12            THE COURT:  I know today is the 4th of March.

 13            MR. LEVIN:  All right.  I'm a little

 14    flustered.  I apologize.

 15            The date of this conversation is 12-14-05.

 16            THE COURT:  12-14-05?

 17            MR. LEVIN:  Yes.

 18            THE COURT:  Thank you.

 19            MR. LEVIN:  Judge, it's the defense's

 20    intention also to -- once we have the actual recording,

 21    to introduce that as well.  I think that was

 22    Ms. Arango's issue.

 23            MS. ARANGO:  I have no problem with that,

 24    Judge.

 25            THE COURT:  Okay.
```

Velazquez - CROSS - By Mr. Levin                    125

```
 1              MR. LEVIN:  May I proceed?

 2              THE COURT:  Yes.

 3  BY MR. LEVIN:

 4  Q.     Special Agent Velazquez, do you need more time to

 5  read this?

 6  A.     No.

 7  Q.     Would you agree with me, sir, that in the context

 8  of this recording, this was a conversation between

 9  Abbas al-Saidi and Narseal Batiste on December 14th,

10  2005?  Correct?

11  A.     That's correct.

12  Q.     Okay.  And in this conversation, there's some

13  conversation about some tools being stolen.

14         Do you agree with that?

15  A.     Yes.

16  Q.     In the conversation, Abbas says something about

17  making a phone call back home.  That would be at Page 2

18  at the bottom.

19         Do you agree with that?

20  A.     Yes.  He made a phone call.

21  Q.     Okay.  And he says something about the brother

22  coming in in a couple of days.

23         And Batiste says, "Really?"

24  A.     Yes.

25  Q.     And Abbas assures him, "So you know everything is
```

```
 1   going all right.  I just wanted to speak to you so I
 2   could get some answers"?
 3   A.     Yes.
 4   Q.     And he talks about getting a sign for the Temple.
 5          Do you see that?  Batiste.
 6   A.     Yes.
 7   Q.     And he says, "Yeah, Occ.  Well, listen, man.  The
 8   whole Temple is turned upside-down.  And whatever you
 9   could give me financially, it would help me right now,
10   because just the sign -- just the sign for the
11   Temple --"
12          And Abbas says, "Brother."
13   A.     Yes.
14   Q.     And Batiste says, "-- cost me $900.  I was told
15   at least 40 but, you know, plus the taxes and
16   everything, it's going to be $900."
17          Do you see that?
18   A.     Yes.
19   Q.     And then Abbas assures him that this brother is
20   coming through.  "We should be able to work something
21   out."
22          And he reminds him, "That's why I'm asking you
23   for the list.  That's why I'm doing the best I could
24   from our side.  Believe me, I've been working on it."
25          Do you see that?
```

```
 1   A.     Yes.

 2   Q.     You testified previously that two days later,

 3   when Elie Assaad, No. 2, cooperating witness, meets at

 4   the Radisson with Batiste, it's Elie Assaad's idea for

 5   Batiste to create the list.

 6          Wasn't that your testimony?

 7   A.     My testimony was that Elie Assaad asked Batiste

 8   to write a list -- or to write it down.

 9   Q.     Not Tony Velazquez?

10   A.     That's correct.

11   Q.     Not Tony Velazquez directing Elie Assaad to ask

12   him for a list.  Correct?

13   A.     That's correct.

14   Q.     Nor John Stewart.  Correct?

15   A.     That's correct.

16   Q.     Nor Joe Garbato?

17   A.     That's correct.

18   Q.     Or any other agent working this case?

19   A.     That's correct.

20   Q.     That was Elie Assaad working, as Mr. Clark would

21   say, within the scope of his authority?

22   A.     Yes.

23   Q.     So it's a mere coincidence that Abbas al-Saidi

24   two days earlier is asking for a list as well.

25          Is that your testimony?
```

```
 1    A.    My testimony is that, with regard to Elie, I

 2    provided no instructions to Elie Assaad on the meeting

 3    on December 16th to ask Batiste for a list.

 4    Q.    Okay.

 5    A.    His instructions were to meet with Narseal

 6    Batiste and find out what it was that he wanted and as

 7    much information as he could gather.

 8    Q.    On December 14th, was Abbas al-Saidi instructed

 9    to ask Narseal Batiste for a list?

10    A.    I provided no such instructions to Abbas al-Saidi

11    on December 14th or prior to.  I provided no such

12    instructions to Abbas.

13    Q.    So Abbas al-Saidi on his own asked Batiste for a

14    list?

15    A.    He may have.  My testimony is that I did not

16    provide any instructions to Abbas al-Saidi with regard

17    to asking Narseal Batiste for a list.

18    Q.    Do you know if John Stewart instructed Abbas

19    al-Saidi on December the 14th to ask for a list?

20    A.    I'm unaware if John Stewart provided such

21    instructions or not.

22    Q.    What about Joe -- well, you know this whole case.

23    Right?  You're one of the three co-case agents.

24    Correct?

25    A.    Yes.
```

1    Q.    Former supervisor -- supervisory agent, actually,

2    in the beginning -- acting supervisory agent.  Correct?

3    A.    That's correct.

4    Q.    You've listened to every tape.  Correct?

5    A.    Most, yes, all of them.

6    Q.    You know this case from A to Z.  Correct?

7    A.    Yes.

8    Q.    And you say that you're unaware as to whether or

9    not your co-case agents advised Abbas al-Saidi on

10   December 14th, 2005, to ask for a list?

11   A.    That's my testimony.  And if such instructions

12   were given to Abbas by another agent, that would have

13   been well within the scope of what Abbas was doing.

14   Q.    So I guess Abbas al-Saidi and Elie Assaad think

15   alike?

16   A.    I'm sure on some matters they may.

17   Q.    Now, referring back to the December 16th meeting,

18   would you agree with me -- 44 is the recording.  44-A

19   is the transcript.  I'll pull it, if necessary.

20         The whole meeting wasn't shown.  We know that.

21   Correct?

22   A.    That's correct.

23   Q.    Would you agree with me that Narseal Batiste

24   didn't know what to put on the list?

25   A.    No.  I don't know if I would agree with that.

2           Let me ask you this:  Would you agree with me

3    that Elie Assaad asked him for a list of what he

4    wanted?

5    A.     That's my recollection.  Yes.

6    Q.     And he basically told him not to hold back and he

7    needed to know everything now.

8           Do you agree with that?

9    A.     Generally, that's my recollection.  Yes.

10   Q.     He said, "Don't hold back.  Put everything that

11   you need on the list now."

12          Correct?

13   A.     I believe so.

14   Q.     Okay.  And the list that was -- he ultimately

15   prepared asked for the knee-high ankle boots.  Correct?

16   A.     That was one of the items.

17   Q.     The pistol machine-type guns?

18   A.     Yes.

19   Q.     Squad cars?

20   A.     Yes.

21   Q.     Okay.  And then later on in the conversation

22   there's some kind of talk about going to Jeb Bush's

23   office?

24   A.     Yes.

25   Q.     Correct?

Velazquez - CROSS - By Mr. Levin                131

1    A.    Yes.

2    Q.    And Elie Assaad said, "I didn't come all the way

3    here for this."

4          Do you recall that?

5    A.    Yes.

6    Q.    So Elie Assaad needed more.  Correct?  He needed

7    more.  Correct?

8    A.    No.  What Elie Assaad was doing was what he was

9    instructed to do, which was to get as much information

10   as he could from Narseal Batiste.

11   Q.    He said, "I didn't come all the way here for

12   this, just for these four little items that you've

13   written down and your little march to Jeb Bush's

14   office."

15         Correct?

16   A.    I'm not sure I -- are you asking me if that's

17   what he said?

18   Q.    That was in response to what Narseal Batiste said

19   he wanted and what he was going to do.

20   A.    That was in response to those statements made by

21   Narseal Batiste in an effort to gather more

22   information.

23   Q.    Now, there's a followup list later on, correct --

24   or, actually, two other followup lists.  Right?

25   A.    I believe three more.

1   Q.     Three other lists?

2   A.     Yes.

3   Q.     And in those lists, he asks for 40 uniforms.

4          Do you remember that?

5   A.     I remember uniforms.  I can't remember if it was

6   40 or 20.

7   Q.     Would you agree with me that the numbers of items

8   that he asked for didn't really add up?  Would you

9   agree with that?  40 uniforms, 10 pair of military

10  boots, 20 bulletproof vests.  Do you recall that?

11  A.     I do.

12  Q.     Would you agree that they don't really coincide

13  with somebody that has a plan to wage a war against the

14  United States -- that truly has the intent to wage a

15  war against the United States?

16  A.     I would disagree with you.  And the reason why

17  is, again, Narseal Batiste made it clear on meetings

18  with Abbas that his intention was to recruit for

19  his organization and that the members of his

20  organization -- all of them were not going to know

21  what the true mission of the organization was.

22         So with regard to your question on the disparity

23  between the number of uniforms and the number of, let's

24  say, bulletproof vests, that would be consistent with

25  what Narseal Batiste told Abbas.

Velazquez - CROSS - By Mr. Levin                    133

1   Q.     Now, prior to the meeting of November 21st, you

2   don't know what conversation Narseal Batiste had with

3   Patrick Abraham prior to going to Abbas's apartment, do

4   you?

5   A.     No, I do not.

6   Q.     You don't know if Batiste said to Patrick, "This

7   guy says he can get us money.  This is a good way to

8   get money.  We're going to try to get money this way"?

9   A.     I do not know any -- I have no information on any

10  conversations that took place between Batiste and

11  Abraham prior to that meeting.

12  Q.     And you knew that Narseal Batiste had an expired

13  driver's license or did not have a valid driver's

14  license during that period of time; did you not?

15  A.     At some point, I did learn that his driver's

16  license was either suspended or rescinded.  I'm not

17  sure if I knew that on the 21st.

18  Q.     Okay.  Now, fast-forwarding, after the 21st of

19  November, there's some conversations into December.

20  Correct?

21  A.     Yes.

22  Q.     And then into January, Batiste -- Abbas is not

23  able to contact Batiste.  Correct?

24  A.     I believe Abbas -- I believe -- no.  I don't

25  believe that's correct.  I believe Elie was unable to

Velazquez - CROSS - By Mr. Levin                134

```
 1    contact Batiste.
 2    Q.      Okay.   And then Abbas attempts to make contact
 3    with Batiste and ends up getting in touch with Patrick
 4    Abraham.   Isn't that true?
 5    A.      That's true.
 6    Q.      And in conversations with Patrick Abraham,
 7    Patrick Abraham basically tells Abbas, "What we're
 8    waiting for, basically, is the financial help," that
 9    the brother -- and has to understand that.   "We got
10    everything else.   Basically, what we're looking for is
11    the financial help."
12            Do you recall that?
13              MS. ARANGO:   Judge, again, I would object.   If
14    Mr. Levin is referring to an exhibit, I have no
15    objection to the introduction of that exhibit.
16              But to sit here and read from a transcript, as
17    he's obviously doing, is improper.   I would object.
18              THE COURT:   Sustained.
19              Rephrase your question --
20              MR. LEVIN:   Okay.
21              THE COURT:   -- or move to introduce the
22    exhibit.
23              MR. LEVIN:   Can I have a moment?
24              THE COURT:   Yes.
25              (Discussion had off the record amongst
```

```
 1   counsel.)

 2   BY MR. LEVIN:

 3   Q.     Let me ask you this, Special Agent Velazquez:  Do

 4   you recall conversations between Narseal Batiste and

 5   Abbas al-Saidi -- or Elie Assaad -- rather, Abbas

 6   al-Saidi where he told Batiste that they had to look

 7   organized?

 8   A.     I do.

 9   Q.     And that they had to have a plan?

10   A.     Something along those lines.  Yes.

11   Q.     And they had to show Elie Assaad that they were

12   for real.  Do you recall that?

13   A.     Yes.  Something along those lines.  Yes.

14   Q.     And now January 28th comes.  You've called it a

15   kidnapping.  Correct?

16   A.     I have in the past.  Yes.

17          MS. ARANGO:  Judge, at this point, I think

18   we've gone into these events.  I've been trying to

19   patient, but we've gone into these events now -- this

20   is about the fifth time.  I'm objecting on cumulative

21   grounds.

22          THE COURT:  Let me hear what the question is.

23   BY MR. LEVIN:

24   Q.     You've testified that Elie Assaad and Abbas

25   al-Saidi felt as if they had been kidnapped.  Correct?
```

Velazquez - CROSS - By Mr. Levin                    136

```
 1   A.     Yes.

 2   Q.     You've testified that it was the impression of

 3   them that the meeting was going to take place at the

 4   Embassy.  Correct?

 5   A.     Yes.

 6   Q.     Isn't it true, sir, that, prior to the 28th of

 7   January, there was a conversation where it was clear

 8   that the meeting would not take place at the Embassy

 9   and that they would be taken some distance from the

10   Embassy?

11   A.     I recall a telephone conversation, but I don't

12   recall the details.  So I don't think I'm in a position

13   to answer that without either listening to that

14   conversation or reading a transcript, if it's

15   available.

16   Q.     Is there something that might refresh your

17   recollection?

18   A.     Yes.

19          MS. ARANGO:  I'm just objecting to the

20   questions as a mischaracterization of the facts.  But I

21   have no objection to showing this witness the

22   transcript.

23          THE COURT:  Okay.

24          MR. LEVIN:  So --

25          THE COURT:  Objection is overruled.
```

```
 1              Go ahead.

 2              MR. LEVIN:  Okay.  May I approach?

 3              THE COURT:  Yes.

 4              MR. LEVIN:  (Tenders document to the witness.)

 5              THE WITNESS:  Yes.

 6   BY MR. LEVIN:

 7   Q.    Isn't it true, sir, that there was a conversation

 8   prior to the 28th of January which clearly indicated to

 9   at least Abbas al-Saidi that the meeting was not going

10   to take place at the 62nd and 15th location?

11   A.    No.  I think there -- from reading this

12   transcript, there seems to be some confusion.

13         That's an exchange between Patrick Abraham and

14   Abbas where Patrick Abraham says, "We're going to pick

15   you up" and Abbas responds that, "We're going to" --

16   "We can meet at a hotel, if we want."

17         Eventually, what happened is that -- and there's

18   other -- there's another comment by Patrick Abraham

19   where he references that the meeting is going to take

20   place somewhere far away.

21         But within the context of this telephone

22   conversation, what was -- what Patrick Abraham was

23   representing is that they were going to pick up the

24   informants.

25         And that, ultimately, is not what happened.  The
```

1    informants took a taxi to the Embassy.  So at that

2    time, it was my understanding that that's where the

3    meeting was going to take place.

4    Q.    But Patrick Abraham references the fact that

5    they're going to take them someplace far away?

6    A.    He does.

7    Q.    So, really, it should have come as no surprise to

8    Abbas and Elie that they were going to be taken

9    someplace away from the Embassy.  Correct?

10   A.    If -- if Abbas and Elie had gone into or met with

11   Patrick Abraham and they drove to a location, I would

12   agree with you.

13        But upon entering the Embassy and being asked to

14   take off their clothes and remove all their electronic

15   devices and driven in a car, not being told where they

16   were being taken and then being, you know, taken to a

17   different location and getting into another car,

18   that -- they would have -- they would certainly have

19   reason to be concerned.

20   Q.    Well, that shows their organization, doesn't it?

21   It shows that that's a way to be organized, doesn't it?

22   A.    It could be construed as being organized.

23   Q.    It shows that they're men of action and they're

24   for real, doesn't it?

25   A.    I think what it demonstrates is a paranoia or

Velazquez - CROSS - By Mr. Levin                    139

```
 1   suspicion that Elie and/or Abbas may either be the
 2   police or working with the police.
 3   Q.    Well, that's one construction.
 4         The other construction is what I said.  Correct?
 5   It shows a plan.  It shows organization.  It shows that
 6   they're men of action; does it not?
 7   A.    I would agree with that.
 8   Q.    Now, the jury has heard, again, clips of the --
 9   what's been referred to as the drive to Islamorada.
10   Correct?  Clips.
11   A.    I believe so.
12   Q.    I mean, correct me if I'm wrong.
13   A.    I don't believe those clips were played during my
14   direct.
15   Q.    Okay.
16   A.    But I could be wrong.
17   Q.    And so could I.
18   A.    No worries.
19   Q.    Give me one second.
20         After the Keys trip, there were conversations in
21   February, were there not, between Patrick Abraham and
22   Abbas al-Saidi?  Correct?
23   A.    I believe so.
24   Q.    Based on your having listened to all the tapes,
25   et cetera?
```

 1    A.    Yes.

 2    Q.    Okay.  And do you recall conversations where

 3    Abbas was inviting Mr. Abraham to go to lunch?

 4    A.    No.

 5    Q.    Do you recall a conversation where he was

 6    inviting him to get together?

 7    A.    The conversations I recall from February are with

 8    Elie Assaad.  There were probably conversations between

 9    Abbas and Narseal Batiste and/or Patrick Abraham.  I

10    just don't recall the content of those conversations.

11    Q.    Now, you did testify with regard to Elie feeling

12    threatened by the whole atmosphere of the trip to

13    Islamorada.  Correct?

14    A.    Elie and Abbas, Abbas more so.

15    Q.    Right.

16          He might have to take measures to ensure his

17    safety?

18    A.    Yes.

19    Q.    And you do also recall that -- and testified to

20    stopping at a Walgreens for refreshments.  Right?

21    A.    I'm not certain if the stop at Walgreens was to

22    use the bath -- I recall it was to use the bathroom,

23    possibly.

24    Q.    Can I show you something that might refresh your

25    recollection as to what else occurred at the Walgreens?

```
 1    A.     Well, I do know that there was some items

 2    purchased, because there was a receipt that was given

 3    to me when we met with the informants to debrief them.

 4    Q.     So it was for more than just a stop at the

 5    Walgreens bathroom.  Right?

 6    A.     Well, again, my recollection is that the

 7    reason -- the initial reason to stop was the bathroom

 8    and there were items purchased.  I mean, it --

 9    Q.     These were kidnappers with a heart?

10    A.     Excuse me?

11    Q.     These were kidnappers with a heart?  They didn't

12    want these guys to wet themselves?

13    A.     Are you asking me if --

14    Q.     I'm asking you that question.  I'll withdraw the

15    question.

16           Were refreshments also purchased?

17    A.     I'm uncertain as to what was actually purchased.

18    Q.     Okay.  Can I approach to refresh your

19    recollection with Government's Exhibit 118?

20    A.     Certainly.

21           MR. LEVIN:  Do you need to see it?

22           MS. ARANGO:  Yes.

23           MR. LEVIN:  May I approach?

24           THE COURT:  Yes.

25           MR. LEVIN:  (Tenders document to the witness.)
```

 1          THE WITNESS:  Yes.

 2   BY MR. LEVIN:

 3   Q.     "Yes," items were purchased?

 4   A.     Yes.

 5   Q.     Just read a couple of them, if you don't mind.

 6   A.     Doritos.  It looks like -- I don't know if this

 7   is a beverage of some sort.  And some Tic-Tacs.

 8   Q.     So you can't tell, other than what you just

 9   testified to, what was purchased at the Walgreens?  You

10   can't tell what else was purchased there?

11   A.     Well, I can tell that there were Doritos,

12   Tic-Tacs.

13   Q.     And a couple of Gatorades?

14   A.     Yeah.  I'm not sure if that's a Gatorade, but....

15   Q.     Now, after the January 28th meeting, with regard

16   to Patrick Abraham, there's a meeting on February the

17   19th at Abbas's -- at Elie's apartment on Miami Beach.

18   Is that correct?

19   A.     Yes.

20   Q.     And in this meeting, which the Government --

21   excuse me -- the prosecutors have shown clips of,

22   Patrick Abraham is observed kind of sitting off to the

23   side.

24          Would you agree with that?

25   A.     Yes.

Velazquez - CROSS - By Mr. Levin                    143

1    Q.    And you would also agree that he said very little

2    during this meeting?

3    A.    Yes.

4    Q.    And he was even asked by Elie Assaad, "Why are

5    you so quiet?" and he said, "I'm observing and I'm

6    listening"?

7    A.    Yes.

8    Q.    And the camera that's capturing all of this is on

9    top of a television.

10         Would you agree with that?

11   A.    Yes.  I believe my recollection is that it --

12   yes.

13   Q.    Okay.  And there's reference to an MBA All Star

14   Game being on television and actually being on the TV

15   where the camera is positioned.  Correct?

16   A.    Yes.  I recall that.

17   Q.    And based on observing the videotape, it appears

18   that Patrick Abraham's attention is focused on the

19   television set as opposed to the conversation between

20   Elie and Narseal -- Elie Assaad and Narseal Batiste?

21   A.    I don't know if I would agree with that

22   characterization.

23   Q.    Okay.  Well, did you ever see him stand up and

24   reposition himself?

25   A.    No.  I don't believe so.  I don't recall that.

Velazquez - CROSS - By Mr. Levin                    144

```
 1   Q.    Did he ever get up and walk around to the other
 2   side of the table and kneel down when Mr. Batiste is
 3   doing this nonsense about -- with Coke cans about the
 4   Sears Tower?
 5   A.    No.
 6   Q.    Did he ever say anything to you like, "Oh, yeah.
 7   I remember when I went to Chicago and we have some
 8   great pictures of the Sears Tower"?  Did he ever say
 9   anything like that, Patrick Abraham?
10   A.    He did not.
11   Q.    And you testified before that he went to Chicago,
12   Patrick Abraham?
13   A.    I believe so.
14   Q.    You said you believed he did, but you didn't know
15   for a fact.  Correct?
16   A.    That's correct.
17   Q.    Okay.  Now, after February 19th, there's another
18   meeting.  And I believe you testified -- or it was
19   played where Elie Assaad is asking Narseal Batiste
20   whether or not Brother Pat is going to be coming with
21   him and Batiste says he doesn't really know.
22         Do you recall that?
23   A.    Yes, I do.
24   Q.    Okay.  And he does, in fact, say that he doesn't
25   know if Brother Pat is going to be coming with him?
```

1    A.      To the training camp or --

2    Q.      To the next meeting.  To a followup meeting that

3    they had scheduled.

4    A.      I don't recall that.  And I apologize.  I thought

5    you were making a reference to a different portion of

6    the transcript.

7    Q.      No problem.

8            You were talking about training camps that they

9    were discussing.  Right?

10   A.      Yes.

11   Q.      But there were never any training camps, were

12   there?

13   A.      No.

14   Q.      There was never any training camp in Liberty

15   City, let alone Haiti or the Dominican Republic.

16   Correct?

17   A.      That's correct.  That was -- that was being

18   offered by Elie Assaad to Batiste.

19   Q.      Right.

20           And there are even references by Narseal Batiste

21   at various times saying his men are ready.  Correct?

22   A.      If I recall, there were references to being

23   ready.  Yes.

24   Q.      Yet, with all the manpower of the FBI and all the

25   surveillance that was done in connection with this

 1   case, there was never ever any observations of any type

 2   of training by any of these gentlemen?

 3   A.    No.  Not that was recorded.

 4   Q.    And there was a lot of activity at the Oak Grove

 5   Park.  Correct?

 6   A.    At which time frame?

 7   Q.    Well, during -- from '05 -- between '05 and

 8   June 22nd of 2006.

 9   A.    Well, when this investigation began, Batiste was

10   operating out of the Temple in Liberty City.  The

11   information that we received about his activities at

12   the Oak Grove Park occurred prior to Abbas al-Saidi

13   coming back to the United States.

14   Q.    Okay.  But there's no surveillance in the area

15   and the reason is it's a difficult area to surveil.

16         Was that your testimony previously?

17   A.    No.  There was -- we did conduct surveillance in

18   the area.  And it is true.  It's a difficult area to

19   conduct surveillance.

20   Q.    That's because there's a -- it's a high-crime

21   area, as has been speculated?

22   A.    It's a high-crime area.  There have been known to

23   be lookouts in certain areas, as that part of Miami.

24   Q.    Now, on March 16th is the meeting that's at the

25   warehouse that's been provided by the FBI.  Is that

```
1   accurate?

2   A.      Yes.

3   Q.      And you had received authorization to have video

4   and audio surveillance of that warehouse.  Correct?

5   A.      Yes.

6   Q.      And when I say "authorization," I mean a court

7   order that permitted you to do that.  Correct?

8   A.      At the end of March.

9   Q.      At the end of March?

10  A.      That's correct.

11  Q.      And during that period of time at the end of

12  March, when there were no government agents, i.e.,

13  informants, there was not -- there's not any evidence

14  whatsoever where any discussions were had amongst these

15  Defendants with regard to any terrorism activities.

16  Correct?

17  A.      No.  That's not correct.

18  Q.      Not correct?

19  A.      There was a meeting between Naudimar Herrera and

20  Batiste where Batiste scolded him for not taking the

21  video and asked if he was a chicken.

22  Q.      Other than that?

23  A.      No.  Not that I'm aware of.

24  Q.      Now, with regard to March 16th, referring you to

25  Government's Exhibit 69-B, this was a meeting that
```

```
 1   lasted for a couple of hours.  Is that true?

 2   A.    Yes.

 3   Q.    About how long, sir?

 4   A.    For this transcript -- because it's -- I believe

 5   it's from the body wire.  So it's longer than the

 6   actual meeting that's videotaped.

 7   Q.    Right.  Okay.

 8   A.    So I would imagine -- two and a half to two three

 9   hours, I would guesstimate.

10   Q.    Okay.  Batiste was impressed with this warehouse;

11   was he not?

12         MS. ARANGO:  Objection, Judge.  Calls for

13   speculation.

14         THE COURT:  Sustained.

15         Rephrase your question.

16   BY MR. LEVIN:

17   Q.    At Page 6, he talks about having bamboo furniture

18   in here.

19         Elie Assaad says, "It's big."

20         And then Narseal Batiste whistles.

21         Do you see that?

22   A.    Yes, I do.

23   Q.    Would you agree with me that he was impressed

24   with the warehouse?

25   A.    I would agree that he was excited about the
```

```
 1    warehouse.
 2    Q.    You would agree with me that, in the course of
 3    this conversation, Elie Assaad represents to him that
 4    he's accomplished all his promises?  Page 46.
 5              THE COURT:  We need to take a break.
 6              MR. LEVIN:  Okay.
 7              THE COURT:  Do not discuss this case either
 8    amongst yourselves or with anyone else.  Have no
 9    contact whatsoever with anyone associated with the
10    trial.  Do not read, listen or see anything touching on
11    this matter in any way.
12              If anyone should try to talk to you about this
13    case, you should immediately instruct them to stop and
14    report it to my staff.
15              You may leave your materials at your chairs.
16    Please be back in the jury room in 15 minutes.  We'll
17    take a 15-minute recess.
18              (Whereupon, the jury exited the courtroom at
19    2:27 p.m. and the following proceedings were had:)
20              THE COURT:  You may step down.
21              (Witness excused.)
22              THE COURT:  We're in recess for 15.
23              (Thereupon a recess was taken, after which the
24    following proceedings were had:)
25              THE COURT:  We're back on United States of
```

 1    America versus Narseal Batiste, et al., Case No. 06 --

 2    06-20373.

 3              Counsel, state your appearances, please, for

 4    the record.

 5              MR. GREGORIE:  Richard Gregorie and Jacqueline

 6    Arango on behalf of the United States, your Honor.

 7              MS. JHONES:  Your Honor, the Court doesn't

 8    know the case number by heart at this point?

 9              THE COURT:  I do know it by heart.  It just

10    sort of left out of my head for a second.

11              MS. JHONES:  Ana Jhones --

12              THE COURT:  It's not the only case I have on

13    my docket with a number I have to remember.

14              MS. JHONES:  Your Honor, I am present on

15    behalf of Mr. Batiste.  The marshals are in the process

16    of bringing him in.

17              MR. LEVIN:  Albert Levin for Patrick Abraham.

18    He's coming in now.

19              MR. CASUSO:  Judge, Lou Casuso on behalf of

20    Burson Augustin, who's present.

21              MR. CLARK:  Nathan Clark for Rotschild

22    Augustine, who's present.

23              MR. HOULIHAN:  Richard Houlihan on behalf of

24    Naudimar Herrera.

25              MR. VEREEN:  Roderick Vereen on behalf of

1    Stanley Phanor, who's present.

2            THE COURT:  Mr. Batiste and Mr. Abraham are

3    now in the courtroom.  So all Defendants are present.

4            Let's bring in the jurors.

5            (Whereupon, the jury entered the courtroom at

6    2:57 p.m. and the following proceedings were had:)

7            THE COURT:  You may be seated.

8            You are still under oath, sir.

9            You may proceed, Mr. Levin.

10           MR. LEVIN:  Thank you, your Honor.

11   BY MR. LEVIN:

12   Q.    Agent Velazquez, it's not a crime to say

13   something that you don't really mean.

14           Isn't that the truth, sir?

15   A.    It's not a crime to say something you don't

16   really mean?

17   Q.    That you don't really mean, that you don't really

18   intend.

19           Like, if I swear an oath of allegiance to

20   Al-Qaeda and I don't really mean it, that's not a

21   crime, is it?

22   A.    If you were joking, I would say so.

23   Q.    Okay.  Now, on this meeting that took place on

24   March 16th where this so-called oath of loyalty was

25   administered, there was a point in time when Elie

```
 1   Assaad was crying.  Isn't that true?

 2   A.    I believe -- yes.  I'm not sure if he was crying

 3   or he became emotional or represented that he was

 4   being -- becoming emotional.

 5   Q.    Isn't it true that, if you listen to the entire

 6   recording, that at one point in time towards the end,

 7   he's, like, crying -- you can tell that he's either

 8   becoming emotional or crying?

 9   A.    Yes.

10   Q.    Now, after this meeting is over with, Patrick

11   Abraham is asked to give a ride to Elie Assaad back to

12   Miami Beach.  Isn't that correct?

13   A.    Yes, sir.

14   Q.    And although there's no obvious video of the ride

15   back, the exhibit depicts any conversation or the audio

16   of what was discussed between Mr. Elie Assaad and

17   Mr. Patrick Abraham on the ride back to Miami Beach.

18   Is that not correct?

19   A.    That's correct.

20   Q.    And would you agree with me, sir, that at no time

21   does Patrick Abraham ever express that he's so grateful

22   now to have become aligned with Al-Qaeda?

23   A.    No.

24   Q.    Would you agree with me, sir, that at no time

25   does Patrick Abraham indicate that he had been waiting
```

```
 1   for this moment for many, many years?
 2   A.    No.
 3   Q.    And, in fact, what mostly you hear, is it not
 4   true, are a couple of songs on the radio?
 5   A.    Yes.
 6   Q.    One of those songs is the song "I Can Feel It
 7   Coming in the Air Tonight."
 8         Do you remember that?
 9   A.    Yes.
10   Q.    And that's by?
11   A.    Phil Collins.
12   Q.    Phil Collins.
13         And that was also the theme song from the TV
14   series Miami Vice.
15         Do you recall that?
16   A.    I don't believe it was the theme song.  I believe
17   that was one of the songs in the early episodes of the
18   first season.
19   Q.    Right.  You're right about that.
20         But that was prominently a song that was played,
21   not that Miami Vice is relevant to this case.  But the
22   point is the words are, "I can feel it coming in the
23   air tonight.  I've been waiting for this moment" --
24         MS. ARANGO:  Objection.
25
```

Velazquez - CROSS - By Mr. Levin                          154

```
 1    BY MR. LEVIN:
 2    Q.     -- "for all my life"; are they not, sir?
 3            MS. ARANGO:  Objection, Judge.  Relevance --
 4            THE COURT:  Sustained.
 5            MS. ARANGO:  -- just as Mr. Levin said.
 6            MR. LEVIN:  I'm sorry?
 7            THE COURT REPORTER:  I didn't hear what you
 8    said.
 9            MS. ARANGO:  I said just as Mr. Levin said,
10    that it's not relevant.
11            THE COURT:  Sustained.
12            MR. LEVIN:  Miami Vice was not relevant.
13            THE COURT:  Sustained.
14    BY MR. LEVIN:
15    Q.     Abraham expresses no exuberance whatsoever with
16    regard to what's just taken place.  Correct?
17    A.     Yes.
18    Q.     He drives him home, back to Miami Beach, probably
19    20 minutes, which the jury can listen to, if they
20    choose, I guess, in the jury room, since the Government
21    has opted not to play that part of this.  And I'll save
22    the Court's time and the jury's time now by not playing
23    it.
24            But, basically, there's no conversation.  Would
25    you agree with that?
```

 1   A.      There's little conversation.

 2   Q.      Now, after the 16th, on March 24th, apparently,

 3   Mr. Abraham drives Mr. Batiste up -- along with Elie

 4   Assaad, to a Best Buy.  Correct?

 5   A.      That's correct.

 6   Q.      Abraham is driving because Mr. Batiste basically

 7   has an invalid driver's license.  Correct?

 8   A.      I believe so.  Yes.

 9   Q.      And Abraham never goes into the Best Buy.  Isn't

10   that correct?

11   A.      I'm uncertain.  But I don't believe he did.

12   Q.      And then you've testified about the 25th or the

13   26th with regard to a van and certain pictures being

14   taken.

15           And Mr. Abraham is not involved in that in any

16   way, shape or form.  Correct?

17   A.      That is correct.

18   Q.      In fact, he has basically now disappeared and has

19   really separated himself because he has a falling-out

20   over money with Mr. Batiste.  Is that not correct?

21   A.      My understanding is that, at some point, there

22   was a disagreement over the leadership and the

23   financial management.

24           And after a trial which was held by Sultan

25   Kahn-Bey on April 17th, Patrick Abraham sided with the

1    Sultan -- or aligned himself with the Sultan and

2    Narseal Batiste was kicked out of the organization.

3    Q.     Well, Abraham was owed money by Mr. Batiste.

4           You're aware of that.  Correct?

5    A.     Yes.  I believe so.

6    Q.     And Abraham was one of Mr. Batiste's -- if not --

7    one of his best, if not the best, stucco workers that

8    worked with Azteca Stucco & Masonry.  Correct?

9    A.     Yes.  That's my understanding.

10   Q.     Okay.  And you've testified to meetings at a

11   Burger King, I believe, on April 19th.

12   A.     Yes.

13   Q.     Mr. Abraham wasn't present at that meeting, was

14   he?

15   A.     No, he was not.

16   Q.     And you say that the Moorish Science Temple

17   you've done a lot of research on.  Correct?

18   A.     I've done some research on that organization.

19   Yes.

20   Q.     And one of the religions that is studied is

21   Judaism; is it not?

22   A.     Yes.

23   Q.     And you would agree with me that Al-Qaeda's

24   archenemies or who they seek to destroy are the United

25   States and the state of Israel.  Would you agree with

1    that?

2    A.    That's correct.

3    Q.    You would agree with me that Mr. Batiste

4    essentially was seeking and was telling Elie Assaad at

5    various times that he needed financial stability in

6    order to get contracts in Chicago.

7          Do you recall that?

8    A.    Yes.

9    Q.    And he was constantly, as has been asked by my

10   predecessors here -- on numerous occasions was asking

11   for financial support?

12   A.    Yes.

13   Q.    In fact, in Government's Exhibit 85-B, which is a

14   transcript -- and if it's necessary, I'll show it to

15   you -- do you recall Batiste telling Elie Assaad that

16   he's overdrawn by $400 in his bank account?  I can get

17   you the copy, if you need it.

18   A.    I do recall some -- I do recall that generally.

19   I don't recall what date it was on.  But I do recall

20   Narseal Batiste telling Elie that --

21   Q.    You don't have to guess.  Let me just provide it

22   to you.

23              MS. ARANGO:  May we get a date, please?

24              MR. LEVIN:  That would be Government's

25   Exhibit 85-B on March 4th, 2009 -- no.  Just kidding.

```
 1              It's April 3rd, 2006.
 2   BY MR. LEVIN:
 3   Q.      That would be Page 20, Special Agent Velazquez.
 4   A.      Yes.
 5   Q.      Batiste tells Elie Assaad that he's overdrawn
 6   $400 in his bank account?
 7   A.      He does.
 8   Q.      And you never -- I mean -- strike that.
 9           Now, there's been some testimony that Batiste, in
10   fact, did receive some money, specifically, $1,000,
11   which was to pay for a lawyer.
12           Do you recall that testimony?
13   A.      Yes, I do.
14   Q.      And you had indicated during your direct
15   examination that you became concerned when Batiste got
16   arrested because you were concerned that it would -- it
17   might impact the flow or the ability to go forward with
18   this investigation.  Correct?
19   A.      It could.  Yes.  Yes.
20   Q.      I mean, did you take any steps to consult with
21   the prosecuting agency, which I assume was the
22   Miami-Dade County State Attorney's Office, to discuss
23   the allegations against Mr. Batiste?
24   A.      I believe there may have been an inquiry with the
25   State Attorney's Office through one of the task force
```

 1    members on a squad.

 2    Q.    This was an important issue for you; was it not?

 3    A.    What?

 4    Q.    Mr. Batiste and his whereabouts, whether he was

 5    going to be arrested or not arrested, because that was

 6    going to impact how you were going to direct the rest

 7    of this investigation.  Correct?

 8    A.    Yes.  And the concern was that Narseal Batiste

 9    had clearly established himself as the leader.  The

10    concern was that, if he was out of the picture, we may

11    not be able to engage in conversations with other

12    members independently without Batiste.

13          One of the factors that was evaluated was the

14    incident on March 9th, when Elie showed up unannounced

15    at the Embassy and Batiste became very upset.

16    Q.    Yet, you didn't know that, on March 27th, this

17    case got dismissed?

18    A.    I did not.  No.

19    Q.    Do you know if any of your colleagues knew about

20    it?

21    A.    I'm uncertain if they knew.

22    Q.    Did you send any surveillance agents to court

23    that day to ensure or to find out what was going to

24    occur?  Wasn't that an important part of this

25    investigation, to keep an eye on somebody that you

 1    suspect to be a guy who wants to wage a war against the

 2    United States and has five or six individuals willing

 3    to help him with it?

 4    A.    Well, at that part of the -- at that point in the

 5    investigation, we were maintaining that contact through

 6    meetings with Elie in furtherance of this proposed plot

 7    to blow up buildings, in which Batiste had provided

 8    pictures.

 9    Q.    Well, Elie didn't go to court on the 27th of

10    March, did he?

11    A.    Not that I'm aware of.

12    Q.    And the $1,000 that he received, Batiste:  He

13    didn't purchase any firearms with that, did he?

14    A.    Not that I'm aware of.

15    Q.    And the $3500 that was given to him:  He did not

16    purchase any type of weapons or anything that one might

17    use to create havoc, if you will?

18    A.    No.

19    Q.    Now, I believe also you testified on maybe direct

20    or cross -- I'm not sure at this point -- that it was

21    the FBI's decision to have this oath given.  Correct?

22    A.    Yes.

23    Q.    I believe you said it was the three of you.

24          I assume you're referring to yourself, Special

25    Agent Stewart and Special Agent Garbato.  Correct?

Velazquez - CROSS - By Mr. Levin                    161

```
 1   A.     That's correct.  And it was pursuant to Batiste
 2   expressing a desire to form an alliance with Al-Qaeda.
 3   Q.     Well, the question was:  Whose idea was it to
 4   administer the oath?
 5          And you testified previously that it was the
 6   three of you and FBI management; did you not?
 7   A.     Well, I believe what my testimony was was it was
 8   the collective -- it was a collective decision with the
 9   approval of FBI management.
10   Q.     FBI management is Washington?
11          MS. ARANGO:  I would object to interrupting
12   the witness.
13          MR. LEVIN:  I thought he was done.  I'm sorry
14   if I did.  I apologize.
15          THE COURT:  Let the witness finish his answer.
16          MR. LEVIN:  Yes, ma'am.
17          THE WITNESS:  No.  In response to your
18   question, a decision like that in an investigation such
19   as this would -- you would notify the supervisor of
20   what you intended to do.
21   BY MR. LEVIN:
22   Q.     Supervisor here in Miami?
23   A.     Yes.
24   Q.     Are you suggesting that this case wasn't being
25   monitored by authorities in Washington, DC?
```

```
 1              MS. ARANGO:  Objection.  Relevance.

 2              THE COURT:  Sustained.

 3    BY MR. LEVIN:

 4    Q.    Driven by anybody in the Washington FBI office or

 5    the Justice Department?  Is that your testimony, sir?

 6    A.    I can tell you that the only conversation I had

 7    with Washington with regard to this investigation was

 8    with respect to the classification of the undercover

 9    proposal, which we were required to submit, just to

10    utilize the undercover officer from Scotland Yard.

11         The decisions -- or the conversations I had with

12    respect to this investigation occurred between myself,

13    the other investigative personnel, the US Attorney's

14    Office and FBI management here in Miami.

15    Q.    Are you aware of any statements that were made

16    subsequent to these gentlemen's arrest by the Attorney

17    General of the United States?

18              MS. ARANGO:  Judge, I would object.  This is

19    rank hearsay.

20              THE COURT:  Sustained.

21              MR. LEVIN:  I just asked him if he was

22    aware --

23              MS. ARANGO:  Judge, can you please admonish --

24              THE COURT:  Move on to another area,

25    Mr. Levin.
```

Velazquez - CROSS - By Mr. Levin          163

```
1              MR. LEVIN:  I wasn't asking for --

2              THE COURT:  Sir --

3              MR. LEVIN:  Yes, ma'am.

4    BY MR. LEVIN:

5    Q.    Now, I believe you testified with regard to a

6    conversation between Narseal Batiste and Elie Assaad

7    that occurred on May the 24th of 2006.  Correct?

8    A.    I believe so.

9    Q.    And in that conversation, there were discussions

10   concerning the continuation of this investigation -- or

11   the continuation of, rather, Mr. Assaad's efforts with

12   regard to reconnecting with Narseal Batiste.  Isn't

13   that correct?

14   A.    On March 24th?

15   Q.    May 24th.

16   A.    May 24th.  Yes.

17   Q.    Okay.  And isn't it true, sir, that in that

18   conversation, Batiste tells Elie Assaad that Patrick

19   Abraham -- all he wanted was the money and that he

20   wasn't going to do what he said he was going to do?

21             MS. ARANGO:  Judge, objection.  Hearsay.

22             And at this point, I would seek some type of

23   admonishment to counsel for this rank hearsay.

24             MR. LEVIN:  Judge, they asked about this

25   exhibit.
```

```
 1              THE COURT:  Sustained.

 2              MR. LEVIN:  Judge, they opened the door to

 3    questions about this particular event.  They asked

 4    about it.  I'm entitled to cross on it.

 5              MS. ARANGO:  Judge, this is hearsay.  This

 6    recording is not in evidence.

 7              THE COURT:  Sustained.

 8              MR. LEVIN:  I have to reserve a motion on this

 9    issue, your Honor.

10              THE COURT:  Sure.

11              MR. LEVIN:  Thank you.

12    BY MR. LEVIN:

13    Q.    Now, finally, Special Agent Velazquez, the jury

14    has been told that there were countless hours of

15    recorded conversations.

16              And you don't have a figure for that, do you?

17    A.    No, I don't.

18    Q.    Would you say it's in the thousands of hours?

19    A.    Yes.

20    Q.    Where the conversations are recorded either

21    audioly, if that's a word, or video?

22    A.    Yes.

23    Q.    Are you laughing at my use of the word "audioly"?

24    A.    I didn't realize that was a word.

25    Q.    Well, let's make up a new word.
```

```
 1          And there were over 15,000 recorded phone

 2     conversations.  Would you agree with that, sir?

 3     A.     There were somewhere in neighborhood.  Yes.

 4     Q.     On June 23rd, 2006, you indicated that you had a

 5     meeting with my client, Patrick Abraham, after his

 6     arrest?

 7     A.     But I believe that was June 22nd.

 8     Q.     Forgive me.

 9     A.     Yes.

10     Q.     And you spoke to him for a period of time?

11     A.     I did.

12     Q.     And you took notes?

13     A.     I did.

14     Q.     And you've testified in front of the jury with

15     regard to what he said?

16     A.     I did.

17     Q.     And, essentially, what he told you is essentially

18     everything you already knew, would you agree with that,

19     about this investigation, since you had monitored it

20     from day one?

21     A.     No.  There was some things that I was made aware

22     of that I don't believe I knew at that time.

23     Q.     Okay.  Now, you had the tape recorders running

24     continuously from October 29th to at least May 26th of

25     2006.  Is that correct?
```

```
1    A.    Yes.

2    Q.    Is there a reason the recorders were turned off

3    when you took my client's statement?

4    A.    Which recorders?

5    Q.    Sorry?

6    A.    Which recorders?

7    Q.    Sir, you had access to videotape and/or audiotape

8    my client's statement; did you not?

9    A.    Yes.

10   Q.    You could have tape-recorded his statement and

11   memorialized it for introduction in these proceedings

12   so the jury could hear it with their own ears, could

13   you not have?

14   A.    That could have been recorded.  However, there is

15   a policy that requires management approval to record a

16   conversation in the FBI.

17   Q.    And in order to get that approval, you could have

18   picked up the telephone and said, "I just arrested

19   someone that's going to be charged with terrorism,

20   which, as you are aware, Mr. Supervisor, is high

21   on our" --

22            MS. ARANGO:  Judge, I would object.  This is

23   argumentative.

24            MR. LEVIN:  I'll rephrase it, your Honor.

25
```

```
 1    BY MR. LEVIN:
 2    Q.    You could have called somebody and asked for
 3    permission to tape-record the conversation.  Right?
 4    A.    I could have.  However, that creates a number --
 5    a few problems with respect to potentially introducing
 6    that piece of evidence later on.
 7          And that may have -- you know, I had an
 8    individual who was willing to talk to me, and I took
 9    notes and conducted the interview.
10    Q.    Well, in terms of these may create issues, they
11    could have been overcome, do you agree?  Like
12    redaction?
13    A.    Well, I'm not sure how you would redact a
14    videotape or an audiotape.  That would be difficult.
15    Q.    Well, would you agree with me, sir, that already
16    in this case there were redactions with regard to
17    Government's Exhibit -- well, a conversation that
18    occurred, apparently, between Master Athea and Narseal
19    Batiste?
20    A.    Yes.
21    Q.    And a videocamera.
22          I mean, post-arrest statements are recorded all
23    the time; are they not?
24    A.    They're typically recorded in -- where there are
25    crimes involving one person.  They're -- they're very
```

 1   commonly used in homicide investigations.  They're not

 2   as frequently used in investigations involving multiple

 3   defendants.

 4   Q.     Well, you recall an FBI investigation out of

 5   California -- out of Lodi, California, do you not, that

 6   involved terrorism?

 7              MS. ARANGO:  Objection.  Relevance.

 8              THE COURT:  Sustained.

 9   BY MR. LEVIN:

10   Q.     Are you familiar with whether or not other FBI

11   agents have recorded interviews with subjects charged

12   with terrorism?

13   A.     Yes, I am.

14   Q.     And, in fact, they have; have they not?

15   A.     They have.

16   Q.     Video and audio?

17   A.     I'm aware of at least one that was videotaped.

18   Q.     And you would agree with me that it would be

19   important to memorialize that, because we're talking

20   about a subject as sensitive as the one we're talking

21   about; would you not?

22   A.     Yes.  In that particular case, the individual was

23   not -- had not committed that crime.

24              MR. LEVIN:  I would move to strike as

25   nonresponsive, your Honor.

```
 1              MS. JHONES:  I'm going to reserve a motion.

 2              MR. LEVIN:  I'm going to reserve a motion as

 3     well.

 4     BY MR. LEVIN:

 5     Q.      The point, Special --

 6              THE COURT:  I'll strike the last answer of the

 7     witness.

 8              The jury is instructed to disregard it.

 9              MR. LEVIN:  Thank you, your Honor.

10              I have no further questions.  Thank you.

11              THE COURT:  Are you withdrawing the last

12     question?

13              MR. LEVIN:  I thought you struck the answer.

14              THE COURT:  I struck the answer.  But the

15     question is still pending.

16              MR. LEVIN:  Okay.  Well, Lisa -- can I ask

17     Lisa to read it back, please?  Maybe I do have further

18     questions.

19              (The question referred to was read by the

20     reporter as above recorded.)

21              MS. ARANGO:  Judge, at this point I would

22     object as to vague.

23              THE COURT:  Sustained.

24     BY MR. LEVIN:

25     Q.      Special Agent Velazquez, the person that could
```

 1   have given you authority to record this works in your

 2   office.  Correct?

 3   A.    Yes.

 4   Q.    You have --

 5   A.    Or -- I'm sorry.

 6         Yes.  Or he could have gotten the appropriate

 7   authority.

 8   Q.    And all you needed to do was pick up the phone

 9   and ask him for permission.  Correct?

10   A.    Yes.

11         MR. LEVIN:  I have no further questions.

12   Thank you.

13         THE COURT:  Ms. Arango?

14                   REDIRECT EXAMINATION

15   BY MS. ARANGO:

16   Q.    Agent Velazquez, you were asked various

17   questions, starting with Ms. Jhones, about your

18   recollection of events that had occurred early on in

19   this investigation.

20         Do you recall that?

21   A.    Yes.

22   Q.    Now, were you the only group supervisor for your

23   squad at that time?  And I'm talking about the time

24   frame at the very beginning of this investigation up

25   until, like -- I think you said mid-November.

A.    Yes.  I was the acting supervisor.

Q.    Were you supervising other investigations as well as this one?

A.    I was.

Q.    Was there any other significant investigations that you were supervising at that time?

A.    There was.

Q.    And were with -- did they also take -- was there a lot of activity going on at that time?

A.    There was.

Q.    All right.  And what was it that you would do with respect to supervising multiple investigations?

A.    I would have meetings with the case agents and determine which direction the investigation was going in, determine -- or be made aware of any developments, try to identify resources that may be needed for any particular investigation, meet with the supervisors of other agencies that were jointly involved in the investigation.

        Generally, most of my time consisted of meetings either with investigative personnel or FBI management or other supervisors from different agencies.

Q.    So what was your -- at least at that point in time, your level of knowledge as to the day-to-day decisions that were being made in this investigation?

Velazquez - REDIRECT - By Ms. Arango          172

1    A.     At that time, I understood that we were going to

2    pursue a proactive approach in this investigation.  But

3    as far as the day-to-day decisions or interactions

4    between Abbas and the investigative agents, I was not

5    kept aware of every single contact on a daily basis.

6    Q.     Let me ask you -- you were specifically asked by

7    Ms. Jhones as to when Narseal Batiste was identified.

8           Do you recall that in this investigation?

9    A.     Yes.

10   Q.     And you testified that you couldn't remember

11   that?

12   A.     Yes.

13   Q.     Can I show you something to refresh your

14   recollection?

15   A.     Sure.

16   Q.     Well, let me just go back before I show this.

17          Just to refresh the recollection of the jury

18   members, what's a 302?

19   A.     An FD-302 is a report that's generated and

20   inserted into the investigative case file.

21   Q.     Thank you.  Let me just show an FD-302.

22          MS. ARANGO:  Judge, is this mic turned on?

23          THE COURT:  No.  It should come on now.

24          MS. ARANGO:  Thank you.

25          MS. JHONES:  Your Honor, I just have an

Velazquez - REDIRECT - By Ms. Arango                173

```
 1   objection to refresh a recollection with this.  If we

 2   could just have a brief side-bar so I don't make a

 3   speaking objection.

 4           MS. ARANGO:  It's an FD-302, Judge.

 5           MS. JHONES:  I understand that.  But there's

 6   an issue, if I could just briefly --

 7           MS. ARANGO:  This is not coming into evidence.

 8   This is just to refresh his recollection.

 9           MS. JHONES:  That's not the reason why I'm

10   objecting.

11           THE COURT:  What's the basis of the objection?

12           MS. JHONES:  The basis of the objection is

13   that this report was not authored by this witness.

14           THE COURT:  Overruled.

15           Anything can be used to refresh recollection.

16   BY MS. ARANGO:

17   Q.    Do you recognize that?

18   A.    Yes.

19   Q.    What is it?

20   A.    This is a 302 prepared by John Stewart and Joe

21   Garbato, indicating --

22           MS. JHONES:  I would object to reading from a

23   document that's not in evidence.

24           THE COURT:  Sustained.

25           He may use it to refresh his recollection
```

 1   only.

 2   BY MS. ARANGO:

 3   Q.     Does that document refresh your recollection as

 4   to when Narseal Batiste was identified in this

 5   investigation?

 6   A.     Yes.  Late -- I'm sorry.

 7   Q.     When was that?

 8   A.     Late October --

 9   Q.     Thank you.

10   A.     -- 2005.

11   Q.     Do you recall how it was he was identified?

12          MS. JHONES:  Objection.  Basis of knowledge

13   and, also, objection to leading.

14          THE COURT:  Overruled as to leading.

15          Lay your predicate.

16   BY MS. ARANGO:

17   Q.     Let me go back.

18          I think you testified earlier with respect to the

19   identification of targets in this investigation.

20          Do you recall that?

21   A.     Yes.

22   Q.     Could you just explain again to the members of

23   the jury how, generally, those identifications would

24   occur.

25   A.     Through driver's license photos.

1    Q.     How was Narseal Batiste identified?

2    A.     Through a driver's license photo.

3    Q.     Now, you were also asked about any financial

4    investigations.

5           Do you recall that?

6    A.     Yes.

7    Q.     Now, do you know what Auto Track is?

8    A.     Yes.

9    Q.     Could you please explain to the members of the

10   jury what Auto Track is.

11   A.     Auto Track is a public source database that you

12   can subscribe to that pulls information from the credit

13   bureaus and other source databases and provides

14   information on individuals or corporations based on a

15   name and the date of birth or partial information which

16   would allow you to identify individuals or

17   corporations.

18   Q.     And does that contain some -- certain financial

19   information as well?

20   A.     It does.  It can contain bank account

21   information, credit card numbers, loans, liens, things

22   of that nature.

23   Q.     Do you know whether Auto Track was used in this

24   case by the case agents early on?

25   A.     Yes.  The information -- what typically happens

 1    is information became available on individuals.  That

 2    information would then be run through Auto Track or

 3    other public source database and closed databases,

 4    which are available to the FBI, to gather more

 5    information on those individuals.

 6    Q.    You were also asked by Ms. Jhones about

 7    investigation into phone records.

 8         Do you know whether there were any subpoenas

 9    issued in this investigation as to any phone companies?

10         MS. JHONES:  Objection as to time period, your

11    Honor.

12         THE COURT:  Overruled.

13         THE WITNESS:  Yes.

14    BY MS. ARANGO:

15    Q.    Do you recall the time period?

16    A.    Early on in the investigation, I know that, once

17    we became aware of Narseal Batiste's cell phone number,

18    a subpoena was issued and we were eventually able to

19    acquire a trap and trace, which allows the capture of

20    incoming and outgoing telephone calls -- or just the

21    numbers, rather.

22    Q.    You were also asked about any investigation into

23    any property owned by Narseal Batiste in Louisiana.

24    A.    Yes.

25    Q.    Do you know whether the FBI in Alexandria,

```
 1   Louisiana, was contacted by the case agents in this
 2   case early on in the investigation?
 3   A.    I believe they were contacted.  And, eventually,
 4   there was a Louisiana State Police entity that was
 5   contacted as well that assisted with this
 6   investigation.
 7   Q.    And the same for any investigation in
 8   Huntsville -- in Alabama?
 9   A.    Yes.
10   Q.    Do you know whether the FBI in Huntsville,
11   Alabama, was contacted by the case agent?
12         MS. JHONES:  Your Honor, I'm going to object
13   as to the leading nature.  I'm also going to object as
14   to time period.
15         THE COURT:  Sustained as to leading.
16         Rephrase your question.
17   BY MS. ARANGO:
18   Q.    What, if any, efforts were made by case agents
19   early on in this investigation to contact the FBI in
20   Huntsville, Alabama?
21   A.    I believe leads were sent out to the office in
22   Alabama to gather information -- any available
23   information on Narseal Batiste.
24   Q.    Now, you testified about persons -- investigation
25   into identity of people through running tags.
```

Velazquez - REDIRECT - By Ms. Arango              178

```
 1           Do you recall that?
 2    A.    Yes.
 3    Q.    And you were questioned by Mr. Vereen about
 4    Stanley Phanor and how he was identified.
 5           Do you recall what car, if any, Mr. Stanley
 6    Phanor was associated with?
 7    A.    Yes.  He was associated with a white Jeep
 8    Cherokee.
 9    Q.    Do you recall when the white Jeep Cherokee was
10    first identified?
11    A.    I believe that was on November 21st.
12    Q.    Well, are you sure?  Is there anything I can --
13           MR. VEREEN:  Objection.
14           MS. ARANGO:  He said "I believe," Judge.
15           MR. VEREEN:  He didn't say he didn't believe.
16           THE COURT:  Sustained.
17    BY MS. ARANGO:
18    Q.    Do you know what date the white Jeep Cherokee
19    connected with Stanley Phanor was first identified?
20           MR. VEREEN:  Objection.  Asked and answered.
21           THE COURT:  Overruled.
22           THE WITNESS:  No.
23    BY MS. ARANGO:
24    Q.    May I show you something -- is there anything I
25    can show you to refresh your recollection?
```

1  A.     Yes.  There may be.

2  Q.     Let me show you an FBI 302.

3         Does that refresh your recollection as to when a

4  white Jeep Cherokee was identified in this

5  investigation?

6  A.     Yes.

7  Q.     And without reading from the document, when was

8  it identified?

9  A.     November 3rd.

10 Q.     And do you recall who the owner of the white Jeep

11 Cherokee was?

12 A.     It was registered to --

13        MR. VEREEN:  Objection.  Reading from a

14 document that's not in evidence.

15        MS. ARANGO:  Judge, he testified to this

16 during Mr. Vereen's cross.

17        MR. VEREEN:  He said he didn't know.  I

18 specifically questioned him as to that name.

19        THE COURT:  Does that refresh your

20 recollection, sir?

21        THE WITNESS:  It refreshes my recollection

22 with respect to who the tag is registered to.

23        THE COURT:  Ask your question.

24 BY MS. ARANGO:

25 Q.     Who is the tag registered to?

 1    A.     Elazine Phanor.

 2    Q.     And who is Elazine Phanor?

 3           MR. VEREEN:  Objection.  Calls for hearsay.

 4           THE COURT:  Sustained.

 5    BY MS. ARANGO:

 6    Q.     Did you do any investigation into who was the

 7    driver of that car?

 8    A.     I did not.

 9    Q.     Do you know whether or not such investigation was

10    done?

11           MR. VEREEN:  Objection.  Calls for hearsay.

12           THE COURT:  Overruled.

13           THE WITNESS:  I'm sorry.  Could you repeat the

14    question.

15    BY MS. ARANGO:

16    Q.     Do you know whether or not such investigation was

17    done?

18    A.     I'm pretty positive it was.

19    Q.     Okay.  And was -- you also were asked by

20    Mr. Vereen on cross-examination about whether or not

21    Stanley Phanor was ever identified through a DL -- a

22    driver's license photograph.

23           Do you recall that?

24    A.     Yes.

25    Q.     Do you recall whether or not -- I believe your

1   answer at that time was that you could not recall.

2   A.     That's correct.

3   Q.     May I show you something to refresh your

4   recollection?

5   A.     Yes.

6   Q.     (Tenders document to the witness.)

7   A.     Yes.

8   Q.     Does that refresh your recollection as to whether

9   or not Stanley Phanor was ever identified by a DL

10  photo?

11          MR. VEREEN:  Objection, your Honor.  That

12  calls for hearsay.

13          THE COURT:  Overruled.

14          THE WITNESS:  Yes.

15  BY MS. ARANGO:

16  Q.     Was he?

17  A.     He was.

18  Q.     Do you recall when?

19  A.     Early November.  The 4th of November.

20  Q.     And you were also questioned by Mr. Vereen and I

21  believe several of the defense attorneys about a

22  misidentification that occurred on November 21st

23  regarding the meeting in Abbas al-Saidi's apartment.

24  A.     Yes.

25  Q.     At that time, it was -- I think your testimony

```
 1   was that it was believed that Stanley Phanor, rather

 2   than Patrick Abraham, was the person in the apartment

 3   with Narseal Batiste and Abbas al-Saidi?

 4   A.    Yes.

 5   Q.    Do you recall what car Patrick Abraham and

 6   Narseal Batiste arrived in to get to that meeting?

 7   A.    The white Jeep Cherokee.

 8   Q.    Okay.  Now, do you know what the cause of the

 9   misidentification was?

10   A.    I believe I do.

11         MS. JHONES:  Objection.  Basis of knowledge,

12   lack of foundation.  This may call for hearsay, your

13   Honor.

14         THE COURT:  Lay your predicate.

15   BY MS. ARANGO:

16   Q.    Well, you testified just now that Narseal Batiste

17   and Patrick Abraham arrived at the meeting in the white

18   Jeep Cherokee.  Correct?

19   A.    That's correct.

20   Q.    And that white Jeep Cherokee, I think you

21   testified already, was identified as being driven by

22   Stanley Phanor?

23   A.    That's correct.

24   Q.    Okay.  And then there was a misidentification of

25   Patrick Abraham at that meeting.  Correct?
```

1   A.      That's correct.

2   Q.      And it was thought for a time for him to have

3   been -- that person to have been Stanley Phanor?

4   A.      That's right.  And that was incorrect.

5   Q.      And do you know what the cause of that

6   misidentification was?

7   A.      The vehicle.

8   Q.      And just explain to the members of the jury what

9   that -- what you mean by that.

10  A.      Well, the vehicle that arrived at Abbas's

11  apartment that evening was the white Jeep Cherokee

12  associated with Stanley Phanor.

13          At the conclusion, there was also a reference to

14  a Brother Ibrahim that Abbas had said he met with.  And

15  it was uncertain at that time what he meant by that.

16  And Stanley Phanor was identified as participating in

17  that meeting when, in fact, he did not.

18  Q.      Now, was Stanley Phanor and Patrick Abraham both

19  present at the meeting on March 16th, which was

20  videotaped, in which they took an oath to Al-Qaeda?

21          MR. VEREEN:  Objection as to leading.

22          THE COURT:  Sustained.

23          Rephrase your question.

24  BY MS. ARANGO:

25  Q.      Were those two persons, Patrick Abraham and

1    Stanley Phanor, in any kind of video recordings in this

2    investigation?

3    A.    Yes.  At the same time?

4    Q.    Yes.

5    A.    Yes.

6    Q.    Which one was that?

7    A.    That was on March 16th.

8    Q.    And you also testified, I believe, about a

9    meeting on March 15th.

10         Do you recall that?

11   A.    Give me a moment.

12         Yes.

13   Q.    And the jury was -- we played for the jury

14   audio -- an audio recording -- excuse me -- a video

15   recording of the front of the warehouse.

16         Do you recall that?

17   A.    That was the day that the warehouse was selected,

18   and Narseal Batiste was there with Elie and Stanley

19   Phanor.

20   Q.    And you could see Stanley Phanor clearly --

21         MR. VEREEN:  Objection.  This is beyond the

22   scope of my cross-examination.

23         THE COURT:  Beyond the scope is overruled.

24         It's sustained as to leading.

25         Rephrase your question.

```
  1    BY MS. ARANGO:

  2    Q.    Were you able to identify Stanley Phanor in that

  3    video recording?

  4    A.    I was.

  5    Q.    Now, also, let me refer you to April 5th of '05.

  6    That's Government's Exhibit 89.

  7    A.    Yes.

  8    Q.    Who was present at that meeting?

  9    A.    At that meeting, it was Elie Assaad, Narseal

 10    Batiste, Burson Augustin and Stanley Phanor.

 11    Q.    And could you see him in the videotape in that

 12    meeting?

 13    A.    Yes.  At different portions.  At the beginning,

 14    you could see when he enters the warehouse.

 15    Q.    Okay.  And was he sitting there when --

 16          MR. VEREEN:  Your Honor, again, objection.

 17    This is beyond the scope of my cross-examination.

 18          THE COURT:  Overruled.

 19    BY MS. ARANGO:

 20    Q.    Was Stanley Phanor sitting there when

 21    conversations were occurring between --

 22          MR. VEREEN:  Objection.  Leading.

 23          THE COURT:  Sustained.

 24          Rephrase your question.

 25
```

```
 1    BY MS. ARANGO:

 2    Q.    Who was sitting there when conversations were

 3    occurring between Narseal Batiste and Brother Mohammed?

 4    A.    Burson Augustin was seated at the door.  And

 5    Stanley Phanor was seated to the left, outside of the

 6    camera view.

 7    Q.    And how did you know he was seated to the left,

 8    outside the camera view?

 9    A.    Because when you watch the video in its entirety,

10    you can actually see him walk over and walk outside of

11    the camera view.

12    Q.    Now, Mr. Levin also asked you about this initial

13    early-on misidentification of Stanley Phanor and

14    Patrick Abraham.

15          Do you recall that?

16    A.    Yes.

17    Q.    And then he asked you about your taking of

18    Patrick Abraham's post-arrest statement.

19    A.    Yes.

20    Q.    And I believe he either asked or implied that you

21    weren't certain whose post-arrest statement you were

22    taking.

23          Do you recall that?

24          MR. LEVIN:  Object to the form of the question

25    and leading.
```

```
 1              THE COURT:  Sustained.

 2              Rephrase your question.

 3   BY MS. ARANGO:

 4   Q.    Did Patrick Abraham sign his name on the waiver

 5   of rights form?

 6   A.    He did.

 7   Q.    Was there any question, in your mind, as to who

 8   you were interviewing after the arrest?

 9              MR. LEVIN:  Objection.  Leading.

10              THE COURT:  Sustained.

11              Rephrase your question.

12   BY MS. ARANGO:

13   Q.    Do you know who you were interviewing when you

14   interviewed Patrick Abraham after he was arrested?

15              MR. LEVIN:  Judge, we'll stipulate that the

16   interview was of Patrick Abraham.

17              THE COURT:  Do you accept the stipulation?

18              MS. ARANGO:  No.  I think that he can answer

19   the question.

20              THE COURT:  He can answer the question.

21              THE WITNESS:  Yes.  I knew who I was

22   interviewing on June 22nd.

23   BY MS. ARANGO:

24   Q.    And I think that Mr. Levin then later asked you

25   about that interview, and he said that Patrick Abraham
```

1    only told you things that you had learned already

2    throughout this investigation.

3         Do you recall that?

4    A.    Yes.

5    Q.    And you testified, "No.  He actually told us

6    things that we didn't know."

7    A.    Yes.

8    Q.    What were some of the things that he told you

9    that you had not known through the course of this

10   investigation?  And if you need anything to refresh

11   your recollection, I can provide you with that

12   statement.

13   A.    Yes.  It would be helpful if I could look at the

14   statement.

15   Q.    (Tenders document to the witness.)

16   A.    Yes.

17   Q.    So, now, what were some of the -- what were the

18   things that Patrick Abraham told you in his post-arrest

19   statement that you had not learned throughout the

20   course of this investigation?

21   A.    Well, one, that on January 28th, there was a

22   .9-millimeter pistol at the Embassy when the informants

23   arrived there for that meeting; that it was his idea to

24   check out Brother Mohammed and Elie and that he had

25   used $400 of his own money to pay for some of the

Velazquez - REDIRECT - By Ms. Arango          189

1    expenses associated with that; that there was a trial

2    held by Sultan Kahn-Bey in which Narseal Batiste was

3    kicked out of the organization; and that Sultan

4    Kahn-Bey thought that Brother Mohammed was the FBI; and

5    that he learned -- he -- he had a disagreement with

6    Narseal Batiste after learning that pictures had been

7    taken of the federal buildings.

8    Q.     Okay.  Thank you.

9           Now, you were also asked by Mr. Levin about

10   Patrick Abraham's conduct in -- and things that he said

11   at the February 19th meeting in Elie Assaad's

12   apartment.

13   A.     Yes.

14   Q.     And I think that Mr. Levin even said that he was

15   just watching TV the whole time.

16          Do you recall that?

17   A.     I think Mr. Levin asked me if that was my

18   assessment.  And I replied that it was not.

19   Q.     Let me show you just a couple portions of the

20   transcript of that recording.  It's marked as

21   Government's Exhibit 56-B.

22          Do you have that Government's Exhibit 56-B before

23   you, which would have been the February 19th

24   transcript?  If not, it's in the box.

25   A.     No, ma'am.

 1              MS. ARANGO:  Judge, will you turn on the ELMO?

 2              THE COURT:  Yes.  This is in evidence?

 3              MS. ARANGO:  Yes.  This is in evidence.

 4              THE COURT:  Do you want to tell counsel what

 5    page you're at, please.

 6              MS. ARANGO:  Yes.  I'm first turning to

 7    Page 27.

 8    BY MS. ARANGO:

 9    Q.    Now, towards the bottom of this page, Patrick

10    Abraham -- the Informant Elie Assaad says, "You want to

11    sit over there?"

12          And then he says -- then Patrick Abraham said,

13    "Feel like home."

14          And then Assaad says, "The chair is for the

15    guest."

16          And then he says, "Yeah."

17          And then he says -- then Elie Assaad says, "The

18    couch is for the family."

19          And then Patrick Abraham says, "You know what?

20    It is my duty to stay on my feet and not get

21    comfortable."

22          Do you see that?

23    A.    Yes.

24    Q.    And where was Patrick Abraham sitting during the

25    course of this meeting?

```
 1   A.     In between and a little back from Narseal Batiste

 2   and Elie.

 3   Q.     Was he sitting on the couch next to Narseal

 4   Batiste?

 5   A.     I believe he was sitting in a chair.

 6   Q.     And did he look as though he was getting

 7   comfortable?

 8   A.     He didn't look comfortable, to me.

 9   Q.     And based on your involvement in this

10   investigation, what did he appear to be doing?

11   A.     Sitting guard or sitting.

12   Q.     And then we played a portion already that's in

13   evidence at Page 67 -- that was referred to by

14   Mr. Levin -- in which Elie Assaad said to him, "Are you

15   are always quiet like this?"

16          Then Patrick Abraham says, "I am observing and I

17   am listening."

18          Do you see that?

19   A.     Yes.

20   Q.     What did it appear that he was doing during this

21   meeting?

22   A.     Observing and listening.

23   Q.     Referring now to Page 73, there's a conversation

24   that occurs between Elie Assaad and Patrick Abraham

25   where Elie Assaad says, "I'm confused.  I'm confused.
```

```
 1   Like you told me last time, like, your real name is
 2   Ibrahim.  Real name Patrick.  Huh?"
 3        And Patrick Abraham says, "Kathman Ibrahim."
 4        And then Elie Assaad responds, "Kathman Ibrahim.
 5   You name?"
 6        And then Patrick Abraham says, "Yes."
 7        And then Assaad says, "But where you came,
 8   Patrick?"
 9        And then Patrick Abraham says, "That's my street
10   name."
11        And then further on down --
12        MR. LEVIN:  Judge, it says, "(Unintelligible)
13   that's my street name."
14        MS. ARANGO:  Excuse me.  "(Unintelligible)
15   that's my street name."
16   BY MS. ARANGO:
17   Q.   And then further down he says, "Patrick
18   Abraham" -- excuse me -- "Patrick Ibrahim."  And that's
19   a phonetic.  "And then 'Mo' is short."
20        MR. LEVIN:  And that's the confidential
21   witness speaking, not Patrick Abraham, So it's clear
22   for the record.
23        MS. ARANGO:  That's correct, Judge.
24   BY MS. ARANGO:
25   Q.   And then Narseal Batiste responds, "'Mo' stands
```

1    for all the brothers."

2          Do you see that?

3    A.    Yes.

4    Q.    And was that conversation consistent with how

5    Patrick Abraham had represented himself to the

6    informant?

7    A.    Yes.

8    Q.    And the brothers call themselves "Mo"?

9    A.    They do.

10   Q.    And then, finally -- just one more page of

11   this -- where Patrick Abraham is watching TV, Page 78,

12   in this conversation, Elie Assaad says, "You can call

13   me brother, Mo.  You can -- okay.  Okay.  I'm glad.

14   I'm happy, you know (unintelligible) something.  And

15   you are all the same society, same group?"

16         Patrick Abraham responds, "That's right."

17         The informant says, "Same organization?"

18         Patrick Abraham says, "He introduced me to it."

19         Elie Assaad says, "Huh?"

20         And then Patrick Abraham says, "He introduced me

21   to it -- to this -- to this whole movement."

22         And Elie Assaad says, "That's good."

23         And then Patrick Abraham says, "To this -- to

24   this mission that I'm" -- and then there's an

25   "(unintelligible)."

1          Do you see that?

2     A.    Yes.

3     Q.    Was that consistent with the -- what had been

4     represented to Elie Assaad by Narseal Batiste?

5     A.    Yes.

6     Q.    Now, Agent Velazquez, in all of these meetings,

7     who acted like the leader?

8          MS. JHONES:  Your Honor, I'm going to object,

9     number one, as to vague, lack of time period, and

10    speculation.

11         THE COURT:  Sustained.

12         Rephrase your question.

13    BY MS. ARANGO:

14    Q.    During the meetings with the informants and

15    Narseal Batiste, who spoke?

16    A.    Both parties.

17    Q.    And if the informants -- excuse me.

18         And if the -- if Narseal Batiste was with any of

19    the Defendants present at the meeting, who was the

20    person who primarily spoke?

21    A.    Narseal Batiste.

22    Q.    And what's your understanding of Narseal

23    Batiste's role in this organization?

24         MS. JHONES:  Objection, your Honor.  This

25    invades the province of the jury.

 1              THE COURT:  Sustained.

 2              Rephrase your question.

 3   BY MS. ARANGO:

 4   Q.    Well, based on your involvement in this

 5   investigation, was there any type of hierarchy?

 6   A.    There was.

 7              MS. JHONES:  Same objection, your Honor.

 8              THE COURT:  Overruled.

 9              THE WITNESS:  Yes.

10   BY MS. ARANGO:

11   Q.    And what was the hierarchy?

12   A.    The hierarchy was that Narseal Batiste was in

13   charge of the organization in Miami and was subordinate

14   to Sultan Kahn-Bey in Chicago.

15         Narseal Batiste's wife was in charge of the

16   sisterhood for the organization down here in Miami and

17   was subordinate to Sultan Kahn-Bey's wife, Queen

18   Zekaya, in Chicago.

19   Q.    I think you mentioned earlier that, on

20   March 16th, you gave Elie Assaad certain directions

21   prior to that meeting.

22   A.    That's correct.

23   Q.    And correct me if I'm wrong:  You said that the

24   first thing that was going to be happening was to

25   see -- was the taking of the Al-Qaeda oath and, if

1   that, in fact, occurred, then Elie Assaad was to ask

2   permission to speak in front of -- ask if he could

3   speak in front of the other brothers and, if that -- if

4   he got a positive response, then he was to --

5   instructed to introduce the Al-Qaeda plot.

6   A.      That's correct.

7   Q.      All right, sir.  Now, why did you instruct Elie

8   Assaad to ask permission of Narseal Batiste before he

9   could speak in front of the other Defendants?

10  A.      To give Narseal Batiste the opportunity to decide

11  who he wanted to be privy to the conversation that he

12  was -- was going to take place with Elie Assaad.

13          So that was an opportunity for Batiste to decide

14  who was going to participate in the rest of that

15  meeting.  After he had made a decision, Elie was then

16  instructed to speak freely in front of Batiste.

17  Q.      Okay.  Now, was that consistent with the

18  hierarchy in this organization?

19  A.      Yes.

20  Q.      Now, going back for a moment to questions that

21  you were asked by Ms. Jhones about a number of

22  telephone calls in November and early December of

23  2005 -- and I believe she showed you, you know,

24  transcripts of telephone calls between Abbas al-Saidi

25  and Narseal Batiste.

Velazquez - REDIRECT - By Ms. Arango          197

1           Do you recall that?

2    A.    Yes.

3    Q.    Now, were you -- early on in the investigation,

4    were you aware of each and every phone conversation and

5    each and every voicemail message that Abbas al-Saidi

6    left for Narseal Batiste?

7    A.    No.

8    Q.    And why is that?

9    A.    Because I was -- I had management

10   responsibilities for the whole squad, and what would

11   occur is John Stewart and/or Joe Garbato would brief me

12   in summary with respect to what was happening in the

13   investigation.

14          So if there were four or five phone calls that

15   took place or one or two meetings, they would highlight

16   the most significant encounters between Abbas and

17   Batiste and update me on which direction they were

18   going in.

19   Q.    Okay.  And did John Stewart and Joe Garbato ever

20   give instructions to Abbas al-Saidi that you were not

21   privy to?

22   A.    Yes.

23   Q.    Now, do you know whether John Stewart instructed

24   Abbas al-Saidi to request a list of Narseal Batiste?

25          MS. JHONES:  Objection, your Honor, because

 1    it's going to call for hearsay.  Mr. Stewart is here to

 2    testify, if need be.

 3            MS. ARANGO:  Judge, I would object to the

 4    speaking objection.  It does not call for hearsay.

 5    It's asking if he knew.

 6            THE COURT:  Overruled.

 7            THE WITNESS:  No.  I'm unaware if Joe Garbato

 8    or -- and/or John Stewart gave a specific instruction

 9    to Abbas al-Saidi to obtain a list.

10    BY MS. ARANGO:

11    Q.    Now, would you have expected to know a detail

12    such as that?

13            MS. JHONES:  Objection, your Honor.

14    Speculation.

15            THE COURT:  Overruled.

16            THE WITNESS:  No.  Not necessarily.  There was

17    a general understanding of what we were trying to

18    accomplish in the investigation and, in that regard,

19    John Stewart and Joe Garbato had the latitude to make

20    those types of decisions with regard to instructions

21    that were given to Abbas.

22    BY MS. ARANGO:

23    Q.    Now, Ms. Jhones asked you about an unrecorded

24    meeting on December 18th.

25            Do you recall that?

 1   A.     Yes.

 2   Q.     And I believe you testified that it was Abbas

 3   al-Saidi and -- that Abbas al-Saidi was in that

 4   meeting.

 5   A.     That's correct.

 6   Q.     Do you know whether or not there was an interview

 7   of Abbas al-Saidi after the meeting on December 18th?

 8          MS. JHONES:  My objection is to the leading

 9   nature of the question and, also, as to basis of

10   knowledge.

11          THE COURT:  Overruled.

12          THE WITNESS:  Yes.  I debriefed Abbas on

13   December 19th regarding the meeting that had occurred

14   the previous day and took possession of the list.

15   BY MS. ARANGO:

16   Q.     And did you write a report as a result of that

17   debriefing?

18   A.     I did.

19   Q.     And did you acknowledge -- did you note anything

20   in the report about the reason why there was no

21   recording?

22   A.     I believe -- I think either -- I can't recall if

23   Batiste showed up unexpectedly or -- I can't recall

24   what the reason was.  But I do believe I included that

25   in my report.

1    Q.    All right.  Would looking at your report refresh

2    your recollection as to whether or not you had included

3    the reason why the meeting was not recorded?

4    A.    It should.

5    Q.    (Tenders document to the witness.)

6    A.    Yes.

7    Q.    Now, does that refresh your recollection?

8    A.    It does.

9    Q.    What was the reason that --

10         MS. JHONES:  My objection is it calls for

11   hearsay, your Honor.  It's based on what the CW told

12   him.

13         THE COURT:  Overruled.

14         What's your question?

15         THE WITNESS:  The answer --

16         THE COURT:  Let me hear the question again.

17   BY MS. ARANGO:

18   Q.    My question was:  Why did the meeting not get

19   recorded?

20   A.    Due to an apparent equipment malfunction and/or

21   operator error.

22   Q.    What, if any, steps did the FBI take to ensure

23   that each and every recording that either Abbas

24   al-Saidi or Elie Assaad -- excuse me.

25         What, if any, steps did the FBI take to ensure

```
 1    that any meeting or conversation that occurred between

 2    Elie Assaad or Abbas al-Saidi and any of the Defendants

 3    in this case get recorded?

 4          MS. JHONES:  Your Honor, my only objection to

 5    that question is that it is nonresponsive to -- it's

 6    not responsive based on -- it's not relevant based on

 7    the witness's response, the previous response,

 8    "and/or."

 9          THE COURT:  Overruled.

10    BY MS. ARANGO:

11    Q.    You may answer.

12    A.    Okay.  The measures that we would take to record

13    conversations were providing Elie and Abbas with

14    recording equipment, instructions on how to use that

15    equipment.

16          If the scenario allowed, at times, the equipment

17    would be activated and the recording started and they

18    would then go into the meeting.

19    Q.    And if a meeting was not recorded, what, if any,

20    steps would the FBI take in response to the fact that

21    the meeting wasn't recorded?

22          MS. JHONES:  Objection as to the hypothetical,

23    your Honor, unless she's referring to a specific

24    meeting.

25          THE COURT:  Sustained.
```

1              Rephrase your question.

2    BY MS. ARANGO:

3    Q.     Were there any instances -- and I believe

4    Ms. Jhones specifically asked you about December 18th.

5    And there was an instance on March 9th in which

6    meetings were not recorded.

7    A.     Yes.

8    Q.     And what -- what did the FBI do in the face of

9    meetings that were not recorded?

10   A.     We conducted debriefings and created detailed

11   reports of those debriefings.

12   Q.     What, if any, instructions did you give to the

13   informants regarding any information that occurred

14   during the course of those unrecorded meetings?

15   A.     I'm not sure I understand your question.

16   Q.     Okay.  What, if anything, did you do to

17   corroborate what had occurred during those unrecorded

18   meetings?

19   A.     We listened to other conversations that would

20   take place after that meeting or before.

21   Q.     And I believe, also, Ms. Jhones referred to some

22   telephone conversations or perhaps Mr. Levin referred

23   to there being telephone conversations that were not

24   recorded.

25           Now, based on your experience as an undercover

1    agent, are there instances in which telephone

2    conversations may not be recorded?

3    A.    Yes.

4    Q.    And explain to the members of the jury how that

5    can come about.

6           MS. JHONES:  Your Honor, I'm going to object

7    to hypotheticals, unless -- unless the Government wants

8    to ask specific --

9           MS. ARANGO:  Judge, this is redirect.  This is

10   in response to questions that were posed by these

11   defense attorneys.

12          THE COURT:  Overruled.

13          Go ahead.

14          THE WITNESS:  That can happen a number of

15   different ways.

16          One is the undercover agent or operative is

17   out in public at a restaurant, for example.  They

18   receive a phone call from a subject of the

19   investigation and they are unable to activate the

20   recording equipment.

21          Another reason would be the batteries on the

22   recording equipment were -- are not functioning

23   properly.  That's happened in the past.

24          You are -- the -- you are unable to activate

25   the recording equipment in a particular area where you

1    may be.

2          Those are just some of the reasons why a

3    telephone conversation may not be recorded.

4    BY MS. ARANGO:

5    Q.    Mr. Levin asked you about -- a number of

6    questions about Elie Assaad's relationship with an

7    attorney and his desire to write a book.

8          Do you recall that?

9    A.    I do.

10   Q.    And do you know when Elie Assaad had ever met

11   with an attorney regarding a desire to write a book?

12   A.    It was prior to this investigation.

13   Q.    So did his -- his desire to write book have

14   anything to do with this investigation?

15          MS. JHONES:  Your Honor, objection.

16   Speculation.

17          MR. CLARK:  Speculation.  Hearsay.

18          MS. ARANGO:  It's not speculative if it

19   occurred before the investigation.

20          MR. VEREEN:  Objection.

21          THE COURT:  Sustained.

22          Rephrase your question.

23   BY MS. ARANGO:

24   Q.    Given that Elie Assaad had met with a lawyer

25   about writing a book prior to his involvement in this

```
 1   investigation, what does that tell you about his --

 2   about any desire to write book in this investigation?

 3               MR. VEREEN:  Objection.

 4               MS. JHONES:  Same objection, your Honor.

 5               THE COURT:  Sustained.

 6   BY MS. ARANGO:

 7   Q.     Given that Elie Assaad had met with an attorney

 8   prior to this investigation about writing a book, what,

 9   if any, understanding do you have regarding whether or

10   not Elie Assaad wanted to write a book about this

11   investigation?

12               MR. VEREEN:  Same objection.  State of mind.

13               THE COURT:  Overruled.

14               MS. JHONES:  Also, hearsay.

15               MR. VEREEN:  Speculation.

16               THE COURT:  Overruled.

17   BY MS. ARANGO:

18   Q.     You may answer.

19   A.     It is my understanding that Elie's interest

20   in writing a book predated his involvement and

21   participation in this investigation and that there were

22   no subsequent conversations regarding that endeavor --

23               MR. VEREEN:  Objection.  Hearsay.

24               MS. ARANGO:  Judge --

25               THE COURT:  Overruled.
```

 1           THE WITNESS:  -- with respect to the attorney

 2    that he was in discussions with regarding potentially

 3    writing a book.

 4    BY MS. ARANGO:

 5    Q.     And, now, also, Mr. Levin asked you about a

 6    deposition that Elie Assaad had given in a civil case.

 7    A.     Yes.

 8    Q.     And when did that civil case occur?

 9    A.     I don't recall.

10    Q.     Do you recall whether or not it was before this

11    investigation?

12    A.     It was -- the civil suit occurred before the

13    investigation.  However, I'm uncertain as to when the

14    deposition took place.

15    Q.     Okay.  You were also asked by Mr. Clark about

16    statements made by Abbas al-Saidi and Elie Assaad in

17    their meetings with Narseal Batiste.

18           Do you recall that?

19    A.     Vaguely.

20    Q.     He asked you whether or not -- with a series of

21    statements and transcripts, whether or not they were

22    instructed to make those particular statements.

23    A.     Yes.  I do remember that.

24    Q.     Okay.  And then -- and in many instances, you

25    answered that they were not so instructed, but that

Velazquez - REDIRECT - By Ms. Arango          207

 1   their statements were made within the scope of their

 2   directives.

 3   A.     Yes.  I recall that.

 4   Q.     Do you -- what, if any, leeway do you give

 5   informants in following your directions while meeting

 6   with targets?

 7   A.     You have considerable leeway with respect to the

 8   role you're going to play.  It's very difficult when

 9   working in an undercover capacity to stick to a script.

10         And so, usually, what occurs is you are given

11   ideas or topics to discuss, because during the course

12   of that conversation you're going to talk about a

13   number of different things.

14         Some would be maybe related to the investigation

15   itself.  Other things may be related to personal

16   matters that are happening in your life.

17   Q.     Now, does that leeway or freedom that you give

18   informants -- does that ever result in, you know,

19   excessive talk or chatter?

20   A.     It can.  It's very common.  Undercover operatives

21   that are -- or people that are going to work in an

22   undercover capacity that haven't had a lot of

23   experience -- their nervousness sometimes is manifested

24   in excessive talking.

25   Q.     Now, in your experience, is it unusual for there

```
 1   to be large spans of conversation which have no impact

 2   on the investigation?

 3   A.    No.  To the contrary.  What you're doing -- when

 4   you're working in an undercover capacity, you're

 5   developing a relationship with an individual for

 6   purposes of gathering evidence, and that relationship

 7   is really no different than any other relationship you

 8   would have in your everyday life.

 9   Q.    You were asked by several of the defense

10   attorneys -- I believe Mr. Casuso and Mr. Levin -- and

11   Mr. Levin as well and, also, Mr. Clark -- they both

12   asked you about the fact that portions of recordings

13   were played through -- in your direct examination.

14         Do you recall that?

15   A.    Yes, ma'am.

16   Q.    Are the entire recordings in evidence?

17   A.    Yes.

18   Q.    Okay.  And, in fact, Mr. Levin, I believe,

19   discussed how -- the method in which the Government

20   chose to choose portions of recordings to play in your

21   direct examination.

22         Do you recall that?

23         MR. LEVIN:  Object to the form of the

24   question.

25         THE COURT:  Overruled.
```

1          THE WITNESS:  Yes, I do.

2    BY MS. ARANGO:

3    Q.     Can the defense play anything they want out of

4    those recordings in evidence?

5    A.     That's my understanding.

6    Q.     And regarding the portions of the recordings

7    that you played in your direct examination, what

8    significance did you have in those portions?

9    A.     Those were portions that --

10          MS. JHONES:  Your Honor, I'm going to object

11   with respect to -- I believe this is going to be a

12   704(b) violation.

13          THE COURT:  Sustained.

14   BY MS. ARANGO:

15   Q.     Are there any portions of the recording -- of

16   these recordings that you consider to have no impact on

17   the investigation?

18          MS. JHONES:  Relevancy, your Honor.

19          MR. CLARK:  704(b), your Honor.

20          MS. JHONES:  704(b).

21          THE COURT:  Sustained.

22          Rephrase your question.

23   BY MS. ARANGO:

24   Q.     Were there any discussions that occurred in any

25   of the transcripts that you -- that you, given your

```
 1    experience and your involvement in this investigation,

 2    considered to not have an impact or have any

 3    significance to your investigation?

 4              MS. JHONES:  Compound question.  Same

 5    objection to the second part of the question.

 6              THE COURT:  Overruled.

 7              THE WITNESS:  Could you please ask me the

 8    question again.

 9    BY MS. ARANGO:

10    Q.    Yes.

11          Are there -- given your involvement in this

12    investigation and your decision-making authority during

13    the course of this investigation, did you -- were there

14    any portions of any of the recordings that you

15    considered to have conversation that had no impact on

16    your investigation?

17    A.    No.  The portions that were played during my

18    direct were of significance to the investigation with

19    regard to the collection of evidence in this matter.

20    Q.    And were there portions in those conversations

21    that did not -- in the conversations that were not

22    played, but that are in evidence, that did not impact

23    on your investigation?

24    A.    Yes.  There are portions that pertain to personal

25    matters that had --
```

1            MS. JHONES:  Your Honor, I'm going to object

2    to the characterization -- to the response.  Improper

3    704(b) and improper 702.

4            MS. ARANGO:  He's explaining, Judge, what

5    didn't have an impact on his investigation, as was

6    asked.

7            THE COURT:  Overruled.

8            THE WITNESS:  There were portions of the

9    meetings that did not have much significance in the

10   investigation.  Some of those portions pertained to

11   personal matters or matters not related to the

12   investigation.

13   BY MS. ARANGO:

14   Q.    Now, let me show you -- Ms. Jhones asked you some

15   questions about the lists that were provided by Narseal

16   Batiste to one or -- one or the other of the

17   informants.

18         Do you recall that?

19   A.    I do.

20   Q.    First of all, with respect to Government's

21   Exhibit 100, she asked you some questions about the

22   boots that were requested on this list, for instance.

23   And she said, "Now, did Narseal Batiste ever ask for

24   boots after providing the list?"

25         Do you recall that?

1    A.      Yes.

2    Q.      Did Narseal Batiste ever ask for boots after

3    providing this list marked as Government's Exhibit 100?

4    In this respect, let me show you what's been marked as

5    Government's Exhibit 102.

6            Do you see that?

7    A.      I do.

8    Q.      And what's that?

9    A.      That's the list of sizes for the boots.

10   Q.      So after Narseal Batiste had provided the initial

11   list marked Government's Exhibit 100 in the hotel room

12   to Elie Assaad, did he follow up with asking for an

13   item on this list?

14   A.      He did.

15   Q.      And were boots indeed provided?

16   A.      They were.

17   Q.      Also, with respect to the item on the list that

18   says "Radio communication, NexTel Motorola cell phone,"

19   did Narseal Batiste seek a cell phone?

20   A.      Yes.

21   Q.      Was a cell phone provided to him?

22   A.      It was.

23   Q.      Now I'm showing you what's been marked as

24   Government's Exhibit 103-A.

25           This is a list that contains some weapons.

1    Correct?

2    A.    Yes.

3    Q.    And I think -- and Ms. Jhones asked you -- she

4    said he never -- Narseal Batiste never asked you for

5    any of the items on this list after he provided the

6    list.

7          Do you recall that?

8    A.    Vaguely.

9    Q.    Let me show you already in evidence Government's

10   Exhibit 56-B, specifically referring to Page 32.

11         At the top of that page, Elie Assaad says,

12   "Hundred.  So -- and do you need pickups or vans or --"

13         And then Narseal Batiste says, "Want everything

14   on that list.  Whatever I can get on that list, that's

15   what I need."

16         Based on your involvement in this investigation,

17   what was your understanding of what he was referring

18   to?

19   A.    The list that had been provided to Elie Assaad.

20   Q.    This list marked Government's Exhibit 103-A?

21   Would this be one of them?

22   A.    Yes.

23   Q.    Ms. Jhones also asked you about artillery and

24   whether or not Narseal Batiste ever asked for

25   artillery.

1    Do you recall that?

2    A.    Yes.

3    Q.    Turning to Page 33 of this same exhibit, at the

4    top -- towards the top, Narseal Batiste says, "Right.

5    Then we, like" -- and there's an "(inaudible)" -- "We

6    use our -- as -- trust our (inaudible) shield to

7    Chicago.  We would put the artillery on the bottom,

8    like, maybe a ton of steel on top.  Nobody can see

9    anything.  You know what I mean?  Now, for, like, the

10   vans."

11         Do you see that?

12   A.    Yes.

13   Q.    What's your understanding as to what he was

14   referring to?

15   A.    Blowing up the Sears Tower in Chicago or using

16   explosives to blow up a building in Chicago.

17   Q.    On April 6th, in a conversation that's in

18   evidence, a video-recorded conversation marked

19   Government's Exhibit 91 -- and the transcript is marked

20   91-B -- again, in response to Ms. Jones's questions

21   about whether or not Narseal Batiste wanted explosives,

22   let me refer you to Page 81.

23         MS. ARANGO:  I apologize, Judge.  I'm putting

24   up my copy.  I don't want to put anything up with

25   writing on it.

BY MS. ARANGO:

Q.    Referring you to Page 81 of Government's
Exhibit 91-B, towards the top, Narseal Batiste says,
"But, I mean, if we're going to do something quick and
easy -- but I would -- I would suggest, no, don't do
that because you're gonna hurt that other plan in
Chicago.  But there's no sooner than you open up a back
door, drive a van through there, boom, soon as the door
opens.  But that won't do anything, maybe kill, like,
ten people."

       And then further down, he says, "If you just
drive a van through there, that wouldn't take it down.
It would take a lot of explosives to take that down."

A.    Yes.

Q.    And what was happening during the course of this
conversation on April 6th of 2006?

A.    This was a discussion about the Al-Qaeda plot to
blow the FBI office in Miami.

Q.    What, if anything, was being reviewed by Narseal
Batiste and Elie Assaad during this meeting?

A.    They were reviewing the pictures and video
footage of the buildings that had been taken by Narseal
Batiste and others on March 25th.

Q.    So when Ms. Jhones asked you about whether or not
there was any -- if Narseal Batiste ever discussed

 1    wanting explosives and artilleries after providing this

 2    list, Government's Exhibit 103-A being one of them,

 3    were there such discussions?

 4    A.     There were.

 5    Q.     Now, you were also asked by Ms. Jhones about --

 6    about the bomb expert.

 7           Do you recall that?

 8    A.     Yes.

 9    Q.     And I believe her questions to you were that

10    Narseal Batiste wasn't interested in a bomb expert.

11    A.     I -- yes.

12    Q.     Okay.  And did you recall any conversations on

13    March 16th that Narseal Batiste had had in that

14    recorded meeting in the warehouse regarding the use of

15    a bomb expert?

16    A.     If I recall correctly, there was -- I think there

17    was a reference to using a family member.

18    Q.     Let me show you a transcript of that recording.

19    It's dated March 16th.  I'm going to refer to Page 57.

20           THE COURT:  State the exhibit number, also,

21    for the record, please.

22           MS. ARANGO:  Government's Exhibit 69.

23    BY MS. ARANGO:

24    Q.     Which I believe might be in front of you.

25    A.     It is.

1    Q.     Let me grab it.

2    A.     (Tenders document to counsel.)

3    Q.     Referring you to Page 57 of Government's

4    Exhibit 69-B, towards the middle of this long passage,

5    Narseal Batiste says, "I'm still, you know -- if I

6    can't -- cannot find somebody who's gonna help me with

7    the explosives along with that other stuff that we

8    talked about, the expertise like that, I'll have to

9    come to your directions, because I don't have the

10   person" -- and there's an "(unintelligible)" -- "But I

11   do have somebody in mind that I trust that's a family

12   member, a blood family member that I can really trust,

13   that can help me.

14         "So you see what I'm saying?  And I'm being

15   honest with you, too.  So in that perspective and in

16   any way, you know, I want you to know that, you know.

17   I cannot sit in one spot and still be working on

18   something and still taking the steps of exactly how

19   Al-Qaeda might be laying out the steps for me to take

20   anywhere for them to give me the assistance, because I

21   got arms in other places."

22         And what's your understanding of what he was

23   referring to in that passage?

24   A.     That he's related to somebody who would be able

25   to help him in the area of explosives.

1  Q.    Was he saying that he did not want a bomb expert?

2  A.    No.

3        MS. JHONES:  Your Honor, I'm going to object.

4  That calls for speculation.

5        THE COURT:  Overruled.

6        THE WITNESS:  No.

7        THE COURT:  We're going to need to take a

8  break.

9        Do not discuss this case either amongst

10 yourselves or with anyone else.  Have no contact

11 whatsoever with anyone associated with the trial.  Do

12 not read, listen or see anything touching on this

13 matter in any way.

14       If anyone should try to talk to you about this

15 case, you should immediately instruct them to stop and

16 report it to my staff.

17       You may leave your materials at your chairs.

18 Ten minutes.  Please be back in the jury room in ten

19 minutes.

20       (Whereupon, the jury exited the courtroom at

21 4:32 p.m. and the following proceedings were had:)

22       THE COURT:  You may step down, sir.

23       (Witness excused.)

24       MR. GREGORIE:  Your Honor, I have one very

25 quick question as soon as the door is closed.

```
 1              THE COURT:  Yes.

 2              MR. GREGORIE:  Your Honor, I have a witness

 3     here.  I don't think -- I don't know how much longer

 4     Ms. Arango has.

 5              THE COURT:  That was going to be my question.

 6              How much longer do you have?

 7              MS. ARANGO:  I think about half an hour.

 8              THE COURT:  We won't get to the witness today.

 9              MR. GREGORIE:  So can I let that person go

10     home for the day?

11              THE COURT:  Yes.

12              So we're in recess for ten.  Please be back in

13     ten.  I'm not going anywhere.

14              (Thereupon a recess was taken, after which the

15     following proceedings were had:)

16              THE COURT:  We're back on United States of

17     America versus Narseal Batiste, et al., Case

18     No. 06-20373.

19              Counsel, state your appearances, please, for

20     the record.

21              MR. GREGORIE:  Richard Gregorie and Jacqueline

22     Arango on behalf of the United States, your Honor.

23              MS. JHONES:  Ana Jhones on behalf of Narseal

24     Batiste, who is present.

25              MR. LEVIN:  Albert Levin for Patrick Abraham,
```

Velazquez - REDIRECT - By Ms. Arango          220

 1   who's also present.

 2          MR. CASUSO:  Louie Casuso for Burson Augustin,

 3   who's present.

 4          MR. CLARK:  Nathan Clark for Rotschild

 5   Augustine, who's present.

 6          MR. HOULIHAN:  Judge, Richard Houlihan for

 7   Naudimar.  I think he's in the bathroom.  Can I be

 8   excused to find him or do you want me to wait?  I'm

 9   sorry.

10          THE COURT:  They'll go find him.

11          MR. VEREEN:  Roderick Vereen on behalf of

12   Stanley Phanor, who's present.

13          THE COURT:  All Defendants are present except

14   for Naudimar Herrera.  So we'll wait for him.

15          (Thereupon, Defendant Herrera entered the

16   courtroom and the following proceedings were had:)

17          THE COURT:  Naudimar Herrera is present.

18          MR. HOULIHAN:  Thank you.

19          THE COURT:  Let's bring in the jury.

20          All Defendants are present.

21          (Whereupon, the jury entered the courtroom at

22   4:45 p.m. and the following proceedings were had:)

23          THE COURT:  You may be seated.

24          You are still under oath, sir.

25          You may proceed, Ms. Arango.

 1            MS. ARANGO:  Thank you.

 2   BY MS. ARANGO:

 3   Q.    Agent Velazquez, do you recall -- you were asked

 4   by Attorney Albert Levin in cross-examination about the

 5   meeting that occurred at the Radisson Hotel on

 6   December 16th.  It was the first meeting that occurred

 7   between Elie Assaad and Narseal Batiste.

 8   A.    Yes.

 9   Q.    And his questioning was that what had occurred --

10   the sequence of events that had occurred at that

11   meeting was that Narseal Batiste said that he wanted to

12   march to Jeb Bush's office and that, after that, Elie

13   Assaad said, "I need to see something stronger" and

14   then, after that, Elie Assaad asked for a list.

15         Do you recall Mr. Levin putting the sequence of

16   events in that way on December 16th?

17            MR. LEVIN:  Judge, object to the form of the

18   question.

19            THE COURT:  Overruled.

20            THE WITNESS:  Yes.

21   BY MS. ARANGO:

22   Q.    Let me refer you to Government's Exhibit 43 --

23   excuse me -- Government's Exhibit 44, specifically with

24   respect to Page 23.

25         And on that page, at the top of the page, Narseal

1    Batiste says, "Uniforms."

2         And then Elie Assaad says, "Uniforms.  So first

3    point.  First point, you want boots and uniforms."

4         And he says -- and Narseal Batiste responds,

5    "Yes, sir."

6         And Elie Assaad says, "What else?"

7         And Narseal Batiste says, "We need artillery."

8         And then, in response, Elie Assaad says, "Like

9    what?  Give me a list of what you want.  Give me all

10   the list what you want."

11        And that is the point in time -- and that is at

12   Page 23 -- in which the list is requested by Elie

13   Assaad of Narseal Batiste?

14   A.    That's correct.

15   Q.    Okay.  Further down -- I believe Page 34 -- later

16   in the conversation, at Page 34, that is where Narseal

17   Batiste starts talking about the Moroccan flag and --

18   if I may just have one moment -- excuse me -- I'm

19   sorry -- at the top of Page 34, "We're gonna go

20   straight to the City Hall, Jeb Bush's office."

21        Do you see that?

22   A.    Yes.

23   Q.    So that occurred later in time after Narseal

24   Batiste had already provided the list of items from

25   Elie Assaad?

1    A.    That's correct.

2    Q.    Also, Mr. Levin referred to the meeting in Abbas

3    al-Saidi's apartment in which Abbas al-Saidi mentions

4    this person who's coming from Yemen who knows his

5    uncle.

6          Do you recall those series of conversations?

7    A.    I do.

8    Q.    Mr. Levin said to you that that portion of the

9    conversation indicated that Narseal Batiste did not

10   know what Elie Assaad was talking about -- excuse me --

11   what Abbas al-Saidi was talking about.

12         Do you recall that?

13   A.    Yes.

14         MR. LEVIN:  Judge, I'm objecting to the form

15   of that question.  It's as if I'm testifying.

16         THE COURT:  Sustained.

17         Rephrase your question.

18   BY MS. ARANGO:

19   Q.    On November 21st, when Abbas al-Saidi talks about

20   the person that's coming from Yemen, was he doing so at

21   your -- within the scope of authority and direction

22   that he was given by FBI?

23   A.    Yes.

24   Q.    And in response to mentioning this person -- I'm

25   referring to Page 34 of Government's Exhibit 43-B,

```
 1   which is the video recording of the meeting in Abbas

 2   al-Saidi's apartment on November 21st -- you see where

 3   Narseal Batiste says, "Has he ever been to the United

 4   States before?"

 5         And then further down he says, "How does he speak

 6   English?"

 7         Do you see that?

 8   A.    Yes.

 9   Q.    And then further over, on Page 35 -- towards the

10   bottom of Page 35, he says, "But he's not gonna take

11   off on us and go do some secret mission.  Right?"

12   A.    Yes.

13   Q.    And then over to Page 36, in this same

14   conversation, at the very bottom of the page, he says,

15   "Yeah.  As long as he speaks English and --"

16         And then over at Page 37, he says, "They know in

17   America.  And all we speak is English."

18         And then further down in that page he says, "So

19   does he know bin Laden?"

20         Do you see that?

21   A.    Yes.

22   Q.    Now, what, if anything, did Narseal Batiste's

23   responses to Abbas al-Saidi's statements about somebody

24   coming from Yemen have on this investigation?

25   A.    It corroborated the information that Abbas
```

```
 1   initially provided, which was that Narseal Batiste
 2   asked him to put him in contact --
 3          MS. JHONES:  Your Honor, I'm going to object
 4   to that response.  And that is improper vouching.  This
 5   pertains to October of 2005, your Honor.
 6          MS. ARANGO:  Judge, he's talking about the
 7   effect these statements had in response --
 8          THE COURT:  Overruled.
 9   BY MS. ARANGO:
10   Q.    You may answer.
11   A.    This corroborated that there was a previous
12   conversation where Batiste had asked to meet with a
13   contact or member of a terrorist organization and that
14   Abbas was going to try and find somebody like that for
15   Batiste to meet with.
16   Q.    Now, you were also questioned by Rod Vereen and
17   Al Levin about your learning that Abbas al-Saidi had
18   smoked marijuana.
19          Do you recall that?
20   A.    That's correct.
21   Q.    And what's your understanding about whether or
22   not Abbas al-Saidi ever smoked marijuana while he was
23   working?
24   A.    On this --
25          MS. JHONES:  Your Honor, excuse me.  My only
```

```
 1    objection to that is basis of knowledge.  Lack of

 2    foundation.

 3              MS. ARANGO:  Judge, they asked these

 4    questions.

 5              THE COURT:  Overruled.

 6    BY MS. ARANGO:

 7    Q.    You may answer.

 8    A.    Could you repeat the question.

 9    Q.    Yes.

10          What was your understanding about whether or not

11    Abbas al-Saidi ever smoked marijuana while he was

12    working on this case?

13    A.    It's my understanding that he -- he did not while

14    working on this investigation, per conversations I

15    recall or statements made by him.

16    Q.    Well, did he ever appear to be incoherent or

17    under the influence in his recordings?

18    A.    No.

19    Q.    What effect, if any, did learning of his

20    marijuana use have on this investigation?

21    A.    It had very little impact, if any.

22    Q.    You were asked by Richard Houlihan, Naudimar

23    Herrera's attorney, a lot of questions about forensics.

24          Do you recall those questions?

25    A.    I do.
```

```
 1    Q.     And he asked you about fingerprints and DNA and

 2    those sorts of forensics type of investigative

 3    technique.  Correct?

 4    A.     Yes.

 5    Q.     Now, when you're trying to determine what

 6    somebody's intentions are, what forensics do you rely

 7    on?

 8    A.     With respect to --

 9           MS. JHONES:  Your Honor, this is going to be a

10    704(b) --

11           THE COURT:  Sustained.

12           Rephrase your question.

13    BY MS. ARANGO:

14    Q.     I think you testified that you were trying to

15    determine at the beginning of this investigation

16    whether or not -- you know, you were trying to

17    determine what Narseal Batiste and the Defendants had

18    intended.

19           MS. JHONES:  Same objection, your Honor.  Same

20    objection.  Improper question.

21           THE COURT:  Sustained.

22           Rephrase your question.

23    BY MR. ARANGO:

24    Q.     I think your testimony was that you were trying

25    to determine Narseal Batiste's intentions at the
```

 1    beginning of this investigation.

 2         Do you recall that?

 3              MS. JHONES:  Same objection, your Honor.

 4              THE COURT:  Overruled.

 5              THE WITNESS:  Yes, I do.

 6    BY MS. ARANGO:

 7    Q.    I think you also testified about the use of

 8    undercover recordings in order to make those

 9    determinations.

10    A.    Yes.

11    Q.    Would those be considered the forensic --

12              MR. VEREEN:  Objection.  Leading.

13              THE COURT:  Sustained.

14              Rephrase your question.

15    BY MS. ARANGO:

16    Q.    So what type of investigative techniques relative

17    to forensics do you use to determine somebody's

18    intentions?

19              MS. JHONES:  Your Honor, again, objection.

20    And it mischaracterizes -- my understanding of the

21    question was with respect to investigative techniques,

22    your Honor.

23              THE COURT:  Overruled.

24              THE WITNESS:  Undercover or secret recordings,

25    which, in my experience, is one of the most effective

```
 1   ways to gather evidence of that kind.

 2   BY MS. ARANGO:

 3   Q.     You were also asked by Mr. Houlihan about the

 4   search of the Embassy.

 5          Do you recall that?

 6   A.     I do.

 7   Q.     What was the date of the search?

 8   A.     June 22nd.

 9   Q.     And was that date after Elie Assaad's cover was

10   blown?

11          MS. JHONES:  Your Honor, objection.  Calls for

12   a conclusion.

13          MS. ARANGO:  He's testified about what had

14   occurred in this investigation, Judge.

15          THE COURT:  I --

16          MS. JHONES:  Your Honor, I would remind the

17   Court as to the Court's ruling on the 4-19

18   conversation.

19          THE COURT:  Overruled.

20          THE WITNESS:  Yes, I did.

21   BY MS. ARANGO:

22   Q.     Was that also after the wiretapped conversation

23   on April 21st between Narseal Batiste and Minerva

24   Vasquez that we heard and played for the jury where --

25          MS. JHONES:  Objection.  Leading.
```

```
 1              THE COURT:  Sustained.

 2   BY MS. ARANGO:

 3   Q.    Do you recall the conversation between Minerva

 4   Vasquez, who was referred to as the Queen, and Narseal

 5   Batiste on April 21st in which Minerva Vasquez tells

 6   Narseal Batiste to stay away from the guy at the

 7   warehouse?

 8   A.    Yes.

 9   Q.    Did the search of the Embassy occur after that

10   conversation?

11   A.    It did.

12   Q.    Do you know whether any evidences was removed or

13   destroyed prior to that search?

14              MS. JHONES:  Objection.  Assumes facts not in

15   evidence, your Honor.

16              THE COURT:  Sustained.

17              Lay your predicate.

18   BY MS. ARANGO:

19   Q.    Do you know whether anything was done -- my

20   question is do you know -- I'm not assuming anything --

21   do you know whether --

22              MS. JHONES:  Your Honor, good-faith basis.

23   The prosecutor has to set forth a good-faith basis for

24   that question, your Honor.

25              THE COURT:  Come on up.
```

```
 1              (Whereupon, proceedings were had at side-bar

 2    outside the presence of the jury which have been sealed

 3    per instructions of the Court.)

 4              (Whereupon, the following proceedings were had

 5    in open court:)

 6              THE COURT:  The objection is sustained.

 7              The jury is instructed to disregard the last

 8    question.

 9              Ask your next question.

10    BY MS. ARANGO:

11    Q.    Do you recall questions by Mr. Casuso about the

12    pawning of the videocamera that was given by Elie

13    Assaad to Narseal Batiste?

14    A.    I do.

15    Q.    Did that pawning occur after --

16              MR. VEREEN:  Objection.  Leading.

17              THE COURT:  Sustained.

18              Rephrase your question.

19    BY MS. ARANGO:

20    Q.    When did the pawing of the videocamera occur in

21    relation to significant events in this investigation?

22              MS. JHONES:  Objection to the

23    characterization -- form of the question.

24              THE COURT:  Overruled.

25              THE WITNESS:  After the Sultan Kahn-Bey trial
```

```
 1   on April 17th and before the -- before the arrest on

 2   June 22nd.

 3   BY MS. ARANGO:

 4   Q.    Now, Mr. Clark asked you questions about phone

 5   calls that Abbas al-Saidi had made to Faisal Hassan.

 6         Do you recall those questions?

 7   A.    Yes.

 8   Q.    Now, who introduced Abbas al-Saidi to Narseal

 9   Batiste?

10   A.    Faisal Hassan.

11   Q.    Now, was it within his -- Abbas al-Saidi's

12   directions to mention Faisal Hassan to Narseal Batiste?

13   A.    Yes.

14   Q.    And why is that?

15   A.    Because at the beginning of the investigation --

16         MS. JHONES:  Objection, if he's going to

17   testify about hearsay, your Honor.

18         THE COURT:  Sustained.

19         Rephrase your question.

20   BY MS. ARANGO:

21   Q.    Well, did Abbas ever use references to Faisal as

22   a way to further his communications with Narseal

23   Batiste?

24         MS. JHONES:  Objection.  It calls for hearsay.

25         THE COURT:  Overruled.
```

1              THE WITNESS:  Yes.

2    BY MS. ARANGO:

3    Q.     Was that within the scope of his direction?

4    A.     Yes.

5    Q.     You were also asked by both Mr. Clark and

6    Mr. Casuso about whether you considered Narseal Batiste

7    to be scamming Al-Qaeda for money.

8              Do you recall those questions?

9    A.     Yes.

10   Q.     Did you consider whether or not Narseal Batiste

11   was trying to scam Al-Qaeda for money?

12   A.     No.

13   Q.     And why is that?

14   A.     Because his actions were inconsistent with a

15   scam.  What I mean by that is the pictures that were

16   requested to be taken of the FBI office that was going

17   to be blown up in this plot -- Al-Qaeda plot were

18   actually taken and provided.

19             Had those pictures -- had the disc that was

20   provided to Elie not contained any pictures or

21   contained pictures of buildings other than the FBI

22   office or federal buildings, that would have -- we

23   would have taken that into consideration as a possible

24   scam.  But that's not what occurred.

25   Q.     Given your experience as a terrorism agent, would

 1   photographs of buildings such as the FBI building and

 2   federal buildings have been of value to Al-Qaeda?

 3          MR. VEREEN:  Objection to the form of that

 4   question, Judge.  It clearly calls for speculation.

 5          THE COURT:  Overruled.

 6          THE WITNESS:  Yes.

 7   BY MS. ARANGO:

 8   Q.    And so, since the photographs of value were

 9   actually provided, could there have been a scam going

10   on?

11          MR. CLARK:  Objection.

12          MS. JHONES:  Your Honor, objection.

13          MR. CLARK:  704(b).

14          MS. JHONES:  704(b), and I reserve a motion.

15          MS. ARANGO:  Judge, this is in direct response

16   to questions --

17          THE COURT:  Overruled.

18          THE WITNESS:  No.  There were -- no.  The

19   answer is "no" because what was requested was actually

20   provided.

21          Also, the financing of Sultan Kahn-Bey to come

22   down here was also something else that was taken into

23   consideration with regard to Narseal agreeing to set up

24   a meeting between Elie and Sultan Kahn-Bey.

25          He could have introduced someone else that

```
 1    represent himself as Sultan Kahn-Bey or never
 2    facilitated the transportation of Sultan Kahn-Bey down
 3    to Miami.
 4    BY MS. ARANGO:
 5    Q.    Now, Mr. Casuso asked you about entrapment.
 6          Do you recall that?
 7    A.    Yes.
 8    Q.    Do you know what entrapment is?
 9    A.    I do.
10    Q.    What is it?
11          MS. JHONES:  Your Honor, my only objection to
12    that is that it calls for a legal conclusion.
13          THE COURT:  Sustained.
14          Rephrase your question.
15    BY MS. ARANGO:
16    Q.    Do you recall Louie Casuso asking you about
17    entrapment?
18    A.    Yes.
19    Q.    What's your understanding about what entrapment
20    is?
21          MR. VEREEN:  Same objection, Judge.
22          THE COURT:  Overruled.
23          THE WITNESS:  My understanding of entrapment,
24    which -- which is something that's considered when
25    you're working in an undercover capacity, is the
```

```
 1   enticement of someone to commit a crime that they are

 2   not predisposed to commit.

 3   BY MS. ARANGO:

 4   Q.    Explain to the members of the jury what

 5   "predisposed" means.

 6   A.    Predisposition is a standard that is --

 7           MS. JHONES:  Your Honor, objection.  We're

 8   getting into legal conclusions at this point.

 9           THE COURT:  Sustained.

10           MS. ARANGO:  You're right.

11           I'll rephrase, Judge.  She's right.

12   BY MS. ARANGO:

13   Q.    What is your understanding when you said that --

14   you said "predisposed."

15         What's your understanding of what "predisposed"

16   means?

17   A.    "Predisposed" is someone that is engaged in

18   activity or has expressed a desire to commit a certain

19   crime, for example, an individual who has discussed

20   with other individuals their desire to rob a bank.

21         It would be well within our investigative

22   activities to introduce people and gather evidence of

23   that crime, which is the bank robbery.

24         It would be entrapment if individuals --

25           MS. JHONES:  Objection.  Objection as to that
```

 1    conclusion, your Honor.

 2           THE COURT:  Sustained as to the remainder of

 3    the answer.

 4    BY MS. ARANGO:

 5    Q.    Is entrapment and predisposition -- your

 6    understanding of what entrapment and predisposition

 7    are -- is that something you take into consideration in

 8    any of your investigations?

 9    A.    In all of the investigations that involve some

10    sort of proactive measure where you're going to have

11    personnel meeting in an undercover capacity.

12    Q.    And how was that taken into consideration, if at

13    all, in this investigation?

14    A.    It's taken into consideration by way of allowing

15    the -- or directing the undercover personnel to engage

16    in conversations based on the information that

17    initiated the investigation.

18           So, in this case, the information that we

19    received resulted in Abbas given directions to engage

20    Narseal Batiste in the conversations that he initially

21    reported on.

22    Q.    Now, Mr. Casuso also asked you about the fact

23    that Narseal Batiste didn't need a lawyer because he

24    said he was already being represented by the Public

25    Defender's Office in the state court case for which he

```
 1   asked for $1,000 for the lawyer.

 2   A.    Yes.

 3   Q.    Do you recall any wire conversations between

 4   Narseal Batiste and Patrick Abraham regarding their

 5   need to hire a lawyer?

 6   A.    Yes, I do.

 7   Q.    Okay.  Let me refer you to a call that is not in

 8   evidence at this time, Judge.

 9         MS. JHONES:  And just for the Government's --

10   so the Government is aware, I have no objection with

11   that call coming into evidence, if they want to

12   introduce it.

13         MS. ARANGO:  Okay.  That's fine.

14         Then, I will move it into evidence and we'll

15   play a portion of it.

16         MS. JHONES:  And for purposes of -- if I may

17   just have a -- if I may just speak with the prosecutor

18   for a second.

19         THE COURT:  Well, I think we're going to start

20   with that tomorrow morning.

21         MS. ARANGO:  Okay.

22         THE COURT:  Do not discuss this case either

23   amongst yourselves or with anyone else.  Have no

24   contact whatsoever with anyone associated with the

25   trial.  Do not read, listen or see anything touching on
```

1    this matter in any way.

2         If anyone should try to talk to you about this

3    case, you should immediately instruct them to stop and

4    report it to my staff.

5         You may leave your binders at your chairs.

6    Please give your notebooks to the court security

7    officer.  I will see you tomorrow morning, 9:00.  Enjoy

8    your well-deserved evening.

9         (Whereupon, the jury exited the courtroom at

10   5:12 p.m. and the following proceedings were had:)

11        THE COURT:  We're in recess until tomorrow

12   morning, 9:00.

13        (End of proceedings.)

14

15             C E R T I F I C A T E

16

17        I hereby certify that the foregoing is an

18   accurate transcription of the proceedings in the

19   above-entitled matter.

20

21

22   _____        /s/Lisa Edwards_____
          DATE           LISA EDWARDS, CRR, RMR
23                       Official United States Court Reporter
                         400 North Miami Avenue, Twelfth Floor
24                       Miami, Florida 33128
                         (305) 523-5499

25