```
 1                   UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                 CASE NO. 06-20373-CRIMINAL-LENARD
 3

 4   UNITED STATES OF AMERICA,        Miami, Florida

 5                  Plaintiff,        March 5, 2009

 6           vs.                      9:19 a.m. to 5:17 p.m.

 7   NARSEAL BATISTE, et al.,         Volume XIX

 8             Defendants.        Pages 1 to 267
     ---------------------------------------------------------
 9

10                            JURY TRIAL
11           BEFORE THE HONORABLE JOAN A. LENARD,
                  UNITED STATES DISTRICT JUDGE
12

13

14   APPEARANCES:

15

16   FOR THE GOVERNMENT:      RICHARD D. GREGORIE, ESQ., and
                              JACQUELINE M. ARANGO, ESQ.
17                            ASSISTANT UNITED STATES ATTORNEYS
                              99 Northeast Fourth Street
18                            Miami, Florida 33132

19
     FOR THE DEFENDANT        ANA MARIA JHONES, ESQ.
20     NARSEAL BATISTE:       300 Seville Avenue, Suite 210
                              Coral Gables, Florida 33134
21

22   FOR THE DEFENDANT        ALBERT Z. LEVIN, ESQ.
       PATRICK ABRAHAM:       261 Northeast First Street
23                            Sixth Floor
                              Miami, Florida 33132
24

25
```

```
 1   FOR THE DEFENDANT      RODERICK D. VEREEN, ESQ.
       STANLEY PHANOR:      BRINKLEY, HENRYS & LEWIS
 2                          4770 Biscayne Boulevard
                            Suite 1200
 3                          Miami, Florida 33131

 4
     FOR THE DEFENDANT      RICHARD K. HOULIHAN, ESQ.
 5     NAUDIMAR HERRERA:    300 Aragon Avenue
                            Coral Gables, Florida 33134
 6

 7   FOR THE DEFENDANT      LOUIS CASUSO, ESQ.
       BURSON AUGUSTIN:     111 Northeast First Street
 8                          Suite 603
                            Miami, Florida 33132
 9

10   FOR THE DEFENDANT      NATHAN CLARK, ESQ.
      ROTSCHILD AUGUSTINE:  17639 South Dixie Highway
11                          Miami, Florida 33157

12
     REPORTED BY:           LISA EDWARDS, CRR, RMR
13                          Official Court Reporter
                            400 North Miami Avenue
14                          Twelfth Floor
                            Miami, Florida 33128
15                          (305) 523-5499

16

17

18

19

20

21

22

23

24

25
```

1                          I  N  D  E  X

2

3                                  Direct     Cross     Red.

4
   WITNESSES FOR THE GOVERNMENT:
5
   Anthony Velazquez                                      6
6
   Mick Coriolan                     21        54       107
7                                              61
                                               77
8                                              78
                                               84
9                                              85

10  Abbas al-Saidi                   117

11

12  EXHIBITS RECEIVED IN EVIDENCE:             PAGE

13  Government's Exhibit No. W2-01576           8
    Government's Exhibit Nos. 96 & 97         119
14  Government's Exhibit No. 144              121
    Government's Exhibit No. 98               144
15  Government's Exhibit No. 146              162
    Government's Exhibit Nos. 37, 37-A, 38,
16    39, 39-A, 40, 41, 41-A, 42, 42-A, 45,
      45-A, 46, 46-A, 46-B, 49, 49-A, 50,
17    50-A, 51, 51-A, 52, 52-A, 53, 54 &
      54-A                                    194
18  Government's Exhibit No. 99               196

19

20

21

22

23

24

25

1            THE COURT:  Good morning.

2            United States of America versus Narseal

3    Batiste, et al., Case No. 06-20373.

4            Counsel, state your appearances, please, for

5    the record.

6            MR. GREGORIE:  Good morning, your Honor.

7            Richard Gregorie on behalf of the United

8    States, your Honor.  Ms. Arango will be right back in.

9            MS. ARANGO:  I'm right here.

10           MR. GREGORIE:  Oh, she's here.

11           Jacqueline Arango and Richard Gregorie on

12   behalf of the United States.

13           MS. JHONES:  Good morning, your Honor.

14           Ana Jhones on behalf of Narseal Batiste, who

15   is present.

16           MR. LEVIN:  Good morning.

17           Albert Levin for Patrick Abraham.  He's

18   present.

19           MR. CASUSO:  Good morning, Judge.

20           Lou Casuso on behalf of Burson Augustin.  He's

21   present.

22           MR. CLARK:  Good morning, your Honor.

23           Nathan Clark for Rotschild Augustine, present.

24           MR. HOULIHAN:  Richard Houlihan with Naudimar

25   Herrera.

1            MR. VEREEN:  Good morning, Judge.

2            Roderick Vereen on behalf of Stanley Phanor,

3    who's present before the Court.

4            THE COURT:  All Defendants are present.

5            Let's bring in the jurors.

6            MR. LEVIN:  Your Honor, before you bring the

7    jury in, I had some motions --

8            THE COURT:  I don't want take them up now.

9            MR. LEVIN:  I was going to ask.  Whenever you

10   want to do it, that's fine.

11           THE COURT:  We can take them up later.

12           MR. LEVIN:  No problem.

13           (Whereupon, the jury entered the courtroom at

14   9:19 a.m. and the following proceedings were had:)

15           MS. JHONES:  Your Honor, may we have the

16   shades turned down?

17           THE COURT:  Sure.

18           MS. JHONES:  Thank you.

19           THE COURT:  Maybe halfway, Patricia.

20           MS. JHONES:  Thank you.

21           THE COURT:  You be may be seated.

22           You are still under oath, sir.

23           You may proceed, Ms. Arango.

24           MS. ARANGO:  Thank you.

25

```
 1                   CONTINUED REDIRECT EXAMINATION

 2    BY MS. ARANGO:

 3    Q.     Picking up where we left off yesterday afternoon,

 4    Agent Velazquez --

 5    A.     Yes, ma'am.

 6    Q.     -- now, Mr. Casuso asked you about the fact

 7    that -- what he said was Narseal Batiste didn't need a

 8    lawyer because he was being represented by the public

 9    defender.

10           Do you recall that?

11    A.     I do.

12    Q.     Claiming that his request for money from -- his

13    request for $1,000 to pay a lawyer of Elie Assaad was

14    all just a scam.

15           Do you recall that?

16    A.     I do.

17    Q.     All right.  Now, do you recall listening to a

18    wiretapped conversation between Narseal Batiste and

19    Patrick Abraham?

20    A.     Yes.

21    Q.     And the wiretapped conversation occurred on

22    March 20th of '06?

23           MS. JHONES:  Your Honor, my objection is to

24    the leading nature of the question.

25           THE COURT:  Sustained.
```

1          Rephrase your question.

2  BY MS. ARANGO:

3  Q.    Do you recall hearing any conversation between

4  Patrick Abraham and Narseal Batiste about the need for

5  a lawyer?

6  A.    Yes.

7  Q.    Now, let me reference you to a wiretapped call,

8  W2-01576.  We don't have a transcript for it.  I'm

9  going to show it to you and ask you if you recognize

10  it.

11          MS. ARANGO:  Judge, I believe there's no

12  objection to this.

13          MS. JHONES:  There is no objection.  And I do

14  have a transcript.

15          MS. ARANGO:  Oh, you do?

16          I haven't seen the transcript.  So we'll have

17  to take that up later.

18          MS. JHONES:  It was provided three weeks ago.

19          MS. ARANGO:  We'll take that up at a later

20  time.  I don't have a transcript.

21          THE COURT:  So you're moving this into

22  evidence?

23          MS. ARANGO:  Yes, I am, Judge.

24          MS. JHONES:  I have no objection, your Honor.

25  And I have no objection to the transcript either.

```
 1              THE COURT:  What's the number?

 2              MS. ARANGO:  Government's Exhibit W2-01576.

 3              Judge, may I hand up a revised exhibit list

 4   for you?

 5              THE COURT:  Okay.

 6              MS. ARANGO:  This exhibit is on the revised

 7   exhibit list.

 8              THE COURT:  Okay.  Thank you.

 9              MS. JHONES:  Your Honor, my request would be

10   for the Government, when it's convenient, to provide us

11   a copy of the revised list -- exhibit list.

12   BY MS. ARANGO:

13   Q.    Agent Velazquez, let me --

14              THE COURT:  One moment, please.

15              It will be admitted as Government's

16   Exhibit W2-01576.

17              (Whereupon, Government's Exhibit No. W2-01576

18   was entered into evidence.)

19   BY MS. ARANGO:

20   Q.    Agent Velazquez, what's the date of that

21   telephone call?

22   A.    March 20th, 2006.

23   Q.    When did Narseal Batiste first ask Elie Assaad

24   for money for the lawyer?

25              MS. JHONES:  Your Honor, lack of foundation.
```

```
 1    And, again, I objected to leading this witness as to

 2    the date.  The Government has just provided him the

 3    disc with the date on it, your Honor, and I object to

 4    that, the leading nature of these questions.

 5              THE COURT:  Overruled.

 6    BY MS. ARANGO:

 7    Q.    You may answer.

 8    A.    I'm uncertain as to the exact date that Elie

 9    asked -- I'm sorry -- that Narseal Batiste asked Elie

10    for money for a lawyer.

11    Q.    Do you recall what occurred on March 24th?

12    A.    Yes.

13    Q.    What happened?

14    A.    Narseal Batiste and Patrick Abraham took Elie to

15    a Best Buy to buy a memory card for the camera and

16    drove him by the FBI office.

17    Q.    And during that meeting, did any conversation

18    occur?

19    A.    Yes.

20    Q.    And was there any conversation regarding the need

21    for money?

22    A.    Yes.  There was a discussion about Narseal

23    Batiste needing money to pay for an attorney.

24    Q.    Okay.  Did he discuss also the date -- the court

25    date by which he would need the attorney -- need the
```

1   money for the attorney?

2   A.      I believe it was the 27th of March.

3   Q.      Was the 24th of March the first time that Narseal

4   Batiste mentioned to Elie Assaad his need for money for

5   a lawyer?

6   A.      As early as the 24th of March.  I'm uncertain

7   if -- there may be a conversation prior to the 24th,

8   but I know, on the 24th, there was a conversation about

9   the need for money for an attorney.

10  Q.      Was that -- how many days after this conversation

11  that we're going to play was that?

12  A.      Four days after this conversation.

13          MS. ARANGO:  At this time, I'd like to publish

14  this telephone call to the jury.

15          THE COURT:  You may.

16          (Whereupon, Government's Exhibit No. W2-01576

17  was published in open court.)

18  BY MS. ARANGO:

19  Q.      Agent Velazquez, did Narseal Batiste say, "We

20  have a public defender.  We don't need any money for a

21  lawyer"?

22  A.      No.

23  Q.      Now, in this conversation, did he tell Patrick

24  Abraham that the court date was on the 21st -- excuse

25  me -- the 27th of March?

1  A.    He did.

2  Q.    Was that consistent with what he had told Elie

3  Assaad?

4  A.    It is.

5  Q.    And was his request -- was his need -- expressed

6  need for money for the lawyer also conveyed to Elie

7  Assaad?

8  A.    Yes.

9  Q.    Now, let me go back for a moment.

10       I think you were asked about a book -- I believe

11 the defense called it a jihad book -- given by Abbas

12 al-Saidi to Narseal Batiste on November 21st of 2005.

13       Do you recall that?

14 A.    Yes.

15 Q.    Do you recall questions about this jihad book

16 that he brought and gave to him?

17 A.    Yes.

18 Q.    And, in fact, Narseal Batiste read from that book

19 in a portion of the meeting on November 21st?

20 A.    Yes.

21 Q.    Did Abbas al-Saidi give anything else to --

22 A.    I believe he gave him a prayer rug as well that

23 he brought back from New York.

24 Q.    When the Embassy was searched in June of '06, was

25 that jihad book or that prayer rug inside the Embassy?

Velazquez - REDIRECT - By Ms. Arango                12

```
 1   A.     I don't believe so.

 2   Q.     Now, Mr. Casuso asked you about whether you knew

 3   what Narseal Batiste told Burson Augustin about the

 4   March 16th oath-taking meeting before it occurred.

 5          Do you recall those series of conversations?

 6   A.     Yes.

 7   Q.     Or those series of questions?  Excuse me.

 8          Was Burson Augustin in the car with Narseal

 9   Batiste when they drove to the meeting and conducted

10   countersurveillance?

11   A.     Yes.

12   Q.     And did they walk into the warehouse together?

13   A.     They did.

14   Q.     Did they have anything in their hand?

15   A.     I recall there was some papers of some kind or --

16   I couldn't tell exactly what they had in their hands,

17   but there was something in their hands when they

18   entered the warehouse.

19   Q.     Let me just play a very brief clip for you of

20   when they walked into the warehouse.  That would be a

21   clip of Government's Exhibit 69-B.

22          (Whereupon, segments of Government's Exhibit

23   No. 69-B were published in open court.)

24   BY MS. ARANGO:

25   Q.     Who's that walking in?
```

1    A.      That's Narseal Batiste.

2            (Whereupon, segments of Government's Exhibit

3    No. 69-B were published in open court.)

4    BY MS. ARANGO:

5    Q.      And who's that that he's hugging now?

6    A.      That's Burson Augustin, I believe.

7    Q.      What did Narseal place on the desk?

8    A.      It appears it be a folder of some kind.

9    Q.      And what did Burson Augustin have in his hand?

10   A.      It appears to be a book.

11   Q.      Was that placed on the desk?

12   A.      Eventually, it is.  Yes.

13   Q.      Thank you.

14           Now, after everyone got to the warehouse, who

15   started this meeting?

16   A.      Narseal Batiste.

17   Q.      And what did he do?

18   A.      He began speaking in front of everyone.

19   Q.      Okay.  After Elie Assaad administered the

20   Al-Qaeda oath to the Defendants, what did Narseal

21   Batiste do?

22   A.      He did two things:  He read from his ministerial

23   license and then he led a prayer.

24   Q.      Would that have been consistent with the items

25   that were placed on the desk?

1    A.    Yes.

2    Q.    What, if anything, did the items on the desk

3    indicate to you in terms of preparation?

4          MS. JHONES:  Objection, your Honor.

5    Speculation.  And this witness is not able to identify

6    what items were on the desk.

7          THE COURT:  Sustained.

8    BY MS. ARANGO:

9    Q.    Did Narseal Batiste appear to be unprepared for

10   this meeting?

11   A.    No.  Not at all.

12   Q.    And did Burson Augustin appear to be unprepared

13   for this meeting?

14   A.    No.  Not at all.

15   Q.    Now, Mr. Levin asked you about the drive home,

16   where Patrick Abraham drove Elie Assaad home after this

17   meeting.

18   A.    Yes.

19   Q.    And he said that -- he said to you that Patrick

20   Abraham didn't say, "Hallelujah, I'm now a member of

21   Al-Qaeda.  Isn't this all great."

22         Do you recall that?

23   A.    I do.

24   Q.    Would that type of talk be consistent with

25   joining membership into Al-Qaeda?

1          MR. LEVIN:  Objection.  704 and vague.

2          MS. ARANGO:  Judge, he asked the question.

3          THE COURT:  Overruled.

4          THE WITNESS:  No.  I don't believe so.

5    BY MS. ARANGO:

6    Q.    Why is that?

7    A.    I think that Patrick Abraham's actions of not

8    speaking much is consistent with his behavior

9    throughout other recorded meetings, and I didn't expect

10   for him to express any excitement to Elie Assaad that

11   he had just formed an alliance or took an oath of

12   allegiance to Al-Qaeda.

13   Q.    Now, when Patrick Abraham and Elie Assaad walked

14   out of the warehouse, did the audio recording -- was

15   there -- did the -- where -- how did the audio

16   recording continue?  Just explain to the members of the

17   jury.

18          MS. JHONES:  Objection as to identification of

19   what audio the question references.

20          THE COURT:  Overruled.

21          THE WITNESS:  There were two things that

22   happened -- well, first of all, to answer your

23   question, Elie Assaad was wearing a body recorder.

24          When Elie Assaad left the warehouse with

25   Patrick Abraham, there were two things that happened.

1          The audio monitoring and recording and the

2     video monitoring and recording at the warehouse was

3     shut off because, at that time, we didn't have a court

4     order authorizing us to monitor those activities.

5          And so those two devices were shut off from

6     the monitoring room at the FBI office.

7     BY MS. ARANGO:

8     Q.    Now, did the audio recording that Elie Assaad was

9     wearing -- did that continue?

10    A.    That continued.

11          MS. ARANGO:  I'd like to play a brief clip at

12    the end of that meeting after -- as Batiste -- excuse

13    me -- as Patrick Abraham and Elie Assaad leave the

14    warehouse.  I'm going to also make reference to Page 98

15    of the transcript.

16          You may go ahead and play it.

17          (Whereupon, segments of Government's Exhibit

18    No. 69-B were published in open court.)

19          MS. ARANGO:  Can you just pause it for one

20    second.

21    BY MS. ARANGO:

22    Q.    Agent Velazquez, right here, the audio that you

23    hear:  Is that on Elie Assaad's body recorder?

24    A.    It is.

25    Q.    Is there a few seconds of the video in the

```
 1    warehouse, you know, while they leave?
 2    A.    Yes.
 3            MS. ARANGO:  Continue.
 4            (Whereupon, segments of Government's Exhibit
 5    No. 69-B published in open court.)
 6    BY MS. ARANGO:
 7    Q.    Agent Velazquez, what's your understanding of
 8    when Patrick Abraham says, "I said you never have
 9    believed in a man before like that.  You'd be -- you
10    made -- you made the right step this time" --
11            MR. LEVIN:  Objection to his understanding.
12            THE COURT:  Overruled.
13    BY MS. ARANGO:
14    Q.    -- and then further down -- I wanted to continue
15    that question -- "We don't -- we don't let nobody
16    down"?
17    A.    Basically, Patrick Abraham is reassuring Elie
18    that he made the right choice in putting his confidence
19    in Narseal Batiste and forming an alliance between
20    Al-Qaeda and Batiste's organization.
21    Q.    Now, both Mr. Casuso and Mr. Levin asked you,
22    "Wasn't this case just a lot of talk?"
23            Do you recall those questions?
24    A.    I do.
25    Q.    And, now, was there a lot of talk in this case?
```

```
 1   Was there a lot of conversations?

 2   A.    Yes.

 3   Q.    And were there hours, many of which have been

 4   played to this jury, of conversations between -- with

 5   the informants and Narseal Batiste and other members of

 6   this organization?

 7   A.    Yes.

 8         MS. JHONES:  Your Honor, I'm just going to

 9   have to lodge another objection to the continuing

10   leading nature of these questions.

11         THE COURT:  On what ground?

12         MS. JHONES:  Leading.

13         THE COURT:  Sustained.

14         Rephrase your question.

15   BY MS. ARANGO:

16   Q.    Now, what, if anything, did you do to see whether

17   the Defendants were willing to do more than just talk?

18         MS. JHONES:  Your Honor, 704(b).  Objection.

19         THE COURT:  Overruled.

20         THE WITNESS:  There were several significant

21   things that we did.

22         After --

23         MR. VEREEN:  Objection.  Calls for a

24   narrative.

25         THE COURT:  Overruled.
```

1         THE WITNESS:  After learning that Batiste

2    expressed a desire to form an alliance with Al-Qaeda,

3    we provided an opportunity for him to take an oath of

4    allegiance, which he did on March 10th.

5         After that, we then took -- we created an

6    opportunity for the other members of Batiste's

7    organization to take an oath -- to take the same oath

8    of allegiance at the warehouse, which they did.

9         There was then -- there was then an

10   opportunity presented to Batiste to allow anyone he so

11   chose to stay to listen to a message that Elie was

12   going to provide, and that message was that Al-Qaeda

13   was -- intended to blow up five FBI offices around the

14   country and needed assistance by way of acquiring photo

15   surveillance footage.

16        And Batiste and members -- and some members of

17   his organization, in fact, took --

18        MS. JHONES:  Objection as to the second -- the

19   answer, your Honor -- this part of the answer.  The

20   question was what -- that I objected to as well -- the

21   question was what was he -- the witness willing to do.

22   What was the witness doing -- let me just phrase my

23   objection more clearly, your Honor.  It's not very

24   articulate.

25        The original question was -- I don't have it

```
 1   on my realtime.  I apologize --

 2            MS. ARANGO:  The original question, Judge,

 3   was, "What did you do to see if the Defendants were

 4   willing to do more than just talk?"

 5            This witness is explaining about the

 6   opportunities that the FBI --

 7            MR. VEREEN:  Objection to the speaking --

 8            THE COURT:  I'm going to overrule the

 9   objection.

10            MS. JHONES:  Your Honor, may we have a brief

11   side-bar on this?

12            THE COURT:  No.

13            MS. JHONES:  Okay, your Honor.  I have to

14   reserve a motion.

15            THE COURT:  That's fine.

16   BY MS. ARANGO:

17   Q.    You may finish your answer, Agent Velazquez.

18   A.    I believe I was at the part where an opportunity

19   was provided to provide Al-Qaeda with photographs of a

20   building that Al-Qaeda intended to blow up.

21            And, in fact, those pictures were taken, as well

22   as video footage of other federal buildings, and

23   provided to Elie Assaad, who was representing himself

24   as a member of Al-Qaeda.

25   Q.    Was that just talk?
```

```
 1   A.     No.

 2          MS. ARANGO:  No further questions, Judge.

 3          THE COURT:  You may step down, sir.

 4          (Witness excused.)

 5          THE COURT:  Call your next witness.

 6          MR. GREGORIE:  The United States calls Mick

 7   Coriolan.

 8   Thereupon--

 9                      MICK CORIOLAN

10   was called as a witness by the Government and, having

11   been first duly sworn, testified as follows:

12          THE COURT REPORTER:  Please have a seat.  If

13   you could, sit as close to the microphone as you can.

14   Please state your name for the record and spell the

15   first and last name.

16          THE WITNESS:  Mick Coriolan.  M-i-c-k,

17   C-o-r-i-o-l-a-n.

18                    DIRECT EXAMINATION

19   BY MR. GREGORIE:

20   Q.     Mr. Coriolan, could you speak up so that folks

21   right at the back of this room can hear you.  Okay?

22   A.     Yes, sir.

23   Q.     Could you tell us how old you are.

24   A.     26.

25   Q.     And where were you born?
```

Coriolan - DIRECT - By Mr. Gregorie                22

```
 1   A.      Bacheville, Haiti.

 2   Q.      You've got to keep your voice up, now.

 3           Can you tell us when you came to the United

 4   States.

 5   A.      1994.

 6   Q.      And how far did you go in school?

 7   A.      Through high school.

 8   Q.      Did you go to high school in the United States?

 9   A.      Yeah.  I went to American.

10   Q.      When did you graduate from there?

11   A.      '99, 2000.

12   Q.      And what's your current immigration status?

13   A.      I'm a permanent resident.

14   Q.      Has anybody in the United States Government

15   promised you anything regarding your immigration

16   status?

17   A.      No.  Not at all.

18   Q.      Has anybody threatened you in any way regarding

19   your immigration status?

20   A.      No.

21           THE COURT:  Sir, you need to move up closer to

22   the microphone, please.

23           THE WITNESS:  No.

24   BY MR. GREGORIE:

25   Q.      Do you work for the US Government in any way?
```

1    A.    No.

2    Q.    Why are you here today?

3    A.    Because I guess I was subpoenaed to come here to

4    testify against -- I got a subpoena in the mail to come

5    to the court since the 27th.

6    Q.    You've got to keep your voice because we can't

7    hear you.  Okay?  Can you make yourself as loud as I

8    am?

9    A.    Yeah.  I try.

10          MS. JHONES:  I doubt that, your Honor.

11   BY MR. GREGORIE:

12   Q.    Now, sir, can you tell us, sir, where you were

13   living in 2004.

14   A.    In North Miami.

15   Q.    And were you married?

16   A.    No.  Not at the time.

17   Q.    In your spare time in 2005, did you go any

18   particular place?

19   A.    Many places.

20   Q.    Okay.  In your spare time and recreation, did you

21   recreate somewhere?

22   A.    I went to Oak Grove Park.

23   Q.    What was the name of it?

24   A.    Oak Grove Park.

25   Q.    Oak Grove Park?

1   A.      Yes, sir.

2   Q.      Can you tell us where that is.

3   A.      It's on 159th Street and 6th Avenue, North Miami.

4   Q.      What did -- did you do in Oak Grove Park?

5   A.      Work out at the park and jog around the park.

6   Q.      Okay.  Do you see anybody in the courtroom today

7   that you met in Oak Grove Park?

8   A.      Yes, sir.

9   Q.      Could you tell the Court and jury who you see

10  that you recognize.

11  A.      The brothers on this side of the room.

12  Q.      I can't hear you.

13  A.      The brothers that's on this side of the room.

14  Q.      The brothers that's on the side of the room?

15  A.      Yes, sir.

16  Q.      Do you know any of their names?

17  A.      Brother Naz and Brother Pat.

18  Q.      Brother Naz and Brother Pat?

19  A.      Yeah.

20  Q.      Can you tell the Court and jury where they're

21  seated, what they're wearing.

22  A.      Brother Naz with his hand and --

23  Q.      I can't hear you.

24  A.      Brother Naz is on this side, and Brother Pat is

25  next to Brother Naz.  The rest of them -- I don't know

 1   their names.  I don't know about names.

 2   Q.    Okay.  Can you tell us what Brother Naz is

 3   wearing.

 4   A.    Like a brown -- like a sweater -- long-sleeved

 5   sweater.

 6          MR. GREGORIE:  Your Honor, for the record, the

 7   witness has identified Defendant Narseal Batiste.

 8          THE COURT:  It will so reflect.

 9   BY MR. GREGORIE:

10   Q.    And how about Brother Pat?  Can you tell us

11   what --

12          MR. LEVIN:  We'll stipulate that this is

13   Brother Pat.

14   BY MR. GREGORIE:

15   Q.    The man sitting next to the man who was just

16   speaking:  Is that Brother Pat?

17   A.    Yes, sir.

18   Q.    Now, how did you meet those two gentlemen?

19   A.    By going to the park and working out.

20   Q.    This was in 2004?

21   A.    I believe so.

22   Q.    And what, if anything, did you do with those two

23   gentlemen in the park in 2004?

24   A.    We did multiple things in the park.  Like I say

25   in my testimony last year, I know Brother Naz real good

Coriolan - DIRECT - By Mr. Gregorie                    26

1   and we talk about everything and we practice martial

2   art and -- I mean, he's a good brother.  I talk to him.

3        I go by his house.  He come by my house, using my

4   computer when I'm not home.  He take me to the beach

5   with his family, talk about family with him because, at

6   the time, we was expecting a baby.

7        And then -- I mean, I know Brother Naz and -- not

8   too much.  But in the park we talk about religion stuff

9   and a lot of stuff.

10  Q.    Could you tell the jury, please, what sorts of

11  religion stuff you talked about with Brother Naz.

12  A.    It was not always based on religion.  We was

13  talking about everything in general.  But even though

14  we do martial art and all this about -- he always kind

15  of like the Koran, the black book, the Bible.  And like

16  I say, we talk about everything, each and everything.

17  I mean, everything -- politic and everything.

18  Q.    Well, what, if anything, did he tell you about

19  politics?

20  A.    Not just me.  Like everybody else.  Talking about

21  people in general, about politic, about what happened

22  on September 11 and -- I mean, things in general, not

23  just about one thing he talk about.

24  Q.    Could you tell us what he told you, please.

25  A.    Regarding, like -- I have so many conversations

1    about Brother Naz.  You have to refresh my mind, like,

2    regarding what.

3    Q.    Well, did he tell you about his beliefs or what

4    he thought ought to be happening in the world?

5    A.    I always think Brother Naz -- the way he seen

6    things was crazy.  But he's a good brother.  The way he

7    was coming from and stuff and -- I don't know.

8          Like the way he seen -- the way he seen about --

9    when we talk about politic, I just think it's a crazy

10   way, the way he talk about politic.  That's all I can

11   see it.

12   Q.    Well, what did you see that was crazy?  What did

13   he say to you that you believed was crazy?

14   A.    Throughout his good way, he always had -- like,

15   recruiting people to be with them and practice martial

16   art with them, do religion study, then politic and

17   about taking over and this and that, which I always

18   think, like, "Brother Naz, this is -- this is crazy,

19   man.  This can get you in real trouble, big trouble."

20   Q.    When you said "taking over," taking over what?

21   A.    Taking over America, taking over the country,

22   which is, like, like I said, crazy.  I always think

23   it's crazy.

24   Q.    What was crazy about that?

25   A.    About taking over and about the way his -- his

 1    way of seeing politic, in general.

 2    Q.    Now, you used the word recruit.  What do you mean

 3    by that?  You said he recruited people.

 4    A.    When I said recruiting people, Brother Naz is a

 5    good brother.  Brother Naz can talk people out of

 6    stuff, and Brother Naz is -- like, Brother Naz is a

 7    family man with four or five kids.

 8          And Brother Naz is really good in what he does;

 9    and people would give him all this time to listen to

10    him and -- like many of us does.  And I always be -- I

11    used to come Brother Naz and practice martial art --

12             THE COURT REPORTER:  Used to what?

13             THE WITNESS:  I used to practice martial art

14    with Brother Naz, and there would be a Bible study, go

15    by his house and -- I mean, that's a good brother, man,

16    like made bad decision.

17    BY MR. GREGORIE:

18    Q.    Were there any other people besides you that did

19    the same thing?  Any of your friends?

20    A.    Yeah.  My brother, Brother Craig, that stay in

21    New York now.

22    Q.    Did you ever talk to Craig about going to see

23    Brother Naz?

24    A.    Like I told Craig, Brother Naz is a good brother.

25    I don't mind going by Brother Naz.  But listen to what

1    he's saying about his view of politic -- because, come

2    on, a group of black dude --

3              MR. VEREEN:  Objection.

4              THE WITNESS:  -- in a house talking about

5    politic will get you in trouble.

6              THE COURT:  One moment, sir.

7              MR. VEREEN:  That's nonresponsive to the

8    question.

9              MR. GREGORIE:  It is, your Honor.

10             THE COURT:  Overruled.

11   BY MR. GREGORIE:

12   Q.    Go ahead.  Explain that again, please, sir.

13   A.    What was the question again?

14   Q.    My question was:  What did you tell Brother

15   Craig?  What did you tell your friend, Craig?

16   A.    Just to be careful with Brother Naz and the way

17   he have a little group of people and going by his

18   house, just to be careful, because he was, like, my

19   brother, like a friend of mine, just like Brother Naz.

20   Q.    Why did you tell him to be careful?  What were

21   you afraid of?

22   A.    Because I know what -- I can feel where Brother

23   Naz was coming from, the type of thing he wanted to do

24   and -- by gathering black men and youth and do boxing

25   and Bible study.  And I just tell my brother, "Be

1   careful, man," like -- I tell him be careful with

2   Brother Naz is telling him.

3   Q.    Be careful of what?

4   A.    Of being part of the group.  Of being part of,

5   like, fighting, talking about politic and every night

6   at Bible study.  I was like, "Be careful.  That shit

7   can get you in trouble.  Be careful.  Be real careful."

8   Q.    Fighting who?

9   A.    I mean fighting to take over, fighting the US.

10  Like I said, it's crazy.  I told my brother, "Be

11  careful with Brother Naz.  Brother, be careful what

12  he's saying."

13  Q.    Well, can you be more specific about fighting the

14  US?  Did he give you any details?

15  A.    I mean, he didn't give me no detail.  But from my

16  point of view, I can tell where he's coming from,

17  fighting the physical fight.

18  Q.    A physical fight?

19  A.    Right.

20  Q.    Are you talking about with your hands?  With

21  weapons?  What?

22  A.    Like I say, sir, I just think it's crazy the way

23  he was coming up with the whole idea.  I always think

24  it's crazy, like I'm saying right now.

25  Q.    And that was in 2004?

 1   A.     I don't recall the time.  I think so.  Yeah.

 2   Q.     Okay.  At some time after that, did you go

 3   looking for a job?

 4   A.     Yeah.  At a convenience store.

 5   Q.     Okay.  And where did you get the job?

 6   A.     At a 24-hour store, Al-Saidi Enterprises.

 7   Q.     Let me go back for just a second.

 8          When you say Brother Naz was talking to you about

 9   this stuff, was anybody there with him when you talked

10   to him about these things?

11          MS. JHONES:  Objection as to time period.

12          THE COURT:  Place it in time.

13   BY MR. GREGORIE:

14   Q.     Going back to the time in the park, was anybody

15   there?

16   A.     At the park?

17   Q.     Yes.

18   A.     Oh, many people.  Always people at the people,

19   people watching Brother Naz doing his --

20   Q.     Okay.  You identified --

21          THE COURT REPORTER:  I'm sorry.  I didn't hear

22   the answer.

23          Brother Naz doing his....

24          THE WITNESS:  Demonstration, like, practicing

25   martial art and....

1    BY MR. GREGORIE:

2    Q.    You identified a second individual in this

3    courtroom.   Correct?

4    A.    Yes, sir.

5    Q.    Was he there?  That's Pat.  Was he there when

6    you --

7           MR. LEVIN:  It's a leading question, your

8    Honor.

9    BY MR. GREGORIE:

10   Q.    Who was the second individual you identified in

11   this courtroom?

12   A.    Brother Pat.

13   Q.    Where was he during the time you had these

14   discussions with Brother Naz?

15   A.    I mean, most of the time with Brother Naz.

16   Q.    What was the relationship between Pat and Naz?

17   A.    From my point of view, Brother Naz -- Brother Naz

18   was, like, the man with the knowledge, the man that had

19   the place, like, for Brother Pat to stay and Brother

20   Pat was just with Brother Naz, his right-man hand

21   [sic], like, always with him.

22   Q.    Say that again.  His right what?

23   A.    His right-man hand.  He always with him.  You see

24   Brother Naz; you see Brother Pat.

25   Q.    His right-hand man?

Coriolan - DIRECT - By Mr. Gregorie                    33

```
 1   A.     Right.

 2   Q.     Now, sir, where did you get this job?

 3   A.     At a convenience store.

 4   Q.     What's the address of the convenience store, if

 5   you know it?

 6   A.     159th Street and 6th Avenue.

 7   Q.     Do you know who owned that store?

 8   A.     Abbas, at the time.

 9   Q.     Had you ever met Abbas before you went to the

10   store?

11   A.     Oh, no.  I met him through the store.

12   Q.     You met him through the store?

13   A.     Yeah.

14   Q.     And what was the name of the store, if you know

15   it?

16   A.     Al-Saidi Enterprises.

17   Q.     Al-Saidi Enterprises?

18   A.     Yeah.  Abbas last name.

19   Q.     That's Abbas's last name.

20          Do you know Brother Naz's last name?

21   A.     I only know -- like now I know it.  But before,

22   no.

23   Q.     Before, you didn't know it?

24   A.     Not at all.

25   Q.     How did you know him?
```

1   A.     I know Brother Naz is, like, a Muslim brother,

2   like, this peaceful brother that talk to young people

3   to the park.  And I say Brother Naz.  He call everybody

4   "brother" and people call him "brother."  I know him by

5   Brother Naz.

6   Q.     Okay.  Now, when you went to the store, what did

7   you do at the store?

8   A.     Oh, I work at the store.

9   Q.     Okay.  And who else worked there?

10  A.     At the time, was me, Mike, Malik and Abbas for

11  just a short period of time.

12  Q.     Okay.  And did anybody from the park come into

13  the store?  Anybody you met at Oak Grove Park ever come

14  into that store?

15  A.     It's like the store is, like, five, ten blocks

16  away.  Like everybody that's in the area come to the

17  store.

18  Q.     Okay.  And did Brother Naz ever come to the

19  store?

20  A.     Right.  Like numerous time.

21  Q.     Okay.  What did he do when he came to the store?

22  A.     Buying items.

23  Q.     I can't hear you, sir.

24  A.     Buying items.  He got little kids.  He come to

25  the store buying little candy and whatever.

1   Q.     Did you ever see him talk to anybody in the

2   store?

3   A.     He come with his brother.  I see him talking to

4   the owner of the store at the time, Brother Abbas.

5   Q.     Did you see him talking to Abbas?

6   A.     Right.

7   Q.     Did you ever hear any of the conversation?

8   A.     The same conversation he had with everybody else.

9   Q.     And what was that?

10  A.     About politic and religion.

11  Q.     The same things he said to you about politics and

12  religion?

13  A.     I mean, at the store -- I'm always working at the

14  store.  So I can't really tell what he talking about.

15  But most of the time, it's about religion and....

16  Q.     What kind of religion?

17  A.     I mean, with Abbas, it's about Islam.

18  Q.     Okay.  And do you know how many times -- how

19  often these conversations occurred between Abbas and

20  Brother Naz?

21  A.     Out of count.

22         THE COURT REPORTER:  Say that again, please,

23  sir.

24         THE WITNESS:  Out of count.  I -- so many

25  times I seen him talking.  Not just one time; not just

1    two time.

2          Brother Naz stay down the block from the

3    store, not even two block from the store, at the time.

4    And he just walked to the store.

5    BY MR. GREGORIE:

6    Q.    On a regular basis?

7    A.    Yeah.

8    Q.    Every day?

9    A.    Every day or every other day.

10   Q.    Okay.  Now, did there come a time when you saw

11   Brother Naz or Brother Pat outside the store after

12   you'd began working there?

13   A.    Brother Naz and Brother Pat?

14   Q.    Yes.

15   A.    Like, if you listen to the first thing I say in

16   the beginning, me and Brother Naz was good friend.  I

17   only see Brother Naz at the park.  I see Brother Naz

18   everywhere else.

19         Me and Brother Naz and my family go to the beach.

20   I go to Brother Naz house and cook.  If seen Brother

21   Naz, like -- if I want Brother Naz, I'm going to see

22   him.

23   Q.    Did there ever come a time when you had a

24   conversation with Brother Naz about Brother Pat?

25   A.    There comes a time when I went to the park when I

1    was by the monkey bar, because I seen Brother Pat

2    walking with a Bible.  I'm saying the Bible, but it was

3    a black book.  He was walking around the park and he

4    was going crazy, like, preaching to people, da, da, da,

5    da, da, da, da.

6         And I confront Brother Naz by the store or

7    something.  I say, "Brother Naz, you probably taught

8    Brother Pat too much because this dude is going crazy,

9    the way I see him in the park."

10        And he admitted it, like, "You not the only one

11   that told me" -- if I remember, "You're not the only

12   one that told me.  I just got to be easy on it."

13        Yeah.

14   Q.    And what did Brother Naz tell you about it when

15   you said Brother Pat is going crazy?

16   A.    He taught him too much, like --

17   Q.    Taught him too much?  I'm sorry.  I didn't

18   understand.

19   A.    Yeah.

20   Q.    Taught, t-a-u-g-h-t?

21   A.    Yeah.

22   Q.    When you said, "Taught him too much," what did

23   you mean?

24   A.    I mean about -- Brother Naz is a man with

25   knowledge, I can say.  I know Brother Naz.  And when he

```
 1   taught Brother -- Brother Pat, stay with the Koran, I

 2   mean, all the time.

 3   Q.    Now you've called it a Koran or a Bible.  Do you

 4   know what it was?

 5   A.    The Koran.  I mean, I say the Bible.  I refer to

 6   the Koran, because I'm not -- I'm not Moses --

 7   Q.    It was a religious book?

 8   A.    It was a religious book.

 9          MS. JHONES:  Your Honor, I'm going to object

10   to the leading nature of the question and interrupting

11   the witness.

12          THE COURT:  Sustained.

13          Rephrase your question.

14   BY MR. GREGORIE:

15   Q.    What type of book was it, sir?

16   A.    I'm not 100 percent sure if it was the Koran or

17   the Bible.  But it was a religious book.

18   Q.    Thank you, sir.

19          Now, sir, did there come a time when Abbas and

20   you had -- became friends?

21   A.    Oh, me and Abbas?  We was never friends.  We was,

22   like, associate.  I talk to Abbas, and we cool.

23          THE COURT REPORTER:  I'm sorry.  I didn't --

24          THE WITNESS:  Abbas was not really my friend.

25   Abbas was my associate.
```

```
 1   BY MR. GREGORIE:

 2   Q.     He worked at the store with you?

 3   A.     Yeah.

 4   Q.     Did you ever smoke marijuana?

 5   A.     Yeah.

 6   Q.     Do you still to this day smoke marijuana?

 7   A.     I smoke it, but I don't think it's something I'm

 8   proud of doing.  But, yeah, I do smoke marijuana.

 9   Q.     Did you ever at any time smoke it with Abbas?

10   A.     Yeah.

11   Q.     Where did you do that?

12   A.     Numerous places, like at my house.

13   Q.     And where did you get the marijuana from?

14   A.     Oh, come on.  Get it off the street.

15   Q.     On the street?

16   A.     Right.

17   Q.     Okay.  Did Abbas supply it to you or did you

18   supply it to him?

19   A.     It was -- I have it.  He have it or I have it.

20   Q.     Okay.  Now, what kind of hours did Abbas work in

21   the store?

22   A.     When I work at the store?

23   Q.     Yeah.

24   A.     Or before I started working?

25   Q.     Before you started working there.
```

```
 1          Did you go in --
 2    A.      Abbas run the store 24.
 3              THE COURT REPORTER:  I'm sorry?
 4              THE WITNESS:  At the time before I work at the
 5    store, Abbas run the store 24 hours.
 6    BY MR. GREGORIE:
 7    Q.      How did he do that, if you know?
 8    A.      Sleeping in the store.
 9    Q.      So he would sleep in the store and do what?
10    A.      Sleeping by the register.  People comes at night,
11    open the window, serve through the window, like 10:00
12    in the morning, open the door.
13    Q.      Okay.  And when he did that, was he dazed from
14    marijuana?  Was he a drug addict of any kind?
15              MS. JHONES:  Objection, your Honor.
16              THE WITNESS:  I --
17              THE COURT:  One second, sir.  There's an
18    objection.  I have to rule on it.
19              What's the ground?
20              MS. JHONES:  Objection as to speculation and
21    basis of knowledge, specifically as to the addict.
22              THE COURT:  Sustained.
23              Rephrase your question.
24    BY MR. GREGORIE:
25    Q.      As you viewed Brother Naz (verbatim), was he wide
```

 1   awake and able to deal with patrons who came in the

 2   store?

 3   A.     Excuse me?

 4          MR. VEREEN:  I think he made a mistake with

 5   regard to who the brother was, Judge.

 6          THE COURT:  You said Brother Naz.

 7          MR. GREGORIE:  I apologize.

 8          MR. VEREEN:  Abbas.

 9   BY MR. GREGORIE:

10   Q.     When you observed Abbas dealing in the store, how

11   did you perceive him?  What was his -- what was his

12   actions?

13          MR. LEVIN:  Could we have a time frame?

14          THE WITNESS:  Abbas?

15          THE COURT:  Overruled.

16   BY MR. GREGORIE:

17   Q.     Yes.  Abbas.

18   A.     Can you rephrase the question?  I don't

19   understand.

20   Q.     Yeah.  Was he sober?  Did you --

21          MR. VEREEN:  Objection.  Leading.

22          THE COURT:  Sustained.

23          Rephrase your question.

24   BY MR. GREGORIE:

25   Q.     How was his actions when you observed him

1    operating the store?

2    A.    I mean, normal.  Maybe I never seen him sober.

3    He was just normal.  That's the way he is.  I have no

4    knowledge if people are sober or not.  I can tell when

5    somebody drunk or -- not when they high, if they sober

6    or not.  I don't know.  He was normal to me.

7    Q.    He was normal?

8    A.    Yeah.

9    Q.    Okay.  Now, sir, did Abbas ever have any

10   protection in the store that you were aware of any

11   kind?

12         MS. JHONES:  Again, objection to the leading

13   nature of the question.

14         MR. GREGORIE:  I'll rephrase it, Judge.

15   BY MR. GREGORIE:

16   Q.    What, if any, protection did Abbas keep in the

17   store?

18   A.    I only seen one.

19   Q.    What was that?

20   A.    An AK.

21   Q.    An AK-47?

22   A.    Right.

23   Q.    Do you know where he got it from?

24   A.    I have no idea.

25   Q.    Okay.  And did you see where he put it or kept

1    it?

2    A.    He put it in the vault on top of the fridge where

3    he stocked the beers and the black garbage bag.

4    Q.    I'm not sure I understand what you told me.

5    You've got to speak up now.

6    A.    He stocked in the vault, like, where he put all

7    the beers, in the fridge -- the walk-through fridge,

8    the vault.  He put it on the top of it.

9    Q.    You said vault?

10   A.    Yeah.

11   Q.    And is that locked?

12   A.    Excuse me?

13   Q.    Is that locked?

14   A.    No.

15   Q.    Okay.  How do you get to it?

16   A.    I open it.

17   Q.    Is it a walk-in refrigerator?

18   A.    It's closed.  It has a door.  You just gotta open

19   the door.  But it's not locked, like, all the time.

20   It's open.

21   Q.    Okay.

22   A.    But nobody can just go to the back.  You has to

23   be an employee to go to the back.

24   Q.    How often did you see that weapon there?

25   A.    I only seen it once.

1   Q.     Do you know if Abbas ever got any other weapon of

2   any kind?

3   A.     Right.  A handgun.

4   Q.     How did he get that?

5   A.     I arranged a deal with somebody I know, and he

6   bought the gun from him, the handgun.

7   Q.     Are you a gun dealer?

8   A.     Oh, not at all.

9   Q.     So where did this person come from that you

10  arranged the deal for him to get a gun?

11  A.     At the store.

12  Q.     Okay.  And what kind of gun was that?

13  A.     It was a handgun.

14  Q.     Okay.  Did either those weapons, the AK or the

15  handgun, have anything to do with anybody in the

16  courtroom today?

17          MR. VEREEN:  Objection.

18          THE WITNESS:  No.  Not at all.

19          THE COURT:  Overruled.

20  BY MR. GREGORIE:

21  Q.     I'm sorry.  I can't hear you.

22  A.     Nothing I know of.  Because Brother Naz know

23  Abbas, and I don't know if something went down behind

24  my back.  I don't know.

25  Q.     Okay.  Did there ever come a time when Abbas was

Coriolan - DIRECT - By Mr. Gregorie                 45

```
 1   no longer in -- owning the store?
 2   A.     Yeah.
 3   Q.     What happened?
 4          MR. LEVIN:  Objection.  Calls for hearsay.
 5          THE WITNESS:  I --
 6          THE COURT:  Overruled.
 7          Sir, if there's an objection, you need to wait
 8   until I've ruled on it.  If I sustain the objection,
 9   you can't answer the question.  If I overrule the
10   objection, then you may answer.
11          I overruled the objection.  So you can answer.
12   BY MR. GREGORIE:
13   Q.     What happened, if you know?
14   A.     Repeat the question.
15   Q.     Yeah.
16          What happened that Abbas no longer ran the store?
17   A.     Oh, financial problems between him and Faisal and
18   Mike and Malik, between them.  I was just an employee.
19   I was not part owner of the store.  They had their own
20   personal problems going on.
21   Q.     Where did Abbas go, if you know?
22   A.     Went to New York.
23   Q.     Do you know where he went from there?
24   A.     Back to his home country, from what he told me.
25   Q.     Do you know what country that is?
```

```
 1   A.      Yemen.

 2            MS. JHONES:  Objection.  Calls for hearsay.

 3            THE COURT:  Sustained.

 4   BY MR. GREGORIE:

 5   Q.      Now, sir, did there come a time when Abbas came

 6   back in town after he left?

 7   A.      Yeah.  He came back to Miami.

 8   Q.      Okay.  Do you remember approximately when that

 9   was?

10   A.      Like a couple months after he left to Yemen.  I

11   think he spent like a month or two in Yemen and came

12   back.

13            MR. LEVIN:  Judge, could we get a time frame,

14   please?

15   BY MR. GREGORIE:

16   Q.      Can you tell us what month that was?

17   A.      I don't remember.

18   Q.      But it was after he left?

19            MR. LEVIN:  Objection.  Leading.

20            THE COURT:  Overruled.

21            THE WITNESS:  A month or two after he left to

22   Yemen, he came back.

23   BY MR. GREGORIE:

24   Q.      And was there some particular event that occurred

25   around the time that he came back?  Did something
```

```
 1   happen in Miami?

 2   A.    It was around a hurricane.

 3   Q.    Do you remember which hurricane that was?

 4   A.    At the time, we had two -- at the time, we had

 5   two hurricane back to back.  So I don't remember which

 6   one was it.  I mean, he left in the first hurricane.

 7   When he came back, it was still another hurricane.  So

 8   it was in the....

 9   Q.    And when he came back, did you see him?

10   A.    Yeah.

11   Q.    Without telling us what he said to you, can you

12   tell us if you did anything as a result of seeing him

13   when he came back?

14         I don't want you to tell me what Abbas said.  You

15   can't tell me what he said.  I just want to know what,

16   if anything, you did after you saw him when he came

17   back.

18   A.    I make sure that -- I told this girl that he's at

19   the hotel.  I told Brother Naz he wanted to see him.  I

20   made sure he got a GPS system.  I mean, me and

21   Brother -- me and Abbas are friend.

22             THE COURT REPORTER:  I'm sorry?

23             THE WITNESS:  Me and Abbas are friend.  When

24   he came back in town, he contact me.  He came by the

25   store.
```

```
 1   BY MR. GREGORIE:

 2   Q.    All right.  So he came by.

 3         And what did you do after he came by?  What --

 4   again, please tell us again what it is you did.

 5   A.    Oh, his ex-girlfriend say, "Abbas is at the

 6   hotel.  Go see him."  He's at the room, blah, blah,

 7   blah.

 8         I see Brother Naz.  I say, "Brother Naz, Abbas

 9   want to see you.  He's at the hotel."

10         THE COURT REPORTER:  I'm sorry.  Brother Naz

11   went to see you or want to see you?

12         THE WITNESS:  Oh, I seen Brother Naz.  And I

13   told Brother Naz that Abbas is at the hotel and wanted

14   to see him at the hotel --

15         THE COURT REPORTER:  Thank you.

16         THE WITNESS:  -- and whatever he wanted to get

17   done with at the time.

18   BY MR. GREGORIE:

19   Q.    Okay.  Now, sir, did there come a time when you

20   were working at the store that you saw something

21   unusual happen?

22   A.    Right.

23   Q.    Would you tell us how long after the time that

24   Abbas came back that this unusual thing happened.

25   A.    The unusual thing when Brother Naz came to the
```

1    store?

2    Q.     Yes.

3    A.     I think by the result of me telling Brother Naz

4    that -- Brother Naz that Abbas was looking for him and

5    Brother Naz -- Abbas was looking for comfort, like he

6    wanted somebody to be with him, because when he came

7    back from Yemen, you know, he lost the store --

8              MS. JHONES:  Objection.  Calls for hearsay.

9              THE COURT:  Sustained.

10             Ask your question.

11   BY MR. GREGORIE:

12   Q.     Would you tell us what happened at the store,

13   please, what you saw, what you observed.

14   A.     Well, I came to work and Brother Naz and these

15   other brothers was just, like, holding up the store, a

16   holdup, like they taking over the store.

17   Q.     Could you tell us where they were standing in the

18   store and what they were doing.

19   A.     When I walked in the store, Brother Naz had a

20   newspaper and he was pacing like real calm and all the

21   other brother was just standing, like.

22   Q.     By all the other brothers, who are you referring

23   to?

24   A.     I mean all of them that's there, the one with the

25   dreadlocks, Pat.

Coriolan - DIRECT - By Mr. Gregorie                    50

```
 1    Q.     I can't hear you.

 2    A.     The one with the dreadlocks, Pat.  I mean, I

 3    don't recall if the one in the red -- the one with the

 4    low cut was there, but the other.

 5    Q.     Okay.  And what were they doing?

 6    A.     They came to help Brother Abbas.

 7    Q.     Do what?

 8    A.     Because Abbas was not getting paid.  They came to

 9    take over the store with him to get paid.

10    Q.     Was there some sort of disturbance?

11           MS. JHONES:  Objection.  Leading.

12           THE COURT:  Sustained.

13           Rephrase your question.

14    BY MR. GREGORIE:

15    Q.     What, if anything, happened?

16    A.     If anything happened?

17    Q.     Yeah.

18           What, if anything, happened?

19    A.     Well, nothing had happened like a fight and

20    stuff, because Brother Naz talk to Abbas and Abbas

21    spoke to Mike and --

22           MS. JHONES:  Objection.  Calls for hearsay.

23           THE COURT:  Overruled.

24    BY MR. GREGORIE:

25    Q.     You can continue, sir.
```

1    A.    And Brother Naz was the leader, because Brother

2    Naz -- Brother Naz was doing all that for Abbas

3    because, when Abbas came back -- that's the reason

4    Abbas said, "If you see Brother Naz, tell him that I'm

5    looking for him."

6    Q.    Now, what happened?  Did they leave the store?

7    A.    Oh, yeah.  They left the store after Mike -- Mike

8    say something to Malik and Brother Naz reach over the

9    counter and --

10          THE COURT REPORTER:  I'm sorry?

11          THE WITNESS:  Brother Naz reach over the

12   counter, because Malik was already behind the counter.

13   I'm on the other side with all the brothers, standing

14   out the store --

15          THE COURT REPORTER:  Standing outside the

16   store?  Just tell me what you said.

17          THE WITNESS:  I'm on the side -- Brother Naz

18   is pacing front of the store, against -- behind -- not

19   the front of the counter.  All the brothers is in each

20   corner of the store, like.

21   BY MR. GREGORIE:

22   Q.    And how were they standing?

23   A.    Like -- I would say they standing, like -- they

24   with Brother Naz.  He just make the rules.  And the

25   brothers just standing there, waiting for him.

```
 1   Q.     Okay.  And what happened?  You were about to tell
 2   us what happened.  What happened?
 3   A.     So we didn't take him seriously and stuff.  We
 4   was just laughing, like, "What the hell they doing?"
 5          And Brother Naz went over the counter and told
 6   Malik, "Those brother don't 'F' around," I mean, real
 7   calm, not talking loud.
 8   Q.     You've got to tell us loud enough so we can all
 9   hear.
10          What did Brother Naz say?
11   A.     He reach over the counter and he told Malik,
12   "Those brother don't 'F' around.  They're the jihad."
13          And Malik went, like, "What the hell you telling
14   me is the jihad, man?"
15          He kept telling me about da, da, da, da, da, and
16   he start talking Arabic to Abbas, da, da, da.
17          And Malik -- Abbas says, "He doesn't mind.  Talk
18   to Brother Naz."
19          So Abbas speak to Brother Naz and Brother Naz
20   went like (snaps fingers) and all the brothers line up
21   and they march out the store.
22   Q.     Okay.  You snapped your fingers.
23          Did Brother Naz do that?
24   A.     I believe so.  Yes.
25   Q.     Okay.  Could you explain that again.  I lost you
```

 1   in some of that.

 2            MR. LEVIN:  Objection to the prosecutor

 3   commenting on his inability to follow the testimony.

 4            THE COURT:  Sustained.  Sustained.

 5            Rephrase your question.

 6   BY MR. GREGORIE:

 7   Q.    Could you explain it again to us, slowly, please,

 8   sir.

 9   A.    We didn't -- we was not taking them seriously in

10   the store when they came.  I don't know what they was

11   talking about before I came in the store.

12         And Brother Naz reach over the counter and told

13   Malik, "Those brothers don't 'F' around," like,

14   "They're the jihad."

15         And later he snapped his fingers; and then the

16   brothers got in line and march out the store.

17   Q.    Who snapped his fingers?

18   A.    Brother Naz.

19   Q.    And did the others follow Naz out of the store?

20   A.    Yeah.

21   Q.    Okay.

22            MR. GREGORIE:  May I have one moment, your

23   Honor?

24            THE COURT:  Yes.

25            (Discussion held off the record amongst

```
 1   counsel.)
 2           MR. GREGORIE:  I have nothing further, your
 3   Honor.
 4           THE COURT:  Ms. Jhones.
 5           MS. JHONES:  Thank you, your Honor.
 6                      CROSS-EXAMINATION
 7   BY MS. JHONES:
 8   Q.    Mr. Coriolan, how old are you?
 9   A.    26.
10   Q.    26?
11   A.    Yes, ma'am.
12   Q.    You're married?
13   A.    Yes, ma'am.
14   Q.    And I believe your wife is in the courtroom?
15   A.    Yeah.
16   Q.    Okay.  And you have some children?
17   A.    Three.
18   Q.    And in 2004, sir, how many kids did you have?
19   A.    One.
20   Q.    One child.
21         And that's when you met Mr. -- how do you call
22   him?  Brother Naz?
23   A.    Mr. who?
24           MS. JHONES:  Narseal, stand up.
25           DEFENDANT BATISTE:  (Complies.)
```

```
 1   BY MS. JHONES:

 2   Q.     This is Brother Naz.  Right?

 3   A.     Yeah.  That's Brother Naz.

 4   Q.     And you met him in 2004?

 5   A.     Yes.

 6   Q.     And you said you met him at the park?

 7   A.     Yes.

 8   Q.     You told the ladies and gentlemen of the jury,

 9   when you met him, Brother Naz would preach to you?

10   A.     Not just me, like, in particular, but --

11   Q.     Everybody?

12   A.     Right.

13   Q.     As a matter of fact, sir, in -- we're talking

14   about the Oak Grove Park; are we not?

15   A.     Yes.

16   Q.     That's that really big park that has a lot of

17   trees and a couple of lakes?

18   A.     Yes.

19   Q.     There are a lot of people that sit around

20   preaching.  There are a lot of preaching groups; are

21   there not?

22   A.     Yes, ma'am.

23   Q.     And you've been going there because that's where

24   you basically hang out?

25   A.     That's where I go and work out.  Not my hang-out
```

1   spot.

2   Q.    Okay.  By working out, you mean jogging, physical

3   activity?

4   A.    Yes, ma'am.

5   Q.    You do that because you want to stay in shape.

6   Right?

7   A.    Yes, ma'am.

8   Q.    Not because he told you to do it.  Right?

9   A.    Not at all.

10  Q.    You do that on your own free will?

11  A.    Yes, ma'am.

12  Q.    What he told you was -- he tried to show you some

13  martial arts, didn't he?

14  A.    Right.

15  Q.    He was showing martial arts to other kids in the

16  park as well?

17  A.    Right.

18  Q.    And, Mr. Coriolan -- am I pronouncing your last

19  name correctly?

20  A.    Go ahead.  Go ahead.

21  Q.    Is that the right way to pronounce it?

22  A.    Nobody ever pronounce it right, so whatever.

23  Q.    Okay.  So I'll continue to mispronounce it.  All

24  righty.

25        And in the park -- your wife would go with you,

```
1    also?

2    A.    Yeah.  Sometime.

3    Q.    Well, sometimes you and your wife had problems,

4    didn't you?

5    A.    What kind of problems you talking about?

6    Q.    Well, you and your wife were having problems

7    during the time period that you met Mr. Batiste.

8    A.    Relationship always got ups and down.

9    Q.    And I understand that.  That's perfectly fine.

10   A.    Right.

11   Q.    But the answer is "yes," you and your wife were

12   having problems?

13   A.    I don't recall.  It's been like four years.  We

14   been having problems every day, like every other day.

15   Q.    Join the club.

16   A.    Yeah.

17   Q.    All righty.  And Mr. Batiste talked to you about

18   trying to make up with your wife?

19   A.    We never had no problem.  But Brother Naz always

20   trying to lead me in the right path.  I never say

21   otherwise.

22   Q.    And there came a time when your wife got pregnant

23   again.  Correct?

24   A.    Oh.  You know that?  Yeah.

25   Q.    I know a lot of things, Mr. Coriolan.
```

Coriolan - CROSS - By Ms. Jhones                    58

```
 1         And when your wife was pregnant again, you
 2   started having some problems, didn't you?
 3   A.    I was having problems?
 4   Q.    With your wife.
 5   A.    I don't know.  Brother Naz is like -- he was like
 6   a counselor, a 'hood counselor.  I was not having
 7   problems.  If I had any problem, I tell Brother Naz
 8   and --
 9   Q.    Well, let me see if I can refresh your memory.
10         When your wife -- one of the times that your wife
11   was pregnant, around 2004 or 2005 -- and you correct me
12   if I'm wrong -- you basically wanted to hang out in
13   South Beach and party.
14   A.    Oh.
15   Q.    Do you remember that?
16   A.    I been doing this since -- since -- since I moved
17   to Miami.  The Beach, the party, doesn't have nothing
18   to do with it.
19   Q.    You are a partying type of guy?
20   A.    Oh, you want to say that?  Yeah.
21   Q.    Right?
22         And Brother Naz would tell you, you know, "Mick,
23   stay home.  Your wife is pregnant."
24   A.    Right.
25   Q.    You know, "You have to be a family man."
```

Coriolan - CROSS - By Ms. Jhones                    59

```
 1   A.      Right.

 2   Q.      He was trying to get you and your wife to get

 3   back together.

 4   A.      Oh, we never broke up.  We never had problem like

 5   that.

 6   Q.      While your wife was pregnant, you're basically

 7   going out on South Beach and having a good time.

 8   A.      At the time, I work in the club and I had

 9   multiple jobs and I go to the beach and do promoting

10   and stuff.  I was actually in the Beach.  I loved the

11   Beach.

12   Q.      Right.

13           And you had family responsibilities at home --

14   A.      That didn't have nothing to do with it because I

15   was making money on the Beach, bringing it to my

16   family.

17   Q.      Brother Naz was reminding you of your family

18   responsibilities, sir.

19   A.      I never say no others.  Brother Naz is a good

20   brother.  I'm not saying that right now.

21   Q.      Now, you said something, sir, that Brother Naz

22   was recruiting.  Right?

23   A.      Yeah.

24   Q.      Is that your word, sir?

25   A.      Oh, maybe it's another words, like -- another
```

Coriolan - CROSS - By Ms. Jhones                    60

 1   words I can phrase it.  But I --

 2   Q.    Why don't you tell me about -- why don't you tell

 3   me about what your understanding of recruiting is.

 4   A.    Oh, when I say "recruiting," like, helping

 5   brothers gets on the right path.  And, like I say,

 6   Brother Naz had the brothers staying with him.  I don't

 7   know all the words I can say, recruiting people.

 8   Q.    Did you see Brother Naz ever shoot anybody?

 9   A.    Oh, I never seen that.

10   Q.    Besides, sir, Brother Naz working out in the

11   park --

12   A.    Right.

13   Q.    -- besides Brother Naz preaching in the park --

14   A.    Right.

15   Q.    -- besides Brother Naz expressing his opinion

16   about politics --

17   A.    All day.

18   Q.    -- did you ever see Brother Naz do anything else,

19   sir?

20   A.    Oh, no.  He's a good family man.

21           MS. JHONES:  Thank you very much, sir.

22           THE WITNESS:  Thank you.

23           THE COURT:  Mr. Vereen.

24

25

1                        CROSS-EXAMINATION

2     BY MR. VEREEN:

3     Q.     Mr. Coriolan, good morning.

4     A.     Hello.

5     Q.     I have just a few questions for you.

6            Your testimony was that you and Abbas al-Saidi

7     smoked marijuana together.  Correct?

8     A.     Yeah.  We smoked.

9     Q.     And either you would supply the marijuana or he

10    would supply the marijuana.  Correct?

11    A.     Like I say, it's not something I did and I'm

12    proud of.  Y'all keep on bringing this up like

13    marijuana is a big issue to the case right now.

14    Q.     My question again -- and see if you can

15    understand my question.

16    A.     Yeah.  I understand your question.

17    Q.     Let me ask my question, sir.

18           Your testimony was that either you would supply

19    the marijuana or he would supply the marijuana.  Is

20    that correct?

21    A.     Yes, sir.

22    Q.     All right.  And you said you smoked marijuana at

23    several different places.  Correct?

24    A.     Oh, we didn't have a specific spot that we smoked

25    marijuana, like a bar and stuff.  But....

```
 1   Q.    You would smoke marijuana over at his apartment
 2   that he had.  Correct?
 3   A.    Abbas?  Yes.
 4   Q.    All right.  And that apartment was located where?
 5   A.    Down the block from the store.
 6   Q.    Down the block from the store.
 7         What store are you talking about?
 8   A.    His store.
 9   Q.    And what year are we talking about?
10   A.    '04, '05.
11   Q.    '04 or '05?
12   A.    Yeah.
13   Q.    And he was staying -- now, you had testified
14   earlier that he was living inside of the store.
15   Correct?
16   A.    Yeah.
17   Q.    All right.  So this was after he had gotten an
18   apartment.  Correct?
19   A.    A month later, when Mike and Malik came from
20   New York, Abbas got an apartment down the block -- two
21   blocks away.
22   Q.    Who was he staying with?
23   A.    Shorty, Mike and Malik.
24   Q.    Shorty?
25   A.    Yeah.  A little short Arabic dude that work at
```

```
 1   the store.  They call him Shorty.  I can never

 2   pronounce his name.

 3   Q.    Okay.  So he had roommates?

 4   A.    Yeah.  Coworker.  Yeah.

 5   Q.    When was the last time, if you recall, that you

 6   smoked marijuana with Abbas?

 7   A.    Oh, man.  I ain't seen Abbas in a long time.

 8   Q.    So do you know when it was?

 9   A.    I say -- I ain't seen Abbas in a long time.

10   Q.    Did you ever visit Abbas when he was residing in

11   a hotel?

12   A.    Sure.

13   Q.    All right.  When he came back from Yemen, he had

14   asked you to tell Narseal Batiste that he was back in

15   town.  Correct?

16   A.    Right.

17   Q.    And he had asked you to tell Narseal to come to

18   his apartment -- excuse me -- to his hotel room where

19   he was residing.  Correct?

20   A.    Correct.

21   Q.    And you had gone over there before to see

22   Abbas al-Saidi.  Correct?

23   A.    Yeah.

24   Q.    All right.  And you don't know how it was that

25   Abbas al-Saidi obtained that hotel room, do you?
```

```
 1    A.      No.  Not at all, sir.

 2    Q.      And you had smoked marijuana with Abbas al-Saidi

 3    in that same hotel room?

 4    A.      Yeah.

 5    Q.      On that occasion, do you recall who provided the

 6    marijuana?

 7    A.      Oh, I probably provided it because he said just

 8    came from New York.

 9    Q.      Okay.  He had just came from New York?

10    A.      Yeah.  When he was at the hotel?

11    Q.      Yeah.

12    A.      Yeah.  He had just came from -- from out of town.

13    I don't know.  He probably would have been somewhere.

14    Q.      You don't know if he was in Yemen or --

15    A.      Abbas is a liar.  I don't know.  Abbas could be

16    anywhere.  Abbas is a liar.  Abbas could be anywhere.

17    Q.      Abbas is a liar?

18    A.      Yeah.

19    Q.      That's your impression of Abbas?

20    A.      I mean, that's what I seen of Abbas.

21    Q.      All right, sir.  And why do you say that he's a

22    liar?

23    A.      I mean, because I don't trust his words.  He

24    could have been anywhere.  He could have been in Miami,

25    in -- I mean, I don't know where he was at the time.
```

Coriolan - CROSS - By Mr. Vereen                    65

 1   Q.    What made you say to this jury that Abbas

 2   al-Saidi is a liar?

 3   A.    Because he actually knew where -- where he went,

 4   like, he was just coming from New York.  I don't know.

 5   Abbas is a liar.  I don't know.

 6         He probably could have been anywhere.  He could

 7   have been -- he could have been in North Miami with me

 8   and I don't see him and stuff.

 9   Q.    So he told you that he just came from New York?

10   A.    Yeah.

11   Q.    Okay.  Let's talk about this AK-47.

12   A.    Yeah.

13   Q.    This was a firearm, a rifle.  Correct?

14   A.    Right.

15   Q.    Have you ever handled that firearm while -- that

16   rifle while it was in the store?

17   A.    No.

18   Q.    It had an obliterated serial number on it, didn't

19   it?

20   A.    Oh, I don't know.  I didn't see it that much.  I

21   don't know nothing about AKs.

22   Q.    But he kept this AK-47, I believe, in the

23   freezer?

24   A.    Right.

25   Q.    And this AK-47 ended up disappearing; did it not?

1   A.     That's something Abbas could answer you.

2   Q.     Well, you don't know?

3   A.     Like I say, it's something Abbas can answer.  I

4   don't know.

5   Q.     Well, when Abbas left to go to New York or to

6   Yemen or wherever it was he went, he left the firearm

7   or that weapon inside of the store.  Correct?

8   A.     The firearm was disappeared the same night he

9   came in the store with it.

10          And Malik was like, "Abbas, get this thing out

11   the store, man.  We Arab.  If anything happen, we can

12   get in big trouble.  Get this out the store."

13          And I ain't look for it --

14              THE COURT REPORTER:  I did not --

15              THE WITNESS:  I did not look for it the next

16   day, if it was still inside the store.

17   BY MR. VEREEN:

18   Q.     Okay.

19   A.     It probably was hidden somewhere, but I don't

20   know.  It was not in my sight.

21   Q.     But there came a point in time where Abbas asked

22   you to arrange the purchase of a firearm.  Correct?

23   A.     Yeah.

24   Q.     Now, you are not a licensed gun dealer, are you?

25   A.     No.  Not at all.

1   Q.    And your status in this country is what?  Are you

2   a resident or a citizen?

3   A.    I'm not a resident.  I'm a permanent resident.

4   Q.    You're a permanent resident?

5   A.    Yeah.  I'm not a citizen.

6   Q.    And you decided to assist him with the purchase

7   of a firearm.  Correct?

8   A.    Yeah.

9   Q.    And you contacted a gentleman by the name of

10  Mike; did you not?

11  A.    Mike?

12  Q.    Who was the person that sold the firearm?

13  A.    I don't remember his name.

14  Q.    Well, how did you arrange the deal?

15  A.    He came to the store and -- because, at the time,

16  Mike -- Abbas had left the store.  Abbas was no longer

17  at the store.

18        So the guy came to the store, offer the gun, and

19  then I arranged the business between him and Abbas.

20  And Abbas came the next day and bought the gun from

21  him.

22  Q.    So the gun was sold at the store to Abbas?

23  A.    He came and offered the gun at the store, that he

24  had the gun for sale.

25  Q.    And where did you all go to get the gun?

```
 1   A.     Oh, down the block, 159th Street.  The guy met

 2   with Abbas and made the deal.

 3   Q.     Do you know how much Abbas purchased the firearm

 4   for?

 5   A.     I don't remember.

 6   Q.     And you said Malik is -- was also an Arab?

 7   A.     Yeah.

 8   Q.     Okay.  That's a term you used.  Correct?

 9   A.     Arabic, like, Arab, Muslim.

10   Q.     I understand.

11   A.     Right.

12   Q.     But that was a term you used?

13   A.     Yeah.  It's the term I used.

14   Q.     And your testimony was that Malik said to Abbas,

15   "We're Arab.  Get this gun out of the store."  Correct?

16   A.     "Get this gun out the store.  Do you know so many

17   trouble we can get ourself into just to have this gun

18   in the store?"

19   Q.     Like deported?

20   A.     Not deported.  Like the FBI and guns and all

21   that.  He didn't want to deal with that.

22   Q.     Well, were you still at the store one day when

23   ICE agents came to arrest Abbas?

24   A.     Oh, never.  I never heard that.

25   Q.     You were not -- you worked at that store.  Right?
```

```
 1   A.      Yeah.  But it was -- they arrest Abbas?  No.

 2   Q.      Were you ever there when federal agents came to

 3   the store?

 4   A.      No.

 5   Q.      Now, you were never charged with brokering that

 6   illegal gun transaction, were you?

 7   A.      No.

 8   Q.      Was that an arrangement you had with the

 9   US Attorney's Office?

10   A.      Oh, not at all.

11   Q.      No?

12   A.      No.  Not at all.

13   Q.      How was it that you came to their attention, if

14   you know?

15   A.      I believe Abbas and -- and I don't know.  I

16   believe Brother Naz, too.  And I don't know.  I don't

17   know how my name got brought up in this thing.

18   Q.      Who was it that contacted you and said they

19   needed to speak to you from the Federal Government?

20   A.      John Stewart from the FBI office.  I thought he

21   was my friend, cracking joke on the phone.

22   Q.      So he contacted you and he tells what you?

23   A.      Oh, "This is John Stewart from the FBI office.  I

24   need to talk to you."

25           And I was like, "Jason, don't play."
```

Coriolan - CROSS - By Mr. Vereen                    70

1           And he was like, "Sir, I'm not playing.  I'm down

2    the block from you."

3           I said, "You're down the block from me?"

4           He said, "Yeah."

5           I said, "You where I'm at."

6           He said, "Yeah.  I know where you're at.  You're

7    on 142nd.

8           And I got so shook, I told him, "I'm on 152nd.

9    Come see me right now."

10          And that's it.

11   Q.    So what happens?

12   A.    They pull up in the parking lot.  And I believe

13   the gentleman on the side, dark-skinned brother, pulled

14   out the badge and the one, this guy with the glasses --

15   they both pull out their badges.

16          At the time, I didn't even care about their

17   badge.  It's just the FBI come to see me.  I got to

18   tell them everything I know.  That's how I got myself

19   in trouble.

20          So at the time, it was, like, "Damn."

21          They got me in the car.  They started showing me

22   pictures.

23          "What -- this is Brother Naz?

24          "Yeah.  That's him.  That's him.  That's him.

25   Yeah."

```
 1          There was many people that I know.

 2          And he was like, "You tell us what you know about

 3     these people."

 4          And I say -- I was just telling them anything I

 5     know.

 6     Q.    So you were sitting in the car with the agents?

 7     A.    Right.

 8     Q.    At that time, had they told you that you were

 9     under arrest?

10     A.    No.  Not at all.

11     Q.    Were you inside of the store at the time?

12     A.    Excuse me?

13     Q.    Were you at the store at the time?

14     A.    No.  I said I was in my apartment when he called

15     me in the morning.  I was not at the store.

16     Q.    And so they tell you, if you don't want to get

17     yourself in trouble, to come with them?

18              MR. GREGORIE:  Objection, your Honor.

19              THE WITNESS:  They never said I was going to

20     get myself in trouble.

21              THE COURT:  One moment.

22              MR. GREGORIE:  Objection, your Honor.

23              THE COURT:  Sustained.

24     BY MR. VEREEN:

25     Q.    Well, what was it that was said to you to get you
```

```
 1   to leave out of your apartment?

 2   A.    FBI come to see me.  I gotta go outside and see

 3   them right now.

 4   Q.    Who told you that?

 5   A.    The gentleman on the phone.  Because when I

 6   called back the number he left --

 7   Q.    There are four gentlemen seated -- sitting here.

 8   A.    Next to the lady in the red.

 9         MR. GREGORIE:  Objection, your Honor.  There

10   are only three gentlemen sitting there.

11         MR. VEREEN:  I'm sorry.  Three gentlemen and

12   two women, then.

13   BY MR. VEREEN:

14   Q.    So the --

15         MR. GREGORIE:  Your Honor, I object to this.

16   It's irrelevant.

17         THE COURT:  Sustained.

18   BY MR. VEREEN:

19   Q.    You described a situation at the store where you

20   stated that several of the brothers had -- were

21   standing inside of the store, you say in the corners --

22   each one in a corner of the store.

23         Do you recall that?

24   A.    Yeah.

25   Q.    And you said that Brother Naz, as you referred to
```

```
 1    Mr. Batiste -- you say he reached over the counter
 2    and -- but then he said something.
 3         When he reached over the counter, what are you
 4    saying he was doing?
 5    A.    Oh, Brother Naz was real calm.  He had the
 6    newspaper in the hands.
 7    Q.    When you said he reached over the counter and
 8    then he said something, what was he doing when you say
 9    he reached over the counter?
10    A.    I mean, that's the store.  And he go over the
11    counter and told Malik, "Those brothers, they don't 'F'
12    around.  Those brothers jihad."
13         And Malik was in this side of the counter.  I
14    don't think he even did anything.  He just reached over
15    and he just....
16    Q.    So he says so Brother Malik -- he doesn't grab
17    Brother Malik.  Right?
18    A.    Oh, not at all.  Not at all.
19    Q.    So when you say he reached over, you're saying he
20    leaned over the counter?
21    A.    Leaned over.  That's the word.
22    Q.    He leaned over the counter?
23    A.    Right.
24    Q.    And he says to Brother Malik, "These guys don't
25    'F' around"?
```

```
 1   A.     Yeah.

 2   Q.     "They're jihad"?

 3   A.     Yeah.

 4   Q.     Uh-huh.

 5          That "They are jihad"?

 6   A.     Yeah.

 7   Q.     Do you know what jihad is?

 8   A.     I don't know.

 9          But Malik told me, "Man.  This is, like, holy

10   war."

11          I've learned about this afterward.  But I ain't

12   knew then what he meant by that.

13   Q.     You learned about what afterwards?

14   A.     What the jihad meant.

15   Q.     Who told you that?

16   A.     When I work with the -- I work with Malik and

17   Mike, I ask what jihad is.  And they told me what it

18   is.

19   Q.     When did you ask them that?

20   A.     Excuse me?

21   Q.     When did you ask Malik and Mike --

22   A.     After he left the store.  Like right after he

23   left the store, because then he got really mad, like he

24   offended him or something.  And when they left the

25   store, I asked Malik.
```

1          MR. VEREEN:  I have no further questions of

2   this witness, Judge.  Thank you.

3          THE COURT:  We're going to take a break.

4          Do not discuss this case either amongst

5   yourselves or with anyone else.  Have no contact

6   whatsoever with anyone associated with the trial.  Do

7   not read, listen or see anything touching on this

8   matter in any way.

9          If anyone should try to talk to you about this

10  case, you should immediately instruct them to stop and

11  report it to my staff.

12         You may leave your materials at your chairs.

13  Please be back in the jury room in ten minutes.

14         (Whereupon, the jury exited the courtroom at

15  10:40 a.m. and the following proceedings were had:)

16         THE COURT:  You may be seated for a moment.

17         Sir, we're going to take a ten-minute recess.

18  Then you need to come back.  You are not to discuss

19  your testimony with anyone or permit anyone to discuss

20  it with you.  Do you understand?

21         THE WITNESS:  Yes, ma'am.

22         THE COURT:  Ten minutes.  We're in recess for

23  ten.

24         (Thereupon a recess was taken, after which the

25  following proceedings were had:)

1          THE COURT:  We're back on United States of

2     America versus Narseal Batiste, et al., Case

3     No. 06-20373.

4          Counsel, state your appearances, please, for

5     the record.

6          MR. GREGORIE:  Richard Gregorie and Jacqueline

7     Arango on behalf of the United States, your Honor.

8          MS. JHONES:  Good morning, your Honor.

9          Ana Jhones on behalf of Narseal Batiste, who's

10    present.

11         MR. LEVIN:  Albert Levin on behalf of Patrick

12    Abraham, who's present.

13         MR. CASUSO:  Lou Casuso on behalf of Burson

14    Augustin, who's present.

15         MR. CLARK:  Nathan Clark for Rotschild

16    Augustine, who's present.

17         MR. HOULIHAN:  Richard Houlihan with Naudimar

18    Herrera.

19         MR. VEREEN:  And Rod Vereen on behalf of

20    Stanley Phanor, who's present.

21         THE COURT:  All Defendants are present.

22         Let's bring in the jurors.

23         (Whereupon, the jury entered the courtroom at

24    11:04 a.m. and the following proceedings were had:)

25         THE COURT:  You may be seated.

```
 1              You are still under oath, sir.

 2              You may proceed, Mr. Houlihan.

 3              MR. HOULIHAN:  May it please the Court.

 4              Good morning.

 5              THE JURY:  Good morning.

 6                         CROSS-EXAMINATION

 7   BY MR. HOULIHAN:

 8   Q.    Sir, I just have a couple of questions.  Okay?

 9   A.    Uh-huh.

10   Q.    What is the correct pronounce of your name?

11   A.    "Coriolan."

12   Q.    Okay.  I see.

13   A.    Yeah.

14   Q.    Moving on, the second question:  Referring to the

15   incident you described in the store --

16   A.    Uh-huh.

17   Q.    -- you just ended with it -- but with snapping

18   fingers and there's other people there.  Okay?

19   A.    Right.

20             MR. HOULIHAN:  Judge, could I ask Naudimar to

21   stand up?

22             THE COURT:  Okay.

23             DEFENDANT HERRERA:  (Complies.)

24   BY MR. HOULIHAN:

25   Q.    That's Naudimar, my client.
```

1    A.      Right.

2    Q.      Was he there?

3    A.      I remember seeing other brothers, but I'm not

4    100 percent sure that this brother was there.

5    Q.      Okay.  So, in other words, you've seen him

6    before, but you don't know --

7    A.      Oh, I have seen him before many times.

8    Q.      But on that day you don't recall whether he was

9    there or not?

10   A.      I'm not gonna say to the jury right now that I

11   remember 100 percent that I have seen him at the store

12   that day.

13   Q.      Okay.  Fair enough.  Thank you.

14   A.      All right.

15           MR. HOULIHAN:  That's all.

16           THE COURT:  Mr. Clark.

17                       CROSS-EXAMINATION

18   BY MR. CLARK:

19   Q.      Good morning.

20   A.      Good morning, sir.

21   Q.      Now, this event that you were talking about --

22   this was sometime around the hurricane?

23   A.      Excuse me?

24   Q.      Was this sometime after the hurricane or around

25   the hurricane?

```
 1              MR. GREGORIE:  Objection, your Honor.  Which

 2    event?

 3              THE COURT:  Sustained.

 4              Rephrase your question.

 5    BY MR. CLARK:

 6    Q.    The event that you testified to in the store.

 7    A.    If it was not around a hurricane, it was, like, a

 8    weeks or two after hurricane.  Because, like I say,

 9    Abbas had just came from New York.

10    Q.    Okay.  All right.  So this was in '05.  Right?

11    Do you know what year it was?

12    A.    I don't recall the year.  But if you say '05....

13    Q.    Approximately.

14    A.    Right.

15    Q.    At this time, how long had you been working at

16    the store?

17    A.    Like five months, six months.

18    Q.    And who owned the store at that time?

19    A.    Faisal owned the store.

20    Q.    Faisal owned the store?

21    A.    Right.

22    Q.    And did you work for Al-Saidi Enterprises?

23    A.    The thing is complicated, who I worked for at the

24    store at the time.

25              Abbas was owner of the store and names on the
```

1   paper and everything.  But the store was -- I was

2   working for Mike.  I was getting paid from -- Mike was

3   paying me.  So....

4   Q.    Whose name was the store in?

5   A.    Abbas al-Saidi .

6   Q.    Okay.  And had -- on the day that -- when this

7   event at the store took place, had Mr. Faisal Hassan

8   sold the store to someone?

9   A.    I don't know what they have going on.  But Mike

10  and Malik took over the store.  But Faisal would

11  constantly come to the store every week or every other

12  week.  I don't know the deal they had.

13  Q.    So did -- was Abbas working at the store at that

14  time?

15  A.    When he came with the brothers --

16          MR. GREGORIE:  Objection, your Honor.  At what

17  time?

18          THE COURT:  Sustained.

19          Rephrase your question.

20  BY MR. CLARK:

21  Q.    At the time that this incident took place at the

22  store --

23  A.    Oh, when the brothers came to the store?

24  Q.    Yes, sir.

25  A.    Oh, no.  Brother Abbas was no longer work at the

Coriolan - CROSS - By Mr. Clark                          81

```
 1   store.  That's why he came to the store with the
 2   brothers.
 3   Q.    Okay.  Now, before this incident, did you ever
 4   work with Abbas at the store?
 5   A.    No.
 6   Q.    Do you know if Abbas ever got paid for working at
 7   the store?
 8   A.    That's between him and Faisal.  I don't know.
 9   Q.    You never saw him get -- you got paid.  Correct?
10   A.    I told you I was working for Mike.
11   Q.    Okay.  And you got paid in cash.  Right?
12   A.    Yeah.
13   Q.    Okay.  This money that you got paid in cash, you
14   did not report this money on your income tax return?
15   A.    Pay the income tax?  I plan on doing it.
16   Q.    You plan on doing it?
17   A.    Yeah.
18   Q.    You haven't done it yet, though?
19   A.    Oh, income tax I haven't done yet.  Me and my
20   wife are gonna take care of that.
21   Q.    Now, Mr. -- at the time that this -- the store
22   had been sold.  Correct?
23   A.    I have no idea.
24   Q.    Well, did you understand that Mr. Abbas was
25   expecting a settlement from Hassan?
```

1    A.    If you say so.

2    Q.    Well, do you -- I'm asking you.

3          He was expecting a settlement, correct, from the

4    sale of the store?

5    A.    I don't know.

6    Q.    Well, do you remember testifying in this case

7    before?

8    A.    Yes.

9    Q.    And you remember previously testifying in this

10   case before.  Correct?

11   A.    Right.  Last year.

12   Q.    All right.  And do you remember testifying that

13   "He was waiting for money from -- Faisal to give him

14   the money from, because Mike and Malik had bought the

15   store at the time"?

16   A.    Right.

17   Q.    Do you remember saying that?

18   A.    Yeah.  That's all I got from Abbas.  But, like I

19   say, I don't trust what Abbas say.  Therefore, I don't

20   know.

21   Q.    Well, you understood that he was getting a

22   settlement at the time.  Correct?

23          MR. GREGORIE:  Objection, your Honor.

24          THE COURT:  Sustained.

25          Rephrase your question.

```
 1   BY MR. CLARK:

 2   Q.    And do you know who arranged this incident at the

 3   store?

 4   A.    Excuse me?

 5   Q.    Do you know who arranged the incident at the

 6   store?

 7   A.    Who arranged what -- the incident at the store?

 8   Brother Naz and Abbas.

 9   Q.    And you didn't take it seriously?

10   A.    No.  Not at all.

11   Q.    Okay.  And you were laughing about it.  Correct?

12   A.    Yeah.

13   Q.    And was Abbas trying to get money out of Faisal

14   at the time from the store?

15         MR. GREGORIE:  Objection, your Honor.  Calls

16   for a conclusion.

17         THE COURT:  Sustained.

18   BY MR. CLARK:

19   Q.    You didn't know what jihad was at that time, did

20   you?

21   A.    Not at all.

22   Q.    You had never heard of it?

23   A.    No.

24         MR. CLARK:  No further questions, your Honor.

25         THE COURT:  Mr. Casuso?
```

```
 1              MR. CASUSO:  Judge, can I ask him from here?
 2   I just have a couple of questions.
 3              THE COURT:  Sure.
 4                        CROSS-EXAMINATION
 5   BY MR. CASUSO:
 6   Q.    Whereabouts was this hotel at that Abbas was
 7   staying at?
 8   A.    Excuse me?
 9   Q.    Where was the hotel at?
10   A.    Off the 826.
11   Q.    Did Abbas ever brag to you that he had a rich
12   uncle in the Middle East?
13   A.    No.  I didn't know that.
14   Q.    He never said anything like that?
15   A.    No.
16   Q.    Okay.  And you testified that it was Abbas who
17   reached out for Brother Naz, right, to go see him at
18   the hotel?
19   A.    Oh, yeah.
20   Q.    That's what happened?
21   A.    Yeah.  Abbas told me to tell Brother Naz come see
22   him at the hotel.
23   Q.    Okay.
24              MR. CASUSO:  That's all.  Thank you.
25              THE COURT:  Mr. Levin?
```

 1            MR. LEVIN:  Yes.  May it please the Court.

 2            Good morning, ladies and gentlemen.

 3            THE JURY:  Good morning.

 4                      CROSS-EXAMINATION

 5   BY MR. LEVIN:

 6   Q.    Good morning, Mr. Coriolan.

 7   A.    Good morning.

 8   Q.    That was close.  Right?

 9   A.    Yeah.  You got it.

10   Q.    Now, you've indicated that you've testified with

11   regard to some of these matters previously.  Correct?

12   A.    Yeah.

13   Q.    Okay.  And you've met -- you've had occasion to

14   meet with these people seated over here.  Correct?

15   A.    Of course.

16   Q.    You met with them, would you say, five times

17   prior to your testimony?

18   A.    I run out of count.

19   Q.    You've run out of count?

20   A.    Yeah.

21   Q.    Meaning it could be like 10 times at this point?

22   A.    Could be, like, 20.

23   Q.    Like 20 times?

24   A.    Yeah.

25   Q.    They've asked you a lot of questions about what

1    you know about this situation.  Right?

2    A.    Right.

3    Q.    Now, when you testified today, you said that

4    Brother Pat was Mr. Batiste's "right-man hand."

5          Do you remember that?

6    A.    Yeah.

7    Q.    You never said that last year, did you?

8    A.    Oh, maybe -- maybe last year you wasn't asking

9    the questions the same way and this year I answered

10   different.  But there's no lying what I said.  That's

11   his best friend.  I thought you said it different this

12   year.

13   Q.    But you never said he was his "right-man hand"

14   before.

15         You mean "right-hand man," though.  Right?

16   A.    I mean, that's his man, that's his friend, that's

17   his homeboy, that's his partner.  He always with him.

18   Q.    He what?

19   A.    He always with him.  You don't see Brother Naz

20   without him.

21   Q.    You used to see them at the Oak Grove Park?

22   A.    Yeah.

23   Q.    And you would see him only at the Oak Grove Park

24   and the store.  Isn't that correct, sir?

25   A.    No.  Not just at the Oak Grove Park and the

```
 1   store.  I know Brother Naz before I met Abbas.  Brother
 2   Naz -- I did -- I did numerous things with Brother Naz.
 3           THE COURT REPORTER:  Okay.  I didn't --
 4           THE WITNESS:  I did many things with Brother
 5   Naz.  We went to the Beach.  We went like -- not just
 6   the store.
 7   BY MR. LEVIN:
 8   Q.    I'm not talking -- let me just stop for a second.
 9         I'm not talking about Brother Naz.  I'm talking
10   about Patrick Abraham.
11   A.    Oh, Pat?
12   Q.    Right.
13   A.    Yeah.  He cool.
14   Q.    We appreciate that.
15   A.    Yeah.
16   Q.    You used to see him at the park.  Correct?
17   A.    Yeah.
18   Q.    You saw him at the store.  Correct?
19   A.    At the store.
20   Q.    Can you tell the ladies and gentlemen of the
21   jury, you know, approximately when you saw him at the
22   park and when you saw him at the store.
23   A.    Oh, I can't even go back in time.  Many time I
24   see him at the park, at the store, at Brother Naz
25   house, in the van, in the parking lot, in the street.
```

Coriolan - CROSS - By Mr. Levin                    88

```
 1   Come on.  He stayed down the block from me.  I seen him
 2   every day.
 3   Q.    You saw Brother Pat every day?
 4   A.    Not every day.  Every other day.
 5   Q.    Now, you've talked about some marijuana that you
 6   used to smoke.  Correct?
 7   A.    Right.
 8   Q.    You're not proud of that fact, obviously?
 9   A.    Not at all.
10   Q.    Basically, you smoke marijuana practically daily.
11   Isn't that true, sir?
12   A.    I'm not saying -- it's not something I'm proud
13   of.  I feel like you been bringing this thing up just
14   to humiliate me, like.
15   Q.    The agents would bring that up to you?
16   A.    Excuse me?
17   Q.    Did you just say the agents would bring that up
18   to you?
19   A.    No agent.  No.  I say you try to put me down,
20   talking about marijuana issue.
21   Q.    I'm not judging you, sir.
22   A.    Well, you are.
23   Q.    I'm asking you questions, sir.
24   A.    Right.
25   Q.    Well, let me ask you, sir:  You are how old?  25?
```

```
 1   A.     26.

 2   Q.     You started smoking marijuana when you were 17.

 3   Isn't that correct?

 4   A.     Yeah.

 5   Q.     And you've been smoking marijuana since the age

 6   of 17 either every day or every other day?

 7   A.     Oh, not at all.

 8   Q.     Let me --

 9          MR. LEVIN:  Your Honor, can you instruct the

10   witness to allow me to finish my question?

11          THE COURT:  Wait until the question is

12   finished, sir.

13          THE WITNESS:  I thought he finished the

14   question already.

15          THE COURT:  In order for the court reporter to

16   take it down, what she needs to do, you need to let him

17   ask the question completely and then you answer it.

18   Okay?

19          THE WITNESS:  Right.

20   BY MR. LEVIN:

21   Q.     Since you've been -- since you were 17 years old,

22   isn't it true that you have smoked marijuana

23   practically every day?

24   A.     No.

25   Q.     Not true?
```

Coriolan - CROSS - By Mr. Levin                    90

```
 1   A.     Not true.  Not every day.

 2   Q.     Every other day?

 3   A.     Yeah.  Every other day.  Yeah.

 4   Q.     So since the age of 17, you've smoked marijuana

 5   every other day?

 6   A.     Yeah.

 7   Q.     And you're 26 years old?

 8   A.     Yeah.

 9   Q.     So we're talking about a period of nine years.

10   Is that correct?

11   A.     No.  You right.

12   Q.     And how many times a day -- or every other day

13   would you smoke marijuana?

14   A.     Come on, man.  Like I said, every other day, not

15   how many times a day.

16   Q.     Well, can you tell the ladies and gentlemen of

17   the jury your routine?

18   A.     My routine?

19   Q.     Would you wake up and smoke marijuana?

20   A.     I tell you guys I smoke marijuana.  That's

21   something I should never start doing because it's a

22   habit and that's something I'm not proud of doing.

23          And then the gentlemen bringing it up back to

24   back.  Of course, yeah, I smoke marijuana.  But this

25   doesn't have nothing to do with me and being in a
```

Coriolan - CROSS - By Mr. Levin                       91

1    relationship with Brother Naz or my family or anybody.

2         Thank you.

3    Q.    You used to smoke with Abbas al-Saidi marijuana?

4    A.    Yeah.

5    Q.    Every day or every other day?

6    A.    Oh, I ain't know him since I was 17.  I met him

7    in 2005.

8    Q.    So since 2005.

9         When you met Abbas al-Saidi in 2005, did you

10   smoke marijuana with him?

11   A.    Oh, not -- not -- as soon as I met him, we start

12   smoking?  That's what you say?  No.

13   Q.    I don't mean the day you met him.  I'm talking

14   after you met him.

15   A.    I thought you meant that.

16        No, sir.

17   Q.    Have you smoked marijuana with Abbas al-Saidi?

18   A.    Sure.  I smoked with him.

19   Q.    And how many times would you say you've smoked

20   with Abbas al-Saidi?

21   A.    Many time.

22   Q.    And that would have been in 2005?

23   A.    Yes.

24   Q.    Would that have been after the hurricanes that

25   you talked about?

Coriolan - CROSS - By Mr. Levin                          92

```
 1   A.      Before the hurricane, after the hurricane.

 2   Q.      So before the hurricane and after the hurricane?

 3   A.      Yes.

 4   Q.      Do you know the last time you saw Abbas al-Saidi?

 5   A.      I don't remember.  Oh, last time I seen him, I

 6   was coming to the courthouse last year and I seen him

 7   and -- going in the other side.  This is the last time

 8   I seen him.  Never talked to him.

 9   Q.      You didn't speak to him at that time?

10   A.      Not at all.

11   Q.      When is the last time you spoke to him?  Do you

12   recall that?

13   A.      I mean -- I don't recall that.

14   Q.      Now, getting back to your smoking routine -- you

15   didn't answer my question before -- how many times a

16   day do you smoke marijuana?

17   A.      Sometimes I smoke once a day.

18   Q.      Did you smoke today?

19   A.      No.  I ain't smoke today.

20   Q.      Did you smoke yesterday?

21   A.      No.  I didn't smoke yesterday.

22           I'm thinking you probably tell them to give me a

23   drug test when I came in here.  So I figured I might be

24   sober and come over here so I don't get myself in

25   trouble.
```

1   Q.    So to avoid getting in trouble, you thought they

2   might give you a drug test --

3   A.    Yeah.  Avoid getting in trouble, having to come

4   over and testify, because I didn't know what was the

5   consequences of dealing with people I didn't even know.

6         And that's why I'm here today, avoid getting in

7   trouble, you know.  I opened my mouth and tell the

8   agent everything I know about the case for not getting

9   in trouble.

10         But I'm not trying to be a snitch or anything to

11   put -- throw my brothers in the ocean.  But it's, like,

12   to avoid getting myself in trouble, like I said.

13   Q.    Now, you testified about an incident that

14   occurred at the store where Brother Naz leaned over the

15   counter and said, "These guys are not 'F-ing' around."

16         Do you recall that testimony?

17   A.    I recall that.

18   Q.    And do you recall that you testified previously

19   that Brother Naz also said, "These guys aren't 'F-ing'

20   around.  These guys are jihad"?

21   A.    This thing in the store is on the surveillance

22   camera in the store.  The store have a 24-hour

23   surveillance camera.

24         And I told the agent I need to bring the tape,

25   because the store have a 24-hour surveillance camera

```
 1   when me and Mike and Malik work at the store at the

 2   time.

 3              THE COURT:  Sir, you need to wait for a

 4   question.  Okay?

 5              THE WITNESS:  Right.

 6   BY MR. LEVIN:

 7   Q.    Well, I was going to ask you about the

 8   surveillance camera, but I guess you've anticipated my

 9   question.

10         This store had a 24-hour-a-day surveillance

11   camera.  Correct?

12   A.    Right.

13   Q.    So there's a -- there could have been something

14   that captured everything you're testifying about.

15   Correct?

16   A.    Of course.

17   Q.    Now, getting back to my previous question about

18   Brother Naz leaning over the counter and allegedly

19   saying, "These guys aren't 'F-ing' around.  These guys

20   are jihad" --

21   A.    Right.

22   Q.    Correct?

23   A.    Right.

24   Q.    You didn't know what jihad was at the time?

25   A.    I didn't know what it mean.
```

1    Q.     You didn't know what it mean.  Right?

2    A.     No.

3    Q.     Yet, you've testified that, prior to that time,

4    you had come into contact with Brother Naz and Brother

5    Pat and some of these other brothers in the park -- Oak

6    Grove Park where jihad was being discussed.  Isn't that

7    true, sir?

8              MR. GREGORIE:  Objection, your Honor.

9              THE WITNESS:  Was jihad --

10             THE COURT:  One minute, sir.

11             Sustained.  Rephrase your question.

12   BY MR. LEVIN:

13   Q.     Where -- you said Brother Pat -- at one time, you

14   saw Brother Pat was going crazy in the park.  Correct?

15   A.     Right.

16   Q.     And then you testified that Brother Naz must have

17   taught him too much.  Correct?

18   A.     Right.

19   Q.     And that Brother Pat was going crazy and he was

20   talking -- what -- what was he talking about?

21   A.     He was just talking crazy.  It's not like I

22   recall every single word that was coming out his mouth.

23   But I asked -- Brother Pat was -- he was out of there.

24   He was losing it.

25   Q.     Right.

1          But you said that they were talking politics;

2    were you not?

3    A.     At the time when I see he was going crazy at the

4    park, it was just him by himself.

5    Q.     Him by himself?

6    A.     Right.

7    Q.     And he was going crazy, holding a book?

8    A.     Man, I know Brother Pat, and I can tell this man

9    changed.  And this guy was just walking -- pacing back

10   and forth by the lake and talking and had the book.  I

11   was on the other side by the monkey bar.

12          And I -- and I confront Brother Naz and I told

13   Brother Naz, "This kid's going nuts, crazy."  And he

14   admit it.

15   Q.     Didn't you testify, sir, that prior to this

16   incident at the convenience store, you had heard about,

17   you know, war against the United States and jihad?

18   Didn't you testify previously about that?

19   A.     Oh, I said they was talking about politic and --

20   based on what was going on in the country in 2001

21   regarding September 11.  And when they talk about

22   politic, they talking about everything in general.

23          But I ain't never mention jihad.  The only time I

24   heard the jihad is when Brother Naz lean up on the

25   counter -- maybe I've heard it before and I never pay

```
 1    attention to the word until I was at the store.  And he
 2    said it.  And I asked Malik and Malik explained to me.
 3    Q.    So you had to ask afterwards because --
 4    A.    Right.
 5    Q.    -- because you, at that time, did not know what
 6    jihad was, even though you said --
 7    A.    He --
 8    Q.    Let me finish my question.
 9          Because you had said that -- you had heard about
10    jihad before this incident.  Yet, afterwards, you
11    didn't know what they were talking about.  So you had
12    to ask Malik and Mike what jihad was.
13          Isn't that true, sir?
14              MR. GREGORIE:  Objection, your Honor.  That
15    mischaracterizes the witness's testimony.
16              THE COURT:  Sustained.
17              Rephrase your question.
18    BY MR. LEVIN:
19    Q.    Sir, you had to ask Malik and Mike what jihad was
20    after Brother Naz allegedly said, "These guys aren't
21    'F-ing' around.  They are jihad."  Isn't that true,
22    sir?
23    A.    The only time I ever pay attention to the word --
24    what jihad mean is when Brother Naz lean over the
25    counter and told Malik that.
```

 1          And that's when I'm, like, "What that mean?

 2    Like, what he getting upset for?  The guy could say

 3    anything.  Why you upset when he says jihad?"

 4          And they explained to me.  They took it seriously

 5    then because they -- they Abbas's neighbor and they

 6    know about it better than I do.

 7    Q.    Now, Abbas -- did you ever borrow money from him?

 8    A.    No.

 9    Q.    Did he ever borrow money from you?

10    A.    Yeah.

11    Q.    He needed money.  Right?

12    A.    This dude was my associate.  If he needed it and

13    I have it, I give it to him.

14    Q.    Right.

15          I mean, you helped him get a pistol.  Right?

16    A.    Yeah.

17    Q.    And this AK-47, you don't know where that came

18    from?

19    A.    I have no idea where it came from.

20    Q.    Now, you worked at that store for how long?

21    A.    Five, six months.

22    Q.    And there were things sold out of that store

23    other than sodas and potato chips.  Correct?

24    A.    Like what?

25    Q.    Guns.

```
 1    A.    Oh, the gun was not sold inside the store.  They

 2    was not selling guns inside the store, like, "We got

 3    guns for sale" and you go buy guns.

 4    Q.    Well, people would come in and you would make

 5    arrangements for them to buy things other than potato

 6    chips and sodas.  Correct?

 7    A.    See, you got me confused.

 8    Q.    I don't want to get you confused.  I'll break it

 9    down for you.

10    A.    You're trying to get me confused.

11    Q.    I'm not trying to --

12    A.    This dude -- they knew me at the store.  They

13    come by the store.

14          "I got some shades for sale.  You want to buy

15    some shades?"

16          "Oh, I got guns for sale."

17          "Oh, I buy some guns.  This guy got a gun for

18    sale."

19          But it's not like we put it on the counter and

20    everybody can walk in the store and see guns for sale.

21    Q.    It was done secretly?

22    A.    Of course.

23    Q.    And Abbas was involved in that type of activity

24    as well, wasn't he?

25    A.    Right.
```

```
 1   Q.     And you've known Abbas since 2005.  Is that
 2   correct?
 3   A.     Yeah.
 4   Q.     And he is a liar.  Correct?
 5   A.     I say I don't trust him.  He lie.  Yeah.  He lie
 6   to me.  He's a liar to me.  He should have told me
 7   everything that was going on.
 8   Q.     Now, you didn't want to say where your marijuana
 9   came from before.
10          Is there a reason for that?
11   A.     From the farmer.
12             THE COURT REPORTER:  I'm sorry?  From the....
13             THE WITNESS:  From the farmer, the one that
14   grows the marijuana plant.
15             THE COURT REPORTER:  Foreman?
16             THE WITNESS:  Farmer.
17   BY MR. LEVIN:
18   Q.     Oh, farmer.  From the farmer?
19   A.     Yeah.
20   Q.     You got your marijuana from the farmer?
21   A.     That's where it come from.
22   Q.     The marijuana is a plant.  We would agree on
23   that?
24   A.     Yeah.
25   Q.     And that's what you're talking about when you say
```

```
 1   the farmer?

 2   A.     Yeah.

 3   Q.     Okay.  Does the farmer have a name?

 4   A.     Oh, no.  You asked me where it come from.

 5   Q.     Where does the marijuana -- where did you get

 6   your marijuana?

 7   A.     Off the street.

 8   Q.     Like any particular street?

 9          MR. GREGORIE:  Objection.  Relevance, your

10   Honor.

11          THE COURT:  Sustained.

12          Move on, Mr. Levin.

13   BY MR. LEVIN:

14   Q.    Now, I believe you testified that Abbas's

15   ex-girlfriend told you that Abbas was at the hotel.  Is

16   that correct?

17   A.     No.  When -- when he asked me about -- the

18   gentleman with the red tie, when he asked me about

19   who -- in regard to whether I spoke to Abbas or what

20   was done, I say "I spoke to his girlfriend.  Abbas at

21   the hotel."

22          I mean, this guy came from out of town.  If I

23   know -- you know, "Abbas, he at the hotel.  Go see him

24   at the hotel.  Hey, Brother Naz, Abbas want to see you

25   at the hotel."
```

 1        Because Brother Naz had things going on with him.
 2   Abbas is a Muslim, born and raised in Yemen.  He know
 3   more about Islam than anybody else.  So, therefore, he
 4   was friendly with Brother Naz.
 5        And it was not a big deal.  I ain't know there
 6   was no crime going on.  So that's why I told him,
 7   "Brother Naz, Abbas at the hotel," room such-and-such.
 8   "Go see him over there at the hotel."
 9   Q.   Do you know his girlfriend, Abbas's?  Do you know
10   the girlfriend?
11   A.   The guy's a store owner.  He have many
12   girlfriends.
13             THE COURT REPORTER:  The guy's a what?
14             THE WITNESS:  He a store owner.  He have many
15   girlfriends.
16   BY MR. LEVIN:
17   Q.   Store hunter?
18   A.   No.  Store owner.  He own a store.  He have many
19   girlfriends.
20   Q.   So, as the store owner, he had many girlfriends.
21   A.   The guy is a Muslim.  He's not Catholic, like I
22   am, with one wife.  He's got many wives and many
23   girlfriends.
24   Q.   Now, I believe you testified that Abbas requested
25   that Mr. Batiste go see him at the hotel?

1   A.      Right.

2   Q.      So Abbas asked Batiste to go to the hotel.

3   Correct?

4   A.      No.  I told Brother Naz that Abbas at the hotel,

5   because he the one that didn't have a phone.  So I give

6   him the room number.  So he went and see Abbas.

7   Q.      So Abbas asked you to tell Brother Naz to go see

8   him at the hotel?

9   A.      Right.  At the time, I was working at the store.

10  Q.      Right.  Okay.

11          Now, do you know a guy named "Fat Boy"?

12  A.      "Fat Boy"?

13  Q.      Yeah.

14  A.      I know, like, five "Fat Boy."

15  Q.      Okay.  Is there a "Fat Boy" who might be

16  associated with the AK-47?

17  A.      I have no idea about the AK-47.  I see it at the

18  store.  The next day, it was gone, because Abbas got

19  kicked out the store.  I don't know.

20          I know "Fat Boy" on 6th Avenue.  I know "Fat Boy"

21  that stay on 27th.  I know many "Fat Boy."

22  Q.      Any of these "Fat Boys" sell you the marijuana?

23          MR. GREGORIE:  Objection, your Honor.

24          THE COURT:  Move on, Mr. Levin.

25          Sustained.

1              MR. LEVIN:  Sorry.

2    BY MR. LEVIN:

3    Q.      What about the AK-47?  Did any of the "Fat Boys"

4    that you're describing --

5    A.      Like I say, when the agent came and talked to me

6    and he told me about the handgun, I admitted I had

7    something to do with it.

8              AK?  I don't know nothing about the AK.  I don't

9    know nothing about "Fat Boy."  I don't know nothing

10   about AK.  That's it.

11   Q.      Now, you said that you're here pursuant to a

12   subpoena.

13   A.      Right.

14   Q.      You're here not because you're here voluntarily,

15   but because they've had the Court --

16   A.      I never come -- I don't ever come here just for

17   me to come here.  I never come here.

18   Q.      Well, sir, isn't it true that you've been

19   involved in illegal activities and you're afraid that

20   you may end up back in Haiti as a result of your

21   illegal activities?

22   A.      I just didn't want to put my mom in trouble by

23   the police knocking at the door.  When I heard the

24   agent was there at the time, he was by my mother and I

25   wanted to go talk to the agent before they come and

```
 1   talk to my mother.
 2   Q.    So you wanted to make sure that you can continue
 3   your pot-smoking ways once you leave here?
 4   A.    Oh, not at all.
 5         MR. GREGORIE:  Objection, your Honor.
 6         THE COURT:  Sustained.
 7   BY MR. LEVIN:
 8   Q.    The videocamera that's in the store:  Where would
 9   that have been located in the store?  Do you know?  Do
10   you remember?
11   A.    In the office, in the back.
12   Q.    Does it show what happens in the front?  I mean,
13   can you describe the store a little bit.  Like, when
14   you walk in the door --
15   A.    When you walk in the door, the TV is right --
16   because there's the counter.  The register is on the
17   side and the TV from the camera.  There's cameras all
18   over the store.  You can see -- whatever walk in the
19   store, one employee can control the store.  It's a
20   small store.
21   Q.    Now, you had a boxing match with Patrick Abraham.
22   A.    Here we go with that boxing match again.
23         Yeah.  We had a boxing match.
24   Q.    Well, okay.  I mean, do you want to just tell us
25   about it so -- just put it in your own words.  How
```

1    about that?

2    A.    Oh, we get to the park.  Like I say, we do

3    martial art, a little boxing every now and then.  And

4    then me and Brother Pat -- we got at it, and that was

5    it.

6         It was nothing about -- nothing, nothing,

7    about -- take to the heart.  Nothing.  It was just a

8    boxing match.  And brother was just playing in the park

9    and we do what we do every day, chill.

10   Q.    Well, he kind of got the best of you; did he not?

11   A.    Yeah.  He did get the best me.

12   Q.    And you weren't real happy about it at the time.

13   Right?

14   A.    No.  I'm just making you happy.

15   Q.    I'm asking you, sir:  You weren't real happy

16   about it at that particular time.  Correct?

17   A.    Sir, I don't have no problem with the boxing

18   thing, man.  Not at all.  Boxing or not.

19   Q.    Well, we're talking now --

20   A.    Because we didn't have a match.  It's not like,

21   "Okay, Brother Pat and Brother Naz.  I represent this.

22   You represent that.  Let's fight for money."

23        It was just for fun.  I can take the gloves out

24   and give it to you and say, "You go box him.  Go ahead.

25   Let me see what you got."

```
 1        That was it.  It was nothing about no personal
 2   boxing.  That's what I'm testifying right now.  It was
 3   none of that.
 4   Q.    Four years ago --
 5   A.    Right.
 6   Q.    -- is when this boxing match happened, or maybe
 7   five.  Is that correct?
 8   A.    Yeah.  It was no hard feeling, man.  No hard
 9   feeling.  Nothing at all.
10   Q.    Is your memory real clear?
11   A.    Oh, yeah.
12   Q.    You talked about the word "sober."  Do you know
13   what "sober" means?
14           MR. GREGORIE:  Objection, your Honor.
15           THE COURT:  Sustained.
16   BY MR. LEVIN:
17   Q.    At the time of this boxing match, you were not
18   happy.  Isn't that true, sir?
19           MR. GREGORIE:  Objection.  Asked and answered.
20           THE COURT:  Sustained.
21           MR. LEVIN:  No further questions.
22           THE COURT:  Mr. Gregorie.
23                   REDIRECT EXAMINATION
24   BY MR. GREGORIE:
25   Q.    Sir, you just told Mr. Levin, "Abbas is a Muslim.
```

 1   He and Brother Naz had had things going on."

 2   A.     Yeah.

 3   Q.     What things did he and Brother Naz have going on?

 4          MS. JHONES:  Objection as to the form of the

 5   question.  Calls for hearsay.

 6          THE COURT:  Overruled.

 7   BY MR. GREGORIE:

 8   Q.     Can you explain, please.  What did he and Brother

 9   Naz have going on?

10   A.     Talking about Islam.  And Brother Naz -- Abbas

11   told him, "Listen, I got somebody in Miami to help

12   you" -- which is Mike and Malik -- "I would have more

13   time to sit down with you brothers and do the study

14   with you guys about religion, about Islam and stuff."

15   Q.     Now, sir, you said that Abbas didn't tell you

16   everything that was going on.

17          What didn't he tell you that irritates you?

18          MS. JHONES:  Your Honor, I'm going to object

19   because it calls for hearsay as to what Abbas told him.

20          THE COURT:  Sustained.

21          Rephrase your question.

22   BY MR. GREGORIE:

23   Q.     Are you irritated with Abbas?

24   A.     Yeah, a little bit.

25   Q.     And why is that?

```
 1   A.    Because he should have told me straight up what
 2   was going on.  I thought me and Abbas was cool like
 3   that.  He should have told me, "Listen" --
 4         MS. JHONES:  Objection, if it calls for
 5   hearsay.
 6         MR. GREGORIE:  Objection, your Honor.  He's
 7   explaining.
 8         THE COURT:  Overruled.
 9   BY MR. GREGORIE:
10   Q.    You may finish your answer.
11   A.    And -- like I say, Abbas should have tell me
12   straight up.
13   Q.    Straight up what?
14   A.    That -- like, people tell me he was working for
15   the Feds.  I mean, that should have never come up here
16   and Abbas should never do that at all, you know.
17   Q.    So you're mad at Abbas because he didn't tell you
18   he was working for the Feds?
19         MR. VEREEN:  Objection.
20         MS. JHONES:  Objection.  Leading.
21         THE WITNESS:  I'm mad at Abbas because
22   sometime --
23         THE COURT:  One minute, sir.  One minute, sir.
24         Sustained.  Rephrase your question.
25
```

```
 1    BY MR. GREGORIE:

 2    Q.    Please tell the jury what it is that you're mad

 3    at Abbas for.

 4             MR. VEREEN:  Objection.  Asked and answered.

 5             THE COURT:  Overruled.

 6             THE WITNESS:  Because I feel like Abbas is

 7    not somebody --

 8             MR. VEREEN:  Objection.  Asked and answered.

 9             THE COURT:  I overruled it.

10    BY MR. GREGORIE:

11    Q.    What, if anything, did your irritation with Abbas

12    have to do with his working for the Feds?

13    A.    Because Abbas had told me he was looking for a

14    gun, first of all.  I didn't know the consequences to

15    it.  And if I know that, I would have never, never have

16    any friend call him and arrange buying or selling guns

17    with Abbas.

18         Abbas never -- I don't say Abbas never come to my

19    house, but I want to know what I'm dealing with.  I

20    feel like I don't know Abbas at all.

21         Abbas sometimes give my wife a ride and my kids

22    and anything could have happen.  I don't trust him.  I

23    don't trust him around my family.  And he's a liar

24    and --

25    Q.    The question is:  Why didn't you trust him?  Why
```

 1   don't you trust him now, sir?

 2          MS. JHONES:  Asked and answered.

 3          THE COURT:  Overruled.

 4          THE WITNESS:  Why I don't trust him now?

 5   Because he lied.  He should have told me, "Listen,

 6   that's what I'm doing."

 7   BY MR. GREGORIE:

 8   Q.    What is "what I'm doing"?

 9   A.    Like they say, he was working for the Feds.

10   Q.    Thank you, sir.

11          Now, sir, you told counsel that you -- your wife

12   had just had a baby, is that correct, when you were in

13   the park?

14   A.    You mean a new baby we just had or the -- it's

15   been four years.

16   Q.    Back in 2004.

17   A.    Right.  But I wonder how you knew my wife was

18   having a baby when nobody knew she had a baby, even my

19   mother.

20   Q.    Did your wife ever come to the park with you in

21   2004?

22   A.    Right.  She come to the park with me every time

23   she's in North Miami.

24   Q.    And did she ever come to Oak Grove Park with you?

25   A.    All the time.

 1   Q.     Okay.  And when you went to Oak Grove Park and

 2   were at the monkey bars, as you say, where did she go?

 3   A.     She sat right there on the bench, waiting for me.

 4   Q.     Was she with anybody when she did that?

 5   A.     Just by herself.

 6   Q.     Just who?

 7   A.     Just her by herself.  If I'm with her, just me

 8   and her.

 9   Q.     Did she ever attend any of the meetings you had

10   with Narseal Batiste and the others in Oak Grove Park?

11          MS. JHONES:  Objection.  Leading.

12          THE COURT:  Sustained.

13          Rephrase your question.

14   BY MR. GREGORIE:

15   Q.     Who, if anyone, did she --

16   A.     She talked with Queen.

17   Q.     And who's Queen?

18   A.     Brother Naz wife.

19   Q.     And what, if anything, did she do with Queen?

20   A.     I mean, they ladies.  They talk about what ladies

21   talk about.  I never go to details.  "What you talking

22   about with Queen?"

23   Q.     Were the men together with the women when they

24   had these meetings?

25          MS. JHONES:  Objection.  Leading.

1              THE COURT:  Sustained.

2              Rephrase your question.

3    BY MR. GREGORIE:

4    Q.     Where were the men --

5              MS. JHONES:  Beyond the scope of cross.

6              THE COURT:  Overruled.

7    BY MR. GREGORIE:

8    Q.     Where were the men in relation to the women when

9    they were meeting in the park?

10   A.     If you know about Islam, Islam is, like, the

11   women on one side and the men on the other side.  If

12   anybody want to study Islam and build a religion and

13   this way they lead their life, if I go with my wife, I

14   be with Brother Naz and my wife would be with his wife

15   and a few other ladies that come to the park, and their

16   kids would be with them.

17             But the mens would be together and discuss -- we

18   discussing about other things, about religion, family

19   life, every good things.  Brother Naz never lead me to

20   nothing.  Brother Naz never told me to do this and do

21   that.

22             But I had just this funny feeling about him that

23   I never, like, go all the way with him.  But he's a

24   good brother.

25   Q.     Did you ever know any other name for Queen?

1   A.     Brother Naz wife.

2   Q.     Did she go by any first name, last name?

3   A.     Brother Naz wife.  I don't know.

4   Q.     But you knew her as Queen?

5   A.     I don't disrespect a man wife and go, "What's

6   your real name?"  I call her Queen.

7   Q.     Now, sir, you were asked about the surveillance

8   tape in the store when the incidents occurred in 2005.

9   Correct?

10  A.     Right.

11  Q.     Do you know who put the tape in the camera?

12  A.     That thing had a hard drive.  So that thing

13  didn't need a tape or a DVD.  That thing has a built-in

14  hard drive.

15  Q.     Did you put that in?

16  A.     No.  I don't go to the office.  They kept money

17  and all this stuff in there.  I don't go to the back.

18  I'm an employee.

19  Q.     Do you know who kept the recording or where it

20  was kept?

21  A.     Oh, Mike and Malik.

22  Q.     So you have no idea where it was?

23  A.     The surveillance thing?  Yeah.  In the back, in

24  the little office.

25  Q.     The recording, the actual DVD or whatever was

```
 1   recorded.

 2   A.     Yeah.  It was in the back.  It's like a hard

 3   drive.

 4   Q.     Did you have control of that?

 5   A.     Oh, not at all.

 6   Q.     Now, sir, one other question.

 7   A.     Right.

 8   Q.     Did you ever join Narseal Batiste's group, the

 9   same group that came into the store in 2005?

10   A.     Joining the group and talking to him or joining

11   the group and being with them as a movement?

12   Q.     Being with them as a movement.

13   A.     No.  Not at all.

14   Q.     Why not?

15   A.     Because -- the gentlemen makes me feel stupid

16   because I smoking marijuana, but I know Brother Naz

17   point of view, where he was coming from, everything he

18   was talking about.  He's a good brother, but he got

19   insane thing he talk about.

20          And I believe, like, people go crazy sometimes.

21   Then need doctors and they need counseling and stuff.

22   And he didn't have it.  But he's a good brother

23   because, if he have all the brother following him, he's

24   a good brother.

25   Q.     Why didn't you follow him?
```

```
 1   A.     Because of that taking over stuff.  America is
 2   our country.  I was born and raised in Haiti and, you
 3   know, I seen different people build their own movement.
 4   I didn't want to come here and build another movement.
 5   I'm here for myself.  That's it.
 6   Q.     Well, what was his movement about that worried
 7   you?
 8          MR. VEREEN:  Objection to the leading nature
 9   of this question, Judge.
10          THE COURT:  Overruled.
11          THE WITNESS:  What happened?
12   BY MR. GREGORIE:
13   Q.     Yeah.  What was his --
14   A.     I don't know if I allowed to talk, to wait.
15          Yeah.  Had a movement.
16   Q.     What was his movement about that concerned you?
17   A.     Basically, everything in general.  The brothers
18   are strong men.  And, also, the thing I didn't like
19   about is the fighting part.  But he would lead them to
20   the right path.  Those brothers stopped smoking for the
21   Brother Naz.
22   Q.     Fighting whom, sir?
23   A.     No.  They stopped smoking for Brother Naz.  They
24   stopped their habit for Brother Naz.  The only thing I
25   never like about Brother Naz is the part of taking
```

al-Saidi - DIRECT - By Mr. Gregorie                117

```
 1   over.

 2   Q.     Taking over what?

 3   A.     The United States of America.  That's why I

 4   always think that's gonna get him in trouble.

 5          MR. GREGORIE:  Thank you.  I have no further

 6   questions, your Honor.

 7          THE COURT:  You may step down, sir.

 8          (Witness excused.)

 9          THE COURT:  Call your next witness.

10          MR. GREGORIE:  The United States calls Abbas

11   al-Saidi.

12   Thereupon--

13                    ABBAS AL-SAIDI

14   was called as a witness by the Government and, having

15   been first duly sworn, testified as follows:

16          THE COURT REPORTER:  Please have a seat and

17   sit close to the microphone for me.  And please state

18   your full name for the record.

19          THE WITNESS:  Abbas al-Saidi.

20                   DIRECT EXAMINATION

21   BY MR. GREGORIE:

22   Q.     Mr. Al-Saidi, can you tell us how old you are,

23   sir.

24   A.     24 years old.

25   Q.     And when did you turn 24?
```

1    A.      February 18.

2    Q.      Just a couple of weeks ago?

3    A.      Yes, sir.

4    Q.      Okay.  Where were you born?

5    A.      In I-b-b, Yemen.

6    Q.      I-b-b, Ibb.

7    A.      Ibb.

8    Q.      Can you give the jury an idea where Ibb, Yemen,

9    is.

10   A.      Yemen is on the Red Sea, south of Saudi Arabia,

11   east of Oman, north of Ethiopia.

12   Q.      Okay.  And when did you first come to the United

13   States?

14   A.      Early 1993.

15   Q.      And how old were you in early 1993?

16   A.      I think I was 9 years old.

17          MR. GREGORIE:  Excuse me a minute.

18   BY MR. GREGORIE:

19   Q.      I'm going to show you what's marked as

20   Government's Exhibits 96 and 97, and ask if you can

21   identify those.

22          First showing you Government's Exhibit 96, can

23   you tell us what that is.

24   A.      Yes.  That's my visa application.

25   Q.      And do you recognize the photograph down at the

1   bottom left?

2   A.      Yes, sir.

3   Q.      And who is that a photograph of?

4   A.      That's me, when I was a little boy.

5   Q.      You have to keep your voice up, please.

6   A.      Yes, sir.  That's me, as a little boy.

7   Q.      I'm now going to show you what's marked as 97 for

8   identification.

9           Do you recognize that?

10  A.      Yes.  That's the application for the immigration

11  file.

12  Q.      And when were those made out, if you know?

13  A.      In '92.

14  Q.      And did you enter the United States with those

15  documents?

16  A.      Yes, sir.

17          MR. GREGORIE:  Your Honor, I move 96 and 97

18  for evidence.

19          MS. JHONES:  No objection.

20          THE COURT:  They will be admitted as

21  Government's Exhibits 96 and 97.

22          (Whereupon, Government's Exhibit Nos. 96 and

23  97 were entered into evidence.)

24          MS. JHONES:  Your Honor -- Mr. Gregorie,

25  what's the exhibit number on that, please?

 1          MR. GREGORIE:  144.

 2    BY MR. GREGORIE:

 3    Q.    Showing you what's marked as 144 for

 4    identification, do you recognize it?

 5    A.    Yes, sir.

 6    Q.    Okay.  And can you tell us what it is, please.

 7    A.    That's my green card.

 8    Q.    And how long have you had a green card?

 9    A.    Since I first arrived in the US.

10    Q.    Did you keep the same green card since you arrive

11    in the US in 1993?

12    A.    No.  I had to renew it.

13    Q.    And is that currently renewed?

14    A.    Yes, sir.

15    Q.    Have you ever had any trouble keeping that green

16    card?

17          MS. JHONES:  Objection, your Honor.  That

18    calls for a legal conclusion.

19          THE COURT:  Overruled.

20          THE WITNESS:  I'm sorry.  I forget the

21    question.

22    BY MR. GREGORIE:

23    Q.    Have you ever had any trouble keeping that green

24    card?

25    A.    No, sir.

```
 1   Q.     Have you ever had any hearings to deport you or

 2   make you leave the country?

 3           MS. JHONES:  Objection.  Leading.

 4           THE COURT:  Sustained.

 5           Rephrase your question.

 6   BY MR. GREGORIE:

 7   Q.     What, if any, hearings have you been in regarding

 8   your -- keeping your green card?

 9   A.     None.

10           MR. GREGORIE:  I move 144 for evidence, your

11   Honor.

12           MS. JHONES:  I have an objection.  First of

13   all, it's hearsay.  It's an out-of-court document.

14           Additionally, your Honor, under 106, I have no

15   objection to his complete immigration file coming in,

16   but I do have an objection as to parts of it coming in.

17           THE COURT:  May I see the document, please?

18           MR. GREGORIE:  Certainly, your Honor.

19           THE COURT:  Overruled.

20           It will be admitted as Government's

21   Exhibit 144.

22           (Whereupon, Government's Exhibit No. 144 was

23   entered into evidence.)

24   BY MR. GREGORIE:

25   Q.     Now, sir, when you arrived in the United States
```

 1   in 1993, who, if anyone, was here to meet you?

 2   A.     My father was.

 3   Q.     And what was his status, if you know?

 4   A.     United States citizen.

 5   Q.     And where was he originally from?

 6   A.     From Yemen, also.

 7   Q.     When you arrived, did anybody else arrive with

 8   you?

 9   A.     Yes.

10   Q.     Who else was with you?

11   A.     My brothers.

12   Q.     How many brothers were there?

13   A.     Three.

14   Q.     Okay.  Now, when you arrived in the United

15   States, how old, again, were you?

16   A.     I think I was 9 years old, sir.

17   Q.     And did you go to school in the United States?

18   A.     Yes, I did.

19   Q.     How long did you -- how far did you go in school

20   in the United States?

21   A.     Third grade.

22   Q.     What happened that you stopped school?

23   A.     My father died.

24   Q.     And after your father died, did you stay in the

25   United States?

al-Saidi - DIRECT - By Mr. Gregorie                    123

```
 1   A.      For several months.

 2   Q.      And then what happened?

 3   A.      I had to go back to Yemen.

 4   Q.      Did you ever go to school anywhere outside the

 5   United States?

 6   A.      Yes, I did.

 7   Q.      What type of school did you attend?

 8   A.      It's religion school.

 9   Q.      When you say "religion school," can you be more

10   specific for the jury.

11   A.      Yes.  It was an Islamic school, based on Koran

12   and the Prophet Muhammed direction.

13   Q.      Okay.  Did you come back and forth to the United

14   States while you were in Yemen?

15   A.      Yes, sir.

16   Q.      Did there come a time when you began working in

17   the US?

18   A.      Yes, sir.

19   Q.      And how old were you then?

20   A.      I was only 12 years old.

21   Q.      Okay.  And what type of work did you do in the

22   US?

23   A.      I worked in a bodega, grocery stores.

24   Q.      And when you say a bodega or grocery store, some

25   sort of Yemenese practice or organization regarding
```

1    that type of work?

2             MS. JHONES:  Judge, my objection is to the

3    leading nature of the questions.

4             THE COURT:  Sustained.

5             Rephrase your question.

6    BY MR. GREGORIE:

7    Q.    Would you tell the Court and jury whether or not

8    there was anything that assists Yemenese in getting

9    work in the United States?

10   A.    Yes.  We do have a system.  The system is that we

11   work on, like, grocery stores and, usually, the --

12   12 hours, 7 days, $500.  It's like a system we've been

13   working on.

14   Q.    And did you begin working in such a store at

15   12 years old?

16   A.    Yes.

17   Q.    And for how long did you do that?

18             MS. JHONES:  Objection to the relevancy of

19   these questions, your Honor.

20             THE COURT:  Overruled.

21   BY MR. GREGORIE:

22   Q.    For how long did you do that?

23   A.    I still do it until now.

24   Q.    You have to keep your head up and speak up.  I

25   can't hear you.

```
 1   A.    I still do that kind of work until now.

 2   Q.    Okay.  Do you work in a grocery store now?

 3   A.    Yes.  I do work and own a grocery store.

 4   Q.    Did there come a time when you began working for

 5   somebody else besides the grocery store?

 6   A.    Yes, sir.

 7   Q.    Would did you begin working for?

 8   A.    The United States Government.

 9   Q.    The United States Government?

10   A.    Yes, sir.

11   Q.    Any particular agency?

12   A.    NYPD, FBI --

13   Q.    And when did you first start working for the --

14   when you say "NYPD," that's New York Police Department?

15   A.    Yes, sir.

16         2001.

17   Q.    Is that the first time you worked for them?

18   A.    Yes, sir.

19   Q.    How old were you then?

20   A.    I believe I was 16 years old.

21   Q.    What type of work were you doing for the New York

22   Police Department?

23   A.    Drug cases.  I also gave them information leading

24   to a gun.

25   Q.    And did you complete any cases with the New York
```

```
 1    Police Department?

 2    A.     Yes, I did.

 3    Q.     As a result of completing the cases, did

 4    something happen to you?

 5    A.     Yes.  I got beat up.

 6    Q.     Who beat you up?

 7    A.     The guy that I told on had a secret hiding place

 8    for his drugs and I was the only one that knew about it

 9    and I didn't knew that.

10           So he found out and the cops found it, that I

11    told them.  That's when he came with two of his buddies

12    and beat me up.

13    Q.     And as a result of that, did you move somewhere?

14    A.     Yes, I did.  I moved to Connecticut.

15    Q.     And how long were you in Connecticut?

16    A.     Approximately two years, two years and a half.

17    Q.     Did you return to New York --

18    A.     Yes --

19    Q.     -- after a while?

20    A.     Yes, sir, I did.

21    Q.     And when you returned to New York, did you go

22    back to work in grocery stores?

23    A.     Yes, I did.

24    Q.     Did you go back to work for anybody else?

25    A.     Yes, sir.
```

1    Q.    Who else did you go back to work for?

2    A.    NYPD.

3    Q.    And what were you doing for them at that time?

4    A.    It was terrorism cases, gun cases.

5    Q.    Okay.  And when you say "gun cases," what is it

6    that you were doing?

7    A.    I was informing them on the dealers who sells the

8    gun and, also, purchasing them, turning them in.

9    Q.    Say that again.  I didn't understand that last

10   sentence.

11   A.    I used to buy the guns from the street and turn

12   it in to the Government with the information of the

13   dealer who sold it to me.

14   Q.    Okay.  By the way, how many languages do you

15   speak?

16   A.    Two languages.

17   Q.    And what are those?

18   A.    Arabic and English.

19   Q.    And what's your first language?

20   A.    Arabic.

21   Q.    Is there a difference in the written -- the way

22   writing is done in Arabic from English or from western

23   languages?

24   A.    Yes, sir.

25   Q.    What's the difference?

```
 1   A.     In Arabic, we start from the right to the left.

 2   Q.     And is there a different calendar in Arabic?

 3   A.     Yes, sir.

 4   Q.     How is it different from the western calendar?

 5   A.     We count since the Prophet Muhammed went to

 6   Jerusalem.  And that's 1420-something years ago.  But

 7   in America, we count since Jesus Christ was born.  And

 8   that's 2009.

 9   Q.     As a result, sometimes you have difficulties --

10          MR. VEREEN:  Objection.  Leading.

11          THE COURT:  Sustained.

12          Rephrase your question.

13 BY MR. GREGORIE:

14   Q.     What difficulty, if any, do you have with dates

15   as a result of the difference in the calendar?

16   A.     It confuses me about the names of the months, and

17   the dates on the month is different.

18   Q.     In 2003, while you were living in Connecticut,

19   did you form any personal relationships?

20   A.     Yes, I did.

21   Q.     And with whom?

22   A.     Stephanie Jennings.

23   Q.     Who?  I'm sorry.  I can't hear you.

24   A.     This young girl I used to have, Stephanie

25   Jennings, as a girlfriend.
```

1    Q.    And when you returned to New York, did she return

2    to New York with you?

3    A.    Yes, sir.

4    Q.    At some time in 2003, did you return to Yemen?

5    A.    Yes, sir.

6    Q.    And when you returned to Yemen, did you take

7    Stephanie Jennings with you?

8    A.    No, I didn't.

9    Q.    What happened when you returned to Yemen?

10   A.    I got married.

11   Q.    Who did you get married to?

12   A.    It was an arranged wedding.

13   Q.    Who arranged it?

14   A.    My mother.

15   Q.    Okay.  Did you know this girl?

16   A.    No, sir.

17   Q.    Were you expecting to get married?

18   A.    No.

19   Q.    How long did you stay in Yemen?

20   A.    Two months, approximately.

21   Q.    Okay.  And did you come back to the United

22   States?

23   A.    Yes, I did.

24   Q.    Did you bring back your new wife?

25   A.    No, I didn't.

1    Q.     When you came back to the United States, did

2    you -- was Stephanie Jennings still living with you?

3    A.     Yes, sir.  I came back to my girlfriend.

4    Q.     Okay.  And did you stay in New York or did you go

5    somewhere?

6    A.     Me and my girlfriend decide to come to Miami.

7    Q.     When, approximately, did you come to Miami, if

8    you remember?

9    A.     In the early 2004s, I believe, or -- I'm not sure

10   exactly, but I think it's 2004.

11   Q.     Did you have a job when you came here?

12   A.     When I first get here, I was looking for a job.

13   Q.     And did anything happen to you after you came

14   here?  Did you get in any trouble?

15   A.     Yes, sir.

16   Q.     What did you do it?

17   A.     I was riding a scooter with no driver's license.

18   Q.     What kind of scooter?

19   A.     Like a motorcycle, a scooter bike.

20   Q.     Did somebody stop you?

21   A.     State trooper.

22   Q.     And what happened?

23   A.     He was asking me a lot of questions, and I think

24   he thought that I was a terrorist.  So I told him that

25   I was working for the NYPD.  And that's when he called

1    on the FBI.

2    Q.    Did somebody from the FBI come to see you?

3    A.    Yes.  John --

4    Q.    Who was that?

5    A.    Special Agent John Stewart.

6    Q.    Did John Stewart give you anything?

7    A.    His card.

8    Q.    His card?

9    A.    Yes.

10   Q.    Did you stay in jail as a result of being stopped

11   for driving the scooter without the license?

12   A.    Yes, I did.

13   Q.    How long?

14   A.    24 hours, time served.

15   Q.    Did anybody get you out of jail?  Did John

16   Stewart or the --

17            MR. VEREEN:  Objection.  Leading.

18            THE COURT:  Sustained.

19            Rephrase your question.

20   BY MR. GREGORIE:

21   Q.    Did anyone get you out of jail?

22   A.    No, sir.

23   Q.    Do you know if anyone attempted to get you out of

24   jail?

25   A.    No.

```
 1    Q.    What happened after you got out of jail?

 2    A.    I went back to the apartment and I seen my

 3    girlfriend stabbing my wedding pictures on the floor

 4    and she was very mad.

 5          So we really get into an argument and she stood,

 6    screaming.  The neighbors called the cops.  I go back

 7    to jail.

 8    Q.    And when you went back to jail, did you call

 9    anybody?

10    A.    Yes.

11    Q.    Who did you call?

12    A.    I tried to call all the numbers.  But I couldn't

13    reach most of them.

14    Q.    Did you talk to anybody in law enforcement?

15    A.    Yes, I did.

16    Q.    Who did you talk to?

17    A.    Kevin Branzetti.

18    Q.    And did he help get you out of jail?

19    A.    No, sir.

20    Q.    What happened?

21    A.    He told me I was out of gas.  He couldn't help

22    me.

23    Q.    Okay.  So what happened?

24    A.    I stayed in jail.

25    Q.    For how long?
```

```
 1   A.     Almost two months.  Was 53 days.

 2   Q.     Were you convicted?

 3   A.     No.

 4   Q.     Why not?

 5          MS. JHONES:  Objection, your Honor, as to why

 6   not.

 7          THE COURT:  Sustained.

 8          Rephrase your question.

 9   BY MR. GREGORIE:

10   Q.     What happened to the case?

11   A.     The judge told me, if I --

12          MR. VEREEN:  Objection.  Hearsay.

13          MS. JHONES:  Objection.  Hearsay.

14          THE COURT:  Restate your question.

15   BY MR. GREGORIE:

16   Q.     What, if anything, happened to you as a result of

17   the case?

18   A.     I spent 53 days in jail, and I got six months'

19   anger management.

20   Q.     Did the case go to trial?

21   A.     No.  She never showed up.

22   Q.     Who never showed up?

23   A.     My -- my Stephanie Jennings.

24   Q.     Your old girlfriend?

25   A.     Yes, sir.
```

1   Q.      Do you know when it is you got out of jail, what

2   month, approximately?

3   A.      I believe it was around December.

4   Q.      December of 2004?

5   A.      Yes, sir.

6   Q.      After you get out of jail, did you stay in Miami?

7   A.      Yes, sir.  I have to stay in Miami to finish my

8   management program.

9   Q.      The anger management program?

10  A.      Yes, sir.

11  Q.      Did you go looking for a job?

12  A.      Yes, I did.

13  Q.      And where did you go looking for a job?

14  A.      I went to the mosque.

15  Q.      And when you say "the mosque," what mosque did

16  you go to?

17  A.      Islamic mosque.  It's North Miami.

18  Q.      And did you find a job by going to the mosque?

19  A.      Yes, sir.

20  Q.      Where did you find a job?

21  A.      In Liberty City.

22  Q.      And do you remember the address of the location?

23  A.      Whatever number is.  62nd and, I think,

24  12 Avenue.

25  Q.      What kind of store was that?

```
 1    A.      Grocery store, also.

 2    Q.      Okay.  Did you stay in that grocery store?  Did

 3    you keep that job?

 4    A.      I worked there for two months.

 5    Q.      After that, what happened?

 6    A.      I get an offer and a better paycheck, another

 7    store.

 8    Q.      And who offered you the better paycheck?

 9    A.      Faisal Hassan.

10    Q.      Can you give us his name again, please.

11    A.      Faisal Hassan.

12    Q.      Who was Faisal Hassan?

13    A.      This Sudanese guy I met in the mosque.

14    Q.      And did you work for him for a while?

15    A.      Yes, I did.

16    Q.      Did you and he come to some business agreement?

17    A.      Yes, we did.

18    Q.      Tell the Court and jury what the business

19    agreement was.

20    A.      The business agreement was that I go and take

21    care of the store that he have in North Miami and that

22    that would be 50 percent for me, 50 percent for him,

23    for me to -- I had to work so I could pay him $2,000 a

24    month off of the amount that we agreed on for the 50

25    percent that I was buying from him.
```

1    Q.    And did you make that agreement with him?

2    A.    Yes, sir.

3    Q.    And did you begin to work in that store?

4    A.    Yes, sir.

5    Q.    Can you give us the address of that store, if you

6    remember it.

7    A.    I think it was 146 -- no -- 14704 Northeast

8    6th Avenue, North Miami.

9    Q.    When you started working there, was anybody

10   working there with you?

11   A.    Yes, sir.  In the beginning, it was my partner,

12   Faisal.  He worked with me for almost a month.

13   Q.    When he worked with you, did he introduce you to

14   any of the customers or people that came into the

15   store?

16   A.    Yes, sir.

17   Q.    Do you see any of the individuals that he

18   introduced you to in the courtroom today?

19   A.    Yes, sir.

20   Q.    Could you point anybody out that you see that you

21   met in the store.

22   A.    I see Brother Naz and --

23   Q.    When you say you see Brother Naz, could you tell

24   us where he's sitting, please.

25   A.    Yes.  He's the second person to the left.

1    Q.     What's he wearing?

2    A.     I think it's a sweater, dark.

3    Q.     Can you tell what color it is?

4    A.     Brown, beige color.

5          MR. GREGORIE:  At this time, your Honor, I

6    would ask the Court to recognize that the witness has

7    identified the -- Defendant Narseal Batiste.

8          THE COURT:  The record will so reflect.

9    BY MR. GREGORIE:

10   Q.     When you were introduced to him, what happened?

11   A.     I was introduced to him as a great Muslim, a very

12   nice guy, and one of the people that I introduced --

13   that he introduced me to in the beginning.

14          But, you know, we started building up a

15   relationship within time.  In the beginning --

16   Q.     Okay.

17   A.     Okay.

18   Q.     Did -- how often did you see Brother Naz, as you

19   call him, come into the store?

20   A.     Approximately three, four, five times a week.

21   Q.     Did it become more or less frequent after a

22   while?

23   A.     Yes.  The more me and him get to know each other

24   and get to speak more often, he would stay longer and

25   come more often.

1    Q.     What did he do when he came to the store?

2    A.     He would, you know, hang out and talk to me and

3    we would discuss politics, religion.  We would discuss

4    the wars that the -- you know, there was a war at that

5    time.  So we would sit down and talk.  Sometimes he

6    would buy, purchase.  Sometimes he doesn't.

7    Q.     Can you be more specific on the things you talked

8    about.  Tell us what you said to him and what he said

9    to you.

10   A.     Sure.

11          I usually, you know, express my feelings about

12   everything that I talk about or go through.  And we

13   would get down and speak about the war in Afghanistan,

14   the war in Iraq.

15          And that's when he start telling me about how he

16   feel about what Al-Qaeda did to the United States and

17   if that was right or wrong.

18          And he started telling me he agrees with Osama

19   bin Laden plans against the US because they killing

20   Muslims, Israel and America is killing Muslims all over

21   the world and so the Muslims should have the right to

22   kill some of their, that innocents being killed all

23   over the world and by all the Governments, not only the

24   Islamic organizations.

25          So he get really deep on him telling me that

 1    there was an organization back a long time ago and they

 2    used to call the Moors and it was built by the

 3    Moroccans and that George Washington has agreed to give

 4    them land as a US -- I mean, here in America for the

 5    Muslims and they agreed into that and signed papers

 6    with the Moors and they was tricked out by the US

 7    Government over that land, just like the rest of the

 8    Muslims in different parts of the world, like the

 9    Palestinians, like deals that the US make and do not

10    keep.

11         That's when he start telling me about him trying

12    to build his own Government and he already have some

13    soldiers in his side.  And he start telling me a lot.

14         I don't remember every word, but in the

15    beginning, I wouldn't take him serious, you know.  So I

16    didn't pay a lot of attention on -- to what he was

17    saying until before I to Yemen.

18    Q.   Before we get to that, did he come to the store

19    alone or did anybody ever come with him?

20    A.   Sometimes he would come alone and sometimes he

21    would come with somebody with him.  But most of the

22    time that he sit down and talk to me, it would be me

23    and him, you know.

24         Like, if there was a line of customers, he would

25    wait until they get out.  Like, if I was speaking to

1    somebody, he would, you know, give me some time.  It

2    wasn't just a normal talk, you know, to speak in front

3    of everybody.

4         So most of the talk that I did with him, it was

5    alone, even though there was business and was people

6    coming in and out.

7    Q.    Did anybody work in the store with you at this

8    point?

9    A.    Yes.  I had Haitian Mike working with me and,

10   also, I had the Yemeni guys that came later on.

11   Q.    Who were the Yemeni guys?

12   A.    One of them called Mike, and one of them called

13   Malik.

14   Q.    Now, sir, did there come a time when you and

15   Faisal had a change in your business agreement?

16   A.    Yes, sir.

17   Q.    And approximately when was that, if you can

18   remember?

19   A.    That was in early September.

20   Q.    Of what year?

21   A.    '05.

22   Q.    2005?

23   A.    Yes, sir.

24   Q.    Okay.  And what happened as a result of your

25   having a disagreement?

```
 1   A.    I decide to let the business go, to let my share
 2   go.
 3   Q.    And what happened?
 4   A.    We made a deal that he was gonna give me $20,000
 5   in payments and I was gonna leave the store.
 6   Q.    And did you agree to do that?
 7   A.    Yes, sir.
 8   Q.    Did he give you any money?
 9   A.    Yes, sir.
10   Q.    How much money did he give you?
11   A.    $7,000 in cash.
12   Q.    And what did you did with the $7,000 in cash?
13   A.    I bought an airline ticket and I got some gifts
14   for my family and I took some with me to Yemen.
15   Q.    Now, sir, the wife that you had back in Yemen:
16   Had something happened to her?
17   A.    (No response.)
18   Q.    What, if any, family did you have back in Yemen?
19   A.    Yes, sir.  My wife had a baby.  And it was the
20   holidays.  So --
21   Q.    What holiday was it?
22   A.    It was an Islamic holiday.  It was Ramadan.  And
23   then, after 30 days fasting, there is a holiday.
24   Q.    And when is Ramadan?
25   A.    It changes in every year.  That year, it was
```

al-Saidi - DIRECT - By Mr. Gregorie                  142

```
 1   around September to start.
 2   Q.    Now, sir, when you decided to go back to Yemen,
 3   did you tell anybody that you were going back to Yemen?
 4   A.    Yes, sir.
 5   Q.    Who did you tell?
 6   A.    I told everybody I know, including Brother Naz.
 7   Q.    You call him Brother Naz.
 8         Did you know his last name at that time?
 9   A.    No, sir.
10   Q.    Did you know where he lived?
11   A.    No.
12   Q.    When, if at all, did you learn his full name?
13   A.    I learned his full name in -- when we get to
14   court.
15   Q.    So until you got to court in this matter, you
16   never knew his full name?
17   A.    No, sir.
18   Q.    Now, sir, when you decided to go to Yemen and you
19   told everybody, did you ever talk to Brother Naz about
20   that?
21   A.    Yes, sir.
22   Q.    What, if anything, did you tell Brother Naz?
23   A.    I told him I was going to Yemen and I was very
24   happy because it's a holiday, I was going to see my
25   newborn baby and I was going to see my family, I missed
```

1    them.

2    Q.    And what, if anything, did Brother Naz tell you?

3    A.    He told me that he wanted to send something with

4    me and he wanted -- he was gonna get it and come back.

5    Q.    Did he do that?

6    A.    Yes, sir.

7    Q.    Did he come back with anything?

8    A.    He came back with a piece of paper.

9    Q.    I'm going to show you what's marked as

10   Government's Exhibit 98 for identification.

11        Do you recognize that?

12   A.    Yes, sir.

13   Q.    Can you tell the Court and jury what that is.

14   A.    That's the same paper that he gave me.

15   Q.    Okay.  And when he gave you that piece of paper,

16   did he tell you anything about it?

17   A.    Yes, sir.  He told me he wanted me to give this

18   to any organization that's willing to support him and

19   his group on taking the mission and the mission was to

20   take back the land that George Washington has promised

21   the Moors and that he wanted me to hand it over to them

22   so they could contact him, that this paper have his

23   full connections.

24        MR. GREGORIE:  Your Honor, the United States

25   moves 98 for evidence.

 1              MS. JHONES:  No objection.

 2              THE COURT:  It will be admitted as

 3   Government's Exhibit 98.

 4              (Whereupon, Government's Exhibit No. 98 was

 5   entered into evidence.)

 6              MR. GREGORIE:  May I publish it for the jury,

 7   your Honor?

 8              THE COURT:  Yes.

 9   BY MR. GREGORIE:

10   Q.     Mr. Al-Saidi, can you see the exhibit?

11   A.     Yes, sir.

12   Q.     Looking at it, sir, can you tell us, what does it

13   say on it?

14   A.     In the top, it says, "Feed the people of Miami."

15   Then it says, "Please support UDS food" --

16   Q.     Pantries?

17   A.     -- "pantries."

18   Q.     Okay.  And what does it say?

19   A.     "Sponsored by" -- that is 50C3CER certificate, I

20   think.

21   Q.     What does it stay underneath?

22   A.     "Universal Divine Saviors."

23   Q.     Had you ever heard of Universal Divine Saviors?

24   A.     No, sir.

25   Q.     What, if anything, did Mr. -- Brother Naz tell

1  you about Universal Divine Saviors?

2  A.    I asked him what was about that information have

3  on top.  He tell me, "That's just a cover," you know,

4  "so nobody asks you where this go back to," you know,

5  "It cover you from the heat."

6  Q.    Cover you from the what?

7  A.    From the heat.

8  Q.    From the heat?

9  A.    Yes.

10 Q.    What did you understand him to mean by "the

11 heat"?

12 A.    The Government suspicion.

13 Q.    Okay.  And what about the numbers that are on

14 here?  Did he tell you what that was?

15 A.    Yeah.  He told me his phone number, fax number

16 and his address.  He told me those are active

17 connections to him, that if I wanted to contact him

18 while I was there, that's how to do it.

19 Q.    And did you have any options of what to do with

20 this particular piece of paper?

21 A.    The minute he gave to me, the FBI came up to my

22 mind.

23 Q.    Well, did you -- before we -- before we reach

24 that, let me ask you another question:  At this time,

25 were you still working in the store?  Had you left the

```
 1    store yet?

 2    A.    I was still working at the store.  But we already

 3    made the agreement that I was leaving to -- I was just

 4    waiting to get paid and leave.

 5    Q.    What kind of hours did you work at the store?

 6    A.    I was working there all the time.

 7    Q.    What kind of hours?

 8    A.    I opened the place 24-hour.  12:00 at night I

 9    would rest my head by a window.  When a customer

10    knocks, that's when I get up and serve them.

11    Q.    Did you keep any protection at the store?

12    A.    Yes, I did.

13    Q.    What kind of protection did you keep at the

14    store?

15    A.    Handgun.

16    Q.    And where did you get the handgun?

17    A.    My partner gave it to me.

18    Q.    Which partner?

19    A.    Faisal Hassan.

20    Q.    And what happened to that handgun?

21    A.    He needed it to take it back to the next store.

22    So he came back and took it back.

23    Q.    And what, if anything, did you do after he took

24    the gun back?

25    A.    I kept asking him for it.  So he introduced me to
```

```
 1   a gun dealership and told me, if I needed to buy, I
 2   could buy from him instead of keep asking for his.
 3   Q.     And who was the gun dealer he introduced you to?
 4   A.     Somebody in the area.  I think he was called by
 5   "Fat."
 6   Q.     He was called what?
 7   A.     "Fat."
 8   Q.     "Fat"?
 9   A.     Yes, sir.
10   Q.     F-a-t?
11   A.     Yes, sir.
12   Q.     Did you know "Fat's" last name?
13   A.     No.
14   Q.     And what happened with "Fat"?
15   A.     He went and got a .45 gun, you know.  He wanted
16   950 for it.  But I told him was too expensive, that it
17   wasn't what I was looking for, that I wanted something
18   cheap.
19          So he takes it back and he brought in an AK-47.
20   And I was impressed when I see it, you know.  He told
21   me that was the whole point, is to impress me.
22          But I decide -- when I seen the AK and it said
23   "Military Use Only" on it, I decided to buy it and turn
24   it in to the FBI.  And I did buy it.  But the sale of
25   the store came before I turned it back to the FBI.
```

1        So I had hid it in a hiding place in the

2   refrigerator in the store until I had the time to give

3   it back to the FBI.

4   Q.    Okay.   Now, was -- what, in time relationship,

5   was that with the time that Narseal Batiste gave you

6   Government's Exhibit 98?

7   A.    I already have the AK before he gave me the

8   Exhibit 98.   When he gave me this piece of paper

9   itself, like two, days away from -- or three -- I don't

10  know.   It was very close on to leaving to Yemen.   But I

11  already had the AK for, like, a week before he gave me

12  the piece of paper.

13  Q.    Did you call anybody or do anything with regard

14  to the piece of paper or the AK-47?

15  A.    Yes, sir.

16  Q.    Who or -- what did you do?

17  A.    I was calling Special Agent John Stewart and -- I

18  was calling him so I could meet with him to give him

19  the piece of paper and the AK-47.

20  Q.    In your dealings with the New York Police

21  Department, had you ever done anything like the AK-47

22  before?

23  A.    Yes, sir.

24  Q.    What was that?

25  A.    I purchased firearms and I turned it to the

1    Government.

2    Q.    And how would you get reimbursed?

3    A.    They would reimburse me for the money that I paid

4    as lost wages.

5    Q.    Okay.  Now, sir, when you called John Stewart,

6    what, if any, message did you leave for him?

7    A.    I told him that I have something for him, I need

8    to meet with him as soon as possible.

9    Q.    And did he meet with you?

10   A.    I left for Yemen before he had met with me.

11   Q.    Okay.  Now, sir, you told us you had difficulties

12   with dates.  Let me show you what's marked as

13   Government's Exhibits 145 and 146.

14              THE COURT:  We're going to break for lunch at

15   this time.

16              Do not discuss this case either amongst

17   yourselves or with anyone else.  Have no contact

18   whatsoever with anyone associated with the trial.  Do

19   not read, listen or see anything touching on this

20   matter in any way.

21              If anyone should try to talk to you about this

22   case, you should immediately instruct them to stop and

23   report it to my staff.

24              You may leave your materials at your chairs.

25   Please be back in the jury room at 1:30.

1           (Whereupon, the jury exited the courtroom at

2     12:22 p.m. and the following proceedings were had:)

3           THE COURT:  You may be seated.

4           Sir, 1:30.  You're not to discuss your

5     testimony with anyone or permit anyone to discuss it

6     with you.  You need to back at 1:30.

7           THE WITNESS:  Okay.

8           (Witness excused.)

9           MR. GREGORIE:  Your Honor, if I may, it would

10    be my intention -- we're going to get close to where

11    we're going to introduce tapes.  We're going to try to

12    introduce them through him all at one time.  We're

13    going to try to show it to them before he gets on at

14    1:30.

15          THE COURT:  Okay.

16          MR. GREGORIE:  If we could meet maybe for ten

17    minutes, maybe at 1:20, I'll be glad to show them all

18    so that that will make it a little more efficient.

19          THE COURT:  Okay.

20          MR. GREGORIE:  Thank you.

21          MS. JHONES:  Your Honor, this exhibit,

22    Exhibit 145, I've never seen it before.  I am going to

23    have an objection to this.  And what this purports to

24    be is a computer printout -- correct me if I'm wrong,

25    Mr. Gregorie --

1          MR. GREGORIE:  Yes.  That's correct.

2          MS. JHONES:  -- a computer printout of

3     approximately four pages with a lot of codes.

4          And Mr. Gregorie tells me this has something

5     to do with -- this is like a computer printout of

6     Mr. Al-Saidi's trip to Yemen.

7          MR. GREGORIE:  This was subpoenaed in the last

8     trial, your Honor, although I don't believe we -- we

9     didn't introduced introduce it as evidence.

10         But it was subpoenaed from the airlines for

11    the computer printout of his travel.  And we've used it

12    to help him with dates, your Honor, because he has

13    difficulty remembering.

14         So I would be showing it to him merely to

15    assist him with the dates, your Honor.

16         THE COURT:  You're not seeking to introduce

17    it?

18         MR. GREGORIE:  I will introduce it, your

19    Honor.

20         MS. JHONES:  I don't have a problem with him

21    showing him something to refresh his recollection.  I

22    can't -- this is -- without a records custodian, your

23    Honor, I have no idea what this means.

24         It's all these codes and I can't properly

25    cross-examine this document because I have no idea what

1    it is.  That's my objection.

2         If I -- and I'm happy to show it to the Court

3    so the Court can look at it.

4         MR. GREGORIE:  It's his computer printout of

5    his travel, your Honor.

6         MS. JHONES:  It doesn't mean that it's not an

7    out-of-court statement offered for it's truth.  It's

8    still a business record.

9         And it has to be done through a records

10   custodian so we have an opportunity to properly

11   cross-examine and understand what all these codes mean.

12        THE COURT:  You can use it to help him refresh

13   his recollection.  If you want to introduce it, you're

14   going to have to have the custodian of records come in.

15        MR. GREGORIE:  Fine, your Honor.

16        THE COURT:  Mr. Levin, you had a motion?

17        MR. LEVIN:  Yes, your Honor.

18        Yesterday, during my cross-examination of

19   Special Agent Velazquez, I attempted to ask questions

20   concerning a conversation that he had testified on

21   direct examination, which was on May 24th of 2006.

22        I had asked a question.  The Government

23   objected on hearsay grounds.  The Court sustained.

24        I basically am moving for a mistrial in that

25   it is my belief that Patrick Abraham was deprived of

1    his right to effectively confront the witness with

2    regard to that conversation which was the subject of

3    direct examination.

4         MS. ARANGO:  Judge, what he was trying to do

5    was discuss a conversation that occurred and he was

6    specifically either reading from the transcript or

7    discussing specific words that were discussed in that

8    conversation that he obtained from the transcript,

9    which was not in evidence.  That was my objection.

10        He was -- it was a conversation that was not

11   in evidence.  It was -- and he -- if he wants to

12   attempt to put it into evidence in his case, he can do

13   so.  But he can't read from a document or quote from a

14   document that's not in evidence.

15        MR. LEVIN:  Well, I wasn't reading or quoting

16   from the document.  I might have been referring to it

17   to formulate my question.

18        THE COURT:  What you said was, "But in that

19   conversation, Batiste tells Elie Assaad that Patrick

20   Abraham -- all he wanted was the money and that he

21   wasn't going to do what he said he was going to do."

22        So you were saying what Batiste stated.

23        MR. LEVIN:  Yes.

24        THE COURT:  So that's hearsay.

25        MR. LEVIN:  Okay.  And it's my position --

1      THE COURT:  And that was the basis that I

2  sustained it.

3      MR. LEVIN:  I understand.

4      It's my position that this Court has allowed a

5  lot of hearsay to come in on direct examination through

6  the Government's witnesses, through the testimony of

7  Special Agent Velazquez, who's been allowed to give his

8  expert opinion under 701 and 704 and allowed to --

9      THE COURT:  Well, you can certainly --

10     MR. LEVIN:  -- offer hearsay statements --

11     THE COURT:  If it goes up to the appellate

12  court, then, you'll have the basis to appeal me, if

13  that's what I've done, sir.

14     MR. LEVIN:  I understand.

15     THE COURT:  But this is hearsay, and that's

16  the basis that I sustained it.

17     MR. LEVIN:  Okay.

18     THE COURT:  And it -- there's no basis for a

19  motion for mistrial.

20     It doesn't mean that it won't come in later or

21  that you can't get it in.  I don't know whether you can

22  get it in or not.

23     But it was a statement coming in for the truth

24  of the matter asserted.  It was hearsay.  On that

25  basis, I sustained it.  It was not a tape or a

1  transcript that is in evidence.  On that basis, I

2  sustained it.

3       There's no basis for mistrial.  It's denied.

4       MR. LEVIN:  Your Honor, there was another

5  motion which I reserved.  But at this time I'm not

6  prepared to address it.

7       I was not able to copy yesterday's transcript

8  because my box is full or whatever Lisa was telling me,

9  that she had attempted to send it to me and I wasn't

10 able to receive it.

11      And, frankly, without --

12      THE COURT:  You reserved a motion on a -- you

13 and Ms. Jhones reserved a motion on a statement that

14 Mr. Velazquez had made that I struck -- a statement

15 that he made that I struck and instructed the jury to

16 disregard it.

17      Do you want to proceed with that?

18      MR. LEVIN:  I would, your Honor.

19      The bell had already been rung.  The answer

20 that Mr. Velazquez gave, off the top of my head, was

21 totally nonresponsive to my question.

22      He went out of his way to point out that -- I

23 believe I was asking him about whether or not the FBI

24 in another case had tape-recorded or video-recorded the

25 statement of a particular accused, and that was a

1     fairly simple, straightforward question.

2           He went out -- went on to say, I believe,

3     something along the lines of, "I believe that's the

4     case.  But in that case, that defendant was innocent"

5     or had not committed the crime or words to that effect.

6           The bell had already been rung.  In essence,

7     he suggested to the jury, by inference, that Patrick

8     Abraham, in fact, is guilty in this case and, in that

9     case, that defendant was not guilty.

10          That is incurable, whether it be stricken or

11    not stricken, and based on the bell being rung, he is

12    deprived of his fair trial rights based on that answer,

13    which absolutely exceeded the scope of the question.

14          There was -- there's not, in my opinion, any

15    margin for any door having been opened to have received

16    that type of an answer.  Accordingly, I move for a

17    mistrial.

18          MS. JHONES:  Your Honor, I'd just like to add,

19    if I may, only because -- even though it did not

20    pertain -- it obviously pertained to Mr. Abraham's

21    statement, because these are four conspiracy charges, I

22    think the spillover effect is obvious.

23          I don't have a citation.  I will get the

24    citation for the Court afterwards.  I, like Mr. Levin,

25    was not prepared to address this.

1          But there is a case out of the Eleventh

2     Circuit, a 1979 case, *United States versus Nickerson*,

3     where something similar happened in terms of bringing

4     out --

5          THE COURT:  What's the cite?

6          MS. JHONES:  I have to get it.  I don't have

7     it.

8          THE COURT:  Well, I don't want to hear it if

9     you don't have the cite.  So you can bring it and then

10    I'll let you argue it.

11         MS. JHONES:  Okay.

12         THE COURT:  But I can't look at it.  And I'm

13    not going to -- quite frankly, I'm just not going to

14    rely on a representation without having the case in

15    front of pee.

16         MS. JHONES:  I understand.  I'll get a copy of

17    the case for the Court.

18         THE COURT:  Okay.  So we're in recess until

19    1:30.

20         I think you all are going to meet with

21    Mr. Gregorie at 1:20.  We're in recess.

22         MR. GREGORIE:  Thank you, your Honor.

23         (Thereupon, a luncheon recess was taken, after

24    which the following proceedings were had:)

25         THE COURT:  We're back on United States of

1   America versus Narseal Batiste, et al., Case

2   No. 06-20373.

3           Counsel, state your appearances, please, for

4   the record.

5           MR. GREGORIE:  Good afternoon, your Honor.

6           Richard Gregorie and Jacqueline Arango on

7   behalf of the United States.

8           MS. JHONES:  Ana Jhones on behalf of Narseal

9   Batiste, who is present.

10          MR. LEVIN:  Albert Levin for Patrick Abraham,

11  who's present.

12          MR. CASUSO:  Louie Casuso Burson Augustin,

13  who's present.

14          MR. CLARK:  Nathan Clark for Rotschild

15  Augustine, who's present.

16          MR. HOULIHAN:  Richard Houlihan on behalf of

17  Naudimar Herrera.

18          MR. VEREEN:  And Roderick Vereen on behalf of

19  Stanley Phanor, who's present.

20          THE COURT:  All Defendants are present.

21          Let's bring in the jurors.

22          (Whereupon, the jury entered the courtroom at

23  1:47 p.m. and the following proceedings were had:)

24          THE COURT:  You may be seated.

25          You are still under oath, sir.

```
 1                 You may proceed, Mr. Gregorie.

 2                 MR. GREGORIE:  Thank you.

 3                 Good afternoon, ladies and gentlemen.

 4                 THE JURY:  Good afternoon.

 5    BY MR. GREGORIE:

 6    Q.    Mr. Abbas, when we left off, we were talking

 7    about your flying to Yemen.  Correct?

 8    A.    Yes, sir.

 9    Q.    Now, sir, what, if any, assistance have you had

10    in remembering the date that you flew to Yemen?

11    A.    If I remember the date that I left to Yemen, I

12    think it's September 13.

13    Q.    Okay.  Are you sure about that?

14    A.    Yes, sir.

15    Q.    And do you remember how long it took you to fly

16    from the United States, Miami, to Yemen?

17    A.    I'm not exactly sure.  I know it's over 24 --

18    20 hours.

19    Q.    Do you remember the route that you took back in

20    2005?

21    A.    I think it was Yemen, Frankfurt, Jordan -- I

22    mean, Miami, Frankfurt, Jordan and then Yemen.

23    Q.    And how is it that you remember that?

24    A.    The FBI showed me the airline ticket.

25    Q.    And do you remember what day it was you arrived
```

 1    in Yemen?

 2    A.     I'm not sure.

 3    Q.     What day, again, did you say you left?

 4    A.     September 13.

 5    Q.     When you arrived in Yemen, did you ever try to

 6    call anybody back here in the United States about the

 7    AK-47 and the document you received?

 8              MS. JHONES:  Objection as to leading.

 9              THE COURT:  Sustained.

10              Rephrase your question.

11    BY MR. GREGORIE:

12    Q.     Who, if anyone, did you call back in the United

13    States after you arrived in Yemen?

14    A.     I called Special Agent John Stewart on the FBI.

15    Q.     How did you call him?  What method did you use?

16    A.     I had to use a calling card to call

17    international.  It was very poor connections.  I had a

18    hard time calling.  But I finally get through.

19    Q.     Why did you have a hard time calling him?

20    A.     Because the -- I had to use a calling card and

21    it's not easy to call from a cellular phone using a

22    calling card to the United States.

23    Q.     From where?

24    A.     From Yemen.

25    Q.     Okay.  Do you remember when, if at all, you ever

1    got in touch with him?

2    A.    I think it's October -- October 6th.

3    Q.    And when you talked to him, what did you tell

4    him?

5    A.    I told him I had the AK and I had the piece of

6    paper and I was very concerned about this group that I

7    was talking to.

8    Q.    Did you use exactly those terms over the

9    telephone?

10   A.    I'm not 100 percent sure.  But I think that's the

11   words that I used.

12   Q.    And what, if anything, as a result of this

13   conversation -- I don't want you to tell me what Agent

14   Stewart told you.

15         But as a result of the conversation, what

16   happened next?

17   A.    I had to come back to the US.

18   Q.    Okay.  And how did you arrange to come back to

19   the US?

20   A.    I bought an airline ticket and I came back.

21   Q.    How did you get the money to buy the airline

22   ticket?

23   A.    I had to borrow it when I was in Yemen.

24   Q.    And did you plan on getting reimbursed?

25   A.    Yes, sir.  The FBI told me they will reimburse me

1    for the airline ticket.

2    Q.    Now I'm going to show you what's marked as 146

3    for identification and ask if you recognize that.

4    A.    Yes.  That's the airline ticket I came with.

5    Q.    Came from where to where?

6    A.    From Yemen to Miami.

7    Q.    And that's the ticket you used?

8    A.    That's a copy of the ticket I used.  Yes, sir.

9          MR. GREGORIE:  United States moves 146 for

10   evidence, your Honor.

11         MS. JHONES:  No objection.

12         THE COURT:  It will be admitted as

13   Government's Exhibit 146.

14         (Whereupon, Government's Exhibit No. 146 was

15   entered into evidence.)

16   BY MR. GREGORIE:

17   Q.    Taking a look at it, do you know exactly what

18   date you came back to the United States from Yemen?

19   A.    I think October 20 is the day I got back to the

20   US.

21   Q.    Do you remember what date you left Yemen?

22   A.    It was the 19, but I think it was when -- I got

23   on the plane around 11:30 p.m.  So they might have the

24   date on the 20th.

25   Q.    Okay.  And how long did it take you to fly back

```
 1   to the US?

 2   A.     Between 20 and 22 hours.

 3   Q.     And do you know how much it cost for that flight?

 4   Did you pay for the ticket?

 5   A.     Yes.  But I don't remember how much.  It was -- I

 6   don't know if it was 800, 900.  I'm not sure.

 7   Q.     $800 or $900, you say?

 8   A.     Yes, sir.

 9   Q.     Now, sir, when you arrived back in the United

10   States, was anybody waiting here for you?

11   A.     Yes, sir.

12   Q.     Who was waiting for you?

13   A.     John Stewart and, I think, Tony Velazquez and

14   Joe.  I don't remember his last name.

15   Q.     And were they all at the airport?

16   A.     Actually, I think Special Agent Tony Velazquez

17   was in the hotel and Special Agent John Stewart and

18   Special Agent Joe is the ones that pick me up from the

19   airport.

20   Q.     What time of night was it that you got here?

21   A.     Midnight.  Around 11:00, 12:00, in the morning.

22   Q.     How did you feel?

23   A.     I was very tired.  It's a long flight.

24   Q.     Did you give anything to the agents when you got

25   here?
```

al-Saidi - DIRECT - By Mr. Gregorie          164

```
 1   A.     I gave them the document and I gave them a CD I
 2   had bought for them.
 3   Q.     When you say "the document," are you referring to
 4   Government Exhibit 98 --
 5   A.     Yes, sir.
 6   Q.     -- that we talked about earlier?
 7   A.     Yes, sir.
 8   Q.     Let's go back to that for a minute.
 9          Do you actually have any contacts with any
10   terrorist organizations in Yemen?
11          MS. JHONES:  Objection, your Honor.  It
12   assumes a fact not in evidence.
13          THE COURT:  Overruled.
14          THE WITNESS:  If I know anybody who was
15   connected with Al-Qaeda in Yemen?
16   BY MR. GREGORIE:
17   Q.     Yes.
18   A.     Yes, I did.
19   Q.     Who did you know that was connected with
20   Al-Qaeda?
21   A.     I knew several people in my area that was
22   connected with Al-Qaeda.  Some people has been charged
23   through the Yemenese Government, and some people
24   haven't.  But, yes, I do know several people in my
25   neighborhood in Yemen.
```

1    Q.    Was it possible for you to actually deliver this

2    document to anyone connected to Al-Qaeda or a terrorist

3    organization?

4    A.    Yes, sir.

5    Q.    How would you do that?

6    A.    There was several ways that I could have done it.

7    I could have went to the mosque and hanged it in the

8    mosque, as Al-Qaeda influence usually does, or I could

9    have took it to anybody that I knew that was an --

10   Al-Qaeda members.

11   Q.    And did you do that?

12   A.    No, sir.

13   Q.    Now, sir, when you came back -- what did you do

14   with this document when you came back into the US?

15   A.    As soon as I see the FBI, that's what I gave it

16   to them.

17   Q.    Did you sit and talk with the FBI that night when

18   you came back on October 20th?

19   A.    We talked, but not for long.  Was -- you know, it

20   was five minute.  And they just dropped me off and we

21   made a deal to meet the next day.

22   Q.    Did you see the FBI the next day, 21st of

23   October?

24   A.    Yes, sir.

25         MS. JHONES:  Again, your Honor, I need to

1    lodge continuing objection to the leading nature of the

2    questions.  I don't want to interrupt the Government

3    every time.  But objection to the leading nature of the

4    questions.

5              THE COURT:  Sustained.

6              Rephrase your question.

7    BY MR. GREGORIE:

8    Q.    Who, if anyone, did you see on October 21st, the

9    next day?

10   A.    I seen the FBI.

11   Q.    And what, if anything, did you tell them?

12   A.    I tell them everything that I known about Brother

13   Naz and I told them about the AK-47.  And, basically,

14   that was most of our conversation.

15   Q.    Whose money did you pay for that AK-47 with?

16   A.    My money.

17   Q.    And were you concerned about getting your money

18   back?

19   A.    Yes, I was.

20   Q.    And what were you going to do to get it back --

21   get your money back?

22   A.    I was supposed to give them the AK-47 back and

23   they were supposed to reimburse me for the money I paid

24   for it.

25   Q.    Did you tell the FBI where you had left it?

1    A.    Yes, I did.

2    Q.    Did you ever get your money back?

3    A.    No.

4    Q.    Why not?

5    A.    Because I wasn't able to turn it in.

6    Q.    Why?

7    A.    Because it wasn't where I left it.  They had gave

8    it to the dealer that I bought it from to hold it until

9    I come back and then he was in jail at the time.  I was

10   never able to reach him.

11   Q.    Now, sir, after you met with the FBI on the 21st,

12   did they give you anything?

13   A.    Yes.  They gave me some money for food and to go

14   buy a cell phone.

15   Q.    And when, if at all, did you go buy a cell phone?

16   A.    I think it's either the 22nd -- yeah.  I think

17   it's the 22nd of October.

18   Q.    And where did you go to buy the cell phone?

19   A.    It was a shopping mall around -- around the hotel

20   that I walked to in North Miami.

21   Q.    Did you see anybody you knew when you went to get

22   the cell phone?

23   A.    Yes, sir.  I seen Mike, my coworker.

24   Q.    When you say Mike, there are a couple of Mikes

25   that were working with you.  Correct?

```
 1   A.      Yes, sir.

 2   Q.      Can you distinguish for the jury.

 3   A.      The guy I seen is Haitian Mike.

 4   Q.      Do you know what his last name is?

 5   A.      No, I don't.

 6   Q.      And when you saw him, what, if anything, did you

 7   tell him?

 8   A.      I told him I was very -- I wanted to know what

 9   happened to the AK-47, and I told him where I was

10   staying.  I told him, if he seen Brother Naz or any of

11   his members, that I want to contact him.  And I told

12   him where I was staying, gave him the room number.  We

13   exchange phones.  That was it.

14   Q.      You say "Brother Naz or any of his members."

15           Who are you talking about when you say "his

16   members"?

17   A.      Brother Naz was known in my area, in my -- I

18   was -- the store I was working in.  He was a leader of

19   his group.  He had a group with him.

20   Q.      Do you see any of that group in the courtroom

21   today?

22   A.      Yes, sir.

23   Q.      Would you point them out, please.

24   A.      Sure.

25           The third person to the left -- I mean, the
```

```
 1   fourth person to the left is Brother Pat.

 2         Two people -- there is Brother Burson next to

 3   him.

 4         And Brother Rot.

 5         Brother Naudy.

 6         And Brother Sunni.

 7   Q.    Did you know them by any other names other than

 8   those?

 9   A.    No.

10   Q.    Can you tell us a little more description about

11   each one, please.

12   A.    Sure.

13         Pat is the one with the little short hair, no

14   beard.

15         Brother Burson is the one with the dread.

16   Q.    The one with what?  I'm sorry?

17   A.    Dread.

18   Q.    Dreads.

19   A.    The hair.  Yeah.

20   Q.    Okay.

21   A.    I don't know how to describe the -- the one in

22   the corner there is Brother Rot, I believe.

23         And Brother Naudy is the light-skinned one, short

24   hair, no beard.

25         And Brother Sunni is the one to the right -- all
```

 1    the way to the right.  I can't see him to describe him.

 2    Q.    Okay.  Now, sir, had you seen them at any time

 3    that -- while you were working in the store?

 4    A.    I'm not sure who was the one that I seen.  But I

 5    did seen several them.  Yes.

 6    Q.    And what, if anything, did you see them doing?

 7    A.    I saw Brother Naz when he was taking them to the

 8    park to train several times and they was running past

 9    my store either -- while they was going on or when they

10    finished and was coming back.

11    Q.    You used the term "train."  By "train," what do

12    you mean?

13    A.    I asked Brother Naz when he told me -- I asked

14    him where they was going.

15          He told me they was going to train.

16          I asked him what kind.

17          He told me they go to the park and do martial

18    arts training and pushup and situp.  He tell me that's

19    his way of keeping them in shape.

20    Q.    Now, sir, after you saw Haitian Mike on the 22nd,

21    where did you go?

22    A.    I went back to the hotel.

23    Q.    And what, if anything, happened after you went

24    back to the hotel on the 22nd?  Did anything happen in

25    Miami?

1    A.      Yes, sir.  It was Hurricane Wilma.

2    Q.      And do you remember approximately when that was?

3    A.      I believe it was the 23rd to the 24th.

4    Q.      And where were you during the hurricane?

5    A.      I was in my room, in the hotel.

6    Q.      And what happened to the power?

7    A.      No power.  Was no light, no water, nothing.  Get

8    cut off.

9    Q.      Who was with you in the hotel?

10   A.      I was alone.  Brother Naz came and visit me with

11   Brother Pat and Brother Naudy, I think -- either Naudy

12   or Burson.  But that's after the hurricane.

13   Q.      Do you remember how long after the hurricane?

14   A.      I'm not sure exactly at all.

15   Q.      And how did they -- when they found you, what

16   happened?

17   A.      I was staying there, and Brother Naz, Brother Pat

18   and another member -- I'm not sure if it was Burson or

19   Naudy -- they came -- surprise me into my hotel.

20   Q.      And did you speak with them?

21   A.      Sure.  I let them in.  We sit down and we spoke

22   and we got out.  We went to a Chinese restaurant.  We

23   get some food.

24   Q.      What, in particular, did you talk about?

25   A.      Brother Naz wanted to know if I get him connected

```
 1    or not.
 2          And I told him I got him connected to Al-Qaeda.
 3          And he was very happy that I made the connection
 4    for him.  And he was telling me about the mission and
 5    how far he got.
 6          And we kept going on and on about politic,
 7    religion, you know, about how will he take back the
 8    land that he planned on taking.
 9    Q.    Now, after you had this meeting with Brother Naz
10    and Pat and Naudy or Burson, whoever was there, did you
11    report this to the FBI?
12    A.    No.  Was no way for me to contact them that day.
13    Q.    Why?
14    A.    My phone was dead.  Was no power.  And there was
15    no way for me to call them.
16    Q.    After that meeting, did you have any other
17    meetings with them?
18    A.    Yes.  They came the second day.
19    Q.    Who came the second day?
20    A.    Brother Naz and -- that time was Brother Naz,
21    Brother Pat, Naudy and Burson.
22    Q.    And what happened when they came on the second
23    day?
24    A.    They took me.  We went out.  We was riding
25    around, talking about how much devastation and how
```

 1   people was going crazy over the gas on the gas

 2   stations.  We went and get some Chinese food.

 3        We was riding around.  That's when we passed the

 4   FBI building.  Brother Naz pointed it out to me and was

 5   telling me, "Look, that's what you want, Occ."

 6        There was a breaking window and he was pointing

 7   to the breaking window and saying, "Look how easy it

 8   is.  You can throw a grenade.  You can throw anything

 9   over it."

10        He was telling me -- pointing to the window,

11   telling me how the US Government is so weak in a

12   disaster, saying, "Look, you could throw anything, even

13   a grenade, if you want."

14        He's still explaining to me that it's -- the best

15   time to attack the US Government is during a disaster,

16   that they so weak, God is stronger.  And he kept going

17   on and on.

18   Q.    After this meeting, did you meet with the FBI

19   again?

20   A.    Yes, I did.

21   Q.    Do you remember how long after this meeting it

22   was that you met the FBI?

23   A.    I believe it was the 27th.

24   Q.    27th of October?

25   A.    Yes, sir.

```
 1    Q.     And where did you meet with them?

 2    A.     In the parking lot of the hotel I was staying in.

 3    Q.     And what did you tell them?

 4    A.     I told them I had two meetings with Brother Naz,

 5    Brother Pat, Burson, Naudy and they point out the FBI

 6    building to me, which was around the area, and there

 7    was a breaking window.  I told them everything.

 8    Q.     And after you met with the FBI, what, if any,

 9    directions did they give you?

10    A.     They told me to go and spend the night with

11    Brother Naz in the Embassy.

12    Q.     And did you do that?

13    A.     Yes, I did.

14    Q.     And do you know where the Embassy was?

15    A.     Yes.  It was on 62nd Street on 15 Avenue.

16    Q.     Now, sir, you call it the Embassy.

17           Do you know why it's called that?

18    A.     Brother Naz called it the Embassy.

19    Q.     Did he tell you why?

20    A.     Yes.  He told me he wanted to start his own

21    Moorish Government and that would be the Embassy that

22    he's going to operate that out of.

23    Q.     And when you went to spend the night there, who

24    was there?

25    A.     In the beginning, when I first get there, we all
```

 1   gathered and spoke, like the whole group.  It was me,

 2   Brother Naz, Brother Pat, Brother Sunni, Brother Naudy,

 3   Burson, Rot.  Was everybody.

 4          But then, you know, when it gets late, everybody

 5   start break up.  Me and Naz, Burson and Pat the ones

 6   that slept over there.

 7   Q.    And did you sleep the night there?

 8   A.    Yes, sir.

 9   Q.    Was there furniture there to sleep on?

10   A.    No.

11   Q.    Was there any air conditioning or power?

12   A.    No.

13   Q.    And after you stayed there the night of the 27th

14   over to the 28th, what happened the next day?

15   A.    The next day, I asked Brother Naz to drop me off,

16   and I went and met the FBI.

17   Q.    Where did Brother Naz drop you off?

18   A.    In Al-Ansar mosque.

19   Q.    Al-Ansar mosque?

20   A.    Yes, sir.

21   Q.    What did you do once you got to the mosque?

22   A.    I walked several blocks down and I got picked up

23   by the FBI.

24   Q.    How did you get in touch with the FBI?

25   A.    I called them.

1   Q.      Your phone was working by then?

2   A.      Yes, sir.

3   Q.      Now, sir, when the FBI picked you up, where did

4   they take you?

5   A.      They put me up on a hotel on the Beach.

6   Q.      And where did they take you?

7   A.      I'm sorry?

8   Q.      Did they take you to the hotel?

9   A.      They bring me up on the hotel on the Beach.  Yes,

10  sir.

11  Q.      When you got to the hotel on the Beach with the

12  FBI, what, if anything, did they do with you?

13  A.      We signed papers for the consensual recording.

14  Q.      Can you explain that to the jury.

15  A.      Basically, it's like a consent form that I signed

16  allowing the Government to record my voice and Brother

17  Naz.

18  Q.      Okay.  Now, after you did this, did you begin

19  recording conversations that you were having?

20  A.      Yes, sir.

21  Q.      How did you do that?

22  A.      The FBI gave me a body recorder.

23  Q.      And did they show you how to use it?

24  A.      Yes, they did.

25  Q.      Did you have any other recording devices at any

 1    time after this time that were used to record

 2    conversations?

 3    A.    Yes, sir.

 4    Q.    What other kind of recording devices did you

 5    have?

 6    A.    I think it was either the TV or the DVD.  But

 7    they set up on the DVD and TV recording equipments and

 8    they --

 9    Q.    Where was that?

10    A.    In the apartment they got for me on the Beach.

11    Q.    Anything else?

12    A.    Yes.  They also gave me something to hook up to

13    the phone so, when I do the phone calls, I could

14    record.

15    Q.    When you say hook it up to the phone, was it

16    obvious when it was hooked up to the phone?

17    A.    Was very obvious.  Yes.

18    Q.    I'm now going to show you a series of exhibits:

19    Government's Exhibit 37 and 37-A.

20    A.    Okay.

21    Q.    Do you recognize those?

22    A.    Yes, sir.

23    Q.    Are these recordings that you made?

24    A.    Yes, sir.

25    Q.    And have you listened to them?

1  A.     Yes, sir.

2  Q.     I'm going to ask you the same questions with

3  regard to each.  Okay?

4         MS. JHONES:  Your Honor, I just -- I'm sorry.

5  I just have to lodge an objection to showing the

6  witness dates prior to asking him questions about the

7  calls.

8         I think it's improper the way the Government

9  is doing this.  I have an objection as to providing

10  this witness with those -- that information at this

11  time in tandem.

12         THE COURT:  Overruled.

13  BY MR. GREGORIE:

14  Q.     Have you reviewed it?

15  A.     Yes, sir.

16  Q.     Does that recording fairly and accurately record

17  the conversation you had on the date -- indicated on

18  that date?

19  A.     Yes, sir.

20  Q.     And was there a transcript made of that?

21  A.     Yes, sir.

22  Q.     And have you listened to the tape and compared it

23  to the transcript?

24  A.     Yes, I did.

25  Q.     Does that fairly and accurately depict what was

1   said on the tape?

2   A.    Yes, sir.

3   Q.    Have there been any alterations or deletions made

4   to that tape recording of the conversation you had?

5   A.    No, sir.

6   Q.    How do you know that you listened to that?  Is

7   there some marking?

8   A.    Yes, sir.

9   Q.    What is that?

10  A.    I initial it and I dated it.

11  Q.    Let's do the same, if you would, with

12  Government's Exhibit 38, just 38.

13        Do you recognize that?

14  A.    Yes, sir.

15  Q.    And is that a recording of a conversation you

16  had?

17  A.    Yes, sir.

18  Q.    Did you listen to it?

19  A.    Yes, sir.

20  Q.    Does it fairly and accurately depict the

21  conversation you had on that date?

22  A.    Yes, sir.

23  Q.    And have there been any alterations or deletions?

24  A.    No.

25  Q.    Let me show you what's marked as Government's

1    Exhibits 39 and 39-A.  Would you take a look at them.

2         Is that a recording you made?

3    A.    Yes, sir.

4    Q.    And does it fairly and accurately depict the

5    conversation you had on that day?

6    A.    Yes, sir.

7    Q.    And is there a transcript, 39-A, with 39?

8    A.    Yes, sir.

9    Q.    Have you listened to the tape and compared it to

10   the transcript?

11   A.    Yes, I did.

12   Q.    Does the transcript fairly and accurately depict

13   what's said on the tape?

14   A.    Yes, sir.

15   Q.    Have there been any alterations or deletions made

16   to the tape recording of that conversation?

17   A.    No, sir.

18   Q.    Let's go to Government's Exhibit 40.  Take a look

19   at 40, please.

20        Do you recognize it?

21   A.    Yes, sir.

22   Q.    How do you recognize it?

23   A.    Because I initial it and dated it.

24   Q.    Did you listen to the -- that recording?

25   A.    Yes, I did.

1   Q.     And does it fairly and accurately depict the

2   conversation you had on that date?

3   A.     Yes, sir.

4   Q.     And is that a fair and accurate recording of the

5   conversation you had on that date?

6   A.     Yes, sir.

7   Q.     Have there been any alterations or deletions made

8   to that tape recording?

9   A.     No, sir.

10  Q.     Let me show you what's marked as Government's

11  Exhibits 41 and 41-A.  Would you take a look at it,

12  please.

13  A.     Sure.

14  Q.     Do you recognize Government's Exhibit 41?

15  A.     Yes, I do.

16  Q.     And how do you recognize it?

17  A.     I initialed it and dated it.

18  Q.     Have you listened to that recording?

19  A.     Yes.

20  Q.     Does that recording fairly and accurately depict

21  the conversation you had on that date?

22  A.     Yes, sir.

23  Q.     And have you compared it to 41-A?

24  A.     Yes, I did.

25  Q.     41-A is a transcript?

al-Saidi - DIRECT - By Mr. Gregorie                    182

```
 1   A.      Yes, sir.
 2   Q.      Does the transcript fairly and accurately
 3   transcribe what appears on the conversation on 41?
 4   A.      Yes.
 5   Q.      Have there been any alterations or deletions made
 6   to 41?
 7   A.      Not that I know of.
 8   Q.      Government's Exhibit 42 and 42-A:  Do you
 9   recognize them?
10   A.      Yes, sir.
11   Q.      And can you tell us what Government's Exhibit 42
12   is.
13   A.      Yes.  It's a meeting between me and Brother Pat.
14   Q.      And is it recorded?
15   A.      Yes, sir.
16   Q.      42 is the recording?
17   A.      Yes.
18   Q.      Have you listened to that recording?
19   A.      Yes.
20   Q.      Does it fairly and accurately depict the
21   recording that was done on that date?
22   A.      Yes, sir.
23   Q.      And 42-A:  Is that a transcript?
24   A.      Yes.
25   Q.      Have you compared the recording to the
```

 1   transcript?

 2   A.    Yes, I did.

 3   Q.    Does the transcript fairly and accurately depict

 4   what is said on the recording?

 5   A.    Yes, sir.

 6   Q.    And have there been any alterations or deletions

 7   made to that tape recording?

 8   A.    No, sir.

 9   Q.    Let's go to Government's Exhibit 45 and 45-A.

10         Would you look at those.

11   A.    Yes.

12   Q.    What is 45?

13   A.    45 is a recording.

14   Q.    Have you listened to that recording?

15   A.    Yes, I did.

16   Q.    Does that fairly and accurately record

17   conversations that -- in which you took part?

18   A.    Yes, sir.

19   Q.    Have you listened to it to determine if it fairly

20   and accurately depicts conversations without any

21   alterations or deletions?

22   A.    Yes, sir.

23   Q.    And does it do that?

24   A.    Yes, sir.

25   Q.    And what is 45-A?

1    A.    It's the transcription -- the transcripts of 45.

2    Q.    And have you compared the transcript to the tape

3    recording?

4    A.    Yes, sir.

5    Q.    And does the transcript fairly and accurately

6    depict what's said in the recording?

7    A.    Yes, sir.

8    Q.    Thank you.

9    A.    You're welcome.

10   Q.    Government's Exhibit 46 and 46-A and -B:  Do you

11   recognize that?

12   A.    Yes, sir.

13   Q.    Can you tell if one is an audio- and one is a

14   videotape?

15   A.    Yes, it is.

16   Q.    Can you tell us if those fairly and accurately

17   depict a meeting you had?

18   A.    Yes, sir.

19   Q.    And have you listened to the audiotape and seen

20   the videotape?

21   A.    Yes, I did.

22   Q.    Do they fairly and accurately depict the meeting

23   you had?

24   A.    Yes, sir.

25   Q.    Have there been any alterations or deletions?

```
 1    A.      No, sir.

 2    Q.      How do you know that?

 3    A.      I dated it and initialed.

 4    Q.      Is there a transcript made of that meeting?

 5    A.      Yes, sir.

 6    Q.      And have you looked at the transcript and

 7    compared it to the tape?

 8    A.      I did.

 9    Q.      And does the transcript fairly and accurately

10    transcribe what is -- occurs in that meeting?

11    A.      Yes, sir.

12    Q.      Thank you.

13            Government's Exhibits 49 and 49-A:  Would you

14    look at that, please.

15            Can you tell us what 49 is.

16    A.      It's a meeting.

17    Q.      And does it fairly and accurately depict what

18    occurred on that particular date?

19    A.      Yes, sir.

20    Q.      Is it a meeting or is it a telephone call?

21    A.      It's a telephone call.

22    Q.      Did you listen to that telephone call on the

23    recording?

24    A.      Yes.

25    Q.      Does it fairly and accurately depict the call?
```

1    A.      Yes.

2    Q.      And have you looked at 49-A, the transcript?

3    A.      Yes.

4    Q.      And does it -- that transcript fairly and

5    accurately transcribe what's on the call that's on

6    Government's Exhibit 49?

7    A.      Yes, sir.

8    Q.      And have there been any alterations or deletions

9    to Government's Exhibit 49?

10   A.      No.

11   Q.      And the transcript fairly and accurately

12   transcribes what was said?

13   A.      Yes, sir.

14   Q.      Thank you.

15   A.      You're welcome.

16   Q.      Government's Exhibits 50 and 50-A:  Would you

17   look at those, please.

18           Can you tell us what Government's Exhibit 50 is.

19   A.      It's a recording.

20   Q.      And have you listened to that recording?

21   A.      Yes, sir.

22   Q.      Does that recording fairly and accurately depict

23   what was said in that particular conversation?

24   A.      Yes, sir.

25   Q.      And have you examined the recording and compared

1    it to 50-A, the transcript?

2    A.    Yes, I did.

3    Q.    Does 50-A, the transcript, fairly and accurately

4    transcribe what's said in 50?

5    A.    Yes, sir.

6    Q.    Have there been any alterations or deletions to

7    Government's Exhibit 50?

8    A.    No.

9    Q.    Thank you.

10   A.    You're welcome.

11   Q.    Let me show you what's marked as Government's

12   Exhibits 51 and 51-A.  Take a look at those, please.

13         Do you recognize them?

14   A.    Yes, I do.

15   Q.    How do you recognize them?

16   A.    It's initialed and dated.

17   Q.    And you did that?

18   A.    Yes, I did.

19   Q.    And Government 51 is a transcript of a

20   conversation?

21   A.    Yes, sir.

22   Q.    And did you listen to that tape, 51?

23   A.    Yes.

24   Q.    And you initialed it?

25   A.    I don't see the initial on the original CD.  I

 1   see -- I see a date, but I don't see my initial in

 2   there.

 3   Q.    Okay.  And does that -- does that transcript

 4   fairly -- that tape fairly and accurately depict -- is

 5   your initial somewhere else?

 6   A.    Yes.

 7   Q.    Where does it appear?

 8   A.    51-A.

 9   Q.    51-A, the transcript?

10   A.    The transcript.

11   Q.    Did you listen to 51 and compare it to 51-A?

12   A.    Yes, sir.

13   Q.    Does 51 fairly and accurately depict the

14   conversation that you had in that -- that's on that

15   DVD?

16   A.    Yes, sir.

17   Q.    And 51-A, the transcript:  Does it fairly and

18   accurately transcribe what appears on 51?

19   A.    Yes, sir.

20   Q.    And have there been any alterations or deletions

21   to that conversation?

22   A.    No.

23   Q.    Thank you.

24   A.    Welcome.

25   Q.    52 and 52-A:  Would you look at those, please.

 1        Could you tell us what 52 is.

 2    A.    It's a meeting from -- recording of a

 3    conversation.

 4    Q.    And did you record -- did you listen to the

 5    recording of that conversation, which is contained in

 6    52?

 7    A.    Yes, sir.

 8    Q.    And does that recording fairly and accurately

 9    depict what was said during that conversation?

10    A.    Yes, sir.

11    Q.    And have there been any alterations or deletions?

12    A.    No, sir.

13    Q.    Have you compared that to 52-A, the transcript?

14    A.    Yes, sir.

15    Q.    Does the transcript fairly and accurately depict

16    what was said in the conversation on 52?

17    A.    Yes, sir.

18    Q.    Thank you.

19    A.    Welcome.

20    Q.    Last one.  Let me show you what's been marked as

21    54 and 54-A.

22        Can you tell us what 54 is, please.

23    A.    54 is a recording of the phone call on the 27th.

24    Q.    27th of what?

25    A.    Of January.

1    Q.     And have you listened to that phone call on the

2    recording?

3    A.     Yes, sir.

4    Q.     Does that recording fairly and accurately depict

5    what was said on that phone conversation?

6    A.     Yes, sir.

7    Q.     And have there been any alterations or deletions

8    to the recording?

9    A.     No, sir.

10   Q.     And 54-A:  Does that fairly and accurately

11   transcribe what was said in 54?

12   A.     Yes, sir.

13   Q.     Have there been any changes, alterations or

14   deletions?

15   A.     No, sir.

16          MR. GREGORIE:  Your Honor, at this point, the

17   United States would move Government's Exhibits 37 and

18   37-A; Government's Exhibit 38; 39 and 39-A;

19   Government's Exhibit 40; Government's Exhibit 41 and

20   41-A; Government's Exhibit 42 and 42-A; Government's

21   Exhibit 45 and 45-A; Government's Exhibit 46 and 46-A;

22   Government's Exhibit 49 and 49-A; Government's Exhibit

23   50 and 50-A; Government's Exhibit 51 and 51-A;

24   Government's Exhibit 52 and 52-A; Government's Exhibit

25   54 and 54-A.

```
 1              I have one more.  Excuse me, your Honor.

 2   BY MR. GREGORIE:

 3   Q.    One more phone conversation.

 4         I'll let you look at what's been marked as

 5   Government's Exhibit 54 for identification.

 6         Do you recognize that?  And I'll ask you to look

 7   at --

 8   A.    Yes, I do.

 9   Q.    And is that a recording that you listened to?

10   A.    Yes, sir.

11   Q.    And does it fairly and accurately depict the

12   telephone conversation you had on that date?

13   A.    Yes, sir.

14   Q.    And have you -- are there any alterations or

15   deletions to the conversation or the recording?

16   A.    No, sir.

17   Q.    And it fairly and accurately depicts what was

18   said?

19   A.    Yes.

20   Q.    That's Government's Exhibit 53?

21   A.    Yes.

22         MR. GREGORIE:  I move 53 for evidence, your

23   Honor.

24         MS. JHONES:  I apologize, Mr. Gregorie.  May I

25   see 53?
```

1              MR. GREGORIE:  Sure.

2              MS. JHONES:  It's just not on my exhibit list.

3              MR. GREGORIE:  (Tenders document to counsel.)

4              THE COURT:  Are you moving 46-B in at this

5    time or not?

6              MR. GREGORIE:  46-B, yes, your Honor, we are.

7    I'm sorry.  In my reading of them, I skipped 46-B.

8    46-B, yes, your Honor.  We move it in evidence.

9              MS. JHONES:  Your Honor, I just need a minute

10   to go through this list, if the Court doesn't mind.

11             THE COURT:  Can you just lay the predicate for

12   46-B, please.

13             MR. GREGORIE:  Sure.  I think I asked him

14   about this.

15   BY MR. GREGORIE:

16   Q.    Can you tell us what -- looking at 46-B, can you

17   tell us, was there both audio and video on 46?

18   A.    The 21st?  Yes.

19   Q.    And did you compare the -- did you look at the

20   video?

21   A.    Yes, I did.

22   Q.    Does it fairly and accurately depict what

23   occurred in that meeting?

24   A.    Yes, it was.

25   Q.    Are there any alterations or deletions?

al-Saidi - DIRECT - By Mr. Gregorie          193

1    A.      No, sir.

2    Q.      Is that what is contained in 46-B?

3    A.      Yes.

4    Q.      Okay.

5            MR. GREGORIE:  I think that completes it, your

6    Honor.

7            MR. VEREEN:  Your Honor, may I ask one

8    question of Mr. Gregorie?

9            THE COURT:  Sure.

10           MR. VEREEN:  With regard to Exhibit 51, was

11   that initialed by this witness?

12           MR. GREGORIE:  Let me make sure I know which

13   one we're talking about.

14           May I speak with counsel for just one second,

15   your Honor?

16           THE COURT:  Sure.

17           (Discussion had off the record amongst

18   counsel.)

19           THE COURT:  Any objections?

20           MR. VEREEN:  I have no objection, Judge.

21           MS. JHONES:  I just need a second, your Honor.

22   I don't believe so.

23           Your Honor, is the last exhibit Exhibit 54-A?

24           MR. GREGORIE:  54 is the last.

25           THE COURT:  54-A.

```
 1              MS. JHONES:  That's the last in the series?

 2              THE COURT:  Yes.  Then he went back to 54.

 3              MS. JHONES:  I have no objection to any of

 4    these exhibits.

 5              THE COURT:  They will be admitted as

 6    Government's Exhibits 37, 37-A, 38, 39, 39-A, 40, 41,

 7    41-A, 42, 42-A, 45, 45-A, 46, 46-A, 46-B, 49, 49-A, 50,

 8    50-A, 51, 51-A, 52, 52-A, 53, 54, 54-A.

 9              (Whereupon, Government's Exhibit Nos. 37,

10    37-A, 38, 39, 39-A, 40, 41, 41-A, 42, 42-A, 45, 45-A,

11    46, 46-A, 46-B, 49, 49-A, 50, 50-A, 51, 51-A, 52, 52-A,

12    53, 54, 54-A were entered into evidence.)

13              THE COURT:  You may publish.

14              MR. GREGORIE:  46-A and -B.  Correct, your

15    Honor?  You have both?

16              THE COURT:  Yes.  46, 46-A and 46-B.

17              MR. GREGORIE:  Thank you, your Honor.

18    BY MR. GREGORIE:

19    Q.    Now, sir, when, if you can remember, did you

20    first record a conversation with Narseal Batiste?

21    A.    On October 29.

22    Q.    And where were you to record this conversation?

23    A.    When I first met him on -- he was in front of a

24    restaurant in North Miami.

25    Q.    And was he with anyone?
```

1    A.    Yes.  He was with his family.  And there was a

2    lot of people in the restaurant.

3    Q.    Okay.  And did you talk to him at all in the

4    restaurant?

5    A.    No, I didn't.

6    Q.    Why not?

7    A.    Because his family was with him and we was in

8    public.  There was a lot of noise, a lot of people in

9    the restaurant.  So it wouldn't help.

10   Q.    Did you go anywhere with him?

11   A.    Yes.  He took me with him and went -- dropped his

12   family off and then took me back to the Embassy.

13   Q.    And when you went back to the Embassy, did you do

14   something there?  What did you do there?

15   A.    When he took me to the Embassy, he gave me the

16   Moorish Paradigm and I got my bag, because I left my

17   bag there when I spend the night.

18   Q.    Can you tell the jury what the Moorish Paradigm

19   is.

20   A.    It's a folder with the Moorish explanations, like

21   it was information about the Moorish Scientist

22   (verbatim) Temple.

23         So, basically, he was giving it to me to give me

24   information about his -- his group and his

25   organization.  Basically, it was information about the

 1    Moors.

 2    Q.    Let me show you what's marked as Government's

 3    Exhibit 99 for identification.

 4          I'm showing you what's marked as 99 for

 5    identification.  Do you recognize that?

 6    A.    Yes, I do.

 7    Q.    What is it?

 8    A.    That's what he gave me that day:  Moorish

 9    Paradigm.

10    Q.    Okay.  And what, if anything, were you supposed

11    to do with that?

12    A.    I was supposed to give it to Al-Qaeda so they can

13    find more information about who the Moors is.

14          MR. GREGORIE:  Your Honor, I move 99 for

15    evidence.

16          MS. JHONES:  No objection, your Honor.

17          THE COURT:  It will it be admitted as

18    Government's Exhibit 99.

19          (Whereupon, Government's Exhibit No. 99 was

20    entered into evidence.)

21          MR. GREGORIE:  May I publish it, your Honor?

22          THE COURT:  Yes.  You may publish.

23    BY MR. GREGORIE:

24    Q.    I'm showing you the cover of Government's

25    Exhibit 99.

1           Is that the document that you were given?

2    A.     Yes, sir.

3    Q.     After that, where did you go?

4    A.     I went and I met the FBI.

5    Q.     And did you have to do something with the Moorish

6    Paradigm after you -- after you got it?

7    A.     Yes.  I gave it back -- I gave it to the FBI.

8    Q.     Now, sir, after that meeting, when, if at all,

9    did you have a conversation with anybody connected with

10   Narseal Batiste again?

11   A.     I think it was on the 31st.  There was a phone

12   call.

13   Q.     And do you remember -- I ask you now to take out

14   what's marked as Government's Exhibit 39 and 39-A.

15   A.     Okay.

16   Q.     Is that a recording of that phone call?

17   A.     Yes, sir.

18          MR. GREGORIE:  Your Honor, if we may publish

19   39 and 39-A.

20          THE COURT:  You may.

21          MR. GREGORIE:  May we have one moment, your

22   Honor?  I believe we have transcripts to give to the

23   jury of these exhibits.

24          THE COURT:  Okay.

25          MS. JHONES:  I'm going to ask him a question

 1    in the meantime.

 2              THE COURT:  Sure.

 3              (Discussion had off the record amongst

 4    counsel.)

 5              THE COURT:  How many binders?

 6              MR. GREGORIE:  One volume, your Honor, of the

 7    conversations that we have just introduced into

 8    evidence.

 9              THE COURT:  So it's Volume I?

10              MR. GREGORIE:  There's -- this is -- I'm

11    sorry.  This is Volume I of III.

12              (Whereupon, said binders were distributed to

13    the jury.)

14              MR. GREGORIE:  May I begin, your Honor?

15              THE COURT:  Yes.  As long as everybody has the

16    notebooks.

17              Everybody has the notebooks?

18              Where are you beginning?

19              MR. GREGORIE:  I'm starting at the very first,

20    Government's Exhibit 39-A listed here in the book, your

21    Honor.

22              THE COURT:  Okay.

23    BY MR. GREGORIE:

24    Q.    Sir, were you dealing with one particular agent

25    in doing these consensual calls?

 1   A.     If I was dealing with one agent?

 2   Q.     Just one agent.

 3   A.     It was more than one agent that I was dealing

 4   with on the case.  But when it come to -- there was

 5   more than one agent that I was dealing with.

 6   Q.     Who were you dealing with?

 7   A.     I was dealing with Special Agent John Stewart,

 8   Special Agent Tony Velazquez and Special Agent Joe.

 9   Q.     In this particular conversation, 39, was there an

10   agent with you when you made the conversation?

11   A.     Yes, sir.

12   Q.     And did you have a code name of some kind?

13   A.     Yes.

14   Q.     And what was that?

15   A.     Baylan.

16          MR. GREGORIE:  Could we play that

17   conversation, please.

18          (Whereupon, segments of Government's Exhibit

19   No. 39 was published in open court.)

20   BY MR. GREGORIE:

21   Q.     Sir, you say there "to finish up with Faisal."

22          Who is Faisal?

23   A.     Faisal is my partner.

24   Q.     And what, if any, relationship was there between

25   Faisal and Narseal Batiste, if you know?

```
 1    A.    Was introduced by Faisal to Brother Naz.  But I
 2    don't know if they have any kind of personal
 3    relationship.  I mean, I know they know each other.
 4    But I don't know if they dealing with each other or
 5    not.
 6    Q.    Why did you bring up Faisal with Brother Naz?
 7    A.    Because that's where I was going and Brother Naz
 8    knows I was doing business with Faisal.  So he know
 9    everything that was happening.  So I --
10    Q.    Well, when you start this conversation, you say,
11    "Hey, salaam aleikum."  What does that mean?
12    A.    "Peace to you."
13    Q.    And Narseal Batiste says, "Yes.  Salaam aleikum."
14          Did he speak Arabic?
15    A.    He was trying.  His language wasn't very clear.
16    But he had some words.
17    Q.    Well, did he speak full sentences in Arabic?
18    A.    Full sentence, no.
19    Q.    What did he speak in Arabic?
20    A.    The basic words, you know, like, "Peace to you,"
21    "Allah," his name, like, "Inshallah," "Allah akhbar," a
22    little bit -- basic words.
23          MR. GREGORIE:  Could you continue with the
24    conversation.
25          (Whereupon, segments of Government's Exhibit
```

1    No. 39 were published in open court.)

2    BY MR. GREGORIE:

3    Q.    Now, sir, at the bottom of that page, you say, "I

4    was wondering if you could gather the soldiers."

5          Who were you referring to when you were talking

6    about "the soldiers"?

7    A.    I was referring to his soldiers.

8    Q.    And who were those?

9    A.    Brother Pat, Brother Sunni, Brother Burson,

10   Brother Naudy, Brother Rot.

11   Q.    And why did you call them "soldiers"?

12   A.    Because that's the term he used.  He called them

13   "soldiers."

14   Q.    And you said that, "We can speak about today that

15   I just received from back home."

16         What are you referring to it?

17   A.    I was referring to speaking to them about the

18   lists, speaking to them about Brother Mohammed.  I'm

19   not sure which subject exactly was or was in mind, but

20   I was saying I had some news from back home.

21         I'm trying to discuss.  I wanted to gather all of

22   them so I could -- you know, identity -- take the

23   identity, like to see who is who, who I was speaking

24   to.

25         So, basically, I was telling him I want you to

 1    gather the soldiers.  I was instructed to ask him to do

 2    that.

 3              MR. GREGORIE:  Could you continue, please.

 4              (Whereupon, segments of Government's Exhibit

 5    No. 39 were published in open court.)

 6    BY MR. GREGORIE:

 7    Q.    Now, sir, when Narseal Batiste says to you, "So

 8    it's sounding good when you talk to your people from

 9    back home," who -- what did you understand him to be

10    telling you?

11    A.    See, when I first arrived back from Yemen and he

12    came to the hotel, you know, the FBI told me, "Go

13    ahead.  Tell him -- you have the right to tell him that

14    you connected him to Al-Qaeda."

15              So I would mention Al-Qaeda to him a lot.  He

16    stopped me and told me not to use the term of

17    "Al-Qaeda" and says use the term of "back home."

18              So when he asked me if things were sounding right

19    from my people back home, if they was sounding good

20    from back home, I told him, "Yes."  I understand him

21    meaning if things was sounding good from Al-Qaeda, if

22    they supporting his mission.

23              My answer was, "Yes.  I told you I was dealing

24    with strong Muslims," describing Al-Qaeda.

25    Q.    And he says to you, "Well, we're gonna come

 1   through all the way, 100 percent."

 2        What did you understand that to mean?

 3   A.    Which is coming through with the missions that

 4   he's been discussing with me and that's blowing up the

 5   Sear's Tower, taking over the land in Miami -- in the

 6   US, to make it an Islamic land and -- there was a lot

 7   that he promised to do so he could get Al-Qaeda's

 8   support.

 9        MR. GREGORIE:   Would you finish the

10   conversation, please.

11        (Whereupon, segments of Government's Exhibit

12   No. 39 were published in open court.)

13   BY MR. GREGORIE:

14   Q.    Now, sir, did you actually go to the Embassy on

15   the -- that night?

16   A.    No.  I don't remember going that night.

17   Q.    Okay.  Did you go the next couple of days, if you

18   remember?

19   A.    Yes, I do.

20   Q.    Do you remember when it is you went to the

21   Embassy?

22   A.    I had a phone call in December 6 and I went --

23   Q.    What date?

24   A.    I mean, December 2nd.  And I went on December 6.

25   Q.    December?  This call happens in October.

1          Do you remember what date it is?

2    A.    Okay.   October.   The next month was November.   I

3    think it was on November -- November 6 that I called

4    him.   And --

5    Q.    So you had a telephone call with him on

6    November 6th?

7    A.    Yes, sir.

8    Q.    Let me show you what's been marked as

9    Government's Exhibit 38.

10         Do you recognize that?

11   A.    Yes, sir.

12   Q.    And is that a recording of the telephone call on

13   November 6th --

14         MR. GREGORIE:   I'll withdraw that question,

15   your Honor.

16   BY MR. GREGORIE:

17   Q.    I'll show you what's marked as Government's

18   Exhibit 40.   Do you recognize it?

19         Government's Exhibit 40:   Is that a recording of

20   the telephone conversation you had on November 6th?

21   A.    Meeting.   It was a meeting.

22   Q.    It was a meeting or a telephone call?

23   A.    November 6.   Yes.   It's a telephone call.   I'm

24   sorry.

25         MR. GREGORIE:   Could we publish that for the

 1    jury, please, your Honor.  There is no transcript of

 2    this November 6th telephone call.

 3                THE COURT:  Yes.  You may publish.

 4                (Whereupon, segments of Government's Exhibit

 5    No. 40 were published in open court.)

 6    BY MR. GREGORIE:

 7    Q.    Now, sir, did you make an arrangement when you

 8    would meet Brother Naz?

 9    A.    Was supposed to be the next day, on November 7.

10    Q.    November 7?

11    A.    Yes, sir.

12    Q.    Where were you supposed to meet him?

13    A.    In the Embassy.

14    Q.    Now, in that call, you said you were trying to

15    get some money yourself?

16    A.    Yes, sir.

17    Q.    Was that true?

18    A.    No.

19    Q.    What were you telling him?

20    A.    I was giving him a reason of where do I get my

21    support, because I just came back from Yemen, no job,

22    and I already have an apartment.

23          So, basically, I was trying to let him know that,

24    because I'm working with Al-Qaeda, you know, this is

25    where I'm getting my money from, because I don't want

1    him wondering how do I have money and I just came back.

2    Q.    Did you, in fact, go to the Embassy the next day,

3    November 7th?

4    A.    Yes, I did.

5    Q.    And when you got there, was anybody there?

6    A.    Yes.  It was Brother Burson.

7    Q.    Burson Augustin?

8    A.    Yes, sir.

9    Q.    Had you ever met Burson before?

10   A.    Yes, I did.

11   Q.    Did you know his name?

12   A.    I was having a hard time remembering his name.

13   Q.    Did the FBI give you any directions?

14   A.    Yes.

15   Q.    What did they tell you to do when you went there

16   on November 7th?

17   A.    I need to find out how many is there and what's

18   their names.  I need to get a clue of how many people

19   and -- I'm dealing with, and I need to get a clue of

20   some names.

21   Q.    Were you supposed to do anything else?

22   A.    I was meeting with Brother Naz, so I could, you

23   know, find out more information from Brother Naz.

24   Q.    Okay.  And when you met Brother Burson, was that

25   call -- was that meeting recorded?

1   A.      Yes.

2          MR. GREGORIE:  Your Honor, I would now ask to

3   play Government's Exhibit 41 and 41-A, which is the

4   next trip in the volume that the jurors have.

5          THE COURT:  You may.

6          You may turn to 41-A.

7          MR. GREGORIE:  41-A is the recording on

8   November 7th, 2005.

9          This clip starts on the top of Page 3, where

10  it says, "Yeah.  I'm just coming in right now."

11         MS. JHONES:  I'm sorry.  May I just have a

12  moment with the Government?

13         I apologize, Mr. Gregorie.

14         (Discussion had off the record amongst

15  counsel.)

16         MR. GREGORIE:  Starting at the top of Page 3.

17         May we play it, your Honor?

18         THE COURT:  Yes.

19         MR. GREGORIE:  Thank you, your Honor.

20         (Whereupon, segments of Government's Exhibit

21  No. 41 were published in open court.)

22  BY MR. GREGORIE:

23  Q.     Now, sir, in there you talk about your new

24  apartment.

25         Why are you bringing this up with Burson

1    Augustin?

2    A.    I was instructed to bring it up.  I'm trying to

3    bring it up so I can get him to come over there.

4    Q.    And why did you want him over there?

5    A.    So I can record him.

6    Q.    Okay.

7          MR. GREGORIE:  Could we play the second clip,

8    now, which starts at the top of Page 20.  It starts at

9    the top of Page 20 where Burson Augustin says, "Like,

10   we kind of looked at the future."

11         (Whereupon, segments of Government's Exhibit

12   No. 41 were published in open court.)

13   BY MR. GREGORIE:

14   Q.    Now, sir, first of all, Burson Augustin uses the

15   term "jihad."

16         Did you see that?

17   A.    Yes, sir.

18   Q.    Do you know the meaning of jihad?

19   A.    Yes, sir.

20   Q.    Does it have just one meaning?

21   A.    No.  It have different meanings.  It depends on

22   the person that's using that term.  Depends.  Some

23   people use that term when -- in a violence way.  Some

24   people use it in a peaceful way.

25   Q.    Did you understand the way in which Burson

 1  Augustin was using it?

 2  A.     Brother Augustin was -- used it, you know, in a

 3  different belief, violence belief, you know.  Jihad --

 4  he meant jihad as a war, you know, as a fight.  That's

 5  how he was looking at it.  That's my belief.

 6  Q.     Now, sir, you say here, "The last thing that you

 7  were speaking about with Brother Naz and the rest of

 8  the brothers at the mosque the other day."

 9         What are you referring to?

10  A.     There was another night that we was speaking, me

11  and Brother Naz and the rest of the group, and it

12  wasn't recorded.

13         And I told the FBI about that.

14         They told me I have to go back and mention it so

15  I could get it on the recording with him agreeing that

16  we did spoke about that.

17         So --

18  Q.     Is that the night you slept at the mosque?

19  A.     Yes, sir.

20  Q.     And you told us who was present.

21         Was Burson there that night?

22  A.     Yes.

23  Q.     Okay.

24         MR. GREGORIE:  Can you continue the tape from

25  that point, please.

1          (Whereupon, segments of Government's Exhibit

2     No. 41 were published in open court.)

3     BY MR. GREGORIE:

4     Q.     What is Burson Augustin telling you there?

5     A.     He's telling me that, "We have brothers."  He

6     basically mentioned -- saying that, "We have other

7     people that will join his move that's running in the

8     street."

9               THE COURT REPORTER:  People that will....

10              THE WITNESS:  Oh, my God.  I must be

11     getting....

12              What he was telling me is about some of the

13     brothers that were gonna join the group.

14              He was saying no matter how crazy they think

15     they is in the streets, selling dope or running around

16     with guns, they like what Brother Naz and his group was

17     talking about and -- even though they think it's crazy

18     because they have big plans, taking over the whole

19     world, but they like it.

20              So, basically, he's saying, "Look, they like

21     what we saying to them.  They like the Moorish

22     Scientist organization.  It's just gonna take, you

23     know, a lot of work.

24

25     BY MR. GREGORIE:

1    Q.     Okay.

2              MR. GREGORIE:   Keep going at the top of 21.

3              (Whereupon, segments of Government's Exhibit

4    No. 41 were published in open court.)

5    BY MR. GREGORIE:

6    Q.     Sir, Burson Augustin's saying, "They get a plan"

7    and he goes through the plan.

8              Had you ever heard that before from anyone

9    besides Burson Augustin?

10   A.     Yes.   That's Brother Naz talking.

11   Q.     You say, "That's Brother Naz talking."

12            What do you mean?

13   A.     I heard him give me this talk back and forth

14   since I first met him in the store.

15   Q.     What did you understand this to mean?

16   A.     That's -- the plans that Brother Naz has been

17   talking about.   He's thinking to organize different

18   plans on different attack on different areas so he

19   could create hysterical devastation.

20            MR. GREGORIE:   Can you continue from there,

21   please.

22            (Whereupon, segments of Government's Exhibit

23   No. 41 were published in open court.)

24   BY MR. GREGORIE:

25   Q.     Sir, did you know who he was referring to when he

1    said, "The devil is against us and the devil is smart"?

2    A.    The US Government.

3    Q.    Thank you.

4         MR. GREGORIE:  Can you continue, please.

5         (Whereupon, segments of Government's Exhibit

6    No. 41 were published in open court.)

7         MR. GREGORIE:  Could we go over to the next

8    bit down, which starts on Page 30, three speakers from

9    the bottom.  It says, "CW:  Exactly, brother."

10   Page 30, three speakers from the bottom, where it says,

11   "Exactly, brother."

12        May we play, it your Honor?

13        THE COURT:  Yes.

14        MR. GREGORIE:  Please, go ahead.

15        (Whereupon, segments of Government's Exhibit

16   No. 41 were published in open court.)

17   BY MR. GREGORIE:

18   Q.    Sir, when he said to you, "By blending in, I'm

19   going to destroy you," did you understand what he was

20   talking about?

21   A.    He's saying that he must agree with the US

22   Government just so he could blend in.

23        But what I understand him saying, "blending in"

24   is staying -- staying away from being outrageous.

25   Basically, he was telling me he wanted for -- by

 1   staying out of -- being outrageous, that he could

 2   destroy his enemy, basically, the US Government.

 3           MR. GREGORIE:  Continue, please.

 4           (Whereupon, segments of Government's Exhibit

 5   No. 41 were published in open court.)

 6   BY MR. GREGORIE:

 7   Q.    Now, sir, we're going to go to the next clip,

 8   which is on Page 49.

 9           Sir, we're jumping over portions of this

10   conversation.

11           Did you talk about other things other than what

12   we've been hearing?

13   A.    We back and forth on the same subjects, you know.

14   If we speak about something else, we -- I mean, it was

15   a long, long conversation.

16   Q.    How long was this meeting this night?

17   A.    Around four, five hours.  Even longer.

18   Q.    We're now going to go to the fourth clip on

19   Page 49.

20           And do you see the -- it's -- it starts four

21   speakers down, "Do you remember the day he left?", on

22   Page 49.

23           (Whereupon, segments of Government's Exhibit

24   No. 41 were published in open court.)

25

```
 1   BY MR. GREGORIE:
 2   Q.    Now, sir, you say here you remember the day he
 3   left, in the nighttime.
 4         What are you referring to?  Do you know?  When
 5   you were talking about, "When I came back...."
 6   A.    I think he was talking about the night that I
 7   spent in the Embassy.  He was telling me the next day
 8   that all the brothers was there.
 9   Q.    Now, what are you doing in this particular
10   conversation?
11   A.    I'm trying to memorize and have him mention all
12   the names so I know who I'm dealing with.
13   Q.    And what, again, did you think Burson's name was?
14   A.    Pete.
15   Q.    Were you wrong?
16   A.    Yes, I was.
17   Q.    Do you know the last names of any of these
18   people?
19   A.    No.
20   Q.    To this day?
21   A.    No.
22   Q.    Okay.
23         MR. GREGORIE:  Continue, please.
24         (Whereupon, segments of Government's Exhibit
25   No. 41 were published in open court.)
```

1          MR. GREGORIE:  Page 50.

2          (Whereupon, segments of Government's Exhibit

3    No. 41 were published in open court.)

4    BY MR. GREGORIE:

5    Q.    When Burson Augustin says here, "I think you seen

6    Brother Rot.  Now, that's my blood brother.  He look

7    like me" and you asked, "Did I see him yet?" and he

8    said, "You seen him at the store.  He wore his

9    uniform," do you know what he was referring to?

10   A.    Yes, sir.

11   Q.    What was he referring to?

12   A.    His blood brother.  I seen him in North Miami, in

13   the store.

14   Q.    And what was he wearing when he came to the

15   store?

16   A.    He was wearing a black uniform with patches.

17   Q.    What kind account of patches, if you know?

18   A.    It's different -- different signs.  I think it's

19   the Moorish patches.

20   Q.    And what did this uniform look like?

21   A.    It was a black uniform, like security uniforms.

22   Q.    Okay.

23          MR. GREGORIE:  Can you continue, please.

24          (Whereupon, segments of Government's Exhibit

25   No. 41 were published in open court.)

 1              MR. GREGORIE:  Could we go to the next clip,

 2    now, which starts at Page 101, three speakers from the

 3    bottom.  CW says, "Call Brother Naz again."

 4              Play it, please.

 5              (Whereupon, segments of Government's Exhibit

 6    No. 41 were published in open court.)

 7    BY MR. GREGORIE:

 8    Q.    What are you referring to there?

 9    A.    I was referring to the Brother Mohammed, to the

10    guy the FBI told me was gonna bring.

11    Q.    Did you have any idea who that guy was?

12    A.    No.

13    Q.    Did they give you any description of him?

14    A.    No.

15    Q.    Did they tell you anything about him?

16    A.    Not at all.

17    Q.    How were you referring to him?

18    A.    They just told me his name was Mohammed and he

19    speak Arabic.  So I was referring -- I was telling

20    them, "Look, somebody was supposed to be sent by

21    Al-Qaeda.  So I don't know when he's coming.  But he's

22    coming."

23              MR. GREGORIE:  We're at the top of Page 102.

24    Continue, please.

25              (Whereupon, segments of Government's Exhibit

1    No. 41 were published in open court.)

2    BY MR. GREGORIE:

3    Q.     What is a mujahedin?

4    A.     Mujahedin is the Islamic fighters, is like a

5    martyr.

6    Q.     A martyr?

7    A.     Yes.

8    Q.     M-a-t-y-r [sic]?

9    A.     Yes.

10         MR. GREGORIE:  Continue, please.

11         (Whereupon, segments of Government's Exhibit

12   No. 41 were published in open court.)

13   BY MR. GREGORIE:

14   Q.     Why were you telling him you didn't want to be

15   together with this fellow coming over from the Middle

16   East?

17   A.     Because I was instructed by the FBI to say that.

18   Q.     Okay.  Do you know why?

19   A.     Because --

20         MS. JHONES:  Objection.  Objection.  Calls for

21   speculation as to why the FBI told him something.

22         THE COURT:  Sustained.

23         MR. GREGORIE:  Continue the tape, please.

24         (Whereupon, segments of Government's Exhibit

25   No. 41 were published in open court.)

1   BY MR. GREGORIE:

2   Q.    When you say, "He has enough financial support

3   'cause he has the same connect I have," what are you

4   telling Burson?

5   A.    I'm telling Burson they don't need to give him

6   any kind of support.  All they have to do is put him

7   up, just like they did with me.  They didn't need to

8   give me nothing.  They just put me up for the night.

9   Q.    When you say "him," who are you referring to?

10  A.    To the guy coming from Al-Qaeda, Brother

11  Mohammed.

12  Q.    So what is his needs in terms of financial

13  support?

14  A.    I told him they don't need to give him anything

15  at all, that he have enough to take care of himself.

16  Basically, all they need to do is put him up.  But

17  they --

18  Q.    Okay.

19          MR. GREGORIE:  Continue the tape, please.

20          (Whereupon, segments of Government's Exhibit

21  No. 41 were published in open court.)

22  BY MR. GREGORIE:

23  Q.    Sir, who is it that says, "He's gonna check us a

24  lot, how we act under tension and how we're organized"?

25  Who says "how we're organized"?

1    A.    I think that was -- no.  I said, "We have to be

2    organized."

3    Q.    And above that, who's speaking?

4    A.    Brother Burson.

5    Q.    And what does he say?

6    A.    He say, "I think he" -- he said, "I think he

7    wants to see us a whole day.  He wants to probably be

8    around us and -- to see how we talk to -- how we talk,

9    how people" --

10         MR. GREGORIE:  Your Honor, may I approach the

11   witness and point to the transcript?

12         THE COURT:  Yes.

13         MR. GREGORIE:  Thank you.

14   BY MR. GREGORIE:

15   Q.    Here's you (indicating).  You say, "We have to be

16   organized," three speakers from the bottom of the page.

17   Correct?

18   A.    Yes, sir.

19   Q.    What is this that Burson Augustin says before you

20   speak?

21   A.    He said -- he was talking about Brother Mohammed.

22   And he said, "He's gonna check us a lot, how we act

23   under" --

24   Q.    Tension?

25   A.    -- "tension.  And we have -- we are organized.

     1    We have" -- no.

     2    Q.    And how --

     3    A.    "We -- how we're organized at Temple."

     4    Q.    So who -- who was it that said first about being

     5    organized?

     6    A.    That was Brother Burson.

     7              MR. GREGORIE:  Could you continue, please.

     8              (Whereupon, segments of Government's Exhibit

     9    No. 41 were published in open court.)

    10    BY MR. GREGORIE:

    11    Q.    Now, sir, after this conversation on November 7th

    12    with Burson Augustin, did you ever see any of these

    13    people again?  When was the next time, if at all, that

    14    you saw them?

    15    A.    I think it was November 10.

    16    Q.    November 10th?

    17    A.    Yes, sir.

    18    Q.    Do you remember where you saw them?

    19    A.    In the parking lot around my apartment.

    20    Q.    In the parking lot?

    21    A.    As a matter of fact -- I'm sorry.

    22          That was in my apartment, the first visit to my

    23    apartment.

    24    Q.    Okay.  Where was this apartment?

    25    A.    It was 7835 Harding Avenue, Miami Beach.

1    Q.     What -- was this a fancy apartment?

2    A.     I'm sorry?

3    Q.     Was it a fancy apartment?

4    A.     No.

5    Q.     Describe it to the jury, please.

6    A.     It was an apartment -- one-bedroom apartment.  It

7    was between Harding and Collins, right on the alley.

8    It was on the first floor.  Basically, you could walk

9    from the alley into the door -- I mean, right into the

10   apartment.  So it wasn't really very fancy.  I mean, it

11   was a one-bedroom apartment.

12   Q.     And who paid for this apartment?

13   A.     The FBI did.

14   Q.     Did they give you cash to pay the landlord or did

15   they pay for it directly?

16   A.     No.  They actually dropped me off and I spoke to

17   the landlord and they gave me the cash and paid -- so I

18   could pay the rent.

19   Q.     You paid it in cash?

20   A.     Yes, I did.

21   Q.     Did you pay it every month?

22   A.     Yes, sir.

23   Q.     And did you get money to pay the landlord every

24   month?

25   A.     Yes.  Every month, the FBI will give me money to

 1    pay the rent and I'll give them the receipt.

 2    Q.    Now, at this point, were you working in some

 3    other job besides doing this for the FBI?

 4    A.    There come a time where I worked.

 5    Q.    When is it that you got your own job?

 6    A.    I think June that -- while I was working.  And

 7    several times -- every time I worked, I had to quit so

 8    I could work on this case.

 9    Q.    So did you -- did you eventually get another job

10    while you were here?

11    A.    Yes.  I also get another job in Liberty City

12    while I was doing this.

13    Q.    Okay.  And did you do anything else besides

14    working in Liberty City?

15    A.    Yes.  I tried to get a HAC license and drive a

16    cab.

17    Q.    And drive a cab?

18    A.    Yes.  So I could have more flexibility to work

19    with the FBI.

20    Q.    Okay.  Was the meeting you had in your apartment

21    on November 10th recorded?

22    A.    No.  It wasn't recorded -- I think it was

23    recorded by a body recorder.

24    Q.    There was no recording equipment in the

25    apartment?

```
 1    A.      Not yet.  No.

 2    Q.      Okay.  But did you have a body recorder on?

 3    A.      Yes.

 4    Q.      Can you tell us who was there for that meeting.

 5    A.      It was Brother Naz and Brother Pat.

 6    Q.      And that was on November 10th.  Correct?

 7    A.      Yes, sir.

 8    Q.      Would you take out Government's Exhibit 42-A.

 9            MR. GREGORIE:  I'd ask the jury to turn to

10    Government's Exhibit 42-A.

11            THE COURT:  Mr. Gregorie, we are going to take

12    a break before we start this.

13            MR. GREGORIE:  Thank you, your Honor.

14            THE COURT:  We are going to take a ten-minute

15    recess.

16            Do not discuss this case either amongst

17    yourselves or with anyone else.  Have no contact

18    whatsoever with anyone associated with the trial.  Do

19    not read, listen or see anything touching on this

20    matter in any way.

21            If anyone should try to talk to you about this

22    case, you should immediately instruct them to stop and

23    report it to my staff.

24            You may leave your materials at your chairs.

25    Please be back in the jury room in ten minutes.
```

```
 1                  We'll take a ten-minute recess.

 2                  (Whereupon, the jury exited the courtroom at

 3      3:25 p.m. and the following proceedings were had:)

 4                  THE COURT:  We're in recess for ten.

 5                  (Thereupon a recess was taken, after which the

 6      following proceedings were had:)

 7                  THE COURT:  We're back on United States of

 8      America versus Narseal Batiste, et al., Case

 9      No. 06-20373.

10                  Counsel, state your appearances, please, for

11      the record.

12                  MR. GREGORIE:  Richard Gregorie and Jacqueline

13      Arango on behalf of the United States, your Honor.

14                  MS. JHONES:  Ana Maria Jhones on behalf of

15      Narseal Batiste, who is present.

16                  MR. LEVIN:  Albert Levin for Patrick Abraham,

17      who's present.

18                  MR. CASUSO:  Louie Casuso on behalf of Burson

19      Augustin, who's present.

20                  MR. CLARK:  Nathan Clark for Rotschild

21      Augustine, who's present.

22                  MR. HOULIHAN:  Richard Houlihan with Naudimar

23      Herrera.

24                  MR. VEREEN:  Roderick Vereen on behalf of

25      Stanley Phanor, who's present.
```

1          THE COURT:  One of the jurors notified the

2     court security officer -- I believe it was Juror

3     No. 6 -- that they were missing Page 101.  I assume

4     that's the -- in the last exhibit that was played.

5          MR. GREGORIE:  Yes.  That's the star clip.

6          THE COURT:  Why don't you give it to me, and

7     I'll mention it and then -- or, in fact, why don't you

8     just hold on to it, if that's what it is.

9          The other thing that I keep on forgetting to

10    tell you is that Juror No. 9 is attending a conference

11    or is a speaker at a conference or a panelist at a

12    conference next Thursday.

13         She initially wanted Wednesday and Thursday,

14    but I guess she told them they're going to have to live

15    without her on Wednesday.  But she indicates that she

16    needs to be there to fulfill her obligation on

17    Thursday, which is the 12th.

18         So I guess that's not going to be a trial day.

19    My inclination is to work with the jurors as much as I

20    can.  We did try and see if they could do without her

21    both days, but the indication was that she had to be

22    there on Thursday.

23         So let's bring the jury in, please.

24         (Whereupon, the jury entered the courtroom at

25    3:57 p.m. and the following proceedings were had:)

1            THE COURT:  You may be seated.

2            It's my understanding that Juror No. 6 is

3     missing 101.  Right?

4            Juror No. 6:  Yes.

5            THE COURT:  Here it is.

6            You are still under oath, sir.

7            THE WITNESS:  Yes, ma'am.

8            THE COURT:  You may proceed, Mr. Gregorie.

9            MR. GREGORIE:  Thank you, your Honor.

10    BY MR. GREGORIE:

11    Q.    Mr. Al-Saidi, in the last tape we played, the

12    tape of November the 7th, in your meeting with Burson

13    Augustin, you mentioned Faisal.

14          Do you remember that?

15    A.    Yes, sir.

16    Q.    Did you ever after you came back from Yemen make

17    an attempt to go collect any more money from Faisal?

18    A.    Yes, sir.

19    Q.    And where did you go to do that?

20    A.    I went to several -- to both of the stores that

21    he owned.  I went one time to North Miami, and I went,

22    I think, several times to the one in Liberty City.

23    Q.    Did anybody ever accompany you on any occasion

24    when you went to collect money?

25    A.    Yes, sir.

```
 1    Q.      And who accompanied you?

 2    A.      It was Brother Naz, Brother Pat, Brother Burson.

 3    Q.      Anyone else?

 4    A.      I don't know.  That's who I recall.

 5    Q.      Okay.  And where did you go and what did you do?

 6    A.      We went to the store.  I tried to speak to the

 7    guys.  Faisal wasn't there.  And I was trying to speak

 8    to the Yemenese guys, but they wasn't cooperating with

 9    me about it.

10            I seen the business name already changed.  It was

11    right after the hurricane.  I tried to contact the

12    cops.  Nobody came.  I went to the precinct.  They told

13    me that I had to go back to the store and get the cops

14    over to the store to make the report.

15            And before I did that, we came to an agreement.

16    So I didn't have to call the cops and get them back in

17    the store again.

18            But, yes, there was one time where I went and I

19    asked Brother Naz to drop me off, and he dropped me

20    off.  It was him, Brother Pat, Brother Burson who I

21    recall that day.

22    Q.      Did Brother Naz go into the store?

23    A.      Yes.

24    Q.      And did he speak -- did you see him speak to

25    anyone?  I don't want to know what anyone said to him.
```

```
 1    I want to know if you saw him speak to anyone.
 2    A.    At first -- when we first get into the store, I
 3    was speaking to the guys while he was, you know,
 4    having -- him and Brother Pat and Brother Burson was
 5    taking a stand -- you know, alert stand.  They was
 6    holding hands, standing up right next -- behind me, you
 7    know, when I was speaking to the guys.
 8          The guys get mad.  They start telling me they
 9    feel threatened.  They felt like I brought Brother Naz
10    and his group so I could threaten them.  And that's
11    when I asked Brother Naz to leave.
12          And I seen him speaking to the guy, but I
13    didn't -- I don't remember what was said.
14    Q.    Okay.  Now, sir, let's go back to where we were
15    on November the 10th.  Correct?
16          We're going back now to the next conversation, if
17    any, that you had after November the 7th.
18          Do you remember when that was?
19    A.    Yes.
20    Q.    When was that?
21    A.    That was on the 10th.
22    Q.    And where was that?
23    A.    My apartment.
24    Q.    And when -- who arrived at your apartment on
25    November 10th?
```

 1    A.     Brother Naz and Brother Pat.

 2    Q.     Did you have any recording device with you?

 3    A.     Yes.  I had a body recorder.

 4    Q.     Did Brother Pat and Brother Naz enter into the

 5    apartment immediately or did you have some conversation

 6    with them before they got in?

 7    A.     (No response.)

 8    Q.     Do you remember?

 9    A.     I don't remember if we had a conversation before

10    we got in that house.  I'm not sure.

11    Q.     Would you look at Government's Exhibit 42-A.

12    A.     42-A.

13    Q.     Do you have it?

14    A.     I don't see 42 here.  Oh, yeah.  I got it.

15    Q.     Would you look at Page 3.

16    A.     Page 3.

17    Q.     And go up three speakers from the bottom.

18    A.     Okay.

19    Q.     Do you see you're speaking there?  Can you tell

20    what you're telling him to do?

21    A.     Yes.  I was actually right in front of the house,

22    trying to tell him where to park so we could come in

23    the house.

24    Q.     Okay.  Now we're going to play a piece of this.

25           Did it take them a while to get in the house?

 1   A.     Yes.  They was mistaken.  They was being -- on

 2   Harding Avenue and I was in the alley.  So I kind of

 3   came out, and I was telling them, "You already passed

 4   me.  I'm behind you, in the alley."

 5   Q.     Let's go, then, to Page 14 and begin at the

 6   bottom of Page 14, where it says "(Background sounds of

 7   television.  Lapse in conversation.)"

 8          Can you find it?

 9   A.     The second line from the bottom?

10   Q.     Page 14, on the bottom.

11   A.     Okay.

12          MR. GREGORIE:  If we could play it, please.

13          (Whereupon, segments of Government's Exhibit

14   No. 42 were published in open court.)

15   BY MR. GREGORIE:

16   Q.     Sir, what are you talking about there?

17   A.     We was talking about a prayer rug.

18   Q.     A prayer rug?

19   A.     Yes, sir.

20   Q.     What's a prayer rug called?

21   A.     Sigada (phonetic).

22   Q.     How come you were talking about a prayer rug?

23   A.     I was going to New York, and I asked him if he

24   wanted me to bring anything for him from New York.  And

25   he told me he wanted a sigada.

1    Q.    Who told you that?

2    A.    Brother Naz.

3    Q.    Okay.

4          MR. GREGORIE:  Could you continue, please.

5          (Whereupon, segments of Government's Exhibit

6    No. 42 were published in open court.)

7          MR. GREGORIE:  That's it?  Okay.

8          Let's go to the next clip, please, which is on

9    Page 28, five speakers from the bottom.

10          (Whereupon, segments of Government's Exhibit

11   No. 42 were published in open court.)

12   BY MR. GREGORIE:

13   Q.    Sir, what is it that Patrick Abraham is asking

14   you there, sir?

15   A.    He was asking me about the guy that was coming

16   over from back home.

17   Q.    Okay.  And who was that?

18   A.    Brother Mohammed.

19   Q.    Okay.

20          MR. GREGORIE:  Could you continue, please.

21          (Whereupon, segments of Government's Exhibit

22   No. 42 were published in open court.)

23   BY MR. GREGORIE:

24   Q.    What are you telling him?

25   A.    I was telling -- I think it was a conversation

```
 1   about somebody leaving the country.  Brother Naz -- me
 2   and him spoke about him or somebody in his group going
 3   to Yemen.
 4        I was telling him, "Remember when we spoke about
 5   that?"
 6        He told me, "Yes."
 7        I told him, "Well, we spoke back home.  I told
 8   him you're not ready to do that.  But they was gonna
 9   send somebody over there instead of you going there."
10            MR. GREGORIE:  Continue, please.
11            (Whereupon, segments of Government's Exhibit
12   No. 42 were published in open court.)
13   BY MR. GREGORIE:
14   Q.    Who says, "Yeah.  That Chinese food was bad,
15   man"?
16   A.    That was Brother Pat.
17   Q.    What was he referring to?
18   A.    The Chinese food we ate right after the
19   hurricane, North Miami.
20   Q.    And what did you do before you went to eat that
21   Chinese food?
22   A.    I'm sorry?
23   Q.    What did you do before you went to eat that
24   Chinese food?
25   A.    That's when we passed the FBI building.  It was
```

```
 1   pointed out to me.

 2   Q.    Okay.

 3         MR. GREGORIE:   Continue the tape to the end,

 4   please.

 5         (Whereupon, segments of Government's Exhibit

 6   No. 42 were published in open court.)

 7   BY MR. GREGORIE:

 8   Q.    Now, sir, that was on November 10th?

 9   A.    Yes, sir.

10   Q.    Where did you go after November 10th?

11   A.    Went to New York.

12   Q.    Why did you go to New York?

13   A.    I was instructed by the FBI to go to New York.

14   Q.    Who paid for the trip to New York?

15   A.    The FBI did.

16   Q.    And why did they want you to go to New York?

17   A.    Because they wanted time to install recording

18   equipment in my apartment while I wasn't around because

19   they don't want him coming up to me and talking to me

20   while they was there.

21   Q.    Okay.   And when did you come back, if you

22   remember?

23   A.    I'm not sure.   I spend, I think, five days in

24   New York.

25   Q.    Okay.   And when you came back, did you see
```

1    anybody?

2    A.      Yes, I did.

3    Q.      Who did you see?

4    A.      I had a meeting with Brother Naz and Brother Pat

5    in my apartment on the 21st.

6    Q.      21st of November?

7    A.      Yes, sir.

8    Q.      And was there recording equipment in your

9    apartment when they came?

10   A.      Yes, sir.

11   Q.      And how did you turn -- how did you -- what did

12   you have to do to turn that recording equipment on?

13   A.      I just had to plug the power on and hit "Record."

14   Q.      Well, could you do that in the open without

15   anybody telling what you were doing?

16   A.      I could have done it, but they would have known

17   what I was doing, because this was a hidden compartment

18   where we left the recording devices in.  So I had to

19   open a shelf, turn it on and close the shelf back down.

20   Q.      Okay.  And did you turn it on before you met with

21   anybody on November the 21st?

22   A.      Yes, sir, I did.

23   Q.      Who came to your apartment on November the 21st?

24   A.      It was Brother Naz and Brother Pat.

25   Q.      And had you turned the equipment on when they

1   came?

2   A.     Yes.  Before they came, I turned it on.

3   Q.     Okay.

4          MR. GREGORIE:  If we could, your Honor, this

5   is already in evidence as Government's Exhibit 43.  I

6   would like to play portions of Government's Exhibit 43.

7          It's a rolling transcript.  So the grand jury

8   can -- the jury can follow it on the screen as they

9   look at the tape, your Honor.

10         THE COURT:  You may publish.

11         MR. GREGORIE:  May I proceed?

12         THE COURT:  Yes.

13         MR. GREGORIE:  Proceed with Clip 1, please.

14         (Whereupon, segments of Government's Exhibit

15   No. 43 were published in open court.)

16         MR. GREGORIE:  Stop there, please.

17   BY MR. GREGORIE:

18   Q.     Sir, looking at the picture, first of all, can

19   you tell who's in the picture?

20   A.     That was Brother Pat on this side.  That was

21   Brother Naz.  All the way to the right was Brother Pat.

22   Next down was Brother Naz.  And then it's me, all the

23   way to the left side.

24   Q.     Okay.  Did you just give somebody something in

25   that picture?

 1   A.      Yes.  I gave -- I gave them a book.

 2   Q.      And what was the book about?

 3   A.      It was questions and answers about jihad.

 4   Q.      And why did you -- where did you get that book?

 5   A.      I bought it from -- in a bookstore in Brooklyn,

 6   Islamic bookstore.

 7   Q.      Why did you do that?

 8   A.      Because I was asked a question by Brother Pat

 9   that I didn't know to -- the answer to it.  And when I

10   was there, I seen the book, and it have all the

11   answers.  So I bought it so I could show them the

12   answer.

13   Q.      Okay.  In this tape recording, you say, "I also

14   do remember when he asked me that question and I didn't

15   know how to answer it.  I got the book to answer it."

16           Is that what you were talking about?

17   A.      Yes, sir.

18   Q.      Okay.  And did, in fact, you give him the book?

19   A.      Yes.

20   Q.      And after that, did you actually read from the

21   book during this meeting?

22   A.      I think they did.

23   Q.      Okay.

24           MR. GREGORIE:  Could you finish the first

25   clip.

1            (Whereupon, segments of Government's Exhibit

2    No. 43 were published in open court.)

3    BY MR. GREGORIE:

4    Q.    Now, sir, who's got the book in his hand there?

5    A.    That was Brother Naz.

6    Q.    And can you tell us how the -- is the apartment

7    decorated any differently than it was when Brother Naz

8    and Patrick Abraham came to visit on the 10th of

9    November?

10   A.    I bought a rug on the floor to sit down on, and I

11   did some stickers -- some stickers with some writing on

12   them.  And I think I bought a -- chairs -- like two or

13   three chairs.

14   Q.    Were they expensive?

15   A.    No.

16   Q.    Okay.  Now, sir, where are you sitting there in

17   this -- there appears to be a blanket or something on

18   the floor.

19         What is that?

20   A.    That's a rug.  It's like a carpet.  It's Arab

21   rug.

22   Q.    And what's it there for?

23   A.    Sit down on it.

24   Q.    Okay.

25         MR. GREGORIE:  Would you go to the next clip,

 1    please.

 2              (Whereupon, segments of Government's Exhibit

 3    No. 43 were published in open court.)

 4    BY MR. GREGORIE:

 5    Q.    Sir, did you know what Narseal Batiste meant by

 6    "guerrilla training"?

 7    A.    He been telling me before that they go to train

 8    and they physically train very hard.  And that's what I

 9    thought he was talking about, you know, training --

10    military training.

11    Q.    Military training?

12    A.    Yes.

13              MR. GREGORIE:  Continue, please.

14              (Whereupon, segments of Government's Exhibit

15    No. 43 were published in open court.)

16    BY MR. GREGORIE:

17    Q.    What you are telling him there, sir?

18    A.    I was giving him reasons of why we shouldn't go

19    to Yemen together as we spoke about before, 'cause me

20    and him spoke about him going to Yemen so he could make

21    the connection.

22          The FBI thought it wasn't a good idea.  And so I

23    told him, "No.  It's not a good idea."

24              MR. GREGORIE:  Continue, please.

25              (Whereupon, segments of Government's Exhibit

 1   No. 43 were published in open court.)

 2   BY MR. GREGORIE:

 3   Q.     What are you telling Narseal Batiste and Patrick

 4   Abraham there?

 5   A.     They was asking me questions about what I have

 6   spoke to Al-Qaeda about this guy.

 7          I told them wasn't much that I spoke to them

 8   about over the phone.  I didn't know that much because

 9   I didn't want to answer wrong answers for questions

10   they asking me.

11          And I also told them, "If you don't want the guy

12   to come, if you guys is not serious about what we been

13   talking about, it's okay."  Just -- I seen a good

14   chance for them to get -- to meet with somebody from

15   Al-Qaeda.

16          So --

17   Q.     Did they tell you, "No.  He shouldn't come"?

18   A.     No.  They was very -- they was very patiently

19   waiting for him.

20          MR. GREGORIE:  Continue, please.

21          (Whereupon, segments of Government's Exhibit

22   No. 43 were published in open court.)

23   BY MR. GREGORIE:

24   Q.     Sir, did you know who this person was going to

25   be?

1    A.      No.

2    Q.      Had the FBI told you anything about this person?

3    A.      Not -- only that he speak Arabic.

4           MR. GREGORIE:  Next clip, please.

5           (Whereupon, segments of Government's Exhibit

6    No. 43 were published in open court.)

7    BY MR. GREGORIE:

8    Q.      Sir, Narseal Batiste says, "Maybe in Chicago."

9           What, if anything, had you ever said about

10   Chicago?

11   A.      Nothing.

12   Q.      Had you ever been to Chicago?

13   A.      No.

14   Q.      Had you ever mentioned Chicago to Narseal

15   Batiste?

16   A.      No.

17          MR. GREGORIE:  Continue, please.

18          (Whereupon, segments of Government's Exhibit

19   No. 43 were published in open court.)

20   BY MR. GREGORIE:

21   Q.      What are you telling Narseal Batiste there?

22   A.      He was asking me questions, and I didn't know the

23   answers for it.  I was giving him the reason why I

24   don't know that information.

25          So I was telling him, "Look, man.  Al-Qaeda don't

 1   give us all -- all information that we don't need to

 2   know," giving him an excuse of why I don't know, you

 3   know.

 4            MR. GREGORIE:  Next clip, please.

 5            (Whereupon, segments of Government's Exhibit

 6   No. 43 were published in open court.)

 7   BY MR. GREGORIE:

 8   Q.    Sir, who's talking there?

 9   A.    Brother Pat.

10   Q.    And where is he?

11   A.    Right here.

12   Q.    What position is he in?

13   A.    He's laying on his back.

14   Q.    Was he talking in his sleep?

15   A.    I'm sorry?

16   Q.    Was he sleeping?

17   A.    No.  He wasn't sleeping.  He was just laying

18   down.

19   Q.    And who was it that's talking?

20   A.    That was him.

21   Q.    Patrick Abraham?

22   A.    Yes, sir.

23            MR. GREGORIE:  Continue, please.

24            (Whereupon, segments of Government's Exhibit

25   No. 43 were published in open court.)

1            MR. GREGORIE:  Next clip, please.

2            (Whereupon, segments of Government's Exhibit

3    No. 43 were published in open court.)

4    BY MR. GREGORIE:

5    Q.    Sir, when Narseal Batiste says, "He's gonna see

6    you, Occ," what did you understand that to mean?

7    A.    A lot of what I haven't seen.  He's been showing

8    machetes, stuff that he use to fight.  He showed me a

9    gun before.

10           He's telling me that he will see an organization

11   that's willing to work with Al-Qaeda to accomplish the

12   mission that he been speaking about.  That's what I

13   thought he was speaking about.

14           MR. GREGORIE:  Next clip, please.

15           (Whereupon, segments of Government's Exhibit

16   No. 43 were published in open court.)

17   BY MR. GREGORIE:

18   Q.    What was Narseal Batiste explaining to you there?

19   A.    He was telling me that he wanted -- that he

20   was -- if he takes an area around the store and make

21   them join in his group, that he may only get 30 strong

22   guerrilla out of all those people he would not recruit.

23   But he was speaking of going to different major cities

24   so he could recruit people to his gang.

25           MR. GREGORIE:  Could you continue, please.

1           (Whereupon, segments of Government's Exhibit

2    No. 43 were published in open court.)

3    BY MR. GREGORIE:

4    Q.     Sir, had you ever heard those comments before

5    that Narseal Batiste just said?

6    A.     Yes, sir.  More than one occasion.  He's been

7    telling me the same comments over and over.

8    Q.     Where did he tell you these things?

9    A.     Since I first get to know him from the store.

10   Q.     Okay.

11          MR. GREGORIE:  Could we play the next clip,

12   please.

13          (Whereupon, segments of Government's Exhibit

14   No. 43 were published in open court.)

15   BY MR. GREGORIE:

16   Q.     Sir, who asked for artillery here?  Who spoke

17   about artillery?

18   A.     That's Brother Naz talking.

19   Q.     Who was talking about getting boots?

20   A.     That's Brother Naz.

21   Q.     Who's talking about getting cell phones?

22   A.     Brother Naz still.

23   Q.     Had Brother Mohammed come yet?

24   A.     No.

25   Q.     What, again, is the date of these conversations?

```
 1    A.      November 10.

 2    Q.      The 21st?

 3    A.      I'm sorry.  The 21st.

 4            MR. VEREEN:  Objection.  Leading.

 5            THE COURT:  Sustained.

 6            Rephrase your question.

 7   BY MR. GREGORIE:

 8    Q.      Can you correct that date.

 9    A.      Yeah.  It's November 21st.

10    Q.      Okay.

11            MR. GREGORIE:  Finish the clip, please.

12            (Whereupon, segments of Government's Exhibit

13   No. 43 were published in open court.)

14            MR. GREGORIE:  Next clip, please.

15            (Whereupon, segments of Government's Exhibit

16   No. 43 were published in open court.)

17   BY MR. GREGORIE:

18    Q.      What is Narseal Batiste telling you there, sir?

19    A.      He telling me that he have a CDL license and he

20   could be doing that amount of money if he wasn't

21   working with the rest of the brothers, that if it

22   wasn't for the mission, that he didn't need to work

23   with them, he didn't need to work on the construction

24   company whatsoever, that he was just doing that so he

25   could accomplish the mission.
```

1   Q.    Did you know what mission he was referring to?

2   A.    Him taking the land back that George Washington

3   promised the Moors.

4         MR. GREGORIE:  Continue the tape, please.

5         (Whereupon, segments of Government's Exhibit

6   No. 43 were published in open court.)

7   BY MR. GREGORIE:

8   Q.    Who mentioned jihad first there?

9   A.    Brother Naz.

10  Q.    And did you understand what type of jihad he was

11  talking about?

12  A.    Yes, sir.

13  Q.    What did you understand him to be talking about?

14  A.    Holy war, violent jihad.

15  Q.    Now, sir, after this meeting on the 21st of

16  November, did you have any other meetings with Brother

17  Naz or any of his people in November?

18  A.    Yes, sir.  I got a surprise visit during the

19  Thanksgiving.

20  Q.    Okay.  Was Thanksgiving a holiday for you?

21  A.    I celebrate every holiday.

22  Q.    Okay.  Now, sir, where were you on Thanksgiving,

23  November the 24th?

24  A.    I was in my apartment on the Beach.

25  Q.    Was there anybody there with you?

1    A.     No.  I was alone.

2    Q.     Okay.  Can you tell the Court and jury what

3    happened on November 24th.

4    A.     I was watching TV, sitting down.  I hear somebody

5    knocking.  I get up to make sure, and I see a lot of

6    people outside.  I open the door and was Brother Naz,

7    Brother Pat, Brother Sunni, Brother Rot.  Seven.  Seven

8    people.

9         So I asked them to come in, and they wasn't gonna

10   come in.  They asked me to go out with them.  So I go

11   out.  And me and Brother Naz was walking in front and,

12   you know, they was marching after us all the way to the

13   Chinese restaurant on 75th Street on the Beach.

14   Q.     Now, had you been in contact with the FBI that

15   day, Thanksgiving?

16             MS. JHONES:  Objection.  Leading.

17             THE COURT:  Sustained.

18             Rephrase your question?

19   BY MR. GREGORIE:

20   Q.     What, if any, contact did you have with the FBI

21   on Thanksgiving, November 24th?

22   A.     I didn't know they was coming.  So I didn't call

23   them before they show up.  But I call them after the

24   guys left because I didn't have no time.

25             But I called them after the guys left.  They told

1   me they wasn't working anyway.  So I could -- I had to

2   wait till the next day to meet them and tell them what

3   happened.

4   Q.    Did anybody come inside so you could turn on the

5   recording equipment?

6   A.    No.  Nobody came in whatsoever.

7   Q.    And where did you go with the guys?

8   A.    We went to a Chinese restaurant and ate some

9   Chinese food that -- I think it was on 75th, 71st,

10  somewhere in -- around Collins Avenue.

11  Q.    Now, when you walked -- did you walk or did you

12  ride?  How did you get to the Chinese restaurant?

13  A.    We walked.  But it was kind of like marching

14  thing.

15  Q.    Can you describe the trip from your apartment to

16  the restaurant.

17  A.    Was a straight right from -- I was on 78th Street

18  and that's where we started walking from.  Down from 78

19  was -- I think it's always to 71st.

20         So we was on the alley walking, and me and

21  Brother Naz was at the head of the line and the rest of

22  the guys was marching behind us.

23  Q.    When you say "marching," what do you mean?

24  A.    You know, hitting the ground while they walking,

25  in order.  So it's like marching, Army training.

al-Saidi - DIRECT - By Mr. Gregorie                    248

1  Q.     Okay.  And did you have any conversation at

2  dinner on the 24th?

3  A.     We didn't have a long conversation.  I mean, was

4  a restaurant.  We was -- everybody was eating.

5        I think the point of that meeting was Brother Naz

6  trying to impress me by bringing them and they wearing

7  the uniforms and they marched behind us to the

8  restaurant.

9        So he was showing me that what he was saying is

10 true, that he does have soldiers and they ready for

11 anything.

12 Q.     Now, that was the 24th of November.

13       When, if at all, did you see or talk to anyone

14 from -- of Narseal Batiste or his group?

15 A.     I think the next month, on December 2nd.

16 Q.     Okay.  Where -- where were you on December 2nd,

17 if you remember?

18 A.     On December 2nd, I think I was -- I went to

19 Liberty City, to Faisal's store.

20 Q.     Why did you go to see Faisal?

21 A.     I went to pick up a payment that he had for me.

22 Q.     Okay.  And did anything happen while you were

23 going to the store to pick up the payment from Faisal?

24 A.     I received a phone call from Brother Naz.

25 Q.     Where were you when you got this phone call?

```
 1    A.    I was right on the front in 62nd and -- by the

 2    Embassy, like, one block from the Embassy.

 3    Q.    Were you able to record the call?

 4    A.    No, I wasn't.

 5    Q.    Why not?

 6    A.    Because the recording equipment was in the house

 7    and I was in the street.

 8    Q.    Can you tell the Court and jury what Narseal

 9    Batiste -- Brother Naz said to you and what you said to

10    him on this phone call.

11    A.    If I can remember the whole conversation, I

12    walked out the store and the phone ring.  So I had to

13    answer it, even though I know there wasn't no

14    recording, because I didn't want them to see me, walk

15    up to me and ask me why I didn't answer the phone.

16          So I answered the phone.  I speak to Brother Naz.

17    And that's when I told him that Brother Mohammed was

18    coming and I asked him for a list.

19    Q.    Why did you ask him for a list?

20    A.    I was instructed to do that by the FBI.

21    Q.    Anybody in particular in the FBI?

22    A.    I don't remember.

23    Q.    Okay.  And did they tell you -- did they tell you

24    why they wanted you to ask for a list?

25    A.    No.
```

 1           MS. JHONES:  Objection, hearsay.

 2           MR. GREGORIE:  I'll rephrase the question.

 3           THE COURT:  Okay.

 4    BY MR. GREGORIE:

 5    Q.    What, if anything, were you looking for when you

 6    asked for the list?

 7    A.    I was looking for more information, to see what

 8    he wants, what Brother wants, what kind of support he

 9    wants from Al-Qaeda.  I want to know something.

10    Q.    Did he give you a list?

11    A.    I don't remember if he gave me a list that day or

12    another day that he gave me the list.

13    Q.    Okay.  That call was on December 2nd?

14    A.    Yes, sir.

15    Q.    After December 2nd, did you have other phone

16    conversations with him, if you remember?

17    A.    I think I spoke to him on the 6th.

18    Q.    Did there come a time when you went somewhere to

19    meet with him?

20    A.    Yes.

21    Q.    What day was that, if you remember?

22    A.    December 6th.

23    Q.    Where did you go?

24    A.    I go to the Embassy.

25    Q.    Were you wearing a recording device?

1    A.    Yes.

2    Q.    And what happened in the Embassy that day you

3    were wearing the recording device?

4    A.    I get there and we sit down and speak a little

5    bit.  And that's when Brother Naz decide to give us

6    some training that day.

7         So we get up inside and we start training, doing

8    pushups and situps.  We would, like, march around.  He

9    would go tell -- like, give us orders to go up front,

10   turn around, go back.

11        And I was really afraid because the recorder

12   almost fell from my pocket.

13   Q.    How many people were there that day, on the 6th?

14   A.    I think around seven, eight people, including me.

15   Q.    Anybody that's here in the courtroom today?

16   A.    Sure.  Brother Naz, Brother Pat, Brother Burson,

17   Brother Rot, Brother Sunni, Brother Naudy.

18   Q.    Okay.  And did you try to record this?

19   A.    Yes.  I recorded it, but it wasn't clear, because

20   the whole time it wasn't a conversation.  We was

21   working out, moving around.

22   Q.    Does that have some effect on the recording

23   device?

24   A.    Yes.  All you hear is movements, you know, hits

25   towards my pocket.  It's not -- it's not a clear

```
 1   conversation.
 2   Q.    Okay.  Did you report this meeting to the FBI?
 3   A.    Yes, I did.
 4   Q.    Did you say anything to the FBI?  Did you
 5   complain about anything?
 6   A.    Yes.  I told them I was scared for my life.  If
 7   that body recorder fall down and they seen it, it would
 8   have been done for me.  They would have killed me, I
 9   think.
10         I mean, they was good fighters and was seven
11   guys.  We was in a bad area.  I'm wearing this body
12   recorder.  So I was afraid.
13   Q.    And what did the FBI tell you?
14         MS. JHONES:  Objection, your Honor.  Hearsay.
15   BY MR. GREGORIE:
16   Q.    What, if any, directions did the FBI give you
17   after that?
18         MR. GREGORIE:  I'm sorry, your Honor.  I'll
19   rephrase the question.
20         THE COURT:  Okay.
21   BY MR. GREGORIE:
22   Q.    What, if any, directions did the FBI give you?
23   A.    They told me that I didn't have to wear it the
24   next time I go.
25   Q.    Did you go again to the Embassy?
```

1    A.      Yes, I did.

2    Q.      When was that?

3    A.      On the 8th.

4    Q.      The 8th of December?

5    A.      Yes, sir.

6    Q.      Were you wearing a recording device that time?

7    A.      No.

8    Q.      When you got there, who was there?

9    A.      It was Brother Naz, Brother Pat, Brother Sunni,

10   Brother Burson, Brother Naudy, Brother Rot.

11          Then there was another -- another guy was

12   preaching.  I don't remember his name.  Somebody who

13   had a -- what do they call it? -- a turban -- a red

14   turban on, old guy.  And we sit down around the table

15   and he was preaching.

16   Q.      Did somebody introduce this fellow who was

17   preaching?

18   A.      Brother Naz did.

19   Q.      What, if any, similarity was there between what

20   this fellow was preaching and what Brother Naz had told

21   you?

22   A.      A lot of -- it's the same talk, because it's the

23   same discussion about how much the US Government is

24   keeping away from the people, the AIDS cure.

25          We was talking about the land that the Moors was

 1   promised to be given by George Washington back then.

 2         We was talking about a lot of -- a lot of stuff.

 3   I mean, was a long conversation.

 4   Q.    And did you report this to anyone after that

 5   meeting?

 6   A.    Yes, sir.

 7   Q.    Now, sir, when, if at all, was the next time that

 8   you remember speaking to Brother Naz?

 9   A.    You said when was the last time I remember

10   speaking to Brother Naz?

11   Q.    When is the next time, the next time, if at all,

12   if you remember?

13   A.    On -- I think it was December -- December 10.  It

14   was a phone call.

15   Q.    Take a look at -- do you remember for sure?

16   A.    I think it's a phone call on the 10th.

17   Q.    On the 10th?

18   A.    Confirming --

19   Q.    Were there any other phone calls besides the one

20   on the 10th?

21   A.    The 8th, the 10th.  Maybe on the 14th.

22   Q.    Okay.  And would you take a look at Government's

23   Exhibit 4 -- 37 and 37-A, please.

24   A.    Yes, sir.

25              MR. GREGORIE:  Your Honor, the transcripts,

```
 1   37-A, have not been handed out to the jury yet.

 2              THE COURT:  Okay.

 3              MR. GREGORIE:  May we do that?

 4              THE COURT:  Yes.

 5              (Whereupon, said document was distributed to

 6   the jury.)

 7              THE COURT:  This is 37-A.  Right?

 8              MR. GREGORIE:  37-A.  Yes, your Honor.

 9              May I publish that?

10              THE COURT:  Yes.

11              MS. JHONES:  Judge, I'm sorry.  I apologize.

12   I just need a minute before we play it.

13              THE COURT:  You may publish.

14              MR. GREGORIE:  Thank you, your Honor.  We

15   start at Page 3.

16              (Whereupon, segments of Government's Exhibit

17   No. 37 were published in open court.)

18   BY MR. GREGORIE:

19   Q.    What are you telling Narseal Batiste there, sir?

20   A.    I'm telling him -- I'm telling him, "I'm doing my

21   best to help you as much as I could.  Hopefully, once

22   this guy come, he might be able to help you out.  I'm

23   asking you for the list."

24         I'm doing everything I could to help, 'cause

25   every time -- not, you know, every time -- but most of
```

```
 1    the time, he expect me to go out of my own and help out

 2    like the rest of his soldiers.  And I'm not sure if I

 3    was -- I have the right to do that.

 4         So, basically, I was trying to make it -- have

 5    him make it very clear on what he want me -- or what he

 6    expect me to do.

 7    Q.    Is the list you're asking for here the same list

 8    you were asking for on December --

 9              MR. VEREEN:  Objection.  Leading.

10              MS. JHONES:  Objection.  Leading.

11              MR. GREGORIE:  I'll rephrase it, your Honor.

12    BY MR. GREGORIE:

13    Q.    What, if any, lists were you asking for here?

14    A.    The FBI has instructed me to ask him to give me a

15    list with the things he asked me to support him with.

16    Q.    Had you received any list thus far?

17    A.    No.

18              MR. GREGORIE:  Continue with the conversation,

19    please.

20              (Whereupon, segments of Government's Exhibit

21    No. 37 were published in open court.)

22    BY MR. GREGORIE:

23    Q.    Now, sir, did you see Mr. Batiste later that day,

24    Brother Naz?  Did you see him later that day?

25    A.    No.
```

1    Q.      When, if at all, did you talk to him next?  Do

2    you remember?

3    A.      On the 18th.

4    Q.      The 18th?

5    A.      No.  As a matter of fact, I speak to him -- I'm

6    sorry.

7            I speak to him on the 16th, 'cause he was trying

8    to pick Brother Mohammed up from the airport and he

9    have a hard time finding him.

10   Q.      How many calls were there between you and Brother

11   Naz on the 16th?

12   A.      It was several calls, because he was looking for

13   the guy in the airport and he couldn't find him.  So,

14   basically, he was -- he was calling me.  I would call

15   him back.  After I find out -- like it was several

16   calls.  I don't remember how many.

17   Q.      And up to this point, had you ever met the guy

18   coming from the Middle East, Mohammed?

19   A.      No, sir.

20   Q.      Did you know anything about him whatsoever?

21   A.      Not -- only he speak Arabic.

22   Q.      Had you seen him, even?

23   A.      No.

24   Q.      Were you present when he was at the airport?

25   A.      No.

```
 1    Q.     Now, when is the next time after the 16th that

 2    you speak to Brother Naz or any of his people?

 3    A.     On the 18th.

 4    Q.     And how did you speak to him?  What mode of

 5    conversation?

 6    A.     The -- I think I got a call from Brother Naz.  He

 7    was resistant to have me go to the Embassy.  I --

 8    Q.     Okay.  Would you look at Government's Exhibit 45

 9    and 45-A, please.

10           On December 18th, what, if any, calls or

11    conversation were you expecting on that day?

12    A.     On December 18.  I'm sorry.  Say that again.

13    Q.     What, if any, calls were you expecting on

14    December 18th?

15    A.     I was speaking to Brother Naz.

16    Q.     Did you expect him to call?

17    A.     Yes, sir.

18    Q.     You did expect him to call?

19           MS. JHONES:  Asked and answered.

20           THE WITNESS:  Oh, no.

21           MS. JHONES:  Asked and answered, your Honor.

22           THE COURT:  Sustained.

23    BY MR. GREGORIE:

24    Q.     What, if any -- what, if anything -- what, if

25    anything, did you expect on December 18th?
```

```
 1   A.    On December 18th, I was going to work.  I got a
 2   phone call from Brother Naz.  He wanted me to go to the
 3   Embassy.  I didn't want to go.  I wanted to bring him
 4   so I could record the conversation.
 5         But, instead, he resist [sic] that I go over to
 6   the Embassy.  And he already sent somebody that was
 7   already outside to pick me up.
 8              MR. GREGORIE:  Could you publish, please, 45
 9   and 45-A.
10              MS. JHONES:  I just need a minute to find it,
11   Mr. Gregorie.
12              MR. GREGORIE:  Fine.
13              MS. JHONES:  Thank you.  I'm fine.
14              THE COURT:  You may publish.
15              MR. GREGORIE:  I believe it starts at Page 4
16   at the bottom of the page.
17   BY MR. GREGORIE:
18   Q.    Did you have more than one call from him on that
19   day?
20   A.    Yes.
21   Q.    What happened?
22   A.    Again, I was thinking about going to work.  He
23   called me and --
24   Q.    No.  I mean, what happened with the calls?  Did
25   something happen with the phones?
```

```
 1              MS. JHONES:  Objection.  Leading.

 2              THE COURT:  Sustained.

 3    BY MR. GREGORIE:

 4    Q.    What, if anything, happened with the phones?

 5    A.    It was several phone calls between me and him.

 6    Every time I told him that I need to call my job and

 7    ask him, I would have to hang up and talk to the FBI

 8    about it and call him back again.

 9    Q.    Okay.

10              MR. GREGORIE:  Would you publish, please,

11    starting at Page 4 at the bottom, where it says "Second

12    Call."

13              (Whereupon, segments of Government's Exhibit

14    No. 45 were published in open court.)

15    BY MR. GREGORIE:

16    Q.    Now, sir, did somebody come to pick you up after

17    that conversation?

18    A.    Two minutes later, Brother Pat already outside my

19    door.

20    Q.    Okay.  Did you have -- did you answer the door?

21    A.    Yes, sir.

22    Q.    Did he come inside?

23    A.    No, sir.

24    Q.    What happened?

25    A.    He asked me to take me to the Embassy, as I was
```

```
 1   told by Brother Naz.

 2   Q.    Did you -- were you able to record that

 3   conversation?

 4   A.    No, sir.

 5   Q.    Why not?

 6   A.    Because I didn't have no body recorder and they

 7   didn't want to come in my house.  So they took me over

 8   to the Embassy.

 9   Q.    Did you go to the Embassy?

10   A.    Yes, I did.

11   Q.    And did you meet with anybody there?

12   A.    Yes, I did.

13   Q.    Who did you meet with?

14   A.    It was Brother Naz, Brother Pat, Brother Burson,

15   Brother Sunni, Brother Naudy.  And there was another

16   guy, somebody they wanted to recruit.  And me.  That's

17   it.

18   Q.    And what, if anything, did you do when you were

19   there?

20   A.    When I first got there, they were sitting around

21   the table inside the mosque.  I went and sit down with

22   them.  Brother Naz was preaching a little while.  And

23   then we walked behind the Embassy, out -- we walked out

24   the facility to behind.

25         And when we get out, Brother Sunni walked
```

1    directly to the white Jeep and he got magazines --

2    weapon magazines.  I think he got two of them.

3         That's when he come towards us and we start

4    looking at the magazines.  And they got a cardboard

5    box.  They would pick items out of the magazine and

6    write down the code for it from the magazine.

7         That's when a little while -- Brother Naz and

8    Brother Sunni went to the Embassy, changed it to a

9    piece of paper.  And Brother Naz came out and handed it

10   to me.

11   Q.    Did you see the piece of paper he handed you?

12   A.    Yes.

13   Q.    Let me show you what's marked as Government's

14   Exhibit 101 in evidence.

15         Do you recognize that?

16   A.    Yes, sir.

17   Q.    And what is that?

18   A.    That look like the same list I got from them that

19   day.

20   Q.    Okay.  Was this the first one or the second one?

21   The one written on the cardboard or the one written on

22   the paper?

23   A.    That was the second one.

24   Q.    Looking at that paper, is that paper in the same

25   condition it was in when you received it?

1    A.     Yes.

2    Q.     Was that paper torn at the bottom, as it appears

3    in that exhibit?

4    A.     Yeah.

5    Q.     Who did the writing on that piece of paper?

6    A.     I don't know, because they went in the mosque and

7    changed it from the cardboard box to this paper.  But

8    it got to be one of the two, either Brother Naz or

9    Sunni.

10   Q.     Okay.  Did you see what was written on the paper?

11   A.     If I see what was written on it?

12   Q.     Yes.

13   A.     Yes.  Yes, I did.

14          MR. GREGORIE:  May I publish it for a moment,

15   your Honor?

16          THE COURT:  Yes.

17          I think you have to take it out of the

18   plastic.

19          MR. GREGORIE:  Oh, I'm sorry.

20   BY MR. GREGORIE:

21   Q.     Can you see that, sir?

22   A.     Yes, sir.

23   Q.     Did you discuss any of the items that are on

24   Government's Exhibit 101?

25   A.     I don't know which one, but there was a gun that

 1   Brother Sunni was telling me about, that he could use

 2   it under the water.

 3   Q.     Under the water?

 4   A.     Yes, sir.

 5   Q.     And any other item on there that you discussed?

 6   A.     They spoke about the bulletproof -- I mean, the

 7   vest.  They spoke about the Motorolas and the boots.

 8   But, basically, the most important thing to Brother

 9   Sunni, as he told me, is the guns that be -- that gets

10   used under the water.

11   Q.     Okay.  Now, sir, was there writing on both sides?

12   A.     Yes.

13   Q.     Did you see the portion here marked "launch

14   rockets"?

15   A.     Yes, sir.

16   Q.     Do you know what those are?

17   A.     Yes.

18   Q.     Did you talk to them about that?

19   A.     I mean, we spoke, again, about different stuff.

20   But I didn't speak to them specifically about the

21   launch rockets.

22   Q.     Okay.  Now, sir, after you got Government's

23   Exhibit 101, what do you with it?

24   A.     After I got the exhibit, I gave it to the FBI.

25   Q.     The same day?

 1    A.    Yes, sir.  I'm not sure, certainly.  I'm not sure

 2    if it's the same day or the next day.

 3    Q.    And after you got out of this meeting and you

 4    turned the item over, when, if at all, did you see

 5    Narseal Batiste or any of his group again after

 6    December the 18th?

 7    A.    I think it's December 21st.

 8    Q.    And where on December 21st did you see them?

 9    A.    On my apartment.

10    Q.    Did you have the opportunity to turn your

11    recording equipment on?

12    A.    Yes, I did.

13    Q.    And who was -- who was there on December the

14    21st, if you remember?

15    A.    It was Brother Naz alone.

16    Q.    So it was you and Brother Naz?

17    A.    Yes, sir.

18    Q.    And would you take a look, please, at

19    Government's Exhibit 46 and 46-A and B.

20          Is that the recording of a meeting you had on

21    December 21st?

22    A.    Yes, sir.

23          MR. GREGORIE:  Your Honor, if I may publish.

24    It should be a rolling transcript for the jury.

25          THE COURT:  How long is it?

1             MR. GREGORIE:  This is a long one.

2             THE COURT:  I think we're going to break here

3    and we'll start in the morning.

4             MR. GREGORIE:  Fine, your Honor.

5             THE COURT:  Do not discuss this case either

6    amongst yourselves or with anyone else.  Have no

7    contact whatsoever with anyone associated with the

8    trial.  Do not read, listen or see anything touching on

9    this matter in any way.

10            If anyone should try to talk to you about this

11   case, you should immediately instruct them to stop and

12   report it to my staff.

13            You may leave your binders at your chairs.

14   Please give your notebooks to the court security

15   officer.

16            I will see you tomorrow morning, 9:00.  Have a

17   nice evening.

18            (Whereupon, the jury exited the courtroom at

19   5:15 p.m. and the following proceedings were had:)

20            THE COURT:  We're in recess until tomorrow

21   morning, 9:00.

22            MR. GREGORIE:  I'm sorry, your Honor?  I

23   missed that.

24            THE COURT:  We're in recess until tomorrow

25   morning, 9:00.

1           MR. GREGORIE:  Your Honor, I think we'll be

2    through with this witness tomorrow by lunchtime, maybe

3    even before.

4           THE COURT:  Okay.

5           MR. GREGORIE:  Thank you.

6           (End of proceedings.)

7

8                 C E R T I F I C A T E

9

10          I hereby certify that the foregoing is an

11   accurate transcription of the proceedings in the

12   above-entitled matter.

13

14

15   _____        /s/Lisa Edwards
         DATE            LISA EDWARDS, CRR, RMR
16                       Official United States Court Reporter
                         400 North Miami Avenue, Twelfth Floor
17                       Miami, Florida 33128
                         (305) 523-5499

18

19

20

21

22

23

24

25