```
 1                 UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2                        MIAMI DIVISION
             CASE NO. 06-20373-CRIMINAL-LENARD
 3

 4   UNITED STATES OF AMERICA,        Miami, Florida

 5                  Plaintiff,        March 6, 2009

 6        vs.                         9:20 a.m. to 5:06 p.m.

 7   NARSEAL BATISTE, et al.,         Volume XX

 8             Defendants.        Pages 1 to 237
     --------------------------------------------------------
 9

10                        JURY TRIAL
11         BEFORE THE HONORABLE JOAN A. LENARD,
                UNITED STATES DISTRICT JUDGE
12

13

14   APPEARANCES:

15

16   FOR THE GOVERNMENT:     RICHARD D. GREGORIE, ESQ., and
                             JACQUELINE M. ARANGO, ESQ.
17                           ASSISTANT UNITED STATES ATTORNEYS
                             99 Northeast Fourth Street
18                           Miami, Florida 33132

19
     FOR THE DEFENDANT       ANA MARIA JHONES, ESQ.
20     NARSEAL BATISTE:      300 Seville Avenue, Suite 210
                             Coral Gables, Florida 33134
21

22   FOR THE DEFENDANT       ALBERT Z. LEVIN, ESQ.
       PATRICK ABRAHAM:      261 Northeast First Street
23                           Sixth Floor
                             Miami, Florida 33132
24

25
```

```
 1   FOR THE DEFENDANT        RODERICK D. VEREEN, ESQ.
       STANLEY PHANOR:        BRINKLEY, HENRYS & LEWIS
 2                            4770 Biscayne Boulevard
                              Suite 1200
 3                            Miami, Florida 33131

 4
     FOR THE DEFENDANT        RICHARD K. HOULIHAN, ESQ.
 5     NAUDIMAR HERRERA:      300 Aragon Avenue
                              Coral Gables, Florida 33134
 6

 7   FOR THE DEFENDANT        LOUIS CASUSO, ESQ.
       BURSON AUGUSTIN:       111 Northeast First Street
 8                            Suite 603
                              Miami, Florida 33132
 9

10   FOR THE DEFENDANT        NATHAN CLARK, ESQ.
      ROTSCHILD AUGUSTINE:    17639 South Dixie Highway
11                            Miami, Florida 33157

12
     REPORTED BY:            LISA EDWARDS, CRR, RMR
13                           Official Court Reporter
                             400 North Miami Avenue
14                           Twelfth Floor
                             Miami, Florida 33128
15                           (305) 523-5499

16

17

18

19

20

21

22

23

24

25
```

I  N  D  E  X

|                                   | Direct | Cross | Red. |
|-----------------------------------|--------|-------|------|
| WITNESSES FOR THE GOVERNMENT:     |        |       |      |
| Abbas al-Saidi                    | 5      | 52    |      |

```
 1              THE COURT:  Good morning.

 2              United States of America versus Narseal

 3   Batiste, et al., Case No. 06-20373.

 4              Counsel, state your appearances, please, for

 5   the record.

 6              MR. GREGORIE:  Good morning, your Honor.

 7              Richard Gregorie and Jacqueline Arango on

 8   behalf of the United States.

 9              THE COURT:  Good morning.

10              MS. JHONES:  Good morning, your Honor.

11              Ana Jhones on behalf of Narseal Batiste, who

12   is present.

13              THE COURT:  Good morning.

14              MR. LEVIN:  Good morning, your Honor.

15              Albert Levin for Patrick Abraham, who's

16   present.

17              THE COURT:  Good morning.

18              MR. CASUSO:  Good morning, Judge.

19              Lou Casuso on behalf of Burson Augustin, who

20   is present.

21              THE COURT:  Good morning.

22              MR. CLARK:  Good morning, your Honor.

23              Nathan Clark for Rotschild Augustine, who's

24   present.

25              THE COURT:  Good morning.
```

al-Saidi - DIRECT - By Mr. Gregorie                    5

```
 1              MR. HOULIHAN:  Richard Houlihan with Naudimar
 2    Herrera.
 3              THE COURT:  Good morning.
 4              MR. VEREEN:  Good morning, your Honor.
 5              Roderick Vereen on behalf of Stanley Phanor,
 6    who's present.
 7              THE COURT:  Good morning.
 8              All the Defendants are present, and all jurors
 9    are now present.
10              So let's bring them in.
11              (Whereupon, the jury entered the courtroom at
12    9:21 a.m. and the following proceedings were had:)
13              THE COURT:  You may be seated.
14              Good morning, ladies and gentlemen.
15              THE JURY:  Good morning.
16              THE COURT:  Mr. Al-Saidi, you are still under
17    oath.
18              You may proceed, Mr. Gregorie.
19              MR. GREGORIE:  Good morning, ladies and
20    gentlemen.
21              THE JURY:  Good morning.
22                   CONTINUED DIRECT EXAMINATION
23    BY MR. GREGORIE:
24    Q.   Mr. al-Saidi, when we left off yesterday, we were
25    talking about a meeting on December the 21st of 2006.
```

```
 1          Do you remember that, sir?

 2   A.     Yes, sir.

 3   Q.     Before we play that particular tape, which is

 4   Government's Exhibit 46, let me ask you a couple

 5   questions about your apartment.

 6          You said it was on the ground floor?

 7   A.     Yes, sir.

 8   Q.     What, if anything, could you hear outside if you

 9   were -- when you were outside of the apartment?

10   A.     I'm sorry.  I didn't understand the question.

11   Q.     How audible was what was going on outside when

12   you were inside the apartment?  Could you hear things

13   from outside the apartment?

14   A.     Yes.  As you sit down in the living room, you

15   could hear people walking.  It's very clear.

16   Q.     Now, what, if anything, did any of the visitors

17   to your apartment tell you about having conversations

18   in your apartment?

19          MS. JHONES:  Objection.  Hearsay as to what

20   other people told him.

21          THE COURT:  Sustained --

22          MR. GREGORIE:  I'll direct it to Narseal

23   Batiste.

24   BY MR. GREGORIE:

25   Q.     What, if anything, did Narseal Batiste say to you
```

1    about noise inside or outside the apartment?

2    A.    He told me that it's easy to hear over to outside

3    the talking.  So he required me to turn on some -- some

4    noise, either the TV or the music.

5    Q.    And so, when there's tape-recording going on of

6    this conversation on December the 21st, can you hear

7    something in the background?

8    A.    Yes.

9    Q.    What do you hear, if you remember?

10   A.    I think it was the radio.

11   Q.    And did you turn it to any particular station?

12   Was there any reason you had for where it was turned on

13   on the radio?

14   A.    I think I was listening to a station before.  So

15   when he asked me to turn it on, I just turned it on.  I

16   didn't look for a different station or nothing.

17   Q.    Now, sir, just to remind us again, who is present

18   in this conversation in your apartment in Government's

19   Exhibit 46, if you remember?

20   A.    It was me, Brother Naz and Brother Pat.

21   Q.    Was Brother Pat there?

22   A.    I'm confused.

23         There was two meeting in my apartment.  There was

24   one time where it was -- Brother Pat is present, and

25   there was one time where it's just me and Brother Naz.

al-Saidi - DIRECT - By Mr. Gregorie                8

1    Q.    This one on the 21st, the second meeting:  Do you

2    remember who exactly was there?

3    A.    Yes.  The second meeting was just me and Brother

4    Naz.

5    Q.    Okay.

6          MR. GREGORIE:  Can we play, please, the first

7    clip, your Honor.  It's a rolling transcript that

8    should appear on the screen for the jury.

9          THE COURT:  Okay.

10          MR. GREGORIE:  Could we play the clip, please.

11   This is Exhibit 46.

12          MS. JHONES:  Clip 1, Mr. Gregorie?

13          MR. GREGORIE:  Clip 1.

14          MS. JHONES:  Thank you.

15          (Whereupon, segments of Government's Exhibit

16   No. 46 were published in open court.)

17   BY MR. GREGORIE:

18   Q.    Sir, what are you talking about where -- you

19   talked about the list.

20          Do you remember that?

21   A.    Yes, sir.

22   Q.    What are you referring to?

23   A.    I was referring to the list that I got on the

24   18th from them, from Brother Naz.

25   Q.    What did you tell him you did with that list?

```
 1   A.    I told him I had to give it to somebody so they

 2   could send it to Al-Qaeda, to back home.

 3            MR. GREGORIE:  Can you continue the

 4   conversation, please.

 5            (Whereupon, segments of Government's Exhibit

 6   No. 46 were published in open court.)

 7   BY MR. GREGORIE:

 8   Q.    Now, sir, when Narseal Batiste says to you, "We

 9   ain't gonna let them down, Occ.  We gonna do it," what

10   did you understand him to be telling you?

11   A.    He was telling me that he -- that he wasn't gonna

12   let Al-Qaeda down, that he was gonna accomplish the

13   mission that he promised, like he told me.

14   Q.    And where did you come up with the idea of how

15   the list traveled, all the different places it went to?

16   A.    From my own mind.  I just told him that to make

17   him feel, you know, less scared, less afraid, of

18   anybody finding it.  So I just told him from my own

19   mind that I gave it to somebody by hand.

20            MR. GREGORIE:  Could we play the next clip,

21   please.

22            (Whereupon, segments of Government's Exhibit

23   No. 46 were published in open court.

24            MR. GREGORIE:  Hold it there one second.

25
```

 1   BY MR. GREGORIE:

 2   Q.    Just looking at that picture, sir, can you tell

 3   us -- because it's kind of dark, can you tell us who's

 4   sitting where.

 5   A.    That is me here, and that's Brother Naz.

 6   Q.    Okay.

 7          MR. GREGORIE:  Go ahead.  Thank you.

 8          MS. JHONES:  Mr. Gregorie, is this Clip 2?

 9          MR. GREGORIE:  Yes.  This is Clip 2.

10          (Whereupon, segments of Government's Exhibit

11   No. 46 were published in open court.)

12   BY MR. GREGORIE:

13   Q.    Sir, whose idea was this that you were talking

14   about, the poison in the salt shakers, the attack

15   downtown?

16   A.    There was more than one occasion that me and

17   Brother Naz have spoke about his attacks.  And he

18   planned on using the salt shaker in exchange of poison

19   to create dev -- hysterical devastation.

20          So I was bringing it up because I told the FBI

21   and they told me I had to speak about it again so I

22   could get it recorded.  And that's what I was doing.

23   Q.    And who is it that says, "That's the kind of

24   attack we (unintelligible)"?

25   A.    That was Brother Naz.

al-Saidi - DIRECT - By Mr. Gregorie                    11

1    Q.    Okay.

2              MR. GREGORIE:  Continue, please.

3              (Whereupon, segments of Government's Exhibit

4    No. 46 were published in open court.)

5    BY MR. GREGORIE:

6    Q.    Who first mentions going on a military base and

7    attack?

8    A.    That was Brother Naz.

9              MR. GREGORIE:  Continue, please.

10             (Whereupon, segments of Government's Exhibit

11   No. 46 were published in open court.)

12   BY MR. GREGORIE:

13   Q.    What did you understand him to be telling you

14   there, sir?

15   A.    I understand him to be telling me that there was

16   a National Guard place on 125th and it's unsecure.  He

17   said that he -- I don't know what he did on the

18   sidewalk, and nobody seeing him.

19   Q.    Okay.

20             MR. GREGORIE:  Continue, please.

21             (Whereupon, segments of Government's Exhibit

22   No. 46 were published in open court.)

23   BY MR. GREGORIE:

24   Q.    What is Narseal Batiste telling you there, sir?

25   A.    He was telling me that he wanted to do the

1   mission so fast before the US military finds out about

2   what he's doing, that attacks is happening all over, so

3   he could create hysterical devastation, basically.

4   Q.    Had he ever told you that before?

5   A.    Yes.  I was hearing this over and over.  I was

6   glad to record it that day.  I heard it a lot.  I told

7   the FBI, and it wasn't recorded.

8   Q.    What, if anything, were you doing during this

9   conversation?

10   A.    I was trying to, you know, keep engaging with the

11   conversation with him so I could pull out information

12   that was said before.

13        MR. GREGORIE:  Continue playing, please.

14        (Whereupon, segments of Government's Exhibit

15   No. 46 were published in open court.)

16   BY MR. GREGORIE:

17   Q.    Sir, did you know what he was talking about here

18   when he said, "Only way we can do this, Occ, is the

19   gangs, the Bloods, the Crips, the Black Stones"?

20   A.    Yes.  He told me prior to that meeting that he

21   wanted to unite the Moors organization with all the

22   gangs that exist in the United States, such as the

23   Bloods, Crips and Black Stones, to gather and be as one

24   group so they could defect to the United States

25   Government.

al-Saidi - DIRECT - By Mr. Gregorie          13

```
 1   Q.     So they could do what to the United States
 2   Government?
 3   A.     Affect the Government.
 4          THE COURT REPORTER:  I'm sorry.  Say that
 5   again, please.
 6          THE WITNESS:  Affect the Government.
 7   BY MR. GREGORIE:
 8   Q.     "Effect" the Government?
 9   A.     Yes, sir.
10   Q.     Okay.
11          MR. GREGORIE:  Continue to play, please.
12          (Whereupon, segments of Government's Exhibit
13   No. 46 were published in open court.)
14   BY MR. GREGORIE:
15   Q.     What is Narseal Batiste telling you there, sir?
16   A.     He was telling me more about his attacks that he
17   have planned.  So, basically, I was going on, jogging
18   more information about how he was going to do it.
19          He said he wanted to blow up the two buildings
20   in -- that's the most important buildings in America.
21   He goes on, explaining to me how he wanted to
22   accomplish his war against the US Government.
23          MR. GREGORIE:  Continue, please.
24          (Whereupon, segments of Government's Exhibit
25   No. 46 were published in open court.)
```

1    BY MR. GREGORIE:

2    Q.    Sir, had you ever heard of the Sears Tower?

3    A.    Not until that moment.

4    Q.    As I say, have you ever been to Chicago?

5    A.    No.

6              MR. GREGORIE:  Continue, please.

7              (Whereupon, segments of Government's Exhibit

8    No. 46 were published in open court.)

9    BY MR. GREGORIE:

10   Q.    What are you looking at there, sir?

11   A.    He was showing me his bank cards.  They were his

12   bank cards.

13   Q.    And what did you understand him to be showing you

14   the bank cards for?

15   A.    He was trying to give me a point about him being

16   in Chicago on a particular time; so, he was pulling out

17   his cards, showing me from different states.

18   Q.    Okay.

19             MR. GREGORIE:  Continue, please.

20             (Whereupon, segments of Government's Exhibit

21   No. 46 were published in open court.)

22   BY MR. GREGORIE:

23   Q.    Sir, did you ever promise to give money to

24   Narseal Batiste?

25             MS. JHONES:  Objection as to the leading

1    nature of the question.

2          MR. GREGORIE:  I'll rephrase the question,

3    your Honor.

4    BY MR. GREGORIE:

5    Q.    What, if any, money did you ever promise to give

6    to Brother Naz?

7    A.    I never promised him an amount.  I told him I was

8    helping as one of his soldiers, and that was our

9    agreement.  I told him since the beginning I'm trying

10   to do whatever I could.  But I never promised a certain

11   amount.

12   Q.    Did you ever give him any money?

13   A.    I think, like, change, pocket, that -- he lend

14   me, I think, $40, and I gave it back to him.  I don't

15   remember giving him money.  No.

16   Q.    Now, sir, after this meeting on December 21st,

17   when, if at all, did you see Brother Naz again in

18   December?

19   A.    I seen him --

20   Q.    Did you see him at all again in December?

21   A.    No.

22   Q.    When was the next time, if at all, that you saw

23   him?

24   A.    I think it was on January -- January 3rd.

25   Q.    Okay.  And where were you on January 3rd?

1   A.     I was in my apartment.

2   Q.     Were you expecting to see anyone when you were in

3   your apartment on January 3rd?

4   A.     No, sir.

5   Q.     Were you expecting to do anything more with

6   regard to this investigation at that time?

7   A.     No.

8   Q.     Why not?

9   A.     Because the FBI told me to stand by because they

10  already connected into Brother Mohammed.

11  Q.     What, if anything, happened while you were in

12  your apartment on January 3rd?

13  A.     I heard knocking on my door.  I get up.  I look

14  through the hole.  I seen a female.  I was wondering

15  who it is.  I opened the door and Brother Naz pushed

16  and came in, him and his wife.

17  Q.     Who was with him?

18  A.     His wife.

19  Q.     Was that the female that was standing in front of

20  the door?

21  A.     Yes, sir.

22  Q.     Had you ever met her before?

23  A.     I seen her several times.  But I didn't knew it

24  was her because I just seen her, drop my head, and I

25  don't talk to her, like, I don't know her.

al-Saidi - DIRECT - By Mr. Gregorie                    17

```
 1    Q.      And did you know what her name was?

 2    A.      No.  Not at the time.

 3    Q.      Okay.  And did you get an opportunity to turn on

 4    the recording equipment?

 5    A.      No.  Because I didn't know it was them.  And I

 6    opened the door before I did that because I didn't know

 7    it was them.

 8    Q.      And what happened?

 9    A.      I couldn't turn it on in front of them.  So I

10    didn't record.

11    Q.      Okay.  Did they come in and have a conversation

12    with you?

13    A.      Yes, sir.

14    Q.      Tell us as best you can, please, what they said

15    to you and what you said to them.

16    A.      When they first came in, we praise each other,

17    like, "Peace and love," in Arabic.

18            And then they sit down, and Brother Naz start

19    speaking to me about the missions.

20            I was -- I didn't know how much he wanted her to

21    know about it.  So I was holding back.  I actually

22    didn't say as much I usually talk to him.

23            And that day he was telling me that he was gonna

24    give the salt jobs, you know, to change the salt

25    shakers into poison in the restaurants -- he was gonna
```

al-Saidi - DIRECT - By Mr. Gregorie                    18

 1  give that job to the ladies.

 2         And his wife was there.  She was shaking her

 3  head.  And he was telling me that he have more ladies

 4  involved in the mission.

 5         He kept on telling me about the Sears Tower in

 6  Chicago, the Empire State Building.  He kept digging

 7  out more and more information about what he's been

 8  planning on doing to accomplish the mission.

 9  Q.    When this meeting ended, did you report it to

10  anybody?

11  A.    Yes, I did.

12  Q.    Who did you report it to?

13  A.    To the FBI, as soon as they left.

14  Q.    This was on January 3rd, you said?

15  A.    Yes, sir.

16  Q.    Now, when, if at all, did you hear from Narseal

17  Batiste or any of his representatives after that, if

18  you can remember?

19  A.    January 10.

20  Q.    I want you to take a look, if you would, please,

21  at Government's Exhibit 51.

22         Do you have that there?

23  A.    Yes, sir.

24  Q.    And did you have some sort of equipment on your

25  phone -- what, if any, equipment did you have on your

 1    phone to record messages?

 2    A.    It was a recording device that I had to turn on,

 3    put it in my ear and use the phone over it.

 4    Q.    Did you have it on your phone on January the

 5    10th?

 6    A.    Yes.

 7    Q.    Okay.  And Government's Exhibit 51 is a recorded

 8    message from that phone machine?

 9    A.    Yes, sir.

10          MR. GREGORIE:  If we could, your Honor, I'd

11    like to publish Government's Exhibit 51 from

12    January 10th.

13          THE COURT:  Is that in the binder?

14          MR. GREGORIE:  I believe it is.  Yes, your

15    Honor.

16          THE COURT:  Okay.  Yes.  You may publish.

17          MR. GREGORIE:  It should say "51-A," your

18    Honor, towards the end.  I think it's the third from

19    the last.

20          THE COURT:  Is everyone there?

21          THE JURY:  Yes.

22          THE COURT:  Okay.  Go ahead.

23          (Whereupon, Government's Exhibit No. 51 was

24    published in open court.)

25

al-Saidi - DIRECT - By Mr. Gregorie                    20

```
 1    BY MR. GREGORIE:

 2    Q.    Now, prior to this call, had you left a message

 3    for Brother Naz?

 4    A.    I was trying to reach him.  Yes, I did.

 5    Q.    And why were you trying to reach him?

 6    A.    Because the FBI instructed me to call him and

 7    find out what was going on.

 8    Q.    Okay.  And after this telephone message, did you

 9    then have a conversation on the telephone with Patrick

10    Abraham on January 10th?

11    A.    Yes, sir.

12          MR. GREGORIE:  If we could, your Honor, I

13    would now like to publish Government's Exhibit 49.

14          THE COURT:  Okay.

15          MR. GREGORIE:  They're a little out of order

16    chronologically, but it should be 49 and 49-A.

17          THE COURT:  That's in the binder as well?

18          MR. GREGORIE:  That's two back in the binder.

19    Yes, your Honor.

20          (Whereupon, segments of Government's Exhibit

21    No. 49 were published in open court.)

22          MR. GREGORIE:  I'm sorry, your Honor.  It's on

23    Page 3.  It should be seven speakers down on Page 3.

24          THE COURT:  You can start again, if you want.

25          (Whereupon, Government's Exhibit No. 49 was
```

1    published in open court.)

2    BY MR. GREGORIE:

3    Q.     Now, sir, in that particular passage, Patrick

4    Abraham says to you, "We have had a couple of things

5    that happened."

6           Did you know what he was referring to?

7    A.     I think he's referring to somebody taking

8    pictures in the mosque or saying -- mentioning Brother

9    Naz's name or something.  Because of that, Brother Naz

10   has gone away.  So if I need to give him a message, I

11   need to send it through Brother Pat.

12   Q.     Did you make arrangements to meet with Brother

13   Pat at any time after this call?

14   A.     Yes.

15   Q.     When did you make arrangements to meet with him?

16   A.     The following day.

17   Q.     January the 11th?

18   A.     Yes, sir.

19   Q.     I want you to look at what's marked as

20   Government's Exhibit 50, which should be the next

21   conversation.

22          Did you have a meeting with Patrick Abraham on

23   January 11th?

24   A.     Yes, sir.

25   Q.     Where did the meeting take place?

```
 1   A.     In front of my apartment, there was a parking
 2   lot.  That's where we met.
 3   Q.     Why didn't you meet in your apartment where you
 4   had the recording equipment?
 5   A.     He didn't want to come out.  He kept calling me
 6   to go outside.
 7   Q.     What was across the street next to the parking
 8   lot?
 9   A.     It was a firefighters' station.
10   Q.     Were you eating anything during this meeting?
11   A.     Yes.  I was eating some pizza.
12          MR. GREGORIE:  If we go to Page 3 of this
13   tape, four speakers down, it says "Brief pause in
14   conversation."
15          Can everybody find it?
16          We can start there, please.
17          (Whereupon, segments of Government's Exhibit
18   No. 50 were published in open court.)
19   BY MR. GREGORIE:
20   Q.     Now, sir, when Patrick Abraham tells you, Those
21   are the words from Brother Naz, what did you understand
22   that to mean?
23   A.     That Brother Naz has sent him to tell me what
24   he's been telling me.
25   Q.     And back at the beginning of this conversation,
```

```
 1    on Page 3, he mentioned to you something about the

 2    heat.

 3          Do you remember that?

 4    A.    Yes, sir.

 5    Q.    What was he referring to?

 6    A.    The Government attention.

 7    Q.    So he was -- what, if anything, was Patrick

 8    Abraham concerned about?

 9    A.    About the Government knowing that they dealing

10    with us.

11    Q.    Okay.

12          MR. GREGORIE:  If we could go back again to

13    the rest of that conversation.

14          (Whereupon, segments of Government's Exhibit

15    No. 50 were published in open court.)

16    BY MR. GREGORIE:

17    Q.    What are you referring to there, sir?

18    A.    I'm referring to Brother Naz telling me that he

19    was a little suspicion about Brother Mohammed because

20    he thinks that Brother Mohammed was either nervous or

21    scared or something, that he was worried.

22    Q.    You say there, "I have a little misunderstanding

23    with Brother Naz because he came with the Queen."

24          When are you referring to?

25    A.    To his wife.
```

al-Saidi - DIRECT - By Mr. Gregorie                    24

1    Q.     And when did he come with the Queen?

2    A.     January 3rd.

3          MR. GREGORIE:  Can we continue with the

4    conversation, please.

5          (Whereupon, segments of Government's Exhibit

6    No. 50 were published in open court.)

7    BY MR. GREGORIE:

8    Q.   When Patrick Abraham says to you there, "The help

9    that he feel like Allah has put in his heart to do us,

10   we were all waiting for it," did you understand what he

11   was telling you there?

12   A.     Yes, sir.  I understand him telling me that he

13   expect Brother Mohammed to help them towards the

14   mission and they was all waiting for that help to come

15   through.

16   Q.     Okay.

17         MR. GREGORIE:  Continue, please.

18         (Whereupon, segments of Government's Exhibit

19   No. 50 were published in open court.)

20   BY MR. GREGORIE:

21   Q.   What is Patrick Abraham telling you there, sir?

22   A.   He was telling me that they was all waiting for

23   Brother Mohammed to come, thinking that -- I guess that

24   he was gonna move faster than what he was.  They was --

25   were still waiting for that help that he was here for.

1          MR. GREGORIE:  We're going to go to a second

2     clip of this meeting, which is at Page 2.  I believe it

3     begins at the bottom, the last speaker.

4          (Whereupon, segments of Government's Exhibit

5     No. 50 were published in open court.)

6          MR. GREGORIE:  We're on Page 13, now, four

7     speakers down, where it says, "Al-hamdu li-llah."

8          Continue, please.

9          (Whereupon, segments of Government's Exhibit

10    No. 50 were published in open court.)

11    BY MR. GREGORIE:

12    Q.    What was Patrick Abraham telling you there?

13    A.    He was telling me he preferred to get financial

14    support because they want -- they preferred to get the

15    financial help from Brother Mohammed instead of him

16    going to buy the guns, because I think they had a deal

17    that he was gonna get them the stuff they had on the

18    list.

19          So he was saying, "We prefer going out there to

20    get it ourself instead of having Brother Mohammed going

21    through the trouble to get weapons.  And he's Arab and

22    Arabs get a strike against them, just like black people

23    does."

24          MR. GREGORIE:  We're now going to go over to

25    the last clip in this conversation, which is on Page 15

 1   at the bottom.  It starts with CW speaking at the

 2   bottom of the page, "We -- whatever makes you feel

 3   comfortable."

 4          (Whereupon, segments of Government's Exhibit

 5   No. 50 were published in open court.)

 6   BY MR. GREGORIE:

 7   Q.    What was Patrick Abraham telling you?

 8   A.    He was telling me that it was up to them on when

 9   to do the attacks and, whenever they feel like Allah

10   tells them to go start the attacks, that they would do

11   it.

12          MR. GREGORIE:  Continue, please.

13          (Whereupon, segments of Government's Exhibit

14   No. 50 were published in open court.)

15   BY MR. GREGORIE:

16   Q.    What is Patrick Abraham telling you there, sir?

17   A.    I think Brother Mohammed has asked them for some

18   kind of written document.  So he was telling me that,

19   "We gonna have to have trust on each other, that it

20   wasn't right -- it wasn't good to write anything in

21   documents of this mission.

22          MR. GREGORIE:  Continue, please.

23          (Whereupon, segments of Government's Exhibit

24   No. 50 were published in open court.)

25

```
 1   BY MR. GREGORIE:
 2   Q.    What did you understand Patrick Abraham to be
 3   telling you there, sir?
 4   A.    He's telling me that there's got to be some
 5   trust.  He was telling me that all the moves that they
 6   doing is secretly, they might look like they not doing
 7   anything, but they actually is moving towards their
 8   mission.
 9   Q.    Okay.  Now, this meeting was on January 11th.  Is
10   that right?
11   A.    Yes, sir.
12   Q.    When, if at all, did you see Brother Pat or
13   Brother Naz again after January 11th, if you remember?
14   A.    Yes.  It was on January 18.
15   Q.    Where were you on January 18th?
16   A.    In my apartment.
17   Q.    Did anybody -- who, if anybody, came to your
18   apartment?
19   A.    Brother Pat came to -- no.  No.  I'm sorry.
20         It was Brother -- on January 18, it was Brother
21   Pat that came to pick me up to the Embassy.
22   Q.    Did you go to the Embassy on January 18th?
23   A.    Yes, I did.
24   Q.    Who did you meet with?
25   A.    I think it was Brother Naz, Brother Pat, Brother
```

1    Naudy, Burson, Sunni.

2    Q.    Was that on the 18th of January?

3    A.    Yes.

4    Q.    I'm going to ask you to look at Government's

5    Exhibit 52.

6    A.    Excuse me.  I think I remember it.

7          Actually, I think it was in my apartment.  It

8    wasn't -- it was near my apartment, in the parking lot,

9    that Brother Naz and Brother Pat came to visit me.

10   Q.    Was it just Brother Naz and Brother Pat?

11   A.    Yes.  I'm sorry.  I was mistaking it by another

12   date.  But that date, it was Brother Naz and Brother

13   Pat that came to visit me near my apartment.

14   Q.    Did anybody come into the apartment?

15   A.    No.

16   Q.    What happened?

17   A.    Brother Pat knocked on my door and told me that

18   he wanted to speak to me with Brother Naz.  And Brother

19   Naz was waiting in the parking lot.

20         I asked him to bring their -- to call Brother

21   Naz.  Come in.  They was, like, "No."  They wanted me

22   to go out.

23         So I wore the body recorder, and I walked to the

24   parking lot.  And Brother Naz was waiting for me there.

25         So Brother Pat get in the car and me and Brother

 1   Naz stay out the car.  I asked him to get in the car.

 2   He resist.  He wanted to talk to me alone outside the

 3   car.

 4   Q.    What sort of day was it that day?

 5   A.    I think it was the afternoon.

 6   Q.    Do you know what sort of day -- what the weather

 7   was like that day?

 8   A.    It was very, very windy.  It was a lot of wind.

 9   It was a lot of --

10   Q.    Have you listened to this particular tape,

11   Government's Exhibit 52?

12   A.    Yes, sir.

13   Q.    Is there any problem with the audio portion of

14   this tape?

15   A.    Yes, there was.  It was a lot of wind.  So you

16   hardly could hear us speaking from the wind.

17   Q.    Okay.  I'm going to ask to turn to the top of

18   Page 2.  It says "Conversation low" and the CW is

19   unintelligible.  Where it says "NB," we're going to

20   start right there.

21         MR. GREGORIE:  If everybody can find it.

22         Could you play it, please.

23         (Whereupon, segments of Government's Exhibit

24   No. 52 were published in open court.)

25

al-Saidi - DIRECT - By Mr. Gregorie                    30

1    BY MR. GREGORIE:

2    Q.    What is Narseal Batiste telling you there, sir?

3    A.    He was telling me that something happened that

4    was -- that had nothing to do with me and him.  They

5    was trying to link things together.  His name was

6    mentioned.

7          Basically, what he was telling me is that the

8    Government is focusing on him and, because of that, he

9    wanted to go away until things cool down.

10          MR. GREGORIE:  Could you continue the tape,

11   please.

12          (Whereupon, segments of Government's Exhibit

13   No. 52 were published in open court.)

14   BY MR. GREGORIE:

15   Q.    Where Narseal Batiste tells you, "This mission

16   here, it's not a mission like going to a candy store or

17   going to Disney Land.  Our life is on the line and

18   then, again, we might lose our life," what did you

19   understand Narseal Batiste to be telling you?

20   A.    He was talking about the mission.  He was saying,

21   basically:  It's not a game.  It's not an easy thing.

22   It's not going to a candy store or Disney Land where

23   you gonna have fun.  It is something that we might lose

24   our life on the line, accomplishing this mission.

25          So, basically, he's telling me that he's taking

al-Saidi - DIRECT - By Mr. Gregorie                    31

 1   it very serious.

 2            MR. GREGORIE:  Continue the tape, please.

 3            (Whereupon, segments of Government's Exhibit

 4   No. 52 were published in open court.)

 5   BY MR. GREGORIE:

 6   Q.    Sir, up above, where Narseal Batiste says, "If

 7   you took those documents right now to FBI -- I'm not

 8   saying that you would (unintelligible) what is causing

 9   all of this (unintelligible)," do you remember what was

10   said there?

11   A.    Yes.  He was asking me -- basically, he was

12   telling me that Brother Mohammed has asked him for a

13   written document and he didn't want to give it to him

14   because, if he would and Brother Mohammed takes it to

15   the FBI, which he think he wouldn't, that it cost

16   $40,000 for that --

17   Q.    It would cost what?

18   A.    That the FBI would have paid $40,000 for that

19   information.

20         And he's saying even he might not do that and,

21   just walk in the street and get caught with those

22   documents, it would have caused everybody a lot of

23   problems.

24            MR. GREGORIE:  Continue, please.

25            (Whereupon, segments of Government's Exhibit

```
 1    No. 52 were published in open court.)

 2    BY MR. GREGORIE:

 3    Q.     Sir, where Narseal Batiste says, "Just recently

 4    there was a guy in Chicago.  He just was demanding they

 5    give him a hundred (unintelligible)," do you remember

 6    what that conversation was about?

 7    A.     Yes.  He was telling me that there is a guy in

 8    Chicago who went and told the FBI about somebody he was

 9    working with and that he received, like, $100,000 for

10    that information from the FBI.

11              MR. GREGORIE:  Continue the tape, please.

12              (Whereupon, segments of Government's Exhibit

13    No. 52 were published in open court.)

14    BY MR. GREGORIE:

15    Q.     That's it.

16         Now, sir, after this --

17              MR. GREGORIE:  May I have one moment, your

18    Honor?  Sorry.

19              THE COURT:  Sure.

20              MR. GREGORIE:  I'm sorry, your Honor.

21              There's one more clip on this tape, which is

22    on Page 7.  It starts at the second speaker down.  It

23    starts with, "NB:  Last time (unintelligible)."  It's a

24    very short piece.

25              (Whereupon, segments of Government's Exhibit
```

```
 1   No. 52 were published in open court.)

 2   BY MR. GREGORIE:

 3   Q.     What is Narseal Batiste telling you there, sir?

 4   A.     He was telling me -- I think he was telling me

 5   that there's -- nobody asks him -- no -- he won't give

 6   that paper because he never thought that he was going

 7   to be asked.

 8   Q.     Do you see the portion at the end where it says,

 9   "That's gonna do -- that's gonna do the mission good.

10   I'm not gonna live to enjoy it further.  See, that's

11   the whole point for the mission"?

12          Did you understand what he was telling you there?

13   A.     He was telling me, if he receive an amount of

14   money from Brother Mohammed, that he was gonna pay it

15   all towards the mission, that he might not even live

16   after the mission.  Basically, he will not live to

17   enjoy it, that he was gonna spend that money on the

18   mission that he promised to.

19   Q.     Now, sir, after January the 18th -- this meeting

20   on January 18th, when, if at all, if you remember, did

21   you hear again from Narseal Batiste or from any of his

22   group?

23   A.     I believe on the 25th.

24   Q.     The 25th of January?

25          Do you know what mode of communication you had on
```

al-Saidi - DIRECT - By Mr. Gregorie                    34

```
 1    that date?
 2    A.    Yes, sir.  I was trying to confirm the meeting me
 3    and Mohammed was gonna go to and find out where.  The
 4    FBI asked me to find out where we was gonna meet.
 5    Q.    Would you turn to Government's Exhibit 53.
 6          THE COURT:  I don't think we have a 53.
 7          MR. GREGORIE:  There's no transcript for this
 8    one.  I'm sorry, your Honor.  There is no transcript.
 9    It's a telephone call and there's no transcript.  It's
10    January 25th.
11          Could you play that, please.
12          (Whereupon, Government's Exhibit No. 53 was
13    published in open court.)
14    BY MR. GREGORIE:
15    Q.    Sir, did you know where you were supposed to go
16    to to go to this meeting on Saturday?
17    A.    I kept trying to find out.  But the only thing I
18    find out is that he told me to take a cab and go to the
19    Embassy.  He didn't tell me where we was gonna meet.
20    Q.    This call was on January 25th.  Correct?
21    A.    Yes, sir.
22    Q.    Did you have any more phone calls with him after
23    this?
24    A.    Yes.
25    Q.    When, if at all, did you talk with him again?
```

1    A.     On the 27th.

2    Q.     Would you take out Government's Exhibit 54 and

3    turn to the middle of Page 3.  It says, "Anyway, did

4    you talk to Brother Naz?"  It's you speaking.  Can you

5    find it?

6    A.     You said three speakers on what page?

7    Q.     Page 3.  You're speaking and it says, "Anyway,

8    did you talk to Brother Naz?"  Did you find it?

9    A.     Yes, sir.

10          MR. GREGORIE:  Would you publish it, please.

11          (Whereupon, segments of Government's Exhibit

12   No. 54 were published in open court.)

13   BY MR. GREGORIE:

14   Q.     Sir, what is Patrick Abraham telling you there?

15   A.     He was telling me that the mastermind got -- he

16   got everything organized.  The body --

17   Q.     Who's the mastermind?

18   A.     Brother Naz.  He's telling me that the body don't

19   need to worry about it, the mind got it.

20   Q.     What does that mean?

21   A.     That means the rest of the group don't have to be

22   worrying about what's happened, that Brother Naz

23   already organized that.

24   Q.     And what did he tell you about where you were

25   going?

1    A.    He didn't tell me where we was going.

2         MR. GREGORIE:  Could you finish the call,

3    please.

4         (Whereupon, segments of Government's Exhibit

5    No. 54 were published in open court.)

6    BY MR. GREGORIE:

7    Q.    Now, sir, you mentioned talking to Brother

8    Mohammed several times in this conversation.

9         Had you actually talked to Brother Mohammed?

10   A.    No.

11   Q.    Up to this point, January 27th, had you talked to

12   Brother Mohammed at all?

13   A.    Never speak to him.  Never met him.

14   Q.    You had never seen him at all?

15   A.    No, sir.

16   Q.    And what, if any, knowledge did you have of what

17   Brother Mohammed had said to Brother Naz or anything

18   about what had happened with Brother Mohammed?

19   A.    There is some things that Brother Naz tried to

20   tell me that Brother Mohammed was asking him for, and

21   that was it.  I didn't know nothing else.

22   Q.    Did anybody else tell you anything about what

23   Brother Mohammed said?

24   A.    The FBI --

25        MR. VEREEN:  Objection.  Calls for hearsay.

```
 1              THE COURT:  Sustained.

 2              Rephrase your question.

 3   BY MR. GREGORIE:

 4   Q.    Did you talk to anybody else about what Brother

 5   Mohammed had said?

 6   A.    No.

 7   Q.    Now, sir, we're at the -- that was on the 27th.

 8         When, if at all, did you go to this meeting that

 9   you were talking to Patrick Abraham about?

10   A.    The following day, on the 28th.

11   Q.    On the 28th?

12   A.    Yes, sir.

13   Q.    And in order to get to this meeting on the 28th,

14   what, if anything, did you do?

15   A.    We -- I went and met the FBI and I met Brother

16   Mohammed on the 28th.  We took a cab.  And we went to

17   the Embassy.

18   Q.    Is this the first time you've ever met Brother

19   Mohammed?

20   A.    Yes, sir.

21   Q.    How much time did you have to talk to him before

22   you went on this meeting?

23   A.    I think it was, like, five minute before the taxi

24   got there.

25   Q.    What language did you speak to him?
```

1   A.     Sometimes I would speak to him in Arabic and

2   sometimes in English.

3   Q.     Tell the Court and jury, please, what happened on

4   January 28th after you got in the taxi with Brother

5   Mohammed.

6   A.     What happened that day, we got on the taxi and we

7   give him the address to the Embassy.  He took us there.

8          When we got there, came out the cab.  I first

9   seen Brother Burson.

10         THE COURT REPORTER:  I'm sorry.  Came out the

11  cab....

12         THE WITNESS:  I seen Brother Burson.  So we

13  walked towards him to the Embassy.  We got in.  That's

14  when he gave me a basket with clothing on it.

15  BY MR. GREGORIE:

16  Q.     Who gave you the basket?

17  A.     Brother Burson did.

18         And he asked me to change clothing and told me to

19  leave all the electronic on the same basket with my

20  clothes until I come back.

21         So I took the basket and I got in the mosque.

22  And Brother Mohammed was arguing with Brother Pat.  And

23  Brother Naudy was standing next to me.

24         So I took the device from my old pocket and I put

25  it in the pants pocket on the bucket.  And I put the

1    bucket on the side, took my -- all clothes off and

2    changed and left the phone there and everything.

3          Again, they was still arguing, talking about

4    Brother Mohammed didn't want to leave the phone and

5    Brother Pat was saying no electronic whatsoever.

6          So argument went on for a little while.

7          They asked me if I left every -- all the

8    electronic.

9          I told them, "Yes."

10         That's when we got into a red Toyota car behind

11   the mosque and we started driving towards the 95.

12   That's when we get into a fast-food parking lot and we

13   switch cars.

14   Q.    You say "we."  Who was in the first car you were

15   in?

16   A.    It was me, Brother Mohammed, Brother Naudy and

17   Brother Pat that got on the first car.

18   Q.    Brother Naudy and Brother Pat?

19   A.    Yes, sir.

20   Q.    Okay.

21   A.    So when we get to the next fast-food parking lot,

22   Brother Burson was there with a newer car.  And we

23   switch.  We get in the car he was on and -- all four of

24   us changed from the old car to the new one.

25         And that's when Brother Pat was really upset

al-Saidi - DIRECT - By Mr. Gregorie                    40

1    about Brother Mohammed not leaving the phones.

2         So we get on the 95 and started going south,

3    south, kept going for almost two hours.

4    Q.    What, if any, concerns did you have driving in

5    this car?

6    A.    I was really worried, you know.  I was scared for

7    my life because I don't know what Brother Mohammed been

8    doing with them.  This is the first time that they ever

9    felt suspicious of me and search me or ask me to change

10   clothing.

11        And then I was worried because we was going to

12   nowhere.  I mean, I didn't know where we was going.

13   They wouldn't tell us.  So I was scared if they was

14   taking us somewhere and kill us.

15   Q.    And how far did you go, if you remember?

16   A.    I believe it was around two, two and a half hours

17   to three hours.  I'm not sure.  I think it was

18   somewhere on the Keys.

19   Q.    Okay.  And did you stop anywhere along the way?

20   A.    Yes.  Brother Mohammed kept saying that he wanted

21   to use a bathroom and he wanted to stop.

22        So Brother Pat stopped for us in the Walgreen.

23   That's when we all got out.  And I bought some stuff

24   and kept the receipt so I could find out where we was.

25   Q.    And what did you do with the receipt after this

1    incident?

2    A.     I turned it to the FBI as soon as we get back.

3    Q.     What happened after you came out of the store?

4    A.     I'm sorry?  What happened?

5           We got back in the car and we kept riding on the

6    95.

7    Q.     And where, if at all, did you stop?

8    A.     I don't know where the area was.  But was on a

9    rest area parking.  We pulled over and then turned

10   around and got back on the same highway, but the

11   opposite direction, for, like, two, three minute.

12          We pulled over in a restaurant parking lot.  And

13   that's when I seen Brother Sunni and Brother Rot.  And

14   they was waiting on the white Jeep.  That's when we

15   park next to them and exchange from the car that we

16   were in to the Jeep.

17          And that's when Brother Mohammed and Brother

18   Sunni again was arguing about the phones.  They came

19   into an agreement that Brother Mohammed was going to

20   leave it in the car.

21          We got on the car and get back to the highway

22   approximately four, five minutes, pulled over again.

23   And that's when we stopped, waited for them.  They have

24   us wait for like, five, ten minute.

25          And then they guide us to a nearby area, to the

al-Saidi - DIRECT - By Mr. Gregorie          42

1   water where -- Brother Naz was fishing there and he

2   have a tent set up next to him.

3        And that's when we all, you know, say, "Hi" to

4   each other and, "Peace" to Brother Naz and gave fives

5   and we all got into the tent.

6        And then, when we get in the tent, they sat down

7   and I try to sit down it.  There was a plastic

8   container, you know, that they put ice and drinks in

9   it.  I thought it was strong.  I tried to sit down on

10  it and I fall down.  But I was worried if the bug fall

11  out of my pocket, but if didn't.

12       So the conversation continued between Brother

13  Mohammed and Brother Naz.  They made an agreement to

14  bring a bomb expert from a different country to teach

15  the group how to make bombs, and they made an agreement

16  about getting a facility, to start operating out of it.

17       And they kept on a long -- I think it was around

18  half-an-hour to 40-minute conversation.

19       And that's when we got back to the car.  And

20  Brother Naudy and Brother Pat took us back towards

21  Miami.

22  Q.   Okay.  Did you have any conversation on the way

23  down there -- on the trip down, did you have any

24  conversation with Brother Naudy or Brother Pat?

25  A.   It was, you know, conversation back and forward.

al-Saidi - DIRECT - By Mr. Gregorie                    43

1          We trying to keep company with Brother Naudy

2    because he was -- he was, you know, being nice since

3    the beginning, speaking to us.

4          Brother Pat was all aggressive and mad.  So he

5    said nothing to us through the whole time.

6          But Brother Naudy was conversation --

7    conversating with us about Islam, about different

8    things.

9    Q.    What, if any, phone calls were there while you

10   were driving in the car?

11   A.    There was phone calls between Brother Mohammed

12   and the FBI.

13   Q.    How do you know he was talking to the FBI?

14   A.    Because he was speaking in Arabic and I

15   recognized him telling a lady, "If these guys do

16   something," you know, "I want you guys to give me the

17   authorization to fight for my life."

18         And when I heard him saying that and I heard him

19   trying to give description of where we was going --

20   because he didn't know where we was going -- that's how

21   I know it was the FBI, because they didn't know where

22   we was.

23   Q.    And how long was this entire trip?

24   A.    Up to six hours or more.  I'm not sure exactly.

25   Q.    And who drove you back?

```
 1   A.     It was Brother Pat and Brother Naudy.

 2   Q.     And did you speak with them on the way back?

 3   A.     I spoke a little bit with Brother Naudy, but most

 4   of my conversation was with Brother Mohammed.

 5   Q.     And what, if anything, did you say to Brother

 6   Naudy -- Brother Mohammed about the trip?  I just want

 7   to know what you said.

 8   A.     I made some comments about the brothers not

 9   speaking clear Arabic and I was very happy, you know,

10   that I didn't get killed.  I record the whole

11   conversation, you know.  I was happy.  I was going home

12   safe.

13   Q.     When you got back, what happened -- where did

14   they take you back to?

15   A.     To the Beach -- no.  First, they took us to the

16   Embassy and we took our clothes with us.  Then they

17   take us back to the Beach.

18          MR. GREGORIE:  Your Honor, at this point, if

19   we could stop for the morning break, I have a couple of

20   exhibits that will take me a minute to organize.

21          THE COURT:  Sure.  We'll take a break at this

22   time.

23          Do not discuss this case either amongst

24   yourselves or with anyone else.  Have no contact

25   whatsoever with anyone associated with the trial.  Do
```

 1  not read, listen or see anything touching on this

 2  matter in any way.

 3          If anyone should try to talk to you about this

 4  case, you should immediately instruct them to stop and

 5  report it to my staff.

 6          You may leave your materials at your chairs.

 7  Please be back in the jury room in ten minutes.

 8          (Whereupon, the jury exited the courtroom at

 9  11:03 a.m. and the following proceedings were had:)

10          THE COURT:  We're in recess for ten.

11          (Thereupon a recess was taken, after which the

12  following proceedings were had:)

13          THE COURT:  We're back on United States of

14  America versus Narseal Batiste, et al., Case

15  No. 06-20373.

16          Counsel, state your appearances, please, for

17  the record.

18          MR. GREGORIE:  Richard Gregorie and Jacqueline

19  Arango on behalf of the United States, your Honor.

20          MS. JHONES:  Ana Maria Jhones on behalf of

21  Narseal Batiste, who is present.

22          MR. LEVIN:  Albert Levin on behalf of Patrick

23  Abraham, who's present.

24          MR. CASUSO:  Lou Casuso on behalf of Burson

25  Augustin, who's present.

1          MR. CLARK:  Nathan Clark on behalf of

2     Rotschild Augustine, who's present.

3          MR. HOULIHAN:  Richard Houlihan on behalf of

4     Naudimar Herrera.

5          MR. VEREEN:  And Rod Vereen on behalf of

6     Stanley Phanor, who's present.

7          THE COURT:  All Defendants are present.

8          Let's bring the jurors in.

9          (Whereupon, the jury entered the courtroom at

10    11:38 a.m. and the following proceedings were had:)

11         THE COURT:  You may be seated.

12         You are still under oath, sir.

13         You may proceed, Mr. Gregorie.

14         MR. GREGORIE:  Thank you, your Honor.

15    BY MR. GREGORIE:

16    Q.   Sir, I'm now showing you what's marked as

17    Government's Exhibits 115, 116 and 117 in evidence, and

18    ask if you recognize them.

19         Can you tell the Court and jury, please, what

20    those are.

21    A.   Yes, sir.  This is the clothing that I get that

22    day that I have to wear on the meeting on January 28th.

23    Q.   Who gave you those clothes?

24    A.   Brother Burson hand them to me on a basket.

25    Q.   And did you keep those clothes on when you came

al-Saidi - DIRECT - By Mr. Gregorie                    47

```
 1   back from the trip?

 2   A.      Yes.  They told us we could have them.

 3   Q.      Did you pick up your own clothes?

 4   A.      Yes, I did.

 5   Q.      And where did you go from there?

 6   A.      They dropped us off of on the Beach and --

 7   Q.      Did you meet anybody after you went to this

 8   meeting?

 9   A.      Yes.  Special Agent Tony Velazquez was waiting

10   for us.  As soon as we get dropped off, we went and met

11   him at the hotel.

12   Q.      Did you give him anything?

13   A.      Yes.  He asked us to take these clothes off and

14   give it to him and wear our own clothes.

15   Q.      Now, sir, we heard on the tape a while ago you're

16   telling Narseal Batiste that you were working on

17   getting your license to drive a taxi.

18           Did you ever get that?

19   A.      Yes, sir.

20   Q.      And did you begin working, driving a taxi?

21   A.      Yes, sir.

22   Q.      During the months of -- during the month of

23   February and into March, did you see anybody related to

24   this case?

25   A.      I also have, I think, two, three more meetings,
```

1   if I remember right.  I think one time I dropped off a

2   van for Brother Naz and called him and told him about

3   it.

4   Q.     When -- do you remember when, approximately, that

5   was?

6   A.     I think it was in March.

7   Q.     And what did you do on that -- first of all, how

8   were you contacted by Brother Naz?

9   A.     I called him.

10  Q.     You called him?

11  A.     Yes, sir.

12  Q.     Who asked you to call him?

13  A.     The FBI instructed me to call him and take the

14  van to the facility and call him and tell him the keys

15  is in the back the van in a bag.

16  Q.     What kind of van was this?

17  A.     I don't recall.  It was a minivan, but I don't

18  recall what company it was.

19  Q.     Do you remember where you took that van?

20  A.     I don't remember that either.

21  Q.     Did you talk to Brother Naz at all when you

22  dropped the van off?

23  A.     Yes.  I called him and I told him that the van

24  was by the warehouse and the keys was in the back in a

25  bag.

al-Saidi - DIRECT - By Mr. Gregorie                    49

```
 1   Q.     Okay.  When, if at all, after that did you talk

 2   to Brother Naz or any of his people?

 3   A.     In April -- April 19.

 4   Q.     April 19th?

 5   A.     Yes, sir.

 6   Q.     Were you expecting to see him or talk to him that

 7   day?

 8   A.     No.  I was -- I was working and I get a call from

 9   Brother Naz.

10   Q.     And what did he ask you?

11   A.     He asked me -- to meet with me.

12   Q.     And did you -- did you go to eat with him?

13   A.     No.  I just went to the restaurant.

14          And him -- I think him and Burson and, if I

15   remember, Naudy -- that's who I recall -- they was

16   eating in the Burger King.  I didn't sit down and eat

17   with them.  I just went and seen what he want.

18          And that's when he was telling me that he have

19   problems with his own group, that they think that he --

20   that he talked to the FBI.

21          So he --

22   Q.     He was talking with whom?

23   A.     To the FBI.

24   Q.     Okay.

25   A.     Yeah.  He's saying he was accused by his own
```

al-Saidi - DIRECT - By Mr. Gregorie                    50

```
 1    group that he talked to the FBI.  So he wanted to clear
 2    that matter off, including -- he had trouble with his
 3    driver's license.  So he wanted to clear that off
 4    before he get back to speak to me and Brother Mohammed.
 5    Q.    Did you have a recording device on when you went
 6    to that meeting?
 7    A.    Yes, I did.
 8    Q.    Do you know if it was working?
 9    A.    Later on, the FBI told me it was malfunctioning.
10    But I turned it on and I went to the meeting, like I
11    did in the normal meetings.
12    Q.    And was that the last meeting you had with
13    Brother Naz?
14    A.    Yes, sir.
15    Q.    What date, again, was that?
16    A.    April 19.
17    Q.    Okay.  Now, sir, were you paid by the FBI for
18    your services?
19    A.    Yes, I was.
20    Q.    Did you pay taxes on that money?
21    A.    No.
22    Q.    Why not?
23    A.    I just never have the opportunity to pay it.
24    I've been trying to gather all the information I could
25    and go ahead and pay it.  But I was never able to pay
```

1    so far.

2    Q.    Have you paid taxes at all in this country?

3    A.    Yes, I did.

4    Q.    What kind of taxes did you pay?

5    A.    I paid income taxes on my businesses.

6    Q.    Have you made any effort to pay the taxes

7    regarding these particular items, these payments you

8    got from the FBI?

9    A.    Yes, sir.  I have a lawyer right now who is

10   working on filing for the past several years I haven't

11   paid.  So far, I find out how much I owe for 2007.  But

12   I have -- I have to wait and find out exactly.

13         I don't know how much I owe so I could go ahead

14   and pay.

15   Q.    Now, sir, have you ever smoked marijuana?

16   A.    Yes.

17   Q.    And how often did you do that?

18   A.    There was days that I -- I would do it twice,

19   three times, four times a week.  And there was days

20   that I do it one time or none at all.

21   Q.    Did you ever smoke marijuana while you were

22   working on the matter -- the matters you've testified

23   about in this case?

24   A.    No.

25   Q.    And, sir, during the time periods that you were

```
 1   tape-recording these conversations, were you under the
 2   influence of any substance?
 3   A.    No, sir.
 4         MR. GREGORIE:  May I have one moment, your
 5   Honor?
 6         THE COURT:  Yes.
 7         (Discussion had off the record amongst of the
 8   counsel.)
 9         MR. GREGORIE:  No further questions, your
10   Honor.
11         THE COURT:  Ms. Jhones.
12         MS. JHONES:  Your Honor, may we approach
13   side-bar for a second?
14         THE COURT:  Okay.
15         (Whereupon, proceedings were had at side-bar
16   outside the presence of the jury which have been sealed
17   per instructions of the Court.)
18         (Whereupon, the following proceedings were had
19   in open court:)
20                    CROSS-EXAMINATION
21   BY MS. JHONES:
22   Q.    Mr. al-Saidi, you are how old, sir?
23   A.    I'm sorry?
24   Q.    How old are you, sir?
25   A.    24 years old.
```

```
 1   Q.     And in September of 2005, how old would you have

 2   been, sir?

 3   A.     I'm sorry.  Say that again.

 4   Q.     In September of 2005, how old would you have

 5   been?

 6   A.     23 year old.

 7   Q.     You testified on direct examination that you have

 8   family in this country?

 9   A.     Yes, I do.

10   Q.     The family that you have in this country are a

11   couple of brothers.  Correct?

12   A.     I -- I have cousins.  I have brothers.  I have my

13   uncle.  I have several people in my family here in

14   America.

15   Q.     And none of those family members live in Miami,

16   do they?

17   A.     No.

18   Q.     And you testified, sir, that your immigration

19   status is that of a lawful permanent resident?

20   A.     I don't understand this question.

21   Q.     Green card.  You have a green card?

22   A.     Yes, I do.

23   Q.     You are not a US citizen?

24   A.     Not yet.

25   Q.     Do you have an application pending with the
```

al-Saidi - CROSS - By Ms. Jhones                54

```
 1   United States Immigration Service for citizenship, sir?

 2   A.    I believe so.

 3   Q.    When did you file it?

 4   A.    I don't remember.

 5   Q.    Was it a couple of months ago?

 6   A.    No.

 7   Q.    Was it before this case started?

 8   A.    No.

 9   Q.    Do you know what year you filed an application

10   with the Immigration Service for citizenship?

11   A.    No, I don't.

12   Q.    Well, let me ask you this.

13         You seem to have -- you were able to answer the

14   prosecutor's questions with respect to dates that took

15   place --

16           MR. GREGORIE:  Judge, argumentative.

17   Objection.

18           MS. JHONES:  I'll rephrase, your Honor.

19   BY MS. JHONES:

20   Q.    You have been testifying since yesterday, sir,

21   about events that took place in September of 2005.

22   Correct?

23   A.    Correct.

24   Q.    And you testified specifically to meetings in

25   October of 2005; did you not, sir?
```

al-Saidi - CROSS - By Ms. Jhones                    55

1   A.    I don't understand your question.

2   Q.    Did you testify yesterday about meetings that

3   took place in October of 2005?

4   A.    Yes.

5   Q.    And you told the ladies and gentlemen of the jury

6   that you remembered what occurred in those meetings in

7   October of 2005?

8   A.    I told them I remember some of the conversations

9   that happen in 2005.  Yes.

10   Q.    And as an example of that, you told the ladies

11   and gentlemen of the jury about a meeting that took

12   place in the Holiday Inn in North Miami?

13   A.    Yes.

14   Q.    And you remembered -- you testified about

15   everything that was spoken at that meeting.  Correct?

16   A.    Not everything.

17   Q.    Well, what you told us yesterday.  Correct?

18   A.    What I recall, yes.

19   Q.    And, similarly, sir, you also told us about

20   meetings that you had in the month of November of 2005?

21   A.    Yes.

22   Q.    Basically, you just went through these months in

23   the fall of 2005 and you told us about what you had

24   done and what you remembered that had taken place back

25   during that time period.  Correct?

al-Saidi - CROSS - By Ms. Jhones                  56

1    A.      Yes.

2    Q.      And so, going back to my question about your

3    citizenship application, is there any reason why your

4    memory with respect to your citizenship application is

5    different from your memory with respect to your -- the

6    meetings that you have testified about so far?  Is

7    there any reason for that, sir?

8    A.      I don't understand your question.

9    Q.      Is there any reason why you remember specific

10   dates that occurred three years ago with meetings --

11   and some of these meetings, of course, were not

12   recorded.  Correct?

13   A.      You asking me if there's any different of me

14   remembering what occurred in those days and why I don't

15   remember the -- those -- this is very important.  We

16   talking about a terrorism case here.

17          But when did I apply for my citizenship wasn't

18   important to me as much the date of when did I send it

19   out.

20   Q.      Because you're not really interested in becoming

21   a citizen in the United States.  Correct?

22          MR. GREGORIE:  Objection, your Honor.

23   Argumentative.

24          THE COURT:  Sustained.

25

```
 1   BY MS. JHONES:

 2   Q.    Becoming a citizen is not important to you, sir?

 3            MR. GREGORIE:  Objection, your Honor.

 4            MS. JHONES:  Your Honor, that's not

 5   argumentative.

 6            THE COURT:  Sustained.

 7            It's irrelevant.

 8            MS. JHONES:  I'll reserve a motion on that,

 9   your Honor.

10            THE COURT:  Okay.

11   BY MS. JHONES:

12   Q.    Now, Mr. al-Saidi, you testified that, in October

13   of 2005, in an unrecorded meeting, Mr. Batiste told you

14   about his desire to be hooked up with Al-Qaeda.

15   A.    If in 2005, Brother Naz has told me about him

16   wanting to meet -- to be connected to Al-Qaeda?  Is

17   that your question?

18   Q.    Yes.

19            In 2005, specifically October of 2005, you

20   testified that Mr. Batiste told you that he wanted to

21   be connected to a terrorist organization.

22   A.    Ma'am, in October, he was already expecting an

23   answer from me.

24   Q.    So the answer is "yes."  Correct?

25            MR. GREGORIE:  Objection, your Honor.  Asked
```

```
 1   and answered.

 2           MS. JHONES:  He has not answered the question

 3   yet, your Honor.

 4           MR. GREGORIE:  He answered it, your Honor.

 5   BY MS. JHONES:

 6   Q.    Mr. al-Saidi, is there any reason why --

 7           THE COURT:  One minute, please.

 8           MS. JHONES:  Oh, I'm sorry.

 9           THE COURT:  Are you withdrawing the question?

10           MS. JHONES:  No, your Honor.

11           THE COURT:  Sustained.

12           MS. JHONES:  One moment, your Honor.

13   BY MS. JHONES:

14   Q.    Okay, sir.  You told us, when the prosecutor was

15   asking you questions yesterday, that there was a

16   meeting in the hotel in North Miami, the Holiday Inn.

17           Do you remember that?

18   A.    Yes.

19   Q.    And you told us that, in that meeting, you met

20   there with Mr. Batiste.  Correct?

21   A.    If Mr. Batiste came and visit me to the hotel,

22   yes.

23   Q.    And you testified, sir, that there were -- in

24   that meeting, Mr. Batiste and you started talking about

25   being connected with Al-Qaeda.
```

al-Saidi - CROSS - By Ms. Jhones                59

1    A.     Brother Naz wanted to know if I get him connected

2    to Al-Qaeda or not.  Yes.

3    Q.     And your testimony -- and that's -- and that is

4    on what date, sir?  What was the date that that

5    occurred?

6    A.     I think it's the 25th of October.

7    Q.     Okay.  The 25th of October.

8           And you testified that Mr. Batiste told you that

9    he wanted to be connected with Al-Qaeda.  Correct?

10   A.     Ma'am, at that time, he was already expecting me

11   to let him know if I got him connected already or not.

12   Q.     Okay. So what you're telling us is that, even

13   before October 25th, Mr. Batiste had already asked you

14   to be connected with Al-Qaeda, even before

15   October 25th?

16   A.     Ma'am, all the way back in September, before I

17   left to Yemen, this guy went and got me a piece of

18   paper with his connection on it, ask me to hand it to

19   anybody that's willing to support him on his missions.

20   So he did mention Al-Qaeda, Hezbollah and Hamas before

21   I went to Yemen.

22   Q.     Okay.  So in addition to Al-Qaeda, your

23   testimony, is, sir, that Mr. Batiste mentioned other

24   terrorist organizations as well?

25   A.     In particular, he mentioned Al-Qaeda, Hamas and

```
 1    Hezbollah.
 2    Q.    Okay.  So he didn't ask -- your response is that
 3    he didn't ask only to be connected with Al-Qaeda, he
 4    asked for other possible connections as well?
 5              MR. GREGORIE:  Objection.  Asked and answered,
 6    your Honor.
 7              THE COURT:  Sustained.
 8    BY MS. JHONES:
 9    Q.    So in October of 2005, you had -- in September of
10    2005 and October of 2005, you had information in your
11    possession, sir, that Mr. Batiste wanted to be
12    connected with at least three terrorist organizations?
13    A.    Yes.
14    Q.    Now, you also testified, sir, that you went to
15    Yemen.  Correct?
16    A.    Yes.
17    Q.    And you went to Yemen before your stay in the
18    Holiday Inn?
19    A.    Yes.
20    Q.    Okay.  And you testified that, before you went to
21    Yemen -- that would have been in September.  Correct?
22    A.    I don't understand your question.
23    Q.    Okay.  Let me rephrase it.
24          Before returning from Yemen, you were in the
25    United States; were you not?
```

```
 1   A.    Before returning from Yemen, if I was in the
 2   United States?
 3   Q.    Yes.
 4         MR. GREGORIE:  Objection, your Honor.  Even
 5   I'm confused with that.
 6         MS. JHONES:  Let me rephrase.
 7   BY MS. JHONES:
 8   Q.    Sir, what date did you leave for Yemen in 2005?
 9   A.    What make me leave for Yemen?
10   Q.    No.  What date.
11         When did you leave?
12   A.    I leave in September 13.
13   Q.    Of 2005.  Correct?
14   A.    Yes.
15   Q.    Okay.  And before you left for Yemen, sir -- do
16   you need time?
17   A.    Go ahead.  Ask me the question, ma'am.
18   Q.    Before you left for Yemen, your testimony was
19   that you had already been in contact with Agent
20   Stewart -- John Stewart of the FBI?
21   A.    Yes.  I did contact him before I left to Yemen.
22   Q.    And, of course, sir, in October -- I'm sorry.
23         Before you left to Yemen in September of 2005,
24   you would have told Agent Stewart about what
25   Mr. Batiste had already discussed with you.  Correct?
```

1   A.     I told him some information about Brother Naz and

2   his group.

3   Q.     Well, let me ask you this:  Did you tell Special

4   Agent Stewart that Mr. Batiste had told you that he

5   wanted to be connected with Al-Qaeda or Hamas or any of

6   those other organizations that you have just mentioned?

7   A.     I don't remember the exact words that I told him

8   when I called him.  But I remember I told him that

9   there was an organization that I wanted him to know

10  about.

11       And I don't know if I told him they was trying to

12  get connected with Al-Qaeda when I was in the US or I

13  told him when I was back home.  I don't remember when

14  did I told him.

15  Q.     Because whether -- being connected -- a citizen

16  of the United States wanting to be connected with

17  Al-Qaeda was something that may have just slipped your

18  mind.

19       Is that what you're telling us?

20       MR. GREGORIE:  Objection.  Your Honor.

21  Argumentative.

22       THE COURT:  Sustained.

23       Rephrase your question.

24  BY MS. JHONES:

25  Q.     Just so we're clear, sir, on the timing, prior to

al-Saidi - CROSS - By Ms. Jhones                63

```
 1   leaving for Yemen in September of 2005, did you or did
 2   you not tell Agent Stewart that Mr. Batiste had told
 3   you he wanted to be connected with Al-Qaeda, Hamas or
 4   any other -- the other organizations that you have
 5   mentioned?
 6   A.    I don't remember if I told him or not.  I
 7   remember calling him to set up a meeting so I could
 8   give him the piece of paper and tell him.  But I can't
 9   say.  I don't remember what I told him.
10   Q.    Okay.  And you also told us that, before you left
11   the United States for Yemen, you also told Agent
12   Stewart about the AK-47 that you had purchased.
13   A.    Again, I don't remember if I mentioned Brother
14   Naz and the AK.  But I told him I had something for him
15   and I was trying to set up a meeting so I could go
16   ahead and tell him about those subjects.
17   Q.    So -- let me see if I understand you.
18         You don't remember whether you told Special Agent
19   Stewart whether or not before -- you don't remember
20   whether or not you told him before you left for Yemen?
21         MR. GREGORIE:  Objection, your Honor.  Asked
22   and answered.
23         THE COURT:  Sustained.
24   BY MS. JHONES:
25   Q.    Now, when you left for Yemen, sir, you purchased
```

al-Saidi - CROSS - By Ms. Jhones                    64

```
 1   a one-way ticket; did you not?

 2   A.    Yes, I did.

 3   Q.    The reason did you that, sir, was because you

 4   weren't sure whether you were going to come back?

 5   A.    No.  That's not true.

 6   Q.    Well, you did not know, sir, did you, before you

 7   left for Yemen, whether or not the FBI was going to pay

 8   for a return ticket, did you?

 9   A.    I didn't know.

10   Q.    You did not know.  Correct?

11   A.    I had no idea.  I didn't knew if the FBI was

12   gonna -- wanted to work with me or not.

13   Q.    Okay.  So you purchased the one-way ticket.

14         Now, let me ask you this:  Is a one-way ticket to

15   Yemen more expensive or less expensive than a round

16   trip?

17   A.    I don't know.

18   Q.    Well, you've traveled to Yemen several times;

19   have you not, sir?

20   A.    Yes, I did.

21   Q.    September of 2005 wasn't the first time you went

22   to Yemen, was it?

23   A.    No, it wasn't.

24   Q.    As a matter of fact, you've been to Yemen many

25   times?
```

al-Saidi - CROSS - By Ms. Jhones                    65

```
 1   A.    Yes.  I did went to Yemen several times.

 2   Q.    You have a wife in Yemen; do you not?

 3   A.    Yes, I do.

 4   Q.    And you have a child in Yemen?

 5   A.    Yes, I do.

 6   Q.    You probably have -- at this point you probably

 7   have more than one child in Yemen.

 8            MR. GREGORIE:  Objection, your Honor.

 9            THE COURT:  Sustained.

10   BY MS. JHONES:

11   Q.    So you're very familiar with the cost of airfare

12   to the country of Yemen?

13   A.    No.

14   Q.    You're not.  Okay.

15         Now, sir -- so you testified that you told --

16   that, when you're in Yemen, you called Special Agent

17   Stewart.

18         Do you remember that?

19   A.    Yes.

20   Q.    And I believe your testimony was that you used an

21   international calling card to communicate with John

22   Stewart.  Right?

23   A.    Yes.

24   Q.    And you were able to contact him; were you not,

25   sir?
```

al-Saidi - CROSS - By Ms. Jhones                66

```
 1    A.      Yes.

 2    Q.      And that's when, your testimony is, that you

 3    provided this very important information to Special

 4    Agent Stewart.   Correct?

 5    A.      Yes.

 6    Q.      And that very important information that you

 7    provided to Agent Stewart was that Narseal Batiste had

 8    asked you to hook him up with Al-Qaeda, Hamas or

 9    whatever other organization you just mentioned a couple

10    of minutes ago.   Correct?

11    A.      I don't know what I told him when I was in Yemen.

12    I was afraid for my safety.   I was in another country

13    calling the FBI to tell them about a group that's

14    trying to get connected to Al-Qaeda from where Al-Qaeda

15    exists.   So I was afraid.   I don't know what I told him

16    over the phone.

17    Q.      You don't remember?

18    A.      I don't remember.

19    Q.      Now, you did tell us, sir, that you had --

20            MS. JHONES:   If I may just grab a Government

21    exhibit for a second, your Honor.

22            I'm sorry, your Honor.   Can I activate this

23    from --

24            THE COURT:   You want the ELMO?

25            MS. JHONES:   Yes, please.   Thank you.
```

```
 1              THE COURT:  I think you have to turn it on
 2    there somehow.  I can't turn it on.  I can only do the
 3    lamps.
 4    BY MS. JHONES:
 5    Q.    Mr. Abbas, I'm showing you Government's
 6    Exhibit 98.
 7          You recognize that.  Right?
 8    A.    Yes.
 9    Q.    And that's the exhibit that you indicated you
10    took with you all the way to Yemen?
11    A.    Yes.
12    Q.    And did you take it in a briefcase?
13    A.    It was in my pocket.
14    Q.    In your pocket?
15    A.    Yeah.
16    Q.    And -- I'm folding it.
17          Is this the way you put it in your pocket?
18    A.    I don't remember how I put it in my pocket.  It's
19    over two years.
20    Q.    Okay.  Well, let me ask you this:  How long did
21    you keep it in your pocket after you took it to Yemen?
22    A.    Until I get to the house.
23    Q.    And you also testified that you returned with
24    this flier.  Correct?
25    A.    Yes.
```

al-Saidi - CROSS - By Ms. Jhones                68

```
 1   Q.    And did you return with this flier, Government's
 2   Exhibit 98, from Yemen to Miami in the same way you
 3   transported it over there?
 4   A.    I don't know if it's exact same way, but I
 5   carried it with me.  Yes.
 6   Q.    And you do remember mentioning to Special Agent
 7   Stewart, do you not, this flier before you left in
 8   September of 2005?
 9   A.    I don't.
10   Q.    You don't remember?
11   A.    Honestly, I don't remember.
12   Q.    Now, did you tell us, sir, that it was Narseal
13   Batiste that had given you this flier?
14   A.    I'm sorry?
15   Q.    Did you tell us, sir, that it was Narseal Batiste
16   that had provided you with this flier?
17   A.    Yes, I did.
18   Q.    And do you know, sir, how many other people
19   Narseal Batiste provided this flier to?
20   A.    Ask me that question again, please.
21   Q.    Do you know how many other people Mr. Batiste
22   provided the flier to?
23   A.    No.
24   Q.    Do you know whether or not you saw any of these
25   fliers in North Miami in September of 2005?
```

al-Saidi - CROSS - By Ms. Jhones                    69

```
 1   A.     If he gave it to me in North Miami?

 2   Q.     No.  Let me ask it again, because I don't want to

 3   confuse you.

 4          Do you know -- in September of 2005, you had been

 5   working at a convenience store in North Miami.

 6   Correct?

 7   A.     Yes.

 8   Q.     And that was a convenience store that you've told

 9   us about earlier that you had partnered with Faisal

10   Hassan.

11   A.     Yes.

12   Q.     Correct?

13   A.     Yes.

14   Q.     Now, my question to you, sir, is that, in

15   addition to Mr. Batiste giving this flier to you, as

16   you have testified, do you know whether or not he gave

17   the flier to anybody else?

18   A.     I don't know.  I said I don't know that.  I don't

19   know if he gave it to -- if he give to somebody else

20   the same one or not.

21   Q.     Sir, isn't it a fact that this was a flier that

22   Mr. Batiste was passing out throughout the North Miami

23   area?

24          MR. GREGORIE:  Objection, your Honor.  First

25   of all, it's asking for hearsay.  Secondly, the witness
```

1    has answered the question that he doesn't know, your

2    Honor.

3            MS. JHONES:  Your Honor, I am not asking for

4    hearsay.  I'm asking if he knows whether or not this

5    was circulated to others in addition to himself.

6            THE COURT:  Well, ask him that question, then.

7    BY MS. JHONES:

8    Q.    Do you know, sir, whether or not this flier was

9    being circulated -- tell me if you know the meaning of

10   that word.  I don't want to confuse you with --

11   A.    No.

12   Q.    Was this flier being handed out by Mr. Batiste,

13   do you know, in September of 2005, throughout the North

14   Miami area?

15   A.    No, ma'am.

16   Q.    You don't know?

17   A.    No.

18   Q.    Now, you have known Mr. Batiste -- you knew

19   Mr. Batiste before September of 2005, didn't you?

20   A.    Yes.

21   Q.    And as a matter of fact, sir, I think you met him

22   as early as January of 2005.

23   A.    No.

24   Q.    Okay.

25           MS. JHONES:  I apologize, your Honor.  I just

 1    need to find a specific location.

 2          I'll just move on and come back to that later,

 3    your Honor.

 4    BY MS. JHONES:

 5    Q.    So what is your recollection, sir, of when you

 6    met Mr. Batiste?

 7    A.    I think it's around March.

 8    Q.    Of what year?

 9    A.    '05.

10    Q.    March of '05.

11          And between March of '05 and September of '05,

12    sir -- I'm sorry.

13          Between March of '05 and, let's say, August of

14    '05, Mr. Batiste did not talk to you about these things

15    that you testified to yesterday, his interest in

16    Al-Qaeda, did he, sir?

17    A.    Yes, he did.

18    Q.    So your testimony is that way back in March of

19    2005, Mr. Batiste was talking to you about terrorism?

20    A.    Yes, he did.

21    Q.    And he talked to you about Al-Qaeda, his desire

22    to be hooked up?

23    A.    He never told me he wanted to get hooked up

24    directly to Al-Qaeda until the day he gave me the

25    paper.

al-Saidi - CROSS - By Ms. Jhones                    72

1          But we been speaking before, and he told me that

2    he's very interested on Al-Qaeda policies -- politics

3    and that he would -- he would like to meet with Osama

4    bin Laden.

5    Q.    And he would have told you this in October of --

6    in March of 2005?

7    A.    I don't know what month exactly.

8    Q.    Within that time period, March and September of

9    2005.  Right?

10   A.    Yes.

11   Q.    And let me see if I understand you.

12         He not only told you that he was interested in

13   Al-Qaeda policies, right, but he also told you he

14   wanted -- he was interested in meeting with Osama

15   bin Laden?

16   A.    Yes.

17   Q.    And, also, he would have talked -- let me not put

18   words in your mouth.

19         Did he also talk, sir, about these things about

20   wanting to overthrow the Government and those types of

21   things between March of 2005 and September of 2005?

22   A.    Yes, he did.

23   Q.    Now, you would agree with me, sir, that that's

24   information that -- wanting to overthrow the United

25   States Government is something that Special Agent

1   Stewart would have wanted to have known.  Right?

2   A.    Yes.

3   Q.    And as a matter of fact, you knew Agent Stewart

4   back -- between March of 2005 and September of 2005,

5   didn't you?

6   A.    Yes, I did.

7   Q.    You had met him because Agent Branzetti from the

8   New York Police Department had hooked you up with

9   Special Agent Stewart.  Correct?

10  A.    No.

11  Q.    It was the police officer that arrested you for

12  the scooter violation that hooked you up with Special

13  Agent Stewart?

14  A.    Ma'am, he didn't hook me up with John Stewart.

15  He called John Stewart to investigate my background.

16  Q.    And that was before March of 2005, wasn't it,

17  sir?

18  A.    Yes, ma'am.

19  Q.    So it's fair to say, sir, that you waited until

20  September of 2005 to pick up the phone and call Agent

21  Stewart and tell him, "We have this gentleman over here

22  in North Miami that wants to be hooked up with Osama

23  bin Laden."  Correct?

24  A.    I don't understand your question.

25  Q.    Well, you've already told us, have you not, sir,

al-Saidi - CROSS - By Ms. Jhones                    74

```
 1    that between March and September of 2005, Narseal
 2    Batiste had already told you that he wanted to meet
 3    Osama bin Laden?
 4    A.    Yes, ma'am.
 5    Q.    You're sure about that, now?  I don't want to put
 6    words in your mouth.
 7    A.    Yes.  He did told me that he wanted to meet with
 8    Osama bin Laden.
 9    Q.    We also know -- because you've just told us --
10    that between March of 2005 and September of 2005,
11    Narseal Batiste also told you that he was interested in
12    overthrowing the United States Government.
13    A.    Yes, ma'am.
14    Q.    Okay.  So did he tell you anything else about his
15    desire to do violence to the United States?
16    A.    It was hours and hours and hours that we spoke.
17    So I don't remember every word that he -- he spokes
18    about.
19          But, yes, he did spoke to me about overthrowing
20    the Government, joining with Al-Qaeda, the Bloods, the
21    Crips, the Black Stones, to make his party stronger so
22    he could take the land that the Moors was promised by
23    George Washington.
24    Q.    And so that I'm clear -- because I don't want to
25    confuse you --
```

1          MR. GREGORIE:  Objection, your Honor.

2          THE COURT:  Sustained.

3          Rephrase your question.

4    BY MS. JHONES:

5    Q.    These things that you have just told us about

6    Mr. Batiste told you for hours and hours and hours

7    between March and September of 2005?

8    A.    Yes.

9    Q.    In addition to having told you in September of

10   2005, because he continued to do it thereafter.  Right?

11         MR. GREGORIE:  Objection, your Honor.

12         THE COURT:  Sustained.

13         Rephrase your question.

14   BY MS. JHONES:

15   Q.    And, Mr. al-Saidi, when you say that Mr. Batiste

16   was telling you about these things for hours and hours

17   and hours, where did this occur?

18   A.    In the store.

19   Q.    And give us a time reference, please, in terms of

20   how often this would happen.  Would it happen once a

21   week?  Would it happen three times a week?  Tell us

22   about that.

23   A.    In the beginning, it was a normal, like, twice,

24   three, four times a week.

25         But in the end, he would come almost every day.

al-Saidi - CROSS - By Ms. Jhones                76

 1   I mean, sometimes he would come five, six times a week.

 2        In the beginning, it was quick, like, 20 minutes,

 3   half an hour, one hour at the most.  But towards the

 4   end, he would spend hours and talk to me.

 5   Q.    Okay.  And when you say at the end, what do you

 6   mean by "the end"?

 7   A.    Just before I left to Yemen.

 8   Q.    So to put things in a time frame, sir, around the

 9   time period that you purchased an AK-47, Mr. Batiste

10   started talking to you about terrorism a little bit

11   more.  Is that fair?

12   A.    No, ma'am.  He didn't knew nothing about the

13   AK-47 at the time.

14   Q.    Well, I understand that.

15        My question to you is:  He started early in the

16   spring of 2005 talking to you about terrorism, but the

17   time period -- the number of times that he would do

18   this increased significantly around September of 2005?

19   A.    The more he get to know me, the more he felt more

20   confident speaking to me.

21   Q.    Well, okay.  But he -- even before he didn't know

22   you very well, in March of 2005 -- between March and

23   August, he was already talking to you about him wanting

24   to meet Osama bin Laden and overthrowing the United

25   States Government?

1          MR. GREGORIE:  Asked and answered, your Honor.

2          THE COURT:  Sustained.

3  BY MS. JHONES:

4  Q.    Now, so we're clear, at no time did you report

5  these incidents of all of these meetings and all of

6  these conversations with Mr. Batiste -- at no time did

7  you call Special Agent Stewart and tell him about that?

8  A.    I don't recall calling him to tell him about

9  that.

10  Q.    Okay.  Let's talk about another incident, sir,

11  besides the AK-47 that occurred in September of 2005.

12  Okay?  Another incident.  I want talk to you about

13  something else besides the AK-47.  Okay?

14          In September of 2005, you told us already that

15  you and Faisal Hassan basically had a disagreement.

16  Right?

17  A.    Actually, we have a new agreement, because I

18  didn't want to stay and he wanted new partners.  So we

19  came into an agreement that he would pay me $20,000 for

20  my share in the store.

21  Q.    Now, let me make sure we're correct about the

22  amount that you say Faisal agreed to pay you.

23          Faisal agreed to pay you, according to your

24  testimony, $20,000.  Right?

25  A.    There was a lot of confusion about the amounts

```
 1    because there was some amounts that I already pay him

 2    and there was some amount that I was expecting to get

 3    from him.

 4         But, yes, there was an agreement about $20,000

 5    that I was gonna get for my share in the store.

 6    Q.    That was sort of like the settlement agreement.

 7    Right?  That's the agreement you guys came to at the

 8    end, $20,000?

 9    A.    I don't understand this question.

10    Q.    Well, let me see if I can make it easier for you.

11    A.    Please.

12    Q.    You and Faisal decided to go your separate ways.

13    Right?

14    A.    Yes.

15    Q.    And that occurred in September of 2005?

16    A.    Yes.

17    Q.    By the way, you did file articles of

18    incorporation with the State of Florida for Al-Saidi

19    Enterprises; did you not?

20    A.    If I file a company for Al-Saidi Enterprises?

21    Yes.

22    Q.    And that's relating to that convenience store

23    over there in North Miami?

24    A.    Yes.

25    Q.    Okay.  And that's a convenience store that you
```

```
 1   said you were partners in with Faisal Hussein --

 2   A.    Yes.

 3   Q.    -- just so we're clear?

 4         How long, by the way, Mr. al-Saidi, did this

 5   partnership last?  When did it begin prior to September

 6   of 2005?

 7   A.    I don't remember the exact date.  But I think

 8   it's around either March or February.

 9   Q.    Of 2005?

10   A.    Yes.

11   Q.    Okay.  So then we get to September of 2005.

12         Your testimony is, sir, that Faisal agreed to

13   give you $20,000?

14   A.    Yes.

15   Q.    And I believe you also testified yesterday when

16   the prosecutor was asking you questions that, indeed,

17   Faisal had given you some money.

18   A.    When I left to Yemen.  Yes.

19   Q.    He gave you $7,000?

20   A.    Yes.

21   Q.    And I guess you used some of that money to buy

22   your plane ticket.  Right?

23   A.    Yes.  I did use some of that money.

24   Q.    You testified a little while ago that you have

25   filed some tax returns.  Right?
```

1    A.     Yes, I did.

2    Q.     And have you filed tax returns on that $7,000,

3    sir?

4    A.     If I filed taxes for the income of that $7,000?

5    Q.     Yes, sir.

6    A.     Not yet.

7    Q.     But you got it three and a half years ago?

8    A.     Yes.

9    Q.     Now, this agreement, sir, with Faisal -- what

10   were -- Well, strike that.

11          It's fair to say, is it not, sir, that -- there's

12   no written agreement between you and Faisal to

13   memorialize this understanding, is there?

14   A.     There wasn't a written agreement between me and

15   him?  There was in the beginning.  But when I settled

16   and left, there wasn't no written agreement.

17   Q.     There isn't a written agreement regarding the

18   $20,000?

19   A.     No.

20   Q.     And what was your understanding, sir, of how the

21   balance -- I guess the balance would have been 13,000

22   that Faisal would owe you?

23   A.     Yes.

24   Q.     What was your understanding as to when these

25   payments were going to be provided to you?

```
 1   A.     He promised me that he was going to give it to me

 2   $2,000 a month.

 3   Q.     And it's fair to say that he never gave you

 4   $2,000 after those -- the initial 7,000?

 5   A.     He did.

 6   Q.     So he gave you more than 7,000?

 7   A.     At that same time he gave me 7,000, I left to

 8   Yemen.  When I came back, I went and picked up more

 9   payments from him.

10   Q.     How many more payments?

11   A.     I don't recall, because he transferred some of

12   that amount to somebody else to pay me.  So I don't

13   know how much did he give me and how much he

14   transferred to somebody else.

15   Q.     And you did talk to Narseal Batiste about the

16   payments that Faisal was to give you, the money that he

17   owed you; did you not, sir?

18   A.     I don't recall telling him exactly about the

19   payments.  But I told him that Faisal owes me some

20   payments -- I mean, some money that -- from the

21   store -- when I sold him the store.

22   Q.     Now, you testified, sir, that the FBI did not

23   provide you with recording equipment -- strike that --

24   that your first recorded conversation would have been

25   in October of 2005?
```

1   A.     I believe it was in October of 2005.

2   Q.     Do you remember when the very first recorded

3   conversation pertaining to this case would have been?

4   A.     On October 29.

5   Q.     And you would agree with me, sir, that on

6   October 29th, the first recorded conversation -- well,

7   let me back up a little bit.

8          When you called Mr. Batiste, you knew that you

9   were recording him.  Right?

10  A.     Yes.

11  Q.     And when you called him on the 29th, sir -- this

12  is a call that the jury hasn't heard yet.  Right?  We

13  haven't played this for the jury yet, October 29th?

14  A.     No.  It wasn't played.

15  Q.     It's fair to say there are a lot of calls that

16  haven't been played yet.  Correct?

17  A.     If there was a lot of calls that hasn't played

18  yet?

19  Q.     Yes.

20  A.     I don't know.

21  Q.     And you would agree with me, sir, that in this

22  phone call of October 29th, Mr. Batiste doesn't say

23  anything about Al-Qaeda.  Correct?

24  A.     If on October 29 he didn't said nothing about

25  Al-Qaeda?

```
1   Q.     Yes.

2   A.     I don't remember.

3   Q.     Okay.  And then you speak to him also on

4   October 31st.  Correct?

5   A.     Yes.

6   Q.     And the meeting in the Holiday Inn in North

7   Miami, sir:  What day was that?

8   A.     I think it was right after the hurricane.  It's

9   either 24, 25.

10  Q.     And that was before you started --

11  A.     Or 25 --

12  Q.     I'm sorry?

13  A.     Either 24, 25 or 25, 26.

14  Q.     That was a meeting that was not recorded.

15  Correct?

16  A.     I wasn't allowed to record yet.  So....

17  Q.     And you have a conversation with Mr. Batiste on

18  October 31st?

19  A.     Yes, I did.

20  Q.     And that is a call that you made to him.  Right?

21  A.     Yes.

22  Q.     And in that phone call, sir -- when you made that

23  phone call, Special Agent Stewart was right next to

24  you; was he not?

25  A.     Yes, ma'am.
```

al-Saidi - CROSS - By Ms. Jhones                84

 1   Q.    And in that phone call, sir, that has been played

 2   for the jury, that is a phone call that you reference

 3   with Mr. Batiste a discussion about Faisal.  Correct?

 4   A.    If I spoke about Faisal when I called him?  Yes,

 5   I did.

 6   Q.    And the reason you spoke about Faisal was because

 7   you and Mr. Batiste had previously spoken about Faisal;

 8   had you not, sir?

 9   A.    I was introduced to Brother Naz by Faisal.  So,

10   yeah, we been speaking about him back and forth.

11   Q.    But, specifically, the reason why you spoke to

12   Mr. Batiste on October 31st about Faisal was because

13   you had -- you and Mr. Batiste had spoken about Faisal

14   just a couple of days before October 31st; had you not,

15   sir?

16   A.    Well, when I came back from back home, I was

17   supposed to come back and collect what's -- I have some

18   payments to collects from Faisal.

19         So, yes, I did speak about Faisal because his

20   first question is why I didn't go through -- to Faisal

21   and back to the store.

22         So I go ahead and I speak to him about it.

23   Q.    Sir, when you talked to Mr. Batiste about Faisal

24   in the Holiday Inn, you also talked to him about the

25   assistance that he needs to help you with in trying to

1   have Faisal pay you the money that he owes you?

2   A.     No.   That's not true, ma'am.

3   Q.     So we're clear, you did not speak to Mr. Batiste

4   in the Holiday Inn about asking him for help and trying

5   to speak to Faisal.

6          Am I correct about that?

7   A.     It's my testimony that I never asked Brother Naz

8   to help me on Faisal's case.

9   Q.     And after October 31st, the Government then asks

10  you about a meeting -- I'm sorry -- a conversation that

11  took place on November 6th of 2005.  Correct?  Do you

12  remember that?

13  A.     Yes.

14  Q.     And in that conversation, sir -- Well, strike

15  that.

16         Before that conversation, you attempt to speak to

17  Mr. Batiste and meet with him even before November 6th;

18  do you not, sir?

19  A.     I don't remember.

20  Q.     Let me ask you this:  When did you check out of

21  the Holiday Inn in North Miami?  What day?

22  A.     I believe it was the 27th.

23  Q.     And when you checked out of the Holiday Inn on

24  the 27th, you did not have a place to live, did you,

25  sir?

1   A.     No.

2   Q.     Basically, you were thrown out of the store in

3   North Miami; were you not?

4   A.     No.

5   Q.     Is it your testimony that you weren't thrown out

6   of there?

7   A.     Yes.

8   Q.     And the place -- you did find a place to go stay

9   at after you left the Holiday Inn, didn't you, sir?

10  A.     The FBI asked me to spend the night in the

11  Embassy.

12  Q.     And you did more than spend the night at the

13  Embassy; did you not, sir?

14  A.     Yes, I did.

15  Q.     You actually stayed there for at least two or

16  three days?

17  A.     No.  One night.

18  Q.     You stayed one night.  Okay.

19         Now, you already had had a recording device.

20  Correct?

21  A.     No.  At that time, I didn't have a device.

22  Q.     What day would you have gone to sleep at the

23  Embassy, sir?

24  A.     27 to the 28.

25  Q.     Okay.  October 27th to October 28th.  That's your

1   testimony.  Correct?

2   A.    Yes.

3   Q.    And you took a bag of clothing with you to the

4   Embassy; did you not?

5   A.    Yes.

6   Q.    Now, did you have keys to the Embassy or did

7   Mr. Batiste let you -- meet you there and let you in?

8   How did that work?

9   A.    When I went there, they was already there,

10  expecting me.

11  Q.    And so, after the 28th of October, sir, where did

12  you go live?

13  A.    After the 29th?

14  Q.    No.  After you left the Embassy.

15        You left on the 28th.  Correct?  That's what you

16  just told us?

17  A.    Yes.  I left the Embassy and I went and met with

18  the FBI and they put me up on a hotel on the Beach.

19  Q.    And you didn't record anything during that one

20  day that you say you stayed at the Embassy.  Correct?

21  A.    I didn't have -- the FBI hadn't gave me no

22  recorders yet.

23  Q.    So we are clear, as of October 27th, you did not

24  have a recording device.  Correct?

25  A.    No.

```
 1              MR. GREGORIE:  Objection.  Asked and answered.

 2              THE COURT:  Sustained.

 3   BY MS. JHONES:

 4   Q.    Now, after October 27th, you went to a hotel on

 5   Miami Beach.  Right?

 6   A.    Yes, ma'am.

 7   Q.    What was the name of that hotel, sir?

 8   A.    I don't remember.

 9   Q.    How many days did you stay in that hotel?

10   A.    I don't remember that either.

11   Q.    Well, let me ask you this:  The FBI gave you cash

12   to pay for that hotel; did they not?

13   A.    No.

14   Q.    How did you pay for this?

15   A.    I didn't.  They did.

16   Q.    They paid for it in advance?

17   A.    Yes -- I don't know.

18   Q.    How many days did you stay in that hotel on Miami

19   Beach?

20   A.    I just said I don't remember.

21   Q.    Oh, okay.  And do you remember, sir, Mr. Batiste

22   asking you on November 1st whether or not Faisal had

23   paid you the $2,000?

24   A.    I don't remember speaking to him on the 1st.

25   Q.    Okay.  You don't remember?
```

1   A.     No, I don't.  I don't.

2   Q.     Do you remember speaking to Mr. Batiste at all

3   during the first week of April (verbatim) about Faisal

4   owing you money?  Do you remember that, sir?

5          THE COURT:  April?

6          MS. JHONES:  I'm sorry.  I misspoke.

7   BY MS. JHONES:

8   Q.     The first week of November of 2005.

9   A.     I remember speaking to him on November 2nd.  But

10  I don't know, again, if I mentioned Faisal or not.

11  Q.     Not you, sir.

12         My question is:  Do you remember whether or not

13  Mr. Batiste asked you whether or not Faisal had paid

14  you the $2,000?

15  A.     I don't remember him asking me that.

16  Q.     Okay.

17         THE COURT:  We're going to break for lunch.

18         Do not discuss this case either amongst

19  yourselves or with anyone else.  Have no contact

20  whatsoever with anyone associated with the trial.  Do

21  not read, listen or see anything touching on this

22  matter in any way.

23         If anyone should try to talk to you about this

24  case, you should immediately instruct them to stop and

25  report it to my staff.

```
 1          You may leave your notebooks and your binders

 2   at your chairs.  Please be back in the jury room at

 3   1:45.

 4          Have a nice lunch.

 5          (Whereupon, the jury exited the courtroom at

 6   12:39 p.m. and the following proceedings were had:)

 7          THE COURT:  You may be seated.

 8          1:45, sir.

 9          (Witness excused.)

10          THE COURT:  Let's take up your issue,

11   Ms. Jhones.

12          MS. JHONES:  Give me a second to get the

13   motion, your Honor.

14          THE COURT:  Yes.

15          As I read it in your motion, the only thing

16   that I can see is concerning an arrest in 2005 of

17   al-Saidi by the Department of Homeland Security.

18          I don't see anything else that was

19   additionally requested in regard to this witness.

20          Is that what you're talking about?

21          MS. JHONES:  I believe so, your Honor.  I just

22   need a minute.  I haven't looked at this in a few days.

23          MR. GREGORIE:  There's no arrest in 2005, your

24   Honor.

25          THE COURT:  I think at the convenience store,
```

1    when the ICE --

2         MR. GREGORIE:  They didn't arrest him, your

3    Honor.  He was never arrested.

4         MS. JHONES:  This is the issue, your Honor:

5    We know that ICE agents came to that store in 2005.  We

6    know that because Mr. al-Saidi references that in the

7    Government's own recordings.

8         Whether or not he was physically taken into

9    custody or not is not material to the issue of

10   production of *Brady*.

11        The issue is whether or not this person -- if

12   ICE showed up and what happened when ICE showed up.

13   There has to be a report generated by the Immigration

14   and Customs Enforcement about that incident.

15        My request, your Honor, would be for the

16   Government to produce in camera that event where this

17   individual -- and let me just say another thing, your

18   Honor, to further supplement -- this is not a

19   speculative request.  This is a very specific request.

20        Mr. al-Saidi refers to in one of these

21   recorded conversations about the fear that he had when

22   he got back from Yemen in the airport that he was going

23   to be detained by Immigration.

24        So the issue is not whether or not physically

25   they hauled this individual away.

1          The issue is what occurred and, at a bare

2    minimum, under the case law -- given what we know

3    exists, that this incident occurred, the actual

4    circumstances surrounding this incident I am not aware

5    of.

6          But at a bare minimum, a report that would

7    have to have been filed on this and, certainly, as I

8    have specified in various motions --

9          THE COURT:  What do you mean, various motions?

10          MS. JHONES:  Well, the issue of ICE -- ICE

11    being involved in this investigation is abundantly

12    clear.  Victor Williams from the Immigration and

13    Customs Enforcement has been present for all three

14    trials.  And, indeed, I think he's present every day.

15          Is it's not like the Government doesn't know

16    about this and doesn't have access to this.

17          My request is that they produce in camera any

18    incident reports surrounding contact by this witness

19    with the Immigration and Customs Enforcement in the

20    fall of 2005.  That's my request.

21          MR. GREGORIE:  Judge, first of all, the

22    witness testified yesterday to the incident in the

23    convenience store.

24          Apparently, a customer came in and opened a

25    beer can and was drinking it inside the store, which is

1    a local violation.

2         Because he is an Arab, apparently, INS was

3    called and came with the police -- with the North Miami

4    Beach police.

5         They came in and questioned him about the beer

6    opening.  They questioned him about his status.  They

7    asked him if he had his passport.  He didn't have his

8    passport, but he had his green card.  They left the

9    store.

10        When an action like that happens and there's

11   nothing that comes of it, there's no search, there's no

12   arrest, nothing happened, no report's filed, Judge.

13        There is absolutely no written report of any

14   kind about this incident.  Nobody was arrested.  Nobody

15   was searched.  No action was taken.  They came into the

16   store, were in the store, walked around and left.  They

17   were there for a while.  They questioned him.  Nothing

18   happened.

19        As far as this thing at the airport, Judge, we

20   have no record of any kind -- and we've asked

21   Mr. Williams to check it -- we have no record of any

22   kind of his being stopped at the airport.

23        There is no -- I mean, I don't know what she

24   expects us to produce when there is no written report

25   of any kind, Judge.

1          If it exists --

2          THE COURT:  Was there a written report of the

3    incident in the convenience store?

4          MR. GREGORIE:  No, your Honor.

5          THE COURT:  So if there's nothing written,

6    there's nothing to turn over.  So that solves that part

7    of the issue.

8          I don't find that it would be *Brady*, anyhow.

9    If anything, if there was any explicit or implicit

10   benefit that was given to him, it might come under

11   *Giglio*.  But it certainly doesn't -- isn't exculpatory

12   information as to the Defendant.

13         MR. GREGORIE:  No action was taken against

14   him, your Honor.

15         THE COURT:  Right.

16         If there was anything that happened, it might

17   be.  But as there's nothing happened, that's the

18   response to that.

19         Let's also take up in regard to --

20         MS. JHONES:  Your Honor, I'm not -- if I may

21   just have a moment, I'm not done yet with the renewed

22   motion for *Brady*.

23         THE COURT:  I know.

24         MS. JHONES:  Oh, okay.  I'm sorry.

25         THE COURT:  There's another issue regarding

 1    the recording of the immigration testimony of Lemorin,

 2    Charlene Mingo and Velazquez.

 3              Charlene Mingo and Lemorin, it seems to me, is

 4    available to the defense by other means, their

 5    information, their evidence, and, therefore, would not

 6    come under *Brady*.

 7              As far as the *Jencks* requirement regarding the

 8    testimony -- Mr. Velazquez testified at the hearing?

 9              MS. ARANGO:  Yes, he did, Judge.

10              THE COURT:  So I'm going to order that the

11    tape recording of his testimony be provided to the

12    defense.

13              MS. ARANGO:  Will do, Judge.

14              MS. JHONES:  Your Honor, may I respond to the

15    Court's finding that the defense has access to that

16    record?

17              The Defendant --

18              THE COURT:  I didn't say you had access to the

19    record.  I said you had access to the evidence from

20    Lemorin and Mingo.

21              MS. JHONES:  I do not have access, your Honor.

22              Quite the contrary.  We attempted, because the

23    Judge, Judge Horowitz, in that proceeding --

24              THE COURT:  I didn't say you said access to

25    the record.

```
1              I said you had access to the information.  The

2      evidence that they have -- of any exculpatory

3      information that they have, Lemorin and Mingo are

4      available to the defense.

5              MS. JHONES:  Your Honor --

6              THE COURT:  Certainly Charlene Mingo is

7      available.  She's certainly available.

8              MS. ARANGO:  She's been in the courtroom,

9      Judge, talking to the defense.

10             MS. JHONES:  Your Honor, as Ms. Arango does

11     often -- I have -- for the first time, I met Ms. Mingo

12     when somebody pointed her out to me in the courtroom.

13     I do not have -- I have never spoken to that woman,

14     other than to meet her once.

15             Specifically, Mr. Lemorin's counsel prohibited

16     me from speaking to his client or otherwise having any

17     access to any record from --

18             THE COURT:  But none of that was laid out in

19     your motion.

20             MS. JHONES:  Your Honor, what I said in the

21     motion was I did not -- I tried to get -- what I did

22     put in the motion was that, when we were trying to get

23     the record, counsel denied -- Judge Horowitz had

24     previously told us that we could have access to that

25     record.
```

```
1              And then we subsequently inquired of

2     Mr. DeFabio and Mr. DeFabio and Mr. Kirk, the two

3     attorneys representing Mr. Lemorin, refused to give

4     defense access to this record.

5              Now, I did not specify that I cannot speak to

6     Mr. Lemorin.  And I can tell you, as an officer of the

7     Court, I cannot speak to Mr. Lemorin.  And I do not

8     have any other way of getting that material, which I

9     believe to have exculpatory contents, without the

10    assistance of the Government.

11             Had I had that ability and --

12             THE COURT:  Well, you certainly have the

13    ability of speaking to Charlene Mingo and subpoenaing

14    her.  She is not being detained in any way.

15             MS. JHONES:  Well, I don't know if she's

16    represented by counsel, and I will inquire as to her,

17    as to Ms. Mingo.

18             But I tell you I do not have access to

19    Mr. Lemorin's testimony.

20             THE COURT:  Well --

21             MS. JHONES:  And it wasn't only -- I believe

22    that Ms. Mingo testified and Mr. Lemorin testified.

23             THE COURT:  It's the evidence that you're

24    entitled to, not necessarily their testimony.  It's the

25    evidence.
```

```
1              The information from Charlene Mingo is

2     available to you, and you have not demonstrated that

3     the information from Lemorin -- it's not demonstrated

4     in your motion that the information from Lemorin is not

5     available to you.

6              MS. JHONES:  Okay.

7              THE COURT:  You haven't demonstrated that in

8     your motion.

9              There's no question that Charlene Mingo is

10    available to you.  You have the processes of the Court

11    available to you, once the requirements of 17(b) are

12    met, to subpoena anybody that is relevant and material

13    to your case.  So she is certainly available to you.

14             And there's not a demonstration in your

15    motion.  The only thing that you requested was the

16    hearing itself.

17             I've ordered the hearing under Jencks, as it

18    relates to -- and that, in fact, was the primary

19    request, was the request concerning Velazquez.  They

20    are ordered to turn over that portion of the tape to

21    you.  As I understand, it's not been transcribed.

22             MS. ARANGO:  It has not.

23             THE COURT:  I will sign a written order for

24    the turnover of the tape regarding Velazquez's

25    testimony.
```

1              But at this junction there's not been a

2      demonstration that meets the requirements of *Brady* as

3      far as the testimony of Lemorin and Mingo at the

4      immigration hearing.

5              I think that takes care of the *Brady* requests.

6              MS. JHONES:  Is the Court also denying --

7              THE COURT:  Let me cite for the record *United*

8      *States versus Vallejo*, 297 F.3d 1154 at 1164, in which

9      the Eleventh Circuit in 2002 stated, "To establish a

10     *Brady* violation, the Defendant must show that the

11     Government possessed favorable evidence to the

12     Defendant; two, the Defendant did not possess the

13     evidence and could not obtain the evidence with any

14     reasonable diligence; three, the prosecution suppressed

15     the favorable evidence; and, four, had the evidence

16     been disclosed to the Defendant, there is a reasonable

17     probability that the outcome would have been

18     different."

19             MS. JHONES:  Okay.

20             THE COURT:  I would also cite *United States*

21     *versus Cook*, 170 F.Appendix 639, a 2006 decision by the

22     Eleventh Circuit.

23             MS. JHONES:  Your Honor, is the Court -- with

24     respect to Docket Entry 1124, which is the renewed

25     motion for disclosure of materials under *Brady* and

```
 1    Giglio, is the Court denying the defense request for

 2    the detailed accounting of the expenses and the

 3    expenses that --

 4            THE COURT:  No.  I thought we resolved that

 5    the other day, that the Government indicated they're

 6    giving -- preparing an updated disclosure to you of all

 7    the monies that have been paid to CW 1 and CW 2 during

 8    the tenure of their cooperation with the FBI or the

 9    Federal Government.

10            MS. JHONES:  Let me be more --

11            MS. ARANGO:  Judge, that was provided in a --

12    there was -- at least it was supplemented.  There were

13    several other discovery disclosures.  But that was

14    supplemented in the Government's 20th supplemental

15    response, which I filed, I guess, last week.  I gave

16    all the updated figures.

17            THE COURT:  Does that not cover everything

18    that you've requested?

19            MS. JHONES:  No, your Honor.

20            What the Government has provided in the

21    one-page document that consists of the 20th

22    supplemental is -- and I'm trying to get to it so I can

23    specifically refer to it accurately for the record.

24            The 20th supplemental, your Honor, was

25    provided by way of Docket Entry 1172, your Honor.
```

1        What's provided in a paragraph is that CW 1

2    has been -- they gave us a total of the amount paid,

3    which was $48,591.

4        And they state that $21,420 was for services

5    and that $27,171 was for expenses.

6        And what I requested, your Honor, in my

7    renewed *Brady* request was a breakdown of the expenses,

8    i.e., how much for housing, how much for food, how much

9    for entertainment, how much for whatever, because

10   giving us the amount -- the total amount of expenses

11   limits our ability to ferret out the nature and the

12   quality of the expenses that have been provided to this

13   person.

14       The Government, for example, has indicated

15   that this apartment in North Miami Beach is a very

16   modest apartment.  That may very well be the case.

17       THE COURT:  Miami Beach.

18       MR. LEVIN:  Miami Beach.

19       That may very well be the case.

20       But as the Court may recall -- and I know that

21   the Court has already ruled that we have to make a

22   choice between whether we confront Agent Velazquez

23   regarding -- and correct me if I'm wrong, your Honor.

24   Maybe I misunderstood the Court's ruling.

25       But my understanding of the Court's ruling is

1    that we cannot inquire -- if we inquire of both Agent

2    Velazquez and the informants about their -- about the

3    compensation issue, that it may be cumulative.  I

4    believe that's what the Court indicated.

5         And when I began to question Velazquez about

6    compensation at side-bar, the Court reminded me of that

7    ruling, which I misunderstood.

8         And my position is this, your Honor:  This is

9    an entrapment case, as the Court knows.  Mr. Batiste

10   has raised in both trials a quasi-entrapment case.

11        Mr. Clark and others of my colleagues have

12   extensively cross-examined Mr. Velazquez about the

13   suitability and the reliability of these informants.

14        And we have been deprived, because we have --

15   as I understand the Court's ruling, the Court has

16   indicated to us we have to make a choice or else, at

17   the risk of striking our cross, we --

18        THE COURT:  When -- I don't know what -- I

19   don't know where you're getting striking cross.

20        I indicated to you that, if Mr. Velazquez had

21   testified on direct regarding the various payments,

22   that there may be a basis for cross-examination.

23        And then I went and reviewed all the

24   testimony, the three or four days, both direct and

25   cross.

 1              He did not testify at all about any

 2     compensation that was paid to these Defendants.  He

 3     testified generally in, I think, maybe two or three

 4     statements -- it was a very short question and

 5     answer -- about there are some cooperating informants

 6     who are paid and some that are unpaid.

 7              That was the extent of it.

 8              MS. JHONES:  Your Honor --

 9              THE COURT:  On that basis, I indicated that it

10     was not something ripe for going into cross-examination

11     of him.

12              The Government had indicated that it went to

13     motive -- the motivation of the various cooperating

14     witnesses and their motivation to testify or please the

15     Government.

16              And I indicated that that's where it was well

17     placed and that you could be subject, if you did decide

18     that you wanted to go into it -- that I would have to

19     think about, if you went extensively into it with

20     Velazquez -- and I allowed you to go into it with

21     Velazquez -- that, if the Government raised an

22     objection to it being cumulative, it might very well be

23     cumulative.

24              It seems to me that the idea of motivation is

25     well placed with the cooperating witnesses, that that's

```
 1    where you want to explore that.  That's how you want to

 2    put it before the jury.

 3           If you want to call Velazquez back, if you

 4    want to go into with him, fine.  I will allow you to do

 5    that, Ms. Jhones, if you want to go into it with them.

 6           And then I'll rule on whatever objections the

 7    Government makes, if they make an objection as to

 8    whether or not it's relevant to his testimony or

 9    whether it's cumulative concerning the cooperating

10    witnesses later.

11           That's fine.  If that's what you want to do,

12    call him back, question him about it, and I'll take up

13    the objections as they come.

14           MS. JHONES:  Your Honor, what I want to do --

15    I don't want to have -- I don't want to call an agent

16    back to the stand so the Court is going to sustain

17    objections lodged by the Government.

18           What I want to do is I want to get guidance

19    from this Court and I want to be heard -- I want to be

20    heard on what my argument is as to why inquiry of

21    Velazquez --

22           THE COURT:  You're asking now about a

23    breakdown of services.  That's what we're talking about

24    here.

25           MS. JHONES:  Yes.
```

```
 1              THE COURT:  You seem to be going off on a

 2    tangents.

 3              Now, the Government gave you compensation and

 4    services.

 5              Give me your authority that you have that you

 6    are entitled to a further breakdown.  Perhaps you are

 7    entitled to a further breakdown.

 8              Do you have authority for further breakdown?

 9              MS. JHONES:  First of all, your Honor, what

10    I'd like to do -- I'd like to be heard.  I'd like to be

11    heard on my argument.

12              And what I -- the Government -- I do not --

13    respectfully, I do not agree with the Court that the

14    Government could limit the scope of cross-examination

15    when it pertains to compensations paid to an informant

16    by simply not asking about it during their direct

17    testimony, because I submit to the Court, your Honor,

18    that how compensation affects the suitability and the

19    reliability of an informant in the context of a

20    quasi-entrapment defense is a different issue, a

21    different issue, from the motivation that an

22    informant -- the personal motivation that an informant

23    as opposed to the FBI --

24              THE COURT:  How does that relate to

25    entrapment?  Please, show me how that relates to
```

1    entrapment.

2         MS. JHONES:  I will, your Honor, gladly.

3         The fact that the Government has testified not

4    in this trial, but in this trial and in previous

5    trials, that they corroborated, that they corroborated,

6    everything that was done -- that was said to them by

7    the informants through -- they corroborated the

8    information provided by the informants under

9    circumstances where we know that there are various

10   meetings that were not recorded, meetings that happened

11   to be pivotal in this case, and the fact that the

12   Government relied upon, relied upon, the credibility

13   and the motivation and everything else pertaining to

14   these informants, as Mr. Clark has indicated, the

15   suitability and the reliability.

16        So the suitability and the reliability are

17   part and parcel to compensation.

18        THE COURT:  As I recall, there was extensive

19   cross-examination by you and other members of the

20   defense team as to suitability and reliability.

21        But what is the --

22        MS. JHONES:  Your Honor, I did not --

23        THE COURT:  What does the monies paid

24   concerning -- the monies paid have to do with

25   entrapment?

```
 1              MR. LEVIN:  Your Honor, if I could --
 2              THE COURT:  "A defendant is entrapped when a
 3    law enforcement officer or cooperating individuals
 4    induce or persuade a defendant to commit a crime that
 5    the defendant had no previous intent to commit."
 6              MR. LEVIN:  Your Honor, the issue that I see
 7    here is one of motivation as opposed to suitability or
 8    reliability.
 9              THE COURT:  Motivation by whom?
10              MR. LEVIN:  By the informant -- by the paid
11    informant to push these Defendants and/or Defendant
12    into --
13              THE COURT:  Right.
14              MR. LEVIN:  -- committing the crime.
15              THE COURT:  I would agree with you.
16              MR. LEVIN:  Right.
17              THE COURT:  That's how it relates to
18    entrapment.  Motivation by the informants.
19              MR. LEVIN:  Correct.
20              THE COURT:  And motivation would include
21    monies that they were paid.
22              MR. LEVIN:  Right.
23              So --
24              THE COURT:  As I recall at the side-bar, you
25    asked me, Mr. Levin, "Well, are we going to be allowed
```

1    to go into how much money the CWs are paid?"

2          And I said, as I recall, "Absolutely" --

3          MR. LEVIN:  Right.

4          THE COURT:  -- that that's a very ripe area of

5    cross-examination.

6          MR. LEVIN:  I --

7          THE COURT:  Certainly you're entitled to put

8    before the jury that CW 1 and CW 2 had a motivation to

9    it -- for your theory of defense, to induce them, to

10   induce the Defendants to be more embroiled in these

11   activities because they wanted money.

12         MR. LEVIN:  Right.  We agree, your Honor.

13         THE COURT:  Are you disagreeing with me?

14         MR. LEVIN:  No.  Judge, I'm not disagreeing

15   with you at all.

16         I was just trying to maybe help -- I don't

17   want to say help Ms. Jhones.  She doesn't need my help.

18   But I was just trying to crystallize the issue.  I'm in

19   total --

20         THE COURT:  I understand the issue.

21         MR. LEVIN:  Okay.  I don't --

22         THE COURT:  I understand the issue of

23   motivation.

24         Motivation for the cooperating witnesses is

25   motivation for them.  It's not motivation for the

```
 1   agent.

 2            If the agent was getting paid a bonus, then

 3   that would be motivation for him.

 4            MR. LEVIN:  Judge, we agree with that.

 5            The only thing that I had raised at

 6   side-bar with regard to that issue -- and I agree

 7   that it should come from the cooperating witness in

 8   terms of what he was compensated.

 9            But what I had stated at side-bar, also --

10            THE COURT REPORTER:  Okay.  Wait.  Slow down,

11   please.

12            MR. LEVIN:  Sorry, Lisa.

13            THE COURT:  Let's go on to the issue of what

14   we were here to discuss, because the amount of time for

15   lunch is slowly going by.  Okay?

16            MR. LEVIN:  Yes, your Honor.

17            THE COURT:  And that was the amount of

18   compensation and what was disclosed.

19            MR. LEVIN:  Right.

20            THE COURT:  Now, do you have authority that

21   you're entitled to a breakdown further than

22   compensation for expenses and compensation --

23            MR. LEVIN:  No.

24            THE COURT:  -- for services --

25            MR. LEVIN:  Not at all.
```

1          THE COURT:  -- of the total amount of money

2     that they were paid?

3          MR. LEVIN:  There isn't.  No, I do not.  I am

4     not asking for that.

5          The issue with regard to the agent testifying

6     about amounts is:  What happens if Mr. al-Saidi

7     testifies to an amount different from what's been

8     disclosed by the Government he received?

9          The only way we can get that in front of this

10    jury is then to re-call Special Agent Velazquez, who

11    should, consistent with the Government's disclosure --

12          THE COURT:  So?

13          MR. LEVIN:  -- testify as to the accurate

14    amounts that have previously been disclosed by the

15    Government.

16          THE COURT:  So?  Who's preventing you from

17    doing that?

18          MR. LEVIN:  No one.

19          THE COURT:  It hasn't even happened yet.

20          MR. LEVIN:  I know.  I mean, we're in

21    agreement here.  I don't -- I think it's time to eat,

22    personally.

23          THE COURT:  If they've given you the

24    compensation and the services -- and I don't see --

25    he's already testified about the rent that he was

1    paid -- that he was paying the rent.

2           So ask him how much the rent was.  If you want

3    to find out that it was this expensive, wonderful

4    apartment on Miami Beach a block and a half from the

5    ocean, ask him how much the rent was.  He testified he

6    paid the rent.

7           What's precluding you from asking him that?

8           MS. JHONES:  Here's the problem, your Honor:

9    I did ask him --

10          THE COURT:  Was that -- did you ask him that?

11   Was that sustained?  What are we talking about here?

12   They've given it to you.

13          MS. JHONES:  Your Honor, if I ask -- here's

14   the problem:  If I ask this witness how much he paid

15   for the rent and this witness says, "I don't know," I

16   have --

17          THE COURT:  He testified he paid the rent.

18          MS. JHONES:  Your Honor --

19          THE COURT:  How could he say he doesn't know?

20   He testified that they gave him the money and he paid

21   the rent.  Maybe he could say "I don't remember."  I

22   guess he could say "I don't remember."

23          MS. ARANGO:  And if he says "I don't

24   remember," Judge, I still don't think that there's a

25   basis for the Government -- I've never seen any law on

```
 1    this.  I don't think any such law exists.

 2           I've never turned over anything other than

 3    expenses and services.  In fact, I don't even believe

 4    the FBI keeps it in any other manner other than

 5    expenses and services.  It's just not relevant.

 6           THE COURT:  If you present some authority to

 7    me, I'll be happy to consider it.

 8           MS. JHONES:  Thank you, your Honor.

 9           Moving on to CW 2, I specifically requested --

10    for CW 2, I specifically requested, as demanded, as

11    demand about by the Magistrate, which till this day I

12    haven't it -- I specifically requested benefits that we

13    know that his control agent, Paul Carpentieri, has

14    already testified this informant received, CW 2.

15           Specifically, CW 2 received not one, but

16    several, special parol requests.  And special parol

17    requests, in the event that the Court doesn't know what

18    those are, CW 2 did not have authority to travel in and

19    out of the United States --

20           THE COURT:  I know what they are.  I heard the

21    testimony about them twice already.

22           MS. JHONES:  Okay.

23           MS. ARANGO:  We turned over the special parol

24    requests.  I remember redacting it and --

25           MS. JHONES:  My request was -- my request
```

1   specifically was for the I-131 application, the I-131

2   application, which is the INS form that is filed by the

3   alien in order for him to get an advance parol, which

4   this gentleman has received.

5           Additionally, this gentleman and his wife,

6   another illegal alien, received work authorization.

7   That's an I-765 application.

8           I have repeatedly requested and the Magistrate

9   has ordered that --

10          THE COURT:  Where is that in the order?

11          MS. JHONES:  I believe it's in my reply, your

12  Honor.

13          THE COURT:  No.  I didn't ask you that.  I

14  asked you where it is in the order.

15          MS. JHONES:  I think it's referenced in the --

16  the page in the order.  Just give me a second.

17          Well, there's a reference to it.  Let me get

18  to the order.

19          THE COURT:  The Government was directed by

20  Judge Torres to supplement their discovery responses.

21  And in the order on the *Brady* --

22          MS. JHONES:  I found it, your Honor.

23          THE COURT:  -- he said it adequately addresses

24  that issue.

25          MS. JHONES:  I'm sorry?

1          That's the Government's response, I believe.

2          THE COURT:  No.  I'm reading from Judge

3    Torres's order.

4          MS. JHONES:  Which order, your Honor?

5          THE COURT:  At Page 7.  It's Docket Entry 420.

6          MS. JHONES:  I was --

7          THE COURT:  "The argument that Batiste makes

8    that there are many unanswered questions in the

9    immigration record or that several irregularities have

10   occurred during the prosecution of CW 2's asylum

11   application is not a sufficient basis to compel

12   wholesale production of the entire immigration file.

13         "The most critical fact here is far narrower.

14   The fact that Immigration officials may have cut a

15   corner here and there in connection with the asylum

16   application is not material to the criminal prosecution

17   here, unless those corners were cut at the request or

18   direction of CW 2's Government handlers.

19         "Only then would any of those issues become

20   relevant in this case.  The Court's order directing the

21   Government to supplement their discovery responses

22   adequately addresses that issue."

23         MS. JHONES:  Okay.  If I may just direct the

24   Court's attention to Page 5 of that same order, the

25   last paragraph that starts, "First, any documents

```
 1   generated by the US Attorney's Office or FBI officials

 2   and forwarded or transmitted to any Immigration

 3   authorities concerning CW 2's asylum application must

 4   be disclosed to the Defendants," this also --

 5            THE COURT:  Hold on.  Let me read that.

 6            MS. JHONES:  Okay.

 7            THE COURT:  So Judge Torres ordered certain

 8   documents to be disclosed.

 9            Do those documents exist and have they been

10   disclosed?

11            MS. ARANGO:  Judge, everything that Judge

12   Torres ordered I provided.  I went through that

13   immigration file with a fine-toothed comb.  I don't

14   have the order in front of me.  But I am absolutely

15   positive that most of it was -- did not exist.

16            Whatever did exist, there was a -- and I'm not

17   sure in what form I disclosed it.  I think it was a

18   supplemental discovery order response.  Maybe it was a

19   pleading.  But I disclosed exactly what it is that he

20   required.

21            And the only thing that I can recall off the

22   top of my head -- there was a notation --

23            THE COURT:  I think I went through the

24   immigration file.

25            MS. ARANGO:  You did.  That's right.  I gave
```

```
 1   it to you as well.

 2          THE COURT:  I went through the immigration

 3   file.

 4          MS. ARANGO:  That's right.

 5          THE COURT:  During either Trial 1 or Trial 2,

 6   I went through the entire file.

 7          MS. ARANGO:  That's right.

 8          THE COURT:  Maybe -- I don't remember -- I'd

 9   have to look at the transcript -- whether I -- there

10   was one or two additional things that I ordered

11   disclosed or I found nothing fell within Brady.

12          But I have reviewed the entire immigration

13   file.  I ordered the Government to provide it to me,

14   and I went through CW 2's entire immigration file.  At

15   this moment, I don't remember if I ordered something.

16   I think it's even marked as an exhibit.

17          MS. ARANGO:  It is.

18          THE COURT:  So that's already been done.

19          MS. JHONES:  Your Honor, that's the political

20   asylum file that the Court reviewed in camera and found

21   that there was no Brady.

22          MS. ARANGO:  That's his entire immigration

23   file, Judge.  That was his entire immigration file.

24          MS. JHONES:  Your Honor, the immigration

25   file -- I don't know -- we have to take Ms. Arango's --
```

```
 1   if Ms. Arango provided to the Court the informants's

 2   entire immigration file, based upon --

 3            THE COURT:  It was the entire immigration

 4   file, because I remember reading things that were in

 5   addition to any asylum application.

 6            MS. JHONES:  Okay.

 7            THE COURT:  It was the immigration file.  I

 8   reviewed it.

 9            There's -- whatever I ordered to be disclosed

10   at that time -- if there were any additional

11   disclosures -- and I don't remember -- those were

12   things that I found may fall within Brady.  If I found

13   nothing, I found that there was no Brady.

14            But I did review the entire file.  So I'm not

15   sure we're here talking about.

16            MS. JHONES:  What I believe may have happened,

17   your Honor, was that, when the Court reviewed the

18   immigration file -- and I'm going on memory -- it

19   pertained -- the -- it pertained to the issue that

20   arose at the time in the trial pertaining to the I-589

21   application, the political asylum application.

22            But pertaining to the specific benefits that

23   Paul Carpentieri, the special agent with the FBI that

24   is CW 2's control agent -- pertaining to what he stated

25   in his sworn testimony on July 18th that existed, that
```

1    was conferred, the benefits -- immigration benefits --

2         THE COURT:  What sworn testimony on July 18th?

3         MS. JHONES:  The pretrial hearings in front of

4    Magistrate Torres.

5         Paul Carpentieri was called to testify.

6    That's when we learned specifically about the parol

7    request, the work authorizations request, not only to

8    CW 2, but CW 2's wife.  And these applications are

9    encompassed within Page 5 of the last paragraph of the

10   Magistrate's order.

11        What I'm simply saying to the Court is that,

12   if the entire files were provided, I submit to the

13   Court --

14        THE COURT:  He's talking about any documents

15   generated by the US Attorney's Office or FBI officials

16   and forwarded or transmitted to any Immigration

17   authority concerning CW 2's asylum application must be

18   disclosed to the Defendants.

19        That's what Page 5 that you referenced me to

20   relates to.

21        MS. JHONES:  Your Honor, as I understand that

22   paragraph, the Government -- the Magistrate referenced

23   the Government's 11th response to the standing

24   discovery order where there are some references to the

25   immigration file.

1          And that is acknowledged -- in that reference,

2     it's acknowledged that there were -- there was

3     knowledge on the part of Immigration officials as to

4     the relationship between the FBI and CW 2.

5          And the Magistrate concludes, as I understand

6     it, that, "This supports the Defendants' contention

7     that there may be documents in the immigration file

8     that evidence communication for which that knowledge

9     has been gained."

10         And --

11         THE COURT:  He's referencing what he ordered.

12         "Documents generated by the US Attorney's

13    Office or FBI officials and forwarded or transmitted to

14    any Immigration authority concerning CW 2's asylum

15    application must be disclosed to the Defendants.

16         "The Government's 11th response to the

17    standing discovery order cryptically refers to

18    documents in the immigration file that reflect

19    knowledge on the part of Immigration officials as to

20    FBI's relationship with CW 2.

21         "That, thus, supports the Defendants'

22    contention that there may be documents in the

23    immigration files or the FBI's own files that evidence

24    communications from which that knowledge could have

25    been gained."

```
 1            That information clearly is subject to
 2   disclosure.  As I understand Ms. Arango, she says that
 3   she went through everything, disclosed if there was
 4   anything.  And, in addition, subsequent to this order,
 5   I reviewed the whole immigration file.
 6            MS. JHONES:  But, your Honor --
 7            THE COURT:  So this was -- after Judge Torres
 8   wrote this order, I then reviewed the entire
 9   immigration file during the trial.
10            MS. JHONES:  The Court did.
11            And the last paragraph -- the last sentence, I
12   should say, in the first paragraph of Page 6 -- the
13   Magistrate states, "Additionally, the documents from
14   the immigration file that are referenced in the
15   Government's 11th supplemental shall be provided to the
16   Defendants."
17            THE COURT:  Okay.
18            MS. JHONES:  And what I'm saying is -- and,
19   your Honor, my memory is, when the Court reviewed the
20   file, the Court reviewed the file in the context of the
21   I-589, the asylum application.
22            What I'm thinking --
23            THE COURT:  Ms. Jhones, I can tell you that,
24   when I reviewed the file, I reviewed the file for
25   Brady.  I read everything in that file for Brady.
```

```
 1              MS. JHONES:  This is Giglio.  Immigration
 2   benefits, your Honor.  Immigration benefits.
 3              We know, because it's -- not only is it
 4   sworn testimony of Paul Carpentieri, but the 11th
 5   supplemental addresses it, work authorization
 6   applications, not just one.
 7              THE COURT:  You've got to slow down.  It's
 8   your record.
 9              MS. JHONES:  Sorry.  Work authorization
10   applications.
11              And I have detailed these, your Honor, as
12   early as June of 2007.  Specific immigration --
13              THE COURT:  Was she given the documents
14   referenced in the 11th supplemental response?
15              MS. ARANGO:  Yes.
16              Judge, whatever -- I recall that the only
17   thick that -- in my review of the file, the only thing
18   that had any -- and which I disclosed in the 11th
19   supplemental -- was there was a notation in his file
20   that had to do with the person who was doing his asylum
21   application called the FBI and just confirmed from the
22   FBI that he was working with them and there was some
23   notation in the file on that.
24              That was the only thing that existed.  They
25   were only doing so because they were going through his
```

1    asylum application and just confirming the things that

2    he had said.

3            But that's the only thing that was in there

4    that had to do with immigration and FBI.

5            And my recollection --

6            THE COURT:  I seem to recall that as well in

7    my review of the file, that there was nothing that

8    referenced any kind of request or any kind of benefit

9    that was conferred on him, but a notation of perhaps a

10   call or some inquiry.

11           MS. ARANGO:  Right.  It was a memo to the file

12   type of a thing.

13           MS. JHONES:  Your Honor, I'm not going to

14   belabor this point anymore.

15           The 11th supplemental -- and there may have

16   been another supplemental -- specifically disclosed --

17           THE COURT:  I'm going to look at it right now.

18           MS. JHONES:  Okay.  And that memo in the

19   immigration file, your Honor -- and, actually, let me

20   go to the 11th supplemental --

21           MS. ARANGO:  Yes.  If you could look it up,

22   because I do recall I -- this is before the hearings or

23   maybe it was after the hearings.  I don't remember.

24   But I did disclose everything in there.

25           MS. JHONES:  Docket Entry 293, the 9th

```
 1    supplemental, is the first one, your Honor.

 2             THE COURT:  No.  I want to see the 11th.

 3    That's what Judge Torres talks about.

 4             It says on Page 2 --

 5             MS. JHONES:  Your Honor, what docket entry is

 6    that, please?

 7             THE COURT:  I think it's 395.  Let me see.

 8             MS. JHONES:  Paragraph D?

 9             MS. ARANGO:  So that was before Judge Torres's

10    order.

11             THE COURT:  It's August 24th.

12             On Page 2, "The Government also discloses

13    solely in an abundance of caution that documents in

14    CW 2's immigration file indicate that, while conducting

15    CW 2's background investigation, USCIS confirmed that

16    CW 2 was an FBI informant and that FBI was interested

17    in CW 2's acquisition of asylum."

18             MS. JHONES:  And, your Honor, that memorandum

19    in that file, I submit, is subject to disclosure.  The

20    actual memo is subject to disclosure.

21             The timing of that memo is important because

22    we learned subsequent to this, when the CW testified,

23    that it was only after March 16th of 2006 that an

24    application for asylum that this informant said had

25    been pending for a long time was granted.
```

```
 1              So the timing of when the FBI made this known

 2    is very relevant and it's Giglio.

 3              MS. ARANGO:  Judge --

 4              MS. JHONES:  In addition to --

 5              MS. ARANGO:  Judge, she's argued this timing

 6    issue before.  All of this has been argued before.

 7              I made the disclosure.  My recollection was

 8    there was a notation at the bottom of a --

 9              THE COURT:  Did you provide the document to

10    her?

11              MS. ARANGO:  I don't recall.

12              MS. JHONES:  She did not provide the document.

13              MS. ARANGO:  I did provide, Judge, the entire

14    file to your Honor.  There was nothing there that

15    was -- providing any more information than I had --

16    than I had given.

17              My recollection was that it was -- there was

18    nothing of significance other than what I had

19    disclosed.  There was no -- it was like a -- it was --

20    my recollection is there was some notation made by a

21    person who had made a phone call.

22              MS. JHONES:  Your Honor, I don't know if I

23    have to belabor this again.  The document with the

24    timing, the timing, is Giglio.

25              And, again, in addition to that, in
```

```
 1   addition --
 2           THE COURT:  So I'm going to order -- if the
 3   Court's in possession of the immigration file, I'll
 4   release it to the Government to go through to pull out
 5   whatever notation there is and to have that provided to
 6   the defense counsel.
 7           MS. JHONES:  And would the Court review the
 8   file for the I-765 applications -- work authorization
 9   applications both for CW 1 -- I'm sorry -- for CW 2 and
10   the spouse in addition to the parol requests and any
11   travel authorizations for CW 2 and the spouse?
12           MS. ARANGO:  Judge, we provided to the defense
13   any benefits that the FBI conferred.  Any special
14   parols were turned over.
15           These documents, if they so exist, are
16   irrelevant unless they are being provided to the
17   witness as a benefit for his work in this case.
18           So my argument -- my point is that it's not --
19   it's not Brady.  It's not Giglio.  It's not relevant
20   unless they're being provided to it.
21           I can tell you, Judge, that we provided the
22   special benefits parols.  We redacted them and provided
23   them to the defense already in this case.  That's the
24   only thing that was provided as benefit to the witness.
25           MS. JHONES:  Your Honor, I direct the Court to
```

```
 1    look at the motions -- I direct the Court to look at

 2    the 9th supplemental, the 11th supplemental, and

 3    specifically the reference to work authorization.

 4          That is an immigration form, an I-765.  That

 5    has nothing to do with the special parol.  That is a

 6    separate benefit.

 7          Authorization to work in the United States:

 8    That is a benefit that people risk their lives on a

 9    daily basis to be able to get.  It is separate and

10    apart from travel.  A parol is travel.  Work

11    authorization is a separate benefit.

12          THE COURT:  Was he authorized to work?

13          MS. ARANGO:  I --

14          MS. JHONES:  Yes, your Honor.

15          MS. ARANGO:  I don't -- I have never -- Judge,

16    I have absolutely no -- I'll find out if there is such

17    a thing.  I have no idea.

18          THE COURT:  I don't remember that he ever got

19    any work authorization.

20          MS. JHONES:  Your Honor, directing the Court's

21    attention to --

22          THE COURT:  First of all, under *Giglio*, there

23    must be some type of explicit deal between the

24    Government and the witness that will trigger the

25    disclosure requirement under *Giglio*.
```

 1            That's cited in Judge Torres's order, *United*

 2   *States versus Curtis*, 380 F.3d 1311, 1315 to 1316, a

 3   2003 decision by the Eleventh Circuit.

 4            MS. JHONES:  Okay.

 5            THE COURT:  I directed the Government to look

 6   through the file and to provide whatever notation there

 7   is.  As I recall, it was a -- just a notation -- there

 8   was nothing further than a notation.

 9            But I'll direct the Government to provide that

10   and, if the Court is in possession of the file, we'll

11   release it to you for that purpose.  But that's the

12   extent of it.

13            We're in recess until 1:45.

14            (Thereupon, a luncheon recess was taken, after

15   which the following proceedings were had:)

16            THE COURT:  We're back on United States of

17   America versus Narseal Batiste, et al., Case

18   No. 06-20373.

19            Counsel, state your appearances, please, for

20   the record.

21            MR. GREGORIE:  Good afternoon, your Honor.

22            Richard Gregorie and Jacqueline Arango on

23   behalf of the United States.

24            MS. JHONES:  Ana Jhones on behalf of Narseal

25   Batiste.

al-Saidi - CROSS - By Ms. Jhones                    128

```
 1              MR. LEVIN:  Albert Levin on behalf of Patrick
 2   Abraham, who's present.
 3              MR. CASUSO:  Lou Casuso on behalf of Burson
 4   Augustin, who's present.
 5              MR. CLARK:  Nathan Clark for Rotschild
 6   Augustine, who's present.
 7              MR. HOULIHAN:  Richard Houlihan on behalf of
 8   Naudimar Herrera.
 9              MR. VEREEN:  And Roderick Vereen on behalf of
10   Stanley Phanor, who's present.
11              THE COURT:  All Defendants are present.
12              Let's bring in the jury.
13              (Whereupon, the jury entered the courtroom at
14   2:04 p.m. and the following proceedings were had:)
15              THE COURT:  You may be seated.
16              You are still under oath, sir.
17              You may proceed, Ms. Jhones.
18              MS. JHONES:  Thank you, your Honor.
19   BY MS. JHONES:
20   Q.    Mr. al-Saidi, before the lunch break, we were
21   talking about October of 2005.
22        You indicated that the first recorded
23   conversation you had with Mr. Batiste was on
24   October 29th.  Correct?
25   A.    Yes, ma'am.
```

al-Saidi - CROSS - By Ms. Jhones                    129

```
 1   Q.     And you had that conversation with him, sir,

 2   after you saw him with his family at a Chinese

 3   restaurant in North Miami.  Correct?

 4   A.     Yes, ma'am.

 5   Q.     And the reason you saw him in a restaurant in

 6   North Miami was because you went out looking for

 7   Mr. Batiste; did you not, sir?

 8   A.     No.

 9   Q.     Is it your testimony that you did not look for

10   him, sir?

11   A.     I don't remember how -- but I didn't look for

12   him.  I think he was expecting me.

13   Q.     And how was it that he was expecting you, sir?

14   A.     There was a phone call, I guess.

15   Q.     And what phone call was that, sir?

16   A.     It wasn't recorded.

17   Q.     Oh, okay.  But you did have your recording device

18   by October 29th; did you not, sir?

19   A.     Yes.  I wore a body recorder.

20   Q.     You run into Mr. Batiste in a Chinese restaurant,

21   and then you later have a conversation with him outside

22   the presence of his family.  Correct?

23   A.     After he dropped off his family, he took me to

24   the Embassy.  Yes.  We did spoke there.

25   Q.     On October 29th?
```

```
1    A.      Yes.

2    Q.      And when you did that, you were wearing a

3    recording device.   Right?

4    A.      Yes.

5    Q.      And you had no problem recording the conversation

6    at the Embassy on October 29th, did you, sir?

7    A.      If I have any problem?

8    Q.      Yes.

9    A.      No.

10   Q.      And -- now, after that, you went -- you recorded

11   another conversation on the 31st, correct, of October?

12   A.      31st, I think, is a phone call.

13   Q.      Phone call.   Yes.

14           Is it your testimony, sir, that you did not meet

15   with Mr. Batiste on October 31st?

16   A.      I don't remember.

17   Q.      Does that mean you could have met with him, but

18   you just don't recall?

19   A.      I don't know if I did or not.

20   Q.      Well, you do know, do you not, sir, that as of

21   October -- on October 31st, there was only one -- there

22   was only one recording and that was a telephone call.

23   Correct?

24   A.      If I'm -- yes.   I know there was a phone call on

25   the 31st.
```

1   Q.     And so we are clear, sir, the phone call that you

2   recorded on October 29th -- okay? -- there was no

3   mention in the October --

4           MR. GREGORIE:  Excuse me, your Honor.

5           That's a mischaracterization.  He just

6   testified that that was a meeting.  In fact, she went

7   through it with him.

8           MS. JHONES:  Mr. Gregorie is correct.

9   BY MS. JHONES:

10  Q.     On the meeting that you had on October 29th, sir,

11  you would agree with me that at no time in that

12  meeting -- which was rather short; was it not?

13  A.     I'm sorry?

14  Q.     It was a short meeting on October 29th.  Correct?

15  A.     I don't know what's a short meeting to you.  But

16  it went on more than an hour.

17  Q.     For an hour on October 29th?

18  A.     Yes.

19  Q.     And that was recorded?

20  A.     Yes.

21  Q.     And in that hour conversation, sir -- that is not

22  one that has been played for the jury yet.  Correct?

23  A.     On that date?  It wasn't a conversation the whole

24  time I was with him.  When I first seen him, he was

25  with his family in public in a restaurant.

```
 1          So it was a lot of people.  There was no

 2   conversation between me and him that day until he

 3   dropped off his family.

 4   Q.    Well, I'm referring to the part where you

 5   actually did record him.

 6   A.    The whole time was recorded.

 7   Q.    Oh, the whole meeting was recorded?

 8   A.    Yes.

 9   Q.    On October 29th?

10   A.    Yes.

11   Q.    Even when the family was present?

12   A.    Yes.

13   Q.    And that recorded conversation, sir -- that

14   lasted -- I'm sorry -- how many hours?

15   A.    I'm not sure how many exactly minutes.  But I

16   think it's less than two hours.  So....

17   Q.    And was this meeting recorded in a restaurant?

18   A.    Yes.

19   Q.    And this is a Chinese restaurant that's in

20   North Miami?

21   A.    Yes.

22   Q.    Is this the Chinese restaurant that is right next

23   to the convenience store?

24   A.    No.

25   Q.    Where is this Chinese restaurant located?
```

```
 1   A.      I don't remember.

 2   Q.      You don't remember?

 3   A.      No.

 4   Q.      Okay.  And, sir, in that recorded conversation

 5   that you reference that lasted an hour or two, you

 6   would agree with me, sir, that at no time is there a

 7   reference by Mr. Batiste to Al-Qaeda or any other

 8   organization, such as Hamas or anything like that?

 9   A.      Every time he spoke to me about "back home," he

10   meant Al-Qaeda.  He told me in the hotel he didn't want

11   to mention the word "Al-Qaeda."  So every time he spoke

12   to me about "back home," he meant "Al-Qaeda."

13   Q.      And -- but my question to you, sir, was -- the

14   answer to my question is, "no," he did not specifically

15   use the word "Al-Qaeda"?

16   A.      I didn't hear him using that specific word that

17   day.

18   Q.      And, sir, the reference to "back home" is a

19   reference that you utilize.  Correct, sir?

20   A.      No.

21   Q.      You do not utilize the reference to "back home"?

22   A.      Ma'am, on -- when we met, me and Brother Naz, on

23   the Holiday Inn -- on the hotel, he had told me not to

24   use the term "Al-Qaeda."  He told me to say "back

25   home."  So that's what I been saying, "back home."
```

al-Saidi - CROSS - By Ms. Jhones                    134

```
 1  Q.    And this is what Mr. Batiste told you in that one
 2  meeting that was not recorded?
 3  A.    Ma'am, that was the first meeting I seen him
 4  since I came from Yemen.  And he told me he don't want
 5  me to say the word "Al-Qaeda."  Then I wasn't expecting
 6  him --
 7          THE COURT REPORTER:  I'm sorry.  Then I
 8  wasn't....
 9          THE WITNESS:  I didn't expect him to meet with
10  me that day.  And at that time, the FBI didn't
11  authorize me to record or gave me any recorders.  So
12  there was no way for me to record it.
13  BY MS. JHONES:
14  Q.    So the answer is, "no," it was not recorded?
15  A.    "No," with an explanation.
16  Q.    And, sir, you would agree with me that, when you
17  began to record Mr. Batiste after the Holiday Inn,
18  Mr. Batiste did not know that you were wearing a body
19  wire, did he?
20  A.    He don't.  No.
21  Q.    He did not.  Correct?
22  A.    No.
23  Q.    And you were instructed by the FBI to get as much
24  information as possible from Mr. Batiste; were you not,
25  sir?
```

1   A.    They did instruct me to get as much information I

2   could about that person.  Yes.

3   Q.    And you would agree with me, sir, that the

4   Government has played clips of certain meetings where

5   Mr. Batiste talks about some pretty bad stuff; does he

6   not?

7   A.    He always talk about pretty bad stuff.

8   Q.    Okay.  And he did that on December 21st; did he

9   not?

10   A.    When?

11   Q.    December 21st.

12   A.    Yes.  He spoke about the missions he's been

13   telling me about.  Yes.

14   Q.    And about salt shakers and blowing up buildings

15   and all of that stuff.  Correct, sir?

16   A.    If he mentioned that to me?

17   Q.    Yes.

18   A.    Yes.

19   Q.    And that's -- you would agree with me that that's

20   pretty bad stuff; is it not?

21   A.    Killing people is.  Yes.

22   Q.    And -- but he did not mention the word "Al-Qaeda"

23   on December 21st, did he, sir?

24   A.    Ma'am, he instructed me not to use "Al-Qaeda"

25   term, and he doesn't use "Al-Qaeda" term because, he

al-Saidi - CROSS - By Ms. Jhones                    136

```
 1   told me, the heat, which is the Government attention.
 2   Q.    But -- he did not want to use the word
 3   "Al-Qaeda," but he talked about blowing up buildings
 4   and poisoning -- and putting poison in salt shakers?
 5   A.    What you witnessed is what has been happening.
 6   Q.    I'm sorry?
 7   A.    What you seen on the exhibit today is what's been
 8   happening between me and Brother Naz.
 9   Q.    So the answer is, "no," there is no reference to
10   Al-Qaeda in any meetings up until December 21st of
11   2005?
12   A.    There was discussions, but he didn't want to
13   mention the term "Al-Qaeda."
14   Q.    Okay.  Now, after October -- after your stay in
15   the Embassy -- which you have stated was only for one
16   day.  Correct?
17   A.    Yes.
18   Q.    And that would be November 1st?
19   A.    That's the wrong date.
20   Q.    What is the date, sir?  October 27th?
21   A.    October 28 to the 12 -- I mean, 27 to the 28.
22   Q.    After that, sir, you continued to attempt to
23   reach Mr. Batiste.  Correct?
24   A.    Every time I was instructed by the FBI to reach
25   him, I did reach him.
```

1   Q.      And, sir, there were many, many times when you

2   could not reach Mr. Batiste, could you?

3   A.      I don't understand what you mean by that

4   question.  It's not clear.  It's not a "yes" or a "no"

5   question.

6           I mean, it's a "yes" with an explanation into it.

7   There was times that it was very easy reaching him, and

8   there was times that I left message for him.

9   Q.      Are you finished?

10  A.      Yes, I am.

11  Q.      Let's talk about November 6th.  Okay?

12  A.      Okay.

13  Q.      Now, November 6th is a call that was played to

14  the jury.  Correct?

15  A.      Yes.

16  Q.      And that's when you called Mr. Batiste and

17  Mr. Batiste told you that he was pretty tired.

18          Remember that?

19  A.      I don't remember him telling me he was pretty

20  tired.  I remember him telling me he was pretty busy.

21  Q.      Okay.

22              MS. JHONES:  May I approach, your Honor?

23              THE COURT:  Yes.

24              MS. ARANGO:  May I ask:  Is this in evidence?

25              MS. JHONES:  The phone call is in evidence.

 1   The Government did not produce a transcript.  I'm

 2   refreshing his recollection.

 3   BY MS. JHONES:

 4   Q.    Now, sir, just so we're clear, your memory is

 5   that Mr. Batiste did not tell you that he was tired

 6   when you finally reached him on November 6th.  Correct?

 7   A.    I don't remember him saying he was tired.

 8   Q.    Okay.

 9         MS. JHONES:  May I approach, your Honor?

10         THE COURT:  Yes.

11   BY MS. JHONES:

12   Q.    I'm going to show you, Mr. al-Saidi, a document.

13         Tell me if that refreshes your memory as to what

14   Mr. Batiste told you when you reached him on

15   November 6th.

16   A.    I see here on the bottom line it said that he

17   said, "Oh, man, I'm tired."  Yes.

18   Q.    He also told you he's been working all day.

19   Correct?

20   A.    Yes.  He did said he was working.

21   Q.    And, sir, that meeting -- that phone call is a

22   phone call where you also tell him that you've been

23   trying to reach him for many, many times and he is not

24   returning your phone calls?

25   A.    Can you show me where I said "many, many times"?

al-Saidi - CROSS - By Ms. Jhones                   139

```
 1    Q.    Sir, why don't you review it.  Take your time.
 2    A.    Okay.  Should I review the whole thing?
 3    Because --
 4    Q.    If you want to.  If you don't remember the
 5    meeting, why don't you review the whole thing.
 6          THE COURT:  Why don't you step back,
 7    Ms. Jhones, please.
 8          MS. JHONES:  Sure.
 9    BY MS. JHONES:
10    Q.    Let me know when you're finished.
11    A.    Ma'am, I still didn't see the terms that you
12    used.
13    Q.    Are you finished with that document, sir?
14    A.    Yes, I am.
15    Q.    Thank you.
16          Sir, it's in this conversation where you tell
17    Mr. Batiste -- you ask him, "What's going on?"
18    Correct?
19    A.    Yes.
20    Q.    And you tell Mr. Batiste that he's been pretty
21    busy.  Correct?
22    A.    If I tell him he's been very busy?
23    Q.    Yes.  He's been very busy working.
24    A.    That's what he was telling me.  I was repeating
25    what he's saying.
```

```
 1   Q.     And he also tells you that he's been so busy that
 2   he hasn't even been able to pay his phone bill.
 3          Do you remember that?
 4   A.     Yes.
 5   Q.     Okay.  And then, sir, you tell Mr. Batiste that
 6   you were thinking about going to the Embassy?
 7   A.     Yes.
 8   Q.     Not the mosque; the Embassy?
 9   A.     That's what he's been calling it.
10   Q.     And you ask him if you could go over to the
11   mosque to visit with him.  Correct?
12   A.     Yes.
13   Q.     And he tells you that he's probably going to get
14   there pretty late because he's going to be working till
15   the late hours of the night; does he not, sir?
16   A.     Yes, he does.
17   Q.     And you tell him that -- he tells you that, if
18   you want to go over very, very late, that maybe he'll
19   have a chance to meet with you.
20          Do you remember that, sir?
21   A.     I remember him saying that he was gonna get off
22   very late and, if I was available at 12:00, that he
23   wanted to meet then.
24   Q.     But you didn't go late at night to meet with him
25   on November 6th, did you, sir?
```

al-Saidi - CROSS - By Ms. Jhones                141

1    A.     No.

2    Q.     In fact, you ask him if he could meet with you

3    the next day, on November 7th.

4           Remember that?

5    A.     Yes, sir.

6    Q.     And he tells you it's probably going to be

7    difficult because of his work schedule the next day?

8    A.     He said he wasn't gonna get off until late the

9    next day.  Yes.

10   Q.     And you tell him about an apartment you're going

11   to get on Miami Beach -- or you have on Miami Beach; do

12   you not, sir?

13   A.     Yes.

14   Q.     And you want him to go see you at the apartment?

15   A.     Yes.

16   Q.     The reason you want him to go see you at the

17   apartment is because you want to start talking to

18   Mr. Batiste about things that the FBI has directed you

19   to talk to him about.  Correct?

20   A.     I don't understand your question.

21   Q.     You want Mr. Batiste to go to your apartment in

22   Miami Beach?

23   A.     Yes.

24   Q.     And you want him to go to your apartment because

25   you want to record him?

1    A.    Yes.

2    Q.    And you want to record him because you want him

3    to start talking about stuff that the FBI has directed

4    you to talk to him about?

5    A.    What happened was, actually, I was trying to get

6    him there so I could record the things we been talking

7    about and I been telling the FBI what we been talking

8    about.  And they wanted to record it.

9    Q.    And, of course, you're not telling Mr. Batiste to

10   come to your apartment because you want to record him,

11   are you, sir?

12   A.    No.

13   Q.    And you -- your intentions are to meet with him

14   not this evening, but to meet with him the next day,

15   November 7th?

16   A.    Because he was -- he wanted to come really late.

17   And I think I was working.  So I made a deal with him

18   to meet the next day.

19   Q.    Well, what really happened was Mr. Batiste said

20   he would try to get off early, but he really wasn't

21   sure if he was going to be able to do that?

22   A.    I'm sorry?

23   Q.    Mr. Batiste did not formally schedule a meeting

24   with you for November 7th.  He said he would see how it

25   goes the next day and maybe or maybe not he could meet

 1   with you.  Correct, sir?

 2   A.    That call was recorded, ma'am.  We made a deal on

 3   meeting on the 7th.

 4   Q.    And that's your testimony.  Correct, sir?

 5   A.    Yes, ma'am.

 6   Q.    That you made a deal with him to meet the next

 7   day, on November 7th?

 8   A.    Yes.

 9   Q.    But you did not meet with Mr. Batiste on

10   November 7th, did you?

11   A.    I went there and he didn't show up.

12   Q.    And when you went there, sir, you met up with

13   another person.  Correct?

14   A.    I met with Brother Burson.

15   Q.    You did not call Brother Burson "Brother Burson"

16   on November 7th of 2005, did you, sir?

17   A.    I wasn't sure of his name then.

18   Q.    Indeed, you weren't sure of the names of any of

19   these gentlemen seated here?

20   A.    I only knew Brother Naz.

21   Q.    And -- but your testimony is, sir, that at the

22   Holiday Inn, in the later part of October, some of

23   these gentlemen were in that room and talking about

24   Al-Qaeda.  Right?

25   A.    But I didn't remember the names until later on in

 1    the investigation.

 2    Q.      Okay.  And on November 6th, sir, you tell

 3    Mr. Batiste that you're trying to gather some money for

 4    him from back home.  Right?

 5    A.      Can you show me something to refresh --

 6    Q.      Sure.

 7              MS. JHONES:  May I approach, your Honor?

 8              THE COURT:  Yes.

 9    BY MS. JHONES:

10    Q.      Bottom of Page 5.

11    A.      I never said I was going to gather him some money

12    from back home.  I was talking about myself --

13    gathering money for myself, not him.

14    Q.      And, of course, sir, what you mean by that is

15    that you never told Mr. Batiste on November 6th or any

16    days prior to November 6th that you were trying to get

17    him money?

18    A.      I told him that I was trying to get him

19    connections and get him connected, like I promised him.

20    But I never promised him any amount of money.  No.

21    Q.      And you never promised him -- you never promised

22    him or spoke to him about giving him money.  Correct?

23    A.      No.

24    Q.      And -- now, on the very next day, you go to the

25    Embassy and you're all wired up with a recording device

1    and you're by yourself.  Right?

2    A.    Yes, ma'am.

3    Q.    And you walk over to the Embassy by yourself.

4    Right?

5    A.    The FBI dropped me off somewhere nearby the

6    Embassy, and I walked to the Embassy.  Yes.

7    Q.    And when you get to the Embassy, you meet -- you

8    see that Burson is at that location?

9    A.    Yes, ma'am.

10   Q.    And the front doors were open.  Correct?

11   A.    Actually, I seen him in the front door when I

12   went in there.

13   Q.    And he invited you in?

14   A.    Yes, ma'am.

15   Q.    And it was 7:35 p.m. when you got to the Embassy;

16   was it not, sir?

17   A.    I'm not sure.  I know it was the afternoon, but

18   I'm not sure what time it was.

19   Q.    Okay.  Would something help refresh your

20   recollection as to the time, sir?

21   A.    The recording.  There's a date and time on the

22   recording.

23           MS. JHONES:  May I approach, your Honor?

24           THE COURT:  Yes.

25

1   BY MS. JHONES:

2   Q.    Government's Exhibit 41-A.

3   A.    Yes, ma'am.  It was at 7:35 p.m.

4   Q.    And, sir, when you greet Burson, Burson tells you

5   that he had just gotten a -- arrived at the Embassy

6   from work.  Correct?

7         MS. JHONES:  Your Honor, I'm going to be using

8   the ELMO, with the Court's permission.

9         THE COURT:  Sure.

10        MS. JHONES:  I'm going to be making references

11  to Government's Exhibit 41, which I believe the jury

12  has, although I will put it on the ELMO, whichever is

13  more convenient.  I will refer to pages.

14  BY MS. JHONES:

15  Q.    Do you see, Mr. al-Saidi, where -- directing your

16  attention to Page 3 of the transcript, where Mr. Burson

17  tells you that he's been -- he's just gotten back from

18  a full day's work?

19        Do you see that, sir?

20  A.    I don't know which sentence you're pointing to.

21        There was several times he spoke about work.  He

22  said he just came from work.  He said he was just

23  coming.

24  Q.    And on the same page, Mr. al-Saidi, you tell

25  Burson that you're still trying to collect your money

 1    from Faisal, directing your attention to Page 4.

 2    Right?

 3    A.      (No response.)

 4    Q.      Do you see that, sir?  It's also on the monitor.

 5            "I still have three weeks.  Faisal gonna give me

 6    my money, like the deal he said on December 1st."

 7            Do you see that?

 8    A.      Yes, I do.

 9    Q.      And you're discussing that with Burson, sir,

10    because that was the very conversation that you

11    discussed in the Holiday Inn.

12    A.      It was one of the conversations we discussed.

13    And I was discussing that because I had to get my

14    income from somewhere.  So, basically, I was telling

15    them, "This is where I'm getting the money from."

16    Q.      But you also tell him, sir, do you not, that --

17    you start talking about back home; do you not?

18    A.      Yes.

19    Q.      And you tell him, sir, that you want to go home

20    and you want to do a quick mission because you want to

21    get a few thousand dollars.  Correct?

22    A.      Yes.

23    Q.      But you don't tell him what type of mission, do

24    you, sir?

25    A.      No.

al-Saidi - CROSS - By Ms. Jhones                    148

1    Q.     You just throw in the word "mission"?

2    A.     Yes.

3    Q.     That was not Burson's word, was it, sir?

4    A.     That was -- I said that.  Yes, I did.

5    Q.     And you tell him that you want to go back home

6    because you want to be with your family; do you not,

7    sir?

8    A.     Yes.  I did said that.

9    Q.     Look at the top of Page 5.

10          And you tell him that -- you're basically having

11   this conversation with young Burson, telling him you

12   really miss your family and it's hard not seeing your

13   daughter.  Right?

14   A.     Yes.

15   Q.     And you want to go back home?

16   A.     Yes.

17   Q.     And when you tell Burson that you want to go back

18   home, you don't mean Al-Qaeda.  Right?

19   A.     I meant I want to go back home.

20   Q.     Home to see your family?

21   A.     Uh-huh.

22   Q.     Right?

23   A.     Yes, ma'am.

24   Q.     And then, sir, you switch the conversation and

25   start talking about your new apartment.  Right?

al-Saidi - CROSS - By Ms. Jhones          149

```
 1    A.     Yes.

 2    Q.     And as of November 7th, Burson knew you to be

 3    homeless.  Right?

 4    A.     I never was homeless, ma'am.

 5    Q.     You didn't have a place to live.  You were living

 6    in a hotel.

 7    A.     That's because I was instructed by the FBI to do

 8    that, ma'am.

 9    Q.     And, sir, you also stayed at the Embassy because

10    you had no place to live.

11    A.     That's not true, ma'am.  I slept in the Embassy

12    because I was instructed by the FBI to do that.

13    Q.     Well, let me ask you this:  Did you have -- did

14    you own an apartment on November 7th of 2005?  Did you

15    actually own a residence in Miami?

16    A.     No, ma'am.

17    Q.     Did you have a lease in some apartment or

18    condominium in Miami?

19    A.     No, ma'am.

20    Q.     In fact, you had no place to go.

21    A.     I had places to go to.

22    Q.     Before you went to Yemen, you were living in a

23    little room on the second floor of a convenience store.

24           You were sleeping at the convenience store; were

25    you not, sir?
```

al-Saidi - CROSS - By Ms. Jhones                    150

```
 1   A.    There was a time that I did slept on the store
 2   that I worked in.  Yes.
 3   Q.    Now, you start talking about -- you start talking
 4   about this apartment with Burson.  Right?
 5   A.    Yes, ma'am.
 6   Q.    And Burson is really happy for you; is he not,
 7   sir?
 8   A.    He seemed happy.
 9   Q.    And he's actually -- then you start telling him
10   about how nice the apartment is.
11   A.    I did said it was a nice bedroom.
12   Q.    And you tell him even more, sir.
13         You tell him about the bedroom and you tell him
14   about the living room; do you not, sir?
15   A.    Yes, I did.
16   Q.    And you tell him that you got it with the help of
17   your family.  Right?
18   A.    Yes.
19   Q.    Not Al-Qaeda, but your family?
20   A.    Yes.  I said that.
21   Q.    And your family back home?
22   A.    I said that.
23   Q.    Okay.  And, sir --
24         MS. JHONES:  I apologize, your Honor.  Just
25   one second.
```

```
 1    BY MS. JHONES:

 2    Q.    And you also tell him, sir, that you've been

 3    trying to contact Brother Naz.  Right?  Look at Page 7.

 4    Do you see the bottom of Page 7, sir?

 5           THE COURT:  Can you turn that around?  It's on

 6    the wrong way on the ELMO.

 7           MS. JHONES:  I'm sorry.  What do I do?

 8           THE COURT:  Can you turn it around, the paper?

 9           MS. JHONES:  Like that?

10           THE COURT:  No.  I'm sorry.  Put it back.

11    It's just not focusing very well.

12           THE WITNESS:  Yes.  I seen that.

13           MS. JHONES:  Your Honor, could you --

14           THE COURT:  Do you want me to bring it out?

15           MS. JHONES:  That's fine.  Thank you.

16    BY MS. JHONES:

17    Q.    Do you see that, sir?

18    A.    Yes, ma'am.

19    Q.    You'd been trying to contact Brother Naz and he's

20    always too busy to meet with you.  Right?

21    A.    He told me he was very busy.  Yes.

22    Q.    And -- now, this is the guy, right -- this is the

23    guy that's been telling you since March of 2005,

24    "Connect me with Al-Qaeda"?

25           MR. GREGORIE:  Objection, your Honor.
```

```
 1   Argumentative.

 2            THE COURT:  Sustained.

 3            Rephrase your question.

 4   BY MS. JHONES:

 5   Q.    Mr. Batiste is the person that you say wants you

 6   to connect him with Al-Qaeda.

 7   A.    Yes, ma'am.  Brother Naz went and gave me a piece

 8   of paper and told me to get him connected to Al-Qaeda.

 9   Q.    He told you that because you say that Brother Naz

10   wants to overthrow the US Government.  Right?

11   A.    Yes, ma'am.  As he told me, he wanted to take

12   back the land that George Washington has promised the

13   Moroccan leader in the 1700s.

14   Q.    And this is really important to Brother Naz,

15   isn't it?

16   A.    I'm sorry?

17   Q.    It's really important to him to be able to take

18   back the land --

19            MR. GREGORIE:  Objection, your Honor.

20            THE COURT:  Sustained.

21   BY MS. JHONES:

22   Q.    But you show up at the Embassy around 7:30 p.m.

23   and you basically complain to Burson, "I can't reach

24   the guy"?

25   A.    The day before, he told me that he was gonna get
```

```
 1   off at 7:00.  So I went at 7:35.

 2   Q.    And he stood you up?

 3   A.    I'm sorry?

 4   Q.    He stood you up?

 5   A.    I don't understand that.

 6   Q.    He didn't show up?

 7   A.    He didn't show up.

 8   Q.    Right.

 9         And you're here at the Embassy with a recording

10   device.  And then you decide -- you and Burson decide

11   that you're hungry.  Right?

12   A.    Yes, ma'am.

13   Q.    And Burson -- you don't have a car.  Right?  You

14   don't have any transportation?

15   A.    At that time, I didn't have a car.

16   Q.    Well, sir, during the whole time in 2005 and

17   2006, you had no car?

18   A.    No.

19   Q.    You didn't have a driver's license?

20   A.    I did get my driver's license.

21   Q.    Eventually.

22   A.    Yes, ma'am.

23   Q.    Right?

24         And the way you would get around would be when

25   the FBI would drive you to places.  Right?
```

al-Saidi - CROSS - By Ms. Jhones                    154

```
 1   A.     They picked me up from the hotel.  They picked me
 2   up, I think, a hotel or two hotels and they dropped me
 3   off when I wanted to be dropped off in the Embassy for
 4   the case.
 5   Q.     You were totally dependent on the FBI; were you
 6   not, sir?
 7   A.     I wasn't.
 8   Q.     Well, they paid for your rent?
 9   A.     Yes, they did.
10   Q.     They paid for your food?
11   A.     Yes, they did.
12   Q.     They paid for your telephone?
13   A.     Yes, ma'am.
14   Q.     They paid your electricity?
15   A.     Yes.
16   Q.     If you got sick and you went to the doctor, they
17   paid for that?
18   A.     That's not true.  I never got sick.
19   Q.     Did they pay for your pot?
20   A.     No, ma'am.
21   Q.     Your marijuana?
22   A.     No.
23   Q.     Now -- so you and Brother Burson get in a car and
24   you decide that you're going to go eat.  Right?
25   A.     Yes, ma'am.
```

1    Q.    And you go to Burson's favorite restaurant, the

2    Taco Bell?

3    A.    I don't know this -- we went to Taco Bell.  Yes.

4    Q.    And throughout the course of this conversation,

5    sir, you continue to complain to Burson that you can't

6    get in touch with Brother Naz.

7          And look at Page 57 of the transcript, sir.

8          Do you see where you tell him, "Brother, where

9    you at, man?  Where is he?"  You chuckle a bit and you

10   say, "I called him earlier and he told me he was busy

11   working."  And you tell him, "I can't understand."

12         Right?

13   A.    That day I was trying to reach him and he wasn't

14   answering the phone.

15   Q.    And that happened a lot, sir; did it not?

16   A.    If I call him a lot of times that day?

17   Q.    No.  Throughout the course of 2005.

18   A.    No.  That's not true, ma'am.

19   Q.    Okay.  And -- now, the prosecutor asked you

20   whether or not you had spoken to Burson about your

21   apartment.

22         Remember that?

23   A.    I don't remember if he asked me that or not.  No.

24   Q.    Okay.  Do you remember -- directing your

25   attention to the transcript of March 5th of 2009 --

al-Saidi - CROSS - By Ms. Jhones                156

 1    that was yesterday -- at Page 207, do you remember

 2    Mr. Gregorie asking you, "Now, sir, is there where you

 3    talk about your new apartment?", meaning November 7th?"

 4    A.    On November 7, if I spoke about my new apartment?

 5    Q.    Yes.

 6    A.    Yes, I did.

 7    Q.    Do you remember the prosecutor asking you why you

 8    had talked to Burson -- why is it that you were

 9    bringing up the issue of the apartment with Burson?

10    A.    Why was it the issue -- if I remember when he

11    asked me why is it the issue that I....

12    Q.    Uh-huh.

13    A.    To be honest with you, I don't even remember why.

14    I mean, I know the FBI told me that I need to bring

15    them in there so we could start doing the recording in

16    there.  But I don't know if that's the exact reason or

17    not.

18    Q.    There was another reason; was there not, sir?

19    A.    I'm sorry?

20    Q.    There was another reason.

21    A.    (No response.)

22    Q.    Let me see if I can help you.

23          You tell Burson that -- you start talking to him

24    about how nice your apartment was.  Right?  And your

25    intent there, sir, is to impress Burson; is it not,

1    sir?

2    A.    If my intention was to impress him?

3    Q.    Yes.  To impress him about the fact that you have

4    a brand-new apartment.

5    A.    I don't see a reason why would I impress him.

6    But I seen -- I was trying to have him come out there,

7    you know.  I'm saying it's a nice apartment so I can

8    have him come look at it.

9    Q.    And you tell him -- you also tell Burson, sir,

10   that not only do you have now a real nice apartment --

11   you also talk to Burson about how much travel you're

12   able to do around the world.  You tell him you've

13   traveled to a lot of different places.

14         Look at Page 53 of the transcript, sir.

15         Are you there, sir, at Page 53?

16   A.    Yes, I am.

17   Q.    And you tell him, "Believe me, man.  Brother, I

18   know a lot of people.  Believe me, I could get names,

19   even in my own family.  That's how many people I know.

20   I travel to a lot of places, a lot of places."  And you

21   say it again, "A lot."

22   A.    Yes.  I see that.

23   Q.    And you tell him, "How clear can I make it to

24   you, Burson?  I mean, I been to a lot of places."

25         Right?

```
 1    A.     Okay.  Yes.

 2    Q.     And you're telling him that you have a fourth

 3    passport -- you've traveled so much that you've gone

 4    through four passports.  Right?

 5    A.     Yes.

 6    Q.     And your purpose, sir -- your purpose in speaking

 7    to Brother Burson is to start planting the seed about

 8    how better off you are, now that you have returned from

 9    Yemen.

10           Isn't that a fact, sir?

11    A.     No, it's not.

12    Q.     And you do that, sir, by showing him the new

13    apartment and telling him where you got the money for

14    that apartment and that money you got from your family.

15    A.     That was the point.  I had to show him the

16    apartment because I'm trying to get him in there so I

17    can record him.  I had to say I get that money from

18    somewhere during the apartment.

19    Q.     Well, you're recording him now on 11-7; are you

20    not?

21    A.     Yes.

22    Q.     You're recording him now?

23    A.     Yes.

24    Q.     You don't have to take him to your apartment.

25    A.     But I was telling him about it so I could get him
```

1    there.

2    Q.    Okay.  You told the ladies and gentlemen of the

3    jury that you think, but you're not sure, as to who was

4    in attendance in this meeting in the Holiday Inn?

5    A.    Well, I'm confused, ma'am, because in the first

6    day was three people.  And the second day was four

7    people.  The first meeting, I don't know if it was

8    Burson or Naudy.

9    Q.    Okay.

10   A.    It's either one of them.

11   Q.    And you tell Burson on November 7th that the

12   reason -- the reason, sir, that you had gone -- that

13   you wanted to speak to Narseal Batiste at the Holiday

14   Inn was so that he could talk to Faisal.

15         Now, directing your attention, sir, to Page 45 of

16   the transcript, the bottom of Page 45, you tell Burson

17   that, "You know, it's like Faisal.  It's like with

18   Faisal -- like my money with Faisal.  But he's saying

19   he hasn't given me my money."

20         Right?  That's you speaking; is it not, sir?

21   A.    Yes, ma'am.  But I didn't say there nothing about

22   Brother Naz.

23   Q.    We're getting there.

24   A.    Yes, ma'am.

25   Q.    The next page, on Page 46 -- top of Page 46,

1    Burson responds, "Hmm, no money."

2          And you say, "No money.  That's was -- I'm trying

3    to get in contact.  I mean, he gave me a thousand

4    dollars.  I told you about that.  But, still, man, come

5    on, brother.  Out of what?  30,000?"

6          Correct?

7          And what you're saying, there, sir, is that you

8    previously told Burson and you previously told Brother

9    Naz that you were trying -- that you wanted to reach

10   him because you wanted to talk to him about Faisal.

11   A.    No, ma'am.  I said there that I talk to Brother

12   Naz -- I wanted to talk to Brother Naz about Faisal.

13   But I never actually asked him to do -- to go and do

14   something with Faisal.  No.

15   Q.    And you also tell Burson that it's not $20,000

16   that Faisal owes you, but it's $30,000.

17          Do you see that at the top of Page 46?

18   A.    Yes, ma'am.

19   Q.    And you also tell Burson that Faisal has only

20   given you $1,000, not 7,000.

21          Correct, sir?

22   A.    Yes, ma'am.

23   Q.    So when you told us earlier that you -- when you

24   left Yemen, you left with $7,000 in cash, that's not

25   true, sir?

```
 1   A.    It is true, ma'am.  Everything that I told
 2   Brother Naz or Brother Burson is not all that was
 3   happening.  So....
 4   Q.    So you lied to Burson about how much money Faisal
 5   had given you.  Right?
 6   A.    I didn't tell him the truth.  Yes, ma'am.
 7   Q.    But you're telling us the truth here today that
 8   it was $7,000 that Faisal had given you?
 9   A.    Yes, ma'am.
10   Q.    And -- so the fact that -- on Pages 45 and 46,
11   and specifically Page 45, you say, "I don't know why.
12   It's always about money.  It's always about money."
13   A.    Yes.  That's work.  That's most -- most -- you
14   know, treatments here in the US is always about money.
15   You work.  You get paid.
16   Q.    And -- well, right before Page 45, sir, what you
17   talk about is the lost AK-47 -- right? -- and how it is
18   that you can't find it and that you want to get the
19   money that you paid for your AK-47.  Right, sir?
20   A.    Yes, ma'am.  I did speak about the AK-47.  I
21   wanted either to get that AK or get the money that I
22   paid for it.  Yes.  I did speak about that.
23   Q.    So during the course of this conversation with
24   Burson, sir, you go into a lot of conversation about
25   back home.  Right?
```

1    A.    If I spoke about back home?  Yes, ma'am.

2    Q.    Well, let's talk about that a little bit.  Okay?

3    A.    Okay.

4    Q.    Let's put this a little bit in context.

5          The prosecutor played a clip yesterday.  That was

6    regarding Page 101 of the transcript.

7          When you tell Brother Burson, in the bottom of

8    Page 101, that, "He told me he was gonna be here by

9    now, but I don't know.  To be honest with you, I don't

10   mind.  It's just -- well, as long as I get to see you,

11   brother, and all.  If I don't see them as much as

12   you're gonna see them -- so our heart is already got

13   close.  Let them know what's in my mind and what's in

14   my heart.  One day we're gonna be together and make it

15   clear and speak about what's going on, work on what's

16   going on," what you're talking about there, sir, is

17   you're talking about getting together with these

18   brothers.  Right?

19   A.    I didn't understand the question.  It went too

20   fast for me.

21   Q.    Let's go back to it.

22         Let's look at Page 101.  You're talking to

23   Burson, sir, on that page about how you don't like it

24   when brothers don't get together, it's important for

25   brothers to get together and to talk and to hang out.

1           MR. GREGORIE:  Objection, your Honor.  That's

2     not the wording that's in the transcript.  If she wants

3     to quote him the transcript, quote it.

4           THE COURT:  Sustained.

5           Rephrase your question.

6           MS. JHONES:  Okay.

7     BY MS. JHONES:

8     Q.    Directing your attention, sir, to the middle of

9     the transcript -- do you have it?  Are you looking at

10    the monitor? --

11    A.    Yes, ma'am.

12    Q.    -- "No, man.  I don't like when brothers don't

13    get together, man.  I want to get together.  We -- that

14    feeling gets me good -- so good, man."

15          Right?

16    A.    (No response.)

17    Q.    And what you're telling Burson --

18          THE COURT REPORTER:  I'm sorry.  I didn't get

19    an answer.

20          THE WITNESS:  I don't know how to answer her

21    question.  I mean, it's not a "yes" or a "no" answer.

22          I said what I said, and it's there.  So I

23    don't understand your question.

24    BY MS. JHONES:

25    Q.    Well, my question is:  What you're talking about

```
 1   there is you're trying to get Brother Burson to hang

 2   out with you more, to be a good brother and hang out?

 3   A.     I'm trying to get him to call me every time they

 4   get together.

 5   Q.     Because they're not calling you?

 6   A.     They are, but I don't know if they're doing that

 7   every time they get together.

 8   Q.     Okay.  And you don't stop there, do you, sir?

 9   You continue with that topic towards the bottom of the

10   page.

11          And you say again, "I thought Brother Naz was

12   gonna be here."

13          Right?

14   A.     I said, "Call Brother Naz again."

15   Q.     Because now, since you haven't met with Narseal

16   Batiste, then you want to get Brother Burson to reach

17   out for the guy to see if maybe he can convince him to

18   show up.  Right?

19   A.     Honestly, I was trying to reach him.  But I don't

20   know what happened.  But I asked him to call Brother

21   Naz and find out if he's still coming or not.

22   Q.     And, once again, in addition to the other pages

23   that we talked about, on Page 101, you're still talking

24   to Burson about the same thing.

25          "He told me he was gonna be here by now, but I
```

```
 1    don't know.  To be honest with you, I don't mind.  It's
 2    just -- well, as long as -- as long as I get to see
 3    you, brother.  That's all.  You know, it's really nice
 4    to get together.  Our heart is already got close."
 5         Right?
 6    A.    Yes.  I said that.
 7    Q.    "And let them know what's -- now what's in my --
 8    let them know what's -- know what's in my mind and
 9    what's in my heart."
10         Correct, sir?
11    A.    It's there.
12    Q.    Okay.  And you're talking to Brother Burson like
13    a buddy; are you not, sir?
14    A.    Yes, ma'am.
15    Q.    Okay.  And after that, sir, on the top of
16    Page 102, you say, "Anyway, my uncle spoke more than
17    once about sending somebody here."  That's on the top
18    of Page 102.
19    A.    Yes, ma'am.
20    Q.    And Brother Burson says, "Oh."
21         Right?
22    A.    Yes.
23    Q.    And you go on and say, "I don't know -- I don't
24    know what he's gonna do about it.  I don't know who he
25    know.  I don't know who's gonna come or where he gonna
```

```
 1   come from.  Don't know nobody.  I know he's a
 2   mujahedin.  I know he's Arab, Muslim."
 3        Right?
 4   A.   Yes, ma'am.
 5   Q.   And Burson says, "Right."
 6        Correct?
 7   A.   Yes, ma'am.
 8   Q.   And Brother Burson asks you, "Does he speak
 9   English?"
10        Correct?
11   A.   Yes, ma'am.
12   Q.   And Brother Burson just follows along with your
13   conversations there.  Correct?
14   A.   Talking about the guy.  Yes.
15   Q.   And then you tell Brother Burson in the bottom of
16   Page 102, "And they told me, you know, he don't speak
17   English.  But I don't know.  I think he do speak
18   English.  I'm really -- I tried -- I'm gonna try to
19   take care of him.  I'm trying to get around while he's
20   with me, but we can't stay together all the time
21   'cause -- I mean, I know his record is not that bad."
22   And you laugh.
23        Correct?
24   A.   (No response.)
25   Q.   Right?  You laugh when you're saying this.  Do
```

1   you see that?

2   A.    I don't see when I laugh.

3   Q.    Do you see where it says "(Short laugh)," sir?

4   A.    No.

5   Q.    Do you see that?

6   A.    Yes.  I see it.

7   Q.    And that's you talking there.  Right?

8   A.    Yes, it was.

9   Q.    And then you tell him that his record is not that

10  bad, but yours is actually cleaner than his record.

11       Right?

12  A.    I was giving them a story, because the FBI told

13  me I can be with him; and I'm trying to give them a

14  reason why I can be with the guy.

15       So I'm telling him, "Man, I think his record is

16  no good.  We can be caught together, you know.  Mines

17  is better than him.  That's why I don't want to deal

18  with him."

19  Q.    And the point of the matter is that you are

20  telling Burson what you want Burson to hear.  Right?

21  A.    I don't know if he want to hear it or not.  I

22  was --

23  Q.    Well, let me -- I'm sorry.  Go ahead.

24       MR. GREGORIE:  Objection, your Honor.  She cut

25  the witness off.

1                 MS. JHONES:  I sure did.

2                 THE COURT:  Let him finish his answer.

3      BY MS. JHONES:

4      Q.    Go ahead, sir.

5      A.    I already forgot.  I'm sorry.

6      Q.    You're the one that starts talking about somebody

7      having a record.  Right?

8      A.    Yes, it was.

9      Q.    Brother Burson is not concerned about anybody

10     having a record.  You're the one that brings it up.

11     A.    Yes.  I did bring it up.

12     Q.    What's going on here, sir, is that you're

13     planting the seed; are you not, sir?

14     A.    I don't understand what you mean by saying that.

15     What seed?

16     Q.    Let me see if I can make it clear.

17     A.    Please.

18     Q.    You're planting the setup.  Right?

19     A.    No.  No, ma'am.  You got this wrong.

20     Q.    Oh, okay.

21           And you would agree with me, sir, that at no time

22     does Brother Burson tell you, "I'm worried, man.  Does

23     this guy have a record or something?"

24           Brother Burson doesn't say that, does he, sir?

25     A.    I don't recall him saying he's worried.  No.

1    Q.     Right.

2           And, in fact, Brother Burson is not worried?

3               MR. GREGORIE:  Objection, your Honor.

4               THE COURT:  Sustained.

5    BY MS. JHONES:

6    Q.     Then you go on, sir, and you start talking to him

7    about -- and, again, Burson is just following along.

8    Right?  You're the one doing the talking here.  Right?

9    A.     Yes.  I was talking there.  Yes.

10   Q.     And you go on and you say, "Especially together.

11   We don't want to be together, especially to be seen.

12   But an assistant to die that we get caught together.

13   But I don't want to" -- going to the top of Page 103 --

14   "I don't want to do.  I don't know, man.  I want to

15   talk to Brother Naz, if I could have him, you know, one

16   day here, one day there, one -- like try to move him.

17   I mean, I'm sure he has enough financial support,

18   'cause he has the same connect I have."

19          Right?

20   A.     Yes, ma'am.  I said that.

21   Q.     And what's going on here, Mr. al-Saidi, is that

22   you're telling Burson this man has money.

23          Right?

24   A.     What I was telling him is that you don't need to

25   take care of him.  You know, I don't want him to think

1    of the guy as a homeless guy, like you think of me.

2    I'm telling him, "The guy have enough financial support

3    for himself.  All you got to do is put him up for

4    several days."

5    Q.    And it's important that this guy have financial

6    support, isn't it, sir?

7    A.    It's important that he take care of himself with

8    his own financial support.  Yes, ma'am.

9    Q.    Narseal Batiste is not going to want to put up a

10   stranger who doesn't have any money, based on the

11   conversations that you've had with him in the past, is

12   he, sir?

13   A.    I don't know.

14   Q.    You don't tell Mr. Batiste or Burson, for that

15   matter, "Put this poor guy up.  He's homeless.  Give

16   him a hand."

17         Right?  You don't say that?

18   A.    No.  I didn't say that.

19   Q.    What you tell them is, "This guy could take care

20   of himself.  He has enough financial support."

21         Right?

22   A.    I did said he have enough financial support.

23   Q.    By the way, you don't tell them, "This guy is

24   loaded with weapons.  Put him up," do you, sir?

25   A.    I wasn't instructed by the FBI to say that.

```
1    Other than that, I would have told him.
2    Q.    Right.
3          When you're talking here, you're telling him what
4    the FBI told you to tell him?
5    A.    I was trying to follow the line and doing exactly
6    what the FBI instructed me to do.  Yes, ma'am.
7    Q.    Okay.  Now, the FBI wants you to get these people
8    to talk.  Right?  They've told you that?
9    A.    I told them information and they wanted me to
10   speak to them while being recorded about it so I could
11   have them agreeing about the subject.
12   Q.    Well, wouldn't it have been a really good idea,
13   sir, to start talking to Brother Burson about Al-Qaeda
14   instead of your family back home?  Wouldn't that have
15   been a good idea?
16   A.    Ma'am, I did my best through this investigation.
17   And I didn't want to get these guys suspicion of me
18   working with the Government.  So I kept dealing with
19   them the same way I been dealing with them.
20   Q.    But you told us, sir, that in the Holiday Inn,
21   where you think Brother Burson was present -- you don't
22   remember -- you think he may have been -- that you were
23   talking about Al-Qaeda.
24   A.    Yes, ma'am.  I was.
25   Q.    You didn't -- you weren't talking in that hotel
```

 1   about your rich uncle or your family who has a lot of

 2   money.

 3       You were talking about Al-Qaeda or Hamas in that

 4   hotel room in that meeting that wasn't recorded.

 5   Right?

 6   A.   He has requested for me not to mention the term

 7   of "Al-Qaeda."  And that's why I stopped.

 8   Q.   Burson doesn't know you're wired when he's

 9   talking -- when you're talking to him, does he, sir?

10   A.   No, ma'am.

11   Q.   You were free to talk about Al-Qaeda and anybody

12   else you wanted to, sir, weren't you?

13   A.   Yes, I was.

14   Q.   But you didn't.

15       You talked about your rich family connections,

16   sir; did you not?

17   A.   I have no rich family.

18   Q.   Well, we know that.  That's your rich family

19   right there, the FBI.

20       MR. GREGORIE:  Objection, your Honor.

21   Argumentative.

22       THE COURT:  Sustained.

23   BY MS. JHONES:

24   Q.   All righty.  Moving along to Page 104, the very

25   next page, you tell Brother Burson, "You just got to

 1   meet him and just -- meet him, see what's going on.

 2   Maybe my uncle is trying to find a direct connect to

 3   you and Brother Naz and the rest of the brothers.  It's

 4   good."

 5        You tell Brother Burson that.  Right?

 6   A.   Yes, ma'am.

 7   Q.   And, sir, Burson tells you, "That is good.  He

 8   takes us seriously when he said (unintelligible)."

 9        Right?

10   A.   Yes, ma'am.

11   Q.   And -- now, first of all, so we're clear on

12   something here, this is a transcript.  Correct?  This

13   is not the actual recording.  This is just a transcript

14   of a recording.  Right?

15   A.   Yes, ma'am.

16   Q.   And you've listened to the recording; have you

17   not?

18   A.   Yes, ma'am.

19   Q.   And sometimes you could make out some words.

20   Sometimes you can't make out the words in the

21   recording.  Right?

22   A.   Excuse me?

23   Q.   Sometimes you could make out the words that are

24   being spoken.  Sometimes you can't, and that's why it

25   says "(unintelligible)"?

```
 1   A.     I don't understand.  I can't answer a question I
 2   don't understand.
 3   Q.     Let me see if I can explain it to you better.
 4          In these transcripts, where you have these
 5   initials here -- right? -- what that means is sometimes
 6   the person who is doing the transcribing can't tell
 7   what's being said.  Right?
 8   A.     I don't know.
 9   Q.     Well, you did testify previously when
10   Mr. Gregorie was asking you the questions that you had
11   reviewed that transcript thoroughly.
12   A.     Yes, I did.
13   Q.     And that it accurately represented everything
14   that's in that CD --
15   A.     Yes, ma'am.
16   Q.     -- the recorded conversation.
17   A.     Yes, ma'am.
18   Q.     Right?
19   A.     Uh-huh.
20   Q.     So what you're telling the ladies and gentlemen
21   of the jury is, when something comes up unintelligible,
22   you can't even figure out what's going on there.
23   You've reviewed it.  You can't tell.
24   A.     It's unintelligible.  Like if -- as intelligible
25   as -- I don't understand what it is.
```

1  Q.    Now, then you tell Brother Burson, talking about

2  this friend of your uncle -- not Al-Qaeda -- friend of

3  your uncle -- "Right, you know.  But at the same time,

4  we have to show him that we're there.  We -- I'm not

5  talking about no bullshit.  I don't want to be looking

6  like a dummy.  You know what I'm saying?"

7        Right?  Those are your words, sir.  Right?

8  A.    Yes.

9  Q.    And Brother Burson says, "Dummy?"

10       "Yeah."

11       And you go on and say, "I don't want us to look

12 like" -- and you say, "Believe me, man."

13       See what you're saying?

14          MS. ARANGO:  Judge, I'm sorry.

15          THE WITNESS:  I think he using his term as my

16 terms, Miss.

17 BY MS. JHONES:

18 Q.    That's right, because he's following you along.

19 Right?

20 A.    (No response.)

21 Q.    And --

22          THE COURT REPORTER:  I'm sorry.  I didn't get

23 an answer to that.

24          THE WITNESS:  It wasn't a question.  She

25 accusing that he's following me.  So I don't know what

 1    to answer it.

 2    BY MS. JHONES:

 3    Q.     You're the one that's basically doing the --

 4    you're the one that's talking in this conversation, and

 5    Burson is pretty much agreeing with you.  Right?

 6    A.     We both spoke, ma'am.

 7    Q.     Now, Burson tells you, "And he's gonna check us

 8    out a lot, how we act under tension."

 9           Right?

10    A.     He said that.

11    Q.     That's Burson talking.  Right?

12           And he said, "And we -- how we're organized at

13    the Temple."

14           Correct?

15    A.     If he said that.  Yes, he did.

16    Q.     And you tell Burson, "We have to be organized."

17           Right?

18    A.     If I said that, yes, I said it.

19    Q.     And what you're telling him there, sir, is that

20    this guy that's coming is coming with some money.

21    Right?

22    A.     I never say that.

23    Q.     Well, why do you have to be organized?

24    A.     Because somebody from Al-Qaeda is coming to meet

25    with them.  I mean, this is what they expecting.  So I

al-Saidi - CROSS - By Ms. Jhones                177

```
 1   was counting myself as one of their members.  I'm
 2   saying, "We have to be organized."  I'm one of them.
 3   That's how I was talking to the guy.
 4   Q.    And what you mean by that, sir, is if you're not
 5   organized, if you don't look like you know what you're
 6   doing, you're not going to get the money.
 7         That's what you mean.  Right?
 8   A.    I didn't say that.
 9   Q.    No.  You didn't say it.  But that's what you
10   mean.  Right?
11   A.    You assuming that's what I mean, ma'am.
12   Q.    Let me ask you this:  That is what you're
13   communicating to Brother Burson over there?
14   A.    No, ma'am.
15   Q.    "If you get organized, you're going to get the
16   money"?
17   A.    No, ma'am.  That wasn't true.
18   Q.    You will agree with me, sir, that the words, "We
19   have to be organized" are coming from you.  Right?
20   A.    Yes, ma'am.
21   Q.    Okay.  And this is on November 7th.  Right?  This
22   is really early on in this investigation.  Right, sir?
23   A.    I don't know if it's early on, late on.  I mean,
24   I been speaking to the guy since March and you telling
25   me early.  But, yes, he -- he said that -- I said that.
```

1    Q.    Let me put it this way:  You have been wearing

2    that body wire a week and a half.  Right?

3    A.    Yes.

4    Q.    A week and a half after you wear that body wire,

5    you're telling this guy, "We have to be organized."

6    Right?

7    A.    If I said that, yes.

8    Q.    Okay.  And Burson tells you, "I think he wants to

9    see us a whole day.  He wants to probably be around us

10   and see how we talk, see how people communicate with

11   us."

12         Right?

13   A.    Yes.  He said that.

14   Q.    And you know what Burson's telling you there,

15   don't you, sir?

16   A.    I'm sorry?

17   Q.    You know what he's talking about, don't you?

18   A.    I understand what he was saying.

19   Q.    He's talking to you about what these guys are

20   really about, isn't he, sir?

21   A.    He was telling me that somebody's coming to check

22   them out.  But you saying he was talking about how --

23   what they all about?  Sorry, ma'am.  I don't understand

24   your question.

25   Q.    Let me see if I can help you.

```
 1   A.     Please.

 2   Q.     You agree that Burson is speaking there when he's

 3   telling you, "He's gonna see us for a whole day.  And

 4   he'll see, probably, around us, to see how we talk."

 5          Right?

 6   A.     Yes.  He said that.

 7   Q.     "And how people communicate with us"?

 8   A.     Yes.  He said that.

 9   Q.     Right?

10          What he's talking about, sir, is something that

11   you are very familiar with, isn't he, sir?

12             MR. GREGORIE:  Objection, your Honor.  Vague.

13             THE COURT:  Sustained.

14             Rephrase your question.

15   BY MS. JHONES:

16   Q.     What he's talking about there, sir, is what you

17   have seen in the past where these guys would go around

18   the neighborhood talking to people.  Right?

19   A.     I never seen them going around the neighborhood

20   talking to people.

21   Q.     You never saw them go over to North Miami in that

22   convenience store to talk to people and jogging around

23   the neighborhood?  You never saw that, sir?

24   A.     I saw them crossing the street, but I didn't

25   never see them talking to anybody, like -- no.
```

1    Q.    Well, you don't go to the Oak Grove Park, do you,

2    sir, in North Miami?

3    A.    If I ever been there?

4    Q.    You don't hang out there, do you, sir?

5    A.    No, I don't.

6    Q.    You hang out at convenience stores.  Right?

7          MR. GREGORIE:  Objection, your Honor.

8          THE COURT:  Sustained.

9    BY MS. JHONES:

10   Q.    Now, going to the bottom of Page 104, you tell

11   him, "I don't know if he is not -- he could be thinking

12   on this person now (unintelligible)."

13         And then you say, "Financial support is not" --

14   directing your attention to the top of Page 105 --

15   "Financial support is not a problem with him.  Just

16   give me an idea that we don't have to take care of him

17   or nothing.  I want to bring him here even though it's

18   not a lot.  Go ahead.  Help."

19         MR. GREGORIE:  Is there a question there,

20   Judge?  I think the witness is waiting for a question.

21   BY MS. JHONES:

22   Q.    Those are your words.  Right, sir?

23   A.    If I remember all the words you said, but....

24   Q.    Well, let me do it again.

25   A.    Please.

1   Q.    Bottom of Page 104 and then it continues on the

2   top of Page 105.   There is an "(unintelligible)" in the

3   middle of the sentence.   And then it says, "Financial

4   support is not a" -- continuing on the top of

5   Page 105 -- "a problem with him."

6        Right?

7   A.    Yes, ma'am.

8   Q.    Those were your words.   Correct, sir?

9   A.    Those is my words.   Yes, ma'am.

10  Q.    And then, sir, continuing on on that page, you

11  talk again about -- talking to Burson about not being

12  able to leave this man alone there all day and all

13  night.

14       You're talking about leaving him alone at the

15  Embassy.   Right?

16  A.    I'm sorry?

17  Q.    You're talking about leaving this man that's

18  coming from back home -- you're telling Burson that

19  that guy -- that man can't be left alone in the

20  Embassy.   Right?

21  A.    Where you see that?

22  Q.    Is that what you're talking about right here,

23  sir, "We can't be leaving him here.   He is -- comes

24  alone all day and night"?   Is that what you're talking

25  about there, sir?

```
 1   A.     Those is my sentence.  Yes, ma'am.

 2   Q.     And you tell Burson again, "We gotta get

 3   organized."

 4          Right?

 5   A.     Yes.  I said we --

 6   Q.     It's important to impress this guy who's coming;

 7   is it not, sir?

 8   A.     I didn't say that.

 9   Q.     Okay.  Well, that's what you meant when you were

10   talking about "organized," isn't it?

11   A.     Are you assuming what I meant?

12   Q.     No.  I'm asking you.

13          That's what you meant, isn't it?

14   A.     I meant what I said.

15   Q.     Tell me what you mean, then, by "organized."

16   Just explain it to me.

17   A.     What I meant is we got to be clear on what we

18   doing.  And that's part of being organized.  We working

19   with Al-Qaeda.  So we got to show them that we ready

20   for them.

21   Q.     But you didn't tell Burson that.

22   A.     I said what I said there, ma'am.

23   Q.     Okay.  And Burson says -- well, first of all,

24   before we get to Burson, you say, "We got to protect

25   him (unintelligible) stays here.  We gotta be there for
```

```
 1   him, answer his questions, ask him questions.  We might

 2   get to know the guy."

 3        Right?

 4   A.   (No response.)

 5   Q.   And Burson repeats --

 6            THE COURT REPORTER:  I'm sorry.  I didn't

 7   hear the answer.  -

 8            MS. JHONES:  I'm sorry.

 9            THE WITNESS:  I'm trying to find where she's

10   reading from.

11            I don't understand the question.

12   BY MS. JHONES:

13   Q.   You do have the whole transcript in front of you

14   there, don't you, sir?

15   A.   Yeah.  But where --

16   Q.   Feel free to look at the transcript, the page

17   before and the page after, if that helps you.

18            THE COURT:  It's Page 105.

19            THE WITNESS:  I mention there, "I mean, I want

20   to get to know him as much as you want to get to know

21   him.  But I don't know when he's coming.  I just want

22   to let you know.  I just -- you know, that's what I

23   wanted to tell to -- tell Brother Naz about.  I don't

24   know if he's gonna come or not.  I'm gonna wait still.

25   I'm not gonna wait too long 'cause I got to work.  I
```

1     don't know, man."

2              Yes.  I did say that.

3     BY MS. JHONES:

4     Q.    Okay.  And then in the bottom, Burson tells you,

5     "This is heavy.  That ain't -- that's nothing light.  I

6     can tell you that."

7              Right?

8     A.    Yes.

9     Q.    Those are Burson's words.  Right?

10    A.    Yes, ma'am.

11    Q.    And then you tell him, "I want to see his opinion

12    to see if he -- you know, if he's gonna help me on

13    this.  Believe me, I don't want to go through nothing

14    alone."  Right?

15    A.    Yes, ma'am.

16    Q.    And what you're telling Burson there is -- what

17    you're telling him there is that you need his help in

18    impressing this guy who's going to come from back home.

19             Right, sir?

20    A.    If I told Brother Naz -- Brother Burson that I

21    want his help to impress the guy?

22    Q.    Yeah.  That's what's going on there, isn't it,

23    sir?

24    A.    I didn't see there.  I'm trying to find out --

25    Q.    Well, tell me what's going on there.

1  A.     Okay.  In this Page 106 --

2  Q.     Tell me the part you're referring to, sir.

3         MR. GREGORIE:  Objection, your Honor.  Let

4  him -- he's about to answer it.

5         THE COURT:  Let him finish his answer.

6         MS. JHONES:  Sure.

7  BY MS. JHONES:

8  Q.     Go ahead.

9  A.     I was speaking here.  I tell him I want to go

10  with him and help him.  I was speaking about Mohammed,

11  that I wanted to go with him and help him.

12        But I never asked Brother Naz to come with me or

13  to help me impress Brother Mohammed.  I didn't see

14  that.  Where you see it?

15        THE COURT:  We're going to take a break.

16        Do not discuss this case either amongst

17  yourselves or with anyone else.  Have no contact

18  whatsoever with anyone associated with the trial.  Do

19  not read, listen or see anything touching on this

20  matter in any way.

21        If anyone should try to talk to you about this

22  case, you should immediately instruct them to stop and

23  report it to my staff.

24        But leave your notebooks and your materials in

25  your chairs.  Please be back in the jury room in ten

     1    minutes.

     2              (Whereupon, the jury exited the courtroom at

     3    3:29 p.m. and the following proceedings were had:)

     4              THE COURT:  We'll take a recess for ten.

     5              (Thereupon a recess was taken, after which the

     6    following proceedings were had:)

     7              THE COURT:  We're back on United States of

     8    America versus Narseal Batiste, et al., Case

     9    No. 06-20373.

    10              Counsel, state your appearances, please, for

    11    the record.

    12              MR. GREGORIE:  Richard Gregorie and Jacqueline

    13    Arango on behalf of the United States.

    14              MS. JHONES:  Ana Jhones on behalf of Narseal

    15    Batiste, who's present.

    16              MR. LEVIN:  Albert Levin for Patrick Abraham.

    17    He's present.

    18              MR. CASUSO:  Louie Casuso on behalf of Burson

    19    Augustin, who's present.

    20              MR. CLARK:  Nathan Clark for Rotschild

    21    Augustine, who's present.

    22              MR. HOULIHAN:  Richard Houlihan with Naudimar

    23    Herrera.

    24              MR. VEREEN:  And Roderick Vereen on behalf of

    25    Stanley Phanor, who's present.

```
 1            THE COURT:  All Defendants are present.

 2            How much longer in your cross?

 3            MS. JHONES:  Oh, your Honor, I'm going to be a

 4    while.  Just with this particular transcript, I'm going

 5    to be quite a bit.

 6            MR. GREGORIE:  Your Honor, if I may, asking a

 7    witness if that's what it says in the transcript is an

 8    improper question, Judge.

 9            What it does is -- the transcript speaks for

10    itself.  Although I haven't interrupted thus far, your

11    Honor, it's improper questioning.

12            If she wishes to ask what he meant or say it

13    meant thus and so, I can't object.  But to merely put

14    the transcript up there and say, "Is that what you

15    said?", the document speaks for itself, your Honor.

16            MS. JHONES:  Your Honor, throughout the course

17    of the Government's directing of witnesses, the

18    Government has continuously -- after they've played

19    tapes, they have read back every single portion of the

20    transcript, they've repeated what has already been

21    published and they went back and they asked the person

22    to explain it.  I'm doing -- there's nothing different

23    that I'm doing.

24            THE COURT:  I think that the objection that

25    Mr. Gregorie is making is there's no problem with your
```

```
 1   asking the witness to explain or what did he understand

 2   that it meant, but just referencing, "Is that what you

 3   said?" is not a proper question.

 4        MS. JHONES:  That's exactly what the

 5   Government did, your Honor.

 6        THE COURT:  No, they did not.

 7        So I'm going to sustain that.

 8        If you want to ask questions about what the

 9   witness understood or what he meant by that, that's

10   fine.  But just to say, "Is that what you said?" is not

11   a proper question.  The Government's objection is well

12   taken.

13        MS. JHONES:  Okay.

14        THE COURT:  We have to stop at 5:00.  One of

15   the jurors has to be somewhere and says that, if we

16   stop at 5:00, that she can get there.  So I did tell

17   them we'd stop at 5:00 today.

18        Let's bring them in.

19        (Whereupon, the jury entered the courtroom at

20   3:55 p.m. and the following proceedings were had:)

21        THE COURT:  You may be seated.

22        You are still under oath, sir.

23        You may proceed, Ms. Jhones.

24        MS. JHONES:  Thank you, your Honor.

25
```

```
 1   BY MS. JHONES:
 2   Q.    Mr. Abbas, before the break, we were talking
 3   about the discussion that was going on between you and
 4   Burson on -- as depicted on Page 106 of the transcript.
 5   Okay?
 6   A.    I'm sorry?
 7   Q.    Do you have Page 106?  Are you looking at
 8   Page 106?  I was asking you some questions about that.
 9   A.    Yes, I am.
10   Q.    I believe the question I asked you before the
11   break was --
12          THE COURT:  He had answered that question.
13          MS. JHONES:  And I lost track of what -- of
14   whether or not he had answered it, your Honor.
15          THE COURT:  He did.
16          MS. JHONES:  Okay.
17          THE COURT:  So you need to move on to your
18   next question.
19          MS. JHONES:  Thank you, your Honor.
20   BY MS. JHONES:
21   Q.    On the same page of the transcript of that
22   conversation, you ask Burson to basically communicate
23   to Narseal Batiste; do you not?
24   A.    What I said to Brother Pat is, "If I don't get a
25   chance to speak to Brother Naz, you -- I know you're
```

1    close to him.  So, like, give him my message.  Tell him

2    what I'm going through.  I already told him -- I mean,

3    I told him I got an apartment.  I don't want to speak

4    on the phone a lot to have somebody come in the middle

5    and then -- I don't want to maintain [sic] that on the

6    phone."

7          That's what I told him.

8    Q.    And, sir, what you're telling him there is that

9    you basically want Burson to get in contact with

10   Mr. Batiste.  Correct?

11   A.    Ma'am, what I told him is, if I get -- don't get

12   a chance to see Brother Naz, that he could told him

13   that I been trying to contact him, I been trying -- I

14   been working on the mission, basically.

15   Q.    Well, that's not what you say there, sir, though,

16   is it?  You're not saying you're working on the

17   mission, are you?

18   A.    Ma'am, what I said is, "If I don't get a chance

19   to get to speak with Brother Naz, you -- I know you're

20   closer to him.  So, like, give him my message.  Tell

21   him what I'm going through.  I already told him -- I

22   mean, I told him I got an apartment.  I don't want to

23   speak on the phone a lot to have somebody coming in the

24   middle and then -- I don't want to mention that on the

25   phone."

```
 1          That's what I said to him.
 2   Q.     And, sir, what you're basically -- what you want
 3   Burson to communicate to Mr. Batiste is, number one,
 4   number one, that this guy's coming from back home.
 5   Right?  That's important, that Mr. Batiste know that.
 6   Right?
 7   A.     I told him that in person already.
 8   Q.     But right here, that's what you mean.  Right?
 9   You want Burson to tell Mr. Batiste that somebody's
10   coming from back home.  I mean, correct me if I'm
11   wrong.
12   A.     What I told him is there.  I mean, I just wanted
13   to let him know that I was working still on the
14   mission.  That's about it.
15   Q.     Okay.  You also tell him -- and you also want
16   Burson to communicate to Mr. Batiste that you don't
17   want to look stupid in front of this person that's
18   coming from back home?
19   A.     Ma'am, if you go through the first and second
20   page, what happened was one day I went and the Embassy
21   was closed.  And I waited outside.  Nobody was there.
22          So I was telling him I don't want the guy to
23   come -- to get here and then there's nobody there for
24   him.
25          I wanted him to let Brother Naz know that I have
```

```
 1   somebody coming and I need to know if somebody's gonna

 2   be there at the Embassy when he arrive or not.

 3   Q.    And -- are you finished, sir?

 4   A.    Yes.

 5   Q.    And the reason why you had this concern is

 6   because Brother Naz -- Brother Naz doesn't know this

 7   guy's coming.  This is your idea.

 8   A.    I already told Brother Naz that this guy was

 9   coming.

10   Q.    Okay.  And you told him -- when -- did you tell

11   him that before November 7th?

12   A.    I don't remember the first time I told him.  But

13   there was several times that the FBI instructed me to

14   tell him.

15         And, by the way, Brother Mohammed didn't arrive

16   to Miami until for sure we know that Brother Naz was

17   gonna pick him up from the airport.

18   Q.    Well, but, sir, you know the day that Brother

19   Mohammed arrived to Miami, don't you?

20   A.    If I know the date?

21   Q.    Yes.

22   A.    I think it's on January 16.

23   Q.    How about December 16th?

24   A.    Oh, I'm sorry.

25         Yeah.  I meant December 16.
```

1   Q.      We're in agreement with that?

2   A.      I'm sorry?

3   Q.      We're in agreement with the date, December 16th?

4   A.      December 16 is the date that Brother Naz was

5   picking up Brother Mohammed.   Yes.

6   Q.      And -- but this conversation is taking place

7   November 7th.   Right?

8   A.      Yes.

9   Q.      And this is, like I said, a week and a half after

10  you started recording -- carrying the body recorder and

11  started recording conversations in this case?

12  A.      Yes.

13  Q.      And right off the top, you've already told us

14  that the FBI said, "Start talking to Mr. Batiste about

15  this guy who's coming from back home right away"?

16  A.      They did instruct me to let him know that there

17  was somebody coming from Al-Qaeda.   Yes.

18  Q.      And that was something you had to do right away,

19  early on?

20  A.      I'm not sure if it was right away or not.

21  Q.      But certainly, sir, you would agree with me that

22  you're doing it as early as November 7?

23  A.      As early as November 7 I was already instructed

24  to tell them that somebody was coming.

25  Q.      You're concerned that this guy might actually get

```
 1   here, go to the Embassy, and no one's going to be there
 2   to greet him.  Right?
 3   A.    I was just making sure we're all on the same
 4   page.
 5   Q.    Okay.  Because, so far, you are not on the same
 6   page?
 7            MR. GREGORIE:  Objection, your Honor.
 8            THE COURT:  Sustained.
 9   BY MS. JHONES:
10   Q.    You're concerned that Brother Naz doesn't know
11   what's going on.  That's why --
12            MR. GREGORIE:  Objection, your Honor.  He's
13   asked and answered this question a half a dozen times
14   now.
15            THE COURT:  Sustained.
16   BY MS. JHONES:
17   Q.    Now, you also tell Burson at this point in time
18   in the conversation that you don't want to speak over
19   the phone.  Right?
20   A.    Well, I'm making him feel comfortable dealing
21   with me by saying I really don't want to speak over the
22   phone.  Yes.
23   Q.    Okay.  And -- but do you feel that -- at this
24   point in time when you're making that statement to him,
25   to your knowledge, was he feeling comfortable with you
```

```
 1   when you told him that on November 7th?

 2   A.    Yes.

 3   Q.    So right now, during -- as far as November 7th is

 4   concerned, as far as this meeting that's going on for,

 5   like, what, three or four hours -- right?

 6   A.    I'm not sure.

 7   Q.    It was pretty long, wasn't it?

 8   A.    It was.

 9   Q.    Burson feels pretty comfortable with you, doesn't

10   he?

11         MR. GREGORIE:  Objection, your Honor.  Calls

12   for a conclusion.

13         THE COURT:  Sustained.

14   BY MS. JHONES:

15   Q.    And then you also tell Burson to tell Mr. Batiste

16   that, "You know, when this guy comes, you know, one

17   word" -- directing your attention to the last paragraph

18   of Page 106, you're basically telling him, "One word

19   and it's going to pay off.  It's going to pay off,

20   man."

21         MR. GREGORIE:  Your Honor, objection.  The

22   document speaks for itself.

23         THE COURT:  Sustained.

24   BY MS. JHONES:

25   Q.    Look at the bottom of Page 106, sir, and tell me
```

 1  whether or not that's the message that you want Burson

 2  to communicate to Mr. Batiste.

 3  A.      On the bottom of 106, there -- I said, "That's

 4  why I wanted to meet with him.  But he's been busy,

 5  working so hard.  And I kind of respect and understand

 6  that.  But, you see, brother, I am not saying that is

 7  gonna happen, but maybe.  You never know.  One word --

 8  it could pay off, like, I mean [sic] of his word from

 9  the construction."

10  Q.      And what you're talking about, there, sir, is

11  that one word could result in Mr. Batiste getting

12  money, just like he gets money in his construction

13  jobs?

14  A.      No, ma'am.

15  Q.      That's not what you're telling him there?

16  A.      What I said is right in front of you, ma'am.

17  So....

18  Q.      I want you to tell me what that means.

19          What is it that you're saying there?

20  A.      What I'm saying is one word could change an

21  agreement, yes or no, to a whole agreement.  It could

22  change the whole thing.  So that's why I wasn't trying

23  to disturb him at his job.

24  Q.      And then, sir, continuing on, on the very next

25  page, Page 107, on the top of Page 107, you talk to

 1    Burson about this -- this connection, this person

 2    that's coming from back home, and the connection he has

 3    with your family; do you not, sir?

 4    A.    Yes, ma'am.

 5    Q.    And you're also telling Burson there that -- on

 6    the top of Page 107, you're telling him that -- you

 7    know, basically, in so many words, that you used to be

 8    able to talk to Brother Naz a lot but, you know, that

 9    was a long time ago.  Things are sort of different

10    right now.  Right?

11    A.    I don't understand your question, ma'am.

12    Q.    Directing your attention, sir, to this part of

13    the transcript -- are you with me?

14    A.    Yes.  That's where it said he's got good heart.

15    Q.    And you're referring to Brother Naz.  Right?

16    A.    Yes, ma'am.

17    Q.    And you're basically telling Burson that, you

18    know, you have a connection with your family from back

19    home and that, you know, you want to be able to stay in

20    contact with Brother Naz and that's been a little

21    difficult.  Correct me if I'm wrong.

22    A.    Well, I had just came back from my country and,

23    when I was in the store, he would visit me a lot of

24    times in the store.  When I just came back, it wasn't

25    the same.

```
 1   Q.    Okay.  And, sir, you tell Burson that there was a

 2   piece of paper that you gave to your uncle.  Right?

 3   A.    Yes, ma'am.

 4   Q.    And you're talking about your uncle from back

 5   home.  Right?

 6   A.    Yes, ma'am.

 7   Q.    And you're not talking about Al-Qaeda, sir.

 8   Right?

 9   A.    Yes.  That's what I was talking about.

10   Q.    But, again, sir, Burson doesn't know that you're

11   wearing a recording device, does he?

12   A.    I didn't want to make him feel suspicious

13   neither.  I don't think he knew.

14   Q.    Okay.  You don't think he knew that you were

15   wearing a recording device?

16   A.    No.

17   Q.    If you thought he knew that, you wouldn't feel

18   very comfortable, would you, sir?

19   A.    If I knew he knew that, I wouldn't -- I wouldn't

20   be there at all.

21   Q.    And, again -- and Burson says, "Oh, yeah.  On

22   that address here?"

23         Do you see that?

24   A.    Yes.

25   Q.    And what you're referring to, sir, is --
```

1          MS. JHONES:  One moment, your Honor.

2    BY MS. JHONES:

3    Q.     What you're referring to in that conversation is

4    Government's Exhibit 98.  Correct?

5    A.     Excuse me?  If I was speaking about that piece of

6    paper?

7    Q.     Yeah.

8    A.     I'm not sure if that was the paper I was speaking

9    to or the list.  But I think it's a piece of paper.

10   Yes.  Okay.

11   Q.     Well, you would agree with me, Mr. Abbas, that on

12   November 7th, Mr. Batiste hadn't given you any lists.

13   Right?

14   A.     I think it's a piece of paper.  You're right.

15   Q.     So when you're talking to Burson about this on

16   Page 107 of the transcript, you actually have this

17   paper?  You're showing it to him?

18   A.     No.

19   Q.     Well, directing your attention back to Page 107,

20   you say, "Oh, yeah.  On this address here?" -- I'm

21   sorry.  Burson says that, not you.  "Oh, yeah.  On this

22   address here?"

23   A.     He meant in Miami.

24   Q.     Well, this address here is not the address at the

25   Embassy, is it, sir?

```
 1   A.     I don't know if that was -- I don't think it's

 2   the address on the Embassy.  I'm think he meant to say

 3   the address here in America, not on the Embassy.

 4   Q.     Okay.  That's what you say is going on here.

 5   Right?

 6   A.     That's what I believe he meant.

 7   Q.     Okay.  And you say to him, "Yeah.  It was a nice

 8   page."  Right?

 9   A.     I said that.

10   Q.     And you're referring to Government's Exhibit 98,

11   correct, when you say "nice page"?

12   A.     Yes.

13   Q.     And you go further on in that conversation and

14   you say, "I wonder why you don't have no more of them,

15   why I haven't seen any more [sic] of them."

16          Right?

17            MR. GREGORIE:  Your Honor, it doesn't say "any

18   more."  It says "any of them."

19            THE COURT:  Sustained.

20            Rephrase your question.

21            MS. JHONES:  Let me make it clear for the

22   record, your Honor.

23   BY MS. JHONES:

24   Q.     "I wonder why you don't have no more of them, why

25   I haven't seen any of them."  Right?
```

 1    A.     Yes.

 2    Q.     And what you're saying is, at one time, there

 3    were quite a few of these things.  Right?

 4    A.     That's not what I said.

 5    Q.     Well, Burson tells you that there are more, it's

 6    in the file, doesn't he?

 7    A.     Ma'am, first of all, I'm not even sure if that's

 8    the page we're talking about.

 9           Second of all, honest to God, I don't remember

10    this -- this conversation as, like, it was now.  So I

11    don't know.  I have to go through the whole thing and

12    see if that's the paper we was talking about or was it

13    another paper.

14    Q.     Well, you know, sir, I want you to take your

15    time.  I don't want to put words in your mouth.

16    A.     Okay.

17           THE COURT:  Is there a question pending?

18           MS. JHONES:  Your Honor, I believe the witness

19    has requested time to look at the transcripts to

20    refresh his recollection.

21           THE COURT:  No.  He answered the question.

22    Ask your next question.

23    BY MS. JHONES:

24    Q.     And, sir, continuing on to Page 107, at the

25    bottom of Page 107, you continue to talk to Burson.

 1          Are you at Page 107, sir?

 2    A.     I continue talking to Burson.  Yes.

 3    Q.     I just want to make sure you're with me.

 4          You continue to talk to Brother Burson about how

 5    it's necessary to be organized.  Correct?

 6    A.     We spoke about -- yes.  I said there he even gave

 7    me the -- we -- I spoke about being organized.

 8    Q.     And you also go on to talk about the United

 9    States and the way the United States protects Saudi

10    Arabia or words to that effect.  Correct?

11    A.     Yes.

12    Q.     During the course of this conversation, sir, you

13    engage Burson in conversation regarding current events,

14    do you not, politics?  Right?

15    A.     Yes.

16    Q.     And you also during the course of this

17    conversation, sir -- and specifically on this page, you

18    talk about watching out for the heat.  Right?  For the

19    heat?

20    A.     If we talked about watching out for the heat?

21    Yes, we did.

22    Q.     Well, I'm not asking you if we talked about the

23    heat, meaning you and Burson.  I'm talking about right

24    now on Page 107.  The one that brings out the topic of

25    the heat -- and by "the heat," we're talking about law

 1    enforcement.  Right?

 2    A.    If you allow me to read it, I said, "Anyway, they

 3    speak to you to organize.  We need to organize things

 4    like that.  I -- we need to organize, especially here

 5    in town, brother.  We got to get up to that world.

 6    Hey, look.  They come to the United States of America

 7    to protect Saudi Arabia -- the United States of America

 8    to protect Saudi Arabia.  You think they want to be

 9    able to help us build a mosque, to help find jobs, and

10    be willing for jihad?  Come on, man.  It's just we got

11    to figure still a lot of -- a mix.  Got to be there.

12    You got to be them and they showing up again.  But,

13    like you said, we gotta watch out for the heat."

14          So I was speaking about him, repeating what he's

15    saying.  When I said that, like you said, we got to

16    be -- we got to watch out for the heat, from the heat.

17    Q.    Repeating what who is saying, sir?

18    A.    Brother Burson.

19    Q.    And where in relationship to this conversation

20    right here does Brother Burson talk about the heat?

21    A.    Ma'am, we on Page 107.

22    Q.    That's you talking, sir.

23    A.    Yeah.  But that's the whole conversation between

24    me and him.

25    Q.    But you would agree with me, sir, that you're the

```
 1   one that mentions the heat, not Brother Burson.
 2   A.    I mentioned it after he it did.
 3   Q.    Where does he mention it, sir?
 4   A.    Early on in the conversation.
 5   Q.    Tell me where.
 6   A.    So you want me to go back from Page 1 and read it
 7   all so I can point it out to you?
 8   Q.    I want you to show me where it was that Brother
 9   Burson mentioned --
10         MR. GREGORIE:  Objection, your Honor.
11         THE COURT:  Sustained.
12   BY MS. JHONES:
13   Q.    You're stating that you were not the first one
14   that raised the topic of the heat, but that it was
15   Burson.  Right?
16   A.    Ma'am, I'm not sure.  I was just having a normal
17   conversation with that guy like we always been doing.
18   So I'm 100 percent sure I repeated him saying something
19   about the heat, that we gotta watch out for the heat.
20   Q.    Okay.  And this is prior to Page 107?
21   A.    I'm sure he mentioned the heat in that meeting.
22   But I'm not sure if it's prior in this meeting itself
23   or another -- another meeting.
24   Q.    And what you're talking about is another meeting
25   prior to November 7th.  Correct?
```

1    A.      It could be.  Yes.

2    Q.      And then you have a recorded conversation prior

3    to November 7th where Burson Augustin is talking about

4    the heat?

5    A.      Yes, ma'am.

6    Q.      Okay.

7    A.      And I said here like you -- like you said.  He

8    didn't disagree with me.  He agreed to that.  So he's

9    gotta mention saying that before.

10   Q.      Let me get back to what your statement was so

11   that I'm sure I understand you.

12           You're saying you have a recorded conversation

13   prior to November 7th where Burson Augustin talks about

14   the heat?

15           MR. GREGORIE:  Objection, your Honor.  That's

16   not what he said.

17           THE COURT:  Sustained.

18   BY MS. JHONES:

19   Q.      What did you say?

20           MR. GREGORIE:  Objection, your Honor.  Asked

21   and answered.

22           THE COURT:  Sustained.

23           You need to --

24           MS. JHONES:  Your Honor, I don't believe he's

25   answered the question.

```
 1              THE COURT:  You need to move on.  He answered

 2     it.

 3              MS. JHONES:  And I need to reserve a motion,

 4     your Honor.

 5              THE COURT:  Go right ahead.

 6              MS. JHONES:  All righty.

 7     BY MS. JHONES:

 8     Q.    Now, after you mentioned the word "heat," sir, on

 9     Page 108, Burson laughs.  Right?  He chuckles?

10              MR. GREGORIE:  Again, your Honor, the document

11     speaks for itself.  Objection.

12              THE COURT:  Sustained.

13     BY MS. JHONES:

14     Q.    Well, let me ask you this:  You were there

15     present in that conversation.  Right?

16     A.    I was present in that conversation.

17     Q.    And do you remember -- in response to your

18     comments about the heat, do you remember whether or not

19     Burson actually laughed?

20     A.    I don't understand your question.  Can you repeat

21     it, please.

22     Q.    Sure.

23          After you mentioned "the heat," do you remember

24     whether or not Burson laughed after you made that

25     statement?
```

1    A.      On the transcript, it said he chuckles.

2    Q.      And is that your memory, sir, of what happened?

3    A.      Ma'am, that happened a long time ago.  I don't

4    know if he was laughing or not when I said that.

5    Q.      Well, let me ask you this:  When the prosecutor

6    was asking you questions, you stated that this

7    transcript accurately -- you had reviewed it

8    completely.  Right?  You did say that.

9    A.      Yes, ma'am.

10   Q.      And you said you reviewed it completely?

11   A.      Yes, ma'am.

12   Q.      And that it accurately reflected what was

13   contained in the conversation that you had with Burson

14   Augustin on August 7th of 2005.  Right?

15   A.      Yes, ma'am.

16   Q.      So if it says it in the transcript, that means

17   that's what happened?

18   A.      Basically.

19   Q.      Okay.  Now, during the course of the prosecutor's

20   questions to you, sir, the prosecutor asked you whether

21   or not Burson Augustin uses the term "jihad."

22           Do you remember that question?

23   A.      If I remember the prosecutor asking me if he used

24   the term of "jihad"?  No.  I don't remember them asking

25   me that.

```
 1   Q.      Would something help refresh your recollection?

 2   A.      Would you show me, please?

 3   Q.      Sure.

 4           MS. JHONES:  Transcript of March 5th,

 5   Page 208.

 6           May I approach, your Honor?

 7           THE COURT:  Yes.

 8           MR. GREGORIE:  Your Honor, the way to do this

 9   is to ask, "This is the question that was asked you and

10   did you give this answer?", your Honor.  To ask this

11   witness to attempt to read the transcript, your Honor,

12   is going to delay these proceedings.

13           MS. JHONES:  Your Honor, I guess the

14   prosecutor wants --

15           MR. GREGORIE:  Improper question, Judge.  The

16   form is improper.

17           MS. JHONES:  The witness said he didn't

18   remember, your Honor.

19           THE COURT:  She can show it to him to refresh

20   his recollection.

21           It's overruled.

22           MS. JHONES:  I have to take some lessons from

23   Mr. Gregorie, your Honor.

24           THE COURT:  I'm sorry?

25           MS. JHONES:  I have to take some lessons from
```

```
 1   Mr. Gregorie as to how to do things, apparently.

 2             THE COURT:  Please refrain from the comments,

 3   Ms. Jhones.

 4             MS. JHONES:  Yes, your Honor.

 5             THE COURT:  It's not appropriate.

 6   BY MS. JHONES:

 7   Q.    Let me know when you're done, sir.

 8   A.    Yes.  I remember.

 9   Q.    Okay.

10   A.    Thank you.

11   Q.    And was that the question that the prosecutor

12   asked you?

13   A.    Yes, ma'am.

14   Q.    Okay.  And in response to that question, sir, you

15   said that --

16             MR. GREGORIE:  In response to what question,

17   your Honor?  Objection.

18   BY MS. JHONES:

19   Q.    In response to the question, "Did -- does Burson

20   Augustin use the term 'jihad'?"

21         And you said, "Yes, he does."

22         Correct?

23   A.    Yes, ma'am.

24   Q.    And the prosecutor asked -- also asked you

25   whether you knew the meaning of the word "jihad"; did
```

1    he not?

2    A.     He asked me what I -- yes.

3    Q.     And you said that you did know the meaning.

4    Correct?

5    A.     Yes.

6    Q.     And in this conversation of November 7th, sir,

7    when the prosecutor asked you that question, he was

8    referring to a particular clip that was played from the

9    meeting of November 7th.

10         Do you remember that?

11   A.     I remember he was playing the whole -- yes -- the

12   clips from that meeting.

13         MS. JHONES:  I just need a moment, your Honor,

14   if I may.

15         Thank you, your Honor.  I apologize.  I lost

16   my place.

17   BY MS. JHONES:

18   Q.     During this conversation, sir, on November 7th,

19   it is you, sir, that begins to speak about the topic of

20   jihad with Burson first?

21   A.     I don't understand your question, ma'am.

22   Q.     In this conversation of November 7th, you began

23   to talk to Brother Burson and you mentioned for the

24   first time the word "jihad"?

25   A.     I don't know if it was me the first time that

 1   mentioned it or it was him.  But --

 2   Q.    Let me direct your attention to Page 14 of the

 3   transcript, please.

 4   A.    Page what?

 5   Q.    14.

 6         THE COURT:  Ask your question, please.

 7   BY MS. JHONES:

 8   Q.    And, sir, on this page -- this is Page 14.

 9   Right?  And this transcript is a total of 176 pages.

10   Correct?

11   A.    Yes, ma'am.

12   Q.    So this is really early on in the conversation;

13   is it not?

14   A.    Yes, ma'am.

15   Q.    And just so we're clear on what's going on here,

16   at the beginning of the conversation, you're

17   actually -- there's actually maybe a couple of pages

18   where you're actually walking up to the Embassy.  And

19   so Page 14 is pretty much at the beginning of the

20   conversation once you get into that Embassy.  Right?

21   Fair enough?

22   A.    You asking me if Page 14 is the first page that I

23   start recording when I got to the Embassy?

24   Q.    No.  No.

25         That Page 14 is really early on in the beginning

1   of this conversation.  Right?

2   A.    Yes.

3   Q.    And in the beginning of the conversation -- the

4   point I'm trying to make is that you -- after you --

5   after you're talking to Burson about your apartment and

6   the fact that you don't have carpeting and you don't

7   have furniture, that sort of thing, then you tell him

8   that -- you start talking to him about, "This jihad is

9   for Allah, man."

10        Right?  On Page 14.

11  A.    Yes, I did.

12  Q.    And Burson basically says, "Allah."

13        Correct?

14  A.    Yes.

15  Q.    Okay.  And so, after you refer to the term

16  "jihad" first -- right? -- then you switch over in the

17  conversation to yet another topic.  Right?  And you

18  start talking to him about, "Well, I want to get a job.

19  I want to get more money," that sort of thing?

20  A.    If I spoke to him about that, yes.

21  Q.    You switch from the term "jihad" to, basically,

22  working on getting more money?

23  A.    I --

24  Q.    Fair enough?

25  A.    I spoke about jihad and I did spoke about a job.

1    Yes.

2    Q.    But right here at the beginning of the

3    conversation, you just mentioned the phrase and then

4    you move on.

5          Fair enough?

6    A.    I'm sorry.  Say that again.

7    Q.    In this point in the conversation, early on in

8    the bottom of Page 14, you just mention the word

9    "jihad."

10         Burson says, "Allah."

11         And then you move on to another topic, and that

12   topic -- you start talking about getting a job, getting

13   some more money and that sort of thing.

14   A.    I did made a comment about jihad and I moved on.

15   That's when I said, "It's for Allah.  We're always

16   gonna be that up front, you know."

17   Q.    Then continuing on, just one more page, you

18   start -- you keep on talking about stuff that you want

19   to get and you want to get a car.  I'm talking now

20   about the top of Page 15.  But you don't talk about

21   jihad anymore for a while.

22         Fair enough?  You start talking about other

23   things?

24   A.    Yes.

25   Q.    Okay.  Now, you've already told us that your

 1   understanding of jihad is there's two different

 2   meanings to it.  Correct?

 3   A.      Yes, sir.

 4   Q.      And, sir, are you a religious person?

 5   A.      Yes.  I am a Muslim.

 6   Q.      And tell us again.  What is your understanding of

 7   the word "jihad"?

 8   A.      The word "jihad" is a martyr.  Now, we believe in

 9   it how -- like, in your own way.  Some people believe

10   doing jihad is by saving people, by doing the right

11   things.  And some people believe doing jihad is by

12   raising a war against the enemy.

13   Q.      By raising what, please?

14   A.      A war.

15   Q.      Now, sir, would you agree with me, sir, that

16   jihad can also mean a struggle within, an inner

17   struggle within yourself, a spiritual struggle?  Is

18   that your understanding of what jihad could mean?

19   A.      Jihad is a martyr.  It's like when you follow

20   Allah, his rules, on either fighting or preventing

21   fighting.  That's how I believe it.

22   Q.      That's what your understanding of jihad is?

23   A.      That's my understanding.

24   Q.      Okay.

25   A.      Now, every person understand jihad in his own

```
 1   way.  Some people think they should fight.  Some people
 2   think they should join a war.  Some people think they
 3   could just prevent war and prevent bad things from
 4   happening and they call that also jihad.  So it's
 5   depends on the person.
 6   Q.    Okay.  And they're does come a point in time,
 7   sir, going back to Page 14 for a moment --
 8         MS. JHONES:  I'm sorry, your Honor.  If I
 9   could have the ELMO again.  Thank you.
10   BY MS. JHONES:
11   Q.    Early on, right before you mention the term
12   "jihad," you basically are talking to Burson about some
13   difficulties that you were having.  Correct, sir?
14   A.    If I was talking to him about difficulties I was
15   having?
16   Q.    Yeah.
17         Like you're trying to -- you ran out of money,
18   for example.  You know, that was something that you
19   were struggling with.  Correct?
20   A.    No.
21   Q.    Okay.  You did tell him, did you not, sir, that
22   you were trying to do better for yourself?
23   A.    Yes.
24   Q.    And you did tell him that -- you also tell him on
25   the next page, on Page 15, that you're looking for a
```

```
 1    job and you're trying to get a job?
 2            MR. GREGORIE:  Objection, your Honor.  The
 3    document speaks for itself.
 4            THE COURT:  Sustained.
 5    BY MS. JHONES:
 6    Q.    Did you talk to Burson Augustin about your
 7    efforts of getting a job?
 8    A.    If I spoke to him about me trying to get a job?
 9    I mean, I was trying to get a job, but I don't know if
10    I spoke to him about it or not.
11    Q.    Okay.  Directing your attention to Page 15, would
12    that help you remember whether you spoke to him about
13    it or not?
14    A.    I'm going through it.  Just a moment, ma'am.
15            There is a sentence there where I said, "Hey,
16    I -- I -- today they offered me a job right there.  I
17    said, 'No.  Hell, no.'"
18            I think we was passing a bad area and that's when
19    I said that.
20    Q.    I'm sorry?
21    A.    I think when we went to grab food, me and Burson,
22    we passed a bad area and I told him that I got a job
23    over there, but I didn't want to take it.
24    Q.    Because it was a bad area?
25    A.    Yeah.
```

```
 1   Q.    Okay.  And when -- you have had conversations

 2   with Burson Augustin where -- in this meeting where he

 3   talks to you about -- strike that.

 4        On Page 20 of the transcript, after you mentioned

 5   jihad earlier, then Burson Augustin talks about the

 6   term "jihad."  Correct?  And I'm directing your

 7   attention to the top of Page 20.

 8   A.    Yes, ma'am.

 9   Q.    And Burson Augustin tells you -- actually, let me

10   just backtrack a second, please, to put this in

11   context.

12        On Page 19, the previous page, in the bottom --

13   actually, towards the middle, you are having a

14   conversation with Burson about, basically, faith; are

15   you not, sir?

16   A.    If I was speaking to him about faith?

17   Q.    Yes.

18   A.    Was a lot of things we talked about.  I don't

19   know if -- that moment if we was speaking about faith

20   or not.

21   Q.    Do you want to review that to see if that's what

22   you were doing at that present time?

23   A.    Please.  Give me a second.

24        Yes, ma'am.  We spoke about faith.

25   Q.    And that's going on on Page 19 of the transcript.
```

 1    Right?   That's what's going on there?

 2    A.     In the middle of Page 19 there, I did mention

 3    faith.

 4    Q.     I'm sorry?

 5           You did or you did not?

 6    A.     Yes.  I did mention faith.

 7    Q.     And you also talk about -- you talk about other

 8    things besides faith, like, "I just want to be so

 9    good."

10           Do you see that, sir, at the bottom of Page 19?

11    A.     Yes.  I see when I mentioned that.

12    Q.     And you're talking about right and wrong; are you

13    not, sir?  You're talking about doing good?

14    A.     I spoke to him about doing good?

15    Q.     Right there in that conversation.

16    A.     Yes.  I told him I want to do so good.  Yes.

17    Q.     You're not talking about doing violence, are you,

18    sir?

19    A.     If I was talking about doing violence?

20    Q.     Right there, in that time of the conversation.

21    A.     I was playing a role that I was on Al-Qaeda,

22    which you expect.  Yes, I was.

23    Q.     You was what?

24    A.     Talking about violence.

25    Q.     Right there, you're talking about violence?

1   A.     Basically.

2   Q.     Okay.  And continuing on to Page 20, at the top

3   of Page 20, Burson mentions to you -- he says that he

4   wants to look to the future?

5   A.     I'm sorry?

6   Q.     At the top of Page 20, Burson tells you that, "We

7   kind of look to the future."  Correct?

8   A.     Yes.

9   Q.     And he says, "What we're doing -- we're gonna do

10  it for jihad until Allah says it's wrong."  Correct?

11  A.     He said that.

12  Q.     Okay.  Now, further on -- and this is a clip that

13  the Government played during your direct testimony; is

14  it not?  The Government asked you some questions about

15  this.  Do you remember?

16  A.     They did.

17  Q.     And you say to Brother Burson that -- in the

18  middle of that page that, "Every time we got to get

19  back -- get into religion, we always have to get back

20  to the same truth."

21  A.     I said that.

22  Q.     And when you make that statement, sir, are you

23  talking about violence?

24  A.     Basically, when we talk about holy war,

25  religions, we always go back to the same truth.  And

 1   it's the same God.

 2         If I was talking about violence?  Yes.  Violence

 3   is involved with religions.  Some Muslims believe that

 4   that should take holy war against everybody.  And some

 5   Muslims think that it's just the Jew and the

 6   Christians.  Some Muslims believe Islam don't have no

 7   enemies.

 8         But, yes, there is violence in religions.

 9   Q.    But what I'm asking you, sir, is that right there

10   when you make that statement, "Every time we get into

11   religion, I'm going to always go back to the same

12   truth" -- that statement -- is it your testimony, sir,

13   that what you are talking about there is violence in

14   religion?  Is that what you're saying?  Just so I

15   understand you.

16   A.    I don't remember what I was thinking then, ma'am.

17   Q.    Okay.  Fair enough.

18         Now, then, later on, a couple of sentences down,

19   you say that -- you're talking about Allah.  Correct?

20   A.    I said, "It's all in Allah's name."

21   Q.    Allah meaning God.  Right?

22   A.    Yes, ma'am.

23   Q.    And then Burson starts to talk to you about, "We

24   don't -- we ain't got no power."

25         Do you remember that?

al-Saidi - CROSS - By Ms. Jhones                    221

1   A.      Yes, ma'am.

2   Q.      And he's talking to you, sir, there about the

3   real mission that you have heard about; is he not, sir?

4   A.      Yes.

5   Q.      He's not --

6   A.      One mission.  It was no fake and real.  It was

7   one mission -- one mission that we was talking about.

8   Q.      Well, let's talk about that a little bit.  Okay?

9   A.      Okay.  Yes, ma'am.

10  Q.      He -- Burson tells you that there are people

11  running in the streets, meaning the neighborhoods,

12  right, and they're running with guns and they're

13  selling dope?  Right?

14  A.      He said, "We got brothers, no matter how crazy

15  they think they are."  That's what he was saying.

16  Q.      Show me where that is, sir, please, if you could

17  point to it.

18  A.      In the bottom of Page 20.  Can you read it?

19  Q.      Could you just point to it.  I think you can

20  point to it on your screen so that I see what you're

21  referring to.  Actually, maybe you can't point to it.

22  A.      (Witness indicates.)

23  Q.      Oh, yes.  You can.  Okay.

24          I actually want you to remove it now because I

25  can't see what is there.  Could you tap on the screen?

```
 1    A.      (Witness complies.)

 2    Q.      There you go.

 3            What he is saying there, sir, is that, "There are

 4    crazy people running with guns and with dope on the

 5    streets."  Correct?

 6    A.      Excuse me?

 7    Q.      "And they come to us" --

 8    A.      What was your question again?  I'm sorry.

 9    Q.      Yes.

10            What Burson Augustin is talking to you about

11    there is that there are crazy people, there are people

12    in the streets and they're running with guns and

13    they're running with dope.  Right?

14    A.      Ma'am, you're changing his comments.  What he

15    said is, "We have brothers."  He didn't say people in

16    the street.

17    Q.      Yes.  "We have brothers," period.  Correct?

18    A.      He said, "We have brothers.  Not matter" --

19    Q.      "No matter how crazy they think, they are in

20    these streets."

21            And by "crazy," he's talking about people running

22    with guns and running with dope, meaning drugs, right,

23    or selling drugs?  Right?

24    A.      What he says speaks for itself.

25    Q.      But I want to get to what you understood that to
```

1   mean.

2   A.    What I believe him saying?

3   Q.    Yes.

4   A.    I believe him saying, not matter how -- we have

5   brothers in the street, not matter how crazy they think

6   they are, for selling drugs or carrying weapons, but

7   they like what Brother Naz and his group is saying and

8   that, once they see the fighting begin, that they was

9   gonna jump on the beast back.

10        Basically, he's saying that, "One day we gonna

11  gather all these people into our group and they like

12  what we talking about, even though they think we

13  exaggerating by saying we will take over the whole

14  world and not just one area."

15  Q.    Well, let's go on to the next page.  Okay?  You

16  will agree with me, will you not, sir, that Burson is

17  saying that these people that are somewhat crazy are

18  running --

19        MR. GREGORIE:  Objection, your Honor.  Asked

20  and answered.

21        THE COURT:  Sustained.

22  BY MS. JHONES:

23  Q.    Now, on the top of the page, sir, after Burson

24  has told you -- has talked about that paragraph that

25  you reference in the bottom of Page 20, you say to him,

```
 1   "It's the hope."  Correct?

 2   A.    I don't understand your question.  Can you ask me

 3   again, please.

 4   Q.    Are you the one talking there, sir?

 5   A.    In the bottom -- in the top of 21?

 6   Q.    Yes, sir.

 7   A.    Yes.

 8   Q.    You say, "It's the hope."  Correct?

 9   A.    Yes.

10   Q.    And then later on, a few sentences down, Burson

11   starts talking about, "They gonna come around here."

12   Right?

13   A.    The transcript speaks for itself.

14   Q.    Well, you were there; were you not, sir?

15   A.    Yes, I was.

16   Q.    And when -- I'm trying to get at your

17   understanding of what you thought Burson was saying.

18   Okay?

19   A.    You asking me my understanding when he was saying

20   what?

21   Q.    "They're coming around here."  They.  Right?

22   Right over here (indicating).  Do you see that?

23   A.    He say, "They don't understand that fight.  When

24   they see us fight, they gonna jump on the beast back

25   and he's gonna be weakened."  But --
```

1    Q.     Go ahead.

2    A.     I'm sorry.  Go ahead.

3    Q.     Are you finished?

4    A.     I'm done.

5    Q.     You say to Burson, "That's why we can make a

6    difference."  Correct?

7    A.     Yes.  That was my comment.

8    Q.     And then Burson talks about different

9    neighborhoods in Miami; does he not?

10   A.     I'm sorry?

11   Q.     Burson talks about different neighborhoods in

12   Miami where the same thing is going to happen.  Right?

13   A.     If you asking me what he said, he said, "All

14   right.  People in this neighborhood, they get a plan.

15   People in Little Havana -- we -- we get a plan.  People

16   Opa-Locka, they got a plan.  Liberty City, they got a

17   plan.  At 7:00, strike every neighborhood.  Cops are

18   going every which way.  We gotta get to another state,

19   same thing."

20   Q.     And you say to him, sir, do you not, that you --

21   basically, words to the effect that you're looking

22   forward to that happening.  Right?

23   A.     Yes.  That was my comment.

24   Q.     You also tell him that, "I know it with hope,"

25   that you're hoping for this to occur.  Correct?

```
 1   A.     I'm sorry?

 2   Q.     You talk about the hope.  You have hope that this

 3   is going to occur.  Correct?

 4   A.     Actually, it was Brother -- oh, yes.  Yes.  I

 5   said, "I know it, with that hope."

 6   Q.     Correct?

 7   A.     I said, "I know it, with that hope."

 8   Q.     And what do you mean by that, sir?

 9   A.     What I mean is, with the hope that he have, it

10   might happen, you know.

11   Q.     Now, continuing on to Page 23 -- I'm sorry --

12   22 -- at the top of Page 22, Burson says to you, "But

13   the thing is it's trickery now."  Right?  He says that?

14   A.     Are you asking me what he says?

15          MR. GREGORIE:  Objection, your Honor.  This

16   document speaks for itself.

17          THE COURT:  Sustained.

18   BY MS. JHONES:

19   Q.     Now, the Government asked you a question on

20   direct regarding your understanding of what Burson

21   referred to when he was talking about the devil.

22   Right?  Do you remember that?

23   A.     Yes, ma'am.

24   Q.     And I believe your answer was that, whenever

25   Burson was talking about the devil, your understanding
```

```
 1    was he was talking about the US Government.
 2    A.    Yes, ma'am.  My understanding -- because we had
 3    discussions, me and Brother Burson and Brother Naz,
 4    about that.  And my understanding is that he's talking
 5    about white people and the US Government.
 6          That's -- when we speak to each other, that's
 7    what I understand them to be saying, because we have
 8    made that clear in the past.
 9    Q.    So when we're talking about what's going on on
10    Page 22 of this transcript, your understanding is
11    that -- when Burson says that, "I will see the devil
12    act out on them, even in me.  I have to catch myself.
13    I know that's not me," you're saying that, when Burson
14    is talking about the devil, your understanding in
15    this conversation is that he's talking about the
16    US Government?
17    A.    Yes, ma'am.
18    Q.    Okay.  And, sir, while Burson is talking about
19    how he has to catch himself, right before that, you
20    start talking about Iraq and Afghanistan; do you not,
21    sir?
22    A.    That's for a reason.  If you look at the comment
23    before, that's why I get into the second comment.  I
24    did spoke about Iraq and Palestine and Afghanistan.  I
25    did.
```

1   Q.     Well, tell me about that, sir.

2          What is the comment before that you get into?

3   A.     Well, Brother Pat has told me, "But you can't

4   understand -- you can't underestimate the devil.  He is

5   strong."

6          That's when I went and told him, "Well,

7   Allahu-akhbar.  He is.  What?  We can see it in Iraq

8   and Palestine and Afghanistan."

9          So, basically, I'm making it clear that he is

10  speaking about the US Government.

11  Q.     But right after you mention Iraq and Afghanistan,

12  Burson is talking about, "I have to catch myself.  I

13  know that that's not me," meaning --

14  A.     I'm sorry?

15         MR. GREGORIE:  That's not what he says, your

16  Honor.

17         THE COURT:  Sustained.

18         Rephrase your question.

19  BY MS. JHONES:

20  Q.     After you mention Iraq and Afghanistan --

21  correct, sir?  Do you see where I'm at?

22  A.     Yes, I do.

23  Q.     Right here (indicating).

24         Burson says that he will see the devil act on

25  them, meaning other people, and he sees it happen in

```
 1    himself as well.  He sees the devil act in himself as

 2    well.  Correct, sir?

 3    A.     I don't understand the question, ma'am.

 4    Q.     Burson is not talking about the US Government

 5    when he says, "I have to catch myself.  I know that's

 6    not me," is he, sir?

 7    A.     He spoke about the devil.

 8    Q.     And then, after that, sir, you tell Burson

 9    that -- something about you have to go and do missions.

10    Correct?

11    A.     If I told him I have to go and do mission?

12    Q.     "Well, we -- before we do any missions, we have

13    to be able to control ourselves."

14           Those are your words.  Correct?

15    A.     Yes.  I said that.

16    Q.     After you say that, sir, Burson says something

17    to, like, "Yeah.  That's probably (unintelligible)."

18    Correct?

19    A.     Yes, ma'am.

20    Q.     And then Burson tells you about what he's all

21    about, basically.  Correct?  In the bottom of Page 22.

22    Right?  He tells you that he doesn't chase any women.

23    Right?  He says that in there, doesn't he?

24           MR. GREGORIE:  Judge, objection.  The document

25    speaks for itself.
```

```
 1              THE COURT:  Sustained.

 2   BY MS. JHONES:

 3   Q.    Well, let's forget about the document for a

 4   minute.

 5         You will agree with me, sir, that before

 6   November 7th of 2005, you had had -- your testimony is

 7   that you had had conversations with Burson Augustin.

 8         Fair enough?

 9   A.    If I have spoke to Burson?

10   Q.    Yeah.

11   A.    I did spoke to him.  Yes.

12   Q.    And what he told you on November 7th was nothing

13   new to you, according to your testimony.  Correct?  You

14   had heard it before?

15   A.    Ask me that question again.

16   Q.    What Burson Augustin is talking to you about on

17   Page 22 of this transcript, you had heard it before.

18   Right?

19   A.    Not all of it.  I heard it from Brother Naz.

20   Don't have to be necessarily from Brother Burson

21   himself.

22   Q.    Well, I want you to tell me whether or not you

23   had had the type of conversation that was going on on

24   November 7th on Page 22 -- tell me whether or not you

25   had heard that type of conversation with Burson before.
```

```
 1  A.    We had some kind of conversation.  But I don't
 2  know how much similarity there is.
 3  Q.    Well, let me ask you a few questions about your
 4  prior conversations.
 5        Did you talk to Burson Augustin about the fact
 6  that he doesn't chase women?
 7  A.    No.
 8  Q.    Did you talk to Burson Augustin about the fact
 9  that -- prior to November 7th, did you talk to him
10  about the fact that he stays away from weed, meaning
11  marijuana?  Did you talk to him about that?
12  A.    If I remember talking to him about that?
13  Q.    Yes.
14  A.    No.
15  Q.    "No," you don't remember.  Correct?
16  A.    No, I don't.
17  Q.    And do you remember talking to Burson about the
18  struggle that he has to do the right thing?  Do you
19  remember talking to him about that?
20  A.    No.
21        THE COURT:  We're going to stop for the day
22  and for the week.
23        Do not discuss this case either amongst
24  yourselves or with anyone else.  Have no contact
25  whatsoever with anyone associated with the trial.  Do
```

1    not read, listen or see anything touching on this

2    matter in any way.

3           If anyone should try to talk to you about this

4    case, you should immediately instruct them to stop and

5    report it to my staff.

6           You may leave your binders at your chairs.

7    Please give your notebooks to the court security

8    officer.

9           I will see you Tuesday morning, 9:00.  Have a

10   nice weekend.

11          (Whereupon, the jury exited the courtroom at

12   5:00 p.m. and the following proceedings were had:)

13          THE COURT:  You may step down, sir.

14          (Witness excused.)

15          THE COURT:  You may be seated for a moment.

16          In regard to Juror No. 9, I had indicated to

17   you that there's been some indication of some speech

18   that she was supposed to give.

19          So I went back and looked at my notes for voir

20   dire and there was nothing in there.  So I asked

21   Patricia to make further inquiry and to put it in

22   writing.

23          She has now put it in writing, which she

24   indicates, "I'm asking you to please give me permission

25   to have Thursday, the 12th of March, to give my annual

1   address" -- and then she names the church -- "I am the

2   district president and this is my first annual address.

3   I didn't know that I would be selected as a juror for

4   two months.  I would have told you of my concern."

5        So now that I've received the official

6   request, I'll hear from anyone who wants to state a

7   position.

8        MR. VEREEN:  Your Honor, did she say what time

9   the address was going to be?

10       THE COURT:  She indicated -- I think she

11  indicated that she needed the day.  Originally, she

12  said two days, but she indicated a day.  No.  She

13  doesn't indicate the time.

14       MR. VEREEN:  Then, I would suggest we give her

15  that time for that Thursday.

16       THE COURT:  I can have Patricia ask and see if

17  it's -- when it is during the day and see if we can

18  work around it.  I don't know.

19       She had asked for the day.  But I'll try and

20  make further inquiry and see if we can at least get

21  some time in, maybe in the morning or something.

22       MR. VEREEN:  All right.  Thank you.  I would

23  prefer that.

24       THE COURT:  I have noticed this person dozing

25  for both direct and cross.  She's an equal opportunity

1   dozer.  She seems to be a little more alert lately, but

2   I have noticed her falling out a number of times for

3   both direct and cross for different people.  It's not

4   one side or the other.  She's been a little bit more

5   alert.  But it has been of concern to me.

6          I've noticed there's one other juror that I've

7   noticed has their eyes closed.

8          Most of the jurors -- I have a great view of

9   them and I can see them.  It's almost like a tennis

10  match.  I see them -- the heads going back and forth as

11  they listen to the questions.  There's this juror and

12  then there's a juror in the front row who sometimes I

13  wonder if she's sleeping.

14         MR. VEREEN:  Well, for the record, your Honor,

15  I know you have a direct view of me.  When my eyes are

16  closed, I'm meditating.

17         THE COURT:  I noticed you with your eyes

18  closed.

19         MR. VEREEN:  Right.

20         THE COURT:  I've noticed Mr. Casuso with his

21  eyes closed once or twice.

22         MR. VEREEN:  Well, for the record, I'm

23  meditating.

24         THE COURT:  I'm sure you're both meditating.

25         Patricia tells me, initially, she needed the

1   day.  Now that she's written me the note, I think

2   there's an opening for Patricia to inquire, now that I

3   have the official inquiry, to see, you know, what time

4   the address is and see if we can work around it.

5        So let's see.  I mean, I really hate to miss

6   another day, especially for something that somebody

7   didn't tell me about initially as a conflict.  But

8   those things come up from time to time.

9        MS. JHONES:  Your Honor, may I address a

10   matter?

11        THE COURT:  Yes.

12        MS. JHONES:  Yesterday, I think I indicated

13   that I was going to provide the Court with a case,

14   *United States versus Nickerson.*

15        THE COURT:  Yes.

16        MS. JHONES:  I have neglected to do that.

17        With the Court's permission, I'd like to

18   provide a copy of that case on Tuesday or I could do it

19   on Monday.

20        THE COURT:  Okay.

21        MS. JHONES:  And then we could just address

22   the completion of that motion that --

23        THE COURT:  What was it in regard to?

24        MS. JHONES:  It was in regards to -- it was

25   reserved by Mr. Levin and I joined in on it.  It was --

```
 1            THE COURT:  I remember.  It was the statement

 2   by Velazquez.

 3            MS. JHONES:  Correct.

 4            THE COURT:  That's fine.

 5            I have nothing else.  If there's nothing

 6   further, we're in recess until Tuesday morning, 9:00.

 7   Have a nice weekend.

 8            MR. CLARK:  Your Honor, there was a matter of

 9   a motion that had been pending regarding Mr. Rotschild

10   Augustine's bond conditions.

11            THE COURT:  I think I signed off on it.  I saw

12   it.

13            MR. CLARK:  Okay.

14            THE COURT:  If not -- I'll check with

15   Patricia.  For his moving.  Right?  It's about his

16   moving, his address?

17            MR. CLARK:  Correct, your Honor.

18            THE COURT:  I think I instructed her that it

19   was a grant.  If not, I will instruct her it's a grant.

20            MR. CLARK:  Okay, your Honor.  Thank you.

21            THE COURT:  Tuesday morning, 9:00.  Have a

22   nice weekend.

23            (End of proceedings.)

24

25
```

1

2                        C E R T I F I C A T E

3

4          I hereby certify that the foregoing is an

5     accurate transcription of the proceedings in the

6     above-entitled matter.

7

8

9     _____          /s/Lisa Edwards
          DATE              LISA EDWARDS, CRR, RMR
10                          Official United States Court Reporter
                            400 North Miami Avenue, Twelfth Floor
11                          Miami, Florida 33128
                            (305) 523-5499
12

13

14

15

16

17

18

19

20

21

22

23

24

25