```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                        MIAMI DIVISION
                  CASE NO. 06-20373-CRIMINAL-LENARD
 3

 4   UNITED STATES OF AMERICA,        Miami, Florida

 5                   Plaintiff,       March 10, 2009

 6           vs.                      9:19 a.m. to 5:08 p.m.

 7   NARSEAL BATISTE, et al.,         Volume XXI

 8             Defendants.       Pages 1 to 220
     --------------------------------------------------------
 9

10                          JURY TRIAL
11           BEFORE THE HONORABLE JOAN A. LENARD,
                  UNITED STATES DISTRICT JUDGE
12

13

14   APPEARANCES:

15

16   FOR THE GOVERNMENT:    RICHARD D. GREGORIE, ESQ., and
                            JACQUELINE M. ARANGO, ESQ.
17                          ASSISTANT UNITED STATES ATTORNEYS
                            99 Northeast Fourth Street
18                          Miami, Florida 33132

19

20   FOR THE DEFENDANT      ANA MARIA JHONES, ESQ.
       NARSEAL BATISTE:     300 Seville Avenue, Suite 210
                            Coral Gables, Florida 33134
21

22   FOR THE DEFENDANT      ALBERT Z. LEVIN, ESQ.
       PATRICK ABRAHAM:     261 Northeast First Street
23                          Sixth Floor
                            Miami, Florida 33132
24

25
```

```
 1   FOR THE DEFENDANT      RODERICK D. VEREEN, ESQ.
        STANLEY PHANOR:      BRINKLEY, HENRYS & LEWIS
 2                           4770 Biscayne Boulevard
                             Suite 1200
 3                           Miami, Florida 33131

 4
     FOR THE DEFENDANT      RICHARD K. HOULIHAN, ESQ.
 5      NAUDIMAR HERRERA:    300 Aragon Avenue
                             Coral Gables, Florida 33134
 6

 7   FOR THE DEFENDANT      LOUIS CASUSO, ESQ.
        BURSON AUGUSTIN:     111 Northeast First Street
 8                           Suite 603
                             Miami, Florida 33132
 9

10   FOR THE DEFENDANT      NATHAN CLARK, ESQ.
      ROTSCHILD AUGUSTINE:  17639 South Dixie Highway
11                           Miami, Florida 33157

12
     REPORTED BY:           LISA EDWARDS, CRR, RMR
13                           Official Court Reporter
                             400 North Miami Avenue
14                           Twelfth Floor
                             Miami, Florida 33128
15                           (305) 523-5499

16

17

18

19

20

21

22

23

24

25
```

1                          I  N  D  E  X

2

3                                      Direct    Cross    Red.

4
   WITNESSES FOR THE GOVERNMENT:
5
   Abbas al-Saidi                                  5
6                                                 162

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning.

2          United States of America versus Narseal

3     Batiste, et al., Case No. 06-20373.

4          Counsel, state your appearances, please, for

5     the record.

6          MR. GREGORIE:  Good morning, your Honor.

7          Richard Gregorie and Jacqueline Arango on

8     behalf of the United States.

9          MR. VEREEN:  Ana Jhones on behalf of Narseal

10    Batiste, who is present.

11         MR. LEVIN:  Albert Levin on behalf of Patrick

12    Abraham, who's present.

13         MR. CASUSO:  Good morning, your Honor.

14         Louie Casuso on behalf of Burson Augustin,

15    who's present.

16         MR. CLARK:  Good morning, your Honor.

17         Nathan Clark on behalf of Rotschild Augustine,

18    who's present.

19         MR. HOULIHAN:  Richard Houlihan with Naudimar

20    Herrera.

21         MR. VEREEN:  Good morning, your Honor.

22         Rod Vereen on behalf of Stanley Phanor, who's

23    present.

24         THE COURT:  Good morning to everyone.

25         All Defendants are present.

```
 1            Is that sun bothering you when you sit down?

 2            MS. ARANGO:  No.

 3            THE COURT:  The jurors are now here.

 4            So let's bring them in.

 5            (Whereupon, the jury entered the courtroom at

 6    9:20 a.m. and the following proceedings were had:)

 7            THE COURT:  You may be seated.

 8            We're waiting for a notebook.

 9            All set?

10            Good morning, ladies and gentlemen.

11            You are still under oath, sir.

12            You may proceed, Ms. Jhones.

13            MS. JHONES:  Thank you.

14            Good morning, ladies and gentlemen.

15            THE JURY:  Good morning.

16                 CONTINUED CROSS-EXAMINATION

17    BY MS. JHONES:

18    Q.    Mr. al-Saidi, when we left off on Friday, we were

19    talking about your encounter with Burson Augustin on

20    November 7th.

21            Do you remember that, sir?

22    A.    I'm sorry.  I don't understand your question.

23    Q.    When we left off on Friday, we were talking about

24    your encounter --

25    A.    Counter?
```

1   Q.      -- your meeting -- with Burson Augustin on

2   November 7th.

3   A.      Yes.  I remember that.

4   Q.      And that was the meeting where you showed up at

5   the Embassy.  Right?  And you were on foot.  Do you

6   remember that meeting?

7   A.      Yes, I do.

8   Q.      That's the meeting that, when you showed up at

9   the Embassy, Burson invited you to go out to lunch and

10  you went to Taco Bell in his car?

11  A.      We decide to go and get some food.  Yes, we did.

12  Q.      After you got the food, you went back to the

13  Embassy and you basically stayed there for

14  approximately three hours and you continued to talk.

15  Correct?

16  A.      I'm not sure how long we stood after we went to

17  the -- to the fast food place until he dropped me of

18  off.  I don't think it's three hours.

19  Q.      It was a long meeting, though; was it not, sir?

20  A.      The whole meeting was approximately five -- four

21  to five hours, most.

22  Q.      Now, let's talk a little bit about -- a little

23  bit more about that meeting.  Okay?

24          In that meeting, sir, you referred to the Embassy

25  location as "the mosque."  Correct?

1    A.    As Brother Naz been calling it before.  He been

2    calling it "the mosque," "Embassy," "the Temple."  So I

3    was using one of the names that I know for it.

4    Q.    Well, you would agree with me, sir, that as of

5    November 7th, there were no recorded conversations

6    between you and Mr. Batiste where Mr. Batiste refers to

7    the location in Liberty City as "the mosque"?

8    A.    I'm not sure.

9    Q.    Okay.  Now, in the November 7th meeting, it is

10   you, sir, not Burson, who refers to this location as

11   "the mosque"?

12   A.    Again, ma'am, I heard Brother Naz before calling

13   it "the mosque."  I heard him calling it "the Temple."

14   And I heard he call it "Embassy."  So those are the

15   names that I heard from him.  Those is the names I'm

16   using for it.

17   Q.    Well, let me ask you this, sir:  Would you agree

18   with me that, on November 7th, you are the one that

19   refers to this place during the early stages of this

20   meeting -- you refer to it as "the mosque"?

21        MR. GREGORIE:  Objection, your Honor.  It's

22   vague.  This is a five-hour meeting, Judge.

23        MS. JHONES:  Okay.  Let me see if....

24   BY MS. JHONES:

25   Q.    Do you remember, sir, or not?

al-Saidi - CROSS - By Ms. Jhones                    8

```
 1    A.      I don't understand your question.

 2    Q.      Okay.  Well, let me see if I can help you.

 3            MS. JHONES:  Your Honor, may I have the ELMO,

 4    please?

 5            THE COURT:  Yes.

 6    BY MS. JHONES:

 7    Q.      I think last week when we were talking about this

 8    meeting, Mr. al-Saidi, just to give an idea of how long

 9    this meeting was, I asked you if you knew how many

10    pages the transcript of this meeting was.

11            Do you remember that question?

12    A.      No.

13    Q.      Well, do you remember, as you sit here this

14    morning -- do you remember how many pages the

15    transcript of the November 7th meeting -- how many

16    pages that transcript is?

17    A.      I'm not sure.  I think it's over 100 page long.

18    Q.      Okay.  And would 175 pages ring a bell?

19    A.      I'm not sure, ma'am.

20    Q.      Let me go ahead and give you a copy of it so you

21    can refer to it.

22            MR. GREGORIE:  Objection.  Relevance, your

23    Honor.

24            THE COURT:  Sustained.

25
```

```
 1   BY MS. JHONES:

 2   Q.    Now, as early as Page 20 of this meeting, you

 3   make a reference to the Liberty City location as a

 4   mosque.

 5         Fair enough?

 6   A.    You asking me if I did or not?

 7   Q.    Yes.  Very early on.

 8   A.    Again, it's -- I don't know, ma'am.

 9   Q.    Let me see if I can help you.

10         Directing your attention, sir -- are you able to

11   see that on your screen? --

12   A.    Yes.

13   Q.    -- to Page 20 of the transcript -- do you see

14   that?

15   A.    Yes, I do.

16   Q.    Okay.  And that is you, sir, is it not, in the

17   middle of the page where you say -- where you refer to

18   this location as "the mosque," starting at where it

19   says, "That's the last thing you were speaking about

20   with Brother Naz"?

21         Do you see that?

22   A.    Yes, I do.

23   Q.    Now, after that, after you referred to this for

24   the very first time as "the mosque," then you continue

25   to speak about that location with Brother Burson in the
```

al-Saidi - CROSS - By Ms. Jhones                10

```
 1    very same meeting.  Correct?  You continue to refer to
 2    it as "the mosque"; do you not, sir?
 3    A.    I'm not sure if I continue using the same name or
 4    not.
 5    Q.    Well, directing your attention, sir, to Page 38
 6    of the transcript -- actually, let me go back for a
 7    moment.
 8          After you've made this reference on Page 20 to
 9    "the mosque," you and Burson continue to talk about
10    this location in Liberty City.  Correct?
11    A.    If I continue to speak to Brother Burson about
12    this facility?
13    Q.    Yes.
14    A.    I'm not sure, ma'am.
15    Q.    Well, directing your attention to Page 38, sir,
16    there's -- and take your time in looking at it.  And
17    specifically directing your attention to Page 38
18    where -- Burson refers to it as "the Temple" and then,
19    after he refers to it as "the Temple," he refers to it
20    as "the mosque."
21          Do you see that?
22    A.    I seen where he mentioned as a "Temple" and,
23    also, he mentioned "the mosque."
24    Q.    And that is after -- you would agree with me,
25    sir, that Page 38 comes after Page 20?
```

al-Saidi - CROSS - By Ms. Jhones                    11

```
 1   A.    If I would agree with you that Page 38 comes
 2   after Page 20?
 3   Q.    Yes.
 4   A.    Yes.
 5   Q.    Now, after that, sir, you continue on.  You go
 6   further and you tell Burson, "This location is a
 7   mosque," do you not, sir, directing your attention to
 8   Page 57, towards the middle of the page.
 9         Do you see that, sir?
10   A.    I'm sorry.  I don't see where you reading from.
11   Q.    If you can look at the middle of the page, where
12   it says, "I can't understand.  Just, you know, this is
13   a mosque."
14         MR. GREGORIE:  Your Honor, it might be helpful
15   if the witness had the transcript there.  I think that
16   he may be having a hard time reading it off that
17   screen.  It's pretty small.
18         THE COURT:  Do you have the transcript for
19   him?
20         MS. JHONES:  I was going to give it him, but
21   the Government objected.  I'm happy to give it to him.
22         MR. GREGORIE:  I objected?  I don't think so,
23   Judge.
24         MS. JHONES:  May I approach, your Honor?
25         THE COURT:  Yes.
```

```
 1   BY MS. JHONES:

 2   Q.     (Tenders document to the witness.)

 3          Turn to Page 57, Mr. al-Saidi.

 4   A.     Okay.  I see where -- where I said, "I understand

 5   you just know this is a mosque.  We got to know -- we

 6   got know how it's in mind.  He always up front.  Even

 7   though he work, he respects, still.  It won't cost in

 8   the hour together if you do" -- or "if you did."  I'm

 9   sorry.

10   Q.     You're the one that says, sir, correct, "this is

11   a mosque"?

12   A.     I said that.  Yes.

13   Q.     Now -- and, finally, directing your attention to

14   Page 73 of the transcript, again, it is you, sir, that

15   say to Burson that -- you're talking to Burson there

16   about the need to fix up the mosque.

17          Do you see that, sir?

18   A.     Yes, I do.

19   Q.     And without going into all of the other pages,

20   sir, you would agree with me that, throughout the

21   course of these 175 or so pages, you refer to this

22   place continuously, "this place" meaning the location

23   in Liberty City, as "the mosque"?

24   A.     Like I said, ma'am, there was conversations

25   between me and Brother Naz.  And before, he told me
```

```
 1    that he was building a mosque.  He also told he want to
 2    make it as an embassy.
 3         From time to time, he call it "Temple."  So I use
 4    "the mosque" because I couldn't pronounce "the Temple"
 5    right and I don't know what is a temple.  And I used
 6    "the mosque" and "the Embassy," which was closest
 7    things to me to use as a word.
 8         It was just a name for the facility.  So it
 9    didn't matter me what I call it, as long as I called it
10    a name that I hear from them.
11    Q.   Okay.  And let's move on, sir, to --
12            MS. JHONES:  Just a moment, your Honor, if I
13    may.
14    BY MS. JHONES:
15    Q.   Likewise, sir, the Government asked you a
16    question during your direct testimony -- by "direct
17    testimony," I mean when the prosecutor was asking you
18    questions.  They played a clip where Mr. Burson
19    Augustin talks about -- something about being
20    organized.
21         Do you remember that, sir?
22    A.   If I remember, when the Government played the
23    clip of this meeting when Brother Naz has -- I mean,
24    when Brother Burson has mentioned -- yes.  I remember
25    when they played the clips.
```

```
 1    Q.     And, likewise, sir, in the clip that the
 2    Government played, which refers to Page 104 of the
 3    transcript, in advance of Page 104, it is you that
 4    tells Brother Burson first, "We need to be organized";
 5    is it not, sir?
 6           Do you remember that?
 7    A.     There was a lot of talking between me and Brother
 8    Naz and Brother Pat about being organized.  So I might
 9    have did mention being organized.  Yes.
10    Q.     And when you say there's a lot of talk between
11    you and Brother Naz and Brother Pat, you are not
12    suggesting, are you, sir, that this talk about being
13    organized occurred before November 7th?  Are you?
14    A.     I definitely did.  Yes, ma'am.
15    Q.     Well, you would agree with me, sir, that all of
16    those conversations that you say occurred before
17    November 7th regarding being organized were not
18    recorded.  Correct, sir?
19    A.     I recorded as much as I could.  This is -- you
20    calling it early in the investigation.  But you -- I'm
21    sorry.  I don't understand your question.
22    Q.     Well, why don't we do this, sir.
23           The first recorded conversation that you had was
24    on October 29th.  Correct?
25    A.     Yes, ma'am.
```

al-Saidi - CROSS - By Ms. Jhones                15

```
 1   Q.    There was no mention of being organized in that
 2   call, was there, sir?
 3   A.    I don't know.
 4   Q.    Well, you don't remember?
 5   A.    Ma'am, I don't know if there was any talk about
 6   being organized on the tape or not.
 7   Q.    Okay.  Let's talk about the next recorded
 8   conversation.
 9         What is your memory as to when that was, sir?
10   A.    I'm sorry.  I don't understand your question.
11   Q.    The next conversation -- recorded conversation --
12   by "recorded," I mean you recorded it.  Okay?
13   A.    Yes, ma'am.
14   Q.    Under the direction of the FBI.
15   A.    Yes, ma'am.
16   Q.    Are you with me?  Do you understand?
17   A.    You asking me about the next recording that I was
18   directed by the FBI to do?
19   Q.    When was the next date after October 29th that
20   you recorded a meeting, sir?
21   A.    I believe it's on the 31st.
22   Q.    You would agree with me, sir, that in the
23   October 31st recorded conversation, there is no mention
24   anywhere about being organized?
25   A.    I don't know.  I can't agree with you to
```

 1   something that I don't know.

 2   Q.    Well, let me see if I can refresh your

 3   recollection, sir.

 4         MS. JHONES:  May I approach, your Honor?

 5         THE COURT:  Show the Government, please.

 6         MS. JHONES:  Government's Exhibit 39-A,

 7   please.  Have you got it?

 8         THE COURT:  39 or 31?

 9         MS. JHONES:  39-A.

10         May I approach?

11         THE COURT:  Yes.

12   BY MS. JHONES:

13   Q.    I'd like for you, Mr. al-Saidi, to look at

14   Government's Exhibit 39-A and tell me where in that

15   conversation Brother Naz says anything about being

16   organized.

17   A.    He didn't mention that in this conversation --

18   phone call, ma'am.

19   Q.    Let's go to the next recorded conversation, sir.

20         The next recorded conversation was on what date,

21   sir?

22   A.    I believe it's on the 6th of November.

23   Q.    Is it your testimony, sir, that on the recorded

24   conversation of November 6th, Mr. Batiste or any of

25   these other brothers talks about the need to be

 1   organized?

 2   A.    I'm not sure if they mention anything about being

 3   organized at that meeting or not, ma'am.

 4   Q.    Would something help refresh your recollection

 5   about that, sir?

 6   A.    If I go through it, yes, it would.

 7   Q.    Okay.

 8         MS. JHONES:  May I approach, your Honor?

 9         THE COURT:  Yes.

10   BY MS. JHONES:

11   Q.    I'd like for you to look at this document, sir,

12   review it and let me know when you're finished.  Let me

13   know when you're ready, sir.

14   A.    Yes, ma'am.

15   Q.    Are you finished?

16   A.    Yes.

17   Q.    Let me get that document back from you.

18   A.    (Tenders document to counsel.)

19   Q.    Now, sir, there is absolutely nothing in this

20   recorded conversation on November 7th where Mr. Batiste

21   or anyone refers to the need to be organized?

22         MR. GREGORIE:  Objection, your Honor.  She

23   just showed him November 6th, the telephone call.

24         MS. JHONES:  I apologize.  Did I say

25   November 7th?

1           MR. GREGORIE:  Yes.

2    BY MS. JHONES:

3    Q.     November 6th, sir.

4    A.     He didn't mention something about being organized

5    on that day, on the 6th.

6    Q.     So there are absolutely no recorded conversances

7    up to November 7th where there are any discussions

8    about being organized?

9    A.     I'm sorry.  I can't agree to what you saying.

10   I'm not sure.

11   Q.     Do you have any other recorded conversations,

12   sir, besides the ones that we have -- that you have

13   mentioned?

14   A.     There's 176 pages.  And you read that I mentioned

15   being organized.  But I'm not sure through this

16   176 pages that I was the only one that mentioned being

17   organized.

18          And if that was the subject, I mean, I don't know

19   what make --

20          THE COURT REPORTER:  I'm sorry.  I don't know

21   what....

22          THE WITNESS:  I don't know what make the case

23   different.  Because, again, I'm only trying to drag out

24   what I've been hearing from Brother Naz with Brother

25   Burson being present.

```
 1            So I'm trying to get to speak about the things
 2      that we been speaking about so I could have him talk
 3      about it.
 4      BY MS. JHONES:
 5      Q.    Okay.  My question to you, sir, is:  There are no
 6      recorded conversations before November 7th where the
 7      discussion of being organized is mentioned.
 8      A.    I can't agree to what you asking me.  I don't
 9      know.  I told you, I don't know.
10      Q.    You don't remember how many conversations you
11      recorded.  Is that what you're telling me?
12            MR. GREGORIE:  Objection, your Honor.
13            THE COURT:  Sustained.
14      BY MS. JHONES:
15      Q.    Now, moving right along, sir, to the topic of
16      soldiers -- do you remember that, sir?
17      A.    Yes, ma'am.
18      Q.    Now, the Government asked you on your direct
19      testimony as to who refers to the topic of soldiers.
20            Do you remember that, sir?
21      A.    Yes, ma'am.
22      Q.    And, sir, again, as it relates to the topic -- or
23      the word "soldiers," that was a word that you brought
24      up first in these conversations; was it not, sir?
25            MR. GREGORIE:  Objection, your Honor.  It's
```

```
 1    vague.
 2              THE COURT:  Sustained.
 3              Rephrase your question.
 4    BY MS. JHONES:
 5    Q.    Was it you that mentioned the word "soldiers"
 6    first on November 7th to Brother Burson?
 7    A.    I'm not sure if it was me.  But I told the FBI
 8    that Brother Naz called his group "soldiers" and
 9    "guerrillas," and they told me to mention that so I
10    could have him agreeing to what I was saying while it
11    was being recorded.
12    Q.    Well, you were playing a role; were you not, sir?
13    A.    Yes, I was.
14    Q.    Look at Page 37 of the transcript of
15    November 7th -- I'm sorry -- Page 35.
16          Do you see that, sir?
17    A.    Yes.  I see that, ma'am.
18    Q.    On Page 35, you say, "We are like soldiers."
19          That is you speaking there; is it not, sir?
20    A.    Yes.  I see that, ma'am.
21    Q.    And, likewise, sir, in Government's Exhibit --
22    I'm going to switch over to a different exhibit for a
23    moment.
24          In Government's Exhibit 39-A, it is also you,
25    sir, that refers to the brothers as "soldiers."
```

al-Saidi - CROSS - By Ms. Jhones                    21

```
 1        Do you remember that, sir?  Do you have 39-A with

 2  you up there?

 3            MS. JHONES:  Your Honor, may I hand it to him?

 4  I don't believe he has it.

 5            THE COURT:  Yes.

 6            MS. JHONES:  (Tenders document to the

 7  witness.)

 8            39-A, sir.  Different meeting.

 9            Your Honor, if I may just have a moment to get

10  a clean copy of this exhibit.

11            THE COURT:  Okay.

12            MS. JHONES:  Thank you.

13  BY MS. JHONES:

14  Q.    Directing your attention, sir, to the bottom of

15  Page 2 of Government's Exhibit 39-A -- do you see that,

16  where you say, "If you could gather the soldiers

17  because, you know, I have a little situation"?

18        Correct?

19  A.    Yes, ma'am.

20  Q.    That's not Mr. Batiste talking about soldiers.

21  That is you, sir, talking about soldiers; is it not?

22  A.    I was instructed by the FBI to say those words.

23  Q.    Okay.  Thank you.

24        Now, also, sir, another thing that the FBI

25  instructed you to talk about was the need to blend in.
```

1          Do you remember that, sir?

2     A.     No, ma'am.

3     Q.     You don't remember or, "no," they did not

4     instruct you?  What is it?

5     A.     You asking me if the FBI told me to -- how

6     important is it blending in?  No.  FBI never told me

7     nothing about blending in.

8     Q.     Okay.  Well, you would agree with me, sir, that

9     it was you that initially told Brother Burson about how

10    important it is to blend in in this conversation of

11    November 7th?

12    A.     I don't remember telling him how important is

13    blending in.  I remember him telling me that, if he

14    blend in, that he could destroy the US Government,

15    basically.

16    Q.     Well, why don't we take a look at what Brother

17    Burson says there for a minute.  Okay?

18    A.     Okay.

19            MS. JHONES:  I just need one moment, your

20    Honor.  I apologize.

21    BY MS. JHONES:

22    Q.     Directing your attention, sir, to Page 31 of

23    Government's Exhibit 41-A, which is the November 7th

24    transcript -- do you see that, sir?

25    A.     I see that.

al-Saidi - CROSS - By Ms. Jhones                    23

1  Q.     And that's what you just referred to a couple of

2  minutes ago about Brother Burson saying blending in.

3  Correct?

4  A.     Yes, ma'am.

5          THE COURT:  Is that a copy that's in evidence?

6          MS. JHONES:  This is a clip.

7          THE COURT:  What's the handwriting on it?

8          MS. JHONES:  Some notations the Government

9  made, your Honor.  I don't know.

10         THE COURT:  Is that on the original?

11         MS. JHONES:  Quite frankly, I don't know.  I

12 could check.

13         THE COURT:  Let's check, please.

14         MR. GREGORIE:  There are no notations on the

15 original, your Honor.

16         MS. JHONES:  Okay.  So if the jury could turn

17 to Page 31, please, and I'll just refer to it that way.

18 BY MS. JHONES:

19 Q.     Do you see why -- you're at Page 31, sir?

20 A.     Yes.  I see Page 31.

21         THE COURT:  What is the exhibit number,

22 please?

23         MS. JHONES:  41-A.

24 BY MS. JHONES:

25 Q.     That was the part you were referring to.

1    Correct, sir?

2    A.    Yes, ma'am.

3    Q.    In reality, however, sir, it was you much earlier

4    on in this conversation where you tell Brother Burson

5    about blending in; did you not, sir?

6    A.    I don't remember saying that, ma'am.

7          MS. JHONES:  I'm going to ask the ladies and

8    gentlemen to turn to Page 17.

9          At this point, your Honor, I'd like to play a

10   small clip of Government's Exhibit 41-A.

11         Your Honor, does the ELMO have to be turned

12   off in order to play a clip?  I'm not sure.

13         THE COURT:  You don't need to turn it off.  I

14   just need to do something.

15         Where are you playing this from?

16         MS. JHONES:  Page 17.

17         THE COURT:  Who is doing it?

18         MS. JHONES:  Eric is, your Honor.

19         (Whereupon, segments of Government's Exhibit

20   No. 41 were published in open court.)

21   BY MS. JHONES:

22   Q.    That was you speaking; was it not, sir?

23   A.    Yes, ma'am.

24   Q.    That was on Page 17 of this transcript.  Correct?

25   A.    Yes, ma'am.

al-Saidi - CROSS - By Ms. Jhones                25

```
 1   Q.     Another thing, sir, that you talked to Brother
 2   Burson about really early on in this conversation, sir,
 3   was about how important it was to watch television.
 4          Do you remember that, sir?
 5   A.     If I remember telling him that it's very
 6   important to watch television?
 7   Q.     Yes.
 8   A.     I don't remember, honestly.
 9          MS. JHONES:  Let's continue on with the clip,
10   if we may, Eric, on Page 17.
11          (Whereupon, segments of Government's Exhibit
12   No. 41 were published in open court.)
13   BY MS. JHONES:
14   Q.     Do you remember, sir, talking to Burson early on
15   on Page 17 and 18 about watching TV?
16   A.     Yes.
17   Q.     You also told him about the need to go to the
18   library and read stuff.  Correct?
19   A.     If I told him he need to go to the library?
20   Q.     Yes.  Top of Page 18, sir.
21          MR. GREGORIE:  That is not what it says, your
22   Honor.  I object.
23          MS. JHONES:  Your Honor, he can -- he can
24   correct me if I'm wrong.  He has a transcript in front
25   of him.
```

```
 1            MR. GREGORIE:  The document speaks for itself,
 2    your Honor.
 3            MS. JHONES:  Your Honor, this is
 4    cross-examination.
 5            THE COURT:  Sustained.
 6    BY MS. JHONES:
 7    Q.    Did you also tell Burson about reading the
 8    newspapers?
 9    A.    Yes.  I did mention something about reading the
10    newspaper once a while.
11    Q.    And, sir, there was a reason why you talked to
12    Burson about that, wasn't there?
13    A.    Honestly, I don't know if I was trying to bring
14    something out that happened in the news.
15    Q.    And what you were trying to bring out is you were
16    trying to get Burson to talk about things that were
17    occurring in the Middle East; were you not, sir?
18    A.    I'm not sure.  I don't remember.
19    Q.    You don't remember?
20    A.    No.
21    Q.    Now, you would agree with me, sir, that on
22    Page 17, Burson tells you, "I don't watch TV" -- or,
23    "We don't watch TV."  Correct?
24    A.    He told me he don't -- I remember him saying
25    something like that.  Yes.
```

```
 1   Q.     Now, in this 175 or so pages of your meeting in

 2   the Temple, at no time do you talk to Burson about the

 3   Moorish Science Temple, do you, sir?

 4   A.     I'm sorry.  The question was long.  I don't

 5   understand.  Can you repeat that to me, please.

 6   Q.     Sure.

 7          On November 7th of 2005, that transcript that you

 8   have in front of you, sir, at no time do you ask

 9   questions of Burson about the Moorish Science Temple,

10   do you, sir?

11   A.     Yes.  I did.

12   Q.     That's your testimony, that you talk about that

13   in here.  Correct?

14   A.     If I spoke about the Temple?  I don't know what

15   the Temple was.  But if I spoke about the Moors, I

16   mean, at least I tried.

17   Q.     And your testimony is that you spoke to Brother

18   Burson about it on November 7th.  Correct?

19   A.     Are you trying to get me to -- I don't know,

20   ma'am.  I'm not sure.  But I was trying to pull out as

21   much information I could.

22   Q.     And, sir, likewise, on November 7th, there was

23   absolutely no discussions whatsoever about Osama bin

24   Laden, was there, sir?

25   A.     Likewise, I don't know.  But if Brother Burson
```

1    spoke to me about bin Laden, I don't think so.

2    Q.    Likewise, on November 7th, Brother Burson did not

3    mention the words "Al-Qaeda," did he, sir?

4    A.    I don't think he did.

5    Q.    Nor did you, did you, sir?

6    A.    I was -- mentioned "back home."  I never

7    mentioned "Al-Qaeda" to Brother Burson.

8    Q.    So the answer is "no"?

9    A.    I'm not sure.

10   Q.    You never mentioned Osama bin Laden either on

11   November 7th, did you, sir?

12   A.    I don't know, ma'am.  I don't see there is a

13   reason for me to mention bin Laden or not.  But, again,

14   I'm -- I don't remember speaking to Brother Burson

15   about bin Laden on November 7th.

16   Q.    Now, the FBI has wired you up with a tape

17   recorder so you can get information out of as many

18   people as you can; have they not, sir?

19   A.    Yes, ma'am.

20   Q.    And this is the first recorded conversation that

21   you had with Brother Burson; is it not, sir?

22   A.    Yes, ma'am.

23   Q.    And it's important to get information out of

24   Burson; is it not, sir?

25   A.    Yes, it is.

al-Saidi - CROSS - By Ms. Jhones                    29

1   Q.    Also, there's no conversation with Brother Burson

2   about the Sears Tower on November 7th, is there, sir?

3   A.    I never knew about the Sears Tower until -- on

4   that date.  So....

5   Q.    What date?

6   A.    November 7.  I don't know about the Sears Tower.

7   I can't remember hardly the name.

8   Q.    Didn't --

9   A.    I didn't know what was the Sears Tower then.

10  Q.    Are you finished?

11  A.    Yes, ma'am.

12  Q.    Didn't you tell us on Friday that you were so

13  tired of hearing Mr. Batiste talk about the Sears Tower

14  even before November 7th?  Wasn't that your testimony

15  on Friday?

16  A.    Ma'am, I was having a hard time to even pronounce

17  the Sears Tower name.  So I was really having a hard

18  time memorizing it.

19  Q.    Memorizing?

20  A.    Yes, ma'am.

21  Q.    And no suggestion on November 7th about blowing

22  up buildings, is there, sir?

23  A.    If there was discussion about blowing up

24  building, well, there was discussion about destroying

25  the US Government by blending in.  That -- my

al-Saidi - CROSS - By Ms. Jhones                    30

```
 1   understanding is discussion of blowing up building.
 2   Yes.
 3   Q.    Is there any -- are there any words coming out of
 4   Burson's mouth about blowing up buildings, sir?
 5   A.    No.
 6   Q.    Okay.  Let's talk about one more topic that was
 7   discussed on November 7th.  Okay?
 8   A.    Okay.
 9   Q.    That topic, sir, has to do with the heat.  Right?
10   A.    Okay.
11   Q.    You know what we're talking about when we're
12   talking about "the heat."
13           THE COURT:  Did you turn off the microphone?
14           MS. JHONES:  Thank you, your Honor.
15   BY MS. JHONES:
16   Q.    You know what we're talking about when we're
17   talking about "the heat," don't you, sir?
18   A.    I believe I do.  Yes, ma'am.
19   Q.    We're not talking about the weather in South
20   Florida, are we, sir?
21   A.    No.  We talking about the US Government
22   attention.
23   Q.    We're talking about the cops.  Right?
24   A.    Yes, ma'am.
25   Q.    We're talking about being in custody.  Right?
```

al-Saidi - CROSS - By Ms. Jhones                    31

1    Being in jail?

2    A.    No.   What I believe is "the heat" is the

3    Government attention, police officers' attention,

4    period.

5    Q.    And on November 7th, sir, you spend a fair amount

6    of time talking to Burson about how afraid you are of

7    the heat; do you not, sir?

8    A.    If I -- yes.   Did I mention being afraid of the

9    heat?  Yes.

10   Q.    You also tell Burson that you're afraid of being

11   in jail again; do you not, sir?

12   A.    Yes, I did.

13   Q.    You tell him that you would kill yourself if you

14   had to go back to jail; do you not, sir?

15   A.    Yes.  But there is an explanation.

16   Q.    Go ahead.

17   A.    I'm playing a role.  I'm a person that's from

18   Al-Qaeda.  So I'm making more confidence that we doing

19   the same thing and I'm not working with the Government,

20   I'm being a part of Al-Qaeda, this is who they are,

21   this is what they believe.  And this is what I made him

22   believe, that I was a person of Al-Qaeda.

23   Q.    Well, when you're talking about being in custody,

24   sir, you're talking about when you really were in jail,

25   not about Al-Qaeda.

 1         You mention that in the transcript; do you not,

 2    sir?

 3    A.    If I spoke about really being in jail?  Yes, I

 4    did.

 5    Q.    And you talked about you would do anything to

 6    stay out of jail.

 7         You also told Burson that; did you not, sir?

 8    A.    If I said that, yes, I did.

 9    Q.    You also talk about -- directing your attention

10    to Page 87 of the transcript, sir, when you're talking

11    about being locked up, sir, you're not talking about

12    Al-Qaeda, but you're talking about your domestic

13    violence situation and how you felt about the woman who

14    had -- who put you in jail; are you not, sir?

15    A.    Yes.  I did it mention being locked up for

16    domestic violence.  Yes.

17    Q.    At no time during the course of your references

18    to being locked up do you mention Al-Qaeda.  Correct,

19    sir?

20    A.    You asking me if I mention Al-Qaeda while

21    being -- while talking about being locked up?

22    Q.    Right.

23    A.    No.

24    Q.    Because when you're talking about the heat, you

25    are not playing a role.  You're talking about your real

al-Saidi - CROSS - By Ms. Jhones                    33

1   life, sir; are you not?

2   A.    There is some -- some things I spoke about that

3   really happened to me, and there is some things I spoke

4   about that wasn't true.

5   Q.    But you being locked up was very real; was it

6   not, sir?

7   A.    Yes, I did.  It was real that I got locked up and

8   I paid the consequences for what I did.  Yes.

9   Q.    As a matter of fact, sir, when this meeting is

10  coming to an end -- and you're at the Embassy with

11  Burson; are you not?

12  A.    When I first met him, he was in the Embassy.  But

13  then we was riding around.  We get some food.  We went

14  all the way to Sunny Isle, and then he dropped me of

15  off back in my apartment.

16  Q.    And you asked him for a ride back to your

17  apartment; did you not?

18  A.    He offered to give me a ride home.

19  Q.    And during the course of you riding around, you

20  actually get stopped by the police; do you not?  The

21  car gets stopped by a police officer?

22  A.    On the way taking me home, we get stopped.  Yes.

23  Q.    And, again, you start talking to Burson about the

24  heat and how bad it is when you get stopped by the

25  cops; do you not, sir?

1    A.    Yes.  I did spoke about -- I spoke about being

2    stopped by the police.

3    Q.    Okay.  Now, during the course of your direct

4    testimony, when the Government was asking you

5    questions, after this meeting of November 7th, the

6    Government went on to ask you about the next

7    conversation you had in this case.

8          Do you remember that, sir?

9    A.    Yes.

10   Q.    And the next conversation you had in this case,

11   you testified, was on November 10th.  Correct?

12   A.    I did.  But that -- I think there was a mistake,

13   because was a phone call on the 10th and a meeting on

14   the 11th.

15   Q.    Let's talk about that, sir.

16   A.    Sure.

17   Q.    Now, again, when you went to the Embassy on

18   November 7th, your intention was to meet with

19   Mr. Batiste.  Correct?

20   A.    Yes, ma'am.

21   Q.    And you ran into Brother Burson?

22   A.    Yes, ma'am.

23   Q.    And you told Brother Burson on numerous

24   occasions, "Please get in touch with Brother Naz.  I

25   want to speak to him" or words to that effect.

```
 1   Correct?
 2   A.    If I told him I want to speak to Brother Naz?
 3   Yes, ma'am, I did.
 4   Q.    But Brother Naz did not call you back on
 5   November 7th, did he?
 6   A.    He didn't call neither one of us that day.
 7   Q.    He didn't call back on November 8th either, did
 8   he, sir?
 9   A.    I'm not sure.
10   Q.    November 9th, sir -- he doesn't call you back on
11   November 9th either, does he, sir?
12   A.    No.
13   Q.    But you do try and reach him; do you not, sir?
14   A.    Yes.  I was trying to reach him.
15   Q.    And you leave voicemail messages on his work
16   phone number for Azteca Stucco & Masonry; do you not,
17   sir is?
18   A.    I think I left a message.  Yes.
19   Q.    And he still doesn't call you back, does he, sir?
20   A.    I mean, eventually, he did.  But I don't know if
21   he called me right away.
22   Q.    After all of the attempts that you made,
23   Mr. Batiste calls you back on November 9th; did he not,
24   sir?
25   A.    I'm sorry, ma'am.  You wasn't clear about the
```

1    question, and I don't got an answer.

2    Q.    Mr. Batiste does call you back at some point on

3    November 9th; does he not?

4    A.    I don't think he call me on the 9th.

5    Q.    All righty.

6         MS. JHONES:  May I approach, your Honor?

7         THE COURT:  Yes.

8    BY MS. JHONES:

9    Q.    Would something help refresh your memory on this,

10   Mr. al-Saidi?

11   A.    Yes, ma'am.

12   Q.    I'd like you to look at this document and tell me

13   if that refreshes your memory.  Let me know when you're

14   ready.

15   A.    Yes, ma'am.  Yeah.  I'm ready.

16   Q.    Finished?

17   A.    (Tenders document to counsel.)

18   Q.    You do have a conversation with Mr. Batiste

19   telephonically on the 9th; do you not, sir?

20   A.    Yes, ma'am.

21   Q.    In that conversation, that's when you tell

22   Mr. Batiste that you're going to be leaving somewhere

23   to New York.  Right?

24   A.    Yes, ma'am.

25   Q.    And you're going to make some contact with some

1    brothers up in New York.  Correct?

2    A.    Yes, ma'am.

3    Q.    You don't tell him you're going to make contact

4    with Al-Qaeda in New York, do you, sir?

5    A.    No, ma'am.

6    Q.    You don't tell him about the conversations you

7    have had in the past regarding the Sears Tower on

8    November 9th, do you, sir?

9    A.    No, ma'am.

10   Q.    And in that conversation, you also tell

11   Mr. Batiste that you don't like to be seen around --

12   you don't like your face to be seen around the

13   neighborhood; do you not, sir?

14   A.    Yes, ma'am.

15   Q.    Mr. Batiste doesn't tell you that he doesn't like

16   being seen around the neighborhood, but you do tell him

17   that you don't like being seen around the neighborhood.

18   Correct, sir?

19   A.    Yes, ma'am.

20   Q.    And so, after that conversation, you try reaching

21   Mr. Batiste again the next day, on November 10th; do

22   you not, sir?

23   A.    Yes, ma'am.

24   Q.    Early in the morning.  Correct?

25   A.    I'm not sure if it was early in the morning.

```
 1   Q.     Actually, let me rephrase that.

 2          In the afternoon, you try reaching Mr. Batiste;

 3   do you not?

 4   A.     That day I did try to reach him.

 5   Q.     And you tried to reach him three separate times?

 6   A.     I have no idea.

 7          MS. JHONES:  One moment, your Honor.

 8          May I approach, your Honor?

 9          THE COURT:  Yes.

10   BY MS. JHONES:

11   Q.     Take a look at these two documents, Mr. al-Saidi.

12   Let me know when you're done.

13   A.     Yes, ma'am.

14   Q.     You try to reach him in the afternoon around

15   4:00.  Correct?

16   A.     Yes, ma'am.  There was two phone calls.

17   Q.     Yes.

18          And then you try to reach him around 8:30 in the

19   evening; do you not, sir?

20   A.     Well, we was supposed to meet and I was making

21   sure that he's on the way.

22   Q.     And that's at around 8:30 p.m.; is it not?

23   A.     Yes, ma'am.

24   Q.     And at that time, again, you mentioned to

25   Mr. Batiste that you're going to be leaving town and
```

```
 1   you're going to be going to New York; did you not, sir?

 2   A.    Yes.  I mentioned to him that I was going to

 3   New York.

 4   Q.    Again, sir, then around 11:30 p.m., after

 5   Mr. Batiste finishes working, he meets you for the

 6   first time in your new apartment?

 7         MR. GREGORIE:  Objection, your Honor.  It

 8   assumes facts not in evidence.

 9         THE COURT:  Sustained.

10         Rephrase your question.

11   BY MS. JHONES:

12   Q.    When Mr. Batiste met with you at 11:00 p.m. on

13   November 10th, he did not tell you that he had just

14   gotten off of work?

15   A.    I don't know the exact time at that night.  But

16   he told me, yes, he did just get off of work and came

17   to meet me.

18   Q.    I'm sorry?

19   A.    I don't know what time exactly the meeting

20   occurred.  But, yes, he told me he finished work and he

21   came to see me.

22   Q.    Okay.

23         MS. JHONES:  Your Honor, may I approach to

24   give the witness a copy of that exhibit?

25         THE COURT:  Yes.
```

1              What exhibit is it?

2              MS. JHONES:  42-A.  It's in evidence.

3              If the ladies and gentlemen can turn to

4    November 10th, Government's Exhibit 42-A, please.

5    BY MS. JHONES:

6    Q.    Do you have that exhibit open, sir?

7    A.    Yes, ma'am.

8    Q.    Now, you may remember, sir, that during the

9    Government's direct questioning of you on Thursday of

10   last week, the Government began by talking to you about

11   Page 14 of that exhibit where you discuss a sigada, a

12   type of rug.  Correct?

13   A.    Yes, ma'am.

14   Q.    But there were other things that occurred prior

15   to Page 14 of that meeting; were there not, sir?

16   A.    Prior things?

17   Q.    Prior to discussing the issue of the rug, there

18   were other discussions that you had with Mr. Batiste;

19   did you not, sir?

20             MR. GREGORIE:  Objection, your Honor.  Vague.

21             THE COURT:  Sustained.

22             Rephrase your question.

23   BY MS. JHONES:

24   Q.    Well, let me ask you this, sir:  On Page 3 of

25   this transcript that's in evidence, that's when you are

```
 1   walking up to your new apartment with Mr. Batiste.
 2   Correct?
 3   A.    He was -- I was waiting in my apartment and he
 4   kept passing the location.
 5         So I have -- went out to front of my apartment
 6   and I was trying to show him where the apartment was.
 7   Q.    Okay.  Eventually, you do meet up with him.
 8   Correct, sir?
 9   A.    Yes, ma'am.
10   Q.    And continuing on to the very next page, Page 4,
11   Mr. Batiste tells you about -- after he greets you, the
12   first thing he says is how nice your neighborhood is.
13   "It's nice around here, man."
14         Do you see that?
15         MR. GREGORIE:  Objection, your Honor.  The
16   document speaks for itself.
17         THE COURT:  Sustained.
18   BY MS. JHONES:
19   Q.    Do you see that, sir?
20         THE COURT:  Sustained.
21         MS. JHONES:  Oh, okay.
22   BY MS. JHONES:
23   Q.    You also, sir, discuss about how nice the air
24   conditioning is in your apartment; do you not, sir?
25   A.    Yes, I did.
```

```
 1   Q.    And after you say that, Mr. Batiste again tells

 2   you how very nice that apartment is; does he not, sir?

 3         MR. GREGORIE:  Objection, your Honor.  The

 4   document speaks for itself.

 5         THE COURT:  Sustained.

 6         MS. JHONES:  Your Honor, I have to ask

 7   questions about this meeting.

 8         THE COURT:  It's sustained.

 9         MS. JHONES:  Okay.

10   BY MS. JHONES:

11   Q.    And you invite Mr. Batiste in; do you not, sir?

12   A.    If I invited him in?

13   Q.    Yes.

14   A.    Yes.  I did ask him to come in.

15   Q.    Okay.  Then, sir, when Mr. Batiste walks into

16   that apartment, once again, you have the television

17   turned on; do you not, sir?

18   A.    When he walked in, if I had the TV turned on?

19   Yes.

20   Q.    And you had it turned on to a particular channel;

21   did you not, sir?

22   A.    I don't know.  I don't remember if I have it in a

23   particular channel.  I mean....

24   Q.    Well, let's go to Page 6 of the transcript, sir.

25   A.    Okay.
```

al-Saidi - CROSS - By Ms. Jhones                    43

```
 1   Q.     Bottom of Page 6.

 2          You're talking about -- in the bottom of Page 6,

 3   you're talking about the television; are you not, sir?

 4   A.     Yes, I do.

 5   Q.     And directing your attention to the very next

 6   page, on Page 7, you refer to a specific channel; do

 7   you not, sir?

 8   A.     I'm sorry.  I don't understand your question.

 9   Q.     On the top of Page 7, you make a reference to a

10   particular channel on your basic cable; do you not,

11   sir?

12   A.     I said there, "You know, I was watching CNN

13   earlier.  You heard what happened in Amman?"

14          Yes.  That's what I said.

15   Q.     And what you're doing, sir, is you are bringing

16   up the topic of events that occurred in the Middle

17   East; are you not, sir?

18   A.     That was the story.  So, yes, I did.

19   Q.     You talked about events occurring in the Middle

20   East.  Correct?

21   A.     Can you repeat that question, please.

22   Q.     Sure.

23          On the top of Page 7 -- in the middle of Page 7,

24   you are talking about events that occurred in the

25   Middle East as they are being televised on CNN?
```

al-Saidi - CROSS - By Ms. Jhones                    44

```
 1   A.     Yes, ma'am.

 2   Q.     And you mention that there was a restaurant where

 3   some people were killed; do you not, sir?

 4   A.     Yes, ma'am.

 5   Q.     And there's no response -- after you mentioned

 6   the restaurant and people being killed, there's no

 7   response from Mr. Batiste regarding that topic, is

 8   there, sir?

 9          MR. GREGORIE:  Objection, your Honor.

10          THE COURT:  Sustained.

11   BY MS. JHONES:

12   Q.     When you make a reference, sir -- when you make a

13   reference to the restaurant and what occurred in the

14   Middle East, there is nothing that can be -- you cannot

15   understand what, if anything, Mr. Batiste said.

16   Correct?

17   A.     Correct.

18   Q.     Can.  And you change the subject; do you not,

19   sir?

20   A.     If I changed the subject?

21   Q.     You tell him how happy you are to see him.

22   A.     Yes, I did.

23   Q.     Right?

24          And you start talking about some of the things

25   that you have and the things that you don't have in
```

1    that apartment.  Correct?

2    A.    Yes, I did.

3    Q.    And then, sir, on the next page, you start

4    talking to Mr. Batiste again about the problems you are

5    having with the heat, meaning law enforcement; do you

6    not, sir?

7    A.    I'm sorry.  I don't understand your question

8    there.

9    Q.    After you talk about your sofa, then you turn and

10   talk to Mr. Batiste about the conversation you had with

11   Pete.  By "Pete," you mean Burson.

12   A.    Yes, ma'am.  I did speak to him about that

13   incident that night.

14   Q.    And, by the way, sir, at this point, we're now up

15   to November 10th.  Correct?

16   A.    Yes, ma'am.

17   Q.    And you still don't know Burson's name.  Right?

18   A.    Not yet.

19   Q.    Okay.  But this is a guy you've been talking to

20   for, like, many, many months?

21   A.    I was talking to Brother Naz for many, many

22   months, ma'am.

23   Q.    Okay.  And you tell him the way -- you don't like

24   the way you were being treated by the heat; do you not,

25   sir?

```
 1   A.     I'm sorry.  Can you ask me that question again.
 2   Q.     Sure.
 3          On Page 8, you were talking to Mr. Batiste about
 4   how badly you were being treated by the heat; do you
 5   not, sir?
 6   A.     By the who?
 7   Q.     By the heat, the cops.
 8   A.     You asking me what's in the transcripts?
 9   Q.     No.
10          I'm asking you -- the transcript speaks for
11   itself.  Right, sir?
12              THE COURT:  Ask another question, please.
13              THE WITNESS:  Yes, ma'am.
14              MS. JHONES:  All right.
15   BY MS. JHONES:
16   Q.     Now, then you start talking to Mr. Batiste about
17   you're going to be meeting with a good brother in
18   New York; do you not, sir?
19   A.     Yes, I did.
20   Q.     You don't tell Mr. Batiste that you're going to
21   be meeting with Al-Qaeda in New York, do you, sir?
22   A.     No, I didn't.
23   Q.     You don't tell him you're going to be meeting
24   with Brother Mohammed in New York, do you, sir?
25   A.     No.
```

1    Q.    You don't tell him you're going to be meeting

2    with Hamas or any other terrorist organization, do you,

3    sir?

4    A.    No.  I didn't make it clear that I was meeting

5    with any terrorist organization.

6    Q.    Now, you're in your apartment.  Right?  This is

7    your brand-new apartment.  Right?

8    A.    Yes, ma'am.

9    Q.    This is the apartment that the Government said,

10   "Please bring the guys over to your apartment so we can

11   record them."  Right?

12   A.    Yes, ma'am.  But -- I'm sorry.  It's just --

13   you're saying this is new, this apartment, and you

14   including things in the question that's not true.

15         Wasn't a new apartment.  And -- but, yes, I did

16   try to get him to meet with me there.

17   Q.    The purpose for that was so you could get

18   Mr. Batiste to talk, right -- to talk to you about all

19   these things that he's been talking to you about in the

20   past.  Right?

21   A.    While being recorded.

22   Q.    While being recorded.  Right?

23   A.    Yes, ma'am.

24   Q.    He doesn't know that you have audio -- a body

25   wire or whatever device you have.

1         He doesn't know that he's being recorded; does

2    he, sir?

3    A.    I was hoping that he didn't.

4    Q.    This is a perfect opportunity to start talking to

5    Brother Naz about, "You know, man, when we talked about

6    Al-Qaeda over there in the hotel in October" -- this is

7    a perfect opportunity to do it, isn't it, sir?

8    A.    Again, I did my best.  I don't know, I mean, if

9    it was perfect opportunity to mention Al-Qaeda or not.

10         But I met him, like -- I tried to get as much as

11   I could that has been mentioned before on tapes without

12   making the guy feel suspicious.

13   Q.    And, sir, when you talk about the brothers in

14   New York, you talk about going up there because you're

15   going to try to get some money from the brothers in

16   New York, some support -- monetary support; do you not,

17   sir?

18   A.    Well, I didn't want him to wonder where I was,

19   you know, getting all the money I was surviving on.  So

20   I was telling him, "Look, I'm getting some kind of

21   support to live on from New York."

22   Q.    And you also tell him, sir, that money doesn't

23   come from Allah, do you not, sir, on that conversation?

24   A.    You're asking me if I told him that money doesn't

25   come from Allah?

```
 1   Q.     Yes.

 2   A.     (No response.)

 3          THE COURT:  Do you want to refer him to a

 4   page.

 5          MS. JHONES:  Page 10.

 6   BY MS. JHONES:

 7   Q.     Middle of the page, sir.

 8   A.     No.  I said there, "Money doesn't come before

 9   Allah."

10   Q.     Okay.  Allah first, then money.

11   A.     Yes, ma'am.

12   Q.     Right?

13   A.     Yes, ma'am.

14   Q.     That's the message.  Right?

15   A.     I'm sorry?

16   Q.     That's the message you're trying to convey to

17   Mr. Batiste?

18   A.     I was speaking about my belief, you know.  My

19   belief was money doesn't come before God.  Money

20   doesn't come before Allah.

21          You see, this guy was -- I don't know how to

22   explain it.  But he was always beside -- asking me for

23   support and writing me a list with guns and different

24   Army artillery stuff that he needed for his group.

25          He also required support, you know, like, he -- I
```

1   know he wanted money from Al-Qaeda or any organization

2   that was willing to give it to him to help the mission.

3       But I know there was no way for the FBI to give

4   him that money.  So I was -- just keep trying to get as

5   much information I could.

6   Q.     Sir, we're now up to November 10th of 2005.

7   Right?

8   A.     Yes, ma'am.

9   Q.     There's been no request for guns from

10  Mr. Batiste.  Correct?

11  A.     I'm sorry?

12  Q.     No request for guns?

13  A.     If he asked me for guns before?

14  Q.     November 10th, sir.  Between October 31st and

15  November 10th, no request for guns.

16  A.     He was requesting Army artillery.  I mean, he

17  asked for any kind of support that he get.  So,

18  basically, more than one time he made it clear to me

19  that, to go ahead on the mission, that he's gonna need

20  guns.

21      He wanted to get them legally.  That's why he was

22  asking for the money, because he wanted to buy them

23  through a security -- security guard company license or

24  something.

25      So, basically, he wasn't trying to get, like, the

 1   guns from us.  He was trying to get the money so he
 2   could buy the guns, because he thinks that he could get
 3   it legally.
 4   Q.     November 10th, sir, did Mr. Batiste ask you for
 5   any guns?
 6   A.     On that day, no.
 7   Q.     November 9th, did he ask you for any guns?
 8   A.     No, ma'am.
 9   Q.     November 6th, did he ask you for any guns?
10   A.     I don't remember.
11   Q.     You also testified about a meeting on
12   November 7th -- I'm sorry -- November 2nd that wasn't
13   recorded.
14          Do you remember that?
15   A.     Yes, ma'am.
16   Q.     He didn't ask for any guns there either, did he?
17   A.     I don't recall him asking me for specific gun.  I
18   mean, the guy gave me a list and add to the list what
19   he wanted.  And it was clear.  So....
20   Q.     Let's go on with the conversation on
21   November 10th, sir.
22          Specifically, you tell him, on November 10th,
23   early on in the conversation, Page 11, that you're
24   going to go to New York and you're going to bring him
25   back a flag.  Right?

```
1    A.     Ask me again.  I'm sorry.  I didn't get your
2    question.
3    Q.     On November 10th, you tell Mr. Batiste early on
4    in the meeting in your apartment that you're going to
5    bring him back a flag when you go to New York for the
6    mosque; do you not?
7    A.     Well, he has told me before that he was gonna put
8    up flags on top of the Embassy representing each
9    country for the group that he have.  Basically, for --
10   each person from each country supposed to have a flag.
11          So, yes.  I might -- I did mention bringing a
12   flag from New York.
13   Q.     You also talked about bringing him some good
14   videos; did you not, sir?
15   A.     Yes, I did.
16   Q.     And you also talked to him about these videos
17   that you were going to bring him was about stuff that
18   was going on around the world.  Right?
19   A.     Yes, ma'am.
20   Q.     And you were also going to bring him back a
21   Koran.  Right?
22   A.     Yes, ma'am.
23   Q.     And, again, sir, while all this conversation is
24   going on in this apartment, CNN is on the television.
25   Correct?
```

al-Saidi - CROSS - By Ms. Jhones                53

1    A.    Yes.  The TV was on.

2    Q.    Okay.  And, sir, you also talked to Mr. Batiste

3    and Brother Pat -- you talked to him about the problems

4    that you're having in getting your money from Faisal;

5    do you not, sir?

6    A.    Yes, I do.

7    Q.    And you tell him that, if he doesn't give you the

8    money, you're basically going to have no other choice

9    but to hire a lawyer to get it; do you not, sir?

10   A.    Yes, ma'am.

11   Q.    And you tell him that Faisal has a lot of money

12   and you don't understand why he's not giving you the

13   money.  Right?

14   A.    Yes.  I did said that.

15   Q.    You tell him you didn't ask him for a lot, but he

16   can't even come up with the $2,000 that he owes you; do

17   you not, sir?

18   A.    Yes, ma'am.

19   Q.    And then, sir, you go back again and you start

20   talking to Mr. Batiste about the problems that the

21   people are having in the Middle East; do you not, sir?

22   A.    If I had spoken about the problem people have in

23   the Middle East?  Yes.  I discussed some of the

24   problems that was happening in the Middle East.

25   Q.    You tell him about the poor people in Jordan, do

1    you not, sir, directing your attention to Page 19?  Do

2    you see that, sir, on Page 19?

3    A.     Yes, ma'am.

4    Q.     And you're telling him how afraid the people in

5    Jordan are to basically act; are you not, sir?

6    A.     Act?

7    Q.     They're afraid to do anything about their

8    circumstances.

9           That's the message you're trying to get across.

10   Correct, sir?

11   A.     I don't understand the question.

12   Q.     In the middle of Page 19, sir, you make reference

13   to how the people are afraid in Jordan; do you not,

14   sir?

15   A.     Yes, I do.

16   Q.     And you talk to him about the United States and

17   Israel; do you not, sir?

18   A.     Yes.  I did mention the United States and Israel.

19   Yes.

20   Q.     And how people are afraid to do anything because

21   they might get killed.

22          Those are your words, sir; are they not?

23   A.     Yes, ma'am.

24   Q.     And Mr. Batiste, in response to that, says,

25   "Yeah.  Uh-huh"; does he not, sir?

1    A.    Yes, he did.

2    Q.    And that continues on -- the television continues

3    on and Mr. Batiste continues to say, "Uh-huh.  Uh-huh"

4    or words to that effect; does he not, sir?

5    A.    There is an unintelligible words and there is him

6    saying, "Uh-huh.  Uh-huh."  Yes.

7    Q.    And as you're talking about this, you laugh for a

8    minute; do you not, sir?

9         MR. GREGORIE:  Objection, your Honor.

10        THE COURT:  Sustained.

11   BY MS. JHONES:

12   Q.    And then, sir, you go back and start talking

13   about the furniture that you need for your apartment;

14   do you not?

15   A.    I did spoke about that I needed some furniture in

16   my apartment.  Yes.

17   Q.    And you told him also about the stuff that you're

18   going to buy -- the stuff -- some of the stuff that

19   you're going to buy for the mosque.  Correct?

20   A.    Yes, I did.

21   Q.    And by "the mosque," you mean the Embassy

22   location in Liberty City; do you not, sir?

23   A.    Yes, ma'am.

24   Q.    And as this is going on, Mr. Batiste tells you

25   he'd better go home.  He's basically tired; is he not,

al-Saidi - CROSS - By Ms. Jhones                    56

1    sir?

2              MR. GREGORIE:  Objection, your Honor.  Calls

3    for a conclusion.

4              MS. JHONES:  I'll rephrase, your Honor.

5    BY MS. JHONES:

6    Q.    You were present in this meeting, sir; were you

7    not?

8    A.    Yes, I was.

9    Q.    And you were able to observe Mr. Batiste; were

10   you not, sir?

11   A.    I don't understand that word.

12   Q.    You were able to look at how Mr. Batiste -- what

13   Mr. Batiste looked like on November 10th; did you not,

14   sir?

15   A.    Yes.  I was able to look at him.

16   Q.    And Mr. Batiste did tell you, "I'd better go

17   home"; did he not, sir?

18   A.    He said that.  Yes.

19   Q.    And he told you that because, based on your

20   observations, it was clear to you that he was tired;

21   was he not, sir?

22   A.    I don't know, ma'am.  I'm under oath.  I can't

23   say he was tired or not if I don't know.

24   Q.    Okay.

25             MS. JHONES:  I just need a moment, your Honor,

1    if I may.

2    BY MS. JHONES:

3    Q.    Directing your attention, sir, to Page 26 of the

4    of the transcript, do you remember telling Mr. Batiste,

5    "Brother, you're really sleepy, man"?

6          Do you remember that, sir?

7    A.    Yes, I do.

8    Q.    And you told him that, sir, because Mr. Batiste

9    was exhausted, wasn't he, sir?

10          MR. GREGORIE:  Again, objection, your Honor.

11          THE COURT:  Sustained.

12   BY MS. JHONES:

13   Q.    Those are your words (indicating).  Right?  On

14   Page 26, that is you speaking?

15   A.    Was both of us speaking.  I don't know what

16   you're pointing at now.

17   Q.    Right there (indicating).

18          Those are your words, "Brother, you're really

19   sleepy, man"?

20   A.    Yes, ma'am.

21   Q.    Why did you say that?

22   A.    Because I'm speaking to the guy and he's laying

23   down.

24   Q.    Okay.  He also tells you, sir, does he not, on

25   Page 23 -- he tells you about how early he got up to go

al-Saidi - CROSS - By Ms. Jhones                    58

```
 1   to work that day; does he not, sir?
 2   A.    Yes, he did.
 3   Q.    You tell him how much you appreciate him coming
 4   by that evening; do you not, sir?
 5   A.    Yes.  I did told him I appreciate him coming by.
 6   Q.    And you tell him that, sir, because he was very
 7   tired?
 8             MR. GREGORIE:  Again, objection, your Honor.
 9             THE COURT:  Sustained.
10   BY MS. JHONES:
11   Q.    And then, sir, on Page 29, you start talking
12   about your uncle.  Correct?  Top of Page 29.
13   A.    Yes, ma'am.
14   Q.    And you talk about your uncle sending somebody
15   over.  Correct?
16   A.    Yes, ma'am.
17   Q.    And you talk about the way your uncle pays for
18   your ticket or words to that effect; do you not, sir?
19   Do you see that?
20   A.    Yes, ma'am.
21   Q.    And you snap your fingers when you say that; do
22   you not, sir?  You slap your hands, I should say.
23         Do you see that?
24   A.    I don't know if that's me or not.  But I --
25   Q.    Well, did you say that -- are you finished?
```

al-Saidi - CROSS - By Ms. Jhones                    59

```
 1   A.     The question if I see that.  I told you, yes,
 2   ma'am, I seen that.  But I don't know if that's me.
 3   Q.     Well, you did testify when the Government was
 4   asking you questions that you had reviewed this entire
 5   transcript.  Right?  You said that, didn't you?
 6   A.     Yes.
 7   Q.     And by doing that, what you say under oath is
 8   that you listened to the CD.  Right?
 9   A.     Yes.
10   Q.     And you compared the CD to the transcript.
11   Right?
12   A.     Yes.
13   Q.     And that the CD -- and that the transcript
14   accurately reflects what the CD is saying.  Correct?
15   A.     Ma'am, was only an audio.  Wasn't video.  And
16   it's snap.  I don't know if I did or they did it.  I
17   don't know.
18   Q.     Sir, you testified under oath that you had
19   reviewed --
20          MR. GREGORIE:  Objection, your Honor.  The
21   question was asked and answered.
22          THE COURT:  Sustained.
23   BY MS. JHONES:
24   Q.     And so now you're telling us that you're not sure
25   where it says "(slap hands)" --
```

```
1              MR. GREGORIE:  Objection, your Honor.  That's
2    not what he said.
3              THE COURT:  Sustained.
4    BY MS. JHONES:
5    Q.    What did you say, just so we're clear?
6    A.    Ma'am, your question was if I slapped my hand
7    when I was speaking -- or making that comment.
8              And I told you I don't know if it was me or one
9    of the Defendants.
10   Q.    Okay.  But you would agree with me, sir, that
11   that's not what the transcript says.  Correct?
12             MR. GREGORIE:  Objection, your Honor.  It
13   doesn't say Abbas slaps hands.  It doesn't say CW slaps
14   hands.
15             THE COURT:  Sustained.
16   BY MS. JHONES:
17   Q.    And then, sir, right about when the meeting is
18   coming to an end, you tell Mr. Batiste that you're
19   going to go up there to New York and you're going to
20   see if you can get some computers, "We could get -- you
21   know, get everything done" or words to that effect; do
22   you not, sir?
23   A.    Yes.  But there was an explanation to that,
24   ma'am.
25   Q.    "Yes," you did say that.  Correct?
```

1    A.    Yes.  With an explanation.

2    Q.    Go ahead.

3    A.    There was talk about the FBI providing computers

4    so we could put in the Embassy to record what was going

5    on.  So I was trying to open up the way, if I get any

6    computers, if they would say, okay, to keep it in the

7    Embassy or not.  So, yes, I did spoke about computer.

8    Q.    Okay.  But you never did give any computers to

9    Mr. Batiste, did you?

10   A.    No, ma'am.

11   Q.    He didn't say "no" to you giving him computers,

12   did he?  He wanted computers.  Right?

13        MR. GREGORIE:  Objection, your Honor.

14        THE COURT:  Sustained.

15   BY MS. JHONES:

16   Q.    Did Mr. Batiste ever tell you he didn't want any

17   computers?

18   A.    There was a meeting on -- when I spent the night

19   in the Embassy and they -- and Brother Naz was telling

20   me, including fixing the Embassy from the inside, that

21   he wanted to get a computer and he wanted to get

22   computer in the Embassy.  Yes.

23   Q.    Okay.

24        THE COURT:  We're going to take a break.

25        Do not discuss this case either amongst

al-Saidi - CROSS - By Ms. Jhones                    62

```
 1   yourselves or with anyone else.  Have no contact

 2   whatsoever with anyone associated with the trial.  Do

 3   not read, listen or see anything touching on this

 4   matter in any way.

 5        If anyone should try to talk to you about this

 6   case, you should immediately instruct them to stop and

 7   report it to my staff.

 8        You may leave your materials at your chairs.

 9   Please be back in the jury room in ten minutes.  We'll

10   take a recess for ten.

11        (Whereupon, the jury exited the courtroom at

12   10:52 a.m. and the following proceedings were had:)

13        (Thereupon a recess was taken, after which the

14   following proceedings were had:)

15        THE COURT:  We're back on United States of

16   America versus Narseal Batiste, et al., Case

17   No. 06-20373.

18        Counsel, state your appearances, please, for

19   the record.

20        MR. GREGORIE:  Richard Gregorie and Jacqueline

21   Arango on behalf of the United States, your Honor.

22        MS. JHONES:  Ana Maria Jhones on behalf of

23   Narseal Batiste, who is present.

24        MR. LEVIN:  Albert Levin on behalf of Patrick

25   Abraham, who's present before the Court.
```

al-Saidi - CROSS - By Ms. Jhones                     63

```
 1              MR. CASUSO:  Lou Casuso on behalf of Burson

 2    Augustin, who's present.

 3              MR. CLARK:  Nathan Clark for Rotschild

 4    Augustine, who's present.

 5              MR. HOULIHAN:  Richard Houlihan on behalf of

 6    Naudimar Herrera.

 7              MR. VEREEN:  And Roderick Vereen on behalf of

 8    Stanley Phanor, who's present.

 9              THE COURT:  All Defendants are present.

10              Let's bring in the jury.

11              (Whereupon, the jury entered the courtroom at

12    11:20 a.m. and the following proceedings were had:)

13              THE COURT:  You may be seated.

14              You are still under oath, sir.

15              You may proceed, Ms. Jhones.

16              MS. JHONES:  Thank you, your Honor.

17              Your Honor, may I have the ELMO?

18              Thank you, your Honor.

19    BY MS. JHONES:

20    Q.    Mr. al-Saidi, do you still have Government's

21    Exhibit 42-A with you?

22    A.    Yes, ma'am.

23    Q.    Okay.  One more question about that meeting, sir.

24          When the meeting is coming to an end, sir, you

25    talk to Mr. Batiste about how hard the construction
```

al-Saidi - CROSS - By Ms. Jhones                64

```
 1   business is, don't you?
 2   A.    If I ask him how -- what's that again?
 3   Q.    How hard the construction business is,
 4   "Construction work is hard" or words to that effect.
 5   And I'm directing your attention to Page 27 of the
 6   transcript, if that will help you.
 7   A.    Yes.  I seen where I did mention construction
 8   work.
 9   Q.    And you tell him it's so hard that you don't even
10   do it.  Right?
11   A.    What I said there is I don't even do construction
12   myself because it's so hard.
13   Q.    Right.
14         And you tell him, sir, that you promise him,
15   meaning you promise Mr. Batiste, that you're going to
16   help him with financing or otherwise; do you not, sir?
17   A.    Yes.  I did promise him, if I could do anything,
18   that I would.
19   Q.    Regarding financing.  Correct, sir?
20   A.    Or otherwise.
21   Q.    Now, after that meeting, sir -- that was on
22   November 10th.  Correct?
23   A.    Yes.  This meeting is November 10.
24   Q.    And after that, sir, you basically have no
25   contact with Mr. Batiste for a number of days.
```

al-Saidi - CROSS - By Ms. Jhones                65

```
 1    Correct?
 2    A.    I have left to New York City.
 3    Q.    Correct.
 4          And while you were in New York City, sir, you
 5    didn't call him, did you?
 6    A.    No, ma'am.
 7    Q.    And he did not call you, did he, sir?
 8    A.    No, ma'am.
 9    Q.    Okay.  And then there comes a time that you
10    return from New York.  Correct?
11    A.    Yes.
12    Q.    And when you return from New York, your
13    instructions from the FBI are to meet with
14    Mr. Batiste -- or to try to meet with Mr. Batiste
15    again.  Right?
16    A.    If the FBI instructed me to contact Brother Naz
17    again?
18    Q.    Yes.
19    A.    Yes, they did.
20    Q.    Do you remember, sir, when you got back from
21    New York?
22    A.    I thinking I spent five, six days in New York.
23    I'm not sure of the exact date.
24    Q.    Do you remember when you tried to contact
25    Mr. Batiste upon your return from New York?  Do you
```

```
 1    remember the date?
 2    A.     No, ma'am.
 3    Q.     Well, you did try to contact him, did you not, on
 4    the 18th of November?  Does that ring a bell?
 5    A.     I'm not sure.
 6    Q.     Okay.  Would something help refresh your
 7    recollection on that, sir?
 8    A.     Yes, ma'am.
 9           MS. JHONES:  May I approach, your Honor?
10           THE COURT:  Yes.
11    BY MS. JHONES:
12    Q.     (Tenders document to the witness.)
13           Does that refresh your recollection on the date,
14    sir?
15    A.     Yes, ma'am.
16    Q.     And that was a telephone conversation you had.
17    Correct?
18    A.     Yes, ma'am.
19    Q.     In that telephone conversation, sir, you asked
20    Mr. Batiste how his little kids are doing.  Correct?
21    A.     If -- yes, I did.
22    Q.     You also have a conversation with Mr. Batiste
23    about Faisal again and the money that Faisal owes you?
24    A.     Yes.  I did mention my partner, Faisal.  Yes.
25    Q.     And you also tell Mr. Batiste again in that
```

```
 1   conversation that you're still expecting Faisal to give

 2   you some money on December 1st of 2005; do you not,

 3   sir?

 4   A.     I don't recall saying that.  But....

 5   Q.     Let me give you the document.

 6          MS. JHONES:  May I approach, your Honor?

 7          THE COURT:  Yes.

 8   BY MS. JHONES:

 9   Q.     (Tenders document to the witness.)

10          Look at Page 3?

11          THE COURT:  Is this an exhibit that we have?

12          MS. JHONES:  Your Honor, this is not in

13   evidence as of yet.

14          THE COURT:  Okay.  Have you shown it to the

15   Government?

16          MS. JHONES:  Yes, I have.

17   BY MS. JHONES:

18   Q.     Did you find it, sir?

19   A.     No.  Not yet, ma'am.

20          I'm not sure.  Am I supposed to be looking for a

21   particular sentence, ma'am?

22   Q.     No.  That document is to refresh your

23   recollection as to whether or not you discussed with

24   Mr. Batiste the money that you were expecting from

25   Faisal on December 1st of 2005.
```

```
 1   A.    Well, here, I seen on Literature 6 that Brother
 2   Naz --
 3            THE COURT REPORTER:  I'm sorry.  Could you
 4   repeat that, please.
 5            THE WITNESS:  On 6 --
 6   BY MS. JHONES:
 7   Q.    Sir, let me just interrupt you.
 8         You can't -- that document is not in evidence.
 9   It's to refresh your recollection as to that meeting.
10   A.    Yes.
11   Q.    My question to you is:  Did you tell Mr. Batiste
12   that you were expecting money from Faisal on
13   December 1st of 2005?
14   A.    I did.  But there is an explanation why I did
15   that.
16   Q.    Go ahead.
17   A.    He asked me here.  He said to me, "So what did
18   you -- what did you do?  What Faisal say?  He's
19   gonna -- to have to -- your money."
20         So, basically, he know about what's going on
21   between me and my partner and he asked me.  That's why
22   I bring this subject up.
23   Q.    Because you constantly talk to Mr. Batiste about
24   Faisal and money that Faisal owes you?
25            MR. GREGORIE:  Objection, your Honor.
```

```
 1              THE COURT:  Sustained.

 2              Rephrase your question.

 3    BY MS. JHONES:

 4    Q.    That's not the first time that you have a

 5    discussion with Mr. Batiste about the money that Faisal

 6    owes you.  Correct?

 7    A.    It wasn't the first time, ma'am.

 8    Q.    Now, additionally, sir, in that conversation, you

 9    also tell Mr. Batiste that you're trying to get him a

10    good sign, meaning a big sign, for outside of the

11    mosque in Liberty City; do you not, sir?

12    A.    He was fixing the mosque at the time.  And I was

13    trying to help him to get it fixed.  Yes.

14    Q.    And, specifically, sir, directing your attention

15    to Page 5 of that document, you do tell Mr. Batiste, do

16    you not, sir, that you're going to get him a good sign

17    for the mosque?

18              MR. GREGORIE:  Objection, your Honor.

19              THE COURT:  Sustained.

20    BY MS. JHONES:

21    Q.    There is a specific sign, sir, that you have told

22    Mr. Batiste you want to get for him, a specific sign

23    for the mosque; is there not, sir?

24    A.    Actually, yes, ma'am.  I brought some posters,

25    some signs -- you know, posters from New York.  And I
```

al-Saidi - CROSS - By Ms. Jhones                    70

```
 1   was telling him that I got it for him.
 2   Q.    Do you remember who those posters said?
 3   A.    Literatures.  Islamic literatures, as Allah, his
 4   name.  Stuff like that.  Just, you know, literatures,
 5   Islamic literatures.
 6   Q.    And, sir, in that meeting, you also, do you
 7   not -- you tell Mr. Batiste that you basically don't
 8   really deserve him or words to that effect; do you not?
 9   A.    I'm sorry?
10   Q.    You tell Mr. Batiste that you don't deserve him?
11   A.    That I don't deserve him?
12   Q.    Look at Page 6.
13         MR. GREGORIE:  Again, your Honor, objection.
14         THE COURT:  Sustained.
15   BY MS. JHONES:
16   Q.    Do you remember telling him that, sir?
17   A.    No, I don't.
18   Q.    Look at the document and see if that refreshes
19   your recollection.
20   A.    What I was saying there, ma'am, is -- I was
21   telling Brother Naz, "Believe me, brother.  I don't
22   want to disturb you."
23         Basically, I was -- I meant to say --
24         THE COURT REPORTER:  Disturb you?
25         THE WITNESS:  "Disturb."  Instead of
```

1   "deserve," it's "disturb."

2          To finish the sentence, I said, "Believe me,

3   brother.  I don't want to disturb you.  The last time

4   you came, you was sleeping."

5          So, basically, it's not saying that I don't

6   deserve him.  It's saying that I didn't want to

7   disturb, bother.

8   BY MS. JHONES:

9   Q.    You said -- you said something else, sir, did you

10  not -- about Mr. Batiste's condition the last time you

11  had met with him; did you not?

12  A.    The sentence I said there was "Believe me,

13  brother.  I don't want to deserve" -- I meant to say

14  "disturb" and I said "deserve" -- you.  The last time

15  you came, you was sleeping, working hard, trying to do

16  the best."

17  Q.    Mr. Batiste.  Correct?

18  A.    That's my sentence to Mr. Batiste -- to Brother

19  Naz.  Yes, ma'am.

20  Q.    And you were referring to the last meeting on

21  November 10th; were you not, sir?

22  A.    Yes, I was.

23  Q.    Now, after the meeting on November -- after the

24  conversation on November 18th, you tried to contact

25  Mr. Batiste again.  Correct?  After the 18th of

al-Saidi - CROSS - By Ms. Jhones                    72

1   November.

2   A.      There was some contacts.  Yes.

3   Q.      And the reason why you were trying to contact

4   him, sir, was because you were trying to get him to

5   come to your apartment on November 11th.  Correct?

6   A.      November 11th?

7   Q.      Yes.

8   A.      We was speaking about November 18 now and you

9   just went back?

10  Q.      Well, after November 18th -- you did not meet

11  with Mr. Batiste on November 18th, did you, sir?

12  A.      No, I didn't.

13  Q.      You didn't meet him on November 19th, did you?

14  A.      The date I met with him was the 21st.

15  Q.      So, again, on November 21st, before you actually

16  met with Mr. Batiste, you tried to reach him; did you

17  not, sir?

18  A.      I don't remember.  I don't remember what

19  happened.

20  Q.      Okay.  Sir, would something help refresh your

21  recollection as to whether or not you attempted to

22  reach Mr. Batiste by phone on November 21st?

23  A.      Yes.

24          MS. JHONES:  May I approach, your Honor?

25          THE COURT:  Yes.

al-Saidi - CROSS - By Ms. Jhones                    73

```
 1   BY MS. JHONES:

 2   Q.     (Tenders document to the witness.)

 3   A.     Yes, ma'am.  These are all -- the two phone calls

 4   that I made on the 21st.

 5   Q.     And after those two phone calls were placed,

 6   there did come a time -- what was the time of the last

 7   call you placed to Mr. Batiste on the 21st, sir?

 8   A.     One is 1:38 p.m.  One is 7:58 p.m.

 9   Q.     And after -- sometime after 7:58 p.m., there came

10   a time where Mr. Batiste showed up at your apartment in

11   Miami Beach.  Correct?

12   A.     Yes, ma'am.

13   Q.     Okay.  And by that time, sir, your apartment was

14   already equipped with audio and video surveillance.

15   Correct?

16   A.     Yes, ma'am.

17   Q.     Okay.  And the Government asked you some

18   questions about that meeting on November 21st during

19   your direct testimony; did they not, sir?

20   A.     Yes, they did.

21   Q.     And, sir, in that conversation with

22   Mr. Batiste -- I believe that's the conversation where

23   you brought him -- you mentioned that you brought him

24   some items back from New York.  Correct?

25   A.     Yes, ma'am.  That meeting on 11-21st was between
```

1   me and Brother Naz and Pat.  And, yes, I did brought

2   them some Islamic literature and a book and a picture

3   of Mecca.

4   Q.    A picture of Mecca.

5         Was that like a poster card, sir?

6   A.    It's -- I don't know what you want to call it.

7   Q.    Okay.  And those were items that you purchased

8   for Mr. Batiste at the direction of the FBI, sir?

9   A.    No, ma'am.

10  Q.    You did that on your own?

11  A.    Basically, the -- the sigada was requested by

12  Brother Naz.  The book -- I bought it because there was

13  some answers about jihad that I didn't -- that I wanted

14  to give to Brother Pat to get the answers he was

15  looking for.  And I bought a picture of Mecca.  That

16  was my....

17  Q.    Your idea.  Right?

18  A.    Yes.

19  Q.    And you also in that conversation -- early on in

20  the conversation you tell Mr. Batiste and Mr. Abraham

21  how happy your family was when you told them about --

22  when you told your family about the brothers.

23        Do you remember that, sir?

24  A.    I remember that the FBI instructed me to tell

25  them that my family back home was very happy that I --

al-Saidi - CROSS - By Ms. Jhones                    75

1   that they get connect with Brother Naz.

2   Q.    Well, your words were not that your family back

3   home was happy that they got connected.

4         Those were not the words that you utilized early

5   on in that conversation, were they, sir?

6   A.    The conversation was a long time ago.

7   Q.    Okay.  Well, let me show you the bottom of

8   Page 10, Government's Exhibit, in evidence, 43.

9   A.    I don't have the Exhibit 43 here.

10        MS. JHONES:  May I approach, your Honor?

11        THE COURT:  Yes.

12        MS. JHONES:  Your Honor, I don't believe the

13   ladies and gentlemen of the jury have this exhibit in

14   their binder.  So I'm just going to utilize the ELMO.

15        THE COURT:  You might want to zoom in a little

16   bit.  It's really hard to read.

17        MS. JHONES:  Okay.  I'm sorry, your Honor.  I

18   really don't know how to use it.  I just turned

19   something off.

20   BY MS. JHONES:

21   Q.    Do you see that, sir, on the bottom of Page 10?

22   A.    Yes.  I see there where I said, "Allah knows how

23   happy my family was when I told them about you."

24   Q.    And while -- when you're saying this, sir, that's

25   when Mr. Batiste and Mr. Abraham are basically laying

1    on the floor and I believe that Mr. Batiste, if memory

2    serves me, is reading from the book that you got for

3    him.  Correct?

4    A.    I'm not sure, ma'am.

5    Q.    Well, let me see if I can help you.

6          Directing your attention to Page 12, you ask

7    Mr. Batiste how he feels about the new book that you

8    got him; do you not?

9    A.    I ask him, "How do you like the book, brother?"

10   Q.    Right?

11   A.    Yes, ma'am.

12   Q.    And you tell him that you've already read it,

13   like, five times; did you not?

14   A.    Yes.  I did said that.

15   Q.    And you tell him that the Koran has the answer.

16   Correct?

17   A.    Yes.  There was literature that I brought with me

18   and it says the same thing.  That's why I said that.

19   Q.    And, sir, directing your attention to Page 13 of

20   that exhibit, that is when -- at the bottom of Page 13,

21   that is when Mr. Batiste begins to read from the book

22   that you purchased; is it not, sir?

23   A.    I know he did read off of the book that I bought.

24   Yes.

25   Q.    Okay.  And that goes on for quite some time; does

al-Saidi - CROSS - By Ms. Jhones                77

```
 1   it not, sir?

 2   A.    For -- yes.  For a little while, he did read off

 3   of the book.

 4   Q.    You also in this conversation -- early on in the

 5   conversation, you talk to Mr. Batiste about how you're

 6   trying to make some money, get some money from back

 7   home, and that you have to be patient about that or

 8   words to that effect; do you not, sir?

 9   A.    Well, yes.  I did said something about me trying

10   to get money.  Yes.

11   Q.    And then you start talking about this person

12   that's going to be coming from -- somebody that your

13   uncle is sending from back home.  Correct?

14   A.    Yes.  I did said that.

15   Q.    And when you start talking about this person, I

16   believe it's Mr. Abraham who tells you, "But what's his

17   mission?  Why is he coming?" or words to that effect;

18   does he not, sir?

19   A.    Yes.  Brother Pat has asked me what was Brother

20   Mohammed's mission, what was his reason.

21   Q.    He has no idea why this guy's coming.  Is that

22   correct, sir?

23   A.    Brother Pat didn't.

24   Q.    Well -- and when Brother Pat said that, sir,

25   Mr. Batiste didn't say, "Oh, I know what his mission
```

```
 1   is.  Let me tell you about it, Brother Pat," did he,

 2   sir?

 3   A.    I think they been -- talked about it before

 4   when --

 5         MR. LEVIN:  I'm going to object to

 6   speculative.  Move to strike.

 7         THE COURT:  Sustained.

 8         THE WITNESS:  I'm sorry.  I didn't --

 9         THE COURT:  Wait for a question, sir.

10   BY MS. JHONES:

11   Q.    And, sir, as you're having this conversation with

12   Mr. Batiste and Mr. Abraham, I believe that there are a

13   series of questions that Mr. Batiste asks you about

14   this person that is coming from back home.  Right?

15   A.    Yes.  They was asking me questions.

16   Q.    They -- Mr. Batiste asks you if he's a

17   businessman.  Correct?

18   A.    He asked me some questions about him.

19   Q.    Such as, "Is he businessman?"

20         He did ask you that; did he not, sir?

21   A.    I don't remember.

22   Q.    Directing your attention to Page 45, sir, do you

23   see that in the middle of the page?

24   A.    Yes.  I see where he asked me, "You think he's

25   much more of a businessman?"
```

al-Saidi - CROSS - By Ms. Jhones                79

```
1   Q.    Okay.  And you tell him that -- you think that he
2   wants to see more of the Moors; do you not, sir?
3   A.    If I said that?  Yes.  I did said.
4   Q.    You also tell him that this person, you
5   understand, wants to see a lot of training; did you
6   not, sir?
7   A.    What I said here is, "I mean, yeah.  He will like
8   to see more -- he like -- he will like to see training.
9   But on the next hand, I don't know the guy.  So I
10  won't -- I won't -- you know, no lies.  Huh?  I
11  know --"
12        Basically, I didn't knew the guy.  I was making
13  comments, thinking -- assuming that's what he wanted to
14  see.  But, I mean, I told him I don't know the guy.
15  So....
16  Q.    And you don't tell Mr. Batiste, do you, sir, "And
17  this is the guy I told you about way back that's coming
18  from Al-Qaeda"?  Do you, sir?
19  A.    I'm sorry.  I didn't understand the question.
20  Q.    You do not tell Mr. Batiste when he asks you
21  whether or not this gentleman is a businessman and when
22  he asks you other questions about this man -- you don't
23  tell him, "Oh, this is the guy from Al-Qaeda that I've
24  been talking to you about all this time," do you, sir?
25  A.    I didn't tell him this guy is from Al-Qaeda.  I
```

al-Saidi - CROSS - By Ms. Jhones                    80

```
 1    told him before.  But in this particular conversation,
 2    I didn't say that.  No.
 3    Q.    All righty.  And Mr. Batiste tells you that, "So
 4    once he sees everything" -- meaning this friend from --
 5    this gentleman coming from your uncle back home --
 6    "Once he sees everything, the support will come through
 7    you," meaning you, Mr. Abbas.  Correct?
 8    A.    He made that sentence.  Yes.
 9    Q.    And what Mr. Batiste is telling you there, sir --
10    your understanding of what he's telling you is, "We're
11    gonna show him some stuff and then he's gonna give
12    support through you."
13          That's what Mr. Batiste is saying there, isn't
14    it, sir?
15    A.    There was more than one conversation where
16    Brother Naz tell me that he wanted to deal with me
17    instead of dealing with Brother Mohammed.  Yes.
18    Q.    Sir, we are now on 11-21, November 21st.
19    Correct?
20    A.    Yes, we are.
21    Q.    There has been no meeting with Brother Mohammed,
22    has there, sir?
23    A.    No.
24    Q.    He hasn't met anybody but you.  Correct, sir?
25    A.    Yes, ma'am.
```

al-Saidi - CROSS - By Ms. Jhones                    81

1    Q.    And right here, he's telling you that his

2    understanding is that, once he shows him a lot of

3    stuff, support is coming through you.  Correct?

4    A.    I don't understand your question.  I mean, I told

5    you the guy was -- he wanted to get support through me.

6    He want to deal with me.

7    Q.    Okay.

8    A.    He didn't care showing Brother Mohammed any of

9    his game or training or anything like that.  He

10   basically didn't have a problem on doing that.  But he

11   wanted to deal with me.

12   Q.    And he tells you on the very next page, does he

13   not, sir, top of Page 46, that, "He's gonna see a lot

14   of" -- expletive?

15         Do you see that, sir, what Mr. Batiste tells you?

16   A.    Yes.  I see that.

17   Q.    And then you start talking about how it's

18   important to fix up the mosque.  Correct?

19   A.    I'm sorry?

20   Q.    You talk to Mr. Batiste about how important it is

21   to fix up the mosque; do you not?

22   A.    I said there I wanted to get the mosque done.

23   But they -- I'm not gonna -- I mean, yes, I spoke about

24   the mosque being done.

25   Q.    Well, sir, let me ask you a question:  You do

```
 1    remember that conversation on November 21st, don't you?
 2    You do remember it, don't you?
 3    A.     I remember portion of it.  Yes.
 4    Q.     Well, you testified about this conversation when
 5    the Government was asking you questions; did you not?
 6    A.     If I answered questions?  Yes, I did.
 7    Q.     So you do have a memory of what happened on
 8    November 21st; do you not?
 9    A.     Yes, I do.
10    Q.     And when you say to Mr. Batiste that this mosque
11    has to be fixed up, you're talking about the location
12    in Liberty City; are you not?
13    A.     Yes, I was.  At that time, he was working on it.
14    Q.     Now, it's important that that location in Liberty
15    City look like a mosque, isn't it, sir?
16    A.     I don't understand your question.  You asking me
17    is it important it looks like a mosque or not?
18    Q.     Yes.
19    A.     Not to me.
20    Q.     You keep on talking about it, sir; do you not?
21            MR. GREGORIE:  Objection.  Argumentative.
22            THE COURT:  Sustained.
23    BY MS. JHONES:
24    Q.     You are the one that mentioned fixing up the
25    mosque?
```

al-Saidi - CROSS - By Ms. Jhones                83

```
 1   A.    There was several times that I went and he's
 2   working on it.  So I'm being one of his, you know,
 3   soldiers or I'm mentioning the mosque being done
 4   because that's a part of his mission.  Yes.
 5   Q.    Okay.  And Mr. Batiste also starts talking to you
 6   about -- in this conversation, you also talk to
 7   Mr. Batiste about how important it is to look
 8   organized; do you not, sir?  Do you remember that?
 9   A.    There was discussion about being organized.  But
10   I don't remember telling him, "You have to be
11   organized."
12   Q.    Okay.  Let's look to the bottom of Page 68, sir.
13   A.    68.
14   Q.    Do you see that, sir?
15   A.    Yes.  I see that.
16   Q.    What's going on there, sir -- correct me if I'm
17   wrong -- is that Mr. Batiste is talking to you about
18   people attacking each other; is he not?
19   A.    People attacking each other?
20   Q.    Yeah.
21         Look in the top where he says, "Well, we make the
22   people attack each other."
23         Those are Mr. Batiste's words; are they not?
24   A.    Those is his words.
25   Q.    And he's talking about --
```

1            MR. GREGORIE:  Objection, your Honor.  The

2    witness was in the mid-sentence of responding.

3            THE COURT:  Let him finish his answer.

4            MS. JHONES:  Oh, I'm sorry.

5    BY MS. JHONES:

6    Q.    Go ahead.

7    A.    There was a whole conversation, you know, before

8    that sentence was said.  Brother Naz was explaining how

9    to go forward in his plan on attacking.

10           And that's how we get into the conversation.

11           And what I was saying there, "That's not an

12   issue, brother.  You see if we could organize a plan

13   for that guy until he comes."

14           Basically, what I'm trying to do, when I kept

15   mentioning to organize, I'm trying to have them give me

16   all the plans that they have to attack before it

17   happened.

18           So I was playing the role that I was from

19   Al-Qaeda, telling him Al-Qaeda have other plans that

20   they wanted to do; so, we have to be organized,

21   basically.  "You have to let us know about your attacks

22   so we can gather the attacks in one time," like he's

23   been talking about.

24           And by me saying that, I'm trying to get him to

25   tell me before he starts on any attack.

1   Q.      Are you finished?

2   A.      Yes, ma'am.

3   Q.      Okay.  Mr. Batiste right before the bottom of

4   Page 68, where you tell him, "If we could organize" --

5   right before you say those words --

6           MR. GREGORIE:  Objection, your Honor.  She

7   took that out of the sentence.

8           THE COURT:  Sustained.

9           Rephrase your question.

10  BY MS. JHONES:

11  Q.      In the bottom of Page 68, Mr. Batiste tells you,

12  "It's going to take a lot of support"; does he not,

13  sir?

14  A.      What he said -- he said, "It's easy.  It's very

15  easy to do it.  But it takes a lot of support."

16  Q.      What he means is money.  Correct?

17  A.      Yes, ma'am.

18  Q.      Okay.  And then in the bottom, after that

19  sentence, you say to him, sir, do you not, "This is not

20  an issue, brother," meaning the money is not an issue;

21  do you not, sir?

22  A.       Ma'am, I was playing a role that I was in

23  Al-Qaeda.  And this guy is telling me it's an issue to

24  buy the bomb.  I'm telling him, "No.  That's not an

25  issue."

al-Saidi - CROSS - By Ms. Jhones                86

```
1    Q.    He's telling you right there about buying a bomb?
2    Is that what you said?
3    A.    What he's saying is, "It's very easy to do it."
4    He's speaking about his missions.  "But it takes a lot
5    of support."
6          So what he's telling me there is that the
7    missions he's been telling me about cost and it does
8    take support -- a lot of support.
9    Q.    A lot of money?
10   A.    He didn't say money, ma'am.  You saying money.
11   Q.    Let's go to the top of Page 69.
12         You again state, do you not, sir, that, "Support
13   is not a problem.  It's not an issue"?
14         That's what you're saying there, sir.  Correct?
15   A.    Yes, ma'am.  I did said that.
16   Q.    And you also, again, tell him about the need to
17   be organized; do you not, sir?
18   A.    Again, I wanted to know about his attacks, and I
19   wanted to know what attack he's talking about and how
20   much do he need and what do he need that amount for.
21   Yes.
22   Q.    Correct.
23         And --
24         THE COURT:  Can you wait a minute, please?
25         MS. JHONES:  Sure.  I'm sorry.
```

```
 1              THE COURT:  Are you okay over there?

 2              UNIDENTIFIED JUROR:  Yes.

 3              THE COURT:  Go ahead.

 4   BY MS. JHONES:

 5   Q.    And, sir, in terms of -- strike that.

 6         You make certain requests of Mr. Batiste during

 7   this meeting; do you not, sir?

 8   A.    I'm sorry, ma'am?

 9   Q.    You make certain requests --

10              MR. GREGORIE:  Objection.  It's vague, your

11   Honor.

12              THE COURT:  Sustained.

13              Rephrase your question.

14   BY MS. JHONES:

15   Q.    You asked Mr. Batiste for a favor; did you not,

16   sir?

17              MR. GREGORIE:  Again, it's vague, your Honor.

18   This is a long conversation.

19              THE COURT:  Sustained.

20   BY MS. JHONES:

21   Q.    Directing your attention to Page 87, sir --

22              THE COURT:  Is there a question?

23              MS. JHONES:  I just want to make sure he got

24   to Page 87.

25              THE COURT:  Ask your question.
```

al-Saidi - CROSS - By Ms. Jhones                    88

```
 1            MS. JHONES:  Yes, your Honor.
 2   BY MS. JHONES:
 3   Q.     You asked Mr. Batiste to please -- "This man is
 4   coming for training.  He needs to see training"; did
 5   you not, sir?
 6   A.     If I ask him please -- what?  I'm sorry.  I
 7   didn't understand the question.
 8   Q.     You have requested of Mr. Batiste that he show
 9   this person who's coming -- that he see training; do
10   you not, sir?
11   A.     Here, what I said in the first literature in
12   87 -- I said, "Believe me" -- "Believe that.  Traveling
13   the world to get here.  You know he's coming for a
14   reason.  Get him some training, brother."
15          And then he said, "Uh-huh."
16          I say, "Do me a favor, man, please."
17          And he goes on, "We're gonna give him some good
18   training.  He's gonna say, 'Shit, these brothers here
19   are some guerrillas.  They go through wells [sic].'"
20   Q.     "'They go through walls.'"  Correct?
21   A.     Walls.
22   Q.     And he laughs; does he not, sir?
23   A.     Yes.
24          What I was -- excuse me.  May I complete the
25   answer, ma'am?
```

1   Q.    Did you want to say something else, sir?

2   A.    I wanted to complete my answer.

3         What I was doing there when I asked him to show

4   Brother Mohammed some training is I'm trying to prove

5   to the FBI what I been going through.  I'm trying to

6   have them show Brother Mohammed what they been showing

7   me.

8   Q.    All the training that they've been showing you.

9   Correct?  Is that what you're saying?

10  A.    What I'm saying is I wanted Brother Mohammed to

11  go through the experience I went through so he could --

12  you know, I could have proof to the FBI what I been

13  telling them.

14  Q.    And what is that, sir?  That you were going

15  through military training, also?  Is that what you're

16  saying?

17  A.    What I'm saying is I asked Brother Naz to give

18  Brother Mohammed training because I wanted to prove to

19  the FBI that they do go through training and, you know,

20  this is the kind of training I been telling the FBI

21  about.

22  Q.    Okay.  Now, after that meeting on November 21st,

23  sir, you try to contact Mr. Batiste again; do you not,

24  sir?

25  A.    After the meeting on the 21st, if I tried to

1   contact Brother Naz again?

2   Q.    Yes.

3   A.    I don't know.  I mean, I know afterward there

4   came a time when the FBI call me and instruct me to

5   call them or deal with them.

6   Q.    And the reason why you wanted to call

7   Mr. Batiste, sir, was because he was not returning your

8   calls.

9         He was not calling you, was he, sir?

10  A.    First of all, I don't know when -- what time --

11  what period of -- when you talking about.  I don't

12  know.

13  Q.    After November 21st.

14  A.    After November 21st, I was surprised by Brother

15  Naz on Thanksgiving in my house.  So I don't remember

16  trying to call him and get denied, where he denied my

17  phone calls.

18  Q.    Let me see if I can help you, sir.

19        MS. JHONES:  I just need a moment, your Honor.

20  BY MS. JHONES:

21  Q.    After November 21st, sir, Mr. Batiste did not

22  call you the next day, did he?

23  A.    I don't know.

24  Q.    Well, you don't have a recorded conversation, do

25  you, sir -- of November 22nd, do you?

al-Saidi - CROSS - By Ms. Jhones                          91

```
 1   A.     I don't remember.

 2   Q.     And on November 23rd, Mr. Batiste did not call

 3   you, did he, sir?

 4   A.     I don't remember any conversation between me and

 5   him until Thanksgiving.

 6   Q.     You're talking about Thanksgiving, the 24th?

 7   A.     Yes, ma'am.

 8   Q.     And that was the meeting that you testified when

 9   the Government was asking you questions.  Correct?

10   A.     Yes, ma'am.

11   Q.     And that's the meeting that wasn't recorded?

12   A.     Yes, ma'am.

13   Q.     But before the 24th, you were trying to reach

14   Mr. Batiste; were you not, sir?

15   A.     I just told you I don't remember, ma'am.

16          MS. JHONES:  May I approach, your Honor?

17          THE COURT:  Yes.

18   BY MS. JHONES:

19   Q.     (Tenders document to the witness.)

20          Does that help refresh your recollection, sir,

21   about your efforts to try and reach Mr. Batiste prior

22   to the 24th?

23   A.     Yes.

24   Q.     You, in fact, did try to reach him on the 23rd;

25   did you not?
```

1   A.     Yes, ma'am.

2   Q.     Okay.  May I have that back, sir.

3   A.     (Witness tenders document to Counsel.)

4   Q.     You testified about a meeting that you had with

5   Mr. Batiste on the 24th of November.  Correct?

6   A.     Yes, ma'am.

7   Q.     Okay.  And after that meeting on November 24th,

8   sir, you continue to try to reach Mr. Batiste; do you

9   not?

10  A.     I don't remember trying to contact him, ma'am.

11  Q.     Okay.

12         MS. JHONES:  May I approach, your Honor?

13         THE COURT:  Yes.

14         MS. JHONES:  Thank you.

15  BY MS. JHONES:

16  Q.     (Tenders document to the witness.)

17         Does that help you refresh your recollection,

18  sir?

19  A.     Yes, ma'am.  There is a phone call on the 25th,

20  and there is two phone calls on the 28th.

21  Q.     Those phone calls were placed by you; were they

22  not?

23  A.     Yes, ma'am.

24  Q.     On the 25th, you left a voicemail message on his

25  work phone; did you not?

al-Saidi - CROSS - By Ms. Jhones                93

```
 1   A.     There was a time when I called him and he won't

 2   answer.  I just leave him a message.  Yes, ma'am.

 3   Q.     May I have those back, sir.

 4   A.     Sure.

 5   Q.     Sir, after your efforts at trying to reach

 6   Mr. Batiste, I believe your testimony was that you saw

 7   him on December 2nd.  Correct?

 8   A.     Yes, ma'am.

 9   Q.     And that call you did not record, did you, sir?

10   A.     No, ma'am.

11   Q.     You saw him on December 6th, I believe your

12   testimony was.  Correct?

13   A.     I record on December 6.

14   Q.     But we did not listen to that recording during

15   your direct testimony, sir, did we?

16   A.     We did.  Some.

17   Q.     We did listen to a recording on December 6th,

18   sir?  Is that your memory?

19   A.     No.  I'm sorry.

20   Q.     After December 6th, sir, you continued to call

21   Mr. Batiste; did you not?

22   A.     Ma'am, there was some times that he would call me

23   and I would not answer.  I would go to the recorder and

24   call him back so I could record it.

25          So there was times where he called me, but I had
```

1    to ignore, start the device and call him back.

2    Q.      And after December 6th, sir, you tried to speak

3    to Mr. Batiste on December 14th; did you not, sir?

4    A.      Yes, I did.

5    Q.      And there was a reason why you tried to speak to

6    Mr. Batiste on December 14th; was there not, sir?

7    A.      I think the FBI instructed me to do that.

8    Q.      And the FBI instructed you to do that because

9    Brother Mohammed, as you call him, was scheduled to

10   come to Miami; was he not, sir?

11   A.      I don't know if that was the only reason.  I

12   didn't question the FBI when they asked me to call him.

13   Q.      Each time you call Mr. Batiste -- each time you

14   called Mr. Batiste, sir, you did so because the FBI

15   asked you to do it.  Correct?

16   A.      Either he just called me and I'm returning his

17   phone call or the FBI has instructed me to give him a

18   call.

19   Q.      He's returning the phone call that you were

20   instructed by the FBI to place to Mr. Batiste.

21   Correct, sir?

22   A.      Sometime he would call back to return my phone

23   call, and sometime he would call, you know, telling me

24   that he wants to meet or for whatever reason.

25   Q.      Do you recall, sir, trying to reach Mr. Batiste

1  on December 12 and leaving a voicemail message?

2  A.    No, ma'am.

3       MS. JHONES:  Your Honor, I just need a minute.

4  I'm going to hand the witness a number of exhibits so I

5  can speed this up a little bit.

6       THE COURT:  Okay.

7       MS. JHONES:  Your Honor, may I approach the

8  witness to show him these documents?

9       THE COURT:  Yes.

10      MS. ARANGO:  Ana, I'm sorry.  There's another

11  one here.

12  BY MS. JHONES:

13  Q.    (Tenders documents to the witness.)

14      I'm going to be asking you some questions on

15  these documents, Mr. al-Saidi.  Please review them.

16      THE COURT:  Are these exhibits in evidence?

17      MS. JHONES:  No, your Honor.  They're to

18  refresh his recollection.

19      MR. GREGORIE:  Refresh his recollection to

20  what, your Honor?  There's no question yet.

21      MS. JHONES:  I just wanted to --

22      THE COURT:  You can't just show him a stack of

23  documents.  If you want to refresh his recollection

24  about your last question, you may show him a document

25  or documents that reflect to that question.

al-Saidi - CROSS - By Ms. Jhones                    96

1              MS. JHONES:  I just wanted to speed it up,

2    your Honor.  I'll do it one by one.

3    BY MS. JHONES:

4    Q.    Do you remember, sir --

5              THE COURT:  So take back the documents,

6    please.  If you want to show him a document that refers

7    to your last question, you may do so.

8    BY MS. JHONES:

9    Q.    After December 6th of 2005, sir, do you remember

10   when you tried to contact Mr. Batiste again?

11   A.    I believe I went and met with him on the 8th.

12   Q.    The 8th of December?

13   A.    Yes, ma'am.

14   Q.    Was that a recorded conversation?

15   A.    No, ma'am.

16   Q.    Do you remember after December 8th when you tried

17   contacting Mr. Batiste again?

18   A.    I believe it was on the 10.

19   Q.    I'm sorry?

20   A.    December 10.

21   Q.    Was that a recorded conversation?

22   A.    I'm sorry.  I think I mixed up December and

23   November.

24              No.  The second conversation was, I think, on the

25   12.

1   Q.     The 12th of December?

2   A.     I was trying to call Brother Naz.

3   Q.     And Brother Naz did not return your phone call on

4   the 12th, did he, sir?

5   A.     I don't remember.

6   Q.     Well, if he did, we would not -- you do not have

7   any recorded conversation between you and Mr. Batiste

8   on December 12th, do you, sir?

9   A.     I was trying to record him.  But I don't know if

10  he did call me back on the same day or not.

11  Q.     Okay.  And the next time after that, sir, do you

12  remember when you tried to call Mr. Batiste?

13  A.     On the 14.

14  Q.     On the 14th, sir, do you remember how many times

15  you tried calling Mr. Batiste?

16  A.     No.

17  Q.     Would something help refresh your recollection?

18  A.     Yes.

19         MS. JHONES:  May I approach, your Honor?

20         THE COURT:  Yes.

21         MR. GREGORIE:  I believe it's in evidence,

22  your Honor, as 37-A.

23         MS. JHONES:  (Tenders document to the

24  witness.)

25         I need to verify that, your Honor.  If it is,

```
 1    I'm happy to refer to it.

 2            It is in evidence, your Honor.  I'll refer to

 3    the exhibit.

 4            THE COURT:  Okay.

 5    BY MS. JHONES:

 6    Q.    Are you ready, Mr. al-Saidi?

 7    A.    Yes, ma'am.

 8    Q.    On December 14th, sir, you tried to reach

 9    Mr. Batiste on more than one occasion; did you not?

10    A.    Yes, ma'am.  Two occasions.

11    Q.    You tried to reach him at 10:23 a.m.; did you

12    not?

13    A.    10:23 and then 10:26.

14    Q.    Well, 10:23 was the first call; was it not?

15    A.    Yes, ma'am.

16    Q.    And then there was a second call.  But there

17    wasn't a time reference, was there, sir?

18    A.    There was.

19    Q.    Could you direct us to where the time reference

20    is where it says "Call No. 2," sir.

21    A.    On the end of the page.  It says the recorded

22    time is 10:26.

23    Q.    That was the second call.  Correct?

24    A.    Yes, ma'am.

25    Q.    And there's a third call?
```

al-Saidi - CROSS - By Ms. Jhones                    99

```
 1   A.     I don't see a third call.  I see two calls.
 2   Q.     Look at the monitor, sir.  I'm referring to a
 3   Government's exhibit in evidence.
 4   A.     I still don't see the third call, ma'am.
 5   Q.     Do you see this right here (indicating), sir,
 6   "Call No. 3"?
 7   A.     Yes.
 8   Q.     Okay.  And, sir, this is -- on Call No. 3, you do
 9   reach Mr. Batiste; do you not?
10   A.     I did reach him that day.  I don't know if it
11   was -- which number was it.
12   Q.     Okay.  And that's when he told you the tools had
13   been stolen in the Embassy.
14          Do you remember that?
15   A.     Yes.
16   Q.     And that's when you tell him, Mr. al-Saidi,
17   that -- it's in this conversation that you tell
18   Mr. Batiste that you need a list from him.
19          Do you remember that?
20   A.     Yes.  I remember I was instructed to ask him for
21   a list.  Yes.
22   Q.     It was the FBI that instructed you to get a list
23   from Mr. Batiste.  Correct?
24   A.     Yes.  Because he's been mentioning different
25   things to me and I told them -- they told me, "Why
```

1   don't you ask him for a list."

2   Q.     Okay.  And you would agree with me, sir, we are

3   now up to December 14th of 2005.  Correct?

4   A.     That's September 14 -- December 14 of 2005.  Yes.

5   Q.     And you tell Mr. Batiste, do you not, that you

6   could help Mr. Batiste with the $900 that he needs for

7   the sign in his Temple?  Do you not?

8   A.     I'm sorry, ma'am?

9   Q.     Mr. Batiste asked you for $900; did he not, sir?

10  A.     No.  He told me the stuff that was stolen cost

11  him about $900 with the taxes.

12  Q.     Okay.

13  A.     So he didn't ask me.  He was telling me that's

14  what was stolen out of the Embassy.

15  Q.     Do you remember telling him, "We should be able

16  to work something out"?

17  A.     Yes, I do.

18  Q.     And what you're referring to is about giving

19  Mr. Batiste some money; are you not, sir?

20  A.     That's not what I said.  I didn't mention no

21  money.

22  Q.     No, you did not.

23         You said, "We might be able to work something

24  out."

25  A.     I feel bad for the guy.  He's telling me he just

1    went through problems.  So I'm telling him, "Hey, we

2    might be able to work something out," just to make him

3    feel better.  You know?

4    Q.    To make him feel like you're going to be able to

5    help him out.  Correct, sir?

6    A.    Again, I counted myself as one of his group.  So

7    I was at least making it seem like I wanted to help.

8    Q.    You did tell us last week that you never promised

9    Mr. Batiste any money, didn't you, sir?

10   A.    Still, even here, I never promised no amount of

11   money.

12   Q.    And you do tell him, sir -- after you say to him,

13   "We might be able to work something out," you do tell

14   him, "That's why I'm asking you for the list"; do you

15   not, sir?

16   A.    Yes.  I said that.

17   Q.    Okay.  You tell him, sir, that you're doing the

18   best you can from your end; do you not, sir?

19   A.    Yes.  I did say that.

20   Q.    Okay.  And in this conversation, sir, you also

21   remind Mr. Batiste that he really needs to stay in

22   touch with you; do you not, sir?

23   A.    I remember telling him to stay in touch with me.

24   Yes.

25   Q.    The reason you're telling him that is because he

```
 1   isn't staying in touch with you.  Correct, sir?  That's
 2   why you tell him that?
 3   A.    You asking me why I told him that?
 4   Q.    Yes, sir.
 5   A.    I told him that because I called him and he
 6   didn't answer.
 7   Q.    Okay.  Fair enough.
 8         And after the 14th, sir, you again try to call
 9   Mr. Batiste, do you not, the very next day?
10   A.    On the 15th?
11   Q.    Yes, sir.
12   A.    I don't remember trying to call him on the 15th.
13         MS. JHONES:  May I approach, your Honor?
14         THE COURT:  You have to show it to the
15   Government first.
16         MS. JHONES:  I showed it to the Government
17   already, your Honor.
18         THE COURT:  Okay.
19   BY MS. JHONES:
20   Q.    (Tenders document to the witness.)
21         Do you see that, sir?
22   A.    Yes, ma'am.
23   Q.    And that is you calling Mr. Batiste and leaving a
24   voicemail message?
25   A.    Yes, ma'am.
```

1    Q.     May I have that back?

2    A.     Sure.

3    Q.     And that's on December 15th.  Correct?

4    A.     That's what it says on the paper.

5    Q.     All righty.  And Mr. Batiste does not call you

6    back, does he, sir?

7    A.     I'm not sure.  I don't remember if he called me

8    back at that day or not.

9    Q.     Well, let me ask you this:  There is no recorded

10   conversation between you and Mr. Batiste on

11   December 15th, is there, sir?

12   A.     Not that I know of.

13   Q.     And then, on the 16th, you call Mr. Batiste

14   again; do you not, sir?

15   A.     There was calls made between me and Brother Naz.

16   But I don't know if I was calling him to ensure that he

17   picked up Brother Mohammed or he was calling me because

18   he have hard time finding the guy in the airport.

19   Q.     Well, before Mr. Batiste spoke to you about

20   having a hard time finding Brother Mohammed, you called

21   him, did you not, sir, on the 16th?

22   A.     Yes.  I did call him.

23   Q.     You called him because you were really worried

24   that he wasn't going to show up to pick up Brother

25   Mohammed; were you not, sir?

1    A.    I never was worried.  I was calling because I was

2    instructed to call him.

3    Q.    Your testimony is, sir, that you did not have a

4    concern that Mr. Batiste would not show up to pick up

5    Brother Mohammed.  Correct?

6    A.    I'm sorry.  I don't understand your question.

7    Q.    Just so I understand clearly your answer, you are

8    telling us that you did not have any concern, you were

9    not worried, sir, that Mr. Batiste would not show up to

10   pick up Brother Mohammed?  That's my question to you,

11   sir.  Were you or were you not worried?

12   A.    Honestly, I didn't care.  I was just trying to do

13   what I was instructed to do and let Brother Naz know

14   that Brother Mohammed is within the airport so he could

15   pick him up.

16   Q.    Okay.  After Mr. Batiste -- the 16th -- on the

17   16th, do you or do you not meet with Mr. Batiste in

18   person?

19   A.    No.  I never met him in person on the 16th.

20   Q.    On the 16th.  Correct?

21         And --

22         MR. GREGORIE:  Your Honor, there's no record

23   of that answer.  The witness, I think --

24         THE COURT:  He needs to answer.

25

1   BY MS. JHONES:

2   Q.     The answer is "no."  Correct?

3   A.     No.  I never met him on the 16.

4   Q.     And on the next day, sir, you don't meet with

5   Mr. Batiste either, the 17th.  Correct?

6   A.     No.

7   Q.     You don't speak to Mr. Batiste on the next day,

8   do you, sir, the 17th?

9   A.     I don't remember.

10   Q.     And on the 18th, sir, I believe you testified

11   that you did meet with Mr. Batiste.  Correct?

12   A.     Yes, ma'am.

13   Q.     And that's the meeting that wasn't recorded.

14   Correct?

15   A.     Yes, ma'am.

16   Q.     And that's the meeting that you testified to that

17   Mr. Batiste provided you a list.

18   A.     Yes, ma'am.

19   Q.     Correct?

20        And after that unrecorded meeting, sir, then you

21   called Mr. Batiste again the next day, did you not,

22   sir, on the 19th?

23   A.     I don't remember calling him on the 19th.

24   Q.     Okay.

25        MS. JHONES:  May I approach, your Honor?

```
 1              THE COURT:  Yes.

 2    BY MS. JHONES:

 3    Q.      Does that refresh your recollection, sir, as to

 4    whether or not you had a conversation with Mr. Batiste

 5    on the 19th?

 6    A.      Yes, ma'am.

 7    Q.      And you did, in fact, have a conversation with

 8    him.  Correct?

 9    A.      Yes, I did.

10    Q.      And do you remember that conversation, sir?

11    A.      Yes, I do.

12    Q.      May I have that back?

13    A.      Sure.

14    Q.      Now, the conversation you had with Mr. Batiste on

15    the 19th was recorded; was it not?

16    A.      Yes, it was.

17    Q.      And in that conversation, sir -- well, let me ask

18    you this:  There were several unrecorded conversations

19    between you and Mr. Batiste between the first time

20    that the Government gave you a recording device on

21    October 20th -- or 27th -- October 27th of 2005 all the

22    way to December 19th of 2005.  Correct, sir?

23    A.      You asking me if there was any I conversations

24    that was unrecorded?

25    Q.      Was not -- were not recorded.
```

1    A.    There was several meetings where they was not

2    recorded.

3    Q.    Okay.  And, sir, you met with Mr. Batiste on

4    December 21st of 2005; did you not?

5    A.    Yes, ma'am.

6    Q.    But before you met with him, you called him; did

7    you not, sir?

8    A.    Yes, ma'am.

9    Q.    The reason why you called him is because you

10   wanted to make sure that he was going to meet with you

11   on the 21st.  Correct?

12   A.    I don't remember.  But that could be the --

13   Q.    I'm sorry?

14   A.    I don't remember what was said then.

15   Q.    Do you remember why you called him on the 21st?

16   A.    If I remember why did I call him on the 21st?

17   Q.    Yes.

18   A.    Confirming the meeting.

19   Q.    And you did that, sir, because you had a concern

20   that Mr. Batiste may not show up for the meeting.

21   Correct?

22   A.    I don't know what was going through my mind then,

23   ma'am.  I don't know if that was the subject or if the

24   FBI instructed me to give him a call and see what was

25   going on.

```
 1    Q.    Okay.  And after you call Mr. Batiste on the

 2    21st, you do, in fact, meet with him; do you not?

 3    A.    Yes.

 4    Q.    And that was that meeting at your apartment.

 5    Correct?

 6    A.    Yes, ma'am.

 7    Q.    That was the meeting that -- the Government

 8    played certain portions of that meeting to the ladies

 9    and gentlemen of the jury.  Correct?

10    A.    Yes, ma'am.

11    Q.    Now, just so we're clear on this, Mr. al-Saidi,

12    on December 21st, this -- Brother Mohammed has already

13    met with Mr. Batiste once.  Correct?

14    A.    Yes.  By December 21st, they already met.

15    Q.    And you have told us that you -- up to this

16    point, you had not met this individual, Brother

17    Mohammed.

18          That's your testimony.  Correct?

19    A.    I never met him.

20    Q.    Okay.  Now, in this meeting, sir, of

21    December 21st, you and Mr. Batiste talk about many

22    things, including Brother Mohammed; do you not?

23    A.    Yes, ma'am.

24    Q.    And, specifically, sir, Mr. Batiste in that

25    meeting tells you a lot of things; does he not?
```

```
 1              MR. GREGORIE:  Objection, your Honor.  Vague.

 2              THE COURT:  Sustained.

 3              Rephrase your question.

 4   BY MS. JHONES:

 5   Q.    He tells you that he has land in Louisiana,

 6   doesn't he, sir?

 7   A.    Yes.  Several times he mentioned that he have

 8   land in Louisiana.

 9   Q.    He also tells you that he has land in Alabama;

10   does he not, sir?

11   A.    I don't recall Alabama.

12   Q.    Let me see if I can show you something.

13              MS. JHONES:  Your Honor, if I may have the

14   monitor.

15              This is Government's Exhibit 46-A in evidence.

16   I'm going to use the monitor.  I don't believe the

17   ladies and gentlemen of the jury have an additional

18   copy.

19   BY MS. JHONES:

20   Q.    At the bottom of Page 21 -- do you see that, sir,

21   directing your attention to the beginning?

22        Do you see -- does that help refresh your

23   recollection, sir?

24              MR. GREGORIE:  Your Honor, can the witness

25   have a copy of this transcript so he can see it
```

```
 1   properly?

 2           THE COURT:  Yes.

 3           I think we're going to break for lunch at this

 4   time.

 5           Do not discuss this case either amongst

 6   yourselves or with anyone else.  Have no contact

 7   whatsoever with anyone associated with the trial.  Do

 8   not read, listen or see anything touching on this

 9   matter in any way.

10           If anyone should try to talk to you about this

11   case, you should immediately instruct them to stop and

12   report it to my staff.

13           You may leave your materials at your chairs.

14   Please be back in the jury room at 1:45.

15           (Whereupon, the jury exited the courtroom at

16   12:38 p.m. and the following proceedings were had:)

17           THE COURT:  You may step down, sir.

18           (Witness excused.)

19           THE COURT:  You may be seated for a moment.

20           In regard to Juror No. 9, Patricia made

21   inquiry of her this morning.

22           Apparently, this is a three-day conference and

23   her -- since it is quite a ways down south, her

24   intention was to go down Wednesday night and stay

25   overnight Wednesday night, and her address is midday --
```

```
 1    I want to say 2:00.  It's somewhere around midday on
 2    Thursday.
 3            Then she would come back Thursday evening for
 4    the Friday session.
 5            So that's the latest information that I have
 6    in regard to her request for no trial on Thursday.
 7            MR. LEVIN:  So is the Court granting her
 8    request?
 9            THE COURT:  Well, I'm waiting to hear from you
10    all as to how you want to --
11            MR. GREGORIE:  Your Honor, I was noticing this
12    morning that this juror was sleeping again a couple of
13    times during the course of cross-examination this
14    morning, your Honor.  She's having a very difficult
15    time staying awake through these proceedings.
16            I would make the motion, your Honor, to have
17    this juror excused.  I think she has missed a great
18    deal of what has gone on, your Honor.
19            She's having a difficult time staying awake
20    through these proceedings.  Although I must admit there
21    are times that the proceedings are slow, I think this
22    juror has already missed a good deal of it, your Honor.
23            This is a matter solely within your Honor's
24    discretion.  There is a great deal of law, your Honor,
25    which says this is a matter solely within your
```

```
1    discretion.
2              I would ask your Honor to look at US versus
3    Fajardo -- F-a-j-a-r-d-o -- which is an Eleventh
4    Circuit case, your Honor, 787 F.2d 1523.  That case
5    refers to US versus Greene, which is a --
6              THE COURT:  787 F.2d --
7              MR. GREGORIE:  F.2d 1523 -- which makes
8    reference to US versus Greene, which I believe is a --
9    it's not from this circuit, but it refers to it, your
10   Honor, which is found at 715 F.2d 555-556, which
11   essentially says that a juror which is sleeping, your
12   Honor, is a juror who is not capable of discharging
13   their duties.
14             And I would suggest, your Honor, that this
15   juror is having a great deal of difficulty.  If we're
16   then going to have her take a trip all the way down
17   south, drive all the way back and be ready to go again
18   on Friday morning, your Honor, I think this is a
19   problem with this juror.
20             We have six alternates in this case, your
21   Honor.  They're quite awake and have been following
22   this case, your Honor.
23             I would suggest -- I would make the motion,
24   your Honor, to dismiss Juror No. 9.
25             MR. CLARK:  Your Honor, on behalf of Rotschild
```

1  Augustine, I would object to this request.

2          I haven't seen this juror sleeping.  I think

3  to conclude that she hasn't been attentive to this

4  trial is inappropriate at this time without any further

5  information from her.

6          I believe that the request should be granted

7  because we've indicated to her that it would be

8  granted.  I've been under the assumption that it would

9  be.

10          THE COURT:  I've never indicated that -- I've

11  indicated to you that I was perhaps inclined, but it's

12  never been indicated to her.

13          MR. CLARK:  Apparently, she's been -- she's

14  provided some information.  She's made a request.

15          THE COURT:  She made a request.  At my

16  request, she wrote a letter when she mentioned it to

17  Patricia.

18          MR. CLARK:  Okay.  She's been given that

19  letter in response to the Court's request.

20          I would note that this is an African-American

21  juror.  We've had numerous *Batson* objections.  The

22  Government has used nearly all of its peremptory

23  challenges on black -- African-American jurors.

24          I would make a *Batson* challenge to this as

25  well.  I don't think it's appropriate at this time to

```
 1    do anything of this nature.
 2              THE COURT:  Do you have authority for a Batson
 3    challenge in regard to the Government's request to have
 4    this juror dismissed at this time because of, number
 5    one, her request to have Thursday off and, number two,
 6    she's sleeping?  Do you have authority for a Batson
 7    challenge at this time?
 8              MR. CLARK:  My authority is the -- is the
 9    previous challenges that they have made --
10              THE COURT:  I'm talking about case law.
11              MR. CLARK:  I'm talking about the cases we
12    have already cited about the pattern.
13              THE COURT:  And what case would you cite that
14    relates to a Batson challenge at this juncture in the
15    proceedings?  Do you have any case law to support that?
16              MR. CLARK:  Specifically, I can't cite you a
17    case.  I'm not citing a case that says that, in the
18    middle of the proceedings, that -- I don't think Batson
19    doesn't apply.  I think it has to be considered, given
20    the challenges that have been made.
21              THE COURT:  Do you have any authority for a
22    Batson challenge at this time?
23              MR. CLARK:  None other than we've already
24    provided, your Honor.
25              THE COURT:  Well, what case that you've
```

```
 1    provided, Mr. Clark, would support that proposition?
 2           MR. CLARK:  Batson versus Kentucky.  We
 3    have --
 4           THE COURT:  Where in Batson does it speak to a
 5    sitting juror and a Government motion at this time?
 6           MR. CLARK:  It may not, your Honor.
 7           But it -- clearly, if it can be challenged on
 8    a peremptory, it be challenged -- that can be raised
 9    with a sitting juror.  Why would it be --
10           THE COURT:  And what authority -- I mean, you
11    say that with authority.  What authority -- other than
12    your authority, what authority do you have to support
13    that?
14           MR. CLARK:  I don't have that -- I will look
15    and see, but I don't have that right at the moment.
16           But I don't think that Batson -- and there's a
17    progeny of cases -- does not apply to a sitting juror.
18    I don't think there's --
19           THE COURT:  And do you have a case that says
20    that Batson does apply to a sitting juror?
21           MR. CLARK:  Not at this moment.
22           THE COURT:  I know that you're saying that
23    Batson -- there's no case that says that Batson doesn't
24    apply.
25           But do you have a case that says that Batson
```

1   does apply so that is something that I should consider

2   at this time?

3        MR. CLARK:  I understand.

4        Not at this moment, your Honor, because I had

5   not anticipated this would be --

6        THE COURT:  I suggest you look for one at the

7   lunch hour, then.

8        MR. LEVIN:  Your Honor, respectfully, I think

9   what Mr. Clark may be suggesting -- and, at most, this

10  is just tantamount to a *Batson* challenge at this point

11  in time.  I know of no case that would suggest that

12  this Court has no authority -- or that *Batson* applies

13  to a sitting juror.

14        That is not really the issue.

15        I think the real issue is -- first of all,

16  this is a juror who is African-American, who, as the

17  Court has noted, the Court had observed her,

18  apparently, nodding at various times a couple of weeks

19  ago.  I personally haven't seen her nodding today, as

20  Mr. Gregorie suggested.

21        She comes to court very well dressed every

22  single day.  She's been here now since January the 27th

23  or thereabouts.  I'm not sure exactly when the opening

24  statements began, but that's when jury selection began.

25  I don't know what group she was in or whatever.

1        But she has, as far as I know, not been late

2   to any of the proceedings.  She has appeared each and

3   every single day.

4        And, apparently -- and we don't what it is --

5   what conference she's speaking at -- but she's

6   apparently a woman who's very responsible and

7   apparently is someone who's apparently well thought of

8   because she's been honored, apparently -- and, again,

9   I'm speaking kind of blindly.

10        But based on the information the Court's

11   provided, it sounds like she's been honored by this

12   organization or whatever it is to give an address at

13   2:00 on Thursday.

14        I think that the Court should honor that

15   request.

16        She apparently did not know during the jury

17   selection process she would be given this opportunity

18   or given this honor.

19        As far as sleeping is concerned, respectfully,

20   there have been other jurors that have had their eyes

21   closed or whatever.  And, you know, she might have her

22   head down.  Her eyes might be closed.  But like

23   Mr. Vereen, it doesn't stretch the imagination, he's

24   not sleeping, but his eyes are closed and he looks like

25   he's sleeping, just like she may not be sleeping.

```
 1              But this is a juror who, frankly, in my view

 2     at least, has been mostly attentive to these

 3     proceedings, just as much as the rest of these jurors.

 4              And to my view, the Court needs to consider --

 5     or should consider, rather, that the Government did

 6     exercise, if not every peremptory challenge on an

 7     African-American, just about every peremptory challenge

 8     on an African-American.

 9              THE COURT:  How many African-Americans are on

10     the jury?

11              MR. LEVIN:  Approximately four.

12              THE COURT:  So you're saying they exercised

13     every -- excuse me?

14              MR. LEVIN:  Approximately four.

15              MR. GREGORIE:  There are five, your Honor, the

16     five including the alternates.

17              MR. LEVIN:  I think you're assuming that the

18     Dominican is of African descent.

19              MR. GREGORIE:  No.  I'm considering the five

20     that are there that are --

21              MR. LEVIN:  Including the alternates.

22              MR. GREGORIE:  There was one additional one

23     who is, I believe, Puerto Rican who is very

24     dark-skinned.

25              I think we're now -- we're now, you know,
```

```
 1   playing games with the basis for challenge, your Honor.

 2            MR. LEVIN:  Nobody's playing games here, your

 3   Honor.

 4            MR. GREGORIE:  But there are five out of 18,

 5   your Honor, who are African-American.

 6            MR. VEREEN:  If I may chime in.

 7            MR. LEVIN:  Please.

 8            MR. CASUSO:  Judge, let me say that, on behalf

 9   of Burson, we have no problem if you give her the two

10   days off.  The other lady got two days off.

11            THE COURT:  I'm not giving two days off.

12            MR. CASUSO:  Well, we have no problem --

13            THE COURT:  She's asking for --

14            MR. VEREEN:  Thursday.

15            THE COURT:  Well, she originally asked for two

16   days off.  Now she's asking for one day off, indicating

17   she plans to drive down Wednesday evening and come back

18   Thursday evening.

19            MR. CASUSO:  We have no problem with that,

20   your Honor.

21            MR. HOULIHAN:  Same for Naudimar Herrera, your

22   Honor.

23            MS. JHONES:  I don't believe any of defense

24   counsel have a problem with that, your Honor.

25            I believe -- I'm going on memory now -- but
```

```
 1    she may have made reference to that during the jury

 2    selection process.

 3                THE COURT:  No, she did not.

 4                MS. JHONES:  Oh, okay.  I don't remember --

 5                THE COURT:  I checked my notes and there's no

 6    indication.

 7                And, in fact, her note indicates, "I did not

 8    know that I would be selected as a juror for two

 9    months.  I would have told you of my concern."

10                And I did check my notes.  She made no mention

11    of this conflict during the voir dire process.

12                MS. JHONES:  I just would like to add, your

13    Honor, that we have accommodated other jurors that have

14    had -- I believe another juror had a doctor's

15    appointment or something --

16                THE COURT:  Both of those jurors did mention

17    both the travel for two days and the doctor's

18    appointment, which was on one of these two days.  And

19    both of those jurors did bring that up during voir

20    dire.

21                MR. LEVIN:  Judge, did this juror know she was

22    going to be asked to speak during jury selection?

23                THE COURT:  Yes.

24                MR. LEVIN:  She knew that?

25                THE COURT:  Yes.  This is a longstanding
```

```
 1    commitment, as I understand it.  She didn't think that
 2    she was going to be chosen.
 3              MS. JHONES:  Oh, okay.  That's the issue.
 4              MR. VEREEN:  My only point, Judge, is this:  I
 5    have not observed the young lady -- well, the woman
 6    sleeping --
 7              THE COURT:  I think she qualifies as a woman.
 8              MR. VEREEN:  That's why I corrected myself.
 9              I did not notice her sleeping today.  I've
10    been watching the jury.
11              THE COURT:  There was one time where I was
12    concerned today that she was dozing.  I can't say
13    that -- on a number of days, I would say probably at
14    least four or five days, I have -- and I think I
15    brought it up to you before -- I have noticed her --
16    and I think I stated that she was an equal opportunity
17    dozer or sleeper -- that she both slept through direct
18    and she has slept through cross of at least portions of
19    two of the witnesses.  And it has been of some concern
20    to me, as it's been more than just a momentary
21    meditation.
22              There have been other jurors that -- in fact,
23    I was looking at one juror this morning that seemed to
24    doze off for a couple seconds.
25              And there's been another juror in the first
```

1   row who I've noticed -- I can't tell if she is just

2   closing her eyes and meditating or if she is dozing.

3   She seems to move her arms in such a way that indicates

4   to me that she's not sleeping, that she's closing her

5   eyes.

6          And I would say that this particular juror has

7   dozed quite a bit more than any other juror.  I've

8   noticed three -- a total of four jurors who from time

9   to time have closed their eyes and seemed to for a

10  moment or two closed their eyes.  But this juror, I

11  have noticed that she has dosed off in both direct and

12  cross.

13         MR. LEVIN:  Is the Court inclined to strike

14  her because she's been dozing?

15         THE COURT:  Well, that was the request of

16  Mr. -- the request of Mr. -- as I understood it, of

17  Mr. Gregorie was a dual request, the combination that

18  she has -- has not been an attentive juror and now

19  she's asking for a day off.

20         MR. GREGORIE:  And I add to that, your Honor,

21  the fact that she's now going to be traveling all the

22  way south.

23         This is a 72-year-old woman, your Honor, and

24  she's going to be traveling all the way south, address

25  this group, come back and have to be here and be wide

1    awake on Friday morning to continue.

2         I asked Agent Velazquez to watch her this

3    morning intermittently.  He told me there were at least

4    seven occasions that he was observing her this morning

5    when she was not paying attention to the

6    cross-examination, that she had her eyes closed and he

7    believed her to be asleep, your Honor.

8         This is of grave concern to me because this is

9    a long, difficult case, and we're asking this lady to

10   travel all this distance, come back here for Friday

11   morning and be wide awake and ready to go for testimony

12   on Friday morning, your Honor.

13        MR. LEVIN:  Judge, maybe you want to inquire

14   of the juror as to how taxing this drive south is going

15   to be on her.  She's speaking at 2:00 on Thursday.  I

16   don't know how long her address is going to be.  And

17   then she's coming home that afternoon.

18        We're talking down south.  Are we talking

19   Cutler Ridge, which is 25 miles from here?  I mean,

20   it's an absurdity in terms of how taxing it's going to

21   be on her and how exhausting a trip it's going to be.

22        You know --

23        MS. JHONES:  Your Honor, if I may just be

24   heard, before such an extreme measure as striking a

25   juror that has been selected in this case -- that is a

124

1    pretty extreme measure.

2           Before the Court undertakes that, I think that

3    the juror does have an opportunity to be heard.  But I

4    would like to --

5           THE COURT:  The juror should have an

6    opportunity to be heard?

7           MS. JHONES:  Well, as to whether or not --

8           THE COURT:  You want me to bring her in and

9    ask her about what she feels about being stricken from

10   the jury?

11          MS. JHONES:  No, your Honor.  No, your Honor.

12          As to whether or not this is -- whether or not

13   the trip is going to be that taxing for her, the

14   concerns the Government has raised.

15          But I would like to look at these cases the

16   Government has cited.  I don't have them.

17          THE COURT:  That's fine.  You can look at

18   them.  I'm going to think about it.

19          MR. GREGORIE:  The second case I would mention

20   also is *US v. Freitag*, which is a Seventh Circuit case,

21   230 F.3d at 1019, your Honor, 230 F.3d 1019, *US v.*

22   *Freitag* -- F-r-e-i-t-a-g -- in addition to the Eleventh

23   Circuit case, *US v. Fajardo*.

24          THE COURT:  We're in recess until 1:45.

25          (Thereupon, a luncheon recess was taken, after

1    which the following proceedings were had:)

2           THE COURT:  We're back on United States of

3    America versus Narseal Batiste, et al., Case

4    No. 06-20373.

5           Counsel, state your appearances, please, for

6    the record.

7           MR. GREGORIE:  Good afternoon, your Honor.

8           Richard Gregorie and Jacqueline Arango on

9    behalf of the United States.

10          MS. JHONES:  Good afternoon.

11          Ana Jhones on behalf of Narseal Batiste, who

12   is present.

13          MR. LEVIN:  Good afternoon.

14          Albert Levin on behalf of Patrick Abraham,

15   present.

16          MR. CASUSO:  Louie Casuso for Burson Augustin,

17   who's present.

18          MR. CLARK:  Nathan Clark for Rotschild

19   Augustine, who's present.

20          MR. HOULIHAN:  Richard Houlihan with Naudimar

21   Herrera.

22          MR. VEREEN:  Rod Vereen on behalf of Stanley

23   Phanor, who's present.

24          THE COURT:  All Defendants are present.

25          Let's bring in the jurors, please.

```
 1              (Whereupon, the jury entered the courtroom at

 2     2:02 p.m. and the following proceedings were had:)

 3              THE COURT:  You may be seated.

 4              You are still under oath, sir.

 5              You may proceed, Ms. Jhones.

 6              MS. JHONES:  Thank you, your Honor.

 7     BY MS. JHONES:

 8     Q.    Mr. al-Saidi, I believe that before we broke for

 9     lunch, we were talking about your meeting with

10     Mr. Batiste on December 21st.

11              Do you remember that, sir?

12     A.    Yes, ma'am.

13     Q.    I believe I put the transcript, Government's

14     Exhibit 46-A, in front of you.

15              Do you have that in front of you, sir?

16     A.    Yes, ma'am.

17     Q.    Would you please tell us the time of that

18     meeting, sir.

19              Do you remember the time, by the way?

20     A.    No, ma'am.

21     Q.    Is the time reflected on the front of the

22     exhibit?

23     A.    (No response.)

24     Q.    Do you see it on the front cover?  I don't know

25     that it is.
```

```
 1   A.     It says 22:56.  Is that it?
 2          MS. JHONES:  Your Honor, may I approach the
 3   witness?  I don't know if his copy is the same as mine.
 4          THE COURT:  Sure.
 5          MS. JHONES:  Thank you.
 6   BY MS. JHONES:
 7   Q.     May I see that, Mr. al-Saidi?
 8   A.     (Tenders document to counsel.)
 9   Q.     There does not appear to be a time on that page.
10   Correct, Mr. al-Saidi?
11   A.     No time appear on this page.
12   Q.     Do you remember what time of day it was when you
13   met with Mr. Batiste on 12-21?
14   A.     I think it's afternoon.
15   Q.     That was at your apartment.  Correct?
16   A.     Yes, ma'am.
17   Q.     Sir, in the -- in the beginning part of this
18   meeting, sir, you start talking to Mr. Batiste, do you
19   not, about the technology that -- the status of the
20   technology in this country?  Do you not, sir?
21   A.     I don't understand your question, ma'am.
22   Q.     Do you remember early on in the conversation,
23   in the first few pages of conversation, talking to
24   Mr. Batiste about technology and how the technology is
25   in this country?  Do you remember that?
```

al-Saidi - CROSS - By Ms. Jhones          128

```
 1   A.     I remember we did spoke about how technology is.

 2   Q.     Well, my question is:  Do you remember you making

 3   a reference to technology in that meeting, early on in

 4   the meeting?

 5   A.     I don't remember saying anything about

 6   technology.

 7   Q.     Let's look to the bottom of Page 5, please.

 8          Do you see that, sir, at the bottom of Page 5?

 9   A.     Yes.  I am.  I see where I mentioned technology,

10   yes.

11   Q.     Do you also remember, sir, again, during that

12   particular time in the conversation -- you're talking

13   to Mr. Batiste about the first World War?  Do you

14   remember that, sir?

15   A.     You're asking me if I remember when I mentioned

16   the first World War?

17   Q.     Yes.

18   A.     I seen it in the paper.  Yes.  I remember.

19   Q.     As a matter of fact, sir, when you are speaking

20   to Mr. Batiste, when you mentioned the first World War,

21   you actually have a book about the first World War that

22   you're showing him; do you not, sir?

23   A.     No.  I don't believe I was ever showing him a

24   book about World War I.  No.

25   Q.     Turn over to the next page, Page 6.
```

1          Directing your attention to the top of the page,

2     sir, do you see that, sir?

3     A.     Number -- Page 6, the first line, second line --

4     I seen those lines, but I --

5     Q.     Where Mr. Batiste is telling you, "You reading

6     the right book, Occ," he's referring to a book that

7     you're reading; is he not, sir?

8               MR. GREGORIE:  Objection, your Honor.

9               MS. JHONES:  I'm asking him if he remembers,

10    your Honor.

11              THE COURT:  Sustained.

12              Rephrase your question.

13    BY MS. JHONES:

14    Q.     Did you or did you not have a book in your hand

15    when you were talking about the first World War?

16    A.     I didn't have a book in my hand.  No.

17    Q.     All righty.  Now, in that same page, sir, you're

18    telling Mr. Batiste, are you not, that you need some

19    training?  Correct?

20    A.     If I told him that I need some training?

21    Q.     Yes.

22    A.     I don't see where did I mention that I need some

23    training.

24    Q.     Words to that effect.  Tell me what you remember

25    telling him about training.

1    A.    Here I was saying, "Yeah, man, but I tried.  I

2    tried to read the -- read the -- much as I could keep,

3    like, busy, doing the right thing.  I exercise my mind.

4    I exercise my mind, my body.  I try to do the same

5    physical work -- workout, pushups and stuff like that.

6    But, man, I'm need a lot of training.  I'm need a lot

7    of training.  On -- one thing I know, I got training in

8    mind.  At least something."

9    Q.    Okay.  And you also tell him, sir, towards the

10   bottom of that page that it's really not a good idea to

11   do training in the mosque; do you not, sir?

12   A.    Yes, I do.

13   Q.    That was something that the FBI instructed you to

14   tell Mr. Batiste; was it not?

15   A.    No, ma'am.

16   Q.    Was that something that you made up, sir?

17   A.    That's the true, something that's not made up.

18   It's not right.  They do Army training in the mosque.

19   I thought that's the right thing.  You know?

20   Q.    When you're referring to the mosque at the bottom

21   of Page 6, are you referring to the location in Liberty

22   City that you call the mosque?

23   A.    It was Brother Naz that start calling it the

24   mosque before I did, ma'am.

25   Q.    Sir, directing yourself to my question, at the

```
 1    bottom of Page --

 2            MR. GREGORIE:  Excuse me, your Honor.  He

 3    answered the question.

 4            THE COURT:  Sustained.

 5            MS. JHONES:  Your Honor, the question that I

 6    asked he has not answered.

 7            THE COURT:  Sustained.

 8    BY MS. JHONES:

 9    Q.    You also start talking to Mr. Batiste early on in

10    this conversation about the possibility that you're

11    going to go to heaven.

12            Do you remember that, sir?

13    A.    Yes.

14    Q.    When you talked about that with Mr. Batiste,

15    Mr. Batiste had not said anything about going to

16    heaven, had he, sir?

17    A.    I'm sorry.  I don't understand your question.

18    Q.    You are the one early on in this conversation

19    that mentioned going to heaven.  Right?

20    A.    I'm not sure.

21    Q.    Well, let me direct your attention to Page 7 of

22    the transcript, sir.

23            Do you see that, sir?

24    A.    Yes.  I see that, ma'am.

25    Q.    And you also continue on and talk to Mr. Batiste
```

1    about how you're not going to feel any pain.  Right?

2    A.    I don't understand your question.

3    Q.    Well, let me see if I can help you.

4    A.    Please.

5    Q.    Turn to the next page, please, sir.

6    A.    Yes, ma'am.

7    Q.    At the top of the page, sir, you're telling

8    Mr. Batiste that you're not going to feel any pain.

9         Correct?

10         MR. GREGORIE:  Objection, your Honor.  That's

11   not what the transcript reads.

12         MS. JHONES:  I'd ask the Government to just

13   voice a legal objection as opposed to a speaking

14   objection.

15         MR. GREGORIE:  It is a legal objection.

16         THE COURT:  Sustained.

17         Rephrase your question.

18   BY MS. JHONES:

19   Q.    You are talking to Mr. Batiste, sir, early on in

20   this conversation about suicide bombers; are you not?

21   A.    Am I talking to him about suicide bombers?

22   Q.    Yes, sir.

23   A.    Can you show me something that refreshes my

24   recollection, please.

25   Q.    Look at the top of Page 8, sir.

al-Saidi - CROSS - By Ms. Jhones                    133

```
 1    A.     I am looking at it.

 2    Q.     Do you see that, sir?

 3    A.     On the top of Page 8?

 4    Q.     Yes, sir.

 5           MS. JHONES:  Your Honor, if I may just have a

 6    moment, we may not have the same pagination.  If I may

 7    just approach the witness.

 8           THE COURT:  Okay.

 9    BY MS. JHONES:

10    Q.     May I see your exhibit, sir.

11    A.     (Tenders document to counsel.)

12           MS. JHONES:  There are some differences in

13    pagination, your Honor.

14    BY MS. JHONES:

15    Q.     I'm going to ask you, Mr. al-Saidi, to look at

16    the bottom -- your bottom of Page 7 and the top of

17    Page 8 on your copy -- or I direct you to look at the

18    screen, whichever you feel more comfortable with.

19    A.     Yes, ma'am.  I see it.

20    Q.     And that's what's going on there.  That's what

21    you're talking about.  Correct?

22           MR. GREGORIE:  Objection, your Honor.  What's

23    he talking about?

24           THE COURT:  Sustained.

25           Rephrase your question.
```

```
 1    BY MS. JHONES:

 2    Q.    You're talking about suicide bombers; are you

 3    not, sir?

 4    A.    Yes, ma'am.  I did spoke about mujahedin.

 5    Q.    And that's why you talk about -- further down in

 6    the transcript about the 70 virgins?

 7    A.    Yes, ma'am.

 8    Q.    Okay.  And you were telling Mr. Batiste that you

 9    can't wait for that opportunity.  Correct?

10    A.    Yes.  I did said that.

11    Q.    Okay.  And moving on in the conversation, sir,

12    you talked to Mr. Batiste about the amount of money

13    that he could possibly get from the people back home;

14    did you not?

15    A.    I don't see where did I mention any money.

16    Q.    Okay.  Let me see if I can help you.

17          You make a reference during this conversation

18    about how much you believe that list that Mr. Batiste

19    has given to you -- how much you believe that list is

20    worth in dollars.

21          Do you remember that, sir?

22    A.    No.

23    Q.    Directing your attention to the bottom of

24    Page 21 -- again, I direct you to the screen.  It may

25    not be the same pagination, sir.
```

 1            THE COURT:  I'm concerned about the record,
 2   Ms. Jhones, because the record has to properly reflect
 3   the pagination of the exhibit that's in evidence or
 4   you're not going to have a record.
 5            MS. JHONES:  I agree with the Court.
 6            We have not been provided a copy of the latest
 7   version.  That's why I'm relying on an old one.
 8            THE COURT:  Then, I suggest that you use the
 9   exhibit that's in evidence.  Because, otherwise, your
10   record is not going to be correct.
11            MS. JHONES:  I understand.
12            And I have the same concern, your Honor.  Let
13   me see if I can go through it without wasting too much
14   time.
15            If I may approach the witness.
16            THE COURT:  Yes.
17            MS. JHONES:  Thank you.
18   BY MS. JHONES:
19   Q.    Directing your attention to your -- the bottom of
20   Page 20 in the exhibit in evidence where you state,
21   "What you wrote (unintelligible) wrote on the list is
22   less than a quarter million dollars."
23            Do you see where I'm referring to, sir?
24   A.    Yes.  I do see where you're talking about.
25   Q.    And, again, what you're telling him there, is it

```
 1    not, sir -- you're referring to how much the list that
 2    Mr. Batiste provided you -- how much you believe that
 3    list is worth in terms of dollars; are you not, sir?
 4    A.    What I said was , "I mean, you looking at the
 5    Government, man," telling Brother Naz.  "Come on, man.
 6    What you worked on that -- on that list is less -- is
 7    less than a quarter million dollars, man.  The
 8    Government -- Government billions in our account.  So I
 9    am not worried about that -- can you could do, 'cause I
10    know you will do it."
11          So, basically, what I was saying was,
12    approximately, the list he gave me is only worth a
13    quarter million dollars.  The Government have way more
14    than that in their account.  Basically, "I know that
15    you was gonna do what you said you would."  You know, I
16    was speaking of my belief.
17    Q.    I'm sorry?  You were speaking of what, sir?
18    A.    Of what I believe.
19    Q.    Okay.  Correct.
20          And you're also saying to Mr. Batiste there in
21    that conversation that, "The only thing that you guys
22    need is a boost, like a shot in the arm."  Correct?
23    A.    I'm sorry?
24    Q.    A boost.  That's your words, sir.  Correct?  Look
25    at the transcript.  I believe it would be -- I don't
```

 1   know if it's your Page 20 or 21.  Right?

 2   A.    What I said there was, "What we asked them for is

 3   a boost, boost us up so we could continue doing what --

 4   what we doing.  Other than that, we all in -- in it

 5   already without their help.  And that how I told

 6   them -- how I explain it to them."

 7         So, basically, I was speaking about me explaining

 8   to Al-Qaeda that Brother Naz and his group need a boost

 9   so they could go ahead on the -- on the mission that he

10   promised.

11   Q.    And you also tell him that this boost that

12   Mr. Batiste has to show, right --

13   A.    I'm sorry?

14   Q.    You're telling Mr. Batiste that, if he does

15   something -- right? -- it's going to give you more

16   credit; do you not, sir?

17   A.    I didn't see where did I say that.

18   Q.    Look right underneath the paragraph that you just

19   read.

20   A.    Okay.  What I said is -- what I said is, "That

21   gives us more credit, more than once.  Like I told you,

22   they don't want to start from nothing.  They want to

23   get something."

24         Basically, what I was trying to say there is I

25   want to know what you have available for Al-Qaeda, you

 1   know.  I'm not bringing Al-Qaeda to start something out

 2   of nothing.  I told them that there was an existing

 3   group that needs their help, and this is what I'm

 4   hoping for them to see.

 5   Q.    But you have told us that Mr. Batiste had been

 6   talking about this for a long time, didn't you?

 7   A.    Yes, I did.

 8   Q.    And talking for a long time about the Sears

 9   Tower.  Correct?

10   A.    It was a lot of things that he spoke about back

11   when we was in the store.

12   Q.    So you do have a lot of things that Mr. Batiste

13   has been talking to you about in the past, according to

14   your testimony; do you not, sir?

15   A.    There was things that Brother Naz has talked to

16   me about that's not in evidence.  Is that a question?

17   Q.    No, sir.

18         My question is:  You have already received a lot

19   of information from Mr. Batiste, according to you, as

20   to what it was that he wanted to do?

21   A.    Yes, ma'am.

22   Q.    And, basically, what you're telling him here is,

23   "You really have to do it because, if you don't do it,

24   we're not going to get anything in return."

25         Right?  That's what's going on here?

1   A.     No, ma'am.

2   Q.     Okay.  And you also tell him that, "What needs to

3   be done now is we need to fix up that mosque."  Right?

4   A.     There was -- again, there was talk on different

5   meetings.  He was at that time working on the mosque,

6   Temple, Embassy, as he call it.

7          So, you know, I was counting myself of one of his

8   crew.  So, I, you know, made a picture of myself to him

9   that I have worries about things that he needs to do,

10  just like he does.

11  Q.     And one of the worries that you have,

12  Mr. al-Saidi, is that training is really not enough for

13  the people back home.

14         That's one of your worries.  Correct?

15  A.     You asking me if I ever worried that training

16  wasn't enough?

17  Q.     Yes, sir.

18  A.     No.

19  Q.     Okay.  Well, let's go to the very next page,

20  Page 23, of this transcript.

21         MS. JHONES:  And if I may approach the witness

22  to make sure that he's on the same page, your Honor.

23         THE COURT:  Sure.

24         MS. JHONES:  Thank you.

25

```
1   BY MS. JHONES:

2   Q.    May I have that, sir?

3   A.    (Tenders document to counsel.)

4   Q.    Directing your attention to the bottom of your

5   Page 21 --

6         MS. JHONES:  And just for the record, your

7   Honor, that's my Page 23, as confusing as that sounds.

8   BY MS. JHONES:

9   Q.    Look at the bottom of Page --

10        THE COURT:  Well, you'd better indicate which

11  is the exhibit in evidence, if you're going to do that.

12        MS. JHONES:  I could do that, your Honor.  I

13  could supplement the record with this exhibit as well.

14  It's the same exhibit, just different pagination.

15        THE COURT:  No.  You need to identify for the

16  record which -- if you're going to name both

17  paginations, you need to identify -- is the exhibit

18  that he has before him the exhibit in evidence?

19        MS. JHONES:  Yes, it is.

20        THE COURT:  Let's just refer to his pages and

21  not to whatever pages you're using.

22        MS. JHONES:  Okay.

23        THE COURT:  Otherwise, it'll confuse the

24  record.

25        MS. JHONES:  Okay.
```

1    BY MS. JHONES:

2    Q.    Look at the bottom of Page 21 in Exhibit 46-A in

3    evidence.

4          Do you see, sir, where you're talking about the

5    difference between the training that's already been

6    done and something else that you want -- that you think

7    should happen?

8              MR. GREGORIE:  Objection, your Honor.  Even I

9    don't understand that question.

10             MS. JHONES:  Let me see if I can rephrase.

11   BY MS. JHONES:

12   Q.    You tell Mr. Batiste that training is one thing

13   and using a bomb is another; do you not, sir?

14   A.    Ma'am, what I said there was, "Even on

15   training -- we cannot just training for anything.  No,

16   man.  Training for certain reason, for certain things

17   we gonna do.  Even training -- training is -- is a word

18   being used for everything.  But training to use a bomb

19   and training how to do pushups is not the same thing."

20         Basically, what I was telling -- what I was

21   trying to get in the recording is that training had to

22   do what?  For what mission?  I'm trying to get him to

23   speak about the missions he's been telling me about.

24   Q.    Because in the conversations that you had that

25   you have previously recorded, sir, there is no mention

al-Saidi - CROSS - By Ms. Jhones                    142

```
 1    of bombs and there is no mention of anything other than
 2    training, running, pushups.  Correct?
 3    A.    Actually, there was different conversations where
 4    it wasn't recorded.  I was trying to pull out some
 5    information that wasn't recorded in the past and get it
 6    recorded.  That's --
 7    Q.    Also, sir, in the same page, you also tell
 8    Mr. Batiste that he really has to come up with more
 9    specifics, do you not, in so many words?  Right?
10    A.    Again, when I said that sentence, I got in mind
11    to have him speak about what we getting ready for, what
12    are we training for.
13    Q.    And what you're telling him is that he needs to
14    give you people, places and missions; do you not, sir?
15    A.    Okay.  Actually, if I told him he need to give me
16    people, places and what?  No.  I don't remember.
17    Q.    Missions.  Look at your Page 21.
18    A.    Okay.
19    Q.    Do you need help in finding it in your exhibit,
20    sir?
21    A.    Is it the second line, Page 21?
22          MS. JHONES:  May I approach, your Honor?
23          THE COURT:  Yes.
24    BY MS. JHONES:
25    Q.    Do you see that, sir?
```

1    A.    Where did I said, "Al-hamdu li-llah.  That's two

2    things that's organized.  We need to organize more.

3    How people we got, whatever it is.  We (unintelligible)

4    to speak about -- about it.  Now, to find it now, find

5    all that (unintelligible) we need people, places,

6    missions."

7    Q.    And those are your words.  Correct, sir?

8    A.    Those is my words.  If you pay attention, there's

9    two sentences that's unintelligible.  So what I believe

10   I was saying there is we need to organize everything

11   that we was planning on doing.  I'm trying to get him

12   to speak about it while I'm recording.

13   Q.    And, sir, additionally, you tell Mr. Batiste

14   shortly thereafter that, again, they need to get

15   organized, right, because they're not going to give him

16   any money for nothing?  He has to show something.  And

17   those are your words; are they not, sir?

18   A.    No, ma'am.

19   Q.    Okay.  Let me see if I can help you.

20         MR. GREGORIE:  Your Honor, I object to counsel

21   using her notes before the jury.  If she wants to put

22   the transcript up there, use what's in evidence.

23         THE COURT:  I agree.

24         MS. JHONES:  It's the same transcript,

25   different page.  But I'll look for that page, your

```
 1    Honor.

 2    BY MS. JHONES:

 3    Q.     Directing your attention, sir --

 4          THE COURT:  Are you using the transcript in

 5    evidence?

 6          MS. JHONES:  Yes, your Honor.  Yes, I am.  I'm

 7    finding it, the pagination in the transcript in

 8    evidence.

 9    BY MS. JHONES:

10    Q.     Directing you to the top of Page 24, the

11    transcript in evidence --

12          THE COURT:  What is on the monitor?

13          MS. JHONES:  It's the same transcript,

14    different --

15          THE COURT:  Come on up, please.

16          (Whereupon, proceedings were had at side-bar

17    outside the presence of the jury which have been sealed

18    per instructions of the Court.)

19          (Whereupon, the following proceedings were had

20    in open court:)

21          MS. JHONES:  May I retrieve the transcript,

22    your Honor?

23          THE COURT:  Yes.

24          MS. JHONES:  Would you like to provide the

25    witness with an additional copy?
```

```
 1              MR. GREGORIE:  We're making extra copies, your

 2    Honor, so it has the same pagination on it.

 3              THE COURT:  Okay.

 4              MS. JHONES:  I'll proceed with the ELMO, your

 5    Honor?

 6              THE COURT:  Yes.  You have to make sure that

 7    the witness can read it, that it's zoomed in enough.

 8              MS. JHONES:  Okay.

 9    BY MS. JHONES:

10    Q.    Okay, sir.  My question to you was with respect

11    to your comments to Mr. Batiste that the people from

12    back home was not going to -- were not going to give

13    anything to him without something in return and that

14    you had made that comment to Mr. Batiste.

15          Do you remember that, sir?

16    A.    If I remember having to make a comment to him

17    that he was not gonna get nothing?  No.  I don't

18    remember making the comment.

19    Q.    Okay.  Directing your attention to Government's

20    Exhibit 46-A at the top -- let me know if you can see

21    that.

22    A.    No.  I can't see it.

23    Q.    Are you able to see it now?

24    A.    No, ma'am.

25    Q.    Are you able to see it now, sir?
```

1    A.    Yes, ma'am.

2    Q.    Is that you speaking on the top of the page, sir?

3    A.    Yes, ma'am.

4    Q.    And that is what you're telling Mr. Batiste

5    there; is it not, sir?

6    A.    Yes, ma'am.

7    Q.    You also tell him -- what you're talking about

8    there is lots of money.  Correct, sir?

9    A.    I'm sorry.  I don't understand what you asking

10   me.

11   Q.    Sure.

12         What you're talking about, that they're not going

13   to give Mr. Batiste something for nothing, the

14   something that these people are going to turn over --

15   you're talking about lots of money; are you not, sir?

16   A.    Ma'am, what I said there was, "That's a good

17   thing.  You see what I'm saying?  They're smart, man."

18   I was telling Brother Naz that.  "They not gonna give

19   nobody a lot of money for nothing.  Believe me, man.

20   Even though they trust me so much.  I know they trust

21   me.  But when it comes to a big discussion [sic] that

22   they -- they very smart."

23         So, basically, what I was telling him is don't

24   even think about cheating Al-Qaeda.  They very smart.

25   You know?

1    Q.    And, sir, you also tell Mr. Batiste that you were

2    going to try to get him some money in the meantime to

3    tide him over.  Correct?

4    A.    Yes, ma'am.  I mentioned that because I think I

5    owed him some -- he loaned me a loan before, pocket

6    change.  I told him I was going to return that to him.

7    Q.    Well, when you tell him you're going to give

8    him some money, sir, you don't tell him, "Hey, those

9    25 bucks you let me borrow, I'm going to give that back

10   to you."

11         That's not what you talked about --

12   A.    I didn't make it very clear, but I did make it

13   clear that it's pocket change only, so nothing major

14   towards the mission or anything.  It was between me and

15   him, favors.

16   Q.    You also tell Mr. Batiste in this meeting, sir,

17   that you want him to change the name of the mosque.

18         Do you remember that, sir?

19   A.    No, ma'am.

20   Q.    Remember telling Mr. Batiste that, "It's really

21   not a good idea to refer to the Moors.  You need to

22   change that name"?

23         Do you remember that, sir?

24   A.    I remember that we was in a conversation and I

25   made him feel less worried by saying, "If you want to

```
 1    operate secretly, you could.  And I think it would have

 2    been a better idea if you change the Moors."

 3    Q.    And you also told him, sir, that it really --

 4    when the Embassy opens up, it really should be more

 5    like a mosque.

 6          Correct?

 7    A.    I don't remember saying that.

 8    Q.    Okay.  Directing your attention to Page 27 of

 9    Government's Exhibit 46-A, I'd like you to take a look

10    at that, sir, and tell me if that refreshes your

11    recollection.

12    A.    Yes.  I remember that, ma'am.  Actually, what I

13    was doing there is I was jogging the information that

14    me and him been through before and, also, giving him

15    ideas like I was one of his soldiers so he could worry

16    less about me being an informant.

17          So what I was doing there was giving him ideas,

18    you know, about what I think he should do and, also,

19    mentioning things that we spoke about in the past, such

20    as the Government that he was planning to have.

21    Q.    Well, sir, you don't tell him in that

22    conversation, do you, "You know, remember, Mr. Batiste,

23    what we've been talking about in the past when you told

24    me about the Moors and the uniforms."

25          That's not what you say in that conversation, is
```

1    it, sir?

2    A.    I did what I could.  I mean, there is a lot more

3    than one conversation that we mentioned a lot of

4    different things.  And he didn't disagree with me when

5    I was talking about his Government or his organization

6    or -- and that was the point.

7    Q.    But what you're asking Mr. Batiste right now --

8    you're asking him to do something; are you not, sir?

9    A.    I was giving him ideas and, also, you know,

10   jog -- again, jogging what we been talking about before

11   so I could get him to speak.

12   Q.    Are you finished?

13   A.    Yes, ma'am.

14   Q.    You're giving Mr. Batiste ideas.  Right?

15   A.    It's the same ideas we been going back and forth.

16   He's been giving me a lot of ideas.  So I'm just

17   repeating those ideas.

18   Q.    You're also -- you also tell Mr. Batiste, sir, do

19   you not, that he has to change the name of the

20   organization?  Do you not, sir?

21   A.    Again, I gave him an idea after him telling me

22   that he was worried, that he felt suspicious.  So I'm

23   trying to share with him his safety concerns.

24   Q.    And, sir, you also tell him that, "Don't use

25   those uniforms that you use.  I don't want you to use

1    those uniforms" or words to that effect; do you not,

2    sir?

3    A.    I'm not sure.

4    Q.    Okay.  Directing your attention to Page 28 on

5    Government's Exhibit 46-B, do you see that, sir?

6    A.    Yes.  I see that, ma'am.

7    Q.    And that's also where you tell Mr. Batiste, do

8    you not, that, "When we get this mosque, it has to be

9    an Islamic mosque, not a Moors mosque or a Moors

10   Temple"?  You're telling him, "I want it to be an

11   Islamic mosque"; do you not, sir?

12   A.    I don't see it there.

13   Q.    Okay.  Let me see if I can help you.

14         Do you see where it says --

15         MR. GREGORIE:  Your Honor, I have a copy of

16   that transcript for the witness.

17         THE COURT:  You can give it to him.

18         MS. JHONES:  It appears to be the same.

19         May I approach, your Honor?

20         THE COURT:  Yes.

21   BY MS. JHONES:

22   Q.    (Tenders document to the witness.)

23   A.    You said that was Page 21?

24   Q.    Page 28.

25   A.    28.

al-Saidi - CROSS - By Ms. Jhones          151

```
 1   Q.     I'll give you a moment to look for it.

 2          Do you see the top of Page 28, sir --

 3   A.     Yes, ma'am.

 4   Q.     -- where you say, "So when we get this mosque,

 5   it's gonna be an Islamic mosque"?

 6          Do you see that on the top, sir, right there

 7   (indicating)?  Look at the screen.  Your top of

 8   Page 28.  First couple of sentences.

 9   A.     I seen where did I mention that.

10   Q.     I'm sorry.  I didn't get that.

11   A.     I seen where did I mention -- you -- I asked

12   him -- I mean, as I was speaking, I said there, "Yeah.

13   When we get this mosque, it's -- is it gonna be an

14   Islamic mosque, a real mosque?"  I did said that.  Yes.

15   Q.     Okay.  And throughout the course, sir, of this

16   conversation, you continue to provide Mr. Batiste with

17   your ideas about how it is that you're going to be able

18   to get this money from back home; do you not, sir?

19   A.     I don't understand your question.  I mean,

20   there's ideas that I gave him, but I didn't tell him

21   that I was -- I mean -- I'm sorry.  I just don't know

22   how to answer your question.

23          You making it seem like it was all my idea --

24          MR. LEVIN:  Objection, your Honor.

25   Nonresponsive as to what Ms. Jhones may or may not be
```

1    doing.  It's argumentative, also.  It's inappropriate.

2            THE COURT:  Sustained.

3            Wait for a question, sir.

4            MS. JHONES:  Your Honor, I just need a minute

5    to get to the correct page.

6            Your Honor, I'm going to move on because I

7    can't seem to find that particular page.

8            THE COURT:  Okay.  Sounds good.

9            MS. JHONES:  It does sound good, your Honor.

10           THE COURT:  While Ms. Jhones is figuring out

11   where she wants to be, we're all going to take a

12   stretch break.  So stand up.

13           Ready?

14           MS. JHONES:  Yes, your Honor.

15           THE COURT:  Okay.  Sit down.

16   BY MS. JHONES:

17   Q.    Mr. Batiste, sir, tells you towards the end of

18   this conversation that, as soon as he gets the money,

19   everything is going to be shown to the people from back

20   home or words to that effect; does he not, sir?

21   A.    I remember him saying that he was waiting for --

22   to get money so he could go further on the mission.

23           We spoke about -- he told me about, if he would

24   have $10,000, that he was ready to go to Chicago.  He

25   showed me some of his soldiers in Chicago.

1    Q.    And you told him, did you not, sir, that -- you

2    said, "Well, all we need, then, is the money, $10,000,

3    for the soldiers in Chicago."  Correct?

4    A.    I am asking him what do we need so he can show me

5    his soldiers in Chicago, like he told me.

6    Q.    You did.

7          And he told you , "If I would get that, we would

8    leave tonight, right for Chicago"; did he not, sir?

9    A.    Yes, ma'am.  He told me, if he would get the

10   $10,000, that he would fix up his van and we would be

11   on our way to Chicago.

12   Q.    And you told him, did you not, sir, "Well, let me

13   see what I can do about that," meaning getting him the

14   money; did you not, sir?

15   A.    Yes.  I did said that.

16   Q.    You also told him, sir -- you also told him that

17   you would let him know how long it's going to take for

18   you to get this money for him; did you not, sir?

19   A.    I'm sorry.  You asking me if I told him that I

20   was going to see how long was it going to take me?  I

21   don't understand your question, ma'am.

22   Q.    Yes.

23         Did you or did you not tell Mr. Batiste that you

24   were going to find out how long it's going to take you

25   to get this money for him or words to that effect?

1    A.     I did said that I was going to find out what is
2    it gonna take me to get him that amount.  Yes.
3    Q.     And how long it was going to take for you to get
4    him that money?
5    A.     As soon as I speak to the FBI and see if they
6    willing to do that or not.
7    Q.     You never told him that you weren't going to get
8    him any money, did you, sir?
9    A.     I'm sorry, ma'am?
10   Q.     You never said, "No, Brother Naz.  I can't give
11   you any money."
12          You never said that to Brother Naz, did you, sir?
13   A.     I never gave it to him because he never gave me a
14   reason to say it like that.  The guy always ask me to
15   help him, to guide him, to any extremist to help him
16   towards his missions.  So I kept trying to do that.
17   Q.     Well, what Mr. Batiste is asking you for on more
18   than one occasion in this meeting is, "You give me the
19   money and I'll show you what I'm made of," words to
20   that effect; did he not, sir?
21   A.     You asking me if he told me, if he would get the
22   mission -- if he would get the money, he would show me
23   what he's talking about, what kind of mission?  Yes.
24   He did told me that, as soon as he get that money, that
25   he was gonna start working on the mission right away.

1    Q.     All he needed was the money?

2    A.     That's not what he told me.  No.

3    Q.     You also told him, sir, this it's really a bit of

4    a problem to get a lot of money right away because

5    maybe, maybe, maybe, there's going to be some questions

6    about where the money came from or words to that

7    effect; did you not, sir?

8    A.     I don't remember, ma'am.

9    Q.     Okay.  Look at Page 48.

10           Do you see that, sir?

11   A.     Yes, I do.

12   Q.     And he says, basically, "No problem.  You can get

13   the money for me," doesn't he, sir?

14   A.     You asking me what he said?

15   Q.     Yeah.

16           You said to him, "You have to find a way" -- "We

17   might have to find a way on how to give it to you,"

18   meaning the money.  Correct?

19   A.     Yes, ma'am.

20   Q.     Okay.

21   A.     I did make that sentence.  I told him, "So we

22   might have to find a way to -- how to give -- to give

23   it to you."

24           He was telling me in the past about using his

25   construction company to cover him.  Basically, he's

1    asking him to do a contract in the mosque and give him

2    the support towards -- as it was -- as he was taking a

3    contract for the mosque so, if he would be asked by the

4    United States Government how he got that money, he

5    could say he made a contract.

6    Q.    Correct.

7          Just give him the money, and he'll worry about

8    the rest.  Right?

9    A.    No.

10   Q.    And, sir, after December 21st of 2005, this

11   meeting that we were just discussing for a while, you

12   basically don't see Mr. Batiste anymore in the month of

13   December, do you, sir?

14   A.    I'm sorry?  Say that again.

15   Q.    After the meeting of December 21st of 2005, you

16   basically don't see Mr. Batiste anymore in the month of

17   December, do you, sir?

18   A.    Yes, ma'am.  I get a visit on Thanksgiving by him

19   and his group.

20   Q.    Was Thanksgiving in December, sir?

21   A.    I'm trying to figure it out.  It's November, I

22   think.

23   Q.    I'm sorry?

24   A.    November.

25   Q.    So after the December 21st meeting, you don't see

```
 1   Mr. Batiste anymore in the month of December of 2005.

 2   Correct?

 3   A.    Correct.

 4   Q.    Okay.  And you testified about a meeting --

 5   or a -- I believe you stated that it was some type of a

 6   surprise visit that Mr. Batiste paid you in your

 7   apartment -- I believe you said sometime in January --

 8   early January of 2006.  Correct?

 9   A.    January 3rd.

10   Q.    And that's, I believe, the conversation where you

11   said he showed up with his wife.  Right?

12   A.    Yes, ma'am.

13   Q.    That's the conversation where you said that you

14   were surprised that Mr. Batiste would talk about these

15   things in front of his wife.

16         Remember that?

17   A.    Yes, ma'am.

18   Q.    So your testimony is that, as early as

19   January 3rd of 2006, Mr. Batiste had discussed his

20   plan with you in the presence of his wife.

21         Am I correct?

22   A.    Yes, ma'am.

23   Q.    And when you say that -- when I say that he had

24   discussed his plan with you in the presence of his

25   wife, we're talking about the Sears Tower plan.
```

1          Fair enough?

2     A.    I'm not -- it was more than one plan.  So I'm not

3     sure, ma'am.

4     Q.    So -- well, let me ask you this:  Did he -- in

5     addition to discussing other plans, did he also discuss

6     the Sears Tower?

7     A.    I believe he mentioned the Sears Tower.

8     Q.    And just so I'm clear about this, he spoke about

9     several plans on that January 3rd meeting in the

10    presence of his wife.  Correct?

11    A.    Yes, ma'am.

12    Q.    And then, sir, you have a meeting with

13    Mr. Batiste in the Florida Keys on January 28th of

14    2006?

15    A.    Excuse me?  I'm sorry.  I didn't get your

16    question.

17    Q.    You have a meeting with Mr. Batiste in

18    Islamorada, the Florida Keys, on January 28th of 2006.

19    Right?

20    A.    Yes.  They did took us to the Keys.

21    Q.    And this was a place where you met with

22    Mr. Batiste -- I believe it was in a little tent.

23    Correct?

24    A.    Yes.  When we got there, there was a tent.

25    Q.    And that meeting lasted for at least an hour; did

1   it not, sir?

2   A.    I'm not exactly sure.  It wasn't a long time that

3   we stood in that tent.

4   Q.    And that is a meeting that we have -- the

5   Government asked you about, but they haven't played any

6   clips about that meeting.  Right?

7   A.    Yes, ma'am.

8   Q.    Okay.  And I believe you mentioned, sir, that

9   after that January 28th meeting, you had a call here

10  and a call there with Mr. Batiste, but you were pretty

11  much not involved at that point.

12        Is that a fair assessment?

13  A.    One call here, one there?  I don't know.  It was

14  three, four phone calls after that.

15  Q.    Okay.  I'm sorry.

16        Are you finished?

17  A.    Go ahead, ma'am.

18  Q.    Do you remember a telephone call, sir, on

19  March 25th of 2006 with Mr. Batiste?

20  A.    Yes, ma'am.

21  Q.    And this is a meeting with Mr. Batiste -- a phone

22  call?

23  A.    Yes.

24  Q.    And this is a phone call where Mr. Batiste asked

25  you about his request of Brother Mohammed for money for

 1   a lawyer.

 2        Do you remember that, sir?

 3   A.    I don't remember.  I remember I called him and

 4   told him that I dropped off a van for him.  That was

 5   it.

 6   Q.    Do you remember having a conversation on the very

 7   same day before the conversation about the van --

 8   another conversation where you spoke to Mr. Batiste

 9   where Mr. Batiste told you about the need that he had

10   for money for a lawyer?

11   A.    I don't recall, ma'am.

12        MS. JHONES:  I have nothing further, your

13   Honor.

14        THE COURT:  We're going to take a break.

15        Do not discuss this case either amongst

16   yourselves or with anyone else.  Have no contact

17   whatsoever with anyone associated with the trial.  Do

18   not read, listen or see anything touching on this

19   matter in any way.

20        If anyone should try to talk to you about this

21   case, you should immediately instruct them to stop and

22   report it to my staff.

23        You may leave your notebooks and materials at

24   your chairs.  Please be back in the jury room in ten

25   minutes.

1          (Whereupon, the jury exited the courtroom at

2     3:13 p.m. and the following proceedings were had:)

3          THE COURT:  We're in recess for ten minutes.

4          (Thereupon a recess was taken, after which the

5     following proceedings were had:)

6          THE COURT:  We're back on United States of

7     America versus Narseal Batiste, et al., Case

8     No. 06-20373.

9          Counsel, state your appearances, please, for

10    the record.

11         MR. GREGORIE:  Richard Gregorie and Jacqueline

12    Arango on behalf of the United States, your Honor.

13         MS. JHONES:  Ana Jhones on behalf of Narseal

14    Batiste, who is present.

15         MR. LEVIN:  Albert Levin on behalf of Patrick

16    Abraham, who's present.

17         MR. CASUSO:  Louie Casuso on behalf of Burson

18    Augustin, who's present.

19         MR. CLARK:  Nathan Clark for Rotschild

20    Augustine, who's present.

21         MR. HOULIHAN:  Richard Houlihan with Naudimar

22    Herrera.

23         MR. VEREEN:  And Roderick Vereen on behalf of

24    Stanley Phanor, who's present.

25         THE COURT:  All Defendants are present.

```
 1              Let's bring in the jurors, please.

 2              THE COURT SECURITY OFFICER:  Yes, your Honor.

 3              THE COURT:  Are you ready, Mr. Vereen?

 4              MR. VEREEN:  I am, your Honor.

 5              (Whereupon, the jury entered the courtroom at

 6    3:45 p.m. and the following proceedings were had:)

 7              THE COURT:  You may be seated.

 8              You are still under oath, sir.

 9              You may proceed, Mr. Vereen.

10              MR. VEREEN:  Thank you, your Honor.

11                        CROSS-EXAMINATION

12    BY MR. VEREEN:

13    Q.    Mr. al-Saidi, good afternoon.

14    A.    Good afternoon.

15    Q.    You know this gentleman, Stanley Phanor?

16    A.    Yes, sir.

17    Q.    You recognize him as the person you know as

18    Brother Sunni?

19    A.    Yes, sir.

20    Q.    And he is the -- one of the gentlemen that you

21    met at the Embassy back in 2005.  Correct?

22    A.    Yes, sir.

23    Q.    Now, let me ask you to reflect back to that year,

24    2005.

25              That is around the same year that you met Narseal
```

```
 1   Batiste.  Correct?
 2   A.     Yes, sir.
 3   Q.     And you met Narseal Batiste because he would come
 4   up to the store where you worked.  Right?
 5   A.     Yes, sir.
 6   Q.     And Narseal Batiste would dress certain ways;
 7   would he not?
 8   A.     Was a lot of times that I seen him and not every
 9   time was the same.  So...
10   Q.     Well, describe what he would wear.
11          MR. GREGORIE:  Objection, your Honor.  When?
12          THE COURT:  Sustained.
13          Rephrase your question.
14   BY MR. VEREEN:
15   Q.    When he would come to the store back in the year
16   2005, would you describe what he wore when you first
17   met him.
18          MR. GREGORIE:  Objection.
19          THE COURT:  Overruled.
20   BY MR. VEREEN:
21   Q.    When you first met him is my question.
22          THE COURT:  Overruled.
23          THE WITNESS:  I don't remember his clothes
24   when I first met him, sir.
25
```

```
 1    BY MR. VEREEN:

 2    Q.      Well, he was introduced to you by Faisal Hassan;

 3    was he not?

 4    A.      Yes, sir.

 5    Q.      Do you remember the introduction?

 6    A.      Yes.  I remember when Faisal Hassan --

 7    Q.      What was he wearing on that day?

 8    A.      I don't remember what he was wearing.

 9    Q.      Nothing stuck out in your mind, such as he's

10    standing there with a cane or wearing a robe or a kufi

11    on his head?

12    A.      I have no idea.  It was long time ago.

13    Q.      Now, you've been in this country since the year

14    19 -- well, let me ask you:  What was the first year

15    you first came here?  1993?

16    A.      Yes, sir.

17    Q.      And you were how old in 1993?

18    A.      I believe I was 9 years old.

19    Q.      But there came point in time when you were in

20    New York that you started working as a confidential

21    informant.  Correct?

22    A.      Yes, sir.

23    Q.      And you were not recruited for that position,

24    were you?

25    A.      If I was recruited for that position?
```

1    Q.      Yeah.

2            Law enforcement didn't come to you and say,

3    "Would you like to work as a confidential informant?"

4    You went to law enforcement.  Correct?

5    A.      Yes, sir.

6    Q.      The reason why you did that is because, after

7    being in the country for the number of years that you

8    had been in at that time, you had learned that law

9    enforcement pays for information.  Correct?

10   A.      No, sir.

11   Q.      That is not correct?

12   A.      When I went the first time to the police station

13   in Brooklyn, I was -- I was just scared for my life.  I

14   had to tell them and get out the area because I was,

15   you know, working for somebody selling drugs in the

16   corner for -- and he wasn't getting paid enough.

17           So I --

18   Q.      Say that again.

19           MR. GREGORIE:  Objection, your Honor.  The

20   witness was interrupted.

21           MR. VEREEN:  I did not hear the witness,

22   Mr. Gregorie.

23           MR. GREGORIE:  He didn't finish his answer.

24           THE COURT:  Let him finish his answer.

25

BY MR. VEREEN:

Q.    If you'll repeat your answer, please.

A.    Okay, sir.  When I first start working for the
NYPD, it was my choice to go give them that information
for no -- and I didn't expect anything in return.

      I didn't knew they was gonna pay me.  I didn't
ask for a paycheck.  And they didn't gave me a paycheck
for the job that I did.

      I think they gave me several days $40 a day for
lost wages and they gave me $200 for a room I was
renting.  That's it.

Q.    And the information you provided was with regard
to a drug dealer that you had been working for?

A.    More than one drug dealer.

Q.    And what were you doing -- what was your job
description?

A.    I was as an informant.  I would go and get the
information of where the secret places, where they
would hide the drugs, what kind of drugs, all the
details the cops asked me for.

Q.    And that became beneficial financially for you at
that time.  Correct?

A.    No, it wasn't.

Q.    It wasn't.  All right.

      And did you stop working as a confidential

1   informant at that time?

2   A.      Yes, I did.

3   Q.      Did you ever go back and work for them again

4   where you got compensated for the information you

5   provided?

6   A.      I'm sorry.  I don't understand.  I never got

7   compensated.  They never gave me anything for giving

8   them that information.  They gave me the lost wages I

9   had, and they gave me $200 for the apartment that I was

10  staying in.

11  Q.      Lost wages for what?

12  A.      I was working and I stopped working during that

13  time and worked to provide the information for them.

14  Q.      And what were you doing -- you said you were

15  working.

16          What was your job description?

17  A.      I had different jobs.  I had -- would work in a

18  grocery store.  The last job I had I was working in a

19  corner store.

20  Q.      So that's what they compensated you for, the

21  $40 a day, for working at the corner store?

22  A.      Yes.

23  Q.      And the $200 was for what?

24  A.      For the rent, for the room I was staying in.

25  Q.      Was that the only time you worked for them as a

 1   confidential informant?

 2   A.     No.  That was the first time.

 3   Q.     When was the second time?

 4   A.     I think it was about a year and a half to two

 5   years after that.

 6   Q.     And why did you do that at that time?

 7   A.     Why did I work for the....

 8   Q.     Did they come to you a year and a half later and

 9   ask you to work as a confidential informant?

10   A.     Yes.  There is a case that occurred and they

11   asked me to work -- to work with them on that case.

12   Yes.

13   Q.     And do you know how it is that they knew how to

14   find you?

15   A.     If I know how did they find me?

16   Q.     Yeah.

17   A.     They find me in my work.

18   Q.     So they came to your job?

19   A.     Yes, sir.

20   Q.     And where were you working then?

21   A.     I was working on 72nd Street and 2nd Avenue,

22   Manhattan, New York.

23   Q.     Doing what?

24   A.     Corner store.

25   Q.     So they found you -- is this a different corner

1    store?

2    A.    Yes, sir.

3    Q.    And so you had given them your information so

4    they can find you?

5    A.    No, sir.  I was working there and a case occurred

6    that I had to speak to them.  And when they find out

7    that I was there, then they asked me to work with them.

8    Q.    So they recruited to you work again for them as a

9    confidential informant?

10   A.    I don't know -- I don't know what they did.  But

11   they asked me to work to help them gather information,

12   and I did exactly that.

13   Q.    How much did you get paid this time?

14   A.    I wasn't counting.  I didn't knew how much that I

15   make.  It was around six months.  It was on and off.  I

16   was getting paid $40 a day.  So I don't know how many

17   days was it.

18   Q.    You did that for six months?

19   A.    Approximately.

20   Q.    Was that the last time you worked as a

21   confidential informant in New York?

22   A.    At that time, yes.

23   Q.    What do you mean, "at that time," Mr. al-Saidi?

24   A.    I mean, before I worked in Brother Naz case, that

25   was it.

```
 1   Q.    So you did the two times in New York and then the
 2   case down here in Miami.  Correct?
 3   A.    Are you asking me that's all I did?
 4   Q.    That's what I've been trying to -- yes,
 5   Mr. al-Saidi.  That's what I'm asking you.
 6         Are those the only two times that you worked as a
 7   confidential informant before getting involved in this
 8   case here?
 9   A.    Yes, they was.
10   Q.    Now, when you were in Miami back in 2005, the
11   jobs that you held again were in corner stores.
12   Correct?
13   A.    I'm sorry?
14   Q.    The jobs that you held were at corner stores?
15   A.    I worked in corner stores.  I also drive a Yellow
16   Cab.
17   Q.    When did you get a license to drive a Yellow Cab?
18   A.    I think it was in 2005 or the beginning of '06.
19   Q.    Are you sure whether or not it was in '05 or '06?
20   A.    I'm not sure.  Either one of those years.
21   Q.    You didn't start driving a cab until after you
22   met these gentlemen.  Correct?
23   A.    Yes, sir.  I decided to work in the cab is so I
24   could have enough flexibility to work with the FBI on
25   this case.
```

```
 1    Q.     Now, prior to this case starting, you were
 2    working -- you were part owner of a store that Faisal
 3    owned the other half of.  Correct?
 4    A.     I'm sorry.  I don't understand your question.
 5    Q.     Faisal Hassan:  Did the two of you own a store
 6    together?
 7    A.     If I was partnered with Faisal Hassan?
 8    Q.     Yes.
 9    A.     Yes, I was.
10    Q.     And there was a falling-out between the two of
11    you.  Correct?
12    A.     A falling-out?  I don't understand.
13    Q.     A separation in partnership.
14           You no longer wanted to be his partner.  Correct?
15    A.     There came a time that we decide to split.  Yes.
16    Q.     And that time came because you thought -- you
17    knew that Faisal Hassan had been engaging in illegal
18    activity inside the store regarding Food Stamps.
19    Correct?
20           MR. GREGORIE:  Objection.  Relevance, your
21    Honor.
22           THE COURT:  Sustained.
23    BY MR. VEREEN:
24    Q.     Whatever the reason, you and Faisal Hassan
25    decided to separate as partners.  Correct?
```

```
 1    A.      It was more than one reason.

 2    Q.      Forget what the reasons were.

 3            The two of you decided to separate as partners.

 4    Correct?

 5    A.      Yes, sir.

 6    Q.      You had gone to the FBI initially complaining of

 7    Faisal Hassan.  Correct?

 8    A.      Yes, I did.

 9    Q.      And then, after that -- in fact, you advised the

10    Federal Government at that time, the FBI, that Faisal

11    Hassan was interested in jihad, correct, against the

12    United States?

13    A.      I don't remember.

14    Q.      You don't remember?

15    A.      I don't remember telling the FBI that Faisal

16    Hassan was interested on jihad.

17            MR. VEREEN:  The Court's indulgence.  One

18    moment, Judge.

19              I'll come back to that.

20    BY MR. VEREEN:

21    Q.    After you informed the Government of your

22    concerns about Faisal Hassan, you turned your attention

23    towards Narseal Batiste and these gentlemen seated here

24    at this table.  Correct?

25            MR. GREGORIE:  Objection, your Honor.  The
```

1    question assumes facts not in evidence, your Honor.

2            THE COURT:  Sustained.

3            Rephrase your question.

4    BY MR. VEREEN:

5    Q.    Your initial complaint to the FBI was with regard

6    to Faisal Hassan.  Correct?

7    A.    I don't understand your question.

8    Q.    When you first went to the FBI -- when you

9    contacted the FBI in this case, your first concern was

10   that of Faisal Hassan.  That's what you contacted them

11   about.  Correct?

12   A.    No, sir.  I contact -- I don't know if I contact

13   them about Faisal, because he introduced Brother Naz to

14   me, if I have mentioned his name.  But I know I called

15   the FBI concerning the flier that Brother Naz gave me

16   and the information he told me.

17   Q.    So is it your testimony that you did not

18   initially complain about Faisal Hassan and his

19   activities?

20   A.    I don't remember that.  I didn't say -- it's my

21   testimony that I didn't say that.  I said I don't

22   remember saying that about Faisal.

23   Q.    You advised the Government -- when I say "the

24   Government," the FBI -- that Narseal Batiste was

25   interpreting the Koran in a violent way; did you not?

al-Saidi - CROSS- By Mr. Vereen                              174

1    A.      Yes, I did.

2    Q.      Now, you are a Muslim?

3    A.      Yes, I am.

4    Q.      You read the Koran?

5    A.      Yes, I do.

6    Q.      You've been to the building called "the Embassy"

7    on a number of occasions.  Correct?

8    A.      I didn't understand the question.

9    Q.      You've been to the building called "the Embassy"

10   on a number of occasions.  Correct?

11   A.      Yes.  Yes.  I have been there in the Embassy on

12   different occasions.  Yes.

13   Q.      Prior to you beginning your work as a

14   confidential informant in this case, how many times had

15   you been to that building?

16   A.      I never been in that building or know about that

17   building until I start working as a confidential

18   informant.

19   Q.      You didn't know anything about the building?

20   A.      No, sir.

21   Q.      When you would attend meetings -- would you ever

22   attend meetings with these gentlemen?

23   A.      Before I speak to the FBI, I never left my store

24   to go meet with Brother Naz.  He always come to my

25   store and meet with me.

al-Saidi -CROSS- By Mr. Vereen                    175

```
 1   Q.    So you never had any prayer sessions with these
 2   gentlemen at all?
 3   A.    I never left my store with Brother Naz or to meet
 4   him until I reported that to the FBI.
 5   Q.    Okay.  Well, tell me what part of the Koran --
 6   what scriptures do you recall Narseal Batiste
 7   interpreting in a violent way?
 8   A.    He interprets a lot of things.  One thing I
 9   remember is that he believe in that jihad is war -- is,
10   basically, an act of war, a hand-to-hand combat, ground
11   war.  He thinks that jihad should be a way to take
12   revenge.  And it's not.
13   Q.    In the beginning of this -- my cross-examination,
14   I asked you if you recognized Stanley Phanor as the
15   person you referred to as Brother Sunni.
16         Do you remember that?
17   A.    Yes.
18   Q.    Do you recall having an argument -- or, better
19   yet, Stanley Phanor having an argument with you with
20   regard to your definition of the term "jihad"?  Do you
21   recall that?
22   A.    No.
23   Q.    Do you recall having -- or attending a meeting
24   with these gentlemen and referring to jihad or giving a
25   definition as to what jihad was when Mr. Phanor told
```

 1   you that he knows of no religion, no religion, that

 2   advocates the killing of women and children?  Do you

 3   recall that?

 4   A.    I don't think that's never occurred.

 5   Q.    It was you that came up with the definition

 6   saying what a good jihad and a bad jihad --

 7             MR. GREGORIE:  Your Honor, could the witness

 8   finish his answer?

 9             MR. VEREEN:  I thought he finished his answer.

10             THE COURT:  Had you finished your answer, sir?

11             THE WITNESS:  I wasn't finished.  But he got

12   me forgot the question, asking me too fast.

13             MR. VEREEN:  Well, I'm not sure what the last

14   question was.

15             Do you want to read it back.

16             THE COURT:  Well, why don't you just ask your

17   next question.

18             MR. VEREEN:  That's fine, Judge.

19   BY MR. VEREEN:

20   Q.    It was you that came up with the two-term

21   definition such as what jihad is, as far as being good

22   jihad and bad jihad.  Correct?

23   A.    When?  When you saying -- to who?

24   Q.    To these gentlemen.  To Stanley Phanor.

25             Do you recall that?

```
 1    A.      No.

 2    Q.      You don't recall that?

 3    A.      No, sir.

 4    Q.      Okay.  During Ms. Jhones's cross-examination of

 5    you, several times you mentioned that the FBI told you

 6    what to say.

 7            Do you recall that?

 8    A.      There is a lot of things I was instructed to say

 9    by the FBI.  Yes.

10    Q.      And there are things that Ms. Jhones questioned

11    you about with regard to some of the statements you

12    made in the transcripts where you admitted that it was

13    actually true.  It wasn't made up.  This was actually

14    true.  For instance, the domestic violence incident.

15            Do you recall that?

16    A.      Yes.  I recall her arguing with me about the

17    domestic violence case.

18    Q.      Now, your status in this country is that of a

19    resident.  Correct?

20    A.      Permanent resident.  Yes.

21    Q.      And you are seeking citizenship; are you not?

22    A.      Yes, sir.

23    Q.      And that is your main goal in this -- in -- I

24    mean, that's the business that you are undertaking.

25    You're trying to get citizenship in this country.
```

1    Correct?

2    A.    I don't understand your question.

3    Q.    You want to be a citizen of the United States; do

4    you not?

5    A.    Yes, I do.

6    Q.    And you want to be a citizen of this country

7    because you see it as a great country; do you not?

8    A.    Yes, sir.

9    Q.    And part of living the life of a citizen in this

10   country is achieving wealth?

11   A.    I'm sorry.  I don't understand.

12   Q.    Well, you want to achieve the American dream,

13   i.e., you want to -- you don't to work the rest of your

14   life in a convenience store.  Right?

15   A.    If I wanted to spend the rest of my life working

16   in a grocery store?

17   Q.    You do not.  I'm not asking you.  I'm telling

18   you.

19         You do not want to work the rest of your life in

20   a grocery store.  Correct?

21   A.    You telling me?

22   Q.    Well, isn't that what you said to Burson

23   Augustin?

24   A.    Sir, are you asking me what I told him or are you

25   telling me what I want to do with my life?

1    Q.     I'll tell you what.

2              MR. VEREEN:  Your Honor, if I may get the

3    ELMO, please.

4              THE COURT:  What exhibit is this?

5              MR. VEREEN:  This is Government's

6    Exhibit 46 -- Government's Exhibit 41-A.

7    BY MR. VEREEN:

8    Q.     Mr. al-Saidi, I'm showing you Page 68 of this

9    transcript.  I'm directing your attention to the middle

10   part of the paragraph.

11             You make the statement, "I'm not gonna stay

12   working for the rest of my life in a store.  It's not

13   my dream.  It's not what I want to do.  But I have to

14   do it.  And we gotta be there.  I -- I can't live life.

15   Think of the shortest way to get to the point that I

16   want to get to.  That's the best thing to do in life,

17   believe me.  I mean, I'm not gonna do nothing stupid

18   like selling drugs to make fast money or something like

19   that, but there's a lot of different ways to get

20   shortcuts."

21             Those were your words.  Correct?

22   A.     Yes, sir.

23   Q.     And that is truly how you feel about why it is

24   that you're doing what you're doing.  Correct?

25   A.     I don't know, sir.

```
 1   Q.     You don't know?
 2          The Government didn't tell you to say those
 3   words, did it?
 4   A.     But they didn't told me not to say them.
 5   Q.     Well, I know they didn't tell you not to.
 6          My question is:  They didn't tell you to say
 7   that.  That's what you were feeling when you were
 8   talking to Burson Augustin.  Correct?
 9   A.     No, sir.
10   Q.     That is not what you were feeling?
11   A.     I don't know what I was feeling three years ago.
12   I mean....
13   Q.     The truth of the matter is that you were under
14   the influence of marijuana when you were having this
15   conversation; were you not?
16   A.     No, I wasn't.
17   Q.     You were not?
18   A.     I was not.
19   Q.     The Government played a clip from the same
20   exhibit and stopped it at Page 22.  Let's go to that
21   page again, if you will.
22          MR. VEREEN:  Let me have the ELMO, your Honor.
23   BY MR. VEREEN:
24   Q.     Now, this is you and Mr. Burson Augustin having a
25   conversation.  This is where the clip stops, where it
```

 1   said, "That's what it takes from."

 2        This is what Mr. Augustine says to you:  "We

 3   don't drink.  We don't chase after women.  Because let

 4   me tell you one thing.  The bag of weed that you got

 5   from somebody, their spirit went into that weed.  When

 6   they were bagging it up, they had thoughts, but --

 7   doing like this with their fingers.  It's like voodoo.

 8   And whatever their thoughts was going in that bag,

 9   they -- all their energy is gonna come out to you when

10   you open it up, breaking the seal."

11        Now, this was Mr. Augustin speaking with you

12   while you were in the car with him that day.  Correct?

13   A.   Yes.

14   Q.   And it is your testimony that you did not have a

15   bag of marijuana with you at that time?

16   A.   I didn't have nothing on me.

17   Q.   And it is your testimony that you were not under

18   the influence of marijuana at that time?

19   A.   I were not.

20   Q.   Now, Mr. Gregorie asked you during your direct

21   examination if you had been under the influence of

22   marijuana any time you were working as a confidential

23   informant in this case.

24        And you responded, "No."

25        Correct?

1    A.     Yes, sir.  I never smoked while working.

2    Q.     You never smoked while working.

3           Well, let me ask you this:  Did you smoke

4    marijuana with Haitian Mike over in the hotel that the

5    Government provided for you?

6    A.     No, sir.

7    Q.     Never?

8    A.     Not that I remember or know about.

9    Q.     Not that you remember or know about?

10   A.     No.

11   Q.     What about in the apartment that the Government

12   provided for you?  Did you smoke marijuana with Haitian

13   Mike at that place?

14   A.     No.

15   Q.     Your mission when you were speaking with

16   Mr. Burson Augustin on November the 7th of 2006 --

17   excuse me -- in 2005 was to, as you said, get him to

18   make admissions or get as many of the brothers to make

19   admissions on tape.  Correct?

20   A.     I don't understand.

21   Q.     Well, you were asked on cross-examination by

22   Ms. Jhones about the nature of the conversation you

23   were having on November the 7th, 2005, and the fact

24   that you were wearing a body wire.

25          Do you recall all those questions?

1    A.    Yes.  I recall her asking me that.

2    Q.    And you recall saying that it was your job to get

3    the brothers to make as many statements on the wire so

4    that they would support what you'd been telling the

5    FBI?

6    A.    I don't understand your question.

7    Q.    What part of my question don't you understand?

8    A.    The whole question, basically.  I don't

9    understand what you asking me.

10   Q.    What was your purpose for wearing a wire on

11   November the 7th, 2005?

12   A.    To record what was happening.

13   Q.    To record what?

14   A.    What was happening between me and the brothers on

15   the meeting.

16   Q.    Okay.  And you'd agree with me that your

17   definition of jihad and Burson Augustin's definition of

18   jihad were two different things?

19   A.    Yes, sir.

20   Q.    And why did you answer that "yes"?

21   A.    Why did I answer that "yes"?

22   Q.    Yes.

23   A.    Because I never had anybody leading me on killing

24   people.  I never have a leader telling me fighting my

25   own country and trading on my own Government is the

```
 1    right thing to do.  That's not me.

 2    Q.    When you met with these gentlemen over at the

 3    Embassy, you saw them studying books.  Correct?

 4    A.    Excuse me?  If I seen them studying books?

 5    Q.    Yeah.

 6    A.    No.  I seen Brother Naz preaching.  I seen

 7    another preacher preaching to them.

 8    Q.    Okay.

 9    A.    I seen them training with machetes, not --

10    different things.  But I never seen him studying like

11    we was in school.  No.

12    Q.    You've heard them -- have you finished?

13    A.    Yes, sir.

14    Q.    They talked about social improvement; did they

15    not?

16    A.    I don't understand what's that.

17    Q.    Cleaning up the neighborhoods.

18    A.    Yes.  I heard Brother Naz talking about cleaning

19    the neighborhoods from drugs and united with different

20    gangs and doing stuff like that.  Yes.  I heard him

21    saying that.

22    Q.    You heard them talk about uplifting each other?

23    A.    Uplifting?  I don't know what's that.

24    Q.    Improving themselves.

25    A.    I don't want to make a wrong comment.
```

1          I never heard them talking about improving

2     themselves.  I heard them talking about improving the

3     mosque.  I heard them talking about improving a lot of

4     things.  But to improve their physical self, no, I

5     never heard them make a statement like that.

6     Q.    Burson Augustin expressed to you essentially what

7     his understanding of jihad was with regard to

8     respecting your elders and improving oneself.  Correct?

9     A.    I don't remember him making that statement, sir.

10    Q.    All right.  Do you recall Mr. Burson Augustin

11    expressing to you that you're going to have the

12    opportunity to meet some of the elders, some of the

13    brothers, and that they've been in jihad for a long

14    time?

15    A.    I think I -- I remember him saying that I was

16    gonna meet some of the elders.  Yes.

17    Q.    Let me go to Page 58 of the same exhibit,

18    Government's Exhibit 41-A.

19          MR. VEREEN:  If I may have the ELMO, please,

20    your Honor.

21    BY MR. VEREEN:

22    Q.    This is Mr. Augustin speaking with you.  Do you

23    see that?

24    A.    Yes.

25    Q.    He says to you, "You -- there's a lot of people

```
 1   that's gonna be coming to Miami.  You're gonna see some
 2   of our elders, the older brothers."
 3   A.     Can you --
 4   Q.     Listen to my question.
 5          You say, "Oh, man."
 6          And then he says, "From the money that we get
 7   from this construction.  And they're really serious
 8   about jihad.  They've been in jihad since" -- and
 9   there's a whistling and a laughter -- "you know, longer
10   than me."
11          And then you say, "Al-hamdu li-llah."
12          And then he says, "Longer than Prince Manna,
13   too."
14          Correct?
15   A.     You asking me if that's his statements?
16   Q.     Right there.
17          That's what he said to you.  Correct?
18   A.     The transcript speaks for itself, sir.
19   Q.     Right.
20          So more than just saying that you're going to
21   meet some of the other brothers, he's telling you
22   they've been -- he's expressing what his understanding
23   is.
24          He's essentially saying they're really serious
25   about jihad.  They've been in it longer than him and
```

1  longer than Prince Manna, too.  Right?

2  A.    I don't know if you asking me a question or you

3  telling me --

4  Q.    I'm asking you.

5  A.    If he said that?

6  Q.    Yes.

7  A.    Yes.

8  Q.    And your understanding of that was that he looks

9  at jihad, saying that they've been in jihad longer than

10  him and they've been in jihad longer than Prince Manna,

11  too.

12        Is that he interprets that jihad to mean holy

13  war?

14  A.    Are you asking me what he mean?  I don't know

15  what he mean.

16  Q.    I asked you was your definition different from

17  his.  You said "yes."

18  A.    Yes.  Because we got into a lot of conversations

19  and he's telling me about his beliefs, not only on one

20  literature.  I mean, it's not one word or one thing

21  that he did or said to make me believe what I believe.

22        It's more than one conversation, more than one

23  meeting, more than one time that Brother Naz preached

24  in front of him without him saying what -- what you

25  saying is wrong.

```
 1    Q.    Mr. al-Saidi, isn't it the other way around?
 2    Isn't it true that they looked at the good jihad as
 3    being a movement of the people versus how you were
 4    trying to play jihad out while you're wearing a
 5    microphone, as if the jihad they're talking about is a
 6    violent war when, in fact, that's what you were talking
 7    about?
 8    A.    No, sir.  In fact, it's exactly what Brother Naz
 9    has been saying:  A war, hand-to-hand combat, taking
10    over the land that the Moors was promised 17 -- I....
11    Q.    To your knowledge, Burson Augustin did not know
12    you were wearing a body wire.  Correct?
13    A.    Yes, sir.
14    Q.    And so you're throwing this word "jihad" out at
15    every opportune time you can throw it out, whether it
16    makes sense or not.  Correct?
17          MR. GREGORIE:  Objection, your Honor.
18          THE COURT:  Sustained.
19          Rephrase your question.
20          MR. VEREEN:  Sure.
21    BY MR. VEREEN:
22    Q.    You brought this word "jihad" up in the
23    conversation; did you not?
24    A.    There was time that I brought it up, and there's
25    time they did.
```

```
 1   Q.    But I'm -- I'm talking about the conversation

 2   between you and Burson Augustin on November the 7th,

 3   2005.

 4         You brought that word up.  Right?

 5   A.    I don't know if it was me first that brought it

 6   up or he was the first that brought it up.  But,

 7   obviously, it was brought up.

 8   Q.    I want to turn to Page 61 of the same exhibit,

 9   Government's Exhibit 41-A.

10         This is one of the statements where you bring up

11   the word "jihad."  You say, "That's the only way.  Know

12   what I mean?  I just want some help, man.  It's not all

13   my decisions on what to do.  I just receive orders and

14   do what I have to do and -- it's jihad."

15         Right?

16   A.    Yes, sir.

17   Q.    Okay.  And then you start talking about you don't

18   know what the first mission is, going further down the

19   same page.  "I just want to make a different.  I see a

20   lot of hope on you, brother.  Believe me, man.  And I

21   even called my uncle back home and he's seeing a lot of

22   hope.  So I don't know what we're gonna do yet, what is

23   the first mission, but I'm finding my way, where I

24   could get a connect.  But trust got to come from all

25   sides."
```

1          Now, you were talking about a conversation you

2     had with whom?

3     A.     I'm sorry?

4     Q.     When you were making this reference here, you

5     didn't have a conversation with Burson Augustin about

6     an uncle coming back from home.  This is a conversation

7     that you claim you had with Narseal Batiste.  Correct?

8     A.     Yeah.  But all the Defendants know about it.

9     There was more than one time that me and Brother Naz

10    sit down and spoke right in front of their face.  They

11    exactly know what to expect.  When they came to the

12    hotel, they know exactly what to expect.  And they all

13    wanted to know if I got them connected or not.

14         And Brother Naz made sure he let them know.  When

15    he speak, they would listen.  And more than one time I

16    spoke to him in front of them about different missions,

17    and they're listening.  It's not like they don't know.

18    They knows what was going on.

19    Q.     Prior to this conversation on November the 7th,

20    2005, you had not seen Burson Augustin in a while.

21    Right?

22    A.     If I haven't seen him in a while?

23    Q.     Yeah.

24         You hadn't seen him in a while.  Right?

25    A.     There were several times that I seen him, but I

```
 1   don't know what you call "a while."
 2   Q.    Well, let's go to Page 3 of that same
 3   conversation.
 4         Do you remember saying this to Mr. Burson
 5   Augustin?
 6         "How you doing, brother?
 7         "I took a big walk.
 8         "You walking?
 9         He says, "I got down on the bus on the 17.
10         "(Muffled sound.)
11         "How you doing, Nahree?"
12         What is Nahree?
13   A.    I think I was making a mistake by the name.
14   Q.    You thought you were talking to Naudy.  Right?
15   A.    I was having a hard time to remember the names.
16   Q.    You thought you were talking to Naudy.  Right?
17   A.    Trying to make me -- sir, I said I don't know the
18   names.  I was having a hard time to remember the name.
19   Q.    Then you go on to say, "A long time no see."
20   A.    Yes.  I said that.
21   Q.    So when was the last time you saw Burson Augustin
22   prior to this conversation?
23   A.    I'm not sure exactly.  But I think it was either
24   in the -- now, this meeting we talking about is in
25   December.  Right?  Well, I seen him on December 18.
```

```
 1   Q.    I'm talking -- this is November the 7th, 2005.

 2   A.    Oh.  This is the November 7th.

 3         I seen him on, I think, the -- I -- the month

 4   before that, I guess.  I'm not sure exactly.

 5   Q.    A month before that where?

 6   A.    I said the month before that.

 7   Q.    That would make it October.

 8         Where?

 9   A.    I seen him in the hotel and I seen him in the

10   Embassy and we was riding around.

11   Q.    You said you had never been to the Embassy before

12   you started working on this case.

13   A.    On October 29 -- I mean, the 20 -- I think the 27

14   to the 28, I spent the night on the Embassy, right

15   after I came from Yemen.

16         Are you waiting for an answer?

17   Q.    Let me ask the questions.

18         So you're saying now, on October the 25th of

19   2005, that you saw Burson Augustin at the Embassy?

20         MR. GREGORIE:  Objection, your Honor.

21         THE COURT:  Sustained.

22         MR. VEREEN:  Was that not his answer?

23         THE COURT:  It was asked and answered.  Ask

24   your next question.

25
```

```
 1    BY MR. VEREEN:

 2    Q.    Who else did you see October the 25th, 2005, at

 3    the Embassy?

 4          MR. GREGORIE:  Objection, your Honor.  He

 5    didn't say he saw anybody on October 25th at the

 6    Embassy.

 7    BY MR. VEREEN:

 8    Q.    What date was it that you were at the Embassy

 9    when you came back from Yemen?

10    A.    What date did I spend?  I think it was the 27 to

11    the 28.

12    Q.    So who did you see at the Embassy on the 27th and

13    the 28th?

14    A.    I seen Brother Naz, seen Brother Pat, seen

15    Brother Burson, Brother Rot, Brother Naudy, Brother

16    Sunni.  And I think was somebody else there that day.

17    Q.    And you talked about what when you got back?

18    A.    I didn't say much.  When I first got in there, it

19    was Brother Naz preaching.  And then we went out behind

20    the Embassy, and that's when Brother Sunni got the

21    weapon magazine and they written me down a list.  Yes,

22    sir.

23    Q.    On October the 27th and 28th, you're saying that

24    Stanley Phanor went and got a magazine and wrote a list

25    for you?
```

1  A.     No.  I'm sorry.  You know, I'm confusing the

2  dates.

3  Q.     Okay.  Well, correct yourself.

4         What day are you talking about?

5  A.     The night that I spent the day at the Embassy.

6  Q.     Which is what date?

7  A.     It was the 27th to the 28th.

8  Q.     Okay.  What happened on that date?

9  A.     That day, I went and spend the night in there.

10 Brother Naz has took me from the Holiday Inn hotel and

11 to the Embassy, and we spent the night there.

12 Q.     I had asked you what conversation -- did you have

13 a conversation with these gentlemen about your trip to

14 Yemen?

15 A.     Yes, I did.

16 Q.     You did?

17 A.     Yes, I did.

18 Q.     And what did you speak to them about?

19 A.     I don't recall.  It's three years ago, man.

20 Q.     You don't recall what you spoke to them about?

21 A.     No.

22 Q.     So, then, November the 7th, 2005, was the next

23 time you saw Burson Augustin.  Correct?

24 A.     Yes, sir.

25 Q.     During this conversation.  Right?

```
 1    A.    Yes, sir.

 2    Q.    And you advised Burson Augustin during this

 3    conversation that it was you that wanted to find jihad

 4    help.  Correct?

 5    A.    I'm sorry?

 6    Q.    I said:  It was during this conversation that you

 7    advised Burson Augustin that you wanted to find jihad

 8    help.

 9    A.    Well, I'm -- Brother Naz had asked me to find him

10    somebody to join him in jihad.  So yes.  It was a part

11    that I was looking forward and -- is to get Brother Naz

12    some help on his mission.  That's what I told him.

13    Yes.

14    Q.    Let me show you Page 66 of Government's

15    Exhibit 41-A.

16          This is you again still talking to Burson

17    Augustin.  Correct?

18    A.    Yes.

19    Q.    Now, in the middle of this page, you say, "I met

20    two brothers here in Miami.  That's not enough.  That's

21    not enough.

22          "I want to go to New York.  I want to go to

23    New Jersey.  I want to go to Detroit.  I want to go to

24    Michigan.  I mean, Michigan is Detroit.  But, anyway,

25    that's the point.  I want to go to California.  I want
```

1    to go everywhere.

2         "Like you say, maybe I'm gonna go to Chicago.

3    I've been thinking about Chicago.  And, believe me, if

4    I could find some good brothers, I may get to speak to

5    my uncle, get some contacts here and there.  I would

6    move on, believe me.

7         "I'm not gonna stay in one place.  I don't care

8    how far is it and where is it.  I know the biggest

9    state in the United States is Texas.

10        "If I have to go there, I would.  I just need to

11   go for a week.  I don't want go waste my time on the

12   streets looking for the devil.  No.  I want to find

13   Islam, Muslims.  I want to find jihad help.  That's my

14   mission, man."

15        Right?

16   A.    You asking me if I said that?  Yes.

17   Q.    Burson Augustin didn't say anything to you about

18   blowing up buildings, did he?

19   A.    You asking me if he said anything about blowing

20   up buildings?

21   Q.    Are you not understanding my questions?

22   A.    No.  Not the way you asking me.

23   Q.    Well, let me ask it again:  Burson Augustin

24   didn't say anything to you in that conversation about

25   blowing up buildings, did he?

al-Saidi - CROSS- By Mr. Vereen                    197

```
 1   A.     Not that I recall.

 2   Q.     He didn't say anything about starting a holy war,

 3   did he?

 4   A.     Starting a holy war?  No.  But he was actually

 5   speaking to me about how to maintain holy war.

 6   Q.     This was you putting your plan in action on

 7   behalf of the FBI so you can get paid.  Right?

 8   A.     No, sir.  I'm sure there was a lot of different

 9   ways I could have making money instead of taking false

10   information to the FBI.

11   Q.     The money you made paid for those clothes that

12   you're wearing right now.  Right?

13   A.     No, sir.

14   Q.     Who provided you the suit?

15   A.     I bought it.

16   Q.     With what?

17   A.     With my own hard income money.

18   Q.     That the Government provided you.  Correct?

19   A.     No, sir.

20   Q.     When you met these gentlemen, you were borrowing

21   clothes from them.  Right?

22   A.     No, sir.

23   Q.     You never borrowed clothes from them?

24   A.     No, sir.

25   Q.     Do you remember having clothes at the Embassy and
```

 1   trying to call Narseal Batiste on November the 7th?

 2   A.    Sir, I brought some clothing from my own country

 3   with me and I had left the bag in the Embassy.

 4   Q.    Let's fast-forward ahead to this trip to Key

 5   West.

 6         Do you recall that?

 7   A.    Yes, sir.

 8   Q.    You knew you would be taking a trip somewhere;

 9   did you not?

10   A.    No, I didn't.

11   Q.    You knew you would be changing clothes to go on

12   that trip; did you not?

13   A.    No, sir.

14   Q.    Isn't it a fact, Mr. al-Saidi, that Patrick

15   Abraham contacted you on the 27th and told you that he

16   was at that time trying to get the gear for you to

17   wear?  And then the following day you called him back

18   and gave him not only your clothing size, but you gave

19   him the clothing size of Elie Assaad; did you not?

20   A.    When he asked me for the clothing size, I did

21   gave it to him, thinking that they was gonna give us

22   uniforms.

23         Brother Naz has asked me in the past if I would

24   wear a uniform that have the marches -- Moors patches

25   on it.

1          And I had to ask the FBI if it was okay if I take

2    one and wear it from him.  Until then, that's what I

3    was thinking.

4    Q.    In fact, you asked him to buy you some clothes --

5    or he told you he was going to do that and you were

6    supposed to reimburse him.  Correct?  And that's what

7    he told you on the 27th; did he not?

8    A.    No, sir.

9    Q.    Would it refresh your recollection if I showed

10   you a copy of that telephone conversation?

11   A.    That would be nice.

12   Q.    Mr. al-Saidi, I'm going to show you a

13   conversation that took place on January the 27th, 2006.

14          MR. VEREEN:  Judge, for purposes of the

15   record, I'll mark it as SP 1, just to refresh his

16   recollection.

17          May I approach?

18          THE COURT:  Yes.

19          Do I have an exhibit list from you?

20          MR. VEREEN:  Your Honor, I'll provide it

21   tomorrow, if the Court permits.

22   BY MR. VEREEN:

23   Q.    Mr. al-Saidi, let me direct your attention to

24   Page 3.

25          Does that refresh your recollection as to the

```
 1   conversation that you had with Mr. Abraham?

 2   A.    Give me a moment, please.

 3   Q.    Sure.

 4         Are you finished reviewing the conversation?

 5   A.    I reviewed it.  But I didn't see the sentence you

 6   was making.

 7   Q.    You don't see what sentence?

 8   A.    Aren't you saying that Brother Pat was telling me

 9   something about the -- me paying for clothes or

10   something?

11   Q.    Do you see that paragraph that I have marked on

12   the third page?

13   A.    Yes, I do.

14   Q.    Do you not see where Mr. Abraham makes reference

15   to you about getting the gear for you and he makes

16   reference to receiving a check from you?  Do you not

17   see the word "check," Mr. al-Saidi?

18         MR. GREGORIE:  Objection, your Honor.

19         THE COURT:  Sustained.

20   BY MR. VEREEN:

21   Q.    Does that not refresh your recollection with what

22   was said to you with regard to a check?

23   A.    I seen it here.  But I don't understand.  I mean,

24   he's mentioning here --

25   Q.    Don't read it.  Just -- don't read it.
```

```
 1          My question is:  Does it refresh your

 2   recollection with what Patrick Abraham said to you with

 3   regard to getting a check from you?

 4   A.    I don't remember him saying that to me, man.  I

 5   don't understand what it is.

 6   Q.    I'm not asking you if you remember.

 7          I said:  Does that refresh your recollection?

 8             MR. GREGORIE:  Your Honor, objection.  The

 9   witness has answered the question.

10             MR. VEREEN:  He just said no.

11             THE COURT:  Sustained.

12             MR. VEREEN:  All right.  If I may approach.

13   BY MR. VEREEN:

14   Q.    But you do acknowledge that, on January 27th of

15   2006, you and Patrick Abraham had that conversation.

16   Correct?

17   A.    We did had a conversation.  But, again, I don't

18   remember him asking me for check.  No.

19   Q.    But it does reference that in this conversation;

20   does it not?

21             MR. GREGORIE:  Objection, your Honor.

22             THE COURT:  Sustained.

23   BY MR. VEREEN:

24   Q.    And then the following day you called him back

25   and proceeded to give him the clothing size and the
```

 1   shoe size.  Correct?

 2   A.     Yes, I did.

 3   Q.     And the reason you called him back to give him

 4   the clothing size is because of the conversation you

 5   had the previous day with regard to him getting you and

 6   Elie Assaad the gear you're going to wear on this trip.

 7   Correct?

 8   A.     My friend, I don't understand where the gear

 9   conversation come from.  I don't know what's the gear.

10   And I don't know.

11          The guy called me and asked me about our clothing

12   size.  I thought they was gonna give us uniforms.

13          I asked the FBI about Brother Mohammed clothing

14   size and I called and gave it to him.

15   Q.     And you don't understand what "gear" means?

16   A.     No.

17   Q.     That's a foreign word to you?

18          MR. GREGORIE:  Objection.  Argumentative, your

19   Honor.

20          THE COURT:  Sustained.

21   BY MR. VEREEN:

22   Q.     Earlier, I asked you about your contact with the

23   FBI concerning Faisal Hassan and whether you had

24   advised the Government that -- anything with regard to

25   Faisal Hassan and jihad.

```
 1          Do you remember me asking you questions
 2   concerning that?
 3   A.     If I remember you asking me a question about
 4   Faisal Hassan --
 5   Q.     Yes.
 6   A.     -- having interest with jihad?
 7   Q.     Yeah.
 8   A.     Yes.  I remember you asking me that.
 9   Q.     Okay.  Did you not tell Agent John Stewart back
10   on October the 21st of 2005 that Hassan was a strict
11   Sunni Muslim and justified his illegal actions in the
12   United States as a cause to support jihad?
13   A.     I don't understand your question again.
14   Q.     My question is:  Did you not tell Agent Stewart
15   that Faisal Hassan was a strict Sunni Muslim and
16   justified his illegal actions in the United States as a
17   cause to support jihad?
18   A.     I don't remember.  I don't remember if I said
19   that or not to him.
20   Q.     You don't remember if you said it?
21   A.     I don't know, sir.  I don't remember if that
22   happened or not.
23   Q.     Okay.  Now, when Ms. Jhones was questioning you
24   also with regard to Elie Assaad and your knowledge as
25   to where he was from, is it your testimony that you had
```

1    advised Narseal Batiste and these gentlemen that Elie

2    Assaad was from Al-Qaeda?

3    A.    Who is Elie Assaad?

4    Q.    CW No. 2.

5    A.    Brother Mohammed?  You asking me if I told them

6    that Brother Mohammed was in Al-Qaeda?

7    Q.    Yes.

8    A.    Yes.  I told them that Brother Mohammed was sent

9    by Al-Qaeda.

10   Q.    In the conversation on November 7, did you say

11   that?

12   A.    I don't know when.

13        MR. VEREEN:  I think Ms. Jhones covered this.

14   So I'm not going to rehash that, your Honor.

15        THE COURT:  Okay.

16   BY MR. VEREEN:

17   Q.    Mr. al-Saidi, you talked about this flier -- or

18   you were questioned about the flier.

19        Let me ask you this:  Did you ever meet a

20   gentleman by the name of Master Athea?

21   A.    No, sir.

22   Q.    Did you ever meet any of the guys that call

23   themselves the Universal Divine Saviors?

24   A.    No, sir.

25   Q.    The flier that you took -- that you say you took

```
 1    back to Yemen made reference to Universal Divine

 2    Saviors.  Correct?

 3    A.    I'm sorry?

 4    Q.    I said it made reference -- it had on there

 5    "Universal Divine Saviors"; did it not?

 6    A.    It had on it the Universal Saviors Divine

 7    (verbatim).

 8    Q.    Say it again.

 9    A.    It had on it written.  Yes.

10    Q.    And it had the address that you said was an

11    address here in Miami.  Correct?

12    A.    Brother Naz told me that was his address.

13    Q.    And there was a phone number.  Right?

14    A.    Yes, sir.  There was a phone number and a fax

15    number.

16    Q.    And Brother Naz told you that was his address to

17    what?

18    A.    He didn't told me to what.  He told me that's his

19    connections and, if I needed to contact him, that's

20    how.

21    Q.    And if you needed to contact Narseal Batiste, you

22    were to use the information that's on that flier?

23    A.    He told me to get him connected with any

24    extremists that will help him out with his mission

25    towards overthrowing the US Government and I also could
```

1   use the connection to contact him, if I want.

2   Q.    When you came back from Yemen, you didn't use

3   that information to contact Narseal Batiste, did you?

4   A.    I don't know.  I gave that paper away to the FBI.

5   And I kept calling the number that he gave me.  So I

6   don't know.

7   Q.    Well, didn't you contact Haitian Mike and ask

8   Haitian Mike to let Narseal Batiste know that you were

9   back in town and that you were at the hotel?

10  A.    When I first seen Haitian Mike when I went to get

11  a phone, yes, I did told him to contact Brother Naz and

12  let him know that I was there.

13  Q.    You said when you went to go get a phone?

14  A.    Yes, sir.

15  Q.    And you got a phone; did you not?

16  A.    Yes, I do.

17  Q.    Did you ever call Narseal Batiste on the phone

18  number that was on that flier?

19  A.    Again, the FBI took the flier.  And when he came

20  to the hotel, he gave me a phone number.  I don't know

21  if it's the same or not.

22  Q.    Okay.  But when you called that number, were you

23  able to get in contact with Narseal Batiste?

24  A.    Sometimes.  And sometimes he don't answer.

25  Q.    So it was a working number?

1    A.     It was.

2    Q.     But did you ever go to that address that you saw

3    on that flier?

4    A.     No.

5    Q.     Do you know what that address leads to?

6    A.     No.

7    Q.     When you claim you would go to -- well, when you

8    went to the Embassy and you say you saw these gentlemen

9    training, you saw them doing martial arts?

10   A.     Who?

11   Q.     Did you see them doing martial arts?

12   A.     If I seen Brother Naz and his group doing martial

13   arts?

14   Q.     Yeah.

15   A.     No.

16   Q.     You never saw him doing any martial arts?

17   A.     They show me some of their moves on the machetes

18   and stuff.  But, you know, we did military training.

19   Q.     What type of military training did you do?

20   A.     We would take orders from Brother Naz while he

21   would tell us what to do.

22   Q.     Jumping jacks?

23   A.     What's that?

24   Q.     Pushups?

25   A.     It was pushups.  It was situps.  He would tell us

1    to go march in the front, turn around, go to the back,

2    left, right, stuff like that.

3    Q.      Did you go running?

4    A.      Running?  No.

5    Q.      Did you go shooting weapons?

6    A.      No.

7    Q.      Did you climb any ropes?

8    A.      No.

9    Q.      Were you carrying logs?

10   A.      I'm sorry?

11   Q.      Logs.  Wooden logs.

12   A.      I don't know what's that.

13   Q.      And you call this military training?

14   A.      That's where I seen the same training happen, in

15   different military.

16   Q.      When you were watching television?

17   A.      If I watch television when I seen that?

18   Q.      Yeah.

19   A.      I seen that on TV.  I seen that alive.

20   Q.      You --

21   A.      I seen it on occasion.

22   Q.      You've been in the military?

23   A.      No.

24   Q.      You've been to a military base?

25   A.      Yes.

1    Q.    Which one?

2    A.    Different ones in my country.

3    Q.    In Yemen?

4    A.    Yes.

5    Q.    You never had conversations -- or, better yet,

6    you never have seen these gentlemen participate in

7    violence in the streets, have you?

8    A.    No, sir.

9    Q.    You never saw them make contact with any gangs,

10    did you?

11    A.    No, sir.

12    Q.    You were never with them or heard them talk about

13    applying for government grants, did you?

14    A.    I don't understand that question.

15    Q.    Do you know what a government grant is, where you

16    can apply for the Government to give you money?

17    A.    I don't know what's that.

18    Q.    You never heard any of that conversation.  Right?

19    A.    No.

20    Q.    Okay.  Did you ever see them drinking liquor,

21    alcohol?

22    A.    No.

23    Q.    Ever heard them using curse words?

24    A.    Yes.

25    Q.    Who?

1    A.    All of them.

2    Q.    Did you ever pray with them?

3    A.    Yes, I did.

4    Q.    Did any of them speak Arabic?

5    A.    A little bit.

6    Q.    Who?

7    A.    Brother Naz.

8    Q.    Did he use Arabic when he was praying?

9    A.    Yes.

10   Q.    When he would say "Allah"?

11   A.    Yes.

12   Q.    Anything other than that?

13   A.    Several words.

14   Q.    Such as?

15   A.    Such as "al-hamdu li-llah," such as "Inshallah,"

16   such as the name of "Allah," such -- it's different

17   words that he -- I don't remember all of them.  But it

18   was a little bit that he speaks in Arabic.

19   Q.    You'd agree with me that the way a Muslim prays,

20   a true Muslim, versus the way these gentlemen prayed is

21   totally different.  Correct?

22   A.    Not totally different.  But I seen in -- Brother

23   Naz experience wasn't as much.  But it's the same way.

24   Q.    Well, he didn't even have a prayer rug, did he?

25   A.    You don't have to have a prayer rug to pray.

```
1    Q.     I understand that.
2           But he didn't have one, did he?
3    A.     I don't know.  I never asked him if he had one or
4    not.
5    Q.     Didn't you bring him one?
6    A.     He asked me to bring him one, and I brought it.
7    Q.     He didn't even know the proper name for it, did
8    he?
9    A.     Not in Arabic.
10   Q.     You brought him one; did you not?
11   A.     Yes, I did.
12   Q.     That's the same time you went and -- you
13   purchased the book on jihad.  Correct?
14   A.     Yes, sir.
15   Q.     Now, he didn't ask you to buy that.  That's
16   something that you gratuitously did.  Correct?
17   A.     It's something that I did because one of the
18   brother asked me a question and I didn't know the
19   answer.  So I thought it was a good idea to bring it.
20   Q.     And that book was left at your apartment when
21   they left that evening; was it not?
22   A.     I don't know.
23   Q.     You don't know.
24          You and Haitian Mike -- that's the same person as
25   Mick Coriolan.  Right?
```

1    A.    I'm sorry?

2    Q.    Mick Coriolan is the one you refer to as Haitian

3    Mike.  Right?

4    A.    I have a friend who named Haitian Mike.  I don't

5    know his real name.

6    Q.    He was the one that worked in the store with you.

7    Right?

8    A.    Yes.

9    Q.    He was the one that brokered that gun deal for

10   you.  Correct?

11   A.    He wasn't there when I bought it.

12   Q.    I didn't say he was there.  I said he brokered

13   it.

14         He's the one that set up the deal.  Right?

15   A.    He wasn't involved.

16   Q.    He was not involved?

17   A.    I don't believe that he was involved on the gun

18   subject.  I showed him where I hid it, but he wasn't

19   involved when I purchased it.

20   Q.    I'm not talking about the AK-47.

21   A.    So what are you talking about?

22   Q.    You purchased another firearm from "Fat Boy."  Do

23   you remember that?

24   A.    It was the only firearm that I purchased from

25   "Fat Boy."  It was an AK-47.

1    Q.    Okay.  When you did not find that AK-47, you made

2    a phone call to a gentleman named Mike, right, to buy a

3    gun from him?  Correct?

4    A.    Yes, sir.

5    Q.    And didn't Haitian Mike set that up for you?

6    A.    Yes, sir.

7    Q.    Say it again.

8    A.    Yes.

9    Q.    So when I asked you a moment ago about him

10   brokering a gun deal for you, you knew what I was

11   talking about; did you not?

12   A.    No.

13   Q.    You know now.  Right?

14   A.    Yes.

15   Q.    He brokered a gun deal for you.  Right?

16   A.    Yes.

17   Q.    You did not tell him that you were acting as a

18   confidential informant at the time, did you?

19   A.    Make this clear:  I never told no one that I work

20   for the FBI --

21   Q.    Right.

22   A.    -- if I was in court.

23   Q.    And that's what caused the two of your

24   friendships to break up.  Correct?

25   A.    We never break up.

```
 1    Q.      You still consider him your friend?

 2    A.      Yes, sir.

 3    Q.      Have you been in contact with him lately?

 4    A.      No, sir.

 5    Q.      Do you know how he considers you?

 6    A.      No.

 7            MR. GREGORIE:  Objection.

 8            THE COURT:  Sustained.

 9            MR. VEREEN:  No further questions.

10            THE COURT:  We're going to break for the day.

11        Do not discuss this case either amongst

12    yourselves or with anyone else.  Have no contact

13    whatsoever with anyone associated with the trial.  Do

14    not read, listen or see anything touching on this

15    matter in any way.

16            If anyone should try to talk to you about this

17    case, you should immediately instruct them to stop and

18    report it to my staff.

19            If you would, give your notebooks to the court

20    security officer.  You may heave your binders at your

21    chairs.  I will see you tomorrow morning, 9:00.

22            Have a nice evening.

23            (Whereupon, the jury exited the courtroom at

24    4:55 p.m. and the following proceedings were had:)

25            THE COURT:  You may step down, sir.
```

1          (Witness excused.)

2          THE COURT:  You may be seated for a minute.

3          In regard to the Government's motion to strike

4     Juror No. 9, I'm going to deny it without prejudice at

5     this time.

6          I still have concern about her ability to pay

7     attention.  I did start to make notes about the times

8     that I observe her dozing as well as -- at some

9     point -- and I've noticed this before regarding her --

10    she seems to be writing.

11         Everyone else in the jury box is like a tennis

12    match, looking back and forth, and she has her head

13    down and is writing and it doesn't seem to be in the

14    cadence of what's going on in the courtroom.  I've

15    noticed that a number of times.

16         I don't know exactly what she's doing, but I'm

17    not prepared at this time -- I'm going to observe her

18    further.  Certainly either side can make the motion

19    again at a later time.

20         She seemed to -- she did seem to perk up a

21    bit -- a little bit this afternoon and paid more

22    attention.  But I do have -- I continue to have

23    concerns.

24         You know, there are other persons on the jury

25    who are either as old or older than her and I have not

1    made any observations about them.

2            For instance, Juror No. 1, who's an

3    African-American gentleman who, I would say, is

4    probably as old as she is and maybe even older -- I

5    don't know --

6            MR. LEVIN:  He's 79, your Honor.  I recall

7    that from jury selection.

8            THE COURT:  He's older than she is, and

9    he's -- he's with what's going on in the courtroom.

10           And for the most part -- I think from time to

11   time there are other jurors who may, as Mr. Vereen

12   said, meditate.  But for the most part, the entire jury

13   is very attentive.

14           I do have concerns about her.  I know I saw

15   Mr. Levin looking at her at some points during the day

16   today and noticing her dozing --

17           MR. LEVIN:  I'll tell you what I noticed, if

18   you want me to tell you what I noticed.

19           THE COURT:  Okay.

20           MR. LEVIN:  I noticed that this juror, in my

21   view, has not been sleeping, at least today when I've

22   been observing her, you know, attentively today, at

23   least.

24           But she seems to be taking a lot of notes.

25   And it's hard to look at the witness and take notes at

1    the same time.

2          THE COURT:  Yeah.  I can't tell if she's

3    taking notes about the trial or if she's doing

4    something else.

5          I have had concerns that she's doing something

6    regarding her speech, because the notes seem to be --

7    you know, she's constantly writing when she's not

8    dozing.  I did notice her dozing today.  I have notes

9    about 2:23, yawns; 2:24, dozes; 2:24, sleeps; 2:25,

10   wakes up; 2:25, sleeps.

11         I mean, I've started to notice, you know, this

12   sort of pattern.  I'm going to continue to look at that

13   pattern.  I think that was at a point that Ms. Jhones

14   was moving very slowly.

15         So in all fairness to the juror, I mean, it

16   was -- I didn't think that we could move any slower

17   until she stopped for several minutes and then -- you

18   know, it just stopped, at which point I said, "Let's

19   have a stretch break" because there was nothing going

20   on and I wanted the jurors to at least get their blood

21   flowing.

22         But I'm going to continue to observe her.  I

23   don't feel comfortable at the point where she asks for

24   this time off for the speech for a religious

25   organization to say "That's it.  You're off the jury."

1    I just don't feel comfortable with that.

2         I'm denying the motion to strike because of

3    the -- I did read the cases that were provided by the

4    Government and certainly observations by the Court of a

5    juror dozing off in court does not require a separate

6    hearing.

7         I have noticed this since the beginning of the

8    trial and, in fact, as I mentioned before, I brought it

9    up to the attorneys, that I felt that she was an equal

10   opportunity sleeper, that she slept both on direct and

11   cross.

12        I'm going to continue to observe her.

13        I would instruct the lawyers on both sides to

14   also observe her and to make whatever motions you feel

15   is appropriate.

16        So at this juncture, I will be telling the

17   jurors that there will be no trial on Thursday.  We'll

18   take it from there.

19        MS. ARANGO:  Judge, if I may inquire of the

20   defense, just to -- my -- our next witness, Ruby

21   Raphael, I would -- needs to go on the stand in the

22   morning.  She's got -- she's got child care issues.

23        I know that there are -- there's many of them

24   that have not yet cross-examined Abbas al-Saidi.  I

25   guess my question is:  Are they going to be all day

1    with him?  Because, otherwise, I have to shuffle things

2    around.

3          MR. HOULIHAN:  I have no problem if she starts

4    with Ms. Raphael and then I'll start my cross later.

5    Let her be called first thing.  That's fine.

6          THE COURT:  Any objection to that?

7          MR. CLARK:  I have no objection to that.

8          MR. LEVIN:  No objection.

9          MR. CASUSO:  No objection, Judge.

10         THE COURT:  Okay.  You want to do that with

11   her tomorrow, start with her?  How long do you expect

12   her to be on the stand?

13         MS. ARANGO:  Really very shortly.  I would

14   imagine about half an hour.

15         The only thing with respect to that is we do

16   have to give her a call because, since Mr. al-Saidi has

17   been on the stand, I have not called to say --

18         THE COURT:  Okay.  We'll leave it open.  If

19   she's not available, they'll go forward with their

20   cross.  If she's available, you can call her first

21   thing in the morning.

22         MS. ARANGO:  Thank you, Judge.

23         THE COURT:  I'll just instruct the jurors that

24   a witness is being called out of turn for her

25   convenience.

220

1          MS. JHONES:  Your Honor, may I address a brief

2   matter *ex parte*?

3          THE COURT:  Sure.

4          MS. JHONES:  Thank you.

5          MR. VEREEN:  Do we have to stay?

6          THE COURT:  Yes.

7          The Government is excused unless there's an

8   objection to the *ex parte* issue.

9          (Thereupon, counsel and representatives for

10  the Government retired from the courtroom and *ex parte*

11  proceedings were had.)

12          THE COURT:  We're in recess for the day.

13          (End of proceedings.)

14

15              C E R T I F I C A T E

16

17      I hereby certify that the foregoing is an

18  accurate transcription of the proceedings in the

19  above-entitled matter.

20

21

22  _____      /s/Lisa Edwards_____
        DATE           LISA EDWARDS, CRR, RMR
23                     Official United States Court Reporter
                       400 North Miami Avenue, Twelfth Floor
24                     Miami, Florida 33128
                       (305) 523-5499
25