```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
                   CASE NO. 06-20373-CRIMINAL-LENARD
 3

 4    UNITED STATES OF AMERICA,        Miami, Florida

 5                   Plaintiff,        March 11, 2009

 6            vs.                      9:14 a.m. to 6:12 p.m.

 7    NARSEAL BATISTE, et al.,         Volume XXII

 8                   Defendants.       Pages 1 to 285
 9    ------------------------------------------------------

10                          JURY TRIAL
11          BEFORE THE HONORABLE JOAN A. LENARD,
                UNITED STATES DISTRICT JUDGE
12

13

14    APPEARANCES:

15

16    FOR THE GOVERNMENT:    RICHARD D. GREGORIE, ESQ., and
                             JACQUELINE M. ARANGO, ESQ.
17                           ASSISTANT UNITED STATES ATTORNEYS
                             99 Northeast Fourth Street
18                           Miami, Florida 33132

19
      FOR THE DEFENDANT      ANA MARIA JHONES, ESQ.
20      NARSEAL BATISTE:     300 Seville Avenue, Suite 210
                             Coral Gables, Florida 33134
21

22    FOR THE DEFENDANT      ALBERT Z. LEVIN, ESQ.
        PATRICK ABRAHAM:     261 Northeast First Street
23                           Sixth Floor
                             Miami, Florida 33132
24

25
```

```
 1    FOR THE DEFENDANT        RODERICK D. VEREEN, ESQ.
        STANLEY PHANOR:        BRINKLEY, HENRYS & LEWIS
 2                             4770 Biscayne Boulevard
                               Suite 1200
 3                             Miami, Florida 33131

 4
      FOR THE DEFENDANT        RICHARD K. HOULIHAN, ESQ.
 5      NAUDIMAR HERRERA:      300 Aragon Avenue
                               Coral Gables, Florida 33134
 6

 7    FOR THE DEFENDANT        LOUIS CASUSO, ESQ.
        BURSON AUGUSTIN:       111 Northeast First Street
 8                             Suite 603
                               Miami, Florida 33132
 9

10    FOR THE DEFENDANT        NATHAN CLARK, ESQ.
       ROTSCHILD AUGUSTINE:    17639 South Dixie Highway
11                             Miami, Florida 33157

12
      REPORTED BY:            LISA EDWARDS, CRR, RMR
13                            Official Court Reporter
                              400 North Miami Avenue
14                            Twelfth Floor
                              Miami, Florida 33128
15                            (305) 523-5499

16

17

18

19

20

21

22

23

24

25
```

1                           I  N  D  E  X

2

3                                   Direct    Cross    Red.

4
   WITNESSES FOR THE GOVERNMENT:
5

6  Abbas al-Saidi                       5      191
                                       13
7                                     103
                                     121
8

9  Elie Assaad              203

10

11
   EXHIBITS RECEIVED IN EVIDENCE:        PAGE
12
   Government's Exhibit Nos. 47 & 47-A     225
13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            THE COURT:  Good morning.

 2            United States of America versus Narseal

 3    Batiste, et al., Case No. 06-20373.

 4            Counsel, state your appearances, please, for

 5    the record.

 6            MR. GREGORIE:  Good morning, your Honor.

 7            Richard Gregorie and Jacqueline Arango on

 8    behalf of the United States.

 9            MS. JHONES:  Ana Jhones on behalf of Narseal

10    Batiste, who is present.

11            MR. LEVIN:  Good morning, your Honor.

12            Albert Levin for Patrick Abraham, who's

13    present.

14            MR. CASUSO:  Good morning, your Honor.

15            Louie Casuso on behalf of Burson Augustin, who

16    is present.

17            MR. CLARK:  Good morning, your Honor.

18            Nathan Clark on behalf of Rotschild Augustine,

19    who's present.

20            MR. HOULIHAN:  Richard Houlihan with Naudimar

21    Herrera.

22            MR. VEREEN:  Good morning, your Honor.

23            Roderick Vereen on behalf of Stanley Phanor.

24            THE COURT:  All Defendants are present.

25            The jurors are here now.
```

al-Saidi - CROSS - By Mr. Houlihan                    5

```
 1              Let's bring in the jury.

 2              Someone needs to turn off their BlackBerry.

 3              (Whereupon, the jury entered the courtroom at

 4  9:15 a.m. and the following proceedings were had:)

 5              THE COURT:  You may be seated.

 6              Good morning, ladies and gentlemen.

 7              You are still under oath, sir.

 8              You may proceed, Mr. Houlihan.

 9              MR. HOULIHAN:  Thank you.  If it please the

10  Court.

11              Good morning, ladies and gentlemen.

12              THE JURY:  Good morning.

13                        CROSS-EXAMINATION

14  BY MR. HOULIHAN:

15  Q.     I have cross-examination on behalf of Naudimar

16  Herrera.  Okay?

17  A.     Yes, sir.

18  Q.     It's going to be very brief.

19  A.     I'm sorry?

20  Q.     It's very short, very brief.

21              If you do not understand any question, please

22  tell me.

23  A.     Yes, sir.

24  Q.     Fair enough?

25  A.     Yes, sir.
```

al-Saidi - CROSS - By Mr. Houlihan                6

1   Q.    The two areas I'd like to discuss with you, in

2   general, would be the Embassy and the Keys trip.  All

3   right?

4   A.    Okay.

5   Q.    How many times physically were you at the

6   Embassy?

7   A.    I don't recall how many -- exactly how many times

8   I was there.

9   Q.    Approximately.

10  A.    I don't know.  Approximately 10, 15 times.  I

11  don't know.

12  Q.    When was the last time physically you were at the

13  Embassy, the date?

14  A.    I believe it was March 8.

15  Q.    Now, do you recall the following question and

16  your answer from prior sworn matters that you gave?

17        On October 9th, 2007, Page 252, I asked you the

18  following -- Page 253, to be correct:

19        "Question:  When is the last time you physically

20  were at the Embassy?

21        "Answer:  January 28."

22        Do you recall that question and answer?

23  A.    I don't know.  It's too many questions and

24  answers that I gave.  So I don't, honestly.

25  Q.    If you gave that testimony back then, you were

```
  1    wrong?

  2    A.     I don't know if I did or not.  And sometime I get

  3    confused.

  4    Q.     I understand.

  5           And if you said that back in 2007, you were

  6    wrong?

  7    A.     I don't know.  So long time ago.  I'm not sure.

  8    Q.     Isn't it true that the Embassy never had running

  9    water?

 10    A.     If -- I don't know.  I'm not -- I don't remember

 11    if it had water or not.  I mean, when I spend the night

 12    there, they was working on it.  They was fixing it.

 13    But I don't know.

 14    Q.     Did you ever use the toilet in the Embassy?

 15    A.     He was working on the bathroom when I spent the

 16    night there.

 17    Q.     During the times you were in the Embassy, did you

 18    ever see any plans dealing with how to make a bomb?

 19    A.     Manuals?

 20    Q.     Manuals -- instruction manuals, guides.

 21           Did you ever see any such manuals dealing with

 22    how to make a bomb?

 23    A.     Not that I remember.

 24    Q.     Did you ever see any material -- physical

 25    material that could actually go into making a bomb?
```

```
 1   A.      I don't recall.

 2   Q.      Did you ever see any type of radical Islamic

 3   literature, extremist literature?

 4   A.      He was reading a lot of books.  But not that I

 5   see.  No.

 6   Q.      So the answer is "no"?

 7   A.      Not -- I didn't see no literatures.  No.

 8   Q.      Did you ever see a photo of Osama bin Laden

 9   hanging up?

10   A.      No, sir.

11   Q.      Did you ever see money there, American money,

12   dollars?

13   A.      No, sir.

14   Q.      On the Keys trip -- I'm telling you, it's brief.

15           The Keys trip was in January of 2006.  Correct?

16   A.      January 28.

17   Q.      2006?

18   A.      Yes.  That's the date they took us to the Keys.

19   Q.      Now, you've described Naudimar during that time.

20           You were with him and Patrick Abraham for four

21   hours, five hours?

22   A.      Correct.  It was me, Brother Pat, Brother Naudy

23   and Brother Mohammed.  Yes.

24   Q.      So you and the other paid informant and Pat and

25   Naudy were together for about five hours?
```

al-Saidi - CROSS - By Mr. Houlihan                    9

1    A.    I'm not exactly sure how long.  But around there.

2    Q.    Now, you've described Naudy, Naudimar, as

3    pleasant.

4          Is that a fair statement?

5    A.    I'm sorry?  I didn't understand.

6    Q.    During the trip, you have described Naudy,

7    Naudimar, as pleasant, acting in a pleasant manner,

8    friendly manner.

9    A.    I don't even understand the word.  So I don't

10   know if I said that.

11   Q.    Naudimar as a fact -- he was not hostile to you,

12   was he?  He wasn't aggressive towards you, was he?

13   A.    No, he wasn't.

14   Q.    He was friendly?

15   A.    He was way friendly and Brother Pat was.

16   Q.    Well, Naudimar was sitting in the front

17   passenger's seat.  Correct?

18   A.    Yes, sir.

19   Q.    Pat had the responsibility of driving the car and

20   paying attention to the road.  Right?

21   A.    Pat was really pissed off because he was arguing

22   with Brother Mohammed.  But Brother Naudy didn't really

23   argue about anything, you know.

24   Q.    I understand.

25         And, in fact, Naudimar and you -- he would ask

 1  you questions?

 2  A.     He did ask me several questions.

 3  Q.     Throughout the whole trip, questions about what

 4  words meant in Arabic?

 5  A.     I seen that he have -- interested on Islam, and

 6  we was speaking.  He was asking me questions.  I asking

 7  him questions.

 8  Q.     In fact, at one point, you said to him during

 9  this trip, "I'm a good teacher," words to that effect?

10  I'm a good teacher.  Right, Naudy?"

11  A.     I don't recall.

12  Q.     Now, since this conversation was taped, have you

13  listened to the tape?

14  A.     Yes, I did.

15  Q.     Have you read the transcript?

16  A.     Yes, I did.

17  Q.     Are they both accurate and complete?

18  A.     Yes, sir.

19  Q.     Do you recall during that trip to the Keys

20  talking with the other paid informant in Arabic?  Is

21  that a fair statement?

22  A.     Yes, sir.

23  Q.     And that you referred to Patrick and Naudimar as

24  "scared"?  You used the word "scared"?  "Yes" or "no"?

25  A.     I might did.  I might not.  I don't remember.  It

 1    was a long conversation.

 2    Q.    Do you remember using the phrase in talking with

 3    the other informant "peeing in their pants"?  Do you

 4    recall that phrase?

 5    A.    I'm sorry?  I didn't understand.

 6    Q.    "Peeing in their pants," referring to Patrick and

 7    Naudimar.

 8    A.    I don't know if I made that statement or not.  I

 9    don't remember.

10    Q.    Okay.  Do you recall joking with the other paid

11    informant?

12    A.    Yes, sir.

13    Q.    And one of the things you were joking about is

14    whether the FBI will pay you hourly, since the trip was

15    so long?

16    A.    I don't know if I said that.  But I remember I

17    was joking with Brother Mohammed.  Yes.

18    Q.    And laughing?

19    A.    Yes, sir.

20    Q.    On more than one occasion, you two are joking in

21    Arabic, making comments back and forth?

22    A.    I tried to stay as comfortable as I could.  And

23    he was closest person.  You know?  He knew what was

24    going on.  So yes, I was laughing with him.  I was

25    joking with him.  I kept myself as calm as I could be.

 1          On the way there, I was really worried and

 2     scared.  On the way back, I was happy that the mission

 3     was accomplished and I didn't get killed.

 4     Q.    Now, you referred to Naudimar and Patrick to the

 5     other paid informant in this trip as a "dumb ass; did

 6     you not?

 7     A.    I don't know if I did or not.  I know there was a

 8     conversation between me and Mohammed in Arabic and I

 9     said something to him in Arabic and he warned me

10     speaking because it -- if they would understand.

11          And I told him I won't speak no more, but I know

12     that these -- you know, they didn't understand Arabic,

13     that when it come to the language, that, you know, they

14     was dumb.  I'm sorry.  I said that.

15     Q.    My question to you is the following, since you've

16     again read the transcript, listened to the tape:  Is it

17     not a fact that you and the other paid informant on two

18     separate occasions on the Keys trip use the word -- or

19     words "dumb ass" or "dumb asses," referring to Naudimar

20     and Patrick, and laughing, mocking them, in Arabic?

21     A.    I don't remember if we did it twice or not.

22     Q.    Part of the conversation that Naudimar and you

23     had -- is it not true that Naudimar said to you, "There

24     is" -- quote, "There is nothing but peace and love in

25     my heart"?  Do you remember him saying that to you?

```
 1   A.    Yes, sir.

 2   Q.    And he said that to you on more than one

 3   occasion, correct -- twice, as a matter of fact?

 4   A.    I don't know if he did that.  But he did said

 5   that he have peace and love for me.  Yes.

 6         MR. HOULIHAN:  Nothing else.  Thank you.

 7         THE COURT:  Mr. Clark.

 8                   CROSS-EXAMINATION

 9   BY MR. CLARK:

10   Q.    Good morning, sir.

11   A.    Good morning.

12         MR. CLARK:  Good morning.

13         THE JURY:  Good morning.

14   BY MR. CLARK:

15   Q.    I believe you have testified that you came to

16   Miami in 2004.  Correct?

17   A.    Yes, sir.

18   Q.    And you had already been working as a

19   confidential informant in the New York area.

20         Is that your testimony?

21   A.    I worked in the past before I came.  Yes, sir.

22   Q.    Were you employed with another job up in

23   New York?

24   A.    Yes, sir.

25   Q.    What were you doing up there?
```

1    A.    I was working in a grocery store.

2    Q.    Grocery store?

3    A.    Yes, sir.

4    Q.    It's in that grocery store that you were selling

5    and buying guns?

6          MR. GREGORIE:  Objection, your Honor.  This is

7    cumulative.

8          THE COURT:  Sustained.

9    BY MR. CLARK:

10   Q.    And you said you had already bought and sold guns

11   to the FBI?

12         MR. GREGORIE:  Objection, your Honor.

13         THE COURT:  Sustained.

14         Move on to another area, please.

15   BY MR. CLARK:

16   Q.    Well, after you came from New York, you got into

17   trouble with the law.  Isn't that correct?

18   A.    When I get to Miami?  Yes, I did.

19   Q.    You had been working -- you had been driving with

20   a suspended license on a scooter.  Correct?

21   A.    No, sir.  When I got caught, I didn't have a

22   license yet.

23   Q.    Oh.  So you were driving without a license.

24   Correct?

25   A.    The answer is "yes."  But there is an

1    explanation.

2         I didn't knew you have to have a license to drive

3    a scooter back then.  I came and I went and rented and

4    the guy didn't tell me.  So I thought it was okay.

5    Q.    You didn't know you had to have a license to

6    drive a scooter?

7    A.    No, sir.  It was my first time in my life seeing

8    a scooter or riding a scooter.  And I didn't knew if I

9    had to have a driver's license to drive it.

10   Q.    Okay.  And you were driving the scooter on the

11   highways and the roads of New York?

12   A.    No, sir.

13        MR. GREGORIE:  Objection, your Honor.

14   Relevance.

15        THE COURT:  Sustained.

16   BY MR. CLARK:

17   Q.    Sir, it's true you knew you had to have a license

18   to drive a scooter, didn't you?

19        MR. GREGORIE:  Your Honor, if I make an

20   objection and you sustain it, I would request that

21   Mr. Clark move on, your Honor.

22        THE COURT:  Sustained.

23        Move on, Mr. Clark.

24        MR. CLARK:  Your Honor, I'll reserve a motion

25   for that.

```
 1            THE COURT:  Sure.

 2   BY MR. CLARK:

 3   Q.      And you are also -- you had a domestic violence

 4   immediately after the scooter incident.  It was

 5   immediately after when you got out of jail.  Correct?

 6   A.      Yes, sir.

 7   Q.      And so you got into trouble right after you got

 8   out of jail.  On the scooter, you got in trouble again?

 9   A.      Yes, sir.

10   Q.      And you were told -- you were met by

11   Mr. Branzetti, I believe you testified, in jail.  Is

12   that right?

13   A.      No, sir.  I called him from jail.

14   Q.      Oh, okay.  Did he come to the jail?

15   A.      No.

16   Q.      You met him outside the jail?

17   A.      No, sir.  He told me I was out of gas and he

18   couldn't help me.

19   Q.      I understand.

20           When he said you're "out of gas," you understood

21   that you were no longer suitable to be an FBI

22   informant.  Is that correct?

23            MR. GREGORIE:  Objection, your Honor.  Calls

24   for an assumption on the part of the witness.

25            THE COURT:  Sustained.
```

1    BY MR. CLARK:

2    Q.    Well, you understand you were no longer -- you

3    were out of gas.  You understood you were no longer

4    going to be working for Mr. Branzetti?

5              MR. GREGORIE:  Objection.  I --

6              THE COURT:  Sustained.

7              MR. CLARK:  Reserve a motion, your Honor.

8    BY MR. CLARK:

9    Q.    And you were in jail for 53 days, according to

10   your testimony?

11   A.    Yes, sir.  I paid the consequences for the crime

12   I did.

13   Q.    And this was in Miami.  Is that correct?

14   A.    Yes, sir.

15   Q.    And you were in jail for approximately two

16   months.

17         Do you know what time -- when you got out of

18   jail, the exact date you got out of jail?

19              MR. GREGORIE:  Your Honor, I object.  This is

20   cumulative.

21              THE COURT:  Sustained.

22              Move on, Mr. Clark.  This has already been

23   covered.

24   BY MR. CLARK:

25   Q.    Well, you must have been in an anger management

```
 1   program when you were working for Mr. --
 2           THE COURT:  Mr. Clark, you need to move on to
 3   another area.
 4   BY MR. CLARK:
 5   Q.    Well, you had a job in -- with Mr. Faisal in the
 6   first half of what year?  '05?
 7   A.    Yes, sir.  When I came out of jail, I started
 8   working on a convenience store in Liberty City.  Yes.
 9   Q.    And so you were under -- and you -- when you
10   reached an agreement, was that with Faisal, to work for
11   him on this 50/50 arrangement that you testified --
12   that agreement was at the beginning of your job.
13   Correct?
14   A.    I was working for a month before that --
15   approximately four months before I get to work under
16   that 50/50 agreement on the North Miami convenience
17   store.
18   Q.    Okay.  And then you basically testified, quote,
19   that you let the store go.  You let your interest in
20   the store go?
21   A.    I sold it.  Basically, when I left, there was an
22   agreement that he would give me a certain amount and I
23   would let go.  Yes.
24   Q.    Well, you said you let -- you let the deal go.  I
25   don't understand.
```

```
 1          When you say you let it go --

 2   A.    It's like an agreement to sell the share that I

 3   had.

 4   Q.    You weren't happy with the resolution with

 5   Mr. Faisal Hassan, were you, sir?

 6   A.    No, I wasn't.

 7   Q.    Okay.  And while you were at the store, you were

 8   buying and selling guns at the store.  Correct?

 9   A.    No, sir.

10   Q.    Well, you bought an AK-47.  Right?

11   A.    I did.

12   Q.    Okay.  And when did you actually stop working at

13   the store?

14   A.    Early September.

15   Q.    And that's when you got the money, the $7,000?

16   A.    Yes, sir.  When we break the agreement, I got

17   $7,000 and I left.

18   Q.    And now you testified that you were going back

19   because your wife had a baby?

20   A.    Yes, sir.

21   Q.    Do you know what the date of birth of the baby

22   was?

23   A.    If I remember the exact date of my own child's

24   birth?

25   Q.    Yes, sir.
```

1    A.     Yes, I do.

2    Q.     What is that date?

3    A.     It's -- I believe it was September 3rd,

4    September 4th, that they call me and told me that --

5    see, it's different there, the dates, than here.  It's

6    different timing, you know.  The dates start different,

7    the hours.  So it's either 3rd or 4 of September that

8    my child was born.

9    Q.     And how did you purchase the ticket?  Did you pay

10   cash for it?

11   A.     I don't remember.  I went with my partner when I

12   purchased it.  And I don't know if I paid cash or I

13   gave him the cash and have him use his credit card.

14   Q.     You don't remember whether you paid cash or

15   whether you used his credit card?

16   A.     I don't.

17   Q.     Whose credit card are you talking about?

18   A.     Yes.

19   Q.     Whose credit card are you talking about?

20   A.     Faisal Hassan, my partner.

21   Q.     And you made an advance purchase on this ticket,

22   didn't you, sir?

23   A.     I'm sorry?

24   Q.     You made -- you purchased a ticket in advance?

25   A.     No.  I bought it two days before I left.

al-Saidi - CROSS - By Mr. Clark                    21

```
 1    Q.     You bought it how many?

 2    A.     Two days.

 3    Q.     You bought it two days before you left.

 4           Well, when did you get the cash to make this

 5    purchase?

 6    A.     Out of the $7,000 that I got from the share that

 7    I sold.

 8    Q.     Yeah.

 9           But when did you get the cash?  I said "when,"

10    the date that you got -- how far in advance of leaving

11    did you get the cash?

12    A.     I don't understand your question.

13           In early September, that's when I went and paid

14    for the ticket.  Two days later, I fly out of the

15    country.

16    Q.     And you left the country on 9-13.  Correct?

17    A.     I believe so.

18    Q.     And you basically were owed, when you left, money

19    by Faisal Hassan.

20           How much money did he owe you, according to you?

21    A.     Approximately was $20,000.

22    Q.     So it was 13 he owed you -- he owed you 20 or 13?

23    A.     13.

24    Q.     And don't you say later that he owed you 30,000

25    totally?
```

1    A.    Well, it got confusing, because the guys that he

2    sold my shares to was from my country.  And I changed

3    the deal with them by buying a car from them back home.

4    So, basically, it got confusing of how I made the deal

5    with him.

6    Q.    Well, before you left, you bought this AK-47.

7          According to your testimony, it was for

8    protection at the store.  Correct?

9          MR. GREGORIE:  Objection, your Honor.  This is

10   cumulative.

11         THE COURT:  Sustained.

12   BY MR. CLARK:

13   Q.    Well, when did you buy the AK-47?

14         THE COURT:  Mr. Clark, you need to move on.

15   This area has been covered.

16   BY MR. CLARK:

17   Q.    Well, you had enough time to give this gun back

18   to the FBI, didn't you, sir?

19         MR. GREGORIE:  Judge --

20         THE COURT:  Sustained.

21         Move on, Mr. Clark.

22   BY MR. CLARK:

23   Q.    You made a -- September the 9th is when you made

24   your first call to the FBI.  Isn't that correct, sir?

25   A.    I think so.

```
 1   Q.    All right.  And you know that -- since you've

 2   worked with the FBI before as an informant, that when

 3   you contact them, that they record the information that

 4   you provide.  Correct?

 5   A.    I don't know.  You asking me if I testified that

 6   they record the information that I provide for them?  I

 7   don't know.

 8   Q.    No, sir.

 9         I'm saying that, from your experience as an

10   informant with the FBI, when you give them information,

11   they document what you say on a 302 -- Federal

12   Document 302.

13   A.    I don't recall if he did or not.  I believe they

14   do.  Yes.

15   Q.    When you have conversations with them and tell

16   them information, they say, "Wait a minute," to give

17   them time to write it down.  Isn't that true, sir?

18              MR. GREGORIE:  Objection, your Honor.

19              THE COURT:  Sustained.

20   BY MR. CLARK:

21   Q.    You've had to carefully give information to the

22   FBI to permit them, as you understood it, to have -- to

23   write the information down?

24              MR. GREGORIE:  Objection, your Honor.

25              THE COURT:  Ground?
```

```
 1           MR. GREGORIE:  Calls for an assumption on the
 2   part of the witness.
 3           THE COURT:  Sustained.
 4   BY MR. CLARK:
 5   Q.    I'm just asking what your understanding is, sir,
 6   your state of mind when you're giving information.
 7           You have to give it to them so they can write it
 8   down?
 9   A.    Yes, sir.  That's why I was calling for a
10   meeting, so I could sit down and debrief.
11   Q.    And the first call that you made to them, you
12   understood that to be occurring.  Isn't that correct,
13   sir?
14   A.    What is -- I'm sorry?
15   Q.    That they were recording your -- the information
16   that you were providing.
17   A.    I had no idea.
18   Q.    You have an idea, sir, that they probably record
19   the information?
20   A.    Sir, I have an idea --
21           MR. GREGORIE:  Objection.  Asked and answered.
22           THE COURT:  Sustained.
23   BY MR. CLARK:
24   Q.    And in this 9-9 call, sir, you never said
25   anything to the FBI about an AK-47.  Isn't that true,
```

1  sir?

2  A.    I don't remember what was the conversation

3  between me and the FBI when I called them.

4  Q.    And on that phone call, you had no intent

5  whatsoever to turn in an AK-47 to the FBI?

6  A.    That's not true, sir.  My intention buying it was

7  to turn it in.

8  Q.    Your intent of buying it was to keep it for

9  protection at the store.

10  A.    So why would I tell the FBI?  I'm sorry.  No.

11  That's wrong.  I told the FBI because I have the

12  intention to turn this weapon in.

13  Q.    Now, you have said -- you have testified that --

14  yesterday that you were posing as an Al-Qaeda, what,

15  sympathizer or operative in this case?

16  A.    I don't understand your question.

17  Q.    You were posing as an Al-Qaeda person or

18  sympathizer or operative.

19        That's what you've been testifying in this case.

20  Right, sir?

21  A.    Well, my understanding was my role was as

22  Al-Qaeda spy.  So I was spying the groups that wants to

23  work with Al-Qaeda.

24  Q.    Now, when you talked about discussions that you

25  had with Mr. Narseal Batiste, you said you talked about

```
 1   war, politics and religion.  Correct, sir?

 2   A.     With Brother Naz, yes, I did.

 3   Q.     And, of course, you understand that the freedom

 4   of speech in the United States is quite different than

 5   the freedom of speech in Yemen.  Correct?

 6   A.     Yes, sir.  And that's why it took me so long to

 7   tell the FBI about his further action by giving me

 8   the --

 9            THE COURT REPORTER:  I'm sorry.  His what?

10            THE WITNESS:  His further action besides --

11   first was in conversations.  And I didn't tell nobody

12   about it.

13            But then, when he gave me the piece of paper,

14   I took him serious; and that's why I contacted the FBI.

15   That's not speech.

16   BY MR. CLARK:

17   Q.     In your -- you've been working with the FBI since

18   when in New York?

19   A.     In New York, with different agencies.  I don't

20   know if the FBI was in my cases or not.

21   Q.     You, in fact, have testified you grew up in the

22   United States?

23   A.     Yes, I did.

24   Q.     And you went to school here in the United States?

25   A.     No.  I get dropped off school early age.  I
```

 1  didn't get to go to school here in the US.

 2  Q.    And so it's quite -- you quite understood as of

 3  2005 what freedom of speech was in the United States,

 4  didn't you, sir?

 5  A.    I'm sorry.  I didn't understand.

 6  Q.    In 2005, when you said you were having these

 7  discussions with Mr. Narseal Batiste, you well

 8  understood what freedom of speech meant in the United

 9  States, generally.  Isn't that true, sir?

10  A.    I had some clues.  I have some understanding

11  about having the freedom to say whatever we want as

12  Americans.  But....

13  Q.    Now, in your direct testimony, you were then

14  asked to be more specific about the discussions.  Isn't

15  that true, sir?

16            MR. GREGORIE:  Objection, your Honor.

17            THE COURT:  Sustained.

18            Rephrase your question.

19  BY MR. CLARK:

20  Q.    Do you recall being asked and giving testimony in

21  your direct to be more specific about the nature of

22  these discussions with Mr. Batiste?

23  A.    Yes, sir.

24  Q.    Okay.  And you testified that you -- you said you

25  expressed your feelings.

1          Do you recall testifying to that?

2   A.     When I was in the store, yes, I do.  I do.

3   Q.     And at that time, sir, you were not working for

4   the FBI on this case, were you?

5   A.     No.  There wasn't no case against Brother Naz

6   then.

7   Q.     And so your feelings that you expressed were your

8   own opinions, weren't they, sir?

9   A.     I mean, some.

10  Q.     I'm sorry?

11  A.     Some of them is my own opinion.  Some of them is

12  the public opinion.

13  Q.     And I believe you testified that Mr. Narseal

14  Batiste expressed his opinion about Al-Qaeda and if

15  that was right or wrong.

16         Do you recall testifying to that?

17  A.     Yes, sir.

18  Q.     Okay.  And so what -- could you tell the jury

19  what opinion you expressed to Narseal Batiste about

20  Al-Qaeda and if what they did was right or wrong?

21  A.     Yes.  Well, I didn't say much of what Al-Qaeda

22  did wrong.  I didn't push a lot towards saying, well,

23  Al-Qaeda is all the worst people in the world and

24  nobody is -- should be able to work with them or

25  contact them or do anything with them.

1     I didn't stop him from saying that he wants to

2  work with Al-Qaeda.  I didn't stop him from saying he

3  wants to smoke a cigarette with Osama bin Laden.  I

4  didn't stop him from expressing his feelings of how

5  much he have love for the Muslims and for Al-Qaeda, of

6  how they operate against Israel and the United States.

7     I didn't stop him from saying any of that.  I

8  kept shaking my head and agreeing with him.  And that's

9  what I did.

10     Yes.  I could have told him, "No.  I'm not the

11  right person to speak to about this and I don't think

12  what you're saying is right."

13     There is some kind of conversations that I did

14  that to him, but was long conversations.  And this guy

15  come to me and look at me as a part of him, you know.

16  He's trying to join my religion.  His understanding of

17  Islam wasn't much.  And that was very clear to me.

18     But what scared me is that he was taking it the

19  wrong -- the wrong way.

20     I tried more than one time to explain to him a

21  lot about the Islamic world and it have more than what

22  Al-Qaeda believe.  It have more than one organization.

23     But all of his interest goes back, to me, as to

24  Hezbollah, Hamas, Al-Qaeda.  And that's what I see at

25  different -- that's when I see a different belief and

 1   what I believe.

 2   Q.    Sir, is it your testimony that you disagreed with

 3   Mr. Batiste about using violence?

 4   A.    There was some times that I disagreed with him of

 5   using violence, and there is some times that I agreed.

 6   Q.    And so, if you disagreed with him about using

 7   violence, that's inconsistent, isn't it, sir, with your

 8   role as an Al-Qaeda sympathizer?

 9   A.    Well, that came afterwards.  That didn't come

10   after months and months I've been talking to the guy.

11        And during that time, before I contacted the FBI,

12   before they told me to play Al-Qaeda role, I had my

13   choices, and it's to say something about what was going

14   on or to just listen and give him the right to keep

15   talking about it.

16        And every time -- every time I speak to him, it

17   seems like he wants to impress me by getting deeper and

18   deeper and deeper.

19        And that wasn't impressing me.  It was scaring

20   me, because I thought:  What if he wants to actually

21   work with Al-Qaeda and do what he wants to do?

22        I mean, it wouldn't have been a good thing for

23   either the Muslims or the Americans.  And that's why I

24   decided to contact the FBI.

25   Q.    But isn't your testimony that you're giving right

1    now inconsistent with your position that you were --

2    you're an Al-Qaeda sympathizer and operative?

3    A.    You asking me if I'm a really Al-Qaeda operative

4    or not?

5    Q.    No, sir.

6          I'm saying that the position that you were

7    taking -- that you claimed you told Narseal Batiste,

8    that you disagreed with the violence, is inconsistent

9    with also posing as an Al-Qaeda operative.

10          Isn't that inconsistent, sir?

11    A.    I don't understand your question, man.

12    Q.    You can't be both an Al-Qaeda operative and,

13    also, against Al-Qaeda violence.  Isn't that true, sir?

14    A.    I don't know, man, because Al-Qaeda is confusing.

15    There is people that join Al-Qaeda and they don't have

16    no idea about that.  They didn't -- every person have

17    his own thoughts and his own rules and his own ways.

18          Not everybody that work with Al-Qaeda agrees

19    on -- to what Al-Qaeda did in September 11.  So that's

20    not up to me to argue about, to get into.

21    Q.    Now, you have -- during your -- when you were

22    asked to be more specific in your direct testimony

23    about what was discussed, you never mentioned the Sears

24    Tower, sir.

25    A.    I mentioned what I remember.  There was a lot of

al-Saidi - CROSS - By Mr. Clark                    32

```
 1   things I don't remember.  This is years ago.

 2   Q.    Well, is it your testimony that the Sears Tower

 3   was or was not mentioned early in your discussions with

 4   Narseal Batiste?

 5   A.    I don't understand your question.

 6   Q.    Is it your testimony today, sir, that the Sears

 7   Tower was mentioned early in your discussions with

 8   Narseal Batiste when you were talking about war,

 9   politics and religion?

10   A.    You asking me if he mentioned the Sears Tower in

11   the store when he would talk to me?

12   Q.    Yes, sir.

13   A.    I don't know, man.  Was a lot of thing he

14   mentioned.

15   Q.    Well, do you remember -- you've testified several

16   times -- at least twice in this proceeding, haven't

17   you, sir?

18   A.    If I testified in this proceeding on what?

19   Q.    You've testified in --

20          MR. GREGORIE:  Objection, your Honor.

21          THE COURT:  Grounds?

22          MR. GREGORIE:  Relevance, your Honor.

23          MR. CLARK:  I have to do prior inconsistent

24   statement, your Honor.

25          THE COURT:  Overruled.
```

```
 1              MR. GREGORIE:  Then, I object to the form of
 2    the question, your Honor.
 3              THE COURT:  Rephrase your question.
 4              Sustained.
 5    BY MR. CLARK:
 6    Q.    You have previously testified on October the 4th
 7    of 2007 in this case that the Sears Tower plan was
 8    discussed before you were working for the FBI.  Isn't
 9    that true, sir?
10    A.    I don't know, my friend.  I don't remember.
11    Q.    Well, on Page -- for the transcript purposes, on
12    Page 226, do you remember being asked by Ms. Arango,
13    "Did you ever agree with any of his points of view?
14         "Answer:  Some I did.  Some I didn't"?
15         Do you remember that?
16    A.    Yes.  I remember.
17    Q.    And, "Question:  Let's talk about the points of
18    view that you agreed with.  What did you agree with?"
19              And you answered, "I agreed with him saying that
20    the US made a mistake on going to Islamic countries.
21    And I agreed with him on saying that, you know, Muslims
22    should take care of their problems on their own.
23    America shouldn't be involved with Muslims' problems.
24    That's about it."
25              Do you remember that answer?
```

1    A.    Yes.  I remember.

2    Q.    And do you remember saying, "Question:  And what

3    did you not agree with him about?

4          "Answer:  About him taking further action towards

5    the US Government and about him taking action about,

6    you know, war and killing people.  And, basically, he

7    talked about plans that he has planned out, such as the

8    Chicago Sears Tower mission and missions like that.  I

9    kind of disagreed with him, but I didn't argue about it

10   with him"?

11   A.    Yes, sir.  Back then in the store, when I would

12   disagree on his plans, he would laugh about it and

13   assume I'm agreeing with him.

14         But I'm scared to show it.  He will assume that

15   I'm a part of Al-Qaeda, but I'm scared to admit it.

16         That happened.  Yes.

17   Q.    And so isn't it true, sir, that in this case,

18   you're testifying that the first time you heard about

19   the Sears Tower was on December 21st of '05?

20   A.    I lost you, man.  I don't know what you saying.

21   Q.    Do you remember you testified in this case that

22   the first time you heard about the Sears Tower was on

23   December 21st of '05?

24   A.    Sir, I don't remember when was the first time or

25   the last time.  But....

1    Q.    Well, do you remember testifying on February 15th

2    of '08 for the second time in this case?

3    A.    You asking me if I remember testifying here?

4    Q.    Yeah.  You testified a second time in this case.

5          Do you remember that?

6    A.    Yes, I do.

7    Q.    And do you remember testifying then that on 12 --

8    December the 21st was the first time you ever heard of

9    the Sears Tower?

10   A.    No.

11   Q.    Well, I'll turn you to -- one moment.  All right.

12         Do you remember testifying -- this is -- I'll get

13   the date correct for the record.  This is on February

14   the 19th of 2008.

15         And do you remember being asked by Mr. Gregorie

16   about 12-21:  "Sir, had you ever heard of the Sears

17   Tower?

18         "Answer:  Not until then"?

19         Do you remember testifying to that?

20   A.    Yes.  I remember.  See, I was having hard time to

21   understand what was Sears Tower.  I never heard about

22   them and I don't know what it is.  And I was having a

23   hard time to remember the name.

24         So, actually, yes, I remember that.

25   Q.    And you said -- "Did you know where it was?"

1          The answer, as of 12-21, no, you didn't know

2     where it was.

3     A.     I didn't.

4     Q.     "And did you ever know anything about it?

5          "Answer:  I never heard of it until he told me."

6     A.     I never heard of anything -- I never heard about

7     it until he told me.  Yes.

8     Q.     Well, one of the -- you testified in '07 that

9     you'd heard about it before, and you testified in '08

10    that you'd never heard about it until December 21st.

11         Which one of those is true, sir?

12         MR. GREGORIE:  Objection, your Honor.

13         THE COURT:  Sustained.

14    BY MR. CLARK:

15    Q.     In one of those, you've lied, haven't you, sir?

16         MR. GREGORIE:  Objection, your Honor.

17         THE COURT:  Sustained.

18    BY MR. CLARK:

19    Q.     Now, when you made that September 9th, '05, phone

20    call to the FBI, you never told them anything about the

21    Sears Tower, did you, sir?

22    A.     Sir, I was having a hard time to remember the

23    name of the Sears Tower, and I didn't know what he was

24    talking about.  I wasn't till that time paying

25    attention to everything that he was telling me about.

 1    And I told the FBI what I knew.

 2    Q.    But you did tell Agent Stewart about Faisal

 3    Hassan, money that he owed you.  Correct?

 4    A.    I don't know what was the conversation back then

 5    between me and the FBI.  They keep record of it.  I

 6    didn't.

 7    Q.    You never told the FBI on September the 9th in

 8    your phone call that the UDS flier was a cover, did

 9    you, sir?

10    A.    I don't know what -- I don't remember.

11    Q.    And you never reported the AK-47, did you, sir?

12    A.    I obviously did.  I don't remember when I

13    actually made -- made it clear to him that I have it.

14    But I -- sometime.

15    Q.    You know -- I'm sorry.  Did you interrupt you?

16    A.    No.  Go ahead.

17    Q.    And you know that what you said to the FBI was

18    documented by them in a Federal Document 302.  Correct,

19    sir?

20              MR. GREGORIE:  Objection, your Honor.

21              THE COURT:  Sustained.

22    BY MR. CLARK:

23    Q.    And you then -- the next -- you went to Yemen on

24    the 13th.  Correct, sir?

25    A.    Yes, sir.

1    Q.    And the airline ticket that's been placed in

2    evidence in Exhibit 146 is not the ticket that you went

3    over there on, is it, sir?  It's the ticket that you

4    returned on.

5    A.    You confusing me.  I don't know, man.

6    Q.    Well, it was introduced into evidence in your

7    testimony, the ticket between Miami and Yemen.

8          That was only the return ticket.  Isn't that

9    true, sir?

10   A.    I just answered that.  I don't know, my friend.

11   I don't know if it's the return or the going.

12   Q.    Okay.  You had enough time before you left and

13   called the FBI -- you already had your money on

14   September the 9th, didn't you?

15   A.    I believe so.

16   Q.    And you had enough time to turn that AK-47 in,

17   didn't you, sir?

18   A.    Sir, I wanted to deal with the agent I know.  And

19   I was waiting to meet with him.  I didn't want to go

20   speak to another agent.  And I'm expecting -- he's

21   expecting meet with me.

22         I got a chance to go home.  I decide to leave the

23   country until I come back.  I would take care of it.

24   Q.    Well, you actually talked to Agent Stewart on

25   September the 9th.

al-Saidi - CROSS - By Mr. Clark                    39

```
 1   A.     If I spoke to him?

 2   Q.     Yes, sir.

 3   A.     Yes, I did.

 4   Q.     You left on the 13th.  So you had enough time to

 5   turn in the AK-47.

 6   A.     Obviously, I didn't.  That's why I didn't.

 7   Q.     And the next phone call that you had was on

 8   October the 6th of '05.  Correct?

 9   A.     I'm sorry?

10   Q.     The next communication with the FBI was on

11   October the 6th of '05.  Correct, sir?

12   A.     Yes.

13   Q.     And you did not mention in that phone call, did

14   you, the AK-47?

15   A.     I don't remember what was said in that phone

16   call.  I was kind of really worried about being watched

17   by my own official back home dealing with the US

18   Government.  So I don't remember what I was saying.  I

19   was nervous.

20   Q.     Well, you did have enough time in that phone call

21   to talk about Faisal Hassan's Food Stamp fraud, didn't

22   you, sir?

23   A.     Like I said, I don't remember.  I don't know.

24   Q.     Do you remember if you talked about Welfare check

25   fraud about Faisal Hassan?
```

```
 1   A.     No, I don't.

 2   Q.     Do you remember if you talked about Faisal Hassan

 3   performing false weddings on October the 6th in your

 4   phone call to the FBI?

 5   A.     No, sir.

 6   Q.     Do you remember claiming that Faisal Hussan was

 7   involved in an organization conducting weapons

 8   trainings?

 9          MR. GREGORIE:  Objection, your Honor.

10   Relevance.

11          THE COURT:  Sustained.

12   BY MR. CLARK:

13   Q.     Sir, when you -- you never saw any weapons with

14   Mr. Narseal Batiste --

15          MR. GREGORIE:  Objection -- I had objected,

16   and he asked the question again.

17          THE COURT:  Sustained.

18          Move on, Mr. Clark.

19          MR. CLARK:  I'm asking the question:  Did you

20   ever see weapons before you left?

21          THE COURT:  Move on.

22   BY MR. CLARK:

23   Q.     Well, in this phone call of 10-6-05, you never

24   reported anything about a Sears Tower mission, did you?

25   A.     I didn't knew about the Sears Tower.  I don't
```

```
 1   believe I could have even mentioned the name right,
 2   pronounce the name right.  So I don't believe I did.
 3   Q.    Yet, in prior testimony under oath in front of a
 4   United States jury, you testified that the Sears Tower
 5   was --
 6            MR. GREGORIE:  Objection, your Honor.  Asked
 7   and answered.
 8   BY MR. CLARK:
 9   Q.    It was talked about during -- in early
10   conversations with Narseal Batiste, sir?
11            THE COURT:  Sustained.
12   BY MR. CLARK:
13   Q.    But you did on your October the 6th phone call
14   talk -- discuss your reimbursement for your airline
15   ticket on coming back.  Isn't that true, sir?
16   A.    If I spoke with the FBI about that airline ticket
17   coming back?
18   Q.    Yes, sir.
19   A.    I didn't talk to them until I was coming back.
20   And I think I actually bought the ticket and came back
21   and then they reimbursed me when I got here.  So I
22   didn't think I mentioned it then.
23   Q.    Well, you introduced this piece of -- this
24   document, this airline ticket, in evidence on
25   Exhibit 146, didn't you, sir?
```

```
 1   A.     There was an airline ticket that I introduced in

 2   evidence.  Yes.

 3   Q.     And isn't that airline ticket -- it was purchased

 4   on October the 19th, wasn't it, sir?

 5   A.     I'm confused now.  I'm not sure if it's the

 6   ticket that I came back or go.  But....

 7   Q.     Well, the ticket that you purchased to return was

 8   purchased after you talked to the FBI.  Isn't that

 9   true, sir?

10   A.     Yes, sir.

11   Q.     And so does that refresh your recollection that

12   you discussed getting reimbursed for the airline ticket

13   on October the 6th?

14   A.     I don't remember if we discussed that or not.

15   Q.     When you got back to Miami, you had a meeting on

16   October the 21st of '05.  Isn't that correct?

17   A.     I'm sorry?

18   Q.     You had a meeting, you've testified, on

19   October 21st of '05 at the hotel in Miami.  Correct?

20   A.     With the FBI.  Yes.

21   Q.     And you mentioned for the first time that you had

22   an AK-47 at the end of your debriefing.  Isn't that

23   true, sir?

24   A.     I don't remember if it was the first time that I

25   mentioned it or not.
```

 1   Q.     You did mention it then?

 2   A.     I did.

 3   Q.     I'm sorry?

 4   A.     Yes.  I did spoke about it.  I was expecting to

 5   return it then.

 6   Q.     But you also remember that most of your

 7   debriefing was about Faisal Hassan, wasn't it, sir?

 8   A.     If I spoke about Faisal Hassan?  Yes, I did.

 9   Q.     Yes.

10          You spoke about him quite a bit, didn't you, sir?

11   A.     I don't know.

12   Q.     About -- you said where he lived.  Correct?

13   A.     No.  I don't remember saying where he lived.

14   Q.     About how many cars he had?

15   A.     I don't remember saying all that.

16   Q.     And you remember talking about how much money he

17   owed you?

18   A.     You asking me if I mentioned how much money he

19   owed me then?  I don't know.

20   Q.     Well, did he owe you any money at that time, sir?

21   A.     Yes, he did.

22   Q.     And did you plan to come back and get a lawyer

23   and sue him to try to get your money?

24   A.     I don't understand your question.  Ask me again.

25   Q.     When you came back, were you planning to get a

1    lawyer to sue him to get your money?

2    A.     There was time that I thought about doing that.

3    Q.     And you handed this UDS flier -- I guess your

4    testimony is you gave the UDS flier to the FBI at this

5    time?

6    A.     I gave it to them on the 20, when I first

7    arrived.

8    Q.     Okay.  And you had a conversation -- a telephone

9    conversation on October the 6th.

10          You didn't mention anything about the UDS flier,

11   did you, sir?

12   A.     I don't know.

13   Q.     And you never faxed the UDS flier back to the

14   agents after you had a telephone conversation, did you,

15   sir?

16   A.     I'm sorry.  I don't understand.

17   Q.     You never sent by facsimile the UDS flier after

18   October the 6th to the FBI, did you, sir?

19   A.     No.  You asking me if I faxed it to them?

20   Q.     Yes, sir.

21   A.     No.

22   Q.     You could have done that, though, couldn't you?

23   A.     I wouldn't.

24   Q.     You could have done that, couldn't you, sir?

25   A.     Yes.

1    Q.      You have fax machines available in Yemen, don't

2    you, sir?

3    A.      There was fax machines available in Yemen.  Yes.

4    But that's not what the FBI asked me to do.

5    Q.      They didn't ask you anything about the UDS flier

6    when you talked them on October the 6th, did they, sir?

7    A.      I don't remember the conversation that happened

8    then.

9    Q.      Now, on this October 21st meeting, you never

10   discussed the Sears Tower, did you, sir?

11   A.      I don't remember.

12   Q.      And you didn't tell the agents at that meeting

13   about your domestic violence with your girlfriend, did

14   you, sir?

15   A.      They knew about it.

16   Q.      You didn't tell them that Agent Branzetti told

17   you you were out of gas, did you, sir?

18   A.      Yes.  I did told them that.

19   Q.      It's your testimony you told them that you were

20   out of gas?

21   A.      It's my testimony that I told them I placed a

22   phone call from the jail cell to Kevin Branzetti in

23   New York and asked him to bond me out or contact my

24   family to come bond me out and he told me, "No.  You

25   out of gas, buddy.  You did a crime.  You do the time."

```
 1   That's what I told the FBI.

 2   Q.     On October the 20th?

 3   A.     I don't know when.

 4   Q.     You didn't tell them that on October the 20th,

 5   did you?

 6            MR. GREGORIE:  Objection, your Honor.

 7            THE COURT:  Sustained.

 8   BY MR. CLARK:

 9   Q.     Now, you also gave some testimony that you

10   said -- you testified that, on 10-21, that while you

11   were there, that you knew some people in Al-Qaeda and

12   Yemen.

13            Is that your testimony?

14   A.     Okay.  You asking me if I testified that I know

15   people on Al-Qaeda?

16   Q.     Yes.

17   A.     Yes.

18   Q.     And your testimony was that you knew people in

19   Al-Qaeda while you were in Yemen between September

20   the 13th and October the 20th?

21   A.     There was people that I know that worked with

22   Al-Qaeda.  But a lot of people won't admit.  It's not

23   something to be in an advertisement.  You know?

24   Q.     My question is:  Is it your testimony that,

25   between September the 13th of '05 and October the 20th
```

1    of '05 -- that it's your testimony that you knew people

2    in Yemen that you could have given the UDS flier to?

3    A.    Yes, sir.

4    Q.    And it's also true that you've never testified in

5    this proceeding to that ever before, have you, sir?

6    A.    I don't know.

7    Q.    Now, at that time, were you familiar with the --

8    where the Embassy -- or what's called the Embassy or

9    the Temple was?

10   A.    What time?

11   Q.    I'm sorry?

12   A.    You asking me --

13   Q.    Prior to leaving for Yemen, were you familiar

14   with where the Embassy or the Temple was located?

15   A.    No, sir.

16   Q.    And after you got back, you remembered where the

17   Temple -- you remembered where -- was that the first

18   time you saw where it was located?

19   A.    The first time I saw where it was located is when

20   Brother Naz took me on the later part of October.

21   Q.    You understand that it's on a commercial street

22   with clear lines of sight all around the building,

23   don't you, sir?

24   A.    I'm sorry?

25   Q.    You understand it's in a commercial area in

```
 1    Liberty City.  Correct?
 2    A.    I don't know if that's commercial or residential.
 3    It's both commercial and residential.
 4    Q.    It's a visibly public building.  Isn't that
 5    correct, sir?
 6              MR. GREGORIE:  Objection.  Asked and answered.
 7              THE COURT:  Sustained.
 8    BY MR. CLARK:
 9    Q.    Now, you said that, when you were in a hotel
10    meeting, that Mr. Batiste told you not to use the term
11    "Al-Qaeda."  Is that correct?
12    A.    Yes, sir.
13              MR. GREGORIE:  Objection -- I withdraw it,
14    your Honor.
15    BY MR. CLARK:
16    Q.    But you never reported that to the FBI, did you,
17    sir, immediately after you claim that was said?
18    A.    As soon as I get to speak to the FBI, I told them
19    that I told him that I got them connected to Al-Qaeda
20    and I spoke about Al-Qaeda more than one time and
21    Brother Naz had required me not to keep mentioning
22    "Al-Qaeda."
23          That was the first time that I ever admit to
24    Brother Naz that I ever -- that I am working with
25    Al-Qaeda.  You see, even until he gave me the flier, I
```

 1   never admit to him that I was working with Al-Qaeda.

 2   Q.     Well, on October the 21st, is that when you

 3   agreed to work as a confidential informant for the FBI?

 4   A.     Yes, sir.

 5   Q.     Now, you ultimately entered into a written

 6   agreement to cover that working relationship, didn't

 7   you?

 8   A.     I don't understand your question.

 9   Q.     On October the 21st, you entered into an

10   agreement to work as a confidential informant for the

11   FBI, but it was an oral agreement.  Correct?

12   A.     Oral agreement?  I don't understand.

13   Q.     It was just an agreement of words.  It wasn't a

14   written agreement.

15   A.     No.  I signed -- I signed paperwork for the FBI.

16   Q.     You were going to get paid how much per month?

17   A.     No promise.  They didn't tell me how much I was

18   going to get paid.

19   Q.     You didn't sign an agreement with the FBI until

20   June the 1st of 2006.  Isn't that true, sir?

21   A.     I don't understand your question, man.

22   Q.     Sir, isn't it true that you didn't sign a written

23   agreement with the FBI on October the 21st of 2005?

24   A.     I signed the paper with the FBI as soon as I came

25   back from Yemen on the 21st of October.  Yes, I did.

1    Q.    Well, let me show you what -- see if you can

2    identify this document, sir.

3              MR. GREGORIE:  Is it marked?

4    BY MR. CLARK:

5    Q.    I'm going to show you what's been marked as

6    Defendant's Exhibit -- it says CR 1.

7              MR. CLARK:  I guess it would be Rotschild

8    Augustine's No. 1, your Honor.

9              THE COURT:  Do you have an exhibit list for

10   me?

11             MR. CLARK:  Not at this time.  I'll make that

12   available.

13             THE COURT REPORTER:  I'm sorry.  You said

14   CR 1?

15             MR. CLARK:  It's Rotschild Augustine 1 for

16   identification.

17   BY MR. CLARK:

18   Q.    Do you recognize this document, sir?

19   A.    Honestly, I don't.  I seen there it's got my name

20   and something that --

21             MR. GREGORIE:  Objection, your Honor.  It's

22   not in evidence.

23             THE COURT:  Sustained.

24   BY MR. CLARK:

25   Q.    Well, you don't recognize your signature on this

 1   document, sir?

 2   A.    That don't look like my signature.  I don't know.

 3   I don't recognize it.

 4   Q.    And you don't recognize this document in any way

 5   as your service agreement?

 6            MR. GREGORIE:  Objection, your Honor.  Asked

 7   and answered.

 8            THE COURT:  Sustained.

 9   BY MR. CLARK:

10   Q.    You did enter into a service agreement at some

11   point.  Is that your testimony?

12   A.    My testimony is I did sign some paperwork for the

13   FBI to be able to work with them.  Especially on

14   October 21st, I did sign paperwork for the FBI.

15   Q.    Do you remember if you signed any paperwork on

16   June the 1st of 2006?

17   A.    No, sir.

18   Q.    You understood when you entered into this

19   agreement on the 21st, regardless of whether it's

20   written or oral, that you were supposed to work as an

21   FBI confidential informant.  Correct?

22            MR. GREGORIE:  Objection, your Honor.  What

23   agreement on the 21st?  Assuming facts not in evidence.

24            MS. JHONES:  I would object to the speaking

25   objections, your Honor.

1          MR. CLARK:  I'll rephrase the question.

2          THE COURT:  Rephrase your question.

3    BY MR. CLARK:

4    Q.    You just testified that you had an agreement on

5    October the 21st with the FBI.  Correct?

6    A.    Yes.  I did have -- I agreed to work for the FBI.

7    Yes.

8    Q.    Okay.  On October the 21st.  Correct?

9    A.    On October the 21st.

10   Q.    So we understand each other.

11         Now, the nature of that agreement that you had

12   was to work as a confidential informant.  Correct?

13   A.    Yes.

14   Q.    And you understood that you were going to be

15   given a recorder to record conversations with Narseal

16   Batiste or anybody else.  Isn't that correct?

17   A.    They told me that we was gonna start working on

18   the case, gathering as much as information we could.

19   Yes.

20   Q.    And you understood that the purpose of you

21   recording information on a recorder was to corroborate

22   what you were telling the FBI.  Isn't that true, sir?

23   A.    They went and came back more than one time and

24   have explained to me what was the purpose of recording.

25   But, I mean, I think it was the 28th or the -- it was

1    like further down when I started recording, because

2    they had to go and get the paperwork -- some more

3    paperwork for my to sign.  So....

4    Q.    You understood that they were not just going to

5    accept your word -- your naked word for it.  They're

6    going to have you make some recordings.  Correct?

7    A.    If I understood they wasn't gonna take my word?

8    I don't know, man.  I told them the information.  They

9    asked me to record, and I agree.

10   Q.    Well, since you've had the experience working as

11   an FBI informant, you understand the nature of having

12   to corroborate what you're saying.  Isn't that true,

13   sir?

14           MR. GREGORIE:  Objection, your Honor.

15           THE COURT:  Sustained.

16   BY MR. CLARK:

17   Q.    Then you went and made a -- you went and had some

18   meetings before you got a recorder.  Correct?

19   A.    They came.  I didn't went.  They came to the

20   hotel.  I didn't expect them to come.  And I had no

21   option but to meet with them.

22   Q.    You had arranged for -- is it Haitian Mike?  You

23   tried to get Haitian Mike to -- get him to come over to

24   see you?

25   A.    I didn't arrange a meeting.  I asked him to

 1    contact them and let them know that I wanted to speak

 2    to them.

 3    Q.     And you understood that -- during these

 4    recordings that you could corroborate that you were not

 5    supposed to use the -- you said you were not supposed

 6    to use Al-Qaeda.  Correct?

 7    A.     I don't understand your question.

 8    Q.     You testified that you were told that -- by

 9    Mr. Narseal Batiste that he was not to use the term

10    "Al-Qaeda"?

11    A.     He did direct me to use the term of "back home"

12    instead of using the term "Al-Qaeda."  Yes, he did.

13    Q.     So you had opportunities with a recorder to

14    corroborate that, didn't you, sir?

15    A.     I don't know.

16    Q.     That's what the use of the recorder is for, isn't

17    it, sir?

18    A.     I did my best to jog the information we spoke

19    about.

20    Q.     And you also knew that you needed to corroborate

21    whether the UDC flier was a, quote, cover, closed

22    quote.  Isn't that true, sir?

23    A.     I don't understand the question.

24    Q.     Well, you testified that you claimed the UDC

25    flier was a cover, Universal Divine Saviors flier was a

 1   cover, is what you testified prior to this occasion.

 2   A.    What I testified to was that Brother Naz -- I

 3   asked him -- when he gave me the flier prior to me

 4   going to Yemen, I asked him what was -- what was on it,

 5   what was the company name.

 6         He told me, "This is a cover.  You don't have to

 7   worry about that.  All you worry about is the connects

 8   of how to contact me.  What I have there is a cover so,

 9   you know, people won't be worrying where these connects

10   lead to."

11   Q.    So when you got the recorder, you knew that was

12   one of the things that you were going to have to

13   corroborate.  Isn't that true, sir?

14   A.    You asking me if I knew?  No.  I don't knew.

15   This is the first case like this case to work on.  I

16   did exactly what the FBI asked me to do.

17   Q.    And then, on October the 29th, I believe, you've

18   testified that you met his family at a restaurant.

19   Correct?

20   A.    When I met him in the restaurant, he was with his

21   family.  Yes.

22   Q.    And then you met him at the -- did you meet with

23   him after that at the Embassy?

24         MR. GREGORIE:  Objection, your Honor.

25   Cumulative.  This was all covered by Ms. Jhones.

```
 1            THE COURT:  Sustained.

 2  BY MR. CLARK:

 3  Q.    You didn't play any tape for us of that

 4  recording, did you, sir?

 5            MR. GREGORIE:  Again, objection, your Honor.

 6  This was covered.

 7            THE COURT:  Sustained.

 8  BY MR. CLARK:

 9  Q.    There was nothing in that recording to

10  corroborate --

11            MR. GREGORIE:  Judge, I objected.  He

12  continues to ask the question.

13            THE COURT:  Sustained.

14            Move on, Mr. Clark.

15  BY MR. CLARK:

16  Q.    As far as -- you never found any -- when you went

17  to the Embassy, you never found any radical literature,

18  did you?

19            MR. GREGORIE:  Objection, your Honor.

20  Cumulative.

21            THE COURT:  Sustained.

22  BY MR. CLARK:

23  Q.    When you met with Mr. Narseal Batiste on the

24  following day, you talked -- you talked to him about

25  Faisal Hassan.  Isn't that true, sir?
```

1          MR. GREGORIE:  Objection, your Honor.  What

2    following day?  Following what?

3          THE COURT:  Sustained.

4          Rephrase your question.

5    BY MR. CLARK:

6    Q.    On -- you met -- did you meet with Mr. Narseal

7    Batiste on October the 30th, the next day?

8    A.    I don't remember if I did or not.  On the 30th?

9    Q.    Yes.

10   A.    No.  I don't remember, man.

11   Q.    When you met with him, do you remember talking

12   about Faisal Hassan?

13   A.    If I remember speaking with Brother Naz about

14   Faisal Hassan?  There was different occasions where we

15   did.  Yes.

16   Q.    And you told him -- this meeting that you had was

17   not entered into evidence as a transcript, or played,

18   was it, sir?

19          MR. GREGORIE:  Objection, your Honor.

20          THE COURT:  Sustained.

21   BY MR. CLARK:

22   Q.    You didn't have anything -- you didn't

23   corroborate anything about a UDS cover or -- did you,

24   sir, on that day?

25   A.    I don't know if I was supposed to cover anything

1    on that or not.

2    Q.    You did not corroborate anything about not using

3    the term "Al-Qaeda," did you, sir?

4    A.    I did.  But to the best of my knowledge, I mean,

5    there was some times I didn't want to make Brother Naz

6    feel suspicious, you know.

7         He's always in control.  And was somebody else

8    coming into the case to investigate further.  So I did

9    what I could.

10   Q.    You could have said that "Al-Qaeda" means people

11   back home.

12   A.    I don't know if I had that opportunity to say

13   that to him without making him feel suspicious.

14   Q.    You could have done that, couldn't you, sir?

15        MR. GREGORIE:  Objection.  Asked and answered.

16        THE COURT:  Sustained.

17   BY MR. CLARK:

18   Q.    You could have referred to the Moorish Paradigm

19   as a cover, couldn't you, sir?

20   A.    I'm sorry?

21   Q.    You could have referred to the Universal Divine

22   Saviors flier as a cover, couldn't you, sir, in that

23   conversation?

24        MR. GREGORIE:  Objection, your Honor.

25        THE COURT:  Sustained.

```
 1   BY MR. CLARK:
 2   Q.    You knew you were having consensually monitored
 3   telephone recordings beginning on October 29th leading
 4   up to November the 7th.  Isn't that correct, sir?
 5   A.    You asking me if it's correct that I knew there
 6   was recorded conversations?
 7   Q.    Did you make arrangements to do consensually
 8   monitored telephone recordings with the FBI on or about
 9   October the 29th?
10   A.    If I did?  No.  Every time the FBI wanted me to
11   call, they always called me and asked me to record
12   it -- the call.
13   Q.    What would you do physically to record a
14   telephone conversation?  Explain to the jury what you
15   would have to do physically to record a telephone
16   conversation.
17   A.    Some -- in the beginning, they would turn the
18   device on and I would get my phone ready.  They give me
19   a piece to put in my ear.  I put the phone over and
20   make the phone call.
21         But in the end, they gave me the recorder and I
22   would do the same thing, because he would call me on
23   different occasions and the FBI wasn't always there.
24         So they actually gave me the device to prevent
25   phone calls without being recorded.
```

1    Q.    So when a phone call was recorded, it was turned

2    on by the FBI.  Correct?

3    A.    Some of them.

4    Q.    And you made a consensually monitored telephone

5    recording on November the 3rd of '05, didn't you, sir?

6    A.    If I make a phone call on November 3rd?

7    Q.    Yes.

8    A.    I might have.

9    Q.    And when you did, you would have a chance to talk

10   about the flier or anything you want.  Isn't that

11   correct, sir?

12   A.    I don't know if there was a reason for me to talk

13   about it or not.

14   Q.    Well, you didn't corroborate anything on 11-3 --

15   you had two telephone calls on 11-3.  You didn't

16   corroborate anything about the flier, sir, did you, as

17   a cover?

18   A.    I don't know.

19   Q.    Well, you actually -- on November the 1st, even

20   before that, is that when you went and tried to get the

21   AK-47 back from Mike?

22   A.    I'm sorry.  I don't understand your question.

23   Q.    You went on November the 1st to try to get the

24   AK-47 back from Mike.  Is that true?

25   A.    I don't remember the date I was trying to get the

1   AK, because it was a lot of days where I was trying to

2   get it.

3        Because they gave it to another guy, this guy,

4   "Fat," the guy I bought it from, and I was looking for

5   him, also, trying to get it back.

6        Was a lot of different occasions that I was

7   working on getting it back.

8   Q.    You never got it back, did you?

9   A.    No.

10  Q.    So not getting it back to the FBI before you left

11  caused that gun not to get back.  Isn't that true, sir?

12  A.    Yes.

13  Q.    Then you made a consensually monitored telephone

14  call on November the 4th as well, didn't you, sir?

15  A.    I don't remember if I did or not.

16  Q.    And you talked about -- don't you remember

17  talking about Faisal Hassan on a daily basis, sir?

18  A.    If I remember speaking about Faisal Hassan on a

19  daily basis?

20  Q.    Yes.

21  A.    I don't know if I was or not, man.

22  Q.    You hadn't gotten paid by him at that time, had

23  you, sir?

24        MR. GREGORIE:  Objection, your Honor.  This is

25  cumulative.

```
 1           THE COURT:  Sustained.

 2   BY MR. CLARK:

 3   Q.    On November the 4th, you didn't corroborate

 4   anything about a UDS cover then either, did you, sir?

 5   A.    Again, I don't know if I did or not.

 6   Q.    And you didn't corroborate about whether -- not

 7   to use the term "Al-Qaeda," did you, sir?

 8   A.    I tried.

 9   Q.    But you did corroborate that Faisal Hassan owed

10   you money, didn't you, sir?

11   A.    I don't understand.  What do you mean by if I did

12   corroborate that Faisal Hassan owe me money?  I don't

13   understand the question.

14   Q.    You had discussions about Faisal Hassan with

15   Narseal Batiste on consensually monitored telephone

16   recordings, didn't you, sir, on November the 4th?

17   A.    Yes.  I did mention Faisal Hassan giving me a

18   payment over the phone call.  Yes, I did.

19   Q.    So whatever you're corroborating is what's

20   happening on that tape, isn't it, sir?

21   A.    I don't understand what you trying to go to.  But

22   I was trying to get as close as I could to Brother Naz.

23   And I had to tell him what I was going -- what I was

24   going through.

25           And I was introduced by Faisal to him.  I just
```

1    sold the store to them.  He know about the whole

2    subject.  And I'm just back from my country.  He knows

3    I'm trying to collect whatever that Faisal's owe me.

4    And he knows about it.  So I had to say something about

5    what was happening with that.

6    Q.    And you had told Mr. Narseal Batiste that, when

7    you got your money from Faisal Hassan, that you were

8    going to give him some money, didn't you, sir?

9    A.    I didn't told him had I was gonna give him a

10   certain amount.  I didn't say it.  But I said I was

11   gonna help, if I could.

12          Basically, it's to make him, again, think that I

13   was one of his soldiers, that I was -- I like what he

14   was thinking and I was supporting him 100 percent.

15   This is what I was doing.

16   Q.    But you didn't really intend to give him any

17   money, did you, sir?

18   A.    No.

19   Q.    So you were using the lure of money to induce him

20   to be there with you, weren't you, sir?

21          MR. GREGORIE:  Objection, your Honor.

22          THE COURT:  Sustained.

23   BY MR. CLARK:

24   Q.    And you had another meeting on November the 6th

25   of '05, a consensually recorded meeting, which is

 1  Exhibit 40 in evidence.  Isn't that true, sir?

 2          MR. GREGORIE:  Objection, your Honor.  It's

 3  not a consensually recorded meeting.  It's a phone

 4  call.

 5  BY MR. CLARK:

 6  Q.    Did you have a consensually recorded telephone

 7  call on -- Exhibit 40 -- on November the 6th, sir?

 8  A.    What about it?

 9  Q.    On November the 6th, you've testified about

10  having a consensually monitored telephone call with

11  Narseal Batiste, Exhibit 40 that's in evidence.

12          Do you recall that, sir?

13  A.    I don't recall.  There's a lot of things I

14  testified about.

15  Q.    Well, in that phone call, you remember at this

16  time that Mr. Narseal Batiste was in desperate

17  financial straits, didn't you, sir?

18          MR. GREGORIE:  Objection, your Honor.  This

19  was covered by Ms. Jhones.  Cumulative.

20          THE COURT:  Sustained.

21  BY MR. CLARK:

22  Q.    You told him that, "I'll -- anything I can do to

23  help you," sir.

24          Remember telling him that?

25          MR. GREGORIE:  Objection, your Honor.

 1    Cumulative.

 2              THE COURT:  Sustained.

 3              You need to move on, Mr. Clark.

 4    BY MR. CLARK:

 5    Q.    Well, isn't it true, sir, that the money that you

 6    were going to give Mr. Batiste, if any, that you were

 7    promising to give him, was only money that was going to

 8    be coming through you?  Isn't that true, sir?

 9    A.    No.

10    Q.    At this time, you were afraid to tell Narseal

11    Batiste that someone was going to be coming over

12    because you had just said that you were going to give

13    him the money.  Isn't that true, sir?

14    A.    No.

15    Q.    Were you instructed to tell him that -- tell

16    Narseal Batiste that the way you got your apartment on

17    Miami Beach was money that you got from back home?

18    A.    No.

19    Q.    You were not instructed to do that?

20    A.    No.

21    Q.    You -- isn't it true you told him that you got

22    the money for the apartment from back home?

23              MR. GREGORIE:  Objection, your Honor.

24    Cumulative.

25              THE COURT:  Sustained.

 1   BY MR. CLARK:

 2   Q.    At this time, had you met with Narseal Batiste at

 3   the store?  Had you met at a store -- Faisal Hassan's

 4   store to try to get your money?

 5          MR. GREGORIE:  Objection, your Honor.

 6   Cumulative.

 7          THE COURT:  Sustained.

 8   BY MR. CLARK:

 9   Q.    Now, you were attempting to meet on November

10   the 7th with Narseal Batiste, weren't you, sir?

11   A.    Yes, sir.

12   Q.    And that was a meeting that was directed by the

13   FBI.  Isn't that true?

14          MR. GREGORIE:  Again, cumulative, your Honor.

15   We've been through with two different lawyers about

16   November 7th.

17          THE COURT:  Sustained.

18   BY MR. CLARK:

19   Q.    Well, on November 7th, sir, the first thing that

20   you talked about --

21          THE COURT:  Mr. Clark, you need to move on to

22   another area.

23          MR. CLARK:  Move away from November 7th?

24          THE COURT:  Yes.  It's been covered.

25          MR. CLARK:  Well, I need to reserve a motion

1    on that, your Honor.

2              THE COURT:  Sure.

3              MR. CLARK:  The entire meeting of

4    November 7th?

5              THE COURT:  Well, if there's something that

6    you think hasn't been covered, you can ask it.  But two

7    lawyers have gone into that already.

8    BY MR. CLARK:

9    Q.    Well, you could have mentioned "Al-Qaeda" in this

10   meeting, couldn't you, sir?

11   A.    Which meeting?

12   Q.    November the 7th.

13         You had a meeting with Burson Augustin.  You

14   could have mentioned "Al-Qaeda," couldn't you, sir?

15   A.    Why would I if I was instructed by Brother Naz

16   not to mention "Al-Qaeda"?  I -- again, I don't want to

17   make them feel like I was recording them.

18   Q.    You could have -- you could have made --

19   corroborated that, "We can't talk about 'Al-Qaeda,'"

20   couldn't you?

21             MR. GREGORIE:  Objection, your Honor.  Asked

22   and answered.

23             THE COURT:  Sustained.

24   BY MR. CLARK:

25   Q.    You could have referred to it as "those people"

```
 1    or you could have made any kind of reference at that

 2    time?

 3              MR. GREGORIE:  Objection.

 4              MR. CLARK:  Excuse me.

 5              MR. GREGORIE:  Objection, your Honor.  He's

 6    repeating the question after your Honor sustained the

 7    objection.

 8              THE COURT:  Sustained.

 9    BY MR. CLARK:

10    Q.    You could have corroborated that you were not

11    supposed to talk about certain things, couldn't you,

12    sir?

13    A.    I did.

14    Q.    And you -- when you testified that you were --

15    when you testified on direct examination, you went to

16    Page 30 and you talked about when Burson Augustin said

17    "blending in."  Isn't that true, sir?

18    A.    If I spoke about Brother Burson saying -- talking

19    about "blending in"?

20    Q.    Yeah.

21    A.    Yes.

22    Q.    But on Page 17 earlier in the transcript, you

23    skipped that where you're the one that first suggested

24    about using the term "blending in."  Isn't that true,

25    sir?
```

```
 1            MR. GREGORIE:  Objection, your Honor.  We've

 2   been through this, Judge, twice.

 3            THE COURT:  Sustained.

 4   BY MR. CLARK:

 5   Q.    After November the 7th, you made more

 6   consensually monitored telephone calls, didn't you,

 7   sir?

 8   A.    Yes, I did.

 9   Q.    Was it after that you went to the store -- to

10   Faisal Hassan's store?

11   A.    Was it after this date that I went to Faisal

12   Hassan's store?

13   Q.    Yes.

14   A.    It was several times.  But I don't -- again, you

15   confusing me.  I don't know about the dates.  But there

16   were several times that I went and picked up payments.

17   Yes.

18   Q.    And you still were owed the money by Faisal

19   Hassan.  Correct?

20   A.    Every time I went, the guy gave me $2,000 out of

21   the amount until it was 9,000 -- or, I think, 8500.

22         And then I decide to buy a car with it back home.

23   So he paid that amount to the Yemen guys that's own the

24   store and I take the car back home.

25         So Faisal Hassan wasn't a big issue.  I went
```

```
 1   twice and picked up two or three payments from him
 2   after I came back from Yemen.  And that was it.
 3   Q.    On November 9th, do you recall making a
 4   consensually monitored telephone recording?
 5   A.    What date again?  I'm sorry.
 6   Q.    November the 9th.
 7   A.    November the 9th of -- yes.  I think I made some
 8   kind of contact between me and either Brother Naz or
 9   Brother Pat.
10   Q.    But that wasn't talked about in your direct
11   testimony, was it, sir?
12   A.    I don't know if it was.  It wasn't up to me on
13   what to talk about.
14   Q.    And then do you remember questioning Narseal
15   Batiste that he said he didn't have enough money to
16   operate his business right now?
17   A.    I'm sorry?
18   Q.    Do you remember telling him that he didn't have
19   enough money to operate the business right now?
20         MR. GREGORIE:  Objection, your Honor.
21   Cumulative.  This was covered in Ms. Jhones's
22   cross-examination, your Honor.  She went through the
23   entire transcript with him.
24         THE COURT:  Sustained.
25
```

```
 1   BY MR. CLARK:

 2   Q.    Well, at this time, sir, you still had not given

 3   him any money that you were supposed to get from Faisal

 4   Hassan, had you?

 5   A.    I don't understand your question.  Give who what?

 6   Q.    You hadn't given Mr. Narseal Batiste any of the

 7   money that you told him that you might give him that

 8   you were going to get from Faisal Hassan?

 9         MR. GREGORIE:  Objection, your Honor.

10   Assuming facts not in evidence.

11         THE COURT:  Sustained.

12         Rephrase your question.

13   BY MR. CLARK:

14   Q.    Sir, you've testified that -- you testified to

15   this jury that you told Narseal Batiste that you

16   were going to -- once you got some money from Faisal

17   Hassan, that you were going to -- might give him some

18   or maybe you were going to give him some.

19   A.    As long as I kept the investigation going, I kept

20   Brother Naz hoping that I was going to support him

21   towards his missions.  Yes.  But I never did, because I

22   wasn't supposed to.

23   Q.    But that money was just coming from you when you

24   got it from Faisal.  Correct?

25   A.    There was no was money that came from me or from
```

 1   Faisal Hassan that was handed to Brother Naz.

 2         There was money that Faisal Hassan owed me for

 3   the work that -- I worked in the store for nine months,

 4   living in the store, working day and night.

 5   Q.    And you had another opportunity you could have

 6   corroborated the UDC flier as a cover.  Correct?

 7              MR. GREGORIE:  Objection, your Honor.  This is

 8   about the eighth time he's asked this question.

 9              MR. CLARK:  It's about a different event.  I

10   think it's fair cross-examination, your Honor.

11              THE COURT:  Overruled.

12              THE WITNESS:  I don't -- I never remember

13   asking any -- to cover anything unless if the FBI asked

14   me to cover it.  You know, it's already covered.

15              THE COURT REPORTER:  Already covered?

16              THE WITNESS:  Yeah.

17              I mean, I covered what I could.  Again, every

18   time the FBI asked me do something, I did it.  And if

19   they didn't ask me, why would I?

20   BY MR. CLARK:

21   Q.    You could have corroborated discussions about

22   weapons, couldn't you, sir?

23   A.    I don't understand, my friend.  I mean, there was

24   times that I could have pushed further, but I didn't

25   because I don't want them to feel suspicious.  And that

al-Saidi - CROSS - By Mr. Clark                    73

```
 1   was what was happening in reality.
 2   Q.    On November the -- on -- since you hadn't had a
 3   meeting with Narseal Batiste on November the 7th, you
 4   were instructed to try to set one up on November
 5   the 10th.  Isn't that true, sir?
 6   A.    If I was trying -- when I met and I couldn't meet
 7   with him on the 7, if I was trying to make to the 10?
 8   I don't know.  I don't remember what was happening,
 9   man.
10         I remember that I met on the 7 and me and Brother
11   Burson was waiting for him the whole night.  He didn't
12   show up.  So Brother Burson dropped me off.
13   Q.    I would like to show you Exhibit 42, sir, which
14   was your meeting on November 10th.
15         Do you recall testifying about that?
16   A.    Yes.
17   Q.    I believe you've already gone over this with
18   Ms. Jhones.  Is that correct?
19   A.    We went through everything with Ms. Jhones.  Yes.
20   Q.    That meeting took place at 11:03 p.m. at night.
21   Do you recall?
22   A.    I'm sorry?
23   Q.    That meeting took place at 11:03 p.m. at night.
24   It began late at night.  Is that correct?
25   A.    It might have.  I don't know.
```

1   Q.    And that's the meeting that Mr. Narseal Batiste

2   would fall asleep at the meeting?

3   A.    I don't know.  But there was a meeting where he

4   came late and they was laying down and I'm speaking to

5   them.  And I didn't appreciate it.  Yes.

6   Q.    And this meeting -- you could have corroborated

7   the UDS flier being a cover at that time.

8         You didn't do it, though, did you, sir?

9   A.    Sir, I didn't knew I was supposed to do that.  If

10  I was told that I was supposed to do that, I would have

11  done it.

12  Q.    But in the middle of that meeting, you were asked

13  about your case with Faisal Hassan, weren't you, sir?

14  A.    I might was.  I don't remember.

15  Q.    At that time, Mr. Narseal Batiste was expecting

16  you to give him some of the money that you got from

17  Faisal Hassan.  Isn't that true?

18        MR. GREGORIE:  Objection.  Calls for a

19  conclusion on the part of the witness.

20        THE COURT:  Sustained.

21  BY MR. CLARK:

22  Q.    You hadn't given him any money at that time from

23  Faisal Hassan, had you?

24  A.    I never did.

25  Q.    And you told Narseal Batiste that you were

```
  1   threatening that you were going to sue him, didn't you,

  2   sir?

  3   A.    At that time, because I was mad, I was thinking

  4   about doing anything I could to receive my payment.

  5   Q.    And you even threatened to close Faisal Hassan's

  6   stores, but you wouldn't do that because it would

  7   affect you.  You might not get your money for sure then

  8   if you closed the store.  Right?

  9              MR. GREGORIE:  Objection.  Relevance, your

 10   Honor.

 11              THE COURT:  Sustained.

 12              Rephrase your question.

 13   BY MR. CLARK:

 14   Q.    Was it your motivation -- your motivation at this

 15   meeting was all about Faisal, wasn't it, sir?

 16   A.    No, sir.

 17   Q.    Sorry?

 18   A.    It wasn't all about Faisal Hassan.  No, sir.

 19   Q.    And it was in this meeting that you told Narseal

 20   Batiste that somebody was going to come up here to

 21   Miami.  Isn't that correct, sir?

 22              MR. GREGORIE:  Objection, your Honor.  Even

 23   counsel has stated this has been covered before by

 24   Ms. Jhones.

 25              THE COURT:  Sustained.
```

 1   BY MR. CLARK:

 2   Q.    Well, Mr. Narseal Batiste was surprised that

 3   somebody was coming up, because he always thought the

 4   money was coming through you.  Isn't that true, sir?

 5           MR. GREGORIE:  Objection.  It's cumulative,

 6   your Honor.

 7           THE COURT:  Sustained.

 8   BY MR. CLARK:

 9   Q.    And you brought up the UDS flier in this meeting,

10   didn't you, sir?

11           MR. GREGORIE:  Asked and answered, your Honor.

12           THE COURT:  Overruled.

13           THE WITNESS:  I don't remember if I -- you

14   asking me if I brought in -- the UDS flier into the

15   conversation when?

16   BY MR. CLARK:

17   Q.    On 11-10, you asked him -- you asked him about

18   the paper you took back home and you asked him for

19   another one, didn't you, sir?

20   A.    I don't know, man.

21   Q.    And you -- you don't remember?

22   A.    I don't recall.  I don't know if I did or not.

23   Sometimes the FBI instructed me to do things, and I did

24   exactly what they instructed me to do.

25   Q.    And you could have right here said -- talked

```
 1   about it as a cover.  "We need it for a cover."  You
 2   could have said anything.
 3   A.     I don't understand your question, my friend.
 4   Q.     The truth is it wasn't a cover, was it, sir?
 5   A.     I don't know.  That's what he told me.
 6   Q.     The truth is you didn't think it was a cover.
 7   You really didn't think it was a cover.
 8   A.     My friend, I don't understand.  I don't know.  He
 9   gave me this piece of paper and he told me this
10   information, and that's what I went on.
11   Q.     And you had every opportunity to corroborate it
12   as a cover and you did not, did you, sir?
13          MR. GREGORIE:  Objection.  Asked and answered,
14   your Honor.
15          THE COURT:  Sustained.
16   BY MR. CLARK:
17   Q.     Isn't it true, sir, you knew, if you had done
18   that, that Mr. Narseal Batiste would realize something
19   was wrong?
20          MR. GREGORIE:  Objection.
21          THE COURT:  Sustained.
22   BY MR. CLARK:
23   Q.     And you told him that somebody else was coming
24   over because they wanted to make sure -- you used that
25   term.  Do you remember using that term?
```

 1              MR. GREGORIE:  Objection.  Cumulative, your

 2    Honor.  This has been covered.

 3              THE COURT:  Sustained.

 4    BY MR. CLARK:

 5    Q.      Now, when you -- you understood that Mr. Narseal

 6    Batiste wanted to put a sign on his building on

 7    Liberty City.  Correct?

 8    A.      I'm sorry.  You asking me if I understood that

 9    Brother Naz wanted to put a sign?

10    Q.      Yeah.

11    A.      I don't know about a sign, but he told me about

12    putting up flags.

13    Q.      He told you what?

14    A.      Putting up flags for different countries on top

15    of the Embassy, representing each member in his group,

16    each country.

17    Q.      You knew he wanted to try to fix up the building

18    that he was in.  Correct?

19    A.      I don't understand your question.

20    Q.      You knew he wanted to try to fix up the building

21    called the Temple or Embassy because it was in bad

22    disrepair?

23    A.      It wasn't in really bad disrepair.  He was

24    thinking about making a restaurant inside so he could

25    feed the soldiers.

1          He was thinking about building a microphone,

2     doing carpet, build roof, doors and stuff like that.

3     He was actually creating work in that Embassy.  It was

4     really not to be done.

5               THE COURT REPORTER:  It was really not to be

6     done?

7               THE WITNESS:  Nothing to really get done, you

8     know.  It was finished, basically.

9     BY MR. CLARK:

10    Q.    And you were talking to him on 11-10 about

11    getting them computers and trying to help him fix up

12    the building known as the Temple.  Correct?

13    A.    That's what he's been talking to me about.

14    That's his concern.  So I'm showing him a part of your

15    organization.

16          I'm showing my concerns that, "Yeah.  This is

17    what you been telling me that we need to get done.

18    This is what I think is right to get done."

19    Q.    And you had -- after this meeting, you had a

20    number of other meetings with him between 11-7 and

21    11-21, didn't you, sir?

22    A.    I don't know.  I don't remember.

23    Q.    Nothing was ever corroborated in those meetings

24    about a UDS cover or Al-Qaeda, were they, sir?

25    A.    I don't know if I was supposed to do that.

 1   That's why I didn't did it.

 2   Q.    Then --

 3              MR. CLARK:  May I have just a moment, your

 4   Honor?

 5              THE COURT:  Yes.

 6              (Discussion held off the record amongst

 7   counsel.)

 8              MR. CLARK:  Could we have a side-bar for a

 9   moment, your Honor?

10              THE COURT:  We're going to take an early

11   lunch.  So we'll break at this time.

12              Do not discuss this case either amongst

13   yourselves or with anyone else.  Have no contact

14   whatsoever with anyone associated with the trial.  Do

15   not read, listen or see anything touching on this

16   matter in any way.

17              If anyone should try to talk to you about this

18   case, you should immediately instruct them to stop and

19   report it to my staff.

20              You may leave your notebooks and your binder

21   at your chairs.  Please be back in the jury room at

22   12:15.

23              (Whereupon, the jury exited the courtroom at

24   10:46 a.m. and the following proceedings were had:)

25              THE COURT:  You may step down, sir.

```
1              (Witness excused.)

2              MR. CLARK:  Your Honor, I was going to try to

3    talk with Ms. Jhones about making sure that I'm not

4    cumulative.

5              THE COURT:  Sure.  Now you'll have an

6    opportunity to do that.

7              MR. CLARK:  Thank you.

8              THE COURT:  We're in recess until 12:15.

9              (Thereupon, a luncheon recess was taken, after

10   which the following proceedings were had:)

11             THE COURT:  We're back on United States of

12   America versus Narseal Batiste, et al., Case

13   No. 06-20373.

14             Counsel, state your appearances, please, for

15   the record.

16             MR. GREGORIE:  Good afternoon, your Honor.

17             Richard Gregorie and Jacqueline Arango on

18   behalf of the United States.

19             MS. JHONES:  Good afternoon, your Honor.

20             Ana Jhones on behalf of Narseal Batiste, who

21   is present.

22             MR. LEVIN:  Good afternoon, your Honor.

23             Albert Levin on behalf of Patrick Abraham,

24   who's present.

25             MR. CASUSO:  Good afternoon, Judge.
```

 1              Lou Casuso on behalf of Burson Augustin, who's

 2    present.

 3              MR. CLARK:  Good afternoon.  Nathan Clark for

 4    Rotschild Augustine, who's present.

 5              MR. HOULIHAN:  Richard Houlihan with Naudimar

 6    Herrera.

 7              MR. VEREEN:  Rod Vereen on behalf of Stanley

 8    Phanor.

 9              THE COURT:  Let's bring in the jurors.

10              MR. CLARK:  Your Honor, I have gone over some

11    things to try to avoid the cumulativeness.

12              THE COURT:  Okay.

13              MR. CLARK:  But in order -- the things that I

14    need to cover, some of those things are going to

15    require me to lay the predicate.

16              It may be an issue that somebody has covered.

17    So I need a little bit of leeway to cover things for my

18    client, and I can't be completely bound by other

19    attorneys.

20              But I will -- I'm moving forward through some

21    things and things that haven't been covered, but I will

22    have to lay a predicate to a little degree.  So I just

23    need some leeway.

24              THE COURT:  Well, the Government will make

25    their objections and I'll rule.

1          MR. CLARK:  Okay.

2          THE COURT:  Let's bring in the jury, please.

3          (Whereupon, the jury entered the courtroom at

4   12:38 p.m. and the following proceedings were had:)

5          THE COURT:  You may be seated.

6          You are still under oath, sir.

7          You may proceed, Mr. Clark.

8          MR. CLARK:  Thank you, your Honor.

9   BY MR. CLARK:

10  Q.    Now, when we left off at the break, we were

11  talking about a time period from November the 7th to

12  November the 21st.  And I believe you had testified

13  during cross-examination of Mr. Vereen that you had

14  only been to the Temple or Embassy one time before

15  November the 7th.  Is that correct?

16  A.    I don't understand your question.  Was too long.

17  Q.    Is it your testimony that you've only been to the

18  Temple one time prior to November the 7th, 2005?

19  A.    I'm not sure if it's one or twice.  I'm not

20  100 percent sure.

21  Q.    Isn't it true, sir, that you've been there many

22  times?

23  A.    Before November 7, no.

24  Q.    Let me show you -- refer you to Page 38 of the

25  November 7th transcript.

```
 1              THE COURT:  What exhibit number is that?

 2              MR. CLARK:  That would be Exhibit 41.

 3   BY MR. CLARK:

 4   Q.    And it says -- Burson Augustin said, "And then I

 5   see your pride went down a little bit.  You started to

 6   help me.  You started to come here to the Temple, to

 7   the mosque, more than any other Muslim.

 8         "And I told your brother down there, 'Come by any

 9   time you want to.'  He hasn't come.  And he's busy at

10   the store.  Yeah.  He's busy.  I can't judge him for

11   that."

12         Remember him saying that to you?

13   A.    Yes, I do.

14   Q.    And that corroborates that you'd been at the

15   Temple many -- more than any other brother, any other

16   Muslim.  Isn't that true, sir?

17              MR. GREGORIE:  Objection, your Honor.

18              THE COURT:  Sustained.

19   BY MR. CLARK:

20   Q.    Does that refresh your recollection that you'd

21   been there many times before November 7th?

22   A.    No, sir.

23   Q.    Now, you also gave testimony about a meeting that

24   you had on November 21st.  Is that right, sir?

25   A.    Yes.
```

al-Saidi - CROSS - By Mr. Clark                    85

```
 1   Q.     And at that meeting, you asked Narseal Batiste
 2   about the movie Fahrenheit 9/11.  Do you recall that?
 3   A.     I recall asking him if he seen it.  Yes.
 4   Q.     And that is something that you -- did you know
 5   about Fahrenheit 9/11 before this meeting?
 6   A.     I heard --
 7          MR. GREGORIE:  Objection, your Honor.
 8   Relevance.
 9          THE COURT:  Sustained.
10   BY MR. CLARK:
11   Q.     You were instructed to ask the question about
12   Fahrenheit 9/11 by the FBI at this meeting on
13   November 21st, weren't you, sir?
14   A.     No, sir.
15   Q.     So you were just doing this on your own?
16          MR. GREGORIE:  Objection, your Honor.
17          THE COURT:  Sustained.
18   BY MR. CLARK:
19   Q.     Were you doing this without instructions from the
20   FBI?
21          MR. GREGORIE:  Objection, your Honor.  I make
22   an objection.  You sustain it.  And he continues to ask
23   the question.
24          THE COURT:  Sustained.
25
```

al-Saidi - CROSS - By Mr. Clark                    86

```
 1   BY MR. CLARK:

 2   Q.    Isn't it true, sir, that at this time,

 3   Mr. Narseal Batiste -- you had told him that any money

 4   you get -- he got was going to be coming through?

 5   Isn't that correct?

 6           MR. GREGORIE:  Objection.  We covered this

 7   before lunch, your Honor.

 8           MR. CLARK:  This hasn't been covered, your

 9   Honor.  This question -- I'll go specifically to the

10   transcript.

11           THE COURT:  Sustained.

12           MR. CLARK:  Can I show him the specific area

13   of the transcript?  Because it hasn't been gone over.

14           THE COURT:  This area has been covered.

15   BY MR. CLARK:

16   Q.    You also had a conversation with Narseal Batiste

17   on November 21st about putting on a turban and a staff

18   and sandals and taking flags and going to the airport.

19   Isn't that correct, sir?

20   A.    I'm sorry.  I don't understand your question.

21   Q.    On November the 21st, 2005, you had a

22   conversation, recorded, about Narseal Batiste putting

23   on a turban, taking a staff, putting on sandals and

24   going with flags to the airport to pick up your -- the

25   uncle.  Correct?
```

 1   A.    I think I remember him making that comment.  But

 2   I think he was joking.

 3   Q.    Well, he actually went to the airport with a

 4   turban.  You're aware of that, aren't you?  He actually

 5   wore a turban and a robe and went to the airport.

 6   A.    I don't know.

 7   Q.    Well, at that time, sir, you told him as well

 8   that the mosque was still the same and that that

 9   bothered you.  Correct?  Do you remember that?

10   A.    I know that he's been talking about fixing it,

11   and I didn't see the progress he was talking about.  So

12   I told him -- I think I did make a comment about the

13   mosque being fixed.

14   Q.    And you wanted him to make it look more like a

15   mosque.  Correct?

16   A.    That's not true.

17   Q.    And isn't it true you told him that, "We want to

18   see Muslims wherever we go" when he goes to the airport

19   dressed in a turban, sandals and with flags?

20   A.    I'm sorry.  I didn't get your question.

21   Q.    Do you recall telling Narseal Batiste that you

22   want to see Muslims wherever we go when he discussed

23   putting on a turban, taking a staff and sandals and

24   flags to the airport?

25   A.    If I remember making a comment like that?

1    Q.    Yes, sir.

2    A.    I might have.  I'm not sure.

3    Q.    And this -- at this time, on 11-21, you were

4    arranging for Narseal Batiste to go to the airport all

5    dressed up like this, which was really putting on a

6    show that wasn't real.  Isn't that correct, sir?

7    A.    I don't understand your question.  Can you be

8    more clear, please?

9    Q.    Sure.

10         When you discussed him putting on a turban and

11   sandals and going to the airport with flags and you

12   wanted Muslims everywhere we go, you were putting on a

13   show at the airport that was a sham or a charade.

14   Isn't that true, sir?

15   A.    No, sir.  You making this up.  I never discussed

16   with him how he wears his clothes or what he does do.

17         I discussed with him if it was okay with him

18   picking up Brother Mohammed from the airport.  That was

19   it.  I don't know what you talking about.

20   Q.    Well, you recognize that this testimony on

21   November 21st is certainly not blending in.  It's being

22   very conspicuous, isn't it, sir?

23              MR. GREGORIE:  Objection, your Honor.

24              THE COURT:  Sustained.

25

1    BY MR. CLARK:

2    Q.    You didn't tell him to blend in and not wear

3    these things, did you, sir?

4    A.    No, I didn't, sir.

5    Q.    And thereafter, you had a number of meetings with

6    him between 11-21 and 12 -- December the 14th that were

7    recorded meetings.  Correct?

8    A.    If there was any meetings between December -- I

9    mean, November 21st and December 14?

10   Q.    Yes, sir.

11   A.    I believe there was a meeting.

12   Q.    And you've had -- you've been -- most of those

13   have been gone over with Ms. Jhones.  Correct?

14   A.    I'm not sure.  I think we went all over

15   everything.

16   Q.    You went over with her that, on December

17   the 14th, you asked for a list.  Correct?

18   A.    I made a phone call on December 14.  And, yes, I

19   did ask for a list.

20   Q.    The list was entered into evidence?

21   A.    Yes, it was.

22   Q.    You testified that you were instructed to do that

23   by the FBI.  Is that correct?

24   A.    Yes, sir.

25   Q.    And then you were aware that Mr. Batiste was

 1   going to get somebody on December 16th at the airport.

 2   Correct?

 3   A.     If I was aware that he was going to -- the FBI

 4   asked me to tell him to pick Brother Mohammed up from

 5   the airport.

 6   Q.     Correct.

 7          So you were aware that, on December the 16th, he

 8   was going to go to the airport that way.  Correct?

 9   A.     I don't understand what you mean by saying --

10   Q.     You knew on December the 14th that Narseal

11   Batiste was going to go to the airport to pick up

12   Confidential Informant No. 2.  Correct?

13   A.     He promised me to do that.

14   Q.     Okay.  And you knew he was going to be dressed up

15   in a turban and sandals and all that.  Correct?

16   A.     No, sir.  That's not true.

17   Q.     Well, you were aware that that was a strong

18   possibility, since it had been discussed on

19   November 21st.  Correct?

20   A.     No, sir.

21   Q.     And then the next time -- you were asked to meet

22   with Narseal Batiste on December the 21st, following

23   that meeting, weren't you, sir?

24   A.     I don't know if I was asked by him or the FBI.

25   I don't know.  But we did have a meeting on

 1    December 21st.  Yes.

 2    Q.    At that meeting, you were -- you could have asked

 3    about the weapons on the list, couldn't you, sir?

 4    A.    If I could have asked about the weapons on the

 5    list?

 6    Q.    The weapons.

 7          Do you remember the list you got?

 8    A.    Yes.

 9    Q.    You could have asked him on December 21st all

10    about the list that you got.  Isn't that true, sir?

11    A.    I mean, I don't know if I was instructed to ask

12    him or not.  I mean, if I was instructed to ask him, I

13    would have.  Yes.  I mean....

14    Q.    Are you saying that you were not instructed to

15    ask him about the list on December 21st?

16    A.    Actually, I remember -- I think the FBI did

17    instruct me to speak to him about the list.  And I did

18    that.

19    Q.    You're saying you talked to him about the list on

20    December 21st?

21    A.    Yes, sir.

22    Q.    Okay.  And when you first went to the meeting on

23    December 21st, the first thing you discussed with him,

24    however, was -- on Page 7, was blowing himself up.

25    Isn't that correct, sir?

 1   A.     I'm sorry.  I didn't get your question.

 2   Q.     The first area that you discussed with Narseal

 3   Batiste on December 21st after the December 16th

 4   meeting with CW 2 was about blowing himself up, on

 5   Page 7 of that transcript.  Do you recall that?

 6   A.     No.  I don't recall talking to Brother Naz about

 7   blowing himself up.  No.

 8   Q.     Well, were you -- you were instructed prior to

 9   that meeting to discuss blowing yourself up?

10   A.     No, sir.

11   Q.     And you were -- isn't it true, sir, that you were

12   also instructed at that meeting to tell Narseal Batiste

13   to be secretive about your discussions with him?  Isn't

14   that true?

15   A.     No, sir.

16   Q.     I'll show you Page 7 of the transcript -- strike

17   that.  I'll get the correct exhibit.

18          I'm showing you Exhibit 46-B.  And I'll show you

19   here on Page 7 -- you say right here, "You not going to

20   feel no pain as mujahad."

21          MR. GREGORIE:  Objection, your Honor.  This

22   specific passage was covered by Ms. Jhones.  This exact

23   passage, your Honor.  We've been through this.

24   Cumulative.

25          THE COURT:  Sustained.

```
 1    BY MR. CLARK:

 2    Q.    So you did talk about --

 3          MR. GREGORIE:  Judge --

 4    BY MR. CLARK:

 5    Q.    Were you instructed to do that, to talk about

 6    blowing yourself up on --

 7          MR. GREGORIE:  Judge, I ask that counsel

 8    not --

 9          THE COURT:  Sustained.

10          MR. GREGORIE:  -- ask the same question after

11    you've sustained the objection.

12          THE COURT:  Sustained.

13          MR. CLARK:  I have to lay the predicate.

14          THE COURT:  I'm sorry?

15          MR. CLARK:  I have to lay the predicate for a

16    question I'm going to ask later on on the transcript.

17          THE COURT:  Come on up.

18          (Whereupon, proceedings were had at side-bar

19    outside the presence of the jury which have been sealed

20    per instructions of the Court.)

21          (Whereupon, the following proceedings were had

22    in open court:)

23    BY MR. CLARK:

24    Q.    I'm showing you Page 32 of Exhibit 46, where you

25    say to Mr. Batiste that -- you're telling him, "That's
```

1    not what I -- not what I mean.  Not what I want.  You

2    keep your F'g crack head, for God's sake, to carry a

3    box of salt shaker.  Leave it in a restaurant.  More

4    than 500 people die -- 200 people die.  Now I more

5    secure for you.  You don't -- you don't have to lose

6    that many soldiers."

7         You're telling him here, sir, that going into Jeb

8    Bush's office or marching in the streets is not what

9    you want him to say when he meets with CW 2 again.

10   Isn't that true, sir?

11   A.    That's not true.

12   Q.    Isn't it true that you're telling him that he

13   needs to tell CW2 that he needs to carry a box of -- a

14   bomb or a salt shaker into a restaurant and kill?

15   That's what he needs to say to CW 2.  Isn't that what

16   you say --

17   A.    No.  That's not what I tell him he need to say.

18   No, sir.

19   Q.    What did you mean when you said, "...not what I

20   mean.  Not what I want"?  Did you say that, sir,

21   "...not what I mean.  Not what I want"?

22   A.    Well, I made some comments about that.  Yes.

23   Q.    You were telling him what you didn't want him to

24   say when he went to see CW 2 again.  Isn't that true,

25   sir?

1    A.     No, sir.  That conversation wasn't -- I wasn't

2    telling him there what to say to another informant or

3    to anybody.  No.  I was making suggestions.

4    Q.     You were maybe suggesting what not to say.

5    Correct?

6    A.     No, sir.  Not what to say or not what to say.

7    What I think it -- should happen.

8    Q.     It's in this meeting after this -- the next page,

9    it says at the bottom, "So you don't have to get nobody

10   killed out of your own soldiers."

11          Do you remember saying that?

12   A.     Yes, sir.  That's his discussion.  I was trying

13   to get him to speak about discussions me and him had

14   spoke about before.  I was telling him I preferred that

15   idea so I could get him speaking about it.

16   Q.     Now, you understand that this transcript is an

17   aid to understanding the tape.  Correct?

18   A.     I'm sorry.  I didn't understand your question.

19   Q.     This transcript here is an aid to understanding

20   what was said on the tape.  Isn't that true, sir?

21   A.     This is a transcripts of what was said that day.

22   Q.     That says, "That's the kind of attack we do."

23          That was actually a question, wasn't it, sir?

24   A.     You asking me if it's a question?  No.  I

25   actually think it's a comment.

al-Saidi - CROSS - By Mr. Clark                          96

1   Q.    And you said, "Exactly, brother."

2   A.    I did said that.  Yes.

3   Q.    It's got, "You see what I'm saying?  And that's

4   the -- where we attack the intelligence, that the

5   strength."

6         And you say, "Thank you, brother."

7         You said that, didn't you, sir?

8   A.    Yes.  I did said that.

9   Q.    Confirming what he is supposed to say when he

10  sees CW 2.  Isn't that true?

11  A.    No, sir.  That's not true.

12  Q.    And he says something else, and you say, "Thank

13  you."  Correct?

14  A.    I did said, "Thank you."  Yes.

15  Q.    Now, also in this meeting, you -- it was after --

16  right after that that the Sears Tower was discussed.

17  Correct?

18  A.    I'm not sure if that was the only time or the

19  first time or if it was.

20  Q.    And this is where, on Page 41 of the transcript,

21  the Sears Tower is discussed.  Is that correct?

22  A.    Yes, sir.

23  Q.    And that is the first time that the Sears Tower

24  has ever been mentioned in this investigation.  Isn't

25  that true?

1   A.    I'm not sure.  That's the first time that I knew

2   it was the second tallest building in the United

3   States.  That's the first time I memorized the name.

4   Q.    And when you're talking about it on Page 42, you

5   say to him, "They gonna know that it's from a

6   restaurant."

7         Correct?

8   A.    We was in a conversation about his plan to use

9   the salt shakers, change them to poison.  I was

10  discussing that with him so I can get it recorded.

11  Yes.

12  Q.    Now, then, after that, he told you that he had

13  5,000 soldiers.  He said something about having

14  5,000 soldiers in Chicago.

15        Is that correct?

16  A.    Yes.  I remember him saying that he have

17  5,000 soldiers in Chicago.  Yes.

18  Q.    And he told you that, if you get him the money,

19  he can go -- "As soon as we get to the money, we can go

20  to Chicago."  Isn't that correct?

21  A.    Yes, it is.

22  Q.    And that was on Page 45 of the transcript.

23  Correct?

24  A.    I don't know what page.

25  Q.    This is Page 45 of the transcript.

1          And he says, "Chicago."

2          And you said, "Okay, brother.  Do you want to go

3    to Chicago?"

4          And he says, "Gotta go to Chicago."

5          And you say, "When do you want to go?"

6          And he says, "As soon as we get the money."

7          MR. GREGORIE:  Objection.  Cumulative, Judge.

8    This very passage was discussed by Ms. Jhones.

9          THE COURT:  Sustained.

10   BY MR. CLARK:

11   Q.    Did you go to Chicago?

12   A.    No, sir.

13   Q.    Did you have any plans to go to Chicago?

14   A.    Me and Brother Naz talked about going.

15   Q.    Did you have any plans with the FBI to go to

16   Chicago?

17   A.    No, sir.

18   Q.    You knew that there was not 5,000 soldiers in

19   Chicago.  Isn't that true, sir?

20   A.    I don't know.

21   Q.    You knew that this was a preposterous statement,

22   didn't you, sir?

23         MR. GREGORIE:  Objection, your Honor.  No

24   basis in fact.

25         THE COURT:  Sustained.

```
 1   BY MR. CLARK:

 2   Q.    And then the very next day, you understand that

 3   Narseal Batiste going to go meet with CW No. 2 again.

 4   Correct?

 5   A.    I don't remember.

 6   Q.    Now, there were meetings that were gone over in

 7   approximate early January.  I don't want to go over all

 8   those either.

 9         But you were instructed, were you not, to -- by

10   the FBI to meet with Narseal Batiste in early January

11   up and to before January 28th of '06.  Isn't that

12   correct?

13   A.    I don't remember the FBI instructed me during

14   that month to meet with them, except the 28th meeting.

15   Q.    And you were to arrange -- to help arrange

16   another meeting with CW 2.  Correct?

17   A.    I'm sorry.  I don't understand your question.

18   Q.    You are instructed to meet with Mr. Batiste to

19   try to arrange another meeting with CW 2?

20   A.    I don't remember if they instructed me to do that

21   or not.

22   Q.    And you were also instructed, weren't you, sir,

23   that, when you met with him, that you were to pretend

24   that -- that you were to hold him off, hold him back,

25   about going -- asking for any money.  Isn't that true?
```

 1   A.     No, sir.  That's not true.

 2   Q.     And you did record meetings and conversations

 3   with him leading to January 28th, didn't you?

 4   A.     I did record conversation over the phone,

 5   confirming --

 6   Q.     And you -- okay.  I'm sorry.  I didn't mean to

 7   interrupt.

 8   A.     No problem.

 9   Q.     And you did tell him -- pretend as if you did not

10   know what was going on about the money with CW 2.

11   Isn't that true, sir?

12   A.     No.  That's not true.

13   Q.     And isn't it true that you told Narseal Batiste

14   that -- or you told -- you were to tell Narseal Batiste

15   that CW 2 has the right to give his reasons for not

16   giving the money?

17   A.     No.  That's not true.

18   Q.     And then you actually met with -- you had some --

19   recorded either telephone calls or meetings on

20   January 25th and 27th about meeting -- this meeting

21   that was going to be had with CW 2.  Correct?

22   A.     You asking me if there was phone calls confirming

23   the meeting?  Yes, there was.

24   Q.     And you were going to be part of that meeting,

25   weren't you, sir?

1    A.     Yes, sir.

2    Q.     And that's because the money was supposed to

3    still come through you.  Isn't that true?

4    A.     I don't know about that.  It was in -- no talk

5    about money.  It was just a meeting that -- we was

6    supposed to meet and clear things up.

7    Q.     And isn't it true that, at this meeting on

8    January 28th, that you told Narseal Batiste that you

9    didn't want to talk about the Sears Tower mission in

10   front of the Queen?  Isn't that true?

11   A.     You telling me that I told Brother Naz after

12   January 28th that I didn't want to discuss the Sears

13   Tower mission?  No, sir.  I never said that.

14   Q.     I'm saying:  Isn't it true that you said that to

15   him in that -- in the January 28th meeting, a recorded

16   meeting, that you did not want to talk about the Sears

17   Tower mission in front of the Queen?

18          MR. GREGORIE:  Objection, your Honor.  No

19   basis in fact, your Honor.

20          THE COURT:  Sustained.

21   BY MR. CLARK:

22   Q.     And you've also testified that you talked to him

23   about it in front of the Queen.  Isn't that true?

24   A.     You asking me if -- is it true that I testified

25   that I talked to him in front of the -- in front of his

1   wife?

2   Q.    Yes.

3   A.    What I testified -- I said he talked to me about

4   the mission in front of his wife.  I didn't say much

5   because I didn't know how much he want her to know.

6   Q.    So that's why you told -- you actually at this

7   time on January 28th told him that you didn't talk

8   about -- it wasn't talked about in front of the Queen.

9   Correct?

10          MR. GREGORIE:  Objection, your Honor.

11          THE COURT:  Sustained.

12  BY MR. CLARK:

13  Q.    And you also knew at that meeting on January 28th

14  that CW 2 was going to announce that they were going to

15  give him a -- give Narseal Batiste a surprise of

16  another building.  Isn't that correct?

17  A.    No, sir.  I didn't knew what Brother Mohammed

18  have or didn't have for them.  I don't know nothing.

19  Q.    Prior to this time, you've never discussed with

20  Narseal Batiste about him moving his building, have

21  you, sir?

22  A.    I don't remember.

23          MR. CLARK:  I have no further questions, your

24  Honor.

25          THE COURT:  Mr. Casuso.

```
1              MR. CASUSO:  Thank you.

2              Very briefly, ladies and gentlemen.

3                        CROSS-EXAMINATION

4    BY MR. CASUSO:

5    Q.    Going back in time, now, to your conversations

6    with Mr. Batiste when you were working at the store --

7    remember that?

8    A.    Yes, sir.

9    Q.    Okay.  And you said you talked about religion,

10   politics.  Right?

11   A.    Yes, sir.

12   Q.    What acts of terrorism, sir, did he tell you that

13   he performed?

14   A.    You asking me what terrorism did he prefer

15   that -- perform?

16   Q.    What acts of terrorism did Narseal Batiste tell

17   you that he had done?

18   A.    No.  He haven't -- he didn't told me that he's

19   been doing terrorism acts.  He didn't told me about

20   none of those.

21   Q.    Okay.  And when you had your conversation with

22   Burson Augustin on November 11, did Burson Augustin,

23   sir, ever tell you that he had hurt anyone in his life?

24   A.    I'm not sure if I met Burson on the 11th.  No.

25   Q.    November -- November 7th.  I'm sorry.  Okay?
```

 1          Remember when you had the long conversation that

 2   many lawyers have talked about?

 3   A.     In November 7, yes.

 4   Q.     Yes.

 5   A.     What about it?

 6   Q.     The reason you went there, you were really trying

 7   to find Narseal Batiste.  Right?

 8   A.     Yes, sir.  I was thinking I was going to meet

 9   with Brother Naz.

10   Q.     You didn't go over there to talk to Burson.

11   Right?

12   A.     Yes, sir.  My --

13   Q.     You did?

14   A.     Go ahead.

15   Q.     You went there to talk to Narseal.  Right?

16   A.     I went to speak to Brother Naz.  Yes, sir.

17   Q.     Right.  Okay.

18          And Burson just happened to be there.  Right?

19   A.     He was there when I get there.  Yes.

20   Q.     Right.  He happened to be there.  Okay.

21          So in the conversation that you had with Burson,

22   did he ever tell you, sir, that he ever hurt anyone?

23   A.     I don't understand your question.

24   Q.     Did he ever tell you that he ever hurt anyone,

25   sir, before?

```
 1   A.     If he ever told me that he -- if he ever hurt
 2   anybody before?
 3   Q.     Yes.
 4   A.     I don't remember him telling me that he have hurt
 5   anybody before.
 6   Q.     Did he ever tell you, sir, that he had engaged in
 7   any acts of terrorism, bombings, burning buildings,
 8   anything like that, sir?
 9   A.     He didn't mention that he was involved on
10   something like that.  No.
11   Q.     No.  Okay.
12          And to quote you, the tape speaks for itself.
13   Right?  Right?
14   A.     It does.  Yes.
15   Q.     Whatever it says, that's what was said.  Right?
16   A.     Yes, sir.
17   Q.     Okay.  Now -- so you go back to your country.
18   Right?  Before -- is it when you're in your country or
19   before going back to your country that you call the
20   FBI?
21   A.     Yes.  Before I left the United States, I did
22   contact them.
23   Q.     Now, why would you think that the FBI would care
24   if this man, Hassan, owes you money?  Why would you
25   call the FBI about that?
```

1    A.    Okay.  I'm not -- your question is not clear.

2    Q.    Well, you're the one who called the FBI.

3          Why would you call the FBI about Mr. Hassan owing

4    you money?

5    A.    Okay.  You asking me if I called the FBI about

6    Faisal Hassan owing me money?  Is that your question?

7    Q.    Well, you did.

8          Did you call the FBI?

9    A.    I called the FBI, but to tell them about the AK

10   and the paper.  I never called the FBI to let them know

11   that Faisal owed me money.  No.

12   Q.    Did you say on direct examination that you told

13   them part of the call was that he owed you money?

14   Anything like that, sir?

15         MR. GREGORIE:  Objection, your Honor.  There's

16   no basis in fact for that question.

17         MR. CASUSO:  I'm asking him if he said that on

18   direct, Judge.

19         MR. GREGORIE:  Well --

20         THE COURT:  Sustained.

21   BY MR. CASUSO:

22   Q.    Okay, sir.  So your answer is you didn't call the

23   FBI about this man, Hassan, owing you money?

24   A.    I don't remember telling the FBI at all that he

25   owed me money.  No.

```
 1   Q.     You don't remember, sir, or you didn't tell them

 2   that, sir?  Which one?

 3   A.     I don't know, man.  I don't remember.

 4   Q.     You don't know.  Okay.

 5          So, then, it's in that conversation for some

 6   reason you tell him about Narseal.  Right?

 7   A.     Actually, the whole call was about Narseal

 8   Batiste and the AK-47 that I had.  But I actually spoke

 9   about Faisal because Faisal was the person that

10   introduced me to Brother Naz.  So I had to bring the

11   subject.  I thought he was with his group in the

12   beginning.

13   Q.     So the call about Faisal is because he introduced

14   you to Brother Naz.  Right?

15   A.     Sir, the call wasn't about Faisal.  Faisal was

16   mentioned in that call.  That's what was happening.

17   Q.     Okay.  Well, whatever is on the 302, that's what

18   it was all about.  Right?

19   A.     I don't know what's on the 302.

20   Q.     You've never seen it?

21   A.     No, sir.

22   Q.     Okay.  So, then, at that point, you get

23   instructions from the FBI to record Narseal Batiste.

24   Right?

25   A.     Wasn't that I got the authorization to record
```

al-Saidi - CROSS - By Mr. Casuso                    108

```
 1    until I came back from Yemen in October.  Yes, sir.

 2    Q.    So they give you instructions and they said, "Get

 3    whatever you want."  Right?  "Corroborate with what the

 4    conversation is."  Is that what was said?

 5    A.    They asked me to gather as much as -- information

 6    I could.

 7    Q.    Did they give you, like, a game plan here?

 8    A.    I don't understand what's a "game plan."

 9    Q.    Did they give you an objective here, sir?

10    A.    I don't understand what you mean.

11    Q.    Let me just sharpen my question here.

12          At some point, sir, you will admit that the

13    question of money came into play here with Narseal

14    Batiste.  Right?

15    A.    You mean if he asked for money?

16    Q.    Who asked for money?  Did you offer money or did

17    he ask for money?

18    A.    I think since the beginning he's been asking for

19    support.  But money, in particular, wasn't his main

20    concern.  There was times that we spoke about his needs

21    for money and my needs for money.

22          But in the beginning, he came to me and he told

23    me to get him connected to any Islamic organization

24    that's willing to support him to take over the land

25    that he was promised by George Washington -- or the
```

al-Saidi - CROSS - By Mr. Casuso                     109

```
 1    Moors was promised.
 2    Q.    But my question to you, sir, is:  You say there's
 3    a question of support, and support you equate with
 4    money.  Right?  "Yes" or "no," sir?
 5              MR. GREGORIE:  Objection, your Honor.
 6              THE COURT:  Sustained.
 7              Rephrase your question.
 8    BY MR. CASUSO:
 9    Q.    You say the question of support -- I asked you --
10    I asked you if the question of money came up.
11              And you said, "Well, he asked about support."
12              By "support," do you mean he asked for money?
13    A.    Sir, he didn't make it very clear that he wanted
14    money from Al-Qaeda or the organization he was trying
15    to contact with.  But he was looking for any kind of
16    support he could get.
17    Q.    Okay.  And by "support," we mean money.  Right?
18    A.    He asked for anything that would help him to
19    accomplish his mission.  He never mentioned it clearly,
20    money, money only.
21              There was a time that he told me it's easier that
22    if he would get the money to buy the guns instead of
23    having Brother Mohammed to go through getting the guns.
24              But he never made it seem like it was all about
25    money.  He even discussed that, if he would have -- if
```

1   he would take $100,000 -- or get $100,000 from

2   Al-Qaeda, that he wasn't gonna live to enjoy that

3   money.

4   Q.    He wasn't going to live to enjoy the $100,000

5   from Al-Qaeda?

6   A.    He said that he would receive that money, it

7   would do the mission good, that he might not even live

8   through.

9   Q.    Sir, isn't it true that, from the time you

10  started recording this man, Narseal, until you stopped

11  regarding this man -- okay? -- before the -- before

12  CW 2, the other man that you talked about -- before he

13  comes into the picture, nothing ever happened here?

14  A.    I'm sorry?

15  Q.    Nothing ever happened here.  All it was was talk,

16  wasn't it?  You wanted -- let me --

17       MR. GREGORIE:  Objection, your Honor.  Is

18  there a question pending?

19       THE COURT:  You need to let him answer the

20  question.

21       MR. CASUSO:  Yes.

22  BY MR. CASUSO:

23  Q.    Go ahead, sir.  You're probably going to ask me

24  to repeat it.  Right?

25  A.    You confusing me, man.

 1    Q.     Let me just ask it again.

 2           From the time you started recording Narseal --

 3    okay? -- until you kind of like came out of the

 4    picture -- okay? -- did anything ever happen here?

 5    A.     "Anything" is what?  I don't know what you mean.

 6    Q.     Other than talk, sir, did anything ever happen

 7    here?

 8    A.     Yeah.  We was training.  They showed me --

 9    Q.     You were training?

10    A.     Yes, sir.

11           MR. GREGORIE:  Objection.  He cut of off his

12    answer, your Honor.

13    BY MR. CASUSO:

14    Q.     Go ahead.

15    A.     Sir, was a lot of things happening.  Brother Naz

16    was waiting for support to start taking action on

17    waging the war.  But it wasn't enough time.

18    Q.     Brother Naz wanted money.  Right?

19           MR. GREGORIE:  Objection, your Honor.  Asked

20    and answered.

21           THE COURT:  Sustained.

22    BY MR. CASUSO:

23    Q.     Did anybody fill any salt shakers with poison,

24    sir?  I mean, how much would that cost?

25    A.     I don't know.  Brother Naz was planning it.  But

1    I don't know if he did it or not.

2    Q.     Did you help him fill any out, sir?

3    A.     No, sir.

4    Q.     Okay.  Did you go and get him a bag of poison so

5    he could fill up some salt shakers, sir?

6    A.     He never request that from me.

7    Q.     Remember, after Wilma, you said that you were

8    going by the FBI office and he pointed out a busted

9    window?

10   A.     Yes, sir.

11   Q.     And you said, "Oh, anybody could throw a hand

12   grenade"?

13   A.     He said.  I didn't say.

14   Q.     Right.

15   A.     Yes, sir.

16   Q.     Okay.  Did you hear about anybody throwing a hand

17   grenade at the building?

18   A.     No, sir.

19   Q.     How about a rock at the building?  Did anybody

20   even do that?

21   A.     No, sir.

22   Q.     What happened here -- okay? -- the mission,

23   sir -- and you spoke about a mission to Burson here on

24   November 7th.  Right?  Right?

25   A.     There was more than one thing we spoke about.

1    Q.     I understand.

2           But one of them was a mission.  Right?

3    A.     It was missions.

4    Q.     The mission, sir -- and you said, "Tell me what

5    your mission is and the support will be there."

6           Remember?  Did you say that?

7    A.     I might have did.

8    Q.     And you knew that anything you said to Burson he

9    would repeat to Narseal.  Right?

10   A.     If I knew what I was gonna say to Brother Burson,

11   that he was gonna tell Brother Naz?

12   Q.     Sure.  You knew that.

13   A.     Well, I know they was gonna talk about what me

14   and him talked about.  But I wasn't sending --

15   delivering a message.

16   Q.     You went to see Brother Naz and you encounter

17   Burson.  And the reason you went there to see Brother

18   Naz is because he wasn't even, like, paying any

19   attention to you.  He wasn't even answering your calls.

20   Isn't that true, sir?

21   A.     That's not true.

22   Q.     And that's the reason you showed up there

23   unannounced?

24   A.     That's not true.

25   Q.     And that's the reason you complained to Burson

 1   that Narseal is ignoring you?

 2   A.      That's not true.

 3   Q.      Okay.   The tape speaks for itself.   Right?

 4   Right, sir?

 5   A.      Yes.   Everything was said is on those papers.

 6   Q.      Yes, sir.

 7   A.      But the reality is different.

 8   Q.      Okay.   The reality here, sir, is that this whole

 9   case was made up.

10   A.      No, sir.

11   Q.      You were playing a role, sir, right, for the FBI?

12   Right?

13   A.      After they told me I could play that role.

14   Q.      I understand that.

15           You were playing a role here.   Right?

16   A.      My role was that I -- yes.   I was playing a role.

17   Q.      And what was your agreement with the FBI, sir?

18   How were you getting paid here?   Tell us.

19   A.      It was -- they would pay me the lost wages that I

20   would get paid if I was working on the store.   At that

21   time, I wasn't working.

22   Q.      So they would pay you your lost wages at the

23   store.

24           Anything else, sir?

25   A.      They paid for where I was staying, for that

1    apartment.

2    Q.    Do you get paid to testify here?

3    A.    No, sir.

4    Q.    Isn't it true, sir, that as of February 26th of

5    this year, you've been paid $48,591?  Is that true,

6    sir?

7    A.    No.

8    Q.    $21,420 for services and $27,171 for expenses.

9    Right?

10   A.    That's the money that I get for --

11   Q.    "Yes" or "no," sir.

12   A.    Sounds about right --

13          MR. GREGORIE:  Objection, your Honor.

14   BY MR. CASUSO:

15   Q.    "Yes" or "no," sir.

16          MR. GREGORIE:  The witness is being cut off,

17   your Honor.

18          THE COURT:  Let him answer the question.

19          THE WITNESS:  Sir --

20   BY MR. CASUSO:

21   Q.    You can answer that "yes" or "no."

22          Is that what you've been paid, sir?

23          MR. GREGORIE:  Objection, your Honor.  The

24   witness is entitled to explain.

25          THE COURT:  You can answer the question "yes"

 1    or "no," sir, and then you may explain, if you wish.

 2              THE WITNESS:  Well, can you ask me the

 3    question again.

 4    BY MR. CASUSO:

 5    Q.    Absolutely.

 6          To February 26th, 2009, you've been paid $21,420

 7    for services and $21,171 for expenses.

 8          Is that what you've been paid, sir?

 9    A.    I agree on how much I got paid for services.  But

10    I don't know how much they gave me for food money.

11    Q.    What's that?

12    A.    I know about the 20-something thousand that was

13    paid to me for my services.

14    Q.    Okay.

15    A.    But I didn't count the last -- the rest.  I

16    didn't count the rest of it because it was during the

17    whole period of time.  They would give me food money

18    and pay for where I stayed.  So I don't know.

19    Q.    So they gave you food money, also?

20    A.    Yes, sir.

21    Q.    Okay.  And you're not being paid to testify here?

22    A.    I'm getting $59 day for food.

23    Q.    So, sir, basically -- and you can correct me if

24    I'm wrong.  Okay?

25          When you go back to Yemen -- okay? -- you've

1   severed your ties with the guy you were working with at

2   the convenience store.  Right?

3   A.     I didn't get your question.

4   Q.     Mr. Hassan.

5          You finished your relationship with him -- your

6   business relationship.  Right?

7   A.     We break down a deal for me to --

8   Q.     Okay.  Okay.  So you get a certain amount of

9   money.  Right?  $7,000.  Right?

10  A.     I don't understand your question.

11  Q.     What is it about it that you don't understand,

12  sir?

13         Did you get $7,000 from this man?  I mean, you've

14  said that on direct examination here.

15  A.     Yes.  I did receive a payment of money that he

16  owed me, $7,000.

17  Q.     So that's a "yes."  Right?  That's what you had?

18         THE COURT:  Ask your next question,

19  Mr. Casuso.

20  BY MR. CASUSO:

21  Q.     Did you have any other money, sir?

22  A.     Did I have any other money?  What time?  When?  I

23  don't understand.

24  Q.     When you went back to your country, sir.

25  A.     No, sir.  All I had is the $7,000 that I made

1    from that store.

2    Q.    Right.

3          And with that money, you bought your ticket and

4    you went back home.  Right?

5    A.    Yes, sir.

6    Q.    Okay.  Basically, sir -- you can correct me if

7    I'm wrong; I may be wrong -- when you came back to the

8    United States, you had very little money.  Right?

9    A.    Yes, sir.

10   Q.    So you were depending also on the FBI?

11   A.    If I was depending on the FBI?

12   Q.    Yes.

13         Did you sign a contract with them?

14   A.    Well, when I came back, I had an option, either

15   to work for the FBI or to go back working in the

16   grocery store.  So --

17   Q.    And you chose?

18   A.    I chose to help the FBI gathering the information

19   they asked me to gather, and they reimburse me for the

20   paychecks I was losing.

21   Q.    You chose to help the FBI for money.  Right, sir?

22   That's what you were doing.  Right?

23   A.    Sir, I did what I was asked to do to save people,

24   to make sure all the information I gave the FBI was

25   correct.  This is my point of view.  Paychecks -- I

1    have to live on something.

2    Q.    Everybody does.

3    A.    Yes, sir.

4    Q.    So you start recording this man and, lo and

5    behold, in all these conversations, sir, nothing

6    objective ever happens here.  Right?

7              MR. GREGORIE:  Objection, your Honor.

8              THE COURT:  Sustained.

9    BY MR. CASUSO:

10   Q.    Does there come a point, sir, that a plan is made

11   to introduce somebody else into this picture?

12   A.    If there was -- came a time that I introduce

13   somebody else into this --

14   Q.    That somebody else was introduced into the

15   picture to deal with Narseal Batiste.

16   A.    Brother Mohammed.

17   Q.    Brother Mohammed.

18         And Brother Mohammed is the big chief from

19   Al-Qaeda.  Right?  He's the big guy.  Right?

20   A.    I don't understand if he's --

21   Q.    He's the guy that you told them that they need to

22   impress.  Right?

23   A.    I never told them they need to impress him.  I

24   told them that was the guy that was coming from

25   Al-Qaeda.

al-Saidi - CROSS - By Mr. Casuso                    120

1    Q.    And he's the guy with the money.  Right?

2    A.    I never said he's the guy with the money.  No,

3    sir.

4    Q.    Did you ever give Narseal Batiste any money, sir?

5    A.    I think there was exchanged between me and him

6    $25.  He loaned me.  I paid him back.

7    Q.    25 bucks.  Right?

8    A.    Yes, sir.

9    Q.    Okay.  Did you ever see 5,000 soldiers in

10   Chicago?

11   A.    No, sir.

12   Q.    Did you ever see any land in Louisiana?

13   A.    No, sir.

14   Q.    Did you ever see any land in Alabama?

15   A.    No, sir.

16   Q.    Isn't everything that -- everything going on so

17   far, sir, is a fiction, like this salt shaker caper?

18   It's kids' stuff, isn't it?

19          MR. GREGORIE:  Objection.  Argumentative.

20          THE COURT:  Sustained.

21   BY MR. CASUSO:

22   Q.    It's comic book stuff, isn't it?

23          MR. GREGORIE:  Objection, your Honor.

24          THE COURT:  Sustained.

25

 1    BY MR. CASUSO:

 2    Q.    Isn't it the kind of stuff like 10-, 12-year-old

 3    boys make up?

 4          MR. GREGORIE:  Your Honor, I object and

 5    counsel continues.

 6          THE COURT:  Sustained.

 7          Mr. Casuso, do you have another question?

 8          MR. CASUSO:  That's all I have, Judge.  Thank

 9    you.

10          THE COURT:  Mr. Levin.

11          MR. LEVIN:  Yes, your Honor.

12                     CROSS-EXAMINATION

13    BY MR. LEVIN:

14    Q.    Good afternoon, Mr. al-Saidi.

15    A.    Good afternoon.

16    Q.    Mr. Casuso asked you -- I didn't -- I don't know

17    if it was clear or not -- how much are you being paid

18    today for testifying?

19    A.    I believe I'm getting $59 a day for food.

20    Q.    Is that 59?

21    A.    Yes, sir.

22    Q.    5-9.

23          $59 just for food?

24    A.    Yes, sir.

25    Q.    And he already brought out the amount that you've

 1   been paid up to this point.

 2        Now, isn't it true, sir, that you're also being

 3   paid -- or have been paid $9,691 in connection with

 4   another case that you're working on?

 5             MR. GREGORIE:  Objection.  Relevance, your

 6   Honor, and basis of fact.

 7             THE COURT:  Come on up.

 8             MR. LEVIN:  Basis of fact?

 9        (Whereupon, proceedings were had at side-bar

10   outside the presence of the jury which have been sealed

11   per instructions of the Court.)

12        (Whereupon, the following proceedings were had

13   in open court:)

14             THE COURT:  The objection is sustained.

15        The jury is instructed to disregard the last

16   statement by Mr. Gregorie.

17        Go ahead.

18             MR. LEVIN:  Thank you, your Honor.

19   BY MR. LEVIN:

20   Q.   Now, Mr. al-Saidi, you've testified that you

21   worked as an informant in New York for the New York

22   Police Department.  Correct?

23   A.   Yes, sir.

24   Q.   And you had been paid for your services while

25   doing that.  Correct?

```
 1    A.    Yes, sir.

 2    Q.    And then, ultimately, you came to Miami in 2004?

 3    A.    Yes, sir.

 4    Q.    Now, you recall being asked questions by

 5    Mr. Vereen.  Do you recall that, the gentleman seated

 6    with the purple tie there?

 7    A.    Yes, sir.

 8    Q.    Okay.  And did you not -- you told him that you,

 9    in fact, prior to becoming an informant, worked as a

10    drug dealer.  Isn't that true?

11    A.    When I was 16 years old.  Yes, sir.

12    Q.    You were a drug dealer?

13    A.    Not a drug dealer.  No.  But I worked for a drug

14    dealer.  Yes, I did.

15    Q.    You worked for a drug dealer, but you weren't a

16    drug dealer?

17    A.    No, sir.  He was a drug dealer.  I was taking

18    customers to him.  And I eventually turned him in the

19    same month.

20    Q.    When would that have been, sir?

21    A.    I don't remember.  It was sometime -- I don't

22    remember the exact day.  It was 2001, I believe.

23    Q.    So your testimony now is that you're not a drug

24    dealer and never have been a drug dealer?

25          MR. GREGORIE:  Objection, your Honor.
```

```
 1              THE COURT:  Sustained.

 2  BY MR. LEVIN:

 3  Q.    You were working for this guy and, basically,

 4  turned in his customers.

 5         That's your testimony, essentially.  Correct?

 6  A.    I don't understand your question.

 7  Q.    You were working for a drug dealer, correct, in

 8  New York?

 9              MR. GREGORIE:  Objection.  Asked and answered,

10  your Honor.

11              THE COURT:  Sustained.

12  BY MR. LEVIN:

13  Q.    Now, you indicated that you met Special Agent

14  Stewart after you were arrested for what's been

15  described as the scooter incident.  Is that correct,

16  sir?

17  A.    The same day.  Yes, sir.

18  Q.    The same day as the scooter incident?

19  A.    Yes, sir.

20  Q.    Now, do you recall the date of the scooter

21  incident?

22  A.    No, I don't.

23  Q.    Would you agree with me, sir, that you met

24  Mr. Stewart the same month you went to Yemen, in

25  September of 2005?
```

1   A.     No.  I disagree with you on that.

2   Q.     Okay.  When is it, to the best of your

3   recollection, that you met Special Agent Stewart?

4   A.     Again, I told you, when I first came to Miami,

5   the same week I purchased -- I rented a scooter and I

6   was driving through -- coming from the Beach towards

7   downtown and I got caught.  That's when I met him.

8   Q.     You came to Miami back in 2004.  Is that correct?

9   A.     I'm sorry?

10  Q.     You came to Miami back in 2004.  Correct?

11  A.     Yes, sir.

12  Q.     And that would have been in or about August of

13  2004.  Would that be correct?

14  A.     I don't know.

15  Q.     With regard to the scooter incident, if I showed

16  you something, would that help to refresh your

17  recollection as to when that occurred?

18  A.     Yes.

19         MR. GREGORIE:  Objection, your Honor.

20  Relevance.

21         THE COURT:  Sustained.

22  BY MR. LEVIN:

23  Q.     What is your best guess as to when you met

24  Special Agent Stewart, sir?

25  A.     I'm not guessing.  I told you, when I got locked

1    up for the scooter, that's when I first met him.

2    Q.    That would have been approximately how long prior

3    to September of 2005?

4    A.    I have no idea.

5    Q.    If I showed you something, would that help

6    refresh your recollection?

7          MR. LEVIN:  Can I have a side-bar, your Honor?

8          THE COURT:  Go ahead.  You can show him.

9          MR. LEVIN:  I'll mark it for identification

10   purposes only as Abraham's Exhibit 2, and I will get

11   the Court an exhibit list.

12   BY MR. LEVIN:

13   Q.    Mr. al-Saidi, let me show you what I've marked as

14   Abraham's Exhibit 2 for identification purposes only.

15         See if this refreshes your recollection as to

16   when you were arrested with regard to the so-called

17   scooter incident.

18   A.    11-08.

19   Q.    And the year?

20   A.    '04.  Yeah.

21   Q.    So does that help refresh your recollection as to

22   when you were arrested for the scooter incident?

23   A.    Yes, sir.

24   Q.    That would be November the 8th of 2004?

25   A.    Yes, sir.

1   Q.     It's your testimony that that's when you met

2   Special Agent Stewart?

3   A.     Yes, sir.

4   Q.     Okay.  And you indicated that he happened to come

5   see you based on the fact that this person that stopped

6   you thought you might have some kind of a terrorist

7   connection.  Is that your testimony?

8   A.     I don't know what I testified before.  But what

9   happened was, I got stopped by the state trooper and he

10  asked me a lot of questions.  And he was wondering what

11  I was doing in Miami, who I know.  He was just asking

12  me a lot of questions.

13        And my -- I believe he thought that I was -- that

14  I have any connection to any of that terrorism cases.

15  So I told him, "Yes.  In fact, I worked for the NYPD.

16  I'm one of the good guys."

17        That's when he told me that he was gonna have to

18  find out if I was saying the truth or not.

19  Q.     He asked you if you had a driver's license.

20  Correct?

21  A.     Yes, sir.

22  Q.     You had a driver's license; did you not?

23  A.     No, sir.

24  Q.     You had a Connecticut driver's license; did you

25  not?

```
 1   A.      No, sir.

 2   Q.      You never had a Connecticut driver's license?

 3   A.      Not that I recall.  No.

 4   Q.      Well, you were arrested for driving while license

 5   suspended; were you not, sir?

 6   A.      I was arrested with driving with no license.

 7   Q.      You didn't tell the officer that you had a

 8   Connecticut driver's license?

 9   A.      I never had a license in Connecticut, sir.

10   Q.      Did you -- you came to this country in 1993.

11   Correct?

12   A.      Yes, sir.

13   Q.      And you grew up primarily in the New York City

14   metropolitan area.  Correct?

15   A.      Yes, sir.

16   Q.      And you never had a driver's license there?

17   A.      I guess I had a driver's license, but my first

18   driver's license was from Miami.

19   Q.      So the very first time you ever got a driver's

20   license was when you came here?

21   A.      Yes, sir.

22   Q.      And that would have been in 2004?

23   A.      I think it was in 2005.

24   Q.      When you got the license?

25   A.      Yes, sir.
```

```
 1   Q.     Now, it was after this arrest when Special Agent

 2   Stewart came to see you, according to your testimony.

 3   Correct?

 4   A.     I'm sorry?

 5   Q.     It was after the arrest with regard to the

 6   scooter that Special Agent Stewart came to see you.

 7   Correct?

 8   A.     It was the same day before they put me in the

 9   cell.  They had me waiting until the FBI show up.

10   Q.     Then you got out of jail.  Correct?

11   A.     I spent 24 hour, and I came out jail.  Yes.

12   Q.     Two days later is when the incident happened with

13   the girlfriend.  Correct?

14   A.     I'm not sure if it was the same day or the second

15   day, but as soon as I get home.

16   Q.     That was your testimony in this case with regard

17   to that.  Correct?

18   A.     I'm sorry.  I don't understand your question.

19   Q.     The incident with regard to Stephanie was, like,

20   the next day or the same day you got out of jail with

21   regard to the scooter incident.  Correct?

22   A.     Yes.  It was the same week.  I'm not sure if it

23   was the first day, the second day.  I'm not sure.

24   Q.     And so then you got arrested on that case.

25   Correct?
```

1    A.    Yes, sir.

2    Q.    And that's when you called Detective Branzetti in

3    New York.  Correct?

4    A.    Yes, sir.

5    Q.    And that's when he told you that you were out of

6    gas.  Correct?

7    A.    Yes, sir.

8    Q.    Now, you've indicated here in this trial that

9    Stewart came to see you with regard to the scooter

10   incident.  Correct?

11   A.    Yes, sir.

12   Q.    And that Branzetti basically said to you, "You're

13   out of gas.  There's nothing I can do for you" or words

14   to that effect.  Isn't that true?

15   A.    Yes, sir.

16   Q.    Now, do you recall testifying in a prior

17   proceeding on October the 10th of 2007?

18   A.    Yes.

19   Q.    At Pages 94 and 95, "Question:  How did you get

20   in touch with the FBI here in Miami?

21        "Answer:  The New York Police Department has got

22   me connected to the FBI here in Miami."

23        Do you recall that question and that answer, sir?

24   A.    I recall.  But I think there was

25   misunderstanding, because when -- when the FBI came in,

```
 1   it was so they could contact the New York Department

 2   and find out what I was doing.

 3         So, basically, they get connected.  The state

 4   trooper that stopped me and the guys I was working for

 5   in New York and the FBI, they all spoke to each other.

 6         So, basically, that's -- that's what was

 7   happening.

 8   Q.    Well, you call Branzetti -- so it's your

 9   testimony now that you never -- that it was not the

10   New York City Police Department that put you in touch

11   with Special Agent Stewart?  Is that your testimony

12   now, sir?

13         MR. GREGORIE:  Objection, your Honor.  Asked

14   and answered.

15         THE COURT:  Sustained.

16   BY MR. LEVIN:

17   Q.    Well, which one is it, sir?  You testified two

18   years ago --

19         THE COURT:  Sustained.

20         Move on, Mr. Levin.

21   BY MR. LEVIN:

22   Q.    You indicated that you met Mr. Batiste in March

23   of 2005.  Is that correct?

24   A.    I'm not sure of the exact month when I first met

25   him.
```

1    Q.    Did you previously testify in connection with

2    this case that you met him in March of 2005?

3    A.    I don't remember.  It was a lot of testifies.

4    Q.    Right.  And this was five days ago.

5          You're testifying to matters that are about two

6    and a half to three years ago.  Correct?

7    A.    This is not my only time testifying.  I'm not

8    sure -- I'm not sure which -- what I said every time I

9    testified.

10   Q.    Now, when you met with Special Agent Stewart in

11   November of 2004, what did you talk about?

12   A.    When he came to the precinct?

13   Q.    Right.

14   A.    He didn't ask me much.  It's just he was

15   wondering if what I told the officer -- the information

16   I told the officer was right or not.

17         He kind of just began my record and find out who

18   I was and gave me his card and told me, if there's

19   anything that I need to talk to him about, to give him

20   a call.  That was it.

21   Q.    Okay.  And then you -- two days later, you went

22   back to jail.

23         Is that accurate, more or less?

24   A.    I'm sorry?

25   Q.    Two days later is when you got arrested?

1    A.     Yes, sir.

2    Q.     You went back to jail?

3    A.     Yes, sir.

4    Q.     And while you were in jail is when you called

5    this New York City Police Department detective that you

6    used to work with.  Correct?

7              MR. GREGORIE:  Objection, your Honor.

8    Cumulative.

9              THE COURT:  Sustained.

10   BY MR. LEVIN:

11   Q.     You stayed in jail for 56 days.  Is that about

12   right?

13             MR. GREGORIE:  Objection, your Honor.

14   Cumulative.

15             THE COURT:  Sustained.

16             Move on, Mr. Levin.

17             MR. LEVIN:  Yes, your Honor.

18   BY MR. LEVIN:

19   Q.     Now, I believe you testified on direct

20   examination that, when you were in New York as an

21   informant, you also were in the business of buying guns

22   and selling them back to the police.  Is that accurate?

23   A.     You asking me if I did any cases buying guns for

24   the NYPD?

25   Q.     Yes.

al-Saidi - CROSS - By Mr. Levin                    134

1   A.      Yes.

2   Q.      You did?

3   A.      Yes, sir.

4   Q.      Okay.  So you knew it was illegal to buy guns.

5   Right?

6   A.      Sir, I was working for the cops.  How you telling

7   me it's illegal if I -- I'm getting authorization from

8   the cops to go and purchase it with their money?

9   Q.      And you, as we've already heard, were paid for

10  your services there.  Correct?

11  A.      Yes.

12  Q.      Okay.  And other than being an informant and

13  working in convenience stores, you've -- that's pretty

14  much the way you've survived in this country.  Is that

15  accurate?

16  A.      I don't understand your question.

17  Q.      Your source of income, of making money, has been

18  either as an informant for law enforcement or working

19  at convenience stores.  Is that true?

20  A.      Most of it.

21  Q.      Okay.  And there came a point in time when you

22  went back to Yemen.

23          We've talked about that already.  Correct?

24  A.      There is different times that I went to Yemen.

25  Q.      September of 2005.

1    A.    Yes.  We talked about that.

2    Q.    And that's the first time you spoke to Special

3    Agent Stewart about conversations you may have had with

4    Narseal Batiste.  Correct?

5    A.    It was prior to me going home, when I contact him

6    about Brother Naz.  Yes.

7    Q.    Right.

8          You had indicated that you had already met

9    Brother Naz and he had been talking a lot of stuff to

10   you since March of 2005.  Correct?

11   A.    You asking me if I -- I don't know if it was

12   March or not.  But when I contact him before I left

13   Yemen, yes, I did told him that I have -- Brother Naz

14   been talking to me.

15         I never tooken him serious until he took further

16   action and gave me his connections to connect him with

17   Al-Qaeda.

18   Q.    You never took him seriously until you needed the

19   money.  True, sir?

20   A.    That's not true, sir.

21   Q.    Okay.  Well, you basically had a falling-out with

22   your partner, Faisal Hassan.  Correct?

23   A.    Yes.

24   Q.    You pretty much were -- you know, you got,

25   basically, kicked out of the business and he bought you

1    out.  Correct?

2    A.    Sir, it was my option to let go --

3    Q.    Just answer the question "yes" or "no" and then

4    you can explain.

5         MR. GREGORIE:  Objection, your Honor.

6         MR. LEVIN:  I said answer the --

7         MR. GREGORIE:  He cut him off when --

8         MR. LEVIN:  -- question "yes" or "no" and then

9    he can explain.

10        THE COURT:  I'm sorry.  If you're both talking

11   at once, I can't hear you or understand you and

12   certainly Lisa can't get anything in the record.

13        MR. LEVIN:  Mr. Gregorie, go ahead.

14        MR. GREGORIE:  I objected, your Honor, because

15   he cut the witness off from answering the question.

16   The witness was in mid-sentence.

17        MR. LEVIN:  Sorry.

18        THE COURT:  Let him answer the question.

19        MR. LEVIN:  Yes, ma'am.

20        THE WITNESS:  Sir, I already forget your

21   question.

22   BY MR. LEVIN:

23   Q.    I'm sorry?

24   A.    Go ahead.  Can you ask me the question again.

25   Q.    Yes, I can.

1        In or about September of 2005, just prior to

2   going back to Yemen, you basically had $7,000 to your

3   name.

4        Would that be true, sir?

5   A.    When I left, I had $7,000.  Yes.

6   Q.    Did you have any other money?

7   A.    I had what he have owed me.  Yes.

8   Q.    Well, did you in your possession or in any bank

9   account have anything more than $7,000, other than the

10  expected payment by Faisal Hassan of money he owed you?

11  A.    Here in the United States, no.

12  Q.    Right.

13       So you went -- that's when you contacted Special

14  Agent Stewart.  Correct?  And you told him about

15  conversations you may or may not have had with Narseal

16  Batiste?

17  A.    Sir, when I first called John Stewart, I had no

18  idea he was gonna ask me to work on the case.  I had no

19  intention working on the case.

20       I just wanted to turn the piece of paper and the

21  gun and leave the country.  That's -- that was my

22  intention.

23  Q.    Well, you said you contacted Stewart in September

24  of 2005.  Correct, sir?

25  A.    Yes, sir.

1    Q.     You told Stewart about conversations that you had

2    had with Narseal Batiste, presumably, at the store.

3    Correct, sir?

4    A.     Yes, sir.

5    Q.     Then you go to Yemen with the last $7,000 to your

6    name.  Correct?

7    A.     No, sir.  It wasn't the last $7,000.

8    Q.     Well, you were owed money by -- again, this is

9    repetitious.

10          But you were owed money by Faisal Hassan.

11   Correct?

12   A.     I'm not understanding your question, sir.

13   Q.     Okay.  You went to Yemen the middle of September?

14   A.     September 13, I left Yemen.  Yes, sir.

15   Q.     Usually, when you go to Yemen, you stay four,

16   five, six months at a clip.  Right?

17   A.     Depend.

18   Q.     Well, did you go to Yemen in 2004?

19   A.     If I went to Yemen in 2004?

20   Q.     Right.

21   A.     Yes.

22   Q.     How long did you stay?  Do you recall?

23   A.     35 days.

24   Q.     35 days?

25   A.     Yes, sir.

 1    Q.    Did you go in 2003?

 2    A.    I never spent more than two months in Yemen, even

 3    though I wanted to spend more.  But I never got enough

 4    time.

 5    Q.    Okay.  And you came to this country because it

 6    was -- it had better opportunities for you.

 7          Would you agree with that?

 8    A.    I'm sorry?

 9    Q.    You came to the United States because it offered

10    you better opportunities here than it did in Yemen.

11          Would you agree with that?

12          MR. GREGORIE:  Objection, your Honor.

13          THE COURT:  Sustained.

14          MR. LEVIN:  I'll link it up, your Honor.

15          THE COURT:  Sustained.

16    BY MR. LEVIN:

17    Q.    Now, when you were in Yemen, that's when you got

18    married, because your mom arranged the marriage.

19    Right?

20    A.    I'm not -- I don't understand your question.

21    Q.    Never mind.  I'll move on from there.

22          You didn't really remember the date of your

23    daughter's birth.  Is that accurate?

24          MR. GREGORIE:  Objection, your Honor.

25          THE COURT:  Sustained.

```
 1   BY MR. LEVIN:

 2   Q.    You have a little bit more clarity with regard to

 3   the dates with regard to this investigation than --

 4            MR. GREGORIE:  Judge, I object to counsel --

 5            THE COURT:  Sustained.

 6            Move on, Mr. Levin.

 7            MR. LEVIN:  Yes, ma'am.

 8   BY MR. LEVIN:

 9   Q.    I believe you testified -- and correct me if I'm

10   wrong -- and it was on the cross-examination of -- I

11   believe it was Mr. Clark -- that, when you went back to

12   Yemen, you decided to buy a car.

13          Do you recall that testimony?

14   A.    I don't know if -- I don't remember, you know,

15   saying that.

16          But, yes, I did bought a car in Yemen.  Yes.

17   Q.    That would have been in September of 2005.

18   Correct?

19   A.    I don't remember the exact date I bought it.

20   Q.    Did you have a driver's license in Yemen?

21   A.    We don't have regular driver's license in Yemen,

22   sir.

23   Q.    Now, you talked about when you were in Yemen

24   thinking about all this information that you had

25   allegedly discussed with Mr. Batiste and then you
```

```
 1    placed a call back to Mr. Stewart.
 2          Do you recall that testimony?
 3    A.    Yes, sir.
 4    Q.    You also indicated that you had Al-Qaeda -- or
 5    you knew people in Yemen that were --
 6          THE COURT:  Mr. Levin, you've got to slow
 7    down.
 8          MR. LEVIN:  I will, your Honor.
 9          THE COURT:  I'm having a hard time following
10    your questions.
11          MR. LEVIN:  Okay.  I'll slow down.
12    BY MR. LEVIN:
13    Q.    Do you recall, sir, testifying that you knew
14    people in Yemen that were apparently linked up with
15    Al-Qaeda?  Is that correct?
16    A.    Yes, sir.
17    Q.    Okay.  You didn't call the authorities in Yemen
18    and disclose to them this information, did you, sir?
19    A.    I didn't.  And I would never do that because they
20    don't care.
21    Q.    Or they don't pay.  Which one?
22    A.    They don't care.  They know that Al-Qaeda exist
23    in our streets.  Actually, I even bought a CD from
24    Yemen and I gave it to the FBI.  They didn't seem like
25    they care either.
```

al-Saidi - CROSS - By Mr. Levin                    142

1    Q.     The FBI didn't care about the CD you bought or

2    Al-Qaeda?

3    A.     About the CD I gave them.

4    Q.     What was the CD?

5    A.     It was images that a person from Al-Qaeda gave to

6    me in Yemen with soldiers -- United States soldiers

7    being killed with knives.

8    Q.     So when you came back here, you indicated that

9    you were -- you met with the agents.  Correct?

10   A.     When I came back, the agents pick me up from the

11   airport.  Yes.

12   Q.     Then I believe you testified about a meeting at a

13   hotel where Narseal Batiste, Patrick Abraham and either

14   Burson or Naudy were present.  Is that accurate?

15   A.     Yes, sir.  Right after the hurricane.

16   Q.     You told them that they -- that you had hooked

17   them up with somebody from Al-Qaeda.  Is that correct?

18   A.     Yes, sir.

19   Q.     Okay.  Now, do you recall meeting on November

20   the 21st with Mr. Batiste and Mr. Abraham in your

21   apartment?  Do you remember that meeting on November

22   the 21st?

23   A.     Yes, sir.

24   Q.     And do you recall Mr. Abraham -- do you recall

25   testifying that Mr. Abraham was asking you about this

```
 1   guy and he asked you, what is his purpose?  What is his
 2   mission?
 3        Do you recall that, sir?
 4   A.   Yes, I do.
 5   Q.   But it's your testimony that you told Mr. Abraham
 6   just three weeks earlier that person's purpose and
 7   mission, that he was Al-Qaeda.
 8        Is that what your testimony is, sir?
 9   A.   You going too fast.  I didn't understand.
10   Q.   I hear you.  Okay.
11        On the 21st of November, Mr. Abraham asked you
12   about this person that was coming over and he said,
13   "What is his purpose?  What is his mission?"
14        Do you recall that?
15   A.   Yes, I do, when he asked me that.
16   Q.   It's your testimony that just three weeks
17   earlier, you had told him in some meeting that was not
18   recorded that you had linked them up with a person from
19   Al-Qaeda.
20        Wasn't that your testimony, sir?
21   A.   I don't remember.
22   Q.   Well, you just a few minutes ago remembered that
23   in that meeting in the hotel, the Holiday Inn --
24   correct?  You have to answer "yes" or "no."
25   A.   "Yes" or "no" to what?  I don't understand your
```

 1   question.

 2   Q.    The meeting was at the Holiday Inn?  "Yes" or

 3   "no"?

 4   A.    What about it?  The meeting in the Holiday Inn.

 5   What?

 6   Q.    I'm trying to help you, sir.  I'm trying to break

 7   it down for you.

 8   A.    But you're not helping me, sir.  You're telling

 9   me Holiday Inn.  Holiday day Inn what?

10   Q.    You testified, sir, to a meeting that occurred in

11   late October of 2005 at a Holiday Inn.  Do you recall

12   that?

13   A.    Yes, sir.

14   Q.    That was your testimony.  Correct?

15   A.    Yes, it was.

16   Q.    And you said that Narseal Batiste, Patrick

17   Abraham and Burson Augustin and/or Naudimar Herrera

18   were present.  Correct?

19   A.    The first time was either Burson or Naudy.  But

20   the second time was both.  It was twice.

21   Q.    There were two meetings at the Holiday Inn?

22   A.    Yes, sir.

23   Q.    And at both of these meetings, you told them that

24   you had linked them up with a person from Al-Qaeda.

25   Correct?

al-Saidi - CROSS - By Mr. Levin                    145

1    A.      Yes, sir.

2    Q.      But three weeks later, on November the 21st, in a

3    meeting at your apartment, Patrick Abraham asked you

4    about this person and said, "What is his purpose and

5    what is his mission?"; did he not?

6    A.      Yes, he did.

7    Q.      Now, on November the 10th, you meet with

8    Mr. Abraham and Mr. Batiste in your apartment at

9    7835 Harding Avenue.

10           Do you recall that?  You've testified about that.

11   A.      Yes, sir.

12   Q.      That was in an apartment that the FBI was paying

13   for.  Correct?

14   A.      Yes, sir.

15   Q.      And how long did you live in that particular

16   apartment, sir?

17   A.      I don't remember.  I think, like, four, five

18   months.

19   Q.      And after that, where did you live, sir?

20   A.      After Miami Beach, I think I went back to

21   New York.

22   Q.      Did the FBI pay for your lodging while in

23   New York?

24   A.      No.

25   Q.      Has the FBI paid for your lodging -- well, how

```
1    long were you in New York for?

2    A.     What do you mean, how long I was....

3    Q.     When you moved back to New York four or five

4    months after living in the Harding Avenue apartment.

5    A.     I stayed all the way till 7-7.  Then I went to

6    Yemen and came back to New York.  And I only come to

7    Miami since then for this case.

8    Q.     Okay.  So you came to Miami for this case in the

9    fall of 2007.  Is that accurate?

10            MR. GREGORIE:  Objection.

11   BY MR. LEVIN:

12   Q.     Do you know what the fall is?

13            MR. GREGORIE:  Relevance.

14            THE COURT:  Sustained.

15   BY MR. LEVIN:

16   Q.     And prior to -- prior to this meeting on the 10th

17   of November, you've testified about going to some

18   Chinese restaurant with Mr. Batiste and his family.  Do

19   you recall that?

20   A.     I met him the first recording in North Miami on a

21   Chinese restaurant, and he was with his family.  Yes.

22   I recall that.

23   Q.     That would have been on or about October the

24   29th.  Would you agree with that, sir?

25   A.     Yes, sir.
```

```
 1   Q.    And during that meeting, you complained to
 2   Mr. Batiste about Faisal Hassan.  Isn't that true?
 3             MR. GREGORIE:  Objection, your Honor.
 4             THE COURT:  Sustained.
 5             You need to move on to another area,
 6   Mr. Levin.  This is cumulative.
 7   BY MR. LEVIN:
 8   Q.    Did you ever tell Mr. Batiste at or about that
 9   time, that is, late October, early November, that you
10   were broke?
11   A.    I don't know.  I mean, was a lot of conversations
12   between me and him.  I don't know if I did or not.
13   Q.    At one point, he loaned you $25.  Right?
14   A.    Yes, sir.
15   Q.    That would have been at or about that time.  Is
16   that correct?
17   A.    I don't know.  I don't remember.
18   Q.    And do you remember telling him that your
19   father-in-law back in Yemen, who you also referred to
20   as your uncle, per the custom of the Yemenese -- is
21   that correct, that that would be the custom?
22   A.    I don't understand your question.
23   Q.    The question being that your father-in-law,
24   who -- he -- well, let me withdraw the question.
25             Did you ever refer to the father of your wife as
```

1   your uncle?

2   A.    Yes.

3   Q.    And did you ever tell Mr. Batiste that your uncle

4   had to send you money because you were broke?

5   A.    I don't recall saying that to him.

6   Q.    Now, in the meeting of November 10th at your

7   apartment, you would agree with me that Mr. Abraham and

8   Mr. Batiste were surprised that you now had an

9   apartment.  Would you agree with that?

10  A.    If they -- if I agree with you that they was

11  surprised that I have an apartment?

12  Q.    Right.

13        MR. GREGORIE:  Objection, your Honor.  Calls

14  for surmise.

15        THE COURT:  Sustained.

16  BY MR. LEVIN:

17  Q.    Let me ask you this, sir:  On November 21st,

18  there was also another meeting at your apartment.  Do

19  you recall that, sir?

20  A.    You're asking me about November 21st?  There was

21  November 21st and December 21st that I met at my

22  apartment.

23  Q.    What about November the 10th?

24  A.    There was a November 10th meeting.  But the

25  21st -- was two different months that I met on the

```
 1    21st.  I'm trying to make sure I got the right date --
 2    I mean, the right month.
 3    Q.    Would you agree with me, sir, there was a meeting
 4    in your apartment on November the 10th?
 5    A.    Yes.
 6    Q.    Would you agree with me, sir, there was a meeting
 7    in your apartment on November the 21st?
 8    A.    Yes.
 9    Q.    And there was another meeting on December --
10    December the 21st?
11    A.    December 21st.
12    Q.    Now, when you had the meeting on November 10th is
13    when you told Abraham and Batiste that you were going
14    back to New York.  Correct?
15    A.    Yes.
16    Q.    And that's when you said that Mr. Batiste asked
17    you to bring him a prayer rug, or a sigada.  Is that
18    accurate?
19    A.    Yes.  I asked him if he needed anything from
20    New York.  He required a sigada.
21    Q.    Did you also tell him, because you were broke,
22    you needed to try to make some business up there?
23    A.    I might have said that.  Yes.
24    Q.    And so then you came back on the 21st -- well,
25    you came back before then, but the next meeting was on
```

1    the 21st of November.  Correct?

2    A.    Yes.

3    Q.    And I believe the Government played a clip of the

4    beginning of that meeting, when Mr. Batiste and

5    Mr. Abraham were coming into your apartment.

6          Do you recall that, sir?

7    A.    If I recall the clip the Government played?

8    Q.    Right.

9    A.    Yes.

10   Q.    And do you recall Mr. Batiste and Mr. Abraham

11   essentially -- well, let me rephrase the question.

12         Do you recall Mr. Abraham and Mr. Batiste seeming

13   rather excited about your new apartment?

14   A.    If they seem excited?

15   Q.    Right.

16         I mean, do you remember Mr. Abraham like, going,

17   "Wow" or clapping his hands and Batiste saying, "Wow,

18   Occ.  What a great place" or words to that effect?  Do

19   you recall that?

20   A.    When they came on the 10th, there was completely

21   nothing in the apartment.  But on the 21st, I bought

22   a -- something to sit down on, like a carpet.  And I

23   also bought pictures of Mecca and I bought some

24   stickers I stick on the wall.

25         So it kind of looked different, including the

```
 1    equipment that the FBI put in the house so they could
 2    record.
 3              THE COURT REPORTER:  Including what?
 4              THE WITNESS:  Equipment.  It was a TV and a
 5    VCR.  So it looked a little bit better.  That's why.
 6    BY MR. LEVIN:
 7    Q.    So they basically walked into a guy's apartment
 8    who had previously a week later been broke and now has
 9    a TV.  Correct?
10              MR. GREGORIE:  Judge, I object to the form of
11    the question.  It's argument.
12              THE COURT:  Sustained.
13              It's been asked and answered.
14    BY MR. LEVIN:
15    Q.    You had -- did you have a stereo system as well?
16    A.    I think.  Yes, I do.  But --
17    Q.    I'm sorry.
18    A.    The stereo system was there from before.  I think
19    it was a small radio.
20    Q.    And you had furniture?
21    A.    No.
22    Q.    Not at that time?
23    A.    I had an air bed.
24    Q.    And at that meeting, you had some discussions,
25    correct, which I'm not going to get into because our
```

```
 1   counsel have already?  Is that correct?
 2   A.    I'm sorry?
 3   Q.    There was a conversation at that time, correct,
 4   on the 21st of November?
 5   A.    There was a conversation, yes, on the 21st.
 6   Q.    And I believe you also indicated that you had
 7   brought back a book on jihad because you had recalled
 8   from a previous occasion Mr. Abraham asking you a
 9   question that you didn't know the answer to.  Is that
10   correct?
11   A.    Yes, sir.  It's correct.  I bought a book and the
12   book have some answers about jihad.  Yes, sir.
13   Q.    And do you have a recollection as to whether or
14   not there was any conversation on November the 21st
15   about whether you had answered Mr. Abraham's question
16   by that jihad book that you say you bought to answer
17   his question?
18   A.    If we discussed that?  I don't understand the
19   question.
20   Q.    I'll break it down.
21         First of all, do you recall when he had asked you
22   a question that you didn't know the answer to?
23   A.    I don't recall the exact date.  I want to -- I
24   don't know.  It was -- I don't know if it was the day I
25   spend the night in the Embassy.  I don't know if it's
```

```
 1    when they came to the hotel.  I don't remember when.

 2    Q.    Do you recall the question?

 3    A.    But I recall him asking me a question.  And as I

 4    was in the store buying the sigada, I seen the book

 5    and it have answers.  So I took it.

 6    Q.    Do you recall the question that Mr. Abraham did

 7    not know the answer to which inspired to you buy this

 8    jihad book?

 9    A.    No, sir.

10    Q.    And it's your testimony that you bought this book

11    while in New York?

12    A.    Yes, sir.

13    Q.    Do you recall where you bought the book?

14    A.    Yes, sir.

15    Q.    Where did you buy the book?

16    A.    There is a clothing -- Islamic place -- clothing

17    place next to the Farouk Mosque in Downtown Brooklyn.

18    Q.    And that's where you bought it?

19    A.    Yes, sir.

20    Q.    How did you pay for it?

21    A.    Cash.

22    Q.    Did you ever submit a receipt to be reimbursed

23    for the book by the FBI?

24    A.    No.

25    Q.    You did this on your own?
```

```
 1   A.     Yes.

 2   Q.     Now, I just want to ask you a few questions about

 3   marijuana, just a few, a couple.

 4          You said you didn't smoke during this

 5   investigation.  Is that accurate?

 6   A.     I'm sorry?

 7   Q.     You did not smoking marijuana during this

 8   investigation.  Is that correct?

 9   A.     Not while I was working.  No.

10   Q.     Now, what is your definition of "working"?

11   A.     When I'm meeting either with Brother Naz or with

12   his group or if I'm meeting with the FBI or if I'm on

13   the job.  Basically, if I'm working, I don't -- I don't

14   do no alcohol and no weed.

15   Q.     And that's either when you're meeting with them

16   (indicating) or meeting with them (indicating), would

17   that be accurate, referring to the Government -- or the

18   FBI -- or involved with these individuals here?

19   A.     No, sir.  Any kind of work.  I don't get high and

20   go to work in any kind of work that I do.

21   Q.     So when you're working at the convenience store,

22   you're not smoking marijuana?

23   A.     I mean, I did try it.  But it's not -- I didn't

24   do it as a habit.  And I don't think it's the right

25   thing to do.
```

```
 1   Q.     It wasn't a regular thing for you?

 2   A.     No.

 3   Q.     But you said that you never smoked marijuana

 4   while doing any kind of job that you do.

 5          That's not true, is it, sir?

 6   A.     You asking me and I tell you under oath that, if

 7   I'm working, I don't get high.  But you're telling me

 8   it's not true.  I don't understand.  You arguing or are

 9   you asking a question?

10   Q.     Sir, let me ask you this:  You didn't meet with

11   the FBI on a daily basis, did you, during this

12   investigation?  You didn't meet with the FBI on a daily

13   basis, did you, sir?

14   A.     There was time that I met on a daily basis, and

15   there is time that I wait for their call.

16   Q.     And you didn't see these people on an everyday

17   basis, did you, sir?

18   A.     No.

19          MR. GREGORIE:  Objection, your Honor.  When he

20   says "these people," the record should reflect --

21          THE COURT:  Sustained.

22          MR. VEREEN:  I'm not talking about you and

23   Ms. Arango.

24          MR. GREGORIE:  That's why the record should

25   reflect that.
```

1            THE COURT:  Rephrase your question.

2            MR. LEVIN:  Yes, your Honor.

3    BY MR. LEVIN:

4    Q.    Sir, let me ask you this:  When you weren't

5    meeting with the FBI and you weren't meeting with the

6    Defendants in this case, were you smoking marijuana?

7    A.    No, sir.

8    Q.    Now, you've talked a little bit about what the

9    FBI directed you to do.  Do you recall that testimony?

10           For example, they directed you to use the word

11   "soldiers."  That was your testimony previously; was it

12   not?

13   A.    No.  I was using "soldiers" because he was.

14   Q.    Well, you've testified that the FBI directed you

15   to have Mr. Batiste prepare a list on December 14th.

16   Correct?

17   A.    I don't remember everything that the FBI directed

18   me to do and not to do.

19   Q.    Okay.  And what about the fact that you

20   constantly stressed to Mr. Batiste that he needed to

21   look organized?  Was that your idea or their idea?

22           MR. GREGORIE:  Objection.  The question is

23   argumentative.  It assumes facts not in evidence, your

24   Honor.

25           MS. JHONES:  Your Honor, I object to that.

```
 1   There is facts in evidence for that, your Honor.

 2   Good-faith basis for that reputation.

 3            MR. GREGORIE:  That's an argument, Judge.

 4            THE COURT:  Sustained.

 5            Rephrase your question.

 6            The objection is sustained.  Mr. Gregorie's

 7   objection.

 8   BY MR. LEVIN:

 9   Q.    Did you ever tell any of these Defendants that

10   they needed to look organized?

11   A.    There was discussion --

12            MR. GREGORIE:  Objection, your Honor.

13   Cumulative.

14            THE COURT:  Sustained.

15   BY MR. LEVIN:

16   Q.    Now, after your meeting on the 21st of November,

17   the next time you have contact with Mr. Abraham would

18   be in January.

19            Would that be accurate?

20   A.    I didn't get your question.

21   Q.    After your meeting on November the 21st of 2005,

22   the next time you had contact, whether it be

23   telephonically or otherwise, with Mr. Abraham would

24   have been January of 2006.  Correct?

25   A.    No.  You know I got a visit on Thanksgiving by
```

```
 1   them.

 2   Q.     Thanksgiving?

 3   A.     Yes.

 4   Q.     Was that recorded or not recorded?

 5   A.     That was unexpected.  I wasn't expecting them to

 6   come.  So I didn't record it.

 7   Q.     And where was that?

 8   A.     They came to the Beach.  But they asked me to get

 9   out with them, and we went to a Chinese restaurant and

10   ate.  I believe it was on 71st Street.

11   Q.     Is that when there were also some of the other

12   individuals on trial here that came with them?

13   A.     All the individuals came with them.

14   Q.     So all the gentlemen, all the Defendants in this

15   case, were present on Thanksgiving.

16          Is that your testimony?

17   A.     It's my testimony that Brother Naz, Brother Pat,

18   Brother Burson, Brother Sunni, Brother Naudy --

19   Q.     What about Brother Levi?  Was he there?

20   A.     Sir, again, I'm not 100 percent sure.  I recall

21   everybody being there, but I'm not 100 percent sure.

22   Q.     Do you recall Brother Levi?

23   A.     I think everybody was there.

24   Q.     Do you recall an individual that's not seated in

25   this courtroom today being there, Brother Levi?
```

```
 1              MR. GREGORIE:  Objection, your Honor.

 2   Relevance.

 3              THE COURT:  Sustained.

 4   BY MR. LEVIN:

 5   Q.    So you went to a Chinese restaurant on

 6   Thanksgiving.

 7         Is that your testimony?

 8   A.    Yes.

 9   Q.    Do you remember what day this was -- I mean, you

10   said it was Thanksgiving.

11         Do you remember the date?

12   A.    I believe it was the 24th.

13   Q.    Your daughter's birthday again is what?

14              MR. GREGORIE:  Objection, your Honor.

15              THE COURT:  Sustained.

16   BY MR. LEVIN:

17   Q.    And so you were marching -- there was marching

18   from 78th and Harding Avenue to 71st Street.

19         Is that what your testimony is?

20   A.    Yes, sir.

21   Q.    And that was seven blocks.  Would you agree with

22   me that it's about seven blocks?

23   A.    About.

24   Q.    What time of the day or night was this?

25   A.    I think it was after 7:00, before 9:00 p.m.
```

1    Q.    Was there a lot of traffic on the street?

2    A.    We were marching in the alley in between Harding

3    and Collins.

4    Q.    What restaurant did you eat at?  Do you remember?

5    A.    I'm sorry?

6    Q.    The name of the restaurant you ate at.

7    A.    I'm not sure.  I think it's Yungbo (phonetic) or

8    something.  I'm not sure.

9          THE COURT REPORTER:  I didn't hear what you

10    said.

11          THE WITNESS:  I'm not sure which restaurant.

12    BY MR. LEVIN:

13    Q.    Who paid the bill?  Do you recall?

14    A.    No.  I don't recall.

15    Q.    Did you get separate checks?  Was there one

16    check?

17    A.    I don't remember who -- how we paid.

18    Q.    Did you get reimbursement by the Government for

19    that meal?

20    A.    I don't know.

21    Q.    Well, you were paid for expenses in connection

22    with this case.  Mr. Casuso asked you about that.

23    Correct?

24    A.    I'm sorry?

25    Q.    You were paid for your expenses, "expenses"

1   meaning things that you'd have to pay for out of your

2   pocket.  Is that correct?

3   A.    Yes.

4   Q.    Like for food.  Is that something you were paid

5   for by the FBI?

6   A.    When I was working, they paid me -- they

7   reimburse me for the paycheck I was supposed to make in

8   the store and I had to buy it.  But on -- when I'm

9   testifying, I get $59 a day for food.

10  Q.    So you got paid based upon how much you were

11  supposed to make in the store on a particular day.

12        That's your testimony?

13  A.    My testimony was, yes, they was reimbursing me

14  what I supposed to make in the grocery store.

15  Q.    And how much money did you make in the grocery

16  store?

17  A.    Different jobs, between 5 to $800 that I was --

18  depending on the job I was working.

19  Q.    Well, what other convenience store did you work

20  at besides the one on 62nd and 15th and 141st and -- or

21  144th and 6th Avenue?

22  A.    It was three different locations in Liberty City

23  that I worked in and one in North Miami.

24  Q.    What other three in Liberty City?  We've heard

25  about one in Liberty City.  What are the other two,

1    sir?

2              MR. GREGORIE:  Objection.  Relevance, your

3    Honor.

4              MR. LEVIN:  Judge, I'm entitled to explore --

5              THE COURT:  Overruled.

6    BY MR. LEVIN:

7    Q.    Go ahead, sir.

8    A.    All right.  I didn't get the question.

9    Q.    You said you worked at three different

10   convenience stores in Liberty City.

11   A.    Yes, I did.

12   Q.    One of them is on 62nd Street and 15th Avenue.

13   Correct?

14   A.    Yes, sir.

15   Q.    What are the addresses of the other two?

16   A.    I don't remember the addresses.

17   Q.    You don't remember the addresses for the other

18   two?

19   A.    No, sir.

20   Q.    Who owned those stores?

21   A.    One of them is Palestinian guy named George, and

22   the second one was owned by a Pakistani guy named

23   Mohammed al-Bashir.

24   Q.    So the amount of money that you would have made

25   in those stores is what they paid you, is what your

1   testimony is.  Is that correct, sir?

2   A.    Yes, sir.

3   Q.    And you said you made between 500 to $800.

4         Is that daily?

5   A.    No.  Weekly.

6   Q.    How many weeks are we talking about?

7   A.    I don't understand.

8   Q.    How many weeks -- for how many weeks of work were

9   you reimbursed by the Federal Government?

10  A.    I don't know.  Altogether, it's around $22,000

11  that I got paid for services.

12  Q.    So you know the amount now?

13  A.    The FBI has gave me a clue so I could go and pay

14  my income tax.  So yes.

15  Q.    So the FBI told you what they paid you?

16  A.    Yes.

17  Q.    About $22,000 for services?

18  A.    Yes.

19  Q.    And you also were paid $27,000 for your expenses.

20  Correct?

21  A.    No.

22  Q.    You don't really know?

23  A.    The expenses came through the whole -- the whole

24  investigation.  So I don't know.  It's not one year.  I

25  didn't count it either.  So I'm not sure.

al-Saidi - CROSS - By Mr. Levin                    164

```
 1   Q.     I'm sorry.  What did you just say?
 2   A.     I didn't kept record of how much did I get.
 3   Q.     What was your understanding with the FBI with
 4   regard to being reimbursed for out-of-pocket expenses?
 5   Do you know what an out-of-pocket expense is?
 6   A.     Out-of-pocket expense is like --
 7   Q.     When you front the money.  When you lay out the
 8   money.
 9          Did you expect to be reimbursed for money that
10   you laid out?
11   A.     Certain things.
12   Q.     Did you submit receipts?
13   A.     I think I submit phone bills and stuff like that.
14   But not on the daily expenses.  No.
15   Q.     Now, after this Thanksgiving -- now, you said
16   they came unexpectedly and that's why it was not
17   recorded?
18   A.     They came in unexpected and they didn't get into
19   the apartment so I could record in the apartment.  We
20   walked out.  And I wasn't expecting them.  The FBI
21   wasn't working.  So I didn't have no body recorder and
22   I didn't -- you know, I didn't expect.
23   Q.     The FBI doesn't work Thanksgiving?
24   A.     Well, I didn't get in touch.  I couldn't get in
25   touch with them then.
```

```
 1    Q.     Did you have a telephone or a cell phone or any
 2    kind of communication device?
 3    A.     Yes.  I had a cell phone.
 4    Q.     Do you know how to text-message?
 5    A.     Yes, I did.
 6    Q.     You know how to text-message?
 7    A.     Yes, I do.
 8    Q.     Now, after this meeting, the next time you saw
 9    Mr. Abraham or spoke to him was in January of 2006.  Is
10    that accurate?  And that would be Brother Pat, so
11    you're not confused.
12              THE COURT:  I didn't hear an answer.
13              MR. LEVIN:  I was trying to help him with --
14    he's been referring to --
15              THE COURT:  Well, you asked a question.  He
16    has to answer the question.
17              MR. LEVIN:  I'm sorry.
18    BY MR. LEVIN:
19    Q.     Do you know who Mr. Abraham is?
20    A.     I believe it's Brother Pat.
21    Q.     Right.
22           That's what I was going to clarify for you.
23    Brother Pat.
24    A.     What about Brother Pat?
25    Q.     The next time you met with him or spoke to him
```

```
 1    was in January of 2006.  Is that correct?

 2    A.    I'm not sure.  I don't remember exactly.  I don't

 3    recall.

 4    Q.    You don't recall.

 5          Well, do you remember trying to find Mr. Batiste

 6    in January, looking for Mr. Batiste?

 7    A.    If I was looking for him?  I think I did made a

 8    phone call or two to look for him.  Yes.

 9    Q.    Okay.  And do you remember ultimately speaking to

10    Mr. Abraham or Brother Pat?

11    A.    I left a message for Brother Naz.  And Brother

12    Pat called me back and tell me that, if I need to

13    deliver any messages to Brother Naz, that I need to

14    give it to Brother Pat because he wasn't in town, and

15    he was gonna give me messages that Brother Naz has told

16    him and, if I need to tell anything to Brother Naz, I

17    need to let Brother Pat know about it.

18    Q.    And Brother Pat said, "When you're speaking with

19    me, it's like speaking with Brother Naz."  Correct?

20    A.    Yes, sir.

21    Q.    Okay.  Now, I'm going to refer you to

22    Government's Exhibit 50-A, which is in evidence.  I'm

23    going to give you a copy so you can follow along.

24          MR. LEVIN:  I'd ask that the Court direct the

25    jury to open their binders to Government's
```

1   Exhibit 50-A.

2              THE COURT:  Okay.  You can open your binders.

3              MR. LEVIN:  If I may approach, your Honor.

4              THE COURT:  Yes.

5              MR. LEVIN:  (Tenders document to the witness.)

6              THE WITNESS:  What page, man?

7   BY MR. LEVIN:

8   Q.    Page 5.

9   A.    5.

10  Q.    Now, in the middle of that page, sir, you see it

11  says, "I want him to be safe and I want him to be

12  organized."

13         What are you referring to there -- or, rather,

14  who are you referring to there?

15  A.    I'm referring to Brother Naz.

16  Q.    So you're telling Patrick Abraham that you want

17  Brother Naz to be safe and you want him to be

18  organized.  Correct?

19  A.    Yes.  I said that.

20  Q.    Now, further in the conversation, at Page 9,

21  three passages from the bottom -- are you with me? --

22  A.    Yes.

23  Q.    -- you say, "Now" -- you say, "Is whatever

24  Brother Naz and Brother Mohammed back home -- and

25  you -- the rest of the brothers here is comfortable

 1    what I'm doing.

 2         "Now, get organized.  Tell me what the plan is

 3    and I'm gonna go by them.  If they have to be by me, I

 4    don't mind.

 5         "Like I told you, I already say, as long as I'm

 6    helping to get the mission done, I want to get it done.

 7    I don't care if there has to be a loan with Brother

 8    Mohammed."

 9         What did you mean by that, sir?

10         THE COURT:  We have a request for a break.

11         Do not discuss this case either amongst

12    yourselves or with anyone else.  Have no contact

13    whatsoever with anyone associated with the trial.  Do

14    not read, listen or see anything touching on this

15    matter in any way.

16         If anyone should try to talk to you about this

17    case, you should immediately instruct them to stop and

18    report it to my staff.

19         You may leave your notebooks and your

20    materials at your chairs.  Please be back in the jury

21    room in ten minutes.  We'll take a ten-minute recess.

22         (Whereupon, the jury exited the courtroom at

23    2:29 p.m. and the following proceedings were had:)

24         THE COURT:  We're in recess for ten.

25         (Thereupon a recess was taken, after which the

 1    following proceedings were had:)

 2            THE COURT:  We're back on United States of

 3    America versus Narseal Batiste, et al., Case

 4    No. 06-20373.

 5            Counsel, state your appearances, please, for

 6    the record.

 7            MR. GREGORIE:  Richard Gregorie and Jacqueline

 8    Arango on behalf of the United States, your Honor.

 9            MS. JHONES:  Ana Jhones on behalf of Narseal

10    Batiste, who is present.

11            MR. LEVIN:  Albert Levin for Patrick Abraham,

12    who's present.

13            MR. CASUSO:  Lou Casuso for Burson Augustin,

14    who is present.

15            MR. CLARK:  Nathan Clark for Rotschild

16    Augustine, who is present.

17            MR. HOULIHAN:  Richard Houlihan with Naudimar

18    Herrera.

19            MR. VEREEN:  And Rod Vereen on behalf of

20    Stanley Phanor, who's present.

21            THE COURT:  All Defendants are present.

22            Let's bring in the jurors.

23            MS. JHONES:  Your Honor, may I just ask --

24    just before -- very briefly?

25            I've inquired of Agent Stewart about the

 1    status of the additional set of revised transcripts.

 2              THE COURT:  Let's take this up after the trial

 3    day is over.  Okay?

 4              MS. JHONES:  That's fine.

 5              THE COURT:  Let's bring the jurors in, please.

 6              (Whereupon, the jury entered the courtroom at

 7    2:52 p.m. and the following proceedings were had:)

 8              THE COURT:  You may be seated.

 9              You are still under oath, sir.

10              You may proceed, Mr. Levin.

11              MR. LEVIN:  Thank you, your Honor.

12    BY MR. LEVIN:

13    Q.    Mr. al-Saidi, when we left off, I was referring

14    you to Government's Exhibit 5-0, 50-A.  We were at

15    Page 9.

16         Are you there, sir?

17    A.    Yes, sir.

18    Q.    Now, toward the bottom of that page, you're

19    telling Mr. Abraham the need to get organized.

20         Would you agree with that?

21    A.    I mentioned being organized.  Yes.

22    Q.    Also, within this conversation as well, there are

23    times when Mr. Abraham says something about keeping you

24    out of the heat.  Do you recall that?

25    A.    Yes, I do.

1    Q.    And that, according to you, meant to be detected

2    by the Government.   Correct?

3    A.    Well, attention of the Government.   Yes.

4    Q.    Attention?

5    A.    Yes.

6    Q.    And that was all part of being organized,

7    correct, or appearing organized?

8    A.    I don't know what you mean by that.

9    Q.    Well, you've arranged to have somebody that you

10   represent to be from a terrorist organization come in.

11   Correct?

12   A.    Yes, sir.

13   Q.    You've told them they need to look organized;

14   have you not?

15   A.    I didn't say they need to look organized.   No.

16   Q.    Well, you've suggested, at least at Page 9 and in

17   other areas of that transcript, "Now, get organized.

18   Tell me what the plan is and I'm going to go by them."

19         Do you recall saying that, sir?

20   A.    There was a conversation, and I did said that.

21   Yes.

22   Q.    Would you agree with me, sir, that by -- "looking

23   organized" means having your act together or having

24   what you're going to do -- having it all planned out so

25   the person that comes in is impressed by you?   Would

1    you agree with that?

2    A.    No, sir.  The transcript speaks for itself.  I

3    went through it and I was explaining to Brother Naz.

4         But when you spoke about him organizing the

5    mission, it's so I could find out what he got in mind,

6    what kind of mission do he got in mind.

7    Q.    So you were trying to find out what kind of

8    mission he had in mind?

9    A.    And, also, have him explain to me what do he have

10   planned.  And there was no conversation between me and

11   him organizing the attacks at one time.

12        And I used that in my advantage to tell him,

13   "Before you do any attack, you got to let me know."

14   And that's being organized.

15   Q.    He never discussed with you any attacks

16   specifically, did he?

17   A.    Yeah.  He discussed specifically attacks on

18   different occasions.  Yes.

19   Q.    By the way, speaking of attacks, you said that

20   you had been to some military bases in Yemen.

21        Do you recall that testimony?

22   A.    Yes, sir.

23   Q.    Where would that have been?  What military base

24   in Yemen were you at?

25   A.    Well, one of them called Al-Anad, and the next

```
 1    one called Al-Wanar.

 2    Q.    Do you recall when you were there?

 3    A.    I went several -- several different times.

 4    Q.    That was when you observed military-style

 5    training.

 6          Is that what your testimony was previously?

 7    A.    I don't remember what I testified, exactly,

 8    before.  But your question is if I participate the

 9    training?

10    Q.    Observed, watched.

11    A.    Yes.  I did.

12    Q.    Referring you to Page 12, back to this exhibit

13    now, what did you mean when you said, "Organize all

14    that" -- this is at the bottom -- "Brother Naz should

15    have did -- done that, to be honest with you.  They

16    like Brother Naz's plan.  I like it.  But he still have

17    to organize more.  Like we can't keep thinking about it

18    and not doing the act about it"?

19          What did you mean by that, sir?

20    A.    I meant what I said.

21    Q.    You were telling him that -- you were telling

22    Mr. Abraham that they needed to organize more.

23    Correct?

24    A.    Making sure that he tells me about the plans

25    before any plans happen.
```

1    Q.     Now, referring to the next page, Page 13,

2    Mr. Abraham tells you what they're waiting for; does he

3    not, sir?

4    A.     Yes, he did.

5    Q.     In the middle of the page, he says, "What we're

6    waiting for, basically, is the financial help, that the

7    brother comes here.  He has to -- he has to understand

8    that -- that --"

9           Do you see that, sir?

10   A.     Yes, I do.

11   Q.     He's telling you that they just want the money.

12   Isn't that true?

13   A.     No, sir.  Further down he went on and explain to

14   me that the list was given out.  So we was just -- it

15   wasn't just the financial support.

16   Q.     Well, he says -- at the bottom, he says, "The

17   list was given out and -- basically, I guess the list.

18   But main thing that really we expect -- we expect -- we

19   really want the help on is the financial, because we

20   got everything else."

21          Do you see that?

22   A.     That's not the whole sentence.

23   Q.     I'll finish.

24          "Everything else we know how to get.  We can get

25   it out.  And that's the thing.  We don't even want to

1    put Brother Mohammed through the heat of trying to get

2    those things 'cause we know he's Arab.  He got a strike

3    against him, just like we black.  We got strikes

4    against us.  We know you all got strikes against you.

5         "So that's why we don't want him to worry about

6    it.  Don't even go to the trouble of trying to get it

7    or not.  That's -- we know how to get that.

8         "That's our ground.  Over here, that's our turf.

9    You see what I'm saying?  We know how to get around.

10   You got an AK.  How did you get it?  Because you know

11   how to.  You see what I'm saying?

12        "So -- and -- the -- you know, basically, I

13   want -- we -- we know how to get it legally, too.  And,

14   actually, we don't want nothing illegal 'cause we don't

15   want be in no heat.  Do you see what I'm saying?  We

16   don't want to bring that type of heat to nobody.

17        And we want to -- man, because if he go through

18   the trouble of getting all them things, he -- you

19   knew -- he, you know, Allah, forbid, what could

20   happen."

21        Do you see all that?

22   A.    Yes, sir.

23   Q.    So he's stressing to you that they really just

24   want the finances because they can get everything else

25   themselves.  Correct?

 1   A.    He was telling me they prefer to get the finance

 2   because they know how to get the weapons on their own.

 3   Q.    Right.

 4         Just like you got an AK-47.  Right?

 5   A.    So he's making it clear it's not all about the

 6   money.

 7   Q.    Right.

 8         Well, he says that they can get an AK-47 like you

 9   got it.  Right?

10   A.    Yes.  He said that.

11   Q.    Right.

12         And was that through "Fat Boy" or was that

13   through Mike?

14         MR. GREGORIE:  Objection, your Honor.

15   BY MR. LEVIN:

16   Q.    Your AK-47.

17         MR. GREGORIE:  Objection, your Honor.

18         THE COURT:  Ground?

19         MR. GREGORIE:  Relevance.

20         THE COURT:  Sustained.

21   BY MR. LEVIN:

22   Q.    Did you ever see any AK-47s at the 62nd and

23   15th location, the Embassy?  Did you ever see any

24   AK-47s there?

25   A.    No, sir.  I didn't see any AK-47, but I seen a

1    .9 millimeter.

2    Q.    You saw one .9 millimeter?

3    A.    Yes, sir.

4    Q.    Any other weapons?

5    A.    Machetes.

6    Q.    How many?  A couple?  Two?  Three?

7    A.    Close to ten.

8    Q.    Ten machetes?

9    A.    I didn't count.

10   Q.    Okay.  Did you ever see any rocket launchers?

11   A.    No, sir.

12   Q.    Any hand grenades?

13   A.    They was trying to get it, but I didn't see none.

14   Q.    Well, the question, sir, is:  Did you see any

15   there?

16   A.    No, sir.

17   Q.    Later on in that conversation that you had on

18   January the 11th -- and this is -- you're now in

19   Mr. Abraham's vehicle.  Is that accurate?

20   A.    I'm sorry.  What date?

21   Q.    January the 11th, 2006.

22   A.    January 11, yes.  I met with Brother Pat.  I

23   don't know who car is it, but in a car in a parking

24   lot.

25   Q.    What kind of car was it?

al-Saidi - CROSS - By Mr. Levin                    178

```
 1   A.      I don't recall.

 2   Q.      You were eating a pizza at the time?

 3   A.      Yes.

 4   Q.      And later in that conversation, at Page 18 -- he

 5   reminds you, does he not, sir, three passages from the

 6   bottom on Page 18, "And -- and the main thing is --

 7   and, remember, it's all -- it's the finance.  That's --

 8   that's all they have to stress to.  As long as they can

 9   get the finance to us, the rest -- they don't have to

10   worry about it.

11        "We'll move that.  That's good enough.  Help us

12   with the finance.  And, you know, when you see, you

13   know, how much was (unintelligible) and you know I need

14   to start, but --"

15        Do you see that he is stressing to you that they

16   want the finances?

17   A.      I don't understand your question.

18   Q.      He's stressing to you that they want the finances

19   and that's all they want.  Isn't that true, sir?

20   A.      Well, he didn't told me that's all they want.  He

21   told me they prefer get the finance.

22   Q.      And he basically told you in this meeting that,

23   when he spoke, he was speaking on behalf of Brother Naz

24   as well; did he not?

25   A.      Early in the conversation, he said that.  Yes.
```

1    Q.    So he's conveying to you as well that that's all

2    Brother Naz wants, is the finances.  Correct?

3    A.    He didn't make it that clear.

4    Q.    I'm finished with that conversation.  Thank you.

5          Now, after this meeting with Mr. Abraham, you

6    have some conversations with regard to a meeting that

7    occurs on January the 28th, 2006.  Is that true, sir?

8    A.    If I has testified about a conversation on

9    January 28th?

10   Q.    No.

11         You have some conversations that lead up to this

12   so-called trip to the Keys on January the 28th.

13   Correct?

14   A.    Yes.

15   Q.    And you speak to Mr. Abraham a couple of days

16   before that.  Correct?

17   A.    Yes, sir.

18   Q.    And he indicates to you that the meeting is

19   probably going to be out of town; does he not?

20   A.    I don't recall him saying that.

21   Q.    Okay.  Does he indicate to you that they don't

22   really know where the meeting is going to be yet, but

23   it's going to be away from the Embassy?

24   A.    I don't recall him indicating to me that it was

25   going to be far.  No.

```
 1   Q.     And you testified previously that you were
 2   surprised when you had to change clothes.  And I
 3   believe one of the others lawyers asked you about a
 4   phone call that you had the day before where
 5   Mr. Abraham was asking for clothing sizes.  Correct?
 6   A.     When he asked me for the clothing size, yes, he
 7   did.  I thought he was speaking about a uniform.  I
 8   never thought he was going to wait for us to get there
 9   and ask us to change clothes right there and then.
10   Q.     Okay.
11   A.     That's kind of weird.
12   Q.     I'm sorry.
13   A.     What you sorry about?
14   Q.     I didn't want to cut you off.
15   A.     What I was saying is I didn't expect for them to
16   tell me to change the clothes that night just because
17   they asked me for the clothing size.
18   Q.     Well, this is the first time that Brother
19   Mohammed is meeting the other individuals.  Correct?
20   A.     I don't know.  I have no idea.
21   Q.     And you've been telling them all along to look
22   organized.  Right?
23   A.     If I been telling them all along to look
24   organized?
25   Q.     Correct.
```

A.    I mentioned several times about being organized
so they could tell me about the missions -- I mean, the
plans so I'll have an idea about what was happening
before they start an attack.

      That was my main reason of asking them to be
organized, basically, is to let me know what they plan
on doing.  That's when I was saying that.

Q.    So on the 28th of January, you show up at the
Embassy.  Right?

A.    Yes, sir.

Q.    You're with Brother Mohammed.  Correct?

A.    Yes, sir.

Q.    You don't know him by his real name?

A.    No.

Q.    Do you now know him by his role name?

A.    Know him as Brother Mohammed.

Q.    So you show up with Brother Mohammed and you've
described Mr. Abraham's demeanor as being real angry.
Is that accurate?

A.    I'm sorry?

Q.    Let me break that down.

      You've described Patrick Abraham as angry,
Brother Pat.  You said he was angry.  You remember you
said Naudy was nice?  Or is that a contradiction?

A.    There was an argument between Brother Mohammed

al-Saidi - CROSS - By Mr. Levin                    182

1    and Brother Pat about the electronics.  They told us no

2    electronics when we first got there, and Brother

3    Mohammed refused to leave his phone because he's saying

4    Al-Qaeda had called and keep contacting him every

5    while.  He resist to leave the phone.

6    Q.    Do you recall Mr. Abraham saying after he said

7    that, "I thought you were a Saudi"?  Do you remember

8    that?

9    A.    No.

10   Q.    Did you have an opportunity to -- this was a

11   tape-recorded meeting; was it not?

12   A.    It was a body recorder.  Yes.

13   Q.    Or a body-recorded meeting.

14         And have you had an opportunity to listen to that

15   meeting?  It's not in evidence at this point.

16         But I'm just asking you:  With regard to

17   preparing for this trial, have you had an opportunity

18   to review that particular meeting?

19   A.    I had the opportunity.  Yes.

20   Q.    So you've listened to that meeting.  Correct?

21   A.    Yes.

22   Q.    You've reviewed a transcript of that meeting?

23   A.    Yes.

24   Q.    And it's your testimony that Mr. Abraham, or

25   Brother Pat, was angry.  Correct?

1    A.    Yes.

2    Q.    Okay.  Now, do you recall, when Brother Pat asked

3    Brother Mohammed to leave his telephone, that Brother

4    Mohammed said, "Listen, I'm from Al-Qaeda" and

5    Mr. Abraham said, "I thought you were a Saudi"?  Do you

6    recall that?

7    A.    No.  I don't recall.

8    Q.    Okay.  Now, you got into a car and then you were

9    taken to another car and then you proceeded to drive

10   south.

11         Do you recall that?

12   A.    Yes.  I recall, when we got in the car, changed

13   the car and kept driving.  Yes.

14   Q.    And you've described Mr. Abraham as being not

15   pleasant.  He was angry, was your word.  Correct?

16   A.    He was angry.  His driving was reckless.  He was

17   mad.  He wouldn't speak to me.  He was very mad.

18   Q.    He was driving reckless?

19   A.    Yes, sir.

20   Q.    So a person that, according to you, was in a

21   conspiracy to engage in trying to hook up with a

22   foreign terrorist organization is driving recklessly on

23   the road.

24         That's your testimony?

25         MR. GREGORIE:  Objection, your Honor.

```
 1   Argumentative.

 2               THE COURT:  Sustained.

 3               Rephrase your question.

 4               MR. LEVIN:  I will.

 5   BY MR. LEVIN:

 6   Q.    At one point, either you or Brother Mohammed

 7   needed to use the bathroom.  Correct?

 8   A.    It was -- honestly, I think we -- Brother

 9   Mohammed used that so we could stop.

10   Q.    Well, Patrick Abraham was driving the vehicle.

11   Correct?

12   A.    Yes, sir.

13   Q.    And he said, "Okay.  I'll stop"; did he not?

14   A.    After four or five requests, yes, he decided to

15   stop.

16   Q.    Four or five requests?

17   A.    Yes.

18   Q.    So it's your testimony that on four or five

19   occasions -- this is all being recorded.  Right?

20   A.    Yes.

21   Q.    It's all being recorded?

22   A.    Yes, sir.

23   Q.    On four or five occasions, either you or Brother

24   Mohammed asked Mr. Abraham to stop.

25         That's your testimony?
```

```
 1    A.    Four or five times, we kept asking him to stop
 2    before he stopped.  Yes.
 3    Q.    So, finally, after four or five requests to stop,
 4    he stops.  Correct?
 5    A.    Yes, sir.
 6    Q.    And you go to a Walgreens.  Correct?
 7    A.    I think, first, it was a store and then they told
 8    us there's no bathroom.  Then we stopped on a Walgreen.
 9    Q.    Okay.  So you stopped first at another store?
10    A.    We made a stop.  We go into a store.  And I think
11    they didn't let Brother Mohammed to use the bathroom.
12    So we -- he stopped again in the Walgreen.
13    Q.    Do you know the name of the first store you
14    stopped at?
15    A.    No.  I don't remember.
16    Q.    Then you stopped at another place, which ended up
17    being a Walgreens.  Is that accurate?
18    A.    Yes, sir.
19    Q.    Okay.  And is he still being angry at this point?
20    A.    He wasn't saying nothing to us, not a word.
21    Q.    Wasn't there a point in time during this trip
22    that you became cold and he gave you a sweater?  Do you
23    remember that?
24    A.    Who?  No.
25    Q.    Either you or Brother Mohammed became cold and
```

1    asked for a sweater, and he gave you or Brother

2    Mohammed a sweater.

3         Do you remember that?

4    A.    No.  I don't remember that, sir.

5    Q.    And you also bought refreshments when you went to

6    this Walgreens; did you not?  You bought a couple

7    Gatorades.  Correct?  Do you remember?

8    A.    I bought some soda and some chips.  Yes.

9    Q.    And Brother Mohammed bought some things as well.

10   Correct?

11   A.    Yes.

12   Q.    And, ultimately, you drive down to a location and

13   there's a meeting in a tent.  Is that correct?

14   A.    Yes.  We met on a tent.  Yes.

15   Q.    And then you came back to Miami.  Correct?

16   A.    After the meeting, yes.

17   Q.    After the meeting, angry Brother Pat took you to

18   Burger King; did he not?

19   A.    I don't believe so.

20   Q.    You don't know if -- you don't remember?

21   A.    I don't recall.

22   Q.    But he took you back to Miami Beach; did he not?

23   A.    Yes.  He took us to the Embassy to get our

24   clothes and then he dropped us off at the Beach.

25   Q.    And where did he drop you off of on the Beach?

1   Was it your apartment on Harding or Brother Mohammed's

2   at the 23rd and Collins Avenue location?

3   A.    I don't know if it was Brother Mohammed or not.

4   But the FBI was waiting for us somewhere on the Beach,

5   and that's where we went and met them.

6   Q.    Okay.  After January the 28th, you never saw

7   Brother Pat Abraham again.  Isn't that true, sir?

8   A.    I don't think I seen him after that again.  I'm

9   not sure.

10  Q.    But you spoke to him in February; did you not?

11  A.    I don't remember.

12  Q.    Well, perhaps if I show you something, it would

13  refresh your recollection.

14  A.    Yes, sir.

15       MR. LEVIN:  Your Honor, permission to

16  approach?

17       THE COURT:  Yes.

18  BY MR. LEVIN:

19  Q.    Let me show you what I've now marked as Abraham

20  for identification purposes only Exhibit 3, and ask you

21  to look at this and tell me if it refreshes your

22  recollection as to whether or not you spoke to

23  Mr. Abraham on February the 15th of 2006.

24  A.    Yes, sir.

25  Q.    Did you?

 1    A.     If it refreshes my recollection?  I remember.

 2    Yes.

 3    Q.     So you did, in fact, have a conversation with him

 4    on the 15th of February, 2006?

 5    A.     Yes, sir.

 6    Q.     In fact, you asked him to go to lunch with you in

 7    February of 2006; did you not?

 8    A.     I might have.  I don't remember.

 9    Q.     In fact, you asked him and, in fact, he loaned

10    you his car in February of 2006; did he not?

11    A.     I think that I asked him to come with me to the

12    DMV so I can take the test.

13    Q.     Did he go with you?

14    A.     No.

15    Q.     Did he lend you his car?

16    A.     No.

17    Q.     Now, let me digress for a second.

18           Aside from receiving a financial benefit from

19    your cooperation with the Government in this case,

20    you've testified about expenses and services.  Correct?

21    A.     I don't understand your question.

22    Q.     All right, sir.  Let me get right to my question.

23           Do you recall, sir, approximately a year ago

24    coming to Miami and being taken to the Dade County Jail

25    as a result of having an outstanding bench warrant for

 1   not appearing in court?

 2   A.     Yes.

 3   Q.     Do you recall Special Agent Velazquez picking you

 4   up from the airport and taking you to the Dade County

 5   Jail?

 6   A.     Yes.

 7   Q.     Do you recall Special Agent Velazquez then

 8   arranging for you to be bonded out of jail?

 9   A.     Yes.

10   Q.     Now, I believe you started your testimony a

11   couple days ago talking about your current occupation.

12          Do you recall those questions?

13   A.     About my current occupation --

14   Q.     Occupation, how you make money.

15   A.     I don't remember the questions.

16   Q.     Well, do you remember saying that you'd rather

17   work with the FBI than a convenience store?  Do you

18   recall that testimony?

19   A.     No.

20   Q.     You don't recall saying that today?

21   A.     No.

22   Q.     Okay.  Well, let me ask you this, sir:  Do you

23   recall testifying on direct examination that not only

24   now do you work in a convenience store, but you own a

25   convenience store?

```
 1   A.    If I remember testifying that I own a grocery

 2   store?

 3   Q.    Yes, sir.

 4   A.    Yes.  I do own a grocery store.

 5   Q.    You do own a grocery store?

 6   A.    Yes.

 7   Q.    Where is that grocery store?

 8   A.    In New York.

 9   Q.    And how much money did you spend on that grocery

10   store?

11   A.    How much money did I spend on it?

12   Q.    Yes, sir.

13   A.    I don't know.

14   Q.    You don't know how much it cost to buy the

15   grocery store?

16   A.    I opened it up.  I didn't buy it.

17   Q.    Well, you said -- you described yourself as an

18   owner of a convenience store today --

19         MR. GREGORIE:  Objection, your Honor.

20   BY MR. LEVIN:

21   Q.    -- March --

22         MR. GREGORIE:  Argumentative.

23   BY MR. LEVIN:

24   Q.    -- 11, 2009.

25         THE COURT:  Sustained.
```

1              Rephrase your question.

2      BY MR. LEVIN:

3      Q.     Do you own a grocery store today, March 11, 2009?

4      A.     Yes, sir.

5      Q.     In New York?

6      A.     Yes, sir.

7              MR. LEVIN:  No further questions.  Thank you.

8              THE COURT:  Mr. Gregorie.

9                      REDIRECT EXAMINATION

10     BY MR. GREGORIE:

11     Q.     Sir, do you remember Mr. Levin asking you about

12     the meeting on November 21st, 2005, and you producing

13     the book on jihad?

14     A.     Yes, sir.

15     Q.     Do you remember what, if anything, you said to

16     attempt to corroborate the fact that you had been asked

17     to get this book?

18     A.     I remember telling Brother Naz -- telling him,

19     "Do you remember when the brother asked me a question?"

20     and that I was talking about Brother Pat while pointing

21     at him at the time.

22          And he told me, "Yes."

23          I told him, "I didn't know how to answer it.  But

24     this is the book that have the answer to that

25     question."

al-Saidi - REDIRECT - By Mr. Gregorie                    192

1    Q.    Let me show you what's marked as Government's

2    Exhibit 43-B.

3          Is this the statement you're talking about where

4    you say, "I also -- do you remember when he asked me

5    that question and I didn't know how to answer it?   I

6    got the book to answer it"?

7    A.    Yes, sir.

8    Q.    Is that you referring to the book you got for

9    Patrick Abraham?

10   A.    Yes, sir.   I was referring --

11   Q.    How is it that Mr. Batiste answered you?

12   A.    I'm sorry?

13   Q.    How did Mr. Batiste answer you?

14   A.    Oh, yeah.   He remember.

15   Q.    Thank you.

16   A.    You're welcome, sir.

17   Q.    Now, sir, you were asked about a statement -- I

18   think, if I'm not mistaken, Mr. Casuso asked you if it

19   was a question or a statement.

20         Do you remember that?   Hold on one second,

21   please.

22         I guess it was Mr. Clark that asked you.   He

23   asked you about -- talking about the salt shakers in

24   the -- salt shakers in the restaurant and the response

25   from Mr. Batiste.   And he asked you whether

1    Mr. Batiste's response was a question or a statement.

2          Do you remember that?

3    A.     Yes.  I do remember.

4    Q.     I'm going to play for you now Government's

5    Exhibit 46-A, starting at Page 32.  I think the jurors

6    should have -- let's see.  46-A is December 21.  I

7    guess that won't be in there.  That'll be on the

8    screen.  So I ask you to look at Page 32 and 33 of

9    Government's Exhibit 46-A.  Listen carefully, please.

10         (Whereupon, segments of Government's Exhibit

11   No. 46 were published in open court.)

12   BY MR. GREGORIE:

13   Q.     Did you hear Mr. Batiste's response?

14   A.     Yes, sir.

15   Q.     Was that a question or a statement?

16         MS. JHONES:  Objection, your Honor.  The

17   transcript speaks for itself.

18         THE COURT:  Sustained.

19   BY MR. GREGORIE:

20   Q.     How did you interpret this, sir?  What did you

21   understand him to be saying to you?

22         MS. JHONES:  Your Honor, the transcript speaks

23   for itself, and it calls for speculation.

24         MR. GREGORIE:  The witness's interpretation.

25         THE COURT:  Overruled.

1          THE WITNESS:  What I understand him to be

2   telling me is exactly this attacks is the kind of

3   attacks we want, is where we don't lose a lot of

4   soldiers.  It was his plan.

5          I just thought it was a better idea than

6   marching in the street, and he agrees to that.  He

7   said, "That the kind of attacks we want -- or we gonna

8   do."

9   BY MR. GREGORIE:

10  Q.     Thank you.

11         Now, sir, do you remember Mr. Vereen asking you

12  about jihad?  And when it was first brought up, he

13  referred you to Page 61 of Exhibit 41-A.  Do you

14  remember that?

15  A.     Yes, sir.

16  Q.     I'm going to ask you to look at Page 20 and

17  ask the jurors to look at Page 20 of Government's

18  Exhibit 41-A.

19         Now, sir, can you see who first -- who mentions

20  jihad at the top of Page 20 of Government's

21  Exhibit 41-A?

22  A.     That's Brother Burson.

23  Q.     Okay.  And after he talks about that jihad, what,

24  if any, reference does he make to where it had been

25  spoken about before?

         1              MS. JHONES:  Objection, your Honor.  The

         2    transcript speaks for itself.

         3              THE COURT:  Overruled.

         4              THE WITNESS:  I can answer?

         5    BY MR. GREGORIE:

         6    Q.    Yes.

         7    A.    He was speaking about the -- the other day we

         8    spoke on the mosque.

         9    Q.    And what day was that?

        10    A.    I'm not sure what exactly -- what -- which day

        11    that he was talking about.  But he was talking about

        12    one of those days.  I think it's the day that I spent

        13    on the Embassy.

        14    Q.    And the mosque and the Embassy are the same?

        15    A.    Yes.  It's the same.  And I call it after them.

        16    Q.    What, if any, explanation of what he -- his

        17    understanding of jihad does he give you during this

        18    conversation?

        19              MS. JHONES:  Objection, your Honor.  The

        20    transcript speaks for itself.

        21              THE COURT:  Sustained.

        22              Rephrase your question.

        23    BY MR. GREGORIE:

        24    Q.    What, if anything, does Burson Augustin do during

        25    this conversation in which he explains his

1    understanding of jihad?

2    A.     He was telling --

3           MR. VEREEN:  Objection as to vagueness, your

4    Honor.  This is a 175-page conversation.  This lasted

5    for hours.

6    BY MR. GREGORIE:

7    Q.    Well, right on the same page, right in the same

8    conversation.

9           MS. JHONES:  Same objection.  The transcript

10   speaks for itself.

11          THE COURT:  Overruled.

12          THE WITNESS:  What he was telling me -- he

13   told me, "We ain't got no -- no power.  We don't got no

14   power.  Believe me, Occ, we have brothers, no matter

15   how crazy they think they are in the streets, running

16   with guns and selling dope or whatever.  They come with

17   us.  They like what we are talking about now.

18          "But when they start to see what we are -- we

19   are not just talking about talking -- taking over Miami

20   or some Dade County, we're talking about taking over

21   Allah's world with his help, they think you're crazy.

22   They say, 'What?  You're taking over -- you're talking

23   about you want to take over the world?'

24          "That -- they don't make no sense.  But we

25   talk -- we tell it's not us that's gonna do it.  It's

1    Allah through us."

2          So, basically, he was -- my understanding of

3    him saying -- making that sentence is that he believed

4    they is Allah's soldiers and they was taking on Allah's

5    mission.

6    BY MR. GREGORIE:

7    Q.    Okay.  I want you to look at the next page.  And

8    about three-quarters of the way down, Burson Augustin

9    tells you, "All right.  People in this neighborhood,

10   they get a plan.  People in Little Havana, we get a

11   plan.  People in Opa-Locka, they get a plan.  Liberty

12   City, get a plan.  At 7:00, strike every neighborhood.

13   Cops are going every which way.  We got to go to

14   another state.  Same thing."

15         What did you understand him to be telling you?

16             MS. JHONES:  Two objections, your Honor.

17             Number one, he's leading the witness.  Number

18   two, the transcript speaks for itself.

19             THE COURT:  Overruled.

20             THE WITNESS:  I understand him to be telling

21   me that they want to organize all the attacks to the

22   same time.  And this is the same thing I been talking

23   about, being organized.

24             He was telling me that they want to attack in

25   different areas at the same time.  And I was asking him

```
 1     to be organized so he could tell me what he planned on

 2     doing.

 3              And my reason of saying that it is --

 4              MS. JHONES:  Objection.  There's no question

 5     pending.

 6              MR. VEREEN:  Objection.

 7              THE COURT:  Wait for a question, sir.

 8     BY MR. GREGORIE:

 9     Q.   What was your reason for asking him -- for making

10     that conversation?

11              MR. VEREEN:  Objection to the vagueness of

12     that question, your Honor.

13              THE COURT:  Sustained.

14              Rephrase your question.

15     BY MR. GREGORIE:

16     Q.   Why did you have that conversation with Burson

17     Augustin?

18              MR. VEREEN:  Same objection.

19              THE COURT:  Overruled.

20              THE WITNESS:  I had that conversation with

21     Brother Burson ensuring things we been talking about,

22     that we was planning on doing, that I told the FBI and

23     it wasn't recorded.

24     BY MR. GREGORIE:

25     Q.    Now, sir, do you remember questions being asked
```

 1   you to about heat -- the meaning of the term "heat"?

 2   A.    Yes, sir.

 3   Q.    I want you to look at Government's Exhibit 41-A,

 4   the same exhibit we've just been looking at.  I'm going

 5   to put it on the ELMO for you so you can look on the

 6   screen and ask you how you understood the following

 7   statement by Burson Augustin to you.

 8   A.    Okay.

 9         MR. GREGORIE:  I'm sorry, your Honor.  I need

10   the ELMO.

11         MR. VEREEN:  What page, Mr. Gregorie?

12         MR. GREGORIE:  This is Government's

13   Exhibit 41-A, Page 129.

14   BY MR. GREGORIE:

15   Q.    Do you see where he says, "No.  This much -- you

16   know that, whoever you're gonna bring by, the heat is

17   coming, 'cause I'm not gonna lie to you, brother.

18   This -- this don't happen to me every day.  But this

19   does let me know whoever's who -- whoever's coming to

20   see you is bringing a lot of heat"?

21   A.    Yes, sir.

22   Q.    What was Burson Augustin -- what did you

23   understand him to be telling you?

24   A.    We get pulled over and he was telling -- no.

25   Actually, we was behind the Embassy.  And there was a

al-Saidi - REDIRECT - By Mr. Gregorie          200

```
 1    police car that kept circling the facility.
 2          So Brother Burson was assuming --
 3              MS. JHONES:  Objection as to what Burson was
 4    assuming.
 5              THE COURT:  Sustained.
 6              MS. JHONES:  Speculation.
 7              THE COURT:  Sustained as to his assumption.
 8    BY MR. GREGORIE:
 9    Q.    What did you understand?  Just what you
10    understood.
11    A.    I understood him to be telling me that who was
12    coming is bringing a lot of heat; he don't see the cops
13    circling around the facility every day.
14    Q.    What do you mean by "whoever is coming"?
15              MS. JHONES:  Objection.  Objection as to what
16    Burson means by who's coming.  Calls for speculation.
17              THE COURT:  Overruled.  That wasn't the
18    question.  Overruled.
19              THE WITNESS:  He was telling me that whoever I
20    got coming from Al-Qaeda is bringing a lot of heat to
21    the Embassy.
22    BY MR. GREGORIE:
23    Q.    Thank you, sir.
24    A.    Welcome.
25    Q.    Now, sir, do you remember questions to you about
```

 1   whether or not you ever discussed training in the

 2   Embassy with any of the Defendants?

 3   A.     If I remember being asked about training in the

 4   Embassy?

 5   Q.     Yes.

 6   A.     Yes, sir.

 7   Q.     Let me show you what's marked as Government's

 8   Exhibit 41, same transcript, Page 10.  I'm going to put

 9   on the ELMO for you.

10          MS. JHONES:  Your Honor, I'm going to object

11   to placing the transcript on the ELMO because of the

12   leading nature -- the leading nature of the questions.

13   I think the appropriate thing is to ask him the

14   question first.

15          MR. GREGORIE:  Your Honor, this is in

16   evidence.

17          THE COURT:  It's overruled.

18   BY MR. GREGORIE:

19   Q.     Sir, do you see at the bottom of the page, it

20   says "(Background voices)" and then Burson Augustin

21   says, "I know that sound from anywhere.  They got

22   paint-ball guns"?

23   A.     Yes, sir.

24   Q.     Do you remember what was happening there when he

25   said that?

```
 1   A.     They was -- I think there was bullets that we

 2   heard.

 3   Q.     Okay.  And you say, "They got something."

 4          And there's clattering sounds.

 5          And then Burson Augustin says to you, "Yeah.  We

 6   usually practice with those."

 7          What was Burson Augustin referring to?

 8   A.     I think he was --

 9          MS. JHONES:  Objection.  Calls for

10   speculation.

11   BY MR. GREGORIE:

12   Q.     What did you understand Burson Augustin to be

13   telling you?

14   A.     I think we hear shots.  And he was -- he is

15   telling me that they practice.  So I thought he was

16   talking about guns.

17          MR. VEREEN:  Objection.  Speculation.  Move to

18   strike.

19          THE COURT:  The motion to strike is granted as

20   to the last sentence by the witness.

21          The jury is instructed to disregard the last

22   sentence.

23          MR. GREGORIE:  I have no further questions,

24   your Honor.

25          THE COURT:  You may step down, sir.
```

```
 1                    (Witness excused.)

 2              THE COURT:  Call your next witness.

 3              MS. ARANGO:  Thank you.

 4              The United States calls Elie Assaad to the

 5    stand.

 6    Thereupon--

 7                          ELIE ASSAAD

 8    was called as a witness by the Government and, having

 9    been first duly sworn, testified as follows:

10              THE COURT REPORTER:  Please have a seat and

11    sit close to the microphone.

12              Please state your full name for the record.

13              THE WITNESS:  My name is Elie Assaad.

14                        DIRECT EXAMINATION

15    BY MS. ARANGO:

16    Q.    Mr. Assaad, where are you from?

17    A.    I'm from Lebanon, descent from Syria.

18    Q.    I'm sorry?

19    A.    From Lebanon, Syrian descent.

20    Q.    And how long have you been living in the United

21    States?

22    A.    Almost 13 years.

23    Q.    Now, let me ask you:  What cities have you lived

24    in in the United States?

25    A.    Chicago, Illinois, and Florida.
```

```
 1   Q.     Sir, what is your native language?

 2   A.     Arabic.

 3   Q.     And how many languages do you speak?

 4   A.     Six languages.

 5   Q.     Now, how comfortable are you speaking English?

 6   A.     There is certain words I don't understand.

 7   Q.     Okay.

 8   A.     But mostly, I can speak.

 9   Q.     All right.  Do you have any difficulties

10   expressing yourself?

11   A.     Sometimes.  Yes.

12   Q.     Now, tell the jury a little bit about your

13   background and how long you lived in -- you know, what

14   countries that you lived in throughout your life.

15          MS. JHONES:  Objection.  It calls for a

16   narrative.

17          THE COURT:  Sustained.

18          Rephrase your question.

19   BY MS. ARANGO:

20   Q.     Well, let's start from where you were born.

21   A.     I was born --

22          MS. JHONES:  Objection.  Asked and answered.

23          THE COURT:  Overruled.

24          THE WITNESS:  I was born in Lebanon.

25
```

```
 1   BY MS. ARANGO:

 2   Q.    And you told the members of the jury earlier that

 3   you were of Syrian descent?

 4   A.    Yes.

 5   Q.    What does that mean?

 6   A.    My father is from Syria.

 7   Q.    You were born in Lebanon and your father is from

 8   Syria?

 9   A.    And my mother, from Lebanon.

10   Q.    Where did you go to school?

11   A.    In Lebanon.

12   Q.    What -- up to what grade did you go to in school?

13   A.    I study until the university.

14   Q.    And then did you go into the military?  Or what

15   did you do after the university?

16   A.    I had to go to the Syrian military.

17   Q.    Why do you say you had to do that?

18   A.    Because my father is from Syria and, at that time

19   in Lebanon, the Syrian -- Lebanon was occupied from the

20   Syrian Government.  And I was obligated to serve in the

21   Syrian Army.

22   Q.    How long did you serve in the Syrian Army?

23   A.    Two and a half years.

24   Q.    And, again, when is it that you came to the

25   United States?
```

```
1    A.      In -- around 1996.

2    Q.      And did you stay in the United States after you

3    arrived here or did you go back to Lebanon?

4            MS. JHONES:  Objection.  Leading.

5            THE COURT:  Overruled.

6            THE WITNESS:  I stayed in Illinois and, after,

7    I had to go back to Lebanon.

8    BY MS. ARANGO:

9    Q.      And when did you come back to the United States

10   after you went to Lebanon in -- after you came to the

11   United States in '96 and went back to Lebanon?

12   A.      I was coming in and coming back to Illinois.

13   Q.      Okay.  And when you came back and forth between

14   Chicago and Lebanon, how was it that you were

15   traveling?  I mean, did you have a visa?

16   A.      I had a --

17           MS. JHONES:  Objection.  Leading.

18           THE COURT:  Sustained.

19           Rephrase your question.

20   BY MS. ARANGO:

21   Q.      What travel documents were you operating under?

22   A.      I had a visa.

23   Q.      And were you -- did you ever come into the United

24   States illegally?

25           MS. JHONES:  Objection.  Leading and calls for
```

1    a legal conclusion.

2              THE COURT:  Sustained.

3              Rephrase your question.

4    BY MS. ARANGO:

5    Q.    Did you ever have any difficulty coming into the

6    United States with the authorities?

7    A.    I had a multiple visa to come in and come out

8    legally.

9    Q.    Now, when did you -- did there come a point in

10   time where you stayed in the United States?

11   A.    Yes, ma'am.

12   Q.    And when was that?

13   A.    The year -- at the end of the year 2000.

14   Q.    Now, have you been an informant with the FBI?

15   A.    Yes, ma'am.

16   Q.    How long have you been an FBI informant?

17   A.    Almost 13 years.

18   Q.    Now, how did you become involved in the

19   investigation that led to this case?

20   A.    I was living in Mexico when FBI Miami called me

21   to assist them in the case.

22   Q.    Now, what were you doing in Mexico?

23   A.    My wife and my family, actually, my kids, live in

24   Mexico.

25   Q.    Is your wife of Mexican descent?

Assaad - DIRECT - By Ms. Arango                    208

```
 1   A.      Yes, ma'am.
 2   Q.      Did you meet her here in the United States?
 3   A.      Yes, ma'am.
 4   Q.      When did you move to Mexico?
 5   A.      Around 2003, to where she's from.  I go and come
 6   back.
 7   Q.      Did you go in and out of the United States after
 8   2003?
 9   A.      Yes, ma'am.
10   Q.      Okay.  And after you got called by the FBI -- I
11   think -- when did you say it was you were called by FBI
12   in connection with this case?
13   A.      Excuse me?
14   Q.      When did you say you got called by the FBI in
15   connection with this case?
16   A.      Around -- in year 2005.  Around October, 2005.
17   Q.      All right.  Did you travel to the United States
18   after that?
19   A.      Yes, ma'am.
20   Q.      When did you travel to the United States?
21   A.      In November, 2005.
22   Q.      Did the FBI assist you in any way in coming to
23   the United States?
24           MS. JHONES:  Objection.  Leading.
25           THE COURT:  Sustained.
```

 1            Rephrase your question.

 2    BY MS. ARANGO:

 3    Q.    How is it that you were able to travel to the

 4    United States?

 5    A.    It was issued a parol letter from the Government,

 6    from the FBI, to come back to the United States.

 7    Q.    And what did you do after you entered the United

 8    States in November of 2005?

 9    A.    I came to Miami and I start to assist the FBI

10    with this case.

11    Q.    Now, when did you -- what was your first

12    involvement in this case?

13    A.    It was in December 16, 2005.

14    Q.    Now, let me ask you something:  After you became

15    involved in this case, when -- when did your work in

16    connection with this case end?

17    A.    End in early of 2008.

18    Q.    So from November-December of 2005 to early 2008,

19    were you working on this investigation -- on this case?

20    A.    Yes, ma'am.

21    Q.    And were you being paid for your services?

22    A.    Yes, ma'am.

23    Q.    And how was -- was it the FBI that was paying for

24    your services?

25    A.    Yes, ma'am.

1    Q.     And how did they pay you?

2    A.     They pay me on my living expenses -- my living

3    expenses.

4    Q.     And they paid your living expenses the entire

5    time from November-December of 2005 to the beginning of

6    2008?

7    A.     Yes, ma'am.

8    Q.     Did you ever have any other kind of work during

9    that time frame?

10   A.     No, ma'am.

11   Q.     Did you ever attempt to get any other kind of

12   work during that time frame?

13          MS. JHONES:  Objection.  Leading.

14          THE COURT:  Sustained.

15          Rephrase your question.

16   BY MS. ARANGO:

17   Q.     What, if any, other -- what, if any, efforts did

18   you do to get any other type of work during that time

19   frame?

20   A.     I tried to apply for jobs.  But the FBI said, no,

21   I have to focus --

22          MS. JHONES:  Objection.  Hearsay.

23          THE COURT:  Sustained.

24   BY MS. ARANGO:

25   Q.     Did the FBI allow you to work on any other -- in

```
 1   any other kind of a job other than with the FBI?

 2            MS. JHONES:  Objection.

 3            THE WITNESS:  No, ma'am.

 4            MS. JHONES:  Leading.

 5            THE COURT:  Sustained.

 6            Rephrase your question.

 7   BY MS. ARANGO:

 8   Q.    Did you work in any other kind of job, other than

 9   with the FBI, while you were here working on this case?

10   A.    No, ma'am.

11   Q.    Did the FBI allow you to work anyplace else?

12   A.    No, ma'am.

13   Q.    Now, when you came to testify in this trial --

14   well, let me ask you this:  When you left -- when you

15   stopped working on this investigation -- or on this

16   case at the end of 2008, where did you go?

17   A.    I went back to Mexico.

18   Q.    And did you go back with your wife and kids?

19   A.    Yes, ma'am.

20   Q.    And have you been there since then?

21   A.    Yes, ma'am.

22   Q.    When did you arrive in the United States for

23   purposes of this trial?

24   A.    Early of 2009.

25   Q.    And how did you get here?
```

```
 1   A.     I came from Mexico to the United States by visa,
 2   by a parol letter.
 3   Q.     Okay.  Did the FBI issue a parol letter so that
 4   you could come into the United States for purposes of
 5   this trial?
 6   A.     Yes, ma'am.
 7   Q.     And since you've been here, have you been being
 8   paid by the FBI in any way?
 9   A.     No, ma'am.
10   Q.     What is your immigration status?
11   A.     I'm asylee.
12   Q.     Did the FBI assist you in any way in acquiring
13   asylum here in the United States?
14          MS. JHONES:  Objection.  Leading.
15          THE COURT:  Sustained.
16          Rephrase your question.
17   BY MS. ARANGO:
18   Q.     What, if any, assistance did the FBI give you in
19   connection with your asylum status in the United
20   States?
21   A.     None.
22   Q.     How did you obtain asylum in the United States?
23          MS. JHONES:  Objection.  It calls for a legal
24   conclusion.
25          THE COURT:  Overruled.
```

 1          THE WITNESS:  I have an attorney --

 2  immigration attorney who applied for me in early 2001

 3  for asylum.

 4  BY MS. ARANGO:

 5  Q.    It was in 2001 that you applied?

 6  A.    Yes, ma'am.

 7  Q.    Okay.  And when did you -- when did you -- when

 8  were you granted political asylum?

 9  A.    2006.

10  Q.    Now, has the FBI -- other than what I've

11  mentioned to you regarding payments during the course

12  of your involvement in this case, did the FBI ever make

13  you any promises in connection with this investigation?

14  A.    No, ma'am.

15  Q.    And other than the parols to get into the United

16  States, did the FBI, you know, confer any benefits upon

17  you?

18  A.    No, ma'am.

19  Q.    Now, after you arrived in the United States in

20  November of 2005, did the FBI give you -- what, if any,

21  instructions did the FBI give you in regard to this

22  investigation?

23  A.    I need to meet a certain person.  I need to sit

24  with him and try to find out what his intentions are.

25  Q.    And did they tell you -- did they tell you when

1   you -- well, let me ask you this:  I think you stated

2   that you first got involved in this investigation on

3   December 16th of 2005?

4   A.    Yes, ma'am.

5   Q.    Explain to the members of the jury what the

6   situation was on December 16th of 2005.

7              MS. JHONES:  Objection.  Vague.

8              THE COURT:  Sustained.

9              Rephrase your question.

10  BY MS. ARANGO:

11  Q.    How was it that -- what was your involvement with

12  this investigation on December 16th of 2005?

13  A.    The FBI told me that --

14             MS. JHONES:  Objection.  Hearsay.

15             THE COURT:  Sustained.

16  BY MS. ARANGO:

17  Q.    What did you do on December 16th of 2005 in

18  connection with this investigation?

19  A.    I met with Brother Naz in Radisson Hotel.

20  Q.    Had you met with him before?

21  A.    No, ma'am.

22  Q.    And was there -- were you -- what, if any, other

23  place were you to meet with him prior to the Radisson

24  Hotel?

25  A.    You mean before?

1   Q.     Yes.  On December 16th.

2   A.     I was supposed to meet him at the airport.

3   Q.     And what -- why was it that you were supposed

4   to meet with him at the airport?  What's your

5   understanding of why you were supposed to meet with

6   him at the airport?

7   A.     For him to -- because I'm coming from overseas

8   and he was supposed to pick me up from the airport.

9   Q.     Okay.  And what happened at the Radisson Hotel?

10  A.     I met with him in one room in the hotel.  And I

11  don't know what's going on at that time.  I start to

12  have conversation with him, and I ask him why he

13  request for me to come from overseas.

14  Q.     What, if any, role were you playing?

15  A.     I was playing I was representing terrorist

16  organization.

17  Q.     You were -- excuse me?  Representing --

18  A.     Represent terrorist organization.

19  Q.     Is that what the -- did -- what, if any,

20  instructions did the FBI give you in that regard?

21  A.     That I have to play my role and I represent

22  terrorist organization arriving from overseas to assist

23  Brother Naz upon his request.

24  Q.     So in furtherance of that, what did you do in

25  this meeting on December 16th, 2005?

```
 1   A.     I was trying to find out what his intentions are,

 2   what he want from terrorist organization and what kind

 3   of help he needs.

 4   Q.     And what did you find out during the course of

 5   this meeting?

 6   A.     We were talking to what -- trying to listen to

 7   him.  And I asked him what kind of help -- "What you

 8   want from us?"

 9          And he request a -- several items.

10          And I asked him to put on the list, to write it

11   down.

12   Q.     What items was he requesting prior to you asking

13   him to write a list?

14   A.     He was asking about guns, boots, uniforms.

15          And I told him, "Best way is to do it -- put it

16   down on the list and -- for me to remember all what you

17   are asking for."

18   Q.     Did the FBI direct you to ask him for a list?

19              MS. JHONES:  Objection.

20              THE WITNESS:  No, ma'am.

21              MS. JHONES:  Leading.

22              THE COURT:  Sustained.

23              Rephrase your question.

24   BY MS. ARANGO:

25   Q.     What, if any, directions did the FBI give you
```

```
 1   regarding having him write out a list?

 2   A.     None, ma'am.

 3   Q.     So it was your idea?

 4          MS. JHONES:  Objection.  Leading.

 5          THE COURT:  Sustained.

 6          Rephrase your question.

 7   BY MS. ARANGO:

 8   Q.     Whose idea was it to ask him for the list?

 9   A.     It was mine.

10   Q.     How did you come up with that idea?

11   A.     Prior to previous work I did for -- like,

12   undercover, and I learned that, with a list -- or when

13   somebody asks several times, better to put it on a

14   piece of paper to give it to the FBI.

15   Q.     So before this case, you've work for the FBI as

16   an informant.  Is that correct?

17   A.     Yes, ma'am.

18   Q.     How many -- let me ask you this:  Did you work

19   with any other FBI office other than Miami?

20          MS. JHONES:  Objection.  Relevancy.

21          MS. ARANGO:  Judge, I'll withdraw that

22   question.

23          THE COURT:  Okay.

24   BY MS. ARANGO:

25   Q.     What, if any, other investigations did you work
```

```
 1   on in Miami -- excuse me.

 2        How many other number of investigations did you

 3   work with -- in Miami with the FBI?

 4             MS. JHONES:  Same objection.

 5             THE COURT:  Sustained.

 6             MS. ARANGO:  Judge, at this point, if they're

 7   going to object to any prior --

 8             THE COURT:  Come on up.

 9             (Whereupon, proceedings were had at side-bar

10   outside the presence of the jury which have been sealed

11   per instructions of the Court.)

12             (Whereupon, the following proceedings were had

13   in open court:)

14             THE COURT:  You're withdrawing the objection?

15             MS. JHONES:  I am, your Honor.

16             THE COURT:  Go ahead.

17             MS. ARANGO:  I'll just ask it again.

18   BY MS. ARANGO:

19   Q.    How many other investigations did you work on

20   aside from this investigation with the FBI in Miami?

21   A.    I work around three.

22   Q.    Okay.  Was that prior to the investigation that

23   led to this case?

24   A.    Nothing to do with this case, ma'am.

25   Q.    Thank you.
```

 1          Now, in those undercover -- in those

 2   investigations, did you work in an undercover capacity?

 3   A.     Yes, ma'am.

 4   Q.     Were you directed by the FBI in those

 5   investigations?

 6   A.     Yes, ma'am.

 7   Q.     All right.  About how long did the meeting last

 8   with Brother Naz in the hotel room at the Radisson

 9   Hotel on December 16th?

10   A.     I don't remember exactly, ma'am.

11   Q.     You mentioned a minute ago that you asked him to

12   write out a list for you.

13   A.     Yes, ma'am.

14   Q.     Let me show you what's been marked as

15   Government's Exhibit No. 100.  It's actually in

16   evidence.

17          MS. ARANGO:  Judge, I'm going to put it on the

18   ELMO for a moment.

19          THE COURT:  Sure.

20   BY MS. ARANGO:

21   Q.     Mr. Assaad, is this the list that Brother Naz

22   wrote out for you in the hotel room at the Radisson on

23   December 16th, 2005?

24   A.     Yes, ma'am.

25   Q.     And did you ask him -- I think you testified you

Assaad - DIRECT - By Ms. Arango                    220

```
 1   asked him to write out this list.

 2   A.      Yes, ma'am.

 3   Q.      During course of that meeting, did you discuss

 4   the items on this list with him?

 5   A.      Yes, ma'am.

 6   Q.      Did you go through the list with him?

 7   A.      Yes, ma'am.

 8   Q.      Was there anything other -- did he request

 9   anything other than what was on this list?

10   A.      No, ma'am.

11   Q.      What did you do with this list after you got it?

12   A.      I gave it to the FBI.

13   Q.      Thank you.

14           Now, what did you do after this meeting?

15   A.      I spoke with the FBI and I left.

16   Q.      Did you meet with the FBI regularly after you

17   would meet with Brother Naz?

18   A.      Before and after, ma'am --

19   Q.      Okay.

20   A.      -- of each meeting.

21   Q.      And what did you call yourself with Brother Naz

22   during the course of these meetings?

23   A.      Brother Mohammed.

24   Q.      What was the next meeting that you had with

25   Brother Naz after the December 16th meeting?
```

1   A.      On December 22nd, 2005.

2   Q.      And where was that meeting?

3   A.      Bayside.

4   Q.      What happened at Bayside?

5   A.      I met with Brother Naz and we went to the

6   Embassy.

7   Q.      How did you get to the Embassy?

8   A.      I drove with Brother -- Brother Naz drove me to

9   the Embassy.

10  Q.      And in what kind of vehicle did he drive you?

11  A.      In a van.

12  Q.      What happened when you got to the Embassy?

13  A.      I was discussing with Brother Naz our request --

14  the size boots he request on December 16.

15  Q.      And why did you ask him for the size of the boots

16  that he requested on December 16th?

17  A.      Because FBI told me to --

18          MS. JHONES:  Objection.  Hearsay.

19          THE COURT:  Overruled.

20          THE WITNESS:  The FBI told me to ask him that.

21  BY MS. ARANGO:

22  Q.      What, if any, directions did you receive from the

23  FBI regarding this meeting on December 22nd?

24  A.      Always -- I gave him a cell phone and -- to give

25  him a cell phone and to request the boot sizes and to

```
 1    let him speak to see what his intention, more.

 2    Q.    When you got to -- where did you say you went

 3    with him?  To the Embassy?

 4    A.    Yes, ma'am.

 5    Q.    Where was that?

 6    A.    In North Miami, on Biscayne Boulevard, something

 7    like that.

 8    Q.    Let me show you a photo and see if you recognize

 9    it.

10          Do you recognize this photograph marked

11    Government's Exhibit No. 7?

12    A.    Yes, ma'am.

13    Q.    Is that the location you're referring to?

14    A.    No, ma'am.

15    Q.    That's --

16    A.    It's the Embassy in Liberty City.

17    Q.    And is that where you met with Brother Naz on

18    December 22nd?

19    A.    Yes, ma'am.

20    Q.    Who else was -- who else, if anybody, was present

21    in the Embassy when you met with Brother Naz?

22    A.    It was another two person was present.

23    Q.    Were you introduced to those persons at that

24    time?

25    A.    I don't remember, ma'am.
```

 1   Q.    Do you even remember -- do you recall who they

 2   were at that -- now -- do you now recall who those

 3   people were?

 4   A.    I don't remember, ma'am.  But I know there were

 5   two person in -- inside the Embassy.

 6   Q.    But you don't recall who they were?

 7   A.    No, ma'am.

 8   Q.    Thank you.

 9         Were they present in the Embassy while you held

10   your meeting with Brother Naz?

11   A.    Yes, ma'am.

12   Q.    About how long did you meet with him in the

13   Embassy on December 22nd?

14   A.    It wasn't too long.  I don't know exactly the

15   time.

16   Q.    And did you obtain the boot sizes from him?

17   A.    Yes, ma'am.

18   Q.    Did you give him a cell phone?

19   A.    Yes, ma'am.

20   Q.    Did you record this conversation?

21   A.    Yes, ma'am.

22   Q.    And have you had a chance -- what did you do with

23   the recording after you met with him on December 22nd?

24   A.    I gave it to the FBI.

25   Q.    Have you had a chance to review that recording?

 1   A.     Do you mean at that time, in the moment?

 2   Q.     No.

 3          Since then, have you had a chance to review the

 4   recording that you made?

 5   A.     Yes, ma'am.

 6   Q.     Let me show you what's been marked as

 7   Government's Exhibit 47 and 47-A and ask you if you

 8   recognize it.

 9          Mr. Assaad, do you recognize Government's

10   Exhibit -- I'm handing you what's been marked as

11   Government's Exhibit 47 and 47-A, and ask you if you

12   recognize them.

13   A.     Yes, ma'am.

14   Q.     What is Government's Exhibit No. 47?

15   A.     It's a CD.

16   Q.     Have you reviewed that CD?

17   A.     Yes, ma'am.

18   Q.     Are your initials on it?

19   A.     Yes, ma'am.

20   Q.     Does that CD contain a true and accurate

21   recording of the meeting that you -- that occurred on

22   December 22nd with -- December 22nd, 2005, with Narseal

23   Batiste?

24   A.     Yes, ma'am.

25   Q.     Have there been any material deletions or

 1   alterations to that original recording?

 2   A.      No, ma'am.

 3   Q.      What is Government's Exhibit 47-A?

 4   A.      It's transcript from the meeting.

 5   Q.      Have you had a chance to review that transcript

 6   in conjunction with listening to the recording marked

 7   Government's Exhibit 47?

 8   A.      Yes, ma'am.

 9   Q.      Is it a true and accurate transcript, to the best

10   of your abilities?

11   A.      Yes, ma'am.

12   Q.      Are the speakers properly identified?

13   A.      Yes, ma'am.

14          MS. ARANGO:  Government offers 47 and 47-A

15   into evidence.

16          MS. JHONES:  No objection.

17          THE COURT:  They will be admitted as

18   Government's Exhibits 47 and 47-A.

19          (Whereupon, Government's Exhibit Nos. 47 and

20   47-A were entered into evidence.)

21          MS. ARANGO:  Judge, at this time, I'd like to

22   publish -- I would ask -- I'm not sure if these are in

23   the binders or if we have to hand out new binders.

24          They're in the existing binders.  So I would

25   ask the jurors to turn to Government's Exhibit 47-A.

1    I'm going to be playing several clips.  The first one

2    will start at Page 21.

3    BY MS. ARANGO:

4    Q.    And I would ask the witness to turn to Page 21 of

5    the exhibit in front of you.

6              (Whereupon, segments of Government's Exhibit

7    No. 47 were published in open court.)

8    BY MS. ARANGO:

9    Q.    Agent -- Mr. Assaad, going back to Page 21, at

10   the very beginning of that clip, towards the top of the

11   of the page, where you say, "Okay.  Your phone.  You

12   know how to contact me.  I contact you.  We speak

13   freely on the phone.  There's no problem," what was

14   happening at that point in time?

15   A.    I was giving him the phone, what the FBI gave to

16   me to give to him.

17   Q.    And then further down, you say, "The" -- you

18   have -- make a reference to other things on the list.

19   "We are working on it."

20         Do you see that?

21   A.    (No response.)

22   Q.    And the other list is --

23              THE COURT:  There was no answer.

24   BY MS. ARANGO:

25   Q.    I'm sorry.

1    A.    Yes, ma'am.

2    Q.    I'm trying to get you -- just go two speakers

3    down.

4    A.    Yes, ma'am.

5    Q.    Do you see what I'm referring to?

6    A.    Yes, ma'am.

7    Q.    What are you referring to when you say, "We are

8    working on the other things on the list"?

9    A.    The list they gave to me on December 16, 2005.

10   Q.    And what things were you working on -- were you

11   telling him that you were working on?

12   A.    Because at this moment, he was showing me a

13   machine gun magazine; and he's requesting certain

14   specific items from the machine gun magazine, what he

15   wants.

16   Q.    Further down on that page, when -- Batiste says

17   to you, "They're cheaper than these two.  I said those

18   are the (unintelligible) 'cause they got 30 rounds.

19   They are very precise."  And then further down he says,

20   "And they shoot grenades."

21         Do you see that?

22   A.    Yes, ma'am.

23   Q.    What was -- what -- what, if anything, was he

24   referring to when you were having this conversation?

25   A.    He was referring to specific items on the machine

 1    gun magazines that the -- have 30 rounds and they can

 2    shoot grenades.

 3    Q.    And then over to Page 22, there's mention of a --

 4    Mr. Batiste mentions bulletproof vests.

 5          What, if anything, was he referring to at this

 6    point in time?

 7    A.    He was requesting from us give him a vest he

 8    wants, also.

 9    Q.    Then you say to him in response, "You didn't put

10    the list."

11          What were you telling him?

12    A.    Because he said he would prepare a specific, more

13    details list and he will give it to me.  So I was

14    asking about the list.

15    Q.    Okay.  Well, further down on Page 22, Batiste

16    says to you, "When I did write, Hamas asked me for it

17    and I gave it to him.  You see what I'm saying?"

18          So -- and then you say, "Hamas?  He asked you for

19    it and you gave it to him."

20          Do you see that?

21    A.    Yes, ma'am.

22    Q.    First of all, were you -- who all were you

23    referring to?  What's your understanding of what you

24    were talking about?

25    A.    He was talking about Brother Abbas.

1   Q.    What is it you were telling Mr. Batiste in this

2   portion of the conversation?

3   A.    Because I ask him, "You told me that you would

4   prepare the list.  Where's the list?"

5         He said he gave it to Hamas.

6   Q.    Who did you understand him to be referring to?

7   A.    To Brother Abbas.

8   Q.    Okay.  Now, at the end of this section, Page 23,

9   you discuss -- you tell Mr. Batiste, "I believe there

10  are -- there my stay will be worth to stay, to be with

11  this brother, those brothers, 'cause I feel like

12  they -- they are so serious."

13        What is it you were trying to communicate to

14  Mr. Batiste?

15  A.    That -- that I will stay because of the group he

16  has, that they are -- I believe he's serious, what he

17  was telling me.  And I will be staying, to extend my

18  stay to see, you know, how I can assist them.

19  Q.    Now, you mentioned earlier that you received a

20  list of boot sizes from Mr. Batiste.

21  A.    Yes, ma'am.

22  Q.    I'm going to show you what's been marked and

23  introduced into evidence as Government's Exhibit 102

24  and ask you if that's the list.

25            MS. ARANGO:  Judge, may I have the ELMO for

```
 1   just a moment?

 2            THE COURT:  Sure.

 3   BY MS. ARANGO:

 4   Q.     Mr. Assaad, referring to Government's

 5   Exhibit 102, do you recognize that?

 6   A.     Yes, ma'am.

 7   Q.     What is it?

 8   A.     It's the list -- the size -- boot sizes he gave

 9   to me on September 22nd.

10   Q.     Was that in the Embassy?

11   A.     Yes, ma'am.

12   Q.     How did he get those sizes?

13   A.     Most of those, he spoke on the phone.  He call on

14   the phone to get the sizes.  The other two, they were

15   present.

16   Q.     And then over to the right, right here

17   (indicating), what -- what -- did Mr. Batiste write

18   those numbers, 10 and then .223?

19   A.     Yes, ma'am.

20   Q.     Did he write it when you were there with him?

21   A.     Yes, ma'am.

22   Q.     And what, if anything, was he -- what was going

23   on when he wrote those numbers down?

24   A.     Referring to specific item on machine -- on the

25   magazine.
```

1    Q.     What magazine?

2    A.     Gun magazine.

3    Q.     Were you -- the two of you sitting down at that

4    time?

5    A.     We were at a table.  Yes, ma'am.

6    Q.     And did you bring the gun magazine to this

7    meeting?

8    A.     No, ma'am.

9    Q.     Was the gun magazine already there?

10          MR. VEREEN:  Objection.  Leading.

11          THE COURT:  Sustained.

12          Rephrase your question.

13   BY MS. ARANGO:

14   Q.     Well, were there any magazines present at the

15   table when you met with Mr. Batiste?

16   A.     It was a gun magazine already over there in the

17   Embassy.

18   Q.     Okay.  Thank you.

19          MS. ARANGO:  I'd like to refer the jurors to

20   Page 26 and the witness to Page 26, please.  We're

21   going to play the second clip.  It's going to start at

22   the bottom of Page 26.

23          THE COURT:  Still on 47-A?

24          MS. ARANGO:  Yes.  I'm sorry, Judge.  Yes.

25   47-A.  It's going to start with the last speaker.

1              (Whereupon, segments of Government's Exhibit

2     No. 47 were published in open court.)

3     BY MS. ARANGO:

4     Q.    Mr. Assaad, at the very beginning of this clip,

5     at Page 26 -- the bottom of Page 26, Mr. Batiste talks

6     about how he has men.

7              "They're very loyal and very dedicated men.  But

8     to say if takes more time for them to be ready to be

9     able to bring out a war and about the jihad --"

10             And then further on, you say, "They're not

11    Arabic," at Page 27.

12             And he says, "Yes.  Most of them are Haitian,

13    Black-Americans, and some are Hispanic.  We got

14    brothers from all nations."

15             And you say to him, "With you?"

16             And he says, "Yes."

17             What is it you all were talking about there?

18    A.    We was talking about his group and his members,

19    that now they are not ready, they need time to be

20    prepare for the jihad.

21    Q.    What is your understanding of what group he was

22    referring to?

23    A.    His group, the general soldiers he has with him.

24    And they are not Arabs.  They are from different

25    nation, African-American, from Haiti, from -- Hispanic,

1   from -- different, but not Arabic.

2   Q.   What, if any, significance did you understand was

3   being expressed to you by the fact that they were not

4   Arab?

5   A.   Because the Government is not focusing on -- the

6   Government is focusing on Arabic people and not

7   focusing on African-American black people.

8   Q.   And then further on in this conversation, you ask

9   Mr. Batiste several questions about his motives, what

10  was his motives and to explain to you his motives.

11       Did the FBI direct you to ask those questions?

12  A.   I don't remember exactly.  But most of the

13  meeting, it was following what the FBI told me.

14  Q.   Why did you ask him about his -- why did you ask

15  Brother Naz about his motives?

16  A.   We trying to -- trying to find out what the

17  reason behind his hatred and his -- against the

18  Government and about what's going on behind all this.

19       MS. ARANGO:  Let's go to the next clip, which

20  will begin at Page 38.  It's going to begin at the

21  bottom third of Page 38, five speakers up from the

22  bottom.

23       THE WITNESS:  What page, please?

24       MS. ARANGO:  Page 38, five speakers up from

25  the bottom.

```
 1              (Whereupon, segments of Government's Exhibit

 2   No. 47 were published in open court.)

 3              MS. ARANGO:   Pause it for a second.

 4   BY MS. ARANGO:

 5   Q.    Mr. Assaad, what was happening at this portion of

 6   the clip where the sounds in the background changed?

 7   Did you hear it?

 8   A.    The sound?  Maybe the door was opening?

 9   Q.    Yes.

10         Did you hear that?

11   A.    Yes, ma'am.

12   Q.    Do you recall what was happening at that point?

13   A.    I don't remember.

14   Q.    Okay.

15              (Whereupon, segments of Government's Exhibit

16   No. 47 were published in open court.)

17   BY MS. ARANGO:

18   Q.    Mr. Assaad, towards the beginning of this clip,

19   at Page 39, almost halfway down, Batiste says to you,

20   "Right now, I'm gonna make a list and give it to you."

21         Do you see that?

22   A.    Yes, ma'am.

23   Q.    Okay.  Did Mr. Batiste ever give you any other

24   lists after December 22nd?

25   A.    Yes, ma'am.
```

```
 1   Q.    Let me just show you for a moment what's been
 2   marked as Government's Exhibit 103.
 3              MS. ARANGO:  If I may have the ELMO for just
 4   one second, Judge.
 5              THE COURT:  Yes.
 6   BY MS. ARANGO:
 7   Q.    We'll discuss this some more later.
 8              But was that list that's been marked as
 9   Government's Exhibit 103-A -- was that list provided to
10   you after the December 22nd meeting?
11   A.    Yes, ma'am.
12   Q.    When was that provided to you?
13   A.    When?
14   Q.    Yes.
15   A.    December 29th, 2005.
16   Q.    And who gave that to you?
17   A.    Brother Naz.
18   Q.    And just generally, what are the items on the
19   list?
20   A.    It was about machine guns, boots, SUVs and
21   $50,000.
22   Q.    Are bulletproof vests on the list, also?
23              MR. VEREEN:  Objection.  Leading.
24              THE COURT:  Sustained.
25              Rephrase your question.
```

```
 1    BY MS. ARANGO:

 2    Q.    Were any items that are on this list discussed in

 3    this conversation that we're reviewing right now on

 4    December 22nd?

 5    A.    Yes, ma'am.

 6    Q.    What are some of the items on this list that were

 7    discussed on December 22nd by Narseal Batiste?

 8    A.    It's machine guns and the -- I can't see --

 9          THE COURT:  Can you zoom it in?

10          MS. ARANGO:  Sure.

11          THE WITNESS:  -- the bulletproof vest.

12    BY MS. ARANGO:

13    Q.    Thank you.

14          Later on, for the next few pages, there's

15    conversations about training and land.

16          And Narseal Batiste tells you at Page 42, "I want

17    to set it up as training ground because this will go

18    unnoticed."

19          And you say, "And no one is watching over there?"

20          And he says, "No.  It's privately owned."

21          You say, "It's far from the people?"

22          He says, "Yes."

23          You say, "You're sure?"

24          He says, "Positive.  I used to live there."

25          Further on, over at Page 43, you say to him
```

1    towards the middle of the page, "The list is for

2    Louisiana."

3           And he responds, "Training."

4           Now, what's your understanding of what was being

5    discussed in these few pages?

6               MS. JHONES:  Your Honor, document speaks for

7    itself.

8               THE COURT:  Overruled.

9               THE WITNESS:  He was telling me that he has a

10   land -- he has soldiers in Chicago and he has a land,

11   private owned, in Louisiana, and the list he gave to me

12   he wanted for the training for his soldiers in

13   Louisiana.

14   BY MS. ARANGO:

15   Q.    And then over at Page 45, the conversation goes

16   on to talk about the Sears Tower.

17           And, Narseal Batiste says, "I know this

18   building."

19           And then he says, "I know how to get inside this

20   building."

21           And you say, "Without no one not seeing you?"

22           And then he says, "Yes."

23           And then you say, "So what you're saying is you

24   know how to go inside this -- both buildings?"

25           And you had earlier been talking about the Empire

 1   State Building as well as the Sears Tower.

 2        And he says, "No.  Sears Tower."

 3        And then going over to Page -- the very bottom of

 4   Page 47, Narseal Batiste says to you, "See, I know this

 5   for a fact, because I know the history of it and I

 6   lived there a long time.  I used to work for, like,

 7   FedEx."

 8        What was your understanding of what Mr. Batiste

 9   was telling you in --

10   A.    That he knows how to go inside the Sears Tower in

11   Chicago, he used to live in Chicago, and he used to

12   work for Federal Express, to go in and out from the

13   building.

14   Q.    Now, at the very end of this clip, he says to

15   you -- excuse me -- you ask Mr. Batiste -- you say,

16   "Let me ask you something.  Who all knows this idea?

17   Who knows about it?"

18        And then he says, "Nobody."

19        And you say, "Not your brother?  No one?"

20        And he says, "No."

21        Do you see that?

22   A.    Yes, ma'am.

23   Q.    Now, why did you ask him that?

24   A.    To identify how many people know about this plan

25   and the amount of people involved in this.

1    Q.      And what plan were you referring to?

2    A.      About the Sears Tower in Chicago.

3    Q.      Now, after this conversation on December 22nd,

4    did Narseal Batiste discuss the plan -- this plan that

5    you're referring to in this portion of the conversation

6    about Chicago in front of --

7              MR. VEREEN:  Objection.  Leading.

8              THE COURT:  Sustained.

9              Rephrase your question.

10   BY MS. ARANGO:

11   Q.      Who, if anybody, did Narseal Batiste discuss the

12   Chicago plan in front of after December 22nd?

13   A.      All the brothers.

14   Q.      In what instances did those discussions occur?

15   A.      The -- you mean the day where we discuss it?

16   Q.      Yes.  If you can recall.

17   A.      It was on February 19, with Brother Patrick, in

18   my apartment, the apartment in South Beach --

19   Q.      Okay.

20   A.      -- and March 16, when they took the oath.

21   Q.      Who took the oath?

22   A.      All -- all -- Brother Sunni and Brother B -- all

23   the brothers -- And Patrick and Brother Rot and Brother

24   Naz.  All of them were there.

25   Q.      Okay.  And was the Sears Tower plan discussed in

Assaad - DIRECT - By Ms. Arango                    240

 1   front of them?

 2   A.    Yes, ma'am.

 3         And on other occasion, also, Brother B was

 4   present when he gave me the -- when we met and we

 5   discussed.

 6         MR. CASUSO:  Objection, Judge.

 7         Time and date, if he can.

 8   BY MS. ARANGO:

 9   Q.    If you can, what were the other meetings that

10   occurred with Brother B, or Brother Burson, where

11   Narseal Batiste discussed the Chicago plan?

12   A.    The March 16 and the -- I guess, March 4 -- the 4

13   and the 1st of March.  I don't remember exactly the

14   date, but --

15   Q.    Well, let me ask you this:  Where did the

16   meetings occur?

17   A.    In the Embassy.  In the warehouse.

18   Q.    This is a different location than the Embassy.

19   Correct?

20   A.    Yes, ma'am.

21   Q.    Was that location someplace that --

22         MR. VEREEN:  Objection.  Leading.

23         THE COURT:  Sustained.

24         Rephrase your question.

25

```
 1   BY MS. ARANGO:

 2   Q.    Would you please explain to the members of the

 3   jury what the warehouse was.

 4   A.    The warehouse was in North Miami, somewhere next

 5   to Biscayne Boulevard.

 6   Q.    Okay.  And did you -- what, if any, meetings did

 7   you have with Narseal Batiste and any of the other

 8   Defendants at the warehouse?

 9   A.    If we had meetings?  Yes, ma'am.

10   Q.    Okay.  And do you remember any of the dates of

11   any of those meetings?

12   A.    It was on March 16 and it was after the -- after

13   the March 16, most of the meetings were in the

14   warehouse until finished.

15   Q.    About when was the date that the meetings

16   ended -- or the approximate date?

17   A.    I remember the last time we met, it was when he

18   took the computers from the warehouse.  But I don't

19   know exactly the exact date.

20   Q.    Did you have any meetings in April?

21   A.    Yes, ma'am.

22   Q.    About how many meetings would you estimate did

23   you have with Narseal Batiste and any of the other

24   Defendants from the March 16th meeting until the

25   computers were taken out of the warehouse?
```

         1              MR. CLARK:  Objection.  That's a vague

         2    question, "the other Defendants."

         3              THE COURT:  Overruled.

         4              THE WITNESS:  More or less, around ten

         5    meetings.

         6    BY MS. ARANGO:

         7    Q.    And what months were those meetings -- did those

         8    meetings occur in?

         9    A.    It was in March and April --

        10    Q.    Okay.

        11    A.    -- 2006.

        12    Q.    Thank you.

        13              MS. ARANGO:  At this point, I'd like to go to

        14    the next clip, beginning at Page 50.

        15              Judge, I don't know if you want to break at

        16    this point.  The clip will be approximately five or ten

        17    minutes.

        18              THE COURT:  We'll go forward with this clip.

        19              MR. CLARK:  Can we identify the exhibit again,

        20    your Honor, that we're on?

        21              MS. ARANGO:  Yes.  Government's Exhibit 47-A.

        22    We're going to turn to Page 51.  And this clip will

        23    begin four speakers up from the bottom.

        24              (Whereupon, segments of Government's Exhibit

        25    No. 47 were published in open court.)

1          MS. ARANGO:  Let's start it over, please.

2    Let's make sure everybody gets to the page.  Page 51 of

3    Government's Exhibit 47-A.

4          (Whereupon, segments of Government's Exhibit

5    No. 47 were published in open court.)

6    BY MS. ARANGO:

7    Q.    Mr. Assaad, at the beginning of this clip, at

8    Page 51, Narseal Batiste says to you, "But once I get

9    what I wrote out on the list."

10          And then you respond and you say a few things,

11    but you say, "How will you take it over there?"

12          At the bottom of Page 51, going over to Page 52,

13    he says, "I can do this either way.  I can buy them

14    legal."

15          And then you have a conversation about

16    purchasing -- that he's got somebody with a registered

17    gun license that will allow the carrying of a concealed

18    gun.

19          What was your understanding of what was going on

20    in this portion of the conversation?

21    A.    You know, he was -- we're talking about the

22    weapon on the list and how he will -- I was asking how

23    he will transport this to Louisiana, to where he

24    establish the training camp.

25          And he said all -- he can transport legally over

 1   there by having a license, because one of his brother

 2   has a license.

 3   Q.    Then over at Page 53, right at the middle of the

 4   page, Mr. Batiste talks to you about, "I have a brother

 5   that gets a security license to be a security officer

 6   or a security company."

 7         Had you ever had any discussions with any of the

 8   Defendants regarding being a security officer or having

 9   a security license?

10   A.    Yes, ma'am.  On December 16 -- on March 16, one

11   of them has the uniform of security.

12   Q.    Okay.  Was there -- did you have any discussions

13   with any of the Defendants on any of the conversations

14   that you had regarding being -- he having a security

15   license?

16   A.    Yes, ma'am.

17   Q.    Who's that?

18   A.    I don't remember the date exactly.  But we were

19   driving down to Miami when he told me about his

20   security -- he work in security company.

21   Q.    And who are you talking about when you say "he"?

22   A.    I don't remember exactly, ma'am.

23   Q.    We'll get to that later.

24         Now, at the -- towards the end of this clip,

25   Mr. Batiste says to you at Page 54, "So, that way, that

1    gives us access to where it doesn't bring no heat upon

2    us.  You don't have to watch our back for nothing.

3    And, you know, nobody can become suspicious unless

4    you're doing something wrong."

5        What was your understanding of what Mr. Batiste

6    was telling you about not bringing any heat down upon

7    us?

8    A.    By creating a license to carry weapons and then

9    we will not have to worry about any heat coming from

10   the Government or from the police if they stop us and

11   they found weapons with us, because they have a license

12   to carry all these weapon to Louisiana.

13   Q.    Thank you.

14            MS. ARANGO:  I'm turning now to the next clip

15   at Page 55.  The clip will start at the bottom -- four

16   speakers up from the bottom.

17            (Whereupon, segments of Government's Exhibit

18   No. 47 were published in open court.)

19   BY MS. ARANGO:

20   Q.    Mr. Assaad, at the top of Page 56, where

21   Mr. Batiste says to you, "So, what made me claim

22   Moors -- sovereign Moors is because I know that it

23   gives me legal rights to move around in the United

24   States," had you ever heard of Moors or sovereign Moors

25   before this?

1    A.    No, ma'am.

2    Q.    And what was your understanding of what

3    Mr. Batiste was telling you there?

4    A.    That he's from sovereign Moors and he can move

5    wherever he wants in the United States -- where he

6    wants, legally.

7    Q.    And then further down on that page where

8    Mr. Batiste says to you, referring to Louisiana, "I

9    have some people over there already that are my blood

10   --" and then further down, "-- that's been in the

11   Marines, know all the military training they would

12   need" and then further on over, at the bottom of

13   Page 57 Batiste says to you, "I can only train two at a

14   time so that it won't become too noticeable," what was

15   being discussed there -- or what's your understanding

16   of what was being discussed there?

17   A.    That he has family members -- because he refers

18   to them like blood -- that were in the Marines and they

19   would train his brothers.  And he can send to Louisiana

20   the -- he has around 80 acres over there and he will

21   send the brothers, each time two people, to get

22   trained.

23   Q.    Now, you responded to him by saying, "I don't see

24   why you have to have two persons at a time" -- at the

25   bottom of Page 57 -- "Why don't you bring in, like, ten

```
 1    persons or seven?"

 2         Why did you respond to him in that way?

 3    A.    Because what he told me before is that his land

 4    is far and he can train with live weapons, no problem,

 5    and no one can interfere with that.

 6         I was trying to get more information from him to

 7    find out the capacity of his group, his activity and

 8    everything we can find out about the moving of -- the

 9    movement.

10    Q.    What, if any, instructions did you receive from

11    the FBI in that regard?

12    A.    Try to identify how many members they are and

13    all -- how big his organization is.

14         MS. ARANGO:  The last clip will be at Page 61,

15    and it's going to be right at the middle, eight

16    speakers down from the top.

17         (Whereupon, segments of Government's Exhibit

18    No. 47 were published in open court.)

19    BY MS. ARANGO:

20    Q.    Mr. Assaad, towards the end of this clip, you ask

21    at Page 62, "Since when you have this idea in your

22    head?"

23         And then there's a long pause.

24         And Batiste responds, "Since '98."

25         Why did you ask him, since when did he have this
```

1   idea in his head?

2   A.    To see if it was from long time or short time

3   from -- how long he had it, how long he was planning to

4   do this.

5   Q.    And what was the idea that you were referring to?

6   A.    Can you explain, please?

7   Q.    What idea were you asking him about that he had

8   in his head?

9   A.    About the Sears Tower in Chicago.

10  Q.    Okay.  And what, if anything, did he tell you in

11  this conversation about living in Chicago?

12  A.    That he used to work over there and he had the

13  idea since '98 and about -- he explained to me

14  previously about the plan he had for the Sears Tower.

15  Q.    Okay.  Did he tell you anything about him living

16  in Chicago?

17           MR. VEREEN:  Objection.  Leading.

18           THE COURT:  Sustained.

19           Rephrase your question.

20  BY MS. ARANGO:

21  Q.    What, if anything, did he tell you about whether

22  or not he lived in Chicago?

23  A.    He mentioned that he lived in Chicago and he

24  worked in Chicago for a long time.

25  Q.    Now, in this conversation, who mentioned this

```
 1    Chicago Sears Tower?

 2    A.      Brother Naz.

 3    Q.      Did the FBI direct you to mention the Sears

 4    Tower?

 5    A.      No, ma'am.

 6    Q.      What did you do with the list that was marked as

 7    Government's Exhibit 102 that you obtained after this

 8    meeting -- after this meeting was over?

 9    A.      I gave it to the FBI.

10    Q.      And who did you meet with, if you recall?

11    A.      Agent Tony Velazquez.

12    Q.      Okay.  When was the next time that you spoke to

13    Brother Naz?

14    A.      December 29, 2005.

15    Q.      Did you -- was that the meeting that you referred

16    to earlier?

17    A.      Yes, ma'am.

18    Q.      Did you talk to him before that meeting?

19    A.      I called him on December 28th, 2005, on his cell

20    phone.

21    Q.      Let me show you what's been marked --

22            THE COURT:  Ms. Arango, we're going to end

23    here.

24            Ladies and gentlemen, one of your member has

25    asked for the day off tomorrow to attend a conference,
```

1    and I've granted that request.  So there's no trial

2    tomorrow.  I will see you on Friday morning at 9:00.

3            Do not discuss this case either amongst

4    yourselves or with anyone else.  Have no contact

5    whatsoever with anyone associated with the trial.  Do

6    not read, listen or see anything touching on this

7    matter in any way.

8            If anyone should try to talk to you about this

9    case, you should immediately instruct them to stop and

10   report it to my staff.

11           You may leave your materials at your chairs.

12   Please give your notebooks to the court security

13   officer.

14           Enjoy your day off tomorrow.  I'll see you

15   Friday morning, 9:00.

16           (Whereupon, the jury exited the courtroom at

17   5:20 p.m. and the following proceedings were had:)

18           THE COURT:  You may step down, sir.

19           (Witness excused.)

20           THE COURT:  You may be seated for a minute.

21           Yes, Ms. Jhones.  You wanted to bring up

22   something in regard to --

23           MS. JHONES:  A couple of things, your Honor.

24           I have inquired of the Government as to the

25   status of providing me with the latest revised

 1    transcripts.

 2            I need them in order to properly prepare for

 3    the cross-examination of this witness.

 4            My understanding was I was going to have them

 5    this morning.  I did speak to Agent Stewart about

 6    another issue, and I did speak to him later on in the

 7    afternoon about the status of the revised transcripts.

 8            And I requested that he be provided with those

 9    transcripts today.  That was my understanding, so

10    that --

11            MR. GREGORIE:  So we don't have to waste time,

12    they're right here for her, Judge.

13            THE COURT:  Okay.

14            MS. JHONES:  Great.

15            The other issue, your Honor, is the Court

16    ordered the production of the document relating to this

17    particular witness's political asylum issue.

18            THE COURT:  Is he out of the courtroom?

19            MR. GREGORIE:  Yes, he is.

20            THE COURT:  Okay.  Go ahead.

21            MS. JHONES:  I'd like to inquire as to the

22    status of the production of that document, the memo in

23    the immigration file pertaining to the FBI's

24    notification --

25            THE COURT:  It wasn't the political asylum.

1    It was the parol.

2         MS. JHONES:  It was the asylum, your Honor.

3         THE COURT:  No.  I don't believe so.

4         I need Ms. Arango.

5         I believe it was the parol request.  That's

6    the notation in the file.

7         Do you have that?

8         MR. GREGORIE:  Judge, we have that.  I know

9    Ms. Arango pulled it, your Honor, and has it.  It may

10   be right here.

11        THE COURT:  So as long as you're going to get

12   that.

13        MR. GREGORIE:  Yes.  They have it, your Honor.

14   It's right here.

15        THE COURT:  They have that?

16        They have that for you.

17        MR. GREGORIE:  Both things are here for her.

18        THE COURT:  Okay.

19        MR. GREGORIE:  We have a copy.

20        THE COURT:  Is that it?

21        MS. JHONES:  Two more issues, your Honor, at

22   the expense of having my colleagues get very upset with

23   me.

24        The other issue is the production of the

25   *Jencks* material from the Lemorin immigration hearing,

1    specifically as it relates to Agent Velazquez.

2            And, lastly, I have a --

3            THE COURT:  What's the status of that tape --

4    portion of the tape?  Ms. Arango?

5            MS. ARANGO:  I'm sorry?

6            THE COURT:  The portion of the tape of the

7    testimony of Agent Velazquez at the Lemorin removal

8    hearing?

9            MS. ARANGO:  We have the tapes now, Judge, and

10   they are in cassette form.  They're, like, in

11   cassettes.

12           I think what I'd like to do at this point is

13   take them and have them copied on to discs.  I think

14   that might be the easiest thing.

15           MS. JHONES:  I don't mind having them in

16   cassettes.  I'd rather have them sooner rather than

17   later.

18           MS. ARANGO:  Well, we have them, Judge.  So

19   what I would --

20           THE COURT:  You're providing the testimony of

21   Agent Velazquez?

22           MS. ARANGO:  Actually, we did Agent Velazquez

23   and, also, Agent Timothy Scott, because he's going to

24   be testifying here and he also testified.

25           THE COURT:  Okay.

```
 1            MS. ARANGO:  They testified back to back in
 2   immigration court.  So we got them both.
 3            I haven't had a chance to review them to make
 4   sure the cassettes are okay, but do I have what
 5   purports to be the testimony.
 6            I would like some time to, you know, make a
 7   copy of them or make a couple copies.  And I will turn
 8   them over to defense.
 9            I'll do that tomorrow, Judge --
10            THE COURT:  Okay.
11            MS. ARANGO:  -- if that's okay.
12            Also, I don't know if you all were talking
13   about the other issue regarding the review of
14   Mr. Assaad's immigration file?
15            THE COURT:  Yes.
16            Mr. Gregorie indicated that you went through
17   and you have the notation.
18            MS. ARANGO:  I just want to state it on the
19   record because this is -- I'm providing this and I want
20   the record to be clear.
21            What I provided -- what I've copied out of
22   that file is a -- it appears to be a sort of memo to
23   the file with the notation that I referred to earlier
24   at the bottom in handwriting.
25            In addition to that, there was a significant
```

1    benefit, parol, for Mr. Assaad to enter into the United

2    States for this trial that was not there before when

3    your Honor reviewed.

4              THE COURT:  For this trial?

5              MS. ARANGO:  For this trial.

6              So I made a copy of that as well.  Those are

7    the two items we are turning over.

8              THE COURT:  Was that it?

9              MS. ARANGO:  The final things that I'll be

10   providing as well with respect to *Jencks* is

11   Mr. Assaad's declaration in the immigration proceeding.

12             Both Mr. Assaad and Mr. al-Saidi signed

13   declarations that were admitted into the immigration

14   proceedings.

15             We turned over to the defense --

16             THE COURT:  In the removal proceedings?

17             MS. ARANGO:  Yes.  Yes.

18             I have Mr. Assaad's -- he signed a declaration

19   as well, which will be turned over to the defense, as

20   well as *Jencks*.

21             THE COURT:  Okay.  Is that it?

22             MS. JHONES:  Your Honor, there's one motion

23   pending.  I don't necessarily need to argue it today.

24   I would like to get that motion disposed of, perhaps --

25             THE COURT:  What motion?

```
1              MS. JHONES:  The motion is a supplemental

2    Brady motion that I filed pertaining to two things:

3    The request for the 302s of certain witnesses and,

4    also, pertaining to the request for production and an

5    evidentiary hearing as to the warehouse audios

6    predating the court order allowing for interception,

7    which was on March 30th of 2006.

8              And I'll give the Court in a second the docket

9    entry as to that meeting.  It has been fully briefed.

10   There was a motion filed, a response by the Government

11   and a reply by --

12             THE COURT:  Isn't this the information that I

13   had Joan Silverstein --

14             MS. JHONES:  Yes.

15             THE COURT:  -- review and report to the Court

16   separate and apart for the last trial?

17             MS. JHONES:  No, your Honor.

18             MS. ARANGO:  Yes, Judge.

19             MS. JHONES:  No.  It's not.

20             The Government conveniently wants to say that

21   it is, but it is not.  It is not.

22             If I could just have a moment to get to the

23   pleading, if the Court would like me to argue it now,

24   I'm happy to do that.

25             THE COURT:  Okay.
```

```
 1              MS. JHONES:  Judge, the motion is Docket
 2     Entry 1188, the initial motion.
 3              Your Honor, I actually need a moment to find
 4     my reply.  The Government's response was at 1193.  I
 5     thought I had my binder in this binder and I don't.  If
 6     I could just have a moment to retrieve it.
 7              MR. GREGORIE:  Judge, while counsel is looking
 8     for that document, may the agents put together the
 9     evidence?
10              THE COURT:  Yes.
11              MR. GREGORIE:  Thank you, Judge.
12              MS. JHONES:  Your Honor, the reply -- oh, I
13     apologize.  I got the wrong pleading.
14              THE COURT:  Your reply was 1196.
15              MS. JHONES:  That's what I thought, your
16     Honor.
17              But that was the reply to the renewed *Brady* as
18     opposed to the supplemental *Brady*.  It's a little
19     confusing, but that's a reply to a different motion.
20              Docket Entry 1208 is the reply, your Honor.
21              THE COURT:  And what was the Government's
22     response?
23              MS. ARANGO:  Judge, I filed a response.  I
24     don't have a copy of it.  I neglected --
25              MS. JHONES:  I may have an extra copy,
```

1    Ms. Arango.

2              MS. ARANGO:  Okay.  Thank you.

3              MS. JHONES:  It's 1193.

4              If I could just have a moment, your Honor, I

5    may have an extra one.

6              THE COURT:  1193?

7              MS. JHONES:  1193 is the Government's

8    response.  Yes.  I believe it was filed 3-2-09.

9              Ms. Arango, I'm afraid I can't find my

10   additional copy.

11             THE COURT:  Go ahead.

12             MS. JHONES:  First of all, your Honor, I think

13   the simpler issue relates to the *Brady* request for 302s

14   regarding witnesses which we believe the Government has

15   interviewed and, as a result of those interviews, 302s

16   exist in the possession of the FBI pursuant to their

17   investigation in this case.

18             The 302s that I believe are in existence

19   relate to an individual by the name of Melvin

20   Septepinra.  Melvin Septepinra is referenced in, I

21   believe, every single application for interception of

22   the wiretap.

23             Allegations are made as to the Government's

24   position that Septepinra is a target or a suspect of

25   being involved in this case.

1        It's our understanding, based on our

2   investigation, that Mr. Septepinra was interviewed at

3   least once.

4        Based on our investigation, this witness

5   provided exculpatory statements relating to the

6   allegations in this indictment not only as to

7   Mr. Batiste, but as to every single Defendant seated

8   here today.

9        And based on that, I would request that

10  production be made of the 302s as to Melvin Septepinra.

11       It's my understanding in the Government's

12  reply that the Government does not object to an

13  in-camera review by this Court for *Brady* as it relates

14  to that and, indeed, as it relates to the request made

15  as to the other witnesses, which are Siltwan Batiste --

16  Siltwan -- Siltwan and Francis Batiste are siblings of

17  Mr. Batiste.

18       Siltwan Batiste, my investigation has

19  revealed, has been interviewed by the FBI at least on

20  two occasions.

21       They were interviewed -- based on the

22  interviews in my investigation of this case,

23  Mr. Batiste provided exculpatory information pertaining

24  to the issue of land in Louisiana, the issue of prior

25  representations made by the Government as it relates to

1    the involvement in this case as well as the

2    Government's allegations that have come out with

3    respect to Mr. Batiste's prior membership in the Moors

4    and what have you.

5            So based on my investigation, there is

6    exculpatory information contained in the 302s.  And,

7    again, I believe there are two 302s in existence.

8            Mr. Batiste -- Siltwan Batiste was interviewed

9    by the FBI.  The first occasion, he was interviewed by

10   not these agents, but agents in Chicago from the FBI

11   pertaining to this case.

12           And then, on a second time, my understanding

13   is he was interviewed by some of the agents in this

14   case and, indeed, maybe by one of the prosecutors in

15   this case, if not two prosecutors.

16           With respect to Francis Batiste, this is

17   Mr. Batiste's sister.  My understanding -- and our

18   investigation has revealed -- that she, too, has been

19   interviewed by the FBI, that there would be exculpatory

20   information as it relates to Mr. Batiste in that 302.

21   I believe she was only interviewed once.

22           And based on these representations,

23   respectfully, I would ask for the Government to produce

24   the 302s as to those three individuals.

25           MS. ARANGO:  Judge, may I respond to that?

1          THE COURT:  Yes.

2          MS. ARANGO:  These witnesses are not

3   informants.  They're not -- they're witnesses that,

4   obviously, they have access to.

5          They could talk to these witnesses.  If

6   there's anything that they -- that they feel is

7   exculpatory, they could present these witnesses and put

8   them up in the witness stand, if they want.

9          So this is -- these are not people that are

10  within our control.  These are witnesses that they're

11  close to, that they know.

12         We did interview those witnesses.  I don't

13  believe anything that they have said contains any kind

14  of exculpatory information.

15         I said that I'm happy to provide your Honor

16  with the reports to review.  But this is not even a

17  close call as to anything that would be discoverable

18  under *Brady* or its progeny.

19         It's not like it's -- it's like an interview

20  of an informant or a cooperating defendant or something

21  that they may not have access to.  But they have access

22  to these witnesses.

23         MS. JHONES:  Your Honor, I believe that the

24  Government misunderstands the purpose of *Brady*.

25         I cannot cross-examine the agents -- the case

1    agents in this case who have made representations as to

2    their investigation and their corroboration.  I cannot

3    cross-examine the agents in this case with other

4    witnesses.

5         I have to cross-examine with documents as to

6    their investigation.  And I do not have access.  The

7    only access I have --

8         THE COURT:  I'm not following you.

9         MS. JHONES:  Your Honor, the agents in this

10   case have generated documents, documents that I believe

11   have exculpatory information.  I cannot get access to

12   those documents.

13        THE COURT:  You have access -- you indicated

14   that, through your investigation, you've talked to all

15   these witnesses.

16        MS. JHONES:  Yes, your Honor.

17        THE COURT:  So you have access to the -- if

18   there is any exculpatory information, you have access

19   to it.

20        MS. JHONES:  Your Honor, I have access to

21   interviewing these people.  I do not have access to the

22   reports generated by law enforcement, memorializing the

23   information in law enforcement 302s.

24        I cannot -- I cannot cross-examine law

25   enforcement in this case with other witnesses.  I need

 1   these documents in order to do that.

 2         That's what I'm talking about.

 3         MS. ARANGO:  Judge, what --

 4         THE COURT:  What cross-examination would there

 5   be of the agents in this case regarding interviews of

 6   other witnesses?

 7         MS. JHONES:  Regarding the extensive testimony

 8   provided by Agent Velazquez, as an example, about their

 9   corroboration of information provided by the

10   informants --

11         THE COURT:  Weren't you given the 302s of the

12   informants?

13         MS. JHONES:  Your Honor, I'm not talking about

14   the 302s of the informants.  I'm talking about the 302s

15   that have not been provided.  I'm talking about 302s of

16   other witnesses, not the 302s of the informants.

17         MS. ARANGO:  There is no reference in Agent

18   Velazquez's testimony about interviews of any of these

19   witnesses.

20         THE COURT:  As I recall, the corroboration he

21   was talking about is the corroboration that the

22   informants were giving him.  He didn't mention

23   corroboration by anybody else.

24         MS. JHONES:  Your Honor, Agent Velazquez

25   testified about the importance of corroborating what

```
 1    the informants were telling him, not -- corroboration

 2    was not limited to the informants.

 3              THE COURT:  Was -- did you cross-examine him

 4    about any interviews or even bring up anything

 5    regarding -- these witnesses did not come up in his

 6    cross.

 7              MS. JHONES:  I did not, because I do not have

 8    those reports, your Honor.  That's the purpose -- why

 9    I'm requesting them.

10              MS. ARANGO:  She spoke to those witnesses,

11    Judge.  She could have asked whatever questions she

12    wanted to on cross.

13              MS. JHONES:  If he responds inconsistent with

14    the 302, I cannot properly cross-examine, your Honor.

15    That's why the 302 --

16              THE COURT:  If who responds inconsistent?

17              MS. JHONES:  The agent, your Honor.

18              THE COURT:  I don't find that you're entitled

19    to the 302s.

20              I'm going to stand by the Government's

21    representation, first of all, that there's nothing

22    exculpatory in the 302s.

23              And there's no *Brady* violation for evidence

24    that you've already been made aware of and that is

25    available to you.
```

1          And you've stated in arguing this motion that

2     you've investigated and you've talked to all these

3     witnesses.  So if, in fact, there's exculpatory

4     information, you have it.

5          MS. JHONES:  Your Honor, the fact --

6          THE COURT:  That's my ruling, ma'am.

7          MS. JHONES:  Okay.

8          The second request has to do with -- the

9     second request has to do with the audios from -- the

10    audios that are in existence from warehouse

11    microphones, unrelated to body wires, that were --

12    audio recordings that were conducted by law enforcement

13    in this case prior to the issuance of the court order

14    on March 30th of 2006, specifically -- and the

15    motion -- both the initial motion and the reply sets

16    out the chronology.

17         Unlike what the Government has represented to

18    this Court on numerous occasions, during the course of

19    the suppression hearing before Magistrate Torres,

20    request was made as to surveillance that was conducted

21    by -- by the FBI in the warehouse.  Request, of course

22    was made with respect to surveillance conducted prior

23    to the issuance of a court order.

24         Specifically directing the Court's attention

25    to Page 3 of this motion, the Court, meaning the

1  Magistrate at that time, specifically asked the

2  Government:  "Let me ask the Government a question.

3  Were monitoring devices, either video or audio,

4  continuously on during that time period?"

5       The Government responds:  "Judge, after

6  March 16th, a video device was on, and the way it

7  worked was" -- and the Government goes on to explain

8  the way the video worked.

9       The Government omitted, omitted, the

10 information that we found out later, number one, that

11 there were warehouse mics, not body wires, in addition

12 to body wires worn by the Informant Assaad.

13      The Government misled the Magistrate into

14 believing that only videos were there.

15      Additionally -- and, again, the Magistrate

16 issued its opinion relying on the representations made

17 by the Government that there was only video and, more

18 importantly, that when audio recording took place in

19 this warehouse prior to the issuance of a court order,

20 that the audio that was being recorded was only the

21 audio coming from the informant.

22      It was based on that representation to

23 Magistrate White -- and, indeed, to this Court,

24 subsequently -- that Magistrate White -- I'm sorry --

25 Magistrate Torres denied the motion to suppress on that

1     occasion.

2          I am not seeking a renewal of that motion to

3     suppress.  What I am seeking is production of what I

4     believe to be *Brady* material content in audio

5     recordings that we believe are in existence from the

6     period of March 16th of 2006 continuing on through

7     March -- up to and including March 29th of 2006.

8          And let me tell the Court why.  I'm not going

9     to go into the numerous instances where the Government

10    misled the Magistrate and, indeed, misled this Court as

11    to the existence of audio independently of body wires

12    worn by Informant No. 2.  That's the first thing.

13         We do know, your Honor, that during the time

14    period that CW 2 was in the warehouse, for instance, on

15    March 16th, the Government was simultaneously

16    audio-recording -- or monitoring, I should say, what

17    was going on inside the front office.

18         They were doing it not through the body wire

19    that was worn by the informant.  We later learned that

20    it was being done by the warehouse mics that were

21    previously installed.

22         We later learned that the warehouse mics were

23    installed way in advance of this warehouse being turned

24    over to Mr. Batiste on March 16th of 2006.

25         We learned that the audio feed was a different

1    feed from the video feed, something that was not told

2    to the Magistrate during the July 16th, 17th and 18th

3    suppression hearings.  Again, they misled the

4    Magistrate.  They had two different feeds, audio and

5    video.

6           Now, we do know, also, that audio surveillance

7    was conducted by the FBI independent of the body

8    recording worn by the informant.  And we know that

9    because Agent Velazquez testified to that effect.

10          We also know --

11          THE COURT:  What was that testimony?

12          MS. JHONES:  As it relates to this trial, the

13   testimony was that, on March 27th of -- again,

14   predating the March 30th order authorizing the

15   interception.

16          We know that, on March 27th, Special Agent

17   Velazquez testified that he was monitoring

18   simultaneously, i.e., realtime, what was being -- what

19   was being heard -- what was being said in that front

20   office between Mr. Batiste and CW 2 not through the

21   body wire, but through the audio feed.

22          Indeed, your Honor, there are -- and,

23   additionally, that occurred on March 16th of 2006.

24          The other reason why those warehouse mics have

25   to be turned over so that we could independently

```
 1   analyze those mics -- and the reason why an evidentiary

 2   hearing is necessary in order to get, once and for all,

 3   to the bottom of this issue is because we do know that

 4   the Government, proceeding under the assumption that

 5   they had the authority to monitor, proceeding under the

 6   assumption that they had the authority to monitor,

 7   improperly monitored on March 20th, March 22nd and

 8   March 23rd.

 9            I believe those are the dates.  We have three

10   dates.  I may be mistaken on the particular dates.

11            We know that those dates predated the

12   authorization.

13            Now, it absolutely makes no sense that the

14   FBI --

15            THE COURT:  What is the evidence that you have

16   or testimony that they were monitoring on March 20th,

17   March 22nd and March 23rd?

18            MS. JHONES:  That was the basis, your Honor,

19   for the hearing that took place in September of -- I'm

20   sorry -- October, I believe, of 2007, when there was a

21   tank attorney, I believe is the term.

22            MS. ARANGO:  "Taint."

23            MS. JHONES:  The videotapes --

24            THE COURT REPORTER:  I'm sorry?

25            MS. ARANGO:  Taint.  Joan Silverstein.
```

```
 1              THE COURT:  Right.

 2              MS. ARANGO:  She was the taint attorney.

 3              MS. JHONES:  Taint.  There we go.  Taint.

 4              THE COURT:  Taint, t-a-i-n-t.

 5              MS. JHONES:  Yes.

 6              When Ms. Silverstein was provided the video of

 7    the monitoring that went on in the warehouse predating

 8    the authorization period, the authorization period

 9    being March 30th, the Government indicated that they

10    were under the impression -- and, again, directing the

11    Court to Page 6 of my motion -- the Government

12    indicated that the video recording was turned off after

13    March 16th and it was turned on -- it was turned back

14    on on March 20th and then it was turned off on March

15    23rd.

16              Therefore, there were three days of unlawful

17    monitoring.

18              During this time period, during this time

19    period, the Government represents --

20              THE COURT:  Where does that come from?

21              MS. JHONES:  I'm sorry?

22              THE COURT:  Where on Page 6 does that -- where

23    does that come from?

24              MS. JHONES:  The date that I just provided?

25              THE COURT:  Yes.
```

1           Where does that information come from?

2           MS. JHONES:  That there was illegal

3     monitoring?

4           THE COURT:  That the video recorder was turned

5     back on March 20th and turned back off -- that says

6     "video."  It doesn't say "audio."

7           MS. JHONES:  Yes, your Honor.  It says

8     "video."  It says "video."

9           THE COURT:  Okay.  So what's the evidence that

10    there was audio?

11          MS. JHONES:  Here's -- your Honor, that is the

12    issue.

13          The Government says there was

14    audio-recording -- only a body recording as the

15    videocamera does not pick up the audio.  That is the

16    misrepresentation.

17          That right there is the key to the

18    misrepresentation by the Government, because we know --

19    we know, that there were two separate feeds.

20          We know that the two -- that the audio feed

21    was activated -- at least we know that it was activated

22    on March 16th because Special Agent Velazquez indicated

23    that.

24          We know that it was activated on March 27th

25    because Agent Velazquez indicated that --

```
 1              THE COURT:  Where is that?

 2              MS. JHONES:  March 27th, Agent Velazquez

 3   testified on direct in this trial that he was

 4   simultaneously monitoring -- simultaneously monitoring

 5   what was going on in the warehouse, the front office,

 6   on March 27th, not through the body recorder, but

 7   through the audio feed.

 8              And what I am telling the Court is --

 9              THE COURT:  Give me a cite.

10              MS. JHONES:  To the date when he said that?

11              THE COURT:  Yes.

12              MS. JHONES:  I need a minute to get the

13   transcript.

14              THE COURT:  I want to see it in the

15   transcript.

16              MS. JHONES:  Okay.  One second, your Honor.

17              Your Honor, the cite is -- I believe I

18   referenced it on Page 11 of my motion.  It was the

19   trial transcript dated February 24th, 2009, at Pages 66

20   and 67.

21              THE COURT:  What's the Government's response

22   in regard to March 27th?

23              MS. ARANGO:  Judge, we have never represented

24   that there were -- that there was no capability of

25   having an audio recording in the warehouse.
```

1        We have represented from the beginning that

2   there were two stationary recording devices in the

3   warehouse, a video feed and an audio feed.

4        We disclosed in the wiretap affidavits that,

5   from March 20th to March 23rd, before the wiretaps

6   were authorized, that there was unauthorized video

7   recording -- not audio -- video recording in the

8   warehouse for those three days.

9        That was disclosed in the wiretap affidavits.

10       THE COURT:  What about March 27th?

11       MS. ARANGO:  March 27th was what Agent

12   Velazquez testified to occurred when the informant was

13   in the warehouse.

14       When the informant was in the warehouse, prior

15   to the issuance of the wiretap order, the agents

16   listened to the audio in addition to the video because

17   the informant was present.  They had consent.

18       They did so pursuant to the consenting party,

19   which is the informant.

20       THE COURT:  Was there a recording made of the

21   audio?

22       MS. ARANGO:  Of March 27th -- anytime the

23   informant was present, there was a video recording and

24   an audio recording before --

25       THE COURT:  And there was a body wire

```
 1   recording?
 2            MS. ARANGO:  And there was a body wire as
 3   well.  But there was a video and an audio.
 4            And, Judge, in the early parts of this case --
 5   I'm sure Ms. Jhones recalls -- we had to -- for
 6   instance, March 16th, we had to marry the audio with
 7   the video because they were on two different devices.
 8   We had to kind of merge them together and make them
 9   fit.
10            Even if you watch them now, you can see that
11   they're a little bit off because we had to put them
12   together afterwards.  Separate video and audio.  Two
13   feeds.  Always been disclosed that.
14            The only --
15            THE COURT:  So was the defense given the audio
16   feed?
17            MS. ARANGO:  Yeah.  They were given both.
18            THE COURT:  They have the audio feed?
19            MS. ARANGO:  Yes.
20            THE COURT:  They have the audio feed and they
21   have the body wire feed?
22            MS. ARANGO:  No.  They have the audio feed
23   from the warehouse.
24            THE COURT:  Okay.
25            MS. ARANGO:  I'm sorry.  I take that back.
```

1             There was two ways of audio recording, the

2     audio feed in the warehouse, the stationary device, as

3     well as the body wire that was being worn by the

4     informant.

5             What the defense has is the body wire that was

6     being -- the recording that was taken from the body

7     wire that the Defendant -- that the informant had on

8     him.

9             The audio was going at the same time in the

10    warehouse when the informant was present, but the audio

11    wasn't recording.  The audio just allowed the agents to

12    listen in --

13            THE COURT:  So there's no recording of the

14    audio.  There was monitoring of the audio --

15            MS. ARANGO:  Exactly.

16            THE COURT:  -- which is what Velazquez

17    testified to.

18            MS. ARANGO:  Exactly.

19            THE COURT:  He was monitoring it and then he

20    compared the body wire feed to see whether it comported

21    with what he listened to?

22            MS. ARANGO:  Exactly.  Exactly.

23            So that's what was -- the body wire is what

24    was -- what was turned over and it was the audio

25    recording.  There was an audio feed separate from a

1    video feed.

2            There's never been any misrepresentation at

3    all about that.  That has always been out there, Judge.

4            THE COURT:  So are there any separate audio

5    recordings --

6            MS. ARANGO:  No.

7            THE COURT:  -- that were monitored by

8    Velazquez or anyone else from the FBI?

9            MS. ARANGO:  Not when the informant wasn't

10   present.  There were no audio recordings made in the

11   warehouse prior to the issuance of the wiretap orders

12   when the informant was not in the warehouse.

13           THE COURT:  And when the informant was in the

14   warehouse --

15           MS. ARANGO:  When the informant --

16           THE COURT:  -- and Velazquez or anyone else

17   was monitoring --

18           MS. ARANGO:  Correct.

19           THE COURT:  -- was there any recording of the

20   stationary audio microphone?

21           MS. ARANGO:  No.  The only recording was made

22   of the body wire.

23           THE COURT:  So the body wire was a recording?

24           MS. ARANGO:  What?

25           THE COURT:  The body wire was a recording --

1              MS. ARANGO:  The --

2              THE COURT:  -- and the video was a recording?

3              MS. ARANGO:  Correct.

4              THE COURT:  The audio was monitoring only?

5              MS. ARANGO:  Correct.

6              THE COURT:  Okay.

7              MS. JHONES:  May I respond, your Honor?

8              THE COURT:  Yes.

9              MS. ARANGO:  And I just want to say, Judge,

10  that from the beginning, the Government disclosed the

11  fact that video was turned on on these dates

12  improperly.  That was disclosed in the wiretap

13  affidavits.  That's how the Defendants knew about this.

14  We disclosed it.

15        Those unauthorized video recordings were put

16  aside.  It was -- we did not rely on them in the

17  wiretap affidavits.  We put the fact that we didn't

18  rely on them.  We didn't look at them.  We didn't

19  review them.  We put them aside.

20              THE COURT:  Those are the videos?

21              MS. ARANGO:  Those are the videos.

22              THE COURT:  And that's what I had Joan

23  Silverstein review?

24              MS. ARANGO:  Exactly.

25        There was no audio recordings.  We never said

1    there was no audio recording.  We never said there was

2    no capability of making an audio recording.  We just

3    said there was only video recording.

4            When Judge Torres asked me was there audio or

5    video, I told him that we had made video recordings,

6    not audio recordings.

7            I didn't say, "Judge, we didn't have the

8    capability of making an audio recording in the

9    warehouse."  I didn't say that to the Judge.

10            There's never been any type of statement made

11    that we were unable to make a video recording or have

12    any kind of video -- excuse me -- audio recording or

13    have any kind of audio monitoring of that warehouse.

14            What Ms. Jhones is saying is she's saying,

15    because we had the capability of doing it, we did it

16    unauthorized.  We must have done it when we weren't

17    allowed to do it and that was -- you know, it was

18    unauthorized.

19            That's ridiculous.  I mean, that is the most

20    reckless leap in logic imaginable.  We were very

21    up-front from the beginning.  Joan Silverstein came in

22    and I have, you know, her testimony.

23            THE COURT:  I saw it.  I remember.

24            MS. JHONES:  Your Honor, just to give the

25    Court -- I need to respond, if I may, with the Court's

1    indulgence.

2          THE COURT:  Sure.

3          MS. JHONES:  Just so the Court could

4    appreciate the level, the level, of omission during the

5    suppression hearing, on Page 6 -- I'm sorry -- on

6    Page 3 of my motion, I outline the question that was

7    posed by Magistrate Torres to the Government.

8          Clearly, in that question, the Magistrate is

9    asking for a response as it relates to either video or

10   audio.

11         This --

12         MS. ARANGO:  Continuously.  Continuously,

13   Judge.  That's what he was talking about.

14   Continuously.

15         MS. JHONES:  Okay.

16         MS. ARANGO:  When the informant wasn't

17   present.

18         MS. JHONES:  Your Honor, as I was saying, the

19   Court's question is, "Were monitoring devices, either

20   video or audio, continuously on during that period?"

21         The Government responds that only -- that -- a

22   video device.

23         Now, you turn to Page 6 of my motion, where

24   the Magistrate makes its findings.  On Page 6 of the

25   order, which I do not have handy, but I quoted from

```
 1    that order, the Magistrate makes the following
 2    findings.
 3              The Magistrate says that the video was turned
 4    off after March 16th.  The Magistrate makes the finding
 5    that the video recorder was turned back on on
 6    March 20th and then turned off on March 23rd and that
 7    the tapes, meaning the videotapes in possession of the
 8    Government, consist of three days of unlawful video
 9    taken during the period.
10              There is no audio of this period of unlawful
11    recording, the Magistrate finds at Page 6 of his order.
12              The Magistrate further finds that the audio
13    recording was only a body recording, as the videocamera
14    does not pick up the audio.
15              Clearly --
16              THE COURT:  Well, that's consistent with what
17    Ms. Arango just said.
18              MS. JHONES:  It is not, your Honor.
19              THE COURT:  Audio recording.
20              MS. JHONES:  Your Honor, the video -- the
21    audio recording came only from the body recording, the
22    body recording, as the videocamera does not pick up the
23    audio.
24              What is abundantly missing, what is abundantly
25    missing, from the Magistrate's findings -- because the
```

```
 1   Magistrate was not told and we certainly did not

 2   know -- was that there was a separate feed -- a

 3   separate audio feed that was operable during at least

 4   the March 16th and March 27 dates.  It was operable and

 5   it was being utilized.

 6          It matters not, your Honor, for purposes of

 7   this, as to whether or not the illegal audio -- any

 8   illegal audio that may have occurred was memorialized

 9   in a recording.

10          I submit that it was.  However, it matters

11   not.

12          What matters is --

13          THE COURT:  And what evidence do you have that

14   there was?

15          MS. JHONES:  Because, your Honor, during -- we

16   know that, on March 16th -- we know that the Government

17   has said that they were under the mistaken impression,

18   they were under the mistaken impression, that they

19   could record from March 20th to March 23rd.  We know

20   that.

21          MS. ARANGO:  That was video only, Judge.  We

22   were under the mistaken impression that we could record

23   video only.  That was clear.  Video only.  We were

24   never under the mistaken impression that we could

25   record audio.  Only video.
```

1          MS. JHONES:  May I continue, your Honor?

2          We know that the Government went into that

3     warehouse prior to the keys being turned over to

4     Mr. Batiste on March 16th.

5          We know that there was -- there were two

6     separate feeds.  We know that those two separate feeds

7     were activated on March 16th.  They were activated on

8     March 27th.

9          It makes absolutely no sense that, under the

10    impression that they were authorized to monitor, that

11    they would choose to activate only the video and not

12    the audio.

13         Also, your Honor --

14         MS. ARANGO:  Judge, I want to interrupt there.

15         It makes perfect sense.  There is law that

16    discusses video as opposed to audio.  If Ms. Jhones did

17    any research, she would see that the law is much more

18    liberal on video than it is with audio.

19         So she's making that leap in logic and she's

20    saying, just because we thought we had the

21    authorization for the video -- we mistakenly thought

22    we did, we should have mistakenly thought we had the

23    authorization for the audio as well.

24         Where -- what's the basis for that, Judge?

25         THE COURT:  I don't see anything -- I've

1    reviewed now Velazquez's testimony.  I don't see

2    anything that supports in his testimony that there was

3    anything other than monitoring going on and that

4    there -- the audio feed that he was listening to was

5    monitoring only remotely in the FBI office and the

6    audio feed that was recorded -- the only audio feed

7    that was recorded is the body wire.

8              MS. JHONES:  Your Honor --

9              THE COURT:  So there's nothing -- if there's

10   no audio recording -- I would agree with you, if there

11   was an audio recording made at that time, that you

12   should be given that audio recording.

13             But there was no audio recording made during

14   that time period.

15             MS. JHONES:  Your Honor, my request is -- I

16   believe that there is audio recording.  The reason why

17   I believe that is, in the --

18             THE COURT:  Well, Ms. Jhones, I think what

19   you're going to have to do, if there are convictions in

20   this case, you can certainly appeal me on that issue.

21             But based -- I asked you what evidence you

22   had.  You pointed me to the testimony of Agent

23   Velazquez on February 24th.

24             I have now reviewed that testimony.  The

25   testimony only refers to monitoring.  It does not refer

1    to recording that was done by him or done by the FBI

2    remotely in the FBI office.

3           And so there's no -- nothing further for the

4    Government to give to you.

5           I'm going to deny your supplemental motion for

6    disclosure as to the 302 reports on the basis that this

7    is information that you have readily available to you

8    and as to the recorded audio surveillance because

9    whatever audio recording there was, which was through

10   the body wire that was being worn by Elie Assaad or the

11   other informant -- I think it was only Elie Assaad at

12   this juncture at the warehouse -- has already been

13   provided and the testimony that you cite in support of

14   your proposition that there was an additional audio

15   recording that was not only being monitored by

16   Velazquez, but was being recorded by the FBI, is not

17   substantiated in the testimony of February 24th.

18          So the motion -- the supplemental motion for

19   disclosure of *Brady* material is denied.

20          And in regard to the *ex parte* issue that you

21   presented to me, you're going to have to get with

22   Patricia, because I do not believe that your motion was

23   filed.

24          You delivered it to Patricia.  It's not filed

25   on the docket.  You sent it as an accompaniment to a

```
1    letter request with vouchers.  It has not been filed.
2    I think we have the original.
3              MS. JHONES:  I did.
4              Would the Court like me to file that on the
5    record?
6              THE COURT:  Yes.  It needs to be filed.
7              MS. JHONES:  So I just --
8              THE COURT:  I should be receiving a copy for
9    Judge, not the original.
10             So you need to get with Patricia.  I don't
11   know if she's still here.  But you need to get with her
12   tomorrow and straighten that out.
13             We're in recess until Friday morning.  Thank
14   you.
15             (End of proceedings.)
16                  C E R T I F I C A T E
17
18             I hereby certify that the foregoing is an
19   accurate transcription of the proceedings in the
20   above-entitled matter.
21
22
23   _____     /s/Lisa Edwards
         DATE         LISA EDWARDS, CRR, RMR
24                    Official United States Court Reporter
                      400 North Miami Avenue, Twelfth Floor
25                    Miami, Florida 33128
                      (305) 523-5499
```