```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                   CASE NO. 06-20373-CRIMINAL-LENARD
 3

 4   UNITED STATES OF AMERICA,        Miami, Florida

 5                 Plaintiff,         March 13, 2009

 6         vs.                        9:23 a.m. to 5:04 p.m.

 7   NARSEAL BATISTE, et al.,         Volume XXIII

 8              Defendants.           Pages 1 to 184
     ------------------------------------------------------

 9

10                          JURY TRIAL
11          BEFORE THE HONORABLE JOAN A. LENARD,
                  UNITED STATES DISTRICT JUDGE

12

13

14   APPEARANCES:

15

16   FOR THE GOVERNMENT:     RICHARD D. GREGORIE, ESQ., and
                             JACQUELINE M. ARANGO, ESQ.
17                           ASSISTANT UNITED STATES ATTORNEYS
                             99 Northeast Fourth Street
18                           Miami, Florida 33132

19

20   FOR THE DEFENDANT       ANA MARIA JHONES, ESQ.
       NARSEAL BATISTE:      300 Seville Avenue, Suite 210
                             Coral Gables, Florida 33134
21

22   FOR THE DEFENDANT       ALBERT Z. LEVIN, ESQ.
       PATRICK ABRAHAM:      261 Northeast First Street
23                           Sixth Floor
                             Miami, Florida 33132
24

25
```

```
 1   FOR THE DEFENDANT       RODERICK D. VEREEN, ESQ.
       STANLEY PHANOR:       BRINKLEY, HENRYS & LEWIS
 2                           4770 Biscayne Boulevard
                             Suite 1200
 3                           Miami, Florida 33131

 4
     FOR THE DEFENDANT       RICHARD K. HOULIHAN, ESQ.
 5     NAUDIMAR HERRERA:     300 Aragon Avenue
                             Coral Gables, Florida 33134
 6

 7   FOR THE DEFENDANT       LOUIS CASUSO, ESQ.
       BURSON AUGUSTIN:      111 Northeast First Street
 8                           Suite 603
                             Miami, Florida 33132
 9

10   FOR THE DEFENDANT       NATHAN CLARK, ESQ.
      ROTSCHILD AUGUSTINE:   17639 South Dixie Highway
11                           Miami, Florida 33157

12
     REPORTED BY:            LISA EDWARDS, CRR, RMR
13                           Official Court Reporter
                             400 North Miami Avenue
14                           Twelfth Floor
                             Miami, Florida 33128
15                           (305) 523-5499

16

17

18

19

20

21

22

23

24

25
```

1                          I  N  D  E  X

2

3                                      Direct    Cross    Red.

4

WITNESSES FOR THE GOVERNMENT:

5

6   Elie Assaad                            6       122

7

8

EXHIBITS RECEIVED IN EVIDENCE:              PAGE

9

Government's Exhibit Nos. 48 & 48-A            9
10  Government's Exhibit Nos. 55 & 55-A           22
Government's Exhibit Nos. 61 & 61-A           69
11  Government's Exhibit Nos. 71 & 71-A           84
Government's Exhibit Nos. 72 & 72-A           86
12  Government's Exhibit Nos. 80, 80-A,
       80-B & 80-C                              101

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            THE COURT:  Good morning.

 2            United States of America versus Narseal

 3    Batiste, et al., Case No. 06-20373.

 4            Counsel, state your appearances, please, for

 5    the record.

 6            MR. GREGORIE:  Good morning, your Honor.

 7            Richard Gregorie and Jacqueline Arango on

 8    behalf of the United States.

 9            MS. JHONES:  Ana Jhones on behalf of Narseal

10    Batiste, who is present.

11            MR. LEVIN:  Albert Levin on behalf of Patrick

12    Abraham, who's present.

13            MR. CASUSO:  Good morning, your Honor.

14            Louie Casuso on behalf of Burson Augustin,

15    who's present.

16            MR. CLARK:  Good morning, your Honor.

17            Nathan Clark for Rotschild Augustine.

18            MR. HOULIHAN:  Richard Houlihan with Naudimar

19    Herrera.

20            MR. VEREEN:  Good morning, your Honor.

21            Roderick Vereen on behalf of Stanley Phanor,

22    who's present.

23            THE COURT:  All the jurors are now here.

24            MS. ARANGO:  Judge, could I put something on

25    the record?
```

1          I haven't filed anything yet, but I did

2    provide Ms. Jones this morning with 11 cassettes.

3    They're numbered 4 through 14.  They consist of Anthony

4    Velazquez's and Timothy Scott's testimony in the

5    immigration hearing relating to Lyglenson Lemorin.

6          THE COURT:  Let's bring in the jurors.

7          MS. ARANGO:  Judge, there's also one other

8    thing we'd like to just --

9          THE COURT:  One moment, please.

10          Go ahead.

11          MS. ARANGO:  There was -- we believe that this

12    is in violation of the gag order.

13          There was a *New Times* article yesterday.  I

14    don't know if you saw it.  It was regarding Rory

15    McMahon.  We would like to hand it to your Honor.

16          It has to do with not -- him not being paid

17    for his services, and there's many comments about the

18    case and -- you know, the proceedings in this case.

19          This came up before with the *New Times*

20    article.  It was our position then and it is our

21    position now that the gag order applies to him as well

22    and that he is clearly in violation of this order.

23          May I hand it to your Honor?

24          THE COURT:  Yes.  I did see it.

25          One of the things that I found particularly

 1   disappointing in the article is that it quotes from an

 2   *ex parte* sealed budget order.

 3            Let's bring in the jury.

 4            (Whereupon, the jury entered the courtroom at

 5   9:25 a.m. and the following proceedings were had:)

 6            THE COURT:  You may be seated.

 7            Good morning, ladies and gentlemen.  Welcome

 8   back.

 9            THE JURY:  Good morning.

10            THE COURT:  You are still under oath, sir.

11            You may proceed, Ms. Arango.

12            MS. ARANGO:  Thank you, Judge.

13                 CONTINUED DIRECT EXAMINATION

14   BY MS. ARANGO:

15   Q.    Good morning, Mr. Assaad.

16   A.    Good morning.

17            MS. ARANGO:  Good morning, ladies and

18   gentlemen.

19            THE JURY:  Good morning.

20   BY MS. ARANGO:

21   Q.    Mr. Assaad, we left off, I believe, a couple days

22   ago with the ending of the meeting that you had with

23   Narseal Batiste on December 22nd, 2005.

24   A.    Yes, ma'am.

25   Q.    And how many meetings -- up to that point in

Assaad - DIRECT - By Ms. Arango                    7

```
 1    time, how many meetings did you have with Mr. Batiste?
 2    A.    It was the second meeting with Brother Naz.
 3    Q.    Now -- and then, after the December 22nd meeting,
 4    did you have any phone contact with Mr. Batiste?
 5    A.    Yes, ma'am.  On December 28th.
 6    Q.    And was that recorded?
 7    A.    Yes, ma'am.
 8    Q.    Let me show you what's been marked as
 9    Government's Exhibit 48-A, and ask you if you recognize
10    it.  It's actually Government's Exhibit 48 and 48-A.
11          MS. ARANGO:  Judge, may I have a moment to
12    check something?
13          THE COURT:  Sure.
14          (Discussion had off the record amongst
15    counsel.)
16    BY MS. ARANGO:
17    Q.    Mr. Assaad, I'm showing you what's been marked as
18    Government's Exhibit No. 48, and ask you if you
19    recognize it.
20    A.    Yes, ma'am.
21    Q.    Now, does that -- what is Government's
22    Exhibit 48?
23    A.    It's a CD.
24    Q.    And does it have several telephone calls on it?
25    A.    Yes, ma'am.
```

1    Q.    Are those telephone calls that you recorded with

2    the Defendant Narseal Batiste?

3    A.    Yes, ma'am.

4    Q.    Have you listened to those -- the telephone calls

5    on that CD?

6    A.    Yes, ma'am.

7    Q.    Are they true and accurate recordings of the

8    phone calls that you have on the dates listed there

9    with Narseal Batiste?

10   A.    Yes, ma'am.

11   Q.    And is one of the telephone calls a telephone

12   call on December 28th of 2005?

13   A.    Yes, ma'am.

14   Q.    And let me show you what's been marked as

15   Government's Exhibit No. 48-A, and ask you if you

16   recognize it.

17   A.    Yes, ma'am.

18   Q.    What is Government's Exhibit 48-A?

19   A.    It's the transcript of the phone call to the 28.

20   Q.    On December 28th?

21   A.    On December 28th.

22   Q.    Have you reviewed that transcript in conjunction

23   with reviewing -- listening to the telephone call on

24   December 28th?

25   A.    Yes, ma'am.

Assaad - DIRECT - By Ms. Arango                    9

1   Q.    Is this a true and accurate transcript --

2   A.    Yes, ma'am.

3   Q.    -- to the best of you abilities?

4   A.    Yes, ma'am.

5   Q.    Are the speakers properly identified?

6   A.    Yes, ma'am.

7         MS. ARANGO:  Government offers 48 and 48-A

8   into evidence.

9         MS. JHONES:  No objection, your Honor.

10        THE COURT:  They will be admitted as

11  Government's Exhibit 48 and 48-A.

12        (Whereupon, Government's Exhibit No. 48 and

13  48-A were entered into evidence.)

14        THE COURT:  You may publish.

15        MS. ARANGO:  Judge, I would ask the jury to

16  pick up their binders and turn to the tab marked 48-A

17  and turn to Page 2 of that transcript.

18        (Whereupon, segments of Government's Exhibit

19  No. 48 were published in open court.)

20  BY MS. ARANGO:

21  Q.    Mr. Assaad, in this conversation, you refer a

22  couple of times on Page 2 and then again on Page 3 to

23  items that you have for him from the list.

24  A.    Yes, ma'am.

25  Q.    Do you see that?

1    A.      Yes, ma'am.

2    Q.      What are you referring to?

3    A.      I was referring to the list gave to me on

4    December 16 and on 22nd, and I was referring to the

5    boots.

6    Q.      You were talking about the boots?

7    A.      Yes, ma'am.

8    Q.      Did you provide the boots to Brother Naz?

9    A.      On December 29th, I gave it to him.

10   Q.      Where did you meet him?

11   A.      On December 29th?

12   Q.      Yes.

13   A.      I met him at Bayside.

14   Q.      Now, did you wear a recording device that day?

15   A.      Yes, ma'am.

16   Q.      When you said you met with him at Bayside,

17   specifically where in Bayside?

18   A.      He pick me up from the front, and we park in the

19   garage.

20   Q.      Did the entire meeting occur in his van?

21   A.      Yes, ma'am.

22   Q.      And do you know whether or not you were able to

23   record that meeting?

24   A.      During that meeting, I believe it was recording.

25   But after I gave the recording to the FBI, I knew later

1    on that the recording wasn't working.

2    Q.    Tell the jury, to the best of your abilities,

3    what you recall discussing with Brother Naz during that

4    meeting on December 29th at Bayside in his van.

5    A.    He pick me up at Bayside.  The FBI gave me the

6    boots to give to him.  And we were speaking.  And we

7    parked in the parking lot inside the -- Bayside.

8          And we were talking about his plan with Chicago

9    Sears Towers and what he needed to take it down,

10   because he said he's expert in building things up and

11   he knows how to take it down.  And he request dynamites

12   and explosives -- dynamites or higher power.

13         And he gave me a list, also details list, for

14   what he need, from explosives -- from guns, large -- I

15   don't remember exactly what he put, but machine guns

16   and cell phones and cars.  Even he gave me a brochure

17   about the specific cars he need, SUVs.

18         And also, we spoke -- he told me about the -- how

19   you pick things up, take it down.  He spoke -- the car.

20         I believe we spoke also about -- he told me

21   about -- I been very specific in each meeting to tell

22   Brother Naz, "I'm here just to listen and to assist.

23   So I'm here.  Just tell me what you want for me to

24   assist you, what you need, what's -- exactly what you

25   want."

```
 1            So he told me also that he has soldiers in

 2     Chicago and he want to free his brother from there,

 3     from Chicago, prison, some support.  We spoke like

 4     that.

 5            He want to create Islamic state, overthrow the

 6     Government, the devil.  I don't remember exactly

 7     details about that meeting, because was long time.  But

 8     I'm trying my best to make the recollection of what I

 9     remember.

10     Q.    Mr. Assaad, you mentioned -- and I just want to

11     clear up -- you mentioned dynamite or more power.

12     A.    More powerful than dynamite.

13     Q.    Just explain that again to the jury.  What do you

14     mean by that?

15     A.    Because he said he knows how -- he calls -- build

16     things, building.  He's expert in construction.  So he

17     knows how to take it down.

18            So he requested, to take it down -- the Sears

19     Tower I'm talking about -- he need dynamites or

20     something more powerful than dynamites.

21     Q.    You also mentioned that he provided you with a

22     list.

23     A.    Yes, ma'am.

24     Q.    And some other documents?

25     A.    Yes, ma'am.
```

 1   Q.    Let me show you what's already in evidence as

 2   Government's Exhibit 103.

 3              MS. ARANGO:   Judge, may I have the ELMO turned

 4   on.

 5              THE COURT:   Yes.

 6   BY MS. ARANGO:

 7   Q.    Mr. Assaad, can you see the screen?

 8   A.    Yes, ma'am.

 9   Q.    Do you see Government's Exhibit 103-A on the

10   screen?  Do you need to hold it or can you identify it

11   from the screen?

12   A.    Just to -- yes.  I can see it.

13   Q.    You can see it?

14   A.    Yes, ma'am.

15   Q.    What is it?

16   A.    It's the list gave to me on December 29th on

17   Bayside.

18   Q.    Now, did he write out this list in front of you

19   or was it already written out when you got there?

20   A.    No.  It's already written.  Already written.

21   Q.    And then just turning to Page 103-B, was that

22   something that he provided to you at Bayside in that

23   meeting?

24   A.    Yes, ma'am.

25   Q.    What's that?

 1   A.    It's a specific SUV he needed, he requested.

 2   Q.    And then, finally, 103-C:  Did he provide you

 3   with that as well?

 4   A.    Yes, ma'am.

 5   Q.    And what's that?

 6   A.    It's also -- he requested.

 7   Q.    And what did you do with these items after the

 8   meeting?

 9   A.    I gave it to the FBI.

10   Q.    After the meeting on December 29th, when did you

11   see Brother Naz again?

12   A.    Until January 28th, 2006.

13   Q.    So it was about a month later?

14   A.    More or less.  Yes, ma'am.

15   Q.    After the meeting on December 29th, did you --

16   what, if any, attempts did you make to contact Brother

17   Naz?

18   A.    I try -- the FBI told me to call him to try to

19   schedule a meeting with Brother Naz.

20   Q.    And were you able to at any time prior to

21   January 28th?

22   A.    No, ma'am.

23   Q.    And why not?

24   A.    At that time, I didn't know.  I was trying to

25   schedule a meeting with him, but I didn't succeed.

 1   Q.    And did you -- were you even able to talk to him

 2   at a point in time?

 3   A.    I don't remember exactly if we spoke or not.  But

 4   I know for sure we didn't meet until January 28th.

 5   Q.    Okay.

 6   A.    But I tried to make several phone calls.

 7   Q.    Did he return those calls?

 8   A.    I don't believe so.  No, ma'am.

 9   Q.    So, now, what happened on January 28th?  Let me

10   start here:  Did you set up the meeting on

11   January 28th?

12   A.    No, ma'am.

13   Q.    And what was your understanding about what this

14   meeting on January 28th was about?

15        MR. VEREEN:  Objection.  Calls for hearsay.

16        THE COURT:  Overruled.

17        THE WITNESS:  Can you repeat the question.

18   BY MS. ARANGO:

19   Q.    What was your understanding about the purpose of

20   the meeting on January 28th?

21   A.    To meet Brother Naz in the Embassy.

22   Q.    And do you know who set up the meeting?

23   A.    The FBI told me to go to the meeting, to the

24   warehouse, to the Embassy, to meet Brother Naz.

25   Q.    Were you to go with anyone?

1    A.    Yes.  I went with Brother Abbas.

2    Q.    Prior to January 28th, had you met Brother Abbas

3    before?

4    A.    No, ma'am.

5    Q.    So the first time you met him was just before the

6    meeting on January 28th?

7    A.    Yes, ma'am.

8    Q.    And how did you get to the Embassy?

9    A.    We took a cab.

10   Q.    What happened when you arrived at the Embassy?

11   A.    I got to -- when we arrive to the Embassy, there

12   was somebody outside the Embassy.  And I was surprised

13   the way -- when we went in, we got strip-searched and

14   they asked us to take our clothes off, to switch them

15   to different clothes.

16   Q.    Let's just take that step by step.

17         First of all, do you recall the person that was

18   outside the Embassy?

19   A.    No, ma'am.

20   Q.    When you got inside the Embassy, who, if anybody,

21   did you see?

22   A.    Brother Patrick and Brother Naudy.

23   Q.    And you said you got strip-searched.  Tell the

24   jury what occurred.

25   A.    They asked us to change our clothes.  They search

 1    us if -- I believe they were suspicious of me -- of us

 2    wearing a wire or device, because they asked us to take

 3    our clothes off and they search us and they give us

 4    different clothes than we had.

 5    Q.    Now, did you feel as though you were free to

 6    leave?

 7    A.    No, ma'am.

 8    Q.    Why?

 9    A.    Because at that moment, when somebody -- you are

10    undercover and somebody ask you -- suspicious of you

11    and they ask you to take your clothes off and they

12    search you, that means they are suspicious you are

13    working for the law enforcement.

14         And now we are in situation where you are

15    surprised, shock, you don't know what to do and you

16    know they are suspicious of you.

17         So any wrong movement, maybe, will affect your

18    life.  Maybe they will kill you.  Maybe they will do

19    something to you.  And I was nervous at this time.

20    Q.    Now, what, if any, concerns did you have about

21    taking off your clothes?

22    A.    That I have my recording device on me.

23    Q.    And when you took off your clothes and put on the

24    new set of clothes, were you able to do so in private?

25    A.    No.  I had to change in the -- change my clothes

```
 1    in front of them to different clothes, in front of

 2    Brother Patrick and Brother Naudy and Brother Abbas.

 3    Q.    Now, did you manage -- what happened with your

 4    recording device, if anything?

 5    A.    If you let me to explain what happened, I kept it

 6    on me and -- by trying to hide it in a way with the --

 7    try to hide it just to keep it on me.

 8    Q.    And did you manage to keep your recording device

 9    on you?

10    A.    Yes, ma'am.

11    Q.    Was this entire episode recorded?

12    A.    Yes, ma'am.

13    Q.    And have you reviewed a copy of that recording?

14    A.    Yes, ma'am.

15    Q.    Now, Judge, at this point -- well, let me

16    first -- let me show you what's been marked as

17    Government's 55 and 55-A, and ask you if you recognize

18    them.

19          Handing you what's been marked as Government's

20    Exhibit 55, do you recognize that?

21    A.    Yes, ma'am.

22    Q.    What is it?

23    A.    It's a CD.

24    Q.    What's on the CD?

25    A.    It's the meeting on January 28th.
```

1    Q.      How long is that recording?

2    A.      More or less, for four hours --

3    Q.      And --

4    A.      -- five hours.

5    Q.      Have you reviewed that recording?

6    A.      Yes, ma'am.

7    Q.      Is it a true and accurate recording of the

8    meeting that you had on January 28th?

9    A.      Yes, ma'am.

10   Q.      And have there been any material deletions or

11   alterations to that recording?

12   A.      Excuse me?

13   Q.      Have there been any deletions or alterations to

14   that recording?

15   A.      Not to my knowledge.  No.

16   Q.      Have you listened to it?

17   A.      Yes, ma'am.

18   Q.      Is it complete and accurate?

19   A.      Yes, ma'am.

20   Q.      And have you reviewed Government's Exhibit 55-A?

21   A.      Yes, ma'am.

22   Q.      What is Government's Exhibit 55-A?

23   A.      A transcript of the meeting that day, on

24   January 28, 2006.

25   Q.      Have you reviewed Government's Exhibit 55-A in

1    conjunction with listening to the recording on

2    Government's Exhibit No. 55?

3    A.    Yes, ma'am.

4    Q.    And is the transcript true and accurate, to the

5    best of your ability?

6    A.    Yes, ma'am.

7    Q.    Does it correctly identify the participants?

8    A.    Yes, ma'am.

9          MS. ARANGO:  Government offers 55 and 55-A

10   into evidence.

11         MS. JHONES:  I'd like to take a look at it

12   before it's admitted.

13         MS. ARANGO:  Oh, I apologize.

14         MR. HOULIHAN:  Judge, on behalf of

15   Mr. Herrera, I would have a predicate objection, since,

16   as you know, a fair amount of this is translated.

17         MS. ARANGO:  I'll ask the questions.

18         THE COURT:  Okay.

19   BY MS. ARANGO:

20   Q.    While they're reviewing it, Mr. Assaad, did you

21   speak in Arabic during -- at any point in time during

22   the course of events on January 28th?

23   A.    Yes, ma'am.

24   Q.    Does the recording contain your conversations in

25   Arabic -- in the Arabic language?

Assaad - DIRECT - By Ms. Arango                      21

1   A.    Yes, ma'am.

2   Q.    And have you reviewed the translation from

3   Arabic to English that are contained in Government's

4   Exhibit 55-A?

5   A.    Yes, ma'am.

6   Q.    And are you familiar -- were you -- was the

7   translation from the Arabic language to the English

8   language true and accurate translations?

9   A.    Yes, ma'am.

10  Q.    And are they contained in any kind of different

11  font?  Like the Arabic language spoken that's

12  translated on Government's Exhibit 55-A:  Is the font

13  different than the English language font?

14  A.    I don't understand what's mean "font."

15  Q.    Is it written in italics as opposed to, you

16  know -- you don't understand?  I'll show it to you

17  after they finish reviewing it.

18        MS. JHONES:  Ms. Arango, I'm finished.

19  BY MS. ARANGO:

20  Q.    I'm just going to turn to -- I'll pick a page.

21  I'm picking as an example Page 60.

22        Do you see that, on Page 60, the writing is

23  different than on Page 8?

24  A.    Yes, ma'am.

25  Q.    On Page 60, are you speaking Arabic there?

1    A.    Yes, ma'am.

2    Q.    And on Page 8, are you speaking English there?

3    A.    Yes, ma'am.

4    Q.    And do you see the difference in the type style?

5    A.    Yes, ma'am.

6    Q.    The type style on Page 60 goes sideways, a little

7    bit?

8    A.    Yes, ma'am.

9    Q.    Okay.  And in the portions of this transcript in

10   which you speak Arabic, just once again, is it a true

11   and accurate translation on Government's Exhibit 55-A?

12   A.    Yes, ma'am.

13        MS. ARANGO:  Government offers 55 and 55-A

14   into evidence.

15        MR. HOULIHAN:  Judge, I would renew my

16   objection.  I believe a proper predicate would be

17   Ms. Raphael.

18        THE COURT:  Overruled.

19        MS. ARANGO:  Judge, at this time I --

20        THE COURT:  Let me introduce --

21        MS. ARANGO:  I'm sorry.

22        THE COURT:  -- note it for the record, please.

23        They will be introduced as Government's

24   Exhibits 55 and 55-A.

25        (Whereupon, Government's Exhibit No. 55 and

```
 1   55-A were entered into evidence.)

 2              THE COURT:  You may publish.

 3              MS. ARANGO:  Thank you, Judge.

 4              At this time, we have new binders which

 5   contain this transcript, Government's Exhibit 55-A.  So

 6   we would like to hand out the binders to the members of

 7   the jury so they can turn to Government's Exhibit 55-A.

 8              (Whereupon, said document was distributed to

 9   the members of the jury.)

10              MS. ARANGO:  For the record, it's Volume II,

11   so you can distinguish the two binders.

12              And I would ask everybody to turn to -- the

13   first clip we're going to play will start at Page 14.

14   The clip will start at the top of the page with the

15   "(Door creaking and closing)."

16   BY MS. ARANGO:

17   Q.    Before I start playing it, Mr. Assaad, could you

18   turn to Page 14 as well.

19   A.    Yes, ma'am.

20   Q.    Do you see at the top of the page where it says

21   (Door creaking and closing)"?

22   A.    Yes, ma'am.

23   Q.    What was happening at that point?

24   A.    We were entering the Embassy.

25              MS. ARANGO:  You can go ahead and play it.
```

```
 1              We're having some technical difficulties.
 2              THE COURT:  It may be me.
 3              THE WITNESS:  Excuse me.  It's not working
 4    here.
 5    BY MS. ARANGO:
 6    Q.    No.  Look at your transcript, sir.  It's not
 7    going to come up on the screen.
 8    A.    Okay.  Sorry.
 9    Q.    Turn to Page 14 of the transcript.
10    A.    Okay.
11              (Whereupon, segments of Government's Exhibit
12    No. 55 were published in open court.)
13    BY MS. ARANGO:
14    Q.    Mr. Assaad, I'm showing you what's been marked as
15    Government's Exhibits -- and already introduced into
16    evidence -- as Government's Exhibit 115-B, 117-B and
17    116-B.  Do you recognize them?
18    A.    Yes, ma'am.
19    Q.    What are they?
20    A.    The clothes they gave to me to change.
21    Q.    What was happening during that clip?
22    A.    They are requesting for me to change my clothes.
23    Q.    And were those the clothes that you changed into,
24    Government's Exhibits 115-B through 117-B?
25    A.    Yes, ma'am.
```

1          MS. ARANGO:  Let's turn to Page 19.  This clip

2     will start at the top of the page with the first --

3     CW 2 speaking the first statement.

4          (Whereupon, segments of Government's Exhibit

5     No. 55 were published in open court.)

6     BY MS. ARANGO:

7     Q.    Mr. Assaad, what was happening at the beginning

8     of that clip when there was a discussion about -- when

9     you said, "I cannot give my cell phone"?

10    A.    Because they are requesting all the electronic

11    devices from me, and I couldn't give it to him.

12    Q.    And why did you not give -- first of all, who's

13    "him"?  Who was --

14    A.    Brother Patrick.

15    Q.    And why did you not give your cell phone to

16    Brother Patrick?

17    A.    Because I need, first, to keep communication --

18    or try to communicate with the FBI in case something

19    happened to us.

20    Q.    What was the reason that you gave Brother Patrick

21    for wanting to keep your cell phone?

22    A.    I told it him, "I am -- you don't know who I am.

23    I am from Al-Qaeda and I need to communicate with my

24    brothers."

25          So try to put, you know, fear in him just to

1   keep -- let me keep my cell phones.

2   Q.    And over at Page 20, where Mr. Abraham says

3   towards the top of the page, "I can look at you eye to

4   eye, Mo," what was physically happening at that point

5   in time?

6   A.    Because we were close to each other, like facing

7   each other, and I were telling him, "Look at me,

8   brother," just to try to make things easier, because at

9   that moment I got scared.

10        I'm getting scared because I told him, "I'm from

11  Al-Qaeda" and he's telling me, "I can look at you eye

12  to eye."

13        So he was standing in my face and looking at me

14  like -- strong, like.

15  Q.    How did that make you feel?

16  A.    You know, ma'am, I told him "Al-Qaeda" and he's

17  looking at me.  It was -- and he answered me this way.

18  So in this moment, I got really scared.

19  Q.    And when he said to you, "Over here, it's our

20  rules" and then he said it again at Page 20, "Over

21  here, it's our rules," what did you understand him to

22  be telling you?

23  A.    He's telling me, "You are in our place and you

24  have to apply with our rules."

25  Q.    And how did that make you feel?

1   A.    I cannot express my feeling when -- outside.  But

2   inside, when you tell someone you are from Al-Qaeda and

3   you represent terrorist organization and they look at

4   you and tell you face to face, "I can look at you

5   and" -- with different tone of voice -- "and here our

6   rules," really, you feel very scared and nervous

7   inside.

8   Q.    All right.  What happened -- what happened after

9   you changed your clothes and after this clip, where you

10  kept your cell phone with you?  What happened next?

11  A.    They took us -- we had to leave with -- to

12  unknown location.  I asked where we are going, and they

13  didn't tell us.

14        And we had to leave the Embassy to a car, and we

15  went from the Embassy.

16  Q.    And who's "we"?  Who got into the car?

17  A.    Brother Patrick was driving.  Brother Naudy was

18  sitting next to him.  I was sitting behind Brother

19  Naudy.  And Brother Abbas was sitting behind Brother

20  Patrick.

21  Q.    And where did you go after you got into that car?

22  A.    We went to a fast food place -- in the back of ae

23  fast food place, where we switch cars.

24  Q.    And who, if anybody, did you see at the fast food

25  place?

1   A.     Brother B.  He is -- he was driving a car.  He

2   was waiting for us.  We arrived.  We switched cars.  He

3   took the car we were driving before and we took the car

4   he was driving.

5   Q.     What kind of car was it that Brother B was

6   driving that you changed into?

7   A.     It's a new car -- new model car.

8   Q.     And did you notice anything about the -- anything

9   about the car or about the keys?

10   A.     It's rental.

11   Q.     It's what?

12   A.     It's rental car.

13   Q.     What led to you that conclusion?

14   A.     Different things.  First, I saw the key.  And,

15   second, we discussed this later on in the meeting.

16   Q.     Okay.  What do you discuss later on in the

17   meeting?

18   A.     I asked Brother Naudy if this car is rental.  And

19   he confirmed it's rental.

20   Q.     What did you do after you got into the rental

21   car?

22   A.     I asked him where we -- you know, where we going,

23   where we meet.

24          They didn't give us any location.  They said --

25   they took us.  We drove through the night.

1   Q.     Who got into the rental car?

2   A.     Brother Patrick was driving.  Brother Naudy.  I

3   was sitting behind Brother Naudy.  And Brother Abbas

4   was behind Brother Patrick.

5   Q.     And then, after you got into the car, how long

6   did you drive until you stopped somewhere?

7   A.     It was a long drive.  Around, maybe, two hours.

8   Q.     Okay.  And during that time, did anybody tell you

9   where you were going?

10  A.     I asked several times.

11         No one answered me, ma'am.

12  Q.     Now, did you have any conversations during that

13  time period with Abbas?

14  A.     Yes, ma'am.  I had.

15  Q.     Did you talk to him in English?

16  A.     I remember I spoke with him in Arabic.

17  Q.     Why is that?

18  A.     Brother Abbas was very -- very scared.  He's

19  young.  And I was looking at him and he was praying his

20  last prayer in Arabic, that they're gonna kill us.

21         And I was trying to make things easy on him

22  because -- meaning I don't know where we're going, but

23  I cannot let him explode or lose control in this

24  situation.

25  Q.     Okay.  Did you speak to anybody from the FBI?

1    A.     I had to call to figure out -- to the FBI.  I had

2    to call to the FBI.

3    Q.     How did you make contact with the FBI?

4    A.     First, I send them text messages.  And, after,

5    they called me and we spoke on the phone.

6    Q.     Who called you?

7    A.     The FBI.  There is a lady from the FBI talked to

8    me in Arabic.

9    Q.     So you didn't speak to either of the agents, did

10   you?

11   A.     I don't remember.  I don't think so.  I spoke

12   with the lady, and she told me in Arabic that she

13   represent -- she's --

14          MS. JHONES:  Objection.  Hearsay.

15          MS. ARANGO:  Judge, this is in the transcript.

16          THE COURT:  Overruled.

17          THE WITNESS:  She told me that she's --

18          MS. JHONES:  Excuse me.

19          Your Honor, what the translator told him is

20   not in the transcript.  My objection is to what was

21   told to this witness by an interpreter.

22          THE COURT:  Overruled.

23          THE WITNESS:  That the FBI -- I spoke with her

24   in Arabic.

25

```
 1   BY MS. ARANGO:
 2   Q.    So -- and, obviously, was she able to speak to
 3   you in Arabic?
 4   A.    Yes, ma'am.
 5   Q.    Okay.  And what did you discuss with her?
 6   A.    I discussed with her if at they know where we at,
 7   because I don't know where I'm going.  There is no
 8   light.  Nothing at all.
 9         She was asking me about sign on the road,
10   something --
11   Q.    I'm sorry.
12         About what on the road?
13   A.    Sign on the road, if I can identify -- I can read
14   something to see where we at.
15   Q.    And how did that make you feel?
16   A.    In that moment, I knew the FBI lost us and they
17   don't know where we at.
18   Q.    So what, if any, other conversation did you have
19   with this woman in Arabic?
20   A.    Ma'am, after -- I don't know where we going.
21   Abbas is praying his last prayer.  He's believing he's
22   dying.  Plus, the FBI lost us.
23         I said, "We are in very, very bad situation."
24         And I asked the lady, "In case something happen,
25   I need permission to kill.  I want -- I need permission
```

1  to kill."

2  Q.     What did she tell you?

3  A.     She said, "You have right to defend yourself,

4  your life.  You have right to defend your life."

5  Q.     Did you ever tell her that you weren't scared?

6           MR. VEREEN:  Objection.  Leading.

7           THE COURT:  Sustained.

8           Rephrase your question.

9  BY MS. ARANGO:

10  Q.     What, if anything, did you tell her about your

11  emotions?

12           MR. VEREEN:  Objection to the form of the

13  question.

14           THE COURT:  Overruled.

15           THE WITNESS:  I told her I wasn't scared.  I

16  told her -- because Abbas is -- understand Arabic.

17  He's next to me.

18           And I don't want to take my fear out and

19  hoping there is -- something good will happen later.

20           So I was telling her on the phone, you know, I

21  been in this situation before.  I was trying to talk

22  calm or make Abbas feel stronger, his emotion, his

23  feeling, feel at least safe, even if we are going to

24  die or I don't know where we going.

25

```
 1    BY MS. ARANGO:

 2    Q.     Now, I asked you earlier when did you stop.

 3           Do you recall that?

 4    A.     Yes, ma'am.

 5    Q.     You said it was about two hours later?

 6    A.     Yes, ma'am.

 7    Q.     All right.  Where did you stop?

 8    A.     You know, I had to give the FBI a location to

 9    locate us before it's too late.  I asked them, "I need

10    to go to the rest room.  I need to go to a place to buy

11    stuff," water or something.  And we stop at Walgreen on

12    our way to -- at that time to unlocated -- we don't

13    know where, but we stop at Walgreen.

14    Q.     What happened at the Walgreens?

15    A.     I knew that they would be -- on the receipt, I

16    knew there would be an address and telephone number.

17    So by giving this to the FBI, maybe they can locate us

18    by -- from the address or anything on the receipt.

19    Q.     Okay.  Let me show you what's been marked and

20    introduced into evidence as Government's Exhibit 118.

21           MS. ARANGO:  May I have the ELMO, Judge.

22    BY MS. ARANGO:

23    Q.     Mr. Assaad, can you see that exhibit on the ELMO?

24    A.     Yes, ma'am.

25    Q.     What is it?
```

1    A.    It's the receipt from Walgreen.

2    Q.    Can you see the address on that receipt?

3    A.    Yes, ma'am.

4    Q.    What is the address?

5    A.    It's 103400 Federal One [sic], Key Largo,

6    Florida.

7    Q.    And did that identify to you where you were?

8    A.    Yes, ma'am.

9    Q.    What happened after you stopped at Walgreens?

10   A.    I gave the address to the FBI.

11   Q.    But going back to when you were, on January 28th,

12   in the car with Patrick Abraham and Naudimar -- Brother

13   Pat and Brother Naudy, what happened after you all got

14   back in the car?

15   A.    We went to a parking lot in the restaurant and,

16   at that time, I met Brother Sunni, where they requested

17   my cell phones.  They said, "Now that's it.  We need

18   the cell phones.  You cannot meet Brother Naz and you

19   have cell phones.  Now we need them."

20   Q.    How long after you stopped at Walgreens in Key

21   Largo did you stop at the restaurant and see Brother

22   Sunni?

23   A.    We had stopped before we see Brother Sunni -- we

24   had to stop somewhere after the bridge where Brother

25   Patrick left the car to another car.  And he came back

1   later on.

2       I don't know the time exactly, but I know we

3   stopped somewhere.  Brother Patrick left the car to

4   another car.  He come back.  We left to the parking lot

5   in the restaurant and -- where I saw Brother Sunni.

6       MS. ARANGO:  At this point, I would like to

7   direct your attention -- please turn to Page 90.

8   BY MS. ARANGO:

9   Q.   And I would ask you, Mr. Assaad, to turn to

10  Page 90.  This clip starts toward the top with "SP,"

11  Stanley Phanor.

12       (Whereupon, segments of Government's Exhibit

13  No. 55 were published in open court.)

14       MS. ARANGO:  Can you stop that, please.

15       This is Clip 5.

16       I'm sorry, Judge.  May I have a moment?

17       THE COURT:  Sure.

18       (Discussion had off the record amongst

19  counsel.)

20       MS. ARANGO:  We'll restart that, Judge.

21       (Whereupon, segments of Government's Exhibit

22  No. 55 were published in open court.)

23  BY MS. ARANGO:

24  Q.   Mr. Assaad, at the bottom of Page 90, when

25  Mr. Phanor says to you, "Living in this country,

1   brother, it -- the electronic devices is something

2   terrible to have 'cause they find all kind of ways to,

3   you know --", what did you understand him to be telling

4   you?

5   A.    That it could -- they can use electronic devices

6   to record or -- it's dangerous.  The Government can

7   spy, law enforcement, to record conversation, to spy on

8   them.

9   Q.    Okay.

10  A.    It's dangerous.

11  Q.    Thank you.

12       MS. ARANGO:  You may continue.

13       (Whereupon, segments of Government's Exhibit

14  No. 55 were published in open court.)

15  BY MS. ARANGO:

16  Q.    Mr. Assaad, what did you understand Brother Sunni

17  to be telling you when he said that, "We have great

18  respect for you" and he goes on to say, "And the

19  mission you're doing for Allah.  Believe me, when your

20  name come up in the circle, we speak of you with great,

21  great, respect," what did you understand him to be

22  telling you?

23  A.    That they already knows who they -- they know who

24  I am.

25       MR. VEREEN:  Objection.  Speculation.

1          MS. ARANGO:  I'm asking him what he

2     understood, Judge.

3          THE COURT:  Overruled.

4          THE WITNESS:  And they already know who I am.

5     They discuss my name.  They discuss me in their group.

6     They know what I do and what I represent, that I came

7     from terrorist organization to assist them.

8     BY MS. ARANGO:

9     Q.    What happened after Brother Sunni got into the

10    car?

11    A.    I had to give him my cell phones.

12    Q.    Where, if any, place did you go after that?

13    A.    We went to see Brother Naz.

14    Q.    Where was Brother Naz?

15    A.    We stopped after the bridge on the right side,

16    and we had to stop the car.  We walked down where there

17    is a tent next to the ocean.  And Brother Naz was

18    fishing.

19    Q.    What happened after you got there?

20    A.    We went to the tent:  Brother Naz, Brother Abbas

21    and myself.

22    Q.    You, Brother Abbas and Brother Naz got into the

23    tent?

24    A.    Yes.

25    Q.    Did anyone else go in the tent with you?

1  A.    It was other people outside, ma'am, guarding the

2  tent.

3  Q.    But did they go inside the tent?

4  A.    I don't remember.  I don't think so.  No, ma'am.

5  Q.    So it was just the three of you inside the tent?

6  A.    Yes, ma'am.

7        MS. ARANGO:  At this point, I would like for

8  everybody to turn to Page 99.  And this clip will

9  start -- it's Clip 6.  It's going to start at the top

10 of the page with the second "CW 2" down from the top.

11        (Whereupon, segments of Government's Exhibit

12 No. 55 were published in open court.)

13 BY MS. ARANGO:

14 Q.    Mr. Assaad, at the bottom of Page 100, where

15 Narseal Batiste says to you, "This President is more

16 concerned about domestic terrorism than anything else,"

17 what did you understand him to be telling you?

18 A.    In this paragraph?

19 Q.    Yes.

20 A.    He's telling me that now the Government -- or the

21 President -- they are focusing on homegrown terrorists

22 because they are helping in -- outside terrorist group

23 to attack this country.

24        MS. ARANGO:  Let's go to the next clip, which

25 starts at Page 103.  And it starts at the very bottom

 1    of Page 103, the second speaker up from the bottom.

 2             (Whereupon, segments of Government's Exhibit

 3    No. 55 were published in open court.)

 4    BY MS. ARANGO:

 5    Q.    Mr. Assaad, toward the bottom of Page 104, when

 6    Mr. Batiste says to you, "But the last time we

 7    talked -- I'm not saying" -- a little bit further

 8    down -- "I'm not saying you did it, because I don't

 9    believe you did.  But it would have been so easy for

10    you to record my conversation the last time we talked."

11            When was the last time you had talked to Brother

12    Naz?

13    A.    It was on December 29th, 2009, in Bayside.

14    Q.    2000-what?

15    A.    2005.

16    Q.    At Bayside?

17    A.    At Bayside.

18             MS. ARANGO:  You can continue.

19             (Whereupon, segments of Government's Exhibit

20    No. 55 were published in open court.)

21    BY MS. ARANGO:

22    Q.    Mr. Assaad, when Narseal Batiste says to you at

23    the top of Page 107, "For a fact of what" -- well,

24    starting at the bottom of Page 106, "Now, you know for

25    a fact" -- going over to Page 107 -- "that I told you

 1  of what my plans are" and then you say that you had

 2  relayed those plans to Al-Qaeda and he says, "Now,

 3  those plans will never change," what was your

 4  understanding of what his plan was?

 5  A.    He was referring to the Sears Towers and the plan

 6  he told me on December 29th, 2005.

 7          MS. ARANGO:  You can continue.

 8          (Whereupon, segments of Government's Exhibit

 9  No. 55 were published in open court.)

10          MS. ARANGO:  Now let's turn to the last clip,

11  which is at Page 112.  And it starts at the very bottom

12  of Page 112 with the last speaker, CW 2.

13          (Whereupon, segments of Government's Exhibit

14  No. 55 were published in open court.)

15          MS. ARANGO:  Pause, please.

16  BY MS. ARANGO:

17  Q.    Mr. Assaad, at the bottom of Page 112, you say,

18  "Believe me, when I came -- and his uncle is very close

19  brother on me.  The reason I came personally, because

20  his -- he's here."

21          And then over on the next page, you start talking

22  about how, "We are Al-Qaeda."

23          What, if any, direction did you receive from the

24  FBI regarding your role in this meeting?

25  A.    I represent Al-Qaeda and I came from overseas

1   because Brother Naz request somebody from terrorist

2   organization to come and help him, assist him, in his

3   plans.

4   Q.    And the portion at the bottom of Page 112 where

5   you discuss, "And his uncle is very close brother of

6   mine," what were you referring to there?

7   A.    Because Brother Naz requests from Brother Abbas

8   when -- to ask for help from overseas from terrorist

9   organization.

10          And the FBI told me --

11          MR. VEREEN:  Objection.

12          THE WITNESS:  -- to say --

13          MR. VEREEN:  Objection.  Hearsay.

14          THE COURT:  I can't hear you.

15          MR. VEREEN:  Objection.  Hearsay.

16          THE COURT:  Overruled.

17          THE WITNESS:  -- told me that -- to mention

18  Abbas uncle, that I know him and, you know, he's with

19  me in Al-Qaeda.

20          MS. ARANGO:  You can continue.

21          (Whereupon, segments of Government's Exhibit

22  No. 55 were published in open court.)

23  BY MS. ARANGO:

24  Q.    Mr. Assaad, at the bottom of Page 115, this

25  conversation that you have with Mr. Batiste where he

1    says, "They admire you" and then a little further down

2    he says, "They're so happy you're here, you just

3    wouldn't believe," what was your understanding as to

4    what he was referring to?

5    A.    He was referring to the member he had in his

6    group.

7    Q.    And who did you -- let me ask you this:  In your

8    conversation earlier with Brother Sunni, what was your

9    understanding of what Brother Sunni said to you in

10   relation to what Brother Naz was telling you here?

11   A.    He was telling me the same thing what Brother Naz

12   telling me, that they discuss my name in the circle --

13   "the circle" are the meetings they usually have -- and

14   they have big respect for what I represent and for what

15   I'm doing for Allah.

16   Q.    Thank you.

17         MS. ARANGO:  You can continue.

18         (Whereupon, segments of Government's Exhibit

19   No. 55 were published in open court.)

20   BY MS. ARANGO:

21   Q.    In this portion of the conversation, where you

22   mention, "You want I call the guy to come over here

23   from Europe to train you or don't you want?" and then

24   Batiste responds, "I would like for him to train when I

25   get closer to the final steps to the mission," what was

1   going on in the conversation at this point?

2   A.    If you allow me to come back a little bit,

3   when -- December 29th, when he told about the Sears

4   Towers and requesting dynamite and something stronger

5   than explosives, more powerful, and -- the FBI told me

6   to mention the expert guy who -- in explosives, if he

7   want to assist Brother Naz to monitor what he wants, to

8   see what he wants.

9        And here, I told him, "Because you request about

10  the expert.  You want me to call him to bring him over

11  here now to train or -- for the explosives or later?"

12       He said, "No.  When I arrive to the final steps

13  of my plans, like I told you, we will call him."

14  Q.    So you were mentioning this, then, the expert

15  from Europe, at the request of the FBI?

16  A.    Yes, ma'am.

17       MS. ARANGO:  You can continue.

18       (Whereupon, segments of Government's Exhibit

19  No. 55 were published in open court.)

20  BY MS. ARANGO:

21  Q.    Mr. Assaad, at Page 116, Brother Naz says to you,

22  "That mission in Chicago, like I told you, nobody knows

23  about that.  He heard it now" -- and Brother Abbas was

24  in the tent with you -- "but nobody knows about that."

25       Do you see that?

1    A.    Yes, ma'am.

2    Q.    Okay.  Did Brother Naz ever discuss the mission

3    in Chicago in front of anybody other than you and

4    Brother Abbas?

5    A.    Do you mean prior to that meeting or after?

6    Q.    After.

7    A.    Yes, ma'am.

8    Q.    When?

9    A.    We discuss it on March 9th in the Embassy in

10   front of everybody; on March 16, when they took the

11   oath in the warehouse; and even when -- March 16 and

12   other -- I don't remember -- other occasion there is,

13   also.

14   Q.    And at the very, very end, where Mr. Batiste says

15   to you, "Like I said, I don't know what it's gonna take

16   for you to get that first 50,000.  That first 50,000

17   will put me in a position where I can get some

18   artillery, some communications, some trucks," let me

19   ask you this:  On any list that Mr. Batiste gave you,

20   was there $50,000 written on it?

21   A.    Yes, ma'am.

22   Q.    And what about trucks, communications and

23   artillery?

24   A.    He gave it me on December 29th, the list, where

25   he requested -- mention in the list the 50,000 and the

 1   trucks and the artillery and all the stuff.

 2   Q.    Let me ask you this, just taking you back for a

 3   moment to when you were in the Embassy in front of --

 4   with Brother Pat and Brother Naudy, when you were asked

 5   to change your clothes:  Who was present when you

 6   announced -- and we heard a clip -- that you were from

 7   Al-Qaeda?

 8   A.    It was Brother Naudy, Brother Patrick and Brother

 9   Abbas.

10   Q.    How long did this discussion with Brother Naz and

11   Brother Abbas occur in the tent?

12   A.    If I'm not wrong, maybe around 30 to 40 minutes.

13   Q.    And after that meeting ended?

14   A.    We went back to Miami.

15   Q.    Who took you back to Miami?

16   A.    Brother Patrick and Brother Naudy, and I was with

17   Brother Abbas.

18   Q.    Where did they take you back when you went back

19   to Miami?

20   A.    I went back to the Embassy.

21   Q.    What did you do at the Embassy?

22   A.    Got my stuff -- clothing and stuff at the

23   Embassy, and they drove us back to South Beach.

24   Q.    Did you meet with the FBI after that?

25   A.    Yes, ma'am.

```
 1   Q.    At any point, did you give your clothes -- the

 2   clothes that you were given to any FBI agent?

 3   A.    Yes, ma'am.  With the recording device.

 4         MS. ARANGO:  At this point, I'd like to turn

 5   the ELMO on, Judge, and show some photographs.

 6   BY MS. ARANGO:

 7   Q.    I'd like to go over who you saw on January 28th

 8   and who you recognize in this case.

 9         Let me show you what's been marked as

10   Government's Exhibit 1.  Do you recognize the person in

11   that photograph?

12   A.    It's Brother Naz.

13   Q.    And did you see him on January 28th?

14   A.    Yes, ma'am.

15   Q.    Okay.  Government's Exhibit No. 2:  Do you

16   recognize the person in that photograph?

17   A.    Yes, ma'am.  Brother Patrick.

18   Q.    And did you see him on January 28th?

19   A.    Yes, ma'am.

20   Q.    Government's Exhibit No. 3?

21   A.    Brother Naudy.

22   Q.    Did you see him on January 28th?

23   A.    Yes, ma'am.

24   Q.    And Government's Exhibit No. 4:  Do you recognize

25   the person in that exhibit?
```

```
 1    A.      Yes, ma'am.

 2    Q.      Who's that?

 3    A.      Brother B.

 4    Q.      Did you see him on January 28th?

 5    A.      Yes, ma'am.

 6    Q.      Where did you see him?

 7    A.      Switching cars outside the fast food store.

 8    Q.      Government's Exhibit No. 5:  Do you recognize the

 9    person in that photograph?

10    A.      Brother Rot.

11    Q.      Now, do you recall seeing him on January 28th?

12    A.      Maybe yes.  Maybe no.  I don't remember exactly,

13    ma'am.

14    Q.      And, finally, Government's Exhibit No. 6.

15    A.      Brother Sunni.

16    Q.      Did you see him on January 28th?

17    A.      Yes, ma'am.

18    Q.      Where did you see him?

19    A.      I saw him taking -- in the parking lot where he

20    took my cell phones and we had conversation with him on

21    January 28.

22    Q.      Mr. Assaad, I'd like to go back into your

23    background just for a moment here a little bit.

24            You testified earlier that you were paid by the

25    FBI in connection with your involvement in this
```

1    investigation?

2    A.    Yes, ma'am.

3    Q.    And that was the -- and then you testified that

4    the FBI paid for your living expenses?

5    A.    Yes, ma'am.

6    Q.    Now, were there any other expenses that the FBI

7    paid on your behalf while you were involved in this

8    investigation?

9    A.    Medical bills.  Yes, ma'am.

10   Q.    I'm sorry?

11   A.    Medical.

12   Q.    Medical bills.

13   A.    Dentist.

14   Q.    Also, have you ever -- were you -- are you

15   married?

16   A.    Yes, ma'am.

17   Q.    Have you ever gone by any other names that

18   weren't your real name?

19   A.    Yes, ma'am.

20   Q.    And where was that?

21   A.    In Miami, when I came from overseas, I use "Elie

22   Assaad Montana" and another name, "Elio Montana

23   Renteria."  I use it in a case in Mexico during -- I

24   was working in a case in Mexico.

25   Q.    But when you used the name "Elio Montana

```
 1   Renteria," was that in connection with any other work

 2   that you were doing in an undercover capacity?

 3   A.    Was under -- yes, ma'am.

 4   Q.    But, now, the name "Elie Assaad Montana":  How

 5   did you use -- where did you use that name?

 6   A.    In Miami.

 7   Q.    Did you use it -- what, if any, way did you use

 8   it in connection with your marriage?

 9   A.    License -- my marriage license.

10   Q.    Why did you use the name Elie Assaad Montana in

11   your marriage license?

12   A.    After I came from overseas, I had a kill attempt

13   on my life.  And, also, I was tortures and

14   chased and --

15   Q.    Let me just stop you right here.

16         Where did you -- where was there an attempt on

17   your life?

18   A.    In Syria and Lebanon.

19   Q.    Where?

20   A.    In Syria and in Lebanon.

21   Q.    Okay.

22   A.    They blew up my car.  And I was in very bad

23   situation.  I seek medical attention here in the United

24   States.  I been tortured for two months, chased

25   everywhere from them.
```

 1          I came direct to -- I arrived in the United

 2    States in December, 2000.  I get married in January,

 3    2001.  It was very short period of time.  And I use

 4    different names to try to hide my location and if

 5    somebody is searching or chasing me.

 6    Q.    And you said that you were tortured?

 7    A.    For two months.

 8    Q.    Where?

 9    A.    In Syria and in Lebanon, one month in each

10    country.

11    Q.    And do you know who you were tortured by?

12          MR. LEVIN:  Objection.  Relevance.

13          THE COURT:  Overruled.

14          THE WITNESS:  I've been tortured from the

15    Syrian and from the Lebanese Government, from the

16    Governments.

17    BY MS. ARANGO:

18    Q.    And you said that you came to the United States

19    in December of 2000?

20    A.    After my car explode, yes, ma'am, immediately,

21    like, three days after that, four days -- three, four

22    days.

23    Q.    Three or four days after your car exploded?

24    A.    Yes, ma'am.

25    Q.    Do you know how your -- do you know who caused

```
 1    your car to explode?

 2    A.    I can assume.  But I am --

 3              MS. JHONES:  Objection, your Honor.

 4              THE WITNESS:  I don't have evidence.

 5              MS. JHONES:  Objection.

 6              THE COURT:  Overruled.

 7    BY MS. ARANGO:

 8    Q.    What's your understanding?

 9    A.    My understanding is they were trying to get rid

10    of me.  And I believe in that period of time the Syrian

11    was -- Lebanon was occupied by Syria.

12          I believe joint forces -- they try, because my

13    car explode before -- three, four -- two miles or three

14    miles before the airport.

15          But the -- probably what save my life is they put

16    something behind the tire, in the backseat, while I was

17    sitting next to the driver's seat.  That's what saved

18    my life at that time.

19          But I had a lot of -- I had 86 stitches,

20    internal, external in my head.  This part of my face

21    opened.  I almost lost my eye.  This part all open, my

22    knee and my stomach (indicating).

23    Q.    Okay.  And when you came to the United States in

24    December of 2000, what was your medical condition?

25    A.    Was -- I received medical attention here, from
```

1    Germany.  After I left, I was helped -- medical

2    attention in Germany, in Frankfurt, and from Frankfurt

3    to United States, to Miami, and they give me medical

4    attention.  I was a little bit bad.

5    Q.    And then, after you used the name Elie Assaad

6    Montana in your marriage license, did you ever use it

7    again?

8    A.    I believe in car accident I had.  Was a rental

9    car accident I had.

10   Q.    What happened as a result of the rental car

11   accident?

12   A.    I didn't understand the question.

13   Q.    Were there any -- were there any lawsuits?

14   A.    Yes.  There was a lawsuit -- a lawsuit.  Somebody

15   close the trunk on my head and I lost conscious, like,

16   for a while.  I went to the hospital.  And we sued the

17   car rental company.

18   Q.    When you say "we," who are you referring to?

19   A.    I.  Sorry.

20   Q.    And when was that lawsuit?

21   A.    In Miami.

22   Q.    When was it?

23   A.    Maybe -- I don't remember, exactly.  Maybe 2004,

24   2003, something like that.

25   Q.    How did you use a different name, other than your

```
 1  own name, in connection with that civil lawsuit?
 2  A.    How?
 3  Q.    Yes.
 4  A.    I didn't understand what --
 5  Q.    When you brought that lawsuit, what name did you
 6  use?
 7  A.    Elie Assaad Montana.
 8  Q.    Why did you use that name?
 9  A.    It's always trying to save my life.  Always try
10  to hide from -- to save my life and my family life from
11  any attempt on our life.
12  Q.    Okay.  And did you give a deposition in that
13  lawsuit?
14  A.    Yes, ma'am.
15  Q.    Did you explain to anybody about your name?
16  A.    Yes, ma'am.  Because when I rent the cars, they
17  have my driver's license.  And my driver's license --
18  it wasn't -- was "Elie Assaad" on my driver's
19  license -- my United States of America license.
20        But when I have the deposition, to make it for
21  court, at that moment, I got -- would be official
22  papers.
23        I was scared, like -- they would be official and
24  they can track -- the Syrian Government or Lebanese
25  Government, they can track it through the system and
```

```
 1    they can find my location.

 2          So I -- I had -- in the deposition, I told them

 3    my name is Elie Assaad Montana.  In case the Syrian or

 4    the Lebanese Government has access or try to find me,

 5    they cannot find my location.

 6    Q.    And did you ever -- in the deposition, what, if

 7    anything, did you say regarding the name "Montana"?

 8    A.    Belong -- my mother last name.

 9    Q.    Was that accurate?

10    A.    No, ma'am.

11    Q.    One other question:  Did you ever consider

12    writing a book?

13    A.    It was in 2003, more or less, when I had the idea

14    about writing a book.  It was -- referred to my

15    experience in overseas, my job overseas, my life, what

16    I went through, the torture.  At that time, yes, ma'am.

17    Q.    And did you contact a lawyer in that regard?

18    A.    Yes, ma'am.  I contact a lawyer in 2003.

19    Q.    And -- well, was that before your involvement in

20    this case?

21    A.    Long before I involved in this case.  2003.

22    Q.    And have you had any discussions with any lawyers

23    or anybody else about writing a book anytime after

24    2003?

25    A.    No, ma'am.
```

```
 1  Q.    All right.  Now, let's see -- we left off --
 2         MS. JHONES:  Your Honor, I'm sorry to
 3  interrupt the Government.
 4         I apologize.  Would it be possible to take a
 5  bathroom break?
 6         THE COURT:  Sure.
 7         MS. JHONES:  Thank you.
 8         THE COURT:  Do not discuss this case either
 9  amongst yourselves or with anyone else.  Have no
10  contact whatsoever with anyone associated with the
11  trial.  Do not read, listen or see anything touching on
12  this matter in any way.
13         If anyone should try to talk to you about this
14  case, you should immediately instruct them to stop and
15  report it to my staff.
16         You may leave your notebooks and your binders
17  at your chairs.  Please be back in the jury room in ten
18  minutes.
19         (Whereupon, the jury exited the courtroom at
20  11:02 a.m. and the following proceedings were had:)
21         THE COURT:  We're in recess for ten.
22         (Thereupon a recess was taken, after which the
23  following proceedings were had:)
24         THE COURT:  We're back on United States of
25  America versus Narseal Batiste, et al., Case
```

1    No. 06-20373.

2           Counsel, state your appearances, please, for

3    the record.

4           MR. GREGORIE:  Richard Gregorie and Jacqueline

5    Arango on behalf of the United States, your Honor.

6           MS. JHONES:  Ana Maria Jhones on behalf of

7    Narseal Batiste, who's present.

8           MR. LEVIN:  Albert Levin on behalf of Patrick

9    Abraham, who's present.

10          MR. CASUSO:  Louie Casuso on behalf of Burson

11   Augustin, who's present.

12          MR. CLARK:  Nathan Clark for Rotschild

13   Augustine, who's present.

14          MR. HOULIHAN:  Richard Houlihan with Naudimar

15   Herrera.

16          MR. VEREEN:  Rod Vereen on behalf of Stanley

17   Phanor, who's present.

18          THE COURT:  All Defendants are present.

19          Let's bring in the jury, please.

20          (Whereupon, the jury entered the courtroom at

21   11:33 a.m. and the following proceedings were had:)

22          THE COURT:  You may be seated.

23          You are still under oath, sir.

24          You may proceed, Ms. Arango.

25          MS. ARANGO:  Thank you.

```
 1   BY MS. ARANGO:

 2   Q.    Mr. Assaad, after the meeting that you had with

 3   Narseal Batiste in the tent on January 28th in the

 4   Keys, when was the next time you met with Narseal

 5   Batiste?

 6   A.    It was February 19.

 7   Q.    And where did that meeting occur?

 8   A.    In the apartment in South Beach.

 9   Q.    Was that meeting audio- and video-recorded?

10   A.    Yes, ma'am.

11   Q.    Who was present at that meeting?

12   A.    Brother Naz and Brother Patrick.

13   Q.    And about how long did that meeting last?

14   A.    I don't remember exactly.

15   Q.    Approximately.

16   A.    Maybe two, three hours.

17   Q.    And did you see the video and the audio recording

18   of that meeting?

19   A.    Yes, ma'am.

20   Q.    Generally, what was discussed in that meeting?

21   A.    Brother Naz spoke about different points, first,

22   about the Sears Towers.  He put it in physical -- not

23   in physical.  Like he put -- like, for example, the

24   bottles represent the Sears Towers.  The box of napkins

25   represent the other one.
```

1        So he put it in -- on the table and he explained

2    details about his plan.

3        And was Brother Patrick present and myself.

4        And we spoke also about training camp.  He want

5    to send his members, his brothers, to be trained by

6    Al-Qaeda, to get training from Al-Qaeda.

7        And we spoke a little bit -- he told me -- he

8    told me about, also -- the training camp....

9    Q.    Let me just interrupt you for just one moment

10   there, because you said you talked about Al-Qaeda

11   training.

12        Did Narseal Batiste talk to you as if you were

13   from Al-Qaeda?

14   A.    Yes, ma'am.  He has full understanding that I

15   represent Al-Qaeda and I am Al-Qaeda.

16   Q.    What else, if -- do you recall discussing at this

17   meeting?

18   A.    It was a long time.  Just trying to refresh my

19   memory.

20        The Sears Tower, the training camp and -- if

21   there is something else to refresh my memory.  But this

22   is the major points we spoke in that meeting.

23   Q.    We have the recording in evidence.

24        Let me ask you something:  Did you talk to

25   Patrick Abraham during the course of that meeting?

1   A.     Yes, ma'am.

2   Q.     Where did you talk to him?

3   A.     I asked him to see if he knows about the plans

4   and if he's aware of the plan and what's going on.

5   Q.     And why did -- were you given any direction by

6   the FBI in that regard?

7   A.     Yes, ma'am.

8   Q.     What was that?

9   A.     Just to try to talk to Brother Patrick to see

10  does he know what's going on, he's aware what's going

11  on, he's part of the plan or what.

12  Q.     Was the Chicago plan discussed by Narseal Batiste

13  in front of Brother Patrick?

14  A.     Yes, ma'am.

15  Q.     When was the next time you spoke to Narseal

16  Batiste after the meeting on February 19th?

17  A.     I believe on March 9.

18  Q.     Well, did you have any telephone conversations

19  with -- with Brother Naz after February 19th?

20  A.     Yes, ma'am.

21  Q.     When was that?

22  A.     The next day.

23  Q.     And what happened?

24  A.     Because Brother Naz called me on -- after we

25  finished the meeting.  He called me early morning.  And

Assaad - DIRECT - By Ms. Arango                    60

```
 1   I didn't answer the phone until the next day.  I
 2   called -- I called him back.
 3   Q.    And what did you discuss?
 4   A.    He want to switch the training camp to United
 5   States, to his land in Louisiana, I believe.
 6   Q.    Now, when was the next time you saw Brother Naz
 7   after February 20th?
 8   A.    On March 9.
 9   Q.    Explain to the members of the jury what happened
10   on March 9th.
11   A.    Because Brother --
12         MS. JHONES:  Your Honor, I'm going to object
13   because this is going to call for a narrative.
14         THE COURT:  Sustained.
15         Rephrase your question.
16   BY MS. ARANGO:
17   Q.    Did you meet with -- did you receive any
18   direction from FBI on March 9th?
19   A.    Yes, ma'am.
20   Q.    And what did you do?
21   A.    To go and -- to the Embassy.
22   Q.    Did you go to the Embassy?
23   A.    Yes, ma'am.
24   Q.    Were you wearing a recording device?
25   A.    Yes, ma'am.
```

1   Q.    What happened when you got to the Embassy?

2   A.    Happened -- they try to search me again,

3   strip-search me again.

4   Q.    Who tried to strip-search you?

5   A.    Two brothers.

6   Q.    Do you remember which two?

7   A.    No, ma'am.

8   Q.    What happened after two of them tried to

9   strip-search you?

10  A.    I said, "I need to go -- I'll be back.  I need to

11  go have dinner and I'll come back."  At that time, I

12  called the FBI.

13  Q.    Why did you say that you needed to go have

14  dinner?

15  A.    Because I didn't -- I couldn't get rid of the

16  device I have on me and, if they will strip-search me

17  and they find it, will be a problem.

18  Q.    So who did you speak to at the FBI?

19  A.    I believe I spoke with Agent Tony Velazquez.

20  Q.    And as a result of talking -- did he give you any

21  permission or directions in that conversation?

22  A.    He told me to --

23        MS. JHONES:  Objection.  Calls for hearsay,

24  your Honor.

25        THE COURT:  Overruled.

```
 1              THE WITNESS:  He told me to get rid of the
 2   device, to take it back and put it away, go back and
 3   put the device and come back.
 4   BY MS. ARANGO:
 5   Q.     Come back where?
 6   A.     To my place.  To leave the device and come back
 7   to the Embassy.
 8   Q.     Did you do that?
 9   A.     Yes, ma'am.
10   Q.     Did you get any phone calls from Brother Naz
11   during that time frame?
12   A.     Yes, ma'am.  When I left.
13   Q.     What happened?
14   A.     He was upset why I show up and I left with no
15   explanation.
16   Q.     And what happened after your conversation with
17   Brother Naz?  What did you do?
18   A.     After that?
19   Q.     Yes.
20   A.     After that, I came back to the Embassy.
21   Q.     Did you have your recording device with you?
22   A.     No, ma'am.
23   Q.     So what happened when you got back to the Embassy
24   the second time on March 9th?
25   A.     We discuss the Sears Towers, the --
```

```
 1   Q.    Let me just stop you.
 2         Who did you see when you got back to the Embassy?
 3   A.    I saw all the brothers over there:  Brother
 4   Sunni, Brother Patrick, Brother B, Brother Naudy,
 5   Brother Naz --
 6   Q.    Take your time.
 7   A.    -- and Brother -- Brother Patrick and Brother
 8   Rot.
 9   Q.    Did you see all these Defendants, then --
10   A.    Yes.
11   Q.    -- at the Embassy on March 9th?
12   A.    Yes, ma'am.
13   Q.    When you got back, were you strip-searched at
14   that point?
15   A.    Yes, ma'am.
16         MS. JHONES:  Objection.  Leading.
17         THE COURT:  Sustained.
18         Rephrase your question.
19   BY MS. ARANGO:
20   Q.    What happened when you got back to the Embassy?
21   A.    I got strip-searched.
22   Q.    Who searched you?
23   A.    I don't remember at the time.
24   Q.    How many people searched you?
25   A.    Two people.
```

```
 1   Q.     Hold on just one moment, please.
 2          (Discussion had off the record amongst
 3   counsel.)
 4   BY MS. ARANGO:
 5   Q.     After the March 9th meeting, did you meet with
 6   the FBI?
 7   A.     Yes, ma'am.
 8   Q.     Did you discuss with them what had occurred
 9   during the meeting on March 9th?
10   A.     Yes, ma'am.
11   Q.     And you've testified that you cannot recall who
12   searched you when you came back to the Embassy?
13   A.     No, ma'am.
14   Q.     Will anything -- can I give you anything to
15   refresh your recollection?
16   A.     Please.
17   Q.     Did you -- after the meeting, did you tell the
18   agents who searched you?
19   A.     Yes, ma'am.
20   Q.     Let me give you a copy of that report.
21          Mr. Assaad, could you just take a minute and
22   review that report and then, after you've finished
23   reviewing it, give it back to me and tell me if it
24   refreshes your recollection.
25   A.     Okay.  Thank you.
```

1    Q.     Does that refresh your recollection?

2    A.     Yes, ma'am.

3    Q.     Thank you.

4           Does it refresh your recollection as to who, if

5    anyone, searched you when you came back to the Embassy

6    the second time on March 9th?

7    A.     Yes, ma'am.

8    Q.     Who's that?

9    A.     Brother Patrick and Brother Sunni.

10   Q.     What happened after you got searched and went

11   into the Embassy?

12   A.     I spoke with Brother Patrick -- Brother Naz and

13   everybody that were in the Embassy.

14   Q.     When you were speaking to Brother Naz on

15   March 9th, what were the other Defendants doing, if

16   anything?

17   A.     Some -- if I remember correctly, some of them

18   sitting next to us, some walking and coming.  They were

19   all in same group.

20   Q.     What did Brother Naz and you discuss on March 9th

21   in the Embassy after you came back?

22   A.     We discuss about the money, that he -- what

23   happened with the money he request.

24          And we discussed also that -- about the plan,

25   Chicago plan, the Sears Towers, and he's happy that

1  Osama bin Laden -- he knows about his plan.

2      And we spoke also about he wants to create

3  alliance with the Moors and Al-Qaeda on March 10th.

4  Q.    And what did you understand him to mean when he

5  said that he wanted to create an alliance between the

6  Moors and Al-Qaeda?

7  A.    He want to be united with Al-Qaeda, to be

8  support -- get support from Al-Qaeda, to be bond with

9  Al-Qaeda.

10      I don't know how to explain.  But it's, like,

11 to -- to -- like, to be from Al-Qaeda, to be in the

12 group of Al-Qaeda by creating an alliance that get

13 support, like, one of their members.

14 Q.    Okay.  And did you report that fact to the FBI?

15 A.    Yes, ma'am.

16 Q.    Did the FBI give you -- what, if any, direction

17 did the FBI give you after you reported that fact to

18 them?

19 A.    After each meeting -- before or after each

20 meeting, I always speak with the FBI, before I go and

21 after I leave.

22      And that day, after I told them what happened

23 in that meeting, immediately, like, 20 minutes or

24 30 minutes after that, they said, "Okay."  And they

25 gave me later on a -- like a pledge, like rules, to

1    give it to Brother Naz.

2    Q.    Okay.  Was that an Al-Qaeda pledge?

3    A.    Yes, ma'am.  Al-Qaeda pledge.

4    Q.    When was the next time you met with Brother Naz?

5    A.    March 10.

6    Q.    Where did that meeting occur?

7    A.    In the street, in South Beach.

8    Q.    And what happened after you met him on the

9    street?

10   A.    He wanted to take the pledge of Al-Qaeda.

11   Q.    And where did that happen?

12   A.    In the car.

13   Q.    What car?

14   A.    A white truck.

15   Q.    Who was present while the meeting occurred

16   between you and Brother Naz on March 10th in the truck?

17   A.    Another brother was present, Brother Levi.

18   Q.    Was he in the truck -- physically in the truck

19   while the alliance was being taken by Brother Naz?

20   A.    No, ma'am.

21   Q.    Where did you go, if you know?

22   A.    He went to the store, I believe, to buy

23   something, and he came back.

24   Q.    Okay.

25   A.    But after he came back, Brother Naz told him that

 1   he took the oath of Al-Qaeda.

 2   Q.     All right.  Did you record that meeting?

 3   A.     Yes, ma'am.

 4   Q.     Let me show you what's been marked as

 5   Government's Exhibit 61 and 61-A, and ask you if you

 6   recognize it.

 7          Showing what's been marked as Government's

 8   Exhibit 61 and 61-A, I'll ask you if you recognize it.

 9   A.     Yes, ma'am.

10   Q.     What is Government's Exhibit 61?

11   A.     It's a CD, ma'am.

12   Q.     And does that CD contain a recording of the

13   meeting that occurred with Brother Naz on March 10th of

14   2006?

15   A.     Yes, ma'am.

16   Q.     Have you reviewed that recording?

17   A.     Yes, ma'am.

18   Q.     Is it a true and accurate recording -- audio

19   recording of the meeting that occurred in the truck on

20   March 10th, 2006?

21   A.     Yes, ma'am.

22   Q.     Have there been any deletions or alterations to

23   the recording?

24   A.     No, ma'am.

25   Q.     Now, turning to Government's Exhibit 61-A, do you

 1   recognize that?

 2   A.     Yes, ma'am.

 3   Q.     Is that a transcript of that recording?

 4   A.     Yes, ma'am.

 5   Q.     Have you read that transcript?

 6   A.     Yes, ma'am.

 7   Q.     Have you read it in conjunction with reviewing

 8   the recording?

 9   A.     Yes, ma'am.

10   Q.     And is the transcript a true and accurate

11   transcription of the recorded conversation on

12   Government's Exhibit 61?

13   A.     Yes, ma'am.

14   Q.     Are the speakers properly identified?

15   A.     Yes, ma'am.

16          MS. ARANGO:  Government offers 61 and 61-A

17   into evidence.

18          MS. JHONES:  No objection, your Honor.

19          THE COURT:  They will be admitted as

20   Government's Exhibits 61 and 61-A.

21          (Whereupon, Government's Exhibit No. 61 and

22   61-A were entered into evidence.)

23          MS. ARANGO:  I'd like to play one clip of that

24   exhibit.  I'd ask the jurors to turn to 61-A,

25   specifically Page 5.

Assaad - DIRECT - By Ms. Arango                    70

1            THE COURT:  Ladies and gentlemen of the jury,

2    let me just remind you that, until such time as I have

3    admitted the exhibits into evidence and instructed you

4    that you can turn to that tab, you are not to turn to

5    tabs -- tabs other than what has already been admitted

6    into evidence in the notebook.

7            You may now turn to 61-A.

8            MS. ARANGO:  This clip will start right in

9    about the middle of Page 5.

10           (Whereupon, segments of Government's Exhibit

11   No. 61 were published in open court.)

12   BY MS. ARANGO:

13   Q.    Mr. Assaad, first, at the very beginning of this

14   clip where you discuss the warehouse and you say, "So

15   we agree about the warehouse" and Narseal Batiste says,

16   "We agree about the warehouse," what were you talking

17   about?

18   A.    About getting a new warehouse.

19   Q.    Okay.  And did the FBI -- what, if any, direction

20   did the FBI give you in that regard are?

21   A.    I was told from the FBI to bring the issue of the

22   warehouse, to get -- to tell him about the warehouse.

23   Q.    Okay.  And right after that, you say, "Like we

24   spoke about yesterday, about the alliance."

25           Then further down you see, "Between Moors and --"

1          And Narseal Batiste responds, "Al-Qaeda."

2          What were you referring to there?

3    A.    This referring to the meeting -- was recorded --

4    that he mentioned that -- I told him, "Like we spoke

5    yesterday, like you said, the alliance between Moors

6    and Al-Qaeda."

7          MS. ARANGO:  You can continue.

8          (Whereupon, segments of Government's Exhibit

9    No. 61 were published in open court.)

10          MS. ARANGO:  Pause, please.

11   BY MS. ARANGO:

12   Q.    Mr. Assaad, here in this last portion, where you

13   discuss, "You're representing the Sheik Osama bin

14   Laden.  God's pledge is upon me and so is his compact,"

15   what are you doing at that point?

16   A.    I'm reading the pledge of Al-Qaeda.

17   Q.    Where did you get that?

18   A.    From the FBI.

19          MS. ARANGO:  Continue.

20          (Whereupon, segments of Government's Exhibit

21   No. 61 were published in open court.)

22   BY MS. ARANGO:

23   Q.    What happened after that meeting was over?

24   A.    We met and -- we had another meeting.

25   Q.    Let me direct your attention to March 15th.

1        Did you meet with Brother Naz on that day?

2   A.   Yes, ma'am.

3   Q.   What was the purpose of that meeting?

4   A.   We were looking for warehouses.

5   Q.   Was that warehouse discussed just now in that

6   March 10th meeting?

7   A.   Yes, ma'am.

8   Q.   And where did you go to look for warehouses?

9   A.   We were looking around the area in North -- in

10  Biscayne, more or less.  I don't know the exact area,

11  more or less.  Up north.

12  Q.   And what, if anything, did FBI do it in this

13  regard?

14  A.   The FBI gave me different location, like, three,

15  four, five warehouses that -- locations, and they told

16  me to drove, choose the warehouses.

17  Q.   And, ultimately, was a warehouse chosen?

18  A.   Yes, ma'am.

19  Q.   Who went with you to look at and choose a

20  warehouse?

21  A.   Brother Naz and Brother Sunni.

22  Q.   And about how long was that meeting where you

23  chose the warehouse?

24  A.   I don't remember the time.  But we were driving

25  the car from one warehouse to another warehouse until

```
 1    they chose the -- Brother Naz chose the warehouse.

 2    Q.    Was that meeting recorded?

 3    A.    Yes, ma'am.

 4    Q.    Now, let me direct your attention to the next

 5    day, on March 16th.

 6          Did you have a meeting on that day?

 7    A.    Yes, ma'am.

 8    Q.    What was the purpose of that meeting?

 9    A.    The purpose of that meeting was -- or the

10    brother -- Brother Naz brothers -- they will take oath

11    and pledge of Al-Qaeda --

12    Q.    Okay.

13    A.    -- in the warehouse.

14    Q.    I was just asking you:  Where was that meeting to

15    be held?

16    A.    In the warehouse.

17    Q.    The new warehouse?

18    A.    The new warehouse.

19    Q.    Now, did you get any directions from the FBI

20    prior to that meeting?

21    A.    Yes, ma'am.

22    Q.    What happened at that meeting?

23          MS. JHONES:  Objection.  It calls for a

24    narrative.

25          THE COURT:  Overruled.
```

1          THE WITNESS:  They took the oath of Al-Qaeda,

2     represent -- they took the oath of -- the pledge of

3     Al-Qaeda.

4          We spoke about Chicago --

5     BY MS. ARANGO:

6     Q.    Let me just stop you there.

7          Who took the pledge to Al-Qaeda?

8     A.    Brother -- I name them?

9     Q.    Yes.

10    A.    Brother Sunni, Brother Patrick, Brother Rot,

11    Brother Naudy, Brother B and Brother Naz.  He was

12    there.

13    Q.    Brother Naz was there?

14    A.    Yes, ma'am.

15    Q.    But, now, did he take another oath to Al-Qaeda or

16    just the other Defendants?

17    A.    He was sitting next to -- standing next to me.  I

18    was focusing on -- because there were everybody in

19    front of me.  Maybe I heard him muttering something,

20    but I was looking at the other brothers.

21    Q.    And was that meeting video- and audio-recorded?

22    A.    Yes, ma'am.

23    Q.    What happened after the Defendants took the

24    pledge to Al-Qaeda?

25    A.    We sat and we discussed -- we spoke about the

1    plan in Chicago and we spoke about the Al-Qaeda plan,

2    attack in the United States.

3    Q.    All right.  Now, what, if any, directions did the

4    FBI give you regarding an Al-Qaeda plan?

5    A.    The FBI told me, before the meeting, to speak

6    about different points.  One of them was to speak about

7    Al-Qaeda attacking the United States against federal

8    building, United States.

9    Q.    And what, if anything, were you to do or say

10   prior to talking about an Al-Qaeda plan?

11   A.    I was giving the reason why we -- why Al-Qaeda

12   has the plan, why they want to attack in the United

13   States.

14   Q.    And did you discuss that in front of Brother Naz

15   alone or with everybody else present?

16   A.    No.  Everybody were present in the meeting.  And

17   we spoke about both plans -- Chicago and Al-Qaeda

18   plan -- in front everybody.

19   Q.    What, if any, questions did you ask Brother Naz

20   regarding the other Defendants being present?

21   A.    I asked him -- I said, "Brother Naz, what you

22   prefer?  We speak alone, you and I, or you want me to

23   speak in front everybody?"

24         And he said, "No.  You speak in front everybody."

25   Q.    What, if any, directions did FBI give you in that

1    regard?

2    A.     That speak and discuss it in front everyone.

3    Q.     Well, did -- what -- did FBI tell you to say

4    that, to ask Brother Naz?

5            MR. VEREEN:  Objection.  Leading.

6            THE COURT:  Sustained.

7            Rephrase your question.

8    BY MS. ARANGO:

9    Q.     What, if any, directions did FBI give you

10   regarding asking Brother Naz to speak in front of the

11   other Defendants?

12   A.     The FBI -- they told me to -- they want to know

13   if everybody knows or everybody is aware of the plan in

14   Chicago and -- the plan of Al-Qaeda, everybody -- in

15   front everybody that are aware of, if they know.

16   Q.     So what, if any, directions did they give you in

17   that regard?

18   A.     To speak in front all of them and ask Brother Naz

19   to see if -- to find out if they know or -- that

20   involved in the plan.

21   Q.     When you asked Brother Naz is it okay for you to

22   speak in front of the other Defendants, was that your

23   idea or FBI's idea?

24   A.     The FBI idea.

25   Q.     Okay.  And what, if anything, did you give to

1   Brother Naz during the course of this meeting?

2   A.     I gave him a videocamera.

3   Q.     And had you discussed a videocamera with him

4   before this?

5   A.     Brother Naz requested videocamera for -- for

6   observation for his plan in Chicago, his Sears Tower

7   plan.

8   Q.     Did you give him a still camera or just a

9   videocamera?

10   A.     I gave him a videocamera, ma'am.

11   Q.     And what, if anything, did you discuss with

12   Brother Naz and the Defendants regarding the Al-Qaeda

13   plan?

14   A.     That the -- Al-Qaeda want to attack five FBI

15   building in United States and asking for the help of

16   the Moors.

17   Q.     And what, if any, help did you request of the

18   Moors in this regard?

19   A.     Assisting Al-Qaeda by locating the building of

20   the -- the federal building, the FBI, and help Al-Qaeda

21   to make observation.

22   Q.     What do you mean by making observation?

23   A.     Location, security of the building, taking

24   pictures, assisting Al-Qaeda.

25   Q.     And what was the response given to you?

1   A.    Said, "We are alliance and now we are Al-Qaeda

2   and we will help Al-Qaeda."

3   Q.    About how long did that meeting in the warehouse

4   last?

5   A.    I don't recall exact the time.  But maybe two,

6   three hours.

7   Q.    I'm sorry?

8   A.    Maybe two, three.  I don't know exactly the time.

9   Q.    Was there a lot of discussions during the course

10  of those two to three hours?

11  A.    Yes, ma'am.

12  Q.    Now, let me ask you something:  Have you reviewed

13  the audio and video recording of that meeting in the

14  warehouse on March 16th?

15  A.    Yes, ma'am.

16  Q.    And what, if any, opinions do you have about how

17  you played your role during that meeting?

18        MR. VEREEN:  Objection as to relevance.  His

19  opinion.

20        THE COURT:  Sustained.

21        Rephrase your question.

22  BY MS. ARANGO:

23  Q.    Well, let me ask you this:  Were you playing a

24  role during the course of that meeting?

25  A.    Yes, ma'am.

```
 1   Q.     And what was your role?

 2   A.     My role was I represent Al-Qaeda and terrorist

 3   organization.  And I did my best to --

 4          MR. VEREEN:  Objection.  It's not responsive

 5   to the question.

 6          THE COURT:  Overruled.

 7          THE WITNESS:  I did my best to play my role

 8   the way how I know.  And maybe I should talk less than

 9   I was supposed to talk.  But....

10   BY MS. ARANGO:

11   Q.     Well, why do you think you talked -- why do you

12   think that you should have spoken less?

13          MS. JHONES:  Objection.  Relevance, your

14   Honor.

15          MR. VEREEN:  Objection.

16          THE COURT:  Sustained.

17   BY MS. ARANGO:

18   Q.     What, if any, directions were you ever given by

19   the FBI regarding the playing of your role?

20   A.     One more time.

21   Q.     What, if any, directions did FBI give you

22   regarding how you play your role?

23   A.     To talk -- my problem is I'm -- in English, I'm

24   not good.  And sometimes try to express myself to make

25   people in front of me to understand --
```

 1          MR. VEREEN:  Objection.  Not responsive to the

 2   question.

 3          THE COURT:  Sustained.

 4   BY MS. ARANGO:

 5   Q.    What, if any, direction did FBI give you

 6   regarding playing your role?

 7   A.    To talk less and listen more.

 8   Q.    Okay.  And did you do so all the time?

 9          MR. VEREEN:  Objection as to time frame.

10   When?

11          MS. ARANGO:  I'm talking about March 16th.

12   BY MS. ARANGO:

13   Q.    Did you do so throughout the course of that

14   meeting?

15   A.    No, ma'am.

16   Q.    Why not?

17          MR. VEREEN:  Objection as to relevance.

18          THE COURT:  Overruled.

19          THE WITNESS:  Because I have a problem

20   expressing myself in English, because it's not my

21   native language.

22          And sometimes I lose the person in front of me

23   and I -- when I say something, I see he's not

24   understanding me.  It's like --

25          MR. VEREEN:  Objection.  Speculation.

```
 1              MS. ARANGO:  That's not speculative.

 2              THE COURT:  Overruled.

 3   BY MS. ARANGO:

 4   Q.    You can answer.

 5   A.    I try to explain what I mean.  I want them to

 6   understand what I'm saying, not what he's hearing, what

 7   I mean, what I'm saying.

 8         And I take my time to express myself or maybe I

 9   use lot more words just to be sure that the person in

10   front me understand what I'm telling him.

11   Q.    Now, did you leave the meeting with anybody?

12   A.    Yes, ma'am.

13   Q.    Who was that?

14   A.    Brother Patrick.

15   Q.    And did he drive you -- did he drive you home

16   after the meeting?

17   A.    Yes, ma'am.

18   Q.    And during the course of him driving you home,

19   did you have any discussions with him?

20   A.    Maybe a few words.  But I didn't have any

21   discussion, like any conversation, with him.

22   Q.    And why is that?

23   A.    Because already we spoke what -- I spoke what I

24   need to speak in front everybody during the meeting in

25   the warehouse.  We spoke about all the major points,
```

Assaad - DIRECT - By Ms. Arango                    82

```
 1    what the FBI told me to bring in front all the members,

 2         And, second, I establish -- I don't want to

 3    offend the relationship or the leadership between

 4    Brother Patrick and Brother Naz, because he's

 5    already established the leadership with Brother Naz.

 6         So I didn't feel anything relevant, you know --

 7    sorry -- I apologize -- to speak something different

 8    with Brother Patrick.

 9    Q.    When was the next time that you met with Brother

10    Naz after the March 16th meeting?

11    A.    If I'm not wrong, maybe March 24.

12    Q.    Now, on March 24 of 2006, who did you meet with?

13    A.    I believe we had two meetings that day, in the

14    morning and in the evening.

15         Which one you are referring to?

16    Q.    I apologize.

17         Let's talk first about the morning meeting.

18    A.    Morning meeting?  I believe Brother Naz and

19    another person, but I don't remember exactly who.

20    Q.    What was the purpose of meeting with Brother Naz

21    that morning on March 24th?

22    A.    We were discussing about the plan -- the Al-Qaeda

23    plan.

24    Q.    Let me ask you something:  Was that meeting

25    recorded?
```

Assaad - DIRECT - By Ms. Arango

```
1    A.     Yes, ma'am.

2    Q.     Let me show you what's been marked as

3    Government's Exhibit 71 and 71-A, and ask you if you

4    recognize them.

5    A.     Okay.

6    Q.     While Ms. Jhones is looking at that, Mr. Assaad,

7    you mentioned that there was a meeting in the evening

8    as well on March 24th.

9    A.     Yes, ma'am.

10   Q.     Was that meeting recorded, also?

11   A.     Yes, ma'am.

12   Q.     I'm going to also show you Government's

13   Exhibit 72 and 72-A.

14   A.     Thank you.

15   Q.     Showing what's been marked as Government's

16   Exhibit 71, I'll ask you if you recognize that.

17   A.     Yes, ma'am.

18   Q.     What is it?

19   A.     This is a CD.

20   Q.     Okay.  Is it a CD of the meeting that occurred on

21   March 24th in the morning?

22   A.     Yes, ma'am.

23   Q.     And does it contain a true and accurate copy of

24   the recording that you made on March 24th in the

25   morning?
```

1    A.      Yes, ma'am.

2    Q.      And have there been any deletions or alterations

3    to the original recording?

4    A.      No, ma'am.

5    Q.      Turning to Government's Exhibit 71-A, is that a

6    transcript of that recording?

7    A.      Yes, ma'am.

8    Q.      Have you reviewed that transcript?

9    A.      Yes, ma'am.

10   Q.      Did you review it in conjunction with listening

11   to the recording?

12   A.      Yes, ma'am.

13   Q.      And does -- is it a true and accurate transcript

14   of the recording?

15   A.      Yes, ma'am.

16   Q.      Are the speakers properly identified?

17   A.      Yes, ma'am.

18          MS. ARANGO:  Government offers 71 and 71-A

19   into evidence.

20          MS. JHONES:  No objection.

21          THE COURT:  They will be admitted as

22   Government's Exhibits 71 and 71-A.

23          (Whereupon, Government's Exhibit Nos. 71 and

24   71-A were entered into evidence.)

25

1    BY MS. ARANGO:

2    Q.    While I'm up here, let me show you Government's

3    Exhibit 72.  Do you recognize it?

4    A.    Yes, ma'am.

5    Q.    Does it contain your initials?

6    A.    Yes, ma'am.

7    Q.    And does Government's Exhibit 72 contain a

8    recording of the meeting that occurred in the evening

9    of March 24th?

10   A.    Yes, ma'am.

11   Q.    And were there any deletions or alterations to

12   that recording?

13   A.    No, ma'am.

14   Q.    Showing -- returning now to 72-A, is that a

15   transcript of that recording?

16   A.    Yes, ma'am.

17   Q.    And have you reviewed that transcript in

18   conjunction with reviewing the recording on

19   Government's Exhibit 72?

20   A.    Yes, ma'am.

21   Q.    Is this a true and accurate transcript, to the

22   best of your ability?

23   A.    Yes, ma'am.

24   Q.    And does it properly identify the speakers?

25   A.    Yes, ma'am.

 1              MS. ARANGO:  Government offers 72 and 72-A

 2    into evidence.

 3              MS. JHONES:  No objection, your Honor.

 4              THE COURT:  They will be admitted as

 5    Government's Exhibits 72 and 72-A.

 6              (Whereupon, Government's Exhibit No. 72 and

 7    72-A were entered into evidence.)

 8              THE COURT:  You may publish.

 9              MS. ARANGO:  Thank you, Judge.

10              Turning first to Government's Exhibit 71-A --

11              THE COURT:  Are these in the notebook?

12              MS. ARANGO:  Yes, they are.

13              THE COURT:  You may turn to the Tab 71-A.

14              MS. ARANGO:  And these page numbers go by the

15    Bates stamp numbers.  So I would ask the jurors to turn

16    to DO 5048.  DO 5048.

17              This clip is going to start at the bottom --

18    three speakers up from the bottom.

19              (Whereupon, segments of Government's Exhibit

20    No. 71 were published in open court.)

21              MS. ARANGO:  Can you pause, please.

22    BY MS. ARANGO:

23    Q.    Right there, where Narseal Batiste says to you,

24    "I need to rent a car because --" and then you say,

25    "Tomorrow morning you will have the van" and he says,

1    "Oh, so you're gonna rent a van" -- do you see that?

2    A.    Yes, ma'am.

3            THE COURT:  What page is this, please?

4            MS. ARANGO:  DO 5048 and then going on to the

5    next page, which is DO 5049.  It's a Bates -- Bates

6    stamp numbers.

7            THE COURT:  Okay.

8            THE WITNESS:  Yes, ma'am.

9    BY MS. ARANGO:

10   Q.    What were you discussing there?

11   A.    He request a car for -- to do -- to take the

12   surveillance for the FBI building.

13   Q.    And when did you understand him to be taking the

14   pictures of the FBI building?

15   A.    On -- in -- he requested for the 25, this

16   weekend.

17   Q.    Well, we're talking now -- we're on March 24th.

18   A.    Maybe 26 and 27.

19   Q.    You say here, "Tomorrow morning you will have the

20   van."

21   A.    The 25th.

22   Q.    So when did -- when was your understanding as to

23   when the pictures were going to be taken?

24   A.    Maybe the 25th and 26th, because he said he will

25   give it to me on Sunday.  The 25th.

1          MS. ARANGO:  Let's go on.

2          (Whereupon, segments of Government's Exhibit

3    No. 71 were published in open court.)

4          MS. ARANGO:  Turning to the next clip,

5    DO 5075.

6          MS. JHONES:  Your Honor, I don't believe there

7    were any questions pending as to this clip.  I believe

8    they just played a clip without any questions of this

9    witness, and I don't think that's proper.

10          MS. ARANGO:  I can publish in any way I'd like

11    to, Judge.

12          THE COURT:  Overruled.

13          (Whereupon, segments of Government's Exhibit

14    No. 71 were published in open court.)

15          MS. ARANGO:  Pause it.

16          I'm sorry.  I should have told you where it's

17    going to start.  It's going to start right in the

18    middle, nine speakers up from the bottom.

19          Could you start it over again, please.

20          (Whereupon, segments of Government's Exhibit

21    No. 71 were published in open court.)

22          MS. ARANGO:  I apologize, Judge.  It's Clip 2.

23          (Whereupon, segments of Government's Exhibit

24    No. 71 were published in open court.)

25          MS. ARANGO:  Can you pause it.

 1   BY MS. ARANGO:

 2   Q.    In this discussion at Page 5076 -- DO 5076,

 3   where -- continuing on from the earlier page, where

 4   Narseal Batiste discusses a north building and a

 5   building downtown and then he's talking at Page DO 5076

 6   about, "We'll take both.  I'm gonna do both," what was

 7   your understanding of what he was talking about?

 8   A.    He would record the -- both building, the north

 9   FBI building and downtown building.

10            MS. ARANGO:   Continue.

11            (Whereupon, segments of Government's Exhibit

12   No. 71 were published in open court.)

13   BY MS. ARANGO:

14   Q.    Now, I think you testified that there was another

15   meeting later on in the evening on March 24th.

16   A.    Yes, ma'am.

17   Q.    What was the purpose of that meeting?

18   A.    Because Brother Naz request lenses for his camera

19   and memory chip for his camera.

20   Q.    And who attended that meeting?

21   A.    They pick me up from South Beach, Brother Patrick

22   and Brother Naz.

23   Q.    And where did you go?

24   A.    We went to -- to North Miami, to the store,

25   Circuit City.

1    Q.      And what happened at Circuit City?

2    A.      We went inside.

3    Q.      Who's "we"?

4    A.      Brother Naz and myself.

5    Q.      Okay.

6    A.      And Brother Patrick stayed in the car.  We went

7    inside, and he bought the lenses for his camera and the

8    memory chip.

9    Q.      Who paid for them?

10   A.      I was directed -- FBI told me to pay.  I pay.

11   Q.      All right.  The memory chip and the lens:  Was

12   that to be used in the videocamera or another camera?

13   A.      He request it for his own camera.  He has a

14   camera, take pictures.  But for his -- he explained to

15   me that, for the distance, he want lenses to take

16   pictures up close.  And he asked me to buy them.

17   Q.      And what was the purpose of the memory chip?

18   A.      It's to take -- to give it to me to -- for the

19   card -- for -- his camera need to download the pictures

20   or to save the pictures, to give it to Al-Qaeda.

21   Q.      Now, let's turn to Government's Exhibit 72-A --

22   actually, before I get there, what happened after you

23   all left the Circuit City?

24   A.      After we left, he wanted to show me the FBI

25   building and other targets.  And he -- we drove next to

1    them.

2    Q.    And what's your understanding of "targets"?

3    A.    The Al-Qaeda targets, because we told him --

4    like, I don't know here -- I don't know where the FBI

5    building -- I don't know the location.

6          I said, "If you want, I can take you.  I show you

7    the building, what Al-Qaeda want to bomb."

8    Q.    Who said that?

9    A.    He said he will show me where the FBI building

10   is, because this is what Al-Qaeda wants to bomb.

11   Q.    Okay.

12   A.    The location.

13          MS. ARANGO:  Let's turn to Page -- 72-A,

14   Page 16.

15          THE COURT:  You may turn to 72-A.

16          MS. ARANGO:  This clip is going to start in --

17   about halfway through the page, ten speakers up from

18   the bottom.

19          (Whereupon, segments of Government's Exhibit

20   No. 72 were published in open court.)

21   BY MS. ARANGO:

22   Q.    What was happening during that clip?

23   A.    Brother Naz was showing me where the Jews pray.

24   He was showing me different targets, interesting places

25   for Al-Qaeda to hit.

1    Q.     Was that a Jewish synagogue?

2    A.     Yes, ma'am.

3    Q.     And where were -- were you in the car?

4    A.     We were driving next to the place.

5    Q.     Who was driving?

6    A.     Brother Patrick.

7    Q.     And where was Brother Naz seated in the car?

8    A.     Yes, ma'am.  He was seated in the back.

9    Q.     He was -- where were you?

10   A.     I was in front.

11          MS. ARANGO:  Let's turn to Page 50.  This is

12   going to be a short clip that will start the fourth

13   speaker down from the top.

14          (Whereupon, segments of Government's Exhibit

15   No. 72 were published in open court.)

16          MS. ARANGO:  Let's turn to the next clip,

17   which is at Page 53.  And nine speakers down from the

18   top is where this clip will start.

19          (Whereupon, segments of Government's Exhibit

20   No. 72 were published in open court.)

21   BY MS. ARANGO:

22   Q.     What was happening during that clip?

23   A.     We were passing next to the FBI building, North

24   Miami.

25   Q.     And what, if anything, did the car do?

1    A.    The car?

2    Q.    Well, what -- how did you drive by that building

3    or how --

4    A.    We were driving with the truck, twice.  We went

5    up and we came down next to the FBI building.

6          MS. ARANGO:  Let's go to the next clip, which

7    would be beginning at Page 55.  It's the fifth speaker

8    down from the top, is where this clip will start.

9          (Whereupon, segments of Government's Exhibit

10   No. 72 were published in open court.)

11         MS. ARANGO:  Pause it, please.

12   BY MS. ARANGO:

13   Q.    Let me ask you something regarding the

14   National -- the National Guard building.

15         Had you requested of Narseal Batiste to drive you

16   by the National Guard building?

17   A.    No, ma'am.

18   Q.    And what about the Jewish synagogue?

19   A.    No, ma'am.

20         MS. ARANGO:  You can continue.

21         (Whereupon, segments of Government's Exhibit

22   No. 72 were published in open court.)

23         MS. ARANGO:  And now let's turn to Page 61.

24   We're going to do a short clip there that will start

25   four speakers down from the top.

Assaad - DIRECT - By Ms. Arango                      94

 1              (Whereupon, segments of Government's Exhibit

 2     No. 72 were published in open court.)

 3     BY MS. ARANGO:

 4     Q.    Mr. Assaad, Narseal Batiste says to you, "Yeah.

 5     That's why I formed alliance with Al-Qaeda, so I can

 6     get the help -- so I can build the amount of the

 7     soldiers I need."

 8              Whose idea was it to form an alliance with

 9     Al-Qaeda?

10     A.    Brother Naz's.

11     Q.    Did you introduce that idea to him?

12     A.    No, ma'am.

13              MS. ARANGO:  Let's go to the last clip, which

14     will start at Page 64.  It's going to be the top of

15     Page 64, the second speaker down.

16              (Whereupon, segments of Government's Exhibit

17     No. 72 were published in open court.)

18              MS. ARANGO:  Pause it, please.

19     BY MS. ARANGO:

20     Q.    What was happening during the clip when Narseal

21     Batiste says, "That's it right here" and then you say,

22     "Is this a base?"  What were you all doing?

23     A.    He was showing me the military base, passing

24     next -- passing next to it.

25              MS. ARANGO:  You can continue.

```
 1              (Whereupon, segments of Government's Exhibit

 2    No. 72 were published in open court.)

 3              MS. ARANGO:  Pause it.

 4    BY MS. ARANGO:

 5    Q.    What were you discussing when you said, "So

 6    tomorrow, what time you starting, brother?"

 7    A.    What time he will go and take -- what time he

 8    will go and take pictures of the targets.

 9    Q.    So, now, this is the -- this recording is

10    occurring on the evening of March 24th.  Correct?

11    A.    Yes, ma'am.

12    Q.    So, then, when were you talking about him taking

13    the pictures?

14    A.    On the next day, 25th.

15              MS. ARANGO:  You can continue.

16              (Whereupon, segments of Government's Exhibit

17    No. 72 were published in open court.)

18              MS. ARANGO:  You can stop it.

19    BY MS. ARANGO:

20    Q.    So when did you meet with Brother Naz again after

21    this meeting on the evening of March 24th?

22    A.    I believe on 26.

23    Q.    Where did that meeting occur?

24    A.    In the Embassy -- in the warehouse.  Sorry.

25    Q.    What was the purpose of the meeting on
```

```
 1    March 26th?

 2    A.    To give me the pictures and surveillance he took.

 3    Q.    Of what?

 4    A.    Of the FBI building, the targets for Al-Qaeda.

 5    Q.    So did you -- was the meeting on March 26th in

 6    the warehouse -- was it audio- and video-recorded?

 7    A.    Yes, ma'am.

 8    Q.    Let me show you what's been marked as

 9    Government's Exhibit 80, 80-A and 80-B, and ask you if

10    you recognize it.

11          THE COURT:  We're going to break here for

12    lunch.

13          Do not discuss this case either amongst

14    yourselves or with anyone else.  Have no contact

15    whatsoever with anyone associated with the trial.  Do

16    not read, listen or see anything touching on this

17    matter in any way.

18          If anyone should try to talk to you about this

19    case, you should immediately instruct them to stop and

20    report it to my staff.

21          You may leave your notebooks and your

22    materials at your chairs.  Please be back in the jury

23    room in one hour -- an hour and five minutes.

24          (Whereupon, the jury exited the courtroom at

25    12:56 p.m. and the following proceedings were had:)
```

```
 1              THE COURT:  We're in recess until 2:00.

 2              (Thereupon, a luncheon recess was taken, after

 3      which the following proceedings were had:)

 4              THE COURT:  We're back on United States of

 5      America versus Narseal Batiste, et al., Case

 6      No. 06-20373.

 7              Counsel, state your appearances, please, for

 8      the record.

 9              MR. GREGORIE:  Good afternoon, your Honor.

10              Richard Gregorie and Jacqueline Arango on

11      behalf of the United States.

12              MS. JHONES:  Good afternoon, your Honor.

13              Ana Jhones on behalf of Narseal Batiste, who

14      is present.

15              MR. LEVIN:  Albert Levin for Patrick Abraham,

16      who's present.

17              MR. CASUSO:  Good afternoon.

18              Lou Casuso on behalf of Burson Augustin, who's

19      present.

20              MR. CLARK:  Good afternoon.

21              Nathan Clark for Rotschild Augustine, who's

22      present.

23              MR. HOULIHAN:  Richard Houlihan with Naudimar

24      Herrera.

25              MR. VEREEN:  And Roderick Vereen on behalf of
```

 1      Stanley Phanor, who's present.

 2               THE COURT:  All Defendants are present.

 3               Let's bring in the jury.

 4               (Whereupon, the jury entered the courtroom at

 5      2:13 p.m. and the following proceedings were had:)

 6               THE COURT:  You may be seated.

 7               You are still under oath, sir.

 8               You may proceed, Ms. Arango.

 9               MS. ARANGO:  Thank you, Judge.

10      BY MS. ARANGO:

11      Q.    Mr. Assaad, I'm just picking up where we left

12      off.

13            Was there a meeting on March 26th, 2006?

14      A.    Yes.

15      Q.    At the warehouse?

16      A.    At the warehouse.  Yes, ma'am.

17      Q.    And was that meeting audio- and video-recorded?

18      A.    Yes, ma'am.

19      Q.    I'm going to show you some exhibits and ask you

20      if you recognize them.

21            First of all, let me show you Government's

22      Exhibit 80-A, and ask you if you recognize that.

23      A.    Yes, ma'am.

24      Q.    Is that a copy of the -- is that a CD of the

25      audio portion of the meeting on March 26th, 2006?

 1   A.      Yes, ma'am.

 2   Q.      Have you reviewed -- have you listened to that

 3   audio recording?

 4   A.      Yes, ma'am.

 5   Q.      Is it a true and accurate recording of the

 6   meeting that you participated in on March 26th, 2006?

 7   A.      Yes, ma'am.

 8   Q.      Let me show you what's been marked as

 9   Government's Exhibit 80, and ask you if you recognize

10   that CD --

11   A.      Yes, ma'am.

12   Q.      -- excuse me -- that DVD.

13   A.      Yes, ma'am.

14   Q.      And is it the video portion of the meeting on

15   March 26th, 2006?

16   A.      Yes, ma'am.

17   Q.      And have you reviewed it?

18   A.      Yes, ma'am.

19   Q.      And is the video portion of the meeting a true

20   and accurate -- is it a true and accurate recording of

21   the video of the meeting?

22   A.      Yes, ma'am.

23   Q.      Now, let me show you what's been marked as

24   Government's Exhibit 80-C.

25           Is that a synchronized version of audio and video

 1    together?

 2    A.     Yes, ma'am.

 3    Q.     And does it also have the transcript at the

 4    bottom of the synchronized video?

 5    A.     Yes, ma'am.

 6    Q.     Let me show you what's been marked as

 7    Government's Exhibit 80-B, and ask you if you recognize

 8    it.

 9    A.     Yes, ma'am.

10    Q.     Is that a transcript of the audio portion of the

11    meeting on March 26th?

12    A.     Yes, ma'am.

13    Q.     Have you reviewed that transcript?

14    A.     Yes, ma'am.

15    Q.     Have you reviewed that transcript in conjunction

16    with viewing the audio and video combined?

17    A.     Yes, ma'am.

18    Q.     And is it a true and accurate transcript?

19    A.     Yes, ma'am.

20    Q.     And is the transcript portion of 80-C a true and

21    accurate transcript taken from 80-B?

22    A.     Yes, ma'am.

23    Q.     Are the speakers properly identified?

24    A.     Yes, ma'am.

25              MS. ARANGO:   Government offers 80, 80-A, 80-B

```
 1   and 80-C into evidence at this time.

 2             MS. JHONES:  No objection, your Honor.

 3             THE COURT:  They will be admitted as

 4   Government's Exhibits 80, 80-A, 80-B and 80-C.

 5             (Whereupon, Government's Exhibit Nos. 80,

 6   80-A, 80-B and 80-C were entered into evidence.)

 7             THE COURT:  You may publish.

 8             MS. ARANGO:  Thank you, Judge.

 9             And since the transcript is going to be on the

10   screen, we're going to have a rolling transcript, I'm

11   not going to turn to any portion of the binders.

12             MS. JHONES:  May we have a reference in the

13   binders, Ms. Arango?  Thank you.

14             MS. ARANGO:  Yes.  Yes.  The first chip will

15   begin at Page 19.

16             (Whereupon, segments of Government's Exhibit

17   No. 80 were published in open court.)

18             MS. ARANGO:  Judge, I'm not getting a feed

19   here.

20             THE COURT:  I don't know what to tell you.

21   The monitors are on.

22             Is there a button to turn it on?

23             MS. ARANGO:  Maybe that's the problem.  Yes.

24   Sorry about that.

25             THE COURT:  The on/off switch always helps.
```

 1          MS. ARANGO:  It starts at the bottom of the

 2   page.

 3          You can continue.

 4          (Whereupon, segments of Government's Exhibit

 5   No. 80 were published in open court.)

 6          MS. ARANGO:  Pause it, please.

 7   BY MS. ARANGO:

 8   Q.    Mr. Assaad, who is the person standing at the

 9   back of the room at the door?

10   A.    Brother Augustine.

11   Q.    Who?

12   A.    Augustine.

13   Q.    How did you refer to him?

14   A.    Brother Rot.

15   Q.    I'm sorry.  I missed that.

16          Who was it that's back there?

17   A.    (No response.)

18   Q.    Do you want to take a look at the transcript?

19   Maybe that'll fresh your recollection.

20   A.    Brother Augustin.

21   Q.    Could you please look at the transcript and tell

22   me who are the participants to this conversation.  Look

23   at the front page of the transcript, please, 80-B.

24   A.    Brother B.  Burson Augustin.

25   Q.    Did you call -- what did you call him during the

 1   course of this investigation?  How did you refer to

 2   him?

 3   A.     Brother B.

 4   Q.     Brother B?

 5   A.     B.

 6   Q.     Okay.  And where is Narseal Batiste?

 7   A.     It's sitting behind the desk.

 8   Q.     Now, during this portion of the clip, where you

 9   had just said, "Thank you, brother.  Allah will thank

10   you.  Thank you.  So you're telling me you want to be

11   involving in this mission to assist Al-Qaeda.  This is

12   what he's telling me," what was happening during this

13   portion of the clip?

14   A.     I was trying to understand -- I was trying to

15   tell Brother Naz that Al-Qaeda will not involve him

16   in -- it will not involve any brother from the Moors,

17   will not ask any more help.  That's it.  You know, "You

18   assist us taking pictures, video.  But we will not ask

19   you to do more."

20          And he was kind of upset, because he want to

21   involve more.  He want to help Al-Qaeda and assisting

22   Al-Qaeda by involving in planning.

23              MS. ARANGO:  You can continue.

24              (Whereupon, segments of Government's Exhibit

25   No. 80 were published in open court.)

1    BY MS. ARANGO:

2    Q.    What was your understanding of what Mr. Batiste

3    was saying to you at the very end there about, "And

4    this is where I stand, but I'm also asking Al-Qaeda for

5    much more assistance in my hard work and my time"?

6    A.    He asking from Al-Qaeda to -- from all his help

7    and his assist to Al-Qaeda, just to took care of him,

8    to help him for all that he needs.

9    Q.    And what was your understanding of what

10   assistance he wanted?

11   A.    He gave me list from all kind of assist he wants:

12   weapons, money, trucks.

13         MS. ARANGO:  Let's play the next clip.

14         For you all, it's at Page 32, about two-thirds

15   of the way down.

16         THE WITNESS:  What page?

17         MS. ARANGO:  Page 32.  But it's going to come

18   up on the screen.

19         (Whereupon, segments of Government's Exhibit

20   No. 80 were published in open court.)

21   BY MS. ARANGO:

22   Q.    What is being discussed here, Mr. Assaad,

23   regarding a building housing Padilla, Noriega and other

24   prisoners?

25   A.    He was speaking about the courthouse and federal

```
 1    prison and US Attorney Office.
 2              MS. ARANGO:  You may continue.
 3              (Whereupon, segments of Government's Exhibit
 4    No. 80 were published in open court.)
 5    BY MS. ARANGO:
 6    Q.    Mr. Assaad, what, if anything, did Narseal
 7    Batiste give you in this meeting?
 8    A.    He gave me the pictures and the surveillance of
 9    the buildings -- the FBI building and downtown
10    building.
11    Q.    Let me show you what's been marked as
12    Government's Exhibit 121 and 122, and ask you if you
13    recognize them.
14          Government's Exhibit 120 and 121 -- excuse me --
15    is -- first of all, let's start with Government's
16    Exhibit 121 that you're holding in your hand right now.
17          Do you recognize that?
18    A.    Yes, ma'am.
19    Q.    What is it?
20    A.    It's from the -- from the camera, pictures.
21    Q.    Okay.  Is it a memory chip?
22    A.    Memory chip.
23    Q.    Is that the same memory chip that you purchased
24    on March 24th with Narseal Batiste?
25    A.    Yes, ma'am.
```

1   Q.    And did he hand that to you on -- at this meeting

2   that's recorded on March 26th?

3   A.    Yes, ma'am.

4   Q.    What did you do with that after you got it?

5   A.    I gave it to the FBI.

6   Q.    Look at Government's Exhibit 120.  What is that?

7   A.    It's a videocassette.

8   Q.    And did that -- was that provided to you by

9   Mr. Batiste on March 26th?

10  A.    Yes, ma'am.

11  Q.    Now, when he handed it to you, what, if anything,

12  did he do with his hands?

13  A.    He was wearing gloves for -- he said for safety,

14  for fingerprints, for all this stuff.

15  Q.    And what did you do with Government's Exhibit 120

16  after you got it?

17  A.    I gave it to the FBI.

18  Q.    Showing you Government's Exhibit 120-A and 121-A,

19  do you recognize those?

20  A.    Yes, ma'am.

21  Q.    What is Government's Exhibit 120-A?

22  A.    It's the DVD.

23  Q.    And what is it a DVD of in relation to

24  Government's Exhibit 120?

25  A.    It's the video from the target bases.

1    Q.    Is it a copy of the videocassette marked

2    Government's Exhibit 120?

3    A.    Yes, ma'am.

4    Q.    And it's in DVD format?

5    A.    Yes, ma'am.

6    Q.    And Government's Exhibit 121-A:  What is that?

7    A.    It's pictures copied from the memory chip.

8    Q.    Marked as Exhibit 121?

9    A.    Yes.

10   Q.    Did you receive Government's Exhibit 120-A and

11   121-A during the course of this investigation?

12   A.    Yes, ma'am.

13   Q.    Who provided it to you?

14   A.    The FBI.

15   Q.    And what, if anything, did you do with it after

16   they provided it to you?

17   A.    I didn't understand.  They gave it to me in the

18   warehouse.  I gave it to the FBI.

19   Q.    We'll go -- the copies that are marked

20   Government's Exhibit 120-A and 121-A:  Did the FBI give

21   you those?

22   A.    Yes, ma'am.

23   Q.    Did you do anything with them during the course

24   of this investigation?

25   A.    I reviewed with Brother Naz in the warehouse.

```
 1   Q.     Do you recall what day you reviewed it with
 2   Brother Naz?
 3   A.     No, ma'am.
 4   Q.     Now, the recording we just played was on
 5   March 26th, 2006.
 6          Did you have any meetings with Narseal Batiste
 7   the next day, on March 27th?
 8   A.     I believe.  Yes, ma'am.
 9   Q.     And where did that meeting occur?
10   A.     In the warehouse.
11   Q.     And what was the -- what was the purpose of that
12   meeting?
13   A.     The FBI told me to schedule a meeting with
14   Brother Naz in the warehouse.
15   Q.     And what did you do at that meeting?  What
16   occurred?
17   A.     If I remember correctly, I gave him -- I gave him
18   money.
19   Q.     Okay.
20   A.     And we discussed -- maybe we saw the video -- the
21   pictures and video.
22   Q.     Let me -- this is the next day, March 27th.
23   Okay?
24          First of all, who was present at the meeting on
25   March 27th?
```

Assaad - DIRECT - By Ms. Arango            109

```
 1   A.     I don't remember.
 2   Q.     Will the transcript of the meeting refresh your
 3   recollection?
 4   A.     Yes.
 5   Q.     I'm showing you what's marked as Government's
 6   Exhibit 81-B, which is already in evidence and has been
 7   played.
 8          So could you just take a quick look at that -- or
 9   take a minute to look at that and refresh your
10   recollection as to what occurred at the meeting on
11   March 27th.
12          I'm sorry.  Let me just interrupt you for just a
13   moment there.
14          First of all, my original question was:  Who was
15   present at the meeting?  Does that exhibit refresh your
16   recollection?
17   A.     Yes, ma'am.
18   Q.     Who was present?
19   A.     Brother B and Brother Naz.
20   Q.     You also mentioned that you paid Brother Naz some
21   money at that meeting.
22   A.     The reason I'm trying to refresh my -- I
23   remember, yeah, I pay him money.
24   Q.     And do you now remember what -- how much money
25   you paid him and what it was for?
```

1    A.    Yes.  I remember.

2    Q.    What was it?

3    A.    Because, on 24, in the night, he told me about

4    his problem and -- with Brother Patrick.  They had a

5    problem and he need to pay his attorney money.

6         And he asked if I can help him with something to

7    pay his attorney.

8         And I told the FBI, and the FBI gave me the money

9    to give to him.

10   Q.    And do you recall how much money it was?

11   A.    Excuse me?

12   Q.    Do you recall how much money it was?

13   A.    I believe it's $1,000.

14   Q.    Now, let me refer your attention to April 3rd.

15        Did you have a meeting with anybody on that day

16   in connection with this investigation?  April 3rd.

17   A.    I believe we had a meeting in the warehouse with

18   Brother Naz and Brother B.

19   Q.    And do you recall generally what occurred in that

20   meeting?  If you need to refresh your recollection, the

21   transcript is in evidence and the video has already

22   been played to this jury.  But I'm asking you just

23   briefly, if you can recall.

24   A.    Is it possible, please?

25   Q.    I'm showing you what's been marked as

 1    Government's Exhibit 85-B.

 2    A.     Yes, ma'am.

 3    Q.     Do you recall what was discussed generally at

 4    this meeting?

 5    A.     Yes.  We were discussing -- he told me about his

 6    big brother, Sultan from Chicago, and how he want to

 7    bring him down from Miami.

 8    Q.     And what was your understanding of who the Sultan

 9    was when -- as Mr. Batiste referred to him in this

10    meeting?

11    A.     That he knows about the plan he had in Chicago

12    and he's his contact in Chicago and he's the guy who

13    inspired him and he's like a leader for him.

14    Q.     And after you met with Mr. Batiste on April 3rd,

15    what, if any, direction did you receive from the FBI?

16    A.     After I told the FBI what happened and -- they

17    told me to pay the trip to bring Brother Sultan and his

18    wife down to Miami.

19    Q.     And do you recall how much money was discussed

20    that was necessary to bring the Sultan and his wife

21    down from Chicago?

22    A.     Brother Naz told me, after the calculations --

23    the hotel and the car and the food -- to bring him

24    down, round trip ticket for him and his wife -- I

25    believe it was around 2500 or 3,000.

1    Q.    And then did you, in fact, pay -- give

2    Mr. Batiste any money for those expenses?

3    A.    Yes, ma'am.

4    Q.    Let me refer your attention to a meeting on

5    April 5th of 2006.

6          I will ask you the same question as to -- do you

7    recall who was present at that meeting?

8    A.    Brother Naz and Brother B.

9    Q.    Do you recall anybody else being at that meeting?

10   A.    (No response.)

11   Q.    Will anything help refresh your recollection?

12   A.    Yes, please.

13   Q.    Let me show you a transcript marked Government's

14   Exhibit 89-B.

15   A.    Yes, ma'am.

16   Q.    Does that refresh your recollection as to who was

17   present at the meeting on April 5th of 2006 in the

18   warehouse?

19   A.    Yes, ma'am.

20   Q.    Who was present?

21   A.    Brother Sunni and Brother B and Brother Naz.

22   Q.    What generally happened at that meeting?

23   A.    I paid him 3500, what the FBI gave to me to give

24   to him.

25   Q.    Now, let me direct your attention to the next

```
 1   day, April 6th of 2006.

 2         Do you recall having a meeting on that day?

 3   A.    I believe -- yes, ma'am.  We reviewed the videos

 4   and the pictures.

 5   Q.    And who did you -- well, let me ask you this:

 6   Where did that review occur?

 7   A.    In the warehouse.

 8   Q.    And who was present at that meeting?

 9   A.    Brother Naz and Brother B.

10   Q.    Let me ask you something:  During the course of

11   these meeting in the warehouse, who, if anybody, was

12   standing at the back of the room by the door?

13   A.    Brother B.

14   Q.    And now what happened again on April 6th of 2006?

15   A.    We review the pictures and the video.

16   Q.    What pictures and what video?

17   A.    Of the FBI building and downtown -- the federal

18   court and US attorney and all what he gave me before.

19   Q.    And how long was your meeting on that day, if you

20   recall?

21   A.    I don't remember, exactly, ma'am.

22   Q.    What kind of discussions do you recall having

23   with Brother Naz during the course of that review?

24   A.    I believe we were trying to -- I was -- to see

25   the picture and the video that he gave me, his advice.
```

1    We were speaking about that.

2    Q.    What do you mean, "his advice"?

3    A.    Because he said he want to involve more and he

4    was telling me about the pictures he gave me and showed

5    me where the camera are on the buildings and he was

6    showing me all the details in what he took.

7    Q.    And during the course of the review, did you stop

8    at any portions in reviewing the video?

9    A.    Yes, ma'am.  We stop.

10   Q.    Now, let me direct your attention to April 19th

11   of 2006.

12         Do you recall what happened that day?

13   A.    I believe we met in South Beach.

14   Q.    How did that meeting occur?

15   A.    The FBI told me I would meet Brother Naz on that

16   day.

17   Q.    Where did you meet with Brother Naz that day?

18   A.    I met with him on the street.

19   Q.    Now, were you able to record that meeting?

20   A.    No, ma'am.

21   Q.    Why?

22   A.    Because when the FBI called me and --

23   specifically Agent Tony Velazquez, they was trying to

24   give me the recording device.

25         When I met with Agent Tony Velazquez and he gave

```
 1    it to me, when I was walking -- going back, a couple

 2    seconds walking, I --

 3    Q.    Let me ask you something.  Let me just stop you.

 4          Where did Agent Velazquez give you the recording

 5    device so you could record your meeting with Brother

 6    Naz on April 19th?

 7    A.    On South Beach, on the street.

 8    Q.    On the street?

 9    A.    Or -- we were physically standing on the street

10    when I came to pick it up, the recording.  Like you are

11    standing over there, I came to you.

12          Before I arrived to -- the distance is, more or

13    less, between over there and here.

14          When -- I received a phone call from Brother Naz

15    and he said to me, "Why -- why you didn't say 'hi' to

16    me?  Why you didn't talk to me?"

17          I said, "Where are you?"

18          And he said, "I'm next to you."

19          At that moment, I was in problem.  First, shock.

20    Second, wasn't able to activate the device for the

21    short time -- the distance between receiving the device

22    and meeting with Brother Naz.

23    Q.    So did you then meet with Brother Naz on foot on

24    April 19th?

25    A.    Yes, ma'am.
```

1    Q.    And did you see who he was with, if anybody?

2    A.    He told me that he parked in the parking lot and

3    there is brother waiting in the car.

4    Q.    And what did he tell you during that meeting?

5    A.    He told me that a problem show up in between the

6    brothers and the brother are divided and some are with

7    him and some with Brother Sultan and Brother Patrick

8    and some are in the middle.

9          He told me that -- be sure that -- they told him

10   I am Government informant or law enforcement and, in

11   14 days, if he doesn't have a contact with me, he will

12   be arrested and taken to jail.

13         But he said, "I believe you, brother.  I know you

14   are not.  And I will continue in my mission,

15   guaranteed."

16         He want to guarantee me that he didn't give up.

17   He want to continue the mission.

18   Q.    Did he tell you who accused you of being with the

19   Government?

20   A.    Brother Sultan.

21   Q.    What happened after this day in this

22   investigation?

23            MR. VEREEN:  Objection.

24            MS. JHONES:  Objection.  Calls for a narrative

25   and, also, calls for hearsay.

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  What happened?  The FBI told me

 3   to wait a little bit and see what's going on.  And they

 4   told me after a while to --

 5              MS. JHONES:  Objection as to what the FBI told

 6   him.

 7              THE COURT:  Ask your next question.

 8   BY MS. ARANGO:

 9   Q.    Did Narseal Batiste treat you any differently

10   after April 19th?

11   A.    We still -- we continue talking.

12   Q.    But did he meet with you regularly like he had

13   before?

14   A.    No, ma'am.

15   Q.    Did he continue to call you?

16   A.    I believe we spoke before that, but not like on a

17   daily basis.

18   Q.    Did the FBI give you any directions as to what to

19   do after April 19th?

20   A.    I always follow what the FBI told me from the

21   beginning, how -- what to do.

22   Q.    What, if any, meetings did you try to set up with

23   Mr. Batiste after April 19th?

24   A.    I guess we saw each other in the warehouse when

25   he pick up some stuff from the warehouse.
```

```
 1    Q.      That was sometime in May.   Correct?

 2    A.      Yes, ma'am.

 3    Q.      Now, what, if any, meetings did you try to set up

 4    with him and a weapons expert from Europe?

 5    A.      I tried to tell him that the bomb expert from

 6    Europe arrived and, you know, if he want to meet or

 7    want to talk.

 8    Q.      And did he meet with you?

 9    A.      I don't remember, ma'am.

10    Q.      Do you recall introducing him to any experts?

11    A.      No, ma'am.

12    Q.      When you asked to meet with him -- when you asked

13    him to meet with the bomb expert, did that occur?

14    A.      No, ma'am.

15    Q.      Did you make any attempts to do so?

16    A.      I don't recall.

17    Q.      Do you recall calling Mr. Batiste about

18    meeting --

19            MR. VEREEN:  Objection.  Leading.

20            MS. JHONES:  And asked and answered.

21            THE COURT:  Sustained.

22            Rephrase your question.

23    BY MS. ARANGO:

24    Q.      What, if any, calls did you have with Mr. Batiste

25    after April 19th regarding the explosives expert from
```

1   Europe?

2   A.    The FBI told me to call him to tell him that the

3   FB -- that the bomb expert -- he is trying to meet, if

4   he want to meet with them -- with him.

5   Q.    And did that ever occur?

6   A.    No, ma'am.

7   Q.    Did you ever tell Mr. Batiste that he was going

8   to get money or did you make any promises to

9   Mr. Batiste that he was going to get money from

10  Al-Qaeda?

11  A.    Ma'am, in the whole conversation -- in the whole

12  investigation, I never promise anything that he will

13  receive or he will not receive.  I left the door open

14  on both side.  No promises.

15        And I left open doors for the FBI and for the --

16  Brother Naz.  I never promised -- no promises in the

17  whole investigation about money or receiving or not

18  receiving.

19            MS. ARANGO:  Thank you.

20            No further questions.

21            MS. JHONES:  Your Honor, may we have a

22  side-bar, please?

23            THE COURT:  Come on up.

24            (Whereupon, proceedings were had at side-bar

25  outside the presence of the jury which have been sealed

1    per instructions of the Court.)

2              (Whereupon, the following proceedings were had

3    in open court:)

4              THE COURT:  We're going to take a ten-minute

5    recess.

6              Do not discuss this case either amongst

7    yourselves or with anyone else.  Have no contact

8    whatsoever with anyone associated with the trial.  Do

9    not read, listen or see anything touching on this

10   matter in any way.

11             If anyone should try to talk to you about this

12   case, you should immediately instruct them to stop and

13   report it to my staff.

14             You may leave your notebooks and your binder

15   in your chairs.  Be back in the jury room in ten

16   minutes.

17             (Whereupon, the jury exited the courtroom at

18   3:06 p.m. and the following proceedings were had:)

19             THE COURT:  We're in recess for ten.

20             (Thereupon a recess was taken, after which the

21   following proceedings were had:)

22             THE COURT:  We're back on United States of

23   America versus Narseal Batiste, et al., Case

24   No. 06-20373.

25             Counsel, state your appearances, please, for

1    the record.

2           MR. GREGORIE:  Richard Gregorie and Jacqueline

3    Arango on behalf of the United States, your Honor.

4           MS. JHONES:  Ana Jhones on behalf of Narseal

5    Batiste, who is present.

6           MR. LEVIN:  Albert Levin on behalf of Patrick

7    Abraham, who is present.

8           MR. CASUSO:  Lou Casuso on behalf of Burson

9    Augustin, who's present.

10          MR. CLARK:  Nathan Clark for Rotschild

11   Augustine, who's present.

12          MR. HOULIHAN:  Richard Houlihan with Naudimar

13   Herrera.

14          MR. VEREEN:  Rod Vereen on behalf of Stanley

15   Phanor, who's present.

16          THE COURT:  All Defendants are present.

17          Has that been resolved now, Ms. Arango?

18          MS. ARANGO:  Yes, Judge, it has.

19          The only thing is we are making extra copies

20   of those two pages.  They should be here within another

21   minute or two.

22          THE COURT:  For who?  Defense counsel?

23          MS. ARANGO:  For the defense counsel.

24          THE COURT:  Let's bring in the jurors.

25          (Whereupon, the jury entered the courtroom at

Assaad - CROSS - By Ms. Jhones                         122

         1   3:26 p.m. and the following proceedings were had:)

         2            THE COURT:  You may be seated.

         3            You are still under oath, sir.

         4            You may proceed, Ms. Jhones.

         5            MS. JHONES:  Thank you, your Honor.

         6            Good afternoon, ladies and gentlemen.

         7            THE JURY:  Good afternoon.

         8                      CROSS-EXAMINATION

         9   BY MS. JHONES:

        10   Q.    Mr. Assaad, you indicated on your direct

        11   testimony that your first meeting with Mr. Batiste was

        12   on 12-16 of '05.  Correct?

        13   A.    Yes, ma'am.

        14   Q.    And that was the meeting that took place at the

        15   Radisson Hotel?

        16   A.    Yes, ma'am.

        17   Q.    Did you actually fly in from out of the country

        18   on 12-16-05?

        19   A.    No, ma'am.

        20   Q.    You had already been here in the US.  Correct?

        21   A.    Excuse me?

        22   Q.    You had already been here in the United States on

        23   12-16.  Correct?

        24   A.    Yes, ma'am.

        25   Q.    So you were just at the airport playing the role

1   that you were assigned to play.  Correct?

2   A.    Yes, ma'am.

3   Q.    How long had you been in Miami, sir?

4   A.    Since I arrived or in general?

5   Q.    No.

6         How long had you been in Miami -- had you been in

7   Miami prior to 12-16-05, in connection with this

8   case -- how long had you been in Miami?

9   A.    If I remember correctly, I came before --

10  maybe -- before December 16, maybe three weeks or two

11  weeks.

12  Q.    And during that time period, sir, is it safe to

13  say that you did not have any residence in Miami?

14  A.    I don't live in Miami.

15  Q.    So you were staying at a hotel?

16  A.    The FBI took me from the airport and put me in

17  the hotel.  Yes, ma'am.

18  Q.    So prior to 12-16, you were in a hotel for

19  approximately three weeks.  Correct?

20  A.    Yes, ma'am.

21  Q.    And you continued to stay in Miami until sometime

22  in 2006, 2007.  Is that correct?

23  A.    I left in 2008 -- early 2008, from Miami.

24  Q.    Let me ask you something about that.

25        In May -- April-May of 2006, this investigation

Assaad - CROSS - By Ms. Jhones                                    124

1    was still going on.  Correct?

2    A.    Yes, ma'am.

3    Q.    And did you leave Miami at any point in April or

4    May of 2006?

5    A.    No, ma'am.

6    Q.    So it wasn't until 2008 that you left the United

7    States.  Correct?

8    A.    Yes, ma'am.

9    Q.    Let's talk a little bit about 12-16.  Okay, sir?

10   A.    Yes, ma'am.

11         MS. JHONES:  Your Honor, may I have the ELMO,

12   please.

13         THE COURT:  Yes.

14         MS. JHONES:  Thank you.

15   BY MS. JHONES:

16   Q.    Now, sir, we probably already know this by now,

17   but just to make sure we're on the same page, 12-16 is

18   the meeting in the Radisson where Mr. Batiste is

19   wearing a turban and has his white robe or whatever he

20   was wearing on that day.  Correct?

21   A.    Excuse me?

22   Q.    12-16 is the meeting where you and Mr. Batiste

23   walk into the hotel room, the room that's supposed to

24   be your room.  Correct?

25   A.    I was already in.

```
 1   Q.     You were already in.

 2          He knocks on the door and comes in?

 3   A.     Yes, ma'am.

 4   Q.     How was it that he knew to go to that room?

 5   A.     Excuse me?

 6   Q.     How was it that he knew what room you were in?

 7   A.     I spoke with Brother Naz and, if I remember

 8   correctly, I went down.  Maybe I came up from the lobby

 9   or I waited for him outside.  I don't remember exactly

10   the small detail.  Was long time.

11   Q.     Did you know what he looked like?  Did you know

12   it was Brother Naz that you were greeting in the lobby?

13   A.     I believe, when we spoke, we gave details on the

14   phone how -- what we were wearing.

15   Q.     And he gave you details as to what he was

16   wearing.  Fair enough?

17   A.     I believe.  Yes.

18   Q.     It wasn't very hard to spot him, was it, sir?

19   A.     No, ma'am.

20   Q.     Now, when he greets you -- when you greet each

21   other inside the room, you had had some food that was

22   ordered in.  Correct?

23   A.     I ordered before he arrived.

24   Q.     Mr. Batiste walks into the hotel room and you

25   have a seat at a table.  Correct?
```

```
 1    A.      Excuse me?

 2    Q.      Mr. Batiste walks into the hotel room -- your

 3    hotel room and there is a round table that you and

 4    Mr. Batiste sit at.  Correct?

 5    A.      Round table or normal table.  Yes, ma'am.

 6    Q.      Whatever.  Round, square.

 7            Normal table.  Right?

 8    A.      Yes.

 9    Q.      Right in front of the bed?

10    A.      Yes, ma'am.

11    Q.      And there is -- somewhere in that room, there is

12    a video recorder that is playing and recording --

13    videotaping everything that's going on.  Fair enough?

14    A.      Yes, ma'am.

15    Q.      There's also an audio recorder that's equipped in

16    that room?

17    A.      I believe so.  Yes, ma'am.

18    Q.      It wasn't -- you weren't wearing a body wire on

19    that occasion, were you?

20    A.      Body wire?

21    Q.      Yeah.

22            You weren't wearing a recording device on your

23    person?

24    A.      I had a wire -- I -- not on me, maybe, but --

25    Q.      In the room?
```

```
 1   A.     In the room.

 2   Q.     Okay.  Just so we're clear.

 3          All righty.  Now --

 4   A.     But I didn't say -- I said "maybe."  If there is

 5   something to recollect my memory.  But I believe it

 6   was.  I don't know.

 7   Q.     You don't remember whether you had a body wire --

 8   body recording on you or not that day?  It's okay if

 9   you don't remember.

10   A.     At all the meetings I attend, I had a body

11   recording device on -- with me.

12   Q.     Well, this meeting was a little bit different in

13   the sense that, even before Mr. Batiste got there, the

14   room was already wired up for surveillance -- audio and

15   video surveillance?

16   A.     Yes, ma'am.  But I believe I didn't have at that

17   date, the first meeting, any body recorder.

18   Q.     How many times had you been in that room before

19   12-16 of '05?

20   A.     Never.

21   Q.     That was your first time?

22   A.     Yes, ma'am.

23   Q.     And when you first start talking to Mr. Batiste

24   on 12-16, you have little small talk about, "Oh, I" --

25   you know, "I didn't see you at the airport.  You were
```

Assaad - CROSS - By Ms. Jhones                128

 1    supposed to pick me up at the airport" or words to that
 2    effect.  Correct?
 3    A.    Yes, ma'am.
 4    Q.    And later on in this conversation, sir, the more
 5    you get to speak to Mr. Batiste, you tell him, you
 6    know, you made, like, 20 calls to him because you were
 7    waiting there and waiting for a long time in the
 8    airport and Mr. Batiste didn't pick you up like you
 9    thought he was going to pick up or words to that
10    effect.  Correct?
11    A.    More or less.  Yes, ma'am.
12    Q.    Now, you told us yesterday -- or Thursday, I
13    guess -- or Wednesday -- I'm losing track of the
14    days -- you told us that you had a specific role that
15    you were playing on December 16th of 2005.  Correct?
16    A.    Yes, ma'am.
17    Q.    You also told us that you had specific
18    instructions from the FBI as to what it was that you
19    were trying to do or what you were trying to accomplish
20    on December 16th of 2005.  Correct?
21    A.    Yes, ma'am.
22    Q.    And one of the things you told us about was that
23    you had to try and figure out what it was that
24    Mr. Batiste -- what his intentions were.  Correct?
25    A.    Yes, ma'am.

1   Q.      And that was very important for the FBI to know,

2   as you were instructed.  Correct?

3   A.      To know his intention.  Yes, ma'am.

4   Q.      And the FBI debriefed you prior to going into

5   that meeting.  Correct, sir?

6   A.      What mean -- "debrief" mean?  Like they gave me

7   details or information?

8   Q.      Well, let me ask you this:  You indicated on your

9   direct examination -- you know what I mean about direct

10  examination.

11          You know what that is.  Right?

12  A.      Yes, ma'am.

13  Q.      And that's when the prosecutor is asking you

14  questions.  Okay?

15  A.      Yes, ma'am.

16  Q.      So we're clear.

17  A.      Yes, ma'am.

18  Q.      You indicated that every time you have a

19  meeting -- now, correct me if I'm wrong -- every time

20  you have a meeting or you have a telephone call with

21  Mr. Batiste, you have to talk to the FBI in advance

22  before you do that?

23  A.      Let me explain about this.

24          I said, before meetings with Brother Naz, the FBI

25  debrief me what to say or what point they want to

```
 1    discuss in this meeting.

 2         After I finish the meeting, I speak with them to

 3    tell them what happened and to give them briefing what

 4    happen in the meeting.

 5         But sometimes there is phone calls when he call

 6    me, Brother Naz.  I have, like -- I don't have

 7    sometimes chance to call the FBI before, prior to the

 8    phone call.

 9         So I respond -- I answer the phone call and I

10    call the FBI after the phone call to tell them what

11    happen.

12    Q.    So you're familiar with the word "debriefing"?

13    A.    Yes, ma'am.

14    Q.    And prior to December 16th, you had meetings with

15    the FBI.  Correct?

16    A.    Yes, ma'am.

17    Q.    And you were debriefed.  Correct?

18    A.    No, ma'am.  Debrief in the meaning -- all what

19    they debrief me was the first meeting with Brother Naz,

20    and they told me, "You are gonna meet someone.  You

21    represent a terrorist group coming from overseas.  And

22    just sit and try to find out what he wants and what his

23    intention are.  That's it."

24    Q.    Did they tell you that you had to identify

25    yourself as somebody from Al-Qaeda?
```

A.    I don't remember.  But terrorist group, yes.  I

represent a terrorist group coming from overseas upon

the request of Brother Naz.

Q.    Did they tell you you had to tell Mr. Batiste

that you were from a terrorist organization?

A.    I don't remember.

Q.    Well, let me ask you this:  You did not tell

Mr. Batiste in that meeting on December 16th that you

came from any terrorist organization, did you?

A.    But I -- I don't remember.  But I said -- if you

allow me to respond, I said, "I'm here upon your

request, your request for me."

      So he knows what he request for, "So I'm here

upon what you request.  I'm here upon," you know, "what

you told me."

Q.    But I'm not asking you what Mr. Batiste knew,

according to your understanding.  I'm asking about what

you said or what you told him.

A.    The FBI --

      MS. ARANGO:  Objection.  Asked and answered.

      THE COURT:  Sustained.

      Rephrase your question.

      MS. JHONES:  Okay.

BY MS. JHONES:

Q.    Did you at any time mention that you were from a

```
 1    terrorist organization to Mr. Batiste on 12-16 of '05?
 2              MS. ARANGO:  Objection.  Asked and answered.
 3              THE COURT:  Sustained.
 4    BY MS. JHONES:
 5    Q.    Now, do you remember, sir, how many pages the
 6    transcript, which you have identified, which I believe
 7    is Exhibit 44-A -- do you remember how many pages that
 8    exhibit is?
 9    A.    How many pages?
10    Q.    Uh-huh.
11    A.    No, ma'am.
12    Q.    I think you indicated on your direct testimony
13    that the meeting lasted approximately an hour.
14    A.    I don't believe she -- they asked me this
15    question.  I don't know.
16    Q.    Well, let me ask you:  What is your memory as to
17    how long that meeting was?
18    A.    I don't remember.
19    Q.    Well, if I showed you an exhibit, would that --
20    Exhibit 44-A, would that refresh your recollection as
21    to how many pages there was -- the transcript is for
22    that meeting?
23    A.    Yes, ma'am.
24              MS. JHONES:  May I approach, your Honor?
25              THE COURT:  Yes.
```

```
 1    BY MS. JHONES:
 2    Q.    (Tendering document to the witness.)
 3          Why don't you hold on to it, Mr. Assaad.
 4          Are you ready for me?
 5    A.    Yes, ma'am.
 6    Q.    How many pages, sir?
 7    A.    40.
 8    Q.    Now, as early as the fourth page -- well, before
 9    I get to that, let me ask you this:  After having
10    looked at the number of pages that comprise
11    Government's Exhibit 44-A, does that in any way help to
12    recall for you approximately how long this meeting was?
13    A.    No, ma'am.
14    Q.    As early as the fourth page of that transcript,
15    you make some suggestions, do you not, to Mr. Batiste?
16    A.    Like what?
17    Q.    Like the need for him to stay in contact with
18    you, have better communication with you.
19          Do you remember that suggestion?
20    A.    Yes, ma'am.
21    Q.    And that is on Page 4 of the transcript.
22    Correct?
23    A.    Yes, ma'am.
24    Q.    And what you tell him, sir, in addition to how
25    important it is for Mr. Batiste to stay in contact with
```

```
 1   you -- right? -- you tell him, because you are not here

 2   to waste your time.  Correct?

 3   A.     Wasting my --

 4   Q.     Let me know if you need any help, sir.

 5   A.     Please.  If you can tell me what you're referring

 6   to.

 7   Q.     Page 4.

 8   A.     Page 4.

 9          Okay.  The question is?

10   Q.     The question is, sir -- hold on one second,

11   because I can't see this very well -- you tell

12   Mr. Batiste that you did not come all the way over here

13   just to waste your time.  Correct?

14   A.     Yes, ma'am.

15   Q.     Now, this is -- Well, strike that.

16          And as you're telling -- did you -- by the way,

17   as you're discussing this with Mr. Batiste, did your

18   order, your meal, come in already or are you still

19   waiting for it?

20   A.     It's already in.

21   Q.     And you also tell -- and when you tell

22   Mr. Batiste that, "We have to stay in touch" and you

23   can't -- you don't have time to waste, he says, "Yes,

24   sir."  Correct?

25   A.     Yes, ma'am.
```

1   Q.    Now, telling Mr. Batiste right off the bat, so to

2   speak, that you have to stay in contact and you're not

3   here to waste your time is something that you were

4   instructed to tell Mr. Batiste by the FBI; were you

5   not, sir?

6   A.    No, ma'am.

7   Q.    So this was your idea?

8   A.    We were talking -- if you refer a couple pages

9   before, we were talking about the communication in the

10  airport, ma'am, and -- because we were talking -- we

11  lost the communication, that he -- I was upstairs.  He

12  was downstairs.

13        And I was trying to explain to Brother Naz that

14  we have to be in communication to understand --

15  contact, to understand each other, not what happened in

16  the airport will happen again.  This is what I'm

17  referring to.

18  Q.    Let me ask you this:  If Mr. Batiste -- whether

19  or not you stay in communication is really up to

20  Mr. Batiste.  Right?

21  A.    Everything is up to Brother Naz.

22  Q.    Because you're just here to try to figure out

23  what his intentions are.  Correct?

24  A.    Yes, ma'am.

25  Q.    But it is you that are telling -- that's telling

1    him, "We have to stay in communication."  Right?

2    That's you telling him, not Mr. Batiste telling you,

3    "You and I have to be in contact.  We have to stay in

4    communication."  Those were your words.  Correct?

5    A.    Referring to misunderstanding what happened in

6    the airport.  Yes, ma'am.

7    Q.    Okay.  And, also, sir, right after this talk

8    about communication, you also start to talk to

9    Mr. Batiste about how important it is to not look so

10   obvious.  Correct?  Do you remember that?

11   A.    Yes, ma'am.

12   Q.    I'm sorry?

13   A.    Yes, ma'am.

14   Q.    And, again, when you do that, sir, this is

15   something that -- a suggestion that came from you, not

16   a suggestion that came from Mr. Batiste.  Correct?

17   A.    If you -- what paragraph are you referring,

18   please, ma'am?

19   Q.    Sure.

20         On the top of Page 5 -- let me just roll this

21   down.  We're on Page 5.  You could look at your

22   transcript or you could look at the ELMO, whichever

23   makes you feel more comfortable.

24         Where you say, "We -- that's okay, brother.  You

25   have to know how to fit between them without them

1    noticing you.  Understanding what I'm saying," those

2    are your words; are they not, sir?

3    A.    Yes, ma'am.

4    Q.    Mr. Batiste is not telling you about his intent

5    to blend in, to not appear obvious.  It is you that is

6    telling Mr. Batiste what should -- how you feel it's

7    appropriate that he conduct himself.  Correct, sir?

8    A.    I guess, ma'am, I'm referring to -- we were

9    speaking about something previous to this -- what I

10   said.  We were mentioning something about something

11   different.  We were speaking about the food.

12         If you look to Page 4, I'm referring to how to

13   fit -- on the bottom, when we speaking about, "You

14   don't eat meat?

15         "No, sir.

16         "Chicken?

17         "That's still considered meat.  It has blood in

18   it.  No offense to you."

19         That is on the bottom of Page 4.

20         And he told me, "I mean, I don't want to spoil

21   your meal.  Enjoy yourself."

22         I respond to him, "That's okay, brother.  You

23   have to know how to fit, how to -- because -- to --

24   between them."

25         So I was speaking about myself, not about Brother

```
 1   Naz.
 2   Q.     You're talking about yourself there?  I'm talking
 3   about -- your not making any suggestions to
 4   Mr. Batiste?
 5   A.     I was speaking about when he was speaking about
 6   the food.  And, like I said, this is at Page -- you are
 7   referring to Page No. 5 on the top page.  Yes, ma'am?
 8   Q.     Yes, I am.
 9   A.     And if you go back to previous page, on Page 4 --
10   Q.     It's on the ELMO.
11   A.     On the bottom, we're speaking about -- something
12   about food and about me eat food, meat, chicken.
13          And I respond to him when he suggests to me, "I
14   don't want to spoil your meal.  Enjoy yourself."
15          We're speaking about food, meat and chicken.
16          I say, "That's okay, brother.  You have to know
17   how to fit between them and them not noticing you.
18   Understand what I'm saying?"
19              THE COURT REPORTER:  I'm sorry?  Not --
20              THE WITNESS:  Not -- them not noticing you.
21              THE COURT:  Could you put the next page up on
22   the ELMO, please.
23              MS. JHONES:  Sure.
24              THE COURT:  Thank you.
25              THE WITNESS:  So it's like I'm referring to
```

1    the conversation, not about telling him, "You should

2    know how to fit," not referring to Brother Naz.

3    BY MS. JHONES:

4    Q.    So, in other words, because Brother Naz, as you

5    call him, does not eat meat, that will make him more

6    noticeable?  Is that what you're -- I want to make sure

7    I understand you.

8    A.    I have to -- if you allow me, give me more time

9    to see the conversation.

10   Q.    Take your time, sir.

11   A.    Because, on Page 4, I say, on the bottom, when he

12   said -- when I asked him -- or the middle of the page,

13   on the Page 4, I said, "Brother Naz" -- well, I ask him

14   about his name.

15        "So you have to -- you don't eat meat?

16        "No, sir.

17        "Chicken?

18        "That's still considered meat.  It has blood in

19   it.  No offense to you.  No offense to you."

20        I said, "Huh?

21        "I mean, I don't want to spoil your meal.  Enjoy

22   yourself."

23        And where -- I respond to him on Page 5, on the

24   top page, "That's okay, brother.  You have to know how

25   to fit between them without them noticing you.

```
 1    Understanding what I'm saying?"

 2         So he's trying to make it like he doesn't want to

 3    offend me.

 4         But I said, "No.  I'm not offended."

 5         You have to know how to even -- to fit between

 6    different cultures in my role.  I'm coming from

 7    overseas.  I'm coming from a terrorist organization.

 8    And I'm here -- I should fit between the culture in the

 9    United States.  I was talking about myself, not about

10    Brother Naz.

11    Q.    Let's talk about your discussion with Mr. Batiste

12    about playing a role.

13         You do talk about playing a role right there on

14    the very same page; do you not?

15    A.    Yes, ma'am.

16    Q.    When you're talking about playing a role, you're

17    not talking about your role as an undercover FBI

18    informant, are you?

19    A.    Excuse me?

20    Q.    You're not talking with Mr. Batiste about your

21    role as an undercover FBI informant.  Correct?

22    A.    No, ma'am.

23    Q.    And you're telling Mr. Batiste there in that

24    conversation right there on the top of Page 5 that,

25    "We -- we have to play a role."
```

1       You and Mr. Batiste have to play a role.

2   Correct?

3   A.      The point here, ma'am -- I don't speak English

4   enough, my major language.  It's -- most of the time, I

5   speak, like, in -- we -- like the guys who work with

6   Al-Qaeda, who work with terrorist organization, we

7   referring to our group -- specific group who travel to

8   different countries.

9       I'm trying to play my role the best to my -- the

10  best I know.  I never been a -- working with a

11  terrorist group or represent any of them.  But best to

12  my -- the way I know, I was doing my role in this

13  meeting -- all meetings.

14  Q.      Besides Arabic, Mr. Assaad, I think you indicated

15  you speak a total of six languages.

16  A.      Yes, ma'am.

17  Q.      And Arabic.  Right?

18  A.      Yes, ma'am.

19  Q.      English?

20  A.      Yes, ma'am.

21  Q.      Spanish?

22  A.      Yes, ma'am.

23  Q.      What other ones?

24  A.      Russian.

25  Q.      Go ahead.  Don't be shy.

Assaad - CROSS - By Ms. Jhones                142

```
 1   A.      Russian, French.

 2           Five you have?

 3   Q.      I lost count, quite frankly.  But you go ahead

 4   and tell me.

 5           Tell me, what other languages do you speak, sir?

 6   A.      Russian, French, English, Spanish, Arabic and

 7   Dutch.

 8   Q.      When you say you speak, you are fluent in those

 9   languages; are you not?

10   A.      90 percent.  Yes, ma'am.

11   Q.      That's a pretty good percentage.  You would

12   agree?

13   A.      To my knowledge, 90 percent -- maybe for you,

14   ma'am, it's -- or for other people who are well

15   educated, maybe 60 percent, because there is lot of

16   words I don't understand in English.

17   Q.      During the course of this investigation, as you

18   have referred to it, you have a lot of conversations

19   with Special Agent Tony Velazquez; do you not?

20   A.      Yes, ma'am.

21   Q.      And as a matter of fact, there are conversations

22   that you have with Special Agent Tony Velazquez over

23   the phone when you're actually in a meeting with

24   Mr. Batiste.  Correct?

25   A.      Yes, ma'am.
```

```
 1    Q.    And when you do that, sir, oftentimes, you speak
 2    to Special Agent Velazquez in Spanish.  Correct?
 3    A.    Yes, ma'am.
 4    Q.    And that's because you don't want Mr. Batiste to
 5    know that you're speaking to an agent from the FBI.
 6    Correct?
 7    A.    Yes, ma'am.
 8    Q.    And Mr. Batiste, of course, doesn't understand
 9    Spanish.  Right?
10    A.    I was playing my role.  I didn't say even in
11    Spanish or in Russian or in French or any language.  I
12    never mentioned to -- on the phone, "Can I speak with
13    Special Agent Tony Velazquez?"
14          But the role of Agent Tony Velazquez was he is a
15    brother who is helping Al-Qaeda, the Spanish guy who's
16    helping Al-Qaeda.
17          So I have to speak with him in Spanish because
18    the role of him was Spanish guy.
19    Q.    Well, let me ask you this, sir:  When you spoke
20    to other people, such as Special Agent Velazquez, over
21    the phone, in the presence of Mr. Batiste, there was no
22    conversation where you said to Mr. Batiste, "Oh,
23    Brother Naz, hold on a second.  I'm speaking to the
24    brother from Europe over the phone."
25          That did not occur here, did it, sir?
```

1    A.    Like I said, ma'am, I didn't say he's from

2    Europe.  I said, "I'm speaking with our associate."  He

3    knew -- because maybe we had a previous conversation --

4    that Brother Pedro, referring to Agent Tony

5    Velazquez -- his role was a Spanish guy who's assisting

6    Al-Qaeda here in Miami.

7    Q.    Okay.  Well, we're going to go through a lot of

8    conversations and maybe we'll get to those.  Okay?

9    A.    Yes, ma'am.

10   Q.    We're going to spend a lot of time together.

11   A.    Yes, ma'am.

12   Q.    All righty.  Now -- so Mr. Batiste -- one more

13   question about Page 5: Mr. Batiste tells you that he

14   has never met anybody who's been on a mission like you.

15   Right, sir?

16   A.    Yes, ma'am.

17   Q.    And he does not tell you, sir, does he -- "I've

18   never met an Al-Qaeda operative like you," does he,

19   sir?

20   A.    No, ma'am.

21   Q.    He doesn't tell you, "I've never met somebody

22   from Hamas or any other of those terrorist

23   organizations that people are with," does he, sir?

24   A.    No, ma'am.  Because this is the fifth page, ten

25   minutes from the meeting.  We still -- we don't know

1    each other yet.  We started to understand each one.

2         It's the first meeting we having, the first ten

3    minutes from the meeting, and we trying to check each

4    other.  Each one playing his role.

5    Q.    Both of you are playing a role.  I agree with

6    that, sir.  I agree with that.

7              MS. ARANGO:  Objection to the comment.

8              THE COURT:  Sustained.

9              MS. ARANGO:  Move to strike.

10             THE COURT:  Motion to strike is granted.

11             The jury is instructed to disregard the last

12   comment by the lawyer.

13   BY MS. JHONES:

14   Q.    Now, going back to this -- to this issue of

15   playing a role, sir, you also tell him that sometimes

16   you have to put on clothes that you really don't want

17   to put on.

18             Remember that?  Go on to Page 6.

19   A.    What part of Page 6?

20   Q.    The top of Page 6, where you say, "Sometimes you

21   have to put on clothes that are not yours" and it goes

22   on.

23   A.    Yes, ma'am.

24   Q.    Now, just so we're clear here -- and correct me

25   if I'm wrong -- Mr. Batiste is the one that's walking

1    in with a staff and a turban and God knows what else.

2    Correct?

3    A.     Yes, ma'am.

4    Q.     You're not wearing a turban?

5    A.     No, ma'am.

6    Q.     You look pretty normal.  Right?

7    A.     Yes, ma'am.

8    Q.     And -- but it is you that is telling Mr. Batiste

9    that, "Sometimes you have to put on clothes that are

10   not yours."  Right?

11   A.     Yes, ma'am.

12   Q.     And you're saying that to him because you are

13   letting him know that it's important to play a role and

14   not appear to look like what you really are.  Fair

15   enough?

16   A.     Yes, ma'am.

17   Q.     Okay.  Now, Mr. Batiste is not telling you that.

18   You are telling him that.  Right?

19   A.     I was saying that.  Yes, ma'am.

20   Q.     Now, then, sir, Mr. Batiste tells you why he

21   thinks that you are here, meaning why you're in Miami.

22   Correct?

23   A.     Excuse me?

24   Q.     Mr. Batiste tells you -- tells you what he

25   believes to be the reason why you have come to Miami;

```
 1   does he not?

 2   A.     What page you are referring, ma'am?

 3   Q.     Same page, Page 6.

 4   A.     Yes, ma'am.

 5   Q.     What he says is he -- correct me if I'm wrong --

 6   is that you are here to study him.  Right?

 7   A.     Yes, ma'am.

 8   Q.     And Mr. Batiste also tells you that -- and I

 9   believe it's on the next page -- he also tells you that

10   he's a Muslim; does he not?

11   A.     Yes, ma'am.

12   Q.     He also tells you that he's very serious.

13   Correct?

14   A.     Yes, ma'am.

15   Q.     And after Mr. Batiste tells you that he's very,

16   very serious, you tell him words to this effect:  You

17   now realize, seven pages into the conversation, that

18   you are not wasting your time here.  Your visit here,

19   basically, has a purpose or words to that effect.

20   Correct?

21   A.     What page?

22   Q.     Page 7.

23   A.     I was asking him if I'm wasting my time.  Yes or

24   no.

25   Q.     Well, you also tell him, do you not, sir, that
```

```
 1   you were not brought here to Miami all the way from

 2   wherever it is that you came -- you didn't come here,

 3   you tell Mr. Batiste, just to hear words.  You tell him

 4   that you want action.  Right?  Take a look at Page 8.

 5   A.    Yes, ma'am.

 6   Q.    Now, sir, so we are clear, we are -- actually,

 7   let me just move on.

 8         After you tell Mr. Batiste that you want to see

 9   action, you also tell him that you believe him to be

10   more serious than any of the other brothers that you

11   have met.  Correct?

12   A.    What page, ma'am?

13   Q.    Same page.  Top of Page 8.  Do you see where I'm

14   referring, sir?

15   A.    Yes, ma'am.

16   Q.    You also tell him, sir -- I believe, as you're

17   eating your French fries, you tell him, "What's in it

18   for me?  What is in it for me?"

19         Do you see that, sir?

20   A.    Yes, ma'am.

21   Q.    And after you tell him that, sir, you also say to

22   him that -- actually, you repeat to him you're here to

23   analyze.  Right?

24   A.    Yes, ma'am.

25   Q.    Bottom of Page 8.
```

1       And you also tell him again you want to know if

2  these people are serious, meaning Mr. Batiste.

3  Correct?

4  A.    Yes, ma'am.

5  Q.    And when you say this to Mr. Batiste, he turns

6  around and he starts talking to you about Jeff Fort.

7  Right?  Look at Page 9.

8  A.    Ma'am, he try to explain to me his position.

9       And he was referring to himself like Jeff Fort,

10 like he asked help from a terrorist country, like

11 Libya, and he needed help here in the United States and

12 they helped him.

13      He is the same spot than Jeff Fort.  He's

14 requesting help from a terrorist organization overseas.

15 Q.    Are you finished?

16 A.    Yes, ma'am.

17 Q.    And he tries to tell you about Jeff Fort.  Right?

18 A.    Yes, ma'am.

19 Q.    You have no idea who Jeff Fort is?

20 A.    No, ma'am.

21 Q.    And as a matter of fact, when Mr. Batiste

22 mentions that -- Jeff Fort and the Blackstone -- and

23 you say to him, "Small stone, headstone, Blackstone,"

24 whatever, you have no idea what he's talking about?

25 A.    No, ma'am.

Assaad - CROSS - By Ms. Jhones                150

1    Q.    And you tell Mr. Batiste, after he tells you

2    this, that you don't have an opinion about him.  Right?

3    You don't really know if he's serious after he told you

4    about Jeff Fort.  Right?

5    A.    It's not up to me, ma'am, to decide or to build

6    an opinion about Brother Naz.  I was playing my role;

7    and there is agents who's listening and who's -- have

8    expert, I believe.  I don't know.  You have to ask

9    them.  Who knows?

10   Q.    Thank you for reminding me about that.

11         As far as you're concerned, the FBI is listening

12   in on this conversation as you are having this talk

13   with Mr. Batiste.  Right?

14   A.    Having what?

15   Q.    The FBI is listening in on what you are saying

16   and what Mr. Batiste is saying to you here.  Right?

17   A.    And -- yes.

18   Q.    Correct?

19         And during the course of this conversation, the

20   FBI calls you at least three times.  Right?

21   A.    Yes, ma'am.

22   Q.    And after Mr. Batiste told you about Jeff Fort

23   and the big stones and the small stones, you didn't get

24   a call from the FBI.  Right?

25   A.    I don't know what time they call me, but I know I

 1  received phone calls from the FBI agent.

 2  Q.    Well, let me ask you this:  Did the FBI call you

 3  and tell you, "Get more information about Jeff Fort"?

 4  A.    No, ma'am.

 5  Q.    Now, after he tells you this, you say to him

 6  again, "You have to give me something so I can support

 7  you."  Right?  Very same page, Page 8 -- I'm sorry --

 8  Page 10.

 9  A.    10?

10  Q.    Are you with me?  Let me know if I'm going too

11  fast.

12  A.    10?  The bottom or the top?

13  Q.    Middle.  If you'd like, I'll point it out to you

14  on the screen.

15  A.    Yes, ma'am.

16  Q.    And so here we are; and you're telling him again,

17  "Give me something so I can support you."  Right?

18  A.    Yes, ma'am.

19  Q.    And what you're talking about, sir, was

20  support -- you're talking about money; are you not?

21  A.    No, ma'am.

22  Q.    Okay.  And when you ask him to give you

23  something, he says to you, "I have brothers that I want

24  you to meet that I trained."  Right?

25  A.    Yes, ma'am.

1   Q.     And you tell him -- actually, you ask him,

2   "Train?"

3          Because you're not exactly sure what he's talking

4   about.  Fair enough?

5   A.     Yes, ma'am.

6   Q.     And he says, "Yes."

7          And you ask him, "Well, are you talking about

8   training in the Koran or teaching the Koran?"  Right?

9   A.     Same page?

10  Q.     Same page.

11  A.     Yes, ma'am.

12  Q.     And Mr. Batiste tells you -- he's talking about

13  how to train soldiers.  Right?

14  A.     Yes, ma'am.

15  Q.     Are you with me?

16  A.     Yes, ma'am.

17  Q.     Now -- and then you say, "Allah akhbar.  Allah

18  akhbar," right there at the bottom of Page 10?

19  A.     Yes, ma'am.

20  Q.     Tell the ladies and gentlemen of the jury,

21  please, what that means.

22  A.     "God is great."

23  Q.     And you said it twice.  Right?

24  A.     Yes, ma'am.

25  Q.     And Mr. Batiste says he has soldiers to train and

```
 1    it is you that tell him, "Military training."  Right?
 2            MS. ARANGO:  Objection.  Mischaracterization
 3    of the facts.
 4            THE COURT:  Sustained.
 5            Rephrase your question.
 6    BY MS. JHONES:
 7    Q.    You ask Mr. Batiste if he's referring to military
 8    training.  Right?
 9    A.    Ma'am, he told me soldiers.  "Soldiers" mean
10    he -- when you say "soldiers," mean military.  No?
11            For me, it's -- like, when I heard -- when I
12    heard "soldiers," it's like, "Military?"  I'm asking
13    him a question.  "Military training?"
14    Q.    You're asking him a question.  Right?
15    A.    Yes.  Yes, ma'am.
16    Q.    And Mr. Batiste responds to that question; does
17    he not?
18    A.    Yes, ma'am.
19    Q.    And he says, "Yes," right at the top of Page 11.
20    Correct?
21    A.    Yes, ma'am.
22    Q.    And you ask Mr. Batiste if he's had military
23    training before; do you not?
24    A.    Yes, ma'am.
25    Q.    And he tells you, "Occ, I could kill you in five
```

```
1   seconds with my bare hands"?

2   A.    Yes, ma'am.

3   Q.    And then you ask him how many brothers he has.

4   Correct?

5   A.    Yes, ma'am.

6   Q.    And he tells you he has seven generals?

7   A.    Yes, ma'am.

8   Q.    I believe that you also ask him -- well, you want

9   to know what type of training is involved in this

10  training that Mr. Batiste has with these soldiers.

11  Correct?

12  A.    Yes, ma'am.

13  Q.    Because you're trying to get information?

14  A.    Yes, ma'am.

15  Q.    And Mr. Batiste tells you what type of training

16  he's been conducting; does he not, sir?

17  A.    Yes, ma'am.

18  Q.    And let's talk about that.  All right?

19        He tells you that he's been training these

20  soldiers to jump off buildings.  Right?

21  A.    Yes, ma'am.

22  Q.    And he's telling you that he has trained these

23  soldiers to fight with their bare hands.  Right?

24  A.    Yes, ma'am.

25  Q.    And he tells you that he's trained these soldiers
```

Assaad - CROSS - By Ms. Jhones                    155

1    to break bricks?

2    A.    Yes, ma'am.

3    Q.    And you say, "Not martial arts.  I'm talking

4    military.  I'm talking military stuff"; do you not,

5    sir?

6    A.    Yes, ma'am.

7    Q.    Okay.  So, now, we are here -- I'm sorry.  Not

8    we.

9          You are here on 12-16 to try and get this man's

10   intent.  Right?

11   A.    Excuse me?

12   Q.    You have been recruited by the FBI to find out

13   what this guy is about.  Right?

14   A.    What his intentions are.  Yes, ma'am.

15   Q.    He's telling you, "I've trained them to jump off

16   buildings."  Right?

17   A.    Yes, ma'am.

18   Q.    He's told you what he's doing with these guys.

19         But you say to him, "Not martial arts.  I'm

20   talking military."

21         Right?

22   A.    Yes, ma'am.

23   Q.    And those are your words?

24   A.    Because he told me he has soldiers, ma'am.  We

25   trying to find out -- I'm trying.  I'm trying to find

```
 1   out if he -- what kind of training he -- when you refer

 2   "soldiers," mean they are military training.

 3        I'm trying to find out what's their knowledge,

 4   how much they know about military training or if he

 5   give it to them or they know about it.

 6   Q.   After he tells you about the jumping off

 7   buildings and the bricks and all that stuff, you tell

 8   him again, "Why am I here?  Mr. Batiste, tell me, why

 9   am I here?"  Right?

10   A.    Yes, ma'am.

11   Q.   And the reason why you tell him that is because

12   here we are 12 pages into this conversation and you

13   have got nothing from Mr. Batiste.  Correct?

14   A.    We got they have soldiers and they have seven

15   generals.  It's first meeting and 12 pages.  When

16   somebody tell you "soldiers" and "generals" in the

17   first meeting, in 12 pages, it's very good.

18   Q.   Well, Mr. Batiste answers your question -- the

19   one question that you say, "Let me ask you a direct

20   question."

21        Those are your words, correct, at the top of

22   Page 12?

23   A.    Yes, ma'am.

24   Q.   And Mr. Batiste says, "Well, you know, I mean,

25   you know, you're gonna think I'm here to ask you for
```

1   money."

2   A.    Excuse me?

3   Q.    Mr. Batiste says, "Well, I know you're gonna

4   think, Occ, I'm here to ask you for money.  But, you

5   know, I really don't care about money."  Right?

6   A.    Yes, ma'am.

7   Q.    Okay.  You say, "I didn't ask you that."  Right?

8   A.    Yes, ma'am.

9   Q.    And Mr. Batiste then tells you, "Here's what I

10  want, Occ.  I want you to tell your people that I am

11  here."  Right?

12  A.    Yes, ma'am.

13  Q.    Okay.  And you say, "To do what?  You're here to

14  do what?"  Right?

15  A.    Yes, ma'am.

16  Q.    We're still on Page 12.

17  A.    Yes, ma'am.  Because --

18  Q.    I'm sorry.  Go ahead.

19  A.    Because he said, "Tell your people I'm here."

20  But I was confusing because he said, "We are here."

21  Q.    Are you finished?

22  A.    Yes, ma'am.

23  Q.    And then you go back to telling him, "I'm here to

24  analyze.  I am here to analyze."  Right?

25  A.    Yes, ma'am.

1    Q.    And you say, "Because 24/7" -- and by that, you

2    mean all day, all night -- "all I hear is blah, blah,

3    blah, blah, blah."  Right?  Those are your words?

4    A.    Yes, ma'am.

5          MS. ARANGO:  At this point I would object to

6    just reading from the transcript.

7          THE COURT:  Sustained.

8          MS. ARANGO:  It's in evidence.

9          MS. JHONES:  I could play it, your Honor, if

10   the Government prefers.

11         MS. ARANGO:  Please.  That's fine.

12         MS. JHONES:  Okay.

13         MS. ARANGO:  But to sit there and read -- when

14   you say this -- my objection is --

15         THE COURT:  It's sustained.

16         Ask your next question.

17         MS. JHONES:  Okay.

18   BY MS. JHONES:

19   Q.    And Mr. Batiste, after you say, "Blah, blah,

20   blah, blah" -- what you mean by that, sir, is that you

21   don't want to hear a lot of talk.  Right?  That's what

22   you're telling him?  You don't want to hear a lot of

23   talk?

24   A.    Yes, ma'am.

25   Q.    You don't want to waste your time?

Assaad - CROSS - By Ms. Jhones          159

1    A.    Yes, ma'am.

2    Q.    You want to see action?

3    A.    It doesn't mean I want to see action.  I want to

4    see what he wants from -- why he request to bring

5    someone from overseas from terrorist organization to

6    come here.

7          So what he want from me?  And I ask him several

8    time in this meeting, "What you want from me?  What you

9    want from us?"

10         So I was just sitting and talking to him.  And we

11   are on Page 12.

12   Q.    And as far as you're concerned, sir -- please

13   correct me if I'm wrong -- as far as you're concerned,

14   up to Page 12, you still don't have what you're looking

15   for.  Fair enough?

16   A.    We are not looking for anything, ma'am.  We

17   suppose -- I meet him and sit with him and chat with

18   him.  I'm the guy who request to come from overseas.

19         So I'm waiting for him to understand what he want

20   from us.  He mentioned in the first 12 pages "soldiers"

21   and "generals" and "training."

22         So -- and he's talking to -- you have to

23   understand, ma'am, that he's talking to a terrorist

24   guy and he's trying to convince him, "Listen" -- in

25   12 pages -- "we need your help.  Jeff Fort -- he's the

```
 1   first guy -- black guy who request help from Libya,

 2   support his terrorism in the United States."

 3        And I'm here like -- "Here's my guy.  This is

 4   what -- my ideal guy."  I'm in same situation.

 5        So in 12 pages, you have "soldiers," you have

 6   "generals," you have comparing himself to Jeff Fort,

 7   and he requesting help from terrorist organization.

 8        So I believe, in 12 pages, it's good what you

 9   have right now.

10   Q.   Yeah.

11        But you keep on telling him that you don't want

12   to waste your time.

13   A.   Because I'm trying to ask him "What you want from

14   us?  You're referring yourself to Jeff Fort.  You're

15   referring yourself that you need help from terrorist

16   organization.  You have generals.  You have soldiers."

17        I say, "Why I'm here?  Why you want -- request my

18   presence?  So what we can help?"

19   Q.   Let's go on.

20   A.   Yes, ma'am.

21   Q.   We'll get to that.

22   A.   Yes, ma'am.

23   Q.   Mr. Batiste also says to you in this conversation

24   that he's going to show you -- or he could show you

25   even that same evening how his soldiers train.  Right?
```

1    A.    Yes, ma'am.

2    Q.    And this is something that he invited you to see.

3    Right?

4    A.    Yes, ma'am.

5    Q.    Now, this was December of 2005.  Right?

6    A.    Yes, ma'am.

7    Q.    You never took Mr. Batiste up on his invitation.

8    Correct?

9    A.    Ma'am, I wasn't wearing a recording device and

10   the FBI wasn't preparing to -- for me to leave the

11   place because -- for my safety and we don't know where

12   we going and I don't have anything to track me down, to

13   know where I'm at.

14   Q.    I'm sorry.  I wasn't clear.

15         I don't mean that you didn't take him up on his

16   invitation on 12-16 of '05.  I wasn't very clear.  I

17   apologize.

18         You never ever took him up on his invitation to

19   see his soldiers train, not in December.  Right?  You

20   didn't do it in the month of December.  Right?

21   A.    No, ma'am.

22   Q.    You didn't do it in the month of January?

23   A.    No, ma'am.

24   Q.    You didn't do it in the month of February?

25   A.    No, ma'am.

```
 1   Q.     You didn't do it in the month of March?

 2   A.     No, ma'am.

 3   Q.     You didn't do it in the month of April?

 4   A.     No, ma'am.

 5   Q.     You didn't do it in the month of May.  Right?

 6   A.     No, ma'am.

 7   Q.     He even told you, "I'll take you to Chicago and

 8   I'm going to show you my 5,000 soldiers."  He told you

 9   he'll take you to Chicago so you could see it -- you

10   could see the real deal.

11          You didn't take him up on that invitation either.

12   A.     It's not up to me, ma'am.  It's up to the FBI.

13   If they tell me go with him, I go with him.  It's not

14   up to me.

15   Q.     I got it.  Okay.

16          Now, after he tells you he has seven generals,

17   you want more information.

18          You say, "Okay.  How about those seven generals?

19   How many men do they have?" or words to that effect; do

20   you not, sir?

21   A.     Yes, ma'am.

22   Q.     And he says what to you?

23   A.     What page you are referring?

24   Q.     Page 14.

25   A.     Says, "That's it."
```

```
 1   Q.    That's it.  Zippo.  No more.

 2         Seven generals.  Right?

 3   A.    Yes, ma'am.

 4   Q.    And he also tells you, sir -- let me see how I

 5   can say this.

 6         After he tells you that he only has seven

 7   soldiers, then you tell him -- or you ask him, sir, do

 8   you not, "Well, how do you train these guys?  What do

 9   you train them with?" or words to that effect.  Right?

10   A.    Yes, ma'am.

11   Q.    And you ask him if -- Mr. Batiste says that you

12   could go ahead and test his soldiers so you could see

13   what they're made of.  Right?

14   A.    Yes, ma'am.

15   Q.    And then you say, "How about weapons?"

16         You ask him, basically, what do these guys know

17   about weapons.  Right?

18         MS. ARANGO:  Same objection, Judge.  This is

19   in evidence.

20         THE COURT:  Sustained.

21   BY MS. JHONES:

22   Q.    And you ask Mr. Batiste whether or not they know

23   about explosives; do you not, sir?

24         MS. ARANGO:  Same objection, Judge.

25         THE COURT:  Sustained.
```

```
  1   BY MS. JHONES:

  2   Q.    And, sir, when you have a conversation with

  3   Mr. Batiste in here about explosives, what does

  4   Mr. Batiste tell you?

  5             MS. ARANGO:  Same objection, Judge.  The

  6   transcript is in evidence.  Just reading from --

  7             THE COURT:  Sustained.

  8             MS. JHONES:  Your Honor, I need to

  9   cross-examine this individual.

 10             THE COURT:  Come on up, please.

 11             (Whereupon, proceedings were had at side-bar

 12   outside the presence of the jury which have been sealed

 13   per instructions of the Court.)

 14             (Whereupon, the following proceedings were had

 15   in open court:)

 16             MS. JHONES:  May I proceed, your Honor?

 17             THE COURT:  Yes.

 18             MS. JHONES:  Thank you.

 19   BY MS. JHONES:

 20   Q.    Now, we were talking, Mr. Assaad, about the

 21   training that you -- the information you were trying to

 22   get from Mr. Batiste regarding training.  Correct?

 23   A.    Yes, ma'am.

 24   Q.    And you had to ask him questions -- you had to

 25   try and get information regarding, basically, what he
```

1    knew.  Right?

2    A.      Excuse me?

3    Q.      You had to ask him questions about what it was

4    that Mr. Batiste knew about weapons.  Right?

5    A.      About -- in general, about his soldiers,

6    generals, trying to play my role.  At the same time,

7    I'm trying to find out what the -- how much advanced

8    they are trained, like.

9    Q.      Who asked the question about weapons?  Did you

10   ask the questions about weapons?

11   A.      I believe.  Yes, ma'am.

12   Q.      And what did he tell you?  What was your

13   understanding about what he told you?

14   A.      What page are you referring to?

15   Q.      Page 14.

16   A.      On the top of the page?

17   Q.      I'm sorry?

18   A.      On the top?

19   Q.      No.  Actually, it's towards the middle.

20   A.      I don't see which one.  If you can show it to me.

21   Q.      I'm sorry.  Sure.

22           Do you see right here (indicating), middle of

23   Page 14?

24   A.      "Explosives?"

25   Q.      Uh-huh.

1          Who asked that question?

2    A.    I did.

3    Q.    And why did you ask it?

4    A.    Ma'am, he said "soldiers," "generals,"

5    "training."  I was trying to find out if they know

6    about explosives to see how dangerous -- or they know

7    that -- I don't know.

8    Q.    Okay.

9    A.    To see how advanced or --

10   Q.    All righty.  And when you asked that question,

11   were you referring to what he knew or what everybody

12   else knew, all the brothers knew, the soldiers?

13   A.    Everybody.

14   Q.    And what did he respond to you?

15   A.    He said, "I know."

16   Q.    Okay.  And by that -- what was your understanding

17   about what he meant when he said, "I know"?

18   A.    He said that he knows about explosives.

19   Q.    Not his generals.  He knows.  Right?

20   A.    Yes.

21   Q.    And what explosives did Mr. Batiste tell you he

22   was familiar with?

23   A.    Napalm bombs.

24   Q.    That's the stuff from Vietnam.  Right?

25   A.    I don't know, ma'am.

```
 1    Q.    You don't know what napalm bombs are?

 2    A.    No, ma'am.

 3    Q.    Now, after you ask him -- he gives you the answer

 4    about napalm bombs, do you try and get more information

 5    from him?

 6    A.    Yes, ma'am.

 7    Q.    About explosives?

 8    A.    Yes, ma'am.

 9    Q.    What does he tell you?

10    A.    "I can't tell you what I don't know."

11    Q.    And what is your understanding about what he's

12    telling you right there, sir?

13    A.    Excuse me?

14    Q.    When he tells you that, what is your

15    interpretation about his answer?  What is he telling

16    you there?

17    A.    I'm asking if he knows, more or less, like, more

18    or less or....

19    Q.    Right.

20          But he does give you an answer; does he not, sir?

21    A.    Referring to what question -- to what answer?

22    Q.    The explosives.  The explosives.

23    A.    He told me that he knows napalm bombs.

24    Q.    Anything else?

25    A.    No, ma'am.
```

```
 1   Q.    Okay.  And after you get this information from

 2   Mr. Batiste, sir, you continue, do you not, to try

 3   and -- to explain to Mr. Batiste why it is that you are

 4   there?  Correct?

 5   A.    Yes, ma'am.

 6   Q.    And what is it that you tell him as to why you're

 7   there?  What do you say to him?

 8   A.    "I am here to analyze, to know what you want from

 9   us."

10   Q.    And you tell him, sir, do you not, that -- well,

11   let me strike that.

12         You continue to tell him that you're there to

13   analyze.  And you also say something else, do you not,

14   sir, about how it is -- what is necessary for you to be

15   able to help and provide support to Mr. Batiste; do you

16   not, sir?

17   A.    Referring to what page, please?

18   Q.    Referring to Page 16 and -- Page 16 and, also,

19   Page 17, sir.

20         Why don't you review that and see if that helps.

21   A.    Yes, ma'am.

22   Q.    And you continue to tell him that you're there to

23   analyze.  Right?

24   A.    Yes, ma'am.

25   Q.    And you're telling that, sir, are you not, for a
```

1   specific reason?  Right?

2   A.    Yes, ma'am.

3   Q.    You're trying to get information from him.

4   Right?

5   A.    Yes, ma'am.

6   Q.    And, so far, he has given you information; has he

7   not?

8   A.    Yes, ma'am.

9   Q.    But you continue to tell him that you're here to

10  analyze him because you want more information.  Right?

11  A.    Never information is enough, ma'am.  Always --

12  you start with something and everything arrive to

13  different stuff, like when you -- first, you try to

14  understand who the person is.

15        He tell you he has soldiers, referring to Jeff

16  Fort.

17        Second, you try to understand what kind of

18  training they have.

19        And every time he give you something, every time

20  you try to get something to understand or to get more.

21  Q.    Well, there was another reason, sir, was there

22  not, as to why you repeatedly -- now we're talking

23  about Pages 17, 18, 19, 20.

24        Something else happened in the course of that

25  conversation that was of concern to you.

```
 1   A.     Something happened?

 2   Q.     Something happened that concerned you; did it

 3   not?

 4          MS. ARANGO:  Judge, I would object.  It's a

 5   compound question or it's vague.  I can't understand

 6   what she's asking.

 7          MS. JHONES:  I'll clear it up.

 8          THE COURT:  Okay.

 9   BY MS. JHONES:

10   Q.     You told Mr. Batiste that you had a concern that

11   he was playing with you; did you not, sir?

12   A.     What page, ma'am?

13   Q.     Sure.  Page 20.

14   A.     What the question is?

15   Q.     You had a concern that Mr. Batiste was playing

16   with you.  Correct?  And that's what you're referring

17   to on Page 20, when you're talking about you could

18   smell when it's a game.  You could smell it.  I believe

19   those are your words.

20   A.     I was telling that -- I was telling him what --

21   my expert.  You know, I can know when it is a game.  I

22   can know what's going on.  I was telling him this in

23   this paragraph.

24   Q.     And why are you telling him that here, sir?  Why

25   are you telling him that you can smell a game?
```

1    A.     If you can give me just a minute to review the

2    previous conversation.

3    Q.     Take your time.

4    A.     Okay, ma'am.

5    Q.     Go ahead.

6    A.     The question?

7    Q.     Why do you tell him that you could smell a game a

8    mile away or words to that effect?  Why do you tell him

9    that, sir?

10   A.     I was playing a role, ma'am, and representing a

11   terrorist organization.  So when I coming from overseas

12   to down here and somebody sitting with me for the first

13   time, we trying to feel each other, see what his

14   intentions are.

15         I am coming here from -- first time in Florida --

16   in Miami, sitting with someone, explain to me that he

17   want help from overseas, he has soldiers, he has

18   generals, training.

19         I said to him, like, I'm an expert.  I'm playing

20   my role like a guy who they sent to analyze or -- I

21   know -- I can smell the game.  I can understand.  Don't

22   waste the time for the future.

23   Q.     You accuse him of having been playing with you

24   since the minute you walk into that hotel room.  You

25   accuse him of playing with you since the minute he got

Assaad - CROSS - By Ms. Jhones                 172

1   into that room; do you not, sir?

2   A.      What part?

3   Q.      Look at Page 21.  Do you want me to point it out

4   for you, sir?  Let me know.

5   A.      Yes, please.

6   Q.      Right there (indicating).

7   A.      Yes, ma'am.

8   Q.      And -- let me know if you're finished.

9   A.      Yes, ma'am.

10  Q.      Finished?

11  A.      Yes, ma'am.

12  Q.      And then, after that, sir, what your

13  understanding is of what's going on is that this man is

14  messing with you.  That's your understanding of what's

15  going on there.  He's messing with you.  He's given you

16  nothing.

17  A.      No, ma'am.  It's not like that.  It's -- I'm

18  playing a role and was -- I was trying to present the

19  picture of a guy who's tough, who's representing

20  something -- terrorist.

21          And, you know, the terrorist is cold-blooded,

22  tough.  "Listen, don't waste my time.  I'm here not for

23  games.  Tell me do this, do that.  We have trust or we

24  don't have trust."  This is -- was the situation.

25  Q.      Okay.  And after you tell him that about the

```
 1   game, you make another request of him; do you not?

 2   A.    Like what, ma'am?

 3   Q.    Look at the top of Page 22.

 4   A.    You are referring to the second line or the third

 5   or the whole paragraph?

 6   Q.    Sir, I'm referring to the whole paragraph.

 7         But, specifically, you make a request of him in

 8   the first couple of lines.

 9   A.    Yes, ma'am.

10   Q.    And what is that request that you're making of

11   Mr. Batiste?

12   A.    Like I said, I told him to give me something,

13   to -- something -- playing my role, "What I'm here for?

14   What you want from us?"

15   Q.    And he tells you; does he not?  Right at the end

16   of that paragraph on Page 22, he tells you.

17   A.    Excuse me?

18   Q.    He gives you the answer right there at the bottom

19   of that paragraph, sir, right next to the letters "NB."

20   A.    Yes, ma'am.

21   Q.    And what does he say to you, sir?

22   A.    The whole answer?  His whole answers?

23   Q.    I want your understanding, sir.

24   A.    Okay.

25   Q.    Tell us what he said there.
```

```
 1   A.      He said, "I'm exhausted financially" --

 2   Q.      Let me stop you.

 3   A.      -- "and" --

 4   Q.      Let me take it one by one.

 5           What is your understanding of what that means,

 6   "I'm exhausted financially"?  Give me your

 7   interpretation of that.

 8   A.      But he didn't finish his --

 9   Q.      What does that mean?

10   A.      But he didn't finish his answer.

11   Q.      No.  I know.  I want to take it part by part.

12   A.      But I cannot take part by part.  You have to

13   understand the whole answer to put it together.

14   Q.      I want you to give me the whole answer.  But I

15   want your understanding of what the words "financially

16   exhausted" mean.

17           What does it mean?

18   A.      Separate or together?  If you put it in a

19   sentence, will mean different.  And you say it -- you

20   answer it and you make stop and that's it, you make

21   different -- something different -- totally different.

22   Q.      Let me ask you this:  Is it in a sentence right

23   there on Page 22 in that transcript?  Is that a

24   sentence?

25   A.      Yes, ma'am.
```

```
 1   Q.    All right.  What does it mean to you, sir?

 2   A.    The whole answer?  I was listening.  I said,

 3   "Okay."  He was continuing the answer he gave me.  So

 4   he said, "I'm exhausted financially."

 5         And continuing of this -- if you want to take it

 6   apart different, then I can give it to you.  If you

 7   want to put the whole answer, what he said, mean

 8   different what -- you split it.

 9   Q.    He gives you a response; does he not, sir?

10   A.    And I was trying to read the whole response,

11   ma'am.

12   Q.    Go ahead.

13   A.    "I'm exhausted financially.  And everything I'm

14   trying to do.  We have nothing.  And the little bit

15   that I have, I took it to fix the mosque.  The men

16   trained hard.  But we don't have boots and uniforms."

17         So I understood that he want money to buy uniform

18   and boots and stuff he needed for his soldiers.

19   Q.    Let me ask you this.  We're going to come back to

20   12-16.  But I want to jump ahead a little bit to 1-28

21   of '06 just for a minute.  Okay?

22   A.    Yes, ma'am.

23   Q.    And you know what I'm talking about on 1-28-06,

24   don't you?

25   A.    Yes, ma'am.
```

1    Q.     That's the meeting in the Keys in the little

2    tent.  Right?

3    A.     Yes, ma'am.

4    Q.     In that meeting, he says to you, "I want the

5    money and I want the money and I want it -- with that

6    money, I'm going to get everything on that list."

7           Doesn't he tell you that on 1-28-06?

8    A.     Yes, ma'am.

9    Q.     And, sir, you know what's going on there, don't

10   you?  You know what's going on, don't you?

11   A.     Are you asking my opinion?

12   Q.     Yeah.  Yeah.

13          You know what's going on?

14   A.     What's going on?

15   Q.     You tell me.

16          What do you think is going on?  Tell me.  When he

17   says to you on 1-28, "You give me the money.  I'll buy

18   the stuff on the list," what is going on there, sir?

19   What is your understanding?

20          MS. ARANGO:  Objection, Judge.  He did not

21   answer the first question, and now she's got a compound

22   question.

23          THE COURT:  Sustained.

24          Rephrase your question.

25

Assaad - CROSS - By Ms. Jhones                177

BY MS. JHONES:

Q.    When Mr. Batiste tells you on January 28th of
'06, "Forget the list.  Give me the money.  I'll buy
that stuff on the list," what is your understanding as
to what he's telling you?

      MS. ARANGO:  Objection.  Mischaracterization
of facts.  There's no forget the list.

      THE COURT:  Sustained.

      Rephrase your question.

BY MS. JHONES:

Q.    Did Mr. Batiste tell you on 1-28 of '06 that he
will buy the stuff on the list with the money that he's
asking you for?  Did he say that to you on January 28th
of '06?

A.    He suggest he can buy -- he can buy it by
himself.

Q.    All righty.  So going back to 12-16, what is your
understanding about what this man wants?  What is your
understanding, sir?  Tell me.

A.    Because in 12-16 -- January 28 didn't happen yet.
And I'm still in January -- in December 16.  So when he
says that, I understood that he want to get boots and
uniform to his -- to his soldiers.

Q.    All right.  Let's talk about the boots.  Okay?

      What type of boots does he want on 12-16 of '05?

Assaad - CROSS - By Ms. Jhones                178

```
 1   Give me the description.

 2   A.    I don't remember, ma'am.

 3   Q.    Let's look at the exhibits.  Okay?

 4   A.    Yes, ma'am.

 5   Q.    In the meantime, I'll put Page 24.

 6         Look at Page 24.  See if that helps refresh your

 7   recollection.

 8   A.    Yes, ma'am.

 9   Q.    Does that help?

10   A.    Yes, ma'am.

11   Q.    What type of boots is he asking you for, sir?  He

12   doesn't want just any boots.  He has a specific type of

13   boot that he wants.  Right?

14   A.    Yes, ma'am.

15   Q.    And what are they?

16   A.    (No response.)

17   Q.    What are they?

18   A.    Knee-high ankle boots.  I don't --

19   Q.    Knee-high.  Right?  He wants them up to the knee.

20         Is that what you understand?

21   A.    That's what it said.  Yes, ma'am.

22   Q.    And he wants squad cars.  Right?

23   A.    Yes, ma'am.

24   Q.    Does he ask for a specific color of a squad car?

25   A.    Black.
```

1    Q.     And he asks for some other things.  Right?

2    A.     Yes, ma'am.

3    Q.     Now, after he gives you this list, you ask him,

4    do you not, sir, why does he want all of these boots

5    and all of these items contained in Government's

6    Exhibit 100?  Right?

7    A.     I ask him, yes --

8    Q.     And, sir -- I'm sorry.  Did I cut you off?

9    A.     Yeah.  Because when I saw machine guns and -- it

10   took my attention to understand why he want this list.

11   Q.     Well, he told you, didn't he?  After so many

12   pages, he tells you why; does he not?

13   A.     He told me two version.  Yes, ma'am.

14   Q.     Give me your understanding of what he told you.

15   A.     If I remember correctly, first, he mentioned he

16   want to march.  He believe in Islamic state.  He

17   believe in -- he believe in speaking about the

18   Government.

19          What I understood, he's against the Government.

20   He wants to create Islamic state.  And they have --

21   deserve to exist, something like that.

22          And in the end, he mentioned the second one.  He

23   said, "Will take it down."

24   Q.     Okay.  Well, let's go in chronological order.

25   Okay?

```
 1   A.      Yes, ma'am.

 2   Q.      Because you said two things.

 3           This is your understanding.  Right?

 4   A.      Yes, ma'am.

 5   Q.      Let's take it one step at a time.

 6           After he gives you the list, he tells you, does

 7   he not, sir, that he's going to build an army?  Right?

 8   A.      Yes, ma'am.

 9   Q.      By "army" -- what do you understand by that?

10   A.      He would recruit more soldiers.

11   Q.      An army is big.  Would you agree with me, sir?  A

12   lot of people?  Right?

13   A.      It doesn't mean a lot of people.

14   Q.      Okay.  So -- he says he wants to build a specific

15   type of army; does he not?

16   A.      Referring to what page?

17   Q.      Referring to Page 26.

18   A.      Yes, ma'am.

19   Q.      And after he tells you that, you need more

20   information from him; do you not, sir?

21   A.      Yes, ma'am.

22   Q.      And you want to know what he's going to do once

23   he has this Islamic army.

24           You need to know this; do you not, sir?

25   A.      He already explain it.  He want it for jihad.
```

1    Q.    But after he tells you that -- you're referring

2    to Page 26; are you not?  Is that what you're referring

3    to?

4    A.    I ask him, "To build an army?

5          And he said, "An Islamic army for Islamic jihad."

6          And this is very, very important and, you know,

7    disturbing to hear.  We have an army.  We have

8    soldiers.  We have generals.  And now he gave me a list

9    and Islamic state -- Islamic army and jihad.

10         This is very, you know....

11   Q.    It's very disturbing to you.  Right?

12   A.    It's what he -- it's like you put one plus one

13   and you have two.  And when he starts the conversation

14   by having an army and soldiers -- soldiers and generals

15   and he give you lists, including weapons, and he gives

16   you -- speaking about the Government, about the devil,

17   about taking down the Government and now he's telling

18   you, "I want to create an Islamic army and I want to

19   start a jihad," that's disturbing.

20   Q.    And after he tells you that he wants an Islamic

21   army for jihad, you tell him, "But what do you want to

22   do with it?" or words to that effect.

23         You need more information; do you not, sir?

24   A.    Yes, ma'am.

25   Q.    And he gives it to you, doesn't he, sir?

1   A.    One part of the reason.  Yes, ma'am.

2   Q.    And the reason he gives you is that he needs his

3   Islamic army because he's going to go marching up to

4   Jeb Bush.

5         Isn't that what he tells you, sir?

6   A.    Can you give me a second, please?

7   Q.    Let me know if you need any help, sir.

8   A.    You are referring to Page 27, ma'am?

9   Q.    No.

10        I'm referring to a little bit earlier, Page 33

11  and 34.  Bottom of Page 33 and the top of Page 34.

12  A.    The question, ma'am?

13  Q.    He tells you with his Islamic army, when he's

14  strong enough, he's going to march up to Jeb Bush's

15  office and tell him something.  Right?  That's what he

16  tells you?

17  A.    It was the first step, what he said.  This is

18  gonna be the first step.

19  Q.    I forgot to ask you something that occurred

20  before Page 34.  I apologize.

21        There comes a time in this conversation where

22  Mr. Batiste offers to pay your ticket back so you can

23  go back home.  Right?

24        He tells you, "You know what?  This ain't working

25  out.  I'll buy you a ticket.  Go back home"; does he

```
 1   not, sir?

 2   A.     Yes, ma'am.

 3   Q.     Okay.

 4   A.     But he also told me that, "I will go on with you

 5   or without you.  I will continue my mission."

 6          MS. JHONES:  I apologize, your Honor.  I just

 7   need a minute.  I lost my place.

 8   BY MS. JHONES:

 9   Q.     Now, sir, he does not say to you, sir, when he's

10   going to go up to Jeb Bush's office -- he doesn't tell

11   you, sir, does he, that he's going to be carrying

12   weapons with him?  Does he?

13   A.     I don't know.  I don't remember.

14   Q.     Well, let's look at -- let's make sure about

15   that.

16   A.     Page 33?

17   Q.     I'm not sure.  I've lost my place.  Let me see if

18   I can find it.

19          THE COURT:  We're going to break for the day.

20          Do not discuss this case either amongst

21   yourselves or with anyone else.  Have no contact

22   whatsoever with anyone associated with the trial.  Do

23   not read, listen or see anything touching on this

24   matter in any way.

25          If anyone should try to talk to you about this
```

1    case, you should immediately instruct them to stop and

2    report it to my staff.

3            You may leave your binders at your chairs.

4    Please give your notebooks to the court security

5    officer.  I will see you Tuesday morning, 9:00.  Have a

6    nice weekend.

7            (Whereupon, the jury exited the courtroom at

8    5:03 p.m. and the following proceedings were had:)

9            THE COURT:  We're in recess until 9:00,

10   Tuesday morning.

11           You may step down.

12           (End of proceedings.)

13

14              C E R T I F I C A T E

15

16           I hereby certify that the foregoing is an

17   accurate transcription of the proceedings in the

18   above-entitled matter.

19

20

21   _____        /s/Lisa Edwards
          DATE            LISA EDWARDS, CRR, RMR
22                        Official United States Court Reporter
                          400 North Miami Avenue, Twelfth Floor
23                        Miami, Florida 33128
                          (305) 523-5499
24

25