```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                    CASE NO. 06-20373-CRIMINAL-LENARD
 3

 4   UNITED STATES OF AMERICA,       Miami, Florida

 5                  Plaintiff,       March 17, 2009

 6          vs.                      9:22 a.m. to 5:15 p.m.

 7   NARSEAL BATISTE, et al.,        Volume XXIV

 8              Defendants.          Pages 1 to 209
     ------------------------------------------------------
 9

10                          JURY TRIAL
11          BEFORE THE HONORABLE JOAN A. LENARD,
                 UNITED STATES DISTRICT JUDGE
12

13

14   APPEARANCES:

15

16   FOR THE GOVERNMENT:    RICHARD D. GREGORIE, ESQ., and
                            JACQUELINE M. ARANGO, ESQ.
17                          ASSISTANT UNITED STATES ATTORNEYS
                            99 Northeast Fourth Street
18                          Miami, Florida 33132

19
     FOR THE DEFENDANT      ANA MARIA JHONES, ESQ.
20     NARSEAL BATISTE:     300 Seville Avenue, Suite 210
                            Coral Gables, Florida 33134
21

22   FOR THE DEFENDANT      ALBERT Z. LEVIN, ESQ.
       PATRICK ABRAHAM:     261 Northeast First Street
23                          Sixth Floor
                            Miami, Florida 33132
24

25
```

2

```
 1   FOR THE DEFENDANT       RODERICK D. VEREEN, ESQ.
       STANLEY PHANOR:       BRINKLEY, HENRYS & LEWIS
 2                           4770 Biscayne Boulevard
                             Suite 1200
 3                           Miami, Florida 33131

 4
     FOR THE DEFENDANT       RICHARD K. HOULIHAN, ESQ.
 5     NAUDIMAR HERRERA:     300 Aragon Avenue
                             Coral Gables, Florida 33134
 6

 7   FOR THE DEFENDANT       LOUIS CASUSO, ESQ.
       BURSON AUGUSTIN:      111 Northeast First Street
 8                           Suite 603
                             Miami, Florida 33132
 9

10   FOR THE DEFENDANT       NATHAN CLARK, ESQ.
      ROTSCHILD AUGUSTINE:   17639 South Dixie Highway
11                           Miami, Florida 33157

12
     REPORTED BY:            LISA EDWARDS, CRR, RMR
13                           Official Court Reporter
                             400 North Miami Avenue
14                           Twelfth Floor
                             Miami, Florida 33128
15                           (305) 523-5499

16

17

18

19

20

21

22

23

24

25
```

1                          I  N  D  E  X

2

3
                                        Direct    Cross    Red.
4

5

WITNESSES FOR THE GOVERNMENT:
6

7    Elie Assaad                          5

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning.

2          United States of America versus Narseal

3     Batiste, et al., Case No. 06-20373.

4          Counsel, state your appearances, please, for

5     the record.

6          MR. GREGORIE:  Good morning, your Honor.

7          Richard Gregorie and Jacqueline Arango on

8     behalf of the United States.

9          MS. JHONES:  Good morning.

10          Ana Maria Jhones on behalf of Narseal Batiste,

11     who's present.

12          MR. LEVIN:  Albert Levin on behalf of Patrick

13     Abraham, who's present.

14          Good morning, your Honor.

15          MR. CASUSO:  Good morning, your Honor.

16          Louie Casuso on behalf of Burson Augustin,

17     who's present.

18          MR. CLARK:  Good morning, your Honor.

19          Nathan Clark on behalf of Rotschild Augustine,

20     who's present.

21          MR. HOULIHAN:  Richard Houlihan with Naudimar

22     Herrera.

23          MR. VEREEN:  Good morning, your Honor.

24          Roderick Vereen on behalf of Stanley Phanor,

25     who's present.

Assaad - CROSS - By Ms. Jhones                    5

1              THE COURT:  Good morning to everyone.

2              The jurors are now here.

3              So let's bring them in and proceed.

4              (Whereupon, the jury entered the courtroom at

5     9:25 a.m. and the following proceedings were had:)

6              THE COURT:  You may be seated.

7              You are still under oath, sir.

8              You may proceed, Ms. Jhones.

9              Good morning, ladies and gentlemen.

10             THE JURY:  Good morning.

11             MS. JHONES:  Thank you, your Honor.

12             Good morning, ladies and gentlemen.

13             THE JURY:  Good morning.

14                  CONTINUED CROSS-EXAMINATION

15    BY MS. JHONES:

16    Q.    Mr. Assaad, when we wrapped up on Friday, we were

17    talking about your meeting with Mr. Batiste on 12-16.

18          Do you remember that?

19    A.    Yes, ma'am.

20    Q.    And I had asked you, sir, if -- we were talking

21    about when Mr. Batiste explained to you what he was

22    going to do as -- when he marched up to Jeb Bush's

23    office.

24          Do you remember that, sir?

25    A.    Yes, ma'am.

1    Q.    And --

2              MS. JHONES:  I apologize, your Honor.  I just

3    need a minute.  I lost my place.

4    BY MS. JHONES:

5    Q.    He said the first step was going to be to march

6    up to Jeb Bush's office.

7              Do you remember that, sir?

8    A.    Yes, ma'am.

9    Q.    And he also -- when he was talking about this

10   march, sir, he was also talking to you about the

11   forefathers and what our Constitution had said about

12   certain rights that individuals had in this country.

13             Do you remember that, sir?

14   A.    Yes, ma'am.

15   Q.    Okay.  And let me know if you need the

16   transcript, sir.  Okay?

17   A.    Yes, ma'am.

18   Q.    And when Mr. Batiste tells you this, you ask him

19   something; do you not, sir?

20   A.    Referring to what, ma'am?

21             MS. ARANGO:  Objection.  Vague.

22             THE COURT:  Sustained.

23             Rephrase your question.

24   BY MS. JHONES:

25   Q.    When Mr. Batiste tells you -- starts talking

1    about our forefathers and the Constitution, at that

2    point in time, you ask Mr. Batiste a question about

3    jihad; do you not, sir?

4    A.    I guess Brother Naz brought jihad first to the

5    conversation.  I never mentioned jihad before he

6    mentioned it first.

7         So whatever subject I bring during the

8    conversation, he brought it first.  And after, I go

9    details about what he mean in jihad.

10        So if I brought it, maybe.  But he first

11   mentioned creating an army -- Islamic army for jihad.

12   Then I questioned him after that, maybe, about the

13   jihad.

14   Q.    Let's look at the transcript.

15   A.    Yes, ma'am.

16           MS. JHONES:  May I approach, your Honor?

17           THE COURT:  Yes.

18   BY MS. JHONES:

19   Q.    (Tenders document to the witness.)

20   A.    Thank you.

21           MS. ARANGO:  Judge, is Ms. Jhones directing

22   hum to a particular page?  If so, I'd like to know what

23   page it is.

24   BY MS. JHONES:

25   Q.    Sir, take a look at Page 35.

1              MS. JHONES:  And, your Honor, if I may have

2      the ELMO, please.

3              THE COURT:  Sure.

4              UNIDENTIFIED JUROR:  The screen is purple.

5              THE COURT:  Did it go off?

6              UNIDENTIFIED JUROR:  Okay.

7              THE COURT:  Did it come back on?  Everybody

8      okay?

9              Go ahead.

10     BY MS. JHONES:

11     Q.     Are you ready, Mr. Assaad?

12     A.     Yes, ma'am.

13     Q.     Do you see, sir, on the top of Page 35 when

14     Mr. Batiste is talking to you about the forefathers and

15     the Constitution and things of that nature?

16     A.     Yes, ma'am.

17     Q.     And he talks about how the brothers have studied

18     law and that sort of thing?

19     A.     Excuse me?

20     Q.     And he talks about a brother who has studied law.

21            Do you see that?

22     A.     You mean the first line?

23     Q.     First paragraph.

24     A.     Yeah.  It's written in their laws.

25     Q.     Okay.  And after Mr. Batiste has told you about

Assaad - CROSS - By Ms. Jhones                    9

```
 1   what he's going to do when he marches over to see Jeb
 2   Bush, flags waving -- right? -- you say to him, "But
 3   what you're talking about, you know, jihad.  Make
 4   something."
 5        Right?
 6   A.   No, ma'am.
 7   Q.   Those are your words.
 8   A.   Referring to previous conversation, if you give
 9   me one second just to look at it, previous than 35, he
10   mentioned the jihad.  He mentioned Islamic army.
11        I didn't mention it first -- I didn't bring it to
12   his attention.  So he mentioned before 35.  I need a
13   second just to --
14   Q.   Sir, I haven't asked you who mentioned it first.
15        MS. ARANGO:  Objection, Judge.  He's answering
16   the question.
17        THE COURT:  Let him finish his answer.
18        THE WITNESS:  You are telling me I brought the
19   word "jihad" to his intention.  But I didn't.  He
20   mentioned the jihad and Islamic army and Islamic state
21   before the Page 35.  So, you know, you are in the
22   conversation.
23   BY MS. JHONES:
24   Q.   And, sir, after you bring up -- you bring up
25   jihad after Mr. Batiste talks to you about marching.
```

```
 1    Correct?

 2            MS. ARANGO:  Objection.  Mischaracterization

 3    of facts, Judge.

 4            THE COURT:  Sustained.

 5            Rephrase your question.

 6    BY MS. JHONES:

 7    Q.    Sir, after you make that comment to Mr. Batiste,

 8    Mr. Batiste tells you --

 9            MS. ARANGO:  Objection.  Vague.

10            THE COURT:  Sustained.

11            Rephrase your question.

12    BY MS. JHONES:

13    Q.    After Mr. Batiste is talking to you about

14    marching to go see Jeb Bush, he also tells you that

15    there are two ways to fight a war; does he not, sir?

16    A.    Referring to what paragraph?

17    Q.    Same page, Page 35, right at the top, third

18    paragraph.

19    A.    Yes, ma'am.

20    Q.    And he tells you, sir, does he not, that there is

21    a way you to fight a war, and that's through the use of

22    one's intelligence?  Does he not, sir?

23    A.    Yes, ma'am.

24    Q.    And he also tells you, sir, that in this country,

25    you have the right to bear arms; does he not, sir?
```

Assaad - CROSS - By Ms. Jhones          11

```
 1   A.      Yes, ma'am.

 2   Q.      And, sir, you then say to him, "Well, I'm going

 3   to speak to my brothers," meaning you are speaking to

 4   your brothers.

 5           And you're referring to your brothers back home;

 6   are you not, sir?

 7   A.      The terrorist organization.  Yes, ma'am.

 8   Q.      Well, you don't tell him, "I'm going to speak to

 9   my terrorist organization brothers back home,

10   Mr. Batiste."

11           You don't tell him that, sir, do you?

12   A.      No, ma'am.

13   Q.      And then you tell Mr. Batiste that you're going

14   to provide your brothers back home with your opinion of

15   what you have seen in this meeting of 12-16.  Correct?

16   A.      Yes, ma'am.

17   Q.      And he tells you, "It's too soon to give an

18   opinion," doesn't he, sir?

19   A.      Referring to what page?

20   Q.      Same page -- actually, it's the next page.  I'm

21   sorry.  Page 38.

22   A.      What paragraph?

23   Q.      If you'd like to look at the monitor, I'll point

24   it out to you.  Top of Page 38.

25   A.      If I can have a second to see the previous
```

1   conversation.

2        The question is, please?

3   Q.    When you tell Mr. Batiste you're going to contact

4   your brothers back home and give them an opinion,

5   Mr. Batiste tells you that it's too soon?

6   A.    Yes, ma'am.

7   Q.    And then, sir, basically, we are at the end of

8   the meeting at this point; are we not?  The meeting is

9   coming to an end?

10  A.    Yes, ma'am.

11  Q.    And Mr. Batiste tells you, "If I could do

12  something to make your stay here more comfortable, let

13  me know."  Right?

14  A.    Yeah.  But, ma'am, he mentioned that, "We gonna

15  bring it down" when -- you know, during this meeting.

16  And he said, "What I can make your stay more

17  comfortable?"

18        So during this meeting, there is a lot of, you

19  know, details.  And in the end of the meeting, he

20  saying, "We're gonna bring it down."

21  Q.    And, sir, when he tells you that, if you need --

22  if he can make your stay more comfortable, you tell

23  him, sir, do you not, "Well, let's stay in touch.

24  Let's not go through the same thing we went through

25  when we were at the airport where I was calling and

```
 1   calling and calling and you wouldn't answer.  Let's
 2   stay in touch, Mr. Batiste."
 3        That's the way you end the conversation; do you
 4   not, sir?
 5   A.   Ma'am, I was playing my role.  I was playing my
 6   role during this meeting.  And there is a lot of -- the
 7   first meeting -- normally, when you don't know the
 8   person, you sit and you meet them for the first time
 9   and you try to understand each other, what you have.
10        I was listening.  I was trying to find out what
11   his intention are, who this person is.  I was following
12   what the FBI told me.  I was just listening and playing
13   a role.
14        I found certain points -- like when he mentioned
15   all what he mentioned in the beginning by himself, I
16   didn't tell him what to say.  I was just listening.
17        So staying in touch doesn't mean, like, I was
18   forcing him to stay in touch.  I said, "Okay.  Let's
19   stay in touch."  And the meeting is almost finished.
20   Q.   But Mr. Batiste does not stay in touch after
21   December 22nd, does he, sir?
22   A.   Doesn't stay in touch?
23   Q.   He does not call you, sir.
24        You are the one that calls him; do you not, sir?
25   A.   Ma'am, I follow what the FBI told me.
```

Assaad - CROSS - By Ms. Jhones                  14

```
 1   Q.     Okay.  I understand that.  I understand.

 2          Let's go --

 3              MS. ARANGO:  Objection to the comment and move

 4   to strike.

 5              THE COURT:  Sustained.

 6              Please refrain from comments.  The motion to

 7   strike is granted.

 8              The jury is instructed to disregard the last

 9   comment.

10   BY MS. JHONES:

11   Q.     Now, you don't hear from Mr. Batiste on the 17th

12   of December, do you, sir?

13   A.     No, ma'am.

14   Q.     You don't hear from him on the 18th of December,

15   do you, sir?

16   A.     We didn't have numbers to communicate with,

17   like -- or to call me -- for him to call me.  I didn't

18   have telephone number at that time.

19   Q.     Well, you did call him, sir; did you not?  You

20   called him on the 22nd, didn't you?

21   A.     The FBI told me to give him a call.

22   Q.     And I understand that, whenever you call him,

23   it's because the FBI told you to call him.  Correct?

24   A.     Yes, ma'am.

25   Q.     And you're following the FBI's instructions.
```

```
 1    Correct?

 2    A.    All the time.

 3    Q.    12-16 to 12-22, this man does not call you; you

 4    call him?

 5    A.    Yes, ma'am.

 6    Q.    All righty.  Let's talk about 12-22.

 7    A.    Yes, ma'am.

 8    Q.    On 12-22, sir, Mr. Batiste picks you up at the

 9    Bayside Marketplace; does he not?

10    A.    Yes, ma'am.

11    Q.    This is now the second encounter you have with

12    Mr. Batiste.  Correct?

13    A.    Yes, ma'am.

14    Q.    You are wired up, so to speak.

15          You have a recorder with you; do you not?

16    A.    Yes, ma'am.

17    Q.    And before you go to that meeting at Bayside, you

18    test the equipment, you make sure that it's working and

19    everything is fine.  Correct?

20    A.    You cannot test the equipment, ma'am.

21    Q.    You can't test the equipment?

22    A.    No, ma'am.

23    Q.    And --

24    A.    You just -- they give it to you and they turn it

25    on and it's working.  You cannot find out if it's
```

```
 1    working at the same time until later on.

 2    Q.      Okay.  And you go over there to the marketplace;

 3    do you not?

 4    A.      Yes, ma'am.

 5    Q.      And you get in the vehicle with Mr. Batiste.

 6    Right?

 7    A.      Excuse me?

 8    Q.      You get into a vehicle that Mr. Batiste is

 9    driving?

10    A.      Yes, ma'am.

11    Q.      And you leave the Bayside Marketplace.  You are

12    leave the Bayside Marketplace?

13    A.      Yes, ma'am.

14    Q.      And Mr. Batiste drives you around Downtown Miami?

15    A.      No, ma'am.

16    Q.      Does he show you high-rises and construction that

17    is taking place in Downtown Miami, sir?

18    A.      We were on our way to the Embassy, ma'am.

19    Q.      Do you see -- does he point out buildings in

20    Downtown Miami that are under construction?

21    A.      It was on our way, not Downtown Miami.  Was on

22    our way to the Embassy.

23    Q.      Let me try again.

24            Does he talk to you about buildings that are

25    under construction in Miami?
```

1   A.    Yeah.  He talked to me about it.

2   Q.    And he's talking to you about how expensive these

3   buildings are.  Correct?

4   A.    Yes, ma'am.

5   Q.    And he talks to you about the construction

6   business; does he not?

7   A.    Yes, ma'am.

8   Q.    And he tells you about how hard it is for a small

9   businessman to get ahead without having money; does he

10  not, sir?

11  A.    Yes, ma'am.

12  Q.    He tells you about how difficult it is to be

13  able to have the money to post a bond so that he could

14  bid on contracts; does he not, sir?

15  A.    Yes, ma'am.

16  Q.    And all of this takes place before you get to the

17  Liberty City location.  Correct?

18  A.    Yes, ma'am.

19  Q.    All right.  And you tell Mr. Batiste, sir, do you

20  not, that it's very important to stay in contact with

21  him, that he stay in contact with you?  Correct?

22  A.    Yes, ma'am.

23  Q.    And you provide him a phone -- a cell phone; do

24  you not, sir?

25  A.    Yes, ma'am.

Assaad - CROSS - By Ms. Jhones                    18

```
 1   Q.    And in that cell phone, you tell him that you can
 2   now speak freely; do you not, sir?
 3   A.    "Freely" mean between each other.  Yes, ma'am.
 4   Q.    And, sir, on 12-22 of 2005, when you began to
 5   talk to Mr. Batiste at the Liberty City location, you
 6   also talk to Mr. Batiste about what your role is, not
 7   your undercover role, but the role that you're playing
 8   for the FBI; do you not, sir?
 9   A.    Can you be more specific, ma'am, please.
10   Q.    Sure.
11         What you tell Mr. Batiste is that you are here to
12   assist him in whatever he needs; do you not, sir?
13   A.    Yes, ma'am.
14   Q.    You tell him that you're not here to take over.
15   Right?
16   A.    Yes, ma'am.
17   Q.    You're here to serve him.  Right?
18   A.    Yes, ma'am.
19   Q.    And you also tell him, "I'm here to assist you,
20   but don't let me stay here for nothing.  Don't let me
21   stay here for nothing, Mr. Batiste."
22         You say words to that effect to him; do you not,
23   sir?
24   A.    Yes, ma'am.
25   Q.    And you also tell him that, because you are
```

Assaad - CROSS - By Ms. Jhones                    19

```
 1   beginning to believe in him, you have told your people

 2   back home that you need to extend your stay here in

 3   Miami or words to that effect; do you not, sir?

 4   A.    Is there something to refresh my memory, please?

 5   Q.    Sure.

 6              MS. JHONES:  May I approach, your Honor?

 7              THE COURT:  Yes.

 8   BY MS. JHONES:

 9   Q.    (Tendering document to the witness.)

10         Government's Exhibit 47-A.

11   A.    Thank you.

12              THE COURT:  Do you have a page?

13              MS. JHONES:  Yes.  I'm getting to it, your

14   Honor.

15   BY MS. JHONES:

16   Q.    Look at Page 23, Mr. Assaad, towards the middle

17   of the page.

18   A.    Yes, ma'am.

19   Q.    And, again, towards the bottom of the page, you

20   tell him, "Mr. Batiste, don't let me stay here for

21   nothing" or words to that effect; do you not, sir?

22   A.    Yes, ma'am.

23   Q.    Okay.  And you repeat that over and over again

24   throughout the course of your dealings with

25   Mr. Batiste; do you not, sir?
```

 1    A.     Yes, ma'am.

 2    Q.     All righty.  And, sir, during the course of this

 3    meeting over here in the Liberty City location, you and

 4    Mr. Batiste talk about his construction business and he

 5    talks about how he's going to fix the Embassy location.

 6    Correct?

 7    A.     Yes, ma'am.

 8    Q.     And when you go to visit him in this location on

 9    December 22nd, that place is looking pretty rough; is

10    it not?

11    A.     Excuse me?

12    Q.     It's looking pretty rough.  The walls are

13    still -- are being worked on.  There's no flooring.

14           Do you remember what it looked like on

15    December 22nd of 2005?

16    A.     No, ma'am.

17    Q.     Do you remember whether or not there was

18    electricity, sir?

19    A.     I don't remember.

20    Q.     And then Mr. Batiste talks to you about going

21    over and taking a trip with him -- actually, he says a

22    vacation with him to Chicago so he can show you the

23    Sears Tower; does he not, sir?

24    A.     What page, please, ma'am?

25    Q.     Page 48.

```
 1   A.     Which paragraph, please?
 2   Q.     Right here, where he says, "I can show you.
 3          "How can you show me?"
 4   A.     The -- he didn't invite me to take vacation,
 5   like -- he said, "Vacation or something."  But he
 6   didn't say, "Let's go vacation."
 7   Q.     Let's backtrack a little.  I just skipped around
 8   and I just realized that.  Okay?  I'm going to go a
 9   little bit earlier in the conversation.  Okay?
10   A.     Yes, ma'am.
11   Q.     We'll get back to the vacation.
12          In this conversation on December 22nd of 2005,
13   Mr. Batiste tells you that he has soldiers in
14   Louisiana?
15   A.     Different question now?
16   Q.     Different question, sir.  Yes.
17   A.     Yes, ma'am.
18   Q.     And he tells you he has soldiers in Chicago?
19   A.     Yes, ma'am.
20   Q.     And he tells you, sir, that they just need a
21   country where these soldiers can train; does he not,
22   sir?
23   A.     Referring to what page, ma'am?
24   Q.     Sure.
25          Look at Page 40.
```

1    A.     Yes, ma'am.

2    Q.     He tells you that he needs your help in getting

3    his soldiers over there.  Right?

4    A.     To where?

5    Q.     Well, you tell me.

6    A.     To --

7    Q.     What does he tell you that he needs your help on

8    in terms of the soldiers in this point in the

9    conversation?

10   A.     He need them to Louisiana, to his land, transport

11   them from Chicago to Louisiana, to the land he has.

12   Q.     He wants you to help him with that.  Right, sir?

13   A.     He's asking help from the beginning from a

14   terrorist organization.  He asking all kind of help to

15   proceed in his plan, what he request from a terrorist

16   organization.  So it's not like my help, like a person.

17   Q.     In the conversation of December 22nd, 2005, he

18   tells you he needs you to help and transport his

19   soldiers.

20          That is mentioned on December 22nd of 2005.

21   Correct?

22   A.     Yes, ma'am.

23   Q.     And then, after this -- he mentions to you that

24   he needs to get his soldiers trained in Chicago and

25   Louisiana.  That's when he tells you, "I'll take you

1    there.  I'll take you there to Chicago."  Correct, sir?

2    Going back --

3    A.     No, ma'am.

4    Q.     "No," that's not when he tells you he's going to

5    take you to Chicago on vacation?

6    A.     No, ma'am.  He told me he will take me to Chicago

7    to see the Sears Tower, where he used to -- he will

8    show me how accurate his plan is.  It's like, "If you

9    don't believe me, I take you over there and I show you

10   personally about Chicago."

11        When he spoke about bringing soldiers from

12   Chicago to Louisiana, he asked that -- "I have a land

13   in Louisiana and I will bring -- I want to bring the

14   soldiers from Chicago to Louisiana to get trained."

15        But he want me to go trip with him not on

16   vacation; just to show me the Sears Towers and show me

17   what -- how his plan is accurate.

18   Q.     Okay.  Well, let's go over there to Page 49.

19   A.     Yes, ma'am.

20   Q.     Actually, it's Page 48.

21        And -- are you with me?

22   A.     Yes, ma'am.

23   Q.     And he tells you -- you ask him, actually, "How

24   can you show me?", meaning how could Mr. Batiste show

25   you what he's talking about.  Correct?

```
1    A.     He said, "I will show you."

2           I said, "How you can show me?"

3           He said, "First, I show you."

4    Q.     And then he says, "Vacation?"; does he not, sir?

5           MS. ARANGO:  Objection, Judge.  She's just

6    reading from the transcript.  If there's a question --

7           THE COURT:  Sustained.

8    BY MS. JHONES:

9    Q.     Does he or does he not suggest that you go up

10   there on a vacation?

11   A.     He suggests it.  Yes, ma'am.

12   Q.     And then you say to him, "Well, I'm going to get

13   approval from my superiors" -- or words to that

14   effect -- "and we can go"?

15   A.     Yes, ma'am.

16   Q.     And when you said that, sir, you were not only

17   talking about going to Chicago, but you were also

18   possibly talking about Louisiana or wherever else

19   Mr. Batiste suggested that you go with him.  Correct?

20   A.     No, ma'am.  I always leave in any meeting -- I

21   leave -- I cannot give promises.  I cannot promise

22   about anything.  I follow what the FBI tell me.

23          But if there is something show up in the meeting,

24   I leave open doors for the FBI to decide what they want

25   to do and for Brother Naz to decide what he want to do.
```

1          So when he suggest to go with him to Chicago, I

2     couldn't promise him I will go.  I couldn't promise him

3     I will go.  I couldn't promise him "yes" or "no."  I

4     said, "Let me see.  Let me check."

5          All my meeting was the same, ma'am.  So I always

6     have to come back to the FBI and leave the suggestion

7     open for both side.  I'm in the middle.  I leave it for

8     the FBI and I leave it for Brother Naz for both to

9     decide what they want to do.

10    Q.    And after this meeting on December 22nd with

11    Mr. Batiste, you spoke to the FBI.  You gave them your

12    little tape with your little recording and they heard

13    this whole conversation.  Correct?  You were debriefed

14    on this meeting?

15    A.    Yes, ma'am.

16    Q.    They knew that Mr. Batiste was inviting you to go

17    to Chicago and check out the Sears Tower, check out his

18    soldiers.

19          They knew about that; did they not, sir?  You

20    told them about that?

21    A.    You can ask them, ma'am.  They knew.

22    Q.    Did you tell them, sir?

23    A.    They debriefed me after the meeting.  Yes, ma'am.

24    Q.    And you also told them Mr. Batiste wanted to take

25    you to Louisiana.  Right?

```
 1   A.     Yes, ma'am.
 2   Q.     And -- but you never went to Chicago with
 3   Mr. Batiste, did you, sir?
 4   A.     Ma'am, it not in my hand to go or not to go.
 5   It's up to the FBI.  So if they tell me they go, I go.
 6   Q.     My question is:  Did you ever go with Mr. Batiste
 7   to Chicago?
 8   A.     No, ma'am.
 9   Q.     Did you ever go with Mr. Batiste to Louisiana?
10   A.     No, ma'am.
11   Q.     Did you ever check out what Mr. Batiste was
12   telling you that he had in Chicago?
13   A.     No.
14   Q.     Did you ever check it out?
15   A.     Did I check?
16   Q.     Yes.
17   A.     No, ma'am.
18   Q.     Did you go?  No.
19          Did you go to Louisiana?
20   A.     No, ma'am.
21   Q.     All righty.  And throughout the course -- by the
22   way, how long was this meeting on December 22nd?
23   A.     I don't remember exactly, ma'am.
24   Q.     Well, it was more than an hour; was it not?
25   A.     If you say so.  Yes, ma'am.
```

Assaad - CROSS - By Ms. Jhones                    27

```
 1   Q.     Well, no.  No.  Let me see if I can help you.

 2          Look at the front page of your transcript and the

 3   last page of the transcript, Mr. Assaad.  Look at

 4   Page 2 of the transcript.

 5          Do you see Page 2 -- top of Page 2?  Does that

 6   refresh your recollection as to when this meeting

 7   began?

 8   A.     Yes, ma'am.

 9   Q.     Look at the last page of the transcript and tell

10   me if that refreshes your recollection as to when the

11   meeting ended.

12   A.     Yes, ma'am.

13   Q.     How long did the meeting last, sir?

14   A.     Two hours and -- almost three.

15          MS. JHONES:  At this point, your Honor, I want

16   to play a clip from this meeting and ask Mr. Assaad

17   questions about it.  Okay?

18          THE COURT:  Okay.

19          MS. JHONES:  If Eric could assist me with --

20   if I may just speak to Eric for a second, your Honor,

21   to make sure I play the right clip.

22          THE COURT:  Sure.

23          (Discussion had off the record amongst

24   counsel.)

25          MS. JHONES:  I apologize, your Honor.
```

 If we could just play Clip C, please.

THE COURT REPORTER: I'm sorry. Could I have an exhibit number for the record, please?

MS. JHONES: Sure. It's Government's Exhibit 47-A.

And what I'm going to do, your Honor, since we -- I don't believe the jury has a transcript, I'd like to put the page where this clip is going to be so they can follow in the transcript, if that's okay.

THE COURT: I can't do the ELMO and the computer at the same time.

MS. JHONES: Oh, I thought we could.

MS. ARANGO: Judge, I believe the jury does have this transcript.

THE COURT: They do?

MS. JHONES: December 22nd?

MS. ARANGO: It's not a rolling video. I mean, it's just an audio.

MS. JHONES: Great.

If the jury could turn to Page 60, your Honor, I would appreciate that.

THE COURT: What's the exhibit number?

MS. JHONES: It's Exhibit 47-A, Page 60.

MS. ARANGO: It's Volume I of III.

THE COURT: Where are you starting on the

```
 1    page?
 2            MS. JHONES:  Towards the bottom, four speakers
 3    up, your Honor.
 4            THE COURT:  Okay.  Everybody ready?
 5            THE JURY:  Yes.
 6            THE COURT:  Go ahead.
 7            (Whereupon, segments of Government's Exhibit
 8    No. 47 were published in open court.)
 9    BY MS. JHONES:
10    Q.    Do you remember that, sir?
11    A.    Yes, ma'am.
12            MS. ARANGO:  Judge, I would object to this
13    type of questioning on cross-examination.  It's
14    improper to just play something and ask, "Did you say
15    that?"  If there is audio question --
16            THE COURT:  Do you have additional questions?
17            MS. JHONES:  If she wouldn't interrupt me, I
18    would go on with my questions, your Honor.
19            THE COURT:  Go ahead.
20            Overruled.
21    BY MS. JHONES:
22    Q.    Sir, when you said to Mr. Batiste, "Big, I mean,
23    big," you were referring, sir, to financial support;
24    were you not, sir?
25    A.    Are you asking me, ma'am, or telling me?
```

```
1    Q.    Yes.  I am asking you, sir.

2    A.    No, ma'am.

3    Q.    When you said, "Big, big," sir, what were you

4    referring to?

5    A.    I was referring to the support from Al- --

6    terrorist organization.

7    Q.    Well, let me ask you this:  He doesn't know that

8    you're recording him, does he, sir?

9    A.    No, ma'am.

10   Q.    You're supposed to be there to get information.

11   Right, sir?

12   A.    Yes, ma'am.

13   Q.    It's better to be very specific from your point

14   of view, isn't it, sir?

15   A.    Excuse me?

16   Q.    It's better to be specific, to explain in detail

17   what you mean, because you are there to get information

18   for the FBI, aren't you, sir?

19   A.    But, ma'am, I'm not professional.  And sometimes

20   during undercover cases -- each case is different than

21   the other case.  And sometime you are sitting and you

22   having conversation.

23        So they don't give you the word word by word to

24   say it or to memorize it or to put memory in your brain

25   to repeat it during the conversation.
```

```
 1        They give you, in general, what -- there is a
 2   point in each meeting.  Before each meeting, they tell
 3   you what to try to understand, to listen, to -- you
 4   know.  But they cannot tell you each word what to say
 5   or to memorize it.
 6        I'm playing the best I can or -- my role or how I
 7   can do it.  So it's not like I have -- I don't know.  I
 8   was doing my best.
 9   Q.   Sir, what's going on right there -- what's going
10   on right there in that conversation, sir, is that
11   you're leading this man to believe that the sky is the
12   limit.  That is why you are not being specific, sir.
13   Isn't that a fact?
14        You do not want to say to him, "I'm going to give
15   you all the money you want."  You are purposely being
16   vague.  That is what's going on there, sir.  Isn't that
17   a fact?
18        MS. ARANGO:  Objection.  Compound question and
19   vague.
20        THE COURT:  Sustained.
21   BY MS. JHONES:
22   Q.   You don't specify it not because you don't have
23   experience.  You don't specify it because you don't
24   want to specify it.  Isn't that a fact, sir?
25        MS. ARANGO:  Objection.  Vague.  Specify what?
```

Assaad - CROSS - By Ms. Jhones                32

```
 1          THE COURT:  Sustained.
 2   BY MS. JHONES:
 3   Q.    The word "big."  The word "big," sir, that you
 4   mentioned on at least two occasions.  The word "big."
 5          You are not being specific about that word
 6   intentionally.  Isn't that a fact, sir?
 7   A.    I didn't mean -- when I say "big," ma'am -- and I
 8   will repeat again -- we are speaking about the Sears
 9   Towers.  We speaking about support from terrorist
10   organization.
11          And I said -- if you can see the same paragraph,
12   I mentioned to him -- and I was very clear -- "If your
13   plan it's legit, if your plan about the Sears Tower and
14   what you are telling us and you need the support of and
15   all what you asking us for -- if it's legit, what you
16   are telling us, then we will support you big.  We will
17   support you whatever you want."
18          So this is nothing -- nothing -- not being
19   specific.  And if you can see -- if you can see, he
20   didn't let me finish the sentence.  He interrupt me,
21   Brother Naz, and -- during the conversation.
22          So I'm not being specific.  I was specific.  I
23   was trying to, you know, speaking about the plan about
24   the Sears Towers, what he promise and he needs the
25   support from the beginning from a terrorist
```

```
 1   organization who I represent.
 2   Q.    And he also told you in this conversation, did he
 3   not, sir, that absolutely no one, absolutely no one,
 4   knows about this Chicago plan?  Doesn't he tell you
 5   that on December 22nd of 2005, sir?
 6   A.    Referring to what paragraph, ma'am?
 7   Q.    Page 48, sir.
 8         MS. JHONES:  If I could have the ELMO, your
 9   Honor.
10         THE WITNESS:  Yes, ma'am.
11   BY MS. JHONES:
12   Q.    So this idea that was discussed for the first
13   time with you on December 22nd -- he tells you no one
14   knows about the idea.  Correct?
15   A.    Yes, ma'am.
16   Q.    And a couple more questions.
17         During this meeting, sir, you get a phone call
18   from the FBI; do you not?
19   A.    What page, ma'am?
20   Q.    Look at Page 69.
21   A.    Yes, ma'am.
22   Q.    And the person that you get a phone call from
23   speaks Spanish.  Correct?
24   A.    Yes, ma'am.
25   Q.    And that's why you are speaking in Spanish to
```

```
 1    this person.  Correct?
 2    A.     To Agent Tony Velazquez.  Yes, ma'am.
 3    Q.     Correct.
 4           And Agent Velazquez makes a suggestion to you
 5    during the course of that phone call; does he not, sir?
 6    A.     What -- I don't know.
 7    Q.     Well, first of all, do you remember?  Do you
 8    remember why he called you?  Do you remember?
 9    A.     Excuse me?
10    Q.     Do you remember what he told you when he called
11    you, without telling me what he said?
12    A.     I don't remember what he told me.
13    Q.     Well, let me ask you this:  After you get a phone
14    call from Special Agent Velazquez, you then start
15    talking to Mr. Batiste about a big guy you know in
16    Mexico; do you not, sir?
17    A.     I was referring why I was speaking in Spanish.
18    The first time, maybe, I was speaking Spanish in the
19    front of Brother Naz, and I said this is the guy, you
20    know.  I was speaking in Spanish.
21    Q.     Well, go over to Page 74, sir, top of Page 74.
22    A.     Yes, ma'am.
23    Q.     Do you see that, sir?  You start talking about
24    Brazil?
25    A.     Yes, ma'am.
```

```
 1   Q.     And you ask Mr. Batiste about whether he knows
 2   people in Mexico.  Correct?
 3   A.     I -- excuse me?  One more time, your question?
 4   Q.     Top of Page 74, do you ask Mr. Batiste -- strike
 5   that.
 6          Top of Page 74, do you talk to Mr. Batiste about
 7   a brother that you have in Brazil?
 8   A.     Yes, ma'am.
 9   Q.     That was after you received the phone call from
10   Special Agent Velazquez.  Correct?
11   A.     Not directly after.  We had -- you know, we were
12   speaking about something different.
13   Q.     All right, sir.  Now, after the meeting on
14   December 22nd, 2005, Mr. Batiste has a cell phone
15   and -- that's been provided to him by you.  Correct?
16   This cell phone was provided to him by you?
17   A.     By the FBI.
18   Q.     And this cell phone is basically -- you tell
19   Mr. Batiste that this is a phone that you are going to
20   pay for him.  Correct?
21   A.     Pay for him?
22   Q.     Yes.
23          Does he pay for the service on the cell phone or
24   does the FBI pay for the service, sir -- well, the
25   brother from back home?
```

1    A.     I don't know, ma'am.   They told me to give it to

2    him and I did.

3    Q.     All righty.   And this is a cell phone, sir, that

4    you began to call Mr. Batiste from that meeting

5    forward.   Correct?

6    A.     Yes, ma'am.

7    Q.     And, at times, sir, later on, if Mr. Batiste is

8    not answering that phone, you also call him on the

9    business phone; do you not, sir?

10   A.     Yes, ma'am.

11   Q.     And going to December 22nd, he takes you back to

12   Bayside; does he not?

13   A.     Yes, ma'am.

14   Q.     And you tell him that he has to stay in touch

15   with you; do you not?

16   A.     Excuse me?

17   Q.     You tell him to stay in touch with you; do you

18   not?

19   A.     Yes, ma'am.

20   Q.     And Mr. Batiste does not stay in touch with you,

21   does he, sir?

22   A.     You mean he never -- yes.

23   Q.     You call him?

24   A.     Yes, ma'am.

25   Q.     And you call him, sir -- let me ask you a few

```
 1   questions about the phone calls that you make.  Okay?
 2   A.    Yes, ma'am.
 3   Q.    You try to reach Mr. Batiste on December 28th of
 4   2005; do you not, sir?
 5   A.    Yes, ma'am.
 6   Q.    And you do reach him eventually on the 28th; do
 7   you not?
 8   A.    Yes, ma'am.
 9   Q.    But before that, you try and call him, and he
10   does not call you back.  Correct, sir?  You place at
11   least one phone call to him; do you not?
12   A.    I don't remember.
13   Q.    I'm going to show you something to see if it
14   refreshes your recollection, sir.  Okay?
15   A.    Yes, ma'am.
16          MS. JHONES:  Your Honor, I'd like to provide
17   the Court with a proposed exhibit list, if I may,
18   because I'd like to mark this for identification.
19          THE COURT:  Sure.
20          MS. JHONES:  I apologize, your Honor.  I just
21   need to mark it.
22          Your Honor, this is Defense Exhibit 19 for
23   identification.  I'm going to have the Court -- if the
24   Court could please just write that in.  I had not
25   spelled it out.
```

1              THE COURT:  Okay.

2              MS. JHONES:  If I may approach the witness.

3              THE COURT:  Yes, you may.

4              MS. JHONES:  Thank you.

5              (Tenders document to the witness.)

6              THE WITNESS:  Thank you.

7    BY MS. JHONES:

8    Q.     Do you see that, Mr. Assaad?

9    A.     Yes, ma'am.

10   Q.     Does that in any way refresh your recollection as

11   to whether or not you had made an attempt to reach

12   Mr. Batiste earlier in the day on December 28th of

13   2005?

14   A.     Yes, ma'am.

15   Q.     Okay.  And did you, in fact, try to reach

16   Mr. Batiste on that occasion?

17   A.     Excuse me?

18   Q.     Did you, in fact, try to reach him early on in

19   the day?  Correct?

20   A.     I don't know.  Which one is the first?  This one

21   or the other one?

22   Q.     Well, let me get you the other one to see if

23   that'll help.  Okay?

24   A.     Thank you, ma'am.

25             MS. JHONES:  May I approach the witness, your

```
 1    Honor?
 2              THE COURT:  Yes.
 3              MS. JHONES:  This is Government's
 4    Exhibit 48-A.
 5              THE WITNESS:  And the question is, please?
 6    BY MS. JHONES:
 7    Q.   You attempted to reach him earlier.  He didn't
 8    call you back.  You called him again.  And then you did
 9    reach him.
10         And Government's Exhibit -- the exhibit I just
11    handed you -- I don't remember the exhibit number --
12    that was the call --
13    A.   I called at 12-28, ma'am, and direct I went to
14    the answering machine.
15         I didn't leave any message -- I believe I didn't
16    leave any messages to him.  And I called him back at --
17    I called him after one minute and he answered the
18    phone.  So --
19    Q.   And that's very typical, is it not, during the
20    course of this case?  You call him until you actually
21    reach him.  Correct?
22              MS. ARANGO:  Objection.  Vague.
23              THE COURT:  Sustained.
24    BY MS. JHONES:
25    Q.   What happened on 12-28, where you call him and
```

```
 1   you leave a voicemail and you call him again and he

 2   answers, that's pretty much how this happens -- this is

 3   the routine that you undertake in this case?

 4           MS. ARANGO:  Objection.  Mischaracterization

 5   of facts.

 6           MS. JHONES:  Judge --

 7           THE COURT:  Sustained.

 8   BY MS. JHONES:

 9   Q.    How many times do you call Mr. Batiste before you

10   were able to reach him on 12-28, sir?

11   A.    Ma'am, it's shown over here.  I called him at

12   12-28, on December 28, and didn't ring.  It didn't ring

13   the phone.  Went direct to the voicemail.  And I didn't

14   leave any messages for him to call me back.

15           And I tried again.  Maybe -- I said maybe the

16   signal -- maybe he's in bad area.  And I called him one

17   time after.

18   Q.    So that's twice?  Twice?

19   A.    The first time he didn't -- the phone went direct

20   to the voicemail.  And the second time, after one

21   minute, he answered the phone.

22   Q.    Is that two, sir?

23   A.    The second time.  Yes, ma'am.

24   Q.    All right.  On the 28th, you have a conversation

25   with him; do you not, sir?
```

 1   A.     Yes, ma'am.

 2   Q.     And on the 28th, sir, in Government's Exhibit --

 3   I believe it's 48 -- you tell him that you don't want

 4   to waste your time; do you not, sir?

 5   A.     What page, ma'am?

 6   Q.     Page 3, sir.

 7          MS. JHONES:  I'm not sure, your Honor, whether

 8   or not the ladies and gentlemen of the jury have this

 9   exhibit.  So I'm going to put on the ELMO.

10          MS. ARANGO:  They do have it, Judge.

11          THE WITNESS:  What the question, ma'am?

12   BY MS. JHONES:

13   Q.     You tell Mr. Batiste on that occasion that you do

14   not want to waste your time or words to that effect; do

15   you not, sir?

16   A.     Yes, ma'am.

17   Q.     And you also tell him, sir, that you are working

18   on the list; do you not, sir?

19   A.     Yes, ma'am.

20   Q.     And you also tell him -- actually, Mr. Batiste

21   tells you that he wanted to go over some of the things

22   with you one more time; did he not, sir?  Bottom of

23   Page 3 and top of Page 4.

24   A.     The question is?

25   Q.     Did Mr. Batiste tell you that he wanted to talk

Assaad - CROSS - By Ms. Jhones                    42

```
 1   to you about some things before you go forward?  Didn't

 2   he say to you, "I need to explain some things to you,

 3   brother," or words to that effect?

 4   A.    Yes, ma'am.

 5   Q.    And he also says, sir -- and what he's -- you

 6   know what he's talking about when he says, "I need to

 7   talk to you about some things"; do you not, sir?  You

 8   understand what he's telling you right there in that

 9   point in the conversation; do you not, sir?

10   A.    How could I, ma'am?

11   Q.    Well, you were there, sir.  Look at Page 4.

12   A.    Ma'am, if you go back to the first page or --

13   it's the beginning of the conversation.  All what I do

14   in the meetings, ma'am, I listen.

15         He's the one who said, "I'm serious about

16   everything I told you, brother."

17         He was telling me that -- he's trying to convince

18   me in the beginning of the conversation that, "I'm

19   being serious.  Whatever I -- what I told you before on

20   December 22nd, I'm serious about it."

21         So if you look at it at Page -- on the top of

22   Page 3 -- or the middle of the page, "Listen.  That's

23   what it is.  Hold off for a minute, Lou.  Only thing

24   is, brother, that, you know, I just want them to be

25   serious, you know, because I'm really serious about
```

```
 1   everything."
 2        So he's being -- you know, telling me he's
 3   serious about everything he told me previously.
 4        And I told him, "Me, too."  It's like, you know,
 5   "I'm here to support.  I don't want to waste my time."
 6        So I always leave him to lead the conversation in
 7   whatever subject he want to open.  That's it.
 8   Q.   Maybe I wasn't clear.  Maybe I wasn't clear.  I
 9   apologize.
10        In this conversation in the middle of Page 3, you
11   say to Mr. Batiste that you're working on the list; do
12   you not, sir?
13   A.   Yes, ma'am.
14        MS. ARANGO:  Objection.  Asked and answered.
15   BY MS. JHONES:
16   Q.   And after you tell him --
17        THE COURT:  One moment, please.
18        Sustained.
19   BY MS. JHONES:
20   Q.   And after you say that to Mr. Batiste, he tells
21   you that he wants to talk to you a little bit about --
22   he wants to see you again and he wants to talk to you
23   about some of the stuff -- Mr. Batiste tells you, after
24   you tell him you're working on the list, that he needs
25   to speak to you some more; does he not, sir?  Bottom of
```

```
 1   Page 3, top of Page 4.

 2          MS. ARANGO:  Objection.  Mischaracterization

 3   of facts.

 4          THE COURT:  Sustained.

 5          Rephrase your question.

 6          MS. JHONES:  Yes.

 7   BY MS. JHONES:

 8   Q.    Mr. Batiste tells you, does he not, sir,

 9   that when he sees you again --

10          MS. JHONES:  I apologize, your Honor.  I just

11   need a moment.

12   BY MS. JHONES:

13   Q.    At the bottom of Page 3 and the top of Page 4,

14   Mr. Batiste tells you, does he not, sir, that he has to

15   explain something to you?

16          MS. ARANGO:  Objection.  Mischaracterization

17   of facts.

18          MS. JHONES:  Your Honor, he can answer the

19   question if it's a mischaracterization.  And I'd ask

20   the Government to lodge their objection and not make

21   speaking objections, your Honor.

22          MS. ARANGO:  That is not a speaking objection,

23   Judge.  Mischaracterization.

24          THE COURT:  The objection is sustained.

25          Rephrase your question.
```

Assaad - CROSS - By Ms. Jhones                    45

```
 1   BY MS. JHONES:
 2   Q.    Mr. Batiste tells you, does he not, sir -- that
 3   the construction business is slow, does he not, sir,
 4   that money is slow for him?
 5   A.    Yes, ma'am.
 6   Q.    Now, in the list that Mr. Batiste provided you on
 7   December 16th -- correct? --
 8   A.    Yes, ma'am.
 9   Q.    -- he didn't say construction business slow, did
10   he, sir?
11   A.    He did not.
12   Q.    But in this conversation, after you tell him that
13   you're working on the list, Mr. Batiste tells you,
14   "Money's slow for me right now.  The construction
15   business is slow"; does he not, sir?
16   A.    Yes, ma'am.
17   Q.    And when he says that to you, you don't say to
18   him, "I don't have anything to do with money and slow
19   construction business."  You don't stop him dead on his
20   tracks and tell him, "That's none of my business," do
21   you, sir?
22   A.    I cannot do that, ma'am.  It's not for me to
23   decide what to tell him or what not to tell him or tell
24   him, "I will give you" or, "I don't give you."  It's
25   not up to me.
```

Assaad - CROSS - By Ms. Jhones                46

```
 1         I'm a person there to listen and to -- you know,
 2   the FBI are the only people who can decide whatever
 3   they want to decide.  For me, it's just, "Okay.
 4   Uh-huh."  No promises.  That's all what I can do.
 5   Q.    So the answer is "no," you do not tell him that.
 6   Correct?
 7   A.    I didn't tell him that.
 8   Q.    And you do tell him, sir, do you not, that if
 9   they give you permission -- if they approve, then you
10   can come through or words to that effect?  Do you not,
11   sir?
12   A.    Referring to what, ma'am?
13   Q.    Page 4 -- the middle of Page 4, sir.
14   A.    Speaking about the trip to Chicago.
15   Q.    Well, sir, you don't say that there, do you?  You
16   do not tell him, "I'm speaking about the trip to
17   Chicago," do you, sir?
18   A.    Yes, ma'am.  I said about the trip, on the middle
19   of the page, "Okay, brother.  Also, I'm doing -- I'm
20   doing also like -- from -- what I can provide with.
21   I'm contacting my brothers about the trip."
22   Q.    That's after you say "also."  "Okay, brother.
23   Also, I'm doing...."; do you not, sir?
24   A.    That's what I said in this paragraph.  Yes,
25   ma'am.
```

1   Q.     And that's right after Mr. Batiste tells you that

2   money is slow for him.  Correct, sir?

3   A.     Yes, ma'am.

4   Q.     And what's going on there, sir, is this man is

5   telling you that he needs money and you are not telling

6   him "no."

7          You're leading him on; are you not, sir?

8   A.     Ma'am, he was speaking not about struggling in

9   money or -- he's speaking about the two lists had he

10  gave me on December 16 and December 22nd.  Weapons on

11  December 16.  Boots, vests, cars on December 22nd.

12  Specific items from machine magazine.  He showed it to

13  me.  All the stuff.

14         And to proceed in his plan -- Chicago plan, train

15  his soldiers and his generals or his members, he needs

16  to -- you know, he's telling me, "I need your help."

17  He's asking help from -- he request help from terrorist

18  organization to come down here to assist him in all

19  what he needs.

20         So he by himself, like he's maybe -- he's not

21  saying me, "I need money from you guys.  He didn't ask,

22  "Guys, I need money.  Give it to me now."

23         He didn't said that.  He has list he provide us.

24  "And, guys, I cannot do it."

25         That's what I understood.  You are telling

```
 1   me what I understood from this.
 2        "I need your support to proceed the plan I told
 3   you about and the list I want to purchase.
 4        So this is what I understood in that time.
 5   Q.    Well, what date was this had conversation, sir?
 6   A.    On the 28th or -- 28th.
 7   Q.    On the 29th, he gives you a list, doesn't he, the
 8   very next day?
 9   A.    Yes, ma'am.
10   Q.    And he asks you for $50,000; does he not?
11   A.    On the list.  Yes, ma'am.
12   Q.    And he puts something next to the $50,000; does
13   he not, sir?
14   A.    Something next to it?
15   Q.    Yeah.  I'll show you.
16   A.    Yes, ma'am.
17   Q.    Showing you Government's Exhibit 103-A, sir, do
18   you recognize that?
19   A.    Yes, ma'am.
20   Q.    Do you see where he says "50 grand cash," sir?
21   A.    Yes, ma'am.
22   Q.    With two little stars on each side?
23   A.    Yes, ma'am.
24   Q.    There is no question that Mr. Batiste is asking
25   you for cash, sir, is there?
```

1    A.     He gave me the list.  It's over there.  Yes,

2    ma'am.

3    Q.     So we are clear, Mr. Batiste -- if there is any

4    confusion as of December 29th of 2005, it is clear that

5    he made a request of you of a specific sum of money;

6    did he not?

7    A.     Yeah.  For his plan, ma'am.

8    Q.     And when he made a specific request for $50,000

9    cash, this was in a meeting at Bayside; was it not?

10   A.     Yes, ma'am.

11   Q.     That's the meeting where you -- your recorder

12   wasn't working?

13   A.     I didn't know at that time wasn't working.  I

14   didn't know at that time.

15   Q.     The answer is "no."  Correct?  It was not

16   working?

17   A.     No, ma'am.

18   Q.     That's your testimony.  Right?  That's your

19   testimony?  It wasn't working?

20   A.     Yes, ma'am.

21   Q.     And when he gave you this list, sir, you didn't

22   scratch out the 50 grand and say, "No.  No.  We can't

23   give you money."

24          You did not tell this gentleman, "No.  We cannot

25   give you money," did you, sir?

Assaad - CROSS - By Ms. Jhones                50

```
 1   A.    Ma'am, like I said before and I said several

 2   times, I am not in position to tell him "yes" or to

 3   delete some stuff -- items from -- on anything or

 4   promise him "yes" or "no" or delete.

 5         I don't have -- I cannot do that.

 6   Q.    Well, let me ask you this:  Are you in a position

 7   to say to him, "Maybe.  Maybe we'll give you the

 8   money"?  Are you in that position, sir?

 9   A.    If I remember correctly, ma'am, all the meeting,

10   I said, "I need to go back to my brothers.  I need to

11   contact with my brothers.  Let me see what I can do."

12         I always leave the meeting or during the

13   conversation with no promises at all.  Let me see.

14   Whatever the FBI tell me to do before -- previous --

15   before the meeting, I try to do it during the meeting.

16         So no promises.  And if you can see, all my

17   meeting, "Let me see what I can do."

18   Q.    We're going to get to the other meetings, sir.

19   A.    Yes, ma'am.

20         THE COURT:  We're going to take a break.

21         Do not discuss this case either amongst

22   yourselves or with anyone else.  Have no contact

23   whatsoever with anyone associated with the trial.  Do

24   not read, listen or see anything touching on this

25   matter in any way.
```

Assaad - CROSS - By Ms. Jhones                    51

```
 1            If anyone should try to talk to you about this
 2   case, you should immediately instruct them to stop and
 3   report it to my staff.
 4            You may leave your notebooks and your binders
 5   at your chairs.  Please be back in the jury room in ten
 6   minutes.  We'll be in recess for ten.
 7            (Whereupon, the jury exited the courtroom at
 8   10:38 a.m. and the following proceedings were had:)
 9            THE COURT:  You may step down, sir.
10            (Witness excused.)
11            THE COURT:  We're in recess for ten.
12            (Thereupon a recess was taken, after which the
13   following proceedings were had:)
14            THE COURT:  We're back on United States of
15   America versus Narseal Batiste, et al., Case
16   No. 06-20373.
17            Counsel, state your appearances, please, for
18   the record.
19            MR. GREGORIE:  Richard Gregorie and Jacqueline
20   Arango on behalf of the United States, your Honor.
21            MS. JHONES:  Ana Jhones on behalf of Narseal
22   Batiste, who is present.
23            MR. LEVIN:  Albert Levin on behalf of Patrick
24   Abraham, who is present.
25            MR. CASUSO:  Louie Casuso on behalf of Burson
```

Assaad - CROSS - By Ms. Jhones                    52

```
 1    Augustin, who's present.

 2             MR. CLARK:  Nathan Clark for Rotschild

 3    Augustine, who's present.

 4             MR. HOULIHAN:  Richard Houlihan with Naudimar

 5    Herrera.

 6             MR. VEREEN:  Roderick Vereen on behalf of

 7    Stanley Phanor, who's present.

 8             THE COURT:  All Defendants are present.

 9             Let's bring in the jury, please.

10             (Whereupon, the jury entered the courtroom at

11    10:58 a.m. and the following proceedings were had:)

12             THE COURT:  You may be seated.

13             You are still under oath, sir.

14             You may proceed, Ms. Jhones.

15             MS. JHONES:  Thank you, your Honor.

16    BY MS. JHONES:

17    Q.    Now, sir, on December 29th, do you recall when it

18    was that you met Mr. Batiste at Bayside in the

19    unrecorded meeting?

20    A.    No, ma'am.

21    Q.    Is it fair to say, sir, that you tried to reach

22    Mr. Batiste on that occasion prior to the meeting on at

23    least five times you called him?

24    A.    I don't remember.

25    Q.    Let me see if I can show you something that'll
```

```
 1    refresh your recollection.
 2            MS. JHONES:  It's marked for identification,
 3    your Honor, Batiste Composite Exhibit 22-B.
 4            May I approach, your Honor?
 5            THE COURT:  Yes.
 6            MS. JHONES:  Thank you.
 7    BY MS. JHONES:
 8    Q.    I'm showing you, Mr. Assaad, what's been marked
 9    for identification as Batiste Composite Exhibit 22-B.
10    I'd like for you to look at that and let me know if --
11    let me know when you're ready.
12    A.    I'm ready, ma'am.
13    Q.    May I have it back?
14    A.    Excuse me?
15    Q.    May I have it back?
16    A.    Oh.
17    Q.    I need for you to review it and give it back.  So
18    let me know when you're ready.
19    A.    Yes, ma'am.
20    Q.    Does that refresh your recollection, sir?
21    A.    Yes, ma'am.
22    Q.    Thank you.
23            How many calls, sir, did you place to
24    Mr. Batiste's phone on December 29th prior to meeting
25    with him?
```

Assaad - CROSS - By Ms. Jhones                54

1    A.    Which cell phone, to be specific?  Which phone?
2    The one I gave to him?
3    Q.    Whatever phone you called him at, sir, however
4    many phones.
5          How many times did you try to reach Mr. Batiste
6    on December 29th prior to having a meeting with him?
7    A.    I called him first twice and was -- went to the
8    answering machine.  And the third was on his business.
9    And the fourth, he answered the phone.
10   Q.    The first couple of times you called him, you
11   called him on the phone that you had provided to him.
12   Correct?
13   A.    Yes, ma'am.
14   Q.    And you were not able to reach him, were you,
15   sir?
16   A.    No, ma'am.
17   Q.    After you weren't able to reach him, you called
18   him on his business phone; did you not?
19   A.    Yes, ma'am.
20   Q.    You left a voicemail.  Correct?
21   A.    Somebody from his business answered the phone.
22   Q.    And you requested that he contact you.  Correct?
23   A.    I asked about him.  Yes, ma'am.
24   Q.    And after that, you called again?
25   A.    And he answered.  Yes, ma'am.

```
 1   Q.     And after that, then you eventually meet with him

 2   in the afternoon at Bayside.   Correct?

 3   A.     Yes, ma'am.

 4   Q.     Okay.   And after December 29th, sir, you do not

 5   hear back from Mr. Batiste the rest of the year,

 6   correct, for the remaining days of the year?

 7   A.     No, ma'am.

 8   Q.     And in the beginning of the year, it is you that

 9   reaches out for Mr. Batiste again; do you not, sir?

10   A.     Reach out?  By calling?

11   Q.     You tell me.

12   A.     I -- the FBI told me to try to establish contact

13   with Brother Naz.   Yes, ma'am.

14   Q.     The reason why you were trying to establish

15   contact with Brother Naz is because Brother Naz is not

16   establishing contact with you?

17   A.     I was following what the FBI told me to do,

18   ma'am.

19   Q.     Mr. Batiste was not returning your phone calls,

20   was he, sir?

21   A.     No, ma'am.

22   Q.     And do you recall, sir, when in January you

23   called him?

24   A.     No, ma'am.

25   Q.     Let me show you something to see if that
```

Assaad - CROSS - By Ms. Jhones

```
 1   refreshes your recollection.  Okay?
 2   A.    Yes, ma'am.
 3         MS. JHONES:  I'm showing the Government, your
 4   Honor, Defense Exhibit for identification 23-B and
 5   25-B.
 6         Your Honor, so we can speed this up, may I
 7   provide the witness with a copy to refresh his
 8   recollection while the Government is looking at --
 9         THE COURT:  I think the Government has to look
10   at it before --
11         MS. JHONES:  It's a duplicate of that.
12         THE COURT:  I know.  But they first have to
13   see it before you give it to the witness.
14         MS. JHONES:  Oh, okay.
15         MS. ARANGO:  Ms. Jhones, all done.
16         MS. JHONES:  May I approach, your Honor?
17         THE COURT:  Yes.
18   BY MS. JHONES:
19   Q.    Mr. Assaad, I'm showing you Defense Exhibit 23-B
20   for identification and 25-B for identification.  Please
21   take a look at them and let me know if you recognize
22   them.
23         Let me know when you're ready, sir.
24   A.    Yes.  I'm trying to refresh my -- what happened.
25         Thank you, ma'am.
```

1    Q.    Now, Mr. Assaad, does Defense Exhibit 23-B and

2    25-B refresh your recollection as to when it was that

3    you spoke to Mr. Batiste in January of 2006?

4    A.    I remember I spoke with him.  Yes, ma'am.

5    Q.    Do you remember what day it was, sir?

6    A.    I'm sorry.  I didn't look at the date exactly.

7          But you have it over there.  Yes?

8              MS. JHONES:  May I approach one more time?

9              THE COURT:  Yes.

10   BY MS. JHONES:

11   Q.    (Tenders document to the witness.)

12         Does that help?

13   A.    Yes, ma'am.

14   Q.    What days did you speak to Mr. Batiste in January

15   of 2006, sir?

16   A.    The 2nd and the 3rd.

17   Q.    Of January.  Correct?

18   A.    Yes, ma'am.

19   Q.    '06?

20   A.    '06.

21   Q.    On January 2nd, sir, you were trying to arrange a

22   meeting with Mr. Batiste; were you not?

23   A.    Yes, ma'am.

24   Q.    And you basically discussed with him

25   availability, when he's available to meet with you.

Assaad - CROSS - By Ms. Jhones                    58

 1   Correct?

 2   A.     Yes, ma'am.

 3   Q.     And on the next day, on January 3rd, that was the

 4   same type of conversation.

 5          You wanted to try and meet with Mr. Batiste.

 6   Correct?

 7   A.     No, ma'am.

 8   Q.     On January 3rd, you were not trying to meet with

 9   Mr. Batiste, sir?

10   A.     He called me several times before that I called

11   him.  I was returning his phone calls, ma'am.

12   Q.     And returning his phone calls from when, sir?

13   A.     Excuse me?

14   Q.     Returning his phone calls from when?  When did he

15   call you?

16   A.     I don't remember.  But if this is clear in

17   this -- what you gave me, ma'am, that I was

18   returning -- I missed his phone calls.  So I was

19   returning his phone calls.

20   Q.     And in January 3 -- on January 3rd of 2006, you

21   have a conversation with Mr. Batiste; do you not?

22   A.     On the 3rd, yes, ma'am.

23   Q.     And you tell Mr. Batiste that you have something

24   for him; do you not, sir?

25   A.     Yes, ma'am.

Assaad - CROSS - By Ms. Jhones                    59

```
 1   Q.    And you tell him it's a surprise; do you not,

 2   sir?

 3   A.    Yes, ma'am.

 4   Q.    But you won't tell him what the surprise is.

 5   Correct, sir?

 6   A.    No, ma'am.

 7   Q.    And Mr. Batiste asks you what it is that you are

 8   going to provide for him; does he not, sir?

 9   A.    Yes, ma'am.

10   Q.    And you tell him it's a surprise.  Correct?

11   A.    Yes, ma'am.

12   Q.    And you tell him it's from the list; do you not,

13   sir?

14   A.    Yes, ma'am.

15   Q.    And the conversation goes on for a while and, on

16   more than one occasion, Mr. Batiste is trying to find

17   out from you what it is that you are going to provide

18   to him.  Fair enough?

19         MS. ARANGO:  Judge, I would just -- she seems

20   to be reading from a transcript that's not in evidence.

21   I really don't have a problem with introducing this

22   into evidence at this time.  That way, we have a

23   transcript that's --

24         MR. LEVIN:  Judge, I would object to the

25   prosecutor's speaking objection.
```

Assaad - CROSS - By Ms. Jhones                          60

```
 1              MS. JHONES:  Likewise, your Honor.
 2              THE COURT:  Overruled.
 3              MS. ARANGO:  I object to her reading from a
 4   document that's not in evidence.  I don't have an
 5   objection to it being introduced into evidence.
 6              MS. JHONES:  I will introduce it when I deem
 7   it proper, your Honor.  I'm asking him questions as to
 8   what he told Mr. Batiste.
 9              MS. ARANGO:  Then, don't read from -- my
10   objection is that she's reading from something that's
11   not in evidence.
12              MS. JHONES:  I'm not reading, your Honor.
13              THE COURT:  She's not reading from anything.
14              Overruled.
15   BY MS. JHONES:
16   Q.    Sir --
17   A.    Yes, ma'am.
18   Q.    -- you stated to Mr. Batiste on more than one
19   occasion that you had a surprise for him.  Correct?
20   A.    Yes, ma'am.
21   Q.    And your instructions from the FBI were to not
22   tell Mr. Batiste -- of all of those items on the list,
23   your instructions were to not tell this man what it was
24   that you were going to provide him.  Correct, sir?
25   Those were your instructions?
```

Assaad - CROSS - By Ms. Jhones                    61

1    A.    Yes, ma'am.

2    Q.    And part -- at this point in time, as of

3    January 3rd of 2006, among the items on the list are

4    $50,000 cash.  Correct?

5    A.    Yes, ma'am.

6    Q.    And you tell Mr. Batiste on that occasion that

7    you're trying to get your hands on this surprise to

8    give to Mr. Batiste.  Correct?

9    A.    Yes, ma'am.

10   Q.    After that conversation of January 3rd, sir, you

11   and Mr. Batiste do not meet the next day, do you?

12   A.    No, ma'am.

13   Q.    As a matter of fact, Mr. Batiste pretty much

14   stops calling you and stops returning your phone calls.

15         Isn't that fair to say, sir?

16   A.    Yes, ma'am.

17   Q.    And the next time you meet with Mr. Batiste is

18   when you go to the Florida Keys, the Keys trip.

19   Correct?

20   A.    Yes, ma'am.

21   Q.    All righty.  Now, just so we are clear, sir, the

22   Florida Keys trip took place -- do you remember the

23   date?

24   A.    January 28.

25   Q.    And as of January 28th, sir, you haven't provided

```
 1    Mr. Batiste with any guns.  Right?

 2    A.     No, ma'am.

 3    Q.     No SUVs?

 4    A.     No, ma'am.

 5    Q.     No trips to Chicago?

 6    A.     No, ma'am.

 7    Q.     No trips to Louisiana?

 8    A.     No, ma'am.

 9    Q.     No 50 grand?

10    A.     No, ma'am.

11    Q.     Nothing has happened.  Right?

12    A.     Boots and cell phones.

13    Q.     Boots and one cell phone?

14    A.     Yes, ma'am.

15    Q.     I forgot about those.

16           Nothing else.  Right?  Boots and a cell phone,

17    just so we're clear?

18    A.     Yes, ma'am.

19    Q.     Now, on January 28th, you arrive at the Florida

20    Keys and you meet with Mr. Batiste; do you not?

21    A.     I didn't arrive.  They took me over there, ma'am.

22    Q.     Yes.  They took you.

23           And you requested on your way down there to stop

24    at a place so you could buy some cigarettes.  Correct?

25    A.     Yes, ma'am.
```

Assaad - CROSS - By Ms. Jhones                          63

1    Q.    And when you -- and that was, I believe, a

2    Walgreens that you stopped at?

3    A.    Yes, ma'am.

4    Q.    When you stopped at the Walgreens, you got your

5    cigarettes and whatever else.  You made purchases

6    there.  Correct?

7    A.    Yes, ma'am.

8    Q.    And then you got right back in the car?

9    A.    Yes, ma'am.

10   Q.    Now, just so we're clear, there weren't any

11   weapons in the vehicle or anything like that, were

12   there?

13   A.    I didn't see.

14   Q.    And, sir, you arrive at a place in the Florida

15   Keys and, basically, close to the water.  Correct?

16   A.    Yes, ma'am.

17   Q.    And you meet with Mr. Batiste?

18   A.    Yes, ma'am.

19   Q.    And just so we're clear, when you meet with

20   Mr. Batiste, it is you, Mr. Batiste and the other

21   informant alone inside this tent.  Correct?

22   A.    Yes, ma'am.

23   Q.    When you got there, Mr. Batiste was fishing; was

24   he not?

25   A.    Yes, ma'am.

Assaad - CROSS - By Ms. Jhones                  64

1   Q.    And when you speak to Mr. Batiste on

2   January 28th, Mr. Batiste brings something to your

3   attention; does he not, sir?

4   A.    Yes, ma'am.

5   Q.    One of the things that Mr. Batiste tells you is

6   that his problem is that, from the very beginning, sir,

7   he's been talking to you about the need for finances.

8   Correct?  Mr. Batiste tells you that; does he not, sir?

9   A.    To buy the items on the list, yes, ma'am.  That's

10  what he told me.

11  Q.    On January 28th, Mr. Batiste now tells you,

12  "Forget about the list.  Just give me the money.  I'll

13  get the stuff on the list."  Right?  "Just give me the

14  money"?

15  A.    That's what he said, yes, ma'am.

16  Q.    And when Mr. Batiste tells you that, you don't

17  say "no" to him, do you, sir?

18  A.    Like I said, ma'am, I never say "no."  I never

19  say "yes."  I always "Let me check.  Let me see.  Let

20  me see what I can do.  Let me contact my brothers."

21        So I wasn't in a position -- I'm not in position

22  to decide.  I listened.  I get briefed from the FBI.

23  The FBI would brief me what to do.  I never promised

24  "yes" or "no."

25  Q.    And all along, sir -- well, let's go specifically

Assaad - CROSS - By Ms. Jhones                    65

```
 1    into some of the things that you told Mr. Batiste on
 2    that occasion.  Okay?
 3    A.    Okay, ma'am.
 4    Q.    All righty.  One of the things you tell
 5    Mr. Batiste on that occasion, sir -- you mention an
 6    episode that occurred in the Middle East; do you not,
 7    sir?
 8    A.    If I remember, yes, ma'am.
 9    Q.    What episode was that, sir?
10    A.    I need -- I need to --
11    Q.    Sure.  Let me give you the exhibit.
12          MS. JHONES:  I'm referring, your Honor, to
13    Government's Exhibit in evidence 55-A.
14          If I may provide the witness with a copy.
15          MS. ARANGO:  Judge, that is in the second
16    binder, Volume II of III, that the jurors have.
17    BY MS. JHONES:
18    Q.    (Tenders document to the witness.)
19    A.    Thank you.
20          What page?
21    Q.    Page 98, sir.
22    A.    Thank you.
23          MS. JHONES:  Is everyone ready?
24    BY MS. JHONES:
25    Q.    Did you get to Page 98, sir?
```

Assaad - CROSS - By Ms. Jhones                66

```
 1   A.     Yes, ma'am.

 2   Q.     Does that refresh your recollection as to the

 3   episode that you bring up in conversation with

 4   Mr. Batiste?

 5   A.     I need to just -- to look at it for one second,

 6   if you don't mind.

 7   Q.     Sure.

 8   A.     Yes, ma'am.

 9   Q.     Do you remember?

10   A.     Yes, ma'am.

11   Q.     What is the episode that you mentioned to him,

12   sir, about?

13   A.     USS Cole.

14   Q.     That was something that was brought up by you.

15   Correct, sir?

16   A.     You mean the FBI told me to speak about it?

17   Q.     Yes.

18          And you followed the FBI's instruction and

19   mentioned the USS Cole.  Correct?

20   A.     Yes, ma'am.

21   Q.     And Mr. Batiste, on the bottom of Page 99, tells

22   you about what it is that he is requesting from you;

23   does he not, sir?

24   A.     Yes, ma'am.

25   Q.     And he tells you that that is financing, money.
```

1    Correct?

2    A.     One of the things.  Yes, ma'am.

3    Q.     And in this conversation, sir, you remind

4    Mr. Batiste of the same thing you reminded him on 12-16

5    and 12-22, and that is that you are here just to assist

6    him.  Right?

7    A.     Yes, ma'am.

8    Q.     He's in control.  You are just here to assist.

9    Words to that effect.  Right?

10   A.     Yes, ma'am.

11   Q.     You are not to make any decisions.  All the

12   decisions are here.  You are here to assist.  Right?

13   A.     Yes, ma'am.

14   Q.     And you specifically say those words to him, you

15   are not here to control.  Correct?

16   A.     No, ma'am.

17   Q.     Look at Page 106.

18   A.     To what part?

19   Q.     Towards the bottom of the page, where it says,

20   "And I told you I'm here, brother, to assist you."

21   A.     Yes, ma'am.

22   Q.     And right after -- you tell Mr. Batiste, sir,

23   that -- Well, strike that.

24         After you tell Mr. Batiste that you're only there

25   to assist and you're not there to control or anything

Assaad - CROSS - By Ms. Jhones                              68

```
 1   like that, you start talking to Mr. Batiste about how

 2   it was that he just basically disappeared on you and

 3   you couldn't find him, you couldn't talk to him.

 4   Right?

 5   A.     Excuse me?

 6   Q.     After you talk to Mr. Batiste and you remind him

 7   that you're only there to assist, you're only there to

 8   help, you're not there to control, then you go into

 9   another topic of conversation with Mr. Batiste; do you

10   not, sir?

11   A.     Maybe.  We were speaking different topics in the

12   conversation.

13   Q.     Do you want me to direct you to a particular

14   page?

15   A.     Exact -- yes, ma'am.

16   Q.     Look at Page 108, sir, the bottom of Page 108.

17   A.     Yes, ma'am.

18   Q.     And you're talking there, sir, about the fact

19   that he disappeared on you and you couldn't talk to him

20   anymore.  Right?

21   A.     Yes, ma'am.

22   Q.     Okay.  And you talk about the issue of money in

23   that part of the conversation, also; do you not, sir?

24   A.     Yes, ma'am.

25   Q.     And what's going on there, sir, is you're telling
```

Assaad - CROSS - By Ms. Jhones                          69

1    him, "You know the money?  I'm not in control of the

2    money.  It's my brothers, you know, my brothers back

3    home.  They're the ones that basically call the shots."

4          Words to that effect is what you're communicating

5    to Mr. Batiste.  Correct, sir?

6    A.    Yes, ma'am.

7    Q.    Okay.  And you basically tell Mr. Batiste, also,

8    sir, that whether it's 50 grand, whether it's

9    100 grand, you know, he has to have a plan before that

10   money comes through.

11         Isn't that what's going on in that part of the

12   conversation, sir, "Give me a plan and I'll give you

13   the money"?

14   A.    What paragraph, ma'am?

15   Q.    Bottom of Page 108, top of Page 109.

16   A.    Ma'am, I have a role, and my role is I represent

17   interest of Al-Qaeda and terrorist organization.  So

18   I -- and he request for me to be here, assisting him.

19   And I'm playing my role to best to my -- how I know.

20         And during this role, you cannot -- everyone

21   come, "Hey, I have a plan.  I need 100,000 for -- to

22   assist me in my plans."

23         So I can't tell him, "Okay.  This is 100,000.

24   Show us a plan and I will present it to Al-Qaeda and

25   Al-Qaeda will approve it and send you whatever you

Assaad - CROSS - By Ms. Jhones                    70

```
 1    need."
 2          So this is part of my role and my position like a
 3    terrorist from Al-Qaeda.
 4    Q.    Well, sir, but your role and your position, as
 5    the FBI has instructed you, is to find out what his
 6    intent is.  You're here not -- not to find out what
 7    your intents is, but his.
 8          That's what you're here to do.  Right?
 9    A.    I follow the instruction of the FBI.  I was
10    following --
11    Q.    I --
12    A.    -- the FBI.
13    Q.    I understand that.
14          MS. ARANGO:  Objection to interrupting the
15    witness, Judge.
16          THE COURT:  Sustained.
17    BY MS. JHONES:
18    Q.    Are you finished?
19    A.    No, ma'am.
20    Q.    Okay.  Go ahead.
21    A.    I was following what the FBI told me, playing my
22    role.  Told me what to say and what subject I have to
23    bring.  And that's it.  Wait for them debrief me and
24    they tell me what to do.
25    Q.    On December 16th, when you went to the hotel
```

1    in -- the Radisson, you told us last week you needed to

2    find out what his intentions were.  Right?

3    A.    Yes, ma'am.

4    Q.    There's what they told you, "Find out what his

5    intentions are."  Right?

6    A.    Yes, ma'am.

7    Q.    And right now, on January 28th, he's telling you,

8    "Give me the money."  From the very beginning, "Give me

9    the money."

10          He's making it perfectly clear to you, sir, isn't

11   he?

12          MS. ARANGO:  Judge, I would object at the

13   speech.  And it's also a mischaracterization of facts.

14          THE COURT:  Sustained.

15          It's argumentative.

16   BY MS. JHONES:

17   Q.    Now, sir, when he tells you -- strike that.

18          You tell him that you're not in control, that

19   he's in control.  Correct?  And he tells you that he

20   needs some money.  Correct?

21   A.    Yes, ma'am.

22   Q.    Okay.  And then right after, sir, when he -- when

23   you tell him that you're not in control, you bring up

24   another subject; do you not, sir?

25   A.    What, ma'am?

```
 1            MS. ARANGO:  Objection.  Asked and answered.

 2   BY MS. JHONES:

 3   Q.     Look at Page 109.

 4            THE COURT:  Sustained.

 5            MS. JHONES:  This is a brand-new area, your

 6   Honor.

 7            THE COURT:  Sustained.

 8   BY MS. JHONES:

 9   Q.     You start talking about a bomb expert; do you

10   not, sir?

11   A.     This is what he request, and this what he spoke

12   about on December 29th in Bayside, ma'am.

13   Q.     The unrecorded conversation.  Right?

14   A.     Unrecorded because I didn't record it.  But

15   this -- during January 28th, there is a lot of part of

16   this day confirming what happened on December 29 in

17   Bayside.

18        And a lot of this conversation inside this

19   meeting show up what happened -- confirming what

20   happened on December 29th, 2009 -- 2005.  Sorry.

21   Q.     Sir, bottom of Page 109.  Let me know -- tell me

22   if -- that's where you address the issue of the bomb

23   expert; is it not, sir?

24   A.     Ma'am, it's saying clear here in this paragraph.

25   "Remember when you asked me about the special expert in
```

1    bomb, in explosive."

2         This is -- I'm telling him to remember what

3    happened on December 29th, when he asked me about the

4    expert.

5    Q.    Well, sir, those are your words, though.

6    Correct?  Just so we're clear.  When you -- "Remember

7    when you asked me...", those are your words; are they

8    not?

9    A.    No, ma'am.  This what I said, the fact what

10   happened on December 29th.

11        Because if you go back in this conversation,

12   ma'am, he said, he said, "I was worried about what we

13   spoke on December 29th.  I was scared that you could

14   record the conversation easily."

15        So referring about the December 29th, 2005.

16        And here, I'm telling him in front of him -- and

17   I can see it's, like -- he's not denying what I said.

18   "Do you remember about what you request?"

19        On Page 110, you see he didn't deny that he

20   request the bomb expert.

21   Q.    Sir, after you talk about the bomb expert, then

22   you bring up another issue before Mr. Batiste responds;

23   do you not, sir?

24   A.    Referring to what, ma'am?

25   Q.    Mr. Batiste -- after you reference the bomb

1     expert, Mr. Batiste does not tell you, sir, "Oh, yes,

2     sir.  That's right.  That's a conversation we had.  I

3     remember that."

4           There is nowhere, sir, in that conversation after

5     you bring up the issue of the bomb expert where

6     Mr. Batiste acknowledges anything about a previous

7     conversation about an explosives expert, sir.

8     A.    He acknowledge, ma'am.  He say "yes."

9     Q.    Okay.

10    A.    And he didn't deny.  He say "yes."  So I don't

11    know.

12    Q.    And, again, in the bottom of Page 110, sir --

13    now, you bring up the issue of the bomb expert again;

14    do you not, sir?

15    A.    I was asking -- I'm telling him I'm here to

16    assist him whatever he needs, bomb expert, training,

17    whatever he want from me.  "What you want from me, I'm

18    here to assist you."

19    Q.    And you tell him, sir, your words, sir -- not

20    Mr. Batiste's words, but your words -- "You -- I need

21    an expert in explosives."

22          Those are your words on Page 110, sir; are they

23    not?

24    A.    Ma'am, if you allow me.  I don't know.

25          Let me read the paragraph from the beginning.

1           "And I'm not here to take control, to tell you

2      what to -- I'm just here -- I'm just to be what you

3      want me -- what you want me to.

4           "You -- I need an expert in explosives.  Hey,

5      come over here.  Help your brother, our brother.  Come

6      here."

7           So I was telling him in this paragraph, "I'm here

8      to assist you.  Whatever you want.  You want me to

9      assist you in explosives.  You want me to assist you --

10     I'm here for you.  What you want from me?"

11          I'm not telling him, "Hey, we need to bring

12     expert from there."  I wasn't never in charge or tell

13     him what to do, ma'am.

14     Q.   You're making the suggestion, sir.  That's what

15     you're doing there.

16     A.   No, ma'am.  I was telling him, like I said, "I'm

17     here to assist you.  What you want?", not, "Hey,

18     let's" -- I didn't say, "Let's bring the expert from

19     there.  Let's do this."

20          I never suggest, and I never tell him what to do.

21     I always there -- like I mentioned several times, there

22     to assist and to support.

23     Q.   And Mr. Batiste, based on the conversation that

24     you're having with him on January 28th, is led to

25     believe that the $50,000 is only the beginning of the

 1   money that's going to be coming his way, isn't he, sir?

 2   A.      Are you asking me opinion?

 3   Q.      I'm asking you whether or not you led Mr. Batiste

 4   to believe that the 50 grand was only going to be the

 5   beginning of the money.

 6   A.      No, ma'am.

 7   Q.      Go on and look at Page 116, sir.

 8   A.      What part?

 9   Q.      Bottom of Page 116, sir.

10   A.      Yes, ma'am.

11   Q.      Sir, after Mr. Batiste says, "The first 50

12   grand...", you say to him, "The money will be

13   approved," do you not, sir, right at the top of the

14   very next page?

15   A.      No, ma'am.  And let me explain to you something

16   important.

17           When he said on the bottom 116, "The first 50,000

18   would put me in position where I can get some

19   artillery, some communications, some trucks," I said

20   clearly -- I told him, "From my previous experience, by

21   assisting terrorist group or homegrown terrorists, I

22   been -- I have experience in this, brother.  Don't

23   worry.  When this plan is ready, everything is ready,

24   you know, I been there.  I experience this.  They will

25   approve it sooner or later."

1        I don't know.  But I didn't tell him, "Your money

2   will be approved."  I didn't tell him that promising

3   him.  I was, based on previous -- telling him about my

4   previous experience assisting a terrorist group,

5   homegrown terrorists, something like that.

6        And I said it clearly here, in the middle of the

7   paragraph on the top of Page 117, "I'm telling you

8   because I been through this a million times.  As for

9   our brother and my Big Brother, my leader, Osama bin

10   Laden, Al-Qaeda, to be with me, support me all this

11   time, 'cause they trust me.  And I know how they work

12   and I know how we work.  So let them approve the

13   50 grand.  Let them approve.

14        I didn't say, "Hey, they will approve it for you.

15   Don't worry about it."

16        I said, "Let them.  They have to be something

17   solid, brother."

18   Q.    "Give me something solid, Mr. Batiste, and I'm

19   going to give you the money."  Right?

20   A.    I didn't say I will give him the money.  I said,

21   "Let them."  I left always the deed and the promises

22   and the money in the hand of the FBI or -- to decide

23   "yes," "no."

24   Q.    And, sir, right after, you're telling Mr. Batiste

25   that you're just here to assist, right --

Assaad - CROSS - By Ms. Jhones                    78

1    A.    Yes, ma'am.

2    Q.    -- only to assist, to fulfill whatever it is that

3    he wants.  Right?

4    A.    Yes, ma'am.

5    Q.    You tell him out of the clear blue, "I'm going to

6    give you a location -- a big location, Mr. Batiste."

7    Right?  Do you not, sir?

8    A.    Ma'am, I was following the FBI, what they had

9    told me to do.  I didn't tell him nothing from my own.

10   The FBI told me to bring the subject.  So I brought the

11   subject.

12   Q.    Now -- so you bring up the subject of giving him

13   a location that he has not asked for.  Correct?

14   A.    Referring to what paragraph?

15   Q.    Same page, Page 117, middle of the page, where

16   you talk about all of your good surprises.

17   A.    Yes, ma'am.

18   Q.    Okay.

19   A.    Yes, ma'am, I did.

20   Q.    So now you're doing more than assisting.

21         Now you are providing things that he has not even

22   requested; are you not, sir?

23   A.    Ma'am, I said I follow the FBI, what they told me

24   to do.  They told me to bring the subject.  I did.

25   Q.    All righty.  And in this conversation, sir,

```
1    Mr. Batiste tells you once again what he had already

2    told you on December 22nd of 2005 about who knows about

3    this Chicago plan; does he not, sir?

4    A.    Yes, ma'am.

5    Q.    He tells you, once again, that no one, no one,

6    knows about the Chicago plan; does he not, sir?

7    A.    Yes, ma'am.

8    Q.    "It's our little secret."  Right?

9    A.    Yes, ma'am.  He didn't say it like this, but he

10   said no one knows.

11   Q.    When he's saying that, none of those brothers are

12   in that tent with you.  Correct, sir?

13   A.    They weren't inside.  But they were -- they were

14   standing outside, next to the tent.  And I believe they

15   were -- our voices --

16              MR. LEVIN:  Objection.  Speculation.

17              THE COURT:  Sustained.

18   BY MS. JHONES:

19   Q.    Right next to the ocean.  Right, sir?

20   A.    Yes, ma'am.

21   Q.    And you go on again on the very next page,

22   Page 117, talking about this huge location, a big, big

23   location, you're going to have for Mr. Batiste; did you

24   not, sir?

25   A.    Yes, ma'am.
```

Assaad - CROSS - By Ms. Jhones                    80

1    Q.    And Mr. Batiste reminds you again that he doesn't

2    like surprises, he likes to know what he's dealing

3    with; does he not, sir?

4    A.    Yes, ma'am.

5    Q.    On Page 119, once again, you tell Mr. Batiste

6    about the money, "I'm not saying 'no.'  We're getting

7    there."

8         That is what you are telling Mr. Batiste on

9    Page 119; are you not, sir?

10   A.    I'm not saying "yes" neither.  No -- yes -- I'm

11   not saying "no" or "yes."

12   Q.    "Give me something solid and the money's coming,

13   Mr. Batiste.  It's coming your way.  Hang in there with

14   me."

15        That's what you're telling him there, sir; are

16   you not?

17   A.    Referring to what paragraph?  Same paragraph?

18   Q.    Bottom of Page 119.  "So we are on schedule," are

19   your words, sir.

20        MS. ARANGO:  Judge, is that a question?

21        THE COURT:  Sustained.

22        Rephrase your question.

23   BY MS. JHONES:

24   Q.    You tell him, do you not, sir, with respect to

25   the money, "I am" -- quote:  "I am not saying 'no'"; do

Assaad - CROSS - By Ms. Jhones                     81

1    you not, sir?

2              MS. ARANGO:   Objection.   Asked and answered.

3              THE COURT:   Sustained.

4    BY MS. JHONES:

5    Q.    Nowhere in this conversation, sir, does

6    Mr. Batiste say, "Forget the money.   Just give me the

7    guns.   I just need my guns," does he, sir?

8    A.    He said he will buy them if he has access.   And

9    like he mentioned, he's requesting, you know, the help

10   from Al-Qaeda and -- to proceed with his plans.

11   Q.    What kind of help, sir?   What help is he

12   requesting?

13   A.    For his plans in Chicago with the Sears Towers.

14   And if we are not delaying, we can provide him with

15   money to buy the trucks, the weapons and, also, to

16   establish, like he mentioned before, and he -- he want

17   the money to create a security company to transport

18   weapons from one part to another part.   And this costs.

19         He want to establish money, have money, to build

20   a fake construction company in Chicago to be -- will be

21   able to proceed in his plans in Chicago Sears Towers.

22         This is what he needed the money for, ma'am.

23   Q.    And, sir, for all of those lists that he

24   gave you -- on December 22nd, he gave you a list?

25   A.    No.   This is what he said.   I believe they are

1    recorded.

2    Q.     On December 22nd, he gave you a list.  Right?

3    A.     Yes, ma'am.

4    Q.     Lots of weapons listed there.  Right?

5    A.     Weapon.  Yes, ma'am.

6    Q.     December 16th, he gave you a list, also.

7    Correct?

8    A.     On the 16, he gave me the list.

9           On the 22nd, he gave me what specific weapons he

10   needed.

11          And on December 29th, he gave me details list.

12   Q.     A lot more weapons on December 29th.  Correct?

13   A.     Yes, ma'am.

14   Q.     SUV truck?

15   A.     Yes, ma'am.

16   Q.     Campers?

17   A.     I don't remember.  Maybe.

18   Q.     Dirt bikes?  Remember the dirt bikes?

19   A.     Yes, ma'am.

20   Q.     A whole lot of stuff.  Right?

21   A.     Yes, ma'am.

22   Q.     But on December 28th, he says, "Forget about

23   that.  Just give me the money.  I'll buy it.  Don't

24   worry about it"?

25   A.     He suggest on January 28th to do that.  Yes,

Assaad - CROSS - By Ms. Jhones                83

1    ma'am.

2    Q.    And you say, "Give me something solid, I'll give

3    you the money"?

4    A.    No, ma'am.  I didn't say that.

5    Q.    All righty.  And after you tell Mr. Batiste that

6    you're going to give him a location -- right? -- a big,

7    big, location, you tell him again in the conversation

8    towards the end, "But I'm only here to assist you.  I'm

9    only here to assist.  I'm not going to make any

10   decisions for you.  I just assist," words to that

11   effect.  Correct?

12   A.    Yes, ma'am.

13   Q.    All righty.  So after January 28th, Mr. Batiste

14   doesn't call you back.  Right?

15   A.    I don't remember.  We have communication.  Yes,

16   ma'am.

17   Q.    Let me see if I can help you remember.  All

18   righty?

19   A.    Yes, ma'am.

20   Q.    Just so we're clear, sir, you don't give him any

21   money, do you, after January 28th?

22   A.    Could you be more specific.

23   Q.    You don't provide him with any more money after

24   January 28th, do you?

25   A.    No, ma'am.

Assaad - CROSS - By Ms. Jhones                    84

```
 1              MS. JHONES:  I just need a moment to locate an
 2    exhibit, your Honor.
 3              THE COURT:  Okay.
 4              MS. JHONES:  I'm going to show the Government
 5    what's been marked for identification --
 6              MS. ARANGO:  Is there a question pending or is
 7    it refreshing recollection?  I'm not --
 8              THE COURT:  Ask your next question,
 9    Ms. Jhones.
10    BY MS. JHONES:
11    Q.    Do you remember when you spoke to Mr. Batiste
12    after January 28th, sir?
13    A.    In person or in meeting or on the phone call?
14    Q.    On the phone.
15    A.    No, ma'am.
16    Q.    Would something help refresh your recollection,
17    sir?
18    A.    Yes, ma'am.
19              MS. JHONES:  I'm showing to the Government
20    Defense Exhibit 26-B for identification.
21              MS. ARANGO:  Ms. Jhones, I'm done.
22              MS. JHONES:  May I approach, your Honor?
23              THE COURT:  Yes.
24              MS. JHONES:  Thank you.
25
```

```
 1    BY MS. JHONES:
 2    Q.    Take a look, Mr. Assaad, at Defense Exhibit 26-B
 3    and let me know when you're finished.
 4          THE COURT:  We have a request from one of the
 5    jurors for a break.  So we'll break for lunch.
 6          Do not discuss this case either amongst
 7    yourselves or with anyone else.  Have no contact
 8    whatsoever with anyone associated with the trial.  Do
 9    not read, listen or see anything touching on this
10    matter in any way.
11          If anyone should try to talk to you about this
12    case, you should immediately instruct them to stop and
13    report it to my staff.
14          You may leave your notebooks and your binders
15    at your chairs.  Please be back in the jury room in one
16    hour, 1:00.
17          (Whereupon, the jury exited the courtroom at
18    11:58 a.m. and the following proceedings were had:)
19          THE COURT:  You may step down, sir.
20          (Witness excused.)
21          THE COURT:  You may be seated for a moment.
22          I got a note from one of the jurors asking off
23    for a few days due to work obligations, indicating that
24    this juror is responsible for billing and it has to be
25    processed, that she was able to accomplish it in March
```

1    because she worked overtime on Sunday, but April and

2    May fall on Wednesday and Friday.

3           This issue actually has -- Patricia has had

4    some conversations about work responsibilities with the

5    jurors, and she at my instruction has indicated to them

6    that this is their work here and their primary

7    responsibility.

8           So unless anybody has a contrary position, I

9    am not inclined to grant the request because, quite

10   frankly, if I start giving jurors off days for work

11   responsibilities, there will be several other jurors

12   who will also want days off for work responsibilities.

13          I have -- so does anybody have any objection

14   to that?

15          I'm just going to have Patricia respond to

16   this juror that it's really not possible, that they're

17   going to have -- her work is going to have to make

18   arrangements.

19          I have -- several jurors have inquired in

20   regard to Passover and Good Friday.  I've asked, if

21   anybody has any requests from the jury, that they will

22   be put in writing.  So I expect any of those requests

23   will be coming soon.

24          I do have some -- I have observations of the

25   holiday for Passover.  So we're going to have to make

```
 1   some arrangements around that.  But I certainly want to

 2   be sensitive to anybody's request for Good Friday as

 3   well.  So we'll see what requests come.

 4            We're in recess until 1:00.

 5            (Thereupon, a luncheon recess was taken, after

 6   which the following proceedings were had:)

 7            THE COURT:  We're back on United States of

 8   America versus Narseal Batiste, et al., Case

 9   No. 06-20373.

10            Counsel, state your appearances, please, for

11   the record.

12            MR. GREGORIE:  Good afternoon, your Honor.

13            Richard Gregorie and Jacqueline Arango on

14   behalf of the United States.

15            MS. JHONES:  Good afternoon.

16            Ana Jhones on behalf of Narseal Batiste, who's

17   present.

18            MR. LEVIN:  Good afternoon, your Honor.

19            Albert Levin on behalf of Patrick Abraham,

20   who's present.

21            MR. CASUSO:  Louie Casuso on behalf of Burson

22   Augustin, who's present.

23            MR. CLARK:  Good afternoon, your Honor.

24            Nathan Clark for Rotschild Augustine, who's

25   present.
```

```
 1              MR. HOULIHAN:  Richard Houlihan with Naudimar
 2     Herrera.
 3              MR. VEREEN:  Roderick Vereen on behalf of
 4     Stanley Grant Phanor, who's present.
 5              THE COURT:  All Defendants are present.
 6              The jurors are back.
 7              So let's bring them in so we can proceed.
 8              THE COURT SECURITY OFFICER:  Yes, your Honor.
 9              MS. JHONES:  Your Honor, may I retrieve an
10     exhibit back from the witness?
11              THE COURT:  Sure.
12              (Whereupon, the jury entered the courtroom at
13     1:15 p.m. and the following proceedings were had:)
14              THE COURT:  You may be seated.
15              You are still under oath, sir.
16              You may proceed, Ms. Jhones.
17              MS. JHONES:  Thank you, your Honor.
18     BY MS. JHONES:
19     Q.    Mr. Assaad, before the lunch break, we were
20     talking about January of 2006, the end of January.
21     Correct?
22     A.    Yes, ma'am.
23     Q.    And I had provided you with a document to refresh
24     your recollection as to when the next -- after
25     January 28th, when was it, if at all, that you had
```

```
 1   reached out for Mr. Batiste.

 2        Do you remember that, sir?

 3   A.    Yes, ma'am.

 4   Q.    And did the -- Defense Exhibit 26-B help refresh

 5   your recollection in that regard, sir?

 6   A.    Yes.

 7   Q.    Did you, in fact, call Mr. Batiste after

 8   January 28th?

 9   A.    Yes, ma'am.

10   Q.    And you did call him, did you not, sir, on

11   January 30th?

12   A.    Yes, ma'am.

13   Q.    And you called him on that date, sir, and you

14   basically told him that you were working on the things

15   that you had discussed with him on January 28th; did

16   you not, sir?

17   A.    Yes, ma'am.

18   Q.    And the things that were discussed on

19   January 28th, sir, were -- as previously discussed, was

20   Mr. Batiste's need for the money.  Correct, sir?

21   A.    No, ma'am.

22   Q.    You did not specify on January 30th, sir, what it

23   was that you were working on.  You just told him you

24   were working on something.  Correct, sir?

25   A.    Let me be -- if I remember exactly.
```

Assaad - CROSS - By Ms. Jhones                    90

1          I was -- I told him I was looking what -- for

2    what we spoke.  And I was speaking about -- about the

3    warehouse.

4          I told him I was looking for what we spoke on

5    January 28th.

6    Q.    Well, sir, on January 28th, it was you who spoke

7    about the warehouse.  Correct?

8    A.    Yes, ma'am.

9    Q.    He did not request the warehouse?

10   A.    No, ma'am.

11   Q.    And when you tell Mr. Batiste, "I'm looking for

12   what we spoke about," you know very well, sir, that the

13   message that you are trying to convey to this man is

14   that, "I'm working on getting you the money," sir?

15   A.    No, ma'am.  I was speaking about the warehouse

16   and was clear what I said.  I was looking for what we

17   spoke on January 28th.

18   Q.    Well, let me ask you this:  In that conversation

19   on January 30th, did you tell him, "I'm looking for

20   that which you and I spoke about, the warehouse"?  Did

21   you use those words?

22   A.    No, ma'am.  Because Brother Naz was very careful

23   on the phone.  Most of the time, he -- like he

24   mentioned previously, that -- you know, "Do not speak

25   specifically on the phone."

1          This was his own words, because, you know -- and

2     he mentioned on January 28th, if I remember correctly,

3     that electronic are very dangerous and they can record

4     our conversations.

5     Q.     And warehouses are very incriminating; are they

6     not, sir?

7     A.     I was following what he told me, ma'am, about not

8     be specific most of the time on the phone.

9     Q.     And, sir, when you spoke earlier about following

10    the FBI's instructions in terms of money, sir, the

11    instructions that were given to you by the FBI were, in

12    fact, not to give Mr. Batiste, at least in January, any

13    money.  Correct, sir?

14    A.     The FBI never shared with me what -- their

15    opinion and what to give or what not to give.  So I

16    don't know.  They never told me, "Tell him there is no

17    money."  They never told me, you know, give or not

18    give.

19    Q.     Well, you did tell Mr. Batiste, did you not, sir,

20    on January 28th, that you had previously supported

21    other brothers, you had previously given money to other

22    brothers and, as soon as you gave them the money, the

23    brothers went bye-bye?

24         You told Mr. Batiste that on January 28th, didn't

25    you, sir?

 1    A.    If I remember correctly, I mentioned that I

 2    have -- I experience, like I represent Al-Qaeda, and I

 3    been in different cases before, like supporting

 4    homegrown terrorists or terrorists overseas or where

 5    they need our -- our -- your -- Al-Qaeda's support.

 6          So I have experience in this.

 7    Q.    Okay.

 8          MS. JHONES:  Your Honor, may I have the ELMO,

 9    please.

10          THE COURT:  Sure.

11          MS. JHONES:  Thank you.

12          THE COURT:  You have to turn it on.

13          MS. JHONES:  That would help, wouldn't it?

14    BY MS. JHONES:

15    Q.    Directing your attention, sir -- do you have

16    Government's Exhibit 55-A up there?

17    A.    55-A?

18    Q.    Yes.

19    A.    Yes, ma'am.

20    Q.    Turn to Page 109, please.

21    A.    Yes, ma'am.

22    Q.    You just told me a minute ago that you had told

23    Mr. Batiste that you support homegrown terrorists.

24    Correct, sir?

25    A.    Ma'am, I didn't say exactly.  I said I have an

Assaad - CROSS - By Ms. Jhones                 93

```
 1    experience.  I was explaining myself to everybody that
 2    I have experience before, like what I experienced
 3    before, supporting other brothers.
 4    Q.    And your previous experience in supporting other
 5    brothers was the minute you gave them money, they went
 6    bye-bye.
 7          That's what you told Mr. Batiste on Page 109 on
 8    January 28th of 2006, sir?
 9    A.    Referring to what paragraph, ma'am?
10    Q.    Right there, sir (indicating):  "And no sign of
11    them.  They took the money and bye-bye."
12    A.    Can you give me one second, please.
13    Q.    Sure.
14    A.    If you go back, please, ma'am, to one paragraph
15    before that, I was telling him about -- from being
16    serious, you know.  "Are you serious what you just told
17    me?  You know, you have to be, you know -- this is what
18    happened.  Many people -- they gave money for many
19    groups.  They said they will do it, 'We will raise
20    Islam, God, to whom be ascribed all perfection and
21    majesty.'"
22          So I was telling him, "You have to be serious.
23    Are you serious what you telling us or what you asking
24    Al-Qaeda for?  Because a lot of people speak and they
25    take the money and they leave.  Are you being serious
```

1    what you just told them?  Al-Qaeda."

2         And I mentioned in the same paragraph, "And no

3    sign of them.  They took the money and bye-bye.  They

4    disappeared.  But we found them later.  Are you

5    serious?  You want to deal?  You want the support of

6    Al-Qaeda?"

7    Q.    Well, sir, when you tell him there on Page 109

8    that you found them later, you are basically telling

9    Mr. Batiste, "You take the money and run, we're going

10   to come and get you."

11        Isn't that what you're telling him there, sir?

12   A.    I was telling him about Al-Qaeda, ma'am.  I'm

13   playing my role to -- best how I know, the best like a

14   terrorist guy representing Al-Qaeda, and this is big

15   organization -- terrorist organization.

16   Q.    All righty.  So after January 30th, sir, you tell

17   Mr. Batiste you're going to provide him with a

18   warehouse.  Correct?

19   A.    Yes, ma'am.

20   Q.    And nothing happens.  Mr. Batiste doesn't call

21   you and say, "Where's my warehouse?  Let's go get the

22   warehouse."  Correct, sir?

23   A.    Not at that day.  Maybe later.  Yes, ma'am.

24   Q.    Well, he calls you in response to the phone calls

25   that you placed to him in the beginning of February of

1    2006; does he not, sir?

2    A.    Maybe.  Yes, ma'am.

3    Q.    Well, maybe February 1st of 2006 you reach out

4    for him, sir; do you not?

5    A.    I don't remember.

6          MS. JHONES:  Showing the Government for

7    identification Defense Exhibit 27-B, your Honor,

8    composite 27-B.

9          MS. ARANGO:  Ms. Jhones, here you go.

10         MS. JHONES:  May I approach, your Honor?

11         THE COURT:  Yes.

12   BY MS. JHONES:

13   Q.    I'm handing you 27-B, composite exhibit,

14   Mr. Assaad.  Please take a look at it and let me know

15   when you're ready.

16   A.    Okay, ma'am.

17   Q.    Does that refresh your recollection, sir?

18   A.    Yes, ma'am.

19   Q.    You tried to reach him once and you were able to

20   reach him a second time on February 1st of 2006?

21   A.    Yes, ma'am.

22   Q.    And in that conversation where you, in fact,

23   reach him -- what time was it, by the way, when you

24   called him, that you were able to reach him?

25   A.    1:46.

Assaad - CROSS - By Ms. Jhones                    96

1    Q.    On that conversation, you're talking about

2    getting a location for him?

3    A.    Yes, ma'am.

4    Q.    You tell him that you're going to ask Brother

5    Abbas to help you in finding a location.  Correct?

6    A.    Yes, ma'am.

7    Q.    And Mr. Batiste does not go with you or with

8    Mr. Abbas on February 1st to look for a location, does

9    he, sir?

10   A.    I don't know about Brother Abbas, if he went with

11   him, yes or no.  But with me, no.

12   Q.    And you do know, do you not, sir, that

13   Mr. Batiste -- almost every single time that you call

14   him, the man's working and he's telling you, "I'm busy.

15   I'm working.  I'm looking at a jobsite," words to that

16   effect.

17         Isn't that a fact, sir?

18   A.    Maybe.  I don't know.

19   Q.    And after Mr. Batiste does not show up on

20   February 1st to look for a warehouse, you call him

21   again the next day; do you not, sir?

22   A.    I don't remember, ma'am.

23   Q.    Would something help refresh your recollection,

24   sir?

25   A.    Yes, ma'am.

Assaad - CROSS - By Ms. Jhones                97

 1          MS. JHONES:  Your Honor, I have handed a
 2  proposed exhibit to the Government.  Here it is.
 3          Finished?
 4          MS. ARANGO:  Yes.
 5          MS. JHONES:  May I approach, your Honor?
 6          THE COURT:  Yes.
 7          MS. JHONES:  Thank you.
 8  BY MS. JHONES:
 9  Q.    I'm showing you Defense Exhibit 30-B for
10  identification.
11  A.    Yes, ma'am.
12  Q.    Does that refresh your recollection, sir, as
13  to --
14  A.    Yes, ma'am.
15  Q.    When was it, sir, that you called Mr. Batiste?
16  A.    Almost noon on the 2nd of February, 2006.
17  Q.    All right.  You called him, sir, because, on that
18  occasion, again you're bringing up the issue of the
19  warehouse.  Correct?
20  A.    I was doing what the FBI told me, ma'am.
21  Q.    The answer is "yes," sir?
22  A.    Yes, ma'am.
23  Q.    And, again, this gentleman right here, whose
24  intentions you are trying to find out, did not say to
25  you, "Please, please, Brother Mohammed.  Where's my

1   warehouse?  Please take me to my warehouse."

2        Correct, sir?

3   A.    Ma'am, in that time on 2nd of February, we

4   previously -- we discussed about the warehouse.  And I

5   asked him, "I need the time to look for the warehouse."

6        So we were looking and calling each other and

7   talking about what we agree about previously, look for

8   the warehouse.

9   Q.    Tell me when, sir -- prior to February 2nd, tell

10  me when you and Mr. Batiste went out looking at

11  warehouses.

12  A.    Ma'am, we didn't look physically to the

13  warehouses, because, if you see in this phone call, our

14  connection -- our -- Brother Pedro, who -- or my

15  connection who work with Al-Qaeda -- he was looking for

16  different locations.

17       So when we spoke on January 28 about the

18  warehouse, after that period of time on January 28th,

19  me and Al-Qaeda were looking for different location of

20  the warehouses.  And we were calling phone calls, "Not

21  yet.  We are looking," you know.

22  Q.    So in this conversation of February 2nd of 2006,

23  it's your testimony that you tell Mr. Batiste that,

24  "We, Al-Qaeda -- our Al-Qaeda brothers, are looking for

25  warehouses."  Correct?

```
 1   A.     I didn't say on the phone call, ma'am,

 2   "Al-Qaeda."  But I said on January 28th I -- you know,

 3   I represent the word "Al-Qaeda," that specifically who

 4   I am.

 5              THE COURT REPORTER:  I'm sorry.  The "world"

 6   or the "word"?

 7              THE WITNESS:  The word "Al-Qaeda."

 8              And I represent Al-Qaeda and all this stuff.

 9   So he already knew that our connection is the Mexican

10   guy who's looking for the warehouses.

11   BY MS. JHONES:

12   Q.     Okay.  And on February 2nd of 2006, sir, you

13   continue to call Mr. Batiste even after that morning

14   phone call, try and get him to go look at warehouses

15   with you; did you not, sir?

16   A.     Maybe I called him.  I believe maybe I called

17   him, but not to go out -- maybe to go with me to go out

18   for looking for warehouses.  Maybe I told him, "We are

19   still in search to find different locations."

20   Q.     Again, when you call Mr. Batiste on February 2nd,

21   Mr. Batiste does not say to you, does he, sir, "Brother

22   Mohammed, where are my weapons?  That list that I gave

23   you back on December 16th or that list that I gave you

24   on December 22nd or that list that I gave you on

25   December 29th, where are all my weapons, Brother
```

Assaad - CROSS - By Ms. Jhones                    100

 1    Mohammed?  Forget the warehouse.  Give me the weapons"?

 2         He did not say that to you in February, sir,

 3    February 1st and February 2nd, did he, sir?

 4    A.    Like I said before, ma'am, he never speak

 5    specifically or speak something about weapons and

 6    terrorist attack or anything on the phones.

 7         So if you check, mostly -- if I remember

 8    correctly, all of the phone calls were not specific

 9    about -- we never spoke about taking down, attacking,

10    weapons, terrorists.

11         So, normally, we speak in person.  When we meet,

12    we discuss things specifically.  But on the phone,

13    where everything like -- he -- we know what we talking

14    about from my side and from his side.  So we understand

15    each other.

16    Q.    Well, let's talk about -- did you meet with him

17    in person on February 1st or February 2nd or

18    February 3rd where this man said to you, "Where are my

19    weapons, Brother Mohammed?  You're really -- you're

20    really delaying things.  Give me my weapons"?

21         Did you meet with him in person, sir, on those

22    days where he would ask you for those weapons, where

23    you would record him?

24    A.    No, ma'am.

25    Q.    Now -- so then you call him again on

 1   February 3rd; do you not, sir?

 2   A.    I don't remember, ma'am.

 3   Q.    Let me see if I can help you.

 4        MS. JHONES:  I'm sorry, your Honor.  I just

 5   need a minute to get my exhibits together.

 6        Your Honor, I am going to provide the

 7   Government with the following exhibits for

 8   identification:  Exhibit 32-B -- Composite Exhibit

 9   32-B, I should say; Composite Exhibits 33-B; 34-B; and

10   35-B.

11        MS. ARANGO:  I'm all done.

12        MS. JHONES:  I apologize, your Honor.  I just

13   have one more to mark.

14        May I approach the witness, your Honor?  I

15   apologize for the delay.

16        THE COURT:  Yes.

17        MS. JHONES:  I'm going to show him, just so

18   the record is clear, Composite Exhibit 32-B, Composite

19   Exhibit 33-B, Exhibit 34-B and Exhibit 35-B.

20        May I approach, your Honor?

21        THE COURT:  Yes.

22        MS. JHONES:  Thank you.

23   BY MS. JHONES:

24   Q.    Take a look at these exhibits, Mr. Assaad, and

25   let me know when you're finished.

1           MS. ARANGO:  Judge, I believe the question is

2     regarding a date, not regarding everything that's in

3     the conversations.

4           MS. JHONES:  I could rephrase the question --

5           THE COURT:  Okay.

6           MS. JHONES:  -- if that would help.

7           THE COURT:  Okay.

8     BY MS. JHONES:

9     Q.    Mr. Assaad, do you remember having called

10    Mr. Batiste on February 3rd of 2006?

11    A.    Yes, ma'am.

12    Q.    Do you remember how many phone calls you made to

13    Mr. Batiste on February 3rd of 2006, including

14    attempts -- attempts to reach him?  Do you remember?

15    A.    I'm just -- I don't remember.  But I'm looking.

16    Q.    Let me know when you're finished.

17    A.    Six times.

18    Q.    And of the six times that you called Mr. Batiste,

19    were you able to reach him on any one of those six

20    times that you called him?

21    A.    Excuse me?

22    Q.    Were you able to reach him?

23    A.    Yes, ma'am.

24    Q.    Tell us what time you were able to reach him,

25    sir.

```
 1    A.     How many times?

 2    Q.     Yes.

 3    A.     Four times.

 4    Q.     And, sir, in those conversations, it is you --

 5    your purpose of calling Mr. Batiste is to try and get

 6    him to go with you to look at warehouses.  Correct?

 7    A.     I don't remember, ma'am.  I need to look.

 8    Q.     Do you want to look and see and tell me if that

 9    refreshes your recollection as to the purpose of you

10    calling him?

11    A.     Yes, ma'am, please.

12    Q.     Okay.

13    A.     The question is?

14    Q.     The question, is:  Does that refresh your

15    recollection as to why you were trying to reach

16    Mr. Batiste on February 3rd of 2006?  Does it refresh

17    your recollection, sir?

18    A.     Yes.  To meet.

19    Q.     And the reason why you were trying to meet him,

20    sir, was because you were still trying to get him to go

21    with you to look Batiste at warehouses.  Correct?

22    A.     Yes, ma'am.

23    Q.     And you have told Mr. Batiste, have you not, sir,

24    during the course of the first few days of February

25    that you have many warehouses to show him?  Correct?
```

1    A.     We are looking for many houses.

2    Q.     Well, that's what you told him.  Correct?

3    A.     Yes, ma'am.

4    Q.     But the reality is, sir, the warehouse had

5    already been chosen by the FBI; had it not, sir?

6    A.     Yes, ma'am.

7    Q.     So when you're telling Mr. Batiste, "I want you

8    to choose the warehouse, Mr. Batiste.  Go around and

9    look at all these nice warehouses" and all of those

10   references for two or three days in February, you're

11   leading him to believe, "You're going to pick the

12   warehouse."  But the FBI had already picked it for him.

13   Correct?

14   A.     No, ma'am.

15   Q.     Sir, on March 15th, did you take Mr. Batiste to a

16   warehouse location?

17   A.     Ma'am, he already picked the warehouse, not -- I

18   didn't tell him, "This is the warehouse for you."  He

19   saw several warehouses and he said, "I want this

20   warehouse."

21   Q.     How many warehouses did you take him to, sir?

22   A.     If I remember correctly, maybe three, four.  I

23   don't know how many warehouses.

24   Q.     When did you take him?

25   A.     I don't know exactly the location.  But I gave

1    him several options.  And in the end, he said, "I want

2    this warehouse.  That's it."

3          I said, "Are you sure?"  And I was specific with

4    him.  "Are you sure, Brother Naz, you want this

5    warehouse?"

6          He said, "Yes.  I want this warehouse."

7    Q.    Tell me the warehouses you took him to prior to

8    the warehouse of March 15th.  Where did you take him,

9    sir?

10   A.    Ma'am, I don't know exactly the addresses.  Was a

11   long time ago, around 2006.

12   Q.    (Tenders document to the witness.)

13         Does that refresh your recollection, sir, what

14   I've just given you, as to any warehouses that you took

15   him to?

16   A.    I don't see if there's any location -- specific

17   location in this phone calls.

18         It's just I was -- I called him first.  The

19   signal was lost.  I called him again.  He told me to

20   call him again.  He told me he's coming, and didn't

21   come.

22         So we were -- this phone calls was based on

23   losing signal and told me to call him.  I was calling

24   him upon his request.

25   Q.    Let me ask you this:  Did you video-tape or

 1    audio-record when you took him to all of these other

 2    warehouses that you showed him and he turned down?  Do

 3    we have any recordings of that?

 4    A.    Most of the meeting -- my belief at that time,

 5    like, every time I see him, there is a recording of

 6    meeting.

 7    Q.    So your answer is "yes," there are recordings of

 8    when you took him to these other warehouses to look?

 9    A.    In my belief, yes, ma'am.

10    Q.    Is it your testimony, sir, that you have video

11    recordings of you showing him around Miami -- different

12    warehouses in Miami?

13    A.    No.  I didn't say there is video recording.  I

14    said there is recording of each meeting, but not video.

15    Q.    There is a video, sir, is there not, of the

16    warehouse location on March 15th of 2006?  Correct?

17    A.    Yes, ma'am.

18    Q.    There was a pole camera that had been previously

19    installed by the FBI so the FBI could record -- could

20    videotape what was going on outside of that warehouse

21    on March 15th of 2006.  Correct?

22    A.    Yes, ma'am.

23    Q.    And it was -- where that pole camera was, that

24    was the warehouse that you say Mr. Batiste selected.

25    Correct?

Assaad - CROSS - By Ms. Jhones                    107

1    A.      Yes, ma'am.

2    Q.      Going back to the beginning of February of 2006,

3    what's going on in the beginning of February is you're

4    trying to find a warehouse.  Fair enough?

5    A.      Yes, ma'am.

6    Q.      And Mr. Batiste basically speaks to you here and

7    there.  No meetings take place.  Correct?  And you

8    continue to call.

9    A.      Between -- he was calling me.  I was calling him.

10   We were in contact with each other, ma'am.

11   Q.      Your testimony is you're calling him; he's

12   calling you back.  Correct?  That's your testimony?

13   A.      Yes, sir.

14   Q.      During the time periods that you're calling

15   Mr. Batiste in the first two weeks of February of 2006,

16   your intent, sir, is to try and get him to go to your

17   apartment in Miami Beach.  Correct?

18   A.      No, ma'am.  Because if I remember correctly

19   exactly what happened -- because Brother Naz -- he want

20   to set up a meeting between him and I.

21           And I said, "Brother Naz, is this what will

22   happen like before, on January 28th?  We will go

23   through all this -- what happened before?"

24           He said, "No, brother.  I come to your place."

25           So he, Brother Naz, who suggests to come to my

 1    place.  I didn't put it out.

 2    Q.    That's your testimony?

 3    A.    And I believe it's recorded conversation on the

 4    phone.  Yes, ma'am.

 5    Q.    So your testimony is that Brother Naz, as you

 6    call him, wants to go to your apartment on Miami Beach.

 7    Correct?

 8    A.    Yes, ma'am.

 9    Q.    And there is -- there does come a time, sir, when

10    there is a meeting in your apartment on February 19th

11    of 2006.  Correct?

12    A.    Yes, ma'am.

13    Q.    And in that apartment, that apartment is already

14    equipped with audio and video equipment so you can

15    record what's going on there.  Correct?

16    A.    Yes, ma'am.

17    Q.    And it's in that meeting where you basically cook

18    a meal for Mr. Batiste; do you not?

19    A.    I was cooking.  Yes, ma'am.

20    Q.    I think it was pasta.  Right?

21    A.    Yes, ma'am.

22    Q.    And this is a meeting where -- parts of it were

23    played to the jury -- where Mr. Batiste is in a living

24    room and you're sitting on one couch and he's sitting

25    on another.  Correct?

```
 1   A.    Yes, ma'am.

 2   Q.    And, sir, in that meeting, there is a discussion,

 3   is there not, sir, about mini-camps?

 4   A.    Yes, ma'am.

 5         MS. JHONES:  Your Honor, at this time I'd like

 6   to publish a couple of clips from that meeting -- that

 7   recording, if I may just have a moment.  That is in

 8   evidence, but I need to identify the exhibit.

 9         THE COURT:  I'm sorry?

10         THE WITNESS:  Could I have one-minute break?

11         THE COURT:  You need a break?

12         THE WITNESS:  One minute, just to go to the

13   rest room.

14         THE COURT:  Go ahead.

15         MS. JHONES:  I'll retrieve the exhibit while

16   he's gone.  Is that okay?

17         THE WITNESS:  Can I go?

18         THE COURT:  Yes.  Yes.  Go ahead.

19         (Thereupon, the witness retired from the

20   courtroom and the following proceedings were had:)

21         MS. ARANGO:  Judge, just for the record, we

22   had previously not provided the jury with copies of the

23   synchronized transcripts, the one with the audio and

24   video.

25         But we did make copies, and I'm happy to
```

Assaad - CROSS - By Ms. Jhones                 110

```
 1   provide them to the jury now, if we're going to be
 2   going over any pages of one of those --
 3            THE COURT:  Which exhibit is this?
 4            MS. JHONES:  This is going to be, your Honor,
 5   Exhibit 56-A.  And there's going to be a rolling
 6   transcript.
 7            MS. ARANGO:  So you're going to play it?
 8            MS. JHONES:  Yes.
 9            MS. ARANGO:  Okay.
10            MS. JHONES:  Although I think it wouldn't hurt
11   to have an additional copy of the exhibit.
12            THE COURT:  Do you want to show -- have you
13   seen it?
14            MS. JHONES:  I have not.
15            THE COURT:  Do you want to show it to her?  Is
16   this the same binder you provided to defense counsel?
17            MS. ARANGO:  This is the same binder that was
18   provided.
19            (Thereupon, the witness entered the courtroom
20   and the following proceedings were had:)
21            MS. JHONES:  I do need to take a look at it,
22   if I may.
23            That's fine, your Honor.  That would help.
24            THE COURT:  Another binder?
25            (Whereupon, said document was distributed to
```

```
 1    the members of the jury.)

 2              MS. JHONES:  Judge, may I approach the witness

 3    and give him a copy of the exhibit?

 4              THE COURT:  Sure.

 5              You are still under oath, sir.

 6              What exhibit number, please?

 7              MS. JHONES:  This is going to be Government's

 8    Exhibit 55-A.

 9              MS. ARANGO:  No.  56.  56.

10              THE COURT:  We have a 56-B.  Is that it?

11              MS. JHONES:  I have 55-A.

12              MS. ARANGO:  55 is the January 28th.

13              Are you referring to February 19th?

14              MS. JHONES:  Yes, your Honor.  The correct

15    exhibit number is 56-B.

16              THE COURT:  Okay.

17              MS. JHONES:  At this time -- again, there is a

18    rolling transcript, whatever is more convenient -- I'd

19    like to publish a clip of --

20              THE COURT:  What page?

21              MS. JHONES:  Page 7, Government's

22    Exhibit 56-B.

23              THE COURT:  Is everybody there?

24              You may proceed.

25              MS. JHONES:  Thank you, your Honor.
```

```
 1              (Whereupon, segments of Government's Exhibit
 2     No. 56 were published in open court.)
 3     BY MS. JHONES:
 4     Q.     Do you remember that, sir?
 5     A.     Yes, ma'am.
 6     Q.     And, sir, in that clip, it is you, not
 7     Mr. Batiste, that says -- that suggests, "Let's send
 8     these people to mini-camps outside of the United
 9     States."  Correct, sir?  That is your suggestion?
10     A.     It's based on -- yes, ma'am.  But it's based on
11     something he requested from before.  I'm trying to
12     look previously about something.  But he suggest about
13     training his brothers, his soldiers.
14     Q.     Yes, sir, he did.
15            On December 22nd, he said he would train
16     testimony in Louisiana and train them in Chicago; did
17     he not, sir?
18     A.     In -- I believe something after December 22nd,
19     where he request -- I want to be sure that he
20     request -- from Al-Qaeda to train -- support and
21     training for his brothers.
22     Q.     Sir, you told him -- it was you in that clip that
23     told Mr. Batiste that you could train his soldiers
24     outside of the United States.
25            That was you speaking there.  Correct, sir?
```

```
 1   A.      Can you give me one second before I answer?

 2   Q.      Sure.

 3   A.      I would refer, ma'am, at your question on the top

 4   of the Page 7, when I said to him in the middle of the

 5   paragraph, "And you remember when you told me about the

 6   brother they get to Mexico?  I have a better idea than

 7   Mexico.  We can send them to mini-camps for a week."

 8           So there is something prior to my suggestion to

 9   him that he requested.  And the FBI told me to mention

10   upon his request previously about the mini-camps.

11   Q.      And, sir -- well, right after this meeting, he

12   calls you and he says, "Forget the mini-camp training

13   outside the United States.  I'm not going."

14           Right?

15   A.      He called me in the -- we spoke next day, I

16   believe, when he mentioned that he wants -- he has an

17   expert people from the Marines and the military and he

18   wants the training to be here the United States.

19   Q.      And that's -- so the answer is "yes"?  He said,

20   "No training outside the United States with Al-Qaeda.

21   I'll take care of it on my own."

22           Correct, sir?

23   A.      Excuse me?

24   Q.      He said "no" to your suggestion of mini-camps in

25   Dominica, Mexico, or anywhere else outside the United
```

Assaad - CROSS - By Ms. Jhones                    114

1    States; did he not, sir?

2    A.    Yes, ma'am.

3    Q.    Now, he also tells you on this clip that he has

4    two brothers that he can send to train outside the

5    United States; does he not, sir?

6    A.    One second before I answer.

7          Yes, ma'am.

8    Q.    But, sir, that's on Page 7 or 8 of the

9    transcript.  Correct?

10   A.    8.  Yes, ma'am.

11   Q.    And then during the course of the conversation,

12   you start to mention more numbers, more soldiers; do

13   you not, sir?

14   A.    What page, ma'am?

15   Q.    Let's listen to a clip.

16   A.    Yes, ma'am.

17         MS. JHONES:  Eric, if you could help me,

18   please, with --

19         THE WITNESS:  Could I have a page, please?

20         MS. JHONES:  Clip C, Eric.

21         Page 27.

22         (Whereupon, segments of Government's Exhibit

23   No. 56 were published in open court.)

24         THE COURT:  One moment, please.

25         MS. JHONES:  I'm sorry?

```
 1            THE COURT:  Not everybody's ready.

 2            MS. JHONES:  I'm sorry.

 3            THE COURT:  Okay.  Go ahead.

 4            MS. JHONES:  All ready, your Honor?

 5            THE COURT:  Yes.

 6            MS. JHONES:  Thank you.

 7            (Whereupon, segments of Government's Exhibit

 8   No. 56 were published in open court.)

 9            THE COURT:  One moment, please.

10            Stop.

11            This is not the right page.

12            MS. JHONES:  Your Honor, the pages reflected

13   on the rolling transcript are not the pages reflected

14   in the book.

15            Starting at Page 27 of the binder.  Let's see

16   if we can rewind it so we can start from the beginning.

17            THE COURT:  Where on 27 does it start?

18            MS. JHONES:  I'll tell you in one second, your

19   Honor.  Seven speakers up, where it says, "So just..."

20            It's Page 27 of the transcript.

21            UNIDENTIFIED JUROR:  It's Page 29.

22            THE COURT:  I'm sorry?  Seven up, it says,

23   "The chairs is for the guest."

24            MS. JHONES:  Your Honor, then, unfortunately,

25   the binder -- the copy in the binder is not --
```

```
 1            MS. ARANGO:  Judge, she has what the jurors
 2   have and what you have.  It's the same thing.
 3            MS. JHONES:  Let me check in another binder,
 4   your Honor.
 5            I see.  It is the top of Page 29.  I
 6   apologize.  Top of Page 29.
 7            THE COURT:  Beginning where?
 8            MS. JHONES:  The second line from the top,
 9   your Honor, where it says, "So just let me..."
10            THE COURT:  Okay.
11            MS. JHONES:  Thank you.
12            (Whereupon, segments of Government's Exhibit
13   No. 56 were published in open court.)
14   BY MS. JHONES:
15   Q.    Sir, so the previous two individuals that were
16   going to go to the mini-camp on Pages 7 and 8 of the
17   transcript has now changed on Page 29 of the
18   transcript.  Correct?
19   A.    Yes, ma'am.
20   Q.    And Mr. Batiste tells you that he's going to
21   leave some brothers over here because they have to run
22   the restaurant.  Correct?
23   A.    Yes, ma'am.
24   Q.    Now, you know, sir, do you not, that there is no
25   restaurant?  Do you not, sir?
```

Assaad - CROSS - By Ms. Jhones                117

```
 1    A.    There is a restaurant?

 2    Q.    There is no restaurant.

 3          When he tells you they have to stay behind

 4    because there's a restaurant, that's not true.  There

 5    is no restaurant.

 6    A.    If I remember correctly, when I went to the

 7    Embassy, ma'am, he was telling me about he was going to

 8    open a restaurant in part of the Embassy.  And it was

 9    about time.  I don't know.  So --

10    Q.    He was going to open a restaurant.  Correct?

11    A.    Yes, ma'am.

12    Q.    Did he happen to take you to the Embassy to the

13    part where there was restaurant equipment?  Did you

14    actually see that?

15    A.    No, ma'am.

16    Q.    Well, you are sure, are you not, sir, that there

17    was, in fact, no restaurant open for business

18    whatsoever that Mr. Batiste owned?

19    A.    No, ma'am.

20    Q.    All righty.  Now, there is a point in this

21    conversation a few pages up where Mr. Batiste says that

22    he needs to film his evidence in Chicago.

23          Do you remember that, sir?

24    A.    Excuse me?

25    Q.    There is a point in that conversation where
```

```
 1   Mr. Batiste says to you that he is going to go to
 2   Chicago.  He wants you to come along with him.
 3        Remember that?
 4   A.   Yes, ma'am.
 5   Q.   And that he wants to film his evidence, I think
 6   were his words.
 7        Do you recall that?
 8   A.   Yes, sir.
 9   Q.   And he made a request, did he not, to film that
10   evidence in Chicago?
11   A.   Yes, ma'am.
12   Q.   What he requested was a phone camera.  Isn't that
13   true, sir?
14   A.   He suggest something like phone camera.  Yes,
15   ma'am.
16   Q.   And then you told him, "No.  Not a phone camera,
17   Mr. Batiste.  How about a videocamera?"
18        Correct, sir?
19   A.   What page, please?
20   Q.   Let's take a look at the clip.
21        MS. JHONES:  Eric, if you would hold on so I
22   can direct the jury towards the page.
23        Your Honor, since I'm not sure about whether
24   this clip corresponds to the transcript exactly, I'm
25   just going to go through the transcript so it's not as
```

 1   confusing.  Okay?

 2           THE COURT:  I don't know what you mean.

 3           MS. JHONES:  Rather than play the clip,

 4   because the pagination may not be correct --

 5           THE COURT:  You're going to use the

 6   transcript?

 7           MS. JHONES:  Correct.

 8           THE COURT:  What page?

 9           MS. JHONES:  Page 38 of the transcript.

10           Your Honor, if I may approach the witness, I

11   want to make sure his version is the same version that

12   we all have.

13           THE COURT:  Okay.

14   BY MS. JHONES:

15   Q.    Mr. Assaad, directing your attention to Page 38

16   of the transcript -- do you see that?

17   A.    Yes, ma'am.

18   Q.    Do you see where Mr. Batiste tells you that he's

19   going to need a camera phone?  You ask him about a

20   camera phone, and he says, "Yes."

21           Do you see that in the middle of the page?

22   A.    Yes, ma'am.

23   Q.    And it is you, sir, that tells Mr. Batiste,

24   "Well, don't you need, like, a camera, like -- don't

25   you need, like, a videocamera?"

```
 1          Isn't that your suggestion, sir?

 2    A.    Yes, ma'am.

 3    Q.    So Mr. Batiste was ready to go up to Chicago and

 4    film his evidence of the Sears Tower with a phone

 5    camera.  Correct?

 6    A.    Yes, ma'am.

 7    Q.    Okay.  And then, sir, Mr. Batiste tells you about

 8    how it is that he's going to make it up there to the

 9    city of Chicago; does he not?

10    A.    Yes, ma'am.

11    Q.    And he's going to make it up there by going in an

12    RV van, a motor home?

13    A.    Yes, ma'am.

14    Q.    And you and he start having a discussion about

15    what type of motor home would be comfortable enough to

16    take all of his soldiers up to Chicago and look at the

17    Sears Tower.  Correct?

18    A.    Yes, ma'am.

19    Q.    And you talk to him about, "Don't worry about the

20    money," you know, "We'll get one with a kitchen and

21    we'll get one with a bedroom and all of the amenities";

22    do you not, sir?

23    A.    What paragraph you are referring to, ma'am?

24    Q.    Look at Page 39, sir -- actually, starting on

25    Page 37 through 39.
```

1   A.      We are speaking about the RV.  Yes, ma'am.

2   Q.      Now, in speaking about the RV, sir, you're

3   speaking about -- you're speaking about the type of RV

4   that would be appropriate to go up there to Chicago;

5   are you not?

6   A.      I was -- we were discussing the RV.

7   Q.      And then you also tell Mr. Batiste that, you

8   know, "We are going to need more than one camera.

9   We're going to need cameras," plural; do you not, sir?

10  A.      What paragraph?

11  Q.      Page 38.

12  A.      This is before he suggest any cameras.  So before

13  we spoke about any cameras, I suggest, "We are going to

14  Chicago.  So do we need cameras?"

15          And he said, "I need a camera phone."

16  Q.      And turning to Page 39, that's where you discuss

17  the different types of amenities that the RV is to have

18  when you travel all the way up to Chicago with

19  Mr. Batiste.  Correct, sir?

20  A.      Ma'am, he suggest the motor camper on the Page

21  37 -- bottom of the Page 37.

22          "I hope we can get motor camper.  If you don't

23  get one by the end, I will probably have the money."

24          And I said, "For what?

25          "To rent one, you know, like a motor camper."

1          So he trying to provide the RV to go to Chicago.

2    If I don't at that time, then he will rent one and he

3    would invite me to go to Chicago.

4    Q.    So here again, on February 19th, sir, as he did

5    back on December 22nd, he's inviting you to go up to

6    Chicago with him; is he not, sir?

7    A.    Yes, ma'am.

8    Q.    You do not go, do you, sir?

9    A.    No, ma'am.

10   Q.    Now, sir, we've already discussed what -- the

11   phone call that you received from Mr. Batiste on the

12   very next day; did we not?

13   A.    Can you be more specific, ma'am.

14   Q.    Sure.

15         Mr. Batiste, after this meeting where there was

16   an agreement to go to mini-camps outside of the United

17   States -- he called you back and he changed his mind.

18   Right?

19   A.    Yes, ma'am.

20   Q.    And he tells you something about, "Oh, Brother

21   Mohammed, I really don't want to be wishy-washy.  But,

22   you know, I thought about it a lot in the middle of the

23   night" -- words to that effect -- "I don't want go."

24   Right?

25   A.    Yes, ma'am.

```
 1    Q.    You do get a couple more phone calls on the 21st
 2    of February from Mr. Batiste; do you not?
 3    A.    I don't remember, ma'am.
 4    Q.    Bottom line, sir, is, in the month of February,
 5    nothing happens.  Correct?
 6    A.    Physical meetings or meetings?
 7    Q.    No.  I'm talking --
 8    A.    Phone calls?
 9    Q.    I'm talking about Mr. Batiste doesn't take
10    possession of -- you don't give him any money in
11    February.  Right?
12    A.    Yes, ma'am.
13    Q.    Mr. Batiste doesn't call you and say, "Where are
14    my weapons?  Give me my witnesses."
15          That doesn't occur in February, does it?
16    A.    No.
17    Q.    You don't provide him the dirt bikes he asked
18    for?
19    A.    No, ma'am.
20    Q.    No motor homes?
21    A.    He didn't request for one.  He would rent one, if
22    he has the money, and he would invite me.
23    Q.    How about the SUVs that he requested on
24    December 29th of 2005?  Any SUVs?
25    A.    No, sir.
```

```
1    Q.     Any bulletproof vests?

2    A.     No, ma'am.

3    Q.     And we already know that there were no trips to

4    Chicago.  Correct?

5    A.     Yes, ma'am.

6    Q.     No trips to Louisiana?

7    A.     No, ma'am.

8    Q.     No trips to Alabama?

9    A.     No, ma'am.

10   Q.     So nothing happens in February.  And then we are

11   now into the month of March.  Correct?

12   A.     Yes, ma'am.

13   Q.     And, by the way, sir, by the way, in the month of

14   February and, indeed, January and March, while all this

15   is going on, you know, sir, do you not, that what

16   Mr. Batiste is really doing is he's working in his

17   business?  Do you not, sir?

18   A.     He was working.  Yes, ma'am.

19   Q.     So now we are in the month of March.

20          Again, you start calling Mr. Batiste again in the

21   beginning of March; do you not?

22   A.     Maybe I was calling him responding to his

23   previous phone calls.

24   Q.     Your testimony is that you were returning his

25   phone calls in the beginning of March.  Is that your
```

```
 1   testimony, sir?
 2   A.    I don't remember exactly.  Every time I call him,
 3   ma'am, was upon the request of the FBI to call.  But
 4   sometimes I receive also phone calls from Brother Naz,
 5   and I call the FBI.  I tell them and they direct me
 6   what to do.
 7   Q.    And, sir, you had a phone call with Mr. Batiste,
 8   I believe, sometime in -- on March 3rd of 2006.
 9         Do you remember that, sir?
10   A.    No, ma'am.
11   Q.    Okay.  And you do know, do you not, that you had
12   no meetings with Mr. Batiste until March 9th of 2006.
13   Correct, sir?
14   A.    Yes, ma'am.
15   Q.    Here we are on March 9th and no warehouses
16   either.  Right?
17   A.    Yes, ma'am.
18   Q.    So you show up to the Embassy location on
19   March 9th; do you not?
20   A.    Yes, ma'am.
21   Q.    Sir, when you show up to the Embassy location,
22   it's your testimony, I believe, that you were actually
23   wearing a recorder.  Correct?
24   A.    Yes, ma'am.
25   Q.    I believe your testimony was that, when you were
```

```
 1   wearing the recorder, you decided that you just had to

 2   leave the Embassy.  Correct?

 3   A.    I didn't decide nothing, ma'am.  I told the FBI

 4   about the situation in the Embassy.  They want to

 5   strip-search.  And the FBI told me to came back.

 6   Q.    Now, your testimony is that you were

 7   strip-searched at the Embassy.  Correct?

 8   A.    Before -- there is two visits to -- on March 9.

 9   First, there was an attempt, if I want to go in, I

10   would be strip-searched.

11         I said, "No.  I will come back.  Just let me go

12   have dinner and I come back."

13         And I called the FBI.  I told them, "This is the

14   situation.  If I will go inside the Embassy, this what

15   will happen."

16         And they recommended to me to bring back the

17   recording device.

18   Q.    And that was because you were really concerned

19   because you were searched.  Right?

20             MS. ARANGO:  Objection.  Mischaracterization

21   account of the facts.

22             THE COURT:  Sustained.

23             Rephrase your question.

24   BY MS. JHONES:

25   Q.    You had a concern; did you not, sir?
```

1    A.      Yes, ma'am.

2    Q.      Well, let me ask you this:  Remember January 28th

3    of 2006?

4    A.      Yes, ma'am.

5    Q.      And remember when you testified that they told

6    you to take off your clothes?  Right?  And these are

7    the clothes that they told you to put on?  Right?

8    A.      Yes, ma'am.

9    Q.      On January 28th, you really were strip-searched,

10   you told the ladies and gentlemen of this jury; were

11   you not, sir?

12   A.      Yes, ma'am.

13   Q.      And you had your recording device on you on

14   January 28th.  Right?

15   A.      Yes, ma'am.

16   Q.      The ladies and gentlemen of the jury heard

17   everything that happened on January 28th, when you were

18   really afraid and you were being strip-searched?

19   A.      But the difference is, between January 28th and

20   March 9th, I was already in the Embassy when they

21   surprise me.  They want to strip-search me.

22          Now, on March 9, they told me, "If you will go

23   in, you will be strip-searched."

24          On January 28th, I was already in and there is no

25   choices to leave the place.  But on March 9, I had a

1   choice before go in to go in or leave.

2        So this is the difference between these two days,

3   ma'am.

4   Q.    How about the difference in recording while all

5   this is going on, sir?  How about that difference?

6            MS. ARANGO:  Objection.  Vague.

7            THE COURT:  Sustained.

8   BY MS. JHONES:

9   Q.    The fact of the matter is, sir, you returned to

10  the Embassy on March 9th after you have a conversation

11  with Mr. Batiste; do you not, sir?

12  A.    Yes, ma'am.

13  Q.    And you have a meeting with Mr. Batiste, no

14  recording.  Correct?

15  A.    Yes, ma'am.

16  Q.    And in that meeting, sir, you tell Mr. Batiste

17  once -- he once again tells you about, "Where is my

18  50 grand?"; does he not, sir?

19  A.    If I remember correctly, yes, ma'am.

20  Q.    And, sir, you tell Mr. Batiste on March 9th,

21  "Take the warehouse and I'm going to give you the

22  money"; do you not, sir?

23  A.    I don't believe this is the correct way.  But if

24  there is something I can refresh my memory, please.

25  Q.    Well, let me ask you this, sir.

```
 1        There is a recording that was played for the
 2   ladies and gentlemen of the jury of the conversation
 3   you had over the phone with Mr. Batiste before you went
 4   back to the Embassy location.  Correct?
 5   A.    Yes, ma'am.
 6   Q.    And in that location, in that conversation, sir,
 7   you tell Mr. Batiste, "Let's talk.  Let's -- give me an
 8   opportunity.  Let's go ahead and let's talk"; do you
 9   not, sir?
10   A.    I have to -- because you asked me first a
11   question about the meeting in the warehouse -- in the
12   Embassy, but I didn't have a chance to answer you yet
13   because I request something to refresh my memory.
14        Second, I told you I need to refresh my memory on
15   something, if you can give me, about that day, if
16   that's possible --
17   Q.    Okay.  Sure.
18   A.    -- about the meeting in the warehouse -- in the
19   Embassy and the phone call.
20   Q.    Sure.
21        MS. JHONES:  May I approach the witness, your
22   Honor?
23        THE COURT:  Yes.
24        THE WITNESS:  There is something, ma'am, about
25   the meeting.  You asked me a question and I --
```

Assaad - CROSS - By Ms. Jhones                    130

```
 1    BY MS. JHONES:

 2    Q.     I don't have anything to refresh your

 3    recollection with that, sir.  So if you don't remember,

 4    you don't remember.

 5           Does that help you remember what you spoke to

 6    Mr. Batiste about over the phone?

 7    A.      The question is?

 8    Q.     Sir, has that refreshed your recollection as to

 9    that phone call?

10    A.      Yes, ma'am.

11    Q.     I'm going to ask you some questions about it.

12    Okay?

13    A.      That's fine.

14    Q.     In that conversation, sir, is it fair to say that

15    Mr. Batiste is upset with you?  Correct?

16    A.      Yes, ma'am.

17    Q.     He's upset with you because you showed up

18    unannounced at the Embassy.  Correct?

19    A.      No, ma'am.  In this conversation, he told me --

20    Brother Naz -- on Page 6 -- he said, "But I gave you my

21    word that, when you would come, I would be here.  You

22    came."

23           So I was invited.  And this is what he said here

24    in this phone call on Page 6 on the top page.

25    Q.     Your testimony is that Mr. Batiste invited you to
```

```
 1   go to the warehouse -- to the Embassy on March 9th?  Is
 2   that your testimony?
 3   A.     That's what he said.  Yes, ma'am.
 4   Q.     And -- so you were invited to go to the Embassy,
 5   but then you just left.  Correct?
 6   A.     Like I said before, ma'am, was a situation.  And
 7   I had -- I was told from the brother in the Embassy, if
 8   I will go in, I will be strip-searched.
 9         I didn't want to take the risk.  I left.  I call
10   the FBI.  The FBI told me what to do, and I did what
11   they told me.
12   Q.     And, sir, Mr. Batiste told you on March 9th in
13   the phone call that this was a very difficult
14   situation; did he not, sir?
15   A.     Referring to what page, ma'am?
16   Q.     Referring to Page 4, sir, he --
17             MS. ARANGO:  Judge, I believe this is in
18   evidence.
19             MS. JHONES:  This is in evidence.
20             If the jury wants to follow along, it's
21   Government's Exhibit W1-01363.  And that would be the
22   Volume III binder.
23             THE COURT:  Say it again it, please.
24             MS. JHONES:  Sure.  W1-01363-T.
25             THE COURT:  What page?
```

Assaad - CROSS - By Ms. Jhones                    132

```
 1              MS. JHONES:  Page 4.

 2              Let me say it again.  W1-01363-T.  Page 4.

 3    BY MS. JHONES:

 4    Q.    Are you there, sir?

 5    A.    Yes, ma'am.

 6    Q.    Mr. Batiste tells you that the situation is

 7    difficult; does he not, sir?

 8    A.    Can you be more specific, ma'am.  Difficult?

 9    Q.    Middle of the page, where Mr. Batiste tells you,

10    "No.  I understand.  It's not your fault.  It's not my

11    fault.  It's not neither one of us fault.  But the

12    situation is difficult, and we have" -- do you see

13    that?

14    A.    Yes, ma'am.

15    Q.    And you tell Mr. Batiste that you are under

16    tremendous pressure; do you not, sir?

17    A.    What paragraph?

18    Q.    Right after -- right after the one I just read,

19    when you talk about your head, "My head today -- my

20    head today is working right with me today."

21          Do you see that, sir?

22    A.    The question is?

23    Q.    You were upset because this man is not returning

24    your phone calls.  He's not meeting with you and you

25    want to meet with him.  And that's what's going on on
```

```
 1    March 9th, sir.  You will not take "no" for an answer.

 2    That's what's going on in this conversation, sir.

 3    You're begging this man to meet with you.  Isn't that a

 4    fact, sir?

 5    A.    Let me correct you, ma'am, for what you saying,

 6    because -- no.  It's -- on Page 3 from the same -- the

 7    same one, Page 3, we already -- he said -- he mentioned

 8    Brother Naz on many occasions in this phone call, that

 9    we had established -- we had phone calls between each

10    other.  So at Page 3, he said, "Well, I told you I will

11    be here when you would come.  Right?"

12          At the bottom of the Page 3, he said, "Brother

13    Mohammed, please listen to me.  I told you that I would

14    be here when you would come and, when you came, I was

15    here, but you left.

16          So it's not -- we are not -- I'm not having

17    difficult to meet and I'm not begging him.  All I'm

18    telling him, "Please" -- you know, it was established

19    phone call, established communication.  We were talking

20    with each other.

21          I don't see where you are referring to, ma'am.

22    Q.    Sir, your testimony is that, in this

23    conversation, there is no problem.  There was a

24    miscommunication gap.

25          Is that what you're saying, sir?
```

1   A.   All what I'm saying, he was upset because -- and

2   was clearly in this conversation -- phone call, because

3   I left without seeing him.

4        I left.  And he even requesting, "If you want to

5   go eat, I will tell the brother to take you to have

6   dinner.  Where do you want to go?"

7        So it wasn't having problems that, "Why you are

8   not calling?  Why we don't have communication?"  He was

9   upset because I left the Embassy without seeing him or

10  talking to him, ma'am.

11  Q.   And that's why you tell him on Page 5, sir,

12  "Because I needed so bad to talk to you, brother.  I

13  needed so bad to talk to you, brother."

14       Correct, sir?

15  A.   What paragraph, ma'am?

16  Q.   Sixth paragraph.

17  A.   Yes, ma'am.

18  Q.   You tell him more than once, do you not, sir, "I

19  needed so bad to talk to you, brother."

20       You say that more than once; do you not, sir?

21  A.   Yes, ma'am.

22  Q.   Again, sir, you show up in that Embassy

23  unannounced because you would not take "no" for an

24  answer, sir?

25            MS. ARANGO:  Objection.  Asked and answered.

```
 1              THE COURT:  Sustained.
 2   BY MS. JHONES:
 3   Q.     And then you tell Mr. Batiste, sir, "I can't
 4   speak too much on the phone.  I can't speak too much on
 5   the phone.  Meet with me, brother"; do you not, sir?
 6   Do you see that, sir?  Page 6.
 7   A.     What page?
 8   Q.     Page 6.
 9   A.     Because I was in the taxicab, ma'am, and I don't
10   want to speak about specific thing on the phone when
11   there is a taxi driver driving.  So I was telling him,
12   you know, "I will come back.  We talk."
13   Q.     You tell him, "One last favor, Mr. Batiste.  One
14   last favor.  Meet with me, please."
15          You're begging him, sir, on Page 6.  You are
16   begging Mr. Batiste to meet with you.
17   A.     I don't see where you are referring, ma'am.
18   Q.     Middle of Page 6, sir.  "Last favor.  One last
19   favor."  You say it four times, sir.
20              MS. ARANGO:  Judge, is that a question?
21              THE COURT:  Sustained.
22              Rephrase your question.
23   BY MS. JHONES:
24   Q.     You are begging this man to meet with you, sir,
25   on March 9th of 2006?
```

```
 1              MS. ARANGO:  Objection.  Asked and answered.

 2              THE COURT:  Sustained.

 3              MS. JHONES:  He has not responded, your Honor.

 4              THE COURT:  Sustained.

 5   BY MS. JHONES:

 6   Q.    The next day, sir, you call Mr. Batiste again; do

 7   you not?

 8   A.    Yes, ma'am.

 9   Q.    And you tell Mr. Batiste that you need to meet

10   with him because you have to discuss something with

11   him; do you not, sir?

12   A.    Yes, ma'am.

13   Q.    And what you were going to discuss with him was

14   the plan that you and the FBI had come up with to give

15   Mr. Batiste a pledge to Al-Qaeda.

16         Isn't that true, sir?

17   A.    No, ma'am.  At all.

18   Q.    Your testimony, sir, is that you told Mr. Batiste

19   on March 9th that he was going to take an oath to

20   Al-Qaeda.

21         Is that your testimony, sir?

22   A.    That Brother Naz request on March 9th that he

23   want to create an alliance with Al-Qaeda.

24         And on March 10th, it was conversation between

25   Brother Naz and myself confirming that he requested
```

Assaad - CROSS - By Ms. Jhones                137

```
 1   alliance to be created with Al-Qaeda.
 2   Q.     Well, let's talk about March 10th.  Okay?
 3   A.     Yes, ma'am.
 4          THE COURT:  We're going to take a break.
 5          Do not discuss this case either amongst
 6   yourselves or with anyone else.  Have no contact
 7   whatsoever with anyone associated with the trial.  Do
 8   not read, listen or see anything touching on this
 9   matter in any way.
10          If anyone should try to talk to you about this
11   case, you should immediately instruct them to stop and
12   report it to my staff.
13          You may leave your notebooks and your binders
14   at your chairs.  Please be back in the jury room in ten
15   minutes.
16          (Whereupon, the jury exited the courtroom at
17   2:52 p.m. and the following proceedings were had:)
18          THE COURT:  We're in recess for ten.
19          (Thereupon a recess was taken, after which the
20   following proceedings were had:)
21          THE COURT:  We're back on United States of
22   America versus Narseal Batiste, et al., Case
23   No. 06-20373.
24          Counsel, state your appearances, please, for
25   the record.
```

1           MR. GREGORIE:  Richard Gregorie and Jacqueline

2      Arango on behalf of the United States, your Honor.

3           MS. JHONES:  Ana Jhones on behalf of Narseal

4      Batiste.

5           MR. LEVIN:  Albert Levin on behalf of Patrick

6      Abraham.

7           MR. CASUSO:  Lou Casuso on behalf of Burson

8      Augustin, who's present.

9           MR. CLARK:  Nathan Clark on behalf of

10     Rotschild Augustine, who's present.

11          MR. HOULIHAN:  Richard Houlihan with Naudimar

12     Herrera.

13          MR. VEREEN:  And Roderick Vereen on behalf of

14     Stanley Phanor, who's present.

15          THE COURT:  All Defendants are present.

16          How much longer do you have, Ms. Jhones?

17          MS. JHONES:  Your Honor, it's kind of hard to

18     tell.  Probably -- I'll probably be with him until the

19     end of the day.

20          THE COURT:  Let's bring in the jurors.

21          THE COURT SECURITY OFFICER:  Yes, your Honor.

22          (Whereupon, the jury entered the courtroom at

23     3:14 p.m. and the following proceedings were had:)

24          THE COURT:  You may be seated.

25          You are still under oath, sir.

```
 1              You may proceed, Ms. Jhones.

 2              MS. JHONES:  Thank you, your Honor.

 3    BY MS. JHONES:

 4    Q.     Mr. Assaad, on March 10th, you reach out for

 5    Mr. Batiste telephonically; do you not?

 6    A.     Yes, ma'am.

 7    Q.     And the purpose of you reaching out for him is to

 8    try and get him to meet with you again, sir.  Correct?

 9    A.     Not trying, ma'am.  We already established this

10    on March 9th, that we will meet on March 10.

11    Q.     And on March 9th, sir, that's the conversation

12    that we have previously learned was an unrecorded

13    conversation.  Correct?

14    A.     Yes, ma'am.

15    Q.     There comes a time when Mr. Batiste shows up, I

16    believe, somewhere close to your apartment in Miami

17    Beach.  Correct?

18    A.     Yes, ma'am.

19    Q.     And do you remember, sir, what time of day or

20    night it was that Mr. Batiste showed up at your place

21    in your area, Miami Beach?

22    A.     It was dark time.  It was dark.  So I don't know

23    what time exactly.

24    Q.     Would something help refresh your recollection,

25    sir?
```

1   A.     About the time?

2   Q.     Yes.

3   A.     Yes, ma'am.

4          MS. JHONES:  Your Honor, I'm going to hand the

5   witness Government's Exhibit 61-A.  I believe the

6   ladies and gentlemen of the jury may have that exhibit.

7          If you could retrieve it, we're going to spend

8   a little bit of time on it.

9          THE COURT:  What volume is it in?

10         MS. ARANGO:  I believe it's Volume II --

11  Volume III, Judge.

12         MS. JHONES:  May I approach the witness, your

13  Honor?

14         THE COURT:  I'm sorry?

15         MS. ARANGO:  Let's check, Judge.  I apologize.

16         MS. JHONES:  May I approach the witness?

17         THE COURT:  Yes.

18         MS. ARANGO:  It's Volume II, Judge.

19  BY MS. JHONES:

20  Q.     (Tenders document to the witness.)

21  A.     Yes, ma'am.

22         THE COURT:  What page?

23         MS. JHONES:  First page, your Honor.

24  BY MS. JHONES:

25  Q.     Sir, in looking at Government's Exhibit 61-A,

```
  1   does that refresh your recollection as to the time of

  2   the meeting?

  3   A.     Yes, ma'am.

  4   Q.     And what time was it, sir?

  5   A.     It was 9:20 p.m.

  6          MS. JHONES:  We're going to play a few clips,

  7   your Honor.  I'm going to ask the witness some

  8   questions.

  9   BY MS. JHONES:

 10   Q.     Directing your attention to Page 2 of the

 11   transcript --

 12          MS. JHONES:  Is everyone ready?

 13          Clip A, Eric, please.

 14          (Whereupon, segments of Government's Exhibit

 15   No. 61 were published in open court.)

 16   BY MS. JHONES:

 17   Q.     Sir, Mr. Batiste had just gotten off of work when

 18   he met with you at 9:20 p.m.  Correct?

 19   A.     Yes, ma'am.

 20   Q.     That's what he's referring to on that clip, sir?

 21   A.     Yes, ma'am.

 22   Q.     After that, sir, you and he discuss where it is

 23   that you're actually going to sit down and talk.

 24   Correct?

 25   A.     That's what he suggest.  Yes, ma'am.
```

```
 1   Q.    Let's go on to Clip B, directing your attention

 2   to Page 3 of the transcript.

 3            (Whereupon, segments of Government's Exhibit

 4   No. 61 were published in open court.)

 5   BY MS. JHONES:

 6   Q.    Do you remember that, sir?

 7   A.    Yes, ma'am.

 8   Q.    And this is right at the beginning of the

 9   conversation; is it not, sir?

10   A.    Yes, ma'am.

11   Q.    And what Mr. Batiste tells you, sir, when he

12   says, "We agree about the warehouse" -- what he's

13   talking about is your idea to provide him with a

14   warehouse.  Correct, sir?

15   A.    Yes, ma'am.

16   Q.    Because that was not his idea.  Just so we're

17   clear, that was your idea that you proposed on

18   January 28th of 2006.  Correct, sir?

19   A.    Yes, ma'am.

20   Q.    Okay.  So in that conversation, sir, Mr. Batiste

21   doesn't tell you that he discussed -- the only thing

22   that he mentions that was discussed was the proposal

23   about the warehouse.  Correct?

24   A.    The only?

25   Q.    That's what he says in that clip, sir, "We agree
```

```
 1    about the warehouse."  Correct?
 2    A.    But he didn't say "the only."  He said, "We agree
 3    about the warehouse."  But we spoke on March 9.
 4    Q.    Okay.  And he doesn't say, sir, that they agreed
 5    about anything else.  He says, "We agree about the
 6    warehouse."  Correct?
 7    A.    Because, on March 9, to make it clear, they
 8    didn't decide, maybe, yet on the warehouse.  But like I
 9    said, same page, No. 5, in the middle of the page,
10    saying -- confirming that -- what we spoke on March 9,
11    what we discussed, that we -- the agreement we have on
12    what we said on March 9.
13    Q.    Let's listen to the clip, sir.  Okay?
14    A.    Yes, ma'am.
15          MS. JHONES:  Eric --
16          MS. ARANGO:  Judge, I would object to
17    interrupting this witness.
18          THE COURT:  Let him finish his answer.
19          Go ahead, sir.
20    BY MS. JHONES:
21    Q.    Are you finished?
22    A.    No, ma'am.
23    Q.    Go ahead.
24    A.    On the Page 5, on the middle of the page, what
25    I -- I was speaking and I was, like, hoping that
```

```
 1   tonight we said -- we said, like, "We would have
 2   agreement with all the brother about, like we said,
 3   like we spoke yesterday, about the alliance," what
 4   we -- what -- March 9, when everybody was in the
 5   warehouse -- well, in the warehouse.
 6   Q.    Tell me, sir, where Mr. Batiste says, "We
 7   discussed it.  We agree about the alliance."  Tell me
 8   where he says that, sir.
 9   A.    It's saying the following -- okay.  So he didn't
10   say -- he didn't deny and say, No.  We didn't discuss
11   that.  No.  Hold on a second, something -- no.
12         He said, "Okay."
13         So we had an agreement.  We spoke about, like I
14   mentioned, "Like we spoke yesterday about the
15   alliance."
16         And he confirm it by saying, "Okay."
17   Q.    And, sir, after that -- then you switch over and
18   you start talking about a tradition.  Correct, sir?  A
19   tradition?
20   A.    Yes, ma'am.
21   Q.    Okay.
22         MS. JHONES:  Eric, let's go ahead and play
23   Clip C, please.
24         (Whereupon, segments of Government's Exhibit
25   No. 61 were published in open court.)
```

```
1              THE WITNESS:  Excuse me, ma'am.  What page?
2              MS. JHONES:  Page 5.
3              (Whereupon, segments of Government's Exhibit
4    No. 61 were published in open court.)
5    BY MS. JHONES:
6    Q.    Are you with me, sir?  Page 5.
7    A.    Yes, ma'am.
8    Q.    And turning over, sir, to Page 6 -- bottom of
9    Page 5 and top of Page 6, Mr. Batiste appears to have
10   absolutely no idea what you're talking about, sir.
11   Isn't that correct?
12   A.    No, ma'am.  Because if you go back to Page 5 --
13   Page 5, where I said -- I repeat, when I said, "Like we
14   spoke yesterday about the alliance" and he said, "Okay"
15   and I said, "Between Moors and" -- and he confirmed
16   Al-Qaeda.
17         So he's aware -- he's aware of what's going on
18   about what we spoke on March 9, about what he requested
19   about the alliance between the Moors and Al-Qaeda.
20         And he's confirmed by his own words, ma'am,
21   "Yes."
22         So -- and I was speaking about -- if you let me
23   finish -- that we have this -- what he requests is the
24   pledge of alliance.
25         I was explaining to him that we translated it
```

Assaad - CROSS - By Ms. Jhones                    146

```
 1   from Arabic to English.
 2   Q.    Well, sir, you don't tell him, "We have an
 3   alliance that we translate from Arabic to English."
 4         Now you're talking about a tradition, not an
 5   alliance.
 6         Now you're talking about a tradition, sir; are
 7   you not?
 8   A.    Ma'am, I was speaking about what he requested
 9   with -- about the alliance.  And this is what he said
10   and what he confirmed and what he's -- his own word,
11   what in his own mouth he spoke --
12   Q.    Okay.
13   A.    Can I finish, ma'am?
14   Q.    Oh, please.  Go right ahead, sir, please.
15   A.    -- the alliance between Moors and Al-Qaeda, what
16   he suggest -- what he spoke, what he said, here in the
17   Page 5.
18         So he knows that is on the March 9 and March 10
19   that was -- what's going on, the pledge.  He's aware of
20   and he knows about it.
21   Q.    And show me, sir, where on Page 5 and Page 6 of
22   the transcript it says, "Oh, yes.  That tradition that
23   we spoke about on March 9th, yes.  I'm ready for it,"
24   sir.  Show me where that says that on Page 5 and 6 of
25   the transcript or, indeed, in any part of this
```

```
 1   transcript.
 2   A.     Ma'am, it's clear here, when I was speaking, like
 3   we spoke yesterday about the alliance.
 4          He said, "Okay.
 5          "Between Moors and?"
 6          And he said, "Al-Qaeda."
 7          So it's -- we having the alliance between Moors
 8   and Al-Qaeda.
 9   Q.     And, sir, on Page 6 of the transcript, you say to
10   him, do you not, "Because you are the leader.  You are
11   the leader of the group.  So for -- would be the order
12   for you to be first"?
13          Correct?
14   A.     Yes, ma'am.
15   Q.     And in response to that, Mr. Batiste says what,
16   sir?
17   A.     He -- he's following me.  He's with me.  Uh-huh.
18   So he's listening.
19   Q.     Uh-huh.  Okay.
20          And then he asks you a question; does he not,
21   sir?
22   A.     Can you be specific, please.
23   Q.     Bottom of Page 6, sir, does he not ask you, "Is
24   this the same thing as this?"
25          He's pointing to something.  Correct?
```

1    A.     Yes, ma'am.  Maybe.

2    Q.     And he's asking you questions about it; is he

3    not, sir?

4    A.     About the pledge, I believe.  Yes, ma'am.

5    Q.     But this is the thing you've already discussed

6    previously, correct, and he was in total agreement

7    with?  Correct?

8    A.     Like I said before, ma'am, we had -- he requested

9    alliance -- to create an alliance with Al-Qaeda.

10          After the meeting on March 9, I told the FBI that

11   what happen during that meeting.

12          And the FBI provide me with the pledge.

13   Q.     And, sir, after that, continuing on on Page 7,

14   sir, you give him instructions as to what it is that he

15   has to do; do you not, sir?

16   A.     Not instructions, ma'am.  I was reading the

17   pledge for him to repeat it.  And that's it.

18   Q.     You say the words, "No.  You have to repeat

19   exactly"; do you not, sir?

20   A.     Yes, ma'am.

21   Q.     Top of Page 7.

22   A.     Yes, ma'am.

23   Q.     But this is the pledge that you've already

24   discussed with him on March 9th and you've already

25   reviewed all this with him; have you not, sir?

```
 1              MS. ARANGO:  Objection.  Asked and answered
 2    about three times.
 3              THE COURT:  Sustained.
 4    BY MS. JHONES:
 5    Q.    And, sir, you also -- on Page 8, Mr. Batiste
 6    responds.  And then again you correct him; do you not,
 7    sir?
 8    A.    Referring to what, ma'am?
 9    Q.    Top of Page 8.
10    A.    Referring to what question, ma'am?
11    Q.    Referring to the question, "To commit myself."
12    Mr. Batiste responds, does he not, sir, in the bottom
13    of Page 7 -- and you're reading from a document at this
14    point; are you not?
15    A.    Yes, ma'am.
16    Q.    And Mr. Batiste repeats your words and says, "To
17    commit myself"; does he not?
18    A.    Yes, ma'am.
19    Q.    And you tell him, "No.  No.  No.  You have to say
20    your name."  Correct?
21    A.    Yes, ma'am.
22    Q.    And you go down the list of things that are being
23    read from a document.  Correct?
24    A.    Yes, ma'am.
25    Q.    And is it your testimony, sir, that this was a
```

1    document that you showed to him on March 9th?

2    A.    Like I said before, ma'am, I didn't show him any

3    documents.  We discussed.  He discussed.  He told me on

4    March 9 that he want to create an alliance with

5    Al-Qaeda.

6        I took it -- the conversation -- when the FBI

7    briefed me after the meeting on March 9, I told them

8    what happened on March 9, that Brother Naz requesting

9    or -- he wants to have an alliance with Al-Qaeda, and

10   they gave me the pledge.

11       And Brother Naz took the oath.  And even he had

12   the freedom, ma'am, during that meeting on March 10 --

13   he chose what to say and what not to say and he

14   corrected and he had his way to take the pledge, by

15   correcting some stuff on the pledge.

16   Q.    Let's talk about that.

17       Directing your attention to Page 9, sir,

18   Mr. Batiste asks you a question, does he not, about

19   Al-Qaeda?

20   A.    Which one, ma'am?

21   Q.    Where Mr. Batiste says, "Now let me ask you this

22   part here.  That means Al-Qaeda will be over us"; does

23   he not, sir?

24   A.    He was asking me.  Yes, ma'am.

25   Q.    And you said, "No.  No.  No.  No.  It's just an

1   alliance."  Correct?

2   A.    Yes, ma'am.

3   Q.    And you explain to him, sir, do you not, what an

4   alliance is, as far as you understand it?  Do you not,

5   sir?

6   A.    Yes, ma'am.

7   Q.    And you tell him, do you not, sir, that an

8   alliance is a commitment?  Right?

9   A.    It's like commitment.  Yes, ma'am.

10  Q.    For each side to respect their own rules.  Right?

11  A.    Yes, ma'am.

12  Q.    And then you ask Mr. Batiste to say something.

13        And, again, you're reading from a piece of paper;

14  are you not, sir?

15  A.    Yes, ma'am.

16  Q.    And you ask him to say, "And to the directive of

17  Al-Qaeda"; do you not, sir?

18  A.    Yes, ma'am.

19  Q.    But Mr. Batiste doesn't want to say "directive to

20  Al-Qaeda," does he?

21  A.    He suggest if he can say "alliance."  Yes, ma'am.

22  Q.    And then you, sir, tell him, "alliance of the

23  directive"; do you not, sir?

24  A.    Excuse me?

25  Q.    Mr. Batiste is saying to you that he wants to say

1    "alliance."

2         And you tell him "alliance and directive"; do you

3    not, sir?

4    A.    This is what he suggest, Brother Naz, previously,

5    when he said, "Can I say an 'alliance' and 'to the

6    alliance of Al-Qaeda'?"

7         And he has choice to -- you know, to correct or

8    to say whatever he feel he want to say, because he

9    doesn't want -- he doesn't want -- want to create the

10   an alliance, but not to be controlled by Al-Qaeda.

11   Q.    By the way, sir, this is taking place inside a

12   car.  Right?

13   A.    Yes, ma'am.

14   Q.    You're stopped at a gas station?

15   A.    No, ma'am.

16   Q.    Where are you parked?

17   A.    We parked on the side of the street -- abandon --

18   not abandoned street.  It's like dark place, like --

19   where the meter is, but on the road, not on a gas

20   station.

21   Q.    And after that, sir, you tell him that now he is

22   officially one of them, meaning one of Al-Qaeda; do you

23   not, sir?  Top of Page 10.

24   A.    Yes, ma'am.

25   Q.    And after this oath is taken, sir, you tell

1    Mr. Batiste that, now that he's taken this oath, now

2    they have to do it with the brothers; do you not, sir?

3    A.    This what he suggest on March 9, ma'am.  They

4    will take the oath of Al-Qaeda.

5    Q.    Directing your attention to Page 13, sir, bottom

6    of Page 13 --

7    A.    I apologize.  Alliance with Al-Qaeda.

8    Q.    Are you with me?  Bottom of Page 13.

9    A.    Yes, ma'am.

10   Q.    It is you, sir, not Mr. Batiste, that says, "So

11   we want to speak -- we gonna speak to Brother Naz and

12   tomorrow -- when we sit tomorrow with the brothers."

13   Correct?

14   A.    Ma'am, same page, before this paragraph, he

15   mentioned, Brother Naz, "We will do it all together,

16   brother."

17   Q.    Sir, answer my question "yes" or "no" and then

18   you can explain.

19        Is it you that are saying to Mr. Batiste about

20   now the brothers are going to do this so-called oath?

21   Those are your words?  "Yes" or "no," sir?

22   A.    Ma'am, I'm --

23        MS. ARANGO:  Objection, Judge.

24   Mischaracterization or vague.  I don't know what she's

25   referring to.

1              THE COURT:  Sustained.

2              Rephrase your question.

3    BY MS. JHONES:

4    Q.     Bottom of Page 13, sir, second speaker up.

5              That is you speaking and it is you, sir -- that

6    is you speaking, first of all.  Correct?

7              MS. ARANGO:  Objection.  Improper question.

8    The transcript speaks for itself.

9              MS. JHONES:  Your Honor --

10             THE COURT:  Sustained.

11   BY MS. JHONES:

12   Q.     At no time, sir, does Mr. Batiste tell you in the

13   bottom of Page 13 or Page 14, "Yes.  Yes, Brother

14   Mohammed.  Like we discussed on March 9, yes, about

15   taking the oath with the brothers."

16             Nowhere in that transcript does Mr. Batiste say

17   that, does he, sir?

18   A.     Ma'am, it's speak -- saying here Brother Naz who

19   suggest we will do it all together, all the brothers.

20             And on the first -- in the first meeting of that

21   day, on March 10, we spoke.  We confirmed.  He

22   confirmed that -- what we spoke on March 9 about the

23   alliance with Al-Qaeda -- the Moors and Al-Qaeda.

24             I didn't bring it up.

25   Q.     Well, you do tell him to do -- you're going to do

1    it the very next day.  Right?  That's the agreement.

2    You're going to get together and go ahead and do it the

3    next day with the brothers.  Right?

4    A.    I didn't suggest that, ma'am.  I didn't -- I

5    don't tell him what to do.  We have the meeting on

6    March 9.  He suggest he wanted to have an alliance with

7    Al-Qaeda.

8    Q.    Look at the --

9    A.    I took his request and I gave it to the FBI.

10         He requested and he suggested he want to, you

11   know, have -- create alliance with his brother with

12   Al-Qaeda.

13   Q.    Look at the bottom of Page 13 and tell me who

14   mentions the word "tomorrow."

15   A.    I was suggesting -- I was talking to him, ma'am.

16   It's like -- because there is something connected to

17   the previous paragraphs, a conversation -- where I had

18   a conversation and somebody that was in the middle came

19   to the conversation.

20   Q.    You go on again later on in the conversation --

21   A.    I didn't -- I was reading.

22   Q.    You're not finished?

23   A.    No.

24   Q.    Go ahead, sir.

25   A.    I was suggesting, "When do you want to do it?

 1    The brothers.  Today?  Tomorrow?  When they want to do

 2    it?"

 3         And he said, "It nice if we do it when we get the

 4    warehouse."

 5         So Brother Naz has a choice, and he already make

 6    up his mind by saying over here, "It nice if we do it

 7    when we get the warehouse.

 8         So he was, again, in the position to decide where

 9    and when they want to take the oath to Al-Qaeda.

10    Q.   And, sir, after you talk about the timing of the

11    next meeting, sir, you agree -- or you ask Mr. Batiste

12    if you can meet the very next day.  Correct?  On Page

13    15.

14    A.   What paragraph, ma'am?

15    Q.   Top of the page, four lines down.  "Exactly.  So

16    tomorrow, what time do you want to finish from this

17    very important point?"

18         Do you see that, sir?

19    A.   Yes, ma'am.

20    Q.   And Mr. Batiste tells you that tomorrow is just

21    not going to work out, they're going to get off work

22    way too late; does he not, sir?

23    A.   Yes, ma'am.

24    Q.   "Tomorrow" meaning March 11th.  Correct?

25    A.   Yes, ma'am.

1    Q.    Nothing happens.  Right?

2    A.    No, ma'am.

3    Q.    And at the end of this conversation, sir, you

4    have -- when Mr. Batiste leaves, you pick up your phone

5    and you make a phone call; do you not?

6    A.    What page, ma'am?

7    Q.    Page 23.

8    A.    Yes, ma'am.

9    Q.    You're talking to the FBI; are you not, sir?

10   A.    I don't remember if it was the FBI or it was

11   personal phone call.  I don't know.  I don't remember.

12   Q.    Well, let me see.  I'm going to play something

13   for you.  Let me see if this refreshes your

14   recollection.

15          (Whereupon, segments of Government's Exhibit

16   No. 61 were published in open court.)

17   BY MS. JHONES:

18   Q.    Do you remember that, sir?

19   A.    It's my voice.  Yes, ma'am.

20   Q.    And where you say, "He already -- he already did

21   it" and then you laugh, do you remember that, sir?

22   Look at Page 23.

23   A.    Yes, ma'am.  It was me.  But I don't know if I

24   was speaking about -- what subject I was speaking

25   about.

1   Q.    When you say, "Okay.  I will bring it" -- do you

2   remember that, sir, in that conversation, "I will bring

3   it"?

4   A.    Yes, ma'am.

5   Q.    You're talking about the recording that you have

6   just completed with Mr. Batiste; are you not, sir?

7   A.    Maybe, yes.  I don't remember exactly what --

8   maybe it was personal.  Maybe it was the FBI.  I don't

9   remember exactly the phone call.

10  Q.    Sir, the taking of this pledge began at what

11  time?  You said it began at 9:20 p.m.; did you not?

12  A.    Yes, ma'am.

13  Q.    What time did it finish?

14  A.    9:20.

15  Q.    So this whole conversation took approximately a

16  few minutes.  Correct?

17  A.    A few minutes?  I don't know.

18  Q.    Well, directing your attention to Page 23 of the

19  transcript, those are your words, correct, where it

20  says, "Today is -- today is March 10, 2006"?

21  A.    Yes.  The time is 9:20 p.m., and starting is

22  9:20 p.m.  So the same time, same second.  I don't

23  know.

24  Q.    It was a very short meeting; was it not, sir?

25  A.    Ma'am, the time speak on the recording.  You

1    can -- maybe I made a mistake -- honest mistake between

2    the time, because it cannot start at 9:20 and it finish

3    at 9:20.  So maybe it was an hour, maybe less.  I don't

4    know.

5    Q.    Okay.  And so, after March 10th, sir, you do not

6    meet with Mr. Batiste again until March 15th.  Correct?

7    A.    Yes, ma'am.

8    Q.    Now, in between March 10th and March 15th, there

9    are phone calls that you make to Mr. Batiste; are there

10   not?

11   A.    Yes, ma'am.

12   Q.    Okay.  And on March 15th, that is the meeting

13   outside of the warehouse where there is a pole camera

14   installed on the outside.  Correct?

15   A.    Not only this warehouse.  We had several

16   warehouses we stop at.

17   Q.    Now, up to March 15th of 2006, sir, there have

18   been no trips to Chicago.  Correct?

19   A.    No, ma'am.

20   Q.    No trips to Louisiana?

21   A.    No, ma'am.

22   Q.    No trips to Alabama?

23   A.    No, ma'am.

24   Q.    No meeting with 5,000 soldiers?

25   A.    No, ma'am.

1   Q.    No videotaping of military training by the

2   brothers over here?

3   A.    No, ma'am.

4   Q.    No videotaping of any military training with

5   anybody anywhere in the United States.  Correct?

6   A.    No, ma'am.

7   Q.    So on March 15th, you tell us that Mr. Batiste

8   selected a warehouse.  Correct?

9   A.    Yes, ma'am.

10  Q.    And then, on March 16th, you give him the keys to

11  the warehouse; do you not?

12  A.    The one he -- the one we chose.  Yes, ma'am.

13  Q.    The one he chose.  Yes.  Okay.

14        And there was a lot of planning, was there not,

15  sir, that went on between yourself and the FBI on this

16  March 16th meeting?  Correct?

17  A.    Can you be specified -- specific, ma'am.

18  Q.    Sure.

19        The warehouse was equipped with audio and video

20  surveillance equipment?

21  A.    Yes, ma'am.

22  Q.    You were wearing a body wire yourself; were you

23  not, sir?

24  A.    Yes, ma'am.

25  Q.    By the way, sir, on March 16th of 2006, you were

1    waiting for Mr. Batiste at the warehouse location; were

2    you not?

3    A.     I believe so.  Yes, ma'am.

4    Q.     And before that, where was it that you -- where

5    were you before your arrival to the warehouse, sir?

6    A.     I don't remember, ma'am.

7    Q.     The meeting at the warehouse was late at night;

8    was it not?

9    A.     Yes, ma'am.

10   Q.     And do you remember the time?

11   A.     No, ma'am.

12          MS. JHONES:  Let's play Clip A, if we can.

13          I'm sorry, your Honor --

14          THE COURT:  What exhibit number?

15          MS. JHONES:  Yes.  It's Exhibit 69-B.

16          For the ladies and gentlemen of the jury, this

17   is a transcript in the third volume, the very thick

18   binder.  Again, it's 69-B.

19          I'm going to hand the witness a copy of the

20   transcript, if it I may, your Honor.

21          THE COURT:  Yes.

22          It's the synchronized -- it's the binder with

23   the synchronized recordings.  It should say

24   "Synchronized" on it.  It's probably the thickest one.

25          MS. JHONES:  There's also going to be a

```
 1   rolling transcript.

 2          May I approach the witness, your Honor?

 3          THE COURT:  Yes.

 4          MS. JHONES:  (Tenders document to the

 5   witness.)

 6          THE WITNESS:  Thank you.

 7          THE COURT:  What page?

 8          MS. JHONES:  This is going to be Page 2, your

 9   Honor.

10          THE WITNESS:  Yes, ma'am.

11          (Whereupon, segments of Government's Exhibit

12   No. 69 were published in open court.)

13   BY MS. JHONES:

14   Q.    Now, sir, that is you saying, "It's showtime"; is

15   it not, sir?

16   A.    Yes, ma'am.

17   Q.    Now, you testified earlier that it was not

18   possible to test your recording device.  You can't do

19   that.  Correct?

20   A.    Yes, ma'am.

21   Q.    Okay.

22          MS. JHONES:  Let's go on to Clip B.

23          One second, your Honor, if I may.

24          Same page, Page 2.

25          (Whereupon, segments of Government's Exhibit
```

1    No. 69 were published in open court.)

2    BY MS. JHONES:

3    Q.      What did you mean by "showtime," sir?

4    A.      Ma'am, that day, if I remember correctly, it was

5    too much pressure.  And I was nervous because I never

6    been -- not never -- but I was too nervous and I

7    believe that the agents were trying to make me just --

8    just relax.  Don't -- you know, in the night, in one

9    place, and nothing about it.

10   Q.      And during the course of what's going on there on

11   Page 2, you're testing your equipment, your body wire;

12   are you not, sir?

13   A.      I believe it was -- there is a video, also, about

14   me showing how -- what I was doing.  Maybe I was trying

15   to test the microphone the FBI had -- because I was

16   with them on the phone -- to see if they can -- what

17   distance they can hear in the warehouse.

18           So I was -- if there is here, I said "I will

19   speak like he speaks too low.  Let's see if you got

20   it."

21           So I was trying to see the distance in the

22   warehouse, where you can get the sound, how -- testing

23   the equipment in the warehouse, ma'am.

24   Q.      And --

25   A.      I was with them on the phone to see if they can

```
 1   hear it, yes or no.
 2   Q.    Okay.  And this is all going on before
 3   Mr. Batiste arrives to the warehouse.  Correct, sir?
 4   A.    Yes, ma'am.
 5   Q.    Eventually, Mr. Batiste does arrive to the
 6   warehouse.  Correct?
 7   A.    Arrive.  Yes, ma'am.
 8   Q.    You were waiting for him there; were you not?
 9   A.    Yes, ma'am.
10   Q.    And when Mr. Batiste arrives there, you have --
11   you engage in some small talk with Mr. Batiste about
12   how much money the warehouse costs and you were just
13   going to -- whatever it took, this was going to be for
14   him, because this is the one that he wanted or words to
15   that effect.  Correct, sir?
16   A.    Yes, ma'am.
17   Q.    Correct?
18   A.    Yes, ma'am.
19   Q.    Okay.
20        MS. JHONES:  Let's go on, Eric, to Clip C,
21   please.  And that's going to be at Page 35.
22        (Whereupon, segments of Government's Exhibit
23   No. 69 were published in open court.)
24        THE WITNESS:  Can you repeat, it please?
25   Because I was trying to find the page.  So I lost.
```

1    Please.

2              MS. JHONES:   Sure.   Page 35, sir.

3              (Whereupon, segments of Government's Exhibit

4    No. 69 were published in open court.)

5    BY MS. JHONES:

6    Q.    Remember that, sir?

7    A.    Yes, ma'am.

8    Q.    Okay.   And Mr. Batiste earlier on in the

9    conversation -- when you give him this warehouse, he's

10   talking to you about all the plans he has for this

11   place, redecorating it, remodeling it, putting in

12   carpeting, that sort of thing.   Right?

13   A.    Yes, ma'am.

14   Q.    He tells you he's going to do that after fixing

15   the other place up back in Liberty City.   Correct?

16   A.    The same page?

17   Q.    Same page, Page 35.

18   A.    Yes, ma'am.

19   Q.    And then, sir, on Page 37 of this transcript,

20   Mr. Batiste starts talking to you about the fact that

21   this is a warehouse and maybe he can make this into a

22   barracks.

23         Do you remember that, sir?

24   A.    Which paragraph, ma'am?

25   Q.    Top of Page 37.

1          Do you see that?

2     A.    Yes, ma'am.

3     Q.    And then, sir, you tell Mr. Batiste, do you not,

4     about, "Well, the brother from Europe could give you a

5     hand" or words to that effect; do you not, sir?

6     A.    Yes, ma'am.

7     Q.    By "the brother from Europe," sir, you're

8     referring to the explosives expert; are you not?

9     A.    Yes, ma'am.

10    Q.    And Mr. Batiste says, "Oh, that's good"; does he

11    not, sir?

12    A.    Yes, ma'am.

13    Q.    And you tell Mr. Batiste that it's his decision,

14    whenever he wants this guy, he's basically at

15    Mr. Batiste's disposal or words to that effect; do you

16    not, sir?

17    A.    I didn't understand what that mean.

18    Q.    I'm sorry?

19    A.    I didn't understand what you said, ma'am.

20    Q.    You tell Mr. Batiste that you have this man who's

21    ready, willing and able to help Mr. Batiste and all

22    that Mr. Batiste has to do is say the word?

23    A.    Yes, ma'am.

24    Q.    And then, sir --

25          MS. JHONES:  Well, actually, Eric, let's go on

```
 1   to the clip, Clip D.  This is at Page 41.  Hold on a
 2   second and let everyone get to the page, Page 41.
 3            (Whereupon, segments of Government's Exhibit
 4   No. 69 were published in open court.)
 5   BY MS. JHONES:
 6   Q.    Remember that, sir?
 7   A.    Yes, ma'am.
 8   Q.    Now, so we're clear on what's going on here,
 9   these brothers have already taken that oath.  Correct?
10   That was right at the beginning of this meeting.
11   A.    Yes, ma'am.
12   Q.    So it's after these guys show up and they take
13   this oath, sir, that you start to talk about the
14   pressure that you are under.  Correct?
15   A.    The job pressure.  Yes, ma'am.
16   Q.    Now, before you gave Mr. Batiste a warehouse --
17   right? --
18   A.    Yes, ma'am.
19   Q.    -- you never told Mr. Batiste about a message
20   from the Sheik and how much pressure you were under and
21   all of that stuff.  Correct?
22   A.    No, ma'am.
23   Q.    Before you gave Mr. Batiste the warehouse, you
24   just told Mr. Batiste, "I'm only here to assist.  He's
25   in control.  I'm only here to assist you, Mr. Batiste."
```

```
 1          Right?

 2   A.     Yes, ma'am.

 3   Q.     But now you gave him a warehouse.  Right?

 4   A.     That he wanted.  Yes, ma'am.

 5   Q.     That you suggested, sir.

 6   A.     Yes, ma'am.

 7   Q.     And now you tell Mr. Batiste -- after you've

 8   given him the keys to the warehouse, you tell him, "I'm

 9   under pressure.  I'm under pressure, Mr. Batiste.  I

10   need your help."

11          Right?

12   A.     Yes, ma'am.

13   Q.     So now you are no longer assisting him.  Now,

14   after you've given him the warehouse, he needs to

15   assist you.  Correct, sir?

16   A.     Let me be clear, ma'am, about your question.

17          And -- I believe after, you know, playing my

18   role, what the FBI told me to do, they took the oath.

19   They become from Al-Qaeda.

20          And this is something -- the role I'm playing,

21   what the FB -- like, normally, in real life or -- they

22   discuss, when they have the alliance between two

23   groups, they become more into discussions, secrets.

24          And the FBI told me to discuss several points

25   during this meeting.  And I brought them, like the FBI
```

Assaad - CROSS - By Ms. Jhones                    169

1    told me to do.

2    Q.    They told you to do it after you secured an oath,

3    not before.  Correct?

4    A.    Secure what?

5    Q.    They told you specifically, "You get that oath

6    first.  You get the oath first.  After you get the

7    oath, then start talking about the message from the

8    Sheik."

9          Those were your instructions.  Correct?

10   A.    I was told what -- I was doing what the FBI told

11   me to do.

12   Q.    And it was also your instructions to tell

13   Mr. Batiste only after you gave him the warehouse, "All

14   right.  Now tell him he has to give us something in

15   return."

16         Correct, sir?

17   A.    I wasn't telling him what he has to do.  I didn't

18   tell him "You have to do this" or "You have to do

19   that."

20   Q.    Okay, sir.

21         MS. JHONES:  Now, let's turn to Page 44,

22   please.

23         Eric, if you could play Clip E.

24         THE COURT:  Where does it start?

25         MS. JHONES:  Give me one minute, your Honor,

Assaad - CROSS - By Ms. Jhones                    170

```
 1    and I'll let the Court know.

 2    BY MS. JHONES:

 3    Q.     Towards the bottom, sir, where it says -- I'm

 4    sorry -- "'Cause yours is your master plan."

 5           (Whereupon, segments of Government's Exhibit

 6    No. 69 were published in open court.)

 7           THE COURT:  Can you stop for a minute.

 8           It started further up.

 9           MS. JHONES:  It did, your Honor.  My notes --

10           THE COURT:  It starts five speakers down.

11           Would you start it again, please.

12           MS. JHONES:  Thank you, your Honor.  I

13    apologize.

14           (Whereupon, segments of Government's Exhibit

15    No. 69 were published in open court.)

16    BY MS. JHONES:

17    Q.     Do you remember that, sir?

18    A.     Yes, ma'am.

19    Q.     And what Mr. Batiste is asking you there, sir --

20    first of all, this question that he poses of you has to

21    do with the request that you have made of him to take

22    photographs of the FBI building.  Correct?

23    A.     One more time.

24    Q.     You have already asked Mr. Batiste to take

25    photographs of the FBI building at this point in the
```

```
 1   conversation; have you not?
 2   A.     I need to check.  One second, please.
 3          I don't believe I asked him already, ma'am.  I
 4   asked him maybe later on in the conversation.
 5   Q.     Look at Page 42, sir.  See if that refreshes your
 6   recollection.
 7   A.     But I didn't ask him yet, ma'am, to tape -- tape
 8   the -- take pictures of the building.
 9   Q.     You've told him about the plan to take down five
10   FBI buildings; have you not?  You've already mentioned
11   that?
12   A.     Yes, ma'am.
13   Q.     Now, again, sir, you have never, prior to
14   March 16th, told Mr. Batiste about any plan that
15   Al-Qaeda or you personally or anybody associated with
16   you was going to undertake.  This is the very first
17   time you mention that to Mr. Batiste.  Correct?
18   A.     Yes, ma'am.
19   Q.     And, again, prior to this time, you were just
20   here to assist.  Right?
21   A.     Ma'am, I was playing my role.  And I'm not the
22   one who called the shots.  The FBI tell me to do
23   something.  All the time, in all the meetings, I been
24   following what the FBI telling me:  Do this and do
25   that.  All the meetings.
```

Assaad - CROSS - By Ms. Jhones                    172

1          So if I didn't bring it before, not because -- or

2    I bring it now, not because I want to.  The FBI told me

3    to speak about this.  And I did.

4    Q.     On March 16th?

5    A.     Yes, ma'am.

6    Q.     Okay.  And on Page 44, in the clip that we just

7    saw, sir, Mr. Batiste, when he says, "Whatever plan

8    you're doing, it's gonna be difficult for us to move on

9    our plan," you assure Mr. Batiste, do you not, that

10   nothing is going to happen with this Al-Qaeda plan

11   until he does his Chicago plan?  His Chicago plan goes

12   first.  Correct?  That's what's going on there on

13   Page 44, sir?

14   A.     I was clear that it would not affect his plans.

15   I was trying to tell him, "It will not affect your

16   plan.  Yours go first, because you are the main -- you

17   have the biggest plan.

18   Q.     But you also tell him -- besides that it will not

19   affect his plan, you also tell him, "We will not do it

20   before your plan"?

21   A.     Yes, ma'am.

22   Q.     Okay.  And, sir, after that conversation, then

23   you provide Mr. Batiste with a gift; do you not, sir?

24   A.     Not the a gift, ma'am.  He requested previously;

25   and I gave it to him.

Assaad - CROSS - By Ms. Jhones                          173

```
 1    Q.    We're talking about a videocamera; are we not,

 2    sir?

 3    A.    Yes, ma'am.

 4    Q.    Now, the phone camera that he requested had been

 5    on February 19th.  Correct?

 6    A.    He didn't request -- we were -- in February 19,

 7    we were speaking, ma'am.

 8          And I suggested, like, "We don't need

 9    surveillance camera, telephone -- videocamera,

10    whatever?"

11          And he said, "Yes.  And we need telephone

12    camera."

13          And he said after that, "Not videocamera?"

14          And I said, "Would be better.  Videocamera would

15    be better."

16    Q.    "We" did not say that, sir.  You said that.

17    Correct?  Could -- it was you that said "videocamera."

18    No?  That was you, not Mr. Batiste.

19    A.    We were suggesting in the conversation, ma'am,

20    like I said, on February 19th.  And I said what he --

21    he requested the plan to go to Chicago and make the

22    surveillance.

23          And I said, "What we need?  We need videocamera?

24    What we need to do the surveillance over there?"

25          He's the one.  He brought, "Let's go there and
```

1    show you and do the surveillance on the Sears Towers."

2          Then when I suggest to him, "What do we need for

3    the surveillance?  You need cameras?  We need -- what

4    we need?"

5          So it's upon what -- having the conversation and

6    what he was requesting for.

7    Q.    Almost an entire month went by and you did not

8    provide him with a phone camera or a videocamera until

9    March 16th.  Correct, sir?

10   A.    Yes, ma'am.

11   Q.    And between February 19th and March 16th, before

12   you gave him the keys to the warehouse, you could have

13   given him -- the FBI could have given him a phone

14   camera, a videocamera, so he could go up there to

15   Chicago and film his evidence.  Right?  Right?

16   A.    I don't know, ma'am.

17   Q.    Well, your role, sir, as you have told us as

18   early as December 16th, is to see what his intent is,

19   to see what he wants to do.  Right?

20   A.    Yes, ma'am.

21   Q.    Okay.  When you hand him this camera, sir, on

22   March 16th, you say to Mr. Batiste, "I accomplish all

23   my promises to you, don't I, Mr. Batiste?" or words to

24   that effect.  Right?

25   A.    Yes, ma'am.

Assaad - CROSS - By Ms. Jhones                    175

```
 1    Q.    And when you say to Mr. Batiste that you

 2    accomplish all of your promises, Mr. Batiste responds

 3    to your comment; does he not, sir?

 4    A.    What page, ma'am?

 5    Q.    Bottom of Page 46 and top of Page 47.

 6    A.    Yes, ma'am.

 7    Q.    What does he tell you, sir?

 8    A.    "You are getting there."

 9    Q.    Meaning you're not quite there, yet.  Right?

10    A.    Yes, ma'am.

11    Q.    What he's talking about, sir, is the money.

12    Correct, sir?

13    A.    What page, ma'am?

14    Q.    I'm asking you right now your understanding of

15    what he's talking about right there when he's saying,

16    "You're getting there."

17    A.    The question is?

18    Q.    What is your understanding, sir, about what he's

19    referring to when he's telling you, "Well, you're

20    getting there"?

21    A.    I don't know, ma'am.  He was speaking about

22    something not specific.

23    Q.    Well, he didn't refer to any money in this whole

24    conversation, sir, did he?

25    A.    I don't know.
```

Assaad - CROSS - By Ms. Jhones                    176

```
 1   Q.     Well, let's go through it.
 2          After you give him the camera, Mr. Batiste tells
 3   you what the next step is going to be as far as he is
 4   concerned, what the next step is going to be; does he
 5   not, sir?
 6   A.     What paragraph, ma'am?
 7   Q.     Look at Page 49, five speakers up.
 8   A.     The question is?
 9   Q.     He tells you what the next step is; does he not,
10   sir?
11   A.     He ask me.  Yes, ma'am.
12   Q.     No.  He doesn't ask you.
13          He tells you, sir; does he not?
14   A.     Yeah.  He speaking about the computers and the
15   stuff at the warehouse.
16   Q.     As far as Mr. Batiste is concerned, that's what
17   he's going to do at the warehouse, fill it up with
18   computers, fix the place up.  Right?
19   A.     No, ma'am.
20   Q.     Does he or does he not say, sir, on Page 49 that
21   that is the next step?
22          MS. ARANGO:  Objection.  Asked and answered.
23          THE COURT:  Sustained.
24   BY MS. JHONES:
25   Q.     Do you offer to provide him with computers, sir?
```

1    A.     We had conversation about computers and -- yes,

2    ma'am.

3    Q.     You said you are -- you offer to provide him

4    computers; do you not?

5    A.     Yes, ma'am.

6    Q.     You talk about the furniture that you have

7    purchased for him in the warehouse; do you not, sir?

8    A.     Yes, ma'am.

9    Q.     Then Mr. Batiste continues to talk to you about

10   his plans for that warehouse; does he not, sir?  Bottom

11   of Page 50.

12   A.     The question is, ma'am?

13   Q.     He tells you about the plans he has for the

14   warehouse, the type of business he's going to be

15   conducting out of that warehouse, sir.

16   A.     By creating connection with Al-Qaeda and re --

17   re -- supporting and expecting support from Al-Qaeda

18   and connection -- using Al-Qaeda for his connections.

19         Like he said the same paragraph, "And -- but,

20   really, we are making the connect -- the kind of

21   connections that we will really up the kind of support

22   that we need to get.  And I'm sure by you being

23   Al-Qaeda, you already have communication."

24         So he's asking Al-Qaeda for his communication --

25   to get communication, support from terrorist

1    organizations.  Same paragraph, ma'am.

2    Q.    He's talking about doing international business

3    with places like Mexico and Cuba, sir.  Isn't that what

4    he talks about right at the beginning of that

5    paragraph?  "International business with Mexico and

6    Cuba and perhaps other countries."  Right?

7    A.    Asking Al-Qaeda, ma'am.  It's clear.  The

8    paragraph is clear that he's asking Al-Qaeda that --

9    he's asking me, "You are Al-Qaeda.  You have

10   communication guys.  We need the communication.  Help

11   us out."

12   Q.    He also talks to you about his need to get some

13   construction permits; does he not, sir?

14   A.    What paragraph, ma'am?

15   Q.    The top of Page 51, sir.

16   A.    Yes, ma'am.

17   Q.    And he tells you he really can't get those

18   contracts -- those construction contacts unless he has

19   money.  Correct?

20   A.    One second.

21         Financial stability.  Yes, ma'am.

22   Q.    And he continues to talk to you about financial

23   stability in the next few pages; does he not, sir?

24   A.    Referring to specific paragraph, ma'am?

25   Q.    Yes.

1        We're going to play a clip for you.  Okay?  Go on

2   to Page 54.

3          MS. JHONES:  Eric, if you could help me with

4   Clip F, please.

5          THE COURT:  Where on the page?

6          MS. JHONES:  That's going to be at -- three

7   speakers up from the bottom, where it starts, "Okay.

8   Let me ask you something, brother."

9          May we proceed, your Honor?

10         THE COURT:  Yes.

11         MS. JHONES:  Thank you.

12         (Whereupon, segments of Government's Exhibit

13  No. 69 were published in open court.)

14  BY MS. JHONES:

15  Q.    Do you remember that part, sir?

16  A.    Now.  Yes, ma'am.

17  Q.    And what you're telling Mr. Batiste there, sir,

18  is, "Al-Qaeda is not saying 'no' to the money."  Right?

19  "We're not disagreeing with the money."  Correct?

20  That's what you told Mr. Batiste right there.

21  "Al-Qaeda is not saying 'no.'"  Right?

22  A.    Yes, ma'am.

23  Q.    And then you make a distinction.  You make a

24  distinction, do you not, sir, between you and Al-Qaeda?

25  You are one thing.  Al-Qaeda is another.  Right?

1   A.    What paragraph, ma'am?

2   Q.    Same paragraph, bottom of Page 54.

3   A.    And the question is?

4   Q.    You are making a distinction for Mr. Batiste and

5   you're saying, "It's not me.  It's not me that's saying

6   'no.'  It's not me.  It's Al-Qaeda.  And Al-Qaeda is

7   not saying 'no.'"

8         But you're making the distinction between you and

9   Al-Qaeda; are you not, sir?

10  A.    No, ma'am.

11  Q.    Okay.

12  A.    Because what I'm saying is the decision is not in

13  my hand.  In Al-Qaeda hand.

14  Q.    "And Al-Qaeda is not saying 'no.'"  Correct?

15  A.    And not saying "no" and not saying "yes."

16  Q.    Well, you didn't say that here, did you?  You did

17  not say, "I'm not saying 'no' and I'm not saying

18  'yes.'"  That's not what you said there, sir.

19  A.    No, ma'am.

20  Q.    Okay.

21  A.    I'm not very good in English.

22  Q.    Let's go on to the next clip, which starts at

23  Page 55.

24        THE COURT:  Where on 55?

25        MS. JHONES:  Give me one second.  It starts

```
 1   at -- right at the top, where it says, "We are saying
 2   okay."
 3           THE COURT:  Okay.
 4           MS. JHONES:  Thank you, your Honor.
 5           (Whereupon, segments of Government's Exhibit
 6   No. 69 were published in open court.)
 7   BY MS. JHONES:
 8   Q.    Do you remember that conversation, sir, that part
 9   of the conversation?
10   A.    Yes, ma'am.
11   Q.    You have previously told us that, "We never
12   promised Mr. Batiste any money."  Right?
13   A.    Yes, ma'am.
14   Q.    And that you were just doing what the FBI told
15   you to do.  Right?
16   A.    Yes, ma'am.
17   Q.    And in this conversation, sir, you are telling
18   Mr. Batiste, "We, Al-Qaeda, are faster than the
19   Internet."  Right?
20   A.    Yes, ma'am.
21   Q.    And you're telling him that, "You give us
22   something.  You give us something.  You give us a plan.
23   We're gonna give you the money."
24        That is what you are telling him very clearly in
25   that part of the conversation; are you not, sir?
```

```
 1    A.    Well -- where I was saying that, ma'am, clearly,

 2    that I told him, "I will give you money" for sure?

 3    Q.    Tell me, sir, whether or not in that clip that

 4    was just played -- whether or not you did or did not

 5    clearly tell Mr. Batiste, "The money is coming if you

 6    give me a plan."  "Yes" or "no"?  Is that the message

 7    that you were trying to convey in that portion of the

 8    conversation, sir?

 9    A.    You are asking me the meaning of the

10    conversation?

11    Q.    Yes, sir.

12    A.    What's the meaning?

13    Q.    No.

14          I'm asking you if that was -- I'm telling you

15    what I believe to be the message that you were

16    conveying to Mr. Batiste.  "How fast we are, we're

17    faster than the Internet.  Give me the plan."

18          Is it or is it not the message you were trying to

19    convey?  "Yes" or "no"?

20    A.    No, ma'am.

21    Q.    Okay.  Mr. Batiste accuses you in that portion of

22    the conversation of delay; does he not, sir?

23    A.    He's asking why we are delaying.

24          Like I said in this conversation you already

25    played, ma'am, it's his plans and he's requesting
```

 1    support from Al-Qaeda in every different subject:

 2    Money to purchase, to proceed, to be faster in his

 3    plans from Al-Qaeda and, clearly, here is speaking

 4    about the plan in Chicago and supporting -- get support

 5    from Al-Qaeda.

 6         And I was explaining to Brother Naz the details

 7    and how Al-Qaeda work.

 8    Q.    Are you finished?

 9    A.    Yes, ma'am.

10    Q.    Look at Page 56.

11         Mr. Batiste tells you that he thinks that you are

12    delaying; does he not, sir?  Those are the words that

13    he uses.  Right?

14    A.    Yes, ma'am.

15    Q.    And you say, "No.  At what point are we

16    delaying?"  Right?  You ask him; do you not, sir?

17    A.    Yes, ma'am.

18    Q.    And he tells you specifically, "Because what I

19    told you from the very beginning.  I didn't get the

20    money that I requested."

21         That's what he tells you right there on the

22    bottom of Page 56, sir; does he not?

23    A.    Yes, ma'am.

24    Q.    And he tells you that he's been telling you that

25    from the very beginning; does he not, sir?

```
 1   A.      From the beginning is the question?

 2   Q.      Yes.

 3           "I have requested from the very beginning."

 4   Those are Mr. Batiste's words.

 5   A.      Yes, ma'am.

 6   Q.      And would you agree with me, sir, that

 7   Mr. Batiste is being very clear in his intent right

 8   there?  Isn't he, sir?

 9   A.      Intent?

10   Q.      Yes.

11           He's being very clear with what that man wants,

12   very clear; is he not, sir?

13   A.      Are you asking my opinion?

14   Q.      Yes, sir.

15           Is he being clear?  Is he being clear to you?  Is

16   he conveying the message to you there, sir?

17   A.      You are asking my opinion?

18   Q.      I'm asking you a very simple question:  Is he

19   conveying a clear message to you?  "Yes" or "no," sir?

20   If it's not clear to you, just say it isn't clear.

21   That's fine.  Is it clear?  "Yes" or "no"?

22   A.      He requested the money, ma'am, to purchase the --

23   he mentioned very clear in that meeting on January 28th

24   that he needed money to purchase the artillery,

25   equipment, boots, all the -- what he put on the -- on
```

1    the list.

2    Q.     On the very next page, sir, on Page 57,

3    Mr. Batiste tells you that he does not need your

4    assistance with an explosives expert; does he not, sir?

5    A.     What paragraph, ma'am?

6    Q.     The last paragraph on Page 57.

7    A.     On the bottom or the middle of the paragraph?

8    I'll try to --

9    Q.     It's in the middle, where it says, "I'm still --

10   you know, if I cannot find somebody who's gonna help me

11   with the explosives."

12          Do you see where I'm reading, sir?

13   A.     Yes, ma'am.

14          The question is, ma'am?

15   Q.     He tells you he doesn't need your help with the

16   explosives expert.  He has his own.  Right?

17   A.     No, ma'am.

18   Q.     Sir --

19   A.     Because -- because in this paragraph you mention,

20   ma'am, when he said, "Who's gonna help me with the

21   explosives, along with that other staff that we talked

22   about, the expertise like that, I will have to come to

23   your directions because I don't have the person" -- so

24   that is clearly explained in his own words that,

25   "Sooner or later, when I need the expert in explosive,

 1   will come to your direction, to Al-Qaeda direction.  I

 2   don't have the person."

 3   Q.     Are you finished?

 4   A.     Yes, ma'am.

 5   Q.     Are you finished?

 6          Look at the sentence right before what you just

 7   read, sir.

 8          "If I cannot find somebody who's going to help me

 9   with the explosives, along with the other stuff that we

10   talked about, the expertise like that, I'll have to

11   come to your directions."

12          And then he says, "But I do have somebody.  I do

13   have somebody.  I don't need you.  Thank you very

14   much."

15          Isn't that what he's telling you, sir, there very

16   clearly?  "I do have somebody"?

17   A.     That's what he said.  Yes, ma'am.

18   Q.     Okay.  And then, sir, let me direct your

19   attention to Page 58.  And, sir, now we're into -- by

20   the way, how many pages is this transcript?

21   A.     I need to check.  One second.

22          108.

23   Q.     And -- I'm sorry?

24          108 did you say?

25   A.     108, 109.

1   Q.     Now, we're up to Page 59.  Correct?

2   A.     Yes, ma'am.

3   Q.     And you guys are basically going around in

4   circles over here; are you not?

5          "Give me the money.

6          "I don't have the money.

7          "We'll give you the money.

8          "I don't have the money."

9          You're basically going around in circles at this

10  point in time in the conversation; are you not?

11         MS. ARANGO:  Objection.  Compound question and

12  vague.

13         THE COURT:  Sustained.

14         Rephrase your question.

15  BY MS. JHONES:

16  Q.     You're discussing -- you're basically discussing

17  what you and he do not agree about when it comes to the

18  money; are you not, sir?

19  A.     Yes, ma'am.

20  Q.     Okay.  Now, this is the point in time, sir, where

21  you then now begin to talk about you, Brother Mohammed,

22  personally, versus Al-Qaeda.  Right?

23  A.     I didn't understand your question, ma'am.

24  Q.     Well, let me see if I can help you.

25         On Page 59 of the transcript, you tell

```
 1   Mr. Batiste, "Mr. Batiste, you know, I'm speaking
 2   about -- what I'm speaking to you right now -- I'm
 3   speaking to you not from my person, but I'm speaking
 4   now from Al-Qaeda."  Right?  Do you see that in the
 5   bottom of -- five speakers up?
 6   A.    Yes, ma'am.
 7   Q.    And you start to make a distinction, a
 8   difference, sir, between when you, Brother Mohammed, is
 9   saying something and when Al-Qaeda is saying something.
10   Correct, sir?
11   A.    No, ma'am.  I'm -- I still represent Al-Qaeda.
12   But what I was trying to say here in this conversation
13   is, like, when you ask question and -- about your job
14   or about your bosses, you deliver the company or the
15   organization idea different what you -- different,
16   like -- but you represent this company, this
17   organization.
18          This was what I was trying to say to Brother Naz,
19   that Al-Qaeda's saying this, Al-Qaeda doing that.
20   Q.    Okay.  Let's go on to --
21          MS. JHONES:  Eric, if we can, go to the next
22   clip, Clip H.  Give me a second so I can tell the Court
23   the page.
24          The clip is at Page 59 at the bottom, where it
25   says, "So I will tell you, brother."  Clip H.
```

1              (Whereupon, segments of Government's Exhibit

2      No. 69 were published in open court.)

3      BY MS. JHONES:

4      Q.    Let me ask you a couple of questions about that

5      clip, sir.

6              When you say to Mr. Batiste, "Because if -- the

7      money is the issue, and I told you before when I visit

8      the Embassy."

9              Are you with me, bottom of Page 59?

10     A.    Yes, ma'am.

11     Q.    What you are referring to, sir, is the

12     conversation that you had with Mr. Batiste on

13     March 9th, that unrecorded conversation; is it not,

14     sir?

15     A.    Can you ask me again, ma'am.

16     Q.    Sure.

17             In the bottom of Page 59, top of Page 60, when

18     you say, "Because the money is not the issue" --

19     actually, let me quote you correctly -- "Because if the

20     money is the issue -- and I told you before when I

21     visit the Embassy" -- right? -- "it's not about the

22     50,000.  It's not about the 100.  It's not about half a

23     million.  That amount doesn't shake us."

24             When you refer back to the visit at the Embassy,

25     you're talking about the visit -- the unrecorded

1    conversation of March 9th of 2006; are you not, sir?

2    A.    I don't know, ma'am, because when I requested

3    from you if there is something to refresh my memory,

4    you said you don't have.  So I cannot confirm this

5    referring to March 9 or not.

6          And here -- specifically here, it's not about the

7    money because Brother Naz said on Page 57 -- in the

8    same paragraph you showed me, ma'am, on Page 57, "The

9    money is not the issue.  I got the means of getting the

10   money.  I got it in my hand.  I got a jobsite.  I got

11   two jobs that's gonna give me the money in two months."

12         And he continue.

13         And he confirm, also, at Page 60 -- he also

14   repeated again in the middle of the page -- he said --

15   at the top page, he said, "It shouldn't, because let me

16   say this.  I got friends right now in Chicago that got

17   that money in their pocket.  You see?  They are, you

18   see -- I haven't even talked to any."

19         So it's not about the money, how you are

20   referring, ma'am.  He has already access and he's not

21   fighting with Al-Qaeda or having problem with Al-Qaeda

22   because of the money.  He's requesting support for his

23   mission to proceed in Chicago plan.

24   Q.    Sir, you know that, when Mr. Batiste was telling

25   you that he's got the money in Chicago, he's got the

1    money all over the place -- you know he wasn't telling

2    you the truth there, sir.

3         You know that?

4    A.    I don't know, ma'am.

5    Q.    He told you on December 16th, 2005, your very

6    first meeting, "I am financially exhausted."

7         He told you that in the very first meeting, sir;

8    did he not?

9    A.    He was telling -- yes, ma'am.  He told me --

10   Q.    He told you in another conversation --

11        MS. ARANGO:  Objection to interrupting the

12   witness.

13        THE COURT:  Let him finish his answer.

14   BY MS. JHONES:

15   Q.    Are you done?

16   A.    Go ahead, ma'am.

17        THE COURT:  Ma'am, let him finish his answer.

18        THE WITNESS:  Ma'am, he said that, and he said

19   also that he has access.  He has access to -- to get

20   the money from Chicago.  But he was asking -- like he

21   said on Page 60, he requested -- "I haven't even talked

22   to any yet."

23        So it's like he didn't approach.  He

24   approached Al-Qaeda to help him to proceed to speed the

25   plan he had financially, training, equipment,

```
 1    everything he want to get from Al-Qaeda to support him
 2    in any -- in all different ways.
 3    BY MS. JHONES:
 4    Q.    Remember the conversation in the Government's
 5    exhibit December 28th where you told you, "Money is
 6    slow for me.  The construction business is slow for
 7    me"?  Do you remember that conversation, sir?
 8    A.    December 28?
 9    Q.    Yes.
10          Do you remember that, when he said, "Business is
11    slow.  Money is slow for me right now"?  Remember that?
12    A.    You're referring to the phone call?
13    Q.    Yes.
14    A.    I don't remember the details of the phone call.
15    Q.    Okay.  You knew, sir, that this man was
16    absolutely broke, didn't you, sir?
17    A.    For me, ma'am, I'm not -- for me to say if
18    I know, I don't know.  It's up to the FBI.  They know,
19    the FBI.
20          My job is to transport what's going on in the
21    meeting, what's going on, what the FBI will tell me to
22    do, what to say, how to act.  And that's it.
23    Q.    You were in the Embassy, sir; were you not?  You
24    were in the Liberty City location, weren't you?
25    A.    Yes, ma'am.
```

Assaad - CROSS - By Ms. Jhones                193

```
 1   Q.    They didn't even have electricity, sir.
 2         You knew that?
 3   A.    I don't know that, ma'am.
 4   Q.    They didn't even have running water.
 5         You knew that?
 6   A.    I don't know, ma'am.
 7   Q.    Tell me about all the expensive restaurants that
 8   Mr. Batiste took you to so you could discuss this
 9   Al-Qaeda plan.  Tell me about all the expensive
10   restaurants that he would invite you to, sir.
11   A.    I don't think we discussed any Al-Qaeda plan in
12   any restaurants.
13   Q.    Tell me about the furnishings that were in the
14   Embassy, sir.  Tell me about the furnishings.
15   A.    I don't remember exactly the furnishing over
16   there.  You mean the couch?
17   Q.    Did you see a couch in the Embassy, sir?
18   A.    I don't remember.
19   Q.    Remember on December 22nd that two-and-a-half,
20   three-hour conversation where Mr. Batiste showed you
21   where he would sleep on the floor and he told you,
22   "That's where I sleep, over there on the floor"?
23   Remember that conversation on December 22nd?
24   A.    I remember he showed me a room where there is a
25   bed and he said some of his brothers sleep here.  They
```

1    are for like guards.  They protecting the place,

2    something like that.  They sleep here.  Something like

3    that I remember, if I'm not wrong.

4    Q.    And he pointed you to the bed; did he not?

5    A.    Yeah.

6    Q.    There was no mattress, sir.  It was -- it was a

7    little cushion on the floor; was it not, sir?

8    A.    Cushion or mattress.  I don't know what the

9    difference is between both.  But I know there is

10   something to sleep.  It was a bed.  And he mentioned

11   about the brothers -- one of the brothers, they are

12   guarding the place, the Embassy, sleeping here.

13   Q.    Let's go on, sir.

14            MS. JHONES:  Eric, Clip I.

15            And this is going to start at Page 69.  It

16   begins where it says, "I'm not denying support

17   financially."

18            (Whereupon, segments of Government's Exhibit

19   No. 69 were published in open court.)

20   BY MS. JHONES:

21   Q.    We're now on Page 69 of the transcript, sir.

22   Right?

23   A.    Yes, ma'am.

24   Q.    And you're still arguing.  You're still arguing,

25   discussing, with Mr. Batiste the money.  Right?

Assaad - CROSS - By Ms. Jhones                    195

```
 1   A.     We are discussing.

 2   Q.     And you are not denying the financial support.

 3          Those are the words that you utilize.  Correct?

 4   A.     Yes, ma'am.

 5   Q.     Now, Mr. Batiste doesn't tell you, "Brother

 6   Mohammed, please give me my weapons.  Give me all of

 7   those machine guns.  Give me all of those items in

 8   those three separate lists, because I really want to

 9   destroy the United States of America.  I want to launch

10   that full ground war.  Please, Brother Mohammed, don't

11   delay any more.  Give me all those items that I've been

12   asking for you -- from you for months."

13          He doesn't say that on March 16th?

14             MS. ARANGO:  Objection to the speech, Judge.

15   If she wants to ask a question, ask a question.

16             THE COURT:  Sustained.

17   BY MS. JHONES:

18   Q.     The only thing he asks you for on March 16th is

19   money.  Correct, sir?

20   A.     No, ma'am.  And the meeting speak by itself.  He

21   spoke about his plan in Chicago.  He spoke about a lot

22   of stuff where -- connection he had, supporting

23   Al-Qaeda, joining Al-Qaeda, asking Al-Qaeda for support

24   financially and all kind of support he's looking from

25   Al-Qaeda.
```

1        So there is a lot of discussion or requesting

2   help from Al-Qaeda in this meeting, ma'am.

3           THE COURT:  We're going to end here for the

4   day.

5           Do not discuss this case either amongst

6   yourselves or with anyone else.  Have no contact

7   whatsoever with anyone associated with the trial.  Do

8   not read, listen or see anything touching on this

9   matter in any way.

10          If anyone should try to talk to you about this

11  case, you should immediately instruct them to stop and

12  report it to my staff.

13          You may leave your binders at your chairs.

14  Please give your notebooks to the court security

15  officer.

16          I will see you tomorrow morning, 9:00.  Have a

17  nice evening.

18          (Whereupon, the jury exited the courtroom at

19  5:00 p.m. and the following proceedings were had:)

20          THE COURT:  You may step down, sir.

21          (Witness excused.)

22          THE COURT:  You may be seated for a moment.

23          MR. GREGORIE:  Your Honor, I have one or two

24  housekeeping issues, if I could.

25          THE COURT:  Okay.

1              MR. GREGORIE:  Is the door closed?

2              THE COURT:  It's closed.  Yes?

3              THE COURT SECURITY OFFICER:  Yes, ma'am.

4              MR. GREGORIE:  Your Honor, my expert witness

5    is coming in this weekend.  My hope is that we will get

6    to other witnesses before this week is out.

7              I realize that, even if we go on a full day of

8    cross-examination tomorrow and a little bit on

9    Thursday -- I'm hoping that we'll get a day and a half

10   of other witnesses in.

11             If that's the case, we should reach the expert

12   by next week.  I didn't know if your Honor had time on

13   Monday to have that *Daubert* hearing.  I don't think it

14   should take too long.  But I am perfectly willing to do

15   it on Monday.  My expert will be in on Sunday, and I'm

16   willing to do it anytime your Honor says.

17             MS. JHONES:  Judge, I just need to bring

18   something to the Court's attention that may affect

19   that.

20             THE COURT:  Yes.

21             MS. JHONES:  I, unfortunately, your Honor,

22   have not been able to complete an *ex parte* matter

23   dealing with the budget.  And I need to have access to

24   our expert for that hearing.  I have been trying as

25   diligently as possible, and I have not been able to do

1    it.

2            And my intent was to finish up with my

3    cross-examination of this witness and submit the

4    request that I need to submit to the Court on an

5    emergency basis.

6            Despite my best efforts, I just haven't been

7    able to do it, your Honor.

8            MR. GREGORIE:  Your Honor, if this is in

9    regards to her expert, I looked at his expertise and

10   material.

11           My expert witness is going to be talking about

12   historical fact, Judge.  I don't think -- and from what

13   I've seen of the credentials for her expert, she may

14   misunderstand where we're going with this, Judge.

15           There is going to be factual evidence that I

16   would be very surprised that any expert is going to

17   disagree with.

18           But that would -- you know, to contradict my

19   expert, she's going to have to have somebody that's

20   going to actually know something about the factual

21   history of El Rukns and Jeff Fort, Judge.

22           MS. JHONES:  And, your Honor, that's precisely

23   what we have.  The Government -- the Government

24   describes the proffer of their expert as something

25   that's factual.

1          We take exception to many of these

2    representations that, as the Court knows, were provided

3    to me on March 5th, right in the middle of this trial.

4    On March 5th, I got these details.

5          I have not been able to react to that.  Right

6    in the middle of trial, preparing for

7    cross-examinations and, at the same time, having to

8    deal with a budget and having to deal with

9    investigating these representations that were provided

10   on March 5th, that's impossible, your Honor.

11         THE COURT:  Is that when the disclosure was,

12   March 5th?

13         MR. GREGORIE:  No, your Honor.

14         The disclosure came before trial began, is

15   when my initial disclosure was.  I have, for the

16   benefit of the Court and counsel, outlined the entire

17   testimony of this witness.

18         I thought that would be helpful, Judge,

19   because it was my estimation that, having received a

20   notice of expert from opposing counsel, I saw that that

21   expert is an expert in sociology, Judge, in giving

22   expert opinions on sociological principles.

23         I don't see anything in that expert's

24   credentials that's a -- that he's listened to wiretap

25   tapes, interviewed gang members, that would change any

1    of the historical facts that are going to come out from

2    this witness.

3           But in any case, Judge, I'm perfectly willing

4    to do this *Daubert* hearing at any time your Honor says.

5           THE COURT:  When do you anticipate calling

6    this witness?

7           MR. GREGORIE:  I would expect he'll be on the

8    stand next week, Judge.  If we get witnesses on the

9    stand on Friday, apart from the one who's on the stand

10   now, we should have, I would say, three more days of

11   testimony after that, at most, Judge.

12          THE COURT:  After Friday?

13          MR. GREGORIE:  After Friday.

14          If we get a full day of testimony on Friday,

15   Judge, I would say we would be finished -- by Wednesday

16   or Thursday of next week, we'd be ready to rest.

17          MS. JHONES:  And I'm -- unfortunately, your

18   Honor, I'm just -- again, I have -- I beg to differ

19   with the Government in having provided what they

20   provided and the date that that was provided.

21          And I have constraints that the Government

22   does not have and I have constraints of a budget.  I

23   have not been able to complete this emergency budget.

24          Again, the Government has known about this

25   person, apparently, for a while and they gave me this

1    disclosure --

2         THE COURT:  Well, what would you propose that

3    I do, Ms. Jhones?  I spoke to you about this a week or

4    so ago in regard to -- there's been no budget submitted

5    by you for your expert.

6         MS. JHONES:  You did, your Honor.

7         THE COURT:  What would you propose that I do?

8         MS. JHONES:  Well, your Honor, I have a motion

9    prepared that I haven't been able to finalize, asking

10   for a brief continuance of a few days so that I could

11   have --

12        THE COURT:  A brief continuance of what?

13        MS. JHONES:  So that I -- this budget could be

14   ruled upon so that I --

15        THE COURT:  A brief continuance of what?

16        MS. JHONES:  Of the trial, so that I --

17        THE COURT:  You want the trial to be recessed

18   for a few days?

19        MS. JHONES:  Yes, your Honor.  Yes.  This was

20   provided to me on March 5th.

21        THE COURT:  No.  No.  No.  Their filing

22   regarding the expert was before trial was -- began.

23        They supplemented it with a very, as I

24   recall -- now that Mr. Gregorie brings it up, I

25   remember reading it -- with a very detailed explanation

1    of the areas that he would be covering and what he

2    would be stating.

3          But the actual compliance with Rule 16 in

4    regard to experts was prior to the beginning of trial.

5          MS. JHONES:  Your Honor, I filed a motion in

6    response --

7          THE COURT:  You expect that I'm going to

8    recess the trial?  We may be recessing the trial

9    because of Passover.

10         One of the jurors indicated to me that --

11   apparently, one of the jurors is fairly religious and

12   has asked for the first two days and the last day off

13   of Passover.

14         So we may be recessing the trial.  That falls

15   right around Good Friday.  We may be recessing during

16   those days.

17         But it sounds like Mr. Gregorie intends to get

18   to his witness prior to that time.

19         I don't anticipate recessing the trial --

20   first of all, you've had every Monday off.  We've not

21   had trial on Monday.  So that's been available time to

22   you.

23         And I don't anticipate recessing the trial for

24   a few days to allow you to prepare a budget.

25         MS. JHONES:  Your Honor, I will detail it in

```
 1    my motion.  But I will tell the Court, as the Court
 2    knows, I have -- I represent Mr. Batiste.  I have no
 3    assistance of a co-counsel in this case.  I --
 4         THE COURT:  Ms. Jhones, I had authorized a
 5    huge amount of money for you for a paralegal.  I
 6    doubled the amount of money for a paralegal from the
 7    last trial.  And you have billed for a huge amount of
 8    money for a paralegal.
 9         So it's a little disingenuous for you at this
10    time to complain to me that you have no co-counsel.
11         This is the third trial of this case.  It's
12    not as if it needed to be investigated or prepared as
13    you would have to prepare it for a first trial.
14         And I have given you a tremendous amount of
15    assistance in this case.
16         So I think it's a little disingenuous to
17    complain to me that you don't have co-counsel when I've
18    authorized almost the same -- very close to the same
19    amount of money that I authorized for counsel to be
20    paid for your paralegal to be paid.
21         So --
22         MS. JHONES:  Your Honor, I will say this.
23         If the Court feels that, with a Monday off, I
24    could review new binders of new transcripts, not --
25    15 cassettes recordings that were provided to me on
```

1   Friday, 15 cassette recordings of *Jencks* material,

2   coupled with preparing what I need to prepare in order

3   to represent Mr. Batiste effectively -- and I

4   understand that the Court has authorized a paralegal.

5           I will tell the Court right now -- and the

6   Court indicated -- and I don't want to get into

7   *ex parte* matters in the presence of the Government -- I

8   will represent to --

9           THE COURT:  Well, it seems that my budget

10  orders are disclosed, anyhow, to investigators and the

11  media.

12          MS. JHONES:  I did not do that, your Honor.

13          THE COURT:  Somebody certainly did.

14          MS. JHONES:  I have not done that, and I have

15  taken great care for that not to occur.

16          THE COURT:  Somebody certainly did.

17          And it certainly does not make me very happy

18  that *ex parte* sealed orders were disclosed --

19          MR. LEVIN:  Judge, if you want to get into

20  that now, we can.

21          THE COURT:  -- to either the media or

22  investigators.

23          MR. LEVIN:  Clearly, I was the one that gave

24  my investigator, who was the subject of numerous

25  motions for this Court to reconsider paying his bill --

1    clearly, it was I who told my investigator that you

2    were -- he was not getting paid and sent him the

3    footnote of the order which said he was not getting

4    paid.

5         THE COURT:  So you disclosed a sealed *ex parte*

6    order, Mr. --

7         MR. LEVIN:  Judge, he's either part of my team

8    or he's not part of my team.  Okay?

9         If he works within my office, which was this

10   Court's finding, that he violated Rule 77 of the local

11   rules because he was part of my office, then he's

12   clearly entitled to have that.

13        Now, if he's not part of my office, then he

14   didn't violate the local rules.

15        So, I mean, what was I supposed to do, Judge,

16   seriously --

17        THE COURT:  So you disclosed to him a sealed

18   *ex parte* order that he then disclosed to the press --

19        MR. LEVIN:  I didn't disclose it.

20        THE COURT:  -- quoting it to the press?

21        MR. LEVIN:  I didn't disclose it to the media,

22   your Honor.  You'd have to take it up with Mr. McMahon.

23   I had nothing to do with any article in the *New Times*.

24        But as far as the order is concerned,

25   absolutely.  This man was entitled to know that my

1    efforts to get him paid were denied by this Court, and

2    I communicated that to him.

3              THE COURT:  At that time, he was no longer an

4    investigator.  Correct?

5              MR. LEVIN:  Judge, I mean, with all due

6    respect, the guy did work on the case.  He worked for

7    me --

8              THE COURT:  Was he an investigator on the case

9    at the time that you disclosed the order to him,

10   Mr. Levin?

11             MR. LEVIN:  Judge, frankly, he was not.  To

12   answer your question, he was not.  But, frankly, I

13   don't think --

14             THE COURT:  That's what I thought.

15             MR. LEVIN:  -- that's really relevant to the

16   inquiry.

17             The issue really --

18             THE COURT:  I think it's pretty relevant.

19             MR. LEVIN:  Judge, the guy did work for me in

20   the first case.  You denied him being paid.  I tried to

21   get him paid.  I had to tell him he didn't get paid.

22             I mean, what was I supposed to do?  "I can't

23   tell you, Mr. McMahon.  I can't tell you"?  I don't

24   think I could really do that in good faith to the

25   investigator.

1    THE COURT:  I never said you couldn't tell him

2    he's not getting paid.

3    I just find it, as I indicated, very, very

4    disappointing that a sealed *ex parte* order was

5    disclosed and quoted in a newspaper article.

6    MR. LEVIN:  And --

7    THE COURT:  So, apparently, it was not only

8    disclosed to Mr. McMahon; it was also disclosed either

9    through you or through him to a newspaper reporter.

10    MR. LEVIN:  Judge, I just told you exactly

11    what I did.  And I did nothing more than that.

12    THE COURT:  Well, I'm not going to recess the

13    trial for a few days.

14    You know, you've brought up your issue of your

15    expert and you filed your motion for the -- your

16    *Daubert* motion very soon after.  We're going to move

17    forward with that.

18    My Mondays are very full.  I've just looked at

19    the next two.  We're probably going to have to come

20    in -- either stay late one evening or, more likely,

21    come in early one morning and do it maybe over two

22    mornings starting at 7:00 or 7:30.

23    MR. GREGORIE:  Okay.  My purpose --

24    THE COURT:  He is arriving when?

25    MR. GREGORIE:  He is arriving this weekend,

1    Judge.  He will be here all of next week, because we

2    expect that we will close the Government's case

3    somewhere in the middle of next week or towards the end

4    of next week.

5              THE COURT:  Okay.  So he arrives on the 22nd,

6    is what you're anticipating?  He's arriving this Sunday

7    or next Sunday?

8              MR. GREGORIE:  This Sunday, Judge.  He's

9    coming in on this Sunday.

10             If we finish with this witness, your Honor,

11   before Friday -- I was hoping we'd be finished by

12   Thursday.

13             If we finish before Friday, then it would be

14   my expectation that the Government would be resting its

15   case, probably, by Wednesday or Thursday of next week.

16             THE COURT:  So let's, then -- we're going to

17   have to see how -- when this witness is finished.  And

18   then I would anticipate either -- probably early

19   Tuesday morning, on the 24th, having the hearing.

20             MR. GREGORIE:  Okay.  Thank you very much,

21   Judge.

22             THE COURT:  We're in recess.

23             (End of proceedings.)

24

25

1              C E R T I F I C A T E

2

3        I hereby certify that the foregoing is an

4   accurate transcription of the proceedings in the

5   above-entitled matter.

6

7

8   _____        /s/Lisa Edwards
         DATE            LISA EDWARDS, CRR, RMR
9                        Official United States Court Reporter
                         400 North Miami Avenue, Twelfth Floor
10                       Miami, Florida 33128
                         (305) 523-5499
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25