```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                  CASE NO. 06-20373-CRIMINAL-LENARD
 3

 4   UNITED STATES OF AMERICA,        Miami, Florida

 5                  Plaintiff,        March 18, 2009

 6          vs.                       9:22 a.m. to 4:56 p.m.

 7   NARSEAL BATISTE, et al.,         Volume XXV

 8             Defendants.        Pages 1 to 213
     ----------------------------------------------------------

 9

10                          JURY TRIAL
11          BEFORE THE HONORABLE JOAN A. LENARD,
                 UNITED STATES DISTRICT JUDGE
12

13

14   APPEARANCES:

15

16   FOR THE GOVERNMENT:   RICHARD D. GREGORIE, ESQ., and
                           JACQUELINE M. ARANGO, ESQ.
17                         ASSISTANT UNITED STATES ATTORNEYS
                           99 Northeast Fourth Street
18                         Miami, Florida 33132

19

20   FOR THE DEFENDANT     ANA MARIA JHONES, ESQ.
       NARSEAL BATISTE:    300 Seville Avenue, Suite 210
                           Coral Gables, Florida 33134
21

22   FOR THE DEFENDANT     ALBERT Z. LEVIN, ESQ.
       PATRICK ABRAHAM:    261 Northeast First Street
23                         Sixth Floor
                           Miami, Florida 33132
24

25
```

```
 1   FOR THE DEFENDANT      RODERICK D. VEREEN, ESQ.
       STANLEY PHANOR:      BRINKLEY, HENRYS & LEWIS
 2                          4770 Biscayne Boulevard
                            Suite 1200
 3                          Miami, Florida 33131

 4
     FOR THE DEFENDANT      RICHARD K. HOULIHAN, ESQ.
 5     NAUDIMAR HERRERA:    300 Aragon Avenue
                            Coral Gables, Florida 33134
 6

 7   FOR THE DEFENDANT      LOUIS CASUSO, ESQ.
       BURSON AUGUSTIN:     111 Northeast First Street
 8                          Suite 603
                            Miami, Florida 33132
 9

10   FOR THE DEFENDANT      NATHAN CLARK, ESQ.
      ROTSCHILD AUGUSTINE:  17639 South Dixie Highway
11                          Miami, Florida 33157

12
     REPORTED BY:           LISA EDWARDS, CRR, RMR
13                          Official Court Reporter
                            400 North Miami Avenue
14                          Twelfth Floor
                            Miami, Florida 33128
15                          (305) 523-5499

16

17

18

19

20

21

22

23

24

25
```

1                          I  N  D  E  X

2

3                                   Direct    Cross    Red.

4
    WITNESSES FOR THE GOVERNMENT:
5

6  Elie Assaad                                  6
                                                59
7                                               118
                                                181
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Good morning.

 2              United States of America versus Narseal

 3    Batiste, et al., Case No. 06-20373.

 4              Counsel, state your appearances, please, for

 5    the record.

 6              MR. GREGORIE:  Good morning, your Honor.

 7              Richard Gregorie and Jacqueline Arango on

 8    behalf of the United States.

 9              MR. LEVIN:  Albert Levin on behalf of Patrick

10    Abraham, who's present.

11              MS. JHONES:  Ana Jhones on behalf of Narseal

12    Batiste, who's also present.

13              MR. CASUSO:  Good morning, your Honor.

14              Lou Casuso on behalf of Burson Augustin, who's

15    present.

16              MR. CLARK:  Good morning, your Honor.

17              Nathan Clark for Rotschild Augustine, who's

18    present.

19              MR. HOULIHAN:  Richard Houlihan for Naudimar

20    Herrera.

21              MR. VEREEN:  Good morning, your Honor.

22              Roderick Vereen on behalf of Stanley Phanor,

23    who's present.

24              THE COURT:  All Defendants are present.

25              Good morning to everyone.
```

```
 1              In regard to the scheduling issues that we

 2    were talking about yesterday, what I've determined to

 3    do is I'm going to reschedule my Monday afternoon, this

 4    coming Monday, and put that on Good Friday.  And then

 5    we'll have the Daubert hearing on Monday afternoon.

 6              MR. GREGORIE:  Thank you, your Honor.

 7              THE COURT:  And then the days that the juror

 8    has requested, which would be the 9th and the 10th,

 9    would then be days that Ms. Jhones can utilize for

10    whatever additional time that she needs.

11              I haven't yet determined whether or not we're

12    going to have trial on the 8th because of my

13    preparation for the holiday.  But I'm working on that.

14              MR. CLARK:  Your Honor, may I -- I had a -- I

15    didn't know that your Honor was considering doing that

16    on Monday.

17              I have a -- my niece is getting married this

18    weekend, and I have plane flight reservations to return

19    on Monday afternoon.  I'm going to have to move these

20    around.

21              THE COURT:  Move them around.

22              MR. CLARK:  Is there any other way your Honor

23    could consider --

24              THE COURT:  No.

25              When is the wedding?
```

```
 1              MR. CLARK:  The wedding is Saturday evening.

 2    And I'll just have to look and see about getting

 3    reservations to try to come back on Sunday.

 4              THE COURT:  Okay.

 5              The jurors are now here.  Let's bring them in.

 6              (Whereupon, the jury entered the courtroom at

 7    9:24 a.m. and the following proceedings were had:)

 8              THE COURT:  You may be seated.

 9              Good morning, ladies and gentlemen.

10              You are still under oath, sir.

11              THE JURY:  Good morning.

12              THE COURT:  You may proceed, Ms. Jhones.

13              MS. JHONES:  Thank you, your Honor.

14              Good morning, ladies and gentlemen.

15              THE JURY:  Good morning.

16                   CONTINUED CROSS-EXAMINATION

17    BY MS. JHONES:

18    Q.    Mr. Assaad, when we left off yesterday, we were

19    talking about your meeting with Mr. Batiste on

20    March 16th of 2006.  Okay?

21    A.    Yes, ma'am.

22    Q.    I believe we left off on Page 69 of the

23    transcript, where --

24              THE COURT:  Which exhibit is this?

25              MS. JHONES:  This is Government's
```

```
 1    Exhibit 69-B.
 2    BY MS. JHONES:
 3    Q.     Do you have the exhibit in front of you, sir?
 4    A.     No, ma'am.
 5           MS. JHONES:  May I provide him with the
 6    exhibit?
 7           THE COURT:  Yes.
 8           MS. JHONES:  (Tenders document to the
 9    witness.)
10           THE WITNESS:  Thank you.
11           MS. JHONES:  69.  I think it's in the
12    synchronized binder.  All set?
13    BY MS. JHONES:
14    Q.     And that's where you told Mr. Batiste that you
15    were not denying him -- you were not denying supporting
16    him financially.
17           Do you remember that, sir?
18    A.     Yes, ma'am.
19    Q.     Okay.  Now we're going to go on to the next clip,
20    which is at Page 70.  And it begins six speakers down
21    with "Occ."
22           MS. JHONES:  Eric, if we may have Clip J,
23    please.
24           (Whereupon, segments of Government's Exhibit
25    No. 69 were published in open court.)
```

1    BY MS. JHONES:

2    Q.     Do you remember that, sir?

3    A.     Yes, ma'am.

4    Q.     And in that clip, what Mr. Batiste is telling

5    you -- well, first of all, this clip comes after you

6    and Mr. Batiste have been going around about, "I

7    haven't gotten the money.

8           "Well, we're working on the money.

9           "I haven't gotten the money."

10          And after that argument is going back and forth,

11   Mr. Batiste tells you, "Well, you what know?  Maybe now

12   is not the time.  I really can't do it now."

13          MS. ARANGO:  Objection.  Vague and compound.

14          THE COURT:  Sustained.

15          Rephrase your question.

16   BY MS. JHONES:

17   Q.     Mr. Batiste tells you on Page 70 of the

18   transcript that, "Now is not the time.  I don't have

19   the money.  Can't do it."

20          Correct?

21   A.     No, ma'am.  He didn't say he cannot do it.  He

22   said, "Take finance to get the men."  He was explaining

23   what he needs to accomplish his plan.

24   Q.     But he told you he had 5,000 soldiers, didn't he?

25   He had thousands of soldiers.

1          Why does he need money for more men, sir?

2    A.    I don't know, ma'am.

3    Q.    All righty.

4          MS. JHONES:  Now we're going to turn to

5    Page 77, Clip K.

6          Give us a couple minutes, Eric.

7          This clip is going to begin at -- four

8    speakers down, where it says, "Yeah.  But my job

9    is...."

10         (Whereupon, segments of Government's Exhibit

11   No. 69 were published in open court.)

12   BY MS. JHONES:

13   Q.    Do you remember that, sir?

14   A.    Yes, ma'am.

15   Q.    Your job -- now that this warehouse has been

16   given to Mr. Batiste, your job has now changed as it

17   relates to what you're telling Mr. Batiste; has it not,

18   sir?

19   A.    No, ma'am.

20   Q.    Well, your job -- you're not telling him there,

21   are you, that your job is to assist him in anything

22   that he needs?  That's not what you're saying there, is

23   it, sir?

24   A.    Ma'am, in this meeting --

25   Q.    Answer "yes" or "no" and then you can explain.

Assaad - CROSS - By Ms. Jhones                    10

1    A.      I'm explaining, ma'am.

2    Q.      Answer "yes" or "no" and then you can explain,

3    sir.  I'm posing the question.

4    A.      Okay.  No, ma'am.

5    Q.      Go ahead and explain, sir.

6    A.      Because in this meeting, I cannot keep rephrasing

7    on every single paragraph, "I'm here to assist you.

8    I'm here to assist you."  It's like repeating myself

9    for three, four hours.

10           We were -- conversation.  I mentioned it in this

11   meeting.  I mentioned it to him, "I'm here to assist

12   you" -- several part in this meeting -- "whatever you

13   need."

14           And I'm up to a point where I'm telling him my

15   job is also to establish communication between the

16   Moors and Al-Qaeda.

17   Q.      You did not tell Mr. Batiste on 12-16 that your

18   job was to establish communication between the Moors

19   and Al-Qaeda?

20   A.      No, ma'am, I didn't, because it was the first

21   meeting and we were establishing -- first meeting

22   between two persons sitting and trying to find out

23   about each other.

24   Q.      You didn't tell him that on 12-22, in your second

25   meeting, either, did you, sir?

1    A.    No, ma'am.

2    Q.    You did not tell him on January 28th of 2006,

3    "I'm here to establish communication between Al-Qaeda;

4    you are the leader and the leader of the Moors," sir?

5    A.    No, ma'am.

6    Q.    It was after you gave him the keys to the

7    warehouse and you told him, "This is yours, brother.

8    Now let me establish communication between the leader

9    of the Moors and the leader of Al-Qaeda."

10         That's when you did it.  Isn't this a fact, sir?

11   A.    Like I said, ma'am, no.

12   Q.    This conversation, sir, on March 16th goes on for

13   approximately another half-hour to 45 minutes; does it

14   not, sir?

15   A.    Can you be specific, ma'am?  Which conversation?

16   Q.    March 16th of 2006.  We left off at Page 77.

17         But the conversation goes on; does it not?

18   A.    Yes, ma'am.

19   Q.    And it goes on for a while.  Correct?

20   A.    Yes, ma'am.

21   Q.    And Mr. Batiste has -- we are now on Page 77 and

22   he still hasn't given you an answer as to whether or

23   not he will take some pictures.

24         Isn't that a fact, sir?

25   A.    I need -- give me one second, please, ma'am.

```
 1    Q.    Take your time.

 2    A.    Yes, ma'am.

 3    Q.    And, sir, you tell Mr. Batiste that you have put

 4    your reputation on the line for him; do you not, sir?

 5    A.    Yes, ma'am.

 6    Q.    And when you start to tell him -- and you tell

 7    him that more than once; do you not, sir?

 8    A.    Yes, ma'am.

 9    Q.    And when you start to tell him how you've put

10    your personal reputation on the line for him, sir, you

11    begin to cry; do you not, sir?

12    A.    No, ma'am.

13    Q.    And after, sir -- after you go through this how

14    you put your reputation on the line, sir, Mr. Batiste

15    says, "Okay, Occ.  Okay.  I'll take the pictures"; does

16    he not, sir?

17    A.    No, ma'am.

18    Q.    On March 26th, sir -- well, actually, before I

19    get to March 26th, let me ask you a question about

20    March 24th.

21          On March 24th, sir, you had two meetings with

22    Mr. Batiste; did you not?

23    A.    Yes, ma'am.

24    Q.    And the one meeting was in the morning.  Correct?

25    A.    Yes, ma'am.
```

```
 1   Q.     And the second meeting was in the evening?

 2   A.     Yes, ma'am.

 3   Q.     You testified when the prosecutor was asking you

 4   questions that Mr. Batiste, on the 24th, in the

 5   evening, drove you around Miami on the way to Circuit

 6   City; did you not?

 7   A.     Can you repeat the question, please.

 8   Q.     On March 24th of 2006, Mr. Batiste drove you to

 9   the Circuit City?

10   A.     Yes, ma'am.

11   Q.     And as you were going to the Circuit City,

12   Mr. Batiste -- you indicated on -- when the prosecutor

13   was asking you questions that he pointed out a Jewish

14   synagogue.

15          Do you remember that?

16   A.     Yes, ma'am.

17   Q.     That was not the only thing he pointed out, was

18   it, sir?

19   A.     I don't remember.

20   Q.     He pointed out -- do you remember him pointing

21   out a ladies' place, where ladies dance nude, a strip

22   club?

23   A.     Yes, ma'am.

24   Q.     Do you remember any other places that he pointed

25   out to you, sir?
```

Assaad - CROSS - By Ms. Jhones                    14

```
 1   A.     No, ma'am.
 2   Q.     And so we are clear, he didn't point out the
 3   ladies' club and say, "We could shoot that place.
 4   That's a great target."
 5          He didn't say that, did he, sir?
 6   A.     No, ma'am.
 7   Q.     And when he pointed out the Jewish synagogue, he
 8   didn't say, "Oh, that's a great place.  We could
 9   destroy that building."
10          He didn't say that, sir, did he?
11   A.     I don't remember exactly what was his words.
12   Q.     Let's go to March 26th.
13          MS. JHONES:  Your Honor, I'd like to inquire
14   of the ladies and gentlemen of the jury if they have
15   Government's Exhibit 80-B.
16          UNIDENTIFIED JUROR:  Yes.
17          MS. JHONES:  If the ladies and gentlemen of
18   the jury could turn to that, please.
19          And, your Honor, I'm going to provide a copy
20   of that to the witness, if I may.
21          THE COURT:  Sure.
22   BY MS. JHONES:
23   Q.     Now, sir, in this exhibit, before you meet with
24   Mr. Batiste -- and you do meet with him at the
25   warehouse location; do you not?
```

```
 1   A.     Yes, ma'am.

 2   Q.     And for the first couple of pages of the exhibit,

 3   you are in a taxicab; are you not?

 4   A.     Yes, ma'am.

 5   Q.     And everything that's going on prior to your

 6   meeting with Mr. Batiste is being recorded.  Correct?

 7   A.     Yes, ma'am.

 8   Q.     And the reason for that is because every time

 9   you're on your way to a meeting, you activate your

10   recorder.  Correct?

11   A.     Yes, ma'am.

12   Q.     And you activate it way in advance of the

13   meeting, such as you did on March 26th.  Correct, sir?

14   A.     Each time is different.  So I don't know how long

15   before.  Sometime it's five minutes.  Depends where

16   I'm -- where I'm at.  If I'm close to the location,

17   maybe three minutes before I activate it.  It depends

18   the distance.  Yes, ma'am.

19   Q.     Okay.  And --

20          MS. JHONES:  One moment, your Honor.  I

21   apologize.

22   BY MS. JHONES:

23   Q.     In this conversation, sir, you tell Mr. Batiste

24   that what's going on between the Moors and Al-Qaeda is

25   like a circle; do you not, sir?  Directing your
```

 1  attention to Page 14 of the transcript.

 2  A.    Yes, ma'am.

 3  Q.    And, sir, what do you mean when you're telling

 4  Mr. Batiste it's like a circle?  What are you

 5  explaining to Mr. Batiste when you're saying that?

 6  A.    I believe I explained it on Page 15 -- on the top

 7  page of Page 15, when I told Brother Naz about the

 8  circle.

 9  Q.    Well, the transcript doesn't speak for itself.

10  So why don't you tell me what you meant, sir.

11          MS. ARANGO:  Objection, Judge.

12          THE COURT:  Sustained.

13          Rephrase your question.

14  BY MS. JHONES:

15  Q.    Tell me what you meant when you told Mr. Batiste

16  that this was like a circle.  What did you mean?  What

17  were you explaining to him, sir?

18  A.    Like I said, on Page 15, on top page, "It's a

19  circle communication for helping or involving in any

20  mission.  Any part need help -- if Al-Qaeda need help,

21  the Moors are ready.  If the Moors need help, Al-Qaeda

22  is ready.  You see, there's a circle between our

23  relationship.  So we have alliance."

24  Q.    But that's not what you told Mr. Batiste that you

25  were here for on December 16th of 2005, sir, was it?

1    A.     On December 16, we didn't have alliance between

2    Moors and Al-Qaeda, ma'am.

3    Q.     That's not what you told him on the 22nd of

4    December either, sir, was it?

5    A.     At that time, we didn't have alliance between the

6    Moors and Al-Qaeda, ma'am.

7    Q.     That's not what you told him on the 28th of

8    January, sir, was it?

9    A.     At that day, we didn't have alliance between

10   Al-Qaeda and the Moors, ma'am.

11   Q.     And you didn't tell him that in between December

12   and January 28th in all the conversations that you

13   would have had with Mr. Batiste, did you, sir?

14   A.     No, ma'am.  Because Brother Naz didn't request

15   alliance with Al-Qaeda until March 9 of 2006.

16   Q.     In the unrecorded conversation.  Right?

17   A.     On March 10 was confirmed what happened on

18   March 9 by requesting alliance with Al-Qaeda, ma'am.

19   Q.     You did not tell Mr. Batiste on any day in the

20   month of February that this was a circle, that this was

21   a circle with Al-Qaeda and the Moors, did you, sir?

22   A.     No, ma'am.  Because, like I said, prior -- before

23   March 9, Brother Naz never request alliance with

24   Al-Qaeda until March 9.  And he requested to create

25   alliance with Al-Qaeda, so creating a circle between --

Assaad - CROSS - By Ms. Jhones                    18

1    like I explained here, between Al-Qaeda and the Moors.

2    Q.    So what you're saying, sir, is that, in the

3    course of one day, one day, March 9th, Mr. Batiste now

4    wants to create an alliance and a circle with Al-Qaeda

5    and the Moors.  Correct?  That's what you're saying,

6    sir?

7    A.    I said he requested on March 9 he wants to have

8    an alliance with Al-Qaeda.  And this -- prior to that

9    day, he never request that.  So....

10   Q.    On March -- on Page 15 of Government's

11   Exhibit 80-B, Mr. Batiste tells you that it was your

12   idea and it was your idea that you put on the table,

13   does he not, referring to the pictures, sir?  Does he

14   not?

15   A.    What page, ma'am?

16   Q.    Page 15 of the transcript.

17          MS. ARANGO:  Objection, Judge.  Misstatement

18   of facts.

19          MS. JHONES:  He can answer, your Honor.

20          THE COURT:  Sustained.

21          MS. ARANGO:  Judge, I --

22          THE COURT:  Rephrase your question.

23   BY MS. JHONES:

24   Q.    Mr. Batiste tells you on Page 15 that there was

25   an idea that you and he put on the table; does he not,

```
 1   sir?
 2   A.    One second, please.
 3         He was referring, maybe, to the warehouse, ma'am.
 4   Q.    Mr. Batiste tells you on Page 16 of the
 5   transcript, bottom of Page 16 -- he reminds you of what
 6   his mission is.  Correct, sir?
 7   A.    Yes, ma'am.
 8   Q.    He tells you that he would not do any missions
 9   that specifically relate to Al-Qaeda; does he not, sir?
10   A.    Excuse me.  One more time the question.
11   Q.    Bottom of Page 18, Mr. Batiste tells you, does he
12   not, sir, that he will not do any missions specific
13   to -- that would be relating to Al-Qaeda?  He tells you
14   that in the bottom of Page 16; does he not, sir?
15   A.    Ma'am, are you speaking 18 or 16?
16   Q.    18 -- bottom of Page 16.
17   A.    Yes, ma'am.
18   Q.    He told you that; did he not, sir?
19   A.    Yes, ma'am.
20   Q.    He also tells you, sir, on Page 19, that you have
21   a big disagreement -- you and he have a big
22   disagreement because his idea was the idea that he told
23   you about from the very beginning; does he not, sir?
24   A.    What paragraph, ma'am?
25   Q.    Bottom of Page 19.
```

 1   A.    He said, "Maybe we have big disagreement."  Yes,

 2   ma'am.

 3         MS. JHONES:  Your Honor, I just need a second.

 4   I lost my place once again.

 5   BY MS. JHONES:

 6   Q.    And after Mr. Batiste tells you that, sir, he

 7   tells you something else regarding the brothers, does

 8   he not, meaning his brothers?  Correct, sir?

 9   A.    What page, ma'am?

10   Q.    Page 24 of the transcript.

11   A.    Yes, ma'am.

12   Q.    Now, this is supposed to be somebody that is

13   involved in jihad.  Right?  Right, sir?

14   A.    I didn't understand your question.

15   Q.    This is somebody, according to you, that has this

16   intent to wage war against the United States, isn't it,

17   sir?

18   A.    According to me, ma'am?  No, ma'am.  Because I

19   never mentioned in any conversation before -- prior to

20   Brother Naz -- what he told me before.  He mentioned

21   the jihad.  He mentioned the Islamic army.  He

22   mentioned the war.  He mentioned everything.

23         According to me, I was -- I didn't say anything

24   about this.

25   Q.    But he really wanted to do all those things,

Assaad - CROSS - By Ms. Jhones                21

```
 1   didn't he, sir?  He told you he really wanted to do all
 2   of these things?
 3   A.    Yes, ma'am.
 4   Q.    And he had all of these soldiers all around the
 5   United States, didn't he, sir?
 6   A.    Yes, ma'am.
 7   Q.    And now he's telling you, "I don't want the
 8   brothers involved.  I don't want them involved,"
 9   doesn't he, sir?
10   A.    No, ma'am.  Because he said, "I still reserve the
11   right to say that if I don't want any of the Moors to
12   go in there and do in there and be the ones, like we
13   discussed earlier, to execute everything."
14         He still reserves the right.  He didn't say, "I
15   don't want."
16   Q.    Look at Page 24 of the transcript, where he says,
17   "No.  I don't want the brothers to get involved."
18         Are you on Page 24, sir?
19   A.    Yes, ma'am.
20   Q.    Tell me right after that sentence where he says,
21   "I reserve the right to have the brothers come get
22   involved."  Where does he say that after that sentence,
23   sir?
24   A.    The first one?  The first paragraph?  Yes, ma'am?
25   Q.    Not the paragraph, sir.  The sentence where
```

```
 1   Mr. Batiste says, "No, period.  I don't want the
 2   brothers to get involved, period."
 3              THE COURT:  Is there a question pending?
 4              MS. JHONES:  Yes.
 5   BY MS. JHONES:
 6   Q.    Tell --
 7              THE COURT:  What's the question?
 8   BY MS. JHONES:
 9   Q.    The question is where he says after that sentence
10   that he reserves the right to bring the brothers back
11   into it.
12   A.    Yes, ma'am.
13   Q.    Did you find it?
14   A.    I wasn't expect -- what was the question, ma'am?
15   Q.    Never mind.
16         Now, sir, the prosecutor asked you questions
17   about lies that you stated on your marriage
18   application.  Do you remember that?
19   A.    Yes, ma'am.
20   Q.    In your marriage application -- that marriage
21   application was here in Miami-Dade County, Florida; was
22   it not?
23   A.    Yes, ma'am.
24   Q.    And that marriage application was in January of
25   2001.  Correct?
```

```
 1   A.     Yes, ma'am.

 2   Q.     And when you did that, sir, you were on a visa

 3   for pleasure, on a B-1 visa to the United States; were

 4   you not, sir?

 5   A.     Yes, ma'am.

 6   Q.     And when you did that, sir, your authorization to

 7   be in the United States was that as a visitor only.

 8   Correct, sir?  That was your immigration status in

 9   2001?

10   A.     Yes, ma'am.

11   Q.     You were not here in the United States because

12   you fled your native land of Lebanon because you were

13   in fear.

14          You were here visiting; were you not, sir?

15   A.     Yes and no, ma'am.

16   Q.     Okay.

17   A.     And --

18   Q.     2001, sir --

19          MS. ARANGO:  Objection to the interruption,

20   Judge.

21          THE COURT:  Let him finish his answer.

22          THE WITNESS:  Because prior to that day, 2001,

23   I was working for United States Government

24   internationally.

25          So what happened, when I came to United
```

1    States -- and my visa was for two years -- I can --

2    business and pleasure.  B-1, B-2 is business and

3    pleasure.

4         So when I came in December, 2000, to United

5    States, it was the -- what happened to me.  And I stay

6    here.

7         So I was legally in United States until 2002.

8    BY MS. JHONES:

9    Q.    We're going to get to that in a minute.  I want

10   to stick with the application for marriage.

11        Your name was not the only misrepresentation --

12        MS. ARANGO:  Judge, I would just object and

13   ask that counsel be admonished to stop making speeches

14   and statements.

15        THE COURT:  Sustained.

16        MS. JHONES:  And I'd like Government to stop

17   making speaking objections, your Honor.

18        THE COURT:  The objection is sustained.

19        Please refrain from comments.

20        Ask your questions.

21        MS. JHONES:  Yes, your Honor.

22   BY MS. JHONES:

23   Q.    That was not the only misrepresentation you made

24   in your application -- in your certificate of marriage,

25   was it, sir?

1   A.      Excuse me?

2   Q.      That wasn't the only lie you told when you

3   applied to get married to your wife in 2001, was it,

4   sir?

5   A.      Can you be more specific.

6   Q.      Sure.

7           You lied about your country of birth?

8   A.      Yes, ma'am.

9   Q.      You lied about your date of birth?

10  A.      Yes, ma'am.

11  Q.      And you misspelled your name as well, in addition

12  to -- you misspelled your last name and you lied about

13  the first part of your name.

14          You called yourself Montana Assaad.  Correct?

15  A.      And -- yes.  And just explain why I did all this.

16  Just --

17  Q.      Did the FBI --

18  A.      Clear --

19  Q.      Did the FBI give you --

20  A.      Can I finish?

21          MS. ARANGO:  Objection to the interruption,

22  Judge.

23          THE COURT:  Sustained.

24  BY MS. JHONES:

25  Q.      Go ahead.

1    A.     I just explain exactly what happened to me and

2    the fear I been living in, try to hide from what

3    happened to me in December, 2000.

4    Q.     Sir, did the FBI give you permission to lie to

5    the authorities about your identity?  Was that

6    permission given to you by the FBI?

7    A.     No, ma'am.

8    Q.     And after you did this in 2001, you left the

9    United States, didn't you?

10   A.     Yes, ma'am.

11   Q.     You left.  Right?

12   A.     To where?

13   Q.     You tell me, sir.

14   A.     I left to Mexico, ma'am.

15   Q.     Because you had been kicked out of Lebanon and

16   you were kicked out of Syria, both countries?

17   A.     Excuse me?

18   Q.     They kicked you out of both countries; did they

19   not, sir?

20   A.     No, ma'am.  I left -- I left from my countries

21   because I was tortured for two months, like I said

22   before, one month in each country.  They attempt to

23   kill me in my car.

24         I had to leave for my life and for my family

25   life.  And I came to United States.

Assaad - CROSS - By Ms. Jhones                    27

```
 1   Q.    And, sir, when you came to the United States, you

 2   were here for a while and then you went to Mexico.

 3   Right?

 4   A.    I went to visit my family wife in Mexico and I

 5   came back to United States on my visa.

 6   Q.    Your visitor's visa.  Right?

 7   A.    Excuse me?

 8   Q.    Your visitor's visa.

 9   A.    My business and -- B-1 and B-2 visa.  Yes, ma'am.

10   Q.    Now, sir, the only business that you were

11   conducting in the United States was that of an

12   informant.  Correct, sir?

13   A.    Informant?

14   Q.    Yes.  An informant.  A paid informant.

15   A.    Yes, ma'am.

16   Q.    And that visa that you had allowed for you to

17   stay for six months in the United States.

18         Your authorization to stay lasted six months; did

19   it not, sir?

20   A.    No, ma'am.  The visa is for two years to -- and I

21   can extend it.  It's the -- the time of the visa is two

22   years.

23         The permission you get from the airport to stay

24   is six months.  Able to extend it for another six

25   months.
```

1    Q.    You have to leave, sir -- you have to leave

2    before the expiration of the six months; do you not?

3    A.    No, ma'am.  I can extend -- -- send application

4    to the Immigration requesting extend stay for my stay

5    in United States.  And I did it before and they extend

6    my stay for another six months.

7    Q.    So you stayed for a total of 12 months.  Correct?

8    A.    I cannot guarantee I stay for 12 months --

9    exactly 12 months.  But I extend before my stay in

10   United States before 2001.

11   Q.    And then, after 2001, you were able to stay for

12   longer periods of time with the assistance of the FBI?

13   A.    No, ma'am.  In 2001, I had an attorney --

14   immigration attorney, who advised me to apply for my

15   asylum in the United States before my visa is expired.

16        The FBI never help me -- can I say never, never

17   help me?  It's just.  When I was in Mexico, they

18   brought me on parol for this case.  But they never --

19   Q.    Okay.

20   A.    Can I finish?

21        THE COURT:  Let him finish.

22        MS. JHONES:  I'll let him finish.

23   BY MS. JHONES:

24   Q.    Go ahead and finish.

25   A.    But the FBI never assist me.  I don't have US

1   citizen.  I been here for long time.  I'm not even US

2   citizen.  I don't have even green card or resident in

3   United States.  They never assist me in any -- besides

4   the parol letter they brought me to do this case.

5   Q.    Is it your testimony, sir, that on June 14th of

6   2001, the FBI did not prevail upon the Immigration

7   authorities to get you a parol to be able to remain in

8   the United States?

9   A.    June what?

10  Q.    June 14th of 2001.

11  A.    No, ma'am.  I don't believe so, because June --

12  on -- 2001, I guess, I applied for my asylum.  And when

13  you apply for the asylum, they give you until they look

14  to your -- to your application.

15        When the Immigration need to look to your

16  application, they give you temporary legal status to

17  work, to be able to feed yourself, until they look and

18  decide for your application.

19  Q.    Is it your testimony, sir, that the FBI did not

20  request on your behalf yet another parol on

21  February 12th of 2002?  Is it your testimony that the

22  FBI did not prevail upon the Immigration authorities to

23  acquire yet another parol on your behalf?

24  A.    In this, ma'am, you have to ask the FBI --

25  Q.    Well, let me see if I can --

```
 1              MS. ARANGO:  Objection to the interruption.

 2              THE COURT:  Let him finish his answer.

 3              MS. JHONES:  Okay, your Honor.

 4    BY MS. JHONES:

 5    Q.    Go ahead.

 6    A.    In this matter, you have to ask the FBI.  In my

 7    understanding and from what I know and from what my

 8    immigration lawyer tell me, I was eligible to apply for

 9    asylum in United States legally before my visa -- my

10    main visa is finished, expired.

11    Q.    And --

12    A.    And --

13    Q.    Go ahead.

14    A.    And when she applied for my application, the

15    Government gave me right for -- like anybody else, to

16    work or to give legal status until they look into my

17    application.

18          Until that time, supposedly, I was legal in the

19    United States.  So I didn't need -- I didn't need any

20    parol letter.  I didn't need anything to make me stay

21    in United States.

22    Q.    Just like you did not need a parol letter to come

23    into the United States in 2008.  Correct?

24    A.    Another -- they call me to come from Mexico,

25    ma'am.  And they did whatever they did.  It's their --
```

```
 1    their job.  I don't know -- I'm not an FBI agent.  I
 2    don't know what the rules are.  All I know, they told
 3    me to come to the United States and I came, like they
 4    told me to do.
 5    Q.    But, sir, you could come and go as you please.
 6    You don't need the FBI's assistance.
 7          Didn't you just tell us that a minute ago?  You
 8    don't need their assistance.  You can come and go as
 9    you please.  Correct me if I'm wrong.  Isn't that what
10    you just said?
11    A.    I said, ma'am, I didn't need their assistance in
12    application, in immigration.  This what I mentioned
13    in -- second ago.
14          They didn't assist me in any immigration besides
15    the parol letter when they told me to come into United
16    States.
17          There is several times, ma'am, if you have my
18    file in front of you, I came and came back with no
19    assistance -- or I didn't ask permission to go and
20    come.
21          I was free -- freely leaving to Mexico and coming
22    to Mexico like I -- like I was -- please, with no
23    approval from the FBI.
24    Q.    Sir, in September of 2005, you were in jail in
25    Mexico for immigration violations.
```

1          You were in custody in Mexico?

2              MS. ARANGO:  Objection.  Relevance.

3              THE COURT:  Sustained.

4              MS. JHONES:  Your Honor, it goes -- *Davis*

5      *versus Alaska*.

6              THE COURT:  Sustained.

7              MS. JHONES:  I have to reserve a motion on

8      that, your Honor.

9              THE COURT:  Okay.

10     BY MS. JHONES:

11     Q.    You were able to come to the United States in

12     September of 2005 because they got you permission to

13     come in here, not your immigration lawyer.

14          The FBI got you permission to come into the

15     United States from Mexico in September of 2004, sir.

16     Isn't that a fact?

17     A.    Yes and no.  Because before that period of time,

18     ma'am, they ask me, the FBI, to come to the United

19     States to assist in specific case.

20          When the time arrive, I came from Mexico to

21     United States from 2005 to 2008.  And I went back to

22     Mexico on 2008.

23     Q.    And you came back in December of 2008 with their

24     assistance.  They gave you a travel document to be able

25     to come back in the United States.

```
 1          It was the FBI that got that for you.  Isn't that

 2    a fact, sir?

 3    A.     But -- but I was legally to come and go to the

 4    United States.

 5    Q.     Answer my question.

 6           "Yes" or "no," did they give you a document to

 7    come into the United States, sir?

 8    A.     You have to ask them, ma'am.

 9    Q.     Did you have a travel document with you, sir?

10    A.     Yes, ma'am.

11    Q.     Did you ever look at it, sir?  You know that they

12    gave you permission to come into the United States,

13    sir.

14          MS. ARANGO:  Objection.  Compound question and

15    argumentative.

16          THE COURT:  Sustained.

17    BY MS. JHONES:

18    Q.     Do you have a green card in the United States,

19    sir?

20    A.     No, ma'am.

21    Q.     The only authorization you have to come in is

22    through the FBI's assistance.

23           Isn't that a fact, sir?

24    A.     No, ma'am, because I have from Immigration travel

25    document to travel outside United States and come back
```

 1    to United States.

 2         And this is how I went to Mexico, by stamping on

 3    my passports -- it's like small passport from United

 4    States Government, when you stamp your visa in it to

 5    travel anywhere you want and you come back to the

 6    United States.

 7    Q.    Sir, you also lied about your identity to an

 8    immigration court; did you not, sir?

 9    A.    Immigration court?

10    Q.    Yes.

11         What is your correct date of birth, sir?

12    A.    August 17, 1972.

13    Q.    Well, that's not the date of birth that you

14    provided to the Immigration authorities, is it, sir?

15    A.    It's exactly the -- the same date I gave the

16    Immigration.

17    Q.    Okay.

18         MS. JHONES:  May I approach, your Honor?

19         MS. ARANGO:  Judge, I'd like to see what she's

20    showing him.

21         THE COURT:  Show it to the Government first.

22         MS. JHONES:  Sure.

23         MS. ARANGO:  Judge, I would object.  This is

24    not a document prepared by Mr. Assaad.  It's not proper

25    for --

1            THE COURT:  Come on up, please.

2            MS. ARANGO:  -- impeachment.

3            (Whereupon, proceedings were had at side-bar

4    outside the presence of the jury which have been sealed

5    per instructions of the Court.)

6            (Whereupon, the following proceedings were had

7    in open court:)

8    BY MS. JHONES:

9    Q.    Sir, did you provide information to the FBI

10   regarding your date of birth?

11   A.    Yes, ma'am.

12   Q.    And the date of birth that you provided to the

13   FBI was which one, sir?

14   A.    My date of birth.  August 17, 1972.

15   Q.    Okay.  You did obtain a special benefit parol in

16   November of 2005 from the FBI; did you not, sir?

17   A.    When I came to United States?

18   Q.    You've been here many times; have you not?

19   A.    Ma'am, can you be more specific for me to answer

20   your question.

21   Q.    November of 2005, you came to the United States

22   based on a special parol that was given to you by the

23   FBI?

24   A.    I came from Mexico.  Yes, ma'am.

25   Q.    And with that special parol, sir -- so we're

```
 1    clear, with that special parol from, there were certain
 2    conditions that were attached to it; were there not?
 3    A.    They didn't give me copy, ma'am.  When I came,
 4    they let me come in.  I didn't see what special
 5    condition are.
 6    Q.    Did they tell you what the conditions were, sir?
 7    A.    No, ma'am.
 8    Q.    They just let you come in without any conditions,
 9    as far as you were concerned.  Is that your testimony?
10    A.    Excuse me?
11    Q.    They didn't give you any specifics, any
12    conditions, regarding your stay in the United States?
13            MS. ARANGO:  Objection.  Relevance.
14            MS. JHONES:  Davis versus Alaska, your Honor.
15            THE COURT:  Overruled.
16            THE WITNESS:  They didn't explain to me
17    anything, ma'am.
18    BY MS. JHONES:
19    Q.    So as far as you were concerned, sir, you did not
20    have any obligations as it related to your special
21    parol?
22            MS. ARANGO:  Objection.  Vague.
23            THE COURT:  Sustained.
24            Rephrase your question.
25
```

```
 1    BY MS. JHONES:

 2    Q.    What, if anything, did the Government tell you

 3    about the requirements of you supporting yourself?

 4    A.    I don't understand your question.

 5    Q.    Was it your obligation to support yourself or was

 6    the Government going to support you as it relates to

 7    the special parol?

 8            MS. ARANGO:  Objection.  Vague and confusing.

 9            THE COURT:  Sustained.

10            Rephrase your question.

11    BY MS. JHONES:

12    Q.    When you obtained a special parol -- and a

13    special parol is an application and authorization to

14    come into the United States.

15            MS. ARANGO:  Objection to the statement.

16            THE COURT:  Sustained.

17            Rephrase your question.

18    BY MS. JHONES:

19    Q.    When you came to the United States on a special

20    parol that was given to you by the FBI, was there a

21    requirement that you support yourself, sir?

22            MS. ARANGO:  Objection.  Outside -- objection

23    to the form, your Honor, if you look at the prior

24    questioning.

25            THE COURT:  Sustained.
```

```
 1              Rephrase your question.

 2   BY MS. JHONES:

 3   Q.      When you came to the United States in November of

 4   2008, whose obligation was it for your support, sir?

 5   Was it yours or was it the FBI's?

 6   A.      2008 or 2005, ma'am?

 7   Q.      I'm sorry.  2005.

 8   A.      And to be more specific, support what?

 9   Q.      How were you going to pay for your living

10   expenses while you were here in the United States in

11   November of 2005?

12   A.      Ma'am, the FBI brought me from Mexico.  I believe

13   they were supposed to take care of all -- I came for --

14   to do job for them.  They brought me from Mexico to

15   over here.  And I was thinking they would pay for the

16   expenses.

17   Q.      So they paid.  Correct?

18   A.      Yes, ma'am.

19   Q.      And as far as you're concerned, you did not have

20   any obligations as it relates to the special parol

21   status -- you didn't have any obligations to support

22   yourself?

23              MS. ARANGO:  Same objection.

24              THE COURT:  Sustained.

25              It's been asked and answered.
```

BY MS. JHONES:

Q.      Okay.  Now, you told us that you applied for

asylum in 2001.  Correct?

A.      Yes, ma'am.

Q.      And you had to reapply in 2003.  Correct?

A.      No, ma'am.

Q.      Well, did you get asylum?  Was asylum granted in

2001?

A.      I applied 2001, ma'am.

Q.      But it wasn't granted, was it, sir?

A.      It take time to take process, I believe.

Q.      You had to file again; did you not, sir?

A.      No, ma'am.

Q.      Okay.  The application in 2003 was not the same

application that you filed in 2001, was it, sir?

A.      I had one interview and one interview only, 2001.

        In 2003, I didn't have another interview, ma'am.

They gave me, I believe, advance -- recommended

approval, I believe, on 2003, and they approve on 2006.

        Because in this period of time, I wasn't in

United States.  And the only thing -- extend it until

2006.

        My fingerprints were pending at this period of

time to finalize my request.  I was in Mexico at that

time, and they couldn't do nothing until I came back

```
 1    and fingerprints for the last step.

 2    Q.    Now, sir, this is all based on -- we don't have

 3    any documents that support what you're telling us here

 4    today.  Right?

 5             MS. ARANGO:  Objection.  Relevance, improper

 6    questioning.

 7             THE COURT:  Sustained.

 8    BY MS. JHONES:

 9    Q.    Your application for asylum was approved, sir, in

10    2006; was it not?  It was approved in 2006?

11    A.    It was approved in -- in my opinion, it was on

12    2003, when I received -- when I received recommended

13    approval.

14          But when I left to Mexico, they sent to my

15    attorney fingerprints to finalize my application.  And

16    I wasn't here.  I was in Mexico, far away.

17          When I came in 2005, I did my fingerprints in

18    Immigration place to finalize my application.

19    Q.    My question wasn't what your opinion was, sir.

20    A.    Was --

21    Q.    That wasn't my question.

22          My question was:  When was your application for

23    asylum approved -- formally approved?

24    A.    In 2006.

25    Q.    April of 2006, to be exact.  Correct?
```

```
 1    A.     I don't know the date exactly.

 2    Q.     It was after the oath of March 16th, 2006, wasn't

 3    it, sir?

 4    A.     I don't remember.

 5    Q.     Okay.  In 2003, the FBI made a recommendation to

 6    the Immigration Service that your application for

 7    asylum be approved; did they not, sir?

 8    A.     One more time.

 9    Q.     In March of 2003, the FBI called the INS and

10    said, "We want his application for asylum to be

11    approved"; did they not, sir?

12    A.     I don't think so, ma'am.

13    Q.     Okay.

14    A.     Because they would recommend me maybe for

15    citizenship.

16    Q.     Well, you're not even a green card holder.

17    Right?

18    A.     See, this is best approval, like -- they didn't

19    even help me in anything.

20    Q.     Okay.

21    A.     I don't have even green card.

22    Q.     Now, sir, you have never filed a tax return in

23    the United States, have you, sir?

24    A.     I never work in the United States, ma'am.

25    Q.     You have received $140,000; have you not, sir?
```

 1   A.     No, ma'am.

 2   Q.     Okay.

 3   A.     I didn't receive 104,000.

 4          THE COURT REPORTER:  I'm sorry.  Did you say

 5   104,000?

 6          THE WITNESS:  I never receive this amount of

 7   money.

 8          MS. JHONES:  I'll withdraw the question, your

 9   Honor.

10          I have nothing further.

11          MS. ARANGO:  Judge, I would object to the

12   withdrawal of a question that she asked and he

13   answered.

14          THE COURT:  Sustained.

15   BY MS. JHONES:

16   Q.     How much money, sir, has the FBI paid you in this

17   case, sir?

18   A.     You want details?

19   Q.     I want a total figure, sir.

20          How much have you been paid by the FBI in this

21   case?

22   A.     I don't remember, ma'am, because they paid for

23   the rent, they paid for my medical.  I had a couple

24   accidents.

25          They paid for the rent.  They paid for the

1    transportation.  They paid for expenses, food, all

2    this, until -- from 2005 -- November, 2005, until early

3    2008.

4         So they were taking care -- I don't live here --

5    taking care of all of my expenses in United States.

6              MS. JHONES:  I need a moment, your Honor.

7              (Discussion had off the record amongst

8    counsel.)

9    BY MS. JHONES:

10   Q.    Isn't it a fact, sir, that you have been paid

11   $137,464, consisting of what the FBI has classified as

12   expenses?

13   A.    Can you be more specific -- I didn't understand

14   the question, ma'am.

15   Q.    You have been paid -- you have received $137,464

16   in expenses; have you not, sir?

17   A.    I don't remember the amount exactly.  But I

18   don't -- they didn't pay me -- I believe they paid,

19   maybe, expenses, the food -- like I said, medical

20   bills, food, living, transportation for three --

21   almost two -- two years and half, three years.  But

22   receiving this amount in my hand, no, ma'am.

23   Q.    In your hand -- you've received $27,500 in your

24   hand?

25   A.    For three years?

```
 1   Q.    Total amount, sir, in conjunction with this case.
 2   $27,500, sir.
 3   A.    I don't know, ma'am.  I don't remember the exact
 4   amount, how much I receive.
 5   Q.    You do remember whatever money you have received,
 6   you have not filed a tax return for.
 7         You do remember that, sir; do you not?
 8   A.    If I was working -- this is my understanding.  If
 9   I am working in -- or I am -- I understand, like, if
10   you are working in a company or you are working
11   somewhere, you have to file.
12         But when you are not working and they are giving
13   you just to eat money, I don't know if you have to pay
14   tax on this.  I don't know that.
15   Q.    The question is:  Have you filed a tax return in
16   the United States ever, sir?  That's the question.
17   "Yes" or "no"?
18   A.    I said no.  Because I never worked in United
19   States.
20   Q.    Did the FBI give you a 1099, sir?
21   A.    Excuse me?
22   Q.    Did the FBI give you an IRS Form 1099, sir?
23   A.    What's that?
24   Q.    A tax form.
25   A.    No, ma'am.
```

```
 1   Q.    You wouldn't know a 1040 if they put it right in
 2   front of your face, would you, sir?
 3              MS. ARANGO:  Objection.  Argumentative.
 4              THE COURT:  Sustained.
 5              MS. JHONES:  I have nothing further.
 6              THE COURT:  There's some matters that I need
 7   to take up with the lawyers.  We're going to take an
 8   early lunch today, so I'm going to give you a break at
 9   this time.
10              Do not discuss this case either amongst
11   yourselves or with anyone else.  Have no contact
12   whatsoever with anyone associated with the trial.  Do
13   not read, listen or see anything touching on this
14   matter in any way.
15              If anyone should try to talk to you about this
16   case, you should immediately instruct them to stop and
17   report it to my staff.
18              You may leave your notebooks and your binders
19   at your chairs.  This will be last week of the early
20   lunch.  Please be back in the jury room at 12:15.
21              (Whereupon, the jury exited the courtroom at
22   10:31 a.m. and the following proceedings were had:)
23              THE COURT:  You may be seated.
24              You can step down, sir.  12:15.
25              (Witness excused.)
```

```
 1              THE COURT:  Yes, Ms. Jhones.  You had a
 2    motion.
 3              MS. JHONES:  Your Honor, I believe that the
 4    Court has precluded me from confronting this witness as
 5    to his bias and his motivation, Davis versus Alaska
 6    clearly, unequivocally, his bias and his motivation.
 7              THE COURT:  His bias and his motivation?
 8              MS. JHONES:  His bias and his motivation to
 9    work as an FBI informant and to make a case.  That's
10    what Davis versus Alaska stands for.
11              I was trying to explore -- it's bad enough
12    that this man has misrepresented the special parols
13    that he's received in the United States.
14              The fact that he was incarcerated,
15    incarcerated, for immigration violations in Mexico,
16    that he was deported from Mexico, the Court sustained a
17    relevancy objection to that.
18              Motive and bias is never irrelevant.
19              As a matter of fact, when it comes to bias and
20    motivation, the Rules of Evidence have said -- and
21    Mr. Batiste's confrontation rights --
22              THE COURT:  What rule are you citing to?
23              MS. JHONES:  I'm citing to specifically --
24    your Honor, I'm citing to Rule 607, which talks about
25    credibility of a witness.
```

1          In *Davis versus Alaska*, your Honor,

2     specifically, the Supreme Court has said that bias and

3     motivation are so critical to credibility of a witness

4     that, when it comes to bias and motive, you could even

5     go into -- you could prove by extrinsic evidence.

6          In this case, this man has every motivation --

7          THE COURT:  Can you give me a page cite as to

8     that in *Davis versus Alaska*, please.

9          MS. JHONES:  Yes.  I need a minute to find my

10    binder, your Honor.

11         Your Honor, unfortunately, I do not have my

12    binder with me that has my materials on impeachment.

13         I will say this -- and I will try and find the

14    pleading for the Court.  I filed a pleading in the fall

15    of 2007 on this issue.

16         Bias and motivation are never collateral,

17    ever.  The Supreme Court has been very clear on that.

18    Bias and motivation are never collateral.

19         I could -- I could -- in the lunch hour, I

20    could get the Court the pleading that was previously

21    filed.

22         I do have a cite for -- that my colleague just

23    gave me for *Davis versus Alaska*, which is 415 US 308,

24    1974, and, also, the case of *United States versus*

25    *Batiste -- Baptiste Rodriguez*, 17 F.3d 1354, Eleventh

1     Circuit, 1994.

2            And --

3            THE COURT:  17 F.3d....

4            MS. JHONES:  1354.

5            Additionally, your Honor, *Wasko versus*

6     *Singletary* -- W-a-s-k-o -- at 966 F.2d 1377, an

7     Eleventh Circuit case in 1992, which stands for the

8     proposition that, "Bias of a witness gives a subjective

9     fact that is influenced by the witness's belief about

10    the benefit the witness will receive is -- the witness

11    will receive if he or she testifies in a particular way

12    and the value to that particular witness, which is

13    measured by what the witness thinks will happen if he

14    does not receive said benefit.

15            "Hence, probing a witness's motivation,

16    interest, bias or expectation of benefit goes to the

17    subconscious of the witness and not what the actual

18    benefit the witness will receive."

19            Also citing to *United States versus Oliveros*

20    from the Eleventh Circuit, a 2001 opinion at 275 F.3d

21    1299.

22            One more case, your Honor, which I believe I

23    did cite in my memo in the fall of 2007:  *United States*

24    *versus Lankford*, L-a-n-k-f-o-r-d.  This is a very

25    well-known opinion from the Eleventh Circuit at

1    955 F.2d 1545, a 1992 decision.

2            "This man's ability to come and go from the

3    United States, a right that people die for each and

4    every day, right here in the shores of our" --

5            THE COURT:  Well, I didn't preclude you from

6    cross-examining him about that.

7            MS. JHONES:  Your Honor, the fact that this

8    gentleman was in Mexico, incarcerated, being deported,

9    being deported -- he can't go back to Syria.  He can't

10   go back to Lebanon.  The man is a man without a

11   country.

12           The Court precluded me on relevancy from

13   bringing out the fact that he was incarcerated in

14   Mexico, that he was -- that his release was secured by

15   the FBI, and sustained the -- I couldn't develop that

16   line of testimony.

17           And the -- and you know what, your Honor?

18   Even if, even if, this man was incarcerated in Mexico

19   on any other charge, it matters not.

20           What matters is that it was the FBI, it was

21   the FBI -- and he knew it -- that got him out of jail

22   in Mexico, A, and not only got him out of jail, but

23   gave him an invitation to come to the United States.

24           Not only is his livelihood contingent upon his

25   work for the FBI, but his very ability to have a place

1   to live as of November of 2005.

2           MR. LEVIN:  Your Honor, for whatever it's

3   worth, in the last trial, you allowed us to go into

4   this.

5           THE COURT:  It's not worth anything.

6           Go ahead.

7           MS. ARANGO:  Judge, you allowed very, very

8   extensive cross-examination on exactly what Ms. Jhones

9   just discussed regarding *Davis versus Alaska*, *Wasko*

10  *versus Singletary*, the benefits that the witness

11  believed that he obtained in exchange for his

12  involvement, cooperation and so forth, his motivation.

13          And she went into that quite extensively,

14  the motive -- you know, what -- the benefits that the

15  FBI -- that he understood the FBI to have conferred

16  upon him.  He discussed that he received parols to

17  arrive into the United States.  He discussed it as far

18  as he could.

19          She tried to get into the special benefit

20  parol letter.

21          He said, "I've never seen a copy of that."

22          He was testifying about what he understood the

23  benefits were.

24          Whether or not he was arrested in Mexico on

25  immigration charges by Mexican authorities is

 1    irrelevant.

 2          What's relevant is that benefit by coming into

 3    the United States that he received from the FBI, which

 4    is the special benefit parol letter.  And he testified

 5    to that.  He testified that that enabled him to come

 6    into the United States.

 7          That is what he -- and he testified as much as

 8    he understood about that to the best his abilities.

 9          And that is all he can -- that is all that is

10    relevant.

11          THE COURT:  What was the case that you were

12    quoting from, Ms. Jhones?

13          MS. JHONES:  The case I was quoting from, your

14    Honor, I believe, was *United States versus Oliveros*.

15          THE COURT:  Okay.  You didn't cite that.

16          MS. JHONES:  I did cite it, your Honor.  Maybe

17    the Court was reading something else, because I cited

18    to several.

19          THE COURT:  Okay.

20          MS. JHONES:  But this is *United States versus*

21    *Oliveros*.

22          THE COURT:  What's the cite to that?

23          MS. JHONES:  That's 275 F.3d 1299 at

24    Page 1307, Eleventh Circuit, 2001.

25          It also cites, your Honor, to *United States*

1     *versus Taylor.*  That one I don't know if I gave to the

2     Court.  17 F.3d 333, Eleventh Circuit, 1994.

3               And I believe, your Honor, that it's the

4     *Lankford* case which I previously cited that talks about

5     the importance -- the more vital the witness is to the

6     Government's case, the greater -- the greater the need

7     for the Defendant to be able to explore and get into

8     the motive, the bias and the interest in

9     cross-examination.

10              This is probably the most important Government

11    witness in this case.

12              Mr. Batiste has a quasi-entrapment defense.

13    This gentleman's motivation to be able to make a case

14    is the entire case, is the entire case, as it relates

15    to Mr. Batiste and I would say, indeed, everyone in

16    this case.

17              This is the most important witness.  And this

18    man is completely --

19              MS. ARANGO:  Just --

20              MS. JHONES:  I'm not finished yet, Ms. Arango.

21              This man is completely, 100 percent, dependent

22    on the FBI.  He's dependent on the FBI for immigration.

23    He's dependent on the FBI for his living expenses and,

24    indeed, his income.

25              MS. ARANGO:  Well, Judge, I disagree --

1        THE COURT:  I allowed you to go into all of

2   that.  Correct?  You don't dispute that you weren't

3   allowed to go into that extensively?

4        MS. JHONES:  Your Honor, I wasn't able to

5   explore extensively the way I wanted to the immigration

6   benefits as it relates to -- as it relates to the fact

7   that this man has --

8        THE COURT:  That's not what I'm asking you,

9   Ms. Jhones.

10        What I'm asking you is:  You're not contesting

11   that I did not allow you to extensively go into his

12   support, his expenses and the benefits he received from

13   the FBI while he was here?

14        MS. JHONES:  Subject to the previous motions

15   that I have filed, in terms of the breakdown of

16   expenses.

17        MS. ARANGO:  Judge, I would say, just in

18   response, she was allowed to and she went into any --

19   you know, any benefits that were conferred upon him by

20   the FBI.

21        She was allowed to go -- she asked him all

22   about his immigration status, anything that FBI may

23   have done to assist him in that respect.

24        He testified what his belief was, which is

25   that FBI allowed him to enter the United States on

1    certain occasions through a parol.

2            He testified.  She explored that.  She

3    implicated -- she implied -- excuse me -- that there

4    was more that the FBI did, which I believe is wrong.

5            But in any respect, she was fully -- you know,

6    she was given, you know, full, you know, rein from your

7    Honor to ask and imply these things that were not

8    accurate, and he testified to the best of his belief.

9    You never once held her back.

10           There was one document that she could not

11   cross -- try to impeach him on, which is not a document

12   that he prepared or he testified that he even had any

13   knowledge of ever seeing.

14           So she was not in any way held back from full

15   cross-examination into his understanding of the

16   benefits that were incurred upon him, his motivation.

17           MS. JHONES:  Your Honor, let me just say this,

18   also:  I believe the Government has an obligation to

19   correct testimony that is, at best, a misrepresentation

20   by this witness.

21           The Government's document -- the significant

22   public benefit parol specifically outlines how many

23   occasions this man -- the FBI prevailed upon the

24   Immigration and Naturalization Service to obtain an

25   I-512, a special parol, for this person.

1          Specifically, the FBI document provided --

2     pursuant to my request under *Giglio*, specified that

3     this gentleman was provided -- the FBI prevailed upon

4     the Immigration Service on June 14th of 2001 for a

5     special parol for -- valid for a period of one year.

6          The FBI did it again on February 12th of 2006,

7     again, valid for multiple entries.

8          The FBI did it again on April 3rd of 2003,

9     another special parol for this witness.

10          The FBI did it again July 2nd of 2003, another

11     special parol allowing for multiple entries from

12     7-1-2003 until 7-1-2004.

13          The FBI -- the Government has the obligation

14     to correct what I believe to be perjured testimony from

15     this witness.  He denied that that ever happened, your

16     Honor, denied it.

17          And, in fact, the only way this individual

18     was able to gain access to the United States was

19     exclusively with the assistance of the FBI, not only in

20     2008, but from 2001 continuing on through to 2008.

21          And that has to be corrected for the record.

22          MS. ARANGO:  Judge, Ms. Jhones cited the case

23     herself -- the cases regarding what the witness

24     believes.

25          He testified what he believed about the

1    benefits that the FBI conferred upon him.  He testified

2    he never saw a copy of any kind of application by the

3    FBI to Immigration for the significant public benefit

4    parols.  And there would no reason he would see that.

5          He testified to the best of his knowledge as

6    to when the FBI assisted him.  And he said that the FBI

7    provided him with parols in certain circumstances to

8    come into the United States.

9          He may not have remembered the exact dates.

10   I'm not sure if Ms. Jhones has the exact dates correct.

11   I'd have to go back and check.

12         But the point is that there's no perjury.

13   He's testifying about what he believes to be true.  He

14   may not remember.  That's not perjury.

15         She fully -- the point of all of this is that

16   she fully explored that with him.

17         THE COURT:  Okay.  I haven't been able to look

18   at the cases while everybody's arguing.

19         So what was the motion that you're making?

20         MS. JHONES:  Your Honor, at this point I'm

21   making a motion for a mistrial.

22         THE COURT:  Well, I'm going to deny the motion

23   for mistrial.  I'm going to look at the cases.

24         I don't find, first of all, that there's been

25   prejudice to the Defendant such that he cannot receive

1    a fair trial.

2             There's been extensive cross-examination.

3             I will look at the cases and think about

4    whether this is an area that I should allow on further

5    cross-examination.  But I haven't had a chance to look

6    at the cases.

7             MS. JHONES:  Your Honor, what time are we

8    supposed to be back, please?

9             THE COURT:  12:15.

10            MS. JHONES:  Are we excused?

11            THE COURT:  Yes.  We're in recess until 12:15.

12            (Thereupon, a luncheon recess was taken, after

13   which the following proceedings were had:)

14            THE COURT:  We're back on United States of

15   America versus Narseal Batiste, et al., Case

16   No. 06-20373.

17            Counsel, state your appearances, please, for

18   the record.

19            MR. GREGORIE:  Good afternoon, your Honor.

20            Richard Gregorie and Jacqueline Arango on

21   behalf of the United States.

22            MS. JHONES:  Ana Jhones on behalf of Narseal

23   Batiste.

24            MR. LEVIN:  Albert Levin on behalf of Patrick

25   Abraham.

```
 1          MR. CASUSO:  Lou Casuso on behalf of Burson

 2   Augustin, who is present.

 3          MR. CLARK:  Nathan Clark on behalf of

 4   Rotschild Augustine, who's present.

 5          MR. HOULIHAN:  Richard Houlihan with Naudimar

 6   Herrera.

 7          MR. VEREEN:  And Roderick Vereen on behalf of

 8   Stanley Phanor.

 9          THE COURT:  All Defendants are present.

10          Let's bring in the jury.

11          Are you ready, Mr. Vereen?

12          MR. VEREEN:  I'm ready, Judge.

13          MR. CLARK:  May I bring up a subject about the

14   scheduled Monday hearing?

15          THE COURT:  Let's do it later, please.

16          MR. CLARK:  Okay.

17          THE COURT:  Let's bring in the jury, please.

18          (Whereupon, the jury entered the courtroom at

19   12:45 p.m. and the following proceedings were had:)

20          THE COURT:  You may be seated.

21          You are still under oath, sir.

22          You may proceed, Mr. Vereen.

23          MR. VEREEN:  Thank you, your Honor.

24          Good afternoon, ladies and gentlemen.

25          THE JURY:  Good afternoon.
```

```
 1                      CROSS-EXAMINATION
 2   BY MR. VEREEN:
 3   Q.     Mr. Assaad, good afternoon.
 4   A.     Good afternoon, sir.
 5   Q.     On December the 16th of 2005, you did not know
 6   what, if anything, Abbas al-Saidi had advised
 7   Mr. Batiste with regard to who you were and who you
 8   were supposed to be, do you?
 9   A.     One more time, sir.
10   Q.     I said:  On December 16th of 2005, prior to your
11   meeting with Mr. Batiste at the hotel -- the Radisson
12   Hotel, you don't know for a fact what it is, if
13   anything, that Mr. Abbas al-Saidi had advised
14   Mr. Narseal Batiste as to who you were or who you were
15   supposed to be, do you?
16   A.     I don't know nothing what -- what they spoke
17   between Brother Abbas and Brother Naz.  I don't know
18   nothing about it.
19   Q.     Right.
20          And you did not at that meeting know what
21   Mr. Batiste's level of education was, did you?
22   A.     No, sir.
23   Q.     But you are here, according to your testimony, to
24   test his resolve, to find out what his interest was
25   with regard to meeting someone from a terrorist
```

```
 1   organization.  Correct?
 2   A.    Yes, sir.
 3   Q.    All right.  And you also testified that, after
 4   each one of these meetings, you would be debriefed by
 5   the Federal Government, the FBI.  Correct?
 6   A.    Yes, sir.
 7   Q.    They would ask you questions with regard to --
 8   even though you were wearing a body wire in these
 9   meetings, they would sometimes ask you, you know, what
10   your understanding was with regard to what Mr. Batiste
11   would be telling you.  Correct?
12   A.    They never -- maybe -- I don't remember they
13   asked my opinion.  But they debrief me about what's
14   going on, what happened in the meeting.
15   Q.    Okay.
16   A.    And that's it.
17   Q.    Would you ever offer your opinions?
18   A.    They never asked for my opinions, sir.
19   Q.    I understand they never asked for it.
20         But did you ever offer your opinion?
21   A.    I don't remember exactly if I spoke about my
22   opinion or not or they asked me or not or I gave my
23   opinion.
24   Q.    Well, with regard to testing Mr. Batiste's
25   resolve, the first thing that you took into your
```

1    possession was the list that you asked for.  Correct?

2    A.    The first thing -- first meeting, the list?  Yes,

3    sir.

4    Q.    And on that list, you -- again, on the video, I

5    think it was clear that you spoke about the things on

6    that list and you questioned Mr. Batiste about those

7    things; did you not?

8    A.    Yes, sir.

9    Q.    And you asked him about this word -- I think you

10   pronounced it as "pilot," but he explained that he

11   meant "pistols."  Correct?

12   A.    Excuse me?

13   Q.    I said:  The list -- you had started reading from

14   a list and I think you said the word "pilot" when the

15   word was actually spelled p-i-t-o-l-s.

16         Do you recall that?

17   A.    No, sir.

18   Q.    Let me show you on the ELMO.  This is

19   Government's Exhibit 100.

20         MR. VEREEN:  If I may, your Honor.

21   BY MR. VEREEN:

22   Q.    This is the list; is it not?

23   A.    Yes, sir.

24   Q.    And I'm pointing to this word right here

25   (indicating).

```
1            It's spelled p-i-t-o-l-s.  Do you see that?

2    A.     Yes, sir.

3    Q.     Do you recall during the meeting you asked

4    Mr. Batiste what did he mean by -- I think you said

5    "pilots."

6            Do you recall that?

7    A.     No, sir.

8    Q.     If I show you Government's Exhibit 69, I believe,

9    is -- hold on for a second.  44.

10           MR. VEREEN:  May I approach, your Honor?

11           THE COURT:  Yes.

12   BY MR. VEREEN:

13   Q.     I'm showing you what's in evidence as

14   Government's Exhibit 44 -- I believe A is the

15   transcript.  It is.  I'm showing you Page 24.  Let me

16   show you specifically where that's mentioned.

17   A.     Okay.  Thank you.

18           So the question is, sir?

19   Q.     The question is:  When you were reading from this

20   list, you stated "hand pilot" and you questioned

21   Mr. Batiste as to what is a "hand pilot."  Correct?

22   A.     But I didn't ask him a question about this -- I

23   don't see where I'm saying -- I said that.

24   Q.     You don't see where you questioned him as to --

25   you state, as you read this, "Pilot," p-i-l-o-t.
```

```
 1    Correct?  You asked him, "What are hand pilots?" -- or,

 2    "What is a pilot?"  Do you see that?

 3    A.    It doesn't say here, sir.

 4    Q.    This is not a trick question.

 5          I'm simply trying to ask you:  You were reading

 6    from the list.  Correct?

 7    A.    Yes, sir.

 8    Q.    And you didn't know what this was that he was

 9    referring to when he put "hand pitols," did you?  And

10    you questioned him about that.  Right?

11    A.    I don't see where I questioned him about it, sir.

12          MR. VEREEN:  May I approach the witness, your

13    Honor?

14          THE COURT:  Yes.

15          MR. VEREEN:  It appears this transcript has

16    been changed.

17    BY MR. VEREEN:

18    Q.    But, nevertheless, you questioned Mr. Batiste

19    with regard to --

20          MS. ARANGO:  Judge, I would object.

21          THE COURT:  Sustained.

22          MR. VEREEN:  I think the video speaks for

23    itself.

24          THE COURT:  I'm sorry?

25          MR. VEREEN:  I said that the video will speak
```

```
 1   for itself.

 2   BY MR. VEREEN:

 3   Q.    With regard to -- well, first of all, the word on

 4   here is supposed to be "pistols."  It's misspelled as

 5   "pitols."  Correct?

 6   A.    Yes, sir.

 7   Q.    There's another word.

 8         The word "guard" is also misspelled; is it not?

 9   A.    (No response.)

10   Q.    Or you don't know?

11   A.    I don't know.

12   Q.    And then he asked for a "Motorola cells phone";

13   did he not?

14   A.    Yes, sir.

15   Q.    Okay.  And that's also incorrect; is it not?

16   A.    I don't see where it's incorrect.

17   Q.    "Cell phones" versus "cells phone"?  Or you're

18   not sure about that either?

19   A.    Cell -- "cells" mean cell phones or -- I don't

20   know.

21   Q.    All right.  That list is the list that you asked

22   him to compile with regard to everything he needed for

23   his mission.  Correct?

24   A.    I --

25   Q.    You can refer to the transcript if you need to
```

 1   refresh your recollection.

 2   A.    Referring to what page?  Or are you speaking in

 3   general?

 4   Q.    I'm speaking in general, during this

 5   conversation.

 6   A.    I don't believe he said everything he needed.

 7   Maybe he said this is what he needed in the beginning,

 8   the first step, something like that.  And --

 9   Q.    Did you not tell him to write down everything he

10   needed?

11   A.    Everything he -- because he was requesting

12   something.  And I said -- I told him, "Everything you

13   need."

14         After, he said he will give to me specific list

15   or more details list, something about this.

16   Q.    Look on Page -- I believe it's 22 of that

17   transcript.

18         Did you not tell him, "Give me a list of what you

19   want.  Give me all the list of what you want"?  Do you

20   not say that to him?

21   A.    Referring to what -- top page?  Middle of the

22   paragraph?

23   Q.    It should be the last major paragraph.

24   A.    (No response.)

25   Q.    Do you not see that?

```
 1    A.     No, sir.

 2           MR. VEREEN:  May I approach, your Honor?

 3           THE COURT:  Yes.

 4    BY MR. VEREEN:

 5    Q.     Let me see the transcript, please.

 6    A.     (Tenders document to counsel.)

 7    Q.     It's Page 23, this paragraph right here

 8    (indicating).

 9    A.     Thank you.

10    Q.     That's what you stated to Mr. Batiste; is it not?

11    A.     Yes, sir.

12    Q.     "Give me a list of what you want.  Give me all

13    the list of what you want."

14           Correct?

15    A.     Yes, sir.

16    Q.     And on December the 16th of 2005, that is the

17    complete list of what Mr. Batiste told you that he

18    wanted.  Correct?

19    A.     Yes, sir.

20    Q.     And this was supposed to be what he needed to

21    wage jihad against the United States.  Right?

22    A.     One second, if -- one second, before I answer.

23           Yes, sir.

24    Q.     Later on during the conversation -- and this is

25    now going to where he said he wanted to march down the
```

```
 1   street or go straight to City Hall, Jeb Bush's office.

 2   Correct?

 3   A.    Yes, sir.

 4   Q.    Now, you didn't know who Jeb Bush was, did you?

 5   A.    Yes, sir.

 6   Q.    Who was Jeb Bush back on December the 16th of

 7   2005?

 8   A.    The Governor.

 9   Q.    And where is the Governor's office?

10   A.    I don't know.

11   Q.    Do you know where City Hall is?

12   A.    Yes.  Every city has one.

13   Q.    Is the Governor's office in City Hall?

14   A.    I don't know, sir.

15   Q.    When Mr. Batiste said that to you -- withdraw

16   that question.

17         It was your understanding on this date -- on this

18   first date with Mr. Batiste that he was interested in

19   waging holy war against the United States at the time

20   you had come to Miami, Florida.  Correct?

21   A.    At the time I came?

22   Q.    Yeah.

23         That he was supposed to be ready to go as soon as

24   you gave him the contact he needed.  Correct?

25   A.    I wasn't -- they didn't tell me anything and --
```

1    about his plans or what's going on with Brother Naz.

2           All what they told me to have to play my role,

3    come to meet this guy and try to find his intention.

4    Nothing about holy war.  Nothing about jihad.  Nothing

5    about preparation.  Only in this meeting show up

6    everything.

7    Q.    At this meeting, did Mr. Batiste appear to be

8    trying to impress you?

9    A.    Excuse me?

10   Q.    I said:  At this meeting, did it appear to you

11   that Mr. Batiste was trying to impress you?

12          MS. ARANGO:  Judge, cumulative.  Everything

13   he's been asking so far has already been covered by

14   Ms. Jhones.

15          THE COURT:  Sustained.

16   BY MR. VEREEN:

17   Q.    After the meeting on December the 16th, 2005, you

18   didn't know what, if anything, Mr. Batiste told these

19   gentlemen about having met with you, do you?

20   A.    He told me that he talk about the brother about

21   me.

22   Q.    My question is:  You do not know what he told

23   them about having met you on December the 16th of 2005,

24   do you?

25   A.    Like I said, sir, what -- I know what Brother Naz

```
 1   told me he told the brothers.  I wasn't with them.  I
 2   wasn't with him.  And I heard what he said.  I heard --
 3   I know what Brother Naz told me, what he told the
 4   brothers.
 5   Q.    And what was that?
 6   A.    That he spoke -- I'm here to support them, I'm
 7   real, I will be supporting them or supporting their
 8   mission.
 9         And I remember something, also, they told me
10   themself.  They told me -- the brothers told me
11   themself they heard about me, they discussed me in
12   their meetings.
13         And that's mean, by them telling me this,
14   confirming what Brother Naz told me.
15         When I went to the Key on 28, in different
16   meetings, that's mean they knew about me and they knew
17   about my -- who I represent and they knew who I am.
18   And that's confirming what Brother Naz told me.
19   Q.    On December the 22nd, 2005, you had a
20   conversation again.
21         You met with Mr. Batiste on that date.  Correct?
22   A.    Yes, sir.
23   Q.    And you specifically asked Mr. Batiste how were
24   the brothers doing.
25         Do you recall that?
```

```
 1   A.     Yes, sir.

 2   Q.     And Mr. Batiste told you -- he says, "Oh, they're

 3   doing good."

 4          Do you recall that?

 5          Then you responded by asking Mr. Batiste,

 6   "They're doing good?"

 7          Which he responds, "Yeah."

 8          This is on Page 10.

 9          "I told them a little bit about you" --

10             MS. ARANGO:  Judge, may I just have an exhibit

11   number, if he's reading from a page?

12             MR. VEREEN:  Government's Exhibit 47-A.

13             MS. ARANGO:  I would ask that he provide it to

14   the witness.

15             MR. VEREEN:  That's not a problem, if the

16   witness says he needs to refresh his recollection.

17             MS. ARANGO:  Judge, he's reading from the

18   exhibit as he's asking the question.

19             THE COURT:  Well, ask him the question.  If he

20   needs the exhibit, he'll let you know.

21             MR. VEREEN:  Thank you.

22   BY MR. VEREEN:

23   Q.     Do you recall Mr. Batiste telling you, "Yeah.  I

24   told them a little bit about you.  They're dying to

25   meet you.  They're not around right now"?
```

```
 1          Do you recall that?
 2   A.     No.  Not -- not exactly word.  Maybe if I can see
 3   it --
 4   Q.     Sure.
 5   A.     -- please.
 6          MR. VEREEN:  May I approach, your Honor?
 7          THE COURT:  Yes.
 8   BY MR. VEREEN:
 9   Q.     (Tenders document to the witness.)
10   A.     The question is, sir?
11   Q.     The question is:  That's what Mr. Batiste told
12   you, that he told them a little bit about you.  But he
13   did not go into detail as to what he told them, did he?
14   A.     Yeah.  Yes, sir.
15   Q.     Okay.  Now, at that point in time, you had not
16   met Stanley Phanor, had you?
17   A.     At that time, sir, I don't know their names.  I
18   met brothers.  They were in the Embassy.  But I don't
19   know -- I don't know what's their names, because most
20   of the time they call each other Brother Mo, Mo, Mo.
21   So I don't know at that time what's their name was.
22   Maybe I met him.  Maybe I'm not -- I didn't.
23   Q.     All right.  By December the 22nd, had you been to
24   the Embassy?
25   A.     Yes, sir.
```

Assaad - CROSS - By Mr. Vereen

```
 1   Q.     How many times?

 2   A.     December 22nd?

 3   Q.     Yes.

 4   A.     One time I came -- I arrived on -- my first visit

 5   to the Embassy was December 22nd.

 6   Q.     December what?

 7   A.     The 22nd.

 8   Q.     That's your first time?

 9   A.     Yes, sir.

10   Q.     And who did you meet the first time you went

11   there?

12   A.     I don't know.  There is -- brothers were there.

13   I don't know who they were.  I didn't know their names.

14   Q.     You know the faces; do you not?

15   A.     It was almost three years ago, sir.  I don't

16   remember.

17   Q.     The first time you met Stanley Phanor, the one

18   you referred to as Brother Sunni -- does that name ring

19   a bell?

20   A.     Yes, sir.

21   Q.     The first time you met him was January the 28th,

22   2006; was it not?

23   A.     The first time I spoke with him.  Maybe I met him

24   before.  Maybe I met him before January 28.

25   Q.     Are you sure about that?
```

```
 1   A.    The first time I spoke with him and been

 2   introduced by names was on January 28th.

 3   Q.    Are you sure you met him before January the 28th?

 4   A.    Like I said, sir, maybe I met him before.  Maybe

 5   I met him in the Embassy or somewhere.  I don't know.

 6         But the first time we introduced each other by

 7   names, like I talked to him personally and he said "My

 8   name is Brother Sunni," was on January 28th.

 9   Q.    And that was the day you arrived in Key West.

10   Correct?

11   A.    Yes, sir.

12   Q.    All right.  And you'd agree with me that

13   Mr. Phanor was very polite with you; was he not?

14   A.    Yes, sir.

15   Q.    In fact, he was very apologetic for you having to

16   come out there; was he not?

17   A.    Excuse me?

18   Q.    He was very apologetic.  "I'm sorry we had to

19   inconvenience you."

20         Isn't that what he said to you?

21   A.    Or something similar.  I don't remember exactly

22   the exact words.

23   Q.    And he introduced himself to you; did he not?

24   A.    Yes, sir.

25   Q.    And at one time, he says, "Well, you know, you
```

Assaad - CROSS - By Mr. Vereen                         74

```
 1   should be used to this."
 2        Isn't that what he said to you?
 3   A.    Excuse me?
 4   Q.    He said to you that you should be used to that.
 5   A.    I don't remember, sir.
 6   Q.    He advised you that he had great respect for you.
 7   Right?  Do you recall that?
 8   A.    I don't know.  Maybe he said that.
 9   Q.    Would looking at the transcript refresh your
10   recollection?
11   A.    Yes, sir.
12   Q.    Let me show you Government's Exhibit 55-A.
13        MR. VEREEN:  May I approach, your Honor?
14        THE COURT:  Yes.
15   BY MR. VEREEN:
16   Q.    I'm showing you Page 90 of Government's
17   Exhibit 55-A.
18   A.    Thank you.
19        The question is, sir?
20   Q.    He says to you in that -- on that page that you
21   should be used to this by now.  Right?
22   A.    Yes.
23   Q.    Do you know what he was making reference to?
24   A.    Excuse me?
25   Q.    Do you know what he was making reference to when
```

```
 1   he said Brother Mohammed -- "Brother, you should be
 2   used to this, you know"?
 3   A.    You mean kidnapping?
 4   Q.    Do you know what he was talking about when he
 5   makes that statement to you?
 6   A.    About -- I don't know.
 7   Q.    You don't know what he was talking about?
 8   A.    Used to this strip-searching and taking you to
 9   unknown places and all this.  Maybe he's referring to
10   this stuff, what happened.
11   Q.    But you don't know what he's talking about?
12   A.    You asking me my opinion on what --
13   Q.    I'm asking you:  At the time he made this
14   statement to you, do you know what he was talking
15   about?
16   A.    About what happened to us:  Taking --
17   strip-searching us, taking us to unknown locations and
18   all this stuff.
19   Q.    That's -- okay.  All right.
20         He then says -- he apologizes for the
21   inconvenience.  Correct?
22   A.    Same page?
23   Q.    Yes.  Two lines down.
24   A.    Yes, sir.
25   Q.    Now go -- skip over to Page 92.
```

1          I believe it's on Page 92 where he starts talking

2     about having great respect for you.

3          Do you see that?

4     A.    Yes, sir.

5     Q.    And he says, "We have great respect for you,

6     great respect for you.  And we don't take nothing away

7     from you.  With us -- we have great, great respect for

8     you and what you're doing in your job and -- and your

9     heart and the mission you're doing for Allah.  We have

10    great respect for you.  Believe me, when your name come

11    up within a circle, we speak of you with great, great

12    respect.  So I apologize again for us going through all

13    of this.  But, you know...."  And he stops there.

14         Correct?

15    A.    Yes, sir.

16    Q.    Okay.  And, again, he's essentially telling you

17    that they admire you.  Whatever they were told about

18    you, they have admiration for you.  Correct?

19    A.    Yes, sir.

20    Q.    And, again, you do not know what Narseal told

21    them about you, do you?

22    A.    Yes and no.  But let me explain, sir.

23         When somebody tell you, "We admire you and we

24    respect what you doing for Allah and" -- by knowing

25    about me, I represent Al-Qaeda and terrorist

Assaad - CROSS - By Mr. Vereen                          77

```
 1   organization, that's at least something -- at least

 2   something, you know, that -- what they are talking

 3   about.  They know what you're doing, what you

 4   represent.

 5   Q.    Did you hear Narseal Batiste tell them that you

 6   were from Al-Qaeda on December the 16th or up to

 7   December 22nd of 2005?  Did you hear Narseal Batiste

 8   tell them that you represented Al-Qaeda?

 9   A.    I didn't hear him, sir.  No.

10   Q.    Okay.  And do you know why it was that Narseal

11   Batiste was in Key West versus being in Miami on that

12   date?

13   A.    I don't know, sir.

14   Q.    Well, did he not tell you during that

15   conversation that there was a warrant out for his

16   arrest for paying -- for not having paid a ticket for

17   driving with a suspended license?

18   A.    Are you referring to a certain page, sir?

19   Q.    Page 102.

20   A.    106?

21   Q.    102.

22   A.    He told me not about the ticket, sir.  He told me

23   about something fraud and diamond -- stolen diamond and

24   all this stuff.

25   Q.    Mr. Batiste told you that he had been
```

1    questioned -- there was a detective that wanted to

2    question him about some diamonds disappearing from a

3    house where he had been working.  Correct?

4    A.    Yes, sir.

5    Q.    And he advised you that he had spoken with the

6    detective and the detective advised him that he knows

7    he didn't take the diamonds because, if he did, he

8    would have been able to pay his ticket.  Correct?

9    A.    No, sir.  He said --

10         MR. VEREEN:  May I approach the witness, your

11   Honor?

12         MS. ARANGO:  Judge --

13         THE COURT:  Let him finish his answer.

14   BY MR. VEREEN:

15   Q.    Finish your answer, sir.

16   A.    He said, "So a detective called me up and he ask

17   all kind of questions.  He wants to bring me down for

18   questioning.  He's following me.  You see what I'm

19   saying?

20        "And then I had a warrant out for my arrest.

21   Remember I told you that?  Because I had a ticket that

22   I didn't pay."

23        So there is two reason -- from my understanding,

24   two reason.  One is the detective following him.  And,

25   second, there is a warrant about the ticket.

1   Q.     About a ticket.  Correct?

2   A.     About both reasons, sir.  Yes.

3   Q.     Now, continuing on to the next page, Mr. Batiste

4   says, "You know, I paid the ticket I got.  But this

5   detective was still following me.  He hasn't called me

6   in about the last two weeks, because I told him -- I

7   said I couldn't have no diamonds because, if I had some

8   diamonds, I would have -- I would have had the money to

9   get my driver's licenses out of suspension.  My

10  driver's license is still in suspension."

11         That's what he tells you.  Correct?

12  A.     No, sir.  There's something prior -- before this

13  stuff what he said.

14         And he mentioned, "And though they had" -- on the

15  Page 103, on the top of the page --

16  Q.     Go ahead.

17  A.     -- "And though they had a warrant out for my

18  arrest and I already knew that they were.

19         "And here we are being surprising.  No.  This

20  happened right after the last time we talked and two

21  days after we talked."

22         And with all this being -- he's being suspicious

23  about me and linking stuff between me, suspicious that

24  I am undercover law enforcement or something or showing

25  up.

```
 1            And he add other stuff during the conversation.
 2   Q.    But he said what I just said.  Correct?
 3   A.    Yes, sir.
 4   Q.    He didn't say anything about what you just said
 5   in this transcript, did he?
 6   A.    What?  Show up?
 7   Q.    About all the suspicion he had of you.
 8            He didn't say that between what I said and what
 9   you just said, did he?
10   A.    In this conversation?
11   Q.    Yes.
12   A.    Yes, sir.  He said.
13   Q.    I'm talking about right now when you said he said
14   he was suspicious about you.
15            That's not in that transcript, is it?
16   A.    About me?  Yes, sir.  He -- what -- not -- this
17   happen right after the last time we talked and two days
18   after we talked.
19            And this is linking this two stuff, I guess,
20   between these two.
21   Q.    Well, are you guessing?
22   A.    I'm understanding about what he said.
23   Q.    Did you just say "I guess"?
24            MS. ARANGO:  Objection.  Asked and answered.
25            MR. VEREEN:  It's not asked and answered.
```

 1              MS. ARANGO:  He said, "Are you" --

 2              THE COURT:  Sustained.

 3              Rephrase your question.

 4     BY MR. VEREEN:

 5     Q.    When you went down to the tent, who followed you

 6     down to the tent in the Keys?  Who followed you to the

 7     tent where you and Narseal and Abbas al-Saidi sat

 8     inside the tent?

 9     A.    There were brothers I didn't recognize.  They

10     were outside the tent.  And Brother Patrick and Brother

11     Naudy -- they were in the car driving, and they come

12     with us.  And Brother Sunni.

13     Q.    My question was who followed you to the tent, not

14     who drove you.

15     A.    Oh.  I was saying, sir, they came down with us.

16     Q.    Who?

17     A.    Brother Sunni, Brother Patrick, Brother Naudy,

18     because they drove us over there and they -- we came

19     down to the tent with Brother Abbas and other brothers

20     were there already.

21     Q.    And is your testimony that they stood around the

22     tent while you were inside with Abbas al-Saidi having a

23     conversation with Narseal Batiste?

24     A.    Yes, sir.

25     Q.    Were you speaking loudly while you were inside

```
 1   the tent?
 2   A.      I believe I have very strong voice, sir.  So....
 3   Q.      You don't know if they heard you or not, do you?
 4   A.      I cannot confirm that.  No, sir.
 5   Q.      Let's back up to January 22nd -- excuse me --
 6   December 22nd, 2005.
 7           You had -- the FBI wanted you to try to figure
 8   out what the motive of Mr. Batiste was.  Correct?
 9   A.      Yes, sir.
10   Q.      And so you, in your line of questioning to
11   Mr. Batiste, asked him to explain to you what his
12   motives were.  Correct?
13   A.      Yes, sir.
14   Q.      And Mr. Batiste tried to -- or he explained to
15   you at least three times what his motive was.  Correct?
16   A.      I guess.  Yes.
17   Q.      And you had asked him, did you not, "What's the
18   motive?  That's what I want to know."
19           He says to you that the -- the first thing he
20   says is, "You have to understand that imagination and
21   Governments are alike."
22           Correct?
23   A.      Referring to what page, sir?
24   Q.      This is Government's Exhibit 47.  Do you have it
25   in front of you?
```

1    A.      Yes, sir.

2    Q.      Look on Page 30.  I believe it's on Page 30.

3    A.      47?

4    Q.      47-A.  Do you see that in front of you?

5    A.      No, sir.

6    Q.      You don't have that exhibit in front of you?

7    A.      Yes.  I don't see it, the page.

8    Q.      Page 30.

9            Do you see where Mr. Batiste says that to you?

10   You asked him prior to that, "So I want to know from

11   you, brother -- like, brother, with me, a part of my

12   religion, brother, in my jihad -- I want to know why

13   you do this.  Why?  What's the motive?  That's what I

14   want to know."

15           Do you see that?

16   A.      Yes, sir.

17   Q.      He responds to you, "You have to understand that

18   imagination and Governments are alike."

19           Do you see that?

20   A.      Yes, sir.

21   Q.      Did you understand -- do you know what he was

22   talking about when he said that?

23   A.      No, sir.

24   Q.      And you even questioned him.  You said,

25   "Imagination?"

```
 1          Right?

 2    A.     Yes, sir.

 3    Q.     And then he tries to give you another example --

 4    or he states again to you in a different fashion what

 5    his motive is.

 6          And he tells you, "Yes.  For example, if you try

 7    to think back till you was a child, after you think

 8    back so far, your mind will go black."

 9          Did you understand what he meant by that?

10    A.     No, sir.

11    Q.     Then you say, "Yes" to him.

12          And he responds, "Then, as you come into your

13    conscience [sic] mind, you start to record facts and

14    then you become ideas.  You become conscience.

15          "Now, what I consider imagination is -- is

16    that -- how from nothing can something be created?  So

17    what I'm saying is that there's nothing impossible in

18    this world for it to be.

19          "As I have understood by studying the Bible,

20    Koran and all righteous books, I have become -- I had

21    became a man who understands who I am."

22          Did you understand what he meant by that?

23    A.     No, sir.

24    Q.     You had no idea, did you?

25    A.     No, sir.
```

1   Q.    And then he says to you, "My purpose, my mission

2   in life -- I know who I am and I don't believe that I

3   just came here in this life."

4         You have no idea as to what he meant by that

5   either, do you?

6   A.    Little bit.  I start to understand what he mean

7   about previous and now.

8   Q.    He then tells you, "I been -- I believe -- not

9   only do I believe, but I know by knowledge, math -- I'm

10  not talking about guessing.  I'm talking about

11  mathematics -- something that it would take me days to

12  try to figure out and explain, but I know that I came

13  around this planet several times for this purpose."

14        Do you have any idea as to what he meant by that?

15  A.    No, sir.

16  Q.    He goes on to say, "Now, I'm not saying that --

17  that I am Mohammed or anybody, but I know one thing.

18  I'll tell you this much:  I know that I'm an angel and

19  I know that I descended from Allah and I know that I

20  got to fulfill my duty for the liberation and the

21  freedom of all Allah children for" -- something

22  unintelligible -- "that want to serve freely.  And

23  that's the best way I can put it to you."

24        Correct?  He says that to you; does he not?

25  A.    Yes, sir.

1   Q.    And you again have absolutely no idea as to what

2   he was talking about, do you?

3   A.    Yes, sir.  I know.

4   Q.    You know what he's talking about?

5   A.    He's like referring to himself like one of the

6   big leaders and he has a purpose to come on this planet

7   to serve and to -- to serve his mission.

8   Q.    Well, you continue to ask him, do you not -- you

9   say, "But you didn't answer my question -- or you

10  didn't give me my answer.  I'm listening to you, but

11  you -- you didn't give me yet my answer.  Why are you

12  doing this?"

13        Correct?

14  A.    Yes, sir.

15  Q.    And then he goes on to explain to you again, does

16  he not, saying, "But, see, the thing about it is that,

17  if a person understands the Bible and understands the

18  Koran, they will see that there's only one government,

19  and that's the government of Islam."

20        Correct?

21  A.    Yes, sir.  Yes, sir.

22  Q.    And you still pressure him because you want to

23  try to get an understanding as to what he is really

24  talking about.  Correct?

25  A.    What his motive, sir.

1   Q.     And then, on Page 33, he goes into it again.

2   This time, he changes everything he said the first two

3   times, does he not, by stating, "Now, since the time I

4   began to realize this, I began to see how it feels to

5   be" -- well, he backs up first.

6          He says, "Now, before I came" -- this is at the

7   top of 33 -- "Before I -- "Now, before I came into

8   knowledge of who I am --"

9          And you say, "Uh-huh."

10         He says, "-- the basic thing that I had to

11  realize is how I first came into this world.  I came

12  into this world as what they call -- as being what they

13  call a black man.

14         He goes on to say, "Now, since the time that I

15  began to realize this, I began to realize how it feels

16  to be low grade and hated because of white supremacy.

17         "And not only that.  We can start" -- and he says

18  something unintelligible -- "This Government came over

19  here, took a nation of people who were free people and

20  literally cut the babies out of the women and stuff,

21  killed them, robbed them, raped them and did everything

22  they can do" -- excuse me -- "did everything they can

23  to the men and the women just for the economic --

24  economical value.

25         "And that's beyond all moral, inhumane" --

```
 1    something unintelligible -- "That's beyond human

 2    consciousness.  Imagine it.  If that's the human game,

 3    why would you do that?"

 4         That's -- again, that's the last thing he says

 5    with regard to any type of motive.  Correct?

 6    A.    Could I have one second, please?

 7    Q.    Sure.

 8    A.    Yes, sir.

 9    Q.    Did you understand what he meant by any of that?

10    A.    No, sir.

11    Q.    After January the 28th, 2006, when was the next

12    time you saw Stanley Phanor, Brother Sunni?

13    A.    March 9.

14    Q.    Let me see if I can -- March 9th?

15    A.    I believe.  Yes, sir.

16    Q.    Are you sure about that?

17    A.    Yes, sir.

18    Q.    And what were you doing on March 9th?

19    A.    In the Embassy.

20    Q.    And that's the day you said you came and they

21    wanted to search you before you went in.  Correct?

22    A.    Yes, sir.

23    Q.    All right.  Now, with regard to -- now, let me

24    back up.

25         You had already met Abbas al-Saidi by that time;
```

Assaad - CROSS - By Mr. Vereen                    89

```
 1   did you not?

 2   A.     Yes, sir.

 3   Q.     And you arrived on one occasion -- at least on

 4   January the 28th, 2006, you rode with Abbas al-Saidi in

 5   a taxicab, did you not, to the Embassy?

 6   A.     One more time, sir, the question.

 7   Q.     Did you ride in a taxicab with Abbas al-Saidi?

 8   A.     What day?

 9   Q.     On January the 28th.

10   A.     On January 28, yes, sir.  We went to the Embassy

11   with a taxicab.

12   Q.     And on that date, you turned your recorder on --

13   well, your recorder was on during your ride to the

14   Embassy; was it not?

15   A.     Yes, sir.

16   Q.     And that's what you'd do when you leave your

17   hotel room, you would turn your recorder on.  Right?

18   A.     Yes, sir.

19   Q.     And that's the practice that you had from the

20   time you started wearing this body wire up until the

21   time you stopped wearing the body wires.  Correct?

22   A.     Yes, sir.

23   Q.     And so, on March the 9th, 2006, you had turned on

24   your body wire prior to leaving your hotel room.

25   Correct?
```

Assaad - CROSS - By Mr. Vereen                    90

```
 1   A.    I don't remember when was that, sir.

 2   Q.    Well, it was on -- you had it on before you went

 3   to the Embassy because you wanted to make sure you

 4   captured any conversations that you had with any

 5   brothers that you met when you got to the Embassy on

 6   March the 9th, 2006.  Correct?

 7   A.    Yes, sir.

 8   Q.    All right.  And so there should then be a

 9   conversation you were having with these brothers

10   talking about strip-searching you on that date, if your

11   recorder was on.  Correct?

12   A.    I believe.  Yes, sir.

13   Q.    Have you heard that recording?

14   A.    No, sir.

15   Q.    It wasn't until you left on that morning -- or

16   that afternoon that you went and took that recorder off

17   before you returned back to the Embassy.  Right?

18   A.    Excuse me, sir?

19   Q.    I said:  You left the Embassy.  You did not allow

20   them to search you.  Correct?

21   A.    Yes, sir.

22   Q.    And that recorder was, as far as you understand,

23   operating at that time.  Correct?

24   A.    Yes, sir.

25   Q.    And you took that recorder off and you gave it
```

```
 1   back to the FBI; did you not?
 2   A.    Yes, sir.
 3   Q.    Have you ever seen a transcript of that
 4   recording?
 5   A.    Yes, sir.
 6   Q.    You have?
 7   A.    The conversation with Brother Naz?
 8   Q.    On March the 9th, when you say you approached the
 9   Embassy and the brothers said they wanted to search
10   you, have you seen a transcript of that recording?
11   A.    No, sir.
12   Q.    But you would agree with me that, if you were
13   wearing a recorder on you at that time that was
14   operable, it should have and would have intercepted
15   that conversation between you and the brothers
16   requesting that they have the opportunity to search
17   you.  Right?
18   A.    That you have ask the FBI, sir.
19   Q.    Who did you turn that recorder over to?
20   A.    The specific agent?
21   Q.    Yes.  The specific agent.
22   A.    I don't remember.  Sometimes.  Most of the time,
23   I gave it to Agent Tony Velazquez and sometimes to
24   other agents.
25   Q.    Well, this is clear in your mind, what took place
```

```
 1   that day.  Right?
 2   A.    I mean, I remember the day what happened, who --
 3   how many people was there or -- but I don't remember
 4   exactly details about that day.
 5   Q.    Well, you can remember each one of the brothers
 6   that you said tried to search you that day.  Correct?
 7   A.    Who want to search me?  The question is?  I
 8   didn't understand the question, sir.
 9   Q.    You've testified, have you not, that the brothers
10   wanted to search you when you arrived at the Embassy
11   that day?
12   A.    I testified -- they told me, if I would go in, I
13   will be strip-searched.  Yes, sir.
14   Q.    And you identified, I think, Stanley Phanor as
15   being one of the guys that wanted to search you that
16   day.  Correct?
17   A.    Yes, sir.
18   Q.    Okay.  If you were wearing a body wire and a body
19   recorder that picked up this conversation, that
20   conversation would have been between you and whoever is
21   telling you that, if you want to go into this Embassy,
22   that they were going to search you.  Correct?
23   A.    Yes, sir.
24   Q.    And so you didn't go into the Embassy.  Instead,
25   you left; did you not?
```

Assaad - CROSS - By Mr. Vereen                      93

```
 1   A.     I didn't understand your question, sir.

 2   Q.     You left the Embassy without having been

 3   searched.  Correct?

 4   A.     Yes, sir.

 5   Q.     You went and you took this recording off of your

 6   person.  Right?

 7   A.     I took with me.  Yes, sir.

 8   Q.     And where did you take that recorder?

 9   A.     I gave it to the FBI.

10   Q.     Who?

11   A.     I don't remember that day who I gave -- I gave it

12   to, because I -- what I testified -- when I said who,

13   they briefed me after the meeting.  When I left from

14   the Embassy on March 9, the FBI talked to me and they

15   debriefed me about the meeting.

16   Q.     Who?

17   A.     And I told them --

18   Q.     Who?

19   A.     Sir, you should ask the FBI.  I don't remember

20   who the person is.

21   Q.     Well, I'm asking you --

22   A.     But most of the time --

23   Q.     I'm asking you, Mr. Assaad.  I'm asking you.

24   You're the one testifying.

25          MS. ARANGO:  I would object to interrupting
```

 1    the witness.

 2              MR. VEREEN:  Well, I object to the witness

 3    telling me to ask the FBI.

 4              THE COURT:  Let him finish his answer.

 5    BY MR. VEREEN:

 6    Q.    Finish your answer, sir.

 7    A.    I was saying, sir, that when I left from the

 8    Embassy, I got debriefed from the FBI.

 9          So who was there, who strip-searched me, who

10    talked to me, what we spoke about, it was fresh.  It

11    was direct after the meeting.

12          But now you are asking me after three years --

13    almost three years whose agent I gave the device to.  I

14    don't remember.

15          Maybe -- I said, most of the time, Agent Tony

16    Velazquez, or sometimes -- I don't know.  But most of

17    the time, it's Tony -- Agent Tony Velazquez.

18    Q.    You're saying, because of the time lapse, you

19    can't recall?

20    A.    More or less.  Yes, sir.

21    Q.    Who pays you your money?

22    A.    It depends.  Not every time same people.

23    Different people.

24    Q.    But you know who those people are.  Right?

25    A.    Sometimes I don't know who they are, sir.

1   Different agents.

2   Q.    Let's talk about March the 16th, 2006.

3         You recall that date; do you not?

4   A.    Yes, sir.

5   Q.    That's the date you and Mr. Batiste were going to

6   go to the Embassy and -- or the warehouse and have

7   these gentlemen take a commitment between yourself and

8   Mr. Batiste.  Correct?

9   A.    Yes, sir.

10        MR. VEREEN:  This is Government's

11  Exhibit 69-B.  May I give a copy of this exhibit to the

12  witness, your Honor?

13        THE COURT:  I'm sorry?

14        MR. VEREEN:  May I give a copy to the witness?

15        THE COURT:  Yes.

16  BY MR. VEREEN:

17  Q.    (Tenders document to the witness.)

18        Now, turn to Page 18, if you will, Mr. Assaad.

19  A.    Yes, sir.

20  Q.    At this point in the meeting, you are now going

21  to attempt to read the bayat to these gentlemen for the

22  first time.  Correct?

23  A.    Yes, sir.

24  Q.    And you start off by telling them, essentially,

25  "I will say something now in English.  And I do this

 1    for you.  And if you don't understand what I'm saying,

 2    please, brother, let me know.

 3           "This Al-Qaeda pledge for Al-Qaeda pledge.

 4           "I am representing -- I am representing the Sheik

 5    Osama bin Laden.  God's pledge is upon me and so is his

 6    compact and that I will be a soldier for the Islamic

 7    soldiers until God's word is exalted and I commit

 8    myself along my brother's path of the role of jihad.

 9           "Do you understand me, all of you?"

10           That's what you first say to them.  Correct?

11    A.    Yes, sir.

12    Q.    And that was your first recitation of what you

13    call the bayat.  Correct?

14    A.    First part.  Yes.

15    Q.    You don't say anything about holy war in that

16    first passage, do you?

17    A.    Excuse me?

18    Q.    You don't say anything about holy war the first

19    time you read that bayat, do you?

20    A.    No.

21    Q.    And then Stanley Phanor says, "Can you wait a

22    second?"

23           Right?

24    A.    Yes, sir.

25    Q.    Did you hear what he said after, "Can you wait a

 1   second?"  Let me rephrase that question.

 2        He did not say, "I believe it's all right?" --

 3   question mark -- did he?

 4   A.    He did, sir.

 5   Q.    He said, "I believe it's all right?", asking a

 6   question of you?

 7   A.    Excuse me?

 8   Q.    Are you saying he said, "I believe it's all

 9   right?", in question format?

10   A.    I believe what is written, what he said.

11   Q.    I'm not asking you what's written.

12        I'm asking you:  Did you hear him say, "I believe

13   it's all right?", in question format?

14   A.    Sir, the question or not, I heard him saying

15   this.

16   Q.    What did you hear him say?

17   A.    Whatever it's saying over here.

18   Q.    Which is what?

19   A.    "I believe it's all right."

20   Q.    Is that a question or is that a statement?

21   A.    I don't know.

22   Q.    Well, you were there.

23        What was he saying?

24   A.    He was saying what -- what -- this sentence.  So

25   I don't know how you want to put it, question or you

```
 1   want to put it -- I don't know.
 2   Q.    Isn't it a fact, Mr. Assaad, that Stanley Phanor
 3   said -- after you read this bayat, he looks to Narseal
 4   Batiste and says, "Can you wait a second?"  He's
 5   telling you this, is he not, "Can you wait a second?"
 6   A.    Yes, sir.
 7   Q.    He turns to Narseal Batiste and he says, "Is this
 8   all right?", not, "I believe it's all right."
 9         He said, "Is this all right?"; did he not?
10   A.    I don't remember.  I remember what he said.  He
11   said, "I believe it's all right," sir.
12   Q.    You'd agree with me that, "I believe it's all
13   right" is not a question, is it?
14   A.    No.  But he's saying he want me to -- when you
15   have doubt about something and you think about it and
16   you say, "I believe it's all right" or, in your mind,
17   you can say, "Okay.  I believe it's all right," saying,
18   "We can proceed the next step."  So both ways you can
19   do it.
20   Q.    Have you seen this video?
21   A.    Yes, sir.
22   Q.    Mr. Phanor is not captured on this videotape, is
23   he, saying what you said you heard?
24   A.    But was a video and was a monitor -- a recording
25   device, sir.
```

```
 1    Q.     I understand.

 2           My question is:  When you hear these words, he is

 3    not on the videotape itself, is he?

 4    A.     I don't remember, sir.

 5    Q.     Narseal Batiste then says, "Yeah, Mo.  Could you

 6    read it to them first, brother, before they repeat it?"

 7           Correct?

 8    A.     Yes, sir.

 9    Q.     Now, you didn't see what, if anything, Narseal

10    Batiste did or said to Stanley Phanor before you

11    started reading this bayat the second time, did you?

12    A.     No, sir.  Because everything is recorded,

13    videotaped and recording -- device recording.  So

14    everything what will happen, even -- whatever will

15    happens during this meeting will be recorded on both

16    side, recording device and videotape.

17    Q.     Well, you couldn't see on this videotape Narseal

18    Batiste at that point when he says to you, "Yeah, Mo.

19    Could you read it to them first, brother, before they

20    repeat it?"

21           He's not on the video screen when this is being

22    said.  Right?

23    A.     No, sir.  But he's on recording device.  So we

24    can hear what he's saying.

25    Q.     But you did not see what -- well, you did not
```

```
 1    see, if anything -- what, if anything, he did with

 2    regard to Stanley Phanor, as far as gestures?

 3    A.    Are you asking me?

 4    Q.    Yeah.

 5          Did you see him make any gesture to Stanley

 6    Phanor when Stanley says, "Is it all right?"

 7    A.    No, sir.  Because I was standing next to Brother

 8    Naz exactly.  And if there is something -- or words he

 9    will say to Brother Sunni or any signal, I will be able

10    to see it or to hear it.

11    Q.    And you believe you saw everything that took

12    place in that room that night?

13    A.    I cannot say I saw every small details, but I was

14    next to the person -- next to him.  If he will be

15    whistling or he will be moving his arm or saying --

16    sending any signal, I will be able to hear it or to see

17    it, because I was next to him exactly.

18    Q.    You then proceed to read the bayat a second time;

19    do you not?

20    A.    Yes, sir.

21    Q.    And this time, the wording changes; does it not?

22    Let me rephrase that.

23          This time, you say, "Okay.  I will read it first

24    complete.

25          "God's pledge is upon me and so is his compact.
```

```
 1    To commit myself" -- and then you say, "When I say 'to
 2    commit myself,' each one has to say his name" -- the
 3    order of the guardian of the agreement.  The guardian
 4    of the order for the misfortune and for the prosperity
 5    and to be a loyalist to the path of holy war and to my
 6    brothers until God's word is exalted and to be
 7    protected by the secrecy of the oath and to the
 8    directive of Al-Qaeda."
 9          That's what you say the second time.  Correct?
10    A.    Yes, sir.
11    Q.    And this time, you added the words "holy war";
12    did you not?  "To the path of holy war."  Do you see
13    that sentence?
14    A.    Yes, sir.
15    Q.    "For the misfortune and for the prosperity and to
16    be a loyalist to the path of holy war and to my
17    brothers."
18          That's something new that you just added.
19    Correct?
20    A.    Yes, sir.
21    Q.    Okay.  And then you go on and you then said a
22    third time at the bottom of that page:  "I am
23    representing the Sheik Osama bin Laden."
24          That's not something you say the first time, is
25    it?  Nor did you say it the second time, did you?
```

1    A.     Sir, I was addressing the brothers.

2    Q.     I understand.

3    A.     So if there is some changing or some -- it was

4    everything taped and everything recorded.  And I was

5    reading, also, the -- if I add something before or

6    during the meeting, it was everything taped and

7    recorded.

8    Q.     Okay.  But my question was:  You didn't say that

9    the first time nor the second time, did you?

10   A.     Yes, sir.  I said it before when I said in the

11   first paragraph on same page, "representing the Sheik

12   Osama bin Laden, God pledge is upon his -- me and -- is

13   upon me and so is compact.  Will be a soldier of

14   Islamic soldiers until God word is exalted."

15          So it's the same as the first paragraph on the

16   same page.

17   Q.     Then you go to the bayat the third time.

18          This time, you ask each person to state their

19   name.  Correct?

20   A.     Yes, sir.

21   Q.     Isn't it a fact, Mr. Assaad, that other than

22   stating his name, Stanley Phanor did not repeat any of

23   that pledge?

24   A.     Excuse me?

25   Q.     I said:  Isn't it a fact, other than stating his

1    name, Stanley Phanor did not repeat any of that pledge?

2    A.    Sir, all of them says their names, from Brother

3    Sunni to every member.  I was looking at each one of

4    them when they were repeating the oath.

5         I was -- they were sitting in front of me.  I was

6    standing.  I was reading it and I was looking at them.

7    And each one of them repeat the pledge.

8    Q.    Mr. Assaad, they were spread out in that

9    warehouse; were they not?

10   A.    They were sitting like in the circle, sir.

11   Q.    You're saying they were sitting in a circle?

12   A.    No.  No.  Like in a circle.  Like there were

13   people on the right -- on the -- on my right, people

14   sitting in the front of me, people sitting next to me.

15        So it was not far distances.  It was between me

16   and yourself, sir, in this kind of -- this -- a smaller

17   room.  So I was able to observe and hear every single

18   person in front of me, sir.

19   Q.    It is your testimony, is it not, that you made it

20   clear to Narseal Batiste that you were from Al-Qaeda?

21   Correct?

22   A.    Yes, sir.

23   Q.    Prior to this meeting.  Right?

24   A.    Yes, sir.

25   Q.    And during this meeting, Mr. Batiste tells you,

```
 1   did he not, that, "I did not know that Osama bin Laden
 2   was your leader"?  Did he not say that to you?
 3   A.     What page, sir?
 4   Q.     Page 31.  The bottom of Page 31.
 5          Do you see that?
 6   A.     One second, sir.
 7   Q.     Does he not make that statement to you?
 8   A.     Can I have one second, sir, if you don't mind?
 9   Q.     There's one line.
10          I'm asking you:  Do you see that statement?
11   A.     I need to look -- before I answer, sir, I need to
12   look what was before and --
13          THE COURT:  Give him an opportunity to look at
14   the transcript.
15          THE WITNESS:  Yes, sir.  He did say that.
16   BY MR. VEREEN:
17   Q.     Well, did you not make it clear prior to December
18   the -- March the 16th of 2006 that Osama bin Laden was
19   your leader because you were from Al-Qaeda?
20   A.     Yes, sir.
21   Q.     Then, why would he ask you such a question if you
22   made it clear?
23   A.     I will answer your question, sir.  Because he
24   answered to me very clearly on January 28.  And if you
25   will go back to December 22nd in 2005, I mentioned I
```

1    need to report to the Sheik.  And on January 28th, was

2    very clear.

3         And he mentioned in the tent -- he himself

4    mentioned that he -- respect Osama bin Laden and he's

5    happy.  And we mention -- we spoke about Al-Qaeda.

6         We spoke about everything in January 28 with his

7    knowledge about Osama bin Laden is my leader and

8    Al-Qaeda and all this stuff, sir.

9    Q.    During this meeting, Mr. Batiste talks to you

10   about this warehouse and how they're going to fix it

11   up.  Correct?

12   A.    Yes, sir.

13   Q.    Your understanding is he was wanting to fix up

14   this warehouse so they can open up a restaurant and

15   business and things of that nature.  Correct?

16   A.    Referring to what page, sir?

17   Q.    Well, I'm just asking you about the conversation.

18   A.    I need to know what part of this conversation to

19   confirm to you or not.

20   Q.    Well, Page 35.

21        Do you see in the middle of the page where he

22   says, "Once we fix it, it's gonna be even nicer?  It's

23   gonna be the nicest and it's gonna be -- be some time,

24   you know, because we gotta finish fixing over there.

25   When we finish fixing over there, we're gonna come over

```
 1   here and we got to finish fixing in here"?  Correct?
 2           MS. ARANGO:  Objection.  This page was
 3   referred to earlier by Ms. Jhones.  This is cumulative.
 4           MR. VEREEN:  Well, it's leading to another
 5   question that is not cumulative.
 6           THE COURT:  Go ahead.
 7   BY MR. VEREEN:
 8   Q.    Right?
 9   A.    The question is?
10   Q.    He's making reference to fixing up this warehouse
11   in the Embassy so they can conduct business.  Right?
12   A.    Yes, sir.
13   Q.    But, then, in the same conversation, he tells you
14   that he expects, after the mission, that his life will
15   be over.  Right?
16   A.    Referring to what part, sir?
17   Q.    Page 64.
18   A.    64?
19   Q.    Yes.
20         Do you see that?
21   A.    No, sir.  I'm just looking.
22         The question is?
23   Q.    He tells you, "There's no after the mission.
24   It's over" and that he embraces his death after the
25   mission.
```

1        Right?

2   A.    Yes.

3   Q.    Okay.

4   A.    And he continues, sir, "If that what Allah

5   chose."  He's not saying, "I want" -- he gonna die

6   after the mission.  He said, "If Allah" -- mean God --

7   "wants -- chose this for me, then I'm ready for it."

8   Q.    Okay.  You didn't ask him after that statement,

9   "Then, why are you going through all this fixing up

10  these embassies and warehouses if you're going to wage

11  holy war and jihad on the United States and possibly

12  get killed?"

13        You didn't ask him why does he need to fix up the

14  warehouses, did you?

15  A.    No, sir.  Maybe he wants to fix it for the

16  followers or for the other brothers.

17  Q.    And you didn't say to him, "Well, if you're going

18  to wage holy war and destroy the United States, then

19  how are you going to conduct business in the United

20  States?"

21        You didn't ask him that either, did you?

22  A.    Sir, most of my questions, sir, was direct from

23  the FBI.  Whatever they ask me -- whatever they told me

24  to ask him, I asked him.  Nothing from my -- I follow

25  whatever they tell me to do.

1   Q.    But you ad-lib a lot, too.  You didn't

2   specifically ask only the questions the FBI told you to

3   ask.

4         You asked your own questions; did you not?

5   A.    It depends about the conversation, whatever he

6   asks me to.  It depends what -- the conversation and

7   filling my role, like a terrorist representative.

8   Q.    Okay.  And so, when he's making these statements

9   to you about fixing up warehouses and embassies and

10  using money for that, you didn't say, "Well,

11  Mr. Batiste, why are you talking about fixing up these

12  businesses when you're trying to destroy the country

13  that these businesses are going to be operating in?"

14  A.    I didn't ask him that, sir.

15  Q.    You didn't.  Okay.

16        And Mr. Batiste advises you, does he not, that

17  the photographs had been taken on March the 25th of

18  2006?  Right?

19  A.    Yes, sir.

20  Q.    And the two of you have a conversation the

21  following day.

22        In fact, you meet the following day.  Correct?

23  A.    You mean on 26?

24  Q.    March the 26th.

25  A.    Yes, sir.

1   Q.      Okay.  Now, you met Mr. Phanor -- or you saw

2   Mr. Phanor on the day you went looking for this

3   warehouse -- or when you took him by the warehouse that

4   had been selected.  Correct?

5   A.      On the 15, you mean?

6   Q.      15th of what?

7   A.      Of March?

8   Q.      Okay.  And so you met with Stanley Phanor and

9   Narseal Batiste on that date.  Correct?

10  A.      Yes, sir.

11  Q.      At the warehouse?

12  A.      Yes, sir.

13  Q.      And you were aware that there was a pole cam

14  videotaping you all at this warehouse.  Correct?

15  A.      At the time, no, sir.  I don't remember if I knew

16  about the camera outside the warehouse.  I didn't know

17  about that.

18  Q.      You didn't know about the camera on the outside

19  of the warehouse?

20  A.      I don't remember if I knew.  I don't think they

21  told me about it until later on, when they mentioned,

22  "We saw you."  And at that time, I knew that they

23  were -- there is something -- kind of camera or

24  something outside.

25  Q.      You intentionally walked over to Stanley Phanor

 1   and hugged him because you knew you were being

 2   videotaped; did you not?

 3   A.     No, sir.  I didn't knew, like I said, before.

 4   The FBI doesn't share with me all their information and

 5   all their technique and all what they doing.  And I

 6   didn't know what was the camera.  For my knowledge, I

 7   know there is camera outside or there is any kind of

 8   recording.

 9   Q.     You do not know what, if any, arguments occurred

10   after the bayat on March the 16th between Narseal

11   Batiste and these gentlemen, do you?

12   A.     No, sir.

13   Q.     And you do not know what, if anything, happened

14   after those photographs were taken with regard to an

15   argument between Narseal Batiste and these gentlemen

16   after March -- after March 25th, do you?

17           MS. ARANGO:  Objection, Judge.  Assuming facts

18   not in evidence.

19           MR. VEREEN:  I said "if anything."

20           MS. ARANGO:  Judge --

21           THE COURT:  Sustained.

22           Rephrase your question.

23   BY MR. VEREEN:

24   Q.     Do you know whether there was an argument

25   between Narseal Batiste and these gentlemen after

1    March the 25th, 2006?

2    A.    No, sir.

3    Q.    But it was on that date that Narseal Batiste told

4    you -- and this is March the 26th, 2006 -- that he did

5    not want these brothers involved.  Correct?

6    A.    No, sir.  He said he will reserve the right to

7    decide "yes" or "no" to involve his brothers in

8    Al-Qaeda -- by helping Al-Qaeda, not the other mission.

9    Q.    Do you have Government's Exhibit 80 in front of

10   you?

11   A.    Excuse me?

12   Q.    Government's Exhibit 80.

13   A.    Yes, sir.

14   Q.    Turn to Page 24.

15        MS. ARANGO:  Judge, I would object.  This is

16   cumulative.

17        THE COURT:  Sustained.

18   BY MR. VEREEN:

19   Q.    Well, let me ask you:  You do not know why it is

20   that Mr. Batiste made that statement do you, do you?

21        MS. ARANGO:  Objection.  Vague.

22        MR. VEREEN:  That's not vague.  I'm asking him

23   about the statement --

24        THE COURT:  Overruled.

25

 1   BY MR. VEREEN:

 2   Q.    You do not know why Mr. Batiste told you, "No.  I

 3   do not -- I don't want the brothers to get involved"

 4   on Page 24.

 5         You do not know why he made that statement, do

 6   you?

 7         MS. ARANGO:  Objection.  Cumulative.

 8   Ms. Jhones went into this quite --

 9         MR. VEREEN:  She did not ask that question,

10   Judge.

11         THE COURT:  Overruled.

12         THE WITNESS:  Can I have a second, sir?

13   BY MR. VEREEN:

14   Q.    You can have a minute.  Take your time.

15   A.    Okay.  So you're asking my opinion, sir, or

16   you're asking for fact or what I think?  You are asking

17   what I think?

18   Q.    Sure.  Tell me why you think Mr. Batiste made

19   that statement to you.

20   A.    Because maybe he's reserving the right to decide

21   how much he wants to be involved in helping Al-Qaeda,

22   him and his brothers.

23   Q.    Did you ever see any the military training going

24   on over at the warehouse or the Embassy?

25   A.    No, sir.

1   Q.    Did you ever see any weapons training going on

2   between these gentlemen?

3   A.    No, sir.

4   Q.    Did you ever see these gentlemen wearing

5   camouflage uniforms with red fezzes?

6   A.    No, sir.

7   Q.    Did Mr. Batiste ever talk to you about any gang

8   affiliations that he had?

9   A.    Can you be more clear, sir?  I didn't understand

10  the question.

11  Q.    On January -- excuse me -- December the 16th,

12  2005, Mr. Batiste brought up the Blackstone Rangers or

13  the Blackstones during your first meeting.  Correct?

14  A.    Yes, sir.

15  Q.    And you didn't know what he was talking about

16  when he brought up the term "Blackstone Nation," did

17  you?

18  A.    No, sir.

19  Q.    And your response actually was -- and, again, you

20  are responding to what Mr. Batiste was saying to you.

21  Correct?

22  A.    Yes, sir.

23  Q.    You didn't know what to expect with regard to

24  what he was going to say to you during that meeting,

25  did you?

```
 1    A.    No, sir.

 2    Q.    And the Government didn't tell you -- or the FBI

 3    didn't tell you to ask any specific questions on that

 4    date, did they?

 5    A.    They tried to direct me to find out his

 6    intention, "Try to find out.  Talk to him.  See why he

 7    wants all this -- asking for help from overseas" --

 8    Q.    Okay.  And when he --

 9    A.    -- "and go with him with the conversation."

10    Q.    And so Narseal Batiste talks to you about a

11    gentleman by the name of Jeff Fort.  Correct?

12    A.    Yes, sir.

13    Q.    And he tells you that he is the first black man

14    convicted of terrorism in the United States.  Correct?

15    A.    Yes, sir.

16    Q.    He tells you, essentially, that you can look him

17    up on the Internet?

18    A.    Excuse me?

19    Q.    He tells you that you can find out about him on

20    the Internet.  Correct?

21    A.    Yes, sir.

22    Q.    And he then brings up that he was the leader of

23    the Blackstone Nation.  Right?

24    A.    I don't remember exactly he said, sir.  But, yes,

25    sir.
```

 1   Q.     Do you have Government's Exhibit 44-A in front of

 2   you?

 3   A.     Yes, sir.

 4   Q.     I believe it's on Page 9, going on to Page 10.

 5   A.     Yes, sir.

 6   Q.     He begins to tell you the history of this guy by

 7   the name of Jeff Fort.  Right?

 8   A.     One more time, sir.

 9   Q.     I said:  He begins to tell you about the history

10   of this person identified as Jeff Fort, who he was,

11   where he came from, things of that nature?

12   A.     Yes, sir.

13   Q.     And your response to him making those statements

14   to you is, "So let me tell you something, brother.

15   Small stone hold big stone.  And I want you to believe

16   in yourself more, and I don't want you to see you down

17   like this.  I want you to be more confident in you."

18          That's your response to what he was telling you

19   about Jeff Fort.  Right?

20   A.     What page, sir?

21   Q.     I believe it's Page 10.

22          Do you see that?

23   A.     Yes, sir.  I see that.

24   Q.     When you said, "Big stone" -- or, "Small stone

25   hold big stone," what did you mean by that?

Assaad - CROSS - By Mr. Vereen                116

```
 1    A.    We can lay on each other.  We can depend on each

 2    other, help each other.  Doesn't matter the size of the

 3    person or doesn't matter the big of the organization is

 4    or small.  You can depend on us.  We can depend on you.

 5    Something like that.

 6    Q.    "So let me tell you something, brother.  Small

 7    stone hold big stone.  And I want you to believe in

 8    yourself more, and I don't want you to see you down

 9    like this.  I want you to be more confident in you."

10          You're saying that this passage means that --

11    explain that to me again.  I'm sorry.  I missed it.

12    A.    I'm saying --

13          MS. ARANGO:  Objection.  Asked and answered.

14          THE COURT:  Sustained.

15    BY MR. VEREEN:

16    Q.    Well, who is the "small stone" in your example?

17    A.    Him, Brother Naz, and the group.

18    Q.    So, "Small stone hold big stone."

19          Who is the "big stone"?

20    A.    Al-Qaeda, terrorist organization, something big.

21    Q.    Uh-huh.

22          At the end of your involvement in this case with

23    regard to your activity as an undercover -- or as a

24    confidential witness, what you eventually obtained from

25    Mr. Batiste was three lists.  Correct?
```

```
 1   A.      Yes, sir.

 2   Q.      But what you gave to Mr. Batiste was boots.

 3   Correct?

 4   A.      Yes, sir.

 5   Q.      And one date, you gave him $1,000.  Correct?

 6   A.      Yes, sir.

 7   Q.      On another date, you gave him $3500.  Correct?

 8   A.      Yes, sir.

 9   Q.      On another date, you gave him a warehouse.

10   Correct?

11   A.      Maybe not in order.  But yes, sir.  And a cell

12   phone.

13   Q.      And a cell phone?  On another date, you gave him

14   a cell phone?

15   A.      Yes, sir.

16   Q.      On another date, you gave him a van?

17   A.      He requested, sir.

18   Q.      I understand.

19           But you gave it to him?

20   A.      Not me, sir.  The FBI.

21   Q.      Well, the FBI through you.  Correct?

22   A.      But not -- yes, sir.

23   Q.      Okay.  Everything came through you.  Right?

24   A.      Through Brother Abbas, I believe.  He drove it to

25   the Embassy.
```

1    Q.    Okay.  And then there was a camera?  On another

2    date, you gave him a camera?

3    A.    Yes, sir.

4    Q.    On another date, you gave him a chip for the

5    camera?

6    A.    He requested.  Yes, sir.

7    Q.    Whether he requested it or not, you gave it to

8    him?

9    A.    We bought it.  Yes, sir.

10          MR. VEREEN:  That's all the questions I have,

11   your Honor.  Thank you.

12          THE COURT:  Mr. Houlihan.

13          MR. HOULIHAN:  Good afternoon.

14          THE JURY:  Good afternoon.

15          MR. HOULIHAN:  May it please the Court.

16                    CROSS-EXAMINATION

17   BY MR. HOULIHAN:

18   Q.    Good afternoon.

19   A.    Good afternoon.

20   Q.    Sir, I represent Naudimar Herrera.

21          My questions with you will be limited to your

22   interactions with him, for the most part.  Okay?

23   A.    Yes, sir.

24   Q.    The first time you saw Naudimar Herrera was on

25   January 28th, 2006?

 1    A.     It was on December 22nd, sir, where people in the

 2    Embassy.  I don't know who I saw exactly.  But there

 3    were brothers over there.

 4    Q.     Well --

 5    A.     The first time we present, me and Brother Naudy,

 6    was on January 28, where we ask him his name.

 7    Q.     I want to make sure I understand you.

 8           The first time you remember ever seeing Naudimar

 9    is January 28th.  Is that a "yes" or a "no"?

10    A.     Yes, sir.

11    Q.     Okay.  The first time you talked with Naudimar

12    was on January 28th, 2006?

13    A.     Yes, sir.

14    Q.     And that's what we have referred to as the trip

15    to the Keys?

16    A.     Yes, sir.

17    Q.     Islamorada, the Keys trip.  Correct?

18    A.     Yes, sir.

19    Q.     The last time -- I'm just trying to get a time

20    limit.  Okay?

21           The last time you saw Naudimar was March 16th?

22    A.     Yes, sir.

23    Q.     And that's this ceremony at the Embassy?

24    A.     Yes, sir.

25    Q.     The last time you ever talked to Naudimar in any

1    way -- phone, face to face -- was also that same time,

2    March 16th?

3    A.    Yes, sir.

4    Q.    Okay.  Now, as to the Keys trip itself --

5    okay? --

6    A.    Yes, sir.

7    Q.    -- now, Naudimar and you were together for about

8    four hours?

9    A.    Yes, sir.

10   Q.    And you went into the tent for maybe an hour or

11   so.

12         But just you and him in the car together, it's

13   about four hours?

14   A.    Yes, sir.

15   Q.    Two hours down; two hours back?

16   A.    More or less.  Yes, sir.

17   Q.    Now, during that time, the Naudimar that you now

18   were able to talk to -- because you asked him who he

19   was.  You asked him his name, I believe?

20   A.    I asked him his name.  Yes, sir.

21   Q.    Now, the transcript that's in evidence that's

22   Government's Exhibit 55-A -- I'm not going to go

23   through this line by line.

24         Whatever is there is what happened.  Correct?

25   A.    Yes, sir.

1    Q.    And my questions, just as best as you can recall.

2    Fair enough?

3    A.    Yes, sir.

4    Q.    Now, you recall Naudimar being a pleasant kid,

5    young man?

6    A.    Normal.

7    Q.    Right.

8          He wasn't aggressive towards you in any way, was

9    he?

10   A.    No, sir.

11   Q.    And, in fact, you could even -- if I'm reading

12   the transcript correctly, since there's no video, you

13   can almost call it friendly, friendly banter, friendly

14   talking between you and him?

15   A.    After a while in the -- on the way back, maybe.

16   Yes, sir.

17   Q.    Even on the way down he started asking you

18   questions concerning how to say things in Arabic?

19   A.    Yes, sir.

20   Q.    In fact, he's seated in the front passenger's

21   seat.  Correct?

22   A.    Yes, sir.

23   Q.    That's on the way down and on the way back?

24   A.    Yes, sir.

25   Q.    You're seated in the rear passenger's seat on the

1   way down and on the way back?

2   A.     Yes, sir.

3   Q.     At the very beginning of the trip, in fact, he

4   asked you, "Hey, can I push my seat back?", referring

5   to moving his seat back into the rear.

6          Do you remember that?

7   A.     No, sir.

8   Q.     If it happened, it's in the transcript?

9   A.     Yes, sir.

10  Q.     Okay.  And if it didn't, it wouldn't be there.

11  Correct?

12  A.     No, sir.

13  Q.     The transcript, aside from being accurate, since

14  you've -- you've read it at least three times now.

15  Correct?

16  A.     More than that.  Yes, sir.

17  Q.     All right.  But there's nothing missing from

18  there, is there?

19  A.     To my knowledge, no, sir.

20  Q.     It isn't like the recorder for some reason

21  stopped functioning or something is in the transcript

22  that shouldn't be.  Correct?

23  A.     No, sir.  Everything is accurate, what happened.

24  Q.     Whatever is there, is there?

25  A.     Yes.

1    Q.     If it's not there, it's because it didn't happen

2    or wasn't said?

3    A.     Yes, sir.

4    Q.     On the way down, Naudimar is the one, I believe,

5    who said to you -- or maybe the other paid informant --

6    "If you're cold, I'll get you a jacket or sweater or

7    something."

8           Do you recall that?

9    A.     No, sir.

10   Q.     Again, if it's there, it's there?

11   A.     Yes, sir.

12   Q.     Do you recall -- and some of your conversation --

13   let me preface it this way:  Some of your conversation

14   on this trip is between you and the other paid

15   informant in Arabic?

16   A.     Yes, sir.

17   Q.     Now, do you recall -- that's my question again --

18   do you recall -- this is going to be a series of

19   things.  Okay?

20   A.     Yes, sir.

21   Q.     Do you recall Naudimar being referred to as

22   scared?  And this will be in Arabic again.  Okay?

23   Scared.  Banter, talk between you and the other paid

24   informant.

25   A.     Are you saying I said --

 1    Q.     You and the other informant, talking back and

 2    forth in Arabic.  It came up that Naudimar -- he is

 3    scared, not Naudimar by name.  Scared.

 4           Do you remember that word "scared" being used?

 5    A.     We spoke about -- I remember we use this word

 6    between me and Brother Abbas by try to calm him down,

 7    because he was too scared and I was telling him, "Don't

 8    worry.  Maybe they are scared.  We're trying to scare

 9    them."  Something like this.  I don't know how we put

10    it.

11    Q.     Do you recall -- again, the transcript will speak

12    for itself.

13           But you recall, in fact, "scared" being used; you

14    just don't recall how it was used between you and the

15    other informant?

16    A.     Yes, sir.

17    Q.     And that is used in relationship to Naudimar --

18    Naudimar and Patrick?

19    A.     I don't know for -- but I know I -- we use this

20    word.  But how, I don't know.

21    Q.     Do you recall the phrase -- and it's -- I'll use

22    it as a quote -- "peeing in their pants"?  Do you

23    recall that?

24    A.     I need to see the transcript.

25    Q.     I understand.  I'm asking you if you recall.

```
 1    A.     I need to check.  I need to see.

 2    Q.     Can I take that to be a "no," then?

 3    A.     I don't remember.

 4    Q.     That's my answer.

 5           You don't recall?

 6    A.     No, sir.

 7    Q.     Do you remember the phrase "dumb ass," referring

 8    to Naudimar and/or Patrick?

 9    A.     Sir, if you are asking me about the -- I need to

10    see to confirm, because --

11    Q.     I'm simply asking you, as you testify -- you've

12    given sworn testimony in this case, what, now, three

13    separate occasions?

14           THE COURT:  Mr. Houlihan, give him a copy of

15    the transcript, please.

16    BY MR. HOULIHAN:

17    Q.     Do you have 55-A?  It's not in the box here.

18    A.     Yes, sir.

19    Q.     You feel free at any point to refer to that?

20           But my question to you --

21    A.     Can I look?

22    Q.     You can look whenever you want to.

23           Do you want to tell me when you're ready?

24    A.     Yes, sir.

25           MS. ARANGO:  Judge, I would object.  If he's
```

1    referring to a particular page -- if he's referring to

2    something, to please show him.  This document is

3    164 pages long.

4         THE COURT:  Refer to a page, please.

5         MR. HOULIHAN:  Judge, I'm asking him if he

6    recalls.  I don't think, number one, he even needs to

7    look at the transcript.  The answer is "yes" or "no."

8         MS. ARANGO:  What is he asking that he --

9         THE COURT:  Then, you need to move on to a

10   different area.

11        MR. HOULIHAN:  I understand.  I'm simply

12   asking whether he recalls.

13        THE COURT:  Move on to a different area, then.

14   If you don't want to refer to a specific page and allow

15   him to refer to it, then move on to a different area

16   other than this transcript.

17   BY MR. HOULIHAN:

18   Q.   Aside from the phrase "dumb ass," do you

19   recall -- this is my question, "Do you remember...."

20   okay?

21        Do you remember talking --

22        MS. ARANGO:  Judge, I would object.  There's

23   no testimony --

24        THE COURT:  Sustained.

25        If you're going to refer him to a page and he

```
 1    can look at that and he can tell you whether he recalls

 2    or not, that's fine.

 3              But if you're just going to go through these

 4    questions, "Do you recall" --

 5              MR. HOULIHAN:  Judge, I'm attempting to test

 6    his memory.  This is the third time of sworn testimony.

 7    I'm simply asking him --

 8              MS. ARANGO:  Judge --

 9              MR. HOULIHAN:  What's in the transcript is in

10    the transcript.

11              MS. ARANGO:  Judge, if he's referring to

12    any --

13              THE COURT:  Okay.  We're going to take a

14    break.

15              Do not discuss this case either amongst

16    yourselves or with anyone else.  Have no contact

17    whatsoever with anyone associated with the trial.  Do

18    not read, listen or see anything touching on this

19    matter in any way.

20              If anyone should try to talk to you about this

21    case, you should immediately instruct them to stop and

22    report it to my staff.

23              You may leave your notebooks and your binders

24    at your chairs.  Please be back in the jury room in

25    15 minutes.
```

 1                 (Whereupon, the jury exited the courtroom at

 2      2:26 p.m. and the following proceedings were had:)

 3                 THE COURT:  You may be seated.

 4                 You may step down, sir.

 5                 (Witness excused.)

 6                 THE COURT:  Would you have him leave the

 7      courtroom, please.

 8                 (Thereupon, the witness retired from the

 9      courtroom and the following proceedings were had:)

10                 THE COURT:  Mr. Houlihan.

11                 MR. HOULIHAN:  Yes, ma'am.

12                 THE COURT:  The witness has said several times

13      that he needs to see the transcript to answer your

14      question -- okay? -- to -- even to determine whether he

15      recalls or not.  He's testified about many, many taped

16      conversations.

17                 Now, if you want him to look at the transcript

18      and refer to a page and then answer your question

19      whether he recalls that word being used, that's the

20      proper way for that.

21                 If the only reason for this is so he can say

22      "I don't recall," "I don't recall," I don't recall,"

23      you need to move on to another area and not this

24      conversation.

25                 MR. HOULIHAN:  Judge, I will certainly follow

 1    your instructions.  And I believe -- this is my

 2    cross-examination.  And I do have a number of questions

 3    referring to the Keys trip:  "Do you recall saying" --

 4              THE COURT:  I'm not precluding you --

 5              MR. HOULIHAN:  Well, you are.

 6              THE COURT:  -- from going into the Keys trip,

 7    sir.

 8              But the witness has asked to see a transcript

 9    to refresh his recollection.

10              MR. HOULIHAN:  I'm not asking --

11              THE COURT:  And I've ordered you to give him a

12    transcript.

13              And the Government is right.  This is a

14    transcript which is over -- 60 pages? --

15              MS. ARANGO:  It's 164 pages.

16              THE COURT:  -- 164 pages.

17              If you really are testing -- now, he can refer

18    to it.  He can say whether he recalls that word being

19    used.  He may not recall that word being used, even

20    after looking at the transcript.

21              But when a witness says, "I need to see a

22    transcript" or, "I don't have a recollection.  Please

23    show me something and then I can tell you whether I

24    recall that word being used," that's the proper form of

25    cross-examination.

```
 1            And that's how I'm going to limit your
 2   cross-examination --
 3            MR. HOULIHAN:  Judge --
 4            THE COURT:  -- Mr. Houlihan.
 5            MR. HOULIHAN:  I understand your limitation.
 6            I just want to respond that I am not here
 7   to refresh his recollection.  This is my
 8   cross-examination.  I have no intention of
 9   refreshing -- or attempting to refresh his
10   recollection.  If he doesn't recall, fine.
11            But I also remind the Court, as he's even
12   said, this is more than the third time he's testified
13   to similar subject matters.
14            But be that as it may, I understand your
15   ruling.  I think, legally, you're wrong.  But I will
16   follow it.
17            THE COURT:  That's fine, sir.
18            MS. ARANGO:  Judge, I would admonish -- on
19   that very point, I would admonish counsel not to
20   mention prior testimony.  This person -- he was not
21   impeaching him.
22            He's asking him for a particular word in over
23   100 pages of a document where there's hundreds of other
24   pages of transcripts and then saying -- using that as a
25   foot -- as a stepping stone for saying, "Oh, you've
```

 1    testified three times before."

 2          That -- I mean, that's just so offensive,

 3    Judge.  It's not even clever.

 4          THE COURT:  I'm going to sustain the

 5    objection.  It's argumentative at that point.

 6          In terms of -- if there's proper impeachment,

 7    you can certainly impeach him and set out the fact that

 8    he's testified previously.

 9          And it becomes argumentative when the witness

10    has said, "I need to see the transcript" for you just

11    to stand up and say, "Do you recall this word?  Do you

12    recall" -- you're talking about one word out of a

13    160-page transcript.

14          If you want to explore his memory concerning

15    that, then you need to refer -- when the witness has

16    asked to look at a transcript and to refer to a page so

17    he can determine whether he recalls your -- the

18    Defendant saying that word or he doesn't recall, that's

19    proper cross-examination.

20          Otherwise, it's argumentative and it's not

21    proper cross-examination.

22          Now, I have reread the cases that were cited

23    by the defense, and I will, pursuant to *Davis versus*

24    *Alaska*, 415 US 308, a 1974 decision by the Supreme

25    Court, and *United States versus Baptiste Rodriguez*,

```
 1   17 F.3d 1354, an April 1st, a 1994 decision, allow the

 2   defense to explore the motivation of the witness to

 3   agree to cooperate or be an informant for the FBI

 4   motivated by his desire to get out of jail in Mexico.

 5           We're in recess for ten minutes.

 6           I don't know whether you want to bring that

 7   up, Ms. Jhones, or you want to leave it to someone

 8   else.  It's up to you.  If you want to come back and

 9   ask him about that, I'll allow you to question him

10   about that.

11           (Thereupon a recess was taken, after which the

12   following proceedings were had:)

13           THE COURT:  We're back on United States of

14   America versus Narseal Batiste, et al., Case

15   No. 06-20373.

16           Counsel, state your appearances, please, for

17   the record once more.

18           MR. GREGORIE:  Richard Gregorie and Jacqueline

19   Arango on behalf of the United States.

20           MS. JHONES:  Ana Jhones on behalf of Narseal

21   Batiste, who's present.

22           MR. LEVIN:  Albert Levin on behalf of Patrick

23   Abraham, who's present.

24           MR. CLARK:  Nathan Clark on behalf of

25   Rotschild Augustine, who's present.
```

 1           MR. HOULIHAN:  Richard Houlihan with Naudimar

 2    Herrera.

 3           MR. VEREEN:  Roderick Vereen on behalf of

 4    Stanley Phanor, who's present.

 5           MR. CASUSO:  Judge, I'm sorry.

 6           Lou Casuso on behalf of Burson Augustin, who's

 7    present.

 8           THE COURT:  All Defendants are present.

 9           Let's bring in the jury, please.

10           (Whereupon, the jury entered the courtroom at

11    3:01 p.m. and the following proceedings were had:)

12           THE COURT:  You may be seated.

13           You are still under oath, sir.

14           You may proceed, Mr. Houlihan.

15    BY MR. HOULIHAN:

16    Q.    Sir, we're going to backtrack a little bit.  I

17    apologize.  Okay?

18    A.    Okay, sir.

19    Q.    Referring to Exhibit 55-A, which is the Keys

20    trip, the trip to Islamorada -- do you have it in front

21    of you?

22    A.    Yes, sir.

23    Q.    On Page 26 -- let me preface this way:  There's

24    four of you in the car?

25    A.    Yes, sir.

1    Q.    Four?

2    A.    Yes, sir.

3    Q.    And like in any human situation, the conversation

4    is going to, many times, involve all four of you.

5    Correct?  It's a process.  There are four of you and

6    you're bantering, talking back and forth.  Is that

7    fair?

8    A.    Yes, sir.

9    Q.    On Page 26 in the middle of the page, do you see

10   where it says "UM"?

11   A.    Yes, sir.

12   Q.    I take that to be an "unidentified male."

13   A.    Yes, sir.

14   Q.    But the situation deals, "Can I push my seat

15   back?"

16         You're CW 2.  Correct?

17   A.    Yes, sir.

18   Q.    And you go something unintelligible, "Huh?"

19         Somebody says something unintelligible.

20         And then you respond, "Okay, brother."

21         Okay?  Does that help you refresh your

22   recollection?

23   A.    Yes, sir.

24   Q.    You're seat -- I mean, we went through this.

25         You're seated directly behind Naudimar?

 1   A.     Yes, sir.

 2   Q.     Is it fair to say Naudimar is the unidentified

 3   male, "Can I push my seat back?"

 4   A.     Yes, sir.

 5   Q.     Do you remember that now or are you simply going

 6   with what you see on the transcript?

 7   A.     I saw it right now.  Yes, sir.

 8   Q.     But do you remember?  Do you have a memory now of

 9   it?

10   A.     No, sir.  I just look at.

11   Q.     Now, if you turn to Page 64, this is going to

12   again be a conversation.  It's going to be involving

13   three of you -- or four of you, actually.  Okay?

14   Page 64.

15   A.     Yes, sir.

16   Q.     Do you see at the very beginning -- "PA" is

17   "Patrick Abraham."  Right?

18   A.     Yes, sir.

19   Q.     "I said you can have my jacket."

20          You're talking -- again, it's a conversation.

21          "Oh, man."

22          "Patrick:  If you're cold, we get you a jacket."

23          You said, "Huh?"

24          You said, "I -- I can't -- I can't hear you."

25          Right?

 1   A.      Yes, sir.

 2   Q.      And then Naudimar, "NH" -- Naudimar:  "If you're

 3   cold, we'll get you a jacket."

 4           You say, "No.  It is -- it has nothing.

 5           Someone says something unintelligible.

 6           And then you said, "It's not cold.  It's just a

 7   joke."

 8           And Naudimar goes, "Oh."

 9           Do you recall that conversation now?

10   A.      Yes, sir.

11   Q.      So both Patrick and Naudimar -- I guess you were

12   joking, correct, about being cold?

13   A.      It wasn't for me, sir.

14   Q.      It was for the other paid informant?

15   A.      I believe.  Yes, sir.

16   Q.      But when you said at the end, "It's not cold.

17   It's just a joke" -- do you see that?  It's about in

18   the middle.

19   A.      Yes, sir.

20   Q.      Do you remember saying that?

21   A.      I don't remember.  But I saw it here.  Yes, sir.

22   Q.      Okay.  I'm not going to beat a dead horse.  Okay?

23           If you'd look at in the transcript Pages 45,

24   really, through 50, and tell me when you're ready.  But

25   if I can say something as you're looking -- Pages 45

 1   through 50 --

 2   A.     Yes, sir.

 3   Q.     -- this deals with Naudimar -- and, again, it's a

 4   conversation in the car amongst all of you, but it

 5   deals with Naudimar being inquisitive, asking you

 6   questions, how do you say things in Arabic.  Okay?

 7   A.     Yes, sir.

 8   Q.     Can you please tell me when you're ready,

 9   Page 45.

10   A.     I'm ready.

11   Q.     You agree with me -- you know, a lot of the

12   conversation is in Arabic.  Right?

13   A.     With Brother Abbas.  Yes, sir.

14   Q.     And Naudimar is -- well, no.  No.

15          45 through 80 is talking about how to say certain

16   things in Arabic.  Correct?

17   A.     Yes, sir.

18   Q.     And Naudimar would be asking you -- I mean, look.

19   It speaks for itself.

20          But on Page 45, in the middle, Naudimar said a

21   word, Bismillah.

22          MR. HOULIHAN:  It's B-i-s-m-i-l-l-a-h, for the

23   reporter.

24          THE WITNESS:  "Bismillah."

25   BY MR. HOULIHAN:

```
 1   Q.    But Naudimar is trying to find out what words

 2   mean, how do you say things in Arabic.  Correct?

 3   A.    Yes, sir.

 4   Q.    For the next four pages or so, that's the subject

 5   of conversation, answering questions, how things are

 6   said, what's the proper rites to use if you're going to

 7   eat and so forth.  Correct?

 8   A.    Yes, sir.

 9   Q.    Now, on Page 46, a little bit lower than the

10   middle, Naudimar -- do you see right above -- do you

11   see right almost in the middle, he goes, "Halal" --

12   H-a-l-a-l -- "Bismillah" again.

13         Do you see that?

14   A.    Yes, sir.

15   Q.    You respond, "No.  No.  No.  It's -- explain to

16   him."

17         Now, you're referring to the other paid

18   informant.  In other words, you kind of threw your

19   hands up, like, "I've tried my best to explain it.  You

20   explain it"?

21   A.    Yes, sir.

22   Q.    Now, I'm not going to go through this -- I mean,

23   it speaks for itself.

24         But it goes "Allah, in the name of God" and so

25   forth.  Right?
```

1   A.    Yes, sir.

2   Q.    And Naudimar -- you truly felt he was being

3   curious with you, wasn't he?

4   A.    Curious?

5   Q.    Yeah.  He wanted to learn.

6   A.    Yes, sir.

7   Q.    For example, towards the ends of Page 49, there's

8   conversation -- you said, "Even with water" -- or "Even

9   with the water" -- excuse me -- "you say" -- and then

10   the translation "in the name of God."

11         You're trying to show this kid the proper way in

12   Arabic an Islam -- Muslim does things to honor the

13   creator?

14   A.    Excuse me?

15   Q.    Do you see where I'm referring to on Page 49?

16   A.    Yes, sir.

17   Q.    You're talking directly with Naudimar.  Correct?

18   A.    Yes, sir.

19   Q.    The phase that's in a different type that says

20   "Naudimar Herrera":  "In the name of God."  He's trying

21   to say something in Arabic.  Correct?  And that's being

22   translated?

23   A.    Yes, sir.

24   Q.    You're trying to teach as much as you can a

25   curious kid the proper Muslim way of even drinking

```
 1   water, opening a bottle of water, to give honor to the

 2   creator.

 3          I mean, that's all that's going on, isn't it?

 4   A.     In this part, yes, sir.

 5   Q.     Yes.

 6          At the very beginning of Page 50, you and

 7   Naudimar -- you said in Arabic, "In the name of God."

 8          Do you see it?  You tell me when you're ready.

 9   A.     Yes, sir.

10   Q.     And then Naudimar -- you know, this is kind of

11   like an American -- "Oh, that's like a shortcut."

12          Right?  That's the quick way of saying something?

13   A.     Yes, sir.

14   Q.     Now, I can go on and on.

15          But that -- for about -- those pages, that time

16   in the car, really, the four of you are talking about

17   how to say things, the proper rites of Arabic -- a

18   Muslim and so forth.  Correct?

19   A.     In this part, yes, sir.

20   Q.     Yeah.

21          And you took it -- Naudimar to be honest and

22   sincere when he's asking you.  Correct?

23   A.     Excuse me?

24   Q.     You agree that context is very important.  Right?

25   Context.
```

1    A.     Uh-huh.  Yes, sir.

2    Q.     And the context here is of a young man in his

3    heart truly asking you in -- seriously questions to

4    learn.  Right?

5    A.     Maybe.  Yes, sir.

6    Q.     I mean, you didn't take him to be joking with you

7    or ridiculing anyone, did you?

8    A.     No, sir.

9    Q.     Now, if we go on -- we're going to go back a

10   little bit.

11          If we go back to Page 29 -- and this is just

12   some, sir.  I'm not going to go through everything.

13          But on Page 29, three speakers from the bottom,

14   CW 2 -- this is you, laughing, "By God, by God, they're

15   scared.  They're peeing in their pants, by God."

16          Right?

17   A.     Yes, sir.

18   Q.     Now, you're saying that -- and it's in italics

19   because you're saying that in Arabic?

20   A.     Yes, sir.

21   Q.     You're saying that in a conversation to your

22   other paid informant?

23   A.     Yes, sir.  Because -- I was saying that because

24   the other informant, Brother Abbas, if you can look

25   before, he was scared that we are going -- "They are

1    gonna kill us.  We are going to the grave."

2         And here I was trying to tell him to just -- just

3    to calm him down, try to let him see -- or let him feel

4    like, "Don't worry about.  Just relax.  They are

5    scared.  They are peeing their pants," whatever, just

6    to make -- anything to say -- just not let Brother

7    Abbas to explode or to lose his control or do something

8    crazy affect our life.

9    Q.    Now -- in other words, it was your opinion that

10   your fellow paid informant was becoming panicky?

11   A.    No, sir.  It wasn't my opinion.  It's a fact.

12   And he mentioned in several times here, if you allow me

13   one second --

14   Q.    Well, sir, my question is:  Is he panicking?

15   A.    You said if it was my opinion.  But it wasn't,

16   because the same page, on 29, he said, "In God

17   almighty's hand, I hope not to the graveyard."

18   Q.    Okay.

19   A.    And I said, "Huh?"

20        And he said again, Brother Abbas, "It's in God

21   almighty hand.  I hope not to the graveyard."

22        And I start to comfort him not to be scared, not

23   to lose control, not to -- all that's what I said.

24   Q.    Now, there's a word in English, "panic."

25        Are you familiar with that word, "panic,"

1    "panicky"?

2    A.    Nervous, something like that?

3    Q.    No.  It's more than nervous.  Panicky.

4    A.    Yes, sir.

5    Q.    Now, if we stop here for a second, you told us

6    already how you were in the Syrian military for two and

7    a half years?

8    A.    Yes, sir.

9    Q.    Now, isn't it a fact that you were actually in

10   the -- well, you were in the intelligence part of the

11   Syrian Army?

12   A.    Yes, sir.

13   Q.    And you've been trained to handle situations that

14   regular people would get scared, panicky and so forth.

15   Right?

16   A.    Handle what?

17   Q.    You've been trained.  Part of your training in

18   the intelligence unit --

19   A.    Yes, sir.

20   Q.    -- is to handle situations where mere mortals,

21   regular people, would become -- getting scared, would

22   become panicky.

23         You agree with me, don't you?

24   A.    No, sir.  Because when I was in military, I

25   wasn't trained like an expert or doing missions or to

 1    deal with very high-profile cases.

 2         I was just -- yes.  I was in military

 3    intelligence, but I was, like, in the office, not doing

 4    cases on the street or jumping from one place to

 5    another place.  I don't have that experience.

 6    Q.    So would it be fair to say -- in English, there's

 7    a phrase, a "desk jockey" -- you would be a desk jockey

 8    in the intelligence division?

 9    A.    I don't know what that's mean, "desk jockey,"

10    sir.

11    Q.    Well, let's continue on Page 30.

12    A.    Yes, sir.

13    Q.    The same conversation's going on.

14         Your fellow paid informant talks about, "Are they

15    gonna follow us from the air?"

16         And you respond, "They're scared."

17         You repeat:  "They're peeing in their pants,

18    those ones."

19         And the other paid informant then says, "Of

20    course.  Of course.  They are scared."

21         Okay?

22    A.    Yes, sir.

23    Q.    Do you see that?

24    A.    Page 30, no?

25    Q.    Yes, sir.  At the very top.

```
 1   A.     Yes, sir.

 2   Q.     So I take it, at this point, you're starting to

 3   get the other paid informant less scared.

 4   A.     Yes, sir.

 5   Q.     You're kind of calming him down.

 6          And then he finally agreed with you, "Yeah.  Look

 7   at those," referring to Naudimar and Patrick.  Right?

 8   A.     Yes, sir.

 9   Q.     And I want to make sure -- "Of course.  Of

10   course.  They're scared."

11          That's what -- that's what the context of this

12   conversation is.  Correct?

13   A.     Yes, sir.

14   Q.     Now, at the end of this same page -- and this is

15   one of my different examples -- three lines from the

16   bottom, in Arabic, again, because the font is

17   different, you say, "I'll kill them all."  All right?

18          I'm not going to go through this with all the

19   different examples.  Many times you said, "I'll kill

20   them.  I'll slit their" -- whatever.

21          It's in the transcript.  Right?

22   A.     Yes, sir.

23   Q.     But you're saying that again to calm -- to make

24   sure he stays calm.  Right?

25   A.     Not -- no, sir.  Because want to make him calm.
```

 1    And, second, to -- at that moment, we find out that the

 2    FBI lost us and we are on our -- on our own.

 3         We are heading in very dark place where we don't

 4    know -- there is no sign.  We don't know where we

 5    going.

 6         The guy next to me is supposed to -- we support

 7    each other.  He was scared to death he was going to

 8    die.  They're taking us to the graveyard.  And I was

 9    trying to calm him down.

10         And, also, when I received a phone call, I was

11    trying to get permission, if they didn't find us at the

12    correct time, at the right time, if there is -- we need

13    to defend ourself.

14         So was trying to just -- trying to put something,

15    sir, important in this -- very important -- try to calm

16    him down, the other -- Brother Abbas.

17         At same time, I cannot take my fear out of me in

18    front of him.  I was scared, too.  I don't know that

19    area.  I don't know where I'm going.

20         And I notice this and I have this inside of me.

21    And I was saying things just out of fear, just out --

22    without knowing what's going on in this moment.

23    Q.   Well -- so for both those reasons, that's how

24    this whole thing about kill people, slit their

25    throats -- you're calming yourself down and you're

1   trying again to keep this other paid informant calm?

2   A.    I'm trying to make myself calm and to keep myself

3   in control and to keep myself in the position not to

4   lose it or explode.

5         And at the same time -- I have to take care of

6   other -- Brother Abbas at the same time.

7         So between me and him and the situation, I try --

8   I try to make myself believe that I can defend myself.

9   Q.    Well, in this -- and I can be wrong.  We all make

10  mistakes.  All right?  It's a lengthy transcript.  Five

11  hours is a long time to be together.  Right?

12  A.    Yes, sir.

13  Q.    Now, can you point to anywhere in the transcript

14  where you asked -- I guess Patrick's driving -- you

15  asked Patrick, "Where are we going?"

16  A.    You want me to show you, sir?

17  Q.    Did you?

18  A.    I asked him.  Yes, sir.

19  Q.    Okay.  Did you get with specificity an answer?

20  "Islamorada"?

21  A.    No, sir.

22  Q.    Did you follow up your questioning and say,

23  "Where" -- you know, things of that nature?

24  A.    If -- I believe, sir, if I'm not wrong, I asked

25  several times where we are heading.  In the Embassy I

 1   asked him.  I asked them.  On the road, I asked them.

 2        So it was different location, different timing

 3   where I asked where we are heading --

 4   Q.    Now --

 5   A.    -- or, "Are we near?  Are we close?  Are we far?"

 6        So I believe this what happened, sir.

 7   Q.    Again, all of that is in the transcript?

 8   A.    Yes, sir.

 9   Q.    Now, do you know whether Naudimar knew where you

10   were driving to?

11           MS. ARANGO:  Objection to the form.

12           THE COURT:  Sustained.

13           Rephrase your question.

14   BY MR. HOULIHAN:

15   Q.    Did Naudimar ever express to you a knowledge in

16   this five-hour transcript of where you were going, the

17   final goal?

18   A.    I didn't understand the question, sir.

19   Q.    I'll move on.

20        If you'd turn to Page 139, 140, 141 and 142 --

21   all right? -- those four pages.

22   A.    141?

23   Q.    139 to 142.  Those four pages.

24   A.    Yes, sir.

25   Q.    Now, again, this is in italics, indicating, sir,

 1    does it not, that this mostly was in Arabic between you

 2    and the other paid informant?

 3    A.    Yes, sir.

 4    Q.    And this is on the way back now from the Keys,

 5    from the tent, from Islamorada?

 6    A.    Yes, sir.

 7    Q.    Now, around the middle of the page, as you and

 8    the other paid informant are bantering back and forth,

 9    he starts by saying, "By God, dumb asses."

10          Do you see that?

11    A.    Who?

12    Q.    The other paid informant.

13    A.    Yes, sir.

14    Q.    "By God, dumb asses.  (Both men laugh)."

15    A.    Yes, sir.

16    Q.    Do you see that?

17    A.    Yes, sir.

18    Q.    Did you laugh?

19    A.    Yes, sir.

20    Q.    You thought it was funny?

21    A.    Let me explain something to you, sir.  And you

22    want my answer.

23          We been going to somewhere for four hours.  We

24    went from one place to another place.  We don't know

25    where we are going, where we are heading.

1          I have a guy with me, like I said before, young

2     guy, not experienced guy, scared, praying for God that

3     we're gonna die, they're gonna take us to the grave and

4     all this stuff.

5          We had the meeting.  We came back.  Nothing

6     happened.  He was so happy.  He was so relieve that

7     nothing happened, he didn't -- they didn't kill us.

8     They didn't -- nothing bad happened to us.

9          He was expressing him -- his feeling, young guy,

10    like -- he's young.  And he was expressing his feeling

11    back home, that, "Thank God we didn't die.  Thank God

12    nothing happened bad."

13         So I was with him.  And if you see, I didn't

14    respond.  I didn't mention, like, or comment -- any

15    commitment -- comment on his -- but I was help -- like,

16    "Okay.  That's fine.  Yes.  He's relaxed.  He's okay.

17    He's relaxed."

18         So that's all is what about.

19    Q.   So you, also, I guess, as a -- just as a

20    compatriot, that's why you joined in his laughter.

21         Is that what you're telling us?

22    A.   It's not joining, sir, laughing, joining, wow,

23    relaxing and -- I was just to -- when somebody telling

24    you something and you laugh -- he laugh and you share

25    with him his laugh, that you are -- his happiness.  He

1   was happy nothing happened.  I was sharing his

2   happiness with -- with him.

3   Q.     So you were just sharing his happiness?  That's

4   why you laughed?

5   A.     Yes.  If you want to say, yes, sir.

6   Q.     The next page.

7          Again, this is a conversation -- putting context

8   on it -- really, at the beginning, he goes --

9   laughing -- he still laughs by himself -- or he laughs,

10  "By God, I will remember this thing all my life."

11         Both of you laugh again.

12         That's basically what you just told us.  You were

13  sharing his laughter.  Right?

14  A.     Yes, sir.

15  Q.     Then you go, "How many hours have we been here?"

16         Again, this is all in Arabic again.

17         And he said, "By God, four, five hours."

18         You go, "Since we left?"

19         He goes -- he answers, the other paid informant,

20  "Yeah.  Since we left."

21         You go, "Ah, good."

22           MS. ARANGO:  Judge, I would object.  The

23  transcript speaks for itself.  If he has a question

24  about his understanding....  But this is improper

25  cross.

```
 1              THE COURT:  Are you leading up to a question,

 2   Mr. Houlihan?

 3              MR. HOULIHAN:  Yes, ma'am.

 4              THE COURT:  Go ahead.

 5   BY MR. HOULIHAN:

 6   Q.    To finish before the question, the other paid

 7   informant, "Good.  Why?  They pay hourly?"

 8         You go, "Five hours."

 9         "(Both men laugh very loud.)"

10         Okay?

11         Now, isn't it a fact that you truly -- you -- you

12   truly saw this as a money-making opportunity?

13   A.    Excuse me?

14   Q.    You saw this -- you're getting paid.  Isn't

15   that what you're -- "We're getting paid for five hours.

16   The United States Government is paying us for five

17   hours."

18         And "(Both men laugh very loud)."

19         Okay?

20   A.    No, sir.

21   Q.    Very loud.

22   A.    You are wrong.  Because, first, the US Government

23   doesn't pay hourly.

24         Second, is -- it was -- he made a joke, Brother

25   Abbas.  He made a joke.  It's like I was -- I didn't
```

 1    know the time and I asked him, "How many hours we been

 2    in this trip?  How many hours we been long?"

 3         And he said, "Four to five hours."

 4         I said, "Since we left?"

 5         And he said -- and -- "Yes, since we left."

 6         I said, "Oh, God."

 7         Was, like, four or five hours."

 8         And it was -- if you can see this from what time

 9    it start and what time we came back, around midnight or

10    after midnight.

11         So --

12         And he said, "Why?  Do they pay hourly?"

13         He was telling a joke, saying like -- a kind of

14    comment, show up like joke.  Was relaxed.

15         I said, "Five hours?"

16         And you can see the tone of my voice in this

17    script -- or in this recording.

18         "Five hours?", like, "Wow, long time."

19         I wasn't commenting, like, they will pay us five

20    hours because me and him -- we know exactly that the

21    Government not paying hourly, sir.

22    Q.   Do you agree with the -- I guess the interpreter

23    put the parentheses, "(Both men laugh very loud)."

24         Is that a fair description?

25    A.   Could be.  Yes, sir.

```
 1    Q.     Could be or it is?

 2    A.     Could be we laugh.  We laugh very loud.

 3           Could be.

 4    Q.     Now, in this same conversation -- remember I said

 5    Page 139 to Page 142 -- towards the end of it, it's

 6    again you and this other informant -- paid informant

 7    speaking in Arabic.

 8           "You know, they took my watch," you said, about

 9    one-third of the way down?

10    A.     What page?

11    Q.     142.  "They took my watch.  Where is my watch?"

12    A.     Yes, sir.

13    Q.     I'm trying to give you a context.  This is a

14    conversation.

15           He responds, "They're pretending to be smart.

16    They took your watch and everything."

17           And if we -- if we drop down a little bit -- we

18    don't need to, but -- you respond, "Don't speak.  Don't

19    speak.  Don't speak now.  Don't say anything like this

20    in Arabic."

21           Do you see that?

22    A.     No, sir.

23    Q.     Almost dead center in the middle of the page.

24           CW 2 -- again, that's you, the Paid Informant

25    No. 2.  Right?
```

```
 1    A.     Yes, sir.

 2    Q.     "Don't speak.  Don't speak.  Don't speak now."

 3           Do you see that?

 4    A.     Yes, sir.

 5    Q.     "Don't say anything like this in Arabic."

 6           Now, that refers, of course, does it not, to --

 7    you know everything you say in the car is being taped

 8    and the tape is going to go to the FBI?

 9    A.     Yes, sir.

10    Q.     And you're telling him, are you not, "Watch what

11    you're saying.  We don't want, maybe, certain things

12    translated later"?

13    A.     Sir -- no, sir.  Because at that time, I'm not

14    thinking about the recording.  I'm not thinking about

15    what they will translate later on.

16           My mind was in the present, in the moment, that

17    we are okay.  We come back.  We just want to arrive

18    where we are heading and go home and that's it.  I

19    wasn't -- my mind wasn't thinking about after.

20           And for you -- for -- for your information, I

21    never been in this situation before.  So I wasn't -- I

22    don't -- I didn't know the proceeding for after.  I

23    didn't know there would be transcript or CD or all this

24    stuff.

25           I was thinking about the moment.  We are okay.
```

```
 1   We came back home.  Let's finish and go home.

 2   Q.    If we finish the next two or three lines, if you

 3   see on Page 142, he goes, the paid informant, "No.  No.

 4   (Pause)."

 5         Do you see where I'm referring to?

 6   A.    Yes, sir.

 7   Q.    And then he says to you, "You think these dumb

 8   asses speak English?  They don't know how to pray."

 9         And you respond, "You don't know, man.  You don't

10   know.  Call (unintelligible) -- call Hussein."

11         Now, who's Hussein?

12   A.    I don't know.

13   Q.    Because that's who you say, "Call Hussein."

14   Correct?

15   A.    (No response.)

16   Q.    You have no idea?

17   A.    I don't remember why I said that.

18   Q.    When the phrase in this conversation, "You think

19   these dumb asses speak English" -- now, does that

20   specifically refer to Naudimar and Patrick or does it

21   refer to all of them?

22   A.    Sir, you have to ask Brother Abbas about that.

23   Q.    You have no idea?

24   A.    No, sir.

25   Q.    Okay.  Lastly, about the Keys trip and going back
```

Assaad - CROSS - By Mr. Houlihan          157

```
 1    a little bit to Page 66 --
 2    A.    66.
 3    Q.    I apologize for the backward and forward.
 4    A.    Yes, sir.
 5    Q.    You see -- let's see -- five from the bottom,
 6    "NH," Naudimar Herrera.  Correct?
 7    A.    Yes, sir.
 8    Q.    Again, this is a conversation in the car on the
 9    way to Islamorada.  Correct?  Just so we have a
10    context, this is going down?
11    A.    Yes, sir.
12    Q.    Naudimar says, "(Unintelligible) you know, it's
13    nothing but love and peace in my heart."
14          And you respond, "Huh?"
15          And Naudimar then says, "In our hearts, love and
16    peace.  You know what I'm saying?  The way I do it like
17    always.  I let Allah lead everything.  You know so
18    (unintelligible) everything Allah's will."
19          Okay?
20    A.    Yes, sir.
21    Q.    Now, when Naudimar tells you "love and peace in
22    my heart," did you say to him, "Hey, what are you
23    talking about?  Aren't you going to go on a jihad?"
24          Because you're having a conversation.  You never
25    asked him.  You never confronted Naudimar with the
```

1    discrepancy, the contradiction, between "love and peace

2    in my heart" and these violent, horrible things that

3    we've heard?

4           MS. ARANGO:  Objection.  Compound question and

5    vague.

6           THE COURT:  Sustained.

7           Rephrase your question.

8    BY MR. HOULIHAN:

9    Q.   Did you confront Naudimar with the seeming

10   discrepancy between what he's talking with you about in

11   the car and what you're there for?

12   A.   Sir, no, sir.  Because it was situation where I

13   don't know who they are.  I don't know their position

14   exactly, what they do, who is -- what's going on.

15          We are trying to be aware of the road, what will

16   happen.  We were going down to the Keys.  We are

17   worried about our life, our safety.

18          We weren't in position to question or to take any

19   subject out for our safety.  We are just listening.

20   And you heard me saying, "Huh?"  I was, like, "Okay,"

21   responding short response.  That's it.

22   Q.   The two times you agree that you saw Naudimar,

23   the 28th and March 16th -- right?

24   A.   And March 9.

25   Q.   We'll get to March 9th in a minute.

 1           But you never asked him about this.  Never?

 2    A.     About what, sir?

 3    Q.     Somebody saying, you know, "Love and peace in my

 4    heart" -- I don't know if you were here in the 1960s.

 5    There's something called hippies.

 6           Do you know about them?

 7    A.     I heard about them.  Yes, sir.

 8    Q.     I mean, it sounds like the hippie generation,

 9    "There's love and peace in my heart."

10           Did you ever ask Naudimar what he meant by that?

11    A.     Sir, it was a comment.  And -- no, sir.

12    Q.     Lastly, about this Keys trip -- you don't need

13    the transcript anymore -- did you ever see Naudimar or

14    Patrick with a gun?

15    A.     No, sir.

16    Q.     A knife?

17    A.     No, sir.

18    Q.     A weapon of any kind?

19    A.     No, sir.

20    Q.     I mean, did they ever -- did you ever see or did

21    they ever produce -- I'm just quickening this by

22    "they."  Okay? -- handcuffs, flexi-cuffs -- do you know

23    what flexi-cuffs are?

24    A.     Like handcuffs.  Right?

25    Q.     Right.  Like plastic.  Police use it a lot, like

```
 1   flexi-cuffs.

 2   A.     No, sir.

 3   Q.     Did you ever see duct tape, something to tie

 4   people up with?

 5   A.     No, sir.

 6   Q.     I'd like to show you Exhibit 118.  I have it

 7   right here.  I'm going to put it up on the ELMO.

 8   A.     Yes, sir.

 9   Q.     This is going to be the Walgreens receipt.

10   A.     Yes, sir.

11   Q.     I'm not going to fiddle with the machine.

12          But Walgreens.  All right?

13          That's -- you can see that.  Right?

14   A.     Yes, sir.

15   Q.     Clearly.

16          Now, you're paying for this?

17   A.     I don't remember if I did, sir.  But I was there.

18   Yes, sir.

19   Q.     Well, since I'm up here for right now, the

20   Cadbury -- you ate that.

21          That was for you?

22   A.     I don't remember, sir.

23   Q.     The Doritos:  That goes to Naudimar?

24   A.     I don't know.

25   Q.     Tic-Tacs to Naudimar?
```

1          You don't remember at all?

2    A.    I don't remember anything about who ate and who

3    didn't.

4          MR. HOULIHAN:  Thank you, Judge.

5          Do you want me to turn the light off or leave

6    it on?

7          THE COURT:  I'll do it.

8          Mr. Clark.

9    BY MR. HOULIHAN:

10   Q.    Now, do you remember testifying -- giving sworn

11   testimony in this case February 28th, 2008?

12         MS. ARANGO:  Objection.  Improper impeachment.

13         MR. HOULIHAN:  Judge, this is the predicate.

14         MS. ARANGO:  No.  That's not the way it's

15   done.

16         THE COURT:  I'm sorry.  I thought you were

17   done, Mr. Houlihan.

18         MR. HOULIHAN:  I'm sorry.

19         THE COURT:  That's why I called Mr. Clark up.

20   I thought you said that you were finished.

21         MR. HOULIHAN:  You hurt my feelings, Judge.

22         THE COURT:  You can stay there as long as you

23   want, Mr. Houlihan.

24         MR. HOULIHAN:  Judge, the peanut gallery over

25   here.

```
 1              THE COURT:  Sustained.

 2   BY MR. HOULIHAN:

 3   Q.     Well, sir, isn't it a fact that you have -- your

 4   memory --

 5   A.     Excuse me?

 6   Q.     Your memory in February of 2008 was better than

 7   it is today?

 8              MS. ARANGO:  Objection.  Improper impeachment,

 9   Judge.

10              MR. HOULIHAN:  Judge --

11              THE COURT:  Sustained.

12   BY MR. HOULIHAN:

13   Q.     The Doritos.  Let's focus on that.  Okay?

14   A.     Which one?

15   Q.     The Doritos that was on the receipt:  You bought

16   that for Naudimar; Naudimar ate the Doritos?

17   A.     I don't remember, sir.

18   Q.     Do you recall in sworn testimony February 28th,

19   2008, being asked this question and giving this

20   response:

21          Question on Page 135:  "You bought that for

22   Naudimar; Naudimar ate the Doritos?

23          "Answer:  Yes."

24   A.     I don't remember that, sir.

25   Q.     I can go through Tic-Tacs and water and so forth.
```

1          You don't remember any of that?

2     A.    No, sir.

3     Q.    Do you recall, though, on February 28th, 2008,

4     me asking you those questions and you giving

5     affirmative responses, "yes," he had the Tic-Tacs,

6     "yes" --

7              MS. ARANGO:  Objection.  Improper impeachment.

8     He's asked --

9              THE COURT:  Sustained.

10    BY MR. HOULIHAN:

11    Q.    Let me ask you, then.

12         "The Tic-Tacs that was on the receipt:  You

13    bought -- or the United States Government bought, since

14    they were reimbursing you -- you bought for Naudimar.

15    Is that right?"

16         Your response was, "Yes, sir."

17         That was your -- the question and your response

18    February 28, 2008?

19    A.    Maybe my respond was, sir, we bought the stuff.

20    Yes.  I'm confirming that we bought the stuff.  But who

21    ate them, sir, or for who -- I didn't stand on --

22    outside the door and I was giving each one, "This is

23    for you.  This is for you.  This is for you."

24         We bought the stuff from Walgreen and I am

25    confirming, "Yes, sir," answering that, yes, we bought

1    the stuff.  But who ate them -- I was in the back, sir.

2    So I don't know who was eating and who was not.

3    Q.    Referring to the Tic-Tacs and Doritos -- and this

4    sounds really petty.

5         But, I mean, do you remember that Naudimar's

6    dinner that night, Naudimar's dinner that night, was

7    the Doritos and the Tic-Tacs?

8    A.    Maybe, sir, we shared in the car.  Maybe -- I

9    don't know.  I don't remember exactly.

10        But the example -- with four people in the car,

11   three people in the car, you open bag of chips and you

12   offer, "Do you want to eat something?  Do you want to

13   eat something?"

14        Maybe they ate from the bag.  Maybe they not.

15   Maybe somebody opened the Tic-Tac and offer to

16   somebody.  I don't know.

17        I remember we bought the stuff.  But who ate them

18   or for who exactly was each item, I cannot remember.

19   Q.    I understand.

20        And it seems relatively speaking petty.  All

21   right?

22        MS. ARANGO:  Objection.  If he has a question,

23   ask a question.  But these comments, Judge --

24        THE COURT:  Sustained.

25

```
1    BY MR. HOULIHAN:

2    Q.    But when I asked you, "Did you not" -- when I

3    asked you, "Naudimar ate the Doritos?", you answered,

4    "Yes."

5              MS. ARANGO:  Objection.  Asked and answered.

6              THE COURT:  Sustained.

7    BY MR. HOULIHAN:

8    Q.    I'll move on.  Okay, sir?

9    A.    Okay, sir.

10   Q.    In March, aside from March 16th, there was a

11   meeting -- you've already gone over it -- March 15th.

12         Do you remember that?

13   A.    Yes.  March --

14   Q.    March 15th.

15   A.    15?

16   Q.    Yeah.

17   A.    Okay.

18   Q.    Naudimar wasn't present at all for that.

19   Correct?

20   A.    No, sir.

21   Q.    On March 10th, there was a meeting.  You've

22   testified about these things.  I've been taking notes.

23   March 10th.

24         Naudimar wasn't present for that either?

25   A.    No, sir.
```

1   Q.     Now we come down to March 9th.

2          That's the day you went to the Embassy twice?

3   A.     Yes, sir.

4   Q.     You testified on direct and somewhat on cross

5   already, but I have some questions to ask you.

6          Concerning the meeting of March 9th, do you

7   recall whether Naudimar was present?

8   A.     In all.  They are all present in the Embassy.

9   Q.     Now, do you remember me asking you the same --

10  that question and you giving the following response on

11  October 24th, 2007?

12         Question on Page 17:  "As we speak, on the

13  meeting of March 9th, do you recall whether Naudimar

14  was present?"

15         And your answer was, "As we speak, if I recall,

16  no, sir.  I don't remember."

17         That was your question and answer back in 2007.

18  A.     Okay.

19  Q.     Is your memory better today than it was a year

20  and a half ago?

21  A.     I don't know.  But there is certain things

22  sometimes you remember.  Sometimes you don't remember.

23         And I remember they were all -- all the seven at

24  the Embassy in March 9.

25         And maybe at that time when you asked me, sir, I

1    didn't have the -- what you call -- the document when

2    the briefing from the FBI --

3    Q.    Now, isn't it a fact --

4    A.    I didn't finish, sir.

5    Q.    Oh, I apologize.

6    A.    So maybe at that time I didn't have it in front

7    of me to refresh my -- my memory.  But now I look at it

8    and my memory was more -- a little bit specific on the

9    day.  So could be different stuff happen.

10   Q.    Now, would it -- in fairness, when you say "the

11   document," you're referring to the FBI 302?

12   A.    I don't know how you call it.  But briefing --

13   debriefing.

14   Q.    The debriefing.

15         Now, I'm sure for our purposes right now it would

16   refresh your recollection to see that.

17         Is that a fair statement?

18   A.    Yes, sir.

19   Q.    I've been given a copy.

20         MR. HOULIHAN:  May I approach him?

21         MS. ARANGO:  Judge, I'm not sure what he's

22   refreshing his recollection on.

23         MR. HOULIHAN:  Concerning the identification.

24   He did not.

25         MS. ARANGO:  He's already testified that

1    Mr. Herrera was present on March 9th.  His recollection

2    does not need to be refreshed again with that document.

3              MR. HOULIHAN:  The debriefing --

4              THE COURT:  Sustained.

5    BY MR. HOULIHAN:

6    Q.    Would it refresh your recollection as to what you

7    told the FBI on March 9th when you were debriefed

8    concerning this matter?

9              MS. ARANGO:  Objection.  Vague and asked and

10   answered.  He's asked the question, and there's nothing

11   to refresh his recollection on.  It's only proper --

12             MS. JHONES:  Objection to the speaking

13   objections, your Honor.  She's coaching the witness.

14             MS. ARANGO:  Oh, Judge, would you please --

15             THE COURT:  The objection is overruled.

16             MS. ARANGO:  -- admonish counsel to stop that

17   silliness.

18             MS. JHONES:  You may think it's silly, your

19   Honor, but that is the objection.

20             THE COURT:  Excuse me?

21             MS. JHONES:  I'm responding to Ms. Arango's

22   comment, your Honor.  That's a valid objection,

23   respectfully.

24             THE COURT:  Would you take the jury out,

25   please.

Assaad - CROSS - By Mr. Houlihan          169

1          Please do not discuss this case amongst

2    yourselves or with anyone else.

3          (Whereupon, the jury exited the courtroom at

4    3:42 p.m. and the following proceedings were had:)

5          THE COURT:  You may be seated.

6          You may step out, sir.

7          (Thereupon, the witness retired from the

8    courtroom and the following proceedings were had:)

9          THE COURT:  I don't think you meant it this

10   way, Ms. Jhones.  But I really think that you have to

11   watch what you say.

12         The jury gulped.  Many members of jury gulped

13   when you said, "Your Honor, you may think it's silly."

14         I don't think you meant to say that I was

15   thinking it was silly.

16         MS. JHONES:  I did not, your Honor.

17         THE COURT:  But you really have to be careful

18   what you say in front of a jury.  Several of them went,

19   "Ah."

20         I don't think you want to convey that to the

21   jury.  I actually broke so they would differentiate

22   this part of what happened from the trial, because

23   what's going on here is very important.  And I don't

24   want them focusing on things that are not important.

25         So I caution you, if you're going to make an

```
 1    objection, there should be no speaking objections on

 2    either side.

 3           The Government's objection was that the

 4    witness's memory did not need to be refreshed.  That's

 5    a proper objection.

 6           For you then to say, "You're coaching the

 7    witness," that is not a proper objection.

 8           I agree Ms. Arango should not have said, "This

 9    is silliness."  But certainly you have not -- you

10    should not have responded, "You may think this is

11    silly, your Honor."

12           I'm the last person to think any of this is

13    silly.

14           MS. JHONES:  I was not directing that at you,

15    your Honor.

16           THE COURT:  I didn't think that you were.

17    But, apparently, some of the jurors thought that you

18    were.

19           So I just -- you know, I understand that,

20    except for Mr. Casuso, this is the third time that all

21    of the lawyers have gone through this.

22           I don't know if Mr. Gregorie -- was

23    Mr. Gregorie here the first time?

24           MS. ARANGO:  Yes, he was.

25           THE COURT:  I've forgotten.
```

Assaad - CROSS - By Mr. Houlihan                    171

```
 1              MR. GREGORIE:  I was, Judge.  I'm sorry you

 2   forgot.

 3              THE COURT:  Sorry.

 4              I guess there were additional folks the first

 5   time from the Government.

 6              I apologize, Mr. Gregorie.

 7              MR. GREGORIE:  That's quite all right, Judge.

 8              THE COURT:  This is the third time.

 9              And I also understand that everyone has a

10   tremendous amount invested because it's the third time.

11   Whether that rises to the surface and you realize it or

12   not, it's human nature.  Okay?

13              But I want to caution everybody to take a deep

14   breath and step back.

15              This is the first time these jurors are

16   hearing it.  And they are devoting day after day -- and

17   I watch them, and except for one or two people who I

18   think get distracted from time to time -- that

19   sometimes concerns me -- but for the most part, they

20   are an extremely attentive jury.

21              They deserve the respect of everybody in the

22   courtroom for the time that they are taking and that

23   the way that we demonstrate that respect is to provide

24   for them American justice.

25              That means being civil to each other,
```

```
 1    advocating for your client, but not making a mockery of
 2    the American criminal justice system.
 3              MS. JHONES:  I don't believe I've done that,
 4    your Honor.  I think Ms. Arango's comment was improper.
 5              THE COURT:  I'm not saying that you did that,
 6    Ms. Jhones.  I'm asking you to take a step back and a
 7    deep breath.  You're not listening to what I'm saying.
 8              I am not accusing anybody of doing that.  I'm
 9    saying that we all have a responsibility to this jury
10    and to these Defendants to make sure that justice goes
11    forward here.
12              And so I'm asking you, as well as everybody
13    else, Ms. Arango and everybody else, to take a deep
14    breath and think about what you're saying before you
15    say it.
16              That's all.
17              MS. JHONES:  Will do, your Honor.
18              THE COURT:  I'm not accusing anybody of
19    anything.
20              It should neither get too familiar in the
21    courtroom between the lawyers, nor should there be any
22    extraneous comments made in the courtroom either to
23    each other or to the jury.  That's all.
24              And that's how I expect all of you to comport
25    yourselves as officers of the court.  And I don't think
```

Assaad - CROSS - By Mr. Houlihan                    173

```
 1    that's too much to expect from any lawyer who's sitting

 2    here.

 3            What you are doing, Mr. Houlihan?

 4            MR. HOULIHAN:  I am impeaching him --

 5            THE COURT:  You know something?  You were

 6    impeaching him about Tic-Tacs at one moment and now

 7    you're dealing with -- which I found -- okay --

 8    curious, but that's okay.

 9            He's now testified that he remembers they were

10    all present in the Embassy.  Then you asked him

11    about -- a question about prior testimony.  And you

12    asked him whether his memory is better today than it

13    was a year ago.

14            And he says, "I don't know."

15            MR. HOULIHAN:  Well, as I --

16            THE COURT:  And then you're trying to present

17    him the 302?

18            MR. HOULIHAN:  The same 302 that was used by

19    the Government in their direct examination, which I

20    have a right to cross-examine him on a document used to

21    refresh his recollection in direct.  This is the

22    document he used to refresh his recollection.

23            MS. ARANGO:  Judge, may I respond?

24            THE COURT:  Yes.

25            MS. ARANGO:  I provided him with that
```

1    document -- I mean, he had it in discovery.  But I

2    provided it with [sic] him in the event that this

3    witness was not able to recollect events that had

4    occurred in that meeting so that he could use it to

5    refresh the witness's recollection.

6            The witness said that he recalled Naudimar

7    Herrera being present at the meeting.  He was then

8    impeached with prior testimony where he didn't recall.

9            The witness then said, "Maybe I hadn't" -- I

10   don't remember the exact language, but something to the

11   effect of "Maybe I hadn't read the 302 then" as an

12   explanation for why he didn't remember it then and he

13   remembers it now.

14           And then he says, "Well, let me show you the

15   302."

16           I don't see that his recollection needs to be

17   refreshed with the 302.  There's no pending question

18   where he's saying "I don't remember."

19           THE COURT:  The question was, "Is your memory

20   better today than it was a year -- than it was a year

21   or so ago?"

22           He says, "I don't know."

23           MR. HOULIHAN:  Judge, that was from a --

24           THE COURT:  Then you start -- it's not -- why

25   would that be an opportunity --

 1              MR. HOULIHAN:  Judge, the document --

 2              THE COURT:  Hold on.

 3              Why would that be a basis for you then to

 4    refresh his recollection with a 302?

 5              MR. HOULIHAN:  I am cross-examining him on a

 6    document that was used by the Government in direct to

 7    refresh his recollection, which I am entitled to.

 8    Anything used to refresh a witness's recollection can

 9    be -- is proper subject matter for cross-examination.

10              THE COURT:  I don't have a problem with that.

11              MR. HOULIHAN:  That's what I'm trying to do.

12              THE COURT:  But he hasn't said that he

13    doesn't -- he doesn't remember.

14              The question that you just asked him -- the

15    question that you asked him is, "Is your memory better

16    now or before?"

17              And he says, "I don't know."

18              MR. HOULIHAN:  Okay.  Maybe the --

19              THE COURT:  So if you ask him a factual

20    question and the witness says, "I don't know," then you

21    can refresh his recollection with the 302.

22              But on a question asking him, "Is your memory

23    better now or before?" and he says "I don't know,"

24    that's it.

25              MR. HOULIHAN:  Well, I think there's -- I

```
 1    understand, I think, where you're coming from.
 2           I could have misunderstood one of the
 3    responses, because I thought he said initially, "Yes.
 4    It would refresh my recollection."  If I'm wrong on
 5    that, then I'm wrong.
 6           But, regardless, an independent basis would be
 7    the cross-examination of a document used in direct
 8    examination -- used to refresh his recollection.
 9           I would then ask him -- quite frankly, I would
10    change the question -- I'm going to --
11           THE COURT:  Why don't you ask him the next
12    question and ask him a factual question and if he --
13           MR. HOULIHAN:  "This document was shown to
14    refresh your recollection."
15           THE COURT:  I'm sorry?
16           MR. HOULIHAN:  When you say "factual
17    question," do you mean this is a doc -- you refresh
18    your recollection --
19           THE COURT:  No.  There has to be factual
20    question that he says he doesn't remember.  Whether his
21    memory is better or not and he says, "I don't know" is
22    not something then for him to refresh his
23    recollection -- nothing will refresh his recollection.
24           MR. HOULIHAN:  Okay.  I think I understand
25    what you're saying.
```

1          Leaving refreshing out, I am entitled to cross

2     on a document used by an opposing party to refresh

3     recollection.

4          THE COURT:  You can use the document and ask

5     him questions.

6          MR. HOULIHAN:  Right.

7          So, then, just to cut this --

8          THE COURT:  You just want to give him the

9     document -- I don't understand.  You can ask him

10    questions looking at the document that they gave you.

11    That's what I mean.

12         MR. HOULIHAN:  I see.

13         THE COURT:  You can look at the document that

14    they gave you that they used to refresh his

15    recollection and you can test his recollection on the

16    facts on that document.  Absolutely.  You have every

17    right to do that.

18         MR. HOULIHAN:  Okay.

19         THE COURT:  And if he says, "I don't

20    remember," you can show him the 302.

21         MR. HOULIHAN:  Okay.

22         THE COURT:  Are we clear now?

23         MR. HOULIHAN:  Yes.

24         THE COURT:  Okay.

25         MR. HOULIHAN:  You know, Judge, it's hard

1    sitting there for hours at a time.

2            THE COURT:  I think I'm sitting the same

3    amount of time you are.  So I know.

4            MR. HOULIHAN:  I'm being slightly facetious.

5            THE COURT:  I know.  I know.

6            And, quite frankly, I've been sitting here for

7    14 years now, 24 years -- 28 years on the bench.

8            And I am amazed, you know, at how well the

9    jury does sitting hour after hour, day after day,

10   because it's not easy for people to come in here and

11   sit seven or eight hours a day.

12           And they are -- you know, you are all very

13   fortunate -- we are all very fortunate that, for the

14   most part, this is an extremely attentive jury.  I see

15   them very well.

16           I can see everyone, and I see the faces going

17   back and forth, for the most part, with one or two

18   exceptions, like they're watching a tennis match,

19   really listening.

20           I do know it's hard to sit for so many hours.

21           Let's bring them in, please.

22           (Whereupon, the jury entered the courtroom at

23   3:57 p.m. and the following proceedings were had:)

24           THE COURT:  You may be seated.

25           You are still under oath sir.

```
 1              You may proceed, Mr. Houlihan.

 2    BY MR. HOULIHAN:

 3    Q.     All right, sir.  Going back to the March 9th

 4    matter.  Okay?

 5    A.     Excuse me?

 6    Q.     The March 9th matter.

 7    A.     March 9?

 8    Q.     March 9th.

 9    A.     Yes, sir.

10    Q.     During your debriefing back on March 10th of

11    2006, regarding the day-before meeting, the March 9th

12    meeting -- all right? -- isn't it a fact --

13    A.     I believe, sir, was debriefing on January --

14    March 9.

15    Q.     All right.  So the debriefing was on the same

16    day?

17    A.     Yes.  I believe so.  Yes, sir.

18    Q.     During your debriefing back on March 9th of the

19    meeting of March 9th at the Embassy, isn't it a fact

20    that you never identified to the FBI Naudimar Herrera

21    as being present at the Embassy?

22    A.     I don't remember, sir.

23    Q.     Is there anything that would refresh your

24    recollection of that debriefing?

25    A.     If there is, yes, sir.
```

```
 1    Q.     And that is actually the 302, the FBI report

 2   concerning that?

 3    A.     Yes, sir.

 4          MR. HOULIHAN:  May I approach, your Honor?

 5          THE COURT:  Yes.

 6   BY MR. HOULIHAN:

 7    Q.     (Tenders document to the witness.)

 8          Okay, sir?

 9    A.     And the question is, sir?

10    Q.     You've read -- been able to look at the report

11   again?

12    A.     I look at it.

13    Q.     That's also -- was shown to you, I think, on

14   direct examination.  Correct?

15    A.     Yes, sir.

16    Q.     You identified three people -- is that a fair

17   statement? -- to the FBI?

18    A.     Yes, sir.

19    Q.     It was Patrick Abraham.  You said he was there?

20    A.     Yes, sir.

21    Q.     Narseal Batiste was there?

22    A.     Yes, sir.

23    Q.     And Stanley -- Stanley Phanor was there.

24   Correct?

25    A.     Yes, sir.
```

1   Q.    And you refer to the others to the FBI for

2   identification purposes as "four unidentified black

3   males"?

4   A.    Yes, sir.  But if you allow me, sir, at that

5   time, on March 9, it's -- like I said -- I don't know.

6   Maybe I -- yes, sir.

7   Q.    Okay.  Thank you.

8         MR. HOULIHAN:  I have nothing else.

9         THE COURT:  Mr. Clark.

10        MR. CLARK:  Thank you, your Honor.

11        May it please the Court.

12                    CROSS-EXAMINATION

13  BY MR. CLARK:

14  Q.    Good afternoon, Mr. Assaad.

15  A.    Good afternoon.

16        MR. CLARK:  Good afternoon, ladies and

17  gentlemen.

18        THE JURY:  Good afternoon.

19  BY MR. CLARK:

20  Q.    You had indicated in your testimony that you

21  haven't been paid in 2009 in this case.  Is that

22  correct?

23  A.    2009?

24  Q.    Yes.

25        Is it your testimony you haven't been paid in the

```
 1    year 2009 in this case?

 2    A.    I didn't understand the question, sir.

 3    Q.    Have you been paid for your services in the year

 4    2009 --

 5              MS. ARANGO:  Objection.  Vague.

 6    BY MR. CLARK:

 7    Q.    -- in this case?

 8              MS. ARANGO:  Paid by whom, Judge?  Vague.

 9    BY MR. CLARK:

10    Q.    By the FBI.

11          You've been paid by the FBI --

12              THE COURT:  Overruled.

13    BY MR. CLARK:

14    Q.    -- for your work in this case in 2009?

15    A.    No, sir.

16    Q.    But you've been working for the FBI for 13 years?

17    A.    Yes, sir.

18    Q.    You're still working for the FBI?

19    A.    No, sir.

20    Q.    When did you stop working for the FBI?

21    A.    In 2008, sir.

22    Q.    And you were paid throughout that time, is that

23    correct, the 13 years with the FBI?

24    A.    No, sir.

25    Q.    You've been paid for other cases, haven't you?
```

```
 1   A.     It depends if I'm working a case, yes or no,

 2   because there is sometimes you working a case and

 3   sometimes you are not working a case.  And when you are

 4   not working a case, you are not paying -- you don't get

 5   paid.

 6   Q.     But when you're working other cases, you are

 7   paid?

 8   A.     It depends if I'm working other case.  Yes, sir.

 9   Q.     Now, I believe you testified that you were called

10   in October of 2005 for this case.  Correct?

11   A.     Yes, sir.

12   Q.     And you obviously discussed the case -- about the

13   case on the telephone.  Correct?

14   A.     No, sir.

15   Q.     You did not discuss anything about the case?

16   A.     I never questioned.  No, sir.

17   Q.     But you were told you were going to come and work

18   on a case.  Is that correct?

19   A.     On a case.  Yes, sir.

20   Q.     All right.

21   A.     Assisting the FBI in -- in the case.  Yes.

22   Q.     I believe you testified that you came sometime in

23   November.

24          You did not give us an accurate date, did you?

25   A.     Excuse me, sir?
```

```
 1   Q.    You did not give us an accurate date as to when
 2   you came here in 2005, did you?
 3   A.    Because, sir, I don't remember what day exactly I
 4   arrive.
 5   Q.    I believe you said it was two to three weeks
 6   before December 16th.  Is that right?
 7   A.    If I said so.  Yes, sir.
 8   Q.    So were you here in November of '05, working on
 9   this case?
10   A.    No, sir.
11   Q.    Were you here in November of '05?
12   A.    No, sir.  I was here in November, but I wasn't
13   working on the case, sir.
14   Q.    Well, you came here for the case.  Correct?
15   A.    Yes, sir.
16   Q.    And you were staying -- when you got here, you
17   first started staying at the hotel down the street from
18   the FBI headquarters.  Correct?
19   A.    Yes, sir.
20   Q.    Now, you are much more experienced as a
21   confidential informant than Abbas.  Isn't that correct?
22   A.    I don't know, sir.
23   Q.    Well, you understand -- well, you've talked a lot
24   about debriefing.  You used that term, "debriefing."
25         You understand that -- the difference between
```

1    "briefing" and "debriefing"; do you not?

2    A.     No, sir.

3    Q.     Well, you can be briefed when -- when you're

4    briefed, you're briefed before you engage in an

5    operation.  You're told about what you need to do and

6    what you're going to do.  That's briefing.  Isn't that

7    correct?

8    A.     Sir, I don't know.  I hear them using

9    "debriefing" and "briefing."  And I don't know what the

10   difference is between these two words.  And I say it

11   because I believe it's -- like they sit with you and

12   they talk to you.  This mean it's debriefing, briefing.

13   I don't know.  Maybe the same thing for me.  I don't

14   know, sir.

15   Q.     Well, before you engaged in an undercover

16   meeting, like on December 16th, for instance, you had

17   to get instructions about what to do.  Isn't that

18   correct?

19   A.     Yes, sir.

20   Q.     And that's what I call "briefing."  You're being

21   briefed what a case is about and what to do --

22   A.     Okay, sir.

23   Q.     -- and the role that you're to play.  Correct?

24   A.     Okay, sir.

25   Q.     Sometimes you're actually briefed -- and it

```
 1    happened in this case -- during the actual meeting by

 2    telephone calls.

 3          That happened in this case, sir, didn't it?

 4    A.    You mentioned December 16?

 5    Q.    As an example.  Yes, sir.

 6    A.    Yes, sir.

 7    Q.    And then, after the meeting is over, then you are

 8    debriefed about what happened at the meeting.  Correct?

 9    A.    Talking with the FBI.  Yes, sir.

10    Q.    You understand the difference in my questions

11    about "briefing" and "debriefing"?

12    A.    Yes, sir.

13    Q.    All right.  Now, before you had to meet on

14    December 16th, you were briefed about information about

15    this case.  Isn't that correct?

16    A.    No, sir.

17    Q.    You were not -- you never discussed that you were

18    going to be coming from overseas?

19          MS. ARANGO:  Judge, I would object.  This is

20    cumulative.  This has been gone over.

21          THE COURT:  Sustained.

22    BY MR. CLARK:

23    Q.    Sir, you are -- you understand that you did, in

24    fact, stay at the hotel and you did meet with the FBI

25    before December 16th, didn't you?
```

Assaad - CROSS - By Mr. Clark                187

```
 1   A.     Yes, sir.  I met with them.
 2   Q.     Okay.  And you discussed what you were to do and
 3   what the case was about?
 4          MS. ARANGO:  Same objection.  Cumulative.
 5          MR. CLARK:  This has not been discussed, your
 6   Honor.  Anybody [sic] has not covered this.
 7   BY MR. CLARK:
 8   Q.     Do you understand that you talked -- you
 9   discussed with the FBI about what the case was about?
10          THE COURT:  I'll overrule the objection.
11          Go ahead.
12          THE WITNESS:  No, sir.  We didn't speak about
13   the case.
14   BY MR. CLARK:
15   Q.     Well, sir, you met -- we know that you met with
16   the FBI -- I'm sorry -- you met with Mr. Abbas on
17   January 28th.  I mean, you went on the trip.  Correct?
18   A.     Yes, sir.
19   Q.     And isn't it true, sir, that you met with Abbas
20   with the FBI before January 28th?  Isn't that true?
21   A.     Yes, sir.
22   Q.     Okay.  And you met with him on more than one
23   occasion with the FBI?
24   A.     No, sir.  I don't remember that.
25   Q.     You don't remember -- well, do you remember
```

```
 1    previously testifying in this case on October the 11th

 2    of 2007?

 3    A.     I don't remember, sir.

 4    Q.     You remember testifying before in October, 2007.

 5    Correct?

 6    A.     I don't remember, sir.

 7    Q.     You know that you've testified in this proceeding

 8    before.  Isn't that correct, sir?

 9    A.     Yes, sir.

10    Q.     And do you remember being asked by Ms. Arango in

11    direct examination, "Had you met" -- "Question:  Had

12    you met" --

13              THE COURT:  Line and page number, please.

14              MR. CLARK:  It's Page 83.

15              THE COURT:  Line number?

16              MR. CLARK:  October 11.

17    BY MR. CLARK:

18    Q.     "Question" --

19              THE COURT:  Line number.

20              MR. CLARK:  Line number?  Okay.  Line 2 on

21    Page 83 -- excuse me.  I'm sorry.  It's actually

22    Line 25 on Page 82, the last line of Page 82.

23    BY MR. CLARK:

24    Q.     Do you remember being asked, "Question:  Had you

25    met -- prior to January 28th, had you met Brother Abbas
```

```
 1   before?
 2        "Answer:  Yes, ma'am.
 3        "Question:  When did you meet him?
 4        "Answer:  I don't remember exactly, but we had
 5   meetings with him with the FBI"?
 6        Do you remember giving that testimony, sir?
 7   A.    No, sir.
 8   Q.    And isn't it true, sir, that there was nothing to
 9   prevent you when you came to Miami and you're working
10   on this case to meet with Mr. Abbas with the FBI to
11   collaborate on this case?
12   A.    What means "collaborate"?
13   Q.    Talk about the case.
14   A.    No, sir.  The only time -- the first time I saw
15   Brother Abbas was on January 28th.
16        Now, maybe -- when you are referring before I
17   said something, maybe I was confused by the date or the
18   time.  Because after January 28th, I believe, I saw
19   Brother Abbas one more time.
20        So the timing, maybe, was maybe after or before.
21        But before January 28, I never met Brother Abbas
22   and I never discussed the case with the FBI in the
23   front of Brother Abbas and never Brother Abbas
24   discussed the case with the FBI in the front of me.
25        So whatever Brother Abbas does in this case, I
```

1    don't never know about it.  And they never told me

2    about what he do in this case.

3    Q.    So are you saying that what you testified to on

4    October 11th --

5          MS. ARANGO:  Objection, Judge.  That's

6    improper.  There is no inconsistency there.  He's

7    explained his answer.

8          MR. CLARK:  I hadn't finished my question,

9    your Honor.

10         MS. ARANGO:  It's improper impeachment, Judge.

11         THE COURT:  Sustained.

12   BY MR. CLARK:

13   Q.    So your testimony is you were confused on October

14   the 11th of 2007?

15         MS. ARANGO:  Judge, that's improper

16   impeachment.

17         THE COURT:  Sustained.

18   BY MR. CLARK:

19   Q.    Well, in fact, sir, you are the one -- isn't --

20   you're the one that came up with the idea for the FBI

21   of you being a friend of Abbas's uncle from overseas?

22   A.    I don't remember, sir.

23   Q.    Well, do you remember testifying to that at the

24   previous case in 2007?

25   A.    No, sir.

```
 1    Q.      This is October 24th of 2007, Page 49, Line 11.
 2            Do you remember me asking you, "When you were
 3    being debriefed about your role was going to be, did
 4    you understand that you were going to be a friend to an
 5    uncle to Mr. Abbas?
 6            "Answer:  I believe, sir, I came up with this
 7    one.  I believe I in certain situation -- I come up
 8    with this friend, uncle and all the stuff.  I come up
 9    with this."
10            Do you remember testifying to that on October
11    the 24th of 2007?
12    A.      No, sir.
13    Q.      Isn't it true, sir, you came up with the plan
14    about you being a friend of Abbas's uncle?
15    A.      It was the FBI idea.  I believe so, sir.
16    Q.      And you were -- you understood that that's what
17    you were to be.  Correct?
18    A.      Excuse me?
19    Q.      You understood that you were going to be a friend
20    of Abbas's uncle?
21    A.      I understood I want to be friend with Abbas's
22    uncle?
23    Q.      Yes, sir.  That was part of your role.
24    A.      Yes, sir.
25    Q.      And -- now, you also had the opportunity while
```

1  you were here before December 16th to be briefed about

2  some of the other recorded conversations.  Isn't that

3  true, sir?

4  A.     No, sir.

5  Q.     Weren't you briefed on the fact that there had

6  been some martial arts training that had occurred by

7  Mr. Batiste in this --

8  A.     No, sir.

9  Q.     And weren't you aware that there was a building

10  in Liberty City -- you were briefed that there was a

11  building in Liberty City that had not been fixed up?

12  A.     The time?  When was the time?  Before

13  December 16?

14  Q.     Before December 16, when you were here in --

15  A.     Sir, let me be clear.

16       Before December 16, the FBI never brief me about

17  Brother Naz and his activities, never told me what's

18  the plan game or what we know about Brother Abbas and

19  his group.

20       They never mention anything at all, not small,

21  not big, about anything related, anything related, to

22  Brother Naz and his group in one way or another.

23  Q.     How could you --

24  A.     And I never met before December 16 -- before

25  January 28, I never met Brother Abbas.

```
 1    Q.     So you can't be a confidential informant and not
 2    know some of the things that were being told to another
 3    confidential informant.
 4    A.     My job was, sir, to come from Mexico to United
 5    States, to Miami, to assist the FBI on out -- on
 6    ongoing investigation.  Ongoing investigation.  That's
 7    mean they started.
 8           My job was to go and meet someone.  I never
 9    questioned the FBI, "Okay.  I cannot -- what's going
10    on?" or, "You have to tell me this or you have to tell
11    me that."
12           They told me, "You have to go meet with this guy
13    and sit with him and talk to him and understand what
14    his intentions are, what his -- what's going on."
15           And that's what I did, sir.  That's all what I
16    knew before December 16.
17           And to be more clear, they told me that he
18    request someone from overseas to come and assist him
19    whatever -- he request someone from overseas and he
20    will pick up from the airport.
21           So I was supposed to meet in the airport and
22    supposed Brother Naz to come and pick me up.  So that's
23    all what I knew before I met brother Abbas -- Brother
24    Naz.
25    Q.     Well, if there's -- if you don't know what the
```

```
 1   other confidential informant is telling the target of
 2   the investigation, isn't it true, sir, there's a
 3   possibility that you could say some things that are
 4   inconsistent with what the other informant said and you
 5   could jeopardize your investigation?
 6   A.    I don't understand what you saying, sir.
 7   Q.    If you say things -- sir, isn't it true, in your
 8   experience as an FBI undercover -- confidential
 9   informant, that if you say things to the target that
10   are inconsistent with what the other informant is
11   saying, then you could jeopardize the investigation
12   because you're making inconsistent statements?
13         MS. ARANGO:  Objection.  Speculative and
14   argumentative.
15         THE COURT:  Sustained.
16   BY MR. CLARK:
17   Q.    Based on your years of experience as an FBI
18   agent.
19         THE COURT:  I sustained the question, sir.
20   BY MR. CLARK:
21   Q.    I'm going to show you now --
22         MR. CLARK:  Your Honor, I'd like to show the
23   front page of Exhibit 41 to the witness.
24         THE COURT:  Okay.  Is that 41?
25         MR. CLARK:  Exhibit 41.
```

```
 1              MS. ARANGO:  Can I have the date, please?

 2              MR. CLARK:  I'm sorry?

 3              MS. ARANGO:  May I have the date of the

 4   transcript?

 5              MR. CLARK:  November 7th, 2005.

 6              MS. ARANGO:  November 7th.

 7              THE COURT:  That's actually 41-A.  Correct?

 8              MR. CLARK:  I'm sorry.  41-A.  I apologize,

 9   your Honor.

10              MS. JHONES:  Excuse me, Mr. Clark.

11              Your Honor, the monitor -- I have it turned

12   on, but I don't have a --

13              THE COURT:  I don't know.  Try turning it off

14   and turning it on.

15              Everyone else has it on their monitor?

16              THE JURY:  Yes.

17   BY MR. CLARK:

18   Q.    All right.  Do you see here -- this is

19   November the 7th of 2005, a transcript of a meeting

20   with Abbas and Burson Augustin.

21              You were briefed on that, weren't you, sir?

22   A.    Like I said, sir, I -- I didn't know nothing

23   before December 16 of 2005 about Brother Abbas or the

24   activity of the group of Brother Naz or any one of the

25   brothers.
```

 1          Before December 16 of 2005, like I said before, I
 2     never briefed or explained the activity of each member
 3     or the members or the group on one way or another, sir.
 4     Q.     Okay.  Well, do you see where it says "Date
 5     Typed"?  And do you see where it says December 9th,
 6     2005?
 7     A.     Yes, sir.
 8     Q.     Where were you?  You were in Miami at the FBI
 9     offices during that time period between December 9th
10     and December 16th, weren't you?
11     A.     Excuse me?
12     Q.     Between December 9th of 2005 and December 16th of
13     2005, prior to going to the meeting at the Radisson,
14     you met with the FBI at their offices, didn't you?
15     A.     Maybe I met with them one time or -- when I
16     arrived.  But during -- before December 16, I wasn't --
17     I was kind of little bit -- not on daily basis I was
18     with the FBI.  I wasn't going with them on daily basis
19     or seeing them on daily basis.
20          I didn't see them maybe until, before
21     December 16, a couple days ago, maybe on the 13, maybe
22     on the 12.  I had to take a break two weeks, more or
23     less, just to relax because I was in bad position.
24          And I came to United States.  They said, "Just
25     relax.  Breathe.  We will call you when we need you.

```
 1   Just we want you to be ready to -- when we call you --
 2   when we need you, we will call you."  And that's it.
 3   Q.    So you're denying that you ever read any of this
 4   transcript?
 5   A.    Absolute --
 6             MS. ARANGO:  Objection.  This is improper,
 7   Judge.
 8             THE COURT:  Sustained.
 9             MR. CLARK:  I'm going to show the witness,
10   your Honor, Exhibit 43-B, the cover page of that as
11   well.
12             MS. ARANGO:  Judge, I would object to these
13   questions about these transcripts.  The witness has
14   already testified.  This is improper.
15             MR. CLARK:  Your Honor, it's not been covered.
16   This has not been covered, the collaboration --
17             MS. ARANGO:  This witness was not a
18   participant to those recordings, Judge.  He's asking
19   questions about what he's been privy to.
20             THE COURT:  Are you going to ask the same
21   questions?
22             MR. CLARK:  I'm going to ask him about where
23   he was the date that this was typed.  Yes, your Honor.
24             THE COURT:  You can ask him where he was on
25   the date.
```

```
 1   BY MR. CLARK:

 2   Q.     Do you see where this says "Date Typed:

 3   12-8-05"?

 4   A.     12-08?

 5   Q.     Yes.

 6   A.     Yes, sir.

 7   Q.     You were in Miami preparing for the December 16th

 8   meeting.  Isn't that correct?

 9   A.     No, sir.

10   Q.     Well, you were in Miami, weren't you?

11   A.     Yes, sir.  But I wasn't -- like I said before, I

12   wasn't -- and, again -- I will say it again.  Before

13   December 16, I never met with -- with Brother Abbas or

14   with -- before January 28, actually.

15          But before December 16, before I met with Brother

16   Naz, the FBI -- all what they told me before that

17   meeting, that you will meet someone, is expecting you

18   to come from overseas, he will pick you up from the

19   airport and you represent a terrorist organization, he

20   request your presence.

21          That's all -- and just sit and listen and

22   understand what he want from you.  That's it, what the

23   FBI told me about this case before December 16.

24   Q.     Weren't you briefed that there were numerous

25   offers made by Abbas to give Mr. Narseal Batiste money
```

```
 1   on November the 7th and November the 21st?

 2              MS. ARANGO:  Judge, same objection.  There's

 3   no basis.

 4              THE COURT:  Sustained.

 5              It's been asked and answered.

 6   BY MR. CLARK:

 7   Q.    Well, weren't you briefed that a discussion was

 8   had on November the 21st that Mr. Narseal Batiste was

 9   going to wear a turban and sandals and have a staff

10   when he came to the airport?

11              MS. ARANGO:  Judge, same objection.  Asked and

12   answered.  No basis for this -- these questions.

13              THE COURT:  It's sustained.

14              You need to move on now, Mr. Clark.

15              MR. CLARK:  I just need to reserve a motion

16   under 607.

17              THE COURT:  Sure.

18   BY MR. CLARK:

19   Q.    Well, one of the things you were briefed on was

20   there were no guns, Mr. Narseal Batiste had no guns --

21              MS. ARANGO:  Judge, same objection.

22              THE COURT:  Sustained.

23              It's been answered.

24   BY MR. CLARK:

25   Q.    You never had any information that there was any
```

```
 1   gang violence going on --

 2             MS. ARANGO:  Judge, same objection.

 3             THE COURT:  Sustained.

 4   BY MR. CLARK:

 5   Q.    You had enough information by December 16th that,

 6   based opinion your experience, you knew that the offers

 7   of money by Abbas could lead to a scam for money by the

 8   target of the investigation.  Isn't that true?

 9             MS. ARANGO:  Judge, vague and compound and no

10   basis.

11             THE COURT:  Sustained.

12   BY MR. CLARK:

13   Q.    Well, on January the 28th, when you went and told

14   him, "People take money and go bye-bye," you understood

15   that there was a possibility that there can be a scam

16   for money, didn't you, sir?

17   A.    What page are you referring to?  What page?

18   Q.    Page 109.

19         Do you want to see the page?

20   A.    I have it.

21   Q.    January 28th?

22   A.    January 28.  Exhibit 55-A.  No?

23   Q.    Yes, sir.

24   A.    Thank you.

25             MS. ARANGO:  Judge, this is cumulative.  I
```

```
 1   believe that this has already been covered by

 2   Ms. Jhones.

 3           THE COURT:  Sustained.

 4   BY MR. CLARK:

 5   Q.    Weren't you -- you were briefed that he might

 6   have a scam for money.  You were briefed about that

 7   before you went there December 16, weren't you, sir?

 8           MS. ARANGO:  Judge, objection.  No good-faith

 9   basis for that question.

10           MR. CLARK:  Move to strike that, your Honor.

11           THE COURT:  Sustained.

12           MR. CLARK:  I'm going to reserve a motion

13   under 607.

14           THE COURT:  Come on up.

15           (Whereupon, proceedings were had at side-bar

16   outside the presence of the jury which have been sealed

17   per instructions of the Court.)

18           (Whereupon, the following proceedings were had

19   in open court:)

20   BY MR. CLARK:

21   Q.    Now, sir, I believe you have testified that you

22   were briefed -- well, actually, the idea of a list --

23   getting a list was your idea?

24   A.    The idea?

25   Q.    Yeah.
```

```
 1           You testified to that on your direct examination,

 2     didn't you, sir, that the idea of getting a list was

 3     your idea?

 4     A.    No, sir.  Because he was telling me items.  And I

 5     told him to write it down, what he's telling me.

 6     Q.    It's your testimony that getting the list from

 7     Mr. Batiste was not your idea?

 8               MS. ARANGO:  Objection.  Asked and answered.

 9               THE COURT:  Sustained.

10     BY MR. CLARK:

11     Q.    You remember testifying on your direct in this

12     case, don't you, on March 11th of --

13               MS. ARANGO:  Judge, improper impeachment.

14     There has to be an inconsistency.

15               THE COURT:  Sustained.

16     BY MR. CLARK:

17     Q.    Isn't it true, sir, that in this case, in your

18     direct examination, that you testified --

19               MS. ARANGO:  Judge, same objection.  Improper

20     impeachment.  There's no inconsistent statement.

21               THE COURT:  Rephrase your question, please.

22     BY MR. CLARK:

23     Q.    Isn't it true, sir, that in this case, on

24     March 11th, you testified that the list -- to ask

25     Narseal Batiste for a list was your idea?
```

```
 1              MS. ARANGO:  Objection.  Improper impeachment.

 2   He asked this question.

 3              THE COURT:  Sustained.

 4   BY MR. CLARK:

 5   Q.    Do you remember testifying that it was your idea

 6   to give Narseal Batiste the list?

 7              MS. ARANGO:  Same objection.

 8              THE COURT:  Come on up.

 9              (Whereupon, proceedings were had at side-bar

10   outside the presence of the jury which have been sealed

11   per instructions of the Court.)

12              (Whereupon, the following proceedings were had

13   in open court:)

14   BY MR. CLARK:

15   Q.    Mr. Abbas -- I mean, Mr. Assaad, the FBI did not

16   direct you to ask for a list.

17          Is that your testimony?

18   A.    On December 16?

19   Q.    Yes, sir.

20   A.    Yes, sir.

21   Q.    They never asked you to ask for a list?

22   A.    No, sir.

23   Q.    Was that your own idea?

24   A.    My own idea?

25   Q.    Was that your own idea, to ask for the list?
```

1    A.     I told him to write it on a list.  He gave me

2    items.  He told me want stuff, items, and I told him to

3    put on the list.

4    Q.     Well, is that the -- on December 16th, while you

5    were engaged in the operation, is that the first time

6    you thought of asking for a list?

7    A.     I said appropriate to ask him to remember stuff.

8    I -- was appropriate to -- when somebody is telling you

9    many items and -- "Okay.  Can you put it down.  Can you

10   write it down on a piece of paper.  Can you put it down

11   on a list?"

12   Q.     My question is:  Is it your testimony that that's

13   the first time you ever thought about getting a list

14   from Narseal Batiste?

15   A.     Yes, sir.

16   Q.     And you're saying the FBI never directed you to

17   get a list?

18          MS. ARANGO:  Objection.  Asked and answered.

19          THE COURT:  Sustained.

20   BY MR. CLARK:

21   Q.     Well, were you ever briefed by the FBI on

22   December 14th that Mr. Abbas had already asked for a

23   list?

24          MS. ARANGO:  Objection.  No good-faith basis.

25          THE COURT:  Sustained.

```
 1              MR. CLARK:  I need a reserve a motion under

 2    607, your Honor.

 3              THE COURT:  Okay.

 4              MR. CLARK:  Your Honor, I'd like to publish

 5    Exhibit 37-A, December 14th, 2005, Page 5 of the

 6    transcript.

 7              MS. ARANGO:  Judge, I would object.  This

 8    person was -- this witness was not a participant.  This

 9    is improper -- I'm not sure what he's trying to do.  I

10    would object on relevancy grounds.

11              THE COURT:  So we're going to end for the day

12    at this time.

13              Do not discuss this case either amongst

14    yourselves or with anyone else.  Have no contact

15    whatsoever with anyone associated with the trial.  Do

16    not read, listen or see anything touching on this

17    matter in any way.

18              If anyone should try to talk to you about this

19    case, you should immediately instruct them to stop and

20    report it to my staff.

21              If you would, give your notebooks to the court

22    security officer.  You may leave your binders at your

23    chairs.  Please be back in the jury room tomorrow

24    morning, 9:00.

25              Have a nice evening.  Drive safely.  It's a
```

1    little wet out there.

2           (Whereupon, the jury exited the courtroom at

3    4:47 p.m. and the following proceedings were had:)

4           THE COURT:  You can step down, sir.

5           (Witness excused.)

6           THE COURT:  You may be seated.

7           What is this area that you're going into,

8    Mr. Clark.

9           MR. CLARK:  Excuse me, your Honor?

10          THE COURT:  What is this area that you're

11   going to into for 37-A?

12          MR. CLARK:  This -- 37 is basically two days

13   before December 16th.  Abbas had asked Mr. --

14          THE COURT:  I can't hear you.  There's a lot

15   of side conversation going on.

16          MR. CLARK:  On December 14th, Abbas had asked

17   Narseal Batiste for a list.  He said he was directed by

18   the FBI to do that.

19          So this man is saying that the FBI never

20   directed him to get a list.  So it's obviously two

21   inconsistent things.

22          And I'm attacking the credibility of this

23   Government witness by saying that the FBI didn't tell

24   him to get a list when the FBI had already told Abbas

25   to get a list.

1          That's what I'm doing, under 607.

2          MS. ARANGO:   Judge, there's no inconsistency

3     there.  He can't impeach him with a document that he

4     was not -- you impeach somebody with prior testimony.

5          He was not a participant in that -- in that --

6     it's not his prior testimony, A.  And, B, he wasn't

7     even a participant to that conversation.  So it's

8     improper impeachment.

9          He's been questioned quite a bit --

10    cross-examined quite a bit about what the FBI briefed

11    him on prior to December 16th.  This has been -- that

12    area has been fully explored, as your Honor has noted

13    earlier.

14         If he wants to make an argument that this

15    person's not credible, Abbas was directed in this

16    regard and he wasn't directed in that regard, that's

17    argument.  He can make that argument all he wants.

18         But he's been fully crossed.  I mean,

19    everything that is proper for cross-examination has

20    been delved into already in this regard.

21         But he can't impeach a witness with somebody

22    else's transcript.  It's not even a transcript of trial

23    testimony.  It's an undercover recording that he was

24    not a party to.

25         That's completely improper impeachment.

208

```
 1              MR. CLARK:  I don't understand the
 2    Government's argument.  I think it's convoluted.  The
 3    man said he did not.  The FBI did not direct him to get
 4    a list.
 5              THE COURT:  Okay.
 6              MR. CLARK:  He's working with another
 7    undercover informant back -- one person's been with him
 8    one day.  The other guy been with him the next day.
 9    The other one comes back.  Back and forth.  He's saying
10    they're not collaborating.  He said the FBI didn't.
11              I'm showing -- I'm attacking his credibility
12    under 607, that this man has every reason to lie --
13              THE COURT:  What is it that you want to show
14    him in 37-A?  What page?
15              MR. CLARK:  Page 5, at the top -- near the
16    top.  It says -- this is where Abbas asks for the list.
17              THE COURT:  37-A?
18              MR. CLARK:  December 14th.  Abbas asks Narseal
19    Batiste to give him a list.  He said the FBI directed
20    him to do that.
21              And I'm showing him that that happened and
22    that was two days before he met -- he's been meeting
23    with the FBI.
24              I want to ask him, "Did you collaborate and
25    meet with the FBI and get briefed on the fact that the
```

1    FBI asked for a list?"

2           That's all I'm doing.  I think it's clear

3    impeachment testimony, attacking the man's credibility

4    under 607.  He can explain it.

5           MS. ARANGO:  He has fully asked and explored

6    on cross-examination what he was briefed on by the FBI

7    prior to December 16th.

8           There's absolutely no basis for showing him a

9    document that he was not a party to and -- it's not

10   even his own prior testimony -- and trying to impeach

11   him with that.

12          I'm not quite sure what the legal basis that

13   he's trying to do this on is.  But you just don't say

14   credibility and every question, therefore, is proper.

15   It has to be a proper question.

16          THE COURT:  I'm going to sustain this.

17          Certainly you can make argument to the jury

18   that it's absolutely incredible that he says that he

19   was not told to get a list and Abbas was told to get a

20   list.  There's nothing that would prevent you from

21   arguing that.

22          But you've fully questioned this witness about

23   whether or not he was directed to get a list.

24          He said he was not directed to get a list and

25   that, after Batiste started listing things, he told him

1    to write it down on a piece of paper and get a list.

2           On direct, he said that he -- something to the

3    effect that he had used lists before or something.

4           So, I mean, you can argue the inconsistency in

5    the investigation determinations and how, you know,

6    that would indicate that he's not being truthful.

7           But there's no basis to question him about a

8    conversation that he was not a party to when he's

9    testified that he didn't get instructions on a list and

10   that he had not -- the fact that Abbas got -- was

11   asking for a list and was directed to ask for a list

12   and he was not has been fully explored.

13          It's not impeachment to impeach him with a

14   transcript that he was not a party to.

15          MR. CLARK:  Well, my only two objections,

16   Judge, to be clear, is, first of all, to say I do not

17   have a good-faith basis to attack this person's

18   credibility --

19          THE COURT:  I didn't say that.

20          MR. CLARK:  No.  But that's what the

21   Government's saying.  They made an objection, no

22   good-faith basis.  I have a December 14th transcript.

23   But, anyway....

24          Secondly --

25          THE COURT:  But he's not a party to this

1    transcript.

2              MR. CLARK:  But he's collaborating and meeting

3    with Abbas and going on -- working on this case with

4    Abbas.  They actually lived together.

5              THE COURT:  That was not his testimony, sir.

6    You can argue that -- you can argue --

7              MR. CLARK:  I don't think his testimony is

8    credible.

9              THE COURT:  Well, you can make that argument

10   to the jury.

11             But that's what he's testified to, that he

12   wasn't meeting with Abbas, that he's brought here by

13   the FBI, that they tell him to go to this hotel room

14   and find out what this guy is all about.  That's

15   basically what he's testified to.

16             And you can argue whatever you want to argue

17   as far as that's an incredible position for him to be

18   in and it's obviously untruthful.  You can certainly

19   argue that to the jury.

20             But there's no basis to go into the fact that,

21   "Well, Abbas was asked for a list.  You mean, you

22   weren't asked for a list?"

23             There's no basis for that.

24             MR. CLARK:  Well, I think I have to put a

25   sufficient -- make a sufficient record so I can make an

1    argument in closing argument.  But that's what I'm

2    trying to do, your Honor.

3         THE COURT:  You've got your record.  He says

4    he wasn't directed to get a list.  Abbas said he was

5    directed to get a list.

6         You can say --

7         MR. CLARK:  I understand the Court's ruling,

8    and I'll respect it.

9         THE COURT:  Okay.  Is that it?

10        We're in recess until --

11        MR. CLARK:  Your Honor, one thing.

12        All the flights were booked coming back from

13   New Orleans to Miami.

14        THE COURT:  Well, you can come Monday morning,

15   because it's not until Monday afternoon.

16        MR. CLARK:  Well, we're working on trying to

17   get one on Monday morning.

18        THE COURT:  You should be able to get one

19   Monday morning.  I'm sure you'll be able to find a

20   flight Monday morning, because it's not starting until

21   2:00 on Monday afternoon.  That'll be the time for the

22   hearing.

23        Okay.  We're in recess until tomorrow morning,

24   9:00.

25        (End of proceedings.)

1

2                      C E R T I F I C A T E

3

4         I hereby certify that the foregoing is an

5    accurate transcription of the proceedings in the

6    above-entitled matter.

7

8

9    _____        /s/Lisa Edwards
          DATE             LISA EDWARDS, CRR, RMR
10                         Official United States Court Reporter
                           400 North Miami Avenue, Twelfth Floor
11                         Miami, Florida 33128
                           (305) 523-5499
12

13

14

15

16

17

18

19

20

21

22

23

24

25