```
 1                 UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2                        MIAMI DIVISION
              CASE NO. 06-20373-CRIMINAL-LENARD
 3

 4   UNITED STATES OF AMERICA,      Miami, Florida

 5                 Plaintiff,       March 19, 2009

 6          vs.                     9:31 a.m. to 5:11 p.m.

 7   NARSEAL BATISTE, et al.,       Volume XXVI

 8            Defendants.       Pages 1 to 249
     -------------------------------------------------------
 9

10                          JURY TRIAL
11           BEFORE THE HONORABLE JOAN A. LENARD,
                 UNITED STATES DISTRICT JUDGE
12

13

14   APPEARANCES:

15

16   FOR THE GOVERNMENT:    RICHARD D. GREGORIE, ESQ., and
                            JACQUELINE M. ARANGO, ESQ.
17                          ASSISTANT UNITED STATES ATTORNEYS
                            99 Northeast Fourth Street
18                          Miami, Florida 33132

19
     FOR THE DEFENDANT      ANA MARIA JHONES, ESQ.
20     NARSEAL BATISTE:     300 Seville Avenue, Suite 210
                            Coral Gables, Florida 33134
21

22   FOR THE DEFENDANT      ALBERT Z. LEVIN, ESQ.
       PATRICK ABRAHAM:     261 Northeast First Street
23                          Sixth Floor
                            Miami, Florida 33132
24

25
```

```
 1   FOR THE DEFENDANT      RODERICK D. VEREEN, ESQ.
       STANLEY PHANOR:      BRINKLEY, HENRYS & LEWIS
 2                          4770 Biscayne Boulevard
                            Suite 1200
 3                          Miami, Florida 33131

 4
     FOR THE DEFENDANT      RICHARD K. HOULIHAN, ESQ.
 5     NAUDIMAR HERRERA:    300 Aragon Avenue
                            Coral Gables, Florida 33134
 6

 7   FOR THE DEFENDANT      LOUIS CASUSO, ESQ.
       BURSON AUGUSTIN:     111 Northeast First Street
 8                          Suite 603
                            Miami, Florida 33132
 9

10   FOR THE DEFENDANT      NATHAN CLARK, ESQ.
      ROTSCHILD AUGUSTINE:  17639 South Dixie Highway
11                          Miami, Florida 33157

12
     REPORTED BY:           LISA EDWARDS, CRR, RMR
13                          Official Court Reporter
                            400 North Miami Avenue
14                          Twelfth Floor
                            Miami, Florida 33128
15                          (305) 523-5499

16

17

18

19

20

21

22

23

24

25
```

1                    I  N  D  E  X

2

3

4                                    Direct    Cross    Red.

5

6   WITNESSES FOR THE GOVERNMENT:

7   Elie Assaad                                5       194
8                                             48
                                              84

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Good morning.
 2              United States of America versus Narseal
 3   Batiste, et al., Case No. 06-20373.
 4              Counsel, state your appearances, please, for
 5   the record.
 6              MR. GREGORIE:  Good morning, your Honor.
 7              Richard Gregorie and Jacqueline Arango on
 8   behalf of the United States.
 9              MS. JHONES:  Good morning.
10              Ana Maria Jhones on behalf of Narseal Batiste,
11   who is present.
12              MR. LEVIN:  Good morning, your Honor.
13              Albert Levin on behalf of Patrick Abraham,
14   who's present.
15              MR. CASUSO:  Good morning, your Honor.
16              Lou Casuso on behalf of Burson Augustin, who's
17   present.
18              MR. CLARK:  Good morning, your Honor.
19              Nathan Clark for Rotschild Augustine, who's
20   present.
21              MR. HOULIHAN:  Richard Houlihan with Naudimar
22   Herrera.
23              MR. VEREEN:  Good morning, your Honor.
24              Roderick Vereen on behalf of Stanley Phanor,
25   who's present.
```

```
 1              THE COURT:  Good morning to everyone.

 2              All Defendants are present.

 3              The jurors are now here.  I think some people

 4   got delayed because of rain, but everybody's here.

 5              So let's begin.

 6              THE COURT SECURITY OFFICER:  Yes, ma'am.

 7              (Whereupon, the jury entered the courtroom at

 8   9:32 a.m. and the following proceedings were had:)

 9              THE COURT:  You may be seated.

10              You are still under oath, sir.

11              You may proceed, Mr. Clark.

12              MR. CLARK:  Thank you, your Honor.

13                   CONTINUED CROSS-EXAMINATION

14   BY MR. CLARK:

15   Q.    Good morning, Mr. Assaad.

16   A.    Good morning.

17              MR. CLARK:  Good morning, ladies and

18   gentlemen.

19              THE JURY:  Good morning.

20   BY MR. CLARK:

21   Q.    When we left off yesterday, we were -- I want to

22   go into the meeting of December the 16th briefly.

23         And the meeting at the Radisson -- did you go to

24   the Radisson Hotel before the meeting to check out the

25   room or....
```

 1  A.      No, sir.

 2  Q.      So you just went -- you went to -- but you went

 3  to the airport?

 4  A.      Yes, sir.

 5  Q.      Before going to the airport, you never went to

 6  the Radisson?

 7  A.      No, sir.

 8  Q.      But you understood you were going to be in a room

 9  at the Radisson?  You understood that you would be in a

10  room at the Radisson?

11  A.      I didn't know about the hotel until later, like

12  when I was at the airport, when they switched the plan.

13  So we went to the Radisson.

14  Q.      Well, how did you know -- when did you first find

15  out you were going to go to the Radisson?

16  A.      I didn't know exactly the -- maybe they mention

17  it before or after.  But I knew when they took me.  I

18  wasn't driving.  The FBI drove me to the hotel.

19  Q.      Okay.  And so you were supposed to meet

20  Mr. Batiste at the airport, but you missed him.

21  Correct?

22  A.      We didn't meet at the airport.

23  Q.      But you went there in advance, to the airport?

24  A.      Yes, sir.

25  Q.      Do you know how -- where you were supposed to

1    tell Narseal Batiste that you were going?  How did you

2    know where you were going to be going?

3    A.     Maybe they mentioned we are going to meet in the

4    hotel or the Radisson.  It was supposed to -- for him

5    to pick me up -- to pick me up from the airport and

6    take me, maybe, to the Radisson Hotel or somewhere like

7    that.  Yes, sir.

8    Q.     You were supposed to tell him to take you to the

9    Radisson?

10   A.     I believe.  Yes, sir.

11   Q.     So before you went to the airport, you knew you

12   were going to be going to the Radisson?

13   A.     Yes, sir.

14   Q.     And you were told to have only one carry-on.

15          Was that what you were -- you had some carry-on

16   luggage?

17   A.     Yes, sir.

18   Q.     So when you missed Mr. Batiste at the airport, I

19   guess you got a -- you were in contact with the FBI

20   through a telephone?

21   A.     In the airport?

22   Q.     Yes, sir.

23   A.     They were present, sir.

24   Q.     Did you communicate with them by telephone -- by

25   a cell phone when you were at the airport and you

1   missed Mr. Batiste?

2   A.     No, sir.

3   Q.     How did you end up communicating with them?  How

4   did you know where to meet them or anything?

5   A.     They were present in the airport, sir.

6   Q.     Did you know where they were?

7   A.     Yes, sir.

8   Q.     And you went to where they were?

9   A.     I was -- I was with them.  They were with me.  So

10  I didn't need to make phone calls.  They were close by.

11  Q.     Well, before going there, were you -- did you

12  discuss the possibility that -- whether there were

13  going to be any guns, there might be any guns, whether

14  Mr. Batiste had a gun or something?

15  A.     One more time, sir.

16  Q.     Before you went to the airport, was there any --

17  did you have to be briefed on whether or not

18  Mr. Batiste might have a gun or might not have a gun?

19  A.     You mean that the FBI told me about the gun or I

20  asked the FBI about the gun?  Who asking who?

21  Q.     I meant -- well, did you have a discussion with

22  them about --

23  A.     No, sir.

24  Q.     -- security on a gun?

25  A.     No, sir.

 1   Q.     Now, when you got -- when you met with the FBI,

 2   before you went to the Radisson, did they try --

 3   identify what Mr. Batiste looked like?  Did they tell

 4   you they were able to surveil him and identify him?

 5   A.     Sir, things about the FBI -- I don't know -- it's

 6   about the FBI.  I don't know what's the procedures are.

 7   All what they told me, I was supposed to come from the

 8   airport, I'm coming from overseas, he will pick me up

 9   from the airport.

10        I called Brother Naz from the airport.  Was

11   miscommunications.  I was upstairs.  He was downstairs.

12   In the end, we met in the hotel.  That's it.

13        That's all what the conversation was and the

14   briefing, whatever you call it.  And was supposed to

15   sit with him, meet him at the hotel, Radisson, and talk

16   to Brother Naz.

17   Q.     When you were on your way to the airport with the

18   FBI, did you come to understand that Mr. Batiste was

19   wearing the turban and the robe and the sandals?

20   A.     No, sir.

21   Q.     Now, when you got to the Radisson, I believe you

22   testified on direct that you met him in a hotel room.

23   Correct?

24   A.     Excuse me?

25   Q.     You met him in a hotel room?

1    A.    Yes, sir.

2    Q.    In your testimony, you said, "I don't know what's

3    going on at that time."

4          Do you remember saying that?

5    A.    Referring to what, sir?

6    Q.    Your testimony in this case.

7    A.    Referring to what?  What's going on?

8    Q.    Well, you were asked --

9          MS. ARANGO:  Objection.  Improper impeachment.

10         THE COURT:  Sustained.

11         MR. CLARK:  I'm not trying to impeach him.

12   BY MR. CLARK:

13   Q.    Do you remember testifying that it --

14         MS. ARANGO:  Objection.  Improper impeachment

15   and irrelevant.

16         THE COURT:  Sustained.

17   BY MR. CLARK:

18   Q.    Did you know what was going on at that time?

19         MS. ARANGO:  Objection.  Vague.

20         THE COURT:  Sustained.

21         Rephrase your question.

22   BY MR. CLARK:

23   Q.    What did you know was going on -- when you got --

24   when you met him in the room, what did you know was

25   going on at that time?

Assaad - CROSS - By Mr. Clark                    11

```
 1   A.     I didn't know nothing, sir.  I was supposed to

 2   meet someone, sit with him and talk to him.  "I'm the

 3   guy who you request for.  I came from the -- from

 4   overseas, like you request.  Let's sit and talk."

 5         That's all what I was supposed to know about this

 6   meeting.  So I sat with him.  I didn't know nothing

 7   before the meeting.  And everything show up during the

 8   meeting.

 9   Q.     Okay.

10         MR. CLARK:  I'd like to go to Exhibit 44, your

11   Honor, to Page 11.  And I don't -- I guess I can put it

12   on the ELMO or --

13         THE COURT:  Whatever your pleasure is.

14         Does the witness have it?

15   BY MR. CLARK:

16   Q.     Do you have a binder, sir?

17         THE COURT:  Which notebook is it in?  Do we

18   have it?

19         MR. CLARK:  I would imagine the first one.

20   It's the synchronized exhibit binder.

21   BY MR. CLARK:

22   Q.     Do you have that binder, sir?

23   A.     I don't have nothing.

24         THE COURT:  Hello?

25         MR. CLARK:  Excuse me, your Honor.
```

1          THE COURT:  Is this in the synchronized

2  notebook?

3          MR. CLARK:  Yes, it is, your Honor.  The

4  synchronized notebook.

5          THE COURT:  Thank you.

6          That tells you which binder.

7          MR. CLARK:  I'm sorry.  I didn't say it into

8  the speaker.

9          THE COURT:  What page, Mr. Clark?

10         MR. CLARK:  Page 11.

11         THE COURT:  Do you want the ELMO, also?

12         MR. CLARK:  I guess I don't need it, your

13  Honor, if everybody has it.

14         THE COURT:  It's up to you.  I'll put it on.

15  I don't know if everybody's turned to it or not.

16         THE WITNESS:  Page 11?

17  BY MR. CLARK:

18  Q.    Yes, sir.

19        At the bottom of Page 11 --

20         THE COURT:  Mr. Clark, I think you have the

21  back light on.  We need the upper lamp on.

22         MR. CLARK:  I'm sorry.

23         THE COURT:  There you go.

24  BY MR. CLARK:

25  Q.    Sir, at the bottom of Page 11, you said that --

```
 1   when he was talking about jumping off the buildings and
 2   breaking bricks, you said -- you said, "I mean
 3   military, not martial arts.  Military" --
 4           MS. ARANGO:  Objection.  Cumulative.  This
 5   exact passage --
 6           THE COURT:  Sustained.
 7   BY MR. CLARK:
 8   Q.   My question -- my question is:  When did you --
 9   that idea of martial arts -- when is the first time
10   that you came up with the idea that this might be
11   martial arts?
12           MS. ARANGO:  Objection.  Cumulative.
13           MR. CLARK:  I don't think this has been
14   covered, your Honor.
15           MS. ARANGO:  Ms. Jhones went into this very
16   question.
17           THE COURT:  Overruled.
18           THE WITNESS:  The question is?
19   BY MR. CLARK:
20   Q.   When is the first time that you came up with the
21   idea of martial arts?
22   A.   One second.  I need to review before I answer
23   you, sir.
24   Q.   That's okay.
25   A.   During the conversation, sir, we were speaking
```

Assaad - CROSS - By Mr. Clark                    14

1    about what training they have, his soldiers.  During

2    this conversation, from the beginning, when he had --

3    "I have soldiers and generals and training" and all

4    this stuff.

5         So I was trying to figure out what kind of

6    training they have, military, martial art, what kind of

7    training that he has -- they have, his soldiers.

8    Q.    Okay.  And that's the first time martial arts is

9    brought up on December 16th, isn't it?

10   A.    I need to review from the beginning to refresh my

11   memory from first page.  But maybe yes.  Maybe no.

12        Everything -- it's in -- recorded and everything

13   from the first meeting.  So -- but to be -- to answer

14   you definitely, I need to review from the first page

15   until this moment.

16        Maybe was brought before.  Yes, sir.

17   Q.    As you sit here now, you can't recall where you

18   got the idea of martial arts?

19   A.    Sir, like I said, it's not -- not -- I don't

20   remember.  Was during the conversation.  We were

21   speaking about training -- soldiers, training,

22   military, what kind -- he can -- he mentioned he can

23   kill me in five second in his -- "I could kill you in

24   five second with my bare hands."

25        And means this is like referring to martial art.

Assaad - CROSS - By Mr. Clark                    15

```
 1    When somebody say "with my bare hands," it's not like

 2    with a weapon or with a pistol.  It's with hand.  And

 3    this mean martial art.

 4    Q.    Okay.  And, of course, it goes on to the second

 5    page from the first page.  "Arts is fun, but what else,

 6    something like -- okay."

 7          You're talking about military training.  Correct?

 8    A.    Excuse me?

 9    Q.    You're talking -- you're not interested in

10    martial arts.  You're talking about military training?

11    A.    Sir, yes.  We're speaking what kind of training

12    they have beside the martial art, beside --

13    Q.    Correct.

14    A.    Yes, sir.

15    Q.    And then over on Page 14 -- could you turn over

16    there.

17          In the middle of Page 14, you say, "I don't want

18    to test them martial arts."

19          Now, when you said them, you're talking about the

20    other brothers?

21    A.    I was talking about the soldiers in general.  It

22    was the first meeting.  He mentioned he has soldiers

23    and he has generals.  And this is what I was meaning,

24    sir.

25    Q.    Well, wasn't this an opportunity for you to be
```

1    able to get with the other soldiers or generals and do

2    an interrogation of them?

3    A.    I wasn't allowed to leave the room for many

4    reason.  First, I was advised from the FBI during the

5    course of the meeting -- I wasn't wearing a body

6    recorder and, for my safety, I guess, they didn't allow

7    me to leave the room.

8    Q.    Well, I mean, were you instructed to just say you

9    don't want to test them at any time in the future about

10   martial arts or....  Why wouldn't you just leave that

11   open?

12   A.    Sir, during the -- all the meeting, I leave

13   things open for -- open doors for both side, for the

14   FBI to have options and for Brother Naz and everybody

15   to have options.  I never give definite -- or guarantee

16   anything in any meeting.

17   Q.    Well, you never attempted to meet with Rotschild

18   Augustine for almost three months, isn't that correct,

19   sir, from this point?

20   A.    Sir, it's not my call to meet with who.  It's up

21   to the FBI to tell me go or not to go and who to meet

22   or who not to meet.

23   Q.    I understand that.

24         I'm just -- I want to point out the fact that you

25   did not meet with Rotschild Augustine for another three

1    months -- almost three months?

2    A.     Excuse me?

3    Q.     I just want to point out the fact that you, in

4    fact, did not meet with Rotschild Augustine for almost

5    three months?

6           THE COURT:  Is that a question?

7           MR. CLARK:  Yes.

8    BY MR. CLARK:

9    Q.     Isn't it true, sir, that you did not attempt to

10   or, in fact, meet with the Rotschild for almost three

11   months?

12   A.     We are in December here.  We have January,

13   February.  Maybe I met him on 22nd.  Maybe not.

14   Because there were people in the Embassy.  I didn't

15   know who they are.  But I couldn't confirm "yes" or

16   "no."  But there were people in the Embassy in that

17   day.

18   Q.     But you didn't make a specific effort to meet

19   with him for at least three months?

20          MS. ARANGO:  Objection.  Asked and answered.

21          THE COURT:  Sustained.

22   BY MR. CLARK:

23   Q.     Let me show you -- go back to Page 12 for a

24   moment.

25   A.     Yes, sir.

1   Q.     Where you say -- in the middle of the page,

2   Mr. Batiste says, "The -- the first thing that would

3   come out of my mouth would be money.  I don't care

4   about the money."

5          And you say, "I didn't ask you that."

6          Were you instructed to not discuss money at this

7   meeting?

8   A.     Like I said, sir, before -- and I will say it

9   again -- is not about -- I wasn't instructed to say or

10  confirm or deny or give promises or anything.

11         All I knew before December 16 and before the

12  meeting at the same day that I will meet someone who

13  requested for me to come from overseas.  The FBI told

14  me to sit with him, try to find out what he wants.

15         So that's all what I knew before the meeting.

16  Didn't tell me to speak about money.  Didn't tell me to

17  speak about training.  They didn't tell me what to

18  speak, what not to speak.

19         That's all what happened in -- during this

20  meeting, sir.

21  Q.     Now, going to Page 17, at the top of the page --

22  you received four phone calls from the FBI during this

23  meeting.  Correct?

24  A.     Yes.  Maybe four -- more or less.  Yes, sir.

25  Q.     And you were receiving instructions on what to do

```
 1   at this meeting.  Correct?

 2   A.    Yes, sir.

 3   Q.    You were being briefed about what to do?

 4   A.    They gave me what to do.  Yes.  They told me what

 5   to do.

 6   Q.    And this is the first phone call.

 7         It says "(Phone ringing)" right here.  Correct?

 8   A.    Page 17?

 9   Q.    Yes, sir.

10         This is Page 17.  Right at the top, it says

11   "(Phone ringing)"?

12   A.    Yes, sir.

13   Q.    And then you -- down -- after that phone call,

14   you say, "I want you one, two, three, four, five."

15         Your instructions, sir, in that phone call were

16   to get Mr. Batiste to simply list the numbered -- just

17   make a list of what exactly he wants.  Is that correct?

18   A.    No, sir.  The phone call was to not speak too

19   much.  The FBI called me and said, "Just relax.  Don't

20   speak too much.  Let him talk."

21         And during -- this is all what -- you know, not

22   what to say or not what to say.  "Just calm down and

23   let him talk."

24   Q.    Then on Page 19, you have -- you come back with a

25   second phone call.  Page 19 here.  It says "(Phone
```

Assaad - CROSS - By Mr. Clark                    20

```
 1   ringing)."
 2        You had a second phone call.  Correct?
 3   A.    Yes, sir.
 4   Q.    You say, "I don't come all the way just to
 5   someone to tell me" -- you say in the middle of this
 6   paragraph, "I don't come all way just to someone to
 7   tell me -- tell me this, do this."
 8        And then, sir, you were -- you got another phone
 9   call.  You're really -- you are instructed to not let
10   him do that much talking.  You just wanted to get --
11   talk about weapons, military training and explosives?
12        MS. ARANGO:  Objection.  Argument and assuming
13   facts not in evidence.
14        THE COURT:  Sustained.
15        Rephrase your question.
16   BY MR. CLARK:
17   Q.    Isn't it true, sir, that you were given -- you
18   were briefed to limit the conversation to weapons,
19   training -- military training and explosives?
20        MS. ARANGO:  Same objection, Judge.
21        THE COURT:  Sustained.
22   BY MR. CLARK:
23   Q.    On Page 20, you say, "I don't know if you are
24   telling me story."
25        What do you mean by that?
```

A.     Sir, it was the first meeting.  And we had
different discussion -- different point of discussion.

       I said, like anyone, for the first time, you sit
and meet someone.  "What you telling me?  You telling
me story?  What you telling me?  Is this real going on?
What's going on?"

       Just we are talking with each other, see, like --
"Are you serious?  You want me to stay here?  You want
me to stay around?  What you want exactly?  So let's be
focused.  Let's be" -- something like that, sir.

Q.     And then a few lines down, you say, "What you
want to approve -- approve, brother?  Just tell me what
you want to prove."

       You were instructed -- "I don't like people to go
with me stories."

       You were -- weren't you trying to limit his
conversation to just the weapons, the explosives and
the military training?

A.     No, sir.  I wasn't trying to limit the
conversation, because sometimes we were speaking about
different subjects.

Q.     Now, on Page 37 --

       MR. CLARK:  One moment, your Honor.  I think
these pages are out of order.

       THE COURT:  Okay.

```
 1   BY MR. CLARK:
 2   Q.    Page 37, near the end, you have a -- the phone
 3   rings again.  Correct?  You got another phone call.
 4          THE COURT REPORTER:  I'm sorry.  I didn't hear
 5   the answer.
 6   BY MR. CLARK:
 7   Q.    You got another phone call and -- right here?
 8   A.    Excuse me?
 9          THE COURT:  You need to rephrase your
10   question, please.
11          MR. CLARK:  Yes.
12   BY MR. CLARK:
13   Q.    Isn't it true you got another phone call there?
14   A.    Yes, sir.
15   Q.    And isn't it true that, after that phone call,
16   you told him, "I'm tired"?  Right here.
17   A.    I told, "I'm tired" to who, sir?
18   Q.    Sorry?
19   A.    I didn't understand your question.
20   Q.    Isn't it true -- were you -- did you -- you said
21   this:  "I'm tired."
22          Were you instructed by the FBI to shut down this
23   meeting at this time by telling him, "I'm tired"?
24   A.    Sir, I wasn't talking to Brother Naz.  I was
25   talking on the phone with the agent.  I was playing my
```

Assaad - CROSS - By Mr. Clark                    23

```
 1  role.  I wasn't talking to -- if you look exactly
 2  and -- I was still on the phone.
 3  Q.    Okay.  So then were you being briefed and you
 4  told them you were tired and didn't want to do this
 5  anymore?
 6  A.    No, sir.  If you look at it exactly, "Brother,
 7  brother, salaam aleikum."  "Salaam aleikum" mean you
 8  are saying, "Hello.  How are you doing?" or, "Salaam
 9  aleikum."
10         I was on the phone.  "What?  Okay.  I'm tired."
11         What I'm saying -- "I'm tired" mean like playing
12  my role.  "I came from the airport.  I had a long
13  flight.  I'm tired.  I'm exhausted."
14         So was still on the phone.
15  Q.    Well, you didn't just come in from a flight.
16         So you wouldn't be telling the FBI that, would
17  you?
18  A.    Sir, I wasn't supposed to let Brother Naz know I
19  was talking to the FBI.  I was playing a role, you
20  know, coming from the flight.
21         I'm -- coming from overseas, 10, 11 hours flying,
22  coming here.  Brother Naz sitting in front of me, and
23  he's listening to.
24         What I will tell him?  "Hello, FBI"?
25  Q.    No.
```

```
1              What I'm saying, sir, is that you were playing a

2     role.  You were saying you were tired for the benefit

3     of Mr. Batiste?

4     A.      Excuse me?

5     Q.      You were saying that you were tired, you have

6     just come in on the flight, for the benefit of

7     Mr. Batiste to hear it?

8     A.      What's mean benefit for Mr. Batiste?

9     Q.      For the purpose of telling -- letting -- making

10    Mr. Batiste think that you're tired.

11    A.      I'm tired on the -- I was speaking on the phone,

12    sir, that I came from long flight.

13            I was, like, having conversations that my brother

14    called me from overseas, asking how I am.

15            "Hey, I arrived.  I'm okay.  I'm tired.  I'm

16    exhausted."

17    Q.      But you're really not tired and exhausted,

18    because you'd already been here two weeks.

19            So if you're saying that, you're saying it to

20    make Brother Naz feel that you want -- you want to end

21    this conversation?

22    A.      No, sir.  Because sometime -- doesn't mean you

23    tired physically.  Sometime when you are on undercover

24    cases and you are for the first time sitting and you

25    try to do the best what you can do.
```

```
 1          Mentally, is very exhaustive situation.  It's not
 2    only about physically.  So it doesn't mean you are
 3    physically tired.  Sometimes you are in a situation.
 4          And if you look to the meeting, until this
 5    moment, we were a little bit -- the situation were a
 6    little bit tense between Brother Naz and myself
 7    about -- we had little bit discussion.
 8          The FBI called me to calm this down and, "Let him
 9    talk.  Don't -- control yourself."
10          So it's not like directing me about how to move
11    this meeting.
12    Q.    Well, the very next page -- that was 37.
13          On the very next page, you're telling Mr. Batiste
14    that, "You have to give me something stronger."
15    Correct?
16    A.    What page?
17    Q.    Page 38.  38.
18    A.    What paragraph, please?
19    Q.    Middle of the page.
20          It says, "So you have to give me something
21    stronger."
22    A.    Sir, is after the whole meeting speaking about --
23    he telling me about jihad and terrorist and -- jihad
24    association and military and weapon and generals and
25    lists of everything.
```

```
 1        You know, I was telling him, you know, "You have
 2   to give me something stronger.  What do you want from
 3   all the list and what do you want from all what you
 4   told me?  What do you need from us?"
 5        And if you look at what he said, he respond to me
 6   after that, "It's there.  We gonna bring it down."
 7        So this is -- confirm what the suspicious are
 8   about asking about the list, the weapons, the
 9   materials, the generals, the training, the Islamic
10   military, the jihad.
11        And he said on his own, "It's there.  We gonna
12   bring it down."
13   Q.   Well, before you got to something -- you said,
14   "So you have to give me something stronger," you
15   remember you had -- you've already gone over this with
16   Ms. Jhones -- you talked about the right to bear -- he
17   talked about the right to bear arms and the Moroccans
18   and the sovereign nation of the Moroccans.
19        Remember that?
20        MS. ARANGO:  Objection.  Asked and answered --
21   cumulative, I mean.
22        THE COURT:  Sustained.
23   BY MR. CLARK:
24   Q.   And then at the bottom, you say, "Monday at
25   10:00 a.m. we will speak."
```

1        You indicated that you were going to meet with

2    Mr. Batiste again on Monday.  Is that correct?

3    A.    And the question is, sir?

4    Q.    You were closing the meeting down and telling him

5    you would meet with him on Monday.  Correct?

6    A.    Yes, sir.

7    Q.    Now, you did meet with him again on December

8    the 22nd, correct?  You testified about that?

9    A.    Yes, sir.

10   Q.    And I'd like to show you Exhibit 47, if I may.

11   Do you have that?  Is that in that synchronized exhibit

12   binder?

13   A.    47?

14   Q.    Yes, sir.  I'd like you to go to that for a

15   minute.

16   A.    No, sir.  I don't have it.

17   Q.    I've got it here.  It's in Volume I of the

18   recorded transcripts.

19   A.    Thank you.

20   Q.    I want you, if you could, to turn to Page 22.  I

21   won't use the ELMO for this.

22        On Page 22, you talk about the list.  Correct?

23   A.    What paragraph, sir?

24   Q.    You started talking about -- on Page 22, you

25   started talking about -- to Narseal Batiste about

1    something he didn't put on the list?

2    A.    What paragraph, sir?

3    Q.    Let's see.  Fifth line down.

4    A.    Could I have one second, sir?

5    Q.    Do you see that?

6    A.    Yes, sir.

7    Q.    You had this conversation with him.  You ask him,

8    "Why -- why you didn't prepare it?  And I told you what

9    you were to order from me.  I told to you prepare me

10   the list."

11        And then Narseal Batiste tells you down --

12   several lines down -- he says, "Well, what happened

13   was, brother, when I did write Hamas" -- that's a

14   typographical error, isn't it, sir?  That's supposed to

15   be "Abbas" where it says "Hamas"?

16   A.    Sometimes he call him "Hamas," "Abbas."  Sometime

17   he refer him differently, "Hamas" or "Abbas."

18   Q.    Well, that just was a typographical error by

19   the -- it sounds -- "Hamas" and "Abbas" sound the same.

20        But he was actually saying "Abbas," wasn't he,

21   sir?

22             MS. ARANGO:  Objection.  Relevance, improper

23   form.

24             THE COURT:  Sustained.

25             It's been asked and answered.

 1            MR. CLARK:  Okay.

 2   BY MR. CLARK:

 3   Q.     And you say -- he tells you that, "Hamas asked me

 4   for it and I gave it to him.  Do you see what I'm

 5   saying?"

 6          You learned there, sir -- at least there that he

 7   had given a list to Mr. Abbas on December 22nd; did you

 8   not?

 9   A.     That's what he said.  Yes, sir.

10   Q.     And you tell him, "So Hamas will assist you."

11          Correct?

12   A.     Yes, sir.

13   Q.     And so did you after this meeting talk to Abbas

14   and the FBI about, you know, what he -- the list that

15   Abbas was giving -- getting from Mr. Batiste?

16   A.     I didn't understand the question, sir.

17   Q.     Did you talk to the FBI about the list that Abbas

18   was getting from Mr. Batiste previously?

19   A.     I got debriefed from the FBI after the meeting.

20   I told them what happened.  We never -- they always

21   try -- the FBI try to limit it or not to inform me what

22   Brother Abbas -- happening with him.  Always they focus

23   on my meeting and what happening with me.

24          So the answer is "no," sir.  They never -- we

25   never discussed the list.  We never discussed what

1    Brother Naz gave Brother Abbas or any of that.

2    Q.    Well, later on in this meeting, you talked

3    about -- you went over the Chicago plan.  Correct?

4    A.    Yes, sir.

5    Q.    And Mr. Rotschild Augustine, when he says -- when

6    Narseal Batiste says that nobody else knows about the

7    plan, you understand that Mr. Rotschild Augustine

8    didn't know about the plan.  Isn't that correct?

9    A.    When we were talking about the plan, there were

10   two brother in the warehouse -- in the Embassy --

11   sorry -- and we were talking in front of them.

12         But at that time, I didn't know who they are.  I

13   didn't know who -- what their name is.  And I was just

14   listening.

15   Q.    Well, do you remember testifying on

16   cross-examination that he said nobody else knows about

17   the plan?

18   A.    Yes, sir.

19   Q.    Okay.  And after that meeting, you met -- you

20   talked about December 29th.

21         And then in early January you weren't able to

22   meet up with Mr. Batiste anymore.  Correct?

23   A.    Yes, sir.

24   Q.    And did you understand that he was upset --

25   Mr. Batiste was upset with you because you hadn't given

    1   him any money?

    2   A.     No, sir.  Because on January 28th, he explained

    3   why we didn't have contact.

    4   Q.     Now, on January 28th, again, in that -- you

    5   testified that nobody knows about -- he told you that

    6   nobody knows about the plan.  Correct?

    7   A.     Yes, sir.

    8   Q.     And Mr. Rotschild Augustine -- he didn't drive

    9   down to the Keys with you, did he, sir?

   10   A.     (No response.)

   11   Q.     Rotschild Augustine was not with you going down

   12   to the Keys?

   13   A.     Driving down to the Keys?  No, sir.

   14   Q.     He wasn't there in the Keys on that day, was he?

   15   A.     Because when I arrived, sir, to the tent on --

   16   where Brother Naz was, there is somebody with him

   17   standing there with Brother Naz.  I didn't recognize

   18   who the person is.

   19   Q.     And did you know on January 28th that the Sears

   20   Tower plan was something that was first discussed on

   21   December 21st?

   22   A.     Excuse me?

   23   Q.     You had met Mr. Batiste.  You had gone down to

   24   the Keys.

   25          Did you know that the Sears Tower plan was first

```
 1   discussed on the -- December 21st, the day before the
 2   December 22nd meeting?
 3   A.     Sir, all my meeting with Brother Abbas, all my
 4   meeting with him, I believe, is recorded from the FBI.
 5          Only time we met, when we went the first time to
 6   the -- January 28, the recording was on.  And all the
 7   discussion or communication between me and Brother
 8   Abbas is on tape.
 9          After that, we another spoke.  We never met.  We
10   never shared telephone numbers to discuss things.  And
11   we were not allowed to communicate with each other.
12   Q.     You mean after January 28th, you weren't allowed
13   to communicate?
14   A.     From December 16 -- from December 16, 2005, until
15   I left 2008 from Miami to Mexico, the only time I spoke
16   with the -- Brother Abbas is when it's recorded on the
17   recording device.
18   Q.     Now, you had -- on January 28th, you introduced
19   the location.  You testified about that.
20          Was there a plan to do a video at this location
21   at that time with the pledge?
22   A.     Excuse me, sir?
23   Q.     On January 28th, when you introduced the new
24   location, the warehouse, did you have a plan at that
25   time to do a video with a pledge?
```

```
 1   A.    No, sir.

 2   Q.    Now, on February -- you didn't meet with -- from

 3   January 28th till February the 19th, you never met with

 4   Rotschild Augustine, did you?

 5   A.    No, sir.

 6   Q.    And you never attempted to have a meeting with

 7   Rotschild Augustine, did you?  You never attempted to

 8   have a meeting with him, did you?

 9   A.    No, sir.

10   Q.    Now, do you remember Mr. Batiste saying that

11   85 percent of Minnesota was Muslim?

12   A.    I believe.  Yes, sir.

13   Q.    Now, you knew that was a preposterous statement,

14   didn't you?

15   A.    (No response.)

16   Q.    You knew that was a preposterous statement, a

17   ridiculous statement?

18   A.    I didn't know that, sir.

19   Q.    Well, didn't you say you lived in Chicago?

20   A.    I lived in Chicago.  I don't know exactly for how

21   many times -- how long I was there, because I was in

22   and of Chicago.  I didn't live-live....

23   Q.    You were in and out of Chicago for, what, a

24   several-year period?

25   A.    Excuse me?
```

1   Q.     What were you doing in Chicago?

2   A.     I was working, sir.

3          MS. ARANGO:  Objection.  Relevance.

4          THE COURT:  Sustained.

5   BY MR. CLARK:

6   Q.     Well, from -- based on your knowledge of Chicago,

7   you knew that Minnesota is not 85 percent Muslim?

8   A.     I don't know nothing about Minnesota, sir.

9   Q.     And then on -- you also talked at that meeting on

10  February 19th that Narseal Batiste said he was going to

11  use horses for a ground war.

12         Do you remember that?

13  A.     I remember he used kind of -- I don't know.  Can

14  you refer to what page, sir.

15  Q.     Page 49.

16  A.     Exhibit?

17  Q.     56-A.

18  A.     Thank you.

19  Q.     Do you have 56 there?

20  A.     56-A?

21  Q.     Yes, sir.  I'm sorry.  It's 56-B.

22         THE COURT:  Which binder?

23         MR. CLARK:  Binder 2.

24         MS. ARANGO:  It's in the synchronized binder,

25  Judge.

```
 1              THE COURT:  Thank you.

 2              THE WITNESS:  What page, please?

 3  BY MR. CLARK:

 4  Q.    I believe 49.

 5              MR. CLARK:  I have the ELMO, too, your Honor.

 6              THE WITNESS:  Yes, sir.

 7  BY MR. CLARK:

 8  Q.    And you said, "Tell me you need Hummers.  So I'll

 9  bring Hummers."

10        Correct?

11  A.    Yes, sir.

12  Q.    And then he says, "Believe it or not, we need

13  horses."

14        And you said, "Horses.  Horses?  Why?"

15        You knew that was a preposterous, ridiculous

16  statement, didn't you?

17  A.    Sir, everything is possible when you want to

18  attack.  You can use anything you want:  Horses,

19  animals, airplanes.

20  Q.    I'm talking about when you said, "Horses.

21  Horses?  Why?"

22        You thought at that moment that that was a

23  preposterous statement?

24              MS. ARANGO:  Objection.  Asked and answered.

25              MR. CLARK:  He didn't answer the question,
```

1    your Honor.

2           THE COURT:  Sustained.

3    BY MR. CLARK:

4    Q.    Now, you also have already testified in

5    cross-examination by Mr. Houlihan that you -- on March

6    the 9th -- you had your recollection refreshed on the

7    302.

8           You did not identify Rotschild Augustine.

9    Correct?

10   A.    No, sir.

11   Q.    "No, sir," you didn't identify him.  Correct?

12   A.    I didn't identify him by name.  No, sir.

13   Q.    You did not identify him there?

14   A.    By name.

15   Q.    But you said there were four unidentified males.

16   A.    I was referring, sir, to the seven, all of them,

17   the name I remember, and the other four people I didn't

18   remember their names.

19          And I told them there were four of the brothers

20   and three I didn't recognize their name and I gave it

21   to the FBI debriefing -- debriefing after the meeting.

22          But I said, "There is four other people and I

23   don't remember their name."

24   Q.    Well, you've been -- now, this is March the 9th.

25   You've been on this case now since December.

 1          And you were -- had the names by then, didn't

 2    you, sir?

 3    A.    Sir, if you look at it, from December 16, I met

 4    with Brother Naz.

 5          On 22nd, I met with Brother Naz in the Embassy

 6    with two unidentified people.  He didn't tell me their

 7    names.

 8          On 29th, I met with Brother Naz.

 9          On January 28th, was on their way to Key West.

10    So I met briefly for short time with each one, and some

11    people say their name and some people -- they didn't

12    say their name.

13          I remember Brother Patrick, because most of the

14    time I had contact with him, driving to the Key, coming

15    to my apartment on February 19th.  So I had contact

16    with him.

17          But other people on -- I didn't have contact.  So

18    it was for me difficult.  I did not on daily basis -- I

19    hear their name.  And most of the time they call each

20    other "Brother Mo."

21          I cannot remember all their name when I don't

22    have contact with them.

23    Q.    Well, while you were being debriefed, you

24    actually -- you had an opportunity to look at

25    photographs made from driver's licenses to make

1    identifications, didn't you, sir?

2    A.    No, sir.  They never showed me in debriefing any

3    pictures or any -- "Listen, this is" -- this guy named

4    like this.  They never did that with me, sir.

5    Q.    Didn't you testify that the -- at the very

6    beginning you were to determine the intentions and

7    identify members of the organization?

8    A.    Sir -- yes, sir.  Remember, I left it to the FBI

9    to decide, because my job is to meet.  I believe the

10   FBI was surveillance.  They have -- they know who.

11   They know each one.

12        So, for me, it's, like, not to memorize their

13   name.  I told them who they were, where the meet is and

14   all this stuff.

15   Q.    Now, you also testified about this oath on

16   December 16th.  Correct?

17   A.    Excuse me?

18   Q.    I'm going to move to the oath on December -- I

19   mean, March 16th.  Forgive me.

20   A.    Okay.

21   Q.    Now, the actual oath that was written, you wrote

22   it up in Arabic, is that correct, as I understand that?

23   A.    No, sir.  The FBI did all the job.

24   Q.    And it was -- and did you translate it from

25   Arabic to English?

```
 1   A.    Like I said, sir, the FBI gave it to me.  I

 2   didn't write anything or translate anything.

 3   Q.    It was a handwritten document?

 4   A.    Like I said, sir, the FBI gave it to me like it

 5   is and they told me to read it.

 6   Q.    And you received it on, what, March -- what date

 7   did you get it?  Do you remember?

 8   A.    If I'm not wrong, sir -- same day, if I'm not

 9   wrong.

10   Q.    March the 16th?

11   A.    If I'm not wrong.  If I remember correctly, yes,

12   sir.

13   Q.    Didn't you have to read the oath to Mr. Batiste a

14   week before?

15   A.    On March 10.  So when I -- they gave it to me, I

16   gave it to them and they gave it to me back, I gave it

17   to them.

18   Q.    You never -- prior to March the 16th, you never

19   had any conversation with Rotschild Augustine, did you,

20   sir?  Prior to March the 16th.

21   A.    You mean from March 9 to March 16?  No, sir.

22   Q.    And you didn't discuss the oath with him, did

23   you?

24   A.    I discussed the oath on March 16.

25   Q.    You didn't sit down with him and go over the
```

Assaad - CROSS - By Mr. Clark                    40

```
 1   oath, did you?
 2   A.    I discussed it in the front everybody who were
 3   sitting and hearing.  And I said very clearly, "If you
 4   have any question, if you don't understand, let me
 5   know."
 6   Q.    You're talking about March 16th?
 7   A.    Yes, sir.
 8   Q.    I'm talking about before that.
 9         You didn't sit down with Mr. Augustine and go
10   over the oath?
11   A.    No, sir.
12   Q.    Whatever happened on March the 9th, that wasn't a
13   recorded meeting, was it?
14   A.    No, sir.
15   Q.    Now, in this -- on March the 16th -- that's in
16   the synchronized book, Exhibit 69.  69-B.  I'll ask you
17   to look at 69-B.
18   A.    59-B?
19   Q.    Yes, sir.  And go to Page 8.
20         THE WITNESS:  59-B?
21         THE COURT:  69-B.
22   BY MR. CLARK:
23   Q.    I'll ask you to turn to Page 8.
24   A.    Yes, sir.
25   Q.    At the top, you say, "Somebody watching the door,
```

1   brother?"

2   A.    Is question, if somebody is watching the door.

3   Q.    You basically -- you're asking a question.

4         But you're suggesting, aren't you, sir, that

5   somebody watch the door?

6   A.    Excuse me?

7   Q.    You're suggesting that somebody watch the door,

8   aren't you?

9   A.    No, sir.  I was asking Brother Naz, "Somebody

10  watching the door or what?"

11  Q.    Well, you wanted somebody to watch the door,

12  didn't you?

13  A.    I didn't want anybody to watch -- or to do

14  anything because I was speaking -- supposedly, Brother

15  Naz is the leader.  And I don't have communication with

16  somebody directly.  I speak with Brother Naz and I ask

17  if I have any doubt or any question.  I talk to him.

18  Q.    Well, if you don't care if somebody is watching

19  the door, why did you ask, "Is somebody watching the

20  door, brother?"

21  A.    Because the way how they were.  There was people

22  standing on the door, people -- like if you watch the

23  video, sir, and you see there is always kind of

24  security.

25        So I said, "Is somebody watching the door?"

Assaad - CROSS - By Mr. Clark                    42

1    Q.    Well, you knew this was being videotaped and you

2    wanted somebody standing at the door, didn't you?

3    A.    Sir, like I said before, I don't want anyone to

4    do anything.  I just ask, "What's going on?" and not --

5    I never told them to do.  "What's going on?"  Just to

6    understand.

7    Q.    Now, I'm going to ask you to go to Page 19.

8          On Page 19, where it says here, "To commit myself

9    to Prince Rot?" -- do you see that, sir?

10   A.    Yes, sir.

11   Q.    It doesn't say, "To commit myself to Al-Qaeda,"

12   does it?

13   A.    They already took -- commit themself in the

14   beginning of the oath, was for Al-Qaeda.  And this

15   is -- they are saying only their name, sir.

16   Q.    The way the oath is written, it doesn't say -- he

17   could have said, "To commit myself to Al-Qaeda,"

18   couldn't he have?

19   A.    Was supposed to say their name, sir.

20   Q.    Okay.  I understand.

21         They were not supposed to say, "To commit myself

22   to Al-Qaeda."  Correct?

23   A.    Like I said, sir, they said at the beginning to

24   commit theirself or to -- the oath to Al-Qaeda.  They

25   do the oath.  This is the moment where they have to

Assaad - CROSS - By Mr. Clark                    43

```
 1    come and mention their names.
 2    Q.    Well, that says, "To commit myself to Prince
 3    Rot," doesn't it?
 4    A.    This what it says.  Yes, sir.
 5    Q.    And this is the front page of the transcript.
 6          You signed this transcript on February the 9th of
 7    '09.  Is that correct?
 8    A.    Yes, sir.
 9    Q.    Now, on Page 27 -- go to Page 27, if you will.
10          Do you see where it says, "To uplift foreign
11    humanity"?
12    A.    Excuse me?
13    Q.    Do you see where it says, "To uplift foreign
14    humanity," right here (indicating), the second -- or
15    the fifth paragraph down?
16    A.    Yes, sir.
17    Q.    Were you reading that?
18    A.    I was reading from what they gave me to read.
19    Q.    Did you -- do you understand that "foreign" is a
20    mistake and it should be "fallen"?
21    A.    Excuse me?
22    Q.    Do you understand that "foreign" is a
23    typographical error in this transcript and it should be
24    "fallen" -- f-a-l-l-e-n -- "fallen humanity"?
25    A.    It could be, sir.  I don't remember exactly what
```

Assaad - CROSS - By Mr. Clark                    44

```
 1   it was.

 2   Q.    Again, this is the transcript that you signed on

 3   February 9th of '09, this year.  Isn't that correct?

 4   A.    Yes, sir.

 5   Q.    Now I want to go to Page 45 of the transcript.

 6         And this is a point where you gave Mr. Batiste a

 7   camera.  Is that correct?

 8   A.    Yes, sir.

 9   Q.    And you say, "That's a" -- and it's

10   unintelligible -- "Everybody be -- like, worry about

11   what's going on here."  And you laugh.

12         Is that correct?

13   A.    Yes, sir.

14   Q.    You sense that the other brothers were worried

15   about what's going on here.  Correct?

16   A.    One second, sir.

17         I believe we were speaking before, on Page 44,

18   sir, about the attack.  And on Page 44, same exhibit,

19   we were speaking about -- Brother Naz and myself --

20   about the plans and all the stuff.  So I believe it's

21   referring to this.  I believe so, sir.

22   Q.    Okay.  Well, you also have -- is there a camera

23   out at that time?

24   A.    Excuse me?

25   Q.    Do you see where Narseal Batiste says, "I hope
```

```
 1    it's got a zoom lens on it, Occ"?
 2    A.     Yes, sir.
 3    Q.     You're having that discussion, and there's also a
 4    camera out at this time.  Is that right?
 5    A.     It could be.
 6    Q.     And so my question was:  You sensed that the
 7    others were worried about what's going on here?
 8    A.     Sir, if you see this Page 44, 45 and 46, we're
 9    not speaking about the brothers.  We're not -- we
10    speaking about the attack and the plans and about the
11    camera.  So we're not mentioning anything.
12           If you want to go to Page 47, 48, 43.  So we're
13    not speaking about the brother in this conversation.
14    Q.     Well, I'm not -- on 47 -- this is before 46, 47
15    and 48.
16           I'm just talking about as of this time -- as of
17    this time in the conversation, you sense that somebody
18    was worrying about what's going on here.
19    A.      No, sir.  Because I said before this happen,
20    before the Page -- is this the Page -- this is the
21    Page 45.
22           Go to Page, sir, 44 -- the Page 44.  That's mean
23    before this sentence was out, we were speaking about
24    the plan.
25           For example, we were discussing -- on Page 44, in
```

 1    the middle of the page, "So we are organizing.  But you

 2    see -- you see now alliance we are organizing.  Right?

 3    So if we tape it" -- we are speaking about -- about the

 4    attack, about the plan, about -- nothing to do with the

 5    brother.

 6           And this is page before the sentence.  That's

 7    mean we had a conversation.

 8    Q.    Well, whatever you're talking about, you sense

 9    that "everybody be, like, worry about what's going on

10    here"?

11           MS. ARANGO:  Objection.  Asked and answered.

12           THE COURT:  Sustained.

13    BY MR. CLARK:

14    Q.    Now, after -- on March the 24th, when you were

15    talking to Narseal Batiste about getting a van -- or

16    whoever you were talking to about getting a van,

17    Rotschild Augustine was not present there, was he, sir?

18    A.    No, sir.

19    Q.    And you've previously testified that, in

20    Exhibit 80 on March the 26th, that Narseal Batiste had

21    told you on Page 24 in the transcript the brothers

22    don't want to be involved.

23           Do you recall testifying to that on

24    cross-examination?

25    A.    I remember I said, sir, he said he has the right

1    to "yes" or "no," the Moors.  So was different.

2    Q.    Then after that, he said he doesn't want the

3    brothers involved?

4          MS. ARANGO:  Objection.  Cumulative.

5          THE COURT:  Sustained.

6    BY MR. CLARK:

7    Q.    Well, that particular event was the day after the

8    photos.  Correct?

9    A.    Excuse me?

10   Q.    That event -- when that was said, that was the

11   very day after Narseal Batiste took the photos in the

12   downtown area.  Correct?

13   A.    Are you referring to the Exhibit 80?

14   Q.    I'm referring -- yes -- to that statement.

15         The photos were taken on March the 25th.

16   Correct?

17   A.    Yes, sir.

18   Q.    So what was said about he doesn't want the

19   brothers involved on March the 26th was the day after

20   that?

21   A.    What paragraph?  What page you're referring to,

22   please?

23   Q.    I'm referring to what you already talked about.

24   You just said, you know, he wants to reserve the right.

25   A.    Yes, sir.

1    Q.    I'm talking that -- on March the 26th, that was

2    the day after the photos were taken downtown.

3    A.    I need to look at what page you're referring,

4    because I remember I said, sir, he has a right to

5    reserve, like to say "yes" or "no" to involve his

6    brother or not.

7    Q.    Well, do you have Exhibit 80 there?

8    A.    Yes, sir.

9          MS. ARANGO:   Judge, I would object.   This

10   portion of the exhibit has been dealt with.

11         MR. CLARK:   I'm not trying to go over it,

12   Judge.   He wants the exhibit.   He's asking for it.

13         THE COURT:   Sustained.

14         It's cumulative.

15   BY MR. CLARK:

16   Q.    And after this, sir, you never made any attempts

17   to meet with Rotschild Augustine, did you?

18   A.    No, sir.

19         MR. CLARK:   I have no further questions, your

20   Honor.

21         THE COURT:   Mr. Casuso.

22         MR. CASUSO:   Yes, ma'am.

23                      CROSS-EXAMINATION

24   BY MR. CASUSO:

25   Q.    Mr. Assaad, what's the first time that you speak

Assaad - CROSS - By Mr. Casuso                    49

```
 1    to the FBI in Mexico?

 2    A.     The first time I spoke with the FBI in Mexico?

 3    Q.     Did you ever speak to the FBI in Mexico?

 4           MS. ARANGO:  Objection.  Vague.

 5           THE COURT:  Rephrase your question.

 6    BY MR. CASUSO:

 7    Q.     On this case -- about this case, sir.

 8    A.     No, sir.

 9    Q.     Were you in Mexico before coming to the United

10    States here on this case?

11    A.     If I was in Mexico?

12    Q.     Yes, sir.

13    A.     Yes, sir.

14    Q.     Okay.  And for some reason, the FBI brings you

15    into the United States, right, to work on this case?

16    A.     Yes, sir.

17    Q.     They brought you in.

18           You make your first appearance with Mr. Batiste

19    on 12-16.  Right?

20    A.     Yes, sir.

21    Q.     Did you -- you arrived in the United States about

22    three weeks before that.  Right?

23    A.     More or less.  Yes, sir.

24    Q.     And you told the jury that it was, like, about

25    two days before you meet with Mr. Batiste that you
```

```
1    talked to anyone from the FBI about what you're

2    supposed to do in this case.  Correct?

3    A.      Two days or three days.  But yes, sir.  It was

4    close to the day I was going to meet him.

5    Q.      Give or take.  Right?

6    A.      Yes, sir.

7    Q.      What did you do for the other couple of weeks

8    that you were here?

9            MS. ARANGO:  Objection.  Relevance.

10           THE COURT:  Overruled.

11           THE WITNESS:  I was kind of on the beach and

12   in hotel, eating, resting.  I didn't put it, like -- I

13   don't remember exactly what I did.  But....

14   BY MR. CASUSO:

15   Q.      Okay.  What were your arrangements with the FBI

16   with reference to you getting paid for this work, sir?

17   A.      What -- one more time.  Can you explain it,

18   please.

19           MS. ARANGO:  Objection.  Cumulative.

20   BY MR. CASUSO:

21   Q.      What were your arrangements --

22           THE COURT:  Sustained.

23   BY MR. CASUSO:

24   Q.      Did you have an arrangement for pay with the FBI

25   about being a witness in this case, sir?
```

```
 1              MS. ARANGO:  Objection.  Cumulative.
 2              THE COURT:  Sustained.
 3  BY MR. CASUSO:
 4  Q.    Were you on the clock, sir, when you were resting
 5  on the beach and sunning yourself?  Were you getting
 6  paid then?
 7  A.    Sir, we never discussed -- I never discussed --
 8  all my 13 years in this job, all my 13 years, I never
 9  discussed with the FBI prior to any case how much I
10  will get or about any amount.  It was 100, was 1,000,
11  was $1.  Whatever I --
12  Q.    Okay.
13  A.    Can I --
14  Q.    Sure.
15  A.    So I never discussed it with them.  I never told
16  them, you know, "If I will do this job, I want this
17  amount."  Never in my whole career until today the
18  money wasn't the issue or the money was not the point.
19  It's not the money.
20         I never in this case -- for this case, they never
21  told me how much I'm getting or how much they will pay
22  me or what benefit I'm getting.  I didn't know about --
23  nothing about that.
24  Q.    Were you paying for your meals?
25  A.    For my meals?
```

1    Q.     Yes.

2    A.     Yes, sir.

3    Q.     Were you paying yourself for your hotel out of

4    your own pocket?

5    A.     No.  The FBI pay for my stay.

6    Q.     So the FBI paid for your stay?

7    A.     Yes, sir.

8    Q.     Okay.  So you're getting a benefit there.  Right?

9               MS. ARANGO:  Objection.  Cumulative.

10              THE COURT:  Sustained.

11   BY MR. CASUSO:

12   Q.     And you're saying to the jury that it was two,

13   three days before you met with Narseal Batiste that

14   you're told what you're supposed to do, right, and

15   which is to let him talk and see what his intentions

16   are?  Right?

17              MS. ARANGO:  Objection.  Asked and answered

18   multiple times.

19              MR. CASUSO:  I haven't, Judge.

20              MS. ARANGO:  And cumulative.

21              THE COURT:  Sustained.

22   BY MR. CASUSO:

23   Q.     Isn't it true, sir, that your meeting with

24   Mr. Batiste on the 16th, twice you say to him, "I want

25   some action.  I'm not here to hear talk"?

     1          Two times you say to him that?

     2    A.    I don't remember how many times, sir, I said

     3    that.

     4    Q.    "I didn't -- I didn't -- they didn't bring me --

     5    they didn't bring me from over there just to hear

     6    words.  I will hear some action.  I will see some

     7    action or not."

     8          Do you remember saying that, sir?

     9    A.    Referring --

    10    Q.    The first meeting.

    11    A.    Yes, sir.  But referring to what page, sir?

    12    Q.    Page 8, sir.

    13          Do you remember saying that, sir, or not?

    14          THE COURT:  What's the exhibit number, please?

    15          MR. CASUSO:  The exhibit number is 44-A,

    16    Judge.

    17          THE WITNESS:  What page, sir?

    18    BY MR. CASUSO:

    19    Q.    Page 8, sir.  Right at the top.

    20          MS. ARANGO:  Judge, this is cumulative.

    21    Ms. Jhones went over Page 7, 8, 9 and 10 and I believe

    22    asked these same questions.

    23          THE COURT:  Sustained.

    24    BY MR. CASUSO:

    25    Q.    Is there any reason you said that, sir?

```
 1              MS. ARANGO:  Same objection.

 2              THE COURT:  Sustained.

 3    BY MR. CASUSO:

 4    Q.    So no one had told you what had happened before

 5    with the other informant in this case?

 6              MS. ARANGO:  Objection.  Cumulative.  Asked

 7    and answered.

 8              THE COURT:  Sustained.

 9    BY MR. CASUSO:

10    Q.    You just said that out of the blue, sir?

11              MS. ARANGO:  Same objection, Judge.

12              THE COURT:  Sustained.

13              You need to move on to another area,

14    Mr. Casuso.

15    BY MR. CASUSO:

16    Q.    Well, you meet with Mr. Batiste on the 16th.

17    Then you meet with him, I think, on the 22nd in

18    Bayside.  Correct?

19    A.    Yes, sir.

20    Q.    He talks to you about these buildings.  He and

21    you have a conversation.  Right?

22    A.    Yes, sir.

23    Q.    And at some point, he takes you to the Embassy.

24    Right?

25    A.    Yes, sir.
```

```
 1   Q.     Okay.  The Embassy is a shop.  Right?  It's not
 2   an embassy, is it?  It's a building.
 3   A.     This is what he called it, sir.
 4   Q.     That's what he called it.  Right?  But it wasn't
 5   an embassy.  It was a shop.  Right?
 6   A.     I don't know that.
 7   Q.     You don't know that?  I mean, did you look at it?
 8   A.     Sir, if he called it "the Embassy," it's "the
 9   Embassy."  If he called it "store," "store."  But he
10   called it "the Embassy."  For me, it's like -- it's the
11   name.
12   Q.     What was the condition of that building, sir,
13   when you saw it?
14   A.     From outside?  From inside?  From -- I don't
15   know.
16   Q.     Did you go -- did you look at it from the
17   outside?
18   A.     I didn't observe it 100 -- perfectly.  I just --
19   I come in -- I go in and I leave.  So I don't check
20   details in the place.
21   Q.     Did you look at it from the inside?
22   A.     I was inside, sir.  Yes.
23   Q.     What did it appear to you to be like, sir?
24   A.     He was in certain times fixing the Embassy.
25   Q.     What was that?  I'm sorry.  I couldn't hear you.
```

```
 1   A.     There is certain time arrive when he was fixing

 2   the Embassy.  He was fixing the floor.  He fixing the

 3   electricity or putting some lamps or -- I don't know.

 4   Q.     It wasn't a fancy building.  Right?

 5   A.     No, sir.

 6   Q.     So you meet with him there.  Then you have -- you

 7   have a number of meetings.  Right?

 8   A.     Yes, sir.

 9   Q.     Did you meet, sir, during some of these meetings

10   that you had -- well, at the first meeting you had on

11   the 16th -- okay? -- was Burson Augustin there?

12   A.     No, sir.

13   Q.     When you go into the so-called Embassy, sir, on

14   the 22nd, is Burson Augustin there?

15   A.     Like I said before, sir, there is people who are

16   there, and I didn't know at that time who they were.

17   Q.     Okay.  The third meeting that you have, sir:

18   When was that?

19   A.     On 29th of December, 2005.

20   Q.     Okay.  And just so -- just so the ladies and

21   gentlemen refresh their -- what happened then?

22   A.     What happened on 29th?

23   Q.     Yeah.  What happened then?

24   A.     You want a general idea what happened?

25   Q.     The general idea.  Yes, sir.
```

```
 1   A.     Okay.  We met in Bayside with Brother Naz, and I

 2   give him the boots.  And we met in the parking lot of

 3   the Bayside, where he gave me the list -- specific

 4   details list --

 5   Q.     Okay.

 6   A.     -- and two other van -- the specific type of van

 7   he wants.

 8          And we spoke -- he told me about his plans about

 9   the Sears Towers -- Chicago Sears Towers --

10   Q.     Right.

11   A.     -- and how he's expert of building -- he's

12   working in construction and he knows how to build

13   things up and he knows how to take things down.

14          And he spoke he wants dynamites or something more

15   powerful than dynamites.

16          And he spoke about his land, his training.

17          He spoke --

18   Q.     Let me ask you this, Mr. Assaad:  Was he by

19   himself?

20          MS. ARANGO:  Judge, I would object.  I believe

21   that the witness was not through with answering that

22   question.

23   BY MR. CASUSO:

24   Q.     Well, I just asked you generally.

25   A.     I just --
```

 1   Q.     Was he by himself or was anybody else with them?

 2          MS. ARANGO:  I have an objection that he

 3   interrupted the witness's answer.

 4   BY MR. CASUSO:

 5   Q.     Okay, Mr. Assaad.  Go ahead and finish your

 6   answer there.

 7          At the end, my question is:  Was he by himself?

 8          THE COURT:  Well, wait for your question when

 9   he finishes.

10          MR. CASUSO:  Okay.

11   BY MR. CASUSO:

12   Q.     Go ahead, sir.

13   A.     So we were speaking about -- he told me about his

14   plan, Chicago, what he needed to execute his plan,

15   about -- the dynamites, about, also, the expert, I

16   believe, from Europe or -- I don't know if we spoke

17   about this.  But, in general, we spoke about -- he told

18   me about this stuff.

19          Go ahead, sir.

20   Q.     Was he by himself?

21   A.     Yes, sir.

22   Q.     What's the next meeting?

23   A.     On January 28.

24   Q.     Okay.  And, generally, what happened then -- oh,

25   by the way, this meeting that you told us about where

```
 1    he said what he needed, did he speak to you about

 2    money?

 3    A.     About who?

 4    Q.     About money, finances.

 5    A.     On what meeting, sir?

 6    Q.     This last meeting you talked about.

 7    A.     Can you speak -- be specific, sir.

 8    Q.     The meeting you just spoke about, sir.

 9    A.     The 29?

10    Q.     Yes.

11    A.     Yes.  He mentioned about 50,000 in the end of the

12    list in cash.

13    Q.     So the next meeting is when, sir?

14    A.     Was January 28.

15    Q.     And what happened then, generally?

16    A.     You want general?

17    Q.     General.  Yes, sir.

18    A.     Well, we supposed to meet Brother Naz in the

19    Embassy.

20           I went with Brother Abbas to the Embassy.  We

21    were surprised they ask us to take our -- they

22    strip-searched us.  They give us different clothes.

23    Q.     That was the Key West thing.

24    A.     Sir, you told me to speak in general.

25           THE COURT:  Let him finish his answer.
```

1          MR. CASUSO:  Okay.

2          THE WITNESS:  We had to take our clothes.

3  They give us different type of clothes.

4          They took us to different car.  It was Brother

5  Patrick and Brother Naudy.  We switched cars.

6          They took us to the Key West, where we met

7  Brother Naz in a tent next to the ocean.

8  BY MR. CASUSO:

9  Q.    Is this the first time, sir, that you say to

10  Mr. Batiste that you are Al-Qaeda or had you mentioned

11  that before?

12  A.    Excuse me, sir?

13  Q.    Is this the first time that you mentioned to

14  Mr. Batiste that you are a representative of Al-Qaeda

15  or had you said that before to him?

16  A.    I believe, on December 22nd, I mentioned

17  something about I need to report to the Sheik.

18  Q.    "The Sheik" being who, sir?

19  A.    Can I finish, sir?

20  Q.    You know, I'm trying to move it --

21          THE COURT:  Mr. Casuso.  Mr. Casuso, you have

22  to let the witness finish his answer.

23          MR. CASUSO:  Okay.

24  BY MR. CASUSO:

25  Q.    My question to you is:  Who is "the Sheik"?

```
 1              THE COURT:  Mr. Casuso, let him finish his

 2   answer.

 3              MR. CASUSO:  Okay.

 4              THE WITNESS:  So -- but specifically, more

 5   clearly, it was on January 28.

 6   BY MR. CASUSO:

 7   Q.    You tell him you're from Al-Qaeda.  Right?

 8   A.    Yes, sir.

 9   Q.    Now, the truth of the matter is, as you stated to

10   the jury, you were playing a role for the FBI.  You

11   don't have anything to do with Al-Qaeda.  Right?

12   A.    No, sir.

13   Q.    You don't have anything to do with Osama bin

14   Laden.  Right?

15   A.    No, sir.

16   Q.    Yeah.

17         He's got nothing to do with this case.  Right?

18   A.    No, sir.

19   Q.    Okay.  You were using the name to establish that

20   you're a terrorist, according to the plan that the FBI

21   had.  Right?

22   A.    I don't know, sir, because Brother Naz request a

23   terrorist organization to come and --

24   Q.    Well --

25   A.    -- assist him in executing his plan, and he
```

```
 1    needed support and help from a terrorist organization.

 2    So the FBI had to put someone to play a role like a

 3    terrorist.

 4    Q.    Okay.  So after you tell him you're from

 5    Al-Qaeda, you come back.

 6          What's the next meeting you had, sir?

 7    A.    After January 28?

 8    Q.    Yes, sir.

 9    A.    February 19.

10    Q.    Okay.  And on February 19th, did you see -- did

11    you see Burson Augustin?

12    A.    I saw him only on January 28, is the first --

13    yes.  January 28.  And February 19, no.

14    Q.    When is it that you said that you were from

15    Al-Qaeda?  When you met Mr. Batiste in the Keys?

16    A.    Yes, sir.

17    Q.    Did you see Burson Augustin after that, sir?

18    A.    Sir, I said I'm Al-Qaeda first in the Embassy on

19    January 28 --

20    Q.    Right.

21    A.    -- where -- I believe Brother B was there.

22          When I mentioned to Brother Patrick and Brother

23    Naudy that I'm from Al-Qaeda and when he switched the

24    cars, Brother B, he -- we were -- he was -- he was

25    waiting for us be -- when we switch cars next to the
```

```
 1   fast food place, and I believe this is when he knew I'm
 2   from Al-Qaeda.
 3   Q.    So when you said you were from Al-Qaeda, did
 4   Brother B say to you that he wanted to sign up for some
 5   camp with Al-Qaeda, sir?
 6   A.    I didn't have a verbal contact with Brother B.
 7   Q.    Okay.
 8   A.    I didn't -- he didn't --
 9   Q.    So I'll --
10   A.    We didn't talk.
11   Q.    So I'll take that as a "no."
12         He didn't --
13            MS. ARANGO:  I would object --
14   BY MR. CASUSO:
15   Q.    -- ask you that.  Right?
16            MS. ARANGO:  -- object to the interruption of
17   the witness yet again.
18            THE COURT:  Let him finish his answer,
19   Mr. Casuso.
20            MR. CASUSO:  Okay.
21   BY MR. CASUSO:
22   Q.    You had no conversation --
23            THE COURT:  Mr. Casuso.
24   BY MR. CASUSO:
25   Q.    -- with Brother B.  Correct?
```

Assaad - CROSS - By Mr. Casuso                    64

```
 1           THE COURT:  Mr. Casuso, let him finish his
 2   answer.
 3   BY MR. CASUSO:
 4   Q.     Go ahead, sir.  Finish your answer.
 5   A.     I didn't have -- on January 28, I didn't have a
 6   contact with -- verbal contact with Brother B.
 7   Q.     Okay.  When did you next see Burson Augustin,
 8   sir?
 9   A.     I saw him on March 9 in the Embassy.
10   Q.     Okay.
11   A.     And I saw him on March 16 when he took the oath
12   of Al-Qaeda.
13           And I saw him on -- I believe, after March 16, on
14   the 24th, on the 26, because -- I don't remember
15   exactly the day -- the date.
16           But mostly -- most of the time, after March 24th,
17   was Brother Naz coming with Brother B, and Brother B
18   was standing and observing, like security for Brother
19   Naz on the door, with him most of the time.
20   Q.     Sir, I'll ask you about that later.
21           But on the 9th that you see them, this is the day
22   that this tape, you say, didn't come out.  Right?
23               MS. ARANGO:  Objection.  Cumulative.
24               THE COURT:  Sustained.
25
```

```
 1   BY MR. CASUSO:
 2   Q.    Did you have a conversation with Burson Augustin
 3   then, sir?
 4   A.    On March 9th?
 5   Q.    Yes, sir.
 6   A.    I spoke.  I don't know I put a note or -- I spoke
 7   with the FBI about that.  I don't remember exactly with
 8   who I spoke.
 9         I spoke -- we had conversation with everybody at
10   that day in the warehouse -- in the Embassy.
11   Q.    Okay.  And did Burson Augustin, say, approach you
12   and ask you if he could sign up with Al-Qaeda?
13   A.    No, sir.  Because Brother Naz on March 9 said
14   they want to create alliance with Al-Qaeda in the front
15   everybody in that warehouse -- in that Embassy and --
16   where he spoke about the brothers.  And like he is the
17   leader.  And I guess he spoke about everybody in that
18   room.
19   Q.    But I'm asking about Burson Augustin, sir.  Okay?
20         Did he say, sir, that he wanted to join some kind
21   of a training camp with Al-Qaeda?  Did he ask you that,
22   since you're an Al-Qaeda representative?
23   A.    No, sir.
24   Q.    Did he give you any money, sir, to support
25   Al-Qaeda and your mission, sir?
```

1    A.     Excuse me?

2    Q.     Did Burson Augustin give you any money to support

3    Al-Qaeda?

4    A.     No, sir.

5    Q.     So you have a conversation with Mr. Batiste, and

6    this is when you say that Mr. Batiste says that he

7    wanted to take an oath to Al-Qaeda.  Right?

8    A.     Excuse me?

9    Q.     That's when he said -- Mr. Batiste said that he

10   was interested in taking an oath to Al-Qaeda.  Right?

11   A.     No, sir.  He said him and the brothers -- or

12   most -- to be more specific, the brothers, want to take

13   oath, want to make alliance with Al-Qaeda.

14   Q.     And he said that in front of these young men

15   here?

16   A.     Yes, sir.

17   Q.     And that's a tape that didn't come out.  Right?

18   A.     That's the tape wasn't recording and confirmed on

19   March 10.

20          THE COURT REPORTER:  The tape that wasn't

21   recording, you said?

22          THE WITNESS:  Wasn't recording and confirmed

23   what we spoke on March 10.

24          The conversation was recorded on March 10 and

25   confirmed what we spoke on March 9, before one day.

1    BY MR. CASUSO:

2    Q.    The conversation on March 9th, you said, was not

3    recorded.  Right?

4          MS. ARANGO:  Objection.  Asked and answered

5    and cumulative.

6          THE COURT:  Sustained.

7          MR. CASUSO:  Well, I didn't understand him,

8    Judge, whether he said it was or wasn't.

9          THE COURT:  Sustained.

10         We're going to take a break.

11         Do not discuss this case either amongst

12   yourselves or with anyone else.  Have no contact

13   whatsoever with anyone associated with the trial.  Do

14   not read, listen or see anything touching on this

15   matter in any way.

16         If anyone should try to talk to you about this

17   case, you should immediately instruct them to stop and

18   report it to my staff.

19         You may leave your notebooks and your binders

20   at your chairs.  Please be back in the jury room in ten

21   minutes.

22         (Whereupon, the jury exited the courtroom at

23   11:03 a.m. and the following proceedings were had:)

24         THE COURT:  We're in recess for ten.

25         (Thereupon a recess was taken, after which the

 1    following proceedings were had:)

 2          THE COURT:  We're back on United States of

 3    America versus Narseal Batiste, et al., Case

 4    No. 06-20373.

 5          Counsel, state your appearances, please, for

 6    the record.

 7          MR. GREGORIE:  Richard Gregorie and Jacqueline

 8    Arango on behalf of the United States, your Honor.

 9          MS. JHONES:  Ana Maria Jhones on behalf of

10    Narseal Batiste, who's present.

11          MR. LEVIN:  Albert Levin on behalf of Patrick

12    Abraham, who's present.

13          MR. CASUSO:  Louie Casuso on behalf of Burson

14    Augustin, who's present.

15          MR. CLARK:  Nathan Clark for Rotschild

16    Augustine, who's present.

17          MR. HOULIHAN:  Richard Houlihan with Naudimar

18    Herrera.

19          MR. VEREEN:  Roderick Vereen on behalf of

20    Stanley Phanor, who's present.

21          THE COURT:  All Defendants are present.

22          Let's --

23          MS. ARANGO:  Judge, I'm sorry.  I have a brief

24    housekeeping matter.

25          THE COURT:  Yes.

Assaad - CROSS - By Mr. Casuso                    69

1            MS. ARANGO:  In our courtroom is Maria

2    Morrison.  She's our witness coordinator.

3            Our plan was to -- after Mr. Assaad finished

4    testifying, which it looks like it's going to be today,

5    he was going to be closed out with our office.

6            And he arrived here, by the way, right before

7    jury selection.  So we had to keep extending his stay.

8            I received a subpoena from Ms. Jhones for

9    Mr. Assaad, as well as Mr. al-Saidi.

10           But Mr. Assaad really is the problem because

11   his plan at this point was to fly back to Mexico.

12           So it's expensive to get him back here.  And

13   I'm not sure -- you know, getting him here this time

14   required a significant public benefit parol --

15           THE COURT:  Let's take this up at the lunch

16   hour.  Okay?

17           MS. ARANGO:  Okay.

18           THE COURT:  Let's bring in the jury, please.

19           THE COURT SECURITY OFFICER:  Yes, ma'am.

20           (Whereupon, the jury entered the courtroom at

21   11:35 a.m. and the following proceedings were had:)

22           THE COURT:  You may be seated.

23           You are still under oath, sir.

24           You may proceed, Mr. Casuso.

25

```
 1   BY MR. CASUSO:

 2   Q.    Mr. Assaad, isn't it true that the idea of this

 3   pledge to Al-Qaeda came from the FBI?

 4   A.    After -- on March 9, Brother Naz request alliance

 5   with Al-Qaeda.  And I got debriefed after the meeting

 6   with the FBI and they gave me the pledge for them to

 7   take it.

 8   Q.    March 9th is the day that Mr. Batiste is very

 9   upset with you, right, because you left the Embassy and

10   you said you went to get food?  Right?

11   A.    He was upset because I left.  Yes, sir.

12   Q.    Yes, sir.

13         And he and you had a discussion on the phone.

14   Correct?

15              MS. ARANGO:  Objection.  Cumulative.

16              THE COURT:  Sustained.

17   BY MR. CASUSO:

18   Q.    So you're telling the jury that, after

19   Mr. Batiste was upset at you, then he offered to take a

20   pledge to Al-Qaeda?  Is that what you're saying?

21              MS. ARANGO:  Objection.  Cumulative.

22              THE COURT:  Overruled.

23              THE WITNESS:  Sir, yes, because -- and this is

24   something you can be -- look at it on March 10, after

25   one day.  We discussed what happened on March 9.  We
```

1    were okay.  We were laughing.  And this is after one

2    day.

3            So this is confirming, confirming, what wasn't

4    recorded on March 9.  We had -- he was upset when I

5    left the -- when I left the Embassy first time because

6    I left.  Not because of me, personally.  Wasn't against

7    me or angry at me because I left.

8            But when I came back, we fix everything.  We

9    talk.  We sit.

10           And March 10 is the most -- is proof what

11   happened on March 9.

12   BY MR. CASUSO:

13   Q.    Sir, did you offer Mr. Batiste money on

14   March 9th?

15   A.    No, sir.

16   Q.    Isn't it true, sir, that whatever conversations

17   you had with Mr. Batiste, you had them outside the

18   building and not inside with these other people

19   present?  Isn't that the fact, sir?

20   A.    Excuse me?

21   Q.    Isn't it a fact that whatever conversations you

22   had with Mr. Batiste reference any oath, reference any

23   money being paid, was done outside the Embassy and not

24   inside, sir?

25           MS. ARANGO:  Objection.  Vague.

```
 1              THE COURT:  Sustained.

 2              MS. ARANGO:  Compound.

 3              THE COURT:  Rephrase your question.

 4   BY MR. CASUSO:

 5   Q.    The conversations that you had with Mr. Batiste

 6   reference to this oath that you said that he offered to

 7   take -- didn't that happen outside the Embassy, sir?

 8   A.    No, sir.  Was -- we were sitting inside.  And the

 9   only time I went outside the Embassy, because wasn't

10   allowed for me to smoke inside.  I go smoke cigarette

11   and I come back.  I don't finish the cigarette, even.

12   I smoke it.  I come back quickly.

13        But the discussion of the alliance with

14   Al-Qaeda -- and this you are confirming right now,

15   sir -- you're telling me that we had discussion about

16   this -- was inside the Embassy, in front everybody.

17   Q.    Sir, didn't Mr. Batiste say time and time again

18   to you that the brothers were not involved?  Didn't he

19   say that many times to you, sir?

20   A.    No, sir.  He didn't say --

21   Q.    He did --

22   A.    -- that.

23   Q.    -- not?  That's your answer?

24   A.    He --

25              MS. ARANGO:  Objection to the interruption,
```

1   Judge.

2              THE COURT:  Let him finish his answer, please.

3              THE WITNESS:  He mentioned several times that

4   the Moors -- and even -- even -- I want to get it --

5   your attention that even we told him -- or I were

6   having conversation that, "Thank you very much for the

7   video, for the pictures."  They got upset.

8              MR. CASUSO:  Judge, objection.  That's not

9   responsive.  That's just not responsive to my question,

10  Judge.

11             Can I repeat my question?

12             THE COURT:  Yes.

13  BY MR. CASUSO:

14  Q.    Didn't Mr. Batiste tell you time and time again,

15  sir, to your face that the brothers were not involved?

16  Didn't he say that, sir?

17  A.    Like I said, sir, before, several times he

18  mentioned on different occasions that -- one time he

19  said, "I have right to keep the decision to involve or

20  not to involve."  And sometime he said, "I don't want

21  the brothers to be involved."

22             THE COURT REPORTER:  I'm sorry.  "Don't"?

23             THE WITNESS:  "Don't."

24             And it depends from time to time.  Even

25  sometimes he wanted to get involved more by assisting

1    Al-Qaeda, him and the brothers.

2    BY MR. CASUSO:

3    Q.    And, sir, isn't it a fact that, on March 10th,

4    when you have the conversation with Mr. Batiste, he's

5    very uneasy about taking that pledge that you gave him?

6    A.    I didn't understand the question, sir.

7    Q.    Isn't it a fact, sir -- let me repeat it -- that,

8    on the 10th, when you give him this pledge -- isn't he

9    very uneasy and has many, many questions about the

10   pledge before he took it, about who's going to be on

11   top, the Moors, you?   Remember that?

12   A.    So you want me to answer you in general, sir, to

13   know how to answer?

14   Q.    No, sir.   I'm asking you a specific question.

15         Do you remember the conversation on the 10th?

16   A.    I remember the -- in general, I remember the

17   conversation.   Yes, sir.

18   Q.    And that was with Mr. Batiste.   Right?

19   A.    Yes, sir.

20   Q.    Was there anybody else present other than

21   Mr. Batiste?

22   A.    There is someone -- another brother was in and

23   out.

24   Q.    And you told him, "Because you're the leader, I'm

25   going to give you this oath first."   Right?

1   A.     Because he was the leader of the Moors.  Yes,

2   sir.

3   Q.     Yes.  Okay.

4          And wasn't he very uneasy and was asking

5   questions about, "Who's going to be the boss?  Is it

6   going to be you?  Is it going to be the Moors?"

7   Remember that?

8              MS. ARANGO:  Objection.  Compound question,

9   improper form.

10             THE COURT:  Sustained.

11             Rephrase your question.

12  BY MR. CASUSO:

13  Q.     That oath, sir, the one with Mr. Batiste, or the

14  pledge:  Who gave you that?

15             MS. ARANGO:  Objection.  Asked and answered

16  and cumulative.

17             THE COURT:  Sustained.

18  BY MR. CASUSO:

19  Q.     Did you make that up?

20  A.     No, sir.

21  Q.     You said the FBI gave it to you.  Right?

22             MS. ARANGO:  Same objection, Judge.  This

23  is --

24             THE COURT:  Sustained.

25

1    BY MR. CASUSO:

2    Q.     Did you translate it?

3           MS. ARANGO:  Same objection.

4           THE COURT:  You need to move on, Mr. Casuso.

5    This has been covered.

6    BY MR. CASUSO:

7    Q.     Isn't it a fact, sir, that since you started

8    working on this case on December the 16th up until

9    March the 10th, all you had heard is talk and more talk

10   and no action, just exactly what you told Mr. Batiste

11   at the first meeting that you didn't want to hear?

12   A.     I didn't understand your question, sir.  Can you

13   rephrase it.

14   Q.     Yes.

15          Since the beginning, sir -- you come into this

16   case December the 16th.  Correct?

17   A.     Yes, sir.

18   Q.     That you had your first contact with Mr. Batiste.

19          Up until March the 10th, sir, the only thing

20   you've heard is talk, nothing else, and requests for

21   money.  Isn't that correct?

22   A.     Yes, sir.

23   Q.     So, sir, I mean, truthfully -- okay? -- did it

24   ever dawn on you, sir, that maybe the plan was to

25   separate you from your money and there was nothing

```
 1   else?

 2   A.    Can you rephrase the question, sir.

 3   Q.    Yes.

 4         Did it ever -- did you ever think, sir --

 5   okay? -- in looking at this case and in everything that

 6   happened, that maybe the plan here was to separate you

 7   from your money, so you could give this man money?

 8   A.    Are you asking my opinion, sir?

 9   Q.    No, sir.

10         Did you ever think that?  Did it ever occur to

11   you as a possibility, sir?

12   A.    So you are asking me what I think?

13   Q.    No, sir.

14         I'm asking you:  Did you ever -- did it ever dawn

15   on you, sir, that maybe the plan here was to take your

16   money?

17   A.    No, sir.  Because --

18   Q.    You never thought about that?

19         MS. ARANGO:  Objection to interrupting the

20   witness, Judge.

21         THE COURT:  Let him finish his answer.

22         THE WITNESS:  No, sir.  Because since

23   December 16 until January 10, he request help from

24   terrorist organization, from Al-Qaeda, and he

25   request -- he gave a list -- three different list, he
```

Assaad - CROSS - By Mr. Casuso                    78

 1    reveal a plan for a terrorist organization and ask to

 2    support him on this plan to proceed -- to speed the

 3    proceeding of taking down the Sears Tower or his plan.

 4           And in the final, he took alliance -- he ask

 5    for alliance with Al-Qaeda.

 6           So we arrive on January -- on March 10 with

 7    getting no money.  He didn't receive any penny.  And

 8    you know what?  He asked for alliance with Al-Qaeda

 9    with no money received from Al-Qaeda to him.

10    BY MR. CASUSO:

11    Q.    Sir, did you ever go to this man's house,

12    Mr. Batiste?

13    A.    No, sir.

14    Q.    Did he look like a rich man to you?

15    A.    I don't know that, sir.

16    Q.    Sir, did he look like he had the wherewithal to

17    finance anything?

18    A.    Well, that the reason he asked from Al-Qaeda,

19    sir, the financing.

20    Q.    Sir, what is that?  He asked for Al-Qaeda.

21    Right?

22    A.    He asked support from Al-Qaeda.  Yes, sir.

23    Q.    The truth is that you were able to observe, sir,

24    that this is a very poor man.  He's struggling.

25           Were you able to see that?

A.    All -- no, sir.  I didn't see that.  I don't

know.

Q.    You didn't see it because you didn't want to see

it.  Right?  Because you wanted to keep that gravy

train coming.  Right?

          MS. ARANGO:  Objection.  Argumentative.

          THE COURT:  Sustained.

BY MR. CASUSO:

Q.    And this is when you and the FBI cooked up this

phony oath thing here, right, to incriminate him?

Right?

          MS. ARANGO:  Objection.  Argumentative.

BY MR. CASUSO:

Q.    That's why you did that?

          THE COURT:  Sustained.

BY MR. CASUSO:

Q.    There was nothing going on here, which is

precisely -- when you first met him, you said, "I want

some action.  I don't want any more talk," blah, blah,

blah, "I'm tired of hearing that"?

          MS. ARANGO:  Objection, Judge.  This is not --

this is not closing arguments.

          THE COURT:  Sustained.

          You have -- ask a question, Mr. Casuso.

```
 1   BY MR. CASUSO:

 2   Q.    When all is said and done, sir, after this oath,

 3   after this oath, this is when you go and you ask him to

 4   take pictures of buildings.  Right?

 5   A.    Is a question, sir?

 6   Q.    Yes, sir.

 7         After this oath on the 16th -- on March 16th,

 8   this is when you asked Mr. Batiste to help you, please,

 9   on this plan that the FBI cooked up to destroy

10   buildings from the FBI.  Right?

11   A.    Yes, sir.

12   Q.    And that came directly from the FBI.  Right?

13   Narseal Batiste or nobody else here said, "We want to

14   bring down any FBI buildings."  Right?

15   A.    No, sir.

16   Q.    And, sir, also, regarding the oath, sir, if it

17   hadn't been for you -- you pushing this thing, nobody

18   here would have taken any oath to Al-Qaeda.  You

19   started it.

20         MS. ARANGO:  Objection, Judge.  Argumentative.

21         THE COURT:  Sustained.

22   BY MR. CASUSO:

23   Q.    And regarding the FBI building, that was cooked

24   up by the FBI, wasn't it, sir?

25         MS. ARANGO:  Same objection, Judge.
```

```
 1              THE COURT:  Sustained.

 2   BY MR. CASUSO:

 3   Q.    And didn't you beg Mr. Batiste to please help you

 4   and didn't you almost cry in his presence for him to

 5   help you until he finally said, "Okay, Occ"?  Remember

 6   that?

 7              MS. ARANGO:  Judge, again, please admonish

 8   counsel this is closing arguments.  This is not

 9   cross-examination.

10              THE COURT:  Sustained.

11   BY MR. CASUSO:

12   Q.    Sir, did anybody here or Mr. Batiste propose any

13   plan to you to blow up any FBI buildings, sir?

14              MS. ARANGO:  Objection.  Asked and answered.

15              THE COURT:  Sustained.

16   BY MR. CASUSO:

17   Q.    And isn't it a fact, sir, that you supplied the

18   camera from the FBI?  You did it.  Right?

19   A.    Is this question?

20   Q.    Yes, sir.  It's a question.

21         Isn't it a fact he -- listen to it again.

22         Isn't it a fact that you provided the camera,

23   sir, from the FBI?

24              MS. ARANGO:  Objection.  Improper form, Judge,

25   and argumentative.
```

1          THE COURT:  Sustained.

2          Rephrase your question.

3   BY MR. CASUSO:

4   Q.    Who came up with the idea, sir, about blowing

5   buildings from the FBI?

6   A.    Who come up with the idea?

7   Q.    Yes.

8   A.    The FBI told me to tell Brother Naz and his group

9   about Al-Qaeda plan to destroy these five federal

10  buildings.  So for Brother Naz and his group, they know

11  Al-Qaeda want to attack these five buildings.

12  Q.    It wasn't their idea.  Right?

13  A.    Al-Qaeda idea for them.

14  Q.    Not Al-Qaeda.

15        Al-Qaeda has nothing to do with this.  This is

16  the FBI.  Right?  Law enforcement?

17          MS. ARANGO:  Objection.  Argumentative.

18          THE COURT:  Sustained.

19          Rephrase your question.

20  BY MR. CASUSO:

21  Q.    And the reason -- and wasn't there -- wasn't

22  there -- didn't you keep dangling the promise of money,

23  sir, to Mr. Batiste?

24  A.    Like I said, sir, before, if you can look in all

25  the meetings recorded, never, never promise.  Always

Assaad - CROSS - By Mr. Casuso                    83

 1    keep option for both sides, for the FBI and for Brother

 2    Naz, to -- for the FBI to do whatever they want to do

 3    and for Brother Naz to decide or he want to continue he

 4    doesn't want to continue.

 5         So it's like left options present, not promising

 6    any money.  Every time he asked me about the financial,

 7    "Let me see what I can do.  They are working on it."

 8    And everything is here, inside.

 9    Q.    And do you remember, sir, telling this man in

10    a conversation, "$250,000, $500,000, a million,

11    2 million, that's no problem to us"?

12         Remember telling him that?

13             MS. ARANGO:  Objection.  Cumulative.

14             THE COURT:  Sustained.

15    BY MR. CASUSO:

16    Q.    And at that point, after three months of this

17    same talk and nothing type of talk, the only thing left

18    to do is to try to trick him into violating the law.

19         Isn't that true, sir?

20             MS. ARANGO:  Objection.

21    BY MR. CASUSO:

22    Q.    To trick him?

23             MS. ARANGO:  Argumentative.

24             THE COURT:  Sustained.

25             MR. CASUSO:  That's all I have, Judge.

```
 1              THE COURT:  Mr. Levin.

 2              MR. LEVIN:  Good morning, ladies and

 3   gentlemen.

 4              THE JURY:  Good morning.

 5                        CROSS-EXAMINATION

 6   BY MR. LEVIN:

 7   Q.     Good morning, Mr. Assaad.

 8          How are you today?

 9   A.     Good morning, sir.  Thank you.

10   Q.     Now, you indicated that -- during Mr. Clark's

11   cross-examination that, when you came here from Mexico,

12   you were in a bad position, you needed to relax.

13          Do you remember that?

14   A.     Yes, sir.

15   Q.     The reason that you needed to relax is because

16   you had been in jail in Mexico; had you not, sir?

17   A.     Yes, sir.

18   Q.     You were being held by the Mexican Government on

19   immigration matters.  Correct, sir?

20   A.     On immigration.  Yes, sir.

21   Q.     And they were seeking to deport you; were they

22   not?

23   A.     Yes, sir.

24   Q.     And in 2005, we've heard testimony that you got a

25   significant benefit from the United States Government
```

```
 1   by way of a parol letter, which enabled you to come to
 2   the United States.
 3        Do you recall that?
 4   A.   Yes, sir.
 5   Q.   So, in essence, the United States Government was
 6   able to get you out of jail in Mexico through this
 7   significant parol benefit letter?
 8   A.   I don't know about that, sir, because you can see
 9   I came -- the Mexican Government gave me the visa.  Was
10   maybe misunderstanding, but I had the visa after -- in
11   2008 to go back to Mexico.
12        So I have it.  I don't know was misunderstanding
13   or problem.  They issue me visa, legal, from the
14   embassy, and I went back.
15   Q.   When you came here, you said you spent some time
16   on the Beach because you needed to relax.  Correct?
17   A.   Maybe I misexplain my -- I didn't explain myself
18   well.
19        Like -- I mean, coming from the flight, from
20   Mexico, sitting over here.  I don't know how you want
21   to define "relax."  You just take time off.  Just like
22   that.  I don't know.
23   Q.   How long had you been in the Mexican jail prior
24   to coming over here?
25   A.   Let me explain to you, sir, how long.  And --
```

```
 1            MR. LEVIN:  Your Honor, could I have the Court
 2   ask the witness to answer the question?  And then he's
 3   more than --
 4            THE COURT:  He is answering.
 5            MR. LEVIN:  -- welcome to explain.
 6            MS. ARANGO:  He's answering, Judge.  Yeah.
 7            MR. LEVIN:  Well, I asked him how long he had
 8   been in a Mexican jail.
 9            THE COURT:  And he's answering.
10            MR. LEVIN:  I didn't hear an answer.
11            THE COURT:  He's answering.
12            MR. LEVIN:  Okay.
13            THE COURT:  Give him a chance to answer.
14   BY MR. LEVIN:
15   Q.    Go ahead.  Sorry, sir.
16   A.    It was more or less around 20, 24 days.  But I
17   wasn't in jail-in jail.  I was sitting in kind of an
18   office and held not to go out.  But wasn't
19   jail-jail-jail.  Like, sitting in a kind of office over
20   there.
21   Q.    Was this an office that you were sitting in
22   24 hours a day, 7 days a week, over the 23 days that
23   you were in this office?
24   A.    It's kind of -- there is a bed.  I can go in.  I
25   can watch TV, popcorn, eat pizza, order pizza on the
```

```
 1   phone, come and go, translate, help them sitting over

 2   there.  It's not -- wasn't like lockdown or I was in

 3   position, wow, locked and sit inside.

 4   Q.     Were you able to go home to your wife and

 5   children?

 6   A.     No, sir.  But, like I said, I was in the place.

 7   There is a bed, an office, eating popcorn, ordering

 8   pizza on the phone, calling outside, coming -- people

 9   come and visit me.  So it's wasn't like I was in jail.

10   Q.     Now, you've been an informant for the FBI since

11   in or about 1997 or 1998.  Is that correct?

12   A.     More or less.  '96 and up.

13   Q.     And you've never actually earned any money

14   through any other means other than as an informant.

15   Isn't that true, sir?

16   A.     In the United States, yes, sir.  In the United

17   States, yes, sir.

18   Q.     In the United States.  Okay.

19          And there was also testimony about you applying

20   for political asylum in 2001 and being granted

21   political asylum in 2006.

22          Was that your testimony?

23   A.     Yes, sir.

24   Q.     Now, you're here today from Mexico.  Correct,

25   sir?
```

Assaad - CROSS - By Mr. Levin                    88

```
 1    A.      I came from Mexico.  Yes, sir.

 2    Q.      And you came pursuant, again, to a significant

 3    public benefit parol letter; did you not?

 4    A.      Yes, sir.

 5    Q.      Even though you have been granted political

 6    asylum?

 7    A.      Yes, sir.

 8    Q.      Doesn't the fact that you have political asylum

 9    allow you to come to the United States without this

10    significant public benefit parol letter?  Do you know

11    that?

12    A.      Sir, you have to ask the FBI or the Immigration.

13    I don't know that.

14    Q.      No problem.

15            You have no understanding with regard to the

16    immigration aspect?

17    A.      No, sir.  They gave me -- before I left, they

18    gave me a document -- travel documents, immigration --

19    or when I apply through my attorney, I apply for travel

20    permission outside the United States.

21            So they issue for me a travel document.  It's

22    like a passport, where I can travel where I want, which

23    country, stamping visa on my passport.

24            So I use it to go to Mexico after they gave me

25    the visa to Mexico, and I come back to the United
```

```
 1   States through this travel documents.

 2   Q.    Okay.  And you had previously worked as an

 3   informant in Chicago; did you not?

 4   A.    Yes, sir.

 5   Q.    And that was in the year 2000.  Is that correct?

 6   A.    I was in Chicago, sir, from '96, I believe, to

 7   2000.  Yes, sir.

 8   Q.    Were you working all during that time as an

 9   informant in Chicago, from '96 to 2000?

10   A.    I was in Chicago and I was working outside,

11   international and national, for Chicago.

12   Q.    Chicago FBI?

13   A.    Chicago FBI.  Yes, sir.

14   Q.    And then you ultimately left Chicago and went to

15   Lebanon.  Is that correct?

16   A.    Yes, sir.

17   Q.    And you came back to the United States in 2001?

18   A.    In the end of 2000.

19   Q.    The end of 2000?

20   A.    December 2nd, 2000.

21   Q.    Now, were you able to travel back from Lebanon to

22   the United States at the end of 2000?

23   A.    Because I had my visa valid until 2002, from 2000

24   to 2002.

25   Q.    Now, you have testified today that, while working
```

Assaad - CROSS - By Mr. Levin                    90

```
 1   with the FBI, you've never had any kind of a

 2   compensation agreement.

 3           Do you recall that testimony?

 4   A.    Can you rephrase your question, sir.

 5   Q.    Yes.

 6           I believe you testified today that, in all your

 7   years of working with the FBI, you've never had any

 8   kind of a compensation or payment agreement with them.

 9           Was that your testimony?

10   A.    Yes, sir.

11   Q.    Okay.  Now, I'd like to show you a document which

12   I will -- has been marked -- I think, Ms. Jhones might

13   have presented it or another counsel --

14           THE COURT:  What is it marked as?

15           MS. ARANGO:  Defendant's Exhibit 2.

16           MR. LEVIN:  It'll be -- we'll make it

17   Abraham's Exhibit 4.

18           And, your Honor, I do need to get you an

19   exhibit list.

20           THE COURT:  I'm sorry?

21           MR. LEVIN:  I do need to get you an exhibit

22   list.

23           THE COURT:  I know.

24           MS. ARANGO:  So it's Abraham's Exhibit No. 4?

25           MR. LEVIN:  Yes.
```

1              And I'll make the appropriate markings.

2              THE COURT:  No. 4?

3              MR. LEVIN:  Yes, your Honor.

4              MS. ARANGO:  Here you go.

5              MR. LEVIN:  If I may approach the witness,

6    your Honor.

7              THE COURT:  Yes.

8    BY MR. LEVIN:

9    Q.    Mr. Assaad, let me show you what I've marked as

10   Abraham's Exhibit 4.  I'll ask you to look at this

11   document, specifically the next page.

12          Tell me what that document is and if that's your

13   signature on that document.

14   A.     Service agreement.

15   Q.     Right.

16          That's an agreement that you had with the United

17   States Government with regard to working as an

18   informant, which specifies your compensation; is it

19   not, sir?

20   A.     Yes, sir.

21          But what I said before, sir, what I meant --

22   maybe I didn't explain myself well -- I never

23   discuss -- that's what I said.  I will try to explain

24   it again.

25          I never discuss with the FBI or with US

1   Government before, prior to any case:  I need this

2   amount of money.  I need 1,000 or 5,000 or 10,000 or

3   100.  I never put condition or I never discuss with

4   them this matter.

5          When the time of payment come, whatever they give

6   me, they give me.  I never argue with them or, "Hey,

7   it's not what we agree about.  It's not the amount we

8   agree about."

9          Whatever I get paid, I get paid.  That's it.

10  Q.     But my question to you, sir, was whether or not

11  you had testified previously if you had ever had any

12  kind of a service agreement.

13         And you said "No."

14         Isn't that correct?

15         When in truth and in fact, Abraham's Exhibit 4 is

16  just that, a service agreement with the United States

17  Government; is it not, sir?

18  A.     Maybe I misunderstand the question, sir.

19         But what I'm saying, this is what I said before.

20  I don't know if they -- they -- I explained myself

21  well.

22         What happened is I never -- I understood the

23  question as I never have a contract prior to any case.

24  I never sit and talk about the amount of the money

25  we're going to get paid or receive prior to any case

1    for the 13 years of service.

2         And this is what you are showing me, sir, like

3    this one right now, is -- I got signed.  I looked at

4    it.  I got signed.

5         And I gave it to them, not before, I believe --

6    if you can see the date, it's 04-26-2006, the date on

7    this document.  And I start this case on December 16,

8    2005.  So at least there is five months different from

9    starting the case and signing this document, sir.

10   Q.    Maybe it was a misunderstanding with regard to

11   the language.

12        But your testimony was, on cross-examination by

13   Mr. Clark, that in 13 years, you never discussed how

14   much you would get.

15        Do you recall that testimony?

16        MS. ARANGO:  Objection, Judge.  Asked and

17   answered.

18        THE COURT:  Sustained.

19   BY MR. LEVIN:

20   Q.    Regardless of the fact that that agreement was

21   signed after or more or less towards the end of your

22   involvement with regard to this case, you, nonetheless,

23   would you agree with me, sir, had an agreement with

24   regard to compensation?

25   A.    It's not having an agreement, sir.  It's

1  signing -- signing a document after.  But I don't

2  know -- I don't -- maybe I'm not understanding what you

3  mean by that.  But I'm trying to explain myself how

4  much I can the -- explain the -- what that.

5  Q.     Is this a language issue for you, sir, in terms

6  of your understanding of English?

7           MS. ARANGO:  Objection, Judge.  Improper form.

8           THE COURT:  Sustained.

9  BY MR. LEVIN:

10 Q.     Well, do you have an -- is there anything about

11 the way I'm asking my question or about that document

12 that you do not understand because it's English?

13          MS. ARANGO:  Same objection, Judge.

14          THE COURT:  Sustained.

15 BY MR. LEVIN:

16 Q.     Now, you have met with the FBI, obviously, on

17 numerous occasions.  Correct?

18 A.     Yes, sir.

19 Q.     And with regard to your testimony in this case,

20 you've actually practiced your testimony; have you not?

21 Practiced.

22 A.     Practiced?

23 Q.     You've rehearsed your testimony before trial?

24 A.     Before the trial.  Yes, sir.

25 Q.     Right.

```
 1            And, in fact, you probably had a session where

 2    Ms. Arango was asking you questions and you would

 3    answer those questions.  Right?

 4    A.     Yes, sir.

 5    Q.     And did that happen in, like, a courtroom?

 6    A.     In a courtroom?

 7    Q.     Yes.

 8    A.     Now?

 9    Q.     No.  When you were practicing for your testimony.

10    A.     No, sir.

11    Q.     Were you instructed that it was important that

12    you look at the jury when you answer your questions?

13    A.     They instruct -- they told me, "You have to be

14    polite.  You have to relax and look at the jury and be

15    relaxed, be polite."

16    Q.     But you were restricted to look at the jury when

17    you answered your questions as opposed to the person

18    that you were speaking with.  Correct?

19    A.     Yes, sir.

20    Q.     You like when people look at you when they speak

21    to you, right, like when you said to Mr. Abraham, "Look

22    at me" --

23            MS. ARANGO:  Relevance.

24    BY MR. LEVIN:

25    Q.     -- "Look at me"?
```

Assaad - CROSS - By Mr. Levin                        96

```
 1              MS. ARANGO:  Relevance.

 2              THE COURT:  Sustained.  Sustained.

 3              Rephrase your question.

 4    BY MR. LEVIN:

 5    Q.    Now, there's been some testimony that you have

 6    gone by the name of Elie Assaad Montana.

 7    A.    Yes, sir.

 8    Q.    Okay.  And the way you got the name "Montana" was

 9    because of the movie Scarface.

10          Isn't that true, sir?

11    A.    Yes, sir.

12    Q.    You like the movie Scarface.  Correct?

13    A.    Is -- yes, sir.

14    Q.    You're familiar with the character named "Tony

15    Montana" in that movie.  Correct?

16    A.    Yes.

17    Q.    So you adopted the name "Montana" because you

18    were concerned that the Lebanon or Syrian Government

19    might locate you here in South -- anywhere in the

20    world, for that matter.  Correct?

21    A.    Yes, sir.  But I was walking in South Beach.  And

22    at that time, was a lot of pictures of -- in any kind

23    store of Tony Montana and the movie and the Scarface

24    and everything.

25          And I said it's a good last name to -- you know,
```

1   just fresh to here and to bond in or to hide or to use

2   something, like Spanish.

3         I thought it's a very famous last name and -- you

4   know, to -- you know, to hide, to keep away from, you

5   know, Arabic society.

6   Q.    So you adopted the name Elie Assaad Montana so

7   as --

8   A.    Hoping.

9   Q.    Let me finish.

10        -- to protect yourself from being detected.

11        Is that your testimony, essentially?

12  A.    Yeah.  Hoping I can hide myself.

13  Q.    Okay.  Yet, your driver's license was in the name

14  of Elie Assaad, your true name.  Correct?

15  A.    Yes, sir.

16  Q.    And that's a driver's license that was given to

17  you by the State of Florida.  Correct?

18  A.    Yes, sir.

19  Q.    So it's your testimony that you took the name --

20  Well, strike that.

21        And at or about that time, there was some

22  testimony that you indicated that you were planning on

23  writing a book.  Correct?

24  A.    At that time, yes, sir.  At that time.

25  Q.    And that would have been back in 2003?

Assaad - CROSS - By Mr. Levin                    98

```
 1   A.      Yes, sir.

 2   Q.      And --

 3   A.      2002, 2003, more or less.

 4   Q.      You took the name "Montana" before that.

 5   Correct?

 6   A.      Yes, sir.

 7   Q.      So it's your testimony to the jury that you want

 8   to kind of remain kind of low key or low profile.

 9           Would you agree with that?

10   A.      Yes, sir.

11   Q.      Yet, at the same time, you're planning on writing

12   a book?

13   A.      Yes, sir.  But -- and this is very important.

14   You have -- I had a driver's license.  Yes, sir.  But I

15   moved from one place to another place.  I never stayed

16   in one place more than one month or two months.

17           The driver's license I had has different address

18   where I used to live.  Every two months, I am change my

19   place where I live, try to hide.

20           Second, the book I was trying to publish -- it

21   wasn't under my name.  And I spoke with my attorney and

22   my attorney told me we are looking for --

23           MS. JHONES:  Objection.  Hearsay, what the

24   attorney told him.  Objection.

25           MS. ARANGO:  Judge, he's -- this
```

```
 1   question was --
 2           MR. LEVIN:  Judge, could we have a side-bar if
 3   she wants to make a speaking objection or a speech?
 4           THE COURT:  I'm going to overrule the
 5   objection.
 6           Go ahead.  You can finish.
 7           THE WITNESS:  So it's like we had a
 8   ghostwriter.  It wasn't a book under my name or
 9   under -- my name was a ghostwriter, somebody else
10   writing the book.
11           So in all -- in both cases, in both my
12   driver's license -- I never left that address on my
13   driver's license because I was moving for my safety at
14   that time from one place to another place.
15           And, actually, until now, I'm moving from one
16   place to another place.  And the book is -- was a
17   ghostwriter under different name at that time.
18   BY MR. LEVIN:
19   Q.    And the story, according to your testimony, was
20   going to be concerning your being tortured in Syria and
21   Lebanon.  Correct?
22   A.    It's about my life -- previous life, about my
23   life, my job, what happened to me, what's going on
24   and -- something previously.
25   Q.    So if the book had been published under the name
```

1  of Joseph Cohen, it's your testimony that somebody that

2  had read the book wouldn't realize that it was about

3  you, sir, Elie Assaad?

4  A.    No, sir.  Because the Syrian and Lebanese people

5  torture -- Lebanese Government torture a lot of people.

6  So it would be difficult to find out who -- from who.

7  Q.    The book was only going to -- the book was only

8  going to be about that part of your life, your being

9  tortured by the Syrian and Lebanese Government?

10 A.    Sir, it's not about only the torture, because a

11 lot of people got torture over there.  It's about my

12 life.  It's like different names, different locations.

13      Instead of saying, for example, specific address,

14 it's different address.  It's -- instead of saying I

15 travel to Russia, I say I travel to Africa.

16 Q.    So it was --

17 A.    I travel to -- all over Europe.

18      So it's like not to be specific details about my

19 address, my mother name, my father name, my name, where

20 I live, who my friend is.  So something different.

21 Q.    And it's your testimony that -- well, let me ask

22 you this:  Did you have a contractual arrangement with

23 an attorney with regard to the writing of this book?

24 A.    Excuse me?  Construction?

25 Q.    Did you have --

Assaad - CROSS - By Mr. Levin                    101

```
 1              MS. ARANGO:  Objection.  Relevance.

 2              THE COURT:  Sustained.

 3   BY MR. LEVIN:

 4   Q.    Well, were you planning on writing the book

 5   because you just wanted the world to know your story or

 6   did you want to make money?

 7   A.    Maybe both.

 8   Q.    Now, you indicated that the book was only going

 9   to be about what you've testified about.

10         But isn't it true, sir, that the book was also

11   going to include your life as an informant for the

12   United States Government?

13   A.    I have two choices on that.  No.  No, sir.

14   Because I have two choices.  If I want to continue my

15   job, I'm not allowed to publish any book.

16         If I want to publish something about involving me

17   with United States Government, being informant, being

18   not informant, then my job will be finished at that

19   time and cannot continue.

20         But I was allowed to speak about my life outside

21   the US Government section, in Syria, in Lebanon, in

22   Russia, in -- where I was.  That's fine.  But not

23   something connected with the US Government.

24   Q.    When do you anticipate doing this book?

25   A.    It was in -- actually, I had the idea when I came
```

 1   back from Lebanon on 2000, 2001.  I spoke with my wife

 2   at that time, and she said, "Why you don't write

 3   something -- a book about what happened?"

 4        So I contact an attorney and I ask him what's the

 5   procedure -- what the procedures are.  But we -- as I

 6   said....

 7   Q.   When do you plan on writing the book?

 8   A.   When I was?

 9   Q.   When do you now plan on -- do you still plan on

10   writing the book?

11   A.   No, sir.  Not now.

12   Q.   Now, do you recall testifying in a prior

13   proceeding in connection with this case on October

14   the 25th of 2007 and testifying at Lines 5 through 8 on

15   Page 42, "Question:  Now, when do you anticipate

16   publishing your book?  When this case is over?

17        "Answer:  When I finish working with the

18   Government, sir.  Ten years -- five years, ten years

19   from now"?

20        Do you recall that answer?

21   A.   Yes, sir.  Maybe I don't -- I don't recall

22   exactly the years.  But I don't know.  Maybe yes.  If

23   you have it in the front of you, that's mean I said

24   that.

25   Q.   If I have it in front of me -- pardon?

1    A.    If you have it in front of you and you are

2    reading from something official, that's mean I said it.

3    Q.    Does not mean you said it?

4    A.    No.  It's mean I said it.

5    Q.    So would it be your testimony, sir, that you

6    anticipate to publish a book when this case is over and

7    when you've finished working for the Government,

8    whether it be in five or ten years from it now?

9    A.    Like I said, sir, you ask me if I want to write a

10   book now.  I said right now I don't want to write a

11   book.  Right now -- I'm not planning to write a book

12   right now.  Maybe -- like we said, maybe ten -- five,

13   ten, 20 years, 50 years from now.  I don't know what

14   will happen.

15   Q.    And --

16   A.    Maybe --

17   Q.    Sorry.

18   A.    Maybe I don't -- you know, I don't know what will

19   happen tomorrow, even.  So....

20   Q.    But the reality is that, if you do have an

21   opportunity to write a book, you're going to write a

22   book.

23         Isn't that true, Mr. Assaad?

24   A.    Right now?  No, sir.

25   Q.    Are you still working as an informant with the

```
 1    United States Government?

 2    A.    With -- not with the FBI, sir.  No.  Not FBI.

 3    Q.    With any other law enforcement agency affiliated

 4    with the United States Government?

 5            MS. ARANGO:  Objection.  Relevance.

 6            THE COURT:  Sustained.

 7    BY MR. LEVIN:

 8    Q.    Are you active as an informant, meaning are you

 9    still available to be an informant with the United

10    States Government?

11            MS. ARANGO:  Objection.  Relevance.

12            MR. LEVIN:  Your Honor --

13            THE COURT:  Sustained.

14            MR. LEVIN:  It's the Davis versus Alaska line

15    of questioning.

16            THE COURT:  Sustained.

17    BY MR. LEVIN:

18    Q.    Well, let me ask you this, sir:  You're living in

19    Mexico now.  Correct?

20    A.    Yes, sir.

21    Q.    And you're residing there legally now.  Correct?

22    A.    Yes, sir.

23    Q.    When -- in 2005, you were not residing there

24    legally, which is why you were in the office

25    confinement.  Correct, sir?
```

1   A.    Sir, my wife Mexican.  And -- my wife is Mexican.

2   At that time, we didn't file the paper that -- when I

3   was married since 2001, in Mexican nationality.  So the

4   Immigration had mis -- problem, confusing.

5         And during when I came from Mexico to United

6   States, my -- they -- my wife apply for the

7   Government -- for Mexican Government and said I have

8   right to be in Mexico.  I have my kids who were born

9   here in -- American and Mexican.

10        And was misunderstanding in the paper --

11  immigration paper.  And they fix it and they gave me my

12  visa to go back to Mexico.

13  Q.    So it was just a big misunderstanding between you

14  and the Mexican Government.  Is that your testimony?

15        MS. ARANGO:  Objection.

16        THE COURT:  Sustained.

17  BY MR. LEVIN:

18  Q.    Well, what are you doing for income these days,

19  sir?

20  A.    Work from Mexico.

21        THE COURT REPORTER:  From Mexico?

22        THE WITNESS:  Mexico.  Working from Mexico.

23  BY MR. LEVIN:

24  Q.    You're working from Mexico?

25  A.    I mean, I'm working in Mexico.

Assaad - CROSS - By Mr. Levin                    106

```
1   Q.      Working in Mexico?

2   A.      Yes, sir.

3   Q.      Can I ask you what type of work you're doing in

4   Mexico?

5   A.      Different incomes.

6           We have a kind of ranch, alfalfa.  I don't know

7   if you -- I don't know what's mean in English.  We have

8   alfalfa over there for my family -- my side of -- my

9   wife side.

10          We are selling tacos.  We have cars in different

11  construction area, where there is people over there.

12  We are selling burritos and tacos and something like

13  this.

14          So different incomes.

15  Q.      And, primarily, it's your wife's family's

16  business.  Is that what your testimony is?

17  A.      No.  This type of ranch, this type of business,

18  like the -- there is -- I don't know "nuez en ingles"

19  mean.  Maybe -- I don't know if -- there is different

20  type of ranch, different type --

21  Q.      Are you saying "ranch"?

22  A.      "Ranch."  "Ranch."

23  Q.      "Ranch."

24  A.      Like --

25  Q.      Like the wild west, a ranch?
```

```
 1   A.      No.  It's not --

 2   Q.      I didn't mean to say that.

 3           I mean a ranch.

 4   A.      Yes.  It's like --

 5   Q.      R-a-n-c-h, ranch?

 6   A.      Yes.  So it's --

 7   Q.      Different type of ranch?

 8   A.      Different type of business.

 9           There is alfalfa, like herbs.  They sell it to

10   feed animals, like cows, like horses.

11           The other one is -- I told you the cars, tacos

12   and burritos in construction area.  We sell food.

13           So it's different -- different kind.  You know,

14   whatever I can get on something, I do it.

15   Q.      What exactly do you do, Mr. Assaad, with regard

16   to these businesses?

17           MS. ARANGO:  Objection.

18   BY MR. LEVIN:

19   Q.      What is your job description?

20           MS. ARANGO:  Objection.  Relevance.

21           THE COURT:  Sustained.

22   BY MR. LEVIN:

23   Q.      When you were working, for example, in connection

24   with this case, you've received money that you've

25   termed "expenses."
```

```
 1          Do you recall that?

 2   A.     I received money?

 3   Q.     In this case, you call them "expenses" as opposed

 4   to, like, "salary," for example.  Right?  You were

 5   reimbursed for your expenses.

 6          Do you remember that testimony?

 7              MS. ARANGO:  Objection.  Cumulative.

 8              MR. LEVIN:  Judge, I'm trying to --

 9              THE COURT:  Sustained.

10   BY MR. LEVIN:

11   Q.     Well, did you ever -- were you supporting your

12   wife and children at that time with these -- with this

13   expense money?

14   A.     No, sir.

15   Q.     They were being supported through their own means

16   at that time?

17   A.     Yes, sir.  Because, like I said, they have -- she

18   has -- receiving part from the ranch, from the business

19   family, and....

20   Q.     When you say "business family," you really mean

21   to say "family business."  Right?

22   A.     For her parents, from her brother and her father

23   and all.

24   Q.     Right.

25          Your wife's?
```

Assaad - CROSS - By Mr. Levin                     109

```
 1   A.     My wife part.

 2   Q.     It's your wife's family's business?

 3   A.     Yes, sir.

 4   Q.     Now, with regard to not staying in the same place

 5   for more than three or four months -- that's what you

 6   testified.  Right?

 7   A.     When I was in the United States.  Right.

 8   Q.     When you're in the United States.

 9          You came here in the latter part of November and

10   they put you up in a hotel.  Is that correct?

11   A.     Yes, sir.

12   Q.     And then they got you an apartment on 23rd and

13   Collins Avenue.  Isn't that correct?

14   A.     Yes, sir.

15   Q.     And that apartment is on the ocean.  Correct?

16   A.     Yes, sir.

17   Q.     And is that the beach you were spending time at

18   prior to the meeting on December the 16th?

19   A.     No, sir.

20   Q.     Were you in that apartment on December the 16th?

21   A.     No, sir.

22   Q.     When did you move into that apartment?

23   A.     I don't know, sir.  I don't remember the date.

24   But was -- wasn't in December 16.  It wasn't in

25   January.  Maybe -- maybe it was in January, 2006.
```

```
 1    Maybe.  Maybe I'm wrong.  Maybe I -- I don't know.  But
 2    maybe in January 26.
 3    Q.     When did you move out of that apartment?
 4    A.     I don't remember, sir.
 5    Q.     Were you there for seven months?
 6    A.     I was moving apartments -- from one apartment to
 7    another apartment.  So I don't know -- I wasn't staying
 8    in same apartment.
 9           I was moving the side of the apartment, maybe one
10    from seven floor, eight floor, ten floor.  So I wasn't
11    all the time in one apartment.
12    Q.     But you were in the same building?  Is what
13    you're testifying about?
14    A.     Yes, sir.
15    Q.     So they put you in one apartment on the seventh
16    floor, then they moved you to the eighth floor, then
17    they moved you to the tenth floor, all in the same
18    building, is what you're saying?
19    A.     Yes, sir.
20    Q.     You don't remember when you moved in and you
21    don't remember when you moved out?
22    A.     Like I said, sir, I -- maybe I'm -- maybe I moved
23    on January, 2006.  But I don't know the date or the
24    time exactly.  But....
25    Q.     When you got paid, you were paid in cash.
```

Assaad - CROSS - By Mr. Levin                    111

1    Correct?

2    A.    Yes, sir.

3    Q.    And how many agents were present when you were

4    paid?

5    A.    Two agents.

6    Q.    Two agents?

7    A.    Yes, sir.

8    Q.    Was there paperwork that was exchanged when you

9    got paid?

10   A.    Excuse me?

11   Q.    Was there any paperwork, any documents, that were

12   exchanged when you got paid?

13   A.    Yes, sir.  They have to sign it, both agent, to

14   confirm I received this amount of money.

15   Q.    Now, when you were going to the Beach in

16   December, you were staying in a hotel that was where?

17   A.    The hotel I was staying -- in South Beach.

18   Q.    The hotel was on South Beach?

19   A.    Yes, sir.

20   Q.    Do you remember the name of the hotel?

21            MS. ARANGO:  Objection.  Relevance.

22            THE COURT:  Sustained.

23   BY MR. LEVIN:

24   Q.    Didn't you testify previously that the hotel you

25   were staying at was in North Miami?

```
 1   A.    Yes, sir.  I stayed in North Miami.  Yes, sir.
 2   And I moved to South Beach -- to the hotel in South
 3   Beach.
 4         So I was -- when I arrived, they asked me -- I
 5   believe they asked me before.  When I arrive from
 6   Mexico, they put me in the hotel in North Miami.  And
 7   after, I moved to hotel in South Beach.
 8   Q.    Now, sir, directing your attention to the meeting
 9   on January the 28th, the one that's been referred to as
10   "the Keys meeting" or "the trip to the Keys meeting" --
11   A.    Yes, sir.
12   Q.    Are you with me?
13   A.    Yes, sir.
14   Q.    Okay.
15         MR. LEVIN:  Referring, if the Court wouldn't
16   mind, the jury to Volume II of III, Exhibit 55-A.
17         THE COURT:  What page?
18         MR. LEVIN:  19.
19   BY MR. LEVIN:
20   Q.    Do you have that exhibit, Mr. Assaad?
21   A.    55?
22   Q.    Yes, sir.
23   A.    Yes, sir.  I have it.  Page?
24   Q.    19.
25   A.    I don't know if I have it.
```

1    Q.    Do you have it, Mr. Assaad?

2    A.    I don't know if I --

3    Q.    It's Volume II of III.  It would say it on the

4    cover.

5    A.    No.  I don't have it, sir.

6              MR. LEVIN:  Permission to present?

7              THE COURT:  Yes.

8    BY MR. LEVIN:

9    Q.    (Tenders document to the witness.)

10   A.    Thank you.

11         Yes, sir.

12   Q.    We're at Page 19.  Are you with me?

13   A.    Yes, sir.

14   Q.    Now, this is the first time you meet Mr. Abraham,

15   correct, on January 28th?

16   A.    Maybe I met him on January 22.  I don't know.  On

17   December 22nd, maybe.

18   Q.    That was a meeting that you said you had at the

19   warehouse?

20   A.    At the Embassy.

21   Q.    Excuse me.  At the Embassy.

22   A.    Yes, sir.

23   Q.    But you don't know if he was there or not there?

24   A.    No, sir.

25   Q.    Okay.  But on the 28th of January, you have

```
 1   contact with him.  Correct?

 2   A.    Yes, sir.

 3   Q.    And at Page 19 of Government's Exhibit 55-A,

 4   they've asked you to change your clothes.  Correct?

 5   "They," referring to Brother Pat and Naudimar Herrera,

 6   have asked you to change your clothes?

 7   A.    Yes, sir.

 8   Q.    And you say in the middle of Page 19, "Whatever.

 9   I accept.  But I have to communicate with my brother.

10   You know who I am?  Do you know who I am?"

11         And Mr. Abraham says, "You a Saudi, aren't you?"

12         You know what he meant by that; do you not, sir?

13   A.    Yes, sir.

14   Q.    He was asking you whether or not you were a

15   Saudi Arabian.  Correct?

16   A.    Yes, sir.

17   Q.    From Saudi Arabia?

18   A.    Yes, sir.

19   Q.    He didn't know who you were.

20         Would you agree with that?

21   A.    No, sir.  I don't agree.

22   Q.    You don't agree?

23   A.    No.  Because when they request for help from

24   terrorist organization, and well-known everywhere, most

25   everybody, they know, when you are Saudi, who is more
```

1    involved in terrorist attack --

2         MR. LEVIN:  Judge, I'm going to object to this

3    answer.  It's a narrative and it's speculative.

4         MS. ARANGO:  Judge, he asked him --

5         MR. LEVIN:  He's giving an opinion.

6         MS. ARANGO:  "He didn't know who you were.

7    Would you agree with that?"

8         And then he says, "No, sir."

9         And then he went on to explain.

10        THE COURT:  Ask your next question.

11        MR. LEVIN:  Yes, your Honor.

12   BY MR. LEVIN:

13   Q.    After he asks you, "You a Saudi, aren't you?",

14   you reply, "No.  I am a brother and I am -- (cell phone

15   ringing in background) -- you know with who I work?

16   You have a clue of who I work or not yet?"

17        Do you see that, sir?

18   A.    Yes, sir.

19   Q.    And he answers, "Huh?"

20        Do you see that?

21   A.    Yes, sir.

22   Q.    And at that point, you say, "I am a member of

23   Al-Qaeda."

24        And he says, "All I knew that the brother

25   (unintelligible)."

1          And you tell him that you have to communicate

2     back home.

3          Do you see that, sir?

4     A.    Yes, sir.

5     Q.    Okay.  And then you tell him to look at you.  Is

6     that correct?

7     A.    Yes, sir.

8     Q.    And the reason you're telling him to look at you

9     is because he has his back to you and you're poking him

10    in the back, telling him to look at you.  Isn't that

11    correct, sir?

12    A.    No, sir.  I was telling him -- he was in front of

13    me face to face.  And I told him to look at me.  "Look

14    at me," that "You know who I am, Al-Qaeda."

15         Maybe, you know -- it was a very difficult moment

16    and what's going on was nervous.  I don't know what

17    will happen.  So I was telling him to look at me.

18    Q.    So he apparently wasn't looking at you.  Would

19    you agree with that?  If you're telling him to, "Look

20    at me," he's not looking at you.  Would you agree with

21    that?

22    A.    It doesn't mean that, sir.  When you say -- when

23    you are talking with someone and I tell him, "Look at

24    me," that's mean, "Stare at me."  That's mean, "Give me

25    your attention."

```
 1          Doesn't mean he's speaking with someone else or

 2     he's looking somewhere else.  I meant "Give me your

 3     attention."

 4     Q.    Okay.  And so you change your clothes.  Correct?

 5     A.    Yes, sir.

 6     Q.    We're not referring to the exhibit right now.

 7     Now I'm just asking you --

 8     A.    Yes, sir.

 9     Q.    -- a question.

10          I may have you go back to it, but....

11     A.    Okay.

12     Q.    You change your clothes.  Correct?

13     A.    Yes, sir.

14     Q.    But you're able to keep your recorder?

15     A.    Yes, sir.

16     Q.    So nobody, like, patted you down after you

17     changed your clothes or nobody was really watching you

18     change your clothes.

19          Would you agree with that, sir?

20     A.    No one watched me change my clothes?

21     Q.    Correct.

22     A.    They did, sir.  They were in front of me.

23     Q.    So it's your testimony that they were standing

24     right in front of you watching you change your clothes

25     and you were able to maintain possession of a recorder
```

```
 1    which was in the clothes you changed out of.

 2          Is that what your testimony is?

 3    A.    Yes, sir.  Because I told them, "I need to keep

 4    my cell phones.  I need to keep my -- what I have in

 5    me -- on me to communicate with my brothers."

 6          So it's not -- nothing to hide it or to -- they

 7    saw it.  They saw it.  And they request it.  And I

 8    said, "I need to keep them with me to communicate with

 9    my brothers."

10          So --

11    Q.    You were talking about a cell phone.  Correct?

12    A.    I was talking about the devices I had on me, cell

13    phones.  You can call whatever you want to call it,

14    sir.  But I had more than one cell phone in my hand.

15    Q.    Well, the recorder doesn't look like a cell

16    phone, does it?

17          MS. ARANGO:  Objection.  Relevance.

18    BY MR. LEVIN:

19    Q.    Well, what does the recorder --

20          THE COURT:  Overruled.

21          MR. LEVIN:  Sorry.

22    BY MR. LEVIN:

23    Q.    What does the recorder look like?

24          MS. ARANGO:  Judge, objection.  Investigative

25    privilege as to what --
```

```
 1              THE COURT:  Come on up.

 2              (Whereupon, proceedings were had at side-bar

 3    outside the presence of the jury which have been sealed

 4    per instructions of the Court.)

 5              (Whereupon, the following proceedings were had

 6    in open court:)

 7              THE COURT:  We're going to break for lunch at

 8    this time.

 9              Do not discuss this case either amongst

10    yourselves or with anyone else.  Have no contact

11    whatsoever with anyone associated with the trial.  Do

12    not read, listen or see anything touching on this

13    matter in any way.

14              If anyone should try to talk to you about this

15    case, you should immediately instruct them to stop and

16    report it to my staff.

17              You may leave all your materials at your

18    chairs.  Please be back in the jury room at 1:45.

19    Enjoy your lunch.

20              (Whereupon, the jury exited the courtroom at

21    12:38 p.m. and the following proceedings were had:)

22              MS. ARANGO:  Oh --

23              THE COURT:  One moment.

24              You may step down.

25              (Witness excused.)
```

1          THE COURT:  You may be seated.

2          Yes.

3          MS. ARANGO:  Just on the housekeeping matter

4    that I was referring to earlier, after his testimony --

5    after Mr. Assaad's testimony is over, we are closing

6    him out.

7          If Ms. Jhones wants to keep him here, she can

8    make whatever arrangements she wants.  We will -- we

9    will hold on to -- you know, we won't have him, you

10   know, fly back to Mexico, if she wants to keep him here

11   and seek whatever from the budget to pay for his stay

12   here.

13         But our office is -- he's a witness for the

14   Government -- for the US Government.  They're paying

15   his lodging under our witness -- victim witness rules.

16   And it's our office's position that, once his testimony

17   is over, we stop paying for his expenses and he goes

18   back.

19         I mean, I have no problem with telling him, if

20   Ms. Jhones wants to keep him here, you know, not to go

21   back.  But I think, at that point, it would be up to

22   the defense to provide for his expenses.

23         MS. JHONES:  Your Honor, I have no problem

24   making application pursuant to CJA for this gentleman's

25   lodging expenses.

```
 1              THE COURT:  Okay.  So you still want him here,
 2   then?
 3              MS. JHONES:  Yes, your Honor.
 4              THE COURT:  Okay.
 5              MS. ARANGO:  Thank you, Judge.
 6              THE COURT:  So 1:30.  We're in recess until
 7   1:30 so we can take up this issue.
 8              (Thereupon, a luncheon recess was taken, after
 9   which the following proceedings were had:)
10              MS. ARANGO:  Judge, do you want the witness in
11   here now?
12              THE COURT:  No.  Not now.
13              You can wait outside, please, sir.
14              (Thereupon, the witness retired from the
15   courtroom and the following proceedings were had:)
16              We're back on United States of America versus
17   Narseal Batiste, et al., Case No. 06-20373.
18              Counsel, state your appearances, please, for
19   the record.
20              MS. ARANGO:  Jackie Arango on behalf of the
21   United States.
22              MS. JHONES:  Ana Maria Jhones on behalf of
23   Narseal Batiste, who's present.
24              MR. LEVIN:  Albert Levin on behalf of Patrick
25   Abraham, who's present.
```

 1              MR. CASUSO:  Lou Casuso on behalf of Burson

 2    Augustin, who's present.

 3              MR. CLARK:  Nathan Clark on behalf of

 4    Rotschild Augustine, who's present.

 5              MR. HOULIHAN:  Richard Houlihan with Naudimar

 6    Herrera.

 7              MR. VEREEN:  Roderick Vereen on behalf of

 8    Stanley Phanor, who's present.

 9              THE COURT:  All Defendants are present.

10              You may be seated.

11              Yes, Ms. Arango.  Did you want to be heard on

12    this privilege?

13              MS. ARANGO:  Yes.

14              And I will just say, your Honor, I -- PACER

15    was down.  I don't know if you all knew it.  So I could

16    not find a pleading that I may or may not have filed,

17    quite honestly.

18              THE COURT:  We couldn't find one.  We looked.

19              MS. ARANGO:  Okay.  What I did find, however,

20    in my files was a memorandum that I had prepared.  So I

21    obviously prepared a memorandum and then meant to file

22    it, but did not.

23              I am actually having the cases that I cited in

24    this memo copied, and they're going to be coming up in

25    just a couple minutes.  But I'm going to start making

1    my argument.

2          The Eleventh Circuit has recognized a

3    qualified Government privilege not to disclose

4    sensitive investigative techniques in the *United States*

5    *versus Van Horn*, 789 F.2d 1492, an Eleventh Circuit

6    1986 opinion, *en banc*.  The privilege applies to the

7    nature and location of electronic surveillance

8    equipment.

9          Quote:  "Disclosing the precise locations

10   where devices are hidden or their precise

11   specifications will educate criminals regarding how to

12   protect themselves against police surveillance.

13         "Electronic surveillance is an important tool

14   of law enforcement, and its effectiveness should not be

15   unnecessarily compromised.

16         "This privilege will yield if Defendants can

17   show a need for the information, i.e., that the

18   information sought is relevant, helpful to the defense

19   of an accused or essential to a fair determination of

20   the case.

21         "In *Van Horn*, the electronic surveillance at

22   issue involved covert audio recordings of the

23   Defendants.  The Defendants sought information

24   regarding the location of the microphones used to tape

25   conversations later used against them.

1          "The Defendants argued that they needed to

2     know where the audio recording devices were concealed

3     to help suggest that the location of the microphone

4     could have resulted in distortion of the voices on the

5     tapes, resulting in improper voice identifications.

6          "The Court concluded in an in-camera hearing

7     to review the Government's assertion of privilege and

8     Defendants' claim of necessity.

9          "The Eleventh Circuit held that the Defendant

10    did not demonstrate necessity.  The Court did not

11    require the Government to disclose how and where the

12    microphones were hidden because the Defendants had an

13    alternative way to challenge the voice identifications,

14    which were the tapes themselves."

15         Quote:  "The ultimate question of whether the

16    voice identifications of the appellants were correct

17    was given to the jury and the appellants were allowed

18    to explore and argue the possibility of

19    misidentification in front of the jury," close quote.

20         "It is important to note that the Eleventh

21    Circuit held that, quote, 'Where the Defendant has

22    access to the evidence such as the product of the

23    surveillance, i.e., the actual recordings as opposed to

24    the recording device, from which a jury can determine

25    the accuracy and validity of the surveillance equipment

1    and techniques, the Defendant has no need for the

2    information that outweighs the Government's interest in

3    keeping it secret," citing to *United States versus*

4    *Garvey* -- G-a-r-v-e-y -- 2004, Westlaw, 2663023 at

5    Page 2.  And it's a Middle District of Georgia case,

6    2004.  It cites to *Van Horn*.

7              Our case is similar.  Again, here, like the

8    Defendants in *Van Horn*, the Defendants have the tapes

9    themselves.

10             So the -- the way -- the way in which the

11   recording device was -- looked and was concealed in a

12   particular object, its specifications, its appearance,

13   is irrelevant.

14             They are free to argue that the search of the

15   informants, you know, could not have been very

16   intrusive or it was very lax because, you know, the

17   informants were free to keep those recording devices,

18   which they've argued, and they've also argued that the

19   informants were able to -- or at least this informant

20   was able to keep his cell phone.

21             So the point that the Defendant's trying to

22   make, which is that these informants were not subjected

23   to some kind of a rigorous search -- they can still

24   make that without necessarily having to identify how

25   the recording device was concealed, what it appeared to

 1    be, its specifications.

 2            Like I stated earlier, in the first trial in

 3    this case, this issue came up.  I did find the portion

 4    of that transcript.  That's being printed up right now.

 5            What your Honor allowed the defense to do was

 6    to ask the approximate size of it so that they could

 7    argue that it was a particular size and, nonetheless,

 8    the informants, you know, were -- the informant was

 9    able to keep the device on him.

10            THE COURT:  Do you have a page cite for me for

11    the *Van Horn* case?  I have it here.

12            MS. ARANGO:  I do not, Judge.  I have it at

13    492, but I don't have -- I'm sorry -- 1492, but I don't

14    have the specific --

15            THE COURT:  I just found it.  Thanks.

16            Yes.

17            MS. ARANGO:  The final point being, Judge, is

18    that the Government does have an -- a sensitive

19    investigative techniques privilege to disclose, you

20    know, sensitive investigative techniques so that the

21    public does not know and cannot -- and, you know, can

22    protect themselves against police surveillance.  That

23    exists.  It is a right that the Government has.

24            The question here is whether the Defendants'

25    rights outweigh that.  And in this situation where the

Assaad - CROSS - By Mr. Levin                    127

1    Defendants can make the arguments that they want to

2    make without having to reveal this specific type of

3    information means that that type of information should

4    not be disclosed.

5              THE COURT:  Yes.  Mr. Levin, did you want to

6    respond?

7              MR. LEVIN:  Judge, the way they -- your Honor,

8    the way they presented this episode, as I indicated at

9    side-bar, was to suggest that Mr. Abraham is just a

10   bad, angry man and he was intimidating this informant

11   in terms of changing his clothes, where he was -- the

12   point, obviously, is -- the point I'm trying to make,

13   which Ms. Arango has correctly stated, is that, you

14   know, it just wasn't what it seemed to be, that is,

15   that this man was able to keep this piece of equipment,

16   which I believe, based on the way they're presenting

17   it, I should be able to explore in terms of its size

18   and shape to show that, you know, Mr. Abraham really --

19   I mean, how could he -- for example, if it's a large

20   device, hypothetically speaking, how could Mr. Abraham

21   have missed that, if he's just standing right on top of

22   him and staring at him while he's changing his clothes?

23             I think the case they've cited, although it

24   talks about -- a little bit about this so-called

25   investigative privilege, really deals with other issues

1    pertaining to preservation of evidence and contesting

2    recordings and contents of recordings and things of

3    that nature.

4             I don't think it really pertains to this

5    situation, which they, in my view, have opened the door

6    to this type of a cross-examination by presenting this

7    in the manner in which they've presented it, i.e., that

8    these guys were intimidating and that they describe it

9    as a kidnapping.

10            So I believe that this is an area that this

11   Court should allow me to delve into.

12            MS. JHONES:  Your Honor, I do have a case that

13   I'd like the Court to look at.

14            THE COURT:  Okay.

15            MS. JHONES:  The case is *United States*

16   *Department of Homeland Security* -- *In re:  United*

17   *States Department of Homeland Security*.  It's at

18   459 F.3d 565.  It's a Fifth Circuit decision from 2006.

19            The interesting thing about -- well, there's

20   two very interesting things about this case.  And,

21   indeed, Ms. Arango is correct that the law does

22   recognize a law enforcement privilege.

23            What Ms. Arango does not recognize is that the

24   law enforcement privilege is bound, so says this case,

25   by relevance and time constraints.  Moreover, the

Assaad - CROSS - By Mr. Levin                    129

```
1   privilege lapses after a reasonable period of time,

2   citing to --

3              THE COURT:  Where is that in the case?

4              MS. JHONES:  That is -- if you look at this

5   case, it's at Page 571, Paragraph 8 through 11.  And

6   I'll give the Court an opportunity to look at this

7   case.

8              It says that several types of -- right above

9   that paragraph where it says that the privilege lapses,

10  it also says that several types of information probably

11  would not be protected, including document -- in this

12  case, the privilege was law enforcement documents --

13  pertaining to people who have been investigated in the

14  past, but are no longer under investigation; people who

15  are merely suspected of a violation without being part

16  of an ongoing investigation; and people who have -- who

17  may have violated only civil provisions.

18             And then thereafter is where it says,

19  "Furthermore, the privilege lapses after a period of

20  time."

21             And citing to the American Civil Liberties

22  Union versus Finch -- F-i-n-c-h -- at 638 F.2d 1336,

23  Page 1344, another Fifth Circuit decision from 1981, it

24  states, "Even the files of active law enforcement

25  agencies lose their privileges after particular
```

Assaad - CROSS - By Mr. Levin                    130

```
 1    investigations become complete.
 2            "Therefore, the privilege lapses either at the
 3    close of the investigation or at a reasonable time
 4    thereafter, based on a particularized assessment of the
 5    document."
 6            And the point -- clearly, your Honor, the case
 7    law recognizes a criminal defendant -- and this case
 8    talks about that as well -- a criminal defendant's need
 9    for the information in the context of a criminal
10    proceeding.
11            You couple that with the fact that the
12    privilege is not unending.  The fact that it may
13    compromise -- well, I guess what the case is saying is
14    find yourself another recording device so you don't
15    have the same problem again, hypothetically.
16            What this is saying is that privilege lapses.
17    Once a defendant is -- the investigation is over and a
18    defendant is subject to criminal prosecution and has to
19    defend himself, he has to be -- the privilege is gone.
20    It's gone.
21            And that's what that case says.
22            MS. ARANGO:  Judge, I haven't seen that case.
23    But what Ms. Jhones just stated is -- it talks -- that
24    case, from what she's saying, refers to documents, an
25    entirely different situation.
```

1          Maybe documents that reveal people's

2     identities who are no longer under investigation -- of

3     course, the privilege would lapse then.

4          We're talking about an investigative technique

5     that the FBI continues to use in ongoing

6     investigations.

7          They continue to use secret recording devices

8     and they have special ways of hiding them, of altering

9     their appearance.  That is what we're talking about.

10    That doesn't lapse.  That is continuing.  The need for

11    the secrecy to protect those investigative techniques

12    continues.  She's talking about an entirely different

13    situation.

14          And, again, yes, you look at the defense's

15    need for it.  What is the defense's need?  Mr. Levin

16    eloquently stated what it was.  And he can make that

17    argument on the record as it stands right now.

18          MS. JHONES:  Your Honor, this case does not

19    qualify the privilege in the context of documents.  It

20    refers to -- the case talks about specifically the

21    category of -- let me just get to the -- the

22    application of the law enforcement privilege.

23          As a matter of fact, in a footnote, it talks

24    about the history of that particular privilege and the

25    way it's referred to in different names.  But it's the

1    same thing.  We're talking about a law enforcement

2    privilege.  And this case talks about that.

3           Yes.  In the context of the case, the

4    particular item are documents, but it doesn't say this

5    is in the context of documents.  It's in the context of

6    the law enforcement privilege, period.

7           MS. ARANGO:  Judge, the law --

8           THE COURT:  Well, okay.  The Eleventh Circuit

9    has found in *United States versus Van Horn*, 789 F.2d

10   1492, a 1986 decision, that there is a qualified

11   Government privilege not to disclose sensitive

12   investigative techniques.

13          The case cited by Ms. Jhones is a Fifth

14   Circuit case from 2006.  Clearly, the Eleventh Circuit

15   case law is the controlling case law here, and the

16   qualified privileges has been recognized by the

17   Eleventh Circuit.

18          In that case, the *Van Horn* case, the

19   Government made a similar argument, that when the

20   appellants tried to discover either the type of the

21   microphone or where the microphone was hidden that was

22   used in the investigation -- the Government raised the

23   same ground that the Government raises here, that the

24   revelation would adversely affect future criminal

25   investigations.

1          And the Government requested of the Eleventh

2     Circuit that they recognize the privilege not to

3     disclose the location and type of equipment used unless

4     the information is relevant and helpful to the defense.

5          At Page 1508, the Eleventh Circuit stated, "We

6     hold the privilege applies equally to the nature and

7     location of electronic surveillance equipment.

8          "Disclosing the precise locations where

9     surveillance devices are hidden or their precise

10    specifications will educate criminals regarding how to

11    protect themselves against police surveillance.

12         "Electronic surveillance is an important tool

13    of law enforcement and its effectiveness should not be

14    unnecessarily compromised.

15         "Disclosure of such information will also

16    educate persons on how to employ such techniques

17    themselves in violation of Title III."

18         The Eleventh Circuit goes on to state:  "The

19    privilege will give way if the Defendant can show need

20    for the information."

21         And, ultimately, the Eleventh Circuit found

22    that the information was privileged and the Defendants

23    did not demonstrate necessity.

24         There was testimony that voices could have

25    been distorted by the way the microphone was hidden.

1    There was comparison of the voices on the tapes.  The

2    appellants had the tapes.  And the identification

3    issue, which was the issue that arose there, was

4    ultimately given to the jury.

5            The appellants were allowed to explore and

6    argue the possibility of misidentification in front of

7    the jury.

8            And, ultimately, the Eleventh Circuit found

9    that they agreed with the district court's finding that

10   necessity was not shown in this case.

11           Here, I also find that necessity is not shown

12   broader than what I have indicated I will allow

13   Mr. Levin to explore, which is the size of the taping

14   equipment.

15           I do not find that this precludes, as the

16   Government has indicated -- that there's no preclusion

17   by the defense to argue and make argument before the

18   jury that it wasn't a very good strip search, that --

19   or the truthfulness of the witness's testimony that, in

20   fact, they were strip-searched, because they were able

21   to keep this recording equipment.

22           I don't find that there's any prejudice to the

23   Defendants whatsoever.

24           In fact, the Government's request to keep this

25   information sensitive, if it bootstraps anybody, it

Assaad - CROSS - By Mr. Levin                    135

1    bootstraps the Government from being able to reveal the

2    nature and the technique that they used that would make

3    the strip-search by the Defendants more plausible.  In

4    fact, it makes it less plausible.  And the Defendants

5    are certainly free to argue that.

6           I find that, based upon the information that

7    Mr. Levin can obtain from the witness as to the size,

8    along with the fact that he kept cell phones and he was

9    able to keep cell phones, along with the fact that the

10   actual recordings are available and the manner and mode

11   of the search is certainly available to the Defendants

12   to explore and they can argue to the jury the

13   implausibility of being strip-searched and being able

14   to retain a recording device, that there is no

15   privilege and, therefore, the Defendants have not

16   demonstrated necessity that would require more specific

17   testimony than what I've allowed.

18          Let's bring the jurors in, please.

19          THE COURT SECURITY OFFICER:  Yes, ma'am.

20          (Whereupon, the jury entered the courtroom at

21   2:04 p.m. and the following proceedings were had:)

22          THE COURT:  You may be seated.

23          You are still under oath, sir.

24          You may proceed, Mr. Levin.

25          MR. LEVIN:  May it please the Court.

1          Good afternoon, ladies and gentlemen.

2          THE JURY:  Good afternoon.

3   BY MR. LEVIN:

4   Q.    Mr. Assaad, I believe we left off with regard to

5   the issue concerning when you were changing your

6   clothes and you expressed that you needed to stay in

7   contact with, I guess, Big Brother.

8          Do you recall that testimony?

9   A.    With Al-Qaeda.  Yes, sir.

10  Q.    And you needed to keep your -- whatever

11  electronic devices you had.  Correct?

12  A.    Yes, sir.

13  Q.    And one of those items was a body recorder.  Is

14  that accurate?

15  A.    Yes, sir.

16  Q.    Can you tell me the size of that recorder?

17  A.    I don't know.  I can show it to you.

18  Q.    Do you want to use your hands to demonstrate?

19  A.    Is that okay?

20  Q.    I believe it's --

21         MR. LEVIN:  Would that be okay, your Honor?

22         THE COURT:  Go ahead.

23         THE WITNESS:  They were different every time.

24  But I don't know.  It's something like -- like this

25  (indicating), like this (indicating).

1              MR. LEVIN:  Judge, would the Court like me to

2     try to estimate for the record what he's doing with his

3     fingers?

4              THE COURT:  Go ahead.

5              MR. LEVIN:  This is for the record, since,

6     obviously, the court reporter cannot take down what you

7     just did with your hands.

8              But the witness was demonstrating the size of

9     the recorder, which --

10    BY MR. LEVIN:

11    Q.    Mr. Assaad, can you help me out again and use

12    your hands like you did before.

13    A.    (Witness complies.)

14    Q.    About 3 inches wide?

15    A.    The distance, yes.  Maybe like this (indicating),

16    and like this (indicating).

17    Q.    3 inches by 3 inches?

18    A.    I don't know.  It's....

19    Q.    All right.  That's fine.

20          So in addition to the cell phone, you had this

21    recorder.  Correct?

22    A.    I had -- yes.  I had more than one cell phone.

23    Q.    How many cell phones did you have?

24    A.    Maybe two.

25    Q.    So you had two cell phones and a recorder?

```
 1    A.     Yes, sir.

 2    Q.     And it's your testimony that you were changing

 3    right in front of Mr. Abraham?

 4    A.     And -- yes, sir.  And Brother Patrick, Brother --

 5    Brother Patrick, Brother Abbas and Brother Naudimar.

 6    Q.     When I say right in front of you --

 7              MR. LEVIN:  Can I approach the witness, your

 8    Honor, so the jury can see the distance that we're

 9    talking about?

10              THE COURT:  Sure.

11              MR. LEVIN:  Thank you.

12    BY MR. LEVIN:

13    Q.     Mr. Abbas -- Mr. Assaad, can you stop me when I

14    get to where Mr. Abraham and Mr. Herrera were when you

15    were changing?  Were they this close to you?  Were they

16    closer?

17    A.     Closer.

18    Q.     Would this be fair?

19    A.     Yes, sir.

20    Q.     And they were looking at you?

21    A.     Yes, sir.

22              MS. ARANGO:  Judge, would the record reflect

23    that Mr. Levin was about 2 feet away, I believe --

24    3 feet?

25              THE COURT:  I'd say 3 feet.
```

```
 1              MS. ARANGO:  3 feet away.
 2   BY MR. LEVIN:
 3   Q.     Now, you indicated that it was a little tense
 4   driving down towards -- do you know exactly where you
 5   ended up, by the way?  Was it Islamorada?  Was it
 6   Key West?  Do you know where you ended up?
 7   A.     No, sir.
 8   Q.     And you indicated in your previous testimony that
 9   it was a little tense as you were driving down, that
10   Abbas al-Saidi, CW 1, was a little nervous.
11          Is that accurate?
12   A.     Yes, sir.
13   Q.     And I believe there's been some testimony
14   concerning somebody expressing that they needed a
15   jacket.
16          Do you recall that testimony?
17   A.     Yes, sir.
18   Q.     Do you recall that Mr. Abraham offered his
19   jacket?  Do you recall that?
20   A.     Somebody offered a jacket.  Yes, sir.
21   Q.     Well, I was going to try to save everybody from
22   having to pick up their binders.  But if we can now go
23   back to Volume II of III, Exhibit 55-A, at Page 63.
24          Do you have that still, Mr. Assaad?
25   A.     What page?
```

Q.    63.   That would be Exhibit 55-A, at the bottom of
Page 63.

A.    Yes, sir.

Q.    And it's Mr. Abraham, in fact, who offers you a
jacket.

      Would you agree with that?

A.    It wasn't for me, sir.

Q.    Oh, it was for the other gentleman?

A.    Yes, sir.

Q.    But you respond to it.

      It says at the bottom, you would agree with me,
"You can have my jacket," "PA."  That's Patrick
Abraham.

      And "CW 2," that would be you.  You say, "Huh?"

      And the conversation continues on Page 64.

      "I said you can have my jacket."

      You said, "Oh, man."

      Patrick Abraham says, "If you cold, we get you a
jacket."

      You said, "Huh?"

      "If you cold, we get you a jacket."

      Do you see that there, sir?

A.    Yes, sir.

Q.    And then, of course, Abbas al-Saidi, CW 1, says,
"Thank you for your offer, Brother Pat.  Thank you,

1    man," towards the bottom of the page.

2    A.    Yes, sir.

3    Q.    And you say at the bottom of that page, "You are

4    getting me, guys, warm with your hospitality.  You are

5    getting me warm, man."

6          Do you see that?

7    A.    Yes, sir.

8    Q.    And you've described this event as a kidnapping?

9    A.    Yes, sir.

10   Q.    Now, you indicated that, at some point, you

11   stopped at a Walgreens?

12   A.    Yes, sir.

13   Q.    And the reason you stopped is because you wanted

14   to try to ascertain your location.  Is that not

15   correct?

16   A.    Yes, sir.

17   Q.    In fact, you had communicated your location based

18   upon the mile markers.  Isn't that true, sir?

19   A.    Yes, sir.

20   Q.    You didn't really need to stop at the Walgreens

21   for that purpose.  In truth and in fact, the reason you

22   stopped at the Walgreens during this so-called

23   kidnapping was because you had requested to stop to go

24   to the bathroom.  Isn't that correct, sir?

25   A.    No, sir.  Because even with what I giving the

```
 1   person on the phone, the direction or the sign or the

 2   mile -- I don't know -- they weren't able to locate us.

 3        And they didn't understand where we at, because I

 4   wasn't able to explain.  Maybe she didn't understand

 5   where we at.

 6        So I had to stop at Walgreen to bring our

 7   location -- exact location.

 8        And if you see, I stopped.  When we went out for

 9   Walgreen, I smoke cigarette.  I gave time for the FBI

10   just to reach to us.

11        So I was -- we went out.  I was smoking a

12   cigarette -- I want to smoke cigarette, just buying

13   time for the FBI to arrive and -- not to arrive -- to

14   locate us or come close to us.

15   Q.   So it's your testimony that you actually

16   communicated the address that was on that Walgreens

17   receipt to the FBI?  Is that your testimony?

18   A.   Yes, sir.  If I remember correctly, sir, I gave

19   them that we stopped at Walgreen or something like

20   that.  I need to review my --

21   Q.   The transcript?

22   A.   -- the transcript, if you don't mind.

23   Q.   Would you like to take a few minutes to do that?

24   Feel free, sir.

25   A.   Thank you.
```

1              MS. ARANGO:  Judge, I think at this point, the

2      relevance is being outweighed by --

3              MR. LEVIN:  Your Honor, I would object to the

4      speaking objection.

5              THE COURT:  What's the pending question?

6              MR. LEVIN:  The pending question is -- that's

7      a good question.

8              THE COURT:  I think he answered the question.

9      I was just looking at that.

10             You were asking about the receipt.

11             MR. LEVIN:  I was asking whether -- I'm sorry,

12     your Honor.

13             THE COURT:  You were asking about the

14     Walgreens receipt.  He answered it.

15             MR. LEVIN:  Right.

16             I was asking whether or not he communicated

17     his location to the authorities that he said he had

18     been in contact with, which was the FBI through an

19     Arabic-speaking interpreter, and he desired an

20     opportunity to review the transcript to see if -- to

21     refresh his recollection as to whether that occurred.

22             MS. ARANGO:  I would object to relevance.

23             THE COURT:  But he answered that already.  He

24     answered your question.

25             "So it's your testimony that you actually

 1    communicated the address that was on that Walgreens

 2    receipt to the FBI?  Is that your testimony?"

 3            "Yes, sir.  If I remember correctly."

 4            MR. LEVIN:  Okay.

 5            THE COURT:  And then he asked to review the

 6    transcript.

 7            MR. LEVIN:  Right.

 8            THE COURT:  So he's answered the question.

 9            MR. LEVIN:  But --

10            THE COURT:  So ask your next question.

11            MR. LEVIN:  -- it seemed as if he wanted an

12    opportunity to verify his answer.

13            THE COURT:  That's okay.  Ask your next

14    question.

15            MR. LEVIN:  Yes, your Honor.

16    BY MR. LEVIN:

17    Q.    Anyway, this Walgreens receipt that we're talking

18    about -- it was put on the ELMO yesterday.

19            Do you know the Walgreens receipt --

20    A.    Yes, sir.

21    Q.    -- with the Tic-Tacs and the Doritos, et cetera?

22            You didn't keep possession of that receipt, did

23    you?

24    A.    I don't remember, sir.

25    Q.    You don't remember whether or not you kept the

1    receipt or Brother Abbas kept the repeat?

2    A.    I believe Brother Abbas.

3    Q.    Okay.  Now, moving along in this transcript to

4    Page 96, towards the bottom -- bottom quarter --

5    A.    Yes, sir.

6    Q.    -- I believe you've testified previously this is

7    when you first disclosed that you were Al-Qaeda, is

8    that correct, at this January 28th meeting?

9    A.    Yes, sir.

10            MS. ARANGO:  Object --

11            MR. LEVIN:  Did you have something?

12   BY MR. LEVIN:

13   Q.    And towards the bottom of Page 96, you say, "I

14   hope -- I hope, you know, you put your nose in

15   somewhere where you should know.  I'm Al-Qaeda.  You

16   haven't heard of Al-Qaeda?  I hope you heard of it."

17            And Mr. Batiste asks, "Who's Al-Qaeda connected

18   with?  I don't (unintelligible).  Is that bin Laden

19   or --"

20            Then Abbas says, "Directly."

21            And then you say, "Because our Big Brother, Osama

22   bin Laden," et cetera, et cetera.

23            Do you see that, sir?

24   A.    Yes, sir.

25   Q.    So would you agree with me, sir, that Mr. Batiste

```
 1   wasn't even familiar with whether or not Osama bin
 2   Laden was connected with Al-Qaeda?  Would you agree
 3   with that, sir?
 4   A.    No, sir.
 5   Q.    Okay.
 6   A.    Because he referred in -- I don't know which
 7   meeting he referred that, on 9/11, he was sitting with
 8   his wife and they were happy about what happened and he
 9   explained exactly details about Osama bin Laden and
10   Al-Qaeda.
11   Q.    Okay.  Well, that was a meeting that came later,
12   wasn't it, sir?
13   A.    I believe so.  Yes, sir.
14   Q.    Wasn't that a meeting that occurred on February
15   the 19th in what was supposed to be Brother Pedro's
16   apartment?
17   A.    Yes, sir.
18   Q.    That's when he talked about the 9/11 and the
19   Al-Qaeda situation.  Correct?
20   A.    Yes, sir.
21   Q.    Not on January the 28th?
22   A.    No, sir.
23   Q.    And on Page 99 -- you would agree with me, sir,
24   that a lot of my co-counsel have asked you questions
25   with regard to -- I'm not going to be repetitious --
```

```
 1   with regard to financing, that he was on many an
 2   occasion asking you for money.  That's pretty apparent.
 3        Would you agree with that?
 4            MS. ARANGO:  Objection.  Cumulative.
 5            THE COURT:  Sustained.
 6   BY MR. LEVIN:
 7   Q.    But at Page 99, which I believe they did not ask
 8   you about --
 9            MS. ARANGO:  Judge, Page 99 was asked about in
10   much detail by Ms. Jhones.
11            MS. JHONES:  Your Honor, may I have a moment
12   to look at it?  Because I don't believe I referred to
13   Page 99 -- referenced Page 99.  I just need a moment to
14   retrieve that transcript.
15            Mr. Levin, what exhibit is this, please?
16            MR. LEVIN:  Page 99, Exhibit 55-A.
17            MS. JHONES:  Thank you.
18            Your Honor, I believe I did make some
19   reference to Page 99.  I don't know what Mr. Levin is
20   intending to ask, but I did address -- it's a very long
21   paragraph, but I did address some parts of that.
22            MR. LEVIN:  Then, I'll move on, your Honor.
23            THE COURT:  Okay.
24   BY MR. LEVIN:
25   Q.    Now, just a couple of questions on this meeting
```

```
 1    in the tent.
 2         Do you recall whether or not from inside the tent
 3    you could see outside?
 4    A.    I don't remember, sir.
 5    Q.    You had testified previously that there were
 6    people that were standing outside the tent.
 7         What was your basis for that understanding?
 8    A.    Because, when we came in the tent, the -- when I
 9    came down from the car, there already people standing
10    next to Brother Naz.  And when we came to the tent,
11    those people were standing, like, alert next to the
12    entrance of the tent.
13    Q.    Now that word "alert" that you just used:  Where
14    did you get that word from, sir?
15    A.    From -- which one?
16    Q.    "Alert."
17    A.    I hear it on TV.
18         MS. ARANGO:  Objection, Judge.  Improper form.
19         THE COURT:  Sustained.
20         Rephrase your question.
21    BY MR. LEVIN:
22    Q.    Have you heard that word "alert" used by anybody
23    affiliated with the Government, the FBI, the
24    prosecutors or possibly CW 1?
25    A.    No, sir.  It's on TV or in military.  They use
```

```
 1   it when they are standing in alert and -- they use it
 2   everywhere.
 3   Q.    But you don't know because you couldn't see,
 4   would you agree with me, sir, who was standing outside
 5   the tent?
 6   A.    It was dark and was -- two brother were standing
 7   alert next to the tent -- or -- I can't -- next to the
 8   tent, there is people standing in this form.  If you
 9   call it alert, I don't know.  But was....
10   Q.    Very well.
11         Now, after this meeting on February 28th, there
12   was another meeting on February the 19th.  Is that
13   correct?
14   A.    Yes, sir.
15   Q.    With regard to the February 19th meeting, that
16   took place at an apartment on Miami Beach.  Is that
17   accurate?
18   A.    Yes, sir.
19   Q.    Would that have been the apartment that you lived
20   in at that time?
21   A.    Yes, sir.
22   Q.    And that apartment would have been on 23rd Street
23   and Collins Avenue.  Is that accurate?
24   A.    Yes, sir.
25   Q.    That was an apartment that was on the ocean, that
```

 1    apartment?

 2    A.     Yes, sir.

 3    Q.     And in this conversation, where -- Mr. Batiste

 4    and Mr. Abraham -- they were present.  Correct?

 5    A.     Yes, sir.

 6    Q.     You had no idea what was discussed between the

 7    two of them prior to their arrival at your apartment.

 8    Isn't that correct?

 9    A.     I didn't know.  No, sir.

10    Q.     Now, referring you to Government's Exhibit 56-B,

11    which is in the synchronized exhibit binder, I'll just

12    ask you a couple questions from this exhibit.

13    A.     Yes, sir.

14    Q.     I'll let the ladies and gentlemen of the jury

15    retrieve their binders before I ask the question.

16    A.     What page?

17    Q.     5.

18           Now, a couple questions before I ask specific

19    questions concerning the transcript at Page 5.

20           Can you tell us, this apartment -- what floor you

21    were on.

22              MS. ARANGO:  Objection.  Relevance.

23              THE COURT:  Sustained.

24    BY MR. LEVIN:

25    Q.     Did you have a view of the ocean?

Assaad - CROSS - By Mr. Levin                    151

```
 1    A.      No, sir.

 2    Q.      And at Page 5, at the bottom, Mr. Batiste says,

 3    "Yeah, Occ.  You're like a rich person up in here,

 4    man."

 5            Correct?

 6    A.      Yes, sir.

 7    Q.      And you respond, "Well, you know, let me tell you

 8    one thing, brother.  We take care of our brothers all

 9    over the world.  Believe me this, brother."

10            Do you recall that?

11    A.      Yes, sir.

12    Q.      And, essentially, you're trying to suggest to

13    Mr. Batiste that he's going to be taken care of.

14    Correct?

15    A.      I was telling him about -- I'm playing my role,

16    sir, and how Al-Qaeda is -- what they do.

17    Q.      Well, you're playing your role.  We understand

18    that.  Okay?  We understand that you're playing a role.

19    Correct?

20    A.      Okay, sir.

21    Q.      We know that some of your actions, true or not

22    true -- we know that your actions are sometimes

23    directed by the FBI and sometimes you do it on your

24    own.  Is that correct, sir?

25    A.      Yes, sir.
```

```
 1   Q.    And, basically, in playing your role, what you're
 2   trying to tell him is, "We take care of our people.
 3   Don't worry about it."
 4         Isn't that true, sir?
 5   A.    Yes, sir.
 6   Q.    And he's already realized that you're living like
 7   a rich person, based on the apartment that you're
 8   living in.  Right?
 9              MS. ARANGO:  Objection.  Speculative.
10              THE COURT:  Sustained.
11              Rephrase your question.
12   BY MR. LEVIN:
13   Q.    Well, you're reassuring him that you take care of
14   your people.  Right?
15   A.    Not me, sir.  Al-Qaeda.
16   Q.    Al-Qaeda.
17         And the one thing that he had been asking you for
18   consistently from the beginning was money.  Correct?
19   A.    From the beginning?
20   Q.    Yes.  Consistently.
21   A.    No, sir.
22   Q.    Well, aside from the lists, which had weapons on
23   them.  Okay?  You would agree with that?
24   A.    In several occasions, sir, he said "It's not
25   about the money."  And only when he asks for the money
```

1    he asks to purchase the item were on the list.

2        And if you can see from the beginning, in

3    different meetings happen that he said, "I pay your

4    ticket and you go back.  With you or without help, I

5    will proceed in my plans and what I'm planning for in

6    Chicago."  In several occasions, in several meetings,

7    several different dates.

8    Q.    Well, you're aware, sir, that until you and your

9    cohort, Mr. Abbas al-Saidi, became involved, these guys

10   were not on anybody's radar screen in terms of reaching

11   out to other organizations or getting support from

12   anybody else.

13       You're aware of that; are you not, sir?

14           MS. ARANGO:  Objection.  Speculative.

15           THE COURT:  Sustained.

16   BY MR. LEVIN:

17   Q.    Now, while you're at this meeting on February

18   the 19th, Mr. Abraham is kind of seated in the corner.

19       Would you agree with that?

20   A.    In the corner?

21   Q.    Yes.

22   A.    Was sitting next to us, sir.

23   Q.    Well, without looking at the video again and

24   wasting, you know, the Court's resources at this

25   point --

```
 1          MS. ARANGO:  Objection, Judge.  That's
 2    improper.
 3          MR. LEVIN:  Judge, I'm just --
 4          THE COURT:  Just refrain from the comments,
 5    Mr. Levin.
 6          MR. LEVIN:  I apologize, your Honor.
 7    BY MR. LEVIN:
 8    Q.    -- you're sitting in a chair and Mr. Batiste is
 9    sitting on the sofa and then there's a coffee table.
10          Do you recall that?
11    A.    Yes, sir.
12    Q.    And Mr. Abraham -- when I say sitting in the
13    corner, he's kind of in the back, behind you guys.
14          Would you agree with that?  He's not sitting on
15    the sofa.  He's sitting on chair that's next to the
16    sofa.
17    A.    Yes, sir.
18    Q.    The TV contains the camera.  Correct?
19    A.    Not the TV.  No, sir.
20    Q.    What is it?  Something on top of the TV?
21          MS. ARANGO:  Objection.  Relevance.
22          THE COURT:  Sustained.
23    BY MR. LEVIN:
24    Q.    Are you watching a basketball game?
25    A.    Yes, sir.
```

1   Q.    There's a basketball game that's on a television

2   that -- you've seen the video a zillion times.  Right?

3   Strike that.

4         You've seen the video on numerous occasions.

5   Correct?

6   A.    Yes, sir.

7   Q.    You would agree with me, sir, that the camera

8   angle is from a position where the TV is located.  Is

9   that correct, sir?

10  A.    Yes, sir.

11  Q.    And there's a basketball game that's being played

12  in the background.  Correct?

13  A.    Yes, sir.

14  Q.    And you're having a discussion with Mr. Batiste.

15  Correct?

16  A.    Yes, sir.

17  Q.    And Patrick Abraham says very little during this

18  conversation.  Isn't that correct?

19  A.    Yes, sir.

20  Q.    And at one point, you even say to him, "Brother,

21  you're so quiet."

22        And he responds, "I'm observing and I'm

23  listening."

24        Do you recall that?

25  A.    Yes, sir.

```
 1   Q.     And during the time that you're speaking to

 2   Mr. Batiste, Mr. Abraham never gets up out of his chair

 3   and walks around and makes any suggestions with regard

 4   to the so-called Chicago plan, does he, sir?

 5   A.     No, sir.

 6   Q.     And you're talking about the Sears Tower.  Right?

 7   A.     Not me.  Brother Naz.

 8   Q.     And you're engaging in that conversation.  Right?

 9   A.     Yes, sir.

10   Q.     Do you know where the Sears Tower is located?

11   A.     Yes, sir.

12   Q.     Where?  Chicago?

13   A.     Yes, sir.

14   Q.     And you would agree with me, sir, that during the

15   course of this conversation, you talk about a lot of

16   things.  But, of course, one of the things you do talk

17   about is money.  Is that correct?

18   A.     Referring to what page, sir?

19   Q.     Just the entire -- I mean, you -- again, you've

20   had an opportunity to review this transcript on

21   numerous occasions.  Correct?

22   A.     Yes, sir.

23   Q.     And I'm just asking you generally:  During the

24   course of this conversation, there were conversations

25   concerning money; were there not?
```

Assaad - CROSS - By Mr. Levin                    157

1    A.      Before --

2    Q.      And support and the Chicago mission?

3    A.      Excuse me?

4    Q.      I'm -- during the course of this conversation

5    with Mr. Batiste where Mr. Abraham is sitting there

6    saying very little, there were conversations concerning

7    money.

8            Would you agree with that?

9    A.      I need to know which paragraph or which page you

10   are referring to.

11   Q.      I can direct you to a page and paragraph.

12           But based on your recollection -- and you have

13   the transcript there.  If you want to review it, feel

14   free to do that.

15           But, generally speaking, based on your experience

16   with this case, based upon the preparation that you've

17   undergone with the Government in preparing for this

18   case, based upon the fact that you've listened to these

19   tapes --

20           MS. ARANGO:  Judge, I would object.  This is a

21   speech.  If he has a question --

22           THE COURT:  Sustained.

23           Rephrase your question.

24   BY MR. LEVIN:

25   Q.      On Page 36, at the top -- are you with me?

1    A.      Yes, sir.

2    Q.      You say the following:  "Two weeks from now, ten

3    days, more or less, ten days, not this Wednesday, the

4    following Wednesday, maybe we can go -- I'll receive

5    the password to get the money."

6            That was a conversation about money; was it not?

7    A.      Before I answer, sir, I need to review what

8    subject we are talking about.

9    Q.      Feel free.

10   A.      Thank you.

11           Sir, I will refer to Page 35 -- before this page,

12   35, and on the bottom, where -- bottom of the page,

13   where I was speaking about the warehouse and buying

14   stuff, furniture, speaking about expenses.

15           So this is -- I believe this is referring to what

16   we were talking about, not about I will pay them or

17   maybe I will give them money or something.  Our

18   purchases of stuff for the warehouse.

19   Q.      And you need money to purchase things for the

20   warehouse.  Correct?

21   A.      I believe so.  Yes, sir.

22   Q.      Now, that's all with that meeting.

23           The next time you have a meeting, I believe, is

24   on March the 9th we've talked about.

25           Is that accurate?

1    A.    Yes, sir.

2    Q.    I believe you testified that, on March the 9th,

3    you went to the Embassy and were advised when you

4    approached the Embassy that you were going to be

5    subjected to a strip-search.

6    A.    Yes, sir.

7    Q.    And then, at that point, you decided, "No

8    thanks" -- those are my words -- "I'll come back."

9          Is that accurate?

10   A.    I went.  I left.  I left.  And I come back later.

11   Yes.

12   Q.    You didn't want to be strip-searched.  Correct?

13   A.    No, sir.

14   Q.    Do you recall testifying in a prior proceeding in

15   connection with this case on March the 4th of 2008,

16   when I asked you the following question and you gave

17   the following answer at Page 33, Lines 8 through 25?

18         "Question:  Now, the next time you saw

19   Mr. Abraham was, I believe, March 9th, when you went by

20   the Temple on 62nd.  Do you recall that?

21         "Answer:  Yes, sir.

22         "Question:  And I think you said that he, at

23   that time, again strip-searched you.

24         "Answer:  Yes, sir.

25         "Question:  Okay.  And what -- did he touch

1    your body at that time?

2            "Answer:  No, sir.

3            "Question:  Did he give you clothes, too, a

4    new set of clothes to change into?

5            "Answer:  I got naked again, sir.  I got

6    naked.  I got -- take off my clothes, put down my pants

7    and turn over and --

8            "Question:  It was a rather humiliating

9    experience?

10           "Answer:  Yes, sir."

11           Do you recall being asked those questions and

12   giving those answers in a prior proceeding in this case

13   on March 4th of 2008, sir?

14           MS. ARANGO:  Judge, I would object.

15   There's -- it's improper impeachment where there's no

16   inconsistency.

17           THE COURT:  Sustained.

18           MR. LEVIN:  Your Honor, I would respectfully

19   request a side-bar on this issue.

20           THE COURT:  Come on up.

21           (Whereupon, proceedings were had at side-bar

22   outside the presence of the jury which have been sealed

23   per instructions of the Court.)

24           (Whereupon, the following proceedings were had

25   in open court:)

```
 1              MS. ARANGO:  Judge, I would move to strike the

 2   statements of Mr. Levin.

 3              THE COURT:  The motion to strike is granted.

 4              The jury is instructed to disregard the last

 5   statements by the lawyer.

 6              Go ahead, Mr. Levin.

 7   BY MR. LEVIN:

 8   Q.    Mr. Assaad, when you went back to the Embassy

 9   after you left your recording device, were you

10   strip-searched?

11   A.    Yes, sir.

12   Q.    Then you were strip-searched?

13   A.    Like I said before, sir, when I went first, they

14   told me, if I will go in the Embassy, they will be

15   strip-searching me.

16         I left -- I give an excuse.  I left.  I called

17   the FBI.  They told me to bring back the recording

18   device.

19         And when I spoke with Brother Naz on our way -- I

20   came back again to the Embassy, where I got

21   strip-searched.  When I arrived, they strip-searched

22   me.  I took my clothes off and they searched me.

23   Q.    Okay.  Now, you had indicated at this meeting

24   that you had on March 9th that Brother Naz had

25   requested an alliance with Al-Qaeda.
```

1        Do you recall that?

2    A.    Yes, sir.

3    Q.    And this was done in front of all the brothers.

4        Do you recall that?

5    A.    Yes, sir.

6        MR. LEVIN:  Your Honor, at this time, with the

7    assistance of the Government, I would ask that

8    Government's Exhibit W1-01440-T be published.

9        I don't know if you can do that.

10       I'd ask the jury to refer to Binder III of

11   III.

12       THE COURT:  What's the number again, please?

13       MR. LEVIN:  W1-01440-T.

14       THE WITNESS:  I don't have it, sir.

15       MR. LEVIN:  I'll retrieve it for you.  Sorry.

16       Your Honor, permission to publish that

17   exhibit?

18       THE COURT:  Go ahead.

19       MR. LEVIN:  Thank you.

20       (Whereupon, segments of Government's Exhibit

21   No. W1-01440-T were published in open court.)

22   BY MR. LEVIN:

23   Q.    Now, Mr. Assaad, this is a conversation that took

24   place on March 10th.  Correct?

25   A.    Yes, sir.

```
 1    Q.     And this was a day after a meeting which you've

 2    testified about, which was not recorded, where you've

 3    testified that in front of all the brothers and

 4    Mr. Batiste you talked about alliance with Al-Qaeda.

 5    Correct?

 6    A.     He requested alliance with Al-Qaeda.  Yes, sir.

 7    Q.     And he requested an alliance with Al-Qaeda?

 8    A.     Yes, sir.

 9    Q.     And you talked about a commitment; did you not?

10    A.     No, sir.  In that meeting on March 9, when he

11    requested alliance, him and the brothers, with

12    Al-Qaeda, I don't know what is the next step.

13           I got debriefed after the meeting with the FBI

14    agent.  I explained to them what happened during that

15    meeting.  And on March 10, they told me -- they gave me

16    the pledge to show to Brother Naz and the brothers.

17    Q.     So in this conversation, you ask him at Page 2,

18    right in the middle, "Because I was planning -- like, I

19    need to -- I read the commitment in front of everybody,

20    but if you want to discuss with me and you first and

21    later on we -- we can discuss it in front of them --"

22           His answer was, "Yeah.  Well, yeah.  We can do

23    that.  We can discuss it with me and you mainly right

24    now and then later on we can discuss it front of them.

25    Okay?"
```

1          Was that -- was that the conversation you had

2     with him?

3     A.     Yes, sir.

4     Q.     So you would agree with me, sir, that he said in

5     that conversation that the commitment would not be

6     discussed in front of the brothers.  Correct?

7     A.     He didn't know about there is a commitment, sir.

8     He didn't know that we are even discussing, because he

9     asked on March 9 the alliance.

10         Over here, you can see very clearly, sir, I told

11    him where -- on the middle of the page, I said,

12    "Because I was planning -- I need to read the

13    commitment in front of everybody because -- but if you

14    want to discuss it with me and you first, and later we

15    can discuss it in front of them."

16         So it's -- trying to talk to him first and asking

17    his opinion about what he want to do.

18    Q.     But didn't you testify previously that the day

19    before you had discussed this in front of them?

20         MS. ARANGO:  Objection.  Vague.

21    BY MR. LEVIN:

22    Q.     Discussed this commitment in front of them?

23         MS. ARANGO:  Objection.  Asked and answered.

24         THE COURT:  Why don't you rephrase your

25    question.

BY MR. LEVIN:

Q.    Well, there was no discussions on March the 9th
with any commitment in front of any brothers.

      Would you agree with that?

A.    Sir, he requested about alliance with Al-Qaeda.
This is what I testified before.  I said he requested
that he want alliance with the brother, with Al-Qaeda.

      We didn't discuss -- he didn't said "I need to
take a pledge" or, "I need to read the statement" or
something.

      He said, "I want" or, "We want, the Moors and the
brothers, to take -- to have alliance with Al-Qaeda."

      And I told this to the FBI.

      And the next day I go and we're talking on the
phone.  This is very clear, the conversation.

      I said, "I have some commitment in my hand.
What?  You want to sit and talk about it first before
you speak with the brothers?"

      It was very clear, sir.

Q.    Yet, the day before, you had presumably discussed
this in front of the brothers when, in truth and in
fact, based on Mr. Batiste's response, "We can discuss
it in front of them later," he said to you on
March 10th.  Isn't that true, sir?

            MS. ARANGO:  Objection.  Asked and answered.

```
 1            THE COURT:  Sustained.
 2   BY MR. LEVIN:
 3   Q.    Let me ask you this, moving to a different area:
 4   This case was directed by the FBI.  Would you agree
 5   with that?  Let me rephrase the question.
 6          Your actions and the actions of Abbas al-Saidi
 7   were directed by the FBI.  Correct?
 8   A.    Yes, sir.
 9   Q.    They told you what to do.  They told what you
10   they wanted -- how they wanted you to act.  Correct?
11   A.    Yes, sir.
12   Q.    They directed you to say certain things and not
13   say certain things.  Correct?
14   A.    Yes, sir.
15   Q.    And at times, by your own testimony, you would
16   agree with me, sir, that you kind of didn't follow that
17   instruction.  Correct?
18   A.    Excuse me?
19   Q.    At times, you didn't necessarily follow their
20   instructions.  Correct?
21   A.    No, sir.  I had to follow their instructions all
22   the time.
23   Q.    Well, for example, I believe you testified the
24   other day sometimes you felt you spoke too much, you
25   felt.
```

1        Do you agree with that?

2   A.    Yes, sir.

3   Q.    And you said you spoke too much because you were

4   saying more than what they were saying.

5        Would you agree with that, sir?

6   A.    No, sir.  I was explaining myself.  I didn't move

7   from the point where the FBI told me to bring upon the

8   conversation -- previous conversation we had before one

9   meeting.

10       Let's say we had meeting on March 9.  I got --

11  after the meeting, I got debriefed from the FBI.  If we

12  will meet the next day, before that meeting, the FBI

13  will meet with me and brief me and tell me what to say,

14  what point I have to bring to the conversation.

15       Now, sometimes I overspeak, but not far from the

16  point.  It's explaining the point, what make me extend

17  or stretch how I want to address the point.

18  Q.    Were you overspeaking the numerous times you told

19  him the money was coming, the money was coming?  Did

20  you overspeak then?

21  A.    What do you mean by that, sir?

22  Q.    Did you overspeak?  Did you say a little bit too

23  much about money coming that really wasn't coming?  Did

24  you say the words too many times about money?

25  A.    Sometimes when he ask me about the money, I have

 1    to explain to him that, "It not in my hand.  It's not

 2    up to me.  I'm not the one who decide.  They receive

 3    your request.  They are working on it," something not

 4    to confirm or deny anything.

 5    Q.    Well, you were constantly reassuring Mr. Batiste

 6    that there was money coming; were you not?

 7              MS. ARANGO:  Objection, Judge, to the form.

 8    It's also --

 9              THE COURT:  Sustained.

10              Rephrase your question.

11    BY MR. LEVIN:

12    Q.    March 16th.

13    A.    Yes, sir.

14    Q.    You met with the FBI prior to this meeting.

15    Correct?

16    A.    Yes, sir.

17    Q.    And, basically, they told you what they wanted

18    you to do.  Correct?

19    A.    Yes, sir.

20    Q.    And just to backtrack just a bit, you were

21    playing a role, as we've -- as you've testified to.

22    Correct?

23    A.    Yes, sir.

24    Q.    And you've testified that it was the FBI who told

25    you to tell these guys, referring to the Defendants,

```
 1   that you were a friend of Abbas's uncle.  Correct?

 2   A.    Yes, sir.

 3   Q.    Now, you testified in a prior occasion on

 4   October the 24th of 2007.

 5         Do you recall that testimony?

 6   A.    No, sir.

 7   Q.    Well, you've indicated that you've testified in

 8   connection with this matter on at least two prior

 9   occasions.  Correct?

10   A.    Yes, sir.

11   Q.    And referring you to October the 24th of 2007, do

12   you recall being asked the following questions and

13   giving the following answers?  And that would have been

14   on October the 24th of 2007, on Page 49, Lines 11

15   through 22.

16         "Question:  All right.  When you were being

17   debriefed about what your role was going to be, did you

18   understand that you were going to be a friend to an

19   uncle to Mr. Abbas?

20         "Answer:  I believe, sir, I came up with this

21   one.  I believe I -- in certain situation, I come up

22   with this friend uncle and all this stuff.  I come up

23   with this.

24         "Okay.  So --

25         "Answer:  I believe that.
```

```
 1          "Question:  So you came up with that

 2   relationship?

 3          "Answer:  I don't believe somebody told me to say

 4   I'm friend of his uncle.  I'm not remembering exactly.

 5   All what they briefed me is...."

 6          That was the end your answer.

 7          Do you recall being asked those questions and

 8   giving those answers with regard to whose idea it was

 9   for you to portray yourself as a friend of an uncle of

10   Abbas al-Saidi?

11   A.     I remember -- if it's there, yes.  I say that.

12   Q.     So was it the FBI's idea or was it your idea,

13   sir?

14   A.     Sir, did you read now and I -- I thought you say

15   something that I don't remember.  Maybe.

16   Q.     Did you want me to --

17   A.     So it's not confirming -- in the end of my --

18   what you said, what you -- was -- was reading, I don't

19   remember.  Maybe.

20          So it's not confirmed that it's my idea

21   100 percent.  I still added, "I don't remember

22   exactly."  And was fair enough.  I don't remember

23   exactly.

24   Q.     Now, in this meeting on 3-16, there came a point

25   in time when you are driven back to Miami Beach by
```

```
 1   Patrick Abraham.

 2           Do you recall that?

 3   A.      Yes, sir.

 4   Q.      And you testified that you had very little

 5   conversation with him during that trip back.  Correct?

 6   A.      Yes, sir.

 7   Q.      And this was after this so-called oath of loyalty

 8   had been taken.  Correct?

 9   A.      Yes, sir.

10   Q.      And during the ride back -- you've listened to

11   the recording of the conversation -- or little

12   conversation that you had.  Correct?

13   A.      Yes, sir.

14   Q.      And you would agree with me that primarily what

15   you hear on the ride back is music?  Would you agree

16   with that?

17   A.      I remember we had small conversation, little bit

18   conversation, and the radio was on or CD.  I don't

19   remember.

20   Q.      Did he ever indicate to you -- and you had

21   testified that you didn't think it was necessary to

22   engage him in conversation at this point because you

23   had already -- you know, there was not really more to

24   talk about.

25           Do you remember that testimony?
```

1    A.    Yes, sir.

2    Q.    But that didn't stop Mr. Abraham from speaking to

3    you, did it?

4    A.    I don't know, sir.

5    Q.    That's true.  You wouldn't.

6          Did he during that ride back ever say to you,

7    "I'm so happy now that we have formed an alliance with

8    Al-Qaeda"?

9    A.    No, sir.

10   Q.    Did he say to you, "I'm really sorry for

11   strip-searching you" on March 9th, 2006, just one week

12   prior?

13   A.    No, sir.

14   Q.    Did you ever ask him any questions about why he

15   had, according to you, strip-searched him -- or why he

16   had strip-searched you, rather, March 9th of 2006?

17   A.    No, sir.

18   Q.    You would agree with me, sir, that the purpose of

19   a recording is to memorialize certain events; is it

20   not?

21   A.    Yes, sir.

22   Q.    And you, being an experienced confidential

23   informant with the FBI for over 13 years, would know

24   that it would be a good technique by to you engage him

25   in a conversation where he were to make admissions

 1   about certain conduct to which you have testified in

 2   this case.  Isn't that correct, sir?

 3   A.    No, sir.  Because every case, there is agent

 4   working the case.  And I'm not an agent.  So I have to

 5   follow the instruction of the FBI or what I am directed

 6   from the FBI.  Each case, different agent, different

 7   people.  I have to follow no matter -- I have to follow

 8   what they tell me to do.

 9         And, second, if -- I believe we established

10   connection with the leader of the group, with the

11   Brother Naz.  They took the oath, pledge to Al-Qaeda,

12   all of them.  And I follow what the FBI told me to do

13   in the meeting.

14         I didn't see any --

15           MR. LEVIN:  Judge, I'm not trying to cut the

16   witness off, but this is at this point a narrative and

17   it's nonresponsive and he, in essence, is giving a

18   speech now.

19           THE COURT:  Well, let him just finish his

20   answer.

21   BY MR. LEVIN:

22   Q.    Finish your testimony, sir.

23   A.    We established the communication.  I didn't see

24   any reason to talk with Brother Patrick about anything.

25   Q.    Well, one of the instructions that you were given

1    with regard to this investigation was to determine the

2    intent and the plan of the individuals involved.

3    Correct?

4    A.    Yes, sir.

5    Q.    And it's your testimony that, with regard to your

6    training, you didn't feel it necessary to determine his

7    intent with regard to this plan?

8    A.    No, sir.  Because already -- March 16, already we

9    had -- prior to the March 16, they explained their

10   intention.  They explained what they want to do.  They

11   took the pledge for Al-Qaeda.  They request weapons.

12   So the intention already is discovered.

13   Q.    Well, they stopped requesting weapons after the

14   lists were provided.  Correct?  Nobody ever requested a

15   weapon after that.  Isn't that true, sir?

16   A.    They give us a list and they were asking for --

17   about the list several times.

18   Q.    Did they ever ask you for guns in February or

19   grenades?

20   A.    Dynamite.

21   Q.    Or rocket launchers?

22   A.    He brought about dynamite and explosives, about

23   his plan in Chicago, sir.

24   Q.    Did Patrick Abraham ever ask you for any weapons?

25   A.    He was present.

1    Q.     You were present with him in a car on March

2    the 16th where he took you back to your oceanfront

3    apartment on Miami Beach.  Correct?

4    A.     Are you asking me, sir, on March 16 now for --

5    Q.     I'm asking you about March 16th, when you were in

6    a car with Patrick Abraham for about a 20-to-30-minute

7    ride from Liberty City to your oceanfront apartment on

8    Miami Beach.

9    A.     No, sir.

10   Q.     Did he ever ask you, like, "What's going on here?

11   When are we going to see our weapons?"

12   A.     No, sir.

13   Q.     Did he ever ask you for any hand grenades?

14   A.     No, sir.

15   Q.     The English language has not been a problem for

16   you.  I just want to make sure.  Is that correct?

17   A.     Sometimes I have problem to explain myself or

18   certain words I don't understand at all.

19   Q.     Now, do you recall testifying about your comfort

20   level with the English language back in February of

21   2008, on February 22nd of 2008 --

22   A.     Yes, sir.

23   Q.     -- and being asked the following question at

24   Page 167, Lines 5 and 6 and 7:  "Question:  How

25   comfortable are you speaking in English?  "Answer:

 1    Very good.  There is certain words I cannot understand,

 2    but I will ask you if I don't," when asked by

 3    Ms. Arango about how well your English was?

 4          Do you recall that testimony?

 5              MS. ARANGO:  Objection.  Improper impeachment.

 6    No inconsistency.

 7              THE COURT:  Sustained.

 8              MR. LEVIN:  Judge, respectfully --

 9              THE COURT:  Sustained.  Sustained, Mr. Levin.

10              MR. LEVIN:  I would just ask that you request

11    that the prosecutor not offer speaking objections with

12    regard to her theory as to --

13              THE COURT:  Overruled.

14          Go ahead.

15              MR. LEVIN:  Okay.

16    BY MR. LEVIN:

17    Q.    Now, the next time you saw Mr. Abraham was on

18    March 24th.

19          Do you recall that?  This is this ride to the

20    Best Buy.

21    A.    Yes, sir.

22    Q.    And he had very little to say during that ride.

23          Would you agree with that?

24    A.    Yes, sir.

25    Q.    He didn't go into the Best Buy with you?

```
 1   A.    No, sir.

 2   Q.    After March 24th of 2006, you never saw him

 3   again.

 4         Would that be correct, sir?

 5   A.    I don't remember exactly, sir.

 6   Q.    Well, you don't remember if you saw him after

 7   March 24th of 2006?

 8   A.    No, sir.

 9   Q.    Was he ever in the warehouse after March 24th of

10   2006, to your recollection?

11   A.    I don't remember, sir.

12   Q.    When you were there?

13   A.    I don't remember, sir.

14   Q.    Was he involved in the taking any kind of

15   pictures in your presence?

16   A.    Excuse me?

17   Q.    Was he involved in taking any pictures in your

18   presence or reviewing pictures in your presence?

19   A.    I don't remember, sir.

20   Q.    Now, referring you, sir, to March 27th,

21   Government's Exhibit 81-B -- that would be in the

22   synchronized binder.

23         Do you have that binder up there still?

24   A.    Yes, sir.

25   Q.    Page 9.  Page 9.
```

1          Now, this was the meeting, you recall, where you

2    gave Mr. Batiste money for a lawyer.

3          Do you recall that?

4    A.    Yes, sir.

5    Q.    And then also during this meeting, you advised

6    him, did you not, that you were working on the money

7    issue?  Do you recall that?

8    A.    What paragraph, sir?

9    Q.    Middle of the page, on Page 9, the longest

10   passage that appears on that page, where you say

11   "Especially, also, I'm working on the money issue, on

12   the money issue, but I don't want to speak about it

13   right now because I don't have the whole information."

14         Do you recall that?

15   A.    Yes, sir.

16   Q.    And the reason that you're making those

17   statements is because Mr. Batiste is asking you about

18   when the money's coming.

19         Would you agree with that?

20   A.    Yes, sir.

21   Q.    And, basically, you're telling him, "I don't want

22   to talk about that right now."  Right?

23   A.    No.  I explained to him, sir, in the paragraph --

24   same paragraph -- the beginning of the paragraph, I

25   explained to him on Page 9, that "There is procedures.

1    There is -- for -- money for the mission."

2         So I explained to him -- if you can read it all,

3    sir, you can see I gave him -- I told him there is

4    procedures and about money of the mission.

5    Q.    The money for --

6    A.    For the mission.  And it's on -- it's on the

7    four -- one, two, three, four --

8    Q.    Right.

9         Where you say, "They are sending to me all the

10   information, because to get the money and to send for

11   support mission" --

12   A.    Yes, sir.

13   Q.    -- "and all what you want, it some -- there is

14   procedures -- procedures in the case.  It's like to --

15   to get to -- I cannot walk and come or anybody can come

16   to the United States (unintelligible) like let's say

17   $20,000 or $40,000 or $100,000."

18        You're even suggesting to him that you might get

19   him $100,000.

20        Do you see that, sir?

21   A.    No, sir.  Because it say -- if you continue, sir,

22   it say -- "You see, we cannot do that."  So it's like

23   continuous of what you said, sir.  It says, "We cannot

24   do that."

25   Q.    And then you're suggesting to him that, "In order

```
 1    to do that, you need to have a bank account over here"?
 2    A.    So it's not like promising him, sir, like you
 3    said.  I said, "We cannot do that."  Was so clear.
 4    Q.    So it's clear, sir, I am not saying that you
 5    promised him anything.  Okay?
 6    A.    Okay, sir.
 7    Q.    I'm only asking you questions as to what you
 8    said, Mr. Assaad.  Correct?
 9              MS. ARANGO:  Objection.
10              THE WITNESS:  Yes, sir.
11              MS. ARANGO:  Improper.
12              THE COURT:  Sustained.
13    BY MR. LEVIN:
14    Q.    I'm asking you questions about what you stated on
15    Page 9 of this transcript.  Is that not correct, sir?
16              MS. ARANGO:  Objection.  Relevance.  It's
17    improper form.
18              THE COURT:  Sustained.
19              Rephrase your question.
20    BY MR. LEVIN:
21    Q.    Then after talk about needing to have an account
22    over here, you say, "It's like -- because it's -- money
23    transfers, you know, money -- getting money from one
24    place to another place."
25              Do you see that, sir?
```

1    A.    Yes, sir.

2    Q.    And what you meant by that was getting money from

3    overseas into his hands.  Correct?

4    A.    No, sir.  Because I was directed from the FBI.

5    The FBI told me, actually, to bring this subject, this

6    conversation, with Brother Naz.

7    Q.    Now, again, you remember specifically that this

8    was a conversation that they asked you to initiate with

9    him?

10   A.    Yes, sir.

11   Q.    And in the same conversation -- rather, moving

12   now to April 3rd --

13   A.    Exhibit?

14   Q.    -- six days later -- 85-B.

15         On Page 20, he tells you that he's overdrawn

16   $400.  At the bottom of Page 20, four up from the

17   bottom.  Rather, you tell him -- strike that.  Let me

18   rephrase.

19         You say -- he says to you, seven speakers from

20   the bottom -- let me rephrase.

21         Just above that, you tell him that the most

22   important -- what's important is that he's able to now

23   have an account.

24         And you're asking him, "When you are able more --

25   when do you think -- when can you able to --"

1          And that's when he says, "Well, I owe some money

2    on my account.  My account is late.  So I got to catch

3    up.

4          "Like how?  How late, the" -- you respond.

5          Do you see that, sir?

6    A.    Yes, sir.

7    Q.    And he tells you that he owes $400 into his

8    account, that he's overdrawn $400.

9          And you indicate "You're overdrawn $400?"

10         Do you see that, sir?

11   A.    Yes, sir.

12   Q.    And he says it hasn't been a good financial month

13   for him.

14         Do you see that?

15   A.    Yes, sir.

16   Q.    That's all with the book.

17         There comes a point in time, sir, does there not,

18   when you're informed that this group is basically

19   breaking up?  Isn't that true?

20   A.    I didn't understand the question, sir.

21   Q.    There comes a point may time -- into April,

22   now -- when something happens and you become aware that

23   the group is breaking up?

24   A.    Yes, sir.

25   Q.    And that happens -- I believe you testified about

```
 1   a meeting on April the 19th?

 2   A.     Yes, sir.

 3   Q.     And after that, you basically have no further

 4   contact with Mr. Batiste until May 24th of 2006.  Isn't

 5   that correct?

 6   A.     Yes, sir.

 7   Q.     You said, "Yes, sir"?

 8   A.     Maybe 24.  Yes, sir.  When he went to the

 9   Embassy -- to the warehouse and get the computers.

10   Q.     Right.

11          And you testified that you met him at the

12   warehouse.  This is a month after your last meeting

13   with him of April 19th.  Correct?

14   A.     Yes, sir.

15   Q.     You were trying to track him down into May

16   telephonically.

17          Would you agree with that?

18   A.     Yes, sir.

19   Q.     And you had a conversation with him at the

20   warehouse on May 24th; did you not?

21   A.     I believe.  Yes, sir.

22   Q.     He told you that it was a problem because he was

23   concerned about Brother Pat and the Sultan.

24          Do you remember that testimony -- do you remember

25   that conversation, I mean?
```

1    A.      I believe was on May 19th, sir, the conversation

2    was -- he told me about Brother Patrick and Sultan.

3    Q.      You're not sure of the date?

4    A.      No.  I'm sure on May 19 he told me about what's

5    going on, that they were suspicious of me, I am

6    undercover agent and I'm working for the Government.

7            And Brother Patrick and Sultan told him, if they

8    stop talking to me for 15 days, the Government will

9    come and pick him up.  And that's the reason there were

10   problems.

11           They split.  Brother with him.  Brother with

12   Brother Patrick and Sultan.  And other brothers were in

13   the middle.  So I believe this is on May 19th.

14   Q.      You believe.

15           Does that mean you don't have a firm

16   recollection?

17   A.      90 percent, I believe -- I know this happened on

18   March -- on May 19, sir.

19   Q.      You testified on direct examination through

20   Ms. Arango that you went to a warehouse on May 24th and

21   had a meeting with Mr. Batiste.

22           Do you recall that?

23   A.      Yes, sir.  When he pick up the computer.

24   Q.      Right.

25           And at the warehouse is when he had a

```
 1   conversation with you with regard to Mr. Abraham; did

 2   he not?

 3   A.    I don't remember about that day, sir.

 4   Q.    You don't remember about that day?

 5   A.    Yes, sir.

 6   Q.    Do you recall him telling you that all

 7   Mr. Abraham and Mr. Sultan Kahn-Bey wanted was the

 8   money?  Do you recall him telling you that?

 9   A.    No, sir.

10   Q.    Is there something that might refresh your

11   recollection?

12   A.    Yes, sir.

13         MR. LEVIN:  Your Honor, if I may approach the

14   witness.

15         THE COURT:  Yes.

16   BY MR. LEVIN:

17   Q.    I'm going to show you what I will mark as

18   Abraham's Exhibit 5 for identification, asking you to

19   read or review at your leisure that particular page,

20   25, and see if that refreshes your recollection as to

21   whether or not Mr. Batiste told you that Mr. Abraham's

22   interest was solely in the money.

23   A.    Before I answer that, I need to review a little

24   bit, sir.

25   Q.    Sorry?
```

1    A.      Before I answer, I need to just --

2    Q.      Go right ahead.

3    A.      Thank you.

4            No, sir.  I need to -- to your question, no.  I

5    need to explain it why, because --

6    Q.      That's fine.

7    A.      -- on Page 24 --

8    Q.      Yes, sir.

9    A.      -- I caught what Brother Naz said.  "Yeah.  The

10   only -- the only brother that they were after -- they

11   were after me because -- like you said, it was because

12   of jealousy.  You know what I mean?

13           "They wanted to be the ones -- the leader that

14   called the shots and whatnot.  Yeah.  They like

15   everything else.  They liked it that -- that we was --

16   that we was gonna be working with Al-Qaeda."

17           I will repeat:  "That we was gonna be working

18   with Al-Qaeda on that, they."

19           So this is what Brother Naz and -- before one

20   page mentioned about Brother Patrick and the other --

21   Brother Sultan.

22   Q.      Do you want to read Page 25 while you're at it.

23           MS. ARANGO:  Judge, this exhibit's not in

24   evidence.

25           MR. LEVIN:  So they're objecting to something

Assaad - CROSS - By Mr. Levin                    187

```
 1    that they created as not being in evidence and he's

 2    reading from it?

 3            THE COURT:  Well, rephrase your question.

 4    BY MR. LEVIN:

 5    Q.    Let me have that transcript back for one second.

 6    A.    (Witness tenders document to counsel.)

 7    Q.    Do you recall in that meeting that Mr. Batiste

 8    said to you that, "They want them to handle

 9    everything --

10            "Yeah.  So they can have --"

11            And Batiste says, "So they can get the money.

12    And, see, once they get money then, you know, they'll

13    do whatever they want with it.  They're not gonna do

14    what they're gonna say they're gonna do."

15            Do you recall that, sir, meaning they're not

16    going to wage war against the United States, sir,

17    they're not going to join forces with Al-Qaeda, sir,

18    they're going to do whatever they want with the money

19    themselves?

20            Do you recall that, sir?

21            MS. ARANGO:  Objection to the speech, Judge.

22            THE COURT:  Sustained.

23            Rephrase your question.

24    BY MR. LEVIN:

25    Q.    Do you recall that, sir?  They're not going to
```

1  do with the money what they say they're going to do?

2          MS. ARANGO:  Same objection, Judge.

3  BY MR. LEVIN:

4  Q.   Do you recall that, sir?

5          THE COURT:  Could you rephrase your question,

6  please.

7  BY MR. LEVIN:

8  Q.   They're not going to do with the money what they

9  say they're going to do.

10         Do you recall that conversation, sir, Mr. Batiste

11  telling you that?

12  A.   Yes, sir.  And explaining why I'm saying "yes,"

13  because he's explaining, like I said, what he told me

14  and was what I said.  "They want to be the one.  They

15  want to work with Al-Qaeda."

16         It's not -- and one of their interest is the

17  benefit what they sought, the money, the support,

18  Al-Qaeda, all this package with Al-Qaeda.

19         So he was explaining his point of view.

20  Q.   And he tells you that, once they get the money,

21  they'll do whatever they want with it and that they're

22  not going to do with it what they say they're going to

23  do with it.

24         That's what he says.  Is that not true, sir?

25          MS. ARANGO:  Objection.  Asked and answered.

```
 1              THE COURT:  Sustained.
 2    BY MR. LEVIN:
 3    Q.    The reason he says that, sir, is because that's
 4    his plan.
 5          That's Mr. Batiste's plan.  Correct?
 6    A.    Is question, sir?
 7    Q.    Mr. Batiste's plan was to get the money.  And
 8    that's how he knew that Mr. Abraham was not going to do
 9    with the money what he said he was going to do with the
10    money, because it was Mr. Batiste's plan all along to
11    get the money.  Isn't that true, sir?
12              MS. ARANGO:  Objection to the speech.  It's
13    also a compound question and convoluted.
14              THE COURT:  Sustained.
15              Rephrase your question.  It's compound.
16    BY MR. LEVIN:
17    Q.    Mr. Batiste told you he wasn't going to do with
18    the money what he said he was going to do.  Correct?
19    A.    About -- I --
20    Q.    About Mr. Abraham, Mr. Batiste says to you he's
21    not going to do with the money what he says he's going
22    to do.  Correct?
23    A.    Yes and no, sir.
24    Q.    That is, use the money to wage a war or to join
25    forces with Al-Qaeda?
```

```
 1              MS. ARANGO:  Objection to interrupting the
 2   witness.
 3   BY MR. LEVIN:
 4   Q.    Sorry, Mr. Assaad.
 5              THE COURT:  Let him finish his answer.
 6   BY MR. LEVIN:
 7   Q.    Sorry.
 8   A.    Because he said -- was clear what he said:  They
 9   want to be the leader.  They want to take him out from
10   the picture.  They want to work with Al-Qaeda.  And he
11   was telling me, "Be careful what you said.  Be careful.
12   They will not be helping Al-Qaeda" or something like
13   that.  "But they want to be working with Al-Qaeda."
14              So he's giving me different -- you know, telling
15   me what they want to do.
16   Q.    On March 16th, when you had the drive back to
17   Miami Beach, did he ever tell you he wanted to be the
18   leader?
19   A.    No, sir.
20   Q.    Did he ever tell you that he was just so excited
21   to have joined forces with Al-Qaeda?
22              MS. ARANGO:  Objection.  Asked and answered.
23              THE COURT:  Sustained.
24   BY MR. LEVIN:
25   Q.    Did he ever tell you, "Look, don't deal with
```

1    Mr. Batiste.  Deal with me.  I want to be in charge"?

2    A.    No, sir.

3    Q.    The reason Mr. Batiste told you about

4    Mr. Abraham's intentions, which were to just get the

5    money and nothing more, was because that was his plan

6    all along, just to get the money.

7         Isn't that true, sir?

8              MS. ARANGO:  Objection.  Assuming facts not in

9    evidence and asking for a conclusion.

10             THE COURT:  Sustained.

11             MR. LEVIN:  One moment, your Honor.

12             I have no further questions, your Honor.

13             THE COURT:  Thank you.  We're going to take a

14   break.

15             Do not discuss this case either amongst

16   yourselves or with anyone else.  Have no contact

17   whatsoever with anyone associated with the trial.  Do

18   not read, listen or see anything touching on this

19   matter in any way.

20             If anyone should try to talk to you about this

21   case, you should immediately instruct them to stop and

22   report it to my staff.

23             You may leave your materials in your chairs.

24   Be back in the jury room in ten minutes.  It will be

25   ten minutes this time.

```
1              (Whereupon, the jury exited the courtroom at

2   3:30 p.m. and the following proceedings were had:)

3              THE WITNESS:  I go down?

4              THE COURT:  You may step down, sir.

5         (Witness excused.)

6              THE COURT:  You may be seated for a minute.

7         I just wanted to supplement my findings in

8    regard to the investigative privilege.

9              I have found that the qualified Government

10   privilege not to disclose sensitive investigative

11   techniques applies -- I find that, when balancing the

12   disclosure of surveillance -- the nature and techniques

13   of surveillance devices that might educate criminals

14   regarding how to protect themselves against police

15   surveillance and compromise electronic surveillance as

16   an important tool of law enforcement and its

17   effectiveness -- when balancing that against the

18   ability of the Defendants here to cross-examine the

19   witness as to the size of the device, the nature and

20   scope of the strip-search, the cross-examination on the

21   retention of other electronic devices, i.e., cell

22   phones, and being able to argue the plausibility or

23   lack of plausibility of the strip-search, its scope,

24   its existence, that they can make those arguments to

25   the jury based upon the facts that they have elicited
```

1    in cross-examination.

2         When balancing those factors, I find that the

3    Defendants have not demonstrated necessity pursuant to

4    *United States versus Van Horn*, 789 F.2d 1492.

5         We're in recess for ten.

6         (Thereupon a recess was taken, after which the

7    following proceedings were had:)

8         THE COURT:  We're back on United States of

9    America versus Narseal Batiste, et al., Case

10   No. 06-20373.

11        Counsel, state your appearances, please, for

12   the record.

13        MR. GREGORIE:  Richard Gregorie and Jacqueline

14   Arango on behalf of the United States, your Honor.

15        MS. JHONES:  Ana Jhones on behalf of Narseal

16   Batiste.

17        MR. LEVIN:  Albert Levin on behalf of Patrick

18   Abraham, who's present.

19        MR. CASUSO:  Lou Casuso on behalf of Burson

20   Augustin, who's present.

21        MR. CLARK:  Nathan Clark for Rotschild

22   Augustine, who's present.

23        MR. HOULIHAN:  Richard Houlihan with Naudimar

24   Herrera.

25        MR. VEREEN:  And Roderick Vereen on behalf of

```
 1    Stanley Phanor, who's present.

 2              THE COURT:  All Defendants are present.

 3              Let's bring the jury in.

 4              (Whereupon, the jury entered the courtroom at

 5    3:49 p.m. and the following proceedings were had:)

 6              THE COURT:  You may be seated.

 7              You are still under oath, sir.

 8              You may be proceed, Ms. Arango.

 9              MS. ARANGO:  Thank you, your Honor.

10                        REDIRECT EXAMINATION

11    BY MS. ARANGO:

12    Q.    Mr. Assaad, do you have the -- all of the binders

13    in front of you with all of the transcripts in them?

14    A.    I believe so.  Yes, ma'am.

15    Q.    Okay.  Great.  Because I'll be referring to some

16    of them during the course of this.

17              Now, Ms. Jhones was referring to Government's

18    Exhibit 44-A, which is in the synchronized binder.

19    It's the recording of the meeting that you had on

20    March -- excuse me -- on December 16th.  It was that

21    first meeting that you had with -- with Mr. Batiste.

22    December 16th.

23    A.    Yes, ma'am.

24    Q.    Now, specifically, she claimed that you first --

25              MS. JHONES:  Objection to the
```

```
 1    characterization.

 2              THE COURT:  Sustained.

 3              Rephrase your question.

 4    BY MS. ARANGO:

 5    Q.    Well, what -- Ms. Jhones questioned you about the

 6    fact that you had allegedly used the word "jihad" for

 7    the first time in this conversation at Page 34.

 8              Do you recall that line of questioning?

 9    A.    Yes, ma'am.

10    Q.    And you can turn to Page 34, if you want --

11    excuse me.  I'm sorry.

12              She was referring to Page 35 -- I apologize --

13    which is the second speaker down --

14    A.    Yes, ma'am.

15    Q.    -- when you say, "But what you're asking for,

16    brother, is to make mission, jihad, make something."

17    A.    Yes, ma'am.

18    Q.    Now, referring to Page -- hold that page.

19              But referring to Page 26, did anyone mention --

20    who was the first person in this conversation to

21    mention the word "jihad"?

22    A.    On the Page 26, ma'am, the second one, that say

23    "NB," ma'am, Brother Naz says, "An Islamic army for

24    Islamic jihad."

25    Q.    And just refresh -- please tell the members of
```

```
 1    the jury what he was referring to in that portion of

 2    the conversation.

 3               MS. JHONES:  The document speaks for itself,

 4    your Honor.

 5               THE COURT:  Sustained.

 6               Rephrase your question.

 7    BY MS. ARANGO:

 8    Q.    What did you understand him to be telling you in

 9    that portion of the conversation?

10    A.    He's saying he want to build an Islamic army and

11    for the jihad.

12    Q.    Okay.  What were you asking him before he told

13    you that?

14    A.    I was asking him what his plans -- on Page 25

15    of -- the bottom of the Page 25, I was asking Brother

16    Naz, "I'm with you, brother.  You have a good

17    influence.  I'm with you.  But what's your plan?"

18    Q.    Now, let's go back to Page 35.

19          Now, Ms. Jhones asked you about how Mr. Batiste

20    discussed his constitutional rights.  Do you see that?

21          She talked about how, at the top of Page 35, he

22    talked about his constitutional rights.  Do you see

23    that at the very top of Page 35?

24    A.    Yes, ma'am.

25    Q.    All right.  Now, turn to Page -- the page right
```

 1   before that, Page 34.

 2        Was that conversation about his constitutional

 3   rights?  Was it a continuation of what he was

 4   discussing at the bottom of Page 34?

 5            MS. JHONES:  Your Honor, I'm going to object

 6   because she's leading the witness.

 7            THE COURT:  Sustained.

 8            Rephrase your question.

 9   BY MS. ARANGO:

10   Q.    What, if anything, did Mr. Batiste discuss at the

11   bottom of Page 34 before he talked about constitutional

12   rights at Page 35?

13   A.    I need one second, ma'am, to answer you.

14   Q.    Go right ahead.

15   A.    That their group -- they have right in United

16   States, because he was telling me about the 1774, the

17   right, the Moroccan flag, the Islamic flag.

18        And they have on Page 34, where he was explaining

19   to me the rights in United States to create an Islamic

20   state and overthrow the Government.

21   Q.    Now, Ms. Jhones also asked you, going -- turning

22   back to Page 25, about how Narseal Batiste said to

23   you -- three speakers down from the top of the page --

24   how -- I believe she said to you how Narseal Batiste

25   discussed with you fighting a war with intelligence.

1        Do you see that?  Fighting a war with

2   intelligence.  Do you recall that questioning?

3   A.     What page, ma'am?  25?

4   Q.     Page 35.

5   A.     Oh, 35.

6   Q.     35, three speakers down.

7        The question is:  Do you recall Ms. Jhones asking

8   you about Narseal Batiste's discussion about fighting a

9   war with intelligence?

10  A.     If -- yes, ma'am.

11  Q.     Referring to Page 35, three speakers down.

12  A.     Yes, ma'am.

13  Q.     Okay.  Now, looking at the third speaker down on

14  Page 35, did Narseal Batiste discuss about any other

15  way to fight a war?

16  A.     No, ma'am.

17  Q.     Well, in this, reading to you, "Now, there's two

18  ways to" --

19        MS. JHONES:  Objection.  Objection.  Leading

20  the witness.

21        MS. ARANGO:  I'm reading it and I'm going to

22  ask him what his understanding is, Judge.  It's not

23  leading.

24        THE COURT:  Overruled.

25

BY MS. ARANGO:

Q.     "Now, there's two ways to fight a war, one with physical and one with intelligence.  Any man with war would know that."

       What did you understand him to be telling you about ways to fight a war?

A.     I understood, ma'am, that in -- he was telling me -- he was explaining to me that -- about the Government, about taking down -- creating the Islamic state, creating Islamic army, jihad against United States.

       This is what explained to me, Brother Naz, how he want to make the war against the United States.

Q.     Well, what did you understand him to mean regarding any different ways to fight a war in addition to intelligence?

       MS. JHONES:  Objection.  Asked and answered and vague.

       THE COURT:  Sustained.

       Rephrase your question.

       MS. ARANGO:  I'll go on.

BY MS. ARANGO:

Q.     Now, Ms. Jhones also stated that you never mentioned in this conversation that you were from Al-Qaeda or from a terrorist organization.

1          Do you recall that line of questioning?

2   A.     Yes, ma'am.

3   Q.     Now, turn to Page 38, please.

4          Three speakers down from the top, where you say,

5   "I have a feel for what you are saying.  The

6   Government, from -- I don't know who (unintelligible) I

7   don't come.  I stay home.  I'm supporting my brothers,

8   but from my home.  I will speak with my brothers today.

9   I will speak with them.  I will give them -- I will

10  give my opinion," who were you referring to there?

11  A.     I was speaking -- referring to Al-Qaeda or to

12  terrorist organization overseas.

13  Q.     Okay.  Also, with respect to this same

14  conversation on December 16th, Mr. Clark asked you:

15  Weren't you trying to limit the conversation to

16  weapons, explosives and military training?

17         Do you recall that -- that questioning by

18  Mr. Clark on cross?

19  A.     Yes, ma'am.

20  Q.     Okay.  Now, who mentioned weapons in this

21  conversation?

22  A.     Brother Naz.

23  Q.     Who mentioned explosives in this conversation?

24  A.     Brother Naz.

25  Q.     Who mentioned military training in this

1   conversation?

2   A.      Brother Naz.

3   Q.      Turning to Volume I of III, specifically

4   Government's Exhibit 47-A, this is the conversation

5   that you had on -- or the meeting that you had with

6   Brother Naz on December 22nd, 2005.  It's Volume I of

7   III, and it's Government's Exhibit 47-A.

8               THE COURT:  Page, please?

9               MS. ARANGO:  Page 23.

10              THE WITNESS:  I don't have it.  I don't have

11  it.

12  BY MS. ARANGO:

13  Q.      Oh, you do not?  You need Volume I of III?  You

14  need Volume I?

15  A.      I have four here.  I don't know which one is

16  Volume I.

17              MS. ARANGO:  May I approach, Judge?

18              THE COURT:  Yes.

19  BY MS. ARANGO:

20  Q.      Volume I.  That was in your hand.

21  A.      47-A?

22  Q.      Yes.  47-A, 4-7.

23  A.      Oh, yeah.

24  Q.      Turn to Page 23.

25              Once again, Ms. Jhones questioned you about how

 1    you never used the words "terrorist organization" or

 2    "Al-Qaeda" in this conversation.

 3         Do you recall that line of questioning?

 4    A.    Yes, ma'am.

 5    Q.    Now, looking at the bottom of Page 23, second

 6    speaker up, you say, "'Cause my" -- excuse me --

 7    "Because I put my work on the line 'cause my Big, Big

 8    Brother, who confident in me, don't let me work go."

 9         Then he responds, "To nothing."  Narseal Batiste

10    responds, "To nothing."

11         Who were you referring to when you talk to

12    Mr. Batiste about the "Big, Big Brother"?

13    A.    Osama bin Laden.

14    Q.    Turn to Page 48, please, of this same exhibit.

15    A.    What page?

16    Q.    Page 4-8.  Four speakers up from the bottom,

17    Page 48.

18         You say, "Take me to Chicago.  I need

19    authorization from my superiors, from my brother."

20         Who are you referring to there?

21    A.    From Osama bin Laden.

22    Q.    Then again, at Page 60, four speakers up from the

23    bottom, you say, "So we will go if they give

24    authorization and we will see -- we will -- you will --

25    believe me, if what you are saying -- everything

 1  saying -- this legitimate, I will be -- I will believe

 2  that you will get all the support and even the Big

 3  Brother will support you."

 4      Who are you referring to when you're talking

 5  about "Big Brother" there?

 6  A.    Osama bin Laden.

 7  Q.    Now, throughout these conversations, did you use

 8  that type of conversation, "Big Brother," "superiors,"

 9  when referring to either Osama bin Laden or Al-Qaeda?

10  A.    Yes, ma'am.

11  Q.    And why didn't you use -- at least in these early

12  conversations, why didn't you use the word "Al-Qaeda"

13  or "terrorist organization"?

14  A.    Why I didn't use?

15  Q.    Yes.

16  A.    I was directed from the FBI, ma'am.

17  Q.    Okay.  Now, Mr. Vereen asked you questions about

18  Narseal Batiste's motives, that you were asking -- at

19  Pages 31 through 33.

20      Mr. Vereen went through almost line-by-line

21  questioning between you and Narseal Batiste about

22  Narseal Batiste's motives.

23      Turn to Page 31 and take a look.

24      Do you see, four speakers down, where Narseal

25  Batiste says, "I'm not saying that I'm Mohammed or

 1    anybody, but I know one thing.  I'll tell you this

 2    much.  I know that I'm an angel.  I know that I descend

 3    from Allah"?

 4          And then right after he talks to you about that,

 5    he says, "But you didn't" -- you say, "You didn't give

 6    me an answer.  You didn't give me an answer.  Why are

 7    you doing this?"

 8          Do you recall that questioning by Mr. Vereen

 9    about this conversation?  Turn to Page 32.

10    A.    Yes, ma'am.

11    Q.    The one portion that Mr. Vereen didn't ask you

12    about is -- one, two, three, four, five, six, seven --

13    eight speakers down, where Narseal Batiste says to

14    you -- when you're asking him why, he says, "That is

15    the only way.  This Government is evil, is of the

16    devil, and the only way that purity can happen, unless

17    the kingdom of Satan, which is this Government, can be

18    destroyed."

19          Do you see that?

20    A.    Yes, ma'am.

21    Q.    What was your understanding as to what --

22          MR. VEREEN:  Your Honor, first of all, I'm

23    going to object.  That's a misstatement.  I did cover

24    that.

25          THE COURT:  Overruled.

 1          MS. JHONES:  Your Honor, I do have a separate

 2   objection.  I think -- and I don't want to make a

 3   speaking objection.

 4          The form of the question is improper because

 5   it's a leading question by referencing one page which

 6   was previously asked by counsel and then pointing the

 7   witness to -- in a direction of a separate page.  The

 8   way it's being done is improper.  It's in a leading

 9   nature.

10          THE COURT:  Overruled.

11   BY MS. ARANGO:

12   Q.    You may answer.

13         What is your understanding of what Narseal

14   Batiste was telling you there about his motives?

15   A.    Ma'am, he told me very clearly here that, "My

16   motive is this Government.  It's evil."  And he

17   explained his hatred against his Government.

18   Q.    Now --

19   A.    And to be --

20   Q.    I'm sorry.

21   A.    I was reading.

22         "And to be destroyed."  So it's very clear what

23   he -- his motive are after he gave me the speech about

24   everything, about details, and he said, "This is my

25   motives."

```
 1   Q.     Thank you.

 2          Now, turning to that -- in that same binder,

 3   please turn to Government's Exhibit 48-A, which should

 4   be the next tab.  Turn to Page 4.

 5          The second speaker from the top, Ms. -- do you

 6   recall Ms. Jhones asking you about the statement that

 7   Narseal Batiste made where he said, "Money is slow for

 8   me.  With the construction business, money is slow for

 9   me"?

10          Do you recall her asking you about how he told

11   you money is slow, inferring that he wanted money?  Do

12   you recall that line of questioning?

13   A.     Yes, ma'am.

14   Q.     Now, in that same -- in that same speaker, right

15   after that, what did you understand him to be telling

16   you when he said, "But with your help, it will speed up

17   the process.  It will cause us to make certain moves

18   that we need to make in order to make this happen"?

19          What was your understanding of what he was

20   talking about there?

21   A.     About his plan, ma'am.  He was referring very

22   clear about his plan and the process, with the help

23   from Al-Qaeda or terrorist organization, will speed the

24   process of proceeding his plan against -- against

25   United States.
```

1    Q.    Now, turning to Volume II of III, I'm going to

2    be asking you questions about questions on

3    cross-examination regarding the Keys trip on

4    January 28th, which is Government's Exhibit 55-A.

5    A.    55-A?

6    Q.    Yes.

7          Before we turn to a page, though, just turn to

8    the Tab 55-A.

9          Do you recall Mr. Houlihan questioning you

10   about -- I think he referred to them as "nice

11   conversations" that you were having in the car with

12   Patrick Abraham and Naudimar Herrera.  Do you recall

13   his questioning you about these conversations?

14   A.    Yes, ma'am.

15   Q.    And do you remember he said to you, "Well,

16   context is important."

17         Do you recall Mr. Houlihan talking to you about

18   how context was important in terms of these

19   conversations?

20   A.    Yes, ma'am.

21   Q.    Okay.  What was the context of the conversations

22   that you had in this car when you were taken from the

23   Embassy to an unknown location?  What was happening?

24   A.    In general?

25   Q.    In general, what was happening?

```
 1   A.     They took us to -- from the Embassy, we left.

 2   They put us in one car.  We went and we switched cars

 3   behind fast food place.

 4          They drove -- I mean, Brother Patrick and Brother

 5   Naudy -- we switched cars with Brother B and we left

 6   from this fast food place to unknown place.

 7          And I was asking them, "Where we going?"

 8          MR. HOULIHAN:  Judge, I would object to a

 9   continuing narrative.

10          THE COURT:  Sustained.

11          Ask your next question.

12   BY MS. ARANGO:

13   Q.     Did you consider them to be nice to you?

14   A.     No, ma'am.

15   Q.     Turn to Page 99 of Government's Exhibit 55-A, the

16   last speaker down.  There's a large -- a lengthy

17   passage here.

18          Ms. Jhones asked you about this statement that

19   Mr. Batiste said.  "So, like I was explaining to the

20   brother, more than anything, our mission is suffering

21   right now because we lack the financing more than

22   anything."

23          And she asked you about how, in that statement,

24   he was saying, "Forget about the lists.  I don't want

25   any of the items on the list.  I just want money."
```

1       Do you recall that line of questioning?

2  A.    Yes, ma'am.

3  Q.    Now, continuing on in that same conversation,

4  where -- he says, "I want to be helped in a way like I

5  told you before, that nobody can detect my moves, that

6  I can't be caught.  I want it all to be legal.  Do you

7  see what I'm saying?

8       "I made the list to explain, basically, what I

9  need to buy more than anything and what I need to --

10 and what I wanted to make sure is that whatever you

11 get, that it be something that is appropriate.  You see

12 what I'm saying?

13      "It's something that is, like -- say, for

14 instance, if you gave -- if he had $10,000 job for me

15 and maybe he was given $20,000, he paid me the extra

16 10.  I did a job for him for maybe 5 or 7,000.  I got

17 the rest of the money.

18      "It went down on paper that I worked for him.  I

19 did something for him.  I did something.  I collected

20 20 for him.

21      "At the same time, however -- whatever process

22 that we take for filtering money.  But I would need the

23 finances and I would need the money to get

24 everything -- or at least half of the things or the

25 most important things on that list in order to produce

1    what I said was gonna do.

2         "Now" -- excuse me -- "what I said I was gonna

3    do.

4         "Now, the thing about it is that I cannot make a

5    physical plan and hand it to you."

6         What did you -- did you understand him to be

7    telling you, "Forget about the list" --

8              MR. VEREEN:  Objection.  Leading.

9              MS. JHONES:  Objection.  Leading, compound.

10             THE COURT:  Sustained.

11   BY MS. ARANGO:

12   Q.    Did you understand him to be telling you, as

13   Ms. Jhones questioned you, "Forget about the list" --

14             MR. VEREEN:  Objection.  Leading.

15             MS. JHONES:  Same objection.

16             THE COURT:  Sustained.

17             Rephrase your question.

18   BY MS. ARANGO:

19   Q.    What did you understand him to be telling you?

20   A.    He was so clear, ma'am, that he told me -- he

21   didn't tell me, "Forget the list" or "Forget whatever

22   on the list."

23        He said -- he was explaining to me that, "You can

24   get me the stuff on the list," explaining to me like,

25   "To proceed, I need your help.  I need you to help me

1    to proceed to speed the process, what I told you I will

2    do," and get the items, the weapons and all what he put

3    on the list, what he gave me before.

4    Q.    Okay.  Now, do you also recall Ms. Jhones asking

5    you about how Narseal Batiste says he didn't need an

6    explosives expert?  Do you recall that?

7    A.    Yes, ma'am.

8    Q.    Please turn to Page 124.  Look towards the

9    bottom, three speakers up.

10         You say, "So what?  You don't need an expert?

11   You need an expert?"

12         And then Narseal Batiste's response:  "Yeah.  We

13   need an expert to show us how to make them."

14         Do you see that?

15   A.    Yes, ma'am.

16   Q.    What was your understanding as to what was being

17   discussed here?

18   A.    Because, ma'am, on the same page, we are speaking

19   about explosives and he requested he need -- he

20   requested from us, Al-Qaeda, he want an expert to show

21   his brother and his group how -- how to make them, how

22   to prepare the explosives.

23   Q.    Okay.  Ms. Jhones also asked you about how

24   Batiste really didn't want the warehouse and how you

25   were pushing it on him.

1          Do you recall that line of questioning?

2    A.    Yes, ma'am.

3    Q.    Please turn to Page 129.

4          Towards the bottom of Page 129, three speakers

5    up, Narseal Batiste:  "I'll find a place and a location

6    and I'll give you the number.  And you can call and get

7    it."

8          And then you say, "However way you want it down."

9          Brother Naz:  "It's up to you, man."

10         And then his response:  "Because if we get a

11   warehouse in a commercial area, where it's only

12   18-wheelers and" -- going on to the next page -- "big

13   trucks doing business international, then they won't

14   suspect."

15         What's your understanding as to what he's telling

16   you there?  That's the bottom of Page 129.

17   A.    He's requesting -- he's asking for a warehouse,

18   ma'am.  And he's telling me where we can get the area

19   and -- for the safety reasons.

20   Q.    What did you understand "safety reasons" to mean?

21   A.    Because he doesn't want to -- his move to be

22   detected from the Government or somebody be watching

23   him and about his plans.

24         Because even in the same page, on 129, he's

25   requesting a warehouse and safe place.  And he said on

Assaad - REDIRECT - By Ms. Arango          213

```
 1    Page 130, "Then they won't suspect."  He refer to the

 2    Government.

 3    Q.    Now I'm going to talk about the conversation --

 4    the meeting that you had with Narseal Batiste and

 5    Patrick Abraham on February 19th, which is in the

 6    synchronized -- the binder with the synchronized

 7    transcript.  I'm going to please ask you to turn to the

 8    exhibit marked 56-B.

 9              THE COURT:  Page?

10              MS. ARANGO:  Page 49.

11              THE WITNESS:  56-B?

12    BY MS. ARANGO:

13    Q.    56-B in the synchronized binder.

14          Do you need some help?

15    A.    Yes, ma'am, please.

16              MS. ARANGO:  May I approach?

17              THE COURT:  Yes.

18              THE WITNESS:  Volume II?

19    BY MS. ARANGO:

20    Q.    No.  Synchronized.  Do you see the word

21    "Synchronized"?

22    A.    Page?

23    Q.    Page 49.

24          I'm referring to about the middle of the page,

25    where Mr. Clark asked you questions about Narseal
```

 1   Batiste telling you that he needs horses.

 2        Do you recall that line of questioning?

 3   A.    Yes, ma'am.

 4   Q.    And Mr. Clark was saying:  Isn't it preposterous

 5   that he would need horses?

 6        Do you recall that line of questioning?

 7   A.    Yes, ma'am.

 8   Q.    Now, looking down at the bottom of Page 49 and

 9   then at the top of Page 50, what, if anything, did

10   Mr. Batiste explain to you about the possibility of

11   using horses?

12        I'm referring to where he says, "It's like once

13   the explosives take place, we're gonna launch a full

14   ground war."

15        Then you said, "What?"

16        He says, "We're gonna have a full ground war."

17        Further on, he says, "That means we're gonna kill

18   all the devils that we can."

19   A.    The question is, ma'am?

20   Q.    The question is:  You had asked him -- after he

21   said horses, you said, "Horses?  Why?"

22        Then he went on to explain that to you.

23        What was your understanding of what he was

24   telling you?

25   A.    He was telling me that full ground war -- it's

```
1    attacking.  It's on the ground.  Physical attack.  He

2    want to -- and on the -- yes.

3         He wanted to attack using all kind -- physical

4    attack, using any kind of -- he can have everything his

5    hand can have.

6    Q.   Now, you were also asked questions by Mr. Levin

7    about this meeting in your apartment with Patrick

8    Abraham and Narseal Batiste.

9         And he asked you questions about the fact that

10   Patrick Abraham was very quiet during this meeting.

11        Do you recall that?

12   A.   Yes, ma'am.

13   Q.   And was he, in fact, very quiet during this

14   meeting?

15   A.   He didn't talk much.

16   Q.   Who was the leader between -- was it -- who was

17   the leader of this group, as you understood?

18             MR. LEVIN:  Objection.  Leading.

19             THE COURT:  Overruled.

20             THE WITNESS:  Brother Naz.

21   BY MS. ARANGO:

22   Q.   And was there -- did you notice in their meetings

23   who would speak more?

24   A.   In all meetings in front all the brother, several

25   times Brother Naz he refer.  He's the leader and they
```

```
 1    listen to him and they obey him.
 2    Q.     Now, Patrick Abraham did speak a little bit
 3    during this --
 4              MR. VEREEN:  Objection.  Leading, Judge.
 5              THE COURT:  Sustained.
 6              Rephrase your question.
 7    BY MS. ARANGO:
 8    Q.     Let me refer you to Page 27.  We'll go through
 9    the pages that Patrick Abraham spoke.
10              MR. VEREEN:  What exhibit?
11              MS. ARANGO:  Same exhibit, 56-B.  Page 27.
12    BY MS. ARANGO:
13    Q.     In about the middle of page, you say, "Join us.
14    Join us.  Come sit."
15         Then Patrick Abraham's response:  "Feel like
16    home."
17         And then you respond:  "The chair is for the
18    guest."
19         And Patrick says, "Yeah."
20         Then you say, "The couch is for the family."
21         And then Patrick says, "You know what?  It is my
22    duty to stay on my feet and not to get comfortable."
23         What is your understanding as to what he was
24    telling you there?
25    A.     It's like -- he's like his bodyguard or his
```

 1    assistant or his protection, on alert all the time to

 2    see what's going on around him.

 3    Q.    And then I think Mr. Levin asked you specifically

 4    about Page 67.  If you would, just turn to Page 67,

 5    seven speakers up from the bottom.

 6         You say, "You were always quiet, like this?"

 7         And then Patrick Abraham says, "I am observing

 8    and I am listening."

 9         What was happening there?

10    A.    I was asking Brother Patrick, "What's going on?

11    You are quiet.  You don't speak much?"

12         And he told -- he answered me, "I am observing

13    and I'm listening."

14         That's mean he's observing what's going on around

15    him and he's listening.  He's telling me, "I'm with

16    you.  I'm listening what's going on."

17    Q.    And please turn to Page 73.  Right in about the

18    middle of the page -- just above the middle of the

19    page, you say, "I'm confused.  I'm confused.  Like you

20    tell me last time your real name is Ibrahim.  Real name

21    Patrick, huh?"

22         Then he responds, "Kathman Ibrahim."

23         And then a little bit further down, you say, "But

24    from where came Patrick?"

25         And he says, "That's my street name."

Assaad - REDIRECT - By Ms. Arango            218

```
 1          And then a little bit further down, you say,
 2     "'Pat' is short for 'Patrick'?"
 3          He says, "Yes."
 4          And then you say, "Patrick Abraham.  'Mo' is
 5     short --"
 6          And then Narseal Batiste says to you, "'Mo'
 7     stands for all the brothers."
 8          What was happening there?
 9     A.   Because at that time, I was confused because
10     every time they call each other their name or "Mo" or
11     something.
12          And I asked him -- I was questioning the name.
13     "You told me your name is Patrick.  Now is Ibrahim.
14     What's going on here?"
15          Brother Naz told me that "Mo" -- "We call each
16     other -- we call our brother Mo."
17     Q.   And then the last page I'll be referring to
18     regarding Patrick Abraham is at Page 78, and I'm going
19     to go on to Page 79 as well.
20          You say in about the middle of the page, "You can
21     call me 'Brother Mo.'  You can -- okay?  I'm happy, you
22     know -- and you are all the same society, same group?"
23          And then Patrick Abraham responds, "That's
24     right."
25          And then you say, "Same organization?"
```

1        And he says, "He introduced me to it."

2        You say, "Huh?"

3        And then he says, "He introduced me to it, to

4   this, to this whole movement."

5        And then you say, "That's good."

6        Then he says, "To this -- to this mission."

7        And there's -- "that I'm" -- and

8   "(unintelligible)."

9        Narseal Batiste says, "He was a Christian."

10       And then going to on to Page 78, you say, "He was

11  a Christian?"

12       And then Narseal Batiste says, "Yeah.  At first."

13       And then you say, "How long you been like when

14  you come a Muslim?"

15       And then Mr. Abraham says to you, "Me and this

16  brother, we met in 2002, 2002.  Actually, June is --

17  was about 2002."

18       Do you see all of that?

19  A.    Yes, ma'am.

20  Q.    What was happening there?

21  A.    I was having conversation with -- we were having

22  conversation between Brother Naz and Brother Patrick,

23  and I was speaking -- asking him about his knowledge or

24  if he's aware of what's going on with the mission,

25  with -- what's going on with the Moors.

```
 1          And he told me here that he's -- on Page 78 that

 2    he's aware of the mission and he transferred -- he

 3    become a Muslim in 2002 and -- we're speaking about --

 4    also -- yeah -- in June, 2002.

 5    Q.    June, 2002 --

 6    A.    He became a Muslim.

 7    Q.    -- was when he told you he became a Muslim?

 8    A.    Yes, ma'am.

 9    Q.    Now, you were asked questions by Mr. Houlihan and

10    Mr. Clark about your identification of persons inside

11    the Embassy when you went there after you had taken off

12    your recording device.

13          Do you recall that?

14    A.    On March 9?

15    Q.    On March 9th.

16    A.    Yes, ma'am.

17    Q.    And they pointed -- I believe Mr. Houlihan said

18    to you that you failed to identify any of the

19    Defendants, other than Patrick Abraham and Stanley

20    Phanor and Narseal Batiste, in the Embassy on that day.

21          Do you recall that line of questioning?

22    A.    Yes, ma'am.

23    Q.    Okay.  Now, after March 9th, did you have an

24    opportunity to meet with all of these Defendants?

25    A.    Yes, ma'am.
```

1    Q.     And when was that?

2    A.     March 16.

3    Q.     And have you reviewed the videotape since

4    March 9th -- have you reviewed the videotape of

5    March 16th?

6    A.     Yes.

7    Q.     Did all of the Defendants identify them there?

8    A.     Yes.

9    Q.     Did you become -- did that enable you to become

10   more familiar with who all of the Defendants are in

11   this case?

12          MR. HOULIHAN:  Objection.  Leading.

13          MS. JHONES:  Objection.

14          THE COURT:  Sustained.

15          Rephrase your question.

16   BY MS. ARANGO:

17   Q.     What, if anything, did your review of the

18   March 16th video and your involvement in the March 16th

19   meeting do with your -- what, if anything, did it do in

20   terms of your familiarity with the Defendants?

21          MR. VEREEN:  Objection.  Vagueness and form of

22   the question.

23          MS. JHONES:  And, your Honor, respectfully, if

24   I may just add an additional objection, this is, I

25   believe, improper redirect, as it relates to the

```
 1   initial question of March 9th.
 2           THE COURT:  I'm going to overrule Ms. Jhones.
 3           But I am going to tell you to rephrase the
 4   question.
 5           MS. ARANGO:  Okay.
 6   BY MS. ARANGO:
 7   Q.    What, if anything, did your involvement in
 8   March 16th do in terms of knowing any of these
 9   Defendants in this case?
10           MR. VEREEN:  Objection.  Form of the question.
11   Vagueness.
12           THE COURT:  Overruled.
13           THE WITNESS:  When I reviewed the tapes and
14   reviewed the video, I -- and when I was -- March 16,
15   this is confirming that the people who were in the
16   warehouse on March 16 were the same people who were in
17   the Embassy on March 9.
18   BY MS. ARANGO:
19   Q.    Now I want to have you turn to Volume II of III,
20   specifically, Government's Exhibit 61-A.  Volume II of
21   III, Government's Exhibit 61-A.  I want you to first
22   look at the cover page.  Volume II, 61-A.
23           Did you find it, Mr. Assaad, or do you need some
24   help?
25   A.    Yes.  I found it.
```

1    Q.     You found it?

2    A.     Yes, ma'am.

3    Q.     Take a look at the cover page.  It's the

4    March 10th transcript.

5    A.     Yes, ma'am.

6    Q.     Do you recall being asked by Ms. Jhones when this

7    conversation began?

8    A.     Yes, ma'am.

9    Q.     Okay.  Look at the third line down under

10   March 10th.

11          Would you please read that line to me under

12   March 10th.

13   A.     "9:20 p.m." -- no.  "Time of the tape:

14   9:20 p.m., ending."

15   Q.     Parentheses "ending"?

16   A.     Yes, ma'am.

17   Q.     Okay.  And Ms. Jhones referred you to the end of

18   this recording where you said the meeting ended at

19   9:20.

20          Do you recall that?

21   A.     Yes, ma'am.

22   Q.     And then I think she asked you how long this

23   conversation -- well, let me ask you this:  Did this

24   conversation last one second, as Ms. Jhones was

25   questioning you about?

```
 1              MS. JHONES:  Objection.  Leading and

 2    mischaracterization of the question.

 3              THE COURT:  Sustained.

 4              Rephrase your question.

 5    BY MS. ARANGO:

 6    Q.    Well, do you recall Ms. Jhones asking you about

 7    the fact that this meeting started at 9:20 p.m. and

 8    ended at 9:20 p.m.?  Do you recall that line of

 9    questioning?

10    A.    Yes, ma'am.

11    Q.    Okay.  Did this meeting start at 9:20 p.m. and

12    end at 9:20 p.m.?

13              MS. JHONES:  Objection.  Leading.

14              THE COURT:  Sustained.

15              Rephrase your question.

16    BY MS. ARANGO:

17    Q.    Do you know when this meeting started?

18    A.    It mention here, ma'am, finish at 9:20 p.m.  The

19    meeting is finished.

20    Q.    Okay.

21    A.    But at least took more -- an hour before.  Maybe

22    8:00, 8:20 start the meeting, something like that.

23    Start the meeting.

24    Q.    It didn't take one second, did it?

25    A.    No, ma'am.
```

```
 1   Q.     Now, turning to Page 13 --

 2          THE COURT:  Same exhibit?

 3          MS. ARANGO:  The same exhibit, yes, which is

 4   61-A.

 5   BY MS. ARANGO:

 6   Q.     Now, Ms. Jhones asked you some questions -- did

 7   you recall -- about how Narseal Batiste and you

 8   discussed that the brothers were going to take the oath

 9   the next day, which would have been March 11th, but, in

10   fact, they didn't take the oath until March 16th.

11          Do you remember that line of questioning?

12   A.     Yes, ma'am.

13   Q.     Now, look at Page 13 at the very bottom, two

14   speakers up, where you say, "So we want to speak to --

15   we want to speak to Brother Naz now and tomorrow.  And

16   when we will -- tomorrow with the brothers, who will

17   present our commitment, our agreements or when you

18   prefer?"

19          And then he responds, "It be nice to do -- it be

20   nice if we do it when we get the warehouse."

21          Do you see that?

22   A.     Yes, ma'am.

23   Q.     When did Narseal Batiste get the warehouse?

24   A.     On March 16.

25   Q.     When did the brothers take the oath to Al-Qaeda?
```

1    A.      On March 16.

2    Q.      We're going to refer now to the meeting on

3    March 16th, which is in your synchronized binder.  It's

4    Government's Exhibit 69-B.

5            Did you find it, Mr. Assaad?

6    A.      Yes, ma'am.

7    Q.      Turn to Page 2, please, of 69-B.

8            Now, do you recall Ms. Jhones asking you some

9    questions about that page when you were testing the

10   mic -- the monitor with the FBI?  Do you recall the

11   line of questioning about this page?

12   A.      Yes, ma'am.

13   Q.      Okay.  And then, at the bottom of the page -- the

14   last speaker at the bottom of the page -- there's a

15   conversation.

16           It says "(On phone.)"

17           Then you say, "Hello.  Yeah."

18           Then there's a voice on the other end that says,

19   "(Unintelligible) on the phone and they are doing

20   countersurveillance.  Okay?"

21           And then you say, "I know.  I --"

22           And then the voice says, "You should take that

23   into consideration when you have to make a decision of

24   whether or not you're going to pull the thing out.  All

25   right?"

```
 1          And then you respond, "Okay."

 2          First of all, who were you talking to?

 3  A.      With the FBI, ma'am.

 4  Q.      What did you understand the FBI to be telling you

 5  when they said that they are doing countersurveillance?

 6  A.      They were observing the warehouse before they

 7  arrive.  They were checking if -- checking the

 8  warehouse before they came.

 9  Q.      And when you say "they," who are you talking

10  about?

11  A.      Brother Naz --

12          MS. JHONES:  Objection.  Calls for

13  speculation, your Honor -- or calls for hearsay.  He

14  did not observe it himself.

15          MS. ARANGO:  My question was his understanding

16  of what this -- what the FBI was telling him.

17          MS. JHONES:  Calls for hearsay, your Honor.

18  Calls for hearsay.  His understanding calls for

19  hearsay.

20          THE COURT:  Sustained.

21  BY MS. ARANGO:

22  Q.      Well, how did you feel when the FBI was telling

23  you they are doing countersurveillance and that you

24  should take that into consideration when you have to

25  make a decision of whether or not you're going to pull
```

1    the thing out?

2    A.    I was nervous, ma'am.  And the FBI were informing

3    me about a --

4              MR. VEREEN:  Objection.

5              MS. JHONES:  Objection.  Hearsay.

6              MS. ARANGO:  Judge, it's right in this --

7              THE COURT:  Overruled.

8              THE WITNESS:  The FBI told me about a

9    situation.  Even I was -- you can see from the video I

10   was on the door.  So I observed also there is something

11   going on.

12             And the FBI called me here and they informed

13   me and I was little bit -- I was nervous, actually.

14   They called me -- they gave me all -- like -- they told

15   me, "You should take that into consideration when you

16   have to make a decision of whether or not you are gonna

17   to pull the things out.  Okay?"

18             So you have to put into consideration.  They

19   gave me when you pull the things off, when to call it

20   off.

21   BY MS. ARANGO:

22   Q.    Was this -- did this meeting occur after the

23   January 28th incident with the Keys -- going to the

24   Keys?

25             MR. VEREEN:  Objection.  Leading.

```
 1              THE COURT:  Sustained.

 2              Rephrase your question.

 3   BY MS. ARANGO:

 4   Q.    On March -- is March 16th after January 28th?

 5   A.    Yes, ma'am.

 6   Q.    And did any experiences affect your emotional

 7   state?

 8              MS. JHONES:  Objection.  Leading.

 9              MS. ARANGO:  I'll rephrase.

10              THE COURT:  Okay.

11   BY MS. ARANGO:

12   Q.    What, if any, experiences in this investigation

13   had any effect, if any, on your emotional state?

14   A.    I had two, one on January 28 and one on March 9.

15         On both day -- on both day, I got kidnapped or

16   drove to unknown location during the night,

17   strip-searched.

18         And on March 9 happened the same when I got

19   strip-searched and -- in the warehouse -- in the

20   Embassy.

21         So I was little bit nervous when I see them

22   driving around the warehouse, coming in in the night.

23         The FBI was telling me -- they are giving me the

24   eyes outside the warehouse, what's going on.

25   Q.    Now, let's turn to Page 31 of this transcript,
```

1  please.

2       Mr. Vereen asked about this comment at the very

3  bottom of Page 31:  "Yeah, Occ.  Because I did not know

4  that Osama bin Laden was your leader."

5       Do you recall that line of questioning?

6  A.    Yes, ma'am.

7  Q.    What was your understanding as to the time frame

8  Mr. Batiste was talking to you about when he said he

9  didn't know that Osama bin Laden was your leader?

10        MS. JHONES:  Objection.  Calls for

11 speculation.

12        MS. ARANGO:  I asked what his understanding

13 is, Judge.

14        THE COURT:  Overruled.

15        THE WITNESS:  Again, ma'am, I was reading just

16 to refresh my memory.

17 BY MS. ARANGO:

18 Q.    Yes.

19 A.    What the question is?

20 Q.    The question is:  What was your understanding of

21 the time frame Narseal Batiste was referring to when he

22 said he didn't know that Osama bin Laden was your

23 leader?

24 A.    On the beginning, when I -- on the 16, the

25 beginning, when we met.

1    Q.    Now, turning to Page 32, at the middle of the

2    page, what was your understanding of what Mr. Batiste

3    was telling you when he said in response to your

4    question, "So because I know you send -- you send after

5    Al-Qaeda.  You send the message" -- and then his

6    response:  "I just told Abbas that, you know, what I

7    was trying to do and I told him I needed some help.

8         "He told me that he knew some people that was

9    fighting in jihad and -- but there's so many different

10   types of groups that's fighting in jihad, like Hamas

11   and all of them.  I thought maybe it was probably one

12   of those"?

13        What did you understand him to be telling you

14   there?

15   A.    He's clearly telling me, "Yes.  I request from

16   Brother Abbas some help from terrorist organization,

17   and I -- and I thought you are from Hamas and -- Hamas

18   group."

19        And he says same page, on 32, "or Palestinian

20   group."

21        So he was telling me that, "I thought you are

22   from Hamas or Palestinian group at the beginning."

23   Q.    Now, Ms. Jhones asked you questions about the

24   sequence of events from when you asked the Defendants

25   for assistance to help an Al-Qaeda plot and when

1   Narseal Batiste agreed to provide that assistance.

2       Do you recall that line of questioning as to when

3   Narseal Batiste agreed that they would take the

4   photographs and the videos?

5   A.    Yes, ma'am.

6   Q.    Let's --

7       MR. VEREEN:  Judge, I object to the form of

8   that question as far as what the Government states

9   concerning the word "assistance."  That was not said by

10  any of these Defendants.

11      THE COURT:  Sustained.

12      Rephrase your question.

13  BY MS. ARANGO:

14  Q.    Well, do you recall questions by Ms. Jhones about

15  when Narseal Batiste agreed that his group would take

16  pictures for -- and videos for Al-Qaeda?

17  A.    Yes, ma'am.

18  Q.    Okay.  Let's look at the sequence of events.

19  Let's start at Page 42.  Please turn to Page 42.

20      Now, at Page 42 and going on to Page 43, you say

21  towards -- the fourth speaker down on Page 42, "You

22  remember my brother die and the Sheik is preparing for

23  a hit for five buildings in the United States,

24  Washington, Chicago, Los Angeles, New York and Miami?"

25      And then Narseal Batiste responds:  "(Repeating

 1   softly) Washington, Chicago, New York, Los Angeles and

 2   Miami."

 3          And then you say, "We are taking down the five

 4   FBI buildings."

 5          And you discuss that a little bit.

 6          Then at Page 43, Narseal Batiste says, second

 7   speaker down, "You need our help to tape it.  Is that

 8   what you're saying?"

 9          And you say, "Just tape it.  We need to tape it

10   only."

11          Now, is this the -- what was going on in this

12   portion of the conversation?

13   A.    I was telling him about the -- Al-Qaeda want to

14   take down the five FBI building in United States.  And

15   I named the states.

16          And I told him all what we need is -- he's asking

17   me if we need their help.  He's asking if we -- if we,

18   Al-Qaeda, need their help to tape it.

19          And I said only just to tape it.

20   Q.    Now turn to Page 48.

21          Just below the middle of the page, after

22   "(Background noises)," Narseal Batiste says to you,

23   "Now, Occ, when I -- when I give you these videotapes,

24   you're gonna have to be very careful with those tapes,

25   Occ."

1        What did you understand him to be telling you

2   there?

3            MR. VEREEN:  Your Honor, I object.  This is

4   improper redirect.

5            THE COURT:  Overruled.

6            THE WITNESS:  That -- "Be careful.  They are

7   very sensitive.  They are very important and dangerous.

8   We don't want it to fall into the hand of the

9   Government.  Be careful."

10  BY MS. ARANGO:

11  Q.    Well, what, if any, understanding did you have

12  regarding whether or not he agreed to do what was being

13  asked of him from Al-Qaeda?

14  A.    That he agree he will tape and help Al-Qaeda to

15  tape and videotape the FBI building in Miami.

16  Q.    Okay.  And that's at Page 48?

17  A.    Yes, ma'am.

18  Q.    Now, let's turn to Page 84, eight speakers up

19  from the bottom.

20       Narseal Batiste says, "The FBI building?"

21       You say, "By taping it or something?"

22       Narseal Batiste says, "What do you want?  The

23  outside taped?"

24       And you say, "The outside.  Is there some way we

25  can get it?"

1          Narseal Batiste says, "Of course."

2          And you say, "'Cause there's a way?"

3          And then he says, "Of course" --

4              MR. VEREEN:  Judge, I object to the Government

5     just reading from a transcript.  The document speaks

6     for itself.

7              THE COURT:  Are you going to be asking a

8     question?

9              MS. ARANGO:  I am.

10             THE COURT:  Go ahead.

11    BY MS. ARANGO:

12    Q.    He says, "Of course.  It's gonna be -- I was

13    gonna -- that's -- you mentioned that one time.  That's

14    it.  Come on.  We Muslims."

15         What did you understand him to be telling you

16    there?

17             MR. VEREEN:  Objection.  Beyond the scope of

18    direct -- excuse me -- cross-examination.

19             MS. ARANGO:  Judge, Ms. Jhones asked --

20             THE COURT:  Overruled.

21    BY MS. ARANGO:

22    Q.    You may answer.

23    A.    It was clear, ma'am, that he said, "You don't

24    have to pressure me.  You don't have to tell me twice.

25    We are Muslims.  Ask me one time.  I understood.  I'm

 1   ready to help you."

 2        So he's offering to tape the building -- the FBI

 3   building and help Al-Qaeda.

 4             MS. ARANGO:  At this point, Judge, rather than

 5   read, I'd like to play a small clip.

 6   BY MS. ARANGO:

 7   Q.    Before I play that, do you recall Ms. Jhones's

 8   questions about whether Narseal Batiste's intent was

 9   clear?  Do you recall her asking you about his intent

10   was clear that all he wanted was money?  Do you recall

11   that?

12   A.    Yes, ma'am.

13   Q.    I'm going to play a small -- short clip.

14             MS. ARANGO:  I would ask that the jurors just

15   to take look at the screen rather than the transcript.

16             MR. CLARK:  Could we get a transcript page?

17             MS. ARANGO:  Yes.  The page is 57 -- 57 to 58.

18             (Whereupon, segments of Government's Exhibit

19   No. 69 were published in open court.)

20   BY MS. ARANGO:

21   Q.    Now, Mr. Assaad, what was your understanding of

22   Narseal Batiste's intent?

23   A.    He told me that he -- he will not be around.  He

24   will go to look -- the money is not the issue.  So he

25   will look for another group to support him.

```
 1          But he will be -- we will still -- he will still

 2     alliance with Al-Qaeda, like he said on Page 57 --

 3     sorry -- on Page 57, and saying "It's like we will

 4     still with alliance with Al-Qaeda.  But I need to go

 5     and search for other people to get the money, what I

 6     requested for -- for my mission, for the mission we

 7     have, we spoke about."

 8          And, eventually, he will ask Al-Qaeda to get

 9     help -- he will get him from Al-Qaeda for other things,

10     like training or expert or something like that.

11     Q.   Was your understanding based -- as Ms. Jhones

12     asked you, that all that he was asking for was money?

13          MR. VEREEN:  Objection.  Leading.

14          THE COURT:  Sustained.

15          Rephrase your question.

16     BY MS. ARANGO:

17     Q.   Well, do you recall Ms. Jhones' questioning about

18     wasn't his intent clear that all he wanted was money?

19     Do you agree with that?

20          MR. VEREEN:  Objection.  Asked and answered.

21          THE COURT:  Overruled.

22          MR. VEREEN:  Whether he agrees with it or not

23     is irrelevant.

24          MS. ARANGO:  He was asked the question on --

25          THE COURT:  Overruled.
```

```
 1   BY MS. ARANGO:

 2   Q.    You may answer.

 3   A.    No, ma'am.  Because he was -- mentioned very

 4   clearly here that the money is not the issue and not --

 5   if Al-Qaeda would not support him financially or for

 6   his mission, he will go find somewhere else to support

 7   or to finance his mission in Chicago and he will leave

 8   Al-Qaeda for training and explosives expert and

 9   training for arms or whatever he's asking from

10   Al-Qaeda.

11   Q.    Now, please turn to Page 45.

12         Mr. Clark asked you a question about a comment

13   that you made in the middle of Page 45, where you said

14   "Everybody be -- like, worry about what's going on

15   here."

16         Do you recall Mr. Clark asking you questions

17   about -- about what your understanding was and about

18   what was going on there?

19   A.    Yes, ma'am.

20   Q.    Let's -- I'm going to play a very short clip

21   right on that page so that you can see what was

22   happening at that time.  Then I'll ask you a question

23   about that.

24         (Whereupon, segments of Government's Exhibit

25   No. 69 were published in open court.)
```

```
 1   BY MS. ARANGO:

 2   Q.    Mr. Assaad, what did some of the Defendants do

 3   when you walked over to Mr. Batiste?

 4              MR. VEREEN:  Objection to the form of the

 5   question.  Vague.

 6              THE COURT:  Overruled.

 7              THE WITNESS:  Excuse me, ma'am?

 8   BY MS. ARANGO:

 9   Q.    Did you just see the video?

10   A.    Yes, ma'am.

11   Q.    What did they do?

12   A.    They follow us to the next room.

13   Q.    Now -- I'm sorry.

14         He followed to you where?

15   A.    To the next room, where I was showing Brother Naz

16   the camera.

17   Q.    So, now, what were you saying then -- or what

18   were you referring to when you said, "Everybody be --

19   like, worry about what's going on here"?

20   A.    When I saw everybody came here behind us and they

21   say there is something I was doing -- or do to Brother

22   Naz --

23              THE COURT REPORTER:  I'm sorry.  I was doing

24   or....

25              THE WITNESS:  Yeah.  To Brother Naz.
```

1          And they -- when I was opening the stuff or

2    something.  So I was maybe referring to this, ma'am.

3    BY MS. ARANGO:

4    Q.     And after you took the camera out, what did the

5    Defendants do?

6    A.     They went back to their position.  When they saw

7    there is only cameras, they went back to their

8    position.

9    Q.     Now, Mr. Levin asked you questions about your

10   ride home with Patrick Abraham after this very meeting

11   on March 16th.

12   A.     Yes, ma'am.

13   Q.     And he pointed out -- he commented, didn't he --

14   or he questioned you about the fact that you and

15   Patrick Abraham didn't have a lot of conversation on

16   the way home.

17   A.     Yes, ma'am.

18   Q.     Now, we talked earlier and Mr. Levin even asked

19   you about the meeting on February 19th and how Patrick

20   Abraham was very quiet during that meeting.

21   A.     Yes, ma'am.

22   Q.     Was he also quiet in your -- in the car on the

23   way home?

24   A.     No.  We spoke.

25   Q.     Well, let me ask you this:  Was there -- was

```
 1   there a lot of conversation on the way home?

 2   A.    I don't remember that, ma'am.

 3   Q.    Well, was Patrick Abraham quiet in the car aside

 4   from some conversation that we'll go over -- but was he

 5   quiet in the car on the way home?

 6   A.    Yes, ma'am.

 7   Q.    Was that consistent with your meeting with him on

 8   February 19th with he and Narseal Batiste?

 9           MR. LEVIN:  Objection.  Leading.

10           THE COURT:  Sustained.

11           Rephrase your question.

12   BY MS. ARANGO:

13   Q.    Well, at this point in time, on March 16th, had

14   you been strip-searched by Patrick Abraham?

15           MS. JHONES:  Objection.  Leading.

16           THE COURT:  Sustained.

17           Rephrase your question.

18   BY MS. ARANGO:

19   Q.    Well, you testified earlier about incidents

20   regarding Patrick Abraham.

21           Do you recall that?

22   A.    Yes, ma'am.

23   Q.    What, if anything, occurred regarding any

24   searching of you by Patrick Abraham?

25           MR. VEREEN:  Objection.  Asked and answered,
```

 1   Judge.

 2            THE COURT:  Overruled.

 3            THE WITNESS:  I got strip-searched from

 4   Brother Patrick twice, one on January 28 and one on

 5   March 9.

 6            And this is -- build kind of very strong

 7   personality of him over me.  It's build like -- not to

 8   communicate with him.  Something separate me, like,

 9   kind of nervous from -- of him, kind of not friendly.

10   BY MS. ARANGO:

11   Q.    Turn to Page 98 of Government's Exhibit 69-B,

12   please.

13            Now, did you have some conversation with

14   Mr. Abraham on the way home?

15   A.    Yes, ma'am.

16   Q.    When he said to you, "He should never believe

17   in a -- that much in a man before, in a way and even in

18   the right one" and then you say, "Huh?" and he says, "I

19   said, you never have believed in a man before like

20   that.  You'd be -- you made -- you made the right step

21   this time," what was your understanding of what he was

22   telling you there?

23   A.    He was telling me that the right step of taking

24   the oath to Al-Qaeda -- I made the right -- they made a

25   good job, that they step in and they took oath of

```
 1   Al-Qaeda and the pledge.
 2   Q.    And when you're talking about he -- excuse me.
 3         When Patrick Abraham is talking about "he" and
 4   the "man," who did you understand him to be referring
 5   to?
 6   A.    To Brother Naz.
 7         MS. ARANGO:  At this point, I want to talk
 8   about Government's Exhibit 72-A, which is in the
 9   second -- two of three binders.
10         THE COURT:  I think we're going to end here
11   for the day.
12         Do not discuss this case either amongst
13   yourselves or with anyone else.  Have no contact
14   whatsoever with anyone associated with the trial.  Do
15   not read, listen or see anything touching on this
16   matter in any way.
17         If anyone should try to talk to you about this
18   case, you should immediately instruct them to stop and
19   report it to my staff.
20         You may leave your binders at your chairs.
21   Please give your notebooks to the court security
22   officer.  I will see you tomorrow morning, 9:00.
23         Have a nice evening.
24         (Whereupon, the jury exited the courtroom at
25   5:05 p.m. and the following proceedings were had:)
```

```
 1              THE COURT:  You can step down, sir.

 2              (Witness excused.)

 3              THE COURT:  We're in recess until 9:00.

 4              MS. ARANGO:  Oh, Judge, I would like to

 5    discuss a housekeeping matter with you.

 6              THE COURT:  Yes.

 7              You may be seated.

 8              MS. ARANGO:  Judge, I mentioned to you earlier

 9    about Mr. Assaad.

10              Since I last spoke to you, he did tell me that

11    he would like to go back to Mexico.  His family -- his

12    wife and his family are expecting him.  He's got a

13    plane ticket to go back.

14              My suggestion is that, you know, he's willing

15    to come back here when Ms. Jhones wants to put him on

16    the stand.

17              THE COURT:  Okay.

18              MS. ARANGO:  And so I don't know when she

19    intends on calling him.  But I would request that he be

20    allowed to go back to Mexico.

21              And then, when she wants to put him on the

22    stand, she can make the arrangements and, if she needs

23    any assistance from her -- from us in terms of -- you

24    know, if we need to assist her in any way, we will do

25    so.
```

1          But he did -- Mr. Assaad did ask me to mention

2    that to you because he does want to go back to Mexico

3    after his testimony is over, which is going to be

4    tomorrow morning.

5          MS. JHONES:  Here's the problem with that,

6    your Honor.

7          The problem with that is that this gentleman

8    does not have legal status in this country.  To come

9    back, he's going to need another entry document.

10         And we're not talking about months away.

11   We're talking about, at most -- the Government has

12   indicated that they're going to close -- I believe

13   they're going to finish sometime next week, I think

14   was their -- as I understood it.  This is not going to

15   be a long time, your Honor.

16         In terms of his expenses, the US marshals

17   could take care of that.  I have already undertaken

18   efforts so that this gentleman could -- the US marshals

19   could provide for lodging.

20         To send this gentleman all the way back to a

21   foreign country under circumstances where he's going to

22   be back on the stand, at most, in two weeks, your

23   Honor, the cost associated with that -- and, again, I

24   cannot -- the timing of crossing over hoops to get

25   travel documents for this gentleman --

 1          THE COURT:  Well, they just said they'll make

 2    him available.

 3          MS. ARANGO:  Yeah.  We'll make him available.

 4          THE COURT:  They just said -- so I assume that

 5    there's -- I assume, by that, you're saying that you're

 6    going to make sure that he has whatever documents he

 7    needs --

 8          MS. ARANGO:  Yes.

 9          THE COURT:  -- to come in from Mexico at the

10    time that Ms. Jhones needs him.

11          MS. ARANGO:  Yes.  Absolutely.

12          In fact, I just checked with Vic Williams, who

13    says that he does have legal -- he's with ICE -- he

14    does have legal status and that he can come back into

15    the United States.

16          THE COURT:  And you'll help her coordinate

17    getting him back here as far as contacting him?

18          MS. ARANGO:  Absolutely.  Absolutely.

19          THE COURT:  Okay.  Because it seems that he's

20    going to be finished tomorrow.

21          MS. ARANGO:  Yes.

22          THE COURT:  And then the Government indicated

23    that you're going to be resting next week?

24          MS. ARANGO:  Yes.

25          MR. GREGORIE:  I think it could be as early as

1    Tuesday or Wednesday, Judge.

2              MS. JHONES:  All the more reason, your Honor.

3              THE COURT:  Well, is he your first witness?

4              MS. JHONES:  Your Honor, he's definitely going

5    to be called the first or the second day.  Yes.

6              THE COURT:  Well, I mean, he may have to come

7    back either on the 27th or the 30th, but he would just

8    have to come back.

9              MS. ARANGO:  Okay.

10             THE COURT:  I don't see any reason for him to

11   be sitting around, as long as there's an assurance that

12   you'll coordinate his flying back.

13             MS. ARANGO:  Okay.

14             MS. JHONES:  Your Honor, I just have a

15   question about that.

16             Since this witness would be coming back for

17   the defense, do I have to make additional application

18   to the Court for funds -- travel funds?

19             THE COURT:  Yes.

20             MS. JHONES:  Because I have not done that.

21             It just seems to me it's really -- it's a

22   needless expense of resources to get an --

23             THE COURT:  Well, you either have to pay --

24   you have to make an application to pay for his

25   subsistence and his lodging while he's here or make an

```
 1    application for the plane flight to come back.

 2            So, either way, you're going to have to make

 3    application.

 4            So as long as the Government assures that

 5    they'll coordinate with him and get him here, I don't

 6    see any reason why he has to sit here and wait.

 7            How much time will you need in advance to --

 8            MS. ARANGO:  Two days.

 9            THE COURT:  So if the Government is going to

10    rest Tuesday or Wednesday, I assume there are going to

11    be Rule 29 motions which will at least take up a day.

12            And then, depending on when they rest, if he's

13    your first witness, they'll have him back here on

14    Friday or Tuesday.

15            MS. JHONES:  Okay.

16            THE COURT:  If he's not your first witness,

17    then, you know, you'll let the Government know when you

18    intend to call him --

19            MS. JHONES:  Okay.

20            THE COURT:  -- so they can coordinate.

21            You'll just have to provide the request.

22            MS. ARANGO:  We would also ask, Judge, for --

23    we don't need two days.  One day.

24            We need two days also for Abbas al-Saidi.

25    He's in New York.  He's back there now.  But we'd like
```

1   a couple days' notice as to when she plans on putting

2   him on the stand so we can help coordinate that.

3         THE COURT:  Okay.  That seems reasonable.

4         So we're in recess until tomorrow morning.

5         (End of proceedings.)

6                 C E R T I F I C A T E

7

8         I hereby certify that the foregoing is an

9   accurate transcription of the proceedings in the

10  above-entitled matter.

11

12

13  _____        /s/Lisa Edwards_____
        DATE             LISA EDWARDS, CRR, RMR
14                       Official United States Court Reporter
                         400 North Miami Avenue, Twelfth Floor
15                       Miami, Florida 33128
                         (305) 523-5499
16

17

18

19

20

21

22

23

24

25