```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                       MIAMI DIVISION
             CASE NO. 06-20373-CRIMINAL-LENARD
 3

 4   UNITED STATES OF AMERICA,        Miami, Florida

 5                  Plaintiff,        March 20, 2009

 6           vs.                      9:17 a.m. to 4:19 p.m.

 7   NARSEAL BATISTE, et al.,         Volume XXVII

 8              Defendants.           Pages 1 to 247
     ----------------------------------------------------------
 9

10                        JURY TRIAL
11           BEFORE THE HONORABLE JOAN A. LENARD,
                 UNITED STATES DISTRICT JUDGE
12

13

14   APPEARANCES:

15

16   FOR THE GOVERNMENT:     RICHARD D. GREGORIE, ESQ., and
                             JACQUELINE M. ARANGO, ESQ.
17                           ASSISTANT UNITED STATES ATTORNEYS
                             99 Northeast Fourth Street
18                           Miami, Florida 33132

19

20   FOR THE DEFENDANT       ANA MARIA JHONES, ESQ.
       NARSEAL BATISTE:      300 Seville Avenue, Suite 210
                             Coral Gables, Florida 33134
21

22   FOR THE DEFENDANT       ALBERT Z. LEVIN, ESQ.
       PATRICK ABRAHAM:      261 Northeast First Street
23                           Sixth Floor
                             Miami, Florida 33132
24

25
```

```
 1   FOR THE DEFENDANT       RODERICK D. VEREEN, ESQ.
       STANLEY PHANOR:       BRINKLEY, HENRYS & LEWIS
 2                           4770 Biscayne Boulevard
                             Suite 1200
 3                           Miami, Florida 33131

 4
     FOR THE DEFENDANT       RICHARD K. HOULIHAN, ESQ.
 5     NAUDIMAR HERRERA:     300 Aragon Avenue
                             Coral Gables, Florida 33134
 6

 7   FOR THE DEFENDANT       LOUIS CASUSO, ESQ.
       BURSON AUGUSTIN:      111 Northeast First Street
 8                           Suite 603
                             Miami, Florida 33132
 9

10   FOR THE DEFENDANT       NATHAN CLARK, ESQ.
      ROTSCHILD AUGUSTINE:   17639 South Dixie Highway
11                           Miami, Florida 33157

12
     REPORTED BY:            LISA EDWARDS, CRR, RMR
13                           Official Court Reporter
                             400 North Miami Avenue
14                           Twelfth Floor
                             Miami, Florida 33128
15                           (305) 523-5499

16

17

18

19

20

21

22

23

24

25
```

1                       I N D E X

2

3                               Direct    Cross    Red.

4

WITNESSES FOR THE GOVERNMENT:

5

6   Elie Assaad                                          5

7   Marcos Figueiras              16        36        97
                                            42
8                                           71
                                            76
9
    Edward Richard Purchase      100       122
10                                         129

11  Jason Martel                 137       153       174
                                           172
12
    Mickey Batiste               175       187
13                                         197

14  Dana Frances Marinelli       200       218

15

16

    EXHIBITS RECEIVED IN EVIDENCE:            PAGE
17
    Government's Exhibit No. 36                32
18  Defendant Stanley Phanor's Exhibit No. 2  57
    Government's Exhibit No. 34               141
19  Government's Exhibit No. 33-A through
       33-F                                   148
20  Government's Exhibit No. 32               149
    Government's Composite Exhibit No. 31     212
21

22

23

24

25

1          THE COURT:  United States of America versus

2   Narseal Batiste, et al., Case No. 06-20373.

3          Counsel, state your appearances, please, for

4   the record.

5          MR. GREGORIE:  Good morning, your Honor.

6          Richard Gregorie and Jacqueline Arango on

7   behalf of the United States.

8          MS. JHONES:  Good morning, your Honor.

9          Ana Maria Jhones on behalf of Narseal Batiste,

10  who is present.

11         MR. LEVIN:  Good morning, your Honor.

12         Albert Levin on behalf of Patrick Abraham,

13  who's present.

14         MR. CASUSO:  Good morning, your Honor.

15         Lou Casuso on behalf of Burson Augustin, who's

16  present.

17         MR. CLARK:  Good morning, your Honor.

18         Nathan Clark for Rotschild Augustine, who's

19  present.

20         MR. HOULIHAN:  Richard Houlihan on behalf of

21  Naudimar Herrera.

22         MR. VEREEN:  Good morning, your Honor.

23         Roderick Vereen on behalf of Stanley Phanor,

24  who's present.

25         THE COURT:  Good morning to everyone.

```
 1              All Defendants are present.

 2              Let's bring in the jury.

 3              (Whereupon, the jury entered the courtroom at

 4     9:18 a.m. and the following proceedings were had:)

 5              THE COURT:  You may be seated.

 6              Good morning, ladies and gentlemen.

 7              You are still under oath, sir.

 8              You may proceed, Ms. Arango.

 9              MS. ARANGO:  Thank you.

10              Good morning, ladies and gentlemen.

11              THE JURY:  Good morning.

12                  CONTINUED REDIRECT EXAMINATION

13     BY MS. ARANGO:

14     Q.     Good morning, Mr. Assaad.

15     A.     Good morning.

16     Q.     A couple more questions.

17            I think, when we left off yesterday, I was about

18     to ask you about events that occurred on March 24th of

19     2006.

20     A.     Yes, ma'am.

21     Q.     Do you recall being asked by Ms. Jhones about the

22     meeting that you had with Patrick Abraham and Narseal

23     Batiste on March 24th, where you were driven around

24     Miami?

25     A.     Yes, ma'am.
```

Assaad - REDIRECT - By Ms. Arango                6

```
 1   Q.     And do you recall Ms. Jhones asking you about
 2   whether or not they drove you by a strip club?
 3   A.     Yes, ma'am.
 4   Q.     And she asked you whether or not you thought that
 5   Narseal Batiste was implying somehow to you that they
 6   were showing you the strip club as a target for
 7   Al-Qaeda to blow up.
 8   A.     Yes, ma'am.
 9   Q.     Okay.  Let me ask you something --
10          MS. JHONES:  Your Honor, I'm going to object
11   to that question as a mischaracterization of the
12   question asked by counsel.
13   BY MS. ARANGO:
14   Q.     Well, what was your understanding, then, of
15   Ms. Jhones' question to you?
16          THE COURT:  Overruled.
17          MS. ARANGO:  Okay.
18          THE COURT:  Overruled.
19          MS. ARANGO:  I'll withdraw that last question.
20   BY MS. ARANGO:
21   Q.     Do you recall -- okay.
22          Let me ask you something:  Did they drive you by
23   a Jewish synagogue?
24   A.     Yes, ma'am.
25          MS. JHONES:  Objection.  Leading.
```

Assaad - REDIRECT - By Ms. Arango                    7

```
 1              THE COURT:  Sustained.

 2              Rephrase your question.

 3  BY MS. ARANGO:

 4  Q.     Did they drive you by -- what, if any, FBI

 5  buildings did they drive you by?

 6  A.     FBI building?

 7  Q.     Yes.

 8  A.     Miami -- North Miami FBI building.

 9  Q.     What, if any, National Guard armories did they

10  drive you by?

11  A.     They drove me -- after we drove from the FBI --

12  show me the FBI, they took me to a military base --

13  Q.     Did --

14  A.     -- National --

15  Q.     Oh, I'm sorry.  Go ahead.

16  A.     Sorry.

17  Q.     What was your understanding of why Narseal

18  Batiste and Patrick Abraham drove you by the Jewish

19  synagogue, the FBI building and the National Guard

20  Armory?

21  A.     They were showing me what Al-Qaeda would be

22  interested in, like the FBI building, the military

23  base.

24         And it's well-known, the hatred between Al-Qaeda

25  and the Jewish.  So they passed me next to the
```

```
 1   synagogue where they pray and say, "Here the Jewish and

 2   the" -- I believe he made a comment and -- where we can

 3   -- Al-Qaeda can targeted these places.

 4   Q.    Take a look at the second volume, Volume II of

 5   III, and specifically turn to Government's

 6   Exhibit 72-A, which is the transcript of the

 7   conversation that evening.

 8             THE COURT:  I think it's in the synchronized

 9   binder, not Volume II of III.

10             MS. ARANGO:  Is that the synchronized?

11             It's actually in both.

12             THE WITNESS:  Which one?

13   BY MS. ARANGO:

14   Q.    You know what?  Turn to the synchronized binder,

15   because the next one we're going to look at is in the

16   synchronized binder.

17   A.    What exhibit?

18   Q.    The synchronized binder.

19             MS. ARANGO:  May I approach?

20             THE COURT:  Yes.

21             THE WITNESS:  Yeah.  But what exhibit?

22   BY MS. ARANGO:

23   Q.    72-A.

24   A.    Page?

25   Q.    Page 20.
```

 1          What I'd like for you to do is --

 2              THE COURT:  Just wait a minute, Ms. Arango.  I

 3     don't know that all jurors have it.  It's a little

 4     tight in there.

 5              MS. ARANGO:  I know.

 6     BY MS. ARANGO:

 7     Q.    Mr. Assaad, could you just look over Page 20 and

 8     21, which is where you were being driven by a strip

 9     mall -- excuse me -- a strip club.  Then I have a

10     question for you.

11     A.    Yes, ma'am.

12     Q.    Was your understanding when they drove you by

13     this strip club that this was --

14              MR. VEREEN:  Objection.  Leading.

15              THE COURT:  Sustained.

16              Rephrase your question.

17     BY MS. ARANGO:

18     Q.    What was your understanding about why they drove

19     you by a strip club as opposed to driving you by other

20     buildings?

21     A.    First, it was next to a Circuit City.

22          And, second, it's -- we were passing and I

23     asked -- I asked them, "What is this?"

24          They didn't tell me, "Look here the strip club."

25          I was -- I referring to Page 20.  And I asked on

 1   the bottom, the fifth one from the bottom to the top --

 2   I said, "This mall?"

 3        And he say -- Brother Naz said, "Huh?"

 4        Said, "This is a mall?"

 5        Said, "Yes.  That's where the women go naked."

 6        So I was questioning, "What's this?"  And....

 7   Q.   Now, was your understanding about pointing out

 8   them --

 9        MR. VEREEN:  Objection.  Leading.

10        THE COURT:  Sustained.

11        Rephrase your question.

12   BY MS. ARANGO:

13   Q.   What was your understanding about them pointing

14   out the strip club in connection with being a target of

15   Al-Qaeda?  Did --

16        MR. VEREEN:  Objection.  Leading and asked and

17   answered.

18        THE COURT:  Sustained.

19   BY MS. ARANGO:

20   Q.   What was your understanding as to why Mr. Batiste

21   was showing you the strip club as opposed to showing

22   you the Jewish synagogue, the FBI building and the

23   National Guard Armory?

24        MR. VEREEN:  Objection.  Asked and answered.

25        THE COURT:  Overruled.

```
 1              THE WITNESS:  He was showing me the place when

 2   I asked him that -- where the brother come here and

 3   relax and they can bring me here also to show me the

 4   place.

 5   BY MS. ARANGO:

 6   Q.    Did you think that he --

 7              MR. VEREEN:  Objection.  Leading.

 8              THE COURT:  I didn't hear the question.

 9   BY MS. ARANGO:

10   Q.    Did you think that he was showing you the strip

11   club as a target for Al-Qaeda?

12              MR. VEREEN:  Objection.  Leading.

13              THE COURT:  Sustained.

14              Rephrase your question.

15   BY MS. ARANGO:

16   Q.    What understanding did you have about showing you

17   the strip club as a target for Al-Qaeda?

18              MR. VEREEN:  Objection.  Asked and answered.

19              MS. JHONES:  Asked and answered.

20              THE COURT:  Sustained.

21   BY MS. ARANGO:

22   Q.    What, if any --

23              THE COURT:  It's sustained as asked and

24   answered.

25              MS. ARANGO:  Okay.  I'll move on.
```

1   BY MS. ARANGO:

2   Q.    You were also asked by Ms. Jhones about the

3   meeting that you had on March 26th of 2006 with Narseal

4   Batiste after the photographs and the videos were

5   taken.

6         Do you recall her questioning you about that

7   meeting?

8   A.    Yes, ma'am.

9   Q.    That meeting occurred in the warehouse?

10  A.    Yes, ma'am.

11  Q.    All right.  Turn to Page -- turn to Government's

12  Exhibit 80, which should be the next tab, and

13  specifically Page 20.

14        Are you there yet?

15  A.    Yes, ma'am.

16  Q.    Ms. Jhones asked you about -- --

17        MS. ARANGO:  I'm sorry, Judge.  If I may have

18  a moment.

19        THE COURT:  Yes.

20  BY MS. ARANGO:

21  Q.    I'm sorry.

22        Turn to Page 19 -- the bottom of Page 19.

23        Now, Ms. Jhones asked about the very last comment

24  made by Mr. Batiste on Page 19 about -- where he said,

25  "Maybe we have a big disagreement."

Assaad - REDIRECT - By Ms. Arango                    13

```
 1          Do you see that?

 2   A.     Yes, ma'am.

 3   Q.     And turn now to Page 20.

 4          Was there any clearing up of any disagreement, on

 5   Page 20?

 6              MS. JHONES:  Objection.  Leading.

 7              THE COURT:  Sustained.

 8              Rephrase your question.

 9   BY MS. ARANGO:

10   Q.     What was your understanding about whether there

11   was a big disagreement between Narseal Batiste and you?

12   A.      The disagreement was Brother Naz want to get

13   involved more by helping Al-Qaeda.  He doesn't want

14   just to take the pictures and the video of the targets.

15   He wants to get involved more, and he's upset because

16   of that.

17          He said, "I don't want to just take the pictures

18   and the video.  I want -- I'm worried about Al-Qaeda."

19          And he referring to Page 21 to Page -- on the top

20   of Page 21.

21          And Brother Naz said, "'Cause I feel like I've

22   been not -- been out, because I wouldn't want not to

23   see nothing happen to Al-Qaeda.  Al-Qaeda got hurt

24   because of me."

25          So he want to get involved.  He want to get
```

Assaad - REDIRECT - By Ms. Arango                    14

1    planning and helping Al-Qaeda to plan the attack

2    against the FBI building in Miami.

3    Q.    Mr. Vereen asked you a question about -- he said

4    to you:  All Narseal gave you was three lists.

5          Do you recall that question -- that questioning?

6    A.    Yes, ma'am.

7    Q.    Let me show you what's been marked as

8    Government's Exhibits 120, 120-A, 121 and 121-A --

9    actually, I'm referring specifically to 120 and 121.

10         Who gave you Government's Exhibit 120 and 121?

11   A.    Brother Naz.

12   Q.    Was he wearing anything on his hands when he gave

13   it to you?

14   A.    He was wearing gloves for security reason for his

15   fingerprints not to be on the items.

16   Q.    And explain to the members of the jury again

17   what's contained within Government's Exhibit 120 and

18   121.

19   A.    It's photographs of the target he took and the

20   videotape.

21   Q.    What's in those photographs?  What's depicted in

22   those photographs and those videos?

23   A.    It's FBI building, downtown, courthouse, federal

24   building, US attorney, all the stuff.  And videotape

25   it, the targets.

Assaad - REDIRECT - By Ms. Arango                    15

1    Q.     And did you review those photographs and videos

2    with Narseal Batiste?

3    A.     Yes, ma'am.

4    Q.     And what, if any, advice did he give you during

5    the course of that review?

6    A.     He was showing me that -- to -- how to plan the

7    attack.  And he took the videos -- not the videos --

8    security camera on the buildings to show how we can

9    attack, and he was advising me about the targets, how

10   he can help by making the plan.

11   Q.     Thank you.

12          MS. ARANGO:  No further questions.

13          THE COURT:  You may step down, sir.

14          (Witness excused.)

15          THE COURT:  Call your next witness.

16          MS. ARANGO:  The United States calls Marcos

17   Figueiras to the stand.

18   Thereupon--

19                   MARCOS FIGUEIRAS

20   was called as a witness by the Government and, having

21   been first duly sworn, testified as follows:

22          THE COURT REPORTER:  Please have a seat and

23   sit close to the microphone.

24          Please state your full name and spell it for

25   the record.

```
1              THE WITNESS:  Marcos Figueiras.  First name,

2    M-a-r-c-o-s.  Last name, F-i-g-u-e-i-r-a-s.

3                      DIRECT EXAMINATION

4    BY MS. ARANGO:

5    Q.     Good morning, sir.

6    A.     Good morning.

7    Q.     What is your -- what is your employment?

8    A.     I'm a special agent with the Federal Bureau of

9    Investigation.

10   Q.     How long have you been a special agent with the

11   FBI?

12   A.     19 1/2 years.

13   Q.     Now, what position do you hold -- what type of

14   work do you do?  What are your duties at the FBI?

15   A.     I am currently assigned to the special operations

16   group, which is a surveillance group for the Miami

17   office.

18   Q.     Explain to the members of the jury what the

19   special operations group does.

20   A.     This is a squad that is in a support role for

21   active investigations within the office.  We specialize

22   in surveillances.

23          When different squads -- different cases in the

24   office require surveillances, they make a request for

25   our group to do -- to do the surveillances for them.
```

Figueiras - DIRECT - By Ms. Arango                    17

```
 1   Q.     And so you work in a different squad that is
 2   different from the investigative squads?
 3   A.     Yes.
 4   Q.     And then the investigative squads call upon you
 5   when they need surveillances?
 6   A.     Yes.
 7   Q.     How many members are in your group?
 8   A.     At any time, between 15 and 20.
 9   Q.     How long have you been with the special
10   operations group?
11   A.     Almost four years.
12   Q.     Now, is it comprised of teams or how is it set
13   up?
14   A.     We are set up in teams -- surveillance teams.
15   Right now, we have two teams.  Each team has usually
16   about seven members on each team.
17   Q.     Now, when you do conduct your operations, do you
18   ever meet with a case agent of the investigative squad?
19   A.     Yes.  We usually do meet with the case agent who
20   is making the request for the surveillances.
21   Q.     And what type of information does the case agent
22   generally give you?
23   A.     They give us an overview of the case and what
24   they expect of the surveillance, what the subjects are
25   or if we don't know who they are, and a general
```

1    overview of what is expected from our surveillance.

2    Q.    Now, let me direct your attention to March 25th

3    of 2006.

4          Were you on duty that day?

5    A.    Yes.

6    Q.    And was the special operations group employed

7    that day?

8    A.    Yes.

9    Q.    And how was your group employed that day?

10   A.    We were requested to work a surveillance that

11   morning on three individuals in the Liberty City area.

12   Q.    And who were the three individuals?

13   A.    Narseal Baptiste [sic], Rotschild Augustine and

14   Stanley Phanor, I believe.

15   Q.    Okay.  Now, were you familiar with these

16   individuals prior to March 25th?

17   A.    Yes.

18   Q.    How were you familiar with them?

19   A.    We had actually done surveillances prior to this

20   date on these individuals.

21   Q.    About how many times had you surveilled these

22   individuals prior to March 25th of 2006?

23   A.    Many times, in excess of -- probably over -- I

24   think about two dozens -- two dozen sometimes.

25   Q.    Now, was there a location that you were to be set

Figueiras - DIRECT - By Ms. Arango                    19

 1   up at on March 25th?

 2   A.     Yes.  We were to set up in Liberty City.  There

 3   was going to be a van that was going to be dropped off

 4   and provided to these individuals, and we were supposed

 5   to stay with the van and the individuals.

 6   Q.     How many people were work in that surveillance on

 7   your team that day?

 8   A.     I believe we had seven.

 9   Q.     What time did you all set up?

10   A.     We set up in the morning -- around 5:00 in the

11   morning that day.

12   Q.     Now, just explain to the members of the jury,

13   where do you all set up when you are preparing for this

14   surveillance?

15   A.     Well, the information that is provided for us is

16   usually an address.  What we do is we get there early.

17          Wherever we're going to be working, we get there

18   early.  We make a -- what's called a -- to know the

19   area, to see where we're going to be.

20          And we get in position before we actually -- or

21   the subjects actually arrive.  So we arrived around

22   5:00 in the morning that day.

23   Q.     Now, let me take you back for just a moment.

24          Do you prepare any paperwork during the course of

25   your surveillances?

Figueiras - DIRECT - By Ms. Arango                    20

```
 1   A.     Yes, we do.  We keep a surveillance log, which is

 2   handwritten.  As the events unfold for the surveillance

 3   that day, we write notes and keep the log active.  And

 4   then that surveillance log is then typed and becomes a

 5   final report.

 6   Q.     Now, is there person -- was there anybody charged

 7   on March 25th with writing in the surveillance log?

 8   A.     Yes, there is.  The responsibility is rotated

 9   around the team.  On that particular day, it was my

10   responsibility to do the log.

11   Q.     What generally do you write in the log?

12   A.     We write the activity that's going on, what the

13   subjects of that surveillance are doing.  We document

14   everything that's happening:  The time of events,

15   places where -- locations, addresses, time.

16          We document everything that's happening during

17   our surveillance on the surveillance log.

18   Q.     Prior to your testimony here today, did you

19   review the surveillance log to refresh your

20   recollection?

21   A.     Yes.

22   Q.     Did you review anything else?

23   A.     Yes.

24   Q.     Was there a report written after the surveillance

25   log was prepared?
```

```
 1   A.      Yes.

 2   Q.      Did you review that as well?

 3   A.      Yes.

 4   Q.      Now, going back to the early morning of

 5   March 25th, after you all had set up in the Liberty

 6   City area, what -- tell the jury what you saw.

 7   A.      Well, we set up in the area of 62nd Street and

 8   Northeast 4th Avenue at a warehouse where the green van

 9   was going to be dropped off.  At approximately 8:23,

10   the green van was dropped off.

11   Q.      What did you see after that?

12   A.      After that, a white truck with three individuals

13   arrived -- three black males --

14           MR. VEREEN:  Judge, I object unless this is

15   his personal observation.

16           THE COURT:  Sustained.

17           Lay your predicate.

18   BY MS. ARANGO:

19   Q.      Did you observe the white truck pull up?

20   A.      Yes.

21   Q.      Let me just ask you something:  During the course

22   of these surveillances, are you in contact with the

23   other individuals that are conducting surveillance?

24   A.      Yes.  Our team that day was seven.  And as a

25   surveillance team, we have radios.
```

Figueiras - DIRECT - By Ms. Arango                    22

```
 1          Of course, we have the phones and we are
 2     constantly in communication, all seven of us, regarding
 3     what's happening at the time.
 4          So we're constantly communicating with each other
 5     so we all know, obviously, what's going on.
 6     Q.   So, now, what did you observe -- well, you
 7     mentioned that you saw a white truck pull up?
 8     A.   Yes.
 9     Q.   What did the white truck look like?
10     A.   It was a white old Ford truck that I had seen
11     before, and it had a sign on it for stucco services,
12     which was -- which I had seen from previous
13     surveillances.  So I was familiar with this truck.
14     Q.   And who, if anybody, had you seen in the truck
15     prior to March 25th?
16     A.   I had seen Narseal Baptiste in that truck,
17     Stanley Phanor and Rotschild Augustine.  And I believe
18     Rotschild Augustine's brother also was in that truck at
19     one time or another.
20     Q.   Now, what did you see after the truck pulled up?
21     A.   I did not see anything else other than when the
22     van and the truck departed that location.
23     Q.   Did you see anybody get out of the truck?
24     A.   What I saw was -- I got next to the truck as it
25     departed and I saw Narseal Baptiste on the passenger's
```

1    side.

2          From my vantage point, which I was on the

3    passenger's side, I could not see who was driving it.

4          But that's what I saw.

5    Q.    All right.  And what happened after the truck

6    departed?

7    A.    We stayed with the van, and the van drove to a

8    duplex in North Miami on 141st Street.

9    Q.    Okay.  Did you see who was driving the van?

10   A.    No.

11   Q.    Okay.  And were you familiar with the duplex that

12   the van drove to on 141st Street in North Miami?

13   A.    Yes.

14   Q.    And had you surveilled that duplex before?

15   A.    Yes.

16   Q.    And who had you seen at that duplex?

17   A.    Narseal Baptiste had had -- we had surveilled him

18   there.  That's where he was currently living at that

19   time.  I'd seen his wife there and Stanley Phanor and

20   Rotschild Augustine also there at that location.

21   Q.    What happened after the van got to the duplex

22   on -- in North Miami?

23   A.    The truck arrived shortly thereafter.

24   Q.    What did you observe after that?

25   A.    After that, we were setting up kind of

1    covering -- we didn't want to be exactly on the street.

2    So we waited to see when the van was going to depart,

3    which was our mission.  We saw that the van departed.

4    Q.    Did you see where the van departed to?

5    A.    The van departed and traveled to a gas station on

6    135th Street in North Miami.

7    Q.    And what happened after the van went to the gas

8    station?

9    A.    From the gas station, the van departed and went

10   to a Dollar Store that day on 125th Street.

11   Q.    And did you see what happened at the Dollar

12   Store?

13   A.    The three individuals in the van -- one of them

14   got out and went in the Dollar Store and bought

15   something and just cleaned the windows on the front and

16   the back of the van.

17   Q.    Did you see the person who cleaned the windows of

18   the front and the back of the van?

19   A.    From where I was, I believe it was either --

20         MR. VEREEN:  Objection as to what he believes.

21         THE COURT:  Sustained.

22         THE WITNESS:  I saw an individual cleaning the

23   windshield of the front and back of the van, and I was

24   uncertain as to which one of the three was cleaning the

25   windshield.

Figueiras - DIRECT - By Ms. Arango                    25

```
 1   BY MS. ARANGO:
 2   Q.    Was there only one person of the three cleaning
 3   the windshield?
 4   A.    Yes.
 5             MR. VEREEN:  Objection.  Leading.
 6             THE COURT:  Sustained.
 7             Rephrase your question.
 8   BY MS. ARANGO:
 9   Q.    How many did you see cleaning the windshield?
10   A.    One.
11   Q.    Okay.  What happened after the windshields were
12   cleaned?
13   A.    After that, the individual got in the van.  And
14   they traveled to a place in -- that we had also
15   surveilled before in Liberty City located
16   on 15th Avenue Northwest.  The address, I think, is
17   6262.
18   Q.    Let me show you what's been previously marked --
19             MS. ARANGO:  And, Judge, I would just like to
20   have the ELMO for a moment.
21             THE COURT:  Okay.
22   BY MS. ARANGO:
23   Q.    -- as Government's Exhibit No. 7 and ask you if
24   you recognize it.
25             Do you recognize Government's Exhibit No. 7?
```

Figueiras - DIRECT - By Ms. Arango                    26

```
 1   A.      Yes.

 2   Q.      And what is that?

 3   A.      That is the place that the -- the three had

 4   traveled to on that date.  That's the place where they

 5   had been before and we had surveilled them there

 6   previously, also.

 7   Q.      And this is the location in Liberty City?

 8   A.      Yes, it is.  I believe it was known as "the

 9   Embassy."

10   Q.      Thank you.

11           How long did the van stay at the Embassy?

12   A.      It stayed for about 10 to 15 minutes.  And then

13   the three departed in the van.

14   Q.      And did you see the individuals go from the

15   building to the van?

16   A.      Yes.

17   Q.      What, if any, items were being carried?

18   A.      I saw that there were, like, two bags -- several

19   bags that were being placed into the back of the

20   minivan.

21   Q.      And what happened after the van left?

22   A.      After the van departed, it traveled to Downtown

23   Miami and arrived here in this area where we're at.

24   Q.      And where did it park?

25   A.      It parked right next to Miami-Dade Community
```

Figueiras - DIRECT - By Ms. Arango                    27

```
 1   College after it had traveled in a circular motion
 2   around this area.
 3   Q.     Just explain to the members of the jury what
 4   streets you saw the van traveling down in this area.
 5   A.     The van arrived and it traveled on 2nd Avenue --
 6   Northeast 2nd Avenue, where the Community College is,
 7   Miami-Dade downtown.  And it traveled south on that.
 8          And then right past the Community College, I
 9   believe -- I'm not sure if it's 1st -- it then went
10   east and it traveled on 1st Avenue.  And then it went
11   north.  It went all the way up to 5th Street.
12          And then it traveled east and, in a circular
13   motion, it traveled around the area here, the Community
14   College, the courthouse, the detention center and the
15   new courthouse here where we're at.
16   Q.     And what happened after it traveled in this
17   circular motion?
18   A.     The van parked just off of 5th next to the
19   Community College, and I parked behind it -- several
20   cars behind it.
21   Q.     What -- did you see what happened after the van
22   parked behind the Community College?
23   A.     Yes.  The three individuals in the van -- Narseal
24   Baptiste, Stanley Phanor and Rotschild Augustine --
25   exited the van.  I noticed several bags in the van that
```

Figueiras - DIRECT - By Ms. Arango                    28

```
 1   were being moved around.  They were putting money in

 2   the meter.

 3   Q.     And what happened after they got out of the van?

 4   A.     After they got out of the van, they traveled to

 5   the Community College and entered Building No. 1.

 6   Q.     Now, were any photographs being taken at this

 7   time?

 8   A.     Yes.

 9   Q.     Who was taking photographs?

10   A.     The team leader on my team that day, Special

11   Agent Karam Govens, was taking photographs.

12   Q.     Let me show you what's been previously marked

13   into evidence as Government's Exhibit 35-A through -H,

14   and ask you if you recognize them.

15          Showing you what's been introduced into evidence

16   as Government's Exhibit 35-H, do you recognize that

17   photograph?

18   A.     Yes.

19   Q.     And did you actually see the scene that is being

20   depicted in the photograph as it occurred?

21   A.     Yes.

22   Q.     And where was this location?  Where was this

23   scene that's being --

24          MS. JHONES:  Your Honor, my objection at this

25   point is based on cumulative.  This was testified to by
```

```
 1   Special Agent Velazquez.

 2             MS. ARANGO:   This witness could testify as to

 3   what he saw.

 4             MS. JHONES:   It's cumulative, your Honor.

 5   That's the problem.

 6             MS. ARANGO:   Agent Velazquez put them

 7   into evidence.

 8             THE COURT:   Overruled.

 9   BY MS. ARANGO:

10   Q.    You may answer.

11   A.    Yes.  The three of them -- this is a picture that

12   was taken after they exited the van and were traveling

13   to the walkway that the Community College has.  The

14   walkway is east and west.  And this is right after they

15   had exited the minivan.

16   Q.    And do you know who the three individuals are in

17   this photograph?

18   A.    Yes.

19   Q.    Who are they?

20   A.    The one in the blue shirt with the stripes is

21   Stanley Phanor.

22         The one with the backpack bag and the green

23   baseball cap is Narseal.

24         And the one with the dreadlocks and the white

25   shirt is Rotschild Augustine.
```

Figueiras - DIRECT - By Ms. Arango                    30

1   Q.    And you said that they went into a building?

2   A.    Yes.  I observed them go into a building.  At

3   that time, it was marked Building No. 1 at the

4   Community College.

5   Q.    What did you see after they went into Building

6   No. 1?

7   A.    After that, I moved my position from where I was

8   at, came around again.  And the next time that I saw

9   them, they were walking in the walkway toward the end

10  of the Community College, to the west side of it, which

11  is closer to the courthouse.

12  Q.    Let me show you what's been marked as

13  Government's Exhibit 35-D, and ask you if you recognize

14  that.

15  A.    Yes.  Those are the three same individuals.

16  Q.    And what area is this photograph taken in?

17  A.    This area is in the courtyard, which is on the

18  west side of the Community College, which borders on

19  the courthouse -- the old courthouse and FDC and the

20  US Attorney's Office here.

21  Q.    What happened after you saw them in the courtyard

22  area?

23  A.    I continued to move.  And we had an agent go out

24  on foot to see where the activities were, and he

25  reported to me.

```
 1           So I continued to monitor it, since I was writing

 2    the report, and I moved around and parked, like, at the

 3    bus stop so I could keep an eye from where I was.

 4    Q.    What did you see when you got to the bus stop

 5    area?

 6    A.    That they were in the courtyard.  They were

 7    moving around and just basically being stationary.

 8    Q.    And who was the agent that went out on foot?

 9    A.    Special Agent Guillermo Salazar.

10    Q.    You said that he was radioing back to you?

11    A.    Yes.  We were -- we had NexTels, and he was

12    actually calling me on the phone and advising me what

13    was happening so I could put it into the log.

14    Q.    And what did he tell you was happening?

15    A.    That he viewed one of the individuals -- and he

16    was unsure who it was -- that was taking pictures of

17    the courthouse and the detention center.

18    Q.    What, if anything, did you see after that?

19    A.    After that, I saw -- after they stayed in the

20    courtyard, which was approximately about 40 minutes, I

21    think, that they were in that area, they traveled back

22    to the minivan.

23    Q.    What did you see after they traveled back to the

24    minivan?

25    A.    After they traveled back to the minivan, they
```

```
 1   entered the minivan and drove off and continued to

 2   drive around the area again in a circular motion, like

 3   they had done previously.

 4   Q.    At this point I would like to show you a map of

 5   the downtown area.

 6         MS. ARANGO:  Judge, it's been marked as a

 7   demonstrative exhibit, Government's Exhibit 36 for

 8   demonstrative purposes only.  It's a map of the

 9   downtown area.

10         THE COURT:  Has counsel for the Defendants

11   seen it?

12         MS. ARANGO:  Yes, they have.  But I'll show it

13   to them again.

14         THE COURT:  Any objection?

15         MS. JHONES:  For demonstrative purposes, no,

16   your Honor.

17         THE COURT:  It will be admitted as

18   Government's Exhibit 36 for demonstrative purposes

19   only.

20         (Whereupon, Government's Exhibit No. 36 was

21   entered into evidence.)

22         THE COURT:  You may publish.

23         MS. ARANGO:  Thank you.

24   BY MS. ARANGO:

25   Q.    I would ask the witness to step down.
```

Figueiras - DIRECT - By Ms. Arango                    33

```
 1   A.      (Witness complies.)

 2   Q.      And I'm going to grab the microphone, too.

 3           First, point out to the members of the jury --

 4   going back to when you first observed the van in this

 5   area, where did you see it first in this area?

 6   A.      Well, the van arrived on 2nd Avenue, traveling

 7   south, and it traveled in this direction.

 8           Can I mark on it?

 9   Q.      Yes.

10   A.      It traveled right here (indicating).

11           And then, on 3rd, it continued to go west and

12   then north here on Northeast 1st and then east here

13   (indicating).  And then it continued.

14           And then it did this for about four -- four

15   times.  And then one last time it traveled.  It went

16   this far to North Miami Avenue, back up north to 5th,

17   and right here (indicating).

18           And this is basically the circular-square

19   direction that the van did.

20   Q.      Where did it park when you first saw it park?

21   A.      After it traveled around about four times, it

22   parked right here (indicating).

23   Q.      Would you please point out to the members of the

24   jury the Miami-Dade Community College buildings.

25   A.      They're marked "F," which are these buildings
```

Figueiras - DIRECT - By Ms. Arango                           34

```
 1   here (indicating).
 2   Q.    Where was the area that you first -- that was
 3   depicted in Government's Exhibit 35-H with the three
 4   Defendants walking?  Where was that?
 5   A.    Right here.  Right about here (indicating).
 6   Q.    And where was the area with the three Defendants
 7   sitting that you described as a courtyard?  Where was
 8   that?
 9   A.    Right here.  This area here (indicating).
10   Q.    Okay.  And what is -- what is Building A?
11   A.    A is the James Lawrence Federal Justice Building.
12   Q.    And do you know what building the -- could you
13   just tell the members of the jury what the other
14   buildings are.
15   A.    Yes.
16         C is the old -- referred to as the old federal
17   courthouse, the David Dyer Building.
18         And then this is the new one where we're at, E
19   (indicating).
20         And B is the detention center.
21         And A is the James Lawrence, which also houses
22   the US attorneys.
23   Q.    Now, after the three Defendants moved from the
24   courtyard area and got back to the van, what did you
25   see the van do?
```

1    A.     The van -- they got back in the van after being

2    in the courtyard and they traveled back here on this

3    walkway here (indicating).

4          And then they traveled around in a circular

5    motion, up like this, traveled again around several

6    times, three to four times (indicating).

7          And at that time, we had another surveillance

8    team in place which relieved us.  And they continued

9    surveillance.

10   Q.     Did you see the three Defendants get back into

11   the van?

12   A.     Yes.

13   Q.     About -- after they got back into the van, about

14   how many times did you see them circle -- did you see

15   the van circle the area that you just depicted on this

16   exhibit?

17   A.     I was behind them when they were doing that.  And

18   they circled twice.  Then we were relieved by another

19   surveillance team.

20   Q.     Thank you very much.  You may be seated.

21   A.     (Witness complies.)

22   Q.     When you broke off your surveillance, had the van

23   left the downtown area?

24   A.     It was in the process of leaving.  Yes.

25   Q.     Thank you.

Figueiras - CROSS - By Ms. Jhones                    36

```
 1              MS. ARANGO:  No further questions.

 2              THE COURT:  Ms. Jhones?

 3              MS. JHONES:  Thank you, your Honor.

 4                      CROSS-EXAMINATION

 5   BY MS. JHONES:

 6   Q.    Good morning.

 7   A.    Good morning.

 8   Q.    How are you?

 9   A.    Good.  How are you?

10   Q.    Pretty good.  Thank you.

11         It's "Special Agent."  Correct?

12   A.    Yes.

13   Q.    Special Agent Figueiras, you've been with the FBI

14   for approximately 19 years?

15   A.    Yes.

16   Q.    And is it fair to say that -- I think you stated

17   you've been with the -- let me get the title

18   correctly -- the special operations group for four

19   years?

20   A.    Yes.

21   Q.    So before that, you did other things with the

22   FBI.  Correct?

23   A.    Yes.

24   Q.    Could you tell us a little bit about that.

25   A.    I worked organized crime, drugs, narcotics and
```

Figueiras - CROSS - By Ms. Jhones                    37

1    violent crimes.

2    Q.    So now you -- for the past four years, you've

3    been in a surveillance team?

4    A.    Yes.

5    Q.    And you are, I believe, one of seven members in a

6    team?

7    A.    Yes.

8    Q.    And you have a supervisor?

9    A.    Yes.

10   Q.    And the supervisor is basically the one that

11   decides, you know, which type of surveillance is going

12   to be conducted on any given day?

13   A.    Yes.

14   Q.    All righty.  So the team surveillance -- or the

15   surveillance team moves when the FBI -- your immediate

16   supervisor tells you, "Okay.  This is what we want you

17   to do"?

18   A.    Yes.

19   Q.    And you've testified about the surveillance that

20   you did in this case on March 25th.  Correct?

21   A.    Correct.

22   Q.    And for that surveillance, you generated a

23   report.  Right?

24   A.    Right.  Yes.

25   Q.    A 302?

Figueiras - CROSS - By Ms. Jhones                    38

```
 1    A.      Yes.

 2    Q.      And I think you also generated a surveillance

 3    log?

 4    A.      Yes.  A handwritten one.

 5    Q.      And that's -- and correct me if I'm wrong,

 6    Special Agent Figueiras -- that's basically when you're

 7    in the car or by foot or wherever you are actually

 8    conducting surveillance and you're jotting down

 9    everything that you see.  Right?

10    A.      Yes.

11    Q.      That's really important so you can document your

12    observations?

13    A.      Yes.

14    Q.      And the purpose of doing that is to basically

15    memorialize matters that the FBI will consider relevant

16    for investigatory purposes?

17    A.      Yes.  You can say that.

18    Q.      Well, does the FBI document surveillance logs

19    when you're sitting around observing and nothing is

20    happening?

21    A.      Yes.

22    Q.      And you indicated that you had conducted other

23    surveillances in this case?

24    A.      Yes.

25    Q.      I believe you testified that one of the locations
```

Figueiras - CROSS - By Ms. Jhones                39

```
 1  that you had surveilled was the Liberty City area?
 2  A.     Yes.
 3  Q.     Specifically, the place that you referred to as
 4  "the Embassy"?
 5  A.     Yes.
 6  Q.     And that's the one that we saw in Government's
 7  Exhibit 7?
 8  A.     The one on 6262 -- I think it's 15th Avenue
 9  Northwest.  Yes.
10  Q.     You had conducted surveillance there before.
11  Correct?
12  A.     Correct.
13  Q.     Do you remember, sir, how many times you did
14  that?
15  A.     I participated, probably, close to 20, I would
16  say.
17  Q.     Did you generate 20 separate surveillance logs
18  for that?
19  A.     No, because the surveillance logs are rotated
20  around the team members.  So I would have been on those
21  surveillances, but somebody else would have had -- it
22  would have been their turn to do the surveillance log
23  that day.
24  Q.     Okay.
25  A.     So I participated in them, but I did not
```

1    necessarily write a log every time I was there.

2    Q.    And is it fair to say the person that did this

3    was on your surveillance team?

4    A.    Yes.

5    Q.    And the 20 times that you did this was prior to

6    March 25th of 2006?

7    A.    No.  I would say a combination of the whole --

8    the whole investigative period.

9    Q.    Did you take photographs during that time period

10   when you were doing the surveillance at the Embassy

11   location?

12   A.    No.

13   Q.    Did others in your team take photographs?

14   A.    I believe so, yes, at times.

15   Q.    Okay.  And in addition to the Embassy location,

16   did you conduct any surveillance of areas other than

17   the Embassy location?

18   A.    Yes.

19   Q.    Well, let me ask you this:  Did you ever follow

20   Mr. Batiste besides the March 25th time period?  Did

21   you follow him around?

22   A.    Yes.

23   Q.    And would it be fair to say that, on the

24   occasions that you followed him around, he was driving

25   a green van?

```
 1   A.    Yes.  He drove that at times, and sometimes his

 2   wife drove it.

 3   Q.    And in the green van, I believe -- did you

 4   observe a sign -- any signs of any sort on his green

 5   van?

 6   A.    No.

 7   Q.    Did you observe any signs -- you indicated that

 8   there was a truck that had the sign for stucco

 9   services?

10   A.    Yes.

11   Q.    And that was a white truck, I believe you stated?

12   A.    Yes.

13   Q.    And did you observe Mr. Batiste in any work site,

14   jobsite?

15   A.    Yes.

16   Q.    Did you observe him with his wife at the

17   jobsites?

18   A.    Yes.

19   Q.    Did you observe him with his children at the

20   jobsites?

21   A.    Yes.

22   Q.    And this was on several occasions.  Correct?

23   A.    Yes.

24   Q.    And did you ever follow him to a Day's Inn in

25   Ft. Lauderdale?
```

 1          MS. ARANGO:  Objection.  Outside the scope of

 2   direct.

 3          THE COURT:  Sustained.

 4   BY MS. JHONES:

 5   Q.    In addition to observing Mr. Batiste on these

 6   occasions that you've mentioned in jobsites, did you

 7   observe any of the other brothers that are seated here

 8   today?

 9   A.    Yes.

10          MS. JHONES:  I have nothing further.

11          Thank you, sir.

12          THE WITNESS:  You're welcome.

13          THE COURT:  Mr. Vereen?

14          MR. VEREEN:  Thank you, your Honor.

15                      CROSS-EXAMINATION

16   BY MR. VEREEN:

17   Q.    Good morning, Agent.

18   A.    Good morning.

19   Q.    Your surveillance started at 5:00 a.m. on

20   March the 25th, 2006.  Correct?

21   A.    Yes.

22   Q.    And you were one of the agents that was located

23   in the area of 6300 Northeast 4th Court; were you not?

24   A.    Yes.

25   Q.    And according to your direct testimony, you had

```
 1   already been debriefed by the case agent with regard to

 2   what the surveillance was going to be about and what

 3   was expected of you and your team.  Correct?

 4   A.    Correct.  But not on that date.

 5   Q.    When were you debriefed -- or briefed?

 6   A.    We were briefed a few months before.

 7   Q.    A few months before with regard to the

 8   surveillance that was going to take place on March

 9   the 25th?

10   A.    No.  No.  Regarding the case.

11   Q.    All right.  With regard to the surveillance that

12   was going to take place on March the 25th, had you been

13   briefed prior to going out to that site that morning?

14   A.    By my team leader, not by the case agent.

15   Q.    Who was your team leader?

16   A.    Karam Govens.  Karam Govens.

17   Q.    Karen Govens?

18   A.    Yes.

19   Q.    Was she a member of the team that morning?

20   A.    Pardon me?

21   Q.    Was she a member of the team --

22   A.    It's a he.  It's a he.

23   Q.    Oh, you said "Kevin"?

24   A.    No.  Karam, K-a-r-a-m, Govens, G-o-v-e-n-s.

25   Q.    Was he a member of the team that morning?
```

Figueiras - CROSS - By Mr. Vereen                    44

```
 1   A.      Yes.

 2   Q.      Now, you set up in the area of 6300 Northeast 4th

 3   Court because you already had information that a van

 4   was going to be delivered.  Correct?

 5   A.      Correct.

 6   Q.      And that was information that had been passed on

 7   to you by Agent Govens; was it not?

 8   A.      Correct.

 9   Q.      And so you were present when the van arrived;

10   were you not?

11   A.      Yes.

12   Q.      Who was driving the van?

13   A.      An individual was driving the van.  I don't know

14   who.

15   Q.      Describe the individual that was driving the van.

16   A.      White male.  I mean, from my vantage point where

17   I was, I saw the van arrive, but I did not have a clear

18   view of the individual driving the van.

19   Q.      Well, you were in communication with your fellow

20   agents; were you not?

21   A.      Yes.

22   Q.      And there were other agents that had the same, if

23   not better, vantage point than you.  Correct?

24   A.      Yes.

25   Q.      And they were relaying to you what they had
```

Figueiras - CROSS - By Mr. Vereen                    45

```
 1    visually observed at the same time because you were
 2    keeping notes.  Right?
 3    A.    Yes.
 4    Q.    What was it -- what was told to you by your
 5    agents with regard to who they observed driving that
 6    van that morning?
 7    A.    An individual, a white male, driving the van.
 8    And the van was getting dropped off.  And he was not
 9    our focus of the surveillance that day.
10    Q.    Well, were you advised that this was a
11    confidential informant by other Governments?
12    A.    At that time, no.
13    Q.    So why would he not be an important detail?
14    A.    It could have been an undercover agent or the
15    confidential informant.  The dropoff of the van, for
16    us, was not that essential, who was dropping off the
17    van.  Our focus was -- were the individuals that were
18    going to get into the van.
19    Q.    You were aware at the time that the person
20    dropping off the van was working at the behest of the
21    Government.  Correct?
22    A.    Yes.
23    Q.    So that's --
24          MS. ARANGO:  My objection was going to be
25    asked and answered, but he answered the question.
```

```
 1            THE COURT:  Go ahead.
 2   BY MR. VEREEN:
 3   Q.    Is that why that person who was dropping off the
 4   van was not an important detail?
 5   A.    Yes.  Well, not the -- I wouldn't say not an
 6   important detail.  He was not the focus of our
 7   surveillance.
 8   Q.    You did not memorialize that in the log with
 9   regard to who the person was that dropped off the van.
10   Correct?
11   A.    What I documented was the van being dropped off.
12   Q.    But my question was:  You did not memorialize
13   that in your log as to -- with regard to who was
14   dropping off the van?
15   A.    No.
16   Q.    All right, sir.  At 8:35 a.m., you observed --
17   excuse me -- 8:30 a.m., you observed a white Ford truck
18   arriving to the warehouse.  Correct?
19   A.    Yes.
20   Q.    And there were several telephone numbers that you
21   had observed on the side of the van; did you not?
22   A.    Yes.
23   Q.    And one of those telephone numbers was
24   (786) 221-8351.  Correct?
25   A.    I believe so.  If I could see it, I could verify
```

Figueiras - CROSS - By Mr. Vereen                    47

```
 1   it for you.  But if I wrote it on the log, I'm sure it
 2   is.
 3   Q.    Would it refresh your recollection if you had an
 4   opportunity to see the log?
 5   A.    Yes.
 6   Q.    All right.
 7         MR. VEREEN:  May I approach, your Honor?
 8         THE COURT:  Yes.
 9         MS. ARANGO:  I have it.
10   BY MR. VEREEN:
11   Q.    (Tenders document to the witness.)
12   A.    Okay.
13   Q.    One of the numbers that you had observed was
14   (786) 221-8351.  Correct?
15   A.    Correct.
16   Q.    And that was a number that purported to go to a
17   business called Azteca Stucco & Masonry.  Correct?
18   A.    I do not know.  I did not call that number, and I
19   did not do any investigative work regarding those
20   telephone numbers.
21   Q.    Well, that was the telephone number that was on
22   the sign that said Azteca Stucco & Masonry.  Correct?
23   A.    Correct.  I wrote those numbers down, but I did
24   not do any investigative work regarding where that
25   telephone number went to.
```

Figueiras - CROSS - By Mr. Vereen                    48

```
 1   Q.     I understand.
 2          But that number was on the sign -- the business
 3   sign of Azteca Stucco & Masonry?
 4   A.     Yes.
 5   Q.     All right.  Now, at 8:32 that morning, according
 6   to your log, you had observed the green van that had
 7   been dropped off departing, and inside of the white
 8   truck -- you observed two black males inside of that
 9   truck.  Correct?
10   A.     Correct.
11   Q.     Do you know who those two black males were?
12   A.     On the passenger's side of the truck was Narseal
13   Baptiste.  And I came along on the passenger's side on
14   the lane next to him and I visually saw him in the
15   passenger's side of the truck.  I was unsure who was
16   driving the truck.
17   Q.     What about the green van?  Who was driving that?
18   A.     I don't know who drove it out of there.
19   Q.     Well, there were other agents besides yourself.
20   Correct?
21   A.     Correct.
22   Q.     By this time, it's daylight; is it not?
23   A.     Yes.
24   Q.     You had photographs of individuals at Miami-Dade
25   that you had taken that morning.  Correct?
```

1   A.    The photographs were taken later on that morning.

2   Q.    Okay.  There was no one with a camera when you

3   were conducting your surveillance at 8:30 the morning

4   of 3-25?

5   A.    Yes.

6   Q.    Photographs were not taken?

7   A.    Photographs are taken when you can, when there's

8   an opportunity to.  You have an individual in a vehicle

9   traveling.  It's not easy to take a photograph of

10  somebody inside a van as he's traveling in traffic.

11       So I did not take a picture of him, and none of

12  my teammates did at that time.

13  Q.    Well, what about when the vehicle wasn't

14  traveling before they even got inside of the vehicle?

15  A.    No photographs were taken there at that location.

16  Q.    Now, this was not your first time, as you stated,

17  conducting surveillance of these individuals.  Correct?

18  A.    Correct.

19  Q.    And so, when you saw these individuals, are these

20  individuals that you had seen before?

21  A.    Yes.

22  Q.    You had seen the individual known as Lyglenson

23  Lemorin before; had you not?

24       MS. ARANGO:  Objection.  Outside the scope of

25  direct.

Figueiras - CROSS - By Mr. Vereen                    50

```
 1              THE COURT:  Sustained.

 2              MR. VEREEN:  Your Honor, may we approach?

 3              THE COURT:  Sure.  Come on up.

 4              (Whereupon, proceedings were had at side-bar

 5    outside the presence of the jury which have been sealed

 6    per instructions of the Court.)

 7              (Whereupon, the following proceedings were had

 8    in open court:)

 9              MR. VEREEN:  May I proceed, your Honor?

10              THE COURT:  Yes.

11    BY MR. VEREEN:

12    Q.    Agent, is it your testimony that you walked to

13    the passenger's side of the van and observed Narseal

14    Batiste in the passenger's seat?

15    A.    I did not walk.  I was in my vehicle, and I

16    parked next to him at a red light.  He was in the

17    passenger's side of the truck.

18    Q.    Where -- did you memorialize that in your log?

19    A.    No.

20    Q.    Why not?

21    A.    All I was doing was verifying who was in the

22    truck -- or attempting to do it.  And I did not.

23    Q.    When you prepared your log, there is a place on

24    the log for time.  Correct?

25    A.    Yes.
```

```
 1    Q.     That indicates when a particular observation was

 2    noted.  Correct?

 3    A.     Yes.

 4    Q.     And then there is a place for initials.  Correct?

 5    A.     Yes.

 6    Q.     And as the log custodian, it is your duty, then,

 7    to get whatever officer relayed that information to you

 8    with regard to an observation to initial that

 9    particular log as indicating this is something that

10    they observed.  Correct?

11    A.     Yes.  It is not exactly my responsibility to make

12    sure that everybody does that.  Everybody does that.

13    It's the normal routine for us.

14    Q.     All right.  Was that done in this case?

15    A.     Yes.

16    Q.     With regard to every entry?

17    A.     Yes.

18           MR. VEREEN:  May I approach the witness, your

19    Honor?

20    BY MR. VEREEN:

21    Q.     Well, let me first ask, before I do it:  Isn't it

22    a fact that there was an observation made at 8:52 with

23    regard to a white truck departing the 420 Northeast

24    151st Street address where there's no notation as to

25    who made that observation?
```

```
 1   A.    The copy that you have doesn't have that.  But it

 2   has been initialed.

 3   Q.    Well, when was that done?

 4   A.    The copy that you have may not have that.  But

 5   that entry has been initialed.

 6   Q.    Oh, I understand it may have been initialed.

 7         My question --

 8   A.    It has been.

 9   Q.    Yeah.

10         My question was:  When was that done?

11   A.    Previous to -- to today.

12   Q.    Wow.  Yeah.

13         But when?

14   A.    I don't have an exact date for you, sir.

15         MS. ARANGO:  Objection, Judge.  Relevance.

16         MR. VEREEN:  Well, it's very relevant, Judge,

17   with regard to -- this is the discovery --

18         THE COURT:  Overruled.

19         MS. ARANGO:  And, Judge, I would also object

20   to those comments.

21         THE COURT:  Sustained as to the comments.

22   BY MR. VEREEN:

23   Q.    There's another entry with regard to the time of

24   10:43 a.m., where it says, "The Nissan Quest arrives at

25   6260 Northwest 15th Avenue.  Three black males enter
```

```
 1    the building.  The passenger of the minivan places a

 2    large bag into the van."

 3          That's not initialed by any agent.  Correct?

 4          MS. ARANGO:  Objection to reading from a

 5    document that's not in evidence.

 6          THE COURT:  Sustained.

 7    BY MR. VEREEN:

 8    Q.    Well, there are other entries with regard to the

 9    time of 10:45 where there is no indication of an agent

10    having provided that particular information.  Correct?

11    A.    What's the question again?  Is it the same issue

12    that -- the same thing?  An entry that is not

13    initialed?  Is that the question that you're asking me?

14    Q.    Yes.

15    A.    It's the same thing.  I already -- I answered.

16    It has been signed.  The copy that you may have may not

17    have the initials, but it has been initialed.

18    Q.    When were those initials placed on this --

19    A.    Those were done within that same day.

20    Q.    Within the same day?

21    A.    (Nods head in the affirmative.)

22    Q.    Is that a "yes"?

23    A.    "Yes."

24    Q.    Did you follow the van when it went to Miami-Dade

25    Community College?
```

1    A.     Yes.

2    Q.     And did you observe three black males get out of

3    the van at Miami-Dade Community College?

4    A.     Yes.

5    Q.     And isn't it a fact that you had observed two of

6    the males get out of the vehicle, one carrying a black

7    bag?  Do you recall that?

8    A.     Yes.  There is an entry there where, when they

9    arrived at the Community College, I parked behind

10   them -- several cars behind them.

11        The three exited the minivan.  There were bags in

12   the back of the minivan.  They were seen to be looking

13   for one particular bag or moving bags.

14        I made an entry that day on that surveillance.

15        At that specific time, they were putting money

16   in the meter.  The doors open.  And I observed at least

17   two bags within that -- the minivan at that specific

18   time.

19   Q.     Well, at 11:35 a.m., did you not make a notation

20   that three black males were --

21        MS. ARANGO:  Objection to reading from a

22   document --

23        MR. VEREEN:  I'm not reading from the

24   document.

25        MS. ARANGO:  Judge, if he wants to move the --

```
 1              THE COURT:  Sustained.

 2              Rephrase your question.

 3   BY MR. VEREEN:

 4   Q.     Did you not observe one black male carrying a

 5   backpack and one carrying a black bag at 11:35 a.m.?

 6   A.     Yes.  By the minivan.  They were moving -- like I

 7   said before, when they initially parked next to the

 8   Community College, the two back doors were open.

 9              They were looking for money to put in the meter.

10   The passenger's side door is open.

11              There's bags in the back.  They're bringing a bag

12   out.  They're putting a back in.

13              At that specific time, that is what I observed.

14   Q.     And you observed the three black males then enter

15   a building at Miami-Dade Community College.  In fact,

16   it was Building No. 1.  Correct?

17   A.     Yes.

18   Q.     And when you saw them enter Building No. 1, one

19   individual was still carrying the backpack and one

20   individual had the carry bag.  Correct?

21   A.     No.  At that time -- because they traveled from

22   their vehicle and walked south toward the Community

23   College, toward that building which had a number "1" on

24   the top of it -- only one individual was carrying a

25   bag, which was Narseal Baptist.
```

```
 1   Q.      Did you not indicate in your log at 11:35 a.m.

 2   the three black --

 3           MS. ARANGO:  Objection.  Asked and answered,

 4   and he's reading from that document.  But this

 5   11:35 a.m. he's asked already about.

 6           THE COURT:  Sustained.

 7           Rephrase your question.

 8   BY MR. VEREEN:

 9   Q.   Would it refresh your recollection with regard to

10   what you indicated -- first of all, let me ask you:  Do

11   you know what you placed in your log with regard to the

12   observation at 11:35 a.m.?

13   A.      Yes.

14   Q.      Tell me what you placed in your log at 11:35 a.m.

15           MS. ARANGO:  Objection to talking -- reading

16   from a document that's not in evidence.

17           I have no objection to introducing the

18   document into evidence.

19           MR. VEREEN:  That's fine.

20           Then, let's introduce the document into

21   evidence.

22           THE COURT:  Okay.  Is it marked?

23           MR. VEREEN:  It is not marked, your Honor.

24   This is a defense copy, but it's marked.  It has

25   markings on it.
```

 1              But if we can get a clean copy, I would then

 2    put it in as Stanley Phanor's No. 2 for identification.

 3    It would be Stanley Phanor's No. 2.

 4              I will get the Court an exhibit list.

 5              May I proceed, your Honor?

 6              THE COURT:  Are you moving it into evidence at

 7    this time?

 8              MR. VEREEN:  Yes.

 9              THE COURT:  It will be admitted as Stanley

10    Phanor Exhibit No. 2.

11              (Whereupon, Defendant Stanley Phanor's Exhibit

12    No. 2 was entered into evidence.)

13              THE COURT:  Yes.  You may proceed.

14              MR. VEREEN:  Thank you.

15    BY MR. VEREEN:

16    Q.    Agent, isn't it a fact that, at 11:35 a.m., you

17    indicated on your log that, "Three black males exit the

18    van.  Two are carrying a backpack and a black bag.  All

19    three enter Building No. 1 of the Miami-Dade Community

20    College campus"?

21          Did you not indicate that?

22              MS. ARANGO:  Judge, at this point I'd like for

23    him to show the witness --

24              MR. VEREEN:  If the witness says he doesn't

25    understand, Judge, or he didn't, then, I will show it

 1    to him.

 2          MS. ARANGO:  If he's reading from a document

 3    that's in evidence, Judge, the witness should be able

 4    to look at the document.

 5          THE COURT:  Overruled.

 6          THE WITNESS:  Could you show me my log?

 7    BY MR. VEREEN:

 8    Q.    Sure.

 9          MR. VEREEN:  May I approach, your Honor?

10          THE COURT:  Yes.

11          MR. VEREEN:  Thank you.

12    BY MR. VEREEN:

13    Q.    (Tenders document to the witness.)

14    A.    Okay.

15    Q.    Have you had an opportunity to read your log,

16    Agent?

17    A.    Yes.

18    Q.    Is that not what you indicated?

19    A.    I wrote that in the log.  Yes.

20    Q.    You did write that in the log?

21    A.    Yes.  That's what -- I wrote on the log that the

22    three individuals exited the van, had bags and then

23    entered the Community College.

24    Q.    Exactly.

25          So what your observation was, you saw them enter

```
 1    the Community College, one carrying a bag and one

 2    carrying a backpack.  Correct?

 3    A.    No.  When they entered the Community College,

 4    only one had a backpack.

 5    Q.    Agent, do you know why it is that they entered

 6    the Miami-Dade Community College, Building No. 1?

 7          MS. ARANGO:  Objection.  Assuming facts not in

 8    evidence.

 9          MR. VEREEN:  He just testified that that's

10    what they did, Judge.

11          MS. ARANGO:  Judge, the document speaks for

12    itself.

13          MR. VEREEN:  I'm not questioning him about the

14    document.

15          THE COURT:  Overruled.

16    BY MR. VEREEN:

17    Q.    Do you know why it is that they went into that

18    building?

19    A.    Why they went into that particular building?

20    Q.    Into Building No. 1.  Yes.

21    A.    No.

22    Q.    Did you observe photographs being taken?

23    A.    I did not.

24    Q.    In your log, you indicate, at 11:41, they are

25    observed taking pictures of the area.
```

Figueiras - CROSS - By Mr. Vereen                    60
247

1          Correct?

2     A.     Correct.  Gil Salazar, an agent on my team,

3     observed them taking photographs, called me on the

4     phone, and I put it on the log.

5     Q.     And did he indicate who was taking the

6     photographs?

7     A.     No.  He was unsure which one of the three were

8     taking photographs, because he was at a distance.

9     Q.     So instead of indicating that, you put "they";

10    did you not?

11    A.     Yes.

12    Q.     Because you were not sure as to who it was?

13    A.     I put what Gil Salazar advised me to put on the

14    log that day, which is he observed these individuals

15    taking photographs.

16    Q.     Okay.  Well, did he say that they passed the

17    camera to each other and each one was trying to take

18    photos?

19    A.     He advised me that some of them or all three were

20    taking photographs.

21    Q.     So he led you to believe that there were three

22    cameras?

23    A.     No.

24    Q.     So, then, he said that they passed the camera

25    around to each other to take photographs?

Figueiras - CROSS - By Mr. Vereen                    61

```
 1   A.     No, he didn't.  What he advised me was that he
 2   observed these individuals taking photographs.
 3   Q.     At 12:00, you indicate in your log that, "The
 4   three are observed sitting across from a bus stop on
 5   the Miami-Dade Community College campus.  Photos
 6   attempted."
 7          Correct?
 8   A.     Correct.
 9   Q.     How do you know photos were attempted versus
10   photos taken?
11   A.     No.  That is for us.  It's a part of our
12   procedure.
13          And the photos attempted were Karam Govens, my
14   team leader, taking pictures.  That is not to indicate
15   that they were taking pictures at that time.
16   Q.     Did you say "Photos attempted by Agent Govens"?
17   A.     No.  All that's required for us in our procedure
18   is that photographs were attempted at that location.
19   Q.     At no time when these Defendants left and got
20   back in the vehicle did you observe who was driving the
21   vehicle.  Correct?
22   A.     I did not observe who was driving the minivan
23   when they departed.
24   Q.     And no agent advised you as to who was driving
25   the van.  Correct?
```

Figueiras - CROSS - By Mr. Vereen                    62

```
 1   A.     Correct.
 2   Q.     The photographs that are now on the ELMO -- or
 3   one photograph, which is Government's Exhibit 35-D --
 4   this is Stanley Phanor.  Correct?
 5   A.     Correct.
 6   Q.     You do not see him with a camera in his hands in
 7   that photograph, do you?
 8   A.     I do not.
 9   Q.     Government's Exhibit 35-C:  Again, Stanley
10   Phanor.  Correct?
11   A.     Correct.
12   Q.     You do not see him with a camera in his hand, do
13   you?
14   A.     No.
15   Q.     Government's Exhibit 35-F:  Stanley Phanor.
16   Correct?
17   A.     Correct.
18   Q.     You don't see him with a camera in his hands, do
19   you?
20   A.     No.
21   Q.     35-E:  No camera.  Correct?
22   A.     Correct.
23   Q.     35-G:  No backpack and no camera.  Correct?
24   A.     Correct.
25   Q.     35-H:  No backpack, no camera.  Correct?
```

Figueiras - CROSS - By Mr. Vereen                    63

```
 1    A.     Correct.

 2    Q.     You didn't take those photos?

 3    A.     No, I did not.

 4    Q.     You don't know whether that's when these

 5    Defendants were leaving Building No. 1 or heading to

 6    Building No. 1.  Correct?

 7    A.     The one where the three of them are with the

 8    backpack, that's when they arrived and they were

 9    traveling to the court area.

10    Q.     Excuse me?

11    A.     Which picture are you referring to?

12    Q.     Well, I think you're referring to -- and correct

13    me if I'm wrong.

14           This is the photograph that you're referring to.

15    Correct.

16    A.     Correct.

17           MS. ARANGO:  Would you please identify it for

18    the record.

19           MR. VEREEN:  Sure.  35-H.  Government's

20    Exhibit 35-H.

21           THE WITNESS:  Correct.

22    BY MR. VEREEN:

23    Q.     Where is Building No. 1 in proximity to where

24    they are in that photograph?

25    A.     It's to their left as they're walking.  That is
```

Figueiras - CROSS - By Mr. Vereen                    64

```
 1    the walkway.  And the Community College -- Building

 2    No. 1 is to the south of where they're at.

 3    Q.    To the south of where they are?

 4    A.    Right.

 5    Q.    So they've already passed Building No. 1?

 6    A.    No.  This is when they exited the van.

 7    Q.    So Building No. 1 is in the opposite direction?

 8    A.    No.  No.  No.

 9    Q.    Is Building No. 1 ahead of them?

10    A.    Right.

11    Q.    And -- but you weren't there when this photograph

12    was taken?

13    A.    Karam Govens took that photograph, and I was

14    there.  Karam Govens was parked by me as he was taking

15    this picture.

16          THE COURT:  Mr. Vereen, we're going to take a

17    break.

18          MR. VEREEN:  Yes, ma'am.

19          THE COURT:  Do not discuss this case either

20    amongst yourselves or with anyone else.  Have no

21    contact whatsoever with anyone associated with the

22    trial.  Do not read, listen or see anything touching on

23    this matter in any way.

24          If anyone should try to talk to you about this

25    case, you should immediately instruct them to stop and
```

1    report it to my staff.

2         You may leave your materials in your chairs.

3    Please be back in the jury room in ten minutes.

4         (Whereupon, the jury exited the courtroom at

5    10:33 a.m. and the following proceedings were had:)

6         THE COURT:  You may step down, sir.  You can

7    step down.

8         (Witness excused.)

9         THE COURT:  You can be seated for one moment.

10        Mr. Vereen, Mr. Levin and Mr. Clark, I need

11   your exhibit lists Monday.

12        MR. LEVIN:  Yes, ma'am.

13        THE COURT:  We're in recess for ten.

14        MR. CLARK:  Your Honor, on that exhibit list,

15   is that just a -- just to give it to you?  Do we have

16   to file that on -- electronically?  Is that just --

17        THE COURT:  No.  No.  Just to give to me at

18   this point.

19        You'd have to provide it to the Government

20   because it can't be an *ex parte* communication.  But I

21   need at least an exhibit list that indicates what

22   you've already presented.

23        I now have Mr. Vereen entering exhibits into

24   evidence and my trial order requires an exhibit list

25   prior to the time of trial.

```
 1          I think we're well into this trial for a
 2  couple of months now.  And I need it by Monday.
 3          MR. CLARK:  Okay.
 4          THE COURT:  We're in recess for ten.
 5          (Thereupon a recess was taken, after which the
 6  following proceedings were had:)
 7          THE COURT:  We're back on United States of
 8  America versus Narseal Batiste, et al., Case
 9  No. 06-20373.
10          Counsel, state your appearances, please, for
11  the record.
12          MR. GREGORIE:  Richard Gregorie and Jacqueline
13  Arango on behalf of the United States, your Honor.
14          THE COURT:  Go ahead.
15          MR. LEVIN:  Albert Levin on behalf of Patrick
16  Abraham, who's present.
17          MS. JHONES:  Ana Jhones on behalf of Narseal
18  Batiste.
19          I apologize, your Honor.
20          MR. CASUSO:  Lou Casuso on behalf of Burson
21  Augustin, who's present, your Honor.
22          MR. CLARK:  Nathan Clark for Rotschild
23  Augustine, who's present.
24          MR. HOULIHAN:  Richard Houlihan with Naudimar
25  Herrera.
```

Figueiras - CROSS - By Mr. Vereen                    67

```
 1              MR. VEREEN:  Roderick Vereen on behalf of

 2    Stanley Phanor, who's present.

 3              THE COURT:  All Defendants are present.

 4              Let's --

 5              MR. VEREEN:  Your Honor, before we bring the

 6    jury in, with regard to Stanley Phanor's No. 2, this

 7    witness has testified that there was a correct -- not

 8    corrected, but an amended document.  This document, he

 9    said, was initialed after the one that I had received.

10              We have not received that document from the

11    Government.

12              I would ask that the Government provide that

13    document, because that is the one that should be

14    entered into evidence versus Stanley Phanor's No. 2.

15              MS. ARANGO:  Judge, I disagree.

16              He introduced that into evidence.  I don't

17    have any -- this is the document that I have that

18    Mr. -- excuse me -- that was introduced into evidence

19    that Mr. Vereen has is the same document that I have.

20              I don't -- this is the document that we've

21    always had.  That's all I can tell you.  If there's

22    another one that exists, we can certainly go and see if

23    there's something --

24              THE COURT:  Why don't you check and see if

25    there's another one that exists.
```

 1            MS. ARANGO:  All right.

 2            THE COURT:  Let's bring in the jury.

 3            (Whereupon, the jury entered the courtroom at

 4   10:57 a.m. and the following proceedings were had:)

 5            THE COURT:  You may be seated.

 6            You are still under oath, sir.

 7            You may proceed, Mr. Vereen.

 8            MR. VEREEN:  Thank you, your Honor.

 9   BY MR. VEREEN:

10   Q.    Agent, just a couple more questions.

11         With regard to the March 25th date, the

12   individual that's depicted on the ELMO right now in the

13   middle with the -- what appears to be a blue or green

14   hat on carrying a bag with what appears to be orange

15   pants:  That's the person you identified as Narseal

16   Batiste.  Correct?

17   A.    Yes.

18   Q.    And that is the person you saw that morning at

19   8:32 leaving -- one of the two individuals that you

20   observed in the Nissan minivan.  Correct?

21   A.    Wrong.

22   Q.    That is not?

23   A.    No.  From the warehouse, he left in a white

24   truck.

25   Q.    I'm sorry.

Figueiras - CROSS - By Mr. Vereen                    69

1            From the warehouse at 8:32 that morning --

2     A.    Right.

3     Q.    -- he left in a white truck?

4     A.    Yes.

5     Q.    Isn't it a fact, Agent, that you're mistaken?

6     A.    No.  If I could see my log, I could --

7     Q.    Sure.

8            MR. VEREEN:  May I approach, your Honor?

9            THE COURT:  Yes.

10    BY MR. VEREEN:

11    Q.    (Tenders document to the witness.)

12    A.    What I wrote -- the two black males are observed

13    inside the truck.

14            After the truck left, I followed the truck to

15    a -- I think it was 7th Avenue on 62nd Street.  I got

16    next to it.

17            The passenger in that truck was Narseal Baptiste.

18    Q.    What time was that?

19    A.    After the vehicle left at 8:32.  So it must have

20    been a few minutes after that.

21    Q.    Isn't it a fact, sir, that Narseal Batiste did

22    not get inside of the vehicle until 8:45 a.m.?  Look at

23    your entry for that date.

24    A.    No.  I don't think so.  No.

25    Q.    What happens at 8:45 a.m.?

```
 1    A.     At 8:45, the Nissan mini -- well, the Nissan

 2    Quest minivan arrives at the house on 141st Street.

 3    Q.     What is that address?

 4    A.     It's 420 Northeast 141st Street.

 5    Q.     Do you know who lives at that address?

 6    A.     Narseal Baptiste and Minerva Hernandez.

 7    Q.     And what time -- I'm sorry.  Go ahead with.

 8    A.     The log states that it was 8:45.

 9    Q.     And your observation of Narseal Batiste being

10    inside of that vehicle, according to your testimony,

11    was prior to 8:45.  Correct?

12    A.     Correct.

13           MR. VEREEN:  I have no further questions of

14    this witness, your Honor -- well, I do.  I do.  I'm

15    sorry.  No.  I don't.

16           THE COURT:  Are you sure?  Okay.

17           MR. VEREEN:  Thank you.

18           THE COURT:  Mr. Houlihan?

19           MR. HOULIHAN:  If it please the Court.

20           Good morning.

21           THE JURY:  Good morning.

22

23

24                    CROSS-EXAMINATION

25
```

```
 1   BY MR. HOULIHAN:
 2   Q.    Good morning, sir.
 3   A.    Good morning.
 4   Q.    I have a few questions.  They're all going to big
 5   picture type of questions.  Okay?
 6   A.    Okay.
 7   Q.    I want to make sure I'm getting it right.
 8         FBI Miami is a special operations group.  Is that
 9   correct?
10   A.    Yes.
11   Q.    Now, that special operations group has within it
12   a surveillance squad?
13   A.    No.  The special operations group is the
14   surveillance squad.
15   Q.    Okay.  And I think you told us earlier the
16   surveillance squad is made up of 15 to 20,
17   approximately, FBI agents?
18   A.    Yes.
19   Q.    Now, each surveillance squad --
20   A.    There's only one squad.
21   Q.    There's one squad, but there's two teams?
22   A.    At the present time, yes.
23   Q.    Back in 2006, when this case was ongoing, were
24   there two teams?
25   A.    No.  There were three teams.
```

```
 1   Q.     Three teams.

 2          Each team had approximately seven members in each

 3   team?

 4   A.     Yes.

 5   Q.     So back when this case was ongoing, I take it --

 6   I'm not being picky here -- a surveillance squad had,

 7   what, 20, 25 members?

 8   A.     Around that.  It varies, because people travel,

 9   people go on leave, people get transferred.  So it

10   always varies.

11   Q.     Of the three teams of approximately seven members

12   each, your general purpose, your basic purpose, in any

13   kind of case, including ours, would be one of two

14   things, if I understand this.

15          One is gathering general intelligence?

16   A.     Yes.

17   Q.     And the second is where an FBI case agent is

18   aware beforehand of some specific either activity or

19   something that's going to occur that, for a very

20   specialized reason, you surveil.

21          Would that be fair?

22   A.     Yes.

23   Q.     Now, in our specific case, were all three teams

24   involved in the surveillance?

25   A.     On that day, there were only two teams involved.
```

Figueiras - CROSS - By Mr. Houlihan                73

```
 1    But all three teams worked this case.  Yes.
 2    Q.    Yeah.  I'm just trying to get, you know, the big
 3    picture.
 4    A.    That's fine.
 5    Q.    So all three teams.
 6          So approximately, again, 20 to 25 agents over a
 7    period of time were involved in surveilling in this
 8    case?
 9    A.    Yes.
10    Q.    What is the start -- and if you already said
11    this, I apologize.  I could have missed it.
12          What is the start of the surveillance period, to
13    the best of your knowledge, in our case?
14    A.    It depended always on the needs or what was going
15    on in the case.  It always varied.
16    Q.    Well --
17    A.    Sometimes you were in the morning.  Sometimes you
18    were in the afternoon, so forth.
19    Q.    What I meant, sir, was, to your knowledge,
20    what -- in temporal time, when did surveillance from
21    any of these units start in our case?  Are we talking
22    about January?  Are we talking about 2005?  Do you know
23    when surveillance just started?
24    A.    I would have to go back and look at that.  Again,
25    that would be something that the case agent could
```

```
 1    answer better.

 2    Q.    To the -- the best guess you have, as you testify

 3    today, would it be in 2006 or could it have been in

 4    2005?

 5    A.    Let's see.  This was in March.  No.  May, 2005, I

 6    think, late, maybe.

 7    Q.    So your best guess is around sometime -- I take

 8    it in the last quarter, the last three months, of 2005.

 9          Would that be a fair --

10    A.    That would be my fair guess.  Yes.

11    Q.    At the other -- going the other way, your best

12    knowledge, your best guess, as to when the surveillance

13    period ended in our case, when there was no more

14    surveillance by any team?

15    A.    When the subjects were arrested.

16    Q.    Now, I know you've got a lot on your plate.

17          The arrest occurred here June 22nd, 2006.  Okay?

18    Does that sound right?

19    A.    I don't remember the exact date when they were

20    arrested.

21    Q.    But that is when the surveillance concluded?

22    A.    After they were arrested, there was no more

23    surveillance by our team.

24    Q.    But to your knowledge, up to that point, there

25    was?
```

1   A.     I mean, there was -- there was surveillance --

2   ongoing surveillances until the date that they were

3   arrested.

4   Q.     Okay.  No problem.

5   A.     Okay.

6   Q.     My last question:  Could you please give an

7   approximate, to the best of your ability -- a total

8   number of surveillance squad agent hours spent in this

9   case.

10  A.     I wouldn't know.  That's a question for

11  management.  I wouldn't want to venture there.

12  Q.     Well, if --

13  A.     I'm not sure --

14  Q.     From -- my rough guess is -- you were, you know,

15  giving figures and so forth -- we're approaching

16  1,000 agent hours.

17         Would that be about, ballpark figure?

18         MS. ARANGO:  Objection.  He just testified he

19  didn't know, Judge.  Outside the scope of his

20  knowledge.

21         THE COURT:  Sustained.

22  BY MR. HOULIHAN:

23  Q.     Is there a way you can make a basic ballpark

24  estimate?

25         MS. ARANGO:  Objection.  Asked and answered.

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  I wouldn't know.  I mean, I'd

 3    have to do the figures and the numbers and so forth.

 4              It's something that I would -- if I'm going to

 5    make a guess at it, I would want to try to be as

 6    accurate as possible.

 7              But I am just a member on this squad, on this

 8    team.  And I didn't make the decisions on how many

 9    times they were going out there or how much resources

10    were allocated to this.

11              So I wouldn't be the person that could really

12    answer that correctly for you.

13    BY MR. HOULIHAN:

14    Q.    Even with my question being just a general

15    ballpark estimate, you're telling us you can't do that?

16              MS. ARANGO:  Objection, Judge.

17              THE COURT:  Sustained.

18              MR. HOULIHAN:  Thank you.  I have nothing

19    else.

20              THE COURT:  Mr. Clark?

21                        CROSS-EXAMINATION

22    BY MR. CLARK:

23    Q.    Good morning.

24    A.    Good morning.

25              MR. CLARK:  Good morning, ladies and
```

Figueiras - CROSS - By Mr. Clark                77

```
 1   gentlemen.

 2            THE JURY:  Good morning.

 3   BY MR. CLARK:

 4   Q.    Now, you have indicated that a white male brought

 5   the green van -- Nissan Quest van to the warehouse.  Is

 6   that right?

 7   A.    That is correct.

 8   Q.    And did you see where the white male left and

 9   went to?

10   A.    No.

11   Q.    Then you have indicated that the Azteca work

12   truck came to the warehouse?

13   A.    Yes.

14   Q.    And you did not identify the driver of that

15   truck.  Correct?

16   A.    Correct.

17   Q.    And -- now, you testified then that you had seen

18   this work truck before --

19   A.    Yes.

20   Q.    -- under surveillance.  Is that correct?

21   A.    Yes.

22   Q.    And you mean on a date previous to March

23   the 25th.  Correct?

24   A.    Yes.

25   Q.    I believe you testified that you saw Rotschild
```

CROSS - By Mr. Clark

```
1   Augustine in that truck on a date previous to
2   March 25th?
3   A.     Yes.
4   Q.     And did you see him get into the truck?  Do you
5   recall where he got into the truck at?
6   A.     On what day, sir?
7   Q.     Prior --
8   A.     On the 25th?
9   Q.     No.
10         You haven't identified him going into the truck
11  on the 25th, have you?
12  A.     No.
13  Q.     Okay.  I'm talking about when you identified him
14  going into the white truck.
15         Do you know where that took place?
16  A.     Numerous surveillances that we conducted in all
17  of South Florida.  Different locations.
18  Q.     And that was a work truck and, when he was in
19  that truck, it would be at times when he was working on
20  jobs.  Isn't that correct?
21         MS. ARANGO:  Objection.  Speculative.
22         THE COURT:  Sustained.
23  BY MR. CLARK:
24  Q.     Did you ever see him exit the truck and work at a
25  job?
```

1  A.    I saw him at -- I believe a few jobs that were

2  being done by Narseal Baptiste.

3  Q.    Okay.  So you actually did observe that on prior

4  occasions, prior to March the 25th?

5  A.    Yes.  I was on several -- numerous surveillances

6  where we surveilled him before.  So I was familiar with

7  him in that vehicle and other vehicles at different

8  locations.

9  Q.    And you have testified that the white truck

10  then -- you don't know who was driving it -- went to

11  Narseal Batiste's home.  Is that correct?

12  A.    Yes.

13  Q.    And, also, the Nissan Quest went to Narseal

14  Batiste's home.  Correct?

15  A.    Correct.

16  Q.    And you did not identify Rotschild Augustine in

17  the Nissan Quest either, did you?

18  A.    I did not see the driver of the minivan when it

19  arrived there or when it left.  So I couldn't tell you

20  who was driving it.

21  Q.    Now, the -- you also have testified -- and it's

22  in your log -- that the -- well, the Nissan Quest

23  arrived at 8:45 a.m. at Narseal Batiste's home?

24        MS. ARANGO:  Objection.  Cumulative.

25        MR. CLARK:  Just laying a predicate, your

 1   Honor.

 2           THE COURT:  Overruled.

 3   BY MR. CLARK:

 4   Q.    Correct?  8:45?

 5   A.    Yes.

 6   Q.    And that the -- then you say that the white truck

 7   departed Narseal Batiste's home at 8:52.  Correct?

 8   A.    Correct.

 9   Q.    So somebody had to drive that truck away?

10   A.    Correct.

11   Q.    And then I believe you testified that the Nissan

12   Quest minivan was next observed at 10:00 a.m.?

13   A.    Yes.

14   Q.    That is approximately an hour and 15 minutes

15   after it was -- it arrived at the home.  Correct?

16   A.    No.  I don't believe so.

17   Q.    Well, if the Nissan Quest minivan arrived at

18   8:45 a.m. and -- do you have a time when it departed

19   from the home?

20   A.    I think it might be in that log, if I can see it,

21   if you have a copy of it.

22   Q.    I'm sorry.  I thought -- --

23           MR. CLARK:  Is it in evidence, your Honor?

24           THE WITNESS:  No.  I don't have it in front of

25   me.

```
 1              THE COURT:  Yes.  It is in evidence.

 2              Where is the log in evidence?

 3              MR. VEREEN:  There's not a clean one, your

 4   Honor.  We have to provide a clean one.  I used

 5   Mr. Clark's and it has markings on it.

 6              MS. ARANGO:  I can provide the witness with my

 7   copy.  Other than some stickers on the back and front

 8   of it, the pages are all clean.

 9              THE COURT:  Okay.

10   BY MR. CLARK:

11   Q.    (Tenders document to the witness.)

12          Getting back to it, the Nissan Quest is

13   identified at 8:45 at the home of Narseal Batiste, and

14   the next identification is made at 10:00 a.m. at the

15   BP gas station?

16   A.    Correct.

17   Q.    Okay.  Is the BP gas station near Narseal

18   Batiste's home?

19   A.    Yes.

20   Q.    Okay.  So is it -- did you lose track of the

21   Nissan Quest for an hour and 15 minutes?

22   A.    No.  The Nissan Quest had left a few minutes

23   before, but nobody saw it leave.  So we picked it up at

24   10:00 at the BP gas station.

25          But it had been, probably, about ten minutes from
```

```
 1   the time it left until the time we picked it up at the
 2   gas station.
 3   Q.     Well, who was -- who observed -- who was
 4   surveilling the Nissan Quest?
 5   A.     The whole team.  The whole team.  We were
 6   surveilling the residence, and the focus was the
 7   minivan.
 8   Q.     You had seven -- how many people did you have at
 9   the -- at Narseal Batiste's home surveilling the Nissan
10   Quest?
11   A.     We had -- I believe it was six or seven with us
12   out there.
13   Q.     And nobody saw the Nissan Quest leave Narseal
14   Batiste's home?
15   A.     We saw it depart.  The van left.
16   Q.     You saw it leave?
17   A.     I did not see it leave.  But the van left the
18   residence.
19          Because what happened was -- is -- the way we did
20   it specifically on this case, we couldn't set up on his
21   front door because it would be too obvious.
22          So the way the surveillance was done, it was in a
23   roving mode.  So nobody was there in the same block.
24   We were kind of doing --
25   Q.     So would it be fair to say that you --
```

```
 1              MS. ARANGO:  Objection to the interruption of
 2   the witness.
 3              THE COURT:  Let him finish his answer.
 4   BY MR. CLARK:
 5   Q.    I'm sorry.  All right.
 6   A.    Well, the -- specifically, the van left and we
 7   picked it up.  And it left before the 10:00, about --
 8   about ten minutes before this 10:00, when we noticed
 9   that it had departed and we hadn't picked it up.
10   Q.    Would it be fair to say that you had seen that it
11   had left, but you actually didn't see it leave?
12   A.    Yes.  You could say that.
13   Q.    Okay.  You noticed that it was gone.
14         And then you -- but you managed to locate it
15   within ten minutes at the BP gas station several blocks
16   away?
17   A.    Yes.
18   Q.    Okay.  So there was a period of time where the
19   van was there.
20         Do you know how long the van was at the home?
21   A.    It was at the home till about 9:50, somewhere
22   around there.
23   Q.    So it was there about an hour.  Is that correct?
24   A.    Yes.
25   Q.    And have you ever surveilled -- do you know where
```

1   Rotschild Augustine lived?

2   A.    Yes.

3   Q.    Where did he live, sir?

4   A.    In North Miami.  I don't remember the exact

5   address, but I had gone to it a couple of times on

6   surveillances.

7   Q.    Was it close to Mr. Batiste's home?

8   A.    Reasonably.  Yes.

9   Q.    What do you mean?  How many blocks?

10  A.    Yes.  Reasonably close.

11  Q.    Would it refresh your recollection if I gave you

12  the address of 14043 Northeast 2nd Avenue?

13  A.    Yes.

14  Q.    And that is pretty close to 420 Northeast 141st

15  Street.  Isn't that correct?

16  A.    Yes.

17  Q.    And after the -- at the BP station, it was the

18  first time that you observed three black males in the

19  Nissan Quest.  Isn't that correct?

20  A.    Yes.  The three -- no.  It's not the first time

21  we observe -- it was the same three individuals that we

22  had observed before.  At 10:00, they're in the minivan

23  at the BP gas station.

24  Q.    You observed three black males at the BP at 10:00

25  in the van?

```
1    A.     Yes.

2    Q.     But you have not identified them yet, have you?

3    A.     Well, from a distance, yes.  I mean, I knew who

4    it was and -- on the log -- since I'm at a distance and

5    I'm on a surveillance, I'm in a vehicle and I'm quite a

6    bit away, I didn't want to put them -- in my log

7    exactly who it was until I was absolutely sure.

8    Q.     So you can't -- you cannot say that those three

9    black males were identified -- the same black males

10   that were identified at 8:45 in the morning?

11   A.     Well, the entry for 8:45 in the morning is that

12   the mini Quest arrives at the residence.  And as to who

13   was in it and how many people, I don't know.  The van

14   arrived there at that address.

15   Q.     Well, what I'm saying to you, sir, is:  You

16   cannot say that the three black males that were

17   identified at 10:00 in the morning were the same three

18   black males that were identified at 8:45 in the

19   morning.

20   A.     The entry for 8:45 doesn't have any black males.

21   All it has is a minivan arriving at a residence.

22   Q.     Well, did --

23   A.     Which entry are you referring to?

24   Q.     Well, you had two black males with the Azteca

25   truck at 8:30.
```

Figueiras - CROSS - By Mr. Clark                86

```
 1   A.     Yes.

 2   Q.     You can't say that those two black males were the

 3   same black males on -- at 10:00?

 4   A.     Yes.   The same.

 5   Q.     You're saying that the two black males at 8:30

 6   were the -- two of the same at 10:00?

 7             MS. ARANGO:  Objection.  Asked and answered.

 8             THE COURT:  Sustained.

 9             MR. CLARK:  I would like to publish

10   Government's Exhibit W2-01998-T.

11             MS. ARANGO:  Objection.  Relevance.

12             THE COURT:  Come on up, please.

13             (Whereupon, proceedings were had at side-bar

14   outside the presence of the jury which have been sealed

15   per instructions of the Court.)

16             (Whereupon, the following proceedings were had

17   in open court:)

18   BY MR. CLARK:

19   Q.     Agent, on March the 25th at 9:12 a.m., do you

20   know if Narseal Batiste --

21             MS. ARANGO:  Objection, Judge.  Improper

22   predicate and irrelevant.

23             THE COURT:  Sustained.

24             Lay your predicate.

25
```

```
1    BY MR. CLARK:

2    Q.    Were you in contact with -- have you reviewed any

3    telephone -- wiretapped calls in this case?

4    A.    No.

5    Q.    Have you ever been asked to do so -- to do that

6    in connection with your report that you made here?

7    A.    No.

8    Q.    Were you on that -- at --

9          MS. ARANGO:  Objection, Judge.  He's asked a

10   question and now he's going into something that --

11         MR. CLARK:  I'm trying to -- I'm continuing to

12   lay a predicate, your Honor.

13         THE COURT:  Ask your question.

14         MR. CLARK:  Okay.

15   BY MR. CLARK:

16   Q.    At -- on that day when you were working the

17   detail, were you in contact with any other agents who

18   were monitoring wiretapped calls?

19   A.    No.

20   Q.    Okay.  Now, did you know whether or not, as part

21   of your surveillance, that Narseal Batiste -- whether

22   he had a valid driver's license on March the 25th or

23   not?

24   A.    No.  I did not know the status of his driving

25   privileges at that time.
```

1    Q.    Okay.  Now, you talked about the circular

2    directions of the vehicle in downtown.

3          Do you recall that?

4    A.    Yes.

5    Q.    And you understand that, being in your -- as your

6    job, that -- in downtown, that streets go east and

7    west.  Correct?

8    A.    Yes.

9    Q.    And that avenues run north and south?

10   A.    Yes.

11   Q.    And that these are one-way streets that you

12   referred to?

13   A.    Yes.

14   Q.    And the avenues are one-way avenues.  Correct?

15   A.    Yes.

16   Q.    You also know that I-95 overpasses downtown on

17   the west side of the area that you talked about?

18   A.    Yes.

19   Q.    It runs north and south.  I-95 does.  Right?

20   A.    Yes.

21   Q.    And that -- not every street that runs east and

22   west that you talked about has an entrance -- or an

23   exit ramp from I-95?

24   A.    Yes.

25   Q.    So in order to go west to get on I-95, depending

Figueiras - CROSS - By Mr. Clark                89

```
 1    on where you are, you may have to first go north or
 2    south and then actually go east and then north or south
 3    again in order to go west?
 4    A.    Yes.
 5    Q.    Now, you had indicated that -- in your testimony
 6    that they went in a circular fashion.
 7          Did you say three or four times or four or five
 8    times?  I don't recall.
 9    A.    When they first arrived, there was about four to
10    five times.  And then, when they left -- I left when
11    they were still in the process of doing a
12    circular-square drive around the area.
13    Q.    In your report, you did not identify the exact
14    number of times, did you?
15    A.    No.
16    Q.    And what you put in your report was several
17    times.  Correct?
18    A.    Yes.
19    Q.    And the parking that you referred to that you
20    observed, parking was metered parking.  Isn't that
21    correct?
22    A.    Yes.
23    Q.    And sometimes it can be difficult to get a
24    parking space downtown.  Isn't that correct?
25    A.    That is correct.
```

Figueiras - CROSS - By Mr. Clark                    90

1   Q.     And when you left -- when the vehicle left the

2   downtown area, the same similar circular action was

3   taken.  Correct?

4   A.     Yes.

5   Q.     And before the -- did you see the van get on

6   I-95?

7   A.     No, I did not.  That was another surveillance

8   team that took over the surveillance at that point.

9   Q.     So you don't -- you do not know if I-95 was taken

10  or not.  Is that correct?

11  A.     No, I did not.

12  Q.     Now, your log says that two are carrying a

13  backpack and a black bag?

14  A.     At the minivan, when they parked.

15  Q.     Okay.  And from -- two people are carrying a

16  backpack and a bag at that point?

17  A.     As I testified before, when they parked next to

18  the Community College, the doors were open.  There were

19  at least two bags in the vehicle which they were moving

20  around.

21         The doors were open.  They're looking for money

22  to be put in the meter.  And that's when I observed

23  that.

24  Q.     You reported that two persons were carrying a

25  black backpack and a black bag?

Figueiras - CROSS - By Mr. Clark                                      91

1    A.      Right by the minivan.  Yes.

2    Q.      From there, you reported, I believe, that they

3    went into the Community College?

4    A.      They entered Building No. 1.  Yes.

5    Q.      And you did not -- you said you did not know why

6    they did that.  Correct?

7    A.      No.

8    Q.      And so the photographs that you've testified

9    about when they left showed only one backpack.  Is that

10   correct?

11   A.      There was one bag being carried by Narseal

12   Baptiste after they had traveled away from the minivan.

13   Q.      And so it's possible, sir, that one bag could

14   have been left in the Community College.  Isn't that

15   correct?

16   A.      I would imagine.  Yeah.  That's possible.

17   Q.      And based on the fact that you saw two going to

18   the Community College and only one after the --

19   going --

20   A.      No.  No.  No.  No.  I saw the three of them

21   traveling together to Building No. 1 at Miami-Dade

22   Community College --

23   Q.      Correct.

24   A.      -- downtown.

25   Q.      Okay.  You saw three of them.  I'm sorry.

1    A.      Right.

2    Q.      But there were two backpacks going with them to

3    the Community College?

4    A.      No.   Only one bag was with them.

5    Q.      Well --

6    A.      On the picture that has been introduced, as you

7    can see, there's only one bag being carried at that

8    time.

9           At the time that they parked putting money in the

10   meter, what I noticed and what I put on the log was

11   that there were more than one bag and that I could see

12   more than one bag in the minivan.

13          And that's the entry on the log.

14   Q.      But the picture we're talking about was after

15   they exited the building?

16   A.      After they exited the minivan.   That's -- that

17   picture was taken after they had left the minivan.

18          And I lost sight.   I did not take that picture.

19   I saw my teammate, Karam Govens, take that picture, who

20   was parked near me.

21   Q.      And the picture, you're saying, was taken before

22   they went into the building?

23   A.      Yes.

24   Q.      And who took the picture?

25   A.      Karam Govens.

1   Q.     How do you know that she took the picture

2   before --

3   A.     It's a he.

4   Q.     I'm sorry.

5          How do you know he took the picture before he

6   went into the building?

7   A.     Because he's letting me know that he's taking the

8   picture on the radio.

9   Q.     Well, he's taking a bunch of pictures.  But he is

10  not telling you which picture that he's taking.

11  A.     Well, he took pictures there when they arrived

12  and then when they went to the courtyard area, where

13  they were there.

14         And Guillermo Salazar, another teammate of mine,

15  followed him there, where they sat around in the

16  courtyard.

17         And Guillermo Salazar called me on the phone and

18  advised me that they -- he didn't know exactly who,

19  because he was at a distance -- were taking pictures.

20         That's when Karam Govens also traveled around and

21  took pictures on that side.

22  Q.     Now, when you -- the pictures that you observed,

23  Rotschild Augustine was not carrying a backpack, was

24  he?

25  A.     That is correct.

1    Q.      He was not carrying a camera.  Correct?

2    A.      Correct.

3    Q.      No one reported that he was taking -- Rotschild

4    Augustine was taking photos.  Correct?

5    A.      No one reported specifically that it was him.

6            What was reported by Gil Salazar, there were the

7    three of them and he observed -- and he could not

8    identify who exactly was taking the picture because he

9    was at distance.  After all, it is a surveillance, and

10   you can't really get up close and personal.

11           So at a distance, he relayed to me that they were

12   taking pictures.  They -- one of the three or all three

13   were taking pictures, according to what my teammate,

14   Guillermo Salazar, told me on the phone that day.

15   Q.      But you didn't observe Rotschild Augustine taking

16   photos?

17   A.      I did not.

18   Q.      You didn't observe him with a camera?

19   A.      I did not.

20   Q.      You didn't observe him carrying a bag?

21   A.      No.

22   Q.      You didn't observe him taking videotapes?

23   A.      No.

24   Q.      You didn't observe him instructing anyone to take

25   pictures?

Figueiras - CROSS - By Mr. Clark                    95

```
 1   A.      No.
 2   Q.      You didn't observe Rotschild Augustine pointing
 3   at any buildings to take pictures?
 4   A.      I did not.
 5   Q.      You don't -- no one reported to you that he was
 6   pointing to take pictures either?
 7   A.      What was reported to me on the phone by Guillermo
 8   Salazar was that they were taking pictures.  If they
 9   were pointing -- they might have and they might have
10   not.  All that I got on my entry and what Salazar told
11   me was that they were taking pictures --
12   Q.      That's what I mean.
13   A.      -- in the courtyard.
14   Q.      I mean, nobody reported that he was pointing --
15   Rotschild Augustine was pointing to take pictures of
16   anything?
17   A.      No.
18   Q.      And no one reported that he was pointing at any
19   other structures?
20   A.      No.
21   Q.      And -- now, you talked about the building -- the
22   James Lawrence King Building.  Correct?
23   A.      Correct.
24   Q.      There's no sign outside that says this is the
25   United States Attorney's Office.  Is that correct?
```

Figueiras - CROSS - By Mr. Clark                96

 1   A.     In '06, I'm not sure.  From that part there, I

 2   don't think there's a sign, no, that says that.

 3   Q.     And there's courtrooms in that building?

 4   A.     Yes.

 5   Q.     There's a cafe in that building?

 6   A.     Offices.  Yes.

 7   Q.     Yes.

 8          But there's no sign on the outside of the

 9   building saying this is the US Attorney's Office

10   building?

11   A.     No.

12   Q.     It just says "James Lawrence King Federal

13   Building"?

14   A.     Yes.

15   Q.     And do you know if there's a Public Defender's

16   Office in that building?

17   A.     I'm not aware of that.  No.

18          MR. CLARK:  I have no further questions, your

19   Honor.

20          THE COURT:  Mr. Casuso.

21          MR. CASUSO:  No questions, your Honor.  Thank

22   you.

23          THE COURT:  Mr. Levin.

24          MR. LEVIN:  No questions, your Honor.  Thank

25   you.

Figueiras - REDIRECT - By Ms. Arango          97

1           THE COURT:  Ms. Arango?

2                   REDIRECT EXAMINATION

3   BY MS. ARANGO:

4   Q.    Agent, a couple times during cross-examination,

5   when you were asked about when you had seen a

6   particular person or identified something, you

7   mentioned, "Well, you know, we couldn't get up on his

8   front door" or, "We couldn't get up close and

9   personal."

10          Could you tell the members of the jury what, if

11  any, concerns you have during the course of conducting

12  these surveillances?

13  A.    It's extremely difficult to -- at times, to

14  surveil.  The whole idea about surveillance is to be

15  covert, that you're not detected.

16          Obviously, in order to accomplish that and to get

17  the goal done and surveil individual subjects of an

18  investigation, you have to do it at a distance.  You

19  have to do it in different areas.  There's different

20  techniques that you use.

21          But the overriding factor there is that you want

22  to be covert.  You don't want to be detected.  So,

23  therefore, there are times where you're not going to be

24  able to see exactly who's driving the vehicle because

25  you're putting the surveillance in jeopardy of being

Figueiras - REDIRECT - By Ms. Arango                    98

 1    detected.  And then the individuals are going to know

 2    that they're being followed and it complicates the

 3    investigation and so forth.

 4         So it's extremely difficult.  Surveillances can

 5    only do -- or are good for -- to a certain extent.

 6    Q.    Okay.  Thank you.

 7         Also, I think at one point you said, "We were in

 8    a roving mode."

 9         Do you recall saying that in response to a

10    question?

11    A.    Yes.

12    Q.    Could you please explain to the members of the

13    jury what a roving surveillance is.

14    A.    Yes.  There will be times during surveillances

15    where you cannot set up in front of somebody's house or

16    close enough.  There's no way what we call keeping an

17    eye.  Somebody has to be focusing and keeping an eye on

18    our subject, our vehicle or the group or whatever it

19    is.

20         So there's -- depending on the situation, it is

21    very difficult.  You can't do that.  You will be

22    detected.

23         So what we do is the whole team focuses on doing

24    a roving.  You're kind of -- very tediously, you kind

25    of try and keep and do the best you can in order to not

Figueiras - REDIRECT - By Ms. Arango                99

```
 1   be detected.  But there's nobody stationary, keeping an

 2   eye on the residence or the vehicle.

 3   Q.    So roving means --

 4         MR. VEREEN:  Objection.  Leading.

 5         THE COURT:  Sustained.

 6         Rephrase your question.

 7   BY MS. ARANGO:

 8   Q.    So in a roving mode, do you or do you not move

 9   around?

10   A.    It's a constant movement.  Nobody is stationary.

11   And then it becomes much more difficult because, of

12   course, you run the risk or the possibility of your

13   subject or the individual that's under surveillance to

14   leave and nobody being able to detect it.

15   Q.    You were also asked about the traffic and the

16   parking on March 25th in the downtown area.

17         Do you know what day of the week March 25th was?

18   A.    It's a Saturday.  So parking was not a problem.

19         MS. ARANGO:  Thank you very much.

20         No further questions.

21         THE COURT:  You may step down, sir.

22         (Witness excused.)

23         THE COURT:  Call your next witness.

24         MR. GREGORIE:  The United States calls Ed

25   Purchase.
```

Purchase - DIRECT - By Mr. Gregorie          100

```
 1   Thereupon--

 2                 EDWARD RICHARD PURCHASE

 3   was called as a witness by the Government and, having

 4   been first duly sworn, testified as follows:

 5                 THE COURT REPORTER:  Please have a seat, sir,

 6   and sit close to the microphone.

 7                 State your full name for the record and spell

 8   your last name.

 9                 THE WITNESS:  Edward Richard Purchase,

10   P-u-r-c-h-a-s-e.

11                 DIRECT EXAMINATION

12   BY MR. GREGORIE:

13   Q.    Sir, would you tell the Court and jury, please,

14   how you're employed.

15   A.    Yes.  I'm a supervisory deputy, United States

16   Marshal, with US Marshal Service, assigned to the

17   Southern District of Florida, here in Miami.

18   Q.    And you said you're a supervisory marshal.

19         Could you tell the Court and jury, please, who it

20   is that you supervise and what area.

21   A.    I supervise our judicial security program.

22   Q.    And when you say "judicial security," can you

23   give us an idea of what that includes.

24   A.    Yes.  It includes three basic components.

25         One is protective investigations.  When
```

```
 1    inappropriate communications come in, we look at those

 2    and follow up on those.

 3         Second is our court security officer program, a

 4    contract program.  I have about 80 officers.

 5         The third is the -- all the security required

 6    for -- to -- needed to operate the courthouses safely.

 7    Q.    When you say the security of the courthouses,

 8    what area does that include?

 9    A.    It includes every area, every aspect of the

10    interior and the exterior.  We require visual

11    capabilities, duress systems, audible systems,

12    throughout the building.

13    Q.    For how long have you been doing that, sir?

14    A.    That particular area, I think three to five

15    years.

16    Q.    And how long have you been a US marshal?

17    A.    21 years.

18    Q.    Okay.  Now, sir, prior to coming in to testify,

19    did you have the opportunity to review what's marked in

20    evidence as Government's Exhibit 81-B, in particular,

21    Page 18 and 19 of Government's Exhibit 81-B?

22    A.    Yes, sir.

23         MR. GREGORIE:  Can you play that for us -- for

24    the Court.  It's Government's Exhibit 81-B.

25         Turn to Page 18 and 19.
```

1          MS. JHONES:  Your Honor --

2          MR. GREGORIE:  18, to start.

3          MS. JHONES:  If I may, your Honor, my only

4    objection as to this publication is that it's

5    cumulative.  That's my objection.

6          MR. GREGORIE:  There is a very specific area

7    that has not been touched, your Honor.

8          THE COURT:  Overruled.

9          Is it in one of the binders?

10         MR. GREGORIE:  Yes, your Honor.  I'm sorry.

11         It's in the synchronized exhibits.  And it's

12   Government's Exhibit 81-B.  It starts at the middle of

13   Page 18, where it says, "Right in front of the federal

14   building..."

15         It should be a rolling copy on the screen as

16   well, your Honor.

17         THE COURT:  Okay.

18         MR. GREGORIE:  If you'd play that clip,

19   please.

20         (Whereupon, segments of Government's Exhibit

21   No. 81 were published this open court.)

22   BY MR. GREGORIE:

23   Q.    Now, sir, what, if any, public information is

24   there about the movement of prisoners?

25   A.    Nothing that's available to the public concerning

Purchase - DIRECT - By Mr. Gregorie                    103

```
 1   Marshal Service policy regarding the movement of
 2   prisoners.
 3   Q.    Are prisoners in this district moved in some mode
 4   underground?
 5   A.    Yes, sir.
 6   Q.    How, if at all, would any member of the public
 7   get information about the movement of --
 8            MR. VEREEN:  Objection.  Speculation.
 9            THE COURT:  Sustained.
10            Rephrase your question.
11   BY MR. GREGORIE:
12   Q.    Is there any public information anywhere, sir,
13   about how prisoners are moved?
14            MR. VEREEN:  Objection.  Asked and answered.
15            THE COURT:  Overruled.
16            THE WITNESS:  There has been information made
17   public.
18   BY MR. GREGORIE:
19   Q.    Such as?
20   A.    Previous testimony and proceedings.
21   Q.    Other than that?
22   A.    No, sir.
23   Q.    Who has access to the underground facilities?
24   A.    Federal employees from the Bureau of Prisons and
25   the US Marshal's Office, some contract personnel, those
```

 1   that maintain it, those that built it and those that --

 2   past and present.

 3   Q.     Other than those individuals, is there anyone

 4   that you're aware of that has access to the information

 5   about the underground movement of prisoners?

 6   A.     Only those that have been through there and have

 7   told people about their experience.

 8   Q.     Okay.  Now, sir, also, have you had the

 9   opportunity to review what's marked as Government's

10   Exhibit 120-A?

11   A.     Yes, sir.

12   Q.     I'm going to ask you to look carefully at the

13   screen.  And we will see certain pictures.

14          I'd ask you to tell us as we look at each one --

15   I will go one by one -- tell us what, if any, aspects

16   of those pictures -- what security issues arise with

17   you when you see each of those pictures.

18   A.     Yes, sir.

19          MR. GREGORIE:  Please play the first clip from

20   Government's Exhibit 120-A.

21          MS. JHONES:  Your Honor, I'm lodging the same

22   objection on a cumulative basis as to the -- this line

23   of questioning with respect to that exhibit.

24          THE COURT:  Overruled.

25          (Whereupon, segments of Government's Exhibit

 1   No. 121-A were published in open court.)

 2   BY MR. GREGORIE:

 3   Q.    Sir, taking at look at this picture, can you tell

 4   us what we're looking at.

 5   A.    We're looking at the vehicle barrier in front of

 6   the -- in front of part of the James Lawrence King

 7   Building.

 8   Q.    Okay.  I'm asking you to look at the lamppost

 9   that's there.

10         Just to the right of the lamppost, can you tell

11   us what, if anything, you see.

12   A.    Yes.  Another security camera.  It looks like

13   there's a fixed post security -- a fixed security post

14   in the lower left -- I'm sorry -- the lower right with

15   another camera.

16   Q.    Can you mark that there with your finger.

17   A.    (Witness complies.)

18         THE COURT:  Mr. Gregorie, I have a question.

19         MR. GREGORIE:  Yes.

20         THE COURT:  Is this 1 --

21         MR. GREGORIE:  This is Government's

22   Exhibit 120-A, your Honor.

23         THE COURT:  120 or 121?

24         MR. GREGORIE:  120.

25         MS. ARANGO:  No.  121.

 1              MR. GREGORIE:  I apologize, your Honor.  It's

 2      my fault.

 3              THE COURT:  Okay.

 4              MR. GREGORIE:  121.  I apologize to the Court.

 5              THE COURT:  That's okay.

 6      BY MR. GREGORIE:

 7      Q.      That security camera.

 8              And what are we looking at at the bottom of the

 9      picture here?

10      A.      That's our vehicle barrier to protect us against

11      car bombs and things like that.  It's reinforced

12      concrete, 8 inches thick, 3 foot high.  It's shaped

13      like an "L."

14              So it's -- the perpendicular wall is supported by

15      an equal amount of product that sits on the floor --

16      the street floor.

17              MR. GREGORIE:  Could you go to the --

18      BY MR. GREGORIE:

19      Q.      And what is the area that we're looking at to the

20      left bottom, just above the vehicle barrier?  What, if

21      any, doorway is that?

22      A.      It looks like a doorway and some steps.  I --

23      Q.      What I'm asking you is:  What building is that?

24      A.      I'm sorry, sir?

25      Q.      What building is that?

Purchase - DIRECT - By Mr. Gregorie                107

A.      The James Lawrence King Federal Building.

Q.      Could you tell the Court and jury who's housed in
there.

A.      It's also known as the 99 building.  I see the
"99" at the front door.

        The -- oh, okay.

        We have the US attorneys offices housed there.
Senior judges are housed there.  Some magistrate judges
and the Eleventh Circuit appellate judges have their
offices there.

        MR. GREGORIE:  Give us the next picture,
please.

BY MR. GREGORIE:

Q.      Could you tell us what we're looking at there,
sir.  If you could erase the....

A.      It's another aspect of the King Building.  It
looks like the east side of it.  And we have our
vehicle barrier.

        And it's indented down because we had a couple
accidents and we lowered that because it wasn't
deemed -- it wouldn't create a significant security
risk and it helped vehicular traffic.

Q.      Okay.

        MR. GREGORIE:  Next picture, please.

Purchase - DIRECT - By Mr. Gregorie                    108

1   BY MR. GREGORIE:

2   Q.     Can you tell us what we're looking at.

3   A.     It's the elevated People Mover system that runs

4   throughout the city of Miami -- Downtown Miami.

5   Q.     And where does that run in relationship to the

6   federal building we just looked at, the King Building?

7   A.     Well, it runs real close, too close.  We

8   perceived that as a problem and asked the City of Miami

9   to stop.  There's a station right there where people

10  exit and enter the train.  It's a drone train.

11         The City of Miami wouldn't honor our request.

12  But they did put a security guard on there and issued a

13  press release indicating that there was a security

14  presence.

15  Q.     What, if any, security risk does that train being

16  there pose to the federal buildings?

17  A.     Well, when the -- when this building was started

18  and when it finished -- it was a long time.  It was a

19  lot of years -- after 9/11, we were much more

20  aggressive in --

21         MR. VEREEN:  Objection.  Nonresponsive to the

22  question.

23         THE COURT:  Overruled.

24         THE WITNESS:  We were much more aggressive in

25  our -- in our barriers -- security barriers because we

 1   perceived that any number of situations could come out

 2   of that -- the use of that train.

 3          It could be filled with explosives.  It could

 4   have a little commando attack and a little squad of

 5   people could run down.  It oversaw our sally ports.  So

 6   it could effect an escape.  There was just a number of

 7   problems with it.

 8          Also, people could stand up there and do

 9   surveillance on how we take prisoners in and out.  It

10   was just -- the whole thing was problematic.

11          But we're -- today, we just remain vigilant on

12   seeing who's there, how long they're there and what

13   they're doing when they're up there.

14          MR. GREGORIE:  Can you give us the next

15   picture, please.

16   BY MR. GREGORIE:

17   Q.    Could you tell us what that is and approximately

18   when that was -- that was taken, if you know.

19   A.    Like I said, the project took many years.  I

20   don't know what year this was.

21          But what it is is the vehicle barrier system for

22   this courthouse.  It's -- if you -- when you go

23   outside, you can see it.  It's aesthetically pleasing

24   as it can be, but it's a very sophisticated vehicle

25   barrier and very effective.

1           MR. GREGORIE:  Could you give us the next

2    picture, please.

3    BY MR. GREGORIE:

4    Q.    What are we looking at there, sir?

5    A.    We're looking at the Calai District that was part

6    of the Bureau of Prisons construction project.  They

7    had to restore the historic buildings.  And then we

8    have what appears to be security cameras.

9    Q.    Can you point those out, please.

10   A.    (Witness complies.)

11   Q.    What, if any, security problems does that

12   historic area pose, if any, to the security of the

13   area?

14   A.    Well, the architecture allows for more

15   concealment if -- when people want to conceal

16   themselves.

17         It -- I have never explored or done a survey on

18   the Bureau of Prisons and how that may or may not allow

19   access into the -- this -- the institution itself.

20         But you have -- they have the gymnasium there.

21   They have executive offices.

22         So the -- there could be potentials for an

23   attack, obviously, or a hostage situation.  I don't

24   know, again, how those offices are occupied.  I think

25   their general counsel is in one of them.

 1         I think what I see here is the infrastructure.  I

 2    don't see the lens on the camera.  That's what I was

 3    hesitant about.  I didn't know if they were lights at

 4    first, but then I realized they didn't put the camera

 5    and the screen in the bottom.  So....

 6         MR. GREGORIE:  Could you give us the next

 7    picture, please.

 8         MR. VEREEN:  Your Honor, unless this is a

 9    composite, none of those photographs are identified for

10    the record.

11         MR. GREGORIE:  These are all coming from

12    Government's Exhibit 121, your Honor.  It's in

13    evidence.  121-A is in evidence.

14         THE COURT:  Are you withdrawing your

15    objection?

16         MR. VEREEN:  Yeah.  If this is a composite, I

17    have no objection.

18         MR. GREGORIE:  Yes.  It is.

19         THE COURT:  Okay.  Go ahead.

20    BY MR. GREGORIE:

21    Q.    Could you tell us what you see there and what, if

22    any, security apparatus you can identify in this clip.

23    A.    We have more cameras, an older generation style

24    of camera and the newer generation.

25         Another weakness in this area is, the way that

Purchase - DIRECT - By Mr. Gregorie                112

1    buildings are layered, it would enable someone with

2    skills to climb their way up and get into the landing

3    of the -- the landing on the top of the picture frame,

4    which is a -- actually, you can see it from outside the

5    courtroom, where there's -- it looks like ventilation

6    duct on the Bureau of Prisons' tower that could be used

7    as an access point.

8    Q.    Sir, when you said climb your way up, do you mean

9    physically climbing the building?

10   A.    Yes, sir.  Like with rappel tools.  If you're

11   trained, you can do that very efficiently, very

12   quickly.

13   Q.    Thank you.

14         MR. GREGORIE:  If we could go to the next

15   picture, please.

16   BY MR. GREGORIE:

17   Q.    Can you tell us what we're looking at.

18   A.    This is the rear of the Bureau of Prisons Federal

19   Detention Center.

20   Q.    Okay.

21   A.    We have some access points, the mirror for

22   security purposes, a camera.

23   Q.    And what are these large doors accessing?

24   A.    Well, I'm not sure.  But they're access points

25   that could be explored, exploited, to keep -- gain

 1    entrance into the facility.

 2    Q.    What building is that?

 3    A.    The Bureau of Prisons Federal Detention Center.

 4          MR. GREGORIE:  Could we have the next photo,

 5    please.

 6    BY MR. GREGORIE:

 7    Q.    What is that?

 8    A.    Well, this would be where I guess they would drop

 9    off materials or food or whatever, because you have the

10    vehicle ramp.

11          So you have a larger access point that be may

12    be -- that would accommodate a vehicle.  If that's what

13    the -- what was in the mind of someone to do against

14    the prison, they could use that for a vehicle ramp.

15          MR. GREGORIE:  And the next picture, please.

16    BY MR. GREGORIE:

17    Q.    Do you notice to the left there's a red item?  Do

18    you recognize that?

19    A.    Yes, sir.  That's part of the emergency water

20    feed to the prison.

21    Q.    Could you circle that, please, so the jury

22    could --

23    A.    (Witness complies.)

24    Q.    What, if anything, does that do?

25    A.    Well, that supplies all the emergency water, like

1   for sprinklers -- the fire sprinklers and any other

2   water defense to support an emergency in the kitchens

3   or throughout the facility.

4           MR. GREGORIE:   Could we have the next picture,

5   please.

6   BY MR. GREGORIE:

7   Q.      What, if any, security significance do those

8   items have?

9   A.      The red is the main emergency water supply.

10          The blue is the domestic water supply, like for

11  showers and cooking and toilet use and personal hygiene

12  use.

13          The yellow is the gas line that feeds the prison

14  and, presumably, the kitchen.

15          And there's just a lot of potential there for a

16  horrible event.  If these were taken out, you would

17  have no emergency water, no domestic water and no gas

18  supply to the prison until it's repaired.

19          And then, if the gas disperses enough, it could

20  be combustible and then you'd have the streets flooded

21  and this fire going and no water getting in the prison.

22          And if a prisoner started a fire in the prison,

23  there would be nothing to put it out with unless

24  there's -- I'm sure they have some fire extinguishers,

25  but it would just create mayhem, chaos and a high risk

 1    of huge loss of life.

 2              MR. GREGORIE:  Next picture, please.

 3    BY MR. GREGORIE:

 4    Q.    Could you tell us what that is.

 5    A.    That's the end of the Bureau of Prisons.  And

 6    then the King Building is to the left.

 7          You've got a garage access point and a door

 8    access point.

 9          That's the Bureau of Prisons -- the northeast

10    corner of the Bureau of Prisons building.

11    Q.    What, if any, security concern is there with the

12    fenced area that is between the Bureau of Prisons and

13    the King Building?

14    A.    Well, the fenced area -- a chain-link fence like

15    that is very easy to -- you can pull up with a wench or

16    whatever or a vehicle with any force can go into that

17    area.

18          And when the buildings are close together and an

19    explosion goes off, the concussion is magnified that

20    much more because the buildings are closer together.

21    It's not dispersed.

22          So you create more of a -- more of a -- the

23    effect of the explosion is magnified because of the

24    proximity of the buildings.

25              MR. GREGORIE:  Could we have the next picture,

 1   please.

 2   BY MR. GREGORIE:

 3   Q.    Could you tell us what, if any, security

 4   apparatus is there and what we're looking at.

 5   A.    Yes.  This is where the fence continues into

 6   the -- where the King Building is.  We've got some

 7   cameras here, here and here.  We have a fixed security

 8   post here (indicating).

 9         We have a vehicle ramp that goes up to feed -- to

10   a parking platform between the two buildings.  That was

11   a risk that we had for quite some time.  We finally

12   fixed it.

13         We have a vehicle barrier -- a vehicle barricade

14   now that, when it's open, it's almost impossible for a

15   vehicle to pass.  But prior to that, it was a

16   significant weakness.

17              MR. GREGORIE:  The next picture, please.

18              THE WITNESS:  This is the emergency water

19   supply to the King Building.  It's much better

20   protected because we have the vehicle barriers out

21   front.  And it's patrolled, too, with security.  But

22   it's in much better shape there security-wise.

23              MR. GREGORIE:  Go ahead.  Next one, please.

24   BY MR. GREGORIE:

25   Q.    And do you know what that is?

Purchase - DIRECT - By Mr. Gregorie          117

```
 1   A.     Yes, I do.  That's the entrance to the City of

 2   Miami Police Department, public entrance.  And it

 3   appears a lot of law enforcement personnel are

 4   gathered --

 5   Q.     Do you --

 6   A.     -- at one time.

 7   Q.     Can you tell the Court and jury where the

 8   entrance to the Miami -- City of Miami Police

 9   Department is in relationship to this complex we've

10   just been looking at.

11   A.     This is just two blocks to the west.

12   Q.     Okay.

13          MR. GREGORIE:  Next picture.

14          THE WITNESS:  More personal congregating.

15   BY MR. GREGORIE:

16   Q.     Okay.

17   A.     The significance of that is you have large

18   numbers of public safety people gathered and you have a

19   potential target for a random act of violence, whether

20   it's a drive-by shooting or if a group so inclined to

21   plant an explosive device there.  It's just -- where

22   people regularly congregate is a weakness, especially

23   law enforcement.

24          MR. GREGORIE:  I have no further questions,

25   your Honor -- I'm sorry.  One minute, your Honor.
```

```
 1    BY MR. GREGORIE:

 2    Q.    Sir, have you looked also -- I have the numbers

 3    confused -- that was 121 -- that was 121-A.

 4          I want you to look and see if you looked also at

 5    121-A -- 120-A.  We played 121-A.  Now we're looking at

 6    120-A.

 7          MR. GREGORIE:  Would you now play 120-A.  So

 8    we're looking at 120.  We were looking at 121.

 9          (Whereupon, segments of Government's Exhibit

10    No. 120-A were published in open court.)

11    BY MR. GREGORIE:

12    Q.    As we start this, sir, what are we looking at?

13    A.    The James Lawrence King Building, the City of

14    Miami police, the security wall for that compound,

15    weaknesses within that wall.  There's -- it's not solid

16    reinforced, that section.

17    Q.    As it goes along, would you tell us what we're

18    going past.

19    A.    We're going past the construction site for the

20    new courthouse -- the new federal courthouse, the

21    Wilkie Ferguson Courthouse.

22          Continuing east on Northeast 5th Street, passing

23    the King Building, the Tower Building, passing Miami

24    Avenue, going to -- oh, I'm sorry.  We're still behind

25    the prison there.
```

1          We have the water supply and gas supply.

2     Q.     Continue.

3     A.     We have the area between the two buildings that

4     is vulnerable.  This is a picture, if I may circle it,

5     of the vehicle barrier that was recently installed

6     there.  We want to get the vehicle barriers on the

7     other -- well, I'm sorry.

8     Q.     Continue, please.

9            Where is that, sir?

10    A.     It's Miami-Dade Community College.

11    Q.     And the train station you were talking about:

12    Did we pass that?

13    A.     Yes.

14           We have the fire department.

15           This is more of Miami-Dade Community College.

16           That is their emergency water system.  That's

17    exposed, too.

18           I think that's south -- I think we're on

19    2nd Avenue -- Southeast 2nd Avenue.

20    Q.     Where are we coming to now?

21    A.     We're still at Miami-Dade Community College,

22    coming up to Southeast 3rd Street.

23           Turning west on 3rd Street.

24           Coming up to the Dyer historic courthouse.  It

25    shows our vehicle barrier protecting that courthouse,

Purchase - DIRECT - By Mr. Gregorie          120

 1    at the corner of Northeast 1st Avenue and Northeast 1st

 2    Street.

 3    Q.     The building in the upper right-hand corner now

 4    as we're going by it, looking at it, is which building?

 5    A.     The James Lawrence King Federal Building.

 6    Q.     Okay.  And this is still the Dyer Building?

 7    A.     Yes, sir.  The historic Dyer Building.  We have

 8    our vehicle barricade along the bottom.

 9           A security camera.

10    Q.     Okay.

11    A.     That's the newer model.  It has a pan/tilt/zoom.

12    It's very effective.

13    Q.     Continue, please.

14    A.     Now we're in front of the Atkins Building.

15           It looks like the new courthouse.

16           Now we're coming eastbound on -- I think it would

17    be 2nd Street.  We've got the Sun Hotel.

18           This would be 1st Street -- or 1st Avenue, going

19    north.

20    Q.     As you turn left there, where are you heading?

21    A.     We're going north again, going by our fixed

22    security checkpoints, the historic Dyer Building and

23    the King Building.

24           A police car.

25           Another police car.

Purchase - DIRECT - By Mr. Gregorie                 121

1          We have our vehicle barrier and the historic Dyer

2     Building.

3          This is a particular weakness here.  It's our

4     fixed post on the east side of the campus.  And we had

5     to widen the barriers because, for regular garbage

6     pickup and regular delivery trucks, we couldn't keep

7     closing those barriers.

8          And we have no -- the vehicle barrier that rises

9     up and down to allow vehicles in -- we don't be have

10    those at either of those fixed posts.  We hope to get

11    those funded soon.

12         So the weakness is because it's a wider area and

13    there's just a little wooden drop bar that would be

14    very easily compromised by a large vehicle.

15    Q.    Continue, please.

16    A.    That is the after-hours exit door at the US

17    Attorney's Office, James Lawrence King Building.  It's

18    utilized by staff and judiciary and assistant US

19    attorneys.  And our building is right inside that door.

20    So it's a weak point.

21         That's Miami-Dade Community College.

22    Q.    Where is that in relationship to the federal

23    buildings?

24    A.    It's -- the sculpture looks familiar.  It's just

25    a block or two from the campus.  And it could even be

```
 1   right across the street.
 2        The campus matches up to Miami-Dade.  But
 3   Miami-Dade is also three or four blocks of buildings
 4   and parking.
 5            MR. GREGORIE:  Thank you, sir.
 6            THE WITNESS:  You're welcome.
 7            THE COURT:  Ms. Jhones?
 8            MS. JHONES:  I have a couple questions, your
 9   Honor.
10                      CROSS-EXAMINATION
11   BY MS. JHONES:
12   Q.    Good morning, Mr. Purchase.
13        How are you?
14   A.    Good.  Thank you.
15   Q.    Mr. Purchase, your title with the US Marshal
16   Service is what, please?
17   A.    I'm a supervisor.
18   Q.    And currently you supervise what?
19   A.    Well, I supervise judicial security.  But I'm
20   also lucky.  I'm the only supervisor that has several
21   areas.
22        I supervise the civil program, which is
23   enforceable writs, nonenforceable writs or asset
24   forfeiture operations; judicial security, which is has
25   the components I spoke of before.
```

```
 1          And then my favorite area is duties as

 2    assigned -- other duties as assigned.  I have different

 3    projects I'm responsible for throughout the year.

 4    Q.    So you wear many hats.  Is that fair to say?

 5    A.    Yes, ma'am.

 6    Q.    And one of the -- when you're talking about the

 7    civil program, that's when the US marshals have to

 8    seize assets -- have to physically go and seize assets

 9    that have been forfeited by virtue of some proceeding

10    brought by the United States.  Correct?

11    A.    Yes, ma'am.

12    Q.    And in addition to the -- some of the duties that

13    you do when you're wearing all these different hats is

14    indigent defendants needing to have subpoenas served

15    for trial purposes.

16          You assist in that regard?

17    A.    Yes, ma'am.

18    Q.    And, basically, the Marshal Service does a great

19    many things for the judicial system.

20          Is that fair to say?

21    A.    We're the bureau of the Department of Justice

22    specifically dedicated to the courts, and we support

23    them in every way we can.

24    Q.    And you've been involved in that capacity for

25    approximately 19 1/2 years?
```

1    A.    Well, my tenure is 21 years.  But I've done most

2    of the duties throughout my career in one form or

3    another.

4    Q.    And I'm sorry.  I may have asked you this

5    already.

6          But did you say you were doing the judicial

7    security program for the last three to five years?

8    A.    Again, when --

9    Q.    Approximately.

10   A.    Approximately, about three to five years.

11   Whenever this building was started, when it was roughed

12   up, they brought me over as a liaison between the

13   builders and our headquarters office.

14   Q.    Are you talking about -- I'm sorry.

15   A.    There was also a lot of problems.  The building

16   had -- the architects were a joint venture,

17   HOK Architectonica.  One did the design.  The other did

18   the functionality.

19          Well, because it was like a ten-year program,

20   because it didn't get funded like it should have, all

21   the security systems were pre-9/11 design.

22          So when we came over here, we had to completely

23   reevaluate a lot our security needs, key sequencing

24   systems, card key tiers for access and refurbish some

25   of the things that were cut, because during the period

 1    money was taken to support other projects.

 2         So I lost track of time.  But it is probably

 3    about five years.

 4    Q.    Are we going to get a cafeteria any time soon in

 5    this building, sir?

 6    A.    Well, don't get me started.

 7    Q.    All right.  So your assignment, as it relates to

 8    the -- correct me if I'm wrong with the terminology --

 9    this judicial security program, was primarily as it

10    relates to this new building that was recently opened.

11    Is that fair to say?

12    A.    This building, and then there's different

13    security enhancement projects that are going on

14    throughout the Miami area, reinforcing cell blocks,

15    updating our command and control centers, an assortment

16    of projects.

17    Q.    And, sir, prior to being -- prior to your service

18    to the US marshals, what were you doing?  How were you

19    employed?

20    A.    I was a police officer.

21    Q.    Is it fair to say, Mr. Purchase, that -- well,

22    actually, let me ask you this:  What is the extent of

23    your educational background in terms of college,

24    postgraduate studies, that sorts of thing?

25    A.    I have a bachelor's degree.

Purchase - CROSS - By Ms. Jhones                    126

1    Q.     In what, please?

2    A.     Criminal.

3    Q.     Thank you very much, sir.

4    A.     Oh, you're welcome.

5           THE COURT:  We're going to break for lunch.

6           Do not discuss this case either amongst

7    yourselves or with anyone else.  Have no contact

8    whatsoever with anyone associated with the trial.  Do

9    not read, listen or see anything touching on this

10   matter in any way.

11          If anyone should try to talk to you about this

12   case, you should immediately instruct them to stop and

13   report it to my staff.

14          But leave your materials at your chairs.

15   Please be back in the jury room at 1:30.  Enjoy your

16   lunch.

17          (Whereupon, the jury exited the courtroom at

18   12:15 p.m. and the following proceedings were had:)

19          THE COURT:  You may step down, sir.

20          (Witness excused.)

21          MS. JHONES:  Your Honor, may I address a brief

22   matter?

23          THE COURT:  One moment.

24          You may be seated.

25          I want to hear the door closed first.

1          MS. JHONES:  I promised my colleagues that I'm

2     not going to keep us here for lunch.

3          THE COURT:  Okay.  I don't know that Mr. Levin

4     is convinced.  But go ahead.

5          MS. JHONES:  Your Honor, I would like to

6     request permission to recess a little bit earlier today

7     to take care of a personal matter.

8          THE COURT:  Patricia talked to me about that.

9          You wanted to leave around 4:00 today?

10         MS. JHONES:  If it's possible, your Honor.

11         THE COURT:  That's fine.  We can do that.

12         MS. JHONES:  Thank you very much.

13         THE COURT:  You can go to lunch.

14         We're in recess until 1:30.

15         Just please wait for the jurors to exit.

16         Will you let them know when the jurors have

17    gone down the elevators, please.

18         THE COURT SECURITY OFFICER:  Okay.

19         THE COURT:  You have to wait until the jurors

20    have gone down to exit the courtroom.

21         We're in recess until 1:30.

22         (Thereupon, a luncheon recess was taken, after

23    which the following proceedings were had:)

24         THE COURT:  We're back on United States of

25    America versus Narseal Batiste, et al., Case

```
 1    No. 06-20373.

 2              Counsel, state your appearances, please, for

 3    the record.

 4              MR. GREGORIE:  Good afternoon.

 5              Richard Gregorie and Jacqueline Arango on

 6    behalf of the United States.

 7              MS. JHONES:  Ana Jhones on behalf of Narseal

 8    Batiste, who is present.

 9              MR. LEVIN:  Albert Levin on behalf of Patrick

10    Abraham, who is present.

11              MR. CASUSO:  Lou Casuso on behalf of Burson

12    Augustin, who's present.

13              MR. CLARK:  Nathan Clark for Rotschild

14    Augustine, who's present.

15              MR. HOULIHAN:  Richard Houlihan with Naudimar

16    Herrera.

17              MR. VEREEN:  Roderick Vereen on behalf of

18    Stanley Phanor, who's present.

19              THE COURT:  All Defendants are present.

20              Let's bring in the jury.

21              MR. CLARK:  Your Honor, I have an exhibit list

22    now.

23              THE COURT:  Great.  Thank you.

24              Patricia, can you get that from him.

25              THE COURTROOM DEPUTY:  (Complies.)
```

```
 1              MR. LEVIN:  Here is my exhibit list.

 2              (Whereupon, the jury entered the courtroom at

 3    1:43 p.m. and the following proceedings were had:)

 4              THE COURT:  You may be seated.

 5              You are still under oath, sir.

 6              You may proceed.

 7              MR. VEREEN:  Thank you, your Honor.

 8                        CROSS-EXAMINATION

 9    BY MR. VEREEN:

10    Q.     Mr. Purchase, good afternoon.

11    A.     Good afternoon.

12    Q.     With regard to the photographs that were depicted

13    during the Government's direct examination, all of

14    those areas are common areas; are they not?

15    A.     Open to the public?

16    Q.     Well, I mean, no special clearance is needed to

17    be able to observe any of those areas.  Correct?

18    A.     Correct.

19    Q.     And if you walk outside this courthouse right

20    now, those areas are visible to the eye; are they not?

21    A.     Yes, sir.

22    Q.     Have you ever Googled this area as far as -- have

23    you ever gone on Internet to see if you can Google this

24    building or the buildings in this area?

25    A.     No, sir.
```

1    Q.    You were asked by the Government questions

2    concerning the underground transportation of inmates.

3          Do you recall those questions?

4    A.    Yes.

5    Q.    Your testimony is that there is -- you do not

6    know of any -- let me see if I'm stating your words --

7    public information that's disseminated with regard to

8    the movement of prisoners.  Right?

9    A.    Correct.

10    Q.    And, essentially, what you're telling this jury

11    is that the movement of prisoners is not something that

12    can be found on any website.  Correct?

13    A.    Correct.

14    Q.    And it's not something that can be found in any

15    pamphlet that's disseminated to the public.  Correct?

16    A.    Correct.

17          If I may make a clarification.

18    Q.    Sure.

19    A.    There was an incident where we found some

20    sensitive areas -- and I think it was the prisoner

21    secure corridor -- on the Web.  And we had to go

22    through the process and have it removed.  But other

23    than that, no.

24    Q.    Okay.  And when was that?

25    A.    Three or four years ago, two or three years ago.

Purchase - Cross - By Mr. Vereen                    131

1   Q.    But this underground hallway, if you will, has

2   been used by the Marshal Service for at least 11 years

3   in the movement of inmates from one building to the

4   next; has it not?

5   A.    Yes.

6   Q.    And you would agree with me that, over that

7   11-year period, there have been thousands of inmates

8   that have been moved from the Federal Detention Center

9   to any of the courthouses.  Correct?

10  A.    Yes, sir.

11  Q.    And you would also agree with me that, as far as

12  individuals that may have knowledge of the underground

13  tunnel, it would be members of the GSA staff and its

14  employees.  Correct?

15  A.    Yes, sir.

16  Q.    As you stated earlier, I think you said

17  contractors who built it?

18  A.    Correct.

19  Q.    Court personnel clearly knows about it.  Right?

20  A.    Yes, sir.

21  Q.    Okay.  Court security officers?

22  A.    Correct.

23  Q.    Of course, the deputies that move the inmates?

24  A.    Yes, sir.

25  Q.    Task force officers, if they're involved in the

1    transportation of inmates.  Correct?

2    A.    Yes, sir.  We also have other contracting --

3    contractor officers, detention security officers that

4    utilize the tunnel.

5    Q.    And then the thousands of individuals, the

6    inmates, of course, know about it?

7    A.    Yes.

8    Q.    And whoever they may have told how they're

9    transported knows about it?

10   A.    Yes, sir.

11   Q.    You were shown some photographs in Government's

12   Exhibit 121-A.  And you described what purported to be

13   cameras.  Correct?

14   A.    Correct.

15   Q.    Now, some of those cameras are located right

16   outside of this building in the walking area.  Correct?

17   A.    Yes, sir.

18   Q.    And not only are there cameras, but there are

19   light poles.  Correct?

20   A.    There's light poles, too.

21   Q.    And the one that you had -- and I don't have the

22   photographs in front of me -- but you had circled, I

23   think, maybe three posts that you said appeared to be

24   cameras, but they didn't have the lenses.

25         Do you recall testifying about that?

Purchase - CROSS - By Mr. Vereen                    133

 1    A.     That's what they appeared to me to be.  Correct.

 2    Q.     Isn't it a fact that those are nothing more than

 3    light posts and that they're not cameras?

 4    A.     They could have been.  It wasn't clear in the

 5    picture.  It was during the construction phase.  So I

 6    could have made an error there.

 7    Q.     Okay.  Now, when you did circle one of the

 8    cameras that had -- that appeared to be the spherical

 9    lens, you made a statement that they are very

10    effective.

11          Do you recall that?

12    A.     I'm sorry, sir?

13    Q.     You made the statement that they are very

14    effective.

15    A.     Yes.

16    Q.     Now, when you said -- when you say they're very

17    effective, that means they give you the best resolution

18    with regard to what is depicted or captured on those

19    cameras.  Correct?

20    A.     Yes, sir.  We've gone to a completely digital

21    program now and they have much more capabilities for

22    zoom and pan and tilt and the digital clarification.

23    Q.     All right.  Now, with regards to the operation of

24    that particular camera, is there one camera underneath

25    the lens that just captures one view or is it rotating?

Purchase - CROSS - By Mr. Vereen                     134

```
 1   A.     They have both.  And I'm not sure which ones are

 2   limited -- are fixed and which ones have the

 3   pan/tilt/zoom.

 4          It's -- generally, the larger enclosure has the

 5   more capabilities.  The smaller enclosure may be more

 6   of a direct line of photography.

 7   Q.     And have you ever seen what is captured on those

 8   cameras?

 9   A.     Yes.

10   Q.     Do you know what the radius is with regard to the

11   ability of that -- of those cameras?

12   A.     The radius?

13   Q.     Yes.

14          How far away do those cameras capture?

15   A.     Half of a mile, a mile -- maybe not quite a mile.

16   At least half a mile.

17   Q.     So if a mile is 5,280 feet, then half of that.

18   Correct?

19   A.     My best guess.  About half a mile.

20   Q.     So, in other words, if I walked up to the camera,

21   if I'm within a half a mile and I'm standing there with

22   a camera, whether it's a photo camera or a videocamera,

23   and I am taking a picture of that particular camera,

24   it's fair to say, then, there's a good possibility that

25   that camera is also videotaping me.  Correct?
```

Purchase - CROSS - By Mr. Vereen                    135

1   A.     It's a possibility.

2   Q.     Since March the 26th of 2006, have you ever

3   observed any footage of any of those cameras capturing

4   anyone taking a photograph or a videotape of those

5   cameras?

6   A.     I haven't.  I can't speak for others in our

7   staff, though.

8   Q.     When was it that the Federal Government came to

9   you and asked you to review footage captured on

10  videocameras or photographs depicted in the

11  Government's exhibits?  When was that?

12  A.     They didn't come to me for that.

13  Q.     Well, how is it that you became a witness if they

14  didn't come to you?

15  A.     The -- Mr. Gregorie asked our marshal for a

16  witness, someone to testify, and she selected me.

17  Q.     Okay.  How long is the video footage maintained

18  by the Marshal's Office with regard to what's depicted

19  in these cameras?

20  A.     I'm not sure.  Because prior to the digital --

21  when we went digital, the tapes were taken out like

22  every 30 days.

23         Now that it's digital -- since it's been digital,

24  I can't -- I don't know exactly when that date was --

25  we've recorded everything.

Purchase - Cross - By Mr. Vereen                    136

```
 1   Q.    So if you were digital prior to March the 25th of

 2   2006, what you're telling this jury is that that

 3   evidence is still available?

 4   A.    I'm just giving my best guesses based on the time

 5   frame.  But from the time we went digital, everything's

 6   been preserved -- should have been preserved.

 7   Q.    Who would have that knowledge?

 8   A.    We would have that.

 9   Q.    Well, as you sit here today, do you know for a

10   fact whether or not, on March the 26th, 2006, you had

11   gone digital?

12   A.    I don't know.

13         MR. VEREEN:  I have no further questions,

14   Judge.  Thank you.

15         MR. HOULIHAN:  No questions.

16         THE COURT:  Mr. Clark?

17         MR. CLARK:  No further questions, your Honor.

18         THE COURT:  Mr. Casuso?

19         MR. CASUSO:  No questions, your Honor.  Thank

20   you.

21         THE COURT:  Mr. Levin?

22         MR. LEVIN:  No questions.

23         THE COURT:  Mr. Gregorie?

24         MR. GREGORIE:  No questions, your Honor.

25         THE COURT:  You may step down, sir.
```

1           (Witness excused.)

2           THE COURT:  Call your next witness.

3           MR. GREGORIE:  Jason Martel.

4   Thereupon--

5                    JASON MARTEL

6   was called as a witness by the Government and, having

7   been first duly sworn, testified as follows:

8           THE COURT REPORTER:  Please have a seat and

9   scoot up to the microphone.

10          Please state your full name and spell your

11  last name for the record.

12          THE WITNESS:  Jason Martel, M-a-r-t-e-l.

13                  DIRECT EXAMINATION

14  BY MR. GREGORIE:

15  Q.    Sir, would you please tell the Court and jury how

16  you're employed.

17  A.    State of Louisiana, Office of State Police.

18  Q.    And how long have you been a state police officer

19  in Louisiana?

20  A.    Seven years.

21  Q.    Now, sir, what is your current assignment?

22  A.    Criminal intelligence unit, as an investigator.

23  Q.    And when did you begin that assignment?

24  A.    May, 2006.

25  Q.    And prior to May of 2006, what were you doing for

1    the State Police?

2    A.      Uniformed patrol.

3    Q.      Did you patrol in a particular area?

4    A.      Yes, sir.

5    Q.      Can you tell the Court and jury -- none of us are

6    from Louisiana, I don't believe.

7            So can you give us an idea, those who don't know

8    anything about Louisiana, where you patrol.

9    A.      Central part of the state, Avoyelles Parish.

10   Q.      Can you spell that for the court reporter.

11   A.      A-v-o-y-e-l-l-e-s.

12   Q.      Can you give us an idea where in Louisiana

13   Avoyelles Parish is.

14   A.      Central part of the state, on the right-hand

15   side, just above the boot -- when it starts to boot

16   out.

17   Q.      And what is the biggest city in Avoyelles Parish?

18   A.      Marksville.

19   Q.      Marksville?

20   A.      M-a-r-k-s-v-i-l-l-e.

21   Q.      And what's the approximate population of

22   Marksville, if you know?

23   A.      Probably, roughly, 8,000 people.

24   Q.      And what is the nearest big city besides

25   Marksville?

1    A.    Alexandria.

2    Q.    How far from Marksville is Alexandria?

3    A.    Roughly, close to 30 miles.

4    Q.    Now, sir, drawing your attention back to the

5    summer of 2006, when you first joined the intelligence

6    unit, what, if any, federal agencies did you have

7    contact with in that position?

8    A.    FBI, mainly.

9    Q.    What, if any, contacts did you get -- I don't

10   want you to -- let me rephrase the question.

11         Did you receive any contacts from the FBI in

12   Miami during the summer of 2006?

13   A.    Not directly from the Miami office.  It was the

14   Alexandria field office that Miami had got in touch

15   with, and then the agents in the Alexandria office put

16   me in touch with Miami.

17   Q.    And as a result of that, did you do something?

18   A.    Yes, sir.

19   Q.    What did you do?

20   A.    They asked me to see if I can identify the

21   Batiste name, people that lived in our area, which I

22   was familiar with those -- with that name because it's

23   a common name in our area.

24         And then I went to a couple of our databases,

25   mainly the driver's license database.

Martel - DIRECT - By Mr. Gregorie                    140

```
 1   Q.     Would you explain to the Court and jury, please,
 2   how the driver's license database is maintained in the
 3   state of Louisiana.
 4   A.     Anytime in the state of Louisiana you apply for a
 5   driver's license or an identification card, you go to
 6   the Department of Motor Vehicles, just like here in
 7   Florida.  They take your picture and you go into a
 8   computerized database, which it stays on file for ten
 9   years after that.
10   Q.     And is that true for every person who either
11   applies for a driver's license or renews their driver's
12   license in the state of Louisiana?
13   A.     Yes, sir.
14   Q.     And do the Louisiana State Police have access to
15   that database?
16   A.     Yes, sir.
17   Q.     I'm now going to show you what's marked as
18   Government's Exhibit 34 for identification.
19          MR. GREGORIE:  May I approach the witness,
20   your Honor?
21          THE COURT:  Yes.
22   BY MR. GREGORIE:
23   Q.     I'm showing you what's marked as Government's
24   Exhibit 34 for identification.
25          Do you recognize that?
```

```
 1   A.     Yes, sir.

 2   Q.     And can you tell us what it is.

 3   A.     It's a copy of a driver's license, Louisiana

 4   issued.

 5   Q.     And is this a driver's license that you pulled

 6   pursuant to the FBI request?

 7   A.     Yes, sir.

 8   Q.     And is it a record of the State of Louisiana?

 9   A.     Yes, sir, it is.

10   Q.     And is it a record kept in the computer system

11   that you have described to the jury?

12   A.     Yes, sir.

13          MR. GREGORIE:  Your Honor, the United States

14   moves 34 for evidence.

15          MS. JHONES:  I have no objection, your Honor.

16          THE COURT:  It will be admitted as

17   Government's Exhibit 34.

18          (Whereupon, Government's Exhibit No. 34 was

19   entered into evidence.)

20          THE COURT:  You may publish.

21          MR. GREGORIE:  If I may publish it on the

22   ELMO, your Honor.

23          THE COURT:  Yes.

24   BY MR. GREGORIE:

25   Q.     Is this the driver's license you pulled, sir?
```

```
 1   A.     Yes, sir.

 2          THE COURT:  Do you want to zoom out?

 3          MR. GREGORIE:  I'm pulling it down just a

 4   little, your Honor.  There we go.  Thank you, your

 5   Honor.

 6   BY MR. GREGORIE:

 7   Q.     Now, sir, whose driver's license is that?

 8   A.     Narseal Batiste's.

 9   Q.     And what is the address listed on the driver's

10   license?

11   A.     193 Alvin Ford Lane.

12   Q.     And what town?

13   A.     Marksville, Louisiana.

14   Q.     And does it indicate when that driver's license

15   was issued?

16   A.     August 22nd, 2001.

17   Q.     And did it indicate -- does it indicate when that

18   driver's license expires?

19   A.     February the 14th, 2006.

20   Q.     And using that particular driver's license, did

21   you do anything concerning that particular address,

22   193 Alvin Ford Lane?

23   A.     Yes.  After looking at the address, I went out

24   and found that location, the residence on Alvin Ford

25   Lane.
```

Martel - DIRECT - By Mr. Gregorie                    143

1    Q.    Okay.  And what did you do -- did you take

2    anybody with you when you went there?

3    A.    Yes, sir, I did.

4    Q.    Who, if anyone, did you take with you?

5    A.    First time there, I took a partner of mine that

6    works with me, another fellow trooper.

7          The second time was an FBI agent from here in

8    Miami.

9    Q.    And what did you do the first time you went

10   there -- what, if anything, did the trooper that went

11   with you do in your presence while you were there?

12   A.    He photographed the area of the address.

13   Q.    Let me show you now what's marked as Government's

14   Exhibit 33-A through -F.  That's -A, -B, -C, -D, -E and

15   -F.

16         Before I show you these, sir, did you actually go

17   on the property itself?

18   A.    Yes, sir.

19   Q.    And did you look around, survey the property?

20   When I say "survey," did you make a physical

21   examination of the property?

22   A.    Yes, sir.

23   Q.    Let me show you what's marked as Government's

24   Exhibits 33-A through -F.

25         Do you recognize those, sir?

 1  A.     Yes, sir.

 2  Q.     Are those photographs taken of the property that

 3  you looked at in -- on Alvin Ford Lane?

 4  A.     Yes, sir.

 5  Q.     And were those all taken at the same time or were

 6  they taken at different times?

 7  A.     Same time.

 8  Q.     And did you take them yourself or did others at

 9  your direction take them?

10  A.     Others.  I did not take any of these myself.

11  Q.     Do those pictures fairly and accurately depict

12  the property at -- on Alvin Ford Lane -- 193 Alvin Ford

13  Lane?

14  A.     Yes, sir, to the best of my knowledge.

15         MR. GREGORIE:  Your Honor, the United States

16  moves Government's Exhibits 93-A through -F for

17  evidence.

18         MS. JHONES:  Your Honor, may I voir-dire the

19  witness?

20         THE COURT:  Yes.

21         MS. JHONES:  Thank you.

22         Is it Agent Martel?

23         THE WITNESS:  Trooper.

24         MS. JHONES:  Trooper Martel.

25         Trooper, do you have those photographs up

1    there with you?

2              THE WITNESS:  Yes, ma'am.

3              MS. JHONES:  May I retrieve them, your Honor?

4              THE COURT:  Sure.

5              MS. JHONES:  Thank you.

6              Thank you, sir.

7              Sir, referring to Government's Exhibit 34,

8    what is the date of issuance of that driver's license?

9              THE WITNESS:  August 22nd, 2001.

10             MS. JHONES:  And -- now, these photographs

11   were not taken by you.  Correct?  They were taken by

12   someone else?

13             THE WITNESS:  That is correct.

14             MS. JHONES:  They were taken in what year,

15   sir?

16             THE WITNESS:  2006.

17             MS. JHONES:  What day?

18             THE WITNESS:  I do not remember.

19             MS. JHONES:  How about the month?  Do you

20   remember the month, sir?

21             THE WITNESS:  Not specifically.  Not the month

22   either.

23             MS. JHONES:  Do you know what time of year it

24   would have been in 2006?

25             THE WITNESS:  Mid-part of the year, probably

1    summertime, close -- maybe June, July.

2              MS. JHONES:  And, sir, when these photographs

3    were taken, did you generate any reports documenting

4    the date and other specifics as to the time period that

5    you appeared on this property to take these

6    photographs?

7              THE WITNESS:  Me personally, no.  The person

8    that did the photographs, yes.

9              MS. JHONES:  So you have no personal knowledge

10   of the date and the circumstances under which these

11   photographs were taken?

12             THE WITNESS:  Date, no, ma'am.  Not specific.

13             MS. JHONES:  Would you agree with me, sir,

14   that they were not taken in 2001?

15             THE WITNESS:  Yes.  I'll agree with that.

16             MS. JHONES:  And would you agree with me, sir,

17   that you have absolutely no knowledge as to whether or

18   not what's depicted in these photographs, in

19   Government's Exhibits 33-A through 33-F -- you have no

20   personal knowledge as to whether or not these

21   photographs accurately depict the way what's depicted

22   in these photographs looked in the year 2001?

23             THE WITNESS:  No, ma'am.

24             MS. JHONES:  Okay.  Is it fair to say that you

25   were never on that property in 2001?

1              THE WITNESS:  That would be correct.

2              MS. JHONES:  And I believe you would have been

3   in that property sometime in the summer of 2006, is

4   your recollection?

5              THE WITNESS:  Yes, ma'am.

6              MS. JHONES:  Thank you, your Honor.

7              MR. GREGORIE:  I move them for evidence, your

8   Honor.

9              MS. JHONES:  I object under 901 and under 401,

10  your Honor.

11             MR. GREGORIE:  Your Honor, the United

12  States -- well, rather than --

13             THE COURT:  Let me just look at the rule,

14  please.

15             MS. JHONES:  Specifically, your Honor,

16  901(b)(4).

17             THE COURT:  Overruled.

18             They will be admitted as Government's

19  Exhibits -- it's -A through -F?

20             MR. GREGORIE:  -A through -F, your Honor.

21             THE COURT:  35 --

22             MR. GREGORIE:  33-A, -B, -C, -D, -E and -F.

23             THE COURT:  They will be admitted as

24  Government's Exhibits 35-A through -F -- I'm sorry --

25  33-A through -F.

```
 1              MR. GREGORIE:  33-A through -F.

 2              THE COURT:  33-A through -F.

 3              (Whereupon, Government's Exhibit Nos. 33-A

 4   through 33-F were entered into evidence.)

 5              MR. GREGORIE:  Thank you, your Honor.

 6   BY MR. GREGORIE:

 7   Q.    Sir, did you do -- prior to -- before I publish

 8   those documents, sir, did you do any other

 9   investigation regarding the property depicted in 33-A

10   through -F?

11              MS. JHONES:  Objection as to time frame.

12              THE COURT:  Place it in time.

13   BY MR. GREGORIE:

14   Q.    When you were doing this investigation in the

15   summer of 2006, did you do any other investigation?

16   A.    I located through the courthouse the land plat

17   for the piece of property on Alvin Ford.

18   Q.    I'm now going to show you what's marked as

19   Government's Exhibit 32 for identification.

20              MR. GREGORIE:  May I approach the witness,

21   your Honor?

22              THE COURT:  Yes.

23   BY MR. GREGORIE:

24   Q.    Can you tell us what Government's Exhibit 32 for

25   identification is, please.
```

 1   A.     It's a property description of 193 Alvin Ford

 2   Lane.

 3   Q.     And, sir, where did you get that?

 4   A.     From the Avoyelles Parish courthouse.

 5   Q.     That a certified copy?

 6   A.     Yes, sir.

 7   Q.     And it is a certified record of the court in the

 8   parish?

 9   A.     Yes, sir.

10         MR. GREGORIE:  Your Honor, I move 32 for

11   evidence.

12         MS. JHONES:  401, your Honor.

13         THE COURT:  Overruled.

14         It will be admitted as Government's

15   Exhibit 32.

16         (Whereupon, Government's Exhibit No. 32 was

17   entered into evidence.)

18         MR. GREGORIE:  If I may publish that first,

19   your Honor.

20         THE COURT:  Yes.

21   BY MR. GREGORIE:

22   Q.     First, sir, showing you the heading of the

23   Document 32, can you tell the jury what it is.  Can you

24   read it?

25   A.     "Sale with Assumption of Mortgages."

```
 1    Q.     And it's a sale from Preston Batiste to

 2    Narcisse J. Batiste.  Is that correct?

 3    A.     Yes, sir.

 4    Q.     On the final page of this document, Government's

 5    Exhibit 32, what appears?

 6    A.     It's a surveyed, hand-drawn photograph of the

 7    property.

 8    Q.     And is this the same property that you saw in

 9    2006?

10    A.     It appears to be.  Yes, sir.

11    Q.     And does this document indicate the size of this

12    property?

13    A.     I believe it does.  Yes, sir.

14              MS. JHONES:  Objection, your Honor.  401.

15              THE COURT:  Overruled.

16    BY MR. GREGORIE:

17    Q.     Let me hand back the document to you.

18           See if you can tell the Court and jury how big

19    the property is, if you would, please.

20    A.     In the last page, the photograph of the property

21    shows 18.834 acres total.

22    Q.     Let me show you what's marked as Government's

23    Exhibit 33-A.

24           Do you see that photograph, sir?

25    A.     Yes, sir.
```

1    Q.    Is that photograph consistent with the sketch in

2    Government's Exhibit 32?

3    A.    Yes, sir.  It appears to be.

4    Q.    Does that sketch include this section of tree

5    area up in the upper left corner?

6    A.    Yes, sir.  To the best of my knowledge, it does.

7    Q.    That picture that you saw in 2006 -- strike that.

8          The picture that was taken in 2006:  Is that

9    consistent with the drawing on the document which is

10   before you as Government's Exhibit 32?

11         MS. JHONES:  Objection, your Honor.  I

12   apologize.  I don't know the rule.  Competency.

13         I believe -- if I may just have a moment to

14   read the realtime to make sure that I am clear on the

15   objection that I'm making, your Honor.  If I may just

16   have a moment.

17         THE COURT:  Sure.

18         MS. JHONES:  Thank you.

19         Your Honor, yes.  The objection is 601, your

20   Honor, given the question posed by the Government.  And

21   lack of foundation as well, your Honor.

22         THE COURT:  It's overruled as to 601.

23         Lay your predicate.

24   BY MR. GREGORIE:

25   Q.    Sir, did you walk this property, as is depicted

1   on Government's Exhibit 33-A, or drive the area?

2   A.    Yes, sir.

3   Q.    And can you for the jury, please, looking at

4   33-A, draw a line around the area which is 193 Alvin

5   Ford Lane.

6   A.    (Witness complies.)

7   Q.    And what is the property -- the rest of the

8   property in that area?

9   A.    The rest of the property is just rural, just

10   pastureland for livestock and some wooded area.

11   Q.    As indicated in Government's Exhibit 32, is that

12   all part of 193 Alvin Ford Lane?

13   A.    Yes, sir.

14   Q.    So when you say you've just circled this one area

15   here, is that the entire property?

16   A.    No, sir.  It's not.

17   Q.    Would you indicate the entire property for the

18   jury, please.

19   A.    (Witness complies.)

20   Q.    Thank you, sir.

21         Now, sir, is hunting permitted in this area?

22   A.    Yes, sir.

23   Q.    Does that happen on a regular basis?

24   A.    Just during hunting season.

25   Q.    Have you ever heard gunshots in that area?

Martel - CROSS - By Ms. Jhones                    153

```
 1    A.      Yes, sir.

 2    Q.      And when is hunting season?

 3    A.      Roughly, from September to the end of February.

 4            MR. GREGORIE:  One moment, your Honor.

 5            I have no further questions of this witness,

 6    your Honor.

 7            THE COURT:  Ms. Jhones?

 8            MS. JHONES:  Thank you, your Honor.

 9            Your Honor, may I retrieve the exhibits from

10    the witness, your Honor, or does Mr. Gregorie have

11    them?

12            MR. GREGORIE:  I have just one.

13            MS. JHONES:  May I approach?

14            THE COURT:  Yes, you may.

15            MS. JHONES:  Thank you.

16                        CROSS-EXAMINATION

17    BY MS. JHONES:

18    Q.      Hello again.

19    A.      Hello.

20    Q.      Welcome to Miami.

21    A.      Thank you.

22    Q.      Trooper Martel, you were -- you are currently --

23    your official title currently is what, please?

24    A.      Just investigator, criminal intelligence unit.

25    Q.      And that is for the parish?
```

1    A.    No, ma'am.

2    Q.    For where?

3    A.    For the State Police.

4    Q.    For the State Police.  Okay.

5          And in -- and the jurisdiction is the parish of?

6    A.    That's one of the jurisdictions inside.

7    Q.    Would you pronounce that name for me again,

8    please.

9    A.    Avoyelles.

10   Q.    Avoyelles?  I'm never going to get that.

11         But that's one of the parishes your jurisdiction

12   covers.  Correct?

13   A.    Correct.

14   Q.    In the summer of 2006, what was your job title?

15   A.    Investigator, criminal intelligence unit, same

16   thing.

17   Q.    Okay.  Great.

18         Now, sir, the Government inquired of you as to

19   whether or not you had received -- let me see if I can

20   get this correctly -- you received a call.

21         Somebody from the FBI contacted you sometime in

22   the summer of 2006.  Correct?

23   A.    Correct.

24   Q.    But, sir, prior to receiving -- you don't know

25   when had he contacted you.  Right?

Martel - CROSS - By Ms. Jhones                      155

1   A.     I can't recall.

2   Q.     You have no recollection?

3   A.     I can't recall an exact date.  No, ma'am.

4   Q.     It could have been in September of 2006?  It

5   could have been in the fall?

6   A.     Possibly.

7   Q.     And the first time -- strike that.

8          When you became familiar with 193 Alvin Ford

9   Lane, it was not as a result of the phone call you

10  received from the FBI, was it, sir?

11  A.     Well, I became -- can you repeat that.

12  Q.     Sure.

13         In 2006, prior to getting this phone call that

14  you received from somebody locally from the FBI up

15  there in your neck of the woods, literally --

16  A.     Uh-huh.

17         THE COURT:  You have to say "yes" or "no."

18         THE WITNESS:  "Yes."

19  BY MS. JHONES:

20  Q.     -- you had been to 193 Alvin Ford Lane before you

21  got that call.  Right?

22  A.     Yes, ma'am.

23  Q.     And you went there, sir, because you heard

24  something about the case in the media, this case.

25  Right?

```
 1   A.      Correct.

 2   Q.      You were sitting around your office, cooler talk,

 3   drinking coffee, and the subject of this case came up.

 4   Right?

 5   A.      Correct.

 6   Q.      And you were just curious.  Right?

 7   A.      Yes.

 8   Q.      And you undertook a fact-finding mission on your

 9   own.  Right?

10   A.      Partially.

11   Q.      And then you knew the Batiste name is a very,

12   very popular name up there in Marksville?

13   A.      Correct.

14   Q.      There are lot of Batistes up there.  Right?

15   A.      Correct.

16   Q.      So you undertook yourself out of sheer curiosity

17   to go up there and check out 193 Alvin Ford Lane.  Fair

18   enough?

19   A.      That's fair.

20   Q.      It wasn't because these guys called you and said,

21   "Go check it out."

22           You did that on your own.  Right?

23   A.      No.  Not completely.

24   Q.      Is it your testimony, sir, that you did not go

25   out there because you were curious as a result of the
```

Martel - CROSS - By Ms. Jhones          157

```
 1    media attention of this case?  Is that your testimony?
 2    A.    No.  That's partially.  But that's not the
 3    complete.
 4    Q.    Okay.  Now, do you remember testifying in a prior
 5    proceeding, sir?
 6    A.    Yes.
 7    Q.    And in a prior proceeding, do you remember the
 8    following question and giving the following answer?
 9          Do you remember being asked -- this, by the way,
10    was October of 2007.  Okay?
11    A.    Okay.
12    Q.    At Page 7, Line 22, "Okay.  So you heard
13    something about this in the media and you were curious
14    and there was some talk around the office.  Fair
15    enough?"
16          And you giving the answer, "Yes."
17          Do you remember that, sir?
18    A.    Yes, ma'am.
19    Q.    Do you remember also being asked, "And with this
20    talk around the office, it came to your attention that
21    there was somebody in your office -- a buddy, a friend,
22    a fellow trooper -- that knew someone who knew someone
23    who knew a gentleman by the name of Batiste.  Fair
24    enough?"
25    A.    Yes.
```

Martel - CROSS - By Ms. Jhones                    158

```
 1   Q.     And you gave the answer, "Yeah.  A trooper in the
 2   office knew a Mickey Batiste."
 3          Remember that, sir?
 4   A.     Yes.
 5   Q.     And do you remember being asked the question,
 6   "Okay.  And this all started, again, because of
 7   curiosity?"
 8          And do you remember giving the answer, "True"?
 9          Okay?
10   A.     Yes.
11   Q.     All righty.  Now, sir, you would agree with me
12   that you are not a property surveyor.  Correct?
13   A.     Correct.
14   Q.     You don't have any type of background in that
15   regard.  Right?
16   A.     No, ma'am.
17   Q.     And as it relates to Government's Exhibit 32,
18   these were property records, again, that you went down
19   to the local appraiser's office and pulled out of the
20   records and obtained a certified copy.  Right?
21   A.     To the courthouse.  Yes, ma'am.
22   Q.     And, sir, this document -- this document depicts
23   ownership of that property by whom, sir?
24   A.     At the time, who owns that property?
25   Q.     Well, first of all, actually, this document was
```

```
 1   prepared on January 23rd, 1975.  Correct?

 2   A.    I'd have to look at it.

 3   Q.    Sure.

 4         MS. JHONES:  May I approach, your Honor?

 5         THE COURT:  Yes.

 6         MS. JHONES:  Thank you.

 7   BY MS. JHONES:

 8   Q.    (Tendering document to the witness.)

 9         Let me know when you're finished.

10   A.    Okay.

11   Q.    Are you finished?

12   A.    Yes, ma'am.

13   Q.    And the date is, sir?

14   A.    January 23rd, 1975.

15   Q.    And, sir, it is your testimony that that -- that

16   that document reflects ownership of the property which

17   is at this address as reflected in Government's

18   Exhibit 33-C.  Correct?

19   A.    Yes, ma'am.

20   Q.    And who, according to that 1975 document, owns

21   that property?

22   A.    Narcisse J. Batiste.

23   Q.    And who is that, sir?

24   A.    As far as I knew, that's Narseal's father.

25   Q.    And by "Narseal," you mean Mr. Batiste.  Right?
```

```
 1    A.     Yes, ma'am.

 2    Q.     So as far as -- that's the only document that you

 3    are aware of, sir, that depicts ownership of 193 Alvin

 4    Ford Lane.  Correct?

 5    A.     Yes, ma'am.

 6    Q.     And the owner of that property is not

 7    Mr. Batiste.  Fair enough?

 8    A.     Yes.

 9    Q.     "Mr. Batiste" meaning Narseal Batiste.  Fair

10    enough?

11    A.     Correct.  Yes, ma'am.

12    Q.     And you did a diligent search in the records over

13    there in your local offices, and that's the only thing

14    you could come up with, 1975.  Correct?

15    A.     Yes, ma'am.

16    Q.     All righty.  Now, you testified that this

17    property is approximately 18 acres.  Correct?

18    A.     Yes, ma'am.

19    Q.     And that this is rural property.  Correct?

20    A.     Correct.

21    Q.     Let's talk a little bit about that.  All righty?

22           Now, showing you Government's Exhibit 33-A, could

23    you show us, please -- first of all, let me get a pen.

24           First of all, sir, with respect to this item

25    right here (indicating), is that the -- first of all,
```

Martel - CROSS - By Ms. Jhones                161

```
 1   on this property, as of 2006 -- and you were there in
 2   2006, summer or fall.  Correct?
 3   A.    Correct.
 4   Q.    There was a church on that property.  Right?
 5   A.    Yes, ma'am.
 6   Q.    And there is basically a church and a few -- I
 7   don't know how many feet away -- you tell me -- maybe
 8   25, 50 feet away there's a home.  Correct?
 9   A.    It's further than that.
10   Q.    I'm sorry?
11   A.    It's further than that.
12   Q.    And we're talking about this place right here
13   (indicating)?
14   A.    Yes, ma'am.
15   Q.    That's the home, and this is the church
16   (indicating).
17   A.    Correct.
18   Q.    Correct?
19         Now, would you please tell us -- showing you
20   Government's Exhibit 33-C, this little mailbox right
21   here (indicating) -- this is -- the mailbox is situated
22   right on Alvin Ford Lane.  Correct?
23   A.    Correct.
24   Q.    If you're coming down the main highway -- which
25   is Highway 1?
```

1    A.    Correct.

2    Q.    And Highway 1 connects the small downtown area.

3    Correct?  And if you're heading what direction

4    towards -- if you leave the downtown area on Highway 1

5    in Marksville, how much of a distance is it from the

6    downtown area to the 193 Alvin Ford Lane?

7    A.    Roughly, eight miles, maybe.

8    Q.    How about four miles?

9    A.    Might be.

10   Q.    Well, let me direct your attention to your

11   previous testimony.

12   A.    Okay.

13        MR. GREGORIE:  Objection, your Honor.  There's

14   no inconsistency.

15        THE COURT:  Sustained.

16        MS. JHONES:  Your Honor, I'm going to -- well,

17   wait a second.  Let me just clear it up.

18   BY MS. JHONES:

19   Q.    Is it your testimony, sir, that it could be four,

20   it may be eight?

21   A.    It's a possibility.

22   Q.    All righty.  So when you leave the downtown area

23   and you're driving -- what direction, sir, on

24   Highway 1?

25   A.    North.

Martel - CROSS - By Ms. Jhones                    163

```
 1   Q.     When you're driving down Highway 1 on 193 Alvin
 2   Ford Lane, you will be making a right off of Highway 1
 3   onto 193 Alvin Ford Lane.  Correct?
 4   A.     On Alvin Ford Lane.  Correct.
 5   Q.     And we're talking about -- from the highway to
 6   the property where the mailbox is, we're talking about
 7   approximately a quarter mile?
 8   A.     In there.  Yes, ma'am.
 9   Q.     Now, would you please show us where it is --
10   where is 193 Alvin Ford Lane depicted in Government's
11   Exhibit 33-A?
12   A.     You want the property or the mailbox you were
13   explaining?
14   Q.     Alvin Ford Lane, actually, the road.
15   A.     (Witness indicating.)
16   Q.     So Highway 1 would be right up here somewhere
17   (indicating).  Right?  Or you would enter off of
18   Highway 1 from here (indicating)?
19   A.     Well, Highway 1 --
20   Q.     Or from the opposite direction (indicating)?
21          THE COURT:  We can't see where you're
22   pointing.
23          MS. JHONES:  Oh, okay.  I'm sorry.
24   BY MS. JHONES:
25   Q.     Would Highway 1 be down -- I'm sorry.
```

1        The entrance to 193 -- the entrance to Alvin Ford

2   Lane:  Would it be from this direction or from the

3   other direction (indicating)?

4   A.    From your first direction.

5   Q.    From here (indicating).  Correct?

6   A.    Correct.

7   Q.    So once you turn off the main highway, you go

8   down approximately a quarter mile, up Alvin Ford Lane,

9   and then you make a left, and then you enter -- this is

10  the church and then this is the home (indicating).

11  Correct?

12  A.    Correct.

13  Q.    Now, before we get there, sir, let's talk a

14  little bit about Highway 1.  All right?

15        On Highway 1, there are numerous businesses.

16  Correct?

17  A.    Correct.

18  Q.    And there were numerous residences as well?

19  A.    Correct.

20  Q.    There's actually more residences than there are

21  businesses?

22  A.    Correct.

23  Q.    And we're talking about a quarter mile away from

24  the -- 193?

25  A.    Correct.

Martel - CROSS - By Ms. Jhones                    165

```
 1   Q.    And the properties -- or the businesses that we

 2   have there, sir, are as follows -- correct me if I'm

 3   wrong -- we're talking now about 2006.  Correct?

 4   A.    Yes, ma'am.

 5   Q.    Because you were not there in 2001.

 6         Are you with me?  You were not in that area in

 7   2001?

 8   A.    No, ma'am.

 9   Q.    We have -- from the downtown area, four to eight

10   miles -- you can't remember which -- up until Alvin

11   Ford Lane, we're going to have the Ivy's Hardware

12   Store?

13   A.    Yes.

14   Q.    We're going to have a feed store?

15   A.    Yes.

16   Q.    The feed store's contained in a strip mall on

17   Highway 1?

18   A.    I wouldn't call it a strip mall.

19   Q.    What would you call it?

20   A.    A building.

21   Q.    Okay.  And that building houses businesses?

22   A.    It's all -- it's all the same business.  They

23   just subdivide it.

24   Q.    Okay.  And in those subdivided businesses, there

25   are people that work there?
```

Martel - CROSS - By Ms. Jhones                166

```
 1   A.     Yes.

 2   Q.     And then we also have a factory steel mill?

 3   A.     Yes.

 4   Q.     And that factory steel mill also is operational?

 5   A.     Yes.

 6   Q.     People are employed there.

 7   A.     Yes.

 8   Q.     Right?  Okay.

 9          Then we have a baseball field or a ballpark?

10   A.     Correct.

11   Q.     And be that baseball field/ball park is an active

12   ballpark; is it not?

13   A.     Yes.

14   Q.     And in addition to these places that you have

15   just testified about, we have houses all the way down

16   Highway 1?

17   A.     Yes.

18   Q.     Now, once we get onto -- we make that right-hand

19   turn as we head north on Highway 1, once we get onto

20   Ford Alvin (verbatim) Lane, then we go up a dirt road.

21   Correct?

22   A.     Correct.

23   Q.     And as you go up a dirt road, sir, just like the

24   mailbox --

25               THE COURT:  What exhibit is this?
```

Martel - CROSS - By Ms. Jhones                167

```
 1              MS. JHONES:  Government's Exhibit 33-C.  I was
 2   about to say it, your Honor.
 3              THE COURT:  Okay.
 4   BY MS. JHONES:
 5   Q.    Just like -- I'm trying to go slow, because I did
 6   have some Cuban coffee at lunch.
 7              Just like the 193 Alvin Ford Lane mailbox, there
 8   are several mailboxes corresponding to different
 9   residences right there on that dirt road; are there
10   not, sir?
11   A.    Yes.
12   Q.    And that occurs along this path right here
13   (indicating).  Correct?
14   A.    Yes.
15   Q.    And this path goes further than what is depicted
16   here in this photograph.  Correct?
17   A.    Yes.
18   Q.    When I say "photograph," I mean 33-A, just for
19   purposes of the record.
20              Are you with me?
21   A.    Yes.
22   Q.    Now, on this property -- again, we're talking
23   about the way this place looked in 2006 -- there is
24   also some motor homes that are present on that
25   property, like, for example, back here (indicating).
```

```
 1           Do you see these?  Those are motor homes; are
 2   they not?
 3   A.      House trailers?
 4   Q.      House trailers.  I'm sorry.  Yes.
 5   A.      Correct.
 6   Q.      As far as you know, people live in those house
 7   trailers?
 8   A.      As far as I know.
 9   Q.      Okay.  And, also, sir, right here (indicating),
10   this is another home; is it not?  I don't know if it's
11   a home or it's a house trailer.
12   A.      It's a house trailer.
13   Q.      Somebody lives there as well?
14   A.      Yes.
15   Q.      As a matter of fact, family members of
16   Mr. Batiste live there?
17   A.      As far as I know, yes.
18   Q.      And all around this area, there are family
19   members of Mr. Batiste that live there, as well as the
20   Ford family as well?
21   A.      Yes.
22   Q.      Now, you said that the population in this area
23   was approximately 8,000.  Correct?
24   A.      In the city of Marksville itself.
25   Q.      In the city of Marksville itself, which includes
```

```
 1   this area?
 2   A.     Which is outside.  But, yes, it does.
 3   Q.     It does include it.  Right?
 4   A.     Right.
 5   Q.     You would agree with me, sir, that that's a
 6   pretty small town?
 7   A.     Yes, it is.
 8   Q.     Everybody pretty much knows each other?
 9   A.     Somewhat.
10   Q.     And everybody knows you up there?
11   A.     Not everybody.  But most.
12   Q.     Don't be shy.
13   A.     I'm not.
14   Q.     And, sir, in addition to these trailers and --
15   house trailers and houses, that extends, again, all
16   around that area on Alvin Ford Lane.  Fair enough?
17   A.     Yes.
18   Q.     Now, let me ask you a few more questions about
19   the church.  Okay?
20          Directing your attention, sir, to Government's
21   Exhibit 33-F, that is the church that I've been
22   speaking to you about.  Correct?
23   A.     Yes, ma'am.
24   Q.     That was there in 2006?
25   A.     Yes, ma'am.
```

```
 1    Q.    Now, right behind this bush, there is a little --
 2    there's something right behind there depicted in white?
 3    A.    Yes.
 4    Q.    That's a grave; is it not?
 5    A.    That's correct.
 6    Q.    And that's Mr. Batiste's mother's grave; is it
 7    not, sir?
 8    A.    Yes, it is.
 9    Q.    Do you happen to know when Mrs. Batiste passed
10    away?
11    A.    I think it was in 2000.  To the best of my
12    knowledge, I believe it was in 2000.
13    Q.    And that's something that you came to know
14    sometime in the summer or fall of 2006?
15    A.    Yes.  After talking to Mr. Batiste, his father.
16    Q.    That's Narcisse.  Correct?
17    A.    Correct.
18    Q.    And, by the way, as far as you know, Narseal's
19    mother is the only person that's buried on that
20    property.  Correct?
21    A.    As far as I know.  I don't really know.
22    Q.    And that's a church that is active; is it not,
23    sir?
24    A.    That I don't know either.
25    Q.    And this right here (indicating), sir, depicted
```

Martel - CROSS - By Ms. Jhones                    171

1    on Government's Exhibit 33-E:  Is that the front of the

2    church, just from a different angle?

3    A.     Yes, ma'am.

4    Q.     And, also, in Government's Exhibit 33-D, same

5    thing?

6    A.     Front, side.  Yes.

7    Q.     You did not take any photographs of the house

8    trailers, did you?

9    A.     I didn't take any photos.  No, ma'am.

10   Q.     The other gentleman that was with you:  He did

11   not take those photographs?

12   A.     Not that I'm aware of.

13   Q.     And, also, you did not take any photographs of --

14   going back to Government's Exhibit 33-A, you did not

15   take any closeup photographs of the home that's right

16   there (indicating).  Correct?

17   A.     Correct.

18   Q.     Nor did you take any photographs of the mailboxes

19   that line up Alvin Ford Lane?

20   A.     No, ma'am.

21          MS. JHONES:  I have nothing further, your

22   Honor.

23          THE COURT:  Mr. Vereen?

24          MR. VEREEN:  Just a couple questions, Judge.

25

                          CROSS-EXAMINATION

BY MR. VEREEN:

Q.     Trooper Martel, good afternoon.

A.     Afternoon.

Q.     The hunting season in Louisiana, you said, is

between September and February?

A.     Correct.

Q.     And you were asked about whether or not you heard

hunting in that area before.  Correct?

A.     Correct.

Q.     And you have heard hunting in that area?

A.     Yes.

Q.     What type of hunting takes place in that area?

A.     Any type of hunting.  Rabbits -- rabbit hunting,

squirrel hunting, deer hunting.

Q.     On that property specifically?

A.     I know the surrounding property.  If I had to

guess, yes.  But I can't be for certain on that

property.

Q.     Okay.

A.     But I know in that area.

Q.     So with regard to that specific parcel of

property, have you ever seen any hunting going on?

A.     No, sir.

Q.     And so, when you say the surrounding areas,

Martel - CROSS - By Mr. Vereen

```
1   you're talking about property that belongs to someone

2   else?

3   A.      Correct.

4   Q.      But you've never seen the Batiste family or

5   anyone from the Batiste family hunting in that area?

6   A.      No, sir.

7   Q.      And with regard to hunting, can anyone hunt or is

8   a permit required?

9   A.      With a license or permit, yes, sir.

10  Q.      How often does a person have to renew that

11  license?

12  A.      Every year.

13  Q.      So if you heard hunting going on when hunting

14  season is not in season, you would go in and

15  investigate that situation; would you not?

16  A.      No.  I wouldn't.

17  Q.      You wouldn't?

18          Why not?

19  A.      No.  I would call Wildlife and Fisheries.

20  Q.      Okay.  Because you know that, if there's gunfire

21  going on when the season is not hunting season, that's

22  suspicious activity; would it not be?

23  A.      Correct.

24  Q.      And are hunters allowed to use machine guns to

25  hunt?
```

1    A.     No, sir.  Not machine guns.

2    Q.     If you heard rapid firing going on, you would

3    investigate that situation; would you not?

4    A.     Correct.

5    Q.     And you've never heard that, have you?

6    A.     No, sir.

7    Q.     Thank you.

8           MR. VEREEN:  I have no further questions,

9    Judge.

10          THE COURT:  Mr. Houlihan?

11          MR. HOULIHAN:  No questions, ma'am.

12          THE COURT:  Mr. Clark?

13          MR. CLARK:  I have no further questions, your

14   Honor.

15          THE COURT:  Mr. Casuso?

16          MR. CASUSO:  No questions.

17          THE COURT:  Mr. Levin?

18          MR. LEVIN:  No questions, your Honor.

19          THE COURT:  Mr. Gregorie?

20                      REDIRECT EXAMINATION

21   BY MR. GREGORIE:

22   Q.     Trooper Martel, is it illegal to shoot a gun

23   outside your personal property when it's not hunting

24   season?

25   A.     No, sir.

```
 1    Q.     And you can do that anytime?

 2    A.     Yes, sir.

 3    Q.     Thank you.

 4           MR. GREGORIE:  Nothing further from this

 5    witness, your Honor.

 6           THE COURT:  You may step down, sir.

 7           (Witness excused.)

 8           THE COURT:  Call your next witness.

 9           MR. GREGORIE:  The Government calls Mickey

10    Batiste.

11    Thereupon--

12                    MICKEY BATISTE

13    was called as a witness by the Government and, having

14    been first duly sworn, testified as follows:

15           THE COURT REPORTER:  Please state your full

16    name for the record, sir, and speak into the

17    microphone.

18           THE WITNESS:  Mickey Batiste.

19                  DIRECT EXAMINATION

20    BY MR. GREGORIE:

21    Q.    Sir, could you give us your address.  Where do

22    you live?

23    A.     Right now?

24    Q.     Yeah.

25    A.     436 Ducker --
```

M. Batiste - DIRECT - By Mr. Gregorie                176

```
 1            THE COURT REPORTER:  Ducker....
 2            THE WITNESS:  Ducker Broullette Road.
 3   D-u-c-k-e-r, B-r-o-u-l-l-e-t-t-e.
 4   BY MR. GREGORIE:
 5   Q.    And where is that, sir?  You have to speak up so
 6   we can all hear you, sir.
 7   A.    It's in Marksville.
 8   Q.    Marksville, Louisiana?
 9   A.    Correct.
10   Q.    Prior to living there, sir, where did you live?
11   A.    171 Alvin Ford Lane.
12   Q.    And how long did you live on Alvin Ford Lane?
13   A.    About 20 years.
14   Q.    Also, sir, where were you born?
15   A.    Marksville.
16   Q.    And did you remain in Marksville your whole life?
17   A.    No.  I moved away for eight years.
18   Q.    And where did you go?
19   A.    Chicago.
20   Q.    Did you have any family or relatives in Chicago
21   when you went there?
22   A.    I did.
23   Q.    Who was that?
24   A.    My brother and --
25   Q.    What's his name?
```

```
 1    A.     Narcisse Batiste.

 2    Q.     Did --

 3    A.     And --

 4    Q.     I'm sorry.  Did I interrupt you?  I apologize.

 5    A.     And I had two sisters -- I had two brothers up

 6    there and two sisters.

 7    Q.     At some point, did you return to Louisiana?

 8    A.     I did.

 9    Q.     And when you returned to Louisiana, what address

10    did you return to?

11           MS. JHONES:  My only objection is to time

12    period.

13           THE COURT:  Place it in time.

14    BY MR. GREGORIE:

15    Q.     When did you return to Louisiana?

16    A.     432 Alvin --

17    Q.     No.

18           When did you return?

19    A.     When?  1971.

20    Q.     And where did you return to?

21    A.     432 Alvin Ford Lane.

22    Q.     Now, at any time after you returned, did your

23    brother Narcisse return to Louisiana?

24    A.     Yes, he did.

25    Q.     Do you remember when, approximately, that was?
```

M. Batiste - DIRECT - By Mr. Gregorie                    178

```
 1   A.      Not exactly.

 2   Q.      Was it long after you returned?

 3   A.      I'd say about seven years after I returned.

 4   Q.      Sometime in the 1970s?

 5   A.      Sometime in the '70s.

 6   Q.      Did your brother Narcisse buy a piece of

 7   property?

 8   A.      Yes.

 9   Q.      Where did he buy the property?

10   A.      193 Alvin Ford Lane.

11   Q.      And did he have any children while he was at

12   193 Alvin Ford Lane?

13   A.      Yes.

14   Q.      Do you remember how many children he had?

15   A.      Six.

16   Q.      And did he have any sons?

17   A.      Yes.

18   Q.      Do you remember their names?

19   A.      Start from the oldest?

20   Q.      Yes, if you can.

21   A.      Siltan, Buford -- their names just ain't coming

22   up.

23           But he had five boys and one girl.

24   Q.      Do you see any of Narcisse's children in the

25   courtroom here today?
```

1   A.     Yes.

2   Q.     Who is that?

3   A.     Narseal.

4   Q.     The man who just stood up?

5   A.     Yes.

6   Q.     And at some time, did he live on Alvin Ford Lane?

7   A.     Yes.

8          MS. JHONES:  My only objection is to the

9   leading nature of the question.

10         MR. GREGORIE:  I'll rephrase the question,

11  your Honor.

12         THE COURT:  Okay.

13  BY MR. GREGORIE:

14  Q.     Did you know your sister-in-law?

15  A.     Yes.

16  Q.     What was her name?

17  A.     Audrey.

18  Q.     What was her name?

19  A.     Audrey.

20  Q.     Audrey.

21         Has Audrey passed away?

22  A.     Yes.

23  Q.     Do you remember when that was?

24  A.     March 24, 2000.

25  Q.     And you sound pretty sure about that date.

```
 1            Did you do something to check on that date?
 2   A.     Yes.
 3   Q.     When did you do that?
 4   A.     When I was told that I had to come back up here,
 5   I looked the date up.
 6   Q.     And was there a funeral for your sister-in-law,
 7   Audrey, in March of 2000?
 8   A.     Yes.
 9   Q.     Do you know if Mr. Narseal Batiste attended that
10   funeral?
11   A.     Yes, he did.
12   Q.     Were you there?
13   A.     Yes.
14   Q.     Did you observe him there?
15   A.     Yes.
16   Q.     Can you tell the Court and jury how he appeared
17   when he came to the funeral on that day.
18   A.     You mean how he was dressed?
19   Q.     How he was dressed.  Yes, sir.
20   A.     Okay.  He had a robe on and a staff.
21   Q.     When you say "a staff," what do you mean?
22   A.     A stick.
23   Q.     How large was it?
24   A.     I'd say about 6 foot in length.
25   Q.     What about the robe?  What kind of robe was he
```

1    wearing?

2    A.    He was wearing a white robe.

3    Q.    Did he have anything else on?

4    A.    A little hat.

5    Q.    I'm showing you what's marked as Government's

6    Exhibit 34 in evidence.  Can you look at the screen and

7    see if you can see it.

8           MR. GREGORIE:  I'm sorry, your Honor.  Could I

9    have the ELMO.

10   BY MR. GREGORIE:

11   Q.    Can you see the --

12   A.    Yes.

13   Q.    -- picture?

14         Do you see the hat that he's wearing there?

15   A.    Yes.

16   Q.    Was the hat that he had on that day similar?

17   A.    Yes.

18   Q.    And after that period in 2000, where, if at all,

19   if you know, did Narseal Batiste live?

20   A.    He went back to Chicago.

21   Q.    Did he ever come back to that address?

22   A.    Yes, he did.

23   Q.    When was that?

24   A.    Approximately two years, I'd say, later.

25   Q.    And where did he live, if you know?

M. Batiste - DIRECT - By Mr. Gregorie                    182

```
 1   A.      He lived at 193 Alvin Ford Lane.

 2   Q.      And did anyone live there with him?

 3   A.      His wife and childrens.

 4   Q.      Did you ever observe him while he lived there?

 5   A.      Yes.

 6   Q.      And did you notice anything unusual that he did

 7   while he was there?

 8   A.      I noted the practicing that he did.

 9   Q.      What kind of practicing?

10   A.      Like Ninja.

11   Q.      I'm sorry.  I can't hear you.

12   A.      Line Ninja.  That's the closest I can put it.

13   Q.      Can you give us an idea of what sort of things he

14   was doing.

15   A.      Exercising, like, with staff or a sword.

16   Q.      And what was he wearing when he did this?

17   A.      A black uniform.

18   Q.      Did he ever have any visitors while he was there?

19   A.      He did.

20   Q.      Can you tell us how they were attired, how they

21   were dressed.

22   A.      Not exactly.  I can't, because the times I seen

23   him, it was at night.

24   Q.      Okay.  Now, sir, is shooting permitted on that

25   property?
```

1    A.    Yes.

2    Q.    Only in hunting season?

3    A.    No.

4    Q.    When does it happen?

5    A.    Year-round.

6    Q.    And what do people shoot at?

7    A.    Well, they have some mannequin, like deer, that

8    they practice on.  And that's -- normally, it stays in

9    the yard.

10        It was not at that location.  But they do it in

11   that area, I'd say, about year-round.  And nobody pays

12   any attention to the shots.

13   Q.    Now, sir, let me show you a photograph -- a

14   couple of photographs, if I could, please -- by the

15   way, that property at 194 (verbatim) Alvin Ford Lane:

16   Has it changed much since it was purchased in the late

17   1970s?

18        MS. JHONES:  Objection, your Honor.

19   Foundation, basis of knowledge.

20   BY MR. GREGORIE:

21   Q.    Have you lived there that entire time since

22   Narcisse bought that piece of property?

23   A.    Yes.

24   Q.    Can you tell us if there have been any buildings

25   built or any changes of any kind between then and now?

1    A.     There's been two houses added and two trailers

2    and a couple of storage buildings.

3    Q.     When were the houses built, if you remember?

4    A.     I don't remember the year.

5    Q.     We're going to take a look at a couple of

6    pictures, and maybe that'll help you.

7           Let's look first at Government's Exhibit 33-F.

8    Do you see it on the screen there, sir?

9            MR. GREGORIE:  I'm sorry, your Honor.  I need

10   the ELMO.

11   BY MR. GREGORIE:

12   Q.     Can you see that picture?

13   A.     Yes.

14   Q.     Can you tell where that is?

15   A.     That -- it's a church now, which was my mother's

16   house.

17   Q.     So it used to be a house?

18   A.     Right.

19   Q.     When was it a house?

20   A.     Up until -- let's see.  It would be about '99,

21   when he started changing it over to a church.

22   Q.     And looking at the tree -- can you see where my

23   finger is pointing (indicating)? --

24   A.     Correct.

25   Q.     -- is there something behind that tree?

1    A.    It's Audrey's grave.

2    Q.    Say that again, sir.

3    A.    Audrey's grave.

4    Q.    So that's Narseal Batiste's mother's grave?

5    A.    Correct.

6    Q.    And let me show you what's marked as 33-E.

7          Do you recognize that, sir?

8    A.    Yes.

9    Q.    Is that a picture of the same building?

10   A.    A picture of the same building.

11   Q.    It's just a different angle?

12   A.    Right.

13   Q.    You say there are a couple of mobile homes on the

14   property?

15   A.    Right.

16   Q.    Who do they belong to?

17   A.    Narcisse.

18   Q.    Does anybody live in them?

19   A.    Nobody.

20   Q.    Nobody lives in them at all?

21   A.    No.

22   Q.    How about the houses that you said were built?

23   Does anybody live in the houses that you said were

24   built there?

25   A.    You mean right now?

1    Q.     Right now.

2    A.     Yes.  They're being rented out.  One his brother

3    is living in.

4    Q.     Whose brother?

5    A.     Narseal.

6    Q.     Is Narseal's brother younger or older?

7    A.     Younger -- no.  He's older.  I'm sorry.

8    Q.     He has an older brother that lives in a house

9    that's on the property?

10   A.     Right.

11   Q.     Anyone else?

12   A.     Then he has some tenant in the house that Narseal

13   was living in.

14   Q.     Let me show you what's marked as Government's

15   Exhibit 33-B, which is an aerial view.  Can you see

16   that, sir?

17   A.     Yes.

18   Q.     Can you give us an idea where the houses and the

19   mobile homes are.

20   A.     You want me to point to them or....

21   Q.     Yeah.  If you put your finger, I think, on the

22   screen, it'll mark it.

23   A.     Okay.  That's the two mobile home (indicating).

24   Q.     Okay.

25   A.     That's the house where Carlton live, which is

M. Batiste - CROSS - By Ms. Jhones                    187

```
 1    Narseal's brother (indicating).

 2    Q.     All right.

 3    A.     That's the church (indicating).

 4    Q.     Okay.

 5    A.     That's the house Narseal lived in (indicating).

 6    Q.     Are there any other changes that have happened to

 7    that property since you began -- since Narcisse moved

 8    there in 1978 or so?

 9    A.     No.

10    Q.     Stayed the same?

11    A.     No.   There's no changes.   A couple of buildings

12    that have been moved around.   But they were on the

13    property all the time.

14    Q.     Thank you.

15           MR. GREGORIE:  One moment, your Honor.

16           I have no further questions, your Honor.

17           THE COURT:  Ms. Jhones?

18           MS. JHONES:  Yes, your Honor.

19                        CROSS-EXAMINATION

20    BY MS. JHONES:

21    Q.     Good afternoon, sir.

22    A.     Good afternoon.

23    Q.     Welcome to Miami.

24    A.     Thank you.

25    Q.     Sir, you are Narseal's uncle?
```

M. Batiste - CROSS - By Ms. Jhones                   188

```
 1   A.      Correct.

 2   Q.      On the father's side?

 3   A.      Correct.

 4   Q.      And Audrey was his mother.  Correct?

 5   A.      Correct.

 6   Q.      And the Batiste family has lived in Marksville

 7   for quite a long time; have they not?

 8   A.      Yes.

 9   Q.      As has the Ford family.  Right?

10   A.      Right.

11   Q.      By "Ford," I mean Audrey Ford --

12   A.      Yes.

13   Q.      -- your former sister-in-law?

14   A.      Correct.

15   Q.      And, sir, you presently live in Marksville?

16   A.      Correct.

17   Q.      You do not live on Alvin Ford -- off Alvin Ford

18   Lane.  Right?

19   A.      No.

20   Q.      You live somewhere else around the area?

21   A.      I've moved.  It's been two months.

22   Q.      You used to live right across Narcisse's

23   property?

24   A.      Correct.

25   Q.      It's like divided by a fence or something.
```

1    Right?

2    A.    Yes.

3    Q.    And then your ex-wife -- I think her name is

4    Dorothy --

5    A.    Correct.

6    Q.    -- she lives further down the road.  Right?

7    A.    Right.

8    Q.    You have a lot of kids, don't you?

9    A.    Six.

10   Q.    And some of them still live over there off of

11   Alvin Ford Lane?

12   A.    Correct.

13   Q.    Now, the prosecutor asked you about an older

14   brother of Narseal's.  Correct?

15   A.    Right.

16   Q.    You didn't give us his name.  Do you remember?

17   A.    Siltan and Buford.

18         THE COURT REPORTER:  I'm sorry?

19         THE WITNESS:  Siltan is the oldest one.

20   Buford is the one next to him.  Frances is the sister.

21   She's the third one.

22   BY MS. JHONES:

23   Q.    You're doing good.

24         How about the gentleman -- the brother that lives

25   in the house trailer over there on the property off

```
 1    of -- right on 193 Alvin Ford Lane?  What's his name?
 2    A.     Carlton.
 3    Q.     Carlton.  Right?
 4    A.     Correct.
 5    Q.     And he still lives there.  Right?
 6    A.     Correct.
 7    Q.     He's lived there for a long time?
 8    A.     Well, since they came back from Illinois.
 9    Q.     And you indicated that Narcisse, meaning your
10    brother --
11    A.     Correct.
12    Q.     -- Mr. Batiste's father --
13    A.     Right.
14    Q.     -- leases the house that's next to the church on
15    193 Alvin Ford Lane.  Right?
16    A.     Correct.  Yes.
17    Q.     He always has tenants there?
18    A.     Yes.
19    Q.     And in addition to the tenants that live on that
20    property, sir, there are tenants that live in other
21    properties around that area, in those house trailers
22    and other houses that are situated right down Alvin
23    Ford Lane.  Fair enough?
24    A.     Yes.
25    Q.     Okay.  And in addition to your children, you have
```

1    other relatives from the Batiste side of the family

2    that live around there.  Right?

3    A.    Correct.

4    Q.    And then we have other relatives from the Ford

5    family.  Right?

6    A.    Not living -- yes.  Correct.  We do.

7    Q.    And correct me if I'm wrong.

8          I think you are affectionately referred to as

9    "Uncle Mickey."  Right?

10   A.    Correct.

11   Q.    And the Ford family has property to this very day

12   that is in the same area as Narcisse's property?

13   A.    Correct.

14   Q.    Do you still own property there, sir?

15   A.    It's still in my name, but I don't -- I gave it

16   to my wife in the divorce.

17   Q.    And there are also -- I'm not going to go through

18   all the people.

19          But there are quite a few people over there,

20   right, in the family?

21   A.    Yes.

22   Q.    But in addition to -- let me just grab an

23   exhibit, because my memory is not very good these days.

24          Mr. Batiste, do you have an exhibit up there with

25   you, by any chance?  Do you have a green folder up

1   there?

2   A.     Do I?  This one here (indicating)?

3          MS. JHONES:  May I approach, your Honor?

4          THE COURT:  Yes.

5          MS. JHONES:  I'm missing an exhibit.

6          THE WITNESS:  I don't know if that's what

7   you're referring to.

8          MS. JHONES:  Oh.  This is what I'm looking

9   for.  Let me just grab this from you.  Okay?

10         THE WITNESS:  Okay.

11         MS. JHONES:  If I may have the ELMO, your

12  Honor.

13         THE COURT:  Sure.

14  BY MS. JHONES:

15  Q.     I'm going to show you, Mr. Batiste, Government's

16  Exhibit 32.  Okay?

17  A.     Okay.

18  Q.     Have you seen this before, by the way?

19  A.     I'm not sure.  I'd have to see it again.

20         MS. JHONES:  May I approach?

21         THE COURT:  Yes.

22  BY MS. JHONES:

23  Q.     Take a look at that.  Let me know when you're

24  finished.

25         THE COURT:  Why don't you identify the

```
 1   exhibit, please, so we know what he's looking at.  Hold
 2   on.  I can help you.
 3              THE WITNESS:  What particular am I looking
 4   for?
 5              THE COURT:  32.
 6              MS. JHONES:  32?
 7              THE COURT:  32.  Yes.
 8   BY MS. JHONES:
 9   Q.    Mr. Batiste, I'm just asking you if you recognize
10   that document.
11   A.    Yes.
12   Q.    Do you know what it is?
13   A.    Yes.
14   Q.    Okay.  Let me grab it back from you.  All right?
15              MS. JHONES:  May I approach?
16              THE COURT:  Yes.
17              THE WITNESS:  (Tenders document to counsel.)
18              MS. JHONES:  Thank you.
19   BY MS. JHONES:
20   Q.    We talked about the Ford family and we talked
21   about the Batiste family that own property in that
22   area, Alvin Ford Lane.  Correct?
23   A.    Correct.
24   Q.    But there are other people that own property in
25   that area as well.  Correct?
```

```
 1    A.      Yes.

 2    Q.      And they own a pretty good amount of property in

 3    that area.  Right?

 4    A.      Right.

 5    Q.      I think one of those people would be the Baldwin

 6    family.

 7            Does that ring a bell?

 8    A.      No.

 9    Q.      This name right here (indicating):  Can you tell

10    what that is?

11    A.      Harold LaBode own property down there.  But

12    there's --

13            THE COURT REPORTER:  I'm sorry.  Harold....

14            THE WITNESS:  Harold LaBode.

15    BY MS. JHONES:

16    Q.      Oh.  I pronounced it incorrectly.

17    A.      Okay.

18    Q.      Does he still own that property, sir?

19    A.      Yes.  Him and his sisters.

20    Q.      They live on the property?

21    A.      He does.

22    Q.      And does he have any other people that live on

23    the property besides himself?

24    A.      No.

25    Q.      And I believe there is some other people that may
```

```
 1   not be depicted on this paper.

 2          But how about Jones -- Manuel Jones?

 3   A.     Yes.  That's my sister.

 4   Q.     Over here (indicating)?

 5   A.     That's my sister.  Yes.

 6   Q.     I'm sorry?

 7   A.     That's my sister -- my oldest sister.

 8   Q.     Oh, okay.

 9          And is she still living in that property?

10   A.     Yes.

11   Q.     Does she have any family?

12   A.     She has childrens.

13   Q.     Do they live on that property as well?

14   A.     No.

15   Q.     She lives there by herself?

16   A.     Yes.

17   Q.     Now, the prosecutor also asked you about clothing

18   that Mr. Batiste wore to his mother's funeral.

19          Do you remember that?

20   A.     Yes.  The robe.

21   Q.     Yes.

22          Now, he asked you about Mr. Batiste's siblings.

23   Right?  And you said there were five boys and one girl?

24   A.     Correct.

25   Q.     The girl is Frances?
```

```
 1   A.      Right.

 2   Q.      Frances is how old, sir?

 3   A.      I don't know.

 4   Q.      And Frances was at the funeral; was she not?

 5   A.      Yes.

 6   Q.      Everybody was at the funeral?

 7   A.      Yes.

 8   Q.      That lasted quite a few days; did it not?

 9   A.      Yes.

10   Q.      And Frances was wearing a robe as well; was she

11   not?

12   A.      Correct.

13   Q.      And so was Curtis, who affectionately is referred

14   to as "Buford"?

15   A.      Yes.

16   Q.      And were you wearing a robe?

17   A.      No.

18           MS. JHONES:  I think I have nothing further,

19   your Honor.

20           Thank you, sir.

21           THE WITNESS:  Okay.

22           THE COURT:  Mr. Vereen?

23           MR. VEREEN:  Just a couple questions, Judge.

24

25
```

```
 1                        CROSS-EXAMINATION

 2   BY MR. VEREEN:

 3   Q.     Mr. Batiste, good afternoon.

 4   A.     Good afternoon.

 5   Q.     You were asked by the Government with regard to

 6   shooting -- or -- I think he asked you, when it's not

 7   the hunting season -- well, let me just ask the

 8   question.

 9          You had stated that there is hunting practice

10   that takes place, but not on that location.  Do you

11   recall stating that?

12   A.     Yes.

13   Q.     And you said something about a mannequin deer?

14   A.     Normally -- can I give you the explanation?

15   Q.     Yes, please.

16   A.     Okay.  Normally, in that part of Louisiana,

17   people do a lot of deer hunting.  So they have some

18   deer statues in their yard and they practice on them.

19   There is not one on Narcisse's property, but they did

20   shoot on it like practice.

21   Q.     When you say "they," who are you making reference

22   to?

23   A.     I'm referring to Narseal and his father and his

24   brother.

25   Q.     How many years ago are we talking?
```

```
 1   A.    When they were living there.  I don't know how

 2   many years ago.

 3   Q.    When -- he would shoot at a deer mannequin --

 4   A.    No.  There was no deer mannequin there.  That's

 5   what I stated.

 6   Q.    Okay.  So what were they shooting at?

 7   A.    Just shooting cans, I guess, bottle, whatever.

 8   Q.    Were you present when this was taking place?

 9   A.    I was not present.

10   Q.    Now, you said that you had observed Mr. Batiste

11   practicing what you said -- what appeared to be Ninja?

12   A.    Yes.

13   Q.    Martial arts?

14   A.    Yes.

15   Q.    Okay.  And you said he would do this with the

16   staff or with a Samurai sword?

17   A.    Yes.

18   Q.    All right.  And you said this would take place at

19   night?

20   A.    I did not say that.

21   Q.    Okay.

22   A.    It was in the afternoon.  I said his visitors

23   would -- visited at night.

24   Q.    And when was that?

25   A.    I don't have a date.
```

1    Q.     What year?

2    A.     That was during the time he was living there.

3    Q.     Do you know when he left Louisiana, what year?

4    A.     Pardon?

5    Q.     Do you know what year he left Louisiana?

6    A.     No.  I know when he left.  I didn't keep a --

7    mark no year down or keep up with it.

8           MR. VEREEN:  I have no further questions.

9    Thank you.

10          THE COURT:  Mr. Houlihan?

11          MR. HOULIHAN:  No questions.

12          THE COURT:  Mr. Clark?

13          MR. CLARK:  No further questions, your Honor.

14          THE COURT:  Mr. Casuso?

15          MR. CASUSO:  No questions.  Thank you.

16          THE COURT:  Mr. Levin?

17          MR. LEVIN:  No questions.

18          THE COURT:  Mr. Gregorie?

19          MR. GREGORIE:  Nothing further, your Honor.

20          THE COURT:  You may step down, sir.

21          (Witness excused.)

22          THE COURT:  Call your next witness.

23          MS. ARANGO:  The United States calls Dana

24   Marinelli to the stand.

25   Thereupon--

```
  1                    DANA FRANCES MARINELLI

  2    was called as a witness by the Government and, having

  3    been first duly sworn, testified as follows:

  4              THE COURT REPORTER:  Have a seat.

  5              Please state your full name and please give

  6    the spelling of the last name.

  7              THE WITNESS:  Dana Frances Marinelli,

  8    M-a-r-i-n-e-l-l-i.

  9                    DIRECT EXAMINATION

 10    BY MS. ARANGO:

 11    Q.    Ms. Marinelli, where do you work?

 12    A.    I work for FedEx Ground Corporate.

 13    Q.    And what is your position with FedEx Ground?

 14    A.    I am a paralegal in the independent contractor

 15    model unit.

 16    Q.    Are you -- in that position, are you also a

 17    custodian of records?

 18    A.    Yes.

 19    Q.    Now, was FedEx Ground served with a subpoena in

 20    this case?

 21    A.    Yes.

 22    Q.    Did you receive that subpoena?

 23    A.    Yes.

 24    Q.    Did that subpoena request any documents?

 25    A.    Yes.
```

Marinelli - DIRECT - By Ms. Arango            201

```
1    Q.     And did you obtain any documents in response to

2    that subpoena?

3    A.     Yes.

4    Q.     What did you -- explain to the members of the

5    jury what you had to do to obtain those documents.

6    A.     We have two databases that we run that houses

7    employee and independent contractor information:  PIT5

8    database and a database called CDAS.

9              THE COURT REPORTER:  What was the last one,

10   please?

11             THE WITNESS:  CDAS, C-D-A-S.

12   BY MS. ARANGO:

13   Q.     And did you go into those two computer databases

14   in response to the subpoena?

15   A.     Yes.

16   Q.     Did you obtain any documents out of those

17   databases?

18   A.     Yes.

19   Q.     Let me show you what's been marked as

20   Government's Exhibit 31, composite, which contains four

21   pages, and ask you if you recognize it.

22         One more question before I show you this.

23         The documents that you obtained responsive to the

24   subpoena:  I believe you just testified they were

25   computer-generated?
```

Marinelli - DIRECT - By Ms. Arango                202

```
 1    A.      Yes.

 2    Q.      And was the computer in good working order?

 3    A.      Yes.

 4    Q.      Were those documents generated and maintained in

 5    the regular course of -- regularly conducted business

 6    activity of FedEx Ground?

 7    A.      Yes.

 8    Q.      Showing you what's been marked as Composite

 9    Exhibit 31, do you recognize it?

10    A.      Yes.

11    Q.      Are those four pages of that exhibit the

12    documents that were responsive to the subpoena that was

13    served on FedEx Ground?

14    A.      Yes.

15    Q.      And did you personally pull those records?

16    A.      Yes.

17            MS. ARANGO:   Government offers Composite

18    Exhibit 31 into evidence.

19            MS. JHONES:   May I voir-dire the witness, your

20    Honor?

21            THE COURT:   Yes.

22            MS. JHONES:   May I retrieve the exhibit, your

23    Honor?

24            THE COURT:   Yes.

25            MS. JHONES:   Or do you have it, Ms. Arango?
```

1            MS. ARANGO:  It's up there.

2            MS. JHONES:  Good afternoon.

3            THE WITNESS:  Hi.

4            MS. JHONES:  Ms. Marinelli, you have stated

5    that your position with FedEx is that of a paralegal?

6            THE WITNESS:  Correct.

7            MS. JHONES:  And when did you start -- when I

8    say "FedEx," I mean FedEx Ground.  Correct?

9            THE WITNESS:  Correct.

10           MS. JHONES:  Because there's two different

11   divisions, ground and regular FedEx?

12           THE WITNESS:  No.  We're a sister company of

13   FedEx.

14           MS. JHONES:  But you work for both or just

15   FedEx Ground?

16           THE WITNESS:  I work for FedEx Ground

17   Corporate.

18           MS. JHONES:  Your offices are out of what

19   location?

20           THE WITNESS:  Pittsburgh, Pennsylvania.

21           MS. JHONES:  And, Ms. Marinelli, when did you

22   start working for FedEx Ground?

23           THE WITNESS:  Around July, 2006.

24           MS. JHONES:  And fair enough, that you've been

25   there ever since?

 1              THE WITNESS:  Yes.

 2              MS. JHONES:  Now, the documents that the

 3    Government has shown you -- which are Government's

 4    Composite Exhibit 31.  Right? --

 5              THE WITNESS:  Yes.

 6              MS. JHONES:  -- these were not documents that

 7    you prepared.  Correct?

 8              THE WITNESS:  Correct.

 9              MS. JHONES:  You have no personal knowledge of

10    when these documents were prepared?

11              THE WITNESS:  Correct.

12              MS. JHONES:  You were not employed by FedEx

13    when these documents -- you have no personal knowledge

14    as to when this information was inputted in the

15    computer, do you, ma'am?

16              THE WITNESS:  Correct.

17              MS. JHONES:  And you have no knowledge as to

18    who made these documents.  Correct?

19              THE WITNESS:  Made the documents?

20              MS. JHONES:  You have no knowledge as to

21    who -- you have no personal knowledge as to when the

22    information was inputted in the computer.  Correct?

23    You have no personal knowledge when this was done --

24              THE WITNESS:  Correct.

25              MS. JHONES:  -- when that information was put

Marinelli - DIRECT - By Ms. Arango          205

```
 1    in the computer?

 2          THE WITNESS:  Correct.

 3          MS. JHONES:  And you have no knowledge as to

 4    who put this information in the computer?

 5          THE WITNESS:  Correct.

 6          MS. JHONES:  Okay.  Now, you do not work in

 7    the distribution of FedEx Ground.  Correct?

 8          THE WITNESS:  Correct.

 9          MS. JHONES:  You do not work in the Chicago

10    office of FedEx Ground.  Correct?

11          THE WITNESS:  Correct.

12          MS. JHONES:  And you were not working for

13    FedEx at any time prior to the summer of 2006.  Fair

14    enough?

15          THE WITNESS:  Correct.

16          MS. JHONES:  What training, if any, have you

17    had in terms of the documentation that the

18    Government -- the documentation that the Government has

19    shown you as depicted in Government's Exhibit 31?

20          MS. ARANGO:  Objection.  Relevance.

21          MS. JHONES:  Your Honor, this goes to 803(6).

22          THE COURT:  Rephrase your question.

23          Sustained.

24          MS. JHONES:  What training in your capacity as

25    a paralegal have you been given with respect to the
```

```
 1   method of FedEx Ground in compiling and storing data?

 2   What training have you received in that capacity?

 3           MS. ARANGO:  Objection.  Relevance.

 4           MS. JHONES:  803(6), your Honor.

 5           THE COURT:  Overruled.

 6           MS. JHONES:  What training have you received,

 7   ma'am?

 8           THE WITNESS:  We've received training from

 9   FedEx University on how to retrieve information.

10           MS. JHONES:  In terms of inputting information

11   and -- when you say retrieving information, what

12   information are you speaking about?  What information,

13   ma'am?

14           THE WITNESS:  The information in your hand.

15           MS. JHONES:  And what information is that,

16   ma'am?

17           THE WITNESS:  The information that I printed

18   out from the database.

19           MS. JHONES:  And when you say you've received

20   training as to how to retrieve, what do you mean by

21   that?

22           THE WITNESS:  We received training on the

23   databases.

24           MS. JHONES:  As to how to access information?

25   Is that what you mean?
```

Marinelli - DIRECT - By Ms. Arango                    207

```
 1              THE WITNESS:  Correct.

 2              MS. JHONES:  Now, with respect to -- tell us

 3   how you are familiar with the mode and the preparation

 4   of the documents as depicted in Government's

 5   Exhibit 31.

 6              MS. ARANGO:  Objection.  Asked and answered,

 7   Judge.  Relevance.  It's just --

 8              MS. JHONES:  Your Honor, this is 803(6).

 9              THE COURT:  You need to rephrase your

10   question.

11              MS. JHONES:  What information do you have,

12   Ms. Marinelli, as to how these records -- the records

13   depicted in Government's Exhibit 33 -- how they were

14   made?

15              THE WITNESS:  Through the terminal.

16              MS. JHONES:  What does that mean, "through the

17   terminal"?

18              THE WITNESS:  The terminal processes the

19   information into the database.

20              MS. JHONES:  My question to you is:  These

21   documents:  When were they generated?  When was the

22   doc -- the information in this document was not

23   generated in 2009.  Fair enough?

24              THE WITNESS:  Correct.

25              MS. JHONES:  This was generated sometime years
```

```
 1   before you ever worked for FedEx.  Correct?

 2         THE COURT:  Correct.

 3         MS. JHONES:  My question to you is:  What

 4   information -- what knowledge do you have as to how

 5   these records were actually made at the time that they

 6   were made?  At the time that they were made, what

 7   information do you have?

 8         MS. ARANGO:  Objection.  Relevance.

 9         MS. JHONES:  803(6), your Honor.

10         THE COURT:  Overruled.

11         THE WITNESS:  The terminal would put the

12   information into the database when the individual was

13   hired.

14         MS. JHONES:  How did that occur, ma'am?  What

15   personal knowledge do you have as to how that occurred?

16         MS. ARANGO:  Objection.  Relevance.

17         MS. JHONES:  This is 803(6), your Honor.

18         THE COURT:  Sustained.

19         Rephrase your question.

20         MS. JHONES:  Okay.  Do you know the method

21   that is utilized today -- well, forget today.

22         In 2006, when you started working for FedEx,

23   what was the method as to how this information was kept

24   by FedEx?  Tell us about the methodology utilized to

25   preserve information by FedEx Ground.
```

1          THE WITNESS:  When an individual is hired

2   and/or becomes an independent contractor, the

3   information is put into a database by the terminal,

4   which we all have access to.

5          MS. JHONES:  Do you put that information in?

6          THE WITNESS:  I do not.

7          MS. JHONES:  Who does?

8          THE WITNESS:  The terminal.

9          MS. JHONES:  When you say "the terminal," what

10  do you mean by that?  I'm sorry.

11         THE WITNESS:  Where the person works out of.

12         MS. JHONES:  So someone else besides yourself

13  puts -- inputs the data.  Correct?

14         THE WITNESS:  I don't input data.  Yes.

15         MS. JHONES:  Okay.  Now --

16         THE WITNESS:  Someone does.

17         MS. JHONES:  I'm sorry.  Are you finished?

18         THE WITNESS:  Someone else inputs the data.  I

19  do not input the data.

20         MS. JHONES:  And that person that inputs the

21  data:  Is that person in the Pittsburgh office as well?

22         THE WITNESS:  The person is at the terminal

23  that inputs the data into the database.

24         MS. JHONES:  And where is the terminal?  Where

25  is the terminal?  Where are these terminals housed that

1    receive the data?

2          THE WITNESS:  The terminals that the

3    individuals work out of throughout the United States

4    and the entire country.

5          MS. JHONES:  So if somebody is working, let's

6    say, in the Chicago office, the data would be input in

7    the Chicago office?

8          THE WITNESS:  Correct.

9          MS. JHONES:  What knowledge do you have,

10   Ms. Marinelli, as to the mode and method of inputting

11   data in these terminals back in 1998?

12         MS. ARANGO:  Objection.  Relevance.

13         MS. JHONES:  Your Honor, 803(6).

14         MS. ARANGO:  Objection.  Relevance, Judge, as

15   to -- the basis for the introduction of a public record

16   is documents that are generated and maintained in the

17   course of the regularly conducted business activity --

18         THE COURT:  You don't mean public record.

19         MS. ARANGO:  I'm sorry, Judge.  I meant

20   business record.

21         MS. JHONES:  Your Honor, may we have a

22   side-bar so we don't have a speaking objection?

23         THE COURT:  Sure.  Come on up.

24         MS. JHONES:  Thank you.

25         (Whereupon, proceedings were had at side-bar

 1  outside the presence of the jury which have been sealed

 2  per instructions of the Court.)

 3          (Whereupon, the following proceedings were had

 4  in open court:)

 5          THE COURT:  Are you moving that into evidence?

 6          MS. ARANGO:  Yes, Judge.

 7          May I ask some questions about the notation?

 8          THE COURT:  Go ahead.

 9  BY MS. ARANGO:

10  Q.    Ms. Marinelli, I'm showing you the fourth page of

11  Composite Exhibit 31.

12          Would you please explain to the members of the

13  jury, first, the computer database out of which you

14  obtained the last page of the exhibit.

15  A.    Sure.  This information was obtained from our

16  PIT5 database.  This houses all independent contractor

17  information.

18          And, also, because of its age, 1999 to 2001, it's

19  done by entering in the individual's last name, Social

20  Security number.  It shows the terminal name, the start

21  date, termination date.

22  Q.    And then the information that's contained in the

23  handwritten portion of the last page of that exhibit:

24  Is that in your handwriting?

25  A.    Yes.

1    Q.     Where did you get the information that is in your

2    handwriting?

3    A.     Actually, whenever the database prints out the

4    information, it prints it out backwards, which is hard

5    to interpret it.

6           I just went ahead, for clarification for myself,

7    that the individual was there 6-14-1999 to 6-15-2001.

8    Q.     And what about the information that's here,

9    "Independent Contractor"?

10   A.     I wrote that.

11   Q.     Where did you get that information?

12   A.     That information was next to the individual's

13   name on the database.

14   Q.     You got it out of the computer database?

15   A.     Yes.  Out of the computer.

16   Q.     Thank you.

17          MS. ARANGO:  Judge, at this time, Government

18   offers Composite Exhibit 31 into evidence.

19          MS. JHONES:  Your Honor, same objection.

20          THE COURT:  Overruled.

21          It will be admitted under 803(6) and the

22   *Dickerson* case as Government's Exhibit 31, composite.

23          (Whereupon, Government's Exhibit No. 31 was

24   entered into evidence.)

25          THE COURT:  You may publish.

```
 1              MS. ARANGO:  Thank you, Judge.

 2              Could I have the ELMO, Judge?

 3              THE COURT:  Yes.

 4   BY MS. ARANGO:

 5   Q.     Ms. Marinelli, I'm going to refer you to the

 6   first page of Government's Exhibit -- Composite

 7   Exhibit 31.

 8   A.     Yes.

 9   Q.     And would you first just explain to the members

10   of the jury -- can you see that on your screen clearly?

11   A.     Yes.

12   Q.     First explain to the members of the jury what you

13   have up on top where it says "Work Location," "Job

14   Information."

15          Are those different screens?

16   A.     Yes.  Those are different tabs that correlate to

17   the screen.

18   Q.     Now, the first page -- what tab is the first

19   page?

20   A.     That would be "Work Location."

21   Q.     And who's the employee here?

22   A.     The employee is Narseal Batiste.

23   Q.     And according to the information on this page,

24   what were the dates that Narseal Batiste worked for

25   FedEx Ground?
```

1    A.      11-1-1998 until --

2    Q.      Do you see "Last Date Worked"?

3    A.      Yes.  That would be 10-31-1998.

4    Q.      I'm going to turn to the second page.

5            Is this second page the next tab?

6    A.      Yes.  "Job Information" tab.

7    Q.      And does that tell us what type of position he

8    held?

9    A.      Part-time package handler.

10   Q.      All right.  Turning now to the third page of the

11   composite exhibit, is that the third tab, "Payroll"?

12   A.      Yes.

13   Q.      And does that tell you -- what kind of

14   information does that tell you?

15   A.      That he was paid hourly.

16   Q.      Now I'm going to turn to the final page.

17           Now, with the printed portion of the last page of

18   this exhibit, explain to the members of the jury, just

19   going from left to right, what this information -- what

20   this exhibit tells you.

21   A.      This exhibit tells us the last name, Social

22   Security number, terminal number, terminal name, 2001

23   earnings, start date, termination date, multi-work

24   area.

25   Q.      Now, does that -- does your hand -- what does

```
 1    your handwriting indicate?

 2    A.     "Independent contractor."

 3    Q.     Now, what do independent contractors for FedEx

 4    Ground do?

 5           MS. JHONES:  Basis of knowledge, your Honor.

 6           THE COURT:  Sustained.

 7           Lay your predicate.

 8    BY MS. ARANGO:

 9    Q.     Are you familiar with what independent

10    contractors FedEx Ground do?

11    A.     Yes.  I work in the independent contractor model

12    unit.

13    Q.     So what do they do?

14    A.     They deliver packages for FedEx Ground.

15           MS. JHONES:  Your Honor, respectfully, the

16    basis of knowledge -- I'm requesting a basis -- a

17    foundation as to basis of knowledge.

18           MS. ARANGO:  She just testified as to what her

19    basis of knowledge was, Judge.

20           THE COURT:  Overruled.

21           You can cross on it.

22           MS. JHONES:  Thank you, your Honor.

23    BY MS. ARANGO:

24    Q.     Do they wear uniforms?

25    A.     Yes.
```

1   Q.     Could they say "FedEx" on them?

2   A.     Yes.

3   Q.     Do they drive FedEx trucks?

4   A.     Yes.

5   Q.     Now, turning to the portion of this exhibit that

6   says "Term" -- t-e-r-m -- and then, under that, "607,"

7   are you familiar with what terminal Terminal 607 is?

8   A.     That would be the Chicago Loop terminal.

9   Q.     Are you familiar with the Chicago Loop area?

10  A.     Yes.

11         MS. JHONES:  Basis of knowledge, your Honor.

12         THE COURT:  Overruled.

13  BY MS. ARANGO:

14  Q.     Is the Sears Tower within the Chicago Loop area?

15         MS. JHONES:  Objection.  Leading and basis of

16  knowledge.

17         THE COURT:  Sustained.

18         Rephrase your question.  It's leading.

19  BY MS. ARANGO:

20  Q.     Are there any buildings of significance within

21  the Chicago Loop area?

22  A.     Yes.

23  Q.     And what is the --

24         MS. JHONES:  Objection.  Your Honor, that --

25  vague and basis of knowledge.

```
 1            THE COURT:  I haven't heard the question.

 2            What's the question?

 3  BY MS. ARANGO:

 4  Q.    What -- what building of significance is in the

 5  Chicago Loop area?

 6  A.    The Sears Tower.

 7  Q.    Okay.  And, finally, what are the dates of the

 8  independent contractor -- what are the dates that

 9  the person who is the subject of this subpoena,

10  Mr. Batiste -- what were the dates that he was an

11  independent contractor with FedEx Ground?

12  A.    6-14-1999 to 6-15-2001.

13  Q.    Okay.  Does Federal Express Ground engage in

14  interstate commerce?

15  A.    Yes.

16            MS. JHONES:  Objection, your Honor.  Basis of

17  knowledge.

18            THE COURT:  Overruled.

19  BY MS. ARANGO:

20  Q.    Does Federal Express pick up and drop off

21  packages at the Sears Tower?

22            MS. JHONES:  Objection.  Leading and basis of

23  knowledge.

24            THE COURT:  Sustained.

25            Rephrase your question.
```

```
 1   BY MS. ARANGO:

 2   Q.    Does FedEx -- Federal Express pick up and drop

 3   off in buildings in the Chicago Loop?

 4   A.    Yes.

 5   Q.    Is the Sears Tower one of those buildings?

 6   A.    Yes.

 7   Q.    Does it maintain a receptacle at the Sears Tower?

 8   A.    Yes.

 9   Q.    Does Federal Express engage in interstate

10   commerce with businesses at the Sears Tower?

11   A.    Yes.

12   Q.    Thank you.

13         MS. ARANGO:  I have no further questions.

14                     CROSS-EXAMINATION

15   BY MS. JHONES:

16   Q.    Good afternoon again, Ms. Marinelli.  Welcome to

17   Miami.

18   A.    Thanks.

19   Q.    Ms. Marinelli, I'm going to ask you a few

20   questions.

21         With respect to --

22         THE COURT:  Ms. Jhones, we're going to have to

23   take a break.

24         Do not discuss this case either amongst

25   yourselves or with anyone else.  Have no contact
```

1   whatsoever with anyone associated with the trial.  Do

2   not read, listen or see anything touching on this

3   matter in any way.

4           If anyone should try to talk to you about this

5   case, you should immediately instruct them to stop and

6   report it to my staff.

7           You may leave your materials at your chairs.

8   We're only going to take a five-minute recess because

9   we're going to be ending early today.

10           So we'll be in recess for five for a quick

11   rest room break.

12           (Whereupon, the jury exited the courtroom at

13   3:40 p.m. and the following proceedings were had:)

14           THE COURT:  You may step down, ma'am.  Five

15   minutes.

16           (Witness excused.)

17           THE COURT:  I just want to find for the record

18   before we break that the handwritten notations I find

19   are admissible under 803(5), that there was a proper

20   predicate under 803(5), based upon the witness's

21   testimony.

22           Five minutes, please.

23           (Thereupon a recess was taken, after which the

24   following proceedings were had:)

25           THE COURT:  We're back on United States of

```
 1   America versus Narseal Batiste, et al., Case

 2   No. 06-20373.

 3           Counsel, state your appearances, please, for

 4   the record.

 5           MR. GREGORIE:  Richard Gregorie and Jacqueline

 6   Arango on behalf of the United States, your Honor.

 7           MS. JHONES:  Ana Maria Jhones on behalf of

 8   Narseal Batiste, who's present.

 9           MR. LEVIN:  Albert Levin on behalf of Patrick

10   Abraham, who's also present.

11           MR. CASUSO:  Lou Casuso on behalf of Burson

12   Augustin, who's present.

13           MR. CLARK:  Nathan Clark for Rothschild

14   Augustine, who is present.

15           MR. HOULIHAN:  Richard Houlihan with Naudimar

16   Herrera.

17           MR. VEREEN:  Roderick Vereen on behalf of

18   Stanley Phanor, who's present.

19           THE COURT:  Okay.  All Defendants are present.

20           How late can you go, Ms. Jhones?

21           MS. JHONES:  4:00.  I don't know what -- I

22   don't have the time, your Honor.

23           THE COURT:  It's ten to 4:00.

24           MS. JHONES:  Oh, my goodness.  I'm going to be

25   a while with this witness, your Honor.
```

1            MS. ARANGO:  Judge, this witness is going to

2    have to stay, then, the entire weekend.

3            THE COURT:  Well, there's nothing I can do

4    about that.

5            Is there any way you can push it back a little

6    bit.

7            MS. JHONES:  Actually, your Honor, the test is

8    at 4:00.  I'm going to get there a little bit late.  I

9    didn't want to interrupt these proceedings.  I wanted

10   to interrupt them the least amount of time as possible.

11   But she's actually already there.

12           THE COURT:  How long do you need with this

13   witness?

14           MS. JHONES:  Probably 20 to 30 minutes.

15           THE COURT:  Well, let's go forward for a

16   while.  Okay?

17           MS. JHONES:  Okay.

18           THE COURT:  You're just going to have to get

19   there a little bit later, I think.

20           Is anybody else going to be questioning this

21   witness?

22           MR. CASUSO:  No, Judge.

23           MR. CLARK:  I don't think so, your Honor.

24           MR. VEREEN:  No.

25           THE COURT:  So let's bring the jurors in.

```
 1              (Whereupon, the jury entered the courtroom at

 2    3:49 p.m. and the following proceedings were had:)

 3              THE COURT:  You may be seated.

 4              You may proceed.

 5              MS. JHONES:  Thank you, your Honor.

 6    BY MS. JHONES:

 7    Q.    Ms. Marinelli, you indicated that information for

 8    FedEx Ground employees are memorialized in terminals

 9    that -- terminals for FedEx Ground.  Correct?

10    A.    Can you repeat the question.

11    Q.    Sure.

12          The information that is memorialized or kept by

13    FedEx Ground is kept in terminals in the different

14    FedEx Ground offices throughout the United States.

15    Correct?

16    A.    Originates in terminals.

17    Q.    The information is inputted in terminals that are

18    located at the place where the employee is employed.

19    Correct?  So if we're talking about Chicago, the

20    terminal would be in the Chicago area.  Correct?

21    A.    Correct.

22    Q.    Okay.  Now, who was Mr. Batiste's immediate

23    supervisor in 1998?

24    A.    I want to say the individual's last name was

25    Chardonnay.
```

```
 1   Q.      And what is your basis of knowledge for that,

 2   ma'am?

 3   A.      From the database.

 4   Q.      Is that reflected in Government's Exhibit 31?

 5   A.      No.

 6   Q.      That name?

 7   A.      No.

 8   Q.      And the terminal -- there is a person that

 9   operates the terminal, and that is the person that

10   inputs the information into the database.  Correct?

11   A.      Correct.

12   Q.      That comes out of the local Chicago office in

13   this case.  Correct?

14   A.      Correct.

15   Q.      Now, who was the person that was inputting this

16   data back in 1998 in the Chicago area where Mr. Batiste

17   was employed?

18   A.      I am not aware.

19   Q.      You are the records custodian for FedEx Ground

20   business records; are you not?

21   A.      Yes.

22   Q.      But you do not have that information?

23   A.      Correct.

24   Q.      Okay.  Now, who was in charge of the terminal in

25   the -- in Chicago, where Mr. Batiste worked in 1998?
```

1    A.    I think the individual's name was Gary

2    Chardonnay.

3    Q.    And your basis of knowledge -- strike that.

4         That information is not contained in Government's

5    Exhibit 31 -- Composite 31.  Correct?

6    A.    Correct.

7    Q.    What was the address of where Mr. Batiste worked

8    in the Chicago area, the FedEx Ground address?

9    A.    It no longer exists.

10   Q.    What was it when it did exist?

11   A.    I am not aware.

12   Q.    Is it contained in Government's Exhibit 31 --

13   Composite 31?  Anywhere in this document is the address

14   where he was employed by FedEx contained in here?

15   A.    No.  The terminal number is on there.

16   Q.    The address, ma'am.

17   A.    It is not on there.

18   Q.    As you sit here today, do you know that address?

19   A.    No.

20   Q.    You have never known that address.  Correct,

21   ma'am?

22   A.    No.

23   Q.    And -- now, who was the terminal manager in

24   1998 -- for FedEx Ground, who was the terminal manager

25   in the office where Mr. Batiste worked?

```
 1              MS. ARANGO:  Objection.  Relevance.

 2              MS. JHONES:  This goes to basis --

 3              THE COURT:  Overruled.

 4   BY MS. JHONES:

 5   Q.    Who was it, ma'am?

 6   A.    I believe it was Gary Chardonnay.

 7   Q.    And, again, that information you do not have with

 8   you documented anywhere here today.  Correct?

 9              MS. ARANGO:  Objection.  Asked and answered.

10              THE COURT:  Sustained.

11   BY MS. JHONES:

12   Q.    Now, what are the ZIP codes -- how many ZIP codes

13   are contained in the Chicago Loop area?  How many ZIP

14   codes?

15              MS. ARANGO:  Objection.  Relevance.

16              THE COURT:  Overruled.

17              If she knows, she can answer.

18              THE WITNESS:  I am unaware.

19   BY MS. JHONES:

20   Q.    Now, you are a records custodian for FedEx

21   Ground; are you not?

22              MS. ARANGO:  Objection.  Argumentative.

23              THE COURT:  Sustained.

24   BY MS. JHONES:

25   Q.    Are you -- strike that.
```

```
1        Do you have -- as the records custodian for FedEx

2   business records, do you have with you the contract

3   between FedEx Ground and Mr. Batiste?

4   A.    No.

5   Q.    Have you ever located such a document?

6   A.    No.

7   Q.    Now, what is a delivery core zone in the context

8   of FedEx Ground business practices?

9            MS. ARANGO:  Objection.  Relevance.

10           MS. JHONES:  Your Honor --

11           THE COURT:  Overruled.

12           THE WITNESS:  Where the individual would

13   deliver packages.

14   BY MS. JHONES:

15   Q.    Tell me the delivery core zones contained within

16   the Chicago Loop area in 1998.

17   A.    I am unaware.

18   Q.    Now, is it fair to say, Ms. Marinelli, you've

19   never worked in the city of Chicago for FedEx Ground?

20   A.    Correct.

21   Q.    Now, showing you Government's Composite

22   Exhibit 31, this document was printed out on

23   August 27th of 2007.  Correct?

24   A.    Correct.

25   Q.    Was this a document that was printed out by you?
```

```
 1   A.     Yes.

 2   Q.     Now, this document -- showing you Government's

 3   Exhibit Composite 31, this document reflects that the

 4   effective -- the start date, right up here

 5   (indicating), is May 18th of 1998.  Correct?

 6   A.     Correct.

 7   Q.     And that's obviously May 18th of 1998, the month

 8   of May?

 9   A.     Yes.

10   Q.     And the termination date was October 31st of

11   1998?

12   A.     Right.

13   Q.     So -- and if these records were to be accurate,

14   Mr. Batiste's last day of employment was October 31st

15   of 1998?

16   A.     Correct.

17   Q.     Fair enough?

18   A.     Uh-huh.

19   Q.     Now, turning to the last page of the composite

20   exhibit, we have independent contractor from June 14th

21   of 1999 until June 15th of '01, 2001?

22   A.     Correct.

23   Q.     Those are your notations.  Correct?

24   A.     Yes.

25   Q.     And what do -- what do those dates reflect,
```

1    ma'am?

2    A.    The dates that he operated as an independent

3    contractor for FedEx Ground.

4    Q.    So did he operate -- did he -- was he an

5    independent contractor for FedEx Ground from May 18th

6    of 1998 until October 31st of 1998?

7    A.    No.

8    Q.    Or was he an independent contractor from

9    June 14th, 1999, to June 15th, 2001?  Which dates was

10   he an independent contractor for FedEx Ground?

11   A.    June 14th, 1999, to June 15th, 2001.

12   Q.    So what do these dates reflect, then, ma'am,

13   May 18th of 1998 through October 31st of 1998?

14   A.    He was a part-time package handler.

15   Q.    So according to these documents, ma'am,

16   Mr. Batiste worked as a package handler on May 18th of

17   1998 through October 31st of 1998?

18   A.    Yes.

19   Q.    Now, you would agree with me, ma'am, that

20   Composite Exhibit 31 indicates that the last date

21   worked was October 31st of 1998?

22   A.    Yes.

23   Q.    Now, nowhere in Government's Exhibit 31, this

24   computer-generated document, does it indicate that

25   Mr. Batiste worked during the time periods that are

```
 1   handwritten in the last page of the composite exhibit.

 2   Correct?

 3   A.     You're going to have to repeat that question.

 4   Q.     Sure.

 5          Your notations on the last page of the exhibit

 6   contradict, do they not, the information contained in

 7   the computer-generated document?

 8   A.     No.

 9   Q.     Tell me where in the computer-generated

10   document -- other than your handwritten notations, tell

11   me where in Government's Composite Exhibit 31 does it

12   indicate that Mr. Batiste worked during the time period

13   of June 14th, 1999, until June 15th of 2001.

14   A.     It says it on the last page.

15   Q.     The handwritten notes?

16   A.     No.  Right up above the handwritten notes.

17   Q.     Right here (indicating)?

18   A.     Yes.

19   Q.     So in Government's Exhibit --

20              THE COURT:  Can you move it down?

21              MS. JHONES:  I'm sorry.

22              THE COURT:  We can't see it.

23   BY MS. JHONES:

24   Q.     Are you talking about this part right here

25   (indicating)?
```

Marinelli - CROSS - By Ms. Jhones                230

```
 1    A.    Yes.

 2    Q.    So where, ma'am, does it indicate in this

 3    document that Mr. Batiste was a package handler during

 4    that time period?

 5    A.    The first page indicates when he was a part-time

 6    package handler.

 7    Q.    Okay.  I think you can point to it on your

 8    screen.

 9          Do you want to go ahead and show us where that

10    is.

11    A.    June 18th, 1998, to October 31st, 1998, this

12    individual was a part-time package handler.

13    Q.    And my question to you is:  Just point to me,

14    please, where it is that it reflects that he was a

15    part-time package handler.

16    A.    You're going to have to move it down a little bit

17    so I can see the tabs.  As you scroll through the tabs,

18    it will tell you underneath the "Payroll" or "Job

19    Information" tab.

20    Q.    If you touch the screen, I think you may be able

21    to highlight it.  Is it working?

22    A.    I touched it.

23          MS. ARANGO:  Judge, I think she has to turn

24    the page.

25          MS. JHONES:  Well, your Honor, I think that
```

```
 1    it's improper for the Government to instruct the

 2    witness.

 3              THE COURT:  Okay.  Go ahead.

 4    BY MS. JHONES:

 5    Q.    You tell me what I need to do, ma'am, in order

 6    for you to be able to answer my questions.  Okay?

 7    A.    To flip the page.

 8    Q.    Okay.  All right.  Now, right here it says

 9    "Package Handler."  Correct?

10    A.    Yes.

11    Q.    And that's where it says "Entry Date:  5-18 of

12    1998"?

13    A.    Correct.

14    Q.    Okay.  And up above, it reflects a termination

15    date.  Correct?

16    A.    Effective date -- I'd have to go back to the

17    first page.

18    Q.    Sure.

19    A.    Yes.  That's what we would classify as

20    termination date.

21    Q.    And how is that, ma'am?  When you say that's how

22    we would classify, what did you mean by that?

23    A.    That would be the next day after the last day

24    worked.

25    Q.    Oh, okay.  So meaning the effective date of
```

```
 1   termination is the day after the last day that he
 2   worked there?
 3   A.      Correct.
 4   Q.      Now, going to the last page -- okay?
 5   A.      Could you please move it down?
 6   Q.      Oh, sure.
 7           Going to the last page, here are the start date
 8   and the termination date.  Correct?
 9   A.      Correct.
10   Q.      And you have indicated to us that "990614"
11   reflects 6-14-99?
12   A.      Correct.
13   Q.      Now, with respect to that information,
14   Ms. Marinelli, why is it that the detail that appears
15   to be depicted in the first three documents of the
16   composite exhibit as it relates to the 1998 period --
17   why is it that that detail is absent from the last page
18   where you have the summary of information up there on
19   the top?  What accounts for the difference in that
20   information?
21   A.      Well, it could be the age of it, the amount of
22   information that the database could have housed,
23   different types of databases.  They're always changing.
24   We're always upgrading.
25   Q.      And what you mean by that is that, when -- the
```

1    database that existed back in 1998 would not have been

2    the same database that exists in 2006, for example.

3    They're constantly changing?

4    A.    No.  We still have access to all of them.

5    Q.    Not access.

6          I'm asking you if the databases -- do they remain

7    the same?

8    A.    The information is always being -- information is

9    always being upgraded.

10   Q.    What does that mean, it's always been updated?

11   A.    Upgraded.

12   Q.    What does that mean?

13   A.    The memory capacity always has to be upgraded

14   because we're always entering information into the

15   databases.

16   Q.    So my question to you, ma'am, is:  The lack of

17   specificity with respect to what is depicted on the

18   last page of the composite exhibit, this date right

19   here (indicating), "990614" and "10615" -- the lack of

20   specificity as to what that means -- what accounts for

21   the absence of information and specificity as it

22   relates to those employment periods.

23              MS. ARANGO:  Objection.  Vague and compound.

24              THE COURT:  Sustained.

25              Rephrase your question.

```
 1   BY MS. JHONES:

 2   Q.    What information -- let me ask you this:  This

 3   document was obtained from accessing old databases.

 4   Correct?

 5   A.    From accessing a database.  Correct.

 6   Q.    Old databases?

 7   A.    Incorrect.

 8   Q.    Well, do you have any original documents with

 9   you, ma'am, original documents, that would -- an

10   employment file for Mr. Batiste?

11   A.    I do not have any original documents with me.

12   Q.    In fact, any documents pertaining to Mr. Batiste

13   with FedEx Ground have been destroyed?

14   A.    I'm not aware.

15   Q.    You are the custodian of records; are you not?

16         MS. ARANGO:  Objection.  Argumentative.

17         THE COURT:  Sustained.

18   BY MS. JHONES:

19   Q.    Are you the person in charge with retrieving

20   documents for FedEx Ground employees?

21         MS. ARANGO:  Objection.  Asked and answered.

22         MS. JHONES:  I don't believe she has, your

23   Honor.

24         THE COURT:  Overruled.

25
```

```
 1   BY MS. JHONES:

 2   Q.    Is that one of your job duties?

 3   A.    Yes.

 4   Q.    And my question to you is:  Is there any file

 5   that you have in your possession or your immediate

 6   supervisor, anyone in the Pittsburgh office or anywhere

 7   else, that contains the documents pertaining to

 8   Mr. Batiste's employment with FedEx Ground, such as his

 9   contract of employment and such as the names of his

10   immediate supervisors and that type of information?

11          MS. ARANGO:  Objection.  Compound question.

12          THE COURT:  Sustained.

13          Rephrase your question.

14   BY MS. JHONES:

15   Q.    Let me break it down.

16          Do you have -- are there any documents --

17   original documents from 1998 or from 1999 in the FedEx

18   Ground files?  Original documents.

19   A.    There may be.  There may be.

20   Q.    Have you searched for them -- well, let me ask

21   you this:  The Government indicated that she -- the

22   Government subpoenaed records from you.  Correct?

23   A.    Correct.

24   Q.    And they detailed the records that they wanted.

25   Correct?
```

1    A.     Correct.

2    Q.     Do you have the attachment to the subpoena that

3    the Government sent to you?  Do you have a list of the

4    documents the Government requested of you?

5    A.     Yes.

6    Q.     Do you have it with you here today?

7    A.     Not with me.  No.

8    Q.     Do you know what documents were requested by the

9    Government that you produce?

10   A.     Yes.

11   Q.     Were some of those documents -- included in those

12   documents, were there -- was there a request for a

13   contract for employment?

14   A.     It wouldn't be for employment.

15   Q.     My question is:  Was there a request made for a

16   contract -- an employment contract between FedEx Ground

17   and Mr. Batiste?

18   A.     There might have been.

19   Q.     Do you have any memory, ma'am, as to whether or

20   not you made a diligent search for those records?

21   A.     Yes.

22   Q.     And did you make a diligent search for those

23   records?

24   A.     Yes.

25   Q.     Were you able to locate them?

1    A.     No.

2    Q.     What other records were requested pursuant to the

3    Government's subpoena?

4    A.     Independent contractor information.

5    Q.     Were you able to obtain any information other

6    than what's contained in the printout in Government's

7    Exhibit -- Composite Exhibit 31?

8    A.     No.

9    Q.     So is it fair to say that whatever was requested

10   by the Government pursuant to the subpoena is contained

11   in this printout?  Correct?

12   A.     Correct.

13   Q.     Now, let me ask you this:  Do you have with you,

14   ma'am, any documents or records which memorialize the

15   routes and the geographic areas that Mr. Batiste was

16   assigned to make deliveries in the Chicago area?

17   A.     No.

18   Q.     Is it fair to say that those documents do not

19   exist?

20   A.     No.

21   Q.     "No," it's not fair to say?

22   A.     They could exist.

23   Q.     You are the records custodian.

24          MS. ARANGO:  Objection.

25          THE COURT:  Sustained.

Marinelli - CROSS - By Ms. Jhones                    238

```
 1    BY MS. JHONES:
 2    Q.     Does that mean, ma'am, that you have to go back
 3    and search for them in order to find out whether or not
 4    they exist?
 5    A.     The terminal would.
 6    Q.     The terminal in Chicago?
 7    A.     Correct.
 8    Q.     Now, does that mean -- how is it that one goes
 9    about getting those records?  Do they go through the
10    records custodian through you or do they go through the
11    terminal?
12           MS. ARANGO:  Objection.  Relevance.
13           THE COURT:  Sustained.
14           THE WITNESS:  Repeat the question.
15    BY MS. JHONES:
16    Q.     Sure.
17           THE COURT:  No.  I sustained.  You need not
18    answer the question.
19           THE WITNESS:  I'm sorry.
20           THE COURT:  Only wait for another question.
21           THE WITNESS:  Sorry.
22    BY MS. JHONES:
23    Q.     My question to you, ma'am, is:  The terminal --
24    the records that would indicate the routes and
25    geographical areas that were assigned to Mr. Batiste
```

```
 1    back in 1998:  Where would those documents be?

 2              MS. ARANGO:  Objection.  Relevance.

 3              MS. JHONES:  Your Honor, this goes --

 4              THE COURT:  Sustained as to relevance.

 5    BY MS. JHONES:

 6    Q.    Payroll records for Mr. Batiste:  Do you have any

 7    payroll records for Mr. Batiste for any time period?

 8    A.    We have records -- employment records on the

 9    first page of this document.

10    Q.    So when -- if a request was made of FedEx Ground

11    for payroll records, the information that you would be

12    able to provide is what's depicted in Government's

13    Composite 31?

14    A.    Correct.

15    Q.    Any records concerning Mr. Batiste's personnel

16    file that would reflect, for example, vacation time,

17    sick time, those types of information:  Do you have --

18    or, first of all, do you have any of those records?

19    A.    Repeat the question.

20    Q.    Sure.

21          Any documentation that -- any employment records

22    such as a personnel file, records of vacation time,

23    sick time, comp time, those type of records:  Do you

24    have any knowledge as to whether or not FedEx Ground

25    has any of those records?
```

```
 1   A.    We would not have any of those records because
 2   the individual was an independent contractor.
 3   Q.    So that would not apply to him?
 4   A.    Correct.
 5   Q.    Now, payroll history, including the pay periods
 6   that Mr. Batiste was paid and the amount of pay and
 7   information regarding withholding of taxes and that
 8   sort of thing:  Would FedEx have any of those records?
 9           MS. ARANGO:  Objection.  Relevance.
10           THE WITNESS:  Repeat the question.
11           MS. JHONES:  There's an objection pending.
12           THE COURT:  Overruled.
13   BY MS. JHONES:
14   Q.    Now you can answer.
15   A.    If you can repeat it.
16   Q.    I knew you were going to say that.
17   A.    Thanks.
18   Q.    Would FedEx Ground have any records in their
19   files that would include, for example, records of pay
20   periods, hours that Mr. Batiste worked and the days
21   that he worked and any tax information, such as
22   deductions, health insurance, those -- that type of
23   information?  Does FedEx -- do you have any of those
24   records in your possession?
25   A.    No.  Because the information would be purged.
```

```
 1   Q.     And is it fair to say that the information is

 2   purged because it's old?

 3   A.     Correct.

 4   Q.     Do you know how long FedEx Ground keeps records

 5   for?

 6   A.     Probably around 18 months.

 7   Q.     Really?

 8   A.     Yes.

 9   Q.     And any -- the same would apply, for example, if

10   a request was made for training records, job

11   performance evaluations, that sort of thing?

12   A.     You're getting the employee part of this and the

13   independent contractor part of this confused.  We would

14   not keep any kind of records for an independent

15   contractor.

16   Q.     And why is that?

17   A.     Because they're an independent contractor.

18   They're not employees of FedEx Ground.

19   Q.     And does that mean -- if they are not an employee

20   of FedEx, but they're an employee of FedEx Ground, it's

21   another -- it's another agency that has all those

22   records, correct, not --

23   A.     Incorrect.

24   Q.     Okay.  Correct me, then.

25   A.     An independent --
```

```
 1              MS. ARANGO:  Objection, Judge.  That's an
 2    improper question.
 3              THE COURT:  Sustained.
 4              Rephrase your question.
 5    BY MS. JHONES:
 6    Q.    Who would keep those types of records that I just
 7    mentioned, the training or the job performance
 8    evaluations?  Who would keep it, if not FedEx Ground?
 9    A.    We wouldn't keep that type of information on an
10    independent contractor.
11    Q.    Because it's not pertinent to FedEx Ground?
12    A.    Because they're not employees of FedEx Ground.
13    Q.    Okay.  Fair enough.
14              And he was not an employee of FedEx Ground and he
15    was also not an employee of FedEx.  Fair enough?
16    A.    Incorrect.  He was an employee of FedEx Ground.
17    He was a part-time package handler.
18    Q.    I'm sorry.  I'm confused, then.  Pardon me.
19    A.    Yeah.
20    Q.    He was an employee of FedEx Ground, but you would
21    not have the training records and the job performance
22    evaluations because he was an independent contractor?
23    A.    Incorrect.  We're dealing with two things here.
24    Q.    Okay.
25    A.    He started off as an employee, part-time package
```

 1   handler.

 2   Q.     In 1998?

 3   A.     Correct.

 4   Q.     Okay.

 5   A.     And then he became an independent contractor for

 6   the company.

 7          The status of a part-time package handler would

 8   not incorporate the kind of information that you're

 9   asking about.

10   Q.     So when Mr. Batiste -- what you're saying is --

11   and, by the way, what is -- how is it that you know

12   that?  What is the basis of knowledge for that?

13   A.     As far as what level or position is that with the

14   company?

15   Q.     No.

16          You would agree with me that there are no

17   longer -- there is no longer a physical file on

18   Mr. Batiste?

19   A.     Correct.

20   Q.     What I'm trying to got at -- because you were not

21   working for FedEx in 1998.  Right?

22   A.     Correct.

23   Q.     You never worked in the Chicago office?

24   A.     Correct.

25   Q.     What I'm trying to get at is:  What is your basis

1    of knowledge as to why it is that what Mr. Batiste did,

2    if anything, in 2001 would not be reflected in the

3    records of FedEx?

4    A.    They are reflected.  That's what is on the last

5    page.  He was an independent contractor during that

6    time period.

7    Q.    But you would agree with me, Ms. Marinelli, that

8    whether or not Mr. Batiste was an independent

9    contractor, as far as Government's Composite

10   Exhibit 31, is exclusively reflected by virtue of your

11   handwritten notations?

12   A.    First of all, if you could move that information

13   down so I can see it.

14   Q.    Sure.

15   A.    Can you repeat the question.

16   Q.    Sure.

17         The status of Mr. Batiste with FedEx Ground as an

18   independent contractor is reflected in the last page by

19   handwritten notations?

20   A.    Correct.

21   Q.    My question to you is:  Where in Government's

22   Exhibit Composite 31 does it reflect, other than

23   through your handwritten notes, that Mr. Batiste was an

24   independent contractor for FedEx during that time

25   period?  What other records exist, basically, is what

```
 1    I'm trying to get at, besides your handwritten notes?
 2    A.    I am not aware.
 3    Q.    And that information that was handwritten in
 4    there was retrieved by you, was obtained by you, how?
 5    A.    Through the PIT5 database.
 6    Q.    And the PIT5 database is something that you
 7    accessed on a screen?
 8    A.    Correct.
 9    Q.    Finally, does -- do you have, as the records
10    custodian for FedEx Ground, any delivery records that
11    would show the places to which Mr. Batiste made
12    deliveries, whether they were in 1998 or whether they
13    were in 1999 through 2001?  Would you have any of those
14    records in your possession?
15    A.    No.
16              MS. JHONES:  Thank you.
17              THE COURT:  Mr. Vereen?
18              MR. VEREEN:  I have no questions.
19              THE COURT:  Mr. Houlihan?
20              MR. HOULIHAN:  Nothing.
21              THE COURT:  Mr. Clark?
22              MR. CLARK:  No further questions, your Honor.
23              THE COURT:  Mr. Casuso?
24              MR. CASUSO:  No questions.  Thank you.
25              THE COURT:  Mr. Levin?
```

```
 1              MR. LEVIN:  None.  Thank you.

 2              THE COURT:  Ms. Arango?

 3              MS. ARANGO:  No redirect, Judge.

 4              THE COURT:  You may step down, ma'am.

 5              (Witness excused.)

 6              THE COURT:  We're going to break for the day.

 7         Do not discuss this case either amongst

 8    yourselves or with anyone else.  Have no contact

 9    whatsoever with anyone associated with the trial.  Do

10    not read, listen or see anything touching on this

11    matter in any way.

12              If anyone should try to talk to you about this

13    case, you should immediately instruct them to stop and

14    report it to my staff.

15              You may leave your binders at your chairs.

16    Please give your notebooks to the court security

17    officer.  I will see you Tuesday morning at 9:00.

18    Enjoy your weekend.

19              (Whereupon, the jury exited the courtroom at

20    4:18 p.m. and the following proceedings were had:)

21              THE COURT:  We're in recess until Monday at

22    2:00.

23              (End of proceedings.)

24

25
```

1                    C E R T I F I C A T E

2

3          I hereby certify that the foregoing is an

4    accurate transcription of the proceedings in the

5    above-entitled matter.

6

7

8    _____      /s/Lisa Edwards
          DATE          LISA EDWARDS, CRR, RMR
9                       Official United States Court Reporter
                        400 North Miami Avenue, Twelfth Floor
10                      Miami, Florida 33128
                        (305) 523-5499

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25