```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
                CASE NO. 06-20373-CRIMINAL-LENARD
 3

 4    UNITED STATES OF AMERICA,        Miami, Florida

 5                 Plaintiff,          March 24, 2009

 6           vs.                       9:20 a.m. to 5:42 p.m.

 7    NARSEAL BATISTE, et al.,         Volume XXVIII

 8              Defendants.       Pages 1 to 283
      --------------------------------------------------------
 9

10                          JURY TRIAL
11           BEFORE THE HONORABLE JOAN A. LENARD,
                 UNITED STATES DISTRICT JUDGE
12

13

14    APPEARANCES:

15

16    FOR THE GOVERNMENT:    RICHARD D. GREGORIE, ESQ., and
                             JACQUELINE M. ARANGO, ESQ.
17                           ASSISTANT UNITED STATES ATTORNEYS
                             99 Northeast Fourth Street
18                           Miami, Florida 33132

19

      FOR THE DEFENDANT      ANA MARIA JHONES, ESQ.
20     NARSEAL BATISTE:      300 Seville Avenue, Suite 210
                             Coral Gables, Florida 33134
21

22    FOR THE DEFENDANT      ALBERT Z. LEVIN, ESQ.
       PATRICK ABRAHAM:      261 Northeast First Street
23                           Sixth Floor
                             Miami, Florida 33132
24

25
```

```
 1   FOR THE DEFENDANT      RODERICK D. VEREEN, ESQ.
      STANLEY PHANOR:       BRINKLEY, HENRYS & LEWIS
 2                          4770 Biscayne Boulevard
                            Suite 1200
 3                          Miami, Florida 33131

 4
     FOR THE DEFENDANT      RICHARD K. HOULIHAN, ESQ.
 5    NAUDIMAR HERRERA:     300 Aragon Avenue
                            Coral Gables, Florida 33134
 6

 7   FOR THE DEFENDANT      LOUIS CASUSO, ESQ.
      BURSON AUGUSTIN:      111 Northeast First Street
 8                          Suite 603
                            Miami, Florida 33132
 9

10   FOR THE DEFENDANT      NATHAN CLARK, ESQ.
      ROTSCHILD AUGUSTINE:  17639 South Dixie Highway
11                          Miami, Florida 33157

12
     REPORTED BY:           LISA EDWARDS, CRR, RMR
13                          Official Court Reporter
                            400 North Miami Avenue
14                          Twelfth Floor
                            Miami, Florida 33128
15                          (305) 523-5499

16

17

18

19

20

21

22

23

24

25
```

1                    I N D E X

2

3                              Direct    Cross    Red.

4

5     WITNESSES FOR THE GOVERNMENT:

6

7     Wayne A. Shields            6        20       39
                                           27
8                                          32

9     Kenneth Joseph             40        44       54
                                           46
10

11    Jesse Lee Rathel           55        92      120
                                          104
                                          107
12

13    Lisa Lamey                131       144
                                          146

14    Harold Medina             191       200

15    Michelle Thompson         201       208
                                          214
16

17    Timothy John Scott        220       233      251

18

19

20

21

22

23

24

25

1

<u>EXHIBITS RECEIVED IN EVIDENCE:</u>                          <u>PAGE</u>

2

3   Government's Exhibit Nos. 143 & 143-A              14
    Government's Exhibit Nos. 21 through 28            81
4   Defendant Batiste's Exhibit Nos. C-13
      through C-20                                     96
5   Government's Exhibit Nos. 126-A
      through 126-F                                    133
6   Government's Exhibit Nos. 125, 125-A
      & 125-B                                          139
7   Government's Exhibit Nos. 125-C
      through 125-O                                    139
8   Government's Exhibit Nos. 153-A
      & 153-B                                          194
9   Government's Exhibit Nos. 154-A
      through 154-I                                    196
10  Government's Exhibit No. 156                       198
    Government's Exhibit Nos. 155-A
11    & 155-B                                          198
    Government's Exhibit No. 147                       224
12  Government's Exhibit No. 148                       232
    Government's Exhibit Nos. 150, 151 & 152           253

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Good morning.
 2              United States of America versus Narseal
 3    Batiste, et al., Case No. 06-20373.
 4              Counsel, state your appearances, please, for
 5    the record.
 6              MR. GREGORIE:  Good morning, your Honor.
 7              Richard Gregorie and Jacqueline Arango on
 8    behalf of the United States.
 9              MS. JHONES:  Ana Jhones on behalf of Narseal
10    Batiste, who is present.
11              MR. LEVIN:  Albert Levin for Patrick Abraham,
12    who's present.
13              MR. CASUSO:  Good morning, your Honor.
14              Lou Casuso on behalf of Burson Augustin, who's
15    present.
16              MR. CLARK:  Good morning, your Honor.
17              Nathan Clark for Rotschild Augustine, who's
18    present.
19              MR. HOULIHAN:  Richard Houlihan with Naudimar
20    Herrera.
21              MR. VEREEN:  Good morning, your Honor.
22              Roderick Vereen on behalf of Stanley Phanor,
23    who's present.
24              THE COURT:  All Defendants are present.
25              The jurors are here.
```

```
 1              Let's bring them in.

 2              (Whereupon, the jury entered the courtroom at

 3    9:20 a.m. and the following proceedings were had:)

 4              THE COURT:  You may be seated.

 5              Good morning, ladies and gentlemen.

 6              THE JURY:  Good morning.

 7              THE COURT:  Call your next witness.

 8              MR. GREGORIE:  The United States calls Wayne

 9    Shields to the stand, please.

10    Thereupon--

11                    WAYNE A. SHIELDS

12    was called as a witness by the Government and, having

13    been first duly sworn, testified as follows:

14              THE COURTROOM DEPUTY:  Thank you.

15              You may be seated.

16              And if you could state your name and spell

17    your last name.

18              THE WITNESS:  Wayne A. Shields, S-h-i-e-l-d-s.

19                    DIRECT EXAMINATION

20    BY MR. GREGORIE:

21    Q.    Good morning, Mr. Shields.

22    A.    Good morning.

23    Q.    Can you tell us, sir, how you're employed.

24    A.    Yes.  Currently I am a court security officer

25    with the federal court system.  Specifically, it's Akal
```

Shields - DIRECT - By Mr. Gregorie                    7

```
 1   Security, A-k-a-l.
 2   Q.    And prior to that job, how were you employed?
 3   A.    Prior to that, I was employed for 27 years as a
 4   special agent with the Federal Bureau of Investigation.
 5   Q.    And what was your last assignment?  What was your
 6   last duty station with the FBI?
 7   A.    My last duty station was working surveillance
 8   matters in the Miami division.
 9   Q.    And were you so employed in 2006?
10   A.    I was.
11   Q.    And directing your attention to April 11th of
12   2006, do you remember where you were on that particular
13   day?
14   A.    Yes.  On that particular day, April 11, 2006, we
15   were asked by the agents that are conducting the trial
16   right now conduct a surveillance.  They asked us to
17   begin and initiate the surveillance at the
18   Ft. Lauderdale/Hollywood International Airport.
19   Q.    Prior to going on that surveillance, did you have
20   a meeting with other FBI agents?
21   A.    Yes.  We had a meeting with other agents about
22   the photographs that we had been given by the case
23   agents to identify the people that we were to surveil.
24   Q.    Prior to this surveillance, had you been involved
25   in other surveillances regarding this particular case?
```

```
 1    A.    Yes.  We had been -- my team had been involved in
 2    a number of surveillances regarding this case before
 3    the airport surveillance.
 4    Q.    And had you observed and identified individuals
 5    involved in this case during those surveillances?
 6    A.    Yes.  We had identified individuals connected
 7    with this case on previous surveillances.
 8    Q.    Now, on April the 11th, 2006, can you tell us
 9    approximately where you were when the surveillance
10    began.
11    A.    Yes.  We initiated the surveillance at 9:45 a.m.
12    at the Ft. Lauderdale International Airport.  And we
13    set up our surveillance.
14          We were in the arrivals section.  Our
15    surveillance was -- our vehicles were out just waiting
16    at the arrivals section, looking for two individuals
17    specifically that we were told to look for.
18    Q.    Did you have any particular type of equipment
19    with you to assist you in this surveillance?
20    A.    Yes.  I had a video recorder and photographic
21    equipment.
22    Q.    Were you there by yourself or was there someone
23    in the car with you?
24    A.    No one was in the car with me.
25    Q.    Did you attempt to take surveillance?
```

Shields - DIRECT - By Mr. Gregorie                    9

```
 1   A.      I did.

 2   Q.      Were you able to do that continuously?

 3   A.      No.  I wasn't able to take continuous video

 4   because we left the Ft. Lauderdale/Hollywood airport

 5   location and we went to another location.

 6           So there are spots where I had to stop the video

 7   and then resume it later on when I actually had a

 8   picture.

 9   Q.      I take it -- is there somebody with you in the

10   car?

11   A.      No.  There was nobody in the car with me.  There

12   were other agents helping me in other cars during the

13   surveillance.

14   Q.      So I take it -- while you were driving, could you

15   take video?

16   A.      No, I could not.  Not while I was driving.

17   Q.      Now, sir, could you tell us what you observed on

18   April 11th, 2006, at the Ft. Lauderdale International

19   Airport.

20   A.      Well, we observed an individual by the name of

21   Sultan Kahn-Bey.  He was accompanied by a lady named

22   Betty Davison.

23           We saw them emerge from the

24   Ft. Lauderdale/Hollywood terminal and they put their

25   baggage down and they appeared to be waiting for
```

1    someone to pick them up.

2            I was able to take video of this.

3    Q.    Could you tell us how they were dressed.

4    A.    Yes.  They were dressed very distinctly.  Mr. Bey

5    was dressed in a purple and black robe.  He had a fez

6    on his head, a type of tall cap with a tassel on it.

7            And Mrs. Bay was dressed similar.  She had a

8    black robe and a purple head covering.

9            One distinctive thing about Mr. Bey was he had

10   the Masonic emblem on his chest.  A Masonic emblem

11   is -- at the top of it is a compass, the kind that you

12   would use in math equations.  The bottom is a square, a

13   90-degree angle.  And in the middle is the letter "G."

14   That's the Masonic emblem.

15           He had that on his chest.  He also had it on a

16   black book that he was carrying.

17   Q.    Now, what happened?  Who, if anyone, met them at

18   the Ft. Lauderdale International Airport that you could

19   identify?

20   A.    Twenty minutes into the surveillance, Mr. Bey got

21   a light from somebody, another gentleman, for a

22   cigarette.  We determined that was inconsequential.

23           But about 50 minutes into their wait, a green

24   Savannah GMC van showed up.  It had Florida license W29

25   TAQ.  And there was a flurry of activity after that van

1    arrived.

2         We saw a number of individuals, three individuals

3    that I could identify.

4         There was Minerva Vasquez Hernandez, who was

5    dressed in a gold robe and a gold cap.  She was talking

6    to Ms. Davison.

7         There was three young men dressed in what I would

8    describe as black military-type uniforms.  Two of those

9    individuals were Rotschild Augustine and Stanley

10   Phanor.

11        There was another young man that I couldn't

12   identify.

13        And shortly after they arrived, they loaded the

14   luggage up into the van and departed the airport.

15   Q.   And where did they go, if you know?  Did you

16   follow them, first of all?

17   A.   We did follow them.  I was able to get video of

18   all this activity at the airport.

19        Then we followed them to -- well, about

20   45 minutes into the journey, going southbound towards

21   Miami.

22        Now, during our journey, we observed -- there was

23   another vehicle riding in tandem with them together.

24   It was a white Jeep Cherokee.  It had license plate,

25   Florida, X54 JNK.

1          And these vehicles were just driving in tandem,

2     the green van and the white Cherokee.

3          About 45 minutes into their journey, they arrived

4     at Joe's Foodland Supermarket.  Briefly some

5     individuals got out of the vehicles, went in the

6     supermarket, spent a few minutes.  Some people just

7     remained in the vehicles.  And then shortly thereafter,

8     the vehicles departed.

9          Then they arrived at 6260 Northwest 15th Avenue,

10    also known to us as "the Embassy."  And at the -- this

11    address, the van arrived.  The Cherokee arrived.  I was

12    able to get video of this arrival.

13         They were met by other individuals in these black

14    military-type outfits I've described earlier.

15         I saw the parties from the two vehicles enter

16    the address, and it appeared that these gentlemen in

17    black military-type attire were standing sentry or

18    standing guard on either side of the entrance at

19    6260 Northwest 15th Avenue.

20    Q.    Did you see any other of those individuals so

21    attired in the black military-type uniforms anywhere

22    else around the premises?

23    A.    Yes.  I saw one individual in the black uniform

24    up on top of the roof, and I saw another -- I took

25    video of that -- and another individual who was walking

Shields - DIRECT - By Mr. Gregorie                    13

1    around the property, again with the black uniform.

2    Q.    Sir, was there any sort of decorative items on

3    this building when you saw it, any items of any kind?

4    A.    Yes.  There was an American flag flying in the

5    front, and there was also another flag which was red in

6    color, a solid red color of flag, flying about 10 feet

7    to the side of the American flag.

8    Q.    I'm now going to show you what's been marked as

9    Government's Exhibit 143 for identification.

10         MR. GREGORIE:  May I approach the witness,

11   your Honor?

12         THE COURT:  Yes.

13   BY MR. GREGORIE:

14   Q.    Now showing you, sir, what's marked as 143 and

15   143-A for identification, do you did recognize those,

16   sir?

17   A.    Yes.

18   Q.    And can you tell the jury what those are, please.

19   A.    Exhibit 143 is the cassette tape that I took of

20   the video on that date, April 11th, 2006.

21   Q.    And what is 143-A?

22   A.    143-A is a disc made off of the cassette tape

23   that I took of the video.

24   Q.    Does the disc contain the same contents as the

25   original tape itself?

1    A.    Yes.

2    Q.    Have you examined 143 and 143-A to determine

3    whether or not they contain a true and accurate

4    depiction of what you saw on that day?

5    A.    I have.  And they do contain a true and accurate

6    depiction.

7    Q.    Have there been any deletions or alterations to

8    those pieces of evidence?

9    A.    No, there has not.

10   Q.    Do they fairly and accurately depict what you

11   were able to videotape on that surveillance?

12   A.    Yes.

13         MR. GREGORIE:  Your Honor, I move 143 and

14   143-A for evidence.

15         MS. JHONES:  No objection, your Honor.

16         THE COURT:  They will be admitted as

17   Government's Exhibits 143 and 143-A.

18         (Whereupon, Government's Exhibit No. 143 and

19   143-A were entered into evidence.)

20         THE COURT:  You may publish.

21         MR. GREGORIE:  Your Honor, you said I may

22   publish?  I'm sorry.

23         THE COURT:  Yes.

24         MR. GREGORIE:  Thank you.

25

 1   BY MR. GREGORIE:

 2   Q.    Sir, I'd like you to look at the screen.  It

 3   should appear right in front of you.

 4         Would you tell the jury as best you can what we

 5   are looking at as the video unfolds.

 6              (Whereupon, segments of Government's Exhibit

 7   No. 143-A were published in open court.)

 8              THE WITNESS:  Right now, we are looking at the

 9   airport environment and people milling around now.

10              There's Mrs. Davison and there's Mr. Bey.  You

11   can see that Mr. Bey has got the black and purple robe

12   with the red fez, and Ms. Davison has the purple head

13   covering with the black robe.

14   BY MR. GREGORIE:

15   Q.    Okay.

16   A.    There they appear to be waiting with their

17   baggage.

18         I may have moved the car at some spots and then

19   restarted the video.

20              MR. GREGORIE:  Can you stop it there one

21   second.

22   BY MR. GREGORIE:

23   Q.    Sir, can you see the emblem on the robe that you

24   mentioned?

25   A.    Yes.  The emblem in gold on his left breast is

Shields - DIRECT - By Mr. Gregorie                    16

```
 1    the Masonic emblem.
 2    Q.    Thank you.
 3              MR. GREGORIE:  Continue, please.
 4              (Whereupon, segments of Government's Exhibit
 5    No. 143-A were published in open court.)
 6              THE WITNESS:  Now, here's the -- 20 minutes
 7    into their wait, he's asking for a light from this
 8    gentleman.  We determined that it was no relation.
 9              (Whereupon, segments of Government's Exhibit
10    No. 143-A were published in open court.)
11              MR. GREGORIE:  Stop it there a second.
12    BY MR. GREGORIE:
13    Q.    Sir, can you see some sort of emblem on the right
14    side of Sultan Kahn-Bey's robe?
15    A.    Yes.  It's a red emblem, and I'm not familiar
16    with it.
17    Q.    Okay.
18    A.    I didn't get a good enough look at it.
19    Q.    Thank you.
20              MR. GREGORIE:  Continue --
21    BY MR. GREGORIE:
22    Q.    And in his hand -- in his left hand, what is he
23    carrying?
24    A.    In his left hand, he has the black book with the
25    Masonic emblem in gray or silver.
```

1          MR. GREGORIE:  Continue, please.

2          (Whereupon, segments of Government's Exhibit

3  No. 143-A were published in open court.)

4          THE WITNESS:  Right here, we're going to have

5  some activity.  There's Mrs. Davison.

6          There is Augustine Rotschild.  There is -- and

7  Stanley Phanor.  They are -- they're going to be taking

8  baggage from Mrs. Bay.  In the gold back there, hugging

9  Mrs. Bay is Minerva Vasquez Hernandez.

10  BY MR. GREGORIE:

11  Q.    Do you know, what, if any, her relationship was

12  to any Defendant in this case?

13  A.    I believe she was the wife of Narseal Batiste.

14          So they have gone ahead and loaded baggage into

15  the vehicle.

16          (Whereupon, segments of Government's Exhibit

17  No. 143-A were published in open court.)

18          THE WITNESS:  Mr. Bey just came into the

19  picture.

20          (Whereupon, segments of Government's Exhibit

21  No. 143-A were published in open court.)

22          THE WITNESS:  This is the arrival at

23  6260 Northwest 15th Avenue.  I had shut the video off

24  on our surveillance to this location.

25          Now I've turned it back on, and we can see

1   some of the individuals we saw at the airport entering,

2   specifically, Mrs. Davison, Rotschild Augustine,

3   Minerva Vasquez Hernandez.

4          MR. GREGORIE:  Continue.

5          (Whereupon, segments of Government's Exhibit

6   No. 143-A were published in open court.)

7          THE WITNESS:  Stanley Phanor is going to be

8   walking behind this child.  Yes.

9          They entered in --

10         MR. GREGORIE:  Stop it there one second.

11  BY MR. GREGORIE:

12  Q.    The individuals in the black clothes:  What, if

13  anything are, they doing?

14  A.    The individuals in the black clothing are --

15  they greeted the individuals from the two vehicles.

16  They appeared to be standing guard or sentry out

17  front, one on each side of the door entrance to

18  6260 Northwest 15th Avenue.

19         MR. GREGORIE:  Continue, please.

20         (Whereupon, segments of Government's Exhibit

21  No. 143-A were published in open court.)

22         THE WITNESS:  There you see another picture of

23  the sentries.

24  BY MR. GREGORIE:

25  Q.    Can you see something waving up at the top of the

1    screen?

2    A.    Yes.  There's a red flag waving at the top of the

3    screen.  And, also, there's an American flag waving to

4    the left of it.

5    Q.    Okay.  What are we looking at now?

6    A.    This is another individual in one of the black

7    uniforms that is on the roof at 6260 Northwest 15th

8    Avenue.

9              MR. GREGORIE:  Can you continue, please.

10             (Whereupon, segments of Government's Exhibit

11   No. 143-A were published in open court.)

12             THE WITNESS:  This is an individual also

13   dressed in the black uniform.  Appears to be patrolling

14   in the side yard.

15             (Whereupon, segments of Government's Exhibit

16   No. 143-A were published in open court.)

17   BY MR. GREGORIE:

18   Q.    Was that the end of the video?

19   A.    That was the end.

20   Q.    Did you break off your surveillance at that

21   point?

22   A.    No.  We did not break it off until later in the

23   day.

24   Q.    Did anyone leave the Embassy after the arrival?

25   A.    Yes.  At one point, we saw Mr. Bey walk out of

1    the Embassy accompanied by a black male in a black

2    robe.

3         Mr. Bey talked to the two guards at the front of

4    the entrance, and then subsequently he and the

5    black-robed individual went back into the Embassy.

6         Now, later on, we saw Mr. Bey again come out of

7    the Embassy, and he was accompanied by two individuals

8    in the black uniforms.  He walked west on

9    Northwest 62nd Terrace all the way to Northwest 17th

10   Avenue.

11        He appeared to be looking around at the

12   neighborhood.  And he -- at one point, he took off his

13   robe.  And subsequently he and the other two

14   individuals went back to the Embassy.

15   Q.    And does that conclude your observations on that

16   day?

17   A.    Yes.  That concludes.

18        MR. GREGORIE:  No further questions, your

19   Honor.

20        THE COURT:  Ms. Jhones?

21                    CROSS-EXAMINATION

22   BY MS. JHONES:

23   Q.    Good morning, sir.

24   A.    Good morning.

25   Q.    Mr. Shields, you are presently employed.

1    Correct?

2    A.    Yes.

3    Q.    And in 2006, when you were conducting this

4    surveillance, you had been working for the FBI.

5    Correct?

6    A.    That's correct.

7    Q.    And you had been -- as of 2006, I think you had

8    been with the FBI for approximately 27 years?

9    A.    Yes.  That's correct.

10   Q.    All righty.  And you went into retirement?

11   A.    Yes, ma'am.

12   Q.    Then you came out of retirement?

13   A.    I came out of retirement.  Yes.

14   Q.    And in 2006, you were assigned, were you not,

15   sir, to the, I guess, surveillance team, the

16   surveillance squad?

17   A.    Yes.

18   Q.    That's for the FBI?

19   A.    Yes.

20   Q.    All righty.  You testified earlier that you had

21   conducted numerous surveillances in this case.

22   Correct?

23   A.    Yes.  We had conducted previous surveillances in

24   the case.

25   Q.    Specifically, these surveillances that you had

```
 1   conducted prior to April 11th:  Approximately how many
 2   had you conducted, sir?
 3   A.     Approximately 10 to 15.
 4   Q.     And those 10 to 15 surveillances that you had
 5   conducted, Mr. Shields:  In what area of Miami had you
 6   conducted them?
 7   A.     Well, in the area that we just saw where the
 8   Embassy was located, at 6260 Northwest 15th Avenue, we
 9   had a number of them.
10          There were also other surveillances at, I
11   believe, construction areas.  And I can't -- I don't
12   have the addresses come to my mind right now.
13   Q.     So is it fair to say, sir, that of -- well, you
14   had approximately 10 surveillances at the Embassy
15   location -- the place that you have stated is the
16   Embassy location.  Correct?
17   A.     Correct.
18   Q.     That's the place in Liberty City?
19   A.     Yes.
20   Q.     And you gave us a number of approximately
21   10 surveillances you conducted there?
22   A.     Yes.
23   Q.     Approximately how many other surveillances did
24   you conduct at the construction site areas?  Just an
25   approximate number.
```

Shields - CROSS - By Ms. Jhones                23

1    A.      I'm going to say another 10.

2    Q.      And is it fair to say, Mr. Shields, that when you

3    conducted these surveillances at these construction

4    site areas, that they were throughout both Dade and

5    Broward County?

6    A.      I believe they were.

7    Q.      During the time periods that you were -- and

8    during the time periods that you were conducting these

9    surveillances, it is at that point that you were able

10   to familiarize yourself with some of the people that

11   you have identified in the video of April 11th of 2006?

12   A.      Yes.

13   Q.      And -- but, nevertheless, on April 11th, 2006,

14   prior to going to the Ft. Lauderdale airport to conduct

15   your surveillance, you had a debriefing with other

16   members of the surveillance squad team.  Correct?

17   A.      Yes.

18   Q.      On that occasion, you were provided by someone in

19   the squad or someone in the FBI -- they provided you

20   photographs.  Correct?

21   A.      That's correct.

22   Q.      And the purpose of those photographs was so you

23   could identify the people, look out for the people,

24   that you were expecting to be present at the airport

25   location?

1    A.    Yes.

2    Q.    Now, in addition to these surveillances -- well,

3    going to the previous 10 surveillances that you

4    conducted at the Liberty City location, would it be

5    fair to say, sir, that you did those surveillances both

6    during the day as well as during the night, later hours

7    of the afternoon, nighttime?

8    A.    I can't recall doing any at night.  I could have,

9    but I don't recall doing any at night.  I specifically

10   remember during the day.

11   Q.    And do you recall, sir, when you conducted those

12   surveillances at the Liberty City location, what

13   observations you made?

14   A.    Well, at those -- we made observations of

15   different subjects in the case that we were to look for

16   and that we had photographs of, predominantly Narseal

17   Batiste, Stanley Phanor, the Rotschild (verbatim)

18   brothers.

19   Q.    And you basically could not -- during the

20   surveillances, you just basically saw them coming in

21   and out of the Liberty City location.  Correct?

22   A.    That's correct.  We really couldn't get too close

23   to the location.

24   Q.    And you saw a lot of activity in terms of

25   working -- construction work in that area as well, sir?

1   A.      Not in the Liberty City area.  I believe that was

2   more up in perhaps Broward County.

3   Q.      And in Broward County, when you did your

4   surveillances, did you ever go to a Days Inn, for

5   example?

6   A.      Yes.  I believe we did.

7   Q.      And there were -- was there other business

8   establishments that you visited where you observed

9   these individuals -- Mr. Batiste and others -- working

10  at these other places?

11  A.      Well, not actually working.  But it appeared that

12  they were dressed for construction and that they were

13  going to a construction area where they would

14  presumably work.

15          But there was also -- I mean, other than the

16  construction areas, there were other areas that we saw

17  them at.

18  Q.      Such as Home Depot -- going to Home Depots to buy

19  materials?

20  A.      I believe we saw them at Home Depot.  I believe

21  we saw them at some -- a military-type store that had

22  different types of weapon paraphernalia and a -- banks.

23  We saw them go to banks.

24  Q.      ATM machines?

25  A.      Not ATM machines.  I think that they just went in

1    the bank and met with people.  They went in the bank

2    and met with banking personnel.

3    Q.     Fair to say you didn't go into the banks and

4    interview the people they had met with?

5    A.     I did not.  But I did go into the bank and saw

6    who they were meeting with.  I possibly could have

7    recorded the name of the personnel that they were

8    meeting with.

9          I would do that as a -- I would usually try to do

10   that and give the case agents as much information as I

11   can.  So if I went into a bank, I would try to get the

12   name of the person they met with.

13         It wouldn't necessarily be going up and asking

14   them.  I could see a name tag on their desk or that

15   type of thing.

16   Q.     I understand.

17         And did you generate any reports in this regard?

18   A.     Well, every time we surveilled the individuals

19   involved in this case, we generated a surveillance log.

20   Q.     And going back to your observations in the

21   Liberty City area, did you also observe children in

22   that area going in and out of the Embassy location?

23   A.     On the video that we just watched, there was a

24   child going in.

25   Q.     Prior to April 11th, did you make those

```
 1    observations during your surveillances?

 2    A.     I can't recall.

 3    Q.     How about in the construction sites, sir?  Did

 4    you ever see -- you identified Minerva Vasquez, did you

 5    not --

 6    A.     Yes.

 7    Q.     -- on the -- 4-11?

 8           Did you ever see her at any construction sites?

 9    A.     I don't believe so.

10    Q.     How about any of the children?

11    A.     No.  I don't recall seeing any of the children.

12           MS. JHONES:  Thank you, sir.

13           THE WITNESS:  Yes.

14                         CROSS-EXAMINATION

15    BY MR. VEREEN:

16    Q.     Good morning, Mr. Shields.

17    A.     Good morning, Mr. Vereen.

18    Q.     With regard to your surveillance back on April

19    the 11th of 2006, you said, initially, you were given

20    pictures as to who you should be on the lookout for.

21    Correct?

22    A.     Correct.

23    Q.     Who were those pictures of?

24    A.     We were given pictures of Sultan Kahn-Bey and

25    Betty Davison.
```

1    Q.    Do you know where those pictures came from?

2    A.    The case agent who is directing this case.

3    Q.    And you did not have any pictures of any of these

4    Defendants at the time, did you?

5    A.    Yes, sir, we did.  We had received pictures

6    previous to the surveillance of all the Defendants.

7    Q.    So you were familiar with who they were before

8    you saw them at the airport.  Is that correct?

9    A.    Yes, sir.

10   Q.    When you saw Sultan Kahn-Bey, as you testified,

11   he was wearing this fez; was he not?

12   A.    Yes.

13   Q.    This is the maroon-colored hat?

14   A.    Yes, sir.

15   Q.    He was wearing this robe that you said had a

16   Masonic emblem on it?

17   A.    Correct.

18   Q.    Now, were you able to see what the other emblem

19   was on the right side of his chest?

20   A.    I saw that it was red in color against the black

21   background.  But I didn't see it clear enough to

22   determine what it was.

23   Q.    You did not see any numbers on the robe itself,

24   did you?

25   A.    No.

1    Q.     You didn't see any circles on the robe, did you?

2    A.     No.

3    Q.     So the only emblem that you saw was the compass,

4    the square and the "G," the Masonic emblem.  Correct?

5    A.     Correct.

6    Q.     Now, you do not know whether Sultan Kahn-Bey is

7    actually a member of the Masonic family, do you?

8    A.     I do not.

9    Q.     The uniforms that you saw Stanley Phanor and a

10   couple of other gentlemen wearing on April the 11th,

11   2006, did not have a Masonic emblem on it, did it?

12   A.     I didn't see a Masonic emblem on them.

13   Q.     You saw a security badge, a patch, on the

14   shoulder; did you not?

15   A.     I saw gold patches.  I didn't get in close enough

16   with my eyes or with the video to determine what the

17   patches said.

18   Q.     And this was a typical black Dickie outfit that

19   they were wearing?

20   A.     It was a black uniform, gold patches on the upper

21   sleeve.

22   Q.     And when they went to pick Mr. Kahn-Bey up, you

23   did not see any saluting of any sort going on, did you?

24   A.     No.

25   Q.     You testified about a gentleman on the roof, and

1    I think you videotaped him on the roof.

2          Do you recall that?

3    A.    Yes.

4    Q.    Isn't it a fact that that gentleman had just put

5    the two flags on top -- or into the flagpole holders?

6    A.    Yes.

7    Q.    You did not see any of the individuals carrying

8    any weapons of any sort on that day, did you?

9    A.    No.

10   Q.    You didn't see any marching going on anytime

11   during your surveillance.  Correct?

12   A.    Correct.

13   Q.    You didn't see any type of military training, did

14   you?

15   A.    Correct.

16   Q.    Now, you stated that, at some point in time --

17   and I think this is when the camera was not rolling --

18   you saw Sultan Kahn-Bey and another individual walking

19   around in the neighborhood.

20   A.    Yes.

21   Q.    Do you know what, if anything, they were doing?

22   A.    Mr. Bey appeared to be looking around at the

23   neighborhood, and he was accompanied by two of the

24   individuals in the black uniforms.

25   Q.    And were they conversing with Mr. -- with Sultan

1    Kahn-Bey during the time -- during the period that they

2    were walking?

3    A.    Yes.

4    Q.    Did you see them stop anyone in the neighborhood

5    and engage them in a conversation?

6    A.    No.

7    Q.    During one of your other surveillances, I think

8    you testified that you conducted surveillance on

9    163rd Street.

10   A.    I believe on 163rd Street.  I'm not sure.  That

11   could be a residence that was connected to this case.

12   Q.    Did you ever conduct surveillance when you saw

13   any of these Defendants go to a martial arts store?

14   A.    Yes.

15   Q.    When was that, if you recall?

16   A.    That was before this surveillance in April, 2006.

17   I would estimate anywhere from one to three weeks

18   before this surveillance.

19   Q.    Was there a videotape of that as well?

20   A.    You know, I'm not sure.  There may be.

21         MR. VEREEN:  That's all the questions I have.

22         Thank you, Mr. Shields.

23         THE WITNESS:  Thank you.

24         THE COURT:  Mr. Houlihan?

25         MR. HOULIHAN:  No questions.

```
 1              THE COURT:  Mr. Clark?

 2              MR. CLARK:  No further questions, your Honor.

 3              THE COURT:  Mr. Casuso?

 4              MR. CASUSO:  No questions, your Honor.

 5              THE COURT:  Mr. Levin?

 6              MR. LEVIN:  Just a few, your Honor.

 7              Good morning, ladies and gentlemen.

 8              THE JURY:  Good morning.

 9                      CROSS-EXAMINATION

10   BY MR. LEVIN:

11   Q.    Good morning, Special Agent -- or Former Special

12   Agent Shields.  You're still special, but you're a

13   former agent.  Good morning.

14   A.    Thank you.  Good morning.

15   Q.    Now, a couple of questions with regard to your

16   involvement in this case.

17          You had indicated that you did surveillance

18   primarily in the daytime.  Correct?

19   A.    Yes.

20   Q.    And the video that you took -- can you tell us

21   approximately where you were situated physically when

22   the video was taken by the 6260 location.

23   A.    I was south of the location.  I was looking up

24   Northwest 15th Avenue.  I was right around

25   Northwest 62nd Terrace and with -- my video was pointed
```

Shields - CROSS - By Mr. Levin                    33

1    north and west up towards the Embassy.

2         Actually, I believe, as I recall, I was at an

3    intersection and I may have been holding up traffic at

4    some point.  But I was trying to get the video.

5    Q.    And you had surveilled this area, as you

6    previously testified about, on 10 separate occasions?

7    A.    Yes, sir, approximately.

8    Q.    So, really, it wasn't terribly difficult to do

9    surveillance at this location.

10        Would you agree with that, sir?

11   A.    Well, I wouldn't agree for the following reason:

12   It was a tough area to have a surveillance.  It was a

13   tough area to have -- not be detected by the subjects

14   that we were surveilling.

15        So although being familiar with it, I just

16   considered it a very tough area to try to see anything

17   without being detected ourselves.

18   Q.    But you were able to take a video on this

19   particular occasion?

20   A.    Yes, sir.

21   Q.    You were able to do surveillance on approximately

22   10 other occasions.  Correct?

23   A.    Yes.

24   Q.    And you also had capabilities -- or did you have

25   capabilities to also take surveillance videos during

Shields - CROSS - By Mr. Levin                                      34

```
 1   the evening hours with the technology that the FBI had?
 2   A.    Well, I have never taken video at night.  At a
 3   certain point, you just don't get a picture.
 4   Q.    You would agree with me, sir, that there is
 5   technology where videos can be taken during the evening
 6   time?
 7   A.    I can't recall.  But that very well may be.
 8   Q.    You're familiar with the interdiction of people
 9   are that are brought over on boats and videos being
10   taken of them at nighttime --
11         MR. GREGORIE:  Objection, your Honor.
12   BY MR. LEVIN:
13   Q.    -- by the Coast Guard?
14         MR. GREGORIE:  Relevance.  And it's outside
15   the scope of direct, your Honor.
16         MR. LEVIN:  It deals with the issue of
17   surveillance.
18         THE COURT:  Sustained.
19   BY MR. LEVIN:
20   Q.    You are aware, sir, that there are cameras that
21   are capable of photographing at night; are you not,
22   sir?
23   A.    I'm sure there are.
24   Q.    Now, outside of this location was an American
25   flag.  Correct?
```

```
 1   A.      Yes.

 2   Q.      And the condition of this flag was -- it was in

 3   good condition; was it not?

 4   A.      It appeared to be good condition.

 5   Q.      It wasn't torn or tattered in any way?

 6   A.      No.

 7   Q.      And this flag appeared in front of the

 8   6260 location?

 9   A.      Yes.

10   Q.      Now, you had indicated that you had also done

11   surveillance and you had seen some of the individuals

12   go into banks.

13           Do you recall that?

14   A.      Yes.

15   Q.      I believe you also indicated that you followed

16   up by going into these banks and trying to acquire

17   information with regard to what activity had occurred

18   inside the bank.  Is that accurate?

19   A.      That's accurate.

20   Q.      Now, you also said that you did surveillance

21   where you observed some of these individuals go into

22   what you described as a military-type store that sold

23   weapons and other paraphernalia.

24           Do you recall that?

25   A.      I think Mr. Vereen described it better.  They
```

```
 1   were martial arts-type places.
 2   Q.    So when you testified on direct examination that
 3   the surveillance you did -- I believe it was your
 4   testimony -- was by military-type stores where there
 5   was weapons paraphernalia, in truth and in fact, you
 6   were referring to martial arts supply stores?
 7             MR. GREGORIE:  Objection, your Honor.  First,
 8   it was not on direct.  It was on cross-examination,
 9   your Honor.
10             THE COURT:  Sustained.
11             Rephrase your question.
12   BY MR. LEVIN:
13   Q.    You've testified either on direct or
14   cross-examination that you surveilled some individuals
15   going into a military-type store where weapons and
16   other weapon-type paraphernalia was sold.
17             MR. GREGORIE:  Objection, your Honor --
18   BY MR. LEVIN:
19   Q.    Do you recall that testimony?
20             MR. GREGORIE:  -- to the form of the question.
21             THE COURT:  Sustained.
22             Rephrase your question.
23   BY MR. LEVIN:
24   Q.    Have you testified, sir, that you surveilled
25   individuals going into a military-type store where
```

1   weapons and other paraphernalia were sold?

2   A.     Yes.

3   Q.     Did you, in fact, go into that so-called

4   military-type store where weapons paraphernalia was

5   sold and follow up with regard to the activity that

6   occurred inside of that store?

7   A.     No.  I did not go in.

8   Q.     What you were really referring to, as I believe

9   you just testified, was -- you said Mr. Vereen

10  described it better -- was a martial arts supply store?

11  A.     I would say that's accurate.

12  Q.     And not a military-type store where weapons and

13  other paraphernalia were sold?

14  A.     Well, I just am of the opinion that martial arts

15  can be a type of weapon.  Martial arts paraphernalia

16  could be a type of weapon.

17  Q.     There's a video of that activity?

18  A.     I'm not sure.  Whenever I was on surveillance, I

19  tried to take video whenever possible.  I don't know if

20  there is one.

21  Q.     You would try to take video because you wouldn't

22  want the -- for later preservation, to preserve the

23  evidence.  Is that correct?

24  A.     Yes.  I like to give the agents as much

25  information as I could.  And pictures and video are an

```
 1    aspect that we try to give them.
 2    Q.    The picture would tell a better story than what
 3    you might be able to relate through your account of
 4    what you observed.  Correct?
 5              MR. GREGORIE:  Objection, your Honor.
 6    Argumentative.
 7    BY MR. LEVIN:
 8    Q.    Would you --
 9              THE COURT:  Sustained.
10    BY MR. LEVIN:
11    Q.    Would you agree with me, sir, that a picture
12    would provide a more accurate account of what your
13    observations were as opposed to your recollection or
14    you describing what you had seen?
15              MR. GREGORIE:  Objection.  Calls for
16    speculation, your Honor, and it's argumentative.
17              THE COURT:  Sustained.
18    BY MR. LEVIN:
19    Q.    It was your practice, sir, to memorialize, was it
20    not, in video or through photography, your observations
21    on surveillance?  Correct, sir?
22    A.    Whenever possible.
23              MR. LEVIN:  I have no further questions.
24    Thank you.
25              THE COURT:  Mr. Gregorie?
```

                          REDIRECT EXAMINATION

1

2    BY MR. GREGORIE:

3    Q.     Sir, you said you went into the banks to try to

4    identify bank employees.  Is that correct?

5    A.     Correct.

6    Q.     Did you actually speak to those employees?

7    A.     No.

8    Q.     Why not?

9    A.     Because I did not want to let them know I was

10   conducting an investigation.  I wanted to keep it

11   discreet.

12   Q.     How about the martial arts store?  Why didn't you

13   go into the martial arts store?

14   A.     There wasn't a lot of people in it at the time.

15   I felt that, for security's sake of the case, that I

16   would not go in.

17   Q.     You said this was a martial arts-type store.

18          What -- how, if at all, did you identify that

19   store, sir?

20   A.     There was a title of the company on the outside

21   of the building, which I can't recall what it is.

22          MR. GREGORIE:  I have no further questions,

23   your Honor.

24          THE COURT:  You may step down, sir.

25          (Witness excused.)

```
 1            THE COURT:  Call your next witness.

 2            MR. GREGORIE:  The United States calls Kenneth

 3   Joseph.

 4   Thereupon--

 5                    KENNETH JOSEPH

 6   was called as a witness by the Government and, having

 7   been first duly sworn, testified as follows:

 8            THE COURTROOM DEPUTY:  Please have a seat.

 9            State your full name.

10            THE WITNESS:  Kenneth Joseph.

11                    DIRECT EXAMINATION

12   BY MR. GREGORIE:

13   Q.    Sir, would you tell the Court and jury, please,

14   how you're employed.

15   A.    I'm employed as a detective with the City of

16   Miami Police Department in the Internal Affairs Bureau.

17   Q.    And how long have you been with the City of Miami

18   Police Department?

19   A.    Approximately four years.

20   Q.    Now, sir, on approximately April the 19th of

21   2006, do you remember where you were on that day?

22   A.    I was on the road on patrol as a PST officer in

23   the north district station.

24   Q.    Can you tell the Court and jury what a PST

25   officer is, please.
```

1   A.      The PST -- a PST officer is simply an officer

2   that belongs on the problem-solving team.  And as a

3   problem-solving team officer, you deal with the

4   prevailing problems of the neighborhood area or net

5   area.

6   Q.      What particular area -- you gave us an area.

7           Can you be more specific for the jury as to what

8   particular area you were working in.

9   A.      We call it Model City.

10  Q.      Now, on that particular day, April the 19th, did

11  you receive a call from someone?

12  A.      That's correct.  I was dispatched as a backup

13  officer for Officer Stevens.  A call went out,

14  reference someone being shot at.

15  Q.      And did you respond to that call?

16  A.      Yes, I did.

17  Q.      And did you go?

18  A.      I went to an area around 15th Avenue between

19  62nd and 64th Street.

20  Q.      I'm now going to show you what's marked in

21  evidence as Government's Exhibit 7.

22          MR. GREGORIE:  Could I use the ELMO for a

23  moment, your Honor?

24          THE COURT:  Yes.

25

```
1    BY MR. GREGORIE:

2    Q.    Do you recognize that location, sir?

3    A.    Yes, I do.

4    Q.    And is that the location you went to on that day?

5    A.    That is the location.

6    Q.    Now, sir, what, if anything, happened when you

7    arrived at that location?

8    A.    When I arrived at that location, I arrived at the

9    rear of the location.  And I arrived behind the primary

10   officer, Officer Stevens.

11         And as I was exiting my vehicle, my marked unit,

12   I heard Officer Stevens say, "Put the gun down."

13         My line of sight was blocked by a large dumpster.

14   But when I made my way around the dumpster, I saw two

15   individuals getting on their knees and one of the

16   individuals to my right was removing their hands from

17   just outside of my sight as if they were placing

18   something down.

19   Q.    Did you go and observe what it is that was just

20   out of your sight that you believed was placed down?

21   A.    After the two gentlemen were on the ground, I

22   went ahead and saw what was placed down.  It was a

23   .9-millimeter handgun.

24   Q.    And did you take custody of that weapon?

25   A.    Yes, I did.
```

1    Q.     Did the individual that you saw next to the

2    weapon -- did he identify himself?

3    A.     He identified himself.

4    Q.     Can you tell the Court and jury, please, who he

5    identified himself as.

6    A.     He identified himself as Sultan Kahn-Bey.

7    Q.     And did you go into the area where they were

8    located, what's shown in Government's Exhibit 7?

9    A.     Yes, I did.  I went into the area to clear the

10   area, in other words, to make sure there was no one

11   else in there or any other -- anything that can harm

12   myself or the individuals or the other officer.

13   Q.     And what, if anything, did you see as you

14   searched that area?

15   A.     When I searched the area, Sultan Kahn-Bey said,

16   "Don't you see my credentials?"

17          So I went looking for some sort of gun license or

18   some sort.  But all I saw were materials that were

19   reference to Freemasonry and other religious material.

20   Q.     Are you familiar with Freemasonry?

21   A.     No, I'm not.

22   Q.     So what appearance on it caused you to say that

23   it was Freemasonry?

24          MS. JHONES:  Your Honor, I'm just going to

25   object based on hearsay.

Joseph - CROSS - By Ms. Jhones                    44

```
 1              If they have the documents and they'd like to
 2     show them to me, maybe I have no objection to them.
 3              But at this point, without knowing what he's
 4     referring to, I'm objecting on hearsay grounds.
 5              MR. GREGORIE:  Your Honor, I'm just asking
 6     what he observed, your Honor.
 7              MS. JHONES:  It's a document, your Honor.
 8              THE COURT:  Sustained.
 9              Rephrase your question.
10     BY MR. GREGORIE:
11     Q.   Did you personally observe any design,
12     description or anything on the document of any kind?
13     A.   There were various documents and books that said
14     "Freemasonry" and had signs like a crescent moon and
15     stars.
16              MR. GREGORIE:  No further questions, your
17     Honor.
18              THE COURT:  Ms. Jhones?
19                      CROSS-EXAMINATION
20     BY MS. JHONES:
21     Q.   Sir, you said you observed several books.
22     Correct?
23     A.   Several material.  There were books and leaflets.
24     Q.   And it's fair to say that you went through all of
25     this location because you were trying to make sure
```

1    there wasn't anything that could pose a danger to

2    yourself or to others.  Correct?

3    A.    That's correct.

4    Q.    And there's two -- on Government's Exhibit 7,

5    there are two sides -- basically, two areas inside that

6    location.  Correct?  There's two different -- for lack

7    of a better term, two different rooms?

8    A.    There was a big general area, and I believe there

9    were two rooms.

10   Q.    And your observations in terms of books were made

11   in which of the two areas?

12   A.    The large area, on a table.

13   Q.    And is it fair to say, sir, that in addition to

14   what you've testified previously, you saw a lot of

15   hard-cover books?

16   A.    I don't remember if it was a lot, and I don't

17   remember if they were hard copies.

18   Q.    You observed books, however.  Correct?

19   A.    That's correct.

20   Q.    Do you remember how many you observed?

21   A.    No, I don't.

22   Q.    Do you remember where they were when you observed

23   them?

24   A.    On the table.

25   Q.    Do you remember, sir, whether or not any of those

Joseph - CROSS - By Mr. Vereen                    46

 1   books were actually opened as opposed to closed?

 2   A.     I do not recall.

 3   Q.     Do you remember seeing a lot of furniture in one

 4   of the areas?

 5   A.     No.

 6   Q.     Any construction materials?

 7   A.     I don't recall.

 8   Q.     Did you make any observations of what it was that

 9   you saw on that occasion?  Did you memorialize your

10   observations?

11   A.     No, I didn't.

12   Q.     Thank you, sir.

13   A.     You're welcome.

14          THE COURT:  Mr. Vereen?

15                    CROSS-EXAMINATION

16   BY MR. VEREEN:

17   Q.     Officer Joseph, good morning.

18   A.     Good morning, sir.

19   Q.     We know each other; do we not?

20   A.     We do know each other.

21   Q.     All right.  Now, you are familiar with the Model

22   City, Liberty City, areas; are you not?

23   A.     That's correct.

24   Q.     And how long have you been with the Police

25   Department?

1   A.      Approximately four years.

2   Q.      How many years?

3   A.      Approximately four years.

4   Q.      And you're familiar with those areas -- first of

5   all, let me ask you:  Were you assigned to those areas

6   when you first came out of the Academy?

7   A.      I was assigned to the north end, which

8   encompasses upper east side, Little Haiti and Model

9   City.

10  Q.      Model City -- what's the boundaries of Model

11  City?

12  A.      Model City stretches from I-95 -- sorry -- the

13  west of I-95 all the way -- as far as 19th Avenue, the

14  south -- as far south as the 112, as far north as

15  71st Street.

16  Q.      And then Liberty City takes over from there.

17  Correct?

18  A.      That's correct.

19  Q.      So those two areas are pretty much connected?

20  A.      That's correct.  And sometimes we refer to Model

21  City as Liberty City and vice versa.

22  Q.      And so shootings is not an uncommon thing in that

23  area, unfortunately.  Correct?

24  A.      That's correct.

25  Q.      And so, when you got the dispatch with regard to

```
 1   a shooting, you didn't know what it entailed.  You just

 2   know it was just another shooting in Liberty City or

 3   Model City.  Right?

 4   A.    Actually, there was someone that was shot at, but

 5   was not struck.

 6   Q.    And so during the period of time when -- first of

 7   all, let me ask you:  Did you go through the Academy at

 8   Miami-Dade?

 9   A.    Yes, I did.

10   Q.    And you would agree with me that those areas are

11   two of the areas that you received field training in.

12   Correct?

13   A.    Two areas?

14   Q.    Yeah.

15         When you go through your field training, what are

16   the areas that you all focus on when you're going

17   through the Academy?

18   A.    When we do field training, the department makes

19   sure that we get some type of training in the north

20   district, the central district and the south district.

21   Q.    And is Model City or Liberty City in those

22   districts?

23   A.    It's in the north.

24   Q.    It's in the north district.

25         The north district is Model City, Liberty City
```

```
1    area?

2    A.      That's correct.

3    Q.      And you said what other districts?

4    A.      Central.

5    Q.      Where is that?

6    A.      That's -- that deals with downtown, Overtown,

7    Wynwood, Allapattah.

8    Q.      And then you said the south district?

9    A.      Yes.

10   Q.      Where is that?

11   A.      That encompasses Flagami, Coral Way, Brickell

12   area --

13   Q.      All right.

14   A.      -- Coconut Grove.

15   Q.      Now, during the period of time that you were in

16   the northern district -- and you're familiar with where

17   this -- this building that you see on the ELMO?

18   A.      That's correct.

19   Q.      You're familiar with that building; are you not?

20   A.      I'm familiar with the building.

21   Q.      Did you ever see any marching going on around

22   that building?

23   A.      I have personally never witnessed any marching.

24   Q.      Did you ever see any occupants ever come in and

25   out of that building?
```

Joseph - CROSS - By Mr. Vereen

```
1    A.     I have never observed that.
2    Q.     Did you ever see any flags being flown -- like
3    the Moroccan flag or the American flag being flown over
4    that building?
5    A.     I do not recall.
6    Q.     Did you ever work with any gang units while you
7    were working in that area?
8    A.     With gang units?
9    Q.     Yes.
10   A.     No.
11   Q.     Are you familiar with any gangs in that area?
12   A.     Not gangs, per se.
13   Q.     Now, that is considered to be a low-income area;
14   is it not?
15   A.     That's correct.
16   Q.     When Sultan Kahn-Bey -- when you went to the
17   address and you met with Sultan Kahn-Bey, do you recall
18   what he was wearing?
19   A.     What I recall was something camouflage.  I don't
20   remember if it was the top portion or the bottom
21   portion of his clothing or the entire clothing.
22   Q.     And his response to you was, "Do you not see my
23   credentials?"
24   A.     That's correct.
25   Q.     And the credentials that you said that he was
```

1    making reference to was some Masonic paraphernalia?

2    A.    At the time, I believed he meant some sort of

3    concealed weapons license.

4    Q.    But, instead, what you saw was some books on

5    Freemasonry?

6    A.    Correct.

7    Q.    And then you said there was some other material

8    with regard to a crescent moon and stars?

9    A.    That's correct.

10   Q.    You did not see a book with a crescent moon and

11   stars and the word "Freemasonry" on it, did you?

12   A.    I believe did I see a pamphlet that said

13   "Freemasonry."

14   Q.    But it didn't have a crescent moon and stars on

15   it, did it?

16   A.    I don't recall.

17   Q.    What was done with that material?

18   A.    That material was left at the location.

19   Q.    Now, you didn't know what Mr. Kahn-Bey was doing

20   with that material, do you?

21   A.    No.

22   Q.    You were asked by Mr. Gregorie if you know

23   anything about Freemasonry.

24   A.    That's correct.

25   Q.    Your response was that you do not know anything

1   specifically about it?

2   A.    That's correct.

3   Q.    You believe it to be, do you not, a secret

4   society?

5   A.    I believe it to be possibly a religion.

6   Q.    Have you ever gone to a library and seen books on

7   Freemasonry?

8         MR. GREGORIE:  Objection, your Honor.

9   Relevance.

10        THE COURT:  Overruled.

11        THE WITNESS:  I don't believe I have.

12  BY MR. VEREEN:

13  Q.    Do you know any of these gentlemen seated at the

14  tables here?

15  A.    I do not know any of the gentlemen seated at the

16  tables.

17  Q.    You've never seen any of these gentlemen walking

18  around that location?

19  A.    I don't recall their faces.

20  Q.    I'm sorry.

21        For the record, "that location" is the Embassy.

22        You've never seen them walking around the

23  Embassy?

24  A.    No.  I don't recall.

25  Q.    And you would agree with me, would you not, that

 1   camouflage, these -- whether it's the pants or the

 2   jackets, are outfits worn by many people in public that

 3   are not military.  Correct?

 4            MR. GREGORIE:  Objection.  Calls for

 5   speculation, your Honor.

 6            MR. VEREEN:  Why is that speculation?  It's

 7   his personal knowledge.

 8            MR. GREGORIE:  He --

 9            THE COURT:  Sustained.

10            Rephrase your question.

11   BY MR. VEREEN:

12   Q.   Well, you are familiar with this building on

13   17th Avenue that's painted like a boot camp with

14   camouflage; are you not?

15            MR. GREGORIE:  Objection, your Honor.  The --

16            THE COURT:  Sustained.

17   BY MR. VEREEN:

18   Q.   Have you ever seen any people walking around the

19   6262 building wearing camouflage?

20   A.   Not that I can recall.

21            MR. VEREEN:  No further questions.  Thank you.

22            THE COURT:  Mr. Houlihan?

23            MR. HOULIHAN:  No questions.

24            THE COURT:  Mr. Clark?

25            MR. CLARK:  No further questions, your Honor.

Joseph - REDIRECT - By Mr. Gregorie                    54

```
 1              THE COURT:  Mr. Casuso?

 2              MR. CASUSO:  No questions, your Honor.

 3              THE COURT:  Mr. Levin?

 4              MR. LEVIN:  No questions.

 5              THE COURT:  Mr. Gregorie?

 6              MR. GREGORIE:  One question, your Honor.

 7                    REDIRECT EXAMINATION

 8   BY MR. GREGORIE:

 9   Q.    Sir, was the weapon you found loaded?

10   A.    Yes, it was.

11              MR. GREGORIE:  Thank you.  Nothing further.

12              THE COURT:  You may step down, sir.

13              THE WITNESS:  Thank you.

14              (Witness excused.)

15              THE COURT:  Call your next witness.

16              MS. ARANGO:  The United States calls Jesse Lee

17   Rathel to the stand.

18   Thereupon--

19                    JESSE LEE RATHEL

20   was called as a witness by the Government and, having

21   been first duly sworn, testified as follows:

22              THE COURT REPORTER:  Thank you.

23              Please have a seat and sit close to the

24   microphone, sir.

25              Please state your full name and give a
```

```
 1    spelling.

 2           THE WITNESS:  Jesse Lee Rathel, R-a-t-h-e-l,

 3    J-e-s-s-e.

 4                      DIRECT EXAMINATION

 5    BY MS. ARANGO:

 6    Q.    Good morning, sir.

 7    A.    Good morning.

 8           MS. ARANGO:  Good morning, ladies and

 9    gentlemen.

10           THE JURY:  Good morning.

11    BY MS. ARANGO:

12    Q.    Would you please tell us where you're employed.

13    A.    With the Bureau of Alcohol, Tobacco, Firearms and

14    Explosives.

15    Q.    How long have you been with ATF?

16    A.    Almost four years.

17    Q.    What's your position there?

18    A.    I'm a special agent.

19    Q.    Now, let me turn -- just tell the members of the

20    jury briefly what you do as an ATF special agent.

21    A.    We conduct criminal investigations into

22    violations of federal laws pertaining to alcohol,

23    tobacco, firearms and explosives.  The majority of my

24    work is usually involved in investigating violations of

25    federal gun laws.
```

Rathel - DIRECT - By Ms. Arango                56

```
 1   Q.     Now, let me turn your attention to May 5th of
 2   2006.
 3          Did you have an occasion on that day to arrest an
 4   individual named Sultan Kahn-Bey?
 5   A.     Yes, I did.
 6   Q.     And what was the reason you were arresting him?
 7   A.     For being a felon in possession of a firearm.
 8   Q.     Where did that arrest take place?
 9   A.     The Dade criminal courthouse.  I think it's the
10   Gerstein building.
11   Q.     Now, do you know why Sultan Kahn-Bey was at
12   the -- that building, that criminal courthouse?
13          MR. VEREEN:  Objection.  Hearsay.
14          THE COURT:  Sustained.
15   BY MS. ARANGO:
16   Q.     Where did you see him specifically within the
17   courthouse?
18   A.     When he was in the hallway awaiting to go inside
19   the courtroom.
20   Q.     And was he facing any charges --
21          MR. VEREEN:  Objection.  Leading.
22          THE COURT:  Sustained.
23          Rephrase your question.
24   BY MS. ARANGO:
25   Q.     Are you aware of why he was in the state
```

```
 1   courthouse?
 2             MR. VEREEN:  Objection.  Calls for hearsay.
 3             THE COURT:  Sustained.
 4   BY MS. ARANGO:
 5   Q.    Did you see any proceedings going on in the state
 6   courthouse?
 7   A.    Yes.
 8   Q.    And what were those proceedings?
 9             MS. JHONES:  Objection as to the nature of
10   the -- what were the proceedings.  It calls for
11   hearsay.
12             MS. ARANGO:  He observed the proceedings.
13             THE COURT:  Overruled.
14             He can testify as to what he observed.
15   BY MS. ARANGO:
16   Q.    You may answer.
17   A.    Yes.  We went inside the courtroom to inform the
18   Judge who was doing the proceedings that, although
19   Sultan Kahn-Bey was there to answer state charges --
20             MR. VEREEN:  Objection.
21             THE COURT:  Overruled.
22             THE WITNESS:  To inform the Judge that,
23   although Sultan Kahn-Bey was there to make an
24   appearance for state charges for aggravated assault
25   with a firearm, that we were there to conduct an arrest
```

 1    for a federal violation of being a felon in a

 2    possession of a firearm.

 3    BY MS. ARANGO:

 4    Q.    Now -- so there were two separate charges for the

 5    state and then you were arresting him for the federal

 6    charges?

 7    A.    Yes.

 8          MS. JHONES:  Objection.  Leading.

 9          THE COURT:  Overruled.

10    BY MS. ARANGO:

11    Q.    Are you familiar with what the basis of the state

12    and federal charges were?

13    A.    Yes, I am.

14    Q.    And what's that?

15          MR. VEREEN:  Objection.  Calls for hearsay.

16          MS. ARANGO:  He was arresting him for this,

17    Judge.

18          THE COURT:  Rephrase your question as to the

19    federal charge.

20    BY MS. ARANGO:

21    Q.    Are you aware of what the bases were for the

22    federal charges?

23    A.    Yes, I am.

24    Q.    And what was that?

25          MR. VEREEN:  Again, calls for hearsay.

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  On April 19th, 2006, Sultan

 3    Kahn-Bey got into an altercation with another

 4    individual at 6260 Northwest 15th Avenue in Miami.

 5              The altercation was over --

 6              MR. VEREEN:  Objection.  Hearsay.  He was not

 7    present.

 8              THE COURT:  Sustained.

 9    BY MS. ARANGO:

10    Q.    And as a result of that altercation, what

11    occurred that left -- that led to the charges?

12              MS. JHONES:  Asked and answered, your Honor.

13              THE COURT:  Overruled.

14              THE WITNESS:  I'm sorry.  Could you --

15    BY MS. ARANGO:

16    Q.    As a result of the altercation, what occurred

17    that led to the federal charges?

18    A.    Well, I was informed that --

19              MR. VEREEN:  Objection.  Hearsay.

20              THE COURT:  Sustained.

21    BY MS. ARANGO:

22    Q.    Without discussing what you were told about the

23    altercation, what happened within the altercation that

24    led to the federal charges?

25    A.    Sultan Kahn-Bey during the altercation produced a
```

1   pistol and fired the weapon at the other individual.

2   That's what led to me investigating the offense, was

3   that Sultan Kahn-Bey was a felon in possession of a

4   firearm.

5   Q.     And do you know who the victim was?

6   A.     Yes.  His name was Master Ali Athea.

7   Q.     Now, do you know whether Master Athea was

8   injured?

9   A.     He was not.

10  Q.     When you arrested Sultan Kahn-Bey at the

11  courthouse on -- I think you testified it was

12  May 5th -- was anyone with him?

13  A.     Yes.  An individual by the name of Patrick

14  Abraham.

15  Q.     Tell the jury how Sultan Kahn-Bey was dressed

16  when you arrested him on that day.

17  A.     He was wearing an olive drab BDU uniform, which

18  stands for battle dress uniform.  It's something

19  similar to what soldiers wear.

20        The pants -- BDU pants were bloused, which is

21  tucked into laced-up military-type boots.  His

22  long-sleeved olive drab shirt had numerous and various

23  patches on it symbolizing his Moorish organization.

24        He also had a four-star general insignia on his

25  collars, and he was as well wearing a purple fez hat.

Rathel - DIRECT - By Ms. Arango                          61

```
 1   Q.     Now, when you were at the courthouse, was Sultan
 2   Kahn-Bey -- did he have anything in his possession?
 3   A.     Yes.  He was carrying a briefcase with him.
 4   Q.     And did you see what happened to that briefcase?
 5   A.     Yes.  When Sultan Kahn-Bey was taken into
 6   custody, we took the briefcase from him and did a brief
 7   search of it to ensure there were no weapons in it.
 8          And then we asked Sultan Kahn-Bey if Patrick
 9   Abraham could take possession of that briefcase rather
10   than Sultan Kahn-Bey taking it with him to the jail.
11          Patrick Abraham agreed to take possession of it.
12   Q.     Okay.  And after you arrested Sultan Kahn-Bey,
13   did you interview him?
14   A.     Yes, I did.
15   Q.     And was there any discussion in the interview
16   regarding --
17              MR. VEREEN:  Objection as to leading.
18              MS. ARANGO:  I'll rephrase.
19   BY MS. ARANGO:
20   Q.     What did Sultan Kahn-Bey tell you in this
21   interview?
22   A.     Sultan Kahn-Bey was insistent --
23              MS. JHONES:  Objection, your Honor.  Hearsay.
24              MS. ARANGO:  It's an admission against
25   interest, Judge.
```

1              MS. JHONES:  Your Honor --

2              THE COURT:  Come on up, please.

3              (Whereupon, proceedings were had at side-bar

4    outside the presence of the jury which have been sealed

5    per instructions of the Court.)

6              (Whereupon, the following proceedings were had

7    in open court:)

8              THE COURT:  We're going to take a break.

9              Do not discuss this case either amongst

10   yourselves or with anyone else.  Have no contact

11   whatsoever with anyone associated with the trial.  Do

12   not read, listen or see anything touching on this

13   matter in any way.

14             If anyone should try to talk to you about this

15   case, you should immediately instruct them to stop and

16   report it to my staff.

17             You may leave your materials in your chairs.

18   Please be back in the jury room in 15 minutes.

19             (Whereupon, the jury exited the courtroom at

20   10:36 a.m. and the following proceedings were had:)

21             MS. JHONES:  Your Honor --

22             THE COURT:  One moment, please.

23             You may step down, sir.

24             (Witness excused.)

25             THE COURT:  You may be seated.

Rathel - DIRECT - By Ms. Arango                    63

```
 1              MS. JHONES:  Your Honor, may I use the rest
 2    room quickly before we entertain argument on this
 3    matter?
 4              THE COURT:  Sure.
 5              MS. JHONES:  Thank you.
 6              MR. LEVIN:  Your Honor, should I avail myself
 7    of the facilities now as opposed to --
 8              THE COURT:  So we'll take five minutes so
 9    everybody can do what they want to do.  But be back in
10    five.
11              (Thereupon a recess was taken, after which the
12    following proceedings were had:)
13              THE COURT:  United States of America versus
14    Narseal Batiste, et al., Case No. 06-20373.
15              Counsel, state your appearances, please, for
16    the record.
17              MR. GREGORIE:  Richard Gregorie and Jacqueline
18    Arango on behalf of the United States, your Honor.
19              MS. JHONES:  Ana Jhones on behalf of Narseal
20    Batiste.  He is present.
21              MR. LEVIN:  Albert Levin on behalf of Patrick
22    Abraham, who's present.
23              MR. CASUSO:  Lou Casuso on behalf of Burson
24    Augustin.
25              MR. CLARK:  Nathan Clark on behalf of
```

 1    Rotschild Augustine.

 2            MR. HOULIHAN:  Richard Houlihan with Naudimar

 3    Herrera.

 4            MR. VEREEN:  Rod Vereen on behalf of Stanley

 5    Phanor, who's present.

 6            THE COURT:  All Defendants are present.

 7            Yes.  Anything further anyone wants to say in

 8    regard to 804?

 9            MS. JHONES:  Yes, your Honor.

10            MS. ARANGO:  Judge, just briefly, you left it

11    with you wanted me to check with Agent Stewart.

12            THE COURT:  Yes.

13            MS. ARANGO:  I have checked with Agent

14    Stewart.  He confirms that, when Sultan Kahn-Bey was

15    incarcerated, he was interviewed.  He canceled the

16    interview, said he wanted an attorney.  That was the

17    end of the interview.

18            After he got released from prison, we have not

19    been able to locate him.  He was sent -- his

20    information was sent to Chicago.

21            The Chicago PD and the Chicago FBI have both

22    made attempts to locate him, and they have not been

23    able to locate him since he was released from

24    incarceration.

25            So we have not -- we know that he uses

```
 1   aliases.  He has not -- we have not been able to locate

 2   him since then, even though efforts were undertaken to

 3   locate him.

 4          THE COURT:  Okay.

 5          MS. JHONES:  Your Honor, if I may be heard.

 6          THE COURT:  Yes.

 7          MS. JHONES:  Under 804(b) -- I'm sorry --

 8   804(a), the definition of unavailability, specifically

 9   the advisory committee notes from 1972 state that, "An

10   actual ruling by the judge is required when -- as it

11   relates to a claim of privilege and that the -- that

12   this actual -- that this actual requirement that a

13   ruling be made by the Court clearly implies" -- and I'm

14   reading directly from the committee notes -- "clearly

15   implies that an actual claim of privilege must be

16   made."

17          It is not, your Honor, sufficient to say, "We

18   placed a call out to Chicago and this person -- we

19   can't locate him."  That is insufficient.

20          I will tell the Court that, in my

21   investigation, I have an address for this individual.

22          The Government just can't say and -- satisfy

23   the criteria of unavailability by saying, "We placed a

24   call and we just can't find this gentleman" and thereby

25   satisfy the requirements of unavailability.
```

```
1              THE COURT:  Have you located him?

2              MS. JHONES:  Your Honor, I've located an

3    address.

4              THE COURT:  That's not what I asked you.

5              MS. JHONES:  I have not spoken to this

6    gentleman.  No.  I have not spoken to this gentleman.

7    But I'm not the FBI, your Honor.

8              And it is insufficient to just proffer that,

9    "We tried to locate him and we couldn't" to invoke this

10   type of -- to invoke this type of exception under

11   804(a).

12             And if I may just have one more moment, your

13   Honor.

14             I believe, your Honor -- I believe -- I don't

15   know if the Government is now changing their position

16   that he is unavailable because of his Fifth Amendment

17   rights and now if it's another criteria, because when

18   we were at the side-bar, they raised the Fifth

19   Amendment claim.

20             I don't know if they're changing it.  If they

21   are changing the basis upon which they're relying upon

22   for unavailability, I'd like to know which section of

23   the rule they're relying upon --

24             THE COURT:  Well, it sounds like they're

25   relying on both, that their two bases --
```

Rathel - DIRECT - By Ms. Arango                    67

```
 1            MS. JHONES:  If I may inquire, which sections
 2   of the rule are they now relying upon in addition to --
 3            THE COURT:  Ms. Jhones, it seems pretty clear
 4   that they're buying on both, that he refused to talk to
 5   them and they're unable to locate him.
 6            MS. JHONES:  Your Honor, all I'm asking for is
 7   the section of the code so I can properly address it.
 8            If they refused to talk to him, what section
 9   of the rule are they relying upon so I may address it?
10            There's criteria --
11            THE COURT:  Ms. Jhones, 804(a),
12   unavailability.
13            MS. JHONES:  But, your Honor, there are five
14   different criteria which define unavailability.  It's
15   not just they're unavailable, period.  There are five
16   different criteria.
17            Which rule, so I can properly address and
18   properly make my objection?  That's all I'm asking.
19   What section of the rule are they relying upon so I can
20   address it, besides privilege?  That's all.
21            MS. ARANGO:  Judge, I thought it was pretty
22   clear.
23            But when he was here and he was incarcerated,
24   he asserted a Fifth Amendment privilege and refused to
25   talk to the agents.
```

```
 1              Since his incarceration, he's now free.  We've

 2    attempted to locate him at the address that I believe

 3    Ms. Jhones has, which was his former address, as well

 4    as we've -- we've provided all the information that we

 5    can about him and where he resided in the past.

 6              Any information that we had was provided to

 7    the Chicago Police Department as well as to the Chicago

 8    FBI.  And efforts were made to locate him.  They were

 9    unable to locate him.

10              MR. VEREEN:  May I inquire?  Is he not on

11    supervised release?

12              MS. ARANGO:  Judge, I don't believe he is.  I

13    think --

14              MR. VEREEN:  Every federal case, the

15    defendant's on supervised release.

16              THE COURT:  Well, if they serve a year or more

17    in jail.

18              MR. VEREEN:  Right.  And he did.

19              THE COURT:  When was that?

20              MR. VEREEN:  He was sentenced to more than a

21    year and a day on that gun charge.

22              MS. JHONES:  I believe he got 14 to 15 months,

23    your Honor.

24              MR. VEREEN:  So how could they not know where

25    he is?
```

Rathel - DIRECT - By Ms. Arango                    69

1          THE COURT:  When was that?

2          MR. VEREEN:  I don't have his conviction in

3    front of me.  I don't know.

4          MS. JHONES:  Your Honor, if -- I may have

5    those records.

6          MS. ARANGO:  That was in 2006, Judge.

7          I know, as of recently, when we contacted Dan

8    Young and another Chicago police officer by the name of

9    Dan Branagan, additional efforts were made by them to

10   locate Sultan Kahn-Bey and they were unable to do so.

11         MR. LEVIN:  Judge, may I suggest you pick up

12   his case on the PACER system?  It was pending in front

13   of Judge Cooke.

14         MS. JHONES:  I have the case number, if the

15   Court would like it, your Honor.

16         THE COURT:  Okay.

17         MS. JHONES:  No. 06 --

18         THE COURT:  One moment, please.  Go ahead.

19         MS. JHONES:  Case No. 06-20304-Criminal-Cooke.

20         MR. CLARK:  Your Honor, may I make some

21   additional argument with regard to --

22         THE COURT:  One moment, please.

23         MR. CLARK:  Okay.

24         THE COURT:  The last activity in his file was

25   a transfer of his supervised release to the Northern

1    District of Illinois in May -- well, it was transferred

2    from here April 28th and acknowledged May 9th, 2008.

3              MR. VEREEN:  Does the record indicate how many

4    years of supervised release he was given?

5              THE COURT:  Three years' supervised release.

6              MR. VEREEN:  And that's after his sentence

7    of -- I'm not sure I -- how long the sentence was.

8              THE COURT:  14 months.

9              MR. VEREEN:  So he should still be on

10   supervised release.

11             THE COURT:  It doesn't indicate what his

12   status was -- what his status is today on supervised

13   release.  The file doesn't indicate.  The last activity

14   was May, 2008.

15             MR. VEREEN:  He should still be on there.

16             THE COURT:  Have you contacted the probation

17   office in the Northern District of Illinois?

18             MS. ARANGO:  Judge, we have not contacted the

19   probation office in the Northern District of Illinois.

20             We just provided the information to Chicago.

21   We let them know that this person had been incarcerated

22   and that he was released.

23             I cannot say what efforts they had made,

24   whether or not they had made any efforts with the

25   probation office themselves other than they had that

Rathel - DIRECT - By Ms. Arango                          71

```
 1    information.
 2              THE COURT:  Yes, Mr. Clark.
 3              MR. CLARK:  Your Honor, my objection is that
 4    under -- as a statement against interest, it's not
 5    relevant in this case.
 6              This man is an unindicted co-conspirator and
 7    it would have to come in as a -- the only way it's
 8    relevant in this case is if it comes in -- to these
 9    gentlemen is if it comes in as a co-conspirator's
10    statement.
11              In that event, it's objectionable because it's
12    not done in furtherance of the conspiracy.
13              A statement to law enforcement under
14    Blakely and --
15              THE COURT:  I don't think they're offering it
16    under 801(d)(2)(E).
17              MR. CLARK:  Well, it's not relevant --
18              THE COURT:  They're offering it under
19    804(b)(3), a statement against interest of a witness.
20              MR. CLARK:  Well, it's not relevant in this
21    case because he's not on trial.  What he may have done
22    is not relevant to this case.  So I object to -- that
23    would be irrelevant in this case, your Honor.
24              I think what it is is an attempt to get what
25    is a co-conspirator's statement that's not in
```

 1   furtherance of a conspiracy -- it's an attempt to get

 2   it in through another way.  In this case, I would

 3   object because it's not relevant.

 4        MS. ARANGO:  It's relevant, Judge.  It

 5   explains why these documents were shown to this

 6   witness.  And those documents are very relevant to this

 7   case.

 8        They're Moorish Science Temple documents that

 9   have -- Mr. Batiste told the informant that he was a

10   minister.  He had the informant read from his

11   ministerial license.

12        He discussed in one conversation -- several

13   conversations about the sovereignty of the Moors in the

14   United States and how they -- in one conversation, he

15   said you can go into court and be relieved of liability

16   as long as you know what to say regarding your

17   affiliation with the Moorish Science Temple.

18        So it is very relevant to the facts of this

19   case to statements that Mr. Batiste made in the

20   recordings.

21        And those documents are relevant to those --

22   to those points.  They show that this is -- they do

23   consider themselves to be a sovereign entity.

24        Mr. Kahn-Bey's statements explain why he

25   showed these documents to Special Agent Rathel.

1          MR. CLARK:  If that's the case, your Honor,

2    then this statement that's being made is not a hearsay

3    statement.  So the only rule that would be applicable

4    would be 801(d)(2)(E).

5          It can't come in because it wasn't in

6    furtherance of a conspiracy, because they're saying

7    that it's relevant as a conspiratorial statement.

8          MS. JHONES:  Your Honor, I don't know if the

9    Court's reading something.

10         THE COURT:  I am reading something.  Just one

11   moment.

12         At this time, I'm prepared to rule that I do

13   not find that the Government has -- without a proffer

14   that they've contacted the probation office in the

15   Northern District of Illinois, that they have met the

16   requirements of (a)(5) as to reasonable means to

17   procure his attendance.

18         It may mean that you just contact -- if the

19   FBI has indeed contacted the probation office and

20   they -- in their case, there's a warrant outstanding

21   for him or they've been unable to locate him or what

22   the status of the supervised release is out there may

23   be sufficient.  I don't know.

24         But without that information or proffer, I am

25   not going to find that he meets the requirements of

Rathel - DIRECT - By Ms. Arango                    74

```
 1    (a)(5).
 2            And I do find that the only case law that I
 3    see in the Eleventh -- strike that.
 4            I don't see any case law in the Eleventh that
 5    supports the proposition that there doesn't have to be
 6    at least a representation by counsel that he would
 7    invoke his privilege, that at least there must be that
 8    representation by his attorney or by the witness
 9    themselves to meet the unavailability, either (a)(1) or
10    (2), the exercise of the privilege.
11            MS. ARANGO:  Thank you, Judge.  That's fine.
12            THE COURT:  So if you can provide further
13    information concerning unavailability -- I do find that
14    the statement comes in under -- it would come in -- if,
15    in fact, it meets the requirements of (a), it would
16    come in under (b)(3).
17            MS. JHONES:  Your Honor, may I -- just to --
18    just so to not unduly delay these proceedings as it
19    relates to this issue, I would like to be heard on
20    804(b)(3), if I may.
21            THE COURT:  Okay.
22            MS. JHONES:  Your Honor, there are
23    foundational requirements under 804(b)(3).
24            THE COURT:  Well, I don't want to really reach
25    that now.
```

 1          MS. JHONES:  Okay.

 2          THE COURT:  If they come back and they proffer

 3  further unavailability, then I'll allow you to make

 4  your argument.

 5          MS. JHONES:  That's fine.

 6          THE COURT:  My inclination is that it does

 7  come under (b)(3), but I'll give you an opportunity to

 8  make your argument to make a final ruling on that.

 9          But as they haven't demonstrated

10  unavailability, I'm not going to allow the testimony at

11  this time.

12          If the Government comes back and further

13  proffers to the Court, then I'll allow you to make

14  further argument.

15          So let's bring the jury in, please.

16          Is this witness coming back on the stand?

17          MS. ARANGO:  Yes, Judge.  I'll go get him.

18          (Whereupon, the jury entered the courtroom at

19  11:09 a.m. and the following proceedings were had:)

20          THE COURT:  You may be seated.

21          You are still under oath, sir.

22          You may proceed, Ms. Arango.

23          MS. ARANGO:  Thank you.

24  BY MS. ARANGO:

25  Q.    Agent Rathel, without saying what Sultan Kahn-Bey

```
 1    told you after he was arrested, did you go anywhere

 2    with him after his arrest?

 3    A.     Yes.

 4    Q.     Where did you go?

 5    A.     To 410 Northeast 141st Street, North Miami, which

 6    is Patrick Abraham's residence.

 7    Q.     And why did you go there?

 8    A.     Sultan Kahn-Bey was insistent on showing me some

 9    documents --

10           MS. JHONES:  Objection.

11           MR. VEREEN:  Objection.  Hearsay.

12           MS. JHONES:  Objection as to what Sultan

13    Kahn-Bey said.

14           THE COURT:  Sustained.

15           Rephrase your question.

16    BY MS. ARANGO:

17    Q.     Let me just go -- when you got to that residence,

18    was anybody there?

19    A.     No.  No one was home.

20    Q.     So what happened?

21    A.     Sultan Kahn-Bey told me he could go through --

22           MR. VEREEN:  Objection.

23           THE COURT:  Sustained as to what he said.

24    BY MS. ARANGO:

25    Q.     Without telling us what he said, would you just
```

```
 1   tell the members of the jury what happened after you
 2   got to the residence.
 3   A.    I called Sultan Kahn-Bey's wife on my telephone
 4   to ask her to come to the residence to let us inside
 5   the residence, because it was locked.
 6   Q.    Okay.  And did she arrive at the residence?
 7   A.    Yes, she did.
 8   Q.    And who, if anyone, was she with?
 9   A.    Melinda Yurla Clark was driving a black Corolla.
10   Patrick Abraham was in the front passenger's seat, and
11   Sultan Kahn-Bey's wife, Queen Zekaya, was in the
12   backseat.
13   Q.    Going back for a moment, who, if anybody,
14   provided you with the telephone number of Sultan
15   Kahn-Bey's wife?
16   A.    Sultan Kahn-Bey did.
17   Q.    Now, what happened after they -- the three of
18   them arrived -- let me ask you something:  Do you know
19   who Melinda Yurla Clark was?
20   A.    She was reported to be Patrick Abraham's --
21         MR. VEREEN:  Objection.  Hearsay.
22         THE COURT:  Sustained.
23   BY MS. ARANGO:
24   Q.    Based on your involvement in this investigation,
25   did you -- were you familiar -- well, had you ever
```

 1   observed her with anybody other than -- well, I take

 2   that back.  Strike that.

 3        After she -- after the three of them got there,

 4   what happened?

 5   A.    Sultan Kahn-Bey went inside the residence with

 6   the other agents.  I stayed outside with Melinda Yurla

 7   Clark, Patrick Abraham and Queen Zekaya.

 8        While outside, I asked who the owner of the car

 9   was.  And Melinda Clark --

10        MR. VEREEN:  Objection.  Hearsay.

11        THE COURT:  Sustained.

12   BY MS. ARANGO:

13   Q.    Why did you ask who the owner of the car was?

14   A.    I wanted to get consent to search the vehicle.

15   Q.    Was consent to search the vehicle provided to

16   you?

17   A.    Yes, it was.

18   Q.    Who was it provided by?

19   A.    By Melinda Clark.

20   Q.    What did you find in the vehicle?

21   A.    In the trunk of the vehicle, there was the

22   briefcase that Sultan Kahn-Bey was carrying when he

23   made his court appearance.

24        I looked inside the briefcase, and there were

25   various documents in there relating to the Moorish

```
 1   organization.
 2   Q.    Was that the same briefcase that he had given to
 3   Patrick Abraham?
 4   A.    Yes.  It's same briefcase.
 5   Q.    What did you do with that -- with that briefcase?
 6   A.    I kept it out there with me until one of the
 7   agents from inside the house said that -- it was asked
 8   for the documents to be brought inside the house, for
 9   them to be reviewed.
10   Q.    And did you bring the documents inside the house?
11   A.    Yes.
12   Q.    Did you review the documents with anybody?
13   A.    I did.
14   Q.    Who?
15   A.    Sultan Kahn-Bey.
16   Q.    Let me show you what's been marked as
17   Government's Exhibits 21 through 28, and ask you if you
18   recognize them.
19         I'm showing you what's been marked as
20   Government's Exhibits 21 through 28.  Let me get them
21   in order here for you.  Government's Exhibit 21,
22   Government's Exhibit 22, Government's Exhibit 23,
23   Government's Exhibit 24, Government's Exhibit 25,
24   Government's Exhibit 26, 27 and, finally, 28.
25         Do you recognize all of those exhibits,
```

1    21 through 28?

2    A.     Yes, I do.

3    Q.     Have you seen them before?

4    A.     Yes, I have.

5    Q.     Where did you see them?

6    A.     In the briefcase that Sultan Kahn-Bey was

7    originally carrying when he made his court appearance.

8    Q.     And are those some of the same documents that

9    was -- were in that briefcase?

10   A.     Yes.

11   Q.     Had you reviewed those documents with Sultan

12   Kahn-Bey?

13   A.     Yes.

14   Q.     What was the purpose of reviewing these

15   documents?

16   A.     Sultan Kahn-Bey was insistent that these

17   documents --

18              MS. JHONES:  Objection.

19              MR. VEREEN:  Objection.

20   BY MS. ARANGO:

21   Q.     Let me ask you this:  Without saying what Sultan

22   Kahn-Bey told you, did he go through each of these

23   documents with you?

24   A.     Yes.

25   Q.     And did he provide any kind of explanation as to

```
 1   what the documents were?
 2   A.    He did.
 3            MS. ARANGO:  Government offers Exhibits 21
 4   through 28 into evidence.
 5            MS. JHONES:  Your Honor, my only objection is
 6   under 106.
 7            I don't want to make --
 8            THE COURT:  Come on up, please.
 9            (Whereupon, proceedings were had at side-bar
10   outside the presence of the jury which have been sealed
11   per instructions of the Court.)
12            (Whereupon, the following proceedings were had
13   in open court:)
14            THE COURT:  Overruled.
15            They will be admitted as Government's
16   Exhibits 21 through 28.
17            (Whereupon, Government's Exhibit Nos. 21
18   through 28 were entered into evidence.)
19            THE COURT:  You may publish.
20            MS. ARANGO:  Thank you, Judge.
21   BY MS. ARANGO:
22   Q.    Agent Rathel, I'm going to ask you to -- I'm
23   going to put this on the ELMO and ask you to read
24   certain portions of it.  If you have any difficulty,
25   let me know, and I'll give you the original.  Okay?
```

```
 1   A.      Yes.

 2   Q.      Can you see that, Agent Rathel?

 3   A.      My screen is not working.

 4           THE COURT:  I'm sorry.  It should come on now.

 5           THE WITNESS:  I see it now.

 6   BY MS. ARANGO:

 7   Q.      What is your understanding of what this document

 8   is?

 9   A.      It's a charter for The Moorish Holy Temple of

10   Science of the World.

11   Q.      I'm going to zoom in here -- try to zoom in here.

12           Can you read where this charter was issued?

13           MR. VEREEN:  Your Honor, objection.  The

14   document speaks for itself.

15           MS. ARANGO:  He can read from the document.

16   It's in evidence.

17           THE COURT:  Overruled.

18           THE WITNESS:  It's from the county of Cook,

19   state of USA.

20   BY MS. ARANGO:

21   Q.      Do you know where Cook County is?

22   A.      Yes.  It's in Chicago, Illinois.  Chicago is in

23   Cook County.

24   Q.      Can you tell us what date this document was --

25   the date this document was issued.
```

Rathel - DIRECT - By Ms. Arango                           83

```
 1    A.     The 18th day of the 10th month of 2000.

 2    Q.     Now I'm turning it to the side.

 3           Could you please read the box marked "Official

 4    Seal."

 5    A.     It states, "Official Seal, Sultan A.M. Kahn-Bey,

 6    Sheik, Saadie L. Shareef, Moroccan Empire, USA Mecca.

 7    My commission is permanent."  It has a notary public.

 8    Q.     For the record, that's Government's Exhibit 21.

 9           Let me show you Government's Exhibit 22.

10           What does that appear to be?

11    A.     It's a charter for The Moorish Holy Temple

12    Science of the World.

13    Q.     I'm going to zoom in.

14           Can you tell us where that charter was issued.

15    A.     In Alexandria, Louisiana.

16    Q.     Now I'm placing the lower right-hand portion of

17    that exhibit.

18           Can you tell us the date of that -- the issuance

19    of that charter.

20    A.     The 27th day of May in 2001.

21    Q.     And can you read who signed the attestation under

22    that date.

23    A.     Sultan A.M. Kahn-Bey, Sheik.

24    Q.     Let me show you what's been marked Government's

25    Exhibit 23.
```

1          What does this document appear to be?

2    A.     It contains -- appears to be a smaller version of

3    the charter, The Moorish Holy Temple of Science of the

4    World.

5    Q.     And then on the upper right-hand....

6    A.     It's another document.  Appears to be the Divine

7    Constitution and Bylaws of the Moorish Holy Temple of

8    Science.

9    Q.     In the Divine Constitution and Bylaws, do you see

10   the -- do you recognize the photograph of a person in

11   the middle there?

12   A.     Yes.  That's Noble Drew Ali.

13   Q.     What's your understanding of who the Noble Drew

14   Ali is?

15   A.     It's my understanding --

16          MR. VEREEN:  Objection.  Hearsay.

17          THE COURT:  Sustained.

18   BY MS. ARANGO:

19   Q.     Did you become familiar with the Moorish Holy

20   Temple of Science?

21   A.     Yes.

22          MS. JHONES:  Your Honor, I'm just going to

23   object on competency basis.

24          MS. ARANGO:  I'm just asking him some

25   questions.

```
 1              THE COURT:  Overruled.

 2    BY MS. ARANGO:

 3    Q.    How did you become familiar with the Moorish Holy

 4    Temple of Science?

 5    A.    Sultan Kahn-Bey explained many --

 6              MR. VEREEN:  Objection.  Hearsay.

 7              MS. ARANGO:  Judge, it's not hearsay to

 8    tell --

 9              THE COURT:  Overruled.

10              THE WITNESS:  Sultan Kahn-Bey explained many

11    facets of it as well as explained these documents to

12    me.

13    BY MS. ARANGO:

14    Q.    Right in the middle here, do you see the date of

15    the issuance of this document?

16    A.    The 16th day of October in 2000.

17    Q.    And then do you recognize the photograph that's

18    on the lower right-hand portion of this document?

19    A.    Yes.  That's a photo of Sultan Kahn-Bey.

20    Q.    And on 23-B, we have something on the back.

21          What does that appear to be on the back of this

22    exhibit?

23    A.    This is the Divine Ministry of the Moorish

24    Science Temple of America.

25    Q.    Let's turn to Government's Exhibit 24.
```

```
 1          What does this document appear to be?
 2    A.    "United State Amexem."
 3    Q.    Do you know what "Amexem" is?
 4          MS. JHONES:  Same objection, your Honor.
 5          THE COURT:  Sustained.
 6  BY MS. ARANGO:
 7    Q.    What does it say under "United State Amexem"?
 8    A.    "The Moroccan Empire Northwest Amexem,
 9  northwestern and southwestern shores of Africa realms,
10  federalize municipal principality Government entity."
11    Q.    And, again, do you see a photograph on the
12  right-hand side of this exhibit?
13    A.    Yes.  That's a photograph of Sultan Kahn-Bey.
14    Q.    And next to that photograph, what does that
15  appear to be at his feet?
16    A.    A fingerprint or thumbprint.
17    Q.    And then the upper -- the lower left-hand side of
18  this document?
19    A.    It's a smaller version of the Divine Constitution
20  and Bylaws of the Moorish Holy Temple of Science.
21    Q.    Turning to the back of Government's Exhibit 24,
22  do you see any items contained on the back of this
23  Government's exhibit?
24    A.    Yes.  The one in the center is Religious
25  Affidavit of Organization.
```

```
 1            On the right-hand side, there's a smaller version

 2   of The Moorish Holy Temple of Science of the World

 3   document.

 4            On the left-hand side is a picture of Noble Drew

 5   Ali.

 6   Q.    And can you see who signed this Religious

 7   Affidavit of Organization?

 8   A.    Sultan Kahn-Bey signed at the top portion and at

 9   the bottom as well.

10   Q.    Let me turn to Government's Exhibit 25.

11            What is that?

12   A.    It's a Moorish passport visa.

13   Q.    Whose photo is on it?

14   A.    Sultan Kahn-Bey.

15   Q.    And who is it issued to?

16   A.    Sultan A.T. Kahn-Bey.

17   Q.    What is the date of the issuance, if you can see

18   it?

19   A.    January 18th, 2005.

20   Q.    Just right under "Moorish USA Passport Visa,"

21   what are the words in green?

22   A.    "Religious Government prima facie Evidence."

23   Q.    There is also something on the back of

24   Government's Exhibit 25.  Do you see that?

25   A.    Yes.
```

1    Q.      Okay.  Whose name is back there?

2    A.      Sultan A.T. Kahn-Bey.

3    Q.      And let me just turn to the next exhibit, 26.

4    Government's Exhibit 26 I'm putting on the screen.

5            Do you recognize that document?

6    A.      Yes.  That's a Moorish license in amortization.

7    Q.      Do you know what "Moorish license in

8    amortization" means?

9    A.      No, I do not.

10   Q.      Who was it issued to?

11   A.      Sultan A.M. Kahn-Bey.

12   Q.      Do you see any photographs on there?

13   A.      Yes.  There's a photograph of Sultan Kahn-Bey.

14   Q.      Under the title The Moorish Holy Temple of

15   Science of the World -- what words are under that?

16   A.      "Political subdivision."

17   Q.      Then under that in parentheses?

18   A.      "State of Mecca City State."

19   Q.      Finally, Government's Exhibit No. 27.  I'm

20   showing you -- it's a booklet.  I'm showing you the

21   front portion of it, the front page.

22           Do you see that?

23   A.      Yes.

24   Q.      What is it?

25   A.      It's a passport.

```
1   Q.    And can you see what it's a passport for?

2   A.    State of USA Mecca City State.

3   Q.    Do you see who the passport was issued to?

4   A.    Sultan A.M. Kahn-Bey.

5   Q.    Who issued the passport?

6   A.    Prophet Noble Drew Ali.

7   Q.    And the signature above Sultan Kahn-Bey's

8   signature?

9   A.    Queen Zekaya Kahn-Bey.

10  Q.    Turning the third page over on its side, what is

11  that?

12  A.    It's a Moorish El Moroccan sovereign state

13  federal driver's license.

14  Q.    Turning to the fourth page, who is this federal

15  driver's license issued to?

16  A.    To Sultan A.M. Kahn-Bey.

17  Q.    Would you read the sentence right after his

18  signature.

19  A.    "As a public/private municipal armed law

20  enforcement officer, attache, sheik and divine minister

21  to establish under divine Muslim canon laws of the Holy

22  Koran of Mecca, Hindu laws of India, et cetera,

23  embassies, counselor posts, religious colonies and

24  nationalization and immigration services in the county

25  of Cook, city of Chicago and state of Illinois,
```

1   et cetera."

2   Q.    Does this claim that he's -- that he's to be

3   armed?

4   A.    Yes.

5   Q.    Then on the fifth page of Government's

6   Exhibit 28, what is that?

7   A.    That's a picture of Sultan Kahn-Bey.  And then

8   below that is his signature.

9   Q.    After you reviewed these documents with Sultan

10  Kahn-Bey, did there come a point in time when you spoke

11  to Patrick Abraham?

12  A.    Yes.

13  Q.    Now, was Patrick Abraham under arrest?

14  A.    No, he was not.

15  Q.    Was he free to leave?

16  A.    Yes, he was.

17  Q.    And how did his statement come about?

18  A.    Patrick Abraham asked me what all of this was

19  about.

20        I told him that I was there to investigate the

21  incident that happened on April 19th, the shooting

22  incident, where Sultan Kahn-Bey fired a weapon at

23  Master Ali Athea.

24  Q.    Now, after that, did Patrick Abraham make any

25  statements to you?

Rathel - DIRECT - By Ms. Arango                    91

1    A.    Yes, he did.  He told me that he was present on

2    that day when the shooting occurred and stated that

3    Sultan Kahn-Bey and Master Ali Athea had a heated

4    argument.

5          Sultan Kahn-Bey wanted Master Ali Athea to leave

6    the premises after he refused to submit to what he

7    called a council.

8          When Master Athea refused to leave or was not

9    leaving quick enough, Sultan Kahn-Bey produced a pistol

10   and shot at him.

11         But according to Patrick Abraham, it was his

12   belief that Sultan Kahn-Bey did not intend to shoot

13   Master Athea.  In his words, it was just a warning shot

14   to get him to leave the premises.

15   Q.    What, if anything, did Patrick Abraham tell you

16   about why Sultan Kahn-Bey had the pistol?

17   A.    Patrick Abraham stated that he and another

18   individual contributed money together to buy the gun.

19   The gun was to be used as protection for the premises

20   where the shooting happened.

21         But on that day, Sultan Kahn-Bey was wearing the

22   uniform.  Whoever is wearing the uniform, which I

23   described earlier as being the olive drab BDU uniform,

24   is charged with the duties of being security.

25         So Sultan Kahn-Bey had that uniform on on that

1    day and was, therefore, in charge of security.

2         Patrick Abraham stated that, normally, he is in

3    charge of security for the premises, but on that day he

4    was not wearing the uniform and, therefore, did not

5    have the authority to carry the weapon and act as

6    security.

7    Q.    Thank you.

8         MS. ARANGO:  Thank you.  I have no further

9    questions.

10        THE COURT:  Ms. Jhones?

11        MS. JHONES:  Your Honor, pursuant to the

12   side-bar, I'm in need of those items so I can conduct

13   my cross.

14        THE COURT:  Do you have those items for her?

15        MS. ARANGO:  I do, Judge.

16        THE COURT:  Okay.

17        MS. JHONES:  Thank you.

18        MS. ARANGO:  Judge, I'm sorry.  I did have

19   them just a moment ago.  Can I just have a moment to

20   look for them?

21        THE COURT:  Sure.

22                    CROSS-EXAMINATION

23   BY MS. JHONES:

24   Q.    Good morning, Agent.  How are you?

25   A.    Good morning.  Fine.

Rathel - CROSS - By Ms. Jhones                    93

1    Q.     I just need a minute.

2    A.     Sure.

3          MS. JHONES:  Thanks for the Court's patience,

4    your Honor.

5          THE COURT:  No problem.

6          MS. JHONES:  Your Honor, may I approach this

7    witness?  Actually, let me ask some questions before I

8    approach.

9    BY MS. JHONES:

10   Q.     Special Agent Rathel, you have testified that the

11   documents that the Government has introduced into

12   evidence were seized from a briefcase that was

13   contained in a vehicle in which Sultan Kahn-Bey was

14   driving.  Correct?

15   A.     At the time that I saw the briefcase in the car,

16   Sultan Kahn-Bey was not in that vehicle.

17   Q.     Oh, okay.  But I think you testified -- correct

18   me if I'm wrong -- that this briefcase -- the

19   Government's exhibits were contained in a briefcase.

20   Correct?

21   A.     Yes.

22   Q.     And that was the briefcase that -- if I

23   understood your testimony, was a briefcase that you had

24   previously seen Sultan Kahn-Bey carrying?

25   A.     Yes.  That's correct.

Rathel - CROSS - By Ms. Jhones                          94

```
 1   Q.     And in addition to these documents -- these
 2   documents were obtained when you went over to -- I
 3   believe you stated to Patrick Abraham's home?
 4   A.     Yes.  That's correct.
 5   Q.     In addition to these documents that were provided
 6   to you that were contained in the briefcase, there were
 7   other documents as well?
 8   A.     Yes.  That's correct.
 9          MS. JHONES:  May I approach the witness, your
10   Honor?
11          THE COURT:  Show the Government.
12          MS. JHONES:  Sure.  These are the ones they
13   gave me, your Honor.
14          MS. ARANGO:  Judge, I have no objection to the
15   admission of these documents, if she wants to put them
16   through.
17          THE COURT:  Okay.
18          MS. JHONES:  May I approach for
19   identification, your Honor?
20          THE COURT:  Yes.
21          MS. JHONES:  Thank you, your Honor.
22   BY MS. JHONES:
23   Q.     Special Agent Rathel, I'm going to show you
24   what's marked as identification -- for identification
25   as Exhibit C-14 --
```

Rathel - CROSS - By Ms. Jhones

```
 1              THE COURT REPORTER:  I'm sorry.  Defense or
 2    Government?
 3              MS. JHONES:  Defense.  I'm sorry.
 4    BY MS. JHONES:
 5    Q.      -- Defense C-14, C-13, C-15, C-17, C-16, C-18,
 6    C-19 and C-20.
 7              Special Agent Rathel, do you recognize those
 8    documents?
 9    A.      Yes, I do.
10    Q.      And is it fair to say, sir, that those were
11    documents that were also contained in the briefcase
12    that you reviewed with Sultan Kahn-Bey on the date in
13    question?
14    A.      Yes.
15    Q.      And, sir, these documents, when you previously
16    testified -- without telling us what Mr. Kahn-Bey told
17    you, you previously testified that he was showing you
18    these documents.  Correct?
19    A.      Yes.
20    Q.      And he was trying to explain something to you.
21    Correct?
22    A.      Yes.
23    Q.      And in the process of doing that, you were
24    reviewing the exhibits that the Government has
25    introduced into evidence as well as those.  Correct?
```

Rathel - CROSS - By Ms. Jhones                    96

```
 1   A.    Yes.
 2             MS. JHONES:  At this time, your Honor, I'd
 3   like to introduce those exhibits on behalf of
 4   Mr. Batiste.
 5             MS. ARANGO:  No objection.
 6             THE COURT:  They will be introduced as Batiste
 7   Exhibits C-13 through C-20.
 8             (Whereupon, Defendant Batiste's Exhibit
 9   Nos. C-13 through C-20 were entered into evidence.)
10   BY MS. JHONES:
11   Q.    I don't know how best it is to do this, sir, but
12   I'm going to retrieve those documents from you, put
13   them on the ELMO and see if we can review them without
14   having to stand next to you.  Is that okay?
15   A.    Yes, ma'am.
16   Q.    Thank you.
17             Special Agent Rathel, C-20:  You recognize that
18   exhibit; do you not, sir?
19   A.    Yes.
20   Q.    And what is your understanding as to who this
21   individual is?
22   A.    Noble Drew Ali.
23   Q.    Special Agent Rathel, you're with the Alcohol,
24   Tobacco and Firearms agency.  Correct?
25   A.    That's correct.
```

1    Q.    Or Bureau.

2          Is it fair to say, sir, that you really don't

3    have any background on the Moorish Science Temple?

4    A.    Yes.

5    Q.    And you acquired some understanding just based

6    on your conversation that particular date with

7    Mr. Kahn-Bey, without telling us what he told you.

8    Correct?  Is that fair to say?

9    A.    Yes.  That's correct.

10   Q.    And based on your understanding, Noble Drew Ali

11   is this gentleman that's depicted in this photograph.

12   Correct?

13   A.    Yes.

14   Q.    Now showing you Defense Exhibit C-19, again, this

15   was one of those documents.  Correct?

16   A.    Yes.

17   Q.    And, sir, what's depicted in this article are the

18   articles of the US Constitution.  Correct?

19   A.    I can't say are for certain without comparing the

20   two articles side by side.

21   Q.    Okay.  Showing you Defense Exhibit C-18, that was

22   also one of the documents.  Correct?

23   A.    Yes.

24   Q.    And this is -- the document pretty much is

25   self-explanatory.

Rathel - CROSS - By Ms. Jhones                    98

1          But this is what's considered to be a divine

2    ministry.  Correct, sir?

3    A.    Yes.

4    Q.    This is one of the documents that was reviewed by

5    you in the presence of Mr. Kahn-Bey.  Fair to say?

6    A.    He removed several of the documents to explain to

7    me his points he was trying to make.  I'm not certain

8    if this is one particular one he talked about.  But,

9    yes, there were numerous documents that he reviewed.

10   Q.    Fair enough.  Fair enough.

11         Additionally, sir, Defense Exhibit C-13:  Do you

12   recall -- let me know if you need to see it up close,

13   since I can't seem to get this whole thing on the ELMO.

14         Do you remember this particular document?

15   A.    I do.  It's consistent with the other documents.

16   I can't say for certain that I remember that particular

17   one.  But, yes, it does appear to be of the same

18   documents that were in the briefcase.

19   Q.    Do you have any memory, sir, as to whether or not

20   this particular exhibit represents the -- Article I of

21   the US Constitution?

22   A.    I can't say.

23   Q.    Without comparing one to the other?

24   A.    Yes, ma'am.

25   Q.    Again, C-14:  This is -- fair to say, Agent

1    Rathel, that what's on the ELMO, C-14, is basically a

2    larger version of Government's Exhibit -- of one of the

3    items depicted on Government's Exhibit 23, namely, this

4    one right here?

5    A.    Yes.

6    Q.    They're basically identical, except one is blown

7    up and one is not?

8    A.    Appears to be.  Yes, ma'am.

9    Q.    And depicted in this document, Defense

10   Exhibit C-14, in particular, sir, is Article IV.

11   Correct?

12   A.    Are you asking is Article IV on the --

13   Q.    Yes.

14   A.    Yes.

15   Q.    Now, Article IV, sir, deals with a

16   Moorish-American and -- correct?  It refers to a

17   Moorish-American?

18   A.    Yes.

19   Q.    And the document also refers to what Moorish --

20   what laws the Moorish-Americans are to obey; does it

21   not?

22   A.    Yes.

23   Q.    And it also speaks to -- it addresses, I should

24   say, the requirement that they obey the laws of the

25   Government.  Correct?

Rathel - CROSS - By Ms. Jhones                100

```
 1   A.     Yes.

 2   Q.     And Article V, sir, which is right below, talks

 3   about the organization, i.e., the Moorish Holy Temple

 4   of Science; does it not, sir?

 5   A.     Yes.

 6   Q.     And it relates in Article V of the Divine

 7   Constitution and Bylaws that the Moorish Science Temple

 8   is not to cause any confusion or to overthrow the laws

 9   and the Constitution of said Government, but to obey

10   thereby, does it not -- or hereby?

11   A.     Yes.

12   Q.     Among the documents that were reviewed, sir, was

13   also Defense Exhibit C-15.  Let me see if I can --

14   correct?

15   A.     I do remember seeing the document.  Yes.

16   Q.     This has several pages to it.  Correct?

17   A.     Yes.

18   Q.     And also reviewed was Defense Exhibit C-16.

19          Do you remember this document, sir?

20   A.     Yes, I do.

21   Q.     And is it fair to say that -- well, first of all,

22   this document purports to be a treaty; does it not?

23   A.     Yes.

24   Q.     And it's a treaty -- basically, an international

25   agreement between the United States and Morocco?
```

Rathel - CROSS - By Ms. Jhones                    101

```
 1    A.      Yes.

 2    Q.      Does that ring a bell?

 3    A.      I do remember discussing a treaty.  Yes.

 4    Q.      And is it fair to say, sir, that this document --

 5    I think I just answered my question.

 6            But just to be clear, this is one of the

 7    documents that was discussed with you by Mr. Kahn-Bey?

 8    A.      Yes.

 9    Q.      Okay.  Finally, sir, I'm going to show you

10    Exhibit C-17.

11            That was one of those documents also that was

12    shown to you and/or reviewed during the course of this

13    discussion that you had with Mr. Kahn-Bey?  And let me

14    know if you need to see it up close.

15    A.      I can see it.

16            I don't remember that one particular document.

17    But it is consistent with the other documents that I

18    saw in the previous case.  I don't remember discussing

19    that particular one.

20    Q.      Fair enough.

21            Now showing you Government's Exhibit 26 --

22    actually, I'm going to put a couple of them on the

23    ELMO, just to expedite things.

24            Government's Exhibits 26, 25 and Government's

25    Exhibit 27:  Those were documents that were also
```

Rathel - CROSS - By Ms. Jhones                        102

```
 1   discussed with you by Mr. Kahn-Bey.  Correct?
 2   A.    Yes.
 3   Q.    And is it fair to say, sir, in reviewing these
 4   documents, these are like identification documents?
 5   A.    Yes.
 6   Q.    And specifically as it relates to Government's
 7   Exhibit 27, this is a passport.  Correct?
 8   A.    Yes.
 9   Q.    Like a travel document?
10   A.    Yes.
11   Q.    Finally, Government's Exhibit 28:  This is
12   basically a driver's license?
13   A.    Yes.
14   Q.    For Moorish citizens?
15   A.    Yes.  As it reads, that's what it is.
16   Q.    Now, Agent Rathel, the Government asked you some
17   questions about some of the names that were contained
18   in -- well, let me just show it to you.
19         Government's Exhibit 21:  This is -- purports to
20   be a charter of some sort.  Right?
21   A.    Yes.
22   Q.    It's too big to put on the ELMO.
23         Is it fair to say, Agent Rathel, that there are
24   several names that are contained in this charter,
25   handwritten names?
```

Rathel - CROSS - By Ms. Jhones                103

```
1    A.    Yes.

2    Q.    And is it fair to say, Agent Rathel, that at no

3    time did you undertake to contact or attempt to contact

4    any of the individuals that are referenced in this

5    charter?

6    A.    That's correct.

7    Q.    In this one exhibit -- I'm sorry for going back

8    and forth.

9          I'm going -- Defense Exhibit C-16, the treaty,

10   sir:  There are certain federal statutes that are

11   referenced in this document.  Correct?

12   A.    Yes.

13   Q.    These statutes reference certain laws and powers

14   that are conveyed by virtue of those laws.

15         Is it fair to say it's a legal document?

16   A.    It's fair to say it's at least made to look like

17   a legal document.

18   Q.    Well, let me ask you this:  This document is a

19   document that deals with -- which refers to certain

20   codes -- certain federal codes?

21   A.    It appears to.  But I haven't researched to see

22   if the actual codes represent an actual law.

23   Q.    You basically saw it, but then you just left it

24   alone.  Fair enough?

25   A.    Yes.
```

Rathel - CROSS - By Mr. Vereen                    104

```
 1   Q.     Fair to say you don't have any training -- well,
 2   you are a law enforcement officer.
 3          But in terms of -- you're not a lawyer and you
 4   would not know whether whatever statutes are contained
 5   therein -- what they mean and that sort of thing --
 6   A.     Not without researching them.  No, I wouldn't.
 7   Q.     -- as a matter of law?
 8          Okay.  Fair enough.
 9          Thank you very much, sir.
10   A.     You're welcome.
11          MS. JHONES:  I believe I don't have anything
12   further, your Honor.  I just need to review my notes.
13          THE COURT:  Okay.
14          MS. JHONES:  I have nothing further, your
15   Honor.  Thank you.
16          THE COURT:  Mr. Vereen?
17          MR. VEREEN:  Thank you, Judge.
18                    CROSS-EXAMINATION
19   BY MR. VEREEN:
20   Q.     Good afternoon, Agent.
21   A.     Good afternoon, sir.
22   Q.     The documents that you were shown on direct
23   examination as well as the documents that you were
24   shown by Ms. Jhones on cross-examination:  Were those
25   all of the documents that were contained within that
```

1   briefcase?

2   A.    I can't say, sir.  I know there were numerous

3   documents.  I don't know how many were in it.

4   Q.    Did you see any books on Freemasonry inside of

5   that briefcase?

6   A.    I don't recall for certain.

7   Q.    Do you know what a Masonic emblem is?

8   A.    Yes, I do.

9   Q.    The compass, the square and the "G" in the

10  middle?

11  A.    Yes.

12  Q.    Did you see that on any pamphlets or binders

13  inside of that briefcase?

14  A.    I don't recall, sir.

15  Q.    That's not one of the things Sultan Kahn-Bey

16  discussed with you, is it?

17  A.    No, sir.

18  Q.    You didn't find any documents related to the

19  El Rukn gang out of Chicago inside that briefcase, did

20  you?

21  A.    Not that I recall.  No.

22  Q.    You didn't see any letters inside that briefcase

23  authored by an individual known as Jeff Fort, did you?

24  A.    No.  Not that I recall.

25  Q.    You didn't see any literature or documents

1  relating to the Gangster Disciples out of Chicago, did

2  you?

3  A.    No, I did not.

4  Q.    Nor did you see any documents relating to the

5  Vice Lords out of Chicago, did you?

6  A.    No.

7  Q.    You didn't see any photographs of any gang

8  members standing around wearing camouflage uniforms

9  with Moroccan fezzes on their heads drinking out of

10  glasses either, did you?

11  A.    No, I did not.

12  Q.    Let me show you what's in evidence as

13  Government's Exhibit 25.

14       What is that last quote that you see on this

15  document?

16  A.    "I am a citizen of the USA."

17            MR. VEREEN:  No further questions.

18            Thank you.

19            THE WITNESS:  Certainly.

20            THE COURT:  Mr. Houlihan?

21            MR. HOULIHAN:  No questions.

22            THE COURT:  Mr. Clark?

23            MR. CLARK:  No further questions, your Honor.

24            THE COURT:  Mr. Casuso?

25            MR. CASUSO:  No questions.  Thank you, Judge.

```
 1              THE COURT:  Mr. Levin?

 2              MR. LEVIN:  Thank you, your Honor.

 3                    CROSS-EXAMINATION

 4   BY MR. LEVIN:

 5   Q.    Good afternoon --

 6   A.    Good afternoon.

 7   Q.    -- Agent Rathel.

 8         "Rathel" or "Rathel"?

 9   A.    "Rathel."

10   Q.    Now, you had indicated that you went to the Dade

11   County criminal courthouse, commonly referred to as the

12   Richard E. Gerstein Justice Building?

13   A.    Yes.

14   Q.    That was on May the 5th of 2006?

15   A.    Correct.

16   Q.    The purpose for your going there was to

17   effectuate the arrest of Sultan Kahn-Bey.  Correct?

18   A.    Yes.

19   Q.    I believe you testified that you actually went

20   into the -- into a courtroom and observed proceedings

21   going on.

22   A.    Yes.  An agent accompanied me -- an agent with me

23   went inside and observed the proceedings.

24   Q.    You and a fellow agent went inside a courtroom?

25   A.    The fellow agent did.  Yes, sir.
```

Rathel - CROSS - By Mr. Levin                    108

1    Q.    You didn't go in the courtroom?

2    A.    No, sir.

3    Q.    Okay.  So you didn't observe any proceedings

4    going on?

5    A.    No, sir.

6    Q.    You had indicated -- I believe you indicated on

7    your direct examination that you saw proceedings going

8    on, that you went into a courtroom and you told a judge

9    why you were there.

10   A.     It wasn't I that told, sir.  If I said that, I

11   misspoke.  It was the agent that was with me that did

12   that.

13   Q.    So a fellow agent went up and told the Judge why

14   you were there?

15   A.     Yes.  That's correct.

16   Q.    And you, Special Agent Rathel, did not observe

17   any proceedings going on?

18   A.     Not relating to that.  I did step inside briefly

19   the courtroom, but I was not there -- I didn't make a

20   statement to the Judge.

21   Q.    Now, in fact, Sultan Kahn-Bey never made it into

22   a courtroom, did he, sir?

23   A.     No, sir.  I don't believe he did.

24   Q.    In fact, sir, you went to the Richard E. Gerstein

25   Justice Building accompanied with how many other

1    agents?

2    A.    I don't remember the exact number, but I would

3    say an estimate of six, maybe.

4    Q.    With six other agents or a total of six?

5    A.    Total of six, approximately.

6    Q.    And you basically were doing, would you agree

7    with me, a surveillance, that is, you were looking for

8    Sultan Kahn-Bey to come into the building?

9    A.    Yes.

10   Q.    And the justice building -- for the benefit of

11   the ladies and gentlemen of the jury, there are a lot

12   of police officers at that building.  Correct?

13   A.    Yes.  That's correct.

14          MS. ARANGO:  Objection.  Relevance, Judge.

15          THE COURT:  Overruled.

16   BY MR. LEVIN:

17   Q.    They're in uniform, uniformed police officers?

18   A.    Yes.

19   Q.    They wear badges, et cetera, et cetera.  Right?

20   A.    Correct.

21   Q.    And you are in a position where you observed

22   Sultan Kahn-Bey go through what we call, I guess, a

23   magnetometer similar to the one this building.

24          Would you agree with that?

25   A.    I didn't see him go through it, but I would agree

 1   that, yes, to enter the building, you do have go

 2   through a magnetometer.

 3   Q.    When he cleared the magnetometer is when you

 4   approached him.  Correct?

 5   A.    When he got upstairs to the -- outside the

 6   courtroom to make his appearance.

 7   Q.    Well, do you recall testifying in a prior

 8   proceeding on March the 4th of 2008 at Page 221,

 9   Lines 18 through 21, and being asked the following

10   question and giving the following answer:

11        "In fact, when you came into contact with

12   Mr. Kahn-Bey and Mr. Abraham, they had just apparently

13   cleared the magnetometer at the building.  Is that

14   accurate?

15        "Answer:  Yes"?

16        Do you recall that testimony?

17   A.    I do.

18   Q.    Okay.  Do you have a recollection today as to

19   where exactly or -- where you came into contact with

20   Sultan Kahn-Bey?

21   A.    We approached him on the floor of the courtroom.

22   He was making an appearance, which was -- I'm not sure

23   of the exact floor, but it was just a short distance

24   away from the magnetometer.

25   Q.    Okay.

1    A.    He would have to clear it and go upstairs to

2    where his courtroom is.

3    Q.    The courtroom was not on the first floor?

4    A.    No, it was not.

5    Q.    So you're saying he had just cleared the

6    magnetometer and then he went upstairs to the courtroom

7    and that's when you stopped him?

8    A.    Yes.

9    Q.    Now, when you stopped him, he was carrying a

10   briefcase?

11   A.    Yes.

12   Q.    And you basically asked him -- or told him why

13   you were stopping him?

14   A.    Yes.

15   Q.    You indicated that you were placing him under

16   arrest for being a felon in possession of a firearm.

17   Is that accurate?

18   A.    I don't know if we informed him of the charges at

19   that exact moment.  We effected the arrest and took him

20   to a more private area to explain what was going on.

21   Q.    And Mr. Abraham was in close proximity?

22   A.    Yes.

23   Q.    And did Mr. Abraham at that time ask you, like,

24   "What's going on here?"

25         He never asked you any questions at that time?

Rathel - CROSS - By Mr. Levin                    112

```
 1    A.      No.
 2    Q.      He didn't, like -- you weren't talking to him at
 3    that time.
 4            You were talking to Mr. Kahn-Bey.  Correct?
 5    A.      Yes, sir.
 6    Q.      But Mr. Abraham basically stayed in the vicinity
 7    while you were taking him away?
 8    A.      Yes.  That's correct.
 9    Q.      And then you would ask Mr. Abraham if he would
10    take possession of that briefcase?
11    A.      Yes.
12    Q.      You don't know whether or not Mr. Abraham knew
13    what was in the briefcase, do you, sir?
14    A.      No.  I don't know if he knew the entire contents.
15    Q.      And you don't know how it is that Mr. Abraham had
16    come into contact with Mr. Kahn-Bey to take him to the
17    courthouse.  Correct?
18    A.      No, I do not.
19    Q.      And, in fact, later on at the residence on
20    141st Street, that's when Mr. Abraham finally asked
21    you, "What's going on here, anyway?"  Correct?
22    A.      Correct.
23    Q.      Now, you said that Sultan Kahn-Bey was wearing a
24    military-style uniform with a purple fez.  Is that
25    accurate?
```

Rathel - CROSS - By Mr. Levin                    113

```
 1   A.      Yes.
 2   Q.      Mr. Abraham was wearing regular clothing; was he
 3   not?
 4   A.      Yes.
 5   Q.      He wasn't wearing a military-style uniform with a
 6   purple hat?
 7   A.      No, he was not.
 8   Q.      Then, apparently, there came a point in time when
 9   you went to this 141st Street location and nobody was
10   there.  Is that accurate?
11   A.      Yes.
12   Q.      That's when Sultan Kahn-Bey called his wife?
13   A.      Yes.
14   Q.      And then shortly thereafter she arrived along
15   with Melinda Clark and Patrick Abraham.  Correct?
16   A.      Yes.
17   Q.      When they arrived, you had asked -- I believe you
18   testified you asked Melinda Clark for permission to
19   search her vehicle.  Is that accurate?
20   A.      Yes.
21   Q.      You would agree with me, sir, that both
22   Mr. Abraham and Ms. Clark gave you permission to search
23   the vehicle?
24   A.      Yes.
25   Q.      That Mr. Abraham was cooperative with you?
```

1    A.    Yes.

2    Q.    And you searched that vehicle and you found the

3    briefcase in the trunk.  Correct?

4    A.    Yes.

5    Q.    That was the same briefcase that you had asked of

6    Mr. Kahn-Bey to give to Mr. Abraham so you didn't have

7    to, in essence, take it in and go through the contents.

8          It would make the process easier, I believe is

9    what you said.  Is that correct?

10   A.    Yes.

11   Q.    Now, when you searched that vehicle, you didn't

12   find any evidence of terrorism, did you, sir?

13   A.    No.

14   Q.    You didn't find any blueprints of any buildings.

15   Correct?

16   A.    Correct.

17   Q.    You didn't find any photographs of any -- of the

18   courthouse or police stations or FBI buildings or

19   anything like that.  Correct?

20   A.    I did not.

21   Q.    Now, at the point when Mr. Abraham gave you the

22   briefcase -- or that you took the briefcase out of the

23   trunk, that's when you went inside and met with Sultan

24   Kahn-Bey?

25   A.    I didn't actually go inside.  I remained outside.

Rathel - CROSS - By Mr. Levin                    115

1   That's when the briefcase was taken inside.  Yes, sir.

2   Q.    And Patrick Abraham was not under any kind of

3   arrest.  Correct?

4   A.    Correct.

5   Q.    And Patrick Abraham was, in fact, free to leave.

6         He didn't have to stay there, did he?

7   A.    He did not have to stay.

8   Q.    But, nonetheless, he stayed there?

9   A.    Yes.

10  Q.    He knew that you were a federal law enforcement

11  agent.  Correct?

12  A.    I don't know if at that time I had identified

13  myself as a federal law enforcement officer or not.

14  Q.    Would you agree with me, sir, that when you --

15  you presented credentials at least to Sultan Kahn-Bey,

16  "credentials" meaning your identification, identifying

17  yourself as an ATF agent?

18  A.    Yes.

19  Q.    And Patrick Abraham was in close proximity to him

20  when you did that?

21  A.    Yes.

22  Q.    Now, another agent apparently went inside and

23  showed certain documents to Mr. Kahn-Bey.  Is that

24  accurate?

25  A.    To review the documents together.  Yes, sir.

Rathel - CROSS - By Mr. Levin                116

1    Q.     Right.

2           Those are the documents that -- some of which

3    were introduced into evidence in this case.  Is that

4    accurate?

5    A.     Yes.

6    Q.     Now, I'd like to refer you to -- I believe it's

7    Government's Exhibit 27.  Is that okay?

8    A.     Yes, sir.

9    Q.     Ms. Arango had you read a portion of this

10   particular exhibit.

11          Do you recall that?

12   A.     Yes.

13   Q.     You stopped in the middle, I believe.

14          And then, you would agree with me -- can you read

15   what appears at, "The above...", starting from that

16   point.

17   A.     Yes.  "The above *prima facie* evidence, Moorish

18   religious Government, Government affidavit is pursuant

19   to the United States of America and Morocco in 1787.

20   The Constitution of the United States of America,

21   Article 3, Section 2; and Article 3, Clause 2, under

22   the original jurisdiction of the Supreme Court;

23   pursuant to the code of private international law,

24   annexed to the Constitution adopted at Habana, Havana,

25   Cuba, February 20, 1928, called the Bustamante Code of

1   Private and International Law, 1928.

2            "Also, the -- also, the code of the laws of

3   the United of America of a general and permanent

4   character in force, January 3rd, 1935, 1934 edition,

5   133, Page 954, Title 22, foreign relations and

6   intercourse, Chapter 2, consular courts.  (See 141-181,

7   et cetera.)

8            "And finally, the Vienna Convention on

9   diplomatic relations, Article 1 through 51, ambassadors

10  and diplomatic consul, the status of prisoners of war

11  is held by the aforesaid Moorish Government and its

12  members/citizens, pursuant to the law of nations

13  and United -- and the United Nations, *ipso facto*, *ipso*

14  *jure*, Moorish Bey proprietary signatory, USA."

15  Q.     Thank you, sir.

16         Now, you indicated that you had conversation with

17  Mr. Abraham outside.

18         Do you recall that?

19  A.     Yes.

20  Q.     That's when he discussed what this was all about.

21  Correct?

22  A.     Yes.

23  Q.     He told you that he was present on the day that a

24  shooting incident occurred between Sultan Kahn-Bey and

25  a guy named Master Athea.

1          Do you recall that?

2   A.     Yes.

3   Q.     He'd indicated, apparently, to you that the gun

4   belonged to him and it was for protection of the

5   premises at 6260.  Correct?

6   A.     He indicated that he and another person both

7   contributed money to buy it for the protection of that

8   premises.

9   Q.     And that gun was actually purchased from a gun

10  shop; was it not?

11  A.     Yes.

12  Q.     It wasn't purchased from somebody on the street?

13  A.     No.

14  Q.     On that day, you did not arrest Patrick Abraham

15  for being in possession of a firearm by a convicted

16  felon; did you, sir?

17  A.     No, I did not.

18          MR. LEVIN:  Could I have a moment, your Honor?

19          THE COURT:  Yes.

20  BY MR. LEVIN:

21  Q.     Now, during your meeting or at any time with

22  Patrick Abraham, he never said anything to the effect

23  that he was not subject to the laws of United States,

24  did he, sir?

25  A.     No.

```
 1   Q.     And in connection with this investigation, Sultan

 2   Kahn-Bey was charged with being in possession of a

 3   firearm by a convicted felon.  Correct?

 4   A.     Yes.

 5   Q.     He was at no time ever charged with conspiracy to

 6   provide material support to any foreign terrorist

 7   organization.  Correct, sir?

 8   A.     Not that -- I did not charge him with that.  I

 9   don't know for certain what he was -- if he was charged

10   with anything else.  But I did not.

11   Q.     He wasn't charged in connection with that case.

12          You know that.  Correct, sir?

13   A.     Sir, I don't know -- I don't know.  I'm sorry.

14   Q.     You have been somewhat involved in this

15   investigation?

16          MS. ARANGO:  Objection.  Relevance, Judge.

17          THE COURT:  Sustained.

18   BY MR. LEVIN:

19   Q.     So it's your testimony that you don't know that

20   Sultan Kahn-Bey was never charged in connection with

21   this matter?

22          MS. ARANGO:  Objection.  Asked and answered,

23   Judge.

24          THE COURT:  Sustained.

25          MR. LEVIN:  Could I have a moment, your Honor?
```

```
 1              THE COURT:  Sure.

 2              MR. LEVIN:  Thank you.

 3              That's all I have, your Honor.  Thank you.

 4              THE COURT:  Ms. Arango.

 5                    REDIRECT EXAMINATION

 6  BY MS. ARANGO:

 7  Q.    Agent Rathel, Ms. Jhones put up here Government's

 8  Exhibit 25 and 26 and 27.

 9        And she asked you:  Aren't these passports or

10  travel documents?

11        Do you recall that?

12  A.    Yes.

13  Q.    Do you know whether or not these travel documents

14  are legal?

15  A.    I don't know.  They don't appear to be official.

16  Q.    Also, she asked you about Government's

17  Exhibit 28.  She asked you:  Well, this is just a

18  driver's license.

19        Do you know whether or not this driver's license

20  is legal?

21  A.    That is not a legal driver's license.

22  Q.    Now, Mr. Vereen put a portion of Government's

23  Exhibit 25 up here, the very last sentence that says,

24  "I am a citizen of the United States."

25        Would you just read to the members of the jury
```

 1    the rest of it.  Would you read from the beginning of

 2    that.

 3    A.    "This is your nationality and identification card

 4    for the Moorish divine and national movement in North

 5    America and birth rights for the Moorish-Americans,

 6    et cetera.

 7          "We honor all the divine prophets, Jesus,

 8    Mohammed, Buddha and Confucius.

 9          "May blessings of the God of our father Allah be

10    upon you that carry this card.

11          "I do hereby declare that you are a Muslim under

12    the divine laws of the Holy Koran of Mecca.  Love,

13    truth, peace, freedom and justice.

14          "I am a citizen of the USA, Noble Drew Ali,

15    Prophet."

16    Q.    Just continue with the location.

17    A.    "7420 South Ingleside, Chicago, Illinois."

18    Q.    Again, the front of that document is listed as a

19    Moorish USA passport visa.  Correct?

20    A.    Yes.

21          MS. ARANGO:  May I have just one moment, Judge

22    some.

23          THE COURT:  Yes.

24          MS. ARANGO:  I have no further questions,

25    Judge.

 1              THE COURT:  You may step down, sir.

 2              THE WITNESS:  Thank you.

 3              (Witness excused.)

 4              THE COURT:  We're going to break for lunch.

 5         Do not discuss this case either amongst

 6    yourselves or with anyone else.  Have no contact

 7    whatsoever with anyone associated with the trial.  Do

 8    not read, listen or see anything touching on this

 9    matter in any way.

10              If anyone should try to talk to you about this

11    case, you should immediately instruct them to stop and

12    report it to my staff.

13              You may leave your materials at your chairs.

14    Please be back in the jury room at 1:30.

15              Enjoy your lunch.

16              (Whereupon, the jury exited the courtroom at

17    12:25 p.m. and the following proceedings were had:)

18              THE COURT:  You may be seated for one moment.

19              Would you let us know when that door is

20    closed, please.

21              I have an *ex parte* matter to take up with

22    defense counsel for just few minutes.  So the

23    Government is excused for lunch, unless there's

24    something you need --

25              MR. GREGORIE:  Your Honor, if I may, I had one

1   housekeeping matter with regard to your Honor's ruling

2   yesterday.

3          THE COURT:  Yes.

4          MR. GREGORIE:  After going back over with the

5   expert witness his potential testimony, if the defense

6   is going to be allowed to go into all of the criminal

7   acts on cross-examination, it not only makes the expert

8   look like he doesn't know what he's talking about, but

9   it also is an unfair advantage on the part of the

10  defense because I'm going to be avoiding all of the

11  talked-about acts in prison, his uniting the gangs in

12  prison, all of those pieces of testimony.

13         I'm willing to do that, Judge, but only if I

14  get an assurance that the defense is not going to go

15  into the criminal acts on cross.

16         If, as Mr. Vereen said yesterday, he intends

17  to do that, then I should be allowed to cover some of

18  those materials on direct.

19         Otherwise, it looks like my expert is not

20  qualified and that we are deliberately leaving out

21  essential parts of the story, Judge.

22         MR. VEREEN:  Judge, that's the equivalent of

23  the Government saying, "Well, we want to play tapes of

24  Mr. Batiste talking to CW No. 1 and CW No. 2, but we

25  don't want the defense to be able to play those tapes."

```
1              That argument makes absolutely no sense.

2              If -- you know, the Court has already ruled

3     with regard to what the Government is going to be

4     allowed to do, because they're the ones bringing this

5     particular expert to try to compare Jeff Fort's

6     organization to these gentlemen here.

7              And now he wants to come in and say -- you

8     know, he's trying to anticipate what we're going to

9     argue.  He's not getting any assurances from me.

10             THE COURT:  Well --

11             MR. VEREEN:  I'm not going to make any

12    assurances as to what I'm not going to do on

13    cross-examination.

14             THE COURT:  I did think about this last

15    evening after we -- court was recessed.

16             And I had indicated initially that I would not

17    allow the Government to go into those areas at the

18    request of the defense.

19             Mr. Vereen then asked if the Defendants would

20    be able to go into it on cross, and I indicated "yes."

21             But if the Defendants are going to bring up

22    those areas on cross, then I'm not going to preclude

23    the Government from going into it on direct.

24             I will certainly preclude them from going into

25    it on direct and leave all of that out at the request
```

1    of the defense because there were concerns on the part

2    of the Defendants that that would be too broad a brush

3    to connect the Defendants with Jeff Fort.

4              And I don't disagree with that.

5              But it would not be fair for the defense to be

6    able to bring that up and the Government not be able to

7    bring that up.

8              So if you assure me that you're not going to

9    go into it on cross, then I will not let the Government

10   to go into it on direct.  If you intend to go into it

11   on cross, I will allow the Government to go into it on

12   direct, though I don't want to focus on that

13   particularly.

14             I don't think that that's the purpose of your

15   presentation of the expert testimony.

16             MR. GREGORIE:  It is not, your Honor.  But it

17   would be important if the defense is then going to

18   cross-examine --

19             THE COURT:  If the defense assures me that

20   they don't intend to go into that, then I will not

21   allow the Government to go into that on direct.

22             If you want to have that availability on

23   cross, then I am not going to preclude the Government

24   from bringing up that particular scope.

25             MS. JHONES:  Your Honor, I think that -- in

```
 1    light of this issue, I think that, in fairness to the

 2    defense, we'd like to discuss it amongst ourselves.

 3              THE COURT:  That's fine.  No problem.

 4              MS. JHONES:  Okay.

 5              THE COURT:  So the Government is excused.  I

 6    just want to review a matter for just a few minutes

 7    with defense counsel.

 8              MR. GREGORIE:  Thank you, your Honor.

 9              MR. CLARK:  Your Honor, could they tell us

10    when they expect the expert to be on?

11              THE COURT:  When are you calling the expert?

12              MR. GREGORIE:  He will be the last witness,

13    your Honor.

14              Just for housekeeping purposes, we have the

15    agent that was in charge of the search at the Embassy.

16    Then we have the fingerprint expert.  Counsel wouldn't

17    stipulate.  We have the fingerprint expert that has to

18    go on.

19              And then I believe we have one witness, the

20    ICE agent, with regard to the confession of -- the

21    statements of Mr. Abraham.  And then we would go with

22    the expert.

23              Oh, I'm sorry.  We have to -- also the man who

24    took the fingerprints in order to get the fingerprint

25    expert on.
```

```
 1              THE COURT:  So it sounds like it's probably
 2    tomorrow morning.
 3              MR. GREGORIE:  I think that's probably true,
 4    your Honor.
 5              MR. VEREEN:  Your Honor, before the Government
 6    leaves, there is still the issue with regard to that
 7    surveillance log that this -- that their witness,
 8    Mr. Figueiras, stated that there was.
 9              THE COURT:  I believe Ms. Arango said she was
10    going to check and see if there was any other logs.
11              Were you able to do that?
12              MS. ARANGO:  Judge, I did agree.  And I
13    apologize.  I haven't done that.  I told the agents,
14    but I haven't checked with them.  I'll do that during
15    the lunch break.
16              THE COURT:  Okay.
17              MS. JHONES:  While Ms. Arango is going to look
18    for that, Agent Jonathan O'Neil testified about
19    additional logs.
20              We have only gotten one log, and that was the
21    surveillance log that dealt with the --
22              THE COURT:  Agent Jonathan O'Neil?
23              MS. JHONES:  Shields.  I'm sorry.  Shields.
24    Shields.
25              THE COURT:  Okay.
```

1          MR. LEVIN:  Wayne Shields.

2          MS. JHONES:  I'm sorry.  I misspoke.

3          Wayne Shields, the gentleman that testified

4   about the surveillance of April 11th.  I believe it was

5   the Government's first witness this morning.

6          This gentleman indicated that he had kept logs

7   of his surveillance.  In our discovery, the only

8   logs -- the only log that I have received -- and my

9   colleagues can correct me if I'm wrong -- were the

10  surveillance logs -- log of 3-25-06.

11         MS. ARANGO:  That's not accurate, Judge.

12         MS. JHONES:  I don't have any other

13  surveillance logs.

14         MS. ARANGO:  We provided all of the 302s,

15  which included the surveillance logs on varying dates.

16         And, in any event, those questions were asked

17  of him on cross-examination, not on direct examination.

18  We could have argued that it was outside the scope.

19         That doesn't make them relevant, the fact that

20  they asked that witness about the surveillance logs on

21  cross-examination.

22         MS. JHONES:  Your Honor, I could tell the

23  Court, as an officer of the Court -- and that's why I'm

24  asking my colleagues to correct me if I'm wrong -- I

25  have every 302 in chronological order.  I have one

1    surveillance log of 3-25-06.

2              And I don't believe that it is a great

3    inconvenience, if they're going to look for a

4    surveillance log of 3-25, an updated or corrected

5    version, if there are additional -- I don't believe --

6              THE COURT:  Will you check and see if there

7    are additional logs --

8              MS. ARANGO:  I will, Judge.

9              THE COURT:  -- concerning Agent Shields,

10   please?

11             Thank you.  You're excused.

12             (Thereupon, a luncheon recess was taken, after

13   which the following proceedings were had:)

14             THE COURT:  We're back on United States of

15   America versus Narseal Batiste, et al., Case

16   No. 06-20373.

17             Counsel, state your appearances, please, for

18   the record.

19             MR. GREGORIE:  Richard Gregorie and Jacqueline

20   Arango on behalf of the United States, your Honor.

21             MS. JHONES:  Ana Jhones on behalf of Narseal

22   Batiste, who is present.

23             MR. LEVIN:  Albert Levin on behalf of Patrick

24   Abraham, who's present.

25             MR. CASUSO:  Lou Casuso on behalf of Burson

```
 1    Augustin, who's present.
 2            MR. CLARK:  Nathan Clark for Rotschild
 3    Augustine, who's present.
 4            MR. HOULIHAN:  Richard Houlihan on behalf of
 5    Naudimar Herrera.
 6            MR. VEREEN:  Rod Vereen on behalf of Stanley
 7    Phanor, who's present.
 8            THE COURT:  All Defendants are present.
 9            Let's bring in the jurors.
10            (Whereupon, the jury entered the courtroom at
11    1:49 p.m. and the following proceedings were had:)
12            THE COURT:  You may be seated.
13            You may proceed.
14            MS. ARANGO:  Thank you.
15            Good afternoon, ladies and gentlemen.
16            The United States calls Lisa Lamey to the
17    stand.
18    Thereupon--
19                    LISA LAMEY
20    was called as a witness by the Government and, having
21    been first duly sworn, testified as follows:
22            THE COURT REPORTER:  Take a seat, please.
23            Please state your name for the record and give
24    a spelling for the last name.
25            THE WITNESS:  Lisa Lamey, L-a-m-e-y.
```

                          DIRECT EXAMINATION

BY MS. ARANGO:

Q.     What do you do for a living?

A.     I'm a special agent with the FBI.

Q.     How long have you been an FBI special agent?

A.     Since September of 1996.

Q.     And what do you presently -- what's your present
position with the FBI?

A.     Presently, I'm assigned to a gang squad as an
investigator.

Q.     Now, prior to being an investigator for the gang
squad, did you have any other duties with the FBI?

A.     Yes.  I was also -- or am currently also a member
of the evidence response team and an assistant team
leader.

Q.     Would you please explain to the members of the
jury what the evidence response team does.

A.     The evidence response team responds to different
crime scenes and/or search warrants and collects
evidence from those scenes.

Q.     How long have you been with the evidence response
team?

A.     I would say approximately ten years.

Q.     Now, as part of the evidence response team, do
you execute search warrants?

1    A.      We do on occasion.

2    Q.      Let me refer your attention to June 22nd of 2006.

3            Did you participate in a search on that day?

4    A.      Yes, I did.

5    Q.      And what was the location of the search, if you

6    remember?

7    A.      I believe it was 6260 and 6262 Northwest 15th

8    Avenue.

9    Q.      Let me show you -- let me ask you this:  During

10   the course of the search, were any photographs taken?

11   A.      Yes.

12   Q.      Let me show you what's been marked as

13   Exhibits 126-A through -F and ask you if you recognize

14   them.

15           I'm showing you what's been marked as

16   Government's Exhibits 126-A through -F.  Please take a

17   look at them and let me know if you recognize them.

18   A.      Yes.  They're photographs taken at the search

19   site.

20   Q.      Are they true and accurate photographs -- excuse

21   me.

22           Do they truly and accurately depict the building

23   that you searched on June 26th, 2006?

24   A.      Yes.

25   Q.      Were those picture taken during the course of the

 1   search?

 2   A.     Yes.

 3   Q.     Do you recognize the areas that are depicted in

 4   those photographs?

 5   A.     Yes.

 6          MS. ARANGO:   Government offers 126-A through

 7   -F into evidence.

 8          MS. JHONES:   I don't have any objection, your

 9   Honor.

10          MR. LEVIN:   No objection.

11          THE COURT:   They will be admitted as

12   Government's Exhibits 126-A through -F.

13          (Whereupon, Government's Exhibit Nos. 126-A

14   through 126-F were entered into evidence.)

15          THE COURT:   You may publish.

16          MS. ARANGO:   Thank you.

17   BY MS. ARANGO:

18   Q.     I'm showing you first what's been marked as

19   Government's Exhibit 126-C.

20          Would you tell the members of the jury what that

21   is.

22   A.     That's the search location.

23   Q.     Now I'm showing you what's been marked as

24   Government's Exhibit 126-B.

25          What's that?

1   A.    That's the interior of the search location -- or

2   one of the rooms, I should say, of the search location.

3   Q.    Looking at the door that I'm pointing to towards

4   the back of the room, what does that door lead to, if

5   you recall?

6   A.    If you're standing in the room, that leads

7   directly outside.

8   Q.    And let me show you what's been marked as

9   Government's Exhibit 126-A.

10        What does this photograph depict?

11  A.    That's a different angle in the same room.

12  Q.    And turning back to 126-B, is that the opposite

13  angle?

14  A.    Correct.  When you're looking at the door with

15  the light behind it, that's one side of the room.  And

16  then the larger pull-down door is the other side of the

17  room.

18  Q.    I'm showing you what's been marked as

19  Government's Exhibit 126-D, and ask you if you

20  recognize that.

21  A.    I do.

22  Q.    What is that?

23  A.    That's also the search location depicting the

24  doors that we just saw from the inside.

25  Q.    And is that the back of the location or the

```
 1   front?

 2   A.     That's the back.

 3   Q.     Is that the door that you went through?  I'm

 4   pointing to the door on the right-hand side.

 5   A.     Yes, it is.

 6   Q.     Now, during -- what -- just tell the members of

 7   the jury, what do you do during the course of a search?

 8   A.     In very broad terms, we identify and collect

 9   evidence that's on the scene.

10   Q.     And as you went through the rooms, were photos

11   taken of different areas of the search location?

12   A.     Yes.

13   Q.     Let me show you what's been marked as

14   Government's Exhibit 126-F, as in "Frank."  Let me zoom

15   in on this a little.

16          Now, would you tell the members of the jury where

17   this is.

18   A.     This is the interior of the location.  It's the

19   hallway adjacent to the room you just saw on the last

20   two pictures.

21   Q.     Do you see the Reeboks box in that location?

22   A.     Yes, I do.

23   Q.     Was that Reeboks box there as you executed your

24   search on June 22nd of 2006?

25   A.     Yes, it was.
```

1    Q.     Was it moved in any way prior to the taking of

2    this photograph?

3    A.     No.

4    Q.     Finally, let me show you what's been marked as

5    Government's Exhibit 126-E.

6           What is that photograph?

7    A.     That's the same box that you saw in the last

8    picture with some of the contents of the box.

9    Q.     What's that placard with the number "40" on it?

10   A.     That's the identification that our evidence

11   response team uses to identify which item of evidence

12   that is in the picture.

13   Q.     And so were all of these documents contained

14   within the Reeboks box all contained within that item

15   number -- within that Exhibit No. 40?

16   A.     Yes.

17   Q.     And showing you -- let me ask you first:  Did you

18   have an opportunity to take a look at the composition

19   book?  You can see part of it in this Photograph 126-E.

20   Did you have a chance to take a look in that book?

21   A.     Yes, I did.

22   Q.     And what did you see?

23   A.     It appeared to be somewhat of -- like a

24   handwritten journal with some sort of religious

25   writings, among other things.

1    Q.    Okay.  Let me show you what's been marked as

2    Government's Exhibit 125, specifically referring you to

3    Page 125-A.

4          First, let me ask you:  Do you recognize

5    Government's Exhibit 125-A?

6    A.    Yes, I do.

7    Q.    And what does that appear to be?

8    A.    It appears to be the same book that we found on

9    the scene, Item No. 40.

10   Q.    Okay.  And take a look at the pages contained

11   within Government's Exhibit -- I'll call it Government

12   Composite Exhibit 125, which has pages in it.

13         Can you just take a quick glance through the

14   pages in the binder as well as the pages in the pocket

15   part.

16   A.    Okay.

17   Q.    What do those pages appear to be?

18   A.    They appear to be pages from the handwritten

19   journal.

20   Q.    And are they copies?

21   A.    Yeah.  I'm sorry.  They're copies of what might

22   have appeared in that journal.

23   Q.    Now, going back to Government's Exhibit 125-A,

24   that has -- were there more pages in that exhibit when

25   you first obtained it?

1    A.    Yes.  There were more pages.  It was thicker.

2    Q.    Did it have also additional -- as depicted in

3    126-E, were there additional pages put in there as well

4    as with the -- with the notebook itself?

5    A.    Yes.

6    Q.    Let me also show you what's been marked as

7    Government's Exhibit 125 -- Composite Exhibit 125-B,

8    which contains several pages, and also Government's

9    Exhibits 125-C through -O.

10         What do those appear to be?

11   A.    Those appear to be the papers that were found

12   within in this book -- or with this book on the day of

13   the search.

14   Q.    Can you tell the members of the jury what was

15   done with those pages -- or based on your training and

16   experience, what do those pictures that are contained

17   within the plastic envelopes, Composite Exhibit 125-B

18   and Exhibits 125-C through -O -- what appears to have

19   been done to them?

20   A.    It appears that they were removed from the actual

21   notebook themselves and then sent to the lab for some

22   processing.

23   Q.    What about it appears to be sent to a lab for

24   processing?

25   A.    Well, some of them are markings on each of the

Lamey - DIRECT - By Ms. Arango                    139

1    items.  For instance, there's a laboratory measurement

2    scale that would indicate they'd been to the lab.

3        Also, you can tell on some of them they've been

4    processed -- or they appear to be processed for

5    fingerprints because you can actually see fingerprints

6    that were developed on them.

7    Q.    Okay.  Thank you.

8        MS. ARANGO:  Government offers 125, which

9    contains 125-A, as well as Composite Exhibit 125-B and

10   125-C through -0 into evidence.

11       MR. HOULIHAN:  No objection.

12       MS. JHONES:  No objection.

13       THE COURT:  They will be admitted as

14   Government's Exhibits 125, including 125-A composite

15   and 125-B composite.

16       (Whereupon, Government's Exhibit Nos. 125,

17   125-A and 125-B were entered into evidence.)

18       MS. ARANGO:  Thank you.

19       Judge, I think also in evidence is

20   Government's Exhibits 125-C through -O.  We moved those

21   into evidence as well.

22       THE COURT:  They will be admitted as

23   Government's Exhibits 125-C through -O.

24       (Whereupon, Government's Exhibit Nos. 125-C

25   through -O were entered into evidence.)

1          MS. ARANGO:  I'd like to publish.

2          THE COURT:  You may.

3     BY MS. ARANGO:

4     Q.    First of all, with respect to the cover, which is

5     marked Government's Exhibit 125-A, Agent Lamey, tell

6     me, can you read the name that was written in in Magic

7     Marker on this cover?

8     A.    Yes.  I believe it says "Naudy," N-a-u-d-y.

9     Q.    Thank you.

10          MS. ARANGO:  Now, Judge, I have put some of

11    the pages in the -- we can pull them up on the computer

12    so I can hand this witness the original document so she

13    can read from there.  We can also have it on the

14    computer.

15          THE COURT:  Okay.

16    BY MS. ARANGO:

17    Q.    Agent Lamey, would you please turn to the page

18    that is Bates-stamped number DO-1455.

19          MS. ARANGO:  And could you please pull that

20    up, Aleyda.

21    BY MS. ARANGO:

22    Q.    Now, I'm going to -- would you please read the

23    first paragraph of that page.

24          MS. ARANGO:  I'm going to ask Aleyda to

25    highlight it and zoom in on it.

Lamey - DIRECT - By Ms. Arango                       141

```
 1   BY MS. ARANGO:
 2   Q.    Go ahead.  You can either read from the document
 3   itself or from the screen, whichever is easier for you.
 4   A.    It says, "Ninja masters of secrecy.  Ninjas
 5   experts on spying, sabotage, assassins and escape.
 6   Exotic weapons and tricks to accomplish their aim.
 7          "Training, running, jumping, climbing, swimming
 8   and diving, balancing on rails, hanging from tree limbs
 9   and standing as still as a statue."
10          And then, in parentheses -- it's not parentheses.
11   It's a -- I'm sorry.  I can't remember the name of that
12   symbol.
13          Anyway, it says, "Could run 100 miles without
14   fatigue and in the cold."
15   Q.    Could you turn to Page DO-1471.  I'm highlighting
16   a portion of it I'd like you to read.
17   A.    You want me to read it?
18   Q.    Yes, please.
19   A.    "Not following orders.  Following orders can get
20   you killed.  Conspiracy can get you killed.  We don't
21   do that you will be sacrificed.
22          "Anyone who does a circle outside of this circle
23   will be dealt with.
24          "Falsehood," I believe that is -- "Falsehood
25   cannot penetrate this circle.
```

1          "It is to destroy all falsehood however it comes.

2          "Woman is to govern the house that the man has

3    placed for her."

4               MS. ARANGO:  You can stop.  Thank you.

5    BY MS. ARANGO:

6    Q.    Now would you please turn to DO-1483.

7               MS. ARANGO:  Just highlight the top.

8               THE WITNESS:  Would you like me to read this

9    one to you, too?

10   BY MS. ARANGO:

11   Q.    Yes, please.

12   A.    "Nine points for a successful mission --

13   emission.  Large groups are easily deterred if there

14   are -- detected" -- I'm sorry -- "easily detected if

15   there are a lot of you.  Split into four-man teams,

16   which are a lot harder to detect.

17         "As long as you are wearing your uniform, you can

18   attack an enemy" -- I don't know what that next word

19   is.

20   Q.    Okay.  Please turn to DO-1520.

21         What does that appear to be?

22   A.    To me, it looks like drawings indicating, I would

23   say, striking points.

24   Q.    1577, please.  What does that appear to be?

25   A.    This would appear to be similar to the last one,

1    with a little more detail.  I can see someone that

2    appears to be fighting with a knife, possibly some

3    boxing, also.

4    Q.     And now 1578.

5    A.     Again, this looks like vital striking areas.

6    Q.     Are what are the words on the upper right-hand

7    corner?

8    A.     On the upper right, it says "Break/dislocate."

9    Q.     And, finally, could you turn to Page DO-1443.

10   I'm going to highlight a couple sentence at the very

11   bottom.

12   A.     It says, "You have surrendered your will to the

13   prince.  No playing.  Take orders as a soldier from the

14   prince."

15          MS. ARANGO:  May I have one moment, Judge?

16          THE COURT:  Yes.

17          MS. ARANGO:  Thank you.

18          Thank you, Judge.  I have no further

19   questions.

20          THE COURT:  Ms. Jhones?

21          MS. JHONES:  Your Honor, I would just ask that

22   Ms. Lamey be made available for later time.

23          THE COURT:  Okay.

24          Mr. Vereen?

25          MR. VEREEN:  Just a few questions, Judge.

                          CROSS-EXAMINATION

1    BY MR. VEREEN:

2    Q.     Agent Lamey, good afternoon.

3    A.     Good afternoon.

4    Q.     With regard to the evidence that you had observed

5    at the 6260-6262 address, it comprised a lot more than

6    what has been placed before you this afternoon.

7    Correct?

8    A.     Are you speaking about the total amount of

9    evidence?

10   Q.     Yes.

11   A.     Yes, sir.

12   Q.     You found -- did you not observe martial arts

13   Samurai swords -- flea market brand Samurai swords?

14   A.     I know that we found some sorts.  I couldn't be

15   specific as to what kind they were.

16   Q.     You don't know whether or not they were authentic

17   or these cheap ones you can buy from a flea market?

18   A.     No, sir.

19   Q.     Okay.  Did you find any other type of martial

20   arts weaponry?

21   A.     I believe we found a knife or two.

22   Q.     Okay.  You found flags; did you not?

23   A.     Yes.

24   Q.     From different countries?

```
 1    A.     I'd like to look at the evidence to tell you

 2    which specific kinds of flags we found.  But I know we

 3    did find flags.

 4    Q.     When you went to the address that day, you did

 5    not see any flags flying on the building?

 6    A.     I don't recall any flags on the building.

 7    Q.     You found a lot of books, did you not, sitting on

 8    tables?

 9    A.     Yes, we did.

10    Q.     Construction books?

11    A.     I don't remember construction.  No, sir.

12    Q.     You don't remember any construction books?

13    A.     I didn't look at every single book that was in

14    there.  But I don't remember construction books.

15    Q.     You found a lot of religious book; did you not?

16    Bibles?

17    A.     We found some religious books.

18    Q.     Bibles?

19    A.     Again, I'd have to look through the evidence to

20    tell you exactly which kind of books we found.

21    Q.     You didn't find any firearms, did you?

22    A.     I don't recall any firearms.

23    Q.     You didn't find any salt shakers.  Correct?

24    A.     Not that I recall.

25    Q.     You didn't find any poisons, did you?
```

```
 1   A.    No, sir.

 2   Q.    You didn't find any blueprints to any buildings?

 3   A.    No, sir.

 4   Q.    You didn't find any photographs depicting any

 5   buildings, federal courthouses, FBI buildings, of that

 6   nature, did you?

 7   A.    No, sir.

 8   Q.    You didn't find any ammunition?

 9   A.    No.

10   Q.    You didn't find any books or magazines with

11   regard to firearms?

12   A.    Not that I recall.

13         MR. VEREEN:  That's all the questions I have,

14   Judge.

15         Thank you.

16         THE WITNESS:  You're welcome.

17         THE COURT:  Mr. Houlihan?

18         MR. HOULIHAN:  If it please the Court.

19         Good afternoon.

20         THE JURY:  Good afternoon.

21               CROSS-EXAMINATION

22   BY MR. HOULIHAN:

23   Q.    Good afternoon, ma'am.

24   A.    Good afternoon.

25   Q.    Let me back up and start from the beginning, if
```

1    you don't mind.

2         You're Agent Lamey?

3    A.    It's "Lamey."

4    Q.    "Lamey."  I knew I wasn't going to pronounce it

5    right.  I apologize.

6    A.    That's okay.

7    Q.    You deal, for our purposes in this case, with

8    what can be called forensics or crime scene

9    investigation?

10   A.    Correct.

11   Q.    And it really deals fundamentally with the

12   application of science and scientific principles to

13   matters that are going to be dealt with in court.

14        Is that a fair statement?

15   A.    I think I need you to rephrase that.

16        We collect evidence from crime scenes.

17   Q.    Well, collecting evidence is -- would you agree

18   it's kind of a three-part process?  One is to identify

19   potential evidence?

20   A.    Yes.

21   Q.    The second is actually to impound it, number it,

22   log it in, so you know what you're dealing with.

23   Correct?

24   A.    That's correct.

25   Q.    And sometimes it's actually preserving it, where

1    there might be an issue that whatever it is might

2    degrade or change?

3    A.    Yes.

4    Q.    Okay.  And what you're doing is taking things

5    that may be of value and preserving it?

6    A.    Yes.

7    Q.    So that later, a laboratory or whatever could

8    look at it, or a jury.  Correct?

9    A.    Yes.

10   Q.    There's a phrase in English.  You don't have a

11   dog to pick in the fight.

12         I mean, you're there.  Evidence -- what you do

13   can convict the guilty.  Right?

14   A.    Yes.  Evidence can lead to a conviction.

15   Q.    And it could also lead to helping acquit the

16   innocent.  Right?

17   A.    Yes, sir.

18   Q.    You're just there to collect -- to identify,

19   collect, preserve and then pass it on.  Fair statement?

20   A.    Yes.

21   Q.    The evidence that you impound goes into the FBI

22   property room.  Yes?  No?

23   A.    Yes.  The evidence that we collect goes -- we

24   have a specific unit that deals with storage of

25   evidence.

```
 1   Q.     I mean, the evidence doesn't go into some FBI
 2   agent's office and wait till they go to court.
 3          I mean, there's specific protocols of what to do
 4   to carefully preserve the evidence.  Correct?
 5   A.     There were two questions.
 6          Sometimes the evidence is examined by agents
 7   following the collection of it.
 8   Q.     Okay.
 9   A.     So that would mean it would not be in the
10   evidence control room at the time.
11          The second question had to do with -- I'm
12   sorry -- preservation for later use in the lab?  Is
13   that what you said?
14   Q.     Evidence at some point.  It's strictly
15   controlled.  Right?  In any case.
16          I mean, there's logs.  Potential evidence is
17   marked, numbered, where it came from.  It's logged in
18   and logged out.  Correct?
19   A.     That's correct.
20   Q.     Okay.  Now, in our specific case, you were part,
21   I think, of a 12-member squad.  Is that right?
22   A.     I'd have to reflect on my report to tell you
23   exactly how many people were on our team that day.
24   Q.     Well, if you recall -- and that day is June 22nd,
25   2006?
```

1    A.      Correct.

2    Q.      And the actual senior team leader of the evidence

3    response team unit -- it's called ERTU, I take it.

4    Right?  E-R-T-U?

5    A.      That's how we say it.  E-R-T-U.

6    Q.      Okay.  The feds love these acronyms.

7            Your ERTU unit was headed by a senior team leader

8    named Hahn?

9    A.      Well, ERTU is a unit that's at headquarters in

10   Washington.

11   Q.      Okay.

12   A.      Our team down in Miami is headed by Scott Hahn.

13   He's a senior team leader.

14   Q.      I'm just going to go through the numbers quickly.

15   Okay?

16   A.      Okay.

17   Q.      The Charlie team leader, I believe, was Lunn,

18   Agent Lunn?

19   A.      Yes.  Rick Lunn.

20   Q.      Then you were the assistant team leader.

21   Correct?

22   A.      Yes.

23   Q.      So that's three people so far.

24   A.      Okay.

25   Q.      Now, we have -- I'm going to go through this

```
 1    kind of quickly -- but somebody named Cruz, Doster --

 2    D-o-s-t-e-r -- Evans, Gjertsen -- G-j-e-r-t-s-e-n.

 3          Okay so far?

 4    A.    Okay so far.

 5    Q.    Lawrence -- last name Lawrence, Lockwood,

 6    McCormick, Nau -- N-a-u -- and Strickland.

 7          Does that sound about right?

 8    A.    Yes.

 9    Q.    So that would be 12 people.

10    A.    Okay.

11    Q.    I mean, I counted them up.  Okay?

12    A.    Okay.

13    Q.    Each one of you -- and the FBI is known

14    throughout the world.

15          What you start to do, aside from the laboratories

16    in Virginia and whenever -- okay? -- your evidence

17    response team unit is known to have a great ability and

18    knowledge and experience in crime scene investigation.

19    Correct?

20    A.    I believe we're good at what we do.

21    Q.    To do what you do professionally, you need to

22    know what you're going to be looking for.  Right?

23    A.    Yes.

24    Q.    What's the case about?

25          And, in our case, I think the jury has heard, on
```

Lamey - CROSS - By Mr. Houlihan                           152

```
 1    June 22nd of 2006, an indictment was returned around

 2    noontime.  Okay?

 3    A.     Okay.

 4    Q.     Your unit had been collected, the 12 of you, and

 5    you were basically briefed about the search that was to

 6    be conducted by your unit.  Right?

 7    A.     Yes.  We were briefed.

 8    Q.     Now, I think an agent named Garbato gave a

 9    briefing concerning just the investigation -- the

10    background of the investigation.

11           Fair enough?

12    A.     I don't remember specifically who gave it.  But

13    it could have been Joe.

14    Q.     But whoever did it, that sounds correct?

15    A.     That sounds correct.

16    Q.     Then you had a Special Agent Velazquez who gave

17    your unit a copy of the search warrant.  Correct?

18    A.     Yes.

19    Q.     Okay.  Now, in our case -- what a search warrant

20    is is basically an order from a federal magistrate

21    permitting you to search a specific location or

22    locations.  Correct?

23    A.     Yes.

24    Q.     And in our case, the warrant was for 6260 and

25    6262 Northwest 15th Avenue and a truck -- a green truck
```

1    of some kind.  Right?

2    A.    I don't remember the truck part.  But I'd have to

3    look at the search warrant to tell you that.

4    Q.    But you remember the search warrant?

5    A.    Yes.  I got a copy of the search warrant.

6    Q.    And even a few years later, you basically

7    remember what was contained therein.  Right?

8    A.    Yeah.  The general background of the case.

9    Q.    A search warrant deals with probable cause; does

10   it not, ma'am?

11   A.    Yes.

12   Q.    It simply means we -- the agent or agents who

13   swear under oath that, to the best of their knowledge

14   and belief, certain things will be found in the search.

15   Correct?

16   A.    Well, the search warrant asks for permission to

17   search a certain location because we believe -- or

18   there's probable cause to believe that these items

19   would be found there.

20   Q.    Right.

21         Now, it's not saying it will be found, to be

22   honest with you.  It's saying maybe, probably, that

23   type of thing.  Correct?

24   A.    Yes.

25   Q.    Now, in our case -- in this case, one of the

 1   things your unit was going to look for were blue -- I

 2   can't speak English -- were blueprints.  Correct?

 3   A.     Yes.

 4   Q.     Were any found?

 5   A.     No.

 6   Q.     Another thing was -- I'm going to lump some of

 7   this together.  Okay? --

 8   A.     Okay.

 9   Q.     -- drawings, sketches, schematic of buildings.

10          That's something that you were briefed about.

11   Correct?

12   A.     That's something that was contained in the

13   warrant.  Yes.

14   Q.     And did anything like that get found?

15   A.     No.

16   Q.     I know I'm jumping to the end of search, but bear

17   with me.

18          Maps showing locations of buildings was one of

19   the things you were briefed about.  Correct?

20   A.     Again, I don't remember -- recall the specific

21   briefing.  But I believe that was mentioned in the

22   search warrant.

23   Q.     Right.

24          Was anything like that found?

25   A.     No.

```
 1   Q.    Documents and information regarding the Sears
 2   Tower.  Okay?  Was anything like that found?
 3   A.    No.
 4   Q.    It's going to be the same set of questions --
 5   okay? -- whether it was there.
 6         Instruction manuals for bomb-making.  You
 7   remember that?
 8   A.    Yes.
 9   Q.    Was anything like that found?
10   A.    No.
11   Q.    Instruction manuals for firearms training.  You
12   remember that?  Instruction manuals for firearms
13   training?
14   A.    I remember that being in the warrant.  Yes, sir.
15   Q.    Anything like that found?
16   A.    No.
17   Q.    Documents and records relating to terrorism.  Do
18   you recall that?
19   A.    Yes.
20   Q.    Now, that's general.  But I mean, you recall
21   that.
22         Anything like that found in this place?
23   A.    I did not go through all of the documents that
24   were found at the -- at this location.  So I'm not -- I
25   can't tell you specifically if any of them were
```

 1   terrorism-related.

 2   Q.    But for purposes of -- you're here today in front

 3   of a jury testifying.

 4         To your knowledge, you don't know of any such

 5   thing found.  Is that a fair statement?

 6   A.    I don't know of any such thing.  No.

 7   Q.    News accounts, magazines and articles relating to

 8   terrorism.  Okay?  Anything like that found?

 9   A.    Again, there were a lot of documents and such

10   found on this location that I did not personally go

11   through.

12         But to the best of my knowledge, nothing like

13   that was found.

14   Q.    I understand.  That's all you can testify to, to

15   the best of your knowledge.

16         To shorten this up a little, the same areas

17   concerning Al-Qaeda.  Correct?  Things dealing with

18   Al-Qaeda, documents, news articles, photographs, things

19   of that nature.  Correct?

20   A.    Again, I didn't find any of that.

21   Q.    I mean, on the wall -- you know how, like, in

22   federal buildings they'll have President Obama's

23   photograph.  Right?

24   A.    Yes.

25   Q.    Did you see a photograph of anybody like Osama

```
 1   bin Laden, you know, up on the wall?

 2   A.    No.

 3   Q.    Anything dealing with Osama bin Laden?  Because

 4   that's part of the warrant, also.  Anything dealing

 5   with Osama bin Laden?

 6   A.    Not that I found.

 7   Q.    The last couple of things dealt -- the verbiage.

 8         But it dealt with Islamic fundamentalism.  Do you

 9   remember that?

10   A.    Vaguely.

11   Q.    Anything like that, that you could look at the

12   jury and say, "Yeah.  We found in this search" --

13   whatever, pictures, documents, articles concerning

14   Islamic fundamentalism?

15   A.    The only thing I could say is that there were

16   some religious-type documents and writings and books

17   and stuff in the warehouse.

18   Q.    We will get to that.

19         But aside from those, no, correct, to your

20   knowledge?

21   A.    With the words "Islamic fundamentalism" on it, I

22   couldn't say --

23   Q.    Or anything that you saw, as the assistant team

24   leader, that you could fairly put into that category?

25   A.    No, sir.
```

1    Q.    The same thing with seditious activities, that

2    phrase.  Okay?

3          You didn't find anything either.  Correct?

4    A.    Nothing that says "seditious activities" on it.

5    No, sir.

6    Q.    Now, if we stop for a second, after your search

7    was completed by the 12 of you -- and you have a very

8    specific protocol on how a search is done.  Right?

9    A.    Yes.  We do have a procedure that we generally

10   follow.

11   Q.    A protocol is a procedure.  This is how it is to

12   be done in whatever case it is.  Right?

13   A.    Correct.  But the procedures are different

14   depending on the scenes.

15   Q.    Exactly.

16         But for our purposes, an established procedure

17   once you realized what kind of scene it was, what to

18   do.  Right?

19   A.    Generally speaking, yes.

20   Q.    Now, the first thing was the search warrant is

21   obtained and physically given to members of your unit.

22   Right?  Am I correct about that?

23   A.    No.  I'm saying -- you're asking me if I got a

24   copy of the search warrant?

25   Q.    Someone in your unit did?

1   A.    Yes.

2   Q.    You had, as we already went over, the briefing

3   about what to look for.  You -- all 12 of you show up

4   at the 6260 address.  Correct?

5   A.    Yes.

6   Q.    Was the media there already?

7        MS. ARANGO:  Objection, Judge.  Irrelevant and

8   outside the scope.

9        THE COURT:  Sustained.

10  BY MR. HOULIHAN:

11  Q.    Well, it's very important for what you do to have

12  what they call preservation of the crime scene; is it

13  not?

14  A.    We definitely preserve the crime scene.  Yes,

15  sir.

16  Q.    And even before you do your work, you want it, to

17  the best it can be done, to have it preserved?

18  A.    Right.  If we're not the first person on the

19  scene, we have to depend on whoever was there before us

20  to do their best to preserve it.

21  Q.    In our case, in fact, SWAT went in before you

22  guys?

23  A.    That's right.

24  Q.    You guys and gals.  I'm not being rude.  I'm

25  sorry.

Lamey - CROSS - By Mr. Houlihan                    160

1   A.    No.  SWAT went into the site before we did.

2   Q.    And that is not a usual procedure?

3   A.    You're asking me if that's a normal --

4   Q.    Is that a usual procedure?

5   A.    Actually, SWAT enters oftentimes before ERT.

6   Q.    And they enter where there's any potential of

7   threat to any member of your unit.  Correct?

8         MS. ARANGO:  Objection.  Relevance, outside

9   the scope.

10        THE COURT:  Sustained.

11  BY MR. HOULIHAN:

12  Q.    Well, SWAT -- how did SWAT gain entry?

13        MS. ARANGO:  Same objection, Judge.

14        THE COURT:  Sustained.

15  BY MR. HOULIHAN:

16  Q.    When you arrived -- the jury has seen pictures of

17  not a lock door, but something that pulls down like

18  metal gates some of kind.

19        Do you know what I'm referring to?

20  A.    Yes.  We saw the front of the building and the

21  rear of the building.  There were a variety of doors.

22  Q.    How was entry gained?

23  A.    We entered through the right-hand door.  She

24  pointed to it on the picture.  It was the right-hand

25  door of the rear of the business or location.

1   Q.    And was it before you entered -- that's why SWAT

2   went in?

3           MS. ARANGO:   Objection -- same objection.

4   Relevance and outside the scope.

5           THE COURT:   Sustained.

6   BY MR. HOULIHAN:

7   Q.    Do you know if -- what, if anything, SWAT altered

8   inside the crime -- this scene?

9   A.    I was not inside with SWAT, sir.

10  Q.    Well, your procedures of doing this, once you

11  actually go in, the first thing you're going to do is

12  to make a -- a couple of you make what they call a

13  walk-around.

14          Is that a fair statement?

15  A.    Yes.  The senior team leader generally does a

16  walk-through of the scene.

17  Q.    In our case, that would have been who?

18  A.    It would have either been Scott Hahn and Rick

19  Lunn, possibly both of them.  And I'm going to venture

20  to say sometimes the photographer and probably one of

21  the case agents.

22  Q.    But you did not?

23  A.    I did not.

24  Q.    The purpose of the walk-through is simply to see

25  what you've got and to divide up for your whole team

1   unit how you're going to do this search.  Correct?

2   A.    It's to take a general look around to more or

3   less set out a game plan.

4   Q.    Fine.

5         The game plan here, the next step, would have

6   been photographing before anything is really done.

7   Correct?

8   A.    Correct.  Photographs are generally taken before

9   anybody on our team moves anything.

10  Q.    How many photographs in our case, to your

11  knowledge, were taken inside -- inside 6260?

12  A.    I don't know.

13  Q.    Would you estimate over a couple hundred?

14  A.    It would probably be about that many.

15  Q.    In fact, after all your work was done and you're

16  going to leave, there was like a couple of van loads of

17  material that was impounded.

18        Is that a fair statement?

19  A.    I don't know how many -- or which vehicles were

20  used to transport this stuff.

21  Q.    Would you agree, though, it was at least more

22  than two vehicles?

23  A.    I honestly don't remember.

24  Q.    The photographs are done.  Now individuals are

25  assigned duties to do inside the building.  Correct?

1    A.    Yes.

2    Q.    The matters that were eventually impounded --

3    we've gone through what was not impounded, but --

4    because it wasn't found.  But some of the things that

5    you look for would be hidden areas.

6          Is that a fair statement?

7    A.    Yes.  We look for hidden spaces.

8    Q.    And that's because bad people in cases a lot of

9    times hide things.  They don't leave things in plain

10   view.  Right?

11   A.    Yes.

12   Q.    Did you find any hidden area in this case?

13   A.    I don't believe we did.

14   Q.    Now, let me ask you one thing.

15         Do you recall that there was a bed?

16   A.    Yes.

17   Q.    And it was on some sort of frame?

18   A.    What I recall is that there was an elevated

19   section towards the back of the room which I'm calling

20   the bed.

21   Q.    I'm not -- see, I'm not trying to trick you.

22         Do you recall in the elevated section one of your

23   team members said, "I would like to take at least a

24   slat or something off just to see it there's anything

25   there"?

```
 1   A.     Yeah.   I believe -- I think it was Scott Hahn

 2   that went and examined that area.

 3   Q.     Nothing was found?

 4   A.     No, sir.

 5   Q.     Any explosive materials found?

 6   A.     No.

 7   Q.     You were looking for that?

 8   A.     Yes, sir.

 9   Q.     Now, unfortunately, I guess, we all read now and

10   we're more familiar with explosive material.

11        But every explosive material has its own unique

12   chemical signature?

13        Would you agree?

14   A.     I think you're getting beyond my knowledge of

15   explosives.

16   Q.     Well, does it sound right, from what you know?

17   A.     I would assume --

18             MS. ARANGO:   Objection.   Speculative.

19             THE COURT:   Sustained.

20   BY MR. HOULIHAN:

21   Q.     Crime scene can try to lift -- to see if

22   explosives either were or had been in the past in a

23   certain area.   Correct?

24             MS. ARANGO:   Same objection, Judge.

25   Speculative.   She just testified about her knowledge.
```

1          THE COURT:  Sustained.

2          Rephrase your question.

3   BY MR. HOULIHAN:

4   Q.    Can you, as a crime scene -- take -- is there a

5   procedure that you're aware of to swab either an area,

6   an object, for later laboratory analysis to see if

7   there's any chemical residue indicating a bomb or bomb

8   materials?

9          MS. ARANGO:  Judge, I would object.  This is

10  way outside the scope of direct, and it's irrelevant.

11         MR. HOULIHAN:  Judge, this is crime scene.

12         THE COURT:  Overruled.

13         THE WITNESS:  I think I remember the question.

14         We have proceedings where you can swab to

15  collect any possible trace evidence, whether it be

16  explosives, DNA, that sort of stuff.

17  BY MR. HOULIHAN:

18  Q.    In dealing with explosives, would you agree with

19  me the science now is basically down to swabbing --

20  positive results can happen with 6 or less nanograms?

21  A.    I have no idea.

22         MS. ARANGO:  Judge, objection.  Way outside.

23         THE COURT:  Sustained.

24  BY MR. HOULIHAN:

25  Q.    Was our scene here swabbed for explosive

1    material?

2    A.    I don't believe it was.

3    Q.    One of the things, I take it, also, you look for

4    in crime scene searches would be what is called

5    encryption or encrypted material.  Is that correct?

6    A.    If I had a reason to believe that there might be

7    encrypted material on a scene, I would look for it.

8    Q.    And if you found anything that might be

9    encrypted -- encrypted is kind of hiding the contents

10   through some sort of encryption.  Would that be a fair

11   statement?

12   A.    I don't think I understand the question.

13   Q.    Well, tell us what "encryption" means.

14         MS. ARANGO:  Objection, Judge.  Outside the

15   scope of direct.

16         THE COURT:  Sustained.

17   BY MR. HOULIHAN:

18   Q.    Did you find anything at this crime scene

19   search -- how long did it take you, would you say, from

20   the moment you went in -- your unit -- until everybody

21   left?

22   A.    I think we were there around three or four hours.

23   Q.    Did you find any kind of business records of a

24   company called Azteca?

25   A.    I don't remember.

1    Q.     You don't recall?

2           Do you recall a couple of desktop -- what are

3    referred to in common language as desktop computers?

4    A.     I remember there being computers at the scene,

5    but I don't remember if they were laptop, desktop or

6    what.

7    Q.     They were impounded, I take it.  Correct?

8    A.     I believe so.  I'd have to look at the evidence

9    log to be certain.

10   Q.     Do you recall -- there's a whole series of

11   computer-related peripherals, disks, things of that

12   nature.

13   A.     Again, I'd have to look at the log to be certain.

14   Q.     But for our purposes now, since you're

15   testifying, does that vaguely sound correct?

16   A.     In previous searches, it would be our habit, you

17   know, if there were electronic media and computers and

18   that was part of the investigation, that we would take

19   it.

20   Q.     Okay.  So if it was there, it would have been

21   impounded?

22   A.     Most likely.

23   Q.     The computers themselves, be they desktops,

24   laptops, they would have been impounded as well?

25   A.     Again, if it was relevant to the case, we could

```
 1    have taken them.

 2    Q.    Would anyone on your crime scene unit, if the

 3    computer was not on, turn it on and see if it worked or

 4    is that for laboratory analysis later?

 5    A.    I don't believe that anybody would turn it on if

 6    it was off.

 7    Q.    So if the computer was on, would somebody go into

 8    it and see -- you know, open things up or would they

 9    simply shut it down and send it to a laboratory?

10    A.    It's not our procedure to go examining the

11    contents of a computer on the crime scene, unless

12    there's an exigent circumstance and we had reason to do

13    that.

14    Q.    Okay.  Fair enough.

15          Now, there was a garbage bin in the back.  Do you

16    remember that, like a Dempsey Dumpster type of thing?

17    A.    I do.

18    Q.    In fact, somebody from your unit actually

19    searched it?

20    A.    I believe so.  Yes.

21    Q.    Do you know who that was?

22    A.    I did know this.  I refreshed my memory with the

23    report.  I can't remember off the top of my head who it

24    was.  I want to say maybe George Nau.

25    Q.    Was he one of the younger, newer people on your
```

```
 1   unit?

 2   A.    Actually, he's not.

 3   Q.    How did he get stuck doing that?

 4   A.    He was most likely assigned --

 5         MS. ARANGO:  Objection, Judge.  Relevance.

 6         THE COURT:  Sustained.

 7   BY MR. HOULIHAN:

 8   Q.    But he literally gets inside the dumpster and

 9   goes through it?

10   A.    I believe so.

11         MS. ARANGO:  Judge, I would object to outside

12   the scope of direct.

13         THE COURT:  Sustained.

14   BY MR. HOULIHAN:

15   Q.    Do you recall finding a Florida Power & Light

16   bill, like a notice of power being shut off in the

17   Embassy?

18         MS. ARANGO:  Objection.  Outside the scope of

19   direct.

20         THE COURT:  Sustained.

21   BY MR. HOULIHAN:

22   Q.    Do you recall having impounded an FP&L bill?

23         MS. ARANGO:  Same objection, Judge.  You just

24   sustained --

25         MR. HOULIHAN:  If she recalls having it
```

```
 1   impounded.
 2          MS. ARANGO:  It's outside the scope of direct,
 3   Judge.
 4          MR. HOULIHAN:  Judge, she's dealing with crime
 5   scenes.
 6          THE COURT:  Sustained.
 7          Rephrase your question.
 8          I'll overrule the basis of the Government's
 9   objection.
10          Rephrase your question.
11          MR. HOULIHAN:  Yes, ma'am.
12   BY MR. HOULIHAN:
13   Q.    Do you recall in your crime scene having
14   impounded -- or a member of your unit having impounded
15   what is called an FPL bill?
16   A.    I would have to look at the list of items that we
17   collected to tell you the answer to that.
18   Q.    Before you came here today, did you do that?
19   A.    Yes, sir.
20   Q.    Do you recall as you testify now?
21   A.    Pardon me?
22   Q.    Do you recall, since you've looked at it -- do
23   you recall whether an FPL bill was impounded?
24   A.    I don't recall an FPL bill specifically.  There
25   were numerous items that we did impound, and I have not
```

 1   memorized the entire list.

 2   Q.     You talked about books before.

 3          How many books would you approximate were

 4   impounded?

 5   A.     I don't know the number.

 6   Q.     Not even an approximate number, a ballpark

 7   figure?

 8   A.     More than five, less than 50.

 9   Q.     Some of them were law books, what one could call

10   legal matters, legal books?

11   A.     I'd have to review the books.

12   Q.     Some were martial arts?

13   A.     I do remember martial arts books.

14   Q.     Some were Bibles?

15   A.     Again, I think there was a Bible -- what happens

16   on the crime scene is there are several people on the

17   scene collecting items.  I'm not in every place at

18   every time.

19          So if a book or two books or three books were

20   recovered in one particular location in one particular

21   room, I might be in another room and didn't see exactly

22   which book was taken from which table.

23          For all that information, I have to go through

24   the evidence recovery logs, just like any other person

25   who wasn't standing right there.

1   Q.     Okay.  Do you recall -- do you recall a Bible?

2   You know, sometimes on the front there's a name like in

3   gold leaf.  Do you recall a Bible with the name

4   "Naudimar Herrera"?

5   A.     I don't.

6   Q.     Do you recall patches -- uniform patches that

7   somebody would put on a uniform?

8   A.     I remember that we collected patches.

9   Q.     Do you remember some of them were the American

10  flag?

11  A.     Again, I don't recall the specific patch.

12  Q.     The bathroom -- there was one bathroom in this

13  facility?

14  A.     There was a bathroom connected to the main area

15  that we searched.  Yes.  I recall that bathroom.

16  Q.     And isn't it a fact that -- if you know, that

17  there was no running water?

18  A.     I don't know if there was running water.

19          MS. ARANGO:  Objection.  Speculative and

20  outside the scope.

21          THE COURT:  Sustained.

22  BY MR. HOULIHAN:

23  Q.     I'd like to talk with you about this journal, if

24  you don't mind.  Okay?

25  A.     Okay.

1   Q.    A number of the exhibits were sent off, as you've

2   already testified, for fingerprinting.  Is that

3   correct?

4   A.    Yes.

5   Q.    You have in front of you copies.

6   A.    I have copies of the pages that were in that.

7   Q.    What I'd like to do -- I don't have the computer

8   graphics.

9         MR. HOULIHAN:  Your Honor, may I approach and

10  use --

11        THE COURT:  Sure.

12        MR. HOULIHAN:  What I'd like to do is use the

13  ELMO.

14  BY MR. HOULIHAN:

15  Q.    And if you need to see it, I'll bring it to you.

16  Fair enough?

17  A.    Okay.

18  Q.    Now, what's in this document, basically, are

19  going to be xeroxed copies.  Correct?

20  A.    In that notebook, there are xeroxed copies.

21  Q.    And you know that there are the actual hard

22  copies available for the jury if they wish to see them.

23  Correct?  You know, the actual --

24  A.    I don't believe that all of the copies in -- I

25  don't believe that of all the original copies that you

```
 1   have there are all of the documents that are in the
 2   notebook.
 3   Q.    Now, what I'm going to go through -- and I'll try
 4   to be brief.  All right?  We refer to Bates stamp
 5   numbers.  Correct?
 6         You know what a Bates stamp is.  Correct?
 7   A.    I actually don't.  But I have heard the term
 8   several times today.
 9   Q.    The different pages we're going to go through
10   have on the bottom right numbers.  All right?
11   A.    Okay.
12   Q.    Let me, for example, start --
13         THE COURT:  Is that microphone on?
14         MR. HOULIHAN:  Yes, ma'am.
15   BY MR. HOULIHAN:
16   Q.    If you see on the bottom right DO 01439 --
17   correct?
18   A.    That's -- yes.  That's the number there.
19   Q.    We refer to that as a Bate number -- Bates stamp
20   number, which is an arbitrary number assigned simply to
21   identify pages.  All right?
22   A.    Okay.
23   Q.    Now, this is a copy -- you've been over it -- of
24   the actual front of the journal.  "Naudy."  Right?
25   A.    Yes.
```

 1   Q.    Now, it also says "Don't" -- then an expletive --
 2   "touch."
 3         Can you see that?
 4   A.    I can see "Don't," "Touch," but I can't really
 5   read the expletive.
 6   Q.    Okay.  Bear with me quickly.  I'm just trying to
 7   get organized.
 8         Now, on Page, again, 1440 -- all right?  Do you
 9   see right down here 1440?
10   A.    Yes.
11   Q.    I'm going to drop the "DO" because they're all
12   sequentially numbered.  All right?
13   A.    All right.
14   Q.    This is something that came from the journal.  Is
15   that fair?
16   A.    I believe it did.
17   Q.    Now, do you know the order of the pages when the
18   journal was found or is that pretty much impossible to
19   know now?
20   A.    I don't know them because I did not go through
21   each and every one of them.
22   Q.    What this basically talks about is discipline,
23   "Stay calm and collective."  Correct?  Collective.
24   A.    This says, "Stay calm and collective" at the top.
25   Yes.

1   Q.    It's "Principles of Leadership."  Is that right,

2   ma'am?

3   A.    That's what the title says.

4   Q.    About -- "Take responsibilities of your actions

5   and the actions of your Marines."

6         Now, you're aware of the United States Marines,

7   correct -- of their existence?

8   A.    Yes, sir.

9   Q.    Was there any book that you saw in the Embassy

10  dealing with the United States Marines?

11  A.    Again, because there were several books taken, I

12  didn't examine each and every book.

13  Q.    Okay.  If we go down this, "Discipline.  Don't

14  worry about what people say."  And then it looks like

15  "loyalty."  Would you agree?

16  A.    I would agree.

17  Q.    And then, "Know yourself and seek

18  self-improvement."

19        Yes?

20  A.    That's what I read as well.

21  Q.    Well, then we go down.  "Set an example.  Develop

22  your subordinates.  Supervise and check on your

23  results.  Self-motivation.  No laziness.  No weed.  No

24  alcohol.  No bad food.  No late nights.  No relations.

25  No complaining."

1       Right?

2  A.    That's what I read as well.

3  Q.    Do you recall seeing that at the time?

4  A.    I don't recall that specific page.

5  Q.    But do you recall somewhat similar types of

6  things in the book -- in the journal?

7  A.    What I recall is a hand-written journal with some

8  sort of religious-type writings.  Again, I didn't

9  examine each page.

10 Q.    Page 1443.  All right?

11 A.    Yes.  That's what it says.

12 Q.    And if you can't read this, I'll bring it to you.

13       There's something -- do you see here?  Can you

14 read what it says?

15 A.    Not really.

16       MR. HOULIHAN:  May I approach?

17       THE COURT:  Yes.

18 BY MR. HOULIHAN:

19 Q.    (Tenders document to the witness.)

20 A.    It looks like "No weapons."

21 Q.    Okay.  Now, you yourself don't know who wrote any

22 of this.  Correct?

23 A.    No, sir.

24 Q.    And, again, on 1444 -- all right?  Up at the very

25 top, it looks like "Galatians" --

1    A.    That's what it looks like.

2    Q.    It looks like "3:26"?

3    A.    Correct.

4    Q.    And then something, "song of," something, "God

5    through Christ."

6          Is that basically fair?

7    A.    I don't know what's up top, but I see "God

8    through Christ."

9    Q.    And it reads basically as -- the 26 would seem to

10   be a verse; would it not?

11   A.    That I can't say.

12   Q.    "You are all sons of God through faith in Christ

13   Jesus"?

14   A.    Yes.

15   Q.    It also says "For all of you who were baptized

16   into Christ, have clothed yourselves with Christ."  And

17   then it looks like "28."  Right?

18   A.    That could be a "28."

19   Q.    "There is" -- and this is, I think, a very famous

20   line.  "There is neither Jew nor Greek, slave nor free,

21   male nor female, for you are all one in Christ Jesus."

22         And then it has "29":  "If you belong to Christ,

23   then you are Abraham's seed and hers" -- would you say

24   "hers" is fair?

25   A.    That could be it.

1    Q.      "According to the promise."

2            And that's one of the things you referred to like

3    as religious writings, I take it.  Correct?

4    A.      Correct.

5    Q.      Ma'am, if I turn my back to you, I'm not being

6    rude.

7    A.      Okay.

8    Q.      If we go to 14 -- and this is from the journal.

9            And there's no way now to know the order of the

10   different pages in the journal.  Correct?

11   A.      No.  I believe there is a way to know that.

12   Q.      How?

13   A.      I believe that whoever pulled the journal apart

14   would know that.

15   Q.      But for -- I've never seen them.

16           Do you see any notation on any of these things

17   indicating any kind of page numbers?

18   A.      No.  But I believe that the lab examiner who --

19   Q.      Might know?

20   A.      Yes.  Correct.

21   Q.      Okay.  Wonderful.  We'll ask that person.

22           Page 1451 -- or Bates stamp 1451.  "King of" --

23   it says something, "King of peace," colon or semicolon,

24   "Melchezedek," M-e-l-c-h-e-z-d-e-k?

25   A.      That's what it looks like.

```
1   Q.      And then "Prince of peace:  Jesus."
2           Underneath that, "What is God's will, according
3   to the New Testament?"
4           Right?
5   A.      Yes.
6   Q.      The other two-thirds of this page is "The order
7   of Melchezdek" and it lists a whole -- a number of
8   different names, 1 through 14.  Right?
9   A.      If you're telling me --
10  Q.      I'm sorry.  I apologize.
11  A.      I don't recognize those names.  So if they're
12  names, then, yes.
13  Q.      Up here, you see it says "According to Genesis
14  Chap" -- it looks "According to Genesis, Chapter 5."
15          Do you want me to bring it to you?
16  A.      I can see that.
17  Q.      But that's a fair recitation of what it looks
18  like?
19  A.      That's what it looks like.
20  Q.      It's almost like a historical order of people?
21  A.      Again, I don't know, really.
22  Q.      Now, there's going to be a couple pages, I
23  believe -- I'll have to show you -- 1465 and 1466.
24  Okay?
25  A.      Okay.
```

1    Q.    I have them together because they appear to go

2    together.

3          I'm not going to go through this.  But they

4    appear -- it appears reasonably to be exercise

5    instructions?

6    A.    This does make reference to several exercises.

7    Q.    And it goes -- you know, for example, here, "Flat

8    bench press, five sets," and so forth.  Right?

9    A.    Yes.

10   Q.    The other page, it's just the same type of

11   instruction.  Correct?

12   A.    Yes.  It's more writings in regard to exercise.

13   Q.    Do you know where that came from?  Do you recall,

14   like, any books of exercise in the Embassy, for

15   example.

16   A.    I don't recall the exact titles of any of the

17   books -- or I shouldn't say any of them.  But, again, I

18   didn't look through each and every book.

19   Q.    Okay.  Now, one of the -- Page 1468.  This

20   evidently is all there was on the page.  It's almost

21   like an aphorism:  "A good name is worth a gold a

22   thousand times."

23          Does that --

24   A.    That's what it says.  Yes.

25   Q.    Do you know where that phrase comes from -- or

1    that sentence?

2    A.    I don't.

3    Q.    If I jump ahead a little -- you saw earlier and

4    went over with our jury a portion of this.

5          But you see it says 1556.  Okay?

6    A.    Yes.

7    Q.    Now, if you recall, I think nine points for a --

8    it's an evasion -- or successful evasion.

9          Do you recall that?

10   A.    I recall it.  But I can't read this.

11         MS. JHONES:  Excuse me, Mr. Houlihan.  Could

12   you zoom that a little bit to make it a little bit

13   bigger?  I'm having a hard time.

14         Thank you.

15   BY MR. HOULIHAN:

16   Q.    Does that help you?  Do you want me to bring this

17   document to you?

18   A.    I can read parts of it.

19   Q.    Well, if we look at -- you recall earlier there

20   was a couple of sentences of this that were shown to

21   the jury.

22         You recall that.  Right?

23   A.    Yes.

24   Q.    But this seems to be the -- more of a complete

25   recitation of whatever is being talked about.  Correct?

1    A.    I know we highlighted a certain portion and I

2    read it out loud.

3    Q.    If you look at 4, where my finger is, would you

4    agree it seems to say "If you landed by parachute, you

5    should assume that the enemy spotted your descent and

6    get out of the immediate area as fast as you can"?

7    A.    That's what it appears to say.

8    Q.    If you want me to bring this to you --

9    A.    No.  I can read what you just read.

10   Q.    Now, would you agree with me that seems to come

11   from some sort of military or Marine manual?

12        MS. ARANGO:  Objection.  Speculative.

13        THE COURT:  Sustained.

14   BY MR. HOULIHAN:

15   Q.    Now, on Page 1495, this seems to be just

16   jottings.  "Darkness:  Ignorance.  The true Temple is

17   within -- inside our self.  Building character.  One of

18   the devil's tools is diving."  And then this stops.

19   A.    What you're reading is not completely on my

20   screen.

21   Q.    I apologize.  Take your time.

22   A.    Yes.  That's what it says.

23   Q.    Now, when it appears to stop, that's, to the best

24   of your remembrance, how it looked at the time the

25   search occurred.  Correct?

1    A.    Again, I didn't look at each and every page in

2    that journal.

3    Q.    Now, this is going to be from the same composite,

4    1473.  All right?  It's going to be very difficult.

5    It's very light.

6          Can you see that?

7    A.    Parts of it.

8    Q.    Now, it appears to say, if we look at the very

9    top here, "Har," h-a-r.  Yes?  No?

10   A.    It could be "hard."

11   Q.    And then, colon, m-u-k-a-d-h-e-d-s-a?

12   A.    It could be that.

13   Q.    Now, directly underneath that, "Har is war in

14   English."

15   A.    That looks like "war" to me.

16   Q.    And on the other side, "holy"?

17   A.    That's a little tougher to see.  I would have

18   said "pony."

19   Q.    You would have said what?

20   A.    "Pony."

21   Q.    "Pony"?

22   A.    Yeah.

23   Q.    Well....

24          MR. HOULIHAN:  May I approach the witness,

25   your Honor?

```
1              THE COURT:  Yes.
2    BY MR. HOULIHAN:
3    Q.    This is going to be the actual original.  Fair
4    enough?
5    A.    Okay.
6    Q.    Does that help you?
7              THE COURT:  Can you say what exhibit number
8    that is, please.
9              MR. HOULIHAN:  It's 125 composite.
10             MS. ARANGO:  It should have a sticker on it.
11   The witness can read the sticker.
12             THE COURT:  Is there a sticker on there?
13             THE WITNESS:  Yes.  It's 125-E.
14             Is that what you're referring to?
15             THE COURT:  Yes.  Thank you.
16   BY MR. HOULIHAN:
17   Q.    Thank you.
18         "E" as in "elephant," I take it.
19   A.    That's correct.
20   Q.    So let's start again.
21         "Har," h-a-r?
22   A.    Yes.
23   Q.    "This is war"?
24   A.    Yes.
25   Q.    Here is that word "mukadhedsa," whatever it is?
```

1    A.    Correct.

2    Q.    And "holy"?

3    A.    Yes.

4    Q.    Now, down here, it goes -- what?  Can you read

5    that?

6    A.    It says "Not jihad.  They lied.  It was a

7    statement without facts."

8    Q.    Okay.  And then what about over here?  "Jihad

9    means juhd," j-u-h-d.  Juhd?

10   A.    Well, it says "jihad" and then, in parentheses,

11   "Root word" j-u-h-d.

12   Q.    Then next to it, it says "Means" --

13   A.    "Also praying."

14   Q.    Okay.  Is there something about "Pay the effort"?

15   A.    Yeah.  That's the next words that I can read,

16   "Pay the effort."

17   Q.    "Pay the effort.  Earning a living.  Work also

18   praying."

19         Is that basically fair?

20   A.    Well, I thought we put the "also praying" up with

21   the "root word juhd."  But it's at the end of that

22   sentence as well.

23   Q.    Okay.  And then underneath that the next couple

24   of sentences appears to be in a foreign language with

25   an English translation, like, "Peace be upon him" and

```
 1   so forth?

 2   A.    Well, there's "Prophet Muhammed, messenger" and

 3   Sahalia.

 4   Q.    Okay.

 5   A.    I can't read all of that -- those two words.

 6   Q.    Fair enough.

 7         But we agree at least as -- the document begins

 8   earlier as to what is contained there.  Right?

 9   A.    The first paragraph, I think, we covered.

10   Q.    Now, there also was found -- you had been shown

11   the picture of the shoe box.

12         There were found some personal documents.

13   Correct?  Do you recall?

14   A.    You're saying were there some personal documents

15   in it?

16   Q.    Yes, ma'am.

17   A.    Yes, there were.

18   Q.    Now, I'd like to show you 1500.  Okay?

19   A.    Yes.

20   Q.    It is the State of Florida Department of Highway

21   Safety and Motor Vehicles.  It appears to be driver's

22   training, a completion certificate.

23         Is that a fair -- in the name Naudimar Herrera.

24         Would that be a fair interpretation of this

25   particular document?
```

1    A.    Yes.  That's what it looks like.

2    Q.    On Bates No. 1510, this is a Florida -- it says

3    "Identification Card."

4          Now, those are issued by the Department of Motor

5    Vehicles; are they not?

6    A.    Generally, they are.  Yes.

7    Q.    It's in the name of Naudimar Herrera?

8    A.    That's what it appears to be.  Yes.

9    Q.    And, lastly -- and I appreciate your patience --

10   1497:  This is, I guess, what we call a birth

11   certificate.  Right?

12   A.    That's what it looks like.

13   Q.    In the name of Naudimar Herrera with Mom's name

14   and Dad's name and so forth?

15   A.    You could zoom it in a little bit.  But that's

16   what it looks like.

17   Q.    I'm going the wrong way.  I apologize.

18   A.    It looks like "Naudimar Herrera."

19   Q.    Right.  Naudimar with Mom's name, Maribel?

20   A.    Correct.

21   Q.    Israel is the father?

22   A.    Correct.

23          MR. HOULIHAN:  Could I have a quick moment,

24   Judge?

25          THE COURT:  Sure.

BY MR. HOULIHAN:

Q.    When evidence is sent to an FBI crime laboratory, who makes that decision:  You or a member of your unit? Or is it more the case agents?

A.    Generally, it would be the case agents.  But it would depend on the circumstances.

Q.    In our case, do you know if you or any member of your unit sent -- directed evidence to go to the FBI crime lab?

A.    I don't believe we did.

Q.    So in our case, it would have been totally up to the case agents?

A.    That's correct.

Q.    Do you know if anything was sent or you're kind of out of the loop at that point?

A.    No.  I believe things were sent.  Specifically, some of these items that have the laboratory marking on them.

Q.    The computers we talked about:  Do you know if any of them -- because your laboratory has a computer section to retrieve data and examine computers. Correct?

A.    Our head --

      MS. ARANGO:  Objection, Judge.  Outside the scope.  She's also -- I believe this is also asked and

```
 1   answered.
 2           THE COURT:  It's been asked and answered.
 3           Sustained.
 4           MR. HOULIHAN:  I have nothing else.  Thank
 5   you.
 6           THE COURT:  Mr. Clark?
 7           MR. CLARK:  No further questions, your Honor.
 8           THE COURT:  Mr. Casuso?
 9           MR. CASUSO:  No questions, your Honor.
10           THE COURT:  Mr. Levin?
11           MR. LEVIN:  No questions.
12           THE COURT:  Ms. Arango?
13           MS. ARANGO:  I have no questions, Judge.
14           THE COURT:  You may step down, ma'am.
15           (Witness excused.)
16           THE COURT:  Call your next witness.
17           MR. GREGORIE:  The United States calls Harold
18   Medina.
19   Thereupon--
20                       HAROLD MEDINA
21   was called as a witness by the Government and, having
22   been first duly sworn, testified as follows:
23           THE COURT REPORTER:  Please have a seat.
24           Please state your full name and spell the last
25   name.
```

 1            THE WITNESS:  Harold Medina, M-e-d-i-n-a.

 2                      DIRECT EXAMINATION

 3   BY MR. GREGORIE:

 4   Q.    Sir, would you tell the Court and jury how you're

 5   employed, please.

 6   A.    With the Federal Bureau of Investigation.

 7   Q.    And for how long have you been so employed?

 8   A.    It's now 26 years.

 9   Q.    What is your current assignment?

10   A.    I'm an administrative specialist for facilities

11   management.

12   Q.    And prior to that, what was your assignment?

13   A.    I was a supervisory investigator for operations

14   analyst.

15   Q.    Let's see if we can put that in laymen's terms

16   for folks.  Okay?

17   A.    Yes, sir.

18   Q.    Can you tell them what that job entailed.

19   A.    Sure.  We did background investigations, research

20   analysis and serviced the agents with service of

21   subpoenas and fingerprinting.

22   Q.    And do you, in fact -- did you, in fact, take

23   fingerprints of the Defendants in this case?

24   A.    Yes, I did.

25            MR. GREGORIE:  May I approach the witness,

```
 1    your Honor?

 2              THE COURT:  Yes.

 3    BY MR. GREGORIE:

 4    Q.    Now I'm showing you what's marked as Government's

 5    Exhibits 153-A through -I, 154-A through -I, 155-A and

 6    -B and 156.

 7          Would you take a look at those, please, sir.

 8    A.    Yes, sir.

 9    Q.    And do you recognize those?

10    A.    Yes, I do, sir.

11    Q.    Looking first at 153-A and -B, can you tell the

12    Court and jury if those are prints you took.

13    A.    Yes, sir.  They are prints I took.

14    Q.    And on what date did you take them?

15    A.    I took them on June 22nd, 2006.

16    Q.    And how do you recognize them, sir?

17    A.    They have my signature, date and printed name on

18    them.

19    Q.    Are there different kinds of prints?  In other

20    words, do you take just one finger?  The whole hand?

21    Can you tell the jury what you do.

22    A.    Depending upon the case agent, I can take what

23    they call palm prints or what we consider major case

24    prints and regular fingerprints.

25    Q.    In this particular case, Government's
```

1   Exhibit 153-A and -B, what type of prints are those?

2   A.    153-A is rolled prints from fingers.

3         The rest of them is what we call the major case

4   prints, which are palm prints and in between the

5   fingers.

6   Q.    Okay.  And after those prints are taken, what, if

7   anything, do you have the individual who took the

8   prints do after the prints are taken?

9   A.    I request them to print their name, sign and

10  date.

11  Q.    And did the individual whose prints are in

12  Government's Exhibit 153-A and -B do that?

13  A.    Yes, he did.

14  Q.    And do you know whose prints you took on that

15  day?

16  A.    Yes.  Those are from Naudimar Herrera.

17        MR. HOULIHAN:  Objection.  It's speculative,

18  Judge.  The document itself -- -- it speaks for itself.

19        THE COURT:  Sustained.

20        Rephrase your question.

21        MR. GREGORIE:  I'm going to rephrase the

22  question, your Honor.

23  BY MR. GREGORIE:

24  Q.    Showing you now what's marked as Government's

25  Exhibit 1 through 6 in evidence, would you look at that

Medina - DIRECT - By Mr. Gregorie                     194

```
 1   and see if you recognize the individual whose prints
 2   you took on that day.
 3   A.      Yes, sir.
 4   Q.      Could you tell us which of the Photos 1 to 6 in
 5   evidence you --
 6   A.      This would be Naudimar Herrera.
 7   Q.      That's the individual whose prints you took on
 8   that day?
 9   A.      That's correct, sir.
10         MR. GREGORIE:  Your Honor, the United States
11   now moves Government's Exhibit 153-A and -B for
12   evidence, your Honor.
13         THE COURT:  It will be admitted as
14   Government's Exhibit 153-A and -B.
15         (Whereupon, Government's Exhibit No. 153-A and
16   153-B were entered into evidence.)
17   BY MR. GREGORIE:
18   Q.      That was done on June 22nd, 2006?
19   A.      That's correct, sir.
20   Q.      Now would you take a look at Government -- one or
21   two or questions.
22         Can those prints be altered or changed in any way
23   after you've taken them?
24   A.      No, sir.
25   Q.      Let's take a look at Government's Exhibit 154-A
```

1    through -I.

2          Have you got those before you?

3    A.    Yes, I do, sir.

4    Q.    Did you take the prints contained in Government's

5    Exhibit 154-A through -I?

6    A.    Yes, I did.

7    Q.    On what day did you do that?

8    A.    That was June 26th, 2007.

9    Q.    And what type of prints are those?

10   A.    Those are also major case prints and

11   fingerprints.

12   Q.    And did you -- as you did in the last one, did

13   you ask the individual whose prints you took to sign

14   and put their name on the prints?

15   A.    Yes, I did, sir.

16   Q.    And I ask you again to look at Government's

17   Exhibits 1 to 6 and see if you see the individual whose

18   prints you took on that day.

19   A.    Yes.

20   Q.    Who is that?

21   A.    It would be Stanley Phanor.

22   Q.    And what exhibit number is that?

23   A.    This is No. 6.

24   Q.    And did you take those on June 26th of 2007?

25   A.    Yes, I did, sir.

1          MR. GREGORIE:  Your Honor, at this time the

2  United States moves Government's Exhibit 154-A through

3  -I for evidence.

4          MR. VEREEN:  No objection.

5          THE COURT:  They will be -- it will be

6  admitted as Government's Exhibit 154-A through I.

7          (Whereupon, Government's Exhibit Nos. 154-A

8  through 154-I were entered into evidence.)

9  BY MR. GREGORIE:

10 Q.    Now looking at Government's Exhibit 155 -- and I

11 believe that's -A and -B.  Is that correct?

12 A.    That's correct, sir.

13 Q.    And are those prints you took?

14 A.    Yes, sir, they are.

15 Q.    On what day did you take them?

16 A.    August 13th, 2007.

17 Q.    What type of prints did you take?

18 A.    These are partial prints of fingers for major

19 case.

20 Q.    Did you ask the individual whose prints you took

21 to initial and -- to sign and print their name on those

22 fingerprints?

23 A.    Yes, I did, sir.

24 Q.    And looking at Government's Exhibit 1 through 6

25 in evidence, can you find the individual whose prints

1   you took?

2   A.    Yes, sir.  It would be Exhibit No. 6, Naudimar

3   Herrera -- excuse me -- No. 3, Naudimar Herrera.

4   Q.    Okay.  And, again, what date was it that you took

5   Naudimar Herrera's prints?

6   A.    August 13th, 2007.

7   Q.    Would you look, finally, at Government's

8   Exhibit 156.

9   A.    Yes, sir.

10  Q.    Is that before you?

11  A.    Yes, sir.

12  Q.    Does that contain fingerprints that you took?

13  A.    Yes, sir.

14  Q.    And what date did you take the prints?

15  A.    August 13th, 2007.

16  Q.    Did you have the individual whose prints you took

17  to sign and print their name on those prince?

18  A.    Yes, sir.

19  Q.    And looking at Government's Exhibit 1 through 6,

20  do you see right there whose prints you took?

21  A.    Yes, sir.  It would be Stanley Phanor.

22  Q.    What exhibit number is that?

23  A.    No. 6, sir.

24        MR. GREGORIE:  Your Honor, the United States

25  move Government's Exhibit 156 for evidence.

```
 1                MR. VEREEN:  No objection.

 2                THE COURT:  It will be admitted as

 3     Government's Exhibit 156.

 4                (Whereupon, Government's Exhibit No. 156 was

 5     entered into evidence.)

 6                THE COURT:  Did you move in 155?

 7                MR. GREGORIE:  I believe so, your Honor.  If I

 8     haven't, I do now.

 9                THE COURT:  It will be admitted as

10     Government's Exhibit 155-A and -B.

11                (Whereupon, Government's Exhibit No. 155-A and

12     155-B were entered into evidence.)

13     BY MR. GREGORIE:

14     Q.    Would you take a look at 153 again.

15           Is that just -A and -B or are there more than two

16     exhibits in there?

17     A.    No.  There's more than --

18     Q.    Is that -A through -I?

19     A.    Yes, sir.

20     Q.    That was my fault.  I apologize.

21           That's Government's Exhibit 153-A through -I.

22     Correct?

23     A.    That's correct, sir.

24     Q.    And, again, whose fingerprints are contained in

25     Government's Exhibit 153-A through -I?
```

 1   A.     Naudimar.

 2   Q.     The same Naudimar Herrera whose photograph you

 3   identified?

 4   A.     Correct.

 5          MR. GREGORIE:  I move 153-A through -I for

 6   evidence, your Honor.

 7          MR. HOULIHAN:  No objection.

 8          THE COURT:  153-A and -B now becomes 153-A

 9   through -I and is admitted into evidence.

10          MR. GREGORIE:  So there should be, your Honor,

11   153-A through -I --

12          THE COURT:  Yes.

13          MR. GREGORIE:  -- 154-A through -I, 155-A and

14   -B and 156, all in evidence.

15          THE COURT:  Yes.  That's correct.

16          MR. GREGORIE:  Thank you, Judge.

17          I have no further questions.

18          THE COURT:  Ms. Jhones?

19          MS. JHONES:  I have no questions.

20          THE COURT:  Mr. Vereen?

21          MR. VEREEN:  Just a couple.

22

23                      CROSS-EXAMINATION

24   BY MR. VEREEN:

25   Q.     Agent Medina, good afternoon.

1    A.     Yes, sir.

2    Q.     I want to direct your attention to Stanley

3    Phanor's prints.

4    A.     One of them, sir?

5    Q.     I believe it's Exhibit 6.  Is that correct?

6    154-A?

7    A.     Exhibit 6 would be the photograph.

8    Q.     The photograph of what?

9    A.     Of Stanley Phanor.  That would be Exhibit 6.

10   Q.     Did you compare any fingerprints of Stanley

11   Phanor to any latent found on --

12   A.     No.  I only take prints.  I am not qualified to

13   lift prints nor to read the prints.

14   Q.     Good enough.

15          MR. VEREEN:  Thank you, Judge.  No further

16   questions.

17          THE COURT:  Mr. Houlihan?

18          MR. HOULIHAN:  No questions.

19          THE COURT:  Mr. Clark?

20          MR. CLARK:  No questions, your Honor.

21          THE COURT:  Mr. Casuso?

22          MR. CASUSO:  No questions, your Honor.

23          THE COURT:  Mr. Levin?

24          MR. LEVIN:  No questions.

25          THE COURT:  Mr. Gregorie?

```
 1            MR. GREGORIE:  No further questions, your
 2    Honor.
 3            THE COURT:  You may step down, sir.
 4            THE WITNESS:  Thank you.
 5            (Witness excused.)
 6            MR. GREGORIE:  The United States calls
 7    Michelle Thompson.
 8    Thereupon--
 9                    MICHELLE THOMPSON
10    was called as a witness by the Government and, having
11    been first duly sworn, testified as follows:
12            THE COURT REPORTER:  Please have a seat.
13            Please state your full name and spell your
14    last name for the record.
15            THE WITNESS:  Michelle Thompson,
16    T-h-o-m-p-s-o-n.
17                    DIRECT EXAMINATION
18    BY MR. GREGORIE:
19    Q.    Ma'am, can you tell the Court and jury how you're
20    employed.
21    A.    I am a fingerprint specialist and a physical
22    scientist, forensic examiner, with the FBI latent print
23    operations unit.
24    Q.    What are your duties on that job?
25    A.    I am an examiner.  I examine evidence for the
```

1    presence of latent prints or friction ridge prints.

2         I compare those prints against known standards or

3    I can search those prints against a computer database.

4         I prepare reports based on my conclusions and, if

5    necessary, I will testify to my results.

6    Q.    What kind of education and training have you

7    received in the area of fingerprints?

8    A.    I have a bachelor of science degree from the

9    College of William and Mary in Williamsburg, Virginia.

10   My concentration is in biology.

11        I have a master of science degree from Virginia

12   Commonwealth University in Richmond, Virginia, a

13   concentration in forensic science.

14        I worked for approximately a year for the

15   Virginia State Police as a fingerprint technician,

16   where my primary duty was to update criminal records

17   using fingerprint comparisons and identifications.

18        I joined the FBI in 1999 and began a two-year

19   training program to become a certified latent print

20   examiner.

21        Following my training, I took a certification

22   test, three days, combining comparison skills as well

23   as written knowledge.  I successfully passed this and

24   was certified as a latent print specialist by the FBI

25   in August of 2001.

1        Since that time, I have worked in that capacity

2   in the Bureau and I have -- over the course of my

3   career, I've done over half a million friction ridge

4   comparisons.

5   Q.     Have you ever testified in federal court as a

6   fingerprint expert?

7   A.     Yes, I have.

8   Q.     How many times have you done that?

9   A.     I believe about 11 times.

10  Q.     So this would be your 12th?

11  A.     Yes.  I believe so.

12  Q.     Okay.

13        MR. GREGORIE:  Your Honor, at this time the

14  United States moves Michelle Thompson as a fingerprint

15  expert.

16        MR. VEREEN:  No objection.

17        MR. HOULIHAN:  No objection.

18        MS. JHONES:  No objection.

19        THE COURT:  She will be accepted as an expert

20  in fingerprints.

21  BY MR. GREGORIE:

22  Q.     Now, ma'am, can you tell the Court and jury what

23  a latent fingerprint is.

24  A.     If you look at the palms of your hands, you

25  notice raised ridges in the skin, which are known as

1   friction ridges.  They allow you to interact with your

2   environment, to grasp things.

3        And if you take an opportunity to take off your

4   shoes to look at the soles of your feet, you'll notice

5   various ridges there as well.  They allow you to walk.

6        Another side benefit of the friction ridges is

7   that they're unique and can be used for --

8             THE COURT:  Can you slow down a little bit.

9             THE WITNESS:  Sorry.

10            THE COURT:  Thank you.

11            THE WITNESS:  Now, sometimes when you interact

12  with your environment you can get substances on your

13  hand.  It can be oils, greases, sweat, things like

14  that.

15       When you touch a surface, you can leave behind

16  an outline of your friction ridges.  That outline is

17  known as a latent fingerprint.

18       Typically, they're not able to be seen by the

19  naked eye and require some type of processing to become

20  visible.

21  BY MR. GREGORIE:

22  Q.   And can you tell us how fingerprints are compared

23  and identifications made.

24  A.   Well, I use -- when doing a comparison, I use a

25  methodology known as ACEV, A-C-E-V.  The first step in

1    the methodology is analysis.  At this stage, I gather

2    all the information I know about a particular print.

3         From there, I move on to the comparison set.

4    From the comparison, I will compare two fingerprints,

5    for example, a latent fingerprint and a known standard

6    or a known individual's fingerprint.

7         From there, I'll move to the next stage, which is

8    evaluation.  In evaluation, it's basically a decision.

9    I can make one of three decisions.

10        First is identification, where the two prints did

11   come from the same individual.  The second possibility

12   is exclusion or nonidentification, where the two prints

13   did not come from the same individual.  And the last is

14   inconclusive.

15        With inconclusive, it's basically I don't know.

16   I need further information, further known exemplars

17   from the individual, to be able to make a conclusion.

18        The culmination of this after making an

19   evaluation is a verification stage.  At verification,

20   another qualified latent print examiner will do their

21   own independent ACEV, analysis, comparison and

22   evaluation.  This can be used for quality control and

23   for peer review.

24   Q.   Now, ma'am, I'm going to show you what's been

25   marked as Government's Exhibit 125-B through 125-O and

1    ask if you recognize them.

2    A.    Yes, I do.  My initials appear on all the pages.

3    Q.    What, if anything, did you do with those

4    exhibits?

5    A.    I processed and examined these items for the

6    presence of latent prints.

7    Q.    And did you find any latent prints on any of

8    those?

9    A.    Yes, I did.

10   Q.    Can you tell the Court and jury where you found

11   latent prints, on which exhibits.

12   A.    I found -- or developed latent prints of value on

13   three pages from Exhibit 125-B comp; one page from

14   Exhibit 125-C.

15        And then latent prints of value appear on

16   Exhibit 125-E, Exhibit 125-F, Exhibit 125-G,

17   Exhibit 125-I, Exhibit 125-J, Exhibit 125-L,

18   Exhibit 125-M, Exhibit 125-N and Exhibit 125-O.

19   Q.    I would ask you to look up there and see if you

20   have before you Government's Exhibits 153-A through -I,

21   154-A through -I, 155-A and -B and 156.

22        Do you see those there?

23   A.    I have 154-B, Exhibit 155-B and Exhibit 156 and

24   Exhibit 153-B.

25   Q.    Have you compared the exhibits in -- that you

Thompson - DIRECT - By Mr. Gregorie                    207

1    just told us you found latent prints on with the

2    exhibits -- the actual fingerprints that are contained

3    in 153, 154, 155 and 156?

4    A.    Yes, I did.  The -- my initials appear on each of

5    the cards.

6    Q.    Can you tell the Court and jury who -- where you

7    found prints that were the same, that -- both on the

8    latent and on the sample print.

9    A.    Well, I identified -- I identified

10   30 fingerprints and five palm prints on the series of

11   exhibits.

12         Do you want the specific exhibit with the

13   specific individual?

14   Q.    Yes, if you could, please.

15   A.    Okay.  On Exhibit 125-E, I identified two

16   fingerprints and three palm prints as belonging to the

17   same -- made by the same person that made the

18   fingerprints on Government's Exhibit 154-A, which

19   was -- is a fingerprint card bearing the name of

20   Stanley Grant Phanor.

21         On the same exhibit page, 125-E, there were also

22   additional fingerprints.  Three fingerprints and two

23   palm prints were identified, with Government's

24   Exhibit 153-A, which is a fingerprint card bearing the

25   name of Naudimar Herrera.

1          On the remaining exhibits, which would have been

2     three pages from Exhibit 125-B, one page from 125-C,

3     Exhibits 125-F, 125-G, 125-I, 125-J, 125-L, 125-M,

4     125-N and 125-O, I identified latent fingerprints of

5     value on those belonging to the Fingerprint Card 153-B,

6     again, Naudimar Herrera.

7     Q.     Thank you very much.

8          MR. GREGORIE:  I have no further questions for

9     this witness, your Honor.

10              THE COURT:  Ms. Jhones?

11              MS. JHONES:  I have no questions, your Honor.

12              THE COURT:  Mr. Vereen?

13              MR. VEREEN:  Just a couple, Judge.

14                       CROSS-EXAMINATION

15    BY MR. VEREEN:

16    Q.     Ms. Thompson, good afternoon.

17    A.     Good afternoon.

18    Q.     With regard to Government's Exhibits 125-E and

19    154-A, it was your testimony that you found two

20    fingerprints and three palm prints belonging to Stanley

21    Phanor.  Correct?

22    A.     That is correct.

23    Q.     Now, with regard to the fingerprints, which

24    prints -- when I asked you which prints, which prints

25    belong to which fingers that you found?

```
 1   A.    I identified the -- which is No. 7, which would

 2   be the left index finger, and the left little finger,

 3   No. 10 finger.  And then the palm prints were all left

 4   palms.

 5   Q.    Okay.  So, in other words, all the prints that

 6   you found, whether they were fingerprints or palm

 7   prints, belong to the left hand.  Correct?

 8   A.    That is correct.

 9   Q.    And do you recall where on the page you found

10   those prints?

11   A.    I have the prints marked, but I'm not -- they're

12   not marked specifically for Mr. Phanor or Mr. Herrera.

13   They were both on the same page.  But do I have where

14   the prints themselves were developed.

15   Q.    Where were those prints?

16   A.    I'm sorry.  I don't see 125-E here.

17         MS. ARANGO:  I believe it was shown to the

18   prior witness earlier and taken out of that bunch.  So

19   it's either up there somewhere or....

20         MR. HOULIHAN:  Which one?

21         MS. ARANGO:  125-E.

22         MR. GREGORIE:  May we approach, your Honor?

23         THE COURT:  Sure.

24         Time for a break.

25         Do not discuss this case --
```

1              THE WITNESS:  I found it.

2              THE COURT:  We'll still take a break.

3              Do not discuss this case either amongst

4    yourselves or with anyone else.  Have no contact

5    whatsoever with anyone associated with the trial.  Do

6    not read, listen or see anything touching on this

7    matter in any way.

8              If anyone should try to talk to you about this

9    case, you should immediately instruct them to stop and

10   report it to my staff.

11             You may leave your materials at your chairs.

12   Ten minutes.

13             (Whereupon, the jury exited the courtroom at

14   3:31 p.m. and the following proceedings were had:)

15             THE COURT:  We're in recess for ten.

16             (Thereupon a recess was taken, after which the

17   following proceedings were had:)

18             THE COURT:  United States of America versus

19   Narseal Batiste, et al., Case No. 06-20373.

20             Counsel, state your appearances, please, for

21   the record.

22             MR. GREGORIE:  Richard Gregorie and Jacqueline

23   Arango on behalf of the United States.

24             MS. JHONES:  Ana Jhones on behalf of Narseal

25   Batiste, who is present.

1             MR. LEVIN:  Albert Levin on behalf of Patrick

2    Abraham, who's present.

3             MR. CASUSO:  Lou Casuso on behalf of Burson

4    Augustin, who's present.

5             MR. CLARK:  Nathan Clark for Rotschild

6    Augustine, who's present.

7             MR. HOULIHAN:  Richard Houlihan with Naudimar

8    Herrera.

9             MR. VEREEN:  Rod Vereen on behalf of Stanley

10   Phanor, who's present.

11            THE COURT:  All Defendants are present.

12            Let's bring in the jury, please.

13            (Whereupon, the jury entered the courtroom at

14   3:47 p.m. and the following proceedings were had:)

15            THE COURT:  You had been seated.

16            You are still under oath, ma'am.

17            You may proceed, Mr. Vereen.

18            MR. VEREEN:  Thank you.

19   BY MR. VEREEN:

20   Q.    Ms. Thompson, I believe, when we left off, we

21   were talking about the Exhibits -- was it 125-E?

22   A.    Yes.

23   Q.    Were you able to locate that exhibit?

24   A.    Yes, I did.

25   Q.    Now, the fingerprints that you said you found was

1   the left pointer finger, the left pinkie finger and

2   three palm prints from the left hand.  Correct?

3   A.     That is correct.

4   Q.     Now, with regard to the exhibit -- and is it

5   125-E -- is that the page that you found the

6   fingerprints on?

7   A.     Yes.

8          MR. VEREEN:  May I approach, your Honor?

9          THE COURT:  Sure.

10  BY MR. VEREEN:

11  Q.     I just want to take a look at that.

12  A.     (Witness tenders document to Counsel.)

13  Q.     Now, with regard to Government's Exhibit 125-E,

14  it's a two-sided document.  Correct?

15  A.     Yes.

16  Q.     Do you know which side you found the pointer

17  fingerprint?

18  A.     I know the index finger was on that, but I don't

19  know exactly where on that particular document the

20  No. 7 finger was identified.

21  Q.     Well, when those prints are lifted -- do you do

22  the lifting yourself?

23  A.     I do the processing myself.  The photography is

24  done by another unit within the laboratory.

25  Q.     Would you not make an indication when you lift a

1    print as to which side of a document that print was

2    found?

3    A.     When -- the process that I use to develop a

4    print is known as ninhydrin, n-i-n-h-y-d-r-i-n.

5    Ninhydrin a chemical process that colors the prints a

6    pinkish-purplish color.

7          I don't know really lift the print as you think

8    of with the traditional movie and TV type of thing

9    where they dust something and lift it.

10         This is just a chemical process that I use.  It

11   makes the prints visible.

12         Once it's visual, then I send it to the

13   photography unit in our laboratory where they

14   photograph it for -- so that they can preserve the

15   print and, also, so I can use it for comparison

16   purposes.

17         When I send this to the photography unit, there

18   are arrows on the document where the prints appear,

19   because I did additional processing which will actually

20   wipe off or remove the ninhydrin prints.

21   Q.     Well, what about the pinkie fingerprint?

22   A.     Again, I wouldn't know exactly where on there I

23   had it.  I would be able to tell through the

24   photograph.

25   Q.     What about the palm prints?  Same answer?

1   A.      Same answer.

2   Q.      Now, you wrote -- you made arrows to indicate

3   where the print was located on the document.  Correct?

4   A.      That is correct.

5           MR. VEREEN:  If I may approach, your Honor.

6           THE COURT:  You may.

7   BY MR. VEREEN:

8   Q.      Please look at that document, Ms. Thompson, and

9   tell me whether the arrows that you indicated appear on

10  the front of the document, where there's writing, or on

11  the back, where there is no writing.

12  A.      They appear on the back, where there is no

13  writing.

14  Q.      Thank you.

15          MR. VEREEN:  No further questions.

16          THE COURT:  Mr. Houlihan?

17          MR. HOULIHAN:  May it please the Court.

18                      CROSS-EXAMINATION

19  BY MR. HOULIHAN:

20  Q.      Good afternoon, ma'am.

21  A.      Good afternoon.

22  Q.      It's a pleasure to see you again.

23  A.      Thank you.

24  Q.      You're out of Quantico.  Right?

25  A.      That is correct.

```
 1   Q.     And that's where the FBI has one of their many --
 2   not many -- but a few laboratories?
 3   A.     That is the main laboratory of the FBI.
 4   Q.     Now, in your laboratory -- are the other
 5   laboratories the FBI has -- are they located physically
 6   in the same place?  Like there's a laboratory dealing
 7   with computers, for example?
 8   A.     Oh.  You're dealing with different units?
 9   Q.     Yes, ma'am.  I'm sorry.  I'm not familiar with
10   the language.
11   A.     That's okay.
12          We have several units.  There's also other units
13   that deal with computer aspects.  And they are on site,
14   an academy lab -- academy area where the laboratory is
15   located.
16   Q.     Another lab would be the encryption?  There's a
17   laboratory dealing with encryption?
18              MS. ARANGO:  Objection.  Relevance, your
19   Honor.
20              THE COURT:  Sustained.
21   BY MR. HOULIHAN:
22   Q.     For our case, do you know if any of the evidence
23   was submitted to any other FBI unit aside from yours?
24   A.     Are you referring to this particular submission?
25   Q.     No.
```

```
 1          Anything in this case, if you have any --
 2              MS. ARANGO:  Objection, your Honor.  Outside
 3     the scope.
 4              THE COURT:  Sustained.
 5     BY MR. HOULIHAN:
 6     Q.    Now, Naudimar Herrera -- the fingerprints you've
 7     talked to the jury about, they all came from paper,
 8     things that seem to be in the composition book.
 9          Would that be fair?
10     A.    All the prints were identified on paper.  Yes.
11     Q.    Can you tell how fresh the prints were?  Is there
12     any way?
13     A.    No.  There's no way.
14     Q.    The orientation -- well, let me sum this up.
15          You found 30 latents of value.  And latents would
16     be like the tips of fingers.  Correct?
17     A.    There are 30 latent fingerprints of value.  Are
18     you referring to that?
19     Q.    Yes, ma'am.
20          And five latent palm prints of value.  Okay?
21     A.    Are you referring to what was identified as
22     Mr. Herrera?
23     Q.    Yes, ma'am.
24     A.    Okay.
25     Q.    And that's from your August 27th, 2007, report?
```

```
  1    A.      Correct.

  2    Q.      All of those identifications came from paper that

  3    looked like it came from a composition book?

  4    A.      All of the identifications were on paper that

  5    looked like -- just on paper, on documents.

  6    Q.      I'm sorry.  Could you say that again.

  7    A.      On paper, on documents.

  8    Q.      You were given -- aside from all of the

  9    individuals charged in this case, you were given

 10    someone named Elie Assaad major case prints.  Is that

 11    correct?

 12    A.      That is correct.

 13    Q.      And you would also compare him to the different

 14    latents of value?

 15            MR. GREGORIE:  Objection, your Honor.

 16    Relevance.

 17            THE COURT:  Sustained.

 18    BY MR. HOULIHAN:

 19    Q.      As we speak today -- well, let me ask you this.

 20            Going back to the papers that you examined of

 21    Naudimar -- all right? --

 22    A.      Uh-huh.

 23    Q.      -- the orientation of the fingerprints on

 24    there -- did they reasonably appear to be someone

 25    writing, you know, you'd have your hand on a book and
```

```
 1   you're writing?
 2   A.    Just off the top of my head, I can't recall.
 3   Q.    As we speak today -- well, on any case, there's
 4   what's called latent prints of value.  Correct?
 5   A.    Yes.  That's a term.
 6   Q.    And that term means, as I understand it,
 7   potential fingerprints lifted from a crime scene or
 8   developed through your laboratory that may indicate who
 9   left the print?
10   A.    Latent prints of value indicates that the latent
11   print has sufficient information to be able to come to
12   a conclusion.
13   Q.    Okay.  Because you were given a fair amount of
14   evidence aside from this book that we've been talking
15   about.  Correct?
16   A.    This particular submission, there were 22 pages
17   that were examined.
18   Q.    But you were given things on August 27th,
19   August 6th, August 29th.  You were given a whole slew
20   of different things?
21   A.    Yes.
22   Q.    How many latent prints of value that have not
23   been identified are in existence in our case, as we
24   speak today?
25         MR. GREGORIE:  Objection, your Honor.
```

```
1              THE COURT:  Grounds?

2              MR. GREGORIE:  Relevance.

3              THE COURT:  Sustained.

4              MR. HOULIHAN:  I have nothing else.

5         Thank you.

6              THE WITNESS:  Thank you.

7              THE COURT:  Mr. Clark?

8              MR. CLARK:  No questions, your Honor.

9              THE COURT:  Mr. Casuso?

10             MR. CASUSO:  No questions, your Honor.

11             THE COURT:  Mr. Levin?

12             MR. LEVIN:  I have no questions, your Honor.

13             THE COURT:  Mr. Gregorie?

14             MR. GREGORIE:  No further questions, your

15        Honor.

16             THE COURT:  You may step down, ma'am.

17             THE WITNESS:  Thank you.

18             THE COURT:  Call your next witness.

19             MS. ARANGO:  Your Honor, the United States

20        calls Timothy Scott to the stand.

21        Thereupon--

22                       TIMOTHY JOHN SCOTT

23        was called as a witness by the Government and, having

24        been first duly sworn, testified as follows:

25             THE COURT REPORTER:  Have a seat.
```

```
 1              Please state your full name for the record.
 2              THE WITNESS:  Timothy John Scott.
 3                      DIRECT EXAMINATION
 4    BY MS. ARANGO:
 5    Q.     Now, by whom are you employed?
 6    A.     The United States Immigration and Customs
 7    Enforcement.
 8    Q.     What's your position with them?
 9    A.     A special agent.
10    Q.     How long have you been a special agent with ICE?
11    A.     Since its inception in 2003.  Prior to that, I
12    was a US Customs special agent since April of 2002.
13    Q.     Okay.  Now, what are your present duties with
14    ICE?
15    A.     I work in the counter-proliferation investigative
16    unit.  We make sure that United States munition items,
17    such as military-purpose items, don't leave the United
18    States to prohibited parties in other countries.
19    Q.     Going back to the year 2005 and 2006, what were
20    you doing -- what were -- where were you tasked during
21    that time frame?
22    A.     I was assigned to the Joint Terrorism Task Force.
23    Q.     What did you do with the Joint Terrorism Task
24    Force?
25    A.     As a task force member, anything involving a
```

Scott - DIRECT - By Ms. Arango                221

```
 1    Customs issue or an immigration matter, I would be
 2    involved in the case.
 3    Q.    Now, were you involved in the investigation which
 4    led to this prosecution?
 5    A.    Yes, ma'am.
 6    Q.    Did you work with the case agents from time to
 7    time?
 8    A.    Yes, ma'am.
 9    Q.    Did there come point in time where you made an
10    arrest of an individual by the name of Patrick Abraham?
11    A.    Yes, ma'am.
12    Q.    When did that arrest occur?
13    A.    I believe it was May 9th of 2006.
14    Q.    Now, what kind of warrant did you have for his
15    arrest?
16    A.    It was an administrative immigration warrant.
17    Q.    What were the charges in connection with the
18    arrest?
19    A.    Mr. Abraham had, I believe, overstayed his visa
20    in the US.  He arrived on a tourist visa, made an
21    attempt to adjust his status to a lawful permanent
22    resident by marriage.
23          However, it did not fulfill the obligations
24    and the conditions --
25          MS. JHONES:  Objection, your Honor.  Calls for
```

1    hearsay, and also calls for a legal conclusion.

2              MS. ARANGO:  Judge, he made the arrest.

3              THE COURT:  Overruled.

4              THE WITNESS:  He had attempted to adjust his

5    status to a permanent status where he could remain in

6    the United States.

7              But there are conditions when you marry.  You

8    have to remain married for two years and come back in

9    and have the conditions removed by the Immigration

10   Service -- Citizenship and Immigration Services, which

11   is a separate agency.

12             At that time, he could remain lawfully.  That

13   never happened.  Therefore, he reverted back to his

14   original status, which was a tourist visa, and,

15   therefore, overstayed it.

16   BY MS. ARANGO:

17   Q.    So was he legally in the United States?

18   A.    No, ma'am.

19   Q.    Now, after you arrested him on -- I think you

20   said it was March 9th of 2006?

21   A.    Yes.

22   Q.    Did you take him anywhere?

23   A.    Yes.  We transported him back to our office in

24   Doral.

25   Q.    Did there come a point in time where you advised

1   him of his rights?

2   A.    Yes, ma'am.

3   Q.    Did you use a notice of rights form?

4   A.    Yes, ma'am.

5   Q.    Let me show you what's been marked as

6   Government's Exhibit 147 and ask you if you recognize

7   it.

8         Do you recognize what's marked as Government's

9   Exhibit 147?

10  A.    I do.

11  Q.    What is it?

12  A.    That's the standard Miranda form, statement of

13  rights, utilized by ICE.

14  Q.    Did you use this prior to speaking to Patrick

15  Abraham?

16  A.    Prior to the questioning that took place at our

17  office, I read him, advised him of his rights, had him

18  initial each line that he understood and asked him if

19  he chose to waive those rights and give a statement.

20  Q.    And did he sign this form?

21  A.    Yes, he did.

22  Q.    Are there -- was that form witnessed?

23  A.    Yes, it was.

24  Q.    Who witnessed it?

25  A.    Myself and Special Agent William Bolton.

```
 1   Q.     And is Government's Exhibit 147 the original of
 2   the waiver of rights form read to and signed by Patrick
 3   Abraham?
 4   A.     It appears to be.
 5          MS. ARANGO:  Government offers 147 into
 6   evidence.
 7          MR. LEVIN:  No objection.
 8          THE COURT:  It will be admitted as
 9   Government's Exhibit 147.
10          (Whereupon, Government's Exhibit No. 147 was
11   entered into evidence.)
12          MS. ARANGO:  Thank you, Judge.
13          May I publish?
14          THE COURT:  Yes.
15          You're going to use the ELMO?
16          MS. ARANGO:  Yes.
17   BY MS. ARANGO:
18   Q.     Now, explain to the members of the jury first how
19   you -- with respect to each of the lines, what is it
20   that you do -- or what you did with Patrick Abraham as
21   you went through this form.
22   A.     We put the form in front of him where they can
23   follow along.  We read it to them aloud.  We ask them
24   if they understand what was read to them.  After they
25   review it, they are to initial at the end of each line.
```

Scott - DIRECT - By Ms. Arango

1    Q.    I'm now zooming in -- I'm zooming in to the lines

2    under "Statement of Rights."

3          Did you read each of those lines to Mr. Abraham?

4    A.    I did.

5    Q.    Is that his -- are those his initials after each

6    and every line?

7    A.    They are.

8    Q.    Let me ask you:  Did he appear to have any

9    difficulty understanding you as you spoke to him?

10   A.    No, ma'am.

11   Q.    Now, did he have any questions regarding any of

12   these rights or ask you to clarify them?

13   A.    He only asked that -- if, in fact, he could stop

14   at any time the questioning.

15         And I said, "Absolutely."

16   Q.    Okay.  And then under "Waiver," does that

17   indicate his signature?

18   A.    It does.

19   Q.    And did he write out his name?  Did he print his

20   name in addition to signing it?

21   A.    Yes, ma'am.

22   Q.    Now, it indicates here that he was taken into

23   custody.

24         Was it at 7:00?

25   A.    Approximately.

```
 1    Q.    And then what time was it that he signed this

 2    document?

 3    A.    Approximately 9:50 a.m.

 4    Q.    Now, during the interview, did he ever stop and

 5    ask you for a lawyer?

 6    A.    No, ma'am.

 7    Q.    Did he appear to be alert and understand what was

 8    going on?

 9    A.    Yes, ma'am.

10    Q.    Where did this interview take place again?

11    A.    In Doral.

12    Q.    Thank you.

13          About how long did the interview take place?

14    A.    I don't recall exactly.  But it was, I mean, a

15    couple hours.

16    Q.    And after you interviewed him, did you write any

17    reports?

18    A.    I did.

19    Q.    What did the report -- what was contained within

20    the report?

21    A.    I asked him some background information on his --

22    on him personally.

23          He told me that he had --

24    Q.    Let me stop you for a minute.

25          I want -- my question to you is:  Did you put the
```

Scott - DIRECT - By Ms. Arango                    227

```
 1    substance of his statement to you in a report?
 2    A.     Yes, ma'am.
 3    Q.     Okay.  Have you reviewed that report prior to
 4    testifying here today?
 5    A.     Yes, ma'am.
 6    Q.     Now, I'm going to ask you what Mr. Abraham told
 7    you after he signed that waiver of rights form and
 8    agreed to speak to you.
 9    A.     Okay.
10           MR. LEVIN:  Objection.  Pretrial motion.
11           THE COURT:  The objection is overruled.  I
12    adopt my require ruling.
13           Go ahead.
14           MS. JHONES:  I apologize for interrupting.
15           Could we have a limiting instruction, your
16    Honor?
17           THE COURT:  Yes.  I'm going to give it --
18    okay.  I can give it now.
19           Ladies and gentlemen of the jury:  This
20    evidence that is about to come in regarding a
21    statement, if any, that Patrick Abraham made is only to
22    be considered by you in the case of the United States
23    of America versus Patrick Abraham.
24           You may proceed.
25           MS. ARANGO:  Thank you.
```

BY MS. ARANGO:

Q.     What did Mr. Abraham tell you?

A.     He told me that he had been married and had a
child with a woman.  They had been separated, I
believe -- actually, he told me, at the time, that he
had entered into becoming a missionary for the Moorish
Science Temple.

Q.     Did he tell you what year he became a missionary
for the Moorish Science Temple?

A.     I don't recall exactly.

Q.     Is there anything that will help refresh your
recollection?

A.     Yeah.  My report.

Q.     Okay.  Let me show you what's been marked as
Government's Exhibit 315 for identification purposes
only.

       Has your recollection been refreshed as to the
year?

A.     Yes, ma'am.  It was 2003.

Q.     Okay.  When did he tell you that he was married?

A.     In 2000.

Q.     You can continue.

A.     Okay.  I asked him a little bit about the Moorish
Science Temple that he was a member of, this missionary
job that he had.

1           He said that he -- that the Moors are an

2    indigenous group that was in the United States and they

3    did not recognize the United States Government.

4           He referred to them as the DC Government

5    Corporation.  They had their own flag.

6    Q.     Did he describe the flag to you?

7    A.     He did.  He said it was a red flag with a

8    five-point green star on it.

9           He also believed -- he also told me that the

10   Moors and Indians did not get along because the

11   American Indians had signed treaties with the United

12   States Government for reservations and they felt

13   betrayed by them.

14          He said, "I believe the Moors trace their

15   ancestry back to Morocco."

16   Q.     What, if any, questions did you ask him regarding

17   any firearms?

18   A.     I asked him if he recalled a shooting incident

19   that happened at their place in Liberty City --

20   Q.     Okay.

21   A.     -- their Temple.

22          He said he did.

23          And I asked him what, if anything, he knew about

24   the firearm pistol that was used by Sultan Kahn-Bey in

25   the shooting at Master Athea.

1        And he said that he and another individual,

2   Brother Levi, had purchased the weapon in a gun store

3   in Hallandale in February of that same year, '06, I

4   believe.

5        He had contributed $125 to the purchase of that

6   firearm.

7   Q.    What, if any, questions did you ask him about the

8   use of the pistol?

9   A.    I asked him if he had ever fired the weapon.

10       He said he had.  He said, "You buy it, you got to

11  try it," I believe.

12  Q.    What, if anything, did he tell you regarding use

13  of the pistol for the Moorish Science Temple?

14  A.    He told me that whoever was on guard duty at the

15  Temple would carry that weapon.

16  Q.    Now, after he made this verbal statement to you,

17  did he make any written statements?

18  A.    He did.  He prepared a written statement in

19  regards to the firearm ownership, purchase.

20  Q.    So what was the purpose of the written statement?

21  A.    At the time, it wasn't a planned statement.  I

22  just asked him to write down a statement of what he had

23  just told me about how he had purchased the firearm

24  with another individual.

25  Q.    Okay.  Let me show you what's been marked as

 1    Government's Exhibit 148 and ask you if you recognize

 2    it.

 3           Do you recognize Government's Exhibit 148?

 4    A.    I do.

 5    Q.    What is it?

 6    A.    It's a copy of the statement that was given --

 7    written statement by Mr. Abraham.

 8    Q.    And was that statement written in his own hand?

 9    A.    Yes, it was.

10    Q.    Did he sign it?

11    A.    He did.

12    Q.    And was it witnessed?

13    A.    It was witnessed.

14    Q.    And is Government's Exhibit 148 a true and

15    accurate copy of that statement?

16    A.    Yes, it is.

17           MS. ARANGO:   Government offers 148 into

18    evidence.

19           MR. LEVIN:   Judge, objection.   Previous

20    grounds raised.

21           THE COURT:   Objection is overruled.   I adopt

22    my prior rulings.

23           It will be admitted as Government's

24    Exhibit 148.

25           (Whereupon, Government's Exhibit No. 148 was

```
 1   entered into evidence.)

 2          THE COURT:  You may publish.

 3   BY MS. ARANGO:

 4   Q.    I'd like for you to read this statement.  If you

 5   have any difficulties reading off the screen, I will

 6   hand it to you.

 7   A.    Okay.  It says, "This statement is to verify and

 8   confirm on the behalf of Sultan Kahn-Bey concerning the

 9   firearm.  It is truthful to say that the firearm does

10   not belong to him, but rather for me."

11          I'm not sure I can make out that next word.

12   Q.    Okay.

13   A.    "For me" --

14   Q.    So there's an unintelligible word.

15          Do you see the word afterwards?

16   A.    Yeah.  It says, "And my friend Levite, who has

17   the legal paper for the firearm.

18          "And it is truthful and honorable for -- to say

19   that Sultan Kahn-Bey is a spiritual teacher for the

20   last 30 years and that was the wholle purpose for him

21   been in Miami.  He's very helpful to the community

22   wherever he goes.

23          "Thank you."

24          And then he signed.

25   Q.    Do you know who his friend Levite was?
```

Scott - CROSS - By Mr. Levin                              233

1    A.      Brother Levite.  Yes.

2            MS. ARANGO:  No further questions, Judge.

3            THE COURT:  Ms. Jhones?

4            MS. JHONES:  No questions, your Honor.

5            THE COURT:  Mr. Vereen?

6            MR. VEREEN:  No questions.

7            THE COURT:  Mr. Houlihan?

8            MR. HOULIHAN:  No questions.

9            THE COURT:  Mr. Clark?

10           MR. CLARK:  No questions, your Honor.

11           THE COURT:  Mr. Casuso?

12           MR. CASUSO:  No questions, Judge.

13           THE COURT:  Mr. Levin?

14           MR. LEVIN:  Questions.

15                   CROSS-EXAMINATION

16   BY MR. LEVIN:

17   Q.      Special Agent Scott, good afternoon.

18   A.      Good afternoon, Mr. Levin.

19   Q.      Now, you indicated that you effected the arrest

20   of Mr. Abraham on immigration violations.  Is that

21   correct, sir?

22   A.      That's correct.

23   Q.      When you did that, you were accompanied by eight

24   to ten of your colleagues.  Is that not true?

25   A.      I believe that's accurate.  Yes.

```
 1    Q.    And it's not common for you to be accompanied by

 2    eight to ten of your colleagues when you're arresting

 3    somebody as an overstay on a tourist visa.

 4          Would you agree with that, sir?

 5    A.    I don't agree with that.

 6    Q.    Okay.  Go ahead.

 7    A.    It depends a lot on the situation.  It was an

 8    ongoing investigation.  Oftentimes in other instances,

 9    we look at criminal history, you know, high-crime

10    areas, lots of other variables, to ensure everyone's

11    safety.

12    Q.    On this particular instance, you were effecting

13    Mr. Abraham's arrest on immigration violations.  But

14    that was all part of you being with the Joint Terrorism

15    Task Force.

16          Would you agree with that?

17    A.    That's correct.

18    Q.    That was a tactical decision that you made to

19    arrest him on an immigration violation.  But in truth

20    and in fact, you were taking him off the streets, for

21    lack of a better word, because of the terrorist

22    investigation that was going on.  Isn't that true, sir?

23          MS. ARANGO:  Objection.  Relevance.  Outside

24    the scope of direct.

25          THE COURT:  Sustained.
```

BY MR. LEVIN:

Q.    Well, you were part of this task force since the
summer of 2005.  Correct?

A.    I believe it was earlier than that.

Q.    Even earlier than that.

      In fact, you worked closely with John Stewart
with regard to this case; did you not?

A.    As the ICE task force member, I was assigned to
the same squad as the case agent, John Stewart.

Q.    Well, you were involved in this investigation
concerning terrorism in September of 2005; were you
not?

A.    Yes, I was.

Q.    You paid a visit over to a convenience store on
146th and Northeast 6th Avenue; did you not?

      MS. ARANGO:  Objection.  Outside the scope of
direct.

      THE COURT:  Sustained.

BY MR. LEVIN:

Q.    Were you involved in the investigation with
regard to this case?

A.    Yes.

Q.    Now, when you stopped Mr. Abraham, you stopped
him at 7:00 in the morning?

A.    It was approximately 7:00 in the morning.  Yes.

1    Q.     And you took the statement at about 9:50.  Is

2    that accurate?

3    A.     Approximately, yeah.

4    Q.     Now, with regard to getting back to the

5    immigration, Mr. Abraham, in fact, attempted to adjust

6    his status to permanent resident via marriage.

7    Correct?

8    A.     Yes.

9    Q.     You testified that there were certain steps that

10   a person had to take in order to do that.  Correct?

11   A.     That's correct.

12   Q.     One of the steps was to leave the country.

13   Correct?

14   A.     I don't --

15   Q.     Did you say you had to leave the country and

16   then --

17           MS. ARANGO:  Objection to interrupting the

18   witness, Judge.

19           THE COURT:  Let the witness finish his answer.

20           MR. LEVIN:  Yes, your Honor.

21           THE WITNESS:  I'm not sure I understand what

22   you mean by leaving the country.  I don't believe I

23   said that.

24   BY MR. LEVIN:

25   Q.     I thought you said that.  I'm sorry.

```
 1          But one of the conditions is that you remain in

 2   the marriage for two years.  Is that correct?

 3   A.     That's correct.  That's one of the conditions.

 4   Q.     He attempted -- he attempted to make his status

 5   legal here.

 6          Would you agree with that, sir?

 7   A.     Well, he did not remain in that relationship.  So

 8   I don't know what his -- I only know that he was not in

 9   status at the time I arrested him.

10   Q.     So all you know is he wasn't in status at the

11   time you arrested him?

12   A.     That's correct.

13   Q.     Now, when you got to -- now, Doral is where your

14   office is.  Is that correct?

15   A.     That's where it was at the time.  Yes.

16   Q.     And you sat down with Mr. Abraham and you read

17   him his rights.  Is that accurate?

18   A.     I advised him of his rights.  Yes.

19   Q.     And this was witnessed by another agent?

20   A.     That's correct.

21   Q.     Now, you have access to recording equipment; do

22   you not?

23   A.     Yes.

24   Q.     You have videotape capacity, the capacity to

25   videotape an interview?
```

Scott - CROSS - By Mr. Levin                    238

```
 1   A.    We don't routinely videotape interviews.  So it's
 2   not equipment that we have in the processing area.
 3   Q.    That -- my question was:  Do you have access to
 4   videotaping equipment?
 5   A.    I'm sure I could have obtained that.  Yes.
 6   Q.    Do you have access to audiotaping equipment?
 7   A.    Yes.
 8   Q.    And you're saying it's not your practice to
 9   record any statements.
10         Is that your testimony?
11   A.    Yes.  It's the policy of my agency to not do that
12   unless directed by the US Attorney's Office.
13   Q.    Unless directed by the US Attorney's Office?
14   A.    Yes.
15   Q.    And you never requested the US Attorney's Office
16   permission to tape-record his statement?
17   A.    No.
18   Q.    So, basically, you did this in two stages.  Would
19   you agree with that?
20         You had an interview with him, which you
21   memorialized in a report.  Is that your testimony?
22   A.    I'm sorry.  Can you restate that.
23   Q.    You interviewed Mr. Abraham and it's your
24   testimony that you memorialized in a report what he
25   said to you.  Is that correct?
```

1    A.    That's correct.

2    Q.    And then you had him hand-write part of this

3    statement.  Correct?

4    A.    That's correct.

5    Q.    Okay.  Now, you asked him his educational

6    background as part of this process or not?

7    A.    I don't believe so.

8    Q.    You would agree with me, Special Agent Scott,

9    that on this date, you were pretty much familiar with

10   the investigation that ultimately resulted in the

11   indictment of these gentlemen here.

12        Would you agree with that, sir?

13   A.    Can you say the question again.

14   Q.    Would you agree with me that you were familiar

15   with this investigation on the date that you arrested

16   Mr. Abraham?  On May the 9th of 2006, you were familiar

17   with pretty much all of the aspects of this

18   investigation that had taken place up to that date.

19   Correct?

20   A.    I wouldn't say that I was -- regarding all of

21   this investigation.

22   Q.    Would you say 75 percent?

23   A.    I'm not sure.  I mean, as the ICE agent, I have a

24   role on many investigations.  So I don't usually know

25   everything about every investigation.

```
  1    Q.      You had met Abbas al-Saidi; had you not?

  2            MS. ARANGO:  Objection.  Relevance and outside

  3    the scope.

  4            THE COURT:  Sustained.

  5            MR. LEVIN:  One moment, your Honor.

  6            (Discussion had off the record amongst

  7    counsel.)

  8    BY MR. LEVIN:

  9    Q.      Well, when did you become involved in the

 10    investigation of the indictment that ultimately was

 11    returned in this case?

 12    A.      Towards the beginning, I believe.

 13    Q.      So towards the beginning of the investigation?

 14    A.      Yeah.  Initially, I believe we were looking at --

 15    into another matter when it came to our attention these

 16    individuals.

 17    Q.      Okay.  Now, I'm going to go through the written

 18    statement, which is in evidence as Exhibit No. 148.

 19    A.      Okay.

 20    Q.      You'll see there's a reference that Mr. Abraham

 21    has written out that, "It is truthful to say that the

 22    firearm does not belong to him, but rather for me" --

 23    and that's the unintelligible -- "and my friend

 24    Levite."

 25            Do you see that?
```

1    A.     Yes.

2    Q.     And then, when Ms. Arango asked who you Levite

3    was, you said, "Yeah.  Brother Levite."  Correct?

4    A.     That's correct.

5    Q.     You know his name is Lyglenson Lemorin.  Correct?

6    A.     Yes.  Lyglenson Lemorin.

7    Q.     And do you see Mr. Lemorin in this courtroom

8    today, sir?

9           MS. ARANGO:  Objection.  Relevance.

10          THE COURT:  Sustained.

11   BY MR. LEVIN:

12   Q.     But you know his name is Lyglenson Lemorin.

13   Correct?

14          MS. ARANGO:  Objection.  Asked and answered.

15          THE COURT:  Sustained.

16   BY MR. LEVIN:

17   Q.     And it says that he has the legal papers for the

18   firearm.  Correct?

19   A.     Yes.  That's what it says.

20   Q.     And, in fact, this firearm was purchased at a gun

21   store.  Correct?

22   A.     Yes.

23   Q.     And you've spoken to -- you're familiar with an

24   incident that occurred four days prior to this

25   involving the arrest of Sultan Kahn-Bey; are you not,

1    sir?

2    A.    I'm familiar with who Sultan Kahn-Bey is, yes,

3    and some of the circumstances around his arrest.

4    Q.    Well, do you know who Special Agent Lee Rathel

5    is?

6    A.    Yes.   I know who he is.

7            MS. ARANGO:   Objection.   Relevance.

8            THE COURT:   Sustained.

9    BY MR. LEVIN:

10   Q.    Well, the purpose for you asking Mr. Abraham

11   about Sultan Kahn-Bey was because you knew that he had

12   been arrested four days prior to giving this statement.

13   Correct?

14   A.    I was aware of the incident that prompted the

15   arrest of Sultan Kahn-Bey.   Yes.

16   Q.    And you asked and the purpose for you to question

17   Mr. Abraham was to find out about that incident.

18         Wasn't that your testimony?

19   A.    To find out about the -- what he knew about the

20   incident as well as the firearm.   Correct.

21   Q.    Correct.

22         That's why you elicited this written statement

23   from Mr. Abraham.   Correct?

24   A.    After he told me he and another individual had

25   purchased the weapon, I asked him if he would write

```
 1    that down.
 2    Q.    And you knew that Sultan Kahn-Bey had been
 3    arrested four days prior to this date.  Correct?
 4    A.    That's correct.
 5    Q.    And it says, "And it is truthful and honorable
 6    for to say" -- the word "me" is missing -- "And it is
 7    truthful and honorable for to say that" -- you would
 8    agree with that?
 9    A.    I agree that there's a word missing.  Yes.
10    Q.    -- "that Sultan Kahn-Bey is a spiritual teacher
11    for the last 30 years and that was the wholle" --
12    w-h-o-l-l-e -- "purpose" -- you would agree with that?
13    A.    Yes.
14    Q.    -- "for him being in Miami."
15          You would agree with that?  That's the way it
16    reads?
17    A.    Yes.
18    Q.    You would agree that the grammar is a little bit
19    off here?
20    A.    Sure.  But he's still able to convey his words,
21    communicate.
22    Q.    I just asked if the grammar was off.
23          MS. ARANGO:  Objection to the interruption.
24    It's also argumentative.
25          THE COURT:  Sustained.
```

```
1   BY MR. LEVIN:

2   Q.    Was the grammar a little bit off here?

3   A.    Sure.

4   Q.    "He's very helpful to the community wherever he

5   goes.  Thank you."

6         Do you see that?

7   A.    Yes.

8   Q.    Now, you indicate that he also told you that he

9   was part of -- you used the word "indigenous."

10        Do you recall that testimony?

11  A.    I believe those were -- that was his words.

12  Q.    So Mr. Abraham used the word "indigenous."

13        That's your testimony?

14  A.    That's what I wrote down.

15  Q.    In fact, he said that the indigenous group, they

16  didn't recognize the United States Government?

17  A.    Are you referring to my report?

18  Q.    I'm referring to what you've testified to with

19  regard to what Mr. Abraham purportedly told you on

20  May 9th.

21  A.    Yes.

22  Q.    He said that this indigenous group -- they,

23  referring to the group, didn't recognize the United

24  States Government?

25  A.    Yeah.  After I asked him a question about the
```

```
 1    Moors to get more background, that's what he said.

 2    Q.     Well, you knew about the Moors; did you not, sir?

 3    A.     I knew a little bit.

 4    Q.     As part of the Joint Terrorism Task Force, you

 5    have debriefings; do you not?

 6    A.     Sure.

 7    Q.     You basically --

 8           MS. ARANGO:  Objection.  Outside the scope and

 9    irrelevant.

10           THE COURT:  Sustained.

11    BY MR. LEVIN:

12    Q.     You said he made some kind of comment like -- I'm

13    sorry.

14    A.     I'm just going to ask for a drink of water.

15    Q.     Do you want to wait?  I mean, are you okay to

16    proceed?

17    A.     Go ahead.  Thank you.

18    Q.     You indicated that he said that, "You buy it, you

19    try it" about the firearm?

20    A.     I believe it was -- whatever I wrote down.  Yeah.

21    Q.     Whatever you wrote down?

22           Well, you didn't write anything down.  Isn't that

23    true?  You took some notes.  Correct?

24    A.     I took notes during the interview.

25    Q.     The notes were basically then made into a written
```

```
 1   report.  Correct?
 2   A.    That's correct.
 3   Q.    And the report was actually printed out on
 4   June 5th of 2006, about a month after you had this
 5   meeting with Mr. Abraham?
 6   A.    When you say "printed out," are you referring
 7   to --
 8   Q.    Well, the report date -- do you need to see your
 9   report to refresh your recollection as to the date of
10   your report?
11   A.    I don't recall the exact date.  But it was
12   sometime later when the report was approved in our
13   system.  Yes.
14   Q.    And that would have been what date, sir?
15   A.    I don't recall exactly the date.
16   Q.    Would you like to refer to your report to refresh
17   your recollection?
18   A.    Sure.
19   Q.    Go ahead.
20   A.    Thank you.
21   Q.    Do you have it in front of you?
22   A.    I don't have the first page.
23         MR. LEVIN:  If I may approach, your Honor.
24         THE COURT:  You may.
25         MR. LEVIN:  The Government had previously
```

```
 1   marked this report for identification.  So it's

 2   apparently missing the first page of that report --

 3             MS. ARANGO:  Judge, there's -- first of all,

 4   it's irrelevant.

 5             Secondly, there's a couple of items on the

 6   report that were blacked out.

 7             MR. LEVIN:  He's just refreshing his

 8   recollection.  It's not being admitted.  It's just to

 9   refresh his recollection as to the date he prepared his

10   report, which is extremely relevant.

11             THE COURT:  What's the problem?  I'm not

12   following the problem here.

13             MR. LEVIN:  Apparently, there's a page missing

14   from --

15             THE COURT:  If you want to show him the

16   additional page to refresh his recollection, go right

17   ahead.

18             MR. LEVIN:  Right.  Thank you, your Honor.

19             If I may approach.

20             THE COURT:  Yes.

21   BY MR. LEVIN:

22   Q.    (Tenders document to the witness.)

23   A.    Thank you.

24         Yes.  The date of the report was June 5th, 2006.

25   Q.    Thank you.
```

1       Now, you testified that you had him write out

2   part of this statement.  Correct?

3   A.    Yes.

4   Q.    Yet, you didn't have him write out the part about

5   not recognizing -- referring to DC Corporation or

6   whatever you said?

7   A.    Yes.

8   Q.    And he didn't write out about being part of this

9   indigenous Moorish group?

10  A.    I only asked him if he wanted to provide a

11  written statement about the firearm.  I didn't ask him

12  for the whole thing.

13  Q.    There was nothing to preclude you from asking him

14  to write out that part of the statement, was there?

15  A.    No.  There wasn't even a plan ahead of time to

16  ask him for a written statement about the firearm.  It

17  was just something at the time that I asked him to do.

18  Q.    Well, is it your testimony that you need a plan

19  in order to ask a person to write out --

20          MS. ARANGO:  Objection.  Argumentative.

21          MR. LEVIN:  Judge, I haven't finished my

22  question.

23          THE COURT:  Rephrase your question.

24  BY MR. LEVIN:

25  Q.    Do you need a plan ahead of time in order to

```
 1    formulate a law enforcement decision to have a certain

 2    statement written out by a person?

 3            MS. ARANGO:  Objection.  Relevance.

 4            THE COURT:  Sustained.

 5            Rephrase your question, Mr. Levin.

 6    BY MR. LEVIN:

 7    Q.    Is there a particular reason, sir, why you did

 8    not have him write that statement out and sign it as

 9    you did the other statement concerning Sultan Kahn-Bey

10    and the firearm?

11    A.    There's no particular reason.

12    Q.    Is there anything that precluded you from doing

13    that?

14    A.    No.

15    Q.    Is there any policy by your agency that precluded

16    you from doing that?

17    A.    We don't routinely have the person write out a

18    written statement in ICE.  It's as a matter of -- how

19    we normally do business.

20    Q.    But you did with regard to part of the statement?

21    A.    With part of the statement, yes.

22    Q.    So that was not following your ICE policy by

23    having him write out part of the statement?

24    A.    There's nothing in my policy that prohibits me

25    from doing it either.
```

Scott - CROSS - By Mr. Levin

```
 1   Q.    So you have -- you have the authority and the

 2   ability to have a person write out a statement if you

 3   choose to do so.  Correct, sir?

 4   A.    That's correct.

 5   Q.    You also have the capacity to record a statement.

 6   Correct, sir?

 7   A.    We have recorders available to us.  Yes.

 8   Q.    Now, after you met with Mr. Abraham, you took him

 9   to the Krome Detention Center.  Is that accurate?

10   A.    After -- can you re --

11   Q.    On May the 9th of 2006.

12   A.    After we were done at the Doral office, yes.

13   Q.    It was a two-hour meeting at the Doral office?

14   A.    Approximately.  I don't recall exactly.  But

15   yeah.

16   Q.    When he got to Krome, he had a bond; did he not?

17         MS. ARANGO:  Objection.  Relevance and outside

18   the scope.

19         THE COURT:  Sustained.

20         MR. LEVIN:  One moment, your Honor.

21         THE COURT:  Yes.

22         MR. LEVIN:  No further questions.

23         THE COURT:  Ms. Arango.

24                 REDIRECT EXAMINATION

25
```

```
 1   BY MS. ARANGO:

 2   Q.    Special Agent Scott, Mr. Levine asked you --

 3   Mr. Levin, I mean, asked you about the statement that

 4   Patrick Abraham made to you about belonging to an

 5   indigenous group called the Moors.

 6   A.    That's correct.

 7   Q.    And I think he also asked you -- he said did --

 8   whether or not Patrick Abraham said that they,

 9   referring to the group, didn't recognize the United

10   States Government.

11         Now, did Mr. Abraham tell you that they didn't

12   recognize the United States Government or that he

13   didn't recognize the United States Government?

14   A.    He -- I believe he said that the group he was a

15   member of, meaning they, did not recognize the United

16   States Government.

17   Q.    Well, you said, "I believe."

18         Do you need to refresh your recollection?

19   A.    Yeah.  If I could --

20   Q.    Would you please review that report.

21   A.    Thank you.

22         Yeah.  I'm sorry.  I wasn't recalling correctly.

23         He --

24   Q.    Don't read from the report.

25         Does the report refresh your recollection as to
```

1   what Mr. Abraham told you?

2   A.    It was two years ago.  He said that he did not

3   recognize --

4   Q.    He did not what?

5   A.    Recognize the US Government, referring to them as

6   the DC Government Corporation.

7   Q.    Thank you.

8         MS. ARANGO:  I have no further questions.

9         THE COURT:  You may step down, sir.

10        THE WITNESS:  Thank you.

11        (Witness excused.)

12        THE COURT:  Call your next witness.

13        MR. GREGORIE:  Your Honor, pursuant to

14  Rule 902, the United States would move Government's

15  Exhibits 150, 151 and 152 for evidence.  I'll show them

16  to counsel, your Honor.

17        THE COURT:  Okay.

18        MS. JHONES:  Your Honor, I just need a couple

19  minutes to pull the rule, if I may.

20        THE COURT:  Sure.

21        MS. JHONES:  Thank you.

22        MR. LEVIN:  Judge, I have an objection.

23        MS. JHONES:  May we have a side-bar, your

24  Honor?

25        THE COURT:  Sure.  Come on up.

1          (Whereupon, proceedings were had at side-bar

2     outside the presence of the jury which have been sealed

3     per instructions of the Court.)

4          (Whereupon, the following proceedings were had

5     in open court:)

6          THE COURT:  They will be admitted as

7     Government's Exhibits 150, 151 and 152.

8          (Whereupon, Government's Exhibit Nos. 150, 151

9     and 152 were entered into evidence.)

10         THE COURT:  You may publish.

11         Did you officially move them in?

12         MR. GREGORIE:  Yes, your Honor.

13         THE COURT:  And I've officially admitted them.

14         MS. ARANGO:  Judge, may we just read the --

15    rather than go through every page, just read the cover

16    page of these exhibits?

17         THE COURT:  Sure.

18         MS. ARANGO:  Thank you.

19         It's the Florida Department of Agriculture and

20    Consumer Services, Certification of Files.

21         "In my capacity as Bureau Chief, Florida

22    Department of Agriculture and Consumer Services,

23    Division of Licensing, I am the official records

24    custodian for the division.

25         "I hereby certify that the attached 68 pages,

1    which have been numbered, are true and correct copies

2    of the original records and licensing history

3    pertaining to Patrick K. Abraham, Social Security

4    No. 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, Class D security guard -- security

5    officer license, No. D2505288, pursuant to Chapter 493,

6    Florida statutes."

7          And it's signed by Mary Kennedy, the records

8    custodian.

9          With respect to Government's Exhibit 151, it's

10   again from the Department of Agriculture and Consumer

11   Services, Certification of Files.  And I'm going to

12   skip forward to after -- "In my capacity, I hereby

13   certify true and correct copies of the original records

14   and licensing history pertaining to Burson Augustin,

15   Social Security No. 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, Class D security

16   guard -- security officer license, No. D2403115,

17   pursuant to Chapter 493, Florida statutes," also signed

18   by Mary Kennedy, records custodian.

19         And, finally, Government's Exhibit 152, which

20   is also from the Department of Agriculture and Consumer

21   Services.  And I'm skipping after the certification of

22   files over to the, "True and correct copies of the

23   original records and licensing history pertaining

24   to Rotschild J. Augustine, Social Security

25   No. 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, Class D security officer license,

1    No. D2527725, pursuant to Chapter 493, Florida

2    statutes.

3         Again, signed by Mary Kennedy, records

4    custodian.

5         THE COURT:  We're going to break for the day

6    unless you have -- do you have another exhibit to

7    introduce?

8         MS. ARANGO:  Those are all the records

9    custodian -- the public records exhibits, Judge.

10        THE COURT:  We're going to break for the day.

11   Tomorrow we're going to begin at 10:00 and lunchtime

12   will be right around noon.

13        Do not discuss this case either amongst

14   yourselves or with anyone else.  Have no contact

15   whatsoever with anyone associated with the trial.  Do

16   not read, listen or see anything touching on this

17   matter in any way.

18        If anyone should try to talk to you about this

19   case, you should immediately instruct them to stop and

20   report it to my staff.

21        You may leave your binders at your chairs.

22   Please give your notebooks to the court security

23   officer.  Enjoy your late morning tomorrow.  I'll see

24   you at 10:00.

25             (Whereupon, the jury exited the courtroom at

```
 1   5:01 p.m. and the following proceedings were had:)

 2             THE COURT:  You may be seated for a moment.

 3             MR. GREGORIE:  Judge, is the door closed?

 4             THE COURT:  Yes.  It just closed.

 5             MR. GREGORIE:  Your Honor, our next and last

 6   witness is the expert, Agent Young.  I'm ready to

 7   proceed tomorrow morning.

 8             However, I'm waiting to hear what the defense

 9   decision was so I can put his testimony in according to

10   your Honor's ruling based on what they tell us.

11             THE COURT:  Oh, okay.

12             Thank you for reminding me.  I forgot.

13             Yes.  What is -- you had an opportunity to

14   speak, as Ms. Jhones had requested.  You wanted to

15   consult with each other as to how you wanted to proceed

16   regarding cross-examination of Agent Young vis-a-vis

17   the drug trafficking and violence and convictions of

18   Jeff Fort and related gangs.

19             What is -- how do you want to proceed?

20             MS. JHONES:  Your Honor, I believe that,

21   given -- as the Court knows, given the Court's decision

22   to allow this, I think that these --

23             THE COURT:  I didn't allow it.

24             MS. JHONES:  No.

25             THE COURT:  I told the Government -- I want to
```

make sure the record is clear, Ms. Jhones.  I don't

want you to misrepresent on the record what my ruling

was.

        I specifically excluded the Government from

presenting that at the request of the Defendants.

        Then Mr. Vereen indicated he wanted to go in

on cross.

        Originally, I said that I would allow the

Defendants to go into it on cross and not allow the

Government to bring it up.

        I was thinking about it last evening as to the

fairness and appropriateness of that ruling, and

Mr. Gregorie brought it up.

        And I said -- strike that -- I indicated today

that I was going to amend my ruling to -- I will

prevent the Government from introducing it; however, if

the Defendants intend to introduce it, then I find that

the Government should be allowed to introduce it.

        MS. JHONES:  I did not mean to misrepresent

what the Court --

        THE COURT:  Okay.  I just wanted to make sure

the record was clear.

        MS. JHONES:  What I meant was, in light of the

Court's ruling allowing Agent Young to testify, period,

and qualifying him as a witness, that we have an

1   obligation to bring these issues up.  We have to bring

2   these issues up.

3          THE COURT:  That's fine.

4          So you intend to go into it on cross?

5          MS. JHONES:  Yes.

6          THE COURT:  Okay.  So, then, you may bring it

7   up given the Defendants' representations that they

8   intend to go into the character of both the gang

9   activity and the criminal convictions of Jeff Fort and

10  gang members.

11         Does that --

12         MS. JHONES:  Your Honor --

13         THE COURT:  -- accurately represent the area?

14         MS. JHONES:  Your Honor, I don't believe -- I

15  don't believe that -- if I may just have a moment, your

16  Honor, because the Court has just mentioned something

17  that I did not contemplate.  If I may just have a

18  moment.

19         THE COURT:  Okay.

20         (Discussion had off the record amongst

21  counsel.)

22         MS. JHONES:  Your Honor, thank you for the

23  Court's time.

24         THE COURT:  No problem.

25         MS. JHONES:  Your Honor, again, in light of

1    the fact that the Government is going to put on this

2    witness, unfortunately, we have no other choice but to

3    go into these issues.

4           And I think we have to go into these issues.

5    And I do so very reluctantly.  But in light of the fact

6    that this is coming in, I think that we have an

7    obligation to bring out those issues.

8           THE COURT:  And which issues are you talking

9    about?

10          MS. JHONES:  I'm talking about the background

11   of Jeff Fort and his associates in terms of their

12   criminal activity, drugs, murder and the activities of

13   that gang and -- the activities of the gang in general

14   and the activities of Jeff Fort in particular.

15          THE COURT:  Okay.

16          MR. CLARK:  Your Honor, I have one other

17   request.

18          As I understand it, the Government is going to

19   go into Exhibits 44, 46, 47 in that telephone call.

20          MR. GREGORIE:  That's correct, your Honor.

21          MR. CLARK:  No other exhibits?

22          MR. GREGORIE:  I don't intend to use any other

23   exhibits, your Honor.

24          THE COURT:  Okay.  44, 46, 47.

25          And you're not going into the wiretap?

```
1              MR. GREGORIE:  The wiretap I am going into,
2    your Honor, the wiretap we referred to yesterday.
3              MS. JHONES:  W1-3031?
4              MR. GREGORIE:  Right.
5              THE COURT:  44, 46, 47 and the wiretap.
6              MS. JHONES:  W1-3031.
7              THE COURT:  Okay.
8              MR. GREGORIE:  3031-T, your Honor.
9              THE COURT:  Mr. Gregorie, I remember.
10             You weren't in the case originally.  You came
11   in for the first trial.  Right?  That's what it was.
12             MR. GREGORIE:  That's right, Judge.  I didn't
13   get into it until a couple of weeks before the trial,
14   Judge, but I was there.
15             THE COURT:  No.  No.  I know that.  I wanted
16   to make sure that you knew that I knew that you were
17   there for the first trial.
18             MR. GREGORIE:  Thank you, Judge.
19             THE COURT:  But, originally, it was Ms. Arango
20   who handled the case up until right before the trial.
21             MR. GREGORIE:  That's correct, Judge.
22             MS. JHONES:  Your Honor, may I --
23             THE COURT:  I didn't want to misspeak about
24   your presence.
25             MS. JHONES:  May I just bring up one more
```

1    issue?

2            THE COURT:  Yes.

3            MS. JHONES:  Your Honor, obviously, the

4    Government is going to close tomorrow.  Correct?

5            MR. GREGORIE:  I believe, Judge, that --

6    assuming everything is in -- and I think it is -- we're

7    going to check tonight -- but we will close after this

8    witness, Judge.

9            THE COURT:  How long is your direct of this

10   witness?

11           MR. GREGORIE:  I think, Judge, it may be

12   40 minutes -- half an hour, 40 minutes.  I may be being

13   optimistic, but that's when I intend.

14           MS. JHONES:  I assume the Court's going to go

15   straight into Rule 29s tomorrow?

16           THE COURT:  Depending on when we finish.  I

17   don't know how long your cross is going to be or your

18   redirect.  So depending on when we finish in the day,

19   you know, we'll go into Rule 29s.  Otherwise, there's

20   always Thursday.

21           MR. GREGORIE:  I would say, your Honor, that

22   your Honor made a very lengthy Rule 29 ruling the last

23   time, and the evidence in this case has not changed at

24   all from the last time, Judge, taken in the light most

25   favorable to the Government.

262

```
 1              In view of the fact that our evidence has all

 2   come in, as it did the last time, Judge, unless there's

 3   something that defense can point out that's different,

 4   I would submit your Honor's ruling from the last

 5   time --

 6              THE COURT:  Well, I think that they have to --

 7   I have to give them an opportunity to make their

 8   Rule 29 motions.

 9              MR. LEVIN:  You can have mine now, if you want

10   it, Judge.

11              THE COURT:  It's fine with me, if you want to

12   do that.

13              MR. VEREEN:  Let's just ask the jury right

14   now, without instructions, how they feel about this

15   case.

16              MR. GREGORIE:  Judge, they may think that's

17   amusing.

18              But I think that -- since the evidence isn't

19   any different, what I was trying to tell the Court is I

20   don't think it needs a great deal of time.

21              THE COURT:  I'll leave it up to each

22   individual lawyer.

23              But I don't disagree with you, Mr. Gregorie,

24   that while I've indicated that I think we have to make

25   sure we have a complete record, certainly one could
```

```
 1    adopt their prior motion on Rule 29, their prior

 2    response and the prior ruling.

 3              But I'm not going to mandate that.

 4              MR. GREGORIE:  I understand that, Judge.

 5              MS. JHONES:  Your Honor, my request would be,

 6    respectfully, I would like to, with the Court's

 7    permission, start my case on Friday.

 8              The Government raised a general objection to

 9    hearsay to -- they haven't indicated specifically what

10    it is that they're objecting to.

11              But I am going -- I have -- they have

12    indicated that they're going to object to the

13    introduction by me to certain recordings.

14              That was not done at the last trial.  I was

15    not on notice that that was going to be done on this

16    trial.

17              And there is a great deal of work that I need

18    to do now as a result of what the Government said

19    yesterday.

20              Again, I don't have the particular objections.

21    There are many, many, many recordings.  Each recording

22    is an individual recording.

23              But in light of what I anticipate to be an

24    objection by the Government, I need to react to that.

25    And I'm talking about approximately anywhere from 60 to
```

1    potentially 80 recordings.  I need time to react to

2    that.

3           Additionally, as I had indicated earlier about

4    the time, the Court was going to allow me some time --

5    and I think the Court mentioned April 9th or 10th or

6    somewhere around that time period.

7           Respectfully, I would ask for at least a day

8    before I start my case, in light of the many things

9    that I have to react to.

10           THE COURT:  Well, it may very well be that I

11    give you the day, but that may be a time period that we

12    meet without the jury to -- so I can hear argument on

13    this particular issue.

14           As I understand the Government's position that

15    Mr. Gregorie stated yesterday, it was that they may be

16    objecting to recordings coming in.  You're correct.

17           And both sides said -- I know that this was an

18    issue, I think, in the first trial and we spent quite a

19    bit of time on it side-bar, as I recall.

20           You may need to have time with me to make your

21    arguments and present your authority.

22           So we may have to spend some time on that

23    prior to the beginning of your case.

24           MR. GREGORIE:  If I may clarify that issue,

25    Judge, in the first trial, we introduced the entire

1    wiretap.  We just put it in.

2          So counsel was able to play portion of wires

3    because we put the whole tape in.

4          THE COURT:  I see.

5          MR. GREGORIE:  In the last trial, we didn't do

6    that.  There was objection to hearsay to a number of

7    tapes she tried to put in, some of which were upheld.

8          Now she's given us list of tapes she intends

9    to try to introduce in this case.  Most of them -- I

10   would say probably 80 to 90 percent -- are clear

11   hearsay, Judge.

12         They aren't just Mr. Batiste.  They're

13   individuals, other than Mr. Batiste, on those tapes

14   with what I would consider statements being offered for

15   the truth of the matter asserted.

16         Aside from those, there were those in which

17   Mr. Batiste himself is on the tapes.

18         I don't believe that they can come in.  I

19   believe it would be a violation of the hearsay rule.

20   And I would be glad to argue that, your Honor, when we

21   reach that point.

22         I don't know if any of the other Defendants

23   are going to intend to introduce any evidence.  Maybe

24   they can go first.  But the Government's position is, I

25   think, that those tapes are hearsay.

```
1                MS. JHONES:  Your Honor, let me clarify.

2           There are two types of recordings in this

3      case, to remind Mr. Gregorie.

4                Mr. Gregorie is correct.  In the first trial,

5      the Government introduced the entire set of wires, the

6      entire set of wires.

7                In addition to the wires, as the Court knows,

8      the applications for the wire interceptions were

9      approved in late February, as to the two different

10     wires.  I don't recall the exact dates.

11               But in addition to that, there are a number of

12     body wire recordings.

13               In the first trial, I don't believe that I

14     introduced any body wire recordings.  I relied upon the

15     body wire recordings that were introduced by the

16     Government.

17               In the second trial -- the Court's going to

18     remember this because, in the second trial, I

19     introduced quite a few of the body wire recordings

20     separate and apart from the ones that the Government

21     did and the quality of those recordings -- some of them

22     were not very good and the Court made a comment as to

23     how difficult it was for the jury to understand them.

24               THE COURT:  Well, I think you didn't have

25     transcripts.
```

1      MS. JHONES:  I did not.  And that's what I

2 undertook to do during the course of the summer and

3 fall, to try and get those.  And I provided them to the

4 Government.  They've had them for quite some time.

5      All of the IDs that -- all of the recordings

6 that I sought to introduce involving Mr. Batiste -- not

7 other people, but Mr. Batiste and either Informant

8 No. 1 or Informant No. 2 -- in the form of a body

9 recording came in last time.  They came in.

10      I was -- my issue is -- the Government is

11 obviously free to raise any objections they deem fit.

12      I have to tell the Court that I am working a

13 great many hours in this case, without having the need

14 now go through approximately what I believe to be

15 60 different transcripts and isolate and

16 analyze each -- anticipate in order to be prepared to

17 address this with the Court.

18      It's not matter of winging it and pulling out

19 a book in order to be adequately prepared to properly

20 represent Mr. Batiste and respond to whatever hearsay

21 objection the Government is going to raise.

22      This is not something I anticipated because it

23 was not an issue in the last trial.  I understand that

24 they're free to do whatever they need to do the third

25 time around.

1          I'm just telling the Court, I cannot

2    possibly -- I cannot possibly --

3          THE COURT:  Well, maybe someone else could go

4    first and then that would give you some more time.

5    There are, you know, other Defendants.

6          That would give you, then, more time to go

7    through the transcripts and be prepared to meet

8    whatever objection, if any, that the Government has.

9          MS. JHONES:  It would, your Honor.

10         But in all fairness -- I can't speak for them.

11   But in all fairness to my colleagues, I was the one

12   that has always gone first.  And now I'm going to shift

13   the problem to them because this thing has just arisen.

14         I'm not asking for two weeks, your Honor.  I'm

15   asking for a little bit of leeway here so I can do what

16   I need to do to properly represent Mr. Batiste.

17         I am not asking for a lot of time.  I'm asking

18   for a day, a day.  That's all I'm asking for.

19         THE COURT:  Well, if, in fact, the Government

20   rests their case tomorrow and we proceed with Rule 29

21   motions either tomorrow afternoon or Thursday, and

22   depending on whether --

23         MR. GREGORIE:  Tomorrow is Wednesday, your

24   Honor.

25         THE COURT:  Right.

```
1              MR. GREGORIE:  Okay.

2              THE COURT:  I'm saying we proceed with Rule 29

3     motions either tomorrow afternoon or Wednesday -- or

4     Thursday -- sorry -- if you give me an indication as to

5     how long you feel you're going to need for making -- if

6     everybody's just going to adopt their prior motion --

7     well, Mr. Casuso would need some time because he can't

8     clone himself into Mr. Prebish.  But I expect

9     Mr. Casuso is fairly succinct in making his motion.

10             I really would prefer -- I mean, we would have

11    Thursday and Friday and then you would have the

12    weekend.  So I'm sure one of your colleagues could go

13    forward with presenting some evidence.

14             There are six separate cases here.  Then that

15    would give you the weekend to then go over what you

16    need to go over.

17             If, in fact, it ends up taking time on

18    Thursday, you may have the rest of Thursday.  But I

19    really would like -- you know, the last thing that I

20    want to do now is start taking more -- take additional

21    days off than we need to take off.

22             Next week, we have a full week.  And then the

23    week after are the days off for the Passover holiday.

24    And I'm still making a determination on how I'm going

25    to proceed on Wednesday.
```

```
 1              I think at the very best we would be here for

 2   part of the day.  I need to prepare for the holiday at

 3   some point.  It's not something that I can do at 5:00

 4   in the afternoon when the holiday begins.

 5              So I need to have some time.  But I'm trying

 6   to determine how much time that I need.  The holiday

 7   begins Wednesday night.

 8              So let's play it by ear.  I may give you some

 9   time.

10              Who's next after Ms. Jones?

11              MR. VEREEN:  I will be, your Honor.

12              THE COURT:  And I remember you saying, "I

13   serve at the Court's pleasure" the last time this kind

14   of issue came up, Mr. Vereen.

15              MR. VEREEN:  Things have changed, Judge, since

16   the first trial.

17              THE COURT:  Oh.  Things have changed?  Hmm.

18              In the event that Ms. Jhones needs some more

19   time, would you be ready to go forward?

20              MR. VEREEN:  Yes, your Honor.

21              THE COURT:  Are you putting on a case?

22              MR. VEREEN:  I believe I will be.

23              THE COURT:  So you would be ready to go

24   forward?

25              MR. VEREEN:  Yes.
```

1          THE COURT:  Okay.  So I anticipate giving you

2     the time.  It's just a question of how to best utilize

3     the time with the jury and to keep the case moving

4     forward.  And so I've got to make those determinations.

5          But I will not say you're up, Ms. Jhones, and

6     you don't get your time.  I'm going to make sure you

7     have your time.

8          You can decide whether you want to begin and

9     then have the weekend or whether you want Mr. Vereen to

10    go forward or it may be that, depending on how the time

11    plays out, that you have somewhat -- you know, you may

12    have a day.

13         I'm going to see how -- I'm going to have to

14    see how tomorrow goes with the expert and the

15    cross-examination.

16         And then you need to tell me if you're going

17    to need time to lay out Rule 29s or if you're going to

18    be adopting the prior record.  And then I'll know

19    better.

20         MS. JHONES:  I could let the Court know as far

21    as I am concerned with Rule 29s.

22         I am going to bring out a couple of issues,

23    but I'm going to be relying on primarily what I have

24    argued in the past.  There may just be a couple of

25    short additional issues.

```
1               THE COURT:  Okay.  So the remainder of counsel

2    need to let me know.

3               It seems that either Ms. Arango or

4    Mr. Gregorie is going to be adopting their prior

5    positions.

6               But certainly I want to give everybody the

7    availability of bringing up whatever they want to bring

8    up.

9               And I will try to accommodate you as best I

10   can, Ms. Jones, in one fashion or another.

11              MS. JHONES:  I appreciate that, your Honor.

12              THE COURT:  And we're going to have to look at

13   this particular issue and make -- and I'm going to have

14   to make a determination.

15              I don't know whether it's going to be on a

16   tape-by-tape basis or whether, in fact -- I think

17   that's one of the things that you want to look at.

18   Correct?

19              MS. JHONES:  Yes.  And I'm glad the Court

20   raised that.

21              Most of these, your Honor -- most of these

22   conversations -- the first one, I believe, is going

23   to -- it's going to start right away.  We're talking

24   about the beginning of -- the bulk of these calls are

25   November, December and January.
```

1          THE COURT:  How do you intend to get these in?

2    Does your client intend to testify?  Have you made that

3    decision?

4          MS. JHONES:  If I seek to introduce them, it

5    would be through him.

6          THE COURT:  Okay.

7          MS. JHONES:  And, also, I need to have Abbas

8    al-Saidi available to me.  I was not going to need him.

9    Originally, the only reason I needed him was for the

10   preamble, as Mr. Gregorie and I discussed yesterday.

11   That was the only objection that was made last trial.

12         And in anticipation of having that objection

13   again, because I have transcripts now and it takes a

14   lot of money -- CJA money to edit the preamble out, go

15   to the photocopy place and it's a very expensive

16   process, I was just going to put Mr. al-Saidi on to

17   address the hearsay issue raised by the Government as

18   it relates to that preamble.

19         But yesterday something else came up, and that

20   is the hearsay objection to the calls.  And so I need

21   Mr. al-Saidi here to address -- to react to, I should

22   say, the objection -- the hearsay objection that has

23   been lodged by the Government.

24         I'm definitely going to need Mr. Al-Qaeda and

25   Mr. Assaad.

274

1          MR. GREGORIE:  How would they change the

2     hearsay issue, Judge?  I fail to see that.

3          MS. JHONES:  Sometimes, your Honor, as -- and,

4     again, I haven't even begun to address -- I did not go

5     home last night and pull my 80 conversations and

6     analyze them.

7          But I do -- I do anticipate that I will put --

8     for example, there would be -- I will put Mr. al-Saidi

9     on, ask him -- some of the out-of-court statements --

10    or the conversations I would ask Mr. al-Saidi about.

11         And it may very well be that the conversations

12    or the statements that are made by Mr. Batiste, which

13    is what the Government is objecting to, will -- by

14    Mr. Batiste will be only to place in context what

15    al-Saidi has said in these recordings.

16         Again, I have not analyzed.  These are -- if I

17    am going to have to go through the hearsay code -- and

18    I don't know what objection -- what objection

19    specifically, just raising a hearsay objection -- I

20    assume it's under 801(c), which is what Mr. Gregorie

21    mentioned yesterday as to -- as it relates to

22    Mr. Batiste's statements.

23         There will be a need for me to have

24    Mr. al-Saidi here to react to that -- to address, I

25    should say, the hearsay objections to Mr. Batiste's

1      out-of-court statements.

2               So, again, I don't believe, your Honor, that

3      when I request issuance of a 17(b) subpoena for

4      witnesses that I do not have access to -- and I

5      don't mind not having access to Mr. al-Saidi and

6      Mr. Assaad -- that I have to explain to the Government

7      why I need these people.

8               I want to have Mr. Abbas al-Saidi in light of

9      what the Government has now alleged that they're going

10     to object to these out-of-court statements.

11              I need to have Mr. al-Saidi here and I need to

12     have Mr. Assaad here.  I need to adequately and

13     effectively represent my client, and getting those

14     calls in is part of that process.

15              And I can't say, now that I've looked at this

16     rule and I've looked at this case, I now realize,

17     "Would you please fly Mr. al-Saidi down."  No.  I need

18     him here.

19              And I sent an e-mail to Ms. Arango indicating

20     that, because I do not know where these people are, nor

21     do I want to know, I --

22              THE COURT:  Well, the Government has said that

23     they would make them him available.  That's not a

24     problem.

25              MS. JHONES:  Right.

1            MR. GREGORIE:  We will, Judge.

2            But our request is that she show your Honor

3      the conversations she wants to get in and make a

4      proffer as to how she wishes to do it, Judge, because I

5      do not -- listening to what she's saying, I do not see

6      any way through either of those informants she's going

7      to be able to get the statements of Batiste into

8      evidence that isn't in violation of the hearsay rule.

9            And I think, Judge, rather than waste this

10     jury's time sitting here while we go up to side-bar

11     every time she goes to offer a tape -- a tape in

12     evidence -- I think it'll be much easier to stand here

13     with the Court and have oral argument on those

14     particular tapes and see how she intends to do it,

15     Judge, because I fail to see how she's going to get it

16     in, if she's going to try to do it though either of the

17     informants.

18            MS. JHONES:  Your Honor, I understand

19     Mr. Gregorie wanting to simplify this.

20            Mr. Gregorie has alleged an 801(c) violation.

21     As far as I know, 801(c) is the basis for their

22     objection.  And I assume that it's an across-the-board

23     objection to the introduction of these tapes.

24            Like I said before, I don't believe that this

25     is -- not that I don't believe -- I know that this is

```
 1    not as simple as the Government would like it to be.  I

 2    need to be able to have the people that I believe are

 3    necessary in order for me to do my job.

 4              And --

 5              THE COURT:  They said they need two days to

 6    bring them down.

 7              Correct?

 8              MS. ARANGO:  Yes.

 9              THE COURT:  And that includes over a weekend?

10              MS. ARANGO:  Yes.

11              MR. GREGORIE:  Well, I think Mr. al-Saidi is

12    still here.

13              MS. ARANGO:  No.  Mr. Assaad is still here.

14    He's still here.

15              We're talking about Mr. al-Saidi.

16              THE COURT:  And he's in New York?

17              MS. ARANGO:  He's in New York.

18              THE COURT:  So that's basically -- that could

19    probably even be less than two days.

20              MS. ARANGO:  It's possible.

21              THE COURT:  I mean, you can get him on a

22    plane.

23              MS. ARANGO:  Yeah.

24              THE COURT:  There are plenty of flights from

25    New York to here.  So that's -- so I don't think it'll
```

1    be a problem.

2          But, you know, this may -- I agree that this

3    may be something that maybe we should front-end and

4    take up rather than having the jury sitting here on --

5    if it's -- what did you say?  60 or 80 tapes?

6          MS. JHONES:  Yes, your Honor.

7          As a matter of fact, when I left here last

8    night, I was in the process of having these transcripts

9    copied, duplicated.  And it's very expensive.  I was

10   fortunate to be able to put a stop to it before

11   incurring that expense.

12         I mean, this is not something that I take

13   lightly.  This is -- you know, I try to be very careful

14   with CJA funds.  And I don't want to -- I can't go and

15   just photocopy over here on the third floor

16   transcripts --

17         THE COURT:  No.  I understand.

18         MS. JHONES:  I have to prepare for this.

19         THE COURT:  Right.

20         MS. JHONES:  And I want to know what the

21   Court's ruling is going to be so I don't waste CJA

22   funds needlessly.

23         THE COURT:  Well, I don't know that you should

24   stop the preparation in the event that they be

25   introduced, because you need to be ready.

```
 1          If your intention is to provide them to the
 2   jury, then I don't think that you should stop that, as
 3   far as preparation is concerned, until such time as
 4   I've made my ruling --
 5          MS. JHONES:  Okay.
 6          THE COURT:  -- because I don't want to turn
 7   around and say -- and I don't know what I'm going to
 8   rule on it.
 9          I know this was an issue that came up before
10   and, originally, I ruled one way and then, as I recall,
11   I changed my ruling based upon argument by counsel as
12   to at least some tapes or some conversations that came
13   in.
14          There's my recollection of it.
15          In looking at the rule, I don't know.  And I
16   said I need to have it relitigated before me because
17   I'm not prepared to say I adopt my prior ruling.  I'm
18   just not prepared to do that.
19          I'm not saying which way I'm going to rule one
20   way or the other, but I need to have argument made
21   before me.
22          MS. JHONES:  I understand.
23          THE COURT:  But I don't want to then have
24   you say, "Okay, Judge.  You've said I can get in
25   Conversations A through M and not N through Z and I
```

```
 1    don't have anything copied.  I'm not ready.  I need two

 2    weeks now."

 3          So you're just going to have to go ahead and

 4    do that.

 5          MS. JHONES:  And I'm happy to do that, your

 6    Honor.

 7          Again, I just bring that as an example.  Now

 8    that the Court has said to go ahead and do it, I will

 9    do it.

10          THE COURT:  And I appreciate and certainly

11    respect your preservation of CJA funds.

12          But as far as the time element is concerned,

13    when dealing with persons on a jury and those time

14    constraints and the fact that these folks have been

15    here since the end of January and that we've got some

16    days off now that we're going to need to take for a

17    religious holiday, we need to keep going forward.

18          MS. JHONES:  Okay.

19          THE COURT:  So those concerns -- they're

20    within the budget, and those concerns have to fall to

21    being prepared rather than saving money at this point,

22    as far as the preparation of those transcripts are

23    concerned.

24          MS. JHONES:  Okay.

25          THE COURT:  I would rather you have them in
```

1   the event that you need them than not have them or than

2   have to ask for a recess to obtain them, unless you

3   tell me it can be done between midnight and 7:00 a.m.

4          But as far as I know with the copying

5   services, it never seems to work that easily.  Copying

6   services seem to take quite a while sometimes in

7   getting all of that out.  I'm not sure why, but that's

8   the way it works.

9          In any event, let's see how it goes.  I have

10  started to -- I have started to research the issue and

11  to look at it, and counsel is going to have to do the

12  same.

13         And then we'll take whatever time we need.

14  And I'm certainly not going to preclude you from having

15  some time to prepare for argument on it or to look at

16  the transcripts.  I may, in fact, have Mr. Vereen go

17  forward if we can utilize that time.

18         I don't think it's a problem.  There are six

19  separate cases here.  So I don't think it's a problem,

20  really, if someone else goes first.

21         But let's see.  I may, in fact, say, "Okay.

22  You've got the rest of today" or give the jury off a

23  certain period of time.  I'm just going to have to make

24  that call when we get there.  But I certainly will make

25  sure you have some time to prepare for the argument.

 1              MS. JHONES:  Thank you, your Honor.

 2              MS. ARANGO:  Judge, may I just inquire on the

 3    record of Mr. Vereen if he filed a witness list?

 4              MR. VEREEN:  That makes it easy for the

 5    Government, then, doesn't it?  If I haven't filed a

 6    witness list, the only person I could possibly be

 7    calling is my client.

 8              THE COURT:  Okay.  And just to let defense

 9    counsel go -- to let defense counsel know, I will be

10    going through a colloquy with each Defendant, whether

11    they testify or do not testify, as to what their

12    decision is.

13              It's up to them as to whether they want to

14    waive or not waive their Fifth Amendment right, but my

15    practice is to go through a colloquy with each

16    Defendant.  So you can start to review that with your

17    client.

18              We're in recess until 10:00.

19              Enjoy your breakfast, Mr. Houlihan.

20              MR. HOULIHAN:  All right.

21              (End of proceedings.)

22

23

24

25

1              C E R T I F I C A T E

2

3         I hereby certify that the foregoing is an

4    accurate transcription of the proceedings in the

5    above-entitled matter.

6

7

8    _____      /s/Lisa Edwards
         DATE            LISA EDWARDS, CRR, RMR
9                        Official United States Court Reporter
                         400 North Miami Avenue, Twelfth Floor
10                       Miami, Florida 33128
                         (305) 523-5499
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25