```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                  CASE NO. 06-20373-CRIMINAL-LENARD
 3

 4   UNITED STATES OF AMERICA,        Miami, Florida

 5                 Plaintiff,         March 25, 2009

 6         vs.                        10:14 a.m. to 2:17 p.m.

 7   NARSEAL BATISTE, et al.,         Volume XXIX

 8              Defendants.           Pages 1 to 100

 9   ------------------------------------------------------------

10                          JURY TRIAL
11           BEFORE THE HONORABLE JOAN A. LENARD,
                 UNITED STATES DISTRICT JUDGE
12

13

14   APPEARANCES:

15

16   FOR THE GOVERNMENT:     RICHARD D. GREGORIE, ESQ., and
                             JACQUELINE M. ARANGO, ESQ.
17                           ASSISTANT UNITED STATES ATTORNEYS
                             99 Northeast Fourth Street
18                           Miami, Florida 33132

19

20   FOR THE DEFENDANT       ANA MARIA JHONES, ESQ.
       NARSEAL BATISTE:      300 Seville Avenue, Suite 210
                             Coral Gables, Florida 33134
21

22   FOR THE DEFENDANT       ALBERT Z. LEVIN, ESQ.
       PATRICK ABRAHAM:      261 Northeast First Street
23                           Sixth Floor
                             Miami, Florida 33132
24

25
```

```
 1   FOR THE DEFENDANT      RODERICK D. VEREEN, ESQ.
       STANLEY PHANOR:      BRINKLEY, HENRYS & LEWIS
 2                          4770 Biscayne Boulevard
                            Suite 1200
 3                          Miami, Florida 33131

 4
     FOR THE DEFENDANT      RICHARD K. HOULIHAN, ESQ.
 5     NAUDIMAR HERRERA:    300 Aragon Avenue
                            Coral Gables, Florida 33134
 6

 7   FOR THE DEFENDANT      LOUIS CASUSO, ESQ.
       BURSON AUGUSTIN:     111 Northeast First Street
 8                          Suite 603
                            Miami, Florida 33132
 9

10   FOR THE DEFENDANT      NATHAN CLARK, ESQ.
      ROTSCHILD AUGUSTINE:  17639 South Dixie Highway
11                          Miami, Florida 33157

12
     REPORTED BY:           LISA EDWARDS, CRR, RMR
13                          Official Court Reporter
                            400 North Miami Avenue
14                          Twelfth Floor
                            Miami, Florida 33128
15                          (305) 523-5499

16

17

18

19

20

21

22

23

24

25
```

1                           I  N  D  E  X

2

3
                                    Direct    Cross    Red.
4

5    WITNESSES FOR THE GOVERNMENT:

6
     Dan Young                        26
7

8

9

     EXHIBITS RECEIVED IN EVIDENCE:          PAGE
10
     Government's Exhibit No. 29               46
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Good morning.

 2              United States of America versus Narseal

 3   Batiste, et al., Case No. 06-20373.

 4              Counsel, state your appearances, please, for

 5   the record.

 6              MR. GREGORIE:  Good morning, your Honor.

 7              Richard Gregorie and Jacqueline Arango on

 8   behalf of the United States.

 9              MR. LEVIN:  Albert Levin on behalf of Patrick

10   Abraham, who's present.

11              MS. JHONES:  Ana Jhones on behalf of Narseal

12   Batiste, who's present.

13              MR. CASUSO:  Good morning, your Honor.

14              Louie Casuso on behalf of Burson Augustin,

15   who's present.

16              MR. CLARK:  Good morning, your Honor.

17              Nathan Clark for Rotschild Augustine, who is

18   present.

19              MR. HOULIHAN:  Richard Houlihan on behalf of

20   Naudimar Herrera.

21              And thank you for the courtesy of starting at

22   10:00.

23              THE COURT:  No problem.

24              MR. VEREEN:  Good morning, your Honor.

25              Roderick Vereen on behalf of Stanley Phanor,
```

```
 1    who's present.
 2             THE COURT:  All Defendants are present.
 3             You may be seated.
 4             We're still waiting for a few jurors, but I
 5    understand that there's something -- an issue.
 6             You may be seated.
 7             Is there an issue?
 8             MS. JHONES:  Yes, your Honor.
 9             Your Honor, on behalf of Mr. Batiste, this
10    issue that we brought up yesterday about what we're
11    going to go into on cross or not go into on cross as
12    it relates to the Government's first witness --
13    respectfully, your Honor, after consulting with my
14    client and thinking about this a great deal, I am not
15    going to go into this on cross, into the violence.
16             And this is such a difficult, difficult issue,
17    and I can't tell the Court how much I've labored over
18    it.
19             I am advising the Court that I am not -- and I
20    believe that my colleagues are in the same position --
21    we are not going to go into those issues, the
22    convictions -- we're not going to go into them on
23    cross.
24             MR. GREGORIE:  Your Honor, we have now
25    confused this witness so much, Judge, that -- he has
```

1  prepared overnight -- although I did get a call from

2  Mr. Levin saying they were considering this.  But this

3  witness isn't going to know what to say, Judge, at this

4  point.

5          He's gone back and forth.  He's prepared this

6  morning to testify as we agreed to yesterday afternoon

7  after standing here for a half an hour waiting for them

8  to come to that decision.

9          Now to tell me five seconds before we put this

10 witness on the stand, I object, Judge.  We've prepared

11 this witness to testify as we agreed to yesterday

12 afternoon.

13         MR. LEVIN:  Your Honor, I called Mr. Gregorie

14 when we get out of court after having a meeting with my

15 co-counsel at approximately 6:00 and advised him that,

16 frankly, we weren't sure which way we were going to go

17 and he should have his witness prepared both ways.

18         We have been put in a position where we have

19 had to commit to the Court in advance of what we intend

20 to cross-examine a man on, which we feel violates our

21 clients' rights of confrontation.

22         Nonetheless, I did call Mr. Gregorie and

23 advise him that it was possible that we were going to

24 take the position that we did not want this witness,

25 since the Court has indicated previously that it was

1  going to limit this witness's testimony to areas that

2  are germane to this case.

3            I would recommend to this Court that, in order

4  to avoid something coming out of Mr. Young's mouth that

5  might result in a mistrial, that perhaps you hear his

6  testimony outside of the presence of the jury to assure

7  the fair trial rights of these Defendants, as well as

8  to be --

9            THE COURT:  Well --

10            MS. JHONES:  -- to be consistent with this

11  Court's ruling.

12            THE COURT:  Regardless of how I rule, I don't

13  find it's necessary that I have to hear his testimony

14  outside the presence of the jury regarding this issue.

15            Obviously, if I determine that this issue is

16  not going to be brought up, the Government's going to

17  have to instruct their witness and that will be the end

18  of it.

19            But I don't find it's necessary to instruct

20  him -- or to hear his testimony outside the presence of

21  the jury.

22            MR. LEVIN:  I was just responding to

23  Mr. Gregorie's assertion that he wasn't sure which way

24  his witness was going to testify, regardless of any

25  admonition to the contrary.

1          THE COURT:  No.  I don't think that's what

2     Mr. Gregorie was saying.

3          Is everyone agreed on the defense, that you

4     are not bringing up this issue?

5          MR. HOULIHAN:  Yes.

6          MR. VEREEN:  It's not my intent to

7     cross-examine this witness with regard to those matters

8     that we discussed yesterday.

9          THE COURT:  What matters are we talking about?

10          MR. VEREEN:  Violence, the convictions, the

11     nature of the El Rukns initiation process or

12     recruitment process with regard to this witness.

13          THE COURT:  The nature of the initiation

14     process or recruitment process?

15          MR. VEREEN:  Yes.

16          THE COURT:  That's new.  That has never been

17     mentioned to me before.

18          Was that something you were intending to go

19     into?

20          MR. GREGORIE:  I -- only that they marched in

21     the street, your Honor, to both recruit and to show

22     their control of that particular area.

23          I expect to bring that out, your Honor.  I'd

24     bring that out regardless of the Court's ruling.

25          MS. JHONES:  Your Honor, I have -- I'm sorry,

1    Mr. Gregorie.  Are you finished?

2           THE COURT:  Well, is there any objection to

3    that?  I don't know if that's included in what you're

4    talking about.

5           I'm not sure I understand what that is, the

6    nature of the initiation process or recruitment

7    process.

8           MR. VEREEN:  Jeff Fort's gang, the El Rukns,

9    use violence to recruit its members.

10          MR. GREGORIE:  I'm not going to bring that up

11   at all, Judge.

12          THE COURT:  All right.

13          MR. GREGORIE:  Judge, may I show your Honor a

14   piece of evidence that's in evidence that I intend to

15   use today?

16          I'd like your Honor to see it because I think

17   it relates to this issue.  If I can just put on the

18   ELMO.

19          THE COURT:  Sure.

20          MR. GREGORIE:  I think everybody can see it.

21          MS. JHONES:  Your Honor, may the witness step

22   outside?

23          MR. GREGORIE:  He knows this is coming, Judge.

24   This is not news to him.

25          MS. JHONES:  In terms of the arguments that

```
 1   we're making, I think it's appropriate to have the

 2   witness step outside.

 3           MR. GREGORIE:  Well, how is he going to

 4   know --

 5           THE COURT:  Well, he needs to know if there's

 6   going to be a limitation or not.  So I'm not going to

 7   order him outside at this point.

 8           MR. GREGORIE:  Judge, we are looking at what

 9   is marked as Government's Exhibit 47-A in evidence,

10   Page 75 of that.  This is statements by Mr. Narseal

11   Batiste.

12           And, in particular, I go to the place in the

13   middle of the page where you can see my finger now

14   where Mr. Batiste tells CW 2, "All my teachers are in

15   prison.  I've never been in prison."  But he says, "All

16   my teachers are in prison."

17           And if you see what he's talking about before

18   that -- he's talking about up at the top about street

19   gangs.  "A lot of them Mexicans, they know me and

20   respect me.  There's a lot of gangs that believe in

21   Islam."

22           "Yes."

23           Blank "are all Islamic, especially in the

24   prisons in Chicago."

25           There is conversation on these tapes about
```

1    breaking people out of the prisons in Chicago.  There

2    will be testimony from this particular witness about

3    the communication between Jeff Fort and members of his

4    gang or members of his group are who are in the prisons

5    in Chicago.

6              MR. VEREEN:  Judge, that is hearsay.

7              MR. LEVIN:  Judge, this is opening a complete

8    can of worms with regard to this case.  This is, in

9    essence, placing Narseal Batiste -- Jeff Fort as an

10   unindicted co-conspirator in this case, your Honor.

11   That's what that's serving to do.  He's trying to draw

12   a link that just does not exist.  This is pure

13   imagination.

14             MR. GREGORIE:  This is Mr. Batiste's words,

15   Mr. Levin.  Did you bother to read the speaker here?

16   It says "Narseal Batiste."

17             MS. JHONES:  Where does it say Jeff Fort --

18             MR. GREGORIE:  This isn't Jeff Fort speaking.

19   This is Narseal Batiste speaking.

20             MS. JHONES:  Where does it say Jeff Fort, your

21   Honor?  Where does it say his teacher, Jeff Fort, is in

22   prison --

23             THE COURT:  Please don't yell.

24             MR. VEREEN:  Your Honor, if I may, first of

25   all, anything with regard to what Jeff Fort has said to

```
 1  other members of his gang, no matter where they are --
 2  that's hearsay.
 3          This witness -- this witness cannot come in
 4  here and talk about something that he has read or
 5  something that he has heard from someone else.  That's
 6  double hearsay.
 7          THE COURT:  Well, I understand from what he
 8  testified -- correct me if I'm wrong -- that he
 9  listened to communications of Jeff Fort from prison and
10  communication with persons in his gang.
11          Is that correct?
12          MR. GREGORIE:  Yes, your Honor.
13          MR. VEREEN:  And we have not received any of
14  that discovery.
15          We should at least have the right to inspect
16  whatever this witness has said that he has received by
17  way of discovery versus having to just rely on his
18  testimony.
19          If he said he has it, then the Government
20  needs to produce it so we can hear it.
21          MS. JHONES:  Wait a second, your Honor.
22           What the Government said to us in their
23  outline in that pleading filed on March 5th was that
24  this witness was going to educate the jury as to who
25  Jeff Fort was, not as to what inference they may draw
```

 1    from what Mr. Batiste's words said.

 2              The inference to be drawn is that Narseal

 3    Batiste has been in contact directly or indirectly with

 4    Jeff Fort in prison, which is exactly what they're

 5    trying to do with Government's Exhibit 47 and going

 6    into that area.

 7              This man is here to educate the jury as to who

 8    Jeff Fort was, not as to an inference of communications

 9    that may have occurred based on that transcript between

10    Mr. Batiste or any other member -- these Defendants

11    here in court.

12              That is absolutely improper.  That's the

13    inference that the Government clearly is trying to get

14    the jury to draw.

15              MR. GREGORIE:  That's wrong, Judge.  That's

16    not what we're drawing at all.

17              What the Government's expert is going to

18    say is that Mr. Fort maintained an open line of

19    communication with those members of the gang, some of

20    whom are in prison, which is exactly what Mr. Batiste

21    is explaining here.

22              Mr. Batiste says, in evidence -- it is now in

23    evidence.  It's on tape.  It's Mr. Batiste's statement.

24    He says --

25              THE COURT:  Do you intend to question him

1   about this?

2          MR. GREGORIE:  I merely -- I intend to ask him

3   if, in fact, there was an open line of communication

4   between Jeff Fort and members of his organization which

5   were imprisoned.

6          He will explain that, yes, they had a line of

7   communication and how they did it.

8          MR. VEREEN:  Your Honor, I would ask the Court

9   to have Mr. Gregorie to have -- show a good-faith basis

10  with regard to the evidence that they have received in

11  the Jeff Fort case or any other case that concerns the

12  El Rukns.

13         THE COURT:  Can you keep your voice down,

14  please.

15         MR. VEREEN:  My apologies, Judge.

16         I'm asking the Court to ask Mr. Gregorie to

17  come forth with some competent evidence to establish

18  that there has been some type of communication between

19  Jeff Fort, the El Rukns and these gentlemen sitting at

20  this table.

21         This is a bunch of nonsense that -- the

22  Government is trying to brainwash the jury into

23  believing something that absolutely does not exist.

24         MR. GREGORIE:  I'm only taking the words of

25  Mr. Batiste.

```
 1              MR. VEREEN:  It doesn't matter.  It doesn't
 2   exist.
 3              MR. GREGORIE:  Did he dream it up, Mr. Vereen?
 4              MR. VEREEN:  You're dreaming it up,
 5   Mr. Gregorie.
 6              MR. GREGORIE:  I'm using Mr. Batiste's words,
 7   not mine.
 8              MR. LEVIN:  Your Honor, would you admonish the
 9   prosecutor to stop the cross-talk and address the
10   Court?
11              THE COURT:  I agree.
12              MR. GREGORIE:  Well, that seemed like
13   cross-talk, to me, from Mr. Levin, your Honor.  I
14   apologize.  But, you know, I get attacked and then I'm
15   responding to it, Judge.
16              But this is clearly a tape made by --
17   statements made by Mr. Batiste.  I'm doing nothing
18   more, your Honor, than explaining what's in the tapes.
19              This is not the only tape where he talks about
20   the prisons, Judge.  Mr. Batiste talks in great detail
21   about breaking people out of prison in Chicago.  He
22   describes the prison in Chicago, Judge.
23              MS. JHONES:  Your Honor, there is nothing --
24   there is nothing in that exhibit that says that
25   Mr. Batiste has communicated with anybody in prison.
```

 1    There's absolutely nothing in that transcript.

 2         He says, "My teachers are in prison."

 3         There is absolutely nothing in that transcript

 4    about communication with people in prison, number one.

 5         Number two, I have the transcript where we

 6    addressed this, what the purpose of this witness was.

 7         Now, now -- right before this witness is going

 8    to take the stand, now we see what we are afraid, what

 9    we are afraid, that the Government is really trying to

10    do with this witness and draw inferences from exhibits

11    in evidence.

12         And that is the problem, your Honor.  This

13    person, this witness, is supposed to talk about the

14    history of Jeff Fort and the P. Stone Nation.

15         MR. GREGORIE:  Well, your Honor, I listed

16    Government's Exhibit 47-A as one of the exhibits in my

17    notice of what he was going to use.

18         This particular tape talks all about Chicago,

19    the Chicago gangs, in that piece and what I filed in my

20    notice, Judge, and in my outline.

21         In fact, we talked about this yesterday.

22    Mr. Clark went through with me a dozen times what

23    pieces I was going to use.

24         He wanted to make sure he knew exactly what

25    pieces I was going to use, and I listed this exhibit as

1    one of the exhibits I was going to use.

2            It would require that counsel read those

3    exhibits, but that's what's in here.

4            MS. JHONES:  Your Honor, this was not provided

5    on December 10th, 2008, when they gave a notice of

6    intent to introduce expert.  That was the whole

7    problem.  That's why I filed a motion in limine.

8            Now, on March 5th, right in the middle of

9    trial, they file an outline and they make a reference

10   to exhibits.

11           They don't say what they're going to do with

12   them.  I asked Mr. Gregorie.  I put it in my motion.  I

13   asked him repeatedly, "What conclusions, what bases, is

14   this witness going to draw?"

15           "None."  He's not drawing any conclusions.

16   None.

17           What he's going to do is he's going to educate

18   the jury.

19           All of a sudden now they're going to make

20   references -- they're going to -- and it's clear what

21   they're trying to do, your Honor.

22           They're trying to get the jury to draw an

23   inference that Narseal Batiste had some communication

24   with people in prison --

25           THE COURT:  Can you keep your voice down,

1    please.

2            MS. JHONES:  Sorry, your Honor.  I apologize.

3            This is -- I apologize, your Honor.

4            This is --

5            THE COURT:  The jurors are in the next room.

6            MS. JHONES:  I understand.  Your Honor, I

7    apologize.

8            This is so egregious.  This is so egregious,

9    your Honor.  And we -- this is exactly the problem that

10   I'm trying to explain to the Court in the 403 problem.

11   That's the problem.

12           They are being disingenuous with what they're

13   attempting to do by referencing these exhibits.

14           MR. GREGORIE:  Your Honor, Jeff Fort was in

15   prison when he engaged in the conspiracy to -- with

16   Libya.  He sent his orders and his directions from

17   prison.

18           He also did that when he was in Bastrop,

19   Texas.  He ran the gang and operated his procedures

20   from the prison, your Honor.

21           Here, we have Mr. Batiste saying that, "All my

22   teachers are in prison."  This is not my statement.

23   This is his statement.

24           He also talks about there being great Islamic

25   fighters, that the army that he is going to --

```
 1              THE COURT:  Well, let me make sure I
 2   understand what you intend to do with this.
 3              MR. GREGORIE:  Yes, your Honor.
 4              THE COURT:  I mean, this is a pretty
 5   straightforward statement by Batiste about --
 6              MR. GREGORIE:  He's talking about gangs, your
 7   Honor.
 8              THE COURT:  No.  I understand that.
 9              But what is it that you intend to ask the
10   expert in regard to this particular passage?
11              MR. GREGORIE:  What, if any, line of
12   communication was there between Jeff Fort and members
13   of his organization in prison, your Honor.
14              He is going to explain that there was an open
15   line of communication, people going in and out of the
16   prison in Downtown Chicago, Cook County, Chicago, where
17   they would send messages and send information back and
18   forth between those in the prison and those on the
19   outside.
20              THE COURT:  I don't have a problem with you
21   asking the expert witness in regard to that area.
22              I do not find it's necessary for him to
23   explain this portion of the transcript.  I find it's
24   very straightforward as to what he's referring to.  And
25   you can certainly bring it up in closing argument.
```

1          MR. GREGORIE:  Okay.

2          THE COURT:  But I don't find it's necessary --

3    as far as him commenting on specific exhibits, my

4    understanding, for instance, in the wire conversation

5    between Sultan Kahn-Bey and Narseal Batiste, was that

6    he was going to be explaining terms and code words.

7          MR. GREGORIE:  He will, your Honor.

8          THE COURT:  That I find is appropriate.

9          MR. GREGORIE:  Yes, your Honor.

10          THE COURT:  But for him to say that this is

11    what he's talking about, I don't find that that's

12    appropriate, as far as his testimony is concerned.

13          You can certainly argue that in closing

14    argument.

15          MR. GREGORIE:  Fine, your Honor.

16          THE COURT:  But I'm going to preclude that

17    area of inquiry.

18          MR. GREGORIE:  Fine, your Honor.

19          THE COURT:  And so instruct your witness

20    accordingly.  I guess you won't be bringing up that

21    page.

22          MR. GREGORIE:  Thank you, your Honor.

23          THE COURT:  And while I agree with you,

24    Mr. Gregorie, that after two consultations -- and there

25    was a long period of time that the defense were

1    consulting and then they made an announcement -- if

2    they have made the determination that they are not

3    going to go into the violence or the drug trafficking

4    or the murders regarding Jeff Fort -- now, that -- I'm

5    going to order that you also not go into that.

6          The reason for changing that ruling in regard

7    to any 403 analysis was because the defense had

8    indicated that they intended to go into that area on

9    cross.

10          On that basis, I found that the Government

11    then should be able to go into that on their direct.

12          But as now they have committed -- and I would

13    say this is the final commitment -- to not go into that

14    area, I'm going to preclude the Government from going

15    into that area.

16          You may go into the area of what we discussed

17    yesterday initially, which was that Jeff Fort, while

18    being in prison and communicating with people in

19    prison, generally -- you may go into the area -- I'm

20    trying to remember what we discussed yesterday

21    initially.

22          MS. JHONES:  Your Honor --

23          MR. GREGORIE:  My only intention, your Honor,

24    to bring it up at all will be the fact that there are

25    time periods in which he is in prison and, therefore,

```
 1    must communicate -- he's not present on the scene and,

 2    therefore, he's communicating by some other means with

 3    the members of his group.

 4          THE COURT:  Okay.

 5          MS. JHONES:  Your Honor, I have to raise

 6    something, just so the Court understands what the

 7    problem here is.

 8          THE COURT:  I just granted your request.

 9          MS. JHONES:  I understand.  But there is an

10    issue here, your Honor.

11          On yesterday's transcript, when we went over

12    this -- on Page 123 of yesterday's transcript, in

13    addressing what the Government was and was not going to

14    go into, subject to what we're going to go into on

15    cross, the Government said -- this is Mr. Gregorie

16    speaking -- "After going back over the expert witness,

17    his potential testimony, if the defense is going to be

18    allowed to go into all of the criminal acts on

19    cross-examination, it not only makes the expert look

20    like he doesn't know what he's talking about, but it is

21    also an unfair advantage" --

22          THE COURT:  Ms. Jhones, this is a non-issue

23    now.  I've just ruled.

24          MS. JHONES:  Wait a second, your Honor.  I

25    want to go to a point.  I want to go to a point that
```

1    the Government has changed.  Okay?

2         -- "it is also unfair -- an unfair advantage

3    on the part of the defense because I'm going to be

4    avoiding" -- I'm going to be avoiding all of the talk

5    about acts in prison, his uniting the gangs in prison,

6    all of those pieces of testimony.  I'm willing to do

7    that, Judge, but only if I get an assurance that the

8    defense is not going into the criminal acts on cross."

9         That's exactly what he's talking about now.

10   He's changed his position.  That was our problem.

11        We don't want -- we stated we didn't want the

12   jury to know that this man is in prison, what he did

13   while he was in prison.

14        The Government committed, "I won't do that if

15   they don't do that."  Now they're saying, "I am going

16   to do it."

17        He was in prison.  He's talking to his people

18   outside of prison.  And that's the problem, your Honor.

19   That's the problem.

20        MR. GREGORIE:  Your Honor --

21        THE COURT:  Well, let me explain what my

22   limitation was.

23        My limitation was on a 403 basis as to the

24   drug trafficking, which has nothing to do with this

25   case, as to the murders and the violence of Jeff Fort

 1   and the Fort gang units as to their violent tendencies

 2   in Chicago and their -- other than the Libya

 3   indictment, which I found to be relevant based upon the

 4   statements made by Batiste as being -- that he wanted

 5   to be like Jeff Fort -- to be like Jeff Fort, who was

 6   the first black man indicted for terrorism.

 7            Yes, Mr. Gregorie.

 8            MR. GREGORIE:  Yes, your Honor.

 9            What he says in that December 16th

10   conversation in talking about Jeff Fort is, "And he got

11   arrested and he went in jail back in 1980," referring

12   directly to Jeff Fort going to jail in 1980-something.

13            THE COURT:  I don't have a problem with your

14   bringing up that Jeff Fort was in jail --

15            MR. GREGORIE:  Okay.

16            THE COURT:  -- and that there were

17   communications --

18            MR. GREGORIE:  With people outside of jail.

19            THE COURT:  Well, the Libya indictment was

20   while he was incarcerated.  Correct?

21            MR. GREGORIE:  Yes, your Honor.

22            THE COURT:  Okay.

23            MR. GREGORIE:  I would ask, however, your

24   Honor, that I also be allowed to do that with regard to

25   Bastrop, Texas, your Honor, because that's how they

1  developed the code language.

2          That's why they were concerned about the --

3          THE COURT:  What is Bastrop, Texas?

4          MR. GREGORIE:  In the early 1980s, he went

5  to -- he was in prison in Bastrop, Texas, and was

6  speaking by phone with his generals on a daily basis.

7          That's why they developed the code language in

8  order -- because he knew he could be intercepted on

9  those conversations.

10          THE COURT:  Okay.  You may go into that.

11          The limitation is on the violence, the drug

12  trafficking and the murders.

13          The jurors are now here.

14          MR. VEREEN:  Your Honor, I do have an exhibit

15  list for the Court now.

16          THE COURT:  Okay.

17          MS. JHONES:  And, your Honor, just to make

18  sure that we're clear, our expert is going to remain in

19  the courtroom during this testimony.

20          THE COURT:  Okay.

21          And did you give a copy of this to the

22  Government?

23          MR. VEREEN:  I did, your Honor.

24          THE COURT:  We have a request from one of the

25  jurors to end at 3:00 on Friday because they need to

```
 1   fly to New York to visit a sick relative.

 2           So whatever our schedule is for Friday, we'll

 3   be ending at 3:00 to accommodate that juror.

 4           Let's bring the jurors in, please.

 5           (Whereupon, the jury entered the courtroom at

 6   10:37 a.m. and the following proceedings were had:)

 7           THE COURT:  You may be seated.

 8           Call your next witness.

 9           MR. GREGORIE:  The United States calls Daniel

10   Young.

11   Thereupon--

12                       DAN YOUNG

13   was called as a witness by the Government and, having

14   been first duly sworn, testified as follows:

15           THE COURT REPORTER:  Please have a seat.

16           And state your full name for the record.

17           THE WITNESS:  Dan Young, Y-o-u-n-g.

18                   DIRECT EXAMINATION

19   BY MR. GREGORIE:

20   Q.    Sir, would you tell the Court and jury, please,

21   how your employed.

22   A.    I'm a special agent with the Department of

23   Homeland Security, Office of Inspector General.

24   Q.    When you say Office of Inspector General, what do

25   you do?
```

1    A.     We're, for lack of a better term, internal

2    affairs for the component agencies of Homeland

3    Security.

4    Q.     I want to take you back to your job prior to

5    that.  Okay?

6    A.     Yes.

7    Q.     What were you doing prior to working for Homeland

8    Security?

9    A.     I was a special agent with the Alcohol, Tobacco,

10   Firearms and Explosives, assigned to the Chicago field

11   office, working on the organized crime/drug enforcement

12   task force.

13   Q.     Were you given a more specific assignment in that

14   job?

15   A.     Yes.  At the time I was hired on in February of

16   1989, we were working jointly with the Chicago Police

17   Department gang crimes unit south.

18   Q.     And were you assigned to the ATF office in

19   Chicago?

20   A.     Yes, sir.

21   Q.     And during the time you worked there, where was

22   that located?

23   A.     When I first started, it was at 175 West Jackson,

24   Downtown Chicago, inside the Loop.  It then was moved

25   to 300 South Riverside.

Young - DIRECT - By Mr. Gregorie                    28

```
 1   Q.     And where, if at all, was the nearest Post Office
 2   to that address?
 3   A.     Sears Tower.
 4   Q.     And has that Post Office been there continuously
 5   at the Sears Tower?
 6   A.     Yes, it has.  It's on the lower level of the
 7   Sears Tower.  Our office is less than two blocks away.
 8   Q.     And so that would include the period from 2004 to
 9   2006?
10   A.     Yes, it would.
11   Q.     Now, sir, have you ever been to the Sears Tower
12   for any other purpose?
13   A.     Out-of-town visitors.  There is an observation
14   deck.  You can go up to the top of the Sears Tower,
15   look out, see the city, look out over Michigan.
16   Q.     Are there any offices or businesses there which
17   relate to those visitors from outside of Illinois?
18              MR. LEVIN:  Objection.  Relevance, your Honor.
19              MR. VEREEN:  Objection.
20              MR. GREGORIE:  It's very relevant, your Honor.
21              THE COURT:  Overruled.
22              THE WITNESS:  They have souvenir stands.
23              As you go in to take a tour of the Sears
24   Tower, you get a 20-minute video of how the tower was
25   built, when it was built.
```

1          Then you go up top and look at the view and

2     you can buy a sandwich and buy souvenirs.

3     BY MR. GREGORIE:

4     Q.    Now, sir, let's go back to your work at ATF.

5          When you started on the job in 1989, could you

6     tell us what exactly you were assigned to do at your

7     first job.

8     A.    I was assigned a training agent, Special Agent

9     Tom O'Brien.  He was the case agent on the El Rukn

10    organization.  So the first day I jumped in -- feet

11    first into investigating the El Rukns.

12    Q.    Okay.  And did you keep investigating El Rukns

13    for a period of time?

14          MS. JHONES:  Objection.  Leading.

15          THE COURT:  Sustained.

16          Rephrase your question.

17    BY MR. GREGORIE:

18    Q.    What, if anything, did you do for the next

19    13 years with ATF?

20          MR. LEVIN:  Objection.  Leading.

21          THE COURT:  Overruled.

22          THE WITNESS:  For the next 13 years, I

23    investigated Jeff Fort and the El Rukn organization.

24    BY MR. GREGORIE:

25    Q.    And when you say "El Rukn organization," did it

```
 1   always go by one name?
 2           MS. JHONES:  Objection.  Leading and lack of
 3   foundation.
 4           THE COURT:  Sustained as to leading.
 5           Overruled as to lack of foundation.
 6   BY MR. GREGORIE:
 7   Q.     What, if any, other names did that group go by,
 8   if you know?
 9   A.     It began as the Blackstone Rangers, became the
10   Black P. Stone Nation, then became the El Rukns.  And
11   today they're known as the Almighty Black P. Stone
12   Nation.
13   Q.     Now, sir, did you in those 13 years -- what, if
14   any, investigative techniques did you use in
15   investigating that group?
16   A.     Did physical surveillance of their headquarters
17   at 39th and Drexel, physical surveillance of other
18   properties that they controlled, listened to consensual
19   overhears, listened to court-authorized wiretaps of the
20   telephones at their headquarters, assisted in making
21   purchases of evidence, reviewed reports -- Chicago
22   intel reports, wrote reports reference the
23   organizations as well, reviewed literature that was --
24   that they wrote.
25   Q.     When you say "they wrote," who in particular?
```

Young - DIRECT - By Mr. Gregorie                          31

1    A.    Jeff Fort.

2    Q.    Okay.  What --

3    A.    I shouldn't say -- counselor, I should say Jeff

4    Fort would have his -- one of his members write it for

5    him.

6    Q.    Why is that?

7    A.    He is functionally illiterate.  But he's a very

8    bright, charismatic individual.  He is a true leader.

9    Q.    What, if any, informants did you have with regard

10   to the group?

11   A.    We had in excess of 50 informants over that time

12   period, ranging from people just pretty much giving us

13   information about the group to going out and purchasing

14   evidence on our behalf.

15   Q.    What, if any, trials did you take part in?

16   A.    Numerous trials, numerous hearings, reference

17   this organization.

18   Q.    And what, if any, witnesses did you talk to?

19   A.    I talked to hundreds of witnesses, debriefing

20   them prior to trials, getting them prepared to testify.

21         We interviewed the lowest members of the

22   organization up to the highest members of the

23   organization, debriefed them, got information from

24   them.

25   Q.    And what, if any, tape recordings, video- or

1    audiotape, did you listen to?

2    A.    Listened to hundreds of hours of court-authorized

3    wiretaps of Jeff Fort talking to the membership,

4    listened to consensual overhears that were made,

5    watched and transcribed videotapes as well.  Through

6    the process of transcribing these tapes, we also had to

7    decipher the code.

8    Q.    Have you ever testified in federal court

9    concerning Jeff Fort and any of the gangs, as you've

10   named them?

11   A.    Yes, I have.

12   Q.    Now, sir, have you ever contributed to any

13   non-law enforcement publications of any kind?

14   A.    I've been consulted reference facts that were

15   going to be printed.  I --

16         THE COURT REPORTER:  What were going to be

17   printed?

18         THE WITNESS:  Facts that were going to be

19   printed reference to gangs' history.

20         I also was consulted by the History Channel.

21   They have a series called *Gangland*.  They were doing a

22   one-hour documentary called *Stone to the Bone*.  I was

23   consulted to verify the information they had on that

24   show.

25         MR. GREGORIE:  Your Honor, at this time I move

1   this witness as an expert regarding Jeff Fort and the

2   El Rukn gang under its four names, your Honor.

3            MS. JHONES:  Same motion, your Honor.

4            THE COURT:  The objections are overruled.

5            He'll be accepted as an expert regarding Jeff

6   Fort and the El Rukn gang under their four names.

7   BY MR. GREGORIE:

8   Q.    Now, sir, can you tell us, sir, very quickly a

9   little bit about the early history of Jeff Fort.

10  A.    Jeff Fort was born in rural Aberdeen,

11  Mississippi, on February 20th, 1947.  In the mid-1950s,

12  his family relocated to the city of Chicago, settling

13  in a neighborhood that's referred to as Woodlawn.  It's

14  on the south side of the city.  His house was actually

15  at 65th and Blackstone.

16            In his early years, he hung around with a group

17  of youngsters, preteens, teens, some in their 20s, down

18  on the street corner at 67th and Blackstone, which is

19  two blocks south of his house.  Chicago is pretty much

20  a straight grid.

21            There was other organizations in the neighborhood

22  as well.

23            At one point in the early 1960s, he meets a young

24  man by the name of "Bull" Hairston, Eugene "Bull"

25  Hairston.  "Bull" Hairston -- he was the leader of

 1   another group in the neighborhood, Woodlawn area.

 2        They get together and then decide they're going

 3   to make one group -- one large group, because "Bull"

 4   was older and a little more physically mature.  They

 5   made "Bull" the leader and Jeff Fort his right-hand

 6   man.

 7        Jeff and "Bull" decided to name their

 8   organization the Blackstone Rangers.  They were

 9   standing on Blackstone Road and named it after the

10   road.

11        As time went by, Jeff won more power in the

12   neighborhood and he started to recruit other gangs.  He

13   started to organize and was trying to unite these gangs

14   on the south side of the city of Chicago.

15        He literally got these gangs together and told

16   their leadership -- and it did come true -- that

17   they --

18             MR. VEREEN:  Objection.

19             THE WITNESS:  -- would become a ruling

20   council --

21             MR. VEREEN:  Objection as to hearsay.

22             MR. GREGORIE:  This is an expert witness, your

23   Honor.

24             THE COURT:  Overruled.

25

```
 1   BY MR. GREGORIE:
 2   Q.    You can continue, sir.
 3   A.    He brought these gangs together.  The leaders of
 4   these smaller gangs became a ruling council called the
 5   Main 21.
 6         And as Jeff always does, he was the number one
 7   guy.  He was the ultimate leader.
 8         By this time, "Bull" Hairston is no longer in
 9   Chicago.  And he renames the gang the black P -- with a
10   P, period -- stone nation.
11   Q.    When you say Black P. Stone Nation, what did the
12   "P" stand for?
13   A.    The "P" represented Jeff Fort's nicknames at the
14   time.  He was called "The Prince of Darkness," "Prince
15   of Death" or just "Prince."  And the "P" has always
16   been a reference to Jeff.  The "P" is Jeff Fort, "The
17   Prince."
18   Q.    What, if anything, did Jeff Fort do going into
19   the late '60s to the early '70s to -- with regard to
20   his leadership of this gang?
21   A.    There was two issues going on in the late '60s.
22         One side, Jeff was reaching out to ministers in
23   the Woodlawn area, civic leaders and, in particular, a
24   group called the Woodlawn Organization, which was
25   businessmen, clergy and just concerned citizens, and
```

```
 1   pretty much telling them that, you know, his group

 2   could control the area.

 3        On the other side, he would have marches.  He'd

 4   have rallies.  He'd have his men dress up in the

 5   organizational colors, wearing red tams or a beret type

 6   of hat.

 7        They'd literally march 500 to 800 strong down the

 8   street to let everyone in the neighborhood know they

 9   were in control, because their motto was, "Stones run

10   it."  He always used it as a recruiting tool.

11   Q.   Now, sir, as a result of this relationship with

12   the community, did he meet with any particular pastor

13   or leader?

14   A.   Yes, he did.  The Reverend John Fry of the First

15   Presbyterian Church at 64th and Kenwood -- I'm sorry --

16   64th and Woodlawn became -- he befriended.

17        And Jeff Fort was able to convince this minister

18   to allow him and his organization to use his church as

19   a place to meet.

20   Q.   Now, sir, did there come a time in the 1970s when

21   something happens to Jeff Fort as a result of all --

22   well, let's take that back.  Let me go back.

23        Financially, how was Jeff Fort receiving money

24   with regard to this civic side of his organization?

25   A.   The Woodlawn Organization that we just talked
```

1    about was trying to -- I shouldn't say help, but trying

2    to solve the problems in the community.  They did this

3    by getting grant money for Jeff Fort and his rival --

4    the rival organization in that neighborhood.

5         This grant money was supposed to be for job

6    training programs.  $927,000 from the Federal

7    Government.

8         They also got money -- grant money from private

9    foundations.  They also got grant money or a donation

10   from the Chicago Archdiocese.

11   Q.   As a result of that, was Mr. Fort ever charged

12   with anything?

13   A.   He was indicted in 1972 for defrauding the

14   Federal Government and contempt of Congress.

15   Q.   Now, going into the 1970s, where was Jeff Fort,

16   if you know?

17   A.   In the mid-1970s, he was at Leavenworth Federal

18   Penitentiary.

19   Q.   And while he was there, did he have any

20   communication with his group in Chicago?

21   A.   Yes, he did.

22   Q.   How did he do that?

23   A.   Over the -- via telephone.  He'd phone home.

24   Q.   Was he able to do that without any difficulty?

25   A.   Yes.

```
 1          But, counselor, it's also important to recognize,

 2   at that time while he was there, he was also being

 3   influenced by the Moorish Science Temple of America

 4   and, also, Islam itself.

 5          So by the time Jeff Fort is released and returns

 6   back to Chicago in 1977, he decides to change the name

 7   of the gang.

 8   Q.     Okay.  Prior to that, just so that we understand,

 9   was he able to do anything with regards to the gang

10   from prison?

11   A.     Yes.  He still controlled his nation from prison.

12   Q.     And have you ever heard the terms "People" and

13   "Folk"?

14   A.     "People" and "Folk" came out of the Illinois

15   Department of Corrections in the '70s as a way for

16   members of different organizations to pretty much --

17   for their safety.

18          The People Nation is made up of the Black P.

19   Stone Nation, the Latin Kings, the Vice Lords.  The

20   Folk side of the alliance is made up of the Black

21   Disciples, Gangster Disciples, Simon City Royals.

22          The whole idea behind it was protection.  If I

23   was just -- I was the only Blackstone Nation member in

24   Stateville, I'd align myself with all the Latin Kings

25   for protection.
```

1           The symbol they used was a five-pointed star.

2   They considered it -- when they talked to each other,

3   they always asked how your "People" were.

4           The Disciples or the "Folk" side of it would use

5   a six-pointed star.  The reason for the six-pointed

6   star was David Barksdale, the founder of the Disciples,

7   Star of David, six-pointed star.  And they referred to

8   themselves as "Folk."

9   Q.    Now, sir, in the mid-1970s, when Jeff Fort comes

10  out of jail, can you tell us what, if anything, he took

11  with him when he came back to the Chicago community.

12  A.    He returned to Chicago and, after studying the

13  Moorish Science Temple of America and Islam, he took --

14  he brought some of the teachings with him.

15          When he got back to Chicago, he decided to rename

16  the gang and institute some of these teachings he'd

17  learned.

18          He kind of picked what he liked out of those

19  teachings and decided to implement it as part of the

20  gang.

21          So the organization was renamed the El Rukns.

22  And "El Rukns," loosely translated, means "Blackstone."

23  Q.    Okay.  And have you ever heard of the "Red Square

24  Ruling"?

25  A.    The "Red Squad Ruling" --

1   Q.     I'm sorry?

2   A.     -- was out of the Northern District of Illinois.

3   It limited the ability of law enforcement to keep

4   intelligent files on religious organizations.

5        When Jeff renamed the organization the El Rukns,

6   he also tried to get status as a religious organization

7   as far as tax purposes.

8        And, also, it limited the ability of law

9   enforcement to keep intelligent files on the membership

10  and, in some aspects, it gave it some legitimacy to the

11  neighborhood.

12  Q.     Now, sir, was there any sort of hierarchy in his

13  organization when he came back to Chicago in the

14  mid-1970s?

15  A.     Yes.  At this point, he reorganizes to his most

16  valued members.  The old Main 21 is removed.  It's a

17  system of Jeff Fort as the leader.

18       Underneath him will be a number of generals,

19  21 to start with.  Under him are ambassadors.  Under

20  the ambassadors comes the muftis, or enforcers, and

21  then the street soldiers.

22  Q.     Now, sir, what, if any, property did he own -- or

23  where did they -- the El Rukns and Jeff Fort meet in

24  the late 1970s?

25  A.     The El Rukn organization purchased an old movie

 1   theater that had been taken over by the City on back

 2   taxes.

 3        If you can picture a theater, it's a huge

 4   building and, as you walked in, it actually still had a

 5   stage from Vaudeville days, but still had a screen.

 6        The upper windows -- they had put steel plating

 7   in.  The front door was a steel plate that had to be an

 8   inch and a half thick.  They also had lookouts around

 9   the building.

10        At times, they also would have a doorman standing

11   at attention, if you were driving by, just to make sure

12   you knew where you were.

13   Q.   And what, if any, recruiting efforts did Jeff

14   Fort make in the late 1970s?

15   A.   This time, Jeff is still using the socials and

16   rallies, but he's also still marching.  He would have

17   his men -- and they refer to them as kufis.  They're a

18   small skull cap.  Some of them would wear a type of

19   flowing robe that almost looks Middle Eastern.

20        They'd walk up and down the areas of their

21   control.  And pretty much, once again, he wanted to

22   make sure everyone in that community knew the El Rukns

23   controlled that neighborhood.  He also used it as a

24   recruiting tool.

25   Q.   Now, sir, did something happen to Jeff Fort in

1    the early '80s?

2    A.    In 1982, the organized crime/drug enforcement

3    task force opened up the original El Rukn

4    investigation.

5          By 1983, Jeff Fort was indicted and he was sent

6    to Bastrop, Texas, to serve his time.

7    Q.    And what, if any, communication did he have with

8    his gang from Bastrop, Texas?

9    A.    Jeff would talk up to five hours a day to the

10   membership back at the El Rukn Fort.  That's the name

11   of the headquarters building at 39th and Drexel.

12         He knew law enforcement was listening in.  First,

13   he knew there was a sign over the phone at the prison

14   saying, "We can monitor your calls."  So he knew that.

15         And then, secondly, he started to believe that

16   law enforcement was monitoring his phone calls.  And he

17   was correct on that as well.

18   Q.    And what, if any, efforts did he make to defeat

19   that in communicating with his people?

20   A.    The El Rukns came up with a coded language.  It

21   was a combination of street slang, Arabic terms and

22   common knowledge.

23   Q.    And can you give us a couple of examples of what

24   sort of code words they used.

25   A.    If they were referring to the city of Chicago,

 1    they called it "Mecca."  If they were referring to the

 2    El Rukn Fort, their headquarters building, they called

 3    it the "N," just the "N."  If they were referring to an

 4    airplane, it was an "up-up."  If they were referring to

 5    Ronald Regan, it was an "actor."

 6    Q.    How about law enforcement?

 7    A.    Law enforcement, we are considered "Romans."

 8    Q.    "Romans" as in the city of Rome?

 9    A.    Correct.

10    Q.    Okay.  And how about referring to Chicago or

11    other cities?

12    A.    Chicago was "Mecca."  Milwaukee was considered

13    "Medina."  And the twin cities, Minneapolis and

14    St. Paul, was called "Dome of the Rock."

15    Q.    Did -- what, if any, principles did the El Rukn

16    group have during this time period?

17    A.    They had five principles:  Love, truth, peace,

18    freedom and justice.  When they'd greet each other on

19    the street, they would throw the five, meaning throw

20    the five principles.

21          The five principles also mean one, two, three,

22    four, five.  It was a way of counting over the phone.

23    If he wanted to say "seven," he would say "all

24    creations" because God created the world in seven days.

25    Q.    Okay.  Can you show the jury and describe it so

Young - DIRECT - By Mr. Gregorie                    44

```
 1    the court reporter can get it down, if Rukns were
 2    greeting each other, how they would do that.
 3    A.    They'd -- open hand just below their heart.
 4    They'd pump it against their chest and raise their
 5    hand, if they were just passing on the street
 6    (indicating).
 7         If they were going to shake hands, they'd start a
 8    handshake in which, halfway through, they'd make a
 9    pyramid, reverting back to the old Black P. Stone
10    Nation days, representing that, thump their chest and
11    throw the five:  Love, truth, peace, freedom.
12    Q.    Now, sir, in the latter part of the 1980s, did
13    something in particular happen that got Mr. Fort's
14    attention -- first of all, did he get out of Bastrop?
15    A.    No, he did not.  But in the mid-1980s, he learned
16    that Lewis Farrakhan had received $5 million from the
17    Libyan Government.
18         Fort knew that the El Rukns should be cashing in
19    on that and made arrangements to offer the El Rukns'
20    services to the country of Libya to commit terrorist
21    acts in the United States.
22    Q.    And how did he do that?
23    A.    He -- at first, he sent two of his generals to
24    Libya to meet with Libyan officials.  When they
25    returned, they announced that Kadhafi -- Moammar
```

```
 1    Kadhafi was very receptive to their offer of their
 2    services.
 3            Later on, he tried to finish the deal by sending
 4    the same generals back to Libya because -- but because
 5    the US and Libyan Government -- at that time, we had a
 6    military conflict and they weren't able to travel
 7    there.  So arrangements were made to meet with Libyan
 8    representatives in Panama.
 9            So Jeff Fort ordered his men to make a video.  In
10    the video, they dressed in paramilitary garb.  Behind
11    them they had a photo of Jeff Fort and a photo of
12    Kadhafi.
13            They each -- each one of his generals stood in
14    front of the camera, announced their allegiance to the
15    El Rukns and Jeff Fort and, also, announced their
16    allegiance to Kadhafi.
17            That videotape was taken to the Embassy -- the
18    Libyan Embassy in Panama in May of '86.
19    Q.    Now, sir, I'm going to show you what's marked as
20    Government's Exhibit 29 for identification.
21            Do you recognize that picture, sir?
22    A.    Yes, I do.
23    Q.    Do you recognize the individuals in it?
24    A.    In the center, in the front, is Jeff Fort, leader
25    of the El Rukns, Black P. Stones.
```

1       To the right is Jackie Clay, a general.  To the

2   left is Derrick Porter, also a general.

3   Q.    Did you have some relationship with Derrick

4   Porter?

5   A.    I had talked to him in the past, interviewed him.

6         And Jackie Clay actually cooperated with the

7   Government.  I talked to him hundreds of hours.

8              MR. GREGORIE:  Your Honor, the United States

9   would move 29 for evidence.

10             MS. JHONES:  Just renewing the previous filed

11  objection, your Honor.

12             THE COURT:  The objections are overruled.

13             It will be admitted as Government's

14  Exhibit 29.

15             (Whereupon, Government's Exhibit No. 29 was

16  entered into evidence.)

17             THE COURT:  You may publish.

18             MR. GREGORIE:  May I publish it?

19             THE COURT:  Yes.

20  BY MR. GREGORIE:

21  Q.    Sir, would you show the jury, please, who is Jeff

22  Fort and the other individuals, if you know them.

23  A.    Jeff Fort would be the gentleman in the center

24  with the glass in his hand, bearded.

25             To the right of the photo, in the background, the

1    tall gentleman, is Jackie Clay.  He ended up being a

2    cooperating witness.

3         And to the left is Derrick Porter, also known as

4    Ricky, also known as Abu, A-b-u.

5    Q.    And how were they dressed?

6    A.    This is a paramilitary uniform that they wore in

7    that videotape that was made for the -- for the

8    Libyans.

9    Q.    Now, sir, as a result of this attempt to offer

10   services to Libya, what, if anything, happened?

11   A.    Because there was -- at the time, there was a

12   court-authorized wiretap going, the FBI introduced an

13   undercover agent who went ahead and provided -- I

14   should say sold an inert LAW rocket.

15        Jeff Fort had requested his men to look for a LAW

16   rocket because he saw one in a movie -- Clint Eastwood

17   movie, *The Enforcer*.  He blew up a tower with it.

18        It's a LAW rocket.  It's a light anti-tank

19   weapon.  It's a tube about that long (indicating), and

20   it extends.  You aim it and it's shoulder-fired.  It's

21   a one-time-use weapon.  It was made military to be able

22   to blow up tanks and keep moving.

23   Q.    And as a result of that, what happened to Jeff

24   Fort and the individuals involved?

25   A.    Counselor, may I add one thing?  I'm sorry.

1        When I said the LAW rocket was inert, all the

2   explosives had been taken out, and inserted was a

3   transmitting device.

4   Q.    And as a result of that, what happened?

5   A.    Jeff Fort and six individuals were indicted.

6   Q.    And going forward into the late 1980s, what

7   happened with the rest of the gang?

8   A.    In 1989, 65 ranking members of El Rukn

9   organization were also indicted.

10  Q.    Now, as a result of that, did the gang end?

11  A.    No.  They're still alive and well today.

12  Q.    What happened in the 1990s to the gang?

13  A.    Jeff Fort realized he had lost most of his upper

14  leadership to the indictment in '89 and reinvented the

15  gang once again.

16        He renamed them the Almighty Black P. Stone

17  Nation, realizing that the front of a religious

18  organization had not worked to defeat law enforcement.

19  And he also needed to bring in younger, more -- more --

20  a younger membership.

21  Q.    Okay.  Would you tell us how the hierarchy

22  changed at all, if it did.

23  A.    The hierarchy was now Jeff Fort is still the

24  leader.  Underneath Jeff Fort, he made seven crown

25  princes for seven geographic areas in the city of

 1   Chicago.

 2        Under the crown -- under the princes are crown

 3   princes -- I should go back.

 4        A crown prince is an actual relative of Jeff

 5   Fort.  His two sons were considered crown princes.  The

 6   other princes -- they just had that title.

 7        Underneath him were the generals.  Underneath

 8   them was the mufti, or enforcers, and then the

 9   soldiers.

10   Q.   And did they -- what, if any, recruiting efforts

11   did they make?

12   A.   Jeff Fort's son, Waketta Valenzuela, who was the

13   crown prince for a geographic area that they called

14   Motown, would take his men into Sherman Park, which was

15   right in the center of the territory they controlled,

16   and they would exercise.

17   Q.   Tell us about the relationship to the women in

18   the organization.

19        Were there any women in the organization?

20   A.   When the organization was referred to as the

21   El Rukns, women were considered Moabitis (phonetic).

22   They were really not allowed around the --

23        THE COURT REPORTER:  I'm sorry.  Are you

24   saying Moabites or Moabaitis?

25        THE WITNESS:  They were considered -- they

 1    referred to women in the organization as Moabitis; and,

 2    for the most part, they didn't take part in the

 3    organization, except for Jeff's wife, Diane Fort.

 4    BY MR. GREGORIE:

 5    Q.    And how was she referred to?  Did she have any

 6    title?

 7    A.    She was referred to as "The Queen."

 8    Q.    Okay.  Now, in the 1990s, you were telling us

 9    about what, if any, efforts his son -- his name is

10    Waketta --

11    A.    Waketta Valenzuela was a -- Jeff had an affair.

12    Waketta Valenzuela was the offspring of that affair.  I

13    interviewed his mother as well.

14          But Waketta was the crown prince and he ran

15    Motown.  And when -- he would -- it was -- they would

16    do exercises in the park so everyone in the

17    neighborhood would see them.

18          So it's kind of used to make sure that everyone

19    in the neighborhood understood that they controlled

20    that neighborhood, not the City of Chicago, and then

21    also as a recruiting tool.

22    Q.    When you say "exercises," what are you talking

23    about?

24    A.    I'm talking about jumping jacks, squat thrusts,

25    and they'd stand at attention between them.

```
 1   Q.     And what park did they do this in?

 2   A.     This was Sherman Park.

 3   Q.     What type of park is that?

 4   A.     It's a city park.  It's approximately a city

 5   block.  It's just north of Garfield Boulevard, which is

 6   55th Street, in Chicago, on a grid, and just west of

 7   the Dan Ryan, if you're familiar with Chicago.

 8   Q.     And I forgot one other code word, if we could.

 9          Back when we were talking about the Libyan

10   rocket, did the group -- did El Rukns or Jeff Fort --

11   did that group have any code language for Moammar

12   Kadhafi, the leader of Libya?

13   A.     Yeah.  Kadhafi is referred to as "Young Friend."

14   At that time, Panama was referred to as "Straw Hat."

15   And the rocket itself was considered a "Walking Stick."

16   Q.     Okay.  And did Jeff Fort ask or offer to do

17   anything with his troops with regard to --

18          MR. VEREEN:  Objection as to leading.

19   BY MR. GREGORIE:

20   Q.     What, if anything, did Jeff Fort ask or offer to

21   do with his troops with regard to Libya?

22   A.     At the same time that Fort is talking about

23   procuring a LAW rocket, he is attempting to bolster to

24   Libya that the El Rukns not only have the manpower, but

25   they're willing to do it.
```

1        So he offered to send El Rukn members to Libya to

2    train in the -- in explosives, both the use and the

3    creation of explosives.

4    Q.    Now, sir, can you tell us, did they own any --

5    did El Rukns or the gang, going by whatever name, own

6    any businesses?

7    A.    Yes, they did.  Over the years, they had Pyramid

8    Construction, Pyramid Building & Maintenance, Pyramid

9    Security Firm, and they also had the People's Choice

10   Restaurant, which was a corner diner.

11   Q.    You said they had Pyramid Security.

12         What did that company do?

13   A.    They provided security.  They actually had a

14   contract with McCormick Place, which is a convention

15   center in the city of Chicago.  They had the loading

16   dock contract.

17   Q.    Did they own any property?

18   A.    They would buy property at times on pretty much

19   tax sales.  So they had quite a few different buildings

20   around the south side of Chicago.

21   Q.    Did -- can you tell the jury, please, what the

22   territories were that were controlled at that time.

23   A.    The seven territories after he renamed them the

24   Almighty Black P. Stone Nation in the early '90s was

25   Motown, Terror Town, Duck Town, Foster Park, Stone

```
 1   Terrorists, Crank Town and Murder Town.
 2   Q.    And, sir, does the gang exist today?
 3         MR. VEREEN:  Objection.  Asked and answered.
 4         THE COURT:  Overruled.
 5         THE WITNESS:  Yes, it does.
 6   BY MR. GREGORIE:
 7   Q.    And under what name?
 8         MR. VEREEN:  Objection.  Asked and answered.
 9         THE COURT:  Sustained.
10   BY MR. GREGORIE:
11   Q.    How many members are there in the El Rukn gang,
12   or now the Almighty Black P. Stone Nation, today?
13   A.    Jeff Fort claims 50,000.  My number, from looking
14   at the numbers in the city of Chicago, as well as
15   numbers in other cities, hard-core Black P. Stone
16   themselves is probably closer to 5,000.  He inflated
17   the number a little.
18   Q.    At this time I'm going to ask you to -- let me
19   rephrase that.
20         Have you listened to certain tape recordings and
21   transcripts in this matter?
22   A.    Yes.
23   Q.    I'm going to now ask you to listen to and look at
24   a tape from Government's Exhibit 46-A and Page 40 of
25   46-A.
```

1            THE COURT:  Are you going to be playing a

2    tape?

3            MR. GREGORIE:  Yes, your Honor.  It's a very

4    small piece.

5            THE COURT:  Is this in the binders?

6            MR. GREGORIE:  It is, your Honor.  It's

7    Government's Exhibit 46-A.

8            THE COURT:  Volume I?  Is that it?

9            MR. GREGORIE:  Yes.

10           THE COURT:  What page, please?

11           MR. GREGORIE:  Page 40.

12           THE COURT:  46-A?  I don't have it.

13           UNIDENTIFIED JUROR:  It's in the synchronized.

14           MR. GREGORIE:  I apologize to everybody,

15   Judge.

16           THE COURT:  It's in the synchronized.  Okay.

17           Page 40?

18           MR. GREGORIE:  Page 40 of Government's

19   Exhibit 46-A.

20   BY MR. GREGORIE:

21   Q.    Would you listen carefully, please, sir, to the

22   tape and watch the screen, if you can.

23           (Whereupon, segments of Government's Exhibit

24   No. 46 were published in open court.)

25

```
  1   BY MR. GREGORIE:

  2   Q.    Sir, listening to that, when Narseal Batiste says

  3   something unintelligible, "folks," are you able to make

  4   out what that is?

  5   A.    He refers to the Vice Lords, which is a street

  6   gang that was created in Chicago, as well as GDs, which

  7   is Gangster Disciples.

  8            MR. VEREEN:  Objection, Judge.  Speculation.

  9            THE COURT:  Overruled.

 10   BY MR. GREGORIE:

 11   Q.    Have you heard that term before, sir?

 12   A.    Yes.

 13   Q.    So where -- where it says "(unintelligible)

 14   folks," what is it?  I think there was an interruption

 15   there.

 16   A.    Yes.  He says "Vice Lords" and he says "GDs,"

 17   which stands for Gangster Disciples.  Then he refers to

 18   "Folks."

 19            As we talked about earlier, you got the Folks and

 20   the People.  GDs are Folks.

 21   Q.    Thank you.

 22            MR. VEREEN:  Judge, that's a misstatement of

 23   the evidence.  That was not said.

 24            THE COURT:  You can cross him on it.

 25
```

 1   BY MR. GREGORIE:

 2   Q.    Now, sir, I'm going to show you several pieces of

 3   transcript.

 4         MR. GREGORIE:  Your Honor, we won't play them.

 5   I'm going to show it to him.  It's from Government's

 6   Exhibit -- this is one of the wiretaps.  So it should

 7   be in W1-0303-T, going first to Page 3.

 8         THE COURT:  Which binder is it in, please?

 9         MR. GREGORIE:  III of III.  Book III of III,

10   your Honor.

11         If I may have the ELMO, your Honor.

12         THE COURT:  Okay.  Could you give me the

13   number again.  I'm sorry.  03031?

14         MR. GREGORIE:  W1-0303-T, I believe.

15         THE COURT:  1?

16         MR. GREGORIE:  1.  I'm sorry.

17         THE COURT:  What page, please?

18         MR. GREGORIE:  Page 3 to start with, your

19   Honor.

20         THE COURT:  Okay.

21   BY MR. GREGORIE:

22   Q.    Sir, have you reviewed this particular tape and

23   transcript?

24   A.    Yes, I have.

25   Q.    Looking, sir, down at the fourth speaker from the

```
 1   bottom, where Sultan Kahn-Bey is speaking --
 2           THE COURT:  Maybe you can give the witness a
 3   binder, because --
 4           MR. GREGORIE:  Yes, your Honor.
 5           THE COURT:  -- the screens are -- some of the
 6   screens are somehow not very bright.
 7           MR. GREGORIE:  (Tenders document to the
 8   witness.)
 9   BY MR. GREGORIE:
10   Q.    Can you see at the bottom where it says, "No.
11   This -- one of them" -- "N" word -- "outta -- outta
12   Oakland.  You know what I'm saying?  So that'd be good.
13   You know what I'm saying?  Mission for the muftis.  You
14   know what I'm saying?  For training practice.  You go
15   in there and kick this" -- "N" word?
16   A.    Yes, I do.
17   Q.    Do you know what the term "mufti" is referring
18   to?
19   A.    "Mufti" is an enforcer.
20   Q.    Thank you, sir.
21         Now, sir, I'm going to ask you to turn to the
22   next page, Page 4.
23         Have you reviewed this one as well?
24   A.    Yes, I have.
25   Q.    And can you see six lines up where Sultan
```

 1    Kahn-Bey is speaking?

 2    A.     Yes, I do.

 3    Q.     Where he says, "Because we ain't playing with

 4    them.  We don't give an 'F' about no Romans and no 'Ns'

 5    that's working with Rome.  You know what I'm saying,"

 6    do you know what "Rome" means?

 7    A.     He's referring to law enforcement, and he's

 8    letting him know that they don't work with law

 9    enforcement and they don't care about anyone who does

10    work with law enforcement.

11    Q.     Thank you, sir.

12           Now let's look at Page 8, if you would.

13           Sir, is this language used by people other than

14    members of the Almighty Black P. Stone Nation or

15    El Rukns?

16    A.     No.

17    Q.     Are there other gangs in Chicago with their own

18    code words?

19    A.     Yes.  But they don't use these terms.

20    Q.     Okay.  Looking at Page 8, do you see the term

21    "Mo"?  Narseal Batiste says, "That's right.  Well, hey,

22    Mo, look, I got to -- I got something coming"?

23           Who, if anyone, in the 1990s used the term "Mo"?

24    A.     Starting in the early 1990s, after Jeff Fort

25    changed the name of the gang back to the Almighty

```
 1    Black P. Stone Nation, members would refer to each
 2    other as "Mo's."
 3    Q.    Now, I want you to look at the bottom of the
 4    page.
 5          Narseal Batiste says, "Yeah.  You know, that's
 6    right.  Well, we know her demonstration is down here."
 7          Is "demonstration" a code word of some kind?
 8            MR. VEREEN:  Objection.  Leading.
 9            THE COURT:  Sustained.
10            Rephrase your question.
11    BY MR. GREGORIE:
12    Q.    What, if any, understanding do you have of the
13    word "demonstration"?
14    A.    "Demonstration" was used over the telephone by
15    members of the El Rukn and still is to this day.  It
16    can mean a person, a place, a thing.
17          Whenever they don't want to talk openly about
18    what they're about to do, who they're going to talk
19    about, they'll use the term "demonstration."
20          You know, we could -- I could tell someone,
21    "Let's go watch that demonstration" and we could be
22    talking about a football game -- going to watch a
23    football game.
24          So it's just used when they don't want to talk.
25    Q.    Now, looking at Page 13, if you would, please,
```

```
 1   sir, again, sir, on that page, Sultan Kahn-Bey, six

 2   speakers up from the bottom, says, "We supposedly free

 3   ourselves from the Romans (unintelligible) by any means

 4   necessary."

 5          MR. VEREEN:  Objection.  That's not Sultan

 6   Kahn-Bey speaking, Judge.

 7          MR. GREGORIE:  I'm sorry.  It is Queen Zekaya

 8   speaking.

 9   BY MR. GREGORIE:

10   Q.    She says, "We supposedly free ourselves from the

11   Romans by any means necessary."

12          Again, do you know what the "Romans" referred to?

13   A.    Law enforcement.

14          MR. GREGORIE:  May I have one minute, your

15   Honor?

16          THE COURT:  Yes.

17   BY MR. GREGORIE:

18   Q.    Go to Page 17, if you would, sir, at the very

19   bottom of Page 17.

20          Do you see the statement, again, by Queen

21   Zekaya-Bey, "Right?  And then they mention the 12th --

22   the 12th, but, like you know the Sultan was saying,

23   also, she did it here, came here, because, you know,

24   this is the Mecca."

25   A.    "Mecca" is Chicago.
```

Young - DIRECT - By Mr. Gregorie                      61

1   Q.    And why is it called "Mecca," if you know?

2   A.    It's the birthplace of the Black P. Stone Nation.

3   Q.    Finally, let's look at Page 18.

4         MR. GREGORIE:  May I have one moment, your

5   Honor?

6         THE COURT:  Yes.

7   BY MR. GREGORIE:

8   Q.    Again, Queen Zekaya is speaking at the bottom of

9   the page, four speakers up, "They wasn't going on over

10  the phone when they communicated with the Sultan.  They

11  should have picked that up in they demonstration with

12  him because that wasn't even going on."

13        Do you understand the meaning there?

14  A.    They're talking about a conversation that

15  previously occurred.

16  Q.    And "demonstration," again?

17  A.    Is meaning that they -- someone at some point had

18  a conversation reference something that she's concerned

19  about.

20        MR. GREGORIE:  Could I have just one minute,

21  your Honor?

22        THE COURT:  Yes.

23        MR. GREGORIE:  I have no further questions,

24  your Honor.

25        THE COURT:  Ms. Jhones?

```
 1              MS. JHONES:  No questions, your Honor.

 2              THE COURT:  Mr. Vereen?

 3              MR. VEREEN:  Nothing as to this witness,

 4    Judge.

 5              MR. HOULIHAN:  No questions.

 6              MR. CLARK:  No questions, your Honor.

 7              MR. CASUSO:  No questions, your Honor.

 8              MR. LEVIN:  No questions, your Honor.

 9              THE COURT:  Okay.  You may step down, sir.

10              THE WITNESS:  Thank you.

11              (Witness excused.)

12              MR. GREGORIE:  Your Honor, if we may approach

13    side-bar one minute.

14              THE COURT:  Come on up.

15              (Whereupon, proceedings were had at side-bar

16    outside the presence of the jury which have been sealed

17    per instructions of the Court.)

18              (Whereupon, the following proceedings were had

19    in open court:)

20              THE COURT:  Yes.

21              MS. ARANGO:  Your Honor, at this point, the

22    Government has moved -- I believe your Honor has

23    granted that motion -- to take judicial notice of the

24    following fact:

25              That Al-Qaeda has been designated by the
```

```
 1    Secretary of State as a foreign terrorist organization.

 2           And with the other few minor matters that we

 3    have -- are going to be dealing with later, your Honor,

 4    at this point, the Government rests its case.

 5           THE COURT:  Ladies and gentlemen, we're going

 6    to break for lunch.

 7           Do not discuss this case either amongst

 8    yourselves or with anyone else.  Have no contact

 9    whatsoever with anyone associated with the trial.  Do

10    not read, listen or see anything touching on this

11    matter in any way.

12           If anyone should try to talk to you about this

13    case, you should immediately instruct them to stop and

14    report it to my staff.

15           Remember, until such time as you have heard

16    all of the evidence and I have instructed you on the

17    law and you have heard the closing arguments of the

18    lawyers, you simply are not to talk about this case.

19           1:30.  Enjoy your lunch.

20           (Whereupon, the jury exited the courtroom at

21    11:40 a.m. and the following proceedings were had:)

22           THE COURT:  You may be seated.

23           Yes.

24           MS. JHONES:  I apologize, your Honor.  Let me

25    just retrieve my notes.
```

1          Your Honor, respectfully, pursuant to

2    Rule 29(a) of the Federal Rules of Criminal Procedure,

3    I renew all previously filed pretrial motions in this

4    cause.

5          I -- including, but not limited to, the

6    pretrial motions to suppress the wiretaps, to suppress

7    the searches of the Embassy and the vehicles -- the

8    green vehicle.

9          I renew all the motions previously filed,

10   including the motions, of course, that were filed

11   way -- in -- before the first trial and before the

12   second trial.

13         Additionally, I renew all of the motions

14   during the course of this trial as it relates to

15   motions for mistrial, motions objecting to evidence

16   that was presented and, again, all the exceptions taken

17   to the Government's evidence and, respectfully, the

18   rulings made by the Court.

19         Additionally, I adopt the previous objections

20   raised as to the Government's evidence in the previous

21   trials for purposes of this trial.

22         THE COURT:  For purposes of Rule 29?

23         MS. JHONES:  For purposes of Rule 29.

24         Thank you.

25         THE COURT:  Mr. Vereen?

1          MR. VEREEN:  Your Honor, pursuant to Rule 29

2    of the Federal Rules of Criminal Procedure, I hereby

3    move the Court for a motion for judgment of acquittal

4    with regards to Stanley Phanor as the Government has

5    failed to present a *prima facie* case of evidence with

6    regard to his guilt as to the counts in the indictment.

7          I adopt my prior arguments with regard to the

8    first two cases, as well as arguments made by

9    co-counsel.

10         THE COURT:  Mr. Houlihan?

11         MR. HOULIHAN:  Judge, with your permission, on

12   behalf of Mr. Herrera, I would adopt all previous

13   motions, arguments, both pretrial and during the course

14   of this trial.

15         I adopt the earlier Rule 29 motion and the

16   Rule 29 motions of co-counsel.

17         In addition, the last time, I believe -- I

18   just would renew for Naudimar, unlike the other

19   remaining five Defendants -- Naudimar, Judge, please,

20   he's on the periphery.

21         And even taking the evidence in the light most

22   favorable to the State, I would ask you to grant --

23         THE COURT:  You mean to the Government?

24         MR. HOULIHAN:  Yes.  I'm sorry.

25         THE COURT:  That's okay.

1          MR. HOULIHAN:  -- to the Government, I would

2    ask you to basically remove Naudimar from any further

3    proceedings.

4          THE COURT:  Mr. Clark?

5          MR. CLARK:  Thank you, your Honor.

6          On behalf of Rotschild Augustine, your Honor,

7    I would move for a judgment of acquittal under Rule 29

8    as to each count -- Count 1, Count 2, Count 3 and

9    Count 4 -- on the basis that the evidence in this case

10   is insufficient to sustain a conviction on any of these

11   counts.

12         I also will adopt all my arguments of my

13   co-counsel, all pretrial motions, the argument -- and

14   also adopt the argument made in the last trial on

15   March the 5th, 2008, all arguments in support of that.

16         THE COURT:  Mr. Casuso?

17         MR. CASUSO:  Yes, Judge.

18         Judge, pursuant to Rule 29, Federal Rules of

19   Criminal Procedure, I would move for a judgment of

20   acquittal on all four counts of the indictment, based

21   on the fact that the Government has failed to prove a

22   *prima facie* case.

23         We adopt all other motions, arguments of all

24   other counsel in the case, as well as the arguments of

25   my prior counsel to Mr. Augustin, Mr. Prebish in this

1    case.

2              THE COURT:  Mr. Levin?

3              MR. LEVIN:  Yes, your Honor.

4              Pursuant to Rule 29 of the Rules of Criminal

5    Procedure, on behalf of Patrick Abraham, we would move

6    for a judgment of acquittal in that it is our belief

7    that a reasonable trier of fact could not find from

8    this record evidence beyond a reasonable doubt my

9    client guilty of the four conspiracies, as charged in

10   the second superseding indictment.

11             I would furthermore move to adopt motions

12   pursuant to Rule 29 made in the first two trials by

13   myself, as well as all arguments of counsel made with

14   regard to their Rule 29s, and any and all other motions

15   filed on behalf of their clients that are applicable to

16   my client with regard to this matter.

17             I would furthermore renew any motions

18   previously made with regard to this case, such as

19   motions for severance, motions for mistrial, based upon

20   the Court's ruling.

21             Thank you.

22             THE COURT:  Mr. Gregorie or Ms. Arango?  Who's

23   responding?

24             MS. ARANGO:  Yes.  I'll respond, Judge.

25             I would also -- I would rely on the

1    Government's previous response to the Rule 29 motions,

2    specifically, our argument on March 5th of 2008 -- in

3    the transcript, it begins at Page 83 and it ends at

4    Page 148 -- citing the cases -- the seminal case of

5    *Glasser versus United States*, 315 US 60 at Page 80,

6    a 1942 case, as well as *United States versus Patton*,

7    226 US 525 at 544, a 1913 case, just basically stating

8    what the standard is, which is that your Honor should

9    view the case in the light most favorable to the

10   Government and any inferences should be made in the

11   light most favorable to the Government.

12          I rely on all of my -- my recitation of the

13   facts and the arguments contained within those pages.

14          I also rely on your Honor's ruling denying the

15   Defendants' motion under Rule 29 on that same date,

16   March 5th, 2008, at Pages 148 through 165.

17          And I would just note that, with respect to --

18   the only changes in this trial that I saw was with

19   respect to the -- in addition to Mr. Young testifying,

20   the element about the Sears Tower being a building used

21   in interstate commerce.

22          In the prior trial, the evidence to that was

23   the evidence about Federal Express having a receptacle

24   there and doing business there.  We introduced that

25   evidence in this case.

 1           In addition, we also introduced evidence that

 2    there was a Post Office there.  That's another --

 3    that's another basis.  And it's a tourist destination.

 4           Those are also additional bases for the

 5    designation of the Sears Tower as being used in

 6    interstate commerce or having a federal agency operate

 7    out of that business -- out of that building.

 8           THE COURT:  Anything further from the

 9    Defendants?

10           MS. JHONES:  Not from Mr. Batiste, your Honor.

11           MR. VEREEN:  No, your Honor.

12           MR. CLARK:  No, your Honor.

13           THE COURT:  I'm going to deny the Rule 29

14    motions as to each of the Defendants.

15           The Court finds that, pursuant to Rule 29(a),

16    that the Government has met its burden and, when

17    viewing the evidence in the light most favorable to the

18    Government, a reasonable jury could find the Defendants

19    guilty beyond a reasonable doubt of all crimes charged

20    in the superseding indictment.

21           The evidence is sufficient to sustain a

22    conviction against each of the Defendants for each of

23    the charges.

24           I specifically adopt my prior rulings in the

25    first and second trial as to specific findings that I

1    made regarding Rule 29, excluding any findings that I

2    made regarding the expert witness, who I believe

3    testified in the first trial, but not in the second

4    trial.

5          I would add that the evidence presented by the

6    expert witness here adds to the evidence, when viewing

7    the evidence in the light most favorable to the

8    Government, that there is a sufficient amount of

9    evidence in this record for a jury to find each and

10   every Defendant guilty of the four counts in the

11   superseding indictment.

12         The Rule 29 motions are denied.

13         MS. JHONES:  Your Honor, may I just inquire

14   just for my clarification purposes?

15         The Court is adopting the rulings in the first

16   trial with respect to the expert witness?

17         THE COURT:  No.  No.  Not the expert witness.

18         MS. JHONES:  I'm sorry.

19         THE COURT:  The expert witness from the first

20   trial did not testify in this trial.

21         MS. JHONES:  Okay.

22         THE COURT:  So I specifically excluded the

23   expert witness from the first trial, who I do not

24   believe testified in the second trial.  He only

25   testified in the first trial.  And I added the evidence

```
 1   by this expert witness --
 2              MS. JHONES:  I understand.
 3              THE COURT:  -- as part of my findings.
 4              So Ms. Jhones wishes to wait.  Correct?
 5              MS. JHONES:  Yes, your Honor, I do.
 6              THE COURT:  And you are ready to go forward?
 7              MR. VEREEN:  My client has decided, your
 8   Honor, he's not testifying.
 9              THE COURT:  Okay.  So let me go through a
10   colloquy with him.
11              MR. VEREEN:  That's fine.
12              THE COURT:  Place him under oath, please.
13              (Whereupon, Defendant Stanley Phanor was duly
14   sworn.)
15              THE COURT:  Would you state your name for the
16   record.
17              DEFENDANT PHANOR:  Stanley Grant Phanor.
18              THE COURT:  And do you understand, Mr. Phanor,
19   that under the Fifth Amendment to the United States
20   Constitution, you cannot be compelled to take the
21   witness stand and testify?
22              DEFENDANT PHANOR:  Yes.
23              THE COURT:  And have you fully discussed your
24   Fifth Amendment rights with your attorney?
25              DEFENDANT PHANOR:  Yes.
```

1          THE COURT:  Do you also understand that, if

2     you wish to, you can waive your Fifth Amendment rights

3     and take the stand and testify?

4          DEFENDANT PHANOR:  Yes.

5          THE COURT:  And you fully discussed that with

6     your attorney as well?

7          DEFENDANT PHANOR:  Yes.

8          THE COURT:  And are you satisfied with your

9     attorney's services?

10          DEFENDANT PHANOR:  Yes.

11          THE COURT:  At this time, sir, do you wish to

12     waive your Fifth Amendment rights or not waive your

13     Fifth Amendment rights?

14          DEFENDANT PHANOR:  Can you repeat that.

15          THE COURT:  Do you wish to take the stand and

16     testify, sir, or not take the stand and testify?

17          DEFENDANT PHANOR:  Not take the stand and

18     testify.

19          THE COURT:  Any questions, Mr. Vereen?

20          MR. VEREEN:  No, your Honor.

21          THE COURT:  Any questions from the Government?

22          MS. ARANGO:  None, Judge.

23          THE COURT:  So are these exhibits in evidence

24     already?

25          MR. VEREEN:  No.  The one that's in evidence

```
 1   is Stanley Phanor No. 2, which is the log -- the
 2   surveillance log.  Actually, it's the initial
 3   surveillance log.
 4           THE COURT:  Okay.  So you are presenting,
 5   then, that one exhibit.  Is that correct?
 6           MR. VEREEN:  Yes, ma'am.
 7           THE COURT:  Do you have additional witnesses
 8   that you're calling?
 9           MR. VEREEN:  No.
10           THE COURT:  Okay.
11           Mr. Houlihan?
12           MR. HOULIHAN:  Judge, like the prior two
13   trials, I've discussed this with Naudimar.  We would
14   not be putting on any evidence, including Naudimar
15   testifying.
16           THE COURT:  Okay.  Place him under oath.
17           (Whereupon, Defendant Naudimar Herrera was
18   duly sworn.)
19           THE COURT:  Would you state your name for the
20   record, sir.
21           DEFENDANT HERRERA:  Naudimar Herrera.
22           THE COURT:  Do you understand, sir, that under
23   the Fifth Amendment to the United States Constitution,
24   you cannot be compelled or forced to take the witness
25   stand and testify?
```

```
1              DEFENDANT HERRERA:  Yes.

2              THE COURT:  Do you also understand that, if

3    you wish to, you can waive your Fifth Amendment rights

4    and take the stand and testify, if you desire to do so?

5              DEFENDANT HERRERA:  Yes.

6              THE COURT:  Have you fully discussed your

7    Fifth Amendment rights with your attorney?

8              DEFENDANT HERRERA:  Yes.

9              THE COURT:  Are you satisfied with his

10   services?

11             DEFENDANT HERRERA:  Yes.

12             THE COURT:  Do you wish to waive your Fifth

13   Amendment rights and testify or do you wish not to

14   testify and not waive your Fifth Amendment right?

15             DEFENDANT HERRERA:  Not waive my Fifth

16   Amendment rights.

17             THE COURT:  Any questions, Mr. Houlihan?

18             MR. HOULIHAN:  No, ma'am.

19             THE COURT:  Ms. Arango or Mr. Gregorie?

20             MS. ARANGO:  I believe he may have misspoken,

21   but I think you should ask him again.  He said, "Not

22   waive my Fifth Amendment rights."

23             THE COURT:  Right.  He doesn't wish to waive

24   his Fifth Amendment rights.

25             MS. ARANGO:  Okay.  Yes.
```

1          THE COURT:  So, Mr. Herrera, you do not wish

2     to testify.  Is that correct?

3          DEFENDANT HERRERA:  That is correct.

4          THE COURT:  Okay.

5          MS. ARANGO:  I apologize, Judge.

6          THE COURT:  That's okay.

7          And you're not presenting any evidence, then,

8     Mr. Houlihan?

9          MR. HOULIHAN:  Correct, ma'am.

10          THE COURT:  Mr. Clark?

11          MR. CLARK:  Yes, your Honor.

12          Mr. Rotschild Augustine is not going to be

13     testifying in this case.  We're not going to be

14     presenting any evidence.

15          THE COURT:  I'm sorry?

16          MR. CLARK:  We're not going to be presenting

17     any evidence.

18          THE COURT:  Place him under oath, please.

19          (Whereupon, Defendant Rotschild Augustine was

20     duly sworn.)

21          THE COURT:  State your name, please, sir.

22          DEFENDANT ROTSCHILD AUGUSTINE:  Rotschild

23     Augustine.

24          THE COURT:  Do you understand, sir, that under

25     the Fifth Amendment to the United States Constitution,

```
 1   you cannot be compelled or forced to take the witness
 2   stand and testify?
 3           DEFENDANT ROTSCHILD AUGUSTINE:  Yes.
 4           THE COURT:  Do you also understand that you
 5   also have the right to waive your Fifth Amendment
 6   rights and take the stand and testify, if you wish to
 7   do so?
 8           DEFENDANT ROTSCHILD AUGUSTINE:  Yes.
 9           THE COURT:  Have you fully discussed your
10   Fifth Amendment rights with your attorney?
11           DEFENDANT ROTSCHILD AUGUSTINE:  Yes.
12           THE COURT:  Are you satisfied with his
13   services?
14           DEFENDANT ROTSCHILD AUGUSTINE:  Yes.
15           THE COURT:  Do you wish to waive your Fifth
16   Amendment right and take the stand and testify or not
17   waive your Fifth Amendment right and not take the stand
18   and testify?
19           DEFENDANT ROTSCHILD AUGUSTINE:  Not waive.
20           THE COURT:  So you do not wish to testify in
21   this case?
22           DEFENDANT ROTSCHILD AUGUSTINE:  No, ma'am.
23           THE COURT:  Okay.  Any questions, Mr. Clark?
24           MR. CLARK:  No questions, your Honor.
25           THE COURT:  Ms. Arango?
```

```
 1              MS. ARANGO:  No questions.

 2              THE COURT:  Mr. Casuso?

 3              MR. CASUSO:  Judge, we're not testifying.

 4    We're not presenting any evidence.

 5              THE COURT:  Place the Defendant under oath.

 6              (Whereupon, Defendant Burson Augustin was duly

 7    sworn.)

 8              THE COURT:  State your name, please, sir.

 9              DEFENDANT BURSON AUGUSTIN:  Burson Augustin.

10              THE COURT:  Mr. Augustin, do you understand

11    that, under the Fifth Amendment to the United States

12    Constitution, you cannot be compelled or forced to take

13    the stand and testify?

14              DEFENDANT BURSON AUGUSTIN:  Yes.

15              THE COURT:  Do you also understand that you

16    can waive your Fifth Amendment rights and take the

17    stand and testify, if you wish to do so?

18              DEFENDANT BURSON AUGUSTIN:  I understand.

19              THE COURT:  Have you fully discussed your

20    Fifth Amendment rights with your attorney?

21              DEFENDANT BURSON AUGUSTIN:  I have.

22              THE COURT:  Are you satisfied with his

23    services?

24              DEFENDANT BURSON AUGUSTIN:  Yes.

25              THE COURT:  Do you wish to waive your Fifth
```

```
 1    Amendment rights and take the stand and testify or not

 2    waive your Fifth Amendment rights and not testify?

 3              DEFENDANT BURSON AUGUSTIN:  I do not wish to

 4    testify.

 5              THE COURT:  Any questions, Mr. Casuso?

 6              MR. CASUSO:  No, Judge.

 7              THE COURT:  Ms. Arango?

 8              MS. ARANGO:  None, Judge.

 9              THE COURT:  Mr. Levin?

10              MR. LEVIN:  Your Honor, at this point we are

11    not in a position to advise the Court as to whether or

12    not Mr. Abraham will or will not testify.

13              I didn't anticipate that we would be getting

14    to me at this point, being the last Defendant in the

15    pecking order.

16              THE COURT:  Do you want to wait until after

17    lunch?

18              MR. LEVIN:  Actually, I need to really wait

19    until after Mr. Batiste presents his case.  And I don't

20    have another witness who's available right now to go

21    forward, other than, if, in fact, my client decides to

22    take the witness stand.  And he has not made that

23    decision as of yet.

24              THE COURT:  How many witnesses are you

25    calling?
```

1          MR. LEVIN:  Some of my witnesses, if the Court

2     recalls, are in common with Ms. Jhones.  Probably three

3     witnesses.

4          I discussed this with the Government yesterday

5     and told them, basically, to just rely on the witness

6     list I provided in the previous trials.  There didn't

7     seem to be a problem with that.

8          THE COURT:  Where are your witnesses?

9          MR. LEVIN:  They're not here at the moment.  I

10    could perhaps try to get them here.  But --

11         THE COURT:  Please.  Over the lunch hour.  Get

12    some witnesses here.

13         MR. LEVIN:  I didn't anticipate, as I

14    indicated, that it would be today.  So I --

15         THE COURT:  Well, the Government indicated

16    that they were resting.  Ms. Jhones indicated that she

17    wanted some time.  And then Mr. Vereen said he was

18    going to go forward.

19         I'm sure you had -- certainly you had the

20    ability to speak with Mr. Vereen as to his decision as

21    to how he was going to go forward and other counsel.

22    You need to have your witnesses here.

23         MR. LEVIN:  Well, candidly, as of last

24    evening, Mr. Vereen's client was testifying.  As of

25    this morning, he was not.  So I went home last night

1    under the impression that Mr. Phanor would be

2    testifying.

3              THE COURT:  Well, see if you can get some

4    witnesses here.  I would like to --

5              MR. LEVIN:  I'll do the best I can.

6              THE COURT:  I want to proceed this afternoon

7    more than just having Mr. Vereen present one

8    transcript.

9              MR. LEVIN:  Yes, ma'am.

10             MR. VEREEN:  Stanley Phanor -- number one,

11   that transcript is not coming into evidence, but it was

12   identified.

13             THE COURT:  It's not coming in?

14             MR. VEREEN:  It's not coming in.

15             THE COURT:  So you're just resting?

16             MR. VEREEN:  Yes.

17             THE COURT:  Okay.

18             Well, see if you can get witnesses here.

19             Otherwise, I'll send them home.

20             And that will be your time off, Ms. Jones.

21   That will be the amount of time that you'll have, is

22   the rest of this afternoon, and to begin tomorrow,

23   either you or Mr. Abraham.  But we're going forward

24   with somebody's witnesses.

25             So if Mr. Levin can have his witnesses this

1    afternoon, we can start with those.  If he can't get

2    his witnesses here, I'll send the jurors home for the

3    afternoon and we'll begin tomorrow morning with the

4    remaining Defendants.

5           We'll have each of the other Defendants rest

6    this afternoon and then you and Mr. Levin will be going

7    forward.  Either one of you will be going forward

8    tomorrow.  But we are going to have court tomorrow and

9    go forward.

10          So this may be your block of time.

11          We're in recess until 1:30.

12          (Thereupon, a luncheon recess was taken, after

13   which the following proceedings were had:)

14          THE COURT:  United States of America versus

15   Narseal Batiste, et al., Case No. 06-20373.

16          Counsel, state your appearances, please, for

17   the record.

18          MR. GREGORIE:  Good afternoon, your Honor.

19          Richard Gregorie and Jacqueline Arango on

20   behalf of the United States.

21          MS. JHONES:  Good afternoon.

22          Ana Jhones on behalf of Narseal Batiste, who's

23   present.

24          MR. LEVIN:  Albert Levin on behalf of Patrick

25   Abraham, who's present.

1          MR. CASUSO:  Lou Casuso on behalf of Burson

2    Augustin, who's present.

3          MR. CLARK:  Nathan Clark on behalf of

4    Rotschild Augustine, who's present.

5          MR. HOULIHAN:  Richard Houlihan with Naudimar

6    Herrera.

7          MR. VEREEN:  Rod Vereen on behalf of Stanley

8    Phanor, who's present.

9          THE COURT:  All Defendants are present.

10          Mr. Levin, do you have witnesses or not?

11          MR. LEVIN:  No, your Honor.

12          I contacted Randy Denike, who would be a

13    witness.  He had an emergency -- or had an emergency

14    dental procedure done.  He'll be here tomorrow morning

15    at 9:00.

16          THE COURT:  Okay.

17          MR. LEVIN:  Again, I'll just remind the Court

18    that, when I left last night, Mr. Phanor was

19    testifying.

20          THE COURT:  I understand.

21          MR. LEVIN:  When I came into court, he was

22    not.

23          THE COURT:  So you're going to be ready --

24    you're going forward tomorrow morning?

25          MS. JHONES:  Based on the Court's ruling.  If

1    the Court says I have to, I have to.  It's a major

2    problem for me.

3             THE COURT:  No.  I'm talking to Mr. Levin.

4             MS. JHONES:  I'm sorry.

5             MR. LEVIN:  Judge, ideally, I wouldn't be

6    calling this man tomorrow, but he's going out of town

7    next Tuesday.  So I have to call him.

8             But I'm not going to be in a position to rest

9    my case.

10            I do have other witnesses that are under

11   subpoena through Ms. Jhones.  Some of our witnesses are

12   common witnesses, you might recall.  So I'll be

13   eliciting their testimony when she calls them as part

14   of my case.

15            And then, with regard to resting my case, I

16   won't be in a position to announce resting until --

17            THE COURT:  You may be seated.

18            MR. LEVIN:  -- my client makes a decision --

19            THE COURT:  So you have witnesses for tomorrow

20   until 3:00?

21            MR. LEVIN:  Me?

22            THE COURT:  Yes.

23            MR. LEVIN:  I have one witness.

24            THE COURT:  You have one witness?

25            MR. LEVIN:  Yes.

1        THE COURT:  What about your other -- that's

2   the only witness you're calling?

3        MR. LEVIN:  No.  I'm calling a second witness,

4   but that witness is in common with Ms. Jhones.

5        I can get him here and have him come back

6   twice, if necessary.  I'll try to get him here for

7   tomorrow at 9:00 as well, which is two witnesses.  And

8   they're very short.

9        THE COURT:  So, then, you're going to be ready

10   to start tomorrow?

11        MR. LEVIN:  With one witness at the very

12   least, possibly two.

13        THE COURT:  Well, do you want to wait to call

14   your witness or do you want to call your witness

15   tomorrow?

16        MR. LEVIN:  I want to call my witness

17   tomorrow.

18        THE COURT:  So, then, you're going to arrange

19   with Ms. Jhones how you're going to proceed?

20        I'm trying to work with you here in terms

21   of -- either you're going forward or she's going

22   forward.  If you need to call a witness out of turn,

23   that's fine.  I'm sure she doesn't have an objection to

24   that.

25        MR. LEVIN:  Right.

1          THE COURT:  So if you want to go forward with

2   your case tomorrow and present your case tomorrow,

3   that's fine.

4          MR. LEVIN:  Well, I want to go forward with

5   this witness, who I need to call out of turn.

6          THE COURT:  And then you're going to be ready

7   with your first witness tomorrow, Ms. Jhones.  Right?

8          MS. JHONES:  Yes, your Honor.

9          THE COURT:  So let's bring the jurors in --

10          MS. JHONES:  Your Honor, I do have a matter,

11   but we could do it after the jury --

12          THE COURT:  So we're going to bring the jury

13   in.

14          And the remainder of the Defendants are going

15   to rest.  Is that correct?  Is that what you want to

16   do?

17          MR. VEREEN:  That is correct, your Honor.

18          THE COURT:  Mr. Houlihan, are you prepared to

19   do that?

20          MR. HOULIHAN:  Yes, ma'am.  That's fine.

21          THE COURT:  Mr. Clark?

22          MR. CLARK:  Yes, your Honor.

23          THE COURT:  Mr. Casuso?

24          MR. CASUSO:  Yes, your Honor.

25          THE COURT:  So let's bring the jurors in and

```
 1    then I'll dismiss them.

 2              (Whereupon, the jury entered the courtroom at

 3    1:59 p.m. and the following proceedings were had:)

 4              THE COURT:  You may be seated.

 5              Mr. Vereen.

 6              MR. VEREEN:  Your Honor, with regard to the

 7    case against Stanley Phanor, the defense rests.

 8              THE COURT:  Mr. Houlihan.

 9              MR. HOULIHAN:  Naudimar Herrera would rest.

10              THE COURT:  Mr. Clark.

11              MR. CLARK:  On behalf of Rotschild Augustine,

12    we rest at this time.

13              THE COURT:  Mr. Casuso.

14              MR. CASUSO:  On behalf of Burson Augustin, we

15    rest.

16              THE COURT:  Ladies and gentlemen, there's some

17    matters that I need to take up with the lawyers outside

18    of your presence.  So you get the afternoon off.  I'm

19    sure you're very unhappy about all of that.

20              So we're going to begin again tomorrow

21    morning, 9:00.

22              Do not discuss this case either amongst

23    yourselves or with anyone else.  Have no contact

24    whatsoever with anyone associated with the trial.  Do

25    not read, listen or see anything touching on this
```

```
 1    matter in any way.

 2              If anyone should try to talk to you about this

 3    case, you should immediately instruct them to stop and

 4    report it to my staff.

 5              You may give your notebooks to the court

 6    security officer.  Everything else may remain at your

 7    chairs.

 8              Enjoy your afternoon and evening.  I'll see

 9    you tomorrow morning, 9:00.

10              Thank you for your patience.

11              (Whereupon, the jury exited the courtroom at

12    2:02 p.m. and the following proceedings were had:)

13              THE COURT:  You may be seated.

14              Yes, Ms. Jhones.

15              MS. JHONES:  Your Honor, I received today a

16    response to my request -- a partial response to my

17    request for surveillance logs that we had not

18    previously received pursuant to the standing discovery

19    order.

20              THE COURT:  This is what we were talking about

21    yesterday.  Correct?

22              MS. JHONES:  Yes.

23              And Agent Stewart was kind enough to give me a

24    stack of surveillance logs.  There's another -- they

25    have to go back to their office in the FBI and
```

1    review -- they believe there are others.

2         I've discussed with the Government -- I asked

3    their assistance in making these witnesses available to

4    me without the need of a subpoena.

5         The Government indicated that they cannot do

6    that, although they are going to call the people --

7    some people are retired.  Some people are still

8    available.  Some people have testified.  A couple of

9    people, I believe, have testified during the

10   Government's.

11        I will address the matter *ex parte* with the

12   Court.

13        But I haven't even reviewed these logs

14   thoroughly.  We're talking about probably 3 inches

15   thick.  There's another stack coming that I haven't

16   even seen yet.

17        But I can tell the Court and I've told the

18   Government that I will be calling some of these agents

19   during my case.

20        And I'd like to make an *ore tenus ex parte*

21   motion because of the Government's position that they

22   require a subpoena.

23        And I need some assistance of the Court in

24   this regard because I'm not going to be able to react

25   to this as quickly as -- I don't have to put these

1    people on this week.  I could do it sometime next week.

2         But I do need the Court's assistance in

3    allowing me to make an *ore tenus* representation to the

4    Court for purposes of issuance of subpoenas under 17(b)

5    for these witnesses and whatever witnesses I'm going to

6    learn about tomorrow when I get the second set of

7    documents on surveillance logs.

8         THE COURT:  Okay.

9         MS. JHONES:  I would like to address that

10   before we leave today so that I can just get that out

11   of the way and, hopefully, again, based on my *ore tenus*

12   request, have the Court issue an emergency order to

13   that effect.

14        THE COURT:  So you want to make an *ore tenus*

15   17(b) *ex parte* motion?

16        MS. JHONES:  Yes.

17        The only reason why I'm addressing this in the

18   presence of the Government is, in fairness to the

19   Government, I want the Court to know what I've

20   discussed with the Government as it relates to the

21   timing of this production.

22        But in terms of the specifics, I can make it

23   *ex parte*.  But I didn't want to do that outside the

24   presence of the Government.

25        THE COURT:  And you're prepared to give me the

1    basis pursuant to 17(b)?

2            MS. JHONES:  Yes.

3            THE COURT:  Okay.  We can do that now.

4            Is there anything further that we need to take

5    up with both sides present?

6            MS. ARANGO:  Oh, Judge, I do want to just

7    state for the record that there were two wiretapped

8    calls that the Government introduced in the whole

9    long -- when we introduced, you know, a large number of

10   wiretapped calls, there were two that we did not intend

11   to introduce.

12           No copies of them were made and put in the

13   jury's binder.

14           I apprise -- I will list them.  One of them is

15   W2-00566 and the other is W2-07798.

16           The one that's W2-07798 is a telephone call

17   between Narseal Batiste and Stanley Phanor.  It was

18   actually introduced -- or played in the first trial by

19   Joel DeFabio on behalf of Lyglenson Lemorin.

20           I have shown that call to Mr. Vereen, and he

21   represents to me that his client wants this call to

22   stay in evidence.

23           I don't have a problem with that.  I just

24   wanted to note it for the record, that there were no

25   copies of that -- of this call made.

```
 1              Now, the other call --

 2              THE COURT:  So you would seek to withdraw

 3    that; but since Mr. Vereen wants that in, you're

 4    leaving that in?

 5              MS. ARANGO:  I'm not going to fight that

 6    battle.

 7              THE COURT:  Okay.

 8              MS. ARANGO:  The other one, though, is

 9    W2-00566.

10              THE COURT:  Okay.

11              MS. ARANGO:  That call is a call between

12    Minerva Vasquez Hernandez and Yamnah -- Sister Yamnah.

13    Her real name is Yamnah Cuba-El.

14              That call is hearsay -- I believe it's

15    hearsay.  It's not -- like I said, it was a mistake in

16    introduction.  We would not have introduced it as an

17    801(d)(2)(E) statement made in furtherance of the

18    conspiracy.  Sister Yamnah is not a co-conspirator --

19    an unindicted co-conspirator.

20              I've shown it to Ms. Jhones.  She hasn't had

21    an opportunity to review it yet.  I don't know what her

22    position is.  She may want to review it before she

23    gives a position.

24              But it is our position that this call should

25    be withdrawn.
```

1          THE COURT:  Okay.

2          MS. JHONES:  Your Honor, with respect to

3    W2-00798, the call that Mr. Vereen has no objection to

4    introducing, I haven't -- I'd like the opportunity to

5    review both.

6          I haven't been able to review either one.  The

7    Government showed them to me.  But, quite frankly, I

8    haven't read them.  I need to study them.

9          If the Court would allow, I could advise the

10   Court as to my position on these -- as it relates to

11   both of these calls tomorrow morning.

12         THE COURT:  Well, 00798 is staying in

13   evidence, as I understand it.

14         MS. JHONES:  Well, Mr. Vereen has no problem

15   with it, but I haven't reviewed it.  I'd like the

16   opportunity to review it.

17         THE COURT:  Well, it's already in.

18         MS. JHONES:  I'm sorry.

19         THE COURT:  It's in.  The Government was going

20   to seek to withdraw it.  But at the request of

21   Mr. Vereen, they're not withdrawing it.

22         MS. JHONES:  I understand that.

23         But I'd like to be -- I'd like to review it to

24   see if I have a position that differs from Mr. Vereen,

25   is what I'm saying.  This applies -- this is a

```
1    conversation that my client is a participant of.

2            So I'm not saying that I'm going to take a

3    position different from Mr. Vereen.  All I'm saying is

4    I'd like an opportunity to read it.  I haven't done

5    that.  I've been reviewing surveillance logs, your

6    Honor.

7            THE COURT:  Okay.

8            MS. ARANGO:  It's 07798.  I just don't want

9    the record to be confused.

10           THE COURT:  W2-07798?

11           MS. ARANGO:  Correct.

12           MS. JHONES:  Yeah.  Because the record did say

13   798, at least in the monitor.

14           Say it again, Ms. Arango, please.

15           MS. ARANGO:  W2-07798.

16           MR. CLARK:  May I inquire of the Court as

17   to -- do we have transcripts of these?

18           MS. ARANGO:  Well, there were transcripts that

19   were provided earlier, and I have one here.

20           MR. CLARK:  Are the transcripts in evidence?

21           MS. ARANGO:  The two files that I'm holding

22   are -- is the only copy that the Government has -- I

23   mean, we have not made copies of it and put them in the

24   binders.

25           MS. JHONES:  I have a question of the
```

```
 1   Government.
 2          In the disclosure of -- I believe it was 12-11
 3   or 12-10, were these transcripts -- do we have copies
 4   of these two transcripts in the December disclosure of
 5   revised transcripts?
 6          MS. ARANGO:  These transcripts were turned
 7   over in discovery.  I don't recall which date.
 8          MS. JHONES:  That's fine.
 9          MS. ARANGO:  But whenever the wiretapped calls
10   were turned over.
11          MS. JHONES:  That's fine.  I'll look for them.
12          THE COURT:  Anything further?
13          MR. GREGORIE:  Your Honor, the only other
14   question is Mr. Abbas al-Saidi.  We need to know
15   whether or not he needs to come from New York.
16          My position is that there is no way that he
17   can be used to put these in evidence because it would
18   be hearsay.
19          You know, if she's asking about the calls in
20   which he states the preamble, the Government will have
21   no problem with that preamble coming in.
22          However, where there are calls in which one of
23   the agents states the preamble, then it's the agent
24   that should be called, not Mr. Abbas al-Saidi.
25          So if those are the only reasons for him to be
```

1    called, the Government sees no reason for him to have

2    to be here.

3            MS. JHONES:   I thought we addressed this

4    yesterday, your Honor, and I said I'd like the witness

5    here in Miami.

6            I told the Court I'm going through every

7    single one of these calls in order to set forth my

8    theory of admissibility, and I have not done that.

9    That is what I'm going to have to begin to do tonight.

10           I need the witness here.  I think that it is

11   unfair for the Government, who has now -- the

12   Government is the one that's changed their position

13   with respect to the admissibility of these calls.  I

14   had no notice of that.

15           And to say to me, "I've changed my position.

16   This is the way it is.  And, by the way, tell me why it

17   is you need this witness" -- they're the ones that are

18   objecting on hearsay grounds.

19           And to assert an 801(c) objection across the

20   board to approximately 60 -- between 60 and 65 calls

21   and expect that I'm going to have a memo of law

22   prepared for that within a 24- or 48-hour period is

23   pretty unrealistic.

24           I think that the Court has granted the 17(b)

25   subpoena.  This person is under subpoena.  My request

 1   is that this witness be brought here.  This is no

 2   different from the issue of copying the binders, you

 3   know, irrespective of whether or not they're going to

 4   be utilized.

 5         I have not in the last however many hours

 6   completed my research on 65 -- minimum 65 calls.

 7         MR. GREGORIE:  And, your Honor, I challenge

 8   that subpoena as being unnecessary.

 9         She can make no proffer to show why that

10   witness is necessary to enter any piece of evidence in

11   evidence in this case.

12         If she's issuing a subpoena, it should be for

13   a good purpose, your Honor.

14         MS. JHONES:  That is --

15         MR. GREGORIE:  And, so far, I haven't heard a

16   good purpose for calling this witness.

17         MS. JHONES:  Your Honor, 17(b), under the

18   circumstances of a criminal indigent defendant, is of

19   no concern to the Government.  Their position need not

20   be heard.  It's the Court that needs to hear it.

21         THE COURT:  Well, I did authorize the issuance

22   of a subpoena for him.

23         When would you intend to call him?

24         MS. JHONES:  Probably Friday.  Probably

25   Friday.

1              MR. GREGORIE:  We'll have him fly down

2      tonight, your Honor.

3              MS. ARANGO:  Who's going to make the

4      arrangements?

5              MR. GREGORIE:  It has to go through the

6      marshals.

7              I guess we'll go through the marshals to get

8      him down here as quickly as possible, your Honor.

9              MS. JHONES:  I believe that Ron Haydee is the

10     person to contact.

11             THE COURT:  So you're going to be calling him

12     on Friday?

13             MS. JHONES:  Your Honor, I don't know if I'm

14     going to get to him on Friday.  I'd like to have him

15     here so that -- available for Friday.

16             THE COURT:  Well, who's your first witness?

17             MS. JHONES:  I don't know, your Honor.  I have

18     no idea who my first witness is.  I will know tomorrow

19     morning.

20             I wasn't expecting to go forward tomorrow

21     morning.  The Court has asked me to.  I will work on it

22     tonight.  I have no idea who my first witness will be.

23             MR. GREGORIE:  Your Honor, last Wednesday I

24     announced to this Court that the Government would rest

25     by Wednesday of this week.

1              I made it clear that we would be done, Judge,

2    by this time.

3              This is not a surprise to defense counsel.

4    We've stated that we were going to be finished.  We

5    finished right on time with what I informed the Court

6    last week.

7              MS. JHONES:  What is a surprise, your Honor,

8    is the Government's position that 65 calls that were

9    not objected to last time are now --

10             THE COURT:  Well, you didn't introduce these

11   65 calls last time, did you?

12             MS. JHONES:  No, your Honor.  I did not

13   introduce 65, but I introduced a great number of them,

14   at least 15, at least, without any problem.

15             This is now -- and the theory of

16   admissibility -- the position the Government has taken,

17   that a statement by Mr. Batiste in these calls are now

18   hearsay, that affects the entire presentation of my

19   case.  It affects the number of hours of work that I

20   need to do.  It affects the legal research that I have

21   to do.

22             And, again, your Honor, I don't think that the

23   Government -- I haven't asked them who they're going to

24   call first, when they're going to call him --

25             THE COURT:  No.  They didn't ask you.  I did.

1          MS. JHONES:  And I'm saying to the Court I'm

2     happy to address that *ex parte*.  But I don't need to

3     tell them, respectfully, who I'm going to call first,

4     why I'm going to call him.

5          And I need Mr. al-Saidi here.  I'm trying to

6     adjust to this new issue raised, along with a 3-inch

7     stack of surveillance logs and I'm going to get another

8     stack tomorrow.

9          I need to react to all of those things.

10         THE COURT:  Make your arrangements to have him

11    come down.

12         MR. GREGORIE:  He will be on his way, your

13    Honor.

14         THE COURT:  So we'll go into an *ex parte*

15    session.

16         The Government is excused.

17         Thank you.

18         (Thereupon, the Government attorneys and

19    related parties retired from the courtroom and the

20    following proceedings were had:)

21         (Proceedings concluded.)

22

23

24

25

1                    C E R T I F I C A T E

2

3          I hereby certify that the foregoing is an

4    accurate transcription of the proceedings in the

5    above-entitled matter.

6

7

8    _____         /s/Lisa Edwards
         DATE              LISA EDWARDS, CRR, RMR
9                          Official United States Court Reporter
                           400 North Miami Avenue, Twelfth Floor
10                         Miami, Florida 33128
                           (305) 523-5499
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25