```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                    CASE NO. 06-20373-CRIMINAL-LENARD
 3

 4     UNITED STATES OF AMERICA,       Miami, Florida

 5                    Plaintiff,       March 26, 2009

 6            vs.                      9:33 a.m. to 4:38 p.m.

 7     NARSEAL BATISTE, et al.,        Volume XXX

 8              Defendants.       Pages 1 to 211
       ----------------------------------------------------------
 9

10                            JURY TRIAL
11           BEFORE THE HONORABLE JOAN A. LENARD,
                    UNITED STATES DISTRICT JUDGE
12

13

14     APPEARANCES:

15

16     FOR THE GOVERNMENT:    RICHARD D. GREGORIE, ESQ., and
                              JACQUELINE M. ARANGO, ESQ.
17                            ASSISTANT UNITED STATES ATTORNEYS
                              99 Northeast Fourth Street
18                            Miami, Florida 33132

19

20     FOR THE DEFENDANT      ANA MARIA JHONES, ESQ.
         NARSEAL BATISTE:     300 Seville Avenue, Suite 210
                              Coral Gables, Florida 33134
21

22     FOR THE DEFENDANT      ALBERT Z. LEVIN, ESQ.
         PATRICK ABRAHAM:     261 Northeast First Street
23                            Sixth Floor
                              Miami, Florida 33132
24

25
```

```
 1    FOR THE DEFENDANT        RODERICK D. VEREEN, ESQ.
        STANLEY PHANOR:        BRINKLEY, HENRYS & LEWIS
 2                             4770 Biscayne Boulevard
                               Suite 1200
 3                             Miami, Florida 33131

 4
      FOR THE DEFENDANT        RICHARD K. HOULIHAN, ESQ.
 5      NAUDIMAR HERRERA:      300 Aragon Avenue
                               Coral Gables, Florida 33134
 6

 7    FOR THE DEFENDANT        LOUIS CASUSO, ESQ.
        BURSON AUGUSTIN:       111 Northeast First Street
 8                             Suite 603
                               Miami, Florida 33132
 9

10    FOR THE DEFENDANT        NATHAN CLARK, ESQ.
       ROTSCHILD AUGUSTINE:    17639 South Dixie Highway
11                             Miami, Florida 33157

12
      REPORTED BY:            LISA EDWARDS, CRR, RMR
13                            Official Court Reporter
                              400 North Miami Avenue
14                            Twelfth Floor
                              Miami, Florida 33128
15                            (305) 523-5499

16

17

18

19

20

21

22

23

24

25
```

1                         I N D E X

2

3                              Direct    Cross    Red.

4

5    WITNESSES FOR THE DEFENDANTS:

6

7    Randy Denike                   7       15       15

8    Dr. Charles B. Shelton        17       39       51
                                            45
9                                           49

10   Teresa LeFlore                54       66       70

11   Michael Sharpe                74       86

12   Eleanor Parker                88

13   Enoch Vilbrun                 93      107
                                          108
14
     Judith Stanley               112
15
     Xavier Smith                 118      129
16
     Lisa Lamey                   132      165      168
17                                         167

18   Elsie Hamler                 171      195      199
                                          198
19
     Una Mae Edwards              200      207
20                                         208

21

22

23

24

25

1    <u>EXHIBITS RECEIVED IN EVIDENCE:</u>                    <u>PAGE</u>

2

     Defendant Batiste's Exhibit Nos. 39
3      through 48                                              95
     Defendant Batiste's Exhibit No. 72                     114
4    Defendant Batiste's Exhibit Nos. B-1
       through B-10 & B-12 through B-54                       134
5    Defendant Batiste's Exhibit No. 16                     142
     Defendant Batiste's Exhibit Nos. 4, 5, 8,
6      13, 14 & 59                                            147
     Defendant Batiste's Exhibit No. 7                      149
7    Defendant Batiste's Exhibit Nos. 17, 18,
       20, 57 & 61                                            150
8    Defendant Batiste's Exhibit Nos. 1, 6,
       9 & 12                                                 120
9    Defendant Batiste's Exhibit No. 15                     152
     Defendant Batiste's Exhibit Nos. 2, 10,
10     60, 62, 58, 70, 69, 68, 67 & 66                        152
     Defendant Batiste's Exhibit No. 51                     155
11   Defendant Batiste's Exhibit No. 65                     161
     Defendant Batiste's Exhibit No. 74                     163
12   Defendant Batiste's Exhibit No. 75                     165
     Defendant Batiste's Exhibit Nos. 76-A
13     through 76-D                                           180

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Good morning.

 2              United States of America versus Narseal

 3    Batiste, et al., Case No. 06-20373.

 4              Counsel, state your appearances, please, for

 5    the record.

 6              MR. GREGORIE:  Good morning, your Honor.

 7              Richard Gregorie and Jacqueline Arango on

 8    behalf of the United States.

 9              MS. JHONES:  Good morning, your Honor.

10              Ana Maria Jhones on behalf of Narseal Batiste,

11    who's present, along with Bernadette Armand.

12              MR. LEVIN:  Your Honor, good morning.

13              Albert Levin on behalf of Patrick Abraham, who

14    is present.

15              MR. CASUSO:  Good morning, your Honor.

16              Lou Casuso on behalf of Burson Augustin, who

17    is present.

18              MR. CLARK:  Good morning, your Honor.

19              Nathan Clark on behalf of Rotschild Augustine,

20    who's present.

21              MR. HOULIHAN:  Richard Houlihan on behalf of

22    Naudimar Herrera.

23              MR. VEREEN:  Good morning, Judge.

24              Roderick Vereen on behalf of Stanley Phanor,

25    who's present.
```

```
1              THE COURT:  Good morning to everyone.

2              All Defendants are present.

3              The jurors are here.

4              Mr. Levin, you have your witness?

5              MR. LEVIN:  I do.

6              THE COURT:  So let's proceed.

7              (Whereupon, the jury entered the courtroom at

8      9:34 a.m. and the following proceedings were had:)

9              THE COURT:  You may be seated.

10             Good morning, ladies and gentlemen.

11             THE JURY:  Good morning.

12             THE COURT:  Mr. Levin, you have a witness

13     you're calling out of turn?

14             MR. LEVIN:  Yes, your Honor.

15             May it please the Court, at this time -- good

16     morning, ladies and gentlemen --

17             THE JURY:  Good morning.

18             MR. LEVIN:  -- Patrick Abraham would call

19     Randy Denike to the witness stand.

20     Thereupon--

21                        RANDY DENIKE

22     was called as a witness by the Defendant and, having

23     been first duly sworn, testified as follows:

24             THE COURTROOM DEPUTY:  You may be seated and

25     sit as close to the microphone as you can.
```

Denike - DIRECT - By Mr. Levin

```
 1              State your full name and give a spelling of

 2    the last name.

 3              THE WITNESS:  Randy Denike, D-e-n-i-k-e.

 4                       DIRECT EXAMINATION

 5    BY MR. LEVIN:

 6    Q.     Mr. Denike, good morning.

 7              Can you please tell the ladies and gentlemen of

 8    the jury a little bit about yourself, who you are.

 9    A.     I'm a state-licensed building contractor.

10    Q.     And what is the name of your company, sir?

11    A.     Denike Construction Company.

12    Q.     How long has Denike Construction Company been in

13    existence?

14    A.     25 years.

15    Q.     What is generally -- what generally does Denike

16    Construction Company build?

17    A.     We do residential and commercial.  We do

18    residential homes, additions, renovations.

19    Commercially, we build restaurants and do tenant

20    buildouts, build shopping centers.

21    Q.     How long have you been in business?

22    A.     25 years.

23    Q.     Do you know an individual named Patrick Abraham?

24    A.     Yes.

25    Q.     I'm going to ask you, sir, to look around the
```

Denike - DIRECT - By Mr. Levin                    8

 1    court and tell me whether or not you recognize or see

 2    Mr. Abraham in this courtroom.

 3    A.     Yes, I do.

 4    Q.     And can you point in the general direction and

 5    perhaps describe an article of clothing.

 6           Is that Mr. Abraham that just stood up?

 7    A.     Yes.

 8    Q.     Now, what are the circumstances under which you

 9    met Mr. Abraham?

10    A.     We were doing a 55-unit condominium conversion

11    and he came on the jobsite to solicit business for

12    doing the stucco work.

13    Q.     Now, you talk about doing a condo conversion.

14           First of all, tell the ladies and gentlemen of

15    the jury which condominium we're talking about.

16    A.     It's the Grove at Wilton Manors.  It was three

17    buildings, two stories, 55 units, apartments that were

18    converted to condominiums.

19    Q.     And Wilton Manors is in Broward County?

20    A.     Correct.

21    Q.     Primarily, where do you do business, sir?

22    A.     Primarily, Broward County, but we do Dade,

23    Broward and Palm Beach.

24    Q.     Now, this condominium conversion:  You indicated

25    that he came onto the jobsite.

```
 1          Can you describe exactly the circumstances under

 2   which you met Mr. Abraham.

 3   A.     He came on the jobsite and asked to speak to

 4   whoever was in charge regarding giving an estimate for

 5   the stucco.

 6   Q.     And after you spoke with him, did you give him

 7   the job?

 8   A.     We tried him because we hadn't done work with him

 9   before.  We let him do the first building.

10   Q.     You said you had not done work with him before?

11   A.     Correct.

12   Q.     So you gave him an opportunity?

13   A.     Yes.

14   Q.     Go ahead.  You said you -- you were going to --

15   A.     We let him do the first building.  Then he did

16   that, completed the first building.  He did a good job.

17   So we let him do the other two buildings.

18   Q.     You were satisfied with the work that he did?

19   A.     Yes.

20   Q.     Can you tell the ladies and gentlemen of the jury

21   what stucco work involves or what exactly it is.

22   A.     It's a masonry coating, usually over, you know,

23   block building or wood building with wire lathe.  It's

24   what you see on the outside of the building.  It

25   usually has a texture or it can be smooth.
```

Denike - DIRECT - By Mr. Levin                    10

```
 1          We basically were redoing the building.  So it
 2   was to freshen it up.  He stuccoed the three two-story
 3   buildings, all the exterior columns, you know, a
 4   monument sign up out front.
 5   Q.    Did you continue to use Mr. Abraham for other
 6   projects that you were involved in?
 7   A.    Yes.
 8   Q.    Approximately what year did he do work for you
 9   with regard to the property that -- what was the name
10   of that property again?
11   A.    The Grove at Wilton Manors.
12   Q.    Right.
13         Approximately what year was that?
14   A.    Mid-2004.
15   Q.    And he continued to do work for you?
16   A.    Yes.  For about two years.
17   Q.    Into 2006?
18   A.    Correct.
19   Q.    And were you satisfied with the services that he
20   performed in all the work that he did for you?
21   A.    Yes.
22   Q.    If he were hirable to do work today, would you
23   hire him to do more work?
24   A.    Yes.
25   Q.    Now, let me ask you this, sir:  In addition to
```

Denike - DIRECT - By Mr. Levin                    11

1    this condominium conversion, did he also do work on

2    homes?

3    A.     Yes.

4    Q.     And did he ever do any work for you or any member

5    of your family?

6    A.     Yes.  He did my stepdaughter's home.

7    Q.     With regard to your stepdaughter's home, was he

8    allowed access to your stepdaughter's home?

9    A.     Yes.

10   Q.     Was he allowed to be in your stepdaughter's home

11   when no one else was there?

12   A.     I don't recall if he was, but he would have been

13   allowed to.  Yes.

14   Q.     Now, did there come a point in time when you came

15   into contact with Mr. Abraham when he read a Bible to

16   you?

17   A.     Yes.

18   Q.     And can you tell the ladies and gentlemen of the

19   jury a little bit about that.

20   A.     He came to my office to either submit an invoice

21   or an estimate or pick up payment.  And he said he

22   wanted to read me something --

23          MR. GREGORIE:  Objection, your Honor.

24   Hearsay.

25          THE COURT:  Sustained.

Denike - DIRECT - By Mr. Levin                    12

```
 1    BY MR. LEVIN:
 2    Q.    Without telling us what he said to you, did he
 3    come into your office and read a passage from a Bible?
 4    A.    Yes.
 5    Q.    And at that time, did he try to convert you to
 6    any religion or anything like that?
 7    A.    No.
 8    Q.    Now, at any time, sir, did you ever write any
 9    letter of recommendation on behalf of Mr. Abraham?
10    A.    Yes.
11    Q.    Do you recall -- let -- can I show you what I've
12    marked as Abraham's Exhibit 5 for it identification at
13    this point?  Let me show you what I've marked as --
14              MR. LEVIN:  If I may approach, your Honor.
15              THE COURT:  Yes.
16    BY MR. LEVIN:
17    Q.    Abraham's Exhibit 5.  I'll ask you to take a look
18    at this and tell me if you recognize this document,
19    sir.
20    A.    Yes.
21    Q.    And can you tell the ladies and gentlemen of the
22    jury what that is I've just handed you.
23              MR. GREGORIE:  Objection, your Honor.  It's
24    hearsay.
25              THE COURT:  Come on up.
```

```
 1              (Whereupon, proceedings were had at side-bar

 2     outside the presence of the jury which have been sealed

 3     per instructions of the Court.)

 4              (Whereupon, the following proceedings were had

 5     in open court:)

 6     BY MR. LEVIN:

 7     Q.    You recall, sir, writing a letter for

 8     Mr. Abraham; do you not?

 9     A.    Yes.

10     Q.    Do you recall what the letter said?

11              MR. GREGORIE:  Objection, your Honor.

12              THE COURT:  Sustained.

13     BY MR. LEVIN:

14     Q.    Did you write a letter recommending

15     Mr. Abraham --

16     A.    Yes.

17     Q.    -- to others to work stucco?

18     A.    Yes.

19     Q.    Okay.  Do you recall the date that you wrote a

20     letter on his behalf?

21     A.    I believe it was about a year after we first

22     started doing business.

23     Q.    You don't recall the exact date?

24     A.    No.

25     Q.    If I showed you something, might that refresh
```

Denike - DIRECT - By Mr. Levin                    14

```
 1   your recollection?

 2   A.    Yes.

 3         MR. LEVIN:  Same exhibit.

 4         MR. GREGORIE:  Yes.

 5         THE WITNESS:  July 21st, 2004.

 6   BY MR. LEVIN:

 7   Q.    That was written on your company letterhead?

 8   A.    Yes.

 9   Q.    You signed the letter?

10   A.    Yes.

11         MR. LEVIN:  I have nothing further.

12         Thank you very much.

13         THE COURT:  Ms. Jhones?

14         MS. JHONES:  I don't have any questions, your

15   Honor.

16         THE COURT:  Mr. Vereen?

17         MR. VEREEN:  No questions, Judge.

18         THE COURT:  Mr. Houlihan?

19         MR. HOULIHAN:  No questions.

20         THE COURT:  Mr. Clark?

21         MR. CLARK:  No questions, your Honor.

22         THE COURT:  Mr. Casuso?

23         MR. CASUSO:  No questions, your Honor.

24         THE COURT:  Mr. Gregorie?

25
```

```
 1                        CROSS-EXAMINATION

 2   BY MR. GREGORIE:

 3   Q.     Sir, did you spend nights and weekends with

 4   Mr. Abraham?

 5   A.     No.

 6   Q.     Did you spend social time with him?

 7   A.     No.

 8   Q.     Do you know what he did on his nights and

 9   weekends and when he wasn't working?

10   A.     No.

11          MR. GREGORIE:  No further questions.

12          THE COURT:  Mr. Levin?

13                      REDIRECT EXAMINATION

14   BY MR. LEVIN:

15   Q.     You maintained -- if I may ask from here?

16          THE COURT:  Sure.

17   BY MR. LEVIN:

18   Q.     You maintained a business relationship with this

19   person over a two-year period of time?

20   A.     Yes.

21   Q.     Into 2006?

22   A.     Correct.

23   Q.     Do you recall when into 2006?

24   A.     Mid-2006.  I don't recall when.

25   Q.     May, June of 2006, or prior to that?
```

```
 1   A.     Yes.

 2   Q.     Thank you, sir.

 3          MR. LEVIN:  No further questions.

 4          THE COURT:  You may step down, sir.

 5          (Witness excused.)

 6          THE COURT:  Is that the only witness you're

 7   calling today, Mr. Levin?

 8          MR. LEVIN:  Today, your Honor, yes.  Thank

 9   you.

10          THE COURT:  Ms. Jhones, call your first

11   witness.

12          MS. JHONES:  Mr. Batiste calls Charles

13   Sheldon.

14          If I may step out to -- actually, I think

15   Mr. Vereen is assisting.

16   Thereupon--

17                    DR. CHARLES B. SHELTON

18   was called as a witness by the Defendant and, having

19   been first duly sworn, testified as follows:

20          THE COURTROOM DEPUTY:  You may be seated.  Sit

21   as close to the mic as you can.

22          State your full name and spell the last name

23   for the record.

24          THE WITNESS:  My name is Dr. Charles B.

25   Shelton, Jr.
```

```
 1              THE COURT REPORTER:  Shelton?

 2              THE WITNESS:  Shelton, t-o-n.

 3              MS. JHONES:  May I proceed, your Honor?

 4              THE COURT:  Yes.

 5              MS. JHONES:  Thank you.

 6                      DIRECT EXAMINATION

 7    BY MS. JHONES:

 8    Q.    Good morning, Dr. Shelton.

 9    A.    Good morning.

10    Q.    Would you please tell us where you reside.

11    A.    I reside in Mansfield, Texas, about 25 miles

12    south of Arlington, Texas.

13    Q.    Okay, sir.  And, sir, what is the extent of your

14    educational background?

15    A.    I received my BA degree from Houston Tillison

16    University in Austin, Texas, in '68.

17          I received my master's of education from Sam

18    Houston State in '69.

19          I received a master's of arts and counseling from

20    Governors State in '83.

21          I received a master's of arts from Chicago State

22    in '79.

23          I received a doctorate degree from Illinois State

24    University in '97.

25    Q.    Is that all, sir?  Just kidding.
```

  1   A.      Yes, it is.

  2   Q.      Dr. Shelton, where did you live -- oh, I'm sorry.

  3           Are you a member of any civic or religious

  4   organizations?

  5   A.      I'm a member of Kappa Alpha Psi Fraternity.  I'm

  6   acting as the vice president, called vice polemarch,

  7   currently in Mansfield, Texas.  I'm an alumni of it.

  8           I'm a member of Prince Hall Masons.  I'm a member

  9   of the Church of Christ of Mansfield.  I'm a member of

 10   the Democratic Party.  I was a delegate to the Austin

 11   convention, state convention, for the recent election.

 12           And that's about it.

 13   Q.      Dr. Shelton, let me ask you a few questions about

 14   your membership in the Masons.

 15   A.      Yes.

 16   Q.      Are you familiar with any emblems that are worn

 17   by the Masons?

 18   A.      Yes, I am.

 19   Q.      Would you please tell us, how is it that you are

 20   familiar with them and what are the emblems that you're

 21   familiar with?

 22   A.      We have an emblem that -- when we go through the

 23   process of becoming affiliated with that organization

 24   that we're all familiar with, and this is something

 25   that is part of the fraternal organization.  When I see

```
 1   it, I recognize it.
 2   Q.    Okay.  And have you ever -- well, first of all,
 3   do you know a gentleman by the name of Narseal Batiste?
 4   A.    Yes, I do.
 5   Q.    And could you please look around the courtroom
 6   and see if you could identify him.
 7   A.    Yes (indicating).
 8   Q.    Dr. Shelton, could you please tell us what he's
 9   wearing.
10   A.    Pardon me?
11   Q.    Could you just describe an article of his
12   clothes.
13   A.    Mr. Batiste's clothing?
14   Q.    Yes, please.
15   A.    A white tie, blue shirt, black suit.
16   Q.    Thank you, sir.
17         And, sir, during the time period that you have
18   known Mr. Batiste, did you ever see him in possession
19   or exhibit any Masonic emblems?
20   A.    Yes.  He manifested an emblem on his clothing
21   attire when he visited my home back in 2000 with his
22   family.
23   Q.    Okay.  And do you remember what the circumstances
24   were when Mr. Batiste visited your family on that
25   occasion?
```

1   A.      Every year, he would bring his wife and his

2   children to visit.  I was the godfather of his eldest

3   son.  We would have -- my wife and I would go out and

4   buy gifts for the children.

5         He would bring them by; and they were always

6   neatly attired and very disciplined.  They didn't tear

7   up the house.  I loved that.

8         And this was a yearly thing, he would bring the

9   children by.

10  Q.      And, sir, could you tell us the name of the

11  godchild -- the child that you became a godfather to.

12  A.      Giovanni Batiste.

13  Q.      And could you also tell us the names of

14  Mr. Batiste's other children.

15  A.      I think there was Nicholas, Narcassia and, of

16  course, Giovanni.  The last child was Prince.

17  Q.      And do you recall, sir, what year Prince was

18  born?

19  A.      I think around -- if I'm not mistaken, 2001,

20  around that time.  I'm not exactly sure.

21  Q.      Okay.

22  A.      I think it's around that time.

23  Q.      And, Dr. Shelton, would you give us just a

24  general overview of the principles of Masonry.

25  A.      One of the things is that you're expected to be a

Shelton - DIRECT - By Ms. Jhones                    21

```
 1    strong believer in the faith, in God.  You are

 2    basically an upright man.

 3         You're a free individual and you're able to

 4    control your passions and you manifest a strong civic

 5    concern for humanity, relatives and outside people, to

 6    help.

 7    Q.    Okay, sir.  Now, let me ask you a few questions

 8    about the areas that you have lived in.

 9         You testified that you are presently residing in

10    Mansfield, Texas.  Correct?

11    A.    Correct.

12    Q.    Prior to Mansfield, Texas, sir, where did you

13    reside?

14    A.    I resided in the Chicago area, in a community

15    known as Homewood, Illinois.

16    Q.    And how long did you live in the Homewood,

17    Illinois, area?

18    A.    Let me just clarify one point.

19         I was born in Chicago, attended school -- public

20    school and high school, went to Texas and went to

21    college -- attended college, came back and moved to

22    Homewood from Harvey, where I originally grew up as a

23    child, about 10 miles away from Homewood, and I resided

24    there about 35 years.

25    Q.    Okay, sir.  And did you own a home in the
```

Shelton - DIRECT - By Ms. Jhones

```
 1   Homewood, Illinois, area?

 2   A.     Yes, I did.

 3   Q.     What is your marital status, sir?

 4   A.     I'm married.

 5   Q.     And how long have you been married?

 6   A.     Since 1970.

 7   Q.     And do you have any children?

 8   A.     Yes.  I have a son, Charles, II -- excuse me --

 9   Charles, III, and a grandson, Charles, IV.

10   Q.     And Dr. Shelton, does your son know Narseal

11   Batiste?

12   A.     Yes.  He knows Narseal very well.

13   Q.     Okay.  And, sir, are you currently -- well,

14   what -- when did you move out of the Homewood,

15   Illinois, area?

16   A.     I moved out of Homewood in 2003.  And my wife had

17   always -- she's from Texas.  She always wanted to come

18   back home.

19          So we retired back into Texas in the Dallas area,

20   which it's about 20 miles south of Dallas -- 25 miles

21   south of Dallas, where I live, and about 20 miles south

22   of Arlington.

23          Those are the two principal cities in the

24   location -- really, between Fort Worth, Texas, and

25   Dallas, Texas, is where I reside.
```

```
 1   Q.     Okay.  And are you currently employed?
 2   A.     Yes.  I -- even though I retired after 34 years
 3   of teaching at the secondary level and 15 years at the
 4   community college level in the evening, I currently am
 5   employed in Dallas, Texas, at the college district --
 6   community college district system.
 7   Q.     And how long have you been employed in the
 8   community college in the Mansfield area, Texas area?
 9   A.     In Dallas --
10          MR. GREGORIE:  Objection.  Relevance.
11          THE COURT:  Sustained.
12   BY MS. JHONES:
13   Q.     Tell us about the year that you met Mr. Batiste.
14   A.     Pardon me?
15   Q.     When did you meet Mr. Batiste?
16   A.     I met Mr. Batiste at the time he was a junior,
17   going on to his senior year, in high school, Richards
18   High School in Oak Lawn, Illinois.
19   Q.     And at that time period, what was your
20   relationship to Mr. Batiste?
21   A.     Teacher-pupil.
22   Q.     What grades did you teach -- well, what was the
23   name of the school that you taught at?
24   A.     Harold L. Richards High School.
25   Q.     And do you have any knowledge, sir, of what
```

```
 1    school Mr. Batiste attended prior to Harold Richards?

 2    A.    I believe he went to Brother Rice, a Catholic --

 3    parochial school.

 4    Q.    And how familiar -- well, first of all, tell us

 5    in what area was -- or is Harold Richards still around?

 6              MR. GREGORIE:  Objection, your Honor.

 7    Relevance.

 8              MS. JHONES:  Your Honor --

 9              THE COURT:  Sustained.

10    BY MS. JHONES:

11    Q.    How familiar were you, sir, with the student

12    population at Harold Richards when you knew

13    Mr. Batiste?

14              MR. GREGORIE:  Objection, your Honor.

15    Relevance.

16              MS. JHONES:  Your Honor --

17              THE COURT:  Come on up.

18              (Whereupon, proceedings were had at side-bar

19    outside the presence of the jury which have been sealed

20    per instructions of the Court.)

21              (Whereupon, the following proceedings were had

22    in open court:)

23              MS. JHONES:  May I proceed, your Honor?

24              THE COURT:  Yes.

25              MS. JHONES:  Thank you.
```

```
 1   BY MS. JHONES:

 2   Q.    Doctor, would you please tell us, from what time

 3   periods did you teach at Howard Richards?

 4   A.    I taught from 1970 to 19 -- to 2003.

 5   Q.    And what grades did you teach at Harold Richards?

 6   A.    11th and 12th.

 7   Q.    Sir, is it fair to say that you resided in the

 8   Chicago area during that time period that you taught?

 9   A.    Correct.

10   Q.    Did you teach at any other schools besides Harold

11   Richards?

12   A.    I taught one year at a middle school, DuBois

13   Elementary School, in Chicago.

14   Q.    Going back to Harold Richards, sir, how familiar

15   were you with the student population in that

16   institution?

17   A.    The student population constituted of about

18   80 percent Caucasian, number of students, 10 percent

19   black, and the rest would be other, Hispanic, Indian

20   and such, Middle Eastern population.

21   Q.    Demographically speaking, what kind of school was

22   Harold Richards?

23   A.    It was a middle class, blue collar type of

24   institution.  It focused on athletics.

25   Q.    And would Harold Richards be considered an inner
```

1    city school?

2    A.    No.  It was a -- basically, a middle-class,

3    suburban school.

4    Q.    And during the 1990s -- late '80s and early '90s,

5    was it in that same category?

6    A.    Correct.

7    Q.    Okay.  Whereabouts, sir, in -- well, where

8    exactly was Harold Richards located?

9    A.    It's located in Oak Lawn, Illinois, bordering the

10   main street of Cicero and Western Avenue.  It's in

11   between that area, heading further south, southerly

12   direction, about three blocks south of those areas.

13   Q.    What, if any, gang presence, Dr. Shelton, was

14   there at Harold Richards?

15   A.    The gang presence, from my recollection, was very

16   minimal.

17        What you had was a feeding from the various

18   elementary or middle schools where you had what we

19   might call gang wannabes.  But there wasn't really a

20   substantiated gang presence, because the school

21   administration had a zero tolerance for gangs.

22        So that was a nonexisting variable, you might

23   say.  People who were into signing or wearing

24   paraphernalia would be automatically ousted from the

25   school.

1    Q.    Those students that you just referred to, sir:

2    Was Mr. Batiste considered to be one of those students?

3    A.    No.

4          MR. GREGORIE:  Objection, your Honor.  Calls

5    for speculation.

6          THE WITNESS:  He wasn't.

7          MR. GREGORIE:  And it would be hearsay.

8    BY MS. JHONES:

9    Q.    Do you know --

10          THE COURT:  Rephrase your question.

11          MS. JHONES:  Sure.

12   BY MS. JHONES:

13   Q.    Do you have any knowledge, sir, as to whether or

14   not Mr. Batiste was the type of person that you have

15   just described?

16   A.    Mr. Batiste would be perceived, from my

17   observation, as a nerd.  The gangs would probably be

18   repulsed at the fact of being -- identifying with him.

19   Q.    Okay.  How would you describe him as a student,

20   sir?

21   A.    He was a student with a C average, but had the

22   capability of being a B-plus student.

23   Q.    Did you ever observe the nerd -- just kidding.

24          Did you ever Mr. Batiste associate with any of

25   these gang wannabes?

```
 1   A.      No.

 2   Q.      Did he ever express any interest to you in

 3   having -- did he ever express any interest in

 4   associating with those type of people?

 5   A.      No.

 6   Q.      How -- what type of person -- or what type of

 7   qualities did you observe in Mr. Batiste during the

 8   time period that he was your student?

 9   A.      The thing that sticks out in my mind is that, as

10   a student, Mr. Batiste developed a passion -- a strong

11   passion for wanting to learn.

12           Mr. Batiste sort of impressed me with the fact

13   that he exhibited altruism.  He was very concerned with

14   others, community involvements and law enforcement.  He

15   supported that.

16           I think, on the record, he has a number of

17   brothers that are in law enforcement.  So he in his own

18   right wanted to have this type of mindset.  He stressed

19   those types of values.

20   Q.      Dr. Shelton, are you familiar with -- well,

21   before I get to that question, how would Mr. Batiste

22   normally dress when he attend Harold Richards?

23   A.      He was dressed very neat and very clean.  And I

24   think the thing that stood out is that, at the time,

25   you had young men going into the mode of what we call
```

```
 1    sagging.  Mr. Batiste didn't do that with his trousers.

 2         He had a belt on.  His clothes were clean and

 3    starched.  And he was on target in terms of being the

 4    model of an ideal student in that respect, in his

 5    attire and appearance.

 6    Q.    Okay.  And were you aware, sir, of any community

 7    activities that Mr. Batiste, while in high school,

 8    participated in?

 9    A.    I know one of the things that --

10         MR. GREGORIE:  Objection, your Honor.

11    Relevance and....

12         THE COURT:  Sustained.

13    BY MS. JHONES:

14    Q.    You've made a reference to his altruistic nature.

15    A.    What -- go ahead.

16    Q.    What, if any -- what did you observe, if

17    anything, that was consistent with that

18    characterization?

19    A.    Mr. Batiste was a member of the Guardian Angels,

20    an organization out of New York started by Curtis Sliwa

21    and its concern was to help --

22         THE COURT REPORTER:  Could you repeat the last

23    name, please.

24         THE WITNESS:  Sliwa.  I think it's S-i-w-a

25    (verbatim).
```

1            THE COURT REPORTER:  Thank you.

2            THE WITNESS:  And he was the founder of this

3    organization in New York City.  They would go into

4    difficult neighborhoods, protect elderly people,

5    children, women alone and walk the subways and streets

6    of dangerous areas of New York.

7            Mr. Sliwa came to Chicago, started a chapter

8    on the north side of Chicago.  Mr. Batiste was a member

9    of that organization.

10            I took my hat off to him because I felt you

11    didn't run into high school students willing to make

12    that type of commitment to protect communities from the

13    criminal element.

14   BY MS. JHONES:

15   Q.    Dr. Shelton, did you personally meet any of the

16   members of the Guardian Angels that Mr. Batiste --

17   A.    Yes, I did.  At one incident, we were on the

18   north side and there was some difficulty with a

19   vehicle.  And Mr. Batiste called a number of these

20   Guardian Angels.

21            They showed up on the scene and willingly

22   assisted.  I was impressed.  They had their regular

23   paraphernalia on and they were committed.

24            And I said, "Hey, this is the real deal.  He is a

25   member of this organization."

Shelton - DIRECT - By Ms. Jhones                    31

```
 1   Q.    When you say their "paraphernalia," what are you
 2   referring to?
 3   A.    I believe they had a red beret and they had an
 4   emblem which -- a guardian angel on their jacket or
 5   shirt.
 6   Q.    Okay.  Do you have any knowledge, sir, as to how
 7   long Mr. Batiste was a member of this organization?
 8   A.    From my recollection, knowing Mr. Batiste, it's
 9   his junior and senior year.
10   Q.    I'm sorry?
11   A.    Junior and senior year of high school.
12   Q.    Okay.  Besides Mr. Batiste's children, do you
13   know any other family members?
14   A.    Yes.  I knew Mr. Batiste's sister, Frances; his
15   brother, Siltwan; brother, Carlton; another brother,
16   Maxwell; and a brother, Curtis.
17   Q.    Did you know his parents?
18   A.    I knew his parents, Mr. and Mrs. Batiste.  I'd
19   been to their home.
20   Q.    And how about your wife, sir?  Did your wife know
21   the Batiste family as well?
22   A.    My wife did --
23           MR. GREGORIE:  Objection, your Honor.
24   Relevance.
25           THE WITNESS:  -- know them.  And my son as
```

```
 1    well.

 2              THE COURT:  Sir, if there's an objection, you

 3    need to wait until I've ruled on it.

 4              THE WITNESS:  No problem.

 5              THE COURT:  Sustained.

 6    BY MS. JHONES:

 7    Q.    Sir, after high school, did your relationship

 8    with Mr. Batiste continue?

 9    A.    Yes.

10    Q.    And going back to -- concentrating on the time

11    period that he was in high school, did you have any

12    discussions with Mr. Batiste regarding politics or

13    Government?

14    A.    At the time, I would focus on a concept of

15    government in our country.  I indicated to Mr. Batiste,

16    as well as his peer -- classmates, that we have a

17    government that strives to improve itself and perfect a

18    perfect government.

19          I indicated that such things -- to correct wrongs

20    in our society, such as poor legislation and the

21    reversal of court cases, such as the Brown decision and

22    such, impact on America's effort to bring about change

23    in a positive way, where you have courts introducing

24    new legislation to reverse past discriminatory

25    practices.
```

 1          I also indicated to the class that Mr. Batiste
 2   was in that, during the Nixon administration, you had
 3   almost a constitutional crises in which President --
 4   Late President Nixon sort of defied the court, which
 5   put us in a dilemma where you had a conflict of the
 6   three branches because they refused to turn over X
 7   number of tapes.
 8          My key thing was to express to these young
 9   students that our Government has a tendency to practice
10   good government, to form a more perfect union, and we
11   go through this process of striving to do this as -- to
12   be good citizens and make our Government work.  It's
13   very flexible, our Constitution, and that's a very good
14   thing.
15   Q.    And, Dr. Shelton, did you have -- did you have
16   any discussions with Mr. Batiste outside of the class
17   regarding government or politics?
18   A.    No.
19   Q.    Now, sir, are you familiar with an individual by
20   the name of Jeff Fort?
21   A.    Yes.
22   Q.    How are you familiar with this individual?
23   A.    One of the interesting things about Mr. Fort was
24   that he had developed leadership of a street gang known
25   as the P. Stone Rangers.

1          They were founded on the south side of Chicago on

2     the street of Blackstone around the '60s -- 1960s, I

3     guess you could say.

4          And they were engaged in what we call some type

5     of pseudo-community activism, but it turned to

6     extortion, prostitution, drug dealing later.

7          Mr. Fort and his group, called the Black P. Stone

8     Rangers, were financed by a wealthy Caucasian

9     philanthropic individual by the name of W. Clement

10    Stone.  I believe that's how they got the name

11    Black P. Stone.

12          MR. GREGORIE:  Objection, your Honor.  This is

13    hearsay.

14          THE COURT:  Sustained.

15    BY MS. JHONES:

16    Q.    Let me ask you this, Dr. Shelton:  Did you

17    personally attend any gatherings involving the P. Stone

18    Nation?

19    A.    In Chicago, you had a yearly parade called the

20    Bud Billiken Parade.  It was a black parade on the

21    south side of Chicago.

22          In Chicago -- it's a very ethnic-diverse city --

23    you have a Puerto Rican parade, St. Patrick's Day

24    Parade for the Irish and various other ethnic groups.

25    And the black community had a yearly parade called the

 1    Bud Billiken.

 2          In this parade, you had various civic

 3    organizations, community organizations.  And at this

 4    time, you had the gang, which had something like a

 5    number of 15- to 20,000 members.  They call them

 6    "soldiers" in the gang.

 7    Q.    What time period are we referring to that you

 8    attended these parades?

 9    A.    This was possibly in the late '60s, early '70s.

10    Q.    And, sir, do you have a recollection as to the

11    number of people that attended those parades?

12    A.    Hundreds of people attended.  I didn't -- at that

13    time, I was just there watching the -- you know, the

14    bands and the -- I wasn't really doing a -- but you

15    could say the community in Chicago, black community,

16    basically attended it and celebrities and such.

17          And it was a newsworthy event, because it was

18    always, you know, showcasing various groups and people.

19    Q.    Did these parades continue into the late '80s and

20    '90s, when you --

21    A.    They -- in essence, they go on as we speak.  I

22    mean, not now, but, you know, every year there's this

23    Bud Billiken.  The community looks forward to this.

24    Q.    Did Mr. Batiste ever participate, to your

25    knowledge, in any of these parades?

```
 1   A.     No.  Not to my knowledge.

 2   Q.     What discussions, if any, did you have with

 3   Mr. Batiste regarding the P. Stone Nation?

 4   A.     There was no discussion of the P. Stone Nation.

 5   You must be mindful -- or I should be mindful to inform

 6   you that Mr. Batiste represented an individual --

 7          MR. GREGORIE:  Objection, your Honor.

 8   Hearsay.

 9          THE WITNESS:  -- an individual of another

10   class.

11          THE COURT:  Sustained.

12   BY MS. JHONES:

13   Q.     To your knowledge, sir, to your knowledge,

14   what -- what basis do you -- Well, strike that.

15          What knowledge, if any, did you have as to

16   Mr. Batiste's association with the P. Stone Nation?

17   A.     None.  Mr. Batiste did not have an identification

18   with the --

19          MR. GREGORIE:  Objection, your Honor.  Again,

20   calling for hearsay.

21          THE COURT:  Sustained.

22   BY MS. JHONES:

23   Q.     Did there come a time, sir -- Well, strike that.

24          Would you visit Mr. Batiste after he had -- after

25   he was married with children?
```

1   A.     Yes, I did.

2   Q.     Do you have a particular recollection, sir, as to

3   any visits that you extended to Mr. Batiste at his

4   residence?

5   A.     At the time he was living -- I visited him, I

6   recall he was living over a storefront, on the second

7   floor of a storefront.  The children were there.

8           One incident I recall, my godson indicated -- he

9   said, "Godfather" -- he used to call me "Godfather" --

10          MR. GREGORIE:  Objection.  Hearsay, your

11  Honor.

12          THE COURT:  Sustained.

13  BY MS. JHONES:

14  Q.     Without telling us -- it's hearsay.

15          THE WITNESS:  Can I make a question?  I have a

16  question, your Honor.  Can I address the question?  Can

17  I address a question to you and -- the Court?

18          MR. GREGORIE:  Objection.

19          THE WITNESS:  The --

20          THE COURT:  Sir, just wait for a question.

21          THE WITNESS:  Okay.  No problem.

22  BY MS. JHONES:

23  Q.     Dr. Shelton, without telling us what your godson

24  told you, what, if anything, did you do after your

25  godson said something to you?

1    A.     I purchased a mattress and box springs so he

2    would not be on the ground level, sleeping.

3           And I asked Mr. Batiste if that was okay and if

4    he would be offended if I gave it.

5           He said he appreciated it and it was a blessing.

6    He appreciated it.

7           So I gave him a box spring and mattress so the

8    child would not be on the floor with the rodents

9    running around.

10   Q.     Have you ever known Mr. Batiste to advocate any

11   form of violence?

12   A.     No.

13   Q.     Have you ever known Mr. Batiste to speak ill of

14   the US Government?

15   A.     No.

16   Q.     Based upon your knowledge and your association

17   with Mr. Batiste, do you have an opinion as to the

18   values that you know Mr. Batiste to hold?

19   A.     My perception is that Mr. Batiste is a very

20   committed family man, he's committed to supporting the

21   Government, he's committed to being a good person all

22   around.

23          And I think the key thing I have to reiterate is

24   that anybody that will spend their time in high school

25   going over to a rough neighborhood, walking the

1   subways, protecting women, children and elderly people

2   from muggers and difficult people is a good person.

3          I indicated I applaud him for that.  I wouldn't

4   have done that when I was in school myself.  So that

5   was a have positive thing.

6   Q.    Thank you, Dr. Shelton.

7   A.    You're welcome.

8          THE COURT:  Mr. Vereen?

9                   CROSS-EXAMINATION

10  BY MR. VEREEN:

11  Q.    Dr. Shelton, good morning.

12  A.    Good morning.

13  Q.    You're a member of Kappa Alpha Psi Fraternity?

14  A.    Yes, I am.

15  Q.    How long have you been a member of that

16  organization?

17  A.    Since '66 of December.

18  Q.    Is that considered old school?

19  A.    Old school.

20  Q.    You also stated that you are a Prince Hall Mason;

21  did you not?

22  A.    Correct.

23  Q.    And Masonry is -- some people refer to it as a

24  secret society?

25  A.    Yes.

1   Q.    But you would agree with me that you can usually

2   walk into the library and check out a book or read a

3   book on Masonry; can you not?

4   A.    Correct.

5   Q.    So although it's referred to as a secret

6   organization or a secret society, the literature is

7   available to the public to read?

8   A.    Correct.

9   Q.    So there's no stopping anyone from walking into a

10  bookstore or a library and reading what masonry is all

11  about?

12  A.    Correct.

13  Q.    Now, you would also agree with me that everyone

14  is not qualified to be a Mason?

15  A.    Correct.

16  Q.    Man does not select Masonry; Masonry selects the

17  man?

18  A.    Correct.

19  Q.    Now, you testified that there was one occasion

20  where you saw Narseal Batiste donning a Masonic emblem.

21  A.    Correct.

22  Q.    Of course, you confronted Mr. Batiste about that.

23  Correct?

24  A.    Correct.  It's known as a challenge.

25  Q.    And did he meet the challenge?

1    A.     No.

2    Q.     And by that, you mean that you challenged to see

3    whether or not he was, in fact, a Mason.  Correct?

4    A.     Correct.

5    Q.     And when I asked you did he meet the challenge,

6    the response was "no," meaning that he did not know the

7    answer to questions or he did not signify certain

8    movements.  Correct?

9    A.     Correct.

10   Q.     Now, you did not see Mr. Batiste -- well, let me

11   ask you this:  After Mr. Batiste did not meet the

12   challenge, surely you advised him that it is improper

13   for him to be donning an emblem when he is not a member

14   of that organization?

15   A.     Correct.

16   Q.     That's the equivalent of someone who's not a

17   member of Kappa Alpha Psi wearing your paraphernalia on

18   one of their shirts.  Correct?

19   A.     Correct.

20   Q.     You could check them out to see whether or not

21   they're a member and, if they're not, you would tell

22   them, "Don't wear your shirt"?

23   A.     Correct.

24   Q.     Masonry, you will agree with me, is a lot deeper

25   than that?

Shelton - CROSS - By Mr. Vereen                    42

```
 1   A.     Correct.

 2   Q.     Now, you grew up in Chicago?

 3   A.     Yes.

 4   Q.     You've seen the organization referred to as

 5   either the Blackstone Rangers or the El Rukns?

 6   A.     Correct.

 7   Q.     Same organization, different time periods?

 8   A.     Yes.

 9   Q.     Have you ever known Narseal Batiste to be the

10   leader of the Blackstone Rangers?

11   A.     No.

12          MR. GREGORIE:  Objection, your Honor.  Calls

13   for hearsay and calls for speculation.

14          THE COURT:  Sustained.

15          MR. VEREEN:  I'll rephrase it, Judge.

16   BY MR. VEREEN:

17   Q.     Do you have any personal knowledge as to whether

18   Narseal Batiste was ever the leader of the Blackstone

19   Rangers?

20   A.     No.

21   Q.     Do you know what year Narseal Batiste was born?

22   A.     Pardon me?

23   Q.     Do you know what year Narseal Batiste was born?

24   A.     Do I know where he was born?

25   Q.     What year.
```

1    A.    Gosh, I'm going to say probably in the '70s.

2    Q.    Was he even born when the Blackstone Rangers

3    became in existence?

4    A.    I think he was either a toddler or an infant.

5    Q.    And you've said that you have seen the El Rukns

6    in parades.

7    A.    Correct.

8    Q.    Marching?

9    A.    Yes.

10   Q.    They wore semi-paramilitary uniforms?

11   A.    Yes.

12   Q.    You would agree with me there were also other

13   organizations within Chicago that wore paramilitary

14   uniforms?

15   A.    Yes.  You had diverse gang activity in Chicago,

16   the Gangster Disciples, the El Rukns.  Later, you had

17   Bloods and Crips from California coming in and then you

18   had Hispanic gangs and Irish gangs.

19        They didn't march -- now, the non-black gangs did

20   not march in the Bud Billiken Parade.  Just the black

21   gangs.

22   Q.    And was it your testimony that you've seen at

23   least 15,000 members of the El Rukns?

24   A.    Yes.

25   Q.    You also testified, did you not, that the

1   El Rukns used extortion?

2   A.     Extortion, kidnapping, murder.

3   Q.     Drug dealing?

4   A.     Drug dealing.

5   Q.     And this is -- are these some of the things you

6   witnessed with your own eyes?

7   A.     Correct.

8   Q.     Are you familiar with the initiation process of

9   the El Rukns?

10            MR. GREGORIE:  Objection.

11            THE WITNESS:  What I've heard -- yes.

12            MR. GREGORIE:  Calls for hearsay, your Honor.

13            THE COURT:  Sustained.

14   BY MR. VEREEN:

15   Q.     Do you have any personal knowledge?  Have you

16   ever seen the initiation process of the El Rukns?

17   A.     Yes.

18            MR. GREGORIE:  Objection, your Honor.  It goes

19   beyond the scope of the direct examination.

20            THE COURT:  Sustained.

21   BY MR. VEREEN:

22   Q.     Let's step back to Masonry for a second.

23          Have you ever heard of the phrase, "Standing on

24   the square"?

25   A.     Yes.

Shelton - CROSS - By Mr. Levin                        45

```
 1   Q.     What does that mean?
 2   A.     That means you're an upright person, committed to
 3   God, country, family.
 4   Q.     And have you ever heard the phrase, "Off the
 5   square"?
 6   A.     Yes.
 7   Q.     What does that mean?
 8   A.     That means that you have deviated from being a
 9   decent, upright citizen and God-fearing, good man.
10   Q.     Thank you, Doctor.
11          MR. VEREEN:  I have no further questions.
12          THE WITNESS:  Thank you.
13          THE COURT:  Mr. Houlihan?
14          MR. HOULIHAN:  No questions.
15          THE COURT:  Mr. Clark?
16          MR. CLARK:  No further questions, your Honor.
17          THE COURT:  Mr. Casuso?
18          MR. CASUSO:  No questions, your Honor.
19          THE COURT:  Mr. Levin?
20          MR. LEVIN:  I have a few questions, your
21   Honor.
22                      CROSS-EXAMINATION
23   BY MR. LEVIN:
24   Q.     Good morning, Doctor.  How are you?
25   A.     Good morning.
```

1    Q.    When did you live in Chicago, what years, just so
2    we're clear here?
3    A.    I lived in Chicago -- I was born in' 44.  I
4    finished high school in '63.  And I've moved --
5    attended college in Texas and went to undergraduate
6    school in Austin, Texas, graduate school in Huntsville,
7    Texas.  And then I went back to Chicago and worked in
8    '70.
9    Q.    So 1970 is when you were in Chicago?
10   A.    Back again in Chicago.  Correct.
11   Q.    So you grew -- you were born in Chicago in 1944.
12   You left Chicago in --
13   A.    '63.
14   Q.    In '63?
15   A.    Correct.
16   Q.    And came back to Chicago in 1970?
17   A.    Correct.
18   Q.    So you've lived continuously or lived -- now
19   you're back in Texas?
20   A.    Correct.  I retired in Texas.
21   Q.    You retired in Texas.
22         So you lived in Chicago from '63 -- let me see if
23   I've got this straight --
24   A.    From '63 and then -- Texas -- and then came back
25   to Texas in '03 -- 2003.

```
 1   Q.     Got it.  Okay.

 2          Now, you've made reference to this Jeff Fort

 3   individual.  Correct?

 4   A.     Correct.

 5   Q.     And your knowledge is based on personal

 6   observations as well as reading the newspaper.  Would

 7   that be correct?

 8   A.     Correct.

 9   Q.     In fact, Jeff Fort was a fairly common thug in

10   Chicago; was he not?

11   A.     Correct.

12   Q.     You'd pick up your Chicago Tribune or whatever

13   paper -- what papers did you read?

14   A.     I read both papers, the Tribune and the

15   Sun-Times.  One had sort of a liberal leaning and the

16   other had a conservative leaning, just to get a slant

17   on the news.

18   Q.     You would agree with me that Jeff Fort -- there

19   were a lot of articles that you read about in the

20   newspapers when you lived in Chicago concerning Jeff

21   Fort and this Black P. Stone Rangers or whatever --

22   A.     Correct.

23   Q.     -- the group was known as?

24   A.     Correct.

25   Q.     They were involved in killing and -- correct?
```

```
 1              MR. GREGORIE:  Objection, your Honor.  Calls

 2   for hearsay.

 3              THE COURT:  Sustained.

 4   BY MR. LEVIN:

 5   Q.    Now, would you agree with me, sir, that Jeff Fort

 6   is as notorious in Chicago as Michael Jordan is famous?

 7   A.    Yes.

 8              MR. GREGORIE:  Objection, your Honor.  That

 9   calls for speculation.

10              THE COURT:  Sustained.

11              Sir, if there's an objection, you may not

12   answer the question --

13              THE WITNESS:  I apologize.

14              THE COURT:  -- until I've ruled on it.

15              THE WITNESS:  Thank you, your Honor.

16              THE COURT:  If I sustain the objection, you

17   need not answer the question.

18              THE WITNESS:  No problem.

19              THE COURT:  If I overrule the objection, then

20   you can answer.

21              THE WITNESS:  I can answer the question.

22              Okay.  Thank you.

23              MR. LEVIN:  I don't have any further

24   questions.  Thank you.

25              THE COURT:  Mr. Gregorie?
```

```
 1                        CROSS-EXAMINATION
 2   BY MR. GREGORIE:
 3   Q.      Good morning, Doctor.
 4   A.      Good morning.
 5   Q.      Doctor, do the Masons advocate violence?
 6   A.      No.
 7   Q.      You told us you know the character of
 8   Mr. Batiste.
 9           Would it surprise you if you heard him say that
10   he was in favor of blowing up a building and, if there
11   are any survivors left, shooting them?
12   A.      Are we speaking in the context of those
13   statements being related to Masonry?
14   Q.      Well, I'm speaking in any context.
15           You say you know his character.
16   A.      Correct.
17   Q.      Would it surprise you if you heard him say that
18   he was in favor of blowing up a building and, if there
19   are any survivors, shooting them?
20   A.      To refer -- reflect on that statement or question
21   you entertain, in our persona or life, we are subject
22   to say or do anything at any given time.
23           There possibly are things that I've said or
24   you've said personally that you may not have meant.
25           The key thing is I don't think we can always hold
```

 1   the individual totally responsible for certain rhetoric

 2   that could be unveiled.

 3        So in terms of Mr. Batiste, I don't believe he

 4   would do that.  If he uttered it or if he didn't utter

 5   it, I basically have confidence -- I wouldn't be here

 6   right now if I didn't have confidence in this man as a

 7   good man.

 8   Q.   You didn't answer my question, though, Doctor.

 9        Would it surprise you if you heard him say that?

10   A.   Yes.  It would surprise me.

11   Q.   Would it surprise you to hear him say that he

12   would kill a man with his bare hands?

13   A.   Yes.  It would surprise me.

14   Q.   Would it surprise you to hear him say that he

15   wanted to overthrow the Government of the United

16   States?

17   A.   Yes.  It would surprise me.

18   Q.   Sir, do you know a gentleman by the name of

19   Sultan Kahn-Bey?

20   A.   No.

21   Q.   Ever met that man?

22   A.   No.

23   Q.   How about a man named Master Athea?

24   A.   No.

25   Q.   You say you've been living in Texas since 2003?

Shelton - REDIRECT - By Ms. Jhones

```
 1    A.      Yes.

 2    Q.      So you haven't been in Miami at any of that time?

 3    A.      No.

 4    Q.      And you weren't in Chicago during that time?

 5    A.      2003 is when I moved to Texas from Chicago.

 6    Q.      Thank you very much.

 7            MR. GREGORIE:  Nothing further, your Honor.

 8            THE COURT:  Ms. Jhones?

 9                    REDIRECT EXAMINATION

10    BY MS. JHONES:

11    Q.      Just a couple of questions, Dr. Shelton.

12            Dr. Shelton, did you ever know Mr. Batiste to run

13    his mouth, so to speak?

14    A.      I'm sorry.  I didn't --

15    Q.      Did you ever know Mr. Batiste to run his mouth?

16            MR. GREGORIE:  Objection.

17            THE WITNESS:  No.

18            MR. GREGORIE:  Form of the question.

19            THE COURT:  Sustained.

20            Rephrase your question.

21            MR. GREGORIE:  Vague.

22            THE COURT:  Sustained.

23            Rephrase your question.

24    BY MS. JHONES:

25    Q.      Did Mr. Batiste talk to you about people that he
```

```
 1   knew in Chicago?

 2              MR. GREGORIE:  Objection, your Honor.  First,

 3   it's leading.

 4              THE COURT:  Sustained.

 5              Rephrase your question.

 6              MS. JHONES:  I'll rephrase.

 7   BY MS. JHONES:

 8   Q.    What, if any, discussions did you have with

 9   Mr. Batiste regarding people that he may have met

10   during the course of his residence in Chicago?

11              MR. GREGORIE:  Objection.  Time period, your

12   Honor.  When?

13              THE COURT:  Place it in time.

14   BY MS. JHONES:

15   Q.    From 1990 to 2003, for example.

16   A.    He may have mentioned individuals that he

17   encountered in his community or his environment.  But I

18   didn't put any stock into it.

19   Q.    Okay.  So is it fair to say, sir, that -- strike

20   that.

21        Are there people that Mr. Batiste would discuss

22   with you that perhaps, as you sit here today, you may

23   not have a recollection?

24              MR. GREGORIE:  Objection, your Honor.  That's

25   leading.
```

```
 1              THE COURT:  Sustained.

 2              Rephrase your question.

 3              MS. JHONES:  Sure.

 4   BY MS. JHONES:

 5   Q.    Are you able to recall, as you sit here today,

 6   every discussion that you may have had with

 7   Mr. Batiste?

 8   A.    Every discussion, can I recall?

 9   Q.    Yes.

10   A.    No.  I can't recall every discussion.

11              MS. JHONES:  I have nothing further.

12              THE COURT:  You may step down, sir.

13              (Witness excused.)

14              THE COURT:  Call your next witness.

15              MS. JHONES:  Mr. Batiste calls Teresa LeFlore.

16              Your Honor, may Mr. Shelton remain in the

17   courtroom, if he desires?

18              THE COURT:  Is he released?

19              MS. JHONES:  He's released as far as I'm

20   concerned, yes.

21              THE COURT:  Any objection?

22              MR. GREGORIE:  I have no objection, your

23   Honor.

24              THE COURT:  Yes.

25   Thereupon--
```

```
 1                      THERESA LeFLORE

 2   was called as a witness by the Government and, having

 3   been first duly sworn, testified as follows:

 4           THE COURT REPORTER:  Please have a seat and

 5   pull that microphone in close to you.

 6           Please state your name for the record and

 7   spell the first and last name.

 8           THE WITNESS:  My name is Teresa LeFlore,

 9   T-e-r-e-s-a L-e-F-l-o-r-e.

10                    DIRECT EXAMINATION

11   BY MS. JHONES:

12   Q.    Good morning, Ms. LeFlore.

13   A.    Good morning.

14   Q.    Ms. LeFlore, could you please tell us what

15   area -- in what area of South Florida do you reside?

16   A.    Unincorporated Dade County.

17   Q.    And how long have you resided in Dade County?

18   A.    About 30 years or more.

19   Q.    And are you presently employed, Ms. LeFlore?

20   A.    Yes, I am.

21   Q.    Would you please tell us how you're employed.

22   A.    Miami-Dade College, North Campus.

23   Q.    What do you do at Miami-Dade, North Campus?

24   A.    I'm the administrative assistant to the director

25   of the Fire Academy.
```

LeFlore - DIRECT - By Ms. Jhones                55

```
 1   Q.      Of the what, please?

 2   A.      Fire Academy.

 3   Q.      How long have you been employed with Miami-Dade

 4   Community College North?

 5   A.      24 years this September.

 6   Q.      And prior to your employment -- in addition to, I

 7   should say, your employment -- directing the fire

 8   department training, did you say?

 9   A.      Assistant -- administrative assistant.

10   Q.      Administrative assistant.

11           Do you have any other employment besides that

12   employment?

13   A.      Yes.  I'm the CEO of a nonprofit organization,

14   Phases of Life, since 1991 to 2005.

15   Q.      Let me ask you a few questions about that

16   nonprofit organization.

17           First of all, do you know how it was founded?

18   A.      By myself and another young lady.

19   Q.      And what is -- what are the time periods, again,

20   that that organization was in existence?

21   A.      From 1991 -- active from 1991 to 2005, the

22   summer.  At the present time we are inactive, getting

23   ready to start back up this summer with the youth

24   programs.

25   Q.      What type of activities did Phases of Life engage
```

LeFlore - DIRECT - By Ms. Jhones                     56

1    in?  What was the mission statement, if you will?

2    A.    To provide education or recreation and social

3    activities for at-risk youth in Miami-Dade County.

4    Q.    And out of -- what was the area in which the

5    Phases of Life offices were located?

6    A.    Basically, in Liberty City.

7    Q.    Okay.

8    A.    We were based in James E. Scott Home Development.

9    Q.    Directing your attention to the spring of 2002,

10   what, if any, involvement did you have in Phases of

11   Life in that time period?

12   A.    I was executive and program director.

13   Q.    And did Phases of Life have any employees?

14   A.    Yes, we did.  We had several programs, computer

15   literacy, tutoring, youth enrichment and martial arts.

16   Q.    And do you know an individual by the name of

17   Narseal Batiste?

18   A.    Yes.  He was an employee of mines in 2002.  He

19   was employed to administer our martial arts class.

20   Q.    Okay.  And, Ms. LeFlore, do you see Mr. Batiste

21   in the courtroom here this morning?

22   A.    Yes.

23   Q.    Would you please describe an article of clothing

24   he's wearing.

25   A.    It looks to be a black or dark blue suit with a

```
 1    teal-colored shirt and white tie.

 2    Q.    Thank you.

 3          Ms. LeFlore, when did you meet Mr. Batiste?

 4    A.    I met him in 2002.  I had put an ad in the paper

 5    that we were looking for a martial arts instructor.  He

 6    came in for an interview.

 7    Q.    And when he came for an interview, did he come by

 8    himself or did he have somebody with him?

 9    A.    I thought he was by myself.  But I found out

10    later that his family was with him, his wife and -- was

11    it three -- three children?  I believe it was about

12    three children.

13    Q.    Okay.  And during -- what was the purpose of

14    Mr. Batiste coming into your office on that occasion?

15    A.    He came in because he was interested in teaching

16    the martial arts class.

17    Q.    Was this a full-time or part-time position

18    that --

19    A.    Part-time position, because we were an

20    after-school program.

21    Q.    And did Mr. Batiste, in fact, acquire that

22    position?

23    A.    Yes, he did.

24    Q.    And tell us about some of the activities that he

25    was responsible for in that position.
```

 1   A.    Well, we look for martial arts instructors that

 2   have high integrity and a good character, because

 3   that's basically what we're looking to instill in the

 4   children.  The martial arts itself, yes, we want our

 5   children to learn the techniques of martial arts.

 6         But the primary purpose for our martial arts

 7   class was to instill self-discipline, respect and,

 8   also, for physical fitness.  But it was to teach them

 9   how to withstand peer pressure and intimidating

10   situations.

11         So, basically, that's what we really looked for

12   out of the martial arts class.

13   Q.    Okay.  And, Ms. LeFlore, approximately what was

14   the age group in the class that Mr. Batiste was to

15   teach?

16   A.    Children from 6 to 18.  It was open to -- to

17   adults, also, but we basically worked with the youth.

18   Q.    Do you recall the time period that Mr. Batiste,

19   again, was employed in -- with Phases of Life?

20   A.    I contracted him in May, but he may not -- he

21   probably got started in the latter part of May.  And he

22   worked up until, I believe, the end of the year.

23         Because it's an annually funded, grant-based

24   program and, unfortunately, during that time, the

25   County had had a big budget cut and I didn't have the

1    chance to recontract him towards the end of the year.

2         And I think, at that time, he was looking for

3    full-time employment in conjunction with working with

4    the after-school program.

5    Q.    And, Ms. LeFlore, prior to Mr. Batiste working at

6    Phases of Life, did you have other martial arts --

7    other individuals that held the same position that he

8    was holding in 2002?

9    A.    No.  He was our sole instructor for the martial

10   arts class, although his wife -- she assisted him with

11   the class, like in monitoring the children, getting the

12   children signed in every morning.  And she always

13   volunteered, along with him, for field trips --

14   whenever we had to take the children on field trips.

15   Q.    Okay.  And how did Mr. Batiste compare to other

16   instructors that were employed at any given time by

17   Phases of Life?

18   A.    Well, he was really our most outstanding martial

19   arts instructor.  I believe it's because he himself had

20   children.  I found that he was a person of very high

21   integrity and good character, and that's what I loved

22   about him most.

23        And you can always tell about a person through

24   the way children react to the adults.  And our children

25   just fell in love with him.

 1         So -- and I used to always monitor the class

 2   myself because we had up to, like, 20 to 25 kids at one

 3   time.  So it required more than one adult to be in the

 4   classroom.  So most of the time I attended the classes.

 5         Also, because the martial arts was our most

 6   high-profile activity, it drew the kids in.  And it was

 7   one of our most important activities simply because we

 8   were a crime prevention program.

 9         We relied on the martial arts to really instill

10   that self-respect, respect for others and,

11   specifically, discipline.  We really looked for that

12   class to develop that in our children.

13         So I always closely monitored that class myself.

14   Q.    And during the -- well, were parents in any way

15   involved in this program, in Phases of Life?

16   A.    We always ask parents to periodically come to the

17   classes.  Once the children got to a certain level in

18   their martial arts, when they had promotions like from

19   the white belt, to the yellow belt, to the blue belt,

20   to the green belt, we always wanted parents to come and

21   see the promotions of the children.  So parents were

22   involved at that degree.

23         Parents were also involved whenever we took them

24   to tournaments.  We would also solicit the parents to

25   come and help us chaperone the children.

1    Q.    What, if any, involvement would Mr. Batiste have

2    with the parents of the children that he taught?

3    A.    Well, anytime we had discipline problems with the

4    children, we would always ask the parents to come so we

5    could sit and speak with them about it so they could

6    help us reinforce the disciplinary action that we

7    wanted to take with the children and discuss matters

8    such as that with the parents.

9    Q.    To your knowledge, as the director of this

10   program, Ms. LeFlore, were there any complaints that

11   were lodged by the parents as it related to

12   Mr. Batiste's conduct?

13   A.    None whatsoever.  I always received excellent

14   comments.

15   Q.    What, if any, activity did you see Mr. Batiste

16   engage in other than the activities for which he was

17   hired, the martial arts?

18   A.    He always volunteered -- it was always extra

19   hours, because we was a nonprofit organization.  And,

20   basically, as charity.

21         Anytime I bring on anyone to work with the

22   organization, I make sure I explain that to them.  I

23   make sure that I explain that it may require more hours

24   than what they're getting paid for.

25         With Mr. Batiste, that was no problem because he

```
 1   had the love for martial arts and working with the

 2   youth.  And many times, he put in extra hours.

 3        Anything that we needed to have done that we

 4   couldn't do ourselves, he always volunteered his

 5   service.  He was always willing, along with his wife,

 6   also.

 7        She was excellent with the program.  And she

 8   wasn't even getting paid, but she was always there,

 9   helped out wherever we needed her assistance.

10   Q.    And, Ms. LeFlore, did you ever observe

11   Mr. Batiste engage the children in any religious

12   teaching?

13   A.    None whatsoever.

14   Q.    Did you ever observe Mr. Batiste engage in any

15   religious teaching with yourself, for example?

16   A.    No.

17   Q.    Did you ever see him carrying any pamphlets or

18   any type of religious books?

19   A.    No.  Not that I can recall.

20   Q.    Okay.  During the time period -- well, let me ask

21   you this:  What type of background check, if any, was

22   required to be employed with Phases of Life?

23        MR. GREGORIE:  Objection, your Honor.  Calls

24   for hearsay.

25        MS. JHONES:  I could lay a predicate, your
```

```
 1   Honor.

 2              THE COURT:  Okay.

 3   BY MS. JHONES:

 4   Q.    Are you aware, Ms. LeFlore, as to whether or not

 5   there is any requirements for employment with Phases of

 6   Life?

 7   A.    We have to do background checks.

 8   Q.    And when you say "background checks," what type

 9   of checks are you referring to?

10   A.    Criminal background checks.  This is required

11   anytime that they're going to be interacting directly

12   with the youth.

13   Q.    And are you aware, Ms. LeFlore, as to whether or

14   not that type of background check was done on

15   Mr. Batiste?

16   A.    Yes.  It was.

17   Q.    What, if any, impediment was there to his

18   employment?

19   A.    None.

20   Q.    What, if anything, made you -- well, first of

21   all, who decided to -- who was the one that made this

22   decision to hire Mr. Batiste?

23   A.    Ultimately, I did.

24   Q.    What, if anything, made you hire Mr. Batiste on

25   that occasion?
```

 1   A.    Well, I'm involved in all hiring processes with

 2   our staff people, our contracted people.

 3         And working with a nonprofit organization, you

 4   have high turnover.  So I've met a lot of people

 5   throughout the 15 years that I've ran Phases of Life.

 6   And I believe that I'm a pretty good judge of

 7   character.

 8         And upon meeting him and talking with him, he

 9   just impressed me as a person with high integrity and

10   good character.

11         And by the fact that -- I know, normally, that

12   people don't take their families on interviews.  But

13   being that we were a youth organization,

14   family-oriented and by the fact that his wife was

15   present and his children and I had the chance to

16   interact with them, I was just impressed with him

17   overall.  He seemed to be a dedicated family man, and

18   he has such a lovely family.

19         MS. JHONES:  If I may just have a moment, your

20   Honor.

21         THE COURT:  Okay.

22   BY MS. JHONES:

23   Q.    Just a couple more things, Ms. LeFlore.

24   A.    Okay.

25   Q.    During the time period that Mr. Batiste worked

```
 1   for you at Phases of Life, were there any other
 2   activities aside from -- any fundraising activities?
 3   A.     Occasionally, we did have fundraisers.  It's been
 4   such -- some time ago.
 5   Q.     That's okay.  If you remember.
 6   A.     Yeah.  We had candy sales.
 7   Q.     What, if any, shows would Phases of Life have?
 8   A.     We had tournaments -- martial art tournaments.
 9   At the end of the year, we would have the annual -- the
10   annual celebration of the children's accomplishments.
11   Q.     In the fundraisers, where would the money be --
12   obtained from the fundraiser -- where did that money go
13   to?
14   A.     It went back into the program.
15          MS. JHONES:  I have nothing further.
16          THE COURT:  Mr. Vereen?
17          MR. VEREEN:  I have no questions, Judge.
18          THE COURT:  Mr. Houlihan?
19          MR. HOULIHAN:  No questions.
20          THE COURT:  Mr. Clark?
21          MR. CLARK:  No further questions, your Honor.
22          THE COURT:  Mr. Casuso?
23          MR. CASUSO:  No questions, your Honor.
24          THE COURT:  Mr. Levin?
25          MR. LEVIN:  No questions, your Honor.
```

LeFlore - CROSS - By Mr. Gregorie                    66

```
 1            THE COURT:  Mr. Gregorie?
 2                    CROSS-EXAMINATION
 3  BY MR. GREGORIE:
 4  Q.     Good morning, ma'am.
 5  A.     Good morning.
 6  Q.     Ma'am, would you say that Mr. Batiste was
 7  charismatic?
 8  A.     No.  Not really.
 9  Q.     How about his leadership skills?
10  A.     His leadership skills, as far as in the martial
11  arts class, we.
12  Q.     He attracted kids to the class?
13  A.     Well, the kids was solicited to the class.  He
14  attracted them?  I wouldn't say attracted them to the
15  class, because we advertised and we really solicited
16  classes within the community.
17  Q.     Well, how about the martial arts?  Would you say
18  the martial arts attracted the kids?
19  A.     Yes.
20  Q.     Especially the teenagers?
21  A.     And the little kids, too.
22  Q.     Okay.  And there were a lot of kids in that
23  area -- you said they were at-risk kids.
24         What kind of kids are we talking about?
25  A.     Well, we were based at James E. Scott Home
```

 1   Development, projects.  We were based there.  So we

 2   were surrounded with children.

 3   Q.    But when you say "at-risk kids," what kind of

 4   kids are you talking about?

 5   A.    Children from low-income families, children that

 6   doesn't have proper supervision -- after school may not

 7   have proper supervision, children that are exposed to

 8   things in their environment that, you know, maybe

 9   upper-class neighborhoods may not be exposed to.

10        They're exposed to crime.  They're exposed to

11   a lot of negative things in the community, living in

12   housing developments.

13   Q.    These are the kids that Mr. Batiste taught?

14   A.    Yes.  And we had some children outside of

15   James E. Scott that came in for the martial arts class.

16   Q.    And this was during the year of 2002?

17   A.    Yes.

18   Q.    He worked there during 2002?

19   A.    Yes.

20   Q.    And you said that you checked his background

21   check.

22        Would it surprise you to know that Mr. Batiste

23   said that he learned from prisoners, gang members in

24   prisons in Chicago?

25   A.    Would it surprise me if he said that --

1   Q.    Yes.

2   A.    -- that he learned from them?

3   Q.    Yes.

4   A.    Well, I guess I would have questions as to how.

5   Q.    Well, did you know that?

6        MR. LEVIN:  Judge, I'm going to object.

7   There's no good-faith basis, and it really assumes

8   facts that are really not in evidence.

9        MR. GREGORIE:  It is in evidence, Judge.

10       THE COURT:  It's overruled.

11       MR. GREGORIE:  I'll play the tape if he would

12   like.

13       THE COURT:  It's overruled as to that basis.

14       Rephrase your last question.

15  BY MR. GREGORIE:

16  Q.    Would it surprise you to know that Mr. Batiste

17  said that he learned from gang members who were in jail

18  in Chicago?

19       MR. VEREEN:  Your Honor --

20       THE WITNESS:  In the --

21       MR. VEREEN:  -- objection.  That's a

22  mischaracterization of the evidence.

23       THE COURT:  Rephrase your question.

24  BY MR. GREGORIE:

25  Q.    Would it surprise you if Mr. Batiste said he was

```
 1   taught by gang members who were in prison in Chicago?
 2           MR. VEREEN:  Again, objection.  That's a
 3   mischaracterization of the testimony -- or of the
 4   evidence.
 5           MR. GREGORIE:  I disagree, Judge, that it's a
 6   mischaracterization --
 7           THE COURT:  Come on up.
 8           (Whereupon, proceedings were had at side-bar
 9   outside the presence of the jury which have been sealed
10   per instructions of the Court.)
11           (Whereupon, the following proceedings were had
12   in open court:)
13           MS. JHONES:  Your Honor, move to strike the
14   original question.
15           THE COURT:  I sustained the objection.
16           Rephrase your question.
17           The motion to strike is denied.
18   BY MR. GREGORIE:
19   Q.    Ma'am, would it surprise if you heard Mr. Batiste
20   that, "All of my teachers were in prison in Chicago"?
21   A.    All of his teachers?
22   Q.    Yes.
23   A.    In martial arts?
24   Q.    Yes.  Or in anything.
25   A.    Not really.  I mean, I'm living with an ex-con.
```

LeFlore - REDIRECT - By Ms. Jhones          70

```
 1   And there are so many black people that's -- have been

 2   incarcerated at some point in time out of so many

 3   families.  It's not uncommon to be in contact or

 4   involved with an ex-con in the black families, in the

 5   black communities.

 6   Q.    And to have teachers for the children who are in

 7   prison?

 8          MR. LEVIN:  Objection.  Argumentative.

 9          THE COURT:  Sustained.

10          THE WITNESS:  Was that the question?

11          MR. LEVIN:  Objection.

12          THE COURT:  I sustained it, ma'am.  You need

13   not answer.

14          MR. GREGORIE:  No further questions, your

15   Honor.

16          THE COURT:  Redirect?

17          MS. JHONES:  Briefly, your Honor.

18                   REDIRECT EXAMINATION

19   BY MS. JHONES:

20   Q.    Ms. LeFlore, what type of place is the James E.

21   Scott establishment that you referenced?

22          MR. GREGORIE:  Objection.  Relevance, your

23   Honor.

24          MS. JHONES:  Your Honor, this was --

25          THE COURT:  Overruled.
```

```
 1              THE WITNESS:  It's a HUD development.
 2   BY MS. JHONES:
 3   Q.     And --
 4   A.     Housing development.
 5   Q.     I'm sorry?
 6   A.     Housing development under HUD.
 7   Q.     How familiar are you with that development?
 8   A.     Very.  I mean, I grew -- I lived in the Liberty
 9   Square housing development for a number of years.  I
10   have friends that lived in James E. Scott Home
11   Development.  And my business was established there for
12   about -- I would say about six years --
13   Q.     Okay.
14   A.     -- the agency, Phases of Life.
15   Q.     Thank you, Ms. LeFlore.
16              MS. JHONES:  I have nothing further.
17              THE COURT:  You may step down, ma'am.
18              (Witness excused.)
19              THE COURT:  We're going to take a break.
20              Do not discuss this case either amongst
21   yourselves or with anyone else.  Have no contact
22   whatsoever with anyone associated with the trial.  Do
23   not read, listen or see anything touching on this
24   matter in any way.
25              If anyone should try to talk to you about this
```

```
 1    case, you should immediately instruct them to stop and

 2    report it to my staff.

 3               You may leave your materials at your chairs.

 4    Please be back in the jury room in ten minutes.  We'll

 5    be in recess for ten.

 6               (Whereupon, the jury exited the courtroom at

 7    10:59 a.m. and the following proceedings were had:)

 8               THE COURT:  You may be seated for a moment.

 9               Do you have a witness list for me?  I don't

10    have a witness list from you.

11               MS. JHONES:  I filed it, your Honor, at the

12    beginning of the trial.  And I filed a supplemental

13    one -- I believe my witness list would have been filed,

14    I think, January 27th.  I'm happy to give the Court --

15               THE COURT:  That's okay.  I'll have Patricia

16    find it.  Thank you.

17               MS. JHONES:  I filed a supplemental one

18    probably -- I don't know -- two weeks ago.

19               MS. ARANGO:  I just want to say for the record

20    that we did receive the -- Ms. Jhones's -- I call it

21    Toeuy statement under the Federal Register about her

22    subpoena of Lisa Lamey.

23               I've reviewed it.  So has Charles White, who's

24    the civil AUSA assigned to this matter in reviewing the

25    subpoenas as well as the statements.
```

 1              And they appear to be -- it appears to be

 2       satisfactory.

 3              So Lisa Lamey, at least from the Government's

 4       point of view, is cleared to testify.  And I'm also

 5       notifying Ms. Jhones that she is here.

 6              MS. JHONES:  Thank you.

 7              THE COURT:  We are in recess for ten.

 8              (Whereupon a recess was taken, after which the

 9       following proceedings were had:)

10              THE COURT:  We're back on United States of

11       America versus Narseal Batiste, et al., Case

12       No. 06-20373.

13              Counsel, state your appearances, please, for

14       the record.

15              MR. GREGORIE:  Richard Gregorie on behalf of

16       the United States, your Honor.

17              We're ready to proceed.

18              MS. JHONES:  Ana Maria Jhones on behalf of

19       Narseal Batiste, who is present.

20              MR. LEVIN:  Albert Levin on behalf of Patrick

21       Abraham, who's present.

22              MR. CASUSO:  Lou Casuso on behalf of Burson

23       Augustin, who's present.

24              MR. CLARK:  Nathan Clark for Rotschild

25       Augustine, who is present.

```
 1              MR. HOULIHAN:  Richard Houlihan with Naudimar

 2   Herrera.

 3              MR. VEREEN:  Roderick Vereen on behalf of

 4   Stanley Phanor, who is present.

 5              THE COURT:  All Defendants are present.

 6              Let's bring in the jury.

 7              (Whereupon, the jury entered the courtroom at

 8   11:19 a.m. and the following proceedings were had:)

 9              THE COURT:  You may be seated.

10              Call your next witness.

11              MS. JHONES:  Mr. Batiste calls Mike Sharpe.

12   Thereupon--

13                        MICHAEL SHARPE

14   was called as a witness by the Defendant and, having

15   been first duly sworn, testified as follows:

16              THE COURTROOM DEPUTY:  Please have a seat.

17              State your name and spell it for the record.

18              THE WITNESS:  Michael Sharpe, S-h-a-r-p-e.

19                      DIRECT EXAMINATION

20   BY MS. JHONES:

21   Q.    Good morning, Mr. Sharpe.

22   A.    Good morning.

23   Q.    Mr. Sharpe, would you please tell us what area of

24   Dade or Broward you reside in.

25   A.    In Ft. Lauderdale.
```

1   Q.    And how long have you resided in that area?

2   A.    About 11 or 12 years.

3   Q.    Sir, what is your occupation?

4   A.    I'm a yacht broker, marine consultant.

5   Q.    And how long have you been doing this type of

6   work?

7   A.    30 years.

8   Q.    And did there come a time, Mr. Sharpe, when you

9   met an individual by the name of Narseal Batiste?

10  A.    Yes.

11  Q.    Would you please tell us when that occurred.

12  A.    I use the reference of Hurricane Wilma, which was

13  in October, I think '05.  A little bit before that.

14  Maybe a month or so before that.

15  Q.    Before the hurricane?

16  A.    Yeah.

17  Q.    And could you please tell us who it was that

18  introduced you -- well, how it was that you met

19  Mr. Batiste.

20  A.    I met him through a subcontractor -- or a

21  contractor who was doing some work on my house.

22  Q.    And when you say work on your house, what type of

23  work are you referring to?

24  A.    The contractor was adding a bathroom.

25  Q.    And as a result of this contractor, did you come

1   into contact with Mr. Batiste?

2   A.     Yes.

3   Q.     And do you remember the contractor's name?

4   A.     Robert Haarsted, H-a-a-r-s-t-e-d or very similar

5   to that.

6   Q.     Do you have any recollection, sir, as to what the

7   purpose was of the introduction?

8   A.     Yes.  He hired Mr. Batiste to do some cementing,

9   concreting, stucco work, as part of the repairs to the

10  bathroom -- or the modification to this bathroom.

11  Q.     And when you say modification to the bathroom,

12  this -- was this your home, sir?

13  A.     Yeah.

14  Q.     Did you, in fact, hire Mr. Batiste?

15  A.     Later, I hired him.  When he'd finished the work

16  for the contractor, I hired him for some additional

17  work at the house.

18  Q.     Let me ask you this:  What, if anything, did

19  Mr. Batiste do for Mr. Haarsted?

20  A.     He was contracted to do the stucco work, the

21  concrete work around a door frame that had been -- led

22  into the wall from the outside of the house, and, also,

23  to do the tiling in the bathroom.

24  Q.     And, sir, do you remember who it was that paid

25  Mr. Batiste for that work?

1  A.     The contractor paid him.

2  Q.     And do you recall, sir -- did you have occasion

3  to observe Mr. Batiste work on the work that was done

4  in your bathroom?

5  A.     Yes.

6  Q.     Do you recall whether or not Mr. Batiste did that

7  work by himself or did he have others with him?

8  A.     Yeah.  He had some associates with him.

9  Q.     And do you have a recollection, sir, as to how

10  long the work would have taken?

11  A.     A couple of weeks.

12  Q.     All righty.  And do you have any recollection,

13  Mr. Sharpe, as to the amount of money that was earned

14  by Mr. Batiste on that particular job?

15  A.     No.  Not really.  That was the contractor who

16  hired him, and he paid him directly.

17  Q.     All righty.  And do you see Mr. Batiste here this

18  morning?

19  A.     Yes.  There he is.  Yes.

20  Q.     Would you please tell us what -- just briefly

21  what article of clothing he's wearing.

22  A.     A blue shirt and a white tie --

23  Q.     Okay.

24  A.     -- and a suit.

25  Q.     Did there come a time, sir, when you personally

 1    hired Mr. Batiste to do some work for you?

 2    A.     Yes.  Yes.

 3    Q.     And approximately when would that have been?

 4    A.     That was at the end of that period, just before

 5    Hurricane Wilma came through.

 6    Q.     Before the hurricane?

 7    A.     Yes.  Just before the hurricane.  A couple days

 8    before.

 9    Q.     And would you happen to remember the year that

10    that would have been?

11    A.     Yeah.  '05.

12    Q.     Okay.  And what was the nature of the work that

13    you hired him for?

14    A.     Some path work.  The side of the house where they

15    added the bathroom door was really not very well

16    finished; so, I wanted a concrete path laid there.  A

17    small cement block wall around a patio area and --

18    basically, some concreting work, cementing work.

19    Q.     Okay.  Was the work completed?

20    A.     Yes.

21    Q.     To your knowledge, sir, was any supervision

22    required of the work that was being done by

23    Mr. Batiste?

24    A.     Only from my point of view, that I wanted it done

25    in a certain way.  So I worked with him, maybe visiting

```
 1   once or twice a day to make sure he was doing things to
 2   my satisfaction.
 3   Q.    And did he have others working with him in that
 4   additional project?
 5   A.    Yes.
 6   Q.    And do you recall approximately how many others
 7   were working with him?
 8   A.    It was anything from two to half a dozen people.
 9   Q.    Okay, sir.  And do you have a recollection as to
10   how long the work -- how many days it took to complete
11   that work on the second project?
12   A.    Well, the second project -- actually, I kept on
13   adding little bits to it.  So probably, from start to
14   finish, it could have been four or five weeks.  There
15   were other elements in there as well.
16   Q.    I'm sorry?
17   A.    There were other elements in there as well.
18         But, probably, from start to finish, I guess six
19   weeks would have covered that, the whole time he was
20   there on the project.
21   Q.    Do you have a recollection, sir, as to how much
22   money was paid by you to Mr. Batiste for that
23   particular job?
24   A.    Well, there was additional work done later that
25   hasn't come up here.
```

```
 1          To do the concrete work and the block work and
 2   the cementing rendering, probably 2- or $3,000 maximum.
 3   Q.     Do you recall, sir, whether or not that included
 4   materials?
 5   A.     Yes.  He would buy materials and then give me the
 6   receipts, and I'd reimburse him for those things.
 7   Q.     All righty.  Did the work that Mr. Batiste did
 8   for you on that second project -- did it require the
 9   reading of any blueprints?
10   A.     No.
11   Q.     Did the work that Mr. Batiste -- what, if any,
12   requirements for knowledge on structural engineering
13   were required for the work that he did for you?
14   A.     None, really, because none of them were
15   supporting walls or load-bearing structures.  Just
16   simple garden walls and footpaths.
17   Q.     All righty.  Did there come a time, sir, when
18   there was another project that Mr. Batiste did for you?
19   A.     Yes.
20   Q.     Tell us about that.
21   A.     After the hurricane, Hurricane Wilma, came
22   through, a very, very large tree on the property was --
23   fell down.
24          He and his team basically cut the whole tree down
25   and removed it from the property, stacked it outside,
```

1    helped to repair the lawn and some of the damage that

2    was done around the patio and things like that.

3         That was really a larger element of the project.

4    This was after the hurricane.

5    Q.    Okay.  And as it relates to that job, sir, do you

6    remember, approximately, the length of time that it

7    took to complete that particular job?

8    A.    I would be including that in the total of that

9    six weeks.

10   Q.    Fair enough.

11        And would that also be included in the price that

12   you previously mentioned?

13   A.    No.  There was additional cost there.

14   Q.    Okay.  How, sir, would you characterize the type

15   of work that was performed by Mr. Batiste and others

16   for you during that time period in the summer or fall

17   of 2005?

18   A.    Basic -- a bit of skilled labor type of work.  It

19   was not structural, not carpentry.  It was just

20   concrete work, which is -- and some concrete block work

21   for the little retaining wall.  So it was not

22   particularly skilled work.

23   Q.    Any complaints with the work that Mr. Batiste did

24   for you?

25   A.    No.  No.  It's still there.  It's still there.

```
 1   Q.     Did there come a time, sir, when there was a
 2   request by you for additional work by Mr. Batiste?
 3   A.     I think that's included in the things that I just
 4   mentioned.
 5   Q.     Okay.  Were there --
 6   A.     That would be inclusive.
 7   Q.     Were -- at any given time, was there any work
 8   requested by you that required a bid?
 9   A.     Yes.
10   Q.     Is that -- was that included in the work that you
11   previously referenced?
12   A.     No.  That was just a bid that I had him give me.
13   But we didn't -- I didn't go ahead with that and have
14   it --
15   Q.     And why did you not, sir?
16   A.     I just decided not to do the work at that time.
17   Q.     Okay.  Was there -- was there a bid ever
18   presented to you by Mr. Batiste for that particular
19   job?
20   A.     Yes.
21   Q.     Do you have a recollection as to how long it took
22   for you to receive that bid?
23   A.     Probably ten days or a little bit longer.  A bit
24   longer than I expected.
25   Q.     And why is it that -- tell us about why you
```

 1    expected it to take less time than the ten days.

 2    A.    It was quite a simple bid.  It was to add a

 3    bedroom that was really straightforward.  His element

 4    of that construction would have been the concrete pad

 5    and then the block walls, and that should have been

 6    something he could come pretty close to quite quickly,

 7    I thought.

 8          But he went out and sent the job out to, I think,

 9    a subcontractor or a professional bidder, and that was

10    the thing that took a bit of extra time.  And I didn't

11    expect it to.  I would have expected him to be able to

12    put something together quite quickly.

13    Q.    What was your understanding, sir, as to why

14    Mr. Batiste resorted to the services of a

15    subcontractor?

16          MR. GREGORIE:  Objection.  Calls for hearsay,

17    your Honor.

18          THE COURT:  Sustained.

19    BY MS. JHONES:

20    Q.    Do you know, sir?

21          MR. GREGORIE:  Objection, your Honor.

22          THE COURT:  Sustained.

23    BY MS. JHONES:

24    Q.    Sir, the total time that Mr. Batiste and others

25    worked for you, do you have an idea of how many days or

1    months Mr. Batiste worked for you in total?

2    A.    I think, start to finish, about six weeks.

3    Q.    And during that time period, did you observe --

4    did you come up with -- did you form an opinion as to

5    the type of skill that Mr. Batiste had as a result of

6    your observations?

7    A.    Yeah.  It was much better than laboring skills,

8    but it was still pretty basic -- basic -- very basic

9    skills.  I couldn't have used him for carpentry or

10   electrical work or plumbing work.

11        But he was able to do a very good job of the

12   concrete paths and the little brick wall that I had

13   made, which was the reason I contemplated using him for

14   this bedroom -- small guest bedroom extension.

15   Q.    And, finally, sir, do you have a bottom-line

16   amount of money that you recall having paid Mr. Batiste

17   for the work that he performed for you?

18   A.    Probably about $10,000, overall.  The biggest job

19   was the tree removal of all things, because it took

20   quite a long time to get that done and then he helped

21   me reestablish the lawn.

22        So I think probably it was 4- or $5,000 for the

23   first element and then about $5,000 or so for the

24   second element, which was the tree removal and cutting

25   down, disposal.

1    Q.     With respect to the tree removal, sir, do you

2    have any recollection as to whether or not any

3    equipment was necessary in order to perform that task?

4    A.     Yeah.  I hired a small backhoe from a rental

5    company, and he used that to assist in some of the

6    stump removal and the roots.  He used that piece of

7    equipment for a day or so.

8    Q.     Okay.

9           MS. JHONES:  One moment, your Honor.

10          I have nothing further.

11          THE COURT:  Mr. Vereen?

12          MR. VEREEN:  No questions, Judge.

13          THE COURT:  Mr. Houlihan?

14          MR. HOULIHAN:  No questions.

15          THE COURT:  Mr. Clark?

16          MR. CLARK:  No further questions, your Honor.

17          THE COURT:  Mr. Casuso?

18          MR. CASUSO:  No questions, your Honor.

19          THE COURT:  Mr. Levin?

20          MR. LEVIN:  Your Honor, if I may ask from

21   here?

22          THE COURT:  Sure.

23          MR. LEVIN:  Thank you.

24                    CROSS-EXAMINATION

25

```
 1   BY MR. LEVIN:

 2   Q.     Good morning, Mr. Sharpe.  How are you?

 3   A.     Good morning.  How are you?

 4          THE COURT:  Is that microphone on?

 5          MR. LEVIN:  It is now.  Sorry, your Honor.

 6   BY MR. LEVIN:

 7   Q.     You indicated that Mr. Batiste had had some other

 8   people that were working with him.

 9   A.     Yes.

10   Q.     Do you recall some of those individuals?

11   A.     In what -- in what way?

12   Q.     Do you remember, for example, this gentleman

13   here?  Do you recognize this man?

14   A.     We're a fair way off.

15          Not particularly.  No.  I can' say.

16          But I recognize the next one down.

17   Q.     You recognize him?

18   A.     Yeah.

19   Q.     And you don't recognize him?

20   A.     I'm not sure.  That could be Narseal's brother,

21   the guy that did some of the work on the tree.  I'm not

22   sure.

23   Q.     Are --

24   A.     I really don't remember.

25   Q.     You don't remember him.
```

1        Well --
2   A.      One of the things was everybody was dressed in
3   pretty casual clothes and climbing up and down trees
4   and covered in concrete dust, et cetera.  So it's a
5   very different setting.
6   Q.      But the work that was performed you were
7   satisfied with?
8   A.      Very satisfied.
9   Q.      All right, Mr. Sharpe.  Thank you very much.
10          THE COURT:  Mr. Gregorie?
11          MR. GREGORIE:  No questions, your Honor.
12          THE COURT:  You may step down, sir.
13          (Witness excused.)
14          THE COURT:  Call your next witness.
15          MS. JHONES:  Eleanor Parker, your Honor.
16   Thereupon--
17                      ELEANOR PARKER
18   was called as a witness by the Defendant and, having
19   been first duly sworn, testified as follows:
20          THE COURT REPORTER:  Please take a seat.
21          Please state your name for the record.
22          THE WITNESS:  My name is Eleanor Parker.
23
24                   DIRECT EXAMINATION
25

```
 1    BY MS. JHONES:

 2    Q.    Good morning, Ms. Parker.  How are you?

 3    A.    Good morning.

 4    Q.    Ms. Parker, what part of South Florida do you

 5    reside in?

 6    A.    Broward County, Lauderdale-by-the-Sea.

 7    Q.    Are you presently employed?

 8    A.    Yes.

 9    Q.    And where are you employed?

10    A.    At Tropic Seas Resort.

11    Q.    What type of -- what is your position with the

12    Tropic Seas Resort?

13    A.    I manage it.

14    Q.    How long have you been doing that, ma'am?

15    A.    About 15 years.

16    Q.    Approximately how many units are in the Tropic

17    Seas Hotel?

18    A.    16.

19    Q.    And how long -- did there come a time, actually,

20    when you met an individual by the name of Narseal

21    Batiste?

22    A.    Correct.

23    Q.    Do you remember when that was?

24    A.    Approximately 2005.

25    Q.    And please tell us the circumstances under which
```

```
 1    you met Mr. Batiste.

 2    A.    We were looking for someone to redo our rattan

 3    furniture.  Tropic Seas has all rooms completely

 4    furnished with rattan furniture.

 5          And we received a phone call from him at that

 6    time stating that he did that type of work, and he was

 7    hired.

 8    Q.    And do you recall, Ms. Parker, whether or not --

 9    well, first of all, how many pieces of furniture had to

10    be refurbished?  Do you remember?

11    A.    We have 16 rooms.  We have one-bedroom

12    apartments, efficiencies and hotel rooms.  I couldn't

13    tell you how many pieces.

14    Q.    Did you, in fact, hire Mr. Batiste --

15    A.    Yes.

16    Q.    -- for that job?

17    A.    Yes.

18    Q.    Do you recall whether or not there were others

19    assisting him with the refurbishing of the rattan

20    furniture?

21    A.    He had someone help him.  Uh-huh.

22    Q.    Do you recall, Ms. Parker, how long that

23    particular job took?

24    A.    I would say approximately about a month, you

25    know, give or take.
```

Parker - DIRECT - By Ms. Jhones                    90

```
 1   Q.     And, Ms. Parker, do you remember how many days

 2   during the course of a -- one given week Mr. Batiste

 3   and others would be present at the Tropic Seas?

 4   A.     I wouldn't know.  On a daily basis, you mean?

 5   Q.     On a weekly basis.

 6          Was it every day or....

 7   A.     Well, I don't really recall.  I'm sure the

 8   weekends it was off, perhaps, but I don't remember.

 9   Q.     And did you have any complaints or any problems

10   with the type of work that Mr. Batiste performed?

11   A.     None whatsoever, except that he did an excellent

12   job.  It was like new after completion.

13   Q.     Do you still have the rattan furniture?

14   A.     We still do.

15   Q.     Ms. Parker, do you have a recollection as to how

16   much was paid to Mr. Batiste for that job?

17   A.     I paid him every so many days, and I think the

18   total amount came to approximately -- close to maybe

19   3,000.

20   Q.     Do you have a recollection, Ms. Parker, as to

21   whether or not those funds were funds are were actually

22   received by Mr. Batiste?

23   A.     Repeat that.

24   Q.     Sure.

25          What, if anything, occurred with respect to the
```

```
 1    monies that were to be paid to Mr. Batiste?
 2    A.     There was an error.
 3    Q.     And what type of error was there?
 4    A.     Well, I ran the charges up as each couple of
 5    rooms were done.  I forget the procedure that was done.
 6    And, unfortunately, the owner, when the bill came from
 7    American Express, charged back the charges.  And I
 8    don't believe he ever got paid.
 9    Q.     Did you ever have occasion to meet Mr. Batiste's
10    family?
11    A.     Yes, I did.
12           MR. GREGORIE:  Objection, your Honor.
13    Relevance.
14           THE COURT:  Sustained.
15    BY MS. JHONES:
16    Q.    Ms. Parker, what, if any, recommendations or
17    referrals did you make as a result of the work that
18    Mr. Batiste did for you?
19    A.     I did recommend him to other motels in the area
20    due to his work that was so very good.
21    Q.     Okay?
22           MS. JHONES:  I have nothing further.
23           Thank you, Ms. Parker.
24           THE COURT:  Mr. Vereen?
25           MR. VEREEN:  I have no questions, Judge.
```

Parker - DIRECT - By Ms. Jhones                    92

```
 1              THE COURT:  Mr. Houlihan?

 2              MR. HOULIHAN:  No questions.

 3              THE COURT:  Mr. Clark?

 4              MR. CLARK:  No further questions, your Honor.

 5              THE COURT:  Mr. Casuso?

 6              MR. CASUSO:  No questions, your Honor.

 7              THE COURT:  Mr. Levin?

 8              MR. LEVIN:  No questions, your Honor.

 9              THE COURT:  Mr. Gregorie.

10              MR. GREGORIE:  No questions, your Honor.

11              THE COURT:  You may step down, ma'am.

12              (Witness excused.)

13              THE COURT:  Call your next witness.

14              MS. JHONES:  Your Honor, may I step out for a

15   moment?

16              THE COURT:  Yes.

17              MS. JHONES:  Thank you.

18              Your Honor, Mr. Batiste calls Enoch Vilbrun.

19   Thereupon--

20                       ENOCH VILBRUN

21   was called as a witness by the Defendant and, having

22   been first duly sworn, testified as follows:

23              THE COURT:  You may be seated.

24              Please state your full name for the record and

25   please spell the last name.
```

```
 1              THE WITNESS:  Enoch Vilbrun, V-i-l-b-r-u-n.

 2                     DIRECT EXAMINATION

 3   BY MS. JHONES:

 4   Q.     Good morning, Mr. Vilbrun.  How are you?

 5   A.     All right.

 6   Q.     Mr. Vilbrun, what area of Miami do you reside in?

 7   A.     Miami Gardens.

 8   Q.     And how long have you resided in Miami?

 9   A.     All my life.

10   Q.     Okay.  And, sir, are you are presently employed?

11   A.     Yes, ma'am.

12   Q.     And how are you employed?

13   A.     Miami-Dade Animal Services.

14   Q.     And how long have you been employed by the

15   Miami-Dade Animal Services?

16   A.     Well, for the County -- I've worked for the

17   County roughly going on five years.

18   Q.     And directing your attention -- well, what

19   position do you hold with the Miami-Dade County?

20   A.     For the County, I work for -- I'm a disposal

21   technician.

22   Q.     All righty.  And, Mr. Vilbrun, directing your

23   attention to the summer and the fall of 2005, were you

24   employed then?

25   A.     Yes.
```

Vilbrun - DIRECT - By Ms. Jhones                    94

```
 1   Q.     And how were you employed?

 2   A.     I was working for Miami-Dade Parks & Recreation.

 3   Q.     Were you assigned to any particular park?

 4   A.     Yes.

 5   Q.     And what park would that have been, sir?

 6   A.     Oak Grove Park.

 7   Q.     Okay.  I'm going to show you, Mr. Vilbrun, some

 8   documents.  I'm going to ask you to identify them, if I

 9   may.

10   A.     Okay.

11          MS. JHONES:  May I approach, your Honor?

12          THE COURT:  Yes.

13   BY MS. JHONES:

14   Q.   Mr. Vilbrun, I'm going to show you Defense

15   Exhibits 39 through 48.  I'm going to ask you to take a

16   look at them and let me know if --

17          MR. GREGORIE:  Your Honor, I have no objection

18   to them being marked in evidence.

19          MS. JHONES:  Okay.

20          MR. GREGORIE:  I stipulate they're pictures of

21   Oak Grove Park, your Honor.

22          MS. JHONES:  Thank you, Mr. Gregorie.

23   BY MS. JHONES:

24   Q.   Mr. Vilbrun, would you please take a look at

25   those and let me know if you recognize them.
```

 1   A.     Yes.  I recognize the pictures.

 2   Q.     Okay.

 3          MS. JHONES:  Your Honor, at this time I'd move

 4   Exhibits 39, I believe, through --

 5          THE WITNESS:  48.

 6          MS. JHONES:  -- 49 into evidence.

 7          THE COURT:  49 or 48?

 8          MS. JHONES:  I'm sorry.  39 through 48.

 9          THE COURT:  They will be admitted as Defendant

10   Batiste's Exhibits 39 through 48.

11          (Whereupon, Defendant Batiste's Exhibit

12   Nos. 39 through 48 were entered into evidence.)

13          THE COURT:  You can publish.

14          MS. JHONES:  Thank you, your Honor.

15   BY MS. JHONES:

16   Q.    Sir, first of all, what were your job

17   responsibilities in Oak Grove Park in the summer and

18   fall of 2004?

19   A.     I was working as a park service aide part-time,

20   and my responsibilities were to assist with homework,

21   aid in -- with the recreational activities, provide

22   snacks, basically, monitor the kids when they got

23   off from school.

24   Q.     What were the hours of that park -- that the park

25   was open?

1   A.     Sunrise to sunset, from roughly 8:00 to 6:00.

2   Q.     Showing you what's in evidence as Defendant's

3   Exhibit 39, do you recognize that, sir?

4   A.     Yes.

5   Q.     What is that?

6   A.     That's the front of the park, the sign.

7   Q.     Approximately -- what is the location -- the

8   approximate location of the Oak Grove Park?

9   A.     The location?

10  Q.     Yes.

11  A.     The address?

12  Q.     The address.

13  A.     Yes.  690 Northeast 159th Street.

14  Q.     Showing you, Mr. Vilbrun, Defendant's Exhibit 40

15  in evidence, do you recognize that?

16  A.     Yes.

17  Q.     And what is that, sir?

18  A.     That's right behind the sign, still in front of

19  the park.

20  Q.     And, sir, what, if any, jogging trails are there

21  in this park?

22  A.     Excuse me?

23  Q.     Any jogging trails?

24  A.     Yes.

25  Q.     Do you also have -- are there any playground

1    types of equipment in the park?

2    A.     Yes.  Tot lots.

3    Q.     I'm sorry?

4    A.     Tot lots.

5    Q.     Showing you Defendant's Exhibit 45, directing

6    your attention to the side, is that what you're

7    referring to?

8    A.     Yes.  That's the swing set -- right in front of

9    the swing set.  Next to it is a tot lot.

10   Q.     Now, tell us just briefly, Mr. Vilbrun, what type

11   of -- what is the general type of activities that you

12   would observe in the park in the summer and the fall of

13   2005?

14   A.     Normal activities, which consisted of joggers

15   early in the morning before I get there.  Basically,

16   activities as far as people coming in with their kids

17   at different hours, times, of the day.

18          You got church members coming in, Jehovah

19   Witnesses passing out pamphlets.  Then you have the

20   occasional Haitians who stay there all day playing

21   dominoes, people playing tennis, stuff like that.

22   Q.     How popular is this park in the summer and fall

23   of 2005?

24   A.     Very popular.  We have kids who register --

25   parents who register their kids, roughly 100 -- when I

 1   was working there, it was roughly 100, 120 kids.

 2   Q.    Mr. Vilbrun, did you have occasion to meet an

 3   individual by the name of Narseal Batiste?

 4   A.    Yes.

 5   Q.    Do you see Mr. Batiste in the courtroom today?

 6   A.    Yes.  If -- he's right there.  He cut his hair.

 7   He looks different.

 8   Q.    Okay.

 9   A.    He looks nice.

10   Q.    And, Mr. Vilbrun, could you please identify an

11   article of clothing Mr. Batiste is wearing.

12   A.    A white tie, a green shirt, black suit.

13   Q.    Okay.  And, sir, how was it that you met

14   Mr. Batiste?

15   A.    Well, I met him through his kids, because his

16   kids registered at the park.  They were there for the

17   after-care and for the summer.

18   Q.    All righty.  Now, this would be in what year,

19   please?

20   A.    When -- the time I started, roughly around '04,

21   '05.

22   Q.    Did you have an immediate supervisor at

23   Oak Grove?

24   A.    Yes.

25   Q.    And who would that person be?

Vilbrun - DIRECT - By Ms. Jhones                    99

```
 1   A.      Coach Michelle.

 2   Q.      Coach Michelle?

 3   A.      Yes.

 4   Q.      And, Mr. Vilbrun, as part of -- what were the

 5   responsibilities that you would have at the park?

 6   A.      My responsibilities at the park?

 7   Q.      Yes.

 8   A.      Well, I was the head of the after-care program.

 9   Q.      And as head of the after-care program, just tell

10   us some of the things that you had to do.

11   A.      I had --

12           MR. GREGORIE:  Objection, your Honor.

13   Relevance.

14           MS. JHONES:  It's background, your Honor.

15           THE COURT:  Overruled.

16           THE WITNESS:  Well, I had to make sure that my

17   schedule was well set for the week, basically, and all

18   the other staff members, coaches, were -- their

19   schedules were already prepared for the week for the

20   different age groups that we had and, basically, that,

21   when the kids were let go from school, that they were

22   picked up properly.

23   BY MS. JHONES:

24   Q.      Okay.  And would this be in the summer months as

25   well as the fall?
```

```
 1   A.     Well, for the summer, it was different.  The

 2   summer, we -- it was six coaches and, roughly -- per

 3   coach, there were roughly 25 kids per coach.

 4   Q.     Okay.  And, sir, in the fall -- in the summer and

 5   fall of 2005, did you have occasion to interact with

 6   Narseal Batiste?

 7   A.     Yes.

 8   Q.     And tell us about that.

 9          How would you interact with him?

10   A.     Well, I would interact with him.  He would ask

11   about how his kids were doing.

12          MR. GREGORIE:  Objection.  Hearsay, your

13   Honor.

14          THE COURT:  Sustained.

15   BY MS. JHONES:

16   Q.     What -- did you have occasion to observe what

17   Mr. Batiste -- well, first of all, let me ask you this:

18   Do you have a recollection as to how often Mr. Batiste

19   would go to the park?

20   A.     Yes.

21   Q.     And how often would that be?

22   A.     On an occasional basis.  Roughly -- sometimes

23   every day.

24   Q.     And when you would see Mr. Batiste at the park,

25   would he be alone or would he have someone with him?
```

1    A.    Yes.  He would have his family members with him,

2    mostly, occasionally, at the time.

3    Q.    Mostly who?

4    A.    Mostly his family members.

5    Q.    Did you know his wife?

6    A.    Yes.

7    Q.    Now, did you have occasion, sir, to observe any

8    of the activities that Mr. Batiste was involved in

9    while at Oak Grove Park?

10   A.    Yes.

11   Q.    And tell us a little bit about those activities.

12   A.    Well, basically, he would exercise early in the

13   morning.  Sometime when he'd drop his kids off, he'd be

14   exercising with the other Haitians who worked there or

15   the other guys who worked there, exercising near the

16   monkey bars and basically jogging around the park or

17   walking around the park with his wife sometimes and his

18   kids.

19   Q.    And did you observe any other activities besides

20   the exercising and the walking around the park?

21   A.    No.

22   Q.    Did you ever have -- did you ever see Mr. Batiste

23   carrying any books or any religious material?

24   A.    Yeah.  It -- it would be a book.  It would be

25   hard to tell because, when you're standing from a

```
 1   distance, you can't really tell what it is.  But I
 2   would assume it would be a Bible.
 3   Q.    What, if anything, did -- what, if any,
 4   conversations did you have with Mr. Batiste involving
 5   religion?
 6   A.    Yeah.  It would be -- it would be about religion.
 7   But it wouldn't be forced upon me or anything like
 8   that.  It would just be an open conversation.
 9         Basically, he was talking towards his kids
10   about not doing something right, you know, and --
11         MR. GREGORIE:  Objection.  Hearsay, your
12   Honor.
13         THE COURT:  Sustained.
14   BY MS. JHONES:
15   Q.    Without telling us what Mr. Batiste said, did you
16   have -- did you make any comments to him about any
17   religious -- any religious views?
18         MR. GREGORIE:  Objection.
19         THE WITNESS:  No.
20         MR. GREGORIE:  Relevance, your Honor.
21         THE COURT:  Sustained.
22   BY MS. JHONES:
23   Q.    Mr. Vilbrun, did you ever observe Mr. Batiste
24   with any weapons in the park?
25   A.    No, ma'am.
```

Vilbrun - DIRECT - By Ms. Jhones                      103

1   Q.     What, if any, observations did you make with

2   respect to Mr. Batiste involved with -- well, first of

3   all, are there any gangs in Oak Grove Park?

4   A.     No.   Probably around the neighborhood, but not in

5   Oak Grove Park.

6   Q.     What observations did you make with Mr. Batiste

7   as far as any associations with gangs in the park?

8   A.     No.   There was no associations, not that I can

9   recollect, because of the fact that he was always there

10  with his kids and his family members and his friends.

11  Q.     Did you meet any of his friends?

12  A.     Yes.

13  Q.     Do you know them by name?

14  A.     No.   Not personally by name.   But I believe I

15  know them by face.

16  Q.     And do you recognize any of those friends here

17  today?

18  A.     Yes.

19  Q.     Okay.   Would you please point them out for me.

20  A.     They're sitting right over there.

21  Q.     And --

22  A.     Well, standing right there with the dreads.   Also

23  next to him with the dreads.   With the green shirt.

24  And right there, him, also.

25  Q.     Did you ever observe any of these individuals

Vilbrun - DIRECT - By Ms. Jhones                      104

```
 1   that you have pointed out engage in any acts of

 2   violence?

 3   A.    No.

 4   Q.    These individuals that you have pointed out:  Did

 5   you ever observe them associated with any gang members?

 6   A.    No.

 7   Q.    Are there any rules and regulations in the park?

 8   A.    Yes.

 9   Q.    Tell us about those rules and regulations.

10   A.    Well, no drinking, no smoking -- well, you can

11   smoke literally, but it doesn't -- as long as it's not

12   marijuana.  No drinking alcohol.

13         Around my kids, I try to tell the parents to --

14   it's a personal rule towards me -- please tone down the

15   profanity.  No dogs allowed in the park and no weapons,

16   basically.

17   Q.    Okay.

18   A.    No soliciting, also.

19   Q.    All righty.  And, Mr. Vilbrun, did at any time --

20   were --

21             MS. JHONES:  I'm sorry, your Honor.  One

22   moment.

23   BY MS. JHONES:

24   Q.    What, if any, assistance would Mr. Batiste

25   provide to you?
```

Vilbrun - DIRECT - By Ms. Jhones                    105

```
 1   A.     Well, basically, during the summer, my eyes and

 2   ears.  All of them were my eyes and ears, not only him.

 3   They were my eyes and ears as far as where we would

 4   have 100 kids.

 5          When it's free play, basically, kids are free to

 6   roam within a restricted area we give them to play in,

 7   our tot lot, the swings, as long as they're not behind

 8   the lake or behind the -- near the lake or behind the

 9   building.

10          And if we can't -- summertimes -- sometimes, when

11   half the coaches go to lunch, we -- it's only three

12   that stays.  So it's three that leave and three that

13   stays.

14          They would be my eyes and ears.  They would tell

15   me -- if there's a kid by the lake or a kid fighting

16   or -- half the time, they would tell me and they'd just

17   stop the fight, or if there are kids that aren't doing

18   what they're supposed to be doing.

19          And I would basically thank them for that.

20   Q.     Were they compensated money-wise for that

21   assistance?

22   A.     No.  No.

23   Q.     Did they ever request any compensation?

24   A.     No.  No compensation.  No.

25   Q.     Did you ever observe Mr. Batiste or any of these
```

 1   other men in violation of any of the rules in that

 2   park?

 3   A.    No.  Because if any -- the first time when I met

 4   them, period, they would have been -- they would never

 5   have came back to the park.

 6   Q.    Okay.  Did you ever observe Mr. Batiste or any of

 7   these other gentlemen pass out any pamphlets or any

 8   materials --

 9   A.    No.

10   Q.    -- in the park?

11   A.    No.  None whatsoever.

12   Q.    Mr. Vilbrun, did you ever observe Mr. Batiste or

13   any of these other gentlemen that you have pointed out

14   in possession of any weapons?

15   A.    No, ma'am.

16   Q.    How long did you work at the Oak Grove Park?

17   A.    From mid-'04 to late '07.

18   Q.    Late '07?

19   A.    Yes.

20   Q.    Okay.  How often would you see Mr. Batiste in the

21   company of his children?

22         MR. GREGORIE:  Objection, your Honor.

23         THE COURT:  Sustained.

24   BY MS. JHONES:

25   Q.    Did you ever observe Mr. Batiste or any of these

```
 1    young men involved in any drug activity?
 2    A.     No, ma'am.
 3           MS. JHONES:  I have nothing further.
 4           THE COURT:  Mr. Vereen.
 5           MR. VEREEN:  Just a couple questions, Judge.
 6                     CROSS-EXAMINATION
 7    BY MR. VEREEN:
 8    Q.     Mr. Vilbrun, good morning.
 9    A.     Good morning.
10    Q.     In a second, it'll be good afternoon.
11           There was a recreation room, also, at this park;
12    was there not?
13    A.     A recreation room, you say?
14    Q.     Yes.
15    A.     Yes.
16    Q.     And these gentlemen also taught art and math
17    classes in that recreation room?
18    A.     No.
19    Q.     No?
20           What was done with that recreation room?
21    A.     That was basically open to -- free to the public.
22    Q.     Okay.  And with regard to the supplies in the
23    recreation room, where did that come from?
24    A.     That came from our closets in the recreation
25    room.
```

1    Q.     Thank you.

2           MR. VEREEN:  No further questions, Judge.

3           MR. HOULIHAN:  No questions.

4           MR. CLARK:  No further questions, your Honor.

5           MR. CASUSO:  No questions, your Honor.

6           MR. LEVIN:  A few questions, Judge.

7                       CROSS-EXAMINATION

8    BY MR. LEVIN:

9    Q.     Good afternoon, sir.  How are you?

10   A.     All right.

11   Q.     Now, you indicated that you don't allow any kind

12   of cussing in this park.  Correct?

13   A.     Correct.

14   Q.     You've identified pretty much the guys sitting

15   over here.  Correct?

16   A.     Yes.

17   Q.     Did you ever hear any of them cuss at all?

18   A.     No.

19   Q.     Did you ever hear any of them ever say, "This is

20   our park"?

21   A.     No.

22   Q.     "This does not belong to Metro-Dade County"?

23           MR. GREGORIE:  Objection, your Honor.

24   Leading.

25

Vilbrun - CROSS - By Mr. Levin                    109

```
 1   BY MR. LEVIN:

 2   Q.    Did you ever hear --

 3              MR. LEVIN:  I can lead.  This is

 4   cross-examination.  I can lead.  Thank you.

 5              MR. GREGORIE:  Your Honor, objection to the --

 6              THE COURT:  Sustained.

 7              Rephrase your question.

 8   BY MR. LEVIN:

 9   Q.   Sir, did you ever hear any of these individuals

10   say, "This park belongs to us"?

11              MR. GREGORIE:  Objection.  This is a speech,

12   your Honor.  This is not a question.

13              THE COURT:  Sustained.

14              Rephrase your question.

15              MR. LEVIN:  Judge, can I have a brief side-bar

16   on this?

17              THE COURT:  No.  Rephrase your question.

18   BY MR. LEVIN:

19   Q.    Sir, did you ever hear any of these individuals

20   say, "This is our park"?

21   A.    I've never heard anybody say anything as far as,

22   "This is my park."  Not from these individuals.  Not

23   from anybody.

24              As long as I was working there -- it was

25   basically my park when I was working there, because --
```

1    to tell you the truth, when I worked Monday through

2    Friday, it was from -- the schedule from 1:30 to 6:00.

3            I was head of the -- like I said, the

4    after-school program.  And my manager and my supervisor

5    gave me the opportunity to lead the park.  If any

6    questions they -- they'd ask -- parents wouldn't even

7    go to my manager or my supervisor.  They would come

8    straight to me.

9            The guys who were around the park never went to

10   my manager, rarely my supervisor.  They came to me.  I

11   was affiliated with the neighborhood.  I knew people

12   around the park.

13           Even the drug dealers, so forth, people who would

14   call themselves drug dealers, they wouldn't even come

15   in my park with that nonsense because I would kick them

16   straight out.  I would call the proper authorities.  I

17   wouldn't even hesitate.  So none of that stuff there.

18   Q.    And the park that you worked at, you worked for

19   Miami-Dade County.  Correct?

20   A.    Correct.

21   Q.    That park is owned by Miami-Dade County; is it

22   not?

23   A.    Yes.  Yes.

24   Q.    You never heard any of these individuals say --

25   A.    No.

```
 1   Q.     -- "This is my park"?

 2   A.     No.

 3   Q.     "It's not Miami-Dade County's park"?

 4   A.     No.

 5   Q.     Thank you, sir.

 6   A.     Yes.

 7          THE COURT:  Mr. Gregorie?

 8          MR. GREGORIE:  No questions, your Honor.

 9          THE COURT:  You may step down, sir.

10          THE WITNESS:  Thank you.

11          (Witness excused.)

12          THE COURT:  Call your next witness.

13          MS. JHONES:  Mr. Batiste calls Judy Stanley.

14          May I have a moment, your Honor, to call

15   Ms. Stanley?

16          THE COURT:  Yes.

17   Thereupon--

18                    JUDITH STANLEY

19   was called as a witness by the Defendant and, having

20   been first duly sworn, testified as follows:

21          THE COURT REPORTER:  Please have a seat.

22          Please state your full name for the record.

23          THE WITNESS:  Judith Stanley.

24

25                  DIRECT EXAMINATION
```

1   BY MS. JHONES:

2   Q.    Good afternoon, Ms. Stanley.  How are you?

3   A.    Good afternoon.

4   Q.    Ms. Stanley, would you please tell us how it is

5   that you are employed.

6   A.    I am employed by Bank of America as a records

7   custodian.  My official title is officer, and I'm an

8   operations team lead.

9   Q.    And, Ms. Stanley, how long have you been employed

10  in that capacity?

11  A.    I have been with the bank for 18 years.  As far

12  as my title, it's been a while.  So I couldn't tell you

13  exactly how long.

14  Q.    Okay.  And are you appearing here today pursuant

15  to a subpoena?

16  A.    Yes, I am.

17  Q.    Have you been able to -- was a request made of

18  you for records?  Was a request for records made?

19  A.    Yes.

20  Q.    And did you provide me with those record?

21  A.    Previously.  Yes.

22  Q.    And in the course of your duties with Bank of

23  America, are you the person -- well, first of all, let

24  me just show you these documents, if I may.

25        MS. JHONES:  May I approach, your Honor?

```
 1              THE COURT:  Yes.

 2              MS. JHONES:  Thank you.

 3    BY MS. JHONES:

 4    Q.    Ms. Stanley, I'm going to show you what's marked

 5    as Defense Exhibit 72 for identification, and I'm going

 6    to ask you to take a look at those documents, please.

 7    A.    Okay.

 8    Q.    Do you recognize them, Ms. Stanley?

 9    A.    Yes, I do.

10    Q.    Are you the person that has the most knowledge of

11    those documents?

12    A.    Yes, I am.

13    Q.    And are these documents that you have with you

14    today the originals?

15    A.    No, they are not.

16    Q.    Are they copies?

17    A.    Yes.

18    Q.    Do you know whether or not these documents were

19    generated by microfiche or other form?

20    A.    Yes, I do.

21    Q.    And how were they generated?

22    A.    Our statements are kept either on microfiche or

23    microfilm.

24    Q.    These particular documents:  How were they

25    generated?
```

1    A.     They are on film.

2    Q.     And you are the person that is tasked with

3    keeping and retrieving those types of records for

4    Bank of America?

5    A.     Yes.

6           MS. JHONES:  At this time, your Honor,

7    pursuant to 803(6), I'd move these documents into

8    evidence.

9           MR. GREGORIE:  No objection, your Honor.

10          THE COURT:  They will be admitted as Defendant

11   Batiste's Exhibit 72.

12          (Whereupon, Defendant Batiste's Exhibit No. 72

13   was entered into evidence.)

14   BY MS. JHONES:

15   Q.     If I may just have them back, Ms. Stanley, I'm

16   going to ask you some questions about them.

17   A.     (Witness tenders documents to counsel.)

18   Q.     Thank you.

19          MS. JHONES:  May I have the ELMO, your Honor,

20   please.

21          THE COURT:  It's on.

22          MS. JHONES:  Thank you.

23   BY MS. JHONES:

24   Q.     Ms. Stanley, I'm going to show you -- this is a

25   composite exhibit.  I'm going to show you some

1    documents from this composite.

2         First of all, directing your attention to the

3    first page of Defense Composite Exhibit 72 -- let me

4    see if I can zoom it in a little better -- do you see

5    the first page of that exhibit?

6    A.    Yes, I do.

7    Q.    And what is that -- let me know if you have

8    trouble viewing it, and I will provide the document to

9    you.

10        What is reflected in the first page of that

11   document, Ms. Stanley?

12   A.    It is a bank statement for the period of

13   August 1st, 2005, through August 31st, 2005.

14        Do you want the account number?

15   Q.    I don't need the account number.

16        But who is the account holder?

17   A.    Azteca Stucco & Masonry, Inc.

18   Q.    During the time period of October 1st, 2005,

19   through October 31st, 2005, what was the account

20   balance?

21   A.    I can tell you the beginning balance and the

22   ending balance.

23   Q.    Okay.  Please tell us that.

24   A.    The beginning balance was negative $669.10.  The

25   ending balance was $698.10.

1    Q.    And by a negative balance, what is your

2    understanding of what that means?

3    A.    The account was overdrawn.

4    Q.    Okay.  Now, directing your attention to the next

5    page of the Composite Exhibit 72, would you please tell

6    us what is reflected in the first page -- first of all,

7    what is the date and who is the account holder?

8    A.    The statement is for the period of September 1st,

9    2005, through September 30th, 2005.  The account holder

10   is Azteca Stucco & Masonry, Inc.

11   Q.    And what balance, if any, is reflected in that

12   page of the exhibit?

13   A.    Okay.  The beginning balance was negative

14   $698.10.  The ending balance was $598.10.

15   Q.    Okay.  Directing your attention to the front

16   page -- another page of this composite exhibit, would

17   you tell me what is reflected in that particular page.

18   A.    Okay.  Well, this is again the statement for

19   October 1st, 2005, through October 31st, 2005.  The

20   account holder is Azteca Stucco & Masonry, Inc.  The

21   beginning balance is $598.10, negative.  The ending

22   balance is zero.

23   Q.    Did anything -- did Bank of America take any

24   action as a result of the status of that account during

25   the fall months of 2005?

1    A.    On October the 11th, there is a forced close

2    debit in the amount of $598.10.

3    Q.    What does that mean, Ms. Stanley?

4    A.    That means that the bank put the money back into

5    the account to just offset it, to close it out.

6    Q.    When you say "close it out," what do you mean by

7    that?

8    A.    The bank closed the account.

9    Q.    Okay.  To your knowledge, Ms. Stanley, was this

10   account ever reactivated?

11   A.    Not to my knowledge.

12            MS. JHONES:  I have nothing further.

13            THE COURT:  Mr. Vereen?

14            MR. VEREEN:  No questions, Judge.

15            THE COURT:  Mr. Houlihan?

16            MR. HOULIHAN:  No questions.

17            THE COURT:  Mr. Clark?

18            MR. CLARK:  No further questions, your Honor.

19            THE COURT:  Mr. Casuso?

20            MR. CASUSO:  No questions, your Honor.

21            THE COURT:  Mr. Levin?

22            MR. LEVIN:  No questions, Judge.

23            THE COURT:  Mr. Gregorie?

24            MR. GREGORIE:  No questions, your Honor.

25            THE COURT:  You may step down, ma'am.

Smith - DIRECT - By Ms. Jhones                     118

```
 1              (Witness excused.)
 2              THE COURT:  Call your next witness.
 3              MS. JHONES:  May I step out for a moment, your
 4    Honor?
 5              THE COURT:  Yes.
 6              MS. JHONES:  Thank you.
 7              Your Honor, Mr. Batiste calls Xavier Smith.
 8              MR. VEREEN:  He's coming through security,
 9    Judge.
10              THE COURT:  Okay.
11    Thereupon--
12                    XAVIER LAMONT SMITH
13    was called as a witness by the Defendant and, having
14    been first duly sworn, testified as follows:
15              THE COURT REPORTER:  Please have a seat.
16              Please state your full name for the record and
17    give the spelling.
18              THE WITNESS:  Xavier Lamont Smith.
19              Judge, I want to apologize.  I just came from
20    work.  I usually dress nicely, but I apologize for the
21    way I'm dressed.
22                    DIRECT EXAMINATION
23    BY MS. JHONES:
24    Q.    Good afternoon, Mr. Smith.  How are you?
25    A.    Good.  Thank you.
```

Smith - DIRECT - By Ms. Jhones                119

1    Q.    Mr. Smith, where do you live?  What area of town?

2    A.    Miramar, Florida.

3    Q.    Are you presently employed?

4    A.    Yes.

5    Q.    And how are you employed?

6    A.    I'm sorry?

7    Q.    How are you employed?

8    A.    Through a union.  I'm a student with the union --

9    plumbers' union.

10   Q.    How long have you worked for the plumbers' union?

11   A.    This is my fourth year in school.

12   Q.    Okay.  Did you graduate from high school, sir?

13   A.    Yes.

14   Q.    Tell us a little bit about your educational

15   background.

16   A.    I graduated from Miami Northwestern.  I lived in

17   Liberty City most of my entire life.  And I took a

18   little bit of courses -- business courses in Miami-Dade

19   County Community College.  And that's pretty much it.

20   Q.    Okay.  And, Mr. Smith, directing your attention

21   to the summer and the fall of 2005, were you affiliated

22   with any church?

23   A.    Yes.

24   Q.    And would you please tell us what church that

25   would be.

```
 1   A.     United Christian Outreach Ministry, located in
 2   Liberty City, 62nd and 15th Avenue.
 3   Q.     And tell us, sir, in the summer and the fall of
 4   2005, how was it that you were affiliated with the
 5   United Christian Outreach Ministry?
 6   A.     My father -- he's the pastor.  I myself am a
 7   musician and a teacher, a pastor, there.
 8   Q.     And how long -- well, first of all, is that
 9   church still operational?
10   A.     No.  Not in Miami.  They moved on, transferred to
11   a new church.
12   Q.     And when did that occur?  When did the transfer
13   occur?
14   A.     Last year.
15   Q.     Okay.
16   A.     The summer.
17   Q.     In the summer?
18   A.     Yeah.
19   Q.     Okay.  Are you an ordained minister, sir?
20   A.     Yes, I am.
21   Q.     And what type of ministry is the United Christian
22   Outreach Ministry?
23   A.     It's Christian-based ministry.
24   Q.     Okay.  And approximately in the fall -- the
25   summer and the fall of 2005, how many members would
```

```
1   your church have?  Approximately how many?

2   A.     Approximately between 75 to 100.

3   Q.     Okay.  When this Outreach Ministry was located in

4   Liberty City, was there any particular reason why it

5   was located there?

6   A.     It was located there to outreach within the

7   community there, to start daycares, help the employment

8   there, bringing business in to employ the families

9   there, pretty much various different things within

10  that -- helping the community build up, working with

11  the City of Miami, Dade County.

12         Whatever influence we can have within the

13  community, the family that live in the area, to help

14  them in their everyday life, that's pretty much what we

15  was doing.

16  Q.     Okay.  Mr. Smith, do you know an individual by

17  the name of Narseal Batiste?

18  A.     Yes, ma'am.

19  Q.     And please tell us when it was that you met him.

20  A.     I met him during that year of 2005, between March

21  and -- between March and April, within roughly that

22  area, I believe.

23         I was going to a store and, after I leave the

24  store, I came back and I noticed that they was at a

25  building that we was trying to also purchase.  But they
```

```
 1    had got -- purchased the building that we was trying to

 2    do for a churching ministry and daycare.

 3         And I met them -- they was outside, like,

 4    renovating the building, making it look nice and, you

 5    know, I just asked them, you know, about the building

 6    and how was the building going and just -- you know, we

 7    just exchanged names and -- pretty much that way.

 8    Q.    Let me show you an exhibit, if I may.

 9    A.    Okay.

10         MS. JHONES:  Your Honor, may I have the ELMO,

11    please?

12         THE COURT:  It's on.

13         MS. JHONES:  Thank you.

14    BY MS. JHONES:

15    Q.    Mr. Smith, I'm going to show you Government's

16    Exhibit No. 7.

17         Can you see that up there?

18    A.    Yes.

19    Q.    Do you recognize that?

20    A.    Yes.

21    Q.    Okay.  Is that -- how do you recognize what's

22    depicted in Government's Exhibit 7?

23    A.    This is the building that sits on the south side

24    of our church building.  And this was actually the

25    building that we was trying to purchase, also.
```

```
 1   Q.    Okay.  And were you successful in purchasing it,
 2   sir?
 3   A.    No.  He beat us to it.
 4   Q.    And by "he," who do you mean?
 5   A.    I'm sorry?
 6   Q.    By "he," who do you mean?
 7   A.    Batiste.
 8   Q.    Do you see Mr. Batiste here in the courtroom
 9   today?
10   A.    Yes.
11   Q.    Would you please describe an article of clothing
12   that he's wearing.
13   A.    He's wearing a suit, nice tie, something I would
14   be dressed in next time.
15   Q.    Okay, sir.  Would you tell us, please, the
16   outreach church ministry, I should say, that you were
17   affiliated with:  What was -- what were some of the
18   objectives that that program had?
19        MR. GREGORIE:  Objection, your Honor.
20   Relevance.
21        THE COURT:  Sustained.
22   BY MS. JHONES:
23   Q.    What, if any, discussions -- without telling us
24   what Mr. Batiste told you, sir, what, if any,
25   discussions -- statements did you make to Mr. Batiste
```

1  regarding your church?

2  A.    Well, I just explained to him what we was also

3  doing, helping the homeless, building new lives to get

4  the people back into the community of working and back

5  into the -- you know, just regular everyday thing that

6  we are doing, also, now.

7        And that's pretty much what we was just

8  describing to him.  We described a church and ministry.

9  That's pretty much what we was talking about.

10 Q.    You mentioned that, when you saw Mr. Batiste, you

11 saw him in front of the location depicted in

12 Government's Exhibit 7.  Correct?

13 A.    Correct.

14 Q.    When you saw Mr. Batiste, was he alone or did he

15 have others with him?

16 A.    I think -- I believe he had one other -- or

17 either -- or two guys with him, working in front of the

18 building.

19 Q.    Now showing you an exhibit that is in evidence,

20 Government's Exhibit 7, do you see how many doors that

21 building has?

22 A.    It has two doors.

23 Q.    On the occasion that you saw Mr. Batiste in the

24 company of two other individuals, were those doors open

25 or closed?

Smith - DIRECT - By Ms. Jhones                 125

```
 1   A.    The one on the left of -- of -- my left was open.

 2   Q.    And were you able to see inside that building,

 3   sir?

 4   A.    Yes.

 5   Q.    What were you able to observe?

 6   A.    I observed that they was putting up, like, new

 7   drywall, the painting, and everything looked very nice,

 8   very nice.

 9   Q.    Did you go inside the building on that occasion?

10   A.    No.

11   Q.    Was there anything unusual about having a church

12   ministry in that location in Liberty City, sir?

13   A.    No.  No, ma'am.

14   Q.    And did there come a time, sir, that you actually

15   went inside the building?

16   A.    Yes.

17   Q.    And when did that occur?

18   A.    It had to be at least a couple of weeks later.

19   Q.    And how was it that you were -- that you came to

20   go inside of that building?

21   A.    We was on the side of the -- of this building

22   from the door.  From the door -- from me looking at the

23   door on the left -- of my left, there's a corner on the

24   side.

25         And we just began to speak about -- more about --
```

 1   because I told him that I was into plumbing.  We

 2   started talking about carpentry, which is what he was

 3   in, doing carpentry and stuff like.

 4        And we start talking about construction work, you

 5   know, new things in the area.  And, you know, I was

 6   asking about, you know, "Can I see the work that you

 7   do?"

 8        So we went around to the back entrance of the

 9   building.  The doors was already open.  And we began --

10   I began to see the nice work that he already did, the

11   building.

12   Q.   And briefly, sir, would you tell us, what type of

13   work were you able to see once you went inside the

14   building?

15   A.   Like I said earlier, like new painting, new

16   drywalls.  Everything was just being renovated.  The

17   walls was pretty much like we standing in today -- or I

18   should say sitting in here.  That's how it pretty much

19   was looking.

20   Q.   All righty.  Mr. Smith, did Mr. Batiste give you

21   anything on that occasion when you saw him?

22   A.   No.

23   Q.   Did you ever meet -- besides the other two

24   gentlemen, did you ever see any other people in that

25   building?

```
 1   A.    I just seen kids.  I met his wife.  That's pretty

 2   much it.

 3   Q.    Mr. Smith, did you ever see any weapons in that

 4   building when you were inside?

 5   A.    No, ma'am.

 6   Q.    When you saw Mr. Batiste or any other gentlemen

 7   around Mr. Batiste, did you ever see him in possession

 8   of any weapons?

 9   A.    No, ma'am.

10   Q.    Did you ever see Mr. Batiste engage in any type

11   of drug activity?

12   A.    No, ma'am.

13   Q.    What, if any, observations did you make with

14   respect to any affiliation with any gang members in

15   Liberty City?

16   A.    I'm sorry?

17   Q.    Any gang members?

18   A.    No, ma'am.

19   Q.    Did you ever see Mr. Batiste or any of the

20   individuals that were with him associated in any acts

21   of violence?

22   A.    No, ma'am.

23   Q.    Did you ask any questions of Mr. Batiste as to --

24   did you ask him any questions with respect to that

25   building?
```

1    A.      With respect to building?

2    Q.      Did you ask him any questions regarding that

3    building?

4    A.      Oh, yes.

5    Q.      Without telling us what he told you, what type of

6    questions would you ask him?

7    A.      We pretty much asked him -- because -- based on

8    that -- when -- the programs that we had, and we pretty

9    much asked him what he's intending to do with the

10   building and -- or he's gonna do outreaches for the

11   community, dealing with employment, the younger kids,

12   being a role model.  You know, we pretty much touched

13   base in that area.

14   Q.      During the fall and -- the summer and the fall of

15   2005, Mr. Smith, did you reside in the Liberty City

16   area?

17   A.      I'm sorry?

18   Q.      Did you live in the Liberty City area during the

19   fall --

20   A.      No.  No.

21   Q.      How often --

22           MS. JHONES:  Strike that, your Honor.

23           I have nothing further.

24           Thank you, Mr. Smith.

25           THE WITNESS:  Okay.

```
 1              THE COURT:  Mr. Vereen?

 2              MR. VEREEN:  No questions, Judge.

 3              THE COURT:  Mr. Houlihan?

 4              MR. HOULIHAN:  No questions.

 5              THE COURT:  Mr. Clark?

 6              MR. CLARK:  No further questions, your Honor.

 7              THE COURT:  Mr. Casuso?

 8              MR. CASUSO:  No questions, your Honor.

 9              THE COURT:  Mr. Levin.

10              MR. LEVIN:  No questions, your Honor.

11              THE COURT:  Mr. Gregorie?

12                      CROSS-EXAMINATION

13    BY MR. GREGORIE:

14    Q.    Sir, just one question.

15          Did you ever attend any meetings inside the

16    building?

17    A.    No.

18              MR. GREGORIE:  No further questions, your

19    Honor.

20              THE COURT:  Ms. Jhones?

21              MS. JHONES:  I'm sorry?

22              THE COURT:  Anything further?

23              MS. JHONES:  Nothing further.

24              THE COURT:  You may step down, sir.

25              (Witness excused.)
```

1          THE COURT:  We're going to break for lunch.

2          Do not discuss this case either amongst

3     yourselves or with anyone else.  Have no contact

4     whatsoever with anyone associated with the trial.  Do

5     not read, listen or see anything touching on this

6     matter in any way.

7          If anyone should try to talk to you about this

8     case, you should immediately instruct them to stop and

9     report it to my staff.

10          You may leave your notebooks and your binders

11     at your chairs.  Please be back in the jury room at

12     1:30.

13          (Whereupon, the jury exited the courtroom at

14     12:29 p.m. and the following proceedings were had:)

15          THE COURT:  We're in recess until 1:30.

16          (Whereupon, a luncheon recess was taken, after

17     which the following proceedings were had:)

18          THE COURT:  We're back on United States of

19     America versus Narseal Batiste, et al., Case

20     No. 06-20373.

21          Counsel, state your appearances, please, for

22     the record.

23          MR. GREGORIE:  Good afternoon.

24          Richard Gregorie and Jacqueline Arango on

25     behalf of the United States.

```
 1              MS. JHONES:  Good afternoon.

 2              Ana Jhones on behalf of Mr. Batiste, who's

 3    present.

 4              MR. LEVIN:  Good afternoon, your Honor.

 5              Albert Levin on behalf of Patrick Abraham,

 6    who's present.

 7              MR. CASUSO:  Lou Casuso on behalf of Burson

 8    Augustin, who's present.

 9              MR. CLARK:  Nathan Clark for Rotschild

10    Augustine, who's present.

11              MR. HOULIHAN:  Richard Houlihan with Naudimar

12    Herrera.

13              MR. VEREEN:  Rod Vereen on behalf of Stanley

14    Phanor, who's present.

15              THE COURT:  All Defendants are present.

16              Let's bring in the jury.

17              Who is your next witness?

18              MS. JHONES:  I believe Lisa Lamey.

19              (Whereupon, the jury entered the courtroom at

20    1:53 p.m. and the following proceedings were had:)

21              THE COURT:  You may be seated.

22              Call your next witness.

23              MS. JHONES:  Mr. Batiste calls Lisa Lamey.

24              THE COURT:  You are still under oath, ma'am.

25              THE WITNESS:  Okay.
```

```
 1                    DIRECT EXAMINATION
 2   BY MS. JHONES:
 3   Q.     Good afternoon, Ms. -- "Lamey"?
 4   A.     "Lamey."
 5   Q.     Good afternoon, ma'am.
 6   A.     Good afternoon.
 7   Q.     Ms. Lamey, I want to ask you just a few questions
 8   about the search that I believe you testified about
 9   yesterday.
10   A.     Two days ago.  But yes.
11   Q.     Two days ago.
12          MS. JHONES:  If I may just retrieve one more
13   document, your Honor.
14          THE COURT:  Sure.
15          MS. JHONES:  Thank you.
16   BY MS. JHONES:
17   Q.     I apologize.
18   A.     That's okay.
19   Q.     Ms. Lamey, you are employed with the FBI.
20   Correct?
21   A.     Yes.
22   Q.     And directing your attention to June 22nd of
23   2006, in what capacity were you involved in the search
24   of the location known as the Embassy?
25   A.     I was part of the search team.  I'm assigned as
```

 1    an assistant team leader.

 2    Q.    And just so -- you are familiar with this place

 3    as being referred to as "the Embassy."  Correct?

 4    A.    I've heard that.  Yes.

 5    Q.    And you had another fellow co-agent by the name

 6    of Special Agent Lunn that was a co- -- I believe the

 7    title would be search team leader?

 8    A.    He's our team leader, yes.

 9    Q.    And during the course -- and many questions were

10    asked of you with respect to the search, and I'm not

11    going to repeat them.

12          But what, if any -- you indicated previously that

13    a number of photographs had been taken.  Correct?

14    A.    Yes.

15    Q.    Do you have a recollection, as you sit here

16    today, with respect to how many photographs were taken?

17    A.    No.  I think that we agreed that there were

18    hundreds taken.  But I don't know how many.

19    Q.    I'm going to go ahead and show you a composite

20    exhibit -- actually, a series of exhibits marked for

21    identification.  Okay?

22    A.    Okay.

23    Q.    Great.

24          MS. ARANGO:  Judge, I have no objection to the

25    introduction of these photographs of the inside of the

1    Embassy during the search.

2            THE COURT:  Okay.

3            MS. JHONES:  Thank you.

4            At this time, I would move them into evidence,

5    your Honor.

6            THE COURT:  I don't know the numbers.

7            MS. JHONES:  Oh.  That would help, wouldn't

8    it, your Honor?

9            THE COURT:  Yes.

10           MS. JHONES:  Your Honor, it's Batiste

11   Exhibits B-1 through B-54.

12           And, your Honor, there was some type of typo.

13   So there's not a B-11.

14           THE COURT:  Okay.

15           MS. JHONES:  So it's B-1 through B-54,

16   excluding B-11.

17           THE COURT:  They will be admitted as Defendant

18   Batiste's Exhibits B-1 through B-54, without B-11.

19           (Whereupon, Defendant Batiste's Exhibit

20   Nos. B-1 through B-10 and B-12 through B-54 were

21   entered into evidence.)

22           MS. JHONES:  Thank you, your Honor.

23           May I publish, your Honor?

24           THE COURT:  Yes.

25           MS. JHONES:  Thank you.

1          THE COURT:  It's ready for you.  You just have

2    to turn it on.

3          MS. JHONES:  Sure.

4    BY MS. JHONES:

5    Q.    Agent Lamey, I'd like to review Batiste

6    Exhibits B-1 through B-54, excluding B-11, with you, if

7    I may.  Okay?

8    A.    Sure.

9    Q.    I do have a log.  So if you need to refer to that

10   to refresh your recollection in any way, please let me

11   know.

12   A.    Okay.

13   Q.    Thank you.

14         Now, do you have any recollection as to how many

15   rolls of film were taken?  I believe you indicated you

16   do not know the exact number.  Correct?

17   A.    That's correct.  I don't know.

18   Q.    I'm going to show you what's in evidence as

19   Batiste Exhibit B-1.

20         Do you recognize what's depicted in that

21   photograph?

22   A.    Yes.

23   Q.    Okay.  And, Agent Lamey, right over here, where

24   the exit sign is depicted -- correct? -- would that be

25   the front part of the location known as the Embassy?

Lamey - DIRECT - By Ms. Jhones                  136

```
 1   By "front" meaning facing 15th Avenue, I believe, it
 2   is.  Or would that be the back?
 3   A.     That's the back.
 4   Q.     And so, if -- and you indicated, I believe,
 5   previously that one of the doors in the back -- I
 6   believe it was the door to the right was the door that
 7   the FBI gained access to the first time -- when they
 8   initially entered?
 9   A.     The door that I entered to do the search was that
10   one you see right there.
11   Q.     Meaning right here (indicating)?
12   A.     Yes.
13   Q.     Okay.  Correct.
14          Now, when you walk in, as you go to your right,
15   do you remember what it is that -- what are these items
16   that are depicted down below?
17   A.     I believe it's bottled water, isn't it?
18   Q.     That's what it appears to me.
19          Do you have any recollection?
20   A.     Yes.  I believe that's what it is.  It would be
21   easier to tell if we zoomed in.
22   Q.     Let me see if I can do that for you.
23   A.     Yes.  That's bottled water.
24   Q.     All righty.  Do you remember at all, Special
25   Agent Lamey, if those bottles of water were already --
```

Lamey - DIRECT - By Ms. Jhones                    137

 1    were presealed or had the seal been broken?

 2    A.     I don't think that I checked that.

 3    Q.     Fair enough.

 4           Now, directing your attention to Batiste

 5    Exhibit B-52 in evidence, what is depicted in Batiste

 6    Exhibit B-52, please?

 7    A.     It's a plastic table sitting adjacent to the door

 8    in the back of the Embassy room.

 9    Q.     Would that just be a different shot of the same

10    table that is contained in the previous exhibit?

11    A.     Yes.

12    Q.     And directing your attention, Agent Lamey, to

13    B-51, do you recall the items depicted in Batiste

14    Exhibit B-51?

15    A.     In a general sense, yes.

16    Q.     Would you happen to remember, Special Agent

17    Lamey, what was contained in these boxes?

18    A.     I don't.

19    Q.     Would there be anything in your inventory that

20    perhaps would identify them?

21    A.     Only if they had been seized.

22    Q.     Okay.  I don't believe they were.

23           Could you tell from your inventory?

24    A.     Well, yes.  I mean, I could see on the list of

25    items seized if we seized two blue plastic bins.

```
 1              MS. JHONES:  May I approach, your Honor, to

 2    show Special Agent Lamey her --

 3              THE COURT:  Yes.

 4              MS. ARANGO:  Judge, I would object to

 5    relevance.  She's going to go through the entire list

 6    to see if two bins were seized.  Is there --

 7              MS. JHONES:  I'd like for her to describe the

 8    items, your Honor, that were seized or not -- if they

 9    weren't seized, she's not able to describe them.  But

10    I'd like to know whether these items --

11              THE COURT:  Overruled.

12              MS. JHONES:  May I approach?

13              THE COURT:  Yes.

14              MS. JHONES:  Ms. Arango, do you need to see

15    the exhibit?

16              MS. ARANGO:  No, thank you.

17    BY MS. JHONES:

18    Q.    (Tenders document to the witness.)

19    A.    Thank you.

20          The paperwork that you just gave me is a photo

21    log and, also, a sketch of the location.  It's not an

22    item -- a list of the items that we seized.

23    Q.    Would the 302 help you?

24    A.    Yes, ma'am.

25    Q.    Great.  Let me see if I can get that for you.
```

1          MS. JHONES:  May I approach, your Honor?

2          THE COURT:  Yes.

3   BY MS. JHONES:

4   Q.     Here you go.

5   A.     Okay.

6   Q.     Does that help in any way, Agent Lamey?

7   A.     Yes and no.  According to our evidence recovery

8   log, which is basically what this is, I don't see

9   anywhere on there that we seized two blue plastic bins.

10         However, it's possible that something was taken

11  out of the bins.  For instance, we have on our log very

12  small items that may have fit inside this.  But I don't

13  have an indication if we took anything out of those

14  bins specifically.

15  Q.     Fair enough.

16         Now, describe for us just -- I know you've

17  previously done this.

18         But just to get back on track where -- this type

19  of location, in Government's Exhibit 7 -- let me show

20  you that -- this is the location where the search

21  occurred.  Correct?

22  A.     Yes.

23  Q.     All righty.  Now, when you -- the FBI gained

24  access through the back, correct, as opposed to the

25  front?

1    A.    Yes.

2    Q.    This side right here is the side that depicts the

3    area that has the table with the bottled waters in the

4    bottom?

5    A.    No.  The table was on the other side of the

6    building.

7    Q.    Oh, I'm sorry.

8          In the back?

9    A.    Correct.

10   Q.    But it's this side of the building as opposed to

11   this side?

12   A.    Yes.

13   Q.    And let me know if you want -- I could always

14   show you, once again, Batiste Exhibit 1, which may

15   help.  So just let me know --

16   A.    I just had to reverse it in my mind.  But yes.

17   That was correct.

18   Q.    Because it is a little confusing to me as well.

19   Okay.

20         Now, as you enter from this side -- which would

21   be your right, correct, in the back -- the back area?

22   A.    If you're looking at the back of the building,

23   where you just pointed would be the right side.

24   Q.    Now, when you enter there, do you recall whether

25   or not you see what's depicted in Batiste Exhibit B-2?

1    A.    Excuse me.  What is the question?

2    Q.    Do you recall whether or not -- first of all, do

3    you recognize what's depicted in Batiste Exhibit B-2?

4    A.    Yes.  That's Item No. 65, an item of evidence

5    that we collected.

6    Q.    And based on the log that you have in front of

7    you, could you tell us where the location of 65 --

8    where that would be.

9    A.    Okay.  Entering in the rear of the business, as

10   we did, it would be almost immediately to your left,

11   along the backside wall.

12   Q.    Okay.  Fair enough.

13         And, Special Agent Lamey, the item that's

14   depicted in Batiste Exhibit B-2:  These items -- would

15   you please tell us what -- based on your recollection,

16   what those items are.

17   A.    They're little miniature flags.

18   Q.    Were those miniature flags seized by the FBI?

19   A.    Yes.

20         MS. JHONES:  If I may approach, your Honor, to

21   have the witness identify Defense Exhibit 16.

22         MS. ARANGO:  No objection to the introduction.

23         MS. JHONES:  I move for its admission, your

24   Honor, Batiste Exhibit 16.

25         THE COURT:  It will be admitted as Defendant

 1   Batiste's Exhibit 16.

 2              (Whereupon, Defendant Batiste's Exhibit No. 16

 3   was entered into evidence.)

 4              MS. JHONES:  Thank you, your Honor.

 5              May I approach the witness?

 6              THE COURT:  Yes.

 7   BY MS. JHONES:

 8   Q.    (Tendering exhibit to the witness.)

 9         Special Agent Lamey, if you would, just remove

10   the items contained in that wrapper and let me know if

11   you recognize them.

12   A.    These appear to be the flags that are in the

13   picture.

14   Q.    Do you recall, Special Agent Lamey, if anything

15   else besides those flags was seized from the top of

16   this location?

17   A.    No, I don't.

18   Q.    Now, in addition to those flags depicted on the

19   photograph in Batiste Exhibit 2, do you recall whether

20   or not there were other flags that were seized?

21   A.    I believe we did.  I'd have to look at this list

22   again.  I believe there was another flag, but I have to

23   be sure.

24         Yes.  There were two others -- other flags seized

25   as Item No. 64.

1    Q.     All righty.  Does your log indicate whether or

2    not those flags were in similar appearance to the flags

3    depicted on B-2?

4    A.     No, it doesn't.

5    Q.     Now showing you just briefly Batiste Exhibit 50,

6    do you recognize that?

7    A.     Yes.

8    Q.     What side of the Embassy location would this area

9    be?

10   A.     I need to see the overall room photo again.

11   Q.     Sure.  This is Batiste Exhibit B-1.

12   A.     Okay.  It would be, as you enter from the rear,

13   on the -- your left-hand side.

14   Q.     Over here (indicating)?

15   A.     No.  On the right-hand side of the picture, but

16   as you enter the room on your left.

17   Q.     Do you recall whether any items contained in

18   Exhibit 50 -- whether any of these items were seized?

19   A.     I believe we seized some files from that file

20   cabinet.

21   Q.     Do you recall, Special Agent Lamey, whether the

22   fax machine was seized?

23   A.     It looks like we seized an HP Officejet.  I

24   believe we seized that as Item No. 26.

25   Q.     Do you have a memory, Special Agent Lamey, as to

1   whether or not this HP had -- was a fax as well?

2   A.    I believe that is a printer/fax in the picture.

3   Q.    Do you know whether or not that was connected to

4   any power that was actually functional?

5   A.    I don't know.

6   Q.    B-48:  Do you recognize what's depicted in that

7   exhibit?

8   A.    Yes.

9   Q.    Do you recall when those computers were seized?

10  A.    Yes.

11  Q.    Do you have a recollection as to whether those

12  computers were actually connected to some Internet

13  service or in any way connected -- any power?

14  A.    I don't know.

15  Q.    B-47:  Is that the same room, Special Agent

16  Lamey?

17  A.    It is.

18  Q.    I'm going to speak to you briefly about a few of

19  the items on the table.

20        Were those items in that location upon entry by

21  yourself and your fellow co-agents?

22  A.    Yes.

23  Q.    Were they photographed immediately upon entry?

24  A.    Yes.

25  Q.    I'm going to show you -- I'm just going to show

1    you a few of them, since they're pretty heavy --

2    A.    Okay.

3    Q.    -- Defense Exhibit 59, and I'm going to show you

4    Defense Exhibit 14 and Defense Exhibit 13.

5            MS. JHONES:  May I approach, your Honor?

6            THE COURT:  Yes.

7            MS. JHONES:  Would you like to see?

8            MS. ARANGO:  No.  No objection.

9            THE COURT:  Do you want to -- counsel, please

10   approach for a minute.

11           (Whereupon, proceedings were had at side-bar

12   outside the presence of the jury which have been sealed

13   per instructions of the Court.)

14           (Whereupon, the following proceedings were had

15   in open court:)

16           MS. JHONES:  May I proceed, your Honor?

17           THE COURT:  Yes.

18           MS. JHONES:  Thank you.

19   BY MS. JHONES:

20   Q.    Special Agent Lamey, do you recognize those three

21   books that I've placed before you?

22   A.    They appear to be law dictionaries.

23   Q.    And you do you recall, Special Agent Lamey, where

24   those books were seized from?

25   A.    These were -- again, as I explained last time,

```
 1    when we do a search like this, there's a team of at

 2    least -- in this case, 12 people.

 3         So at any one time, I may be standing where the

 4    books are or I may be standing where the flags are.  So

 5    I don't recall specifically these books exactly.

 6         But they appear to be similar to the ones that I

 7    saw in the Embassy.

 8    Q.   Okay.  I'm just going to show you a few more and

 9    just try to get through them as quickly as I can.

10    Okay?

11    A.   Okay.

12              THE COURT:  Are these marked as one exhibit?

13              MS. JHONES:  No, your Honor.  I believe I did

14    not identify them.  Let me just identify them for the

15    record.

16              THE COURT:  Okay.

17    BY MS. JHONES:

18    Q.   Special Agent Lamey, let me show you what's been

19    marked for identification as Defense Exhibit 13,

20    Defense Exhibit 59 and Defense Exhibit 14, Defense

21    Exhibit 5, Defense Exhibit 4 and Defense Exhibit 8.

22         Do you recognize those books as books that were

23    seized from the Embassy location on June 22nd?

24    A.   Again, they appear to be similar to the ones that

25    I saw.
```

Lamey - DIRECT - By Ms. Jhones                147

```
 1            MS. JHONES:  At this time, your Honor, I'd
 2   move into evidence Defense Exhibits 8, 4, 14, 5 --
 3   thank you -- Defense Exhibit 5, Defense Exhibit 3 --
 4   I'm sorry -- 13 -- not 3 -- and Defense Exhibit 59.
 5            And I believe, your Honor, I did move in
 6   Defense Exhibit 16, which had the flags.
 7            THE COURT:  Yes.  That's in already.
 8            MS. ARANGO:  Judge, I have no objection,
 9   subject to the --
10            THE COURT:  The side-bar?
11            MS. ARANGO:  Yes.
12            THE COURT:  They will be -- the books will be
13   admitted as demonstrative evidence, Exhibits 4, 5, 8,
14   13, 14 and 59.
15            (Whereupon, Defendant Batiste's Exhibit
16   Nos. 4, 5, 8, 13, 14 and 59 were marked for
17   identification.)
18            THE COURT:  Ladies and gentlemen of the jury,
19   these books are being introduced as demonstrative
20   evidence, which means that they are not going to be
21   going back to the jury room with you at the conclusion
22   of the case as evidence.
23            In their stead will be a copy of the title
24   page of each book.  And that will be introduced in
25   evidence and will go back to the jury room with you.
```

```
 1              MS. JHONES:  Thank you, your Honor.

 2              If I may once again approach the witness, your

 3    Honor.

 4              THE COURT:  Yes.

 5              MS. JHONES:  Ms. Arango, do you need to see

 6    these books?

 7              MS. ARANGO:  No.

 8    BY MS. JHONES:

 9    Q.    Special Agent Lamey, I'm going to show you

10    Defense Exhibit 17, Defense Exhibit 20, Defense

11    Exhibit 19, Defense Exhibit 57 --

12              THE COURT:  There already is a 19.

13              MS. JHONES:  There is?

14              THE COURT:  Yes.

15              MS. JHONES:  Okay.  Let me take this one back,

16    your Honor, and double-check Defense Exhibit 19.

17    BY MS. JHONES:

18    Q.    -- Defense Exhibit 61, Defense Exhibit 18,

19    Defense Exhibit 7.

20         If you could just review those, Special Agent

21    Lamey, and let me know if you recognize those as books

22    that were seized from the Embassy on June 22nd of 2006.

23    A.    Yes.  Again, these appear to be similar to the

24    ones seized on that day.

25              MS. JHONES:  Your Honor, at this time I'd move
```

 1    the Exhibits 7, 57, 18, 61, 20 and 17 into evidence.

 2            MS. ARANGO:  Judge, I have no objection.  Of

 3    course, if there's any that are subject to the

 4    side-bar -- I'm not sure if there are, but --

 5            MS. JHONES:  There is one.

 6            THE COURT:  Which one is that?

 7            MS. JHONES:  *Commercial Law*, which would be --

 8            THE COURT:  Which number?

 9            MS. JHONES:  Defense Exhibit 7.

10            THE COURT:  7 will be admitted as

11    demonstrative evidence.  Again, the title page will be

12    introduced into evidence.

13            (Whereupon, Defendant Batiste's Exhibit No. 7

14    was entered into evidence.)

15            MS. ARANGO:  Judge, for the record, the

16    Government stipulates to the introduction of any

17    evidence seized from the Embassy, of course, subject to

18    the side-bar regarding some of the books.

19            THE COURT:  Okay.

20            MS. JHONES:  Great.  So I'm --

21            THE COURT:  I have some more exhibits to

22    announce.

23            The additional exhibits are admitted as 17 --

24    Batiste Exhibit 17, 18, 20, 57 and 61.

25            (Whereupon, Defendant Batiste's Exhibit

 1    Nos. 17, 18, 20, 57 and 61 were entered into evidence.)

 2            MS. JHONES:  If I may approach the witness to

 3    identify another set of books, your Honor.

 4            THE COURT:  Yes.

 5            MS. JHONES:  Thank you.

 6            Ms. Arango?

 7            MS. ARANGO:  That's fine.

 8    BY MS. JHONES:

 9    Q.    Special Agent Lamey, I'm handing you Defense

10    Exhibit 1, Defense Exhibit 12, Defense Exhibit 9 and

11    Defense Exhibit 6, and ask if you recognize those

12    exhibits.

13    A.    Again, these appear to be similar to the books we

14    seized at the Embassy that day.

15            MS. JHONES:  I move into evidence -- I'm going

16            to move all, but I have to identify it.

17            I'd like to move into evidence No. 6, No. 9,

18    No. 12 and No. 1.

19            THE COURT:  They will be admitted as

20    demonstrative exhibits, Batiste Exhibits 1, 6, 9 and

21    12.

22            (Whereupon, Defendant Batiste's Exhibit

23    Nos. 1, 6, 9 and 12 were entered into evidence.)

24            MS. JHONES:  Thank you, your Honor.

25

BY MS. JHONES:

Q.    Special Agent Lamey, if you can, just tell us
what Defense Exhibit 12 is.

A.    It's a book entitled *Studies in Contract Law*.

Q.    How about Defense Exhibit 9?

A.    A book entitled *Processes of Dispute Resolution*.

Q.    Defense Exhibit 6?

A.    Another book titled *Constitutional Law*.

Q.    And Defense Exhibit 1?

A.    That's a *Webster's New Collegiate Dictionary*.

Q.    Thank you.

        MS. JHONES:  Your Honor, may I approach the
witness?

        THE COURT:  Yes.

        MS. JHONES:  Thank you.

BY MS. JHONES:

Q.    Special Agent Lamey, I'm going to hand you
Defense Exhibit 2, Defense Exhibit 60, Defense
Exhibit 58, Defense Exhibit 10, Defense Exhibit 70,
Defense Exhibit 69, Defense Exhibit 68, Defense
Exhibit 67, Defense Exhibit 66, Defense Exhibit 62 and
Defense Exhibit 15.

        Do you recognize those exhibits, Special Agent
Lamey?

A.    Yes.  Those appear to be more books that we

1    seized from the Embassy.

2            MS. JHONES:  I'd like to move into evidence,

3    your Honor, at this time as demonstrative evidence

4    Defense Exhibit 15.

5            THE COURT:  It will be admitted as

6    demonstrative -- Batiste demonstrative evidence

7    Exhibit 15.

8            (Whereupon, Defendant Batiste's Exhibit No. 15

9    was entered into evidence.)

10           MS. JHONES:  Defense Exhibit 62 --

11           THE COURT:  Give me the whole list.

12           MS. JHONES:  Defense Exhibit 66, 67, 68, 69,

13   70, 10, 58, 60, and Defense Exhibit 2.

14           THE COURT:  They will be admitted as Defendant

15   Batiste's Exhibits 2, 10, 60, 62, 58, 70, 69, 68, 67

16   and 66.

17           (Whereupon, Defendant Batiste's Exhibit

18   Nos. 2, 10, 60, 62, 58, 70, 69, 68, 67 and 66 were

19   entered into evidence.)

20           MS. JHONES:  Thank you, your Honor.

21   BY MS. JHONES:

22   Q.    Just quickly, Special Agent Lamey, please tell us

23   what Defense Exhibit 2 is.

24   A.    This is the Holy Bible.

25   Q.    Defense Exhibit 58?

Lamey - DIRECT - By Ms. Jhones                153

1    A.      The Holy Koran.

2    Q.      Defense Exhibit 10?

3    A.      A book entitled *Poisons in Your Food*.

4    Q.      Defense Exhibit 70?

5    A.      A book called *The Way of the Ninja*.

6    Q.      Defense Exhibit 69?

7    A.      A book regarding Krav Maga.  It's a defensive

8    tactics type of book.

9    Q.      Defense Exhibit 68?

10   A.      *History of Edem* -- and I don't know how to say

11   that word.

12           THE COURT REPORTER:  Would you spell it for

13   the record.

14           THE WITNESS:  Yes.  It's K-h-a-z-a-r-i-a.

15   BY MS. JHONES:

16   Q.      Defense Exhibit 67?

17   A.      A book entitled *Selected Prayers*.

18   Q.      Defense Exhibit 66?

19   A.      Another book called *Dynamic Aikido*.

20   Q.      Defense Exhibit 62?

21   A.      A book called *Our Saver has arrived*.

22   Q.      Defense Exhibit 15?

23   A.      One entitled *Black's Law Dictionary*.

24   Q.      And, finally, Defense Exhibit 60?

25   A.      This one is *The Muslim/Christian Dialogue*.

1    Q.      Thank you.

2            MS. JHONES:  Your Honor, I apologize.  May I

3    verify that I moved these into evidence?  I may have

4    missed them.

5            Is Defense Exhibit 17 in?

6            THE COURT:  Yes.

7            MS. JHONES:  I have one more.

8            Your Honor, I just have to re-mark this,

9    because it was marked with a number already assigned.

10           THE COURT:  Right.

11           MS. JHONES:  This will be Defense Exhibit 45.

12           Is that number --

13           THE COURT:  39 to 48.  You have a 3 open.  You

14   have 3 open.

15           MS. JHONES:  Actually, I don't.

16           THE COURT:  You have 39 through 48.

17           MS. JHONES:  I have 39 through 48 open?

18           THE COURT:  Those are the photos.  Those were

19   introduced already.

20           What number is this that you wanted?  45.  So

21   45 you don't have open.

22           MS. JHONES:  Great.

23           THE COURT:  You need another number.

24           MS. JHONES:  Oh, 45 is taken?

25           THE COURT:  Yes.

1          MS. JHONES:  How about 51?

2          MS. ARANGO:  Judge, I think that's one of the

3    photos.

4          MS. JHONES:  The photos, just for the record,

5    your Honor, are all marked differently.  They're all

6    marked B-1 through B-54.  Those are marked differently,

7    B-1 through --

8          THE COURT:  I'm sorry?

9          MS. JHONES:  The photographs that I moved in

10   are marked B-1 through B-54.

11         THE COURT:  Right.  Okay.

12         MS. JHONES:  So I --

13         THE COURT:  So you want to make this one 51?

14         MS. JHONES:  Yes, your Honor.

15         THE COURT:  It will be Defendant Batiste's

16   Exhibit 51.

17         Are you moving that into evidence?

18         MS. JHONES:  Yes, your Honor.

19         THE COURT:  Any objection?

20         MS. ARANGO:  No objection, Judge.

21         THE COURT:  It will be admitted as Defendant

22   Batiste's Exhibit 51.

23         (Whereupon, Defendant Batiste's Exhibit No. 51

24   was entered into evidence.)

25

```
 1    BY MS. JHONES:

 2    Q.     Just for the record, Agent Lamey --

 3              MS. JHONES:  If I may approach, your Honor.

 4              THE COURT:  Sure.

 5    BY MS. JHONES:

 6    Q.     Could you please identify Defense Exhibit 51.

 7    A.     Yes.  This is the Complete Idiot's Guide to

 8    Learning Spanish.

 9    Q.     Thank you very much.

10              Special Agent Lamey, let me just go through some

11    more photographs with you.

12              Batiste Exhibit 49:  Do you recognize what's

13    depicted in that photograph?

14    A.     Yes.  It's a table with what appears to be a

15    candy dispenser of some sort.

16    Q.     Special Agent Lamey, do you recall what items

17    were placed in this wall over here where I'm marking?

18    Do you remember what those items were?

19              THE COURT:  This is B-49, right?

20              MS. JHONES:  B-49.

21              THE WITNESS:  You want to know what's placed

22    on the walls?  Are you talking about those certificates

23    and such on the wall?

24    BY MS. JHONES:

25    Q.     Yes.
```

1    A.    I don't know what they were.  No.

2    Q.    Is it fair to say those were not seized?

3    A.    I can't say for certain.  They may be the real

4    estate documents that we have seized as Item No. 2 or

5    they could be -- it could have been one of the smaller

6    items that are on here.

7    Q.    Fair enough.  Okay.

8          I'm going to show you Batiste -- or B-20.

9          First of all, Special Agent Lamey, do you have a

10   recollection as to what room is depicted in B-20?

11   A.    Yes.  I believe this was on the other side.  It

12   wasn't in that main Embassy room.  I'm going to say the

13   other address.

14   Q.    Do you know what address that would be?

15   A.    I think it's going to be 6260.

16   Q.    Fair enough.

17         And -- I'm sorry.  The items depicted on B-20:

18   Do you have a recollection as to what items those were?

19   A.    I'm not familiar with all of it, but it looks

20   like tools.

21   Q.    And B-19:  What location would that be?

22   A.    Again, that's going to be on the other side.  And

23   it's some more tools and electric cord that, sort of

24   stuff.

25   Q.    The same vicinity?

  1    A.    Yes.

  2    Q.    B-18?

  3    A.    That would be the same.

  4    Q.    And, finally, B-17?

  5    A.    More of the same.

  6    Q.    B-13?

  7    A.    Again, that's going to be part of that storage

  8    area.

  9    Q.    And B-12?

 10    A.    Those are some edged weapons.

 11    Q.    Do you know where those items were retrieved

 12    from?

 13    A.    It looks like that's going to be Item No. 52,

 14    retrieved -- it will also be from the 6260, adjacent to

 15    Room E.

 16    Q.    Thank you.

 17          Now, B-54:  Do you recall what room?

 18    A.    I believe that was the sleeping space, if I'm

 19    correct, in the main living area of 6262.

 20    Q.    And would this be the same room, B-53?

 21    A.    That looks -- yes.

 22    Q.    B-9?

 23    A.    It's going to be sort of a peek-a-boo window into

 24    the sleeping area.

 25    Q.    B-7?

1   A.     It's going to be part of a rest room or bathroom.

2   Q.     Do you recall, Special Agent Lamey, how many

3   bathrooms this -- those two locations had?

4   A.     I know there was one adjacent to the living

5   quarters, but I don't recall if we had a second one or

6   not.  I think there may have been a second one on the

7   6260 side as well.

8   Q.     Now, with respect to B-6, do you recognize that

9   room?

10  A.     I think that's going to be the bathroom on the

11  6262 side.

12  Q.     Do you remember, Special Agent Lamey, whether or

13  not there was running water in this Embassy location?

14  A.     I don't.

15  Q.     B-5 -- actually, I think it goes that way.

16         Do you recall what these items are depicted on

17  B-5?

18  A.     I think they're swords.

19  Q.     Now, finally, I'm going to show you a series of

20  photographs from a different location.

21         B-46:  Is that something you recognize?

22  A.     I think that's the back part of 6260.

23  Q.     And if we look at Government's Exhibit 7, what

24  room would -- what side of the two buildings would that

25  location on B-46 --

1    A.    That would be on the right, painted red.

2    Q.    This side right here (indicating)?

3    A.    Yes.

4    Q.    B-45:  Which side of the two?

5    A.    That's the same.

6    Q.    The same side?

7    A.    Correct.

8    Q.    B-35, Special Agent Lamey?  Could you please tell

9    us which side of the --

10   A.    That would be the same side that was painted red.

11   Q.    There is a door up front depicted on B-35.

12   Correct?

13   A.    Yes.

14   Q.    That faces what side of -- what direction,

15   actually, would that face?

16   A.    That's the back of the location.

17   Q.    Do you have any recollection as to what these

18   items were?

19   A.    You're asking me what the items were on the

20   right-hand side of this picture?

21   Q.    Yes.  If you --

22   A.    I think they're refrigeration devices.

23   Q.    Do you know if they were operational?

24   A.    I don't.

25   Q.    Now showing you B-26, do you recall that?

 1    A.     It's a picture of Item No. 64, which would be two

 2    flags.

 3    Q.     Were those the flags that you were previously

 4    referring to?

 5    A.     Yes.

 6    Q.     Finally, B-23?

 7    A.     I believe that's going to be the second bathroom

 8    on the 6260 side.

 9    Q.     Thank you.

10          Now, Special Agent Lamey, I'm going to show you

11    an item that's marked as Defense Exhibit 65.

12              MS. ARANGO:  No objection, Judge.

13    BY MS. JHONES:

14    Q.     Do you recognize this -- well, with --

15              MS. JHONES:  Your Honor, at this time I'd like

16    to move it into evidence before I publish it, Defense

17    Exhibit 65.

18              MS. ARANGO:  No objection.

19              THE COURT:  It will be admitted as Defendant

20    Batiste's Exhibit 65.

21              (Whereupon, Defendant Batiste's Exhibit No. 65

22    was entered into evidence.)

23              MS. JHONES:  Thank you, your Honor.

24    BY MS. JHONES:

25    Q.     Do you recognize that, Special Agent Lamey?

1    A.    It's a patch.

2    Q.    Do you know whether or not -- do you know where

3    that was seized from?

4    A.    If I could see the packaging, I would be able

5    to --

6    Q.    Sure.

7          MS. JHONES:  May I approach, your Honor?

8          THE COURT:  Yes.

9    BY MS. JHONES:

10   Q.    (Tenders document to the witness.)

11   A.    Yes.  This patch was found on the 6260 side of

12   the location.

13   Q.    Thank you.

14         MS. JHONES:  Your Honor, I just need a minute

15   or two to review a couple more exhibits, if I may.

16         THE COURT:  Yes.

17         MS. JHONES:  Thank you.

18         Your Honor, if I may have a moment to the

19   consult with the Government?

20         THE COURT:  Yes.

21         MS. JHONES:  Thank you.

22         (Discussion had off the record amongst

23   counsel.)

24         MS. JHONES:  Your Honor, may I approach the

25   witness to show her --

```
 1              THE COURT:  Yes.

 2              MS. JHONES:  Thank you.

 3    BY MS. JHONES:

 4    Q.    Special Agent Lamey, I'm going to show you

 5    Defense Exhibit 74, along with this packaging.  If you

 6    could, just let me know if you recognize that.

 7    A.    That was Item No. 6, a black notebook that was

 8    seized.

 9    Q.    Any idea what location that was seized from?

10    A.    That was in the 6262 side of the location.

11              MS. JHONES:  At this time I'd move Defense

12    Exhibit 74 into evidence, your Honor.

13              MS. ARANGO:  No objection.

14              THE COURT:  It will be admitted as Defendant

15    Batiste's Exhibit 74.

16              (Whereupon, Defendant Batiste's Exhibit No. 74

17    was entered into evidence.)

18              MS. JHONES:  I have one more exhibit that's

19    being retrieved.

20              MS. ARANGO:  Ms. Jhones, if you have a copy of

21    that exhibit --

22              MS. JHONES:  I believe I do.

23              MS. ARANGO:  I don't have an objection to

24    moving the copy in.

25              MS. JHONES:  That's fine.
```

```
 1              At this time, your Honor -- actually, let me
 2    just show the witness an exhibit in order for her to
 3    identify it.
 4              THE COURT:  They have the original.
 5              MS. ARANGO:  I think the original is here now.
 6              MS. JHONES:  Thank you.
 7              If I may approach, your Honor.
 8              THE COURT:  Yes.
 9              MS. JHONES:  Thank you.
10    BY MS. JHONES:
11    Q.    I think this is the final one, Agent Lamey.
12          If you can, look at that document and let me know
13    if you can identify it.
14    A.    It's an FPL power bill.
15    Q.    Yes.  I think I have the packaging.
16              THE COURT:  What's the number, please?
17              MS. JHONES:  Defense Exhibit 75.
18              MS. ARANGO:  The packaging is here.
19    BY MS. JHONES:
20    Q.    Agent Lamey, would you need the packaging to
21    identify it?
22    A.    That would help.  Yes.
23    Q.    Here you are.
24    A.    This is a power bill that we collected as Item
25    No. 15.
```

 1            MS. JHONES:  And, your Honor, if I haven't

 2    done so, I'm ready to move for its admission as Defense

 3    Exhibit 75 in this case.

 4            MS. ARANGO:  No objection.

 5            THE COURT:  It will be admitted as Defendant

 6    Batiste's Exhibit 75.

 7            (Whereupon, Defendant Batiste's Exhibit No. 75

 8    was entered into evidence.)

 9            MS. JHONES:  Thank you, your Honor.

10            If I can just have one more moment, I think I

11    am finished, your Honor.  Thank you.

12            THE COURT:  Okay.

13            MS. JHONES:  I have nothing further.

14            Thank you, your Honor.  Thank you for your

15    patience.

16            THE COURT:  Mr. Vereen?

17            MR. VEREEN:  Just a couple questions.

18                        CROSS-EXAMINATION

19    BY MR. VEREEN:

20    Q.    Agent Lamey, good afternoon.

21    A.    Good afternoon.

22    Q.    When you went to the Embassy to photograph the

23    building and its contents, do you recall -- well, first

24    of all, let me ask you:  Were you ever in the back of

25    the Embassy?  The building, 6260, were you ever in back

1    of that building?

2    A.      That's the direction we entered from.

3    Q.      Do you recall there being a surveillance camera

4    above the door?

5    A.      Yes.

6    Q.      And do you recall there being a monitor inside of

7    the building?

8    A.      I don't remember the monitor for that camera.

9    No.

10   Q.      But you do recall the camera being there?

11   A.      I do recall the camera.  I know we had -- there

12   were computers and a computer monitor, a computer

13   screen, but I can't tell if you they were hooked up to

14   one another.

15           MR. VEREEN:  Thank you.

16           THE COURT:  Mr. Houlihan?

17           MR. HOULIHAN:  No questions.

18           THE COURT:  Mr. Clark?

19           MR. CLARK:  No further questions, your Honor.

20           THE COURT:  Mr. Casuso?

21           MR. CASUSO:  No questions, your Honor.

22           THE COURT:  Mr. Levin?

23           MR. LEVIN:  No questions, your Honor.

24           THE COURT:  Ms. Arango?

25           MS. ARANGO:  Just one or two questions, Judge.

CROSS-EXAMINATION

1

BY MS. ARANGO:

2

Q.    Agent Lamey, I'm showing you what's been marked

3

as Defense Exhibit -- and introduced into evidence as

4

Defense Exhibit No. 10, a book entitled *Poisons in Your*

5

*Food*.

6

        Do you know -- there are items -- there are pages

7

in that book that are highlighted in yellow and orange

8

highlighter, specifically an item on Page 10.

9

        Do you know whether or not those highlights

10

existed before the FBI seized this?

11

A.    It would be distinctly against our practice to

12

mark a book like that.

13

Q.    Thank you.

14

        One more question, Agent Lamey.

15

        Defense Exhibit No. 65:  Are you familiar with

16

any federal state seal indicating sovereignty in the

17

United States that's consistent with this exhibit?

18

A.    No, ma'am.

19

Q.    Thank you.

20

        MS. ARANGO:  I have no further questions.

21

        THE COURT:  Redirect?

22

        MS. JHONES:  Yes, your Honor.  Thank you.

23

24

25

                        REDIRECT EXAMINATION

BY MS. JHONES:

Q.     Special Agent Lamey, directing your attention to
Defense Exhibit in evidence 10, could you tell who
wrote the introduction of the book *Poisons in Your
Food*?

A.     It says the introduction was written by Senator
Walter F. Mondale.

Q.     And with respect to Defense Exhibit 65, do you
recognize what's depicted in the center above the
letters "USA"?

A.     To me, it looks like the Star of David.

Q.     Thank you.

          MS. JHONES:  I have nothing further, your
Honor.

          THE COURT:  You may step down, ma'am.

          (Witness excused.)

          THE COURT:  Call your next witness.

          MS. JHONES:  May I just step outside for a
second, your Honor?

          THE COURT:  Sure.

          MS. JHONES:  Thank you.

          Defendant Batiste calls Elsie Hamler.

Thereupon--

                        ELSIE HAMLER

Lamey - REDIRECT - By Ms. Jhones                    169

```
 1   was called as a witness by the Defendant and, having

 2   been first duly sworn, testified as follows:

 3             THE COURT REPORTER:  You may be seated.

 4             Please state your full name for the record and

 5   spell your last name.

 6             THE WITNESS:  Elsie Hamler, H-a-m-l-e-r.

 7             MS. JHONES:  Your Honor, I apologize.  I have

 8   misplaced my notes.  I just need a minute.

 9             THE COURT:  Okay.  Let's take a break.

10             Do not discuss this case either amongst

11   yourselves or with anyone else.  Have no contact

12   whatsoever with anyone associated with the trial.  Do

13   not read, listen or see anything touching on this

14   matter in any way.

15             If anyone should try to talk to you about this

16   case, you should immediately instruct them to stop and

17   report it to my staff.

18             You may leave your materials at your chairs.

19   Please be back in the jury room in ten minutes.

20             (Whereupon, the jury exited the courtroom at

21   3:08 p.m. and the following proceedings were had:)

22             THE COURT:  We're in recess for ten.

23             (Whereupon a recess was taken, after which the

24   following proceedings were had:)

25             THE COURT:  United States of America versus
```

 1   Narseal Batiste, et al., Case No. 06-20373.

 2            Counsel, state your appearances, please, for

 3   the record.

 4            MR. GREGORIE:  Richard Gregorie on behalf of

 5   the United States, your Honor.

 6            We're ready to proceed.

 7            MS. JHONES:  Ana Jhones on behalf of Narseal

 8   Batiste, who is present.

 9            MR. LEVIN:  Albert Levin on behalf of Patrick

10   Abraham, who's present.

11            MR. VEREEN:  Lou Casuso on behalf of Burson

12   Augustin, your Honor.

13            MR. CASUSO:  Nathan Clark for Rotschild

14   Augustine, who is present.

15            MR. HOULIHAN:  Richard Houlihan with Naudimar

16   Herrera.

17            MR. VEREEN:  Rod Vereen for Stanley Phanor,

18   who's present.

19            THE COURT:  All Defendants are present.

20            Let's bring in the jury.

21            (Whereupon, the jury entered the courtroom at

22   3:33 p.m. and the following proceedings were had:)

23            THE COURT:  You may be seated.

24            You are still under oath, ma'am.

25            You may proceed, Ms. Jones.

```
 1              MS. JHONES:  Thank you, your Honor.

 2                       DIRECT EXAMINATION

 3   BY MS. JHONES:

 4   Q.     Good afternoon, Ms. Hamler.

 5   A.     Good afternoon.

 6   Q.     Ms. Hamler, would you please tell the ladies and

 7   gentlemen of the jury how you are employed.

 8   A.     I am -- my name is Elsie Hamler and I am

 9   president of Contractors Resource Center.

10   Q.     Would you please tell the ladies and gentlemen of

11   the jury, what is Contractors Resource Center?

12   A.     Contractors Resource Center is a nonprofit

13   organization that provides services to small and

14   minority contractors throughout South Florida.

15   Q.     And, Ms. Hamler, how long have you been president

16   of the Contractors Resource Center?

17   A.     Since 1994.

18   Q.     And when you say "small and minority

19   contractors," could you give us an idea of how small.

20   A.     Contractors who are just starting in the

21   business and need some guidance and technical

22   assistance to kind of go through the moves of getting

23   their business off the ground to contractors who have

24   been in business 10, 15, 20 years.  You know, we have a

25   lot of existing businesses around, too.
```

1    Q.     Okay.  And where is the Contractors Resource

2    Center located?

3    A.     We're located at 1730 Biscayne Boulevard,

4    Suite 201, Miami, Florida, 33132.

5    Q.     And with respect to the services that the

6    Contractors Resource Center provides, could you just

7    give us a brief overview of what type of services CRC

8    provides?

9    A.     We provide administrative services.  When I say

10   "administrative services," services that might require

11   a letter being typed or helping with the payroll

12   requisition or preparing an estimate, which is another

13   area that we actually spend a lot of time; helping

14   contractors bid projects, particularly small

15   contractors, ones who don't have that kind of resource

16   on their staff.  They come to us because we have a

17   department who will help with their estimates and

18   prepare for a bid.

19         And we have a lot of other services, but those

20   are just to name a few.

21   Q.     Does CRC charge a fee for those services?

22   A.     There is a fee in place, but it's not heavily

23   enforced.  What I mean by that is we get some grants to

24   do some of the services we have and we get other funds

25   from consulting projects.

Hamler - DIRECT - By Ms. Jhones                    173

```
 1            But there's a nominal fee that we charge the

 2     contractors because, as I said, we're a 501(c)(3) and

 3     we're always looking for funding ourselves to help keep

 4     the copier going and the lights on and those kinds of

 5     things.

 6            It's not mandatory that they give us this money,

 7     but when we know we've helped them and they're getting

 8     projects, then we expect them to help, you know, with

 9     these nominal fees.

10     Q.    Ms. Hamler, you mentioned a bid department, an

11     estimate department.

12     A.    Yes.

13     Q.    Who, if anyone, runs that department in CRC?

14     A.    Her name is Agnes Sangster, S-a-n-g-s-t-e-r.

15     Q.    Tell us what Ms. Sangster does for CRC.

16     A.    She's our chief estimator, and she's been in

17     construction for more than 30, 35 years.  She

18     actually -- we get plans in the Center and we look at

19     projects.

20            And if there's contractors or a group of

21     contractors who is interested in bidding those

22     projects, they may come to her for those services.

23            She will actually do the physical takeoff of the

24     plans, the quantity takeoffs, and help any contractor

25     with the quantities, if that's all they need, or if
```

Hamler - DIRECT - By Ms. Jhones                    174

```
 1   they actually need help with the actual preparation of

 2   the bids, she will help prepare it with the cost and

 3   everything.

 4   Q.    Do you have an idea -- an estimate of what

 5   percentage of the CRC clients need the services that

 6   are provided by Ms. Sangster?

 7   A.    Well, I don't really have a firm percentage.  But

 8   from my experience, probably about 40 percent of the

 9   companies that come in there will get some level of

10   estimating or some level of support services from her.

11   Q.    And --

12   A.    I guess that's to say not every contractor that

13   comes in needs estimating support, is my point.

14   Q.    I understand.

15         What services, if any, does CRC provide to the

16   customers or -- of CRC in terms of referrals?

17   A.    Well, the -- we have a referral process that

18   entails -- if an owner -- whether it's residential or

19   commercial, if any project -- if they call up the

20   Center looking for contractors, depending on the size

21   of the project, depending on the scope of the work, we

22   actually will go through our database and actually give

23   them a certain number of referrals and, usually, no

24   less than three in each category that they're looking

25   for.
```

1    Q.    And is there a particular reason for that?

2    A.    Just to spread the work around, make sure that

3    we're not, you know, giving all the work to one or two

4    people.  And I stay close to that process for that

5    reason alone.

6    Q.    Okay.  And do you, Ms. Hamler, know an individual

7    by the name of Narseal Batiste?

8    A.    Yes, I do.

9    Q.    Would you -- first of all, would you please point

10   him out for us here in the courtroom.

11   A.    He's sitting right there.  He's standing.

12   Q.    Would you please tell us when you met

13   Mr. Batiste.

14   A.    I'm not sure exactly when, but I would think

15   somewhere around the late spring, early summer of 2005,

16   I suppose, somewhere in there.

17   Q.    And in the late spring, early summer of 2005,

18   were you working for CRC?

19   A.    Yes, I was.

20   Q.    And would you please tell us the circumstances

21   under which you met Mr. Batiste.

22   A.    I'm not really clear, but I think he came in the

23   Center for services.  He had heard about us from

24   someone and he came in for support.  I want to say he

25   came in because he met someone on my staff, but I don't

 1   remember the exact of it.

 2        But do I remember him coming in and saying that

 3   he -- you know, what he did and his trade and he was

 4   just starting out and, you know, we gave him the same

 5   tour and information that we give any new contractor

 6   coming in.

 7   Q.   What was your understanding, Ms. Hamler, as to

 8   the level of -- what level of knowledge Mr. Batiste had

 9   had in the construction field when you first met him?

10        MR. GREGORIE:  Objection, your Honor.  Calls

11   for hearsay.

12        THE COURT:  Sustained.

13        Lay your predicate.

14        MS. JHONES:  Sure.

15   BY MS. JHONES:

16   Q.   Ms. Hamler, did you ever have any occasion to

17   observe the work that Mr. Batiste did?

18   A.   Yes, I did.

19   Q.   And when was it, Ms. Hamler, that you had

20   occasion to do that?

21   A.   On several.  I guess one in particular would be

22   when we -- at the Center itself, we have built houses

23   ourselves.  That's another way of getting work to

24   contractors.

25        He did some work for us that we actually

Hamler - DIRECT - By Ms. Jhones                177

```
 1   contracted him to do.  So that's one of the items.  And
 2   just feedback from other clients that we've referred
 3   him to.
 4            MS. JHONES:  If I may have a moment, your
 5   Honor.
 6            THE COURT:  Yes.
 7            MS. JHONES:  Your Honor, may I approach the
 8   witness?
 9            THE COURT:  Yes.
10            MR. GREGORIE:  Your Honor, my objection is
11   going to be to relevance.
12            THE COURT:  Why don't you come up.
13            (Whereupon, proceedings were had at side-bar
14   outside the presence of the jury which have been sealed
15   per instructions of the Court.)
16            (Whereupon, the following proceedings were had
17   in open court:)
18            MS. JHONES:  May I proceed, your Honor?
19            THE COURT:  Yes.
20            MS. JHONES:  Thank you.
21            May I approach the witness?
22            THE COURT:  Yes.
23   BY MS. JHONES:
24   Q.   Ms. Hamler, I've handed you some exhibits.  And,
25   of course, I forgot what number they are.
```

```
 1        While I'm identifying the numbers, would you
 2   please look at them and tell me if you recognize them.
 3   A.    Yes, I do.
 4          MS. JHONES:  May I approach the witness, your
 5   Honor?
 6          THE COURT:  Yes.
 7          MS. JHONES:  Thank you.
 8   BY MS. JHONES:
 9   Q.    Let me just identify them for the record,
10   Ms. Hamler.
11        Showing you Defense Exhibit 76-A, 76-B, 76-C,
12   76-D, 76-E and 76-F, do you recognize those documents?
13   A.    Well, yes.  The documents -- the pictures I don't
14   recognize, but it look like some of our work.
15          MR. GREGORIE:  Objection, your Honor.
16          THE COURT:  Sustained.
17   BY MS. JHONES:
18   Q.    Well, let me just -- you made a reference a few
19   minutes ago about a project that CRC --
20          MR. GREGORIE:  Objection.  Now it's leading,
21   your Honor.
22          MS. JHONES:  I will rephrase.
23   BY MS. JHONES:
24   Q.    What, if any, relationship does the photograph
25   depicted in Defense Exhibit 76-E and -- they're not in
```

 1    evidence yet.  So you can't describe them.  Okay,

 2    Ms. Hamler?

 3         But what relationship, if any, do Defense

 4    Exhibits 76-E and 76-F have to any projects that CRC

 5    may have referred, if any, to Mr. Batiste?

 6              MR. GREGORIE:  Objection, your Honor.  The

 7    witness just said she doesn't recognize those

 8    photographs.

 9              THE COURT:  Sustained.

10    BY MS. JHONES:

11    Q.    Let me ask you:  Do you recognize these

12    photographs?  Do you know what they are?

13              MR. GREGORIE:  Asked and answered, your Honor.

14              THE WITNESS:  Yes.  They are --

15              THE COURT:  One moment, ma'am.

16              THE WITNESS:  Okay.

17              THE COURT:  Sustained.

18    BY MS. JHONES:

19    Q.    Ms. Hamler, referring to Defense Exhibits 76-A,

20    76-B and 76-C and 76-D, do you recognize those

21    exhibits?

22    A.    Yes, I do.

23    Q.    Are those documents that are kept in the regular

24    course of business at the Contractors Resource Center?

25    A.    Yes, they are.

1    Q.     Are those documents prepared by you at the

2    Contractors Resource Center?

3    A.     Yes.  Me and my staff, yes.

4    Q.     And do you recognize those documents?

5    A.     Yes, I do.

6    Q.     And are those documents documents that are kept

7    in the regular course of business activity at the

8    Contractors Resource Center?

9    A.     Yes, they are.

10          MS. JHONES:  At this time I would move Defense

11   Exhibits 76-A, -B, -C and -D into evidence.

12          MR. GREGORIE:  No objection, your Honor.

13          THE COURT:  They will be admitted as Batiste

14   Exhibits 76-A through -D.

15          (Whereupon, Defendant Batiste's Exhibit

16   Nos. 76-A, 76-B, 76-C and 76-D were entered into

17   evidence.)

18   BY MS. JHONES:

19   Q.     Ms. Hamler, I'm going to ask you some questions

20   about them through the ELMO.

21          MS. JHONES:  May I have the ELMO, your Honor?

22          THE COURT:  It's on from here.

23          MS. JHONES:  Thank you.

24          THE COURT:  It's showing up black, though.  Is

25   it on there?

1              MS. JHONES:  I just turned it on.

2              THE COURT:  Now it's okay.

3              MS. JHONES:  Thank you.

4    BY MS. JHONES:

5    Q.     Showing you, Ms. Hamler, Defense Exhibit in

6    evidence -- Composite Defense Exhibit 76-B, would you

7    tell us what this -- the first page of this exhibit

8    represents, please.

9    A.     It's a document that we use -- it's part of a

10   package that we use for our referral process.  It's the

11   first page that -- the administrator who's doing it has

12   to kind of like go through a checklist to make sure all

13   of the referral steps are done.

14   Q.     Tell us a little bit about the steps that CRC has

15   in the referral process.

16   A.     Well, it's kind of outlined right here on the

17   checklist.

18          We start with -- a request will come in from an

19   owner or from a prime contractor or someone requesting

20   us to give them a list of contractors as a referral.

21          And once that piece is done, they identify the

22   actual project that's being done and they fill out a

23   form on that.

24          And then the next part would be to identify who

25   we're going to refer to that project.  And that's, you

1   know, depending on the actual size of the project, what

2   kind of trades they're asking for, you know, the scope

3   and all.  We will determine who we are going to pull

4   from our database, and we try to spread the work

5   around.

6   Q.     And who is contained in the database for CRC?

7   A.     Probably over 700 contractors plus in the South

8   Florida area.  And they are primarily small

9   contractors.

10  Q.     And you indicated that, once you know what the

11  project is about, that will determine who you're going

12  to list?

13  A.     That's correct.

14  Q.     Fair enough?

15         Why do you need to know what type of project is

16  involved?

17  A.     Because, depending on the scope and the size, it

18  will determine who we're going to send.

19         For instance, if it's a major project and they're

20  calling for, you know, small contractor involvement,

21  "small" might be those who can handle 5 million or

22  10 million.  That's still small in the construction

23  industry, in a sense.

24         Or if it's a small project, like $100,000 or a

25  half million dollars, then you could send smaller

 1   contractors, someone who can handle that size.

 2   Q.    And in this -- referring back again to Defense

 3   Exhibit -- Composite Exhibit 76-B, who is Mecias

 4   Construction?

 5   A.    Well, actually, they're a small contractor, too,

 6   but they might be doing the size of the project,

 7   maybe -- I don't remember this particular project.  I

 8   just know that they could handle up to maybe 5 million

 9   dollars' worth of a project.

10         So, in this case, Mecias Construction was asking

11   for some masonry contractors.  They apparently had a

12   job that they needed some masonry contractors to do

13   some work on, one of the scopes.

14   Q.    And what was the date of that project?

15   A.    Here, it looks like -- I can't see it clear.  It

16   says February the 16th -- is that 2006?

17   Q.    Does that help?

18   A.    Yeah.  2006.

19   Q.    Okay.  Now, turning to the next page, tell us

20   about this page, Ms. Hamler.

21   A.    That's the actual referral page we use to decide

22   which contractors we are going to refer to the project.

23   Q.    And what criteria, if any, went into -- first of

24   all, who makes that decision?

25   A.    Well, it's a combination between me and my staff.

1    But I stay involved because, as I said, I want to know

2    who we're referring and how the referrals are going.

3           So it's a joint effort between me and my staff.

4    As I said, we'll look at who we gave the last couple of

5    opportunities to and try to make sure we're moving it

6    around.

7    Q.     What role, if any, does the contractor's level of

8    competency to do the work play in Contractors Resource

9    Center's decision to select some prospective clients?

10   A.     It plays a heavy role, because, you know, if you

11   refer someone to a project and they don't perform, it

12   reflects on all of us.

13          So, you know, we are very diligent in trying to

14   make sure we send people who are going to respond and

15   get the job done, also.

16          When I say that, I'm primarily saying, when a

17   referral -- we're going to -- we want to call the

18   contractors ourselves before we actually do the

19   referral to make sure that they're going to respond.

20          I mean, it's just that important so that the

21   owners who are coming to us are -- feel like they're

22   getting a service.

23   Q.     Now, on this particular page that's depicted on

24   the ELMO, tell us who it was that was referred -- who

25   CRC referred for that project.

1    A.     Well, we have Mr. Baptiste [sic], Mr. Goode and

2    Mr. Aguilar.

3    Q.     Now, lastly, the last page of the composite

4    exhibit, what does this last page -- what does this

5    page depict in the referral process?

6    A.     That's the final document that actually goes back

7    to the person requesting the referral.  The other

8    documents were our worksheets, trying to determine who

9    was going to bid it.

10          And, in this case, this letter is the one that

11   goes back.  That's the formal referral response from

12   the Center saying who we are referring to her project

13   and the name and the contact so that she can contact

14   them.

15          And then we turn around and call these guys and

16   give them the same information on the project so they

17   can contact the person asking for the referral.  So we

18   go both ways.

19   Q.     Okay.  Now, again, referring to another composite

20   exhibit, Composite Exhibit 76, drawing your attention

21   to the second page of the composite exhibit, please

22   tell us what type of --

23          THE COURT:  Is that the correct number?  It

24   must have a letter attached to it.

25          MS. JHONES:  I'm sorry.  76-C.

1          THE COURT:  Okay.

2    BY MS. JHONES:

3    Q.     Referring to the second page, what type of trades

4    were requested in that project?

5    A.     It looks like there were several trades.  They

6    have masonry/concrete, stucco/plastering; electrical,

7    drywall and roofing.

8    Q.     And, please, Ms. Elsie, if you will, drawing your

9    attention to the third page of Composite Exhibit 76-C,

10   would you tell us who CRC -- what CRC's response was to

11   that referral.

12   A.     It looks like we gave the requester a group of

13   contractors, some of which can do different trades.

14          We have Mr. Baptiste, Mr. Roberts, Mr. Burgess,

15   Ms. Stevens and Mr. Telfort.

16          So some of them were electrical and some of them

17   were other trades, like concrete and masonry and what

18   have you.

19   Q.     What was your understanding as to the trade that

20   Narseal Batiste and Azteca were --

21   A.     We would have been referring him, probably, with

22   the concrete/plastering part of it, more so -- because

23   he's not an electrician.  So some of the others were

24   electricians.  So that's a mixture.

25   Q.     Lastly, referring to Composite Exhibit 76-D and

 1   turning to the second page, please tell us what type of

 2   trades were requested in this referral.

 3   A.    Looks like a lot of the various trades.  There

 4   are probably about 12 to 16 trades in construction, and

 5   it looks like this one covers most of them.

 6         It has the HVAC -- which is mechanical --

 7   interior finishing, electrical, plumbing, landscaping,

 8   earth work, painting, concrete work, fire protection,

 9   flooring and acoustic ceiling.

10         So they were looking for contractors in all of

11   those trades.

12   Q.    Okay.  Directing your attention to Page 5 of

13   Defense Exhibit 76-D, specifically this name right here

14   (indicating), do you recognize the name Azteca, Inc.?

15   A.    Yes, I do.

16   Q.    And what -- how do you recognize it?

17   A.    Well, it's under concrete work.  And on this

18   particular referral, we are referring him in the trade

19   of concrete, along with four -- three other

20   contractors.

21   Q.    Okay.  Finally, Ms. Hamler, referring you to

22   Defense Exhibit 76-A, do you recognize this document?

23   A.    Yes, I do.

24   Q.    And please explain to the ladies and gentlemen of

25   the jury what this document represents.

1    A.     This is -- this comes from our accounting system.

2    And it has "Azteca" up at the top, which means that we

3    pulled out all the transactions we have done with that

4    particular contractor, whether it be billing him for

5    the services that we provide or paying him some money

6    out.  It's all the transactions that comes out of our

7    accounting system for that particular contractor.

8    Q.     What time period -- what time periods are covered

9    in Exhibit 76-A?

10   A.     It shows from September 9th, 2005, to April 28th,

11   2006 --

12   Q.     Okay.

13   A.     -- all the transactions we did with him.  That's

14   everything in our system as it pertains to him.

15   Q.     Thank you, Ms. Hamler.

16          Now, going back to Azteca Corporation, what, if

17   any, services were provided -- what administrative

18   services, if any, were provided to Azteca,

19   Incorporated, by CRC?

20   A.     Services -- administrative support.  When I say

21   "administrative support," we received his phone calls

22   and we took messages for him.

23          We received faxes on their behalf.  So we

24   actually made sure they got their faxes.  We received

25   mail for them.  So we placed the mail in there.

1          So those are the kind of administrative services.

2          If they came in and asked for something to be

3     copied, we would copy it.  We provide estimating

4     support.

5          Now, you asked for administrative and now I'm

6     moving into other services.  Are you asking that, too?

7     Q.    Let me ask you a couple things about the

8     administrative services.

9          What procedures, if any, does Contractors

10    Resource have as it relates to handling of mail and/or

11    faxes received that go to the customers of CRC?

12    A.    Well, we have sort of a headquartered

13    environment.  That means that all of the companies that

14    become a subscriber to the Center -- every company that

15    we deal with are not necessarily subscribers to the

16    Center.  But there is a subset that is.

17         And in that subset, if they are receiving -- if

18    they have a box number associated with our Center,

19    they're a subscriber, they want to be located there,

20    therefore, they can receive their mail, their fax,

21    their phone calls and what have you, then our procedure

22    is as such.

23         When the mail comes in, it comes to my

24    administrative staff.  And I have one administrator

25    that's designated to put the mail -- sort the mail and

1    put it into each one of the slots or in the box for

2    each one of the contractors that are subscribing in

3    that vein.  If it's a fax, it's the same way.  The

4    administrator actually will distribute the fax back to

5    their slots.

6    Q.    And do you know whether or not Azteca,

7    Incorporated, had a mailbox and a fax at CRC in 2005?

8    A.    Yes, they did.

9    Q.    Do you have any knowledge as to whether or not

10   any requests for assistance with respect to the type of

11   work that -- or the type of service that was offered by

12   Ms. Sangster -- was any request made by Azteca or

13   Mr. Batiste for those types of services?

14   A.    Yes.

15   Q.    Go ahead.

16   A.    Yes, she did.  Agnes worked with him on several

17   projects.  I don't know how many, but several projects.

18   Q.    Do you have any knowledge, Ms. Hamler, as to what

19   type of projects -- what type of projects were handled

20   by Mr. Batiste and/or Azteca, Incorporated?

21   A.    Primarily, small projects -- very small projects.

22   Q.    Well, when you say "small," give us a range.

23   A.    Well, he was a young -- he was starting out, in a

24   sense.  So it's a small -- small project, being 1,000,

25   2500, I mean, nothing great.  I'll give you an example.

1        The work he did for the Center, I think we paid

2   him $400 to replace some contract.  So when I say

3   "small contracts," really small.

4   Q.    What, if any, award ceremonies are held by the

5   Contractors Resource Center?

6         MR. GREGORIE:  Objection, your Honor.

7   Relevance.

8         THE COURT:  Sustained.

9   BY MS. JHONES:

10  Q.    During the course of -- strike that.

11        What, if any, procedure exists in CRC to receive

12  feedback from those referrals that are made to

13  potential projects that CRC is affiliated with?

14        MR. GREGORIE:  Again, objection, your Honor.

15  Calls for hearsay.

16        MS. JHONES:  I'm asking for the procedures, if

17  any.

18        THE COURT:  Overruled.

19  BY MS. JHONES:

20  Q.    You may answer, Ms. Hamler.

21  A.    The procedures -- we get feedback in several

22  ways.  We have -- we do followup with the owners who

23  might have called for work.

24        We sometimes take the time to call back to see

25  who actually got the work if we don't get that

 1   information from the contractors directly.  We find out

 2   how the job went.

 3        So we get feedback in that regard.

 4        We talk to all of the major construction

 5   companies pretty much around the South Florida area to

 6   find out what they're doing and how they're doing it.

 7        We have -- we try to get the two together so that

 8   we can actually make sure that there's a positive

 9   networking relationship going on.

10        So I think -- you know, we just try to find ways

11   to give feedback -- I mean, get feedback on how we are

12   doing with the small contractors in the arena.

13   Q.   And in addition to Azteca, Inc., do you recognize

14   a company by the name of Acme Organization?

15   A.   Yes, I do.

16   Q.   And what knowledge, if any, do you have as it

17   relates to who Acme Organization is related to?

18   A.   They are a general contractor with some size,

19   some bonding capability.  They do a lot of earth work

20   or underground utility kinds of work.

21        If I'm giving you --

22   Q.   And do you know -- I'm sorry.  Go ahead.

23   A.   And, you know, they're general contractors.  So

24   they can go from just doing earth work to actually

25   building a building.

```
 1   Q.     And --

 2          MS. JHONES:  Just a couple minutes, your

 3   Honor.  One moment, your Honor.  I just need to access

 4   an exhibit.

 5          THE COURT:  Okay.

 6          MS. JHONES:  Thank you.

 7          Your Honor, may I have the ELMO again?

 8          THE COURT:  Yes.

 9          MS. JHONES:  Thank you.

10   BY MS. JHONES:

11   Q.     Ms. Hamler, I'm going to show you Government's

12   Exhibit 98, which is in evidence.

13          Is your ELMO working up there?

14   A.     Yes, it is.

15   Q.     Ms. Hamler, have you ever seen this exhibit

16   before?

17   A.     Yes, I did.

18   Q.     And do you recognize the address that appears on

19   the exhibit?

20   A.     Yes, I do.

21   Q.     And what address is that, please?

22   A.     That's the Contractors Resource Center's address.

23   But our address is Suite 201.  That's 201-P.  So that

24   belongs to a contractor.

25   Q.     Do you know what contractor that would be?
```

1   A.     Well, I -- I don't know who it belongs to.  I

2   mean, Universal Divine is not one of our contractors.

3   Q.     Do you recognize the fax number that appears in

4   Government's Exhibit 98?

5   A.     That's correct.

6   Q.     And what fax number is that?

7   A.     That's the Center's fax number.

8   Q.     And do you recognize the cell number?

9   A.     I don't really recognize the cell number.

10  Q.     You do or you don't?  I'm sorry.

11  A.     I don't recognize the cell number.  No.

12  Q.     Fair enough.

13         Do you remember ever having received any mail in

14  Contractors Resource Center addressed to Universal

15  Divine Saviors?

16  A.     No.

17         MS. JHONES:  I have nothing further, your

18  Honor.

19         THE COURT:  Mr. Vereen?

20         MR. VEREEN:  No questions, Judge.

21         THE COURT:  Mr. Houlihan?

22         MR. HOULIHAN:  No questions.

23         THE COURT:  Mr. Clark?

24         MR. CLARK:  A couple questions.

25

```
 1                    CROSS-EXAMINATION

 2   BY MR. CLARK:

 3   Q.    Good afternoon.

 4   A.    Good afternoon.

 5        MR. CLARK:  Good afternoon, ladies and

 6   gentlemen.

 7        THE JURY:  Good afternoon.

 8   BY MR. CLARK:

 9   Q.    You had -- on 76-D, I believe, this is the -- you

10   had -- this is -- you have a telephone number for

11   Narseal Batiste.  Is that correct?

12   A.    That's correct.

13   Q.    "Baptiste," it says.

14   A.    That's correct.

15   Q.    Is his name actually Batiste?  Is that a

16   misspelling?

17   A.    I don't know the correct spelling of his name.

18   But it looks like it's the same as who we think we

19   know.

20   Q.    And that's a mobile telephone number.  Correct?

21   A.    That's correct.

22   Q.    (786) 222-8351?

23   A.    That is correct.

24   Q.    Did you correspond with Mr. Batiste with that

25   number?
```

A.     Well, yes.  That probably came from our database.
That would say that -- any of the phone numbers in the
right-hand column means that that's the phone number to
the corresponding contractor.

Q.     I'm going to show you again Exhibit 98, the
Government's Exhibit 98.

       Isn't that the same?

A.     That's the same number.  Yes.

Q.     Do you recognize that as Mr. Batiste's cell
number?

A.     That's correct.

Q.     And the fax number belongs to the Contractors
Resource Center.  Correct?

A.     That's correct.

Q.     Now, if something came to Universal Divine
Saviors to the address of 201-P, that mailbox would
belong specifically to Azteca.  Isn't that true?

A.     Yes.

Q.     So if anything came in the mail to 201-P, you
would know that that would belong to Azteca.  Is that
correct?

A.     Well, yes.  Let me just say this, though:  The
way our system works is that -- and we've had this
happen with other contractors -- we -- they're only, in
a sense, really providing services to one contracting

1    firm.

2         So if something like this came in, my staff would

3    not know what to do with it because we don't have

4    anyone that's named Universal Divine Saviors.

5         We don't service we -- service contractors.

6    That's what we do.  So that wouldn't go to Suite 102 --

7    201-P.

8    Q.    Well, 201-P -- you know that that is the mailbox

9    for Azteca.  Correct?

10   A.    That's correct.

11   Q.    So if something came to 201-P and you weren't

12   sure, you would, I assume, contact Mr. Batiste and ask

13   him, "Is this yours?"

14   A.    Well, the first thing my staff would do is bring

15   it to me, because I would get involved with anything

16   that came in that's not the norm.

17   Q.    You would investigate who it belongs to?

18   A.    I would.  That's correct.  And maybe bring them

19   this and find out if they're trying to operate another

20   system here, another company.

21   Q.    If it came in to the attention of Narseal

22   Batiste, Universal Divine Saviors, you could contact

23   Mr. Batiste?

24   A.    Probably, yes.

25   Q.    You would probably contact Mr. Batiste if this

```
 1    came in to this mailbox, because he was the contact

 2    person for Azteca?

 3    A.     That's correct.

 4           MR. CLARK:  I have no further questions, your

 5    Honor.

 6           THE COURT:  Mr. Casuso?

 7           MR. CASUSO:  No questions, your Honor.

 8           THE COURT:  Mr. Levin?

 9           MR. LEVIN:  No, your Honor.  No questions.

10           THE COURT:  Mr. Gregorie?

11           MR. GREGORIE:  Yes, your Honor.

12                        CROSS-EXAMINATION

13    BY MR. GREGORIE:

14    Q.     How are you, Ms. Hamler?

15    A.     I'm fine.  How are you doing?

16    Q.     When you told counsel that you had seen

17    Government's Exhibit 98 before, you've seen it before

18    with regards to this case.  Correct?

19    A.     That's correct.

20    Q.     Agents came and talked to you about it, and

21    you've been to court before and have been asked about

22    it.  Is that correct?

23    A.     That's correct.

24    Q.     Have you ever seen it in regard to your business?

25    A.     No.  Not to my knowledge.
```

Hamler - REDIRECT - By Ms. Jhones                    199

1   Q.    Just so we're clear here -- and we're looking at

2   it -- do you have any food pantries?

3   A.    No, we do not.

4   Q.    None whatsoever?

5   A.    No.

6   Q.    Your business is a 501(c)(3) business, meaning

7   it's tax-exempt.  Correct?

8   A.    That's correct.

9   Q.    Do you have any businesses that you are working

10  with, that is, any of the construction firms, who are

11  tax-exempt?

12  A.    A little bit, yes.  We work with CDCs, Community

13  Development Corporations.  They're 501(c)(3)'s, too.

14  They do construction projects.  We refer contractors to

15  them.  So, yeah, we do have some relationships with

16  some 501(c)(3)'s.

17  Q.    This particular organization, Universal Divine

18  Saviors, has nothing to do with your business

19  whatsoever.  Isn't that so?

20  A.    That's correct.

21        MR. GREGORIE:  Nothing further, your Honor.

22        THE COURT:  Ms. Jhones.

23                    REDIRECT EXAMINATION

24  BY MS. JHONES:

25  Q.    Ms. Hamler, the Government asked you whether or

Edwards - DIRECT - By Ms. Jhones                    200

1   not the FBI had been over to visit with you at the CRC.

2       Do you remember that question?

3   A.    Yes.

4   Q.    Do you remember when that was?

5   A.    I don't remember exactly when it was.  But it was

6   probably before the first trial.

7           MS. JHONES:  Thank you very much.

8           THE COURT:  You may step down, ma'am.

9           (Witness excused.)

10          THE COURT:  Call your next witness.

11          MS. JHONES:  May I step out, your Honor?

12          THE COURT:  Yes.

13          MS. JHONES:  Thank you.

14          Thank you, Ms. Hamler.

15  Thereupon--

16                  UNA MAE EDWARDS

17  was called as a witness by the Defendant and, having

18  been first duly sworn, testified as follows:

19          THE COURT REPORTER:  Thank you.

20          Please be seated and state your full name for

21  the record.

22          THE WITNESS:  Una Mae Edwards, U-n-a.

23                  DIRECT EXAMINATION

24  BY MS. JHONES:

25  Q.    Good afternoon, Ms. Edwards.

```
 1   A.    Good afternoon.

 2   Q.    Ms. Edwards, where do you reside?

 3   A.    13952 Northeast 4th Avenue in North Miami.

 4   Q.    And how long have you lived in North Miami?

 5   A.    26 years.

 6   Q.    And Ms. -- I'm sorry?

 7   A.    26 years.

 8   Q.    Ms. Edwards, are you employed?

 9   A.    Yes.

10   Q.    How are you employed?

11   A.    I'm a teacher in Miami-Dade County public

12   schools.

13   Q.    Do you have any children?

14   A.    Yes.

15   Q.    How many children do you have?

16   A.    One.

17   Q.    And how old is he or she?

18   A.    He's 15.

19   Q.    Ms. Edwards, do you know an individual by the

20   name of Narseal Batiste?

21   A.    Yes.

22   Q.    Do you see him here in the courtroom today?

23   A.    Yes.

24   Q.    How do you know Mr. Batiste?

25   A.    I know -- I got to know the family through their
```

1    children, because of my -- the association of my child

2    with their children.

3    Q.    Okay.  And just for purposes of the record, could

4    you please identify an item of clothing that

5    Mr. Batiste is wearing.

6    A.    As in -- oh, he's wearing a black suit, white

7    tie, green shirt.

8    Q.    Okay.  Tell me, please, the circumstances under

9    which you met Mr. Batiste.

10   A.    I -- well, I -- Oak Grove Park is the main park

11   in my community.  I often take my son there, and I go

12   there to exercise as well, pretty much five, six days

13   each week.

14          Over time, I got to know the family.  My son

15   started, you know, playing with the children.  I got to

16   know the mom.  And I knew the mom and the children

17   before I got to know Mr. Baptiste [sic], her husband.

18   Q.    And would you please tell us the time period

19   that -- when it was that you met Mr. Batiste and his

20   family.

21   A.    I'm not sure that I can be specific about the

22   year.  But it's been a few years, at least five, six

23   years, at the very least.  My son is 15.  So it's

24   probably been even longer than that.  It might be

25   closer to seven years, even eight.  It's possible.

 1    Q.    And, Ms. Edwards, what, if anything -- what, if

 2    any, attracted you to the Batiste family?

 3    A.    The children and the wife.

 4          MR. GREGORIE:  Judge, I object to the

 5    relevance.

 6          THE COURT:  Sustained.

 7    BY MS. JHONES:

 8    Q.    Well, let me ask you this:  Did you have occasion

 9    to observe any of the activities that Mr. Batiste

10    engaged in in Oak Grove Park?

11    A.    Yes.  My son is into karate, self-defense.  And

12    oftentimes, Mr. Baptiste would be engaged with the

13    children -- with children, not just his own, but other

14    children in the park, in teaching them these skills.

15          Additionally, the family often played chess.

16    That was a daily routine, playing chess.  And other

17    children were engaged in these activities with them as

18    well.

19    Q.    Did your child play any chess with Mr. Batiste?

20          MR. GREGORIE:  Objection, your Honor.

21          THE COURT:  Sustained.

22    BY MS. JHONES:

23    Q.    Was there any assistance that was provided by

24    Mr. Batiste to your son?

25    A.    Not in particular.  My son played with the

Edwards - DIRECT - By Ms. Jhones                    204

```
 1   children, though, in general, not necessarily with

 2   chess or with self-defense.  No.

 3   Q.     And did you have occasion to observe Mr. Batiste

 4   interact with other people in the park besides yourself

 5   and -- besides yourself?

 6   A.     Yes.  There was generally a group of other

 7   adults, men and women, that -- they were generally in a

 8   group or even, again, when they were engaged in the

 9   self-defense activities with the children, other adults

10   appeared to have participated as well.

11   Q.     And could you tell us, please, how long -- what

12   period of time -- during what period of time did you

13   observe these activities?

14   A.     I'm sorry.  Can you be more specific.

15   Q.     Do you know how long the span of time that you

16   were able to --

17   A.     Oh.  The -- I'm sorry.

18          The activities were -- that was pretty much

19   daily.  Again, the self-defense activities, the playing

20   chess was -- those were daily activities, whenever they

21   were there.

22   Q.     Okay.  And what, if any, religious activities did

23   you observe Mr. Batiste participate in?

24   A.     I'm sorry.  I can't answer that specifically.

25   What I do -- what I can say is that, just in speaking
```

Edwards - DIRECT - By Ms. Jhones                    205

```
 1    with his wife, they appeared to be very --
 2               MR. GREGORIE:  Objection, your Honor.
 3               THE COURT:  Sustained.
 4    BY MS. JHONES:
 5    Q.    Was -- did you participate in any religious
 6    activity with Mr. Batiste or his wife?
 7    A.    No, I didn't.
 8    Q.    Did you ever -- what observations, if any, did
 9    you make of Mr. Batiste as it relates to any illegal
10    activity in the park?
11    A.    Again, mostly what concerned me -- or what
12    intrigued me about the family were the children and
13    how -- again, I'm an educator.  I know children.
14    And --
15               MR. GREGORIE:  Objection, your Honor.
16    Relevance, your Honor.
17               THE COURT:  Sustained.
18               THE WITNESS:  May I -- okay.
19               THE COURT:  Sustained.
20               Wait for another question.
21    BY MS. JHONES:
22    Q.    Ms. Edwards, did you ever observe any association
23    with -- well, first of all, do you know of any gang
24    activity in the Oak Grove Park?
25    A.    I don't know about that specifically.  No.
```

```
 1   Q.     Did you ever observe Mr. Batiste with any

 2   weapons?

 3   A.     No.

 4   Q.     Did you ever observe his wife with any weapons?

 5   A.     No.

 6   Q.     Okay.

 7          MS. JHONES:  If I may just have a moment, your

 8   Honor.

 9          THE COURT:  Yes.

10   BY MS. JHONES:

11   Q.     Just one final question, Ms. Edwards.

12          What efforts, if any, did Mr. Batiste undertake

13   or Mr. Batiste's wife to recruit you into any religious

14   activities?

15   A.     We've -- his wife and I, you know, spoke about

16   just religion in general.  But they've never tried to

17   recruit me specifically into their religious, you know,

18   affiliations in any way.

19   Q.     Thank you very much, Ms. Edwards.

20   A.     Okay.

21          THE COURT:  Mr. Vereen?

22          MR. VEREEN:  Just one question, Judge, if I

23   may ask from here.

24          THE COURT:  Sure.

25                    CROSS-EXAMINATION
```

```
 1   BY MR. VEREEN:

 2   Q.     Good evening, Ms. Edwards.

 3   A.     Yes.

 4   Q.     Did Narseal Batiste ever try to recruit your son

 5   into any of his religious activities?

 6   A.     No.

 7   Q.     And did you ever see Narseal Batiste or any of

 8   the individuals that he associated with in the park

 9   trying to intimidate anyone else in the park?

10   A.     Oh, no.  Not at all.

11   Q.     Thank you.

12   A.     You're welcome.

13           THE COURT:  Mr. Houlihan?

14           MR. HOULIHAN:  No.  Nothing.

15           THE COURT:  Mr. Clark?

16           MR. CLARK:  No further questions, your Honor.

17           THE COURT:  Mr. Casuso?

18           MR. CASUSO:  No questions, your Honor.

19           THE COURT:  Mr. Levin?

20           MR. LEVIN:  No questions, your Honor.

21           THE COURT:  Mr. Gregorie?

22           MR. GREGORIE:  Just one question.

23

24

25                   CROSS-EXAMINATION
```

```
 1   BY MR. GREGORIE:

 2   Q.    Ma'am, you said this was about six or seven years

 3   ago.  So your son would have been about 8?

 4   A.    Yes.  About 8 or 9.  Yes.

 5            MR. GREGORIE:  Thank you very much.

 6            THE COURT:  Ms. Jhones?

 7            MS. JHONES:  I have nothing further, your

 8   Honor.

 9            THE COURT:  You may step down, ma'am.

10            (Witness excused.)

11            THE COURT:  Call your next witness.

12            MS. JHONES:  Your Honor, may we approach?

13            THE COURT:  Sure.

14            MS. JHONES:  Thank you.

15            (Whereupon, proceedings were had at side-bar

16   outside the presence of the jury which have been sealed

17   per instructions of the Court.)

18            (Whereupon, the following proceedings were had

19   in open court:)

20            THE COURT:  We're going to break for the day.

21            Tomorrow, we're going to end, at the request

22   of one of your members, at 3:00.  So I wanted to give

23   you advance notice of that.

24            Do not discuss this case either amongst

25   yourselves or with anyone else.  Have no contact
```

```
 1    whatsoever with anyone associated with the trial.  Do

 2    not read, listen or see anything touching on this

 3    matter in any way.

 4         If anyone should try to talk to you about this

 5    case, you should immediately instruct them to stop and

 6    report it to my staff.

 7         You may leave your binders at your chairs.

 8    Please give your notebooks to the court security

 9    officer.  I will see you tomorrow morning, 9:00.

10         Have a nice evening.

11         (Whereupon, the jury exited the courtroom at

12    4:35 p.m. and the following proceedings were had:)

13         MR. GREGORIE:  Your Honor, I have two matters,

14    if that door is closed.

15         THE COURT:  Is the door closed?

16         THE COURT SECURITY OFFICER:  Yes, ma'am.

17         THE COURT:  Yes.

18         You may be seated.

19         MR. GREGORIE:  Two of agents that Ms. Jhones

20    has told us she wanted, Paul Carpentieri and Joe

21    Garbato, are both due to fly out of the country on FBI

22    business next week.  They're available for tomorrow.

23         Ms. Jhones told us she didn't believe she was

24    going to need them.

25         So I wanted to put that on the record, if
```

```
 1    that's accurate, so that -- because, if she does, I
 2    would ask her to put them on tomorrow.  Otherwise,
 3    they're going to be out of the country next week,
 4    Judge.
 5          MS. JHONES:  That is accurate.  I spoke to
 6    Special Agent Stewart and advised that I would not be
 7    needing Special Agent Carpentieri or Special Agent
 8    Garbato.
 9          THE COURT:  Okay.
10          MR. GREGORIE:  The second issue, your Honor,
11    is a little bit more complicated.
12          As you know, we told you yesterday that we
13    would do everything possible to get Mr. Abbas al-Saidi
14    here.  And we did do that.  He has a plane reservation
15    for tonight.  He was supposed to be here.
16          But I guess I have to -- I would have to
17    disclose, anyway, Mr. al-Saidi got arrested for driving
18    his car without an appropriate license.  He is in court
19    in New York as we speak fixing his personal problems
20    with his automobile.
21          Hopefully, he will -- we'll be able to get him
22    on a plane.  But, unfortunately, he was driving without
23    an appropriate license and the New York police arrested
24    him, Judge.
25          THE COURT:  Okay.
```

1          MR. GREGORIE:  So I just wanted everybody to

2    be aware of that for two reasons.

3          One, I think we should disclose it, although

4    it's well after the period that I think it would be

5    relevant.

6          But I also want to note that for the Court in

7    case we have trouble getting him here exactly on time

8    tomorrow morning.

9          THE COURT:  Okay.

10         MS. JHONES:  I appreciate the Government

11   advising me of that, your Honor.

12         I will do my best to work tonight to put other

13   witnesses on.

14         THE COURT:  Okay.  We're in recess until

15   tomorrow morning, 9:00.

16         (End of proceedings.)

17

18              C E R T I F I C A T E

19         I hereby certify that the foregoing is an
     accurate transcription of the proceedings in the
20   above-entitled matter.

21

             _____          /s/Lisa Edwards           _____
22   _____          LISA EDWARDS, CRR, RMR
          DATE             Official United States Court Reporter
23                         400 North Miami Avenue, Twelfth Floor
                           Miami, Florida 33128
24                         (305) 523-5499

25