```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                   CASE NO. 06-20373-CRIMINAL-LENARD
 3

 4      UNITED STATES OF AMERICA,        Miami, Florida

 5                    Plaintiff,         March 27, 2009

 6           vs.                         9:30 a.m. to 3:02 p.m.

 7      NARSEAL BATISTE, et al.,         Volume XXXI

 8                    Defendants.        Pages 1 to 125
        ----------------------------------------------------------

10                             JURY TRIAL
11               BEFORE THE HONORABLE JOAN A. LENARD,
                     UNITED STATES DISTRICT JUDGE
12


13


14      APPEARANCES:

15


16      FOR THE GOVERNMENT:    RICHARD D. GREGORIE, ESQ., and
                               JACQUELINE M. ARANGO, ESQ.
17                             ASSISTANT UNITED STATES ATTORNEYS
                               99 Northeast Fourth Street
18                             Miami, Florida 33132

19

20      FOR THE DEFENDANT      ANA MARIA JHONES, ESQ.
          NARSEAL BATISTE:     300 Seville Avenue, Suite 210
                               Coral Gables, Florida 33134
21


22      FOR THE DEFENDANT      ALBERT Z. LEVIN, ESQ.
          PATRICK ABRAHAM:     261 Northeast First Street
23                             Sixth Floor
                               Miami, Florida 33132
24


25
```

```
 1    FOR THE DEFENDANT        RODERICK D. VEREEN, ESQ.
         STANLEY PHANOR:       BRINKLEY, HENRYS & LEWIS
 2                             4770 Biscayne Boulevard
                               Suite 1200
 3                             Miami, Florida 33131

 4
      FOR THE DEFENDANT        RICHARD K. HOULIHAN, ESQ.
 5       NAUDIMAR HERRERA:     300 Aragon Avenue
                               Coral Gables, Florida 33134
 6

 7    FOR THE DEFENDANT        LOUIS CASUSO, ESQ.
         BURSON AUGUSTIN:      111 Northeast First Street
 8                             Suite 603
                               Miami, Florida 33132
 9

10    FOR THE DEFENDANT        NATHAN CLARK, ESQ.
       ROTSCHILD AUGUSTINE:    17639 South Dixie Highway
11                             Miami, Florida 33157

12
      REPORTED BY:             LISA EDWARDS, CRR, RMR
13                             Official Court Reporter
                               400 North Miami Avenue
14                             Twelfth Floor
                               Miami, Florida 33128
15                             (305) 523-5499

16

17

18

19

20

21

22

23

24

25
```

1                          I  N  D  E  X

2

3                                    Direct    Cross    Red.

4
   WITNESSES FOR THE DEFENDANT:
5

6  Lance Williams                       8        35       98
                                                 89
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Good morning.

 2              United States of America versus Narseal

 3    Batiste, et al., Case No. 06-20373.

 4              Counsel, state your appearances, please, for

 5    the record.

 6              MR. GREGORIE:  Good morning, your Honor.

 7              Richard Gregorie and Jacqueline Arango on

 8    behalf of the United States, your Honor.

 9              And if -- before we call the jury in, when the

10    others have announced their presence, your Honor, I

11    would ask for just a moment for a housekeeping matter.

12              THE COURT:  Okay.

13              MS. JHONES:  Good morning.

14              Ana Jhones on behalf of Narseal Batiste, who

15    is present.

16              MR. LEVIN:  Good morning.

17              Albert Levin on behalf of Patrick Abraham,

18    who's present.

19              MR. CASUSO:  Good morning, your Honor.

20              Lou Casuso on behalf of Burson Augustin, who

21    is present.

22              MR. CLARK:  Good morning, your Honor.

23              Nathan Clark on behalf of Rotschild Augustine,

24    who's present.

25              MR. HOULIHAN:  Richard Houlihan with Naudimar
```

```
 1   Herrera.
 2           MR. VEREEN:  Good morning, your Honor.
 3           Rod Vereen on behalf of Stanley Phanor, who's
 4   present.
 5           THE COURT:  All Defendants are present.
 6           Yes, Mr. Gregorie.
 7           MR. GREGORIE:  Your Honor, I wanted to advise
 8   the Court Mr. Abbas al-Saidi apparently had a couple of
 9   parking tickets he had not paid, and that was the
10   reason for his incarceration.
11           He has paid his fine and his bail on his own
12   and he is attempting to get a flight to come here.
13           It does not appear that he would be here much
14   earlier than 3:00, Judge.  If he gets the noon flight,
15   he'd be here at 3:00.
16           I just wanted to know from Ms. Jhones whether
17   she wanted him to do that due to the fact that we're
18   closing today at 3:00 or not or whether it would be
19   more efficient to have him come on Monday.
20           THE COURT:  Tuesday.
21           MR. GREGORIE:  Tuesday.  I'm sorry.
22           Well, he would arrive Monday, Judge.  We want
23   to make sure he's here for Tuesday.
24           MS. JHONES:  Your Honor, I think that Monday
25   would be fine, to have him here Monday, so I could
```

```
 1    speak to him.  I think that I don't need him today.  I

 2    don't need him to rush down here to be here today.

 3              THE COURT:  Okay.

 4              MR. GREGORIE:  That's what I'll do.

 5              The second part, your Honor, very quickly, is

 6    I noticed outside there's a -- I think it's a

 7    Mr. Williams who is waiting -- Lance Williams waiting

 8    to testify.

 9              I've had no notice of any other expert

10    witnesses other than the one counsel notified me of.

11    And if she's going to call him, I'd like to know if his

12    testimony is going to be expert testimony, because

13    other than that, I don't know what relevance he could

14    possibly have, Judge.

15              MS. JHONES:  He's a regular witness.  No

16    expert.

17              MR. GREGORIE:  Okay.

18              THE COURT:  Okay.

19              MS. JHONES:  Your Honor, if I may just address

20    a couple of things.

21              THE COURT:  You may be seated.

22              MS. JHONES:  I don't think it's going to be

23    that long, your Honor.

24              Your Honor, we are having a little bit of

25    technical difficulties.  I don't need the computer
```

```
1    access for this next witness.  But we may need to

2    take -- actually, we do.  I need to clear up what's

3    going on with the computer after this next witness.

4            THE COURT:  Okay.  What's the problem with the

5    computer?

6            MS. JHONES:  Your Honor, we had --

7    unfortunately, the computer that we normally utilize to

8    play clips was not available to us.  And we've been

9    working on it for many hours this morning.  So I

10   brought in another computer.

11           And what we had done in order to avoid one of

12   the problems last time, in the first or second trial, I

13   believe it was, is that the desktop not appear in the

14   monitor so as to avoid any stuff that may be on the

15   desktop that's going to be published to the jury.

16           And Mr. De Armendi has been trying to --

17           THE COURT:  I can just wait until -- I have

18   that control.  So when you bring up the specific clip,

19   I can then -- that's the time that I can let the jury

20   see it.

21           MR. DE ARMENDI:  Perfect.

22           THE COURT:  So you don't have to worry about

23   that.  I'll just wait.

24           MS. JHONES:  That's great, your Honor.

25   Thanks.
```

```
 1              THE COURT:  Let's bring the jurors in, please.
 2              And get your witness here, please.
 3              (Whereupon, the jury entered the courtroom at
 4    9:34 a.m. and the following proceedings were had:)
 5              THE COURT:  You may be seated.
 6              Good morning, ladies and gentlemen.
 7              THE JURY:  Good morning.
 8              THE COURT:  Call your next witness.
 9              MS. JHONES:  The defense calls Lance Williams,
10    your Honor.
11    Thereupon--
12                     LANCE WILLIAMS
13    was called as a witness by the Defendant and, having
14    been first duly sworn, testified as follows:
15              THE COURTROOM DEPUTY:  You may be seated and
16    sit as close to the mic as you can.
17              And state your name for the record.
18              THE WITNESS:  My name is Lance Williams.
19              MS. JHONES:  Good morning, ladies and
20    gentlemen.
21              THE JURY:  Good morning.
22                    DIRECT EXAMINATION
23    BY MS. JHONES:
24    Q.    Good morning, Mr. Williams.
25    A.    Good morning, Attorney.
```

1    Q.    Mr. Williams, will you please tell us where you

2    reside.

3    A.    I reside in Chicago, Illinois.

4    Q.    How long have you lived in Chicago, Illinois?

5    A.    My whole life, 46 years.

6    Q.    What is the extent of your educational

7    background, Mr. Williams?

8    A.    I am currently an assistant professor and

9    assistant director of the Carruthers Center for Inner

10   City Studies at Northeastern Illinois University.

11         I hold a Ph.D. in community health, violence --

12   youth violence prevention from the University of

13   Illinois at Chicago.

14   Q.    And what is your current occupation, sir?

15   A.    Current occupation is assistant professor and

16   assistant director at Northeastern Illinois University.

17   Q.    Do you belong to any civic organizations?

18   A.    I belong to multiple civic organizations.

19   Q.    And could you just name a few.

20   A.    Sure.  Five Hands Foundation is a civic

21   organization that I am a member of.  I'm also a member

22   of the Illinois United Fund, also a civic organization,

23   the Know Thyself Program in Chicago.

24   Q.    Now about any community involvement?

25   A.    I'm very involved in the community in Chicago --

```
 1    south side, west side of the city of Chicago.  Involved

 2    in faith-based organization initiatives.  Also involved

 3    in many outreach programs for youth.

 4    Q.    And do you have, sir, any knowledge of gangs in

 5    Chicago?

 6    A.    Absolutely.

 7          MR. GREGORIE:  Objection, your Honor.

 8    BY MS. JHONES:

 9    Q.    What is --

10          MR. GREGORIE:  Your Honor --

11          THE COURT:  Come on up, please.

12          (Whereupon, proceedings were had at side-bar

13    outside the presence of the jury which have been sealed

14    per instructions of the Court.)

15          (Whereupon, the following proceedings were had

16    in open court:)

17          THE COURT:  Ladies and gentlemen, this is

18    going to take a few minutes.  So I'm going to let you

19    have a coffee break.

20          Do not discuss this case either amongst

21    yourselves or with anyone else.  Have no contact

22    whatsoever with anyone associated with the trial.  Do

23    not read, listen or see anything touching on this

24    matter in any way.

25          If anyone should try to talk to you about this
```

```
 1    case, you should immediately instruct them to stop and

 2    report it to my staff.

 3              You may leave all your materials at your

 4    chairs.  Please be back in the jury room in 15 minutes.

 5              (Whereupon, the jury exited the courtroom at

 6    9:41 a.m. and the following proceedings were had:)

 7              THE COURT:  You may step outside, sir, please.

 8              (Thereupon, the witness retired from the

 9    courtroom and the following proceedings were had:)

10              THE COURT:  You may be seated.

11              Ms. Jhones, I need to hear a proffer of his

12    testimony.

13              MS. JHONES:  Yes, your Honor.

14              I'm going to ask this witness -- I asked him

15    the question, "How did you" --

16              THE COURT:  Is your microphone on?

17              MS. JHONES:  Yes, your Honor.

18              Your Honor, this gentleman grew up with gangs

19    in Chicago.  Specifically, before his father became

20    a --

21              THE COURT:  Was he a gang member?

22              MS. JHONES:  He was not a gang member.  But he

23    grew up, associated with and was very familiar with and

24    has personal knowledge of many --

25              THE COURT:  What does associated with gangs
```

1    mean, if he's not a gang member?

2         MS. JHONES:  Your Honor, he knew them.  There

3    were gang members that were friends of his.

4         As a young man, with respect to his community

5    involvement, he has basically dedicated most of his

6    life to interacting with members of the P. Stones, the

7    El Rukns, whatever you want to call it, throughout --

8    since the time that this gentleman was 8 years old, his

9    father was a Vice Lord.  And after he --

10        THE COURT:  What does that men?

11        MS. JHONES:  Vice Lord is a gang in Chicago.

12        And subsequent to that, his father became

13   involved in community activism, went out in the

14   community and started a program to -- so I'm not going

15   to get into the specifics.  But that's his basis of

16   knowledge.  This man --

17        THE COURT:  And then what are you going to ask

18   him?

19        MS. JHONES:  I'm going to ask him is he

20   familiar with terms.  "How are you familiar with terms?

21        "I've used them.  I've used them in order to

22   be able to communicate with them.  I know this term,

23   that term," what have you.

24        "Hand shakes, any symbols?  How do you know?

25        "I've used them.  I've used them.  My father's

```
 1    used them.  I've been using them since I was a young

 2    man.  And now, as an adult, in order to continue my

 3    community involvement, in order to be able to talk

 4    about and communicate with these people in the course

 5    of my work, I use these symbols."

 6              THE COURT:  So you're going to ask him his

 7    opinion on symbols, his interpretation of symbols?

 8              MS. JHONES:  No.  I am not going to ask him

 9    his opinion.  I'm going to ask him:  What are the

10    symbols?  What words did you use?  What was the context

11    of those words?

12              I'm not going to ask him an opinion.

13              MR. GREGORIE:  That's hearsay, your Honor.

14    This is an expert witness of which we've received no

15    notice.  She hasn't proffered him as an expert witness.

16              And as far as relevance goes, your Honor, if

17    he's a fact witness, does he know Mr. Batiste?  Did he

18    talk to Mr. Batiste about these symbols?  What, if any,

19    relationship does -- as a fact witness, what

20    relationship does -- did he have with this case?

21              She's now attempting to call a -- an expert

22    witness, your Honor, without providing notice that this

23    expert witness was going to be called.

24              MS. JHONES:  Your Honor, unless Mr. --

25              MR. GREGORIE:  There's no relevance, your
```

1   Honor, to the -- to this particular case.  Those

2   symbols that she's referring to, do they have some

3   relevance to this case?

4          MS. JHONES:  Your Honor, I --

5          MR. GREGORIE:  And is it other than hearsay

6   that he's getting his information from?  This man is

7   45 years old, your Honor -- 46.

8          MS. JHONES:  Your Honor, I agree with

9   Mr. Gregorie.  Prior to calling Dan Young as a witness,

10  this man's testimony would have been totally

11  irrelevant.

12         They made it relevant by calling Dan Young and

13  putting in front of this jury --

14         THE COURT:  Well, but they called Dan Young as

15  an expert --

16         MS. JHONES:  Your Honor --

17         THE COURT:  -- an expert by experience and

18  gave notice.  And you filed a motion to exclude him

19  based upon *Daubert*.

20         Why is this witness any different from Dan

21  Young as an expert based upon experience?

22         MS. JHONES:  Your Honor, because under 701,

23  opinion testimony by lay witnesses are permitted as

24  long as it is based on personal knowledge and personal

25  observation.

 1            There is not going to be -- maybe this

 2     gentleman could qualify as an expert.  But I don't want

 3     to qualify him as an expert.

 4            I want somebody who has personal knowledge,

 5     who has interacted with these people and knows based on

 6     observations and personal knowledge.

 7            I don't want an expert witness here to testify

 8     about what his opinions are and all of that stuff.  I

 9     want somebody who's been there, done that and seen

10     that.

11            And I am going to elicit testimony based on

12     strict personal observation and involvement and nothing

13     else, your Honor.

14            Now -- and that is --

15            THE COURT:  But if he wasn't a gang member,

16     what's his strict personal involvement with the

17     P. Stone Rangers?

18            I might agree with you if, in fact, he was a

19     gang member or a former gang member, because that would

20     be based upon his personal knowledge.

21            But you say he wasn't a gang member.  His

22     father was another gang member.  So I don't understand

23     what his -- if he's basing it on his contact with

24     persons who were members of the Blackstone Rangers,

25     then that would be hearsay.

 1              And whether he's a -- it would not come in
 2    under 701.  He would be an expert.  Expert witnesses
 3    are allowed to testify as to hearsay.
 4              A 701 witness can testify about his opinions
 5    or inferences which are rationally based on his
 6    perception, helpful to a clear understanding of the
 7    witness's testimony or determination of a fact in issue
 8    and not based on scientific, technical or other
 9    specialized knowledge within the scope of Rule 702.
10              MS. JHONES:  Your Honor, just let me -- if I
11    may just have a moment to look at my cases.
12              THE COURT:  Okay.  And then you intended to
13    play tapes for him?
14              MS. JHONES:  No, not at all.
15              THE COURT:  Oh, that's right.  You said it was
16    after this witness.
17              But you intend to ask him about symbols?
18              MS. JHONES:  What symbols did he -- I intend
19    to ask him what words or symbols has he used, has he
20    used.
21              THE COURT:  But if he wasn't a gang member,
22    what do you mean, what symbols he used?
23              MS. JHONES:  Your Honor, he's used them
24    because he was raised with them and in order to be able
25    to communicate -- in order to be able to communicate

1    with the people with whom he was raised.  This was a

2    language that was employed in order to be able to

3    communicate with gang members.

4         He does not, your Honor, have to be a gang

5    member in order to be able to testify based on personal

6    knowledge.  This man is intimately familiar --

7         MR. GREGORIE:  He's familiar, Judge, because

8    he studied this.  He learned this by hearsay, Judge.

9    Somebody told him.  That's hearsay.

10        If he was an expert and he said, "I've spent

11   years studying it," I can give it to you.

12        Rule 701 talks about facts that are relevant

13   to the case, your Honor.  What symbol is she talking

14   about?  We've talked about -- when we put our expert

15   up, we talked about the symbol the Main 21, the

16   pyramid.

17        I don't think this witness is going to

18   contradict the fact that the pyramid is a symbol.  What

19   other symbol she talking about?  Are we talking about

20   the symbol that appears on Sultan Kahn-Bey's robe?

21        She's got to give you some relevant purpose

22   for this fact testimony, Judge.  It has to be relevant

23   to this case if he's a fact witness.

24        THE COURT:  What symbols are you talking

25   about?

1          MS. JHONES:  Your Honor, the handshake, the

2     greeting.  He's going to talk -- he's going to explain

3     how he has utilized the word "Mo."  He's going to

4     explain how he has utilized the word "Mecca."

5          He is -- and not based on his studies.  Based

6     on what he's been using since he was 8 years of age,

7     your Honor, before he even began his formal studies.

8          This man -- again, prior to this man even

9     going to college, he -- this is where he grew up.  His

10    father was a gang member.

11         Subsequent to his father's gang membership,

12    this young man, then inspired by what his father had

13    done -- his father began community involvement and,

14    subsequent to his father's community involvement --

15         THE COURT:  Well, if he wasn't a gang member,

16    where did he learn what the word "Mo" meant and what

17    the word "Mecca" meant?

18         MS. JHONES:  Your Honor, it's no different --

19    it's no different than how I learned the English

20    language.

21         I didn't speak English when I was born.  But

22    when I came to the United States, I had to learn

23    English in order to be able to communicate with other

24    people.  This is the same thing.

25         This is a special -- this is a form of

 1    communication that gang members and non-gang members

 2    alike in Chicago utilize.  It is the popular culture.

 3          He knows it not because he has studied it, but

 4    because that's the only way he would be able to

 5    communicate.  It's just no different.  It's a form of

 6    communication.

 7          The Government has put on an expert witness to

 8    say, "'Mo' means this exclusively in the context of

 9    this."

10          This guy's going to say, "I use that word.

11    I've been using that word since I was 8 years old.  I

12    have personally been using that word.  I have

13    personally been using the word 'demonstration.'"

14    He's going to explain it, again, based on personal

15    knowledge.

16          I have not misled this Court.  I'm not

17    qualifying him as an expert.  Maybe he does qualify.  I

18    don't want to qualify him as an expert.  I don't want

19    him to give me opinions.

20          I want him to tell the jury --

21          THE COURT:  Well, you just gave all his

22    educational background and his Ph.D. and gangs.

23          Why was that all brought out?

24          MS. JHONES:  Just like I brought out the

25    educational background of every single witness that I

 1   have called, Dr. Shelton, Una Edwards.  It's background

 2   information.

 3          Who -- who a person is when they're rendering

 4   testimony, your Honor, is very important.  Is it a

 5   person -- you know, what's the person's background?

 6   This is just basic -- just general basic information --

 7          MR. GREGORIE:  This is a very bad ruse, Judge.

 8   This is counsel attempting to contradict the testimony

 9   of my expert without giving the Government notice.

10   It's an abuse of that rule, Judge.  She had more than

11   ample opportunity to do it.

12          The use of the term "Mo" and the use of the

13   term "Mecca" -- there are people around the world who

14   know where Mecca is, Judge, but you've got to use it in

15   the context that -- in a context that's relevant to

16   this case.

17          In this particular case, we demonstrated the

18   context of those words in the tape-recorded statements

19   that were used, Judge.  That's how we put it in there.

20          This -- if she's doing that, she's calling him

21   as an expert, Judge.  To understand those code words

22   and how they're used is expert testimony, Judge.  This

23   is merely a ruse to get around the rule.

24          MS. JHONES:  Your Honor, I understand

25   perfectly why Mr. Gregorie is so upset.  I understand.

1            Because the power of a fact witness, not

2       somebody who is qualified as an expert, but somebody

3       who has been there, done that, is quite powerful.

4            And that's why I chose -- and I have the

5       authority and the obligation to choose however I like

6       what witness I put on the stand --

7            THE COURT:  I think it would have been better

8       for you to file a motion in limine to have this subject

9       area parsed out before the Court.  This is now going to

10      take some time.

11           MS. JHONES:  Your Honor, respectfully, we

12      wanted a proffer of Dan Young before they put him on

13      the stand and they said "no."

14           THE COURT:  I had a whole *Daubert* hearing.

15      Come on.

16           MS. JHONES:  Your Honor, I am talking about --

17      I'm talking about --

18           THE COURT:  We spent all Monday afternoon here

19      because you filed a motion pursuant to *Daubert* saying

20      he was -- could not be qualified as an expert.  The man

21      got on the stand and testified.

22           MS. JHONES:  Yes, your Honor.

23           And he also started talking about Chicago and

24      where the building is and the Chicago Loop and what

25      have you.  Did we have notice of that?  We sure didn't.

```
 1   You talk about a ruse.
 2            I could call, subject to the Rules of
 3   Evidence, whatever witness I want for whatever purpose
 4   I want.  That's why I represent him, not the
 5   Government.  And this is a fact witness.
 6            They may not like it, but this is
 7   completely --
 8            THE COURT:  I think I need to hear -- I want
 9   to hear his testimony.
10            Bring him in.
11            (Thereupon, the witness entered the courtroom
12   and the following proceedings were had:)
13            THE COURT:  You're still under oath, sir.
14            Go ahead, Ms. Jhones.
15   BY MS. JHONES:
16   Q.   Good morning, Mr. Williams.
17   A.   Good morning.
18            THE COURT:  One moment, please.
19            You can tell the jurors that they can come
20   back in half an hour.
21            THE COURT SECURITY OFFICER:  Yes.
22            THE COURT:  Thank you.
23            MS. JHONES:  Should I wait, your Honor?
24            THE COURT:  Yes.
25            Go ahead.
```

```
 1              MS. JHONES:  Thank you.
 2    BY MS. JHONES:
 3    Q.    Mr. Williams, I want to ask you a few questions
 4    about your background and your childhood.  Okay?
 5    A.    Yes.
 6    Q.    Who is your father, sir?
 7    A.    My father is Roy Williams.  He was originally a
 8    member of --
 9              THE COURT:  One moment, sir.
10              Go ahead.
11              THE WITNESS:  So my dad is currently -- he's
12    69 years old.  He was originally a member of a street
13    organization -- street gang called the 14th Street
14    Clovers.  That ultimately became a part of a larger
15    street organization called the Vice Lords.
16              And, ultimately, he -- he had a little --
17    problems as a young person, a teenager, was
18    incarcerated in juvenile detention.
19              When he got out, went back to school, reformed
20    his life early -- in his early 20s, as a reformed gang
21    member, got a job working with the YMCA as a -- what
22    was called an outreach worker -- detached worker, I
23    should say, who specialized in mediating conflict
24    between street gangs on Chicago's streets.
25
```

BY MS. JHONES:

Q.    And when your father did this work subsequent to being released from prison, were you around your father?

A.    Yes.

Q.    And tell us a little bit about what interactions, if any -- how often would you be with your father when he would be involved in his community work?

A.    Yeah.  Primarily, during the summer months, when I was out of school and my dad was out on the street working with the street gang members.

      He was given resources to help get them organized, get into job training programs, social activities, took them on field trips, to games -- organized ball games for them and other cultural activities.

      So when he did these things with the street organizations, I would hang out with him during the summer months.

Q.    How old were you, sir, when this would occur?

A.    It ranged from 9, 10 years old all the way through my high school years.

Q.    And subsequent to -- when you became an adult, what, if any, interaction would you have with Vice Lords, P. Stones or any other gang members?

 1   A.     Well, in addition to living in communities that

 2   had the presence of these various street organizations

 3   as a young adult, when I finished undergrad, I came

 4   back to Chicago and, ultimately, my first job was

 5   working with Chicago public schools as an outreach

 6   worker, similar to doing the same kind of work that my

 7   father was.

 8        So --

 9        THE COURT:  Sir, you need to slow down a

10   little bit, please.

11        THE WITNESS:  Okay.

12        THE COURT:  Thank you.

13        THE WITNESS:  So the community -- the first

14   community that I worked in, I was assigned to a

15   community that was -- had the presence of a major

16   street organization called the Black Stones.

17   BY MS. JHONES:

18   Q.     And when you did this, sir, how old were you?

19   A.     I was 23, 24 years old.

20   Q.     Have you continued your work in that capacity

21   since the age of 22?

22   A.     Yes.  Until this day.

23   Q.     Okay.  And during the course of your work, what

24   interaction, if any, have you had with non-gang members

25   as well?

```
 1   A.      Oh, a lot of interaction with non-gang members
 2   and gang members alike.  So in these communities, of
 3   course, you have a lot of young people who are affected
 4   by street gangs and maybe have marginal participation
 5   to no participation.
 6          But my responsibility was to work with those kids
 7   that were involved in gangs and those who were not to
 8   try to deter them from becoming involved in gangs.
 9   Q.      In the course of your work with gang members and
10   non-gang members alike, did you familiarize yourself
11   with their terminology -- their terminology and any
12   symbols that these gang members and non-gang members
13   alike may have employed?
14   A.      Yes.  You know --
15   Q.      Tell us about that, please.
16   A.      Absolutely.
17          In order to effectively communicate with young
18   people that are involved in street organizations and as
19   a way to deter them from becoming members -- I mean, of
20   street organizations, you have to know the language
21   that they speak.  You have to know about the symbols
22   that they use to represent these various street
23   organizations so you can talk intelligently to them
24   about not participating.
25   Q.      How many years have you been doing, this sir?
```

```
1    A.    I've been doing it since -- as a professional

2    since the late '80s, early '90s.

3    Q.    Prior to that, sir?

4    A.    Prior to that -- I didn't do the work

5    professionally prior to that.  I was just, you know,

6    hanging out with my dad at that point.

7    Q.    When you were hanging out with your dad, what --

8    was it necessary to employ the lingo in order to --

9    when you were hanging out with your father as a child?

10   A.    Not necessary, but it was something that I did as

11   a social interaction with these individuals.

12   Q.    How many years did you do that, sir?

13   A.    From the time that I was 9 or 10 until 17, 18

14   years old.

15          MS. JHONES:  One moment, your Honor.

16          I just need a second, your Honor.

17   BY MS. JHONES:

18   Q.    A few more questions, Mr. Williams.

19          What were some of the terms, sir, that you

20   employed as a young man and, also -- well, first of

21   all, as a young man?  What were some of the terms that

22   you utilized?

23   A.    As a young man prior to becoming a professional

24   in this arena?

25   Q.    Yes.
```

A.     As a young man, I may refer to street

organization members as "Folks," as "People," "Are you

People?", "Are you Folks?"

Q.     And as -- when you became older, what -- as an

older person, what terms did you employ in order to

communicate with these people?

A.     Well, I think a good example would be, if I'm

approaching a group of young people who actually give

the appearance of hanging out and posturing as if they

were gang members -- for instance, if I'm in -- on the

GD set, Gangster Disciples set -- it's a community

that's affiliated to a particular street gang known as

the Gangster Disciples, for short, GD -- I would refer

to -- I may come up to them and say, "Hey, what's going

on, Little Folks?", you know, and that would get their

attention because they know that I'm referring to them.

       So that would be one of the ways that I would

approach them.

Q.     Okay.  Did you speak that way socially around

your neighborhood?

A.     Yes.

Q.     Were you one of those kids that basically hung

around gang members, but were not one?

A.     Absolutely.

Q.     Okay.  Is this part of the culture in Chicago?

```
 1              THE COURT:  Don't lead him.

 2              MS. JHONES:  Oh, I'm sorry.  I'm sorry.

 3    That's exactly what I'm doing, your Honor.  I

 4    apologize.

 5    BY MS. JHONES:

 6    Q.    What, if any, role did this type of lingo play in

 7    the culture in Chicago?

 8    A.    Well, it's a very intricate -- street gang

 9    culture is very much a part of the popular culture in

10    Chicago communities.

11    Q.    What does that mean?

12    A.    Well, that means that, because it is -- it is --

13    street gangs are so prevalent, that the culture that is

14    associated with them in many cases becomes a social

15    norm.

16          And you refer and use terms that some people from

17    outside of the communities may seem as gang-related,

18    but in the community, it's just general lingo, slang,

19    social interaction.

20    Q.    Okay.

21              MR. GREGORIE:  Your Honor, I'm not objecting

22    because I want the Court to be able to hear this

23    sufficiently.

24              So I want to make it clear I'm not accepting

25    everything that's going on.  I just think it's more
```

1    important to get this out.

2            THE COURT:  I understand.

3            MS. JHONES:  Your Honor, I just need a moment

4    to make sure I haven't left anything out.

5            MR. GREGORIE:  Your Honor, I would ask,

6    though, that we hear what other terms he's going to

7    refer to, if that's what she's looking for.  So far,

8    we've only heard the use of one.

9            THE COURT:  Are there other terms?

10           MS. JHONES:  Yes, your Honor.

11   BY MS. JHONES:

12   Q.    What, if any, use have you made of the term "Mo"?

13   A.    "Mo"?  I have used that term many times in

14   communicating with young people in these communities.

15        "Mo" is a term associated with the Moorish

16   Science Temple of America.  It also was a term that is

17   used among members of Blackstone Rangers, but is also a

18   term that is, again, popular.

19        It's very difficult to associate this -- that

20   particular term to any one group because it's such a

21   popular term in communities in Chicago.

22   Q.    How about "demonstration"?

23   A.    "Demonstration," likewise, is a popular term used

24   among young people in these communities to represent an

25   activity, something that you do collectively, to

1   demonstrate.

2        So a young person may say, "Hey, hey, Mo, let's

3   go demonstrate," meaning, "Let's go play ball" or

4   something.  But it's -- you have to understand that you

5   can only interpret it within the context that it's

6   being used.

7   Q.    Mr. Williams, do you know Jeff Fort?

8   A.    I've met him a few times over my lifetime.

9   Q.    What is "the Fort"?

10  A.    "The Fort" is known as the headquarters for the

11  Blackstone Rangers.  It used to be located on the

12  corner of Oakwood and Drexel.  It's no longer standing.

13  Q.    Have you ever been there?

14  A.    Yes.

15  Q.    Did you go inside?

16  A.    Yes.

17  Q.    Did you observe any flags that were displayed in

18  the exterior of the Fort?

19  A.    I've never seen any flags displayed there.

20  Q.    How many times did you go to the Fort?

21  A.    I can't count the number of times.

22        MS. JHONES:  I have nothing further, your

23  Honor.

24        THE COURT:  That's all you intend to question

25  him?  That's the extent?

```
 1              MS. JHONES:  I believe so, your Honor.  Just
 2    give me a minute.  But I believe so.
 3              That's it, your Honor.
 4              THE COURT:  Do you have any cross?
 5              MR. GREGORIE:  There would be, your Honor.
 6              First, I would like -- I would note that he
 7    has given an opinion on the use of terms in the
 8    community.  That's a sociologist's opinion, your Honor.
 9              It's an opinion that is not fact testimony.
10    As to his opinion as to how terminology is used by
11    different groups in the community, that is expert
12    opinion, your Honor, not 701 opinion.
13              I do have one or two questions for him that I
14    would use on cross, your Honor.  And I'm perfectly
15    willing to -- if your Honor permits him -- and I don't
16    think he should be permitted, because this is expert
17    testimony, your Honor.
18              THE COURT:  Well, I'm just asking now -- I
19    want to wait for argument.  I don't want the witness
20    here during argument.
21              But I'm asking if there are any questions that
22    you want to ask him now during the proffer.
23              MR. GREGORIE:  Not during the proffer, your
24    Honor.
25              THE COURT:  Okay.
```

1              MS. ARANGO:  Could we just have one second,

2    Judge?

3              THE COURT:  Sure.

4              MR. GREGORIE:  We're fine, your Honor.

5              THE COURT:  Okay, sir.  If you would, step

6    outside and go into the lobby, please.

7              THE WITNESS:  Okay.  Thank you.

8              (Thereupon, the witness retired from the

9    courtroom and the following proceedings were had:)

10             MS. JHONES:  Your Honor, may I have a moment

11   to retrieve a binder?

12             THE COURT:  Sure.

13             MS. JHONES:  Thank you.

14             MR. GREGORIE:  Your Honor, may I be heard for

15   a moment?

16             THE COURT:  Yes.

17             MR. GREGORIE:  Your Honor, my concern here is

18   that Ms. Jhones will now step down and there will be

19   five cross-examinations and your Honor has not heard

20   what questions co-counsel intends to --

21             THE COURT:  You're right.

22             MR. VEREEN:  No questions, your Honor.

23             THE COURT:  Does anyone else intend to ask him

24   questions?

25             MR. LEVIN:  I might.  It depends on what comes

1    out.

2              THE COURT:  Well, let's bring him back in so I

3    can hear what Mr. Levin is going to ask him.

4              MR. LEVIN:  Your Honor --

5              THE COURT:  I want to hear a full proffer.

6              MR. LEVIN:  I'm going to ask him

7    factual-related questions if they don't come out.

8              THE COURT:  That's fine.  Let's hear what he

9    has to say.

10             MR. CLARK:  Your Honor, I don't intend to ask

11   any further questions.

12             THE COURT:  Mr. Casuso?

13             MR. CASUSO:  I don't either, Judge.

14             THE COURT:  Let's bring him back in, please.

15   Get your witness.

16             Would you please use your paralegal to help

17   with the witness, please.  I think that's appropriate.

18             MS. JHONES:  Yes, your Honor.

19             THE COURT:  Thank you.

20             (Thereupon, the witness entered the courtroom

21   and the following proceedings were had:)

22             THE COURT:  You're still under oath, sir.

23             Go ahead, Mr. Levin.

24

25

```
 1                      CROSS-EXAMINATION
 2   BY MR. LEVIN:
 3   Q.     Mr. Williams, good morning again.
 4   A.     Good morning.
 5   Q.     You've lived in Chicago all your life?
 6   A.     Yes, sir.
 7   Q.     Do you read the newspapers there?
 8   A.     Yes.
 9   Q.     Have you ever read any articles pertaining to
10   Jeff Fort or the Black P. Stone Rangers in the Chicago
11   newspapers?
12   A.     Absolutely.  Many.
13   Q.     Do you have access to the Internet?
14   A.     Yes, sir.
15   Q.     Have you ever done any research on the Internet
16   with regard to Jeff Fort and the Black P. Stone
17   Rangers?
18   A.     I've read tons of things, information about Jeff
19   and the Black Stones, on the Internet.
20   Q.     Now, where is your office located?
21   A.     My office currently is located at 700 East
22   Oakwood Boulevard.
23   Q.     Where is that in relation to what you've
24   testified about concerning the location of what was
25   known as "the Fort"?
```

1    A.    Yes.  As I mentioned, the Fort, before it was

2    demolished, was located on the corner of Drexel and

3    Oakwood.  You can actually see where the Fort was

4    located -- or, actually, the Fort, when it was

5    standing, directly out of my window -- office window.

6    Q.    So the Fort no longer -- the building itself has

7    been demolished?

8    A.    It's been demolished.  Yes.

9              MR. LEVIN:  That's basically it, your Honor.

10             THE COURT:  That's all you're going to ask

11   him?

12             MR. LEVIN:  Pretty much.  I'm not going to ask

13   him his opinion on anything.  I mean, we're not in

14   argument the stage yet.  So I'll save that.

15             THE COURT:  Thank you, sir.  You can step

16   outside into the lobby.

17             THE WITNESS:  Thank you.

18             (Thereupon, the witness retired from the

19   courtroom and the following proceedings were had:)

20             THE COURT:  Yes, Mr. Gregorie.

21             MR. GREGORIE:  Your Honor, again, I object.

22   This witness's testimony is either hearsay or

23   irrelevant.

24             And any information he has, your Honor, is

25   opinion, which is -- should be -- come under the form

1    of an expert witness, and we should have been notified

2    of it, your Honor.

3            MS. JHONES:  Your Honor, I do want to respond

4    to that, if I may.  I'm still looking for something

5    else, but I'm ready to respond to Mr. Gregorie's

6    comment.

7            701 of the Rules of Evidence, opinion

8    testimony by lay witnesses, is called opinion

9    testimony.

10           The witness's testimony in the form of

11   opinions or inferences is limited to those opinions or

12   inferences which are rationally based on the perception

13   of the witness.

14           This man has -- the knowledge that I seek to

15   elicit from him is all based on his personal knowledge.

16   "Helpful to clear understanding of the witness's

17   testimony or the determination of a fact at issue."

18           We did not put these facts at issue, your

19   Honor.  We did not do that.  It was the Government that

20   did that.

21           And we -- Mr. Batiste has a right to present

22   evidence to rebut the Government's evidence, and I have

23   the obligation to do that.

24           MR. GREGORIE:  Your Honor --

25           THE COURT:  Continue reading the rule.

1        MS. JHONES:  "Not based on scientific" --

2        THE COURT:  "And not based" --

3        MS. JHONES:  "And not based on scientific,

4   technical or other specialized knowledge within the

5   scope of 702."

6        MR. GREGORIE:  Your Honor, I would note that

7   she began this witness by going through his expertise,

8   Judge, how he's got a doctorate, how he's worked in the

9   community, how he's -- she's established his expertise,

10  Judge.

11       She's not calling him as a 701 witness, your

12  Honor.  She's calling him as an expert witness.  As I

13  say, your Honor, this is a ruse.

14       MR. LEVIN:  Judge, she'll leave out whatever

15  he does for a living.

16       THE COURT:  It's already come out before the

17  jury.  He's already testified as to that.

18       MS. JHONES:  Your Honor, respectfully, I

19  disagree with my colleague.  Your Honor, this is

20  background information.

21       What the Government is trying to do is they're

22  trying to limit my right and my -- to present --

23       THE COURT:  Ms. Jhones, nothing would have

24  prevented you from noticing him as an expert witness

25  and calling him as an expert witness based upon his

1    experience and his specialized knowledge.

2          MS. JHONES:  Your Honor, my point is, as a

3    matter of --

4          THE COURT:  Strategically -- as a matter of

5    strategy, you decided not to do that.

6          MS. JHONES:  Yes, I did, because what I am

7    seeking to elicit from this person is not based on his

8    specialized knowledge.

9          It's based on his personal life experiences as

10   a person living in Chicago, as a person who was born in

11   Chicago and as a person who needs to communicate and is

12   familiar with the popular culture in Chicago.

13         That is the very point.

14         THE COURT:  Do you have authority to support

15   your proposition?

16         MS. JHONES:  Yes, your Honor.  I'm looking for

17   a page, if I may.

18         MR. LEVIN:  Judge, if I can just chime in at

19   this point while she's looking.

20         THE COURT:  Sure.

21         MR. LEVIN:  With regard to the fact that --

22   you could give a curative instruction to the jury that

23   he's not being offered as an expert witness.

24         Additionally, your Honor, the Government, when

25   they presented Special Agent Velazquez, on numerous

1    occasions prefaced their question -- Ms. Arango did

2    probably 20 -- I haven't counted them, but if I had to

3    give a rough estimate, 20 times -- "Based on your

4    involvement in this investigation and your experience

5    as a trained special agent with the FBI, do you have an

6    opinion as to..." -- and this particular question I'm

7    reading from the transcript as to who Narseal Batiste

8    was referring to.

9         And Special Agent Velazquez -- and on this

10   particular occasion, one of what I perceive to be 20,

11   it's referring to a conversation that -- I guess it was

12   12-16 --

13        THE COURT:  But we're talking about this

14   witness now.

15        MR. LEVIN:  I understand.

16        But I'm trying to draw a parallel between what

17   you allowed through Special Agent Velazquez, based upon

18   his experience as a trained special agent with the FBI

19   and his involvement in this investigation.

20        That's basically what we're doing -- or what

21   Ms. Jhones is doing through Mr. Williams.  Based upon

22   his experience, based upon his life's experience,

23   growing up on the streets of Chicago, based upon his --

24        THE COURT:  And what involvement has he had in

25   this investigation?

1        MR. LEVIN:  Well, he's had no involvement in

2   this investigation, but that's not the issue.  The

3   issue for the Government was the investigation of this

4   case.

5        The issue now is to refute or rebut an expert

6   witness who was qualified to give his opinion.  This

7   guy is basing his testimony on his life's experiences.

8        THE COURT:  What did you just say?  The issue

9   now is to rebut an expert witness who was qualified --

10        MS. ARANGO:  Exactly.

11        THE COURT:  -- to give his opinion?

12        MR. LEVIN:  Well --

13        MS. ARANGO:  Yes.

14        THE COURT:  That's what you just said.

15   Correct?

16        MR. LEVIN:  Well, not just that witness, but

17   all of the witnesses and all of the testimony and all

18   the evidence that's come in in the Government's

19   direct -- the Government's direct case -- case in

20   chief.

21        MS. ARANGO:  Judge, may I just respond briefly

22   to that?

23        Your Honor held many times on the record with

24   respect to Agent Velazquez's testimony that the

25   testimony was permissible under Federal Rule 701,

1    citing the case of *United States versus De La Fe*, which

2    states that, under Federal Rule of Evidence 701, a case

3    agent or other witness may offer an opinion or state an

4    inference for the jury if he can do so based on his own

5    training and experience and his perception of the facts

6    in the case.

7         And in that case, specifically, a law

8    enforcement witness can testify based on their

9    particularized knowledge garnered from years of

10   experience in the field and his knowledge of the facts

11   of the case without being noticed as expert.

12        So that is the context in which you allowed

13   Agent Velazquez's testimony in.

14        And I don't believe that the parallel could be

15   drawn here.  I just wanted to point that out, that

16   there is no parallel here when you've got a person

17   who's basically -- has no knowledge of the facts of

18   this case and is just testifying about what he knows

19   about his involvement on the streets of Chicago.

20        It's -- well, it's -- as Mr. Gregorie stated,

21   it's hearsay, it's irrelevant.  And as Mr. Levin

22   stated, it's really just done to rebut the testimony of

23   the expert witness, Dan Young.

24        MR. LEVIN:  That's -- and the other evidence

25   that was brought out in their case in chief.

1          I'll also note that Rule 701 states that it's

2     a law enforcement officer or other witness.  It doesn't

3     exclude non-law enforcement witnesses.

4          THE COURT:  Oh, I agree with that.

5          But the *De La Fe* case specifically is based

6     upon the perception of the facts of the case.  And

7     that's the basis that Agent Velazquez was able to

8     testify under 701 that he has -- it is within the realm

9     and scope of his experience as a law enforcement

10    officer and the fact that he's the case agent on the

11    case and was perceiving and investigating the facts of

12    this case pursuant to *De La Fe*.

13         That is substantially different from Mr. -- or

14    Dr. Williams, who comes here and states, "As a

15    professional, I've had many contacts with the gang

16    members on the streets of Chicago."

17         MR. CLARK:  May I address that for a moment,

18    your Honor?

19         THE COURT:  Yes.

20         MR. CLARK:  I think, though, what the

21    Government's argument is really supports what

22    Ms. Jhones is attempting to do, because the facts that

23    have been testified to are facts that are happening in

24    Chicago, in this neighborhood.

25         And this particular witness, his past

1    experience is in that neighborhood.  And that's what's

2    being testified to about.

3                So it is unique to our case, although Mr. --

4                THE COURT:  I agree.  It's unique to your case

5    and it's facts on the streets of Chicago.

6                It's hearsay.  It's hearsay.  It's things that

7    he has heard on the streets of Chicago as part of his

8    role as -- his work as a professional.

9                And the only people who are allowed to

10   testify, unless it's a hearsay exception, experts are

11   allowed to testify because they take in hearsay to form

12   their opinions.

13               And that may be the basis of their opinions.

14               MR. CLARK:  I don't think he's testify -- I

15   don't think he is testifying about hearsay in this

16   case, Judge.

17               I mean, he's just giving an opinion, a lay

18   opinion.  He actually used those words.  He actually --

19   it was his personal observation.  And that's the basis

20   of a lay opinion.

21               But it's not -- it's just like the case agent.

22   I mean, the case agent is testifying about things he

23   saw.  They're out-of-court things.  But it's not

24   offered for the truth of the matter.  It's just offered

25   for -- based on his perception as an opinion, as a lay

1   witness.

2           THE COURT:  It's not being offered for the

3   truth of the matter asserted?  It certainly is being

4   offered.

5           His testimony as to what symbols mean is being

6   offered for the truth of the matter asserted.

7           MR. CLARK:  Well, the actual fact that it's

8   being -- the fact that the statement was made is not

9   being -- is not offered for the truth asserted in the

10  content of the statement.

11          The fact is that there's no question that the

12  statements were made.  And the question is the effect

13  on the mind of the hearer.  It's just a lay opinion

14  regarding that.

15          I don't think that it is being offered for the

16  truth of the matter asserted, any statement.  It's

17  actually -- it's not an assertion at all.

18          The fact that people are using these terms is

19  already in evidence, that they're being made.  It

20  doesn't matter -- it's not saying is it true that

21  somebody is a Mo or not a Mo.  The fact is that the

22  statements are being made.

23          MS. JHONES:  Your Honor, whenever it's

24  appropriate, I'd like to be heard.

25          THE COURT:  Yes.

1           MS. JHONES:  I want to cite to and make

2    reference to *United States versus Novaton*, which I'm

3    sure the Court is very familiar with, at 271 F.3d 968,

4    an Eleventh Circuit decision from 2001.

5           The issue, as the Court may recall, in

6    *Novaton*, the -- we are taking the position that the

7    Government took in *Novaton*.  And it was -- one of the

8    many issues in that case was lay opinion testimony

9    regarding the use of code words.

10          And in *Novaton*, what happened was that the

11   Defendants sought to exclude the testimony, I believe

12   it was of a police officer, and his or her knowledge of

13   code words because those -- that type of testimony was,

14   the defense argued, really 702 as opposed to 701.

15          The defense in *Novaton* argued, not unlike

16   Mr. Gregorie is arguing here, that this is really

17   expert testimony in the guise of lay opinion testimony.

18          And the interesting thing about *Novaton* is

19   that it explains that, just because -- and I just want

20   to quote directly.  I don't want to misquote this

21   aspect.

22          The Court states that -- in referring to

23   Rule 701, that the testimony was rationally based on

24   the perception of the witnesses, nor do they dispute --

25   they're referring to the appellants -- the concessions

1    made by the appellants in that case -- nor do they

2    dispute that the testimony was helpful to the jury in

3    understanding the witness's testimony or in

4    determining, quote, "a fact at issue in the case."

5            Instead, the appellants argue that, despite

6    the satisfaction of each of the two prerequisites for

7    admitting lay witness opinion testimony, the evidence

8    should have been excluded because the testimony might

9    also have been characterized as expert testimony

10   subject to the requirements of 702 because the agent's

11   opinion testimony was based, in part, on their prior

12   experiences.

13           The appellants' argument is characterized by

14   *Novaton* as superficial because the agent's experience

15   in drug investigations could be viewed as the type of,

16   quote, "specialized knowledge" under Rule 702.

17           "In fact," says the Court of Appeals, "we have

18   in the past affirmed the admission under 702 of the

19   expert testimony of police officers interpreting drug

20   codes and jargon," citing to a case which -- I could

21   tell the Court the citation, but I don't know that it's

22   necessary.

23           "However, we do not accept the appellants'

24   position because it is based on the erroneous

25   assumption (at least with respect to the pre-amendment

1  version of 701) that, because an expert could provide

2  the type of testimony at issue, a lay witness cannot."

3          "Our" -- says the Eleventh Circuit, "Our case

4  law is squarely to the contrary," citing to *United*

5  *States versus Myers*" -- M-y-e-r-s -- at 972 F.2d 1566

6  at Page 1577, a case out of the Eleventh Circuit, 1992.

7          This Court made clear that a witness does not

8  fall outside of 701 simply because his or her rational

9  perception is based, in part, on the witness's past

10  experiences.  And it goes on and on.

11          And I just need one more moment, your Honor,

12  because there's another issue that I'd like to

13  address -- another aspect, I should say, of this issue.

14          THE COURT:  What were the facts of *Novaton*?

15  What were the facts of *Novaton*?

16          MS. JHONES:  There were police officers, your

17  Honor -- there were police officers that, apparently,

18  were not qualified under 702; and they wanted to, under

19  701, allow these police officers to testify about code

20  words that were being utilized, I believe, were in

21  recorded conversations.  I don't know if they were

22  recorded conversations or --

23          THE COURT:  So as I recall *Novaton*, it was

24  the interpretation of specific words in specific

25  conversations.

```
 1              MS. JHONES:  I believe so.

 2              Mr. Levin advises me that he was involved in

 3    that case.  So he probably has a lot more familiarity

 4    with the facts than do I.

 5              MR. GREGORIE:  It was a wiretap, Judge.  And

 6    the opinions given by the agents directly related to

 7    the wiretap evidence introduced at trial, the facts of

 8    that case, Judge, that they monitored, that they

 9    personally monitored, your Honor.

10              THE COURT:  And so the interpretation of the

11    codes were the actual words used on the wiretap?

12              MR. GREGORIE:  That's correct, your Honor.

13              THE COURT:  What page were you reading from,

14    Ms. Jhones, please?

15              MS. JHONES:  Give me a moment, your Honor.

16              Just what I read just a minute ago?  The last

17    part?

18              THE COURT:  Yes.  It's a very lengthy case.

19              MS. JHONES:  I know.  It is.

20              Actually, I think I read -- they follow.  It

21    starts at Page -- I believe it starts at Page 1007,

22    although I think it's towards -- it's actually towards

23    the middle of 1007.  And I concluded at Page -- I

24    believe I concluded at Page 1009.

25              THE COURT:  Is this witness here under
```

1  subpoena?

2          MS. JHONES:  Your Honor?

3          THE COURT:  Is this witness here under

4  subpoena?

5          MS. JHONES:  No.  No.  I didn't have time to

6  get him under subpoena.

7          Your Honor, I would like at some point -- it's

8  not pertinent to this right now, but to -- for purposes

9  of a CJA issue, to explain what occurred as it relates

10  to this particular witness.

11          THE COURT:  Do you have *De La Fe* there?

12          MS. ARANGO:  Yes, I do, Judge.

13          THE COURT:  I know I have it, but it'll take

14  me a few minutes to dig it out.

15          MR. CASUSO:  Judge, can my client be excused

16  to go to the bathroom, please?

17          THE COURT:  Yes.

18          MS. JHONES:  Your Honor --

19          THE COURT:  One moment, please.  We need to

20  wait for Mr. Casuso's client to be back.

21          MS. JHONES:  I was just going to ask the Court

22  if I could step out for a few minutes.

23          THE COURT:  Sure.  Well, not long.  Are you

24  going to use the rest room?

25          MS. JHONES:  Yes.

1            THE COURT:  Yes.  Go ahead.

2            MR. VEREEN:  Your Honor, could we all take a

3    break to go use the rest room?

4            THE COURT:  Sure.  We're in recess for five.

5            (Thereupon a recess was taken, after which the

6    following proceedings were had:)

7            THE COURT:  We're back on United States of

8    America versus Narseal Batiste, et al., Case

9    No. 06-20373.

10            Counsel, state your appearances, please, for

11    the record.

12            MR. GREGORIE:  Richard Gregorie and Jacqueline

13    Arango on behalf of the United States, your Honor.

14            MS. JHONES:  Ana Jhones on behalf of Narseal

15    Batiste.  He's present.

16            MR. LEVIN:  Albert Levin on behalf of Patrick

17    Abraham.  He's present.

18            MR. CASUSO:  Lou Casuso on behalf of Burson

19    Augustin, who's present.

20            MR. CLARK:  Nathan Clark on behalf of

21    Rotschild Augustine, who is present.

22            MR. HOULIHAN:  Richard Houlihan with Naudimar

23    Herrera.

24            MR. VEREEN:  Rod Vereen on behalf of Stanley

25    Phanor, who's present.

```
 1            THE COURT:  All Defendants are present.

 2            You may be seated.

 3            What I want to do is this:  Mr. Gregorie, you

 4   indicated that there were some additional objections

 5   that you had to some of the testimony that the witness

 6   gave.  So I've outlined the areas of what he gave and I

 7   want to hear those objections.

 8            MR. GREGORIE:  Fine, your Honor.

 9            THE COURT:  And then, quite frankly, I need

10   some time to assess all this and make my decision and

11   my findings.  That's why earlier I said it would have

12   been better to have front-loaded this with a motion in

13   limine so I could be prepared and consider it.

14            So what I intend to do now is -- I don't see

15   any reason to keep the jurors here for the rest of the

16   day.  I'll take some time and have you come back in the

17   afternoon and given you my ruling, if I'm prepared to

18   give it at that time.

19            MS. JHONES:  Your Honor, I certainly have no

20   problem with that.

21            The only thing I would ask the Court -- there

22   are some cases that I'd like to pull.  I would just

23   like an opportunity before the Court makes the ruling

24   to be heard.

25            THE COURT:  Well, then, now is the time,
```

1   because I am going -- after I dismiss the jury, I'm

2   going to go back into chambers and I'm going to spend

3   the time going over both the testimony and the cases

4   and the rule.

5           MS. JHONES:  Okay.

6           THE COURT:  And I'm not intending to come back

7   and have further argument.

8           MS. JHONES:  Well, let me just --

9           THE COURT:  This is obviously an issue that

10  you anticipated was going to be raised.  And so, if you

11  have further argument or cases that you want me to

12  consider, now is the time.

13          MS. JHONES:  Well, let me do the best I can,

14  then, your Honor.

15          THE COURT:  Let me dismiss the jury first,

16  because they've been waiting for quite a while.

17          Let's bring them in, please.

18          THE COURT SECURITY OFFICER:  Yes, your Honor.

19          (Whereupon, the jury entered the courtroom at

20  11:21 a.m. and the following proceedings were had:)

21          THE COURT:  You may be seated.

22          Ladies and gentlemen, there's still some

23  determinations that I have to make.  And rather than

24  have you either go to an early lunch and come back for

25  just a few hours, I'm going to dismiss you for the day.

1    Do not discuss this case either amongst

2  yourselves or with anyone else.  Have no contact

3  whatsoever with anyone associated with the trial.  Do

4  not read, listen or see anything touching on this

5  matter in any way.

6    If anyone should try to talk to you about this

7  case, you should immediately instruct them to stop and

8  report it to my staff.

9    If you would, give your notebooks to the court

10  security officer.  You may leave the binders at your

11  chairs.

12    Enjoy your weekend and your afternoon off.

13  I'll see you Tuesday morning, 9:00.

14    Thank you for your patience.

15    (Whereupon, the jury exited the courtroom at

16  11:24 a.m. and the following proceedings were had:)

17    THE COURT:  You may be seated.

18    Yes, ma'am.

19    MS. JHONES:  Thank you, your Honor.

20    Your Honor, I wanted to make a type of

21  parallel or analogy to one of the witnesses called by

22  the Government, because I sense a concern that some of

23  these cases -- well, first of all, let me say what the

24  cases do not -- what I believe are the facts of these

25  cases that we have dealt with as, for example, *Novaton*

1    or *De La Fe*.

2         In *De La Fe* -- and I believe the witness in

3    that case that was at issue is a gentleman by the --

4    who was a law enforcement officer, a gentleman by the

5    name of Agent Sciortino -- S-c-i-o-r-t-i-n-o -- in

6    *De La Fe*.

7         And then, also, I believe, in *Myers*, the

8    officer at issue in that case in the context of 701 was

9    an officer by the name of Welch.

10        I don't know offhand.  Maybe Mr. Levin could

11   enlighten me on the -- whether or not the officer in

12   *Novaton*, for example, was an officer that was actually

13   involved in the investigation of the case.

14        I have a concern that there may be a belief

15   that one cannot be a lay witness and offer lay witness

16   testimony in a case unless the person is involved in an

17   investigation of that case.

18        I have that concern, because my position is,

19   to the extent that that's an issue here, I don't

20   believe that the cases say.

21        For example, in *De La Fe*, as in *Myers*, at

22   least, the facts do not in any way help on that issue

23   because we do not know -- we do not know if Agent

24   Sciortino was called and he was not involved in the

25   investigation, as we do not know as Officer Welch.

1           Interestingly enough, in the parallel that I

2     want to draw, we had a gentleman -- a very nice

3     gentleman with the US Marshals Office, Ed Purchase.

4           Ed Purchase had absolutely nothing to do with

5     this case.  I thought long and hard as to whether or

6     not I was going to take issue with that gentleman

7     testifying as he did and that the Government did not

8     qualify him.

9           But I thought that Ed Purchase was a

10    701 witness.  So I didn't bring it up.

11          Ed Purchase had absolutely nothing to do with

12    the facts of this case, but he rendered opinions about

13    the photographs that were taken and the plumbing and

14    the security and the dangers.  He went on and on.

15          And I didn't say a word because I thought it's

16    a -- he's a 701 witness.  He's not -- they didn't

17    qualify him as an expert.  Based on his experience and

18    based on his work, he's able to do that.

19          And I am doing no different.

20          I did not like the fact, your Honor, that they

21    brought in a United States marshal who's been a marshal

22    for 26 years, who is the marshal responsible for the

23    security of this courthouse, to come into this

24    courtroom and testify and render opinions on

25    photographs that are at issue in this case.

```
1              I did --
2              THE COURT:  But you didn't object.
3              MS. JHONES:  I didn't, because I didn't think
4     I could.
5              THE COURT:  No one objected on the defense
6     side.
7              MS. JHONES:  That's correct.  That's correct,
8     your Honor, because I think that the Government has the
9     right to do -- to present their case subject to the
10    Rules of Evidence as they deem fit.
11             And that's exactly what I'm doing here with --
12             THE COURT:  But they've objected.
13             MS. JHONES:  They have.
14             THE COURT:  That's the difference.
15             MS. JHONES:  They have.
16             THE COURT:  So they've objected.  So now it's
17    at issue before me.  So I have to make a determination.
18             MS. JHONES:  And, your Honor --
19             THE COURT:  It's no longer a decision made
20    between the lawyers as to the evidence to be presented
21    and how it's presented.  It's now before the Court.
22             So that's the difference.
23             MS. JHONES:  Your Honor, I'm not saying --
24             THE COURT:  There's really no argument --
25    there's no basis for argument to say, "I didn't object
```

```
 1    to that and it came in.  So now I'm presenting this.

 2    They don't have a right to object."

 3           MS. JHONES:  I'm not saying that, your Honor.

 4    I'm not --

 5           THE COURT:  I don't understand the point of

 6    your argument.

 7           MS. JHONES:  The point of my argument is --

 8    the point of my argument is that there is a concern

 9    that I have that the Government may be arguing that you

10    have to be a witness in the investigation of the case

11    in order to render lay witness testimony under 701.

12           I'm simply -- of course, the Court has to make

13    a ruling.  I understand that.  But that's not the point

14    I'm making.

15           The point I'm making is that it is perfectly

16    within the realm of 701 and the extensive case law on

17    this issue that people that may have experiences, that

18    people that may be offered as expert witnesses, may

19    not -- need not be so, depending on the circumstances

20    and the nature of their testimony.

21           That's all I want to say.

22           And Myers, Novaton, De La Fe support that

23    proposition.

24           MR. GREGORIE:  Your Honor, the difference she

25    refuses to recognize is Ed Purchase testified based
```

1    upon photographs and videotape taken by the Defendants

2    in this case, Judge, which were entered into evidence.

3          His testimony was based on perceptions of the

4    facts in this case, which is exactly what *US versus*

5    *De La Fe* testified -- stands for and Federal Rule of

6    Evidence 701.

7          So what she's doing here, Judge, is trying

8    to -- and I represent to the Court that she

9    deliberately misrepresented what this witness was going

10   to do when he walked in here this morning, your Honor.

11         She deliberately did not tell this Court ahead

12   of time what he was going to do because it was her hope

13   that this ruse would allow her to avoid the rule,

14   Judge.

15         And I submit, Judge, that this has made this

16   jury -- I hope it does not make them look badly on the

17   Government because I was forced to object in their

18   presence when I raised this before the jury was brought

19   out.

20         But her now trying to tell this Court that

21   this has to do with 702, your Honor, is totally

22   inappropriate.

23         And to raise Ed Purchase, a witness she didn't

24   object to, and a witness who testified about evidence

25   in this case, Judge, it was the photographs and

```
 1    videotape that these Defendants presented to the

 2    undercover informants.

 3            MS. JHONES:  Your Honor, I'm happy -- I did

 4    not like the fact, your Honor, that a person unrelated

 5    to this case -- that's the issue, a person unrelated to

 6    this case.

 7            I had no idea who Mr. Purchase was when they

 8    called him.  No idea whatsoever.  There is no

 9    difference.

10            As I said earlier, the Government may not like

11    the fact that Mr. Williams is a witness in this case.

12    But I have done nothing --

13            THE COURT:  Didn't Ed Purchase testify in the

14    other trial?

15            MS. ARANGO:  Twice.

16            MR. GREGORIE:  Twice, Judge.

17            MS. JHONES:  Yes.

18            Your Honor, I'm talking about when it first

19    happened, when it first happened.  I'm referring to

20    when it first happened.

21            And, again, I'm raising the parallel because I

22    have the concern that that might be one of the issues

23    that may be under consideration.

24            MS. ARANGO:  Judge, I would just point out

25    that Ms. Jhones has objected during this trial numerous
```

```
 1    times to pieces of evidence that have come in in prior

 2    trials.  She's -- you know, thing that were not a

 3    mystery to her.

 4         She could have objected to Ed Purchase.  She

 5    knew exactly what he was going to testify to.

 6         THE COURT:  So these are the areas that I

 7    printed out and reformed on the proffered testimony of

 8    the witness.

 9         And, Mr. Gregorie, you had indicated that you

10    had some objections separate and apart -- were they

11    separate and apart from the 701 objections?

12         MR. GREGORIE:  Yes, your Honor.

13         THE COURT:  That's what I want to hear now

14    from both sides, because I'm going to have to make

15    complete findings as to the different areas; and I want

16    to make sure I hear argument from everybody.

17         The first question and answer was:  "What

18    interaction, if any, have you had with non-gang

19    members?"

20         His answer was:  "Oh, a lot of interaction

21    with non-gang members and gang members alike.  So if

22    these communities -- in these communities, of course,

23    you have a lot of young people who are affected by

24    street gangs, but maybe have marginal participation to

25    no participation.
```

1          "My responsibility was to work with those kids

2     that were involved in gangs and those who were not to

3     try to deter them from becoming involved in gangs."

4          Do you have an objection to that?

5          MR. GREGORIE:  Yes, your Honor.

6          My objection is relevance and hearsay.

7     There's no way he could know whether they were or were

8     not gang members, Judge, unless they told him that,

9     unless he had discussions with them that involved that.

10          So it's both relevance, your Honor, and

11     hearsay.

12          THE COURT:  And your response?

13          MS. JHONES:  Your Honor, I'm sorry.  I'm

14     sorry.

15          Your Honor, with respect to the relevancy

16     objection, again, this is not an issue that we made.

17     This is an issue that the Government made.

18          The issue of gangs, gang membership, Jeff

19     Fort, gang affiliation, the notion that this is not

20     relevant, your Honor, is, quite frankly, preposterous.

21          Number two:  Hearsay.  This gentleman has

22     testified of -- regarding his interaction with these

23     people.

24          He has engaged these people, gang members and

25     non-gang members alike.  He was raised with them.  He's

1   familiar with the lingo.

2          His experience is based on not what he heard,

3   but what he did and how he reacted to what he heard.

4          This is not hearsay.  He's testifying about

5   the -- he's testifying about what he did, what he did,

6   as a result of what he heard.  He communicated back to

7   them over the course of 22 years.

8          MR. GREGORIE:  Your Honor, the testimony about

9   the effects of gangs on people, the testimony about the

10  relationship and whether somebody is a gang member or

11  not a gang member -- he's saying that he knows.

12         That means he had to be told by somebody, "I

13  am a gang member," "I am not a gang member."  And his

14  testimony about what the relationship is between the

15  two has no relevance in this case whatsoever.

16         If you can point to a transcript or a tape in

17  which somebody says, "I am a member of the Blackstone

18  Rangers" or, "I am -- I bear a tattoo which indicates

19  that I belong to a certain gang," I can understand

20  there being some relevance.

21         But for him to testify about gangs over what

22  period of time, in what context, how do you know

23  whether they are or are not a gang member, the only way

24  you could know that is hearsay, Judge.

25         MS. JHONES:  Your Honor, additionally -- I

1    maintain that this is obviously nonhearsay.  This man

2    interacted with these people.

3           Additionally, his observations, your Honor,

4    his observations -- these gang members, as the

5    Government's own expert witness testified -- not that I

6    agree with the characterizations that were made, those

7    are the issues.

8           But this individual observed certain colors,

9    certain modes of dress that were worn by gang members

10   as well as non-gang members.

11          THE COURT:  He didn't testify as to that.

12          MS. JHONES:  Your Honor -- your Honor, we

13   haven't -- I've proffered the areas.  I've proffered

14   the areas.

15          THE COURT:  No.  No.  No.  No.  No.  No.  No.

16   No.  No.  Absolutely not.  You didn't proffer areas.  I

17   said I wanted to hear his testimony.  This was not

18   areas.

19          MS. JHONES:  I understand that, your Honor.  I

20   understand that.

21          If --

22          THE COURT:  And I even said, "Is that it?"

23   And I said to Mr. Levin, "Is that it?"

24          And you both said "yes."

25          Now you're bringing up colors and certain

```
 1    modes of dress?  That was not part of the testimony.
 2              MS. JHONES:  Your Honor -- your Honor, I'm
 3    bringing that up because he talked about the
 4    perceptions, the perceptions.
 5              Those are the areas -- I believe that the
 6    Court wanted me to get into the areas that I was going
 7    to inquire about.  Those are the areas.
 8              MR. GREGORIE:  Your Honor, I would note --
 9    because I've looked up this man on the Internet and I
10    have some of his material -- he is a conspiracy
11    theorist, your Honor.
12              If you read his articles, you'll see he has
13    great conspiracy theories about the Government, the
14    Government's actions regarding the Black P. Stone
15    Nations.
16              My fear is she's going to ask a question,
17    Judge, and we're going to get an answer we don't
18    expect.  This witness has not been offered as an
19    expert, Judge, but he has years of conspiracy theories.
20              Under his theory, your Honor, the CIA
21    intercepted the LAW rockets that were coming to Chicago
22    and actually put the hidden transmitter in them, and he
23    blames the Government for this, which is so factually
24    wrong it's ridiculous.
25              There are a number of other pieces of his
```

```
 1    article, your Honor, which are really absolutely crazy.

 2            And my fear is that she's going to put him up

 3    and ask him a question, Judge, and we're going to get

 4    an answer that we don't expect, Judge.

 5            MS. JHONES:  Your Honor, I indicated in

 6    questioning this person the areas that I'm going to ask

 7    him about.

 8            I'm going to ask him about his interaction

 9    with the gangs.  I'm not going to ask about any

10    conspiracy theories.  I'm going to limit it to what I

11    asked him.

12            There may be a situation --

13            THE COURT:  You would agree with me that

14    colors and dress was -- you didn't ask him.

15            MS. JHONES:  I didn't, your Honor.

16            But, your Honor, I cannot anticipate -- I'm

17    responding to -- I'm responding to Mr. Gregorie's

18    objection.

19            I did not -- I asked him about his

20    interaction.  There may be a question or two

21    additional, "Did you observe anything about" -- to

22    supplement the basis in response to an objection as to

23    how he has -- how he was able to interact with these

24    people.

25            But it's not -- I haven't enlarged the area,
```

1   your Honor.

2        MR. GREGORIE:  Judge, she was given the

3   opportunity to do that.  Your Honor asked her several

4   times to do that.

5        And this is my fear, Judge, that she is going

6   to get up there and ask a question and we're going to

7   get an answer that is totally unknown to us or

8   unexpected, Judge, and then it's before this jury.

9        MS. JHONES:  Your Honor, I'm perfectly fine

10   with the Court limiting the areas.  I have no problem

11   with that.

12        I want --

13        THE COURT:  Ms. Jhones, when I instructed you

14   to provide a proffer with the witness here, it was the

15   testimony that you seek to elicit from the witness.

16        And I said the same thing to Mr. Levin.

17        And when you were finished, I asked each one

18   of you, "Is that it?"

19        And you said "yes."

20        MS. JHONES:  Well, your Honor, I will say

21   this:  If when I asked that question the Government

22   would have objected and said, "Hearsay," I would have

23   followed up and said, "How did you observe this?"  And

24   I would have answered that question.

25        But he said, "Oh, I'm not going to object

1    because I don't want to interrupt.  I will voice my

2    objections later."

3           That is not -- that is not going into an

4    additional area, your Honor.  That is laying a --

5           THE COURT:  Well, certainly colors and mode of

6    dress is an additional area.

7           MS. JHONES:  In response to an objection based

8    on hearsay, that is --

9           THE COURT:  What has that got to do with

10   anything that -- that has nothing to do with a hearsay

11   objection.

12          MS. JHONES:  Yes, it does, your Honor, because

13   the Government has taken the position --

14          THE COURT:  It's a different subject area.

15          MS. JHONES:  Your Honor, I elicited from this

16   witness how it was that he knew and how it was that he

17   was aware of these terms.

18          He said, "I interacted with these people.  I

19   lived with these people," et cetera, et cetera.

20          I did not ask him --

21          THE COURT:  Now we're going on to the terms

22   that you asked him about, because Mr. Gregorie had

23   indicated that he had other objections and I wanted to

24   give everyone an opportunity to voice those objections

25   so I can make my rulings and make alternate rulings, if

1    I need to make alternate rulings.

2          MS. JHONES:  Well, your Honor, perhaps,

3    perhaps, if Mr. Gregorie would -- if what we have

4    here -- when we did this test run, so to speak, if what

5    we had -- if we had both sides participating and

6    Mr. Gregorie would have lodged a hearsay objection,

7    then I would have addressed it and I would have laid my

8    foundation.

9          I cannot anticipate --

10         THE COURT:  Colors and dress is not a response

11   to a hearsay objection.  A hearsay objection is an

12   objection that it's an out-of-court statement coming in

13   for the truth of the matter asserted.

14         MS. JHONES:  Respectfully --

15         THE COURT:  What colors people wore, what

16   dress they wore, is not in response to a hearsay

17   objection on another area.

18         MS. JHONES:  Your Honor, respectfully,

19   respectfully, the colors and the mode of dress, what it

20   goes to is -- these are items that are gleaned from

21   observation, observation.  And that's why it is a

22   response.

23         I'm saying that -- I think that Mr. Gregorie

24   may have not meant it.  Maybe he did.

25         But if he would have objected when this

1    witness was there and the proffer was being made -- and

2    the proffer was being made by this witness and I was

3    inquiring, I would have followed up and I would have

4    said, "How did you observe that?"  And I would have

5    addressed that issue.

6             He did not ask it and now I'm precluded from

7    going in there because --

8             THE COURT:  Bring your witness in and let me

9    hear the full testimony.  That's what I asked you for

10   before.

11            MS. JHONES:  Is the Government going to cross?

12            THE COURT:  I want to hear a proffer of what

13   he's going to testify to.  That's what I asked you for

14   earlier, full and complete.  Not areas.  I didn't ask

15   for his areas of testimony.  I said I wanted to hear

16   what he's going to testify to.

17            (Thereupon, the witness entered the courtroom

18   and the following proceedings were had:)

19            THE COURT:  You're still under oath, sir.

20            Go ahead, Ms. Jhones.

21            MS. JHONES:  I'm sorry, your Honor.  I just

22   need to retrieve my questions.

23                  CONTINUED DIRECT EXAMINATION

24   BY MS. JHONES:

25   Q.    Hello, Mr. Williams.

```
 1    A.     Hello.

 2    Q.     Mr. Williams, a few more questions.

 3           You've testified that you have -- that you are

 4    aware of and interacted with gang members in Chicago

 5    and non-gang members alike.  Correct?

 6    A.     Correct.

 7           MR. GREGORIE:  Objection, your Honor.  Over

 8    what period of time?

 9           THE COURT:  Place it in time.

10    BY MS. JHONES:

11    Q.     Would you please tell us over what period of time

12    you have made these observations and affiliated -- or

13    interacted with gang members in Chicago and non-gang

14    members alike.  Over what period of time?

15    A.     My whole life.  Roughly, from the age of maybe 9

16    or 10 years old until now.

17    Q.     And, sir, during the course of your observations

18    of these two groups of people in Chicago --

19           MR. GREGORIE:  Objection, Judge.  What two

20    groups of people?

21    BY MS. JHONES:

22    Q.     Gang members and non-gang members alike --

23    A.     Yes.

24           MR. GREGORIE:  Objection, your Honor.

25    Relevance.
```

```
 1   BY MS. JHONES:

 2   Q.     Have you had --

 3               THE COURT:  Let me hear the question.

 4               Then you can make your objection,

 5   Mr. Gregorie.

 6   BY MS. JHONES:

 7   Q.   Mr. Williams, have you made any observations

 8   regarding certain items of clothing that are worn by --

 9   first, let me ask you in general -- by gang members,

10   certain modes of clothing, some items of clothing?

11   A.     Yes.

12               MR. GREGORIE:  Objection as to "gang members,"

13   your Honor.  That's a very broad scope.

14               MS. JHONES:  I'm asking --

15               THE COURT:  Sustained.

16               Rephrase your question.

17   BY MS. JHONES:

18   Q.     Let me ask you this:  What items of clothing have

19   you observed being worn by P. Stone Nation members?

20   A.     Hats, jackets, primarily --

21   Q.     I'm sorry.  I didn't get your first response.

22   A.     Could you ask the question again, please.

23   Q.     Sure.

24               What do P. Stone Nation members -- gang

25   members -- do they wear -- what certain -- do they wear
```

```
 1   any distinct clothing?

 2           MR. GREGORIE:  Objection, your Honor.  Time

 3   period.

 4           THE COURT:  Place it in time.

 5   BY MS. JHONES:

 6   Q.    Well, let me ask you this:  Has the clothing of

 7   P. Stone Nation members changed over the course of

 8   time?

 9   A.    Absolutely.

10   Q.    Just explain to us, what observations, if any,

11   did you make as a child when you interacted with

12   these -- this group, the P. Stone Nation gang members,

13   and how did it change?

14   A.    Yes.  Over the years, from approximately the late

15   '70s through the early to mid-'80s, the clothing that

16   symbolized membership in the Blackstone organization

17   has changed.

18         In the late '60s, they commonly wore --

19           THE COURT:  Sir, tell us what you observed.

20   The question was what you observed as a child.

21           THE WITNESS:  I observed them wearing hats and

22   jackets that identified them with their organization.

23   BY MS. JHONES:

24   Q.    And please tell me the time period that you

25   observed -- before -- I'm going to ask you additional
```

1    questions about the hats and jackets.

2         But so we have time periods, what time period

3    when you were a child did you observe -- prior to going

4    into your studies -- your advanced studies, did you

5    observe hats and jackets worn by -- and what was the

6    group called during that time period?

7    A.    Initially, '68, '69, the Blackstone Rangers.

8    Q.    And when did you begin to make your observations

9    of their attire --

10             THE COURT:  What year were you born?

11             THE WITNESS:  I was born in '62.

12   BY MS. JHONES:

13   Q.   So would you please, to the best of your ability,

14   tell us when you began to make these observations as to

15   the attire worn by the Black Stones.  And during the

16   time that you made those observations, what was -- how

17   were they referred to?  What were they referred to as?

18   A.    They referred to it as the Blackstone Rangers.

19   Q.    Okay.  And from that period that you had just

20   mentioned -- and I apologize.

21         The time period, I think -- '69 to the early

22   '70s, did you say?

23   A.    '68, '69 to the early '70s.  Yes.

24   Q.    What was their -- what type of attire did they

25   wear?

Williams - DIRECT - By Ms. Jhones                    75

```
 1              MR. GREGORIE:  Objection, your Honor.
 2   Calls -- it's a vague question.  When they say "they,"
 3   your Honor, how did he know that they were Blackstone
 4   Rangers?  How did --
 5              THE COURT:  Sustained.
 6              It's been asked and answered.  You asked him
 7   that question.  Go on to the next question.
 8              MS. JHONES:  Okay.
 9   BY MS. JHONES:
10   Q.    And besides the hats and the jackets -- did the
11   hats and the jackets have any colors -- any distinctive
12   colors?
13   A.    Yeah.  The hats were red tams.
14   Q.    I'm sorry?
15   A.    Tams.  Red tams.
16   Q.    How about the jackets?
17   A.    The jackets were generally waist length, black,
18   sometimes leather jackets.  And, generally, they would
19   have insignia, letters that indicated, you know,
20   "Stones," "Blackstone Rangers."
21   Q.    Could you describe the insignia.
22   A.    Stones?  It would be "BS," "BSPN."
23   Q.    In addition to the letters, were there any
24   drawings or any type of symbol in addition --
25   A.    Yeah.  Stars -- five-point star.
```

```
1    Q.    Anything else in the insignia?

2    A.    Those would be the major symbols and insignia

3    that stand out.

4    Q.    Into the '70s -- the later '70s, did the attire

5    change in any way?

6    A.    Yeah.  I think the tams went away.  The

7    language -- the name moved from Blackstone Rangers to

8    Almighty Black P. Stone Nation or, as it evolved, to

9    the -- ultimately to El Rukns.

10   Q.    What was different about the attire?  And please

11   place it in a time period.  The mid-'70s to when?

12   A.    Yeah.  In the mid-'70s, still insignia that

13   indicates a relationship to the Blackstone Rangers or

14   Almighty Black P. Stone Nation.

15         When you get towards the end of the '70s, early

16   '80s, you're beginning to see the organization refer to

17   themselves as El Rukns and, at that time, they're

18   wearing fezzes, primarily, red fezzes with a black

19   tassel.

20   Q.    Anything else, sir?

21   A.    Symbols change.  A pyramid, circle, "7."  That

22   would be a circle with a "7" in the middle.

23   Q.    If you saw those symbols, would you be able to

24   recognize them?

25   A.    Yes.
```

1    Q.     During the '70s -- the mid-'70s to the -- the end

2    of the '70s to the early '80s, did they wear any

3    distinct colors in their attire in addition to the

4    fezzes?

5    A.     Yeah.  The distinct colors would be red and

6    black, sometime red, black and green.

7    Q.     Okay.

8            MS. JHONES:  If I may have a moment, your

9    Honor, to make sure I haven't left anything out.

10   BY MS. JHONES:

11   Q.     Sir, could you give us an idea of how often --

12   I'm going to break it up into the periods of your

13   life --

14   A.     Yes.

15   Q.     -- just so the record is clear and for the

16   benefit of the Court.

17           Could you give us an idea of the amount of time

18   that you would spend with the members of -- I don't

19   want to call it the wrong thing.

20           The P. Stones?  Is that the first -- the first

21   name?

22   A.     Blackstone Rangers.

23   Q.     Blackstone Rangers?

24           MR. GREGORIE:  Objection.  Relevance, your

25   Honor.

1       MS. JHONES:  Your Honor, I'm trying to

2   establish a foundation for his -- this witness's --

3       THE COURT:  Overruled.

4       MS. JHONES:  -- ability to perceive.

5   BY MS. JHONES:

6   Q.     Starting from -- the late '60s, I believe, was

7   the first time period that we established.

8   A.     Yes.

9   Q.     The late '60s to the early '70s, how old were you

10  during that time period, approximately?

11  A.     9 -- 8, 9 years old.

12  Q.     And what -- how often would you spend time with

13  and make the observations that you have just testified

14  about in a given -- just give us an idea.  Weekly?

15  Monthly?

16  A.     Not regularly during the school year.  Maybe a

17  few times during the school year.  Throughout the

18  summer months, probably once or twice a week.

19         Keep in mind that I went to school -- an

20  elementary school that had members that were part of

21  the organization.  But not much representation of those

22  organizations on a day-to-day basis in school.

23         Most of my interaction came when I was hanging

24  with -- you know, hanging out with my father, you know,

25  on primarily the weekends throughout the summer.  Some

```
 1   weekdays.
 2   Q.    And how about, sir, into the -- I guess the late
 3   '70s and the early '80s is the other time period.
 4   A.    Yes.
 5   Q.    Give us your approximate age range and --
 6   A.    Right.
 7         So between '76 and '80, I'm in high school.  And
 8   I go to school with -- I went to school with kids who
 9   were in street organizations, primarily Blackstone --
10   Rangers or Almighty Black P. Stone Nation, by that
11   time.
12         That ultimately is beginning to evolve into the
13   El Rukns between '78 and '80, a little bit past that.
14   But I go away to college in '80.
15         So to answer your question, pretty much every day
16   from '76 through '80.
17   Q.    And do the El Rukns still exist today, sir?
18   A.    No.  I don't -- I don't see young people or
19   anyone in street organizations today referring to
20   themselves as El Rukns.
21   Q.    When did you stop observing -- did there come a
22   time when -- well, let me ask you this.  I don't
23   believe I've asked you this.
24         As it relates to when the name of this particular
25   gang changed to El Rukns, could you just tell us so
```

```
 1   we're clear, is there a time period when that occurred,
 2   a range of time period?
 3   A.     Yeah.  Yeah.  That's going on in a very formal
 4   way, very easy to see and identify, from 1980 through
 5   probably '86, maybe, around '86.  Therefore, about a
 6   five- or six-year period.
 7   Q.     And you said it was very easy to see.
 8          Tell us about --
 9             THE COURT:  I don't know what the question is
10   or what the answer relates to.  I don't know what was
11   easy to see.
12             MS. JHONES:  I thought he said -- correct me
13   if I'm wrong --
14             THE COURT:  Would you ask him a question,
15   please.
16             MS. JHONES:  Sure.
17   BY MS. JHONES:
18   Q.     Did -- what, if any, changes in clothing styles,
19   insignia, anything that you were able to observe, based
20   on your interaction with this group -- what, if any,
21   changes existed relating to those areas, clothing --
22   A.     Clothing, yes.  Hats.  They're now wearing
23   fezzes.  They are wearing -- actually, one of the big
24   indicators was changes in names.
25          They were using Islamic names.  They were using
```

1    hyphenated names, whatever your first name would be,

2    "El."  So it would be -- if your name was "Mike," it

3    would be "Mike-El."

4    Q.     Anything else?

5    A.     E-l.

6    Q.     I'm sorry.

7    A.     Those were the two big indicators.

8    Q.     Anything else in clothing besides the fezzes?

9    A.     No.  No.  Those are the big -- and those fezzes

10   were not worn on a day-to-day basis.

11   Q.     Any differences in symbols?  Any symbols utilized

12   during this time period, '80-'86, that you recall?

13   A.     I think the pyramid becomes a little more

14   prominent as a symbol.  Also, the star and crescent --

15   crescent moon and five-point star become a little bit

16   more prominent.

17   Q.     Sir, are you familiar with any greeting signs

18   that were utilized, any handshake type of signs,

19   utilized by this organization?  And tell us -- to the

20   extent you're knowledgeable about any greeting signs or

21   handshakes, was it the same or did it change throughout

22   the course of --

23   A.     It changed throughout the course.  As the group

24   kind of transformed itself into the El Rukns, you would

25   see more hand gestures of what they would call throwing

```
 1   up the five, five-point star, crossing, love on the
 2   chest.  You see that more.  Yeah.
 3   Q.     When did you start seeing --
 4   A.     Around the '80s -- early '80s to mid-'80s.
 5   Q.     Okay.
 6   A.     There was also a -- what you call a five-point
 7   stance.  They would stand certain kind of ways to
 8   represent a five-point stance, representing a
 9   five-point star.  That became more prominent.
10   Q.     During what time period, please?
11   A.     Mid-'80s.  Early to mid-'80s, again.
12   Q.     Are any of these stances that you reference --
13   are they employed today?
14   A.     They're not used as much today.  Some of the
15   hand -- the hand gesture is used very widely, almost in
16   a more popular way now.
17        Many of these rituals and traditions and symbols
18   now have been adopted among young people who are not
19   necessarily in street organizations.
20        MR. GREGORIE:  Objection, your Honor.  That's
21   an opinion, and that's hearsay.
22   BY MS. JHONES:
23   Q.     Let me ask you this, sir.
24        MS. JHONES:  I'm sorry, your Honor.
25        THE COURT:  I'll take note of your objection.
```

1    For purposes of this hearing, I'll let it go forward.

2    But I do note your objection that this has now gone

3    into the realm of opinion.

4    BY MS. JHONES:

5    Q.    What -- Mr. Williams, the statement that you just

6    made:  How is it that you know this?

7    A.    I see it.

8    Q.    Tell us about the circumstances under which you

9    have seen this.

10   A.    I've seen it as a youth worker who is out on the

11   streets working with the kids who are members of the

12   organizations.

13        MS. JHONES:  Your Honor, I just need a moment,

14   please.

15   BY MS. JHONES:

16   Q.    Mr. Williams, just a few more questions, please.

17        This clothing --

18   A.    Yes.

19   Q.    -- that you have described -- let me break it up

20   into the time periods so the record is clear.

21        The clothing that you described that you observed

22   during the late '60s into the early '70s -- and by that

23   clothing, I believe you testified the jackets and the

24   red tams?

25   A.    Yes.

1    Q.     Did you make any observations of this type of

2    attire being worn that was being worn by non-Black

3    Stones?

4              MR. GREGORIE:  Objection.  Leading, your

5    Honor.

6              THE COURT:  Sustained.

7              MS. JHONES:  I'm sorry.

8    BY MS. JHONES:

9    Q.     What, if any, observations did you make with

10   respect to this -- these hats and jackets during the

11   late '60s or the early '70s -- what, if any,

12   observations did you make as it relates to non-Black

13   Stones?

14   A.     Yeah.  I didn't see any non-Black Stones wearing

15   those red tams.

16   Q.     How about when it came to the late '70s and the

17   '80s?  Were there -- what observations, if any, did you

18   make with respect to the red fezzes and the black

19   tassels?  Did you encounter -- I want to say "folks,"

20   but I'm going to say "people."

21   A.     Say "people."  "People" is appropriate.  Yes.

22   Q.     By "people," I mean non-gang members.

23   A.     Oh, okay.  "People" is also a term that refers to

24   certain factions -- a certain faction of gang members.

25            Young people who are not gang-affiliated did not

 1   wear red fezzes with black tassels.

 2   Q.    Okay.  Were there any non-gang members that wore

 3   attire or employed colors in their dress that were

 4   similar to the P. Stones?

 5              MR. GREGORIE:  Objection.  Leading, your

 6   Honor.

 7              THE COURT:  Sustained.

 8              Rephrase your question.

 9   BY MS. JHONES:

10   Q.    Mr. Williams, during this time period that we're

11   talking about, whether it be the late '60s, early '70s,

12   and the next time period, which is the end of the '70s

13   to the early '80s, what observations, if any, did you

14   make of attire and/or symbols worn or utilized by

15   members of the Moorish Science Temple?

16              MR. GREGORIE:  Objection, your Honor.  That --

17   first, it's leading.  Second, your Honor, does he know

18   anybody in the Moorish Science Temple?  Who's he --

19              THE COURT:  I don't find it's leading.

20              But you need to lay a predicate.

21              MS. JHONES:  Sure.

22   BY MS. JHONES:

23   Q.    In addition to the -- your observations of

24   P. Stone members, El Rukn members and the Almighty

25   Black Stones --

1   A.    Yes.

2   Q.    -- did you have any -- did you know or meet any

3   members of the Moorish Science Temple?

4   A.    Yes.

5   Q.    Let's break it down into the time period so the

6   record is clear.

7         When did you first -- what, if any, contact have

8   you had with Moorish Science Temple members?

9   A.    Well, you know, in the African-American

10  community, definitely the Moorish Science Temple of

11  America has a presence, has always had a presence --

12        THE COURT:  Sir, what contact did you have is

13  the question.

14        THE WITNESS:  Contact?  I wouldn't say any

15  personal contact.  Just observations of their presence

16  in the community, seeing them in the community.

17  BY MS. JHONES:

18  Q.    And give me the time periods when you would see

19  them.

20  A.    I think I could probably recall seeing members of

21  the Moorish Science Temple of America as early as

22  seeing the Stones.

23  Q.    Would that be --

24  A.    It would be probably late '60s, early '70s.

25        MR. GREGORIE:  Objection.  Hearsay, your

```
 1    Honor.  How does he know who's a member of the Moorish
 2    Science Temple?
 3              MS. JHONES:  I'll lay my predicate, your
 4    Honor.
 5              THE COURT:  Okay.
 6    BY MS. JHONES:
 7    Q.    What knowledge, sir, did you have -- how do you
 8    gather your knowledge -- how do you know that these
 9    people that you observed in the late '60s, early
10    '70s -- how do you know them to be members of the
11    Moorish Science Temple?
12    A.    They participated in community activities.  They
13    had storefront facilities, locations where they
14    worshipped.
15          They participated in -- I know one of the big
16    events in Chicago was the Bud Billiken Day Parade.  And
17    they would march in the parade.
18    Q.    How often would that happen?
19    A.    Once a year.
20    Q.    When you made these observations, could you tell
21    us some of -- could you tell us about some of the
22    observations that you made in terms of their attire.
23    A.    Yeah.  They've always had a very strong Islamic
24    presence.  So they would wear garbs that were in the
25    tradition of Islam:  Fezzes.
```

```
1          I think the term of the overgarb is "jalabiya,"
2   but it was -- and I don't know the exact terminology
3   for the garb.  But it looks very similar to what you
4   would see worn by people in the Islamic community.
5   Q.     Were there any particular colors?
6   A.     No.  Not that I recall.
7   Q.     Okay.
8          MS. JHONES:  I have nothing further, your
9   Honor.
10         THE COURT:  Mr. Levin?
11         MR. LEVIN:  No questions, your Honor.  No
12   further questions.
13         THE COURT:  That's it for areas?
14         MS. JHONES:  Yes, your Honor.
15         THE COURT:  Mr. Levin?
16         MR. LEVIN:  Nothing further than what I've
17   already offered previously.
18         THE COURT:  Anyone else?
19         Mr. Vereen?
20         MR. VEREEN:  No, your Honor.
21         MR. LEVIN:  Mr. Houlihan?
22         MR. HOULIHAN:  No.
23         THE COURT:  Mr. Clark?
24         MR. CLARK:  No further questions.
25         THE COURT:  Mr. Casuso?
```

 1              MR. CASUSO:  No questions.

 2              THE COURT:  Mr. Gregorie?

 3              MR. GREGORIE:  Sure, your Honor.

 4                         CROSS-EXAMINATION

 5   BY MR. GREGORIE:

 6   Q.    Good afternoon, sir.

 7   A.    Good afternoon, sir.

 8   Q.    Sir, when you were -- you say you were born in

 9   1963?

10   A.    '62.

11   Q.    '62.  Okay.

12         So in 1970, you were 8 years old?

13   A.    Yes.

14   Q.    Okay.  Even for me, that math is not too hard.

15         So in the late 1960s, you, in fact, watched

16   parades of the Blackstone Rangers.  Correct?

17   A.    Parades?  The parade that I was just referring to

18   was the Bud Billiken Parade.

19   Q.    Well, you've written an article -- actually, you

20   lectured back in 2001 --

21   A.    Yes.

22   Q.    -- at the University of Illinois Chicago.

23   Correct?

24   A.    Correct.

25   Q.    And you lectured on "Black Power Politics and

1    Gang Banging?

2    A.     Yes.

3    Q.     And in that article, you wrote that the Main 21,

4    meaning the united gangs that formed the Black P. Stone

5    Nation, had processions in the park and they walked

6    through the park like a big parade and all the kids and

7    other people from the community would walk behind them.

8           Didn't you write that?

9    A.     I didn't write it.  I spoke it and someone

10   transcribed it, translated it.  Yes.

11   Q.     And you said that the Main 21 would give the

12   little kids money and candy and all this stuff every

13   Sunday.  Is that right?

14   A.     Yeah.

15   Q.     And you said that, at that point in your life,

16   you didn't see the Main 21 and the Blackstone Rangers

17   as something bad until you grew a good deal older.

18   Correct?

19   A.     That's correct.

20   Q.     So the Blackstone Rangers -- or the Black P.

21   Stone Nation, at that time, actually marched down the

22   street in public; did they not?

23   A.     Yes, they did.

24   Q.     And they attracted young people to follow behind

25   them?

Williams - CROSS - By Mr. Gregorie                    91

```
 1    A.    They didn't attract -- I mean, we were attracted

 2    to the spectacle.  It was interesting to us.  Yes.

 3    Q.    How were they dressed when they marched down the

 4    street?

 5    A.    During that time, they were very -- this is -- I

 6    always call this the "super fly era."

 7    Q.    Okay.

 8    A.    This is when, you know, it was popular to wear,

 9    you know, the very loud colors and the big platform

10    shoes.  So you would see that type of garb.

11    Q.    Okay.  Now, the pyramid.  You understood the

12    symbolism of the pyramid; did you not?

13    A.    Yes.

14    Q.    That was a uniting of the 21 gangs and each stone

15    in that pyramid represented one of those gangs.  Is

16    that right?

17    A.    Correct.

18    Q.    And the garb changed in the 1980s, when the

19    Black P. Stone Nation became El Rukns; did it not?

20    A.    Correct.

21    Q.    And El Rukns at times wore a tam, a small, white

22    skull cap.  Correct?

23    A.    I think you're referring to a kufi.

24    Q.    A kufi.  That's what I was looking for.

25    A.    Okay.
```

1    Q.     They wore kufis; did they not?

2    A.     Yes.

3    Q.     Sometimes they'd wire white robes sort of like

4    Middle Easterners wear?

5    A.     Yes.  That's the '80s that I was talking about.

6    Q.     In fact, that was -- you'd see a lot of them at

7    funerals.

8          If there was a gang funeral, you'd see a lot of

9    those white robes and kufis on; did you not?  Did you

10   observe that?

11   A.     I didn't attend any funerals.

12   Q.     But you would see the old El Rukns wearing those

13   white robes and kufis?

14   A.     You would see kufis.  I don't recall seeing any

15   white robes.

16   Q.     And then, when the -- Jeff Fort gets arrested for

17   the Libyan case and there's a prosecution of members of

18   his gang, there is another transformation of the gang.

19   Is that correct?

20          MS. JHONES:  My objection is beyond the scope

21   and the basis of knowledge has not been established.

22          THE COURT:  Lay your predicate.

23          MR. GREGORIE:  Okay.

24   BY MR. GREGORIE:

25   Q.     Were you still observing the El Rukns at a time

1  period when their leader, Jeff Fort, and members of his

2  gang are accused of attempting to form an alliance with

3  Libya?

4  A.    Yes.

5  Q.    And was there a transformation in the way in

6  which the El Rukns hierarchy proceeded at that time?

7  A.    Yeah.  I think the transformation that you were

8  mentioning actually occurs before that incident.

9  Q.    Okay.  And tell us a little bit about that

10  transformation.  What happened?

11  A.    Well, you just saw the organization become more

12  aligned with Islamic tradition.

13  Q.    And did the -- were there titles for the

14  hierarchy in the organization?

15          MS. JHONES:  Your Honor, I'm going to object

16  based on the scope.  I have not inquired of titles in

17  the organization, hierarchy.  I have not gone into

18  that, nor do I intend to.  He's not an expert, your

19  Honor.

20          MR. GREGORIE:  She asked what his observations

21  were.  I'm merely asking him what he observed, your

22  Honor.

23          MS. JHONES:  That is -- what I'm saying is

24  it's beyond the scope of the observations that were

25  elicited in my direct testimony.

```
 1            THE COURT:  I'm going to overrule it for
 2   purposes of this hearing.
 3            Go ahead.
 4   BY MR. GREGORIE:
 5   Q.    Did you observe a change in the hierarchy of
 6   El Rukns?
 7   A.    Not -- I mean, the only change in the -- in terms
 8   of titles, that I'm aware of, other than Jeff Fort
 9   being a leader, is the title of Main 21.  He's a
10   Main 21.
11   Q.    Now, what was the group -- what was the gang
12   called?
13   A.    They were essentially Blackstone Rangers at the
14   time.  But when they become El Rukns, I'm not familiar
15   with any of the titles associated with the organization
16   at that point.
17   Q.    Okay.  Well, then, what was the gang called after
18   it went from El Rukns -- what is the next name that the
19   gang is called?
20   A.    Black Stones.
21   Q.    The Black Stones?
22   A.    Yes.
23   Q.    Is it also --
24   A.    Today.  Today, presently, yes.
25   Q.    Is it referred to as the Almighty Black P. Stone
```

1    Nation?

2    A.    No.  That hasn't been used since the '70s.

3    Q.    And that gang still exists?

4    A.    You have to understand that it's not -- they are

5    not different gangs.  They're just different titles

6    used at different points of their evolution.

7    Q.    I understand that.

8    A.    Okay.

9    Q.    So what I'm saying is:  Its last title is what?

10   A.    Black Stones, period.

11   Q.    But the Black Stones are the evolution of Jeff

12   Fort's gang from the early 1960s up to the present?

13   A.    In my opinion --

14         MS. JHONES:  Objection as to his opinion, your

15   Honor.

16         THE COURT:  Sustained as to his opinion.

17   BY MR. GREGORIE:

18   Q.    The observations that you have made, have you

19   observed the same gang proceed right up to the present?

20   A.    No.

21   Q.    Okay.  And, sir, does a gang called the Black

22   Stones still exist today?

23   A.    Yes.

24         MR. GREGORIE:  That's all I have, your Honor.

25         THE COURT:  I'm sorry, sir.

1          I thought that you testified earlier when you

2     began this morning that you're still working in the

3     area?

4               THE WITNESS:  Yes, I am.

5               THE COURT:  So you don't make any observations

6     of the Black Stones --

7               THE WITNESS:  Yes.

8               THE COURT:  -- anymore?

9               THE WITNESS:  Yes, I do.

10              THE COURT:  I thought you just told

11    Mr. Gregorie that you no longer observe them.

12              THE WITNESS:  No.  Maybe I didn't

13    understand -- I thought his question was:  Is there an

14    organization called the Black Stones?

15              THE COURT:  He asked you, "The observations

16    that you've made, have you observed the same gang

17    proceed right up to the present?"

18              And you said, "No."

19              THE WITNESS:  Okay.  What I mean by that is

20    that there are different factions of that organization

21    that view themselves as separate entities that are no

22    longer a part of that main organization, kind of

23    offshoots, so to speak.

24              MR. GREGORIE:  May I ask another question,

25    your Honor?

```
 1              THE COURT:  Yes.
 2    BY MR. GREGORIE:
 3    Q.    Does that main organization still exist?
 4    A.    I would say so.
 5    Q.    So we're talking about the main organization of
 6    the Blackstone Rangers to Black P. Stone Nation, to
 7    El Rukns, to Black Stones, as you call it now?
 8    A.    Yeah.  But the hierarchical structure is not the
 9    same.  It's not the once super so-called gang led by
10    Jeff Fort and the Main 21s.
11              In Chicago now, what you have are a bunch of
12    renegade kind of operation sets that have their own
13    infrastructure and their own leadership that is totally
14    not aligned with Jeff Fort and the regular, normal
15    structure of the Main 21.
16              MR. GREGORIE:  Your Honor, may I ask one other
17    question?
18              THE COURT:  Yes.
19    BY MR. GREGORIE:
20    Q.    You mentioned that -- some knowledge or
21    observation of the Moorish Science Temple.
22    A.    Yes.
23    Q.    Are you a member of the Moorish Science Temple?
24    A.    No, I'm not.
25    Q.    Are you -- have you attended Moorish Science
```

1   Temple ceremonies?

2   A.    No.

3   Q.    Have you been at Moorish Science Temple

4   activities?

5   A.    I've been at activities where Moorish Science

6   Temple members were present, but not events that they

7   were the sole organizers of this particular event that

8   I went to.

9   Q.    And how did you know they were Moorish Science

10  Temple members?

11  A.    Because they identified themselves as Moorish

12  Science Temple members.

13  Q.    That's what they told you?

14  A.    Yes.

15          MR. GREGORIE:  Nothing further, your Honor.

16          THE COURT:  Anything further?

17          MS. JHONES:  Yes, your Honor.

18                  REDIRECT EXAMINATION

19  BY MS. JHONES:

20  Q.    Mr. Williams, in addition to -- as it relates to

21  the -- your knowledge of the Moorish Science Temple,

22  were there other -- what, if any -- were there any

23  other ways -- were there ways, other than speaking to

24  the Moorish Science Temple members, that you utilized a

25  basis for identification of that group?

```
 1              MR. GREGORIE:  Objection.  Leading, your
 2    Honor.
 3              THE COURT:  Sustained.
 4              Rephrase your question.
 5    BY MS. JHONES:
 6    Q.   How many ways did you utilize or employ to
 7    identify people that were Moorish Science Temple
 8    members?
 9    A.   People identifying themselves.  I've seen on
10    various programs that there will be a representative
11    from the Moorish Science Temple of America presenting
12    at this particular activity.
13         People saying to me, "These are Moorish Science
14    Temple of America members."  Signs on their storefront
15    that identified them as that.
16    Q.   What, if anything, with respect to the appearance
17    of the members relate to your ability to identify these
18    people?
19              MR. GREGORIE:  Objection.  Leading, your
20    Honor.
21              THE WITNESS:  Yeah.  I --
22              THE COURT:  Overruled.  Overruled.
23              You can answer.
24              THE WITNESS:  Okay.  Yeah.
25              I think it's -- unless someone identifies
```

1    themself as a Moorish Science Temple of America member

2    or unless you are, I think, maybe inside of one of

3    their facilities, it may be difficult to identify them,

4    because in Chicago, you have a lot of different groups

5    that affiliate themselves with various forms of Islamic

6    tradition.  And so, just by looking at them, you can't

7    tell.

8            I mean, you may find members that are --

9    people who are members of what you might call more

10   orthodox Muslims, members of the Shiite community or

11   Sunni community.  They all kind of use and dress in a

12   similar garb.

13           So unless they identify themselves as a Moor

14   or a Shiite or a Sunni, it's difficult to tell who's

15   who.

16           MS. JHONES:  One moment, your Honor.

17           I have nothing further.

18           THE COURT:  Sir, if you would wait outside in

19   the lobby, please.

20           (Thereupon, the witness retired from the

21   courtroom and the following proceedings were had:)

22           MR. GREGORIE:  Your Honor, for the record, I

23   would object to any testimony about the Moorish Science

24   Temple.

25           This witness has himself said anything he

1    knows is pure hearsay.  Unless somebody tells him

2    directly that they are a member of the Moorish Science

3    Temple, he wouldn't know because they appear -- those

4    who dress in Islamic clothes appear alike, and he

5    wouldn't know unless it was pure hearsay, Judge.

6          MS. JHONES:  Your Honor, I believe,

7    respectfully, that it is incorrect to characterize as

8    hearsay observations that are made -- observations that

9    are made by a person.

10          If a person is walking around and sees

11   characteristics, storefronts, interaction, people going

12   in and out dressed a certain way, that is not -- that

13   is not hearsay.

14          And the witness is not bringing an

15   out-of-court statement for its truth.  The witness is

16   relying upon his observations, his observations, in

17   order to make an identification.

18          MR. GREGORIE:  That's not what he testified

19   to, Judge.  In fact, he testified to the contrary.

20          He testified that he'd be unable to tell by

21   merely looking at them whether they were parts of the

22   Moorish Science Temple or not unless he was told for

23   there was some hearsay statement made that he would not

24   be able to identify them.

25          MS. JHONES:  Your Honor, as an example, I

 1    don't believe that there is any out-of-court statement.

 2         This gentleman testified as to various forms,

 3    such as a person that would go into a store -- go into

 4    a store dressed a certain way.  The store had -- the

 5    store was identified as a Moorish Science Temple store

 6    or business establishment.

 7         And based on that activity and the dress,

 8    those observations are what summed up the conclusion

 9    that these were Moorish Science Temple people, because

10    are there are many, many people that wear items of

11    clothing similar to members of the Moorish Science

12    Temple.

13         THE COURT:  I'm going to sustain that area

14    regarding his observations of members of the Moorish

15    Science Temple based upon the proffer of testimony of

16    the witness, who has stated that his identification of

17    persons who are members of the Moorish Science Temple

18    is based upon people identifying themselves, signs on

19    storefronts that identify them as that, programs that

20    state that there's a representative of the Moorish

21    Science Temple and, in fact, he stated that, unless

22    someone identifies themselves as a Moorish Science

23    Temple member, it is difficult to identify them because

24    they dressed in a similar fashion to lots of other

25    groups in Chicago.

```
 1          Do you have objections to his observations --
 2   let's take up the other part of his last testimony
 3   first, the proffered testimony.
 4          Do you have objections to his observations of
 5   the dress of the Jeff Fort gangs --
 6          MR. GREGORIE:  I --
 7          THE COURT:  -- utilizing Mr. Houlihan's term?
 8          MR. GREGORIE:  I still maintain my objection,
 9   your Honor, to the -- the original objection.
10          THE COURT:  Right.  I know you have the
11   original objection.
12          MR. GREGORIE:  But to the actual question
13   itself?
14          THE COURT:  As to his observations.
15          MR. GREGORIE:  No.  His personal
16   observation -- I do not have an objection to his
17   personal observation, your Honor.
18          THE COURT:  Now, going back to the earlier
19   testimony, the second area of inquiry was regarding the
20   terms that he utilized as a young man prior to becoming
21   a professional.
22          And he stated that he may refer to street
23   organization members as "Folks," as "People."
24          And he went on further to say, if he was in a
25   community and, for instance, there were Gangster
```

```
 1    Disciples, which I take it was the name of a gang --
 2    oh, it's a community that's affiliated to a particular
 3    street gang known as the Gangster Disciples, for
 4    short -- that he would go up to them and say, "What's
 5    going on, Little Folks?"  And that would be one of the
 6    ways that he would approach them.
 7            Do you have an objection to that area?
 8            MR. GREGORIE:  Yes, your Honor.
 9            That is -- calls for an opinion, your Honor,
10    because he has to form an opinion as to who's "Folks"
11    and who's "People" and that distinction, Judge.
12            That is opinion testimony and would require
13    expert testimony to distinguish between who are "Folk"
14    and who are "People."
15            It also would require some hearsay knowledge,
16    your Honor, because you'd have to be able to determine
17    who is a Gangster Disciple, who was a Blackstone, in
18    order to make that distinction.
19            And the use of the term itself, your Honor, is
20    coming from an outside -- an outside source.
21            MS. JHONES:  Your Honor, I --
22            THE COURT:  What would be the relevance of
23    this?  What's relevant about how he might refer to --
24    when he was a young man and before he became a
25    professional in the arena, how he might refer to street
```

1    organization members or members of the Gangster

2    Disciples?

3         MS. JHONES:  The relevance, your Honor, is

4    that not -- the characterization was that, when people

5    refer to "Folks" and "People," that is -- that only

6    occurs when you're speaking about P. Stone members.

7         MR. GREGORIE:  That's not what the testimony

8    was at all, your Honor.

9         My expert testified that there are two groups:

10   "Folks" and "People."  It was very consistent with what

11   this man said.

12        THE COURT:  That there were some street

13   members who were "Folks" and some street members who

14   were "People."

15        MR. GREGORIE:  Not of the Black P. Stones,

16   Judge, that there are different gangs.  The Gangster

17   Disciples -- the black Gangster Disciples would be

18   "Folk" and the P. Stone Rangers would be "People."

19        And there is a distinction.  If you call

20   someone "Folk," then they are part of the opposite

21   alignment of gang, if you remember Agent Young's

22   testimony.

23        Of course, this was expert testimony, Judge,

24   explaining the difference between "Folk" and "People."

25   And it requires a distinction to be made by someone who

1    knows what gang a certain person belongs to as to how

2    they address them.

3            THE COURT:  So your objection is basically

4    that this is opinion testimony --

5            MR. GREGORIE:  And hearsay.

6            THE COURT:  -- under 701, based upon hearsay?

7            MR. GREGORIE:  Correct, your Honor.

8            THE COURT:  Anything further that you want to

9    state on that?

10           MS. JHONES:  Your Honor, I -- I disagree with

11   the characterization as this being hearsay, but I have

12   nothing further to add.

13           THE COURT:  The next area --

14           MS. JHONES:  Your Honor, may we release the

15   witness, since, I don't believe --

16           THE COURT:  No.  Not yet.

17           The next area is -- he was asked about the

18   role of this type of lingo playing in the culture of

19   Chicago.

20           And he answered, "It's a very intricate street

21   gang culture.  It's very much a part of a popular

22   culture in Chicago communities."

23           Do you have an objection to that?

24           MR. GREGORIE:  Yes, your Honor.

25           That is pure opinion, Judge.  And that is

1    based upon his own interpretation, based on hearsay,

2    Judge.  That's opinion testimony, and he is not an

3    expert.

4              THE COURT:  And your response?

5              MS. JHONES:  Yes, your Honor.

6              Your Honor, the title of 701 is opinion

7    testimony by lay witnesses.  This gentleman is allowed

8    to render an opinion based on his observations and his

9    interactions and his perceptions as a member of the

10   popular culture in Chicago for over 40 years.

11             THE COURT:  As a member of the popular culture

12   in Chicago?

13             MS. JHONES:  A resident, your Honor.

14             THE COURT:  What does that mean?

15             MS. JHONES:  Your Honor, he is able -- he is

16   part of -- he is part of, a participant of, the

17   neighborhood and the popular culture that has arisen in

18   this area that he has been a resident of in excess of

19   40 years.

20             MR. GREGORIE:  That is a personal opinion,

21   your Honor, that has no relationship to the facts in

22   this case.

23             That is no more than a personal opinion that

24   he has garnered and renders with no basis in fact, your

25   Honor, other than his own study as an expert.

1          But this is not 702 opinion related to facts

2    in this case, your Honor.

3          THE COURT:  The next area would be Area No. 4.

4          "Question:  What, if any, use have you made of

5    the term 'Mo'?"

6          This is his answer:  "'Mo'?  I've used that

7    term many times in communicating with young people in

8    these communities.  'Mo' is a term associated with the

9    Moorish Science Temple of America.

10         "It also was a term that is used among members

11   of Blackstone Rangers.  But it's also a term that is,

12   again, popular.  It's very difficult to associate

13   this -- that particular term to any one group because

14   it's such a popular term in communities in Chicago."

15         MR. GREGORIE:  Again, your Honor, that is --

16   that is opinion testimony of an expert, your Honor, not

17   relating directly to any facts in this case, Judge.

18   And it's also hearsay, Judge.

19         It goes to the Moorish Science Temple,

20   which -- he's told you that he's not sure who is a

21   member of the Moorish Science Temple.

22         And we don't know where he gets his

23   information about people outside of the Blackstone

24   Rangers and the Moorish Science Temple who may use that

25   term.

1            THE COURT:  Yes.  Do you have a response?

2            MS. JHONES:  Yes, your Honor.

3            This gentleman is -- this is exactly the type

4    of testimony that 701 is designed to allow.  This is a

5    terminology, a language.  There is nothing distinct

6    about the utilization of the word "Mo."  That's the

7    whole point.

8            And his knowledge of this is based on his

9    participation, his observations and his interaction

10   with people from the Chicago community.

11           MR. GREGORIE:  Your Honor, under Ms. Jhones's

12   theory, any citizen of Chicago can walk in here and

13   tell us what their opinion of terms and words are,

14   Judge.

15           That is not appropriate unless it relates to

16   particular facts in this case or some particular

17   evidence that it adds some light to the jury on, Judge.

18           Every citizen, I'm sure, will probably give

19   you some opinion on the meaning of "Mo," everything

20   from mowing the lawn to the identification of

21   individuals.

22           It has to have some basis of relevance, your

23   Honor, to this case.  And his answer is so vague in

24   saying that, you know, there are some outside groups

25   that may use the term.

1          Even his relationship -- his saying that the

2    Moors use it, Judge, is hearsay.

3          THE COURT:  Well, certainly I can make this

4    finding:  Based on his testimony about identification

5    of members of the Moorish Science Temple, the fact that

6    it's a term associated with the Moorish Science Temple

7    is based upon hearsay.

8          And, therefore, it's not rationally based on

9    the perception of the witness pursuant to Rule 701.  So

10   he would not be able to testify as to that.

11         As far as the remaining -- so that is

12   sustained as to the use by the Moorish Science Temple.

13         If he can't even identify the members without

14   them telling him that they're members, it's a leap to

15   then associate the term "Mo" with the Moorish Science

16   Temple, unless the person identifies themselves as a

17   member of the Moorish Science Temple.

18         So that's sustained.

19         As far as the term being used with members of

20   the Blackstone Rangers and in the popular culture,

21   that's the remainder of what I need to rule on in

22   regard to that area.

23         MR. GREGORIE:  Again, your Honor, the term

24   "the popular culture" is vague and unidentifiable.

25         THE COURT:  The next area was:  "How about

1    'demonstration'?"

2           "Question:  How about 'demonstration'?

3           "Answer:  'Demonstration,' likewise, is a

4    popular term used among young people in these

5    communities to represent an activity, something that

6    you do collectively to demonstrate.

7           "So a young person may say, 'Hey, hey, Mo,

8    let's go demonstrate,' meaning, 'Let's go play ball' or

9    something.  But it's -- you have to understand that you

10   can only interpret it within the context that it's

11   being used."

12          That's pretty similar to what Agent Young

13   testified about, isn't it?

14          MR. GREGORIE:  Yes.  I think that's very

15   similar, your Honor.

16          However, it is an expert opinion, because you

17   have to see the use of the term in the context in which

18   it's given.

19          I demonstrated -- I had -- demonstrated -- I

20   used the word myself, Judge.

21          I showed Agent Young transcripts that are in

22   this case in which the term "demonstrate" and

23   "demonstration" are used.

24          This witness has essentially attempted to give

25   a general description of the use of the term, Judge.

```
 1              THE COURT:  Response?
 2              MS. JHONES:  Your Honor, this gentleman -- I
 3     believe that this gentleman can testify as to the use
 4     of the word "demonstration."
 5              Just the fact that an expert opinion
 6     renders -- an expert witness renders an opinion as to
 7     the use of the word "demonstration" does not mean that
 8     a layperson cannot render an opinion as to the word
 9     "demonstration."
10              MR. GREGORIE:  Under Ms. Jhones's comment,
11     your Honor, it then becomes irrelevant because the
12     meaning of the term is not placed in context.
13              THE COURT:  What's the relevance of the
14     observation of any flags that were displayed in the
15     exterior of the Fort?  Both you and Mr. Levin
16     questioned him about that.
17              MR. LEVIN:  Your Honor, the relevance is that
18     the Government's evidence, when Sultan Kahn-Bey arrived
19     from Chicago, revealed via videotape that there was an
20     American flag flying on top of the Embassy.
21              And it's basically offered to contrast --
22     they're trying to say, basically, Judge -- their theory
23     is that this man is a co-conspirator of Jeff Fort's,
24     that he was an El Rukn, that he adopted the ideology of
25     Jeff Fort and brought it here.
```

1          THE COURT:  Is that your theory?

2          MR. GREGORIE:  No.  Not at all, your Honor.

3          My theory is that this was a model that he

4    followed.  He looked at how Jeff Fort grew his

5    organization, developed his organization, and he

6    adopted some of what Jeff Fort did.

7          The evidence in this case had two flags over

8    the -- over the Temple or Embassy, as we call it in

9    this case.

10         There was no testimony, to my knowledge, about

11   there being flags or no flags at the Fort.  I think all

12   we did was describe that the Fort was the headquarters.

13         And I think Agent Young testified that it

14   was -- they had steel blocking the windows it and the

15   doors.  But I don't remember any testimony about flags

16   at the Fort.

17         It's irrelevant, your Honor.

18         THE COURT:  The next area was the questions

19   regarding reading any articles in the newspapers about

20   Jeff Fort or the --

21         MR. GREGORIE:  I object to that as hearsay.

22         THE COURT:  -- P. Stone Rangers.

23         MR. GREGORIE:  Hearsay.

24         THE COURT:  Do you have a response to that,

25   Mr. --

1          MR. LEVIN:  Judge, I just asked if he read any

2   articles in the newspaper concerning Jeff Fort.  I'm

3   not asking for the content of the articles.

4          MR. GREGORIE:  Whether he read any or not,

5   your Honor, is not hearsay.  But what -- the content of

6   the articles is blatant hearsay, Judge.

7          THE COURT:  So you don't have any objection to

8   him asking, if, in fact, he testifies, if he read any

9   articles on the Internet or in the newspaper about Jeff

10  Fort?

11         MR. GREGORIE:  To a "yes" or "no" answer, I

12  have no objection.

13         THE COURT:  Okay.  Then the last area in the

14  first part of his testimony was the location of his

15  office and that he could see where the Fort was and

16  it's been demolished.

17         MR. GREGORIE:  Relevance, your Honor.

18         THE COURT:  What's the relevance of that?

19         MR. LEVIN:  Special Agent Young said the

20  El Rukn organization is still in existence and Jeff

21  Fort runs it.

22         THE COURT:  Well, he testified that it's still

23  in existence.  You're talking -- this was a question

24  about the building.

25         MR. LEVIN:  Right.

```
 1            MS. JHONES:  Your Honor, I don't believe this
 2   witness testified that Jeff Fort runs the El Rukns.
 3            MR. LEVIN:  Right.
 4            MS. JHONES:  This witness has not said that.
 5   And I believe that this witness --
 6            THE COURT:  No.
 7            This question was where was his office in
 8   relation to the Fort, which was identified as the
 9   headquarters of the P. Stone Rangers or whatever the
10   name of the gang is?
11            And he said, yes, he could see it, it was
12   demolished.  He could see it from his --
13            MR. LEVIN:  I'll withdraw the question, your
14   Honor.
15            THE COURT:  You're withdrawing that area?
16            MR. LEVIN:  I'll withdraw it, Judge.
17            THE COURT:  Okay.  We're going to take a break
18   now and I will give you my ruling at, let's say, 2:30.
19   Be back at 2:30.
20            MR. GREGORIE:  Thank you, your Honor.
21            MS. JHONES:  Your Honor, should I have the
22   witness available?
23            THE COURT:  No.  I'm just going to make a
24   ruling at 2:30.  He doesn't need to be here.
25            (Thereupon, a luncheon recess was taken, after
```

```
 1    which the following proceedings were had:)

 2              THE COURT:  Good afternoon.  You may be

 3    seated.

 4              United States of America versus Narseal

 5    Batiste, et al., Case No. 06-20373.

 6              Counsel, state your appearances, please, for

 7    the record.

 8              MR. GREGORIE:  Good afternoon, your Honor.

 9              Richard Gregorie and Jacqueline Arango on

10    behalf of United States.

11              MS. JHONES:  Good afternoon, your Honor.

12              Ana Jhones on behalf of Narseal Batiste, who

13    is present.

14              MR. LEVIN:  Good afternoon.

15              Albert Levin on behalf of Patrick Abraham, who

16    is present.

17              MR. CASUSO:  Good afternoon, your Honor.

18              Lou Casuso on behalf of Burson Augustin, who's

19    present.

20              MR. CLARK:  Nathan Clark for Rotschild

21    Augustine, who is present.

22              MR. HOULIHAN:  Richard Houlihan with Naudimar

23    Herrera.

24              MR. VEREEN:  And Roderick Vereen on behalf of

25    Stanley Phanor, who's present.
```

```
1              THE COURT:  All Defendants are present.

2              Based upon the proffer of testimony this

3    morning, as I see it, there are basically several areas

4    of inquiry the Defendants wish to go into with

5    Mr. Williams under 701, the first being that, based

6    upon his interaction with non-gang members and gang

7    members alike, there are a lot of young people who are

8    affected by street gangs, but have marginal

9    participation to no participation; the second being the

10   terminology that he used when referring to street

11   organization members as "Folks," as "People," and that,

12   if he was approaching someone in the Gangster

13   Disciples, that he would say, "What's going on, Little

14   Folks?"  That's how he would approach them.  And that

15   specifically is as a young man prior to becoming a

16   professional in this arena, that that's how he might

17   refer to gang members, as "Folks," as "People."

18             The third is that street gang culture has

19   become very much a part of the popular culture in

20   Chicago communities, that it's become a social norm,

21   and that gang terminology is just general lingo, slang,

22   social interaction.

23             The fourth is the use of the term "Mo" and

24   that he's used that term many times in communicating

25   with young people, that it was a term that was used
```

1     among members of the Blackstone Rangers and, again,

2     that it's become a popular term in communities.

3          The next one is what the term "demonstration"

4     means and the use of any flags displayed on the

5     exterior of the Fort headquarters and whether he's read

6     articles pertaining to Jeff Fort or the P. Stone

7     Rangers, which I think the Government has said they

8     didn't have a problem with, as long as it was a "yes"

9     or "no" answer.

10          So having considered the arguments and review

11     of the case law, I find as follows:

12          This witness may testify pursuant to Rule 701

13     about his -- strike that.

14          And then there were the further observations

15     in the second portion of the testimony as to his

16     observations of the dress of the P. Stone Rangers and

17     some of the symbols of the P. Stone Rangers.

18          I, first of all, find that he can testify as

19     to his observations of how the P. Stone Rangers and the

20     other incantations of the name -- how they dressed;

21     that he can testify -- if a proper predicate is laid,

22     he can testify to hearing the term "Mo" being used by

23     non-gang members, though he may not testify as to the

24     transition of the term "Mo" from gang members into the

25     lexicon of popular culture of communities in Chicago;

1    that he may testify that, as a young man, he referred

2    to gang members as "Folks" and as "People."

3          He may testify about his observations as to

4    whether or not there were flags displayed in the

5    exterior of the headquarters of Jeff Fort.

6          He may not testify as to gang terminology

7    becoming part of a popular culture in Chicago

8    communities and becoming part of slang and social

9    interaction.

10          He may not testify that "Mo" has become part

11   of the lexicon of -- a popular term in communities.

12          I find that his definition of "demonstration"

13   is cumulative.  It's almost word for word to what Agent

14   Young testified; and, therefore, it's cumulative.

15          Now, as a basis for my ruling, I, first of

16   all, turn to Rule 701.  It's important to note that, in

17   the year 2000, 701 was amended and (c) was added, which

18   did not appear in the prior rule.

19          In the 2000 amendment's commentary notes, it

20   states as follows:  "Rule 701 has been amended to

21   eliminate the risk that the reliability requirements

22   set forth in Rule 702 will be evaded through the simple

23   expedient of proffering an expert in lay witness

24   clothing.

25          "Under the amendment, a witness's testimony

1    must be scrutinized under the rules regulating expert

2    opinion to the extent that the witness is providing

3    testimony based on scientific, technical or other

4    specialized knowledge within the scope of Rule 702.

5            "The amendment does not distinguish between

6    expert and lay witnesses, but, rather, between expert

7    and lay testimony.

8            "Certainly, it is possible for the same

9    witness to provide both lay and expert testimony in a

10   single case.

11           "The amendment is not intended to affect the

12   prototypical examples of the type of evidence

13   contemplated by the adoption of Rule 701 relating to

14   the appearance of persons or things, identity, the

15   manor of conduct, competency of a person, degrees of

16   light or darkness, sound, size, weight, distance and an

17   endless number of items that cannot be described

18   factually in words apart from inferences."

19           And that's quoting from *Asplundh* --

20   A-s-p-l-u-n-d-h -- *Manufacturing Division versus Benton*

21   *Harbor Eng'g*, 57 F.3d 1190 at 1196, a Third Circuit

22   decision from 1995.

23           The last paragraph in the commentary reads as

24   follows :  "The amendment incorporates the distinctions

25   set forth in *State v. Brown*, 836 Southwest 2nd, 530,

 1   549, 1992, a case involving former Tennessee Rule of

 2   Evidence 701, a rule that precluded lay witness

 3   testimony based on special knowledge.

 4        "In *Brown*, the Court declared that the

 5   distinction between lay and expert witness testimony is

 6   that lay testimony results from a process of reasoning

 7   familiar in everyday life, while expert testimony

 8   results from a process of reasoning which can be

 9   mastered only by specialists in the field.

10        "The Court in *Brown* noted that a lay witness

11   with experience could testify that a substance appeared

12   to be blood, but that a witness would have to qualify

13   as an expert before he could testify that bruising

14   around the eyes is indicative of skull trauma.

15        "That is the kind of distinction made by the

16   amendment to this rule."

17        And that is the reason for my finding that the

18   witness can testify that he has heard the term "Mo"

19   used if there's a proper predicate laid as to

20   observation of gang and non-gang members, but he may

21   not then use the process of reasoning to state that

22   that terminology and, in fact, gang terminology has

23   become part of the lexicon of various communities in

24   Chicago and is used as a slang -- the term that he used

25   was, "It's just general lingo, slang, social

1    interaction."

2         That, I find, is testimony of an expert

3    witness with -- under 702, of specialized knowledge

4    and/or experience.

5         As further support of my ruling, I cite *United*

6    *States versus Feliciano*, 300 Fed. Appx. 795, a 2008

7    decision by the Eleventh Circuit; *United States versus*

8    *Sepulveda* -- S-e-p-u-l-v-e-d-a -- 115 F.3d 882 at

9    884-885, a 1997 decision by the Eleventh Circuit.

10        In *Sepulveda*, the Government used experts to

11   explain scientific and technical issues pertaining to

12   the cloning of cellular telephones.

13        In the *Feliciano* decision, the Court allowed

14   701 testimony as to the location of cell towers based

15   upon a detective's personal knowledge concerning the

16   location of certain cellular towers and distinguished

17   that from *Sepulveda*, which talked about issues

18   pertaining to cloning, which was much more specialized.

19        I further cite *United States versus Perez*

20   *Lopez*, 262 Fed. Appx. 974, a 2008 decision; *Tampa Bay*

21   *Shipping & Repair Company versus Cedar Shipping*

22   *Company, Limited*, 320 F.3d 1213; *United States versus*

23   *De La Fe*, 214 Fed. Appx. 900, a 2007 decision by the

24   Eleventh Circuit; *United States versus Novaton* --

25   N-o-v-a-t-o-n -- 271 F.3d 968; *United States versus*

1   *Myers* -- M-y-e-r-s -- 972 F.2d 1566; *United States*

2   *versus Tinoco* -- T-i-n-o-c-o -- 304 F.3d 1088.

3          It's important to note here that the proffer

4   presented by the defense in this case does not involve

5   and did not involve the interpretation of the witness

6   as to specific terms regarding the specific facts and

7   utilization of terms in this case, either on the tape

8   recordings or through the wiretapped calls, but,

9   instead, asked the witness to opine as to -- based upon

10  his experience in the field of working with gangs and

11  his education -- asked him to opine as to what is now

12  within the popular culture and slang terminology in

13  Chicago.

14         I find that that distinguishes his testimony

15  from the testimony of many of the cases, including

16  *Novaton* and *De La Fe.*

17         And I have made a ruling based upon not the

18  character of the witness as either expert or lay, but

19  based upon the testimony that is offered to be

20  presented.

21         MS. ARANGO:  Judge, I do have one question?

22         THE COURT:  Yes.

23         MS. ARANGO:  I think I know the answer to it,

24  but I just want to make sure it's clear on the record.

25         The first area of testimony, that young people

124

```
1   are affected by street gangs who have marginal or no
2   participation in the street gang --
3            THE COURT:  I find that that's -- that would
4   fall within what the -- the amendment -- it results
5   from a process of reasoning which can be mastered only
6   by specialists in the field, under the Brown case and
7   the committee notes, and would not be reasoning
8   familiar in everyday life.
9            So that would be expert testimony as opposed
10  to his observation that a non-gang person, if a
11  predicate is laid, used the term "Mo."
12           MS. ARANGO:  Thank you, Judge.
13           THE COURT:  Anything further?
14           MR. GREGORIE:  Your Honor, I take it that does
15  not limit any of the questions I asked him on
16  cross-examination.
17           THE COURT:  It depends on what the direct is.
18           MR. GREGORIE:  Okay.
19           THE COURT:  So I can't answer that until I
20  hear what the direct testimony is.
21           Certainly it's a decision for the defense to
22  make, as they make all strategic decisions.
23           But it seemed to me that some of his
24  observations may be of a character that perhaps they
25  might not want to present.  I don't know.
```

125

1          That's a decision for them to make, and

2    certainly your cross would be -- the cross-examination

3    I would allow would be with some latitude, as I give

4    everyone, of exploring the testimony of the witness.

5          So I don't know how much they're going to

6    limit his testimony or -- it's limited in scope based

7    upon my ruling, but it's their determination as to how

8    much they want to present and what they want to present

9    him for.

10          We're in recess in this matter until Tuesday

11    morning, 9:00.

12          (End of proceedings.)

13

14          C E R T I F I C A T E

15          I hereby certify that the foregoing is an
     accurate transcription of the proceedings in the
16    above-entitled matter.

17

     _____        /s/Lisa Edwards_____
18      DATE              LISA EDWARDS, CRR, RMR
                          Official United States Court Reporter
19                        400 North Miami Avenue, Twelfth Floor
                          Miami, Florida 33128
20                        (305) 523-5499

21

22

23

24

25