```
 1                 UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2                       MIAMI DIVISION
             CASE NO. 06-20373-CRIMINAL-LENARD
 3

 4   UNITED STATES OF AMERICA,      Miami, Florida

 5                Plaintiff,        March 31, 2009

 6        vs.                       9:34 a.m. to 5:06 p.m.

 7   NARSEAL BATISTE, et al.,       Volume XXXII

 8           Defendants.      Pages 1 to 205
     ------------------------------------------------------
 9

10                         JURY TRIAL
11          BEFORE THE HONORABLE JOAN A. LENARD,
                 UNITED STATES DISTRICT JUDGE
12

13

14   APPEARANCES:

15

16   FOR THE GOVERNMENT:    RICHARD D. GREGORIE, ESQ., and
                            JACQUELINE M. ARANGO, ESQ.
17                          ASSISTANT UNITED STATES ATTORNEYS
                            99 Northeast Fourth Street
18                          Miami, Florida 33132

19
     FOR THE DEFENDANT      ANA MARIA JHONES, ESQ.
20     NARSEAL BATISTE:     300 Seville Avenue, Suite 210
                            Coral Gables, Florida 33134
21

22   FOR THE DEFENDANT      ALBERT Z. LEVIN, ESQ.
       PATRICK ABRAHAM:     261 Northeast First Street
23                          Sixth Floor
                            Miami, Florida 33132
24

25
```

```
 1   FOR THE DEFENDANT      RODERICK D. VEREEN, ESQ.
       STANLEY PHANOR:      BRINKLEY, HENRYS & LEWIS
 2                          4770 Biscayne Boulevard
                            Suite 1200
 3                          Miami, Florida 33131

 4
     FOR THE DEFENDANT      RICHARD K. HOULIHAN, ESQ.
 5     NAUDIMAR HERRERA:    300 Aragon Avenue
                            Coral Gables, Florida 33134
 6

 7   FOR THE DEFENDANT      LOUIS CASUSO, ESQ.
       BURSON AUGUSTIN:     111 Northeast First Street
 8                          Suite 603
                            Miami, Florida 33132
 9

10   FOR THE DEFENDANT      NATHAN CLARK, ESQ.
      ROTSCHILD AUGUSTINE:  17639 South Dixie Highway
11                          Miami, Florida 33157

12
     REPORTED BY:           LISA EDWARDS, CRR, RMR
13                          Official Court Reporter
                            400 North Miami Avenue
14                          Twelfth Floor
                            Miami, Florida 33128
15                          (305) 523-5499

16

17

18

19

20

21

22

23

24

25
```

```
 1                     I  N  D  E  X

 2

 3                                  Direct    Cross    Red.

 4
      WITNESSES FOR DEFENDANT BATISTE:
 5

 6    Frank Adetu                     11

 7    Narseal Batiste                 32

 8

 9
      EXHIBITS RECEIVED IN EVIDENCE:          PAGE
10
      Defendant Batiste's Exhibit No. 100       48
11    Defendant Batiste's Exhibit No. 101       76
      Defendant Batiste's Exhibit Nos. 64-A
12      & 64-B                                   85
      Defendant Batiste's Exhibit No. 89-B     156
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              THE COURT:  United States of America versus

2    Narseal Batiste, et al., Case No. 06-20373.

3              Counsel, state your appearances, please, for

4    the record.

5              MR. GREGORIE:  Good morning, your Honor.

6              Richard Gregorie and Jacqueline Arango on

7    behalf of the United States.

8              MS. JHONES:  Good morning, your Honor.

9              Ana Maria Jhones on behalf of Narseal Batiste,

10   who is present.

11             MR. LEVIN:  Good morning, your Honor.

12             Albert Levin on behalf of Patrick Abraham, who

13   is present.

14             MR. CASUSO:  Good morning, your Honor.

15             Lou Casuso on behalf of Burson Augustin, who's

16   present.

17             MR. CLARK:  Good morning, your Honor.

18             Nathan Clark on behalf of Rotschild Augustine,

19   who's present.

20             MR. HOULIHAN:  Richard Houlihan with Naudimar

21   Herrera.

22             MR. VEREEN:  Good morning, your Honor.

23             Roderick Vereen on behalf of Stanley Phanor,

24   who is present.

25             THE COURT:  All Defendants are present.

```
 1              Are you ready to proceed, Ms. Jhones?

 2              MS. JHONES:  Yes, your Honor.

 3              THE COURT:  Is Mr. Williams coming back on the

 4   stand?

 5              MS. JHONES:  He is not, your Honor, in light

 6   of the Court's ruling.

 7              THE COURT:  Okay.

 8              MR. GREGORIE:  If that's the case, your Honor,

 9   what are we going to tell the jury?

10              THE COURT:  You can be seated.

11              Let's take that up.

12              What would you propose that I tell the jury?

13              MR. GREGORIE:  Well, your Honor, I would think

14   it would it be appropriate to tell them that defense

15   counsel has withdrawn this witness on their own accord,

16   your Honor.

17              There's been no cross-examination.  I don't

18   know that he testified to anything that would have been

19   relevant, other than his background, Judge.

20              But to put a witness up there and then have

21   the witness just disappear -- I don't think you can do

22   that.

23              I think counsel has got to stand and say,

24   "Your Honor, defense withdraws the witness and agrees

25   to strike any -- what, if any, testimony he gave."
```

1          THE COURT:  Ms. Jhones?

2          MS. JHONES:  Your Honor, I agree that I have

3   to announce that I'm withdrawing the witness.

4          However, I think that, in light of -- I think

5   that it's appropriate to say, in light of the Court's

6   ruling, I'm withdrawing the witness, not that I'm

7   withdrawing it on my own accord.

8          In light of the Court's ruling, I'm

9   withdrawing the witness.  I think that's the

10  appropriate and accurate statement.  I'm not

11  withdrawing it on my own accord.

12         MR. GREGORIE:  Your Honor, I object to that

13  tremendously.

14         This counsel called this witness on a ruse,

15  Judge.  Then when your Honor ruled on what this witness

16  could testify to -- your Honor didn't rule he couldn't

17  testify, but merely limited what he could testify

18  within the rules.

19         I think now in open court counsel --

20         THE COURT:  Well, I am not going to instruct

21  the jury that, based upon my ruling, defense is

22  withdrawing the witness.

23         The defense chose to proceed in a certain

24  fashion regarding this witness.

25         What I will do is announce to the jury that

7

```
 1   Mr. Lance -- is it Lance Williams? --
 2           MS. JHONES:  Yes.
 3           THE COURT:  -- Lance Williams will not be
 4   testifying and they are to disregard any statements he
 5   made.
 6           MS. JHONES:  That's fine, your Honor.
 7           MR. LEVIN:  Your Honor, would you also add
 8   that the jury is also instructed to draw no inference
 9   from the fact that he's not testifying?
10           MR. GREGORIE:  Your Honor, I -- I don't think
11   that's appropriate, your Honor.
12           THE COURT:  Okay.
13           MR. GREGORIE:  The witness was called and then
14   was withdrawn, your Honor.  Your Honor has not
15   prevented this witness from continuing his testimony.
16           THE COURT:  That is absolutely correct.  I
17   gave areas --
18           MR. GREGORIE:  I think the jury is entitled to
19   know that.  I don't think it should appear that the
20   Government objected and this man was not allowed to
21   testify because Government objected.  I don't think
22   that impression ought to be given to this jury.
23           They either ought to withdraw the witness on
24   their own, Judge, or the Court ought to tell them that
25   the defense has decided not to ask any further
```

8

1    questions of this witness.

2         MS. JHONES:  Your Honor --

3         THE COURT:  It appears that the Government

4    objected and prevented this man from testifying, and

5    that's not what happened here, Judge.

6         MS. JHONES:  Your Honor, the statement that

7    the Court made a minute ago I believe to be the

8    appropriate statement.

9         It is -- the Government continues to call --

10   to characterize my calling this witness as a ruse, and

11   I take offense to that.  I called this witness based on

12   what I believe to be an appropriate basis to call him.

13        And I don't want Mr. Batiste in any way to be

14   penalized in front of the jury.

15        What the Court said -- and I can't see it here

16   in the realtime -- what the Court said a couple of

17   minutes ago I think to be the appropriate statement to

18   the jury.  It's absolutely neutral either way.

19        MR. GREGORIE:  Well, your Honor, I think, in

20   this particular incident, they had a witness on the

21   stand.  Your Honor allowed them to ask this witness

22   certain questions.  They have decided to withdraw the

23   witness.

24        I think the jury is entitled to know that, and

25   it shouldn't appear that the Government is at fault for

1   this man's testimony not continuing.  This is a defense

2   choice.  They chose not to ask the witness questions.

3           MR. VEREEN:  Well, first of all, your Honor,

4   if I can chime in, this is not a defense choice.  This

5   is Ms. Jhones's choice.  This is not our witness.

6           For the jury to believe that this is a defense

7   witness versus Ms. Jhones's witness would be

8   disingenuous.  I mean, this is not our witness.

9           I don't have a choice whether or not to put

10  him on the stand or not put him on the stand.  The jury

11  should not be advised as such.

12          MR. GREGORIE:  I won't dispute that, your

13  Honor.

14          The instruction should be, then, this was a

15  witness that was called by Narseal Batiste and Narseal

16  Batiste's attorney has now decided to withdraw that

17  witness, your Honor.

18          MS. JHONES:  And, again, your Honor --

19          THE COURT:  All right.  This is my next

20  proposal.

21          My next proposal is that I inform the jury

22  that Defendant Batiste has elected not to ask any

23  further questions of the Witness Lance Williams and the

24  jury is instructed to disregard any statements he made.

25          MR. GREGORIE:  Thank you, your Honor.

```
1            THE COURT:  And I will add -- what was your

2   request, Mr. Levin?

3            MR. LEVIN:  I'll withdraw my request, your

4   Honor.

5            THE COURT:  Let's bring in the jurors.

6            Do you have your next witness?

7            MS. JHONES:  Yes, your Honor.

8            May I call him -- may I retrieve him, I should

9   say?

10           (Whereupon, the jury entered the courtroom at

11  9:42 a.m. and the following proceedings were had:)

12           THE COURT:  Good morning.

13           THE JURY:  Good morning.

14           THE COURT:  You may be seated.

15           Good morning, ladies and gentlemen.

16           THE JURY:  Good morning.

17           THE COURT:  Ladies and gentlemen of the jury:

18  Defendant Batiste has elected not to ask any further

19  questions of the Witness Lance Williams.

20           You are instructed that you are to disregard

21  any statements he made.

22           You may call your next witness.

23           MS. JHONES:  Thank you.

24           The defense calls Mr. Frank Adetu.

25  Thereupon--
```

```
 1                        FRANK ADETU

 2   was called as a witness by the Defendant and, having

 3   been first duly sworn, testified as follows:

 4              THE COURTROOM DEPUTY:   Thank you.

 5              You may be seated and sit as close to the

 6   microphone as you can.

 7              State your name with a spelling for the

 8   record, please.

 9              THE WITNESS:   My name is Frank Adetu,

10   A-d-e-t-u.

11                     DIRECT EXAMINATION

12   BY MS. JHONES:

13   Q.    Good morning, Mr. Adetu.  How are you?

14   A.    Good morning, ma'am.

15   Q.    Mr. Adetu, where do you reside?

16   A.    I live at 8217 Northwest 194th Terrace in

17   Hialeah.

18   Q.    And how long have you lived there?

19   A.    About 13 years.

20   Q.    And are you married, sir?

21   A.    Yes, ma'am.

22   Q.    Do you have any children?

23   A.    Yes, ma'am.

24   Q.    Would you please tell us the extent of your

25   educational background.
```

Adetu - DIRECT - By Ms. Jhones                    12

```
 1   A.     I have a graduate degree in business and my
 2   master in accounting.
 3   Q.     How are you employed, sir?
 4   A.     I'm self-employed.  I own a small construction
 5   company.
 6   Q.     And what is the name your company?
 7   A.     Acme -- A-c-m-e -- Organization, Inc.
 8   Q.     And what type of service does Acme Organization
 9   provide?
10   A.     We are a general contractor.
11   Q.     And where does Acme Organization do business?
12   A.     Our office is at 1730 Biscayne Boulevard,
13   Suite 201, in Miami.
14   Q.     Is Acme Organization licensed?
15   A.     Yes, ma'am.
16   Q.     And how long have you been in business, sir?
17   A.     Since 2003.
18   Q.     And what, if any, name -- the location where Acme
19   does business from, is there any name to that location?
20   A.     Yeah.
21   Q.     And --
22   A.     Contractor Resources Center.
23   Q.     And who is the president of the Contractors
24   Resource Center?
25   A.     Mrs. Elsie Hamler.
```

Adetu - DIRECT - By Ms. Jhones                    13

```
 1   Q.      And how long, sir, has Acme Organization,
 2   Incorporated, been affiliated with the Contractors
 3   Resource Center?
 4   A.      Since 2003.
 5   Q.      Okay.  What type of work, basically, does your
 6   company do?
 7   A.      We are a general contractor.  We do building and
 8   we do site work.
 9   Q.      And for the ladies and gentlemen of the jury,
10   could you please explain to us what site work is.
11   A.      Site work is a combination of doing clearing,
12   grading, water line, sewer line and some concrete
13   walks.
14   Q.      What role, if any, Mr. Adetu, do subcontractors
15   play in your company?
16   A.      Subcontractor play a major role because, as a
17   general contractor, we cannot do most of the work.
18   Especially if a work has electrical, we can't do
19   electrical by ourself.  Plumbing we cannot do.  Roofing
20   we cannot do.
21           Also, when we are doing building, we have some
22   stucco work, drywall work, some carpentry work, and we
23   can sub all those to some subcontractors.
24   Q.      Okay.  And do you know an individual by the name
25   of Narseal Batiste?
```

```
 1   A.      Yes.  Yes, ma'am.

 2   Q.      Do you see him in the courtroom here this

 3   morning?

 4   A.      Yes.  That's the gentleman.

 5   Q.      Would you please describe the article -- any

 6   article of clothing that he's wearing.

 7   A.      He's wearing a black suit.

 8   Q.      Thank you, Mr. Adetu.

 9   A.      Yes, ma'am.

10   Q.      How did you meet Mr. Batiste?

11   A.      I met Mr. Batiste between September and October,

12   2005, at Contractors Resource Center.  There is a

13   gentleman there who, I believe, was the business

14   development manager.  His name is Mr. Ted Lyons.

15           He called me and said that there's a young man

16   that has an --

17               MS. ARANGO:  Objection.  Hearsay, Judge.

18               THE COURT:  Sustained.

19   BY MS. JHONES:

20   Q.      Without telling us, Mr. Adetu, what Mr. Lyons

21   told you, as a result of having a conversation with

22   Mr. Lyons, what, if anything, did you do?

23   A.      Mr. Batiste called me and he said he would love

24   to meet me.  So we set up a meeting at Contractors

25   Resource Center for both of us to meet.
```

Adetu - DIRECT - By Ms. Jhones                          15

1    Q.     Just very briefly, what is it that the

2    Contractors Resource Center -- what service do they

3    provide?

4    A.     Contractors Resource Center provide networking

5    for construction company.  Also, some contractor also

6    has like a mailbox services there.  They provide

7    secretarial duties, like answering phone.

8          Also, they provide plan rooms.  They provide what

9    they call estimating.  If you don't have an estimator,

10   they have a staff there that can help small

11   construction company to do the takeoff.

12         And then, if you need some subcontractor, you can

13   tell them, because they have a list of all small -- all

14   trade contractors.  So you can talk to them.  They can

15   give you -- they can make references.

16         And, also, they perform, like, networking for

17   contractors.

18   Q.     Okay.  And were you -- well, what was the name,

19   sir, of Mr. Batiste's company?

20   A.     I believe the name is Azteca Stucco & Masonry.

21   Q.     And if you could, tell us again the time period

22   that you met Mr. Batiste.

23   A.     I believe I met him between September and

24   October, 2005.

25   Q.     Okay.  Did there come a time, sir, after you met

1    Mr. Batiste that you had occasion to see him a second

2    time?

3    A.    Yeah.  I met him the first time -- I met him

4    at -- he came in with his kids and wife.  So we had a

5    meeting.  So that was the first time I met him.

6         And he showed me an album which he had for the

7    work he has done before, because he want me to give him

8    some work, if I have any work that I can sub to him.

9    Q.    Sir, when you say he showed you an album, would

10   you -- what was it that -- were you able to see that

11   album?

12   A.    Yeah.  I look at it.  It shows some of the work

13   that he has done.

14   Q.    Do you remember what some of that work was that

15   was shown to you at that time?

16   A.    Yeah.  Most of them are drywall, stucco, like

17   built -- like interior decoration for buildings and

18   outside.

19   Q.    And after seeing -- meeting Mr. Batiste and

20   looking through this album, did you have occasion to

21   see him or talk to him again?

22   A.    Yes.  I think about a week or so later he called

23   me again, if I have anything for him.

24        And I told him that I'm doing a job --

25              MS. ARANGO:  Objection.  Hearsay, Judge.

```
 1            THE COURT:  Sustained.
 2   BY MS. JHONES:
 3   Q.    Mr. Adetu, without telling us what Mr. Batiste
 4   told you, just tell us what you said.
 5   A.    Oh, okay.
 6         I told him that I have a job I'm doing on
 7   58th Street, it's a punch list, and if he can go there
 8   and meet me there and I can show him the job.
 9   Q.    And please describe for us what a punch list is.
10   A.    A punch list is what -- after you finish a house,
11   the owner will come for inspection.  They will take a
12   look and they will want you to make some
13   small changes -- to repair some minor changes in
14   the building.
15         So that is what we did.
16   Q.    And did you -- what type of minor changes had to
17   be done to this particular location?
18   A.    Mostly, there was a drywall -- this is stucco.
19   They say it's not smooth enough, that we needed to do
20   it in the hallway, and, also, the door.  We have about
21   six doors in the building.
22         When they check it with their hand, this is not
23   smooth enough.  They want us to sandpaper it, smoothing
24   it, and repaint it.
25   Q.    And did you, in fact, hire Mr. Batiste for this
```

1    job?

2    A.    Yes, ma'am.

3    Q.    Do you remember, sir, whether or not Mr. Batiste

4    had anybody with him when he was performing the job

5    that he was hired for?

6    A.    Yes.  After I gave him the job, when he came to

7    the jobsite, he brought two of his guy.  But there's

8    one guy in particular that I know because he was always

9    there.  His name is Patrick.

10   Q.    Do you see Patrick here today?

11   A.    Yeah.  I think that's him there.

12   Q.    Could you tell us just for the record just an

13   article of clothing that Patrick is wearing.

14   A.    He's wearing -- I don't know the color.  But he's

15   wearing a suit and like a beige shirt.

16   Q.    Do you recall the name of the other individual,

17   sir?

18   A.    No, ma'am.

19   Q.    Now, how much time did that work take to

20   complete, sir?

21   A.    It's about between two and three weeks.

22   Q.    And do you remember, sir, what was -- who paid

23   Mr. Batiste for that work?

24   A.    I did.

25   Q.    Do you remember what you paid him?

Adetu - DIRECT - By Ms. Jhones                 19

```
 1   A.      About 1,200.

 2   Q.      Did that, sir -- did that include materials or

 3   was that just labor?

 4   A.      That's labor.  I bought the materials.

 5   Q.      Were you satisfied with the work that was

 6   performed by Mr. Batiste and others?

 7   A.      Yes, ma'am.

 8   Q.      Did there come a time, sir, when you hired

 9   Mr. Batiste's company again?

10   A.      Yes.  I was -- I was doing an additional project

11   at North Miami for Dr. Giwa --

12           THE COURT REPORTER:  Dr. who?

13           THE WITNESS:  Dr. Giwa, G-i-w-a -- in North

14   Miami.  We have to do the outside apron.  This is also

15   like a punch list.

16           So I told -- I told him to meet me over there,

17   for him to go out there and take a look at the job.

18           He went there and I give him the job, also.

19   BY MS. JHONES:

20   Q.      And do you recall, sir, whether or not -- well,

21   first of all, do you recall the time period that this

22   job was given to Mr. Batiste?

23   A.      Yes, ma'am.

24   Q.      And what time period would that be?

25   A.      I would say, like, early 2006.
```

Adetu - DIRECT - By Ms. Jhones                    20

```
 1    Q.    And what type of work was it that Mr. Batiste was

 2    to do on that jobsite?

 3    A.    He has to do the outside apron and to join the

 4    roof of the new building -- of the new addition to the

 5    old one.

 6          Because there's an existing old house in the

 7    front.  We just had about two rooms in the back.  And

 8    when the inspector came, he said it's better for the

 9    roof of both houses to be joined together.

10    Q.    Okay.  Sir, did that type of work require

11    Mr. Batiste to read any building plans?

12    A.    No.

13    Q.    Did it require any knowledge on the part of

14    Mr. Batiste of any electrical or structural

15    engineering?

16    A.    No.

17    Q.    Was Mr. Batiste supervised?

18    A.    Yes.  I go there.  I -- occasionally I will go

19    there to see what they are doing.

20    Q.    And why did you do that, sir?

21    A.    Because I'm the general contractor on the

22    project.

23    Q.    How long did it take for Mr. Batiste -- well, did

24    Mr. Batiste do the job by himself or did he have others

25    with him?
```

```
 1    A.      Oh, he has Patrick there and -- with another guy.

 2    Q.      And do you remember, sir, how long that job took?

 3    A.      It's about two weeks.

 4    Q.      Do you remember approximately, sir, how much

 5    Mr. Batiste was paid for the work on that particular

 6    house?

 7    A.      It's about -- less than a thousand, because it's

 8    a small job.

 9    Q.      Before I go on to the next question, sir, have

10    you ever employed Mr. Batiste to work on a

11    multiple-story building?

12    A.      No.  We don't do it.

13    Q.      Sir, did you hire be Mr. Batiste for any other

14    jobs?

15    A.      Yes, ma'am.  He did another job for -- he did

16    another job at Mr. Sampson's house.

17            There was -- I think they have, like, hurricane

18    damage to the fence outside.  So I asked him to go

19    there and talk to them.

20            And he give them a price and he did the job.

21    Q.      Do you have a recollection, sir, as to what type

22    of hurricane damage it was that Mr. Batiste was to

23    repair?

24    A.      I do it -- it was back in 2005.  There was a

25    hurricane in Miami.  So they have their fence damaged
```

```
 1   and they want it to be done.

 2   Q.     Was Mr. Batiste hired for that job?

 3   A.     Yes, ma'am.

 4   Q.     And did you ever have any problems with any work

 5   that Mr. Batiste or any of the other gentlemen that

 6   worked for him -- did you ever have any problem with

 7   the work that they did?

 8   A.     No, ma'am.

 9   Q.     Did they ever fail to show up at any jobsite?

10   A.     No, ma'am.

11   Q.     Based on your experience in having hired

12   Mr. Batiste and his workers, do you have an approximate

13   opinion as to the extent of Mr. Batiste's knowledge or

14   skill in the construction business?

15   A.     For me, I think he's more or less like a

16   handyman, because he doesn't -- I don't think -- we

17   didn't give him any complex job.  But from the way --

18   from the job he did for us, it's just like handyman's

19   project.

20   Q.     Okay.  Do you have any knowledge, sir, of a job

21   that Mr. Batiste would have done --

22          MS. JHONES:  If I may just have a moment, your

23   Honor.

24          THE COURT:  Sure.

25          MS. ARANGO:  Judge, I would just object thus
```

1   far to "would have done," the form of the question.

2   It's speculative.

3           MS. JHONES:  I'll rephrase it, your Honor.

4   I'll rephrase it.

5           THE COURT:  Okay.

6   BY MS. JHONES:

7   Q.    Are you aware, Mr. Adetu, of a job that

8   Mr. Batiste was hired to do in a commercial

9   establishment in Ft. Lauderdale?

10          MS. ARANGO:  Objection.  Leading.

11          THE COURT:  Sustained.

12          Rephrase your question.

13          MS. JHONES:  I'm sorry.

14  BY MS. JHONES:

15  Q.    What, if any, job was Mr. Batiste hired with your

16  company in the city of Ft. Lauderdale?

17  A.    Yeah.  He did a job for one auto parts company.

18  That is a flat concrete that needs to be done.

19          So he went there.  But they asked him that he

20  needs to bring a company that have a --

21          MS. ARANGO:  Objection.  Hearsay.

22          THE COURT:  Sustained.

23  BY MS. JHONES:

24  Q.    Without telling us what someone else told you, as

25  a result of you hearing what someone told you, what did

Adetu - DIRECT - By Ms. Jhones                    24

```
 1   you do?
 2   A.     Okay.  We got the job, which is for the concrete
 3   flat -- flat walk, and he was hired to do it.
 4   Q.     And what role, if any, did your company, Acme
 5   Organization, Incorporated, play in that job?
 6   A.     We got the job under our company and we provided
 7   the insurance.
 8   Q.     What was the -- do you remember the price to do
 9   that work?
10   A.     I think it's about 7,000, but we only got paid
11   3,000.
12   Q.     And do you remember, sir, why you were only paid
13   3,000?
14   A.     I think the company -- they went bankruptcy or
15   they said they have no more money to pay.  They're an
16   out-of-state company.  I think they are based in
17   New Jersey.  So they just left town and they didn't
18   pay.  They only paid $3,000.
19   Q.     While that -- did Mr. Batiste complete the work
20   for the auto parts company?
21   A.     Yes, he did.
22   Q.     Did you personally supervise that work?
23   A.     Yes, I did.
24   Q.     Based on your supervision, what was the quality
25   of the work that was performed for the auto parts
```

1    company?

2    A.    It was done okay.

3    Q.    Mr. Adetu, would you hire Mr. Batiste, Patrick

4    and any of the other brothers that did work for you

5    again?

6    A.    Yes.

7              MS. JHONES:  I have nothing further.

8              THE COURT:  Mr. Vereen?

9              MR. VEREEN:  I have no questions, Judge.

10             THE COURT:  Mr. Houlihan?

11             MR. HOULIHAN:  No questions.

12             THE COURT:  Mr. Clark?

13             MR. CLARK:  No further questions, your Honor.

14             THE COURT:  Mr. Casuso?

15             MR. CASUSO:  No questions, your Honor.

16             THE COURT:  Mr. Levin?

17             MR. LEVIN:  No questions, your Honor.

18             THE COURT:  Ms. Arango?

19             MS. ARANGO:  No questions.

20             THE COURT:  You may step down, sir.

21             THE WITNESS:  Thank you, ma'am.

22             (Witness excused.)

23             THE COURT:  Call your next witness.

24             MS. JHONES:  Your Honor, may we have a

25    side-bar?

```
1              THE COURT:  Come on up.

2              (Whereupon, proceedings were had at side-bar

3    outside the presence of the jury which have been sealed

4    per instructions of the Court.)

5              (Whereupon, the following proceedings were had

6    in open court:)

7              THE COURT:  Ladies and gentlemen, would you

8    step into the jury room for just a few minutes.

9              Do not discuss this case either amongst

10   yourselves or with anyone else.  It'll only be about --

11   less than five minutes.

12             (Whereupon, the jury exited the courtroom at

13   10:02 a.m. and the following proceedings were had:)

14             THE COURT:  You may be seated for a moment.

15             First of all, let me go through a colloquy

16   with him.  And then we'll have the -- the marshals, I

17   believe, are going to remove the leg irons because the

18   jurors walk right past here.

19             So --

20             MS. ARANGO:  Judge, I'm sorry.

21             Before we do the colloquy, are we going to --

22   is Ms. Jhones going to need Elie Assaad and Abbas

23   al-Saidi?  Abbas al-Saidi just arrived yesterday.  Elie

24   Assaad's been here for over a week.

25             I thought she was going to be calling them.  I
```

```
 1   mean, I don't care.  But she's -- we -- there is --
 2            THE COURT:  Do you still need them?
 3            MS. JHONES:  I don't believe I do, your Honor.
 4   I don't believe I do.
 5            But I will say this, your Honor:  I would
 6   prefer to have -- I am not absolutely sure I do or I
 7   don't, quite frankly.
 8            I would rather -- I would rather just have
 9   them here for a couple of more days.  I'm doing the
10   best I can to get through my case, and I have not made
11   every single decision.
12            And, unfortunately, that's -- frankly, that's
13   the best I can do.  I'd rather just have them here a
14   couple more days.
15            THE COURT:  Okay.  So place Mr. Batiste under
16   oath, please.
17            (Whereupon, Defendant Batiste was duly sworn.)
18            THE COURT:  Could you state your name for the
19   record, sir.
20            DEFENDANT BATISTE:  My name is Narseal,
21   N-a-r-s-e-a-l, Batiste, B-a-t-i-s-t-e.
22            THE COURT:  And do you understand, sir, that
23   under the Fifth Amendment to the United States
24   Constitution, you cannot be forced to take the stand
25   and testify?
```

1          DEFENDANT BATISTE:  Yes, ma'am.

2          THE COURT:  Do you also understand that you

3  can waive that right to not be forced and testify and

4  you may take the stand and testify if you wish to do

5  so?

6          DEFENDANT BATISTE:  Yes, ma'am.

7          THE COURT:  Have you fully discussed your

8  Fifth Amendment rights with your attorney?

9          DEFENDANT BATISTE:  Yes, ma'am, I have.

10         THE COURT:  Are you satisfied with her

11 services?

12         DEFENDANT BATISTE:  Yes, I am.

13         THE COURT:  Do you wish to waive your Fifth

14 Amendment right and take the stand and testify or not

15 waive your Fifth Amendment right and take -- and not

16 take the stand and not testify?

17         DEFENDANT BATISTE:  I wish to waive my Fifth

18 Amendment right.

19         THE COURT:  So as I understand it, sir, you

20 wish to waive your Fifth Amendment right and take the

21 stand and testify?

22         DEFENDANT BATISTE:  That is correct.

23         THE COURT:  And you understand that, if you do

24 waive your Fifth Amendment right and take the stand and

25 testify, all of the other attorneys, including the

```
 1   attorneys for the Government, will have the opportunity
 2   to cross-examine you?
 3            DEFENDANT BATISTE:  That is correct.
 4            THE COURT:  Any questions, Ms. Jhones?
 5            MS. JHONES:  I do not have any questions, your
 6   Honor.
 7            THE COURT:  Any other counsel have any
 8   questions?
 9            MS. ARANGO:  No, Judge.
10            MR. VEREEN:  No, your Honor.
11            MR. CLARK:  No, your Honor.
12            THE COURT:  So how is it that you want to
13   proceed?  Do you want to have him come up and you'll
14   take off the leg irons here?
15            THE US MARSHAL:  Yes.
16            THE COURT:  You're going to have people here.
17            MS. JHONES:  Your Honor, if I may, quite
18   frankly, in light of the fact that we took this recess,
19   my preference would be if Mr. Batiste could just walk
20   to the stand after the jury is seated.  That would be
21   my preference, just to walk from here to the stand, if
22   that's okay.
23            THE COURT:  Any problem with that from the
24   marshals?
25            THE US MARSHAL:  No problem.
```

 1            MS. JHONES:  Okay.  I appreciate that.

 2            THE COURT:  No problem.

 3            MS. ARANGO:  Judge, just on the issue about

 4    Mr. al-Saidi, he is working.  Is it -- I will note for

 5    the record that I went back and checked and, on the

 6    first trial, Mr. Batiste testified for a total of ten

 7    days.  On the second trial, he testified for a total of

 8    seven days.

 9            So we're not -- you know, we're talking

10    about -- if it's going to be in any way consistent with

11    his prior testimony, we're talking about going into

12    next week, which is going to be a short week, and then

13    the week thereafter, possibly.

14            And that would be a huge inconvenience to

15    Mr. al-Saidi.

16            THE COURT:  How long is Mr. Batiste going to

17    be testifying?

18            MS. JHONES:  It's actually kind of hard to

19    say, your Honor.

20            What I would do -- what I propose that be done

21    in order to accommodate the Government is -- I just

22    need some time to think about this.  And I will --

23            THE COURT:  By the end of the day you'll let

24    them know?

25            MS. JHONES:  Yes.

```
1              THE COURT:  You'll let the Court know?

2              MS. JHONES:  Yes.

3              THE COURT:  For both of those witnesses?

4              MS. JHONES:  Yes.

5              THE COURT:  Okay.

6              MS. ARANGO:  Thank you.

7              THE COURT:  So are we ready for the jury now?

8              MS. JHONES:  I believe we are, your Honor.

9              THE COURT:  So let's bring them in.

10             (Whereupon, the jury entered the courtroom at

11   10:08 a.m. and the following proceedings were had:)

12             THE COURT:  You may be seated.

13             Call your next witness.

14             MS. JHONES:  Yes, your Honor.

15             Defense calls Narseal Batiste.

16   Thereupon--

17                    NARSEAL BATISTE,

18   the Defendant, was called as a witness and, having been

19   first duly sworn, testified as follows:

20             THE COURT REPORTER:  Please have a seat.

21             Please state your full name for the record.

22             THE WITNESS:  My name is Narseal,

23   N-a-r-s-e-a-l, Batiste, B-a-t-i-s-t-e.

24             MS. JHONES:  Your Honor, may I proceed?

25             THE COURT:  Yes.
```

```
 1              MS. JHONES:  Thank you.

 2                      DIRECT EXAMINATION

 3   BY MS. JHONES:

 4   Q.    Good morning, Mr. Batiste.

 5   A.    Good morning.

 6              MS. JHONES:  I don't remember if I said good

 7   morning to the ladies and gentlemen of the jury.

 8              If I didn't, good morning.

 9              THE JURY:  Good morning.

10   BY MS. JHONES:

11   Q.    Mr. Batiste, would you please tell us your age.

12   A.    I'm 35 years old.

13   Q.    And where were you born, sir?

14   A.    I was born in Chicago in 1974.

15   Q.    And where did you grow up?

16   A.    I grew up in Louisiana.  And by the age of 13,

17   around 1988, my family had moved to Chicago.

18   Q.    Do you have any siblings?

19   A.    Yes, I do.

20   Q.    Would you just tell us briefly the names of your

21   siblings.

22   A.    My oldest son is Giovanni.  He's 16.  My son

23   after Giovanni is Nicholas, who's 15.  And I have a

24   daughter who's 13 years old.  And I have a younger son

25   named Prince, who's 10.
```

```
 1   Q.     How about brothers and sisters?

 2   A.     Yes, ma'am.

 3   Q.     Would you give us the names of your brothers and

 4   your sisters.

 5   A.     I have an older brother whose name is Siltwan.

 6   My brother next to him is named Buford.  And my sister,

 7   Frances.  Then there's Carlton and then Maxwell.  And

 8   I'm the youngest.

 9   Q.     With whom did you grow up, sir?

10   A.     When I was in Louisiana, I grew up with my sister

11   and my two older brothers.

12   Q.     And how about when you moved to Chicago?

13   A.     When I moved to Chicago, that was around the time

14   my sister had gotten married.  So she moved out of the

15   house.  She had moved out of my parents' house.

16          And, basically, I just grew up with my mother and

17   my father and my brothers that were next to me in age,

18   which would have been Maxwell and Carlton.

19   Q.     And where did you go to school, sir?

20   A.     I went to school at Brother Rice my freshman and

21   sophomore year.

22   Q.     Before you tell me about another school, what

23   type of school was Brother Rice?

24   A.     Brother Rice was a Catholic school.

25   Q.     And after Brother Rice, what school did you
```

```
 1    attend?

 2    A.    I attended Harold Richards.

 3    Q.    And did you -- I'm sorry.

 4          Harold Richards was -- what grades did you attend

 5    Harold Richards?

 6    A.    I attended Harold Richards in junior and senior

 7    year in high school.

 8    Q.    And where is Harold Richards High School located?

 9    A.    That's located in the west suburbs of Chicago.

10    It's called Oak Lawn.

11    Q.    Now, did you attend any other school after --

12    well, first of all, did you graduate from high school?

13    A.    Yes, I did.

14    Q.    And did you attend any other school after high

15    school?

16    A.    Yes, ma'am.

17    Q.    And what would that be?

18    A.    I attended a community college called Moraine

19    Valley.  And that's in Palos Hills, Illinois.

20    Q.    Okay.  And were you involved in any --

21          (Computer noises heard in the courtroom.)

22          MS. JHONES:  May I just have a moment, your

23    Honor?

24          THE COURT:  Yes.  Let's see if we can stop

25    that, please.
```

```
 1            MS. JHONES:   Hopefully, we fixed the problem,

 2   your Honor.

 3   BY MS. JHONES:

 4   Q.     Mr. Batiste when you were in high school, were

 5   you a member of any clubs?

 6   A.     Yes, ma'am.

 7   Q.     What were those clubs?

 8   A.     I was a member of the Art Club.  I was the

 9   president of the Art Club in high school.  And I was

10   also a member of the Drama Club and, also, band.

11   Q.     Any other work or extracurricular activities in

12   high school?

13   A.     Yes.

14   Q.     And what would that be?

15   A.     I had became a member of the Chicago Guardian

16   Angels in my junior year in high school.

17   Q.     Sir, what is your wife's name?

18   A.     My wife's name is Minerva.

19   Q.     And during high school, did you have any work?

20   Did you work?

21   A.     Yes, I did.

22   Q.     And where did you work, sir?

23   A.     I worked at a store called Merry-Go-Round.  It

24   was a clothing store.

25   Q.     How long did you work there?
```

N. Batiste - DIRECT - By Ms. Jhones                    36

 1   A.     I worked there for approximately about a year.

 2   Q.     And did you do any other type of work while you

 3   were in high school?

 4   A.     Yes, ma'am.  With affiliation with the people

 5   that I knew at Merry-Go-Round, I wound up going to

 6   Barbizon Talent Agency for acting and modeling, and I

 7   was doing stuff as far as trade shows with the clients

 8   that they had at the talent agency as well as runway

 9   modeling.

10         And I also worked with another talent agency

11   called Bernie Haggarty Talent Agency.  They did a lot

12   of projects.  And I was the coordinator for the Miss

13   Windy City pageant.

14   Q.     And going back to one of the activities that you

15   just mentioned, the Guardian Angels, what type of

16   activities were you involved with -- were you involved

17   in with the Guardian Angels?

18   A.     The Guardian Angels -- what we did as the

19   Guardian Angels was a lot of street patrol.  And that

20   dealt with self-defense classes and just being aware of

21   criminal activity that could happen on the streets and

22   on subways in Chicago.  And, basically, that's it.

23         And most of the times, what we would do as

24   Guardian Angels was we would ride the trains and the

25   subways and we would just make sure that the area was

```
 1    safe for people coming back and forth from work.
 2         There was a couple of times that we had phone
 3    calls where there was elderly citizens who were very
 4    concerned about walking home late from work.  So we
 5    would meet them at their job and we would escort them
 6    back home.
 7         Then there was a couple of occasions where we had
 8    domestic violence activity and, usually, the lady that
 9    would be involved in the domestic violence activity
10    probably knew one of us personally in the neighborhood;
11    and they would call us over to try to help them settle
12    their dispute before the police got there.
13    Q.   Okay.
14    A.   And there was certain occasions where we
15    participated in different parades, events.  Like if
16    there was a Puerto Rican parade, we would -- we were
17    part of that.
18         If there was the parade like the Bud Billiken, we
19    would be a part of the Bud Billiken Parade.  And,
20    basically, that's it.
21         And then including the self-defense classes that
22    we had -- that we taught, the Guardian Angels.
23    Q.   What knowledge, if any, did you have about any
24    self-defense techniques or any classes that you may
25    have taken in self-defense?
```

1    A.    My classes in self-defense basically started with

2    my brother.  My brother was -- he was in the Marines

3    and he had got a black belt in the Marines.

4          I just remember him always teaching martial arts

5    and he opened up a martial arts school in Louisiana.  I

6    didn't attend the school like I wanted to because it

7    was kind of far from where I lived then.  But it was

8    still a spark in interest.

9          So, eventually, in my junior year in high school,

10   my interest was more into martial arts to have

11   something to do after school.  Other than just doing my

12   textbooks and homework and stuff like that, I wanted to

13   get myself involved into something that would be

14   positive and, also, had my interest.

15         And that's when I started to really pursue my

16   martial arts.  Like I would say hobby is when I joined

17   the Guardian Angels.  That's when I got more knowledge

18   about martial arts.

19   Q.    And let's talk a little bit more about the type

20   of work that you have done after school.

21         After the jobs that you have told us about, did

22   you do any other type of work -- well, first of all,

23   after you graduated from high school and went on to

24   Moraine Valley College, did you continue to work?

25   A.    Yes, ma'am, I did.

1    Q.     And what type of work did you do after -- in

2    addition to the work that you've already described with

3    Merry-Go-Round and the trade shows?

4    A.     Eventually, there was a work program that -- with

5    a company named Roadway Packaging Systems, RPS.  And

6    they had a college program where you could work and

7    they would also help you pay for your college tuition.

8           And they were paying a reasonable amount of money

9    that a person could earn at that time.  So I signed up

10   for -- with that company and they awarded me the job

11   opportunity.

12   Q.     When you signed up with that company, sir, do you

13   recall approximately how old you were?  If you

14   remember.

15   A.     I would say I was around the age of 21.

16   Q.     At that time, sir, did you have any children?

17   A.     Yes, I did.

18   Q.     How many children did you have when you were 21?

19   A.     I had one child, and my wife was pregnant again

20   already.

21   Q.     And -- all righty.

22          When you -- did there come a time when you

23   started working for that company, RPS?

24   A.     Yes.

25   Q.     And when you started working for RPS, where were

1    you residing?

2    A.    I had just moved out of my parents' house,

3    because me and my wife -- me and my wife had lived at

4    my parents' for a long time during my senior year in

5    high school.

6          So I was staying around 47th Street in Chicago

7    right off of Ashland.

8    Q.    And after -- what type of work did you do for

9    RPS, sir?

10   A.    It was work that was done within a terminal.  I

11   loaded boxes into trailers, and I worked -- I handled

12   boxes on top of the conveyor belt.

13   Q.    How long did you do that, sir -- that type of

14   work with RPS?

15   A.    I'd say I did the work all the way up until 1998.

16   I started around '96 and it lasted until about '98,

17   when --

18   Q.    Okay.  Did RPS continue to do business in

19   Chicago?

20   A.    Eventually, RPS was bought out by FedEx Ground.

21   Q.    And did you continue to work once RPS was bought

22   out by FedEx Ground?

23   A.    Yes, ma'am.

24   Q.    And what did you do for -- and when did RPS --

25   when did RPS merge with FedEx Ground?

```
 1   A.      I believe that was sometime in '98.

 2   Q.      Okay.

 3   A.      I --

 4   Q.      I'm sorry.  Are you finished?

 5   A.      But there is an employment document that's in

 6   evidence that could refresh my recollection as to the

 7   exact date.

 8   Q.      Okay.  You don't remember the exact date?

 9   A.      No, ma'am.

10   Q.      I think I know what you're talking about.

11           MS. JHONES:  May I retrieve an exhibit, your

12   Honor?

13           THE COURT:  Yes.

14           MS. JHONES:  Thank you.

15           May I approach, your Honor?

16   BY MS. JHONES:

17   Q.      I'm handing you Government's Exhibit 31,

18   Mr. Batiste.  Let me know if this is the document

19   you're referring to.

20   A.      Yes, it is.

21   Q.      What time period was it, sir, that you worked for

22   FedEx Ground?

23   A.      I worked at FedEx Ground as a part-time

24   employer -- employee -- I'm sorry -- on 5-18-1998.  The

25   termination date was 10-31 of 1998.
```

```
 1    Q.     During the time period, what were your job duties
 2    at FedEx Ground?
 3    A.     It was the same job duties that I had as a
 4    package handler for RPS.  I worked inside the terminal,
 5    handling packages.  I would load packages on the
 6    trailer, unload them off the trailers, and I would work
 7    packages on the conveyor belt.
 8    Q.     During that time period, did you make any
 9    deliveries?
10    A.     No.
11    Q.     Did there come a time, sir, when you actually --
12    when your job duties or responsibilities at FedEx
13    Ground changed?
14    A.     Yes, ma'am.
15    Q.     And when would that have been?
16    A.     That was after my termination date on 10-31 of
17    '98.  My job duties had changed because I had got hired
18    by a temporary agency as a driver.
19    Q.     And as a result of being hired by a temporary --
20    do you remember the name of the temp agency?
21    A.     Yes, I do.
22    Q.     And what was the name of that company?
23    A.     I believe that company was called Pomerantz.
24    Q.     And do you remember when you were hired by
25    Pomerantz?
```

N. Batiste - DIRECT - By Ms. Jhones                    43

```
 1   A.     The exact date of my termination date,

 2   10-31-1998.

 3   Q.     As a result of being hired by the temporary

 4   agency, what, if any, changes occurred in your duties?

 5   A.     I became a driver.  I was no longer just working

 6   inside of a terminal.

 7   Q.     And how long did you work for Pomerantez -- the

 8   Pomerantz agency?

 9   A.     I worked for them all the way up until the time I

10   became a contractor for FedEx Ground, which would have

11   been 10-31 of '98 up until 6-14 of '99.

12   Q.     Now, during that time period, sir, where were you

13   assigned to make deliveries?

14   A.     I worked with my supervisor, and I was assigned

15   on the west side of Chicago, which would be the route

16   that I would eventually take over as a contractor.

17   Q.     And do you remember the places that you made

18   deliveries to?

19   A.     Yes, ma'am.

20   Q.     And what places would those have been?

21   A.     I made deliveries to Malcolm X College, the

22   United Center.  I had a couple hospitals in that area,

23   Rush Hospital, Cook County Hospital.  And the rest was

24   just industrial businesses that manufactured different

25   items and products.
```

1    Q.     What, if any, deliveries did you make to the

2    Sears Tower?

3    A.     I didn't make no deliveries to the Sears Tower.

4    Q.     What, if any, assignments did you have that would

5    involve any work in your capacity as a FedEx Ground --

6    as an independent contractor?  What assignments, if

7    any, would you have that would entail going to the

8    Sears Tower?

9    A.     I didn't have any assignments that was in the

10   Sears Tower route.  That was not what we call FedEx

11   core zone, which is the last three digits of the ZIP

12   code of that area.  I was not assigned that route.

13          That was for people who had been with FedEx for a

14   long time and they had invested their trucking company

15   into FedEx Ground and they had those kind of contracts.

16   Q.     Now, sir, besides your work as a delivery person,

17   do you have any type of trade or any type of skill?

18   A.     Yes, ma'am.

19   Q.     And what would that be?

20   A.     I have a trade in interior decorating when it

21   deals with marble, tile, painting and stucco.

22   Q.     Sir, directing your attention to January of 2005,

23   where were you living?

24   A.     I was staying in North Miami.

25   Q.     And who were you living with, if anyone?

```
 1   A.     I was staying with my family.

 2   Q.     And by your family, you mean your wife and your

 3   children?

 4   A.     That's correct.

 5   Q.     At that time, did you own or did you rent the

 6   location where you were living at?

 7   A.     We were renting.

 8   Q.     Have you ever owned a home, sir?

 9   A.     No.

10   Q.     Have you ever owned any property?

11   A.     No, ma'am.

12   Q.     When -- in January of 2005, sir, were you

13   employed?

14   A.     I was self-employed at that point.

15   Q.     And what type of work were you doing in January

16   of 2005?

17   A.     I was just transforming the company from a

18   cleaning company to a stucco company.

19   Q.     Did you have any other -- did you do any other

20   work besides the cleaning and the stucco company?

21   A.     Yes, ma'am.

22   Q.     What would that be?

23   A.     When I first moved to Miami, I was working for

24   BFI as a garbage man.

25   Q.     And after that?
```

N. Batiste - DIRECT - By Ms. Jhones                    46

```
 1   A.     Then after that, I got transferred to a Miami
 2   location to work for Waste Management, because Waste
 3   Management wound up buying out BFI and they offered me
 4   a higher job opportunity with the company.
 5   Q.     Approximately what time period would this be?
 6   A.     I would say around 2002 is when I started working
 7   for BFI.  And then I believe a year later, in '03, I
 8   started working for Waste Management in Miami.
 9   Q.     Did there come a time when that work ended?
10   A.     Pardon me?
11   Q.     Did there come a time when that work came to an
12   end?
13   A.     Yes, it did.
14   Q.     And after that work came -- when would that have
15   been?  When did that work end?  If you remember.
16   A.     I would say that work ended around October of
17   2004.
18   Q.     And at that time -- and when that work came to an
19   end, sir, what type of work did you take up?
20   A.     At that time, I was trying to generate my own
21   business.
22   Q.     And what type of business were you trying to
23   establish?
24   A.     I had various ideas.  The first business that me
25   and my wife came up with was doing floral designing,
```

```
 1   putting flowers together.
 2   Q.    Okay.
 3            MS. JHONES:  If I may just have a moment, your
 4   Honor, to retrieve an exhibit.
 5            THE COURT:  Yes.
 6            MS. JHONES:  I apologize, your Honor.  I
 7   didn't mark this exhibit.  I just need a second, if I
 8   may.
 9            THE COURT:  Okay.
10            MS. JHONES:  Judge, I apologize.  Would the
11   Court -- never mind.  I'm going to go ahead and assign
12   it a number just to make sure I haven't taken that
13   number up.
14            THE COURT:  Okay.
15            MS. JHONES:  Your Honor, may I approach the
16   witness after showing this exhibit to the Government?
17            THE COURT:  Yes.
18            MS. JHONES:  Thank you.
19            MS. ARANGO:  I have no objection to the
20   introduction of this evidence.
21            MS. JHONES:  At this time, your Honor, I'd
22   move it into evidence.
23            And if I may just approach the witness.
24            THE COURT:  What exhibit number is this?
25            MS. JHONES:  It's Exhibit 100.
```

```
 1              THE COURT:  It will be admitted as Defendant

 2     Batiste's Exhibit 100.

 3              (Whereupon, Defendant Batiste's Exhibit

 4     No. 100 was entered into evidence.)

 5              MS. JHONES:  Thank you, your Honor.

 6     BY MS. JHONES:

 7     Q.    Mr. Batiste, do you recognize Defense Exhibit in

 8     evidence 100?

 9     A.    Yes, I do.

10     Q.    And how do you recognize it?  What is it, please?

11     A.    It's pictures of the work that me and my wife had

12     put together as far as doing floral arranging.  And

13     it's also pictures of the different wood carvings and

14     the different type of floral vases that me and my wife

15     was putting together to try to have something to sell.

16     Q.    If I may have that back.

17     A.    Uh-huh.

18     Q.    I'll publish a couple of those items.

19              MS. JHONES:  If I may have the ELMO, your

20     Honor.

21              THE COURT:  Yes.

22              MS. JHONES:  I just need a moment, your Honor,

23     if I may.

24              MS. ARANGO:  Judge, I have no objection.

25     These are, I guess, exhibits within Defense
```

 1  Exhibit 100.

 2          MS. JHONES:  I had inadvertently removed

 3  these.  I just wanted to add them, if I could.

 4          THE COURT:  Okay.

 5          MS. JHONES:  Well, first of all, I just want

 6  to ask the witness if these are part of this exhibit,

 7  if I may.

 8          THE COURT:  Sure.

 9          MS. JHONES:  Thank you.

10  BY MS. JHONES:

11  Q.    Mr. Batiste, I'm going to show you some

12  additional photographs, if I may.  Take a look at them

13  and let me know, please, if these photographs belong in

14  that -- in Defense Exhibit 100.

15          Were they part of the same exhibit?

16  A.    Yes, ma'am.

17  Q.    Okay.  May I have those back, please.

18  A.    (Tenders documents to counsel.)

19  Q.    I'm just going to show you a few of these items.

20  And just tell me how they related to any work that you

21  may have had.  And, again, what time period would this

22  be?

23  A.    This would be around '04 of October.

24  Q.    Showing you Exhibit -- items contained in

25  Exhibit 100, do you recognize this, sir?

1    A.      Yes, ma'am.

2    Q.      And what is that, please?

3    A.      That's one of the floral arrangements that me and

4    my wife had came up with.  And these items -- we were

5    going to try to sell them on eBay as well as different

6    special events that people would be having.  We would

7    have a site vending -- where we'd be displaying these

8    kind of items.

9    Q.      Who created this item that's depicted in the

10   ELMO, sir?

11   A.      Actually, my children and my wife kind of created

12   it.  I just added on it when they were building it.

13   Q.      Showing you another item contained in the

14   exhibit, please tell me if you recognize that.  And

15   what is it?

16   A.      It's the same thing.  It's an exhibit of, you

17   know, different type of exotic dry flowers.

18   Q.      Showing you an additional photograph contained in

19   Exhibit 100, what is that, sir?

20   A.      That's a customer that we had in North Miami.  We

21   helped put together the arbor that's over her house,

22   the floral thing here.

23           And, basically, we helped her come up with the

24   design of her house with all the flowers all around it,

25   her landscaping.

```
 1   Q.    And showing you an additional item contained in

 2   Defense Exhibit 100, what is depicted in that exhibit,

 3   sir?

 4   A.    Those are candles.  Now, these candles we didn't

 5   make ourselves.  We got those from a -- from people

 6   that was already distributing those candles.  But we

 7   also did make some of our own.

 8   Q.    What did you do with those candles, if anything?

 9   A.    We basically would sell those to neighbors around

10   us and friends that knew us.

11   Q.    Finally, sir, showing you another item contained

12   in Defense Exhibit 100, what is depicted on that part

13   of the exhibit?

14   A.    Those are the labels that we would print up and

15   cut up.  And we would attach them to the soap bars.  It

16   consist of just giving information about the soap --

17   what kind of soap that we would be selling.

18   Q.    Now, there is a name on the top here.

19         Do you recognize that name?

20   A.    Yes, ma'am.

21   Q.    And what is that name, sir?

22   A.    Azteca Soap Factory.

23   Q.    And what does Azteca Soap Factory relate to, sir?

24   A.    That related to the corporation that we had under

25   Azteca.
```

1    Q.    Was that a corporation that was formally

2    incorporated in Florida?

3    A.    Yes, ma'am.

4    Q.    And who came up with the name Azteca?

5    A.    Me and my wife.

6    Q.    And was there any particular reason why you and

7    your wife came up with the name Azteca?

8    A.    Yes.  My wife is from South America.  She's

9    Mexican.  So, you know, it deals with her ancestral

10   background.  So she thought it was a great idea.

11   Q.    Now, tell us, sir, when was it that you met an

12   individual by the name of Abbas al-Saidi, the

13   individual we have come to know as the first informant?

14   A.    I met Abbas -- I believe it was late January,

15   early February, of 2005.

16   Q.    How was it that you met Informant No. 1, Abbas

17   al-Saidi?

18   A.    I met Abbas al-Saidi at the store that he had

19   worked at and possibly owned at that time, because the

20   store was only, like, two blocks away.  We stayed on

21   144th Northeast 6th Avenue, and I believe the store was

22   like around 147th Street Northeast 6th Avenue.

23   Q.    And during the time period that you mentioned,

24   January -- or the winter or the spring of 2005, would

25   you visit the store?  Would you visit the store?

1    A.      Yes, ma'am.

2    Q.      Why would you visit that store, sir?

3    A.      The store was convenient to go to.  It was only

4    two blocks away from the house.  The majority of the

5    times I was tired when I came back from work and I

6    didn't want to go too far to try to get, you know, a

7    simple bag of potato chips and a soda pop.  So I'd just

8    go to the closest store that's near me.

9    Q.      And during the -- the winter or the summer of

10   2005, did you have occasion to begin to know -- or to

11   come to know this person, Abbas al-Saidi, the first

12   informant?

13   A.      Yes, ma'am.

14   Q.      And how was it that that occurred?

15   A.      That happened through my son, Giovanni.

16   Q.      And how was it that -- tell us about that.

17   A.      My son -- prior to Abbas taking over the store,

18   my son would go over there and he would get candy and

19   stuff like that for his brothers and sisters.

20           And Faisal's wife, which was the previous owner,

21   would have him bring out a couple of boxes that she

22   didn't need anymore because she -- they were just in

23   the store taking up space.

24           So he would put them in the dumpster right

25   outside and she would give him, like, 5 or $10 for

1    doing that.

2          And so my son came and told me that she's not

3    going to be no longer there at the store anymore.  So

4    what he wanted to do was to still be able to continue

5    to do the same kind of chore.

6          And the guy that was owning the store now, he

7    wanted me to meet him so he would get me to say that it

8    was okay for him to go ahead and do that.

9    Q.    And during the spring and the summer of 2005, did

10   you have occasion to have any conversations with this

11   individual known as Abbas al-Saidi, Informant No. 1?

12   A.    Yes.

13   Q.    And just tell us briefly, what was the nature of

14   the conversations, if any, that you would have with

15   this person?

16   A.    Well, the conversation was with -- my son

17   actually brought me over there.  He introduced me to

18   the gentleman formally and I got to meet him.

19         And he explained to me that he would like my son

20   to do the same kind of thing.  I told him I would think

21   about it.  And I never came to a final decision on it.

22   So I never gave him a final answer on it.

23         And then, eventually, my children were going

24   there a lot to buy candy and stuff like that.  And,

25   plus, the other brothers' children and sisters'

1   children that was part of our group is -- all their

2   kids would go in there together and get candy and pop

3   and chips and stuff like that out of the store.

4        And then I had learned that Abbas had been giving

5   them free candy and free sodas and chips.  So I went in

6   there one day to thank him.

7   Q.    Okay.  And do you remember approximately when

8   this would have been?  If you remember.

9   A.    I believe this was between -- around April or

10  March.

11  Q.    Of what year, sir?

12  A.    2005.

13  Q.    You referred to -- you mentioned "our group."

14        What were you referring to, sir?

15  A.    I was referring to the group that I had that I

16  was trying to build up on the Universal Divine Saviors

17  at that time.

18        And that was a group of the gentlemans who I

19  refer to as my brothers who are seated over here to my

20  left, as well as there was also some sisters that was

21  involved that are not present here at this time.

22  Q.    And where -- how was it that this group that you

23  referred to -- this group that you referred to:  Where

24  was it formed?

25  A.    It was formed, basically, inside my house where I

N. Batiste - DIRECT - By Ms. Jhones                56

```
 1   was staying at -- my apartment.  The brothers and
 2   different sisters -- they would come by and they would
 3   have study classes with me and my wife.
 4        And then, when it got to a point where it was
 5   getting to be too many people, eventually, we just
 6   started inviting them to activities that me and my
 7   family was already doing at the park.
 8   Q.    What park are you referring to, sir?
 9   A.    I'm referring to Oak Grove Park on 6th Avenue.
10   Q.    And what type of activities would -- what type of
11   activities were you involved in with these people and
12   your family?
13   A.    Basically, we did everything together at the
14   park.  This was the recreational time that we had.
15   Basically, you know, we would play basketball,
16   football, soccer.  We did martial arts activities with
17   the families, the wife, the kids.
18        And we barbecued and then we all sat down and had
19   dinner together.  And then we also all prayed together
20   in the park and we studied the word of God, the Bible.
21   Q.    This would occur in what location, sir?
22   A.    This mainly occurred this Oak Grove Park.
23   Q.    How often would you engage in these activities
24   during the course of a week period, for example?
25   A.    I would say two times in the week.  It would be
```

1    sometime during the middle of the week and then on the

2    weekend.  And then sometimes it would be three times.

3    So it was between two and three times.

4    Q.   Tell us a little bit, sir, about the -- your

5    religious background.

6         Was there a particular religion that you were

7    raised or brought up in?

8    A.   Yes, ma'am.

9         My first religion that I came known to be was

10   Catholicism.

11   Q.   And did there come a point where that changed?

12   A.   Yes, ma'am.  There did come a point where my

13   parents did change their faith -- or their form of

14   practice.  But they was still underneath the Christian

15   banner.

16        That happened around -- I would say around 1985.

17   That was when my brother had moved from the Philippines

18   because he had been -- my brother had became an

19   evangelical minister overseas after his life experience

20   in the military.

21        And when he came back, he was able to sit my

22   parents down and explain to them some things of how he

23   felt about the Bible and the different views.  And,

24   eventually, that persuaded them to become a Baptist.

25   Q.   As a result -- and how old were you when this had

occurred with your brother, approximately?
A. I was approximately around 11 years old.
Q. How important, sir, was religion in your family when you were growing up?
A. Religion was very important. We were the family that we would sit down and eat at the table together every day. And we had to pray before we ate.
And on the weekends, we had to definitely go to Sunday School, afternoon service. And if there was an evening service, our parents wanted us to attend that as well.
Q. Do you know a name -- or an organization by the name of Universal Divine Saviors?
A. Yes, ma'am.
Q. And how is it that you know it, sir?
A. I'm the vice president of Universal Divine Saviors as the co-overseer and ambassador. That was the title that the gentleman who is the president of the organization gave me, whose legal name is Master GJG Athea.
Q. When did you meet Mr. Master Athea? If you remember.
A. I believe it was around -- around 1996 that I met Mr. Master Athea.
Q. And do you remember how it was that you met him?

1    A.      Yes, ma'am.

2    Q.      And how was that, sir?

3    A.      It was the day of my birthday, on February 14th.

4    I was going to the mall -- Evergreen Plaza Mall in

5    Chicago.  And I seen Master Athea on what he considers

6    to be his mission.

7            He had a briefcase in his hand just like you see

8    the Jehovah Witnesses and he had a whole bunch of

9    pamphlets from his organization on dietary, lose weight

10   information.  Nutritional healing type of information

11   was in there.

12           And I seen him talking to a couple of people

13   about the Scriptures and about eating healthy and

14   taking the right herbs for medication.

15           And his conversation had interested me.  I was

16   interested in his conversation at that time.  And I

17   began to talk to him.

18                MS. JHONES:  If I may have a moment, your

19   Honor.

20                THE COURT:  Sure.

21                MS. ARANGO:  I would object, Judge, as

22   hearsay.

23                MS. JHONES:  803(6), your Honor.

24                THE COURT:  Come on up.

25                (Whereupon, proceedings were had at side-bar

```
 1   outside the presence of the jury which have been sealed

 2   per instructions of the Court.)

 3           (Whereupon, the following proceedings were had

 4   in open court:)

 5           THE COURT:  Ladies and gentlemen, we're going

 6   to take a break.

 7           Do not discuss this case either amongst

 8   yourselves or with anyone else.  Have no contact

 9   whatsoever with anyone associated with the trial.  Do

10   not read, listen or see anything touching on this

11   matter in any way.

12           If anyone should try to talk to you about this

13   case, you should immediately instruct them to stop and

14   report it to my staff.

15           You may leave your notebooks and your binders

16   in your chairs.  15 minutes.

17           (Whereupon, the jury exited the courtroom at

18   11:02 a.m. and the following proceedings were had:)

19           THE COURT:  We'll come back in ten minutes,

20   please.  We're in recess for ten.

21           (Thereupon a recess was taken, after which the

22   following proceedings were had:)

23           THE COURT:  We're back on United States of

24   America versus Narseal Batiste, et al., Case

25   No. 06-20373.
```

```
 1              Counsel, state your appearances, please, for
 2    the record.
 3              MR. GREGORIE:  Richard Gregorie and Jacqueline
 4    Arango on behalf of the United States, your Honor.
 5              MS. JHONES:  Ana Maria Jhones on behalf of
 6    Narseal Batiste, who is present.
 7              THE COURT:  You can be seated.
 8              MR. LEVIN:  Albert Levin on behalf of Patrick
 9    Abraham.
10              MR. CASUSO:  Lou Casuso on behalf of Burson
11    Augustin, who is present.
12              MR. CLARK:  Nathan Clark for Rotschild
13    Augustine, who is present.
14              MR. HOULIHAN:  Richard Houlihan with Naudimar
15    Herrera.
16              MR. VEREEN:  Roderick Vereen on behalf of
17    Stanley Phanor, who's present.
18              THE COURT:  All Defendants are present.
19              MR. LEVIN:  Judge, can we adjust the shades?
20              THE COURT:  Sure.
21              MR. LEVIN:  It's a little bright in here.
22    Thanks.
23              THE COURT:  Sure.
24              Why don't you bring them down a little bit.  I
25    don't want it to get too dark.
```

```
 1              MR. LEVIN:  That's better.  Thank you.  I

 2   appreciate it.

 3              THE COURT:  You're still under oath, sir.

 4              Go ahead, Ms. Jhones.

 5              MS. JHONES:  Thank you, your Honor.

 6              Your Honor, may I show the witness the

 7   document?

 8              THE COURT:  Yes.

 9                          EXAMINATION

10   BY MS. JHONES:

11   Q.    Mr. Batiste, I have just handed you Defense

12   Exhibit 101 for identification.

13   A.    Yes, ma'am.

14   Q.    Do you recognize that document?

15   A.    Yes, ma'am.

16   Q.    Mr. Batiste, how do you recognize that document?

17   A.    This was the Universal Divine Saviors

18   headquarters at that time at 6154 South Ashland.  This

19   is where me and Master Athea generated this document

20   that demonstrates the board of directors, as him being

21   the vice president, the assistant secretary/treasurer,

22   the permanent spiritual director, the chaplain and,

23   also, myself as being the spiritual ambassador and

24   co-overseer.

25   Q.    Mr. Batiste, was this a document that was kept in
```

1   the regular course of business for the Universal Divine

2   Saviors?

3   A.    Yes, ma'am.  This is the document that we had to

4   submit and personally sign ourselves.  We submitted it

5   to the Government so that we would be qualified for

6   501(c)(3) status.

7   Q.    And were you familiar with the method in which

8   Universal Divine Saviors kept business documents?

9   A.    Yes, ma'am.

10  Q.    And how was it that you were familiar with their

11  method of keeping business documents?

12  A.    We kept our business documents in folders, inside

13  of a file cabinet.  And we kept the 501(c)(3) status --

14  like I said, the documents that said that we verified

15  that we were of 501(c)(3) status, as well as we kept

16  fundraising documents, our mission, purpose and aim

17  goal document, our board of directors documents.

18  Everything that consists with the structure of the

19  organization I had to have on my possession.

20  Q.    Okay.  And --

21        MS. JHONES:  I don't have anything further,

22  your Honor.

23        THE COURT:  Ms. Arango?

24        MS. ARANGO:  Yes.

25

```
 1                      EXAMINATION

 2    BY MS. ARANGO:

 3    Q.     Mr. Batiste, you said the purpose of that

 4    document was to provide it to the Government to obtain

 5    501(c)(3) status.

 6    A.     That is correct.

 7    Q.     So this is not a document that is regularly

 8    generated in the business of the Universal Divine

 9    Saviors, is it?

10    A.     It is a document that we must have in the

11    organization itself so that it explains the aim,

12    purpose and goal and the positions of the board of

13    directors of who's in charge.

14    Q.     Mr. Batiste, it does not go to the business of

15    the Universal Divine Saviors.  It goes to your ability

16    to qualify as a 501(c)(3) corporation for the

17    Government.  Is that not true?

18    A.     I don't understand your question.  Could you

19    repeat it.

20    Q.     The purpose of this document is not the business

21    of Universal Divine Saviors.  It's for Universal Divine

22    Saviors to be able to qualify as a 501(c)(3) business

23    within -- and -- and the purpose of -- is to submit it

24    to the Government.  Correct?

25    A.     I disagree.  Without the structure of the board
```

1    of directors, there wouldn't be a Universal Divine

2    Saviors.

3         Without my position as the vice president and

4    co-overseer and ambassador, then the rest of the

5    body -- or the members wouldn't understand where the

6    position of authority is at within the organization.

7         This is the structure.  This is the ground -- the

8    ground line, the backbone for the organization, this

9    document right here.

10   Q.    Mr. Batiste, when was that document generated?

11   A.    This -- I don't remember the exact date.  But

12   this document had to be generated, I would say, roughly

13   between 1996 and 1997.

14   Q.    And were you with the Universal Divine Saviors in

15   1996 and 1997?

16   A.    Yes, ma'am.  I was with the organization when we

17   put the organization together as Universal Divine

18   Saviors and when we put the board of directors together

19   like I just named it right here, where the structure is

20   the president, the assistant secretary, the permanent

21   spiritual director, chaplain and myself as the

22   spiritual advisor.

23        I had advised Master Athea on the person -- the

24   other two people to choose as -- like John Gray and the

25   other gentleman -- Minister Gray, his other brother.  I

1    was the person that assisted him in choosing those two

2    people for the organization.

3    Q.     Do you know who prepared that document?

4    A.     Yes.

5    Q.     Who prepared it?

6    A.     Me and Master Athea.

7    Q.     And did you submit that document to a Government?

8    A.     Yes, ma'am.  From my understanding, when we had

9    the 501(c)(3), they wanted to know the board of

10   directors; they wanted to know our aim, purpose and

11   mission and goal, what we would be doing; and we had to

12   spell it all out exactly, what was our purpose that we

13   would be doing in the community and, if we had a board

14   of directors, what would those positions qualify that

15   person, as far as their job description goes, what

16   would they be doing.

17   Q.     What Government was -- well, first, let me go

18   back.

19          Who submitted this, and to what Government?

20   A.     Me and Master Athea.  We submitted this to the

21   United States Government.  And it was sent to

22   Springfield, Illinois, which is the state capital --

23   Q.     What agency of the United States --

24              MS. JHONES:  Your Honor, I'm going to object.

25              This is going beyond the requirements of

```
 1   803(c).  Whether the document was submitted to a

 2   government agency or not is not dispositive of whether

 3   or not the Government -- the document qualifies under

 4   803(6).

 5           The requirement is whether or not it's a

 6   document kept in the regular course of business,

 7   whether or not it's presented or not presented to any

 8   governmental agency.

 9           MS. ARANGO:  Judge, I disagree with that.

10           He has testified that this -- the purpose of

11   this document is so that they can obtain 501(c)(3)

12   status.  That was the purpose, so that they could sent

13   it in to a government agency.

14           There's -- first of all, you know, what's --

15           THE COURT:  I'll overrule the objection.

16           Go ahead.

17           MS. ARANGO:  Okay.

18   BY MS. ARANGO:

19   Q.    So what government agency was this document

20   submitted to?  What agency of the United States

21   Government was this document submitted to?

22   A.    It was submitted to the State of Illinois and the

23   department that would grant funding on 501(c)(3)'s for

24   the not-for-profit organization.

25           And this document is not just for that purpose
```

1    only.  This document also is for the structure of our

2    organization.

3        When we had members be a part of our organization

4    or when we get any kind of funding whatsoever, we show

5    them this document so that it would explain to them who

6    our board of directors are and what is our purpose and

7    our aim and our goal.  We use this document every day

8    within the organization.

9    Q.    What agency of the Government -- first you said

10   United States Government.  Now you're saying the State

11   of Illinois.

12        What agency of what Government was this document

13   submitted to for the purpose of obtaining 501(c)(3)

14   status?

15   A.    I'm not sure exactly what particular branch

16   within the Government that it was submitted to, because

17   we hired a tax person, a person that would assist us in

18   501(c)(3).

19        And that person -- once we put all the paperwork

20   together, then that person took all the information and

21   he sent it out to the agency that would grant us the

22   501(c)(3).

23   Q.    Who was this tax person?  What was this person's

24   name?

25              MS. JHONES:  Objection, your Honor.

1          THE COURT:  Now you're going into cross.

2          I'll hear argument on this, please.

3          MS. JHONES:  Your Honor, respectfully, this

4     document is being offered as a record which was kept in

5     the regular course of business of Universal Divine

6     Saviors.

7          Mr. Batiste is somebody with knowledge.  He

8     has indicated that this document is a document that was

9     prepared by him in conjunction with Master Athea in the

10    1996-1997 period.  He is part of -- he is part of the

11    officers of that organization.  His name is depicted in

12    that document.

13         And it is a document that is kept in the

14    regular course of business.

15         THE COURT:  Could you ask him about that.  I

16    didn't see his name on there.

17         MS. JHONES:  Oh, I thought I did.  But I'll

18    ask him, your Honor.

19         Mr. Batiste, directing your attention to

20    Defense Exhibit 101, is your document -- is your name

21    reflected in that document?

22         DEFENDANT BATISTE:  The name that Master Athea

23    gave me at that time was Prince Nazareth Israel Athea

24    and that was the name that I signed at the bottom.

25         THE COURT:  Ms. Arango, anything you want to

1    say in regard to your objection to the introduction of

2    this document?

3            MS. ARANGO:  Yes, Judge.

4            I would refer your Honor to *United States*

5    *versus Dickerson*, which is 248 F.3d 1036.  It is an

6    Eleventh Circuit 2001 case.  Specifically, Page 1048.

7            In that case, hotel records were found to be

8    inadmissible where there was not a custodian or

9    qualified witness to authenticate the records.

10           But the Court stated in that case that, "The

11   plain language of 803(6) permits the introduction of

12   business records that would otherwise be inadmissible

13   as hearsay evidence, provided that the testimony of the

14   custodian or other qualified witness verifies the

15   recordkeeping procedure of the document in question and

16   confirms that such document is created as part of

17   normal business practice."

18           This witness testified that this document was

19   created so they could obtain 501(c)(3) status.  So it

20   is not a document that is a business record like a

21   hotel record or a record kept in the normal course of

22   business activity of that particular business.

23           This is a document that he's testified was

24   specially created to obtain that status and was turned

25   over to a tax person.

1          And, you know, if this document was created

2     and turned over to a tax person and submitted like he

3     testifies to, to a government agency, why aren't -- why

4     didn't they go to the government agency and get a copy

5     of it that would be -- that would actually provide some

6     indicia of trustworthiness?  There is absolutely no

7     indicia of trustworthiness, which the rule requires.

8          And I referred to it earlier, your Honor.  But

9     the rule states, "A memorandum, report, record or data

10    in any form of acts, events, conditions, opinions or

11    diagnoses made at or near the time by or with

12    information transmitted by a person with knowledge, if

13    kept in the course of a regularly conducted business

14    activity and if it was the regular practice of that

15    business activity to make the memorandum, report or

16    data compilation, as shown by the testimony of the

17    custodian or other qualified witness, or by

18    certification that complies with 902(11) or 902(12)" --

19    which is authentication -- "or a statute permitting

20    certification unless the source of information or the

21    method or circumstance of preparation indicate lack of

22    trustworthiness."

23          This is a document that was obtained --

24    supposedly was obtained -- I still haven't checked

25    that, but supposedly was obtained in a binder out of

1    the Embassy that appeared to be -- to belong to Master

2    Athea, along with a bunch of other testimonials.

3            There's absolutely no indicia of

4    trustworthiness in this document.  It is undated.

5    There is -- there's been no evidence presented in this

6    case that this witness was even called by that name.

7            If you hear the recordings, he's always called

8    by the name of Prince Manna.

9            Judge, it's my position that this is not --

10   that the predicate for the submission of this document

11   under 803(6) is -- they fail to establish that

12   predicate on those grounds, Judge.

13           MS. JHONES:  Your Honor, Mr. Batiste has

14   indicated, unlike what the Government seems to be

15   saying, that this was -- this document was generated

16   for one purpose only, the purpose of obtaining 50(c)

17   (verbatim) status.

18           Whether it was prepared for the purpose of

19   obtaining 50(c) status --

20           THE COURT REPORTER:  50(c)?

21           MS. JHONES:  501(c) status -- I'm sorry -- or

22   for any other purpose, the purpose of generating the

23   document is not what's dispositive.

24           What's dispositive is whether or not it's a

25   document kept in the normal course of regularly

1    conducted business activity with a person with

2    knowledge or other qualified person.

3         In this particular case, Mr. Batiste has

4    testified that not only does he have knowledge, but

5    that he, along with Master Athea, prepared this

6    document.

7         There is -- whatever argument the Government

8    is making goes to the weight that this document may

9    have, but certainly not to the admissibility.

10        They could engage in whatever

11   cross-examination they'd like to as it relates to this

12   particular document.

13        MS. ARANGO:  Judge, I'm sorry.

14        May I also read from the notes to the rule

15   itself?

16        In the *Federal Criminal Code and Rules*, 2009

17   edition, Page 356, which is a note to Paragraph 6:

18   "Sources of information presented no substantial

19   problem with ordinary business records.

20        "All participants, including the observer or

21   participant furnishing the information to be recorded

22   were acting routinely under a duty of accuracy with

23   employer reliance on the result" -- and I stress "with

24   employer reliance on the result" -- "or, in short, 'in

25   the regular course of business.'

1           "If, however, the supplier of the information

2    does not act in the regular course, an essential link

3    is broken.  The assurance of accuracy does not extend

4    to the information itself.  And the fact that it may be

5    recorded with scrupulous accuracy is of no avail."

6           MS. JHONES:  Your Honor, what the rule

7    addresses itself to is the issue of the regularity of

8    the document and whether or not it is kept by somebody

9    with knowledge.

10          What the rule seems to be addressing, your

11   Honor, is whether or not the supplier of the

12   information, i.e., the information that is contained in

13   the document, is someone who does not act in the

14   regular course of the business.

15          If they don't, then what the -- I believe this

16   is what Ms. Arango is addressing -- then the essential

17   link is broken.

18          Mr. Batiste -- Mr. Batiste has testified that

19   he's familiar with this document, he prepared it along

20   with Master Athea.  He has indicated the purpose of the

21   document.  He has indicated why -- one of the many

22   reasons the document was prepared.

23          It was also to delineate the individuals

24   that -- the purpose of the organization and the -- the

25   purpose of the organization as well as the assignments

```
 1    to other individuals that form the board of directors.

 2            He has indicated every element of the --

 3            THE COURT:  I'm going to overrule the

 4    objection.

 5            I find that the Government's arguments go to

 6    weight of the document.  They can certainly

 7    cross-examine as to the document itself.

 8            So let's bring the jury in, please.

 9            MS. JHONES:  Your Honor, may I retrieve the

10    document from --

11            THE COURT:  Yes.  Sure.

12            MS. JHONES:  Thank you.

13            (Whereupon, the jury entered the courtroom at

14    11:38 a.m. and the following proceedings were had:)

15            THE COURT:  You may be seated.

16            You are still under oath, sir.

17            You may proceed, Ms. Jhones.

18            MS. JHONES:  Thank you, your Honor.

19            Your Honor, may I approach the witness so I

20    can have him properly identify the document?

21            THE COURT:  Yes.

22            MS. JHONES:  Thank you.

23    BY MS. JHONES:

24    Q.    Mr. Batiste, I'm going to show you a document

25    which is marked as Defense Exhibit 101 for
```

```
 1   identification.  I'm going to ask you to look at it and

 2   tell me if you recognize it.

 3   A.    Yes, ma'am, I do.

 4   Q.    How is it that you -- without telling me what's

 5   in the document, how is it that you recognize it?

 6   A.    I recognize the name and that it's the board of

 7   directors.  It's a document that consists of the board

 8   of directors for Universal Divine Saviors.

 9   Q.    Does your name appear on that document?

10   A.    Yes, ma'am.

11   Q.    Was that a document that you were familiar with

12   when it was prepared?

13   A.    Yes, ma'am.

14   Q.    Did you have any role in preparing that document?

15   A.    Yes, ma'am, I did.

16   Q.    Was that document prepared in the regular course

17   of business of the Universal Divine Saviors?

18   A.    Yes, it was.

19         MS. JHONES:  At this time, your Honor, I'd

20   move that document into evidence.

21         THE COURT:  Based upon my ruling, it will be

22   admitted as Defendant Batiste Exhibit 101.

23         (Whereupon, Defendant Batiste's Exhibit

24   No. 101 was entered into evidence.)

25         THE COURT:  You may publish.
```

```
 1              MS. JHONES:  Thank you.

 2              THE COURT:  Do you want the ELMO?

 3              MS. JHONES:  Yes.  Thank you.

 4    BY MS. JHONES:

 5    Q.    Mr. Batiste, is your screen on?  Are you able to

 6    see this?

 7    A.    Yes, ma'am.  It's kind of blurry at the bottom,

 8    but I'm going to try my best.

 9    Q.    Let me see if I can --

10    A.    That's better.

11    Q.    Let me start from the top.

12    A.    Okay.

13    Q.    What is -- tell us again, please, what is

14    Universal Divine Saviors?

15    A.    Me and Master Athea came up with the name

16    Universal Divine Saviors out of the Bible, out of the

17    Prophet Obadiah, the last --

18              THE COURT REPORTER:  I'm sorry.  Obadiah?

19              DEFENDANT BATISTE:  Yes, ma'am.  I believe

20    that's O-b-e-d-i-a-h (verbatim).

21              I think the Book of the -- Obadiah is one of

22    the -- what they call minor prophets in the Bible.

23    It's usually -- I think it consists of one chapter

24    only.

25              In the last verse, it mentions that, at a
```

```
 1    certain time, there will come a day that Jehovah will

 2    send saviors to Zion to save its people.

 3              That's how we came up with the name Universal

 4    Divine Saviors.

 5    BY MS. JHONES:

 6    Q.    Approximately when was this document prepared,

 7    sir?

 8    A.    This document was prepared about -- I'd say

 9    between 1996 and '97.

10    Q.    And does your name, sir, appear anywhere on this

11    document?

12    A.    Yes, ma'am, it does.

13    Q.    Would you please show us where it is that your

14    name appears.

15    A.    Right here (indicating).

16    Q.    Now, would you please tell us what that name is.

17    A.    Prince Nazareth Israel Athea.

18    Q.    And how did you acquire that name, sir?

19    A.    Master Athea -- as him taking me on as a young

20    student, he gave me that name, Prince Nazareth Israel

21    Athea, because of his Jewish philosophy.

22    Q.    And, sir, I don't know if you're -- thank you.

23              What was the organization's purpose, aim and

24    goal?

25    A.    The purpose was to bring all spiritually divinely
```

1    guided minds that are unified and focused on the

2    concerns and needs of those that desire guidance in

3    their lives in the areas of -- mentally, spiritually,

4    physically and economically.  That is the purpose.

5          The aim is to be an organization that is

6    inclusive to the needs and concerns and aspirations of

7    every person who populates this planet, irregardless to

8    race, creed, color, national origin or religious

9    affiliation.  That is the aim.

10   Q.     Finally, what was the goal of Universal Divine

11   Saviors?

12   A.     The goal is that this organization may be

13   instrumental in fulfilling the needs and aspirations

14   of everyone that may involve themselves with this

15   membership benefit program, that they will find

16   fulfillment in four major areas of their lives,

17   mentally, physically, spiritually and economically,

18   which is also, again, the purpose of this organization.

19   Q.     And what role, if any, sir, did you have in the

20   Universal Divine Saviors in 1996-1997?

21   A.     I was like the vice president, which Master Athea

22   outlines right here, which were my duties as the

23   spiritual ambassador and co-overseer of all squads,

24   that is, and shall be organized locally, nationally and

25   internationally.

N. Batiste - DIRECT - By Ms. Jhones                    80

1    Q.    What are the squads, sir?

2    A.    The squads are the part where we put the men,

3    women and children into groups and we train them

4    physically in the area that I was familiar with, which

5    would be martial arts.

6          And that was where we generated the idea of

7    reduplicating what the Guardian Angels do and then we

8    would go out into the neighborhood and perform the same

9    tasks that the Guardian Angels do.

10   Q.    What, if any -- what, if any, efforts -- or

11   what -- how was it that the Universal Divine Saviors

12   obtained funding?

13   A.    We obtained funding basically from going door to

14   door, explaining to people what our organization was

15   about, going to public areas where they have different

16   events and festivals and, basically, giving people the

17   information of who we are and what is our aim and our

18   purpose and our goal.

19         And, also, we sold different items.  You know, we

20   baked cakes and made pies and stuff like that and we

21   sold them to friends that owned businesses and

22   coworkers.

23   Q.    During the time period that you lived in Chicago

24   and you were affiliated with the Universal Divine

25   Saviors, what, if any, attendance did you and Master

1    Athea make in any public -- did you make any public

2    appearances?

3    A.    Yes, ma'am.  When it came down to festivals like

4    the African Festival, me and Master Athea -- we would

5    go out there and we had pamphlets of our organization

6    and we would stand in the front entrance of the area

7    and we tried to greet as many people as we possibly

8    could and explain to them our purpose and our aim and

9    our goal of the organization and see how -- that

10   whoever we talked to, how they wanted to associate

11   themselves with us.

12   Q.    Okay.  Now, what role -- okay.

13         What role, sir, if any, did the Universal Divine

14   Saviors play in your goals once you -- your goals in

15   the early part and the latter part of 2005?

16   A.    Universal Divine Saviors played a major role.

17   That was the organization that I was trying to build

18   right here in Miami.  I was trying to set up a

19   satellite headquarters right here in Miami for

20   Universal Divine Saviors.

21   Q.    Was that the Universal Divine Saviors -- was

22   there any other organization or any religious or

23   community organization that you had in mind to utilize

24   down in Florida or Miami during the 2005 year?

25   A.    Yes, ma'am.

```
 1   Q.     Okay.
 2   A.     I was in the process of also researching and
 3   studying the information of the Moorish Science Temple,
 4   and that was the organization that I was putting
 5   together to incorporate with Universal Divine Saviors.
 6   Q.     Let's talk a little bit more about Abbas
 7   al-Saidi.
 8          You spoke about Oak Grove Park.
 9          Did Mr. Abbas al-Saidi, the first paid
10   informant -- what, if any, activities did he
11   participate in in Oak Grove Park?
12   A.     I don't -- there was no activities that Abbas
13   al-Saidi ever came and participated in in the Oak Grove
14   Park.
15   Q.     Was Mr. Abbas al-Saidi ever invited by you to
16   join the activities at the Oak Grove Park?
17   A.     Yes.  I invited him several occasions.
18          MS. JHONES:  One moment, your Honor.
19   BY MS. JHONES:
20   Q.     Mr. Batiste, did there come a time in September
21   of 2005 when you had some contact with Abbas al-Saidi,
22   Paid Informant No. 1?
23   A.     Yes, ma'am.
24   Q.     And in September of 2005, did you have any
25   telephone contact with him?
```

1    A.     No, ma'am.

2    Q.     During the month of 2005, what knowledge, if any,

3    did you have as to Mr. Abbas al-Saidi's telephone

4    number?

5    A.     I didn't have Abbas al-Saidi's telephone number.

6    However, he had mine because I handed him a business

7    card.

8    Q.     And the business card that you gave Mr. Abbas

9    al-Saidi was for what business?

10   A.     For Azteca Stucco & Masonry.

11   Q.     Why would you give Mr. Abbas al-Saidi a business

12   card?

13   A.     At the time that I went in to thank him for

14   giving the kids candy, I explained to him a little bit

15   more about myself and I explained to him that I had a

16   construction company and that, if he needed me to do

17   any kind of work for him in the store or he could give

18   any reference about our company, this is my business

19   card and this is how I can be contacted.

20   Q.     Now, in the fall of 2005, specifically September

21   of 2005, what, if any, changes were taking place in

22   your life personally?

23          Let me ask you this:  Where were you residing in

24   September of 2005?

25   A.     I was residing in North Miami.  But at that time,

```
 1   we were trying to look for a facility where we could

 2   take the organization and have our annual meetings in

 3   the -- in a building instead of just having them open

 4   in the park.

 5   Q.    And did there come a time when you found a

 6   location -- another location besides -- that was not in

 7   North Miami?

 8   A.    Yes, ma'am.

 9   Q.    And when did that occur?

10   A.    That occurred sometime in September.  I don't

11   exactly remember.

12         Do you have something that can refresh my

13   recollection?

14   Q.    Do you know the date of when you acquired the

15   property in -- well, first of all, did you acquire a

16   property?

17   A.    Yes, I did.

18   Q.    Was it leased or was it purchased?

19   A.    It was leased.

20   Q.    And do you remember the date that you did that?

21   A.    I don't remember the exact date.

22         MS. ARANGO:  I have no objection to the

23   introduction of those exhibits.

24         MS. JHONES:  May I approach the witness, your

25   Honor?
```

```
 1              THE COURT:  Yes.

 2              MS. JHONES:  And let me just verify that I

 3     have them properly marked, if I may.

 4              THE COURT:  Sure.

 5              MS. JHONES:  Thank you.

 6              I believe I do, your Honor.

 7              THE COURT:  Okay.  Are you moving it in at

 8     this time?

 9              MS. JHONES:  Yes, your Honor.  I'd like to, if

10     I may.

11              I'd like to move at this time, your Honor,

12     Defense Exhibits 64-A and 64-B.

13              THE COURT:  They will be admitted as Defendant

14     Batiste Exhibits 64-A and 64-B.

15              (Whereupon, Defendant Batiste's Exhibit

16     Nos. 64-A and 64-B was entered into evidence.)

17              THE COURT:  You may publish.

18              MS. JHONES:  Thank you, your Honor.

19     BY MS. JHONES:

20     Q.   Mr. Batiste, I'm going to show you what's in

21     evidence as Defense Exhibit 64-A.  And if you need me

22     to show it to you -- hand you the document so you can

23     read it more closely, please let me know.

24              Do you recognize that document, sir, at least the

25     first page?
```

```
 1    A.      Yes, ma'am.

 2    Q.      And what is that document?

 3    A.      That's the lease agreement with the landowners at

 4    the top, Greenland Realtors, Incorporated.

 5    Q.      And who is the -- who has entered into this

 6    commercial lease?  With whom has Greenland Realtors

 7    entered into this lease agreement?

 8    A.      Universal Divine Saviors and Narseal Batiste.

 9    Q.      And does this help refresh your recollection as

10    to the date?

11    A.      Yes, ma'am.

12    Q.      And what is the date, sir?

13    A.      October 1st of '05.

14    Q.      Before I show you the other exhibit in evidence,

15    Mr. Batiste, I'm going to show you Government's

16    Exhibit 7 in evidence.

17    A.      Uh-huh.

18    Q.      What is --

19            THE COURT:  You need to say "yes" or "no,"

20    sir.

21            DEFENDANT BATISTE:  I'm sorry.

22            "Yes."

23    BY MS. JHONES:

24    Q.      I'm sorry.

25            Did you say you recognize it?
```

1    A.     Yes.  I do recognize it.

2    Q.     What's depicted in Government's Exhibit 7?

3    A.     That's the picture of the Temple and right next

4    door, which also is the restaurant that belongs to the

5    Temple.

6    Q.     I'm going to ask you some questions about

7    Government's Exhibit 7 later on.

8           But right now, I just want you to tell me whether

9    or not Government's Exhibit 7 in evidence -- the way

10   it's depicted, is that the way it looked, the

11   exterior -- is that the way it looked back in September

12   of -- I'm sorry -- in October of 2005?

13   A.     No, ma'am.

14   Q.     Tell us some of the differences, if any.

15   A.     Back in October, '05, the building was -- it was

16   painted the color -- that orange type of color.  And

17   there was a lot of broken bottles and trash all in

18   front the building.

19          And right now, at this stage, we was in the

20   process of re-stuccoing the outer part of the building.

21   So the building was under construction at this point.

22   Q.     Now, going back to Defense Exhibit 64-A, what was

23   the purpose that that premises was leased?  What was

24   the purpose that you had undertaken to engage in a

25   commercial lease?

1    A.     The purpose was to have a Temple for Universal

2    Divine Saviors and Moorish Science Temple.  And, also,

3    I explained to the owner that I would be selling items

4    out of there, which would have been the herbal healing

5    products.

6          That included the soaps and the -- you know,

7    different clothing, material that -- African type of

8    clothing material and, also, the flowers.

9    Q.     And what was the monthly rent in this building?

10   A.     The monthly rent for -- was $1200.

11   Q.     Did there come a time, sir, where you entered

12   into another lease with Greenland Realtors?

13   A.     Yes, ma'am.

14   Q.     Showing you what's in evidence as Defense

15   Exhibit 64-B, do you recognize that?

16   A.     Yes, ma'am.

17   Q.     And what is that, sir?

18   A.     That's a lease for the other side of the building

19   that's connected to it.

20   Q.     And, by the way, sir, the address that is

21   depicted in the commercial lease above:  What address

22   does that correspond to?

23   A.     That corresponds to my PO box at CRC.

24   Q.     Is that the same thing, showing you now 64-A?

25   A.     Yes, it is.

1  Q.     Now, was there any -- what was the purpose for

2  the lease agreement that is contained in Defense

3  Exhibit 64-B?

4  A.     The landowner -- he had been informed that we

5  were -- we were occupying the other side and he told me

6  that I had to go into a lease and I had to pay for it.

7         So I went ahead and negotiated an amount and I

8  explained to him, "Well, I want to use that side for

9  restaurant," since I already had had a visual look and

10 seen the kind of appliances they had on the inside and

11 it was already prepared and ready for a restaurant.

12        And so we put together a lease and we came up

13 with an amount.

14 Q.     What was the date of the lease entered into for

15 the other side of the location?

16 A.     He went ahead and marked it for October the 1st,

17 which would be -- also coincided with the original

18 lease we had.

19 Q.     And directing your attention to the second page

20 of that agreement, what is the date that this agreement

21 was signed?

22 A.     On the 13th day of February of 2006.

23 Q.     One more question regarding this document:

24 Directing your attention back to the original lease,

25 64-A, I'm going to show you the last page.

1          Tell me, what was the date that the original

2     lease was executed on?

3     A.    It was actually signed a little bit before

4     October the 1st.  It was signed on the 26th day of

5     September in '05.

6     Q.    Okay.  Thank you.

7          As a result of acquiring -- as a result of

8     acquiring this location in -- and where -- just for

9     purposes of the record, where was this building

10    located?  In what area of Miami?

11    A.    It was located in Liberty City at

12    6260 Northwest 15th Avenue and 6262 Northwest 15th

13    Avenue.

14    Q.    All right.  And during the fall of 2005, how were

15    you employed, sir?

16    A.    I was still self-employed.

17    Q.    And self-employed -- engaged in what type of

18    business?

19    A.    At that point, I had converted the company to

20    Azteca Stucco & Masonry.

21    Q.    And who were the officers of that company?

22    A.    Me and my wife were the officers of the company.

23    Q.    Okay.  Now, in the fall of 2005, how active was

24    the business of Azteca Stucco & Masonry?

25    A.    The business was -- it was just starting to

 1    generate business.  We were just getting small

 2    contracts in before the hurricane.

 3    Q.     Prior to the -- September of 2005, what type of

 4    work, sir, did you do, for example -- Well, strike

 5    that.

 6           In addition to the construction business, did you

 7    handle any other type of work, for example, in the

 8    summer of 2005?

 9    A.     Yes, ma'am.

10    Q.     And just tell us briefly about that.

11    A.     I also knew how to repair bamboo, wicker and

12    rattan furniture.  That was something I also did.

13    Q.     And give us the name of somebody that you would

14    do that type of work for.

15    A.     For example, Tropical Seas Hotel.  It was

16    basically several hotels.  I can't exactly remember

17    their names.  It's been such a long time.

18           But a lot of hotels had hired me.  And a lot of

19    people that I knew personally who had bamboo and

20    rattan, they would hire me personally to come by their

21    house and repair that furniture.

22    Q.     And when -- during that time period that you were

23    doing those reparations, did you have any of the

24    brothers that are seated here today that would assist

25    you with those types of -- that type of work?

1   A.      Yes, ma'am.

2   Q.      How did they acquire the knowledge to repair that

3   type of bamboo furniture?

4           MS. ARANGO:   Objection.   Speculative and vague

5   as to who is "they."

6           THE COURT:   Sustained.

7           Rephrase your question.

8   BY MS. JHONES:

9   Q.      Would you please tell us who it was, what

10  members -- what individuals that are seated here today,

11  who assisted you with the repair of furniture.

12  A.      Namely, it was Rotschild Augustine and sometimes

13  his brother, Burson.   And then sometimes Patrick would

14  come out on the jobsite.

15  Q.      And did these individuals have that skill or did

16  they subsequently acquire it?

17  A.      They subsequently acquired the skill.

18  Q.      How did they acquire it, sir?

19  A.      Basically, I showed them how to do it, how to

20  recane furniture and how to restrap rattan and,

21  basically, how to varnish it and finish it with a

22  sealer.

23  Q.      Why did you show them how to do that, sir?

24  A.      That was a part of the program, of our purpose

25  and aim and goal, was to uplift somebody and show them

1    spiritually, economically, how to support themselves.

2         This is one of the things that I wanted the

3    brothers to learn in case, you know, they couldn't find

4    a regular 9:00 to 5:00 job, that they would be able to

5    generate their own type of funding to support

6    themselves.

7    Q.    Now, in terms of the work that you had during the

8    summer of 2005, what was the cash flow, if you will, of

9    the business in the summer, for example, of 2005?

10   A.    The business was -- it was starving, because this

11   was something that we just -- we just -- you know, just

12   started off with zero.

13        We didn't have a certain amount of money that we

14   were gonna put to the side to say that we were gonna be

15   able to start a company.  We started a company just off

16   the idea that we know that we can do it.

17   Q.    Did you have a bank account in the fall of 2005?

18   A.    Yes, ma'am.

19   Q.    Was it active in the fall of 2005?

20   A.    It was active for a while in the fall of 2005.

21   And then, eventually, the account was closed.

22   Q.    Why was the account closed?

23   A.    Well, the first start of the account being closed

24   was that, with the job that I did have with Tropical

25   Seas Hotel, I had bought a lot of supplies and

1    materials.

2         And there was a transaction where the manager of

3    the property was paying me with her American Express

4    card.

5         And by the time the money that she was trying to

6    pay me got into my account and the charges that I was

7    already making on the account, buying the materials,

8    supplies and running the business -- it ran the account

9    into the negative.

10        And the next thing you know there was a

11   discrepancy between her and her boss, which was the

12   owner of the property.

13        And, eventually, he stopped payment from American

14   Express, and then the bank charged me for all the

15   charges that American Express had issued -- had issued

16   into my account.

17   Q.    Approximately how much money are we talking

18   about?

19   A.    $5500.

20   Q.    Now, in the fall of 2005, sir, do you recall

21   having -- well, specifically, in September of 2005, did

22   you have any conversations -- person-to-person

23   conversations with Abbas al-Saidi, Paid Informant

24   No. 1?

25   A.    Yes, ma'am.

N. Batiste - DIRECT - By Ms. Jhones                    95

```
1   Q.     What did that occur that?

2   A.     During the -- during the time when I went there

3   to the store in the late evening and -- there was a

4   situation that I observed personally that was going on

5   in the store.  It was -- ICE and Homeland Security was

6   trying to arrest Abbas.

7   Q.     As a result of --

8          MS. ARANGO:  Objection.  Hearsay.

9          MS. JHONES:  He's talking about his

10  observations, your Honor.

11         THE COURT:  Overruled.

12  BY MS. JHONES:

13  Q.     Tell us what you observed, sir.

14  A.     There was a lot of agents circling around the

15  store and there was some on the inside.  When I walked

16  in the store, Abbas was pacing back and forth and he

17  told me, "Brother" -- he says, "I'm in a very" -- well,

18  I understood him --

19         MS. ARANGO:  Objection.

20         THE COURT:  Sustained.  Sustained.

21         MS. JHONES:  Your Honor, this not being

22  offered for -- this is 801(c).  801(c), your Honor.  I

23  don't want to make a speaking objection.

24         THE COURT:  Sustained.

25
```

```
 1   BY MS. JHONES:

 2   Q.    As a result of what you observed, sir, what did

 3   you do?

 4   A.    What happened was that I -- I handled the store

 5   because I thought that it was -- nobody was gonna be

 6   there in the store if Abbas would be arrested.

 7         And from that -- from what -- my understanding

 8   was, because I was doing all those things, that if I

 9   ever needed any kind of assistance, I would be able to

10   receive the same assistance back from Abbas, he would

11   look out for me.

12   Q.    After that incident, sir -- well, first of all,

13   do you remember when in September this incident

14   occurred?  If you recall.

15   A.    No, ma'am.

16   Q.    After this incident, did you have occasion -- did

17   you have occasion to see Mr. Abbas again?

18   A.    I saw him about a week later.

19   Q.    And when you say "a week later," approximately in

20   what month would that have been?

21   A.    In September.

22   Q.    Okay.  And tell us, where did you see him a week

23   later?  Where was it that you saw him?

24   A.    I saw him on his way walking out the store,

25   heading to -- he was heading down 6th Avenue.  He had
```

```
 1   some items in his hand, a folder and some information

 2   about his business.

 3   Q.    And did you talk to him at that time period?

 4   A.    Yes, ma'am.

 5   Q.    And why did you talk to him?

 6   A.    We were walking.  He had -- facing each other on

 7   the sidewalk.  So it was kind of like unavoidable for

 8   me not to speak with him.

 9         When I did speak with him, I asked him, "Well,

10   how is everything going?" and, "Are you okay?"

11             MS. ARANGO:  Objection.  Hearsay.

12             MS. JHONES:  He's talking about what he said,

13   your Honor, Mr. Batiste.

14             THE COURT:  Sustained.

15             MS. JHONES:  As to what --

16             THE COURT:  As to anything further, sustained.

17   BY MS. JHONES:

18   Q.    And did Mr. -- without telling us what Mr. Abbas

19   told you, did you have a conversation with him?

20   A.    Yes.

21   Q.    As a result of your conversation, what, if

22   anything, did you do?

23   A.    Did I do?

24   Q.    Yeah.

25         Did you do anything?
```

1   A.     No, ma'am.

2   Q.     Okay.  Did there come a time when you saw

3   Mr. Abbas al-Saidi, Paid Informant No. 1, again?

4   A.     Yes, ma'am.

5   Q.     And when would that have been?

6   A.     That was, like, about three days it later.  I saw

7   him inside the store.

8   Q.     And what month are we talking about, sir?

9   A.     September.

10  Q.     And what was the -- why was it that you were in

11  the store?

12  A.     I went back again to make sure that everything

13  was okay with Abbas.  And, also, at the same time, I

14  was getting a couple of items out of the store.

15  Q.     Now, did there come a time, sir, when you stopped

16  seeing Abbas al-Saidi for a while?

17  A.     Yes, ma'am.  It was -- actually, it was during

18  this time period when I went back in the store.  Abbas

19  kind of -- well, he informed me that he would be

20  leaving.

21  Q.     What knowledge, if any, sir, did you have as to

22  where it was that this individual was going?

23         MS. ARANGO:  Objection.  Hearsay.

24  BY MS. JHONES:

25  Q.     What was your understanding as to where it was

 1   that he was going?

 2           MS. JHONES:  And, your Honor, again, it's --

 3   again, if we may have a side-bar on this issue.

 4           THE COURT:  Come on up.

 5           MS. JHONES:  Thank you.

 6           (Whereupon, proceedings were had at side-bar

 7   outside the presence of the jury which have been sealed

 8   per instructions of the Court.)

 9           (Whereupon, the following proceedings were had

10   in open court:)

11           THE COURT:  Go ahead.

12           MS. JHONES:  Ms. Edwards, could you read back

13   the last question.  Thank you.

14           (The question referred to was read by the

15   reporter as above recorded.)

16   BY MS. JHONES:

17   Q.    You may answer, Mr. Batiste.

18   A.    From what I understood, Abbas told me that he

19   would be going back home to Yemen.

20   Q.    And what else did Mr. Abbas tell you, if

21   anything, about why he was going back to Yemen?

22   A.    From what I understood, that there was some

23   problems dealing with the store ownership between him

24   and Faisal.

25           MS. ARANGO:  Objection.

1          THE COURT:  Sustained.  It's hearsay.

2    BY MS. JHONES:

3    Q.    What, if anything, did he say to you with respect

4    to whether or not he was going to return?

5    A.    From what I understood, that he was not going to

6    return.

7    Q.    Okay.  Did there come -- and, please, when was it

8    that this conversation took place?

9    A.    This took place sometime after the fact that,

10   when I went by there, it appeared that he was going to

11   be arrested.

12   Q.    But what month would that have been, sir?

13   A.    September.

14   Q.    Did there come a time after this encounter with

15   Mr. al-Saidi that you -- that you saw him again?

16   A.    I saw him a few days later, like one or two days

17   later.  He was still at the store.

18   Q.    Now, did there come a time when you saw him in

19   the month of October?

20   A.    No.  I don't believe I saw him in the month of

21   October.

22   Q.    Well, let me direct your attention to -- what, if

23   anything, occurred in the month of October by way of an

24   event -- a weather event in Miami?

25   A.    Hurricane Wilma.

1   Q.     Do you have a recollection, Mr. Batiste, as to

2   whether or not sometime -- during the course of that

3   event or afterwards whether or not you had any -- you

4   heard from -- telephonically or in person from

5   Mr. al-Saidi?

6   A.     Yes, ma'am.

7   Q.     And when would that be, if you remember?

8   A.     Sometime around the last week of October.  I know

9   it was after the 25th.  I had heard about -- that Abbas

10  was in town.

11  Q.     And as a result, did you actually come into

12  contact with Abbas al-Saidi in late October of 2005?

13  A.     Yes, ma'am.

14  Q.     Okay.  Now, when was the first time that you

15  recall seeing him?  And if you don't remember a

16  specific date, that's fine.

17         But when was the first time -- where was it that

18  you saw him for the first time in late October of 2005?

19  A.     The information that I had got was that Abbas was

20  at the hotel and that he wanted to speak with me.  And

21  I wound up going to the hotel, I would say, around

22  October the 27th or the 28th, one of the two.

23  Q.     And when you went to the hotel, did you have a

24  conversation with Abbas al-Saidi, Paid Informant No. 1?

25  A.     Yes, ma'am.

1    Q.     And on that occasion, what was it --

2            MS. JHONES:  And we're going to go into an

3    issue, now, your Honor, just so the Court knows.

4    BY MS. JHONES:

5    Q.     What was it that -- what did you discuss with

6    Mr. Abbas al-Saidi at that location in the hotel?

7            MS. ARANGO:  Objection.  Hearsay.

8            THE COURT:  Sustained.

9            MS. JHONES:  Your Honor, again, I cite --

10           THE COURT:  Come on up.

11           (Whereupon, proceedings were had at side-bar

12   outside the presence of the jury which have been sealed

13   per instructions of the Court.)

14           (Whereupon, the following proceedings were had

15   in open court:)

16           THE COURT:  Ladies and gentlemen, this is

17   going to take a few minutes.  So I'm going to send you

18   to lunch.

19           Do not discuss this case either amongst

20   yourselves or with anyone else.  Have no contact

21   whatsoever with anyone associated with the trial.  Do

22   not read, listen or see anything touching on this

23   matter in any way.

24           If anyone should try to talk to you about this

25   case, you should immediately instruct them to stop and

```
 1   report it to my staff.
 2            You may leave your binders and your notebooks
 3   at your chairs.  Please be back in the jury room at --
 4   I haven't been too good on time today -- I know that --
 5   1:50.
 6            (Whereupon, the jury exited the courtroom at
 7   12:27 p.m. and the following proceedings were had:)
 8            THE COURT:  You may step down, sir.
 9            (Witness excused.)
10            THE COURT:  You may be seated.
11            Now, what is the proffer of testimony that you
12   are seeking to elicit from this witness, please?
13            MS. JHONES:  Yes, your Honor.
14            The proffer of testimony to elicit as it
15   relates to this conversation -- and I'm happy to go
16   into other ones to try and speed this along -- is that
17   he had a conversation -- a meeting with this informant
18   at the hotel room and the informant told him certain
19   things.
20            Among the things that the informant told him
21   was that he was having problems with Faisal, that
22   Faisal owed him money, that he needed assistance in
23   collecting this money and that the -- if assistance in
24   collecting this money by Mr. Batiste -- assistance
25   would be forthcoming by Mr. Batiste, that this
```

```
 1    individual would reciprocate.

 2           I am not offering those statements of the

 3    informant for their truth.  And the fact -- and this is

 4    what Cruz talks about in the Anderson opinion -- the

 5    fact that the statements may be true in no way

 6    whatsoever affects their -- the fact that they're

 7    being -- the purpose for which they're being offered.

 8           The purpose for which they're being offered

 9    is to show Mr. Batiste's state of mind and the effect

10    that those statements had on Mr. Batiste, the hearer of

11    those statements.

12           What Cruz, what United States versus Herrera,

13    what United States versus Rubin, tells us, your Honor,

14    is that --

15           THE COURT:  What's the cite are for Herrera?

16           MS. JHONES:  The cite for Herrera, your Honor,

17    is --

18           THE COURT:  Herrera?

19           MS. JHONES:  Herrera is H-e-r-r-e-r-a.

20           It's 600 F.2d 502.  It is a 1979 Fifth Circuit

21    decision.  And it's a decision written by Judge

22    Tjoflat.

23           In this particular case, your Honor, there

24    were statements that were offered.  And the position --

25    and the Court in that instance treated the conversation
```

1   as hearsay.

2         However, the Court indicated that it was not

3   hearsay because it was -- the statements were not being

4   offered for the truth of the matter under 801(c).

5         In this case, there were threatening

6   statements that were made by an individual by the name

7   of Escamilla and that were offered during the -- during

8   the conversation and that these statements were not

9   offered to prove whether or not -- in fact, there were

10  some threatening statements, you know -- and I'm going

11  to paraphrase -- "I'm going to hit you," "I'm going to

12  kill you," "I'm going to shoot you," whatever.

13        They weren't coming in for the proposition

14  that, in fact, this person was actually going to shoot

15  or going to kill or going to harm in any way the person

16  that was the object of the statements.

17        Rather, they were being offered to show the

18  effect that these statements had on the hearer.

19        And this is the pivotal point, which is what

20  I'm trying to explain to the Court and, quite frankly,

21  was what we discussed during the last trial when this

22  issue came up.

23        The statements that are made by the informant

24  to Mr. Batiste are not being offered for their truth.

25  They're being offered for the effect that it had on the

1    hearer, for -- it goes to the effect -- Mr. Batiste's

2    state of mind, what Mr. Batiste's intent was, when he

3    reacted to the statement.  That's what is going on, not

4    for the fact that they are true.

5            And *United States versus Cruz*, your Honor --

6    and if I can just have a moment, I'm going to point to

7    the area -- the part in that opinion where Judge

8    Anderson talks about the fact that there may be

9    instances where these statements -- to the extent

10   that there may be assertions or statements that are

11   statements and there may be statements that are not

12   assertions.

13           But to the extent that they, in fact, may be

14   true -- and most of what the informant says, of course,

15   our position is, is not true.  At no time was it true.

16   At no time was the informant going to give Mr. Batiste

17   think money.  Never.

18           It's being -- they're being offered for the

19   effect it had on Mr. Batiste.

20           But to the extent that there may be some

21   statements -- there are zillions of statements, of

22   course, during the course of this eight- or nine-month

23   period that were made by the informants.

24           To the extent that there may be some truth or

25   they may be true, that does not in any way affect the

1    purpose for which the proponent of the statement, i.e.,

2    Mr. Batiste, is offering them.  We are not offering

3    them to prove the truth of a statement that was made by

4    the informant.

5            And, again, I just need a couple of minutes to

6    retrieve that portion of the Anderson opinion that

7    speaks about this particular prong, if you will, of

8    801(c).

9            THE COURT:  What's the Government's response

10   to all of this?

11           MS. ARANGO:  Judge, I cite your Honor to

12   *United States versus Gomez*, 922 F.2d -- excuse me --

13   927 F.2d 1530 at Page 1535.  It's an Eleventh Circuit

14   1991 decision.

15           THE COURT:  Give me the cite again, please.

16   927 F.2d --

17           MS. ARANGO:  -- 1530 at Page 1535.

18           And in this case, the appellants --

19           THE COURT:  What year is it?

20           MS. ARANGO:  1991.  An Eleventh Circuit case.

21           THE COURT:  Go ahead.

22           MS. ARANGO:  In this case, the appellants

23   attempted to introduce a statement made by another

24   person to the effect that she had told the Defendant,

25   appellant, to travel to Tampa to pick up money.

1          The statement would have been relevant to the

2     appellant's defense that he did not know that he was

3     traveling to Tampa to receive drugs.

4          The district court found that the statement

5     was barred as hearsay, and the appellate court agreed.

6          Specifically, at Footnote -- at Headnote 5,

7     the Court says, "Nor could the district court have

8     admitted the statement as indicative of the Defendant's

9     state of mind under 803(3).

10          "Appellants asserts that the statement would

11     show his state of mind, that is, that he thought he was

12     traveling to Tampa to pick up money, and, therefore,

13     was admissible."

14          And then it cites to the state-of-mind

15     exception to the hearsay rule.

16          And it goes on to say, "Gomez attempted to

17     introduce a statement not to show Barrios's state of

18     mind" -- that's the declarant -- "but to show his, and

19     the statement itself concerned her memory of her prior

20     statement.

21          "He was not trying to introduce a statement he

22     made concerning his belief at the time of the Tampa

23     trip, but a statement that asserted the truth of his

24     contention that Barrios had told him to pick up the

25     money."

 1            And then it goes on to say that the district

 2    court correctly refused to admit the statement on this

 3    ground.

 4            I'd also cite your Honor to the case of *United

 5    States versus Martinez*, and it is at 83 F.3d 371, an

 6    Eleventh Circuit 1996 case.

 7            THE COURT:  Give me the cite again, please.

 8            MS. ARANGO:  83 F.3d 371 at Page 376.

 9            And in Footnote -- at Page 376, at Footnote 4,

10    the Court says, "A close reading of Martinez's brief

11    and of the cases cited within it discloses that his

12    real argument is that the testimony should have been

13    admitted because it was not offered to prove the truth

14    of the matter asserted and, thus, was not hearsay at

15    all.

16            "Gallo's statements were not admissible under

17    803(3) to show Martinez's state of mind."

18            And it goes on to cite *Gomez*, saying that the

19    state-of-mind exception would make the statement

20    admissible only to show the Declarant's then-existing

21    state of mind, not the Defendant's.

22            I would finally, your Honor, cite to an

23    unpublished decision only because it -- the language is

24    very good.

25            And it is *United States versus Piatz* --

```
 1   P-i-a-t-z -- 172 F.3d 54.  It is a Seventh Circuit case

 2   decided in 1999.  It cites to these cases that I just

 3   cited your Honor to.

 4          And I'm going to read from the case:  "Lambert

 5   sought to testify about statements made by Piatz which

 6   Lambert contended would establish that Lambert thought

 7   he and Piatz had a legitimate business arrangement.

 8          "Similarly, Lambert tried to use evidence of

 9   hearsay statements by others -- another Government

10   employee to establish his own state of mind.

11          "In all three instances, the district court

12   refused to admit these statements because they were

13   hearsay.

14          "Lambert argued that the statements made by

15   Piatz and the other two were admissible to prove his

16   state of mind.

17          "Lambert cannot establish his own state of

18   mind through statements made by third parties," citing

19   to United States versus Martinez at Footnote 4 and to

20   United States versus Gomez as well as another -- other

21   cases cited in the Seventh Circuit."

22          They cite to United States versus Peek, a

23   Seventh Circuit case at 856 F.2d 825, in support.

24          "But in both of those cases, the Defendant

25   attempted to establish his state of mind through his
```

1    own statements, not the statements of third parties.

2            "Therefore, those cases do not support his

3    claim.

4            "Moreover, Lambert cannot leverage his own

5    statements of intent to make Piatz's out-of-court

6    statements admissible."

7            It goes on to discuss that.

8            But the point of these is that the courts have

9    held -- the Eleventh Circuit has held that you can't

10   use a third party's statements to show the -- it has to

11   show the declarant's state of -- the declarant's

12   statement -- out-of-court statement has to show the

13   declarant's state of mind.  You can't use a third

14   party's out-of-court statement to show the declarant's

15   state of mind.

16           I think Ms. Jhones is also kind of mushing

17   this state-of-mind exception into a verbal -- into the

18   verbal act exception.  This is not a verbal act.

19   She -- I think she's kind of using a little bit of both

20   concepts.  But you need to keep them separated.

21           There's nothing about these statements that

22   Abbas had problems with Faisal, Faisal owed him money,

23   he needed assistance from Batiste, if Batiste assisted

24   him, he would reciprocate -- that's not a verbal act.

25           And those -- I think Ms. Jhones admits the

```
 1    bases for trying to seek the admission of those

 2    statements are the effect on Batiste's state of mind.

 3    But Batiste was not the declarant.

 4            I would also state, Judge -- well, we're not

 5    at that point yet, when we come to Batiste's

 6    statements.  So I'm not going to go there yet.

 7            MS. JHONES:  Your Honor, I'd like to respond,

 8    but I don't want to interrupt the Court.

 9            THE COURT:  Yes.  Go ahead.

10            MS. JHONES:  Your Honor, I think that there is

11    a fundamental misunderstanding on the part of the

12    Government.

13            Let me start by first addressing the Martinez

14    case, because Martinez specifically addresses what I am

15    not seeking to do and, unfortunately for the Defendant

16    in Martinez, what his counsel did mistakenly.

17            Martinez goes -- discusses the fundamental

18    difference between 803(3), an exception to the hearsay

19    rule, as opposed to 801(c), which addresses when a

20    statement is or is not hearsay.

21            Martinez addresses that.

22            Specifically, I'm going to direct the Court

23    to -- in the Martinez case to Page -- Martinez,

24    interestingly enough, agreed that, when a statement is

25    offered -- and I will direct the Court to the very same
```

 1   footnote that the Government addressed, which is

 2   Footnote 4, which is found on Page 376.

 3              What happened in *Martinez* was that,

 4   unfortunately, his counsel relied on 803(3).  And this

 5   is addressed in the *Martinez* decision in Footnote 3,

 6   which is found at Page 375, where it says --

 7   specifically where it says that the objection that was

 8   preserved by the Defendant in *Martinez* was an objection

 9   under Rule -- Federal Rule of Evidence 803(3).

10              Later, says the opinion in the footnote, after

11   the defense rested and immediately before the charge

12   conference, Gomez's counsel -- and I apologize --

13   Gomez's counsel objected to the exclusion of Gallo's

14   statements on the grounds that they were not hearsay

15   because they were not introduced to prove the truth of

16   the matter asserted, which is what I'm arguing here.

17              Gomez's counsel said that this idea is what

18   was meant when he said "state of mind objection."

19              The district court ruled that, quote, not

20   being offered for the truth was not the same as state

21   of mind and ruled that they're not being offered for

22   the truth objection was untimely.

23              So crucial to the analysis of this issue is,

24   as I said in the side-bar, what is the purpose for

25   which I am offering these out-of-court statements.

1           And I'm not offering them, your Honor, to show

2     the state of mind of Mr. Batiste, to show the state of

3     mind of the informants.  I'm offering them -- I'm

4     offering the statements of the informant to show the

5     effect that it had on the hearer, the listener,

6     Mr. Batiste.

7           That is what *Rubin* --

8           THE COURT:  Doesn't that go to state of mind?

9           MS. JHONES:  No, your Honor.  No, it does not.

10          There's a distinction, your Honor, and --

11          MR. CLARK:  Excuse me.

12          (Discussion had off the record amongst

13    counsel.)

14          MS. JHONES:  Yes.

15          And, your Honor -- and Mr. Clark elucidates

16    this for me a little bit more.

17          Yes.  They're offering -- they're being

18    offered to show the mental processes of Mr. Batiste,

19    but not -- but not -- but the statements are being

20    offered -- the purpose for what they're being offered

21    is to show the effect it had on his state of mind, the

22    effect.

23          That is different from 803(3).  It's totally

24    different.

25          That's what *Martinez* talks about.  That is

```
 1    what -- that is what the Supreme Court decision of

 2    Dutton versus Evans at 400 US 74, a Supreme Court

 3    decision from 1970, which is cited in Rubin -- but I

 4    want to -- I want to read to the Court a sentence in

 5    the Dutton case, which I think may be --

 6            THE COURT:  What case?

 7            MS. JHONES:  Dutton versus Evans.

 8    D-u-t-t-o-n.  Dutton versus Evans.

 9            And specifically, your Honor, at Page 88, the

10    Court writes:  "The hearsay rule does not prevent a

11    witness from testifying as to what he heard.  It is,

12    rather, a restriction on the proof of fact through

13    extrajudicial statements."

14            And we're not trying to prove those

15    statements.  We're trying to prove what it was that

16    Mr. Batiste heard and the effect that what he heard had

17    had on him.

18            That is precisely the distinction that

19    Martinez drew, and that is precisely the distinction --

20    the issue that is explained thoroughly on -- in United

21    States versus Herrera, in United States versus Rubin

22    and in United States versus Cruz.

23            It's a crucial, crucial distinction, your

24    Honor.  What triggers the analysis is the purpose for

25    which they are being offered, the purpose for which
```

1      they are being offered.

2              And directing the Court's attention to the

3      *Rubin* case, specifically on Page 283, the Court stated,

4      "The statements that were offered by *Rubin* were not

5      offered to prove the truth of the matter asserted, but,

6      instead, to prove that he had heard them and to

7      establish the effect on his state of mind," citing to

8      *Dutton versus Evans*.

9              "Thus, Rubin's proffered testimony was not

10     hearsay and, because it was relevant to his state of

11     mind, it should have been admitted."

12             We're not talking about an exception under

13     803(3), your Honor.  We're talking about 801(c).

14     They're not hearsay because they're not being offered

15     for the truth.

16             And, again, as *Martinez* clarifies for us, had

17     counsel in the *Martinez* case preserved the appropriate

18     objection, i.e., that they were not being offered for

19     the truth, then it would have been a different story.

20             So in the *Martinez* decision -- the *Martinez*

21     decision agreed with *Rubin*, with *Dutton* and with *Cruz*.

22     The distinction was that they applied a plain error

23     analysis in *Martinez* because, unfortunately, the

24     objection was not properly preserved and it was subject

25     to a plain error standard of review.

1              That's what happened in *Martinez*.

2              These are not very long cases, your Honor.

3              And one more area that I wanted to -- or not

4    one more area, but one more authority that I wanted to

5    direct the Court to that is referenced in the *Cruz*

6    decision, again, another decision from the Eleventh

7    Circuit from 1986 -- they cite to Weinstein and Burger

8    and Weinstein's own evidence as -- for the proposition

9    that these particular utterances or statements may be

10   admitted to show the effect it had on the hearer.  That

11   is the purpose.

12             And when I was trying to get in, your Honor --

13   into the issue of -- and this brings it into this

14   area -- this issue, I should say, as well as

15   potentially other areas of the Rules of Evidence --

16   when I was trying to elicit through Mr. Batiste what

17   had occurred back in the store when Abbas al-Saidi had

18   the issue with ICE, I wasn't offering them for -- to

19   prove the fact that he was arrested by ICE.

20             I'm offering them to prove the effect that

21   that action had had on Mr. Batiste, how he reacted, the

22   effect that it had on the listener.

23             And there is a clear distinction.  There's a

24   clear distinction, your Honor.

25             And, again, not to belabor the point, but we

1    went through this and --

2            THE COURT:  What was the effect that that had

3    on the listener?

4            MS. JHONES:  That he went ahead and helped

5    him.  The way he reacted:  He went ahead and helped

6    him.

7            THE COURT:  He did testify as to that.

8            MS. JHONES:  Your Honor --

9            THE COURT:  He said he took command of the

10   situation and, as a result of that, he expected that,

11   when he needed help, that al-Saidi was --

12           MS. JHONES:  What I was --

13           THE COURT:  -- would be there for him.

14           So he did testify as to that.

15           MS. JHONES:  What I was precluded -- what I

16   was precluded from getting into, your Honor, was the

17   request that was made -- the request that was made by

18   Abbas al-Saidi, which goes to --

19           THE COURT:  Which was what?

20           MS. JHONES:  That he needed help.  "Please

21   help me, Mr. Batiste."  He needed help, because without

22   that --

23           THE COURT:  He asked Batiste for help when the

24   ICE agents were there to arrest him?

25           MS. JHONES:  Yes.  Yes, your Honor.  Yes.

 1              And without that, I can't -- the picture is

 2     incomplete.  It makes no sense.

 3              MS. ARANGO:  Judge, may I respond briefly?

 4              THE COURT:  Yes.

 5              MS. ARANGO:  First of all, *Martinez* does

 6     state -- Ms. Jhones didn't -- kind of alluded to this

 7     statement by -- alluded to a holding by *Martinez*, but

 8     without reading it to you.

 9              *Martinez* -- I'm reading from 83 F.3d 371 at

10     Page 375.

11              *Martinez* says the district court erred because

12     the testimony was not being offered to prove the truth

13     of the matter asserted, but to show Martinez's lack of

14     intent and knowledge, lack of intent and knowledge.

15              It goes directly to the issue at -- the --

16     it -- it goes directly to the issue before the Court

17     about the -- it goes directly to a -- the Defendant's

18     lack of intent to commit a crime.

19              And then it goes on to say Gallo says the main

20     issue was the nature of the conspiracy and says the

21     district court ruling prevented the jury from learning

22     what the conspirators discussed and agreed to do.

23              And when he talks -- when the *Martinez* court

24     says lack of intent and knowledge, they cite to *United*

25     *States versus Rubin*, which is what -- the case that

1    Ms. Jhones was referring to.

2         In *United States versus Rubin* -- and I'm

3    referring now to 591 F.2d 278 at Page 283.

4         "One of Rubin's defenses in this case was lack

5    of criminal intent.  He claimed that, because he

6    interpreted the union's constitutions as allowing the

7    salary increases, he was unaware that the increases

8    were actually unauthorized.

9         "The constitutions, however, appear clearly to

10   mandate a different procedure for obtaining salary

11   increases from the procedure followed by Rubin.

12        "To explain why he nonetheless believed the

13   salary increases were authorized, Rubin testified" --

14   and I'm going to skip forward here -- "that both

15   present" -- or "he wanted to explain that both present

16   and past presidents of the unions, those individuals

17   given the duty of interpreting the constitutions, had

18   told him that the constitutions were flexible,

19   living -- flexible living documents that could be

20   interpreted to fit the needs of a particular local."

21        And then the Court goes on to say -- and I

22   think that the language -- although it says "state of

23   mind," they're not talking about the state-of-mind

24   exception.  They're talking about a defense of lack of

25   criminal intent and the statements -- the third-party

N. Batiste - DIRECT - By Ms. Jhones          121

```
 1    statements going to -- directly to that defense.

 2             What Ms. Jhones is doing is she's mushing that

 3    up with the state-of-mind exception and says -- she's

 4    trying to create another exception that doesn't exist

 5    here.

 6             Here, what they're -- what she's trying to do

 7    is introduce problems with Faisal, needing assistance

 8    from Batiste, as going to Batiste's state of mind.

 9             But it doesn't go to his state of mind

10    establishing a lack of criminal intent, establishing

11    his defense in any way.

12             And that's really what the Martinez and the

13    Rubin court were talking about.  I'm trying to draw

14    this distinction between what those courts were dealing

15    with and the state-of-mind exception, which is really

16    what Ms. Jhones is talking about here.

17             And, also, the state of mind -- even under the

18    state-of-mind exception --

19             THE COURT:  Well, clearly, it can't be the

20    state-of-mind exception because it's the declarant's

21    state of mind --

22             MS. ARANGO:  Correct.

23             THE COURT:  -- that the state-of-mind

24    exception comes in under, 803(3).

25             MS. ARANGO:  Right.
```

```
 1            THE COURT:  So what's the theory of defense

 2   here as to these statements?

 3            I thought your theory of defense was that he

 4   was scamming the -- that this was all a scam.  I

 5   thought that was your theory of defense.

 6            So what theory of defense does this go to?

 7            MS. JHONES:  Your Honor, it doesn't have to go

 8   to the theory of defense.  In some circumstances, some

 9   of the statements may.  But they don't have to.

10            In Cruz, for example -- and let me just again

11   reiterate -- because, again, as I said earlier,

12   these --

13            THE COURT:  Well, where does the case law say

14   that?  Rubin clearly speaks to the fact that it was

15   being offered specifically to establish -- and that's

16   what you've argued, that you want to offer these

17   statements to show their effect on his state of mind

18   and, therefore, they're not hearsay.

19            But what's the theory of defense?

20            MS. JHONES:  Your Honor, let me give you -- as

21   I said, they don't necessarily have to go to the theory

22   of defense.  Sometimes they may.

23            Let me tell you what the statement was in

24   Cruz.  In Cruz, the statement, which was --

25            THE COURT:  In Cruz, it was a verbal act.
```

1              MS. JHONES:  Yes.

2              THE COURT:  I read *Cruz*.  It was a verbal act.

3    Verbal acts are never hearsay.  If you tell somebody,

4    "Go to the store," that's not hearsay because it's a

5    directive.  It's a verbal act.  So that was *Cruz*.

6              In *Rubin*, it was his state of mind, that he

7    had been told that the constitution were flexible,

8    living documents and, therefore, he didn't have the

9    intent of the embezzlement of the monies from the

10   employee welfare benefit plan funds.

11             But what's your theory of defense here?

12             I'm a bit confused.  I thought your theory of

13   defense was -- and what you've said repeatedly to me

14   side-bar -- is that the statements that Batiste made

15   were lies because he was trying to scam for money.

16             MS. JHONES:  As were the statements that were

17   made by the informants.  The statements made by the

18   informants were not true.

19             THE COURT:  No.  I'm asking you what your

20   theory of defense is.

21             MS. JHONES:  Your Honor, the statements -- the

22   theory was that the reason why Mr. Batiste was dealing

23   with the first and, indeed, the second informant was

24   under the promise of money, money that was to be

25   utilized not for the purpose for which the Government

1  is charging; money for the purpose of committing -- of

2  providing material support to a foreign terrorist

3  organization.

4      Indeed, the purpose for eliciting money and

5  the purpose for dealing with these informants was

6  exclusively for the purpose of creating and

7  facilitating and carrying out his real mission, which

8  was to establish this organization in the community

9  that supplies jobs and supplies religious teachings and

10 discipline to the group and to other people.

11      But the -- and that is relevant, your Honor.

12      But, again, when we're talking about -- when

13 we're talking about taking a statement -- taking a

14 statement or an assertion out of -- out of the context

15 of 801(c), it doesn't -- I'm not offering the statement

16 to show that it was true.  I'm offering these

17 statements to show the effect that it had --

18      THE COURT:  Well, what about the statement

19 that he would give him money -- if he helped him with

20 Faisal, that he would give him money?  That's not being

21 offered for the truth of the matter asserted?

22      MS. JHONES:  Well, your Honor, it was said,

23 but it wasn't true, because he was never going to give

24 him money.

25      It's the effect that it had on Mr. Batiste and

 1    why he reacted the way he did.  He continued to deal

 2    with this man.

 3            He didn't continue to deal with him because he

 4    wanted to go ahead and bring down the Sears Tower or he

 5    wanted to go ahead and take photographs of the FBI

 6    building.

 7            He continued to deal with him because he

 8    wanted to get money out of him.  We all know that they

 9    weren't going to give him any money.  He wasn't going

10    to give him 50 grand.

11            It's not being offered for the truth.  In

12    fact, it wasn't true.  He never gave him money from

13    Faisal.  He wasn't.

14            THE COURT:  Let me make sure I have your

15    cases.  And then I want to read over the cases at some

16    point during the lunch hour.

17            MS. JHONES:  Your Honor, may I just say one

18    more thing?  Because I just want to make sure that my

19    position is clear so that I have -- for the benefit of

20    the Court, obviously, and for -- and so that I do my

21    job correctly.

22            When you look at *United States versus Cruz*,

23    *United States versus Cruz* is not a case that deals with

24    the criminal -- the purpose of the statements to prove

25    criminal intent.

1            When we're talking about statements being

2    offered for something other than its truth, what we're

3    offering them for is for the effect on the listener,

4    the effect on the listener.

5            And I just have to make this very --

6            THE COURT:  I understand that's your position.

7            So I want to make sure I have all your cases.

8    *Dutton versus Evans*, *US versus Rubin*, *US versus*

9    *Herrera*, *US versus Gomez*, *US versus Martinez*.

10           Is that it?

11           MS. JHONES:  I just want to cite to one case

12   which is contained within *Cruz*.  I'll bring it to the

13   Court's attention.

14           It is *Lubbock* -- L-u-b-b-o-c-k -- *Feed Lots,*

15   *Incorporated, versus Iowa Beef Processors,*

16   *Incorporated*, 630 F.2d 250, a Fifth Circuit decision,

17   1980.

18           THE COURT:  Do you have that case for me?

19           MS. JHONES:  I'm sorry?

20           THE COURT:  Do you have that case there for

21   me?

22           MS. JHONES:  I don't.  Let me just check, your

23   Honor.

24           THE COURT:  I wish you'd provided these cases

25   ahead of time to me.

```
 1              MS. JHONES:  Your Honor, I have copies of most
 2    of these cases.  I don't --
 3              THE COURT:  Well, I meant "ahead of time" like
 4    ahead of court.
 5              I have it.
 6              Is that it?  Do I have all the Government
 7    cases?
 8              MS. ARANGO:  Yes.
 9              I also cited to you, your Honor, the
10    unpublished opinion.
11              THE COURT:  Do you have that?
12              MS. ARANGO:  Yes, I do.  I have it, although
13    it's all written up.  Do you want the cite or do you
14    want the case?
15              THE COURT:  Give me the case, if you have it.
16              MS. ARANGO:  Okay.
17              MS. JHONES:  What unpublished decision is
18    that?
19              MS. ARANGO:  172 F.3d 54, Seventh Circuit,
20    1999.
21              MS. JHONES:  I have to read that over the
22    lunch period, your Honor.
23              THE COURT:  Okay.
24              What was that?  172 F.3d?
25              MS. ARANGO:  Yes.
```

```
1               THE COURT:  That's not unpublished, then.

2               MS. ARANGO:  No.  It says "unpublished."

3               THE COURT:  With a 172 F.3d cite?  That's news

4    to me.

5               MS. ARANGO:  I agree, Judge.  I don't really

6    understand.

7               THE COURT:  It says it's in a table of

8    decisions without reported opinions.  Could have fooled

9    me.

10              We're in recess until 2:00.

11              (Thereupon, a luncheon recess was taken, after

12   which the following proceedings were had:)

13              THE COURT:  You may be seated.

14              We're back on United States of America versus

15   Narseal Batiste, et al., Case No. 06-20373.

16              Counsel, state your appearances, please, for

17   the record.

18              MR. GREGORIE:  Good afternoon, your Honor.

19              Richard Gregorie and Jacqueline Arango on

20   behalf of the United States.

21              MS. JHONES:  Ana Maria Jhones on behalf of

22   Narseal Batiste, who is present.

23              MR. LEVIN:  Albert Levin Patrick Abraham,

24   who's present.

25              MR. CASUSO:  Lou Casuso on behalf of Burson
```

```
 1    Augustin, who's present.

 2              MR. CLARK:  Nathan Clark for Rotschild

 3    Augustine, who's present.

 4              MR. HOULIHAN:  Richard Houlihan for Naudimar

 5    Herrera.

 6              MR. VEREEN:  Roderick Vereen for Stanley

 7    Phanor, who's present.

 8              THE COURT:  All Defendants are present.

 9              As I understand it, Ms. Jhones, the question

10    that you are now asking is what Abbas al-Saidi -- well,

11    tell me what your question is.

12              MS. JHONES:  The specific question -- the last

13    question I may have asked, quite frankly, I don't

14    remember.  But the area of questioning that I was about

15    to get into was the conversation that Mr. Batiste and

16    Abbas al-Saidi had had at the hotel after -- in late

17    October after Abbas al-Saidi returned from Yemen.

18              THE COURT:  What was that conversation?

19              MS. JHONES:  The conversation had to do with

20    Mr. Batiste's -- number one, one of the things is why

21    was Mr. Batiste there, why did he go to the hotel, why

22    did he meet with this individual, what did Abbas

23    al-Saidi tell him, represent to him.

24              And the representations, I believe, are going

25    to be representations such as his need, i.e., Abbas
```

 1   al-Saidi's request of Mr. Batiste to assist him with

 2   Faisal in getting money that is owed to Abbas al-Saidi

 3   by Faisal and questions regarding that area.

 4          And, additionally, your Honor, to the extent

 5   that Abbas al-Saidi -- to the extent that Mr. Batiste

 6   is going to relate to the ladies and gentlemen of the

 7   jury what Abbas al-Saidi, to the extent that Abbas

 8   al-Saidi did not say anything regarding, "I got you

 9   your support from the terrorist organization back

10   home," et cetera, et cetera, I want to elicit testimony

11   from Mr. Batiste to show what Abbas al-Saidi did not

12   say, did not say.

13          And to the extent -- and what he did say,

14   obviously, will be relevant in terms of what -- and

15   what Abbas asked or comments he that made to the extent

16   that they exclude any reference whatsoever to Al-Qaeda,

17   a terrorist organization, "This flier that you gave me

18   for -- so I can get the support you need from Al-Qaeda

19   in order to further your mission to overthrow" -- you

20   know, "to bring down the Sears Tower," et cetera,

21   et cetera.

22          The nature of the conversation, your Honor,

23   that took place at that pivotal point, the commencement

24   of the -- this period in September of 2005, is highly

25   relevant to show what it was that -- why Mr. Batiste

```
 1    was there and what it was this informant was telling

 2    him.

 3           And why Mr. Batiste was there is a function of

 4    what the -- the informant was the one that reached out

 5    for him.  There's already been testimony to that.  It

 6    wasn't Mr. Batiste that showed up.  The informant

 7    reached out for Mr. Batiste to show up.  Why did

 8    Mr. Batiste --

 9           THE COURT:  So as I understand it, the

10    testimony that you want to elicit is that al-Saidi was

11    owed money by Faisal and needed Batiste's help with

12    that?

13           MS. JHONES:  Yes.  And the specifics

14    surrounding that issue.

15           THE COURT:  What does that mean?

16           MS. JHONES:  Well, who told him, you know, how

17    did Mr. Batiste know that -- you know, how did

18    Mr. Batiste know that Faisal was owed money.

19           Faisal was owed money because CW No. 1 told

20    him that Faisal owed him money.

21           THE COURT:  Faisal owed CW 1 money?

22           MS. JHONES:  Yes.  Correct.

23           THE COURT:  That's coming in for the truth of

24    the matter asserted and that is hearsay.

25           MS. JHONES:  Your Honor, it's not coming in
```

1    for the truth.  Whether or not --

2              THE COURT:  Well, that's what I'm ruling.

3              MS. JHONES:  I understand.

4              THE COURT:  I'm ruling that that particular

5    statement, that Faisal owed al-Saidi money, is coming

6    in for the truth of the matter asserted, that Faisal

7    owed al-Saidi money.  And, therefore, it is excluded as

8    being hearsay.

9              MS. JHONES:  Your Honor, is the Court's ruling

10   the same with respect to whether or not a request was

11   made by CW 1 of Mr. Batiste -- a request to assist him

12   with Faisal?  Which is not a statement, your Honor.

13   Which is not a statement.

14             THE COURT:  The request to help him with

15   Faisal I do not find is hearsay, and he may testify

16   that CW 1 asked him to help him with Faisal.

17             Is that the subject area of this questioning?

18             MS. JHONES:  Your Honor, I don't believe it

19   is.  I believe that there is -- that there's going to

20   be additional conversation and --

21             THE COURT:  Well, what's the additional

22   conversation?

23             MS. JHONES:  Your Honor, it's going to be --

24   they're going to discuss the basis why Mr. Batiste is

25   there, statements that are made by the informant that

 1    are unrelated to Faisal, such as what he did in Yemen,

 2    his family from back home, the flier that was given

 3    to -- the flier -- the Universal Divine Saviors flier,

 4    what, if anything, Abbas al-Saidi did with this flier.

 5              These are all -- all of these --

 6              THE COURT:  What's the proffer?  I need to

 7    know exactly what the proffer is.  I'm going to have to

 8    rule on these one at a time.  This is not something

 9    that I can wholesale rule on.

10              I have to make a determination for each

11    statement whether, in fact, it's coming in for the

12    truth of the matter asserted or is not coming in for

13    the truth of the matter asserted or falls within an

14    exception to the hearsay rule if it does -- is coming

15    in not the truth of the matter asserted.

16              MS. JHONES:  Your Honor, I understand.

17              THE COURT:  So what is it that he's going to

18    testify as to what al-Saidi said?  What he -- what he

19    did in Yemen and with his family?

20              Well, that would be coming in for the truth of

21    the matter asserted.  That would be hearsay, because

22    that would be an assertion of what he actually did.

23              Now, what is the testimony going to be

24    concerning the flier?

25              MS. JHONES:  Your Honor, again, just so the

1    Court is clear, what he did in Yemen, whether he did it

2    or not is not of interest -- is the not --

3          THE COURT:  It doesn't matter whether it's of

4    interest.  It's a matter of whether it's an assertion.

5    And it's an assertion of, "This is what I did."  So

6    that's hearsay.  It's coming in for the truth of the

7    matter asserted.

8          MS. JHONES:  Your Honor, it goes to what I'm

9    trying to prove, the basis of why I'm offering this

10   statement, why am I attempting to bring it in, why am I

11   offering it for.

12         And as *Martinez* and *Cruz* and *Rubin* say, it is

13   why -- what is the purpose that this is -- this

14   statement is being offered for?  If it's offered to

15   prove that the statement was true, yes, it's hearsay.

16         THE COURT:  And that's what I found.  It's

17   offered to prove the statement is true:  "This is what

18   I did in Yemen.  This is what I did with my family."

19   It's being offered for the truth of the statement.

20         We're going on to the next area now, which is

21   the proffer of what al-Saidi says in regard to the

22   flier.

23         What is your proffer of what al-Saidi said in

24   regard to the flier?

25         MS. JHONES:  I'm going to inquire of

```
1    Mr. Batiste:  Was there any discussion with respect to
2    the flier?  What discussion, if any, was there --
3              THE COURT:  What is he going to say?
4              MS. JHONES:  Mr. Batiste is going to say that
5    Abbas al-Saidi said that the flier -- that the flier
6    was given to his uncle, who is his wife's father-in-law
7    from back home -- I'm sorry -- his wife's father, i.e.,
8    Abbas al-Saidi's father-in-law, from back home and the
9    purpose of providing that flier was to assist --
10   Mr. Abbas al-Saidi is going to also say that he's going
11   to be able to get support -- he's going to try and help
12   him with support -- monetary support as it relates to
13   the request in that flier and what purpose -- and what
14   was -- what Mr. Abbas al-Saidi said to Mr. Batiste as
15   to the purpose of the use of the request for support as
16   indicated in that flier, what was related by Abbas
17   al-Saidi to the uncle, who is the father-in-law back
18   home.
19             And, additionally, your Honor --
20             THE COURT:  What is it that al-Saidi said to
21   him about the purpose of the flier?
22             MS. JHONES:  Your Honor, just so I'm clear,
23   just so I'm clear, may I inquire of Mr. Batiste as to
24   specifically what --
25             THE COURT:  Sure.  He can stay right there.
```

 1   He can proffer right there what he's going to say.

 2            MS. JHONES:  (Confers privately with client.)

 3            THE COURT:  Let me hear it from him.

 4            DEFENDANT BATISTE:  Yes, your Honor.

 5            Abbas al-Saidi told me that he took the flier

 6   with him when he went to Yemen and that he had given

 7   the flier to his wife's father, who was his uncle, and

 8   that he was supposed to be working on the money

 9   connections that he said he had between him and his

10   father-in-law and wanted to support the information

11   that we had on the flier.

12            MS. ARANGO:  May I respond to that, Judge?

13            THE COURT:  Yes.

14            MS. ARANGO:  That is hearsay.  He's stating --

15   he's making an assertion about what Abbas told him he

16   did with the flier, which is contrary to the premise in

17   which they're seeking to introduce this, which is --

18   I'm looking at *Rubin*, which is to prove the effect --

19   not to prove the truth of the matter asserted, but,

20   instead, to prove what -- that he had heard them and to

21   establish their effect on his state of mind to commit

22   this crime or not to commit the crime.

23            And I'm contrasting that type of assertion

24   with his testimony, which I assume will occur, about

25   what Abbas al-Saidi asked him to do, because that would

 1    have an effect.

 2          I believe that this is just simply an

 3    assertion about what Abbas said he did with the flier.

 4    I mean, it's an out-of-court statement that they're

 5    offering to prove the truth of that matter asserted,

 6    not how it affected him in any way.

 7          MS. JHONES:  Your Honor, just one more point.

 8          The issue is not -- the issue is not what

 9    Abbas al-Saidi did with the flier.  This is not the

10    issue.

11          The issue is what Mr. Batiste thought Abbas

12    al-Saidi did with the flier.  Whatever it was, whatever

13    response was provided to Mr. Batiste by Abbas al-Saidi,

14    the issue is the effect that that had on Mr. Batiste,

15    who is the hearer of that statement.  That's the issue.

16          And, again, going back to -- going back to

17    *Cruz* and all of the other cases, it's not -- there's a

18    two-part component to what is hearsay.

19          It's an assertion or conduct that's intended

20    as an assertion and not -- not disjunctive -- and it is

21    being offered to prove the truth of the matter

22    asserted.

23          It doesn't matter if Abbas al-Saidi got that

24    flier and he threw it away in Yemen or if he got that

25    flier and gave it to Al-Qaeda or -- it doesn't matter.

1           What matters is what effect -- what --

2     whatever he did -- whatever he told Mr. Batiste in that

3     meeting in that hotel room -- whatever he told him that

4     he did with the flier, the effect of that statement on

5     Mr. Batiste, whether or not it's true.  That's the

6     issue.

7           MS. ARANGO:  Judge, she's confusing matters

8     here.

9           I agree what Abbas al-Saidi actually did with

10    the flier is irrelevant.

11          But what they're trying to prove -- the truth

12    of the matter asserted is that Abbas al-Saidi told him

13    that he did certain things with the flier.

14          That is what they're trying -- they're seeking

15    to introduce that statement to prove the truth of that

16    assertion, of that assertion.

17          So what Ms. Jhones is saying is, "Well, what

18    he really did what the flier doesn't matter."

19          But that's not what she's proving -- she's --

20    she's offering it to prove that Abbas al-Saidi made

21    that assertion.

22          MS. JHONES:  Your Honor, as *Cruz* says, whether

23    or not what Mr. Batiste relates as to what Abbas

24    al-Saidi told him -- whatever he relates -- and, again,

25    it's being offered for the effect on the listener and

1        what -- just to prove that it was said.

2                Now, Mr. Batiste is on the stand.  And as *Cruz*

3        states at Page 1478, the truth of Mr. Batiste's

4        statements -- the truth of what Mr. Batiste is saying

5        about what Abbas told him is testimony now coming from

6        the stand and it's fully subject to cross-examination.

7                And, again, at Page 1478 -- whatever it was

8        that, in reality, happened with that flier is not the

9        issue, your Honor.

10               MS. ARANGO:  Judge, using that logic, taken to

11       its logical conclusion, it would just wipe out hearsay

12       altogether, because all she's saying is, "Any assertion

13       out there that my client heard" -- that the Defendant

14       heard -- "is going to have an effect on him.

15       Therefore, it's not being offered to prove the truth of

16       the matter asserted, but the effect it had on him."

17               That's not -- this is a very narrow exception,

18       Judge.  I mean, you either have a verbal act or you

19       have this *Rubin*-type exception, which I still believe

20       goes directly to the issue of criminal -- or lack of

21       criminal intent.

22               But any statement out there that Mr. Batiste

23       claimed was made -- he could say any statement had an

24       effect on him.

25               MS. JHONES:  Your Honor, if this rule only

1   applied to criminal intent, then we wouldn't have the

2   hearsay rule in the context of civil cases.

3          The key -- the key is:  What is the purpose

4   for which the statement is being offered?

5          And, again, the key is:  What is the statement

6   being offered for?

7          And the statement is being offered in order to

8   show the effect that it had on Mr. Batiste.

9          MS. ARANGO:  She could ask him, "Did he tell

10  you anything as a result of that?  What did you think?

11  What did you do?  What did you" -- the assertion itself

12  is irrelevant to that point, and it's being offered to

13  prove the truth that he made that assertion -- that

14  matter asserted.

15         MS. JHONES:  Your Honor, again citing to *Cruz*

16  at Page 1478, the paragraph that begins, "Moreover,

17  Jackson's out-of-court declaration to Barry...", the

18  Eleventh Circuit tells us that this is -- the following

19  purpose for which a statement is being offered is

20  entirely proper and takes it out of the hearsay

21  context, the hearsay context, whether assertion or not.

22         And that is the statement is offered solely

23  for the fact that it was made and the effect it might

24  have had upon the hearer.

25         And that is the very basis, the very basis,

 1    that we are seeking to do this.  That is a nonhearsay

 2    purpose.  It matters not what this individual did with

 3    that flier.

 4         What matters is what Mr. Batiste thought he

 5    did with the flier.

 6         MS. ARANGO:  *Cruz* is talking about verbal

 7    acts, Judge.  That's what she's talking about here.

 8         MS. JHONES:  Your Honor, the Government wants

 9    to narrow the hearsay rule.

10         If that were the case, as I said, this would

11    not apply -- they're trying to narrow 801(c).  801(c)

12    doesn't say criminal -- it applies to criminal intent

13    or words to that effect.

14         That is absolutely absurd and contrary,

15    absolutely contrary, to the case law not only in the

16    Eleventh Circuit, but the common understanding of the

17    proponent of a statement -- of an out-of-court

18    statement.

19         MS. ARANGO:  Judge, 801(c), which is --

20    defines what a hearsay statement is -- it defines that

21    it is a statement offered to prove the truth of the

22    matter asserted.

23         You can't then -- you can't use any statement

24    out there and say, "I'm not offering it to prove the

25    truth of the matter asserted.  I'm just offering it to

 1   prove the effect that it had on me."

 2          That's not -- you -- you have to have some

 3   kind of exception, something that allows that.

 4          If you were to take what Ms. Jhones is saying,

 5   that any statement made by Mr. Batiste, any

 6   out-of-court statement, he could just say, "It had an

 7   effect on me."

 8          That's not what this law that discusses

 9   exceptions to the -- to this hearsay rule and discusses

10   what is not offered to prove the truth of -- or what is

11   offered was not being offered to prove the truth of the

12   matter asserted -- that's not what that's talking

13   about.

14          There's limited -- like I said before, there's

15   limited exceptions.  A verbal act is one of them.

16   That's what *Cruz* is talking about.

17          MS. JHONES:  That is absolutely incorrect,

18   your Honor.

19          MS. ARANGO:  She's taking *Cruz* completely out

20   of context.

21          MS. JHONES:  That is absolutely incorrect,

22   your Honor.

23          Ms. Arango --

24          THE COURT:  Well, that is what *Cruz* is dealing

25   with, a verbal act.

1          MS. JHONES:  Your Honor, in the context --

2          THE COURT:  *Cruz* is dealing with a verbal, a

3    directive.  That's what that case is.

4          MS. JHONES:  Your Honor, in *Cruz*, they're

5    dealing with a verbal act.

6          But they also say, they also say -- and as it

7    relates to the particular statement, yes.  But that is

8    not limited to a verbal act.

9          THE COURT:  Well, that's the holding of *Cruz*.

10         MS. JHONES:  Your Honor, respectfully,

11   respectfully --

12         THE COURT:  That's not the holding of *Cruz*?

13         MS. JHONES:  As it relates to that statement.

14         But *Cruz* says --

15         THE COURT:  But that was the issue in *Cruz*,

16   was the verbal act.

17         What other issue was there?

18         MS. JHONES:  Well, your Honor, because the

19   particular statement in *Cruz* had -- the particular

20   statement in *Cruz* was a verbal act, that was the

21   analysis.

22         But in the case -- in the cases cited and

23   directly in the portion that I just read to the

24   Court -- first of all, when they define hearsay under

25   801(a), it says it's an assertion or conduct intended

```
 1    as an assertion and it must be offered to prove the
 2    truth of the matter asserted.
 3           So it doesn't -- if it was a verbal act, but
 4    it was offered to prove the matter asserted, then there
 5    may be a problem.
 6           THE COURT:  No.  A verbal act is never
 7    hearsay.  A verbal act is never hearsay.
 8           MS. JHONES:  Your Honor, that's fine.
 9           The point of the matter is that the definition
10    of hearsay has two components.
11           And, again, in Cruz -- in Cruz, again, it says
12    the statement is offered solely for the fact that it
13    was made and the effect it might have had upon the
14    hearer.
15           Additionally, if you read Cruz, which was a
16    verbal act, and you read Rubin and you read Herrera and
17    you read the other cases, it doesn't narrow it to a
18    verbal act, your Honor, because if that was the case,
19    then we could never have a statement that doesn't come
20    in if it comes in for a purpose other than its truth.
21           We couldn't have -- it just would totally do
22    away with 801(c).
23           MS. ARANGO:  Judge, you're holding already
24    that the request to help Abbas with Faisal is not
25    hearsay.  There's an exception right there that your
```

1    Honor just found.

2              So that's not correct.

3              MS. JHONES:  Your Honor, additionally, along

4    the same lines as this issue as to the out-of-court

5    statement offered for something other than its truth,

6    under circumstances where the out-of-court statement

7    may, in fact, have been true, in -- I just came across

8    a case that cited to the *Cruz* case.

9              The case is *Weaver versus Tech Data Corp.*,

10   *Weaver versus Tech Data Corp.*, which is at

11   66 F.Supp. 2d 1958, a Middle District Florida case

12   from 1999.

13             THE COURT:  I'm not going to read district

14   court cases on this.  It's not -- it doesn't have any

15   persuasive authority.

16             Mr. Batiste, when you say he was supposed to

17   be working on the money connections that he said he had

18   between him and that he was supposed to be working on

19   the money, who's the "he"?

20             DEFENDANT BATISTE:  Abbas al-Saidi.

21             MS. JHONES:  Your Honor, I would like to

22   address a couple more points.  But the Court appears to

23   be reading.  So I don't want to interrupt.

24             THE COURT:  I've indicated that the statements

25   that he had given the -- that he went to Yemen and had

 1   given the flier to his wife's father is hearsay.

 2          But I will allow the Defendant to testify that

 3   al-Saidi said he was working on the money connections

 4   that he had between him and his father-in-law and

 5   wanted to support the information on the flier.

 6          What else?

 7          MS. JHONES:  Your Honor, I just wanted to say,

 8   in the -- I just want to highlight for the Court --

 9   because I do have a concern because I believe that this

10   area is so crucial and is so vital to Mr. Batiste's

11   ability to present his defense -- I want to cite to the

12   Court *United States versus Lankford*, which I'm sure the

13   Court -- I think I've cited it for other propositions.

14   It's a very cited case in the Eleventh Circuit -- at

15   955 F.2d 15 --

16          THE COURT:  Is there an Internet connection

17   here somewhere that someone has?

18          Please turn it off.  If you have any phone or

19   anything that has the Internet on it, it's very

20   distracting.

21          Go ahead.

22          MS. JHONES:  It's 955 F.2d 1545, I believe, at

23   Page 1550, an Eleventh Circuit case from 1992, where

24   the Court observed that, "Where specific intent is an

25   issue, it is highly probative for the defense to show

1    that the Defendant's belief, whether or not mistaken,

2    was reasonable where such beliefs negate specific

3    intent.

4           "Where the element of willfulness is critical

5    to the defense, the Defendant is entitled wide latitude

6    in the introduction of evidence tending to show lack of

7    intent."

8           That's the same general proposition that has

9    also been cited in the case of *United States versus*

10   *Word* -- W-o-r-d -- at 129 F.3d 1209.

11          My concern here is I don't want to do anything

12   that is in violation of the Court's ruling and, on the

13   other hand, this is -- this is the Defendant's

14   testimony.

15          And, again, my concern is that I'm not going

16   to be able to -- Mr. Batiste is not going to be able to

17   tell the story as he understood it, whether or not what

18   was told to him is true.

19          That's the concern that I have.

20          And, quite frankly, one of the problems is

21   that, in not being able to get into the flier issue and

22   what his understanding was as to what happened with the

23   flier --

24          THE COURT:  Well, I just said he could.

25          MS. JHONES:  I --

1          THE COURT:  I just said he could.

2          MS. JHONES:  Okay.  I want to understand if

3    there's any limitation on what I can get into with the

4    flier so I do not go in violation of the Court's

5    ruling.

6          THE COURT:  He said that al-Saidi told him

7    that he was working on the money connection that he had

8    between him and his father-in-law and he wanted to

9    support the information in the flier.

10          I just said that you could go into that.

11          MS. JHONES:  Am I allowed to go into when

12    he -- when did Mr. Batiste give him the flier and, when

13    he gave him the flier, what did Abbas al-Saidi tell him

14    as to what he was going to do with the flier?

15          MS. ARANGO:  You just said "no," Judge.  You

16    just said that that was hearsay.

17          THE COURT:  Well, I said that, when he said

18    that he went to Yemen and he gave the flier to his

19    father-in-law, his uncle, that that was hearsay.

20          MS. JHONES:  And, again, your Honor --

21          THE COURT:  That's an after-the-fact, what he

22    did.

23          MS. JHONES:  I'm sorry?  I missed that.

24          THE COURT:  That's an after-the-fact, what he

25    did.  I ruled that that was an assertion after the

1   fact.

2          Are you now saying you're presenting testimony

3   of what he said prior to him going to -- I thought this

4   conversation was after he came back from Yemen.

5          MS. JHONES:  Your Honor, it -- well, there was

6   two -- two conversations.  There was a meeting before

7   he left and there was a meeting after he left.

8          THE COURT:  Well, you're talking about the

9   meeting after he came back in the hotel.

10          MS. JHONES:  Yes.

11          THE COURT:  That's been the subject area of

12   this inquiry.

13          That was after he went to Yemen and came back.

14   That's the area that he's testifying on now.

15          MS. JHONES:  Yes.

16          But, your Honor, at that meeting in the hotel,

17   there were discussions as to what Mr. Batiste -- what

18   Abbas al-Saidi had said about what he was going to do

19   with that flier before he -- in Yemen before he left.

20          In other words, when he got the flier, before

21   he left, what was it that he was going to do with that

22   flier?

23          And the problem is, your Honor, that --

24          THE COURT:  Well, but you just --

25          MS. JHONES:  Your Honor, it's the whole --

1           THE COURT:  You just had Mr. Batiste tell me

2    what he was going to testify to, which was -- he just

3    said it out.

4           And I said he couldn't say that he gave the

5    flier to the uncle, who was the father-in-law, but he

6    could say that he was going to support the information

7    in the flier and he was going to try to connect him

8    with money.

9           MS. JHONES:  But, your Honor, who --

10          THE COURT:  Now you're changing the whole

11   proffer of testimony.

12          MS. JHONES:  Your Honor --

13          THE COURT:  You really should have front-ended

14   this, Ms. Jhones.  It really is a -- you know, it's a

15   terrible waste of the jury's time.  They're now sitting

16   in there for over an hour.

17          This should have been a motion in limine, a

18   memorandum of law presented to the Court, prior to the

19   jury sitting in there for well over an hour.  It's just

20   a waste of jury time.

21          MS. JHONES:  Your Honor, I don't believe --

22   respectfully, the Government is the one that objected

23   to this testimony.  I don't believe that --

24          THE COURT:  Ma'am, you knew that this area was

25   coming up.

```
1              MS. JHONES:  Your Honor, I knew that they made

2       a broad objection to hearsay.

3              THE COURT:  Well, I don't know why you

4       wouldn't want to educate me before you brought the area

5       up.

6              MS. JHONES:  Well, I certainly do not want to

7       proffer to the Government what my client's testimony is

8       going to be.  I certainly don't want to do that, nor do

9       I believe that I'm obligated to do that.

10             I have --

11             THE COURT:  No.  You're not obligated,

12      Ms. Jhones.  But it is a terrible waste of jury time.

13             Let's go forward.  Let's bring the jurors in,

14      please.

15             (Whereupon, the jury entered the courtroom at

16      2:56 p.m. and the following proceedings were had:)

17             THE COURT:  You may be seated.

18             I apologize for the delay, ladies and

19      gentlemen.

20             You are still under oath, Mr. Batiste.

21             You may proceed, Ms. Jhones.

22             MS. JHONES:  Thank you, your Honor.

23      BY MS. JHONES:

24      Q.   Mr. Batiste, before the lunch break, we were

25      talking about your conversation with Abbas al-Saidi,
```

 1    Paid Informant No. 1, at the hotel.

 2         Do you remember that, sir?

 3    A.    Yes, ma'am.  Yes, I do.

 4    Q.    What discussions, if any, were there as it

 5    related to -- well, first of all, what was your

 6    understanding as to why -- why were you at the hotel?

 7    A.    I understood that Abbas had needed my help and he

 8    wanted to speak with me.

 9    Q.    And when you got to the hotel, did Abbas al-Saidi

10    tell you what -- strike that.

11         What was your understanding as to what help Abbas

12    al-Saidi needed?

13    A.    That there was a situation between him and Faisal

14    and that he wanted me to be a part of the discussion

15    that he would have with Faisal in solving the issue.

16    Q.    And in addition to Abbas al-Saidi requesting your

17    help as it related to Faisal, were there any other

18    discussions that you had with Mr. Abbas al-Saidi at the

19    hotel?

20    A.    Yes, ma'am.

21    Q.    What was the subject of additional discussions?

22    A.    He told me that he was working on his money

23    connections between him and his father-in-law and that

24    what he was -- that that pertained to the information

25    that was on the flier.  That's what he told me.  And

1   that as soon as he got information about that, he was

2   going to let me know.

3   Q.    What was your understanding as to who the

4   father-in-law was?

5   A.    His wife's father.

6   Q.    I'm sorry?

7   A.    His wife's father.

8   Q.    Did Abbas al-Saidi refer to his wife's father by

9   any other name?

10  A.    Yes, ma'am.  He mentioned him as being his uncle.

11  Q.    What was your understanding as to what it was --

12  well, what was your understanding as to how it was that

13  Abbas al-Saidi -- well, first of all, what, if

14  anything, did you provide to Abbas al-Saidi?

15  A.    I had given Abbas al-Saidi a flier before he left

16  to Yemen after the situation had occurred where I

17  understood that he would be supporting the mission that

18  I was on and I had given him a flier for him to put in

19  the store and to -- just to have the flier in the

20  store.

21        And he said that he would help me and support me

22  in doing that.

23  Q.    Okay.  Besides those discussions back in the

24  hotel, were there any other discussions between you and

25  Mr. al-Saidi?

1  A.     No, ma'am.

2  Q.     After that -- by any chance, Mr. Batiste, do you

3  remember the date of the meeting in the hotel?

4  A.     Like I said, I believe that date was the last

5  week October.  I would say around the 27th or the 28th

6  of October.

7  Q.     After that meeting in the hotel, did you have

8  occasion to meet with Abbas al-Saidi again?

9  A.     Yes, ma'am.

10  Q.     And at this time -- do you remember, I should

11  say, when it was that you met with him again?

12  A.     I believe that was October 29th.

13  Q.     And do you remember where it was that you met

14  with Abbas al-Saidi?

15  A.     I was at a restaurant off of Northeast 6th

16  Avenue, a Chinese restaurant not too far from the hotel

17  where he was staying at on 163rd Street.

18  Q.     Okay.

19          MS. JHONES:  May I approach the witness, your

20  Honor?

21          THE COURT:  Yes.

22          MS. JHONES:  Thank you.

23          THE COURT:  What are you showing him?

24          MS. JHONES:  I'm showing him Defense Exhibit

25  for identification 89-B.

1          THE COURT:  Have you shown it to the

2  Government?

3          MS. JHONES:  I have.

4          THE COURT:  Okay.

5  BY MS. JHONES:

6  Q.    Mr. Batiste, I'm showing you what's marked for

7  identification as Defense Exhibit 89-B.

8          Do you recognize it?

9  A.    Yes, ma'am.

10  Q.    And how do you recognize it, sir?

11  A.    My signature is on the document.

12  Q.    I'm also showing you Government's Exhibit 38,

13  which is in evidence.

14          Do you recognize it?

15  A.    Yes, ma'am.

16  Q.    And what is Government's Exhibit 38?

17  A.    It's the audio version to the transcript.

18  Q.    Okay.  Have you compared Government's Exhibit 38,

19  the audio, to Defense Exhibit 89-B?

20  A.    Yes, I have.

21  Q.    Does Defense Exhibit 89-B accurately represent

22  the contents of Government's Exhibit 38?

23  A.    I think so, to the best of my abilities.  There's

24  possibly two errors in there.

25  Q.    And aside from the two errors that you mentioned,

```
 1   does it accurately represent the contents of

 2   Government's Exhibit 38?

 3   A.    I believe it's accurate.  Yes, it is.

 4         MS. JHONES:  At this time I move into evidence

 5   Defense Exhibit 89-B.

 6         MS. ARANGO:  No objection.

 7         THE COURT:  It will be admitted as Defendant

 8   Batiste Exhibit 89-B.

 9         (Whereupon, Defendant Batiste's Exhibit

10   No. 89-B was entered into evidence.)

11         MS. JHONES:  Thank you, your Honor.

12         Your Honor, I'd like to publish that exhibit.

13         But before I do so, I do have a copy for the

14   jury and I have binders to provide the jury with

15   that --

16         THE COURT:  Okay.

17         MS. JHONES:  -- with instructions to only turn

18   at this point to the first transcript in that binder,

19   if that's okay.

20         THE COURT:  Okay.  Do you have binders for the

21   Government and for me?

22         MS. JHONES:  I do.

23         THE COURT:  Why don't you show the binder to

24   the Government first.

25         MS. ARANGO:  Judge, may we see this first
```

1    before it's handed to the jury?

2          MS. JHONES:  Your Honor, all of these have

3    been previously provided to the Government.

4          I'd like to hand one to the Court.

5          THE COURT:  Yes.  Give it to the court

6    security officer.

7          MS. ARANGO:  Judge, it appears as though

8    there's other transcripts in this binder that are not

9    in evidence.

10          So I would just ask -- maybe -- maybe it was

11    discussed already and I didn't hear.

12          But I would just ask that the jurors turn to

13    the transcript that is in evidence, because there's --

14    there may be issues with respect to other transcripts.

15          MS. JHONES:  That's exactly what I told the

16    Court initially, your Honor.  As I understand the

17    Court's ruling, we're going to go one by one.

18          THE COURT:  So I don't understand -- how are

19    they marked?

20          MS. JHONES:  Your Honor, actually, the

21    exhibit -- they're marked by the date.  The exhibit

22    number, 89-B, is not reflected on the tab.  I'm going

23    to address it by the date of the call.

24          THE COURT:  You can pass out the binders.

25          Ladies and gentlemen, you may only turn to the

```
 1    tabs that I'm going to tell you to turn to.

 2             Don't open it yet, please.

 3             So which is the --

 4             MS. JHONES:  The first one, your Honor.

 5             THE COURT:  The first one is 89-B?

 6             MS. JHONES:  Yes.

 7             THE COURT:  That is the one without the tab?

 8             MS. JHONES:  Yes.  That is the only one

 9    without a tab, your Honor.

10             THE COURT:  You may turn to the first

11    transcript.

12             It's the October 29th call.  Correct?

13             MS. JHONES:  Correct, your Honor.

14             THE COURT:  Are you playing this?

15             MS. JHONES:  Yes.

16             Before we do, I'd like the ladies and

17    gentlemen of the jury to turn to the second page.  And

18    the clip you will begin at the top, where it says,

19    "What's going on, Aki?"

20             THE COURT:  Okay.

21             MS. JHONES:  Thank you, your Honor.

22             (Whereupon, segments of Government's Exhibit

23    No. 38 were published in open court.)

24    BY MS. JHONES:

25    Q.    Mr. Batiste, I'd like to ask you some questions
```

```
 1    about that clip.
 2            First of all, do you remember this meeting?
 3    A.     Yes, I do.
 4    Q.     Where, again, did this meeting take place?
 5    A.     At a restaurant in North Miami.
 6    Q.     How was it, sir -- how was it that Abbas al-Saidi
 7    met you there at that restaurant?
 8    A.     He had contacted me prior to meeting me at this
 9    restaurant, and I told him where I would be at around
10    this time.
11    Q.     Okay.  And who, if anyone, was with you at that
12    restaurant before Mr. Abbas al-Saidi arrived?
13    A.     I had my wife there.  I had my kids.  And I had
14    Sister Charlene's kids and Brother Lou's kids, who also
15    were members of our group.
16    Q.     What were you doing, sir, prior to the informant
17    showing up?
18    A.     We was all having lunch together.
19    Q.     And why was it, sir, that you agreed to meet with
20    the informant at that particular time?
21    A.     Like I said, once again, according to what he had
22    told me at the meeting at the hotel, after he gave me
23    that phone call asking me where I would be at, he said
24    he had some more info that he wanted to follow up on.
25    Q.     And the info that he had to follow up on
```

N. Batiste - DIRECT - By Ms. Jhones          160

```
 1   pertained to what issue, sir?
 2   A.     Concerning the same issues.
 3   Q.     And specifically, sir, directing your attention
 4   to Page 2 of the transcript, where Abbas al-Saidi says
 5   to you, "Yeah, man.  Trying to survive.  Hey, so I been
 6   calling you, leaving you messages, stuff about go to
 7   pick up the money and sign the papers with them.  Do
 8   that.  Do this.  Tell them okay.  I'm coming -- I'm
 9   going to come, but I'm not going to come alone.
10   Expecting the specs, man.  That's how I'm going to do
11   it.  I want to have," what is your understanding, sir,
12   as to what Mr. al-Saidi was referring to in that
13   paragraph?
14   A.     I understood that he wanted me to come with him.
15   That's why he said that he was not going to come alone
16   when he goes to sign this deal in this negotiation of
17   the final money that's owed to him between him and
18   Faisal and the other gentleman that was involved in it,
19   Mike, the guy that he had knew from New York.
20         And when he says "expecting the specs," that
21   word -- I think he was saying "specs" because sometimes
22   he spoke in broken-up English.  But I understood that
23   to be respect, "Expecting respect, man."
24   Q.     And at the beginning of that paragraph, where he
25   says, "Hey, so I been calling you, leaving you
```

1   messages," what was he referring to, sir?

2   A.    He was referring that he had been calling me

3   prior and trying to leave me messages.

4   Q.    And what response, if any, did you make to -- do

5   you know how many messages -- how many times Abbas

6   al-Saidi had called you?

7   A.    No.  I can't recall.  But I'm sure he called me

8   quite a few times.

9   Q.    And going on in the second paragraph -- or the

10  third paragraph, I should say, on Page 2, in the middle

11  of the paragraph, where it says, "Anyway, I called

12  some -- I called my brother from New York and I have

13  him, you know, being on the line, a call back home.  My

14  father-in-law -- you know, my wife's father is leaving

15  me messages to call him.  I want to call him.  I

16  thought he wasn't going to really come through.  But,

17  Inshallah, he's coming through, you know.  He's got a

18  contact with him.  See what's going on and what

19  missions some -- me had been on and continued further

20  on," what was your understanding as to what Mr. Abbas

21  al-Saidi, Paid Informant No. 1, was telling you when

22  he's talking about "brother from New York,"

23  "father-in-law," "my wife's father"?

24  A.    In addition to him saying that he had a

25  father-in-law back home that would give him money and

1   support and he would use that money to support our

2   group and our organization, he also explained to me

3   that he had family members that stayed in New York as

4   well as friends that he would also give this -- pass

5   this information on to them and see what kind of

6   support that they would be willing to give.

7   Q.    Okay.  Now, when -- going now to Page 3, sir,

8   when he says in the middle of the page, "Now, you know,

9   today's mission to me is go to Faisal and pick up that

10  money so I can start moving and sign the paper with

11  him" and he further states, "And I have -- I have a

12  dead phone, you know, one of the Metro PCS that I can't

13  even contact on.  It's in my bag.  I want to get some

14  numbers out of it," what is your understanding, sir, as

15  to what Mr. Abbas al-Saidi, Paid Informant No. 1, is

16  telling you in that particular paragraph?

17  A.    Okay.  At the very top, when he talks about going

18  back to New York, I'm thinking that he might go back up

19  there to New York to talk to his family and, also,

20  explain his situation, what's going on and what he's

21  trying to do.

22      And at the bottom of the page, when he tells me

23  that he needs to get something out of his bag, he had

24  just stayed prior to this meeting at the Temple and he

25  left a couple of baggage there of his clothing.

1          And there's some items he left in his clothing,

2     like a battery charger, that he needs to go and

3     retrieve and he wants me to take him back over there.

4     Q.     When you say he stayed at the Temple, what are

5     you referring to, sir?

6     A.     I'm talking about the Temple at 6260 -- I'm

7     sorry -- 6260 Northwest 15th Avenue.

8     Q.     And why was Abbas al-Saidi staying at the Temple?

9     A.     Abbas told me that he didn't have a place to stay

10    and he needed to come by and stay there because he was

11    hungry, he wanted to eat and he didn't have a place to

12    stay and he wanted us to help him.

13    Q.     When -- okay.

14          What, if any, personal belongings did the

15    informant have at the Temple location?

16    A.     I don't know, because I didn't search his bags.

17    I felt that it was his personal property.  I wasn't

18    going to go inside of it.  But he was explaining to me

19    that he had a phone cord inside of it.

20    Q.     Did there come a time when you leave the Chinese

21    restaurant?

22    A.     Yes, ma'am.

23    Q.     Okay.

24          MS. JHONES:  At this point I'd like the ladies

25    and gentlemen of the jury to please turn to Page 9.

1          We're going to publish a second clip, which

2    should begin at -- towards the middle of the page,

3    where it says, "NB:  That's the other, like, masjid."

4          Eric, if you could assist me.  Thank you.

5          (Whereupon, segments of Government's Exhibit

6    No. 38 were published in open court.)

7    BY MS. JHONES:

8    Q.    Do you remember that part of the conversation,

9    Mr. Batiste?

10   A.    Yes, ma'am.

11   Q.    Please tell us, where were you and the informant

12   during this particular time in the transcript?

13   A.    I was leaving from North Miami.  I was going

14   southbound on I-95 and I was exiting off around

15   54th Street.

16   Q.    Directing your attention, sir, to Page 10,

17   specifically the middle of the page, where you say at

18   the top of the page, "What does 'Al-Ansar' mean?" and

19   the informant responds to you, sir, what is it that

20   you're asking him?  Why are you asking it?

21   A.    There's an Arabic phrase on top of a masjid

22   that's on 54th and Northwest 7th Avenue.  I always seen

23   the name on this building, but I never knew what it

24   meant.

25          So I was just out of my curiosity -- because

 1    that's what we always had in our group.  We always had

 2    curiosity over information.

 3         And I asked Abbas, "What does this name mean?"

 4    Because I see it says "Al-Ansar masjid."  "Does that

 5    mean 'mosque' or does 'mosque' mean 'masjid' or do they

 6    both have two different meanings?"

 7    Q.    Was it unusual for you to ask these types of

 8    questions of this particular individual, sir?

 9    A.    No, ma'am.  That's the kind of person I am and

10    how the brothers are.  We've always went out and we

11    talked to people of various races and nationalities and

12    cultures.

13         And how we got to know those people in Arab is

14    because those people -- we would ask them questions

15    about their life and their religious beliefs and their

16    interpretations.

17    Q.    Okay.  At the bottom of Page 10, where the

18    informant says, "Oh, man, I remember this area.  I used

19    to work right here at this -- there is one -- one owner

20    of the whole building.  I used to work in the grocery

21    store in this one," what is your understanding, sir, as

22    to what it is that Paid Informant No. 1 is telling you

23    at the bottom of Page 10?

24    A.    Well, once we approached 62nd Street around

25    Northwest 14th Avenue, he's pointing out a corner store

```
 1    and he's letting me know that he used to work at this
 2    store, that he's familiar with this area.
 3    Q.    Did you know this individual when he used to work
 4    at that store?
 5    A.    I didn't know Abbas that well at that time.  But
 6    during the conversation of me learning about him on
 7    6th Avenue, he did tell me that he did work in Liberty
 8    City.
 9         MS. JHONES:  Now, at this point I'd like the
10    ladies and gentlemen of the jury to turn to Page 12.
11         The next clip is going to begin at the top of
12    the page, where Confidential Informant No. 1 states,
13    "Faisal?"
14         Eric, if you could help me.
15         (Whereupon, segments of Government's Exhibit
16    No. 38 were published in open court.)
17         MS. JHONES:  I'm sorry.  I'd like to apologize
18    in advance for the quality of this audio.  It's -- at
19    times, it's a little bit difficult to listen to.
20         Okay, Eric.
21         (Whereupon, segments of Government's Exhibit
22    No. 38 were published in open court.)
23    BY MS. JHONES:
24    Q.    Mr. Batiste --
25    A.    Yes, ma'am.
```

1    Q.      -- first of all, at this point in the

2    conversation, where are you and where is the informant?

3    A.      We are actually inside the Temple.  And he's

4    going through his bag right now.

5    Q.      I'm sorry?

6    A.      He's going through his bag.

7    Q.      Okay.  When the informant says, "I knew you'd

8    like some of this, brother," what is he referring to?

9    What is he showing you?

10   A.      He pulled out a big bag of marijuana.

11   Q.      And when you say a sentence or two down, "No.  I

12   can't," what are you referring to, sir?

13   A.      I had took a hit off of it and then, after that,

14   I -- and he wanted me to take more.

15           I told him, "No.  I can't do that."

16   Q.      Why did you tell him that, sir?

17   A.      Well, the reason why is because, you know, me and

18   the brothers, we were trying to stay away from smoking

19   marijuana.

20           We like smoking marijuana, but we knew that was

21   one of the things that we did not want to incorporate

22   amongst us because it just creates us to be too lazy

23   and, you know, a lot of people look at it as a drug and

24   it's not a good thing.

25           So we wanted to stay much more on the positive

 1   side.  So we was trying our best to avoid the

 2   temptation of smoking weed.

 3   Q.     Okay.

 4          MS. JHONES:  Could you continue, please, Eric.

 5          (Whereupon, segments of Government's Exhibit

 6   No. 38 were published in open court.)

 7   BY MS. JHONES:

 8   Q.     Mr. Batiste, a couple of questions about Page 13.

 9   A.     Yes, ma'am.

10   Q.     When the informant tells you -- well, first of

11   all, what's going on in the middle of the page where it

12   says -- six speakers down, where it says, "CI 1:  Oh,

13   okay.  Now I know.  Thank you, Aki."  And there's noise

14   and phone cords and -- what's going on there, sir, if

15   you recall?

16   A.     I just told him that we got our ironing board and

17   our iron in the other room; and I'm offering it to him

18   so he can iron his clothes if he needs it.

19   Q.     And where the informant begins to talk about "a

20   kid back home who born with new in Koran" and later on,

21   a few speakers down in the same page, he talks about

22   "this kid and what so -- where is that he born reading

23   Koran out of his mind," what is the informant -- what

24   is your understanding as to what the informant is

25   telling you there?

```
 1    A.     He's speaking about the Koran and the religion as
 2    he understands it and some information that he had
 3    about a young child when he went back home who born
 4    with a natural gift to know how to recite Suras, which
 5    is Scriptures out of the Koran, without it ever being
 6    read to him.  And he's letting me know how amazing that
 7    is and that's a good thing.
 8    Q.     Was there anything unusual, sir, about the
 9    informant talking to you about topics such as the
10    Koran, as he's doing right here on Page 13?
11    A.     No, ma'am.  This is how Abbas -- this is a very
12    good example of how Abbas talked about the Koran.  And
13    he mentioned a lot of good things about the Koran at
14    that time to me and prior to him leaving for Yemen, as
15    well as he also talks about politics around the world.
16           This is some of the discussions that --
17           MS. ARANGO:  Objection.  Hearsay.  Outside the
18    scope of the question, Judge.
19           THE COURT:  Wait for a question, sir.
20           Ask your next question.
21           MS. JHONES:  Okay.  I'd like the ladies and
22    gentlemen of the jury to turn to Page 15.
23           The next clip is going to start at -- towards
24    the bottom of the page, three speakers up, where it
25    says, "It's very good."
```

 1              Eric, if you could help me with the next clip.

 2    Thank you.

 3              (Whereupon, segments of Government's Exhibit

 4    No. 38 were published in open court.)

 5    BY MS. JHONES:

 6    Q.    Mr. Batiste, do you recall that part of the

 7    conversation, sir?

 8    A.    Yes, I do.

 9    Q.    Let me ask you some questions starting with

10    Page 15.

11              At the bottom of Page 15, where the informant

12    says, "It's very good.  I mean, if this (indiscernible)

13    in there, you need a lot of work to get it done" and he

14    goes on to make a reference to microphones, what is

15    your understanding, sir, as to what it is -- well,

16    first of all, what is going on at that point in the

17    conversation with the informant?

18    A.    I'm taking him through a little tour through the

19    Temple and I'm showing him an area that used to be like

20    a control room or an office that's right next to the

21    hall of the Temple.

22              And I'm showing him the wiring and how we've

23    already started the wiring for the setup for

24    microphones inside the hall and how it's going -- it's

25    connected to the exterior wall that's on the main

1    street, which is 15th Avenue, which you see on the

2    front view.

3         I'm explaining to him that we're going to set up

4    a speaker outside so people can hear the meetings

5    that's going on inside the Temple, and I'm showing him

6    the different areas where we're going to be placing the

7    microphones.

8    Q.    Okay.  Why is it, sir, that you're giving -- that

9    you're showing this to the informant and talking to him

10   about what your plans are with this place?

11   A.    Well, I was very proud of what -- the opportunity

12   that I had to be able to get this building and doing it

13   for the reasons that I had planned on doing it for, me

14   and the brothers.

15        And Abbas al-Saidi, by him being a friend of ours

16   and how he had befriended us, we thought that he would

17   be excited over the fact that we was doing something

18   good and our vision was finally moving on.

19        So that's why I was more than happy to even show

20   him the plans that we had as far as fixing the building

21   and everything, because I was proud of the work.

22   Q.    And directing your attention, sir, to Page 16,

23   where the informant says -- like four speakers down,

24   where the informant says, "Man, it's very better than

25   with the light on (laughs).  There's a lot big more

1   space out there, brother," what is your understanding,

2   sir, as to what it is that he's referring to?

3   A.    At that point, I thought he was feeling it, that

4   he was saying, "Yeah," you know, "I like this building

5   and I can see it more clearly," because the first time

6   he came we didn't have any lights because of the

7   hurricane.

8           And now, since he's here and the lights is on, he

9   can really see how it really look on the inside.

10  Q.    Okay.  And when you say, sir -- I apologize.

11  Just one moment.

12          When you say in the middle of the page, "That's

13  how -- open the door right here" -- do you see where

14  I'm referring to, sir?

15  A.    Yes, ma'am.

16  Q.    Okay.  What is it that you're referring to there?

17  A.    Well, I'm explaining to him more of the potential

18  that this building has.  I'm showing him that, on the

19  front entrance door, when people come inside the

20  Temple, that they will not be opening up the door

21  swinging outward into the sidewalk.

22          Because the main entrance is right on the

23  sidewalk.  This building is right next to the street.

24  The street is only like about -- I'd say about 8 feet

25  away.  The sidewalk is right there.

1          So instead of somebody walking inside the

2     building and somebody coming behind them and having to

3     walk around them because they're opening the door and

4     the door is swing outwardly, I'm explaining to him that

5     we're going to design the door where it'll be able to

6     swing inwardly.

7     Q.    And, again, what purpose, if any, is there to you

8     giving this explanation to the informant?

9     A.    I'm just letting him know that this building, you

10    know, has potential and the way that we're putting the

11    plan together, it's gonna work out and it's gonna look

12    real nice.

13    Q.    Direct your attention, sir, to the top of

14    Page 17, where the informant says, "I'm hoping from the

15    help that I'm getting from back home it's the only help

16    that is going to make different," what is your

17    understanding, sir, as to what it is that he's

18    referring to?

19    A.    That he's saying -- once again, he's encouraging

20    me that the hope that he's been telling me about, the

21    hope that he wants to be involved with with our

22    organization and the finances that he's going to help

23    bring us is -- he's going to be a part of the

24    difference that we're going to be making.

25    Q.    Okay.  And what, if any, discussions, sir, in

 1   Page 17 and perhaps going on to Page 18 is there about

 2   a restaurant?

 3   A.     That occurs at the bottom of Page 17.

 4   Q.     Okay.  When you say, "'Cause hot food in this

 5   neighborhood is hard to find," why are you making that

 6   statement, sir, at that time?

 7   A.     Because, at this point, I'm explaining him the

 8   restaurant.

 9          If you look at Line 18, he says, "Especially like

10   this restaurant I had is really the restaurant right

11   here."

12          That's the mistake -- what I had pointed out that

13   I felt was a mistake in the translation.

14          And he's speaking of the restaurant that's at

15   6262 Northwest 15th Avenue, which is the building

16   connected to the Temple.

17   Q.     At this point in time, was there a restaurant

18   that was fully functional at that location, sir?

19   A.     No, ma'am.  It was still in the birth state.

20   Q.     Now directing your attention, sir, to Page 17, in

21   the middle of the page, five speakers down, where the

22   informant says, "So if I have to come and stay here for

23   a while, is okay?  I can come?  I can go and come?  I

24   have the brothers on my side to work?" --

25   A.     Yes, ma'am.

1    Q.    -- do you remember that statement, sir?

2    A.    Yes, ma'am.

3    Q.    What is your understanding as to what it is that

4    he is telling you there in that particular point in

5    time in the conversation?

6    A.    That everything that he has observed from us

7    and -- in our understanding, that he knows that he can

8    count on us and that we'll be willing to help, because

9    he knows that we are those type of people.

10   Q.    Okay.  Now, did the informant, in fact, stay at

11   that location in the month of October?

12   A.    Yes, ma'am.

13   Q.    Did he stay in that location in the month of

14   November?

15   A.    Yes, he did.

16   Q.    Directing your attention to the bottom of Page 18

17   and the paragraph that starts with the informant

18   speaking, "I'm not sure, but as soon as I can get some

19   money -- I mean, I want to stay out here, to be honest

20   with you, and get some fighting skills going, get some

21   connection back home.  I'm trying -- trying hard

22   because I have a promise when I was back home that I

23   might get a computer and I might get some connections,

24   good support, you know, which I -- you know, it's

25   keeping me a long way from business right now," what is

```
 1   your understanding, sir, if you have any, as to what it

 2   is that the informant is telling you there?

 3   A.     At that point, during that time, I didn't have

 4   very much of an understanding because he had said so

 5   many things at one time.

 6          So I'm just letting him talk so I can make out

 7   what he's saying to me.

 8   Q.     Okay.  When he goes -- when you say after that,

 9   "Uh-huh" and the informant tells you, "But once I get

10   everything going, man, yeah.  I'm going to get the car,

11   maybe the business.  So you need any kind of support, I

12   could be able to help.  But I can't help myself.  How

13   can I help anybody else?  I been thinking real hard

14   about what we talked about, about jihad" --

15   A.     Yes, ma'am.

16   Q.     -- and you respond, "Right" --

17   A.     Yes, ma'am.

18   Q.     -- do you remember that, sir?

19   A.     Yes, I do.

20   Q.     What is the -- what is your understanding, sir,

21   as to what the informant is telling you in that

22   particular paragraph?

23   A.     He's talking about the good jihad, the good jihad

24   that he had always been mentioning to me even at the

25   store of making a difference and helping other people
```

1    and everything that pertains to those issues.

2    Q.    As it relates to his statement, sir, that, "I'm

3    going to get the car, maybe the business.  So you need

4    any kind of support, I could be able to help" --

5    A.    Yes, ma'am.  When he says that he's going to get

6    a car and maybe the business -- just previously, on

7    Page 18, he was already discussing with me of going

8    50 percent on the restaurant.

9          So he's saying that, once he gets some more,

10   maybe the business -- the restaurant business, that

11   he's looking into the idea of going 50 percent on the

12   restaurant with me.

13   Q.    And, finally, sir, at the bottom of -- towards

14   the bottom of that page, where Mr. al-Saidi says,

15   "Inside of the heart, that's what is most important,

16   like we talked about.  And I don't know, man.  It's a

17   whole lot of progress that we got to go through.  It's

18   not something that we could do one or two day," what is

19   your understanding, sir, as to what it is that he's

20   telling you at that point in the conversation?

21   A.    That he's giving definition to the word "jihad"

22   that he ended at -- ended on this last discussion, what

23   he said in the paragraph in the middle.

24         And he's letting me know -- he's assuring me once

25   again that this is the jihad that he's talking about

 1    that is inside the heart, because he knew that we

 2    always talked about heart-to-heart conversations and

 3    talking about real-life experience that we all go

 4    through and the pains and struggles and coming

 5    together.

 6         So once again he's affirming that what he's

 7    saying is from inside of his heart, that he really

 8    means this for all the reasons of good, moral

 9    principles and good.

10    Q.    What discussions, if any, had you had -- Well,

11    strike that.

12         MS. JHONES:  I'd like the ladies and gentlemen

13    of the jury, please, to turn to Page 20, specifically

14    where it starts, "I'm going to run to the bath."

15         Eric, if I could have your assistance with

16    Clip E.

17         (Whereupon, segments of Government's Exhibit

18    No. 38 were published in open court.)

19         MS. ARANGO:  Judge, I would object to this.

20    This is really irrelevant and not necessary, this

21    portion of the clip.

22         MS. JHONES:  Your Honor, this is in evidence.

23         THE COURT:  Come on up, please.

24         (Whereupon, proceedings were had at side-bar

25    outside the presence of the jury which have been sealed

```
 1    per instructions of the Court.)

 2              (Whereupon, the following proceedings were had

 3    in open court:)

 4              THE COURT:  We're going to take a break.

 5              Do not discuss this case either amongst

 6    yourselves or with anyone else.  Have no contact

 7    whatsoever with anyone associated with the trial.  Do

 8    not read, listen or see anything touching on this

 9    matter in any way.

10              If anyone should try to talk to you about this

11    case, you should immediately instruct them to stop and

12    report it to my staff.

13              You may leave all your materials at your

14    chairs.  Please be back in the jury room in ten

15    minutes.

16              (Whereupon, the jury exited the courtroom at

17    3:57 p.m. and the following proceedings were had:)

18              THE COURT:  You may be seated.

19              Go ahead.  Play the tape.

20              (Whereupon, segments of Government's Exhibit

21    No. 38 were published.)

22              MS. JHONES:  Your Honor, the --

23              THE COURT:  Is that the end of the clip?

24              MS. JHONES:  Yes.  That's it.

25              MR. BLANCO:  Yes, ma'am.
```

```
1              MS. ARANGO:  That's fine.

2              My recollection -- maybe there's a portion of

3    it that's cut out.  But I had a distinct

4    recollection -- and so did Mr. Gregorie -- of, you

5    know, him....

6              THE COURT:  Okay.  We're in recess for ten.

7              (Thereupon a recess was taken, after which the

8    following proceedings were had:)

9              THE COURT:  We're back on United States of

10   America versus Narseal Batiste, et al., Case

11   No. 06-20373.

12             Counsel, state your appearances, please, for

13   the record.

14             MR. GREGORIE:  Richard Gregorie and Jacqueline

15   Arango on behalf of the United States, your Honor.

16             MS. JHONES:  Ana Jhones on behalf of Narseal

17   Batiste, who is present.

18             MR. LEVIN:  Albert Levin on behalf of Patrick

19   Abraham, who's present.

20             MR. CASUSO:  Lou Casuso on behalf of Burson

21   Augustin, who's present.

22             MR. CLARK:  Nathan Clark for Rotschild

23   Augustine, who is present.

24             MR. HOULIHAN:  Richard Houlihan with Naudimar

25   Herrera.
```

```
 1              MR. VEREEN:  Roderick Vereen on behalf of

 2   Stanley Phanor, who's present.

 3              THE COURT:  All Defendants are present.

 4              Mr. Batiste, you can take the stand.

 5              Let's bring the jurors in.

 6              (Whereupon, the jury entered the courtroom at

 7   4:19 p.m. and the following proceedings were had:)

 8              THE COURT:  You may be seated.

 9              You are still under oath, sir.

10              You may proceed, Ms. Jones.

11          MS. JHONES:  Thank you, your Honor.

12              Let me just ask a question of Eric, if I may,

13   your Honor.

14              (Discussion had off the record the between

15   counsel and Mr. Blanco.)

16          MS. JHONES:  We're just trying to pick up

17   where we left off, your Honor.

18              THE COURT:  Okay.

19          MS. JHONES:  Ladies and gentlemen, we're back

20   on Page 20, specifically, in the middle of the page,

21   where there is noise around with no conversation, "The

22   general of the Moor."

23              Could you start, Eric, please.

24              (Whereupon, segments of Government's Exhibit

25   No. 38 were published in open court.)
```

```
 1   BY MS. JHONES:

 2   Q.    Mr. Batiste, directing your attention to the

 3   bottom of Page 20 and the top of Page 21, what is the

 4   informant doing there, please?

 5   A.    Before he left out to go use the rest room, he

 6   seen a pamphlet called "The Moorish Paradigm" sitting

 7   on the table.

 8         He asked me could he read it.

 9         And I told him, "Yeah, you can," because it had

10   information that consisted of the Moors.

11         MS. JHONES:  Eric, let's go on with the

12   following clip, which continues on the same page.

13         (Whereupon, segments of Government's Exhibit

14   No. 38 were published in open court.)

15   BY MS. JHONES:

16   Q.    Mr. Batiste, do you remember those pages, that

17   portion of the conversation that we just heard?

18   A.    Yes, ma'am.

19   Q.    Let me ask you a few questions about it.

20         First of all, sir, when the informant says on

21   Page 21, in the middle of the page, "Sorry to desert

22   you, man.  Yeah.  I'm ready.  Can I fax this back home?

23   I want to show somebody that would know more about it,"

24   do you know what he's talking about, sir?

25   A.    Yes, ma'am.
```

1    Q.      And what is he talking about?

2    A.      "Sorry to desert you" means that he had just went

3    over to me and shrugged me to wake me up because I was

4    between asleep and awake.

5            And asked him was he ready.

6            After that, he showed me the document and he

7    said, "This document I want to fax back home."

8            I'm thinking that he's talking about his family

9    and his father-in-law.

10   Q.      And when -- he says to you, sir, in the bottom of

11   Page 21, "Look, I called Mike at the store.  He telling

12   me that, after I left, Faisal started calling him,

13   speaking to him about meeting me, but he wants to take

14   me to a lawyer.  I don't know what kind of stuff that

15   he wants to do."

16           Now I'm reading at the top of Page 22:  "I don't

17   want to let him know that I'm here.  If you ever see

18   Mike or Faisal and they ask you if I'm here, no.  I

19   don't want them to know that this is my base.

20           "Here is (indiscernible) with you I can stay

21   safe.  One of my missions from back home is that I have

22   to stay safe, you know.  I can't let everybody know --

23   knows where I am exactly.

24           "When I meet with Faisal, I'm going to meet with

25   him at the mosque or anywhere else where he don't find

 1   out exactly where I stay.

 2        "Now I'm going to try to fax this back home so I

 3   could get money to move around.  Tell them, listen, I'm

 4   not wasting no time, I'm moving and doing things."

 5        And you respond, "Uh-huh."

 6        What is going on there, sir, in the bottom of

 7   Page 21 and the top of Page 22?

 8   A.   Okay.  During the time period that I was dozing

 9   off on the couch, he was telling me that he got in

10   contact with Mike, who's the new owner of the store,

11   who I understood to be his cousin, and that they had

12   word back from Faisal that they're going to get a

13   lawyer involved and that Faisal wants to meet him with

14   the lawyer to solve the issue over the money -- the

15   money that Faisal had owed him.

16   Q.   Why would -- why would the informant discuss with

17   you the issue of money that is owed to Abbas al-Saidi

18   by Faisal?

19        MS. ARANGO:  Objection.  Speculative and

20   hearsay.

21        THE COURT:  Sustained.

22        Rephrase your question.

23   BY MS. JHONES:

24   Q.   Do you know, sir, when he -- when he is asking --

25   when he's telling you in the bottom of Page 21 and the

```
 1    top of Page 22, what is your understanding, sir, as to

 2    why it is that he is giving you the status of Faisal

 3    and whether or not to go to a lawyer?

 4    A.    That's the information that he chose to give me

 5    over the fact that -- from I understood, it's that he

 6    wanted my help and my assistance and my advice through

 7    this whole ordeal of going on between him and Faisal

 8    and, in benefit of doing so, he would give me some of

 9    the money that Faisal had owed him.

10    Q.    Now, at this point in the conversation on the

11    bottom of Page 21 and the top of Page 22, what was your

12    understanding as to what Abbas al-Saidi was going to do

13    as it relates to a lawyer?

14              MS. ARANGO:  Judge, this is -- objection.

15    Speculative.

16              THE COURT:  Sustained.

17    BY MS. JHONES:

18    Q.    Do you know, sir?  Do you know, sir, what

19    Mr. Abbas al-Saidi is referring to when he says at the

20    bottom of Page 21, "He wants to take me to a lawyer"?

21    Do you know what he's referring to?

22    A.    Yes, ma'am.

23    Q.    What is he referring to, sir?

24    A.    He's referring to the proposition that Faisal and

25    Mike is making to him about taking the issue to a
```

1    lawyer, getting the document signed of how much was

2    owed and how much is going to be paid to him.

3    Q.      What is your understanding as to what's going to

4    happen when money is paid to Abbas al-Saidi?

5    A.      That out of that money, if I -- since I've been

6    advising him and helping him on this situation, that he

7    would take some of this money and he would donate it to

8    the organization.

9    Q.      Okay.  Now, further on down on Page 22, when the

10   informant says, "To see what -- what can they learn

11   from this, more than what I did, try to explain to them

12   what I got in mind.  Like I told you, man, that's why I

13   want to, you know, give them some information and push

14   it, so I can send you some money.  But I really need it

15   and I don't want to go through Faisal to get it because

16   that money that I'm getting from Faisal is only some of

17   the debt I'm going to keep here.  The rest of it, I'm

18   going to pay the airline ticket and the hotel that has

19   to go to" -- what is your understanding, sir, first of

20   all, when he tells you in the middle of the page about

21   what it is that he wants to -- when he's referring to

22   "what can they learn from this" and further on down,

23   when he says, "give them information so I could send

24   you some money"?

25   A.      First of all, Abbas explained to me, once his

```
 1   family back home found out that he was doing something

 2   positive over here in the United States and that he was

 3   helping people do -- an organization like ours who was

 4   open to Muslims -- Arabic Muslims, that they would be

 5   happy for him and that they would support him and

 6   then, if I would give them the information of our

 7   organization, that they would actually send a large

 8   amount of money to assist him and, in turn, he would

 9   take this money and he would assist us.

10          And that's what he means in the middle of

11   Page 22, "If I give them this Moorish Paradigm and they

12   finally see that I have an organization that I am

13   working with and that I'm a part of and they need this

14   information, that they're gonna give me money."

15          That's what he's explaining right here when he

16   says "so I can get money to move around."

17          And then he goes further on and explains about

18   the situation with Faisal, that, really, he doesn't

19   really want to use that money to give to us, but he

20   would rather prefer to get the money from back home.

21   Q.     And when he says "money from back home," sir,

22   what is your understanding as to what he's referring

23   to?

24   A.     His understanding -- my understanding was the

25   ties that he has between him and his father-in-law.
```

```
 1   Q.     Okay.

 2          MS. JHONES:  If I may just have a moment to

 3   retrieve an exhibit, your Honor.

 4          May I have the ELMO for just a couple of

 5   minutes, your Honor?

 6          THE COURT:  Yes.

 7   BY MS. JHONES:

 8   Q.    Mr. Batiste, I'm going to show you Government's

 9   Exhibit 99, the front page.

10          Do you recognize that, sir?

11   A.     Yes, ma'am.

12   Q.     What does this document have to do, if anything,

13   with what Abbas al-Saidi was reading in that portion of

14   the clip that was just played?

15   A.     This is the document that Abbas picked up off the

16   table in its entirety and he took to the bathroom, and

17   what he was reading out of was some of the pages that's

18   contained inside this document.

19   Q.     Who requested that this document be sent back

20   home?

21   A.     Abbas did.

22   Q.     What request, if any, did you make as it relates

23   to this document?

24   A.     I didn't make any requests.

25   Q.     At the end of this conversation on 10-29,
```

1    Mr. Batiste, what -- how did you and -- how did Abbas

2    al-Saidi leave things with you in terms of where he was

3    going to stay?

4    A.    Abbas had plans to come back to the Temple and

5    staying overnight.  That's what he was talking about at

6    the end of Page 22.

7    Q.    And -- go ahead.

8    A.    In the last sentence of the paragraph, he says,

9    "I don't know when -- when exactly I'm going to do it,

10   but sometime today I'll be back here --"

11        He starts at the top of Page 23, "-- I'll be back

12   here and stay with you overnight."

13   Q.    Okay.

14   A.    The dashes I believe to be the word "night."

15   Q.    Okay.  Now, Mr. Batiste, did you drive Mr. Abbas

16   al-Saidi anywhere at the conclusion of this meeting?

17   A.    Yes, ma'am.  According to what he told me, that

18   he wanted to try to meet Faisal at the masjid that I

19   had just pointed out to him on the way going to the

20   table called Al-Ansar.  So he asked me to drop him off

21   over there in the front entrance.

22   Q.    And did you do that?

23   A.    Yes, ma'am.

24        MS. JHONES:  Your Honor, I'd like, if I may,

25   the ELMO once again so I can publish an exhibit that's

 1    in evidence.

 2              THE COURT:  It's still on.

 3              MS. JHONES:  Thank you.

 4    BY MS. JHONES:

 5    Q.    Mr. Batiste, I'm going to show you a document

 6    that's in evidence.  It's Government's Exhibit 3-A.

 7    I'm going to show you the front of the page.

 8          And tell me if you recognize it.  Okay?

 9    A.    Yes.

10          Yes, I do.

11    Q.    And what is the -- what is this document, please?

12    A.    This is a conversation that me and Abbas had on

13    October 31st of 2005.

14    Q.    When -- first of all, was this in person or was

15    it over the phone?

16    A.    This was over the phone.

17    Q.    Who called who?

18    A.    Abbas al-Saidi called me.

19    Q.    Now, Mr. Batiste, how much time after the

20    October 29th meet did this telephone call occur?

21    A.    I'd say it was about a day and a half.

22    Q.    Where was Abbas al-Saidi staying, if you know, as

23    of October 31st of 2005?

24    A.    Well, it appeared to me that he was staying back

25    at the hotel, at the Holiday Inn in North Miami.

1    Q.     What, if anything, changed from October 29th to

2    October 31st in terms of his living arrangements?

3    A.     Well, he had went back to the hotel to stay.

4    That's as far as what I understood.

5    Q.     And so did he, in fact, stay at the hotel on the

6    30th -- I'm sorry.  Strike that.

7           Did he stay at the Embassy on the 30th?

8    A.     No, ma'am.

9    Q.     Directing your attention to Page 2 of this

10   transcript, when the informant tells you, "Al-hamdu

11   li-llah, I'm on my way to finish up with Faisal and

12   make sure everything goes like he promised me to" and

13   you say, "Okay," what is your understanding as to what

14   it is that he's referring to?

15   A.     That after I dropped him off at the masjid called

16   Al-Ansar, that there was a meeting that, in fact, took

17   place between him and Faisal and --

18           MS. ARANGO:  Objection.  Hearsay.

19           MS. JHONES:  Your Honor, as to our previous --

20   our previous discussion regarding 801(c).

21           THE COURT:  Sustained.

22           You have to lay your predicate.

23   BY MS. JHONES:

24   Q.     Based on your discussions with Abbas al-Saidi on

25   10-29, the conversation we just heard -- we just played

1    for the jury and -- what is being told to you by Abbas

2    al-Saidi in this conversation in 10-31?  What is your

3    understanding, sir, as to what it is that he's

4    referring to when he says "everything goes like he

5    promised me to"?

6    A.    That him and Faisal have an attorney that's gonna

7    draw up a legal document that's gonna resolve the

8    friction between both of them concerning any monies

9    that is owed to Abbas al-Saidi, that this is in the

10   progress of being worked out as of him meeting him on

11   the 29th.

12   Q.    Okay.  And directing your attention to the bottom

13   of this transcript -- let me see if I can highlight it

14   or focus in on it a little bit better -- where the

15   informant says, "Okay.  I was wondering if we're -- if

16   you could gather the soldiers because you know I got a

17   little situation we could speak about today that I just

18   received from back home," do you remember that, sir?

19   A.    Yes, I do.

20   Q.    Okay.  And turning again to the top of Page 3

21   from the same exhibit, Government's Exhibit 39-A,

22   "Okay.  Well, they -- they not gonna be by until the

23   evening time, around 7:00.  We're gonna have a big

24   meeting tonight," what is your understanding, sir --

25   did you have an understanding of what Abbas al-Saidi

 1    was referring to when he said at the bottom of

 2    Government's Exhibit 39-A, "I got a little situation we

 3    can speak about today that I just received from back

 4    home"?

 5    A.    Yes, ma'am.

 6    Q.    What was your understanding, sir?

 7    A.    My understanding was the conversation that we had

 8    talked about on October the 29th was that, once he get

 9    back in touch with his father-in-law, that the money

10    would be on the way that he said that he was looking

11    forward to receiving.

12         So when he calls me up and he says, "I have a

13    little situation I need to speak to you about," about

14    the information from back home, I'm thinking that the

15    response was positive and that everything's okay and

16    that this money that he was talking about that he

17    wanted to give me, this is what he's calling me by --

18    to speak to me about and I need to go talk to him in

19    person.

20    Q.    Okay.  And you say to the informant, now

21    directing your attention to Page 3 of the transcript,

22    "Yeah.  Hey, so -- so it's sounding good when you talk

23    to your people from back home, huh?"

24         "Yes.  Yes, sir.  I know I told that brother.  I

25    depend on Muslims and I know always come through."

1        And you say, "That's right."

2        What is your understanding, sir, as to what he's

3   referring to there?

4   A.    Well, I made that statement in case there's any

5   second-guessing going on on my part that I'm correct

6   that this is the issue that he's talking about.

7        I'm hinting towards it to see if I can get him to

8   tell me even before I get there that, "Yes.  It's good.

9   I got it."

10  Q.    When you say "got it," what are you referring to,

11  sir?

12  A.    The money and the finances that he talked about

13  that he was going to be receiving.

14  Q.    Now, after that phone call, sir, where did you

15  go, if you remember?

16  A.    I picked some of the brothers up and then, after

17  that, we went to the hotel where he was at, at the

18  Holiday Inn.

19  Q.    And what happened at the hotel?

20  A.    I got it out the van and I asked him what was

21  going on.

22       And I asked him do we want to go up to his room

23  and talk.

24       He said, no, that he was checking out and that he

25  had to speak to me about a few issues concerning Faisal

```
 1    again, that he wanted me to go over to the store
 2    unexpectedly --
 3               MS. ARANGO:  Objection.  Hearsay.
 4               DEFENDANT BATISTE:  -- and talk to Faisal --
 5               THE COURT:  Sustained.
 6    BY MS. JHONES:
 7    Q.    When you went to the hotel, sir, what was your
 8    understanding as to -- as a result of going to the
 9    hotel and speaking to Abbas al-Saidi, what, if any --
10    did you -- your previous understanding change in any
11    way?
12    A.    Yes, ma'am.
13    Q.    And how did it change?
14    A.    I expected Abbas to be talking about the
15    information he received back home.  But, instead, he
16    started talking more about the Faisal issue.  He was
17    asking me to go to the store with him and be present
18    with him when we talk to Mike.
19               MS. ARANGO:  Objection.  Hearsay.
20               MS. JHONES:  Again, your Honor, I don't want
21    to lodge a speaking objection.  But relying on the case
22    law previously cited to the Court.
23               THE COURT:  Overruled.
24    BY MS. JHONES:
25    Q.    I'm sorry, Mr. Batiste.
```

1          Could you tell us again --

2              THE COURT:  He answered the question.

3              Go ahead.

4              MS. JHONES:  Okay.

5     BY MS. JHONES:

6     Q.    As a result of what Abbas al-Saidi told you,

7     where, if anyplace, did you go?

8     A.    I wound up taking Abbas to the store on

9     Northeast 6th Avenue and 147th Street.

10    Q.    When you did that, sir, what was it that -- why

11    did you do that, actually?  First of all, why did you

12    do that?

13    A.    Because he asked me once again -- he asked me for

14    my moral support and my advice and --

15             MS. ARANGO:  Objection.  Hearsay.

16             THE COURT:  Sustained.

17    BY MS. JHONES:

18    Q.    As a result of what Abbas al-Saidi asked you to

19    do, sir, did you, in fact, go to the store?

20             MS. ARANGO:  Objection.  Leading and hearsay.

21             THE COURT:  Sustained.

22             Rephrase your question.

23    BY MS. JHONES:

24    Q.    What happened as a result of what Abbas al-Saidi

25    told you?

 1   A.    I decided to accompany Abbas to the store because

 2   I felt that I could help him in his situation because I

 3   knew my face was respected around North Miami.

 4         And I thought that Abbas felt that, if I did go

 5   with him, that the people over there -- Mike, his

 6   cousin, who owns the store now, and Faisal -- would

 7   respect him more and his decision of him wanting to get

 8   paid and get a lawyer.

 9   Q.    Okay.  And what was -- what was your

10   understanding, sir, as to what role you were to play

11   there at that store?

12   A.    He just wanted me to be present and possibly --

13          MS. ARANGO:  Objection.  Hearsay, Judge.

14          THE COURT:  Sustained.

15          MS. JHONES:  I'm asking him, your Honor, what

16   his understanding was, based on his discussions --

17          THE COURT:  Sustained.

18   BY MS. JHONES:

19   Q.    Sir, what was your purpose in going to that

20   store?

21   A.    I was just gonna go and listen in to the

22   conversation between him -- between Abbas and Mike and,

23   possibly, if Faisal was there, if they would have

24   invited me into the conversation.  Otherwise, I would

25   have just stood off to the side and -- off away from

```
 1   them while they were talking.

 2   Q.    Okay.  Now, what, if anything, were you

 3   expecting -- or what, if anything, were you expecting

 4   to receive as a result of going to the store?

 5   A.    Well, I knew if Abbas was -- once he had

 6   rectified this deal between him and Faisal, that he was

 7   gonna give me financial support, as well as, once

 8   again, it was still on the back burner over his

 9   connections that he had going on with him and his

10   father-in-law.

11   Q.    After the meeting in the store -- do you remember

12   the date of that meeting in the store?

13   A.    That happened right after this discussion on

14   October the 31st.

15   Q.    After that meeting in the store, did you, in

16   fact, receive any financial assistance from Mr. Abbas?

17   A.    No, I didn't.

18   Q.    Did you have any discussion with Mr. Abbas after

19   October 31st of 2005?

20   A.    Yes, ma'am.

21        MS. JHONES:  I'm sorry, your Honor.  I just

22   need a moment to find a document.

23   BY MS. JHONES:

24   Q.    Mr. Batiste, did you receive any communication

25   from Mr. al-Saidi, the paid informant, after
```

1  October 31st?

2  A.     Yes, I did.

3  Q.     Do you remember when it was that you received

4  communication from him?

5  A.     That very same day, he came to stay by the Temple

6  again.

7  Q.     When you say "he came to stay by the Temple,"

8  what do you mean by that?

9  A.     That he had his luggages with him, the bags that

10 he did take with him, and he still had his other

11 luggage at the Temple.  He never took that luggage with

12 him.  He just brought the rest of the stuff along with

13 us and he stayed overnight.

14 Q.     And during the time period that you stayed --

15 that he stayed there, did you have any discussions with

16 him?

17 A.     Yes, we did.

18 Q.     Now, how long, approximately, did Paid Informant

19 No. 1 stay at the Temple?

20 A.     I'd say it was approximately about four days.

21 Q.     Did there come a time, sir, when the informant

22 left the Temple?

23 A.     Yes, he did.

24 Q.     Do you recall when that was?

25 A.     It's possibly sometime around November the 3rd.

1    Q.     I'm sorry?

2    A.     Around November the 3rd.

3    Q.     When the informant left the Temple, did he

4    continue to call you?

5    A.     Yes, he did.

6    Q.     Give us a sense, sir, as to how often this

7    individual would, if at all, call you.

8    A.     I would say, between October and November and

9    December, he called me at least 45 times.

10   Q.     I'm sorry.

11          He called you --

12   A.     At least 45 times.

13   Q.     Okay.  Now, Mr. Batiste, did there come a time

14   where you had a telephone conversation with the

15   informant in the early part of November, after he left

16   the Temple?

17   A.     Yes, ma'am.

18   Q.     Do you remember what day that would have been?

19   A.     That day was on November the 6th.  He had given

20   me a call.

21          MS. JHONES:  Your Honor, at this time I'd like

22   to -- actually, let me just lay a foundation first, if

23   I may.

24          MS. ARANGO:  May I have a moment, Judge?

25          I'm trying to decide if this disc is in

```
 1   evidence already.

 2            MS. JHONES:  That is not in evidence as of

 3   yet.

 4            MS. ARANGO:  Judge, may I just have a moment

 5   just to check what's in evidence?

 6            Because if this is in evidence, I don't have a

 7   problem.  But if this is not in evidence, I would

 8   object on hearsay grounds.

 9            MS. JHONES:  It's not in evidence.  This is a

10   call that I'm seeking to introduce into evidence.

11            THE COURT:  I think we're going to break for

12   the day.

13            Do not discuss this case either amongst

14   yourselves or with anyone else.  Have no contact

15   whatsoever with anyone associated with the trial.  Do

16   not read, listen or see anything touching on this

17   matter in any way.

18            If anyone should try to talk to you about this

19   case, you should immediately instruct them to stop and

20   report it to my staff.

21            You may leave your binders at your chairs.

22   Please give your notebooks to the court security

23   officer.

24            Have a nice evening.  I'll see you tomorrow

25   morning, 9:00.
```

```
 1              (Whereupon, the jury exited the courtroom at

 2    4:59 p.m. and the following proceedings were had:)

 3              THE COURT:  You may step down, sir.

 4              (Witness excused.)

 5              THE COURT:  You may be seated.

 6              MS. ARANGO:  Judge, may I just ask if

 7    Government's Exhibit 40 was introduced into evidence?

 8              THE COURT:  Yes.

 9              Yes.  Government's Exhibit 40 is in evidence.

10              MS. JHONES:  Your Honor, Government's

11    Exhibit 40 may actually be the same as Defense

12    Exhibit 80-A.  I have a transcript.  Apparently, there

13    is no transcript in evidence.

14              But this may be a similar situation as -- I

15    believe it's 38 -- Government's Exhibit 38, for

16    which --

17              THE COURT:  It doesn't look like there's a

18    transcript that was admitted.

19              MR. GREGORIE:  That's correct.  I played it

20    without the transcript, your Honor.

21              MS. JHONES:  I think I actually do recall now

22    that, yes, I did inquire of the informant as to this

23    transcript.

24              MR. GREGORIE:  Right.

25              I think you marked a transcript and used it to
```

1    cross-examine him with.

2             MS. JHONES:  I believe I did.  I believe

3    Mr. Gregorie is correct.

4             So the --

5             THE COURT:  Hold on.

6             I don't have any.

7             MS. JHONES:  I'm sorry, your Honor?

8             THE COURT:  I don't have any transcript being

9    identified by Mr. al-Saidi.

10            One moment.

11            I don't have any transcript marked.  I don't

12   see it on my list.  I have Assaad having identified a

13   number of transcripts.

14            This is November 6th.  Right?

15            MR. GREGORIE:  Yes, your Honor.

16            I know he testified and played that tape.  The

17   tape was played while Abbas was on the stand, your

18   Honor.

19            THE COURT:  Yeah.

20            It may have been played, but I don't have any

21   transcript being identified.

22            MS. ARANGO:  Yeah.  I think, Judge -- my notes

23   indicate that there was a transcript.  But I agree with

24   you.  I don't think it was identified with a particular

25   exhibit number.

204

```
1            But I have written down under the cross of

2    al-Saidi by Ana Jhones a reference to a November 6th

3    phone call and a transcript that she showed him on

4    cross.

5            THE COURT:  I don't have anything marked.

6            Is there an objection to this transcript?

7            MS. ARANGO:  No.  As long as it's a transcript

8    of that same phone call that's in evidence, I don't

9    have a problem with that.

10           THE COURT:  Okay.  If there's nothing further,

11   we're in recess until tomorrow morning, 9:00.

12           MR. VEREEN:  Your Honor, I do have one matter.

13           Stanley Phanor has advised me that his

14   god-sister passed and she's having a funeral -- they're

15   having the funeral for her this Saturday.

16           If I prepare a motion, would the Court address

17   it?

18           THE COURT:  Yes.

19           MR. VEREEN:  Okay.  Thank you.

20           THE COURT:  We're in recess until tomorrow

21   morning, 9:00.

22           (End of proceedings.)

23

24

25
```

1                    C E R T I F I C A T E

2

3          I hereby certify that the foregoing is an

4    accurate transcription of the proceedings in the

5    above-entitled matter.

6

7

8    _____        /s/Lisa Edwards_____
         DATE             LISA EDWARDS, CRR, RMR
9                         Official United States Court Reporter
                          400 North Miami Avenue, Twelfth Floor
10                        Miami, Florida 33128
                          (305) 523-5499
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25