```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                        MIAMI DIVISION
               CASE NO. 06-20373-CRIMINAL-LENARD
 3

 4   UNITED STATES OF AMERICA,        Miami, Florida

 5               Plaintiff,           April 1, 2009

 6         vs.                        9:25 a.m. to 5:41 p.m.

 7   NARSEAL BATISTE, et al.,         Volume XXXIII

 8               Defendants.          Pages 1 to 146
     ------------------------------------------------------
 9

10                          JURY TRIAL
11          BEFORE THE HONORABLE JOAN A. LENARD,
                 UNITED STATES DISTRICT JUDGE
12

13

14   APPEARANCES:

15

16   FOR THE GOVERNMENT:     RICHARD D. GREGORIE, ESQ., and
                             JACQUELINE M. ARANGO, ESQ.
17                           ASSISTANT UNITED STATES ATTORNEYS
                             99 Northeast Fourth Street
18                           Miami, Florida 33132

19
     FOR THE DEFENDANT       ANA MARIA JHONES, ESQ.
20     NARSEAL BATISTE:      300 Seville Avenue, Suite 210
                             Coral Gables, Florida 33134
21

22   FOR THE DEFENDANT       ALBERT Z. LEVIN, ESQ.
       PATRICK ABRAHAM:      261 Northeast First Street
23                           Sixth Floor
                             Miami, Florida 33132
24

25
```

```
 1    FOR THE DEFENDANT      RODERICK D. VEREEN, ESQ.
        STANLEY PHANOR:      BRINKLEY, HENRYS & LEWIS
 2                           4770 Biscayne Boulevard
                             Suite 1200
 3                           Miami, Florida 33131

 4
      FOR THE DEFENDANT      RICHARD K. HOULIHAN, ESQ.
 5      NAUDIMAR HERRERA:    300 Aragon Avenue
                             Coral Gables, Florida 33134
 6

 7    FOR THE DEFENDANT      LOUIS CASUSO, ESQ.
        BURSON AUGUSTIN:     111 Northeast First Street
 8                           Suite 603
                             Miami, Florida 33132
 9

10    FOR THE DEFENDANT      NATHAN CLARK, ESQ.
       ROTSCHILD AUGUSTINE:  17639 South Dixie Highway
11                           Miami, Florida 33157

12
      REPORTED BY:           LISA EDWARDS, CRR, RMR
13                           Official Court Reporter
                             400 North Miami Avenue
14                           Twelfth Floor
                             Miami, Florida 33128
15                           (305) 523-5499

16

17

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X

 2

 3                                Direct    Cross    Red.

 4
     WITNESSES FOR THE DEFENDANT BATISTE:
 5

 6   Narseal Batiste                    5

 7


 8

 9   EXHIBITS RECEIVED IN EVIDENCE:             PAGE

10   Defendant Batiste's Exhibit No. 80-B        7
     Defendant Batiste's Exhibit Nos. 81-A,
11     81-B-1, 81-B-2, 82-A & 82-B             17
     Defendant Batiste's Exhibit Nos. 83-A
12     & 83-B                                  59
     Defendant Batiste's Exhibit Nos. 84-A,
13     84-B-1 & 84-B-2                         73

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURT:  Good morning.

 2              United States of America versus Narseal

 3    Batiste, et al., Case No. 06-20373.

 4              Counsel, state your appearances, please, for

 5    the record.

 6              MR. GREGORIE:  Good morning, your Honor.

 7              Richard Gregorie and Jacqueline Arango on

 8    behalf of the United States.

 9              MS. JHONES:  Ana Jhones on behalf of Narseal

10    Batiste, who is present.

11              MR. LEVIN:  Albert Levin on behalf of Patrick

12    Abraham, who's present.

13              MR. CASUSO:  Good morning, your Honor.

14              Lou Casuso on behalf of Burson Augustin, who's

15    present.

16              MR. CLARK:  Good morning, your Honor.

17              Nathan Clark on behalf of Rotschild Augustine,

18    who's present.

19              MR. HOULIHAN:  Richard Houlihan with Naudimar

20    Herrera.

21              MR. VEREEN:  And Roderick Vereen on behalf of

22    Stanley Phanor, who's present.

23              THE COURT:  All Defendants are present.

24              Are we ready for the jury?

25              MS. JHONES:  Yes.
```

```
1              THE COURT:  Let's bring them in, please.

2              You can take the stand.

3              (Whereupon, the jury entered the courtroom at

4    9:26 a.m. and the following proceedings were had:)

5              THE COURT:  You may be seated.

6              Good morning, ladies and gentlemen.

7              You are still under oath.

8              THE JURY:  Good morning.

9              THE COURT:  You may proceed, Ms. Jhones.

10             MS. JHONES:  Thank you, your Honor.

11             Good morning, ladies and gentlemen.

12             THE JURY:  Good morning.

13                 CONTINUED DIRECT EXAMINATION

14   BY MS. JHONES:

15   Q.    Good morning, Mr. Batiste.

16   A.    Good morning.

17   Q.    Mr. Batiste, when we left off yesterday, we were

18   starting to talk about what was going on in the

19   beginning of November of 2005.

20             Do you remember that, sir?

21   A.    Yes, ma'am, I do.

22   Q.    Okay.  We were about to discuss any communication

23   that you may have had with Abbas al-Saidi, Paid

24   Informant No. 1, on November 6th.

25             Do you remember that?
```

1    A.      That's correct.

2    Q.      And did you, in fact, have any contact with Abbas

3    al-Saidi on November 6th?

4    A.      Yes, I did.  Abbas called me on November the 6th.

5    Q.      Okay.

6            MS. JHONES:  I believe the audio call is in

7    evidence, Government's Exhibit 40.

8            At this time, your Honor, if I may approach

9    the witness to show him Defense Exhibit 80-B?

10           THE COURT:  You may.

11           MS. JHONES:  May I approach the witness, your

12   Honor?

13           THE COURT:  Yes.

14           MS. JHONES:  Thank you.

15   BY MS. JHONES:

16   Q.    Mr. Batiste, I'm going to show you what's in

17   evidence as Government's Exhibit 40.  I'd like for you

18   to please take a look at that.

19         I'm also going to show you Defense Exhibit 80-B

20   for identification and ask you if you recognize that.

21   A.      Yes.  I do recognize this document.

22   Q.      If you could just identify it by the exhibit

23   number, please.

24   A.      Defense Exhibit X80-B.

25   Q.      And have you had a chance to listen to the audio

1    recording that's contained in Government's Exhibit 40?

2    A.    Yes, I have.

3    Q.    And have you been able to compare it to the

4    transcript that is Defense Exhibit 80-B?

5    A.    Yes, I have.

6    Q.    Does Government's Exhibit 40 accurately reflect

7    what's contained in Defense Exhibit 80-B?

8    A.    Yes.

9          MS. JHONES:  At this time, I would move it

10   into evidence.

11         MS. ARANGO:  No objection.

12         THE COURT:  It will be admitted as Defendant

13   Batiste Exhibit 80-B.

14         (Whereupon, Defendant Batiste's Exhibit

15   No. 80-B was entered into evidence.)

16         THE COURT:  You may publish.

17         Is this in the binder?

18         MS. JHONES:  Yes, it is, your Honor.  If I may

19   just verify.  It should be.

20         THE COURT:  This is the November 6th call?

21         MS. JHONES:  Yes.

22         THE COURT:  You may turn to the tab marked

23   November 6th.

24         MS. JHONES:  May we publish, your Honor?

25         THE COURT:  Yes.

```
 1              MS. JHONES:  Thank you.

 2              Eric.

 3              (Whereupon, segments of Government's Exhibit

 4    No. 40 were published in open court.)

 5    BY MS. JHONES:

 6    Q.    Mr. Batiste, let me ask you a few questions about

 7    that call.

 8    A.    Yes, ma'am.

 9    Q.    Approximately what time of day was that call that

10    you received?

11    A.    Around the afternoon.

12    Q.    Could you turn to the first page of Defense

13    Exhibit 80-B and see if that helps you with the time.

14    A.    It says around 10:48 a.m.

15    Q.    Now, Mr. Batiste, at the bottom of Page 1 and the

16    top of Page 2, you're talking to the informant about

17    how busy you are.

18    A.    Yes, ma'am.

19    Q.    Why are you telling him how busy you are?

20    A.    Because I know he's been trying to reach me and I

21    have been busy.  I haven't been returning his phone

22    calls.

23    Q.    Okay.  And when you tell him, sir, that -- when

24    he tells you, I should say, around the middle of Page 2

25    that he was thinking about you and he wants to come
```

```
 1    down to the Embassy and he didn't want to take a chance

 2    in going there and your not being there, what is your

 3    understanding as to what Mr. Abbas al-Saidi is trying

 4    to do?

 5              MS. ARANGO:  Objection.  Speculative.

 6              THE COURT:  Sustained.

 7              Rephrase your question.

 8              MS. JHONES:  Yes, your Honor.

 9    BY MS. JHONES:

10    Q.    When Mr. al-Saidi tells you that he's been -- he

11    wants to come down to the Embassy because he's calling

12    you and you're not answering, sir, what is your

13    understanding as to what it is that Mr. al-Saidi wishes

14    to do?

15              MS. ARANGO:  Same objection, Judge.

16              MS. JHONES:  If he knows, your Honor.

17              THE COURT:  Overruled.

18              THE WITNESS:  He's doing his best to catch up

19    with me.  He wants to inform me of the conversations

20    that he's been having with me previously.

21    BY MS. JHONES:

22    Q.    Okay.  And -- now, what, if any, agreement, sir,

23    do you make with the paid informant on November 6th as

24    to solidifying any meeting plans?

25    A.    I didn't give him a definite answer, will I be at
```

1   the Temple or not.  I told him I'm gonna try to be

2   there, but I'm not sure if I will basically be there.

3   Q.     And why is it that you're not sure as to whether

4   or not you're going to be able to be there?

5   A.     Because I'm busy trying to build a construction

6   company.  I'm trying to earn a living for me and my

7   family, along with working with the brothers.

8   Q.     And when he tells you, sir -- first of all, on

9   Page 3, where the informant advises you that he has an

10  apartment in Miami Beach, towards the middle of the

11  page where he says, "That's good.  Anyway, I got an

12  apartment in Miami Beach" and he goes on further, what

13  knowledge, if any, did you have about where this

14  individual was residing as of November 6th?

15  A.     My understanding was that Abbas didn't have a

16  place as of November the 6th and that possibly he was

17  gonna try to go stay with his cousin back at -- Mike,

18  or he was gonna ask him can he sleep back into the --

19  at the store on Northeast 6th Avenue until he gets his

20  place.

21  Q.     And this apartment that he references on

22  November 3rd, sir:  Was that a place that you were

23  familiar with?

24  A.     November the 6th?

25  Q.     I'm sorry.  November 6th.  Yes.

1    A.      No, ma'am.

2    Q.      And on Page 5, Mr. Batiste, specifically towards

3    the bottom of the page, where the informant says, "I'm

4    trying to gather some money from back home.  You know

5    how it goes.  I'm trying to do the good jobs.  So, you

6    know...." and continuing on on Page 6, where he

7    indicates, "They gave me some money.  I got the

8    apartment."  It's a nice apartment.  "It's a nice step

9    to the front" --

10          THE COURT:  Do you have the wireless up there

11   with you?

12          MS. JHONES:  The wireless?

13          THE COURT:  The wireless microphone.

14          MS. JHONES:  Actually, it's right here next to

15   the exhibits, your Honor.

16          THE COURT:  Okay.

17          MS. JHONES:  Is there some interference?

18          THE COURT:  Yes.  There's a lot of

19   interference going on.

20          MS. JHONES:  I can check the wireless to see

21   if I left it on.  Maybe that's the problem.

22          THE COURT:  That's okay.  Go ahead.

23          MS. ARANGO:  And, Judge, I would just object

24   to the portion where she said "It's a nice apartment."

25   It's not in the transcript.

1              THE COURT:  Sustained.

2              Rephrase your question.

3    BY MS. JHONES:

4    Q.    At the top of Page 6, where the informant said,

5    "They gave me some money.  I got the apartment and

6    that's a nice step to the front.  I'm trying to get,

7    you know, a computer or somewhere where I can get -- I

8    can contact them by, like, writing or e-mails or

9    something like that.  But, Inshallah, it takes time,"

10   what is your understanding, sir, as to what it is that

11   the informant is telling you there?

12   A.    At that time, when he told me -- when Abbas had

13   told me that, I automatically understood that his

14   father-in-law came through for him and gave him money.

15   Q.    And was that something that was of interest to

16   you, sir?

17   A.    Yes, ma'am, it was, because that's what he's been

18   telling me all along, that he's been trying to get

19   money from his father-in-law because they have a close

20   relationship.

21         And I remember him taking the Moorish Paradigm

22   and saying he's gonna get money from his father-in-law

23   once he faxes this over there.

24         So this is the indication to me that the money

25   he's been telling me about is finally landing.

1    Q.    And what -- why would Abbas al-Saidi receiving

2    money from his father-in-law be something that was of

3    interest to you?

4    A.    Because all along Abbas says, once he receives

5    money from back home, that out of this money he would

6    give me something to benefit our program and for me

7    helping him negotiate the deal between him and Faisal.

8    Q.    Okay.  Now, after November 6th, the next day, on

9    November 7th -- Well, strike that.

10          Did you meet with Paid Informant No. 1 in the

11   evening -- on the evening of November 6th?

12   A.    No.

13   Q.    Okay.  How about the next day, November 7th?

14   A.    No, ma'am.

15   Q.    And why did you not, sir?

16   A.    I was too busy.

17   Q.    Now, what, if any, calls did you make to the

18   informant on November 6th to excuse yourself from

19   showing up from meeting with him either on the 6th or

20   the 7th?

21   A.    I didn't make any calls to Abbas on November 6th

22   to excuse myself from meeting him.  Abbas was just a

23   friend of mine that I had met at the store.  Even

24   though we were friends, he was not that valuable in my

25   life at that time.

 1   Q.      Now, when was the next contact, sir, that you

 2   had with Abbas al-Saidi after this phone call on

 3   November 6th?

 4   A.      It would be on November the 7th, while I was

 5   working.   I had a phone call that Abbas was at the

 6   Temple.

 7   Q.      Did you speak directly to him?

 8   A.      No, ma'am.

 9   Q.      When was it that you spoke directly to him after

10   November 6th?

11   A.      I don't exactly recall.   I believe that there was

12   a phone call between me and Abbas on November the 18th.

13   Q.      Okay.   Do you need something to help refresh your

14   recollection?

15   A.      Something to help refresh my recollection would

16   help.

17            MS. JHONES:   May I approach, your Honor?

18            THE COURT:   Yes.

19            MS. JHONES:   Thank you.

20   BY MS. JHONES:

21   Q.      Mr. Batiste, I'm going to show you Defense

22   Exhibit for identification 81-B-1 and 81-B-2.   And if

23   you could, just take a look at this and let me know if

24   that at all refreshes your recollection as to when it

25   was that you next had contact with Abbas al-Saidi.

1   A.      Yes, it does.

2   Q.      Okay.  And when was the next time that contact

3   was had with Abbas al-Saidi, sir?

4   A.      Abbas al-Saidi tried to contact me two days later

5   from November the 7th, which would have been November

6   the 9th.

7   Q.      As of November 9th, sir, did you have a

8   telephone?

9   A.      Yes, I did.

10  Q.      And was your telephone number provided to Abbas

11  al-Saidi?

12  A.      Yes, ma'am.

13  Q.      And do you remember when that occurred?

14  A.      I gave Abbas al-Saidi my business card.  I made

15  all my phone calls off my cell phone.  That's how I

16  operated my business when I first got it started.  And

17  on my business card that I handed him when he was at

18  the store is where my number was at.

19          MS. JHONES:  Your Honor, I'd like to approach

20  the witness and show him another defense exhibit.

21          THE COURT:  Okay.

22          MS. JHONES:  Thank you.

23  BY MS. JHONES:

24  Q.      Mr. Batiste, I'm going to show you Defense

25  Exhibit 81-A for identification.  I'm going to ask you

1    to see if you recognize that.

2    A.      81-A.

3    Q.      First of all, let me ask you this:  Do you recall

4    having -- receiving a telephone call on November 6th?

5    A.      Yes, I do.

6    Q.      Have you listened to that telephone call?

7    A.      Yes, I have.

8    Q.      Looking at Defense Exhibit 81-A, have you

9    listened to the -- have you listened to Defense

10   Exhibit 81-A?

11   A.      This is November the 9th.

12   Q.      Well, have you listened to that exhibit?

13   A.      Yes.

14   Q.      Does the contents of 81-A accurately reflect the

15   contents of 81 -- I'm sorry -- 81-B-1 and 81-B-2?

16   A.      Yes, it does.

17   Q.      Okay.  Do you know if there are any changes in

18   the transcript as a result of you listening to the

19   phone call?

20   A.      As a result of me listening to it?

21   Q.      Yes.

22   A.      Did you make any changes out of it?

23   Q.      Yes.

24   A.      I believe so.  There was some changes that I had

25   made.

1    Q.    As the transcript now is before you, Defense

2    Exhibit 81-B-1 and 81-B-2, is that an accurate

3    depiction of what's contained on the CD?

4    A.    Yes.

5          MS. JHONES:  At this time, your Honor, I'd

6    move into evidence Defense Exhibit 81-A, 81-B-1 and

7    81-B-2.

8          MS. ARANGO:  Objection.  Hearsay and

9    cumulative.

10         THE COURT:  Come on up.

11         (Whereupon, proceedings were had at side-bar

12   outside the presence of the jury which have been sealed

13   per instructions of the Court.)

14         (Whereupon, the following proceedings were had

15   in open court:)

16         THE COURT:  They will be introduced as -- can

17   you give me the numbers, please.

18         MS. JHONES:  Yes, your Honor.

19         Defense Exhibit 81-A and 81-B-1 and -B-2.

20         As it relates to the last exhibit, the 11-10,

21   it's Defense Exhibit 82-A and 82-B.

22         THE COURT:  They will be admitted as Defendant

23   Batiste Exhibits 81-A, 81-B-1, 81-B-2, 82-A and 82-B.

24         (Whereupon, Defendant Batiste Exhibit

25   Nos. 81-A, 81-B-1, 81-B-2, 82-A and 82-B were entered

```
 1    into evidence.)

 2    BY MS. JHONES:

 3    Q.    Mr. Batiste, do you have a transcript in front of

 4    you for 11-9?

 5    A.    Yes, ma'am.

 6    Q.    Okay.

 7          MS. JHONES:  At this time, I'd like to

 8    publish -- well, first of all, I'd like to request that

 9    the ladies and gentlemen of the jury turn to Tab 9,

10    with the Court's permission.

11          THE COURT:  Which one?

12          MS. JHONES:  Tab 11-9-05.

13          THE COURT:  Well, there's two tabs.

14          MS. JHONES:  The first one, your Honor.

15          THE COURT:  Okay.  That's 81-B-1.  Correct?

16          MS. JHONES:  Yes.

17          And the next tab, just for the record, would

18    be 81-B-2.

19          (Whereupon, segments of Defendant Batiste's

20    Exhibit No. 81-A were published in open court.)

21    BY MS. JHONES:

22    Q.    Mr. Batiste, do you recall that voicemail

23    message?

24    A.    Yes, ma'am.

25    Q.    When Mr. Abbas al-Saidi tells you, "Give me a
```

```
 1    call when you get this message," what, if anything, did

 2    you do?

 3    A.    I continued working.  I didn't call him back.

 4    Q.    Okay, sir.  Did this -- had you received

 5    voicemail messages similar to these prior to

 6    November 9th?

 7    A.    Yes, ma'am.

 8    Q.    And when you would receive them, sir, what, if

 9    anything, would you do?

10    A.    I wouldn't respond to those messages.

11    Q.    And why not, sir?

12    A.    Once again, Abbas -- he wasn't that important to

13    me.  And what was most important was that -- is that I

14    operate this construction company and make sure that

15    the guys that were working with me get paid.

16    Q.    What was the status, sir, of the construction

17    company as it relates to the cash flow during this time

18    period?

19    A.    During this time period, I got into a little

20    trouble with an invoice on a jobsite that I had

21    submitted in and I expected the people to pay me on

22    time.

23          And there was -- there was a discrepancy between

24    me and the jobsite manager.  So they were holding back

25    my funds.  And I had used up a lot of the money to get
```

N. Batiste - DIRECT - By Ms. Jhones            20

```
 1    the production so I could produce this kind of invoice

 2    and, also, on the material costs.

 3         So it was like material costs and labor costs, I

 4    was behind on them.  So I owed the guys money, and I

 5    owed a couple of credit companies that had loaned me

 6    materials.

 7         And, plus, the money that I had from other

 8    jobsites, I took the profit off -- that I made on those

 9    jobsites and I invested it into one jobsite that I was

10    trying to submit this invoice on.

11  Q.    Okay.

12         MS. JHONES:  At this time, your Honor, I'd

13    like to publish Defense Exhibit 81-A.

14         And with the Court's permission, I'd ask the

15    ladies and gentlemen of the jury to turn to the second

16    tab for 11-9-05.

17         THE COURT:  You may turn to the second tab

18    marked 11-9-05.

19         (Whereupon, segments of Defendant Batiste's

20    Exhibit No. 81-A were published in open court.)

21  BY MS. JHONES:

22  Q.    Do you remember this call, Mr. Batiste?

23  A.    Yes, I do.

24  Q.    Let me ask you a couple of questions before I get

25    into this phone call.
```

1        What, if any, discussions had you had with

2   Mr. Abbas al-Saidi prior -- on November 9th or prior to

3   November 9th regarding any plan to blow up the Sears

4   Tower?

5   A.    I didn't have no plan with Abbas al-Saidi about

6   blowing up the Sears Tower.

7   Q.    What, if any, discussions had you had with

8   Mr. Abbas al-Saidi prior to this phone call regarding

9   any acts of violence that you were planning against the

10  United States?

11  A.    That did not exist.

12  Q.    Directing your attention, sir, to this phone

13  call, when the informant says at the first page, "I was

14  waiting for you Monday night at the -- at the Temple,"

15  do you know what he was referring to, sir?

16  A.    Yes, ma'am.  He was -- Abbas was responding to me

17  like -- as though we had a definite agreement that I

18  was gonna meet him at the Temple on November the 7th.

19        And I'm just listening to him, but I didn't want

20  to be rude to him at the same time because we didn't

21  have a definite agreement, because I told him I was not

22  sure I was gonna be there.

23  Q.    And when you tell the informant that you're under

24  a lot of stress, you've got a lot of stress right now,

25  sir, on Page 2, what are you referring to?

```
 1    A.     I'm referring to exactly what I had just

 2    explained, that I had run into some problems on an

 3    invoice at one of the -- one of the jobsites that I had

 4    and I was behind on payroll.

 5    Q.     Why were you telling the informant this, sir?

 6    A.     Because I knew he had been trying to call me

 7    previously and he has not been reaching me.  And, also,

 8    I'm just letting him know that, you know, "I'm busy

 9    right now and I'm going through a lot of things" and

10    I'm trying to give him the hint so he can understand

11    that -- you know, "Quit trying to call me all the time

12    and quit trying to get me to hook up with you because

13    I'm going through a lot."

14    Q.     When the informant tells you that he's going to

15    New York and he's -- when he mentions this on Page 2

16    and again on Page -- on the top of Page 4 -- when he

17    says, "A few minutes because I'm going to New York and

18    there are some brothers there that I can speak to,

19    also, besides back home," sir, what is your

20    understanding as to what he's telling you there when

21    he's referring to brothers in New York and also back

22    home?

23    A.     That he's still got in mind that he's trying to

24    seek finances and, when he goes to New York, that's

25    gonna be one of the topics that he's gonna be
```

1    discussing.

2    Q.    And why is that of interest to you, sir?

3    A.    Because, also, he's letting me know that, "I

4    can" -- you know, "I'll be the answer to your problem.

5    You're going through financial stress.  I can answer

6    that problem for you because I can give you some

7    finances."

8    Q.    What, if any, discussions had you had with

9    al-Saidi prior to November 9th as it relates to this

10   type -- these brothers from New York or brothers from

11   back home?

12   A.    It's the same thing all the time.  He says he has

13   personal family, blood family, from New York, he has

14   associate friends from New York, and, plus, he has this

15   relationship between him and his father-in-law.  That's

16   the complete spin that he always gave me.

17   Q.    Okay.  Now, a couple more questions.

18        In the bottom of Page 2, Abbas al-Saidi

19   mentions -- states that, "They showed me a lot of heat,

20   which I'm not trying to get into."

21        And, also, Mr. al-Saidi mentions on Page 4 of the

22   transcript that, "There is not a lot of heat."

23        Do you recall, sir, what he was referring to in

24   those two calls when he mentions -- when he refers to

25   "the heat"?

N. Batiste - DIRECT - By Ms. Jhones                    24

1    A.     Yes, ma'am.

2    Q.     And what is he referring to?

3    A.     He's referring to two incidents.

4           The first incident is when ICE and Homeland

5    Security came by the store and that was the time that I

6    took over the store for him.

7           And, also, on November the 7th, when him and

8    Burson was in a conversation about somebody coming from

9    his father-in-law, some guy that's supposed to be

10   coming, that they got pulled over by the police and

11   that, because of --

12              MS. ARANGO:  Objection.  Hearsay, Judge.

13              THE COURT:  Sustained.

14   BY MS. JHONES:

15   Q.    Without telling me what anybody else said, sir.

16   Just with respect to your understanding of what he's

17   referring to as it relates to the heat.  Without

18   telling me what somebody else said.

19   A.     Okay.  Well, those are the two incidents.

20          First was when ICE came by his store, when he was

21   there when I took over the store.

22          The second incident was November the 7th, when he

23   was pulled over by the police in the car with Burson

24   Augustin.

25

N. Batiste - DIRECT - By Ms. Jhones                25

BY MS. JHONES:

Q.    How often prior to November 9th would this informant talk to you about the heat?

A.    Ever since his experience that I witnessed at the store, he's been very paranoid about the police.

Q.    Finally, sir, what, if any, agreement was reached at the end of this conversation regarding whether or not you and Abbas al-Saidi were to meet in person?

A.    Because he was pressuring me to meet with him.

       I asked him, "Could I meet this weekend?"

       He said, no, he's leaving to New York sooner than that; so, I have to meet him -- if I'm gonna meet him, it has to be sooner.

       So I told him I'd give him a call the next day in the evening time.

Q.    I'm sorry?

A.    I told him I would give him a call the next day in the evening time, around 8:00.

Q.    Did you do that, sir?

A.    I'm not sure.

Q.    That's fine.

       Now, do you have a recollection as to whether or not you spoke to Abbas al-Saidi on November 10th?

A.    Yes, I do.

Q.    And did you speak to him?

```
 1   A.     Yes, ma'am.

 2   Q.     Do you recall -- okay.

 3          MS. JHONES:  I need to retrieve an exhibit,

 4   your Honor, if I may.

 5          THE COURT:  Yes.

 6          MS. JHONES:  May I approach, your Honor?

 7          THE COURT:  Yes.

 8          MS. JHONES:  Thank you.

 9   BY MS. JHONES:

10   Q.     I'm going to show you, Mr. Batiste, what's marked

11   for identification as Defense Exhibit 82-A and Defense

12   Exhibit 82-B.

13          I'm going to ask you --

14          THE COURT:  They're both in evidence.

15          MS. JHONES:  Have the --

16          THE COURT:  82-A and 82-B are in evidence.

17          MS. ARANGO:  That's correct, Judge.

18          MS. JHONES:  I'm sorry, your Honor.  I'm

19   confused.

20          As a defense exhibit?

21          THE COURT:  You just introduced them.

22          MS. JHONES:  Okay.

23          THE COURT:  You moved to introduce them and I

24   admitted them, 82-A and 82-B.

25          MS. JHONES:  Okay.  I apologize.  I didn't
```

1    realize I had gone through the exercise.

2            At this time, then, I'm going to publish 82-A.

3            (Whereupon, segments of Defendant Batiste's

4    Exhibit No. 82-A were published in open court.)

5            THE COURT:  Can you stop it for a minute.

6            Is there a transcript for this?

7            MS. JHONES:  Yes, there is.  I apologize.  I

8    didn't mention that to the ladies and gentlemen of the

9    jury.

10           The -- it is the tab -- the only tab that's

11   marked 11-10-05.

12           THE COURT:  So that's -- it says -- it says

13   File No. 4396.3, 11-10-05, 8:38 p.m.?

14           MS. JHONES:  Yes, your Honor.

15           THE COURT:  You may turn to the tab marked

16   11-10-05, which is 82-B.

17           MS. JHONES:  I'm just going to check with Eric

18   to make sure we have the right recording.

19           THE COURT:  It didn't seem like it was the

20   right recording.

21           MS. JHONES:  Your Honor, may we take a short

22   break?  There is an issue with clipping, if you will.

23           THE COURT:  We'll take ten minutes.

24           MS. JHONES:  Thank you.

25           THE COURT:  Do not discuss this case either

 1   amongst yourselves or with anyone else.  Have no

 2   contact whatsoever with anyone associated with the

 3   trial.  Do not read, listen or see anything touching on

 4   this matter in any way.

 5        If anyone should try to talk to you about this

 6   case, you should immediately instruct them to stop and

 7   report it to my staff.

 8        You may leave your materials at your chairs.

 9   Be back in the jury room in ten minutes.

10        (Whereupon, the jury exited the courtroom at

11   10:51 a.m. and the following proceedings were had:)

12        THE COURT:  We're in recess for ten.

13        (Thereupon a recess was taken, after which the

14   following proceedings were had:)

15        THE COURT:  We're back on United States of

16   America versus Narseal Batiste, et al., Case

17   No. 06-20373.

18        Counsel, state your appearances, please, for

19   the record.

20        MR. GREGORIE:  Richard Gregorie and Jacqueline

21   Arango on behalf of the United States, your Honor.

22        MS. JHONES:  Ana Jhones on behalf of Narseal

23   Batiste.

24        MR. LEVIN:  Albert Levin on behalf of Patrick

25   Abraham, who's present.

```
 1            MR. CASUSO:  Louie Casuso on behalf of Burson

 2   Augustin, who's present.

 3            MR. CLARK:  Nathan Clark for Rotschild

 4   Augustine, who's present.

 5            MR. HOULIHAN:  Richard Houlihan for Naudimar

 6   Herrera.

 7            MR. VEREEN:  Roderick Vereen on behalf of

 8   Stanley Phanor, who's present.

 9            THE COURT:  All Defendants are present.

10            Let's bring in the jury.

11            (Whereupon, the jury entered the courtroom at

12   11:15 a.m. and the following proceedings were had:)

13            THE COURT:  You may be seated.

14            You are still you under oath, sir.

15            You may proceed.

16            MS. JHONES:  Thank you, your Honor.

17            Again, turning to the tab that's marked

18   11-10-05.

19            THE COURT:  This is 82-B?

20            MS. JHONES:  Correct.

21            THE COURT:  The second tab marked 11-10-05?

22            MS. JHONES:  Actually, your Honor, there's

23   only one tab.

24            THE COURT:  Only one.  Okay.

25            MS. JHONES:  11-9 had two.
```

1              (Whereupon, segments of Defendant Batiste's

2     Exhibit No. 82-A were published in open court.)

3     BY MS. JHONES:

4     Q.     Mr. Batiste, do you remember that call?

5     A.     Yes, ma'am.

6     Q.     Who called who?

7     A.     Abbas called me at 8:3 -- 8:38.

8     Q.     And what was purpose of Abbas calling you, sir?

9            MS. ARANGO:  Objection.  Speculative.

10           THE COURT:  Sustained.

11    BY MS. JHONES:

12    Q.     What did Abbas want you to do when he called you,

13    sir?

14    A.     Actually, I was supposed to call Abbas.

15    According to the last phone call, I told him I would

16    call him at 8:00.

17           Once he seen that the time went past that time,

18    he called me at 8:38.

19           MS. ARANGO:  Judge, I would object as to

20    hearsay.  And I would ask your Honor to admonish this

21    witness to answer the questions.  It's nonresponsive.

22           MS. JHONES:  Your Honor, there is no --

23           THE COURT:  Sustained.

24           MS. JHONES:  There's no need to admonish the

25    witness, your Honor, respectfully.

```
 1   BY MS. JHONES:
 2   Q.    Mr. Batiste --
 3            THE COURT:  Ask him the question again.  He
 4   needs to answer the question that you asked him.
 5            MS. JHONES:  Yes.  I forgot what the question
 6   was, your Honor, quite frankly.
 7            Lisa, would you read it back to me, please.
 8            (The question referred to was read by the
 9   reporter as above recorded.)
10            THE WITNESS:  In this call right here, he
11   wanted me to come by his place.
12   BY MS. JHONES:
13   Q.    And did you know why he wanted you to come by?
14   A.    So he could rediscuss some issues about New York,
15   the people that he's gonna be talking to.  He wants to
16   give me the information about it.
17   Q.    And when he's referring to the people of
18   New York, sir, did you have an understanding as to who
19   those people were?
20   A.    Like I said, once again, he said he had personal
21   family in New York and he had associates and he was
22   talking to those people concerning finances, money, and
23   that's why he called me, because he wanted to rediscuss
24   with me about the money that he was supposed to be
25   getting.
```

1   Q.    What effect, if any, did Abbas al-Saidi telling

2   you that he was going to New York have on you, sir, as

3   it relates to that particular phone call?

4   A.    Well, I wanted to meet Abbas later on during the

5   week.  I told him that already in the last phone call.

6         However, Abbas told me that he was leaving -- he

7   rescheduled his -- he was leaving to New York and he

8   told me he was leaving tomorrow.  So that pressured me

9   into meeting him that very might.

10  Q.    Why were -- why did you agree to meet with him

11  later on that evening?

12  A.    I had a concern about the money issue.  I was

13  interested in getting the money from Abbas, like he had

14  promised me that he would do.

15  Q.    Okay.  Why was it, sir, that -- do you have -- do

16  you have any knowledge as to why Mr. Abbas requested

17  that you go to his house as opposed to any other

18  location?

19  A.    Two reasons.

20        MS. ARANGO:  Objection.  Speculative.

21        THE COURT:  Sustained.

22  BY MS. JHONES:

23  Q.    Did he tell you, sir?

24  A.    Yes.

25  Q.    Without telling -- without telling us what he

1   said, did you have an understanding as to why he wanted

2   you to go to him as opposed to him coming to you?

3   A.    Yes, ma'am.  He says at Page 3, "Brother, I don't

4   want to go back -- I don't want to go back to the

5   neighborhood, you know, down to the mosque.  So I was

6   wondering if you could come over here."

7        He was referring to the fact that he doesn't want

8   to be harassed by the police.  And --

9   Q.    Now, sir, where the informant says on Page 3,

10  "you know, down to the mosque," who -- first of all,

11  what was he referring to when he would say "the

12  mosque"?

13  A.    The Temple.

14  Q.    And when did you -- on November 9th or prior to

15  November 9th, when would you refer to that location as

16  "the mosque"?

17  A.    I hadn't referred to it as a mosque, even though

18  I listened to Abbas.  And, like I said, I understood

19  his terminology and his language.  I knew he meant the

20  Temple.

21  Q.    Okay.  Did you, in fact, meet with the informant

22  later on on November 10th, sir?

23  A.    Yes, ma'am.

24       MS. JHONES:  Your Honor, at this time, I am

25  going to publish clips from something that is in

1    evidence --

2              THE COURT:  Okay.

3              MS. JHONES:  -- which is Government's

4    Exhibit 42.

5              And if the ladies and gentlemen of the jury

6    could turn to 42-A, which is in one of those many

7    binders.  I just know that it's not the synchronized

8    binder, but I'm not exactly sure --

9              MS. ARANGO:  It's I of III.

10             MS. JHONES:  I of III.

11             THE COURT:  What page?

12             MS. JHONES:  The first clip is going to be

13   at -- it's going to start on Page 4 of Government's

14   Exhibit 42-A, specifically where it says, seven

15   speakers up from the bottom, "Hello, man.  It's nice

16   around here."

17             Just one moment, your Honor.

18   BY MS. JHONES:

19   Q.    I'm sorry, Mr. Batiste.  Do you have a copy of

20   that transcript?

21   A.    No, ma'am.

22   Q.    I apologize.

23             MS. JHONES:  May I provide him a copy?

24             THE COURT:  Yes.

25             MS. JHONES:  Thank you.

1              (Tenders document to the witness.)

2              (Whereupon, segments of Government's Exhibit

3      No. 42 were published in open court.)

4      BY MS. JHONES:

5      Q.     Mr. Batiste, were you able to follow in the

6      transcript?

7      A.     Yes.

8      Q.     Just a couple of questions, sir.

9              In the bottom of Page 4, where you say, "Oh, man.

10     You got it going on, man," what are you referring to

11     there, sir?

12     A.     I'm referring to everything that he's been

13     telling me about, that he's got the money and -- some

14     money and he got a place, that the neighborhood is very

15     nice where he's staying.

16             Because he's staying on the Beach, and I'm

17     familiar with this area because I used to work for

18     Waste Management and that was one of the areas that I

19     serviced.  So I know --

20             MS. ARANGO:  Again, I would object to being

21     nonresponsive.

22             MS. JHONES:  Your Honor --

23             THE COURT:  Sustained.

24     BY MS. JHONES:

25     Q.     What was it, sir, about the area that made you

 1   state that, "You got it going on, man"?

 2   A.    It's a real clean area and it's a middle-class to

 3   high-class area.

 4   Q.    On the next page, on the middle of Page 5, when

 5   you make a reference, "Nice apartment, man," what is it

 6   that you're doing at that time when you make that

 7   statement?

 8   A.    I'm walking inside and I'm taking a visual look

 9   at his place.

10   Q.    Is anybody with you, sir, when you're doing this?

11   A.    Yes, ma'am.  I believe Patrick Abraham is coming

12   right behind me.

13   Q.    And what time of day or night was it when you met

14   up with the informant on -- at this particular

15   location?

16   A.    It appears to be like around 11:00.

17   Q.    11:00 a.m. or p.m., sir?

18   A.    P.m.

19   Q.    What had you been doing prior to 11:00 p.m.?

20   A.    I had been working all day.

21   Q.    How many apartments -- how many apartments

22   that -- belonging to Abbas al-Saidi had you visited

23   prior to this apartment on November 10th?

24   A.    I had never visited an apartment that Abbas had

25   been staying in.  As far as I knew, he was staying in

 1    the back of the store.

 2    Q.     Okay.

 3          MS. JHONES:  Let's go on to the next page,

 4    Page 6, where it says -- the bottom of Page 6, where

 5    the second speaker up from the bottom says, "No.  No.

 6    Sit down."

 7          If I may publish, Eric, Clip B.  Thank you.

 8          (Whereupon, segments of Government's Exhibit

 9    No. 42 were published in open court.)

10    BY MS. JHONES:

11    Q.    Mr. Batiste, what is going on in the bottom of

12    Page -- in this particular clip, specifically in the

13    bottom of Page 6, when the informant says, "No.  No.

14    Sit down.  Not a problem" and then he goes on to say,

15    "Yeah, man.  I have -- I have the basic channels"?

16          What is he doing at that particular time in the

17    conversation?

18    A.    He's still showing us his apartment.  He got a

19    pretty nice-sized TV and he's flicking the TV on and he

20    puts the TV to the news.

21    Q.     Do you remember what station he turned to?

22    A.     I believe that was CNN news.

23    Q.     Do you have any knowledge as to -- Well, strike

24    that.

25          What was being depicted on the news at that time

N. Batiste - DIRECT - By Ms. Jhones                    38

1    when he turned to CNN?

2    A.    The confrontation that was going on in Iraq, the

3    Middle East.

4    Q.    Towards the middle of page, when he talked to

5    you -- when he says to you, "In a restaurant, 30 people

6    was killed and a few of them was -- a few of them was

7    injured.  I -- like I don't know.  60-some

8    (unintelligible)," what was he telling you there, sir?

9    A.    About the incident that's on the TV channel right

10   now.

11   Q.    Had Abbas al-Saidi discussed current events --

12   current events in general or any specific events prior

13   to November -- his comment on November 10th as to what

14   was on the news?

15   A.    Prior to this?

16   Q.    Yes.

17   A.    Yes, he has.

18   Q.    And was there anything unusual about this

19   informant making reference to matters that were

20   occurring in the Middle East?

21   A.    Absolutely not.

22   Q.    Do you recall, sir, after he made a reference to

23   the incident in the restaurant -- underneath that,

24   there's an "(unintelligible)."

25        Do you recall what it was that you said, if

1   anything?

2   A.    I don't exactly recall.  But I believe, at that

3   point, Patrick was walking in and I was kind of like

4   pointing around, trying to get his attention to look at

5   his new place.

6          MS. JHONES:  I'd like, with the Court's

7   permission, for the ladies and gentlemen of the jury to

8   turn to Page 9, specifically six speakers down, where

9   it says, "You know how it goes, I think."

10          (Whereupon, segments of Government's Exhibit

11  No. 42 were published in open court.)

12  BY MS. JHONES:

13  Q.    Mr. Batiste, let me ask you some questions about

14  that particular clip.

15          First of all, how long had it been as of

16  November 10th that you had seen this individual in

17  person, if you recall?

18  A.    As of November 10th?

19  Q.    Yes.

20  A.    I don't think I seen him between the 5th all the

21  way up to the 10th.  So it had to have been about

22  five -- about five days.

23  Q.    And when you say the 5th, where had you seen him

24  on the 5th, sir?

25  A.    I seen him around that time because he was just

1    now leaving from staying at the Temple.

2    Q.    And when you say "staying at the Temple," you

3    mean what?

4    A.    That he was living there and that -- around that

5    time and that was around the time frame when he left.

6    Q.    And did you have any knowledge, sir, as to any

7    employment that this individual had in the early part

8    of November?

9    A.    No.  I don't recall any employment.  But I know

10   he did mention that he was going to go back and try to

11   work at one of the stores.  But I don't recall exactly

12   that he was employed.

13   Q.    And what was your understanding as to how he was

14   supporting himself back then in the first or second

15   week of November?

16   A.    What he was telling me was that he was starving

17   and that he was trying to get in touch with his

18   father-in-law and that he was trying to get money from

19   him or he needed this -- he needed the situation to

20   resolve immediately with Faisal.

21   Q.    Directing your attention, sir, to the middle

22   towards -- or middle-bottom of Page 10 in this

23   transcript, I'd like to ask you a few questions about

24   that.

25   A.    Okay.

1    Q.    Specifically, where the informant says in the

2    middle of the page, "I -- I have that -- I haven't

3    received my family and do what they asked me to do

4    and -- and follow jihad and deal with all the problems

5    with everything I have in my mind.  I can't -- I can't

6    really do that.  I don't know.  Okay?  Money don't come

7    before Allah," sir, did you have an understanding as to

8    what he was trying to tell you there?

9    A.    Mainly, I understood that he didn't receive the

10   money yet back from his family.

11   Q.    Okay.  And following -- in the next paragraph,

12   when again he repeats, "Money don't come before Allah.

13   That's why I decided go ahead and do what I gotta do.

14   I gotta bring some big things (unintelligible), believe

15   me," do you understand what he's talking about there,

16   sir?  Did you have an understanding of what he was

17   trying to say there?

18   A.    I think he was trying to say that he was going to

19   still go ahead and buy some things over there for the

20   Temple.

21   Q.    Now, when he mentions, "I'm gonna bring -- I'm

22   gonna bring a lot of stuff.  I'm gonna bring the

23   flag" -- do you see that, sir?

24   A.    Yes, ma'am.

25   Q.    What, if any, requests did you make of this

 1    individual for a flag?

 2    A.    I didn't make any request for him to bring a

 3    flag.  But since he knew that this was the Embassy, he

 4    said that he wanted the Yemenese flag to be over there,

 5    too.

 6    Q.    When he says, "I'm gonna bring, like, videos.  I

 7    want to bring -- I want to bring -- I want to bring

 8    some good, good videos from back home, from Iraq," what

 9    is your understanding, sir, as to what it is that he's

10    telling you at that particular time in the

11    conversation?

12    A.    That he's giving me his suggestions.  He's

13    exercising his power of suggestion.  He's telling me

14    that this is the things that he wants to hand to me and

15    for me to look at.

16    Q.    What, if any, requests had you made of this

17    informant for requests for videos?

18    A.    I haven't.  I haven't made any requests for any

19    videos.

20    Q.    When the informant says in the same paragraph,

21    "And, besides, they have Koran, Arabic, English.  They

22    have on tape.  They have video.  They have on DVD.  So

23    I'm gonna try to get what I could, you know.  It

24    depends on how it goes, Allah, man," what requests, if

25    any, had you made for a Koran on DVD or in video format

```
 1   or in any format, Mr. Batiste?

 2   A.    I hadn't made any request.

 3   Q.    What, if any, response did you provide to the

 4   informant when he was making -- when he was telling you

 5   about these things that he was going to purchase?

 6   A.    I didn't really make a response.  I was listening

 7   to him.  At the end -- when he got done talking towards

 8   the end, I just said, "Right" and (unintelligible)

 9   something."

10         I'm sorry.  I looked at the wrong page.

11   Q.    I was going to ask you where you were looking at.

12   A.    I didn't make a response at all.  He just kept

13   going on in a monologue while I was listening to him.

14             MS. JHONES:  With the Court's permission, I'd

15   like the ladies and gentlemen of the jury to turn to

16   Page 15, where it starts -- seven speakers up, where it

17   says, "So what about your case?"

18             If we may publish Clip D, Eric, please.

19             (Whereupon, segments of Government's Exhibit

20   No. 42 were published in open court.)

21   BY MS. JHONES:

22   Q.    Mr. Batiste, do you remember that part of the

23   conversation, sir?

24   A.    Yes, ma'am.

25   Q.    Let me ask you a few questions about that clip.
```

1    A.    Okay.

2    Q.    Sir, in the beginning of the clip, when -- where

3    it reads, "So what about your case?  Did you ever talk

4    to Nati?", first of all, who is speaking there in that

5    part of the conversation?

6    A.    That's Brother Pat.

7    Q.    And when the informant says, "I call him and I

8    don't want to work out with" -- "I call him and don't

9    want to work out with me.  Now I'm trying to find a

10   lawyer.  I'm going to sue him" and he goes on and on,

11   what is he referring to there, sir?

12   A.    The gentleman that he told me that owned the

13   store, Faisal.

14   Q.    And in the top of Page 16, where the informant

15   says, "He changes his mind and told me that he don't

16   have it.  I swear to God, I didn't ask him for a lot.

17   We made a -- we first made a deal on 2,000," what is

18   your understanding, sir, as to what it is that the

19   informant is referring to when he makes that statement?

20   A.    That out of the bulk of money that Faisal owed

21   him, which was 30 grand, Faisal told him that he would

22   give him the first payment of 2,000.

23   Q.    Prior to this conversation on November 10th, what

24   understanding did you have as to what the status --

25   what the status was as to this Faisal issue?

```
 1   A.     I knew it was an ongoing issue ever since the

 2   hotel.  I knew definitely at that time when he first

 3   met him when he came from Yemen that it was an ongoing

 4   issue.

 5   Q.     And when the informant at the bottom of Page 16,

 6   the last paragraph -- when he states, "I mean, even

 7   though -- come on, man.  Out of 30,000, you're going to

 8   buy me an airline ticket to New York, $120?", what is

 9   your understanding as to what it is that he's referring

10   to at that point?

11   A.     He's letting me know where the money is coming up

12   from to buy the airline ticket, because I had asked

13   him, "Is this airline ticket gonna cost you a lot of

14   money?"

15          And so now he's informing me of how he's getting

16   that money.  It's because Faisal was willing to buy

17   this ticket for him.

18   Q.     Why did you make the comment, sir, about the

19   airline ticket costing a lot of money?

20   A.     Because I'm thinking that, if the airline ticket

21   costs a lot of money and he had to pay for it, that he

22   has come into a certain amount of cash.

23   Q.     And why would that be of concern to you, sir?

24   A.     I would ask him at that point to fulfill his

25   promise that he had been telling me, since I had helped
```

 1    him out on the situation between him and Faisal, that

 2    he would, you know, give me some of the money that he

 3    had owed me.

 4           THE COURT:  We're going to break here for

 5    lunch.

 6           Do not discuss this case either amongst

 7    yourselves or with anyone else.  Have no contact

 8    whatsoever with anyone associated with the trial.  Do

 9    not read, listen or see anything touching on this

10    matter in any way.

11           If anyone should try to talk to you about this

12    case, you should immediately instruct them to stop and

13    report it to my staff.

14           You may leave your notebooks and your binders

15    at your chairs.  Please be back in the jury room at

16    1:30.

17           (Whereupon, the jury exited the courtroom at

18    11:54 a.m. and the following proceedings were had:)

19           THE COURT:  We're in recess until 1:30.

20           (Thereupon, a luncheon recess was taken, after

21    which the following proceedings were had:)

22           THE COURT:  We're back on United States of

23    America versus Narseal Batiste, et al., Case

24    No. 06-20373.

25           Counsel, state your appearances, please, for

```
 1   the record.
 2           MR. GREGORIE:  Good afternoon, your Honor.
 3           Richard Gregorie and Jacqueline Arango on
 4   behalf of the United States.
 5           MS. JHONES:  Good afternoon, your Honor.
 6           Ana Jhones on behalf of Narseal Batiste, who's
 7   present.
 8           MR. LEVIN:  Albert Levin on behalf of Patrick
 9   Abraham, who's present.
10           MR. CASUSO:  Lou Casuso on behalf of Burson
11   Augustin, who's present.
12           MR. CLARK:  Nathan Clark for Rotschild
13   Augustine, who's present.
14           MR. HOULIHAN:  Richard Houlihan with Naudimar
15   Herrera.
16           MR. VEREEN:  Good afternoon, Judge.
17           Roderick Vereen on behalf of Stanley Phanor,
18   who's present.
19           THE COURT:  All Defendants are present.
20           Mr. Batiste, you can take the stand.
21           Let's bring the jurors in.
22           MS. ARANGO:  Judge, one second.
23           We've been told -- Abbas al-Saidi is still in
24   town.  He's called the FBI agents.  He says that
25   they're going to kick him out of the hotel.
```

1          He doesn't have any contact -- anybody from
2    the Marshals Service or Ms. Jhones as a contact person.
3    So he calls the FBI agents.
4          We still don't know from Ms. Jhones what she's
5    going to do with him.  He's been told that the Marshals
6    Service is no longer paying for the hotel.
7          THE COURT:  Ms. Jhones?
8          MS. JHONES:  First of all, your Honor, with
9    respect to what the Marshals Service is doing or not
10   doing, I indicated to the Government that I will do
11   whatever needs to be done in order to accommodate this
12   person's hotel.
13          I do know I have witnesses that I have sent
14   back --
15          THE COURT:  Well, let's deal with the initial
16   issue, which was yesterday you were supposed to
17   announce whether you needed him or not.
18          MS. JHONES:  I don't know if I'm going to call
19   him or not.  But I do know that Mr. Batiste is going to
20   take awhile.
21          And not unlike other witnesses that I have --
22   this has occurred with other witnesses -- it is much
23   more economically feasible to send him back.  I have
24   discussed this with Mr. Haydee.  So I have no problem
25   in having this witness go back.

1          But I need him available and I will not bring

2     him down unless I'm certain I'm going to call him.  But

3     I need him to continue to be under subpoena, like my

4     other witnesses.

5          THE COURT:  Okay.

6          MS. ARANGO:  I don't believe Elie Assaad has

7     informed us -- is he being kicked out, also?  Elie

8     Assaad is still here.

9          MS. JHONES:  I don't believe I'm going to need

10    Assaad.

11         THE COURT:  So you're releasing Assaad?

12         MS. JHONES:  I am releasing Assaad from the

13    subpoena.

14         THE COURT:  He is released.

15         Do you have a flight back for Mr. al-Saidi?

16         MS. JHONES:  I'm sorry?

17         THE COURT:  Do you have a flight back for --

18         MS. JHONES:  Your Honor, I'm happy to have my

19    investigator make the arrangements.

20         THE COURT:  Okay.

21         MS. JHONES:  I could do it at the next break.

22    I could do it now.  Whenever the Court --

23         THE COURT:  At the next break.

24         MS. JHONES:  Okay.

25         THE COURT:  Let's bring in the jurors.

1          You can take the stand, sir.

2          (Whereupon, the jury entered the courtroom at

3  1:55 p.m. and the following proceedings were had:)

4          THE COURT:  You may be seated.

5          You are still under oath, sir.

6          You may proceed.

7  BY MS. JHONES:

8  Q.    Mr. Batiste, when we left off before the lunch

9  break, we were talking about the last clip that was

10  played that covered Pages 15 through 18 of the

11  transcript in evidence, which is Government's

12  Exhibit 42-A.

13         Just a couple questions before we go to the next

14  clip, Mr. Batiste.

15         Directing your attention to Page 18 of the

16  transcript, Mr. Batiste, where the informant says, four

17  or five speakers up from the bottom, "Now the FBI's

18  going to Jordan.  Now, look, look (unintelligible)

19  (laughs)," do you recall what was going on at that

20  point in the conversation when he makes that comment,

21  sir?

22  A.    Yes, ma'am.

23  Q.    And what was going on?

24  A.    He was trying to draw my attention back to the

25  program that was on TV, what was going on in the world

```
 1   news.
 2   Q.    After that, when he says, "See, 44 killed," do
 3   you remember what that was referring to?
 4   A.    He was talking about the lives that were lost in
 5   Jordan.  Obviously, there was some kind of bombing that
 6   happened in Jordan, and he was talking about 44 people
 7   got killed.  And he had a smirk and a laughter behind
 8   it.
 9   Q.    What, if any, comments did you make to him, sir,
10   in response to -- in response to the informant's
11   statements about 44 people being killed?
12   A.    I was silent.
13   Q.    Directing your attention, sir, to Page 19 of the
14   transcript, the references that are made by the
15   informant regarding -- specifically on the top of the
16   page, "I feel bad for the people in -- in Jordan that
17   didn't know nothing about it going on and they have to
18   get killed.  Jordan is the closest hand to Israel and
19   America," what was your response, if any, sir?
20   A.    "Uh-huh."
21   Q.    Was there any response or any comments made by
22   you while this conversation about what was going on in
23   the Middle East -- any comments made by you to the
24   informant, sir?
25   A.    No, ma'am.  I didn't make any comments at this
```

 1   point.

 2   Q.    Okay.

 3         MS. JHONES:  With the Court's permission, if

 4   the ladies and gentlemen could turn to Page 21 to play

 5   a clip, Clip F.

 6         Eric, if you can just wait a couple of

 7   seconds.

 8         This clip is going to begin towards the

 9   bottom, where it says, "I gotta get this more

10   comfortable, man."

11         Proceed, Eric.  Thank you.

12         (Whereupon, segments of Government's Exhibit

13   No. 42 were published in open court.)

14   BY MS. JHONES:

15   Q.    Sir, directing your attention to the top of

16   Page 22, where the informant says, "It's something you

17   could use while -- you don't have to keep buying it, I

18   mean, and it's something you could use either while

19   you're sleeping, while you're up, while you're praying,

20   while -- and it's not like furniture when you're gonna

21   go and go to sleep on or sit down or --" and you

22   respond, "Yeah," what is it that he is doing at that

23   particular point in the conversation, sir?

24   A.    He's talking about buying carpet.

25   Q.    What, if any -- what, if any, praying had you

1    done with this individual prior to 11-10 of '05?

2    A.    I have never prayed with Abbas in Middle Eastern

3    faith with him.

4    Q.    To your knowledge, sir, have any other brothers

5    sitting in this courtroom today engaged in any praying

6    with this individual?

7    A.    No.   They wouldn't have done so.

8    Q.    Sir, there was some pause in the conversation

9    that we listened to.

10         What were you doing during that pause, if you

11   remember?

12   A.    I don't exactly remember.

13   Q.    Okay.   When you said to the informant, "I better

14   go on home.   Yeah," do you recall, sir, what you were

15   thinking when you made that statement at that

16   particular time in the conversation?

17   A.    Well, I knew I had a busy work schedule the next

18   day.   So at that point -- and I was tired.   I just came

19   right from work.   We had to work pretty late that day.

20   So I was ready to go back home.

21   Q.    Now, did you make any requests at this point --

22   had you made any requests of the informant as it

23   relates to money?

24   A.    No.

25   Q.    Was there any particular reason why you hadn't

N. Batiste - DIRECT - By Ms. Jhones                54

```
 1    done that, sir?
 2    A.    I mean, it was his money.  He was the person that
 3    was offering it to me.  This whole thing about getting
 4    money from him, it all originated from his idea, with
 5    him constantly offering me money.
 6    Q.    Okay.  Was there anything -- just directing your
 7    attention to Page 23 of the transcript, Mr. Batiste,
 8    who is the person that -- in this conversation,
 9    specifically on Page 23 -- who is the person that is
10    basically doing the talking?
11    A.    CW 1.
12    Q.    Directing your attention, sir, to the bottom of
13    the page, four speakers up, where it says,
14    "(Unintelligible) well, I'd better get going, man,
15    'cause I've been up since 5:00 in the morning," what
16    were you referring to, sir?
17    A.    I was referring to my work schedule and the
18    prior -- well, actually, earlier that morning, at
19    5:00 in the morning, I was already up and on my way to
20    the jobsite.
21    Q.    Directing your attention, sir, to Page 24 -- the
22    top of Page 24 --
23    A.    Yes, ma'am.
24    Q.    -- when the informant says, "And to be honest
25    with you, Akim, you know, I only could give you that
```

1    point.  I really hate to hate.  I mean, I'm not -- I'm

2    not a hater.  I'm a Muslim.  But I didn't like what was

3    going on, huh?  I don't want to get locked up again.

4    That's why I haven't showed up and I don't want to

5    come" and you respond, "Yeah.  Understand.  I

6    understand.  Especially that time who -- last time he

7    was with a brother that stopped him," what was your

8    understanding, sir, as to what it was -- what was the

9    informant referring to, I should say, when he's talking

10   about I really hate to hate and those statements that

11   he made on the top of Page 24?

12   A.    He's speaking once again about all his bad

13   run-ins with the law that he's always explained me

14   about.  And he's also referring to the last incident

15   that happened.

16         And he's just telling me, you know, he doesn't

17   want to come by where the Temple is at because he know

18   that it's a lot of police officers around that area

19   because it is a high-crime and he's scared, you know.

20   He doesn't want to get involved or being in that

21   vicinity.

22         And, also, at the same time, because he feels

23   that way and all the things he said about how he feels

24   about law enforcement doesn't mean that he really hates

25   them.

1   Q.    Okay.  Now, was there any agreement to meet

2   again, sir -- what, if any, agreement was there at the

3   end of this meeting between you and Mr. al-Saidi at the

4   conclusion of the meeting?  What, if any, agreement to

5   meet again was there?

6   A.    My understanding was, when he came back from

7   New York, that he would inform me of how everything

8   took place.

9   Q.    Okay.  Now, after November 10th, sir, did you

10  have -- from -- first of all, did you have any

11  telephone contact with this informant while he was in

12  New York?

13  A.    Not that I recall.

14  Q.    Were there any efforts made by you to reach out

15  for him or to contact him after -- while he was in

16  New York?

17  A.    No, ma'am.

18  Q.    While this individual was in New York, sir, what

19  were you doing during that time period down here in

20  Miami?

21  A.    I was trying to secure my -- the company more

22  than anything, because that was -- the company was the

23  bread and butter and that's what was paying all my

24  personal bills as well as the people that I had

25  employed.  I had owed them some money.  So I was trying

```
  1    to catch up on all -- basically, my bills.
  2    Q.    After November 21st -- strike that.
  3          After November 10th, do you have a recollection
  4    as to the next time that you had contact with Informant
  5    No. 1, Abbas al-Saidi?
  6    A.    Like I said, I believe, like, around
  7    November 18th he had given me a call.
  8    Q.    Do you recall where it was that he called you?
  9    A.    I don't know exactly where he was at.  But I was
 10    in Miami when he called me.
 11    Q.    And that call was received by you -- where did he
 12    call you?  Did he call you at the home number?  What --
 13    A.    He called me on my cell phone.
 14    Q.    Okay.
 15          MS. JHONES:  May I approach the witness, your
 16    Honor, and show him an exhibit?
 17          THE COURT:  Yes.
 18          MS. JHONES:  Thank you.
 19    BY MS. JHONES:
 20    Q.    Mr. Batiste, may I have that exhibit back?
 21    A.    Sure (tenders document to counsel).
 22    Q.    Thanks.
 23          I'm showing you what is marked for identification
 24    as Defense Exhibit 83-A and Defense Exhibit for
 25    identification 83-B.
```

```
 1              MS. JHONES:  I actually don't have a sticker

 2    on 83-B, your Honor.  I'll put one on in a second.

 3    BY MS. JHONES:

 4    Q.    Do you recognize these defense exhibits marked

 5    for identification?

 6    A.    Yes, ma'am.

 7    Q.    How is it that you recognize it, sir?

 8    A.    My initials is on the transcript.

 9    Q.    Have you had a chance to listen to Defense

10    Exhibit 83-A and compare 83-A with 83-B?

11    A.    Yes, I have.

12    Q.    Do the contents of 83-A accurately -- are the

13    contents of 83-A accurately reflected in what is

14    depicted in 83-B?

15    A.    Yes, ma'am.

16    Q.    Are there any changes or any deletions that you

17    made to that transcript after having listened to

18    Defense Exhibit 83-A?

19    A.    Yes, there was.

20    Q.    And that version of 83-B -- does that reflect all

21    the changes?

22    A.    Yes, it does.

23              MS. JHONES:  At this time, your Honor, I'd

24    move into evidence Defense Exhibit 83-A and 83-B.

25              MS. ARANGO:  Judge, it's my position -- it's
```

1   the Government's position that this call is cumulative

2   and hearsay.

3           However, I also believe that it falls within

4   the ambit of your ruling at side-bar.  So I don't think

5   we need to litigate the issue again.

6           THE COURT:  Okay.  The objections are

7   overruled.

8           It will be admitted as Defendant Batiste

9   Exhibits 83-A and 83-B.

10          (Whereupon, Defendant Batiste's Exhibit

11  Nos. 83-A and 83-B were entered into evidence.)

12          MS. JHONES:  At this time, your Honor, with

13  the Court's permission, I'd like to have the ladies and

14  gentlemen of the jury turn to the tab that's marked

15  11-18-05 in preparation for publication of 83-A.

16          THE COURT:  11-18-05 is 83-B?

17          MS. JHONES:  Yes, your Honor.

18          THE COURT:  You may turn to the tab in the

19  exhibit marked 11-18-05.

20          You may publish.

21          MS. JHONES:  Thank you, your Honor.

22          (Whereupon, segments of Defendant Batiste's

23  Exhibit No. 83-A were published in open court.)

24  BY MS. JHONES:

25  Q.    Mr. Batiste, do you recall that conversation,

1   sir?

2   A.    Yes, I do.

3   Q.    Who called who?

4   A.    Abbas had called me when he supposedly came back

5   from New York.

6   Q.    And, sir, directing your attention to Page 2 of

7   that transcript, where the informant tells you, five

8   speakers down, "Thanks a lot.  Say, how you doing?  I

9   had a good week in New York, man.  I just came back

10  last night" and you respond, "Yeah?  Oh, man, that's a

11  blessing," what is your understanding as to what it is

12  that he's telling you there, sir?

13  A.    I mean, my understanding was that the whole

14  purpose of him going up there for all the money

15  issues -- that it must be coming through or it has

16  already came through.

17  Q.    Towards the bottom of that page, sir, where you

18  say, "Oh, yeah (laughs).  Well (indiscernible) yeah.

19  Sure.  How did it go?  How did it go in New York?  You

20  met some brothers up there?", what were you referring

21  to, sir?

22  A.    I'm referring to the previous conversation and

23  the reasons why he went up to New York, and I'm trying

24  to go back to that conversation so he can give me more

25  information.

1    Q.    And why is it, sir, that you want more

2    information?

3    A.    Because I want to -- I wanted to see what he's

4    been telling me -- is it the truth?  Did it really

5    happen?  Did he really get financial help?

6    Q.    When he responds, sir, "Yes.  Well, it went very

7    good, man, al-hamdu li-llah.  Everything went like it's

8    supposed to be, got you," what was your understanding,

9    sir, as to what it was that he was telling you at that

10   point in time?

11   A.    That it's a definite -- it's a definite

12   come-through.  The money is either in his hand or

13   everything's -- it done worked out, what he said.

14   Q.    When the informant says, "I got you what you

15   asked me for.  I got a few" -- whatever -- there's no

16   words there -- do you know what he's referring to?

17   A.    Well, he's the type of person -- Abbas -- who

18   will say that -- he'll mention a subject, like, "Did

19   you -- you like" --

20           MS. ARANGO:  Objection.  Nonresponsive.

21           THE COURT:  Sustained.

22           Restate your question.

23           MS. JHONES:  Yes.

24   BY MS. JHONES:

25   Q.    When he says -- when he tells you, Mr. Batiste,

1    "I got what you asked me for.  I got a few" --

2    whatever, do you know what he's referring to?

3    A.    Yes, ma'am.

4    Q.    What is he referring to, sir?

5    A.    He's referring to the things he told me about in

6    the previous meeting, on the 10th.  And I didn't ask

7    him for it.  But he told me about it.

8          And so, therefore, since I listened to him about

9    it, then that was just like me asking for it.

10   Q.    Okay.

11   A.    I mean, that's the kind of character he is.

12   Sometimes, if he tells me he's got something or if he

13   tells me about something and he goes and gets it, then

14   he'll say, "Oh, you asked for it.  Here it is."

15   Q.    Now, a few lines down where he says, "You know, I

16   got a book -- a book for -- remember when we talked

17   about the mosques at Halajal?" --

18   A.    Uh-huh.

19          THE COURT:  You have to say "yes" or "no,"

20   sir.

21          THE WITNESS:  I'm sorry.

22          "Yes."

23   BY MS. JHONES:

24   Q.    -- do you know what he's referring to, sir?

25   A.    Yeah.  He's talking about -- there's an Islamic

1    prophecy called the dajowe.  There is a book about the

2    dajowe.  I had asked him back in the store about the

3    dajowe, and he said that he would look up that

4    information.

5    Q.    Now, towards the bottom of the page, sir, in the

6    middle of that last paragraph, when he says, "I'm in

7    the hole right now for them back home.  Even though I

8    went and met some brothers in New York and everything

9    went all right, al-hamdu li-llah, but, you know, I'm

10   still on the run.  I'm just got to go and see about the

11   job because I really need a job.  I don't want to say

12   I'm without a job.  I'm used to it, you know.  It's

13   kind of boring, staying in a house all day," what is

14   your understanding, sir, as to -- if any, what is your

15   understanding as to what it is that the informant is

16   communicating to you at that point in the conversation?

17   A.    Well, what he's telling me is, like, "Yeah," you

18   know, "I got the financial situation -- support from

19   back home that's helping me.  I got this new place to

20   stay.  But that doesn't mean nothing because I don't

21   know how long that might last.  I might have to

22   eventually leave out of here."

23          So he's not sure, you know, how long he's gonna

24   be able to stay in the place he's gonna be staying at

25   and, in order to secure his finances, that he's gonna

1    have to supplement his income, like, start working.

2    Q.    Sir, directly after the informant makes those

3    statements to you, a couple of lines down, when you

4    say, "So what did -- what did -- what did Faisal say?

5    He going to have your money?", why do you ask the

6    informant about money that Faisal may or may not give

7    this informant?

8    A.    Well, I'm trying to go back over the fact that --

9    the agreement that we had dealing with the fact that,

10   if I helped him with Faisal, that he would give me

11   money.

12         It's not my money to say, "Hey, where's my money

13   at that you said you was gonna give me?"  So I'm trying

14   to hint towards him to let him know I'm asking about

15   the situation, "What about Faisal?", so he can tell me,

16   "Okay.  Well, look, this is what it is about the money

17   situation."

18   Q.    Okay.  Now, at the end of that -- at the end of

19   that page, sir, the informant tells you -- after you

20   ask him about Faisal, the informant says to you towards

21   the middle of the last paragraph, "That's for Allah.  I

22   got -- I got some Koran, Arabic and English, that I

23   want to sit down and listen with you.  Is from Sodit

24   el Fatah" --

25              MS. JHONES:  I don't know if you want me to

N. Batiste - DIRECT - By Ms. Jhones          65

1    spell it, Lisa.  It's S-o-d-i-t, e-l, F-a-t-a-h, three

2    different words.  R-a-c-h-m-a-n, phonetic.

3    BY MS. JHONES:

4    Q.     -- "It's very good, man.  Arabic, English.  I

5    couldn't get a lot more than what I did, but I did a

6    best I could.  I got some good signs for the mosque

7    that are saying" -- quote -- "'Allah is the only one,'

8    'In the name of Allah'" -- end quote -- "I got some

9    good pictures for Kaaba," et cetera.

10          What request did you make of this informant for a

11   Koran, sir?

12   A.     I didn't make any request for a Koran.

13   Q.     What request, if any, did you make of this

14   informant for good signs for the mosque?

15   A.     It's the same answer.  I didn't make any requests

16   for good signs for the mosque.

17   Q.     Whose idea was it to get any of those things that

18   he's referring to on 11-18, sir?

19   A.     These are all the CW's ideas.

20   Q.     Now, in the middle of the page, the informant

21   tells you, "I tell you, brother -- I tell you, the

22   brother that I told you about?  Because I asked him --

23   when I was in New York, they told me I don't know what

24   he is.  He's already in the United States.

25          "But I'm not exactly -- but I'm not sure exactly

1    where he's staying right now.  They told me a week to

2    ten days he's going to call me and then tell me what's

3    going on so we can meet with him out here in Miami."

4         And you respond, "Great.  Okay."

5         What is your understanding as to who he's talking

6    about, sir?

7    A.    Abbas had told me sometime in the beginning of

8    February -- I'm sorry -- November that his uncle might

9    be sending somebody to come and meet him to evaluate

10   and see what's going on.  That's what he was telling me

11   about.

12   Q.    Now, what information or what knowledge did you

13   have as to who this person was?  Did you have any

14   information?

15   A.    I didn't have no information about who this

16   person was because I had never requested this person.

17   Q.    Now, the informant says on November 18th in this

18   conversation, "When you get a chance" -- words to that

19   effect -- "give me a call so we can meet" in the bottom

20   of the page.

21        What is your understanding, sir, as to -- or do

22   you have an understanding as to why it is that this

23   informant wants to meet with you again?

24   A.    Everything -- everything that dealt with between

25   me and Abbas at this point was all driven by money.  It

```
 1    was the money that he was promising that he could get

 2    either from one of his connections or from his uncle.

 3         And every time he asked to speak with me, it

 4    would be over that issue because he knew that I was

 5    trying to fix the mosque.  He knew I was in financial

 6    crisis at that point.

 7         So -- and these are the things that he just kept

 8    on telling me, that he could help me and -- this is

 9    things he kept reiterating to me.

10    Q.    Where in that conversation on November 18th of

11    2005 do you refer to your request for ammunition, sir?

12    A.    I have no request for no ammunition.

13    Q.    Where in that conversation is there any request

14    for weapons made by you, sir?

15    A.    It's the same answer.  I have no request for any

16    weapons.

17    Q.    Directing your attention to the bottom of Page 6,

18    where the informant says, "Anyway, how's everything

19    towards the mosque?  How's the heat?", what is he

20    referring to, sir, when he's asking you, "How's the

21    heat?"

22    A.    He's asking me, you know, do I still see a lot of

23    police and squad cars around the mosque.

24    Q.    Where in this conversation did you come up -- did

25    you ask him about -- or express any concern that you
```

1   had with respect to the heat?

2   A.    I never -- I never expressed anything about law

3   enforcement in this conversation.

4   Q.    Following that sentence, sir, where you say, "All

5   right.  It's going good.  I mean, I'm still trying to

6   make the money to fix it.  You know, money is slow,"

7   why do you make that statement to the informant, sir?

8   A.    Because he's always talking about money, money,

9   money, money, money.  "I'm gonna get you this money,"

10  "I'm gonna get you this money."  He's always saying,

11  "Well, I'm gonna have the money probably this week or

12  next week" or whatever the case may be.

13       So I'm letting him know, you know, "You keep on

14  talking about" -- you know, "You gonna talk to all

15  these people about all this money.  I'm trying to do

16  what I need to do in order to make -- to better myself

17  and my situation and you taking my time up from

18  everything I'm doing to come meet you and talk to you.

19  And the issue is money is slow for me now.  Are you

20  gonna really help me about the money issue or are you

21  not?"

22  Q.    In response to that, sir, what, if anything, does

23  the informant tell you regarding a partner?

24  A.    He's referring back again about the guy who was

25  supposed to be coming that his uncle was supposed to be

1    sending.

2           He says, "And I've been thinking about to bring

3    somebody that we could have as a partner and try to

4    open the next door to the mosque and try to fix it up.

5    But I have to sit down with you."

6           And it goes on to Page 7 and he explained

7    everything then.

8    Q.    Now -- are you finished?

9    A.    Yes, ma'am.

10   Q.    Directing your attention to the bottom of Page 6,

11   where the informant says, "I understand, brother.  I

12   understand what you're saying.  You know what I'm

13   trying to do here is -- at least if I could, you know,

14   get someone who's going to push me up with the money.

15   You know what I'm saying?  Other than that, we won't

16   have no partners," what is your understanding, sir, as

17   to what the informant is telling you right there at

18   that particular time in the conversation?

19   A.    He's trying to say that the only way that this

20   situation is gonna work out is the route that he's

21   taking, that I have to wind up meeting this guy and he

22   has to bring this guy into the deal that we have.  He's

23   saying that to me because he knows that I don't have no

24   knowledge about this guy.

25           MS. ARANGO:  Objection.  Speculative.

```
 1              THE COURT:  Sustained.

 2   BY MS. JHONES:

 3   Q.     In the same paragraph, sir, after he tells you

 4   that -- "going to push me up with the money," a few

 5   lines down when he says, "It's just at least.  I have

 6   somebody that is going to see you and come and see that

 7   I have visitors, that my credit is going good.  That is

 8   going to push and help me, the support.

 9           "That's what I'm saying.  Other than that,

10   brother, believe me, if I would have had the money, I

11   would have been fixed the mosque and been open that

12   restaurant and keep going," at the top of Page 8 --

13   A.     Yes, ma'am.

14   Q.     -- what is the informant -- what is your

15   understanding as to what he's telling you right then

16   and there at that point in time in the conversation,

17   sir?

18   A.     He's telling me once again he -- he's responding

19   basically to what I said on Page 7, between Lines 6 and

20   8, when I told him, "I don't want to deal with too many

21   people and I just really want to deal with you."

22           And he's responding by saying that his -- the

23   people that he's been talking to are his

24   father-in-law's relationship and his brothers in

25   New York.
```

1          They need to come see what he's been telling them

2     so they can approve his credit -- his credit means his

3     word -- and that they need to come over there, they

4     need to see him, they need to meet me.

5          And then, once they see that everything's good

6     as -- according to how he's been telling me, then that

7     support that he been wanting to do as far as fix the

8     mosque and come 50 percent with me in the restaurant --

9     it'll happen.

10    Q.    Finally, sir, at the end of this conversation,

11    what, if any, agreement is there between you and the

12    informant as it relates to any future communication?

13    A.    I told him that I would get in contact with him,

14    because he's asking me to follow up with him.

15    Q.    Now --

16    A.    Actually, he wanted me to get -- to meet him

17    again the next day.  But I just told him I'll get in

18    contact with him.

19    Q.    Now, did you meet with him the next day?

20    A.    No, ma'am.

21    Q.    Do you have a recollection, sir, as to when it

22    was that you met with him -- when you heard back from

23    him after November 18th?

24    A.    That would be the 21st.  I know we met.

25    Q.    Do you have a recollection, sir, as to whether or

```
 1   not there was any telephone contact on November 21st?
 2   A.    I suppose there have been.  But if there's
 3   something that can refresh my recollection, I would
 4   need to --
 5   Q.    Let me see if I can help you, sir.
 6         MS. JHONES:  I just need a moment, your Honor,
 7   to verify something, if I may.
 8         Your Honor, may we approach for a second just
 9   to address an issue I'm not the exactly sure how to
10   handle?
11         THE COURT:  Okay.
12         MS. JHONES:  Thank you.
13         (Whereupon, proceedings were had at side-bar
14   outside the presence of the jury which have been sealed
15   per instructions of the Court.)
16         (Whereupon, the following proceedings were had
17   in open court:)
18         THE COURT:  You're moving the items into
19   evidence?
20         MS. JHONES:  Yes, your Honor.
21         At this time I'd like to move Defense
22   Exhibits 84-A and 84-B-1 and 84-B-2 into evidence.
23         THE COURT:  You're making the same objections.
24   Correct?
25         MS. ARANGO:  Yes.  Same objection, Judge.
```

```
 1              THE COURT:  The objections are overruled.

 2              They will be admitted as Defendant Batiste

 3     Exhibits 84-A and 84-B-1 and -B-2.

 4              (Whereupon, Defendant Batiste's Exhibit

 5     Nos. 84-A, 84-B-1 and 84-B-2 were entered into

 6     evidence.)

 7              THE COURT:  Ladies and gentlemen, these are

 8     two exhibits, two calls on November 21st.  There's some

 9     concern that maybe some of you, you may not have both

10     tabs that are marked November 21st.

11              Can you check and see if you have two tabs

12     marked November 21st.  One is at 1:58 p.m., and one is

13     at 7:58 p.m.

14              Do you have both?

15              If there's anybody -- you only have one?

16              JUROR NO. 18:  We have both, but I don't think

17     it has the actual paper.

18              THE COURT:  You have the tab, but not the

19     transcript?

20              JUROR NO. 18:  Yes.

21              JUROR NO. 12:  And I'm missing the other one.

22              THE COURT:  We have one person missing the

23     first one and one person missing the second one.

24              Anyone else?

25              That's it?
```

1          Everybody else has both calls.

2          MS. JHONES:  I do have extra sets of the first

3    one.  I could provide -- I do have one extra set of the

4    second one.

5          THE COURT:  You have an extra of the second?

6          MS. JHONES:  Of the second one, I have one

7    extra one, as opposed to --

8          MS. ARANGO:  Judge, I need the first one,

9    1:38.

10         MS. JHONES:  Here you are.

11         May I provide the additional --

12         THE COURT:  Why don't you give it to the court

13   security officer and he can hand it to the jurors who

14   are missing it.

15         We need one of the first and one of the

16   second.

17         MS. JHONES:  (Complies.)

18         THE COURT:  Juror No. 12 and Juror No. 18.

19         You're missing 7:58 p.m.?

20         Juror No. 18:  I'm sorry.  I have three tabs

21   for 1-21.  And I have the 1:38 call duplicated.  So I

22   don't need that.

23         THE COURT:  Okay.  You don't have the 7:58?

24         Juror No. 18:  Right.

25         THE COURT:  And then would you pass down to

1    Juror No. 12 -- you're missing the 1:38 call.  Right?

2             Juror No. 12:  Yes.

3             THE COURT:  What are you missing, ma'am?

4             Juror No. 9:  I'm missing the 7:58 call.

5             THE COURT:  Here you go.

6             MS. JHONES:  I just need a moment, your Honor.

7             THE COURT:  Sure.

8             MS. JHONES:  I apologize for the

9    inconvenience.

10            THE COURT:  These are 84-B-1 and -B-2.

11   Correct?

12            MS. JHONES:  Your Honor, may I approach the

13   witness to hand a witness a copy of these exhibits?

14            THE COURT:  Yes.

15            MS. JHONES:  I have moved them into evidence;

16   have I not, your Honor?

17            THE COURT:  Yes.  They're in evidence.

18            MS. JHONES:  Thank you.

19            Again, I apologize for the delay and the

20   mixup, your Honor.

21            At this point, Eric, it we can go ahead and

22   publish Defense Exhibit 84-A.

23            With the Court's permission, if the ladies and

24   gentlemen of the jury can turn to the first tab that

25   reflects 84-B-1, which is a call at 11-21-05 at

1    1:38 p.m.

2              (Whereupon, segments of Defendant Batiste's

3    Exhibit No. 84-A were published in open court.)

4              MS. JHONES:   If we could just go ahead to

5    speed things up, your Honor, and publish 84-A, the

6    second call, which is in the transcript 84-B-2 and then

7    I'll just ask the witness some questions.

8              THE COURT:   Sure.

9              (Whereupon, segments of Defendant Batiste's

10   Exhibit No. 84-A were published in open court.)

11   BY MS. JHONES:

12   Q.    Mr. Batiste, do you remember those two calls?

13   A.    Yes, I do.

14   Q.    Who call who?

15   A.    He had contacted me twice.

16   Q.    I'm sorry?

17   A.    He had contacted me twice.

18   Q.    And, sir, to your recollection, is this the -- is

19   this the first call that you received -- when I say

20   this one, I mean 84-B-1, the phone call at 1:38 p.m.

21         Was that the first call you received from the

22   informant after you last spoke to him on the 18th?

23   A.    Yes, ma'am.

24   Q.    Were there any meetings between -- what, if any,

25   meetings were there between you and this individual

1    between November 18th and November 21st?

2    A.    No meetings had took place.

3    Q.    Just so we're clear, when was the last time you

4    saw this individual in person prior to November 21st?

5    A.    I saw him in person on November the 10th.

6          And before that -- I wanted to clear that up,

7    because last time I said November 5th and I actually

8    think I saw him around November 3rd or 4th.

9    Q.    Okay.  Now, directing your attention specifically

10   to Defense Exhibit 84-B-1, the conversation of 11-21-05

11   at 1:38 p.m., sir, specifically the middle of Page 2,

12   where the informant says to you, "I mean, I'm at my

13   house.  I'm in my house.  You know, my house is -- I

14   have my tapes that I want to go over with you.  It's

15   more safe, you know, over here.  It's quiet" and you

16   respond, "Okay.  The same place I met with you last

17   time.  Right?", what is -- what are you referring to,

18   sir, when you ask him, "The same place I met with you

19   last time?"

20   A.    I'm referring to the apartment that I went to on

21   November 10th that was in -- on Miami Beach.

22   Q.    What response, if any, sir, did you have to the

23   informant's comments that, "I have my tapes I want to

24   go over with you"?

25   A.    What response did I have?

1    Q.     Yes.  If any.

2    A.     I just told him, "Okay."

3    Q.     Do you know what he was referring to when he

4    said, "My tapes.  I have my tapes"?

5    A.     I'm not exactly sure.  There's a possibility he's

6    talking about the *Fahrenheit 9/11* tapes or the Fatah,

7    whatever, Rachman (phonetic) tapes.  I don't know.

8    Q.     Now, turning to Defense Exhibit 84-B-2, which is

9    the conversation that took place at 7:58 p.m., who

10   called who?

11   A.     He called me again.

12   Q.     And in this conversation, sir, do you recall

13   what -- where you were when you received this call?  If

14   you know.

15   A.     I'm not quite sure.  It's possible that I could

16   have made it home.

17   Q.     When he says, "I don't" -- I'm at the top of

18   Page 2.

19          When you say, "We're coming, brother.  We're

20   coming," who are you referring to, sir?

21   A.     I'm referring to myself and, also, whatever

22   brother that would drive me there.

23   Q.     When you say "whatever brother that would drive

24   me there," what do you mean by that, sir?

25   A.     I had problems with my driver's license.  I had

1   some past-due tickets.  And so my driver's license was

2   going into suspension.  So at that point, I couldn't

3   drive anymore.  I tried to drive as less as possible.

4   Q.    And on November 21st, sir, did you -- well,

5   before that, with respect to the second page of 84-B-2,

6   where the informant says, "I just don't want to be

7   missing him because I'm praying alone and I don't like

8   it and I'm waiting for you, Inshallah," first of all,

9   had you engaged in any praying with this individual

10  between November 18th and November 21st?

11  A.    No.

12  Q.    Now, did you, in fact, meet with the informant on

13  November 21st?

14  A.    Yes, ma'am.

15  Q.    How did you get to that apartment?

16  A.    Brother Patrick Abraham had drove me over there.

17  Q.    Was there any particular reason why it was

18  Brother Patrick that drove you?

19  A.    He was the gentleman I was working with that day.

20  So when I was on my way back, I mentioned to him that I

21  would need a ride over to Abbas from work.

22  Q.    Why did you go to the informant's house on

23  November 21st, 2005, sir?

24  A.    Because he had been inviting me and inviting me.

25  Like he said -- you know, like I said before, Abbas was

1    somewhat my friend, too, at the time.  At least I felt

2    that he was.  He didn't know a lot of people even from

3    the first time that I met him.

4         And I became his friend because of, you know, the

5    things that we talked about.  You know, the guy told me

6    about his life experiences and stuff, that he lost his

7    father and everything.

8         So I felt sorry for him in a way.  So that's why

9    I would take out a lot of my time at the times that I

10   did go meet with Abbas and talk with him.

11        And, also, over the fact that his -- at this

12   point now, we have a communication where he's so

13   certain as -- he keeps on affirming to me that he knows

14   a way that he can help me with my financial situation

15   and the money that he's promising me that he can come

16   through on.  So I wanted to go see what all this was

17   all about.

18   Q.   Okay.

19        MS. JHONES:  Your Honor, at this point, I am

20   going to publish a Government exhibit, which is

21   Government's Exhibit, I believe, 42 -- actually, it's

22   Government's Exhibit 43.

23        I believe -- Ms. Arango will correct me if I'm

24   wrong -- the ladies and gentlemen of the jury have this

25   in the binder --

 1              MS. ARANGO:  It's in the synchronized binder.

 2     It's the first transcript in the synchronized binder.

 3              MS. JHONES:  Your Honor, for the record, it is

 4     43 and 43-A that's being published, Government's

 5     exhibits.

 6              THE COURT:  What page?

 7              MS. JHONES:  We are starting at Page 2, your

 8     Honor.

 9              Let me make sure about that, your Honor,

10     because I may be mistaken.

11              No.  That is correct.

12              THE WITNESS:  Pardon me, Ms. Jhones.  I would

13     need a transcript.

14     BY MS. JHONES:

15     Q.    I'm sorry.

16     A.    That's okay.

17              MS. JHONES:  May I approach, your Honor?

18              THE COURT:  Yes.

19              MS. JHONES:  Thank you.

20              (Tenders document to the witness.)

21              Eric, if you could start with the first clip,

22     please.

23              (Whereupon, segments of Government's Exhibit

24     No. 43 were published in open court.)

25

```
 1   BY MS. JHONES:
 2   Q.    Just a couple of questions, Mr. Batiste, if I
 3   may.
 4         Mr. Batiste, you have something in your hand.
 5   A.    Yes, ma'am.
 6   Q.    What do you have in your hand, sir?
 7   A.    I have a couple of items that he handed me of
 8   different pictures of Mecca.  And I have the -- a book
 9   called The Dajowe.
10         And there might be a few more items that he --
11   he's gotten, probably some different names of Allah,
12   stuff like that, he had handed me that he had on top
13   of, like, the fireplace area, it looks like.
14   Q.    All righty.  And did you make any request at this
15   point of the informant?  Well, did you make any request
16   of the person you knew to be Brother Abbas at this
17   point in the meeting?  At the very beginning, did you
18   request anything of him?
19   A.    Did I walk in and request anything?
20   Q.    Did you request anything of him?  Yes.
21   A.    No, ma'am.  When I walked in, I just noticed his
22   apartment and I just looked around.
23   Q.    Did you ask him to do anything?
24   A.    Oh, he was cooking.  He was making beef with
25   rice.  And I know he wanted to offer me some because
```

```
 1    that's what I understood, that he was going to offer me

 2    some.  So I told him I don't eat meat.

 3          Instead of just telling him I'm not going to eat

 4    at all, I just said, "If you can just make some rice,

 5    that would be fine."

 6          MS. JHONES:  Could you continue with the clip,

 7    please.

 8          (Whereupon, segments of Government's Exhibit

 9    No. 43 were published in open court.)

10    BY MS. JHONES:

11    Q.    Sir, do you remember that part of the meeting?

12    A.    Yes, ma'am.

13    Q.    What is going on there, sir, when -- at the

14    bottom of Page 6 when the informant is asking you

15    whether or not you have fixed the Temple?

16    A.    He wants to know how the project -- progress is

17    going at the Temple and did I get it the finances to

18    fix the Temple like I said I was gonna try to do.

19    Q.    What was your response, sir, if any?

20    A.    Well, as he carries off into Page 7, I tell him,

21    "You know, I'm still waiting to get some money.  It's

22    gonna take about 30 days before I get some money."  So

23    I'm speaking of an invoice.

24    Q.    And why are you telling the informant this, sir?

25    A.    I'm -- since -- the subject is brought up about
```

 1   fixing the Temple.  Then I'm bringing up the main

 2   subject that I really wanted to discuss -- and that's

 3   the money issue -- to get a response out of him to let

 4   me know what's the status of what he's been talking

 5   about.

 6   Q.    Okay.

 7         MS. JHONES:  If we could publish the next

 8   clip, which starts --

 9   BY MS. JHONES:

10   Q.    Before we go on to the next clip, just a couple

11   of questions.

12         The next couple of pages, Mr. Batiste, Pages 8

13   and 9:  Do you recall what it is -- what, if anything,

14   you begin to do after Page 7 and up and through Page 8?

15   A.    I begin to read a book -- he handed me another

16   book, a book on jihad.

17   Q.    Do you remember the title of the book, by any

18   chance?

19   A.    The title was *Jihad*.

20   Q.    Was -- who requested that book, sir?

21   A.    I never requested that book.  That was something

22   that Abbas al-Saidi decided to give me.

23         MS. JHONES:  If we could go to the next clip,

24   which is going to start at Page 9, specifically where

25   it says right at the top, "Man, that's nice there."

 1              (Whereupon, segments of Government's Exhibit

 2     No. 43 were published in open court.)

 3     BY MS. JHONES:

 4     Q.      Do you remember this part of the meeting, sir?

 5     A.      Yes, ma'am.

 6     Q.      Let me ask you a couple questions about Page 9.

 7              First of all, directing your attention to the

 8     bottom of Page 9, where it reads, "NB:  Believe me,

 9     Akim, I just waiting for a phone call right now.  Other

10     than that, as long as I get the house I want

11     (unintelligible) come back, get some food in the

12     refrigerator" and it goes on, does the transcript

13     correctly identify the speaker there, sir?

14     A.      No, ma'am.  There's a mistake.

15     Q.      Who was speaking at that point in time?

16     A.      That is the CW.

17     Q.      And after that, where it says, "Right," is that

18     the correct speaker?

19     A.      Yes, ma'am.

20     Q.      And who would that be?

21     A.      That was myself.

22     Q.      And after that, sir, where it says, "NB:  I don't

23     need much.  The brother's getting me the DVD.  They got

24     me the video.  I'm expecting a" -- does the transcript

25     correctly identify the speaker?

1    A.      No, it doesn't.

2    Q.      Who is speaking at that point?

3    A.      At that point, that was the CW again.

4    Q.      And after that, where it says, "Oh, man," who is

5    saying that, sir?

6    A.      That's myself.

7    Q.      Is that correctly reflected in the transcript?

8    A.      Yes.

9    Q.      And after that, finally, where it says, "NB:

10   Computer, so al-hamdu li-llah, that brother

11   (unintelligible)" --

12   A.      That's the CW once again.

13   Q.      Is the transcript correctly -- correct when it

14   reflects you as the speaker?

15   A.      Yes, ma'am.

16   Q.      Is it correct when it reflects you as the

17   speaker?

18   A.      When it says, "That's it" at the bottom?

19   Q.      No.  I'm sorry.  I meant where it says,

20   "Computer, so al-hamdu li-llah."

21   A.      No.  That is the CW speaking right there.  That

22   is not myself.

23   Q.      And after that, where it says, "That's it"?

24   A.      Yes, ma'am.  That is my response, "That's it."

25   Q.      Now, again, where the informant is making a

1   reference, sir, to the, "The brother's getting me the

2   DVD.  They got me the video I'm expecting," what, if

3   any, expectation did you have of any DVDs or any

4   videos, sir?

5   A.    I didn't have an expectation of any DVDs or

6   videos because I never request for that -- for him to

7   provide anything like that to me.

8   Q.    And did -- did you finish?

9   A.    Yes.

10  Q.    Now, directing your attention to Page 10, sir,

11  where the informant says towards the bottom of the

12  page, three speakers up, "Allah knows how happy my

13  family was when I told them about you," do you remember

14  that, sir?

15  A.    Yes, ma'am.

16  Q.    What is your understanding as to what he was

17  saying there, sir?

18  A.    Well, he's always been telling me that he's gonna

19  mention me to his family.  When he came to the Temple

20  specifically, he had told me at that time that he was

21  going to mention me to his family.

22        That's when he began to tell me about the

23  gentleman, if he does come around, that's from his

24  family and how he will want me to carry myself.

25  Q.    Now, when the informant says to you on the same

 1   page, "That's -- I'm so happy.  You don't know how

 2   happy I am getting good, good Muslim brothers.  You

 3   know?", what is he referring to, sir?

 4   A.     That we are of a value to him, because he knows

 5   that he can count on us and he has counted on us in the

 6   past and we have supported him.

 7   Q.     Okay.  Directing your attention back for a moment

 8   to Page 9 -- the bottom of Page 9, Mr. Batiste --

 9   A.     Yes, ma'am.

10   Q.     -- where the informant says, "Computer, so

11   al-hamdu li-llah, that brother (unintelligible)," what

12   is he referring to there, sir?

13   A.     Well, he's talking about getting computers.  When

14   he says "al-hamdu li-llah, that brother," I'm not sure

15   exactly what he might be referring to at that point.

16          I suspect that he's talking about the brother

17   that he was saying that was already in the United

18   States that he wanted me to meet.

19              MS. ARANGO:  Objection.  Speculative.

20              THE COURT:  Sustained.

21              MS. JHONES:  I agree.  I agree, your Honor.

22   BY MS. JHONES:

23   Q.     Now, what, if anything, had the informant told

24   you prior to November 21st about the issue of

25   computers?  Had he mentioned them before?

1    A.    Yes, sir.

2    Q.    When he mentioned computers, sir, what was the

3    context of the reference to computers?

4          MS. ARANGO:  Objection.  Hearsay.

5          THE COURT:  Sustained.

6    BY MS. JHONES:

7    Q.    Did you ever request any computers, sir?

8    A.    No, ma'am.  Actually, when we was over at the

9    Temple -- it was already in the transcript -- when I

10   was showing him the view of the Temple area and I

11   showed him the office area, he mentioned computers --

12         MS. ARANGO:  Objection.  Nonresponsive.

13         THE COURT:  Sustained.

14         MS. JHONES:  That's fine.

15   BY MS. JHONES:

16   Q.    Did you ever make any request for computers?

17   A.    No.

18   Q.    Okay.

19         THE COURT:  We're going to take a break.

20         Do not discuss this case either amongst

21   yourselves or with anyone else.  Have no contact

22   whatsoever with anyone associated with the trial.  Do

23   not read, listen or see anything touching on this

24   matter in any way.

25         If anyone should try to talk to you about this

 1   case, you should immediately instruct them to stop and

 2   report it to my staff.

 3          You may leave your materials at your chairs.

 4   Please be back in the jury room in ten minutes.

 5          (Whereupon, the jury exited the courtroom at

 6   3:27 p.m. and the following proceedings were had:)

 7          THE COURT:  We're in recess for ten.

 8          (Thereupon a recess was taken, after which the

 9   following proceedings were had:)

10          THE COURT:  We're back on United States of

11   America versus Narseal Batiste, et al., Case

12   No. 06-20373.

13          Counsel, state your appearances, please, for

14   the record.

15          MR. GREGORIE:  Richard Gregorie and Jacqueline

16   Arango on behalf of the United States, your Honor.

17          MS. JHONES:  Ana Jhones on behalf of Narseal

18   Batiste.

19          MR. LEVIN:  Albert Levin on behalf of Patrick

20   Abraham, who is present.

21          MR. CASUSO:  Lou Casuso on behalf of Burson

22   Augustin, who's present.

23          MR. CLARK:  Nathan Clark for Rotschild

24   Augustine, who's present.

25          MR. HOULIHAN:  Richard Houlihan with Naudimar

 1   Herrera.

 2              MR. VEREEN:  Roderick Vereen on behalf of

 3   Stanley Phanor, who's present.

 4              THE COURT:  All Defendants are present.

 5              Let's bring in the jury.

 6              (Whereupon, the jury entered the courtroom at

 7   3:58 p.m. and the following proceedings were had:)

 8              THE COURT:  You may be seated.

 9              You are still under oath, sir.

10              You may proceed.

11              MS. JHONES:  Thank you, your Honor.

12   BY MS. JHONES:

13   Q.    Mr. Batiste, before the break, I was asking you

14   some questions about Pages 11 through 14,

15   approximately.  Let me ask you a few more questions

16   before we get into the next clip.

17              On the top of Page 12, sir, where the informant

18   says, "How do you like that book, brother?" and you

19   respond, "That is a good book," what are you referring

20   to, sir?

21   A.    I'm referring to the book that he gave me, the

22   *Jihad* book that I'm reading.

23   Q.    And later on on that Page 12, when -- the

24   informant says, "This is Koran.  See what that says

25   right there?

1          "Yeah," you respond.

2          "Yeah.  The Koran has the answer."

3          And your response:  "That's right."

4          And the informant says, "And people always ask

5     about jihad."

6          What is going on at that point in the

7     conversation, sir?

8     A.    He's pointing to a passage in the *Jihad* book.

9     Q.    And do you recall what that passage was about,

10    sir?

11    A.    No.  Not in particular.  But it's -- the book

12    itself was just confirming that -- everything it's

13    saying, that this is the belief of -- the

14    interpretation of what the Koran is meaning when it

15    talks about jihad.

16    Q.    Okay.  Now, directing your attention, sir, to the

17    top of Page 14, you state, sir, "Mecca, Mecca.  In

18    spite of harm and the harm they received, being in

19    prison made to suffer from hunger and thirst and

20    getting beaten in a horrible manner so, so, much that

21    some of them were not able to sit straight from the

22    severity of their injuries of their beatings" and it

23    goes on.

24          What is going on there, sir, when you are making

25    these statements?

1    A.     I'm just talking about the ground wars that

2    happened during jihad between the Prophet Mohammed and

3    the Jews and all those that had opposed the Islamic

4    people.

5    Q.     And where did you -- from where did you acquire

6    the information that you're talking about in the top of

7    Page 14?

8    A.     This was all contained in the *Jihad* book.

9    Q.     Okay.  Directing your attention, sir, to -- now,

10   just before I get to Page 18, from Pages 14 through --

11   up until Page 18, there are several references, sir,

12   to -- you are seen making various -- very long

13   statements.

14        What is going on when you are doing this, sir?

15   For example, on Page 15.

16   A.     Okay.  All this is information that I'm reading

17   out of the *Jihad* book.

18   Q.     Specifically directing your attention to Page 18,

19   where it says, five speakers down, "See those towers?

20   What are those called?" and the informant says,

21   "These?", "Yeah," and he responds, "This is

22   (unintelligible) mosques.  It's called manada

23   (phonetic)," what are you referring to, sir, when you

24   say, "See those towers?  What are those called?"

25   A.     I'm referring to the rug that he gave me.  He

 1    gave me a rug that had the inscription of it -- of

 2    Saudi Arabia, the -- how it looks in Mecca, and

 3    there's, like, four towers that's there and there's,

 4    like, a square, which I believe is the Kaaba that was

 5    in the middle.

 6          And I'm asking him, "What are these towers?  What

 7    do they mean?"

 8    Q.    Okay.

 9          MS. JHONES:  If we could go to the next clip

10    and -- which starts at Page 19, where it says, four

11    speakers down -- I'm sorry -- eight speakers down, "So

12    now when they call in (unintelligible)."

13          THE WITNESS:  What page?

14    BY MS. JHONES:

15    Q.    Page 19.

16    A.    Thank you.

17          (Whereupon, segments of Government's Exhibit

18    No. 43 were published in open court.)

19    BY MS. JHONES:

20    Q.    Mr. Batiste, do you remember that part of the

21    conversation?

22    A.    Yes, ma'am.

23    Q.    Directing your attention, sir, to the bottom of

24    Page 19, where you state, "But you believe in Allah, in

25    his messenger Mohammed, and that you strive hard and

1    fight in the cause of Allah with your health and your

2    lives.  That's jihad" and -- when you make that

3    statement, sir, where, if anyplace, do you get that

4    information from?

5    A.    I got that when CW 1 draw my attention back to

6    the book.  That's when I read right out of the *Jihad*

7    book.

8    Q.    What follows after that where the informant is

9    talking about, "That's jihad.  That's real jihad, Akim.

10   I just love this book, man" and he goes on and on,

11   where is the informant getting that information from?

12   A.    He's pointing to a certain area in the book that

13   he wanted me to look at.

14   Q.    Okay.  Now, turning -- directing your attention

15   to Page 20 -- I'm sorry -- the bottom of Page 19 and

16   the top of Page 20, at the bottom of Page 19, the

17   informant says, "Prophet told me you can't.  So he

18   started asking him, 'Where is it?'  He said, 'Can you

19   fast as soon as the mujahed leaves his house to go to

20   war?'"

21         And you say, "Uh-huh."

22         And he goes on and says, "I stand up fast without

23   eating."

24         And you respond, "Uh-huh."

25         And the informant says something else.

1         And then you say, "So did you get a chance to see

2    Michael, your cousin?"

3         What did your question about "Michael, your

4    cousin," sir, have to do with what the informant was

5    saying directly above your question?

6    A.    It had nothing to do with it.

7    Q.    Why did you ask that question of the informant?

8    A.    Because his cousin, Michael, pertains to the

9    money that he's been telling me about, the deal between

10   him and Faisal.

11   Q.    After you finish speaking about Michael, the

12   cousin, what, if anything, does the informant do in

13   that conversation towards the bottom of Page 20 and the

14   top of Page 21?

15   A.    He continues reading back into the book.

16   Q.    Okay, sir.

17         MS. JHONES:  Let's go on to the next clip,

18   which starts at Page 28.

19         Just give us a minute, Eric, if you could.

20         Specifically, the clip starts at the third

21   speaker, "Next time (unintelligible).  I messed up

22   today and made the meat and stuff."

23         (Whereupon, segments of Government's Exhibit

24   No. 43 were published in open court.)

25

```
 1    BY MS. JHONES:
 2    Q.    Mr. Batiste, turning -- do you remember, first of
 3    all that, part of the conversation?
 4    A.    Yes, ma'am.
 5    Q.    Turning to Page 28, at the beginning of the clip,
 6    sir, when -- in the middle of the page, the informant
 7    says something unintelligible, "Cost a lot to fix it
 8    up."
 9          And you respond, "Uh-huh."
10          And the informant responds, "(Unintelligible) to
11    make some money from back home.  Patience.  Take a
12    minute, some time.  But Allah, yeah.  Allah.  Inshallah
13    is coming, brother.  Allah don't leave his mujahedin
14    with no money."
15          And you respond, "That's right.  Hey, you
16    know...." and you laugh.
17          What is going on there, sir, in that part of the
18    conversation?
19    A.    I'm talking about fixing up the Temple.  And
20    that's the way he responds, about it costs a lot to fix
21    it up.  And then, at the bottom, he makes a comment
22    about the mujahedin.
23          I just thought it was kind of comical, a little
24    bit about what the book was talking about and kind of
25    like the language he was using.
```

N. Batiste - DIRECT - By Ms. Jhones                98

1    Q.      And later on, in the bottom of that page, you

2    say, "And I went to buy something and I handed one of

3    those dollars you gave me, the 20 -- rare, uh-huh --

4    and the lady look at it.  She just (unintelligible) on

5    the thing."

6            What were you referring to, sir?

7    A.      I was referring to a real incident where I

8    cracked a joke at a lady that worked at Wal-Mart when I

9    went to purchase some items.

10           I used one of the Yemenese $20 that he had given

11   me after she had done ranged up my food and stuff.  I

12   handed it to her and she looked at it and she took me

13   all seriously and she started calling -- I don't

14   know -- I guess the personnel department to find out

15   was this money real or not.

16           And I just told her it was just a joke, and I

17   just paid her the real money.

18   Q.      What money, if any, had the informant given you

19   on that occasion?  What type of money had he given you,

20   if any?

21   A.      I believe I picked up another -- a Yemenese

22   dollar from him or something like that that he had

23   handed me.  But it was no American money he had given

24   me.

25   Q.      Now, directing your attention to Page 29,

1    where -- at the top of Page 29, where you're talking

2    about -- at this point in the conversation, you and the

3    informant and Patrick are doing what?

4    A.     We're eating the rice that he had given us.

5    Q.     Now, after some pause in the conversation, the

6    informant says, "You remember the guy I told you

7    about?"

8           And you respond, "Which one?"

9    A.     Yes, ma'am.

10   Q.     What were you referring to, sir, when you said,

11   "Which one?"

12   A.     One of the guys that he was telling me about.  I

13   mean, he told me about his father-in-law.  He told me

14   about his brothers from New York that was his family.

15          Then he told me about the associate brothers.

16   And then he told me about Mike, who had just took over

17   the store, and a short man that was in there helping

18   him.

19          So he was always going on a constant rampage

20   about who he knew.  So I didn't know in particular who

21   he was talking about.  So that's why I asked him which

22   one.

23   Q.     And at the bottom of the page, sir, when you say,

24   "So what about this guy?  What -- what -- I mean,

25   what -- what is he?", what, if anything, does the

1    informant respond to you, sir?

2    A.    He just says, "Well, what I know."

3          And then I asked him directly, "Is this somebody

4    that your uncle knows?"

5    Q.    Okay.

6          MS. JHONES:  Let's go on to the next clip,

7    which starts at Page 30, where it reads a little bit in

8    the middle -- towards the middle of the page, "Does he

9    speak English?"

10         THE WITNESS:  What page again?

11   BY MS. JHONES:

12   Q.    I'm sorry.  Page 30.  The middle of Page 30.

13   A.    Okay.

14         (Whereupon, segments of Government's Exhibit

15   No. 43 were published in open court.)

16   BY MS. JHONES:

17   Q.    Mr. Batiste, do you remember this part of the

18   conversation?

19   A.    Yes, ma'am.

20   Q.    Okay.  Let me ask you a few questions.

21         At the bottom of Page 30, sir, when -- the

22   informant says, "He can explain back home more about

23   true brothers, this -- and, hey, I'm sure he would help

24   (unintelligible) I have, like, all the Muslims help

25   each other.  I'm sure he'd help us so."

1           And you respond, "He -- he ain't gonna get scared
2       about our guerrilla training, will he?"
3           And the informant responds, "I don't think so,
4       Akim.  I think he's very trained.  Okay.  Believe me."
5           And it goes on to Page 30.
6           And there's laughter.
7           Why -- did you laugh, sir?
8       A.     Yes, ma'am.
9       Q.     Why do you laugh, sir?
10      A.     Because I'm cracking jokes with the guy.  I mean,
11      he knows the guerrilla training that I'm talking about
12      is just the self-defense that he sees we always do --
13              MS. ARANGO:  Objection.  Speculative.
14              THE COURT:  Sustained.
15      BY MS. JHONES:
16      Q.     Why are you laughing, sir?
17      A.     Because it's -- I mean, the conversation is
18      partial comical to me.  And at the same time, when I
19      say "guerrilla training," I'm not referring to no real
20      combat guerrilla training that you -- a person might
21      see on TV that the military might be doing.  I'm just
22      referring to the self-defense that we do and the
23      workout that Abbas always see us do.
24      Q.     Now, when he says at the top of Page 31, "But,
25      hey, I want to get some training myself.  I'm getting

1  weak these days.  Brother, believe me, I used to work

2  out and now I don't.  You remember I have a crack in my

3  back.  You told me not to do that no more" and he goes

4  on and on, sir, what is he referring to there?

5  A.    I invited him to one of our self-defense training

6  classes.  I would have loved to seen Abbas get on the

7  mat and demonstrate what he knew.  But he said he had a

8  bad back, and he was just reminding me of the bad back

9  that he had.

10  Q.    Why do you ask Mr. Abbas al-Saidi in the middle

11  of the page, "When we started -- so how is this brother

12  that's coming?  Does he have a clean record or is he

13  wanted?"  Why do you ask those questions?

14  A.    I'm getting uncertain about what he's talking

15  about, and I'm getting a little scared, like, a little

16  more concerned about what this guy's really talking

17  about and what is he up to.

18        So I'm trying to pump information out of him to

19  see if he gonna come straightforward with me and say,

20  "Hey, this is who this person is" or, "I don't really

21  know this person."  But he's not really giving me much

22  information.

23  Q.    Now, what did he tell you about what he does know

24  about him, directing your attention to the bottom of

25  Page 31?

1    A.    He says, "I don't know him."

2    Q.    What, if any, references in this conversation,

3    sir, does the informant -- where in this conversation

4    does the informant tell you this man's from Al-Qaeda?

5    A.    He never told me this man was from Al-Qaeda.

6    Q.    In the bottom of Page 31, where Patrick Abraham

7    says, "But what's his mission?  I mean, what -- what

8    is his purpose?  What is the purpose that

9    (unintelligible) I mean?" and the informant responds at

10   the top of Page 32, "Well, I was thinking about going

11   home.  Remember, Brother Naz, when we talked about

12   that?" and you say, "Uh-huh," what is your

13   understanding -- what did you mean when you said,

14   "Uh-huh" in response to the informant's question,

15   "Well, I was thinking about going home.  Remember,

16   Brother Naz, when we talked about that?"

17        What is -- what was he referring to, sir?

18   A.    When he was talking about that he would be going

19   back to Yemen and that he would be speaking with his

20   father-in-law personally in Yemen to see what his

21   father-in-law would be able to do for us.

22   Q.    Now, the informant tells you, sir, in -- after

23   you say, "Uh-huh" in the top of Page 32, "They told me,

24   'No.  Don't have him in the scene right now because, if

25   you go to Yemen, it's gonna look like, you know, what

```
 1    is this guy going to Yemen for?'"

 2         And he goes on and on.

 3         And he says, "'Cause once you go over there and

 4    you come back, they're gonna look at you different.

 5    They look at you totally different.  You're a Muslim.

 6    You already went to the Middle East.  It's not gonna be

 7    look good towards you."

 8         And you say, "Uh-huh."

 9         What is -- what -- when you respond, "Uh-huh,"

10    what is -- what are you thinking in response to what

11    the informant just said?

12    A.   I'm trying to see exactly where he's going at it

13    with it, because we talked about his home country and I

14    said I would like to visit his home country according

15    to how beautiful he told me it is and everything.

16         But he kind of mixed in the fact that -- when he

17    says, "They gonna look at you totally different.

18    You're a Muslim and, when you come back from the Middle

19    East, they're gonna look at you totally different," and

20    I'm trying to see what was the purpose of him really

21    saying that.

22         I'm not in full agreement of understanding why

23    he's saying that.  So that's why I say, "Uh-huh."

24    Q.   Okay.

25         MS. JHONES:  The next clip starts at Page 33,
```

 1    towards the middle of the page, where it reads, "Hey, I

 2    might look weak, man, but I got a lot," et cetera,

 3    et cetera.

 4              If we could play the next clip, Eric, please.

 5              (Whereupon, segments of Government's Exhibit

 6    No. 43 were published in open court.)

 7    BY MS. JHONES:

 8    Q.    Do you remember that part of the conversation,

 9    sir?

10    A.    Yes, ma'am.

11    Q.    Directing your attention to Page 33, the

12    informant says, towards the bottom of the page, "I seen

13    it as a chance for them to bring somebody to come over

14    there and give us some -- support the mosques, do this,

15    do that.  I mean, I'm not (unintelligible) gonna

16    happen, but I have a good feeling about him.

17          And you respond, "You do?"

18          What is going on there, sir?  What is your

19    understanding as to what it is the informant is telling

20    you?

21    A.    He's informing me that this is a good idea that

22    he has, to bring this guy over here so we can have this

23    opportunity to have a chance to get the support that

24    he's been telling us about that would be financial.

25    Q.    Okay.

1          MS. JHONES:  The next clip starts at Page 37.

2          If I may just have a moment, your Honor, with

3     Eric.

4          THE COURT:  Sure.

5          (Discussion had off the record between counsel

6     and assistant.)

7          MS. JHONES:  Page 37 starts at -- I believe it

8     starts right at the top, where it says, "Yeah.  Oh, I

9     don't -- I don't think..."

10          (Whereupon, segments of Government's Exhibit

11     No. 43 were published in open court.)

12     BY MS. JHONES:

13     Q.    Do you remember that part of the conversation,

14     sir?

15     A.    Yes, ma'am.

16     Q.    Let me ask you a few questions about those pages.

17          When -- the informant is telling you at the top

18     of Page 37, "Yeah.  Yeah.  And because he was supposed

19     to be coming -- teaching us a lot of Arabic, a lot of

20     Koran, a lot Hadiths.  We'll be in jihad together.  I

21     mean, he got to speak English."

22          Patrick Abraham says, "Right."

23          And the informant said, "See?"

24          Patrick says something unintelligible.

25          The informant says, "I'm hoping that that's the

1    link.  Remember, I told you (unintelligible) and

2    before."

3         And you respond -- you ask, "So does he know bin

4    Laden?"

5         And the conversation on bin Laden goes down to

6    Page 37.

7         What is going on there, sir -- well, first of

8    all, when the informant says, "He's coming to teach us

9    a lot of Arabic, Koran, Hadiths," what is your

10   understanding as to what the informant is telling you

11   at that point?

12   A.    At that point in the conversation -- because I

13   just previously told him I don't know about this guy

14   coming -- and that's marked on Page 34 -- he's trying

15   to reassure me that this guy that's coming -- he's just

16   coming just like how he does, just talk about Koran,

17   talk about jihad and read the Hadith, which I believe

18   is the Islamic law.

19        And that's one of the purposes that he knows that

20   this guy's coming and that's the main purpose of why

21   he's coming.

22        So as at conversations goes on, I try to put an

23   ice-breaker on it.  And I say, "Well, does he know

24   Osama bin Laden?" --

25   Q.    Does --

1   A.    -- to see --

2   Q.    I'm sorry.  Go ahead.

3   A.    -- to see what his response would be.  Would it

4   be like, "Oh, yeah.  Well, you know, he's with

5   Al-Qaeda" or whatever.

6       And if he would have said he was with Al-Qaeda at

7   that point, I would have told him, "Forget about it.  I

8   don't want to meet this guy at all."

9   Q.    Now, when you refer to smoking a cigarette with

10   Osama bin Laden on the next page, 38, what is going on

11   in the conversation, Mr. Batiste, when you're talking

12   about smoking a cigar with Osama bin Laden and the

13   informant responds, "Hey (unintelligible) it's not a

14   problem, man, (unintelligible)"?

15       At the top of Page 39, there is laughter.

16       What is going on there when you're referring to

17   this individual referred to as Osama bin Laden?

18   A.    I'm just cracking a joke.  CW 1 also knows that I

19   don't smoking cigarettes.  So it was obvious that I was

20   just cracking a joke just to be funny and, also, at the

21   same time, just going back and trying to reinitiate an

22   ice-breaker to see who is he talking about bringing.

23   Q.    In the middle of Page 39, when the informant

24   says, "Believe me" -- well, before I get to that

25   paragraph, one or two lines up where the informant

```
1    says, "I mean, he's not the devil.  He's
2    (unintelligible) like us, man" and you respond, "Yeah,"
3    has -- prior to 11-21, what, if any, references has
4    this informant made to you about utilizing the word
5    "devil"?  Has he ever mentioned that word before to
6    you?
7    A.    Yes, ma'am.
8    Q.    Was it anything unusual to hear this man refer --
9    utilize that word?
10   A.    No.  He's used that word pretty often, "devils,"
11   "Satan," "God," "Allah" and so on.
12   Q.    Now, when he says, "Believe me, bring
13   Fahrenheit 9/11, but I lent it to a friend of mine to
14   see it.  I promise you the next time we're meeting I'm
15   gonna show you.  I'll bring some Koran and bring some
16   Hadiths and even bring some, like, words that was
17   recorded by Osama bin Laden himself.  Anyway, when we
18   get -- when I get him back, Inshallah, when we meet
19   next time, wherever we get --" and you respond,
20   "Yeah" --
21   A.    Uh-huh.
22   Q.    -- what is going on there, sir?
23   A.    I'm giving him a chance to talk.  I'm seeing what
24   he's trying to draw up to.
25   Q.    Now, what request, if any, had you made for any
```

1    videos of *Fahrenheit 9/11*?

2    A.    That's my point.  I hadn't made any requests for

3    any of these videos or Osama bin Laden, the speeches,

4    whatsoever.  This is all his conversation that's coming

5    from -- generating from him.

6    Q.    Why not?  Why had you not made any requests for

7    Osama bin Laden speeches, *Fahrenheit 9/11* tapes?  Why

8    hadn't you made those types of request of this

9    informant?

10   A.    Those things never interested me, and I had no

11   reason to even want to look at those things.

12   Q.    What conversations had you had with this

13   informant prior to November 21st about Osama bin Laden,

14   about Al-Qaeda or about speeches that may have been

15   made by this individual?

16   A.    I hadn't had any conversations with him about

17   Al-Qaeda in specific.  He has mentioned Osama bin Laden

18   in the past when he talked about the political things

19   going on around the world.

20   Q.    Okay.

21        MS. JHONES:  Your Honor, I believe we're going

22   to have to switch the video.  There's a problem with

23   the one we have in the computer.  I just need a second.

24        THE COURT:  Sure.

25        MS. JHONES:  Thank you.

1              (Discussion had off the record amongst

2     counsel.)

3              MS. JHONES:  Your Honor, would the Court mind

4     turning off the video just to test it?

5              THE COURT:  Okay.

6              MS. JHONES:  This is just to make sure we have

7     the right one.

8              Thank you.

9              Your Honor, we only have one clip on this

10    video that we're going to play.  Then I'm going to

11    resort to the transcript just because of this technical

12    problem.  Okay?

13             THE COURT:  Okay.

14             MS. JHONES:  If the Court would please --

15    we're going to go ahead and publish.  I don't know if

16    the Court has to do anything with the computer up there

17    in order to be able to publish.

18             THE COURT:  How are you publishing?

19             MS. JHONES:  We're publishing the last clip

20    from the video, which is going to be at --

21             THE COURT:  What exhibit is this?

22             MS. JHONES:  This is the same exhibit --

23             THE COURT:  Go ahead.

24             MS. JHONES:  -- a continuation of the exhibit.

25    We just had a problem with the one --

1              THE COURT:  What page?

2              MS. JHONES:  The page is going to be, your

3    Honor -- I apologize, your Honor.  I lost the page.

4    Just one moment.

5              It's going to be Page 47, top of the page,

6    where, in parentheses, it states "(Brief pause in

7    conversation)."

8              (Whereupon, segments of Government's Exhibit

9    No. 43 were published in open court.)

10   BY MS. JHONES:

11   Q.    Do you remember that part of the conversation,

12   sir?

13   A.    Yes, ma'am.

14   Q.    At the beginning of -- at the top of Page 47,

15   where the informant says -- well, actually, where you

16   say, "So what did they say about Saddam Hussein?", do

17   you see that, sir?

18   A.    Yes, ma'am.

19   Q.    Why do you say that?

20   A.    I'm reading from a newspaper that he had that had

21   Arabic and English in it.  It was a pretty radical

22   newspaper.  It was talking about different issues

23   around the world, and it did mention Saddam Hussein in

24   the article.  And so I was asking him to explain to me

25   what they're talking about.

1    Q.    And was that one of the items that -- well, where

2    did that newspaper come from?

3    A.    I really don't know.  I just know it had an

4    Islamic name to it and the newspaper was talking about

5    jihad and the war going on in the Middle East and

6    what's going on in Palestine.  It had world news on

7    there.

8    Q.    Okay.  Now, towards the middle of Page 47, where

9    it reads, "(Brief pause in conversation)" and after

10   that it says -- the informant says, "Hey, brother,

11   won't you -- won't you pick him up from the airport?"

12   and you say, "I would," what is your understanding as

13   to what he's referring to?

14   A.    He's referring to CW 2, who would be at the

15   airport, the brother he's been telling me about.

16   Q.    And what, if anything, do you tell the informant,

17   sir, about what you plan to do when you go to the

18   airport to pick up this individual?

19   A.    I'm trying to understand more of the role that

20   he's been handing to me that he would want me to play.

21         And I'm trying to figure out, you know, "How

22   should I come across to this guy that you got me

23   meeting?"

24   Q.    What, if anything, do you say -- what do you mean

25   when you -- down in the bottom of Page 47, when you

1    say, "Because, you know, airport with my big, old,

2    white turban on, I mean, that'd be too hot

3    (unintelligible).  I might wear one of these hats like

4    this with a big gold chain and my gold -- and gold in

5    my mouth" and then there's laughter?

6        What is going on there, sir?

7    A.    There's a mixture of things.  I'm still trying to

8    figure out the identity of this guy.  At the same time,

9    I'm cracking a joke, me going to the airport looking

10   like an Islamic fundamentalist as -- in comparison --

11   as looking like a drug dealer to this guy or a rapper

12   or whatever.

13       And I find -- I was just cracking a joke about

14   it.  And he found it to be very comical.

15   Q.    Okay.

16       MS. JHONES:  Your Honor, at this point,

17   because of the problem with the DVD, I'm going to use

18   the ELMO, with the Court's permission.

19           THE COURT:  Sure.

20       MS. JHONES:  Thank you.

21   BY MS. JHONES:

22   Q.    Now, after that page, after Page 47, directing

23   you --

24       MS. JHONES:  Your Honor, I apologize.  I don't

25   have to use the ELMO.  I didn't realize everybody has a

1    copy of the transcript.  I apologize.

2              THE COURT:  No problem.

3    BY MS. JHONES:

4    Q.    Directing your attention to Page 48, when you say

5    at the top, "You know, but when he -- when he gets to

6    the Temple, all of a sudden I put my turban and I grab

7    my staff and my sandals and it'll be 'Asalam alaikum

8    alaikum'" and the informant says, "He gonna be like,

9    'What happen?'" and there's laughter, what is going on

10   there, sir, when you make that comment to the informant

11   and he responds, "He gonna be like, 'What happen?'"

12   A.    I'm just telling him the joke all over again of

13   the -- of two stereotypic issues, what people

14   stereotype people to look like if they're in the hood

15   and they're drug-dealing or they're a street thug,

16   how they would look and act, as opposed to at the

17   same time how a person would stereotype an Islamic

18   fundamentalist, how they would look and how they would

19   talk and act.

20         I'm comparing the two and I'm using the example

21   in comparison of the two of me actually meeting this

22   guy and he's coming by the Temple and I show him one

23   role where I look like this street guy that's really

24   thugged out from the hood, wearing a gold chain and a

25   hat and talking very "street" and then, when he gets to

1    the Temple, then I flip the script and now I turn into

2    this Islamic fundamentalist guy and I'm saying, "Asalam

3    alaikum Aki," which he always says to me.

4          And he's laughing and he's like, "That's kind of

5    way out there," and that's when he goes further and

6    says, "Well, he's gonna say, 'Well, these guys ain't no

7    real guerrillas.'"

8    Q.    Did --

9    A.    I'm sorry.

10          That I would make that statement, that he would

11   look at us and go, "These guys ain't no real

12   guerrillas."

13   Q.    While this conversation is going on, sir, who, if

14   anyone, is laughing?

15   A.    Me and CW 1 are both cracking up.

16   Q.    Okay.  In the bottom of the page, you say, "Well,

17   now we can go up there with our flags now

18   (unintelligible) airport."

19          And the informant, at the top of Page 49, said,

20   "It's up to you, brother."

21          And again, there's laughter.

22          Who in the conversation, sir, is laughing?

23   A.    CW 1.  He knows I'm just cracking another joke.

24   Q.    Okay.  Now, directing your attention, sir, to

25   Page 50 of the transcript, where it says, "In

1    sandals" -- in the middle -- towards the middle part of

2    the page, you say, "And sandals, just like here.  It's

3    just now, you know, 'cause I got to make money

4    (unintelligible)," what are you referring to there,

5    sir?

6    A.    I'm referring to the real missions that me and

7    the brothers used to go on and that I was saying to him

8    that I haven't been doing any kind of missions like

9    that in the areas that we used to walk around and talk

10   to people and that the reason why is because I have to

11   make money now to support the construction companies so

12   everybody can get paid.

13   Q.    Okay.  And directing your attention, sir, to the

14   bottom of Page 52, sir, where the informant says,

15   "Brother, that -- that (unintelligible) you can take

16   that with you to read it because --" and you say in the

17   top of Page 53, "Yeah" and the informant says, "It's

18   really good.  But it's the whole story, man.  That's

19   what you asked for.  I got it for you and that's the

20   whole story," what is the informant referring to, sir?

21   A.    He is referring to the dajowe book that he had

22   given me.

23   Q.    Okay.  Did you take that book with you, sir, at

24   the end of this meeting?

25   A.    No, ma'am.

1    Q.    Now, In pages -- well, let's go to Page 52.

2          At the top of the page, you talk about -- you

3    state, "Yeah.  We have to fix it.  Now, let me ask you

4    this.  Now, Muslims:  Do they believe -- do they

5    believe Jesus will come back in flesh and blood?"

6          The informant responds, "Flesh and blood?"

7          And the conversation goes on for the next few

8    pages.

9          What is the subject matter of what you and the

10   informant are talking about, starting at Page 54 and

11   continuing on for the next, I believe, couple of pages

12   or three pages?

13   A.    There's -- I'm -- there's a confrontation of

14   conversation right now.  I've given him a confrontation

15   of a different idealistic belief, which would be a

16   Christian type of ideology.

17         I'm comparing it to the ideology that he's given

18   me about Islam, and I'm asking him questions about

19   certain things that Christians believe.

20   Q.    Later on, on the middle -- towards the bottom of

21   Page 57, there is the -- the informant asks you,

22   "Listen, if you'll please look, brother, you know, 'Fat

23   Boy'?  If you find somebody, ask him about him for me,

24   man.  I want to know where he at."

25         What is he referring to, sir?

1    A.    He's referring to a gentleman that I met because

2    he was a friend of my next-door neighbor.  And Abbas

3    has been mentioning this guy to me ever since he --

4    ever since I understood that his AK-47 was missing,

5    that this was the guy that was in possession of that

6    firearm.  He wanted to get in contact back with this

7    guy.

8    Q.    Did you make any contact with "Fat Boy"?

9    A.    No, ma'am.

10   Q.    Okay.  Now, directing your attention, sir, to

11   Page 64 of the transcript, let's start with the top of

12   the page, if we can.

13         When you ask the question, "They got weed in

14   Yemen?", do you see that, sir?

15   A.    Yes, ma'am.

16   Q.    What was going on in the conversation at that

17   point in time, sir, on the top of Page 64?

18   A.    Well, Abbas had got, like, a little disturbed

19   over the question of me asking about Islam and how I

20   was confronting it with other -- another ideology.

21         So I switched the conversation to something that

22   I felt that he --

23         MS. ARANGO:  Objection.  Speculative and

24   nonresponsive.

25         THE COURT:  Sustained.

BY MS. JHONES:

Q.     What was your understanding as to what was happening in the conversation towards the bottom of Page 63 and the top of Page 64, Mr. Batiste?

A.     I was just changing the conversation to knowledge that he had about marijuana --

Q.     Okay.

A.     -- in other countries -- or in his own home country.

Q.     And when you get to the bottom of Page 64, where the informant -- strike that -- you say, "You think it's possible that the prophet didn't want to mention about it?"

      The informant says, "Yes.  It's possible that not even -- not only the prophet (unintelligible) weed nobody knew about it" and it goes on and on.

      What is it that you are -- what is going on in the conversation at that point?

A.     I had asked him, "Did the Prophet Mohammed ever smoke a joint?"

      And he's giving me the best answer he has.

Q.     Now, going on to Page 65, sir, when -- let me ask you this:  On Page 65, what is going on at that point in the conversation?

A.     I'm trying to see how familiar he is with the --

1    with Africa and the Middle East, because we never had

2    that conversation before where I asked him specific

3    regions:  "What do you know about this area?"  Like,

4    for example, "What do you know about Afghanistan and

5    Palestine?  Have you been to places like Morocco?"

6    Q.    Okay.  Now, directing your attention to Page 66,

7    specifically in the middle of the page, where -- the

8    informant says, "Man, them brothers are getting real

9    serious.  They didn't care about nobody.  They don't

10   care about nothing."

11         And you respond, "What?"

12         And the informant goes on after your question and

13   states, "It's getting serious, man.  It's getting too

14   hot.

15         "They just wanted to let the world question

16   why what's going on is happening, why what's happening

17   is happening.  So they don't care what's -- what's

18   done, what's happened.  They want damage and to be

19   complete."

20         He goes on to talk about a lot of innocent people

21   that got killed.

22         "Bottom line, it is war, politic, and they don't

23   care about innocent persons, even though in the Koran

24   right there, in jihad, they say you don't kill elders,

25   womens and kids.  You don't do that.  But if you had

1    to, you will no matter what it takes."

2          And you say, "Oh, wow."

3          What is going on at that point in the

4    conversation, sir?

5    A.    He's telling me how the Islamic people are being

6    taken advantage of by other countries, killing women

7    and children that are Muslims in their country.

8          He's also saying at the same time that Islamic

9    people are not going to just stand there and just take

10   it.  They're going to be on the uprise and they're

11   going to start fighting.

12   Q.    Okay.  Directing your attention to Page 67 where

13   the informant says, "Brother, inside a guerilla and

14   soldier, no American would want to go to the Middle

15   East and that's the final definition.  That's what they

16   want to do.  They want -- they want nobody to go from

17   America to invest over there 'cause investing is just

18   like they know coming to you giving 100, $200,000, but

19   I'm taking over your (unintelligible)" and it goes on

20   and on.

21          At this point in the conversation, sir, after you

22   were talking about Yemen and marijuana, how does the

23   conversation change, if any?

24   A.    It changed when I began to ask him about world

25   information.

```
 1    Q.      And did it change?

 2    A.      I mentioned to him about a situation that I had

 3    seen on the news that day about something that happened

 4    at a hotel bombing or something like that.

 5    Q.      Could you direct me where that is, sir.

 6    A.      Yes.  Page 66.

 7    Q.      Where is that?  I'm sorry.

 8    A.      That would be at the top of the page.

 9    Q.      Where it says, "Hey, you heard about that big

10    bombing they had at the hotel in England?"

11    A.      Yes, ma'am.

12    Q.      Is that what you're referring to?

13    A.      Yes.

14    Q.      Why did you ask that question?

15    A.      I asked that question because I wanted to get

16    back to the person that's coming.  So I felt, if I

17    chose this angle to talk about politics, that Abbas

18    will give me more information about the situation.

19    Q.      Did you get more information, sir?

20    A.      He didn't give me much more information other

21    than what he spoke of in the past.

22    Q.      Which was what, sir?

23    A.      That he's not sure this guy is coming, but he is

24    coming to give us some support, and that we will find

25    out more information about this guy, but we need to
```

1    organize a plan that we could tell this guy about so

2    that he would be able to give us funding.

3    Q.    Now, on Page 68, sir, you state in the middle of

4    the page, "You've got -- you cut off food supplies."

5          The informant says, "That's what America did,

6    light, food, water, phone."

7          After that, you say, "Uh-huh.  Yep."

8          And the informant says, "Yeah.  But do we have

9    the -- the peoples to do it, man?"

10         And you say, "It's easy.  It's very easy to do,

11   but it takes a lot of support."

12         And the informant responds, "That's not an issue,

13   brother.  You see?  If we could organize a plan for

14   this guy until he comes --"

15         And you say, "Uh-huh" at the bottom of Page 48.

16         What is going on there, sir?

17   A.    This was what Abbas had led me to believe, that

18   this was the things that we needed to talk about when

19   this gentleman would come.

20   Q.    At the top of the page, where it says, "Bring it

21   to the table.  The support is coming.  I already

22   spoke -- I already spoke more than that, more than

23   once, you about the support.  It's not an issue.  But

24   we need to be organized.  We have to have the plan

25   ready.  We need that amount of money.  We need this

1    amount of this, this amount of this.  And we're gonna

2    do this.  From there, they gonna help us on it" and you

3    say, "Uh-huh," what plan, sir, had you discussed with

4    Paid Informant No. 1, if any, prior to November 21st of

5    2005?

6    A.    I hadn't discussed any plan about attacking the

7    United States or nothing of this type with Abbas.

8    Q.    What is your understanding when Abbas al-Saidi is

9    saying, "But we need to be organized.  We have to have

10   the plan ready.  We need this amount of money.  We need

11   this amount of that" -- or "this amount of this, this

12   amount of this, and we're going to do this.  From

13   there, they're gonna help us work on it"?

14         What is your understanding as to what he is

15   telling you at that point in the conversation, sir?

16   A.    Well, it was very clear that Abbas made it to me

17   that, when this gentleman would come, that I had to

18   have this plan to tell this guy and, if I didn't have

19   this plan to tell this guy, then he was not gonna give

20   us the support.

21         So I needed to get organized with my thoughts.  I

22   needed to have a plan ready so, when I talked to this

23   guy, it would -- it would confirm what Abbas had been

24   telling him.

25   Q.    Bottom of Page 69, where -- the informant says,

1    "Well, look.  Listen.  What I'm explaining, they may be

2    hard, so hard that you can't pay the people to change

3    their mind.  They has to have (unintelligible) from the

4    they heart."

5          And you say, "The people -- believe it or not

6    (unintelligible) people come knocking at the mosque all

7    the time."

8          The informant says, "Al-hamdu li-llah."

9          By the way, do you know what "al-hamdu li-llah"

10   means?

11   A.    No.

12   Q.    Okay.  When the informant says, "The people that

13   change their mind, that has to be (unintelligible) from

14   the heart" and you respond, "The people, believe it or

15   not...", what are you referring to, sir?

16   A.    I'm referring to the people that come by the

17   Temple and they see us fixing it up and they want to be

18   a part of it.

19   Q.    When you say, "We're not gonna open" -- again,

20   top of Page 70 -- "We're not gonna open -- we don't

21   even go -- we don't even go looking for them because

22   you want -- you got to understand, they tired of being

23   put down.  They're tired of being stomped on by the

24   system.  Everybody -- hey, the only thing everybody has

25   in common, everybody hate the system" and the informant

1    responds, "Believe me, it's your right.  Absolutely.

2    But you absolutely got your right" and you say,

3    "Uh-huh," what is going on there, sir?

4    A.    Well, I'm telling him of the different grievances

5    that I've heard from the people out there on the street

6    of how they've been put down by the system and the

7    brutality that they have faced.

8         And Abbas knew that I was very sympathetic to

9    that, and he also knew that I had like a Black

10   Panther/Malcolm X side to me.  This is what he was

11   trying to tap into to get me to go forth with this

12   plan.

13   Q.    What does that mean, sir --

14   A.    That means that he knew I was willing to speak

15   out things that I felt that were wrong about the

16   Government.

17   Q.    When you say in the middle of Page 70, "So what

18   we got to do is we got to get those same people that

19   been locked up, locked up, treated bad by the system,"

20   et cetera, et cetera, and further down in that

21   paragraph, you say, "You see what I'm saying?  I done

22   this" -- expletive -- "before (unintelligible).  I used

23   to be -- there's one gang that -- that's just as big as

24   the Crips (phonetic).  Basically, New York, too.  I

25   know they in New York.  But you probably heard of it.

1    It's called the Black Stones (phonetic)," what are you

2    referring to, sir?

3    A.    I'm talking about the different gangs that was in

4    New York.  Abbas -- he was from New York.  And I was

5    trying to refer to him in the street terminology that

6    he would be familiar with.

7    Q.    Does that continue on on the next page, sir?

8    A.    Yes, ma'am.

9    Q.    Okay.  On Page 71, you tell the informant in the

10   middle of the page, "I already got different cells and

11   different places just waiting on me to make a call."

12        What are you talking about?

13   A.    That right there -- that wasn't the truth.  I was

14   just telling Abbas that information, and I was giving

15   him that information to let him know that this is the

16   information that I will be giving to CW 2.

17   Q.    When you say CW 2, who are you referring to, sir?

18   A.    The gentleman that's coming.

19   Q.    In the middle of the page where it says, "The

20   support.  Because you see what I'm saying?  It's easy

21   for me to say 'yeah'" and the informant says, "That's

22   not a problem.  What do you need and what do we need it

23   for?", what is your understanding as to what the

24   informant is saying?

25   A.    Are we still on Page 71?

1    Q.    Yes, sir.  Page 71 towards the -- six speakers

2    up.  "The support.  Because you see what I'm saying?

3    It's easy for me to say 'yeah.'"

4    A.    Oh.  I'm telling him that I'm agreeing with him,

5    that I'm going to go ahead and be part of this, of

6    which -- what he been giving me hints on on this role

7    that I should play to meet this guy.

8    Q.    Now, at the bottom of Page 73, sir, the informant

9    says, "So even though we have the support, we're gonna

10   share -- we're gonna share what we have.  But we still

11   gotta understand that it's not always about what we'll

12   get.  It's what we do.

13         "'Cause in small example, bin Laden, billions and

14   trillions that he earned and live in a cave.  I'm sure

15   he didn't want as a rich man, but he has to -- and

16   that's jihad.

17         "Now, I'm not saying that we're gonna go work

18   (unintelligible) so we can do jihad.  What I'm saying

19   is the time's important.  The support is important.

20   Who -- who we support on wants to be important in the

21   final destinations, but we are heading up to gotta be

22   clear so we can get much support we want."

23         And you say, "Right."

24         What is your understanding, sir, as to what the

25   informant is conveying to you in that part of the

1    conversation, bottom of Page 73, top of Page 74?

2    A.    He's assuring me that, you know, we're not

3    putting together a plan, when he says, "I'm not saying

4    that we're gonna work (unintelligible), which is a plan

5    so we can do jihad.  What I'm saying that is it's

6    important.  The support is important."

7         So he's letting me know that, you know, even

8    though we're gonna go through this -- doing this, that

9    doesn't mean that we're gonna really do jihad.  It's

10   just only for the money.

11        And then that's when he keeps on going on into

12   Page 74, where he says -- at the bottom of Page 73,

13   where he says, "Who we support on our wants" and then

14   on 74 he says "To be important in the final

15   destination.  But what are we heading up to?  Gotta be

16   clear so we can get much support we want."

17        So what he was saying again is that we have to --

18   we have to have the plan and it has to be clear what

19   the plan looks like and sound like so we will be able

20   to get the support that we do want.

21   Q.    Had there been any discussions about any plan

22   that you had -- had there been any discussions with

23   this informant prior to November 21st?

24   A.    No, ma'am.

25   Q.    Why not?

```
 1   A.     I didn't have a plan.  There was no reason for me

 2   to have any plan.

 3   Q.     When the informant says on the bottom -- towards

 4   the bottom of Page 74, "And got to be clear, clear,"

 5   what is your understanding as to what it is that he's

 6   saying, sir?

 7   A.     That in the plan -- that it has to be clear that

 8   we want to attack somebody.

 9   Q.     At the bottom of Page 76, sir, the informant

10   says, "Always Jesus Christ come back and that's what

11   Koran is saying, brother."

12          And you say, "Yeah?"

13          And the informant says, "Always between good and

14   evil -- is always a fight till he comes back, 'cause

15   when he comes back, he's gonna perish the world, tells

16   the world and then (unintelligible) and

17   (unintelligible)."

18          And you go on and start -- and you respond by

19   saying, "But think about it.  If he tells the world the

20   truth" and the conversation goes on.

21          What is going on, sir, at that point in time in

22   the conversation at the bottom of Page 76 and the top

23   of Page 77?

24   A.     That was a theological confrontation that me and

25   CW 1 was going through.  I was explaining to him at
```

1    that point that I felt that, when Jesus comes back,

2    that it would be -- he would bring the world to world

3    peace, and he was saying, no, it's always gonna be a

4    balance between fighting between good and evil --

5    Q.    And --

6    A.    -- forever.

7    Q.    I'm sorry?

8    A.    Forever, eternally.

9    Q.    Okay.

10          MS. JHONES:  I apologize, your Honor.  I just

11   need a minute.  I lost my place.

12   BY MS. JHONES:

13   Q.    At the bottom of Page 82, sir, you say, "You

14   know?" -- this is five speakers up from the bottom --

15   "You know?  I know one thing:  I need some guerrillas,

16   man.  Wherever they at, I'm gonna find them.  I think

17   my steps -- me is the investment in here."

18          The informant says, "That's what I'm looking

19   for."

20          And there's laughter.

21          "I want guerrillas as bad as you want."

22          And then, after that, "(Unintelligible) once you

23   got the guerrillas, you can do anything, man.

24          "Uh-huh.  That right."

25          What's going on there in that part of the

1    conversation, sir?  And why, if you remember, is there

2    laughter?

3    A.    Because CW 1 -- you know, he's still on the

4    rampage of joking.

5          And he's just telling me, "Yeah.  I want some

6    guerrillas as bad as you want.  Once we get" -- and

7    then I tell him, "Once you got guerrillas, then you can

8    do anything."

9          So, basically, what I was trying to tell him at

10   that point was that you can accomplish whatever you

11   want once you have people that are following you.

12   Q.    How many guerrillas did you have, sir, as of

13   November 21st of 2005?

14   A.    I never had any guerrillas.

15   Q.    How many soldiers did you have, sir, in Miami on

16   11 -- on November 21st of 2005?

17   A.    How many soldiers?

18   Q.    Yes.  Soldiers.

19   A.    I didn't have any soldiers.

20   Q.    How many soldiers, if any, did you have in

21   Louisiana on November 21st of 2005?

22   A.    I didn't have any soldiers.

23   Q.    How about Chicago or Alabama, sir?

24   A.    I never had any soldiers.

25   Q.    Is there any agreement at the end of this

1    conversation, sir, to meet again?

2    A.    Yes, ma'am.

3    Q.    What was the agreement, sir?

4    A.    I'm sorry.  I misspoke.

5          I don't see where I told Abbas anywhere at the

6    end that I'll be meeting him.  I don't see where he's

7    also trying to set up another meeting with me as well.

8    Q.    Well, do you have any recollection as to whether

9    or not that was discussed?

10   A.    No, I do not.

11   Q.    Do you know whether or not the informant called

12   you after November 21st, sir?

13   A.    Yes, he did.

14   Q.    Do you remember when that was?

15   A.    No, ma'am.

16         Is there something that you have that could

17   refresh my recollection?

18   Q.    Yes, sir.

19         MS. ARANGO:  Judge, I just have the same

20   objection.  Cumulative and hearsay.

21         MS. JHONES:  With this -- I was just going to

22   refresh his recollection on this one, your Honor.

23         THE COURT:  Okay.

24         MS. JHONES:  May I approach, your Honor?

25         THE COURT:  Yes.

```
 1              MS. JHONES:  (Tenders document to the

 2   witness.)

 3   BY MS. JHONES:

 4   Q.    Mr. Batiste, does Defense Exhibit 85-B help to

 5   refresh your recollection as to when it was that you

 6   spoke to the informant after November 21st?

 7   A.    He called me on the 23rd.

 8   Q.    Do you remember whether there had been any

 9   contact between you and the informant before -- after

10   November 21st, but before November 23rd?

11   A.    No, ma'am.  There hadn't been any contact.

12   Q.    What had you been doing, sir, after this meeting

13   on November 21st?

14   A.    I went back to work on my day in the life, what I

15   always be doing.

16   Q.    What efforts, if any, did you make to contact

17   this informant after November 21st?

18   A.    I didn't make any efforts to contact him.

19   Q.    Now, did you have -- did you actually speak to

20   him on November 21st, sir?

21   A.    Pardon me?

22   Q.    Did you actually speak to the informant -- Paid

23   Informant No. 1 on November 23rd?

24   A.    No, ma'am.

25   Q.    Do you recall whether or not you spoke to him on
```

1    the next day?

2    A.    No.  I don't recall.  But I know that it was a

3    followup call.

4    Q.    Followup by whom?

5    A.    By CW.

6    Q.    What followup calls, if any, did you make?

7    A.    I'm not sure.  I possibly could have called him

8    back.

9    Q.    Do you remember when it was next after

10   November 23rd that you -- that you had contact with

11   this informant?

12   A.    It would be -- I'm definitely sure that

13   November the 25th we had contact.

14   Q.    Why are you so sure about that, sir?

15   A.    Because I was on the way to a jobsite and he

16   called me up and he asked me am I running late to meet

17   with him.

18         I told him, "Yeah.  I'll be on my way there."

19         MS. ARANGO:  Objection.  Hearsay.

20         THE COURT:  Sustained.

21         We're going to break for the day.

22         Do not discuss this case either amongst

23   yourselves or with anyone else.  Have no contact

24   whatsoever with anyone associated with the trial.  Do

25   not read, listen or see anything touching on this

1    matter in any way.

2            If anyone should try to talk to you about this

3    case, you should immediately instruct them to stop and

4    report it to my staff.

5            You may leave your binders at your chairs.

6    Please give your notebooks to the court security

7    officer.

8            Have a nice evening.  I will see you tomorrow

9    morning, 9:00.

10           (Whereupon, the jury exited the courtroom at

11    5:28 p.m. and the following proceedings were had:)

12           THE COURT:  You can step down, sir.

13           (Witness excused.)

14           THE COURT:  We're in recess --

15           MS. ARANGO:  Judge --

16           MR. LEVIN:  I just want to bring up one

17    matter, Judge.

18           THE COURT:  Yes.  You may be seated.

19           MS. ARANGO:  I'd like to just cite your Honor

20    to a few cases.  I don't know if this is an appropriate

21    time or not.

22           However, I would note that Mr. Batiste is on

23    the stand for two days and we have just -- we're not

24    even into December yet.  And I know that there's a

25    lot -- a long way to go.

1          And, your Honor, there is a case -- even

2    though -- it's a district court case out of the

3    Northern District of Iowa.

4          But it cites -- and it refers -- the case

5    is *United States versus Hildebrand* --

6    H-i-l-d-e-b-r-a-n-d -- 928 F.Supp. 841.

7          At Page 844 and 845, it discusses and cites to

8    a number of district court cases for the proposition

9    that federal courts -- that -- for the proposition that

10   there's no disagreement among the federal courts that

11   district judges have broad discretion in managing their

12   dockets, including trial procedures and the conduct or

13   pace of trials.

14         And then it string-cites cases within that

15   case:  A Fifth Circuit 1996 case, that "The trial court

16   has broad discretion to regulate the pace of trial and

17   must not be a passive spectator"; another Ninth Circuit

18   court case, "Generally, a district court may impose

19   reasonable time limits on a trial."

20         And there is a number of cases cited within

21   *Hildebrand* discussing the different -- you know, the

22   authority the district court judges have done to manage

23   the conduct and pace of their trials, including even

24   time limitations, when necessary, of course, balancing

25   the rights of the Defendants in presenting their cases,

 1    but your Honor's rights to place certain reasonable

 2    time limitations on the presentation of evidence to

 3    prevent undue delay, waste time or needless

 4    presentation of cumulative evidence.

 5         I would note, I've looked at the Batiste

 6    exhibits that haven't been introduced thus far.  I've

 7    obviously -- you know, I've already objected to the

 8    cumulative nature of them as well as hearsay.

 9         I would just note for the record that I just

10    counted -- out of those transcripts that she has not

11    introduced yet, but which are in the binder that she's

12    provided to us, 13 of them are telephone messages,

13    voicemail messages.

14         Out of those 13, there's about five or six

15    that don't even appear to be messages.  They're just

16    phone call that was made and the call gets cut off.

17         I can't -- I just think that that's

18    cumulative.  It's hearsay.  It's -- this witness has

19    testified about being called numerous times by the

20    informants.

21         I think that your Honor has -- has certainly

22    the right and the discretion to at some point say that,

23    you know, some of this evidence, you know, should not

24    admitted and impose certain limitations on the

25    presentation of this evidence.

1              I would also cite your Honor to the case of

2    *United States versus Midgett* -- M-i-d-g-e-t-t --

3    488 F.3d 288.  It is a Fourth Circuit 2007 case.

4              And then, at Page 299 to 300, the Fourth

5    Circuit discusses the district court's authority and

6    broad discretion to control the mode of interrogation

7    of witnesses, including imposing time restrictions.

8              And it explains -- in that case is a good

9    balance of allowing the defense -- let me just read

10   here.

11             "Here, the district court took care to enforce

12   its time limits so that Midgett's lawyer was allowed to

13   complete his questioning.

14             "Importantly, the time restrictions were

15   announced only after lengthy interrogation had elicited

16   each witness's central evidence and then drifted into

17   areas of less obvious relevance.

18             "Moreover, the cross-examination of Russell

19   was allowed to continue long after the Court initially

20   instructed Midgett's counsel to conclude it within five

21   minutes and, in his subsequent recross-examination, the

22   defense lawyer was able to ask all the questions he

23   wished.

24             "Similarly, the direct examination of Midgett

25   was restricted only after defense counsel had advised

1    the Court that his questioning was nearly finished and

2    he concluded before the time limit imposed by the Court

3    had expired."

4              So I would cite that case to your Honor as

5    well, which I think tries to make that balance between

6    the Defendant's rights and the Court's authorities.

7              Thank you.

8              THE COURT:  Where are we in your direct?

9              MS. JHONES:  Your Honor, I would say that I am

10   closer to the beginning than I am to the middle.  And I

11   will highlight for the Court why that is the case.

12             It's the Government that chose to reduce an

13   84-page transcript that took more than two hours.  They

14   reduced it to approximately 18 pages of clips.

15             As the Court may recall -- and what I'm

16   talking about is 43-A, the November 21st, 2005, meeting

17   that we just finished going through.

18             THE COURT:  Well, let me ask you a question:

19   What's the probative value about marijuana in Yemen?

20             MS. JHONES:  The probative value, your Honor,

21   is that this was a conversation that shifted from many,

22   many, many different areas as opposed to the picture

23   that the Government would like -- or, indeed, played

24   for the jury during their case when they went ahead --

25             THE COURT:  But couldn't you ask him a

```
 1   question? -- "Did you discuss other subjects in this
 2   conversation?" and, "What subjects did you discuss?" --
 3   instead of playing clips and asking him questions
 4   about, "What are you discussing here?"
 5            Marijuana in Yemen?  I mean, I just don't -- I
 6   really have a hard time seeing what the probative value
 7   of that was.
 8            I mean, if the idea is that there were lots of
 9   subjects covered, you ask how long the conversation
10   was, approximately how many subjects were discussed and
11   what did they range from.
12            MS. JHONES:  Your Honor, I --
13            THE COURT:  I think there may be ways of, you
14   know, getting out what you want to get out without
15   playing every single clip and every single area.
16            MS. JHONES:  Well, your Honor, I've tried to
17   do that.  I certainly will look at the other clips that
18   I have.
19            But, again, there have been just an awful lot
20   of things that have been skipped.
21            But I certainly will do -- I would like to get
22   this trial over with, believe me.
23            THE COURT:  It's okay by me.  This is what I
24   do.  I'm here every day.  I hear cases.
25            We're in recess until tomorrow morning, 9:00.
```

```
 1              MR. LEVIN:  Judge, I wanted to bring up a

 2    matter, if it's okay with the Court.

 3              THE COURT:  Yes.

 4              MR. LEVIN:  This might seem a little overly

 5    sensitive.  But the way the courtroom is set up,

 6    obviously, the Government is closer to the jury box

 7    than we are.

 8              During the direct examination of Mr. Batiste,

 9    Juror No. 10 sneezed and Ms. Arango said, "God bless

10    you," which I think is inappropriate.  I don't think

11    there should be any kind of communication --

12              MS. ARANGO:  That's absolutely untrue.  I did

13    not say --

14              MR. LEVIN:  Who did, then?

15              MS. BORGES-TOGNOZZI:  I did.

16              MR. LEVIN:  Okay.  Well, sorry.

17              Somebody from the prosecution table.  And I

18    think that -- I mean, if a defense attorney had done

19    that --

20              THE COURT:  Well, I think that there have been

21    times when, as an automatic, people from both sides may

22    have said "God bless you" to people in the jury box.

23              I would agree that, for the most part, there

24    shouldn't be a comment on it.

25              But I think I've also -- when a lawyer's been
```

1    at the podium, a lawyer will directly address the jury.

2            In fact, I think you've done that a couple of

3    times, Mr. Levin.  You've directly addressed the jury

4    or jurors and I don't find that --

5            MR. LEVIN:  With a "Good morning"?

6            THE COURT:  -- that somebody sitting there

7    inadvertently saying "God bless you" -- I think it is a

8    little oversensitive.

9            I've heard people from both sides say "God

10   bless to you" jurors if they sneezed.

11           MR. LEVIN:  Well --

12           THE COURT:  You know, I think it's a little

13   oversensitive.

14           MR. LEVIN:  Okay.  I prefaced it by saying

15   that it might be overly sensitive.

16           THE COURT:  Frankly, the way it's set up, the

17   Government closer to the jury box, is deliberate

18   because the Government has the burden and they're

19   always closer to the jury box.  That's our system of

20   justice.

21           MR. LEVIN:  That one is -- I don't understand.

22           So that's why the Government sits closer to

23   the jury?  Because they have the burden of proof.

24           THE COURT:  Yes.  That's correct.

25           They have the burden of proof.  They sit

1    closer.  The Plaintiff is closer.  They have the burden

2    of proof.  That's why they're there.  That's the way

3    it's set up in federal court.

4          MR. LEVIN:  Okay.

5          THE COURT:  I would mention that it is perhaps

6    better for no one to acknowledge sneezes from the jury.

7    But I'm certainly not going to make a big deal about

8    it.  I've heard it from both sides.

9          MR. LEVIN:  Judge, I wasn't asking you to make

10   a big deal about it.

11         And I apologize to Ms. Arango for

12   misidentifying who it was.

13         I just personally felt that I don't think it's

14   appropriate for a Government representative to be

15   acknowledging a sneeze.

16         And I don't think that anybody from the

17   defense side has acknowledged a sneeze from the podium.

18         THE COURT:  Oh, I think people have.  There

19   have been lots of sneezes in this courtroom, and some

20   of them have come from the jury box and people have

21   said "Bless you" to jurors from the Government and from

22   the defense.

23         MR. LEVIN:  Okay.

24         THE COURT:  Hang in there, Mr. Levin.

25         MR. LEVIN:  I will.

1            THE COURT:  We're in recess until tomorrow

2    morning, 9:00.

3            (End of proceedings.)

4

5               C E R T I F I C A T E

6

7        I hereby certify that the foregoing is an

8    accurate transcription of the proceedings in the

9    above-entitled matter.

10

11

12    _____        /s/Lisa Edwards_____
          DATE          LISA EDWARDS, CRR, RMR
13                       Official United States Court Reporter
                         400 North Miami Avenue, Twelfth Floor
14                       Miami, Florida 33128
                         (305) 523-5499
15

16

17

18

19

20

21

22

23

24

25