```
                   UNITED STATES DISTRICT COURT
 1                 SOUTHERN DISTRICT OF FLORIDA
                        MIAMI DIVISION
 2            CASE NO. 06-20373-CRIMINAL-LENARD

 3

 4   UNITED STATES OF AMERICA,        Miami, Florida

 5                  Plaintiff,        April 2, 2009

 6            vs.                     9:25 a.m. to 4:45 p.m.

 7   NARSEAL BATISTE, et al.,         Volume XXXIV

 8            Defendants.             Pages 1 to 166
     ---------------------------------------------------------
 9

10                          JURY TRIAL
11           BEFORE THE HONORABLE JOAN A. LENARD,
                 UNITED STATES DISTRICT JUDGE
12

13

14   APPEARANCES:

15

16   FOR THE GOVERNMENT:     RICHARD D. GREGORIE, ESQ., and
                             JACQUELINE M. ARANGO, ESQ.
17                           ASSISTANT UNITED STATES ATTORNEYS
                             99 Northeast Fourth Street
18                           Miami, Florida 33132

19
     FOR THE DEFENDANT       ANA MARIA JHONES, ESQ.
20     NARSEAL BATISTE:      300 Seville Avenue, Suite 210
                             Coral Gables, Florida 33134
21

22   FOR THE DEFENDANT       ALBERT Z. LEVIN, ESQ.
       PATRICK ABRAHAM:      261 Northeast First Street
23                           Sixth Floor
                             Miami, Florida 33132
24

25
```

```
 1   FOR THE DEFENDANT        RODERICK D. VEREEN, ESQ.
        STANLEY PHANOR:          BRINKLEY, HENRYS & LEWIS
 2                               4770 Biscayne Boulevard
                                 Suite 1200
 3                               Miami, Florida 33131

 4
     FOR THE DEFENDANT        RICHARD K. HOULIHAN, ESQ.
 5     NAUDIMAR HERRERA:        300 Aragon Avenue
                                 Coral Gables, Florida 33134
 6

 7   FOR THE DEFENDANT        LOUIS CASUSO, ESQ.
       BURSON AUGUSTIN:         111 Northeast First Street
 8                               Suite 603
                                 Miami, Florida 33132
 9

10   FOR THE DEFENDANT        NATHAN CLARK, ESQ.
      ROTSCHILD AUGUSTINE:    17639 South Dixie Highway
11                               Miami, Florida 33157

12
     REPORTED BY:             LISA EDWARDS, CRR, RMR
13                               Official Court Reporter
                                 400 North Miami Avenue
14                               Twelfth Floor
                                 Miami, Florida 33128
15                               (305) 523-5499

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2

3                                    Direct    Cross    Red.

4

WITNESSES FOR THE DEFENDANT BATISTE:

5

6    Narseal Batiste                    5

7

8

EXHIBITS RECEIVED IN EVIDENCE:              PAGE

9

Defendant Batiste's Exhibit Nos. 86-A
10    & 86-B                                   11
Defendant Batiste's Exhibit Nos. 87-A,
11    87-B-1 & 87-B-2                          16
Defendant Batiste's Exhibit Nos. 88-A,
12    88-B-1, 88-B-2, 96-B-1, 96-B-2, 90-A,
      90-B-1 & 90-B-2                          25
13   Defendant Batiste's Exhibit Nos. 91-B-1,
      91-B-2 & 91-B-3                          82
14   Defendant Batiste's Exhibit Nos. 92-A,
      92-B-1 & 92-B-2                          91

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Good morning.

 2              United States of America versus Narseal

 3    Batiste, et al., Case No. 06-20373.

 4              Counsel, state your appearances, please, for

 5    the record.

 6              MR. GREGORIE:  Good morning, your Honor.

 7              Richard Gregorie and Jacqueline Arango on

 8    behalf of the United States.

 9              MS. ARANGO:  Good morning, Judge.

10              MS. JHONES:  Good morning.

11              Ana Maria Jhones on behalf of Narseal Batiste,

12    who is present.

13              MR. LEVIN:  Good morning, your Honor.

14              Albert Levin on behalf of Patrick Abraham,

15    who's present.

16              MR. CASUSO:  Good morning.

17              Lou Casuso on behalf of Burson Augustin, who's

18    present.

19              MR. CLARK:  Good morning, your Honor.

20              Nathan Clark on behalf of Rotschild Augustine,

21    who's present.

22              MR. HOULIHAN:  Richard Houlihan with Naudimar

23    Herrera.

24              MR. VEREEN:  Good morning, your Honor.

25              Roderick Vereen on behalf of Stanley Phanor,
```

```
 1    who's present.
 2              THE COURT:  All Defendants are present.
 3              Good morning to everyone.
 4              Let's bring in the jury, please.
 5              (Whereupon, the jury entered the courtroom at
 6    9:26 a.m. and the following proceedings were had:)
 7              THE COURT:  You may be seated.
 8              Good morning, ladies and gentlemen.
 9              THE JURY:  Good morning.
10              THE COURT:  You are still under oath, sir.
11              You may proceed, Ms. Jhones.
12              MS. JHONES:  Thank you, your Honor.
13              Good morning, ladies and gentlemen.
14              THE JURY:  Good morning.
15                   CONTINUED DIRECT EXAMINATION
16    BY MS. JHONES:
17    Q.    Mr. Batiste, when we ended for the day yesterday,
18    we had finished talking about November 21st.  But I
19    want to take you back to a couple of questions I
20    neglected to ask you.
21              MS. JHONES:  For the record, this is
22    Government's Exhibit 43-A.
23              I just have a couple questions on that.
24              If I may provide the witness with a copy of
25    the transcript, your Honor.
```

1          THE COURT:  Sure.

2          MS. JHONES:  Thank you.

3          (Tenders document to the witness.)

4    BY MS. JHONES:

5    Q.     Mr. Batiste, directing your attention to -- well,

6    first, let me ask you this:  During the course of the

7    November 21st, 2005, conversation between you and the

8    informant, was the issue of guns ever discussed?

9    A.     Yes, ma'am.

10   Q.     Directing your attention to Page -- I believe

11   it's Page 84, sir.

12   A.     Okay.

13   Q.     Directing your attention, sir, to the top of the

14   page -- I'm sorry -- the middle of page -- where the CW

15   says, "The best mujahedin is the one that don't turn

16   back jihad mission, even though Muslims that I know,

17   every -- each of them fight for the mission.  You see

18   (unintelligible)?  I know, man, it's confusion."

19          And it goes on and on for a very long paragraph.

20          And your response is, "Hmm."

21          Then the informant says, "(Unintelligible) that's

22   in the real days.  Now, two old mens like me and you is

23   afraid to carry a gun for Allah, but they would carry a

24   gun and go and rob somebody."

25          And your response is, "Right."

1           "They would get afraid, go to jail for Allah, but

2     they would sell drugs and go to jail.  They were afraid

3     to fight for Allah, but they would go to the Army and

4     start killing Muslims all the over the world.  You see

5     between the point I'm trying to give you?"

6           What is your understanding, sir, as to what the

7     informant is saying at this particular point in the

8     conversation as it relates to the issue of guns?

9     A.    What he's saying is that he realized, in reality,

10    that nowadays, comparing to back then, the book that we

11    was reading about jihad, that he knows the reality,

12    that I'm not the type of person that's going to carry a

13    gun.

14              MS. ARANGO:  Objection.  Speculative.

15              THE COURT:  Sustained.

16    BY MS. JHONES:

17    Q.    What was -- what was -- what did you take him to

18    mean when he says, sir -- and please listen to my

19    question.

20          What did you take him to mean when he said in the

21    bottom of Page 84 that, "In the real days now, two old

22    mens like me and you is afraid to carry a gun for

23    Allah, but they would carry a gun and to go rob

24    somebody" and you said, "Right"?

25          What was your understanding -- or what did you

1    take him to mean when he made that statement?

2    A.    That my expression wouldn't be to carry no gun to

3    go on no jihad mission and that -- he's speaking

4    also -- he's speaking in terms of that the Mujaheds or

5    the people who fought for Islam in that way and in any

6    kind of war or whatever, they're like a martyr.

7          That's how he's explaining it.  And he's saying

8    that they fought for a right cause as being a martyr.

9          He's also saying that, at the same time, people

10   in the street, like -- he's describing, like, around

11   Liberty City area and whatnot -- they would go rob

12   somebody and carry a gun for no cause and go to jail.

13         And, also, he's saying within that phrase that he

14   knows that I'm not no martyr and I'm not gonna carry no

15   gun for Allah, because he's -- he observed me for a

16   long time and he has an idea of my personal character.

17   Q.    Okay.  Now, did you continue, sir, to receive

18   calls from the informant after November 21st?

19   A.    Yes, ma'am.

20   Q.    After November 21st?

21   A.    Yes, ma'am.

22   Q.    Do you recall when it was that you heard from the

23   informant again?

24   A.    I recall on the 25th of November.

25         If there was a call before that, I would need

1    something to remind me of that call.

2    Q.    Is your testimony, sir, that you don't remember

3    whether or not you heard from him before the 25th?

4    A.    That's correct.

5    Q.    One second, please.

6          MS. JHONES:  Your Honor, may I approach?

7          THE COURT:  Yes.

8          MS. JHONES:  Thank you.

9    BY MS. JHONES:

10   Q.    Let me show you Defense Exhibit 85-B.  Let me

11   know if that refreshes your recollection.

12   A.    Yes, ma'am.

13   Q.    And was there -- may I have that back,

14   Mr. Batiste?

15   A.    (Tenders document to counsel.)

16   Q.    Was there a conversation on that day, sir?

17   A.    No, ma'am, it wasn't.

18   Q.    What, if any, contact was there on the 23rd?

19   A.    We didn't contact each other on the 23rd.  It was

20   just that he left a voice message.

21   Q.    Did you return the phone call?

22   A.    I don't remember.

23   Q.    After the 23rd, sir, when was the next time you

24   heard from this informant?

25   A.    I heard from him on the 25th.

1   Q.     What happened on that occasion -- first of all,

2   who called who?

3   A.     He had gave me a phone call and he wanted to

4   schedule a meeting to meet with me.

5   Q.     I'm sorry, sir.  I didn't get your response.

6   A.     He wanted to meet with me.

7   Q.     And do you know why?

8   A.     He wanted to rediscuss some issues back over

9   again about what he's been telling me about all along,

10  the same issue, the money issue, and just -- he wanted

11  to tell me "hi" over Thanksgiving in person.

12         MS. JHONES:  May I approach the witness, your

13  Honor?

14         THE COURT:  Yes.

15         MS. JHONES:  Thank you.

16  BY MS. JHONES:

17  Q.     Mr. Batiste, I'm showing you what is marked for

18  identification as Defense Exhibit 86-A and 86-B.  I

19  believe the transcript is not marked.

20         Do you recognize 86-A and 86-B, sir?

21  A.     Yes, I do to.

22  Q.     Have you had a chance to listen to 86-A and

23  compare it to 86-B?

24  A.     Yes, I have.

25  Q.     Does the contents of 86-B accurately reflect what

N. Batiste - DIRECT - By Ms. Jhones                    11

```
 1   is contained in Defense Exhibit 86-A?

 2   A.    Yes, it does.

 3         MS. JHONES:  At this time, your Honor, I would

 4   move into evidence Defense Exhibit 86-A and 86-B.

 5         MS. ARANGO:  Judge, I would just raise the

 6   same objection I've made before, that it's cumulative

 7   and hearsay.

 8         THE COURT:  Overruled.

 9         It will be admitted as Defendant Batiste

10   Exhibits 86-A and 86-B.

11         (Whereupon, Defendant Batiste's Exhibit

12   Nos. 86-A and 86-B were entered into evidence.)

13         MS. JHONES:  Your Honor, with the Court's

14   permission, I'd like to have the ladies and gentlemen

15   of the jury turn to Defense Exhibit 86-B, which is

16   contained in the binder, so that we may publish.

17         THE COURT:  What date is it?

18         MS. JHONES:  This is 11-25-05 at 3:42 p.m.

19         THE COURT:  You may turn to the tab marked

20   November 25th, 2005.

21         And that is 86-B?

22         MS. JHONES:  Yes, your Honor.

23         Is everyone ready?

24         (Whereupon, segments of Defendant Batiste's

25   Exhibit No. 86-A were published in open court.)
```

 1   BY MS. JHONES:

 2   Q.    Mr. Batiste, do you recall that conversation?

 3   A.    Yes, ma'am.

 4   Q.    First of all, when you say at the -- on the first

 5   page, towards the bottom, "I've been waiting for you,"

 6   what are you referring to, sir?

 7   A.    When I listened to that call, I remembered the

 8   fact that he was trying to call me on Thanksgiving and

 9   have -- come over and have Thanksgiving with me and my

10   family.

11         He wound up not coming.

12         And so, when he did call me on the 25th, that's

13   what I was telling him, was that, "I had been waiting

14   for you."

15   Q.    And on the top of Page 2, where the informant

16   says, "I'm going to be working night shift from now on.

17   So I don't know if I want -- if you want me to come

18   over or if you want to come over.  I'm free now," you

19   respond by telling him that you have to go look at a

20   job, but you're going to be leaving in an hour.

21         Later on, you say -- one sentence down -- "I'm

22   going to stop by tonight and then talk to you."

23         Did you, in fact, stop by and talk to this

24   informant?

25   A.    Yes, ma'am.

1    Q.    Do you remember what time it was that you went

2    by?

3    A.    It was sometime in the evening, around 8:00.

4    Q.    Were you by yourself or did you have somebody

5    with you?

6    A.    I was by myself.

7    Q.    And where was it that you went to talk to this

8    person?

9    A.    We went to eat at a Chinese restaurant.

10   Q.    And what was discussed at that meeting, sir?

11   A.    Basically, he was just talking about Islam and

12   the religion and giving me the history of the Prophet

13   Mohammed.

14   Q.    Okay.  After that meeting, were there any -- what

15   discussions, if any, did you have regarding -- strike

16   that.

17          Besides that, did you discuss anything else?

18   A.    He also reminded me about CW 2 would be coming.

19   Q.    And when you say CW 2, who are you referring to,

20   sir?

21   A.    Elie Assaad, the guy that he referred to as --

22   that his uncle was sending.

23   Q.    Okay.  At that point, sir, did you have an

24   understanding as to the date that this person was going

25   to be coming?

1    A.     No.

2    Q.     How long did the meeting on 11-25 last?

3    A.     I'd say it was about an hour and 45 minutes,

4    close to two hours.

5    Q.     Okay.  Now, one more question about that.

6           Do you have any knowledge as to how it was that

7    the informant made it over to the Chinese restaurant on

8    11-25?

9    A.     We walked down Collins Avenue together, talking.

10   Q.     Walked -- when you said you walked down Collins

11   Avenue, where did you meet up with him first before

12   going to the Chinese restaurant?

13   A.     I called him and I let him know that I was on my

14   way to his apartment.

15   Q.     Now, is this Chinese restaurant that you're

16   referring to on Collins the same Chinese restaurant

17   that you saw this individual at on 10-29 of '05?

18   A.     No, ma'am.

19   Q.     Now, after 11-25, sir, did you have occasion to

20   hear from or speak to this individual again?

21   A.     Yes, ma'am.  But I don't remember the exact date.

22   Q.     Okay.

23          MS. JHONES:  Your Honor, may I just have a

24   moment?  I seem to be missing 87-A, if I may just step

25   out to speak to Ms. Armand.

```
 1              THE COURT:  Okay.

 2              MS. JHONES:  Thank you.

 3              Your Honor, may I approach?

 4              THE COURT:  Yes.

 5              MS. JHONES:  Thank you.

 6   BY MS. JHONES:

 7   Q.    Mr. Batiste, would you please look at Defense

 8   Exhibit 87-A, 87-B-1 and 87-B-2.  And please let me

 9   know if you recognize those exhibits.

10   A.    Yes, I do.

11   Q.    And have you had an opportunity to listen to the

12   CD that's contained in 87-A?

13   A.    Yes, I have.

14   Q.    And have you had a chance to compare the contents

15   of 87-A with the contents of 87-B-1 and 87-B-2?

16   A.    Yes, I have.

17   Q.    And do the transcripts reflected in 87-B-1 and

18   -B-2 accurately reflect the contents of 87-A?

19   A.    Yes, ma'am.

20              MS. JHONES:  At this time, your Honor, I'd

21   move into evidence Defense Exhibit 87-A and 87-B-1 and

22   -B-2.

23              MS. ARANGO:  Same objection, Judge.  It's

24   cumulative and hearsay.

25              THE COURT:  Overruled.
```

1          They will be admitted as Defendant Batiste

2     Exhibits 87-A and 87-B-2.

3          (Whereupon, Defendant Batiste's Exhibit

4     Nos. 87-A and 87-B-2 were entered into evidence.)

5          MS. JHONES:  Your Honor, respectfully, at this

6     time I'd ask the Court to instruct the ladies and

7     gentlemen of the jury to turn to -- there are two tabs

8     marked 11-28-05.  In order to move things along, I'm

9     going to publish both Exhibits 87-B-1 and 87-B-2 and

10    ask Mr. Batiste --

11         THE COURT:  -B-1 is not in evidence.  You

12    introduced 87-A and 87-B-2.

13         MS. JHONES:  I'm sorry, your Honor.  I thought

14    I mentioned 87-B-1 and -B-2.  If I did not, that was an

15    omission.

16         THE COURT:  Same objection by the Government?

17         MS. ARANGO:  Yes, Judge.

18         THE COURT:  87-B-1 marked for identification

19    is entered into evidence as Defendant Batiste

20    Exhibit 87-B-1 and -B-2.

21         (Whereupon, Defendant Batiste's Exhibit

22    Nos. 87-B-1 and 87-B-2 were entered into evidence.)

23         So the first tab for November 28th is 87-B-1?

24         MS. JHONES:  Correct.

25         THE COURT:  And the second tab is -B-2?

1          MS. JHONES:  Correct, your Honor.

2          THE COURT:  You may publish.

3          MS. JHONES:  Thank you.

4          (Whereupon, Defendant Batiste's Exhibit

5   Nos. 87-B-1 and -B-2 were published in open court.)

6   BY MS. JHONES:

7   Q.    Mr. Batiste, do you remember -- first of all, the

8   11-28 9:20 a.m. voicemail --

9   A.    Yes, ma'am.

10  Q.    -- did you actually retrieve that voicemail?

11  Back on 11-28 -- did you actually listen to that

12  voicemail back on 11-28-05?

13  A.    It's very much possible, but I'm not sure.

14  Q.    Well, did you call this individual on 11-28-05?

15  A.    No.

16  Q.    The next exhibit, 87-B-2:  What is the time of

17  that call?

18  A.    That's at 11:28 a.m.

19  Q.    Who called who?

20  A.    He returned me another phone call again at that

21  time.

22  Q.    And when you received this call, do you have a

23  recollection, sir, as to where it was that you were

24  located?

25  A.    Yes, ma'am.

```
 1   Q.     Where were you?

 2   A.     I was on a jobsite.

 3   Q.     And what, if any, effort, sir, had you made prior

 4   to 11-28 -- between 11-28 and 11-25 to meet this

 5   informant?

 6   A.     I made no efforts.

 7   Q.     When the informant says to you on the top of

 8   Page 2, "I mean, if you want to come over to my house

 9   or, if I'm going to come out there -- I mean, do you

10   have time?  What do you think?" and you respond with,

11   "Huh?", "What's going on with you today?  Can I meet

12   you today?", what was your response, sir?

13   A.     Basically, I told him had I had to work, I was

14   busy, and I would contact him -- I would be working all

15   the way till about 10:00.

16   Q.     Towards the bottom of Page 2, where it reflects,

17   "NB:  (Speaking to someone else)," what was going on

18   there at that point in time in the conversation?

19   A.     I was working on a jobsite and I was holding up

20   some drywall.  One of my guys actually drilled through

21   a water pipeline; so, I had to get off the phone

22   immediately.

23   Q.     After this conversation, sir -- well, in this

24   conversation, where the informant requests that you

25   meet with him, did you meet with him on 11-28?
```

```
1    A.      No, ma'am.

2    Q.      Did you meet with him on 11-29?

3    A.      No.  I don't recall meeting with him on 11-29.

4    Q.      Did you meet with him on 11-30?

5    A.      No.

6    Q.      Any telephone contact between those days between

7    you and the informant?

8    A.      I don't recall.

9    Q.      Do you recall when it was that you next saw this

10   informant?

11   A.      12-14.

12   Q.      I'm sorry?

13   A.      December the 14th.

14   Q.      Do you recall whether or not you had any contact

15   with him prior to December 14th?

16   A.      Yes, ma'am.

17   Q.      When would that have been?

18   A.      Possibly between the 10th and the 13th.

19   Q.      Do you recall, sir, whether any -- this

20   informant -- if you heard from this informant before

21   December 12th?

22   A.      It's possible.  I would need something to remind

23   me of that.

24   Q.      Okay.

25           MS. JHONES:  Your Honor, may I approach?
```

 1              THE COURT:  Yes.

 2              Counsel, please approach for a minute.

 3              (Whereupon, proceedings were had at side-bar

 4    outside the presence of the jury which have been sealed

 5    per instructions of the Court.)

 6              (Whereupon, the following proceedings were had

 7    in open court:)

 8              MS. JHONES:  Your Honor, may I approach?

 9              THE COURT:  Yes.

10              Are you presenting him with the --

11              MS. JHONES:  I was going to inquire of the

12    Court if the Court wants me to go through the colloquy

13    or just move them into evidence in terms of the

14    additional exhibits.

15              THE COURT:  Will the Government stipulate to

16    the predicate?

17              MS. ARANGO:  Yes.  We will stipulate to the

18    predicate.

19              THE COURT:  Present all of them.  You don't

20    need to go through a colloquy.

21              MS. JHONES:  After these exhibits, I was going

22    to publish a Government exhibit.  So I wanted to just

23    introduce these defense exhibits, publish the

24    Government exhibit and then go through the next set, if

25    that's okay with the Court.

```
 1                THE COURT:  Okay.

 2                MS. JHONES:  Thank you.

 3                At this time, your Honor, the defense would

 4    move into evidence the following exhibits --

 5                MS. ARANGO:  Ms. Jhones, I'd ask, when you

 6    give the exhibits, could you please give a date.

 7    Because there's no exhibit numbers listed on the

 8    exhibits that you provided me with.

 9                MS. JHONES:  I'm sorry?

10                MS. ARANGO:  Are you going to list your

11    exhibits?

12                MS. JHONES:  Sure.

13                MS. ARANGO:  Could you give us the dates?

14                MS. JHONES:  Yes.

15                MS. ARANGO:  Because you don't have an exhibit

16    number here.

17                MS. JHONES:  Yes.

18                The next exhibit, your Honor, is going to be

19    Defense Exhibit 88-A --

20                MS. ARANGO:  Is that 12-14-05 at 10:23 a.m.?

21                MS. JHONES:  88-A is 12-12-05 at 10:30 a.m.

22                88-B-1 is the transcript of 12-12-05 at

23    10:31 a.m.

24                88-B-2 is a call on 12-12-05 at 12:01 p.m.

25    And, again, that's 88-B-2.
```

 1              And just for clarification purposes, 88-A

 2     contains both of the calls.

 3              The next --

 4              THE COURT:  So 88-B-2 is the transcript?

 5              MS. JHONES:  Correct, your Honor, of 88-A.

 6              Exhibit 96-A is -- are two calls on 12-14-05.

 7              96-B-1 is a voicemail of 12-14-05 at

 8     10:23 a.m.

 9              And 96-B-2 is another voicemail of 12-14-05.

10              MS. ARANGO:  Judge, I would just note for

11     the record that these two exhibits, 96-B-1 and 96-B-2,

12     did come into evidence earlier as Government's

13     Exhibit 39-A.  Both of them were contained within --

14     excuse me -- 37-A.  I think --

15              THE COURT:  The recording or the recording and

16     transcript?

17              MS. JHONES:  Let me check that, your Honor.

18              MS. ARANGO:  The tape and the two --

19              THE COURT:  Transcripts?

20              MS. ARANGO:  Yeah.  They came in earlier.

21              MS. JHONES:  Including the actual call,

22     Ms. Arango?

23              MS. ARANGO:  Yes.

24              MS. JHONES:  Okay.

25              That's fine, your Honor.  That's fine.  I

 1    don't recall there being a transcript.

 2              MS. ARANGO:  Yes.  For both of them.

 3              MS. JHONES:  But if there is, that's fine.

 4    It's a duplication.

 5              THE COURT:  So are you withdrawing those or do

 6    you still want to introduce them?

 7              MS. JHONES:  If I may just have a moment to

 8    check 37-A, if I may.

 9              THE COURT:  Okay.

10              MS. JHONES:  Thank you.

11              MS. ARANGO:  I would just also note that 37-A

12    also has a telephone call.  37-A has two voicemail

13    messages, and then there is a phone call.

14              MS. JHONES:  That's correct.  I did not move

15    the phone call in because I did recollect that that was

16    part of the Government's exhibits.

17              So I do not have the actual phone call, since

18    it already was in evidence.  It was the prior

19    voicemails that I was unsure of.

20              THE COURT:  Okay.  So do you want to introduce

21    96-A, -B-1 and -B-2?

22              MS. JHONES:  Yes, your Honor, if I may.

23              THE COURT:  Okay.

24              MS. JHONES:  Thank you.

25              There's no need to introduce 97-A, since it is

1    contained within the Government's Exhibit 37.

2              THE COURT:  Okay.  So that's what you're

3    moving into evidence now?

4              MS. JHONES:  Yes, your Honor, which would be

5    97-B-1 -- I'm sorry -- 96-B-1 and 96-B-2.

6              THE COURT:  And those are the transcripts.

7    Correct?

8              MS. JHONES:  Correct.

9              THE COURT:  And you're moving in 96-A or not?

10             MS. JHONES:  It's not necessary.

11             THE COURT:  Okay.

12             MS. JHONES:  It's a duplication.

13             THE COURT:  And, Ms. Arango, you want a

14   continuing objection to all of this?

15             MS. ARANGO:  Yes, please.

16             THE COURT:  All right.

17             MS. ARANGO:  Obviously, I have no objection to

18   this exhibit because it's already in evidence.

19             THE COURT:  Okay.

20             MS. JHONES:  Lastly, your Honor, I would move

21   Defense Exhibit 90-A, which is a composite exhibit

22   containing two voicemails dated 12-15-05.  90-B-1 is

23   5:29 p.m.  90-B-2 is 6:12 p.m.

24             THE COURT:  -B-1 and -B-2 are the transcripts?

25             MS. JHONES:  -B-1 and -B-2 are the

1    transcripts.

2           THE COURT:  And you're moving them in at this

3    time?

4           MS. JHONES:  Yes, your Honor.

5           And that would be extent of the set at this

6    time.

7           THE COURT:  All right.  The Government's

8    continuing objection is overruled.

9           They will be admitted as Defendant Batiste

10   Exhibits 88-A, 88-B-1, 88-B-2, 96-B-1, 96-B-2, 90-A,

11   90-B-1, 90-B-2.

12          (Whereupon, Defendant Batiste's Exhibit

13   Nos. 88-A, 88-B-1, 88-B-2, 96-B-1, 96-B-2, 90-A, 90-B-1

14   and 90-B-2 were entered into evidence.)

15          MS. JHONES:  Thank you, your Honor.

16          If I may just approach and provide the witness

17   with one more transcript so I can ask him some

18   questions about it.

19          THE COURT:  Yes.

20          MS. JHONES:  (Tenders document to the

21   witness.)

22   BY MS. JHONES:

23   Q.    Now, sir, directing your attention to --

24          MS. JHONES:  Respectfully, your Honor, if I

25   could have the Court instruct the ladies and gentlemen

```
 1    of the jury to turn to Defense Exhibit 88-B-1.  Again,

 2    just --

 3            THE COURT:  You may turn to the tab -- the

 4    first tab marked 12-12-05, which is 88-B-1.

 5            MS. JHONES:  I'm going to move through these

 6    rather quickly, your Honor.

 7            THE COURT:  Okay.

 8    BY MS. JHONES:

 9    Q.    Mr. Batiste, do you have Defense Exhibit 88-B-2

10    in front of you?

11    A.    Yes, ma'am.

12    Q.    Do you recall what occurred on 12-12 as it

13    relates to any contact made by the informant or by you?

14    A.    Yes, ma'am.  He had just called me previously and

15    left a message.

16    Q.    Did you return the phone call, sir?

17    A.    No, I didn't.

18    Q.    Directing your attention, sir, to 88-B-2 --

19            THE COURT:  You may turn to the second tab

20    marked 12-12.

21    BY MS. JHONES:

22    Q.    -- do you recall receiving a phone call from the

23    informant at that time?

24    A.    At 12:01 p.m.?

25    Q.    Yes.
```

1    A.      Yes, ma'am.

2    Q.      Was there any contact between you and the

3    informant between 10:31 and 12:01 p.m.?

4    A.      No, ma'am.

5    Q.      As it relates to the phone call of 12-12-05 at

6    12:01 p.m., what request is made, if any, by the

7    informant?

8    A.      He wants to meet with me.  He wants to either

9    come by the Embassy or he wants me to go by his place.

10   Q.      Had you requested anytime prior to that to meet

11   with him, sir?

12   A.      No, I haven't.

13   Q.      What was your response to his request to have a

14   meeting?

15   A.      I explained to him that we was doing tile and

16   there was a lot of work going on right now.

17   Q.      Let me ask you a couple of questions about that.

18           When you say you were doing tile, what are you

19   referring to, sir?

20   A.      I'm referring to the work that I do.  There was

21   some tile work being done at the Embassy and, also, I

22   had another jobsite that I would be doing tile on.

23   Q.      Okay.  Now, what, if anything, did the informant

24   tell you when you told him that you were busy at the

25   Embassy doing tile work?

 1    A.    He's trying to find out my time schedule, when

 2    I'm going to be there.

 3          And I told him, basically, I'm going to be there

 4    all evening, working.

 5          And he sounds to be happy.  He's, like, "That's

 6    good news," and he's trying to find out who else is

 7    going to be there accompanying me.

 8    Q.    Did the informant, sir, go to the Embassy --

 9    Embassy/Temple on December 12th of 2005, if you recall?

10    A.    I don't exactly recall.  But it's very much

11    possible.

12    Q.    Now, after December 12th, sir, do you recall when

13    the next contact was?

14    A.    He called me around the 14th.

15    Q.    Who called who?

16    A.    CW 1 called me.

17    Q.    What was the first contact that you received from

18    him?

19    A.    Usually, he calls me and a leaves a voicemail

20    message several times.

21          MS. JHONES:  Your Honor, respectfully, I would

22    ask the Court to instruct the ladies and gentlemen of

23    the jury to turn to 12-14-05, the first tab.

24          THE COURT:  You may turn to the first tab,

25    12-14-05, which is 96-B-1.

1              MS. JHONES:  Thank you.

2    BY MS. JHONES:

3    Q.     What time of day would that be, sir?

4    A.     Around 10:26 a.m.

5    Q.     What does the informant tell you at the bottom of

6    10-14-05, the 10:23 voicemail?

7    A.     He say, "I was waiting all night last night for

8    me.

9    Q.     I'm sorry.

10          Would you make sure that you have in front of you

11   Defense Exhibit 96-B-1.

12   A.     Oh, okay.  I'm sorry.

13          That phone call was at 10:23 a.m.  And the last

14   thing he said to me on the voice message was, "Brother

15   Naz, this is Abbas.  What happened?  Man, answer my

16   phone, brother."

17   Q.     Do you recall having received that voicemail,

18   sir?

19   A.     Yes, ma'am.

20   Q.     Did you return the phone call?

21   A.     No.

22   Q.     Okay.  Turning to 96-B-2 -- do you have that in

23   front of you, sir?

24   A.     Yes, ma'am.

25   Q.     What type of communication is reflected in

1    96-B-2, sir?

2    A.    I'm sorry.  What's your question again?

3    Q.    What type of contact was made on 12-14-05, the

4    second tab, 96-B-2?

5    A.    He's leaving another message that he had received

6    my phone call this morning, calling me back.  And then

7    he tells me, "Why not answer my phone, brother?  I was

8    waiting all night last night."

9    Q.    Okay.  Well, first of all, had you called him?

10   A.    I don't remember calling him.

11   Q.    When he states, "Why not answer my phone,

12   brother?  I was waiting all night last night," do you

13   remember what he's referring to, sir?

14   A.    Yes, ma'am.  There was a meeting that he was

15   trying to hook up with me on.  And I scheduled a

16   meeting with him on the 13th.  But some more important

17   matters came up.  So I just didn't make it.

18   Q.    And do you remember when it was that you

19   scheduled that meeting for the 13th?

20   A.    It was in the evening time.

21   Q.    Of what date, sir?

22   A.    Of December the 13th.

23   Q.    Did you make that meeting?

24   A.    No, ma'am.

25   Q.    Okay.  Now, directing your attention, sir, to the

 1    next day, 12-15, what, if any, contact was had between

 2    you and the informant?

 3         Before you answer that, sir, when you said on

 4    12-13 you did not meet with him because there were more

 5    important matters going on, what were those matters?

 6    A.    There was some family matters that my wife wanted

 7    to talk with me and discuss with me on.

 8    Q.    Now, directing your attention to Defense

 9    Exhibit 90-B-1 and 90-B-2 --

10         MS. JHONES:  With the Court's permission, your

11    Honor, if the ladies and gentlemen of the jury could

12    just turn to those two brief exhibits.

13         THE COURT:  You may turn to the December 15th

14    tabs, which are 90-B-1 and 90-B-2.

15         MS. JHONES:  Thank you, your Honor.

16    BY MS. JHONES:

17    Q.    Mr. Batiste, do you have 90-B-1 and 90-B-2 in

18    front of you?

19    A.    Yes.

20    Q.    What type of communication, if any, was had on

21    that day?

22    A.    There was another voice message that he had left

23    me.

24    Q.    How about 90-B-2?

25    A.    It's the same.

 1   Q.     Did you return the phone call, sir?

 2   A.     No, ma'am.

 3          MS. JHONES:  I just need a moment, your Honor.

 4          Your Honor, I just need to find a particular

 5   exhibit so I can ask Mr. Batiste questions.

 6          At this time, with the Court's permission, I

 7   would like the Court to please instruct the ladies and

 8   gentlemen of the jury to turn to Government Exhibit,

 9   which is in evidence, 37.

10          I believe, Ms. Arango -- you correct me if I'm

11   wrong -- it's the first volume of the Government's

12   binders.  Am I correct?

13          MS. ARANGO:  Correct.

14          MS. JHONES:  Your Honor, if the Court could

15   inquire of the ladies and gentlemen if they do, in

16   fact, have 37-A.

17          THE JURY:  No.

18          MS. JHONES:  Okay.  I don't have one either.

19   So what I could -- it is in evidence.  Correct?

20          MS. ARANGO:  Yes.

21          MS. JHONES:  What I would like to do, in order

22   to save time, is I would just get one exhibit and

23   publish it on the ELMO to just move things along.

24          THE COURT:  Sure.

25          UNIDENTIFIED JUROR:  We have it.

```
 1              MS. JHONES:  Some do; some don't?

 2              THE COURT:  No.  Everybody should have it.

 3              MS. ARANGO:  Judge, I would note for the

 4    record that it was handed out.  So perhaps the jurors

 5    could check, maybe, the pocket part.

 6              THE COURT:  Which number is it, please?

 7              MS. JHONES:  37-A.

 8              THE COURT:  37-A.

 9              THE JURY:  We have it.

10              THE COURT:  Does everyone have it?

11              THE JURY:  Yes.

12              THE COURT:  Good job.

13    BY MS. JHONES:

14    Q.    Mr. Batiste, do you have 37-A?

15    A.    What would be the date for that?

16    Q.    12-14-05.  It's a Government exhibit with a

17    yellow sticker.

18    A.    Yes, ma'am.

19    Q.    Do you have it?

20    A.    Yes, ma'am.

21    Q.    So directing your attention, sir, to Government's

22    Exhibit 37-A and specifically Page 3 of that exhibit,

23    in the bottom of Page 3, sir, you relate something to

24    the informant as to what occurred.

25              Do you see that there, sir?
```

```
1    A.      Yes, ma'am.

2    Q.      Would you please tell us about that.

3    A.      We was under construction with the Temple.  We'd

4    always leave the --

5            MS. ARANGO:  Objection.  Relevance and

6    hearsay.

7            MS. JHONES:  Your Honor, I don't want to make

8    a speaking objection as to relevance.

9            THE COURT:  This is Page 3?

10           MS. JHONES:  Yes.  Page 3 of Government's

11   Exhibit 37-A.  This is in evidence, your Honor.

12           THE COURT:  Rephrase your question.

13           MS. JHONES:  Sure.

14   BY MS. JHONES:

15   Q.     In the bottom of Page 3, sir, you say to the

16   informant, "And then my tools were stolen, you know.

17          "Not a problem," says the informant.

18          And then, "Yeah, man.  That's okay."

19          And then on to Page 4, at the top, "Sometimes I

20   can't believe that the builders let somebody walk in

21   there last night and they steal our tools.  And I was

22   really upset and I really wasn't in a good mood at that

23   point.  You know what I mean?"

24          And the informant says, "I understand.  I

25   understand, brother."
```

1          MS. ARANGO:  Judge, I would just point out

2    that he did not say "builders."  He said "the brothers"

3    let someone walk in there.

4          MS. JHONES:  Your Honor, I'm reading directly

5    from the transcript.

6          THE COURT:  Mine says "brothers."

7          MS. JHONES:  Mine says "builders."

8          We can play it.  It may be an error.

9          MS. ARANGO:  Perhaps.

10          MS. JHONES:  Do you want to play it?  Would

11    you like to play it?

12          MS. ARANGO:  We've played it before.  I think

13    it's cumulative to play it again.

14          THE COURT:  Well, the transcript that's in

15    evidence --

16          MS. ARANGO:  Says "brothers."

17          THE COURT:  -- says "brothers."

18          MS. JHONES:  Okay.

19          MS. ARANGO:  We must have provided her with an

20    extra -- she asked for an extra copy.  We probably had

21    an old --

22          MS. JHONES:  Okay.

23    BY MS. JHONES:

24    Q.    Mr. Batiste, let me just clear it up.

25          THE COURT:  Why don't you -- where is the

```
 1  transcript in evidence?

 2          MS. JHONES:  Mr. Batiste has it.

 3          THE COURT:  Okay.

 4  BY MS. JHONES:

 5  Q.    What does yours read, Mr. Batiste, at the top of

 6  Page 4?

 7  A.    It says, "Sometimes I can't believe it.  The

 8  brothers let somebody walk in there."

 9  Q.    Is that -- does your recollection reflect that

10  that's the correct -- the correct statement, "the

11  brothers"?

12  A.    Yes.  I said "the brothers."

13  Q.    Great.  All righty.

14          And next to that, he says, "I understand.  I

15  understand, brother."

16          Now, after that, you say, "Yeah.  But listen.

17  Where you at right now?"

18          Correct?

19  A.    Yes, ma'am.

20  Q.    What is going on in that conversation at that

21  point in time, sir?

22  A.    Well, I'm explaining him my situation.

23          Because, normally, we leave the Temple doors

24  open; and people come in that's walking by on the

25  sidewalk and they want to look at the construction work
```

1  and they want to walk inside to see what's going on

2  inside the Temple.

3        And there was an incident where we let some

4  people come in and I had walked away from the Temple to

5  go get something down at the store.  When I came back,

6  I found a couple of saws missing and a hammer drill.

7  And that was pretty -- that was pretty expensive.

8        So I was upset over that matter and I was just

9  letting CW know that, you know, I wasn't in a good mood

10 because of that.

11 Q.   Now, in this conversation, is there any request

12 made by the informant to meet with you?

13 A.   Yes, ma'am.

14 Q.   Could you direct me to where that appears on the

15 transcript, please.

16 A.   Okay.  A few speakers down -- five speakers down

17 from where I tell him about the brothers let somebody

18 come in and take our tools, he says, "Right now, I'm

19 gonna go to a (unintelligible) a job, check something

20 out and come back.  I'm gonna be here later, brother.

21 Can you make it to my house anytime later, brother?

22 Please."

23 Q.   What was your response, sir?

24 A.   I told him, "Yeah.  Yeah.  Today -- I'm gonna

25 make it today definitely.  Definitely.  Because I'm

```
 1    very sorry about yesterday, you know.  I'm really

 2    sorry.  Look."

 3    Q.    Okay.  A sentence or two down, the informant

 4    says, "Not a problem.  That sounds really good.

 5    Anyway, yesterday I made a phone call to back home --

 6          "Uh-huh.

 7          "-- the brother that was coming those two days."

 8          And you say, "Really?"

 9          What is your understanding as to what it is that

10    he's referring to there, sir?

11    A.    He was referring back to CW 2, the person he's

12    been reminding me about and constantly telling me that

13    he's coming over and this is the guy that's gonna be

14    the connection with the money issue between him and his

15    father-in-law.

16    Q.    Directing your attention to the top of Page 5,

17    where the informant says, "You know this brother is

18    coming through.  We should be able to speak to him

19    when we help him the airport -- when we help him the

20    airport to his hotel.  And we should be -- we should

21    be -- we should be able to work something out.  That's

22    why I'm asking you for the list.  That's why I'm doing

23    the best I could from my side.  Believe me" and you

24    respond, "Okay," what is your understanding, sir, first

25    of all, as to what the informant is telling you when he
```

```
 1   says, "We should be able to work something out.  That's
 2   why I'm asking you for the list"?
 3   A.    Everything in this conversation is driven over
 4   the fact that this guy's coming.  This guy is the guy
 5   that he wants me to meet and he wants me to talk to
 6   about the jihad plan so he can give us the money.
 7   That's his evaluation, is what he's explaining to me.
 8   Q.    Let me ask you this, sir.
 9   A.    Yes, ma'am.
10   Q.    Directly before that statement by the informant,
11   bottom of Page 4 and continuing to the top of Page 5,
12   what had you told the -- what request, if any, had you
13   made of the informant at that point?
14   A.    I told him, "Whatever you can give me
15   financially," because I just mentioned to him in the
16   first sentence that the Temple is turned upside-down.
17         When he was telling me that Mohammed was coming,
18   he said he wanted the whole plan that he had -- his
19   idea was to have Mohammed come stay by the Temple.
20         So I'm telling him that the whole Temple is
21   turned upside-down and there's a lot going on, it's
22   under construction, it's not even suitable for this guy
23   to really come stay over here.
24         And then I tell him at the same time, you know,
25   "Whatever you can give me financially, it would help me
```

```
 1    right now.  And just a sign -- just a sign for the

 2    Temple."

 3         So I'm letting him know, also, I still got like a

 4    lot of expenses going on.  I'm trying to put up a sign

 5    at the Temple, and that's costing me a lot of money.

 6         MS. JHONES:  May I have the ELMO for a couple

 7    minutes, your Honor?

 8         THE COURT:  Sure.

 9         MS. JHONES:  Thank you.

10    BY MS. JHONES:

11    Q.   Directing your attention, Mr. Batiste, to

12    Government's Exhibit 7, that's the Temple.  Correct?

13    A.   That's correct.

14    Q.   Now, on December 14th, did the exterior of the

15    Temple look as it appears on Government's Exhibit 7?

16    A.   Yes, ma'am.  Basically.

17    Q.   Now, this item right here:  Do you know what that

18    is?

19    A.   Yes.

20    Q.   What is that, sir?

21    A.   That's the electrical lighting sign.  That's the

22    sign that illuminates.

23    Q.   Now, we can't see what's up here.

24         But could you tell the ladies and gentlemen of

25    the jury what's above this pole right here
```

```
 1   (indicating)?

 2   A.    It's a square box.  The box is about 3 feet high,

 3   wide, and about 5 feet long.

 4   Q.    Okay.  What, if any, relationship is there

 5   between what you're saying on 12-14, "Sign.  Just the

 6   sign," and what's depicted on Government's Exhibit --

 7   what's partially depicted on Government's Exhibit 7?

 8   A.    This is the sign that I'm speaking of, to get

 9   the -- to get the artwork done that we requested on the

10   sign and get it in Plexiglass.  It was gonna cost us

11   quite a bit of money.

12   Q.    Okay.  Now, when the informant says in --

13   towards -- four lines down, "I been working on it,

14   believe me," "Yeah.  Okay," what is your understanding

15   as to what he's telling you?

16   A.    That he's working on the financial issue.

17   Q.    What, if anything -- strike that.

18         When -- the informant says, "I'm gonna find my

19   way on doing that.  It's just -- you know how it is,

20   brother.

21         "Yeah.  Right.

22         "There's reason for doing everything.

23         "Right.  Yeah.

24         "And I just got to do whatever.  Anyway, when I

25   see you, I'll speak to you more -- some more, brother.
```

 1    Inshallah."

 2         What did you take him to mean when he said,

 3    "There's reason for doing everything and I just" --

 4    "Right.  Yeah," you respond, "And I just gotta do

 5    whatever (unintelligible).  Anyway, when I see you,

 6    I'll speak to you some more, brother"?

 7    A.    What page is that on?

 8    Q.    Page 5 of the transcript, towards the middle.

 9    A.    This is the hints that he's giving me.  He's

10    going back to refer me back to the fact that, "Well,

11    you know what you gotta do.  If you follow along with

12    my idea and my plan, then you ain't gonna have to worry

13    about these finances."

14    Q.    Now, did you -- where it says, "And I just gotta

15    do whatever (unintelligible).  Anyway, when I see you,

16    I'll speak to you more, brother," did you see him on

17    the evening of December 14th?

18    A.    There came a time period sometime in the early

19    evening I did meet with him.

20    Q.    Was this before December 16th?

21    A.    Yes, ma'am.

22    Q.    Okay.

23    A.    I think that points that out on Page -- the last

24    page where I tell him, "I'll see you later" -- or he

25    tells me, "I'll see you later, Bro."

Q.     Okay.  Finally, on the middle of Page 6, where
the informant says -- or, actually, where you say
before initially, "Only thing I remember" -- I'm sorry.
Strike that.

       You say prior to that, "Only thing I remember --
only thing I remember on your number is (786) 419.  I
couldn't remember the last digits."

       Do you recall that, sir?

A.     Yes, ma'am.

Q.     How often would you call this individual?

A.     I wouldn't call him very often at all.

Q.     And when the informant tells you, "Brother, to be
honest with you, that's where I had a problem.  So we
should be more connected, more able to contact each
other from many different ways.  I mean, it shouldn't
be like that.  We shouldn't be cut off" and you say,
"Yeah," what is your understanding as to what the
informant is trying to communicate to you at that
point?

A.     My understanding was that he was complaining
about our friendship, because he had been calling me a
lot in the last -- since he came back from -- in
October from Yemen, he's been calling me almost every
day, several, several times, leaving messages.  And I
hardly been calling him.

1        And he's trying to -- you know, he's giving me

2    the impression, "Hey, I'm doing you a favor.  I'm

3    trying to help you guys.  I appreciate all the help

4    you're giving me.  I'm steady trying to call you all

5    the time, but you're not answering the phone.  You're

6    faking me out on meetings.  We're supposed to be

7    meeting with each other.  You're not showing up.

8        "And now I ask you why you ain't showing up and

9    why you ain't letting me know that you ain't showing

10   up, and you're telling me that you can't even remember

11   my phone number."

12       And he's saying, "It shouldn't be like that.  If

13   we're gonna be friends, I should be able to count on

14   you better."

15   Q.    Okay.

16       MS. JHONES:  At this time, your Honor, I'm

17   going to publish some clips from another Government

18   exhibit.

19       With the Court's permission, I'd like the

20   ladies and gentlemen of the jury to retrieve -- I

21   believe it's the synchronized binder that has been

22   provided by the Government -- Government's Exhibit 44-A

23   in that binder.

24       May I provide the witness with that --

25

 1   BY MS. JHONES:

 2   Q.    Do you have that transcript there, Mr. Batiste,

 3   44-A?

 4   A.    No, ma'am.

 5           MS. JHONES:  May I provide it?

 6           THE COURT:  Yes.

 7           MS. JHONES:  Thank you.

 8           (Tenders document to the witness.)

 9           MS. JHONES:  We're going to start at the

10   beginning, which would be Page 2.

11           Does everybody have 44-A?

12           I apologize for the delay, your Honor.  We're

13   ready, I believe.

14           (Whereupon, segments of Government's Exhibit

15   No. 44 were published in open court.)

16   BY MS. JHONES:

17   Q.    Mr. Batiste, a couple of questions about that

18   clip.

19   A.    Yes, ma'am.

20   Q.    When the informant tells you on Page -- I believe

21   it's Page 2 -- he says, "I missed you at the airport,"

22   did you, in fact, meet up with this gentleman at the

23   airport?

24   A.    No, ma'am.  I intentionally did not meet with him

25   at the airport.

1    Q.     Why is that, sir?

2    A.     I was still uncertain did I really want to meet

3    this guy and bring him by the Temple.

4    Q.     What was your understanding as to what it is that

5    you were going to do with him, once you met him?

6    A.     That I had to pick him up and give him room and

7    board at the Temple.

8    Q.     Okay.  That was based on what?  Your

9    understanding was based on what?

10   A.     The conversation that transpired between me and

11   CW 1.

12   Q.     When?

13   A.     On the 14th and on November the 21st.

14   Q.     Now, sir, do you normally dress the way you

15   appear on 12-16-005?

16   A.     Occasionally, I'll wear a head wrap and -- or

17   I'll wear a pair of slacks and shirt.  I didn't have a

18   robe on.  I had a head wrap and a pair of slacks and a

19   shirt.  Every now and then, I do wear my staff -- I

20   carry my staff with me.

21   Q.     Why do you do that, sir?

22   A.     The staff is a symbol of wisdom, and that was

23   something that Master Athea had given me.  And I

24   usually carry a staff when I go on certain patrols

25   through the neighborhood.

1   Q.    And when you say "certain patrols through the

2   neighborhood," what are you referring to?

3   A.    As far as, like, walking through the

4   neighborhood, making an assessment of the neighborhood

5   and getting to meet the people in the neighborhood.

6   Q.    Why would you carry your staff when you were

7   going through the neighborhood on patrols?

8   A.    It was something that was just a part of me, and

9   it also grabbed a lot of attention.  I was able to

10   strike conversations about what it means, what it

11   consists of.

12        I had got approached a lot with the fact that I

13   did have a staff in my hand.  So it was easy for me to

14   have conversation with people on that subject.

15   Q.    Why did you wear it on that -- why did you

16   utilize the staff and the wardrobe -- why did you wear

17   it on that occasion on 12-16?

18   A.    Because it has an Islamic feel to it.  And I --

19   from what I heard from CW 1 telling me that this guy

20   was kind of like an imam and that he was gonna have

21   Hadith books and Korans and -- so I felt like, if I

22   look more like this way, this is something that he will

23   possibly be more comfortable in relating to me with.

24   Q.    On Page 4, the informant tells you, "We have to

25   improve it -- our communication.  We have to improve

1   it.  Let's say I call you.  You answer.  That's okay.

2   I'm okay."

3        Did you call the informant prior to meeting him

4   on 12-16?  Did you call him?

5   A.    No, ma'am.

6   Q.    Did he --

7   A.    I mean, CW No. 2?

8   Q.    Yes.

9        Before meeting him at the airport -- I'm sorry.

10  Strike that.

11       Before meeting him at the hotel, had you called

12  this informant over the phone?

13  A.    No, ma'am.

14  Q.    Had he called you?

15  A.    Several times.

16  Q.    Prior to this meeting at the Radisson?

17  A.    Yes, ma'am.

18  Q.    Do you have any knowledge as to how it was that

19  he acquired your telephone number?

20  A.    As far as what I was told, was that CW 1 told me

21  that he gave Mohammed my number.  When I asked him, you

22  know, "Where I'm gonna meet this guy at?", he's like,

23  "Well, I've already given him your number.  So he's

24  gonna call you when you get there."

25  Q.    And what number did you provide, sir?

1    A.    I provided my business line -- my cell phone

2    business line, (786) 222-8351.

3    Q.    Okay.  Now --

4    A.    Excuse me.

5          I didn't provide it.  CW 1 provided it.  That was

6    the number he had.

7    Q.    Now, where it says in the middle of the page,

8    "You know what I'm saying?  Because I don't want to

9    come all the way -- they didn't send me all the way to

10   here just to waste my time.  So we have to work with

11   each other.  Yes?" and you respond, "Yes, sir," what is

12   your understanding, sir, as to what it was that the

13   informant was telling you there?

14   A.    Based on those two statements that he just made,

15   from me observing his facial expressions, he looked

16   pretty hot, like he was really upset over the fact that

17   I didn't meet with him at the airport.

18   Q.    Okay.

19         MS. JHONES:  Now, let's go on to Clip B, which

20   starts at --

21         THE COURT:  We're going to take a break.

22         Do not discuss this case either amongst

23   yourselves or with anyone else.  Have no contact

24   whatsoever with anyone associated with the trial.  Do

25   not read, listen or see anything touching on this

1    matter in any way.

2          If anyone should try to talk to you about this

3    case, you should immediately instruct them to stop and

4    report it to my staff.

5          You may leave your notebooks at your chairs

6    and your binders.  Be back in the jury room in

7    15 minutes.

8          (Whereupon, the jury exited the courtroom at

9    10:50 a.m. and the following proceedings were had:)

10          THE COURT:  We're in recess for 15.

11          (Thereupon a recess was taken, after which the

12    following proceedings were had:)

13          THE COURT:  We're back on United States of

14    America versus Narseal Batiste, et al., Case

15    No. 06-20373.

16          Counsel, state your appearances, please, for

17    the record.

18          MR. GREGORIE:  Richard Gregorie and Jacqueline

19    Arango on behalf of the United States, your Honor.

20          MS. JHONES:  Ana Jhones on behalf of Narseal

21    Batiste.

22          MR. LEVIN:  Albert Levin on behalf of Patrick

23    Abraham.

24          MR. CASUSO:  Lou Casuso on behalf of Burson

25    Augustin, who's present.

1          MR. CLARK:  Nathan Clark for Rotschild

2    Augustine, who's present.

3          MR. HOULIHAN:  Richard Houlihan with Naudimar

4    Herrera.

5          MR. VEREEN:  Roderick Vereen on behalf of

6    Stanley Phanor, who's present.

7          THE COURT:  All Defendants are present.

8          Let's bring in the jurors.

9          (Whereupon, the jury entered the courtroom at

10   11:19 a.m. and the following proceedings were had:)

11         THE COURT:  You may be seated.

12         You are still under oath, sir.

13         You may proceed, Ms. Jhones.

14         MS. JHONES:  Thank you, your Honor.

15   BY MS. JHONES:

16   Q.   Mr. Batiste, before the break, we had listened to

17   the first clip on this -- on Government's Exhibit 44-A.

18   Okay?

19         I want to play another clip now, which starts at

20   Page 6, at the top of the page, three speakers down,

21   where it says, "Sometimes you have to..."

22         (Whereupon, segments of Government's Exhibit

23   No. 44 were published in open court.)

24   BY MS. JHONES:

25   Q.   Mr. Batiste, do you recall that part of the

 1   conversation?

 2   A.     Yes, ma'am.

 3   Q.     Let me ask you a couple of questions about it.

 4          At the top of Page 6, sir, three speakers down,

 5   where the informant says, "Sometimes you have to put on

 6   clothes -- put clothes on you that are not yours.  You

 7   have to do things you don't believe in" and he goes on

 8   and on, what did you take the informant to mean when he

 9   made those statements to you, sir?

10   A.     The first part, I felt like he was talking about

11   the way I looked, because I looked like I was a

12   spiritual person, and that I shouldn't look that way.

13          And on top of it, "It's okay to lie to me.

14   Whatever you gotta say, just go ahead and say it,

15   because we're gonna give you what you want.  And it's

16   okay to do those things."

17          That was something that CW 1 had told me in

18   November, when he had came back from Yemen, when he

19   given me a conversation about being political and doing

20   like politicians, that sometimes they say things, but

21   that doesn't mean that they're really gonna do those

22   things, but they only say those things just to get the

23   things they need for their objective.

24   Q.     When the informant -- I'm sorry.  Strike that.

25          Further down, when you say -- well, when the

1    informant tells you, "Very good.  Very good.  So tell

2    me, why I am here for?  Why?" and you respond, "Well,

3    you must be here to study me," what is it that you were

4    saying to the informant at that point in time, sir?

5    A.    I'm trying to let him know what I've been told

6    are the reasons why you're here.  And that's what I was

7    told by Abbas, was that this guy was coming to evaluate

8    me.

9         And at the same time, Abbas had been prepping me

10   for a while to try to meet this guy and how should I go

11   about in my conversation with him.

12        And I wasn't really prepared like how he wanted

13   me to be prepared.  That's why he wanted me to read

14   those videos and all those books, because this is what

15   he wanted me to talk about when I would meet CW 2 in

16   that conversation.

17        And I avoided a lot of meetings with Abbas.  So I

18   never went over that material.  And I really didn't

19   know what to say with the guy.  I thought, from what I

20   knew --

21             MS. ARANGO:  I would object, Judge, as

22   nonresponsive.

23             THE COURT:  Sustained.

24   BY MS. JHONES:

25   Q.    Sir, specifically, when you say to the informant,

1    "So the part you are here to study me for, I have

2    information for you":  Did you have information for

3    him, sir?

4    A.     No, ma'am.

5    Q.     Did you have any idea what you were going to say

6    to him prior to meeting with him?

7    A.     No.

8    Q.     Now, finally, on the same page, Page 6, four

9    speakers up, "As me being a Muslim, I don't want to

10   talk.  I do."

11          Sir, are you a Muslim?

12   A.     Technically speaking, I'm not a Muslim.  But I

13   understand what the term mean and I relate to the term,

14   because the term means one who is willing to submit his

15   will to God or Allah.  And I believe in that term.  So

16   I adopt the fact of saying, yes, Muslim.

17          But when it comes -- in terms of, like, ritual

18   and ceremony, I don't think that a person would

19   consider me a Muslim who is a Muslim because I don't

20   participate in the same kind of practices nor am I

21   knowledgeable of how Muslims pray and their belief

22   system as far as laws of marriage and so on.

23          So I wouldn't be considered, in so many words, by

24   a Muslim as a Muslim because of that fact.

25   Q.     When you tell this individual that you're a

1   Muslim, were you telling him the truth?

2   A.     No.  I was not telling him the complete truth.

3   Q.     Okay.  Now, let's go on to --

4          MS. JHONES:  I apologize, your Honor.

5          The next clip starts at Page 11, middle of the

6   page.

7          (Whereupon, segments of Government's Exhibit

8   No. 44 were published in open court.)

9   BY MS. JHONES:

10  Q.     Do you remember that, Mr. Batiste?

11  A.     Yes, ma'am.

12  Q.     First of all, directing your attention to

13  Page 11, when you tell the informant that you have

14  seven generals, was that true, sir?

15  A.     No.

16  Q.     Why did you tell this individual that you had

17  seven generals?

18  A.     During the course of this conversation, he

19  constantly told me what else do I know, what else do I

20  know.

21         And from -- my understanding is that everything I

22  was saying was not good enough for him, because he

23  wanted me -- he wanted to hear something strong,

24  something that relates to the fact that I'm here to do

25  jihad.

 1          So I told him, "Well, I got seven generals."

 2  That's what I thought of off the top of my head that I

 3  can say to him and I thought that was gonna satisfy

 4  him.

 5  Q.     Now, when you tell him that your generals could

 6  jump off buildings, sir, was that true?

 7  A.     No, ma'am.

 8  Q.     Had you ever engaged in any type of training or

 9  exercise that involved jumping off buildings?

10  A.     No, I haven't.

11  Q.     Directing your attention to Page 12, sir, where

12  you state towards the middle of the page, "The main

13  thing is, Occ, quite naturally, you would probably

14  think that the real thing -- the first thing that would

15  come out of my mouth would be money.  I don't care

16  about money."

17          The informant says, "I didn't ask you that."

18          And then you say, "The only thing I want your

19  people to know is that we're here."

20          When you tell this informant -- what was it that

21  you were telling the informant, I should say, when you

22  state to him, "The main thing, Occ, is, quite

23  naturally" and you go on?  What was your intent, sir,

24  when you made that statement to the informant?

25  A.     My intent was to let him know that -- because I

```
 1    was going through, like, different phases in meeting

 2    this guy in my mind.

 3         And a side of me didn't want to go through -- all

 4    the way through this scam with this guy and follow

 5    through with what Abbas was telling me.  So I was

 6    battling between that.

 7         So I felt that the best way to end this

 8    conversation is just to let him know that we are here.

 9    And I was speaking in terms of us as being Moors and

10    Moorish Science Temple, that we are here as a nation.

11    Q.    When you tell him, "The main thing, Occ" -- I'm

12    sorry -- when you tell him that the -- why did you say

13    to him -- strike that.

14         Why did you say to him that, "The first thing

15    that would come out of my mouth would be money.  I

16    didn't care about money"?  What was the purpose in you

17    telling him that?

18    A.    I was hinting towards him what this meeting was

19    all supposed to be about, was money.

20         If you understand the fact that I never requested

21    any money, nor did I request meeting this guy.  So I

22    felt very uncomfortable telling this guy, "Hey, where's

23    the money that I been asking for?  I'm here to get the

24    money from you."

25         The whole reason -- my understanding was that
```

1    this guy was willing to come through Abbas's

2    connection, that he told me that he had worked out on

3    the request that he was making for money.

4         So I mentioned this issue of money to see if this

5    guy's gonna go straight to the point to say, "Hey, I'm

6    here to give you guys money.  I'm here to support you

7    guys for whatever cause that you -- that Abbas has sent

8    us over here for."

9    Q.    Okay.  After you make this statement, does the

10   informant at this point tell you that he's here to give

11   you money?

12   A.    No, ma'am.  He continue on.  He tells me,

13   "Look" -- he's going back to what he said up top --

14   "talk straight and direct to me," because he knows at

15   this point he can see very clearly that I'm playing

16   games with him and I really --

17             MS. ARANGO:  Objection.  Speculative.

18             THE COURT:  Sustained.

19   BY MS. JHONES:

20   Q.    What did you understand him to mean, sir, when

21   the informant says, "That sometimes" -- in the middle

22   of the page -- "That sometimes people serious and they

23   prove it, but most of the time, people like to speak,

24   ba-ba-ba-ba-ba.  That's it.  When you come to

25   serious -- when you come to the serious, you are ready.

1    You don't see any more around you"?

2         What did you understand him to mean when he made

3    that statement to you, sir?

4    A.    At that specific time, I felt that he could see

5    right through me and he knew I was faking and I ain't

6    serious.

7         Because, if I was serious, I would have been

8    ready for something and I would have sounded much more

9    like I was serious and prepared to meet a guy like him.

10        Basically, you know, he's experienced enough to

11   read through all that.  He knows I'm just playing a

12   game.

13   Q.    Okay.

14            MS. JHONES:  If we could start with --

15            One moment, your Honor.

16            The next clip begins at Page 14, where it says

17   at the top, "You have seven generals..."

18            (Whereupon, segments of Government's Exhibit

19   No. 44 were published in open court.)

20   BY MS. JHONES:

21   Q.    Do you remember that part of the conversation,

22   Mr. Batiste?

23   A.    Yes, ma'am.

24   Q.    When the informant tells you that he has -- when

25   he asks you, "That's it?  Seven?  Only the seven you

```
 1    have.  That's good.  And you train them?" and you

 2    respond, "Yes, sir" and then later on, a few sentences

 3    down, you tell him that you can train them for

 4    anything, what response does the informant provide to

 5    you -- or what question, I should say, does the

 6    informant ask of you as it relates to the training that

 7    you may or may not have provided to your generals?

 8              MS. ARANGO:  Objection to the form.  The

 9    request is, "I can test them," not "train them."

10              THE COURT:  Sustained.

11              Rephrase your question.

12              MS. JHONES:  Sure.

13    BY MS. JHONES:

14    Q.    When the informant -- when the informant -- when

15    you tell the informant you can test them, what is it

16    that you're referring to, sir?

17    A.    I was referring to martial arts.

18    Q.    When he tells -- when the informant tells you --

19    or questions you, "Weapons?  They know explosives?

20    They know explosives?", what, if anything, had you said

21    to this informant in this conversation prior to him

22    bringing up the subject of explosives?  What had you

23    said to him about explosives?

24    A.    I never mentioned explosives to the informant.

25    Q.    Prior to December 16th, what, if any,
```

 1  conversation had you had with the other informant

 2  regarding explosives?

 3  A.    I had never mentioned to him explosives, also.

 4  Q.    And when he asks you, "Do they know explosives?",

 5  sir, what do you respond?

 6  A.    I told him I know.

 7  Q.    And what did you tell him that you know -- that

 8  you knew, sir?

 9  A.    Napalm bombs.

10  Q.    Was it true, sir?

11  A.    No.  The only thing I -- the only time I've heard

12  of napalm bombs is from watching a Vietnam movie.

13  Q.    And why did you tell him that, sir?

14  A.    Because I'm just running off at the mouth.  I'm

15  trying to fish out what I can say to this guy, just

16  basically talking foolish and nonsense.

17  Q.    Okay.

18          MS. JHONES:  If we can, Eric, let's go to F.

19          Before we start, that's Page 16, towards the

20  bottom, where it says, "Let me play something..."

21          (Whereupon, segments of Government's Exhibit

22  No. 44 were published in open court.)

23  BY MS. JHONES:

24  Q.    Mr. Batiste, do you remember that part of the

25  conversation?

1   A.    Yes, ma'am.

2   Q.    Specifically, on Page 16, when -- the informant

3   tells you, "Let me play something for you before we

4   start.  Tell me, will this work with you or doesn't

5   work with you?

6         "I'm here not to get asked.  I'm here to ask.

7   I'm here -- people to analyze me.  I'm here to analyze

8   brothers.  I'm here to give my opinion to brothers over

9   there who's the one who's leading us around the world,

10  to help guide ahead us."

11        Do you remember that, sir?

12  A.    Yes, ma'am.

13  Q.    Do you have any idea who he was talking about

14  when he's talking about "brothers over there"?

15  A.    No, ma'am.  I was actually trying to get

16  information of who is he talking about and, "Who is

17  your leader?"

18        He told me in so many words -- what I interpreted

19  was, you know, "Shut your mouth.  I'm gonna do the

20  talking.  Whatever I ask you, that's what I want the

21  answer."

22  Q.    When you say -- when he says to you, "I'm here to

23  analyze brothers," what did you take him to mean?

24  A.    That he's -- you know, he's here to watch me and

25  see what I'm about and, also, come by the Temple and

1    analyze what's going on over there.

2    Q.    Okay.  The next page, sir, top of the page, where

3    you say -- top of the page, two speakers down, "Do you

4    want me to leave now?", why did you tell him that --

5    why did you ask him that, I should say?

6    A.    At that point, I felt like I was not being the

7    good -- the character that Abbas wanted me to be and by

8    this guy -- his reactions is that he didn't like me and

9    he felt like this is not what he was looking for and he

10   didn't like the fact that I asked him who his leader

11   was.

12        That's why he said at the top of the page -- he

13   says, "I don't question him" and he goes on to continue

14   to talk.

15        So, basically, this meeting was just going bad.

16   I made a bad impression on this gentleman, and I really

17   don't want to be there no more myself.

18        So I asked him, "Do you want me to leave?"

19   Q.    Okay.

20        MS. JHONES:  If we could go to the next clip,

21   please, which starts at Page 19, where it reads three

22   speakers down, "Listen.  I'm here not to tell me

23   what..."

24        (Whereupon, segments of Government's Exhibit

25   No. 44 were published in open court.)

BY MS. JHONES:

Q.    Do you remember that part of the clip, sir?

A.    Yes, ma'am.

Q.    Do you know how long -- we're now up to Page 22.

      Do you know approximately how long that meeting
had been going on?

A.    I would say for about a good 45 minutes.

Q.    And is there any reason, sir, why -- well, first
of all, why did you tell this individual on Page 22
that you were exhausted financially?

A.    Yes, ma'am.  That was the whole reason why I was
there at the meeting.  All the way up to this point,
this guy kept on telling me, "Talk straight.  Talk
straight," tell him what I want.  I went through a
whole lot at this point, me listening to this guy.

      At that point then, I just -- I couldn't fake it
no more of trying to hide the fact that I was only
there for the money.  So that's what I told him.

Q.    Is there any particular reason why you didn't
tell him that from the very beginning?

A.    Because I was not the one that requested the
money.  I felt that he was the one that should offer me
the money because I was there through someone else, his
words.

Q.    When the informant tells you on Page 21, sir --

```
 1   specifically, five speakers up from the bottom, where

 2   he says, "But you are playing with me since I arrive.

 3   'Do me this.  Do me this.'  All this trust between me

 4   and you.  Now, now, this moment, where is the trust?

 5   Or there is no trust.  One second.  Very important" and

 6   you say to him, "If I didn't trust you, I wouldn't be

 7   here.  I wouldn't be here right now," why did you tell

 8   the informant that, "If I didn't trust you, I wouldn't

 9   be here right now"?

10   A.    Because I wanted the guy to relax at that point,

11   because he started yelling and hollering.  He got upset

12   over the fact that I said I didn't eat meat and he ate

13   meat and he was a Muslim and he felt like I insulted

14   the fact that he was -- I'm not a Muslim.

15         And, basically, you know, he keeps on telling me

16   I'm playing games with him.

17         So I'm trying to let him know -- I'm trying to

18   establish that, "This is not a game.  I'm not playing

19   with you."

20         But he still sees right through it.  That's why I

21   tell him -- I tell him what I said.

22         MS. JHONES:  The next clip, please, at Page --

23   it starts at Page 26, where it says, "But what you want

24   to do..."

25         Eric, if you can assist me.
```

1            (Whereupon, segments of Government's Exhibit

2     No. 44 were published in open court.)

3     BY MS. JHONES:

4     Q.     Mr. Batiste, do you remember that part of the

5     conversation, sir?

6     A.     Yes, ma'am.

7     Q.     Let me ask you a couple of questions about it.

8            At the beginning of this clip, Page 26, it starts

9     off, "But what you want to do?"

10            A little bit before, where the clip begins, the

11     informant was asking you about your plan, top of the

12     page.

13            Do you see that, sir?

14     A.     Yes, ma'am.

15     Q.     "What's your plan?"

16     A.     Yes, ma'am.

17     Q.     Now, you told him what your plan was; did you

18     not, sir?

19     A.     Yes, ma'am.

20     Q.     What did you tell him?

21     A.     I told him that I wanted to build an Islamic army

22     and then -- and he look at me and I said, "For

23     Islamic."  And we both said at the same time, "Jihad."

24     Q.     Why did you tell him that, sir?

25     A.     Well, that was the information that I got out of

```
 1    the book that I -- that Abbas had on November 21st, the
 2    Jihad book.
 3    Q.    Why did you tell this gentleman that you wanted
 4    to build an Islamic army for jihad?
 5    A.    Because that's what Abbas led me to believe that
 6    that's what I would have to tell him.
 7    Q.    When you told him that you had to build -- you
 8    were going to build an Islamic army for jihad, what did
 9    you take it to mean when the informant told you down in
10    the middle of the paragraph, "Give me something solid
11    to -- for me to understand"?
12    A.    That even though I had those words, that still
13    meant nothing to him.  He was looking for something
14    much more serious and much more for real.
15          It's -- you know, it's like I've been saying all
16    along.  It's obvious to me that this guy feels very
17    strongly that I'm faking it.
18          MS. ARANGO:  Objection, your Honor.
19    Speculative.
20          THE COURT:  Sustained.
21    BY MS. JHONES:
22    Q.    Mr. Batiste, directing your attention to Page 27,
23    where you tell the informant -- this is four speakers
24    down -- "And I don't know.  Would that make me an idiot
25    if I was to tell you something that's so obvious?" and
```

1   the informant asks to you repeat it -- to repeat it one

2   more time, what is it that you are attempting to tell

3   the informant when you tell him, "That would make me an

4   idiot if I was to tell you something that was so

5   obvious"?

6   A.   To explain to him the real reason why I was

7   there, that, "I was only there by the impression what

8   Abbas told me to tell you.  But I really didn't have

9   any knowledge about the conversation that you really --

10  you're really trying to seek out of me."

11  Q.   Now, on Page 28, sir, four speakers down, where

12  you say, "Brother Mohammed, I'll give you this.  I'll

13  do this as a respect for myself here and for you.  I'll

14  pay for your trip back and I'll allow you to wait maybe

15  a half a year," what was your purpose -- well, first of

16  all, what was it that you were conveying to the

17  informant at that point on Page 28?

18  A.   At that point, you know, basically, I was just

19  trying to exit out the meeting.  At that point, I was

20  just trying to let him know, you know, "Just forget

21  about the money.  If I got to go through all this,

22  forget it.  I'll just pay your trip back."

23        The guy already took personal offense toward me

24  from the conversation that already happened in the past

25  during this meeting.  He already analyzed the fact

```
 1   that, when I wrote out the list, I didn't have no

 2   knowledge about guns --

 3           MS. ARANGO:  Objection.  Speculative.

 4           THE COURT:  Sustained.

 5   BY MS. JHONES:

 6   Q.    Just tell me, sir -- just tell me why it was that

 7   you told him -- what was going through your mind when

 8   you told him, "I'll do it as a respect for myself and

 9   for you.  I'll pay for your trip back."

10   A.    "I ain't gonna be begging for your money.  If you

11   got your money and you don't want to give it up, then

12   I'll pay for your trip back.  And you can leave."

13   Q.    Okay.

14           MS. JHONES:  I just need a moment, your Honor,

15   to go through my notes here.

16           I'm going to play one more clip on -- from

17   this meeting.

18   BY MS. JHONES:

19   Q.    I want you to listen, sir, because I'm going to

20   ask you a couple questions about the last clip I'm

21   going to play.

22        That starts at Page 33 -- I'm sorry.

23        It starts at Page 30 and -- where it says, "I

24   came today and I call you from the airport," which is

25   at the bottom of Page 30.
```

```
 1              (Whereupon, segments of Government's Exhibit

 2   No. 44 were published in open court.)

 3   BY MS. JHONES:

 4   Q.    Mr. Batiste, do you remember that part of the

 5   conversation, sir?

 6   A.    Yes, ma'am.

 7   Q.    Are we getting towards the end of this meeting?

 8   A.    Yes, ma'am.  We are getting towards the end.

 9   Q.    Okay.  Directing your attention to the third

10   paragraph on Page 31, specifically where the informant

11   says, "Put something in this room.  I'm putting myself

12   in danger before you, one, and I'm putting risk all my

13   brother, because I have something bigger than here.

14   Third, I want Al-Qaeda to do something," is that what

15   the informant said in that conversation, sir?  "I want

16   Al-Qaeda to do something?"

17   A.    No, ma'am.  The informant did not mention

18   Al-Qaeda.

19   Q.    What was it that the informant said there, sir?

20   A.    I believe he said something to the words of "our

21   time" --

22   Q.    Okay.

23   A.    -- to do something.

24        MS. JHONES:  The last clip starts at Page 38,

25   where it starts three speakers down, "Brother Nazaree,
```

1    I will be honest..."

2              (Whereupon, segments of Government's Exhibit

3    No. 44 were published in open court.)

4    BY MS. JHONES:

5    Q.    Do you remember that part of the conversation,

6    Mr. Batiste?

7    A.    Yes, ma'am.

8    Q.    When you tell the informant, "I think it's too

9    soon," why are you telling him that, sir?

10   A.    Because he said, basically, at this point, that

11   he has his opinion already about me and that he's gonna

12   get in contact with his brothers and possibly go back

13   home and share the opinion that he had.

14   Q.    Okay.  And when you say, "It's there.  We gonna

15   bring it down," what were you referring to, sir?

16   A.    When I said, "It's there," I said, "I'm gonna

17   bring it down."  I did not say, "We gonna bring it

18   down."  That's a typographical error.

19   Q.    And what are you referring to when you say that,

20   sir?

21   A.    I'm referring to the fact of what he's trying to

22   get me to understand in this meeting, why he keeps on

23   saying, you know, "What is it?" and, "What are you

24   really saying?  Get it across to me what you really

25   mean."

1           And I'm letting him know, "Well, I don't fully

2     understand what you want from me.  And so these

3     thoughts of what you're trying to convey is over my

4     head and, when I'm able to grasp it, then I'll bring it

5     down to my understanding."

6     Q.    Okay.

7     A.    And that's what I followed up -- said before the

8     tape broke.  Before it says "(Break in the tape)," I

9     did tell him, "I'm trying to figure out what you're

10    saying."  And that's not present in this transcript.

11    Q.    I'm sorry.  Say that again.

12    A.    I'm saying --

13    Q.    I didn't understand you.

14    A.    After he said, "I like this word, this word here,

15    what you said, 'bring it down,'" I told him very

16    briefly right after that, "I'm trying to understand

17    what you're saying."

18    Q.    Okay.

19    A.    And I'm saying I don't see that present in the

20    transcript, where it says "(Break in the tape)."

21    Q.    Okay.  Now, I'm directing your attention to

22    Page 39 of the tape, sir.

23          Towards the bottom, the informant says, "Tomorrow

24    I'll get another phone, because all the -- because

25    nobody -- and move -- I like to -- I have different

1   lines so I don't like to be on one line.  I want to --

2   tomorrow I will get --"

3        And you say, "I was gonna pick one up for you."

4        And on Page 40, he says, "You can bring phone for

5   me?"

6        And you say, "I will buy it.  I'll buy it."

7        And this -- the informant says, "Tomorrow --

8   tomorrow, Monday.  Okay."

9        First of all, sir, did you have any agreement

10  with this gentleman to meet with him the next day?

11  A.   No, ma'am.  I didn't have a formal agreement with

12  him about meeting with him.

13  Q.   Why --

14  A.   He --

15  Q.   I'm sorry.

16  A.   He told me that he -- it was too soon for me and

17  him to have any further meetings because we, first,

18  don't have a communication and he felt like we needed

19  to get a communication first before we have any

20  meetings with me or any other -- the people that might

21  be at the mosque.

22  Q.   Do you go out and buy a telephone for this

23  individual, sir?

24  A.   No, ma'am.

25  Q.   Do you receive a phone from this individual?

```
 1   A.     Yes.

 2          MS. JHONES:   Your Honor, I just need a couple

 3   minutes to make sure I've reviewed all my notes, if I

 4   may have a minute or so.

 5   BY MS. JHONES:

 6   Q.     What, if any, conversations were there in this

 7   meeting on 12-16 about the Sears Tower, sir?

 8   A.     There's nothing mentioned about the Sears Tower.

 9   Q.     What, if any, conversations were there in this

10   meeting about the Empire State Building, sir?

11   A.     There was no mention of the Empire State

12   Building.

13   Q.     What, if any, acts of violence did you express to

14   this informant at this meeting, sir, that you were

15   going to engage in?

16   A.     There's no acts of violence I expressed to the

17   informant in this meeting.

18          In fact, I told him that I'm not just gonna grab

19   some machine gun and try to go shoot up something just

20   to prove that I have a mission in this meeting.

21   Q.     I'm sorry.  What was the last part?

22   A.     I told him in this meeting that I'm not gonna go

23   grab no machine gun and shoot up something so I have

24   something to prove.

25   Q.     Now, after this meeting, sir, on the 16th with
```

```
 1    this informant -- okay.  Mr. Batiste, on --

 2            MS. JHONES:  I'm sorry, your Honor.  I just

 3    need to address an exhibit with Mr. Batiste.

 4    BY MS. JHONES:

 5    Q.    A couple more questions about the 16th, sir.

 6            Did you provide the second informant with

 7    anything on December 16th?

 8    A.    Yes, ma'am.

 9    Q.    What did you provide him?

10    A.    I wrote out a list.

11    Q.    Okay.

12            MS. JHONES:  Your Honor, may I have the ELMO

13    for a couple minutes?

14            THE COURT:  Sure.

15            MS. JHONES:  Thank you.

16    BY MS. JHONES:

17    Q.    Showing you what's in evidence as Government's

18    Exhibit 100, do you remember that, sir?

19    A.    Yes, I do.

20    Q.    Is this what you provided the informant?

21    A.    Yes, ma'am.

22    Q.    Whose idea was it to provide a list, sir?

23    A.    CW 1 had been mentioning to me about providing a

24    list, and then CW 2 also mentioned at the meeting that

25    I need to write out a list.
```

1    Q.      When was the first time that CW -- when you say

2    "CW 1," who are referring to?

3    A.      Abbas al-Saidi, the paid informant.

4    Q.      And when was it that Abbas al-Saidi requested a

5    list from you?

6    A.      I believe it goes as back as early as November

7    the 10th.

8    Q.      Were there any phone conversations, sir, where

9    it's -- where Abbas al-Saidi requests a list from you?

10   A.      Yes, ma'am.

11   Q.      And what phone conversation or meeting would that

12   be have been prior to 12-16?

13   A.      That would have been on 12-15.

14   Q.      Now, this list:  Why did you provide the

15   information in this list to the second paid informant?

16   A.      Because, from what I was led to believe, that --

17   I had to have a reason for the money.  So I had to

18   write out something to explain what I was going to

19   utilize the money for.

20   Q.      How many machine guns did you request, sir?

21   A.      There was no number amount.

22   Q.      How many radio communications did you request,

23   sir?

24   A.      It doesn't have a number figure as well.

25   Q.      How many squad cars?

1    A.     There's no number for squad cars.

2    Q.     And how many boots?

3    A.     There's no number for boots.

4    Q.     One more thing I forgot to ask you about.

5           You mentioned a gentleman by the name of Jeff

6    Fort.

7           Do you remember that?

8    A.     Yes, ma'am.

9    Q.     Why did you do that?

10   A.     Jeff Fort is somebody that's well known in

11   Chicago as being a pretty bad, mean guy.  And I felt at

12   that point that I wanted to mention his name so maybe

13   this guy might be familiar with that.

14          Because I wasn't making a good impression that I

15   was a big, mean, bad guy.  So I thought, if I mentioned

16   the name of a big, mean, bad guy, that he would think,

17   "Okay.  Well, he might" -- you know, "He might be on to

18   something here."

19   Q.     Okay.  Now, after December 16th, sir, does there

20   come a time when you hear from either one of these

21   informants?

22   A.     Yes, ma'am.

23   Q.     And when is the next time you hear from either

24   Informant No. 1 or Informant No. 2?

25   A.     There was a conversation that transpired between

1   Informant No. 1.

2   Q.      Do you remember when that was?

3   A.      I'm not exactly sure.

4   Q.      If I showed you something, would that help

5   refresh your recollection, sir?

6   A.      Yes, it would.

7              MS. JHONES:  Your Honor, I just need a minute

8   to make sure we're not duplicating one exhibit.

9              MS. ARANGO:  Judge, I'd just note for the

10  record that two of these transcripts -- 91-B-2 and

11  91-B-3 -- are in evidence as Government's Exhibit 45-A.

12             MS. JHONES:  I'm looking at 45-A right now,

13  your Honor, to make sure it's complete.

14             THE COURT:  Okay.

15             MS. JHONES:  Thank you.

16             Your Honor, with the Court's permission, I'd

17  like to provide the defense version of 45-A, which

18  would be 91-B-2 and 91-B-1.

19             MS. ARANGO:  Judge, I haven't compared the

20  defense version with the Government's version.  So I

21  don't know if it's the same or not.  I know that we

22  have reviewed the Government's version.  So I can't --

23             MS. JHONES:  These were previously provided in

24  January of 2009, your Honor.  I don't have any problem

25  with the Government taking time to review them.

1           THE COURT:  Well, are they duplicates or

2    they're --

3           MS. JHONES:  They are the same -- they are the

4    same call.  But the transcript has -- the defense

5    version has additional information and I'd like to

6    provide a defense version of the transcript.

7           THE COURT:  Lay your predicate.

8           MS. JHONES:  Okay.

9           MS. ARANGO:  I would just note for the record,

10   Judge, that the exhibit marked 92-B-1 and -2 doesn't

11   have a disc in here.

12          THE COURT:  Was the disc previously entered

13   into evidence as a Government's exhibit?

14          MS. ARANGO:  No, Judge.

15          MS. JHONES:  Let me check.

16          MS. ARANGO:  It was for the other one, for 91.

17          THE COURT:  So the transcripts of 91 --

18   there's a recording in evidence in the Government's

19   exhibits.  And that's what?

20          MS. ARANGO:  That is 45 and 45-A.  The

21   recording is 45, and the transcript is 45-A.

22          THE COURT:  Okay.

23          MS. ARANGO:  And the Government transcript

24   that's marked Government's Exhibit 45-A has two

25   recordings on it, on December 18th.

```
 1              THE COURT:  And 45 has two recordings?

 2              MS. ARANGO:  Yes.

 3              THE COURT:  Okay.

 4              MS. JHONES:  And just for the record, your

 5    Honor, Government's Exhibit 45 has three recordings.

 6              MS. ARANGO:  Oh.  That's possible.  I'm sorry.

 7              THE COURT:  Okay.

 8              MS. JHONES:  It was by stipulation.

 9              There's three recordings.  So there might be

10    some overlap.  But there's only one transcript.  And

11    that is for -- one Government transcript.  That is for

12    12-18-05.

13              I'm going to put in transcripts for the

14    recordings that are contained in Government's

15    Exhibit 45, but that would --

16              THE COURT:  Lay your predicate.

17              MS. JHONES:  Thank you.

18              May I approach, your Honor?

19              THE COURT:  Yes.

20              MS. JHONES:  Thank you.

21    BY MS. JHONES:

22    Q.    Mr. Batiste, I'm going to show you Defense

23    Exhibit for identification 91-A and 91-B-1, 91-B-2 and

24    91-B-3.

25              I'm going to ask you, sir, to look at those
```

```
 1   exhibits and tell me if you are able to identify them.

 2   A.    Yes, ma'am.

 3   Q.    Have you listened to Defense Exhibit for

 4   identification 91-A?

 5   A.    Yes, I have.

 6   Q.    Do the contents of Defense Exhibit 91-A

 7   accurately reflect what's depicted in Defense

 8   Exhibits 91-B-1, 91-B-2 and 91-B-3?

 9   A.    Yes, they do.

10   Q.    Okay.  And are there any deletions that you have

11   made to these -- to the contents of 91-B-1, 91-B-2 or

12   91-B-3?  Any corrections or deletions?

13   A.    I have made some corrections.

14   Q.    And those exhibits, as they appear now in front

15   of you -- 91-B-1, -B-2 and -B-3 -- do they contain,

16   based on your review, the contents of 91-A?

17   A.    Yes, they do.

18         MS. JHONES:  At this time, your Honor, I don't

19   think it's necessary to move into evidence 91-A because

20   there's already a Government's exhibit.  But I would

21   like to move in 91-B-1, -B-2 and -B-3.

22         MS. ARANGO:  Just the same --

23         THE COURT:  The continuing objection?

24         MS. ARANGO:  Yes.  Yes.  Thank you.

25         THE COURT:  The continuing objection is --
```

```
 1    continues to be overruled.
 2            And they will be entered into evidence as
 3    Defendant Batiste Exhibits 91-B, -B-2 and -B-3.
 4            (Whereupon, Defendant Batiste's Exhibit
 5    Nos. 91-B, 91-B-2 and 91-B-3 were entered into
 6    evidence.)
 7            MS. JHONES:  Okay.
 8            THE COURT:  And 91-A is only marked for ID.
 9            MS. JHONES:  Your Honor, just in order to
10    expedite things pursuant to the Court's earlier
11    side-bar, I'd like to at this point move into
12    evidence -- but I believe I have to check for an
13    exhibit that Ms. Arango has indicated as to Defense
14    Exhibit 92.  I just need a moment to search for the
15    disc, which appears to be missing.
16            Your Honor, may I step out to the attorney
17    room for a second to inquire of Ms. Armand?
18            THE COURT:  Yes.
19            MS. JHONES:  Thank you.
20            I apologize for the delay, your Honor.
21            Your Honor, if I could just inquire of
22    Mr. Batiste as to the exhibits that I have moved into
23    evidence, those transcripts.
24            We do have the disc that's missing and we're
25    just going to -- I just need a couple of minutes to
```

1   acquire that disc.  We seem to have misplaced it.

2           If I could just go forward with the ones that

3   are in evidence now.

4           THE COURT:  Sure.

5           MS. JHONES:  And I apologize for taking the

6   Court's time on this.

7           THE COURT:  That's okay.

8           MS. JHONES:  With the Court's permission, I'd

9   like the jury to turn to Exhibit -- the tab for

10  12-18-05.  There's tabs which are now in evidence,

11  91-B-1 and 91-B-2.

12          THE COURT:  What are the dates on these tabs?

13          MS. JHONES:  12-18-05.  The first one is

14  1:19 p.m.  That corresponds to 91-B-1.

15          The second one is 12-18-05.  It says "Second

16  Call."  And at the end of the call, it reflects

17  1:23 p.m.

18          THE COURT:  You may turn to the three tabs

19  marked 12-18-05, the first being 91-B-1; the second,

20  91-B-2; the third, 91-B-3.

21          You may publish.

22          MS. JHONES:  Thank you, your Honor.

23  BY MS. JHONES:

24  Q.    Mr. Batiste, do you recall receiving -- well,

25  first of all, after that meeting with the second

1   informant on 12-16, did you have any contact with

2   either one of the informants on the 17th -- the next

3   day, on the 17th of December?

4   A.     No, I didn't.

5   Q.     What, if any, efforts did you make to contact

6   either the first informant or the second informant?

7   A.     I didn't make any efforts to try to contact

8   neither one of them.

9   Q.     After the meeting of December 16th, sir, did

10  you have any meetings with the first informant on

11  December 16th?

12  A.     No, ma'am.

13  Q.     What did you do after that meeting on

14  December 16th?

15  A.     Basically, I just went back to the Temple.

16  Q.     Now, directing your attention to Defense

17  Exhibit 91-B-1, do you recall having received any phone

18  call or any voicemail from someone?

19  A.     I'm sorry.  You know, I didn't finish answering

20  your question as far as December 16th.

21         Informant No. 1 did call me about four times

22  before I met with CW 2.

23  Q.     Are you talking about before the 12-16 meeting at

24  the Radisson?

25  A.     Yes, ma'am.

1          Now, what was your new question?

2    Q.    My new question is:  Directing your attention

3    to Defense Exhibit 91-B-1, which is a voicemail of

4    12-18-05 at 1:19 p.m., do you recall having received a

5    voicemail?

6    A.    Yes, ma'am.

7    Q.    Did you return any phone call on December 18th of

8    2005?  Do you recall having done so, sir?

9    A.    No.  I don't recall.  But I might have.

10   Q.    Now, directing your attention to the next defense

11   tab, which is 91-B-2, do you remember having had a

12   conversation with either one of the informants, sir?

13   A.    On 12-18?

14   Q.    Yes.

15   A.    Yes.

16   Q.    Please tell us who it was that you had a

17   conversation with on 12-18 of '05.

18   A.    CW 1.

19   Q.    Okay.  On the second page, sir, of Defense

20   Exhibit 91-B-2, you say -- you state, three speakers

21   down, "Hey, you know, Occ, listen, I want you to come

22   by and see the work in the Temple today.  I'll send one

23   of the brothers to pick you up."

24          Do you remember that, sir?

25   A.    Yes, ma'am.

1   Q.    Now, towards the bottom of that -- well, first

2   of all, did you meet with the Informant No. 1 on

3   December 18th of 2005?

4   A.    Yes, I did.

5   Q.    In the bottom of Page 2, where it says, "Okay,

6   brother.  Let me see what I'm going to do, if I can get

7   an hour or two or something.  I'm going to call you

8   back and let you know, brother," do you remember that,

9   sir?

10  A.    Yes, ma'am.

11  Q.    And then directing your attention to Page 3,

12  where the informant says, "But if I can't make it

13  today, I don't know, my brother.  Late tonight you

14  can't make it either?"

15        And you say, "Late tonight?"

16        "Yeah."

17        And you respond, "We're going to be working all

18  night tonight."

19        Is there -- was there a meeting in the late

20  evening on 12-18-05 between you and Informant No. 1?

21  A.    No, ma'am.

22        MS. ARANGO:  Objection.  Asked and answered.

23        THE COURT:  Sustained.

24        MS. JHONES:  Your Honor, I'm sorry.  I just

25  need -- your Honor, did I move into evidence 91-B-3?

1            THE COURT:  Yes.

2            MS. JHONES:  If the ladies and gentlemen of

3    the jury could turn to that tab, which is the third

4    call on 12-18-05.

5            THE COURT:  You can turn to that tab.

6            MS. JHONES:  Thank you, your Honor.

7    BY MS. JHONES:

8    Q.    Do you have that in front of you, Mr. Batiste?

9    A.    Yes, I do.

10   Q.    Is there a conversation that you have on --

11   another conversation that you have on 12-18 of 2005?

12   A.    Yes, ma'am.

13   Q.    And with whom do you have a conversation, sir?

14   A.    With CW 1.

15   Q.    What is the time of that conversation?

16   A.    He contacted me at 1:26 p.m.

17   Q.    Is that before or after the previous

18   conversation?

19   A.    That's after the last two previous conversations.

20   Q.    Now, who called who, sir?

21   A.    He called me.

22   Q.    And what was the request that was made, if any,

23   by the informant in that particular phone call?

24   A.    He was telling me that he needed some time before

25   he comes by the Temple.

1   Q.     Okay.  And on the second page of that call, where

2   it says, "So can you -- can you stop by my house, like,

3   anytime before 3:30?", do you see that, sir?

4   A.     Yes, ma'am.

5   Q.     And you say, "Okay.  I got a brother over there

6   now.  He's coming to pick you up now"?

7   A.     Yes, ma'am.

8   Q.     After this phone call, sir, is there any meeting

9   between you and Informant No. 1?

10  A.     Yes, ma'am.  Because he told me that he talked to

11  his boss and he could meet with me for about half an

12  hour to 45 minutes.

13         I was just letting him know that, "There will be

14  a brother that would be come picking you up in the

15  early -- early evening, around 3:30."

16  Q.     And did -- where did that meeting take place,

17  sir?

18  A.     It took place at the Temple.

19  Q.     Now, what, if anything, was discussed at that

20  meeting between you and the first informant, sir?

21  A.     I discussed with him the meeting with CW 2.

22  Q.     And what did you tell the first informant about

23  your meeting with CW 2?

24  A.     That he didn't give me the full details about

25  meeting this guy and that the impression that I got

```
 1   from this guy was not the impression that he had given

 2   me that he would be like when I would meet him.

 3   Q.     In that meeting of 12-18-05, sir, what, if

 4   anything, else did you discuss -- did you discuss

 5   anything else with Informant No. 1?

 6   A.     I discussed with him that this guy was asking me

 7   for a list and I didn't know what to put on the list.

 8          The guy asked me about guns.  He seen that I

 9   didn't have no knowledge about guns.

10          And I just told him that, "I really don't think

11   that I pulled it off, what you was trying to ask me to

12   do."

13   Q.     Okay.  Now, after December 18th, sir, does there

14   come a time where you have telephone contact with the

15   second informant?

16   A.     After December the 18th?

17   Q.     Yes.

18   A.     Yes, ma'am.

19          MS. JHONES:  Your Honor, I believe we now have

20   the disc to 92-A.

21          May I approach, your Honor?

22          THE COURT:  Yes.

23          Have you shown it to the Government?

24          MS. ARANGO:  I did, your Honor.

25          I inquired as to whether or not they needed to
```

 1   listen to it, and they said that was okay.

 2          THE COURT:  Okay.

 3          MS. JHONES:  Your Honor, now I have the

 4   complete set.  I'd like to show the witness Defense

 5   Exhibit 92-A, 92-B-1 and 92-B-2.

 6          May I approach, your Honor?

 7          THE COURT:  Yes.

 8          MS. JHONES:  Thank you.

 9   BY MS. JHONES:

10   Q.    Mr. Batiste, would you please look at Defense

11   Exhibit 92-A and Defense Exhibit 92-B-1 and 92-B-2 and

12   please tell me if you recognize those three exhibits.

13          MS. ARANGO:  Judge, I think we've already

14   stipulated to the predicate.  We have a continuing

15   objection.  But I don't think we need to go through all

16   this predicate.

17          THE COURT:  Unless there's an issue as to the

18   transcript, you don't need to go through the predicate.

19          MS. JHONES:  Okay.  I thought the Court wanted

20   me to.

21          THE COURT:  No.

22          MS. ARANGO:  We just have our continuing

23   objection to the transcript, but the predicate is not

24   necessary to be laid.

25          THE COURT:  Okay.

1           MS. JHONES:  Okay.  Great.

2           At this time I'd like to move into evidence

3    Defense Exhibits 92-A, 92-B-1 and 92-B-2.

4           THE COURT:  What's the date of 92-A, please?

5           MS. JHONES:  There's two calls, your Honor.

6    12-19-05 at 6:25 p.m., and 12-19-05 at 7:44 p.m.

7           THE COURT:  The continuing objection is

8    overruled.

9           They will be admitted as Defendant Batiste

10   Exhibits 92-A, 92-B-1 and 92-B-2.

11           (Whereupon, Defendant Batiste's Exhibit

12   Nos. 92-A, 92-B-1 and 92-B-2 were entered into

13   evidence.)

14           THE COURT:  You may turn to the two tabs --

15   okay.  I only see one tab -- no.  There are two tabs.

16   I'm sorry -- the two tabs marked December 19th, 2005,

17   the first one being 6:25 p.m., which is 92-B-1, and the

18   second at 7:44, which is 92-B-2.

19           You may publish.

20           MS. JHONES:  Thank you, your Honor.

21   BY MS. JHONES:

22   Q.   Mr. Batiste, directing your attention, sir, to

23   Defense Exhibit in evidence 92-B-1, is there a

24   telephone call between you and one of the informants,

25   sir?

1   A.      Yes, ma'am.

2   Q.      Which informant is the participant in that phone

3   call?

4   A.      It would be myself and CW 2.

5   Q.      Who calls who?

6   A.      He's giving me a call at this point.

7   Q.      Okay.  And what, if anything, do you tell the

8   informant on December -- the second informant -- well,

9   first of all -- I'm sorry -- what is the time of that

10  call, sir?

11  A.      This call is at 6:25 p.m.

12  Q.      And what, if anything, do you tell the informant

13  in this call -- Informant No. 2 in this phone call?

14  A.      That I had tried to reach him.

15          MS. ARANGO:  Objection, Judge.  It's vague.

16  And there's a transcript in evidence.

17          THE COURT:  Sustained.

18          Rephrase your question.

19          MS. JHONES:  Sure.

20  BY MS. JHONES:

21  Q.      Directing your attention to Page 2, sir, where

22  you say, "Salaam aleikum," what does that mean, sir?

23  A.      That means "Peace be with you."

24  Q.      "Yeah.  I just called you."

25          And the informant says, "Just called me?

1        "Yes."

2        Did you, in fact, reach out for the informant,

3   sir?

4   A.    I tried to call him.  Abbas told me to give him a

5   call.

6   Q.    And were you able to reach him when you tried

7   calling him?

8   A.    No.

9   Q.    And as a result of you calling -- what did you

10  tell the informant after telling him that you had tried

11  to reach him?

12  A.    I told him I called him at the Radisson.

13  Q.    And why was it, sir -- what did you tell him as

14  to the reason why you had called him?

15  A.    I never gave him a full reason why I called him.

16  Q.    What, if anything, did the informant tell you

17  about you calling him?

18  A.    He told me, "Remember what I told you," that he's

19  gonna get in contact with me, for me not to get in

20  contact with him.

21  Q.    Now, what, if anything, does the informant tell

22  you at the end of this transcript as to what, if

23  anything -- what, if any, request he has of you?

24  A.    He told me he had researched a couple of things

25  and he has a couple of things ready for me.

1    Q.    Okay.  And did you have any knowledge as to what

2    he was referring to as having some things ready?

3    A.    Yes, ma'am.

4    Q.    What was your understanding as to what he had

5    ready?

6    A.    I thought he was talking about the money.  That's

7    why Abbas had told me to give him a call.  But he

8    didn't allow me a chance to ask him anything about the

9    money issue.  He just told me, "I got things ready

10   now."

11   Q.    Now, directing your attention to Page -- the

12   middle of Page 3, sir, the informant says, "You

13   remember the declaration -- the list declaration?  You

14   wrote it for me?"

15        And you respond, "Yes, sir.

16        "Well, things -- some things are now -- are ready

17   now."

18        And you say, "Okay."

19        What was -- when you say that you were expecting

20   money, sir, was there any request of you written down

21   in that list for money?

22   A.    Yes, there was.

23   Q.    Now, sir, was there -- in Government's

24   Exhibit 100, was there any money on that list?

25   A.    No, there wasn't.

 1    Q.    Where was it that you had requested money, sir?

 2    A.    I wrote it at the bottom of the list.

 3    Q.    I'm sorry?

 4    A.    I had wrote it at the bottom of the list that I

 5    gave Mohammed.  It was $50,000 cash.

 6    Q.    I'm talking now, sir, about 12-19.

 7    A.    Yes, ma'am.

 8    Q.    December 19th.

 9    A.    Yes, ma'am.

10    Q.    Are you referring to a list -- what date, please?

11    A.    December the 16th.

12    Q.    Okay.  All righty.  Now, directing your

13    attention, sir, to Defense Exhibit 92-B-2, do you

14    receive any phone call on that occasion -- on the same

15    date, but a different time?

16    A.    Yes, ma'am.

17    Q.    Who did you receive a phone call from?

18    A.    After I talked to Mohammed, CW 1 calls me at the

19    time of 7:44.

20    Q.    And on the second page of the transcript, the

21    informant tells you at the top of the page, "Al-hamdu

22    li-llah.  This is -- this is -- haven't write

23    (phonetic) even though it wasn't met.  Listen, I really

24    want to speak to you, but I don't want to do it over

25    the phone.  So tomorrow, what time would be?"

1        And you say, "No.  Tonight, because, like,

2   tomorrow, man, I got a lot of work to do -- I got to do

3   tomorrow.  But I'm free right now."

4        Do you remember that, sir?

5   A.   Yes, ma'am.

6   Q.   Did you, in fact, meet with the informant on

7   December 19th of '05?

8   A.   I sure did.

9   Q.   And where did you meet -- when I say "the

10  informant," what informant are you referring to, sir?

11  A.   CW 1.

12  Q.   Where did you meet with him?

13  A.   At the Temple.

14  Q.   Do you remember how long that meeting was, sir?

15  A.   That meeting was, I would say, close to two

16  hours.

17  Q.   What, if anything, did you provide the informant?

18  A.   I provided him a second list.

19  Q.   Okay.  Now, after December 19th, sir, did you

20  have occasion to meet with either one of the informants

21  after that?

22  A.   Yes, ma'am.

23  Q.   Who did you meet with, and when did you meet with

24  them?

25  A.   CW 1 scheduled a meeting for me to meet with him

1    on December the 21st.

2    Q.    Do you recall where that meeting was?

3    A.    That was at his place.

4    Q.    Okay.

5          MS. JHONES:  Your Honor, at this time, I'd

6    like to publish -- refer to, I should say, certain

7    portions of Government's Exhibit, I believe, 46-A,

8    which would be contained in the synchronized binder.

9          THE COURT:  What page?

10         MS. JHONES:  Yes, your Honor.  Page 5 of

11   Government's Exhibit 46-A.

12         And if I may provide a copy of that exhibit to

13   the witness, your Honor.

14         THE COURT:  Sure.

15         MS. JHONES:  Thank you.

16         (Tenders document to the witness.)

17   BY MS. JHONES:

18   Q.    Mr. Batiste, directing your attention to Page 5

19   of Government's Exhibit 46-A --

20         THE COURT:  Are you publishing?

21         MS. JHONES:  Yes, your Honor.  I'm going to

22   refer to the transcript alone.  I believe everybody has

23   copies of it.

24         THE COURT:  Okay.  I was waiting for the

25   screen.  Go ahead.

1   BY MS. JHONES:

2   Q.     Seven speakers up, Mr. Batiste, where the

3   informant says -- and, again, just for clarification

4   purposes, what informant is this?

5   A.     This is Informant No. 1.

6   Q.     It says, "That's why I got (unintelligible).

7   Look, the first (unintelligible) the first World War.

8   That's where you look into today's technology, weak."

9          And you say, "That's right."

10         Do you remember that, sir?

11  A.     Yes, ma'am.

12  Q.     And after that, where you say, "Uh-huh.  You

13  reading the right book, Occ," what are you referring

14  to, sir?

15  A.     He had a book on war.  It was a book that

16  contained how to fight a war and what the -- I mean,

17  what kind of things you look for in order to attack a

18  nation or people who has a military, and he was trying

19  to display that book to me.

20  Q.     And directing your attention, sir, to Page 6 of

21  that transcript --

22  A.     What page again?

23  Q.     Page 6.

24         Specifically, sir, where you say -- I'm sorry.

25         At the top of the page, the informant says,

1    "Yeah, man.  But I tried.  I tried to read the much as

2    I could keep, like, busy doing the right thing.  I

3    exercise my mind (unintelligible) my body.  I try to do

4    some physical workout, pushups and stuff like that.

5    But, man, I need a lot of training.  One thing, I know

6    I got training on my mind.  At least it's something

7    (unintelligible)."

8            And you say, "(Unintelligible) shape there, Occ.

9    But --"

10            What is your understanding, sir, as to what the

11    informant is referring to when he's talking about --

12    when he's referring to what he's referring to in the

13    top of Page 6?

14   A.    He's speaking as far as the book goes, that he

15   likes this book.  And then he's also talking about

16   exercising, because that's what I'm involved with a

17   lot.

18            That's why I mentioned, "Yeah.  You have to stay

19   in shape there, Occ."  I'm talking about his physical

20   body there as far as running and jogging.  That's what

21   he's mentioning, too.

22   Q.    And had this informant engaged in any physical

23   training with you, sir?

24   A.    No, ma'am.  The only thing that he ever did was

25   around December the 6th, I believe, that he came by the

 1   Temple and he was marching in place along with me and a

 2   couple other brothers.

 3   Q.     And December 6th was a meeting -- another meeting

 4   that you had with this individual?

 5   A.     Yes, ma'am.  It was a meeting that I had at the

 6   Temple -- I'm sorry.  It was possibly December the 9th.

 7   I could be having the dates mixed up.  It was either

 8   the 6th or the 9th.

 9        But this meeting did take place, and he did march

10   in place.

11        At that meeting, there was no martial arts

12   training whatsoever.  I had never demonstrated any type

13   of martial arts move to this gentleman or any type of

14   things that I did as far as that level of what I -- my

15   understanding was about martial arts.

16   Q.     Okay.  Now, directing your attention, sir, to the

17   bottom of Page 7 and, also, the top of Page 8, where

18   the informant says, "That's part of life.  Our soul

19   moves from one body to the next.  (Unintelligible) our

20   body is soul slave.  And Allah ordered our soul to be

21   his slave, and that's a test.  Other that our soul is

22   always alive.  Our soul's not going to die.  It's never

23   been (unintelligible).  It's gonna die either.  I just

24   gonna move from one world to the next.  When you look

25   Koran very close (unintelligible), you kind of

1    understand that it mentions that a lot, a lot.

2    Mujahedin (unintelligible), heavens, heaven" and it

3    goes on, what did you take the informant to mean when

4    he's talking about in the bottom -- on the bottom of

5    Page 7 and towards the top of Page 8, sir, and

6    specifically when he's talking about "heavens, heaven"?

7    A.    My understanding was he was trying to give me his

8    theology about how he felt about life and his religion,

9    Islam, at that point.  He's letting me know that he

10   feels like that, basically, in life he wants to be a

11   mujahedin.

12        I'm still kind of confused because this guy gave

13   me so many different meanings of how he felt mujahedin

14   meant to him.  But I think he goes on and I think the

15   transcript can explain much more, you know, about the

16   point that he's trying to convey at that point.

17   Q.    Now, going on to Page 10, sir, this informant

18   continues to talk to you about --

19            MS. ARANGO:  Judge, objection.  Leading.

20            THE COURT:  Sustained.

21            Rephrase your question.

22            MS. JHONES:  I'll rephrase, your Honor.

23   BY MS. JHONES:

24   Q.    Directing your attention to Page 10, where the

25   informant starts, "Yes, brother.  I want to -- it's not

 1   far.  Believe me.  That's why I speak about heaven,

 2   'cause that's our definition.  That's not far.  I'm not

 3   leaving the subject we're speaking in, 'cause the

 4   definition of that subject is heaven and that's why I'm

 5   speaking about it, al-hamdu li-llah.  Anyway, so I

 6   like -- so, like I said, brother, you (unintelligible)

 7   with this brother?  You (unintelligible) meet with this

 8   brother?  Let me know how did it go.  See if -- I don't

 9   know, man.  You can be better than me.  I don't know.

10   Like (unintelligible) me, but I know -- I know for sure

11   I'm getting some answer about the -- the list I gave,"

12   do you remember that, sir?

13   A.    Yes, ma'am.

14   Q.    What, if any, relationship does his reference to

15   heaven have to do with his reference to a list at the

16   bottom of that paragraph?

17         MS. ARANGO:  Objection.  Speculative and

18   leading.

19   BY MS. JHONES:

20   Q.    Do you know --

21         THE COURT:  Sustained.

22         Rephrase your question.

23         MS. JHONES:  Sure.

24   BY MS. JHONES:

25   Q.    What is your understanding, sir, as to what it

```
 1   was that the informant was telling you right there in

 2   that particular paragraph on Page 10?

 3   A.    Well, he's -- we just went through a series of

 4   him telling me his philosophy of heaven, that he has to

 5   be a martyr.

 6         I tell him in a very short phrase -- I said,

 7   "Rich."

 8         He says, "No.  It's not all about money."

 9         So he's got the impression that I'm looking at it

10   on just an economical way.

11            MS. ARANGO:  Objection.  Speculation.

12            THE COURT:  Sustained.

13   BY MS. JHONES:

14   Q.    Directing your attention to Page 8 of the

15   transcript, sir, five speakers up from the bottom, when

16   the informant says, "Heaven, heaven (unintelligible),"

17   what is your response, sir?

18   A.    I say, "Shhh.  Rich."

19   Q.    And when you -- I'm sorry.

20   A.    And he says, "Brother, there's no necessary for

21   no money.  That's the best thing to me."

22   Q.    And what does he do when he says that,

23   Mr. Batiste?

24   A.    He starts laughing, 'cause he's laughing over the

25   fact that I -- I look at heaven as a place rich.
```

1          MS. ARANGO:  Objection.  Speculative.

2          THE COURT:  Sustained.

3    BY MS. JHONES:

4    Q.    Directing your attention, sir, back to Page 10,

5    six speakers down from the top, Mr. Batiste, where the

6    informant says, "I is expecting.  But either way,

7    through him or through me, I don't mind, 'cause it's

8    same purpose.  As long as it's there, I don't -- I

9    don't mind.  I'm go and get (unintelligible)," what is

10   your -- and after that, you say, "How was you able to

11   get that list to him?", what is your understanding,

12   sir, as to what it is that you are discussing with the

13   informant at that point in the conversation?

14   A.    Right there at that point, this conversation

15   derives from what come out at the top.  He's saying in

16   so many words, "Brother Naz, you can play this role

17   better than me with Mohammed" and that, once again,

18   Mohammed is the one that's gonna get the list and that

19   he knows the list is money and he's gonna come through

20   on that.

21         And then I asked him about the list that I give

22   him.

23         I said, "Well, how are you able to get him the

24   list?"

25         And he says, "I haven't given it to somebody."

1        So I took it that he was saying that he did not

2   give it to nobody yet.

3        And then he also told me that the list that I

4   gave Mohammed -- that he's gonna be changing the list.

5             MS. ARANGO:  Objection, Judge.  This is

6   nonresponsive.

7             THE COURT:  Sustained.

8   BY MS. JHONES:

9   Q.   Now, directing your attention, sir, to Page 11 of

10  the transcript, towards the middle, where the informant

11  says, "Just (unintelligible) be cool.  Do it the right

12  way.  And that's what will (unintelligible) cut off.

13  Never cut off (unintelligible) 'cause we Allah

14  soldiers" and you say, "We ain't gonna let them down,

15  let down thought, Occ.  We're gonna do it," what are

16  you referring to there, sir, in that page of the

17  transcript?

18  A.   That place is -- what he told me at that time,

19  CW 1 -- he said, "Just play it cool.  Do the right --

20  do it the right way.  And that's what we'll" -- you

21  know, and then cut him off.

22       So he was telling me -- once again, during the

23  meeting he would talk loud and then sometimes he would

24  start whispering and put his hand ever his mouth.

25       He was telling me that I just need to play

1    everything cool, like we had talked about previously in

2    the past, and once the money come through, then we'll

3    cut this dude off.

4    Q.    Directing your attention to Page 13 of the

5    transcript, sir, five speakers up from the bottom,

6    where the informant says, "Brother, I wasn't doing

7    nothing.  I just came out here (unintelligible) try to

8    do good working on.  I had no contact with back home,

9    because they didn't like what I was going through when

10   I got locked up" -- and he goes on and on -- "I

11   apologized to my family.  I explained it and they

12   supported me," what is your understanding, sir, as

13   to -- when he references "back home" as to who it is

14   that he is speaking about?

15   A.    He's talking about his father-in-law and his

16   wife, his family, basically.

17   Q.    Okay.  Now, directing your attention, sir, to

18   Page 20 of this transcript, where you say to the

19   informant, "That's it, Occ.  You know (unintelligible)

20   I could get it.  Like I was telling Brother Mohammed, I

21   was, like, you know, I could get the money, but it

22   would take me much longer.  It would take me a year to

23   make it with the construction business, 'cause, believe

24   me, Occ, the construction business is doing good."

25          The informant tells you, "And believe me, that's

 1    not the only thing we're gonna need, brother.

 2         "Right."

 3         And the informant says, "I mean, you looking at

 4    the Government.  Come on, man.  What you wrote

 5    (unintelligible) wrote on the list is less than a

 6    quarter million dollars, man.  Government

 7    (unintelligible) billions in our account.  So I'm not

 8    worried about what you can do, 'cause I know you will

 9    do it."

10         What is it, sir, that you are referring to on

11    this page of the transcript when you tell him -- when

12    you talk about money?

13    A.    Basically, right there, he's -- I'm telling him

14    that, you know, I will -- basically, I told CW 2 that

15    my construction company was doing good.

16    Q.    Was that true, sir?

17    A.    No.

18         And he's telling me, "Well, that's not gonna be

19    the only way you gonna be able to get the money that

20    you want."

21         He's telling me -- once again, he's confirming in

22    an implied way that, "The list you wrote is worth a lot

23    of money" and the people that he has -- they gonna give

24    me a lot of money for that list.

25    Q.    Directing your attention to the top of Page 21,

1    sir, where -- the informant tells you right at the top,

2    "What we asking for is -- is a boost.  Boost us up so

3    we can continue doing what we doing.  Other than that,

4    we all need -- other than that, we all need in already

5    without their help.  And that's how I told them, how I

6    explained it to them.

7           "Right.  You told them.  Right."

8           And the informant follows up after that by

9    saying, "That gives us more credit, more than once,

10   like I told you.  They don't want start from nothing.

11   They want to get something.  It's just like same thing

12   with fire."

13          And he goes on.

14          What is your understanding, sir, when he is

15   saying to you, "What we are asking for is a boost"?

16   And when -- what is your understanding, sir, when he

17   says that and, in addition, what he references in that

18   top paragraph of Page 21?

19   A.    It goes back to the issue again that we don't

20   have to keep on dealing with these people.  Once we get

21   a substantial amount of money at the beginning, the

22   only thing we can do is just push for it on our own.

23          Then he continues on and goes on and tells me,

24   assuring me once again that, if I just told him that,

25   "Hey, I just want money from you guys," they weren't

1   gonna give anything because I didn't have nothing and

2   they needed something in order for me to -- for them to

3   give me money.

4   Q.    Directing your attention to the bottom of

5   Page 21, where the informant says, three speakers up

6   from the bottom, "Al-hamdu li-llah.  That's two things

7   that's organized.  We need organize more.  How many

8   people we got?  Whatever it is, we (unintelligible) to

9   speak about it now, to find it now, for all the

10  (unintelligible) we need.  Peoples, places and

11  missions" and you respond by saying, "Uh-huh.  Uh-huh,"

12  what is your understanding, sir, as to what the

13  informant was telling you when he said, "We need

14  peoples, places and missions"?

15  A.    He wants me to fine-tune my conversation with

16  CW 2, that I need to be much more specific and I need

17  to cover these areas talking about the people that

18  we're gonna recruit, the places that we plan on going

19  and what kind of mission that we're gonna be carrying

20  out.

21  Q.    Prior to December 21st, sir, what, if any,

22  discussions have you had with Informant No. 1 about the

23  Sears Tower?

24  A.    I hadn't had any discussions with Informant No. 1

25  about the Sears Tower.

1    Q.    What, if any, discussions had you had with the

2    informant about explosives?

3    A.    The same answer.

4    Q.    Directing your attention to the bottom of

5    Page 21, when the informant tells you, "Even on

6    training, we can't just (unintelligible) training for

7    anything.  No, man.  (Unintelligible) train for certain

8    reason, for certain things we gonna do it, even

9    (unintelligible) training.  Training is a word being

10   used for everything.  But training to use a bomb and

11   training how to do pushups is not the same thing," what

12   did you understand the informant to be telling you when

13   he says, "Training to use a bomb and training how to do

14   pushups is not the same thing"?

15   A.    He's comparing me to the discussion that I need

16   to have with Mohammed and the discussion I already had

17   with Mohammed, CW 2.

18         And he's telling me that I just need to quit

19   talking about just doing training, I gotta -- when I

20   speak to him, I gotta make it sound like that, you

21   know, I been having training on how to use a bomb or

22   that's the kind of thing that I'm interested in,

23   because it basically sounds silly and stupid that I'm

24   just saying training and training to do pushups and

25   martial arts.

1  Q.    What involvement, sir, did you have prior to your

2  involvement with these informants -- what discussions,

3  if any -- prior to meeting these informants, had you

4  had regarding explosives?

5  A.    I had never had any discussions regarding

6  explosives.

7  Q.    What discussions did you have outside of the

8  presence of the informant regarding explosives with

9  these brothers here?

10 A.    That never occurred.

11 Q.    Now, directing your attention to the middle of

12 Page 22, when you say, "No, no, no, Occ.  I'm open to

13 everything" and the informant says, "I'm just trying to

14 help," what is -- what are you telling Informant No. 1

15 there when you say, "No, no, no.  I'm open to

16 everything"?

17 A.    That was a discussion we always had where, even

18 when it came down for -- to him sharing his views with

19 me, I told him I was open to listen to him.  Because of

20 that, I feel like that's where he came in and he looked

21 at it as an act of stupidity and being naive, which I

22 see now today that it is.

23        What he's saying right here is that -- really,

24 I'm telling him I'm open to his advice at this point on

25 how should I go ahead and get this money through his

```
 1   connection with CW 2 -- or his relationship with his

 2   father-in-law, and he's telling me that his whole

 3   purpose here, once again, is really to just try to help

 4   me financially.

 5   Q.    Okay.  Now --

 6             THE COURT:  We're going to break for lunch.

 7             Do not discuss this case either amongst

 8   yourselves or with anyone else.  Have no contact

 9   whatsoever with anyone associated with the trial.  Do

10   not read, listen or see anything touching on this

11   matter in any way.

12             If anyone should try to talk to you about this

13   case, you should immediately instruct them to stop and

14   report it to my staff.

15             You may leave all your materials at your

16   chairs.  Please be back in the jury room at 2:30.

17   Enjoy your lunch.

18             (Whereupon, the jury exited the courtroom at

19   1:23 p.m. and the following proceedings were had:)

20             THE COURT:  We're in recess until 2:30.

21             (Thereupon, a luncheon recess was taken, after

22   which the following proceedings were had:)

23             THE COURT:  We're back on United States of

24   America versus Narseal Batiste, et al., Case

25   No. 06-20373.
```

```
 1              Counsel, state your appearances, please, for

 2    the record.

 3              MR. GREGORIE:  Richard Gregorie and Jacqueline

 4    Arango on behalf of the United States, your Honor.

 5              MS. JHONES:  Ana Maria Jhones on behalf of

 6    Narseal Batiste, who is present.

 7              MR. LEVIN:  Albert Levin on behalf of Patrick

 8    Abraham, who's present.

 9              MR. CASUSO:  Louie Casuso for Burson Augustin,

10    who is present.

11              MR. CLARK:  Nathan Clark for Rotschild

12    Augustine, who's present.

13              MR. HOULIHAN:  Richard Houlihan with Naudimar

14    Herrera.

15              MR. VEREEN:  And Roderick Vereen on behalf of

16    Stanley Phanor, who's present.

17              THE COURT:  All Defendants are present.

18              Mr. Batiste, you can take the stand.

19              Let's bring the jurors in.

20              (Whereupon, the jury entered the courtroom at

21    2:51 p.m. and the following proceedings were had:)

22              THE COURT:  You may be seated.

23              You are still under oath, sir.

24              You may proceed, Ms. Jhones.

25              MS. JHONES:  Thank you, your Honor.
```

1    BY MS. JHONES:

2    Q.    Mr. Batiste, before the lunch break, we were

3    talking about a conversation you were having with

4    Informant No. 1 on December 21st.

5          Do you remember that, sir?

6    A.    Yes, ma'am.

7    Q.    Specifically, and for purposes of the record, we

8    were discussing this meeting, which is Government's

9    Exhibit 46-A, and we left off at Page 22.

10          After you tell the informant, sir, that -- on the

11   middle of the page, "No, no, no, Occ.  I'm open to

12   everything," further on down, sir, the informant says,

13   "We need to organize everything that we got to do and

14   plan the whole" --

15          And then you respond, "So it can be perfect."

16          Do you remember that, sir?

17   A.    Yes.

18   Q.    What is your understanding that the informant is

19   telling you when he says, "We need to organize

20   everything" and you respond, "So that it can be

21   perfect"?

22   A.    Once again, he's talking about the negotiations

23   between me and CW 2, and he's also referring to, after

24   those negotiations are over with, then we need to know

25   what we're gonna do in moving forward.

1    Q.    Okay.  Now, at the top of Page 23, sir, the

2    second paragraph, where the informant says, "And

3    those -- those the ones (unintelligible) back.  That's

4    they -- you -- that's they (unintelligible).  You

5    (unintelligible) no matter how big the mission is, I

6    don't want you to be on the front -- be the front line.

7    Because without you, I wouldn't be here, if you're

8    gone, even if I'm here.  It don't make no sense for me

9    being here -- her if you not here giving the orders.

10   So you be in the back and have the brothers

11   (unintelligible) plans take the orders.  That's exactly

12   what I want to -- what I want, to be honest with you.

13   I'm not doing it -- they gotta be somebody up top.

14   They gotta be somebody to give the orders to the

15   brothers.  They gotta be somebody (unintelligible) from

16   both sides.  Look, back home, it's not gonna be

17   (unintelligible) detail, but at least we doing the

18   mission" and you say something unintelligible, did you

19   have an understanding, sir, of what this informant was

20   telling you when he says, "They gotta be somebody up

21   top.  They gotta be somebody to give the orders to the

22   brothers"?  Did you understand what he was referring

23   to, sir?

24   A.    Yes, ma'am.

25   Q.    What was --

1    A.     That --

2    Q.     What was your understanding as to what he was

3    referring to?

4    A.     That it has to be clear that I distinguish myself

5    from the brothers as the leader.

6    Q.     Now, directing your attention, sir, to the bottom

7    of Page 23, where the informant states, "Al-hamdu

8    li-llah, as long as you feel it, 'cause

9    (unintelligible), brother, (unintelligible).  So

10   organize what you gotta organize.  See what brothers

11   coming -- hoping he's gonna come up (unintelligible),

12   get some of the merchandise (unintelligible) start

13   (unintelligible).

14        "I'm gonna call that number, like I told you, and

15   find out what happened with the brother who's giving

16   you (unintelligible) why he's got you (unintelligible)

17   list and asking you for a list.  Why did he get a list

18   and he get a list?

19        "I'm asking, hey, Brother Naz, ask me that.  We

20   need to know what's going on?  We need to know exactly

21   what's happening?

22        "What I think is they ask him for a list so they

23   can compare it to see if it's -- it's --"

24        And you respond, "The exact same thing."

25        What is your understanding as to what it is that

1    the informant is referring to when he's -- on the

2    paragraph right before you say, "The exact same thing"?

3    A.    The main thing was -- is that I had conveyed to

4    him that I was surprised that this guy would be asking

5    me for a list.

6            MS. ARANGO:  Objection.  Nonresponsive.

7            THE COURT:  Sustained.

8            MS. JHONES:  Your Honor, I believe he's trying

9    to respond to the question.

10            THE COURT:  Rephrase your question.

11            MS. JHONES:  I was afraid you were going to

12    ask that, your Honor.  Let me try.

13   BY MS. JHONES:

14   Q.    Mr. Batiste, when the informant makes a reference

15   to a list, and specifically when he makes a reference

16   to -- in the middle of that paragraph, on the bottom of

17   Page 23, "Why did I get a list and he got a list?  I'm

18   asking, hey, Brother Naz, ask me that.  We need to know

19   what's going on," did you have an understanding as to

20   what it was that the informant was referring to when he

21   said -- when he asked those questions in that

22   paragraph?

23   A.    My initial question to him was, "Why are they

24   asking me for a list?"

25            And he's telling me at the same time he doesn't

 1   know why.  But he asked me to go ahead -- he said,

 2   "Well, maybe you need to go ahead and make another list

 3   out so we can get you the money off the list.  I'm

 4   going to find out why Mohammed is asking you for a

 5   list."

 6        He's saying, that way, in so many words, they're

 7   probably gonna compare both the lists to make sure that

 8   it's saying the exact same thing.

 9   Q.    Okay.  Now, directing your attention to the top

10   of Page 24, where the informant says, "That's a good

11   thing.  You see what I'm saying?  That's -- they smart,

12   man.  They're not gonna hand nobody a lot of money for

13   nothing, believe me, even though they trust me so much.

14   I know they trust me, but when it comes to big

15   decisions like that, they very smart (unintelligible),

16   just" and you respond by saying, "Right," what is your

17   understanding, sir, as to what Informant No. 1 is

18   telling you when he says, "They not gonna give" --

19   "They not gonna hand nobody a lot of money for

20   nothing"?

21   A.    That's the followup response that he had from the

22   list.  He's letting me know the list -- "Okay.  You

23   produced something.  And that's what they needed to see

24   in order to give you this money."

25        And he's telling me that he's sure of this

```
 1    because this is something -- he knows that they trust

 2    him.  So he knows what this information is all about.

 3          So what he's telling me is factual.

 4    Q.    Okay.  Now, directing your attention, sir, to

 5    Page 25, at the top of Page 25, where the informant

 6    tells you, "Okay.  I'm gonna try to get you some money,

 7    as much as I could, even if it's pocket change for a

 8    while" and you respond, "Oh, that's great

 9    (unintelligible) whatever you can do, Occ.  Whatever

10    Allah put in your hands" and the informant says,

11    "Inshallah," what is your understanding as to what the

12    Informant No. 1 is telling you on the top of Page 25?

13    A.    That, at this point, since I produced the second

14    list, which I've -- I've given it to him, that he's

15    gonna work on this right away and he's gonna get some

16    type of money as credit at this point to be able to

17    give to me.

18    Q.    And, sir, after the informant says,

19    "Inshallah" -- by the way, sir, do you know what

20    "Inshallah" means?

21    A.    I believe that means "in the will of God."

22    Q.    When you say, "That's Allah's blessing and that's

23    the main thing" --

24    A.    Yes, ma'am.

25    Q.    -- and the informant says, "Al-hamdu li-llah,
```

1    brother," and you say, "That's the main thing," what

2    are you referring to, sir?

3    A.     The money.

4    Q.     Okay.  Now, directing your attention, sir, to

5    Page 27 of the transcript, where -- the informant in

6    the middle of the page begins by saying, expletive,

7    expletive, "That's it.  Like the ones (unintelligible)

8    already, the ones (unintelligible) purpose, brother, to

9    give them -- the brothers the mission.  "You don't have

10   completely giving him our -- all our business and all

11   our plans.  No.

12        "And -- okay.  Another thing we need to

13   mention -- I need to mention, we don't need to tell

14   anybody we getting the Government (unintelligible)

15   when you come up with an organization that's better

16   than (unintelligible) on our Government

17   (unintelligible).

18        "They meet somebody (unintelligible).  I have an

19   organization.  It sounds (unintelligible).  If you tell

20   anybody hearing that, it's gonna hit in his mind,

21   'cause you know what kind of violation, just thinking

22   about that, brother.  Something you don't want to think

23   about.

24        "So our organization (unintelligible)

25   (unintelligible).  Look, even though ours is the Moors,

1   we don't have to say that.  We don't have to repeat

2   that out loud.

3         "Okay.  It's not a problem.  I understand we're

4   proud of who we are.  Trust me.  We need to do this the

5   right way.  We don't have to make it high, loud.

6         "All -- all what we already learned, we're gonna

7   keep that inside.  When the Embassy open up, it's gonna

8   open up as a mosque."

9         Now, I want to ask you some questions about that

10  part of the paragraph before I go on to the rest.

11        Okay, Mr. Batiste?

12  A.    Yes, ma'am.

13  Q.    What is your understanding, sir, as to what the

14  informant is telling you that has to be done?

15  A.    Basically, he's telling me that he wants the

16  Temple to be called a mosque and he didn't want me to

17  give the rest of the brothers too much information

18  about what me and him discuss.

19  Q.    What, if anything, is he telling you about the

20  Moors?

21  A.    That I need to go ahead and just put that to the

22  side and think of a new name that we can come up with.

23  Q.    "Only certain peoples going to be

24  (unintelligible) with us.  Not everybody.  So is that

25  clear?

1          "We can communicate with any mosque, have anybody

2     walk on our mosque in the praying time."

3          Now, sir, how many times did you have prayer in a

4     mosque?

5     A.    I never had prayer.  He's speaking in terms of

6     when they pray five times a day in the mosque.

7     Q.    "When the praying hours only."

8          Now, sir, did you have any set hours of prayer in

9     the Temple?

10    A.    No, ma'am.

11    Q.    What is your understanding as to what it is that

12    he's telling you right there when he says "when the

13    prayer -- praying hours only"?

14    A.    From my understanding, that orthodox Islamic

15    Muslims and Shiites -- they pray at least five times a

16    day at certain times.  I believe it's at morning,

17    afternoon, evening and at night.

18         And that's what he's speaking of, that during

19    these time and these hours, since we're gonna set it up

20    like how they do in the Middle East, they're gonna --

21    everybody's going to be praying at that time.

22    Q.    Whose idea was that, sir?

23    A.    That was CW 1.

24    Q.    Again, going over to Page 28, sir, second speaker

25    down from the top of the page, "But that's one of the

     1    reasons I keep away from the Embassy, 'cause, brother,

     2    we don't know who we dealing with.  But you can't trust

     3    anybody.  Can't do that.

     4         "So, yeah, when we get this mosque, it's gonna be

     5    an Islamic mosque, a real mosque.  (Unintelligible)

     6    people can pray.  We friends with everybody."

     7         Whose idea was it, sir, to have an Islamic

     8    mosque?

     9    A.    CW 1.

    10    Q.    Do you have any knowledge as to why CW 1 wants

    11    this to be an Islamic mosque?

    12         MS. ARANGO:  Objection.  Speculative.

    13    BY MS. JHONES:

    14    Q.    If you know.

    15         THE COURT:  Sustained.

    16    BY MS. JHONES:

    17    Q.    Do you know?

    18    A.    Yes.

    19         MS. JHONES:  May he answer, your Honor?

    20         MS. ARANGO:  Judge, it's still speculative.

    21         THE COURT:  Sustained.

    22    BY MS. JHONES:

    23    Q.    In the middle of the paragraph, sir, the

    24    informant says to you, "Stay safe (unintelligible).

    25    Everything secret.  (Unintelligible) secret.  I swear

1    to Allah, not anyone can know what I'm doing

2    (unintelligible).  Okay?  I don't -- I don't

3    (unintelligible).

4        "The Muslims, just like me.  But that's -- that's

5    an organization (unintelligible) long time, brother.

6        "You couldn't using your name clean record.  In

7    no position (unintelligible) you made that clean

8    record.  That's good future.  (Unintelligible) name,

9    like the Moors got a lot of (unintelligible), once,

10   (snaps) (unintelligible) that's our enemy.

11       "You understand what I'm saying?

12       "But if you come up (unintelligible) a different

13   name, even if the rules -- the same rules -- even if

14   the information is the same information, it's just a

15   name, brother.  They gonna (unintelligible) a

16   difference.

17       "And like I told you, please, how you want it to

18   be safe.  Sit down at home.  Write some papers.  Change

19   the name of the organization.  That uniforms that we

20   have?  Keep them, but only for a certain places,

21   certain times, not all the time."

22       What is the informant asking you to do at this

23   point in time in this part of the conversation, sir?

24   A.   He's making it clear that he -- the way he

25   observed my character when he tells me, "You can't be

 1    trusting everybody and anybody," 'cause he sees that

 2    I'm very open to the people that's in the community.

 3         And he's making it clear that I need to turn all

 4    of this into a secret, quit trying to talk to everybody

 5    all the time.

 6         And at the same time, he's making it very clear

 7    that he need to change the name to an Islamic name and

 8    restructure the rules at the same time, don't display

 9    the uniforms that I had the brothers wearing.

10         He opposed the idea for the uniforms because they

11    had a Jewish star on there.  He says he doesn't believe

12    in anything like that and we shouldn't wear that.

13    That's adding on to the religion and that's falsehood.

14         So he had a problem with the uniforms.

15         MS. JHONES:  Your Honor, I just need to

16    retrieve an exhibit.

17         THE COURT:  Okay.

18         MS. JHONES:  Thank you.

19         I'll have to come back to that later, your

20    Honor.  I can't retrieve the exhibit at this moment.

21    BY MS. JHONES:

22    Q.   What uniforms, if any, did you have as of

23    December 21st of 2005, Mr. Batiste?

24    A.   The brothers had a uniform.  It was basically

25    just a black Dickie shirt, black Dickie pants.  And

1   whatever their nationality was, they would put the flag

2   of their nationality on the right side with the

3   American flag on top.

4           And on the left side, then we had -- we had what

5   we call the Moorish State Seal, which was the bird --

6   the phoenix bird of Egypt, and on top of the bird's

7   head was the Star of David.

8   Q.     And why did you have uniforms?

9   A.     So we could be organized.  And the whole thing of

10  the Moorish Science Temple was to be disciplined and

11  have a uniform and be part of representing a nation.

12  Q.     Okay.  Why was that important, sir?

13  A.     Because it developed dignity and respect for

14  everybody that joined.

15  Q.     Now, continuing on, in the middle of Page 28,

16  where the informant says, "Keep them, but only for

17  certain places, certain times, not all of the time

18  (unintelligible) (unintelligible).  If we want a turn

19  to go back to the Moors and stuff like that, it's not a

20  problem.  The rules -- the same rules, and that's what

21  matters.  But the name got to change so people don't

22  pay attention.  Gotta get a name that not -- and it's

23  not close," what is your understanding, sir, as to what

24  he's saying -- first when he refers to keep them only

25  for certain places and then afterwards when he's

1    talking about the rules have to change?

2    A.    He was saying that -- basically, again the

3    uniforms.  He knew that that was my idea and I took a

4    lot of pride in uniforms.

5         So by him saying that, he was just only

6    indicating that, "If you still want them, just, you

7    know, bring them out only at certain times.  Don't be

8    bringing them out all the time because they just draw

9    too much attention.  Everybody in the neighborhood

10   knows what they look like and people are going to want

11   to know who you guys are more."

12        So, basically, he's giving me the opinion that I

13   just need to play things undercover.

14   Q.    Now, after that, after you say, "Uh-huh," the

15   informant then says, "That way, we stay safe

16   (unintelligible) the soldiers we got to change that

17   name.  Pick out anything.  Just write it down.  Lay the

18   brothers know that we gonna start using the name to

19   each other.  Even our names with each other -- we

20   should use different names.

21        "Whatever (unintelligible) even nicknames.  It's

22   good, brother.  It's good, brother.  You know?

23   (Unintelligible) work on a secret, 'cause the more

24   secure we are and our security is (unintelligible)

25   anything.

1          "(Unintelligible) telling me the same thing, but

2     I don't want to tell you what to do.  I got a lot of

3     respect for you, brother.  You're older than me.

4          "Uh-huh," you respond.

5          "You know more than me.  So I'm not trying to

6     tell you anything.  Just please work this out

7     secretly."

8          What is your understanding, sir, as to what the

9     informant is requesting that you do, if anything?

10          MS. ARANGO:  Judge, I would just object to

11     just reading these long passages.  The transcript is in

12     evidence.  There's got -- she's just --

13          MS. JHONES:  I believe that's what the

14     Government did, your Honor.

15          THE COURT:  Overruled.

16          Go ahead.

17          THE WITNESS:  He's reiterating to me to make

18     sure that I understand that we gotta change the name to

19     the Temple and not only that, but we gotta change the

20     names to the brothers and we need to come up with a

21     higher level of security because we just too open to

22     the public that's in the neighborhood and everybody

23     that's around us and that would be -- that would make

24     me more safer and, at the same time, we gotta start

25     learning secret codes amongst each other as well as

1    give ourselves nicknames.

2    BY MS. JHONES:

3    Q.    Okay.  Now, finally, directing your attention to

4    the bottom of Page 29, towards the bottom of the

5    paragraph, at the bottom of the page, the informant

6    says, "Before we start the mission, our mission is to

7    secure ourselves in this secret.  Everything is secret.

8    Again, you already told me that you have a license from

9    the Government.  You can have a Moorish Government and

10   this and that."

11          And on the top of Page 30, "We gotta get one of

12   them Masons (unintelligible)."

13          And the informant tells you, "Brother, then you

14   (unintelligible) you all done (unintelligible).  Number

15   and destroy it no matter what it costs, even if they

16   have to throw bombs to do that."

17          And then there's laughing.

18          What is your understanding, sir, of what it is

19   that the Government -- that the informant is asking you

20   to do at the bottom of Page 29 and the top of Page 30,

21   if anything?

22   A.    I'm telling him that Moorish Science Temple have

23   made themselves known and -- amongst the United States

24   Government and aware and the Government has issued them

25   the right to be able to set up their own community and

1    their own Temple.  And that's what I had explained to

2    him before.

3         And then he telling me on Page 30 that -- when he

4    says, "Brother, they know you all done.  Number and

5    destroy it no matter what it costs," he's telling me

6    that's what the American Government is going to wind up

7    doing to us if we build up Moorish Science Temple right

8    there in the neighborhood, that no matter what purpose

9    that we might be doing, even though it might be for a

10   positive purpose and everything and we're trusting the

11   Government, that they're gonna try to destroy us, no

12   matter how much it costs.

13   Q.    Okay.  Now, does this conversation with this

14   informant go on after Page 30, sir?

15   A.    Yes, ma'am.

16   Q.    In the next few pages, sir, what, if any,

17   building do you mention, any building in the United

18   States?

19   A.    Could I have a second to look?

20         I believe at this -- later on down the line,

21   that's when the idea of the Sears Tower is mentioned

22   and, also --

23   Q.    Who mentions it, sir?

24   A.    I do.

25   Q.    Where do you mention it?

1    A.     Page 41.

2    Q.     When you tell informant, sir, on the top of

3    Page 41, "Let me tell you something.  There's two major

4    buildings we gotta blow up, the Empire State Building

5    and the Sears," how many times prior to December 21st

6    had you told the informant about blowing up the Sears

7    Tower, sir?

8    A.     I never mentioned to Abbas anything about blowing

9    up the Sears Tower or the Empire State Building.

10          This whole conversation was generated over the

11   fact that he told me that I had to have a big plan, an

12   idea to tell the CW 2.

13   Q.     Okay.  Now, directing your attention, sir, to the

14   bottom of Page 45, you say, "As soon as we get the

15   money, as soon as we get the money --"

16          And the informant says, "Yeah.  But how much do

17   we need?"

18          and you say, "But it's got to be some serious

19   money, Occ.  I mean, 'cause you got to think about it.

20   Construction company right now, I make at least 2,000 a

21   week.  See what I'm saying?  After I pay everybody out,

22   I still clear at least $800.  You see what I'm saying?

23   So if that's the only finance I got to build for the

24   mission, just look at the money that I made.

25          "And I can also -- it's always an opportunity

1   every week for me to get a major contract, at least

2   30,000, $100,000, because they always asking me to bid

3   on different jobs.  'How much do you do this job for?'

4   Like Bank of America called me to do a job for them and

5   other people called me to do a five-story building."

6        And then you say, "But I don't need no more money

7   now.  See what I'm saying?  What I'm saying, I need

8   after a whole lot of money.  I am not after a whole lot

9   of money."

10       Then you continue on in the paragraph.

11       And then the informant says, "Okay.  So we need

12   $10,000 go to Chicago?  When do you want to do that?"

13       And you respond, "I leave tonight if I had it."

14       What are you talking about there, sir?

15   A.   I'm trying to pressure the issue about me getting

16   money from this guy because he's been constantly

17   telling me he's working on the money, he's working on

18   the money.

19       I tell him, "If I had $10,000, I would go to

20   Chicago.  I would leave tonight."

21       I was not being realistic with him.  But I had

22   mentioned before in the past that I had a lot of

23   friends in Chicago and a lot of them were friends that

24   I knew from high school and whatnot and that they would

25   love to know the fact that I'm dealing with Muslims.

1    Q.     Okay.  After this meeting on December 21st, sir,

2    what, if any, other meetings take place between either

3    one of the informants?

4    A.     I meet CW 2 the very next day.

5    Q.     Do you know how that meeting was arranged, sir?

6    A.     I'm not sure.  But I know CW 1 told me that he

7    was gonna talk to him.

8    Q.     Okay.

9           MS. JHONES:  Your Honor, at this time, I am

10   going to publish some clips from a Government exhibit.

11   It's Government's Exhibit 47-A.

12          With the Court's permission, I'd like to

13   retrieve the one transcript Mr. Batiste has and give

14   him Transcript 47-A that's in evidence.

15          THE COURT:  Sure.

16          What binder is it?

17          MS. JHONES:  The line begins at --

18          THE COURT:  What binder is it in?

19          MS. JHONES:  Oh, I'm sorry.

20          The synchronized --

21          MS. ARANGO:  No.  It's I of III.

22          MS. JHONES:  I'm sorry?

23          MS. ARANGO:  I of III.

24          MS. JHONES:  I of III.

25          THE COURT:  Okay.

```
 1              MS. JHONES:  The first clip, your Honor, is

 2      going to begin at Page 2.

 3              (Whereupon, segments of Government's Exhibit

 4      No. 47 were published in open court.)

 5              THE COURT:  One moment, please.

 6              What is this?

 7              MS. JHONES:  This is Government's

 8      Exhibit 47-A.  It's in the binder -- the Government

 9      binder, Volume I.

10              THE COURT:  Okay.

11              MS. ARANGO:  I think there appears to be a

12      page missing.

13              UNIDENTIFIED JUROR:  There is.

14              MS. ARANGO:  It's missing on mine as well,

15      Judge.

16              THE COURT:  Mine starts on Page 3.

17              UNIDENTIFIED JUROR:  Mine, too.

18              MS. JHONES:  Page 2 is missing?

19              UNIDENTIFIED JUROR:  Yes.

20              MS. ARANGO:  Can we look at the original to

21      see if the page is there?

22      BY MS. JHONES:

23      Q.    Mr. Batiste, do you have Page 2?

24      A.    Yes, ma'am.

25      Q.    I have Page 2 as well.
```

 1            MS. JHONES:  Your Honor, if you'd like, I can

 2    just put it on the ELMO and just address this page,

 3    just to move on.

 4            THE COURT:  Okay.

 5            MS. JHONES:  We'll do it without the audio,

 6    because we can't do both at the same time.

 7            THE COURT:  Right.

 8    BY MS. JHONES:

 9    Q.    Mr. Batiste, do you recall what time of day this

10    meeting took place?

11    A.    Around 4:25 p.m.

12    Q.    Do you know -- tell us how this meeting occurred.

13    Where did you initially encounter the informant?

14    A.    I encountered him at -- I believe it was Bayside

15    Mall -- Bayside Marketplace.

16    Q.    And which informant -- which of the two

17    informants were you meeting with on this occasion?

18    A.    I was meeting with CW 2 this time.

19    Q.    Do you have another name for CW 2 back in

20    December --

21    A.    I just used to call him Brother Mohammed.

22    Q.    Now, towards the bottom of the page, where the

23    informant says, "I bought one phone -- one for you.

24    Okay?", what's going on there when he makes that

25    statement?  Is he giving you anything?

1    A.    He's handing me a phone and he's telling me this

2    phone is for me and this phone is secure, I don't have

3    to worry about nobody trying to tap into our

4    conversation.

5          Because he has these computer chips that he

6    showed me on December 16th when I met him.  He said he

7    installs those into his phone so this he'll have a

8    direct line without any interruption of somebody trying

9    to wiretap his line.

10   Q.    Okay.  Directing your attention to Page 3 of this

11   transcript --

12            THE COURT:  Do you want to put it on now?

13            MS. JHONES:  It's only a two-page clip.  So

14   rather than bother with it, I'm just going to finish up

15   this way and go to the next clip.

16            THE COURT:  Okay.

17            MS. JHONES:  Thank you, your Honor.

18   BY MS. JHONES:

19   Q.    The informant says, "There's no interruption.

20   There's no worry who will be interrupting the line."

21          And you say, "Okay."

22          The informant says, "Okay?  This -- and you

23   know -- when I call on this line, you know I'm the only

24   one who is calling, like I'm calling you and you can

25   speak (unintelligible).  I call you.  I call you."

1           And you say, "Right."

2           Do you remember that, sir?

3    A.     Yes, ma'am.

4    Q.     What's your understanding as to what it is that

5    he's telling you?

6    A.     That I can speak freely, I can say anything I

7    want to say because I don't have to worry about nobody

8    taping my conversation.

9    Q.     Now, after that, you tell him, "No.  Nobody's

10   gonna have that number.  Just you."

11   A.     Yes, ma'am.

12   Q.     And then he says, "Whatever."

13          And you say, "VIP," and you laugh.

14   A.     Yes.

15   Q.     How many people did you give the number to, sir?

16   A.     I'd say a lot of people.

17   Q.     Did you have clients that would call you on that

18   number?

19   A.     Yes.

20   Q.     Did you use it for business?

21   A.     Yes, I did.

22   Q.     Did you use it for personal reasons?

23   A.     Yes, I did.

24   Q.     That became your phone; did it not, sir?

25   A.     It did.

1   Q.    So when you tell the informant, "No one is going

2   to have this number," were you telling him the truth?

3   A.    No, ma'am.  I was just giving him a line.

4          MS. JHONES:  The next clip begins at Page 9.

5          THE COURT:  We're going to go back to the

6   audio?

7          MS. JHONES:  Yes.  Yes, please, your Honor.

8   Thank you.

9          (Whereupon, segments of Government's Exhibit

10  No. 47 were published in open court.)

11  BY MS. JHONES:

12  Q.    Sir, first of all, while -- during this clip, do

13  you know where you are in this point in the

14  conversation, physically where you're located?

15  A.    Yes, ma'am.

16  Q.    And where is that, sir?

17  A.    I'm heading back on -- I believe it's 195 West.

18  It's the expressway that leads to Miami airport.  But

19  I'm exiting onto I-95 and I'm heading north to 62nd.

20  Q.    And 62nd is where, sir?

21  A.    62nd is the -- 62nd and I-95 is where Liberty

22  City area is at.

23  Q.    And why were you going to the Liberty City area?

24  A.    Because I was taking him through the area to show

25  him a construction jobsite that I was trying to bid on.

```
 1    I was heading towards the Temple.
 2    Q.    And in this -- at the bottom of Page 9, you state
 3    that -- you're talking to somebody by the name of
 4    Miss Maria and you state, "I've been thinking about
 5    going in there to take care of that balance."
 6          What are you referring to, sir?
 7              MS. ARANGO:  Objection.  Relevance.
 8              MS. JHONES:  Your Honor, this is highly
 9    relevant.
10              THE COURT:  Come on up.
11              (Whereupon, proceedings were had at side-bar
12    outside the presence of the jury which have been sealed
13    per instructions of the Court.)
14              (Whereupon, the following proceedings were had
15    in open court:)
16              MS. JHONES:  May I proceed, your Honor?
17              THE COURT:  Yes.
18              MS. JHONES:  Thank you.
19    BY MS. JHONES:
20    Q.    Mr. Batiste, without telling us what another
21    person may have told you, when you state, "I'm thinking
22    about going in there to take care of that balance,"
23    what are you referring to, sir?
24    A.    I'm talking about a balance that I had at a
25    storage facility in North Miami.
```

1    Q.    Okay.  And what was the status of that balance?

2    A.    It was past overdue.

3    Q.    Okay.

4          MS. JHONES:  The next clip is going to take

5    place on the very next page, Page 10.  It starts where

6    it says towards the middle -- actually, six speakers

7    up, "How all the brothers doing?"

8          (Whereupon, segments of Government's Exhibit

9    No. 47 were published in open court.)

10   BY MS. JHONES:

11   Q.    Mr. Batiste, do you recall that part of the

12   conversation?

13   A.    Yes, I do.

14   Q.    Starting at Page 10, sir, when you tell this

15   informant, three speakers up from the bottom of the

16   page, "Yeah.  I told them a little bit about you.

17   They're dying to meet you.  They're not around right

18   now.  They gotta all work for --", who are you

19   referring to, sir?

20   A.    I'm referring to the brothers.

21   Q.    Was it true when you told him that they were

22   dying to meet him?

23   A.    No, ma'am.  I'm just --

24   Q.    Why -- I'm sorry.

25   A.    I'm just still, you know, blowing smoke to this

1    guy.

2    Q.     At that point in time, what, if anything, had you

3    told the brothers about this guy?

4    A.     I hadn't told them yet that I had met this guy.

5    Q.     Now, on Page 11 and Page 12, sir, you engage this

6    individual in a conversation talking about what topic?

7    A.     He started out telling me, "The first -- before

8    you start telling the brothers anything about me, we

9    must build a first floor first.  And then we're gonna

10   go build a second floor.  But the first floor consists

11   of the communication that me and you gonna have.

12        "I'm not here to take over.  You're the leader

13   and everything.  But before I meet anybody, I want to

14   make sure we have an agreement that you're going to do

15   what I want.  And then I'll meet the rest of them."

16        That's what I understood him telling me.

17   Q.     And when this informant tells you at the top of

18   Page 11, "I'm here to assist you.  You are the boss.

19   You are the brother who's guiding them," what is your

20   understanding as to what he's telling you when he's

21   saying, "I'm here to assist you"?

22   A.     That he's not gonna try to take control, but he's

23   just here just to see whatever help that I need, and

24   that's what he's gonna help me along on.

25   Q.     Okay.  Now, after that -- after that paragraph,

 1   you start talking about a particular topic when you

 2   start talking about $35,000 and $80,000 and it goes on.

 3        What are you talking about there, sir?

 4   A.   I'm talking about a jobsite that I had an

 5   interest in bidding on, but I was held back from that

 6   jobsite because of a purchase bond that did cost about

 7   $35,000.

 8   Q.   And why are you having this discussion with this

 9   informant?

10   A.   Because this guy is -- from my understanding, he

11   was supposed to be all about money, supposed to be

12   somebody who was rich, and I was trying to grab his

13   interest to see if I could -- that would sway his

14   interest in wanting to give me money.

15   Q.   Okay.  Now, towards the end of this clip, which

16   is in the middle of Page 13, have you arrived at any

17   particular location at that point in the conversation?

18   A.   We just pulled up at the Temple.

19   Q.   Okay.

20        MS. JHONES:  Now, the next clip is going to

21   start on Page 15.  It starts where it says at the top

22   of the page, "Go ahead, brother.  Have a seat."

23        (Whereupon, segments of Government's Exhibit

24   No. 47 were published in open court.)

25

 1    BY MS. JHONES:

 2    Q.    Do you remember that portion of the conversation,

 3    sir?

 4    A.    Yes, ma'am.

 5    Q.    When you tell this informant that you might put a

 6    restaurant next door, start a restaurant, something

 7    like that, sell halal food -- what is halal food, by

 8    the way?

 9    A.    That's food that has -- it's been specially

10    prepared by Islamic tradition.  I believe that it's

11    kind of almost similar to kosher food, where the blood

12    is drained after the animal is sacrificed.

13          That's all I know about it.

14    Q.    Okay.  Why did you tell him that you might put a

15    restaurant there and sell something like maybe halal

16    food?  Why did you tell him that?

17    A.    It's just -- I'm just trying to get this guy to

18    be impressed about the place that -- where we're at.

19          According to people from the Middle East, halal

20    food and kosher food, it's better off eating than

21    regular food.

22    Q.    Okay.

23          MS. JHONES:  And let's go on to the next clip,

24    which starts at Page 20, which begins at the -- four

25    speakers down, "Hey, y'all, give me some time."

1                  (Whereupon, segments of Government's Exhibit

2     No. 47 were published in open court.)

3     BY MS. JHONES:

4     Q.    I'm just going to stop it there so I can ask you

5     a question about that part of the clip, so I don't

6     forget.

7     A.    Yes, ma'am.

8     Q.    When you tell this informant, "Hey, y'all, give

9     me some time (unintelligible).  Brother, talk some

10    more," what are you referring to, sir?  What's going on

11    there when you make that statement?

12    A.    I'm speaking to the two brothers that were there.

13    And I'm trying to let CW 2 -- I'm telling him to hold

14    on a minute.

15    Q.    Why?

16    A.    Because there are two brothers there, and I

17    wanted to talk to them privately, one on one.

18    Q.    Why?  Why not talk in front of the brothers?

19    A.    Well, CW 1 had already -- and 2, both, had

20    advised me not to talk in front the brothers.  At the

21    same time, I didn't want to talk in front the brothers

22    because they didn't know all the negotiations that was

23    going on with -- between me and CW 1 and CW 2.

24    Q.    Why did you not want the brothers to know what

25    you were doing?

1   A.     Because I knew they weren't going to approve of

2   it.

3               MS. JHONES:  Go ahead, Eric.

4               (Whereupon, segments of Government's Exhibit

5   No. 47 were published in open court.)

6   BY MS. JHONES:

7   Q.     A couple of quick questions about the remainder

8   of the clip, sir.

9          When you say, "I'll stand outside" -- this is

10  towards the bottom of the page -- "(unintelligible)

11  smoking.  I'll stand outside with you," what are you

12  referring to, sir?

13  A.     CW 2.  He was getting a little comfortable.  He

14  pulled out a cigarette.  He was about to light it up.

15  And I asked him could he step outside the Temple and

16  smoke that cigarette.

17  Q.     Did he do that?

18  A.     Not at first.  He said that he smelled smoking in

19  here.  And I told him, "No.  Those are incense."  So

20  after that, he said, "Okay.  No problem.  I'll step

21  outside.  Yes."

22  Q.     And then a couple of lines down, you say, "That

23  book.  I read that book backwards and forwards at least

24  five times."

25          What book are you referring to, sir?

1    A.     I'm referring to some gun magazines that he

2    noticed on the table.

3    Q.     Why did you have gun magazines on the table, sir?

4    A.     Because when I went to write out the list on

5    December 16th, he kept asking me what kind, what kind.

6    And I don't know nothing about guns and have no

7    information about guns.

8          And I wanted to give the appearance that I was

9    knowledgeable and I knew what I was talking about.  So

10   I went to 7-Eleven and I purchased two gun magazines

11   so, when I met him again, I would be able to give the

12   appearance that I knew what I was talking about.

13          MS. JHONES:  Let's go on to Page 22 for the

14   next clip.

15          And the next clip starts at, "What types you

16   want?"  And that's three speakers down from the top.

17          (Whereupon, segments of Government's Exhibit

18   No. 47 were published in open court.)

19   BY MS. JHONES:

20   Q.     Mr. Batiste, do you remember that part of the

21   conversation with Paid Informant No. 2?

22   A.     Yes, ma'am.

23   Q.     Let me ask you some questions about that.

24          Directing your attention, sir, to Page 22 of the

25   transcript, when the informant says, "What types you

1    want?  This (unintelligible) only machine gun," what is

2    happening at that point in time in the conversation,

3    sir?

4    A.    He's explaining that I didn't put together a list

5    and he was expecting for me to have a list for him.

6    Q.    Okay.  And then he says, "You didn't put the

7    list."

8         And you say, "No.  I didn't get -- I gave -- you

9    know, I need to make (unintelligible)."

10        And then he says, "Why?  Why you didn't prepare

11   it?  I told you what you were to -- I told you what you

12   were to order for me.  I told you to prepare me the

13   list."

14        When did this informant, Paid Informant No. 2 --

15   when did he tell you to prepare a second list, sir?

16   A.    I'm not exactly sure.  I believe it was on

17   December the 16th before I left, because he was

18   complaining over the fact that the list that I wrote

19   wasn't clear.

20   Q.    Is your memory, sir, that, on December 16th, he

21   asked you to prepare a second list?

22   A.    I believe so.

23   Q.    Okay.  Directing your attention to the top of

24   Page 25, he says, "We need to establish communication.

25   We are working with each other.  That's it.  If I was

 1   in your place and you wanted to impress me, 'The list

 2   is ready.  Ready.  Hey, this is the list.  Everything

 3   ready.  I worked on it.'"

 4        What is your understanding, sir, as to what the

 5   second paid informant is telling you at the top of

 6   Page 25?

 7   A.   He's telling me that if I -- if I wanted the

 8   money that he was supposed to be giving me.

 9        And this right here reminds me of the meeting

10   that I had with Abbas when he came by the Temple and he

11   also mentioned --

12             MS. ARANGO:  Objection.  Nonresponsive.

13             THE COURT:  Sustained.

14   BY MS. JHONES:

15   Q.   Just tell me what your understanding is of what

16   Paid Informant No. 2, not Paid Informant No. 1 -- we'll

17   get to him later -- Paid Informant No. 2 --

18             MS. ARANGO:  I would object to --

19             THE COURT:  Sustained.

20             Rephrase your question.

21             MS. JHONES:  Yes, your Honor.

22   BY MS. JHONES:

23   Q.   What is Paid Informant No. 2 -- what is your

24   understanding as to what he's telling you at the top of

25   Page 25 when he's referring to if you "wanted to

```
 1   impress me"?

 2   A.    That I would have had the list right then and

 3   there.

 4   Q.    And did you have the list right then and there,

 5   sir?

 6   A.    No.

 7   Q.    Directing your attention, sir, to the bottom of

 8   Page 24, where the informant says, towards the bottom,

 9   "So this what the problem is.  This is why I need to

10   know.  That's all.  But I don't want to

11   (unintelligible)" and there's a cell phone that's

12   ringing, do you recall whose cell phone was ringing,

13   sir?

14   A.    That's CW 2's cell phone.

15   Q.    Did this individual engage in a conversation,

16   sir, with somebody on the phone?

17   A.    No.  He just looked at the number and he kept

18   talking.

19   Q.    After that happens, when he says, "So for that

20   reason, I spoke about you and I told -- and he told me

21   to assist you.  So he gave me the green light to assist

22   you.  You know what I'm saying?" and you say, "Yes,

23   sir," what is your understanding as to what he means

24   when he says, "They gave me the green light to assist

25   you"?
```

1    A.    That means that the support for the money from

2    Abbas's uncle, that has been okayed and it's coming

3    through at this point now.

4    Q.    Okay.  Are you finished?  I'm sorry.

5    A.    Yes.

6    Q.    Okay.  Now, last sentence on Page 24:  "So I

7    have green light, 'cause I believe you are.  I have

8    something to believe in you.  I don't know why.  I

9    have something like I'm not wasting my time.  So

10   (unintelligible).  So like this, today" -- going up

11   to the -- Page 25 -- "and like I told you

12   (unintelligible)" and then he goes on.

13         How many times, sir, does this informant tell

14   you, "So I have something to believe in you.  There's

15   something about you.  I having something to believe"?

16   How many times did the paid informant tell you that,

17   sir?

18              MS. ARANGO:  Objection.  Vague.

19              THE COURT:  Sustained.

20              Rephrase your question.

21   BY MS. JHONES:

22   Q.    How many times, sir, did this informant tell you

23   what he's telling you now in the bottom of Page 24:  "I

24   have something to believe in you.  I don't know why.  I

25   have something like I'm not wasting my time"?

```
 1              MS. ARANGO:  Same objection.

 2              THE COURT:  Sustained.

 3              Rephrase your question.

 4              MS. JHONES:  Okay.

 5    BY MS. JHONES:

 6    Q.    What is your understanding, sir, about what this

 7    informant is telling you -- Paid Informant No. 2 --

 8    when he tells you what he tells you at the bottom of

 9    Page 24?

10    A.    That he believes somehow or another that I'm

11    somebody who's sincere.

12    Q.    A couple more questions and we'll move on to the

13    other clip, sir.

14              At the bottom of Page 23, where -- the informant

15    says towards the bottom of the page, four speakers up

16    towards the bottom of that paragraph, "So he -- I guess

17    he will give me his authorization.

18              "But I want to tell you something to make me stay

19    and believe in you, 'cause I believe in -- since I met

20    you the first time, there was something in you,

21    something in you, telling me that I should stay, I

22    should be with you.  I should stay.  I don't know what

23    it is.  I do discover it.  So I'm telling you from now

24    on, brother."

25              And you say, "Yes, sir."
```

 1          And then he says, "Don't let my stay go for

 2    nothing.  This is what I'm telling you, because I put

 3    my work on the line, 'cause my big, big brother who

 4    confident in me don't let my work go --"

 5          And you say, sir, "To nothing."

 6          What is your understanding as to what the

 7    message -- what it is that this informant is trying

 8    to convey to you at that point in time in the

 9    conversation, sir?

10    A.    That he's already invested a strong level of

11    confidence in me and he doesn't want to be fooled to

12    think that I pulled a trick on him.

13    Q.    Now, finally, sir, directing your attention to

14    Page 25, the middle of the page, where you say, "And

15    what I wanted to say to you, Brother Mohammed, was

16    that -- is that I don't want to do nothing fast and I

17    can tell you're seeing that right away," what are you

18    referring to, sir, when you tell him you don't want to

19    do anything fast?

20    A.    Because he keeps on asking me what's my plan.

21    He's making it sound like he wants me to produce

22    something for jihad right now.

23          And I know, in reality, that's not gonna happen.

24    So I'm trying to just give him a long story.  So I'm

25    telling him, "Whatever I'm gonna tell you, it's not

1    gonna happen right away."

2          MS. JHONES:   The next clip starts at Page 34.

3    And it begins at -- three speakers up from the bottom,

4    "I told you again..."

5          (Whereupon, segments of Government's Exhibit

6    No. 47 were published in open court.)

7    BY MS. JHONES:

8    Q.    Do you remember that part of the conversation,

9    sir?

10   A.    Yes, ma'am.

11   Q.    Now, when this individual says, "I don't want to

12   interfere with the sheik between you and the brothers.

13   I don't go in the middle.   No.   I want to be next to

14   you, see how I can help, how I can assist to be aware

15   of the project.   Do you understand?" --

16   A.    Yes.

17   Q.    -- what understanding, if any, sir, do you have

18   about what the informant is telling you at the bottom

19   of Page 34?

20   A.    He's assuring me again during that conversation

21   that developed that he's not here to take over, that

22   his position is, once again -- is to assist me because

23   it seems as though I'm not understanding that.

24   Q.    When he tells you, sir, on the top of Page 35,

25   "So this is my job, not to take over," what is your

 1   understanding as to what it is that he's telling you
 2   there when he says, "This is my job, not to take over"?
 3   A.    That he's not trying to take my position, work
 4   through the advice that he's going to be giving me.
 5   Q.    And how did that affect you in terms of how you
 6   proceeded to deal with this gentleman as you went
 7   forward with him?
 8   A.    Basically, I was listening to his advice first.
 9   He said he wanted the communication to only be between
10   me and him.
11         And that's how I kept the conversation going,
12   only just between me and him.
13              MS. ARANGO:  Objection.  Nonresponsive.
14              THE COURT:  Sustained.
15              MS. JHONES:  Let me see if I can rephrase,
16   your Honor.
17   BY MS. JHONES:
18   Q.    What effect, Mr. Batiste, did the informant's
19   words to you at the top of Page 35 -- what effect, if
20   any, did it have on you when he said, "This is my job,
21   not to take over"?
22   A.    I felt like he was trying to take over.
23              MS. JHONES:  The next clip is going to start
24   at Page 36, where it reads -- towards -- six speakers
25   down, "Not to forget it, no."

1              (Whereupon, segments of Government's Exhibit

2     No. 47 were published in open court.)

3     BY MS. JHONES:

4     Q.     Do you remember that part of the conversation,

5     sir?

6     A.     Yes, ma'am.

7     Q.     A couple of questions about that.

8              At the bottom of Page 36, when you tell this

9     individual -- actually, five lines up from 36 -- "Is

10    there a time limit on how long we will have to wait?",

11    why are you asking -- what -- first of all, what are

12    you asking him, sir?

13    A.     I'm asking him about the plan that I'll be

14    telling him, because in the middle of the paragraph, he

15    said, "That's all we want, is to know that you're

16    ready."

17             And what he means by saying that is, "We want to

18    know what's the finish date when you can tell me,

19    'Look, I'm ready to execute a jihad plan and this is my

20    jihad plan.'"

21             And once he knows that, then everything --

22    there's no problems with the money or any of that.  He

23    just wants me to confirm that.  He wants me to lock in

24    to an agreement of when that will be.

25    Q.     What do you say to him with respect to having

```
 1   locked -- locking in to an agreement?

 2   A.    I'm trying to not lock myself in to any agreement

 3   because I know this is no real jihad plan.  So I'm

 4   trying to pick his mind by asking him, "Well, is there

 5   a time limit on how long we have to wait?"

 6         And then he tells me, "No.  There's not a rush."

 7         And then I tell him, "Well, I want to have

 8   control over that date."

 9         And he says, "Okay" -- Page 37 I'm on.

10         He says, "Because you know why?" -- I asked

11   him -- I said, "Because you know why?"

12         Then he goes, "Oh, okay.  Why don't you give

13   me -- this is what -- you're not understanding me at

14   this point, brother."

15         And I just, you know, told him straight out, "I

16   don't have a date."

17   Q.    And why don't you have a date, sir?

18   A.    Because there is no plan.

19   Q.    Let me ask you some questions about some other

20   pages here.

21         Directing your attention, sir, to Page 39, where

22   you tell this informant that you have brothers in

23   Chicago -- Chicago and Louisiana -- do you see that,

24   sir? --

25   A.    Yes.
```

1    Q.       -- and, I believe, you say you have soldiers in

2    Chicago and soldiers in Louisiana, was that true, sir?

3    A.       No, ma'am.

4    Q.       Why did you tell him that?

5    A.       I was just making up stuff just to sound good to

6    his ears.

7    Q.       And then you tell him, sir, on Page 40, again,

8    "Strong, strong soldiers in Chicago."

9             Do you see that, sir, middle of the page?

10   A.       Yes.

11   Q.       And the informant asks you, "How many?"  Right?

12   A.       Yes, ma'am.

13   Q.       How many do you tell him you have?

14   A.       I tell him it could be ten.

15   Q.       Why did you tell him that, sir?

16   A.       I was just -- I'm just making up stuff as I'm

17   trying to go along.

18   Q.       When you tell this informant, "My men need to

19   train in a country," why do you tell him that, sir?

20   A.       Once again, it's just making up stuff.

21   Q.       On Page 41, you tell him about land you have in

22   Louisiana and Alabama; do you not, sir?

23   A.       Yes, ma'am.

24   Q.       Why do you tell him that?

25   A.       I'm just trying to impress the guy, trying to

```
 1   tell him a bunch of stuff.

 2   Q.     What land do you have in Alabama, sir?

 3   A.     I don't have no land in Alabama.

 4   Q.     What land do you have in Louisiana?

 5   A.     I don't have any land in Louisiana.

 6   Q.     Why do you tell this informant on Page 40 that

 7   you need a country to train your soldiers and that --

 8   on Page 41, you tell him you have land in Alabama and

 9   Louisiana for training?

10   A.     Because I want to make it sound like I have a

11   plan.

12   Q.     On Page 45, sir, who mentions the Sears Tower?

13   A.     I do.

14   Q.     Why do you mention the Sears Tower, sir?

15   A.     That was a discussion that me and Abbas had the

16   day before.  He said I needed to come up with

17   something, something big.

18          So this was my chance to try to mention the Sears

19   Tower, to see if this guy would bite into it.

20          MS. JHONES:  Your Honor, if I may just have a

21   moment to speak to Eric.

22          THE COURT:  Okay.

23          MS. JHONES:  Thank you.

24          (Discussion had off the record between counsel

25   and assistant.)
```

```
 1   BY MS. JHONES:
 2   Q.    Directing your attention, sir, to Page 65 of this
 3   transcript, the middle of the page, sir, where the
 4   informant says, "And when I call, I call no other
 5   people to answer the phone" and you say, "No.  When you
 6   call me on that phone, it's between me and you" and the
 7   informant says, "Between me and you.  Because when I
 8   gave you the phone, you can keep -- please, so no one
 9   will be interfering and even no systems can interfere
10   between these two lines.  No one" and you say, "Okay,"
11   what is your understanding, sir, as to what he's
12   telling you?
13   A.    I'm confirming to him that I understand, when he
14   told me that he can put these computer chips in our
15   phones, that it won't be no interference of any
16   wiretapping, and that me and him will talk directly,
17   one on one.
18   Q.    Okay.  Does there come a time when this meeting
19   at the Embassy comes to an end, sir?
20   A.    Yes, ma'am.
21   Q.    After you finished your conversation at the
22   Embassy, where does this informant go?
23   A.    I dropped him back off at Bayside Marketplace.
24   Q.    Is there any understanding left between you and
25   the second informant as to what is going to happen
```

```
 1   next?

 2   A.    That he's -- he asked me for the boot list -- and

 3   I gave him the boots -- and that he's gonna be working

 4   on the money as soon as possible and he'll get in touch

 5   with me as soon as he has an answer.

 6   Q.    Let me review a couple of things on the list with

 7   you, sir.

 8         MS. JHONES:  I'm just going to need the ELMO

 9   for a couple of minutes, your Honor.

10         THE COURT:  Okay.

11         MS. JHONES:  Thank you.

12   BY MS. JHONES:

13   Q.    I'm going to show you, sir, what's in evidence as

14   Government's Exhibit 102.

15         Do you recognize that, sir?

16   A.    Yes, ma'am.

17   Q.    Is that your handwriting, sir?

18   A.    The black, yes.

19   Q.    And where was this list prepared?

20   A.    This was at the Temple, at the table, when me and

21   Mohammed was talking.

22   Q.    When you say at the Temple, at the table, when

23   you and Mohammed were talking, what date are you

24   referring to?

25   A.    December the 22nd.
```

1    Q.     Prior to December 22nd, had you provided any

2    other list?

3    A.     Yes, I had.

4    Q.     Again, Exhibit 100:  When was that provided?

5    A.     That was at the Radisson Hotel.

6           MS. JHONES:  I'm missing one exhibit, your

7    Honor.

8    BY MS. JHONES:

9    Q.     I'm going to show you what's in evidence as

10   Government's Exhibit 101, Mr. Batiste.  I'm going to

11   ask you to tell me if you recognize that exhibit.

12   A.     Yes, I do.

13   Q.     What is Government's Exhibit 101?  I'm going to

14   turn it around so you can see the second -- the back

15   page.

16   A.     This is the list that I gave -- well, actually,

17   me and Abbas had prepared together when he came by the

18   Temple on December the 19th.

19   Q.     After December 22nd, sir, what, if any, contact

20   do you have with either one of these two informants?

21   A.     I believe there was a phone call between me and

22   CW 2 around December 29th.

23   Q.     Around when, please?

24   A.     December 29th.

25   Q.     Do you know whether you had any contact with him

1   prior to December 29th?  Do you remember?

2   A.    No, ma'am.

3   Q.    Would something help refresh your recollection,

4   sir?

5   A.    Yes.

6         MS. JHONES:  May I approach, your Honor?

7         THE COURT:  Yes.

8         MS. JHONES:  Thank you.

9   BY MS. JHONES:

10  Q.    Mr. Batiste, would you please look at

11  Government's Exhibit 48 and let me know if that

12  refreshes your recollection.

13  A.    Yes, it does.

14  Q.    Does it help refresh your recollection, sir?

15  A.    Yes, ma'am.

16  Q.    Did you have contact -- any contact with any of

17  the two paid informants on December 28th?

18  A.    Yes, ma'am.

19  Q.    With whom did you have contact, sir?

20  A.    With CW 2.

21  Q.    What type of contact was it?

22  A.    It was a telephonic contact.

23  Q.    Okay.  And --

24        MS. JHONES:  Your Honor, with the Court's

25  permission, if the ladies and gentlemen of the jury can

 1    turn to Government's Exhibit 48-A, which should be in

 2    the first binder.

 3              Thank you, Ms. Arango.

 4              THE COURT:  It's the next tab.

 5              What page?

 6              MS. JHONES:  This is going to be Page 3.

 7    BY MS. JHONES:

 8    Q.    The informant tells you, Mr. Batiste, "So, you

 9    see, every time I'm seeing you, every time I have

10    something providing you from what you asked me for."

11          Do you see that, sir?

12    A.    Yes, ma'am.

13    Q.    And you say, "Okay.  Okay."

14    A.    Yes.  I say, "Okay."

15    Q.    What is your understanding, sir, as to what he's

16    referring to?

17    A.    He's telling me that every time he sees me that

18    he wants to have something to give me from the list.

19    Q.    And when you tell this informant further on down

20    in the page, "Because, you know, brother -- because,

21    with me, with the construction business, money is slow

22    for me.  So it's hard for me to -- you know, I got a

23    slow pace going now.  But with your help, it will speed

24    up the process."

25              THE COURT:  What page is this?

```
 1              MS. JHONES:  Your Honor, actually --

 2              THE COURT:  Oh.  It's on Page 4.

 3              MS. JHONES:  Yes.  Top of Page 4.

 4    BY MS. JHONES:

 5    Q.    What is it, sir, that you're telling the

 6    informant at that time in the conversation?

 7    A.    I'm telling him, you know, "All the money that

 8    I've been explaining to you that I need, this is what I

 9    need right away, because I'm in this construction

10    business and I don't have any money right now to

11    operate or move around."

12    Q.    At the end of that conversation, sir, is there

13    any agreement to meet again with this informant?

14    A.    Yes, ma'am.  He tells me that, "We will meet,

15    Inshallah."

16    Q.    And just so we are clear, this conversation on

17    12-28 is between you and which one of the two

18    informants?

19    A.    Informant No. 2.

20    Q.    Okay.

21              THE COURT:  We're going to end for the day at

22    this time.

23              Do not discuss this case either amongst

24    yourselves or with anyone else.  Have no contact

25    whatsoever with anyone associated with the trial.  Do
```

 1   not read, listen or see anything touching on this

 2   matter in any way.

 3           If anyone should try to talk to you about this

 4   case, you should immediately instruct them to stop and

 5   report it to my staff.

 6           You may leave your binders at your chairs.

 7   Please give your notebooks to the court security

 8   officer.

 9           Have a nice evening.  I'll see you tomorrow

10   morning, 9:00.

11           (Whereupon, the jury exited the courtroom at

12   4:43 p.m. and the following proceedings were had:)

13           THE COURT:  You can step down, sir.

14           (Witness excused.)

15           THE COURT:  Where are we, Ms. Jhones?

16           MS. JHONES:  Today is Wednesday, your Honor?

17           THE COURT:  Today's Thursday.

18           MS. JHONES:  Thursday.

19           Your Honor, I'm going to try to wrap it up

20   tomorrow, but it may not be possible.

21           I may have to go on to -- I have -- I just

22   can't see myself finishing up tomorrow, quite frankly.

23           THE COURT:  Okay.

24           All right.  We're in recess until tomorrow

25   morning, 9:00.

```
 1              (End of proceedings.)

 2

 3                  C E R T I F I C A T E

 4

 5         I hereby certify that the foregoing is an

 6    accurate transcription of the proceedings in the

 7    above-entitled matter.

 8

 9

10    _____        /s/Lisa Edwards_____
          DATE            LISA EDWARDS, CRR, RMR
11                        Official United States Court Reporter
                          400 North Miami Avenue, Twelfth Floor
12                        Miami, Florida 33128
                          (305) 523-5499
13

14

15

16

17

18

19

20

21

22

23

24

25
```