```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                        MIAMI DIVISION
                  CASE NO. 06-20373-CRIMINAL-LENARD
 3

 4    UNITED STATES OF AMERICA,      Miami, Florida

 5                   Plaintiff,      April 22, 2009

 6         vs.                       9:18 a.m. to 2:58 p.m.

 7    NARSEAL BATISTE, et al.,       Volume XXXIX

 8            Defendants.      Pages 1 to 110
      ------------------------------------------------------

 9

10                         JURY TRIAL
11         BEFORE THE HONORABLE JOAN A. LENARD,
                UNITED STATES DISTRICT JUDGE
12

13

14    APPEARANCES:

15

16    FOR THE GOVERNMENT:     RICHARD D. GREGORIE, ESQ., and
                              JACQUELINE M. ARANGO, ESQ.
17                            ASSISTANT UNITED STATES ATTORNEYS
                              99 Northeast Fourth Street
18                            Miami, Florida 33132

19
      FOR THE DEFENDANT       ANA MARIA JHONES, ESQ.
20      NARSEAL BATISTE:      300 Seville Avenue, Suite 210
                              Coral Gables, Florida 33134
21

22    FOR THE DEFENDANT       ALBERT Z. LEVIN, ESQ.
        PATRICK ABRAHAM:      261 Northeast First Street
23                            Sixth Floor
                              Miami, Florida 33132
24

25
```

2

```
 1   FOR THE DEFENDANT        RODERICK D. VEREEN, ESQ.
        STANLEY PHANOR:        BRINKLEY, HENRYS & LEWIS
 2                             4770 Biscayne Boulevard
                               Suite 1200
 3                             Miami, Florida 33131

 4
     FOR THE DEFENDANT        RICHARD K. HOULIHAN, ESQ.
 5     NAUDIMAR HERRERA:       300 Aragon Avenue
                               Coral Gables, Florida 33134
 6

 7   FOR THE DEFENDANT        LOUIS CASUSO, ESQ.
        BURSON AUGUSTIN:       111 Northeast First Street
 8                             Suite 603
                               Miami, Florida 33132
 9

10   FOR THE DEFENDANT        NATHAN CLARK, ESQ.
      ROTSCHILD AUGUSTINE:    17639 South Dixie Highway
11                             Miami, Florida 33157

12
     REPORTED BY:             LISA EDWARDS, CRR, RMR
13                             Official Court Reporter
                               400 North Miami Avenue
14                             Twelfth Floor
                               Miami, Florida 33128
15                             (305) 523-5499

16

17

18

19

20

21

22

23

24

25
```

3

1                          I N D E X

2

3                                    Direct    Cross    Red.

4
WITNESSES FOR THE DEFENDANT BATISTE:
5

6    Victor Egoavil                    18        24       26

7    Maxwell Batiste                   43

8    Mary Ramos-Valik                  47        57       58

9
REBUTTAL WITNESS FOR THE GOVERNMENT:
10

11   Anthony Velazquez                 70        73
                                                 75
12

13
EXHIBITS RECEIVED IN EVIDENCE:              PAGE
14
Defendant Batiste's Exhibit Nos. 3-A
15     and 3-B                                  21
Defendant Abraham's Exhibit Nos. 6-A
16     through 6-D                              59
Government's Exhibit Nos. W1-00360
17     and W1-00360-T                          72

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Good morning.  You may be seated.

 2              United States of America versus Narseal

 3    Batiste, et al., Case No. 06-20373.

 4              Counsel, state your appearances, please, for

 5    the record.

 6              MR. GREGORIE:  Good morning, your Honor.

 7              Richard Gregorie and Jacqueline Arango on

 8    behalf of the United States.

 9              THE COURT:  Good morning.

10              MR. LEVIN:  Your Honor, Albert Levin on behalf

11    of Patrick Abraham.

12              Ms. Jhones is coming into the courtroom as we

13    speak.

14              MR. CASUSO:  Good morning, your Honor.

15              Lou Casuso on behalf of Burson Augustin, who's

16    present.

17              MR. CLARK:  Good morning, your Honor.

18              Nathan Clark on behalf of Rotschild Augustine,

19    who's present.

20              THE COURT:  Nice to have you back, Mr. Clark,

21    your voice, at least.

22              MR. CLARK:  Not completely, but I'm working on

23    it.

24              THE COURT:  It sounds pretty good.

25              MR. HOULIHAN:  Richard Houlihan on behalf of
```

5

1    Naudimar Herrera.

2          MR. VEREEN:  Rod Vereen on behalf of Stanley

3    Phanor, who's present.

4          MS. JHONES:  Ana Jhones on behalf of Narseal

5    Batiste, who is present.

6          THE COURT:  All Defendants are present.

7          Juror No. 7 left a message on Patricia's

8    machine at 7:30 that she still has a fever and is still

9    feeling ill.  So she is not here.

10         I believe every other juror is here?

11         THE COURTROOM DEPUTY:  Yes.

12         THE COURT:  Every other juror is here.

13         So I'll hear positions on both sides.

14         MR. GREGORIE:  Your Honor, it's the United

15   States' motion that Juror No. 7 be excused pursuant to

16   Rule 24 of the Federal Rules of Criminal Procedure and

17   that she be replaced by one of the six alternate jurors

18   your Honor has chosen and have sat through this entire

19   trial.

20         MR. LEVIN:  Your Honor, it's the defense

21   position that you afford the same courtesy to Juror

22   No. 7 that you afforded to Juror No. 12 and the same

23   courtesies that you afforded to Juror No. 11 when she

24   had to attend a funeral, which is why we were in

25   session only two days last week.  At least give Juror

```
1   No. 7 today just like you gave Juror No. 12 yesterday

2   to recuperate.

3           Yesterday the Government had no problem with

4   Juror No. 12 getting the day off.  Today they have a

5   problem with Juror No. 7 getting the day off to

6   recuperate.

7           It's an obvious attempt at manipulating the

8   jury composition.  I mean, they've been watching

9   these jurors just like we have in terms of facial

10  expressions, things of that nature.

11          I'm just asking for fairness --

12          THE COURT:  I have no idea what you're

13  referring to.

14          MR. LEVIN:  It's -- that aspect is neither

15  here nor there, frankly.

16          The issue really is one of fairness.  The

17  issue is:  Since Juror No. 12 was given a day to

18  recuperate, should not Juror No. 7 be given the day to

19  recuperate?

20          MR. GREGORIE:  Your Honor, this juror asked

21  for two days.  It's not sure she'll be back.

22          On top of it, your Honor, at this --

23          THE COURT:  Well, actually, what she said to

24  Patricia is that she was instructed two days and she

25  wouldn't know after the two days and she would be
```

1    calling to -- I mean, she's sick.

2            She has a fever.  She has the runs.  She's not

3    feeling well.  Everyone in her house has now gotten it.

4    She's not feeling well.

5            It's unclear whether -- if she has a fever

6    today, I would expect that she won't be here tomorrow

7    either.

8            MR. GREGORIE:  I would expect that as well,

9    your Honor.  And we have now only served two days last

10   week, and we've had nothing this week, your Honor.

11           This on my part, your Honor, has nothing to do

12   with which juror it is.

13           Number one, she may infect the rest of the

14   jury, which we certainly don't want to have happen.

15           And, number two, your Honor, this case has

16   been put off long enough.  There reaches a point where

17   the jury becomes irritated at the fact that they're

18   still having to serve and they're not hearing any

19   evidence, your Honor.

20           I think it's time that we replace the juror

21   and move on, Judge.  We've already missed a good part

22   of this case -- we've only had two days last week and

23   have had nothing so far this week.

24           That's why we picked six alternates, your

25   Honor.  That's why the system provides for that.

8

1          THE COURT:  Anything further?

2          MR. CLARK:  Your Honor, I don't know how this

3    may affect the Court.  But I'm going to ask the Court

4    to be able to postpone closings until next week because

5    I don't believe that I will be able to deliver a

6    substantial closing argument in this case because

7    it'll require tomorrow or Friday.

8          That's my concern.  You know, if I have to

9    talk for an hour, I'm going to lose my voice within

10   that hour.  It's been a very slow recovery from this

11   particular thing.

12         I just want to ask the Court to consider -- I

13   believe I need to have until the weekend to fully

14   recover my voice to be able to do the substantial

15   closing argument required by this case.

16         MR. LEVIN:  Judge, I'd like this all to be put

17   on the record.

18         I think that Juror No. 7 -- any conversations

19   with Juror No. 7 should be put on the record, that she

20   should be questioned by the Court with regard to her

21   illness on the record.

22         It's not that I have any distrust for this

23   staff whatsoever.  I've known Patricia for years.

24   Okay?

25         But I just think, based upon this case and the

1   high-stakes nature of this case, that Juror No. 7, if

2   this Court is inclined to move forward with an

3   alternate and not be given the same consideration that

4   Juror No. 12 was given, one-day recuperation --

5   nobody's a doctor in this courtroom.

6         We haven't heard from any doctors.  We're just

7   getting everybody's opinion based on their own bodies

8   and their own recovery times and things of that nature.

9         THE COURT:  I'll have her send in her doctor's

10  note.

11        I'm going to excuse Juror No. 7.

12        First of all, let me make sure the record is

13  clear that, in regard to Juror No. 12, what Juror

14  No. 12 stated is that she would come in on Tuesday,

15  but, if possible -- she was intent on coming in -- she

16  was released from the hospital.  She was intent on

17  coming in on Tuesday.  If possible, she would like the

18  day on Tuesday, but, otherwise, she would be here.

19        After consulting with counsel -- and there was

20  not an objection by anybody as to postponing the trial.

21  We were not having trial on Monday.  There were no

22  objections.

23        Unfortunately, Juror No. 7 then became ill,

24  took herself to Urgent Care, has a doctor's note, which

25  I will have Patricia obtain from her so it is clear in

1    the record and placed in the record, without her name,

2    and -- indicating that she needed, as I understand it,

3    two days of bedrest, which was yesterday and today.

4              That was prior to -- I believe, at the time

5    that she went to the doctor, she was not running a

6    fever.  She started a fever yesterday, as was conveyed,

7    as I understand it, to Patricia, and she still has a

8    fever today.

9              When she spoke to Patricia, she could not

10   commit -- while she had the doctor's note for two days,

11   she said that she would have to see and there was some

12   talk between her and Patricia about not being able to

13   come Thursday.

14             It may have even -- she may have even talked

15   about the rest of the week.  But certainly she did

16   mention Thursday and that she wouldn't know whether she

17   would be able to come in.

18             I mean, she has a virus.  I have a concern

19   about infecting the whole jury.  There are a lot of

20   viruses going around, and she did indicate to Patricia

21   that other persons in her house have now gotten sick

22   from her.

23             We do have six alternates and I have --

24   there's been no indication on the record from this

25   juror -- if anything, this juror has -- and I look at

1    the jury, as I have a full and clear view of them.

2         She has a very placid visage the entire time

3    that she is in court.  She makes no indication one way

4    or the other of what her feelings are, nor has any

5    juror, in my estimation, made any facial gestures or

6    indications in body language or facial expressions as

7    to their view of the case.

8         I have no idea as to anybody's view of the

9    case, quite frankly, nor do I think anybody else in

10   this courtroom can have any idea about any juror's view

11   of the case.

12        This case is no more a high-stakes case than

13   any other federal criminal case that is handled in

14   federal court.  The stakes in this case for these

15   Defendants are as high as the stakes for a defendant in

16   any criminal case where a defendant is facing serious

17   criminal charges.

18        So this case should not be handled any

19   differently than any other federal criminal case is

20   handled, nor would I handle one case differently from

21   the other.

22        At this point, we need to go forward.  We need

23   to proceed with both the close of evidence and the

24   beginning of closing arguments.

25        I am not going to postpone closing arguments,

 1   Mr. Clark.  However, you can be the last person who

 2   gives a closing argument.  I don't have a problem with

 3   that.

 4           If, at that time, you still feel that you

 5   can't go forward with your closing argument, I will

 6   consider at that time recessing court for the day and

 7   having you come back.  I expect it'll be sometime on

 8   Friday.

 9           I'm certainly willing to give that serious

10   consideration.  I don't want to make a ruling before I

11   hear from the Government.

12           But certainly, if you don't feel you're able

13   to make your closing argument, being the last person on

14   Friday, if that's where we are on Friday, I would

15   certainly give it serious consideration.

16           And I can't imagine the Government would

17   object to postponing the -- your closing argument to

18   Tuesday morning.

19           So that's how we're going to proceed.

20           I will inform the jurors that Juror No. 7 is

21   ill and not able to proceed.  I will have Patricia call

22   her and just have her either e-mail or fax or mail the

23   note for the Court, which will be placed in the record.

24           And I think you may owe an apology, Mr. Levin,

25   to my courtroom deputy, quite frankly.

```
 1              MR. LEVIN:  Judge, I --

 2              THE COURT:  But that's between you and her.

 3              MR. LEVIN:  And I'll say on the record that I

 4   have the utmost trust in Patricia Mitchell, who I've

 5   known for many, many years, and I'm not doubting her.

 6              The only reason I thought maybe in this case

 7   it should be on the record is because this case is

 8   different, your Honor.

 9              You have sequestered a jury.  You have

10   impaneled an anonymous --

11              THE COURT:  This jury is not sequestered.

12              MR. LEVIN:  This is the third trial for this

13   case, your Honor.

14              THE COURT:  Is this jury sequestered,

15   Mr. Levin?

16              MR. LEVIN:  Judge, I'm talking

17   historically with regard to this case.

18              This case --

19              THE COURT:  Well, if you want to get into

20   historically --

21              MR. LEVIN:  -- in 2006 --

22              THE COURT:  Mr. Levin, if you want to get into

23   historically as to why the Court did the things with

24   the jury that the Court did, we can have that

25   discussion on the record.
```

1          I'm not sure that you want to get into that,

2    Mr. Levin, because --

3          MR. LEVIN:  Judge, I --

4          THE COURT:  -- some of that was as a result of

5    your actions, Mr. Levin, in the first trial.

6          MR. LEVIN:  That is absolutely incorrect, your

7    Honor.

8          THE COURT:  That's absolutely incorrect?

9          MR. LEVIN:  Absolutely incorrect.

10         And I welcome a hearing on that issue, your

11   Honor, at any point in time.  I frankly --

12         THE COURT:  Well, it certainly was one of --

13         MR. LEVIN:  I am tired -- I am now -- I have

14   reached my level of frustration with this Court again

15   impugning my integrity to the extent that I violated

16   any local rules by speaking to the media.  At no time

17   did that ever occur.

18         THE COURT:  I wasn't speaking about that,

19   Mr. Levin.

20         MR. LEVIN:  Well, I'm not really sure what

21   you're talking about.

22         But I did not occasion this Court's decision

23   to impanel an anonymous jury or a sequestered jury over

24   the course of these three trials nor for this case to

25   be selecting an anonymous jury.

```
 1              So this case is a little different than the
 2    other cases.
 3              I was not meaning to impugn Ms. Mitchell's
 4    integrity whatsoever.  I just felt that, under the
 5    circumstances, to have --
 6              THE COURT:  Well, were you impugning my
 7    integrity, Mr. Levin?
 8              MR. LEVIN:  Clearly not, your Honor.
 9              THE COURT:  I see.  Okay.
10              MR. LEVIN:  Judge, I have the utmost respect
11    for this Court.  Okay?  We may disagree, but I have the
12    utmost respect for this Court, as I do any judge that I
13    appear in front of.
14              And although I might appear frustrated and I
15    might have a very expressive face, that doesn't --
16              THE COURT:  I'm not talking about your face,
17    Mr. Levin.
18              MS. ARANGO:  Judge, may I just put a case cite
19    on the record?
20              Your Honor has ruled and this case cite that I
21    want to cite to the Court just basically sets forth
22    that you have the utmost discretion and authority to do
23    what you just did.  I just want to put it on the
24    record.
25              THE COURT:  Sure.
```

1          MS. ARANGO:  It's *United States versus*

2    *Fajardo* -- F-a-j-a-r-d-o -- 787 F.2d 1523 at 1525,

3    Eleventh Circuit, 1986.

4          THE COURT:  Okay.

5          MS. ARANGO:  Thank you.

6          THE COURT:  And I'm aware that I have the

7    discretion.

8          We do have six alternates.  I am exercising

9    my discretion after thinking about this and the

10   circumstances of the illness of Juror No. 7, which I

11   find is substantially different from the situation of

12   either the funeral or the juror who asked for one day

13   after being released from the hospital to recuperate.

14         In fact, I had considered that, if it was

15   going to be more than one day, that I would certainly

16   think about whether to replace her.  But she is here.

17         And this juror has -- is -- has either the

18   flu or a virus, which could be anywhere from a few

19   days to six, seven, ten days, depending on how -- the

20   seriousness of the infection and whether or not her

21   body is able to fight it off quickly.

22         So it is unpredictable as to how long she'll

23   be removed.

24         I do feel badly that she has been here for all

25   these months and now -- I always feel badly when jurors

```
1   have been so attentive and have attended court on a
2   regular basis.  She's been a very attentive juror.
3   It's unfortunate that she has now gotten ill.
4           But this case now needs to move forward for
5   both this case and for the administration of justice
6   regarding this case and for the administration of the
7   Court's docket.
8           So would you bring the jurors in.
9           (Whereupon, the jury entered the courtroom at
10  9:33 a.m. and the following proceedings were had:)
11          THE COURT:  You may be seated.
12          Ladies and gentlemen, Juror No. 7 has gotten
13  ill with a virus or the flu.  I know you join me in
14  wishing her well.
15          But she's just not able to attend today, and
16  it's not clear if she would be able to come back later
17  in the week.
18          So I have excused her.
19          So we're going to proceed today.
20          Call your next witness.
21          MS. JHONES:  Yes, your Honor.
22          May it please the Court.
23          Good morning, ladies and gentlemen.
24          THE JURY:  Good morning.
25          MS. JHONES:  At this time the defense would
```

Egoavil - DIRECT - By Ms. Jhones                    18

 1  call Victor Egoavil.

 2  Thereupon--

 3                      VICTOR EGOAVIL

 4  was called as a witness by the Defendant and, having

 5  been first duly sworn, testified as follows:

 6           THE COURTROOM DEPUTY:  Thank you.

 7           You may be seated.  If you can, sit as close

 8  as you can to the mic.

 9           THE WITNESS:  Okay.

10           THE COURTROOM DEPUTY:  And state your name

11  with the spelling of your last name.

12           THE WITNESS:  Victor Egoavil, E-g-o-a-v-i-l.

13                      DIRECT EXAMINATION

14  BY MS. JHONES:

15  Q.    Good morning, sir.

16  A.    Good morning.

17  Q.    Mr. Egoavil -- am I pronouncing it correctly?

18  A.    It's "Egoavil."

19  Q.    "Egoavil."

20  A.    "Egoavil."  Yeah.

21  Q.    All righty.  Sir, would you please tell us, sir,

22  how are you employed.

23  A.    I'm employed in Value Pawn & Jewelry since

24  August 11th.

25  Q.    Okay.  What is the address of Value Pawn &

Egoavil - DIRECT - By Ms. Jhones                    19

```
 1   Jewelry?

 2   A.    We got several addresses.  I'm working right now

 3   in the store on 103 and 7 -- State Road 7 in Miami.

 4   Q.    And what is your position at Value Pawn &

 5   Jewelry, sir?

 6   A.    Assistant manager.

 7   Q.    And are you familiar with the mode and

 8   preparation of the records at Value Pawn & Jewelry?

 9   A.    Yes.

10   Q.    And --

11         MS. JHONES:  May I approach the witness, your

12   Honor?

13         THE COURT:  Yes.

14         MS. JHONES:  Thank you.

15         Your Honor, may I approach the witness?

16         THE COURT:  Yes.

17         MS. JHONES:  Thank you.

18   BY MS. JHONES:

19   Q.    Mr. Egoavil, I'm going to hand you what --

20         MS. JHONES:  Your Honor, is the microphone on?

21   I've turned it on.

22         THE COURT:  No.  There you go.  It should take

23   a minute now.

24   BY MS. JHONES:

25   Q.    Mr. Egoavil, I'm going to hand you what's marked
```

 1  for identification as Defense Exhibit 3-A and Defense

 2  Exhibit 3-B.

 3          I'm going to ask you, please, to take a look at

 4  those documents and let me know if you recognize them.

 5  A.    Yes.

 6  Q.    How do you recognize -- without telling us what's

 7  in the documents just right now, how do you recognize

 8  these documents?

 9  A.    The pink copy -- it's a pawn ticket.  The white

10  copy -- it's a copy of the computer data that we kept

11  in the system.

12  Q.    Were these records prepared on or about the date

13  that is depicted in the records -- contemporaneously

14  with the data that is depicted on Defense Exhibit 3-B

15  as well as Defense Exhibit 3-A?

16  A.    Yes.

17  Q.    Are these records kept in the normal course of

18  business for Value Pawn & Jewelry?

19  A.    Yes.

20          MS. JHONES:  At this time, your Honor, I'd

21  like to move into evidence Defense Exhibits 3-A and

22  3-B.

23          MR. GREGORIE:  No objection, your Honor.

24          THE COURT:  They will be admitted as Defendant

25  Batiste's Exhibits 3-A and 3-B.

```
 1              (Whereupon, Defendant Batiste's Exhibit
 2   Nos. 3-A and 3-B were entered into evidence.)
 3              MS. JHONES:  I'm going to attempt, your Honor,
 4   to ask questions from the ELMO.  One is a carbon copy;
 5   so, it may be a little difficult.  But I'm going to try
 6   to publish to the jury as I ask the questions.
 7              THE COURT:  Sure.
 8              MS. JHONES:  Thank you.
 9   BY MS. JHONES:
10   Q.    Mr. Egoavil, is your monitor turned on?
11   A.    Yes.  But there's nothing there.
12   Q.    Okay.  I'm getting there.
13         Are you able to read that document, sir, from the
14   monitor?
15   A.    Not that clear.
16              MS. JHONES:  I'm going to have to do it from
17   the bar, your Honor.  I apologize.
18              THE COURT:  That's fine.  No problem.
19   BY MS. JHONES:
20   Q.    Showing you in evidence Defense Exhibit 3-A,
21   would you please tell us what Defense Exhibit 3-A is.
22   A.    This is a pawn ticket.  It's given to the
23   customer when they come to apply for a loan.
24         On the top portion of the ticket, you have the
25   date when the loan was made.  In this case, it's
```

```
 1    April 26th, '06.

 2    Q.     And the customer that came to apply for a loan

 3    was whom, please?

 4    A.     Hernandez, Minerva.

 5    Q.     And what was the date that the loan was applied

 6    for?

 7    A.     April 26th, '06.

 8    Q.     Was there any item that was taken by Value Pawn

 9    in exchange for a loan?

10    A.     Yes.  It was video equipment.  It was a Canon

11    camera, .8-millimeter camcorder, color of gray, and the

12    serial number is 502212024558.

13    Q.     Now, as a result of that camera being pawned at

14    Value Pawn & Jewelry, how much money, if any, was

15    received by the customer?

16    A.     We loaned to Ms. Hernandez $59.

17    Q.     Now, sir, how much time -- does that document

18    reflect what time, if any, the customer had to retrieve

19    the item?

20    A.     We gave a grace of two months, until June 25th,

21    '06.  But the first month due was on May 26th, as under

22    maturity date.

23    Q.     And what was the amount of the payment due?

24    A.     The payment due is 14.75.

25    Q.     And is that $14.75?
```

1    A.    Yes.

2    Q.    Now, directing your attention, sir, to Defense

3    Exhibit 3-B, would you please tell us what is depicted

4    in that document.

5    A.    This document is a copy of the data in the

6    system, telling us the story of this item.

7          When it came into the store on April 26th, we

8    gave $59 for it.  And when it came out of the store on

9    July 24th --

10   Q.    Okay.  And when it came out of the store, how was

11   it that it left the store?

12   A.    It was left under a sale transaction.

13   Q.    And how much was that item sold for?

14   A.    $93.45.

15   Q.    And what payments, if any, were made by the

16   original -- by Ms. Hernandez on -- as it relates to

17   that camera?

18   A.    In this document, it doesn't tell.

19   Q.    Does the document reveal who the camera was sold

20   to?

21   A.    No.

22   Q.    Does the document reveal whether or not

23   Ms. Hernandez ever came back to pick that camera up?

24   A.    No.

25   Q.    Thank you.

```
 1              MS. JHONES:  I have nothing further, your

 2    Honor.

 3              THE COURT:  Mr. Vereen?

 4              MR. VEREEN:  I have no questions, Judge.

 5              THE COURT:  Mr. Houlihan?

 6              MR. HOULIHAN:  No questions.

 7              THE COURT:  Mr. Clark?

 8              MR. CLARK:  No questions, your Honor.

 9              THE COURT:  Mr. Casuso?

10              MR. CASUSO:  No questions, your Honor.

11              THE COURT:  Mr. Levin?

12              MR. LEVIN:  No questions, your Honor.

13              THE COURT:  Mr. Gregorie?

14              MR. GREGORIE:  Yes, your Honor.  Just a

15    couple.

16                      CROSS-EXAMINATION

17    BY MR. GREGORIE:

18    Q.    Very quickly, sir, again, when was that camera

19    brought into your shops?  What do the documents

20    indicate?

21    A.    This loan was made on April 26, '06, at

22    11:22 a.m.

23    Q.    April 26, 2006.  Correct?

24    A.    Yes.

25    Q.    That's some nine days after April 17th, 2006.
```

1    Correct?

2    A.    It should be.

3    Q.    And the name on the document is "Hernandez"?

4    A.    "Hernandez, Minerva."

5    Q.    Do you see the name "Batiste" anywhere on that

6    document?

7    A.    No.

8    Q.    And do you see an address there on that document?

9    A.    Yes.

10   Q.    Can you tell us what that is.

11   A.    14047 Northeast 2nd Avenue, Miami, Florida,

12   33161.

13   Q.    And, sir, that -- and that camera was sold on

14   what date?

15   A.    It was sold on May 26, '06.

16   Q.    May 26th?

17   A.    Oh.  July 24, '06.  Sorry.

18   Q.    July 24th.

19   A.    Uh-huh.

20   Q.    And July, 2006, is after June of 2006.  Correct?

21   A.    Yes.

22   Q.    Thank you, sir.

23          MR. GREGORIE:  Nothing further.

24          THE COURT:  Redirect?

25          MS. JHONES:  Yes.  Just very quickly, your

 1    Honor.

 2                        REDIRECT EXAMINATION

 3    BY MS. JHONES:

 4    Q.     Mr. Egoavil, directing your attention, sir, to

 5    Defense Exhibit 3-A, what is depicted in the bottom

 6    right-hand corner of the document?

 7    A.     That is the finger -- the right thumb fingerprint

 8    from the person who makes the loan.

 9    Q.     What, if any, identification is required by Value

10    Pawn prior to accepting any items?

11    A.     A state ID, driver's license.

12    Q.     Okay.  Thank you.

13                MS. JHONES:  Nothing further, your Honor.

14                THE COURT:  You may step down, sir.

15                (Witness excused.)

16                THE COURT:  Call your next witness.

17                MS. JHONES:  The defense calls Maxwell

18    Batiste.

19                May I check for a moment, your Honor?

20                THE COURT:  Yes.

21                MS. JHONES:  Thank you.

22                MR. GREGORIE:  Your Honor, if we could have a

23    quick side-bar before this witness begins.

24                THE COURT:  Come on up.

25                (Whereupon, proceedings were had at side-bar

1  outside the presence of the jury which have been sealed

2  per instructions of the Court.)

3          (Whereupon, the following proceedings were had

4  in open court:)

5          THE COURT:  This is going to take a few

6  minutes.  So it's coffee time for you.

7          Do not discuss this case either amongst

8  yourselves or with anyone else.  Have no contact

9  whatsoever with anyone associated with the trial.  Do

10 not read, listen or see anything touching on this

11 matter in any way.

12         If anyone should try to talk to you about this

13 case, you should immediately instruct them to stop and

14 report it to my staff.

15         You may leave your materials at your chairs.

16 Please be back in the jury room in 15 minutes.

17         (Whereupon, the jury exited the courtroom at

18 9:53 a.m. and the following proceedings were had:)

19         THE COURT:  You may be seated.

20         You may step outside, sir.  15 minutes.

21         MR. GREGORIE:  Your Honor, I have a copy for

22 counsel and I'm handing it to her, and I have a copy

23 for the Court if you'd like me to hand it up.

24         THE COURT:  Yes.

25         MR. GREGORIE:  I believe, your Honor, Pages 8

```
1   through 11 of the xeroxed copies -- the xeroxed

2   1 through 19, Judge -- if you look at 8 through 11, I

3   believe those are the relevant portions.

4           (Thereupon a recess was taken, after which the

5   following proceedings were had:)

6           THE COURT:  We're back on United States of

7   America versus Narseal Batiste, et al., Case

8   No. 06-20373.

9           Counsel, state your appearances, please, for

10  the record.

11          MR. GREGORIE:  Richard Gregorie and Jacqueline

12  Arango for the United States, your Honor.

13          MS. JHONES:  Ana Maria Jhones on behalf of

14  Narseal Batiste, who is present.

15          MR. LEVIN:  Albert Levin for Patrick Abraham,

16  who's present.

17          MR. CASUSO:  Louie Casuso on behalf of Burson

18  Augustin, who's present.

19          MR. CLARK:  Nathan Clark on behalf of

20  Rotschild Augustine, who's present.

21          MR. HOULIHAN:  Richard Houlihan with Naudimar

22  Herrera.

23          MR. VEREEN:  Roderick Vereen on behalf of

24  Stanley Phanor, who's present.

25          MR. GREGORIE:  Your Honor, if I may, just so
```

1    the record is clear, on April 15th of this year, 2009,

2    Mr. Batiste was on the stand.

3            He was on cross-examination by Mr. Levin, at

4    which time he stated in an answer to a first

5    question -- Mr. Batiste stated on the stand, "I had a

6    brother that was on the airplane during 9/11 and that

7    was a very tragical time for me."

8            And then Mr. Levin asked another question,

9    "And the same thing with celebrating when you heard

10   about 9/11.  You didn't really celebrate, did you, sir?

11           "Answer:  No.  Absolutely not.  Like I said, I

12   had a brother that was in the airplane flying from

13   Puerto Rico to the United States and I was on the phone

14   praying with him that he would make it home safe."

15           That's at Page 137, Line 25, through Page 138,

16   Lines 2 through 8, of the testimony of April 15th,

17   2009, your Honor.

18           And I've referred to the case of *United*

19   *States* -- United States Supreme Court case of *US*

20   *versus* -- I'm sorry -- *Tome* -- T-o-m-e -- *versus United*

21   *States*, which is found at 513 U.S. 150.

22           And, in particular, I'm looking at Page 161,

23   where the Supreme Court indicated that it's difficult

24   to imagine that the drafters of the rule who noted the

25   new substantive use of prior consistent statements

1   would have remained silent if they intended to modify

2   the premotive requirement, that is, the requirement

3   that there be some cross-examination on recent

4   fabrication, your Honor, which there was none here.  We

5   did no cross-examination whatsoever of the statements

6   of 9/11.

7            MS. JHONES:  May I respond, your Honor?

8            THE COURT:  Yes.

9            MS. JHONES:  Your Honor, first of all, I'm not

10   exactly sure -- I am not seeking the introduction of

11   this testimony under 801(d)(1)(B).

12            The notion that the Government can select a

13   theory of admissibility of an out-of-court statement --

14            THE COURT:  What is your theory of

15   admissibility?

16            MS. JHONES:  As it relates to what Mr. Batiste

17   told -- it as it relates to what Mr. Batiste told --

18   what Narseal Batiste told his brother, Maxwell Batiste,

19   the theory of admissibility is present-sense

20   impression.

21            And if the Government -- if I understand what

22   the Government is saying, if the Government wants to

23   stipulate that Narseal Batiste was not being truthful

24   on February 19th of 2006 when he said to Informant

25   No. 2 that he was -- he and his wife were dancing and

1    singing, words to that effect, to 9/11 -- if they want

2    to stipulate that Narseal Batiste was not being

3    truthful and that that is not his true intent, then we

4    certainly have no problem.  I sincerely doubt that

5    that's what the Government is going to do.

6             THE COURT:  What is it that you seek to elicit

7    from this witness exactly?  What do you expect him to

8    testify to?

9             MS. JHONES:  Your Honor, the same thing that

10   was done last time, which is that this gentleman --

11   this witness was on an airplane -- literally on an

12   airplane on September 11th, that when he found out

13   about what had occurred, that he called his brother,

14   Narseal Batiste.

15            He had a conversation with Narseal Batiste and

16   Narseal Batiste -- I asked him -- I wanted to ask him

17   more, but the Court limited what I was able to ask him.

18            And I ask asked him, "What, if anything, did

19   Mr. Batiste say to you?"

20            And he is going to testify that Mr. Batiste

21   was very upset.  He told him he was upset and that he

22   expressed his regret about people having lost their

23   loved ones and family members on September 11th.

24            Now, this is circumstantial evidence, your

25   Honor, of Narseal Batiste's true feelings about 9/11,

1    true feelings about buildings coming down.  This is

2    circumstantial evidence of that.

3            And, again, the notion -- if the Government

4    wants to stipulate that Narseal Batiste was not being

5    truthful on February 19th, then that's fine.

6            But I am not seeking the admissibility of

7    these statements under 801(d)(1)(B).  And, as such, I

8    believe that their reliance on *Tome* is completely

9    misplaced.

10           I have not sought to introduce these

11   statements under that -- under 801(d)(1)(B).

12           MR. GREGORIE:  Your Honor, using it for the

13   purpose she has stated would then seek to be bolstering

14   her client's testimony.

15           Secondly, your Honor, a statement made on

16   September 11th, 2001, would be irrelevant to what he

17   said in conversations some four or five years later, in

18   2005 or -- this was February 19th, 2006.  So it would

19   be five years later, your Honor.

20           And especially the statements on this

21   particular call, as the witness has stated on the

22   stand -- Mr. Batiste took the stand and said, "I prayed

23   with my brother that he would get there safe."  That's

24   his description of the testimony.

25           Now they're seeking to put in to bolster that

1    testimony, Judge, some statement from a witness who

2    was on an airplane in 2001, which would be totally

3    irrelevant, your Honor, about his arrival safely in the

4    United States, your Honor.

5              The statement is irrelevant, one.  Two, your

6    Honor, it's being sought to be used to bolster.  The

7    testimony has come out through Mr. Batiste.  It's

8    hearsay through this particular witness, your Honor.

9              And as far as it going to the state of mind of

10   Mr. Batiste, your Honor, I'm not sure that it can be

11   stated that this testimony does do that.

12             MS. JHONES:  Your Honor, I am not seeking -- I

13   think the Government -- the Court, I should say, would

14   recall how many times the Government blatantly elicited

15   questions of their witnesses, specifically their case

16   agents, in terms of corroboration.

17             This witness will corroborate Narseal

18   Batiste's true intent as it relates to true intent and

19   true feelings as it relates to --

20             THE COURT:  Well, it can't be true intent

21   because it's in 2001.  It couldn't corroborate his

22   intent in 2005 and 2006.

23             MS. JHONES:  Your Honor, as it relates to the

24   event of September 11th, specifically -- the specific

25   testimony that's been offered by the Government is

1    the conversation -- Mr. Batiste's statements on

2    February 19th, 2006, relating to Mr. Batiste's feelings

3    regarding September 11th.

4           And whether or not -- if the Government wants

5    to make the argument that what Mr. Batiste said in 2006

6    regarding September 11, 2001, was different, his

7    feelings were different then, in 2006, from what they

8    were in 2001, they can make that argument.  That goes

9    to the weight of the testimony, not the admissibility.

10   That's argument.  That's argument.

11          The fact remains that, on February 19th, 2006,

12   Mr. Batiste said he was dancing -- he and his wife were

13   dancing and singing on September 11th when, in truth

14   and in fact, Mr. Batiste had a conversation with this

15   witness to express the absolute opposite -- the

16   absolutely opposite feelings.

17          That is -- that is strong circumstantial

18   evidence of Mr. Batiste's true intent.  And,

19   furthermore, it is crucial testimony as it relates to

20   the theory of defense that Mr. Batiste, when he was

21   talking to the informants, was feeding them a bunch of

22   hogwash that he really did not mean.  This is crucial

23   to Mr. Batiste's theory of admissibility.

24          And the thought that just because one witness

25   is going to be able to corroborate that, that it's

 1    bolstering -- I've never heard of such a thing, quite

 2    frankly.

 3          MR. GREGORIE:  Your Honor, the question in the

 4    last trial which was asked of this witness is, "What,

 5    if anything, did he say" -- meaning Mr. Maxwell

 6    Batiste -- "talking on the telephone to his brother?"

 7          And the answer he gave:  "He was very upset."

 8          First of all, that's speculation, your Honor.

 9    He can't tell on the telephone whether his brother is

10    laughing, crying, what he's doing.  That would be pure

11    speculation.

12          And, secondly, he says -- he said, "People

13    lost their loved ones, their family members."

14          That was the total amount of testimony that

15    was allowed to come in through this witness last time,

16    your Honor.

17          That does not go to this man's state of mind.

18    He wasn't present with him.  He was talking to him on

19    the telephone.  And according to his own testimony, he

20    was praying with him that his brother would arrive

21    safely on a flight on that day, Judge.

22          It certainly is not a present-sense

23    impression, your Honor, because he's not there at the

24    time the planes are crashing into the buildings in

25    New York.

1          It's an attempt to back-door a statement by

2     his brother that he was upset.  It's not relevant, your

3     Honor, to a statement made in 2006, in February, your

4     Honor, some five years later or four and a half years

5     later.

6          MS. JHONES:  I guess Mr. Gregorie is stating

7     that, in order to have been upset about 9/11, you had

8     to be in Ground Zero in New York.  No one else in this

9     country was upset while we were watching the TV

10    monitors on September 11th.  That is absolutely

11    ludicrous.

12         THE COURT:  I don't -- okay.

13         MR. GREGORIE:  I won't even answer that,

14    Judge.  I'll leave that.

15         MS. JHONES:  And, your Honor, again, if the

16    Government wants to stipulate that Mr. Batiste was not

17    expressing his true intent on February --

18         THE COURT:  Do you want to stipulate to that?

19         MR. GREGORIE:  No, your Honor.

20         THE COURT:  So you don't need to bring that up

21    anymore.  Okay?

22         Relating to what Mr. Gregorie -- let me just

23    check something.

24         The proffer that you gave, Ms. Jhones, is

25    different --

1          Can I see the transcript, please?

2          MR. GREGORIE:  Yes, your Honor.

3          THE COURT:  The proffer that you gave is

4     different from what Mr. Gregorie gave.  I'd like to see

5     what the transcript was for the prior testimony.

6          Do you have that?

7          MR. GREGORIE:  You're talking about the

8     transcript of Mr. Batiste's testimony, your Honor?

9          THE COURT:  No.

10          MR. GREGORIE:  Oh.  The proffer from the last

11     trial?

12          THE COURT:  Yes.

13          MR. GREGORIE:  Yes.  I have it right here,

14     your Honor.

15          (Tenders document to the Court.)

16          MS. JHONES:  Your Honor, I would like to bring

17     something else to the Court's attention when it's

18     appropriate.

19          THE COURT:  Yes.

20          MS. JHONES:  The Government has told this

21     Court that they did not cross-examine Mr. Batiste on

22     the issue of September 11th.

23          On April 17th of 2009, last Friday, I believe,

24     that was, at Page 50 of the transcript, Ms. Arango made

25     the following -- posed the following questions to

1    Mr. Batiste:

2         "You also said that you weren't returning

3    Mohammed's calls, that you were constantly avoiding him

4    and he wouldn't stop bothering you.

5         "That's correct.

6         "Now, you also told this jury about all the

7    horrible, awful things that you said to Brother

8    Mohammed about your intentions.  Correct?

9         "Yes, ma'am.  As far as the words go and the

10   role that I was playing with Brother Mohammed, yes.

11        "You talked about blowing up --

12        THE COURT:  You've got to say "question" and

13   "answer."

14        MS. JHONES:  I'm sorry.

15        THE COURT:  Otherwise, she's not going to be

16   able to set it out in the record properly.

17        MS. JHONES:  Okay.  Would you like me to start

18   again, your Honor?

19        THE COURT:  Yes, please.

20        MS. JHONES:  "Question:  You also said that

21   you weren't returning Mohammed's calls, that you were

22   constantly avoiding him and he wouldn't stop bothering

23   you.

24        "Answer:  That's correct.

25        "Question:  Now, you also told this jury about

1    all of the horrible, awful things that you said to

2    Brother Mohammed about your intentions.  Correct?

3         "Answer:  Yes, ma'am.  As far as the words go

4    and the role that I was playing with Mohammed, yes.

5         "Question:  You talked about blowing up

6    buildings.  You expressed your joy when the towers came

7    down on September 11th.  And you were greatly

8    embarrassed about these awful conversations that you

9    had with Brother Mohammed?

10        "That's true, because they do not reflect my

11   true intentions."

12        That's the answer.

13        "Question:  And what you told this jury was

14   you said all those awful things, hours and hours of

15   recordings -- you said all those awful things because

16   you wanted money?

17        "Answer:  Yes, ma'am.  I wanted to convince

18   Mohammed what Abbas had told me that I needed to do in

19   order to get the money.

20        "Question:  So you were willing to say

21   these -- those terrible things, but you weren't willing

22   to return their -- the phone calls.  Is that what

23   you're telling this jury?

24        "Answer:  Yes, ma'am.  I wasn't willing to

25   return the phone calls because I was not -- at that

```
 1   particular time, I was not really counting on them."
 2           And it goes on.
 3           Clearly, they did cross-examine Mr. Batiste on
 4   September 11th.  Clearly, the implication is that he
 5   wasn't playing a role, that those were his true
 6   intentions.
 7           MR. GREGORIE:  The point of those questions,
 8   your Honor, are the inconsistency in his testimony.
 9   He's saying he's not willing to call the man and, yet,
10   he's willing to say these terrible things.
11           That has nothing to do with making an
12   allegation of recent fabrication of what he said, your
13   Honor.  That's not cross-examination on that issue.
14           THE COURT:  If counsel for the Defendant is
15   arguing that this now comes under the prior consistent
16   statements rule, I find that the cross-examination, as
17   cited by counsel for the Defendant, is not recent
18   fabrication or improper influence or motive.
19           MS. JHONES:  I'm not saying that, your Honor.
20           THE COURT:  Okay.
21           MS. JHONES:  I'm not saying that.  I cited
22   that for purposes of the relevancy of this person -- of
23   this witness's testimony.
24           It's the Government that's brought up the
25   issue of 801(d)(1)(B).  I'm not citing that rule at
```

```
 1    all.  They're the ones that invoked it.
 2            THE COURT:  So what was the purpose of
 3    bringing up the cross-examination?
 4            MS. JHONES:  They were saying that they never
 5    even questioned him about it and that --
 6            THE COURT:  Okay.  I will allow the testimony
 7    of the witness under 803(3) as it relates to -- he said
 8    people lost their loved ones, their family members --
 9    as a statement of the declarant's then-existing state
10    of mind, emotion and sensation -- a state of mind or
11    emotion.
12            However, the statement that he was very upset
13    is not a statement under 803(3), as this is the
14    witness's -- the way he testified, he was very upset,
15    is -- does not come under 803(3).
16            MS. JHONES:  Your Honor, may I be heard?
17            First of all, this witness is competent to
18    give his opinion as to how Mr. Batiste felt.  This is
19    his brother.  He's familiar with his demeanor.  He's
20    familiar with his voice.
21            THE COURT:  Well, if you're going to let me
22    finish, Ms. Jhones --
23            MS. JHONES:  Okay.
24            THE COURT:  -- if you can lay a predicate as
25    to his being -- that he was able to determine that, by
```

```
 1    the sound of his voice, he was upset or -- you may lay

 2    a predicate.

 3           But just his statement that he was very upset

 4    I find is not admissible.

 5           But if you can lay a predicate, it may be

 6    admissible.

 7           Would you give this back to Mr. Gregorie,

 8    please.

 9           THE COURT SECURITY OFFICER:  (Complies.)

10           THE COURT:  Let's bring the jurors back in.

11           (Whereupon, the jury entered the courtroom at

12    10:39 a.m. and the following proceedings were had:)

13           THE COURT:  You may be seated.

14           You are still under oath, sir.

15           Was he sworn in?

16           THE COURT REPORTER:  I don't believe so.

17           THE COURT:  Okay.  Swear him in.  I'm sorry.

18    Thereupon--

19                    MAXWELL BATISTE

20    was called as a witness by the Defendant and, having

21    been first duly sworn, testified as follows:

22           THE COURT REPORTER:  Thank you.

23           Please have a seat and spell your full name

24    for the record.

25           THE WITNESS:  Maxwell Batiste.
```

```
 1              THE COURT:  You need to sit close to the
 2     microphone, sir.
 3              THE WITNESS:  Okay.
 4              Maxwell Batiste.
 5              MS. JHONES:  May I proceed, your Honor?
 6              THE COURT:  Yes.
 7              MS. JHONES:  Thank you.
 8                      DIRECT EXAMINATION
 9     BY MS. JHONES:
10     Q.    Mr. Batiste, where do you reside?
11     A.    In Chicago, Illinois.
12     Q.    And what, if anything, do you do for a living?
13     A.    I do property management and construction
14     management.
15     Q.    And, sir, do you know Narseal Batiste?
16     A.    Yes.  That's my baby brother.
17     Q.    Directing your attention, sir, to the tragic
18     events of 9/11, where were you when that occurred, sir?
19     A.    I was flying from Miami to Chicago.
20     Q.    And, sir, did there come a time when you found
21     out, as you were flying from Miami to Chicago, that
22     something had occurred?
23     A.    I think just before we landed, the captain got on
24     and it showed on the screen that two planes had hit the
25     Twin Towers.
```

```
 1   Q.     And when -- what, if anything, sir -- after you
 2   found that out, what, if anything, did you do?
 3   A.     I called my brother, Narseal.
 4   Q.     Was there any particular reason why you called
 5   him?
 6   A.     Yeah.  I was in shock.  I was traumatized about
 7   it.
 8   Q.     Were you able to speak to your brother, Narseal?
 9   A.     Yes, I was.
10   Q.     And when -- do you know where your Brother
11   Narseal -- where he was when you called him?
12   A.     He was in Louisiana.
13   Q.     And, sir, what did you say to him?
14   A.     I asked him did he see what happened in New York.
15          He said, "Yes."
16   Q.     Now, sir, are you familiar with -- with Narseal's
17   voice?
18   A.     Yes.
19   Q.     Are you familiar with Mr. Batiste's tone of voice
20   and -- depending on his mood at the time that you --
21   that he is speaking?
22   A.     Yes.
23   Q.     And how is it that you are familiar with that,
24   sir?
25   A.     Well, I spent most of my time with Narseal,
```

```
 1   growing up.
 2   Q.    And -- okay, sir.
 3         What, if any, concerns, sir, did Mr. Batiste
 4   express to you regarding the events of September 11th?
 5         MR. GREGORIE:  Objection to the form of the
 6   question, your Honor.
 7         THE COURT:  Sustained.
 8         Rephrase your question.
 9         MS. JHONES:  I'll rephrase it.
10   BY MS. JHONES:
11   Q.    What, if anything, did Mr. Batiste -- did Narseal
12   tell you when you spoke to him on 9/11?
13   A.    He was quite upset, you know.  People lost their
14   lives on that day, you know, family members.  It was a
15   tragedy, you know.
16   Q.    What, if any, joy did Mr. Batiste express on that
17   day, sir?
18   A.    There's no joy in --
19         MR. GREGORIE:  Objection to the form of the
20   question, your Honor.
21         THE COURT:  Sustained.
22         Rephrase your question.
23         MS. JHONES:  Okay.
24   BY MS. JHONES:
25   Q.    What was your brother's demeanor, based on your
```

```
 1   conversation with him as -- regarding the events of

 2   September 11th?

 3           MR. GREGORIE:  Objection.  Asked and answered,

 4   your Honor.

 5           MS. JHONES:  I asked him what he said, not

 6   what his demeanor was.

 7           THE COURT:  Overruled.

 8           THE WITNESS:  Like I said, he was very sad for

 9   the victims.  The normal feelings when people suffer a

10   loss.

11   BY MS. JHONES:

12   Q.    And how long did you speak to Mr. Batiste over --

13   to Narseal over the phone, Mr. Batiste?

14   A.    I would only be guesstimating, it's so long ago.

15   Q.    Okay.

16           MS. JHONES:  I have nothing further, your

17   Honor.

18           THE COURT:  Mr. Vereen?

19           MR. VEREEN:  I have no questions, Judge.

20           THE COURT:  Mr. Houlihan?

21           MR. HOULIHAN:  No questions.

22           THE COURT:  Mr. Clark?

23           MR. CLARK:  No questions, your Honor.

24           THE COURT:  Mr. Casuso?

25           MR. CASUSO:  No questions, your Honor.
```

```
 1            THE COURT:  Mr. Levin?

 2            MR. LEVIN:  No questions, your Honor.

 3            THE COURT:  Mr. Gregorie?

 4            MR. GREGORIE:  No questions, your Honor.

 5            THE COURT:  You may step down, sir.

 6            (Witness excused.)

 7            MS. JHONES:  Thank you, your Honor.

 8            THE COURT:  Call your next witness.

 9            MS. JHONES:  The defense calls Mary Ramos.

10   Thereupon--

11                    MARY RAMOS-VALIK

12   was called as a witness by the Defendant and, having

13   been first duly sworn, testified as follows:

14            THE COURT REPORTER:  Thank you.

15            Please have a seat.  State your full name and

16   spell the last name for the record.

17            THE WITNESS:  My name is Mary Ramos-Valik.

18   Last name is spelled R-a-m-o-s, dash, V-a-l-i-k.

19                   DIRECT EXAMINATION

20   BY MS. JHONES:

21   Q.    Ms. Ramos-Valik, good morning.

22   A.    Good morning.

23   Q.    Where do you reside, ma'am?

24   A.    I reside in Tamarac, Florida.

25   Q.    And how long have you lived there?
```

```
 1   A.      Approximately two years.

 2   Q.      And prior to that, ma'am, where did you live?

 3   A.      Prior to that, I lived in Pembroke Pines, in

 4   South Florida, basically.

 5   Q.      And how long have you lived in South Florida?

 6   A.      14 years.

 7   Q.      All righty.  And what is your marital status?

 8   A.      I'm currently married.

 9   Q.      And do you have any children?

10   A.      Yes, I do.

11   Q.      How many children do you have?

12   A.      I have three children.

13   Q.      And do you know Narseal Batiste?

14   A.      Yes, I do.

15   Q.      And do you see him in the courtroom?

16   A.      Yes, I do.

17   Q.      And would you please identify him.

18   A.      He's standing right over there.

19   Q.      How do you know him?

20   A.      That's my cousin.

21   Q.      And how is it -- just give us briefly -- what

22   side of the family is Narseal -- does Narseal come to

23   be -- become your cousin?

24   A.      On my mother's side.

25   Q.      And your mother's name is?
```

1    A.     My mother is Margie Batiste.

2    Q.     Okay.

3    A.     Her maiden name was Batiste.

4    Q.     And, Ms. Ramos-Valik, where -- have you ever

5    lived in Louisiana?

6    A.     Yes, I have.

7    Q.     How long did you live in Louisiana?

8    A.     Oh, goodness.  From -- I was born there.  I was

9    born in Marksville and I was raised there from zero to

10   18 years of age.

11   Q.     During the time period that you lived in

12   Marksville, Louisiana, was Narseal Batiste living in

13   Marksville?

14   A.     Yes, he was.

15   Q.     Now, how often do you visit -- do you visit

16   Marksville, Louisiana, since you left?

17   A.     Absolutely.  Yes.

18   Q.     How often would that be?

19   A.     Once a year.  And on some good years, I've gone

20   two or three times.

21   Q.     All righty.  Now, directing your attention --

22   strike that.

23          Do you know Narcisse Batiste?

24   A.     Yes, I do.

25   Q.     And who is that?

1    A.    That's Narseal's father and, also, my uncle, my

2    mother's brother.

3    Q.    Are you familiar with Alvin Ford Lane?

4    A.    Yes, I am.

5    Q.    Do you know it by any other name?

6    A.    I used to call it "The Lane" as a kid, growing

7    up.

8    Q.    Now, in terms of "The Lane," Ms. Ramos-Valik, are

9    you familiar with the distance from -- are you familiar

10   with Narcisse Batiste's, your uncle's, property?

11   A.    Yes, I am.

12   Q.    And do you have any knowledge as to where that

13   property is located?

14   A.    Yes, I do.

15   Q.    And where is that located?

16   A.    It's just located on the outskirts of the city,

17   directly up Alvin Ford Lane and right next door to my

18   old grandmother's house, where I used to go all the

19   time.

20   Q.    How many family members, if any, reside in -- on

21   or about "The Lane" in -- on or about "The Lane," as

22   you call it, in Marksville?

23   A.    The majority --

24         MR. GREGORIE:  Objection, your Honor.  Time

25   period?

Ramos-Valik - DIRECT - By Ms. Jhones                    51

```
 1              MS. JHONES:  Oh.
 2              THE COURT:  Place it in time.
 3              MS. JHONES:  Sure.
 4    BY MS. JHONES:
 5    Q.    2005-2006.
 6    A.    Generally, the family that is still there, the
 7    majority of them stay either down that lane or just
 8    along the main strip there, which is Route 1.  So I
 9    would say more than 50 percent of the family probably
10    still resides in that area.
11    Q.    Now, a couple of questions about -- I believe --
12    what is the main road that "The Lane" -- that "The
13    Lane" falls into?  In other words, how -- what is the
14    main road that you access when you leave "The Lane"?
15    A.    Route 1.
16    Q.    And what is the approximate distance between "The
17    Lane" and Downtown Marksville?
18              MR. GREGORIE:  Objection, your Honor.
19    Relevance.
20              THE WITNESS:  I would say about --
21              THE COURT:  Wait a minute, ma'am.
22              THE WITNESS:  Oh, I'm sorry.
23              MR. GREGORIE:  Objection, your Honor.
24    Relevance.
25              THE COURT:  If there's an objection, you have
```

 1    to wait until I've ruled on it.

 2            Sustained.

 3    BY MS. JHONES:

 4    Q.    Are you familiar with -- are you familiar with,

 5    Ms. Ramos-Valik, the tourist attractions that exist as

 6    of 2005-2006 in Marksville, Louisiana?

 7            MR. GREGORIE:  Objection, your Honor.

 8            THE WITNESS:  Yes.

 9            MR. GREGORIE:  Relevance.

10            MS. JHONES:  Your Honor --

11            THE COURT:  Come on up.

12            MS. JHONES:  Okay.

13            (Whereupon, proceedings were had at side-bar

14    outside the presence of the jury which have been sealed

15    per instructions of the Court.)

16            (Whereupon, the following proceedings were had

17    in open court:)

18            MS. JHONES:  Lisa, would you please read back

19    the last question so I could --

20            THE COURT:  Well, there was an objection to

21    the last question and she answered it.

22            MS. JHONES:  I understand.

23            THE COURT:  And I'm sustaining it.  So the

24    answer is stricken.

25            MS. JHONES:  No.  I understand, your Honor.  I

```
 1   just wanted to -- a point of reference to move on.

 2           THE COURT:  Okay.  You can read back the

 3   question, but not the answer, please, Lisa.

 4           THE COURT REPORTER:  Yes, Judge.

 5           THE COURT:  The question is sustained.

 6           Well, just go on, please.  I'm not going to

 7   have the question read back.  Just go on.

 8           MS. JHONES:  Okay.

 9   BY MS. JHONES:

10   Q.    Ms. Ramos-Valik, in order to -- what road, if

11   any, has to be taken in order to leave Ford Alvin Lane

12   (verbatim)?

13   A.     Route 1.

14   Q.     And Route 1, Ms. Ramos-Valik, connects what --

15   what -- if you go west on Route 1, what major city

16   would you -- what major city would you come into

17   contact with?

18   A.     Alexandria, Louisiana.

19   Q.     And east of "The Lane" on Highway 1, what city

20   would you come into contact with in that direction?

21   A.     Downtown Marksville.

22   Q.     Now, directing your attention to -- directing

23   your attention to 2001, did there come a time when you

24   visited -- you received a visit from Narseal and his

25   family?
```

```
 1    A.      Yes.

 2    Q.      And where were you residing in 2001?

 3    A.      I lived on Hollywood Beach, on the ocean.

 4    Q.      And do you recall when it was that you

 5    received -- that the family visited you?

 6              MR. GREGORIE:  Objection, your Honor.

 7              THE WITNESS:  Yes.  It was my --

 8              MR. GREGORIE:  Objection, your Honor.  2001?

 9              MS. JHONES:  Yes.

10              THE COURT:  Sustained.

11              MR. GREGORIE:  Objection.  Relevance.

12              THE COURT:  Sustained.

13              MS. JHONES:  Okay.

14    BY MS. JHONES:

15    Q.      Did there come a time when Narseal and his family

16    moved to Florida?

17    A.      Yes.

18    Q.      And when was that, ma'am?

19    A.      It would have been 2002, about the fall, early --

20    I'd say late summer, early fall.

21    Q.      And do you know how it was that they came to live

22    in Florida?

23              MR. GREGORIE:  Objection, your Honor.  Calls

24    for hearsay.

25              MS. JHONES:  If she knows.
```

```
 1              THE COURT:  Sustained.
 2   BY MS. JHONES:
 3   Q.    Without telling us what anybody told you, what,
 4   if any -- what, if any, suggestions did you make to
 5   Narseal as it relates to living in Florida?
 6              MR. GREGORIE:  Objection, your Honor.
 7   Relevance.
 8              MS. JHONES:  Your Honor, I could proffer the
 9   relevance.
10              THE COURT:  It's hearsay.
11              Sustained.
12              MS. JHONES:  I have to reserve on that issue,
13   your Honor, respectfully.
14              THE COURT:  Okay.
15   BY MS. JHONES:
16   Q.    Ms. Ramos-Valik, have you ever known Narseal to
17   engage in any acts of violence?
18   A.    Absolutely not.
19   Q.    Have you ever known Narseal to advocate the use
20   of violence?
21   A.    Absolutely not.
22   Q.    Have you ever known his wife to advocate any
23   violence?
24              MR. GREGORIE:  Objection, your Honor.
25              THE WITNESS:  Absolutely not.
```

1          MR. GREGORIE:  Objection, your Honor.

2          THE COURT:  Sustained.

3          Ma'am, if there's an objection, you have to

4    wait until I've ruled on it.

5          THE WITNESS:  I'm sorry, your Honor.  I'm a

6    little bit nervous.  I'm answering them as quick as

7    they come.

8          THE COURT:  Just wait.  Okay?

9          THE WITNESS:  Okay.

10   BY MS. JHONES:

11   Q.    Now, have you ever known Narseal to advocate or

12   to harbor any ill will towards the United States

13   Government?

14   A.    Absolutely not.

15   Q.    Okay.  Have you ever known Narseal to own any

16   firearms?

17   A.    Never.

18   Q.    Any weapons of any sort?

19   A.    Never.

20         MS. JHONES:  I have nothing further, your

21   Honor.

22         THE COURT:  Mr. Vereen?

23         MR. VEREEN:  I have no questions, Judge.

24         THE COURT:  Mr. Houlihan?

25         MR. HOULIHAN:  No questions.

Ramos-Valik - CROSS - By Mr. Gregorie                   57

```
 1                  THE COURT:  Mr. Clark?

 2                  MR. CLARK:  No questions, your Honor.

 3                  THE COURT:  Mr. Casuso?

 4                  MR. CASUSO:  No questions, your Honor.

 5                  THE COURT:  Mr. Levin?

 6                  MR. LEVIN:  No questions, your Honor.

 7                  THE COURT:  Mr. Gregorie?

 8                       CROSS-EXAMINATION

 9    BY MR. GREGORIE:

10    Q.    Ma'am, are you familiar with an organization

11    called the Universal Divine Saviors?

12    A.    No, I am not.

13    Q.    Do you know a man by the name of Sultan Kahn-Bey?

14    A.    I have heard the name before.

15    Q.    Have you ever met him?

16    A.    No, I have not.

17    Q.    Are you familiar with the Moorish Science Temple?

18    A.    Yes, I am.

19    Q.    Are you a member?

20    A.    No, I am not.

21    Q.    Were you ever a member?

22    A.    No, I am not.  Never.

23                  MR. GREGORIE:  Nothing further, your Honor.

24                  THE COURT:  Redirect?

25                  MS. JHONES:  Just briefly.
```

```
 1                    REDIRECT EXAMINATION

 2   BY MS. JHONES:

 3   Q.    Ms. Ramos-Valik, do you know a gentleman by the

 4   name of Master Athea?

 5   A.    Yes, I have.

 6             MS. JHONES:  Nothing further.

 7             THE COURT:  You may step down, ma'am.

 8             (Witness excused.)

 9             THE WITNESS:  Thank you.

10             MS. JHONES:  Thank you, Ms. Ramos-Valik.

11             THE COURT:  Call your next witness.

12             MS. JHONES:  The Defendant rests, your Honor.

13             THE COURT:  Mr. Levin?

14             MR. LEVIN:  Yes, your Honor.

15             Your Honor, I have a stipulation with the

16   Government with regard to certain photographs.  I'll

17   just review that very briefly with Mr. Gregorie now.

18             THE COURT:  Okay.

19             (Discussion had off the record amongst

20   counsel.)

21             MR. LEVIN:  Your Honor, I'll read the

22   stipulation and then I'll need the ELMO.

23             THE COURT:  Okay.

24             MR. LEVIN:  Your Honor, the parties hereby

25   agree that the introduction of Patrick Abraham's
```

```
 1   Exhibits 5-A through -D, composite --

 2            THE COURT:  You have a 5 already.

 3            MR. LEVIN:  Well, according to my list, this

 4   would be 5-A through -D.  If I have a 5, I'll make it a

 5   6.

 6            THE COURT:  Okay.

 7            MR. LEVIN:  6-A through -D.

 8            In any event, the parties hereby agree that

 9   Patrick Abraham's Exhibits 6-A through -D are

10   photographs pertaining to the testimony previously by

11   Randy Denike, who testified a couple of weeks ago in

12   this proceeding, with regard to a project in Wilton

13   Manors as well as his stepdaughter's home.

14            Permission to publish the photographs, your

15   Honor?

16            THE COURT:  You need to move them into

17   evidence first.

18            MR. LEVIN:  Your Honor, at this time I would

19   move Patrick Abraham's Exhibits 6-A through -D into

20   evidence.

21            THE COURT:  They will be admitted as Defendant

22   Abraham's Exhibits 6-A through -D.

23            (Whereupon, Defendant Abraham's Exhibit

24   Nos. 6-A through 6-D were entered into evidence.)

25            THE COURT:  You may publish.
```

1          MR. LEVIN:  Thank you.

2          THE COURT:  Can you all approach for one

3     moment, please.

4          (Whereupon, proceedings were had at side-bar

5     outside the presence of the jury which have been sealed

6     per instructions of the Court.)

7          (Whereupon, the following proceedings were had

8     in open court:)

9          THE COURT:  Go ahead.

10         MR. LEVIN:  Pursuant to the stipulation, may I

11    publish at this time, your Honor?

12         THE COURT:  You why.

13         MR. LEVIN:  Thank you.

14         (Whereupon, several of Defendant Abraham's

15    Exhibits 6-A through 6-D were published in open court.)

16         MR. GREGORIE:  Your Honor, could Mr. Levin

17    announce which ones he's putting up?

18         MR. LEVIN:  Yes.  This is 6-B.

19         This would be 6-C.

20         This is 6-D.

21         And the first one was 6-A.

22         MR. GREGORIE:  Thank you.

23         MR. LEVIN:  Thank you.

24         At this time, your Honor, Patrick Abraham

25    would rest his defense.  Thank you.

1          THE COURT:  Ladies and gentlemen, if you

2   would, step into the jury room for a moment.  Do not

3   discuss this case either amongst yourselves or with

4   anybody else.

5          It will just be about two or three minutes.

6          (Whereupon, the jury exited the courtroom at

7   11:13 a.m. and the following proceedings were had:)

8          THE COURT:  You may be seated.

9          I want to proceed with the colloquy of

10  Mr. Abraham.

11         Place him under oath, please.

12         (Whereupon, the Defendant was duly sworn.)

13         THE COURT:  Can you point the microphone

14  towards you, sir, and make sure it's on.

15         Would you state your name for the record.

16         DEFENDANT ABRAHAM:  Patrick Abraham.

17         THE COURT:  Mr. Abraham, do you understand

18  that, under the United States Constitution -- the Fifth

19  Amendment to the United States Constitution, you cannot

20  be compelled to take the stand and testify?

21         DEFENDANT ABRAHAM:  Yes, ma'am.  I do.

22         THE COURT:  And do you understand that you may

23  also waive your rights under the Fifth Amendment to the

24  United States Constitution and take the stand and

25  testify, if you wish to do so?

1        DEFENDANT ABRAHAM:  I do.

2        THE COURT:  Have you fully discussed your

3    Fifth Amendment rights with your attorney?

4        DEFENDANT ABRAHAM:  I have.

5        THE COURT:  Are you satisfied with his

6    services?

7        DEFENDANT ABRAHAM:  That would be a question

8    that I would be most comfortable to answer after the

9    closing argument.  But if I have to answer that, I

10   would say "yes."

11       THE COURT:  Well, do you have a problem with

12   his services, sir?

13       DEFENDANT ABRAHAM:  I don't.  But the case --

14   this is not concluded yet.  So I think --

15       THE COURT:  I know the case hasn't concluded

16   and you don't know what the result is.

17       But do you have any problems with his

18   representation of you thus far?

19       DEFENDANT ABRAHAM:  So far, no.

20       THE COURT:  Are you satisfied with his

21   preparation of a defense case for you and defending you

22   in this case?

23       DEFENDANT ABRAHAM:  Most definitely.

24       THE COURT:  Do you wish to waive your Fifth

25   Amendment right and take the stand and testify or not

1   waive your Fifth Amendment right and not take the stand

2   and not testify?

3          DEFENDANT ABRAHAM:  At this moment, I do not.

4          THE COURT:  You do not....

5          DEFENDANT ABRAHAM:  I do not wish to waive.

6          THE COURT:  You don't wish to waive?

7          DEFENDANT ABRAHAM:  No, ma'am.

8          THE COURT:  Any questions, Mr. Levin?

9          MR. LEVIN:  No, your Honor.

10         THE COURT:  Mr. Gregorie?

11         MR. GREGORIE:  Your Honor, I just -- to make

12  it clear that this Defendant does not wish to testify.

13  I understand he says he does not wish to waive his

14  Fifth Amendment.  I want to make sure he does not wish

15  to testify.

16         THE COURT:  You don't wish to testify.  Is

17  that what you're saying, sir?

18         DEFENDANT ABRAHAM:  Yes, ma'am.

19         THE COURT:  I'm not trying to put words in

20  your mouth.  I just want to make sure it's clear for

21  the record.

22         DEFENDANT ABRAHAM:  No.  I do not wish to

23  testify.

24         THE COURT:  You can bring the jury.

25         Are you ready to proceed?

```
 1              MR. GREGORIE:  Yes, your Honor.

 2              (Whereupon, the jury entered the courtroom at

 3    11:16 a.m. and the following proceedings were had:)

 4              MS. JHONES:  Your Honor, may we have a

 5    side-bar?  I don't know if the Court is going to go

 6    directly into the rebuttal.

 7              THE COURT:  I am.

 8              MS. JHONES:  Okay.  I need to bring something

 9    up.  I apologize.

10              THE COURT:  Come on up.

11              (Whereupon, proceedings were had at side-bar

12    outside the presence of the jury which have been sealed

13    per instructions of the Court.)

14              (Whereupon, the following proceedings were had

15    in open court:)

16              MR. LEVIN:  Your Honor, while Ms. Jhones is

17    looking for that, that issue with regard to the

18    licensing and taking judicial notice, frankly, I'm a

19    little unclear whether it was something I needed to do

20    before I rested or in the -- or whether the Court can

21    take judicial notice of the statute prior to the charge

22    conference.

23              THE COURT:  What's Government's position?

24              MR. GREGORIE:  I just want to see the statute,

25    your Honor.
```

1          THE COURT:  I don't think it's going to be a

2   problem, even if you need to reopen your case for

3   purposes of the Court taking judicial notice of that.

4   But Mr. Gregorie has asked to see the statute.

5          MR. GREGORIE:  I just want --

6          THE COURT:  And I'm going to need to see it as

7   well.

8          Please tell them it's going to be another five

9   minutes.

10         THE COURT SECURITY OFFICER:  Yes, your Honor.

11         THE COURT:  I have it up on the computer.

12  I'll try and help you find the area.  If you give me a

13  search word, I can bring it up in the transcript.

14         MR. CLARK:  "Illuminati."

15         THE COURT:  I don't know if "Illuminati" is

16  going to be --

17         MS. JHONES:  Your Honor, I believe it's going

18  to be in the transcript of April 15th.  We do not have

19  an index, but the Court --

20         THE COURT:  April 15th?

21         MS. JHONES:  April 15th.

22         THE COURT:  I thought you said Friday.  It

23  wasn't Friday?

24         MS. JHONES:  I don't think it's Friday.

25         THE COURT:  Okay.  It's the 15th?

1          No.

2          Do you have a search word?

3          MS. ARANGO:  "Illuminati."  We found the

4     conversation.  It begins at Page 182, Line 25, and goes

5     on for a couple of pages.

6          MR. GREGORIE:  Your Honor, I think this covers

7     his whole testimony, your Honor, his attitude towards

8     what his position was with regards to those who were in

9     his group.

10          His position was that he merely made

11     suggestions to them, he didn't control the group, that

12     they could do or not do whatever they wanted.

13          I think this goes to the entire testimony, not

14     just the one piece, your Honor.

15          THE COURT:  May I see the transcript again,

16     the transcript of the call?

17          MR. GREGORIE:  I'm sorry, your Honor.  It's

18     right here.

19          (Tenders document to the Court.)

20          THE COURT:  Thank you.

21          Anything further from the defense?

22          MS. JHONES:  Your Honor, Mr. Batiste's

23     position is that this is improper rebuttal.

24          I think that the Government could have

25     appropriately introduced this transcript during

1    Mr. Batiste's cross-examination and inquired of him.

2          But the transcript, as the Court has

3    repeatedly stated -- the Government has stated

4    Mr. Batiste on -- I'm sorry.  Let me start over.

5          In Mr. Batiste's cross-examination by

6    Ms. Arango, he admitted to watching the movies,

7    admitted to problems that were had -- that he felt were

8    associated with some types of movies such as *Blade III*.

9          And in this conversation of November 23rd,

10   which, for whatever reason, they did not introduce

11   through Mr. Batiste's cross-examination but, rather,

12   chose to ask him about it -- this is a conversation

13   between Mr. Batiste and his wife.

14         There is no reference in this conversation

15   that I see about Mr. Batiste telling the wife anything

16   about the brothers.

17         They're talking about the movies that the wife

18   and the other sister may have watched.  I believe it's

19   the *Omega* movie.

20         For that reason, your Honor, again, I think

21   that it is improper rebuttal.  This is -- this is

22   something that they could have done through

23   cross-examination.

24         To introduce a transcript after there has

25   been testimony elicited of Mr. Batiste about this --

1    there is nothing in here about the brothers.  This is a

2    conversation between Mr. Batiste and his wife regarding

3    movies that were being watched by the wife and, I

4    believe, the children as well.

5            MS. ARANGO:  Judge, if you take a look at that

6    call, there's no discussion about the kids.  There was

7    discussion about the -- Patrick, about the -- Sister

8    Melinda watching the movie, Patrick, referring to

9    Abraham.

10           I'm just -- and there's absolutely no mention

11   here that I can see about the kids watching the movie.

12   And that was his excuse on the stand, when I questioned

13   him with about this.

14           He said, "Oh, I just -- I'm just concerned

15   about the kids watching the movie.  I was expressing my

16   concern about the children watching these movies."

17           There's nothing in this conversation about --

18   in which he expresses his concern about the children

19   watching these movies.

20           THE COURT:  I find this to be appropriate

21   rebuttal for both the statements made on cross by

22   Batiste as to the children -- the concern about the

23   children watching the movies and as to his statements

24   on the stand as to the fact that he did not have

25   control over the other members of his organization.

1          And, in fact, in this portion of

2     cross-examination, he specifically states that he

3     didn't want his kids watching any of those movies, and

4     the conversation does not relate to children.

5          And he also states at Page 185 about his

6     conversation with Abraham about the movies.  At

7     Line 13, "I was trying to talk to Abraham in respect of

8     the fact that he's a man and he has a right to make a

9     decision on how he's going to govern his household.

10    But at the same time, I wanted to let him know that I

11    was very much disappointed over the fact that I found

12    out these sisters were watching these movies and he had

13    found out as well."

14         So it goes to the overall characterization of

15    Batiste's statements -- the Defendant's statements on

16    the stand and his testimony on the stand as to the

17    character of his leadership and role in the

18    organization.

19          And I find it's appropriate rebuttal.

20          The objection is overruled.

21          You can give this back to the Government.

22          And bring the jury in, please.

23          (Whereupon, the jury entered the courtroom at

24    11:38 a.m. and the following proceedings were had:)

25          THE COURT:  You may be seated.

1          I apologize for the delay.  I know you think

2    I'm not a great estimator of time, and I apologize.

3          You may proceed.

4          MS. ARANGO:  The United States calls Special

5    Agent Anthony Velazquez to the stand.

6          THE COURT:  You're still under oath, sir.

7          THE WITNESS:  Yes, ma'am.

8    Thereupon--

9                    ANTHONY VELAZQUEZ

10   was called as a witness by the Government and, having

11   been first previously sworn, testified as follows:

12                    DIRECT EXAMINATION

13   BY MS. ARANGO:

14   Q.    Agent Velazquez, during your direct examination,

15   I believe, I questioned you regarding the issuance of

16   wiretap orders.

17   A.    Yes.

18   Q.    And pursuant to those wiretap orders, were there

19   phone calls that were recorded by the FBI?

20   A.    Yes.

21   Q.    And were -- was the recording equipment

22   functioning properly?

23   A.    Yes.

24   Q.    And were the phone calls that were being

25   intercepted by the FBI -- were they properly recorded

Velazquez - DIRECT - By Ms. Arango                    71

1   pursuant to the wiretap order?

2   A.    They were.

3   Q.    And were there any alterations or deletions in

4   those recordings, other than the minimization?

5   A.    No.

6   Q.    Let me show you what's been marked as Government

7   Exhibit W1-00360 and ask you if you recognize it, as

8   well as W1-0036-T, for "transcript."

9            MS. ARANGO:  May I approach?

10           THE COURT:  Yes.

11           THE WITNESS:  Yes.  Government

12   Exhibit W1-00360 is a copy of a telephone conversation

13   between Minerva Vasquez and Narseal Batiste on

14   February 23rd, 2006.

15           And Government Exhibit W1-00360-T is a

16   transcript of that conversation.

17   BY MS. ARANGO:

18   Q.    Have you listened to the telephone call that is

19   depicted on the CD?

20   A.    I have.

21   Q.    And is it a true and accurate recording of a

22   telephone call that was recorded by the FBI?

23   A.    Yes.

24   Q.    And have you listened to that call while

25   reviewing the transcript marked W1-00360-T?

```
 1    A.      I have.

 2    Q.      And is the transcript a true and accurate

 3    transcript, to the best of your ability?

 4    A.      It is.

 5            MS. ARANGO:  Government offers W1-00360 and

 6    -00360-T into evidence.

 7            MS. JHONES:  Same objections previously

 8    lodged, your Honor, with respect to hearsay.

 9            THE COURT:  Overruled.

10            They will be admitted as W1-00360 and

11    W1-00360-T.

12            (Whereupon, Government's Exhibit Nos. W1-00360

13    and W1-00360-T were entered into evidence.)

14            THE COURT:  You may publish.

15            MS. ARANGO:  Thank you, Judge.

16            And I do have copies of transcripts for the

17    members of the jury.

18            THE COURT:  Okay.

19            MS. ARANGO:  Should I just hand it to the

20    court security officer?

21            THE COURT:  Yes, please.

22            Do you have a copy for me as well?

23            MS. ARANGO:  Yes, I do.

24            MS. JHONES:  Excuse me, Ms. Arango.

25            Do you have an extra copy?
```

```
 1              MS. ARANGO:  Oh, yes.

 2              MS. JHONES:  Thank you.

 3              THE COURT:  You may publish.

 4              MS. ARANGO:  Thank you, Judge.

 5              I would ask the jurors to turn to Page 2.

 6              (Whereupon, Government's Exhibit No. W1-00360

 7    was published in open court.)

 8              MS. ARANGO:  Judge, I have no further

 9    questions.  Thank you.

10              THE COURT:  Ms. Jhones?

11              MS. JHONES:  I didn't hear any questions, your

12    Honor.

13              I have no questions.

14              THE COURT:  Mr. Vereen?

15              MR. VEREEN:  Just a couple, Judge.

16                        CROSS-EXAMINATION

17    BY MR. VEREEN:

18    Q.    Agent Velazquez, you've heard this conversation?

19    A.    Yes.

20    Q.    Do you know what Mr. Batiste is making reference

21    to when he talks about Illuminati and the president

22    being in the Freemasonry and all that kind of crazy

23    stuff?

24              MS. ARANGO:  Objection.  Relevance and outside

25    the scope of cross.  It also calls for speculation,
```

```
 1    Judge.

 2            MR. VEREEN:  I'm asking does he know.  He's

 3    testified about many conversations and what his

 4    understanding was of Mr. Batiste's statements during

 5    these conversations.

 6            THE COURT:  Sustained.

 7    BY MR. VEREEN:

 8    Q.    With regard to Page 4, Blade:  Trinity, that

 9    stars Wesley Snipes; does it not?

10    A.    Yes, it does.

11            MS. ARANGO:  Objection.  Outside the scope.

12            THE COURT:  Sustained.

13    BY MR. VEREEN:

14    Q.    When Mr. Batiste makes reference to a physical

15    fight in the spirit, do you know what he's making

16    reference to?

17            MS. ARANGO:  Objection.  Outside the scope.

18            THE COURT:  Sustained.

19    BY MR. VEREEN:

20    Q.    This conversation on February the 23rd -- excuse

21    me -- April -- let me back up -- February the 23rd,

22    2006, that was played as Government's Exhibit

23    W1-00360-T, the conversation that they just heard about

24    Illuminati, the movies, the president being a part of

25    Freemasonry and a physical fight in the spirit -- is
```

1    that what this case boils down to?

2              MS. ARANGO:  Objection.  Outside the scope.

3              THE COURT:  Sustained.

4              MR. VEREEN:  No further questions.

5              THE COURT:  Mr. Houlihan?

6              MR. HOULIHAN:  No questions.

7              THE COURT:  Mr. Clark?

8              MR. CLARK:  No questions, your Honor.

9              THE COURT:  Mr. Casuso?

10             MR. CASUSO:  No questions, your Honor.

11             THE COURT:  Mr. Levin?

12             MR. LEVIN:  A couple, your Honor, if I may,

13   from here.

14             THE COURT:  Okay.

15             THE COURT REPORTER:  You've got to use the

16   microphone.

17             MR. LEVIN:  There you go.

18                       CROSS-EXAMINATION

19   BY MR. LEVIN:

20   Q.    Special Agent Velazquez, on Page 3 of the

21   transcript, about four speakers from the bottom,

22   attributable to Narseal Batiste, it says, "In the

23   Freemasonry, all that king of crazy stuff."

24        Is that a correct translation of what was said

25   there, the transcription?

1    A.     To the best of my ability.

2    Q.     So "king of crazy stuff" as opposed to "all that

3    kind of crazy stuff"?

4    A.     I could listen to it again.  I reviewed this this

5    morning, and that's what it sounded like it said.  But

6    I'd be happy to listen to it again.

7    Q.     I mean, that's -- you had heard it this morning

8    and you said that he said "that king of crazy stuff" as

9    opposed to "that kind of crazy stuff"?

10   A.     That's correct.

11   Q.     The movies that are referenced here, they're all

12   rentable at Blockbuster.  Correct?

13          MS. ARANGO:  Objection.  Outside the scope of

14   cross.

15          THE COURT:  Sustained.

16   BY MR. LEVIN:

17   Q.     To the best of your knowledge -- I mean, you're

18   the case agent in this case.  Right?

19          MS. ARANGO:  Same objection, Judge.

20          THE COURT:  Are you asking if he's the case

21   agent?

22          MR. LEVIN:  Right.

23          THE COURT:  Overruled.

24   BY MR. LEVIN:

25   Q.     You're the co-case agent in this case?

```
 1   A.     Yes, sir.

 2   Q.     Do you go to Blockbuster Video?

 3          MS. ARANGO:  Objection.  Relevance and outside

 4   the scope of cross.

 5          THE COURT:  Sustained.

 6          MR. LEVIN:  No further questions.

 7          THE COURT:  Anything further, Ms. Arango?

 8          MS. ARANGO:  No.  Nothing further, Judge.

 9          THE COURT:  You may step down.

10          (Witness excused.)

11          THE COURT:  Anything further from the

12   Government?

13          MS. ARANGO:  Nothing further from the

14   Government, Judge.

15          THE COURT:  Ladies and gentlemen, that

16   concludes the presentation of evidence in this case.

17          There are a number of matters that I need to

18   take up with the lawyers outside of your presence in

19   preparation for the instructions to you on the law and

20   the closing arguments.

21          So I'm going to dismiss you for the day.

22   Before I do dismiss you, I want to apprise you of what

23   the schedule will be once you start deliberating.

24          I expect that the closing arguments will

25   either conclude on Friday or on Tuesday.
```

1          Whenever the closing arguments conclude and

2     the case is turned over to you for your deliberations,

3     you will deliberate every day, Monday through Friday,

4     until such time as you have concluded the case.

5          So I just wanted to apprise you that, once you

6     do start deliberating, you'll be coming in Monday as

7     well for deliberations.

8          So do not discuss this case either amongst

9     yourselves or with anyone else.  Have no contact

10    whatsoever with anyone associated with the trial.  Do

11    not read, listen or see anything touching on this

12    matter in any way.

13         If anyone should try to talk to you about this

14    case, you should immediately instruct them to stop and

15    report it to my staff.

16         Remember, until such time as you have heard

17    the Court's instructions on the law and the closing

18    arguments of the attorneys, you simply are not to talk

19    about this case.

20         If you would, give your notebooks to the court

21    security officer.  I will see you tomorrow morning,

22    9:00.

23         Have a nice afternoon and evening.  See you

24    tomorrow.

25              (Whereupon, the jury exited the courtroom at

1    11:56 p.m. and the following proceedings were had:)

2            THE COURT:  We're going to be in recess until

3    2:00.

4            (Thereupon, a luncheon recess was taken, after

5    which the following proceedings were had:)

6            THE COURT:  You may be seated.

7            We're back on United States of America versus

8    Narseal Batiste, et al., Case No. 06-20373.

9            Counsel, state your appearances, please, for

10   the record.

11           MR. GREGORIE:  Good afternoon, your Honor.

12           Richard Gregorie and Jacqueline Arango on

13   behalf of the United States.

14           MS. JHONES:  Ana Maria Jhones on behalf of

15   Narseal Batiste, who is present.

16           MR. LEVIN:  Albert Levin on behalf of Patrick

17   Abraham, who is present.

18           MR. CASUSO:  Louie Casuso on behalf of Burson

19   Augustin, who is present.

20           MR. CLARK:  Nathan Clark for Rotschild

21   Augustine, who is present.

22           MR. HOULIHAN:  Richard Houlihan for Naudimar

23   Herrera.

24           MR. VEREEN:  And Rod Vereen on behalf of

25   Stanley Phanor, who is present.

80

1            THE COURT:  All Defendants are present.

2            Mr. Levin, you wanted to take up the issue of

3    the Florida statute?

4            MR. LEVIN:  Yes, your Honor.

5            If I may pass it up to the Court, and I

6    believe I provided Mr. Gregorie a copy of a proposed

7    instruction.

8            THE COURT:  May I see the statute, also?

9            MR. LEVIN:  Yes, your Honor.

10           THE COURT:  Thank you.

11           What's the Government's position?

12           MR. GREGORIE:  Your Honor, I would object to

13   it as an instruction, Judge.  It doesn't apply to any

14   element of the offense or it didn't fit anywhere in the

15   instructions.

16           I have no objection for a copy of the statute

17   or a relevant portion of that statute being entered in

18   as a defense exhibit.  They certainly can argue from it

19   to the jury.

20           But it doesn't appropriately fit anywhere in

21   the jury instructions, and it doesn't apply to any

22   element of the offenses, your Honor.

23           MR. LEVIN:  Judge, if you've taken judicial

24   notice of the statute, then -- it can be converted into

25   a jury instruction if you take judicial notice of the

1    statute.  And for the jury to have to decipher, in

2    essence, the Florida statute I think is rather unfair.

3           The unfairness aspect of this, your Honor, is

4    that the Government knows that they can introduce this

5    license with a custodian of records certification and

6    it's -- the Defendant really should be entitled and the

7    jury should know that the license that he had was for

8    an unarmed security position.

9           And since violence and evil intent with regard

10   to terrorism is such a material issue in this case, the

11   jury really should know that this license that they've

12   applied for doesn't entitle them to carry any kind of

13   weapon.

14          MR. GREGORIE:  Your Honor, that can be argued

15   to the jury.  Put it in.  He's welcome to make that

16   argument.  It's a great argument to the jury, if he

17   wishes to make it.  That's up to him.

18          But it doesn't fit in the jury instructions,

19   your Honor.  It's not an element of any offense.  It's

20   not essential to any of the instructions to the jury,

21   Judge.  It's an argument.  What counsel is doing is

22   he's arguing it.

23          The instruction he's given, your Honor, is not

24   a totally appropriate instruction.  It's limited the

25   breadth of the statute.  I think the statute speaks as

```
 1    to what kind of license you need to do certain things.

 2           If they want to put the statute in and argue

 3    from it, that's fine, Judge.

 4           MR. LEVIN:  Judge, I'd move to reopen my case,

 5    then, so the Court can take judicial notice in front of

 6    the jury so that I can rightfully stand up in front of

 7    the jury and make that argument.

 8           Absent some instruction with regard to this

 9    license, it's an unfair inference that's presented with

10    regard to this license, since they made such an issue

11    with regard to the fact that certain of these

12    Defendants -- or some of these Defendants applied for a

13    security license.

14           And there was -- might have been some

15    reference that -- and they're probably going to argue

16    something along the lines that the Jeff Fort

17    organization did similar things.

18           That's what they're going to do, your Honor.

19           THE COURT:  I'll allow you to reopen your case

20    and introduce the statute.  I don't find that a jury

21    instruction is necessary.  But you can reopen your case

22    and have the statute marked as an exhibit and introduce

23    it.

24           And you can make whatever argument you want

25    that -- and then you can argue that they weren't
```

1   licensed to carry a firearm.

2          It's not part of the elements of the offense.

3   If anything, I think it may go to rebut a Government

4   theory, though.

5          As I understand the Government's theory, it's

6   that they were obtaining security guard licenses so

7   they could act as security guards.

8          MR. GREGORIE:  That's correct, your Honor.

9          THE COURT:  I don't find that the Government's

10  theory was that they were getting security licenses to

11  be armed security guards, though there was evidence

12  that they had a gun -- or the Defendants possessed a

13  gun that, I believe, Patrick Abraham and Lyglenson

14  Lemorin purchased and whoever was in uniform acted as

15  guard with the gun at the Embassy.

16         But there's really -- it doesn't go to any of

17  the elements or any decisions that the jury has to

18  make.

19         But you can certainly make argument that they

20  had a security license in which they were not able to

21  even carry a firearm.  I don't have any problem with

22  that.

23         MS. JHONES:  Your Honor, I believe -- and

24  Mr. Levin could correct me if I'm wrong -- the request,

25  the request, based upon the side-bar discussion that

1    took place -- I don't remember when -- when the

2    Government sought to introduce these licenses

3    without -- in the absence of a custodian of records --

4         THE COURT:  They were a certified public

5    record, Ms. Jhones.

6         MS. JHONES:  Your Honor, I understand that.

7         THE COURT:  They were absolutely entitled to

8    introduce them.  They had a State of Florida seal on

9    them.  I introduced them as a public -- I admitted them

10   as a public record.

11        MS. JHONES:  Your Honor, I understand the

12   Court did.  Respectfully, we took -- we just preserved

13   the issue.

14        But during the side-bar discussion, what was

15   contemplated and what was discussed -- and I don't

16   remember the exact words -- my only request -- and I

17   believe this is what Mr. Levin is requesting -- that

18   the Court take judicial notice of the fact -- not the

19   argument; the fact -- that the class license as

20   depicted in these exhibits that were introduced as

21   State records --

22        THE COURT:  Well, I'm not going to take

23   judicial notice of a fact.

24        I will and have taken judicial notice of the

25   Florida Statute 493.6115 entitled "Weapons and

1    Firearms" that I'm allowing Mr. Levin to introduce

2    into the record.

3            But I'm not going to take judicial notice

4    of -- what are you asking me to take judicial notice

5    of?

6            MS. JHONES:  I'm asking the Court to take

7    judicial -- and, quite frankly, I think that Mr. Levin

8    is probably better capable of arguing --

9            MR. LEVIN:  I'll be more than happy to do it,

10   if you want me to.

11           MS. JHONES:  If you could.  If you could.

12   Because this is more -- but I just wanted to make the

13   distinction.

14           And the request, respectfully, is that the

15   Court take judicial notice as to the fact that a

16   particular -- the particular license that was conferred

17   by virtue of the Government's exhibits does not allow

18   for the security guards to carry firearms per the

19   statute.

20           THE COURT:  I'm not going to take judicial

21   notice of that.

22           That is certainly something you can argue to

23   the jury, based upon the fact of what the license was.

24           It's not appropriate for me to take judicial

25   notice of the fact that the license introduced was a

```
 1    Class C or a Class G.
 2              I will take judicial notice of the statute,
 3    that it has certain provisions.  And you can make
 4    whatever argument you want to make based upon the
 5    statute.
 6              And I'll allow Mr. Levin to reopen his case
 7    when the jury comes in tomorrow morning for the
 8    purposes of introducing this into the record.
 9              Then you can make whatever argument you want
10    as to whether or not -- what they were entitled to do
11    based upon what security license they had and what
12    their intent was, based upon the existence of the
13    Class D and not a Class G license.
14              You can certainly make that argument, that the
15    Government has not introduced -- there's no evidence in
16    the record of a Class G license and, therefore, they
17    weren't licensed to carry a firearm.
18              MR. LEVIN:  And it was done purposely, your
19    Honor.  And that is --
20              THE COURT:  Excuse me?
21              MR. LEVIN:  It was done purposely.  It was
22    done purposely.  There was a purpose behind it.
23              The purpose was so the jury might be left with
24    the inference that they were able to carry firearms.
25    Okay.
```

1          We are in a position -- we are able to --

2          THE COURT:  Was that the inference that you

3     were raising?

4          MR. GREGORIE:  No, your Honor.  No.

5          The tape recordings talk about him getting --

6     having a security license for his guys and him

7     arranging so they would have a security license to work

8     in certain places, Judge.

9          We didn't mention anything about firearms,

10    your Honor.  This is their argument.  And now they have

11    it in evidence.  It's before the jury.  They can make

12    whatever argument they choose.

13         THE COURT:  Yes.  They purposely introduced

14    the security licenses to show that one or more of the

15    Defendants had applied for or obtained security

16    licenses in the state of Florida.

17         That was relevant -- and I'll make that

18    finding now.

19         That was relevant to the evidence in the case

20    in which there had been statements made by Defendant

21    Batiste on more than one tape and on more than one

22    occasion that he had security guards and not only that

23    he had security guards -- or that members of his

24    organization were security guards, but there was

25    evidence presented in the case that this -- there was

1   discussion about the members of the organization under

2   Mr. Batiste getting a job as a security guard as part

3   of any given plan that -- in regard to the federal

4   buildings or the -- I don't know if he came up with the

5   Chicago plan, but the federal buildings.

6          So they can make whatever argument they want

7   to make in regard to the evidence of the security

8   license.

9          And you can make the argument that they were

10  not licensed to carry a firearm.

11         MS. JHONES:   Okay.   And just for purposes of

12  the record and in the event that I haven't articulated

13  this clearly enough, my request -- and I believe the

14  request of all my fellow defense counsel -- is that,

15  pursuant to Rule 201(b), not that -- that judicial

16  notice be taken of -- as pursuant to 201(b), a

17  judicially noticed fact must be one that not, one, be

18  not subject to reasonable dispute in that it is either,

19  one, generally known within the territorial

20  jurisdiction of the trial court or, B -- or, two,

21  capable of accurate and ready determination by resort

22  to sources whose accuracy cannot reasonably be

23  questioned.

24         And not unlike the Court having taken judicial

25  notice that Al-Qaeda is a foreign terrorist

1    organization as designated by the Department of State,

2    et cetera, et cetera, this is no different.

3        A Class D license, the license that exists per

4    the Government's exhibit, is a license that does not

5    entitle the possessor of the license to carry a

6    firearm.

7        That is the only judicial fact that we are

8    asking the Court to take judicial notice of, and it is

9    entirely appropriate, I respectfully submit to the

10   Court, under 201(b).  That's all we're asking.

11       MR. GREGORIE:  Judge, we don't object to your

12   Honor taking judicial notice of the statute.  We're

13   saying, "Okay.  Put as much or as little of the statute

14   in as you choose and argue from it."

15       They're asking it be put in a jury instruction

16   and it doesn't apply to any elements of the offense,

17   unlike the Al-Qaeda designation, and it doesn't apply

18   to any issue of law before the jury.

19       THE COURT:  I don't find that -- strike that.

20       I have taken judicial notice of the statute.

21   I've indicated that Mr. Levin can reopen his case and

22   introduce those portions or the entire statute,

23   whatever he wishes to do.

24       I do not find that what counsel -- Ms. Jhones

25   is requesting of the Court, that I should take judicial

1   notice of the fact they only had one class license and

2   that's another class license, is an appropriate fact

3   for me to take judicial notice.

4       It is not generally known within the

5   territorial jurisdiction of the trial court, and it is

6   not capable of accurate and ready determination by

7   resort to sources whose accuracy cannot reasonably be

8   questioned, as opposed to a statute that is the law in

9   the state of Florida or the designation of Al-Qaeda as

10   a terrorist organization by the Secretary of State.

11       Those are totally different types of facts

12   that I have taken judicial notice of.

13       I have no idea -- it is not generally known

14   within the territory of the Southern District of

15   Florida whether these Defendants had a Class G license

16   or a Class D license or any license.  That's not

17   generally known.

18       MS. JHONES:  I'm sorry, your Honor.

19       That's --

20       THE COURT:  And it's not capable of accurate

21   and ready determination by resort to sources whose

22   accuracy cannot reasonably be questioned.

23       Now, if you wanted to, I guess that you could

24   have gone to the licensing agency and gotten a

25   certified document from them that said that they did

1    not possess a Class G license, that they searched their

2    records and that there was no Class G license.  Nothing

3    would have prevented you from doing that.

4         MR. LEVIN:  Judge --

5         THE COURT:  But what's been presented here is

6    the records that the Government introduced as public

7    records.  And you can certainly argue that there's no

8    Class G license there, that those are the records from

9    the State of Florida.

10        But I'm not going to take judicial notice that

11   they have one license versus another license.  I don't

12   find that that's an appropriate fact for the Court to

13   take judicial notice of.

14        But nothing prevents you from making that

15   argument to the jury.  But you may not make that

16   argument with the imprimatur of the Court as a

17   judicially noticed fact.

18        You can make it based upon the evidence.  The

19   evidence is clear.  The Government introduced -- and

20   you can certainly argue the Government introduced that

21   they applied for a Class D -- strike that.

22        The Government introduced evidence that one or

23   more of the Defendants applied for or had a Class D

24   license, but there's no evidence in the record that

25   they had a Class G license or applied for a Class G

1    license.  You can certainly make that argument.

2          But it's not appropriate under 201(b) to have

3    the imprimatur of the Court for either side to argue I

4    take judicial notice that they applied for a Class D

5    license; and I wouldn't take judicial notice of that.

6    It's not appropriate.

7          I wouldn't allow the Government to have the

8    imprimatur of the Court that the Defendants applied for

9    a Class D license.  And I don't find it's appropriate

10   for the imprimatur of the Court for a Class G license.

11         But it doesn't prevent you from making

12   argument about it, based upon the evidence in the

13   record.

14         And I will allow Mr. Levin to introduce the

15   statute.

16         You can give this back to him so he can mark

17   it.

18         THE COURT SECURITY OFFICER:  (Complies.)

19         MR. LEVIN:  If the reason that a security

20   person wasn't called -- and I don't have the date of

21   the side-bar conference.

22         But when this issue did come up, the Court

23   indicated it would be addressed in the form of a jury

24   instruction.  And, frankly, I detrimentally, if you

25   will, relied on that representation by the Court.

1            And, again, that's my recollection --

2            THE COURT:  Well, if you can show me,

3    Mr. Levin --

4            MR. LEVIN:  I don't have the side-bar

5    conferences.

6            THE COURT:  -- that I said --

7            MR. LEVIN:  I don't have the side-bar

8    conferences.

9            MS. JHONES:  They haven't been transcribed,

10   your Honor.  The side-bar conferences for this trial

11   have not been transcribed.

12           THE COURT:  Do you know what day it came up?

13   This --

14           MR. LEVIN:  I would have to review my notes,

15   your Honor.

16           MS. JHONES:  I think I can tell the Court,

17   your Honor, if I --

18           THE COURT:  I can't imagine that I said that I

19   would give it as a jury instruction.  I'm sure that, if

20   I said anything in regard to it, I said it would be an

21   issue that you may want to bring up on jury

22   instructions.

23           MS. JHONES:  If I may just have a moment,

24   maybe I could tell the Court the day.

25           MR. CLARK:  I believe it would have to be

1    March the 25th, your Honor, because I think that was at

2    the close of the Government's case.

3             MR. GREGORIE:  The security licenses were

4    admitted, your Honor, on March 24th.

5             THE COURT:  The side-bar indicates --

6    Mr. Levin stated, Page 18, Line 22, "Judge, if the

7    Court is inclined to allow these to come in, I would

8    ask that the Government be required to advise the jury

9    that a Class D security officer license is an unarmed

10   license.  A Class D license is an unarmed security

11   license."

12            Mr. Gregorie replied, Page 19, Line 2, "Judge,

13   they have a defense case.  They can do anything they

14   like.  We've put that evidence in.  If they want to put

15   somebody on to say it's an unarmed security license, I

16   have no objection."

17            And Mr. Clark stated on Line 6, "That's part

18   of our hearsay objection.  It is what it is.  It's a

19   Class D security license."

20            And then I said at Line 9, "I think that that

21   would be something that we would take up in terms of

22   jury instructions as to what a Class D security license

23   is unless he wanted to present some evidence in his

24   case.

25            "But we can take it up as far as

1   restrictions" -- it must be "instructions" -- "to the

2   jury as to what a Class D license is -- security

3   officer license is under the laws of the State of

4   Florida."

5           So at no time did I indicate that I was going

6   to give the instruction.  I said that we could take it

7   up and you could introduce it as evidence in your case.

8           But I didn't -- I wouldn't have stated that I

9   was granting a jury instruction on that matter, but

10  that I would take it up if you wanted me to take it up

11  as jury instruction.

12          MR. LEVIN:  I'm asking you to take it up as a

13  jury instruction.

14          THE COURT:  And I denied it as a jury

15  instruction.

16          MR. LEVIN:  Okay.

17          THE COURT:  I'm allowing you -- I'm allowing

18  you to reopen your case and introduce the statute so

19  you can make argument.

20          I really don't see what the problem is.  It's

21  not like I'm preventing you from introducing the

22  statute so you can't make argument about it in closing

23  argument.

24          You can make argument about it in closing

25  argument.  You can introduce the statute.

1              MR. LEVIN:  Fine, your Honor.

2              THE COURT:  I'm really at a loss as to what

3    the problem is here.  I have found that the imprimatur

4    of the Court, as far as what the license is, is not --

5    does not come under Rule 201 and at the time of

6    side-bar was not something that was presented to me,

7    nor would I have said you're entitled -- I didn't say

8    you're entitled to it.  I said we would take it up,

9    unless you presented evidence in your case.  Well, now

10   you're presenting the evidence in your case.

11             Just as I would not comment on the Class D

12   license as a jury instruction, I don't find it's

13   appropriate to comment on it or have a jury instruction

14   on the Class G license.

15             But you can certainly make that argument and

16   you can point out the statute.  You can say that that's

17   all they introduced.  They didn't introduce anything

18   else.  And you can argue the inference that it shows.

19             You've now received the packet of jury

20   instructions that were previously prepared.

21             Has everybody had an opportunity to review

22   them?

23             MR. GREGORIE:  Yes, your Honor.

24             THE COURT:  Mr. Vereen, have you reviewed it?

25             MR. VEREEN:  I did, Judge.  Ms. Jhones has my

1  copy.

2           MS. JHONES:  Oh.

3           THE COURT:  Do you want me to go over them one

4  by one or can we just review the packet as a whole?

5           MR. VEREEN:  The packet as a whole is fine

6  with me.

7           THE COURT:  Any objections to the packet as a

8  whole?

9           MR. VEREEN:  I have no objections, Judge.

10          MS. JHONES:  No, your Honor.

11          And just for purposes -- could we just adopt

12  whatever argument we made, I think, in the first trial

13  as opposed to --

14          THE COURT:  For?

15          MS. JHONES:  There were some arguments made in

16  the instructions.  Quite frankly, your Honor, I don't

17  remember them, to be 100 percent honest with the Court.

18  I think that's what we did the second trial, just for

19  purposes of preserving the issues.

20          THE COURT:  Any objection to that?

21          MR. GREGORIE:  No objection, your Honor.

22          THE COURT:  So you can adopt your prior

23  arguments.

24          Ms. Jhones, you're adopting prior arguments?

25          Mr. Gregorie, you're adopting prior arguments?

1          MR. GREGORIE:  And prior responses.  Yes, your

2    Honor.

3          THE COURT:  Prior responses.

4          And I'll adopt my prior rulings.  How's that?

5          MR. GREGORIE:  Thank you, Judge.

6          MR. CLARK:  Your Honor, I want to adopt my

7    prior arguments in the first case and the second case.

8          THE COURT:  Okay.  All prior arguments by

9    defense counsel as to the first and second case are

10   adopted.

11         All prior responses in the first and second

12   trials are adopted by Mr. Gregorie.

13         I'll adopt all my prior rulings in the first

14   and second trial as to the jury instructions.

15         MR. CLARK:  I have one other objection, your

16   Honor, in addition to the first and the second one.

17         THE COURT:  Okay.

18         MR. CLARK:  I believe, in the second trial, we

19   had an objection to the mere presence paragraph, where

20   we had asked for the knowing spectator additional

21   language from the aiding and abetting statute.

22         I believe it says in the aiding and abetting

23   statute that, even if you know there's a conspiracy,

24   you have -- you still have to willfully join in it.

25         I think that's consistent with the way the

1    mere presence paragraph is.  The Government has to

2    prove that the Defendants willfully joined the

3    conspiracy.

4              What I wanted to tell --

5              THE COURT:  What page are you referring to?

6              MR. CLARK:  It's at the end of -- it's in two

7    places.  It's the mere presence paragraph --

8              THE COURT:  Page 14 is the mere presence.

9              MR. CLARK:  That's one place.  I think it also

10   shows up in --

11             THE COURT:  The conspiracy charges --

12             MR. CLARK:  19.  It shows up in a couple

13   places.  Maybe more.

14             Basically, Judge, what I -- as I understand

15   the law -- and I'm -- there's a Supreme Court case,

16   *Nissen versus U.S* --

17             THE COURT REPORTER:  Nissan?

18             MR. CLARK:  Nissen, N-i-s-s-e-n.

19             That's at 336 US 613.  It's a 1949 case.

20             Basically, that's also -- I think it's cited

21   in *United States versus Gallo-Chamorro*.

22             THE COURT REPORTER:  Spell it for me, please.

23             MR. CLARK:  G-a-l-l-o, hyphen,

24   C-h-a-m-o-r-r-o.

25             It's a 1995 Eleventh Circuit case at 48 F.3d

1    502.

2              Essentially, what these cases say is that

3    18 USS, Section 2, the aiding and abetting statute, has

4    a broader application than conspiracy law.  It's

5    different from conspiracy law, but it's broader.  It

6    encompasses conspiracy law.

7              And so, if it's true that knowledge of a

8    conspiracy is not sufficient, you have to prove that

9    you knew -- you know, you have to prove that you did

10   something in furtherance of it, then the same would be

11   true as conspiracy law.

12             Mere knowledge of a conspiracy is not

13   sufficient to -- you know, it doesn't mean you

14   automatically become a conspirator.  You still have to

15   prove that you willfully joined it.

16             THE COURT:  Isn't that what the instruction

17   says?

18             MR. CLARK:  No.  The instructions do say that,

19   Judge.  But I think the problem with the instruction is

20   that it's kind of -- it doesn't address the situation

21   where somebody knows about a -- possibly knows of a

22   conspiracy, but doesn't join -- you know, that

23   situation where they know about -- that's not

24   sufficient.  They still have to prove that they

25   willfully joined it.

```
1              So I think the factual -- the facts that we

2    have in this case warrant an instruction that addresses

3    the situation where someone might be --

4              THE COURT:  Are you talking about the

5    conspiracy instructions?

6              MR. CLARK:  I'm sorry?

7              THE COURT:  On Page 14 and 19?

8              MR. CLARK:  I'm looking at them.

9              What I'm asking is that additional -- the

10   knowing spectator -- you know, you could still be a

11   knowing spectator in a conspiracy.

12             I'm asking that the instructions add the

13   aiding and abetting.  I think it's Special Instruction

14   No. 7.  I don't have my book here.

15             THE COURT:  You're asking that the aiding and

16   abetting language be in the conspiracy instruction?

17             MR. CLARK:  Yes, Judge.  And I'd asked that

18   before.  It had been denied.

19             But this time, I just wanted to -- I didn't

20   have any law about that.  But the law is that aiding

21   and abetting is a broader application.  It includes --

22   it covers a conspiratorial situation, but it goes

23   beyond that.

24             Even if you don't have a conspiracy, you just

25   have somebody who's aiding and abetting something, you
```

```
 1    have --or you do have a conspiracy, you have to still
 2    to prove that they -- you can have a situation where
 3    they knew that there was a conspiracy and they can be
 4    charged with aiding and abetting that conspiracy.
 5            The point is that, in order to be convicted
 6    of -- whether it's aiding and abetting or in a
 7    conspiracy, you have to willfully join in the
 8    conspiracy.
 9            So that was my additional request, that it
10    cover -- knowing spectator language be included,
11    because we have a factual situation where one of the
12    Defendants might be aware of a conspiracy.  The jury
13    might find that.
14            But that's not necessarily sufficient to
15    convict him.  He still has to prove -- I want to be
16    able to argue that, just because they might have been
17    aware of something, it doesn't mean that they willfully
18    joined in it.
19            MR. GREGORIE:  Judge, Mr. Clark is confusing
20    the law on the subject.  First, aiding and abetting is
21    not charged here.  These are pure conspiracies, your
22    Honor.
23            In Gallo-Chamorro, the Defendant had been
24    charged with aiding and abetting.  However, he was
25    extradited from Colombia to the United States and, in
```

1    the extradition, the Colombian Government denied

2    extradition on the aiding and abetting charge.

3            Therefore, at the court in the United States,

4    the Court only charged the jury on conspiracy and not

5    on aiding and abetting.

6            However, the Court gave a *Pinkerton*

7    instruction in that case.  So the Eleventh Circuit had

8    to distinguish the *Pinkerton* instruction and the fact

9    that aiding and abetting was not a charged count before

10   that jury because of the ruling on the extradition.

11           That's very different from this case, your

12   Honor.  In this case, these Defendants have only been

13   charged with conspiracy.  Knowingly and willfully are

14   both in this instruction and apply to this instruction.

15           The conspiracy instruction here is complete

16   and has nothing to do with aiding and abetting.  Aiding

17   and abetting is not a charge that was brought here, not

18   even aiding and abetting a conspiracy, in which there

19   is a great deal of debate among legal scholars and the

20   courts whether such a thing even exists, your Honor.

21           THE COURT:  Anything further on that,

22   Mr. Clark?

23           MR. CLARK:  Only that I think that what I'm

24   saying is -- I'm assuming we agree on the law, that you

25   can know that a conspiracy exists, but still not

1    willfully join in it.

2            I don't think the Government is saying that's

3    not true.

4            MR. GREGORIE:  No.  That's not what we're

5    saying, your Honor.

6            Your Honor's instruction on knowingly and

7    willfully is in this instruction and it makes it

8    completely clear that the Defendant must join the

9    conspiracy knowingly and willfully.

10           MR. CLARK:  So I'm just saying, Judge, that in

11   this situation, the jury instructions -- I'm asking

12   that it be clarified to show that, even if they know

13   that there's a conspiracy, still have to prove they

14   willfully joined it, that it does not automatically

15   make you joining in a conspiracy.

16           THE COURT:  I'm going to deny the request.

17           I find that the instruction on both Page 14

18   and 19, the conspiracy instructions, state as follows:

19   "A person may become a member of a conspiracy without

20   knowing all of the details of the unlawful scheme and

21   without knowing who all of the other members are.

22           "So if a defendant has a general understanding

23   of the unlawful purpose of the plan and knowingly and

24   willfully joins in that plan on one occasion, that is

25   sufficient to convict that Defendant for conspiracy,

1   even though the Defendant did not participate before

2   and even though the Defendant played only a minor part.

3        "Of course, mere presence at the scene of a

4   transaction or event or the mere fact that certain

5   persons may have associated with each other and may

6   have assembled together and discussed common aims and

7   interests does not establish proof of a conspiracy.

8        "Also, a person who has no knowledge of a

9   conspiracy, but who happens to act in a way which

10  advances some purpose of one, does not thereby become a

11  conspirator.

12       It's very clear, I find, from the instruction

13  that, besides the four elements that are laid out

14  clearly, that the instruction contains exactly what you

15  request, Mr. Clark, is that a defendant must have a

16  general understanding of the unlawful purpose of the

17  plan and knowingly and willfully join in the plan on

18  one occasion.

19       So the request is denied.

20       MR. LEVIN:  Your Honor, I have an issue I need

21  to raise.

22       THE COURT:  Yes.

23       MR. LEVIN:  Your Honor, as part of the

24  photographs that I published today, which was an

25  exhibit that had been, by mistake, maintained by the

1  Government, there was a payment sheet that reflected

2  payments made to Mr. Abraham.

3          I would like to introduce that as well.  It

4  was introduced in the second trial.

5          Basically, I didn't have the file with me.

6  The evidence was not with me until it was turned over

7  to me after Mr. Denike had testified.

8          I would like to introduce that either by --

9          MR. GREGORIE:  I haven't seen this exhibit.

10  I'm not sure I know what he's talking about.

11          MR. LEVIN:  I'll show it to Mr. Gregorie.  It

12  was introduced in the last case.

13          MR. GREGORIE:  Judge, if he wishes to add this

14  as an exhibit number to the photographs, we have no

15  objection, Judge.

16          THE COURT:  Okay.  You mean just add it as

17  part of 6 -- the 6 composite?

18          MR. LEVIN:  Right.

19          THE COURT:  Okay.  So it will be admitted

20  as --

21          MR. LEVIN:  Judge, would you give me the

22  overnight to deliberate on this?

23          THE COURT:  Okay.

24          MR. LEVIN:  I need a little time to deliberate

25  on this.

1        THE COURT:  So you don't want to introduce it

2  now?

3        MR. LEVIN:  At this moment in time, no.  But

4  in the morning, I'll let you know.

5        THE COURT:  Sure.

6        MR. LEVIN:  Thank you, your Honor.

7        MS. JHONES:  One more thing, your Honor.

8        I think at this time I have to -- just to

9  preserve the record, I think I have to move for a

10  Rule 29 at the close of all the evidence, respectfully.

11        Pursuant to Rule 29(a), Mr. Batiste moves

12  for a judgment of acquittal and re-raises all the

13  previously made objections and motions --

14        THE COURT:  Can you just wait for one moment?

15  I just want to finish with the jury instructions.

16        MS. JHONES:  I'm sorry.

17        THE COURT:  Because I haven't heard from

18  everybody as to whether or not they have objections to

19  the -- Mr. Clark raised an objection.

20        Do you have any other objections, Mr. Clark?

21        MR. CLARK:  No, your Honor.  I just adopted my

22  previous, and that was the additional.

23        THE COURT:  That was it.  Right?

24        MR. CLARK:  Yes.

25        THE COURT:  Mr. Vereen said he has no

1    objections.

2           Mr. Houlihan, any objection to the packet?

3           MR. HOULIHAN:  I would -- no.  But I would

4    just adopt --

5           THE COURT:  Other than the previously argued

6    objections?

7           MR. HOULIHAN:  No, ma'am.

8           THE COURT:  Mr. Casuso?

9           MR. CASUSO:  No, your Honor.

10          THE COURT:  Mr. Levin?

11          MR. LEVIN:  No, your Honor.  No objections.

12          THE COURT:  Go ahead, Ms. Jhones.  Now you can

13   proceed on the Rule 29.

14          MS. JHONES:  Thank you, your Honor.

15          Respectfully, pursuant to Rule 29(a) of the

16   Rules of Criminal Procedure, Mr. Batiste respectfully

17   moves for a judgment of acquittal.

18          We raise -- we re-raise all the previously

19   filed objections during the course of these

20   proceedings -- this trial, as well as all pretrial

21   motions filed throughout the course of this case,

22   respectfully.

23          THE COURT:  And do you all join in that

24   motion?

25          MR. HOULIHAN:  Yes, your Honor.

109

```
 1            MR. VEREEN:  Yes, Judge.

 2            MR. CASUSO:  Yes, your Honor.

 3            MR. LEVIN:  Yes.

 4            MR. CLARK:  Yes, on behalf of Rotschild

 5   Augustine, your Honor.

 6            THE COURT:  Who's responding?

 7            MS. ARANGO:  I'll respond, Judge.

 8            The Government adopts all of its arguments

 9   made in its response to the original Rule 29 motion,

10   both in this case as well as the Rule 29 motion in the

11   previous two trials that were at the end -- that were

12   made at the end of the completion of both the defense

13   and the Government case, as well as the Government --

14   as well as your Honor's rulings on all of those Rule 29

15   motions.

16            THE COURT:  Anything further?

17            MR. LEVIN:  Judge, just -- I was -- I had

18   joined into the Rule 29 motions as well and I noticed

19   that the realtime did not reflect that.  I just wanted

20   to ensure that I'm in on these motions.

21            THE COURT:  I adopt all my prior rulings on

22   objections and motions made in this trial and

23   throughout the course of this case.

24            I adopt my prior rulings on the Rule 29

25   motions made at the end of both the first and second
```

1    trials.

2           And I will deny at this time the Rule 29

3    motion.

4           I find that there is a sufficient amount of

5    evidence and that a reasonable jury could find all

6    Defendants guilty of all crimes charged in the

7    indictment.

8           Therefore, the Rule 29 motion is denied.

9           Is there anything further or are we done for

10   today?

11          MS. JHONES:  I believe we're done.

12          MR. GREGORIE:  That's all we have from the

13   United States.

14          THE COURT:  See you tomorrow, 9:00.

15          We're in recess until 4:00 for calendar call.

16          (End of proceedings.)

17               C E R T I F I C A T E

18          I hereby certify that the foregoing is an
     accurate transcription of the proceedings in the
19   above-entitled matter.

20
                        /s/Lisa Edwards
     _____       _____
21      DATE            LISA EDWARDS, CRR, RMR
                        Official United States Court Reporter
22                      400 North Miami Avenue, Twelfth Floor
                        Miami, Florida 33128
23                      (305) 523-5499

24

25