```
 1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
 2                      MIAMI DIVISION
             CASE NO. 06-20373-CRIMINAL-LENARD
 3

 4   UNITED STATES OF AMERICA,       Miami, Florida

 5                  Plaintiff,       April 23, 2009

 6           vs.                     9:28 a.m. to 5:38 p.m.

 7   NARSEAL BATISTE, et al.,        Volume XL

 8              Defendants.          Pages 1 to 258

 9   ------------------------------------------------------

10
                         JURY TRIAL
11         BEFORE THE HONORABLE JOAN A. LENARD,
               UNITED STATES DISTRICT JUDGE
12

13

14   APPEARANCES:

15

16   FOR THE GOVERNMENT:    RICHARD D. GREGORIE, ESQ., and
                            JACQUELINE M. ARANGO, ESQ.
17                          ASSISTANT UNITED STATES ATTORNEYS
                            99 Northeast Fourth Street
18                          Miami, Florida 33132

19
     FOR THE DEFENDANT      ANA MARIA JHONES, ESQ.
20     NARSEAL BATISTE:     300 Seville Avenue, Suite 210
                            Coral Gables, Florida 33134
21

22   FOR THE DEFENDANT      ALBERT Z. LEVIN, ESQ.
       PATRICK ABRAHAM:     261 Northeast First Street
23                          Sixth Floor
                            Miami, Florida 33132
24

25
```

```
 1   FOR THE DEFENDANT      RODERICK D. VEREEN, ESQ.
       STANLEY PHANOR:      BRINKLEY, HENRYS & LEWIS
 2                          4770 Biscayne Boulevard
                            Suite 1200
 3                          Miami, Florida 33131

 4
     FOR THE DEFENDANT      RICHARD K. HOULIHAN, ESQ.
 5     NAUDIMAR HERRERA:    300 Aragon Avenue
                            Coral Gables, Florida 33134
 6

 7   FOR THE DEFENDANT      LOUIS CASUSO, ESQ.
       BURSON AUGUSTIN:     111 Northeast First Street
 8                          Suite 603
                            Miami, Florida 33132
 9

10   FOR THE DEFENDANT      NATHAN CLARK, ESQ.
      ROTSCHILD AUGUSTINE:  17639 South Dixie Highway
11                          Miami, Florida 33157

12
     REPORTED BY:           LISA EDWARDS, CRR, RMR
13                          Official Court Reporter
                            400 North Miami Avenue
14                          Twelfth Floor
                            Miami, Florida 33128
15                          (305) 523-5499

16

17

18

19

20

21

22

23

24

25
```

1                              I  N  D  E  X

2
                                                              PAGE
3

4    Charge of the Court                           11

5    Closing Argument by Ms. Arango                 57

6    Closing Argument by Ms. Jhones               154

7


8


9

     EXHIBITS RECEIVED IN EVIDENCE:              PAGE
10
     Defendant Abraham's Exhibit No. 6-E           9
11   Defendant Abraham's Exhibit No. 7             9

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Good morning.

 2              You may be seated.

 3              United States of America versus Narseal

 4    Batiste, et al., Case No. 06-20373.

 5              Good morning, counsel.

 6              State your appearances, please, for the

 7    record.

 8              MR. GREGORIE:  Good morning, your Honor.

 9              Richard Gregorie and Jacqueline Arango on

10    behalf of the United States.

11              THE COURT:  Good morning.

12              MS. JHONES:  Good morning, your Honor.

13              Ana Maria Jhones on behalf of Narseal Batiste,

14    who is present.

15              THE COURT:  Good morning.

16              MR. LEVIN:  Good morning, your Honor.

17              Albert Levin on behalf of Patrick Abraham, who

18    is present.

19              THE COURT:  Good morning.

20              MR. CASUSO:  Good morning, your Honor.

21              Lou Casuso on behalf of Burson Augustin, who

22    is present.

23              THE COURT:  Good morning.

24              MR. CLARK:  Good morning, your Honor.

25              Nathan Clark on behalf of Rotschild Augustine,
```

```
 1   who is present.

 2            THE COURT:  Good morning.

 3            MR. HOULIHAN:  Richard Houlihan with Naudimar

 4   Herrera.

 5            THE COURT:  Good morning.

 6            MR. VEREEN:  Good morning, Judge.

 7            Roderick Vereen on behalf of Stanley Phanor,

 8   who is present.

 9            THE COURT:  Good morning.

10            All Defendants are present.

11            I believe Patricia provided to everyone copies

12   of the verdict forms for each Defendant.  Correct?

13            MR. HOULIHAN:  Yes, your Honor.

14            MR. GREGORIE:  Yes, your Honor.

15            THE COURT:  Any objections to the verdict

16   forms?

17            MR. GREGORIE:  None from the United States,

18   your Honor.

19            MR. LEVIN:  No, your Honor.

20            MS. JHONES:  No, your Honor.

21            MR. CASUSO:  No, your Honor.

22            MR. CLARK:  No, your Honor.

23            MR. HOULIHAN:  No.

24            MR. VEREEN:  I have not received a copy.  I

25   don't know when they were passed out, but I have not
```

1    received one.

2              THE COURT:  Do you have it now?

3              MR. VEREEN:  I'm looking at Mr. Gregorie's

4    right now.  Give me one second, please.

5              MR. GREGORIE:  I handed him my copy.

6              THE COURT:  Sorry, Mr. Vereen.  I don't know

7    what happened.

8              MR. VEREEN:  No problem, Judge.

9              I have no objection.

10              THE COURT:  Mr. Levin, what is it that you

11    wish to do this morning?  Are you introducing a copy of

12    the statute?

13              MR. LEVIN:  Yes, your Honor.

14              I'm introducing a copy of the statute, which

15    will be Abraham's Exhibit 7, as well as a copy of the

16    Denike Construction Company find -- f-i-n-d -- report

17    reflecting payments to Mr. Abraham, which would be

18    Abraham's Exhibit 6-E, composite.

19              THE COURT:  Okay.  So when the jurors come in,

20    I'm just going to indicate that, "Mr. Levin, it's my

21    understanding that you wish to reopen your case for the

22    introduction of two exhibits."

23              MR. LEVIN:  Yes.  That's correct, your Honor.

24              And I will be able to publish those?

25              THE COURT:  Sure.  Yes.

```
 1              MR. LEVIN:  Great.  Thank you.

 2              THE COURT:  So are we ready for the jury?

 3              MR. GREGORIE:  Yes, your Honor.

 4              THE COURT:  Oh, let me ask this:  Who's giving

 5   the initial closing?

 6              MS. ARANGO:  I am, Judge.

 7              THE COURT:  And do you want any kind of

 8   warning?

 9              MS. ARANGO:  Yes.  Thank you for reminding me,

10   Judge.

11              I'd like a 15-minute and a 5-minute warning.

12              THE COURT:  Okay.

13              MS. ARANGO:  Thank you.

14              THE COURT:  And Ms. Jhones?

15              MS. JHONES:  Your Honor, I'd like a half an

16   hour.

17              THE COURT:  A half an hour remaining?

18              MS. JHONES:  Yes.  And 15 minutes remaining.

19              Thank you.

20              THE COURT:  30 and 15?

21              MS. JHONES:  Yes.

22              THE COURT:  Okay.

23              MR. VEREEN:  Your Honor, does the Court

24   anticipate that I'll be going today as well?

25              THE COURT:  Not before lunch.  If you want to
```

```
 1    give me your request for warnings now, that's fine.
 2              MR. VEREEN:  30 and 15, Judge.
 3              THE COURT:  30 and 15.  Okay.
 4              MR. VEREEN:  Thank you.
 5              THE COURT:  So let's bring in the jurors.
 6              (Whereupon, the jury entered the courtroom at
 7    9:32 a.m. and the following proceedings were had:)
 8              THE COURT:  You may be seated.
 9              Good morning, ladies and gentlemen.
10              THE JURY:  Good morning.
11              THE COURT:  Mr. Levin, it's my understanding
12    that you wish to reopen your case for the introduction
13    of two exhibits.  Correct?
14              MR. LEVIN:  Yes, your Honor.  That is correct.
15              THE COURT:  You may do so.
16              MR. LEVIN:  Thank you, your Honor.
17              Good morning, ladies and gentlemen.
18              THE JURY:  Good morning.
19              MR. LEVIN:  Your Honor, with the Court's
20    permission, Patrick Abraham would seek to publish
21    Abraham's Exhibit 6-E, which is a Denike Construction
22    Company find report reflecting --
23              THE COURT:  You need to move them into
24    evidence first, please.
25              MR. LEVIN:  I'm sorry.
```

```
 1              Your Honor, at this time Patrick Abraham
 2   would seek to introduce into evidence Abraham's
 3   Exhibit No. 6-E.
 4              THE COURT:  It will be admitted as Defendant
 5   Patrick Abraham's Exhibit 6-E.
 6              (Whereupon, Defendant Abraham's Exhibit
 7   No. 6-E was entered into evidence.)
 8              MR. LEVIN:  That is a Denike Construction
 9   Company find report, which reflects payments to Patrick
10   Abraham from June 22nd, 2004, through April 18th of
11   2006.
12              Permission to publish?
13              THE COURT:  You may.
14              (Whereupon, Patrick Abraham's Exhibit No. 6-E
15   was published in open court.)
16              MR. LEVIN:  Your Honor, at this time
17   Mr. Abraham would seek to introduce into evidence
18   Florida Statute 493.6115, which has been marked as
19   Abraham's Exhibit 7.  I seek to move this into
20   evidence.
21              THE COURT:  It will be introduced as Defendant
22   Patrick Abraham's Exhibit No. 7.
23              (Whereupon, Defendant Abraham's Exhibit No. 7
24   was entered into evidence.)
25              MR. LEVIN:  We seek permission to publish this
```

```
 1    as well.

 2              THE COURT:  You may.

 3              (Whereupon, Defendant Patrick Abraham's

 4    Exhibit No. 7 was published in open court.)

 5              THE COURT:  These are coming up very small on

 6    the screen.

 7              MR. LEVIN:  I know, your Honor.  I'm trying to

 8    figure out how to zoom this in.

 9              There we go.

10              Your Honor, with regard to this exhibit, I

11    would like to read just the first two sections of the

12    statute.

13              THE COURT:  Any objection?

14              MR. GREGORIE:  No objection, your Honor.

15              THE COURT:  You may.

16              MR. LEVIN:  Thank you, your Honor.

17              The first paragraph reads:

18              "The provisions of this section shall apply to

19    all licensees in addition to the other provisions of

20    this chapter."

21              Two:  "Only 'Class C,' 'Class CC,' 'Class D,'

22    'Class M,' 'Class MA' or 'Class MB' licensees are

23    permitted to bear a firearm and any such licensee who

24    bears a firearm shall also have a Class G license."

25              With that, Abraham rests.
```

1              Thank you.

2              THE COURT:  Ladies and gentlemen, in just a

3    few moments, you are going to receive a copy of the

4    instructions on the law that I am going to give you now

5    in regard to this case.

6              These packets of instructions that you receive

7    are your instructions to utilize both as I instruct you

8    on the law and during your deliberations.

9              You may distribute to the jury the

10   instructions on the law.

11             THE COURTROOM DEPUTY:  (Complies.)

12             THE COURT:  Members of the jury:  It is now my

13   duty to instruct you on the rules of law that you must

14   follow and apply in deciding this case.  When I have

15   finished, you will hear the closing arguments of the

16   lawyers and then go to the jury room and begin your

17   discussions, what we call your deliberations.

18             It will be your duty to decide whether the

19   Government has proved beyond a reasonable doubt the

20   specific facts necessary to find the Defendants guilty

21   of the crimes charged in the indictment.

22             You must make your decision only on the basis

23   of the testimony and other evidence presented here

24   during the trial, and you must not be influenced in any

25   way by either sympathy or prejudice for or against the

1    Defendants or the Government.

2              You must also follow the law as I explain it

3    to you, whether you agree with that law or not, and you

4    must follow all of my instructions as a whole.  You may

5    not single out or disregard any of the Court's

6    instructions on the law.

7              The indictment or formal charge against any

8    Defendant is not evidence of guilt.  Indeed, every

9    Defendant is presumed by the law to be innocent.

10             The law does not require a defendant to prove

11   innocence or to produce any evidence at all and, if a

12   defendant elects not to testify, you cannot consider

13   that in any way during your deliberations.  The

14   Government has the burden of proving a defendant guilty

15   beyond a reasonable doubt and, if it fails to do so,

16   you must find that Defendant not guilty.

17             Thus, while the Government's burden of proof

18   is a strict or heavy burden, it is not necessary that a

19   defendant's guilt be proved beyond all possible doubt.

20   It is only required that the Government's proof exclude

21   any reasonable doubt concerning the Defendant's guilt.

22             A reasonable doubt is a real doubt, based upon

23   reason and common sense after careful and impartial

24   consideration of all the evidence in the case.

25             Proof beyond a reasonable doubt, therefore, is

1    proof of such a convincing character that you would be

2    willing to rely and act upon it without hesitation in

3    the most important of your own affairs.

4           If you are convinced that the Defendants have

5    been proved guilty beyond a reasonable doubt, say so.

6    If you are not convinced, say so.

7           As I said earlier, you must consider only the

8    evidence that I have admitted in the case.  The term

9    "evidence" includes the testimony of the witnesses and

10   the exhibits admitted in the record.

11          Remember that anything the lawyers say is not

12   evidence in the case.  It is your own recollection and

13   interpretation of the evidence that controls.

14          What the lawyers say is not binding upon you.

15   Also, you should not assume from anything I may have

16   said that I have any opinion concerning any of the

17   issues in this case.  Except for my instructions to you

18   on the law, you should disregard anything I may have

19   said during the trial in arriving at your own decision

20   concerning the facts.

21          In considering the evidence, you may make

22   deductions and reach conclusions which reason and

23   common sense lead you to make and you should not be

24   concerned about whether the evidence is direct or

25   circumstantial.

1          Direct evidence is the testimony of one who

2     asserts actual knowledge of a fact, such as an

3     eyewitness.

4          Circumstantial evidence is proof of a chain of

5     facts and circumstances tending to prove or disprove

6     any fact in dispute.

7          The law makes no distinction between the

8     weight you may give to either direct or circumstantial

9     evidence.

10          While statements and arguments of counsel

11     generally are not evidence in the case, if a statement

12     is made as an admission or stipulation of fact, it is

13     evidence.

14          When the attorneys on both sides stipulate or

15     agree as to the existence of a fact, you must, unless

16     otherwise instructed, accept the stipulation as

17     evidence and regard that fact as proved.

18          Now, in saying that you must consider all of

19     the evidence, I do not mean that you must accept all of

20     the evidence as true or accurate.

21          You should decide whether you believe what

22     each witness had to say and how important that

23     testimony was.  In making that decision, you may

24     believe or disbelieve any witness in whole or in part.

25     Also, the number of witnesses testifying concerning any

Charge of the Court                                    15

1   particular dispute is not controlling.

2           In deciding whether you believe or do not

3   believe any witness, I suggest that you ask yourself a

4   few questions:  Did the witness impress you as one who

5   was telling the truth?  Did the witness have any

6   particular reason not to tell the truth?  Did the

7   witness have a personal interest in the outcome of the

8   case?  Did the witness seem to have a good memory?  Did

9   the witness have the opportunity and ability to observe

10  accurately the things he or she testified about?  Did

11  the witness appear to understand the questions clearly

12  and answer them directly?  Did the witness's testimony

13  differ from other testimony or other evidence?

14          You should also ask yourself whether there was

15  evidence tending to prove that a witness testified

16  falsely concerning some important fact or whether there

17  was evidence that, at some other time, a witness said

18  or did something or failed to say or do something which

19  was different from the testimony the witness gave

20  before you during the trial.

21          You should keep in mind, of course, that a

22  simple mistake by a witness does not necessarily mean

23  that the witness was not telling the truth as he or she

24  remembers it, because people naturally tend to forget

25  some things or remember other things inaccurately.

1       So if a witness has made a misstatement, you

2  need to consider whether it was simply an innocent

3  lapse of memory or an intentional falsehood, and the

4  significance of that may depend on whether it has to do

5  with an important fact or with only an unimportant

6  detail.

7       A defendant has a right not to testify.  If a

8  defendant does testify, however, you should decide in

9  the same way as that of any other witness whether you

10  believe the Defendant's testimony.

11       The testimony of some of the witnesses must be

12  considered with more caution than the testimony of

13  other witnesses.

14       For example, a witness who was using addictive

15  drugs during the time he or she testified about may

16  have an impaired memory concerning the events that

17  occurred during that time.

18       Also, a witness who hopes to gain more

19  favorable treatment in his or her own case may have a

20  reason to make a false statement because the witness

21  wants to strike a good bargain with the Government.

22       Additionally, a paid informer may have a

23  reason to make a false statement because the witness

24  wants to strike a good bargain with the Government.

25       So, while a witness of that kind may be

1   entirely truthful when testifying, you should consider

2   that testimony with more caution than the testimony of

3   other witnesses.

4          In any criminal case, the Government must

5   prove, of course, the identity of the Defendant as the

6   person who committed the alleged crime.

7          When a witness points out and identifies a

8   defendant as the person who committed a crime, you must

9   first decide, as with any witness, whether that witness

10  is telling the truth.  Then, if you believe the witness

11  was truthful, you must still decide how accurate the

12  identification was.

13         Again, I suggest that you ask yourself a

14  number of questions:  Did the witness have an adequate

15  opportunity at the time of the crime to observe the

16  person in question?  What length of time did the

17  witness have to observe the person?  What were the

18  prevailing conditions at the time in terms of

19  visibility or distance and the like?  Had the witness

20  known or observed the person at earlier times?

21         You may also consider the circumstances

22  surrounding the later identification itself, including,

23  for example, the manner in which the Defendant was

24  presented to the witness for identification and the

25  length of time that elapsed between the incident in

```
1    question and the witness's identification of the

2    Defendant.

3             After examining all of the testimony and

4    evidence in the case, if you have a reasonable doubt as

5    to the identity of the Defendant as the perpetrator of

6    the offense charged, must find the Defendant not

7    guilty.

8             When knowledge of a technical subject matter

9    might be helpful to the jury, a person having special

10   training or experience in that technical field is

11   permitted to state an opinion concerning those

12   technical matters.

13            Merely because such a witness has expressed an

14   opinion, however, does not mean that you must accept

15   that opinion.  The same as with any other witness, it

16   is up to you to decide whether to rely upon it.

17            When the Government offers testimony or

18   evidence that a defendant made a statement or admission

19   to someone after being arrested or detained, the jury

20   should consider the evidence concerning such a

21   statement with caution and great care.

22            It is for you to decide, one, whether the

23   Defendant made the statement and, two, if so, how much

24   weight to give to it.

25            In making these decisions, you should consider
```

1    all of the evidence about the statement, including the

2    circumstances under which the Defendant may have made

3    it.

4           Of course, any such statement should not be

5    considered in any way whatsoever as evidence with

6    respect to any other Defendant on trial.

7           At this time I will explain the indictment,

8    which charges four separate offenses called "counts."

9    I will not read it to you at length because you will be

10   given a copy of the indictment for reference during

11   your deliberations.

12          In summary, Count 1 of the indictment charges

13   the Defendants with a conspiracy to provide material

14   support or resources to a foreign terrorist

15   organization, specifically, Al-Qaeda.

16          Count 2 of the indictment charges the

17   Defendants with a conspiracy to provide material

18   support or resources, or to conceal the nature,

19   location, source or ownership of that support or

20   resources, for use in preparation for maliciously

21   damaging or destroying federal buildings and/or

22   buildings used in interstate commerce by means of an

23   explosive.

24          Count 3 of the indictment charges the

25   Defendants with a conspiracy to maliciously damage or

1   destroy federal buildings and/or buildings used in

2   interstate commerce by means of an explosive.

3           Count 4 of the indictment charges the

4   Defendants with a conspiracy to levy war against the

5   Government of the United States or oppose by force the

6   authority of the Government of the United States.

7           You will note that the Defendants are not

8   charged in any of the counts of the indictment with

9   committing a substantive offense; rather, they are

10  charged with having conspired to do so.

11          Count 1 charges the Defendants with a

12  violation of Title 18, United States Code,

13  Section 2339B.  That statute makes it a criminal

14  offense for a person to conspire with others to provide

15  material support or resources to a foreign terrorist

16  organization.

17          So, under the law, a conspiracy is an

18  agreement or a kind of partnership in criminal purposes

19  in which each member becomes the agent or partner of

20  every other member.

21          In order to establish a conspiracy offense, it

22  is not necessary for the Government to prove that all

23  of the people named in the indictment were members of

24  the scheme or that those who were members had entered

25  into any formal type of agreement or that the members

1   had planned together all of the details of the scheme

2   or the overt acts that the indictment charges would be

3   carried out in an effort to commit the intended crime.

4           Also, because the essence of a conspiracy

5   offense is the making of the agreement itself, it is

6   not necessary for the Government to prove that any of

7   the overt acts in the indictment were committed or that

8   the conspirators actually succeeded in accomplishing

9   their unlawful plan.

10          What the evidence in the case must show beyond

11  a reasonable doubt is, first, that two or more persons

12  in some way or manner came to a mutual understanding to

13  try to accomplish a common and unlawful plan, as

14  charged in the indictment, the object of which was to

15  provide material support or resources to a foreign

16  terrorist organization, namely, Al-Qaeda; second, that

17  the Defendant, knowing the unlawful purpose of the

18  plan, willfully joined in it; third, that the Defendant

19  knew that Al-Qaeda has engaged or engages in terrorist

20  activity; fourth, that one of the jurisdictional

21  requirements is satisfied.

22          I will explain the terms used above in a

23  moment.

24          A person may become a member of a conspiracy

25  without knowing all of the details of the unlawful

1    scheme and without knowing who all of the other members

2    are.  So if a defendant has a general understanding of

3    the unlawful purpose of the plan and knowingly and

4    willfully joins in that plan on one occasion, that is

5    sufficient to convict that Defendant for conspiracy,

6    even though the Defendant did not participate before

7    and even though the Defendant played only a minor part.

8              Of course, mere presence at the scene of a

9    transaction or event or the mere fact that certain

10   persons may have associated with each other and may

11   have assembled together and discussed common aims and

12   interests does not necessarily establish proof of a

13   conspiracy.

14             Also, a person who has no knowledge of a

15   conspiracy, but who happens to act in a way which

16   advances some purpose of one, does not thereby become a

17   conspirator.

18             You are instructed that a government agent

19   and/or an informer acting on behalf of the Government

20   in an undercover capacity cannot be a co-conspirator

21   and, therefore, no conspiracy may exist between the

22   Defendant and the government agent and/or the informer.

23             The object of the conspiracy charged in

24   Count 1 was to provide material support or resources to

25   a designated foreign terrorist organization, namely,

Charge of the Court                              23

1    Al-Qaeda.

2             The term "provide" means to furnish, supply,

3    equip or make available.

4             The term "material support or resources" means

5    in any property, tangible or intangible, or service,

6    including currency or monetary instruments or financial

7    securities, financial services, lodging, training,

8    expert advice or assistance, safe houses, false

9    documentation or identification, communications

10   equipment, facilities, weapons, lethal substances,

11   explosives, personnel (one or more individuals who may

12   be or include oneself) and transportation, except

13   medicine or religious materials.

14            The term "training" means instruction or

15   teaching designed to impart a specific skill as opposed

16   to general knowledge.

17            The term "expert advice or assistance" means

18   advice or assistance derived from scientific, technical

19   or other specialized knowledge.

20            No Defendant can be convicted in connection

21   with providing personnel unless he has knowingly

22   conspired to provide Al-Qaeda with one or more

23   individuals who may be or include himself to work under

24   Al-Qaeda's direction or control or to organize, manage,

25   supervise or otherwise direct the operation of

Charge of the Court                                        24

```
 1    Al-Qaeda.

 2            If the Defendant acted entirely independently

 3    of Al-Qaeda to advance its goals or objectives, he

 4    shall not be considered to be working under Al-Qaeda's

 5    direction and control.

 6            The term "terrorist organization" means an

 7    organization designated as a terrorist organization by

 8    the Secretary of State through a process established by

 9    law.

10            The Court has taken judicial notice that

11    Al-Qaeda was designated by the Secretary of State as a

12    foreign terrorist organization on October 8, 1999, and

13    that Al-Qaeda remains designated as such today.  You

14    may, but are not required, to accept such notice as

15    conclusive.

16            The third element in Count 1 is that the

17    Defendant you are considering knew that Al-Qaeda has

18    engaged or engages in terrorist activity.

19            The term "terrorist activity" involves the

20    following:

21            One:  Hijacking or sabotage of an aircraft,

22    vessel or vehicle.

23            Two:  Seizing or detaining and threatening to

24    kill, injure or continue to detain another individual

25    in order to compel a third party, including a
```

```
 1    Government, to do or abstain from doing any act as an

 2    explicit or implicit condition for the release of the

 3    individual seized or detained.

 4         Three:  A violent attack upon an

 5    internationally protected person, including employees

 6    and officials of governments or international

 7    organizations or upon the liberty of such a person.

 8         Four:  An assassination.

 9         Five:  The use of any biological, chemical or

10    nuclear weapon, agent or device, or explosive, firearm

11    or other weapon or dangerous device with intent to

12    endanger, directly or indirectly, the safety of one or

13    more individuals or to cause substantial damage to

14    property; or

15         Six:  A threat, attempt or conspiracy to do

16    any of the foregoing.

17         The term "engage in terrorist activity" means,

18    in an individual capacity or as a member of an

19    organization, one, to commit or to incite to commit,

20    under circumstances indicating an intention to cause

21    death or serious bodily injury, a terrorist activity;

22    two, to prepare or plan a terrorist activity; three, to

23    gather information on potential targets for terrorist

24    activity; four, to solicit funds or other things of

25    value for a terrorist activity or a terrorist
```

1    organization; five, to solicit any individual to engage

2    in conduct otherwise described in this subsection or

3    for membership in a terrorist organization; six, to

4    commit an act that the actor knows or reasonably should

5    know affords material support, including a safe house,

6    transportation, communications, funds, transfer of

7    funds or other material financial benefit, false

8    documentation or identification, weapons (including

9    chemical, biological or radiological weapons),

10   explosives or training for the commission of a

11   terrorist activity to any individual who the actor

12   knows or reasonably should know has committed or plans

13   to commit a terrorist activity or to a terrorist

14   organization or to any member of such an organization.

15            The fourth element in Count 1 is that there is

16   jurisdiction over the offense.  To prove that there is

17   jurisdiction over the offense, the Government must

18   prove beyond a reasonable doubt that, one, the

19   Defendant you are considering is a national of the

20   United States, which includes a United States citizen,

21   or, two, the offense occurred, in whole or in part, in

22   the United States or, three, the Defendant that you are

23   considering conspired with an individual over whom

24   jurisdiction does exist to provide material support or

25   resources to Al-Qaeda.

1           The First Amendment to the United States

2     Constitution provides:  Congress shall make no law

3     respecting an establishment of religion or prohibiting

4     the free exercise thereof or abridging the freedom of

5     speech or of the press or the right of the people

6     peaceably to assemble and to petition the Government

7     for redress of grievances.

8           Nothing in this statute shall be construed or

9     applied so as to deprive the exercise of rights

10    guaranteed under the First Amendment to the

11    Constitution of the United States.

12          Count 2 charges the Defendants with a

13    violation of Title 18, United States Code,

14    Section 2339A.

15          That statute makes it a criminal offense for a

16    person to conspire with others to provide material

17    support or resources or conceal or disguise the nature,

18    location, source or ownership of that material support

19    or resources, knowing or intending that they are to be

20    used in preparation for or in carrying out a violation

21    of Title 18, United States Code, Section 844(f)(1), or

22    Title 18, United States Code, Section 844(i).

23          Title 18, United States Code,

24    Section 844(f)(1), makes it a separate offense to

25    maliciously damage or destroy by means of an explosive

1    any federal building owned or possessed by or leased to

2    any agency of the United States.

3            Title 18, United States Code, Section 844(i),

4    makes it a separate offense to maliciously damage or

5    destroy by means of an explosive any building used in

6    interstate or foreign commerce or in any activity

7    affecting interstate or foreign commerce.

8            So under the law, a conspiracy is an agreement

9    or kind of partnership in criminal purposes in which

10   each member becomes the agent or partner of every other

11   member.

12           In order to establish a conspiracy offense, it

13   is not necessary for the Government to prove that all

14   of the people named in the indictment were members of

15   the scheme, or that those who were members had entered

16   into any formal type of agreement, or that the members

17   had planned together all of the details of the scheme

18   or the overt acts that the indictment charges would be

19   carried out in an effort to commit the intended crime.

20           Also, because the essence of a conspiracy

21   offense is the making of the agreement itself, it is

22   not necessary for the Government to prove that any of

23   the overt acts in the indictment were committed or that

24   the conspirators actually succeeded in accomplishing

25   their unlawful plan.

```
 1              What the evidence in the case must show beyond

 2     a reasonable doubt is:

 3              First:  That two or more persons in some way

 4     or manner came to a mutual understanding to try to

 5     accomplish a common and unlawful plan, as charged in

 6     the indictment, the object of which was to provide

 7     material support or resources or to conceal or disguise

 8     the nature, location, source or ownership of that

 9     material support or resources, with the intent to

10     damage or destroy by explosive a building owned or

11     possessed by or leased to an agency of the United

12     States or a building use in interstate or foreign

13     commerce or in any activity affecting interstate or

14     foreign commerce.

15              Second:  That the Defendant, knowing the

16     unlawful purpose of the plan, willfully joined in it.

17              I will explain the terms use above in a

18     moment.

19              A person may become a member of a conspiracy

20     without knowing all of the details of the unlawful

21     scheme and without knowing who all of the other members

22     are.

23              So if a Defendant has a general understanding

24     of the unlawful purpose of the plan and knowingly and

25     willfully joins in that plan on one occasion, that is
```

1    sufficient to convict that Defendant for conspiracy,

2    even though the Defendant did not participate before

3    and even though the Defendant played only a minor part.

4         Of course, mere presence at the scene of a

5    transaction or event or the mere fact that certain

6    persons may have associated with each other and may

7    have assembled together and discussed common aims and

8    interests does not necessary establish proof of a

9    conspiracy.

10        Also, a person who has no knowledge of a

11   conspiracy, but who happens to act in a way which

12   advances some purpose of one, does not thereby become a

13   conspirator.

14        You are instructed that a government agent

15   and/or an informer acting on behalf of the Government

16   in an undercover capacity cannot be a co-conspirator

17   and, therefore, no conspiracy may exist between the

18   Defendant and the government agent and/or the informer.

19        The object of the conspiracy charged in

20   Count 2 was, one, to provide material support or

21   resources or, two, to conceal or disguise the nature,

22   location, source or ownership of that material support

23   or resources, knowing or intending that the material

24   support or resources provided would be used to prepare

25   for or to carry out the separate offense of maliciously

1    damaging or destroying by explosive a building owned

2    or possessed by or leased to an agency of the United

3    States or a building used in interstate or foreign

4    commerce or in any activity affecting interstate or

5    foreign commerce.

6         The term "provide" means to furnish, supply,

7    equip or make available.

8         The terms "conceal," "disguise," "nature,"

9    "location," "source" and "ownership" have their

10   ordinary and obvious meanings.

11        The term "material support or resources" means

12   any property, tangible or intangible, or service,

13   including currency or monetary instruments or financial

14   securities, financial services, lodging, training,

15   expert advice or assistance, safe houses, false

16   documentation or identification, communications

17   equipment, facilities, weapons, lethal substances,

18   explosives, personnel and transportation, except

19   medicine or religious materials.

20        The term "personnel" means one or more

21   individuals who may be or include oneself and refers to

22   persons who are jointly involved in conspiring to

23   damage or destroy by explosives a building owned or

24   possessed by or leased to any agency of the United

25   States or a building used in interstate or foreign

Case 1:06-cr-20373-JAL   Document 1323   Entered on FLSD Docket 05/19/2009   Page 32 of
Charge of the Court                                  32
258

commerce or in any activity affecting interstate or

foreign commerce.

The term "training" means instruction or

teaching designed to impart a specific skill as opposed

to general knowledge.

The term "expert advice or assistance" means

advice or assistance derived from scientific, technical

or other specialized knowledge.

The material support or resources that trigger

a violation of Section 2339A does not need to be

provided to a particular or specified terrorist group

(unlike the requirements of a violation of

Section 2339B discussed in connection with Count 1).

Instead, the support or resources must be

provided in furtherance of a separate federal offense,

namely, maliciously damaging or destroying by

explosives a building owned or possessed by or leased

to an agency of the United States or a building used in

interstate or foreign commerce or in any activity

affecting interstate or foreign commerce.

The term "maliciously" means to act either

intentionally or with willful disregard of the

likelihood that damage will result and not mistakenly

or carelessly.

"Interstate or foreign commerce" refers to

1    commercial activity between places in different states

2    or between someplace in the United States and someplace

3    outside the United States.

4            The term "explosive" means, one, gun powders;

5    two, powders used for blasting; three, all forms of

6    high explosives; four, blasting materials; five, fuses,

7    other than electric circuit breakers; six, detonators

8    and other detonating agents; seven, smokeless powders;

9    eight, dynamite and all other forms of high explosives;

10   nine, any explosive bomb, grenade, missile or similar

11   device; ten, any incendiary bomb or grenade, fire bomb

12   or similar device, including any device which, one,

13   consists of or includes a breakable container including

14   a flammable liquid or compound and a wick composed of

15   any material which, when ignited, is capable of

16   igniting such flammable liquid or compound and, two,

17   can be carried or thrown by one individual alone; or,

18   eleven, any chemical compounds, mechanical mixture or

19   device that contains any oxidizing and combustible

20   units or other ingredients in such proportions,

21   quantities or packing that ignition by fire, by

22   friction, by concussion, by percussion or by detonation

23   of the compound, mixture or device in any part thereof

24   may cause an explosion.

25            It is sufficient for the Government to prove

Charge of the Court                                    34

1   beyond a reasonable doubt that the Defendant you are

2   considering conspired to provide material support to

3   maliciously damage or destroy by means of an explosive

4   either a building owned by or possessed by or leased to

5   an agency of the United States or a building used in

6   interstate or foreign commerce or in any activity

7   affecting interstate or foreign commerce.

8          It is not necessary for the Government to

9   prove that the Defendant you are considering conspired

10  to provide material support to damage or destroy both

11  buildings.

12         Count 3 charges the Defendants with a

13  violation of Title 18, United States Code,

14  Section 844(n).  That statute makes it a criminal

15  offense to conspire to maliciously damage or destroy by

16  means of an explosive, one, any building leased to an

17  agency of the United States or, two, any building used

18  in interstate or foreign commerce or in any activity

19  affecting interstate or foreign commerce.

20         So, under the law, a conspiracy is an

21  agreement or a kind of partnership in criminal purposes

22  in which each member becomes the agent or partner of

23  every other member.

24         In order to establish a conspiracy offense, it

25  is not necessary for the Government to prove that all

1   of the people named in the indictment were members of

2   the scheme or that those who were members had entered

3   into any formal type of agreement or that the members

4   had planned together all of the details of the scheme

5   or overt acts that the indictment charges would be

6   carried out in an effort to commit the intended crime.

7          Also, because the essence of a conspiracy

8   offense is the making of the agreement itself, it is

9   not necessary for the Government to prove that any of

10  the overt acts in the indictment were committed or that

11  the conspirators actually succeeded in accomplishing

12  their unlawful plan.

13         What the evidence in the case must show beyond

14  a reasonable doubt is:

15         First:  That two or more persons in some way

16  or manner came to a mutual understanding to try to

17  accomplish a common and unlawful plan, as charged in

18  the indictment, the object of which was to maliciously

19  damage or destroy by means of an explosive a building

20  leased by an agency of the United States, namely, the

21  Miami FBI building, or a building used in interstate or

22  foreign commerce or in any activity affecting

23  interstate and foreign commerce, namely, the Sears

24  Tower.

25         Second:  That the Defendant, knowing the

1    unlawful purpose of the plan, willfully joined in it.

2            A person may become a member of a conspiracy

3    without knowing all of the details of the unlawful

4    scheme and without knowing who all of the other members

5    are.

6            So if a defendant has a general understanding

7    of the unlawful purpose of the plan and knowingly and

8    willfully joins in that plan on one occasion, that is

9    sufficient to convict that Defendant for conspiracy,

10   even though the Defendant did not participate before

11   and even though the Defendant played only a minor part.

12           Of course, mere presence at the scene of a

13   transaction or event or the mere fact that certain

14   persons may have associated with each other and may

15   have assembled together and discussed common aims and

16   interests does not necessarily establish proof of a

17   conspiracy.

18           Also, a person who has knowledge of a

19   conspiracy, but who happens to act in a way which

20   advances some purpose of one, does not thereby become a

21   conspirator.

22           You are instructed that a government agent

23   and/or an informer acting on behalf of the Government

24   who enters into a conspiracy in an undercover capacity

25   cannot be a co-conspirator and, therefore, no

Case 1:06-cr-20373-JAL   Document 1323   Entered on FLSD Docket 05/19/2009   Page 37 of
258
Charge of the Court                                          37

1    conspiracy may exist between the Defendant and the

2    government agent and/or the informer.

3            The object of the conspiracy charged in

4    Count 3 was to maliciously damage and destroy federal

5    property, namely, the Miami FBI building, or a building

6    used in interstate or foreign commerce, namely, the

7    Sears Tower, by means of an explosive.

8            The term "maliciously" means to act either

9    intentionally or with willful disregard of the

10   likelihood that damage will result and not mistakenly

11   or carelessly.

12           "Interstate or foreign commerce" refers to

13   commercial activity between places in different states

14   or between someplace in the United States and someplace

15   outside the United States.

16           The term "explosive" means, one, gun powders;

17   two, powders used for blasting; three, all forms of

18   high explosives; four, blasting materials; five, fuses,

19   other than the electric circuit breakers; six,

20   detonators and other detonating agents; seven,

21   smokeless powders; eight, dynamite and all other forms

22   of high explosives; nine, any explosive bomb, grenade,

23   missile or similar device; ten, any incendiary bomb or

24   grenade, fire bomb or similar device, including any

25   device which, one, consists of or includes a breakable

1    container including a flammable liquid or compound and

2    a wick composed of any material which, when ignited, is

3    capable of igniting such flammable liquid or compound

4    and, two, can be carried or thrown by one individual

5    acting alone; or, eleven, any chemical compounds,

6    mechanical mixture or device that contains any

7    oxidizing and combustible units or other ingredients in

8    such proportions, quantities or packing that ignition

9    by fire, by friction, by concussion, by percussion or

10   by detonation of the compound, mixture or device or any

11   part thereof may cause an explosion.

12          It is sufficient for the Government to prove

13   beyond a reasonable doubt that the Defendant you are

14   considering conspired to maliciously damage or destroy

15   by means of an explosive either the Miami FBI building

16   or the Sears Tower.

17          It is not necessary for the Government to

18   prove that the Defendant you are considering conspired

19   to damage or destroy both buildings.

20          Count 4 charges the Defendants with a

21   violation of Title 18, United States Code,

22   Section 2384.  That statute makes it a criminal offense

23   to conspire to overthrow, put down or destroy by force

24   the Government of the United States or to levy war

25   against the United States or to oppose by force the

1       authority of the United States.

2              So, under the law, a conspiracy is an

3       agreement or a kind of partnership in criminal purposes

4       in which each member becomes the agent or partner of

5       every other member.

6              In order to establish a conspiracy offense, it

7       is not necessary for the Government to prove that all

8       of the people named in the indictment were members of

9       the scheme or that those who were members had entered

10      into any formal type of agreement or that the members

11      had planned together all of the details of the scheme

12      or the overt acts that the indictment charges would be

13      carried out in an effort to commit the intended crime.

14             Also, because the essence of a conspiracy

15      offense is the making of the agreement itself, it is

16      not necessary for the Government to prove that any of

17      the overt acts in the indictment were committed or that

18      the conspirators actually succeeded in accomplishing

19      their unlawful plan.

20             What the evidence in the case must show beyond

21      a reasonable doubt is:

22             First:  A conspiracy, that is, an agreement or

23      mutual understanding between two or more persons, as

24      charged in the indictment, the object of which was to

25      levy war against the Government of the United States or

1    to oppose by force the authority of the Government of

2    the United States.

3            Second:  That the Defendant, knowing the

4    unlawful purpose of the plan, willfully joined in it.

5            Third:  That the conspiracy took place in a

6    state or territory subject to the jurisdiction of the

7    United States.

8            A person may become a member of a conspiracy

9    without knowing all of the details of the unlawful

10   scheme and without knowing who all of the other members

11   are.

12           So, if a defendant has a general understanding

13   of the unlawful purpose of the plan and knowingly and

14   willfully joins in that plan on one occasion, that is

15   sufficient to convict that Defendant for conspiracy,

16   even though the Defendant did not participate before

17   and even though the Defendant played only a minor part.

18           Of course, mere presence at the scene of a

19   transaction or event or the mere fact that certain

20   persons are associated with each other and may have

21   assembled together and discussed common aims and

22   interests does not necessarily establish proof of a

23   conspiracy.

24           Also, a person who has no knowledge of a

25   conspiracy, but who happens to act in a way which

1    advances some purpose of one, does not thereby become a

2    conspirator.

3            You are instructed that a government agent

4    and/or an informer acting on behalf of the Government

5    in an undercover capacity cannot be a co-conspirator

6    and, therefore, no conspiracy may exist between the

7    Defendant and the government agent and/or the informer.

8            The object of the conspiracy charged in

9    Count 4 was to levy war against the Government of the

10   United States or to oppose by force the authority of

11   the Government of the United States.

12           The type of war under this statute does not

13   require the presence of an enemy, foreign state or

14   actual war.  However, the Defendant must conspire to

15   use force, to the just to advocate the use of portion.

16           The third element in Count 4 is that there is

17   jurisdiction over the offense.  To prove that there is

18   jurisdiction over the offense, the Government must

19   prove beyond a reasonable doubt that the offense

20   occurred in the United States.

21           You will note that the indictment charges that

22   the offense was committed on or about a certain date.

23   The Government does not have to prove with certainty

24   the exact date of the alleged offense.  It is

25   sufficient if the Government proves beyond a reasonable

 1   doubt that the offense was committed on a date

 2   reasonably near the date alleged.

 3            The word "knowingly," as that term is used in

 4   the indictment or in these instructions, means that the

 5   act was committed voluntarily and intentionally and not

 6   because of mistake or accident.

 7            The word "willfully," as that term is used in

 8   the indictment or in these instructions, means that the

 9   act was committed voluntarily and purposely with the

10   specific intent to do something the law forbids, that

11   is, with bad purpose either to disobey or disregard the

12   law.

13            "Intent" and "motive" should not be confused.

14   "Motive" is what prompts a person to act, while

15   "intent" refers to the state of mind with which the act

16   is done.

17            So, if you find beyond a reasonable doubt that

18   the acts constituting the crime charged were committed

19   by the Defendant voluntarily with specific intent to

20   do something the law forbids, then the element of

21   willfulness, as defined in these instructions, has been

22   satisfied, even though the Defendant may have believed

23   that the conduct was religiously, politically or

24   morally required or that ultimate good would result

25   from such conduct.

1          While it is the position of Defendant Batiste

2     that he did not have the intent to commit the crimes

3     charged in the indictment, alternatively, Defendant

4     Batiste asserts entrapment concerning the offenses

5     charged in the indictment.

6          A defendant is entrapped when law enforcement

7     officers or cooperating individuals under their

8     direction induce or persuade a defendant to commit a

9     crime that the Defendant had no previous intent to

10    commit, and the law as a matter of policy forbids a

11    conviction in such a case.

12         However, there is no entrapment where a

13    defendant is ready and willing to break the law and

14    the Government merely provides what appears to be a

15    favorable opportunity for the Defendant to commit the

16    crime.

17         For example, it is not entrapment for a

18    government agent to pretend to be someone else and to

19    offer, either directly or through an informer or other

20    decoy, to engage in an unlawful transaction with the

21    Defendant, and it is not for you to evaluate the

22    conduct of law enforcement officials or the conduct of

23    persons acting for or at the request of law enforcement

24    officials, including informers and cooperating

25    witnesses, to determine if you approve or disapprove of

1    that conduct or to determine if you think that conduct

2    was moral or immoral, except to the extent that such

3    conduct may bear on the central issue of whether a

4    defendant was ready and willing to break the law and

5    the Government merely provided the Defendant with what

6    appeared to be a favorable opportunity.

7              So a defendant would not be a victim of

8    entrapment if you should find beyond a reasonable doubt

9    that the Defendant, before contact with Government

10   officers or cooperating individuals, was ready, willing

11   and able to commit the crime charged in the indictment

12   whenever opportunity was afforded and that the

13   Government did no more than offer an opportunity.

14             On the other hand, if the evidence in the

15   case leaves you with a reasonable doubt whether the

16   Defendant had any intent to commit the crime except for

17   inducement or persuasion on the part of some Government

18   officer or cooperating individual, then it is your duty

19   to find the Defendant not guilty.

20             As part of the evidence in this case, you have

21   heard recordings that contain conversations that took

22   place completely or partially in the Arabic language.

23   You were also provided with English transcripts of

24   those conversations.  The transcripts were provided to

25   you so that you could consider the content of the

1    conversations on the recordings.

2           As I advised you previously, I admitted the

3    transcripts for the limited and secondary purpose

4    of aiding you in following the content of the

5    conversations as you listen to the tape recordings and,

6    also, to aid you in identifying the speakers.

7           Whether the transcripts contain accurate

8    translations of the Arabic language portions of the

9    recordings, in whole or part, is for you to decide.

10          In considering whether a transcript accurately

11   describes the meaning of conversation, you should

12   consider the testimony presented to you regarding how

13   and by whom the transcript was made.

14          You may consider the knowledge, training and

15   experience of the translator, as well as the nature of

16   the conversation and the reasonableness of the

17   translation in light of all the evidence in the case.

18          With respect to the Arabic language portions

19   of the recordings, you should not rely in any way on

20   any knowledge you may have of the Arabic language

21   spoken on the recording.  Your consideration should be

22   based on the evidence introduced in trial.

23          Some of the recordings you heard were in the

24   English language, in whole or part.  With respect to

25   the English language portion of any recordings, the

 1   tape recordings themselves are the evidence of what was

 2   or was not recorded on the tapes.

 3          With respect to the English language portions

 4   of the recordings, the transcripts were provided to you

 5   solely as a listening aid.  If from your hearing of the

 6   English portion of a particular recording you perceive

 7   any variation between the tape and corresponding

 8   transcript, you should be guided solely by the tape and

 9   not the transcript.

10          The transcripts also purport to identify the

11   speakers engaged in these conversations.  Whether the

12   transcript correctly or incorrectly reflects the

13   identity of the speakers is entirely for you to

14   determine based upon your own evaluation of the

15   testimony.

16          A separate crime or offense is charged against

17   one or more of the Defendants in each count of the

18   indictment.  Each charge and the evidence pertaining to

19   it should be considered separately.

20          Also, the case of each Defendant should be

21   considered separately and individually.  The fact that

22   you may find any one or more of the Defendants guilty

23   or not guilty of any of the offenses charged should not

24   affect your verdict as to any other offense or any

25   other Defendant.

 1          I caution you, members of the jury, that you

 2   are here to determine from the evidence in this case

 3   whether each Defendant is guilty or not guilty.  Each

 4   Defendant is on trial only for the specific offenses

 5   alleged in the indictment.

 6          Also, the question of punishment should never

 7   be considered by the jury in any way in deciding the

 8   case.  If a defendant is convicted, the matter of

 9   punishment is for the judge alone to determine later.

10          In this case, you have been permitted to take

11   notes during the course of the trial, and most of you,

12   perhaps all of you, have taken advantage of that

13   opportunity and have made notes from time to time.

14          You will have your notes available to you

15   during your deliberations, but you should make use of

16   them only as an aid to your memory.  In other words,

17   you should not give your notes any precedence over your

18   independent recollection of the evidence or the lack of

19   evidence, and neither should you be unduly influenced

20   by the notes of other jurors.

21          I emphasize that notes are not entitled to any

22   greater weight than the memory or impression of each

23   juror as to what the testimony may have been.

24          Any verdict you reach in the jury room,

25   whether guilty or not guilty, must be unanimous.  In

1    other words, to return a verdict, you must all agree.

2    Your deliberations will be secret.  You will never have

3    to explain your verdict to anyone.

4           It is your duty, as jurors, to discuss the

5    case with one another in an effort to reach agreement,

6    if you can do so.  Each of you must decide the case for

7    yourself, but only after full consideration of the

8    evidence with the other members of the jury.

9           While you are discussing the case, do not

10   hesitate to reexamine your own opinion and change your

11   mind if you become convinced that you were wrong.  But

12   do not give up your honest beliefs solely because the

13   others think differently or merely to get the case over

14   with.

15          Remember, that in a very real way, you are

16   judges, judges of the facts.  Your only interest is to

17   seek the truth from the evidence in the case.

18          When you go to the jury room, you should first

19   select one of your members to act as your foreperson.

20   The foreperson will preside over your deliberations and

21   will speak for you here in court.

22          A form of verdict for each Defendant has been

23   prepared for your convenience.  I will read them to you

24   now:

25                United States District Court, Southern

1   District of Florida, Case No. 06-20373-CR-Lenard,

2   United States of America versus Narseal Batiste.

3            Verdict:  We, the jury, unanimously find the

4   Defendant, Narseal Batiste, as to Count 1, not guilty,

5   a line; guilty, a line.

6            As to Count 2:  Not guilty, a line; guilty, a

7   line.

8            As to Count 3:  Not guilty, a line; guilty, a

9   line.

10           As to Count 4:  Not guilty, a line; guilty, a

11  line.

12           So say we all, a line for the foreperson to

13  sign his or her name, a line for the foreperson to

14  print his or her name it, and a line for the date.

15           United States District Court, Southern

16  District of Florida, Case No. 06-20373-CR-Lenard,

17  United States of America versus Patrick Abraham.

18           Verdict:  We, the jury, unanimously find the

19  Defendant, Patrick Abraham, as to Count 1, not guilty,

20  a line; guilty, a lane.

21           As to Count 2:  Not guilty, a line; guilty, a

22  line.

23           As to Count 3:  Not guilty, a line; guilty, a

24  line.

25           As to Count 4:  Not guilty, a line; guilty, a

1  line.

2           So say we all, a signature line for the

3  foreperson, a line for the foreperson to print his or

4  her name, and a line for the date.

5           United States District Court, Southern

6  District of Florida, Case No. 06-20373-CR-Lenard,

7  United States of America versus Stanley Grant Phanor.

8           Verdict:  We, the jury, unanimously find the

9  Defendant, Stanley Grant Phanor, as to Count 1, not

10  guilty, a line; guilty, a line.

11           As to Count 2:  Not guilty, a line; guilty, a

12  line.

13           As to Count 3:  Not guilty, a line; guilty, a

14  line.

15           As to Count 4:  Not guilty, a line; guilty, a

16  line.

17           So say we all, a line for the foreperson to

18  sign his or her name, a line for the foreperson to

19  print his or her name, and a line for the date.

20           United States District Court, Southern

21  District of Florida, Case No. 06-20373-CR-Lenard,

22  United States of America versus Naudimar Herrera.

23           Verdict:  We, the jury, unanimously find the

24  Defendant, Naudimar Herrera, as to Count 1, not guilty,

25  a line; guilty, a line.

1        As to Count 2:  Not guilty, a line; guilty, a

2   line.

3        As to Count 3:  Not guilty, a line; guilty, a

4   line.

5        As to Count 4:  Not guilty, a line; guilty, a

6   line.

7        So say we all, a line for the foreperson to

8   sign his or her name, a line for the foreperson to

9   print his or her name, and a line for the date.

10        United States District Court, Southern

11   District of Florida, Case No. 06-20373-CR-Lenard,

12   United States of America versus Burson Augustin.

13        Verdict:  We, the jury, unanimously find the

14   Defendant, Burson Augustin, as to Count 1:  Not guilty,

15   a line; guilty, a line.

16        As to Count 2:  Not guilty, a line; guilty, a

17   line.

18        As to Count 3:  Not guilty, a line; guilty, a

19   line.

20        As to Count 4:  Not guilty, a line; guilty, a

21   line.

22        So say we all, a line for the foreperson to

23   sign his or her name, a line for the foreperson to

24   print his or her name, and a line for the date.

25        United States District Court, Southern

 1    District of Florida, Case No. 06-20373-CR-Lenard,

 2    United States of America, Plaintiff, versus Rotschild

 3    Augustine.

 4           Verdict:  We, the jury, unanimously find the

 5    Defendant, Rotschild Augustine, as to Count 1, not

 6    guilty, a line; guilty, a line.

 7           As to Count 2:  Not guilty, a line; guilty, a

 8    line.

 9           As to Count 3:  Not guilty, a line; guilty, a

10    line.

11           As to Count 4:  Not guilty, a line; guilty, a

12    line.

13           So say we all, a line for the foreperson to

14    sign his or her name, a line for the foreperson to

15    print his or her name, and a line for the date.

16           Whomever the foreperson is, if you would, also

17    put your juror number next to your signature and the

18    printing of your name.

19           You will take the verdict forms to the jury

20    room and, when you have reached unanimous agreement,

21    you will have your foreperson fill in the verdict

22    forms, date and sign them and then return to the

23    courtroom.

24           If you should desire to communicate with me at

25    any time, please write down your message or question

1  and pass the note to the court security officer, who

2  will bring it to my attention.  Also, put the date and

3  the time on the note.

4          I will then respond as promptly as possible

5  either in writing or by having you return to the

6  courtroom so that I can address you orally.  I caution

7  you, however, with regard to any message or question

8  you might send, you should not tell me your numerical

9  division at the time.

10          That concludes the instructions on the law.

11          Before we begin the closing arguments, we're

12  going to take a ten-minute recess.

13          So do not discuss this case either amongst

14  yourselves or with anyone else.  Have no contact

15  whatsoever with anyone associated with the trial.  Do

16  not read, listen or see anything touching on this

17  matter in any way.

18          If anyone should try to talk to you about this

19  case, you should immediately instruct them to stop and

20  report it to my staff.

21          Remember, until such time as you have heard

22  all of the closing arguments and I have instructed you

23  to begin your deliberations, you simply are not to talk

24  about this case.

25          We'll be in recess for ten minutes.

```
 1              (Whereupon, the jury exited the courtroom at
 2      10:39 a.m. and the following proceedings were had:)
 3              THE COURT:  You may be seated for a moment.
 4              Are there any objections to the instructions
 5      as given?
 6              MR. GREGORIE:  None from the United States,
 7      your Honor.
 8              MR. CASUSO:  No, your Honor.
 9              MR. LEVIN:  No, your Honor.
10              MS. JHONES:  No, your Honor.
11              MR. CLARK:  No.
12              MR. HOULIHAN:  For Mr. Herrera, we'd just
13      renew the previous motion -- objections made.
14              THE COURT:  Other than the objections already
15      made, I'm talking about as given.
16              MR. HOULIHAN:  No, ma'am.
17              MR. VEREEN:  No, your Honor.
18              MR. CLARK:  No.
19              THE COURT:  Did I omit any instructions that I
20      indicated that I would give?
21              MR. GREGORIE:  No, your Honor.
22              MR. VEREEN:  No, your Honor.
23              MR. CASUSO:  No, your Honor.
24              MR. LEVIN:  No, your Honor.
25              MR. CLARK:  No.
```

1           THE COURT:  In regard to the verdict forms, as

2    you heard, they have a line for both the signature and

3    the printing of the foreperson's name.

4           In open court, the number of the juror will be

5    read and, when the verdict forms are signed, the

6    signatures will be redacted.

7           So I just wanted to inform everybody of that.

8           MR. GREGORIE:  Your Honor, would questions

9    which we hadn't addressed.

10          Number one:  I believe the jurors, with all of

11   their transcripts -- they may have been taking notes.

12   I've noticed some of them writing.  I can't tell

13   whether it was in their notebooks or on the transcripts

14   themselves.

15          Will the transcripts be going back with them?

16          THE COURT:  Yes.  They'll have the -- their

17   notebooks.  Everything that's there in the jury box,

18   they can have with them.  It'll get a little crowded in

19   there, but they can have it with them.  Yes.

20          MR. GREGORIE:  Okay.

21          THE COURT:  I believe some of them may have

22   made notes on the binders.

23          MR. GREGORIE:  Yes.

24          Secondly, your Honor, with regard to playing

25   any of the recordings they may wish to hear, is your

 1    Honor going to provide them equipment to do that?

 2            THE COURT:  I believe previously you provided

 3    a computer -- a blank computer with only the program to

 4    play any DVD or CD.

 5            MR. GREGORIE:  We will do that again, your

 6    Honor.

 7            THE COURT:  So I expect that you're going to

 8    do that again.

 9            MR. GREGORIE:  Thank you, your Honor.  We will

10    do that.

11            THE COURT:  We're in recess for ten minutes.

12            (Thereupon a recess was taken, after which the

13    following proceedings were had:)

14            THE COURT:  We're back on United States of

15    America versus Narseal Batiste, et al., Case

16    No. 06-20373.

17            Counsel, state your appearances, please, for

18    the record.

19            MR. GREGORIE:  Richard Gregorie and Jacqueline

20    Arango on behalf of the United States, your Honor.

21            MS. JHONES:  Ana Jhones on behalf of Narseal

22    Batiste, who is present.

23            MR. LEVIN:  Albert Levin on behalf of Patrick

24    Abraham, who's present.

25            MR. CASUSO:  Lou Casuso on behalf of Burson

```
 1   Augustin, who's present.
 2              MR. CLARK:  Nathan Clark for Rotschild
 3   Augustine, who's present.
 4              MR. HOULIHAN:  Richard Houlihan with Naudimar
 5   Herrera.
 6              MR. VEREEN:  And Roderick Vereen on behalf of
 7   Stanley Phanor, who's present.
 8              THE COURT:  All Defendants are present.
 9              Are we ready for the jury?
10              MS. ARANGO:  Yes.
11              MR. CASUSO:  Yes.
12              THE COURT:  Let's bring them in.
13              MS. ARANGO:  Judge, I'm sorry.
14              MS. BORGES-TOGNOZZI:  Can we get a signal?
15              THE COURT:  Yes.
16              MS. BORGES-TOGNOZZI:  Thank you.
17              (Whereupon, the jury entered the courtroom at
18   11:11 a.m. and the following proceedings were had:)
19              THE COURT:  You may be seated.
20              You may proceed, Ms. Arango.
21              MS. ARANGO:  Thank you, Judge.
22              Good morning, ladies and gentlemen.
23              THE JURY:  Good morning.
24              MS. ARANGO:  Now, I just want to start off by
25   telling you that you are to be thanked.  We thank you
```

1   so much and we appreciate greatly the service that you

2   have given us.

3           You have listened quietly and closely and

4   attentively to all of the evidence in this case.  You

5   are to be commended for those efforts.

6           It's clear that you understand that you have

7   an important and solemn task and you've taken that task

8   seriously.

9           You are to be -- you are appreciated, really,

10  more than you -- more than you know.

11          As the Judge explained to you, I'm going to be

12  talking to you first and giving you my closing

13  arguments for the next couple of hours.

14          After that, you're going to hear from the

15  defense attorneys.  And then, before you deliberate,

16  you will hear from Mr. Gregorie, who will also give you

17  his rebuttal closing argument, just before you go to

18  deliberate.

19          Now, ladies and gentlemen, as I told you in

20  opening statements, this is a case about a man, Narseal

21  Batiste, who sold out his country for money.

22          He recruited these men -- Patrick Augustine --

23  Patrick Abraham; Burson Augustin; his brother,

24  Rotschild Augustine; Naudimar Herrera; and Stanley

25  Phanor -- to join him.

Closing Argument by Ms. Arango                    59

1              They all agreed to help who they undoubtedly

2       believed was Al-Qaeda to provide their services to

3       Al-Qaeda for money.

4              None of them cared that what they were doing

5       was putting innocent lives in danger.  What they cared

6       about was providing services -- selling their services

7       to a terrorist organization for money.

8              As I told you in opening statements -- I put

9       the same board up in front of you and I said to you

10      this is what the evidence is going to show.  You see at

11      the top of the board what the evidence will show.

12             Well, now the evidence has shown -- the

13      Government has established beyond a reasonable doubt

14      each of those five facts.  Throughout my closing

15      statement, I'm going to go through all of them with

16      you.

17             But each of those five facts have been proven

18      to you beyond a reasonable doubt.  And when you apply

19      the law to those facts, you will arrive at one

20      inescapable conclusion, that is, these Defendants are

21      all guilty of the crimes charged.

22             Now, I also just want to point out that, as I

23      go through my closing statements with you, you are

24      going to see screens up on your monitor.  The screens

25      will -- the presentation is not going to go back to the

Closing Argument by Ms. Arango                    60

 1    jury room with you.

 2          I go through that -- I'm going to be going

 3    through that with you because there is voluminous

 4    evidence in this case, as you know already through all

 5    of the binders that you have.

 6          I'm going to try to direct you to certain

 7    places which will make it easier for you.  You're

 8    welcome to take notes during the course of this closing

 9    argument.

10          THE COURT:  Ms. Arango, could you just move

11    the poster board right over here.

12          MS. ARANGO:  Absolutely.

13          THE COURT:  It's blocking the view of some of

14    the jurors.

15          MS. ARANGO:  Is that better now?

16          THE COURT:  I don't know who it was.  Thank

17    you.

18          UNIDENTIFIED JUROR:  I'm so short.

19          MS. ARANGO:  Do you want me to move it up a

20    little bit more?

21          UNIDENTIFIED JUROR:  Around this way.

22          MS. ARANGO:  How's that?

23          UNIDENTIFIED JUROR:  Okay.

24          MS. ARANGO:  I'll be reading it to you, too.

25          Before I go through the points on this board,

Closing Argument by Ms. Arango

1    I want to talk to you a moment about Narseal Batiste's

2    testimony.

3           Because he chose to testify in this case, you

4    must judge his credibility like that of any other

5    witness.

6           And that is, you have to consider the fact

7    that he has a personal interest, a personal stake, in

8    the outcome of this case.

9           He wants to save himself as well as his men

10   who followed him, because they believed him to be their

11   divine leader.  He wants to be a hero to them.

12          Now, ask yourselves:  Did he appear to be

13   telling you the truth?  Because, ladies and gentlemen,

14   that man took responsibility for nothing.  He gave an

15   excuse for everything, no matter how inconsistent it

16   was with his other excuses.  He bent and twisted every

17   piece of evidence to fit his excuses, no matter how

18   shamelessly incredible.

19          Do you remember the "8s"?  I just want to -- I

20   want to just refer you to this just for a moment

21   because it's illustrative of the types of -- the term

22   that this man gave to you, the deception, the

23   inconsistencies.

24          Do you remember the "8s"?  Let's put up

25   this -- this up on the screen.  I was questioning him

 1    about a conversation he had with Elie Assaad.

 2           And the point that I was trying to make with

 3    him was:  When did he have this idea?  When did this

 4    idea about reaching out to a terrorist organization,

 5    about waging war against the US Government -- when did

 6    this pop into his head?  When did he have these --

 7    these feelings?

 8           And he told you in his own testimony that he

 9    met Sultan Kahn-Bey in 1998, that he was introduced to

10    the Moorish Science Temple in 1998.  He was living in

11    Chicago at that time.  He was working for Federal

12    Express, FedEx Ground, and he was delivering packages

13    throughout the Chicago Loop, which included the Sears

14    Tower.

15           And so, in this conversation that was held on

16    December 22nd of 2005, he was talking to Elie Assaad

17    about his Sears Tower plan.

18           And Elie Assaad says to him, "Since when you

19    have this idea in your head?"

20           And Narseal Batiste responds, "Since '98."

21           And I said to him, "It's no coincidence that

22    you say '98 -- since 1998, which happens -- which

23    was -- look at what was going on in your life at that

24    time.

25           "You know, you were being introduced to this

Closing Argument by Ms. Arango                        63

 1    movement.  You were -- you just met this man who has

 2    these thoughts and ideas.  You connected with him.  You

 3    were working with -- in -- at FedEx.  You were

 4    delivering packages.

 5             "This idea popped into your head in 1998.  Was

 6    it a coincidence?"

 7             And he said, "Oh, no.  I just liked the number

 8    '8.'"  I had talked earlier about 85 percent and I

 9    just -- I just liked the number '8.'"

10             That was his excuse.  That was the excuse that

11    he came up with on a very viable point in this case,

12    which is:  How does an idea like that pop up into

13    somebody's head?  How does it -- how does it get

14    created?  How does a germ of an idea begin?

15             "Oh, just the number '8.'  I liked the number

16    '8' that day."

17             Absurd.

18             Now, ladies and gentlemen, as your Honor

19    instructed you, you are here as finders of the facts.

20    You are -- you are judges.  Each and every one of you

21    are judges.  You're here to determine the truth.

22             And your most valuable asset is your common

23    sense, your common sense, based on your life

24    experiences.  You're not to leave that at the door when

25    you come here.

1          That's why you're here, so that you can apply

2     that common sense to the facts in this case and you can

3     make a determination as to what really occurred.

4          Because what you're trying to determine here

5     is what people are thinking, what Narseal Batiste and

6     these men are thinking.

7          When he gets up there on the stand and tells

8     you, "Oh, I was thinking something else," you have to

9     consider what he really was thinking.

10          You have to determine whether or not what he

11     was telling you on the stand was the truth.  You have

12     to determine whether or not what he told you -- what

13     you heard in those recordings when he didn't know that

14     he was being recorded is actually true.

15          And, ladies and gentlemen, as I told you in

16     opening statements, the reason the FBI records people

17     in an undercover capacity is to determine what they

18     think, is to determine what is really going on in their

19     head, because people speak the truth when they don't

20     know that they're being recorded.

21          And that's what we have here.  We have

22     basically two types of recordings here.  We have

23     recordings that Narseal Batiste and his men had with

24     the informants, but we also have recordings -- and I'm

25     going to focus on these other types of recordings --

 1   recordings that he had with members of his

 2   organization, with his mentors, Master Athea and Sultan

 3   Kahn-Bey.

 4         And those were private conversations that had

 5   absolutely nothing to do with the informants.  Because

 6   he told you, "Oh, I was influenced by Abbas al-Saidi.

 7   Everything I said I did because he exerted the power of

 8   suggestion over me."

 9         Well, let's take a look for a moment at the

10   things that occurred without Abbas al-Saidi's

11   involvement at all, without any of the informants'

12   involvement at all.

13         But I also want to talk to you a little bit

14   more about when you consider Narseal Batiste's

15   testimony.

16         Do consider admissions that he made on the

17   stand, because you can peel away the deceptive and

18   untruthful things that he said on the stand for some of

19   the truthful things he said and some of the admissions

20   that he made.

21         Consider those.  And I'm going to go through

22   them with you.  And keep those things in mind.

23         First of all, I want to talk about Fact 1 and

24   Fact 2 on this board.

25         The Government has proved to you beyond a

1    reasonable doubt that Narseal Narseal Batiste was the

2    leader of a paramilitary and cult-like group.

3            Fact 2 -- I'm going to merge them both because

4    you can't get -- you can't discuss the -- Narseal

5    Batiste and the group without discussing the other

6    Defendants.

7            Fact 2:  He recruited the Defendants, these --

8    these members who voluntarily became members, and,

9    also, they called themselves "soldiers" in this group.

10           Now, let's talk for a moment about some of

11   Mr. Batiste's admissions right here on the stand that

12   go to establish those two facts.

13           First, he admitted that, in the year 2005, he

14   formed an organization and he was the leader.

15           Now, he also testified that, in 2004, he

16   traveled with his men to Chicago and they went to look

17   for Master Athea and they went and saw Sultan Kahn-Bey

18   and then, when they didn't find Master Athea, they went

19   down to Alabama.

20           He testified that all of that occurred in

21   2004, indicating that his organization was formed back

22   in 2004.  But at least you can consider that as of

23   2004, before he met Abbas al-Saidi -- because I asked

24   him that on the stand -- he had formed this

25   organization.

1          In forming this organization, he merged the

2     Moorish Science Temple with the Universal Divine

3     Saviors.  He testified, "That was my goal, to merge

4     these two organizations."

5          Now, you heard that the Moorish Science Temple

6     is a conglomeration of different religions, including

7     Islam.  They have their own Koran, which they call the

8     Circle 7 Koran.  And they believe that they are

9     entitled to their own sovereign Government within the

10    United States.

11         But on that point the official Moorish Science

12    Temple and this group disagreed.  And you've heard

13    recordings about that disagreement.  They did not agree

14    with the Moorish Science Temple being in line with the

15    United States Government, working with the United

16    States Government, acting under the United States

17    Government.

18         They did not think that the United States was

19    a legitimate country.  They believed in their own

20    sovereignty.  They -- he hated the United States.  He

21    had many discussions about his hatred for the United

22    States.

23         So on that point, he and the Moorish Science

24    Temple diverged.

25         He also admitted on the stand that it was part

Closing Argument by Ms. Arango                    68

1    of his organization and mission to recruit people.  And

2    you heard of one of those -- from one of those personal

3    recruits.  That was Mick Coriolan.  And we'll talk

4    about his testimony in a moment.

5           But he said he was out there in the park and

6    he was trying to recruit people to join his mission.

7           He admitted on the stand -- I asked him

8    directly "You recruited all of these Defendants, and

9    they voluntarily joined your organization?"

10          He admitted that.

11          He referred to his Defendants -- excuse me --

12   to his men as "soldiers."  He also admitted that he

13   trained his soldiers.  We're going to go over a

14   conversation that he had with Sultan Kahn-Bey where he

15   talks about his men.

16          Remember, Sultan Kahn-Bey is his most trusted

17   associate.  He was a mentor to him.  He followed him.

18   He considered Sultan Kahn-Bey royalty.  He considered

19   him to be his leader.

20          So when he was talking with Sultan Kahn-Bey

21   and referring to these men, he called them his

22   "soldiers."  He didn't do that at the behest of Abbas

23   al-Saidi or anybody else.  He did that on his own.

24          And he bragged about how well trained they

25   were, how they were hard as steel, how they were

Closing Argument by Ms. Arango

 1    jogging around and how -- and how he made sure that

 2    they were in good shape.

 3            He led -- he admitted that he led his men in

 4    military marching exercises.  He had the Defendants

 5    wear uniforms and Army boots.  He wanted his

 6    organization to look structured and organized.

 7            I asked him about that.  I said, "You wanted

 8    to look this way because it was part of your

 9    recruiting?"

10            They wanted to attract attention.  They wanted

11    people -- potential recruits to flock to them and think

12    that, "These people are organized.  They've got

13    something going on."

14            And that's why he had his men in shape.

15    That's why he led marching exercises.  That's why he

16    had uniforms.  Because he wanted to give that

17    appearance.

18            He ordered his men to hold post and to be on

19    guard duty at the facility in Liberty City that they

20    called the Embassy or the Temple.

21            And it was him making those orders.  It was

22    him telling them when to -- to hold post at the

23    Embassy.  He ordered his men to clean and sweep.

24            He was more than a spiritual leader.  He said

25    this on the stand.  He was in complete control of this

Closing Argument by Ms. Arango                    70

 1   organization, and he admitted that when I asked him

 2   about this.

 3            You heard one of the last tapes that was

 4   played in this case.  He didn't allow the members of

 5   his organization to watch movies that he didn't approve

 6   of.

 7            He told you, "Oh, no.  I just was merely

 8   making a suggestion.  I wasn't really telling them

 9   movies they couldn't watch."

10            Well, you heard that recording.  He was

11   saying, "You people are not to watch these movies.  I'm

12   the leader here.  I tell you what movies to watch.  I

13   don't like this spiritual stuff that you're watching.

14            "Because I'm your divine leader.  I'm the one

15   that gives you the -- tells you the path to follow in

16   your spirituality, not these movies that have to do

17   with spirituality.  I don't want you watching any of

18   that and becoming infected with that."

19            In fact, he was the divine leader; and he made

20   decisions as the divine leader of the organization.

21   And we're going to go into a telephone call that he had

22   with Patrick Abraham in which he discusses that.

23            And he admitted that on the stand.  He

24   believed he was the divine leader, that his -- that his

25   authority -- his leadership authority was vested in him

1   by God.  This is not insignificant.  This is what this

2   man believed, and these gentlemen followed him.

3          And, in fact, I questioned him about this.  He

4   said on the stand that he believes that man has the

5   authority to, on a certain level, be God.

6          Because I asked him, "You think you're God of

7   this organization?"

8          He says, "Well, I think -- I think that God

9   gives the authority for man to be God."

10          And he admits that he was the God of this

11   organization.  He believed that.

12          He called himself "The Prince."  He called his

13   wife "The Queen."  His men called him "Prince" and his

14   men called the wife "Queen."

15          He held meetings.  He admitted that he held

16   meetings to his men where he preached to his men.

17   We're going to talk about what he preached to his men

18   in a moment, and we're going to talk about the fact

19   that these meetings were secret meetings and most of

20   them occurred in the Embassy or the Temple.

21          And I just want to point out to you now,

22   ladies and gentlemen, that that facility was a facility

23   that the FBI could not monitor.  They could not get in

24   there and record private, face-to-face meetings between

25   these men in the Temple or the Embassy.  They could not

1    do so.

2              The only way they could record conversations

3    was with -- with Narseal Batiste or somebody else and

4    an informant or wiretap on the telephone.

5              But that was -- those were telephone calls

6    between these men.  These men practically lived

7    together.  They worked together.  They hung out

8    together.  They cleaned up and fixed up the Embassy on

9    their off-hours.  They were always together.  They

10   didn't even have much reason to use the telephone.

11             So these telephone calls are significant

12   because they're not that common and they tell you a

13   little bit -- they give you an idea as to what was

14   really going on in the head of these men.

15             All right.  Let's talk about a telephone call

16   that Narseal Batiste had with Patrick Abraham on

17   March 23rd of '06.  It's Government Exhibit W2 -- and

18   I'm going to put portions of it up on the screen for

19   you -- W2-01932.

20             And, again, you may recall this.  This is --

21   this was a telephone call initiated by the fact that

22   Patrick Abraham's wife or girlfriend, who was called

23   Sister Melinda -- she was not abiding to the authority

24   of Narseal Batiste's wife, the Queen.

25             He had put her in charge of what they called

Closing Argument by Ms. Arango                    73

1    the sisterhood.  That's the wives and girlfriends of

2    these men.  The Queen was in charge of them.

3              Sister Melinda was acting up.  In this

4    conversation, Narseal Batiste is chastising Patrick

5    Abraham for his wife's behavior.

6              He says at Page 2, "She doesn't do any kind of

7    reporting to the Queen."

8              At Page 4:  "She doesn't want to place herself

9    under the authority of the leadership of the

10   sisterhood."

11             He's mad that Sister Melinda is not placing

12   herself under the authority of the leadership of the

13   sisterhood, the Queen, his wife, and he is exerting his

14   leadership and influence on the husband to put his --

15   put his wife in line.

16             Then he goes on to say at Page 5, "The

17   sister's gonna have to be able to survive on this

18   mission."

19             Survive.  They've got a secret mission they're

20   talking about here, something that's going to require

21   the sisters having to survive.

22             Further down at Page 5, he says, "Because you

23   might not always be in the same state as her."

24             Their mission may take them to another state.

25             Let's go to the next clip.

Closing Argument by Ms. Arango                    74

1          Because he says, "What happens when we're on a

2    mission and we're not gonna be around?  What if the

3    sisters have to evacuate?"

4          They're talking about fleeing the state, that

5    their mission is going to require them to flee and the

6    sisters to have to evacuate.

7          And he says at Page 6, "'Cause when the call

8    is made, the call is made.  There could be a flight at

9    night."

10         Ladies and gentlemen, these men were preparing

11   for something big.  They knew that it -- they were

12   risking their lives.  They knew that the sisters had to

13   be together and bond together because the sisters'

14   lives were at risk as well.

15         They weren't talking about preaching to

16   people.  They weren't talking about doing martial arts

17   in the park.  They were talking about a dangerous

18   mission involving violence.

19         I'll go into more of that later, because that

20   comes out in other parts.

21         He says further in that conversation at

22   Page 6, "The Queen is like the other half of me.  The

23   Queen is the Christa.  She has the role of their Christ

24   and that savior with the sisterhood."

25         He's saying that he's the Christ and she's the

1    Christa.  Again, he admitted that he was the divine

2    leader.  Ladies and gentlemen, he was a cult leader

3    with a messianic complex if you've ever seen one.

4            He says further down at Page 8, "She" --

5    meaning Sister Melinda -- "is not on the Queen's

6    level."

7            There's a hierarchy here.  Sister Melinda is

8    subordinate to the Christa.  There's definite hierarchy

9    here.

10           And then he says, "You have to be ready to

11   humble yourself and submit yourself to divine

12   guidance."

13           I questioned him about this.  Divine guidance

14   is him.  He's the divine leader.  He is a cult leader.

15   Let's call a spade a spade.

16           Now, what he was talking about here about

17   having to evacuate, to flee in the middle of the night,

18   to travel to other states, well, he was talking about

19   causing chaos, having multiple coordinated attacks,

20   waging war against the Government.

21           And how do we know that?

22           Because we're getting bits and pieces of

23   information, and you have to apply, again, your logic

24   and common sense to this.

25           Well, let's take a look at a conversation that

1   Burson Augustin had with Abbas al-Saidi early on in

2   this investigation, on November 7th of 2005.

3          And it's Government Exhibit 41 and 41-A.  I'm

4   referring to Page 20.

5          Burson Augustin -- again, Narseal Batiste

6   wasn't present at this -- in this meeting.  This is

7   with Burson Augustin and Abbas al-Saidi.

8          Burson Augustin explains to him -- he says,

9   "People in this neighborhood, they get a plan.  People

10  in Opa-Locka, they get a plan.  Liberty City, they get

11  a plan.  Strike every neighborhood.  Cops are going

12  every which way.  We gotta go to another state."

13         Same thing.  This is -- this is exactly what

14  was being discussed in the conversation with Narseal

15  Batiste and Patrick Abraham.  Multiple coordinated

16  attacks, causing chaos.

17         It's no coincidence that, in a private

18  conversation between these two men, they talk about the

19  very same topic that Burson Augustin is talking about

20  here.

21         And then further down on that same page

22  Burson Augustin says, "We have brothers.  They like

23  what we're talking about.  But when they start to see

24  that we're not just talking about taking over Miami or

25  some big county, we're talking about taking over

Closing Argument by Ms. Arango                    77

1    Allah's world, with his help, they think you're crazy."

2          He's talking about what Narseal Batiste

3    preaches to his men and to other men that they're

4    trying to recruit and some of these men saying, "I'm

5    out of here.  You're crazy.  I don't want to have

6    anything to do with you.  You looked good.  You looked

7    organized.  You looked like a group I was interested

8    in, but you're really not what you appear to be.  Now

9    that I know what you're about," like Mick Coriolan did,

10   "I'm out of here."

11         Now, let's refer -- I'm going to refer now to

12   another wiretap of a private telephone call that

13   Narseal Batiste had with one of his men, Lyglenson

14   Lemorin.  He described his organization as a secret and

15   sacred order.

16         And just to explain this telephone call,

17   Lemorin's son, Luke, had acted up, had misbehaved, had

18   spoken out against the mission.  Narseal Batiste was

19   exerting his power and he said, "Your son has

20   misbehaved.  You need to chastise him because" -- he

21   says to him -- "this is a secret and sacred order."

22         They understood what was going on.  Not

23   everybody could be privy to their meetings and their

24   ceremonies.

25         And he said people in their secret and sacred

Closing Argument by Ms. Arango                    78

 1   order had to be pure vessels.  They have to be the most

 2   purest vessels.

 3          And then further -- at the end of this clip,

 4   he says, "They have to come to the throne of

 5   righteousness.  You have already yielded and submitted

 6   to righteousness."

 7          His men have to submit themselves to the

 8   throne of righteousness, which is his throne, according

 9   to him, with his men in these secret and sacred

10   meetings that they're having, not meetings that are

11   open to the public.

12          And in this -- as a result of this

13   conversation, he kicks Little Luke out of one of their

14   ceremonies.  He's so concerned about the children, as

15   he testified to, and he wants the children to be

16   involved.

17          But one of the children acts -- speaks up

18   against the mission and he kicks him out.  Out of a

19   Bible study class?  Is that what he wants you to

20   believe?

21          In fact, in a private wiretapped conversation

22   with his wife, the Queen, he discusses a ceremony

23   which included the exchange of blood.

24          He said in Wiretap -- W2-03414 at Page 2 -- he

25   says, "You know, at some of these ceremonies, they had

Closing Argument by Ms. Arango                    79

1    the exchange of blood and one person we cannot exchange

2    our blood with, and you know who that is."

3              And I asked him about this.

4              I said, "You were talking about the literal

5    exchange of blood.  You were concerned about a person

6    in your organization who had a disease?"

7              And he said, "Well, I sort of knew -- I heard

8    that somebody had a disease, but that's not really what

9    was going on here."

10             Ladies and gentlemen, he's talking about

11   literal exchange of blood and being concerned about

12   becoming infected.  That's what was going on in their

13   secret and sacred meetings.  That was what was going on

14   in this cult.

15             In these meetings, Batiste preached to these

16   men.  Let's talk a little bit about what he preached.

17   Well, we'll talk about that in just a minute.

18             First, I want to go -- I want to just talk to

19   you about the third point on this board, which is

20   Fact 3, that this group and its dangerous ideology

21   existed long before the FBI became aware of their

22   existence.

23             As I told you before, these private telephone

24   conversations between these men show you -- apply your

25   logic and common sense -- tell you what these men

1    were about, irrespective of Abbas al-Saidi or the

2    informants.  Abbas, like Mick Coriolan, saw what they

3    were about and he reported them to the FBI.

4           They existed -- and this is important --

5    before the FBI became aware of them.  And their

6    ideology was a dangerous one.  You heard these

7    conversations.  They are talking about causing chaos.

8    They are talking about multiple attacks.

9           Now, on this point about -- that they existed

10   before the FBI became aware of their existence, Narseal

11   Batiste admitted that he became affiliated with the

12   Moorish Science Temple back in 1998, when he was living

13   and working in Chicago.

14          He met Master Athea, another one of his

15   mentors, in 1997, and he used -- he and Master Athea

16   used to attend festivals and preach about the United --

17   Universal Divine Saviors, wearing turbans, robes and

18   carrying staffs.

19          And then remember this picture that I showed

20   him?  He said that that picture was dated in 1998.  And

21   he was wearing a turban and carrying a staff.  And

22   that's Master Athea next to him.

23          I point this out to you because we're going to

24   talk in a moment about the first meeting he had with

25   Elie Assaad, a man that he thought was a terrorist that

Closing Argument by Ms. Arango                    81

 1  was being sent by a terrorist organization to evaluate

 2  him and his organization.

 3          And he wore a turban and staff just like he

 4  wore back in 1998.  He didn't just go to a prop store

 5  and buy some props to meet this man in 2005.  This is

 6  what this man wore.  This is how he attracted attention

 7  to himself.  This is what he was about way before the

 8  FBI ever heard about him.

 9          He admitted that, in 2004, he gathered up his

10  soldiers and he traveled to Chicago to meet with Master

11  Athea and Sultan Kahn-Bey.  This occurred in 19 --

12  again, in 2004, before he met Abbas al-Saidi.

13          Now, Sultan Kahn-Bey and Master Athea, the

14  other man in this picture, were his spiritual leaders,

15  he testified, his spiritual godfathers.

16          You recall there was a telephone call between

17  Narseal Batiste and Burson Augustin.  And that's

18  Wiretap -- Wire 2, Government Exhibit W2-03687.

19          And in this call, Burson is saying to Narseal

20  Batiste, "Look, Master Athea's telling me that you're

21  going around saying that you are Allah and that Allah's

22  too powerful to be in one vessel."

23          And Batiste says, "Well, I know that Allah is

24  too powerful to be in one vessel.  The three of us,

25  we're supposed to come together."

Closing Argument by Ms. Arango                    82

1            He, Master Athea and Sultan Kahn-Bey were to

2     come together and comprise Allah.  He thought that the

3     three of them composed the Trinity.  He thought that

4     God had granted him this divine authority.

5            Now, when I asked him about these -- on the

6     stand about these private telephone calls with his men

7     where they talked about their mission requiring them to

8     flee in the middle of the night, their order being a

9     secret and sacred order, being a part of the Trinity,

10    being the Christ, with his wife as the Christa, he

11    admitted that these phone calls that we've just

12    reviewed had absolutely nothing to do with the

13    informants.

14           That goes to show you that those activities

15    were occurring before Abbas al-Saidi alerted the FBI to

16    what he saw going on.

17           Now, let's talk for a moment about what the --

18    Narseal Batiste, "The Prince," as he called himself,

19    preached to these men in his secret and sacred

20    meetings.

21           We saw a journal belonging to Naudimar

22    Herrera.  And if you recall, ladies and gentlemen, it

23    was Naudimar Herrera's journal with his name on the

24    front.

25           But, additionally, we provided evidence to you

1    that -- fingerprint evidence that Stanley Phanor's

2    fingerprint was on this same journal.

3          And it's clear as we go through some of the

4    pages of this journal that this journal is what was

5    being preached not only to Naudimar Herrera, but the

6    rest of these men by their leader, their divine leader,

7    "The Prince."

8          Okay.  Let's look at the -- let's zoom in on

9    the first slide.

10         "Take orders from 'The Prince.'  Take orders

11   from 'The Prince.'"

12         What have all these phone calls that we've

13   gone through told you?  He calls himself "The Prince."

14   He gives orders.  He admitted those things.

15         It's not a stretch that Naudimar Herrera is

16   writing down exactly what you already know based on his

17   own admissions.

18         What's -- can you please pull up the next one.

19   Yes.

20         "You have surrendered your will to 'The

21   Prince.'  No playing.  Only take orders as a soldier

22   from 'The Prince.'"

23         Ladies and gentlemen, it's not a coincidence

24   that Naudimar Herrera is writing in his journal about

25   taking orders from "The Prince," about surrendering his

Closing Argument by Ms. Arango                    84

```
 1    will to "The Prince," about the fact that he's a

 2    soldier.

 3            It's no coincidence that he's writing those

 4    things and those same topics are being discussed in

 5    these conversations, these private conversations.

 6            It goes to show you that Naudimar Herrera was

 7    just writing down exactly what he -- what he heard was

 8    being preached to him.

 9            Here's one more.

10            "Nine points for a successful evasion.  Large

11    groups are easily detected if there are a lot of you

12    split into four-man teams, which are a lot harder to

13    detect."

14            This sounds an awful lot like that

15    conversation that Narseal Batiste had with Patrick

16    Abraham about fleeing in the middle of the night,

17    having to go to another state, having to flee under the

18    cover of darkness, rendering yourselves undetectable to

19    the Government, to law enforcement.

20            This is -- there's no coincidence that -- that

21    Naudimar Herrera is writing these things in his

22    journal.  And that is what Batiste is discussing.

23            This journal had nothing to do with the

24    informants.  Abbas al-Saidi didn't write in this

25    journal.  This journal what -- tells you what was going
```

Closing Argument by Ms. Arango                    85

 1    on, what was happening in the minds of these men, in

 2    what can only be described as a cult long before

 3    Abbas al-Saidi ever came along.

 4            Now, let's talk for a moment about this

 5    group's ideology and what they preached to their

 6    potential recruits.  I touched on that earlier, other

 7    young men who they were trying to recruit into this

 8    organization.

 9            You heard from one of them:  Mick Coriolan.

10            Ladies and gentlemen, he was not happy about

11    having to testify.  He told you several times on the

12    stand in his own words, "I'm not a snitch."

13            He was, at one point in time, friends with

14    Abbas al-Saidi.

15            When he found out that Abbas was a Government

16    informant he said, "I don't trust him.  He's a liar.

17    He's a snitch.  He didn't tell me what was going on."

18            He had no respect for people who were working

19    with the Government.

20            But he did have an obligation to tell the

21    truth about what he heard from these men.  He didn't

22    really want to talk ill of them.  He didn't want to be

23    a snitch.

24            He said, "Batiste is a really nice guy.  I

25    just didn't like what he was talking about."

1          He tried to downplay it.  That means his

2    testimony -- consider that testimony with your logic

3    and common sense.  It's very significant.

4          You have a man on the stand who really doesn't

5    want to say bad things about them, doesn't want to

6    align himself with the Government, thinks that

7    informants are snitches, doesn't want to be a snitch

8    himself.

9          But what does he tell you?  This is very

10   important, what he tells you.

11         His testimony -- I'm going to put up -- on

12   March 5th of 2009, this year, at Page 115 and 116 -- he

13   was asked by Mr. Gregorie, "Why didn't you follow

14   him?", referring to Mr. Batiste.

15         "Because of taking over stuff.  America is our

16   country.  I was born and raised in Haiti and, you know,

17   I seen different people build their own movement.  I

18   don't want to come here and build another movement."

19         He used that word.  Nobody put that word in

20   his mouth, "movement."  That's a very good word.  It

21   explains clearly what this mission was about.

22         Mr. Gregorie asked him, "What was his movement

23   about that concerned you?"

24         He says, "Well, everything.  The men -- the

25   brothers are strong.  I didn't like -- the thing I

Closing Argument by Ms. Arango                    87

1   didn't like is the fighting part."

2            And, remember, he testified, "I didn't like

3   the physical fighting that was -- fighting part that

4   was being preached here."

5            Mr. Gregorie continues:  "Fighting whom, sir?"

6            This is like pulling teeth.

7            "The only thing I never liked about Brother

8   Naz is the part about taking over.

9            "Taking over what, sir?

10           "The United States of America.  That's why I

11   think -- I always think that that's gonna get him in

12   trouble."

13           He did not like that Narseal Batiste was

14   preaching taking over the United States of America,

15   forming a movement of strong men to do so.

16           And that's why he was out.

17           He said, "I don't want to have any part of

18   this."

19           He wasn't forced to stay.

20           These men weren't forced to stay.  They did so

21   on their own.  They heard exactly what Mick Coriolan

22   heard, and they liked it.  They signed on to it.

23           They didn't say "No.  No.  No.  I'm out of

24   here.  I don't like what you're preaching here.  I'm

25   out."

1    They said -- they became a part of his inner

2  circle, who Narseal Batiste trusted implicitly.

3    Let's compare for a moment what Mick Coriolan

4  describes as a movement with what Patrick Abraham --

5  how he described this organization in a conversation

6  with Elie Assaad on February 19th of 2006.

7    That's Government Exhibit 56-A, -B, -C and,

8  specifically, the transcript, which is Government

9  Exhibit 56-B, at Pages 78 through 79.

10    You know, in this conversation, Narseal

11  Batiste -- and, if you recall, Narseal Batiste and Elie

12  Assaad talked about the plan -- about their plan to

13  take over the United States, to burn buildings down, to

14  blow up the Sears Tower, to shoot any survivors.  That

15  was being discussed.

16    And Patrick Abraham was sitting there for the

17  most part quitely.

18    But at one point, Elie Assaad turns to Patrick

19  Abraham and asks him about, you know, when he got

20  introduced to all of this, when he became a member of

21  this organization.

22    And Patrick says, "He introduced me to it" --

23  referring to Narseal Batiste -- "this whole movement."

24    Again, the use of the word "movement."  It's

25  no coincidence that he used the word "movement" and

Closing Argument by Ms. Arango                    89

1    Mick Coriolan used the word "movement."  That's how

2    they described their mission, their plan.

3          And then down at the bottom, he says, "Well,

4    we met in 2002, June in 2002," indicating that this

5    organization was in existence in June of 2002,

6    certainly at least a portion of this organization, and

7    Narseal Batiste was -- was forming it at that point in

8    time, long before the informants ever came into the

9    picture.

10          Now, speaking of Mick Coriolan's concerns,

11    remember, he was concerned -- he expressed a concern

12    about physical fighting.  Well, there was another

13    person who was very close to Narseal Batiste as well,

14    Narseal Batiste's spiritual godfather, Master Athea.

15          You heard testimony about how he went to the

16    FBI.  He was concerned about what was going on here.

17    He went to the FBI and he agreed to do an undercover

18    recording to record secretly a conversation with his

19    godson, Narseal Batiste.

20          And let's turn to -- I'm going to put a slide

21    up, Government Exhibit 93.  The recording is 93, and

22    the transcript is 93-A.

23          And Master Athea says, "I'm talking about

24    dealing with a spiritual war, and you're talking about

25    a physical war."

Closing Argument by Ms. Arango                    90

 1          And you see what Narseal Batiste says at the

 2   bottom of this?

 3          "The divine father, he put the soldier in

 4   man."

 5          There's no coincidence here that Master Athea

 6   is concerned about them engaging in a physical war and

 7   Mick Coriolan was worried about physical fighting and a

 8   war against the United States or a movement against the

 9   United States.  That's no coincidence.

10          These two men were concerned about the same

11   thing, one of those men being his spiritual godfather,

12   and he calls him out on it.

13          He says, "I'm concerned."

14          And Narseal Batiste -- not only is he talking

15   to Master Athea -- and, again, this is -- the informant

16   was -- no informant was present for this conversation.

17   He's giving you a glimpse into what he thinks, what's

18   going on in his mind.

19          He says, "The divine father put the soldier in

20   man.  We are warriors.  We are soldiers.  We are meant

21   to fight."

22          That's what he's about.

23          And then Master Athea says, "Well, anybody

24   who's thinking about subversive work against this

25   nation, you know, in a diabolical way --"

1          And Narseal Batiste responds, "I don't

2    consider this place here to be a legitimate nation."

3    He says, "What are you talking about?  You're concerned

4    about me waging war against the United States, about me

5    wanting to attack the United States?  I don't consider

6    this place to be a legitimate nation."

7          That tells you what he's thinking, what he's

8    about, what they're all about.

9          Let's talk for a moment about the third part

10   of this Trinity.  This is Master Athea and Narseal

11   Batiste.

12         The third part of the trinity, according to

13   Narseal Batiste, is Sultan Kahn-Bey, the man he met in

14   Chicago, the man who introduced him to the Moorish

15   Science Temple.

16         He has a conversation with him on April 9th of

17   '06.  It's Government Exhibit W1-03031.  At Page 7,

18   Sultan Kahn-Bey is on a -- is ranting and raving.

19         He's talking about Sister Yamnah, the woman

20   who's the head of the Moorish Science Temple here in

21   Miami.  He is at odds with her.

22         Why?  Because they disagree with the official

23   Moorish Science Temple's view that they have to work

24   within the confines of the United States Government.

25         And he -- they disagree about that.  Sultan

1    Kahn-Bey makes it clear -- again, this is a private

2    conversation; no informant in this conversation -- he

3    says, "That" -- "B" word -- "is putting us under the

4    Government of the United States, Mo, through the

5    Department of Justice.

6                "We ain't got nothing to do with the United

7    States Government, period.  We're at war with that" --

8    "B" word.

9                He's talking about being at war with the

10   United States Government.  They don't want to have any

11   part to it.  They believe in their own sovereignty.  As

12   crazy as it seems, this is what these people believe.

13               Narseal Batiste says at Page 13 about how she

14   works directly with the Feds.  He doesn't like that.

15   He doesn't want to work with the Feds.  He wants his

16   own country.

17               And that's what -- that's what this sect --

18   this extremist sect of the Moorish Science Temple was

19   about, that he was trying to form here, being about

20   creating a sovereign country and being -- and going

21   against the authority of the United States Government,

22   because they don't believe in the legitimacy of the

23   United States Government.

24               And that's what he talks to -- talks about

25   with one of his most trusted mentors in a private

1    conversation.

2          It's no coincidence that, in both

3    conversations that he had, one with Master Athea and

4    the other with Sultan Kahn-Bey, the two people in his

5    trinity -- he talks in both of those conversations

6    about his hatred for the United States Government.

7          That's not a coincidence, ladies and

8    gentlemen.  It tells you something about what he's

9    thinking.  And that's what you're here to do, is to try

10   to ferret out what is going on in the minds of these

11   people that you're deciding on.

12         Now, you recall that his excuse was, "Well,

13   the only reason I said those horrible, awful things,

14   the only reason I talked about blowing up buildings and

15   being at war with the United States Government and

16   hating the United States Government and rejoicing when

17   the towers fell on 9/11 -- the only reason I said those

18   things was because Abbas al-Saidi coached me into it."

19         Listen to -- first of all, listen to those

20   conversations.  See if you ever, ever hear any kind of

21   coaching.  It's the most ridiculous thing.

22         And listen to the conversations he has with

23   not only his men, but with the informants.  Is this man

24   ever being coached?  Is he ever listening to anybody

25   else?  Is he ever allowing anybody to exert influence

1    over him?  Absolutely not.

2            This man is power-hungry.  He's ambitious.

3    He's power-hungry.  He tells people what to do.  He

4    gets mad at them when they disobey him.

5            He's -- Abbas al-Saidi, a Yemeni immigrant

6    with a third-grade education, is exerting all this

7    influence on him?  That's absurd, ladies and gentlemen.

8    Use your common sense.

9            Abbas al-Saidi, as I said before, wasn't privy

10   to those private conversations.  He didn't write in

11   Naudimar Herrera's journal.  Yet, his testimony is

12   consistent with what was going on apart from him.

13           Again, it's corroboration.  And what does

14   corroboration tell you?  That -- that the person who's

15   telling you something that is corroborated by other

16   information is telling you the truth.

17           Abbas al-Saidi came in here and he said,

18   "Listen, I was concerned about these guys," just like

19   Mick Coriolan, just like Master Athea.  "I was

20   concerned about what they were preaching.  I was

21   concerned about what was going on.  I called the FBI

22   because of my concerns."

23           And everything he thought was going on is

24   exactly what these private conversations showed you.

25           Now, again, these three points that I've just

Closing Argument by Ms. Arango                    95

1    gone over with you on the board were proven beyond a

2    reasonable doubt with you -- without you ever having to

3    consider the testimony of either of the informants.

4          What the informants told you merely

5    corroborated what you already knew based on those

6    private conversations, the journal, Mick Coriolan's

7    testimony and Narseal Batiste's own admission during

8    his testimony.

9          So let's turn to the fourth fact.

10         The Government has established beyond a

11   reasonable doubt that the Defendants sought funding for

12   their group from a terrorist organization to advance

13   their goals.

14         Now, it seems like a crazy idea.  Who would go

15   to a terrorist organization to fund their group?  How

16   does an idea like that spring into existence?

17         Well, it was not a new idea.  This idea had

18   already sprung into the mind of another man, Jeff Fort,

19   a man that Narseal Batiste modeled himself after.  This

20   idea was not formed by Abbas al-Saidi.  This idea was

21   formed by Jeff Fort.

22         These men understood that the only way to

23   build their movement, the only way to recruit people,

24   to become big and strong, was funding, money.  Of

25   course they needed money.  Any movement like that needs

Closing Argument by Ms. Arango                         96

1    money.

2          Jeff Fort had that same idea.  He was also a

3    leader.  He was the leader of a gang, but he was a

4    leader.  He had men following him.  He knew that he

5    needed money to make his organization bigger and

6    stronger.  That was the only way to grow, so that he

7    could become stronger.

8          And you heard from Dan Young.  He was the

9    expert in the El Rukn gang, Jeff Fort's gang.  He told

10   that you Jeff Fort was a power-hungry, ambitious man

11   and that, in order to get the funding that he needed,

12   he approached Kadhafi.  He went to the Libyan

13   Government.  This was back in the 1980s.

14         He said, "Listen, we're, you know, a gang in

15   Chicago, but we can help you here.  We can offer our

16   services.  We're big, we're strong, and we can wreak

17   havoc.  Give us $2 million and we'll do whatever you

18   want us to do.  We don't like this Government either.

19   You've got an ally in the United States."

20         He sent two of his gang members to Libya to

21   meet with Kadhafi, to let Kadhafi know that they

22   existed and that they were willing to do his bidding

23   for $2 million.

24         In fact, in that very first meeting that

25   Narseal Batiste had with the man that he thought he

1    made the connection with, the man that he thought had

2    just arrived from the Middle East -- within five

3    minutes of that meeting, he tells him -- he compares

4    himself to Jeff Fort.

5              And I'm referring now to Government

6    Exhibit 44 -- 44-A and 44-B, which is a videotaped

7    meeting in the Radisson Hotel on December 16th of '05.

8              Elie Assaad -- and this meeting -- this was

9    their very first meeting, where Narseal Batiste wore

10   his turban or kufi hat and his staff.

11             And Elie Assaad said, "Why am I here?  You

12   have asked for me.  I have come.  Why am I here?"

13             And Narseal Batiste says early on, "There's a

14   man that you probably don't know and he was probably in

15   the same situation that I am in right now."

16             And he goes on to talk about him.  "His name

17   is Jeff Ford."

18             He said Jeff "Ford."  The man's name is

19   actually "Fort."

20             "Jeff Fort was the leader of one of the

21   biggest gangs and it started off with Islamic

22   philosophy."

23             And Then he goes on to explain, "He was the

24   first black man to ever be indicted in the United

25   States court for terrorism.  He was being helped by

Closing Argument by Ms. Arango                    98

1    Libya."

2             He knew exactly what Jeff Fort was about.

3    What he was saying was, "Here's the guy that I'm

4    modeling myself after.  I've asked for you to come

5    here, just as Jeff Fort did back in the '80s.  He asked

6    for Libya.  He was trying to help Libya."

7             He just didn't want to get caught.  Narseal

8    Batiste didn't want to get caught.  He didn't want to

9    make the same mistakes that Jeff Fort did.  But he

10   wanted to accomplish the same goal, a goal that Jeff

11   Fort failed to accomplish.

12            And he explained this to him right here in

13   this conversation.

14            So what does that tell you?  This idea to

15   reach out to a terrorist organization for funding came

16   up in the mind of one man.  That's Narseal Batiste, who

17   was emulating another man.

18            It certainly didn't come into the mind of any

19   informant.  Use your logic.  Use your common sense.

20   The evidence shows you exactly what was going on.

21            You also heard a lot more about Jeff Fort from

22   Dan Young.  I'm just going to quickly go through some

23   of the similarities between Jeff Fort and Narseal

24   Batiste.

25            Most of these are no coincidence, although I

Closing Argument by Ms. Arango

1  would say the first is a coincidence.

2        They're both born in the rural south and

3  raised in Chicago.

4        They both call themselves "Prince" and both of

5  them had sons and called their sons "Prince."

6        They're both natural leaders, ambitious,

7  power-hungry and charismatic.

8        And you got a chance to see Mr. Batiste on the

9  stand.  He's a charismatic man, articulate.  You can

10  see why he can influence others and convince others to

11  go his way.  And he's power-hungry.  The man thinks

12  he's a God.

13        Jeff Fort sought and obtained Government

14  grants allegedly to help disadvantaged Chicago

15  communities.

16        Narseal Batiste testified that he sought

17  public funding, also allegedly to help disadvantaged

18  Miami communities.

19        Continue.

20        Jeff Fort created his own version of the

21  Moorish Science Temple, but was never an official

22  member.

23        Same goes for Narseal Batiste.

24        Jeff Fort purchased a building in the Chicago

25  south side and called it a mosque.

Closing Argument by Ms. Arango                    100

1          Batiste leased a building in Liberty City and

2    called it a Temple.

3          He's following a model here, ladies and

4    gentlemen.

5          Jeff Fort's gang members would march on the

6    streets in uniforms and kufis to exhibit their control

7    and identify themselves to the public.

8          Same thing with Narseal Batiste's soldiers.

9    They wore uniforms and they did so in order to look

10   structured and organized and to identify themselves to

11   the public and to help recruit.

12         Jeff Fort's gang hosted functions at the Fort

13   as a recruiting tool and for community.

14         Batiste testified about his functions at the

15   Embassy and at the park and how he was trying to

16   recruit and how he was trying to help the community

17   uplift humanity, I think is what he said.

18         Jeff Fort's gang used certain terms, symbols

19   and code words.  I'm going to go into some of those in

20   a moment.  So did Narseal Batiste.

21         And, of course, lastly, he offered his gang's

22   services to the Libyan Government to carry out attacks

23   against US targets in exchange for money.

24         Narseal Batiste offered his group's services

25   to Al-Qaeda to carry out attacks in the United States

1     against US targets in exchange for money.

2             Now, some of the terms that were use both by

3     Jeff Fort and Narseal Batiste were "prince," "chief,"

4     "khalifa."

5             Narseal Batiste also incorporated some of the

6     symbols used by Jeff Fort that you heard Dan Brown

7     [sic] testify to, the five-pointed start and the color

8     scheme red, black and green.

9             Also -- and this is significant -- Jeff Fort

10    owned several businesses, including a construction

11    company, a security company and a restaurant.

12            Narseal Batiste had started a construction

13    company.  He talked about starting a security company,

14    and he also talked about starting a restaurant.  In

15    fact, he testified that he wanted to open up a

16    restaurant in half of the building that he leased.

17            It's obvious that Narseal Batiste modeled

18    himself after Jeff Fort.  These similarities that I

19    went into are no mere coincidence.  He researched him,

20    he was enthralled by him, and he decided, you know,

21    "He's a guy that I want to emulate.  I'm going to do

22    what he failed to do."

23            And that is why he discussed Jeff Fort within

24    the first five minutes of meeting a man he thought was

25    sent by a terrorist organization to evaluate him and

Closing Argument by Ms. Arango                    102

1    his organization.  He was just explaining why that man

2    was there.

3              And he told you, ladies and gentlemen, "Well,

4    I just thought I was going to show up and I would be

5    handed money."

6              Ladies and gentlemen, how absurd is that?  He

7    just is going to show up somewhere and someone's just

8    going to hand him money for nothing?  For acting?

9              The only way he's going to get handed money by

10   a terrorist is by providing services to that terrorist.

11   That's the only way he was going to get money.

12             He talked about, "Oh, I wanted the money.  I

13   wanted the money."

14             How do you think he was going to get the

15   money?  How did he think -- how did you think he

16   thought he was going to get the money?  What's most

17   logical?

18             He had to act like a terrorist because he was

19   selling his services to a terrorist.  Nobody was going

20   to hand him money for a good act.  That's absurd,

21   ladies and gentlemen.

22             So now that you understand that he was

23   emulating Jeff Fort, that fact corroborates Abbas

24   al-Saidi.  It tells you what really happened in

25   September, when Abbas al-Saidi told Batiste that he was

Closing Argument by Ms. Arango                    103

```
 1    traveling to Yemen to be with his family.

 2            Batiste realized, "I've got this guy that I've

 3    been talking to.  He's a Muslim.  He's an Arab.  He's

 4    from Yemen.  We have a connection going.  Now this

 5    guy's telling me he's going back to Yemen.  Oh, my God.

 6    This could be my only chance.  This could be my only

 7    chance to actually reach out to and connect with a

 8    terrorist organization."

 9            Those opportunities are not going to come

10    around very often.  It's not like you've got Al-Qaeda

11    members walking around the streets.  It's not like he

12    can pick up the phone and say, "Hey, can somebody

13    connect me to Al-Qaeda?"

14            How is he going to have that connection?

15    Abbas al-Saidi was going to be a connection.

16            He thought, "Wow, maybe Abbas could do that.

17    Maybe Abbas knows somebody in Yemen."

18            In fact, Abbas testified he does know people

19    in Yemen who are connected to Al-Qaeda.  So it

20    wasn't -- it actually wasn't an absurd thought in his

21    mind.  He actually had a good idea.  It just turned out

22    that Abbas al-Saidi was an informant.

23            But he had an idea, and that idea could have

24    worked if Abbas al-Saidi wasn't an informant.  He could

25    have made the connection that he wanted to make.
```

Closing Argument by Ms. Arango                    104

 1          And that tells you what Narseal Batiste

 2   believed was happening early on in this investigation

 3   when Elie Assaad arrived here.  He had reached out for

 4   a terrorist organization.  He got Abbas al-Saidi and

 5   Abbas al-Saidi, through the FBI, introduced him to Elie

 6   Assaad.

 7          Now, he even admitted this in a conversation

 8   that he had with Elie Assaad on March 16th.  And this

 9   is very important.  This was a conversation that

10   occurred after these men took an oath of allegiance to

11   Al-Qaeda in the warehouse.

12          We're going to talk about that some more a

13   little bit later.

14          But this is significant because Batiste says

15   to him -- to Elie Assaad, who he was calling Brother

16   Mohammed, or Occ, "Yeah, Occ.  I did not know" -- let

17   me just go back.

18          He was talking about when he first met Brother

19   Mohammed in this conversation.

20          He says, "I did not know that Osama bin Laden

21   was your leader, the great Sheik."

22          You will see that Elie Assaad was a little

23   taken aback by that.

24          He says, "You didn't know?  You did not know

25   that?"

Closing Argument by Ms. Arango                105

1          And he says, "No.  I didn't know it."

2          And he says, "Well, because I know you send --

3     you send after Al-Qaeda.  You send the message."

4          And what was being discussed here was -- Elie

5     was saying, "Wait a minute.  How did you not know I was

6     from Al-Qaeda when you were the one that reached out to

7     a terrorist organization?  You were the one that called

8     out for us."

9          And Batiste says, "I just told -- I told Abbas

10    that -- what I was trying to do and told him I needed

11    some help -- financial help.  And he told me he knew

12    some people that was fighting in jihad" -- meaning he

13    knew terrorists -- "and -- but there's so many

14    different types of groups that's fighting in jihad,

15    like Hamas.  I thought maybe it was probably one of

16    those."

17         So all Batiste was saying here was, "Yeah.  I

18    reached out for a terrorist organization.  I wasn't

19    sure what terrorist organization I'd get.  I might have

20    gotten Hamas" -- he understood that Hamas was a

21    Palestinian terrorist organization -- "I might have

22    gotten Hamas.  But I wound up getting Al-Qaeda.  Isn't

23    that great, the deadliest terrorist organization in the

24    world?"

25         He's giving you an insight here into what he

```
 1   was thinking when he was dealing with Abbas early on.

 2   He was thinking, "I want to be hooked up with a

 3   terrorist organization.  It doesn't matter which one."

 4        And now he's saying, "I'm thrilled.  I hit the

 5   jackpot.  I hit Al-Qaeda."

 6        That's what's going on in that conversation.

 7        You heard the testimony of Special Agent

 8   Anthony Velazquez.  He told you that, after they got

 9   the report from Abbas al-Saidi as to what his concerns

10   were about this group, they had to find out what was

11   going on, and that the only way to determine what

12   somebody's true intent was was to record them when they

13   didn't know they were being recorded.

14        And I discussed that with you in opening

15   statements.  I said that undercover recordings are

16   designed to ferret out whether people are involved in

17   or preparing to be involved in criminal activity,

18   because people tell the truth when they don't know

19   they're being recorded.

20        That's why the FBI uses undercover recordings

21   as a law enforcement tool to find out what's going on.

22   What are these people about?  And you have to listen to

23   those recordings yourself through the filter of your

24   common sense.

25        After Abbas was flown back from Yemen by the
```

Closing Argument by Ms. Arango                107

 1    FBI, he started recording conversations with Narseal

 2    Batiste about whether or not he wanted to meet up with

 3    a terrorist organization from the Middle East.

 4         He discusses it in terms of his uncle.  What

 5    he tells Narseal Batiste is, "That connection is my

 6    uncle.  My uncle is connected to a terrorist

 7    organization."

 8         So they have this -- they have these sort of

 9    coded conversations where they talk about "back home"

10    being the Middle East and "my uncle" being "the person

11    who's going to connect us to Al-Qaeda."

12         And the FBI's listening to these recordings

13    to determine -- to see how Narseal Batiste responds.

14    They're directing Abbas al-Saidi.  But what they want

15    to see is:  How does Narseal Batiste respond when Abbas

16    al-Saidi mentions these things?

17         Is he going to say, "I don't know what you're

18    talking about.  I want to start a food bank.  I'm

19    hoping to -- I want to start a church.  I want to help

20    humanity"?  You know, they want to see what's going on

21    here and how he responds.

22         And in one of the very first telephone

23    conversations with Narseal Batiste, when Abbas al-Saidi

24    says, "You know, gather up your soldiers because I've

25    got some word going on from back home" -- and this is

1    Government Exhibit 39 and 39-A at Page 3 -- Batiste

2    responds, "Yeah.  So it's sounding good, huh, when you

3    talked to your people from back home, huh?"

4         He's -- he's excited.  He's interested.  He

5    thinks that perhaps this connection might actually get

6    made.

7         And then a week or so later, in a meeting in

8    Abbas al-Saidi's apartment, November 10th, Patrick

9    Abraham was with -- with Narseal Batiste at that

10   meeting and Patrick Abraham brings it up.

11        He says, "Hey, there was somebody who's

12   coming.  The brother was saying to me" -- talking about

13   Narseal Batiste -- "some brother was coming over

14   there."

15        And then the informant says, "Yeah.  I asked

16   my uncle.  He told me he was gonna send somebody out."

17        That was Patrick Abraham initiating that

18   conversation.  "We're interested in seeing if this

19   connection was made.  You know, we think it's kind of

20   farfetched, but, you know, maybe it'll happen."

21        And then in the first video-recorded meeting

22   of this investigation on November 21st in Abbas

23   al-Saidi's apartment, you know, at the direction of the

24   FBI, Abbas al-Saidi brings up the guy that they're

25   talking about.

Closing Argument by Ms. Arango                    109

1          He says, "Remember the guy I told you about?

2    I told you somebody's supposed to be coming over."

3          Batiste says, "Yeah.  What happened to him?

4    Did we make that connection?"  He says, "Is it somebody

5    your uncle knows?"

6          He's trying to focus in now.  He's trying to

7    determine, "Is this the guy that is hooking us up to a

8    terrorist organization?  Are we making the connection

9    that we're trying to make?"

10         And he wants to know more about this person.

11   He says, "Does he speak" -- Patrick Abraham says, "Does

12   he speak English?"

13         And then Narseal Batiste says, "Is he gonna

14   get scared about our guerrilla training?"

15         Continue.

16         He says -- Narseal Batiste talks about, "Well,

17   you know, we have to be careful.  He might be a double

18   agent.  He might work for the FBI, too."

19         They want to know who this guy is, where he's

20   coming from, what's his background.  They want to make

21   sure that they've made a real connection.

22         They don't want to make a connection to a

23   terrorist -- they don't want to inadvertently make a

24   connection to a double agent.

25         And then he says at Page 30 -- excuse me --

```
 1    Page 37 -- he says, "Does he know bin Laden?"
 2            He wants to know -- he is trying to find out
 3    whether that connection is made.
 4            And the FBI is listening to these
 5    conversations.  They understand exactly what's going
 6    on.
 7            And in this same meeting on November 21st of
 8    2005, you heard Narseal Batiste talk about how they
 9    have to -- how there has to be a ground war, how they
10    have to cause chaos, how there has to be fighting in
11    the streets, how the people have to get desperate.
12            He's talking about his plan.
13            So -- oh, let me just go back to that
14    conversation on November 21st.
15            You heard Narseal Batiste talk about this
16    conversation on direct testimony.  His lawyer said to
17    him, "Well, what were you trying to do?  Why did you
18    ask these questions?"
19            And he said, "Well, I was trying to find out
20    if this guy was a terrorist, if he was, like, connected
21    to Al-Qaeda or something."  So he admits that.
22            She says, "Well, what would you have done if
23    he was connected to Al-Qaeda?"
24            And he says, "Oh, I would have said, 'Forget
25    about it.  I'm out of here.'"
```

1          Ladies and gentlemen, that doesn't make any

2     sense.

3          A, the only way for him to get money would be

4     if he made that connection to Al-Qaeda, to some kind of

5     terrorist organization.  That's why he put on the show

6     that he claims he put on, was for money.  So why would

7     he say, "I'm out of here" if he actually made the

8     connection he was trying it make?

9          And, secondly, he did meet that guy, the guy

10    he's talking about that knows bin Laden.  That turned

11    out to be Elie Assaad, who he called Brother Mohammed.

12         And what did Brother Mohammed tell him?  "I'm

13    from Al-Qaeda.  In case there's any confusion, I'm from

14    Al-Qaeda."

15         He said that to Narseal Batiste and he said

16    that to these men.

17         Did any of them say, "I'm out of here"?

18         Not a one.  Not a one of them said, "I'm out

19    of here."

20         They all, in fact, took allegiance to

21    Al-Qaeda, pledged allegiance to Al-Qaeda, in front of

22    this man.

23         They took photographs and videotapes of

24    buildings that they thought Al-Qaeda wanted to target

25    and they handed it over to this man who they thought

Closing Argument by Ms. Arango                112

1       was the Al-Qaeda representative.

2               They were hoping to get money.  But look what

3       they were hoping to do for -- what they did for that

4       money, not what they were hoping to do.

5               That's what's significant here, ladies and

6       gentlemen.  They provided the services.  They provided

7       them.  This is not a matter of whether or not they were

8       going to provide services.  This is not a scam.  A scam

9       is when you don't do something.

10              If -- you know, if Batiste said to Brother

11      Mohammed, "Listen, give me $50,000" and then he handed

12      it over and, as they were handing over $50,000, he

13      handed over some blank cassettes and some blank memory

14      chips, that might be a scam then.

15              But if he's handing over exactly what the

16      person wants, photographs and videotapes of buildings

17      that they want to target for destruction, that's just

18      providing services for money, which is what they did

19      here.

20              They never said, "I'm out of here."  They

21      never said, "Oh, you're from Al-Qaeda.  That's not who

22      we wanted to connect with."

23              Of course that's who they wanted to connect

24      with.

25              So what did Agent Velazquez tell you that the

Closing Argument by Ms. Arango                    113

1    FBI did after they heard Narseal Batiste in these early

2    meetings confirm that he did want to meet up with a

3    terrorist organization and that he was interested in

4    meeting somebody who was being sent by Abbas's uncle

5    from Yemen?

6            They decided to send him the person that he

7    was requesting.  They wanted to see what he would do

8    and what these men would do if they actually met a

9    real, live terrorist.  And that's where Elie Assaad

10   came into the picture.

11           The first meeting was set up at the Radisson

12   Hotel.  They were supposed to meet at the airport, but

13   they didn't connect at the airport.  So Narseal Batiste

14   went to the Radisson Hotel.

15           We've talked about this briefly earlier.

16           At this point I'm going to go through the

17   slides quickly with you on the chronology of events

18   that occurred after the terrorist arrived, after

19   Al-Qaeda arrived, in Miami to evaluate the

20   organization.

21           In the first meeting in the hotel room on

22   December 16th of '05, we've already discussed about how

23   Batiste compares himself to Jeff Fort.

24           Batiste discusses how he wants support --

25   financial support to train his soldiers.

Closing Argument by Ms. Arango                    114

 1              He says he's got generals.  He says they're

 2      well trained.  In fact, he tells Brother Mohammed, "I

 3      can kill you in five seconds with my bare hands.  He

 4      wants to let him know, "We're tough men.  We are an

 5      asset to Al-Qaeda."

 6              And he tells him, "We want to build an Islamic

 7      army for jihad."

 8              And then Elie Assaad says to him, "Well, tell

 9      me what you specifically -- specifically what you want.

10      Write a list."

11              And he writes a list.  And you saw that as

12      Government Exhibit 100.  He writes down boots,

13      uniforms, machine guns, radios, squad cars, things like

14      that, things that would help their movement.

15              Then they have another meeting -- well, the

16      next meeting was with -- was between Abbas and Batiste,

17      which was shortly after the meeting on December 16th

18      with Brother Mohammed, who had just arrived.

19              They have discussions in that meeting about

20      what had occurred on December 16th, and Batiste

21      provides another list to Abbas.  And that's Government

22      Exhibit 101.

23              And in that list, he provides a little bit

24      more detailed information.  He talks about

25      Bushmaster-type guns and he talks about cameras and

1    bulletproof vests and, specifically, revolvers.

2          And then he meets again with Abbas al-Saidi on

3    December 21st, and they have conversations about this

4    plan.

5          Narseal Batiste discusses how there's two

6    major buildings that need to be targeted.  He says the

7    Empire State Building and the Sears Tower.

8          And then he goes on to say that the Sears

9    Tower is the tallest building in the world and, in

10   order to attract attention, you've got to blow up

11   buildings of this magnitude.

12         And he goes on in this conversation to tell

13   him, "I know the Sears Tower.  I'm from Chicago.  I've

14   worked there.  I've worked for FedEx.  I know the Sears

15   Tower."

16         And the next day he has a conversation with

17   Elie Assaad.  He tells Elie Assaad in that meeting

18   that, in order for a small number of people to take

19   down millions of people, it has to be -- you have to

20   have -- create confusion and distress.

21         And that is a theme that you see from the very

22   beginning.

23         Batiste wasn't making this up because -- you

24   know, for Brother Mohammed at the behest of Abbas

25   al-Saidi.  He had been talking about confusion and

Closing Argument by Ms. Arango                    116

1   distress in private conversations with Patrick Abraham,

2   with Burson Augustin, with Sultan Kahn-Bey.  These

3   conversations had been going on.

4          He was just telling Brother Mohammed, "This is

5   what we're about."  He was truthfully telling him what

6   they're about.

7          And, also, in this conversation, he tells him

8   about when he worked for Federal Express and when the

9   idea came into his head about targeting the Sears

10  Tower.

11         Also, in that meeting, he provided him a list

12  of boot sizes.  Those are actual sizes of boots for his

13  men.  And Elie Assaad provides him with the boots in

14  another meeting on January 29th.

15         And at that meeting, after he provides him

16  with the boots, Batiste gives Brother Mohammed, or Elie

17  Assaad, a more detailed list.  This one specifically

18  sets out serial numbers of machine guns.  It provides

19  telephone numbers to the gun dealers.

20         You heard Narseal Batiste talk about, "Oh,

21  this was just a fake list.  I really didn't want any of

22  these things."

23         Is it really necessary, then, to put the

24  telephone numbers to the gun dealers?  You really don't

25  want the guns, but you give him the telephone numbers?

1    Was that really necessary?  Does that make any sense to

2    you, ladies and gentlemen?

3          With this Glock weapon, these Glock guns, he

4    talks about all the different -- subcompact and

5    different pieces that he needs.  He gives very specific

6    detailed information, including, of course, that

7    $50,000 in addition to all of those things.

8          And during the course of all of these

9    conversations, he maintains how he wants the items on

10   the list, how he needs these items on the list, to form

11   his army, to wage his war, to swell his ranks.

12         But then, after this meeting on December 29th,

13   at the beginning of the year 2006, the organization

14   becomes suspicious.  They're concerned that they've

15   revealed too much information to Elie Assaad.  They're

16   concerned that there might be, you know, Government

17   attention to them.

18         And Narseal Batiste takes off.  He lays low

19   for a while.  He leeches his number two in charge,

20   Patrick Abraham.

21         And Patrick Abraham has a phone call with

22   Abbas al-Saidi, because they're not returning Elie

23   Assaad's phone calls at that point in time.  But they

24   do trust Abbas al-Saidi.

25         So Patrick Abraham has a phone call and

1    Patrick Abraham says, "Listen, Batiste is laying

2    low" -- it's Government Exhibit 49 -- "is laying low

3    until things cool down.  The heat is on.  We think

4    something's happening here.  We're not sure if it's

5    Brother Mohammed's fault.  But we need to just lay low

6    until the heat is off."

7             And then, on January 11th, Patrick Abraham and

8    Abbas al-Saidi meet.  Patrick Abraham talks to him

9    about how they don't want Brother Mohammed to go

10   through the heat of trying to get those things, meaning

11   those weapons, because he's Arab and he's got a strike

12   against him.

13            They're now concerned that he's going to be

14   out there trying to buy weapons for their organization

15   and that they're -- that this Arab is going to be

16   attracting law enforcement attention.  They're

17   concerned about that.  They're scared.  Something's

18   going on.

19            And you heard Narseal Batiste testify about

20   what was going on.  He said there was an investigation

21   going on into some stolen diamonds and he was concerned

22   that he might be the target of that investigation.

23            So he felt as though there was law enforcement

24   that was looking at him, and he just wanted to make

25   sure that he got out from under it.

Closing Argument by Ms. Arango                    119

1              And then, on January 18th, Batiste comes to

2     town and meets briefly with Abbas al-Saidi and he talks

3     to him about how he's running scared, how the heat is

4     on and how he has to lay low.

5              And he says to him, "Listen, this mission that

6     we're on, it's not like going to a candy store.  It's

7     not like going to Disneyland.  Our life is on the line.

8     We might lose our life."

9              He was -- listen to that recording.  It's at

10    Page 2.  He was scared.  He was scared because he

11    understood exactly what their mission was about.  He

12    wasn't talking about scamming somebody.  He was talking

13    about their true mission and the Government finding out

14    about what they were really about.

15             Why would he tell -- let me just go back for a

16    minute.

17             He told you, ladies and gentlemen, that Abbas

18    al-Saidi was just trying to -- telling him, "Oh, go

19    along.  Go along.  Just kind of act along.  You're

20    going to get a lot of money your way.  All you have to

21    do is act.  You don't have to do anything.  You just

22    have to put on a good act and pretend you're a

23    terrorist and tons of money will fall into your laps."

24             That's what he told you.  Right?

25             If that's the case, why would he tell this

 1    same man, "Our life is on the line.  Our mission is

 2    not -- is a serious mission.  We understand that we can

 3    lose our lives in this mission."

 4          He's telling the truth about what was going on

 5    in their mission, in their movement, in this

 6    conversation.

 7          And then they decided what to do to make sure

 8    that they could deal safely with the informants,

 9    because they weren't sure what was going on.  They felt

10    the heat was on.

11          And they said -- they decided that they were

12    going to kidnap the informants, that they were going to

13    remove them of any electronic devices, of any cell

14    phones, make sure that their clothes didn't contain any

15    recording devices, remove their clothing, provide them

16    with new clothes.

17          You will see that every single one of them had

18    a role in this -- in this kidnapping, this whole event.

19          Abbas al-Saidi and Elie Assaad were asked to

20    show up at the Embassy.  They thought that they were

21    going to meet with Narseal Batiste at the Embassy.

22          And, remember, Elie Assaad had -- the last

23    time he had met with Narseal Batiste was on

24    December 29th, about one month before this.

25          So this is the first time since then that he's

Closing Argument by Ms. Arango                   121

1    meeting with Narseal Batiste again and he's getting

2    this investigation going again.

3           They show up there, and who greets them but

4    Patrick Abraham and Naudimar Herrera.  That was their

5    task, to make sure that they had an eye on these two

6    men the entire time and to get them from Liberty City

7    to Islamorada.  That was their task.

8           They -- they're told to change their clothes,

9    leave their electronic devices, their jewelry, their

10   cell phones.

11          During this whole commotion, it's evident that

12   the informants are upset.  They're scared.  They didn't

13   know what's going on.  They realize that they are not

14   free to leave.  They realize that these people are

15   testing them.

16          They do manage to keep their recording devices

17   on them.  So you are able to hear this conversation.

18          And Elie Assaad announces, "Listen, I'm from

19   Al-Qaeda.  You all try to do something to me and you're

20   going to have some bad, scary people on your backs."

21          He was warning them, "Don't mess with me.  You

22   hurt us and somebody's going to come out looking for

23   you."

24          That's why he announced he was from Al-Qaeda.

25   He was trying to save his skin at that point.

 1              What does Patrick Abraham say to him?

 2    "Listen, Mo.  Over here, it's our rules."

 3              And he says, "I can look at you eye to eye.

 4    I'm not afraid of you, Mo."

 5              He was telling him, "I'm in power.  I'm in

 6    control.  You listen to me."

 7              And during the course of this, somebody

 8    that -- was tasked to guard the door.  Neither Abbas

 9    al-Saidi or Elie Assaad was able to testify as to who

10    that person was.

11              But certainly that person was somebody that

12    was -- that was with -- part of the inner circle,

13    because this was a very serious task that they were

14    doing.

15              They were kidnapping these men, having them

16    remove their clothes, people that could be possibly be

17    Government informants.  They understood that what they

18    were doing was grave and serious.  Of course they're

19    going to have somebody guarding the door with a weapon.

20              They drive the two informants to another

21    location.  Burson Augustin was tasked with having the

22    rental car there so they could make the switchoff.

23              And Abraham and Herrera drove the two of them

24    down to Al-Qaeda -- excuse me -- down to Islamorada,

25    never telling them where they were going.

Closing Argument by Ms. Arango                    123

1           And you heard the phone calls that Elie Assaad

2    was having with the translator.  He was scared.  He was

3    saying Abbas is scared.  They were in fear of their

4    lives.

5           They were saying, you know, "If these guys try

6    to do anything with us, we need permission to be able

7    to kill."  They didn't know where they were going, what

8    was happening to them.

9           When they get to Islamorada, they're tasked

10   with meeting Stanley Phanor.  He's there waiting for

11   them.

12          He says, "Okay.  We let you keep your cell

13   phone this long so you can talk to Al-Qaeda.  But

14   before I bring you to the tent, before you actually

15   meet with Narseal Batiste, you gotta hand everything

16   over."

17          He had to make sure that they were clean.  He

18   said, "Listen, electronics are a dangerous thing to

19   have," because he understood electronics and cell

20   phones are a way that the Government could track you.

21          And he tells Elie Assaad how much they respect

22   him, how much they talk about him in their inner circle

23   and how much they respect the mission that he's on,

24   this man who just announced that he was from Al-Qaeda.

25          Then he takes the informants to the tent, and

1    that's where they meet up with Batiste.  And, finally,

2    it comes out in the tent what is going on.

3            Batiste says to him, "Listen, this -- this

4    country is all concerned about domestic terrorism.

5    That's people over here that are willing to help out

6    terrorist organizations over there."

7            He understood what the term "domestic

8    terrorism" was.

9            And he said, "That's who we are.  And the

10   Government is out looking for people like us."

11           That's why he mentions "domestic terrorism."

12           Take a look at Government Exhibit 55-A at

13   Page 100 through 101.

14           He says, "Listen, I don't want to be a fool

15   and be caught."

16           He tells him about the investigation that --

17   that was going on and how he was -- he thought he might

18   have been followed.

19           He said, "Listen, the last time I met with

20   you, you could have recorded my conversation."

21           He tells him all about -- basically explaining

22   to him, "This is why we did what we did.  This is why

23   we kidnapped you.  This is why we humiliated you with

24   removing your clothes.  This is why we took away all of

25   your devices.  This is why we scared the dickens out of

Closing Argument by Ms. Arango                    125

 1    you.  We had to make sure you all are clean.  We had to

 2    satisfy ourselves.

 3           "I don't want to be a fool and be caught.  I

 4    know that we are the people that the Government is

 5    looking for here.  I don't want to show up on the

 6    Government's radar screen.  That's why I did what I

 7    did."

 8           And you'll recall I asked him on

 9    cross-examination -- I said, "Sir, you were concerned

10    that cell phones were a way the Government could track

11    you?"

12           And he said, "Yes."

13           He admitted that.  That gives you some insight

14    into why they did this kidnapping.  They wanted to make

15    sure that it was okay to deal with Elie Assaad, to deal

16    with Brother Mohammed.

17           And then, now that they -- now that they --

18    that they had gotten -- that was all explained, then

19    they could talk about the plan.  And in this meeting in

20    the tent, they discussed looking for a warehouse,

21    reestablishing their communications.

22           Batiste agrees that he needs an explosives

23    expert, because they had discussed earlier, on

24    December 29th, the need for explosives to blow down --

25    to blow up buildings.

Closing Argument by Ms. Arango                    126

1           Batiste had said he knew how to put a building

2    up and he could take one down.  He talked about

3    dynamite and other powerful explosives.

4           So those conversations now could continue

5    freely because Batiste felt as though he's put these

6    men to the test and now he knows it's okay to go

7    forward.

8           So the next meeting that he has with Elie

9    Assaad is on February 19th in Elie Assaad's apartment.

10   And that's Government Exhibit 55 through -- excuse

11   me -- 56-A, -B and -C.

12          And, like I said, he feels free at this point

13   in time to discuss his plan openly with Brother

14   Mohammed.  He talks about sending his soldiers to

15   Al-Qaeda mini-camp training.  He talks about how this

16   attack that he's planning would be just as great or

17   greater than 9/11.

18          He talks about how he needs a camera phone and

19   a videocamera to film his evidence in Chicago.  He

20   talks about launching a full ground war.  He outlines

21   his plan.

22          He says, "We're gonna kill all the devils that

23   we can."

24          He says -- he says, "We embrace death.  We

25   understand the risk that we're taking here.  It's a

1    risk we all are prepared to take."

2          At one point, when he's talking about the plan

3    and how the building is going to come down and all of

4    these people are going to die, the informant says,

5    "There's going to be no survivors."

6          And he goes, "No.  We'll make sure of that.

7    If we see anybody surviving, we'll shoot them.  We're

8    not -- we're going to make sure there's no survivors."

9          After that, they discuss creating an alliance

10   between the Moors and Al-Qaeda.  And you heard Elie

11   Assaad discuss how there was an unrecorded meeting on

12   March 9th, and you heard some of the phone calls -- a

13   phone call that occurred afterwards when Elie Assaad

14   showed up.  He had his recording device.  They tried to

15   strip-search him.  He left.

16         Batiste got very upset that he had left.  He

17   called him up.  Again, this tells you a little bit of

18   what Batiste is like.  This man is not afraid of any of

19   these informants.  This man is not being influenced by

20   anybody.

21         He says, "Brother Mohammed, you showed up here

22   and you left.  What are you doing?"

23         He's calling him on that.  He says, "If

24   you're" -- Brother Mohammed came up with a phony excuse

25   about having to go get dinner.

1          "Oh, come on, now."  He calls him on that.

2     He's exerting his power and control.  He's saying, "I'm

3     in charge here.  You don't show up at my facility and

4     then turn around and leave.  I'm offended by that.  You

5     come right back here and you talk to me face to face

6     and you explain it to me."

7          And he does come back.  And they have this

8     conversation about creating a formal alliance between

9     the Moors and Al-Qaeda.

10         Narseal Batiste denies that on the stand.  But

11    look at the very -- the conversation that is recorded

12    the very next day on March 10th.  This is when Batiste

13    takes the pledge of allegiance to Al-Qaeda.

14         And it starts off with Brother Mohammed

15    saying, "Like we spoke yesterday about the alliance

16    between the Moors and --"

17         And Batiste responds, "Al-Qaeda."

18         Because they had that conversation already.

19    There's no mystery about it here.

20         Batiste says, "Oh, no, no.  We never had this

21    conversation.  He sprung this on me."

22         Why would he finish the sentence?  He finished

23    the sentence because that's what they discussed

24    earlier.

25         And then Batiste takes the oath of Al-Qaeda

1    first as the leader of the group.  And what's

2    significant here is he changes some of the words to

3    that oath.

4           He testified to you, "Oh, I took that oath,

5    but that was just silliness.  Those words are just

6    silly.  I wasn't really concerned about them."

7           If that's the case, he would have just taken

8    the oath without changing any of the words.

9           Read Government Exhibit 61-A.  Listen to that

10   recording.

11          He says, "Well, I don't want to say 'God.'  I

12   want to say 'Allah.'"

13          He says, "I don't want to say we are 'at the

14   directive of Al-Qaeda.'  I want to say we are 'at the

15   directive and alliance with Al-Qaeda.'"

16          He wanted to make sure that the Moors and

17   Al-Qaeda directed each other and were in alliance with

18   each other.

19          He wanted to make sure that, if Al-Qaeda asked

20   the Moors to do something, they would do so, and if the

21   Moors needed Al-Qaeda to do something, like pay them,

22   Al-Qaeda would do so.

23          He was concerned about the wording.  If he

24   thought this wording was silly, he would have just said

25   whatever Brother Mohammed read him.  But he didn't do

1    that.

2            And then he said at Page 6 through 17, "The

3    brothers" -- meaning the men -- "don't have any problem

4    with the pledge.  They understand that, if you're in

5    jihad, this is what you do."

6            And, sure enough, that's what these men do.

7    These men didn't -- they knew that he was from

8    Al-Qaeda.  He announced that he was from Al-Qaeda on

9    January 28th, months earlier -- or a month earlier.

10           They knew exactly who he was.  And they all

11   showed up on May 16th -- excuse me -- on March 16th at

12   the warehouse that was to be their new facility.

13           And Agent Velazquez testified that they wanted

14   to be able to record the private conversations of these

15   men.  So they were offering a warehouse that they

16   could -- that they could have concealed microphones in

17   so that they could record their -- their secret

18   meetings and conversations.

19           That's why this warehouse was offered.

20           The warehouse was turned over on March 16th.

21   And these men all attended the meeting at that

22   warehouse, knowing exactly what was going to happen.

23   One of the reasons we know that is we hear their

24   wiretapped calls just before the meeting as they're

25   arriving, as they're driving there.

Closing Argument by Ms. Arango                 131

1          You hear Narseal Batiste talking to Stanley

2    Phanor.

3          And he says to him, "Listen, don't bring

4    Brother Corey to this meeting because he's shown some

5    dedication, but he's not part of the inner circle.  I

6    only want my most trusted men at this meeting.

7          "These men out here on the periphery that, you

8    know, come in and out of our organization, you know,

9    they're not -- they're not in the inner circle.  This

10   is a special meeting.  You all are going to be taking a

11   pledge to Al-Qaeda in this meeting."

12         And they drive by.

13         "Is the coast clear?"

14         Stanley Phanor tells him, "Yeah.  Why?  I

15   drove by.  You know, Occ is standing there.  The lights

16   are on.  I don't see anything.  Appears to be okay."

17         They want to make sure that there's no law

18   enforcement out there.  They know exactly what they're

19   going to be going in there to do.  They don't want to

20   get caught.  They don't want there to be police driving

21   around saying, "Hey, what's going on here?"  That's why

22   they had these telephone conversations.

23         Then the meeting occurs in the warehouse.  And

24   one of the first things that Narseal Batiste does --

25   and review Government Exhibit 69, 69-A, -B and -C.

Closing Argument by Ms. Arango                    132

1        One of the first things he does when that

2   meeting begins is he gives a speech about how happy

3   they all are to have connected with Osama bin Laden,

4   how they liken him to an angel, that they don't think

5   he's a devil like the rest of the world is, they think

6   he's an angel, and they're appreciative that they've

7   made a connection.

8        That was an honest -- that was honest, because

9   they were happy that they finally reached their goal

10  that Jeff Fort tried to do, connecting with a terrorist

11  organization.

12       They were going to now ally themselves with

13  that terrorist organization.  Of course, they were

14  hoping for funding, but they were happy that that

15  occurred.

16       Then each and every one of these Defendants

17  stands up -- you see it on videotape -- and they each

18  in a very solemn ceremony with reverence pledge an oath

19  of allegiance to Al-Qaeda.

20       Afterwards, Batiste reads a prayer from the

21  Koran and every single one of them stand up and

22  applaud.

23       You heard Narseal Batiste say, "Oh, they were

24  all mad.  Afterwards they left me" -- we'll talk about

25  what happened afterwards -- "Afterwards they all left

 1    me.  They didn't know what was going to happen.  They

 2    were all very angry with me."

 3            Look at that recording yourself, ladies and

 4    gentlemen.  Every single one -- nobody walked out.

 5    Every single one of them willingly took that oath.

 6    After it was over, they all applauded.  They all hugged

 7    Brother Mohammed.

 8            These are not men that were angry.  They knew

 9    exactly what they were doing when they walked into that

10    warehouse.

11            And then Brother Mohammed, at the request of

12    the FBI, says, "Can I have permission to speak in front

13    of your men or do you want to speak privately?  Because

14    I have a message directly from the Sheik" -- meaning

15    directly from Osama bin Laden -- "that I need to convey

16    to you.

17            And he was saying that because FBI directed

18    him to say that because FBI wanted to see whether or

19    not this -- whether or not Elie Assaad's conversations

20    were -- with Narseal Batiste were intended to be just

21    between the two of them or if it was okay for the

22    others to hear, if they were really involved.

23            And, of course, Batiste says, "Oh, yes.  These

24    are my -- this is my inner circle.  This is my closed

25    circle.  You can talk in front of them freely."

Closing Argument by Ms. Arango                    134

 1          He didn't say, "Hold off.  Hold off.  Don't

 2   relay that message just yet.  We'll talk about it

 3   later."

 4          He says, "Talk openly in front of these men.

 5   I don't have anything to hide in front of these men."

 6          And then right afterwards is when -- is when

 7   Brother Mohammed tells him -- tells all of these men

 8   about the Al-Qaeda plan to blow up FBI buildings around

 9   the country, Miami FBI building being one of them, and

10   enlisting their help, saying, "We need your assistance.

11   We need photographs and videos of these buildings.  We

12   need you to surveil these buildings."

13          He says, "I'm not from Miami.  I'm not from

14   here.  I don't even know where the FBI building is.

15   You all are from here.  That's part of the services

16   that you are to provide to Al-Qaeda.

17          "You're from here.  You know which -- where

18   these buildings are.  Can you give us some pictures?

19   Can you give us some videos?  Can you give us some

20   footage so we know which buildings to attack, we know

21   where to go, we know what to do?"

22          And Agent Velazquez testified -- he said, you

23   know, "We introduced that plot because we wanted to see

24   what they were willing to do, whether they were really

25   willing to provide material assistance, material

Closing Argument by Ms. Arango                135

1    support," that is, videos and photographs of buildings

2    they believe Al-Qaeda wants to target to a person that

3    they believe is from Al-Qaeda, to the Al-Qaeda

4    representative.

5            FBI wanted to see if they were willing to do

6    that.

7            And we'll go into that in more detail.

8            But, of course, ladies and gentlemen, you know

9    they did it.  They provided material support.  They

10   provided exactly what Al-Qaeda asked of them at this

11   meeting on March 16th.

12           Now, after March 16th, what happened?  Because

13   you heard Narseal Batiste testify, "All these men left

14   me.  They all went every which way.  They were so mad."

15           Well, each and every one of these men stayed

16   with him, and each and every one of these men were

17   tasked with jobs that had to do with the filming and

18   the photographs and providing those items to the

19   Al-Qaeda representative after they knew that the

20   Al-Qaeda representative was here, after they took an

21   oath of allegiance to Al-Qaeda.

22           On March 24th, there's a telephone

23   conversation -- excuse me -- a meeting between Narseal

24   Batiste and Elie Assaad.

25           And Batiste says, "Listen, I need a van in

Closing Argument by Ms. Arango                    136

1    order to take those photographs and those videos.  I

2    can't be driving around in my van doing so.  I need you

3    to rent a van.  I also need a memory chip for my

4    personal camera, my digital camera" so he could hand

5    over that memory chip with the requested photographs on

6    it.

7            At that point, he had already had the

8    videocamera that was provided by Brother Mohammed.

9            And then later that night, on the evening of

10   the 24th, Patrick Abraham and Batiste drive Elie Assaad

11   to the Circuit City to purchase those items.  They also

12   purchase a zoom lens for the digital camera.

13           After they purchase those items, understanding

14   that the next day those videos and those photographs

15   are going to be taken, they drive Elie Assaad, this man

16   that they believe is from Al-Qaeda, who they took an

17   oath of allegiance to Al-Qaeda in front of -- they

18   drive him by various buildings.

19           They drive him by the FBI building in North

20   Miami.  Listen to Government Exhibit 72 and 72-A.

21           They drive him by the -- they say, "Okay.

22   Slow down.  Drove slow.  There it is.  It's only got

23   one guard shack.  That building is easy to attack.

24   This Government is weak.  This country is weak.  Look

25   how easy it is to drive a van right -- with explosives

1    right into that building."

2            He helps -- not only does he tell him what to

3    do, he gives him some suggestions.

4            And then he says, "Let's drive by some other

5    places."

6            He drives him by a Jewish synagogue.  "Hey,

7    that's why where the Jewish people go to pray.  That

8    may be a target for Al-Qaeda."

9            He drives him by the National Guard Armory, a

10   government building.  "That might be another building

11   Al-Qaeda might be interested in targeting."

12           They -- that's Patrick Abraham as well as

13   Narseal Batiste doing this.

14           What happens the next day on March 25th?  This

15   is the day that they take the pictures and the videos.

16           Well, you see Stanley Phanor and Rotschild

17   Augustine go with Narseal Batiste to the downtown area,

18   right around here.  They -- that's where he takes

19   videos and photographs of all the federal buildings in

20   the courthouse complex.

21           And you see this surveillance photograph of

22   Stanley Phanor standing up, Rotschild Augustine sitting

23   there, and that's Narseal Batiste behind him.  The

24   three of them are there at the Miami-Dade campus

25   because it's right next door to the Federal Government

Closing Argument by Ms. Arango                    138

1    buildings.

2           And you heard from the surveillance agent,

3    Marcos Figueiras.  He was following them.  He testified

4    about what he saw.

5           First, they took that van and they went to a

6    Dollar Store and they cleaned the windows so that they

7    could get good pictures.  They didn't want dirty

8    windows that would muck up the pictures that they were

9    going to give to Al-Qaeda.

10          Then they drove around in a circle -- in a

11   circular fashion around all of the Government

12   buildings.  And then you saw the pictures and the

13   video.

14          You saw the same areas that Marcos Figueiras

15   described these people drove around in.  You saw the

16   video that was taken from inside the van that was

17   provided to the Al-Qaeda representative.

18          That was these three men after they all took

19   an oath of allegiance to Al-Qaeda.

20          Narseal Batiste says, "Oh, no.  They left me."

21          They didn't leave him.  He's not going to

22   drive around in the van -- drive the van by himself and

23   take videos and photographs.  They were with him.  Of

24   course they were with him.

25          That's what they were supposed to do.

 1    Somebody was tasked with driving the van while the

 2    video was being taken.  That's exactly what they did on

 3    March 25th.

 4            THE COURT:  You have 15 minutes left.

 5            Ms. Arango, there's a request for a rest room

 6    break.  So what we're going to do is -- I don't want to

 7    break, but we'll just take a moment.

 8            If there's any juror who needs to go use the

 9    rest room, you may do so now.  If you can wait, it'll

10    be another 15 minutes.

11            Go ahead.

12            MS. ARANGO:  What's significant here, too, is

13    you saw the video that was taken of the Government

14    buildings.  It was taken in the daytime and in the

15    nighttime.  They went back and they took more.

16            In those videos, they focused on surveillance

17    cameras.  They focused on gas mains and water mains and

18    the back entrances where vehicles could go into

19    buildings and the barriers and guard shacks.

20            They focused on sensitive areas and vulnerable

21    areas that Ed Purchase told you were real vulnerable

22    areas of these buildings.

23            They focused on them because they wanted to

24    help out Al-Qaeda.  That was part of the services that

25    they were providing to Al-Qaeda.  In exchange for

Closing Argument by Ms. Arango                    140

1    money?  Sure.  But that was part of their services.

2            And these three men conducted -- did that on

3    March 25th.

4            I'm going to talk, also, later about somebody

5    else who was -- who was tasked to do something -- to

6    take video on March 25th, and that person is Naudimar

7    Herrera.  We're going to review that -- a conversation

8    that he had with Narseal Batiste in a moment.

9            But Narseal Batiste tasked each of these men

10   to do something on March 25th to obtain the photographs

11   and the footage that Al-Qaeda was requesting.

12           And then, on the 26th -- I'm going to go

13   through these quickly -- on the 26th, in meetings with

14   Burson Augustin, there was no -- after the -- after the

15   oath-taking meeting on the 16th, there was at least

16   five meetings between Elie Assaad, Burson Augustin and

17   Narseal Batiste where this Al-Qaeda plot was discussed.

18   So Burson Augustin didn't say, "I'm out of here."

19           One of these meetings was on the 26th.  And in

20   this meeting is when -- with putting gloves on his

21   hands, Narseal Batiste hands over the memory chip and

22   the videocassette with the photographs and videos.

23           Continue.

24           On the 3rd, Narseal Batiste -- the three of

25   them meet in the warehouse and they discuss Sultan

1    Kahn-Bey.  They also discuss the fact that Burson has a

2    security license to get into some of these buildings,

3    that he could possibly get a job there.

4           On the 5th, they talk about Sultan Kahn-Bey.

5    Agent Velazquez testified how he wanted to know who all

6    of the members of this organization were.

7           Sultan Kahn-Bey was the leader of the

8    organization in Chicago.

9           So, "Offer to bring him down" is what they

10   told Elie Assaad.  "We'll pay to bring him down.  We

11   want to make sure we've got everybody under the

12   microscope here."

13          He gives him money, 3500, to bring Sultan

14   Kahn-Bey to Miami.

15          And then the next day, Elie Assaad brings a

16   computer to the warehouse.  Narseal Batiste stands over

17   his shoulder and he explains -- he goes through all of

18   those photographs and he goes through all of those

19   videos and he explains to him, "This is how I would

20   attack these buildings.  This is what I would do."

21          He gives him advice.  In addition to giving

22   him the photographs and videos, he gives him advice as

23   well, which is material support.

24          He tasked Naudimar Herrera with taking video

25   of the FBI building in Miami.  And, if you recall, for

1    the FBI building in Miami, only photographs were turned

2    over, not video.

3             Naudimar Herrera didn't take that video

4    either inadvertently or on purpose.  And in Government

5    Exhibit 90-A through -C, Batiste chastises him for not

6    taking that video.

7             You heard him take the stand and say, "Oh, I

8    really didn't say this.  I said, 'I had the tape.  I

9    played the tape back.  I did not record anything.'"

10            He claims that this conversation was about

11   when he picked up the camera in the warehouse on

12   March 16th.

13            He says, "I didn't record anything."

14            Ladies and gentlemen, use your common sense.

15   We're not going to play it.  Use your common sense.

16   Because we don't have much time here.

17            Listen to this snippet of this recording on

18   April 6th.

19            He says, "You didn't record anything."

20            And what he's talking about was the fact that

21   Naudimar Herrera didn't turn on the camera when he was

22   supposed to, because he was tasked with videoing the

23   FBI building.

24            Go on.

25            All right.  And then, on the Chicago

Closing Argument by Ms. Arango                143

1    connection, Sultan Kahn-Bey, you heard a wiretapped

2    call between Sultan Kahn-Bey and Narseal Batiste where

3    he tells him on April 2nd, "Listen, we've made the

4    connection that we've always wanted to make.  The boys

5    are here.  They want to get down with us."

6          And Sultan Kahn-Bey says, "Well, you know, I

7    have to check with my chief of -- my other chief.  I

8    have to check with my other brothers first."

9          And Narseal Batiste is a little offended that

10   Sultan Kahn-Bey is not exuberant over this news.  So he

11   has a conversation with Stanley Phanor right

12   afterwards.  He talks about his conversation with

13   Sultan Kahn-Bey.  And, again, none of the informants

14   were privy to these conversations.

15         And he says, "Listen, I told him, these boys

16   want to get down with us, but he didn't really react as

17   well as he should have."

18         And Stanley Phanor says, "Well, I don't think

19   he understands.  They -- he doesn't understand how much

20   we've advanced with our training and our jobsite."

21         He was talking about how this group is down

22   here getting big and strong and they're making the

23   connections and Sultan Kahn-Bey is not fully

24   understanding that they've got the connections that

25   they've been looking for.

Closing Argument by Ms. Arango                    144

1          And then, on April 11th, Sultan Kahn-Bey

2     arrives in Miami.  He's greeted by the soldiers in

3     black uniforms, and there's a lot of pomp and

4     circumstance.  They pick him up at the airport.  You

5     saw them picking him up in their uniforms.  They bring

6     him to the Embassy.

7          You can continue.

8          After he arrives, he never does meet Elie

9     Assaad.  And it becomes evident, the reason why.

10    Because when Batiste tells Sultan Kahn-Bey about his

11    dealings with Brother Mohammed, Sultan Kahn-Bey smells

12    a rat.

13         And he says, "Listen, you're dealing with the

14    FBI.  Come on, guy.  Clearly you're dealing with a

15    double agent here.  Wake up.  You have put yourself and

16    all of these men at danger."

17         And he accuses him of dealing with the FBI and

18    he kicks him out of the organization.

19         And on April 19th, Batiste has a conversation

20    with Elie Assaad.

21         He says, "Listen, Sultan Kahn-Bey's accusing

22    me about -- he says you're the FBI, I've been dealing

23    with the FBI.  My men, now they're going every which

24    way."

25         Of course, now that they believe that Elie

Closing Argument by Ms. Arango                      145

1    Assaad could be an informant, now they're all

2    scattering.  They weren't scattering anytime before

3    April 17th.  They were scattering afterwards.

4             And on that same day, Sultan Kahn-Bey got

5    arrested for shooting at Master Athea in the Embassy.

6             After that, basically, the FBI cover --

7    undercover was blown.  You heard the conversation

8    between Narseal Batiste and his wife, Minerva Hernandez

9    [sic].

10            She says to him, "Listen, move that guy out of

11   our lives.  Don't meet up with that guy again."

12            She was there.  She knows that Sultan Kahn-Bey

13   accused this guy that she wants him to stay away from

14   as being with the FBI.

15            And, basically, for all intents and purposes,

16   ladies and gentlemen, the investigation was over.

17            The FBI sent Elie Assaad back to try to meet

18   with Narseal Batiste, to try to regain some

19   communication, because they didn't want him to go off

20   on his own and reconnect with somebody else.

21            So they tried to do what they can to

22   reestablish the communications, but it wasn't working.

23   For all intents and purposes, it was over.

24            Now, ladies and gentlemen, as to the final

25   point, the fifth fact that was proven beyond a

 1    reasonable doubt, as I've just gone through all the

 2    evidence with you, the Defendants each swore allegiance

 3    to someone they believed was Al-Qaeda.

 4            They provided material support, that is, the

 5    video and the photographs of the federal buildings, to

 6    assist Al-Qaeda in blowing up those buildings.

 7            And now, just briefly, conspiracy law.

 8            Because conspiracy is a plan or agreement

 9    between two or more people to violate the law.  It is a

10    crime under the United States law whether the plan

11    succeeds or not.

12            And you heard the Judge instruct you.  It is

13    not necessary for the Government to prove that all of

14    the people named in the indictment were members of the

15    scheme or that the members had planned together all of

16    the details of the scheme, because -- and this is

17    important -- the essence of a conspiracy offense is the

18    making of the agreement.  The crime is the agreement.

19            It is not necessary for the Government to

20    prove any of the overt acts in the indictment were

21    committed or that the conspirators actually succeeded

22    in accomplishing their unlawful plan.

23            THE COURT:  You have five minutes.

24            MS. ARANGO:  Thank you.

25            Go on to the next one.

Closing Argument by Ms. Arango                    147

1          So if a defendant has a general understanding

2   of the unlawful purpose of the plan and knowingly and

3   willfully joins in that plan on one occasion, it is

4   sufficient to convict that Defendant for conspiracy.

5          Ladies and gentlemen, once again, it's

6   important for you to understand -- because you're going

7   to be applying the law to the facts.  A conspiracy --

8   under conspiracy law, the crime is the agreement.

9          Conspiracy law makes the crime complete before

10  buildings go down and before people get killed, because

11  the crime is the agreement.

12         Now, what are the conspiracies that the

13  Defendants are charged with here?  They're charged with

14  four conspiracies:

15         One:  To provide material support to Al-Qaeda.

16         Pledging themselves to al-Qaeda and providing

17  the surveillance videos and photographs equals material

18  support to Al-Qaeda.

19         They provided it to a person they believed was

20  from Al-Qaeda.  They were doing it for money, but they

21  provided material support, those services.

22         Two:  Conspiracy to provide material support

23  to acts of terrorism.

24         It's a little different than Count 1.  But,

25  basically, that is -- the act of terrorism being to

1    destroy buildings.

2              So, again, providing those videos, providing

3    those photographs, to Al-Qaeda, who wanted to destroy

4    those buildings, is providing material support to an

5    act of terrorism.

6              Third conspiracy:  Conspiracy to destroy

7    buildings.

8              They agreed to help Al-Qaeda and they provided

9    Al-Qaeda with the materials that they needed and the

10   services and the planning that they needed to destroy

11   buildings.

12             Fourth:  Conspiracy to oppose by force the

13   authority of the United States Government.

14             That's called "sedition."  It may have been --

15   you know, whether or not they could actually accomplish

16   this goal is irrelevant.  It's what they wanted to do.

17             You heard Narseal Batiste talk many times in

18   those private conversations about his hatred for the

19   US Government, about being at war with the US

20   Government.

21             Ladies and gentlemen, as I told you in opening

22   statements, this is a case about a group of men who

23   decided to sell out their country for money.

24             They wanted to do what Jeff Fort tried to do,

25   but failed to accomplish.  They wanted to sell their

Closing Argument by Ms. Arango                149

 1   services to a terrorist organization.  It's quite

 2   simple what they were trying to do, and it's quite

 3   obvious.

 4          They didn't care that buildings might go down

 5   and people might get killed.  It was only because the

 6   FBI was on to them that they didn't accomplish their

 7   goal.  That's what stopped them, not themselves.  The

 8   FBI stopped them.

 9          The Government proved these five facts to you

10   beyond a reasonable doubt.  These five facts point you

11   to only one conclusion.  There's only one conclusion

12   you can arrive at.

13          So when you go back to that jury room and you

14   deliberate and you apply your common sense and your

15   knowledge and your life experiences and your logic to

16   the facts of this case, in reviewing the facts of this

17   case, you will arrive at the only conclusion that the

18   facts support, that the law supports and that justice

19   demands, and that's guilty, all Defendants, all counts.

20          Thank you.

21          THE COURT:  We're going to break for lunch.

22          Do not discuss this case either amongst

23   yourselves or with anyone else.  Have no contact

24   whatsoever with anyone associated with the trial.  Do

25   not read, listen or see anything touching on this

```
 1   matter in any way.

 2            If anyone should try to talk to you about this

 3   case, you should immediately instruct them to stop and

 4   report it to my staff.

 5            Remember, until such time as you have heard

 6   all of the closing arguments and I have instructed you

 7   to begin your deliberations, you simply are not to talk

 8   about this case.

 9            Please be back in the jury room at 2:15.

10   Enjoy your lunch.

11            (Whereupon, the jury exited the courtroom at

12   1:10 p.m. and the following proceedings were had:)

13            THE COURT:  We're in recess until 2:15.

14            (Thereupon, a luncheon recess was taken, after

15   which the following proceedings were had:)

16            THE COURT:  Good afternoon.  You may be

17   seated.

18            United States of America versus Narseal

19   Batiste, et al., Case No. 06-20373.

20            Counsel, state your appearances, please, for

21   the record.

22            MR. GREGORIE:  Good afternoon, your Honor.

23            Richard Gregorie and Jacqueline Arango on

24   behalf of the United States.

25            MS. JHONES:  Good afternoon, your Honor.
```

1          Ana Maria Jhones on behalf of Narseal Batiste,

2    who is present.

3          MR. LEVIN:  Albert Levin on behalf of Patrick

4    Abraham.

5          MR. CASUSO:  Lou Casuso on behalf of Burson

6    Augustin, who's present.

7          MR. CLARK:  Nathan Clark for Rotschild

8    Augustine, who's present.

9          MR. HOULIHAN:  Richard Houlihan with Naudimar

10   Herrera.

11         MR. VEREEN:  Good afternoon, Judge.

12         Roderick Vereen on behalf of Stanley Phanor,

13   who is present.

14         THE COURT:  We were waiting for one juror, but

15   they're all back.

16         I just wanted to bring up to you before we

17   begin that, apparently, someone on the jury was not

18   able to go for the two hours with Ms. Arango without

19   sending me a note for a bathroom break, which is why I

20   make that announcement at the 15-minute warning,

21   because I'd been handed this note.

22         I don't know that they're going to be able to

23   make it three hours after lunch.

24         So is there a place that would be a natural

25   place --

```
 1              MS. JHONES:  Yes.

 2              THE COURT:  -- for me to take a break?  Or how

 3    do you want me to handle it?

 4              MS. JHONES:  Yes, your Honor.

 5              I was actually going to ask the Court to let

 6    me know when I've taken up two hours.  And I don't know

 7    where I'm going to be in two hours, but I don't mind

 8    the Court stopping at the two-hour point.

 9              THE COURT:  Okay.  Hopefully, we'll make it

10    two hours.

11              MS. JHONES:  If the Court has to stop before

12    then, that's fine.

13              THE COURT:  Okay.  I appreciate that.

14              It puts me in a very difficult position.  I

15    didn't want to -- I don't like to take breaks during

16    closing arguments because I think that you should be

17    entitled to have that amount of time to go forward with

18    your arguments.

19              But if I get handed a note, I'll see how close

20    we are to the two hours and, if we're relatively close

21    to the two hours, I'll wait till then.

22              If it's before that and I feel -- I kept on

23    looking over at the jury to see if anybody was giving

24    me, you know, soulful eyes, you know, that they needed

25    to leave the room.  But nobody did.  So I waited until
```

1    the 15-minute warning and then asked.

2            So I'll just play it by ear.  Hopefully, no

3    notes.  We'll see.

4            So you want a two-hour warning and then a

5    30-minute and a 15-minute.  Right?

6            MS. JHONES:  Yes, your Honor.

7            Your Honor, if the Court wants to stop me at

8    an hour and a half and inquire of the jury if they're

9    okay, I don't have a problem with that.

10           THE COURT:  I'm not going to do that.

11           I don't know who it was.  But whoever it was

12   wrote the note to the court security officer and they

13   handed it to me.  If I get a note, I'll see where we

14   are, as far as the two hours, and I'll just make a

15   judgment call.

16           MS. JHONES:  Okay.

17           THE COURT:  I do that from time to time.

18           Let's bring in the jurors.

19           (Whereupon, the jury entered the courtroom at

20   2:30 p.m. and the following proceedings were had:)

21           THE COURT:  You may be seated.

22           You may proceed.

23           MS. JHONES:  Thank you, your Honor.

24           Good afternoon, ladies and gentlemen.

25           THE JURY:  Good afternoon.

Closing Argument by Ms. Jhones                    154

1          MS. JHONES:  Thank you for your patience.  You

2     may all be very tired of hearing from me.  Just a

3     little while longer and we're done.

4          Approximately two months ago I told you all --

5     I delivered an opening statement and I told you what I

6     thought the evidence was going to show.

7          I began by talking to you about Narseal

8     Batiste, his family, his life before he came into

9     contact with the two informants, the two individuals

10    that, as you may recall, I referred to as "The Thug"

11    and "The Muscle," which, by the way, brings me to

12    another issue.

13         If at any point in time during the course of

14    this trial I have said or done anything to offend you

15    or cause you to think negatively on Mr. Batiste, hold

16    it against me.  Don't hold it against my client.

17         Everyone has a way of referring to certain

18    people and certain things.  As it relates to these two

19    informants, I believe that the facts of this case

20    clearly support a designation as "The Thug," "Street

21    Hustler" and "The Muscle."

22         Now, you heard from witnesses that Mr. Batiste

23    had presented that talked about the type of person that

24    Mr. Batiste not only was, but continues to be, even

25    today.

Closing Argument by Ms. Jhones                    155

1           I talked to you about Mr. Batiste's dreams,

2     his aspirations, his work ethic, his characteristic for

3     someone that wanted to make a difference.

4           I think that the evidence in this case as it

5     relates to the witnesses that I have presented to you

6     has supported, supported, the person that I have told

7     you that Mr. Batiste was before he came into contact

8     with these informants and continues to be, as he sits

9     before you today.

10           I want to talk to you a little bit about those

11     witnesses.

12           You heard, first of all, from Mr. Charles

13     Sheldon.  Mr. Charles Sheldon was Mr. Batiste's high

14     school teacher and with whom he continues a

15     relationship to this very day.

16           Mr. Charles Sheldon is an individual who is

17     the godfather of Mr. Batiste's oldest son, Giovanni.

18     Mr. Charles Sheldon is a man -- a decent, law-abiding,

19     God-fearing man who traveled all the way from

20     Mansfield, Texas, to come over here because he felt it

21     important to let you know how he believed in this man,

22     in this man who is charged with four counts of

23     terrorist conspiracies, how he continues to believe to

24     this very day that there is no way that the person

25     that he knows is capable of engaging in the types of

Closing Argument by Ms. Jhones                    156

 1   horrendous things that were said by Narseal Batiste.

 2        And as Mr. Sheldon told you -- I think he said

 3   words to the effect, "I think the key thing I have to

 4   reiterate is that anybody that will spend their time in

 5   high school going over a rough neighborhood, walking

 6   the subways, protecting women, children and elderly

 7   people from muggers and difficult people is a good

 8   person."

 9        Mr. Sheldon told you that he applauded

10   Mr. Batiste for that, that he would have not done that

11   himself when he was in school.

12        He told you about the fact that he had -- that

13   he had a positive thing going.  He told you that he

14   perceived Mr. Batiste as being a nerd.

15        Mr. Batiste was an individual who went to

16   parochial schools.  Then he went to Howard Richards,

17   the school where he met Mr. Sheldon.  Mr. Batiste had

18   absolutely no involvement or contact with gangs.

19        I think that is abundantly clear in this case,

20   ladies and gentlemen.  And Mr. Sheldon said that he

21   would not be here testifying if he didn't believe in

22   the sincerity and the character of Mr. Batiste.

23        Teresa LeFlore.  Teresa LeFlore is the lady,

24   you may recall, who worked for Phases of Life, a

25   community organization that teaches children different

Closing Argument by Ms. Jhones                157

 1    types of activities after school.

 2            As it relates to the role that Mr. Batiste had

 3    played in Phases of Life, it was a karate -- he was a

 4    martial arts trainer.

 5            She characterized Mr. Batiste as the sole

 6    instructor that they had for martial arts during a

 7    certain period of time.

 8            She told you that he assisted with the

 9    children.  His wife volunteered and their children went

10    over.  His wife gave her free time while Mr. Batiste

11    was teaching the children martial arts.  The wife

12    volunteered on the field trips and they went along with

13    the children.

14            The parents of these children knew

15    Mr. Batiste, had contact with Mr. Batiste.  She

16    characterized him as being one of the most outstanding

17    martial arts instructors.

18            And she attributed that to the fact that he

19    had children and the way he related to his very own

20    children.

21            And she had ample opportunity to observe him

22    and the way he conducted himself not only with his own

23    kids, but with the kids that were affiliated with

24    Phases of Life.  As she said, the children just fell in

25    love with him.

1           He worked extra hours.  He would take home --

2    he would take work home with him.  He would go out of

3    his way, whether paid or not, to do what was required

4    of him and above.

5           And this was around the 2003 period.  People

6    don't become terrorists overnight, ladies and

7    gentlemen.  This occurred within 2003.

8           She characterized the program as an excellent

9    program, and she also said she had -- she has met a lot

10   of people.  This is a lady who has the ability to judge

11   people's character.

12          She is in an area of town that is

13   characterized as a rough area.  She knows the real from

14   the fake.  She knows the dangerous from the

15   nondangerous.  She knows the authentic from the

16   nonauthentic.  She came in here and told you about the

17   type of person that Mr. Batiste is.

18          Una Edwards.  Una Edwards, you may recall, is

19   one of the ladies whose son would go to the Oak Grove

20   Park and how Mr. Batiste interacted with other children

21   there and with his own family, how they held Bible

22   studies in Oak Grove Park.

23          She talked about how the family often played

24   chess in the Oak Grove Park.

25          Now, I don't know about you, but I don't know

Closing Argument by Ms. Jhones          159

 1   if Jeff Fort utilized the practice of chess in order to

 2   recruit his fellow gang members at whatever park Jeff

 3   Fort may have been affiliated with during the 1960s.

 4          This was a daily routine, Una Edwards told

 5   you, of Mr. Batiste and his children and his wife and

 6   others playing chess in the Oak Grove Park.

 7          Then you had Enoch Vilbrun.  Enoch Vilbrun,

 8   you may recall, is the individual who was an employee

 9   of the park and who was entrusted with maintaining the

10   safety of the park, given the fact that, of course, a

11   lot of children were -- would frequent this park and he

12   had to supervise.

13          Mr. Vilbrun told you about the fact that he

14   had many conversations with Mr. Batiste.  He never said

15   anything about him -- Mr. Batiste trying to recruit

16   Mr. Vilbrun.  He told you about the associations that

17   he had in the park.  He hung out with the kids and with

18   his family.

19          He told you that, during the summer,

20   Mr. Batiste and these young men -- all of these men

21   were his eyes and his ears in that park.

22          And during that -- during the summertime,

23   there were like 100 kids in this park.  He was the only

24   employee there.  These were the gentlemen that were

25   helping him:  The terrorists.

Closing Argument by Ms. Jhones                    160

 1            They were not compensated for their efforts.
 2   They never -- he trusted them fully.
 3            Finally, you heard from a gentleman by the
 4   name of Xavier Smith.  As you may recall, Xavier Smith
 5   is the gentleman that had the church right next to the
 6   Embassy location in Northwest Miami.
 7            The testimony in this case from a couple of
 8   the Government witnesses was that that Embassy location
 9   looked like a fort, that it was a place where secret
10   meetings were to be held, that it was a -- that it was
11   the most -- the place that looked -- that would be
12   least likely to have a religious organization
13   participate or reside in that particular location.
14            Xavier Smith you told you that, when he was
15   walking down the street and he met Mr. Batiste and he
16   saw what Mr. Batiste and the brothers were doing in
17   there and he walked in and he thought what a great job
18   they're doing, this place looks great, "I wanted to
19   rent this place for our church and Mr. Batiste beat us
20   to it."
21            There's no secret about what was going on in
22   the Liberty City location, ladies and gentlemen.  There
23   was no secret about what was going on there.  The doors
24   were open many, many times, as you have heard.
25            Before the informants came into the life of

Closing Argument by Ms. Jhones                    161

1   these men, Mr. Batiste in particular, these men were

2   doing and acting in the way that they consistently have

3   acted throughout the course of their life:  Law-abiding

4   citizens.

5        Please do not underestimate the power, the

6   power, of manipulation at the hands of two informants.

7   Please do not underestimate that, ladies and gentlemen.

8        Mr. Charles Sheldon was not paid by the FBI to

9   come in here and sit and testify.  Una Edwards was not

10  paid by the FBI to come in here and testify.  Enoch

11  Vilbrun was not paid by the FBI to come here and

12  testify.

13       None of the witnesses presented by the defense

14  were paid to come in here and testify.

15       Do not underestimate the power of

16  manipulation, especially as it relates to "The Muscle."

17       Make no mistake about it:  If Mr. Batiste

18  would have had the will and the intent that the

19  Government wants you to believe that he had, it would

20  not have taken two informants, back to back, for eight

21  months to get him to take a bunch of bogus pictures.

22       Because a true believer, a true believer,

23  doesn't need to be paid to do it.  A true believer

24  doesn't need two informants to call him constantly to

25  do it.  A true believer is ready, willing and able to

Closing Argument by Ms. Jhones                    162

 1   do what he wants to do.

 2          And in the context of what they want you to

 3   believe that this man wanted to do, not in 2005, not in

 4   2006, but in 1998 -- since 1998, Mr. Batiste has wanted

 5   to do harm to the United States, according to them.

 6          Why do they have to pay "The Thug" and "The

 7   Muscle" to get Mr. Batiste to do what he was supposed

 8   to do, wanting to do, since 1998?  Why?  Why?

 9          We will get into the jury instructions a

10   little bit later.  But it's very important, ladies and

11   gentlemen, that you do not let that concept escape you.

12   True believers do not need to be paid to do what they

13   want to do, because they have it in their heart.  They

14   don't need to be paid to do it.

15          I want to begin to talk to you about what I

16   have characterized as "the fix."  The fix at the hands

17   of Confidential Informant No. 2 -- No. 1 began in the

18   fall of 2005.

19          You may recall, ladies and gentlemen, that

20   the theory held by these people over there, the

21   prosecution -- the theory is that Mr. Batiste gave a

22   flier.  Mr. Batiste had -- this was the key to

23   Mr. Batiste's dream of overthrowing the United States

24   Government.  This was the key right here.

25          This, Government's Exhibit No. 98, was the

Closing Argument by Ms. Jhones                    163

1    opportunity.

2          And I think that the words utilized by one of

3    the two prosecutors -- Ms. Arango, specifically, in

4    opening statements, besides characterizing

5    Mr. Batiste -- I think she forgot to tell you that now,

6    in closing -- besides characterizing Mr. Batiste as

7    someone who was violent to the core, violent to the

8    core -- besides characterizing Mr. Batiste in that

9    fashion, she told you a couple of months ago that

10   Mr. Batiste had a unique opportunity when "The Thug"

11   was going to Yemen, because he wanted to go to Yemen

12   for a religious ceremony for Ramadan, not because he

13   had purchased an AK-47 on the streets of Miami, not

14   because Faisal threw him out of the store, not because

15   ICE, the Immigration and Customs Enforcement, had come

16   in and arrested him, but he went over there to Yemen

17   out of the kindness of his heart for religious purposes

18   and that, before he left, Narseal said, "Please,

19   please, please.  Don't leave yet.  Don't leave.  Take

20   the flier.  Hook me up, babes.  Hook me up.  I've been

21   waiting since 1998.  Hook me up."

22          And the prosecution, Ms. Arango, told you that

23   he became very excited.  This was the opportunity of a

24   lifetime, opportunity of a lifetime, for Narseal

25   Batiste and, presumably, for these brothers right here,

1    and that this front, the front, the charitable

2    organization, was going to be the way he was going to

3    be able to conceal that.  And that's how this all

4    began, so they say.

5         Let's talk about that, because I agree with

6    one thing with the prosecution over there:  You need to

7    use your common sense.  This is a case -- it's a very

8    sad case.  It's a very sad case.  But in addition to

9    that, it is a case where common sense is going to bring

10   you to decide the appropriate verdict.

11        And if Mr. Batiste has harbored this desire

12   from 1998, burning in the recesses of his heart to do

13   harm to the United States, to take over the mighty

14   United States Government, since 1998, you could best

15   believe that, when CW 1 got back from Yemen, after he

16   called John Stewart, John Stewart said, "No problem,

17   babes.  How much money do you need for your ticket?

18   Come on over."

19        Never mind about the fact that there's an

20   AK-47.  We don't know, ladies and gentlemen, how many

21   people -- how many children that AK-47 on the streets

22   may have harmed.  We don't know.  We can only

23   speculate.

24        "Come on over.  I'll pay your ticket."

25        One thing we do know is that, because

 1   Mr. Batiste harbored this desire from 1998 in the deep

 2   recesses of his heart, when that guy got back, this man

 3   was going to talk to Mr. Batiste about his connections

 4   right away.  It's common sense.

 5         Well, let's talk about what Mr. Batiste talked

 6   to "The Thug" about when he got back from Yemen.

 7         Now, we know, of course, that there were at

 8   least two unrecorded conversations back at the Holiday

 9   Inn, the place where "The Thug" was staying because he

10   was homeless.  They paid for that, too.  We know those

11   conversations were not recorded.

12         But we did have one recorded conversation.  I

13   believe it was Government's Exhibit 38, which they did

14   not play for you, which they did not provide a

15   transcript for, but I did.  And that's Defense

16   Exhibit 89.

17         I am going to address several portions of

18   Government's Exhibit 89, because, ladies and gentlemen,

19   I believe -- excuse me -- Defense Exhibit 89-B.  I

20   believe that Defense Exhibit 89 tells the entire story

21   of this case, the entire story, because their theory is

22   that this man has been harboring a desire to overthrow

23   the United States of America since 1998.

24         And you know what that feels like when you

25   have that in your heart.

Closing Argument by Ms. Jhones                166

1              Let's talk Defense Exhibit 89.

2              As you may recall, Defense Exhibit 89 was a

3      conversation that started at a Chinese restaurant in

4      North Miami when Baylan, who's also CW 1, "The Thug,"

5      as I call him, went out looking for Mr. Batiste.

6              Now, Baylan is back from Yemen.  Baylan has

7      already been interviewed by the FBI.  And Baylan is

8      equipped with a body recorder.  And this conversation

9      is recorded.  It starts off in the Chinese restaurant

10     in North Miami.

11             And Baylan starts off by stopping a woman and

12     saying, "Excuse me.  I'm looking for a Chinese

13     restaurants around here."

14             And he finds it.

15             He encounters Narseal Batiste with his wife

16     and his children, something that is -- often happens

17     when you encounter Narseal Batiste.

18             And Baylan says at Page 2 of Defense Exhibit

19     89 -- he says, "What's going on, Aki.  How you doing,

20     man?  Okay?  Nice seeing you again, Brother Naz.  Man,

21     how you doing?"

22             Narseal Batiste says, "Oh, great."

23             Baylan says, "Yeah, man.  Trying to survive.

24     Hey, so I been calling you, leaving you messages.

25     Stuff about go pick up the money and sign the papers

1   with them, do this, do that.  Tell them okay.  I'm

2   going to come home, but I'm not going to come alone.

3   Expecting the specs -- expecting the spec, man.  That's

4   how I'm going to do it.  I want to have."

5         What is the first thing that the informant

6   tells Mr. Batiste, the guy with that desire burning in

7   his heart?  "I been calling you, man.  I been leaving

8   you messages," a theme that you are going to hear

9   consistently throughout this case.  You have heard it

10  consistently throughout this case.

11        "Where you been, Brother Naz?  Where you been?

12  I'm calling you.  Call me back, man."

13        Okay.  Then Narseal Batiste responds, "So did

14  you meet him yesterday?"

15        I know they want you to think it's Osama bin

16  Laden that he wanted to meet.  But, no, it wasn't.  It

17  was Faisal.  It was Faisal, the guy with the money, the

18  guy that bumped CW 1 out of the store -- out of the

19  convenience store.  You know where that AK-47 was

20  placed in the freezer?  That Faisal?

21        And CW 1 says, "No, man.  He kept calling me.

22  I was at Mike's house, but I didn't want to answer the

23  phone.  I got his message.  He's saying, 'Come.  Pick

24  up the money that we made a deal on and sign papers for

25  the rest,' do this, do that.

1          "Anyway, I called some -- I called my brother

2     from New York.  And I have him, you know, being

3     on-line, a call back home.  My father-in-law.  You

4     know, my wife's father is leaving me messages to call

5     him.

6          "I want to call him.  I thought he wasn't

7     going to really come through, but, Inshallah" -- and we

8     all know what "Inshallah" means at this stage of the

9     proceeding; "God willing," "si Dios quiere," "it's

10    coming, God willing" -- "Inshallah, he's coming

11    through.

12         "You know, and he's got to contact -- he's got

13    to contact him and see what's going on with -- what

14    missions some me had been on and continue further on."

15         What is the importance of that, ladies and

16    gentlemen?  The importance of that is that, in the

17    context of missions, as early as the fall of 2005,

18    "missions" relates to the terminology that is employed

19    by the Informant No. 1.

20         And when he's talking about missions on

21    October 29th of 2005, he's not talking about missions

22    of waging war and jihad by Narseal Batiste.  He's

23    talking about his missions.

24         And when he's talking about his missions in

25    the context right here at the beginning on 10-29, he's

Closing Argument by Ms. Jhones                    169

1    talking about getting the money from Faisal, the money

2    that he says Faisal owes him.

3          Okay?  So that's the -- that's the initiation

4    of the conversation on 10-29 -- the recorded

5    conversation on 10-29.

6          Oh.  And Mr. Batiste says, "Yeah."

7          And the informant says, "You know, I spoke to

8    my brothers and I've been thinking, I don't know how

9    long I'm gonna stay in Miami.  But I'm going to keep,

10   you know, moving, coming to New York, coming here --

11   over here.  'Cause I am out of money, you know?  And

12   that's a big deal to me."

13         Now, why is that important, ladies and

14   gentlemen?  On Page 3 of Defense Exhibit 89-B, when the

15   informant says, "I don't know how long I'm going to

16   stay in Miami," I'm going to tell you why that's

17   important:  Because Ms. Arango just finished telling

18   you less than an hour ago that Anthony Velazquez

19   testified that, after they realized and they heard

20   Narseal Batiste talk about terrorism sometime in

21   November or December of 2006 -- only after that, only

22   after that, when they corroborated with the informant

23   and told him -- when they corroborated with him about

24   that, that's when they reached out for "The Muscle," to

25   bring him over, you know, the representative from back

Closing Argument by Ms. Jhones                    170

 1    home.

 2            But that's not true, ladies and gentlemen.

 3    That is not the case.  The fix, the entrapment, the

 4    setup, began from 10-29 of '05, if not earlier, right

 5    then and there.

 6            He was already instructed to tell Narseal

 7    Batiste, "I'm not going to be around very much time.

 8    I'm not going to be around very much time."

 9            And the conversation continues.

10            "I don't know how long I'm going to stay in

11    Miami, but I'm going to keep, you know, moving, coming

12    to New York, coming over here, 'cause I'm out of money,

13    you know, and that's -- that's a big deal to me.  But

14    I'm waiting for my uncle to call me from back home and

15    send me some money.

16            "I'm waiting for the Western Union, Inshallah.

17    Should be able to move these two or three days.

18            "Now, you know, today's mission is to go to

19    Faisal and pick up that money so I can start moving and

20    sign the paper with him.  And I have -- I have a dead

21    phone, you know, one of those Metro PCS that I can't

22    even connect on.  It's in my bag.  I want to get some

23    numbers out of it.  Okay?"

24            What happens?  This informant, the guy who's

25    trying to find out Narseal's intent, had been staying

Closing Argument by Ms. Jhones                    171

1    at the Embassy.  This informant had his bag with the

2    cell phone at the Embassy location and he went to the

3    Chinese restaurant and told Narseal, "Hey, brother.

4    Take me to the Embassy.  I need my stuff."

5            Now, they told you that they had to give

6    Narseal Batiste a warehouse because they really

7    couldn't record in the Embassy.  It was too dangerous.

8    He was too scared.

9            The guy had a bag with his cell phone and his

10   personal belongings.  Narseal Batiste didn't even know

11   where it was as early as October of 2005.

12           Narseal says, "Okay."

13           And the informant asks him, "How's the

14   family?"

15           Narseal Batiste asks the informant, "How about

16   that little turtle?  Where is that little turtle my

17   daughter gave you?"

18           And the conversation continues.  There comes a

19   point in time in the meeting that Narseal Batiste and

20   the informant leave the Chinese restaurant alone in

21   Narseal Batiste's van.  Because, remember, the

22   informant doesn't drive, doesn't have a car.

23           He drives him back to the Embassy to pick up

24   the phone and to go through his bag and get some

25   clothes.

Closing Argument by Ms. Jhones                    172

1           And that is borne out by the transcript.

2           And on their way from the Chinese restaurant

3    over to Liberty City to the location, he's pointing

4    out -- they're talking about different buildings and

5    there's a mosque and "Al-Ansar" and Narseal asks, "What

6    does that mean?" and the informant tells him what it

7    means.

8           And so Narseal asks, "Why do they call it a

9    masjid?"  Because he's an experienced Islamist, but

10   he's asking these questions of the informant on Page 10

11   of Defense Exhibit 89.

12          Then -- now, by the way, they are now alone.

13   Okay?  Maybe the informant did not want to talk at the

14   Chinese restaurant.  You never know if a waitress is

15   going to hear him talking about Osama, jihad, la, la,

16   la.  But now they're alone in the car.  They're alone.

17          Get him.  Come on.  Start -- why don't you

18   tell him, you know, "I hooked up, man.  You know that

19   flier you gave me?  I hooked you up."

20          But that doesn't happen.

21          Page 12.  The informant says -- first of all,

22   before the informant says anything, Narseal says

23   something and the transcript reflects

24   "unintelligible" -- "indiscernible."

25          The informant answers by saying, "Faisal?"

Closing Argument by Ms. Jhones                    173

 1            The clear implication is that, once again,
 2   Narseal is asking this person about Faisal.  And why is
 3   he asking him about Faisal?  Because the informant
 4   promised him that he was going to give Narseal some
 5   money so Narseal could help him intercede on his behalf
 6   so the informant could get the money that the informant
 7   says Faisal owes him.
 8            Okay?  That's the hook.  That is the hook.
 9   "Continue to deal with me, man.  I'm going to take care
10   of you."
11            The informant says, "No, man.  He left me
12   messages.  I haven't spoken to him.  What I need to do
13   is charge my phone so I could -- I think something is
14   wrong with high battery or something."
15            "Oh, yeah?", says Narseal.
16            The informant says, "I don't know why it don't
17   keep power.  Use for a long time.  Noises, whatever.  I
18   knew" -- by this time -- and I want you guys to look at
19   that page, Page 12 of the transcript -- they are now
20   back in the Embassy, ladies and gentlemen.  They're
21   back in the Embassy.
22            And if a promise of money for Narseal Batiste
23   is not enough, it's not enough to hook him, what does
24   the informant do?  Goes to the Embassy.  He's wearing a
25   body wire.  He knows the FBI is listening.  What does

Closing Argument by Ms. Jhones                      174

1    he do?

2            He goes in there, takes out a bag of weed, of

3    pot, throws it on the table and starts smoking pot,

4    courtesy of the US Government.  He knows that Narseal

5    Batiste likes pot.

6            What does Narseal Batiste -- he's smoking

7    pot -- this informant is smoking pot while working as

8    an undercover agent and he's smoking pot with Narseal

9    Batiste.

10           What does Narseal Batiste say?  He says, "Oh,

11   yeah.  That's some good-smelling stuff."

12           The informant says, "Yes.  I'm going to leave

13   it open.  Go ahead.  Take some."

14           Narseal says, "I can't --"

15           You will see further a little bit on

16   December 21st where this informant and Narseal Batiste

17   are having a conversation about pot again.

18           And Narseal Batiste -- and the informant says,

19   "You know, I stopped doing that.  I'll really trying

20   to -- really trying to get my act together."

21           Narseal says, "I'm glad that you're doing

22   that.  I'm glad that you're doing that, Aki.  You know,

23   I like smoking pot, too.  I'm really trying to get away

24   from it.  You know, I'm glad that you stopped."

25           And Narseal Batiste, as early as 10-29, was

Closing Argument by Ms. Jhones                175

 1   trying -- trying to exercise some self-restraint and

 2   stay away from the weed.

 3          This guy is saying, "Here.  Have some,"

 4   courtesy of the US Government.

 5          And it continues on Page 12.

 6          "Take another" -- meaning a toke of the

 7   joint -- "Take another.  I'm going to leave it out on

 8   the table."

 9          "Okay," says Narseal.

10          At the bottom of Page 12, the informant says,

11   "Well, you know" -- there's a couple of

12   "indiscernables."

13          And then the informant says, "Well, you know,

14   that's when I had money, brother.  I used to be at the

15   store and these brothers used to come selling to me.

16   But when" -- then he laughs -- "that's when I used to

17   be at the store (indiscernable) this is me."

18          Clearly, what we already know is -- because

19   Mick Coriolan told us about this -- this man, while he

20   was working at the store, would buy and sell pot in

21   addition to buying and selling AK-47s.

22          Okay.  Then on Page 13, the informant goes

23   over to a room, opens up his bag.  And you hear it in

24   the recording.  You hear when the zipper opens up.  He

25   takes out of his bag some clothes.  He takes out a

Closing Argument by Ms. Jhones                176

1    phone.

2              Now, this is the place that they cannot

3    penetrate.  They can't go in there and record or

4    anything like that.  This is the place where the

5    informant as early as 10-29 retrieves his personal

6    belongings.

7              And the conversation continues.

8              Now we're up to Page 15.  Nothing about the

9    flier.  Nothing about the terrorist connection.

10   Nothing about -- oh, my God.  Nothing from Narseal

11   Batiste saying, "Did you hook me up, man?  I've been

12   waiting since 1998.  Did you hook me up?"  Nothing.

13             We're on to Page 15.

14             What do they start doing?  They start talking

15   about the real plans, the real plans, that Narseal

16   Batiste and these brothers had:  Building up that

17   Embassy location.

18             Let me show you more corroboration of that.

19   Think about it, ladies and gentlemen.  You want to wage

20   war against the United States.  You want to take over

21   the United States.  You want to create an Islamic army

22   and all of those things.

23             Well, what is Narseal Batiste doing?

24             Oh.  One more thing.

25             On March 16th, he tells Informant No. 2, on

Closing Argument by Ms. Jhones                    177

 1    that oath ceremony, that, you know, when the mission is

 2    over, he's going to commit suicide or words -- "When

 3    the mission is over, if you need to ask that question,

 4    you don't know anything about the mission.  You know,

 5    there's not going to be any tomorrow" or words to that

 6    effect, Narseal tells Informant No. 2.

 7            But, apparently, he wants to fix up this

 8    Embassy before he does himself in.

 9            And in Defense Exhibits -- you will have them

10    back there -- B-1 through B-55, you will be able to see

11    all of the remodeling that Narseal Batiste and these

12    brothers did.

13            These guys would work 10, 15 hours a day.

14    Then, when they'd finish trying to earn an honest

15    living, then they went back and they started doing the

16    remodeling at the Embassy.

17            And, ladies and gentlemen, I don't know.

18    Maybe you think it's silly for me to concentrate on

19    this in the context of a terrorism case.

20            But I'll tell you why it isn't silly:  Because

21    this is not a terrorism case.  This is a manufactured

22    crime.  This was made, directed and orchestrated by the

23    FBI and the informants.

24            You will have to ask your questions why that

25    happened.  Were they suckered in by these two

Closing Argument by Ms. Jhones                    178

 1    informants?  Did they have motivation to make a case,

 2    given the political climate in 2006?  I don't know.

 3    That's for you to decide.

 4            But what these guys were doing, they put

 5    lights in this building.  They put tile around the

 6    edges.  They left -- they left the center open because

 7    they were going to put carpeting.

 8            I guess that's where they were going to do

 9    their military training, on the carpeting, so maybe it

10    wouldn't hurt their knees while they were practicing

11    with their AK-47s.  It is ridiculous.  It is absolutely

12    ridiculous.

13            And in the conversation of 10-29 -- and I'll

14    go back to it now -- in the conversation of 10-29,

15    Narseal Batiste and the informant start talking

16    about -- Narseal Batiste tells the informant, "I'm

17    going to microphones."  You may have heard that.  I

18    played a clip for you.  "The microphones are going to

19    be inside and outside."

20            Why -- why would a secret and sacred order

21    install microphones and speakers inside the Embassy and

22    outside the Embassy so everybody in Liberty City could

23    find out what they're doing?  The secret and sacred

24    order?

25            Ridiculous.  Ridiculous.

Closing Argument by Ms. Jhones                    179

1          But that's what happened -- that's what

2     happens when you pay a thug, AK-47-buying informant

3     who's been an informant since he was 16 years old and

4     he's a street hustler.

5          That's when you delegate to that man what to

6     do in a case rather than having the FBI do what they're

7     supposed to do and investigate real crimes.  That's

8     what happens.

9          So as early as October 29, the secret and

10    sacred order has a plan to put speakers outside so not

11    only people inside, but people outside, can hear

12    everything that's going on in Liberty City.

13         That's at Page 156, Defense Exhibit 89.

14    Nothing about Osama yet.  Nothing about terror.

15    Nothing about overthrowing the United States

16    Government.  But he has had that in his heart since

17    1998, ladies and gentlemen.

18         So then we're going on to Page 16.  Now,

19    remember, Narseal Batiste does not know that the

20    informant is wearing a wire.

21         Narseal Batiste has been talking to this

22    informant about blowing up the Sears Tower and all

23    these things way before October 29th, so says the

24    informant in this courtroom under oath, under -- and

25    not under pot -- under the influence of pot.  I don't

Closing Argument by Ms. Jhones                180

1   know.  But that's what he said.

2          Nothing about that yet.

3          Page 16:  Narseal says, "Next time, when you

4   come back down from New York, this place is gonna be

5   fixed."

6          "I hope so, brother," says the informant.

7   "I'm waiting for you.  Even if I go to New York,

8   brother, or wherever I go, this place is still in my

9   mind."

10          Page 17:  The informant says, "I'm hoping for

11   the help that I'm gonna get from back home..."  He

12   doesn't say, "I'm hoping from the help I'm gonna get

13   back home that you told me about the flier.  He doesn't

14   say that.

15          The informant says, "I'm hoping from the help

16   that I'm gonna get -- I'm getting from back home, it's

17   the only help that is going to make different."

18          Narseal says, "Yeah?  Yeah?  I wish you could

19   open up a store in the neighborhood, Aki.

20          "Oh, that's not -- that's not very big

21   difficulty now," says the informant.  "What I been

22   meaning, I wanted to get things going and get

23   everything set up.

24          "Oh, okay."

25          Now they're talking about opening up a

1    neighborhood restaurant in Liberty City.

2            Maybe the Sears Tower and Osama and the

3    connect is going to come later.

4            But we're still on Page 17.  So let's move on.

5            Then the informant says, "So if I had to come

6    and stay here for a while, it's okay?  I can come and

7    go.  I have the brothers on my side to work?"

8            You know what he's saying there, ladies and

9    gentlemen.  He knows that he can count on these

10   brothers to help him, let him stay there.  He's

11   homeless.  "Whatever you want.  We're your brothers.

12   We'll take care of you."

13           This is the guy -- these are the guys that

14   that thug set up.

15           It continues.

16           "It's not a big issue to open a store, not

17   buy a store.  You need a lot of money.

18           "Right," says Narseal.

19           "Specifically, like this restaurant I had.

20   Just get the restaurant long gone.  That's good.

21   That's very good," says the informant.

22           And what does Narseal say?  "You know, hot

23   food in this neighborhood is hard to find."

24           Does Narseal say, "You know what?  I have to

25   make a restaurant because Jeff Fort had a restaurant

1    and I want to be like Jeff Fort and" -- no.  No.  He

2    doesn't say that.

3           He says, "Hot food in this neighborhood is

4    hard to find.  You cannot have hot food

5    (indiscernible)."

6           Okay.  We move on to Page 18.

7           The informant says once again at Line 14, "I

8    mean, I don't like to have a lot of time on my hands;

9    and these days I have a lot of time.  It's because the

10   hurricane warmed -- because Faisal has been holding on

11   me."

12          There again comes Faisal, you know, moving his

13   little head, 15 -- Page 18 and we've mentioned Faisal

14   three or four times.  Nothing about Osama or the

15   terrorist organization yet.

16          "And he's been holding on me, too, because I

17   just came from back home free.  Other than that, I want

18   to keep my time busy.  I just want to have some time to

19   rest, take a shower, eat.  And then I want to keep,

20   'cause I'm used to it.  You see how I used to work.

21   I'm used to it.

22          "Yeah," says Narseal.

23          Then the informant says, "I'm not sure.  But

24   as soon as I can get some money, I mean, I want to stay

25   out of here, to be honest with you, and get some

Closing Argument by Ms. Jhones                    183

 1    fighting skills going, get some connection back home.

 2            "I'm trying -- trying hard, because I have a

 3    promise when I was back home I might get a computer.  I

 4    might get some good connections, good support, you

 5    know, which I -- you know, it keeps me a long way from

 6    business right now."

 7            Ladies and gentlemen, ladies and gentlemen,

 8    use your common sense, please.  This is the informant

 9    talking.  This is the informant saying that he has his

10    connections back home.  This is the informant saying

11    that he wants a computer.  This is the informant saying

12    that he wants good support from back home.

13            The Government has told you that, since 1998,

14    Mr. Batiste has been harboring ill will to do harm to

15    the United States Government and the opportunity came

16    in September of 2005, and this man says nothing.  He

17    says nothing.

18            But who does say something about connections

19    back home?  Who does say something about support?  It's

20    the informant, because he is the one that has the

21    ticket to set Narseal Batiste up in exchange for

22    tax-free money, in exchange for not being prosecuted

23    for possessing an AK-47, in exchange for continuing to

24    do harm to people who are not predisposed to do harm to

25    anyone.

1          That's why.

2          This is so offensive.  It is so offensive.

3          I continue on.

4          "But once I get everything going, then, yeah,

5    I'm gonna get a car, maybe the business.  So you need

6    any kind of support?  I could be able to -- to help."

7          Wait a second.  "So if you need any kind of

8    support, maybe I can help you?"  I thought he already

9    had asked him.  He told him, "Hook me up."  He already

10   had told him, "Hook me up, man."

11         He took the flier with him in his pocket while

12   he was going to Yemen.  What do you mean, "if"?

13   "Didn't we already have that conversation before you

14   went to Yemen?"

15         "The Thug" continues.

16         "But if I can't help myself, how can I help

17   anybody else?  I been thinking real hard about what we

18   talked about, about jihad."

19         There we go.  Throw in that word.  You know,

20   just throw in the word "jihad."  See what he's gonna

21   say about it.

22         Narseal says, "Right.

23         "Building Islam in here.

24         "Yeah," says Narseal.

25         "Inside the heart.  That is what's most

1    important, like we talked about.  And I don't know,

2    man.  It's a whole lot of progress that we got to go

3    through.  It's not something we can do one or two.

4            "Right," says Narseal.

5            And he continues.

6            Page 20:  The informant tells Narseal Batiste

7    that he has to run to the bathroom.

8            But, you know, before he runs to the bathroom

9    or somewhere along the trip to the bathroom, do you

10   remember what he picks up?

11           He picks up what a year and a half later, when

12   Narseal Batiste is indicted, becomes Government's

13   Exhibit 99, this pamphlet which is rife with terrorism,

14   violence and subversive activities.

15           I'm going to read some of it to you.

16           The informant, in a desperate attempt to

17   convince these folks that Narseal Batiste harbored some

18   type of ill will to the United States Government, picks

19   up the Moorish Paradigm, goes to the bathroom and then

20   he starts reading from it because he has -- his

21   microphone is going and he's reading very softly.  You

22   can listen to it on the tape.  Listen to the tape.

23   Compare it to the transcript.

24           On Page 20, the informant says

25   parenthetically, (Reading out loud quietly while he's

Closing Argument by Ms. Jhones                    186

1    recording)."  Why aren't you telling Narseal Batiste?

2    Why aren't you having a conversation with this man?

3    Why aren't you having a conversation with the man,

4    discussing everything that you have discussed with him

5    since January of 2005 about overthrowing the United

6    States Government?  Why?

7            Because it didn't happen, ladies and

8    gentlemen.  It never happened.  It never happened.

9    That's why.

10           On Page 20, he does it.  On Page 21, he

11   continues to do it.

12           And at Line 7 of Page 21, the informant says,

13   "I think I want to take this back home with me.  (Noise

14   around the mic).  Listen, Brother Naz.  Are you

15   sleepy?"

16           Narseal says, "Are you ready?

17           "Sorry to desert you, man.  Yeah.  I'm ready.

18   Can I fax this back home?  Can I fax this back home?  I

19   want to show somebody that would know more about it.

20           "Yeah.  Yeah," says Narseal.

21           "I'm going to give it back to you.  I just

22   want to show them what I'm talking about, because I

23   don't know much -- how much I could explain over the

24   phone.

25           "Okay," says Narseal.

Closing Argument by Ms. Jhones                    187

1          And the informant says, "You know, it's better

2    than speaking on the phone, you know.  It's a long

3    story, man.  I don't even -- I don't even know half of

4    this myself.  The other day, we picked it up at the

5    hotel.  I looked at it for a half an hour.  I didn't

6    understand nothing."

7          Then the informant continues and says, "I

8    called Mike at the store."

9          And there it comes again, the topic that

10   Narseal is really interested in discussing.

11         "He telling me, after I left, Faisal started

12   calling him, speaking to me -- to him about meeting me.

13   But he wants to take me to a lawyer.  I don't know.  I

14   don't know what kind of stuff that he wants to do.  I

15   don't want to let him know I'm here.  If ever you see

16   Mike or Faisal and they ask you if I'm here, no.  I'm

17   not here.  I don't want them to know this is my base."

18         This is this guy's terminology, ladies and

19   gentlemen.

20         "When I meet Faisal, I'm gonna meet with him

21   at the mosque or anywhere elsewhere where he don't find

22   exactly where I stay."

23         Now, we do know that for the next couple of

24   days or the next three days, Narseal Batiste is going

25   to stay at the Embassy.  He's staying there.  That is

1    undisputed.

2              This is -- this is the opportunity of a

3    lifetime to right then and there, in October of 2005 --

4    to record Narseal and confirm and corroborate, to use

5    their words -- confirm and corroborate that they've

6    been discussing this since January of 2005.

7              And it continues on.

8              And clearly, at the end, ladies and gentlemen,

9    of the body wire recording of October 29th of 2005,

10   what happens is -- what the informant tells Narseal

11   Batiste is, "Drop me off at that mosque where I can

12   find Faisal, because I'm going to talk to Faisal and

13   I'm going to see if I can resolve these problems that I

14   have with Faisal.  If not, then I'll let you know.  But

15   he wants me to get a lawyer.  I think it's all going to

16   work out.  I think it's all going to work out."

17             That is the way that conversation ends.

18   24 pages of nothing but Faisal.

19             I want to direct your attention to a couple of

20   pages in Government's Exhibit 99, which is the Moorish

21   Paradigm.  And you're going to be able to go and sift

22   through all this evidence that we've been talking about

23   for the past two and a half months.

24             You'll be able to read it yourself.  You'll be

25   able to listen to whatever portions of whatever

Closing Argument by Ms. Jhones                      189

 1    conversation you feel is important to the questions

 2    that you have in your minds, because you are the ones,

 3    not us -- you are the ones that determine what the

 4    facts of this case are.

 5            You are the ones that determine the

 6    motivations by the people that the Government utilized

 7    to make this case, and you are the ones that will

 8    determine the most important aspect of this case.

 9            And that is the intent, the intent, of Narseal

10    Batiste and how the actions of the Government

11    influenced that intent and what predispositions, if

12    any, Narseal Batiste had independently of the

13    influences that were visited upon him, of the pot,

14    money and constant, constant, hounding at the hands of

15    two master manipulators.  That's for you to determine.

16            But I'm going to point out a couple pages in

17    the Moorish Paradigm.

18            On Page 11 of Government's Exhibit 99, the

19    tools of terrorism, folks.

20            "The image and likeness refers to our

21    micro-cosmic scale model relationship with Allah, God,

22    the great spirit.

23            "In order for us Moors to do our job of

24    raising fallen humanity, we must first pull ourselves

25    up by our own bootstraps and raise ourselves to a

Closing Argument by Ms. Jhones                 190

1   higher level of existence.

2           "By pulling ourselves up, who are the most

3   fallen of humanity, we will have qualified ourselves to

4   perform our job in uplifting the world, of uplifting

5   the world."

6           This is a sad case, ladies and gentlemen.  Sad

7   case.

8           It continues on.

9           On Page 17, notice it also says:  "Lest he put

10  forth his hand and take also of the tree of life."  And

11  that is a quote.  "The fruit of the tree of life is the

12  knowledge of the book of life, or the human genome,

13  whose findings are promising to allow us to live

14  forever by discovering and eliminating the very roots

15  of disease and death embedded in our genetic code.

16          "Things are getting pretty noggle, as Don Juan

17  would say."

18          Page 10:  "Moors, I would like to talk to you

19  about the science of genetics and some of the recent

20  findings of the human genome project.

21          "The reason why the science of genetics so

22  important for us Moorish scientists is because we

23  release that the human body or organism is the key to

24  understanding the nature of the universe."

25          And it goes on and on.

Closing Argument by Ms. Jhones                    191

         1            Why is Government's Exhibit 99 so important?

         2    It's so important because the Federal Bureau of

         3    Investigation, which, with all due respect to the

         4    agency that is the Federal Bureau of Investigation --

         5    in this case, I have termed it as the "Federal Bureau

         6    of Entrapment."  In the context of the facts of this

         7    case, the Federal Bureau of Investigation became the

         8    "Federal Bureau of Entrapment."

         9            And in October of 2009, the Moorish Paradigm

        10    was taken by "The Little Thug," given to John Stewart,

        11    Anthony Velazquez, Joe Garbato, these prosecutors, and

        12    this was evidence of terrorism.  And they said, "Let's

        13    keep the case going."

        14            Let's move forward a little bit.

        15            On June 22nd of 2006, the Government executed

        16    a search warrant.  In that search warrant they made

        17    representations of all the things they were expecting

        18    to find at the Embassy.  You guys are going to be able

        19    to see all of that.  I'm sure my colleagues will talk

        20    about that as well.

        21            And when they went on June 22nd of 2006 to

        22    this Embassy, the fort where all the acts of terrorism

        23    were formed, this is what they found.

        24            Now, they didn't take everything.  They left

        25    stuff behind.  But I think you can pretty much assume

Closing Argument by Ms. Jhones                    192

1    that, if they did not take it with them, it's because

2    it did not have any evidentiary value.  You can pretty

3    much make that assumption.

4          But this is what they took.  And here are

5    sitting right before you the tools of terrorism.

6          Let's start with the American flag, because,

7    obviously, somebody who's been harboring a desire since

8    1998 to wage war against the United States Government

9    is going to have an American flag in their central

10   headquarters.

11         This was not the only American flag there,

12   because you guys saw the video on April 11th.  You saw

13   it when Narseal Batiste -- at the behest of the

14   informant, at the behest of the informant, they put up

15   the Moorish flag.  They put up another huge American

16   flag.

17         Remember in that video that you saw on

18   April 11th while these flags were waving as the Sultan

19   came by, American flag and Moorish flag?  This was not

20   the only one there.

21         The other tools of terrorism are the Mexican

22   flag.  And I'm going to apologize.  I'm not very good

23   at identifying all this flags.  I believe this one is

24   from Jamaica.

25         But they wanted this Embassy to be a welcoming

Closing Argument by Ms. Jhones                    193

1    place to everyone in the neighborhood.  This place was

2    welcome to everybody.  They wanted to welcome people

3    from every race and every nationality and this was one

4    of those symbols.

5            Tools of terrorism, folks.

6            And another indicator of the real problem,

7    the Achilles' heel, if you will, that Informant

8    No. 1/"Thug" and Informant No. 2 knew about is Defense

9    Exhibit 75.

10           On June 21st of 2004, the Embassy lights --

11   the power had been turned off, final notice, June 13,

12   2006, before power is turned off.  150 bucks.

13           These terrorists had not -- had no money to

14   pay their light bill.  This is why Narseal Batiste was

15   going to sell his country, sell his country, sell his

16   country, by dealing with these informants.

17           Apparently, before he was willing to sell his

18   country, in order to model himself after Jeff Fort, he

19   forgot to pay the light bill.

20           Tools of terrorism.

21           This is a symbol of the sacred and secret

22   order.  I don't know about you, ladies and gentlemen,

23   but how many people that do not want to be seen go

24   around in uniforms, patches in tow?  I don't get that.

25           These men were so proud of what they really

Closing Argument by Ms. Jhones                194

1    represented.  They wanted to have uniforms because that

2    was a symbol to them of discipline, of unity, of a

3    purpose.  Unity, discipline and purpose.

4            Federal, state seal.  These were handmade.

5    Again, USA, Jewish flag, authority, justice and

6    sovereignty.

7            Tools of terrorism, folks.

8            Defense Exhibit 65.

9            *Black's Law Dictionary*.  We have three or four

10   of them.

11           Selected prayers.

12           *Ancient Teachings for Beginners*.

13           *A Brief Illustrated Guide to Understanding*

14   *Islam*.

15           *Muslim-Christian Dialogue*.

16           *Jesus:  Last of the Pharaohs*.

17           Multi-state books.  These are books that

18   lawyers -- would-be lawyers utilize before they take

19   their Bar exam.  Two of these.

20           A couple of Korans.

21           Audrey Ford's Bible.  Narseal Batiste's

22   mother's Bible.

23           Another Holy Bible.

24           A dictionary.

25           More law books.  A book on *Learning to Read*

Closing Argument by Ms. Jhones                    195

1    *Spanish for Idiots*.

2              More documents on the Moorish Science Temple.

3              I'm not going to read them to you.  I can read

4    them.  You can find out what the Moorish Science Temple

5    is all about -- or at least get an idea.

6              *The Way of the Ninja Techniques*.

7              Now, there's a couple of other books here on

8    self-defense techniques, *Aikido*, *How to Defend Yourself*

9    *Against Armed Assault*.

10             Let me tell you, ladies and gentlemen, one of

11   the dangers with the so-called war on terror as it

12   existed in 2006.  Hopefully, things will change.

13             When the Federal Government is going to get in

14   the business of questioning why you have certain books,

15   when the Federal Government is going to get in the

16   business of paying informants, informants -- one in

17   particular who was in jail in Mexico, who was thrown

18   out of his country in Syria, Lebanon, in jail in Mexico

19   and they're going to pay him $100,000, tax free, never

20   worked a day in his life in the United States of

21   America from 2001, and you are going to give that man

22   the benefit of the doubt and you're going to let that

23   man manipulate Narseal Batiste, a man of good, a man

24   who has absolutely no history whatsoever of violence,

25   none whatsoever, none, and you're going to let this man

1    manipulate Narseal Batiste into taking pictures and

2    then you're going to go, "Look, of course he meant it.

3    He has a book on *How to Defend Yourself Against Armed*

4    *Assault* and you're going to start to question why

5    people have in their possession certain books -- you're

6    going to see in the jury instructions, ladies and

7    gentlemen, as it relates to Count 1 -- the Court read

8    it to you -- the First Amendment is not dead, not yet.

9         We are free to associate with whomever we

10   please.  We are free to think whatever we want to

11   think.  We are free to want to engage in blood

12   ceremonies or any ceremony we want.  Still we are free

13   to do that in this country.

14        Keep your eye on the ball, please.  These men

15   are charged with engaging -- with agreeing to commit

16   four acts of terrorism, one of them being conspiracy to

17   overthrow the United States Government.

18        Here are the tools of terrorism that were

19   found at the Embassy in 2006.

20        I'd like -- actually, that is not true.  I

21   wouldn't like, but I have to go through a little bit of

22   a painful process now.

23        I'm going to play some clips for you.  I

24   promise you this is the last time.  But this is very

25   important, because what's at issue here is Narseal

```
 1    Batiste's intent.

 2             At this time I'm going to ask dear Eric to

 3    give me a hand.

 4             And let's start it, Eric, if you will, with

 5    Sequence No. 1.  Give me a second.

 6             Let me tell you what I'm doing with Sequence

 7    No. 1, ladies and gentlemen.

 8             I have introduced, and you have been very

 9    patient and kind in listening to a bunch of defense

10    transcripts that I published for you in the defense

11    binder.

12             You don't need to get to them right now.

13    These are going to be very short clips.  But they're

14    going to be very illustrative of what -- of Narseal

15    Batiste's intent and the influence perpetrated upon him

16    by CW 1, a/k/a "The Thug," and CW 2.

17             And I'm going to talk briefly in between these

18    clips, but I want you to listen, please.

19             Let's begin, Eric, please, with Sequence

20    No. 1.

21             THE COURT:  Could you identify the exhibit,

22    please.

23             MS. JHONES:  I'm going to identify them as I

24    do.

25             The first one, your Honor, is going to be
```

```
 1    Defense Exhibit 80-A.
 2              They're going to be very, very short clips.
 3              THE COURT:  Okay.
 4              (Whereupon, segments of Defendant Batiste's
 5    Exhibit No. 80-A were published in open court.)
 6              MS. JHONES:  Hold on a second, Eric, if you
 7    can.
 8              What's significant about Special Agent Joe
 9    Garbato on November 6 saying that this is a recording
10    between Baylan and Narseal Batiste?
11              Do you remember when Anthony Velazquez, that
12    gentleman sitting right over there, took the stand and
13    said to me when I was cross-examining him -- I said,
14    "You know, you guys do a lot of investigation.  You
15    could corroborate things in different ways.  Right?
16    Like you could get documents, like you have the power
17    of subpoena, like you could impanel a grand jury, like
18    you could get subpoenas out to banks, like you could
19    get documents from the State of Florida, like you could
20    get phone records, you could get whole credit reports.
21    You could get a lot of information just by getting
22    someone to sign a subpoena."
23              And Anthony Velazquez said, "Yeah.  But -- but
24    I really didn't know -- we had not clearly identified
25    Narseal Batiste 's name yet."  That's what he said.
```

1    That's what he said.

2            Well, on November 6, Joe Garbato, his

3    colleague, said, "This is a recording between Baylan

4    and Narseal Batiste."

5            Go ahead, Eric.

6            (Whereupon, segments of Defendant Batiste's

7    Exhibit No. 80-A were published in open court.)

8            MS. JHONES:  Hold on a second, Eric.

9            The other significant -- Defense Exhibit 80,

10   which is the tape, and 80-A, which is the transcript --

11   the other significance is this:  The Government says --

12   I'm sorry.  Strike that.

13           Informant No. 1 said that he had a meeting the

14   next day on November 7th with Narseal Batiste.  He had

15   already scheduled it.  You may recall that testimony.

16           Well, when you go through Defense Exhibit 80

17   and 80-A, it is clear that Narseal Batiste tells the

18   informant, "Listen, I've been working all day.  I'm

19   really not going to be able to meet with you today.  I

20   may be able to meet with you tonight around 12:30 a.m.

21   That's the only time I have available.

22           "Well, no.  I really can't do that," says the

23   informant.  "I'll be waiting for you tomorrow," says

24   the informant, even though Narseal Batiste clearly

25   says, "I'm not going to be there.  I have to work."

1          Again, this is a guy who's been waiting

2     from -- since 1998 to go ahead and wage war against

3     United States of America.

4          Let's go on to the next clip, which is Defense

5     Exhibit 81, and the transcript is 81-B.

6          (Whereupon, segments of Defendant Batiste's

7     Exhibit No. 81 were published in open court.)

8          MS. JHONES:  The next one is 82-B.

9          (Whereupon, segments of Defendant Batiste's

10    Exhibit No. 82-B were published in open court.)

11         MS. JHONES:  Defense Exhibit 83-B.

12         (Whereupon, segments of Defendant Batiste's

13    Exhibit No. 83-B were published in open court.)

14         MS. JHONES:  Stop a second, if you could,

15    Eric.

16         This is, so far, since November 6th.  And

17    we're up to November 18th.  This is Baylan -- Baylan is

18    Informant No. 1 -- reaching out for Narseal Batiste day

19    after day after day.

20         Narseal Batiste does not call Baylan.  The guy

21    that's been harboring this desire since December --

22    strike that -- since 1998 is too busy working to sell

23    out his country.  He's not returning any phone calls.

24    He's calling.  He's putting him off.  He's busy.

25         But this is somebody who has this desire deep

1    down in the recesses of his heart.

2              Let's go on, Eric, to 83, please.

3              (Whereupon, segments of Defendant Batiste's

4    Exhibit No. 83 were published in open court.)

5              MS. JHONES:  Now we're up to November 18.  I

6    mean, okay.  He didn't mention it on October 29.  He

7    didn't mention it on November 6.  He didn't mention it

8    on whatever.  Now we're up to November 18.

9              What about that flier?  What about that terror

10   connection?  What is Narseal asking?

11             Faisal.  "Is he going to give you the money?

12   Does he have the money?"  That's what Narseal is

13   asking.

14             Let's go on with 83-B.

15             (Whereupon, segments of Defendant Batiste's

16   Exhibit No. 83 were published in open court.)

17             MS. JHONES:  "I'm sorry I had to drag you all

18   the way down hire, man."  This is someone who had to be

19   dragged.  He can't come himself.  But he has the intent

20   to overthrow the United States Government.  "Sorry to

21   drag you down here, Narseal."

22             Continue, Eric, please.

23             (Whereupon, segments of Defendant Batiste's

24   Exhibit No. 84 were published in open court.)

25             THE COURT:  What exhibit number is that,

1   please?

2           MS. JHONES:  This is Defense Exhibit 84.

3           The next one is Exhibit 84-B-2.

4           (Whereupon, segments of Defendant Batiste's

5   Exhibit No. 84-B-2 was published in open court.)

6           MS. JHONES:  Again, the informant is reaching

7   out for Narseal Batiste, not the other way around.

8           Let's go to the next exhibit, which is 87-B-1.

9           (Whereupon, segments of Defendant Batiste's

10  Exhibit No. 87-B-1 were published in open court.)

11          MS. JHONES:  One second, Eric.

12          I need to correct the record.  That was

13  Defense Exhibit 84-B-2, the previous exhibit just

14  published.

15          And the informant said, "I'm waiting for you,

16  brother.  I'm waiting for you.  I don't like to pray

17  alone."

18          Let's go on to the next one, Eric, 87-B-1.

19          (Whereupon, segments of Defendant Batiste's

20  Exhibit No. 87-B-1 were published in open court.)

21          MS. JHONES:  Again, "Please call me.  Call me,

22  Brother Naz.  Call me, Brother Naz."

23          Let's go on to 87-B-2.

24          (Whereupon, segments of Defendant Batiste's

25  Exhibit No. 87-B-2 were published in open court.)

1          MS. JHONES:  Narseal Batiste has no time to

2     meet with the person who has provided him, in the words

3     of Ms. Arango, a once-in-a-lifetime opportunity.  He

4     has to work.

5          Let's go on with the next clip, Eric, which is

6     Defense Exhibit 88-B-1.

7          (Whereupon, segments of Defendant Batiste's

8     Exhibit No. 88-B-1 were published in open court.)

9          MS. JHONES:  88-B-2.

10          (Whereupon, segments of Defendant Batiste's

11     Exhibit No. 88-B-2 were published in open court.)

12          MS. JHONES:  Give me a second, Eric.

13          In Defense Exhibit 88-B-2, Narseal Batiste,

14     who's been harboring a desire to overthrow the United

15     States Government since 1998, said, "Come on over.  We

16     are fixing -- we're working at the Embassy.  We're

17     actually doing some tile.  We have a lot of work to do

18     here right now.  If you want to come on over to the

19     Embassy, come on over."

20          Now, the importance of this, ladies and

21     gentlemen, is that, at the end of this conversation,

22     Page 2, the informant says, "Okay.  I'll see you later,

23     Aki.  I'll see you later."

24          There was no recorded conversation introduced

25     in this case indicating what was discussed with Narseal

1    Batiste and the informant on the evening of

2    December 14th -- December 12th of 2005.

3            Let's go on to Defense Exhibit 96-B-1.  This

4    is a call on 12-14.

5            (Whereupon, segments of Defendant Batiste's

6    Exhibit No. 96-B-1 were published in open court.)

7            MS. JHONES:  Let's go on to the next one,

8    Defense Exhibit 96-B-2.

9            (Whereupon, segments of Defendant Batiste's

10   Exhibit No. 96-B-2 were published in open court.)

11           MS. JHONES:  One second, Eric.

12           The informant says, "I received a phone call

13   from you last night.  Call me back, man.  Why you not

14   answering my phone?  I waited for you all last night,

15   brother."

16           It makes no sense.  It makes no sense.

17           Is this a self-serving voicemail?  Response to

18   a voicemail?  That's for you to decide, ladies and

19   gentlemen.

20           Let's go on to Defense Exhibit 90-B-1.

21           (Whereupon, segments of Defendant Batiste's

22   Exhibit No. 90-B-1 were published in open court.)

23           MS. JHONES:  This is -- one second, Eric.

24           This is on December 15 of 2005 at 5:29.

25   Again, leaving a voicemail.  Brother Naz is not

1   responding.

2          Now, you at this stage of the game probably

3   know what's coming up on the very next day,

4   December 16.  This is -- if Narseal Batiste did not

5   have the opportunity of a lifetime with CW 1, he's

6   certainly going to have it now, because "The Muscle" is

7   coming to town.  CW 2 is coming to town.

8          And let's go ahead and publish, Eric, Defense

9   Exhibit 124-B.

10          (Whereupon, segments of Defendant Batiste's

11   Exhibit No. 124-B were published in open court.)

12          MS. JHONES:  Let me share a few observations

13   about this exhibit, ladies and gentlemen.

14          I only played a small clip.  There are a

15   series of voicemails in Defense Exhibit 124-B and I

16   only played a small portion.

17          You will be able to look at it on your own

18   and, if you want to play the CD, you will have to play

19   it.

20          The significance of this is the following:

21   Now, Narseal Batiste, who according to them, is violent

22   to the core, who's been harboring this desire to get on

23   with his real mission of waging jihad and overthrowing

24   the United States Government of America -- the guy is

25   coming to town.

 1            It's December 16th.  It is clear that CW 1,

 2    "The Thug," and Narseal Batiste have had a conversation

 3    about this guy coming to town.

 4            We know that, on November 10th -- on

 5    November 10th and November 11th, the informant told

 6    Narseal Batiste, "The brother from back home is coming

 7    to town."  We know that.

 8            Now, in this exhibit, the informant calls

 9    Narseal Batiste not once, not twice, not three times,

10    not four times.  I believe he calls him four, if not

11    five, times, message after message after message.

12            Now, Narseal Batiste does answer the phone.  I

13    haven't played this for you.  I played it for you

14    during the course of the presentation of evidence.

15            But one of the things, besides what you have

16    just heard, that you will see on Page 3 of this

17    transcript is the informant saying, "Al-hamdu li-llah.

18    Finally, man."

19            This is when Narseal answers.

20            "I was worried.  Why you not answering my

21    phone?  What's up -- what you up to, Aki?"

22            Why is the informant worried, ladies and

23    gentlemen?  So what if Narseal Batiste doesn't show up?

24    So what?

25            Why does the informant have a stake on whether

```
 1    or not Narseal Batiste shows up to pick up this
 2    informant?  Why is he worried?
 3            The informant asks Narseal Batiste to assure
 4    him that he's going to go ahead and pick up the
 5    brother, meaning "The Muscle," at the airport and he's
 6    coming tonight.
 7            And, of course, we know that, on the evening
 8    of December 16th of 2005, sure enough, Narseal does not
 9    meet the informant at the airport.  Narseal Batiste
10    meets the informant at the Radisson.
11            Now, before we get into the next clips, just a
12    few things about December.  You heard the clips.  You
13    can play it yourself.  You can go through it.
14            Narseal Batiste -- you will make a
15    determination as to that particular Government exhibit,
16    which I believe may be 44 -- I may be wrong about
17    that -- is the meeting at the Radisson, the first
18    meeting with "The Muscle" and Narseal Batiste.
19            You will determine who is in control of that
20    meeting.  You will determine whether or not "The
21    Muscle" is there to determine what Narseal Batiste's
22    intent is or not.  That's for you to determine.
23            But what is clear is that, for whatever
24    reason, for whatever reason, Anthony Velazquez has to
25    call in at least two or three times to give some
```

1    direction to this informant.

2           We don't know what he said.  Well, actually,

3    Mr. Velazquez testified as to what he said.  That's for

4    you to determine, whether or not what Mr. Velazquez

5    testified to is consistent with that tape.

6           Now, we also know that Narseal Batiste tells

7    the informant that he is financially exhausted.  That's

8    what he tells him.  No mention of a flier.  No mention

9    of the Sears Tower.  No mention of blowing up

10   buildings.  He's financially exhausted.

11          Oh, yeah.  He does say about the Islamic army.

12          And he also says -- the informant says, "What

13   are you going to do when you build this army and when

14   you get these weapons?"

15          Because he gave him a list that you have heard

16   ample testimony about.

17          Narseal Batiste says, "I'm going to march.

18   I'm going to march all the way up to Jeb Bush's

19   office."

20          And tell him what?  Are you going to shoot Jeb

21   Bush?  No, no, no.  Narseal Batiste is going to march

22   up there with his boots and say, "I am here."

23          That was the testimony.

24          One last thing about December 16th.  I forget

25   the page number.  You will see towards the end of the

1    conversation the transcript -- that the Government

2    transcript reflects that the words "Al-Qaeda" were

3    spoken in that exhibit.

4          The words "Al-Qaeda" were never spoken.  That

5    transcript is not accurate.  Listen to it for yourself.

6          Why those words were inserted in there, why

7    that was necessary, that's for you to determine.

8    Listen to the tape.

9          Let's go on, Eric, with Defense Exhibit 94-B.

10         (Whereupon, segments of Defendant Batiste's

11   Exhibit No. 94-B were published in open court.)

12         MS. JHONES:  Hold on a second, Eric.

13         For your information, ladies and gentlemen, I

14   skipped over a series of calls -- attempts and/or calls

15   by Informant No. 1 before -- for the month of December.

16   I'm not going to bore you with playing every single

17   one.

18         The point of the matter is that, when you look

19   at all of these calls, calls that were not played to

20   you, were not introduced in the Government's case in

21   chief, I was forced to put on evidence in order to tell

22   the real story.

23         But the point of this is that, if we are

24   trying to find out what Narseal Batiste's intent is --

25   okay? -- why is Informant No. 1 or Informant No. 2

Closing Argument by Ms. Jhones                210

1    always the one calling and calling and calling and

2    calling, when this man has had a desire from 1998 to do

3    what he wants to do, which is perpetrate violence on

4    the United States of America, because he wants to take

5    over?

6              That's the point of all of these clips.

7              There are clips that I haven't played, but you

8    have the transcripts.  Of course, Narseal Batiste

9    returns some of these phone calls.

10             But the points of the matter is you can see

11   who generates the call, who is the one that wants to do

12   this, who is one that is running the show.

13             Okay.  This is going to be Defense Exhibit 94.

14             (Whereupon, segments of Defendant Batiste's

15   Exhibit No. 94 were published in open court.)

16             MS. JHONES:  I have skipped over a couple of

17   defense exhibits -- I'm sorry -- Government's exhibits

18   and I have to comment on them.

19             We are now up to December 28th.  What has

20   happened from December 16th up to December 28th?  Well,

21   you know that the informant met -- Informant No. 1 met

22   with Narseal Batiste on 12-21 of '05.

23             That's that meeting in that apartment when

24   Narseal Batiste and the informant say the most

25   horrendous things in front of a TV set and there's some

 1    rap music playing in the background.  You heard it.

 2         What is the significance of 12-21?  The

 3    significance of 12-21, ladies and gentlemen, here is

 4    that, again, again, we are here to determine Narseal

 5    Batiste's intent.  Okay?

 6         In that conversation, the Informant No. 1

 7    tells him -- Narseal is talking about taking the

 8    informant to California.  "California is a beautiful

 9    place to visit."

10         The informant tells Narseal Batiste at

11    Page 22, "You have to look organized."

12         The informant tells Narseal Batiste on

13    Pages 27 and 28, "This has to be in secret.  It has to

14    be in secret.  People can't know about this."

15         The informant tells Narseal Batiste, "You've

16    got to make the place look like a mosque."  Not the

17    Jeff Fort gang place.  "Make it look like a mosque."

18         Okay.  On Page 31 -- on Page 31, Narseal

19    Batiste is laughing, laughing, with Informant No. 1

20    when he's telling Informant No. 1 what had happened on

21    December 16th with Informant No. 2.

22         "I told him, brother, that I was going to get

23    guerrillas and march over to Jeb Bush's office," ha,

24    ha, ha, ha, ha, ha.  That's at Page 31 of that

25    transcript.

Closing Argument by Ms. Jhones                    212

1            Narseal Batiste tells Informant No. 1 that

2     he has not one, not two, not three, not four --

3     5,000 soldiers in the city of Chicago.  5,000 soldiers,

4     ladies and gentlemen.

5            Now, he had told the Informant No. 2 just two

6     or three days prior on December 16th that he had seven

7     generals and that was it.  The only thing the seven

8     generals did were jump off buildings and -- I don't

9     know what else.

10            He didn't tell Informant No. 2 that he had

11     5,000 soldiers in Chicago.  He did that on the 21st.

12            But he has had this plan since 1998.

13            On Page 45, Narseal says, "I'm going to take

14     you to Chicago.  As soon as we get the money, I'll take

15     to you Chicago.  But it's serious money, Occ.  It's

16     gonna cost serious money."

17            And the informant says at Page 45 -- I'm

18     sorry -- Narseal says, "I need at least $10,000."

19            At Page 46, the informant says, "I'll see what

20     I can do about getting you that amount of money.  I'll

21     try and get it.  I'll try and get it," he says, at

22     Page 47.

23            On December 22nd, Narseal Batiste meets with

24     the second informant.  You've heard numerous clips

25     about that meeting.  That's the meeting in the Embassy,

Closing Argument by Ms. Jhones                213

1    again, the place where they can't really record

2    anything, it's too dangerous, they can't go there.

3          Well, guess what?  Informant No. 2 is there

4    wearing a body wire, plugging along and recording to

5    his heart's content.

6          In that meeting, Narseal Batiste talks about

7    the Sears Tower.  He talks about the Empire State

8    Building.  He talks about how Lake Michigan is right

9    next to the Sears Tower and how the lake is going to go

10   ahead and drown the Sears Tower and it's going to come

11   down.

12         That's the plan, folks.  That's the plan as of

13   December 22nd.  Lake Michigan is going to drown the

14   Sears Tower.

15         And Brother Mohammed was so impressed that he

16   says, "Brother, brother, who knows about this plan?"

17         And what does Narseal tell him?  "No one.  No

18   one knows about the plan."

19         Then he goes on and the informant -- this is a

20   conspiracy case, ladies and gentlemen -- the informant

21   tells Narseal, "I prefer" -- this is Informant No. 2 --

22   "I prefer to have -- when I speak with you, you are the

23   boss, Brother Naz.  I'm here to assist you.  I'm not

24   here to take over.  But I'm here to assist you.  And

25   you know what?  You don't have to -- we don't have to

1    discuss this in front of any of the other brothers.

2    This is just between you and me."

3           Why, ladies and gentlemen, is a Government

4    informant telling Narseal Batiste to not talk to

5    anybody else about this plan, "Let's just you and I

6    discuss it"?

7           Why is he not telling him, "I'm from

8    Al-Qaeda"?  Why is he not telling him, "Bring all these

9    other guys on.  I want to hear what everybody is

10   thinking and planning"?  Why?

11          You have to ask yourself those questions.

12          Okay, Eric.  Let's go on with the next

13   exhibit, which is Defense Exhibit 95.

14          (Whereupon, segments of Defendant Batiste's

15   Exhibit No. 95 were published in open court.)

16          MS. JHONES:  The significance of those calls,

17   ladies and gentlemen, is that, on December 29th, as you

18   may recall, Narseal Batiste and the informant had a

19   meeting at Bayside.

20          This is where Narseal Batiste provided another

21   list to Informant No. 2 and that's the list that talks

22   about the SUVs and the motor bikes and the 50 grand

23   cash, among other things.

24          The significance is that this meeting -- this

25   informant called Narseal Batiste six times, six times,

1    to make sure that that guy was going to show up.  And

2    he does show up.  But he shows up and he doesn't record

3    the meeting.

4           You decide whether that was a casual

5    malfunction or whether or not that was an intentional

6    omission.

7           This is the conversation where the informant

8    says that Narseal Batiste said that, if he could put a

9    building up, he could bring a building down, meaning

10   the Sears Tower.

11          You heard testimony, ladies and gentlemen,

12   from Frank Adetu.  Frank Adetu is the gentleman that

13   owns Acme Construction and is affiliated with the

14   Contractors Resource Center.

15          Frank Adetu is the gentleman that came in here

16   and talked to you about the different jobs that he had

17   given Narseal and the brothers.

18          He told you that Narseal Batiste pretty much

19   is a glorified handyman.  He didn't characterize it in

20   that fashion, of course.

21          Elsie Hamler came in here, the director of the

22   Contractors Resource Center, and told you that Narseal

23   Batiste basically could do stucco and he can do some

24   construction work.

25          And she talked to you about the different

1    projects that she was familiar with him having done

2    because he bid on these different projects and that's

3    what the Contractors Resource Center does.

4            You heard from Mike Sharpe.  Mike Sharpe is

5    the gentleman from Ft. Lauderdale who talked about the

6    projects that Narseal Batiste and some of the brothers

7    worked on during the hurricane.

8            His tree fell down.  They were there at his

9    premises for a week, chopping up this tree.  They

10   helped him with many things, with the bathroom and some

11   other minor repairs.

12           Frank Adetu told you that the level of skill

13   of Narseal Batiste is basically that of stucco,

14   one-story buildings.  And you have to look at the

15   Defense Exhibit 77-A through -J, which will show you

16   some of the work that Narseal Batiste and the brothers

17   have done.

18           You will also have a couple of other

19   photographs, 76-E and 76-F.  You determine to the

20   extent that you believe that Narseal Batiste told this

21   informant on December 29th that he could bring the

22   Sears Tower down because he could put buildings up.

23           It's for you to determine whether Narseal

24   Batiste was feeding him a line or if he really said

25   that.  We know there's obviously no evidence in this

Closing Argument by Ms. Jhones                     217

 1    record that he could bring anything down, let alone the

 2    Sears Tower.

 3            After December 29th, according to the

 4    testimony of the Informant No. 2, they agreed to meet.

 5    Well, guess what?  They don't meet.  They didn't meet.

 6    Narseal Batiste doesn't call him.  Who calls who?

 7            On January 2nd, the informant reaches out for

 8    Narseal Batiste.  You may recall that -- that call that

 9    I played for you, which is a very -- the audio quality

10    of that call is very bad, Defense Exhibit 110.

11            In that call -- it's a very short call.  The

12    informant wishes Narseal Batiste a Happy New Year.  He

13    talked about being able to see him again, "Give me a

14    call again," what have you.

15            The very next day, December 3rd, there is

16    another call.  This call, ladies and gentlemen -- I

17    would strongly suggest that you all listen to it in its

18    entirety.  I played it in its entirety.  But I think

19    it's worth for you to listen to it again.

20            And why?  It's Defense Exhibit 111.  There

21    are -- it's a five-page conversation.

22            Now, Narseal Batiste has met -- has

23    encountered the opportunity of a lifetime, according to

24    the prosecutor.  This is the man.  This is the man that

25    he's been waiting for.

Closing Argument by Ms. Jhones                218

 1          And what does the man say to Narseal Batiste
 2   on January 3rd?  "I have a surprise for you, brother.
 3   I have a surprise for you, brother."
 4          Narseal Batiste tells him, "I don't like
 5   surprises.  What do you have for me?"
 6          "Oh, no, no, no.  When you receive it, you
 7   gonna be so happy.  You always happy.  You happy with
 8   my surprises."
 9          Give me a break, ladies and gentlemen.  We are
10   talking about some serious things here.  And this
11   informant, "Oh, no, no, no.  I can't tell you.  It's a
12   surprise.  It may be a bomb.  It may be" -- I don't
13   know.  "It's a surprise, man."
14          Narseal Batiste tells him, "I do not like
15   surprises."
16          The informant tells him on Page 3, "Every time
17   I see you, I'm going to have something for you in my
18   hand."
19          What is the implication, ladies and gentlemen?
20   "I'm going to have money for you.  I'm going to give
21   you what you really, really want."  That's the
22   implication, ladies and gentlemen.
23          Narseal Batiste goes back and forth.
24          And he tells him, "You have to trust me.  You
25   know, tell me what you have."

1          And Narseal Batiste tells him on Page 4, "We

2   have to have a frank communication with each other.  We

3   have to have a frank communication with each other."

4          And Narseal tells him, "I feel like choosing

5   that position is because -- I feel like choosing that

6   position is because you always want to have something

7   in a position where I don't fully know.  And that's not

8   good.

9          "I want to know," says Narseal Batiste,

10  "because -- I'll tell you why."  "Because I'm very open

11  and straightforward with you," says Narseal Batiste.

12         "Trust me, brother.  Trust me.  Trust me.

13  You're gonna love what you have for you.  I have

14  surprise."

15         Click.  Click.

16         Narseal Batiste hangs up on this man.

17         The other thing about that exhibit, ladies and

18  gentlemen, is that it breaks up an awful lot.  It's for

19  you to determine it -- now, we know that the informant

20  is the one that's controlling this body wire, not

21  Narseal Batiste.

22         You all have to determine whether or not that

23  was accidental or whether or not the informant is

24  trying to keep some conversations from being recorded.

25  That's for you to determine.  Listen to Defense

1    Exhibit 111.

2          We go on to -- I have a lot more clips, but

3    I'm going to skip over a little bit because there's

4    just too many here.

5          Again, we all know what happens in January.

6    Narseal Batiste disappears.  He disappears.  "I'm

7    through with this guy.  I'm through with this guy."

8          And why is he through with him?  Because the

9    plan -- the original plan to get money from this guy,

10   as Narseal Batiste and the first informant had agreed,

11   is not happening.

12         This was supposed to be fast money.  This was

13   supposed to be a piece of cake.  But it's not

14   happening.  It's not happening.  It's not working out

15   the way Informant No. 1 said it was going to work out.

16   "All you need to do is look organized and you'll get

17   your money."  Well, guess what?  Narseal Batiste has

18   not gotten his money.

19         We know one thing.  By this time, there are a

20   lot of lists circulating, lists with weapons and

21   handguns and boots.  Narseal Batiste stopped asking for

22   any of that stuff.  He disappears in the month of

23   January.

24         What happens?  Because they want to find out

25   Narseal Batiste's intent.  He disappeared.  No more.

1    He's in Ft. Lauderdale.  He's working.  He's done with

2    this guy.  So what do they do?  They sic the other

3    informant on him because Informant No. 2 lost control

4    of him.

5              "Let's get No. 1 back in.  We need to know

6    this guy's intent, but we can't rely on just one

7    informant.  We have to sic two informants on this guy

8    to find out what his true intent is.

9              But we know his true intent.  He's been trying

10   to do this since 1998.

11             We all know what happens in January.  I'm not

12   going to talk to you about this kidnapping.  That --

13   the notion that these two individuals are kidnapped is

14   the most absurd thing.

15             Listen to that transcript.  Read that

16   transcript, ladies and gentlemen.  What nice kidnappers

17   we have here.  "You want to go to the convenience

18   store?  You want some cigarettes?  Doritos?  Do you

19   want share?"

20             But we do know what happens on January 28th,

21   because Narseal Batiste tells the informant, "I want

22   what I told you from the very beginning, not the

23   weapons, not what I wrote on the list on 12-16 or 12-9

24   or 12-29, except the money.  I just want the money.

25   Just give me the money."

1          Ladies and gentlemen, you all know who Mick

2   Coriolan is.  Mick Coriolan is the guy who brokered a

3   gun deal with CW 1.  Okay?

4          Narseal Batiste could get guns from a whole

5   lot of people.  Narseal Batiste could get guns from

6   CW 1.  CW 1 purchased an AK-47.

7          Where on this record, where, do you see

8   Narseal Batiste reaching out for CW 1, who, supposedly,

9   he trusts, and says, "Forget about the weapons from the

10   informant.  You get me the AK-47.  You get me all my

11   guns.  I want you to get me the guns"?  Where?

12          Nowhere.  Because Narseal Batiste doesn't want

13   any guns.  This was a farce to try and get money.  This

14   is abundantly clear, ladies and gentlemen.

15          It's not money to sell out their country.

16   It's money that he's going to scam off of these people.

17   It is abundantly clear, ladies and gentlemen.

18          The informant continues after January 28th --

19   one more thing about January 28th.

20          Narseal Batiste tells him, "No one knows about

21   the plan."  Why are they in the tent?  Why aren't all

22   the other guys that are there -- why don't they just

23   all come in there and talk about it?  Why?

24          And all of a sudden, the informant says,

25   "Well, money is not a problem.  But you know what?  You

Closing Argument by Ms. Jhones                    223

```
 1    need to get a warehouse.  You really need to get a
 2    warehouse."
 3            Is this Narseal Batiste's request?  Is this
 4    Narseal Batiste's intent?  Is Narseal Batiste in
 5    control?  He thinks he is.  But he's not.  They are in
 6    control.
 7            Okay.  So January 28th is over.  They all
 8    decided they trust each other again.  "We like each
 9    other again."  Everything is nice and dandy.
10            So Narseal Batiste now starts calling this
11    guy.  Right?  Wrong.  Wrong.  He doesn't call him.  And
12    the cat and mouse game continues again.
13            You will see in Defense Exhibit 112, in
14    Defense Exhibit 112-B-1 and 112-B-2, again, the
15    informant calls -- CW 2 calls Narseal Batiste on
16    February 1 and said, "I've left you three messages.
17    I've left you three messages."
18            Narseal Batiste says, "I was in the middle of
19    a meeting."
20            It continues on in February.  Nothing happens,
21    ladies and gentlemen.  Nothing happens.
22            On February 3rd, you heard the testimony.
23    They finally hook up.  On February 3rd, Narseal Batiste
24    and this informant sometime in the early morning or
25    later morning -- they meet up.  And where do they go?
```

Closing Argument by Ms. Jhones                    224

1    They go, supposedly, to look at warehouses.

2             You all know, ladies and gentlemen, that these

3    folks, the FBI, had already chosen the warehouse that

4    they were going to give to Narseal Batiste on

5    March 16th.  We know that.

6             There was a pole camera set up in front of the

7    warehouse on March 15th.  They didn't show Narseal

8    Batiste any warehouses.  They led him to believe that

9    he was in control, that he was choosing.  They already

10   had the warehouse chosen.

11            Narseal Batiste wanted to get the warehouse

12   over with because the warehouse meant, "Okay.  You told

13   me on January 28th, if I get this warehouse, I'm going

14   to get the money."  All right.

15            Now, in the month of February, again, the

16   calls continue.  Narseal Batiste doesn't respond.  The

17   calls continue.  Narseal Batiste says, "I'll met up

18   with you, brother."  He doesn't meet up with him.  The

19   cat and mouse game continues and it continues and it

20   continues.

21            Or February 7th, you heard a conversation,

22   ladies and gentlemen, and it's a very long

23   conversation -- well, it's a seven-page conversation

24   where Narseal Batiste told -- tells him, "You know, you

25   said you were going to get this to me.  You said you

Closing Argument by Ms. Jhones                    225

```
 1      were going to get me the money.

 2              "I'm calling you back, but you don't return my

 3      phone calls."

 4              The cat and mouse game continues, ladies and

 5      gentlemen.

 6              And then the informant inserts the comment

 7      on -- in the conversation on February 7th about the

 8      USS Cole.

 9              Why do they do that?  Why do they have to talk

10      about the USS Cole?  Did Narseal Batiste say anything

11      about the USS Cole?

12              No.  You have to decide why they have to do

13      that.  Why do they have to interject these tragic

14      episodes overseas?

15              Nothing happens again.  The cat and mouse game

16      continues, continues, continues.

17              And, lo and behold, on February 19th, after --

18      and you will see it on the defense exhibits, ladies and

19      gentlemen -- are all of the phone calls where this man

20      is calling Narseal Batiste.

21              And when the CW 2 -- when Narseal Batiste

22      doesn't return the calls to CW 2, they bring CW 1 back

23      in.  This is the way it goes.  That's the way it goes.

24              But Narseal Batiste has this desire.  He's had

25      this desire since 1998.
```

1           February 19th, they meet up.  Narseal Batiste

2    goes to the apartment and Patrick Abraham goes with

3    him.

4           Ladies and gentlemen, listen to that entire

5    tape.  The most horrendous things are said in there.  I

6    am not excusing, justifying, condoning what Narseal

7    Batiste said.

8           But what I'm telling you is he did not mean

9    it.  He was feeding these guys what he believed this

10   guy wanted to hear.

11          He's talking about his Sears plan.  He has a

12   couple of Coke cans, two remote controls from the

13   television and a tissue box as he's explaining to this

14   informant how he's going to bring down the Sears Tower.

15          Ridiculous, ladies and gentlemen.  Ridiculous.

16          While he's doing that, he is watching the All

17   Star Game.  He needs horses.  He needs horses to

18   overthrow the United States Government.

19          THE COURT:  Ms. Jhones, we're going to need to

20   take a break.

21          MS. JHONES:  Okay.

22          THE COURT:  Do not discuss this case either

23   amongst yourselves or with anyone else.  Have no

24   contact whatsoever with anyone associated with the

25   trial.  Do not read, listen or see anything touching on

1    this matter in any way.

2           If anyone should try to talk to you about this

3    case, you should immediately instruct them to stop and

4    report it to my staff.

5           You may leave all your materials in your

6    chairs.  Please be back in the jury room in ten

7    minutes.

8           (Whereupon, the jury exited the courtroom at

9    4:17 p.m. and the following proceedings were had:)

10          THE COURT:  We're in recess for ten.

11          (Thereupon a recess was taken, after which the

12   following proceedings were had:)

13          THE COURT:  We're back on United States of

14   America versus Narseal Batiste, et al., Case

15   No. 06-20373.

16          Counsel, state your appearances, please, for

17   the record.

18          MR. GREGORIE:  Richard Gregorie and Jacqueline

19   Arango on behalf of the United States, your Honor.

20          MS. JHONES:  Ana Jhones on behalf of Narseal

21   Batiste, who is present.

22          MR. LEVIN:  Albert Levin on behalf of Patrick

23   Abraham, who is present.

24          MR. CASUSO:  Lou Casuso on behalf of Burson

25   Augustin, who is present.

1          MR. CLARK:  Nathan Clark for Rotschild

2    Augustine, who is present.

3          MR. HOULIHAN:  Richard Houlihan for Naudimar

4    Herrera.

5          MR. VEREEN:  And Roderick Vereen on behalf of

6    Stanley Phanor, who's present.

7          THE COURT:  All Defendants are present.

8          Ms. Jhones, you're at two hours and 15

9    minutes.

10          Do you still want a two-hour warning?

11          MS. JHONES:  No.

12          THE COURT:  That will suffice for that?

13          MS. JHONES:  Yes.

14          THE COURT:  And the reason we had to break is

15    because Lisa's disc ran out.

16          MS. JHONES:  Oh, that's fine, your Honor.

17          THE COURT:  That's what happened.

18          MS. JHONES:  It was welcomed.

19          THE COURT REPORTER:  And steam.

20          THE COURT:  If you could slow down just a

21    drop.  Okay?  I've been amazed, watching the screen,

22    that she's gotten everything down.  But you are moving

23    at quite a clip.

24          MS. JHONES:  I've been told.  Thank you, your

25    Honor.  I will.  I will.

```
 1              THE COURT:  Let's bring the jurors in.

 2              THE COURT SECURITY OFFICER:  Yes, your Honor.

 3              THE COURT:  The next one will be the 30-minute

 4    warning, Ms. Jhones.

 5              MS. JHONES:  Thank you, your Honor.

 6              (Whereupon, the jury entered the courtroom at

 7    4:46 p.m. and the following proceedings were had:)

 8              THE COURT:  You may be seated.

 9              You may proceed.

10              MS. JHONES:  Thank you, your Honor.

11              It's almost over, I promise.

12              Ladies and gentlemen, at this time I'd like

13    to lay for you a very small clip from Government's

14    Exhibit 42-A.

15              And, Eric, if you could help me with that.

16              (Whereupon, segments of Government's Exhibit

17    No. 42-A were published in open court.)

18              MS. JHONES:  You are probably wondering what

19    could that possibly be relevant about.

20              What that clip was -- Government's

21    Exhibit 42-A is the body wire that was worn by CW 1 on

22    November 10th.

23              And the reason why that's important, ladies

24    and gentlemen, is when you go back there and start

25    deliberating and you go through these body wires --
```

1    body wires as distinguished from the wiretaps -- the

2    wiretaps -- because those types of calls are directly

3    intercepted from the phone company, there is no

4    preamble type of thing.

5           You're not going to have, "This is Baylan

6    calling" or whatever, because it's coming directly

7    from -- it's a wiretap as opposed to the body wire.

8           The body wire, only the informant controls it.

9           What happens is, in that clip that I just

10   played for you for November 10th, the informant -- in

11   the vast majority of the body wires, starting as early

12   as November and even October, you can hear the

13   informant walking up to the Chinese restaurant.  You

14   can hear the informant walking up to the -- his place

15   on the Beach on November 10.  You can hear the

16   informant walking up to -- both of them, CW 1 and CW 2.

17          Why is that important?  Because CW 2 has told

18   you that, on November 9th, among others -- we have

19   December 29th that wasn't recorded -- right? -- where

20   Narseal said he could put a building up, he could take

21   it down.  But that body wire didn't function.

22          Well, wait a second.  You will hear in the

23   vast majority of the body wires where these informants

24   are testing these things before they even come into

25   contact with any of these people.

Closing Argument by Ms. Jhones                231

1         So why didn't they test it on December 29th?

2    Why did they not test it on March 9th?  March 9th is a

3    very important day, ladies and gentlemen.

4         Do you remember what happened on March 9th?

5    Okay.  Narseal Batiste resolves all of the problems

6    with the informants on January 28th.  They're

7    lovey-dovey again.  "We're gonna go out there, do what

8    we have to do."  But Narseal Batiste stops calling him.

9    I've already been through that.

10         After Narseal says all those horrific things

11   in that apartment while he's watching the basketball

12   game and -- but they patch things up.  Right?  Narseal

13   Batiste is going to go to a mini-camp and he's going to

14   take all his soldiers, except that he calls him around

15   7:00 in the morning and says, "I really don't want to

16   be wishy-washy, but I've changed my mind about -- I

17   don't want any mini-camps.  Forget that.  85 percent of

18   it is okay, but no mini-camps."

19         And then Narseal Batiste calls him and he

20   says, "You know, I don't need the phone.  I don't need

21   that.  I told you I don't need that.  Oh, yeah.  I need

22   that."

23         On March 9th -- on March 9th, the informant is

24   at the end of his rope.  The Informant No. 2 is at the

25   end of his rope.  Nothing has happened.  Narseal

1    Batiste has not taken possession of any weapons.

2    Narseal Batiste has not met with any brother from

3    Europe, the explosives guy.

4            Narseal Batiste has not taken into possession

5    any tools of terrorism.

6            The money may stop coming to the informant

7    because he hasn't gotten anything accomplished.

8    Nothing has been accomplished.

9            Okay.  Listen to the body wires, ladies and

10   gentlemen, where you hear 5, 10, 20 minutes of walking,

11   paying the cab driver for the fare to drive to the

12   Embassy, talking to all the people that you encounter

13   before you meet up with the person you're setting up.

14   That's the relevance of that clip.

15           Make no mistake about it.  If the informant is

16   telling the truth, which I submit to you that he's not,

17   on March 9th, when he walked up to the Embassy and he

18   says that some of these brothers patted him down and

19   that really scared him and so he went back, left the

20   body recorder, and then Narseal Batiste called him and

21   said, "Why did you leave?  Why did you come back?", la,

22   la, la -- remember that one?

23           Why don't we have his ride over to the Embassy

24   with the brothers patting him down like we heard on

25   January 28th -- you heard it on January 28th -- when he

```
 1    says, "I'm Al-Qaeda" and Brother Pat is saying, "This

 2    is our turf now"?

 3              Remember that?  You heard all that.

 4              But the Informant No. 2, "The Muscle," wants

 5    you to believe that, on March 9th, it was -- he had to

 6    take that body wire off because these guys were patting

 7    him down.

 8              The reason why you don't have a recording of

 9    March 9th, the reason why you don't have it, ladies and

10    gentlemen, is because the informant tells you that, on

11    March 9th, he sat down with Narseal Batiste and with

12    the brothers, with all these guys over here, and all of

13    them said, "Yes.  I haven't been returning your phone

14    calls.  I haven't been doing anything since

15    January 28th.  I haven't taken any weapons.  I haven't

16    called you.  But you know what?  I want to take an oath

17    of allegiance to Al-Qaeda."

18              Don't you think that would have been really

19    nice to record that?

20              Ladies and gentlemen, what happened on

21    March 9th is that this guy promised Narseal Batiste

22    that he was going to give him his 50 grand if all he

23    does is take that warehouse and the warehouse is coming

24    right away.  That's what happened on March 9th.

25              Now, I don't doubt that this manipulator par
```

1    exsalonce would have told Narseal Batiste on March 9th,

2    not these brothers -- but I don't doubt that this

3    informant would have told Narseal Batiste, "And, you

4    know, we can talk about a commitment."

5          What the heck does that mean?  Does a

6    commitment mean an oath of allegiance to Al-Qaeda,

7    ladies and gentlemen?

8          You have heard the way this informant talks.

9    You have heard the way CW 2 turns words around and puts

10   words in his mouth and manipulates and turns around

11   and -- I couldn't get the guy to say things that were

12   so abundantly obvious.  I mean, he told me he didn't

13   cry on March 16th.  "No.  I didn't cry."

14         Listen to the preliminaries of before these

15   informants reach Narseal Batiste or any one of these

16   Defendants on the body wires.  When they don't record

17   somebody, believe you me, they're not recording them

18   because they don't want to, not because they can't.

19         Now, I want to play for you a series of -- one

20   more sequence, but I promise you they're not hangups.

21   They're not attempts.  Promise.

22         Eric, if you could help me.

23         And we're going to start with -- these are

24   short clips.  We're going to start with a clip from

25   Defense Exhibit 121, which is a call between Informant

 1    No. 2, "The Muscle," and Narseal Batiste, on March 4th

 2    of 2006.

 3              (Whereupon, segments of Defendant Batiste's

 4    Exhibit No. 121 were published in open court.)

 5              MS. JHONES:  First of all, Narseal Batiste is

 6    expressing his true intent.  "You've got to understand,

 7    Brother Mohammed, I gotta pay so many finances.  I

 8    gotta pay rent.  I gotta pay rent."

 9              What does the informant do?  He cuts Narseal

10    off.  You've seen this a lot happen here.  He cuts him

11    off.

12              Now, this guy is here to try and find out what

13    Narseal Batiste's true intent is, but he cuts him off.

14    He cuts him off.

15              Could you continue with that clip, Eric,

16    please.

17              (Whereupon, segments of Defendant Batiste's

18    Exhibit No. 121 were published in open court.)

19              MS. JHONES:  "God willing, Inshallah, it's

20    whatever you want, brother, whatever you want.

21    Whatever you want, brother."

22              Eric, could we go with the next clip, please.

23    Same exhibit.

24              (Whereupon, segments of Defendant Batiste's

25    Exhibit No. 121 were published in open court.)

1              MS. JHONES:  Just in case, promising him

2     50 grand, just in case, promising to pay his rent, just

3     in case, promising to give him the first 50 grand --

4     because you'll remember, on January 28th, they talked

5     about the first 50 grand and then, in some of the

6     other conversations, the informant says, "50 grand,

7     200 grand, that amount doesn't shake us" -- just in

8     case that is not inducement enough, that's not

9     inducement enough, "By the way, I have pot for you.

10    Come smoke pot with me.  Come smoke pot.  We smoke.

11    You relax, you know."

12             Now, a true believer, a guy who's been

13    harboring a desire to do what the Government says

14    Narseal Batiste has been wanting to do since 1998,

15    doesn't need people to give him pot to do it, doesn't

16    need people to pay him to do it, because it comes from

17    the heart, from the heart.

18             There is absolutely no predisposition here,

19    ladies and gentlemen.  They are giving Narseal Batiste

20    every possible inducement to do what Narseal Batiste

21    clearly has not done.

22             We're up to March.  This has been going on

23    since October.  And this guy is only supposed to be

24    here to assist.  That's what he said.  "I'm here to

25    assist."

1           Let's go with the next one, please, Eric.

2           The other one -- I apologize, your Honor.  The

3    other one is Government's Exhibit W1-01363-T.

4           (Whereupon, segments of Government's Exhibit

5    No. W1-01363 were published in open court.)

6           MS. JHONES:  Ladies and gentlemen, "I can't

7    speak too much on the phone right now.  I can't speak

8    on the phone right now"?

9           Are you kidding me?

10          "I don't want to speak on the phone right now

11   because I'm about to approach you and I'm about to give

12   you a deal you can't refuse."

13          That's what he's telling you, ladies and

14   gentlemen.

15          He doesn't know he's being recorded.  Narseal

16   Batiste doesn't know he's being recorded.  "Do me one

17   last favor.  Do me one last favor."

18          Whose intent are we trying to find out here,

19   ladies and gentlemen?

20          What if a -- imagine this.  What if they would

21   have left Narseal Batiste alone?  What if they would

22   have said to the informants, "Lay off.  You know what?

23   Let's -- we're not going to call him.  We're not going

24   to offer him money.  We're not going to offer him pot.

25   Let's leave Narseal Batiste alone for a while.  Let him

1    come to us.  Let him come to us."  After all, he has

2    been waiting since 1998.  "Let him come to us.  Let's

3    lay off of the guy.  Let's lay off of the brothers."

4            Have you seen that happen in this case?  Have

5    you seen that, ladies and gentlemen?

6            If what Anthony Velazquez says is accurate,

7    we're here to find out Narseal Batiste's intent, leave

8    him alone.  Because people who want to do things will

9    do them on their own.  They don't need pot.  They don't

10   need money.  They don't need to be called.

11           Let's go to the next one, please, Eric.

12           Defense Exhibit 129.

13           (Whereupon, segments of Defendant Batiste's

14   Exhibit No. 129-B were published in open court.)

15           MS. JHONES:  Ladies and gentlemen --

16           Lisa, for purposes of the record, that clip

17   that we just played was from Defense Exhibit 129-B.

18           Ladies and gentlemen, the informant told

19   Narseal Batiste -- this is a conversation of April 21st

20   of 2006, by the way.

21           The Government takes the position that the

22   only reason why Narseal Batiste is not meeting the

23   brother from Europe is because, you know, the Sultan

24   came down, told him he's dealing with the FBI and

25   Narseal is running the other way.  Right?  That's their

Closing Argument by Ms. Jhones                    239

1    position.

2             Please tell me, ladies and gentlemen, please

3    tell me, where, where, in every single one of the

4    hundreds of hours of body wire, 15,000 recorded

5    wiretaps -- where does Narseal Batiste say, "Bring him

6    on.  Bring the brother from Europe.  I want to meet

7    with him"?  Where Narseal Batiste say that?

8             Not one time.  Not one time.

9             "I open my vein for you, brother."

10            He doesn't need to open his veins for Narseal

11   Batiste.  Narseal Batiste has wanted to do harm to the

12   United States since 1998, ladies and gentlemen.  "I

13   open my veins"?

14            Let's go to 4-22 of '06.  That's going to be

15   Defense Exhibit 130 and 130-B.

16            (Whereupon, segments of Defendant Batiste's

17   Exhibit No. 130 were published in open court.)

18            MS. JHONES:  One second, Eric.  I'm sorry.

19            The informant tells Narseal Batiste in this

20   clip, "I'm not pressuring you.  I'm not pushing.  I'm

21   not pressuring you.  I'm not pushing.  You're the one

22   that decides."

23            When you go back there, ladies and gentlemen,

24   and you read and you listen to this clip -- or to this

25   conversation, Defense Exhibit 130, I want you to count

1   the number of times that the informant told Narseal

2   Batiste about money.  I counted 27 times in one

3   recorded conversation.  27 times.

4         That's exactly what this informant is doing.

5   He is pressuring.  He's manipulating.  He won't go

6   away.

7         Remember where the informant, "The Muscle," on

8   March -- I apologize -- strike that -- on -- in his

9   testimony, he said that he never promised Narseal

10  Batiste money?  Remember when he said that?  He never

11  promised him money?

12        Ladies and gentlemen, all we have heard in

13  this case from October 29th is, "Come on, Brother Naz.

14  Just a little bit more.  Come on, brother.  Just a

15  little bit more.  Come on.  Come on.  Just a little bit

16  more.  Take the warehouse.  A little bit more.  It's

17  coming.  It's coming.  Just a little bit more.  Come

18  on.

19        Let's go on to the last clip, Eric, please.

20        (Whereupon, segments of Defendant Batiste's

21  Exhibit No. 130 were published in open court.)

22        MS. JHONES:  Please pause it.

23        This is a very important part of the

24  conversation, ladies and gentlemen, not unlike the

25  other time that the informant interrupted Narseal,

 1    because Narseal says, "Did you request this guy to come

 2    down?  Because I --"

 3            What Narseal was going to say, it's clear, "I

 4    didn't tell this guy to come down."

 5            The guy interrupts him.  He stops him.  He

 6    knows he's recording Narseal.  "That can't be on tape.

 7    That's not convenient.  That may affect the cash flow

 8    that I've been receiving as a government informant tax

 9    free."

10            But we're trying to determine the intent of

11    Narseal Batiste.

12            "Did you request this guy to come down?

13    Because I --"

14            "No, no, no, no, no.  No, I didn't."

15            Go ahead, Eric.

16            (Whereupon, segments of Defendant Batiste's

17    Exhibit No. 130 were published in open court.)

18            MS. JHONES:  Ladies and gentlemen, since when

19    does determining the intent of a defendant in a

20    criminal case -- what does relieving the pain of an

21    informant have to do with it?  Relieving the pain of

22    the informant?

23            You know what that reminds me of?  That

24    reminds me of CW 1 on December 16th when Narseal

25    Batiste is not returning the phone calls and CW 1 is

Closing Argument by Ms. Jhones                242

1   afraid that Narseal Batiste is not going to show up at

2   the airport to pick up "The Muscle" and CW 1 says, "You

3   had me worried, brother.  You had me worried."

4           Do these informants have a stake in the

5   outcome of this case?  You bet they do.

6           You have a jury instruction that says that the

7   testimony of paid informants has to be viewed with

8   greater caution.  It's like a flashing yellow light.

9   Because people who are paid to testify -- you know what

10  that means.  Use your common sense.  "Relieve my pain,

11  brother"?  Are you kidding me?  "Relieve my pain"?

12          A couple of comments about March 16th.

13          I'm sure that my other colleagues will talk

14  about March 16th as well.

15          At the beginning of that clip, along the same

16  lines of what I told you a few minutes ago regarding

17  the marching of steps, preparing the body wires before

18  you start recording the Defendants, CW 1 -- I'm

19  sorry -- CW 2 is talking on the phone with the agent --

20  I believe it's Mr. Velazquez -- and he says,

21  "Showtime."

22          And he says it again, "Showtime."

23          And he says it again, "Showtime."

24          Is this a joke?  Is this a joke?  "Showtime"?

25          Go to the end of the transcript of March 10th

 1    of 2006, where Narseal is taking what I call the

 2    drive-by oath.

 3           At the end, again, Mr. Anthony Velazquez

 4    speaks to the informant, and the informant is laughing,

 5    saying, "He did it.  He did it."

 6           Is this a joke?  They succeeded in entrapping.

 7    They succeeded in manipulating.  They succeeded in

 8    doing it.  It took a while.  It took a while.  It

 9    shouldn't have taken that long.  Narseal Batiste has

10    been wanting this moment since 1998.

11           I want to talk to you about another recorded

12    conversation, April 6th of 2006.

13           This is Government's Exhibit -- this is

14    Government's Exhibit 90 and 90-B.  I believe this is

15    going to be in your synchronized binder.  You don't

16    need to get it.

17           This is the transcript where the prosecutor

18    takes the position that Narseal Batiste cast, I think

19    is her word, Naudimar Herrera, Naudimar over there, the

20    guy who told the informant on the way to the Keys trip

21    while he was kidnapping, "I have nothing but peace and

22    love in my heart for you, brother."  That Naudimar.

23    Remember him?  The terrorist is telling this gentleman,

24    "I have nothing but peace and love in my heart for

25    you."

Closing Argument by Ms. Jhones                    244

1          And this is -- this is the exhibit where the

2     Government takes the position that Narseal Batiste had

3     ordered Naudimar Herrera to take video footage of the

4     FBI building, because we know there is no video footage

5     of the FBI building.  It was not taken.  It's not --

6     you don't have it in here.

7          And the Government wants you to believe that

8     that's what's going on.

9          I want you to listen to that video.  That

10    transcript is not accurate.  In addition to what

11    Narseal already told you on the stand, it had so many

12    unintelligibles.  Maybe, if you listen to it, you can

13    figure it out.

14          But specifically, I want to direct you to a

15    couple of pages.

16          First of all, what's going on in the

17    warehouse, they're fixing up some tile.  They're

18    putting tile down on the floor.

19          And on Page -- this is an insignificant

20    detail.  I just want to bring it to your attention,

21    because it was one of the -- one of the errors in the

22    transcript I saw.  But it's nothing compared to the

23    other issues.

24          On Page 6, Narseal says, "I gotta get

25    Mr. Frank in a minute.  I gotta meet Mr. Frank."  By

1    "Mr. Frank," he's referring to Frank Adetu.

2            On Page 9 of that transcript, Narseal says to

3    Naudimar somewhere -- almost in the middle, but more

4    towards the top of the page, "Why did matter if the

5    camera was on or not?"  That's what Narseal is saying.

6    It doesn't matter if the camera was on or not.

7            Now, wait a second.  Narseal Batiste has

8    tasked, her word, Naudimar to go take video footage of

9    the FBI building and he's telling him, "It doesn't

10   matter if the camera was on or not"?

11           That is absolutely ludicrous.

12           What they are referring to on April 6th of

13   2006 is that Narseal Batiste had the camera in his

14   hands on March 16th when he said, "I see all the Mos,"

15   meaning, "I see all the brothers."  Naudimar felt

16   uncomfortable.  He thought that he filmed him.

17           That's what they're referring to, clearly.

18   When you read this entire transcript, nowhere could you

19   come up with the impression that Narseal -- they're

20   talking about Naudimar not having filmed footage of the

21   FBI building.  Nowhere could you come to that

22   conclusion, ladies and gentlemen.

23           Additionally, when you look at Page 10,

24   towards the middle, it says, "No.  I don't mean if -- I

25   mean, I don't know if it did happen.  It didn't really

 1   happen.  I guess I didn't go.  It doesn't make any

 2   difference.  It already done and a week passed."

 3            Listen to it because there are some

 4   unintelligibles that you aren't going to be able to

 5   make out.  Again, he's referring to March 16th.  He is

 6   not referring to taking of any video footage.

 7            And, by the way, ladies and gentlemen, did you

 8   see the army of surveillance people that were employed

 9   on March 25th when Narseal Batiste came down to

10   Downtown Miami and they filmed him?  What happened to

11   that army of people when Naudimar was filming the FBI

12   building?  It never happened.  It didn't happen.  It

13   did not happen.

14            On March 16th, when Narseal -- when the

15   informant tells Narseal Batiste after -- after the

16   so-called oath was administered, he springs a surprise

17   on Narseal and all these brothers.  "The grand Sheik

18   has told us that I have to do something."

19            Now, he was here to assist, but now he's here

20   to basically call the shots.

21            And he says, "I need you to film -- just take

22   a little bit of film of the FBI building."

23            Narseal Batiste says, "It's going to be

24   difficult."

25            And you hear what goes on and around.

Closing Argument by Ms. Jhones                    247

 1            "You didn't give me the money.  You didn't

 2    give me the money."

 3            It goes on and on and on.

 4            Narseal Batiste -- I'm sorry.

 5            The informant, towards the end of that video,

 6    begins to cry.  I counted the sighs.  There are nine of

 7    them (sighing).  And then he cries.

 8            "Okay, Occ.  I'll take the pictures."

 9            Narseal Batiste says, clearly, "Nothing is

10    going to happen with those pictures until I do my

11    Chicago plan."  Clearly says that.

12            What does the informant say?  "Oh, no, no, no.

13    Yes, yes, yes.  You are in control.  Nothing is going

14    to happen with these pictures until you bring down the

15    Sears Tower, until you do the Chicago plan."

16            Why doesn't the informant say, "Are you crazy?

17    You can't tell Al-Qaeda what to do.  You're under our

18    direction and control.  Get out of here"?

19            Because all of this is a bunch of nonsense,

20    because this man has absolutely no intent to do

21    anything, except get the money to pay his bills and pay

22    these guys and try and get ahead.

23            I'm not saying that that's right, ladies and

24    gentlemen.  I am not saying that that's right.  What

25    I'm saying is that it's not terrorism.  It's not an

1    intent to commit Count 1.  It's not an intent to commit

2    Count 2.  It's not an intent to commit Count 3.  And

3    it's certainly not an intent to overthrow the United

4    States Government.  That's what I'm saying.

5            As the Court instructed you, he is only

6    charged with the offenses in this indictment.  And the

7    indictment is not evidence.  That's the evidence.

8            A couple more things.  Well, actually, more

9    than a couple.  I'm wrapping it up.

10           I want you to look at when you go back there

11   Government's Exhibit 80-B.  That's the conversation on

12   March 26th, after these pictures were taken, after this

13   so-called oath is taken, after all that has happened,

14   after they hooked him -- but they're only here to

15   assist -- after they hooked him and reeled him in and

16   reeled him in, "50,000, 250, doesn't shake us," after

17   they got him, reeled him in.

18           Narseal Batiste says, "And I told you -- I

19   explained to you" -- bottom of Page 16 -- "I explained

20   to you, I recollect, I would not do any missions in

21   specific that were relating to Al-Qaeda.  I told you

22   that."

23           Narseal Batiste tells him, "I don't want the

24   brothers involved.  I don't want the brothers

25   involved."

1        Now, ladies and gentlemen, these people,

2   according to them, are here to wage war.

3        Why would Narseal Batiste not want his

4   generals involved and those 5,000 soldiers that he has

5   in Chicago?  Why would he say that?

6        Because the things that he said to the

7   informants and clearly said to the informants only he

8   did not mean.

9        You have 15,000 wiretapped recordings, ladies

10  and gentlemen.  I believe the Government introduced

11  approximately 40.  Where, where, where, are the

12  conversations with Narseal Batiste talking about

13  terrorism with somebody other than the informant?

14  Where are they?  Where are they?

15       You could use your common sense in determining

16  what -- if they didn't introduce 15,000 recorded

17  conversations, it's because there was nothing in there

18  that had any evidentiary value as it relates to the

19  charges in this indictment.  Pretty common-sensical.

20       On March 26th -- read that transcript in its

21  entirety, 80-B -- Narseal Batiste says on Page 17,

22  "Now, through our relationship and our communications,

23  like you said, Al-Qaeda more than one thing, that we

24  have communication, because we're friends."

25       Direction and control?  "Because we're

 1    friends."

 2              "Okay," says the informant.

 3              And Narseal says, "And we're brothers.  You

 4    ask me and you said, 'I need you to do a mission for

 5    me.'"

 6              What does the master manipulator say to

 7    Narseal Batiste on Page 17?

 8              "No, no, no, no, no.  Not for me.  No.

 9    Huh-uh.  Not for me.  I never spoke about me.  I am no

10    one.  I am no one, brother."

11              Ladies and gentlemen, listen to March 16th.

12    That's exactly what this man did on March 16th.  "What

13    I'm doing now, brother" -- as he's crying -- "what I'm

14    doing now, brother, is not right.  I'm not speaking for

15    Al-Qaeda.  I'm speaking for me.  Do it for me,

16    brother."

17              And then the master manipulator, on March

18    26th, after he got -- after he has him, he says, "No,

19    no, no.  I never spoke about me.  I never spoke about

20    me."

21              After Narseal said, "I don't want the brothers

22    involved," on Page 23, the informant says, "Oh, the

23    Moors wants to be more involved?  Is that what they

24    want?"

25              This is the master manipulator, which is

1   needed.  That man doesn't stand a chance.  Because they

2   don't want to know Narseal Batiste's true intent.

3   Charles Sheldon told you about that.  Elsie Hamler told

4   you about that.  Frank Adetu told you about that.  Mary

5   Ramos told you about that.

6          He wants to make it in life like every one of

7   us.  He made the wrong calls.  What he did was not

8   appropriate.  What he said was horrendous.

9          But it's not terrorism.  This man no more

10  wanted to bring down a building or blow up a building

11  than the man on the moon.

12         You don't need to pay somebody when you've

13  been harboring that desire for a long time.

14         The videocamera, which the Government says

15  Narseal Batiste requested, but we know that that is not

16  the truth -- because on February 19th, when Narseal

17  Batiste was saying all the ridiculous things that he

18  was saying, he said, "I want -- yeah.  Give me a phone

19  camera.  Give me a phone camera so I can videotape my

20  evidence."

21         Can you imagine going to the Sears Tower with

22  a phone camera?  Can you imagine how absurd that is?

23         And the master manipulators says, "No, no.

24  Videocamera.

25         "Oh, yeah, yeah.  Yeah.  That's what I meant.

1    Videocamera.  I'm filming my evidence with a phone

2    camera."

3            Ridiculous, ladies and gentlemen.  Ridiculous.

4            Defense Exhibit 3-A and 3-B.  That videocamera

5    which he never requested was pawned.  The Government

6    says, "Oh, you know, Minerva Hernandez -- he didn't use

7    his real name."  That's the implication.

8            Well, she used her real thumb prints.  She

9    used her real address.  Guess what?  Here's the phone

10   she gave.  (786) 222-8351.  All of us know what phone

11   number that is.  Because the Government wiretapped that

12   phone for eight months -- not eight months -- three

13   months.  We all know what that phone is.

14           She was really trying to hide something.

15   Maybe the fact that she needed 54 bucks so she could

16   eat.  She could have thrown the camera away if they

17   wanted to get rid of it.

18           Why did they have to pawn it?  They needed the

19   54 bucks because these people are dirt poor.  They

20   didn't even have running water.  They didn't even have

21   running water.  And they knew it.  And they knew it.

22           15,000 wire calls.  Nothing about Narseal

23   Batiste saying, "Give me the weapons."  Nothing about

24   Narseal Batiste saying, "Give me my explosives.  I want

25   explosives.  I want my napalm bombs.  I want to bring

1    down the Sears Tower."

2           15,000 conversations.  Nothing about violence

3    against the United States.  Nothing about, "I want to

4    declare war against the United States."  Nothing about

5    blowing up buildings.  Nothing about terrorism.

6    Nothing about hatred towards the United States.

7           By the way, by the way, when you look at the

8    jury instructions and specifically as it relates to

9    Count 4 -- I believe it's Page 27 -- as the Court read

10   to you, "The type of war under this statute does not

11   require the presence of an enemy, foreign state or

12   actual war.  However, the Defendant must conspire to

13   use force, not just to advocate the use of force," why

14   is that?

15          Because this is a free country.  If we don't

16   disagree with our Government, we could say it.  If we

17   think that we want to advocate the use of force because

18   that's what we feel we would like to do, even if we

19   don't do it, we could do it, because it's a free

20   country.

21          It's the First Amendment.  Freedom of

22   expression, freedom of association, freedom of

23   religion, still exists.  That's why it's in the jury

24   instruction.

25          So if you want to believe that Narseal Batiste

1   is talking to Sultan Kahn-Bey about being at war with

2   the United States, so what?  So what?  You can go

3   around and say that as much as you want.

4          That's not what he was talking about, though.

5   Huh-uh.  No way.  You go to those conversations on

6   April 2nd, on April 9th.  He was talking about Sister

7   Yamnah, the Moorish Science Temple, that he was

8   competing with.

9          That's what he's talking about, ladies and

10  gentlemen.

11         Read the evidence.  That's what he's talking

12  about.  He is not at war with the United States.  He's

13  talking about competition.  The Moorish Science Temple

14  is competing with their Moorish Science Temple.

15  Imagine that.  That never happens.  Right?  There's no

16  competition in our churches and associations.  That

17  never happens.

18         Defense Exhibit C-14 is the Divine

19  Constitution and Bylaws of the Moorish Holy Temple of

20  Science.  Look at that for yourself.

21         Act 4 of the Divine Constitution and Bylaws

22  talks about:  "All members must preserve these holy and

23  divine laws and all members must obey the laws of the

24  Government because, by being a Moorish-American, you

25  are part and partial -- and a partial" --

 1            THE COURT REPORTER:  Partial?

 2            MS. JHONES:  Actually -- it says "partial,"

 3    actually.

 4    BY MS. JHONES:

 5    Q.     -- "of the Government and must live the life

 6    accordingly."

 7            And, also, Act 5:  "This organization of the

 8    Moorish Holy Temple of Science is not to cause any

 9    confusion or to overthrow the laws and the Constitution

10    of said Government, but to obey hereby."

11            This is what they seized from Sultan Kahn-Bey.

12    This is what Special Agent Rathel seized from Sultan

13    Kahn-Bey.

14            Noble Drew Ali.  This is the guy -- one of the

15    guys that inspired these brothers.  Because this is the

16    man that, in the 1930s, talked about uplifting fallen

17    humanity, not bringing down humanity, not bringing down

18    buildings.  Uplifting.  Uplifting fallen humanity.

19    That's who this guy was.  That's who these guys were

20    inspired by.  That was their true intent.

21            I'm going to close with some of the

22    discussions that were had by the prosecutor with

23    respect to Little Luke, Melinda, the cult, the bad

24    movies, *Omega*, Illuminati, whatever the heck all these

25    movies are, on the tape of February 23rd.

1          What does that have to do with terrorism?

2    Have you ever been to a church that tells you what they

3    recommend you watch or not watch?  Does that happen?

4    Is that outside the norm?

5          Maybe they don't like what these guys are

6    about.  But you know what?  It's none of their

7    business.  The Government has no right to judge what

8    these people watch, what these people tell other people

9    to watch.  It's none of their business.

10          Not only do you set him up, but you judge him

11    because of his practices.  You call him a terrorist,

12    and you pay two foreigners, tax-free money, to set him

13    up.

14          This is a sad case, ladies and gentlemen.  A

15    sad case.

16          When CW 1 said that, on December 29th, 2005,

17    Narseal Batiste said he could bring up a building, he

18    could also bring it down, there were no buildings

19    brought down in this case.  The only thing that was

20    brought down was the hope, the dreams and the

21    aspirations of those brothers.

22          I have nothing further.

23          THE COURT:  We're going to break for the day.

24          Do not discuss this case either amongst

25    yourselves or with anyone else.  Have no contact

1  whatsoever with anyone associated with the trial.  Do

2  not read, listen or see anything touching on this

3  matter in any way.

4          If anyone should try to talk to you about this

5  case, you should immediately instruct them to stop and

6  report it to my staff.

7          If you would, give your notebooks to the court

8  security officer.  Remember that, until such time as

9  you've heard all of the closing arguments and I've

10  instructed you to begin your deliberations, you simply

11  are not to talk about this case.

12          Have a nice evening.  I'll see you tomorrow

13  morning, 9:00.

14          (Whereupon, the jury exited the courtroom at

15  5:37 p.m. and the following proceedings were had:)

16          THE COURT:  We're in recess until tomorrow

17  morning, 9:00.

18          (End of proceedings.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3        I hereby certify that the foregoing is an

4    accurate transcription of the proceedings in the

5    above-entitled matter.

6

7

8    _____        /s/Lisa Edwards_____
         DATE               LISA EDWARDS, CRR, RMR
9                           Official United States Court Reporter
                            400 North Miami Avenue, Twelfth Floor
10                          Miami, Florida 33128
                            (305) 523-5499
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25