```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
                   CASE NO. 06-20373-CRIMINAL-LENARD
 3

 4   UNITED STATES OF AMERICA,        Miami, Florida

 5                  Plaintiff,        April 24, 2009

 6            vs.                     9:20 a.m. to 6:45 p.m.

 7   NARSEAL BATISTE, et al.,         Volume XLI

 8                  Defendants.       Pages 1 to 300
     ---------------------------------------------------------
 9

10                          JURY TRIAL
11          BEFORE THE HONORABLE JOAN A. LENARD,
                 UNITED STATES DISTRICT JUDGE
12

13

14   APPEARANCES:

15

16   FOR THE GOVERNMENT:    RICHARD D. GREGORIE, ESQ., and
                            JACQUELINE M. ARANGO, ESQ.
17                          ASSISTANT UNITED STATES ATTORNEYS
                            99 Northeast Fourth Street
18                          Miami, Florida 33132

19

20   FOR THE DEFENDANT      ANA MARIA JHONES, ESQ.
       NARSEAL BATISTE:     300 Seville Avenue, Suite 210
21                          Coral Gables, Florida 33134

22   FOR THE DEFENDANT      ALBERT Z. LEVIN, ESQ.
       PATRICK ABRAHAM:     261 Northeast First Street
23                          Sixth Floor
                            Miami, Florida 33132
24

25
```

```
 1   FOR THE DEFENDANT       RODERICK D. VEREEN, ESQ.
       STANLEY PHANOR:       BRINKLEY, HENRYS & LEWIS
 2                           4770 Biscayne Boulevard
                             Suite 1200
 3                           Miami, Florida 33131

 4
     FOR THE DEFENDANT       RICHARD K. HOULIHAN, ESQ.
 5     NAUDIMAR HERRERA:     300 Aragon Avenue
                             Coral Gables, Florida 33134
 6

 7   FOR THE DEFENDANT       LOUIS CASUSO, ESQ.
       BURSON AUGUSTIN:      111 Northeast First Street
 8                           Suite 603
                             Miami, Florida 33132
 9

10   FOR THE DEFENDANT       NATHAN CLARK, ESQ.
      ROTSCHILD AUGUSTINE:   17639 South Dixie Highway
11                           Miami, Florida 33157

12
     REPORTED BY:            LISA EDWARDS, CRR, RMR
13                           Official Court Reporter
                             400 North Miami Avenue
14                           Twelfth Floor
                             Miami, Florida 33128
15                           (305) 523-5499

16

17

18

19

20

21

22

23

24

25
```

1                         I  N  D  E  X

2

3                                                    PAGE

4

5   Closing Argument by Mr. Vereen              57

6   Closing Argument by Mr. Houlihan            55

7   Closing Argument by Mr. Clark               98

8   Closing Argument by Mr. Casuso             149

9   Closing Argument by Mr. Levin              161

10  Rebuttal Argument by Mr. Gregorie          234

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  Good morning.

2              United States of America versus Narseal

3    Batiste, et al., Case No. 06-20373.

4              Counsel, state your appearances, please, for

5    the record.

6              MR. GREGORIE:  Good morning, your Honor.

7              Richard Gregorie and Jacqueline Arango on

8    behalf of the United States.

9              MS. JHONES:  Good morning, your Honor.

10             Ana Maria Jhones on behalf of Narseal Batiste,

11   who is present.

12             MR. LEVIN:  Your Honor, good morning.

13             Albert Levin on behalf of Patrick Abraham, who

14   is present.

15             MR. CASUSO:  Good morning, your Honor.

16             Lou Casuso on behalf of Burson Augustin, who

17   is present.

18             MR. CLARK:  Good morning, your Honor.

19             Nathan Clark for Rotschild Augustine, who is

20   present.

21             MR. HOULIHAN:  Richard Houlihan with Naudimar

22   Herrera.

23             MR. VEREEN:  Good morning, Judge.

24             Roderick Vereen on behalf of Stanley Phanor,

25   who is present.

```
 1              THE COURT:  All Defendants are present.

 2              First of all, Mr. Clark, are you able to

 3      proceed today?

 4              MR. CLARK:  I think so, your Honor.  I think

 5      I'm in better shape than Mr. Casuso.

 6              THE COURT:  Okay.  Did you share it with him?

 7              MR. CLARK:  Possibly so.  I apologize.

 8              But I'm going to go ahead and do my oral

 9      argument.

10              THE COURT:  Mr. Casuso, are you having

11      laryngitis problems?

12              MR. CASUSO:  Yes, Judge.  But I'm going to go

13      ahead.  I can do it.

14              THE COURT:  So I have Mr. Vereen's time.

15              Mr. Houlihan, do you want any --

16              MR. HOULIHAN:  15 minutes, please.

17              THE COURT:  Mr. Clark?

18              MR. CLARK:  15 minutes, your Honor.  I don't

19      know that I'm going to go an hour and a half.  But just

20      in the abundance of caution, with all evidence, I ask

21      for that.  But 15 minutes.

22              THE COURT:  Okay.  Mr. Casuso?

23              MR. CASUSO:  Five minutes to wrap up, Judge.

24              THE COURT:  Mr. Levin?

25              MR. LEVIN:  15.
```

```
 1             THE COURT:  I think that'll be enough for a

 2   while.

 3             I'll get to you, Mr. Gregorie.

 4             The jurors are now here.

 5             Let's bring them in and proceed.

 6             Are you ready, Mr. Vereen?

 7             MR. VEREEN:  I am, your Honor.

 8             (Whereupon, the jury entered the courtroom at

 9   9:23 a.m. and the following proceedings were had:)

10             THE COURT:  You may be seated.

11             Good morning, ladies and gentlemen.

12             THE JURY:  Good morning.

13             THE COURT:  You may proceed, Mr. Vereen.

14             MR. VEREEN:  Thank you, your Honor.

15             May it please the Court, counsel for the

16   Government, agents, defense team and Defendants.

17             Ladies and gentlemen, good morning.

18             THE JURY:  Good morning.

19             MR. VEREEN:  Oh, come on.  You all can do

20   better than that.

21             Good morning.

22             THE JURY:  Good morning.

23             MR. VEREEN:  We've been together now for

24   approximately three months.  This case started back on

25   January the 27th.  This did not take into consideration
```

Closing Argument by Mr. Vereen                    7

 1    the time we spent during jury selection.

 2            When you first came into this courtroom, you

 3    were ignorant of the facts of this case.  You were

 4    asked many questions by the Court, and you were

 5    eventually chosen by the lawyers to be the jury.

 6            You have a very serious job ahead of you, and

 7    I do not envy you.  You are what we call the checks and

 8    balances of the criminal justice system.

 9            You are the ones who will decide what the

10    facts of this case are.  You are the ones that will

11    decide what witnesses to believe, what of their

12    testimony should not be believed.

13            You are the ones that will enter the ultimate

14    verdict as to each one of these Defendants as to each

15    count of the indictment as it pertains to that

16    Defendant.

17            My name is Roderick Vereen, and I represent

18    Stanley Phanor.

19            Stanley Phanor is not just a name that's going

20    to be on a piece of paper.  Stanley Phanor is an

21    individual and a citizen of this country.

22            Mr. Phanor, stand up.

23            DEFENDANT PHANOR:  (Complies.)

24            MR. VEREEN:  That is the person that you have

25    heard throughout the course of this trial being

 1    referenced to as either "Sunny" or "Stanley Phanor."

 2            The Government refers to him sometimes as the

 3    "Defendant," a "soldier," a "brother" or a "Mo."

 4            I'm not going to talk to you about the movies

 5    that these gentlemen watched -- *Blade:  Trinity*,

 6    *Omega* -- the Illuminati, Freemasonry.  I'm not going to

 7    discuss that with you because its irrelevant to what

 8    you're called here to do.

 9            You may recall that that was the Government's

10    rebuttal to a three-month trial, to put on Agent

11    Velazquez to introduce a tape and a transcript with

12    regard to a phone call that Mr. Batiste was having with

13    his wife, with his wife.

14            Talking about the sanctity of marriage.  With

15    his wife, about movies.

16            This is a terrorism case with regard to what

17    has been charged in this indictment.  This is not about

18    the Moorish Science Temple.  This is not about the

19    Universal Divine Saviors.  It's not about patriotism to

20    this country.  That's not what this case is about.

21            The Government has charged these men with

22    being terrorists, the worst kind of human being in the

23    history of the world, a terrorist, and they are now

24    asking that you label these Defendants with that brand.

25            When Ms. Arango was up here, she used a phrase

 1    that, in some communities, is a very derogatory phrase

 2    when she referred to Narseal Batiste.

 3            These are her exact words:

 4            "He is -- he is the divine leader.  He is a

 5    cult leader.  Let's call a spade a spade."

 6            In certain neighborhoods, that's the

 7    equivalent of saying, "Let's call a nigger a nigger."

 8            Now, let me say this in her defense:  I know

 9    Ms. Arango and I know that that phrase, when she used

10    it, was not meant to have that meaning.  Because in

11    other circles, it is a phrase with a dual meaning.

12    "Let's call a spade a spade."  Let's talk straight up.

13    Let's call it what it is.

14            So I know her true intent was to convey that

15    to you.  But to the listener, depending on who that

16    listener is, it means something totally different.

17            And is that not what this case is about?  Is

18    that not what has happened throughout the course of

19    this trial with regard to listening to conversations

20    that Narseal Batiste had with either some of these

21    gentlemen or with his wife or with other individuals?

22    Were there not dual meanings to a lot of those words?

23            They called Dan Young in from Chicago.  You'll

24    recall he was the agent that came in and discussed the

25    El Rukns and Jeff Fort.  He came in to talk to you

Closing Argument by Mr. Vereen                10

1    about terms -- "Peoples," "Folks" -- and that these

2    somehow -- those words defined which gang you were a

3    member of.

4            Well, in some neighborhoods, among some

5    people, when you go and you say, "How are you folks

6    doing?", you're not asking them, "What gang are you

7    from?"  You're asking them, "How are your parents?"

8            When you use the term, "How are your people

9    doing?", you're not saying, "What gang are you from?"

10   You're saying, "How is your family as a whole?"

11           But when you are not from that culture, you

12   don't know the duality of the meaning of those words.

13   That's a problem in this case.

14           Up until now, you have not seen the

15   indictment.  You have not read the indictment, other

16   than been given a summary of the four counts of the

17   indictment when you first sat down before the trial

18   began.  You never heard about the overt acts in the

19   indictment as to how they are listed.

20           But you're going to get a copy of the

21   indictment when you go back to the jury room.  That

22   indictment spells out the name of the Defendants, the

23   name of the case, the judge who's presiding over the

24   case, the district that it's in.

25           Then it has what they call general

Closing Argument by Mr. Vereen                    11

 1   allegations, and there are four general allegations.

 2   Those are just, if you will, the steps to the overt

 3   acts, things that you initially just have to get out of

 4   the way.  These are the general things to give you an

 5   idea as to what this case is about.

 6          And it talks about -- it gives you a couple

 7   terms as to Al-Qaeda being designated as a foreign

 8   terrorist organization.

 9          And it talks about how members of Al-Qaeda

10   take this pledge of allegiance to Osama bin Laden and

11   Al-Qaeda called the "bayat."  You heard about this

12   throughout the course of this trial, the bayat.

13          It talks about how the word "jihad," as used

14   in the indictment, is referred to.  It's talking about

15   violent jihad in this indictment, not the good jihad

16   that -- again, duality of terms, bad jihad, good jihad.

17   When it's used in this indictment, they're talking

18   about the violence.

19          It talks about the Sears Tower being located

20   in Chicago -- okay? -- and that it is a commercial

21   space -- it rents commercial space and the FBI

22   building.

23          In other words, it's giving you the focal

24   point as to what this case is going to be about.

25          And then it lists -- starts off with Count 1,

Closing Argument by Mr. Vereen          12

```
 1   and it talks about what is charged in Count 1.

 2           It then discusses the manner and means of the

 3   conspiracy.  Then it goes into the overt acts.

 4           I want you to hear what the overt acts are as

 5   alleged in the indictment.  I also want you to see how,

 6   when the Government filed this indictment, everything

 7   was going in chronological order, in the sequence of

 8   events, in the sequence in which things happened, until

 9   you get to two paragraphs and then the Government flips

10   the script.

11           By that, I mean, they invert the two

12   paragraphs.  Instead of 15 -- or what took place in

13   Paragraph 15 followed by what happened in sequence with

14   regard to Paragraph 16, they changed it.

15           They made what happened in Paragraph 16 appear

16   as if it occurred before what happened in Paragraph 15.

17   Let me tell you -- explain to you what I'm talking

18   about.

19           These are the overt acts.

20           Now, keep in mind -- the Judge has already

21   instructed you -- the Government doesn't have to prove

22   the overt acts.  These are just allegations that they

23   made to try to give you a blueprint as to how

24   everything happened in this case.

25           Overt Act No. 1 -- and keep in mind -- I want
```

```
1     you to hear -- when the name Stanley Phanor comes up in

2     the overt acts, I want you to see what those overt acts

3     were.

4               Overt Act No. 1:  On or about December

5     the 16th, 2005, Narseal Batiste met in a hotel room

6     with an individual known to the grand jury who was

7     purporting to be a member of a foreign terrorist

8     organization, later identified as Al-Qaeda,

9     hereinafter, the Al-Qaeda representative.

10              Overt Act No. 2:  On that same day, December

11    the 16th, 2005, Narseal Batiste told the Al-Qaeda

12    representative during a meeting that he was organizing

13    a mission to build an Islamic army in order to wage

14    jihad.

15              Overt Act No. 3:  On or about December

16    the 16th, 2005, Narseal Batiste provided the Al-Qaeda

17    representative with a list of materials and equipment

18    needed in order to wage jihad, which the list included

19    boots, uniforms, machine guns, radios and vehicles.

20              Overt Act No. 4:  On or about December 22nd,

21    2005, during a subsequent meeting with the Al-Qaeda

22    representative, Narseal Batiste outlined his mission to

23    wage war against the United States Government from

24    within using an army of his soldiers to assist in

25    destroying the Sears Tower in Chicago, Illinois.
```

Closing Argument by Mr. Vereen                    14

1          Overt Act No. 5:  On or about December

2    the 22nd, 2005, Narseal Batiste provided the Al-Qaeda

3    representative with a list of shoe sizes for the

4    purchase of military boots for his soldiers.

5          Overt Act No. 6:  On or about December

6    the 29th, 2005, Narseal Batiste met with the Al-Qaeda

7    representative and took possession of military boots

8    from the Al-Qaeda representative.

9          THE COURT:  Mr. Vereen -- counsel, please

10   approach.

11          (Whereupon, proceedings were had at side-bar

12   outside the presence of the jury which have been sealed

13   per instructions of the Court.)

14          (Whereupon, the following proceedings were had

15   in open court:)

16          THE COURT:  Ladies and gentlemen, you are

17   instructed to disregard the portion of the argument

18   that Mr. Vereen just gave you when he started reading

19   the indictment.

20          I've instructed him and he has agreed to begin

21   again at that portion of his argument.

22          Go ahead, Mr. Vereen.

23          MR. VEREEN:  Thank you, Judge.

24          Ladies and gentlemen, let me go back and

25   clarify these overt acts again for you.  Okay?

1          Overt Act No. 1 was the meeting -- talked

2     about the meeting that took place with regard to

3     Narseal Batiste meeting in the hotel room with the

4     individual known to the grand jury who was purported to

5     be a member of a foreign terrorist organization, later

6     identified as Al-Qaeda.

7          Overt Act No. 2:  On or about that same date,

8     Narseal Batiste told the Al-Qaeda representative during

9     the meeting that he was organizing a mission to build

10    an Islamic army in order to wage jihad.

11         Overt Act No. 3 says that, on or about

12    December the 16th, 2005, Narseal Batiste provided the

13    Al-Qaeda representative with a list of materials and

14    equipment needed in order to wage jihad, which list

15    included boots, uniforms, machine guns, radios and

16    vehicles.

17         Overt Act No. 4 was that, on or about December

18    the 22nd, 2005, during a subsequent meeting with the

19    Al-Qaeda representative, Narseal Batiste outlined his

20    mission to wage war against the United States

21    Government from within using an army of his soldiers to

22    assist in destroying the Sears Tower, Chicago,

23    Illinois.

24         Overt Act No. 5:  On or about February 19th,

25    2006, Narseal Batiste and Patrick Abraham met with the

Closing Argument by Mr. Vereen                    16

1    Al-Qaeda representative at an apartment in Miami-Dade

2    County, Florida.

3              Overt Act No. 6:  On or about February

4    the 19th, 2006, during that meeting, Narseal Batiste

5    told the Al-Qaeda representative that he wanted to

6    attend an Al-Qaeda training along with five of his

7    soldiers during the second week of April and further

8    detailed his mission to wage a full ground war against

9    the United States in order to "kill the devils" --

10   "kill all the devils we can" in a mission that would

11   "be just as good or greater than 9/11," beginning with

12   the destruction of the Sears Tower.

13             Overt Act No. 7 states that, on or about

14   February the 19th, 2006, during the meeting, Narseal

15   Batiste told the Al-Qaeda representative that he needed

16   a videocamera for a trip to Chicago and asked the

17   Al-Qaeda representative to travel with him.

18             Overt Act No. 8:  On or about March the 16th,

19   2006, Narseal Batiste, Patrick Abraham, Stanley Phanor,

20   Naudimar Herrera, Burson Augustin and Rotschild

21   Augustine attended a meeting with the Al-Qaeda

22   representative at a warehouse in Miami-Dade County

23   where a plot to bomb Federal Bureau of Investigation

24   buildings in five cities was discussed.

25             Overt Act No. 9:  On or about March 16th,

Closing Argument by Mr. Vereen                     17

1    2006, during this meeting, Patrick Abraham, Stanley

2    Phanor, Naudimar Herrera, Burson Augustin and Rotschild

3    Augustine each swore an oath to Al-Qaeda.

4         Overt Act No. 10:  On or about March 16th,

5    during this meeting, Narseal Batiste took possession of

6    a digital videocamera from the Al-Qaeda representative

7    and said that within a week he would obtain good

8    footage of the FBI building in North Miami Beach,

9    Florida.

10        Now, it goes on.  Let me just go ahead and

11   finish those.

12        Overt Act No. 11:  On or about March 24th,

13   2006, Patrick Abraham drove Narseal Batiste and the

14   Al-Qaeda representative by car past the FBI building

15   and the National Guard Armory in Miami-Dade, Florida.

16        Overt Act No. 12:  On or about March 24th,

17   2006, Narseal Batiste and Patrick Abraham traveled with

18   the Al-Qaeda representative to a store in Miami-Dade

19   County, Florida, to purchase a memory chip for a

20   digital camera to be used to take reconnaissance

21   photographs of the FBI building.

22        Overt Act No. 13:  On or about March the 26th,

23   2006, during this meeting, Narseal Batiste and Burson

24   Augustin provided the Al-Qaeda representative with

25   photographs of the FBI building as well as photographs

Closing Argument by Mr. Vereen

1    and video footage of the James Lawrence King Federal

2    Justice Building, federal courthouse buildings, the

3    Federal Detention Center and the Miami Beach -- excuse

4    me -- the Miami Police Department, all located in

5    Miami-Dade County, Florida.

6            The last overt act is:  On or about April

7    the 6th, 2006, Narseal Batiste, Stanley Phanor and

8    Burson Augustin met with the Al-Qaeda representative to

9    review and discuss photographs of the FBI building as

10   well as photographs and video footage of the James

11   Lawrence King Federal Justice Building, federal

12   courthouse buildings, the Federal Detention Center and

13   the Miami Police Department.

14           Now, those were the overt acts as alleged in

15   the indictment.

16           I want to back up.

17           As I told you earlier, the Government had

18   placed the overt acts in chronological order in the

19   sequence of events as they occurred throughout the

20   course of this case except for two paragraphs.  And,

21   again, listen to what they said.

22           Overt Act No. 8.  I want you to keep in mind

23   the videotape of the March 16th meeting.  It started

24   off with a phone call from Narseal Batiste to Stanley

25   Phanor, telling him that he wanted him to meet at the

1    warehouse.

2           That is the conversation where Stanley says,

3    "Well, should I get Brother Corey?"

4           Narseal Batiste tells him, "No.  Do not bring

5    Brother Corey," essentially, "He's not a part of the

6    inner circle.  He's showing some loyalty to the

7    brotherhood, but he still has a way to go."

8           Then there's a phone call as Stanley Phanor is

9    driving around.

10          And he says, "Well, do you want me to wait

11   five minutes until after you walk in?" or something to

12   that effect.

13          They then proceed to go into the warehouse,

14   where they met CW No. 2.

15          Narseal Batiste starts off with a statement in

16   front of the brothers.  CW No. 2 proceeds to recite

17   this bayat and asks them to repeat it after him.

18          Some individuals are on video.  Some

19   individuals are not.

20          Stanley Phanor is off to the left of the video

21   as you're looking at it.  Narseal Batiste is off to the

22   left of the video.  And then there were several

23   brothers in view of the camera and the camera's viewing

24   them.

25          Each person stands and says their name.

 1          During this bayat -- right before it begins

 2   and it starts going into it, Stanley Phanor stops the

 3   bayat and says, "Can you wait a second?"

 4          And then, according to the transcript, there's

 5   something unintelligible.

 6          And then there's something to the effect of --

 7   according to the Government, Stanley Phanor says,

 8   "Because I think it's all right?" -- with a question

 9   mark -- "Because I think it's all right?", which

10   doesn't make sense.

11          Narseal Batiste was asked what was said.

12          His response was, "I believe Stanley Phanor

13   says, 'Is this all right?'"

14          Now, why is that important?  Why is that

15   important?

16          It is important because the Government is

17   accusing these men, Stanley Phanor, of being a

18   terrorist.

19          What terrorist do you know that stops a bayat,

20   your pledge of allegiance, your oath to Al-Qaeda and

21   Osama bin Laden, and says, "Is this all right?"

22          And Narseal Batiste tells him, "Yeah, Mo.

23   Could you say it again?  Slow it down so they can

24   understand what you're saying" or something to that

25   effect, you know.

Closing Argument by Mr. Vereen                    21

1          And then they go through this -- CW No. 2 goes

2     through the bayat like three different ways, saying

3     three different pledges, before you see anybody raise

4     their hand and they go along with it.

5          He tells them, "Yeah," you know, essentially,

6     "Go along with it."  And he does.

7          But it is after that pledge that they sit down

8     and CW No. 2 says, "Can I talk in front of the brothers

9     or can we go somewhere else and talk?  What is your

10    preference?"

11         Narseal says, "Yeah.  In front of the

12    brothers.  These are my close guards," you know, or

13    something to that effect.

14         Then he proceeds to sit down and tell them

15    what Al-Qaeda wants to do and he starts talking about

16    this plot that he has in his own mind to blow up

17    federal buildings.

18         But what the Government puts in their

19    indictment -- they said that, on or about -- in

20    Paragraph 8 -- on or about March the 16th, that these

21    men attended a meeting with an Al-Qaeda representative

22    at a warehouse in Miami-Dade County, where a plot bomb

23    Federal Bureau of Investigation buildings in five

24    cities was discussed.

25         Then they say, on that same date, during this

Closing Argument by Mr. Vereen                    22

 1    meeting, each swore an oath to Al-Qaeda and,

 2    essentially, after hearing about this plot, then they

 3    said, "Sign me up."

 4            And then it goes back to the sequence in which

 5    things happened throughout the course of the case.

 6            Now, why did I point that out?  Because if you

 7    weren't paying attention, if you weren't paying

 8    attention, if you did not take copious notes and you

 9    get back and you read this, you're going to say, "Well,

10    they're listing these things in chronological order."

11            If you say, "I'm not going to watch the

12    videotape and see it for myself.  I'm just going to

13    rely on what the Government says and places in their

14    indictment," then you've been hoodwinked.  You've been

15    bamboozled.  It's gone over your head and you missed

16    it.  It's gone over your head and you missed it.

17            Now, let me also tell you some other things

18    that happened throughout the course of this trial.

19            And let me just say this:  I'm going to focus

20    on the facts, the law and the instructions.

21            Ms. Arango got up here in her closing and put

22    a placard in front of you which had what she claimed

23    were five facts that they proved.

24            She didn't talk about the jury instructions.

25    She didn't even talk about the indictment, because the

Closing Argument by Mr. Vereen                    23

1    Government is bound by what they charge.  But she got

2    up here and again flipped the script.

3              And let me tell you how she did it.

4              She got up here.  The first thing she did, she

5    castigated every one of these young men for being a

6    part of the Moorish Science Temple.  She turned this

7    into a religious persecution.

8              "He's a cult leader."  You know what?  So what

9    if he is?  It's our position he's not.  But so what if

10   he is?  There is no law that says you cannot be a cult

11   in the United States.  There's no law against that.

12             Charles Manson -- they say -- *Helter*

13   *Skelter* -- Charles Manson was a cult leader.  He got in

14   trouble because of the murders, not because he was a

15   cult leader.  You have factions out there who say, "You

16   know what?  Polygamy is our way of life.  I can have as

17   many wives and kids as I want to."

18             Oprah Winfrey has those shows on all the time.

19   And there may be laws against it.  But do they enforce

20   those laws?

21             So she takes them down saying, essentially,

22   "They're a cult.  They are his puppets.  He is their

23   leader.  He thinks he's God."

24             You heard him himself.  He says God puts --

25   you know, God is in man, God is in man.

Closing Argument by Mr. Vereen                    24

1          The way Narseal Batiste talks is like many

2     preachers.  Narseal has been raised in a family of

3     preachers.  It's innate in him to speak like that.

4          They put in in that rebuttal that

5     transcript -- and I'm kind of glad they put it in.

6     Because while he and his wife are having this

7     argument -- and let me ask you a question:  Did she

8     sound submissive to you?

9          She said the word s-h-i-t more than any sailor

10    I've ever met.  In a span of a three-minute

11    conversation, she used it probably 30 times.  I may

12    be exaggerating a little bit.  She may have used it

13    10 times.

14         But she was throwing that word out every --

15    left and right.  "They'd better keep out their mouth"

16    and she kept going on and on.  Did she sound

17    submissive?

18         The Government says he calls himself a

19    "prince."  He thinks he's God, but he calls himself a

20    "prince," not a "king."  He calls his wife "The Queen."

21         Well, didn't he tell you that she had that

22    name "Queen" before he ever even met her?  He said,

23    "When I met her, they were calling her 'Queen.'  When I

24    met her, I didn't give her that name.  She already had

25    that name."

Closing Argument by Mr. Vereen                    25

1        Why is that important?  Because they're trying

2   to show that this is some type of hierarchy with regard

3   to how those gentlemen ran their lives.

4        Narseal Batiste introduced to these gentlemen

5   the Moorish Science Temple, an ideology -- that is not

6   an extreme ideology.  It's not extreme for these men to

7   buy into Noble Drew Ali's concept and beliefs that the

8   black men and women in this country -- our history did

9   not start with slavery -- that our history did not

10  start with slavery, that they were part of the Moors

11  that conquered Spain, that they had been to America,

12  had been to this country, before Christopher Columbus

13  discovered it.

14        If it doesn't fit into what the United States'

15  says is their way of thinking, that this is how this

16  Government started, it is immoral?  They are not the

17  moral compass for this country.

18        This Government is not without fault.  This is

19  the same Government that enslaved people.  This is the

20  same Government that said women and minorities cannot

21  serve on a jury.  It took a Civil War to change that.

22        Her Honor would not be a judge.  I clearly

23  would not be standing in front of you, and many of you

24  would not be on this jury.  Do not let them be the

25  moral compass to decide what is patriotic and what is

Closing Argument by Mr. Vereen                26

1    not.

2          You want to burn an American flag, ladies and

3    gentlemen, by God, you can do it.  It's not against the

4    law.  If you don't want to fight for this country

5    because your religion tells you you don't have to, like

6    Muhammad Ali, who was stripped of his title and

7    imprisoned because he says, "I'm not going over to

8    Vietnam and fight.  The Vietnamese have never called me

9    a nigger," that's unpatriotic.  They called Martin

10   Luther King a Communist.  They called President Barack

11   Obama Muslim.

12          Labels.  Labels.

13          Now they want to call these gentlemen

14   terrorists, kidnappers.

15          Stanley Phanor has to be the most polite

16   kidnapper I've ever seen in my life.  "We respect you."

17   Ms. Arango said Stanley Phanor told CW No. 2, "Listen,

18   it's time to give up the phones now.  We let you hold

19   the phone long enough so you can contact Al-Qaeda as

20   much as you want to.  Now it's time to give the phones

21   up."

22          Did you hear the tape saying that?

23          Now let's talk about facts.

24          Did you hear any tape where Stanley Phanor

25   says, "We let you use the phone long enough to contact

Closing Argument by Mr. Vereen                    27

1   Al-Qaeda as much as you wanted to.  Now turn the phones

2   over"?  No.  That's not what he said.

3          He says, "All right.  You got the phones,"

4   essentially, "Give me the phones.  Phones can be used

5   to trace people" -- yada, yada, yada -- "Give me the

6   phones."

7          Do you ask a person you kidnap for anything?

8   Do you tell a person you kidnap, "I respect you?"

9          They would have you believe that CW No. 1

10  had no idea that this was going to happen, no idea

11  whatsoever that he was going to be asked to change

12  clothes, get in a vehicle and go to Islamorada or

13  somewhere else.

14         Did you not hear or listen to me when I was

15  questioning him on cross-examination?  "You called

16  Patrick Abraham the day before and gave him the

17  clothing sizes, your shoe sizes.

18         "Oh, I thought he was going to buy us

19  uniforms."

20         Have you seen one videotape, one picture, with

21  all these guys dressed uniformly throughout the entire

22  investigation of this case?  No.

23         You saw a couple when Sultan Kahn-Bey was

24  coming.  Then they put on their little black Dickies

25  with the security patches on them and they went to the

Closing Argument by Mr. Vereen                    28

1    airport and picked him up.  That was it.

2            They didn't tell him anything about they were

3    going to buy him uniforms.  There's no evidence of

4    that.  And all the conversations, for the most part,

5    were recorded.

6            Where is the conversation where he's having a

7    conversation with Patrick Abraham saying, "I'm giving

8    you our clothing sizes so you can go buy us uniforms"?

9    No.

10           He knew they were going to be asked to change

11   clothes.  And he walks in here under oath and he tells

12   you what he wants you to hear because he is a puppet

13   for the Government.

14           Now, you have to determine what's going to be

15   credible with regard to what these witnesses have said

16   and what's not credible with regard to what these

17   witnesses have said.

18           But one thing is clear:  Abbas al-Saidi is a

19   liar.  He sat up here time after time after time and

20   said he did not smoke marijuana while working as a

21   confidential informant.

22           Is that really important with regard to the

23   facts of this case?  No.

24           It is important with regard to his credibility

25   with regard to the statements he has made?

Closing Argument by Mr. Vereen                    29

 1          If you cannot accept responsibility and tell

 2     the truth -- let me just tell you this:  If he would

 3     have said, "Man, I smoked marijuana every chance I

 4     got," would that have made him more credible when he

 5     opened his mouth or less credible?

 6          If he admitted to violating the policies of

 7     the FBI, he might not be used again by the FBI without

 8     going through some type of drug rehab.

 9          But he would have been credible, in your eyes,

10     by saying, "Well, you know what?  This man admitted" --

11     he probably lost his job as a result of that -- "to

12     smoking marijuana while he was working as a

13     confidential informant."

14          We know at least on two occasions it's been

15     recorded when he's in possession of marijuana, the

16     conversation that Ms. Arango brought out -- excuse

17     me -- Ms. Jhones brought out -- my apologies,

18     Ms. Jhones -- with regard to CW No. 1 throwing a bag of

19     weed up on the table and Narseal Batiste saying, "It

20     smells good."

21          The second time is when I brought it out when

22     he's riding with Burson Augustin and Burson Augustin

23     makes reference to the fact, "Man, you know that bag of

24     weed you just got?  You don't know what they put in

25     that.  That bad karma.  As soon as you smoke it, that

 1   bad karma goes into."

 2            That's at least two occasions.

 3            What did Mick Coriolan say?  He said, "Man, we

 4   smoked marijuana all the time."

 5            So, now, when the Government says, "Well" -- I

 6   mean, when he says, "Well, not while I was working as a

 7   confidential informant," well, when was he working as a

 8   confidential informant?  Clearly, when he was in the

 9   hotel down from the FBI office, he was working as a

10   confidential informant.

11            I asked Mick Coriolan, "Did you smoke

12   marijuana with him at the hotel?

13            "Yes.

14            "Who supplied it?

15            He would supply it or I would supply it."

16            So we know he was lying about that.

17            "Well, what about the apartment on South

18   Beach?  Did you smoke marijuana with him at the

19   apartment on South Beach?

20            "Yes.

21            "Who supplied it?

22            "Either he would have it or I would have it."

23            The Government says, "Well, Mick Coriolan

24   didn't want to be here."  No.  He didn't want to be

25   here.  He's upset with CW No. 1.  Yes, he is.  Why?

Closing Argument by Mr. Vereen                    31

 1              Because I asked him, "Are you a citizen of
 2   this country?
 3              "No.  I'm a permanent resident."
 4              But you know what?  Permanent residents can
 5   get deported.
 6              What did Mick Coriolan do?  He was the
 7   middleman, he was the broker, of an illegal gun deal.
 8   He did not know CW No. 1 was an informant.
 9              CW No. 1 had him broker an illegal gun deal
10   and, when he found out that CW No. 1 was an informant
11   for the FBI, he went ballistic.
12              He came here and said, "That man is a liar.
13   You can't trust him."  Because he said, "He could have
14   got me deported over a gun."
15              That's why he was upset.  That's why he was
16   upset.  Not because he was subpoenaed.  This is a
17   person he trusted who betrayed him and could have
18   gotten him kicked out of this country.
19              And he said himself, "I am here for me."
20              Look at his -- "I am here for me, and that is
21   it.  I'm not here to be part of no Moorish Science
22   Temple.  This philosophy about starting your own
23   sovereignty, I'm not with that.  I am here for me."
24              That's what his testimony was.
25              Let's talk about the indictment with regard to

1    what the Government charged and the instructions you

2    are going to hear from the Court -- excuse me -- that

3    you've heard from the Court.

4           Count 1 charges the Defendants with conspiracy

5    to provide material support and resources, as that term

6    has been defined in Title 18, United States Code,

7    Section 2339A(b)(1), to a foreign terrorist

8    organization, that is, Al-Qaeda -- now, listen to what

9    I'm about to tell you -- by agreeing to provide

10   personnel, including themselves, to work under

11   Al-Qaeda's direction and control, knowing that Al-Qaeda

12   has engaged or engages in terrorist activity, as that

13   term has been defined in Title 8, United States Code,

14   Section 1182(a)(3)(B).

15          Now, the Government has charged that what they

16   are accused of doing in Count 1, the providing material

17   support -- the Government indicted them, saying

18   specifically what they were agreeing to provide was

19   personnel, personnel to work under Al-Qaeda's direction

20   and control, personnel, including themselves, to work

21   under Al-Qaeda's direction and control.

22          Now, why is that important, that I point that

23   out?

24          The Government got up here and argued to you

25   that the material support that they provided was the

Closing Argument by Mr. Vereen                    33

1    video and the photographs -- the videos and the

2    photographs.

3            What they've indicted them with providing was

4    personnel.  There's a difference.  To work under

5    Al-Qaeda.  In other words, Al-Qaeda is their boss.

6    Al-Qaeda is over them.

7            Now, where was the evidence with regard to

8    direction and control with regard to these gentlemen?

9            You have two different events that took place

10   where CW No. 2 made it clear that Al-Qaeda did not

11   control the Moors and that the Moors did not control

12   Al-Qaeda.

13           The first is when Narseal Batiste did the

14   drive-by pledge that Ms. Jhones made reference to in

15   her closing argument, where he's sitting in the vehicle

16   with CW No. 2 and they're going through this and

17   Narseal is changing the words.

18           "I prefer to say 'alliance.'

19           "Okay.  We have an alliance.  We are partners,

20   brother."  Partners.

21           Partnership is equal-equal, not under the

22   direction and control.

23           The second scenario -- or the situation is

24   when, on March the 16th of 2006, they were at the

25   warehouse -- when I say "they," I mean all these

Closing Argument by Mr. Vereen                    34

 1    Defendants were at the warehouse -- and this whole

 2    bayat was administered again.

 3            CW No. 2 tells these gentlemen, "You have your

 4    leader in Narseal Batiste.  I have my leader in Osama

 5    bin Laden.  We are partners.  The Moors and Al-Qaeda

 6    are one."

 7            That's what he says.  There is no direction

 8    and control of these gentlemen by Al-Qaeda.

 9            There's another instruction the Court is going

10    to give you with regard to Count 1.  Let me find that

11    instruction for you.  This is going to be on Page 15 of

12    the instructions.

13            The Judge has told you that no Defendant can

14    be convicted in connection with providing personnel

15    unless he has knowingly conspired to provide Al-Qaeda

16    with one or more individuals who may be or include

17    himself to work under Al-Qaeda's direction or control

18    or to organize, manage, supervise or otherwise direct

19    the operation of Al-Qaeda.

20            If the Defendant acted entirely independently

21    of Al-Qaeda to advance its goals or objectives, he

22    shall not be considered to be working under Al-Qaeda's

23    direction and control.

24            Ms. Arango didn't want to discuss that with

25    you because that negates her entire argument with

Closing Argument by Mr. Vereen                    35

1    regard to Count 1.

2          If there's no direction and control, Al-Qaeda

3    is not dictating to these gentlemen what to do, how to

4    do it, there's no direction and control.

5          You heard on the videotape -- or the

6    audiotapes CW No. 2 begging Narseal, begging Narseal,

7    "Please, brother, do this one more favor.  One more

8    favor and you can get the money.  Please, brother, one

9    more favor, one more favor."

10          I don't think that a general in any of the

11    Armed Forces says that to a soldier that comes under

12    his direction and control:  Please do this.  Please do

13    that.  They tell you what to do:  "I'm ordering you to

14    do this."

15          When a police officer on the street stops you,

16    he tells you what to do.  You either comply with it or

17    you go to jail.  It's no different here.

18          If these gentlemen were supposed to be under

19    the direction and control of Al-Qaeda, they do what

20    they are told to do by the Al-Qaeda representative.

21    That did not happen in this case.

22          But there's more to Count 1 than just

23    direction and control.  The Government also has to

24    establish that they knew that Al-Qaeda has engaged or

25    engages in terrorist activity.

Closing Argument by Mr. Vereen                    36

1          Now, can you assume that every one of these

2     guys knew that -- first of all, who Al-Qaeda was?  Can

3     you assume that?  Can you assume that every person

4     walking around in America knows who Al-Qaeda is?

5          Without having spoken to every person in this

6     country, the answer would be "no."

7          You can say, "Well, it's been on the news."

8     When 9/11 happened, it was all -- you know, on the

9     television stations with regard to who caused the

10    attack on America during 9/11.

11         And as Narseal Batiste says, "I've heard

12    different accounts as to who's responsible.  I've heard

13    different accounts as to who really caused the attacks

14    on our country on September the 11th, 2001."

15         That's an element of proof that the Government

16    has to come forward and establish.  They can't say,

17    "Come in here and assume."

18         You can't assume a fact.  You can't.  You

19    cannot assume a fact.  That is something that the

20    Government has to prove by evidence beyond and to the

21    exclusion of each and every reasonable doubt.

22         They haven't done that with regard to any of

23    these Defendants.

24         Now, maybe Narseal said to one of -- "Well, I

25    know that there's several groups fighting jihad, Hamas

Closing Argument by Mr. Vereen                        37

1    and things of that nature."

2         Did you hear anything from Stanley Phanor with

3    regard to him knowing who Al-Qaeda is, was, what

4    they've engaged in?  No.

5         One thing that you will not get an instruction

6    on that is not permissible is prejudicial spillover.  I

7    used that term in my opening statement, and I'm going

8    to use that term again.

9         There is no jury instruction with regard to

10   prejudicial spillover.  You cannot impute to another

11   what the mindset or what the knowledge is as to someone

12   else.

13        You can't say, because the mother knows, that

14   the daughter knows as well; the father knows, so the

15   son knows as well; Narseal knows, so all of these other

16   Defendants know as well.  There's no evidence of that.

17        Now, the Government will get up here -- and

18   they've already done it.  They got up and talked about

19   conspiracy.  You can be a part of a conspiracy even if

20   you don't know all the facts, even if you don't know

21   all the details.

22        The Judge is going to give you the

23   instructions as to -- she has given you the

24   instructions as to the elements.  One of the elements

25   is that they must know.  That Defendant must know that

Closing Argument by Mr. Vereen                    38

1    Al-Qaeda engaged in terrorist activity or engages in

2    terrorist activity.

3             So, therefore, you must say to yourself,

4    "Well, let me go through the facts as they have been

5    presented in this case and let me see where they say

6    Stanley Phanor knew that Al-Qaeda engaged or engages in

7    terrorist activity.  Let me see if there's any evidence

8    in the record to establish that element."

9             Because three out of four don't get it.  You

10   can't say, "It's close enough for me."  You can't wave

11   the American flag and say, "You know what?  I'm going

12   to do this in the name of justice."

13            Because justice dictates that you follow what

14   you said you would do when you took that oath.  You

15   will follow the law.

16            The Judge told you you don't have to like the

17   law.  You don't have to agree with the law.  But if

18   this is going to be an ordered society, you must follow

19   the law.  And three out of four don't get it.

20            In the case of Count 1, they haven't proven at

21   least two things here:  Direction and control by

22   Al-Qaeda over these Defendants.  They have not proved

23   knowledge on the part of Stanley Phanor that he knew

24   Al-Qaeda was a terrorist activity -- I mean, a

25   terrorist organization that engaged or engages in

```
1    terrorist activities.  There's no evidence of that.
2           Let me tell you what I expect they will come
3    in and say.
4           "Well, isn't he the one that stopped the
5    bayat?  Isn't he the one that says, if you want to
6    listen to Mr. Vereen, "Is this all right?  Is this all
7    right?"
8           And he hears the word, "Yeah.
9           "Then, what I'm doing cannot be illegal."
10          Nowhere do they say they will be under the
11   direction and control of Al-Qaeda.  They have not
12   demonstrated that.  In fact, just the opposite.
13          You remember that on January 28th?  Now,
14   Ms. Arango says they announced to these Defendants that
15   they were Al-Qaeda on January the 28th.
16          When that happened, Stanley Phanor was already
17   in Islamorada.  That didn't happen in the presence of
18   Stanley Phanor.  That didn't happen in the presence of
19   Stanley Phanor.
20          The first time Stanley Phanor heard "Al-Qaeda"
21   coming out of one of the CI's mouths was on March
22   the 16th.  He didn't hear that on January the 28th.  He
23   wasn't even present when that happened.
24          But you think that, "Okay.  You're Al-Qaeda.
25   You tell us what to do.  We're under your direction and
```

Closing Argument by Mr. Vereen                    40

1    control."

2          What evidence do we have to establish that

3    that didn't even happen on January the 28th?

4          Patrick Abraham.  Patrick Abraham.  "Look,

5    man, in our country, it's our rules.  Over here, it's

6    our rules."

7          Does that sound like he's under the direction

8    and control of Al-Qaeda?

9          "Over here, we call the shots.  It's our

10   rules."

11         You got the transcripts.  The Government

12   played it for you.  They gave you copies of the

13   transcript so you can see that exchange.

14         "Over here, it's our rules.  The heck with

15   Al-Qaeda."

16         That's Count 1.  That's Count 1.

17         Let's talk about Count 2.

18         Count 2 of the indictment charges the

19   Defendants with a conspiracy to, again, provide

20   material support or resources or to conceal the nature,

21   location, source of ownership of that support or

22   resources for use in preparation for maliciously

23   damaging or destroying federal buildings and/or

24   buildings used in interstate commerce -- and here's the

25   clincher -- by means of an explosive.

Closing Argument by Mr. Vereen          41

1              That's another reason why the Government did

2    not want to talk to you about the indictment, what it

3    charges, the elements and the facts.

4              Because with regard to an explosive, you

5    simply have to look at the four lists:  Government's

6    Exhibit 100, 101, 102 and, I believe, 103.

7              On none of those lists is there a request for

8    explosives.  On none of those lists.

9              Forget about the conversations about Narseal

10   sitting down with some Coke cans and remote controls.

11   That's just heifer dust.  It's nonsense.

12             What did he request?  Not one explosive.  How

13   are you going to take down the Sears Tower without

14   requesting explosives?  How are you going to bomb the

15   FBI building if you never ask for any bombs?

16             You know what?  They rely relied -- and I say

17   "they."  The Government relies on this conversation

18   where they say Narseal drives by and says, "See, you

19   can drive a tank up into that building or a truck up

20   into building and blow it up or you can throw a grenade

21   through the window and blow it up."

22             That's not a conspiracy.  That's talk.  That's

23   nothing but talk.  He didn't say, "This is how we're

24   going to do this.  We're going to go get bombs.  I'm

25   going to request some bombs.  Since I'm making a list

Closing Argument by Mr. Vereen                    42

1    for you, let me write 'bombs.'  I need bombs.  I need

2    bombs.  We gotta have many, many bombs."

3              And why is that important?  Because if you

4    don't have a true intent to use an explosive, then you

5    don't have Count 2.

6              And guess what?  You don't have Count 3,

7    because both counts require the taking down of these

8    buildings by use of an explosive.

9              But Count 2 -- there's even more to Count 2,

10   because Count 2 charges that, again, what they offered

11   to do -- and this goes back to the indictment -- is not

12   take photographs, ladies and gentlemen.

13             The Government charged them in Count 2 saying

14   that they were providing material support.  And you're

15   going to see that.

16             In Count 2, again, they charge that they

17   conspired and agreed to provide material support and

18   resources, that is, by agreeing to provide personnel,

19   including themselves, knowing and intending that they

20   were to be used in preparation for and in carrying out

21   a violation of Title 18, United States Code,

22   Section 844(f)(1) and 844(i), and to conceal and

23   disguise the nature, location, source and ownership of

24   such material support and resources.

25             So Count 2 charges not only did they conspire

Closing Argument by Mr. Vereen                43

1    to -- or have an agreement to destroy these buildings,

2    they were going to be used as the ones to destroy this

3    building with the explosives.  They were going to be

4    the ones that destroy the building, the Sears Tower,

5    and the FBI buildings, with explosives.

6           Now, again, I want you to point to one

7    conversation, whether recorded or videotaped, where

8    Stanley Phanor is agreeing to do any of that, or any of

9    these other gentlemen, where they said, "You know what?

10   Give us the explosives.  We're going to request them

11   from you.  When we get them, we're going to blow up

12   these buildings."

13          One, it is ludicrous to even believe that they

14   think they can take it down.  That's first of all.

15   That's just ludicrous.

16          But what evidence do we have to rebut any

17   notion of that intent?

18          Well, we have to go to where CW No. 2 is

19   trying to push this explosives guy on Narseal Batiste.

20          Time after time after time -- you remember,

21   "Hello, bye-bye," that conversation?  "All you have to

22   do is come say, 'Hi, bye-bye.'  Just meet the guy.

23   Just meet him.  We need for you to meet him."

24          Do you remember that conversation where they

25   said, "He did it.  He did it"?  They called Brother

Closing Argument by Mr. Vereen                44

 1   Pedro" -- Tony Velazquez -- "He did it.  He went for

 2   the bayat.  He went for it.  He did it.  He took it."

 3            "We got him on that one.  Now let's see if we

 4   can push on this explosives guy."

 5            Because if you can say on so-and-so date --

 6   another overt act on so-and-so date, Narseal Batiste

 7   met with the explosives guy, the guy who was going to

 8   show him or he had recruited to blow up the

 9   buildings -- if Narseal is a terrorist, if it is his

10   intent to overthrow the Government of the United

11   States, there's his sweet opportunity.  There's his

12   opportunity to claim fame, to do what no other person

13   has done:  Take down the Sears Tower and blow up an FBI

14   building.

15            After all, he's trying to be Jeff Fort, right,

16   according to the Government?

17            But it didn't happen.  He blew him off time

18   and time and time and time again.

19            Ms. Jhones just went through some of the tapes

20   where you were shown the number of calls made to

21   Narseal Batiste.  She went through some of them.  There

22   were 15,000 -- at least 15,000 intercepted

23   conversations in this case.  15,000.

24            The Government, of course, is going to argue

25   that he wasn't entrapped because he exonerated every

1   one of these guys by saying, "They didn't know what I

2   was talking about in the tent.  They didn't know what I

3   said or what we discussed on March -- on December

4   the 16th, December the 22nd, December the 29th."

5         He kept this from them.  Stanley Phanor was

6   not privy to all those conversations.

7         And you didn't hear any calls from Narseal

8   Batiste calling Stanley, telling him, "Man, I just met

9   with this guy who is supposed to be from over there.

10  He didn't tell me which organization he was from or who

11  his contacts were, but he's here to study us.  He's

12  gonna get us some money because I told him I'm

13  financially exhausted.  He said he's gonna help us."

14        There were no conversations like that with

15  Stanley Phanor.

16        This is what you call evidence.  These are the

17  facts.

18        There aren't any.  There aren't any that says

19  that Stanley Phanor is a freaking terrorist.

20        Count 3, again, charges that they conspired to

21  destroy or maliciously damage the Sears Tower and the

22  FBI building, again, with explosives.

23        When you start deliberating and making

24  decisions that affect Stanley Phanor's life, the Judge

25  tells you to consider the evidence as you would

Closing Argument by Mr. Vereen                    46

```
 1    consider it in the utmost of your own affairs, of your

 2    own affairs.

 3            In other words, you don't say, "Well, you

 4    know, whatever I decide doesn't affect me.  I mean, you

 5    know, I'm just a juror.  I can say guilty.  I can say

 6    not guilty and go home."

 7            No.  You decide this case and you remember

 8    that oath you took and you be as serious about my

 9    client's life as you would your own.

10            You can't wage a war against the United States

11    with empty guns.  You can't wage a war against the

12    United States with seven young men who don't have a --

13    as that old phrase, a pot.

14            I know, when you all first heard about this

15    case, for those of you who heard about the case, you

16    said, "No way possible that these guys could be

17    terrorists.  But we don't know the evidence.  Let us go

18    sit down and listen to the evidence."

19            And, luckily, we were able to select you as

20    the jury that swore that you would have an open mind

21    and listen to the facts of the case and be fair to

22    these Defendants.

23            That's what the system is about, after all; is

24    it not?

25            But the Government has gone over and above the
```

Closing Argument by Mr. Vereen                    47

1    call of duty, as Ms. Jhones said, to make a case

2    against these young men that would not have existed

3    without the use of their own confidential informants

4    who constantly prodded and prodded and prodded until

5    they finally got them to bite the worm, hook, line and

6    sinker.

7             But there's something that's even more

8    disturbing about this case as it relates to Stanley

9    Phanor.  It wasn't until Narseal Batiste was on the

10   stand and he was being questioned about the books that

11   something stuck out like a sore thumb.

12            And it was that Koran, that Koran that had the

13   name of "Sunny Grant" written in it.  Not my client's

14   handwriting.  Not even the way my client spells his

15   name.  And then it had his address written in it.

16            And I asked Narseal Batiste, "Did he write

17   that in there?"

18            His answer was, "No.  He knows not to write in

19   the Koran."

20            But then there was even something more

21   disturbing about that Koran.  Mind you, it was put in

22   evidence in the same position we got it back from the

23   Government.

24            In that Koran --

25            MR. GREGORIE:  Objection, your Honor.  There

```
 1    is no proof of that.
 2            THE COURT:  Sustained.
 3            MR. VEREEN:  Well, let me show you the proof.
 4            MR. GREGORIE:  Your Honor, you sustained my
 5    objection and he continues --
 6            THE COURT:  Sustained.
 7            MR. GREGORIE:  -- in an improper argument?
 8            THE COURT:  Sustained.
 9            MR. VEREEN:  May I use --
10            THE COURT:  Move on --
11            MR. VEREEN:  -- the ELMO?
12            THE COURT:  -- Mr. Vereen.
13            MR. VEREEN:  May I use --
14            THE COURT:  Excuse me.
15            MR. VEREEN:  -- the ELMO?
16            Yes.
17            This is a picture.  This is Defendant's
18    Exhibit B-49 as it was taken when the search was
19    conducted.
20            This is that same Koran that is now in
21    evidence as Defendant's Exhibit 58.
22            This is the same Koran, Defense Exhibit B-56.
23    You see no stickies.  This is how it now appears in
24    evidence.
25            This is the name written in that Koran.
```

1   That's disturbing.

2           Ladies and gentlemen, let me just say this:

3   Stanley Phanor is not guilty of Count 1 in this

4   indictment.  He did not conspire to provide material

5   support to Al-Qaeda.

6           He is not guilty of Count 2.  He did not

7   conspire to provide himself for purposes of blowing up

8   any buildings.  And there's no evidence that he knew

9   who Al-Qaeda was or what they engaged in.

10          He's not guilty of Count 3.  Again, he did not

11  conspire to provide material support to Al-Qaeda.  He

12  did not conspire to blow up any buildings.

13          He is not guilty of Count 4, that he conspired

14  to wage war against these United States.

15          He may not have exercised the best judgment at

16  all times in his life.  That's not what he's on trial

17  for.  That's not what he's on trial for.

18          You've heard the limited amount of testimony

19  from the witnesses with regard to Stanley Phanor.

20          You heard them talk about this -- he was

21  followed -- that the agents said they followed while

22  they went to Miami-Dade and photographs were taken by

23  Narseal.

24          Narseal told you that they didn't know that he

25  was going out there to take photographs.

Closing Argument by Mr. Vereen                50

1          In fact, you heard the conversation where he

2     told Rotschild, you know, "We've got to go out there

3     and do that thing."  And he said, "You need to bring

4     your books.  So you need to bring your books."

5          But then, when the photographs were taken,

6     Rotschild Augustine's not carrying any books.

7          And Narseal says, "Well, yeah.  They did not

8     know I was going out there to do that."

9          And then they voiced their displeasure on the

10    25th of March.

11         And then what happens on the 26th of March?

12    The most important thing that happened, concrete, that

13    exonerates these gentlemen in this case is that Narseal

14    Batiste told CW No. 2, "I do not want the brothers

15    involved.  I want to engage you more."

16         Because they had already voiced their

17    displeasure.  He's already been told that they think

18    CW No. 2 is an FBI agent or is law enforcement.  He's

19    trying to convince them he's not.

20         "I'll tell you what.  I'll deal with him.  You

21    all don't have to."

22         "The brothers are not involved.  I do not want

23    the brothers involved."  He tells that to the CI.

24         What better proof is that -- than that?  What

25    better proof than that?

Closing Argument by Mr. Vereen                    51

 1              That's why the Government didn't want to talk

 2    about the jury instructions.  That's why the Government

 3    didn't want to talk about the elements.  That's why the

 4    Government didn't want to talk about the indictment.

 5              She says providing the photos and videos was

 6    the material support.

 7              The videotape was not of the FBI building.  It

 8    was of Downtown Miami, which is not the buildings that

 9    they have charged in this indictment.  There were

10    photographs of the FBI building, but Stanley Phanor was

11    not involved in the taking of those photographs.

12              They said in the overt acts that Stanley

13    Phanor and Narseal Batiste met with the CI to discuss

14    the video and the photos.

15              Did you see Stanley Phanor sitting down with

16    any confidential informant, going over photos and

17    videos?  Did you see that?  Did you see him

18    participating in that?  And there's a videotape of

19    that.

20              Tell the Government to show you on the

21    videotape where Stanley Phanor is participating in that

22    meeting with the CI saying, "Let me show you this.  Let

23    me show you that.  You see this?  That's a good shot.

24    You see that?  That's great videotape."

25              You won't see that.  You won't see that.

Closing Argument by Mr. Vereen                    52

1          I mean, this is not a high school play.  It

2    really isn't.  This is not some drama being played out

3    on the stage of America.

4          No.  It is not.

5          These men's lives hang in the balance.  Their

6    ability for life, liberty and the pursuit of happiness

7    rests in this courtroom.  This doesn't get any more

8    serious for these guys than this.  It doesn't get any

9    more serious than that.  This is not some brand you can

10   shake off.

11         Since June the 23rd of 2006, my client's life

12   has been a living hell, and it is time to put the fire

13   out.  Once and for all, it is time to put the fire out.

14   He has been living with this for three years.

15         It's not a game.  It is not a game.  You will

16   give citizenship and asylum to somebody who's been

17   kicked out of that -- three different countries -- or

18   at least two, hundreds of thousands of dollars to put

19   them up in hotels, buy them clothes.  They walk in here

20   and they walk out, and these guys still sit here day

21   after day.

22         You talk about respecting the system?  That's

23   exactly what they've been doing.  They want to

24   overthrow the Government?  Oppose it by force?

25         Every single day my client sits up here and he

1    listens to these people castigate him one after the

2    other.  His only defense is me.

3         Narseal Batiste does not speak for my client.

4    I speak for my client.  I'm telling you my client is

5    not guilty of these charges.  And I'm asking you, I

6    beget you, to find my client not guilty of each one of

7    these counts in this indictment and let him go on with

8    his life.

9         Nothing further, your Honor.

10        THE COURT:  We'll take a break.

11        Do not discuss this case either amongst

12   yourselves or with anyone else.  Have no contact

13   whatsoever with anyone associated with the trial.  Do

14   not read, listen or see anything touching on this

15   matter in any way.

16        If anyone should try to talk to you about this

17   case, you should immediately instruct them to stop and

18   report it to my staff.

19        You may leave your materials at your chairs.

20   Be back in the jury room in ten minutes.

21        (Whereupon, the jury exited the courtroom at

22   10:42 a.m. and the following proceedings were had:)

23        THE COURT:  We're in recess for ten.

24        (Thereupon a recess was taken, after which the

25   following proceedings were had:)

1          THE COURT:  We're back on United States of

2    America versus Narseal Batiste, et al., Case

3    No. 06-20373.

4          Counsel, state your appearances, please, for

5    the record.

6          MR. GREGORIE:  Richard Gregorie and Jacqueline

7    Arango on behalf of the United States, your Honor.

8          MS. JHONES:  Ana Jhones on behalf of Narseal

9    Batiste, who is present.

10          MR. LEVIN:  Albert Levin on behalf of Patrick

11    Abraham, who is present.

12          MR. CASUSO:  Louie Casuso on behalf of Burson

13    Augustin, who is present.

14          MR. CLARK:  Nathan Clark for Rotschild

15    Augustine, who's present.

16          MR. HOULIHAN:  Richard Houlihan with Naudimar

17    Herrera.

18          MR. VEREEN:  Rod Vereen on behalf of Stanley

19    Phanor, who is present.

20          THE COURT:  All Defendants are present.

21          Are you ready, Mr. Houlihan?

22          MR. HOULIHAN:  Yes, ma'am.

23          THE COURT:  Let's bring in the jury.

24          (Whereupon, the jury entered the courtroom at

25    11:01 a.m. and the following proceedings were had:)

Closing Argument by Mr. Houlihan                    55

```
1              THE COURT:  You may be seated.

2              You may proceed, Mr. Houlihan.

3              MR. HOULIHAN:  Thank you, Judge.

4              Good morning.

5              THE JURY:  Good morning.

6              MR. HOULIHAN:  Thank you on behalf of

7    Naudimar.  Thank you for your time.  Each one of you

8    was living life, and that means happy and sad and

9    worries and frustrations and the whole bit.

10             And, you know, like real troopers, you were

11   here.  Thank you so much.  And while I know it's been

12   hard at times, you've really hung in there.  You've

13   paid attention, and you've listened.

14             I'm deeply appreciative of that and of you.

15             Now, I am going to be, relatively speaking,

16   brief.  Here's what I'm going to talk with you about.

17             I'm going to start with general ideas and

18   principles and go into some had specific facts of the

19   case.

20             Even though you've been told there's six

21   separate trials, all of my colleagues -- my esteemed

22   colleagues -- we have tried our best not to be

23   repetitive.  You don't need to hear the same thing.

24             So a lot of -- some of what I would have said

25   I don't need to say.  It's either been said so
```

Closing Argument by Mr. Houlihan                    56

 1    eloquently by Ms. Jhones or Mr. Vereen or it's going to

 2    be said.

 3              But I'd like to talk to you and start with

 4    what we have here.

 5              We have what amounts to a multi-million-dollar

 6    stage production brought to you by the United States

 7    Attorney's Office in conjunction with the Federal

 8    Bureau of Investigation, both of Miami.

 9              If we stop and look at what you heard, I would

10    respectfully submit to you -- there's four areas I

11    would ask you to consider.

12              Number one:  There's no context.

13              Number two:  The information bias that has

14    rampantly run throughout this entire case.

15              Number three:  Questions -- and serious

16    questions -- about the integrity of the evidence that

17    you heard.

18              And, number four:  The failure of proof.

19              Now, what am I talking about?  Let's start

20    with the "no context."

21              A contemporary writer said the following:

22    "Context is everything."  What more needs to be said?

23    We can sometimes forget that.  But in truth, context is

24    everything.

25              You know, we can take a phrase, eight

Closing Argument by Mr. Houlihan                    57

1    letters -- and the phrase is, "I love you" -- and,

2    depending upon the context, it can be just a happy,

3    great thing either you say or to be said to you.  Or,

4    in context, it could be a very nasty, cruel, mean --

5    it's like somebody's putting a dagger into your back.

6    It depends upon the context.

7         But throughout the United States Attorney's

8    Office's case, there's no such thing as context.

9    Something is said and, therefore, it's etched in stone.

10        What is the context?

11        You know and you've been told that, for

12   purposes of audiotapes, videotapes, there must be

13   thousand of hours.

14        And while it is unreasonable for you to listen

15   to thousands of hours, to take a 20-second blurb of a

16   20-minute, an hour, conversation and say, "Poof, here,"

17   is that fair?  Is that right?  Is that what we here

18   for, as Americans?  Is that what we stand for?

19   Justice.

20        The second area:  The information bias.  What

21   does that mean?  Obviously, from the title, you have an

22   idea.  But let's go into it a little bit.

23        And these are going to interrelate with each

24   other.

25        Information bias, first and foremost:  There's

Closing Argument by Mr. Houlihan                    58

1    no context.  They're just thrown out there.

2              There's no application of basic common sense,

3    good old American common sense.  There's no application

4    of it.

5              The group.  The group evaluating and the group

6    being attacked are made, first of all, into a group,

7    devoid of any rule humanity.

8              But the group is possessing one mind.  There's

9    no dissenting voices.  It's presented to you as the

10   group.

11             And it applies here not only to these young

12   men but, also, to the Federal Bureau of Investigation,

13   their agents and the United States Attorney's Office:

14   One mind.

15             Have we ever heard of any dissenting voices in

16   the presentation of this case to you as the case is

17   being investigated over a long period of months?

18             No dissenting voices, evidently.  Everybody is

19   on that same train.

20             Another aspect of information bias is where

21   multiple interpretations fairly exist.

22             Only that interpretation favoring guilt is

23   considered.

24             If you look back upon what you heard, how true

25   that is.  Many, many times, there's multiple -- in

Closing Argument by Mr. Houlihan                    59

 1    fairness, multiple interpretations of guilt or

 2    innocence.

 3            The only interpretation that is considered by

 4    them and they're asking you to consider only, that of

 5    guilt.  That of innocence, of not guilty:  Totally

 6    ignored.

 7            Where applicable, body language, which is part

 8    of us, as human beings, our communication.  Right?

 9    Body language is ignored.  It is -- even when it's not

10    congruent with verbal statements.

11            Now, obviously, if you have an audiotape only,

12    you can't see.  But you have seen videos.  You will

13    have videos.

14            Like on March 16th, for example, there's a

15    group of seven men sitting there -- or six men, I

16    guess, in the camera.

17            They look like, body language-wise, they're

18    waiting in an office of a dentist waiting to have, you

19    know, some cavity filled.  They're not exactly beaming

20    up and down and jumping up and down.

21            Reliance upon an incorrect or dubious

22    proposition or belief.  Now, one example of that

23    happened yesterday when the United States Attorney's

24    representative argued in front of you -- and it was

25    said to you, "People tell the truth when they don't

Closing Argument by Mr. Houlihan                    60

 1    know they're being recorded."

 2           "People tell the truth when they don't know

 3    they're being recorded."  Wow.  That's an -- think

 4    about that.  Reflect upon that.  That really is not

 5    true.  That's an incorrect statement.  At best, it's a

 6    dubious statement.

 7           But, you know, if you take the entire case

 8    you've had presented to you, that's really what has

 9    happened here.

10           Remember the Keys trip, March -- excuse me --

11    January 28th?  We've been over this.  Naudimar said,

12    "I'm nothing but peace and love in my heart" -- "I have

13    nothing but peace and love in my heart."

14           Well, under that theory that's been put

15    forward to you, he's telling the truth.  That's the

16    exact opposite of a terrorist, somebody who wants to

17    hurt people, who wants to inflict pain.

18           And there are people like that.  We can just

19    open up the newspaper to see.  Who among us wants a

20    loved one to go to a mall or go to school and never

21    come back because some idiot wants to blow themselves

22    up?  It happens in the world.  It doesn't happen here,

23    thank God.

24           But these people are who are sitting in front

25    of you may be stupid, may be fools.  They're not

1    terrorists.  They're not like that.

2            Naudimar Herrera has a good spirit, has a pure

3    heart.  He would not hurt a flea.

4            More information bias.  There's a "blind eye."

5    There's a failure to perceive, to think, to accept, of

6    any other conclusion aside from the one that that party

7    wants.  Contrary information just doesn't exist.

8            In psychology, there's a field called

9    "cognitive dissonance," explaining how good people,

10   honest people, honorable people, when confronted with a

11   fact or facts that just go against the way they're

12   thinking, they just ignore it, just ignore it.

13           Not because they're bad people.  Not because

14   they're evil.  These people over here, my cohorts --

15   and I'm proud of them.  Mr. Gregorie I would trust with

16   the life of my wife and children.  He's an honorable

17   man.

18           But, you know, cognitive dissonance.  They

19   didn't sit down and say, "Hey, wait a minute.  This

20   doesn't make sense.  This doesn't fit in."

21           There's a refusal in this information bias to

22   utilize forensic science.  And there's a failure, more

23   importantly, of the forensic science, when used, to

24   confirm the guesswork that's been done.

25           We will be getting into this a little bit more

Closing Argument by Mr. Houlihan                    62

 1    later.

 2            In information bias, suggestion replaces

 3    facts.  Supposition becomes the tool of art.  Suppose

 4    this or maybe this.  And guesswork becomes rampant

 5    throughout.

 6            But, you know, ladies and gentlemen, we're

 7    here in a court of law, as Mr. Vereen said moments ago,

 8    and I cannot compete with his excellence.

 9            These kids, Naudimar and the others -- they

10    have lived three years of living hell.  Their families

11    have gone through it with them.

12            MR. GREGORIE:  Objection, your Honor.

13            THE COURT:  Sustained.

14            MR. HOULIHAN:  I'd like to in the information

15    bias category give a couple of quotes from different

16    people.  Emerson -- Ralph Waldo Emerson.  Quote:

17    "People only see what they are prepared to see."

18            And in some ways, that's the heart of this

19    information bias.  Again, it doesn't have to be a bad

20    person.  But you see only what you want to see.  You

21    see only what you're prepared to see.

22            And in truth and in fact, as Mr. Levin would

23    say, my esteemed colleague -- in truth and in fact,

24    throughout this case, that's what has occurred.

25            A contemporary man who consults, I suppose

Closing Argument by Mr. Houlihan                    63

1   would be the good word -- he writes numerous books, the

2   following quote comes from a book.  His name is Stephen

3   Covey.  He said, "Each of us tends to think we see

4   things as they are, that we are objective."

5          But this is not the case.  We see the world

6   not as it is, but as we are -- or as we are conditioned

7   to see it.

8          So here you have an FBI terrorism unit.

9   Throughout the United States, we Americans are known

10  for our productivity, aren't we?  We produce.  We're

11  very good.  We're hard workers.

12         Do you think the Department of Justice in

13  Washington is happy to have all these terrorist units

14  sitting around drinking a cup of Starbucks, reading a

15  newspaper and not doing anything?

16         This unit -- I mean, God, the golden egg came

17  in, didn't they?  Here's seven individuals in this kind

18  of offshoot, non-mainline, evidently, religion or

19  whatever it is, the perfect target.

20         You couple that with the information bias, the

21  refusal to look, the refusal to evaluate, the refusal

22  to see contrary information, hey, it's great for them.

23  They probably got kudos up and down.  The heat is off

24  them from Washington.  "We can do this."

25         Another thing with the information bias.  I'm

Closing Argument by Mr. Houlihan                          64

1    using this as an example.  We keep hearing the word

2    "soldier" over and over again.  "Soldier."

3              Well, there is -- in the Roman Catholic

4    church, there's an order called the Jesuits.  I had

5    eight years of the Jesuits.  They are considered to be

6    the intelligentsia.  They're teachers.

7              You know what they're called?  "The soldiers

8    of Christ."

9              Now, if you think about their history, they

10   started in 1534.  They and the Dominicans ran the

11   Spanish Inquisition.  They tortured people.  They

12   burned people at the stake.  Nasty, nasty stuff.

13   Soldiers of Christ, huh?

14             Are they a terrorist group?  Are they a cult?

15   They have about 20,000 people throughout the world.

16             The other name they use:  "Foot soldiers of

17   the Pope."

18             See, my point is the use of language.  We can

19   say, "Oh, the FBI special agent" -- remember these

20   agents?  "Oh, I'm a special agent."

21             Well, let's change the language.  Instead of

22   "special agent," let's make them "soldier."  "I'm a

23   soldier of the FBI."  It's language.

24             But it's language meant to push you, as a

25   juror, against Naudimar and against these other young

Closing Argument by Mr. Houlihan                    65

1    men.

2            We talked -- the integrity of the evidence.

3    What do I mean by that?  And, again, this is my general

4    presentation.

5            Integrity -- I'm referring to the sanctity or

6    the sacredness of what you hear from the witness stand.

7    You could have an incident with two eyewitnesses.  Both

8    eyewitnesses come in and give diametrically opposed

9    statements about what happened.

10           That still has integrity.  Two people truly

11   believe, "This is what I saw."  You know, we can see it

12   all the time.  It doesn't necessarily apply to a great

13   extent here.

14           But eyewitness identification.  We've seen

15   throughout, you know, the United States people have

16   been put on death row and it turns out the eyewitness

17   was wrong.

18           That witness wasn't wrong.  We're talking

19   about the sanctity of the evidence.

20           I'm talking about -- negatively now -- when

21   evidence is manipulated.  And what do I mean by that?

22           In addition to what has been put forward by my

23   colleagues and what will be put forward, I would like

24   to put forward to you one specific thing.  It concerns

25   Naudimar.

Closing Argument by Mr. Houlihan                    66

1              And if you recall, on March 9th, 2006, that's

2     the day twice this informant, Paid Informant No. 2,

3     went to the Embassy.

4              And he testified, "The first time I went,

5     somebody was outside.  They wanted to search me.  So I

6     left."

7              If you recall, Batiste called him.  He came

8     back.

9              Now, what did he tell you from that witness

10    stand?  "Oh, yeah.  All the brothers were there.  Yes."

11    He named them.  Naudimar was there.  Naudimar Herrera

12    was there.

13             Well, Naudimar Herrera was not there, I

14    suggest to you.

15             Now, why do I say that?

16             Let me backtrack for a quick second.

17             This is the actual quote from Paid Informant

18    Assaad's direct examination on March 13th, 2009.

19             On Page 63, Line 9:  "Did you see all these

20    Defendants then?

21             "Answer:  Yes.

22             "At the Embassy on March 9th?

23             "Yes, ma'am."

24             So let's make no dispute about this.  And then

25    he goes on and personally identifies them.

Closing Argument by Mr. Houlihan

1            Well, then we have cross-examination.

2            I asked him, if you recall, "Do you recall

3    giving sworn testimony October 24th, 2007, concerning

4    this very issue?"

5            And let me read it to you.

6            On Page 166, 3-18-2009: "Question:  Now, do

7    you remember me asking you the same -- that question

8    and you giving the following response on October 24th,

9    2007:

10           Question on Page 17:  "As we speak on the

11   meeting -- of the meeting of March 9th, do you recall

12   whether Naudimar was present?"

13           And your answer was, "As we speak, if I

14   recall, no, sir, I don't remember.

15           That was your question and answer back in

16   2007.

17           He responded, "Okay."

18           Even more importantly, on March 9th, the same

19   day, he was debriefed.

20           I asked him in front of you, "Well, were you

21   debriefed March 10th?

22           "No, no, no.  I was debriefed March 9th, the

23   same day."

24           We showed him what is called and you've seen

25   here a 302.  That's a report of investigation the FBI

Closing Argument by Mr. Houlihan                    68

1    makes of debriefings.

2            The question I asked him, the penultimate

3    question:  "And you referred to the others for the FBI,

4    for identification purposes, as four unidentified black

5    males."

6            Now, Naudimar would be within those four

7    unidentified black males.

8            "Answer:  Yes, sir.  But if you allow me, sir,

9    at that time on March 9th, it's like -- it's like I

10   said.  I don't know.  Maybe I -- yes, sir."

11           I put forward to you that the sanctity of the

12   evidence is another example I would ask you to

13   consider.  It's being manipulated.

14           He could think he's a team player.  He's doing

15   what he thinks the team wants.

16           I don't know what happens.

17           But it defies our experience as human beings

18   that your memory three years after an event is better

19   than hours after the event when professionals are

20   interviewing you and taking the information down.  It

21   defies human experience.

22           Naudimar Herrera in the debriefing was not

23   identified to be there on March 9th, 2006.

24           But then three years later, it is.  There's

25   some reason.  It's manipulation.  The very integrity of

1    the evidence is put into doubt that you heard.  It

2    should not be that way.  It isn't right.  It's not

3    acceptable.  But it happened.

4              The last area is failure of proof.

5              What do I mean by that?  In general, it's:

6    Given the premise, what should be there, but is not?

7              The absence of evidence can speak just as

8    loudly and just as forcefully as its presence,

9    depending upon, if you recall, the context.  All these

10   things interweave.

11             For example, two times in this case we have

12   seen in videos euphoria, happiness, joy.  Both times

13   it's when -- it's by Narseal Batiste.  Both times.  Do

14   you remember he got paid $1,000?  It was on camera.  He

15   was happy.  "Oh, yeah."

16             The second time, when he was -- got the $3500,

17   he was orgiastic, if you recall.  And you'll have the

18   videos.  You can look at them again.  Those are the two

19   times.

20             Someone who is intending to be a terrorist, to

21   hurt someone, to cause pain and suffering, when given

22   the opportunity to and given the road map, you would

23   expect some sort of reaction, maybe happy, maybe, "Hey,

24   yeah."

25             But on the part of these six young men -- five

Closing Argument by Mr. Houlihan                    70

1    young men, never.  Never once did you ever see that.

2              Now, I would like to speak to you about the

3    law.  Mr. Vereen and Ms. Jones covered it.  But I would

4    like to, without repeating what they said, ask you to

5    remember in your jury instruction packet on Page 29 --

6    on Page 29 are what lawyers learn in law school.

7              Now, these are like for a lawyer.  These are

8    our key.  These are like the red lights flashing, like,

9    "Whoa."

10             What am I referring to?  It has in there the

11   word "knowingly."  It defines "knowingly."  It defines

12   "willfully."  It defines and says "voluntarily and

13   purposely with the specific intent."

14             That really -- you know how you might have on

15   a Hollywood movie the red light, the klaxon going off?

16   That's the law, "with specific intention."

17             These are crucial concepts in addition to what

18   Mr. Vereen and Ms. Jhones told you already.  Critical.

19   This is what makes our law the American system of

20   justice, the American law.

21             You know, I can take that same oath that you

22   heard here, as offensive as it is.  I could stand right

23   in front of you right here now, take the exact same

24   oath, and under the law of the United States of America

25   I have not committed a crime.

Closing Argument by Mr. Houlihan                    71

1           I can take that same oath or I can make up

2     another worse oath, go into Little Havana or go up to

3     the Freedom Tower -- because people in our community

4     who have had their lives horribly hurt by the genocidal

5     killing in Cuba -- and I could say, "Viva Fidel.   I

6     love you" and whatever and I have not committed a crime

7     under American law.

8           It's called freedom of speech, as offensive as

9     it is, as shameful for me to do something like that.

10    And I wouldn't.  But that is not a crime.

11          Similarly, I could go over to Miami Beach with

12    a Holocaust memorial, you know, with the hand sticking

13    up, and I think in every single one of our minds -- I

14    don't think any one of us will ever forget pictures

15    we've seen of little children who are going to be led

16    to a gas chamber.  I mean, my God.

17          This is -- but I can go over there and make

18    the most horrible comments.  I can take an oath to

19    Adolf Hitler.  I can do whatever.  It is not a crime.

20          The words that I pointed out to you on

21    Page 29:  That is what transforms things to crimes.

22          The specific intent to do something.

23          Now, these young men here -- I mean, the

24    evidence -- Batiste, as Mr. Vereen has told you over

25    and over again, "Don't tell these people that.  Don't

Closing Argument by Mr. Houlihan                72

1    do that.  Don't do this," blah, blah, blah, blah, blah.

2    It's repetitive.

3            What does the Government do?  And don't

4    forget.  You know, we, as Americans, really have so

5    much freedom.  While I've never traveled a lot, I've

6    read a lot.  And we are really fortunate.

7            Because I just mentioned the oath.  In other

8    countries, you'd never see me again.  They'd take me

9    and they'd put me in prison or they'd kick me out of

10   some helicopter or plane over the Atlantic Ocean.

11   They'd take care of me.  But not in America.

12           And we're not perfect.  We've got a lot to

13   improve.  But, you know, quite honestly, all of us,

14   we're pretty good, overall.

15           Now, specific areas -- let's talk about the

16   Keys trip, January 28th, 2006.  It's Exhibit 55, 55-A.

17           You've heard this, but I would just like to

18   briefly go through some of what you've heard.

19           I'm going to take it in chronological order,

20   because, remember, this trip was about five hours.

21   It's the longest continuous tape-recorded statements --

22   conversation, to my knowledge, in this case.

23           It's starting on Page 29.  The Confidential

24   Witness No. 2, CW 2 -- I refer to him as Paid Informant

25   No. 2 -- laughter.  This is how it is.  "(Laughs.)  By

Closing Argument by Mr. Houlihan                73

 1    God, by God, they're scared.  They're peeing in their

 2    pants.  By God," referring to Naudimar and Patrick.  We

 3    went over this.

 4            On Page 30, again, Paid Informant 2:  "They're

 5    scared.  They're peeing in their pants, those ones."

 6            Paid Informant No. 1:  "Of course.  Of course

 7    they are scared."

 8            Beginning on Page 36, first three or four,

 9    five pages, Naudimar, this kid who has always wanted to

10    find out -- to learn about his relationship to a

11    creator -- you've seen a ledger, a composition book.

12    Who -- you know, "What is my relationship to God?

13            He asked these two people questions about how

14    you say things in Arabic, "How do you bless our food?

15    What is the procedure?"

16            And then, you know, Naudimar -- he goes on

17    Page 50 -- the paid informant says something to him.

18            Naudimar goes, "Oh, that's like a shortcut."

19            See, that's Naudimar.  He's talking about

20    religion.  "Oh, yeah.  That's a shortcut.  So when you

21    bless the food, you can say this instead of that.

22    That's a shortcut."

23            He's a kid.  He's a sweet kid.  He's a good

24    kid.  He's a decent kid.  He wouldn't harm the hair of

25    a flea.

Closing Argument by Mr. Houlihan                    74

1              On Page 56, again, the Paid Informant No. 2:

2    "They're still young, those ones.  These ones are still

3    young," again referring to Patrick and Naudimar.

4              On Page 59, the Paid Informant No. 1:

5    "(Unintelligible) those ones, we mess with their

6    minds."

7              Then on Page 65, the first paid informant is

8    ridiculing Naudimar and Patrick and everybody else.

9    He's puffing himself up.

10             He's telling his friend in Arabic, which is

11   translated, "(Unintelligible) I went to pray with them

12   one day and, while I was praying with them, as the

13   imam, and they -- if I say one word, they just say

14   Islam (unintelligible)."

15             In other words, they don't got a clue.  They

16   have no clue.  They're being mocked.  They're being

17   laughed at by these two people, the two informants.

18             And this, remember -- there's a quote, you

19   know, from *Macbeth* in Shakespeare about, "My lady doth

20   protest too much."  And that's really these two paid

21   informants.  "Oh, we were kidnapped.  Oh, we were held

22   hostage.  I was scared.  We were scared."

23             No guns.  Remember that?  No knives.  No

24   weapons.  Nothing like that.

25             Naudimar is in the front passenger's seat and

Closing Argument by Mr. Houlihan                    75

```
 1    asks the Paid Informant No. 2, "Can I push my seat

 2    back?"

 3              Do you remember that?  That's the testimony.

 4              In other words, these two paid informants --

 5    you know, you're just exaggerating it too much.  "My

 6    lady doth protest too much."

 7              Mr. Paid Informant, you're just doing --

 8    you're acting too much.  You know, you should tone it

 9    back.

10              If there was a director, the director would

11    say, "Listen, just" -- you know, "That's good.  That's

12    good.  But tone it down a little because that's --

13    you're conveying the opposite, if anybody's paying

14    attention."

15              So on Page 66, Naudimar Herrera:

16    "(Unintelligible) you know, it's nothing but love and

17    peace in my heart."

18              That is Naudimar Herrera.  I just don't know

19    how to -- "There's nothing but love and peace in my

20    heart."

21              So what does this Paid Informant No. 2 or

22    No. 1 say to him?  I mean, that's directly opposite of

23    what's going on in this case, isn't it?  "There's

24    nothing but love and peace in my heart."

25              CW No. 2, the Paid Informant 2, says -- this
```

Closing Argument by Mr. Houlihan                    76

1   is his response, right, the trained intelligence agent,

2   speaks six languages?  Naudimar and Patrick are like

3   Silly Putty in this guy's hands, if he wanted it to be.

4           He says, "Huh?"

5           Naudimar responds, again on Page 66, "In our

6   love" -- "In our hearts, love and peace."

7           Is he referring to himself and Patrick or to

8   all the guys?  I have no idea.  But certainly he and

9   Patrick.

10          What does either informant do?  Change the

11  subject.

12          Why?  Because if you have some sophistication,

13  if you're this informant, you're being put up tax free,

14  paid by the United States Government, the United States

15  Attorney's Office, by the FBI, let's not rock the boat.

16          You gain nothing by asking Naudimar, "What do

17  you mean?"  You gain nothing.  You can only have a

18  downside.

19          The kid says, "Truly, what's going on?  I

20  mean, I just want to learn."

21          I mean, there goes their case.  Right?  There

22  goes Naudimar and Patrick out of the case.

23          So we stay away from it.

24          When the FBI -- the US Attorney's Office hears

25  the recording later -- and this is not realtime.  They

Closing Argument by Mr. Houlihan                    77

```
 1    had to hear the recording after the trip was over,

 2    bring back information bias, for example.

 3            What would you say if you truly are looking

 4    for the truth?  What do you say to somebody?

 5            "Hey, listen.  What do you mean, love and

 6    peace?"  Do something about that.  Find out what is

 7    going on here.

 8            Are we taking innocent people and putting our

 9    cross hairs on them?  Well, the answer is "yes."  But

10    they never did do that.  Oh, they're staying away.

11    Contrary information.  They just don't see it.  It's

12    like a duck with water coming off its back.

13            Naudimar further on on Page 79 -- Naudimar's

14    personality is -- I think you can gather.  He's quiet.

15    He's introverted.  As I said, he's good, decent kid.

16            Patrick Abraham is loud.  He's one of these

17    people in a restaurant -- I could see him being very

18    demanding.  Okay?  That's his personality.  He, being

19    Patrick, and this paid informant are going at it like

20    this.

21            What does Naudimar say on Page 79?  "Oh, now,

22    brother, don't take that personally," referring to

23    Patrick and what he says.  "Trust me.  That's just how

24    he was with me."

25            And then we have the little slime ball -- I
```

1    shouldn't categorize people like that -- but the little

2    slime ball, the Paid Informant No. 1, a guy who, if he

3    told you it's sunny outside, nobody in this courtroom

4    would believe him unless they went out and looked

5    themselves -- he interjects.  "He's a (unintelligible)

6    once you get to know him."

7              The Paid Informant No. 2 goes, "Huh?"

8              I guess that's his favorite word when he --

9    things aren't going according to the script.  "Huh?"

10             Naudimar:  "That's just how he was with me.  I

11   told you in the beginning (unintelligible)."

12             Paid Informant No. 1.  Here he goes again:

13   "With me, too.  Yeah.  I mean, he (unintelligible) like

14   that."

15             Naudimar:  "Yeah.  Yeah."

16             Paid Informant 1:  "Yeah.  It just takes time

17   to know him."

18             What is going on here?  Terrorists?  Please.

19             They may be young.  They may have trusted when

20   they should not have, just like the FBI agent, if you

21   recall, who's partner took advantage of him.  He

22   trusted his partner.  Remember that?  It's kind of like

23   an eerie parallel in this case.

24             Naudimar trusted Batiste.  He was his teacher,

25   Bible classes.  He was his boss.  He was his friend.

Closing Argument by Mr. Houlihan                    79

1    He was his mentor.  He trusted him.

2           At the most significant level, for money,

3    Batiste betrayed him.  He was willing to throw him

4    under the bus.  He was willing to throw Patrick and

5    these other young men under the bus for money.

6           But when I reflected upon this, trying to act

7    my age, trying -- let's put ourselves in Batiste's

8    shoes for a second.  He wouldn't harm a flea either.

9           It's like that teacher, that very impressive

10   man from Texas, who came in.  He said, "He's a nerd."

11   I mean, that's what Batiste is.  That's his

12   personality.  That's what he was.  That's probably what

13   he'll be his whole life.  He's a nerd.

14          He probably loves himself.  He thinks he's

15   great.  He thinks he's bright.  He thinks he's the best

16   thing that walks the face of the earth.

17          But put -- let's put ourselves in his shoes.

18   You do a job and then, if I understand the facts

19   correctly, doing something about some equipment, like,

20   you know, in a motel, and they reverse the charges on

21   American Express.  It's $2,000 or $3,000.

22          So what does Batiste do?  Nothing.  He has a

23   little business.  He doesn't do anything about it,

24   evidently.  Just, "Oh, jeez, they reversed the

25   charges."

Closing Argument by Mr. Houlihan                    80

1          He has equipment stolen.  He has evidently

2     cash that he's gotten from a job.  That's stolen.

3          What does he do about it all?  Nothing.

4          His business is in the tubes.  You saw the

5     Bank of America credit -- checking statements.  They

6     closed his account.

7          It makes you wonder whether you should even

8     bank with Bank of America because they waited until he

9     was in hock to them for, what, 400, 800, whatever it

10    was, hundreds of dollars.

11         But he's sitting there.  He's a father.  He's

12    got four kids.  There's no money except what his

13    beloved wife brings in.

14         What kind of man is that when your kid says,

15    "Hey, can I do something with one of my playmates or

16    school chums?" and you don't have the money, in truth?

17    What do you say to your child?

18         What do you say to your wife, your spouse,

19    when, financially, you're just in the -- you're going

20    down the tubes?  What do you say?

21         Well, we know what he said.  You know how we

22    know that?  Paid Informant No. 1.  Unless I have my

23    times wrong, he said back in the Oak Grove Park times

24    and so forth he used to come in -- "he" being

25    Batiste -- and spend -- two, three times a week, spend

1    a little time talking, "Hey, how are you doing?" and so

2    forth.  He'd give Batiste's children some candy and

3    things like that.

4            But as it went along, as the business is going

5    down, as he's having serious financial problems,

6    instead of confronting them like a man, he goes to that

7    store and spends -- remember -- the guy spent hours

8    there, four, five, hours.  He'd come almost every day.

9            Well, Batiste isn't getting paid by that guy.

10   He's not making any money.

11           Is he's the kind of personality, character,

12   that, when it hits the fan, he kind of takes a dive.

13   I'm sorry to put it that way.  But he -- that's what it

14   is.

15           He was willing to take a relationship with

16   Naudimar he built up over two, three years, and throw

17   it out the window, throw it out the window, for money.

18   And the rest of these kids.

19           To finish it up with the Keys trip, on

20   Page 139, you've heard this before, but, you know,

21   quote from the Paid Informant 1:  "By God, dumb asses.

22   And then, in parentheses, both men laugh.  They're

23   having a great time, great time, ridiculing Naudimar

24   and Patrick.

25           On Page 140, Paid Informant No. 2:  "Good."

1          Paid 1:  "Good.  Why?  They pay hourly."

2          Paid Informant 2:  "Five hours."

3          Both men laugh very loud.

4          They're -- man, they're on the Government

5     payroll.  Five hours going down to the Keys and back.

6     Boy, they're going to make a little score here.

7          On Page 142, Paid Informant 1:  "They're

8     pretending to be smart."

9          Then a little bit later on the same page, Paid

10    Informant No. 1:  "You think these dumb asses speak

11    English?  They don't know how to pray."

12         Now, we went over all this before, I'm

13    reminding you.

14         This is mockery.  They are ridiculing in

15    Arabic between the two of them Naudimar and Patrick.

16    Ridiculing, demeaning.

17         But then they come here and tell you, "Oh, we

18    were kidnapped.  I was scared.  The other guy was

19    scared.  I'm trying to be a man.  I speak six

20    languages."

21         No.  It's a setup.  It's a fraud.

22         But moving on, do you remember someone named

23    Marcos Figueiras?  He was a surveillance agent, special

24    agent from the FBI.  We can call him a soldier.  Why

25    don't we call him a soldier, huh?  He was a soldier

1    from the FBI, from that organization over there.

2    Surveillance was his expertise.

3              He told you that he surveilled, he, at the

4    Embassy, at least 20 times.  Wow.  20 times.

5              He went on to tell you that from the last

6    quarter of 2005 -- October, November, December -- until

7    the date of arrest, June 22nd, 2006, all three teams

8    were involved in surveilling these people.

9              Do you recall that?  All three teams.  Each

10   team had seven agents.  They had a boss who probably

11   does nothing and then six agents who actually work.

12             If I remember correctly, he spent -- he

13   wouldn't tell me how many agent hours -- "How many

14   agent hours do you think these whole" -- "I can't tell

15   you that."

16             His?  Maybe about 200, 250, I believe, if I

17   recall correctly.  But we know, whatever it is, it's

18   substantial.

19             And why don't we multiply that by 20.  I mean,

20   we're talking about a lot of agent time, a lot of

21   money.  The United States taxpayers are paying for

22   these people.  Okay?

23             So what happened?  What was gotten out of it?

24   Just that.  Silence.  Nothing.

25             If there was one piece of evidence that showed

Closing Argument by Mr. Houlihan                84

1    Batiste was a terrorist, that that was his true

2    intent -- remember specific intent -- or any of these

3    young men -- the United States Attorney's Office would

4    come in here, blow something up as big as the Sistine

5    Chapel in Rome and say, "Look at this.  Look at this."

6           But, actually, it's a blessing for these young

7    men.  They were almost under constant surveillance from

8    October through June.  What inculpatory evidence was

9    obtained?  Zero.  None.

10          Do you know why?  Well, if you leave out the

11   information bias, because the premise is wrong.  The

12   underlying premise is wrong.  They're not terrorists.

13   They're not into that.

14          Next, let's talk about this composition book,

15   the ledger.

16          The United States Attorney's Office yesterday

17   brought out three pages of it.  And if you recall, on

18   the bottom right, there were numbers:  1442, 1443 and

19   1483.

20          Well, you know, again, hadn't we been over

21   this?  There was the direct examination of Lisa Lamey

22   from crime scene, if you recall.  They brought out the

23   exact same things.

24          Then I got up and said, "Well, let's go

25   through this.  There's other things in the same

1   document that speak the opposite."

2          Why is that being ignored?  But after we went

3   through all of this in a closing argument to you, it's

4   like it never happened.

5          For example, in this book, which I believe is

6   Government's Exhibit 125, composite -- remember we

7   talked about the Docket Entry 1440.  Whoever wrote

8   this, it looks look it's Naudimar.  His name is on the

9   front cover.

10         "Take responsibility for your actions and the

11  actions of your Marines."

12         Here's a kid who has this thing.  He loves the

13  Marines.

14         "Semper Fi.  Duty, honor country."

15         Good values.  Take responsibility.

16         And we went through it.  On Page 1414, it

17  takes up the entire page.

18         On Page 1451, we keep hearing about "prince,"

19  "prince," "prince."  It's written down here "Prince of

20  peace."  It's not Batiste.  "Prince of peace.  Jesus.

21  Jesus Christ."  We went through this.

22         The Government then -- there was -- on

23  Page 1483, docket entry, there was nine points for a

24  successful evasion.  There was like three or four

25  lines.

Closing Argument by Mr. Houlihan                    86

 1           Then I pointed out to you -- and, obviously,

 2   not to them -- but on Page 1556 of the same ledger --

 3   and that's docket entry -- it's Bates-stamped -- there

 4   was the exact same stuff, but it was the full

 5   paragraph.

 6           You remember one of the things was, "If you

 7   parachute -- if you land by parachute, you should

 8   assume the enemy spotted you and get out."

 9           This is coming from a Marine manual.  The

10   Government would have you believe here's Batiste's

11   training.  Nine points for a successful evasion.

12           Come on.

13           They're taking evidence, manipulating it.

14   It's wrong.

15           There is in that composition not one statement

16   of hatred.  Read it.  There's not one statement of

17   hatred against anybody.

18           There's not one statement of any evil intent.

19   There's not one statement of any violent jihad.

20           In fact, if you went over it, just the

21   opposite.  You'll recall there's that thing describing

22   jihad.

23           There's a lot of questions dealing with his --

24   Naudimar's relationship to our creator.  Really, that's

25   good, isn't it?  As human beings, don't we want to use

Closing Argument by Mr. Houlihan                87

1    our minds?

2              You know, Naudimar made a very big mistake

3    dropping out of school in the ninth grade, even though

4    some of the smartest, sharpest people I have ever met

5    are people who probably never even went and finished

6    grammar school.

7              But in our country, there's an emphasis put on

8    formal education.

9              But Naudimar is pure spirit.  He keeps

10   striving.  He keeps doing.  He's going to make it.

11             But, you know, let's take everything I said

12   right now and just put it aside.  You might think I'm

13   crazy.  But here comes an area that I would ask you to

14   consider.

15             Let's put all this aside.  Let's put it all

16   aside.  It's lawyers' talk.

17             You have put into your laps a serious issue

18   with devastating consequences for everybody involved.

19             What do we turn to?  Well, that's what we

20   talked about already:  Forensic science.  Okay?

21             Because forensic science is a phrase in

22   English, "Where the" -- "The chips will fall where they

23   may."  Forensic science cuts away personalities, sides.

24   What it is, it is, if it's collected properly.

25             What do we know?  This is the FBI's -- this is

Closing Argument by Mr. Houlihan                    88

1    their primo area.  They are internationally known

2    around the world for their crime scene investigation

3    and their crime laboratory.  All around the world.

4           Two days ago, that same organization with

5    their soldiers in it, in cooperation with the local

6    police force --

7           MR. GREGORIE:  Objection, your Honor.  None of

8    this is in evidence.

9           THE COURT:  Sustained.

10          MR. HOULIHAN:  When properly used, forensic

11   evidence convicts the guilty and can acquit the

12   innocent.

13          Now, the FBI properly uses forensic evidence.

14   How so?

15          They have specialized ERTU units.  It sounds

16   like a llama in the Himalayas.  ERTU, evidence response

17   team units.

18          Highly trained, highly specialized agents or

19   soldiers, again, if you want to call them that, since

20   we're changing our terminology.

21          12 people.  You recall that?  In this case,

22   12 people are on that unit.  12 specialized agents

23   participating in the crime scene search at the Embassy.

24          Prior to them going to the Embassy, as their

25   own protocol dictates, there was a conference with a

 1     case agent telling them what the case is about, what

 2     they're looking for.  That's the FBI's protocol.

 3              Ms. Lamey told you that's what happened.  They

 4     became aware of a search warrant, if you recall, which

 5     we'll get into in a moment.

 6              Now, Ms. Lamey told you that, aside from the

 7     search warrant -- as I said, we'll get into that --

 8     aside from that stuff, their protocols tell them to do

 9     very specific things.

10              For example, look for hidden areas.  Bad

11     people hide things, many times.  They just don't leave

12     it out on the kitchen table.  They hide it.  They

13     secrete them.  Look for hidden areas where things can

14     be put.

15              That's what they did here.  Nothing was found.

16     No hidden areas.  The only one was underneath some bed,

17     and that's probably the way it was constructed.  They

18     started taking it apart so they could see under it.

19              The garbage dumpster was searched, if you

20     recall.  One of the agents who was newer to the unit

21     got assigned and gets into the garbage dump and goes

22     through there like a rat.  See if you find anything.

23              But that's their protocol.

24              Nothing was found.

25              Ms. Lamey -- I mean, it's a terrorist case.  I

Closing Argument by Mr. Houlihan                    90

1   asked her, "Any explosive material found?"

2          Answer:  "No.

3          "You were looking for that?"

4          Answer:  "Yes, sir."

5          Well, of course.  It's a terrorist case.

6   Right?  Bombs.

7          In the debriefing, this crime scene unit that

8   is highly equipped with the top-of-the-line equipment

9   looked for bomb materials, bomb materials that can be

10  identified by the FBI crime laboratory in Quantico,

11  Virginia down to the level of 20 nanograms.

12         With specificity, the laboratory can tell the

13  FBI, the agents, US Attorney's Office, this is the

14  material.  A nanogram is 10 to the negative ninth.

15  Remember high school science?  10 to the negative

16  ninth.  One billionth of a gram.

17         So 20 nanograms would be 20/100ths of a

18  million.  So .00, whatever, 2.  Infinitesimally small

19  size.  And what was found?  Zero.  Nothing.

20         But the search warrant -- okay?  We heard the

21  search warrant.  We talked to Agent Velazquez.  We

22  talked to Agent Lamey about it.

23         What do we know -- what were they looking for

24  in the search warrant?

25         Blueprints.  That makes sense, doesn't it?

Closing Argument by Mr. Houlihan                    91

 1   Blueprints.

 2            What was found?  Zero.

 3            Drawings, sketches and schematics of

 4   buildings.  Okay?

 5            What was found?  Zero.

 6            Maps showing locations of buildings.  Zero.

 7   Nothing.

 8            Documents and information regarding the Sears

 9   Tower.

10            Well, you know, okay.  That's wonderful.

11            Nothing.  Nowhere.

12            Instruction manuals for bomb-making.  Zero.

13   Nothing.

14            Instruction manuals for firearms training.

15   Nothing.

16            Documents and records relating to terrorism.

17   That's very general.  We all know what that means.

18            What was found?  Nothing.  Nothing.

19            News accounts, magazines and articles relating

20   to terrorism.

21            Well, zero.  Nothing.

22            Was any money found, by the way?

23            No.  No cash was found there either.

24            THE COURT:  You have 15 minutes.

25            MR. HOULIHAN:  Thank you.

Closing Argument by Mr. Houlihan                    92

1              Things such as Al-Qaeda, Osama bin Laden,

2    Islamic fundamentalism, seditious activities, all in

3    the search warrant.  Zero.  Nothing was found.

4              Was there a picture of Osama bin Laden, I

5    guess, hero, if you want to believe the Government's

6    case, hanging on the wall?  No.  Nothing like that.

7              They found two computers.  We went through

8    that about hard drives being analyzed.  Major

9    corporations in the United States with tons of lawyers

10   in their corporations, MBAs.  They got their own

11   security.

12             When they're sued civilly or if they get

13   themselves involved in some criminal matter, almost

14   always they get taken down through forensics.  It could

15   be an e-mail that's in the -- on the server somewhere.

16   It could be something on somebody's computer.

17             The FBI had the two computers.  And what did

18   they find?  It's analyzed.  Nothing.  Nothing for this

19   case.  Zero.

20             Now, there's one of two explanations.  Narseal

21   Batiste, that man that you saw testify -- he has the

22   ability, the smarts, the intelligence, whatever, to

23   successfully hide and evade and wipe away every single

24   trace of criminal activity on his part.  That man.  I'm

25   telling you, with all due respect to him, no way.

Closing Argument by Mr. Houlihan                    93

1          Major corporations can't do it.  He's going to

2    do that?  All it takes is one e-mail, one visit on the

3    Internet to an Islamic site, a terrorist site, a

4    radical site.  You would have seen it.  You would have

5    heard it.  Here it is in front of you.

6          But it's nothing.

7          The only rational explanation, the only, is

8    that the underlying premise is wrong.  This is not

9    terrorism.  That's the only explanation.  It never was,

10   and it isn't now.

11         I am winding up.

12         And, in general, I would ask you a question to

13   reflect on.

14         Does repeating a lie make it the truth?  Does

15   repeating a falsity, a misstatement, make it the truth?

16   Does repeating over and over again a nonexistent

17   fact -- does that now make it a fact?

18         The answer, of course, I think we all would

19   agree, is "no."

20         But does it?

21         There's two responses I have for you.

22         There was an 18th century Englishman of great

23   renown named Edmond Burke.  He would answer to that

24   question -- he did a lot of the juries -- "No,

25   provided...."

Closing Argument by Mr. Houlihan                    94

1          And what's his proviso?  "No passion so
2    effectively robs the mind of all its powers of acting
3    and reasoning as fear."  Fear, an underlying theme
4    current throughout this entire case.
5          "Oh, we got these people here.  They're
6    terrorists.  They have this wacko religion."  They got
7    this.  They got that.
8          They're different than we are.
9          The second response is modern advertising.
10   Executives would -- would claim without a doubt -- the
11   answer to that is "yes" -- "We can sell anything to the
12   American people if you give us enough money."
13         You have had produced to you a
14   multi-million -- literally, a multi-million production.
15   A multi-million-dollar production was presented to you.
16   And this is the best that they can do.
17         And it's the best they can do not because --
18   they're good people -- because it isn't -- the
19   underlying premise isn't there.  They're not
20   terrorists.  They never were.
21         It was really nothing more than Narseal
22   Batiste wanting to get money for whatever purpose he
23   wanted for his -- for himself.
24         You, as a jury -- and, again, thank you.
25   Thank you again for your patience with me, your

Closing Argument by Mr. Houlihan

1   attention.

2         You -- as I look at you, I see juries, you

3   know, going back 800 years.  1215, really, it started.

4   What you're doing here started in 1215, and it's not

5   the time.  In the year 1215, the Magna Carta.

6         The English peasants, the masses, most of

7   them -- all right? -- went to the nobles and said, "You

8   ain't gonna do this to us anymore.  You're not just

9   gonna do whatever you do to us because you group of

10  nobles want to do what you want.  We want the right to

11  a jury trial."

12        Because in Clause 39, in 1215, it said:  No

13  free man shall be taken or imprisoned or disseised or

14  outlawed or exiled or in any way harmed nor will we go

15  upon or ascent upon him save by the lawful judgment of

16  his peers.

17        So you literally stand on the shoulders of

18  previous juries for 800 years.  I would ask you to

19  please remember that.  While this is secular, it rises

20  almost to holiness.  It's important.

21        You apply the law.  That's your choice.  You

22  do what you want to do when that jury room door closes.

23  You can have your own prejudices, biases, say, "I don't

24  like these people."

25        You would be doing a disservice to your own

Closing Argument by Mr. Houlihan                    96

```
 1    sense -- you know, I respectfully submit, to your own
 2    sense of integrity.  But you will be doing a violent
 3    disturbance to 800 years of Anglo English law, law.
 4            It's the law that Naudimar Herrera, the US
 5    citizen, the nice kid, the good kid, literally is
 6    throwing himself on for refuge, because that is what
 7    protects him.
 8            But, actually, in truth, beyond the law, is
 9    you.  Will you faithfully apply the law?
10            If you do, there's one and only one verdict
11    for Naudimar that you can have, with all due respect.
12    That's a verdict on each and every count of not guilty.
13            I put, after three years, Naudimar Herrera's
14    life, his future, in your hands.
15            Godspeed.
16            Thank you.
17            THE COURT:  We're going to break for lunch.
18            Do not discuss this case either amongst
19    yourselves or with anyone else.  Have no contact
20    whatsoever with anyone associated with the trial.  Do
21    not read, listen or see anything touching on this
22    matter in any way.
23            If anyone should try to talk to you about this
24    case, you should immediately instruct them to stop and
25    report it to my staff.
```

```
 1            Remember, until such time as you have heard

 2   all of the closing arguments and I have instructed you

 3   to begin your deliberations, you simply are not to talk

 4   about this case.

 5            Please be back in the jury room at 1:15.

 6   Enjoy your lunch.

 7            (Whereupon, the jury exited the courtroom at

 8   12:05 p.m. and the following proceedings were had:)

 9            THE COURT:  We're in recess until 1:15.

10            (Thereupon, a luncheon recess was taken, after

11   which the following proceedings were had:)

12            THE COURT:  We're back on United States of

13   America versus Narseal Batiste, et al., Case

14   No. 06-20373.

15            Counsel, state your appearances once more for

16   the record.

17            MR. GREGORIE:  Good afternoon, your Honor.

18            Richard Gregorie and Jacqueline Arango on

19   behalf of the United States.

20            MS. JHONES:  Good afternoon.

21            Ana Maria Jhones on behalf of Narseal Batiste,

22   who is present.

23            MR. LEVIN:  Your Honor, Albert Levin on behalf

24   of Patrick Abraham, who is present.

25            MR. CASUSO:  Good afternoon, your Honor.
```

```
 1              Lou Casuso on behalf of Burson Augustin, who

 2     is present.

 3              MR. CLARK:  Good afternoon, your Honor.

 4              Nathan Clark for Rotschild Augustine, who's

 5     present.

 6              MR. HOULIHAN:  Richard Houlihan with Naudimar

 7     Herrera.

 8              MR. VEREEN:  Good afternoon, Judge.

 9              Roderick Vereen on behalf of Stanley Phanor,

10     who is present.

11              THE COURT:  All Defendants are present.

12              Mr. Clark, are you ready?

13              MR. CLARK:  Yes, your Honor.

14              THE COURT:  Let's bring the jurors in.

15              (Whereupon, the jury entered the courtroom at

16     1:35 p.m. and the following proceedings were had:)

17              THE COURT:  You may be seated.

18              You may proceed, Mr. Clark.

19              MR. CLARK:  Thank you, your Honor.

20              May it please the Court, counsel for the

21     Government, counsel for the defense, Mr. Batiste,

22     Mr. Patrick Abraham, Mr. Burson Augustin, Mr. Rotschild

23     Augustine, Mr. Naudimar Herrera and Mr. Stanley Phanor,

24     ladies and gentlemen in the gallery.

25              My name is Nathan Clark and, of course, I
```

Closing Argument by Mr. Clark                    99

1   represent Rotschild Augustine.

2          Good morning -- or good afternoon, I should

3   say.

4          THE JURY:  Good afternoon.

5          MR. CLARK:  Good afternoon.

6          I'm going to talk to you about some of the

7   jury instructions in this case, what I believe is

8   important for you to hear.

9          I'm going to talk to you about how that

10  applies to the evidence in this case.

11         I'm going to submit to you that the evidence

12  in this case is not of the necessary character to

13  sustain a burden -- the heavy burden of proof in this

14  case.

15         I'm going to go over that and the evidence

16  with you, and I hope that you will bear with me as I do

17  that.

18         With regard to the instructions in this case,

19  on Page 2 of the instructions, it says that you must

20  not be influenced in any way by either sympathy or

21  prejudice for or against the Defendants or the

22  Government.

23         And then, after some things, it says on the

24  next page that a reasonable doubt is based upon reason

25  and common sense after careful and impartial

Closing Argument by Mr. Clark                    100

1    consideration of all the evidence in the case.

2           Now, I want to talk to you a little bit for a

3    few minutes about the word "impartial," because the

4    word is -- that's the only time, I believe, it's in the

5    jury instructions.  But it has very significant

6    history.

7           You see, the right to a jury trial -- we

8    didn't have that before the Constitution was brought

9    into this country.  Under the English law, you only got

10   a jury trial at the discretion of the British Crown.

11          And, actually, in England -- the English

12   Constitution has a fundamental difference from our

13   Constitution.  In England, William Blackstone tells

14   us -- an English historian -- that it is based upon the

15   fact or the principle that the king can do no wrong.

16   That is a fundamental principle underlying the English

17   Constitution.

18          And while we were -- before we had our

19   Constitution, frequently the English Crown did not

20   provide us with the right to a jury trial.

21          In a famous case of David Peter Zenger, David

22   Peter Zenger, who was charged with seditious libel as a

23   news columnist, interestingly, a sedition charge

24   similar, in a sense, to the fourth count in this case,

25   he -- we managed -- people managed to get a jury trial

1    and he was acquitted.

2            As a result of that, when the Constitution

3    was written in 1787, the founders wrote into the

4    Constitution that everybody would have the right to a

5    jury trial.

6            And that was a time when the political parties

7    at that time, the federalists and the anti-federalists,

8    couldn't agree on anything, much like the political

9    parties today.

10           However, the right to a jury trial was the

11   only thing that they agreed upon, because it was so

12   important.

13           And our Constitution, when it was written, was

14   based upon a different principle from the English

15   Constitution.  Our Constitution was based upon the

16   premise that power corrupts and absolute power corrupts

17   absolutely.

18           No longer is it true that the king cannot do

19   any wrong.

20           America is a special place because the leaders

21   here -- we have the ability to admit when we're wrong.

22   And that's what dictators don't like to do.

23           And so we had that thing written in 1787, the

24   Declaration of Independence, which also promised the

25   right to a jury trial, what's known as the promise, and

1    the Constitution, which was written four years later --

2    or 17 -- I'm sorry.

3            The Declaration of Independence was 1776, and

4    the Constitution was written in 1787, which was 11

5    years later.

6            Both of those guaranteed the right to a jury

7    trial.  The Declaration of Independence was the

8    promise, and the Constitution was the fulfillment of

9    that promise.

10           Over the course of the next years, the

11   founders realized they had make some mistakes.  So they

12   had to write the Bill of Rights, because the way it was

13   written -- it wasn't drawn perfectly.  And so they had

14   to make some modifications to ensure that certain

15   things did not happen.

16           So one of the mistakes that they had to

17   correct was in the Sixth Amendment.  They had to say

18   that everyone was entitled to a trial by an impartial

19   jury.  They had to add that one word.

20           So even though you see that word in these jury

21   in that one place, that carries with it tremendous

22   significance, because you are like a fourth branch of

23   Government.

24           Alexis de Tocqueville, who wrote from Europe,

25   who wrote about our Government, made that comment.  And

Closing Argument by Mr. Clark                    103

1    that was the purpose of voir dire, when we went through

2    the voir dire proceedings, was to ensure that each and

3    every one of you could be a fair and impartial juror,

4    to look at this evidence with an open mind, with no

5    prejudice or sympathy towards either side.

6            Now, this is a terrorism case.  So, naturally,

7    there's going to be some sympathy for the Government

8    and prejudice against people charged with terrorism

9    because of what we've been through.  It's only natural.

10           But you were chosen because you committed to

11   setting aside that prejudice and looking at this

12   evidence impartially, to weigh it and determine if it

13   meets the standards that we have.

14           Now, if we -- you know, if confidential

15   informants didn't have a stake in the case and we could

16   just believe what they said, we wouldn't have to have a

17   jury.

18           You have to judge their testimony the way the

19   instructions say.

20           The right to an impartial jury -- and the

21   impartial administration of justice is absolutely the

22   most important thing we do in this country.

23           This is a very important function because, if

24   we don't administer justice impartially and fairly,

25   then we become -- we become something that we're not

1    supposed to be.  It's like -- if we fall, it's going to

2    be from within, because we are a voice to the world.

3           There are people just in our region that are

4    looking to see if we mess it up over here.  And they're

5    going to point -- that's the wrong way to do it, with

6    the checks and balances that we have, and to try to

7    instill themselves as dictators in their own country.

8           So what we do here is of utmost importance to

9    the American people, as jurors.

10          Now, it hasn't been perfect in this country.

11   And there was a time, even if you were white, if you

12   didn't own property, you couldn't serve on a jury.

13   Then after a while, minorities were able to serve and

14   then women.  It took a while.

15          But the principle is right and it's true and

16   needs to be followed and needs to be practiced to the

17   best of our ability.

18          In fact, Ben Franklin, when he left the

19   Constitutional Convention, was asked, "What have we

20   wrought here?"

21          And he said, "A republic, if we can keep it."

22          We have to practice these principles to the --

23   go to the -- to any extent to practice these principles

24   properly.  That's how important it is to our country.

25          Now, in the jury instructions, on Page 3, it

Closing Argument by Mr. Clark                    105

```
 1    talks about a reasonable doubt.  And it says:  It is a
 2    real doubt based upon reason and common sense after
 3    careful and impartial consideration of all the evidence
 4    in the case.
 5           I submit -- I'm going to submit to you and I'm
 6    going to be talking to you as I go through some of this
 7    evidence as to why there's a real doubt in this case, a
 8    real doubt exists.
 9           And I'm not going to be able to go through
10    every single transcript and all that.  I'm only going
11    to be able to hit the important points.  You've heard a
12    lot of the evidence, but I'm going to try to explain to
13    you why that doubt exists.
14           It's also -- the instructions say that proof
15    beyond a reasonable doubt is proof of such a convincing
16    character that you would be willing to rely and act
17    upon it without hesitation in the most important of
18    your own affairs.
19           And the very key word there is called
20    "character," because that's what I'm going to be
21    talking about, is the character of the evidence.
22           Now, sometimes the character of the evidence,
23    if there's a defense, it may come up in some other
24    evidence that's put on by -- after the Government puts
25    on its case.
```

Closing Argument by Mr. Clark                    106

1          But sometimes, and in this case, the

2     Government's own evidence, I submit to you,

3     demonstrates a character that shows that these

4     Defendants are not guilty, that Rotschild -- especially

5     Rotschild Augustine is not guilty of these types of

6     charges.

7          William Blackstone, who told us what the

8     fundamental principle is, has said that -- called -- he

9     calls it the Blackstone Ratio -- it's better that ten

10    guilty people go free than for one innocent person to

11    be convicted.

12         Ben Franklin followed up on that and said it's

13    better to have 100 guilty people go free than to have

14    one innocent person be convicted.

15         Because when innocent people are convicted, it

16    tears down the entire fabric of the country.  It's

17    wrong.  And people can look to that from other

18    countries and talk about what's wrong with America.

19         This is the most important thing that --

20         MR. GREGORIE:  Objection, your Honor.

21         THE COURT:  Sustained.

22         MR. CLARK:  The instructions also tell us

23    that the jury -- you may make deductions and reach

24    conclusions which reason and common sense lead you to

25    make.

Closing Argument by Mr. Clark                    107

1           And then it goes on to talk about witnesses.

2   You need to look at witnesses.  Do they have a reason

3   to tell -- not tell the truth?  Do they have a personal

4   interest in the case?  Does a confidential witness have

5   a personal interest in the case?  Is there inconsistent

6   testimony?  Is he inconsistent on important issues as

7   opposed to unimportant issues?  Is he using addictive

8   drugs?  Is he seeking to gain favorable treatment?

9           You have to look at that with even more

10  caution.  These are things that tell us what the

11  character of the evidence is.

12          Now, in the instructions, in talking about

13  Count 1, that says -- that charges the Defendants with

14  a conspiracy, the object of which was to provide to a

15  terrorist organization material support and resources.

16          And the Government has to prove with

17  convincing -- proof of such a convincing character that

18  you're able to rely and act upon it without hesitation

19  in the most important of your own affairs, that that

20  was the object of this plan or conspiracy, that that's

21  what they were trying to really do, was to give

22  material support and resources to a terrorist

23  organization.

24          If the evidence does not show that, if it does

25  not prove that, that -- such a convincing character, if

Closing Argument by Mr. Clark

1    it shows that the object was to scam money only out of

2    somebody, then the proof doesn't suffice.  And they

3    have failed to prove that there was such a conspiracy

4    with that object.

5          Secondly, Count -- actually, Count 2 has the

6    same conspiracy charges.  This time, it says the object

7    has to be to provide material support or resources

8    knowing or intending that it be used in preparation or

9    carrying out of such a thing.

10         I submit to you, as I go through this

11   evidence, that the Government's own evidence that

12   hasn't been listed in the indictment, but is their

13   evidence, is of such a character that proves, actually,

14   that it was a scam for money, that this guy was -- the

15   only object was to get money from this guy and they

16   never intended to blow up buildings or to support -- to

17   give aid to a terrorist organization.

18         And not only that, they have to prove that the

19   support was material support.

20         The instructions give us a definition of what

21   "material" is, and they talk about "training."  It says

22   that training means an instruction or teaching designed

23   to impart a specific skill as opposed to general

24   knowledge.  It's just not any training.  Congress wrote

25   this very specifically.

1        And then the term "expert advice or

2   assistance" means advice or assistance derived from

3   scientific, technical or other specialized knowledge.

4        The object of this conspiracy would have to be

5   that they intended to give expert advice or assistance,

6   material support.  That is not just any kind of

7   support.

8        Then, of Count 1, as Mr. Vereen explained to

9   you, in providing personnel, it has to be under the

10  direction of Al-Qaeda.  That's all a part of -- this is

11  the kind of conspiracy the object of this conspiracy

12  within it has to be.

13       And the Government has to prove that with such

14  convincing character as you would be willing to rely

15  and act upon it in the most important of your own

16  affairs.

17       After that, the Government would have to prove

18  that Defendant Rotschild Augustine willfully joined in

19  that conspiracy.  That means -- there's a definition of

20  "willful."

21       It's in the back of the instructions, but it's

22  an important instruction, because it tells us that the

23  word "willfully," as that term is used in the

24  indictment on Page 29 or in these instructions, means

25  that the act was committed voluntarily, purposely, with

Closing Argument by Mr. Clark                    110

1    the specific intent to do something the law forbids,

2    that is, with a bad purpose either to disobey or

3    disregard the law.

4           So there has to be a bad purpose in the nature

5    of trying give support to a terrorist organization and

6    it has to be material support.  And that has to be the

7    object of the conspiracy.

8           And then we have a First Amendment instruction

9    that tells us that nothing in here can be construed --

10   religious talk and free speech that may be

11   anti-Government cannot be construed in such a way --

12   I'll get to that instruction specifically -- that's on

13   Page 17 -- so apply and so as to deprive the exercise

14   of rights guaranteed under the First Amendment to the

15   Constitution of the United States.

16          You're going to hear religious and free speech

17   in this.  That does not mean necessarily that

18   somebody's engaged in terrorist activity, because

19   there's anti-Government rhetoric going on.

20          Then Count 3 says that the object has to be

21   to maliciously damage a building and it has to be the

22   Miami FBI building and the Sears Tower.

23          Counts 4 is that the object of the conspiracy

24   to be actually to levy a war against the United States.

25          So if the object of Mr. Batiste's plan was to

Closing Argument by Mr. Clark                        111

1    simply get money from somebody and not really provide

2    material support or to aid a terrorist organization,

3    then the Government's evidence fails.

4           To carry their burden, to sustain their

5    burden, the character of their evidence has to be of

6    such a convincing nature that you would be willing to

7    rely and act upon it in the most important of your own

8    affairs.

9           I submit to you that this evidence is not

10   sufficient to carry that burden of proof.

11          Now, the first thing that's interesting to

12   look at is about the indictment.  In the indictment,

13   they allege in chronological order, as Mr. Vereen has

14   told you, under the manner and means of the conspiracy,

15   what happened.

16          But all the evidence -- but just what the

17   allegations are in the indictment is not all the

18   evidence, because a lot of the evidence was not listed

19   in the indictment.  But all of that evidence is

20   important in determining the character account of this

21   case.

22          For example, November the 7th -- what happened

23   on November the 7th is not in this indictment.

24          What happened on November 21st is not in this

25   indictment, but it is the Government's evidence.

Closing Argument by Mr. Clark                    112

 1            November the 10th -- the meeting on November

 2     the 10th is not in this indictment.

 3            What happened on 12-18 and 12-21, when

 4     Mr. Abbas -- what I will submit to you coached

 5     Mr. Batiste to talk about bombs instead of marching --

 6     that's not in this indictment.

 7            And what -- now, 3-16 is in the indictment.

 8     But what is very interesting about March the 16th of

 9     2006, which is called the oath, is that in -- what is

10     in the indictment -- it says in a paragraph that there

11     was a plan to blow up a -- a plot to blow up buildings

12     was discussed and, in the next paragraph, it says that

13     an oath was taken.

14            That's in the indictment.  But the evidence in

15     this case, the character of the evidence, does not

16     reflect that at all.  It reflects the reverse

17     chronology.

18            First, there was an oath, and then there was a

19     plot discussed.  It doesn't say what else was discussed

20     at that meeting.

21            That will be important to explain to you why

22     Rotschild Augustine -- the Government's evidence fails

23     to prove that he willfully joined any kind of plan.  I

24     will get to that.

25            In the indictment, there's nothing about

Closing Argument by Mr. Clark                      113

1    Blackstone Rangers.  And in the indictment, there's

2    nothing about the disassociation that occurred that

3    happened shortly after the so-called oath.

4         Now, another thing that's in the indictment,

5    but came out in the evidence in this case that has to

6    do with the character of the evidence in this case, is

7    what came out about the background of Rotschild

8    Augustine before this stuff took place.

9         Because what happened was that he was living

10   with his mother and his family.  He happened to be

11   living near Narseal Batiste.  He graduated from high

12   school -- Michael Cropp High School --

13        MR. GREGORIE:  Judge, there's been no evidence

14   in this case about this.

15        THE COURT:  Sustained.

16        MR. CLARK:  In the security license

17   application that the Government has placed into

18   evidence -- this is listed in the security license

19   application.  You can look at the security license

20   application and make reasonable inferences from that.

21        In that application, also, it says that he

22   attended Miami-Dade Community College for a period of

23   time.  And it says he's a US citizen in that

24   application.

25        Some other things about that application:  It

1    has to do -- it was taken in school in July of 2005.

2    He was taught by somebody in a regular course.  It has

3    to do with being an unarmed security guard.

4            This is all in the evidence in this case.

5            After 12,000 wiretaps -- or 15,000 -- I don't

6    know how many wiretaps in this case, ladies and

7    gentlemen -- there's been no evidence of any resentment

8    towards the United States by Rotschild Augustine or his

9    country.  There's no radical Islamic training or

10   recruiting by Rotschild Augustine.

11           He never owned a gun.  In fact, what that

12   security -- the point of that security license is he

13   never made an effort to get a gun with a security -- it

14   was an unarmed security license.

15           In order to get a gun, in the piece of

16   evidence that Mr. Levin put in about the Florida

17   statute -- you have to make an application for a "G"

18   license to get a gun.

19           There's been no evidence that he had any

20   intent to get a gun.  There's no radical literature, no

21   plans to do any harm, no explosives, no bombs.

22           All of that precedes Mr. Abbas coming into

23   this case.

24           We also have evidence that Azteca was run by

25   Mr. Batiste and his wife, that it did construction, and

1    that Rotschild Augustine occasionally worked there at

2    minimum wage.  He tried to work for a living.

3              And the -- what -- the place that was rented

4    in October of '05 was in a busy, well-trafficked area,

5    used for a construction office.

6              There's been undisputed and credible testimony

7    from the Contractors Resource Center from the lady,

8    Ms. Elsie Hamler, and from other people of the work

9    that they did in trying to make a living.

10             That's what the evidence shows.  That has to

11   be considered in the character of the evidence, too, of

12   what you've heard, as opposed to -- if somebody -- if

13   evidence had come in that Rotschild Augustine was

14   running around with guns -- there's no evidence that he

15   was involved in a gang.  There's no evidence that he

16   was selling drugs.  There's no evidence that he was

17   doing gang-related activity.

18             This is the character of the evidence that's

19   before you, and you need to consider that.

20             As far as involvement with Universal Divine

21   Saviors or Moorish Science Temple, or both, well,

22   there's evidence that, on occasion, there was Bible

23   studies.  People studied the Bible and studied

24   spiritual literature.

25             Some of those people -- Mr. Batiste tried to

1    get local support for that.  That UDS flier had a fax

2    number that went back to the Contractors Resource

3    Center.  It is a combination of Judaism, Christianity

4    and Islam.  And the Bibles -- they studied the Sermon

5    on the Mount.  He simply worked occasionally there and

6    studied there.

7            There's been no weapons found there.  There

8    were no explosives there.  There's no plans there to

9    blow up buildings.  There's nothing to do with Sears

10   Tower ideation there.  There's no talk of Al-Qaeda

11   there.

12           This is all a part of the character of the

13   evidence.

14           And that doesn't -- is not -- in no way

15   convinces anyone that there's proof beyond a reasonable

16   doubt from that that Mr. Rotschild Augustine was ever

17   going to do anything to harm the United States or levy

18   war or conspire to aid any enemy.

19           We also have testimony about the suitability

20   and -- of confidential witnesses.  The Government gave

21   that evidence and it came in.  We have evidence of

22   Mr. Abbas's suitability as a confidential witness.

23           This man has domestic violence, anger

24   management, driving with a license suspended, had

25   disagreements with the store owner, Mr. Faisal --

1    Faisal Hassan.  He smoked -- marijuana, by the way,

2    violates his services agreement.  He's smoking

3    marijuana during this period of time.

4          In fact, when I put the services agreement in

5    front of him, he said he saw his name, but he didn't

6    recognize his own services agreement.

7          This is part of the character of the evidence,

8    too, of a man sitting on the stand and just refusing to

9    acknowledge a simple services agreement.

10         He had an AK-47 and he didn't turn it in.

11   Agent Branzetti told him that he's out of gas as a

12   confidential witness.

13         Mainly -- the main thing that Abbas needs in

14   October of '05 is money.  That has to be considered

15   with -- as part of the character of this evidence, too.

16         And then we see where he's given a recorder on

17   10-29.  And, apparently, he's smoking marijuana on his

18   first meeting where he picked up the Moorish Paradigm.

19         During that -- here is to corroborate -- he's

20   going to corroborate that there's supposed to be

21   terrorist activity, and what we hear in the very

22   inception is talk about money that Faisal Hassan owes

23   him.

24         And he uses the term "help from home."  And

25   all -- that doesn't -- there's no reason for that to be

 1  a cover.  They could have easily said "Al-Qaeda."

 2          There could have been numerous ways of

 3  corroborating that somebody was trying to get money

 4  from back home for terrorist activities or to give

 5  material support as opposed to just getting money for

 6  his Moorish Science Temple activities.

 7          And then, after -- on October 29th of '05,

 8  right after that, the character of the evidence tells

 9  us that, on 11-1, the FBI tried to take Abbas and go

10  get the AK-47 back off the street from Haitian Mike,

11  who ended up coming here and testifying.  They never

12  got the AK-47 back off the street.

13          That is part of the character of the evidence

14  in this case.

15          And then, on 11-6, November the 6th, in a

16  conversation which is Government's Exhibit 40 -- it's

17  recorded -- he talks to Narseal Batiste about Faisal

18  owing him the money and that he's got a lot of money

19  from home and he's got an apartment now.  He seems to

20  be carrying himself off of as someone who's got

21  connections to a lot of money.

22          Also, we inquired of Mr. Abbas about the Sears

23  Tower plan.  He admitted to having previously testified

24  that the Sears Tower plan was mentioned in the store

25  way before he ever got working for the FBI.

1          First, he said, "I don't remember that."  But

2     then he said -- when I refreshed him, he said, "Oh,

3     yeah.  I said that."

4          And then, in the second proceeding, he says

5     that the Sears Tower was mentioned for the first time

6     on December the 21st.

7          Now, these are totally inconsistent statements

8     coming from a key witness of the Government.  That's

9     the kind of character of the evidence that's in this

10    case.  He said, "I had a hard time understanding what

11    was the Sears Tower."

12         And he never told the FBI in telephone calls

13    about the Sears Tower.  He says he doesn't remember.

14         This is the most important thing in the case,

15    the plot to blow up the Sears Tower announced across

16    the whole world, and he doesn't remember.

17         That's the kind of character of the evidence

18    that's coming from the witness stand in this case.

19         On 11-7, November the 7th, when he went

20    looking for Narseal Batiste and met with Burson

21    Augustin, the first thing he starts talking about is

22    Faisal's money and how he needs a quick mission for

23    thousands of dollars and he's trying to get the money

24    from Faisal.  He's trying to reach Narseal Batiste, but

25    he can't find him.

Closing Argument by Mr. Clark                    120

1          He -- Burson Augustin didn't even know where

2     he lived at the time.  He starts talking about religion

3     and money from back home.  He's the first person to

4     say -- use the term "got to blend in" on Page 17 of

5     that transcript.

6          And he talked about his stepfather on Page 16

7     of the transcript.  They start talking about religion.

8     That's when he starts saying -- Abbas himself starts

9     talking about the devil is in Iraq and Palestine and

10    Afghan and the devil made the president on Page 67 of

11    that transcript.

12         The first time we hear this kind of talk, it's

13    coming from the Government's informant.  That's just

14    the character of the evidence in this case.

15         And then, at the end of the transcript, when

16    he starts talking about his uncle being referred to and

17    trying to get enough support, he tells Burson Augustin,

18    "You gotta look organized.  Don't make me look like a

19    dummy" -- Page 104 of the transcript -- "Don't make me

20    look stupid.  I got somebody I want to maybe bring over

21    or get money.  So you gotta make me look like I'm

22    somebody that knows what I'm talking about and not make

23    me look stupid."

24         That's what I mean by coaching.

25         Now, on 11-10 -- Abbas was not able to meet

 1    with Narseal Batiste on 11-7.  He hooked up with him on

 2    11-10.

 3           You go through the entire transcript on 11-10.

 4    The first 15 pages are talking about going to New York

 5    and conflicts on TV and, "I'm gonna get you some videos

 6    for your mosque and flags for your mosque."

 7           And what you hear from Narseal Batiste is a

 8    bunch of silence.

 9           And, finally, either Mr. Abraham or

10    Mr. Batiste says, "What about the money from Faisal?

11    I'm supposed to get a cut of that money from Faisal

12    Hassan."

13           And he starts talking about getting a lawyer

14    to try to get the money and he may even shut down the

15    store or whatever.

16           We go through the whole 11-10 transcript.

17    There's not one mention about terrorism or Al-Qaeda or

18    anything of that nature.  And they're -- he's supposed

19    to be corroborating this.  It's not even in there.

20           And so then on -- in Government's Exhibit

21    No. 43, on 11-21, he meets up with Mr. Batiste again

22    and he starts talking about the person that he -- that

23    this uncle knows.  He starts talking about

24    *Fahrenheit 9/11*.  He tells him, "You don't have to be a

25    terrorist to meet Osama bin Laden."

Closing Argument by Mr. Clark                    122

1           If this is a case about terrorism and he's

2    willing to do terrorism, why would he have to tell him,

3    "You don't have to be a terrorist"?  Because he's

4    coaching this stuff up.

5           Then he tells him -- the coaching really

6    begins.

7           He says on Page 45, "We need to see training

8    to get this money."

9           "We need to fix the mosque up," on Page 46.

10          "Will you pick him up at the airport?",

11   Page 47.

12          On Page 48, "Put on the turban."

13          "And we need to see Muslims," on Page 50.

14          And then on Page 68, "We need to organize a

15   plan to get this money."

16          At Page 69, "No plan, no money."

17          Page 75, stuff to the effect of, "No plan, no

18   money."

19          And that is when there's some talk about

20   Blackstone Rangers.  Well, there's never been any

21   Blackstone Rangers.  There never was before, there

22   never was then, and there never was after.

23          You hear reference made several times because

24   it's just posturing.  It's talking about something that

25   doesn't exist.

1          That's the character of this evidence.

2          Now, I want to talk a little bit about the

3     fact that, leading up to 12-16, we've heard testimony

4     that Mr. Batiste and Mr. Elie Assaad, CW 1 and CW 2,

5     did not collaborate prior to January 28th.

6          It's absurd.  It's completely absurd and

7     preposterous.  The evidence shows it in this case.

8          That's the kind of character that's coming

9     from this witness stand.

10         The transcripts for 11-7 and 11-21 were typed

11    up on 12-8 and 12-9 while Mr. Elie Assaad was in town.

12    He's been in town since November the 7th.

13         On 12-4, CW 1, Abbas, asked Mr. Batiste for a

14    list, which also was referred to on December 22nd by

15    Mr. Assaad in his conversation.

16         And when I asked about -- CW 2 about his prior

17    testimony about having meetings before January 28th, he

18    says, "I don't remember my prior testimony."  When

19    asking about the uncle idea, "Whose idea was it?", "I

20    don't remember my prior testimony."

21         He denies that he collaborated at all.

22         Yet, on 12-16, CW 2 tells you that the list

23    idea was his.

24         Abbas told us the list idea on 12-14 was the

25    FBI's.

1          That's incredible testimony to believe, that

2     there was no collaboration between Abbas and Assaad

3     prior to 1-28.

4          The fact of the matter is they collaborated

5     throughout the whole entire case.  Yet, that's the kind

6     of character evidence that comes from the witness

7     stand.

8          And then, on 12-16, CW 2 says that he doesn't

9     remember how he got the idea of martial arts as opposed

10    to military training.

11         He was trying to get Mr. Batiste to simply say

12    military training, explosives and weapons, because he

13    knew what the situation was.  He knew that this stuff

14    had been had coached up from the typing up of those

15    transcripts.

16         And he keeps telling him, "Don't tell me a

17    story."  He didn't want to hear any other stories.

18         We had three calls during this meeting to try

19    to coordinate this meeting, to try to get Narseal

20    Batiste to say exactly what they wanted him to say.

21         And what -- so what does he tell him?

22         "I want to march downtown with Jeb Bush."

23         It wasn't good enough.

24         So they have a fourth call to shut down the

25    meeting.  We're told -- he's telling on the phone that,

1    "I'm tired.  I've been on a long plane flight" so that

2    Mr. Batiste could hear it.

3         And he's trying to say, "No.  It wasn't" --

4    he's trying to tell us he wasn't shutting the meeting

5    down.

6         Well, he wasn't on a plane flight.  He wasn't

7    tired.  He's been here for two, three weeks.

8         It's not the kind of evidence of the character

9    that you can accept as convincing character, that you

10   can rely upon in the most important of your own affairs

11   to -- and act upon it.

12        This is not the kind of evidence, ladies and

13   gentlemen.  This is not what they were talking about

14   when they wrote these -- this law that has been

15   developed over 200 years.

16        And then he says, "You gotta give me something

17   stronger."

18        And then, on December the 21st, when Abbas

19   meets with Mr. Batiste again, that's when the coaching

20   actually occurs, when he says -- he starts talking

21   about blowing up people at the beginning.  That's how

22   he explained it to them on Page 22.

23        On Page 25, "You've got to organize more."

24        On Page 25, he says, "I'm not gonna hand

25   nobody" -- "They're not gonna hand nobody a lot of

Closing Argument by Mr. Clark                    126

1    money for nothing."

2            And Page 26, "I'm gonna try to get you some

3    money, as much as I could."

4            Page 29:  "Don't promote the Moors."

5            Page 30:  "You need to change your name."

6            And then he tells him on Page 32, "Don't talk

7    about marching downtown.  I prefer war to marching

8    downtown.  That's what I'm talking about."

9            Coaching, to say something that's not true.

10           And that's when the Sears Tower plan came up.

11   And he told -- Narseal Batiste said, "I'll go to

12   Chicago as soon as I get some money."

13           One point to make about this is that, at this

14   point in time, the Government's own evidence, the

15   character evidence, shows that this was a scam to get

16   money, not a real plan, the object of which was to blow

17   up buildings or to aid terrorist organizations.  This

18   is a plan get money.  That's why he's telling him what

19   to do and to say.

20           And the Government has the burden to prove

21   evidence of such a convincing character that you'd be

22   willing to rely and act upon it in the most important

23   of your own affairs.

24           This evidence was not listed in the

25   indictment.  That indictment's one thing.  But the

Closing Argument by Mr. Clark                    127

1   evidence -- careful and impartial consideration of the

2   evidence is what matters.

3          And then, on 12-22, he goes back to Mr. Assaad

4   again and he tells him -- Narseal Batiste -- "No one

5   else knows about the Chicago plan."

6          There is no evidence, first of all, at this

7   point beyond a reasonable doubt that there is a plan to

8   blow up the Sears Tower as opposed to a plan just to

9   get money out of somebody.

10          And there's certainly no evidence that

11   Rotschild Augustine ever willfully joined anything.  He

12   didn't even know about it.

13          The Government's evidence fails at that point

14   in two respects.

15          And then, on 12-28, a conversation takes place

16   with Narseal Batiste and Elie Assaad that -- he tells

17   him, "I don't want to believe it's a joke."

18          There's plenty of evidence now to show that

19   this was a scam to get money when he's telling Narseal

20   Batiste the FBI knows it's just a scam for money,

21   because he tells him, "I don't want to believe it's a

22   joke."

23          And he tells him, "I'm gonna" -- "Every time I

24   see you, I'm providing something for you."

25          So he keeps him -- inducing him.

1        You know, one of the things in the jury

2   instruction is the difference between "motive" and

3   "intent."

4        It says that -- after the word "willfully" is

5   described, it says:  "Intent" and "motive" should not

6   be confused.  "Motive" is what prompts a person to act,

7   while "intent" refers to the state of mind with which

8   the act is done.

9        Well, every time money is mentioned, these are

10  inducements for this man to make these statements.

11  That's the motive.  Money is the motive behind this

12  case.

13        That's what the character of the evidence

14  demonstrates in this case.

15        Now, moving on to early January, up to

16  January 28th -- that's not listed in the indictment

17  either.  And we see that, on -- something like, on

18  January the 3rd, Mr. Batiste has a phone call with CW 2

19  that says, "I don't like surprises.  I don't -- there's

20  no trust between us."

21        And they terminate the conversations.

22        And on January the 10th, in Exhibit 51, CW 1

23  says -- he pretends -- they had -- they have a call

24  with Narseal Batiste.  Abbas pretends that -- like he

25  does not know what's going on.

Closing Argument by Mr. Clark                    129

1              And Exhibit -- and the next day, January

2    the 11th, which is Exhibit 50 -- 51 is for January

3    the 10th and 50, in reverse numbers, goes for January

4    the 11th -- CW 1 tells Patrick Abraham, "You gotta

5    organize more" again.

6              And on Page 13, they talk about they're just

7    trying get the money.

8              And on January 18th, CW 1 tells, I believe,

9    Patrick Abraham -- he says -- or no -- he tells Narseal

10   Batiste -- he finally gets in touch with Narseal and he

11   says, "CW 2 has the right to ask you what you're gonna

12   do with the money."

13             What the character of the evidence is showing

14   over a period of time more and more is that the object

15   is to get the money out of the guy, not to provide

16   terrorist aid -- aid to terrorists and not to give any

17   kind of material support.

18             The Government has a heavy burden to prove to

19   you with evidence of a convincing character that you

20   can rely upon and act upon without hesitation in your

21   own affairs.

22             And it's not there in this case.

23             It proves that the object was something

24   different.

25             And then we go to January the 28th.

1    Mr. Rotschild Augustine -- there's no evidence that he

2    was even there.  So he doesn't even know of the plan --

3    of the scam for money.

4            The best that you could probably infer is he

5    might know that Abbas lives on Miami Beach and has a

6    fancy apartment, is a guy -- a kid running around with

7    connections for a lot of money.

8            And on that occasion, on January 28th, CW 2

9    and Abbas are together.  They're certainly

10   collaborating now.

11           And he says on Page 110 -- or CW 2 tells

12   Narseal Batiste, "What happens is people take the money

13   and run."

14           So it proves even more that the object of this

15   whole plan of Narseal Batiste was to get the money and

16   not to provide any terrorist activity.

17           And he says again on Page 116, "Nobody knows

18   about the Chicago mission."

19           So certainly Rotschild Augustine could not

20   willfully join anything that he doesn't know about.

21           And so, at that time, Abbas also says that

22   he's the only person that's heard of it, except he

23   tries to say that even the Queen hasn't heard of it.

24   Yet, he said the Queen heard of it on January the 3rd.

25           Totally inconsistent statements again.  That's

1   the character of the evidence.  That's what's coming

2   from the witness stand.

3          Now, on 2-19 we hear Narseal Batiste meeting

4   with CW 2 and they talk about 85 percent of Minnesota

5   is Muslim.

6          And then he tells him, "I want horses."

7          And CW 2 says, "Horses?  Why?"

8          This is more evidence of a character that

9   shows that this was just a scam to get money.  There's

10  not a -- the object of this plan was not to go aid a

11  terrorist organization or give material support.  It's

12  just about trying to get the money.

13         Then we have evidence that's coming in about

14  this Illuminati on February the 24th.  I don't know

15  where the movies -- there's no evidence of where the

16  movies were watched, who was watching the movies, or a

17  discussion between his wife.

18         And this is supposed to be evidence of a

19  convincing character -- such a convincing character

20  that you would be willing to rely upon it and act upon

21  it in the most important of your own affairs, to charge

22  this man with terrorism -- Rotschild Augustine with

23  terrorism?

24         It's not sufficient under the law.  It wasn't

25  10,000 years ago.  It wasn't 200 years ago.  And it's

1    not today and it never will be.

2           When you carefully consider it as an impartial

3    jury and not make a decision based upon prejudice

4    against the Defendants for what they're charged with or

5    sympathy for the Government -- because we all have been

6    through terrible times over the last few years -- but

7    you have to be an impartial jury.

8           They knew what they were talking about when

9    they corrected that Constitution, ladies and gentlemen.

10          Then we see that, on March the 9th, the

11   evidence continues.  There's this claim of a patdown,

12   but there's no record of it.  He says he's got a body

13   recorder on, but we don't hear any record of it because

14   it didn't happen.  That's the kind of evidence that's

15   coming from this witness stand.  That's the character

16   from CW 2.

17          Then on March the 10th, there's this

18   conversation that CW had with Narseal Batiste in which

19   he asked him to take the pledge.  And he talks about --

20   instead of direction and control, they talk about that

21   alliance stuff.

22          In that conversation that he had Narseal

23   Batiste take the pledge, which was for money -- to get

24   money, he asked him to say -- he said "to commit

25   myself."

1        And Narseal Batiste said "to commit myself."

2        And then he said, "Brother," expecting Narseal

3   to say "Narseal Batiste" -- or "Brother Naz."

4        Instead, he says, "Brother."

5        He doesn't even understand that he was

6   supposed to say his name on March the 10th.

7        It reminds me of Gene Wilder in *Blazing*

8   *Saddles* giving a -- which is a farce, giving a

9   conversation -- you know, an oath to all the people out

10  there that were going to be deputies and, when he said,

11  "And you're going to do this and say your name," that

12  everybody said, "Your name."  It's a farce.

13       And then -- and it took him two or three

14  times.  He couldn't even get that right.

15       And then CW 2 has attempted to testify that

16  Rotschild Augustine or the brothers or somebody knew

17  that the oath was discussed in front of them.

18       And W1-1440-T, at 8:00 that night, refutes

19  that totally, because in that conversation between

20  Narseal Batiste and CW 2, CW 2 says, "When can we

21  discuss the oath in front of them?"  Because it hasn't

22  happened.

23       That's a material inconsistency.  That's the

24  character of the evidence that's coming from the

25  witness stand.

1       At this stage, there's still not evidence of a
2   conspiracy, the object of which is to provide
3   terrorism -- or provide material support to a terrorist
4   organization.
5       And there's obviously no evidence of any
6   willfulness on Mr. Rotschild Augustine's part because
7   he doesn't know about it.
8       And so we come to 3-16, March the 16th, which
9   was -- in previous talk, it was to be -- it was Narseal
10  Batiste is getting a building.  He was trying to get
11  money from somebody.
12      And Rotschild Augustine comes in and the first
13  thing that CW 2 does is directs Rotschild Augustine in
14  two places to stand at the door.  Everyone wants to
15  testify that this is some kind of paramilitary
16  organization.  It was orchestrated.
17      But the orchestration of this is more
18  reflected in the order of what happened at that
19  meeting, which is completely reverse of what's in the
20  indictment, because the indictment says that they
21  plotted and then it says they took an oath.  And that's
22  not what happened.
23      That's the character of the evidence in this
24  case.  The evidence controls.
25      Actually, when they got there, the first thing

 1   they did was try to administer the oath without talking

 2   about the plot.  And that was carefully orchestrated by

 3   the FBI, because, if they had done it the other way,

 4   there would have been some problems.

 5        So -- and when they did the oath, they had to

 6   explain it three times.  They hadn't heard this oath

 7   before.  All they did was ask them to put in their

 8   name.  The first person before Rotschild Augustine

 9   said -- used the term "prince."  Lyglenson Lemorin, I

10   believe, used the term "prince."

11        So when it came to Rotschild Augustine, he

12   said, "To commit myself to Prince Rot."  He didn't even

13   make a commitment to Al-Qaeda or anybody.  He thought

14   he was committing himself to himself.  He didn't even

15   understand the nature of this oath.

16        And then, of course, we've heard the

17   Government talk about, "Well, then they had a plan that

18   was discussed in front of everybody with the camera."

19   It was at that point that everybody -- that even CW 2

20   had to say -- everybody is like, "What's going on

21   here?"  Because there was some concern.

22        But what the Government doesn't talk about is

23   that they also had discussions in front of everybody

24   about the money.  That's the character of this

25   evidence.

Closing Argument by Mr. Clark                    136

1          On Page 54, when Narseal says, "Where's my

2    money?", CW 2 says, "I'm not disagreeing with you."

3          And on the next page, on 55, he says, "I'm

4    going to get you the money."

5          And then, after that, Narseal Batiste in front

6    of everybody accuses him of delaying him for the money.

7          And after CW 2 denies it, he confronts him

8    again, because the object of Narseal Batiste's plan is

9    to get this money.  It's not to commit terrorist

10   activities or provide material support.

11         Because of the order that has happened,

12   Rotschild Augustine didn't have an opportunity to hear

13   the plan and then go into -- read the oath and then

14   take an oath.

15         That's why, in taking the oath, he never

16   willfully joined any arguable plan to blow up any

17   buildings.  The evidence -- that's the evidence.

18   That's the way it comes out.

19         And it's not of a convincing character that

20   you can rely upon and act upon in the most important of

21   your own affairs.  That's why it's the case.

22         And the Government knew -- the FBI knew that

23   they could do it the other way around, but they chose

24   not to because they knew it would be -- that's part of

25   the evidence, too.

Closing Argument by Mr. Clark                    137

```
 1              They orchestrated it that way because they
 2     recognized that -- they knew that this was a time --
 3     they had every reason to believe that this is the
 4     time -- that this was just a scam to get money.
 5              And then there was discussion afterwards and
 6     Mr. Batiste assuring people, "Look, I'm just trying to
 7     get this money."  They didn't want to have anything,
 8     really, to do with this.
 9              And the evidence is going to show that,
10     corroborate that, too, because, on the 24th, Narseal
11     Batiste talks to CW 2.  He tells him he has a water
12     leak, which is not true.  But that's when they talk
13     about, "I'm going to get the van the very next day.
14     I'm going to go take these pictures."
15              That night, he buys a chip, tells him he's
16     busted, he needs money for a lawyer.
17              On 3-24, in the a.m. conversation and the p.m.
18     conversation, he goes and buys a chip because he --
19     CW 2 goes with him because he doesn't even have the
20     money to buy a chip.
21              On the next day, in the morning -- the
22     Government has introduced W2-01998, which is a 9:00 --
23     9:12 a.m. telephone call from Narseal Batiste to
24     Rotschild Augustine, who lives several blocks away from
25     him.
```

Closing Argument by Mr. Clark                    138

1        The whole conversation is about trying to get

2   a witness -- trying to talk to a witness across the

3   street because he's got that trial on Monday, the 27th.

4        And then he asked him, "I need you to go to

5   school with me."

6        He says "that thing."

7        It has nothing to do with taking pictures.

8   It's all in the context of getting a witness.

9        And he doesn't have a driver's license.

10  Rotschild Augustine drives him around.

11       And so that's not evidence of a convincing

12  character, that he willfully joined some plan and that

13  he thought he was going to try to blow up some

14  building.

15       Whatever the case is, the object at this point

16  is still just to scam this guy out of money.

17       And so, to corroborate all of this, after the

18  photos are taken -- and in the conversation on the

19  24th, I believe, Narseal Batiste says, "I'm going to

20  take photos in the morning and in the evening."

21       But on the 26th, Narseal Batiste, in

22  Government's Exhibit 80, has a conversation with CW 2.

23  On Page 24, he says, "The brothers don't want to be

24  involved."  It's the very next day.

25       Now, Government will tell you that -- tries to

Closing Argument by Mr. Clark                    139

```
1    argue from the evidence that the only reason somebody

2    didn't want to be involved is because Sultan Kahn-Bey

3    said that the -- this guy was an FBI agent.

4            Sultan Kahn-Bey hadn't been called yet.  The

5    evidence -- the character of the evidence does not hold

6    true to that because, on the 26th, Sultan Kahn-Bey

7    hadn't been called yet.  Nobody had -- not even dreamed

8    yet.

9            And the brothers -- Rotschild Augustine just

10   doesn't want to be involved with this scam to get

11   money.  He doesn't even want to be involved in the scam

12   to get money.  It's not even a scam to blow up

13   buildings.  There's no conspiracy to even willfully

14   join.

15           It's the character of the evidence that

16   counts.

17           And on the 27th, Narseal Batiste -- that's

18   where he get the $1,000.  It's a scam, getting this

19   $1,000 for attorney's fees when he doesn't even have an

20   attorney.

21           The FBI is seeing all this.  They know they're

22   being scammed for $1,000.  They have every reason to

23   understand that.

24           He says, "I have" -- and he tells him -- CW 2

25   tells him on Page 20 of that -- on Government's
```

Closing Argument by Mr. Clark                    140

1    Exhibit 81, "I'm working on the money."  It's all --

2    everywhere they go, it's the -- the object is all about

3    the money.  It's not about blowing up buildings.

4              On 4-1, Government's Exhibit 82 -- they even

5    have a meeting in which they're talking about moving

6    money.  The whole conversation is, "How are you gonna

7    move money and have different accounts?"

8              And Rotschild Augustine's not even aware of

9    all this.

10             But this shows that the object of what --

11   Narseal Batiste's plan was to just get money.

12             And he says -- that's when they -- CW 2 says,

13   "You're going to have to bring somebody."  He's only --

14   he says, "I only got one person in Chicago."

15             And he tells CW 2 they don't even know about

16   the plan.  He doesn't even know about the plan.

17             And CW 2 says, "The money's coming, coming,

18   coming," on Page 31.

19             Narseal Batiste denies that he was going to

20   steal the money, because CW 2 apparently accused him of

21   stealing money.

22             And then, on 4-3, Government's Exhibit 85,

23   there's another piece of evidence.  He talks that he's

24   got ten women, but they're not aware of any plan.

25             And then, on 4 --  April the 5th is when he

1    gets the $3500.  He's -- all that joy about

2    Government's Exhibit 89.  He was overjoyed because he

3    got $3500 because he's going to bring Sultan Kahn-Bey

4    down.  He actually used the money for his own purposes.

5          It's another scam for money.  The object of

6    Narseal Batiste's plan is to get money.  It's not a

7    conspiracy to provide material support.

8          Incidentally, these photos -- they're not

9    technical, expert photos that Narseal Batiste -- in

10   fact, there's a meeting that they have when they go

11   over the photos in which he tells him -- CW 2 --

12   "They're not even clear."

13         It's not even material support.  It's not even

14   evidence convincing of that element of the conspiracy

15   charge, that it's material support to a terrorist

16   organization.

17         At 4-6, there's a telephone call played

18   between Narseal Batiste and Rotschild Augustine.  He

19   happened to show up at the place in Liberty City, not

20   the warehouse.

21         He's wondering if there's a meeting.  He

22   doesn't have the keys.  Mr. Narseal Batiste says, "Just

23   consider yourself on post."

24         Somehow, this is going to be -- this is not --

25   ladies and gentlemen, the context of this evidence --

1   this is not evidence of such a convincing character to

2   prove Rotschild Augustine willfully had joined any plan

3   to blow up any buildings.

4           On 4-11, there's evidence that Rotschild

5   Augustine drove his wife in the family van to go to the

6   airport to pick up somebody, that is, Sultan Kahn-Bey.

7           And Sultan Kahn-Bey, on the day after, in

8   telephone calls that are in evidence, talked about --

9   he thought he was coming down here on an opportunity

10  for business, for money.  He says, "Got to be rich."

11          That's W1-03257 and W1-03259.

12          On April the 13th, CW 2 is trying to meet with

13  Sultan Kahn-Bey.

14          On 4-17, all this -- this separation occurs.

15  A lot of this had to do with the fact that money was

16  owed to a lot of these people for the work that they

17  had done.

18          Narseal Batiste was doing something that

19  people didn't really approve of in trying to get this

20  money.  It still proves the -- the object of the

21  conspiracy was just to get money from this guy.

22          And we might hear argument from the Government

23  that everything after this is somehow irrelevant.

24          Well, I don't think so, because, for one

25  thing, the Master Athea meeting took place on 5-16.

Closing Argument by Mr. Clark                    143

1    And Abbas al-Saidi came back in the picture again

2    because Narseal Batiste couldn't get the money.

3            At this -- Rotschild Augustine is no longer

4    involved at all.

5            Ever since the day after the photos were

6    taken, which he didn't know he was going to, he didn't

7    want to be involved.  So there's no evidence that he

8    willfully did anything.

9            And in that -- finally, we have -- on 4-21, we

10   have Narseal Batiste talking to CW 2, saying, "I

11   understand what you're going through," talking about

12   the fact that the brothers don't want to be involved

13   with him.  He was trying to get the key about this

14   thing -- brother coming from Europe to look at the

15   warehouse.

16           And then we also have at that time his wife

17   calling and saying, "Remove this guy out of my life."

18           And then we have the pawning of the camera.

19           And then, on 5-16, we have to the very end

20   evidence that the only object of Narseal Batiste's plan

21   was to get money out of this guy.

22           He talks to Master Athea and he tells him on

23   Page 10 -- he denies a physical war.  He said he's

24   never taken weapons.  He never intended to take

25   weapons.

Closing Argument by Mr. Clark                     144

 1          He said he agreed with Master Athea about

 2     "taking charge of ourselves" and he told Master Athea

 3     it's about finances, on Page 11.

 4          He denied on Page 13 that he was doing

 5     subversive work in a diabolical way.  He was just

 6     trying to get money.

 7          Finally, the arrest -- the investigation

 8     actually continued on because the arrests didn't occur

 9     until June 22nd.

10          So for May and June -- from May -- April

11     the 17th to June the 22nd, more than two months,

12     nothing is really going on.

13          And so the seizures and arrests occur.  And

14     there are no radical, extreme literature.  There's no

15     explosives or weapons.  There's a *Poison in Your Food*

16     book written by Senator Walter Mondale.

17          We simply have a construction office doubling

18     as someplace to read the Bible.

19          And I submit to you that the Government has

20     failed to prove beyond a reasonable doubt that there

21     was any illegal plan, first of all, to commit terrorism

22     or to provide material support to a terrorist

23     organization.

24          It's just -- it doesn't -- it's not convincing

25     enough.  The evidence is that there was an object --

1   was to scam somebody for money.

2          They certainly failed to prove beyond a

3   reasonable doubt that Rotschild Augustine willfully,

4   with a bad purpose, joined the plan.

5          When you take the evidence from the time prior

6   to this -- Abbas coming in about Rotschild Augustine

7   and what happened throughout this evidence, there's

8   no -- there's not sufficient evidence to prove that he

9   willfully joined anything after 12,000 [sic] tapes and

10  months of surveillance.

11         So after impartial consideration of the

12  evidence, I submit to you that he is not guilty of all

13  four counts.

14         Now, if Rotschild Augustine were convicted on

15  this evidence and this order of presentation that we've

16  been hearing, the true terrorists would win, because

17  then there would be -- terrorism would be in the

18  administration of our justice.

19         Then it would be tyrannical-type prosecutions.

20  It would be an affront to our principles behind the

21  impartial administration of justice, I submit to you.

22         It would be based upon fear about terrorism

23  and half truths.

24         MR. GREGORIE:  Objection, your Honor.

25         THE COURT:  Sustained.

Closing Argument by Mr. Clark                    146

1           MR. CLARK:  It would not be based on reason

2    and impartiality.

3           And then the terrorists would applaud a

4    conviction in this case, because they want to defeat

5    our principles more than anything else.

6           MR. GREGORIE:  Objection, your Honor.

7           THE COURT:  Sustained.

8           MR. CLARK:  We labor under the Great Seal of

9    the United States, this courtroom.

10          And that -- on the reverse side of that

11   seal -- you don't see it there, but it's -- you can see

12   it on a common one-dollar bill, because it applies to

13   everybody.  It's the most common form of monetary --

14   money that we have.  And it's got some very significant

15   things on there that I want to talk to you about.

16          It's in Latin because that's the universal

17   language since the translation of the -- the Vulgate

18   translation of the Bible in about 350 AD.  It applies

19   to everybody.

20          And it tells us on the reverse side novo --

21   "novus ordo seclorum," which means it's a new order of

22   things.

23          In other words, no longer is it true that the

24   king can do no wrong.  We can make mistakes.  Not only

25   is it okay to admit that our Government has made a

Closing Argument by Mr. Clark                    147

1    mistake.  It's necessary for the administration of

2    justice.  That's why we have jury trials.  We need jury

3    trials.

4           If we don't have jury trials, then power

5    corrupts and absolute power corrupts absolutely.  Then

6    people can do whatever they want.

7           John Langbein and Victor Rabinowitz have said

8    that -- about jury trials, "Are there any hippos in New

9    York City -- any hippopotamuses New York City?"

10          And the answer is, "Yes.  There's a couple in

11   the Bronx Zoo."

12          We have just enough jury trials in this

13   country to please cable TV.  It's necessary to acquit

14   the innocent in this country to show that we are a

15   government of the people, for the people and by the

16   people.

17          That -- that is what an American jury is all

18   about.  It has been brought down to -- at least no

19   longer is it true that the king can do no wrong.  It's

20   a new order of things.

21          When America admits that it makes a mistake,

22   it's a special place.  That's what makes America so

23   special.  Dictators can't admit that they're wrong.

24   They don't want to admit that they're wrong.

25          Franklin D. Roosevelt once said, "We have

Closing Argument by Mr. Clark                    148

1    nothing to fear but fear itself."

2          And, also, we have -- on the reverse side of

3    the seal, you will see the single eye.  It's in the

4    caprock that goes down on the pyramid.  You see it on

5    the dollar bill.  It's coming down on top of the

6    pyramid.

7          What that means is, until you have a single

8    eye on top of the building, the building's not

9    complete.

10          The single eye is a symbol about truth, and it

11    says that -- there's a famous Scripture that says that

12    the eye is the lamp of the body.  If the eye is single,

13    then the whole body would be full of the light of

14    truth.  But if the eye is not single, then the body is

15    full of darkness and falsehood.  This -- and then it

16    says:  And how terribly destructive and awesome that

17    darkness is.

18          Because when innocent people are convicted, it

19    undermines the entire system of justice.  It's wrong.

20    It's just wrong.

21          So I ask you to return a verdict of not guilty

22    as to all four counts as to my client, Rotschild

23    Augustine, because that's the only right and true

24    verdict from an American jury, based on the character

25    of the evidence that's been presented in this case.

Closing Argument by Mr. Casuso                    149

```
 1              I thank you for your service and your time and
 2    your attention in this matter.
 3              Thank you very much.
 4              THE COURT:  Mr. Casuso?
 5              MR. CASUSO:  Thank you, Judge.
 6              Ladies and gentlemen, I'll be very brief
 7    because my voice is about ready to give out here.
 8    Okay?  I won't go long.  I just have a few things to
 9    say because it's kind of like all been said before.
10              Look, the way the system works is, if we all
11    do our jobs, the system is supposed to work.  The
12    system is supposed to acquit the innocent and convict
13    the guilty.
14              What do you do?  Your job is to be impartial,
15    have an open mind, come in here using your common sense
16    and look at the evidence.
17              Listen to the evidence.  When you go back
18    there into the jury room, you make a verdict.
19              "Verdict" comes from the Latin, "veritas,"
20    meaning truth.  Okay?  A true verdict.
21              You consider the evidence and you follow the
22    law.  It's very important that you do both, that you
23    follow the law.  And the law is what Judge Lenard gave
24    you.  There are no other laws in this case.
25              What do we have here?  Look, anyone, anyone,
```

Closing Argument by Mr. Casuso                    150

1   who looks at this case -- anyone who's ever had job

2   dealing with the public, anyone who's a car salesman, a

3   store salesman -- anybody dealing with the public, when

4   you come across a customer -- okay? -- if you've been

5   doing it for a while, you'll know within 15 minutes

6   whether you have a serious customer or you don't --

7   okay? -- if there's somebody wasting your time or not.

8           I suggest, when you look -- when you look at

9   this case -- okay? -- when you look at the evidence in

10  this case and what happened here, it's very obvious

11  that this was not a conspiracy to blow up anything or

12  do anything.  It's a conspiracy to scam money from

13  these two people.  Okay?

14          What do -- why do we say that?  Okay?  What's

15  the evidence?

16          Look, first of all, these people, all these

17  brothers -- okay? -- including Narseal Batiste --

18  they're not political.  They're not concerned with

19  problems in the Middle East.  They're not concerned

20  with these kind of problems that happened that bring

21  about this terrorism as we know it.

22          They're concerned with making a living, paying

23  their bills, that sort of thing.

24          What's the problem here?  They're members of a

25  church that's a little weird.  Why?  It's Muslim this.

Closing Argument by Mr. Casuso                    151

1    It kind of sounds like Middle Eastern.  It's a little

2    strange.  Okay?  It's not a Catholic church.  It's not

3    a Protestant church.  It's not a Jewish synagogue.

4    It's a little strange.

5         Well, let me tell you -- okay? -- the First

6    Amendment -- and you have it in the instructions.

7    Okay?  That is the cornerstone of all our freedoms.

8    This is what makes us a free people.

9         Freedom of speech.  Freedom of religion.  We

10   don't get prosecuted in court for our religious

11   beliefs.  We don't -- that doesn't happen in the United

12   States.

13        Freedom of association.  We can associate with

14   whoever we want and, as long as we don't violate the

15   law, it's none of their business.  It's none of their

16   business who we pray to, what movies we watch, who

17   we -- who our friends are.

18        But what happens here?  Look, they bring the

19   informant -- they have a first informant.  With the

20   first informant it doesn't work.  Narseal Batiste is --

21   he's in it for the money, the money, the money.  Every

22   other thing is the money.

23        They bring a second informant.  When he's not

24   biting, the second informant, again, money, money,

25   money.  He's not concerned with any weapons.  He's not

Closing Argument by Mr. Casuso                                152

1   concerned with any explosives.  He's not concerned with

2   anything except getting some money from this guy.

3         Now, let me tell you something:  People from

4   the FBI, 16 years' experience, you've got to know

5   something something's wrong here, something's not

6   working here.

7         You have this guy under surveillance for,

8   like -- I don't know how many months and you keep

9   going and going and going.

10        And what happens here is unbelievable, because

11   they reach down into the -- into the poorest city in

12   Dade County, people struggling -- okay? -- to pay their

13   bills.  These are not rich people.

14        These are people, you know, trying to do

15   something for their community, whatever.  Nobody's --

16   nobody is a saint here.  Okay?  But they're not

17   terrorists.

18        And if you work terrorism and you know what

19   you're doing, something is very wrong in this case.

20   It's not happening.

21        All this man wants is money.  They keep

22   baiting him.  And you know what?  You're not supposed

23   to do that.  The Judge told you you're not supposed to

24   entrap people.

25        Why?  The instructions say it's against public

Closing Argument by Mr. Casuso                    153

```
 1   policy.  Do you know why it's against public policy?
 2   Because we're human.  We're all human.  We're all
 3   sinners.
 4          We all go -- you know what?  If you read the
 5   Bible, Adam took the apple from Eve.  If you pray to
 6   the Lord the Lord's Prayer, "Lead us not into
 7   temptation and deliver us from evil."
 8          We're human beings, and we go for it.
 9          So as long as we're not criminals, they're not
10   supposed to bait us into committing a crime.  They're
11   not supposed to take decent, law-abiding people and
12   turn them into criminals.
13          I got a 20-year-old boy here -- he's 24 now --
14   that I'm representing.  Abbas al-Saidi, he's chasing
15   Narseal Batiste.  He chases him and he chases him and
16   he doesn't find him.
17          And what does he do when he finds him?  And
18   you see the tape there.  He's frantic.  He starts
19   working him.  He starts working him.
20          And you see, like, all this trash talk that a
21   20-year-old -- well, you know, the law says you can
22   talk all the trash talk you want as long as it's not
23   criminal.
24          Instruction at Page 27:  The type of war under
25   the statute does not require the presence of an enemy,
```

Closing Argument by Mr. Casuso                    154

1    foreign state or actual war.  However, the Defendant

2    must conspire to use force, not just to advocate the

3    use of force.

4           And I'm talking about -- what he's talking

5    about, oh, this war, this -- people in Hialeah and

6    people in Opa-Locka, it's trash.  Trash talk.  It's not

7    even charged.  It's not even a part of anything.  You

8    can't conspire with an informant.

9           What's the evidence here?  If you put

10   yourself -- do you think that anyone from Al-Qaeda

11   would take a second look at Narseal Batiste?  Are they

12   fools?  They're not fools.  Would they take a second

13   look at him?

14            This is the plan:  salt shakers.  Sleeping

15   gas.  People -- the Sears Tower.

16           And he wants $50,000.

17           I suggest to you that it probably costs more

18   than $50,000 in explosives to blow up that building.

19           It's all trash.  It's all fiction.  It's all

20   stuff that isn't even, like, planned out.  It's all,

21   like, foolishness for months and months and months.

22           I told you when we started, you're going to

23   listen to two months here of nonsense.  It's not even

24   serious stuff.  You think they'd take a second look.

25            But you know what?  Because it's the FBI and

Closing Argument by Mr. Casuso                    155

1   because they can and because of the political climate

2   at that time, like what Narseal Batiste said.  Okay?

3           And I have no love for Narseal, because I

4   think he used my client.  Okay?  I think he used the

5   boy, because he shouldn't have had him driving him

6   around on his errands.  He shouldn't have done that.

7           Because he looked up to him.  Burson looked up

8   to Narseal.  He was his boss.  He taught him a trade.

9   His pastor.  And he used him.

10          And I'm sorry to say that, but he did, because

11  of all these shenanigans that he had going on, all

12  these shenanigans that he had when he scammed $1,000.

13  He spent it on his bills.  When he got the -- it's not

14  like they divided anything.  It was for him.

15          And he shouldn't have had -- he shouldn't have

16  had Burson driving him around because he had -- didn't

17  have a driver's license.  Maybe he should have paid his

18  ticket and gotten a driver's license, like everybody

19  else.

20          So when -- so then the prosecutor stands up

21  here and says, "Oh, Burson was at these meetings."  He

22  wasn't at these meetings.  He drove that man over there

23  and he sat over there in the corner and he did not

24  participate, participate, in any meetings with the

25  informant.  Okay?

Closing Argument by Mr. Casuso                    156

1          There's only one conversation as far as, like,

2     this informant.  Then it was this al-Saidi guy at the

3     beginning on the 7th of November.  There's no other

4     talk.

5          There are no other tapes here that you have of

6     any brother talking to another brother about any plot

7     to blow up anything.

8          There is no tapes or anything that you have of

9     any -- any conversations at this warehouse when the

10    informant wasn't there of any -- between the -- between

11    the brothers by themselves of any plot to do anything

12    or blow up anything.

13         He said, "I don't want the brothers involved."

14         But you know what?  He should not have had

15    Burson drive him around when he spoke to this man,

16    because he's here because of him.  Okay?  That's the

17    bottom line.

18         Did he conspire to blow up anything?  You be

19    the judge.  Okay?

20         We trust you to make the right decision in

21    this case.  We trust you to bring in a just verdict.

22    Because when you bring in a just verdict and you do

23    justice in this case, everybody wins here.  Everybody

24    wins.

25         But I don't have to tell you any more.  You

```
 1    know very well what happened here.

 2              That's all I have.  Thank you.

 3              THE COURT:  We're going to take a ten-minute

 4    recess.

 5              Do not discuss this case either amongst

 6    yourselves or with anyone else.  Have no contact

 7    whatsoever with anyone associated with the trial.  Do

 8    not read, listen or see anything touching on this

 9    matter in any way.

10              If anyone should try to talk to you about this

11    case, you should immediately instruct them to stop and

12    report it to my staff.

13              Remember, until such time as you have heard

14    all of the closing arguments and I have instructed you

15    to begin your deliberations, you simply are not to talk

16    about this case.

17              Please be back in the jury room in ten

18    minutes.

19              (Whereupon, the jury exited the courtroom at

20    3:03 p.m. and the following proceedings were had:)

21              THE COURT:  You may be seated for a moment.

22              Yes.

23              MS. ARANGO:  Judge, we've been told by some of

24    the marshals -- or a court security officer that they

25    found in one of the bathrooms a stack of religious
```

1    cards.

2          One of them -- and then there was also one

3    left on the table where the marshals are checking

4    people in.

5          This one just is a prayer and it says "Hope

6    for today."

7          I think -- I don't have --

8          THE COURT:  Where are these from?

9          THE COURT SECURITY OFFICER:  I went to the

10   ladies' room after court started and, as I walked in, I

11   noticed a lot of these cards by the sink.  So I picked

12   them up.  Then I check the ladies' stalls and I didn't

13   see any more.

14         Then I had another deputy marshal go to the

15   men's room and he check the men's room.  He didn't find

16   any cards.

17         When I asked him, they said that they had one

18   card on the table.  So I grabbed them and I brought

19   them.

20         THE COURT:  Would you check again, please, the

21   ladies' room?

22         THE COURT SECURITY OFFICER:  Certainly.

23         MS. ARANGO:  I just want to make sure, your

24   Honor, that, you know, the -- any family members or

25   witnesses are admonished that they're not to have any

1    contact with the jurors.

2         THE COURT:  Well, they're not supposed to be

3    using these bathrooms at all.  This is only -- the

4    floor -- the bathrooms on this floor are for jurors

5    only.

6         It is not appropriate for anyone to be leaving

7    any material in the bathrooms here.

8         I'm going to have someone stationed at each

9    bathroom.

10        We're taking a ten-minute recess.

11        We're going straight through, Mr. Gregorie.

12        So we're finishing today.

13        MR. GREGORIE:  I'm ready, Judge.

14        THE COURT:  Lisa, are you up for it?

15        THE COURT REPORTER:  I'm okay, Judge.

16        THE COURT:  Okay.  So you've got about --

17    well, we'll take ten minutes from now.  But you have to

18    be back in the courtroom by 3:15.

19        (Thereupon a recess was taken, after which the

20    following proceedings were had:)

21        THE COURT:  We're back on United States of

22    America versus Narseal Batiste, et al., Case

23    No. 06-20373.

24        Counsel, state your appearances, please, for

25    the record.

```
 1            MR. GREGORIE:  Richard Gregorie and Jacqueline
 2   Arango on behalf of the United States, your Honor.
 3            MS. JHONES:  Ana Jhones on behalf of Narseal
 4   Batiste, who is present.
 5            MR. LEVIN:  Albert Levin for Patrick Abraham,
 6   who is present.
 7            MR. CASUSO:  Lou Casuso on behalf of Burson
 8   Augustin, who is present.
 9            MR. CLARK:  Nathan Clark for Rotschild
10   Augustine.
11            MR. HOULIHAN:  Richard Houlihan.
12            MR. VEREEN:  Roderick Vereen on behalf of
13   Stanley Phanor, who's present, waiting on Naudimar
14   Herrera to come back into the courtroom.
15            MR. GREGORIE:  We're missing one Defendant,
16   your Honor.
17            THE COURT:  Right.
18            Where is Mr. Herrera?
19            MR. HOULIHAN:  Judge, I was told -- I guess he
20   went down to have a smoke.  I apologize.
21            (Thereupon, Defendant Naudimar Herrera entered
22   the courtroom and the following proceedings were had:)
23            THE COURT:  Naudimar Herrera is now here.
24            Bring in the jury, please.
25            THE COURT SECURITY OFFICER:  Stand for the
```

```
 1    jury, please.

 2            THE COURT:  All Defendants are present.

 3            (Whereupon, the jury entered the courtroom at

 4    3:19 p.m. and the following proceedings were had:)

 5            THE COURT:  You may be seated.

 6            You may proceed, Mr. Levin.

 7            MR. LEVIN:  May it please the Court.

 8            Ladies and gentlemen, good afternoon.

 9            THE JURY:  Good afternoon.

10            MR. LEVIN:  I suspect the last thing you

11    wanted on a Friday afternoon was to hear from a fifth

12    defense attorney with regard to the issues of this

13    case.

14            But you're going to have to, unfortunately,

15    because I have a job to do on behalf of my client,

16    Mr. Abraham.

17            A lot of what I say may be repetitious.  Don't

18    hold that against me.  It's not an easy thing to stand

19    up here in front of you all and not be repetitious or

20    not make some of the same arguments that you've heard

21    already.  But I'll do the best I can to use my time

22    wisely and expeditiously.

23            One of my greatest fears is that -- well, when

24    I was sitting down there listening to some of my

25    colleagues, with all due respect to them, falling
```

 1    asleep, that was my greatest fear.  My second greatest

 2    fear is you guys falling asleep.

 3              So I'm going to try to avoid that.  Because I

 4    told you in my opening statements I was going to sing

 5    my opening statement.  Of course, I was kidding.  I

 6    actually thought about singing my closing argument.

 7    And, again, I'm kidding.

 8              But what you are going to hear is some music,

 9    which might help to change the mood a little bit.

10              My client, Mr. Abraham, is not guilty, as

11    charged, with regard to all the counts in this

12    indictment.

13              Ms. Arango was up here for two hours yesterday

14    and, basically, devoted the last five minutes of her

15    closing argument telling you a little bit about the law

16    in this case.

17              That's really, frankly, the most important

18    aspect of this case.  Because, if it was just based on

19    the facts, you really wouldn't really know how to

20    navigate through the facts, number one.

21              Number two, you obviously have a burden of

22    proof that you need to deal with, which you've heard

23    about.  That is proof beyond a reasonable doubt, which

24    is, again -- as Mr. Clark pointed out on numerous

25    occasions and as have some of my other colleagues told

1   you, proof beyond a reasonable doubt is proof of such a

2   convincing character that you would be willing to rely

3   and act upon it without hesitation in the most

4   important of your own affairs.

5          I just leave you with this thought before I

6   launch into the balance of my closing argument.  I

7   leave with you this thought.

8          The Government began this -- what I call a

9   sting operation.  It's where they try to -- and they

10  have, in my opinion, manufactured a crime here.  They

11  started this in September of 2005, and it continued

12  until May of 2006.

13         Question:  Why at no time in that entire

14  period of time was any weapon ever asked for?

15         Remember, the lists were not the idea of

16  Narseal Batiste.  The lists were the ideas of the FBI

17  and the informant.

18         You might recall Abbas al-Saidi told you that,

19  "The FBI told me to have a list prepared" and Elie

20  Assaad told you that, "That was my idea.  I had done it

21  in a previous case."

22         Well, the lists are handed out.  And what

23  happens over the course of time in this case?

24         Not one weapon is ever asked for.  Not one

25  explosive is ever asked for.  Not one bomb is ever

Closing Argument by Mr. Levin                              164

 1    asked for.  Not one gun is ever asked for.  Not one

 2    bullet is ever asked for.

 3           If there is intent to conspire to commit these

 4    acts, I would submit to you, ladies and gentlemen, that

 5    these items would have been asked for.

 6           It is patently obviously, at least to me, that

 7    this case, as my colleagues have asserted, is strictly

 8    about a really stupid attempt by Narseal Batiste to

 9    acquire money from these Government informants.

10           That's what this case comes down to.

11           The Government in this case, the prosecutors,

12    have presented evidence with regard to this Jeff Fort

13    individual.

14           They want to do that primarily because

15    Mr. Batiste mentions Jeff Fort and -- on December

16    the 16th, in his first meeting with Elie Assaad.

17           So they know want to take this notion of Jeff

18    Fort and compare the Jeff Fort organization with

19    Mr. Batiste and the brothers sitting in this courtroom.

20           There's a real big difference, ladies and

21    gentlemen, aside from the fact that we know that Jeff

22    Fort ran a gang of murderers, drug dealers, people that

23    were enforcers and intimidators -- you heard testimony

24    from Dan Young that they would go into a park and they

25    would say, "This is our park.  Stones rule."  We don't

1    have that here.

2            That may sound like minutia with regard to

3    what they're going to be able to tell you.  This is the

4    last defense lawyer you're going to hear from.  Some of

5    you might say, "Well, thank God for that," but,

6    hopefully, not at this point.

7            Mr. Gregorie is going to have an opportunity

8    when I'm finished to come up and offer what's called a

9    rebuttal argument.

10           He's going to tell you why they brought Jeff

11   Fort.  He's going to say, first of all, "Well, we

12   brought Jeff Fort -- it wasn't our idea to bring Jeff

13   Fort.  It was Mr. Batiste's idea.  He's the one that

14   mentioned Jeff Fort."

15           He's going to talk about Dan Young and his

16   testimony and the similarities and the code words and,

17   you know, "Mecca" is "Chicago."  You're going to hear

18   this again.

19           That's simply designed for you to be

20   influenced on matters that are really collateral to

21   this case.  The one major distinction between Jeff Fort

22   and Narseal Batiste and the brothers here is that Jeff

23   Fort asked for and took delivery of a LAWs rocket from

24   the Libyan Government.

25           And I ask you again, ladies and gentlemen, if

Closing Argument by Mr. Levin                 166

1    the intent in this case was to conspire to provide

2    material support as charged in Count 1 and Count 2, to

3    blow up buildings in interstate commerce or buildings

4    of the FBI or to wage a war against this country -- ask

5    yourself, ladies and gentlemen, how strange it is that

6    at no time was a weapon ever asked for.

7              I can stand up here and say -- and try to

8    humor you by saying you can't wage a war with boots,

9    you can't wage a war with the 35- or $4500 that he got,

10   you can't wage a war with the other items that were

11   given, the money, the boots.  You know what they are.

12             None of those items you'd be able to wage a

13   war with.  That's what he got.

14             Now, these jury instructions that you've heard

15   about so far, they're very, very important.  And I

16   don't mean to be repetitious, but it's important.  So I

17   have to be, because that's what you have to decide this

18   case upon, ladies and gentlemen, the law, not upon the

19   facts -- well, pardon me.  Yes.  The facts as applied

20   to the law, as filtered through the law, because that

21   was the oath that you took.

22             The oath that you took was to follow the law,

23   whether you agreed with the law or disagreed with the

24   law.  But that was the oath that you took, to follow

25   the law.  I'm sure you're going to follow the law.

```
 1    That's why you're sitting here.

 2            And, by the way, thanks very much for sitting

 3    here for the last three and a half months of your

 4    lives.

 5            Your service is before and beyond the call of

 6    jury service.  You're, in essence, sitting in six

 7    separate trials.  So it's almost like sitting jury

 8    service six times.

 9            They say that jury service is one of the

10    highest civic duties that a citizen can render.  And

11    everybody thanks you for that.  There's no question

12    about that.

13            But it's a critical time in this case because

14    soon the talking will cease and the real talking will

15    begin, and that is your deliberations, when you go back

16    into the jury room and you decide whether or not -- and

17    this is the issue, ladies and gentlemen -- whether or

18    not the prosecution has proven beyond a reasonable

19    doubt the case.

20            And that's what it comes down to.  They either

21    proved it beyond a reasonable doubt or they didn't

22    prove it beyond a reasonable doubt.

23            Now, mind you, the jury form -- the verdict

24    form, rather -- it says "guilty," "not guilty."  Those

25    words simply mean proven, not proven.
```

Closing Argument by Mr. Levin                    168

1              You'll never see on the verdict form a line

2      that says "innocent."  That's an important distinction,

3      because it talks about what your task is.

4              It's not to determine whether something -- "I

5      smell a rat in Denmark," if you will, that this is,

6      like, really kind of strange stuff, because it

7      obviously is.

8              You know, the Moorish Science Temple -- none

9      of you probably had ever heard of that before coming

10     into this courtroom.  You know?

11             You've heard, you know, of blood letting and

12     you've heard of the movies, all this stuff that would

13     be so easy for you to take and, if you really wanted to

14     reject the law, if you really wanted to disregard the

15     law, you know, and you really wanted to be judgmental

16     in the wrong way, that is, you just don't agree with

17     their lifestyle -- and it's not fair for me to say, you

18     know, "I don't like the tie you wear" or, you know, "I

19     think you should wear your hair a certain way" or, "I

20     don't like the job that you do," you know.

21             That's not for me to say, just like it's not

22     for the Government to say the type of religion people

23     should be able to practice.  As long as it's within the

24     law, then it's okay, as strange and bizarre as it might

25     seem.

 1          You know, I was in a grocery store about six

 2   months ago and I saw a woman.  She was probably, you

 3   know, 50-ish or thereabouts, whatever.  Age is

 4   irrelevant.

 5          She was wearing a T-shirt which said "I love

 6   my country."  It said that on the front, "I love my

 7   country."  On the back it said "But I hate my

 8   Government."

 9          She was at a grocery store somewhere in the

10   south part of the county, wearing a shirt like that,

11   you know, a normal enough person.  But that's what this

12   country is all about.  You can express your views, as

13   long as they're within the law.

14          So the question becomes:  Has the law been

15   violated here or has it not been violated here?

16          Did Patrick Abraham have the specific intent

17   to violate the law in this case?  I submit to you he

18   did not.

19          Was Narseal Batiste entrapped or did he not

20   have the specific intent or did any of these brothers

21   have the specific intent, that is, with an evil

22   purpose, to do something wrong, to do something which

23   the law forbids you to do?

24          I submit to you they did not.  And the

25   evidence bears it out.

Closing Argument by Mr. Levin                    170

1          Ms. Arango talked about, you know, the purpose

2    of taping is to see what's going on in a person's mind.

3    That's what this case is about, what's going on in a

4    person's mind.

5          But let's get back to your deliberations,

6    because when you go back into the jury room, you're

7    going to start by electing a foreperson, as Her Honor

8    has instructed to you to do.

9          And then I would anticipate and hope that you

10   take your time and you go through this evidence and you

11   listen to tapes and you read transcripts and you

12   discuss testimony and then, if you can, you decide

13   beyond a reasonable doubt whether or not you are

14   convinced of the guilt of these Defendants or you are

15   not convinced of the guilt of these Defendants.

16         But I must say to you this:  This could be a

17   long process.  And you can take all the time that you

18   need to make these separate determinations which you

19   have to make.

20         You have six Defendants.  Each Defendant is

21   charged with four counts.  You have 24 counts to

22   decide.  You need to take all the time that you need to

23   carefully go through this evidence and make a just

24   decision.

25         I have all the confidence in the world that

Closing Argument by Mr. Levin                    171

 1    you can do that.

 2            However, you may not all agree.  Some of you

 3    might say, "I think this person's guilty."  Some of you

 4    might say, "I think this person's not guilty."  Seven

 5    of you might say, "I think this one person is guilty."

 6    Five of you might say, "This person is not guilty."

 7            But that's not a verdict.  You need to try to

 8    come up with a verdict.  But there's no requirement

 9    that you come up with a verdict.

10            Another thing I want to caution you against --

11            MR. GREGORIE:  Objection, your Honor.

12            THE COURT:  Sustained.

13            MR. LEVIN:  One thing I want to caution you

14    about is what we call a compromised verdict.  A

15    compromised verdict is where you say and you decide

16    amongst yourselves, "Well, you know, I think he's

17    guilty."

18            "I think he's not guilty."

19            "But we'll compromise."

20            "We'll, if you say he's not guilty, I'll say

21    he's guilty."

22            I want you to avoid that kind of situation.  I

23    want you to stick to your guns, is the bottom line.  I

24    want you to stick to your honestly held beliefs,

25    whatever they might be, in accordance with the Court's

Closing Argument by Mr. Levin                    172

1    instructions.

2         Now, I have to go over a couple of the

3    instructions in this case.

4         You've already been read the instructions, and

5    I assume you already have a package with you.  I'd like

6    to go over a couple of the instructions.

7         Very important, this instruction, No. --

8    Page 2 of 36.  It's the bottom paragraph.  It talks

9    about the indictment is not evidence of a -- guilt

10   against any Defendant and that every Defendant is

11   presumed to be innocent.

12        The law does not require a defendant to prove

13   innocence or to produce any evidence at all and, if a

14   defendant elects not to testify, you cannot consider

15   that in any way during your deliberations.

16        Now, why do I stress that?

17        Naturally, you might say to yourself, "Well,

18   somebody's being accused of doing something wrong.  Why

19   don't they tell us they didn't do it?"

20        The law says they don't have to and you cannot

21   consider the fact that a defendant -- my client,

22   Mr. Abraham, elected not to testify.

23        When you go back into the jury room, if any

24   one of your members says, "If only Mr. Abraham would

25   have taken the stand and said he didn't do it, I might

Closing Argument by Mr. Levin

1    feel differently," stop them, because this instruction

2    says you are not to consider that in any way during

3    your deliberations.

4           You already know the definition of "reasonable

5    doubt," which is probably the most important

6    instruction in this package, because that's the way you

7    have to decide this case:  Proof beyond a reasonable

8    doubt -- on Page 3 of 36 -- is proof of such a

9    convincing character that you would be willing to rely

10   and act upon it without hesitation, without hesitation,

11   in the most important of your own affairs.

12          Whatever the most important of your own

13   affairs is -- or are, that's the proof you have to

14   find.

15          And Mr. Clark went over that.  So I'm not

16   going to belabor that.

17          But if you have any hesitation whatsoever,

18   if you have a reasonable doubt that these informants

19   went too far, if you have a reasonable doubt that

20   Mr. Abraham's true intent was really to go along with

21   Mr. Batiste's plan and just go along with it, sit there

22   and say very little, drive him here, drive him there,

23   to get paid, then you have to find him not guilty, even

24   though he's a Moor, even though there's talk about

25   watching movies, even though it sounds like Narseal

1   Batiste controls people.

2           That's really not what this case is about, but

3   that's what the Government wants you to believe it's

4   about.

5           And some of these have already been reviewed

6   by some of my colleagues.

7           We know about the testimony of some witnesses

8   must be considered with more caution.  That's at Page 8

9   of 36.

10          And Ms. Jhones made reference to a yellow

11  light.  It's as if the Court is telling you, when you

12  evaluate that type of testimony, that is, people that

13  use addictive drugs, such as Mick Coriolan, if you

14  consider marijuana an addictive drug -- that's entirely

15  up to you.

16          I recall, when I was cross-examining him, I

17  probably went too far in my cross-examination with

18  regard to his marijuana use.  I think I beat the

19  proverbial dead horse by maybe going a little too far

20  with him.

21          But the point was the guy smoked marijuana, by

22  his own account, every day or every other day for the

23  last eight or nine years.  There was no scientific

24  evidence presented.  I can't tell you what that would

25  be like to do and to have -- what kind of memory you

1    might have after leading that kind of a lifestyle.

2            But the law tells you you've got to be careful

3    when you evaluate that type of testimony.  The law at

4    Page 8 of 36 says that that type of testimony must be

5    considered with more caution.

6            Also, a paid informant may have a reason to

7    make a false statement because the witness wants to

8    strike a good bargain with the Government and, although

9    these people may be entirely truthful, this type of

10   testimony must be considered with more caution.

11           Now, I'll have examples of that as I go along

12   with my closing argument.  But just to digress for a

13   second, you know, this case really starts with Abbas

14   al-Saidi.

15           And I ask you, ladies and gentlemen, and I ask

16   the Government in their rebuttal if, in fact, the

17   theory is that Mr. Batiste actually began and started

18   having -- having had these thoughts back in 1998, why

19   did it take him until September of 2005, when he met

20   Mr. Abbas al-Saidi, for these ideas to come to

21   fruition?

22           He had seven years to get something going,

23   seven years to get something going.  Why did it take

24   seven years for him to get something going?

25           They're going to say, "Oh, he was starting a

Closing Argument by Mr. Levin                        176

 1    movement.  He didn't have any people.  He was trying to

 2    raise resources."

 3            The guy lived in Chicago.  They equated him

 4    with Jeff Fort.  Okay?

 5            Jeff Fort was the master at getting money out

 6    of people.  Jeff Fort still rules, according to Dan

 7    Young, this gang in Chicago.  Okay?  He had soldiers in

 8    Chicago, even back in 1998, according to the testimony.

 9            Why did it take him seven years to end up

10    sitting in front of a federal jury facing an indictment

11    charging allegations of terrorism?

12            I'll tell you why:  Abbas al-Saidi.  Abbas

13    al-Saidi.  The guy's been an informant since he was

14    16 years old.

15            You've heard that already.  I'm sorry.  I've

16    got to repeat it.

17            He used to work in a convenience store in

18    New York.  He used to selectively pick who he would rat

19    on and who he wouldn't rat on, per his own testimony.

20            He knew the game.  He got put up in an

21    apartment in Brooklyn for a period of time.  He got

22    paid per case in New York for a period of time.

23            And then he came down here, beat up his

24    girlfriend, picked up the phone, called up Detective

25    Branzetti -- we don't know who he is -- he's a New York

Closing Argument by Mr. Levin                    177

1    police detective -- and said, "Branzetti, can you help

2    me again?"

3            And, of course, you've heard the famous line,

4    "I'm out of gas" -- or, "You're out of gas, pal."  And,

5    you know, the rest is history.  He gets out.  And now

6    the ball starts to roll.

7            Now, you heard a portion of the instruction

8    dealing with the law of conspiracy read to you by

9    Ms. Arango.

10           She read a portion of that instruction.  I

11   will read to you the other portion of that instruction.

12           We know at this point that an essential

13   element of each of these offenses is the element of

14   willfulness, that is, that the Defendant, knowing the

15   unlawful purpose of this plan, willfully joined in it.

16           And then, of course, "willfully" later gets

17   defined in the instructions as an act committed

18   voluntarily and purposely with the specific intent to

19   do something the law forbids, that is, with bad purpose

20   either to disobey or disregard the law.

21           That definition is contained at Page 29 of 36.

22           But that is an essential element of each of

23   the four charges as contained in this indictment.  And

24   as it pertains to Mr. Abraham, as I believe the

25   evidence has shown, that is, that Mr. Abraham did not

Closing Argument by Mr. Levin                178

1    have the requisite specific intent to do something that

2    the law forbids and, accordingly, the only appropriate

3    verdict would be not guilty.

4           Now, the part of the instruction that

5    Ms. Arango left out concerning the law of conspiracy is

6    found at Page 14 of 36.  That's in the middle of the

7    page.

8           And it reads as follows:  Of course, mere

9    presence at the scene of a transaction or event or the

10   mere fact that certain persons may have associated

11   with each other and may have assembled together and

12   discussed common aims and interests does not

13   necessarily establish proof of a conspiracy.

14          Also, a person who has no knowledge of a

15   conspiracy, but who happens to act in a way which

16   advances some purpose of one, does not -- does not --

17   thereby become a conspirator.

18          Within these instructions -- and I believe

19   it's towards the beginning of the instructions.  You

20   don't have to flip back to the front of the

21   instructions.

22          But there is an instruction which basically

23   tells you that you are to consider these instructions

24   as a whole -- that would be at Page 2 -- which

25   admonishes you -- and I use that word strongly -- you

 1   must -- at Page 2 of 36 -- also follow the law as I

 2   explain it to you, whether you agree with that law or

 3   not, and you must follow all of my instructions as a

 4   whole.

 5          You may not single out or disregard any of the

 6   Court's instructions on the law.

 7          Now, finally, getting back to the instruction

 8   with regard to conspiracy, it's also very important for

 9   you to understand that an individual cannot conspire

10   with a government informant or an agent of the

11   Government working at the direction and control of the

12   Government.

13          For example, that would be at Page 14 of 36.

14   That's what I'm referring to.

15          I'll repeat what it says, since I was

16   paraphrasing, but fairly close to what it says:  You

17   are instructed that a government agent and/or an

18   informer acting on behalf of the Government in an

19   undercover capacity cannot be a co-conspirator and,

20   therefore, no conspiracy may exist between the

21   Defendant and the government agent and/or the informer.

22          Now, that's the law.

23          There are other instructions in there.  I

24   highlighted the ones that are pertinent and relevant.

25   There are other counts that have the same instructions.

Closing Argument by Mr. Levin                    180

1          As I said, each of the four counts requires

2     that the Government convince you beyond a reasonable

3     doubt that my client and the other Defendants had the

4     specific intent to do something which the law forbids,

5     that is, with evil or bad purpose, and that must be

6     proven to you beyond a reasonable doubt.

7          And, again -- and I'll hopefully say this for

8     the final time -- proof beyond a reasonable doubt is

9     proof of such a convincing character that you would be

10    willing to rely and act upon it without hesitation in

11    the most important of your own affairs.

12          What input goes into making decisions of the

13    most important in your own affairs?  That's what we're

14    talking about here.

15          What goes into your mind and what do you

16    factor in when you make the most important decision of

17    your own affairs?

18          I'm not going to tell you what those decisions

19    are because they're individual to every person, whether

20    it be getting married, buying a residence, getting a

21    new job.

22          Those are important decisions that we all

23    make, and the proof that's required is proof that

24    convinces you to such an extent that you would be

25    willing to rely upon that without hesitation in the

Closing Argument by Mr. Levin                      181

1    most important of your own affairs.

2              If you have a hesitation, that equals

3    reasonable doubt.  And reasonable doubt equals not

4    guilty.

5              Now, what is the evidence in this case?

6              The evidence in this case is that, on or

7    about -- in or about September of 2005 or October of

8    2005, the FBI gets a call from Abbas al-Saidi, who says

9    that, "There's a guy who runs a convenience store" --

10   or "I met at a convenience store who's been running his

11   mouth and talking a lot of trash.  I'm concerned about

12   it."

13             So what happens after that?

14             Well, Abbas al-Saidi -- he knows how to play

15   the game.  He basically tells Narseal Batiste, "I got

16   this uncle.  This uncle's got a friend who's got a lot

17   of money.  This guy's going to be coming over."

18             Batiste sees this -- sees this guy, knows this

19   guy to be in debt, knows this guy to be owed money by

20   Faisal Hassan.  And you've heard this probably four or

21   five times already.

22             But we're talking about what's going on in a

23   person's mind.  That's what Ms. Arango told you.  All

24   right?

25             So they put a wire on this guy.  All right?

 1    And what else do they do?  They give him a nice

 2    apartment on Miami Beach.

 3             And why is that significant?  Because the guy

 4    had been living in a store -- a convenience store on

 5    Northeast 6th Avenue.  The guy was basically homeless.

 6    The guy had stayed at the Temple on occasion.  The guy

 7    didn't have a residence.

 8             And, viola, on November the 10th of 2005, he

 9    ends up in an apartment one block from the Atlantic

10    Ocean, one block from the Atlantic Ocean.

11             Now, I hate to do this, but I have to, because

12    I have an obligation to my client.  But I've got to go

13    through -- and I'll do in a -- where I go to a page and

14    I'll say what page it's from.

15             Do not be picking up binders at this point.

16    You got your exercise for probably the rest of the year

17    in this trial picking up these binders.

18             But let's go through -- or you don't have to

19    go through.  I'll tell you where it's at, and I'll read

20    it to you.  That's what the evidence is in this case.

21             And that is what, I submit to you, shows you

22    the state of mind of my client, Patrick Abraham, and

23    the other individuals on trial in this case.  That

24    shows you their lack of a specific intent to do

25    something which the law forbids.

1          It starts with November the 10th.  You'll

2   recall Government's Exhibit 42-A.  That's the

3   transcript of the meeting that's at the apartment on

4   Miami Beach with Batiste, Patrick Abraham and Abbas

5   al-Saidi.

6          And, lo and behold, at Page 4 of Government's

7   Exhibit 42-A, they're arriving -- Batiste and Abraham

8   are arriving.

9          The first words out of Narseal Batiste's mouth

10   were, "Oh, man.  You got it going on, man.  Oh, yeah."

11          The next page, 5, "Air conditioning here,"

12   Abbas al-Saidi says.  "There's three of them.  Man, I

13   gotta keep turning them off because it gets too cold."

14          Same page, Narseal Batiste:  "Nice apartment,

15   man."

16          Mind you, this is a guy that a week earlier

17   was living in a convenience store on Northeast 6th

18   Avenue and 144th Street and, at times before that, was

19   living in the Temple.

20          I believe it was Mr. Vereen who talked about

21   that old expression about the pot.  The guy had no

22   money.  The guy was broke and, all of a sudden, here he

23   is.

24          Now, why is he there?  Why is he there?

25   Because he's got connections.  He's got connections.

1   He's got people that have money.

2           He even talks about the type of television he

3   has at Page 6:  "No.  No.  Sit down.  Not a problem.

4   Yeah, man.  I have the basic channels."

5           I would submit to you he's referring to the

6   cable TV package which he has, again, a guy that was

7   basically homeless a week before.

8           Then he's talking at Page 8 about not wanting

9   to go back to jail, talking about that he still has

10  court.  He's referring to this domestic violence case

11  that he still has pending against his girlfriend.

12  Okay?

13          He's working for the Government, mind you, as

14  an informant.  Okay?  He's receiving a benefit, ladies

15  and gentlemen.  This is exactly the type of benefit

16  that that jury instruction I read to you is talking

17  about, that the testimony of that type of witness must

18  be considered with more caution than the testimony of

19  other witnesses.

20          Patrick Abraham:  "How much you pay a month?"

21          Abbas al-Saidi:  "Huh?  650."

22          Then they're talking about the area -- how

23  nice the area is.

24          And then Special Agent Velazquez, when he

25  testified, he wanted to downplay the area, you know,

Closing Argument by Mr. Levin                    185

```
 1    "It's a one-bedroom apartment and it wasn't really that
 2    nice."
 3         Well, it's a one-bedroom apartment that's one
 4    block from the Atlantic Ocean.  Okay?  This guy walks a
 5    block and he's on the beach.  If you're a beach-goer,
 6    that's great.  If you're not, I guess it really doesn't
 7    matter.
 8         But, you know, a lot of people live in South
 9    Florida because of its proximity to water.  This guy's
10    living a block away after living in a convenience store
11    on 146th Street and 6th Avenue and living at the
12    Embassy because he's homeless.
13         Then he talks about -- at Page 9, he starts
14    talking to him about going up to New York to meet this
15    brother that's coming in to New York.
16         He says, "It's gonna be a long trip, but I'm
17    gonna met a good brother down there in New York.  So I
18    don't mind, man."
19         He's basically already starting to feed him.
20    He's already starting to dangle the carrot a little
21    bit.  He's already starting to tell him, "This is my
22    connection.  This is my connection.  This is how I got
23    my money.  This is how you're gonna get your money for
24    the mission."
25         And the mission he wants him to be talking
```

1   about is a violent mission.  The mission they're

2   talking about is a Moorish mission.

3         Now, when I want say "a Moorish mission,"

4   you've heard of uplift fallen humanity and do good

5   things for the community.  That's a Moorish mission.

6   Okay?

7         They're going to come up here and they're

8   going to tell you that their Moorish mission was a

9   bunch of hogwash.  Okay?

10        Let me ask you this, ladies and gentlemen:  If

11  Narseal Batiste was truly intent on conspiring to offer

12  himself to Al-Qaeda, after he got the warehouse on or

13  about March 16th of 2006, why did he tell Elie Assaad,

14  "You know, I still need to keep the Temple because I

15  don't want to take it out of the community"?  Okay?  "I

16  don't want to do that to the people in the community."

17  Okay?

18        If this guy's life was going to be a life of

19  dedication to Al-Qaeda, why does he want to still

20  maintain a premises in Liberty City?  Why?  Because

21  he's not a terrorist and he's not conspiring with

22  anybody, nor is my client conspiring with anybody, to

23  offer material support to Al-Qaeda.

24        And then he's talking about on the next page,

25  at Page 10, "They told me they're going to have to

 1    bring somebody else, try to work with them, but it

 2    didn't.  I can't let go for nothing, man.  I haven't

 3    received my family and do what they asked me to do and

 4    follow jihad and deal with all the problems with

 5    everything I have in mind.  I can't -- I can't really

 6    do that.  I don't know.  Okay?  Money don't come before

 7    Allah."  Okay?

 8          But the next -- in the next sentence, he says,

 9    "Money don't come before Allah.  That's why I decided,

10    go ahead and do what I gotta do.  I gonna bring some

11    big things, believe me.  I gonna bring -- I'm gonna

12    bring a lot of stuff.  I'm gonna bring the flag.  I'm

13    gonna bring -- to guide us for us for the mosque."

14          And he goes on and on and on.

15          And then, at Page 14, he's talking about

16    showing them the apartment.  At the top, "I wanted to

17    show you the apartment.  How you like it, brother?"

18          He's trying to impress him -- that's what he's

19    doing -- by showing him all these things.

20          In any event, he talks about how he's going up

21    to New York and that he'd just like to make a deal with

22    one of those people.  That's at Page 18 of the

23    November 10th conversation.

24          He's talking about how long he's going to be

25    there, talking about the brothers that he's going to be

 1    meeting up there, basically, implying to them that he's

 2    going to be in a position to get some money.

 3            You'll have an opportunity to go through the

 4    rest of that transcript when you go back into the jury

 5    room.

 6            Now, the next meeting occurs on November

 7    the 21st.  That's Government's Exhibit 43 and 43-A.

 8    Mr. Abbas al-Saidi has now come back from New York, and

 9    now he's here to tell them that he's made this

10    connection for somebody that's going to help their

11    mission and, in their mind, or, in the mind of Patrick

12    Abraham, the mission means the Moorish mission, not the

13    jihad mission, not the mission to join Al-Qaeda or to

14    support any foreign terrorist organization, but the

15    Moorish mission.  Okay?

16            Now, Ms. Arango got up here and attributed

17    certain words to Mr. Abraham, who basically said very

18    little during this conversation.  And I would submit to

19    you that my client was merely present during this

20    meeting, that whatever the plan was, in his mind, it

21    was a plan that this guy was going to get money for

22    their Moorish mission.

23            And at Page 30, Ms. Arango in her closing

24    argument attributed in the middle of Page 30, "PA:

25    Does he speak English?"

 1            Eric, would you please play that clip.

 2            And, ladies and gentlemen, I submit to you

 3    that it's not Mr. Abraham that is saying, "Does he

 4    speak English?", but, rather, it's Mr. Batiste.

 5            THE COURT REPORTER:  I'm sorry, counsel.

 6    Could you give me an exhibit number of what's being

 7    played.

 8            MR. LEVIN:  I thought I did.  I'm sorry, Lisa.

 9            This is Government's Exhibit 43-A.

10            (Whereupon, segments of Government's Exhibit

11    No. 43-A were published in open court.)

12            MR. LEVIN:  Play it again, the large-screen

13    version.

14            (Whereupon, segments of Government's Exhibit

15    No. 43-A were published in open court. )

16            MR. LEVIN:  In any event, ladies and

17    gentlemen, you're going to have an opportunity to watch

18    this back in the jury room.  I submit to you that, at

19    Page 30 of that transcript, Mr. Abraham does not ask

20    whether or not this person speaks English.

21            At the next page, 31, Mr. Abraham does ask,

22    "But what is his mission?  I mean, what is his purpose?

23    What is the purpose that -- I mean --"

24            And, again, you'll have the opportunity to

25    review that Government exhibit.

Closing Argument by Mr. Levin                    190

 1              But I submit to you, ladies and gentlemen,

 2    that that is basically Abbas al-Saidi essentially

 3    telling Narseal Batiste that he has somebody that can

 4    help him, that he can help the mission, and he's real

 5    excited about that.  But they're talking about two

 6    different missions, ladies and gentlemen.

 7              Now, when you go forward to December the 16th,

 8    that is when Mr. Batiste meets with Elie Assaad.  And

 9    what is significant about that meeting?

10              The significance of that meeting is that

11    that's where he talks to him about why he's there.  And

12    at Page 4 of the December 16th meeting, Elie Assaad,

13    who is a seasoned Government informant, says, "Look, I

14    didn't come all the way here -- they didn't send me all

15    the way here just to waste my time.  So we have to work

16    with each other.  Yes?"

17              He's planting the seeds, ladies and gentlemen.

18    He continuously is planting the seeds.  He's

19    continually dangling the carrot.  I don't need to sit

20    here and beat you guys up anymore.  It is crystal clear

21    that this was a scam for money.

22              I'm going to continue to highlight more

23    illustrations of that.

24              As far as my client, Patrick Abraham, is

25    concerned, on 11-21, he was at work.  He drove Narseal

1   Batiste.  He did not have a valid driver's license.  He

2   was there.  At the very worst, he was merely present,

3   merely present.

4          Mere presence at the scene of a transaction or

5   event or the mere fact that persons may have assembled

6   and associated with each other and discussed common

7   aims and interests does not thereby make one a

8   conspirator.

9          Now, what evidence is there to show the

10  mindset of Mr. Abraham with regard to what his intent

11  is here?

12         The evidence of that comes in January, on

13  January the 10th, first of all, which would be

14  Government's Exhibit 49-A.  There's a phone call where

15  Mr. Abbas al-Saidi was trying to call Mr. Abraham and

16  Mr. Abbas al-Saidi tells Mr. Abraham at Page 2 that he

17  had left him a message.

18         And Mr. Abraham says, "Oh, no.  I didn't hear

19  it.  I just want to see who was calling and I called

20  back."

21         What that means is Mr. Abraham did not know

22  Mr. Abbas al-Saidi's phone number.  He basically did

23  like a redial on a missed call.  That's what I submit

24  to you, ladies and gentlemen, that means.  So what?

25         What is significant, however, ladies and

1    gentlemen, is that.  At this point, you know,

2    Mr. Batiste has testified and the evidence suggests and

3    shows that Mr. Abbas al-Saidi has told them that they

4    need to look organized, that they need to be organized.

5    Okay?

6              And all along, the only thing that Mr. Batiste

7    ever really wants -- and we know that because he tells

8    Mr. Elie Assaad on 12-16, "I am financially exhausted."

9    Those are his words.

10             All the other trash-talking he does there is

11   without the specific intent to do something the law

12   forbids, ladies and gentlemen.  I would submit that to

13   you.

14             He tells him right up front on December

15   the 16th, in his very first meeting, "I am financially

16   exhausted."

17             And I can't impress upon you enough one of the

18   first things I said in this closing argument.  He

19   never, nor did any of these other people sitting behind

20   me, these Defendants, these brothers, ever ask for any

21   weapons of any kind from any of these informants, from

22   anybody.

23             They had surveillance teams on these guys,

24   different sets of surveillance teams.  The only

25   surveillance that they saw here was a trip from the

1    Ft. Lauderdale airport.

2              And then, I believe, Wayne Shields, who was

3    one of the surveillance agents, testified that he saw

4    them at construction sites, which is where they worked,

5    and at a Ninja shop or a -- he described it initially

6    as a gun shop and, in truth and in fact, it was a

7    martial arts store.

8              Other than that, they never had him going and

9    trying to buy weapons.  They live across the street

10   from the projects, mind you.  You heard about this Pork

11   and Bean projects.  They live right across the street.

12   Okay?

13             They were asking for the money.  And it's

14   clear.  "I am financially exhausted," on 12-16.

15             Now, Government's Exhibit 50-A, on January

16   the 11th of 2006.  Abbas al-Saidi is telling Patrick

17   Abraham, "You gotta get organized.  You gotta be

18   organized.  You gotta look organized.  That's the way

19   you're gonna get paid here.  Look organized.  Be

20   organized.  Show organization.  Show that you can

21   deliver.  If you can show it, you're going to get

22   paid."

23             It's in the evidence, ladies and gentlemen.

24   These are not my words.  This comes right from these

25   transcripts, right from their exhibits.

Closing Argument by Mr. Levin                    194

1           They put the evil spin on it because they want

2   to equate him to a Jeff Fort and they want you -- you

3   know, with the poison in the food and the salt shakers

4   and the voodoo and all this other red herring stuff,

5   you know, to deflect your attention from the true

6   issues in this case.

7           Do you want to find them guilty of being

8   weirdos?  Go right ahead.  I'll vote with you.  They're

9   weirdos.  Okay?  But I'm not going to judge them.

10  Okay?  And it's not your job to judge them on that

11  issue.

12          Your job is to judge them on the law that

13  Her Honor has read to you as to whether or not they've

14  sustained their burden of proof, that is, that they

15  specifically intended to conspire to provide material

16  support to a foreign terrorist organization.

17          It's crystal-clear this is only about money,

18  ladies and gentlemen.

19          Patrick Abraham at Page 13 on January 11th:

20  "You see what I'm saying?  And, you know, hey, so we

21  have to -- that's why we're talking this measure of

22  precaution.  So the only thing we want right now, what

23  we're waiting for, basically, is the financial help

24  that the brother come here.  He has to -- he has to

25  understand that."

 1          He continues on:  "But main thing that,

 2     really, we was -- we expect -- we expect -- we really

 3     want the help on is the financial, because we got

 4     everything else."

 5          Well, you know that they don't have everything

 6     else because nothing was ever found and they didn't

 7     have it and it's pretty obvious that they didn't have

 8     it.  Had they had it, they would have been arrested at

 9     that time, because they were being surveilled by the

10     FBI continuously.

11          So Patrick Abraham is puffing and he's

12     basically just telling this guy, "All we care about is

13     the financial help."  That shows his state of mind.

14     Okay?  That shows what he's thinking about, Patrick

15     Abraham.

16          He goes on in the same conversation at

17     Page 18, "And -- and the main thing is -- and,

18     remember, it's all -- it's the finance.  That's all

19     they have to stress to.  As long as they get the

20     finance to us, the rest they don't have to worry about.

21     We'll move that.  That's good enough.  Help us with the

22     finance and, you know, when you see -- you know how

23     much was and, you know -- I mean, to start -- but...."

24          The finance.  He continues to stress the

25     finance.

1        Now, they're going to get back up here on

2   rebuttal.  This is our last opportunity and my last

3   opportunity to speak.  They're going to come back up on

4   rebuttal and they're going to say, "Yeah.  Once they

5   got that money, they were going to go out and buy all

6   these weapons and they were going to take down the

7   Sears Tower and they were going to blow up the FBI

8   buildings."

9        That's what they're going to say, ladies and

10  gentlemen.  A scam for money so they could go get this

11  stuff on their own.

12       If they were true -- truly intent on waging a

13  war and blowing up these buildings, why didn't they

14  just say, "Give us the weapons" already?  From

15  September to May of 2006, "Give us the weapons.  I made

16  a list for you.  I gave you the gun manufacturer's

17  phone number, which I got out of a magazine.  Bring us

18  the weapons.  All right?  You're not gonna bring the

19  money?  Bring us the weapon."

20       Never, ever, ever, ever were weapons asked for

21  by anybody, even Narseal Batiste.  Never asked for a

22  weapon, because it's about money, as stupid as it seems

23  and as dumb.  It's really dumb.

24       I wrote down, you know, my take on this case.

25  It's -- if I can find it.  I'll try to do it off the

Closing Argument by Mr. Levin                    197

 1    top of my head.  It's the perfect storm.

 2            Have you heard that expression, "the perfect

 3    storm," things coming together and it just makes it to

 4    look like something really sinter?  You've got the

 5    perfect storm with these guys, the Moors.

 6            And, you know, I apologize to these brothers

 7    if I've said anything that is disrespectful to their

 8    beliefs, because I have no right to judge their

 9    beliefs.  Okay?  It's different.  I mean, it's

10    definitely different.  No question about it.  Okay?

11    But it's not illegal.  It's their beliefs.

12            You know, that's why we live in this country.

13    Okay?  Because we can have those beliefs.  That's the

14    beauty of being an American.  Because you can have

15    those beliefs.

16            But this was strictly about the money.  Okay?

17            Now, the Government wants you to believe that

18    my client is a co-conspirator with Batiste and he's

19    like his number one and all this other stuff.

20            Well, go to Government's Exhibit 55-A.  That's

21    this so-called kidnapping -- okay? -- which, as has

22    been stated by co-counsel before me, Abbas al-Saidi

23    said and knew the day before they were going out of

24    town.  They were changing clothes.  He got clothing

25    sizes.  Okay?

1          And Patrick Abraham -- I hate the word, but

2    I'll use, too -- is tasked with having them hand over

3    body recorders -- or phones and he does such a good

4    job, Patrick Abraham, that the guy's actually able to

5    keep a body recorder so you can hear the entire event.

6    Okay?

7          You know, at Page 19, when Elie Assaad -- and

8    I'll digress right now just to give you guys a little

9    break from going through these tedious transcripts.

10         Elie Assaad, interesting character, came to

11   this country back in 1997, worked as a Government

12   informant in Chicago.  It's all he's ever known,

13   working for the Government as an informant.

14         He got kicked out of the country, went to

15   Syria and Lebanon, said he was tortured over there.

16   Okay?  They banished him from that country.

17         He went back to Mexico with his wife.  Okay?

18   He ended up not having status in that country.  All

19   right?

20         Then he comes back to the United States and,

21   when he's here, he tells you that he needed to change

22   his name to Elie Assaad Montana and he gets the name

23   "Montana" from the movie *Scarface*.

24         He told you he was walking on Lincoln Road on

25   Miami Beach, sees the poster of Tony Montana and says,

Closing Argument by Mr. Levin                    199

  1    "You know what?  I'm going to put 'Montana' on the end

  2    of my name in case the Syrians and the Lebanese come

  3    looking for me."

  4            Elie Assaad Montana.   That's going to be tough

  5    to find, ladies and gentlemen.   Elie Assaad Montana.

  6    And his driver's license says "Elie Assaad Montana."

  7    Okay?

  8            And another thing about Elie Assaad Montana is

  9    he's gonna write a book about his experience as a

 10    Government informant, because he hopes to profit from

 11    his activities in this case.

 12            And you don't think he has an interest in the

 13    outcome of this case?  He clearly has an interest in

 14    the outcome of this case.

 15            And his conduct, his conduct, over the course

 16    of five months speaks volumes as to his interest in the

 17    outcome of this case, ladies and gentlemen.

 18            "The idea for a list was my idea," he says.

 19    "I did it in a previous case."

 20            Well, you'll rely on your own recollection.

 21            The Government may come back up here and try

 22    to say that, you know, he really -- you know, he was

 23    going to write a book when he finished his experience

 24    with the Government, but it wasn't going to be about

 25    his experience with the Government.   It was going to be

1    about his experience being tortured in Syria and

2    Lebanon.

3          And, mind you, I said, "You're going to write

4    a book.  Yet, you're a guy that has to move around

5    every three or four months because you don't want them

6    to find you?"

7          And he says, "Well, I wasn't going to write it

8    under my name.  I was going to write it under an

9    assumed name."  Okay?

10          I mean, the mere fact that the guy's going to

11    write a book -- and then I asked him, "Well" -- and

12    that would be on March the 19th of this year at

13    Page 101 -- "Well, were you planning on writing a book

14    because you just wanted the world to know your story or

15    did you want to make money?

16          "Answer:  Maybe both."

17          And then I pressed him on whether or not the

18    book was going to be about his experience as a

19    Government informant.

20          "But isn't it true, sir, that the book" --

21    that's on the same page -- "that the book was also

22    going to include your life as an informant for the

23    United States Government?

24          "Answer:  I have two choices on that.  No.

25    No, sir.  Because I have two choices.  If I want to

 1   continue my job, I'm not allowed to publish any book.

 2   If I want to publish something about involving me with

 3   the United States Government, being informant -- being

 4   not informant, then my job will be finished at that

 5   time and cannot continue."

 6          Draw your own conclusions on this guy.  Draw

 7   your own conclusions.

 8          But there's a jury instruction that talks

 9   about that.  I've been over it probably too many times

10   for your liking at this point.  So I'm not going

11   through it again.

12          Now, at Page 19, here's a little flash into

13   the state of mind of Patrick Abraham.  It's

14   Government's Exhibit 55-A at Page 19.  Patrick Abraham

15   is taking -- they're changing clothes.  He's taking his

16   recording device, his phone, whatever it might be.

17          Elie Assaad is complaining about giving all

18   this stuff up, and he says, Elie Assaad, "Whatever.  I

19   accept.  But I have to communicate with my brother.

20   You know who I am?"  "Do you know who I am?", Elie

21   Assaad asks Patrick Abraham.

22          And Patrick Abraham says, "You a Saudi, aren't

23   you?"

24          Now, if Patrick Abraham knew about some plan

25   to help Al-Qaeda, why wouldn't he say, "Yeah.  You're

1    with Al-Qaeda."  Okay?  "You're over here to help us

2    wage a war against the United States.  You're over here

3    to help us destroy buildings in this country that we

4    hate so much."

5             But no.  Patrick Abraham says -- and this

6    shows his intent, his state of mind -- "You a Saudi,

7    aren't you?"

8             And that's when Assaad said, "No.  I'm a

9    brother and I am -- you know with who I work?"  "You

10   have a clue of who I work or not yet?", Elie Assaad

11   says.

12            This is Page 19.

13            You'll be able to carry those binders to the

14   back.  Rely on them consistent with the Judge's

15   instructions, that they're an aid to your memory, an

16   aid to what you may hear with your own ears.

17            But I submit to you that this is an

18   accurate -- this is an accurate interpretation or -- it

19   accurately reflects what was said on the recording.

20            "You have a clue of who I work or not yet?"

21            Patrick Abraham:  "Uh."

22            Elie Assaad:  "I am a member of Al-Qaeda."

23            Patrick Abraham:  "All I knew, that the

24   brother."  Patrick Abraham:  "All I knew, that the

25   brother," showing, "I didn't know."

Closing Argument by Mr. Levin                    203

 1            That's what that means:  "All I knew, that the

 2    brother (unintelligible)."

 3            And then he goes on to say, "I'm a member of

 4    Al-Qaeda.  I have to communicate with my leaders back

 5    home."

 6            And that's when that -- "So you have to look

 7    at me, brother.  You have to look at me."

 8            And then that's when it says -- when Patrick

 9    Abraham says on Page 20, "I can look at you eye to eye,

10    Mo."  And then Patrick says, "Let me tell you

11    something:  Over here, it's our rules."  Okay?

12            So this is the first time that Patrick Abraham

13    is being made aware that somebody from a foreign

14    terrorist organization is here.  This is the first

15    time.  Okay?  Not on November 21st.  In his mind,

16    somebody's coming over here to bring support for the

17    mission.

18            And Narseal Batiste has this really dumb idea

19    that Patrick Abraham goes along with to help him try to

20    get the money from these people.  And that goes on.

21            And you've heard a lot of excerpts from this

22    particular exhibit.  I'll just -- you know, I'll just

23    talk about a couple of them.

24            They talked about how they feared for their

25    lives and stuff like that, and you've heard that they

were the friendliest kidnappers and things like that.

It's an absurdity.

At one point, Patrick Abraham at Page 63

offers his jacket because one of them said they might

be cold.

Page 64.

And then there's a conversation at Page 96

where Narseal Batiste tells him after -- this is where

Narseal Batiste at Page 96 is told by Elie Assaad, "I

hope -- I hope you know you put your nose in somewhere

where you should know.  I'm Al-Qaeda.  You haven't

heard of Al-Qaeda?  I hope you heard of it."

Narseal Batiste:  "Who's Al-Qaeda connected

with?  I don't (unintelligible).  Is that bin Laden?"

This is a guy that, since 1998, has had

designs on waging a war -- Narseal Batiste -- or

destroying the Government or bringing down buildings,

that doesn't know who bin Laden is affiliated with?

They're going to say that he was playing him

in that conversation, that he knew who bin Laden was

and he was playing him.

And Narseal Batiste at Page 99 at the bottom:

"So like I was explaining to the brother, more than

anything, our mission is suffering right now because we

lack the financing more than anything."

1         At the bottom of Page 99:  "But I would need

2    finances and I would need money to get everything or at

3    least half of the things or the most important things

4    on that list in order to produce what I said I was

5    going to do."

6         More reference to the money.

7         Page 107.  Now, the only thing Narseal Batiste

8    says:  "Like I said, like I did from the very

9    beginning, is ask for your help.  And it has to be

10   financially.  It has to be with a loan."

11        And then, of course, he's talking about why he

12   can't give him the money, because he's got to show him

13   a plan because there were people from the past.  And

14   that's at Page 109.  He has to show some plan because

15   people in the past that they give money to took the

16   money and took off.

17        He tells him, "In order to" -- just one point.

18   To ask them for money" -- referring to the people back

19   home -- "I need to give them something solid.  Hey, not

20   written or something."

21        Something solid.  Okay?  Not written.

22   Something solid.  He's got to show him something before

23   he gets his money.

24        That's inducement, ladies and gentlemen.

25   That's manufacturing a crime that otherwise would not

1    have been committed.

2            That is deplorable.  That is the FBI allowing

3    this type of activity to have occurred.

4            I'm not throwing stones at the agents in this

5    case, because they couldn't exactly control this

6    informant that they tried to control on many an

7    occasion.

8            You might recall that first meeting.  Tony

9    Velazquez calls up Elie Assaad three or four times,

10   "Hey, you're talking way too much.  Let this guy do the

11   talking.  You're talking way too much."

12           And what he's concerned about, I would submit

13   to you, Special Agent Velazquez is, is that he's

14   planting the ideas in Narseal Batiste's head.  And you

15   know what?  Special Agent Velazquez was right.  He was

16   doing just that.

17           Page 109 -- I already did that one.

18           Narseal Batiste, at the bottom of 116:  "Occ,

19   it's on you.  Like I said, I don't know what it's gonna

20   take for you to get that first 50,000.  That first

21   50,000 would put me in a position where I can get some

22   artillery, some communications, some trucks."

23           Just on and on about the money.

24           And you'll have it.  You'll have it in the

25   back.  And I submit to you that, you know, you really

1   need to go through these transcripts and you really

2   need to look at this stuff.

3           But, you know, it's -- it's about the money --

4   financial money, he says, on Page 119.

5           Page 120, Narseal Batiste:  Well -- well, like

6   I said, I can only say it so many times.  The problem

7   is that we don't have the funds to do it."

8           And then CW 2 says, "No.  We have the money."

9   You know, "We have the money."

10           Never asks for an explosives experts.  I mean,

11   I don't want to beat -- I don't want to beat you all up

12   with this.  But let's keep going here.

13           The next significant meeting is on

14   February 19th, Government's Exhibit 56-B.  Patrick

15   Abraham is there.  This is where they hatch the plan on

16   the table with the remote control and the Coke cans.

17   Patrick Abraham basically says very little.

18           In fact, at one point, Elie Assaad says,

19   "Brother, you're so quiet."

20           And he says, "I'm observing and I'm

21   listening."

22           He's sitting on a chair and, I submit to you,

23   ladies and gentlemen, that the NBA All Star Game was on

24   on the television where the camera was and, basically,

25   Patrick Abraham was watching the ball game while

1    Narseal Batiste was doing his thing.

2              Now, Patrick Abraham has known Narseal Batiste

3    for a couple of years now, since about 2002.  Okay?

4    They want -- they're going to want you to believe that,

5    as soon as he met him, they became the best of friends.

6    Well, there's no evidence to support that.

7              Patrick Abraham did say he met him back in

8    2002 and they did talk about their mission.  But the

9    mission that Patrick Abraham's talking about is a

10   spiritual mission.  He's not talking about a mission

11   that's alleged in this case.  Okay?

12             And the evidence of that is his mindset.  And

13   I'll get to that.  It is a very critical piece that's

14   coming up that should convince you beyond a reasonable

15   doubt that Patrick Abraham did not have the specific

16   intent to do what they've charged him with in this

17   indictment.  And I'm getting to that.

18             And, of course, Elie Assaad is living in --

19   this one's on the ocean.  This apartment is on the

20   ocean on 23rd and Collins.

21             Now these brothers, who live over in Liberty

22   City and are desperate for money -- and I'll show you

23   why I introduced yesterday the funds that Patrick

24   Abraham had received when he was working for Randy

25   Denike, who was the witness that I had called a couple

1    of weeks ago.

2          Patrick Abraham had a lull in his work.  Okay?

3    So he needed the money, too.  And, of course, he wanted

4    to help out his friend and his mentor and his rabbi and

5    his priest.  Okay?  And that's something that you just

6    can't judge Mr. Batiste.

7          And Narseal Batiste at Page 5 says, "Man,

8    yeah, Occ.  You're like a rich person up in here, man,"

9    referring to his apartment.

10         And lest we forget, lest we forget, on 11-21,

11   after Abbas al-Saidi has gone to New York for that week

12   period of time and, when they come back, how decorated

13   the apartment now is on 11-21, shows more to Patrick

14   Abraham how this guy was able to acquire money from

15   these people in New York, his connections.  Okay?

16         Another way to encourage or plant the seed

17   that these people have the capacity and the

18   capabilities to provide this money.

19         And, basically, that's it with that particular

20   conversation.

21         Patrick Abraham basically said, "I'm observing

22   and I'm listening."  That was the essence of what he

23   said during that conversation.  Maybe a little bit

24   more.  And I'm sure, if there was a little bit more,

25   which I'm sure there probably was, Mr. Gregorie will

 1   tell you about it.

 2          March the 16th, the so-called oath of alliance

 3   with Mr. Elie Assaad.

 4          This oath -- or so-called oath, as I like to

 5   called it, was shoved down these guys' throats.  Okay?

 6   If you think for a moment they knew what -- or

 7   understood what they were doing when they did it,

 8   you're mistaken.  Okay?

 9          Now, if, in fact, if, in fact, Patrick Abraham

10   has evil intent, if, in fact, he finally, finally,

11   after years of trying, aligned himself with a foreign

12   terrorist organization, tell me, ladies and

13   gentlemen -- when he drives Elie Assaad back to Miami

14   Beach, you hear the following.

15          It's Government's Exhibit 69, I believe.

16          (Whereupon, segments of Government's Exhibit

17   No. 69 were published in open court.)

18          MR. LEVIN:  Narseal Batiste has asked if

19   Patrick Abraham will give Elie Assaad a ride back home.

20   That's what you're going to hear, the ride back home.

21          This is after the oath ceremony.  This is

22   after the pledge of allegiance or alliance, if you

23   will, with Al-Qaeda.

24          This is the reaction of Patrick Abraham, who

25   has now fulfilled what, according to the Government,

Closing Argument by Mr. Levin                    211

1    he's been trying to fulfill for a long time.

2              (Whereupon, segments of Government's Exhibit

3    No. 69 were published in open court.)

4              MR. LEVIN:  This is the music I promised you,

5    by the way.  So enjoy it.  For your listening pleasure.

6              (Whereupon, segments of Government's Exhibit

7    No. 69 were published in open court.)

8              MR. LEVIN:  Keep in mind, Elie Assaad has the

9    body recorder in his pocket.  So that's what you're

10   hearing.

11             (Whereupon, segments of Government's Exhibit

12   No. 69 were published in open court.)

13             MR. LEVIN:  They had to go back to pick up the

14   key to the warehouse.  That's what's happening here.

15   Narseal Batiste had called the CW, Elie Assaad, and

16   told him that he needed to come back for the key.

17             (Whereupon, segments of Government's Exhibit

18   No. 69 were published in open court.)

19             MR. LEVIN:  Eric, would you fast-forward it

20   20 seconds or 30 seconds.

21             (Whereupon, segments of Government's Exhibit

22   No. 69 were published in open court.)

23             MR. LEVIN:  For those of you who aren't

24   familiar with this song, it's by Phil Collins.  "I can

25   feel it coming in the air tonight.  I've been waiting

1      for this moment all my life...."

2            How ironic.  And the conversation between

3      Patrick Abraham and Elie Assaad is about directions as

4      to how to take him home.

5            (Whereupon, segments of Government's Exhibit

6      No. 69 were published in open court.)

7            MR. LEVIN:  I asked Elie Assaad, "It's a good

8      investigative technique.  Here you had him one on one,

9      just like they told you.  Try to get as much

10     information out of them as possible."

11           I hope I'm not ruining this song for anybody,

12     but my time is limited.

13           He doesn't engage him in my any.

14           "Brother, why did you strip-search me on

15     March the 10th when I came to the warehouse?  What was

16     that all about?  Why did you do that?"

17           He never asks him about that.

18           (Whereupon, segments of Government's Exhibit

19     No. 69 were published in open court. )

20           MR. LEVIN:  Nothing prevented Patrick Abraham

21     from expressing how grateful he was to Brother Mohammed

22     for coming over and supporting their mission and how,

23     finally, he was able to join forces with a foreign

24     terrorist organization after waiting for this moment

25     for all of his life.

1          (Whereupon, segments of Government's Exhibit

2     No. 69 were published in open court.)

3          MR. LEVIN:  The Government will get up here on

4     rebuttal and say Patrick Abraham said, He chose a good

5     one, referring to Narseal Batiste.

6          That'll be their rebuttal to this part of my

7     argument:  He chose a good one, which shows his intent.

8          We're talking jihadists here.  We're talking

9     radical fanaticism.  This guy is listening to Phil

10    Collins.  He's not listening to rap music.  He's not

11    listening -- they don't have boom box speakers, not

12    that's there's any -- I'm not commenting on that

13    either.  Okay?  Because if you're into that, that's

14    cool, too.  But, you know, this is what he's playing in

15    his car.

16         (Whereupon, segments of Government's Exhibit

17    No. 69 were published in open court.)

18         MR. LEVIN:  He's having some small chitchat

19    about Abbas.

20         (Whereupon, segments of Government's Exhibit

21    No. 69 were published in open court.)

22         MR. LEVIN:  That's enough Eric.

23         Apologies to anybody who wanted to hear the

24    rest of the song, but I'm running out of time.

25         If I had more time, I would have played the

1    next song, which was a Tina Turner song.

2            But, in any event, we're running out of time

3    here.

4            The point is, ladies and gentlemen, this shows

5    Mr. Abraham's state of mind, I would submit to you.  I

6    would submit to you, if he truly intended to want to

7    offer his support to a foreign terrorist organization

8    and he was sitting next to their representative on a

9    20-to-25-minute ride from 62nd and 15th or thereabouts

10   in Miami to Miami Beach on 23rd and Collins, he would

11   have had an ample opportunity, either Elie Assaad, to

12   gather more evidence, or Patrick Abraham, to express

13   himself to this man that now, finally, apparently, is

14   going to deliver on his promise, the promise of the

15   money, which is why, I submit to you, ladies and

16   gentlemen, these brothers, without any specific intent

17   whatsoever to violate the law, raised their hand and

18   committed an oath -- or spoke an oath of alliance that,

19   I would submit to you, none of them really, really

20   understood the breadth and magnitude of what exactly

21   they were getting themselves into when they did that.

22           But they did not intend to violate any law by

23   doing that, I would submit to you, and my client in

24   particular, since I represent him.

25           And I speak for him, but everybody is

1    similarly situated in that regard.

2         And when he rode back with Elie Assaad, he had

3    absolutely no expression whatsoever of gratitude,

4    absolutely no expression of -- asking for any kind of

5    weapons, "Now that I'm part of your team" -- these are

6    my words -- "can I now have my LAWs rocket?  Can I now

7    have my grenade launcher?  Can I get my AK-47?  Can I

8    have my hand grenade so I can toss it through the

9    windows of the FBI?"

10        You never heard that from Patrick Abraham.

11        Now, moving over to March 24th, which is the

12   next time Patrick Abraham and -- pretty much the last

13   time Patrick Abraham is around, there is a -- in that

14   exhibit, the Government's transcript -- and I need to

15   retrieve it -- there's some more irony on the way.

16        This is Government's Exhibit 72-A.  At

17   Page 55, there's another mistake in the transcript, and

18   it's for you to decide.  But I've asked that that clip

19   be played to bear that out.

20        (Whereupon, segments of Government's Exhibit

21   No. 72 were published in open court.)

22        MR. LEVIN:  Ladies and gentlemen, I would

23   submit to you that where it's attributed to Patrick

24   Abraham at Page 55 saying, "Oh, good pictures," that

25   Patrick Abraham does not say, "Oh, good pictures."

1            That'll be for you to decide when you go back

2    into the jury room to deliberate this case.

3            And so there's no confusion, the irony I was

4    referring to was it was the same Phil Collins song

5    playing on March the 24th that was playing on March

6    the 16th when I just played that clip.  So much for

7    ironies.

8            They're saying that my client doesn't respect

9    the laws of the United States.  Yet, he went to court

10   on March the 27th when he had been arrested, along with

11   Mr. Batiste, for an assault on a man that had fired

12   shots at them.

13           He stood up in front of a judge, and the

14   evidence in this case bore that out.  I asked

15   Mr. Batiste about that.  He stood up in front of a

16   judge.  The State of Florida decided to take no action

17   against Mr. Abraham.

18           Now, Sultan Kahn-Bey is another red herring

19   here.  Okay?  At this point, Mr. Abraham has kind of

20   gone his own way.  And I'm not going to put it on the

21   ELMO now because you're going to be able to take it

22   back into the jury room.

23           It's Government's -- excuse me -- Defense

24   Exhibit 6-E, which is the Denike Construction Company

25   find record, which reflects payments made to

Closing Argument by Mr. Levin                217

1    Mr. Abraham.  You'll be able to review this at your

2    leisure.  It shows the payment history by Randy Denike

3    to Patrick Abraham.

4         I would submit to you that this issue with

5    regard to a security license is another red herring,

6    because this was a period of time when Mr. Abraham --

7    there was a lull in his work.  And you can compare the

8    dates when you go back in there.

9         And, also, in addition, when you look at the

10   Government's exhibit on that, which is Government's

11   Exhibit 150, you'll note that it certainly appears that

12   the license was issued, but returned to Tallahassee.

13   It was issued on April 7th of 2005 and returned to

14   Tallahassee on April 20th of 2005.

15        And at no time did Mr. Abraham work as a

16   security guard with regard to working as a security

17   guard.

18        And they're going to say, "Well, he's a

19   security guard because that's what Jeff Fort did."

20   Jeff Fort -- he had security guards.  He had his men as

21   security guards.  Jeff Fort's men had contracts with

22   McCormick Place in Chicago.  You heard from Dan Young.

23   It's a big convention center up there.

24        Patrick Abraham never worked as a security

25   guard.  Patrick Abraham looked at it as a way to make

```
 1    money.  Okay?

 2           And you'll look at the Denike Construction

 3    report and you'll see that there was a lull in the

 4    activity of his work and he needed the money, which is

 5    why he did that.  Okay?

 6           This is a hard-working kid who came to this

 7    country from Haiti in 1997, who has a 7-year-old

 8    daughter, who I submit to you --

 9           MR. GREGORIE:  Your Honor, I object.  None of

10    this is in evidence, Judge.

11           THE COURT:  Sustained.

12           MR. LEVIN:  That's not true.  And I can come

13    side-bar and let you know where it is.

14           THE COURT:  Come on up.

15           (Whereupon, proceedings were had at side-bar

16    outside the presence of the jury which have been sealed

17    per instructions of the Court.)

18           (Whereupon, the following proceedings were had

19    in open court:)

20           THE COURT:  We have a juror who needs a rest

21    room break.

22           Are you okay?

23           UNIDENTIFIED JUROR:  I'm okay.

24           THE COURT:  We'll take a break when he's done.

25           Go ahead.
```

1          MR. LEVIN:  Now, I was talking about the issue

2    with regard to Sultan Kahn-Bey.

3          Sultan Kahn-Bey, apparently, is involved in a

4    shootout where Mr. Abraham is present.  Mr. Abraham

5    speaks to the police officer.  Mr. Abraham ends up

6    taking Sultan Kahn-Bey to court the day that Mr. Sultan

7    Kahn-Bey has to go to court.

8          They're going to get up here and argue and

9    tell you that that's because there's an association

10   between Mr. Abraham and Mr. Kahn-Bey.

11         In truth and in fact, Mr. Abraham, after he

12   met with Special Agent Rathel -- okay? -- that was the

13   agent that picked him up in the Justice Building.  You

14   might remember the Richard E. Gerstein Justice

15   Building.

16         This guy, Sultan Kahn-Bey, is in a green

17   military-style uniform with Moorish insignia.  Patrick

18   Abraham is wearing civilian clothes.  Patrick Abraham

19   gets the briefcase of this guy.  They ask him if he'll

20   take his personal effects.  He takes his personal

21   effects.

22         The Government wants you to believe that this

23   is a guy that's involved in terrorism.  He ends up --

24   this agent introduces himself as a federal agent.

25   Okay?

1          Mr. Abraham goes to this residence where

2     they're going to take this -- Mr. Sultan Kahn-Bey.  He

3     doesn't try to leave, doesn't try to flee.  He's

4     cooperative with Special Agent Rathel.

5          And, basically, he tells him, you know, what

6     the situation is, you know, with regard to what had

7     occurred.  Special Agent Rathel asked him what had

8     occurred, and he talked about the gun.

9          Now, the reason that Mr. Abraham took him was

10    because the gun that was used was a gun that had been

11    purchased by Lyglenson Lemorin through a loan that

12    Mr. Abraham gave him, lawfully purchased at a gun shop.

13    And that's in evidence in this case.  Okay?

14          And they want you to think that, because they

15    had a gun, that these are bad people.  Okay?  They had

16    one gun they find in this case, one lousy gun, and they

17    want to make a big issue of it.

18          Well, go ahead and make a big issue one lousy

19    gun.

20          On March the 5th, Patrick Abraham gets

21    arrested by Immigration authorities, Special Agent

22    Timothy Scott.  Nine agents come and they arrest him.

23    They take him over to the Doral headquarters, and they

24    sit him down and they question him about the shooting

25    that had taken place.

Closing Argument by Mr. Levin                    221

1          They also take a statement from him where he

2     allegedly tells him he's part of an indigenous society.

3     And those were his words.  I asked Special Agent

4     Timothy Scott.  He said he used the word "indigenous."

5     Okay?

6          I don't even, frankly, with all due respect,

7     know what the word means.  I kind of have an idea.

8     Okay?  But I assure you, I submit to you, that those

9     were not his words.  Okay?

10         By what's interesting about all this?  They

11    had him write out a statement, Government's Exhibit

12    148, which basically says -- and the reason this

13    statement is written by Patrick Abraham is because he

14    wants to help out Sultan Kahn-Bey -- okay? -- who he

15    heard about from Narseal Batiste, who -- Batiste had

16    told him at a previous time about Sultan Kahn-Bey, who

17    he was, what he was about.

18         Patrick Abraham did not know Sultan Kahn-Bey,

19    but said:  "This statement is to verify and confirm on

20    the behalf of Sultan Kahn-Bey concerning the firearm,

21    it is truthful to say that the firearm does not belong

22    to him, but rather for me and my friend, Levite, who

23    has the legal paper for the firearm.

24         "And it is truthful and honorable for to

25    say that Sultan Kahn-Bey is a spiritual teacher for

1    the last 30 years and that was the wholle" --

2    w-h-o-l-l-e -- "purpose for him being in Miami.  He's

3    very helpful to the community wherever he goes.

4             "Thank you."

5             And I apologize.

6             This guy doesn't know what the word

7    "indigenous" means.  And if he's going to have him

8    write out a statement, let him write the whole

9    statement out.  Okay?  Let him write it out that he's

10   part of the Moorish Science Temple and blah, blah,

11   blah, blah, blah.

12            More importantly, get a tape recorder and

13   record it.  15,000 recordings in this case.  Get a tape

14   recorder.  "Oh, by policy, we don't record statements,"

15   "By policy, we don't record statements."

16            What a better way to memorialize something

17   than to record it.  They recorded these statements for

18   those very reasons, because people tell the truth when

19   they don't know they're being recorded, says

20   Ms. Arango, whatever that means, frankly.  But record

21   the statement.  Be fair.

22            And it happens again on June 22nd when Special

23   Agent Velazquez takes a statement and the FBI, by

24   policy, doesn't record a statement unless you pick up

25   the phone and call the special agent in command and get

1    permission.

2            And they've got recording devices galore.

3    This whole case is about recordings.  Why couldn't the

4    tapes run a little bit longer?  Why couldn't the tapes

5    have run a little bit longer?  Okay?

6            Game, set, match, ladies and gentlemen.  Why

7    didn't they deliver to these guys a LAWs rocket that

8    was disengaged just like the one they delivered to Jeff

9    Fort so you people wouldn't have to have been sitting

10   here for three months?

11           Because it would have been game, set, match.

12   Case finished.  Because they never asked for one.  They

13   never asked for one gun.  This case is disgusting.

14   It's a travesty of justice.  It is a perversion of the

15   American criminal system.

16           They're going to say, "What are we supposed to

17   do?  Wait until the lives are lost and the buildings

18   start to fall?"  That's going to be their rebuttal,

19   ladies and gentlemen.  "What are we supposed to do?"

20           What you're supposed to do is conduct a

21   professional investigation and not lead people on and

22   say, "Come on.  Just one more thing, brother.  Just one

23   more thing, brother.  Just one more thing.  Just one

24   more promise.  Just do me one more favor.  Just do me

25   one more favor."

Closing Argument by Mr. Levin                        224

 1              One final instruction.

 2              I hate reading glasses.

 3              On Page 11 of 36 of your jury instruction

 4     packet, another instruction that the Court has given

 5     you:  When the Government -- I'll wait for you -- When

 6     the Government offers testimony or evidence that a

 7     defendant made a statement or admission to someone

 8     after being arrested or detained, the jury should

 9     consider the evidence concerning such a statement with

10     caution and great care.

11              It is for you to decide whether the Defendant

12     made the statement and, if so, how much weight to give

13     it.

14              In making these decisions, you should consider

15     all the evidence about the statement, including the

16     circumstances under which the Defendant may have made

17     it.

18              Of course, any such statement should not be

19     considered in any way whatsoever -- or whatever as

20     evidence with respect to any other Defendant on trial.

21              I mean, ladies and gentlemen, just take a

22     look at all the evidence in this case.  It's these

23     Government's exhibits -- I mean, Ms. Jhones -- she

24     spent a great amount of time talking to you about the

25     various inducements and the statements.

1          But, I mean, this guy, Batiste, was broke.  He

2    was overdrawn.

3          In any event, the evidence that you've heard

4    in this case is just replete with the references about

5    CW 2, Elie Assaad, you know, basically telling him,

6    "The money's going to be coming.  The money's going to

7    come.  The money's going to be coming."  This goes on

8    and on and on to the very end.

9          May I approach, your Honor?

10         THE COURT:  Sure.

11         (Whereupon, proceedings were had at side-bar

12    outside the presence of the jury which have been sealed

13    per instructions of the Court.)

14         (Whereupon, the following proceedings were had

15    in open court:)

16         THE COURT:  We have a juror who went to the

17    rest room, Mr. Levin.

18         MR. LEVIN:  I understand.

19         THE COURT:  You just need to wait.

20         MR. LEVIN:  No problem.

21         THE COURT:  You're fine.

22         Go ahead.

23         MR. LEVIN:  Thank you, your Honor.

24         Previously, I had indicated something that was

25    not exactly accurate.  But what is exactly accurate

Closing Argument by Mr. Levin                    226

 1    which comes from the record is about what Mr. Abraham

 2    had told Special Agent Timothy Scott with regard to his

 3    background -- familial background.

 4            "He told me that he had been married and had a

 5    child with a woman and that they had been separated."

 6            I had made reference to an age and a gender.

 7    So I apologize for that.

 8            Ladies and gentlemen, I am not going to -- and

 9    I apologize and feel that I've taken probably more time

10    than I really wanted to.

11            You know, Ms. Jhones, at the end of her

12    closing yesterday, she he cried.  She cried because

13    this has been three years.  These guys -- Mr. Abraham's

14    life has been on hold, as these other brothers' lives

15    have been on hold, since June the 23rd of 2006.  It's

16    now April of 2009.  Okay?

17            You already know my feelings about this case.

18    This case has not been proven, ladies and gentlemen.

19    Okay?  Proof beyond a reasonable doubt is proof of such

20    a convincing character that you would be willing to

21    rely and act upon it without hesitation in the most

22    important of your own affairs.

23            The intent of my client, I think, is borne out

24    primarily by his nonreaction.  And they're going to

25    say, "Oh, the reason he didn't react is because of his

1    personality.  He's just quiet anyway.  Because, on

2    February 19th, he sat there and said nothing.  He's not

3    going to say anything.  It's just his nature to be

4    quiet."

5           But if somebody in their heart, if somebody in

6    their heart -- based upon the allegations in this case,

7    if somebody in their heart has an evil intent and has

8    been waiting a long time for this moment for -- in the

9    words of Phil Collins, "all their life" -- okay? -- and

10   after waiting a long time and finally having an

11   opportunity to join forces, to form an alliance with a

12   foreign terrorist organization -- okay? -- they're

13   going to have some expressions to that person that has

14   come and has offered and afforded them that

15   opportunity.

16          But the bottom line is he did not have such

17   intent.  He did not have such aspirations.  And the

18   evidence in this case has borne that out.  At the very

19   least, there's reasonable doubt.  There is reasonable

20   doubt.  You have to go back and find beyond, beyond, a

21   reasonable doubt that he had evil intent.

22          He's charged in four counts in this

23   indictment, just like all these other brothers:

24   Conspiracy to provide material support to a foreign

25   terrorist organization.  That's Count 1 and Count 2.

Closing Argument by Mr. Levin                    228

        1              And there are some varying legal elements

        2       associated with those particular counts.

        3              But the one that runs the thread -- or that

        4       the thread runs through -- the one element that the

        5       thread runs through with regard to this entire case is

        6       the element of intent.  Willfulness.

        7              In Count 3, he's charged with a conspiracy to

        8       blow up a federal building or a building in interstate

        9       or foreign commerce.

       10              And in Count 4, he's charged with conspiring

       11       to wage a war against the United States of America.

       12              I cannot stress enough how I started this

       13       closing argument, by reminding you that their theory is

       14       that Narseal Batiste, in 1998, began an ideology in his

       15       mind and that seven years later, only after coming into

       16       contact with Abbas al-Saidi, who has been an informant

       17       since the age of 15 years old, who knows how to play

       18       the system, who ends up going from homeless to Miami

       19       Beach -- and what a tremendous leap that is and what a

       20       tremendous fortune that is for him -- and you apply the

       21       instructions on the law in this case, the cautionary

       22       instructions about how you have to evaluate the

       23       testimony of those types of witnesses, the Elie Assaads

       24       of the world, who basically -- although this case was

       25       written, produced, directed and choreographed by the

1    FBI, the actors were Elie Assaad -- and I would wonder

2    if Al Pacino would actually play him in any movie, that

3    being the Tony Montana reference from the movie

4    *Scarface*, if this were a movie.  That was a

5    parenthetical.

6            But you have to really, really evaluate this

7    case very, very carefully.  And I submit to you, after

8    you do that -- and you need to take your time and not

9    rush to judgment -- and, frankly, I know you won't do

10   that.  I know you'll take your time -- I'm confident

11   that you're going to return a verdict that speaks to

12   one thing and one thing alone, and that is justice.

13           Because that's what your mission is, ladies

14   and gentlemen.  Your mission is to do justice.

15           THE COURT:  You have 15 minutes.

16           MR. LEVIN:  I'll be done in one.

17           Your mission is to be fair.

18           I just want to say, if there's anything that

19   I've said during this trial, if there's any facial

20   expression I've made -- because I have a very

21   expressive face -- if there's anything I said that may

22   have offended any of you, don't hold it against

23   Patrick.  I'm sure you won't.  Don't hold it against

24   me.

25           Go back there.  Do the right thing.  Be fair,

 1   as I'm sure you will be.  Find Mr. Abraham not guilty

 2   of Counts 1, 2, 3 and 4 and, frankly, send all of these

 3   brothers home.

 4          Thank you very much.

 5          THE COURT:  Okay, ladies and gentlemen.  We're

 6   going to take a ten-minute recess.  I've determined

 7   that we're going to finish the closing arguments.  We

 8   have an hour to go.  That's so you can begin your

 9   deliberations on Monday morning.

10          Do not discuss this case either amongst

11   yourselves or with anyone else.  Have no contact

12   whatsoever with anyone associated with the trial.  Do

13   not read, listen or see anything touching on this

14   matter in any way.

15          If anyone should try to talk to you about this

16   case, you should immediately instruct them to stop and

17   report it to my staff.

18          Remember, until such time as you have heard

19   all of the closing arguments and I have instructed you

20   to begin your deliberations, you simply are not to talk

21   about this case.

22          Ten minutes.  We'll be in recess for ten.

23          (Whereupon, the jury exited the courtroom at

24   5:05 p.m. and the following proceedings were had:)

25          THE COURT:  You may be seated for a moment.

 1              I just want to state for the record that

 2     Mr. Levin began his closing argument at 3:19.  He had

 3     until 5:19, which was the two hours that he requested,

 4     and he ended at 5:05.  So he did not use all of his

 5     time.

 6              We're in recess for ten minutes.

 7              (Thereupon a recess was taken, after which the

 8     following proceedings were had:)

 9              THE COURT:  We're back on United States of

10     America versus Narseal Batiste, et al., Case

11     No. 06-20373.

12              Counsel, state your appearances, please, for

13     the record.

14              MR. GREGORIE:  Richard Gregorie and Jacqueline

15     Arango on behalf of the United States, your Honor.

16              MS. JHONES:  Ana Maria Jhones on behalf of

17     Narseal Batiste, who is present.

18              MR. LEVIN:  Albert Levin on behalf of Patrick

19     Abraham, who is present.

20              MR. CASUSO:  Louie Casuso on behalf of Burson

21     Augustin, who's present.

22              MR. CLARK:  Nathan Clark for Rotschild

23     Augustine, who's present.

24              MR. HOULIHAN:  Richard Houlihan with Naudimar

25     Herrera.

1           MR. VEREEN:  And Roderick Vereen on behalf of

2    Stanley Phanor, who's present.

3           THE COURT:  All Defendants are present.

4           My plan is as follows:  When we finish in an

5    hour, I'm going to dismiss the -- Jurors 1 through 13,

6    who are the members -- the 12-member jury.

7           And then what I normally do is conditionally

8    release the alternate jurors, telling them that they

9    can't discuss the case either amongst themselves or

10   with anyone else and they can't have any contact with

11   anybody associated with the trial nor can they read the

12   whole nine yards of -- that they have to continue not

13   reading or talking about the case, just in case they're

14   called back into service, but not have them come back

15   on Monday morning.

16          Any objection to that?

17          MR. VEREEN:  No objection, Judge.

18          MR. GREGORIE:  No objection, your Honor.

19          THE COURT:  And as far as Monday is concerned,

20   I'm not going to require you all to come in.  I'm going

21   to give the jurors who are going to be -- in fact,

22   perhaps what I'll to is dismiss the alternates first

23   and then instruct the 12-person jury panel.  I think I

24   like that better.

25          I'm going to tell them that they're going to

1    come in Monday morning, that they can't begin their

2    deliberations until all of their members are present

3    and their cue will be when Patricia bring to them the

4    notebooks and all the evidence and the binders.  That's

5    when they begin their deliberations.  And I give them a

6    very strong instruction as to that.  It seems to have

7    worked very well.

8              Okay?  Any objection to that?

9              MR. GREGORIE:  None from the Government, your

10   Honor.

11             MR. VEREEN:  No, Judge.

12             MS. JHONES:  Not from the defense.

13             MR. CLARK:  No, your Honor.

14             THE COURT:  So let's bring them in so

15   Mr. Gregorie -- do you want to test?

16             MR. GREGORIE:  Could I have 15 and 5, your

17   Honor?

18             THE COURT:  15 and 5.  Yes.

19             MR. GREGORIE:  And is this on, Judge?

20             THE COURT:  Yes.  It's got a new battery.

21             Sorry, Mr. Levin.  When it runs out, it

22   doesn't give us any warning.

23             MR. LEVIN:  It's okay.  No problem, Judge.

24             (Whereupon, the jury entered the courtroom at

25   5:24 p.m. and the following proceedings were had:)

Rebuttal Argument by Mr. Gregorie                     234

1          THE COURT:  You may be seated.

2          You may proceed.

3          MR. GREGORIE:  Thank you, your Honor.

4          Fellow counsel.

5          Good evening, ladies and gentlemen.

6          THE JURY:  Good evening.

7          MR. GREGORIE:  Because I anticipated that

8    today I may be the last one to speak and it could be

9    very late, I wore my rebuttal summation socks.

10         I was hoping some of you could see them.  They

11   are bright red argyles.  There's a reason for that,

12   ladies and gentlemen.  I wanted everybody to get a

13   chance to clear their head.

14         They're also a distraction, ladies and

15   gentlemen.  And I think for the last ten hours you've

16   heard a number of distractions.  We heard about the

17   Great Seal.  We heard about the Magna Carta.  We heard

18   about the Jesuits.  We heard Phil Collins sing.

19         None of that, ladies and gentlemen, is

20   relevant to the evidence in this case.  In fact, I'm

21   going to answer a lot of what defense said by telling

22   you this:  When you go back in that jury room, the only

23   evidence you should rely on to prove the Government's

24   case beyond a reasonable doubt are the tape recordings,

25   videotapes, audiotapes and photographs that were given

Rebuttal Argument by Mr. Gregorie                    235

  1    to you that corroborate or stand by themselves as

  2    evidence in this case.

  3            This case is about the words and actions of

  4    these six Defendants.  It doesn't relate to anything

  5    else, ladies and gentlemen.  That's what this case is

  6    about.

  7            When you go back there, you have the tape

  8    recordings, you have the transcripts and you have that

  9    evidence.

 10            Let me talk about one or two of the other

 11    distractions.

 12            You were given -- shown a copy of the Koran

 13    with old, yellow stickies on it.  Well, if you look on

 14    Mr. Batiste's Bible, there are some yellow stickies on

 15    that, too.

 16            The Government didn't introduce this in

 17    evidence, ladies and gentlemen.  This was introduced by

 18    the Defendant.

 19            The Government didn't give this to you.  Yet,

 20    they would suggest to you that somehow the FBI put the

 21    things on there.

 22            This was a defense exhibit.  This is not

 23    relevant to this case, ladies and gentlemen.  It is not

 24    relevant to why you're here.

 25            The Government didn't use it to try to prove

Rebuttal Argument by Mr. Gregorie                              236

1    anything beyond any -- any possible doubt.  It had

2    nothing to do with the Government's case.  It was

3    brought in by the Defendants.

4         Let me show you something else, ladies and

5    gentlemen.

6         You were talked to about the indictment.  In

7    the indictment, it states that the Defendants -- and

8    it names all six of the individuals there -- together

9    with others known and unknown to the grand jury, did

10   knowingly combine, conspire, confederate and agree to

11   provide material support and resources -- and here is

12   exactly what the indictment says -- as that term is

13   defined in Title 18, United States Code, Section

14   2339A(b)(1).

15        And you know what, ladies and gentlemen?  In

16   your jury instructions, because that's what the

17   indictment says, that section of the law is defined.

18        On Page 14, you'll see a definition of

19   "material support" just as it is used in that

20   indictment.  What it tells you is that "material

21   support or resources" means any property, tangible or

22   intangible, including photographs, videotapes, any

23   property, tangible or intangible.

24        And if you turn it over to Page 15, it goes

25   all the way down and includes transportation, so that

Rebuttal Argument by Mr. Gregorie                237

```
 1    when Mr. Patrick Abraham and Mr. Narseal Batiste are
 2    driving the informants to show them where the FBI
 3    building is, to show them where a synagogue is, to show
 4    them where the National Guard Armory is, that's
 5    transportation.
 6             And it includes personnel, including
 7    themselves.  Personnel.
 8             All six of these individuals took part in
 9    showing this Defendant where the target sites were,
10    taking photographs and videotapes.  They didn't just
11    agree to provide the material support.  They provided
12    it.
13             They gave them the pictures and the
14    videotapes.  They're in evidence.  Look at them, ladies
15    and gentlemen.  They didn't just agree to do it.  They
16    did it.
17             That was one of the arguments about the jury
18    instructions, ladies and gentlemen.  They seemed to
19    indicate that Ms. Arango didn't say anything about the
20    jury instructions.  If you looked at the board she had
21    up there from day one, on the bottom she had the
22    conspiracy instruction and she talked to you about it.
23             The Government didn't avoid the instructions.
24    They meet it head on, ladies and gentlemen.
25             But I don't want to waste time on things that
```

Rebuttal Argument by Mr. Gregorie                    238

1    are easily covered.  Let's talk about what the

2    Defendants told you, because their defenses were

3    inconsistent.

4           Think about it a minute.  On the one hand, the

5    first member of the tag team got up and told you

6    that --

7           MR. HOULIHAN:  Objection to the form.

8           MR. LEVIN:  And objection to --

9           THE COURT:  Sustained.

10          Rephrase that, Mr. Gregorie.

11          MR. GREGORIE:  The first member of the defense

12   team got up and told you that Mr. Batiste wanted no

13   part of this whole scheme, he wanted nothing to do with

14   it, he didn't want any part of it, these guys kept

15   calling him and calling him and he kept telling them

16   that he didn't want anything to do with them.

17          And then, on the other hand, they say this was

18   a scam.  They wanted to get money out of these guys.

19          Well, you can't have it both ways, ladies and

20   gentlemen.  If you were trying to get money out of

21   them, you had to talk to them, you had to have meetings

22   with them, you had to try to scam them.  If you didn't

23   want to meet with them, then you couldn't have been

24   pulling a scam on them.

25          So either they were manipulated into coming to

Rebuttal Argument by Mr. Gregorie                    239

1    the meetings that they didn't want to go to or you

2    really wanted to come to the meetings in order to get

3    the money.  You can't have it both ways, ladies and

4    gentlemen.  It doesn't make any sense.  But that's what

5    they tried to argue to you.

6              Think about that, ladies and gentlemen.

7              I am going to in the next 55 minutes go over a

8    number of pieces of the evidence in this case.  I'm

9    going to refer to the substance.  I'm not going to play

10   you calls that weren't answered or messages or let you

11   hear music with nothing happening or people walking.

12   We're going to talk about the substantive evidence in

13   this case.

14             And on it I'm going to try to give you the

15   page and exhibit number so that you can try to find it.

16   If somebody wants to take a note, look at it, that's

17   great.  But the jury's job is to work together.  So if

18   somebody has a note and can help somebody else find it

19   when you get back in that jury room, please do.

20             If you could, please.

21             On November 6th -- and this is one of the

22   first things you heard from Ms. Jhones -- she said that

23   Narseal Batiste never agreed to have a meeting on

24   November 7th with Abbas al-Saidi.

25             Well, here's the conversation.  Here's the

Rebuttal Argument by Mr. Gregorie                    240

1    transcript.  It's Government Exhibit 40.

2            And the defense exhibit is 80-B, which is the

3    transcript.  The Government put the tape in and played

4    the tape for you, but the Defendant put the transcript

5    in, 80-B.  And it's Narseal Batiste and Abbas al-Saidi.

6            As you can see, on Page 4, the -- Abbas says,

7    "Okay.  Not a problem, man.  Give me a call and, if I'm

8    still up, it will be nice."

9            As you remember, the informant was telling

10   him, "Look, it's late.  I'm going to bed.  I may not be

11   still up.  I'm gonna see you tomorrow, though,

12   definitely, at the mosque, brother."

13           This is November the 6th.  Tomorrow is

14   November the 7th.

15           And Narseal Batiste says to him, "Okay.  Yeah.

16   I'm gonna to take -- I'm gonna try -- I'm gonna try to

17   get off early, if I can."

18           He's telling him he's going to meet him the

19   next day.

20           On Page 5, the CI says, "Anyway, so like I

21   say, if I don't see you tonight, it's gonna be tomorrow

22   at the mosque, Inshallah."

23           And Narseal says, "Okay.  Inshallah.  I

24   appreciate your calling me now."

25           So Abbas went on November 7th to the mosque.

```
 1              What happens on November 7th when he gets

 2    there?

 3              When he gets there, it's Burson Augustin.  It

 4    isn't Narseal Batiste.  In fact, Burson's waiting for

 5    Narseal Batiste.  He thinks he's coming there as well.

 6              And when they get there, here is what

 7    happened.

 8              On Narseal Batiste's direct testimony,

 9    Ms. Jhones said to him -- questioned him -- this is

10    direct testimony -- "Had there been any discussions

11    about any plan that you had -- had there been any

12    discussions with this informant prior to

13    November 21st?"

14              And Mr. Batiste said, "No, ma'am.

15              "Why not?

16              "I didn't have a plan.  There was no reason

17    for me to have any plan."

18              So what he says -- this is what the defense is

19    putting up -- prior to November 21st, he had no plan

20    for anything, nothing on his mind.

21              Now, I want you to look.

22              We're going to go to the next slide.

23              On November the 7th, Exhibit 41, Page 20, you

24    have what Burson Augustin and Abbas al-Saidi are

25    talking about.
```

Rebuttal Argument by Mr. Gregorie                242

1            And on November 21st, when this idea first

2    came into his head, you have what Narseal Batiste and

3    Abbas al-Saidi are talking about.

4            Well, let's take a look at this.

5            On November the 21st, Mr. Batiste is telling

6    Abbas that, "This has to be more than just a bombing.

7    It has to be a real war, 'cause somehow or another we

8    have to get the civilians.  You have to have people go

9    crazy."

10           And Mr. Batiste uses the term "chaos."

11           "You make people attack each other.  Chaos.

12   We want the people to get hysterical."

13           Where did that come up on November 7th?

14           Burson Augustin says almost the exact same

15   thing:  "All right.  People in this neighborhood, they

16   gotta get a plan.  People live around -- we get a plan.

17   They go to Opa-Locka, get a plan; Liberty City, get a

18   plan.  Cops are going every which way.  We gotta go to

19   another state."

20           Same thing.  Chaos.

21           Where did Burson Augustin get that?  Was that

22   his idea?  Was this Burson Augustin dreaming this up?

23           This is a conspiracy, ladies and gentlemen.

24           Narseal Batiste is the preacher.  He's the

25   teacher.  The ideas of chaos, this war causing chaos,

Rebuttal Argument by Mr. Gregorie                    243

1   disruption in the community, is coming from Narseal

2   Batiste.

3          But it was said on November 7th.  Mr. Batiste

4   said he didn't have a plan before then.  So how could

5   he have possibly preached it to Burson Augustin?

6          But Burson learned it.  Maybe he got it -- it

7   just sort of infiltrated his brain.

8          If you can, please.

9          Let's look at another thing Narseal Batiste

10  said on November -- on December the 22nd when he was

11  with Elie Assaad.

12         Here's what Narseal Batiste says:  "That is

13  the only way.  This Government is evil, is of the

14  devil, and the only way that purity can happen, unless

15  the kingdom of Satan," which is this Government, "can

16  be destroyed."

17         What sort of terms -- what terminology -- what

18  language does Burson use on November 7th, before

19  Mr. Batiste's plan came into existence?

20         "But the thing is it's tricky now.  The devil

21  is against us and the devil is smart.  But Allah has

22  the best planners.  But you can't underestimate the

23  devil.  He is strong."

24         Where did this come from?  How is it that

25  Burson Augustin uses the example the devil -- the same

Rebuttal Argument by Mr. Gregorie                    244

 1   way that Mr. Batiste uses it?  Where is he learning

 2   this from?  How did he get it?

 3           It comes from Narseal Batiste, ladies and

 4   gentlemen.  This plan was in existence long before

 5   Abbas al-Saidi came in.

 6           The problem was that Mr. Batiste couldn't get

 7   the money, the funds, to start his little army, to

 8   start his war that he had in mind.  He needed to get

 9   somebody to help him do it.

10           Next, please.

11           Let's look again at what Burson Augustin says

12   on the 7th of November.

13           He says that taking a receipt from somebody in

14   a store -- a lady in a store, you know, something that

15   shows sales tax, a receipt -- he says it looks like

16   he's supporting what the Government is doing because he

17   takes the receipt.  So, "Okay.  I'm at fault because I

18   got to blend in."

19           But here's what's important, what he says:

20   "But am I blending in?  By blending in, I'm gonna

21   destroy you."

22           "I'm going to destroy you."

23           Sure, they fly an American flag and a Moorish

24   flag.  They do things they have to do and they go to

25   court when they're supposed to be there, because

 1   they're blending in.  But by blending in, they're going

 2   to destroy you.

 3           This is November the 7th.  This is Burson

 4   Augustin.

 5           Go on, please.

 6           Let's look at a little more of what Burson

 7   says.  Remember, on November the 7th -- this is well

 8   before Narseal Batiste claims that anybody knew about

 9   what was going on.

10           But on November the 7th, the informant tells

11   Burson Augustin that, "My uncle's gonna send somebody

12   here."

13           THE COURT:  Can you identify the exhibit,

14   please, for the record.

15           MR. GREGORIE:  Oh, yes.  I'm sorry.  That's

16   Exhibit 41.

17           And in Exhibit 41, at Pages 101 to 109,

18   Mr. Abbas al-Saidi tells Burson Augustin that, "He's

19   gonna" -- that somebody's coming, that his uncle is

20   sending somebody, that the informant doesn't know who

21   it is, "But I know he's in jihad."

22           He's not talking about the friendly jihad.

23   He's talking about the real jihad.  "I know he's Arab,

24   Muslim."

25           And what does Burson Augustin say?  "And he's

Rebuttal Argument by Mr. Gregorie                    246

 1   gonna check us out a lot, how we act under tension and

 2   how we're organized at the Temple."

 3           This is Burson's statement.  This is

 4   November 7th, before Narseal Batiste says he had any

 5   plan.

 6           Burson says, "I think he wants to see us a

 7   whole day.  He wants to probably be around us and see

 8   how we talk, how people communicate with us."

 9           This is the man coming from overseas.

10           Next, please.

11           Now we go to December 16th.  You know, we

12   heard everybody say that they didn't ask for arms, they

13   didn't ask for explosives.  Oh, yes, they did, ladies

14   and gentlemen.

15           When Narseal Batiste asked to send somebody

16   from the Middle East, from a terrorist organization,

17   that was his bomb, ladies and gentlemen.  That was his

18   explosives.  That was his armaments.  He couldn't

19   afford this stuff.  He couldn't get it.

20           But he knew what he was doing.  He tells us on

21   December 16th exactly, "I'm in the same position that

22   Jeff Fort was in.  I'm gonna get support from over

23   there, from those people from that terrorist

24   organization."

25           Jeff Fort went to Libya.  He sent Abbas to

Rebuttal Argument by Mr. Gregorie                           247

```
 1    Yemen.
 2             What is it that happens when -- in Exhibit 44
 3    when Narseal Batiste and Elie Assaad talk?
 4             Narseal Batiste says -- he's meeting with Elie
 5    Assaad, the informant, because CW 1, Abbas, a Muslim,
 6    introduced them.  He's the one that put them together.
 7             This is what Narseal Batiste says about Abbas:
 8    "From what he's always been seeing and know about me,
 9    'cause him to feel that I'm very serious in everything
10    that I do, which allowed him -- and he told me -- he
11    said -- he said, 'I have contacts.  I have people that
12    can bring help with the mission that you want.'
13             "So that brings me to this point where I am at
14    right now, meeting you.  And don't get me wrong.  I'm a
15    man that is determined.  I'm a man that is determined
16    whether I get any help from you or not."
17             Narseal Batiste doesn't have to say that.
18    Nobody talked him into it.  He's determined to do this
19    whether this man helps him or not.
20             Further on in this same exhibit, the guy that
21    he's come to see now, that he said that Abbas set him
22    up with, that he's met with, keeps asking him, "What do
23    you want from me?  What do you want from my brothers
24    over there?  What are you asking for from the people
25    over in the Middle East?  Why are you asking for?"
```

Rebuttal Argument by Mr. Gregorie                248

```
 1              And Narseal Batiste tells him, "The only thing
 2    I want your people to know is that we are here."
 3              What does that mean?  That means, "You're over
 4    there in the Middle East.  You can't do anything from
 5    over there.  You need us.  We're here, and I want you
 6    to know that."
 7              That's what he's offering, is his services.
 8    This is the agreement he's looking for:  "I'm telling
 9    you I've got people over here.  We can do your bidding.
10    You pay us and we'll do your bidding."
11              This is Narseal Batiste reaching out for a
12    terrorist organization for money.  He's selling out,
13    ladies and gentlemen.  They're right.  He was doing it
14    for money.  But he had a purpose in mind.
15              But the informant keeps asking him.
16              He could have said, "Hey, look, I'm -- I want
17    to uplift the community.  I want to do good things for
18    the community.  I'd like to build a temple, a mosque.
19    Can you help me build a temple?  Can you help me build
20    a mosque?  That's what I want to do.  That's what I'm
21    about."
22              Is that what Narseal Batiste says to this man?
23              What does he say?
24              "We have to build.  We cannot build.  We
25    cannot convince.  I cannot convince my people.  We're
```

Rebuttal Argument by Mr. Gregorie                    249

1   already in the wrong religion.  You have forgotten

2   about yourself.  Doesn't know anything about the true

3   religion."

4          What true religion is he talking about?

5          They talk about freedom of religion.  He's

6   talking about making people believe his religion.

7          "I cannot show them strength, I cannot show

8   them power, if I'm still weak and talking about what

9   we're gonna do.  They have to see that we're strong.

10  They have to see that we have boots, military uniforms.

11  They have to see that we have great communications."

12         What else does he say?

13         "We have to see that we have access to bring

14  them to training grounds so they can train for

15  guerrilla warfare."

16         Is this uplifting the community?  Is this the

17  saintly man, the saintly man, you heard about?

18         What's the final thing he says?

19         This is December 16th, the first time he meets

20  this man that comes from the Middle East.

21         "What's your plan?

22         "To build an Islam army -- an Islamic Army for

23  Islamic jihad.

24         "Jihad.  Wage jihad?

25         "Yes."

Rebuttal Argument by Mr. Gregorie                250

1          He's talking about a war -- a holy war, ladies

2    and gentlemen.  This is the very first time he meets

3    this informant.

4          He doesn't say, "I need your money to build

5    the mosque.  I need your money to help uplift the

6    community."

7          He's talking about a war.  This man has a

8    messianic complex.  He believes he's God.  He believes

9    he has that power.  And he convinced his fellow

10   soldiers of that.  And what's he want to do with it?

11   He wants to wage war.

12         If we go on to 12-21, Narseal Batiste is again

13   with Elie Assaad.  This is the second real meeting they

14   have.  It's Exhibit 46 at Pages 40 to 42.

15         What does Narseal Batiste say that you may

16   have heard before?  "We need to have the gangs go

17   straight -- crazy in the streets.  You see what I'm

18   saying?  This will cause a massive confusion."

19         That's similar to what Burson Augustin said on

20   the 7th of November.

21         "We need to have a massive confusion.  Then we

22   need to have somebody to go steal one of them at the

23   same time.  We need to explode and blow up the

24   building."

25         Mr. Vereen asked for explosives.  Here you

Rebuttal Argument by Mr. Gregorie                251

 1   go, ladies and gentlemen.  This is as early as

 2   December 21st.

 3         "Let me tell you something.  There's two major

 4   buildings to blow up, the Empire State Building and the

 5   Sears -- Sears Tower.  Sears Tower, it's the tallest

 6   building in the world.  It used to be the Empire State

 7   Building.  Then you gotta get -- you gotta get

 8   buildings right here in Miami, California, some in

 9   Texas."

10         Then what did he say?

11         "That sounds impossible, but it can be done.

12   It can be done because they can be put on fire.  Burn

13   them to the ground.  But whatever they take to burn

14   them, whatever they take to destroy them, they gonna

15   have to be destroyed."

16         Is this a plea for money, ladies and

17   gentlemen?  Is this a peaceful conversation,

18   nonviolent?  This is what he says on December the 21st.

19         Now, Narseal Batiste is here talking on

20   Exhibit 55 and 55-A, Pages 101 and 102, with Elie

21   Assaad and Abbas al-Saidi in the tent.  Let's talk

22   about this a minute.

23         In January, we know that, for some reason,

24   Narseal Batiste stops talking to Elie Assaad and he

25   sends his number one soldier, Patrick Abraham, to do

Rebuttal Argument by Mr. Gregorie                252

 1    the talking.

 2            He says, "I'm speaking like I'm Narseal

 3    Batiste."

 4            This is a conspiracy, ladies and gentlemen.

 5    It's agreement, people working together, operating

 6    together.

 7            And what's he saying when they seize these

 8    guys on the 28th after he's brought them all the way

 9    down to the Keys?

10            "The reason why," Narseal Batiste says, at

11    Pages 101 and 102, Exhibit 55 -- "The reason why I

12    didn't call you back right away, like I explained to

13    this brother here, is that I was being followed."

14            And the CW says, "You were being followed?

15            "Yes.  Because of the outside association,

16    outside problem that happened.  And I'll explain to you

17    what the problems were."

18            Then he says, "So my team -- my people was

19    working at that house, too, when they -- they out of

20    town, because we didn't know that they was gonna do

21    this --

22            "Uh-huh.

23            "So the detective called me up."

24            He's talking about the detective now.

25            "He's following me.  You see what I'm saying?

Rebuttal Argument by Mr. Gregorie                253

1    And then I had a warrant out for my arrest.  Remember I

2    told you that?  Because I had a ticket that I didn't

3    pay.  And so they had a warrant out for my arrest and I

4    already knew that they were -- now, this happened right

5    after the last time we talked, two days after we

6    talked."

7           Well, the last time they talked was

8    December 29th.  Two days makes it December 31st.  So

9    from December 31st until January 28th, he was worried

10   about police surveillance.  He was worried a detective

11   was chasing him.

12          It wasn't that he didn't want to talk to the

13   informants.  It was that he was being followed by the

14   police and he was worried about being caught.  That's

15   why he had them brought all the way down to the Keys.

16          Now, he tells you that he believed Abbas was

17   going to pay for it.  I wonder if you could hear a

18   conversation where he says, "You know what, Abbas?  I'm

19   going to kidnap you.  I'm going to make you change your

20   clothes.  I'm going to make you take all your

21   electronic equipment off.  I'm going to take you to a

22   place you don't know where you're going, and I want you

23   to pay for it."

24          I don't think that conversation occurred,

25   ladies and gentlemen.

Rebuttal Argument by Mr. Gregorie                254

1           Who took part in all of that?  Oh, yes.  Naudy

2  Herrera rides in the front seat while they're driving

3  all the way down there.

4           But these men say, "We're with Al-Qaeda.

5  We're with one of the worst terrorist organizations in

6  the world."

7           Well, we heard testimony at one point, you

8  know, that, "If that was the case, I wouldn't have

9  anything more to do with them."

10          So good.  The case ends January 28th.  Nothing

11  more to do.

12          But you and I know that doesn't happen, ladies

13  and gentlemen.  That's not what happens in this case.

14          Let me take this back just a little bit,

15  because we hear here about this arrest warrant, this

16  warrant.

17          In November -- Mr. Batiste tells you he didn't

18  drive to the meeting on November 21st or the meeting on

19  November 10th.  He had Patrick Abraham take him because

20  he couldn't drive.  He had a suspended license.

21          Well, think about December 16th.  He has no

22  trouble driving to the airport and driving to the

23  motel.  And on December 21st and 22nd, he had no

24  trouble driving to those meetings.

25          On December 29th, we know that he went to

Rebuttal Argument by Mr. Gregorie                    255

1   Bayside.  We have a picture of him there in the green

2   truck.  He had no problem driving there.

3           So that excuse doesn't work on those

4   occasions.

5           And, in fact, if you look, there's in evidence

6   a Louisiana driver's license that he got back when he

7   was in Louisiana, which is good until February of 2006.

8   So he really did have a license he could have used.

9           Now, ladies and gentlemen, they tried to tell

10  you -- and this is the competing defenses you have

11  here -- that he wanted no part of these people.

12          He went to look for the warehouse, but he

13  didn't like them.  He wasn't happy about it.  You know,

14  they said the only time he was happy was when they gave

15  him money.

16          Well, we're going to hear a little bit about

17  what happened on February the 19th.  But I want you to

18  look closely at the screen, ladies and gentlemen.

19          You're going to see Mr. Batiste walk into this

20  room on February the 19th in the apartment belonging to

21  Elie Assaad, and I want you to watch him as he walks

22  in.

23          Would you play it, please.

24          (Whereupon, segments of Government's Exhibit

25  No. 56 were published in open court. )

Rebuttal Argument by Mr. Gregorie                256

1           MR. GREGORIE:  Do you think he was sad, not

2   happy to be there, didn't feel like he was welcome,

3   didn't want to be there?  He jumps in, claps his hands,

4   jumps on the couch.  Man, he's in heaven.  Is he in

5   heaven because he's going to get money?

6           Let's hear some of what happens on the --

7   February the 19th.

8           Here's what he says.  And this is an answer to

9   Mr. Vereen's argument.

10          He's sitting there with Patrick Abraham.

11          Mr. Patrick Abraham says he's listening.

12          Well, you've got to remember these are

13  soldiers.  This is "The Prince" that's running this

14  meeting.  This is the man you don't argue with.  This

15  is the man who gives the orders.

16          So Patrick's there as the loyal guard, keeping

17  his mouth shut, but he's listening.

18          And here's what Narseal Batiste says:  "Then

19  we're gonna have -- we're gonna have (unintelligible)

20  trucks bring explosives."

21          Explosives.

22          "We will take it from there and we will go

23  under the ground."

24          And further down, he says, "They call it,

25  like, missiles.  I put, like, a missile in the ground

Rebuttal Argument by Mr. Gregorie                257

1    and I shoot it, boom, and I make it stop at that

2    building over there.  It'll create a big hole in the

3    ground."

4         Did they discuss explosives?  Did two of these

5    Defendants know what they were going to do with the

6    Sears Tower, a building that has the US Post Office, an

7    agency of the US Government in its basement and that

8    has a tourist attraction at the top where people from

9    all sorts of places come to visit?

10        But that wasn't the only time he talks about

11   it on February the 19th.  Here's Narseal Batiste again

12   at Pages -- Page 63.

13        "Now, what I plan I doing is attacking here,

14   here and here."

15        This is when he's at the table showing where

16   he's going to attack.

17        "So -- but you're not attacking here?", the

18   informant asks.

19        And he says, "With explosives.  I'm gonna have

20   some in here.

21        "Oh, you have it in the center, around it?

22        "Under the ground," Narseal Batiste says.

23        "So what will happen?"

24        Narseal Batiste says, "They will all explode

25   at one time."

Rebuttal Argument by Mr. Gregorie                    258

1              Explosives, ladies and gentlemen.

2              Let's go to March the 16th.

3              And I want you to think about this a little

4    bit, ladies and gentlemen, because there's certain

5    facts in this case that are indisputable.

6              Defense can't argue with it.  I submit to you

7    they didn't play them for you or put them on because

8    there's no argument for it.

9              On March the 16th, it's late in the evening.

10   People have been working all day long.  They don't

11   argue with that.

12             But they get in three different cars, and they

13   drive all the way to this warehouse.  Before they get

14   to the warehouse, they talk to each other on the phone.

15   Stanley Phanor's in one car.  People are in the other

16   cars.

17             First, they make sure who's in which car.

18   They make sure only the inner circle is coming.  So

19   they know something very important is going to happen,

20   and it's something they don't want law enforcement to

21   know about.

22             They do countersurveillance while they're

23   there.  What are they doing countersurveillance for?

24   Do they think they're going to a party?

25             And then they don't go in at the same time.

Rebuttal Argument by Mr. Gregorie                    259

```
 1    First, one group goes in.  Five minutes later, the
 2    other group goes in.  Now they get there.
 3            And when they are there, one of the first
 4    things that happens is Narseal Batiste gets up in front
 5    of the whole group.  And it takes a little while for
 6    them all to get there.  They walk around inside.  They
 7    arrive at different times.
 8            But Narseal Batiste says, "The first thing is
 9    that we're all very grateful for all the help and
10    support that you -- that's coming through you from my
11    great brother, Osama bin Laden.
12            "And for me personally, I respect Osama bin
13    Laden.  And when I first heard -- when I first seen on
14    TV, you know, I did not look at him as being a devil or
15    nothing.  The first thing I said to myself is that this
16    man was like an angel."
17            So they start this meeting with their leader,
18    telling them that he loves Osama bin Laden, he's like
19    an angel to him.
20            Now, ladies and gentlemen, if you deal with
21    teenagers or have teenagers, one of the first things
22    you say to them is, "When you get someplace and
23    somebody's talking about doing something bad or causing
24    a problem, what do you do?"
25            You leave.  There were three cars.  You get up
```

Rebuttal Argument by Mr. Gregorie                    260

1    and you walk out.

2            But this is the inner circle.  These men are

3    soldiers, ladies and gentlemen.  And when I'm through

4    with this piece about March 16th, we're going to show

5    what I mean by "soldiers."

6            But these are soldiers.  They follow orders.

7    They do what "The Prince" tells them.  Naudy wrote it

8    down in his book.  You can look at it and see it.  They

9    do exactly what "The Prince" told them.

10           And what is it that Narseal Batiste says on

11   the 16th?  He says, "I'm very excited and overwhelmed

12   that he's willing" -- meaning Osama bin Laden -- "to

13   help us on our mission."

14           Okay.

15           Further on -- this is Government's Exhibit 69

16   at Page 57 -- we go back to the explosives.  Now, it's

17   kind of funny.  I guess defense attorneys focused on

18   the order of the overt acts.

19           Well, does it make any difference at all?

20   Really, ladies and gentlemen, if you got there and

21   you're listening to this great thing about Osama bin

22   Laden and you take the oath and then discuss a plan to

23   blow up buildings, or if you discuss the plan to blow

24   up buildings and then you take the oath, what

25   difference does it make?  You're agreeing to be part of

Rebuttal Argument by Mr. Gregorie                    261

1    Al-Qaeda.

2              Whether you did that after you heard that they

3    were going to blow up buildings and wanted your help or

4    before you heard they were going to blow up buildings

5    and wanted your help, what difference would it make as

6    to whether or not you were conspiring, agreeing, to do

7    it?

8              It makes no difference whatsoever.

9              But let's see.  In front of all the people --

10   all of the Defendants are there.  You see them.  They

11   all get up and take the oath.  So we know they're all

12   there.

13             Here's the thing about explosives.

14             Narseal Batiste says, "You see what I'm

15   saying?  I'm still -- I'm -- you know, if I cannot find

16   somebody who's gonna help me with the explosives, along

17   with that other stuff that we talked about, the

18   expertise like that, I'll have to come to your

19   directions, because I don't have the person.

20             "But I do have somebody in mind that I trust

21   that's a family member, a blood family member that I

22   can really trust that can help me."

23             He's talking about the explosives.

24             Mr. Vereen asked you, "Where's the

25   explosives?"  Here's the explosives in front of

1     everybody who's there.

2           Now, they talk about knocking down five

3     federal buildings in five different cities.  I don't

4     think they were planning on leaning on them, ladies and

5     gentlemen.  Even Narseal Batiste, with his divine

6     power, couldn't just lean on them.  They were going to

7     need explosives.

8           Now, I want you to look, ladies and

9     gentlemen -- because you know what?  Mr. Levin just

10    played this.  But he didn't play it for the same person

11    I'm playing it -- same reason I'm playing it for you.

12          They've just taken an oath to Al-Qaeda.

13    They've heard that Al-Qaeda is going to blow up five

14    federal buildings.  They're going to blow it up.

15          And the informant leaves.  He walks out.  He's

16    gone.  Because the informant leaves, the FBI's supposed

17    to shut the camera off, and they do.

18          But until they're sure he's out of there, the

19    camera continues to run.  And you're going to see the

20    brothers standing there.

21          I want you to watch this carefully, ladies and

22    gentlemen.

23          Because if, after the informant left, they

24    really were upset, they weren't happy about being in a

25    place where they just took an oath to Al-Qaeda, they

Rebuttal Argument by Mr. Gregorie                    263

1    just were told they were going to blow up federal

2    buildings, wouldn't you think somebody would be angry,

3    somebody would be walking up to Narseal Batiste, who's

4    sitting at the desk here, saying, "What the hell is

5    going on here?  What did you just do to us?"

6             Watch the soldiers, ladies and gentlemen,

7    stand at attention, stand there.

8             Would you play it, please.

9             (Whereupon, segments of Government's Exhibit

10   No. 69 were published in open court.)

11            MR. GREGORIE:  The informant is leaving.  Look

12   at them.  They're standing at attention.  The guard

13   goes and closes the door.

14            One man very politely, very quietly, walks up

15   to the desk where some of the documents were that they

16   were reading from, picks them up.

17            Nobody's saying a word.  These are soldiers,

18   ladies and gentlemen, at attention who are doing what

19   they were told.

20            You heard Narseal Batiste.  We didn't play the

21   conversations about the movies so that we could show

22   you that he didn't like movies.  We played them so we

23   could show you that these men did what they were told.

24            Do you see anybody objecting?  Do you see

25   anybody saying, "No, no, no.  I don't want any part of

Rebuttal Argument by Mr. Gregorie                264

```
1    this" --

2            MS. JHONES:  Your Honor, objection.

3            MR. LEVIN:  Objection.  Mischaracterization of

4    the evidence.

5            MS. JHONES:  This is misleading.  There was no

6    microphone activated, your Honor.  That is a misleading

7    statement.

8            THE COURT:  Overruled.

9            MR. GREGORIE:  Do you see anybody speaking?

10           MS. JHONES:  There was no -- your Honor --

11           THE COURT:  Overruled.

12           This is closing argument.

13           MS. JHONES:  Your Honor --

14           MR. GREGORIE:  You look and see if anybody's

15   lips are moving.  You can see.

16           (Whereupon, segments of Government's Exhibit

17   No. 69 were published in open court.)

18           MR. GREGORIE:  Is this objection?  They can

19   object all they like, ladies and gentlemen.  But the

20   picture speaks for itself.

21           MS. JHONES:  I'm going to reserve a motion,

22   your Honor.

23           MR. GREGORIE:  What else happens?

24           We have Patrick Abraham riding with Elie

25   Assaad.  And counsel played for you the Collins music.
```

Rebuttal Argument by Mr. Gregorie                265

1   But there was some conversation.

2              Now, Patrick Abraham is a soldier.  He's not

3   in charge.  He's the number two man.

4              He doesn't speak up unless he's taking

5   orders, given permission to.  This is like a military

6   organization.

7              What does the informant say to him?  "You

8   know, I believe in Brother Naz too much.  I believe in

9   him and his leadership.  He's a very great person."

10             Patrick says, "Uh-huh."

11             And he says, "And he care about you, also,

12   about all the brothers.

13             "Yes."

14             And then Patrick says he should never believe

15   that much in a man before, in a way, and even in the

16   right one.

17             "Huh?"

18             He says -- this is what Patrick Abraham says:

19   "I said you never have believed in a man before like

20   that?  You'd be -- you made -- you made the right step

21   this time."

22             He's telling the informant, "You made the

23   right step in forming an alliance with Narseal

24   Batiste."

25             That's what he's telling him.

1          And then Patrick Abraham says, "We don't -- we

2     don't let nobody down," meaning, "We formed this

3     alliance.  We'll help you.  You help us.  This is it."

4          Now, we talked about direction.  Direction

5     doesn't have to be an order.  It doesn't have to come

6     from a general, "You will do this."

7          It can be, "Okay.  We want to bomb five

8     federal buildings.  I need to know where the FBI

9     building is."

10         Well, Narseal Batiste took him to where he

11    believed the FBI building was, this federal complex

12    downtown and the FBI building in North Miami Beach.

13         That was direction, ladies and gentlemen.

14         "We want to bomb FBI buildings."  He didn't

15    take him to a grocery store.  He didn't take him to an

16    empty warehouse.  He took him to the FBI building.

17         The tape on March the 24th, 2006, Government's

18    Exhibit 44, Pages 25 to 26, is where we're going to

19    start.

20         Because they're driving in the car.  Patrick

21    Abraham is driving.  Narseal Batiste is riding in the

22    front seat.  You haven't heard this piece, but it's in

23    the transcript at Page 25 and 26.  They're driving

24    along.

25         Out of the blue, this is what Narseal Batiste

Rebuttal Argument by Mr. Gregorie                267

1    says:  "Are we gonna burn Miami Beach?

2            "Brother, we'll burn any chance we get," the

3    informant says.  "We'll do."

4            And Narseal Batiste says, "We'll set it on

5    fire, huh?"

6            And the informant says, "We will set it on

7    fire.

8            "Good," Narseal Batiste says.

9            The informant says, "You are enjoying a little

10   bit.  We'll enjoy it, also."

11           This is the religious man, the man we should

12   feel sorry for?

13           What is it that Narseal Batiste says?  "That's

14   great.  I need this war to come on."

15           Count 4, ladies and gentlemen.

16           "I need this war to come on," the same one he

17   wants to cause chaos in.

18           "I'm ready for war.

19           "You are what?

20           "I'm ready for war."

21           This is after he's made this -- the oath to

22   Al-Qaeda, after they've talked about blowing up the FBI

23   buildings.  This is him.  "I'm ready for war."

24           Next, please.

25           They're driving along.

Rebuttal Argument by Mr. Gregorie                    268

```
 1              The informant says, "Where are we now?

 2              The informant doesn't know where he's going.

 3              This is transportation, ladies and gentlemen.

 4   Patrick Abraham, Narseal Batiste are driving the

 5   informant, who doesn't know where the FBI is, doesn't

 6   know where he's going.  He's not from Miami.  He's a

 7   Middle Easterner.

 8              And he says, "We're in North Miami."

 9              All of a sudden, a Hummer passes by.  Narseal

10   Batiste sees a Hummer.

11              Okay.  He could just let it go.  He doesn't

12   need to say anything.

13              And he tells the informant, "A Hummer can go

14   through a building."

15              This is a man who's making plans to blow up an

16   FBI building, federal buildings.

17              He's telling him, "Here's a Hummer.  It can go

18   through a building."

19              He's providing him advice.

20              Further on, Pages 53 and 54, here's Narseal

21   Batiste.  "This is it, coming up on your right side.

22              "What?", says the informant.

23              "This is it right here.

24              "Which -- what is this?"

25              The informant doesn't even know what it is.
```

Rebuttal Argument by Mr. Gregorie                269

1              "The FBI building.  One security guard right

2       there in the shack, right there.

3              "Is this the FBI building?", the informant

4       asks.

5              "Yeah.  See how they got it barricaded?  They

6       got one security guard."

7              This is Patrick Abraham and Narseal Batiste

8       providing the transportation, providing the direction,

9       giving the advice on where the FBI building -- "You

10      want to blow it up?  Here it is."

11             Still Exhibit 44.  We now go to Page 57.

12             What does Narseal Batiste say?  "You want to

13      see military base?  It's even smaller."

14             Now he takes him over to show him the National

15      Guard.

16             Why?  Because he's providing material

17      assistance.  The man wants to blow up buildings?  He

18      wants to fight a war?

19             "Let me show you where to go next.  Here's

20      where the National Guard Armory is."

21             We're still on the same exhibit, 44,

22      March 24th.  This is after the oath.  Patrick Abraham

23      is still driving.

24             Here's what the CW says:  "So you think,

25      like -- like you said, 30 guerrillas?  You can take

Rebuttal Argument by Mr. Gregorie                270

1    that building?"

2           Narseal Batiste says, "Yeah."

3           He says, "But how we can go in?

4           "With a good truck is how we gonna do it."

5           He says, "What?"

6           Narseal Batiste says, "Take a truck."

7           Then he says, "Out of the building."

8           Then Narseal Batiste says, "You gonna do a

9    mission, you can't be scared to die for Allah.

10          "Exactly, brother.  Exactly.

11          "Otherwise, don't fight for jihad," Narseal

12   Batiste says.

13          Is he planning a war?  Has he got a plan in

14   his mind?

15          We're still on the same exhibit, Exhibit 44,

16   Page 61.

17          Narseal Batiste says, "Yeah.  That's why I

18   formed the alliance with Al-Qaeda, so I can get the

19   help so I can build the amount of soldiers I need,

20   'cause if I have a lot of soldiers that are willing to

21   fight for jihad, then I can take more states at one

22   time, along with your help."

23          This is why he asked for the representative

24   from the Middle East.  This is the plan.  These are the

25   words coming out of the mouth of Narseal Batiste.

Rebuttal Argument by Mr. Gregorie                    271

1           You don't have to weigh the testimony of

2    anybody.  All you have to do is pay attention to the

3    tape recordings.

4           Page 61.

5           THE COURT:  You have 15 minutes.

6           MR. GREGORIE:  Thank you, your Honor.

7           "You can do more damage.

8           "Yes."

9           Narseal Batiste says, "I say there's a

10   difference.  Why hit the target when you can destroy

11   it?"

12          And he says at the end, "Why just hit the

13   United States?  Just destroy it.  Get rid of the

14   problem."

15          Now, after the oath and after this ride-around

16   on the 24th, on the 25th, there's videotape taken by

17   Narseal Batiste, Stanley Phanor and Rotschild

18   Augustine.

19          What I'm about to show you now is very

20   important, because Narseal Batiste testified on that

21   stand that, after he went to go take those pictures,

22   the two guys with him -- Rotschild and Stanley

23   Phanor -- didn't want to take the pictures.  They left.

24   They left him sitting there.

25          Well, if you remember, that surveillance

Rebuttal Argument by Mr. Gregorie                 272

 1   started at 11:30 in the morning.  You'll see in the

 2   first clip that there's bright lights -- there are no

 3   lights.  It's bright sunshine.

 4        And the drive-around -- they drive around

 5   several times.  Narseal Batiste is taking the pictures

 6   with the videocamera.  He can't drive because he's got

 7   a suspended license, and he can't take the videotape

 8   and drive around at the same time.

 9        I want you to look at these three videos.

10   Look at them carefully, please.

11        (Whereupon, segments of Government's Exhibit

12   No. 126 were published in open court.)

13        MR. GREGORIE:  This is the one going by the

14   prison, showing the gas lines and the water lines.

15        THE COURT REPORTER:  I'm sorry.  Could I just

16   have an exhibit number, counsel?

17        MR. GREGORIE:  I'm sorry.  This is 26 --

18   Government's Exhibit 26.

19        THE COURT REPORTER:  Thank you.

20        MS. ARANGO:  126.

21        MR. GREGORIE:  126.

22        (Whereupon, segments of Government's Exhibit

23   No. 126 were published in open court.)

24        MR. GREGORIE:  Okay.  Now, as you see, it's

25   getting later.  There's -- there are lights on.

Rebuttal Argument by Mr. Gregorie                    273

1              And I want you to watch the last one.  That's

2     the US Attorney's Office building.

3              And now it's dark night, ladies and gentlemen.

4     Look at the lights on.  This is darkness.  You can look

5     at it yourself.  Go pull out Exhibit 126.  It'll show

6     you videotapes.

7              It goes from 11:00 in the morning to

8     nighttime.  This is March -- March 25th.  Dark doesn't

9     come until almost 7:00 at night, ladies and gentlemen.

10             So he didn't take videotape merely at 11:00

11    and they quit and went home.  They're still taking

12    video at close to 7:00 or later.  They took videotape

13    in the daytime and in the nighttime.

14             Narseal Batiste wasn't by himself.  Rotschild

15    and Stanley Phanor are soldiers.  They do what "The

16    Prince" tells them, exactly as Naudy wrote in his book.

17             Next, please.

18             Okay.  We go to March the 27th.  Burson

19    Augustin's with him.

20             And, you know, Narseal Batiste says, "Yeah.

21    'Cause, usually -- or the information that I gave you

22    and the police knew I had?  They would give $100,000

23    for my head.

24             "Really?  What information?

25             "You know, pictures and stuff like that."

Rebuttal Argument by Mr. Gregorie                    274

1          If Narseal Batiste was pulling a scam and he

2    knew that all he had to do was turn in this terrorist,

3    he can get $100,000.  On the list, he writes 50.

4          All he had to do was say, "I was taking

5    pictures of the federal building.  I'll give you the

6    pictures.  I turned them over to a terrorist."  And

7    he'll get $100,000.  The man knows how valuable this

8    information is.

9          Did he turn them over to the FBI?  Did he call

10   the police?  Did any one of these men go and try to

11   collect a reward?

12         That was not their intent.  Their intent was

13   to do exactly what they did:  Provide material

14   assistance to a terrorist organization to get money.

15         That's what they wanted.  They could have

16   turned these guys in for $100,000.  He didn't do it.

17   That's intent, ladies and gentlemen.

18         Next, please.

19         And on April 3rd, Narseal Batiste, Burson

20   Augustin and Elie Assaad are meeting together.  Now,

21   here's where the security licenses come in.

22         So what is it that Mr. Batiste at Page 43 and

23   44, Government's Exhibit 85, says?  He says, "We got a

24   lot of brothers who can work security."

25         Why is he telling the informant that?

Rebuttal Argument by Mr. Gregorie                    275

1          "Yeah.  Security anywhere.  Government

2   buildings, anywhere.  You want to blow up Government

3   buildings?  We got guys who can work security in the

4   buildings.

5          "They in charge of security of the building?",

6   the informant asks.

7          And Narseal Batiste says, "Well, they can

8   do -- they can work on their -- in charges.  Well,

9   they're not supervisors."

10          And then he says, "But they can post -- you

11   know, work as a security officer."

12          And Narseal Batiste says further on, "That's

13   why I say the security is very good, 'cause it gets

14   them into a lot of places.  Everything."

15          That's why we introduced those security

16   licenses.  He got his soldiers to get security licenses

17   so he could get in places.

18          Next, please.

19          Now, let's look at Naudimar Batiste [sic].

20   And this one we're going to look at very carefully,

21   ladies and gentlemen.

22          Because Naudy is in the warehouse.  This is on

23   April the 6th.  The ceremony was on March the 16th,

24   when they took an oath to Al-Qaeda.

25          And they took the oath to Al-Qaeda -- this is

Rebuttal Argument by Mr. Gregorie                    276

```
 1   6 -- we're talking about probably some three or four
 2   weeks after the oath was taken.
 3            Naudy's in the warehouse.  He hasn't left.
 4   He's in the warehouse.  And he's working with Narseal
 5   Batiste.
 6            But here's what Narseal Batiste told you.  He
 7   said that he told Naudy that he played back the tape
 8   and the camera was not on "Record."
 9            And he says, "I know I didn't record
10   anything."  That's what Narseal Batiste says this tape
11   says.
12            I'm going to play it for you twice, ladies and
13   gentlemen, so you can hear it.  Because we say it comes
14   out "you," because what he's telling Naudy is, "You
15   didn't record it.  You took the camera.  But you didn't
16   record it."
17            And I want you to listen to something else
18   here, ladies and gentlemen.
19            He says, "I take it all the way back to the
20   first 35 or 40 minutes."
21            Well, you remember when he had the camera on
22   the Mos during the ceremony.  It may have been 5 or
23   10 minutes.  It wasn't 35 or 40 minutes.
24            I don't know what Narseal Batiste did.
25   There's no evidence of what he did.  But the pictures
```

Rebuttal Argument by Mr. Gregorie                    277

```
 1    didn't come out, and it didn't record.

 2             But listen to the tape, ladies and gentlemen.

 3             (Whereupon, segments of Government's Exhibit

 4    No. 90 were published in open court.)

 5             MR. GREGORIE:  "Are you still with me or not?"

 6    Is there an agreement?  "Are you still with me or not?

 7             "I'm down.  I'm down.  I'm with you."

 8             Is there an agreement or no agreement?

 9             Play it one more time so the jury can hear it,

10    please.

11             (Whereupon, segments of Government's Exhibit

12    No. 90 were published in open court.)

13             MR. GREGORIE:  Now, if you back in that tape,

14    there were two conversations.  They talk about two sets

15    of things that are going on.  They talk about the

16    meeting on March the 16th, and they talk about the

17    camera back then.

18             But this is clearly talking about Naudimar

19    Herrera having been tasked with taking a tape recording

20    and -- for 35 or 40 minutes and nothing coming out on

21    it, whether he didn't know how to do it or he did it

22    wrong or he didn't want to do it.

23             You'll see earlier on that tape he says, "I

24    like operating in the shadows.  I don't want to be on

25    front.  I don't want my picture taken."  Clearly, he
```

Rebuttal Argument by Mr. Gregorie                    278

```
 1   didn't want his picture taken on March the 16th.
 2            THE COURT:  You have five minutes.
 3            MR. GREGORIE:  Thank you.
 4            This is the evidence of that particular
 5   meeting.
 6            Next, please.
 7            Let's talk about Narseal Batiste a minute.
 8            This is the man that everybody wants you to
 9   feel sorry for.
10            Here's some of the things he said on
11   November 21st:  "It has to be more than just a bombing.
12   It has to be a real grounds war, 'cause somehow or
13   another you have to get the civilians.  You have to get
14   the people involved, make them go crazy.  You have to
15   make the people attack each other, cause chaos."
16            That's Pages 68 and 69.
17            12-21:  The Sears Tower.  He's talking about
18   the Sears Tower.  This is on December the 21st.
19            "It can be done because they can put on fire,
20   burn them to the ground.  But whatever they take to
21   burn them -- whatever they take to destroy them, they
22   gonna have to be destroyed."
23            On February the 19th, when he's talking about
24   the Sears Tower, if there are any survivors, what will
25   he do?
```

Rebuttal Argument by Mr. Gregorie                279

 1                "No.  We'll make sure of that.  If we see them
 2      surviving, we'll shoot them."
 3                On March the 24th, "Are we gonna burn Miami
 4      Beach?
 5                "We'll set it on fire.
 6                "That's great.  I need this war to come on."
 7                These are these man's words, ladies and
 8      gentlemen.  This is out of Narseal Batiste's mouth.
 9                I have one more thing to talk to you about,
10      ladies and gentlemen.
11                Because you see, in Exhibit 121-A, Narseal
12      Batiste went and took pictures.  Remember, he got his
13      own camera.  He could take the still pictures.
14                He went to the FBI and he went around the back
15      of the FBI building, ladies and gentlemen.  He stood
16      in a play yard for children, right next to the FBI
17      building.  This is the man that just said all those
18      things that you heard.
19                He stood in that yard and took this picture of
20      the FBI.  For what reason, ladies and gentlemen?
21      Because a man who was a representative of Al-Qaeda told
22      him they wanted to blow that building up.
23                I'm sorry, ladies and gentlemen.  I have no
24      tears for a man who could say those things and do that.
25                Thank you, ladies and gentlemen.

1          THE COURT:  Ladies and gentlemen, that

2    concludes the closing arguments.

3          If Jurors No. 14 through 18 would step into

4    the jury room.  Do not discuss this case amongst

5    yourselves.  If you would just step into the jury room

6    with -- for one moment, and then I'll be with you.

7          (Whereupon, Juror Nos. 14 through 18 exited

8    the courtroom at 6:23 p.m. and the following

9    proceedings were had:)

10          THE COURT:  Ladies and gentlemen, as I

11    indicated to you, this concludes the closing arguments.

12          You're going to come back Monday morning at

13    9:00.  It's a little late to start deliberations now.

14    It's been a long day, I know.

15          Do not discuss the case either amongst

16    yourselves or with anyone else.  Have no contact

17    whatsoever with anyone associated with the trial.  Do

18    not read, listen or see anything touching on this

19    matter in any way.

20          If anyone should try to talk to you about this

21    case, you should immediately instruct them to stop and

22    report it to my staff.

23          Let me give you your instructions for Monday

24    morning.

25          You are not going to come back to the

1    courtroom.  You're going to go directly to the jury

2    room at 9:00.

3             You may not begin your deliberations until

4    such time as all of your members are present.  There's

5    lots of other things to talk about.  Talk about the

6    baseball season.  Talk about hockey playoffs.  Talk

7    about the Heat playoffs.  Don't talk about the case

8    until every one of your members is present.

9             Your cue will be when Patricia brings you your

10   notebooks, the jury instructions, the verdict forms and

11   the indictment.  The evidence that has been introduced

12   into the record will be available for you, and she will

13   bring that in as well.

14            Now, one thing.  When you come in Monday

15   morning, you're going to give to Patricia your cell

16   phones.  You are not allowed to have cell phones during

17   deliberations.

18            You may use them for personal calls during

19   breaks, and Patricia will have them and will take care

20   of them and will give them to you during your breaks

21   and at lunchtime.

22            So that concludes the trial day today.  And

23   I'm sure I will see you sometime on Monday.

24            Have a good weekend.

25            And, remember, you're coming back Monday

 1    morning at 9:00.

 2            Thank you for your patience today.

 3            (Whereupon, the jury exited the courtroom at

 4    6:25 p.m. and the following proceedings were had:)

 5            THE COURT:  Please give your notebooks to the

 6    court security officer.  Thank you.  And tell your

 7    fellow jurors to make sure they give their notebooks

 8    in.

 9            Can you go in there, Anita, and make sure they

10    give their notebooks in.

11            And I need the four alternates to come out.

12            THE COURTROOM DEPUTY:  Yes, your Honor.

13            (Whereupon, the alternate jurors entered the

14    courtroom at 6:26 p.m. and the following proceedings

15    were had: )

16            THE COURT:  Take any seats.  That's fine.

17    They don't have to be your seats.

18            You may be seated.

19            As alternate jurors, you do not proceed to

20    deliberate at this time.  I'm going to conditionally

21    release you, which means that you are free to go about

22    your business.

23            You may not discuss the case either amongst

24    yourselves or with anyone else.  You must have no

25    contact with anyone associated with the trial.  You

```
 1    cannot read, see or listen to anything touching on this
 2    matter in any way, because you are still serving on the
 3    jury as alternates in the event that it's necessary to
 4    call you back into service.
 5          Please make sure that we have all the phone
 6    numbers that we need for you.
 7          I know, Juror No. 15, that you've had a death
 8    in the family, and I express my condolences to you.
 9    You may be out of town.  So make sure that Anita has a
10    number for you while you're gone.  But you're certainly
11    free to do --
12          PROSPECTIVE Juror No. 15:  It'll be here.
13          THE COURT:  Oh, okay.  Fine.
14          But just make sure we have all the numbers for
15    you in the event that we need to call you back into
16    service.
17          I know that I speak for everyone when we tell
18    you how much we do appreciate your service.
19          Patricia will call you when the jury has
20    concluded its deliberations so that you know when you
21    are finally discharged.  Okay?
22          If you would, give your notebooks to the court
23    security officer.  We will hold them for you in the
24    event that you need to have them.  We'll take care of
25    your binders and your jury instructions as well.
```

1          You are free to go.  You do not need to come

2    back on Monday morning.

3          Thank you so much for your service.

4          (Whereupon, the alternate jurors exited the

5    courtroom at 6:29 p.m. and the following proceedings

6    were had:)

7          THE COURT:  You may be seated.

8          Anything further?

9          MS. JHONES:  Yes, your Honor.  I have a motion

10   to make.

11         THE COURT:  Okay.

12         MS. JHONES:  I have a motion for a mistrial.

13         I have to tell the Court, with the years of

14   experience that Mr. Gregorie has as a prosecutor in the

15   Southern District, I am nothing short of shocked,

16   nothing short of shocked, with his conduct.

17         This prosecutor knows that I have made

18   numerous efforts to have the Government produce what I

19   am convinced that they have in their possession, which

20   is exculpatory tapes, microfilms of what occurred on

21   March 16th post leaving of the informant in that

22   warehouse.

23         These prosecutors know very well, as their own

24   agents have testified for -- on three separate

25   occasions, notwithstanding the misleading nature of

 1    their testimony to the Magistrate, that there were

 2    microphones in that warehouse.

 3              And for this prosecutor, with his years of

 4    experience, to tell this jury that, if these men would

 5    have objected to taking an oath, they would have heard

 6    it on that tape, they would have heard it -- they knew

 7    that these men remained in that warehouse, your Honor,

 8    for God knows how long.

 9              They had microphones in that warehouse and

10    this man, with all his years of experience, told this

11    jury that, if these Defendants had any objection to

12    that oath, they would have heard it.

13              There was no court order allowing for

14    interception of audio or video, and that's why his

15    comments are nothing short of outrageous.

16              And notwithstanding that, notwithstanding his

17    knowing how many efforts I have made for them to

18    produce what I am thoroughly convinced that they have

19    in their possession, exculpatory tapes of the

20    discussions of these men of what went on in that

21    warehouse after that oath was taken, he had the

22    audacity, not even to suggest, but to tell the jury --

23    not even to suggest -- this man, with all his

24    experience, this man who received an award of

25    prosecutor of the year during the course of this case,

1    this man had the audacity to suggest to this jury to

2    consider evidence in violation of the Fourth Amendment

3    of the United States Constitution and to ask this jury

4    to consider evidence, evidence, that we have been

5    trying to get in this case for months.

6         MR. GREGORIE:  Judge, first of all, I don't

7    know what evidence she's talking about, because no

8    tapes exist.  That's been examined a dozen times.

9         Secondly, if you look at that tape, you can

10   see the lips.  You can seen the faces.  You can see the

11   actions of everybody in that room.  That's what I was

12   talking about.

13        It's very clear that nobody is objecting to

14   anything, Judge.  All you need to do is look at it.

15   That's clear from the tape.  And I am entitled to argue

16   from it.

17        I'm sorry she doesn't like the fact that her

18   clients were soldiers and didn't argue, didn't

19   challenge their boss, didn't challenge "The Prince."

20   But that's what happened on that tape.

21        You can see it, Judge.  All that jury does --

22   needs to do is to look at it, Judge.

23        MS. JHONES:  Your Honor, he cannot ask a jury

24   to consider evidence that's constitutionally

25   prohibited.  The informant was out, was out, of that

```
 1   warehouse.  He cannot -- they had no authority to

 2   intercept --

 3            THE COURT:  Ms. Jhones, Mr. Levin -- well,

 4   this was introduced into evidence.  It's an exhibit in

 5   evidence.

 6            And Mr. Levin played this exact portion --

 7            MR. GREGORIE:  The same thing.

 8            MR. LEVIN:  Your Honor --

 9            THE COURT:  -- not more than 30 minutes -- not

10   more than 30 minutes before Mr. Gregorie played it.

11   You had no objection when he played it.

12            MR. LEVIN:  Your Honor, that --

13            THE COURT:  It's exactly the same portion of

14   this exhibit that is in evidence, which is Exhibit

15   No. 69.  It is in evidence.  This was exactly what

16   Mr. Levin played.

17            MR. LEVIN:  Judge, this is not --

18            THE COURT REPORTER:  Please use the

19   microphone.

20            MR. LEVIN:  Your Honor, this is not an issue

21   with regard to objecting to the exhibit.

22            The point was that Mr. Gregorie knew that Elie

23   Assaad, who had left the warehouse, had the recording

24   device in his pocket.

25            So, in essence, the argument borders on -- and
```

1    I'm not calling him disingenuous, but he knows very

2    well that there's no recording in the warehouse to pick

3    up any conversations that may have occurred amongst

4    these Defendants.

5           He was basing his argument, although in a way

6    where he managed to just leave out the fact that the

7    recording device wasn't in there, on -- he now couches

8    it in terms of observations of lips moving or not

9    moving.

10          But he knew full well that there was no

11   recording capabilities --

12          THE COURT:  Well, and you told the jury that.

13          MR. LEVIN:  -- in the warehouse at that time.

14          I did tell the jury that.

15          THE COURT:  You told -- when you played

16   Exhibit 69 --

17          MR. LEVIN:  Right.

18          THE COURT:  -- and the music was on and this

19   exact scene was played -- in fact, I thought to myself:

20   They're all just standing there.

21          That was the video.  That's what I thought to

22   myself as I watched it and heard it.

23          And you said -- and I quote -- "Keep in mind,

24   Elie Assaad has the body recorder in his pocket.

25   That's what you're hearing."

1        And then Mr. Gregorie said, after he laid out

2    that, "They've just taken on oath to Al-Qaeda.  They've

3    heard that Al-Qaeda is going to blow up five federal

4    buildings.  They're going to blow it up.

5        "And the informant leaves.  He walks out.

6    He's gone.  Because the informant leaves, the FBI's

7    supposed to shut the camera off, and they do.

8        "But until they're sure he's out of there, the

9    camera continues to run."

10       And perhaps it runs for maybe -- I don't

11   know -- at most, it could be 25, 30 seconds.  I don't

12   even think it's that.  I didn't time it.

13       "And you're going to see the brothers standing

14   there.

15       "I want you to watch this carefully, ladies

16   and gentlemen.

17       "Because if, after the informant left, they

18   really were upset, they weren't happy about being in a

19   place where they just took an oath to Al-Qaeda, they

20   just were told they were going to blow up a federal

21   building, I would think that somebody" -- I can't read

22   the realtime -- "somebody would be angry, somebody

23   would be walking up to Narseal Batiste, who's sitting

24   at the desk here, saying, 'What the hell is going on

25   here?  What did you just do to us?'

1          "Watch the soldiers, ladies and gentlemen,

2     stand at attention, stand there.

3          "Would you play it, please."

4          And then he stated, "The informant is leaving.

5     Look at them.  They're standing at attention.  The

6     guard goes and closes the door."

7          And then he describes exactly what's going on

8     in the 20 or 30 seconds.

9          "The guard goes and closes the door.  One of

10    the" -- one of the men, one of the Mos -- I don't know

11    what term he used -- one of the soldiers -- "very

12    politely, very quietly, walks up to the desk where some

13    of the documents were that they were reading from,

14    picks them up.

15         "Nobody's saying a word.  These are soldiers,

16    ladies and gentlemen, at attention who are doing what

17    they were told."

18         And then he goes on to talk about Narseal

19    Batiste and about the movies that we -- "You heard

20    Narseal Batiste" -- I'll just read it:  "You heard

21    Narseal Batiste.  We didn't play the conversations

22    about the movies so that we could show you that he

23    didn't like movies.  We played them so we could show

24    you that these men did what they were told.

25         "Do you see anybody objecting?  Do you see

1    anybody saying, 'No, no, no.  I don't want any part of

2    this' --"

3            And then there was the objection.

4            This is closing argument.  He is entitled to

5    have the jury view the same exact scene that you had

6    them view for the purpose that he wants to show it for,

7    just like you had your purpose for playing Exhibit 69.

8            There's been no -- there's been nothing that

9    has gone on in his closing argument such that the

10   Defendants could not receive a fair trial.  This was

11   fair closing argument.

12           The motion for mistrial is denied.

13           And as far as Ms. Jhones being convinced that

14   there's exculpatory tapes, this is an issue that the

15   Court has heard at least two or three times and --

16   through the course of this case.

17           There have been hearings on it.  Judge Torres

18   had hearings on it.  I had hearings on it.  Orders were

19   entered.  There are no tapes.  This was fair argument

20   by Mr. Gregorie in his closing.

21           And we are in recess.  You are all on

22   ten-minute standby, starting Monday morning.

23           MR. CLARK:  Your Honor, did you say we needed

24   to be here Monday?

25           THE COURT:  Ten-minute standby.

1          MR. CLARK:  Okay.

2          MS. JHONES:  Your Honor --

3          MS. ARANGO:  Judge, I would just ask

4     Ms. Jhones on the record.

5          We're missing Government's Exhibit 33-F, as in

6     "Frank."

7          THE COURT:  Be seated, please.

8          MS. ARANGO:  I'm sorry.

9          THE COURT:  We're not in recess.

10         Sorry, Lisa.

11         MS. ARANGO:  I apologize.

12         THE COURT:  No.  We need to discuss the --

13    thank you, Ms. Arango.

14         Be seated, please.

15         We're not -- everybody needs to be here.

16         All the Defendants are here?

17         Just state your appearances, please.

18         Sorry.  I said we're in recess and we're back.

19         MR. GREGORIE:  Richard Gregorie and Jacqueline

20    Arango for the US, your Honor.

21         MS. JHONES:  Ana Jhones for Narseal Batiste.

22         MR. LEVIN:  Albert Levin for Patrick Abraham.

23         MR. CASUSO:  Lou Casuso on behalf of Burson

24    Augustin.

25         MR. CLARK:  Nathan Clark for Rotschild

1    Augustine.

2         MR. HOULIHAN:  Richard Houlihan and Naudimar

3    Herrera.

4         MR. VEREEN:  Rod Vereen for Stanley Phanor,

5    who's present.

6         THE COURT:  All Defendants are present.

7         Okay.  If you want to come early Monday

8    morning and go over the exhibits prior to the jury

9    coming in at 9:00, you may do that.  That's fine.

10        I don't expect you to stay here and,

11   certainly, I don't want to make my staff stay here any

12   later than it is.  It's already 6:39.  And the one

13   thing I try and do is not have court late on Fridays.

14        So if you want to come in early Monday morning

15   and go through everything with each other, as far as

16   the exhibits are concerned, and make sure that

17   everything that is going to be available to the jury is

18   what they're supposed to be getting, I think that --

19   are there prepared exhibit lists for them to have?

20        I seem to recall that we may have done that in

21   this case.

22        MS. JHONES:  We have not done that in the

23   past, your Honor.

24        THE COURT:  We did not?

25        MS. JHONES:  We did not.

1          THE COURT:  Well, I would request of everybody

2     that you prepare --

3          MS. ARANGO:  I think we did.

4          THE COURT:  -- an exhibit list.

5          I know some of you have done a handwritten

6     exhibit lists.

7          But Patricia will be here Monday morning.

8     I'll make sure that she comes in a bit early on Monday

9     so she can go over the exhibit lists with you.

10          And you may want to think about having

11     exhibit -- you know, a clean exhibit list for the

12     jurors.  I have done that in the past.  It makes it a

13     little easier --

14          MS. ARANGO:  Judge, it's our recollection that

15     we did that in this case.

16          THE COURT:  I thought we did.

17          MS. JHONES:  No.  We did not submit an exhibit

18     list to the jury.

19          MS. ARANGO:  Yes, we did.

20          MS. JHONES:  Well, if it went in there, it

21     went in -- if the jury received a copy of an exhibit

22     list, it was done -- I did not know that.  And

23     certainly --

24          THE COURT:  Well, it wouldn't have gone in

25     unless it went in from both sides.  There's no way it

1    would have happened by one side.

2              MS. JHONES:  Your Honor, my -- again, I'm just

3    telling the Court my recollection is my exhibit list,

4    as the Court remembers, was in pretty bad shape.  And I

5    think the Court filed --

6              THE COURT:  That's this case.

7              MS. JHONES:  They've been in bad shape in all

8    cases.  But my recollection is that the second trial

9    was even worse.

10             But -- and the Court filed the Court's exhibit

11   list -- or my exhibit list with the Court -- with the

12   Court's notations, because mine was just in deplorable

13   condition in the second trial.  I have absolutely no

14   recollection of any exhibit list.

15             THE COURT:  I don't know.  I don't remember.

16   And, quite frankly, I've heard so many cases, I don't

17   know.  You know, in some cases, I've had exhibit lists.

18   I thought we did in this case, but --

19             MS. ARANGO:  We provided it to the Court,

20   Judge.  I mean, obviously, we didn't give it to the

21   jury.  But we did provide it to the Court.  I don't

22   know whether --

23             THE COURT:  Well, it wouldn't have gone into

24   the jury room unless there were exhibits lists from

25   everybody -- I can tell you that -- which it doesn't

1   matter, anyhow, because the other two trials are

2   ancient history.

3          But you do need to go over the evidence and

4   make sure -- for instance, the books are supposed to

5   get -- the front covers are supposed to be copies, the

6   *Black's Law Dictionaries* and all the law books, as I

7   ruled when this -- they were introduced, that it will

8   be the front copies and not coming in -- I believe

9   that's how they were supposed to come in, just the

10  front copy --

11         MS. JHONES:  That's the Court's ruling.

12         THE COURT:  -- and not have dictionary -- law

13  dictionaries or law books in there, because that would

14  not be appropriate.

15         MS. ARANGO:  And I would --

16         THE COURT:  You can do that Monday morning.

17         MS. ARANGO:  I would just note for the record,

18  though, just to give ample time for Ms. Jhones to look

19  for it, Government Exhibit 33-F, as if "Frank," is

20  missing.

21         And I think it has been brought to her

22  attention.  She did use it during the course of -- I

23  don't know -- either -- I guess maybe

24  cross-examination.

25         THE COURT:  What is 33-F?

297

1          MS. ARANGO:  It's the property in Louisiana.

2    She used some of the photographs in some of her

3    examination.  I believe that she has it.

4          THE COURT:  That's the photos of the property?

5          MS. ARANGO:  Yes.  And she's been --

6          MS. JHONES:  To correct Ms. Arango, to correct

7    Ms. Arango, I -- Ms. Armand had that file and I -- when

8    I was going to question a witness, and I did not use

9    them.

10          But thinking I was going to use them, I

11    grabbed that exhibit file.  And the Government brought

12    to my attention last week or yesterday or whenever it

13    was that there was a photograph missing.

14          I indicated to the Government that I would ask

15    Ms. Armand.  It's possible that, when she had it in her

16    possession that -- I have no idea what happened to

17    that.

18          But I have not inquired about that particular

19    photograph.  But I did not use that exhibit.  I

20    intended to use it and I did not.

21          THE COURT:  Well, does Ms. Armand have it?

22          MS. JHONES:  Your Honor, I have not inquired

23    of her.  I forgot about it.

24          I'm just saying I don't know if -- if, when I

25    briefly gave that folder to Ms. Armand, maybe

```
1    inadvertently somebody fell out.  I forgot ask her,

2    but I will.

3              THE COURT:  You need to contact her

4    immediately.

5              MS. JHONES:  Yes.

6              MS. ARANGO:  It's been introduced into

7    evidence.  It's a serious matter.  It's not a matter of

8    just picking it up and losing it, Judge.  That's what I

9    wanted to --

10              THE COURT:  We need to find the photograph.

11   You need to find the photograph.

12              Is it one photograph in that exhibit or all

13   the photographs?

14              MS. ARANGO:  Just one.

15              MS. JHONES:  Just one photograph.

16              THE COURT:  So one photograph.

17              You need to find it.

18              MS. JHONES:  Your Honor, what I want to make

19   clear is I do not know -- I do not know whether or not

20   the photograph is -- Ms. Armand -- I'm sorry -- if that

21   photograph was misplaced while we had it.  I don't

22   know.

23              The implication, which is what I'm concerned

24   about, that somehow we took an exhibit -- that's my

25   concern.
```

1              I will ask --

2              THE COURT:  I don't think Ms. Arango is saying

3      you intentionally took an exhibit.  But you had the

4      exhibit and now the photograph is missing.  So you need

5      to locate the photograph.  That's all.

6              MS. JHONES:  We will try to find it, your

7      Honor.

8              THE COURT:  I mean, Ms. Armand has been here

9      the last two days, you know, sitting here.  So, you

10     know, you need to find the photograph.  If she has it,

11     you need to find it.

12             You need to call her now and find out where

13     that could possibly be or start looking through all

14     your things to make sure that it didn't inadvertently

15     get put into another folder.  Okay?

16             MS. JHONES:  Will do.

17             THE COURT:  All right.  We're in recess for

18     the week.

19             (End of proceedings.)

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I hereby certify that the foregoing is an

4    accurate transcription of the proceedings in the

5    above-entitled matter.

6

7

8    _____          /s/Lisa Edwards
          DATE               LISA EDWARDS, CRR, RMR
9                            Official United States Court Reporter
                             400 North Miami Avenue, Twelfth Floor
10                           Miami, Florida 33128
                             (305) 523-5499
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25